*DeLeon-Reyes v. Guevara, et al.*
Case No. 18 CV 01028

*Solache v. Guevara, et al.*
Case No. 18 CV 02312

# EXHIBIT 6

Dr. Richard A. Leo, Ph.D., J.D.
**JUSTICE RESEARCH & CONSULTING, INC.**
15 Ashbury Terrace
San Francisco, CA 94117

_____

Phone: (415) 661-0162
Email: rleo@jrcsf.com

December 17, 2025

Steve Art,
Attorney at Law
LOEVY & LOEVY
311 N. Aberdeen St., 3rd Floor
Chicago, Illinois 60607

Dan Stohr
Attorney at Law
311 N. Aberdeen St., 3rd Floor
Chicago, Illinois 60607

**Re:** **David Gecht v. Reynaldo Guevara, et al.**
**Case No. 1:23-cv-01742**

**Richard Kwil v. Reynaldo Guevara, et al.**
**Case No. 1:23-cv-04279**

**Ruben Hernandez v. Reynaldo Guevara, et al.**
**Case No. 1:24-cv-15375**

Dear Mr. Art and Mr. Stohr,

This report is per your request in the above-referenced cases of *David Gecht v. Reynaldo Guevara, et al., Richard Kwil v. Reynaldo Guevara, et al., and Ruben Hernandez v. Reynaldo Guevara, et al.*

## I. Qualifications

I am the Hamill Family Professor of Law and Psychology at the University of San Francisco, and formerly a tenured Associate Professor of Psychology and an Associate Professor of Criminology at the University of California, Irvine. My areas of research, training, and specialization include social psychology, criminology, sociology, and law. For over 30 years, I have conducted and published extensive empirical research on police interrogation practices, the

Steve Art, Esq.
Dan Stohr, Esq.
December 17, 2025
Page 2

psychology of interrogation and confessions, psychological coercion, police-induced false confessions, and erroneous convictions. In the last three decades, I have observed, studied and analyzed thousands of interrogations and confessions; I have researched, written, and published numerous peer-reviewed articles on these subjects in scientific and legal journals; and I have written several books on these subjects, including *Police Interrogation and American Justice* (Harvard University Press, 2008) and *Confessions of Guilt: From Torture to Miranda and Beyond* (Oxford University Press, 2012).

I am regarded as a national and leading expert on these topics, and I have won numerous individual and career achievement awards for my scholarship and publications. My scholarship has often been featured in the news media and cited by appellate courts, including the United States Supreme Court, on multiple occasions. To date, I have consulted with criminal and civil attorneys on more than 2,400 cases involving disputed interrogations and/or confessions, and I have been qualified and testified as an expert witness 434 times in state, federal, and military courts in 38 states and the District of Columbia, including 43 times in federal and military courts, and multiple times in the 7th Circuit. I have given many lectures to judges, defense attorneys, prosecutors, and other criminal justice professionals, and I have taught interrogation training courses and/or given lectures to police departments in the United States, China, and the Republic of Cyprus.

My qualifications are summarized in greater detail in my curriculum vitae, which is attached to this report (Exhibit A). A list of my court and deposition testimony in the last four years is attached to this report (Exhibit B). I am being compensated for my time at the rate of $550 per hour. This is my typical hourly rate. My compensation is not contingent on the outcome of this litigation nor on the opinions I express in this report or in subsequent court testimony.

## II. Materials Reviewed

In conjunction with my preparation of this report, I have reviewed the following materials:

1.  David Gecht Second Amended Complaint

2.  Richard Kwil First Amended Complaint

3.  Corrected Amended Complaint, R. Hernandez v. Guevara, No. 23-cv-15375, Dkt.83 (N.D. Ill.)

4.  Investigative File for D057410 (RFC-Gecht 000001 - 000204)

5.  Permanent Retention File for D057410 (RFC-Gecht 000205 - 000288)

6.  Photos for D057410 (RFC-Gecht 000289-000322)

7.  Kwil Petition for Certificate of Innocence and Exhibits (Gecht 009850 - 009932)

Steve Art, Esq.
Dan Stohr, Esq.
December 17, 2025
Page 3

8. Gecht Petition for Certificate of Innocence and Exhibits (Gecht 06154 - 016579)

9. David Gecht Certificate of Innocence Order (Gecht 011394)

10. Richard Kwil Certificate of Innocence Order (Gecht/Kwil 019977)

11. Felony Review Notes (CCSAO 000468-000470, 0001021-001026, 001055-001066, 001068-001072)

12. David Gecht Successive Petition for Post-Conviction Relief (Blagg Subpoena Resp. 008556-008627) and Exhibits (Gecht 011823 - Gecht - 015837)

13. Richard Kwil Successive Petition for Post-Conviction Relief (Gecht 004086 – 004098) and Exhibits (Gecht 004099 – 004613)

14. Richard Kwil Post-Conviction Petition (Gecht 011171 – 011288)

15. Photos of Street (Gecht 003663 – 003668)

16. Photos of Crime Scene (Gecht 003877 – 003882)

17. Photo Array (Gecht 012035 – 012036)

18. Evidence Inspection (Gecht/Kwil Evidence Inspection 000001 – 000226)

19. Fingerprint Cards (RFC-Gecht 000323 - 000324)

20. Gecht Mugshot and Criminal History (RFC-Gecht 000325 – 000328)

21. Kwil Mugshot and Criminal History (RFC-Gecht 000334 – 000337)

22. Statement of Richard Kwil (Blagg Subpoena Response 003154 – 003178)

23. Statement of Rosendo Hernandez (Blagg Subpoena Response 003189 – 003212)

24. Statement of Colleen Miller (Blagg Subpoena Response 003216 – 003220)

25. *Gecht/Kwil/Hernandez* Trial Transcript (Gecht 017866 – 018834)

26. Deposition of Alan Pergande September 11, 2024

    - Exhibit 1 - Motion to Quash Transcript
    - Exhibit 2 - Arrest Reports Ruben – JGS_Gecht 2590-2597
    - Exhibit 3 - Cleared Closed Report – RFC-Gecht 213-236
    - Exhibit 4 - Investigative File Control – RFC-Gecht 5
    - Exhibit 5 - Investigative File Inventory – RFC-Gecht 1-2
    - Exhibit 6 - Statement of Colleen Miller RFC-Gecht 111-115
    - Exhibit 7 - Consent to Search RFC-Gecht 121

3

Steve Art, Esq.
Dan Stohr, Esq.
December 17, 2025
Page 4

- Exhibit 8 - Supplemental Report by Detective Mohan and Troche – RFC-Gecht 162 - 166
- Exhibit 9 - Supplemental Report by Detectives Guevara and Halvorsen – RFC-Gecht 169 - 170
- Exhibit 10 - Supplemental Report by Detectives Rutherford and Dickinson – RFC-Gecht 251 - 256
- Exhibit 11 - Alan Pergande's Answers to Hernandez's First Set of Interrogatories

27. Deposition of Phillip Bartolementi April 7, 2025
   - Exhibit 1 - Subpoena with Rider
   - Exhibit 2 - Subpoena and Response SDT Bartolementi
   - Exhibit 3 - 5/17/99 – State v David Gecht Report of Proceedings – JGS Gecht 4151. 4152, 4168, 4169, 4170
   - Exhibit 4 - Statement of David Gecht – 3/2/99 – RFC-Gecht 000071-000078, 000094, 0000110
   - Exhibit 5 - Motion to Quah Arrest and Suppress Statements – JGS Gecht 004066-004069
   - Exhibit 6 - 11/18/99 Report of Proceedings – Gecht 004234 – 004314
   - Exhibit 7 - 11/22/99 Report of Proceedings – JGS Gecht 004234-004314
   - Exhibit 8 - Motion for Court Appointment as Counsel for Defendant – JGS Gecht 004070-004074
   - Exhibit 9 - Affidavit of Phillip J. Bartolementi – CCSAO 000422, 000423
   - Exhibit 10 - Affidavit for Attorney Fees and Costs – CCSAO 000090-000092
   - Exhibit 11 - 3/21/2000 Report of Proceedings – JGS Gecht 004533, 004161, 004552-004558
   - Exhibit 12 - 3/23/2000 Report of Proceedings JGS Gecht 004886, 004165, 005059-005162

28. Deposition of Brendan McGuire July 9, 2025
   - Exhibit 1 - Clear Closed Report RFC-Gecht 16-27
   - Exhibit 2 - Trial Testimony – Gecht 5694, 5695, 5867-5919

4

Steve Art, Esq.
Dan Stohr, Esq.
December 17, 2025
Page 5

- Exhibit 3 - Handwritten Statement of Colleen Miller – RFC-Gecht 111-115
- Exhibit 4 - Court Reporter Typed Statement of David Gecht – Gecht 11788-11812
- Exhibit 5 - Court Reporter Typed Statement of Ruben·Hernandez - Gecht 11729 – 11752

29. Deposition of Colleen Miller May 13, 2025

- Plaintiff's Exhibits:
- Exhibit 1 - Handwritten Statement 3/2/1999 (JGS_Gecht 6879-6886)
- Exhibit 2 - Email-A. Swaminathan and Colleen Miller (Gecht 2562)
- Exhibit 3 - Declaration of Colleen Miller (Gecht 2559-2560)

- Defendant's Exhibits:
- Exhibit 1 - Chicago police report (RFC-Gecht 000213-000235)
- Exhibit 2 - Grand Jury Testimony 3/3/1999 (Gecht 011813-011821)
- Exhibit 3 - Text messages-C. Miller and A. Swaminathan (Gecht-Kwil 019998-020009)
- Exhibit 4 - Declaration-Jamie Gecht (EP_Gecht_014075-014076)
- Exhibit 5 - Trial Testimony, 3/23/2000 (Gecht 010445-010459)

30. Deposition of David Gecht November 14, 2024

- Exhibit 1 - Bates RFC-Gecht 000071-Bates 000110
- Exhibit 2 - Bates JGS-GECHT 6742

31. Deposition of Reynaldo Guevara September 4, 2025

- Exhibit 1 - Area 5 Supplementary Report
- Exhibit 2 - Investigative File Inventory
- Exhibit 3 - Investigative File Control
- Exhibit 4 - Investigative File Inventory
- Exhibit 5 - Initial Report
- Exhibit 6 - Area 5 Supplementary Report
- Exhibit 7 - General Progress Report Detective Division/Chicago Police
- Exhibit 8 - Area 5 Supplementary Report
- Exhibit 9 - Area 5 Supplementary Report

Steve Art, Esq.
Dan Stohr, Esq.
December 17, 2025
Page 6

- Exhibit 10 - Chicago Police Department CB Report - Ruben Hernandez and CB Report - Benjamin DeJesus
- Exhibit 11 – Line Up Report
- Exhibit 12 - Moving of Arrestee Out of & Into Arrest/Detention Facility
- Exhibit 13 - Chicago Police Department CB Report - David Gecht CB Report - Richard Kwil
- Exhibit 14 - Statement of Richard Kwil
- Exhibit 15 - Statement of David Gecht
- Exhibit 16 - Statement of Ruben Hernandez
- Exhibit 17 - Statement of Colleen Miller
- Exhibit 18 - Area 5 Supplementary Report

32. Deposition of Jamie Gecht February 11, 2025
- Exhibit 1 - Declaration of Jamie Gecht EP_Gecht_014075-76
- Exhibit 2 - Text messages Blagg Subpoena Resp. 014626-30
- Exhibit 3 - 2/7/22 Excerpt of Proceedings Gecht 009544 and Gecht 09637-9660

33. Deposition of Jorge Shapiama April 9, 2025
- Exhibit 1 - Google Map Image
- Exhibit 2 - Supplementary Report
- Exhibit 3 - Line Up Report
- Exhibit 4 - Roberto Cruz Mug Shot
- Exhibit 5 - CD Report of David Gecht - RFC 139
- Exhibit 6 - CD Report of Richard Kwil - RFC 141
- Exhibit 7 - CD Report of Ruben Hernandez - RFC 145

34. Deposition of Michael Hood May 22, 2025
- Exhibit 1 - Michael Hood's Testimony from Richard Kwil's Criminal Trial
- Exhibit 2 - Front/Back of Polaroid Photograph with Attached Photographs
- Exhibit 3 - Richard Kwil's Court-Reported Statement
- Exhibit 4 - Area 5 Field Investigation 0-Progress Report Submitted January 29, 1999
- Exhibit 5 - Cause and Manner of Death Report

6

Steve Art, Esq.
Dan Stohr, Esq.
December 17, 2025
Page 7

- Exhibit 6 - Area 5 Field Investigation 0-Progress Report Submitted January 30, 1999

- Exhibit 7 - Cleared Closed Report

35. Deposition of Michael Muzuappa September 12, 2024

- Exhibit 1 - General Offense Case Report RFC_Gecht 203-204

- Exhibit 2 - Supplemental Report - RFC_Gecht 251-256

- Exhibit 3 - Arrest Report of Ruben Hernandez JGS_Gecht 02596-2597

- Exhibit 4 - Arrest Report of Ruben Hernandez RFC_Gecht 30

- Exhibit 5 - Moving of Arrestee out of and into Arrest/DetentionFacility, CCSAO 60

- Exhibit 6 - A5 Supplemental Report - RFC_Gecht 213-236

- Exhibit 7 - Property Inventory Report RFC_Gecht 173-175

- Exhibit 8 - Consent to Search - RFC_Gecht 121

- Exhibit 9 - Arrest Record of Gecht - RFC_Gecht 116

- Exhibit 10 - Statement of Colleen Miller RFC_Gecht 111-115

36. Deposition of Richard Kwil November 06, 2024

- Exhibit 1 - Plaintiff Kwil's Responses to Defendant Muzupappa's First Set of Interrogatories to Plaintiff

- Exhibit 2 - Plaintiff Kwil's Responses to Lynn Yanow's First Set of Interrogatories to Plaintiff

- Exhibit 3 - Plaintiff Kwil's Responses to Kevin Rogers as Special Representative of Defendant Frank Cappitelli's (Deceased) First Set of Interrogatories to Plaintiff

- Exhibit 4 - Plaintiff Kwil's Responses to ASA Defendants Hood's and McGuire's First Set of Interrogatories Issued to Plaintiff

- Exhibit 5 - Plaintiff Kwil's Responses to Defendant Robert Rutherford's First Set of Interrogatories to Plaintiff

- Exhibit 6 - Plaintiff Kwil's Responses to Defendant Alan Pergande's First Set of Interrogatories to Plaintiff

- Exhibit 7 - Plaintiff Kwil's Responses to Defendant Guevara's First Set of Interrogatories to Plaintiff

Steve Art, Esq.
Dan Stohr, Esq.
December 17, 2025
Page 8

- Exhibit 8 - Plaintiff Kwil's Supplemental Responses to Defendant Muzupappa's First Set of Interrogatories to Plaintiff
- Exhibit 9 - Kwil's Second Supplemental Responses to Defendant Robert Rutherford's First Set of Interrogatories to Plaintiff
- Exhibit 10 - Plaintiff Kwil's First Supplemental Responses to Geri Lynn Yanow's First Set of Interrogatories to Plaintiff
- Exhibit 11 - Plaintiff Kwil's First Supplemental Responses to Defendant Alan Pergande's First Set of Interrogatories to Plaintiff
- Exhibit 12 - Plaintiff Kwil's First Supplemental Responses to Defendant Robert Rutherford's First Set of Interrogatories to Plaintiff
- Exhibit 13- Google Maps
- Exhibit 14- 3/2/99 Statement of Richard Kwil
- Exhibit 15- 12/20/99 Report of Proceedings
- CONFIDENTIAL PORTION – Deposition Transcript Pages 131-132

37. Deposition of Robert Rutherford October 21, 2024
- Exhibit 1 - Chicago Police Department General Offense Case Report - RFC-Gecht 000205-000206
- Exhibit 2 - Chicago Police Department Investigative File Inventory RFC-Gecht 000001-000002
- Exhibit 3 - Chicago Police Department Investigative File Control - RFC-Gecht 000005-000006
- Exhibit 4 - Chicago Police Department General Progress Report - RFC-Gecht 000202
- Exhibit 5 - Chicago Police Department Area 5 Supplementary Report - RFC-Gecht 000251-000256
- Exhibit 6 - Chicago Police Department Area 5 Supplementary Report - RFC-Gecht 000162-000166
- Exhibit 7 - Chicago Police Department Area 5 Supplementary Report - RFC-Gecht 000169-000170
- Exhibit 8 - Chicago Police Department CB Report RFC-Gecht 000145-000148

8

Steve Art, Esq.
Dan Stohr, Esq.
December 17, 2025
Page 9

- Exhibit 9 - Detective Division Area 5 To From Memo - RFC-Gecht 000124

- Exhibit 10 - Felony Minute Sheet Form 101 -RFC-Gecht 000123

- Exhibit 11 - Illinois State Police Division of Forensic Services Report - RFC-Gecht 000012-000013

- Exhibit 12 - Chicago Police Department Area 5 Supplementary Report - RFC-Gecht 000016-000027

- Exhibit 13 - Answer to Discovery Gecht 011338-011339

- Exhibit 14 - Notice of Disclosure Pursuant to Illinois Compiled Statutes CH. 725 SEC. 5/112-6(c)(1) and (2) - RFC-Gecht 000122

- Exhibit 15 - Defendant Robert Rutherford's Supplemental Answers to Plaintiff Gecht's First Set of Interrogatories

- Exhibit 16 - Defendant Robert Rutherford's Supplemental Answers to Plaintiff Kwil's First Set of Interrogatories

38. Deposition of Ruben Hernandez May 6, 2025

- Exhibit 1 - Plaintiff Hernandez's Responses to Defendant Michael Muzupappa's First Set of Interrogatories to Plaintiff

- Exhibit 2 - Plaintiff Hernandez's Supplemental Responses to Defendant Michael Muzupappa's First Set of Interrogatories to Plaintiff

- Exhibit 3 - Plaintiff Hernandez's Responses to Defendant Alan Pergande's First Set of Interrogatories to Plaintiff

- Exhibit 4 - Plaintiff Hernandez's Supplemental Responses to Defendant Alan Pergande's First Set of Interrogatories to Plaintiff

- Exhibit 5 - Plaintiff Hernandez's Responses to Defendant Robert Rutherford's First Set of Interrogatories to Plaintiff

- Exhibit 6 - Plaintiff Hernandez's Supplemental Responses to Defendant Robert Rutherford's First Set of Interrogatories to Plaintiff

- Exhibit 7 - Plaintiff Hernandez's Responses to Defendant Edwin Dickinson's First Set of Interrogatories to Plaintiff

9

Steve Art, Esq.
Dan Stohr, Esq.
December 17, 2025
Page 10

- Exhibit 8 - Plaintiff Hernandez's Supplemental Responses to Defendant Edwin Dickinson's First Set of Interrogatories to Plaintiff
- Exhibit 9 - Plaintiff Hernandez's Responses to Defendant Edwin Dickinson's Third Set of Interrogatories to Plaintiff Hernandez
- Exhibit 10 - Plaintiff Hernandez's Responses to Defendant Brendan McGuire's First Set of Interrogatories to Plaintiff
- Exhibit 11 - Plaintiff Hernandez's Responses to Defendant Michael Hood's First Set of Interrogatories to Plaintiff
- Exhibit 12 - Blagg Subpoena Resp. 009055-009066

39. Deposition of Ruben Hernandez Transcript (August 6, 2025)

- Confidential Excerpts from the deposition of Ruben Hernandez (Attorneys Eyes Only)

- Exhibit 13 – Statement of Ruben Hernandez – CCSAO 188-218

- Exhibit 14 – Enterprise Receipt – JGS_Gecht 6794-96

- Exhibit 15 – Hernandez v People Transcript of Proceedings 11/18/1999 – CCSAO 532-541

- Exhibit 16 – Petition for Post Conviction Relief – JGS_Gecht 6686-6699

- Exhibit 17 – IDOC – Internet Inmate Status – Richard L. Gaines

- Exhibit 18 – Affidavit – Ruben Hernandez – EP_Gecht_014105-07

40. Deposition of Edwin Dickinson October 23, 2024

- Exhibit 1 - Investigative File Control Card (RFC Gecht 5)
- Exhibit 2 - Scene Supplementary Report (RFC Gecht 132-138)
- Exhibit 3 - Clear Closed Report (RFC Gecht 11903-11914)
- Exhibit 4 - January 30, 1999 Report by Troche and Mohan (RFC Gecht 162-166)
- Exhibit 5 - January 20, 1999 Report by Guevara and Halvorsen (RFC Gecht 169-170)

10

Steve Art, Esq.
Dan Stohr, Esq.
December 17, 2025
Page 11

- Exhibit 6 - Lineup Report (RFC Gecht 117-118)

- Exhibit 7 - Felony Minute Sheet (RFC Gecht 123-124)

- Exhibit 8 - Investigative File Inventory 22 (RFC Gecht 1-2)

- Exhibit 9 - Grand Jury Page (RFC Gecht 122)

- Exhibit 10 - Supplementary Report by Rutherford and Dickinson (RFC Gecht 251-256)

- Exhibit 11 - General Progress Report Dated January 29, 1999 (RFC Gecht 202)

- Exhibit 12 - Records Division File (RFC Gecht205-288)

41. Gecht Order for New Trial (Gecht 016122-Gecht 016151)

42. Opinion and Order - Court of Claims (Gecht-Kwil 019978-Gecht-Kwil 019981)

43. Court of Claims Letter and Order for Award (Gecht-Kwil 019982-Gecht-Kwil 019984)

44. Kwil Testimony (JGS_GECHT 2996-JGS_GECHT 3010, JGS_GECHT 2919, & JGS_GECHT 2939-2951)

45. 7/28/2023 Order Granting Post-Conviction Petition in 99CR7227

46. 3/19/2025 Supplement to Successive Petition for Post-Conviction Relief in 99 CR 07227 (02)

47. 5/27/2025 Order granting Certificate of Innocence in 99CR07227 (02)

48. 5/27/2025 Order Expunging and Sealing in 99CR7227 (02)

49. Motion to Suppress (Gecht 009751-Gecht 009758)

50. Order (Gecht 009810-Gecht 009815)

51. Ruben Hernandez Statement (Gecht 11729- Gecht 11752)

52. Ruben Hernandez Affidavit (Gecht 012011-Gecht 012013)

53. Motion (Gecht 016659-Gecht 016666)

54. 2/2/2024 Hernandez Petition for Certificate of Innocence and exhibits in 99 CR 07227 (02)

55. 6/5/2023 Successive Post-Conviction Filings in 99 CR 07227 (02)

11

Steve Art, Esq.
Dan Stohr, Esq.
December 17, 2025
Page 12

56.  Affidavit of Ruben Hernandez, June 6, 2020

57.  *People v. David Gecht*, order granting post-conviction relief, May 25, 2022

58.  *People v. David Gecht*, order granting certificate of innocence, November 18, 2022

59.  *People v. Richard Kwil*, order granting post-conviction relief, April 13, 2023

60.  *People v. David Gecht*, post-conviction successive petition for post-conviction relief, Oct. 7, 2020

61.  *People v. David Gecht*, post-conviction hearing, transcript, February 7, 2022

62.  *People v. David Gecht*, post-conviction hearing, transcript, February 8, 2022

63.  *People v. David Gecht*, post-conviction hearing, transcript, July 18, 2023

64.  *People v. Richard Kwil*, post-conviction successive petition for post-conviction relief, January 6, 2023

65.  *People v. Richard Kwil*, post-conviction hearing, transcript, April 13, 2023

66.  Affidavit of David Gecht, Aug. 18, 2020

67.  Affidavit of Richard Kwil, Aug. 27, 2020

68.  *People v. Ruben Hernandez and David* Gecht, No. 1-00-2060, cons. with 1-00-2286

69.  Ruben Hernandez PC (fs)

70.  *Sierra v*. Guevara, deposition of Reynaldo Guevara (excerpt), August 20, 2019

71.  *People v. David Gecht*, post-conviction hearing, transcript, July 18, 2023

72.  Decision in People v. Jackie Wilson dated June 20, 2018 (PTP-NOTICE-000709-    827)

73.  118 Documented Burge Area 2 and Area 3 Torture Victims 1972-1991 (PTP-NOTICE-000829-842)

74.  Summary of Statements of City Council Members, July 24, 2007 (PTP-NOTICE-000843-844)

75.  Decision in People v. Cortez Brown dated June 3, 2009 (PTP-NOTICE-000845-854)

76.  People v. Stanley Wrice, 406 Ill. App. 3d 43 (4th Dist. 2010) (PTP-NOTICE-000855-877)

77.  People v. Stanley Wrice, 2012 IL 111860 (2012) (PTP-NOTICE-00879-893)

78.  Testimony of Diane Panos in U.S. v. Burge (PTP-NOTICE-000895-899)

79.  Testimony of Sammy Lacey in U.S. v. Burge (PTP-NOTICE-000901-918)

Steve Art, Esq.
Dan Stohr, Esq.
December 17, 2025
Page 13

80. Statement of Facts and Conclusions of Law in People v. Tillman, No. 92 CR 27711 dated January 11, 2010 (PTP-NOTICE-000919-927)

81. Decision in People v. Stanley Wrice dated December 10, 2013 (PTP-NOTICE-000929-939)

82. Testimony of Michael McDermott in U.S. v. Burge (PTP-NOTICE-000941-982)

83. Transcript of Sentencing of Jon Burge in U.S. v. Burge (PTP-NOTICE-000983-994)

84. Excerpts of 2016 Police Accountability Task Force Report (PTP-NOTICE-000995-1065)

85. Excerpts of 2017 DOJ Pattern and Practice Report (PTP-NOTICE-001067-1140)

86. Affidavit of Kenneth Caddick (PTP-NOTICE-001141-1142)

87. Affidavit of Joanne Archibald (PTP-NOTICE-001143-1144)

88. U.S. v. Burge, 711 F.3d 803 (7th Cir. 2013) (PTP-NOTICE-0001145-1152)

89. Chicago Torture Resolution and Ordinance 2015 (PTP-NOTICE-001153-1157)

90. List of Burge's Assertions of the Fifth Amendment (PTP-NOTICE-001159)

91. Affidavit and Testimony of Darlene Lopez (PTP-NOTICE-001160-1175)

92. People v. Shawn Whirl, 2015 IL App (1st) 111483 (PTP-NOTICE-001176-1211)

93. Daley News Statements (PTP-NOTICE-001212-1218)

94. Daley July 19, 2007 Code of Silence Statement (PTP-NOTICE-001219)

95. Deposition of Michael Kill re N Word (PTP-NOTICE-001220-1224)

96. People v. James Gibson, 2018 IL App (1st) 162177 (PTP-NOTICE-001226-1265)

97. CPD Code of Silence Court Decisions 2012-2106 (PTP-NOTICE-001268-1347)

98. Special Prosecutor's Report July 19, 2006 (PTP-NOTICE-002893-3183)

99. Citizens' Report on Special Prosecutor Failures (PTP-NOTICE-001348-1463)

100. Brceczek Letter to Daley with Raba Letter dated February 25, 1982 (PTP-NOTICE-001464-1465)

101. City Memo Admitting Pattern of Torture 1.22.92 (PTP-NOTICE-001466-1497)

102. City Admissions Regarding Torture of Melvin Jones and Andrew Wilson 5.15.95 (PTP-NOTICE-001498-1521)

103. Amnesty Torture Report and Related Letters 5.12.90 (PTP-NOTICE-001522-1532)

104. Wilson Verdict Form Finding Policy of Area 2 Abuse 6.8.89 (PTP-NOTICE-001533)

105. Burge Police Board Finding Decision 2.1.93 (PTP-NOTICE-001534-1594)

Steve Art, Esq.
Dan Stohr, Esq.
December 17, 2025
Page 14

106. Burge Police Board Appellate Decision (PTP-NOTICE-001595-1623)

107. Melvin Duncan Affidavit dated April 19, 2004 (PTP-NOTICE-002020-2021)

108. Doris Byrd Statement dated November 9, 2004 (PTP-NOTICE-002022-2065)

109. Walter Young Statement dated November 2, 2004 (PTP-NOTICE-002066-2098)

110. William Parker Statement dated October 4, 2004 (PTP-NOTICE-002099-2131)

111. People v. Darrell Cannon, 293 Ill. App. 3d 634 (1st Dist. 1997) (PTP-NOTICE-001647-1653)

112. December 24, 1990 Torture Hearing Before City Council (PTP-NOTICE-001694-1744)

113. Anonymous Letters (2.2.89, 3.6.89, 3.15.89, 6.16.89) (PTP-NOTICE-002208-2215)

114. Governor Ryan's Innocence Pardon Statement 1.10.03 (PTP-NOTICE-002473-2490)

115. Expert Report of Anthony Bouza in Orange v. Burge dated August 19, 2006 (PTP-NOTICE-000681-687)

116. Hillard Deposition (PTP-NOTICE-001943-1989)

117. News articles Regarding Daley, Martin, et al. (PTP-NOTICE-002216-2234)

118. Fogel City Council Testimony 10.6.89 (PTP-NOTICE-002237-2247)

119. Fogel and Martin Excerpts City Council Testimony 10.11.89 (PTP-NOTICE-002248-2262)

120. Brzeczek Affidavit 8.26.04 (PTP-NOTICE-002271-2276)

121. Fogel Memo to Mayor Regarding OPS 10.19.87 (PTP-NOTICE-002277-002284)

122. Tribune Article Regarding Secreting Torture Findings 2.23.99 (PTP-NOTICE-002310-2314)

123. Citizens Alert Letter to Hillard (PTP-NOTICE-002318-2324)

124. History of Police Disciplinary Proceedings in 105 Torture Cases (PTP-NOTICE-002458-2467)

125. U.N. Committee Against Torture Burge Findings 5.18.06 (PTP-NOTICE-003187)

126. Expert Report of Richard Rosenthal in Smith v. Burge dated July 24, 2018 (PTP-NOTICE-0031930-3223)

127. 12/16/2005 Order in *People v. Gray* (PTP-J GRAY-000001-28)

128. Testimony of Jason Gray in *People v. Gray* (PTP-J GRAY-000029-31)

14

Steve Art, Esq.
Dan Stohr, Esq.
December 17, 2025
Page 15

129. Amended Petition for Post-Conviction Relief in *People v. Gray* (PTP-J GRAY 000032 - 123)

130. Affidavit of Manuel Bobe (PTP-M BOBE-000001)

131. *People v. Robinson*, 238 Ill.App.3d 48 (1992) (PTP-A ROBINSON-000001- 000006)

132. *People v. Bounds*, 171 Ill.2d 1 (1995) (PTP-F BOUNDS-00001-30)Excerpt of Second Amended Petition for Post-Conviction Relief in *People v. Kitchen* (PTP-R KITCHEN-000001-178)

133. Special Prosecutor Reports regarding Ronald Kitchen (PTP-R KITCHEN- 000179-208)

134. Deposition of Michael Kill in *Wiggins v. Burge, et al.* (PTP-JOHNNY AND PHILLIP WALKER-000001-42)

135. Excerpt of 04/03/1989 Report of Proceedings in *People v. Phillip Walker* (PTP- JOHNNY AND PHILLIP WALKER-000043-50)

136. Complaint in *Burton v. Kill, et al.* (PTP-A BURTON-000001-9)

137. Complaint Register #166416 Summary Report Digest (PTP-M CRAIGHEAD 000001-4)

138. *People v. Lash*, 252 Ill.App.3d 239 (1993) (PTP-A LASH-000001-11)

139. Affidavit of Demond Weston (PTP-D WESTON-000001)

140. 04/05/2006 OSP File Memo (PTP-D WESTON-000002-3)

141. Affidavit of Dwayne Macklin (PTP-D WESTON-000004)

142. Complaint in *Young v. City of Chicago, et al.* (PTP-D YOUNG-000001-39)

143. Excerpt of 09/19/1994 Report of Proceedings in *People v. Young* (PTP-D YOUNG-000040- 94)

144. Excerpt of 09/19/1994 Report of Proceedings in *People v. Young* (PTP-D YOUNG-000095- 169)

145. Excerpt of 09/19/1994 Report of Proceedings in *People v. Young* (PTP-D YOUNG-000170- 187)

146. Appellate Opinion in *Hill v. Coppelson, et al.* (PTP-H HILL-000001-10)

147. Amended Complaint in *Hill v. City of Chicago, et al.* (PTP-H HILL-000011-46)

148. Affidavit of Peter Williams (PTP-H HILL-000047-49)

15

Steve Art, Esq.
Dan Stohr, Esq.
December 17, 2025
Page 16

149. Volume I of Deposition of Demoni Clemon in *Saunders v. City of Chicago, et al.* (PTP-JESSE & DEMONI & IMARI CLEMON 000001-26)

150. Deposition of Jesse Clemon in *Saunders v. City of Chicago, et al.* (PTP-JESSE & DEMONI & IMARI CLEMON 000027-95)

151. Volume II of Deposition of Demoni Clemon in *Saunders v. City of Chicago, et al.* (PTP-JESSE & DEMONI & IMARI CLEMON 000096-276)

152. Deposition of Marcus Wiggins in *Wiggins v. Burge, et al.* (PTP-M WIGGINS- 000001-103)

153. Complaint in *Wiggins v. Burge, et al.* (PTP-M WIGGINS-000104-149)

154. Chicago Tribune article – "Veteran detective's murder cases unravel" (PTP-A NEAL-000001-8)

155. 01/29/1993 Report of Proceedings in *People v. Day* (PTP-A DAY-000001-37)

156. TIRC Disposition regarding Claim of Arnold Day (PTP-A DAY-000038-52)

157. Affidavit of Arnold Day (PTP-A DAY-000053-55)

158. Complaint in *Day v. Boudreau, et al.* (PTP-A DAY-000056-105)

159. Complaint in *Jakes v. Boudreau, et al.* (PTP-A JAKES-000001-37)

160. 12/02/1992 Report of Proceedings in *People v. Jakes* (PTP-A JAKES-000038-84)

161. 08/18/2015 Report of Proceedings in *People v. Jakes and Anderson* (PTP-A JAKES-000085-204)

162. Appellate Opinion in *People v. Jakes* (PTP-A JAKES-000205-219)

163. Testimony of Anthony Jakes (PTP-A Jakes-000220-312)

164. 09/10/2013 Report of Proceedings in *People v. Jakes* (PTP-A JAKES-000313- 378)

165. TIRC Disposition regarding Claim of Anthony Jakes (PTP-A JAKES-000379- 409)

166. *People v. Plummer*, 306 Ill.App.3d 574 (1999) (PTP-J PLUMMER -000001-10)

167. Complaint in *Watkins v. Halloran, et al.* (PTP-K WATKINS-000001-14)

168. Affidavit of Kilroy Watkins (PTP-K WATKINS-000015)

169. Complaint in *Smith v. City of Chicago, et al.* (PTP-C SMITH-000001-10)

170. Complaint Register #203754 (PTP-F EWING-000001-143)

171. Complaint in *Ewing v. O'Brien, et al.* (PTP-F EWING-000144-150)

16

Steve Art, Esq.
Dan Stohr, Esq.
December 17, 2025
Page 17

172. First Amended Petition for Post-Conviction Relief and Petition for Relief from Judgment In *People v. Gillespie* (PTP-J GILLESPIE-000001-20)

173. Motion to Hold Appeal in Abeyance in *People v. Gillespie* (PTP-J GILLESPIE- 000021-30)

174. Affidavit of Tyrone Reyna (PTP-T REYNA-00001-00005)

175. Affidavit of Nicholas Escamilla (PTP-T REYNA-000006-10)

176. Statement of Miguel Morales (PTP-T REYNA-000011-18)

177. *People v. Williams*, 303 Ill.App.3d 33 (1999) (PTP-A WILLIAMS-00001-8)

178. Third Amended Complaint in *Fulton v. Yanow, et al.* (PTP-D FULTON-000001- 29)

179. 04/16/1996 Report of Proceedings in *People v. Fulton* (PTP-D FULTON-000030- 86)

180. Second Amended Complaint in *Coleman v. City of Chicago, et al.* (PTP-N COLEMAN-000001-41)

181. 06/28/1996 Report of Proceedings in *People v. Coleman* (PTP-N COLEMAN- 000042-105)

182. Complaint in *Flewellen v. City of Chicago, et al.* (PTP-D FLEWELLEN-000001- 15)

183. Deposition of Harold Richardson in *Richardson v. City of Chicago, et al.* (PTP-H RICHARDSON-000001-238)

184. Order in *People v. Thames, et al.* (PTP-H RICHARDSON-000239-247)

185. First Amended Complaint in *Richardson v. City of Chicago, et al.* (PTP-H RICHARDSON-000248-300)

186. FBI 302 Reports regarding Terence Johnson (PTP-H RICHARDSON-000301- 306)

187. Order in *People v. Thames, et al.* (PTP-M SAUNDERS-000001-12)

188. Vol. I of Deposition of Michael Saunders in *Saunders v. City of Chicago, et al.* (PTP-M SAUNDERS-000013-313)

189. Vol. II of Deposition of Michael Saunders in *Saunders v. City of Chicago, et al.* (PTP-M SAUNDERS-000314-607)

190. Complaint in *Saunders v. City of Chicago, et al.* (PTP-M SAUNDERS-000608- 658)

191. Complaint in *Swift v. City of Chicago, et al.* (PTP-T SWIFT-000001-28)

192. Vol. I of Deposition of Terrill Swift in *Swift v. City of Chicago, et al.* (PTP-T SWIFT-000029-295)

Steve Art, Esq.
Dan Stohr, Esq.
December 17, 2025
Page 18

193. Vol. II of Deposition of Terrill Swift in *Swift v. City of Chicago, et al.* (PTP-T SWIFT-000296-576)

194. Vol. III of Deposition of Terrill Swift in *Swift v. City of Chicago, et al.* (PTP-T SWIFT-000577-600)

195. Vol. I of Deposition of Vincent Thames in *Saunders v. City of Chicago, et al.* (PTP-V THAMES-000001-97)

196. Vol. II of Deposition of Vincent Thames in *Saunders v. City of Chicago, et al.* (PTP-V THAMES-000098-186)

197. First Amended Complaint in *Thames v. City of Chicago, et al.* (PTP-V THAMES-000187-212)

198. Appellate Opinion in *People v. Murray* (PTP-K MURRAY-000001-13)

199. TIRC Disposition regarding Claim of Kevin Murray (PTP-K MURRAY-000014-28)

200. Order in *People v. Seaton* (PTP-F SEATON-000001-12)

201. Opinion in *Seaton v. Kato, et al.* (PTP-F SEATON-000013-19)

202. Complaint in *Seaton v. Kato, et al.* (PTP-F SEATON-000020-35)

203. Appellate Opinion in *People v. Shelton* (PTP-G SHELTON-000001-6)

204. Opinion in *Steward v. Summerville, et al.* (PTP-T STEWARD-BEY-000001-4)

205. Complaint Register #165728 (PTP-STEWARD-BEY-000005-92)

206. Complaint Register #240931 (PTP-STEWARD-BEY-000093-000157)

207. *Chicago Reader* article – "Good Cop, Bad Cop" (PTP-K WASHINGTON-000001-32)

208. Order in *People v. Washington* (PTP-K WASHINGTON-000033-65)

209. Complaint Register #171359 (PTP-S HARDY-000001-50)

210. Complaint Register #184112 (PTP-M HOLSTON-000001-73)

211. Appellate Opinion in *People v. West* (PTP-R WEST-000001-8)

212. *Chicago Tribune* article – "Fine line between tough police work, brutality" (PTP- H LUCAS-000001-4)

213. Opinion in *Waslewski v. Kato* (PTP-M WASLEWSKI-000001-5)

214. Order in *People v. Prince* (PTP-P PRINCE-000001-8)

Steve Art, Esq.
Dan Stohr, Esq.
December 17, 2025
Page 19

215. Petitioner's Closing Memorandum in *Prince v. State of Illinois* (PTP-P PRINCE- 000009-16)

216. Order granting Certificate of Innocence in *People v. Prince* (PTP-P PRINCE- 000017)

217. Appellate opinion in *People v. Harvey* (PTP-D HARVEY-000001-13)

218. 08/29/1995 Report of Proceedings in *People v. Wallace* (PTP-A WALLACE- 000001-32)

219. Appellate opinion in *People v. Wallace* (PTP-A WALLACE-000033-53, PTP-A WALLACE-000073-93)

220. Order in *People v. Wallace* (PTP-A WALLACE-000054-66)

221. Amended Complaint in *Wallace v. Kato, et al.* (PTP-A WALLACE-000067-72)

222. Complaint Register #206469 (PTP-A WALLACE-000094-117)

223. Complaint Register #240931 (PTP-X JOHNSON-000001-65)

224. Complaint Register #235098 (PTP-K MITCHELL-000001-34)

225. Appellate opinion in *People v. Wright and Threatt* (PTP-JEREMIAH WRIGHT & ELIJAH THREATT-000001-7)

226. Complaint in *Chatman v. City of Chicago, et al*. (PTP-C CHATMAN-000001-48)

227. Appellate opinion in *People v. Chatman* (PTP-C CHATMAN-000049-82)

228. Opinion in *Hunt v. Jaglowski* (AR-L 545335-545336)

229. Opinion in *Hunt v. Jaglowski* (AR-L 545337-545338)

230. Opinion in *Hunt v. Jaglowski* (AR-L 545339-545345)

231. Appellate opinion in *Hunt v. Jaglowski* (AR-L 545346-545351)

232. 07/14/1986 Report of Proceedings in *People v. Perez and Pena* (AR-L 154619- 154687)

233. Affidavit of Victor Vera (AR-L 154810-154813)

234. Affidavit of Daniel Rodriguez (AR-L 147462-147466)

235. Excerpt of 07/14/2021 Report of Proceedings in *Munoz v. People* (AR-L 155313- 155363)

236. Affidavit of David Rivera (AR-L 155028-155029)

237. 03/31/1995 Report of Proceedings in *People v. Cruzado* (AR-L 155033-155055)

238. 04/11/2013 Report of Proceedings in *People v. Reyes & Solache* (AR-L 154693- 154805)

239. Affidavit of Adrian Duta (AR-L 154806-154809)

240. Complaint in *Maysonet v. Beuke, et al.* (AR-L 537371-537383)

Steve Art, Esq.
Dan Stohr, Esq.
December 17, 2025
Page 20

241. Deposition of Edwin Davila in *Johnson v. Guevara, et al.* (AR-L 154814-155027)

242. Deposition of Gloria Ortiz Bordoy in *Johnson v. Guevara, et al.* (AR-L 148767- 148860)

243. Complaint in *Gomez v. Guevara, et al.* (AR-L 532490-532533)

244. Affidavit of Jed Stone (AR-L 155056-155058)

245. Complaint Register #124631 (AR-L 648760-648819)

246. Complaint Register #150473 (AR-L 648889-648898)

247. Letter from Leshurn Hunt to Eugene Hudson regarding CR #145129 (AR-L 545458-545460)

248. Complaint Register #152902 (RFC-Solache/Reyes 31530-31592)

249. Complaint Register #217624 (RFC-Solache/Reyes 31756-31791)

250. Deposition of Jose E. Melendez in Sierra v. Guevara, et al. (AR-L 155271- 155312)

251. Orders granting Certificates of Innocence in *People v. Montanez* and *People v. Serrano* (AR-L 154691-154692)

252. Sworn Statement of Timothy Rankins (AR-L 155230-155268)

253. Corrected First Amended Complaint in *Montanez v. Guevara, et al.* (AR-L 563644-563688)

254. Complaint in *Serrano v. Guevara, et al.* (AR-L 563597-563643)

255. G.O. 87-07 (JR-L 006141-006155)

256. Deposition of Commander Eric Winstrom

257. Deposition of Gabriel Solache (Vols. I, II, and III)

258. Affidavit of Leshurn Hunt

259. State of Wisconsin v Emmett White Transcript of Proceedings April 17, 1993 (PTP-E WHITE-000001-000007)

260. Tyrone Hood v. City of Chicago Plaintiff's Response to City's Motion for Summary Judgement and Plaintiff's Response to the Individual Defendant Officers (PTP-T HOOD & W WASHINGTON-000001-000396)

261. November 1884 and February 1885 David Fogel Report for 11 Cases of Electric Shock (PTP-GENERAL-000001-000006)

262. December 18, 2020 COI Order for Jackie Wilson (PTP-GENERAL-000007- 000065)

20

Steve Art, Esq.
Dan Stohr, Esq.
December 17, 2025
Page 21

263. Dr. Leo Report June 12, 2010 (PTP-GENERAL-000066-000085)

264. Excerpt from Kill Deposition (PTP-J COSTON-000001-000003)

265. Affidavit of Joseph Jackson (PTP-J JACKSON-000001-000003)

266. "Good Cop, Bad Cop" Chicago Reader Article by Steve Bogira December 12, 1991 (PTP-M CAGE-000001-000063)

267. March 14, 2008 Deposition of Abel Quinones in Hill v. City of Chicago (PTP-O GOMEZ & A QUINONES-000001-000232)

268. March 19, 2008 Deposition of Oscar Gomez in Hill v. City of Chicago (PTP-O GOMEZ & A QUINONES-000233-438)

269. Cruzado MTS Testimony Transcript (AR-L 524149-524167)

270. January 31, 1995 People v. Maysonet Trial Transcript (AR-L 537618-537792)

271. Hunt Affidavit and Letter (AR-L 545497-545501)

272. April 7, 1999 Dembski Transcript (Bluhm 034650-34753)

273. Affidavit of Adolfo Frias Munoz (Bluhm 010887-010888)

274. Gomez PC Petition (JR-L 300501-300555)

275. People v. Santos Flores MTS Guevara Testimony (JR-JJ 040337-040388)

276. George Anderson Amended TIRC Disposition (PTP-A NEAL-000009-PTP-A NEAL-000012)

277. ANDERSON amended determination (PTP-A NEAL-000009-PTP-A NEAL- 000012)

278. 1997.09.12 Motion to Suppress Gregory Watkins Testimony Continued (PTP-D FLEWELLEN-000016-PTP-D FLEWELLEN-000024)

279. 1997.09.12 Motion to Suppress Gregory Watkins Testimony (PTP-D FLEWELLEN-000025-PTP-D FLEWELLEN-000044)

280. 2015.09.19 Daniel Gasca Deposition in Chatman v. Chicago et al (PTP-D GASCA-000001-PTP-D GASCA-000107)

281. 1991.03.28 Harold Lucas Motion to Suppress testimony transcript (PTP-H LUCAS-000005-PTP-H LUCAS-000025)

282. 1991.08.07 Harold Lucas Motion to Suppress testimony transcript (PTP-H LUCAS-000026-PTP-H LUCAS-000079)

Steve Art, Esq.
Dan Stohr, Esq.
December 17, 2025
Page 22

283. Joseph Jackson trial testimony excerpt (undated) (PTP-J JACKSON-000004-PTP- J JACKSON-000018)

284. Affidavit of Johnnie Plummer (PTP-J PLUMMER-000011-PTP-J PLUMMER- 00001)

285. Johnnie Plummer CR 194392 (Clancy Foley) (PTP-J PLUMMER-000145-PTP-J PLUMMER-000354)

286. Johnnie Plummer CR 262538 (Lipkin and Laurin) (PTP-J PLUMMER-000586- PTP-J PLUMMER-000641)

287. Kilroy Watkins Motion to Suppress Transcript Excerpt (PTP-K WATKINS- 000016-PTP-K WATKINS-000042)

288. 1993.04.27 Waslewski v. Kato et al. Judgment (PTP-M WASLEWSKI-000006- PTP-M WASLEWSKI-000007)

289. 2015.09.25 - Chatman v. Chicago et al. - Waslewski dep. (PTP-M WASLEWSKI- 000008-PTP-M WASLEWSKI-000032)

290. Waslewski v. Kato et al. Complaint (PTP-M WASLEWSKI-000033-PTP-M WASLEWSKI-000048)

291. Coleman Agreed Certificate of Innocence Order (PTP-N COLEMAN-000106- PTP-N COLEMAN-000107)

292. Muniz, Virgilio Calderon Affidavit (PTP-V MUNIZ-000001-PTP-V MUNIZ- 000001

22

Steve Art, Esq.
Dan Stohr, Esq.
December 17, 2025
Page 23

### III. Overview of Case Specific Opinions

In this report, I will first provide an overview of the relevant social science research on the psychology of police interrogation practices and techniques, police-induced false confessions, risk factors for false confession, psychological coercion, police interrogation contamination and scripting, and indicia of unreliability. I will then discuss these issues as they relate to the police investigation, interrogation, and interrogation-induced confession statements of David Gecht, Richard Kwil and Ruben Hernandez on March 1-2, 1999.[1]

1) David Gecht's description of what occurred during his lengthy period of custodial interrogation on March 2, 1999 by Chicago police detectives Reynaldo Guevara, Ernest Halvorsen, Alan Pergande, and Muzupappa that led to his confession statement is consistent with the empirical social science research on the types of interrogation techniques, methods, and practices that explain how and why innocent individuals are moved to make and/or agree to false and unreliable confession statements.

2) David Gecht's description of what occurred during his unrecorded custodial interrogation on March 2, 1999 by detectives Guevara, Halvorsen, Pergande and Muzupappa involved physically coercive interrogation, which is known to cause false and unreliable incriminating statements, admissions and confessions.

3) According to David Gecht's description, the lengthy period of custodial interrogation on March 2, 1999 by Chicago police detectives Reynaldo Guevera, Ernest Halvorsen and Alan Pergande that led to his confession statement was guilt-presumptive, confession-driven and confirmatory. According to Mr. Gecht's description, the interrogation was structured to break down Mr. Gecht's denials of guilt and to incriminate him by coercively pressuring and persuading him to agree with, and admit to, detectives Guevara's and Halvorsen's pre-existing conclusion that he actively participated in the murder of Roberto Cruz, first as the shooter, then as the driver and eventually as the lookout. Detectives Guevara's, Halvorsen's, Pergande's and Muzupappa's guilt-presumptive interrogation sessions were not structured to assess the reliability of any information they learned from Mr. Gecht, but purely to submit him to their will and extract an incriminating statement from him; they demonstrated a reckless disregard for the truth.

4) David Gecht's description of what occurred during his lengthy period of custody and interrogation by detectives Guevara, Halvorsen, Pergande and Muzupappa on March 2, 1999 involved the use of psychological interrogation techniques, methods, and strategies that have been shown by social science research to increase the risk of eliciting false and unreliable statements, admissions and/or confessions (*i.e.*, *situational* risk factors) when misapplied to the

---

[1] Because there is no recording of David Gecht's, Richard Kwil's and Ruben Hernandez's many hours of custody and interrogation, we do not have objective record of what occurred during their custodial detentions and interrogations on March 1-2, 1999.

Steve Art, Esq.
Dan Stohr, Esq.
December 17, 2025
Page 24

innocent. According to Mr. Gecht's description of the interrogation, these included: physical coercion, lengthy interrogation, sleep deprivation, explicit threats of harm, explicit promises of freedom/leniency and physical and psychological coercion.

5) David Gecht's description of his lengthy period of custody and interrogation by detectives Guevera, Halvorsen, Pergande and Muzupappa on March 2, 1999 contains examples of extremely psychologically coercive interrogation techniques, methods, and strategies that have been demonstrated to cause suspects to perceive that they have no meaningful choice but to comply with the demands of their interrogators, and that are known to increase the risk of eliciting involuntary statements, admissions and/or confessions.

6) The lengthy custodial interrogation sessions on March 2, 1999 described by David Gecht involved police interrogation contamination (*i.e.*, leaking and disclosing non-public case facts) and police interrogation scripting (pressuring and persuading the suspect to accept the police narrative of how and why the alleged crime occurred), which increased the risk that Mr. Gecht's confession statement, if false, would misleadingly appear to be detailed, accurate and self-corroborating and thus increase his risk of being falsely convicted at trial.

7) The lengthy custody and interrogations by Detectives' Guevara, Halvorsen, Pergande and Muzupappa on March 2, 1999 described by David Gecht violated numerous universally accepted police investigative and interrogation national training standards, police protocols and commonly accepted best practices that existed in 1999.

8) David Gecht's interrogation-induced confession statement contains numerous indicia of unreliability associated with false confessions, and it contains no indicia of reliability. If Mr. Gecht's interrogation-induced confession statement is false, it is properly classified as what is known in the social science research literature as a *coerced-compliant* false confession.

9) Richard Kwil's description of what occurred during his lengthy period of custodial interrogation on March 1-2, 1999 by Chicago police detectives Guevara, Halvorsen, Pergande and Muzupappa that led to his confession statement is consistent with the empirical social science research on the types of interrogation techniques, methods, and practices that explain how and why innocent individuals are moved to make and/or agree to false and unreliable confession statements.

10) According to Richard Kwil's description, of his interrogation, the lengthy period of custodial interrogation on March 1-2, 1999 by Chicago police detectives Guevera, Halvorsen, Pergande and Muzupappa that led to his confession statement was guilt-presumptive, confession-driven and confirmatory. According to Mr. Kwil's description, the interrogation was structured to break down Mr. Kwil's denials of guilt and to incriminate him by coercively pressuring and persuading him to agree with, and admit to, detective Guevara's, Halvorsen's, Pergande's and Muzupappa's pre-existing conclusion that he actively participated in the murder of Roberto Cruz. Detectives Guevara's, Halvorsen's, Pergande and Muzupappa guilt-presumptive

24

Steve Art, Esq.
Dan Stohr, Esq.
December 17, 2025
Page 25

interrogation sessions were not structured to assess the reliability of any information they learned from Mr. Kwil, but purely to submit him to their will and extract an incriminating statement from him; they demonstrated a reckless disregard for the truth.

11) Richard Kwil's description of what occurred during his lengthy period of custody and interrogation by detectives Guevara, Halvorsen, Pergande and Muzupappa on March 1-2, 1999 involved the use of psychological interrogation techniques, methods, and strategies that have been shown by social science research to increase the risk of eliciting false and unreliable statements, admissions and/or confessions (*i.e.*, *situational* risk factors) when misapplied to the innocent. According to Mr. Kwil's description of the interrogation, these included: physical coercion, lengthy interrogation, sleep deprivation, false evidence ploys, explicit threats of harm, explicit promises of freedom/leniency and psychological coercion.

12) Richard Kwil's description of his lengthy period of custody and interrogation by detectives' Guevera, Halvorsen, Pergande and Muzupappa on March 1-2, 1999 contains examples of extremely psychologically coercive interrogation techniques, methods, and strategies that have been demonstrated to cause suspects to perceive that they have no meaningful choice but to comply with the demands of their interrogators, and that are known to increase the risk of eliciting involuntary statements, admissions and/or confessions.

13) The lengthy custodial interrogation sessions on March 1-2, 1999 described by Richard Kwil involved police interrogation contamination (*i.e.*, leaking and disclosing non-public case facts) and police interrogation scripting (pressuring and persuading the suspect to accept the police narrative of how and why the alleged crime occurred), which increased the risk that Mr. Kwil's confession statement, if false, would misleadingly, appear to be detailed, accurate and self-corroborating and thus increase his risk of being falsely convicted at trial.

14) The lengthy custody and interrogations by Detectives Guevara, Halvorsen, Pergande and Muzupappa on March 1-2, 1999 described by Richard Kwil violated numerous universally accepted police investigative and interrogation national training standards, police protocols and commonly accepted best practices that existed in 1999.

15) Richard Kwil's interrogation-induced confession statement contains numerous indicia of unreliability associated with false confessions, and it contains no indicia of reliability. If Mr. Gecht's interrogation-induced confession statement is false, it is properly classified as what is known in the social science research literature as a *coerced-compliant* false confession.

16) Ruben Hernandez's description of what occurred during his custodial interrogation on March 1-2, 1999 by Chicago police detective Reynaldo Guevara, Halvorsen, Pergande and Muzupappa that led to his confession statement is consistent with the empirical social science research on the types of interrogation techniques, methods, and practices that explain how and why innocent individuals are moved to make and/or agree to false and unreliable confession statements.

25

Steve Art, Esq.
Dan Stohr, Esq.
December 17, 2025
Page 26

17) Ruben Hernandez's description of what occurred during his unrecorded custodial interrogation on March 1-2 by detective Guevara involved physically coercive interrogation, which is known to cause false and unreliable incriminating statements, admissions and confessions.

18) According to Ruben Hernandez's description, the interrogation on March 1-2, 1999 by Chicago police detective Reynaldo Guevera that led to his confession statement was guilt-presumptive, confession-driven and confirmatory. According to Mr. Hernandez's description, the interrogation was structured to break down Mr. Hernandez's denials of guilt and to incriminate him by coercively pressuring and persuading him to agree with, and admit to, detective Guevara's, Halvorsen's, Pergande and Muzupappa's pre-existing conclusion that he actively participated in the murder of Roberto Cruz. Detective Guevara's, Halvorsen, Pergande and Muzupappa's guilt-presumptive interrogation session was not structured to assess the reliability of any information he learned from Mr. Hernandez, but purely to submit him to his will and extract an incriminating statement from him; Guevara demonstrated a reckless disregard for the truth.

19) Ruben Hernandez's description of what occurred during his interrogation by detectives Guevara, Halvorsen, Pergande and Muzupappa on March 1-2, 1999 involved the use of psychological interrogation techniques, methods, and strategies that have been shown by social science research to increase the risk of eliciting false and unreliable statements, admissions and/or confessions (*i.e.*, *situational* risk factors) when misapplied to the innocent. According to Mr. Hernandez's description of the interrogation, these included: sleep deprivation, false evidence ploys, explicit promises of freedom/leniency and physical and psychological coercion.

20) Ruben Hernandez's description of his interrogation by detectives Guevera, Halvorsen, Pergande and Muzupappa on March 1-2, 1999 contains examples of extremely psychologically coercive interrogation techniques, methods, and strategies that have been demonstrated to cause suspects to perceive that they have no meaningful choice but to comply with the demands of their interrogators, and that are known to increase the risk of eliciting involuntary statements, admissions and/or confessions.

21) The interrogation session on March 1-2, 1999 described by Ruben Hernandez involved police interrogation contamination (*i.e.*, leaking and disclosing non-public case facts) and police interrogation scripting (pressuring and persuading the suspect to accept the police narrative of how and why the alleged crime occurred), which increased the risk that Mr. Hernandez's confession statement, if false, would misleadingly, appear to be detailed, accurate and self-corroborating and thus increase his risk of being falsely convicted at trial.

22) The interrogation by Detectives Guevara, Halvorsen, Pergande and Muzupappa on March 1-2, 1999 described by Ruben Hernandez violated numerous universally accepted police

26

Steve Art, Esq.
Dan Stohr, Esq.
December 17, 2025
Page 27

investigative and interrogation national training standards, police protocols and commonly accepted best practices that existed in 1999.

23) Ruben Hernandez's interrogation-induced confession statement contains numerous indicia of unreliability associated with false confessions, and it contains no indicia of reliability. If Mr. Hernandez's interrogation-induced confession statement is false, it is properly classified as what is known in the social science research literature as a *coerced-compliant* false confession.

24) Starting in 1972 and continuing up to at least 2000, the City of Chicago's Police Department had a systemic practice of subjecting African American and Latino suspects who were interrogated by detectives and supervisors to physically abusive and coercive interrogations with the result of coercing and/or fabricating false and/or unreliable inculpatory evidence to be used against the interrogated suspect without regard to his actual guilt or innocence.

25) At least as early as February of 1982 and continuing through the 1990s, high ranking officials in the City of Chicago and the Chicago Police Department and numerous police command personnel, received continuing notice of this systemic practice of physical abuse and coercion of Black and Latino suspects in order to coerce and fabricate confessions, including from the repeated documented allegations that accumulated against supervisors and detectives, first at the Area 2 Detective Division, and later at Areas 3, 4 and 5; from the testimony of criminal defendants at motion to suppress hearings and trials; from numerous court decisions in criminal cases; from the findings in numerous Office of Professional Standards reports; from federal and state court decisions; and from the admissions of City officials.

## IV. The Scientific Study of Police Interrogation and False Statements, Admissions and Confessions[2]

---

[2]  There is a substantial empirical research literature on the scientific study of police interrogation, psychological coercion and false statements, admissions and/or confessions.  For reviews of this literature, see: Saul Kassin (2022), DUPED: WHY INNOCENT PEOPLE CONFESS – AND WHY WE BELIEVE THEM (Latham, MD: Prometheus Books); Gisli Gudjonsson (2021) "The Science-Based Pathways to Understanding False Confessions and Wrongful Convictions," *Frontiers in Psychology*, 12, 1-15; William Woody and Krista Forrest, UNDERSTANDING POLICE INTERROGATON: CONFESSIONS AND CONSEQUENCES (New York, NY: New York University Press); Gisli Gudjonsson (2018), THE PSYCHOLOGY OF FALSE CONFESSIONS: FORTY YEARS OF SCIENCE AND PRACTICE (Hoboken, NJ: John Wiley & Sons);  Saul Kassin, Hayley Cleary, Gisli Gudjonsson, Richard A. Leo, Christian Meissner, Allison Redlich and Kyle Scherr (2025), "Police-Induced Confessions, 2.0: Risk Factors and Recommendations," Law and Human Behavior, 49, 7-53: G. Daniel Lassiter and Christian Meissner (2010), POLICE INTERROGATION AND FALSE CONFESSIONS: CURRENT RESEARCH, PRACTICE AND POLICY RECOMMENDATIONS (Washington, DC: American Psychological Association; Richard A. Leo (2009), "False Confessions: Causes, Consequences and Implications" *Journal of the American Academy of Psychiatry and Law*, 37, 332-343; and Richard A. Leo (2008), POLICE INTERROGATION AND AMERICAN JUSTICE (Cambridge, MA: Harvard University Press).

Steve Art, Esq.
Dan Stohr, Esq.
December 17, 2025
Page 28

There is a well-established empirical field of research in the academic disciplines of psychology, criminology, and sociology on the subjects of police interrogation practices, psychological coercion, and false confessions. This research dates back to 1908; has been the subject of extensive publication (hundreds of academic journal articles, stand-alone books, and book chapters in edited volumes); has been subjected to peer review and testing; is based on recognized scientific principles, methods, and findings; and is generally accepted in the social scientific community. Significantly, these principles, methods, and findings are generally accepted in the social science community,[3] beyond common knowledge,[4] and therefore numerous courts have repeatedly accepted expert testimony in criminal and civil rights litigation.[5]

This research has analyzed numerous police-induced false confessions and identified the personal and situational factors associated with, and believed to cause, false confessions.[6] The fact that police-induced false confessions can and do occur has been well-documented and is no longer disputed by anyone in the law enforcement or academic communities. Social scientists

---

[3]    *See* Saul Kassin, Allison Redlich, Fabiana Alceste and Timothy Luke (2018). "On the General Acceptance of Confessions Research: Opinions of the Scientific Community" *American Psychologist*, 73, 63-80.

[4]    See Fabiana Alceste, Timothy Luke, Allison Redlich, Johanna Hellgren, Aria Amrom, and Saul Kassin (2020). "The Psychology of Confessions: A Comparison of Expert and Lay opinions." *Applied Cognitive Psychology*, 25, 39-51.

[5]    *See Gray v. City of* Chicago, No. 1:18-cv-02624, Dkts. 489 & 503 (N.D. Ill. May 14, 2023) at *11 (N.D. Ill. May 14, 2023) (Admitting the testimony of Dr. Melissa Russano, "If ever there were a subject that is helpful to the jury, it is on the subject of false confessions."); *Andersen v. City of Chicago*, No 16 C 1963, 2020 WL 1848081, at *2 (N.D. ILL. Apr. 13, 2020) (finding false-confession expert Dr. Saul M. Kassin qualified to speak on false confession risk factors); *Hunt v. Vantlin*, No. 3:14-cv-00092-JMS-MPB, 2019 WL 8267074 at *4-5 (S.D. Ind. Sept. 26, 2019) (finding that a false confessions expert may opine on "the circumstances under which police interrogation tactics are likely to produce false confessions"); *Harris v. City of Chicago*, 14 C 4391, 2017 WL 2436316, at *9, 16 (N.D. Ill. June 5, 2017) (finding false confession expert Richard Leo's methodology to be "sound, accepted and reliable" and that he could testify as to the reliability of the plaintiff's confession, and "Dr. Leo will be permitted to testify to various factors that can cause false confessions, and to their presence in this case."); *Kluppelb*erg *v. Burge*, 13 C 3963, 2016 WL 6821138, at *4-*5 (N.D. Ill. Sept. 16, 2016) (denying defendants' motion to bar the testimony of plaintiff's false confession expert Dr. Richard Ofshe as his methodology is "sound" and could be applied to the facts of the case); *Caine v. Burge,* 11 C 8996 2013 WL 1966381 at *3 (N.D. Ill. May 10, 2013) ("Dr. Leo will be permitted to testify to various factors that can cause false confessions, and to their presence in this case."); *Scott v. City of Chicago*, 07 C 3684, 2010 WL 3034254, at *5 (N.D. Ill. Aug. 3, 2010) (denying defendants' motion to bar the testimony of Dr. Richard Ofshe); *United States v. Hall*, 974 F. Supp. 1198, 1206 (C.D. Ill. 1997), *aff'd,* 165 F.3d 1095 (7th Cir. 1999) (denying the Government's motion to bar the testimony of a criminal defendant's expert, Dr. Richard Ofshe).

[6]    *See* Saul Kassin, Hayley Cleary, Gisli Gudjonsson, Richard A. Leo, Christian Meissner, Allison Redlich and Kyle Scherr (2025), "Police-Induced Confessions, 2.0: Risk Factors and Recommendations," Law and Human Behavior, 49, 7-53: Richard A. Leo (2008). POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press); and Gisli Gudjonsson (2003). THE PSYCHOLOGY OF INTERROGATIONS AND CONFESSIONS: A HANDBOOK (John Wiley & Sons Inc.).

Steve Art, Esq.
Dan Stohr, Esq.
December 17, 2025
Page 29

have documented hundreds of false confessions in America since the early 1970s,[7] but this is surely an underestimate and thus the tip of a much larger iceberg for multiple reasons. First, false confessions are difficult for researchers to discover because neither law enforcement nor any private organization keep a comprehensive database of the interrogations that have produced them. Second, even when they are discovered, false confessions are notoriously hard to establish because of the factual and logical difficulties of establishing the confessor's factual innocence to an absolute certainty. As a result, Richard Ofshe and I coined the term "*proven* false confession" in 1998,[8] showing that there are four ways in which a disputed confession can be classified as proven beyond any doubt to be false:

1) When it can be objectively established that the suspect confessed to a crime that did not happen;

2) When it can be objectively established that it would have been physically impossible for the confessor to have committed the crime;

3) When the true perpetrator is identified and his guilt is objectively established; and/or

4) When scientific evidence dispositively establishes the confessor's innocence.

However, only a small number of cases involving a disputed confession will ever come with independent case evidence that allows the suspect to prove his innocence beyond dispute because doing so is akin to proving the negative. The documented number of false confessions in the scientific research literature is, therefore, a dramatic undercount of the actual false confessions that police have elicited in the United States in recent decades. There have almost certainly been far more police-induced false confessions than researchers have been able to discover and classify as false. Indeed, in a survey of police that my colleagues and I published in 2007, police investigators themselves estimated that they elicited partial or full false admissions and/or confessions in 4.78% of their interrogations.[9] If this estimate is accurate, American police elicit numerous false confessions every year.

---

[7] The largest published study of false confessions to date is Steven Drizin and Richard A. Leo (2004). "The Problem of False Confessions in the Post-DNA World" *North Carolina Law Review*, 82, 891-1007. For a review of the literature documenting proven false confessions, *see* Richard A. Leo (2008). POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press).

[8] Richard A. Leo and Richard Ofshe (1998). "The Consequences of False Confessions: Deprivations of Liberty and Miscarriages of Justice in the Age of Psychological Interrogation." *The Journal of Criminal Law and Criminology*. Vol. 88, No. 2. Pp. 429-496.

[9] Saul Kassin, Richard Leo, Christian Meissner, Kimberly Richman, Lori Colwell, Amy-May Leach, and Dana La Fon (2007). "Police Interviewing and Interrogation: A Self-Report Survey of Police Practices and Beliefs" *Law and Human Behavior*, 31, 381-400.

Steve Art, Esq.
Dan Stohr, Esq.
December 17, 2025
Page 30

The subject of police interrogation and false confessions is beyond common knowledge and highly counter-intuitive.[10] Police detectives receive specialized training in psychological interrogation techniques; most people, including most jurors, do not know what these techniques are or how the techniques are designed to work (*i.e.*, move a suspect from denial to admission). In addition, most people also do not know what psychological coercion is, why some techniques are regarded as psychologically coercive, and what their likely effects are. Moreover, most people do not know which interrogation techniques create a risk of eliciting false confessions or how and why the psychological process of police interrogation can, and sometimes does, lead suspects to falsely confess. This unfamiliarity causes most people to assume that virtually all confessions are true.

### V. The Social Psychology of Police Interrogation[11]

Police interrogation is a cumulative, structured, and time-sequenced process in which detectives draw on an arsenal of psychological techniques in order to overcome a suspect's denials and elicit incriminating statements, admissions, and/or confessions. This is the sole purpose of custodial interrogation (as opposed to interviews). To achieve this purpose, interrogators use techniques that seek to influence, persuade, manipulate, and deceive suspects

---

[10]  *See* Danielle Chojnacki, Michael Cicchini and Lawrence White (2008). "An Empirical Basis for the Admission of Expert Testimony on False Confessions" *Arizona State Law Journal*, 40, 1-45; Richard A. Leo and Brittany Liu (2009). "What Do Potential Jurors Know About Police Interrogation and False Confessions?" *Behavioral Sciences and the Law*, 27, 381-399; Linda Henkel, Kimberly Coffman, and Elizabeth Dailey (2008). "A Survey of People's Attitudes and Beliefs About False Confessions," *Behavioral Sciences and the Law*, 26, 555-584; Iris Blandon-Gitlin, Kathryn Sperry, and Richard A. Leo (2011). "Jurors Believe Interrogation Tactics Are Not Likely to Elicit False Confessions: Will Expert Witness Testimony Inform Them Otherwise?" *Psychology, Crime and Law*, 17, 239-260; and Mark Costanzo, Netta Shaked-Schroer and Katherine Vinson (2010). "Juror Beliefs About Police Interrogation, False Confession and Expert Testimony" *The Journal of Legal Empirical Studies,* 7, 231-247.

[11]  There is a substantial empirical scientific research literature on the social psychology of police interrogation, psychological coercion and false statements, admissions and/or confessions. For reviews of this literature, see: Saul Kassin (2022), DUPED: WHY INNOCENT PEOPLE CONFESS – AND WHY WE BELIEVE THEM (Latham, MD: Prometheus Books); Gisli Gudjonsson (2021) "The Science-Based Pathways to Understanding False Confessions and Wrongful Convictions," *Frontiers in Psychology*, 12, 1-15; William Woody and Krista Forrest, UNDERSTANDING POLICE INTERROGATION: CONFESSIONS AND CONSEQUENCES (New York, NY: New York University Press); Gisli Gudjonsson (2018), THE PSYCHOLOGY OF FALSE CONFESSIONS: FORTY YEARS OF SCIENCE AND PRACTICE (Hoboken, NJ: John Wiley & Sons); Saul Kassin, Hayley Cleary, Gisli Gudjonsson, Richard A. Leo, Christian Meissner, Allison Redlich and Kyle Scherr (2025), "Police-Induced Confessions, 2.0: Risk Factors and Recommendations," Law and Human Behavior, 49, 7-53: G. Daniel Lassiter and Christian Meissner (2010), POLICE INTERROGATION AND FALSE CONFESSIONS: CURRENT RESEARCH, PRACTICE AND POLICY RECOMMENDATIONS (Washington, DC: American Psychological Association; Richard A. Leo (2009). "False Confessions: Causes, Consequences and Implications" *Journal of the American Academy of Psychiatry and Law*, 37, 332-343; and Richard A. Leo (2008). POLICE INTERROGATION AND AMERICAN JUSTICE (Cambridge, MA: Harvard University Press).

Steve Art, Esq.
Dan Stohr, Esq.
December 17, 2025
Page 31

into believing that their situation is hopeless and that their best interest lies in confessing.[12] Sometimes, however, interrogators cross the line and employ techniques and methods of interrogation that are coercive and increase the likelihood of eliciting false confessions or statements.

Dating back to the early 1940s, psychological interrogation methods in the United States have been structured to persuade a rational guilty person who knows he is guilty to rethink his initial decision to deny culpability and choose instead to confess.[13] Police interrogators know that it is not in any suspect's rational self-interest to confess. They expect to encounter resistance and denials to their allegations, and they know that they must apply a certain amount of interpersonal pressure and persuasion to convince a reluctant suspect to confess. As a result, interrogators have, over the years, developed a set of subtle and sophisticated interrogation techniques whose purpose is to alter a guilty suspect's perceptions so that he will see the act of confessing as being in his self-interest.

These interrogation techniques were developed for the purpose of inducing guilty individuals to confess to their crimes, and police are admonished in their training to use them only on suspects believed to be guilty.[14] When these same techniques are used on innocent suspects, they carry the risk that they will elicit false statements, admissions and/or confessions.

The goal of an interrogator is to persuade a suspect to view his immediate situation differently by focusing the suspect's attention on a limited set of choices and alternatives, and by convincing him of the likely consequences that attach to each of these choices. The process often unfolds in two steps: first, the interrogator causes the suspect to view his situation as hopeless; and, second, the interrogator persuades the suspect that only by confessing will the suspect be able to improve his otherwise hopeless situation. The interrogator makes it clear what information he is seeking and attempts to convince the suspect that his only rational option is to confirm the information the interrogator purports to already know.

The first step or stage of an interrogation consists of causing a suspect to view his situation as hopeless. If the interrogator is successful at this stage, he will undermine the

---

[12] Deborah Davis and William O'Donohue (2004). "The road to perdition: Extreme influence tactics in the interrogation room" in William O'Donohue, ED. (2004). *Handbook of Forensic Psychology* (San Diego: Academic Press) at 897-996.

[13] Fred Inbau, John Reid and Joseph Buckley (1986). CRIMINAL INTERROGATION AND CONFESSIONS, 3rd Edition (The Williams and Wilkins Company).

[14] *See* Fred Inbau, John Reid, Joseph Buckley and Brian Jayne (2013). CRIMINAL INTERROGATION AND CONFESSIONS, 5th Edition ( Jones & Bartlett Learning) at 187 ("These nine steps are presented in the context of the interrogation of suspects whose guilt seems definite or reasonably certain"). For empirical support for this observation, *see* Richard A. Leo (2008). POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press).

Steve Art, Esq.
Dan Stohr, Esq.
December 17, 2025
Page 32

suspect's self-confidence and cause the suspect to reason that there is no way to escape the interrogation without incriminating himself. To accomplish this, interrogators accuse the suspect of having committed the crime; they attack and try to undermine a suspect's assertion of an alibi, alternate sequence of events, or verbalization of innocence (pointing out or inventing logical and factual inconsistencies, implausibilities, and/or impossibilities); they exude unwavering confidence in their assertions of the suspect's and his accomplices' guilt; they refuse to accept the possibility of the suspect's denials; and, most importantly, they confront the suspect with incontrovertible evidence of his guilt, whether real or non-existent. Because interrogation is a cumulative and time-sequenced process, interrogators often draw on these techniques repeatedly and/or in succession, building on their earlier accusations, challenges and representations at each step in the interrogation process.

Through the use of these techniques, the interrogator communicates to the suspect that he has been caught, that there is no way he will escape the interrogation without incriminating himself and other suspects, and that his future is determined—that regardless of the suspect's denials or protestations of innocence, he is going to be arrested, prosecuted, convicted, and punished. The interrogator seeks to convince the suspect that this is a fact that has been established beyond any doubt, and thus that any objective person must necessarily reason to this conclusion. By persuading the suspect that he has been caught, that the existing evidence or case facts objectively prove his guilt, and that it is only a matter of time before he will be prosecuted and convicted, the interrogator seeks to alter the suspect's perceptions, such that he comes to view his situation as hopeless and to perceive that resisting the interrogator's demands is futile.

Once the interrogator has caused the suspect to understand that he has been caught and that there is no way out of this predicament, the interrogator seeks to convince the suspect that the only way to improve his otherwise hopeless situation is by confessing to the offense(s) of which he is accused and confirming the information the interrogator is seeking to extract from the suspect. The second step of the interrogation thus consists of offering the suspect inducements to confess—reasons or scenarios that suggest the suspect will receive some personal, moral, communal, procedural, material, legal or other benefit if he confesses to the interrogator's version of the offense. One goal of these scenarios or inducements is to downplay both the seriousness of the alleged crime and the suspect's role in the alleged crime as well as the consequences of confessing, leading the suspect to perceive that the consequences of continuing to deny the accusations will be worse than the consequences of admitting to participation in the crime. The interrogator's attempt to diminish the suspect's perception of the consequences of confessing is combined with techniques that are designed to increase the suspect's anxiety in order to create the perceived need for release from the stress of prolonged interrogation.[15]

---

[15]   See Brian Jayne (1986).  "The Psychological Principles of Criminal Interrogation," in Fred Inbau, John Reid and Joseph Buckley (1986).  CRIMINAL INTERROGATION AND CONFESSIONS, 3rd Edition (Baltimore, MD: Williams & Wilkins) at 332. ("The goal of interrogation is therefore to decrease the suspect's perception of the consequences of confessing, while at the same time increasing the suspect's internal anxiety associated with his deception.").

Steve Art, Esq.
Dan Stohr, Esq.
December 17, 2025
Page 33

Investigators also use scenarios to plant ideas or suggestions about how or why the suspect may have committed the crime which they may later pressure the suspect to accept and repeat.

Researchers have classified the types of inducements investigators use during the second step of interrogation into three categories: *low-end* inducements, *systemic* inducements, and *high-end* inducements. *Low-end* inducements refer to interpersonal or moral appeals the interrogator uses to convince a suspect that he will feel better if he confesses. For example, an interrogator may tell a suspect that the truth will set him free if he confesses, that confessing will relieve his anxiety or guilt, that confessing is the moral or Christian thing to do, or that confessing will improve his standing in the eyes of the victim or the eyes of the community.

*Systemic* inducements refer to appeals that the interrogator uses to focus the suspect's attention on the processes and outcomes of the criminal justice system in order to get the suspect to come to the conclusion that his case is likely to be processed more favorably by all actors in the criminal justice system if he confesses. For example, an interrogator may tell a suspect that he is the suspect's ally and will try to help him out—both in his discussions with the prosecutor as well as in his role as a professional witness at trial—but can only do so if the suspect first admits his guilt. Or the interrogator may ask the suspect how he expects the prosecutor to look favorably on the suspect's case if the suspect does not cooperate with authorities. Or the interrogator may ask the suspect what a judge and jury are really going to think, and how they are likely to react, if he does not demonstrate remorse and admit his guilt to authorities. Interrogators often couple the use of *systemic* incentives with the assertion that this is the suspect's one and only chance—now or never—to tell his side of the story; if he passes up this opportunity, all the relevant actors in the system (police, prosecutor, judge and jury) will no longer be open to the possibility of viewing his actions in the most favorable light. This tactic may incentivize a suspect to either falsely confess or confirm an incorrect story for the interrogator based on the belief that the suspect will not have the same opportunity to help himself again in the future. Interrogators rely on *systemic* inducements to persuade the suspect to reason to the conclusion that the justice system naturally confers rewards for those who admit guilt, demonstrate remorse, and cooperate with authorities, whereas it inevitably metes out punishment for those who do not.

Finally, *high-end* inducements refer to appeals that directly communicate the message that the suspect will receive less punishment, a lower prison sentence and/or some form of police, prosecutorial, judicial or juror leniency if he complies with the interrogator's demand that he confess, but that the suspect will receive a higher sentence or greater punishment if he does not comply with the interrogator's demand that he confess. High-end inducements may either be implicit or explicit: the important question is whether the interrogation technique communicates the message, or is understood to communicate the message, that the suspect will receive a lower criminal charge and/or lesser punishment if he confesses as opposed to a higher criminal charge and/or greater amount of punishment if he does not.

Steve Art, Esq.
Dan Stohr, Esq.
December 17, 2025
Page 34

Explicit *high-end* inducements can include telling a suspect that there are several degrees of the alleged offense, each of which carry different amounts of punishment, and asking the suspect which version he would like to confess to. Or the interrogator may explicitly tell the suspect that he will receive a long prison sentence—or perhaps even the death penalty—if he does not confess to the interrogator's version of events. The interrogator may also point out what happens to men of the suspect's age, or men accused of crime, in prison if the suspect does not confess to the interrogator's minimized account. Sometimes interrogators who rely on *high-end* inducements will present the suspect with a simple two-choice situation (good vs. bad): if the suspect agrees to the good choice (a minimized version of the offense, such as involuntary manslaughter or self-defense, or the implication of another person), he will receive a lower amount of punishment or no punishment at all; but if he does not confess right then, criminal justice officials will impute to him the bad choice (a maximized version of the offense, such as pre-meditated first degree murder, or that the suspect was acting alone), and he will receive a higher level of punishment, or perhaps the harshest possible punishment.[16] The purpose of *high-end* inducements is to communicate to a suspect that it is in his rational self-interest to confess to the minimized or less-incriminating version of events that the interrogator is suggesting because if the suspect does so, he will receive a lower charge, a lesser amount of punishment and/or no time in prison, but if he fails to do so, he will receive a higher charge, a greater amount of punishment and more time in prison, perhaps even the death penalty.

High-end inducements are psychologically coercive. Psychologically coercive interrogations are problematic because they induce both involuntary and unreliable information, statements, admissions and/or confessions by causing suspects to feel trapped, hopeless, frightened and/or that they have no meaningful choice but to comply with the demands of their interrogator(s). To evaluate whether a particular interrogation was psychologically coercive, an expert must evaluate the interrogator's techniques, methods, and strategies in the light of the generally accepted findings of the social science research literature on the subjects of interrogation, coercive influence techniques, and confessions.

Social science research has repeatedly demonstrated that some *systemic* inducements (depending on the content of the inducement, how explicitly or vaguely it is stated, and the message that it communicates) and all *high-end* inducements are coercive because they rely on implicit and/or explicit promises of leniency and threats of harm to induce compliance. *Systemic* and *high-end* inducements increase the likelihood of eliciting false confessions and false statements from suspects because of the *quid pro quo* arrangement and the benefit a suspect expects to receive in exchange for the information the interrogator is seeking, regardless of whether the suspect knows that information to be true or not. Such promises of leniency and

---

[16] This technique is sometimes referred to in the academic literature as the maximization/minimization technique. *See* Saul Kassin, Hayley Cleary, Gisli Gudjonsson, Richard A. Leo, Christian Meissner, Allison Redlich and Kyle Scherr (2025), "Police-Induced Confessions, 2.0: Risk Factors and Recommendations," Law and Human Behavior, 49, 7-53: Richard A. Leo (2008), POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press).

Steve Art, Esq.
Dan Stohr, Esq.
December 17, 2025
Page 35

threats of harm are regarded as coercive in the social science literature because of the messages they convey and their demonstrated impact on the decision-making of individuals. The expert may also evaluate whether the interrogation techniques, either individually or cumulatively, had the effect of causing a suspect to perceive that he had no choice but to comply with the demands of the interrogator, and thus, the interrogation, in effect, overbore the suspect's will.

### VI. The Three Types of False Confessions[17]

False confessions and false statements, of course, will occur in response to traditionally-coercive methods of interrogation such as the use of physical violence, threats of immediate physical harm, excessively long or incommunicado interrogation, or deprivation of essential necessities such as food, water, and/or sleep. The psychological techniques of interrogation that cross the line and sometimes cause false confessions typically involve one of two patterns: (1) the interrogator communicates to the suspect, implicitly or explicitly, that he will receive a higher charge and harsher sentence or punishment if he does not provide a satisfactory statement, but that he will receive a lesser charge or sentence, or perhaps no punishment at all, if he does; or (2) the interrogator wears down and distresses the suspect to the point that the suspect subjectively feels that he has no choice but to comply with the interrogator's demands if he is to put an end to the intolerable stress of continued interrogation and/or escape the oppressive interrogation environment.

Whether a police-induced false confession or statement is caused primarily by coercive interrogation techniques or by a suspect's pre-existing vulnerabilities to interrogation, or some combination of both, there are three fundamental types of false confessions and statements: a *voluntary* false confession or statement (*i.e.*, a false confession knowingly given in response to little or no police pressure); a *coerced-* or *stress-compliant* false confession or statement (*i.e.*, a false confession knowingly given to put an end to the interrogation or to receive an anticipated benefit or reward in exchange for confession); and a *coerced-* or *non-coerced-persuaded* false confession or statement (*i.e.*, a confession given by a suspect who comes to doubt the reliability

---

[17] There is a substantial empirical scientific research literature on the three types of false confessions. For reviews of this literature, *see*: Saul Kassin (2022), DUPED: WHY INNOCENT PEOPLE CONFESS – AND WHY WE BELIEVE THEM (Latham, MD: Prometheus Books); Gisli Gudjonsson (2021) "The Science-Based Pathways to Understanding False Confessions and Wrongful Convictions," *Frontiers in Psychology*, 12, 1-15; William Woody and Krista Forrest, UNDERSTANDING POLICE INTERROGATION: CONFESSIONS AND CONSEQUENCES (New York, NY: New York University Press); Gisli Gudjonsson (2018), THE PSYCHOLOGY OF FALSE CONFESSIONS: FORTY YEARS OF SCIENCE AND PRACTICE (Hoboken, NJ: John Wiley & Sons); Saul Kassin, Hayley Cleary, Gisli Gudjonsson, Richard A. Leo, Christian Meissner, Allison Redlich and Kyle Scherr (2025), "Police-Induced Confessions, 2.0: Risk Factors and Recommendations," Law and Human Behavior, 49, 7-53: G. Daniel Lassiter and Christian Meissner (2010), POLICE INTERROGATION AND FALSE CONFESSIONS: CURRENT RESEARCH, PRACTICE AND POLICY RECOMMENDATIONS (Washington, DC: American Psychological Association; Richard A. Leo (2009). "False Confessions: Causes, Consequences and Implications" *Journal of the American Academy of Psychiatry and Law*, 37, 332-343; and Richard A. Leo (2008). POLICE INTERROGATION AND AMERICAN JUSTICE (Cambridge, MA: Harvard University Press).

Steve Art, Esq.
Dan Stohr, Esq.
December 17, 2025
Page 36

of his memory and thus comes to believe that he may have committed the crime, despite no actual memory of having done so).[18] These different types of false confession typically involve different levels of police pressure, a different psychology of influence and decision-making, and different beliefs about the likelihood of one's guilt.

## VII. The Three Sequential Police Errors
## That Can Lead to False (But Sometimes Detailed) Confessions[19]

There are three important decision points in the interrogation process that are known to be linked to false confessions or statements. The first decision point is the police decision to classify someone as a suspect. This is important because police only *interrogate* individuals whom they first classify as suspects; police *interview* witnesses and victims. There is a big difference between interrogation and interviewing: unlike interviewing, an interrogation is accusatory, involves the application of specialized psychological interrogation techniques, and the ultimate purpose of an interrogation is to get an incriminating statement from someone whom police believe to be guilty of the crime. False confessions or statements occur when police misclassify an innocent suspect as guilty and then subject him to a custodial interrogation, and are satisfied with elicitation of a version of events that, in fact, is not true. This is called *the misclassification error*. It is one reason why interrogation training manuals implore detectives to investigate their cases before subjecting any potential suspect to an accusatorial interrogation.[20]

---

[18]   *See* Richard Ofshe and Richard A. Leo (1997). "The Social Psychology of Police Interrogation: The Theory and Classification of True and False Confessions." *Studies in Law, Politics & Society*, 16, 189-251.

[19]   There is a substantial empirical scientific research literature on the three sequential police errors that sometimes lead to interrogation-induced false statements, admissions and/or confessions. For reviews of this literature, *see*: Saul Kassin (2022), DUPED: WHY INNOCENT PEOPLE CONFESS – AND WHY WE BELIEVE THEM (Latham, MD: Prometheus Books); Gisli Gudjonsson (2021) "The Science-Based Pathways to Understanding False Confessions and Wrongful Convictions," *Frontiers in Psychology*, 12, 1-15; William Woody and Krista Forrest, UNDERSTANDING POLICE INTERROGATION: CONFESSIONS AND CONSEQUENCES (New York, NY: New York University Press); Gisli Gudjonsson (2018), THE PSYCHOLOGY OF FALSE CONFESSIONS: FORTY YEARS OF SCIENCE AND PRACTICE (Hoboken, NJ: John Wiley & Sons); Saul Kassin, Hayley Cleary, Gisli Gudjonsson, Richard A. Leo, Christian Meissner, Allison Redlich and Kyle Scherr (2025), "Police-Induced Confessions, 2.0: Risk Factors and Recommendations," Law and Human Behavior, 49, 7-53: G. Daniel Lassiter and Christian Meissner (2010), POLICE INTERROGATION AND FALSE CONFESSIONS: CURRENT RESEARCH, PRACTICE AND POLICY RECOMMENDATIONS (Washington, DC: American Psychological Association; Richard A. Leo (2009). "False Confessions: Causes, Consequences and Implications" *Journal of the American Academy of Psychiatry and Law*, 37, 332-343; and Richard A. Leo (2008). POLICE INTERROGATION AND AMERICAN JUSTICE (Cambridge, MA: Harvard University Press).

[20]   *See* Fred Inbau, John Reid and Joseph Buckley (1986). CRIMINAL INTERROGATION AND CONFESSIONS, 3rd Edition (Williams & Wilkins) at 3-12 ("Prior to the interrogation, and preferably before any contact with the suspect, become thoroughly familiar with all the known facts and circumstances of the case…. All too often, time and effort are unnecessarily expended in the interrogation of a suspected innocent person when an alibi check could have readily established the fact of his innocence."). *See also* Fred Inbau,

Steve Art, Esq.
Dan Stohr, Esq.
December 17, 2025
Page 37

The second important decision point in the process occurs when the police interrogate the suspect. Again, the goal of police interrogation is to elicit an incriminating statement from the suspect by moving him from denial to admission. To accomplish this, police use psychologically-persuasive, manipulative, and deceptive interrogation techniques. As described in detail in the previous sections, police interrogators use these techniques to accuse the suspect of committing the crime, to persuade him that he is caught and that the case evidence overwhelmingly establishes his guilt, and then to induce him to confess by suggesting it is the best course of action for him, sometimes resulting in false confessions from innocent suspects. This is called *the coercion error*. However, properly trained police interrogators do not use physically- or psychologically-coercive techniques because they may result in involuntary and/or unreliable incriminating statements, admissions, and/or confessions.[21]

The third important decision point in the interrogation process occurs after the police have elicited an admission—an "I did it" statement—from the suspect. This is referred to as the post-admission phase of the interrogation. The post-admission phase of the interrogation is important because it is here that the police can acquire information and evidence that will either support or not support the accuracy of the suspect's admission. Properly-trained police interrogators should know that innocent people sometimes falsely confess to crimes they did not commit, the need for police interrogators to be diligent to avoid false confessions has been present for decades. From the very first manual in 1942 and in all subsequent editions (1948, 1953, 1962, 1967, 1986, 2001 and 2013), the "Reid" Manual[22] has repeatedly implored interrogators not to use any methods that are "apt to make an innocent person confess to a crime he did not commit," such as "the use of force, threats, of promises of leniency," suggesting that interrogators do know that suspects can be made to falsely confess to crimes they did not commit.

Properly-trained interrogators also know that guilty suspects sometimes implicate others for crimes they themselves committed in order to diminish their role in the crime.[23] Interrogators therefore will seek to elicit information (that is not generally known and cannot likely be guessed

---

John Reid, Joseph Buckley and Brian Jayne (2013). CRIMINAL INTERROGATION AND CONFESSIONS, 5th Edition (Burlington, MA: Jones & Bartlett Learning) at 18 ("One basic principle to which there must be full adherence is that the interrogation of suspects should follow, and not precede, an investigation conducted to the full extent permissible by the allowable time and circumstances of the particular case. The authors suggest, therefore, that a good guideline to follow is "investigate before you interrogate").

[21]  Fred Inbau and John Reid (1967). CRIMINAL INTERROGATION AND CONFESSIONS, 2nd Edition (Williams & Wilkins), at 114-115, 198-200.

[22]  Fred Inbau and John Reid (1986). CRIMINAL INTERROGATION AND CONFESSIONS, 3rd Edition (Williams & Wilkins).

[23]  *Id.*

Steve Art, Esq.
Dan Stohr, Esq.
December 17, 2025
Page 38

by chance) from the suspect that either demonstrates, or fails to demonstrate, independent knowledge of the crime scene details and case facts. Properly-trained interrogators, therefore, will not ask leading or suggestive questions and will not educate the suspect about details of the victim's allegations or of the alleged crime. This is called *the contamination error*. Instead, properly trained interrogators will let the suspect supply the details of the case independently. Properly-trained interrogators will also seek to test the suspect's post-admission account against the physical and other credible evidence. Truthful confessions and statements are typically corroborated by solid physical evidence and independent knowledge of underlying case facts that have not been suggested to the suspect; false confessions and false statements are not.[24]

### VIII. Populations with Particular Vulnerability in the Interrogation Room[25]

While coercive and/or improper interrogation techniques are often the primary cause of false confessions, certain types or groups of individuals are far more vulnerable to the pressures of interrogation, having their will overborne and/or making a false confession. This includes individuals who are mentally ill, and therefore may confess falsely because they are easily confused, disoriented, delusional or experiencing a non-rational emotional or mental state. This also includes juveniles and individuals with a low IQ or low-level cognitive or intellectual functioning, who may be more vulnerable to interrogators because of their inability to understand the nature or gravity of their situation, their inability to foresee the consequences of their actions, their inability to cope with stressful situations and/or their eagerness to please others, especially authority figures. This is especially true of individuals with intellectual disability who test in the

---

[24] Richard A. Leo and Richard Ofshe (1998). "The Consequences of False Confessions: Deprivations of Liberty and Miscarriages of Justice in the Age of Psychological Interrogation" *The Journal of Criminal Law and Criminology*, 88, No. 2 at 429-496. This observation has been made in the police interrogation training literature as well. *See also* Fred Inbau, John Reid, Joseph Buckley and Brian Jayne (2013). CRIMINAL INTERROGATION AND CONFESSIONS, 5th Edition (Burlington, MA: Jones & Bartlett Learning) at 354-360.

[25] There is a substantial empirical scientific research literature on the individuals who are more susceptible to making or agreeing to false statements, admissions and/or confessions during police interrogation. For reviews of this literature, *see*: Saul Kassin (2022), DUPED: WHY INNOCENT PEOPLE CONFESS – AND WHY WE BELIEVE THEM (Latham, MD: Prometheus Books); Gisli Gudjonsson (2021) "The Science-Based Pathways to Understanding False Confessions and Wrongful Convictions," *Frontiers in Psychology*, 12, 1-15; William Woody and Krista Forrest, UNDERSTANDING POLICE INTERROGATION: CONFESSIONS AND CONSEQUENCES (New York, NY: New York University Press); Gisli Gudjonsson (2018), THE PSYCHOLOGY OF FALSE CONFESSIONS: FORTY YEARS OF SCIENCE AND PRACTICE (Hoboken, NJ: John Wiley & Sons); Saul Kassin, Hayley Cleary, Gisli Gudjonsson, Richard A. Leo, Christian Meissner, Allison Redlich and Kyle Scherr (2025), "Police-Induced Confessions, 2.0: Risk Factors and Recommendations" *Law and Human Behavior*, 49, 7-53; G. Daniel Lassiter and Christian Meissner (2010), POLICE INTERROGATION AND FALSE CONFESSIONS: CURRENT RESEARCH, PRACTICE AND POLICY RECOMMENDATIONS (Washington, DC: American Psychological Association; Richard A. Leo (2009). "False Confessions: Causes, Consequences and Implications" *Journal of the American Academy of Psychiatry and Law*, 37, 332-343; and Richard A. Leo (2008). POLICE INTERROGATION AND AMERICAN JUSTICE (Cambridge, MA: Harvard University Press).

Steve Art, Esq.
Dan Stohr, Esq.
December 17, 2025
Page 39

very low borderline range of mental retardation (an IQ of around 70 or lower). Juveniles may also be more easily intimidated than adults and may lack the maturity, knowledge, or sense of authority needed to resist simple police pressures and manipulations. Finally, this also includes individuals who, by their nature and personality, are naive, excessively trusting of authority, highly suggestible and/or highly compliant and who are therefore predisposed to believe that they have no choice but to comply with the demands of authorities or who simply lack the psychological resources to resist the escalating pressures of accusatorial interrogation.[26]

Juveniles and young adults are especially vulnerable to the pressures of psychological interrogation and increased risk of making or agreeing to a false confession because of their psychosocial immaturity, which affects their perceptions, reasoning processes, judgements and decision-making. Substantial empirical research shows that juveniles and young adults are more impulsive, more averse to stress, more conflict-avoidant, more impulsive and have fewer psychological resources with which to withstand pressure from authority figures. As a result, juveniles and young adults are more naïve, more easily led and manipulated, and more suggestible and compliant. For all of these reasons, juveniles and young adults are disproportionately represented in the known universe of documented false confessions. The younger the juvenile, the greater the risk that they will make or agree to a false statement, admission and/or confession in response to police interrogation pressure.

## IX. Evaluating the Reliability of Incriminating Statements, Admissions and Confessions[27]

---

[26]  *See* Saul Kassin, Hayley Cleary, Gisli Gudjonsson, Richard A. Leo, Christian Meissner, Allison Redlich and Kyle Scherr (2025), "Police-Induced Confessions, 2.0: Risk Factors and Recommendations" *Law and Human Behavior*, 49, 7-53; Richard A. Leo (2008), POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press).

[27]  There is a substantial empirical scientific research literature on the reliability of interrogation-induced statements, admissions and/or confessions.  For reviews of this literature, see: Saul Kassin (2022), DUPED: WHY INNOCENT PEOPLE CONFESS – AND WHY WE BELIEVE THEM (Latham, MD: Prometheus Books); Gisli Gudjonsson (2021) "The Science-Based Pathways to Understanding False Confessions and Wrongful Convictions," *Frontiers in Psychology*, 12, 1-15; William Woody and Krista Forrest, UNDERSTANDING POLICE INTERROGATION: CONFESSIONS AND CONSEQUENCES (New York, NY: New York University Press); Gisli Gudjonsson (2018), THE PSYCHOLOGY OF FALSE CONFESSIONS: FORTY YEARS OF SCIENCE AND PRACTICE (Hoboken, NJ: John Wiley & Sons); Saul Kassin, Hayley Cleary, Gisli Gudjonsson, Richard A. Leo, Christian Meissner, Allison Redlich and Kyle Scherr (2025), "Police-Induced Confessions, 2.0: Risk Factors and Recommendations," Law and Human Behavior, 49, 7-53: G. Daniel Lassiter and Christian Meissner (2010), POLICE INTERROGATION AND FALSE CONFESSIONS: CURRENT RESEARCH, PRACTICE AND POLICY RECOMMENDATIONS (Washington, DC: American Psychological Association; Richard A. Leo (2009). "False Confessions: Causes, Consequences and Implications" *Journal of the American Academy of Psychiatry and Law*, 37, 332-343; and Richard A. Leo (2008). POLICE INTERROGATION AND AMERICAN JUSTICE (Cambridge, MA: Harvard University Press); Richard A. Leo, Peter Neufeld, Steven Drizin, and Andrew Taslitz (2013), "Promoting Accuracy in the Use of Confession Evidence: An Argument for Pre-Trial Reliability Assessments to Prevent Wrongful Convictions" *Temple Law Review*, Vol. 85, Pp. 759-838; and Richard Leo, Steven Drizin, Peter

Steve Art, Esq.
Dan Stohr, Esq.
December 17, 2025
Page 40

In addition to studying the psychology of police interrogation and the correlates and causes of false confessions from the innocent, scientific researchers have also analyzed the patterns, characteristics and indicia of reliability in true and false confession cases. To evaluate the likely reliability or unreliability of an incriminating statement, admission or full confession from a suspect, scientific researchers analyze the fit between the suspect's post-admission narrative and the crime facts and/or corroborating evidence derived from the confession (*e.g.*, location of the missing murder weapon, loot from a robbery, the victim's missing clothing, etc.).[28]

The purpose of evaluating the fit between a suspect's post-admission narrative and the underlying crime facts and derivative crime evidence is to test the suspect's actual knowledge of the crime. If the suspect's post-admission narrative corroborates details only the police know, leads to new or previously undiscovered evidence of guilt, explains apparent crime fact anomalies and is corroborated by independent facts and evidence, then the suspect's post-admission narrative objectively demonstrates that he possesses the actual knowledge that would be known only by the true perpetrator and therefore may be strong evidence of guilt. If the suspect cannot provide police with the actual details of the crime, fails to accurately describe the crime scene facts, cannot lead the police to new or derivative crime evidence, and/or provides an account that contains factual errors and is disconfirmed by the independent case evidence, then the suspect's post-admission narrative demonstrates that he fails to possess the actual knowledge that would be known only by the true perpetrator and is therefore strongly consistent with innocence. Indeed, absent contamination (*i.e.*, the leaking and disclosing of non-public crime facts that cannot easily be guessed by chance), the fit between the suspect's post-admission narrative and both the crime scene facts and the derivative crime evidence therefore provides an objective basis for evaluating the likely reliability of the suspect's incriminating statements.

The well-established and widely accepted social science research principle of using the fit standard to evaluate the validity of a confession statement is also a bedrock principle of criminal investigation within law enforcement. Well-trained police detectives realize that an "I did it" statement is not necessarily evidence of guilt and may, instead, turn out to be evidence of innocence.[29] For example, in high-profile murder cases, police regularly screen out volunteered

---

Neufeld, Brad Hall and Amy Vatner (2006), "Bringing Reliability Back in: False Confessions and Legal Safeguards in the Twenty-First Century," *Wisconsin Law Review.* Vol. 2006, Pp. 479-539.

[28] *See* Richard Ofshe and Richard A. Leo (1997). "The Social Psychology of Police Interrogation: The Theory and Classification of True and False Confessions." *Studies in Law, Politics & Society*, 16, 189-251; and Richard A. Leo and Richard Ofshe (1998). "The Consequences of False Confessions: Deprivations of Liberty and Miscarriages of Justice in the Age of Psychological Interrogation" *The Journal of Criminal Law and Criminology*, 88, No. 2. at 429-496.

[29] Fred Inbau, John Reid and Joseph Buckley (1986). CRIMINAL INTERROGATION AND CONFESSIONS, 3rd Edition (Williams & Wilkins).

Steve Art, Esq.
Dan Stohr, Esq.
December 17, 2025
Page 41

confessions by seeing whether or not the person can tell the police details known only to the perpetrator or lead the police to derivative crime evidence that either corroborates, or fails to demonstrate, the person's guilty knowledge.[30] Police often keep particularly heinous or novel aspects of the crime from the press so that they can be used to demonstrate a confessor's guilty knowledge. Police sometimes deliberately include an error in media releases or allow incorrect statements to go uncorrected so that a true perpetrator will be able to demonstrate his personal knowledge of the crime. In other types of cases, police detectives regularly rely upon the fit standard to identify a true admission that might be mixed in with a collection of volunteered statements.

Using the fit standard to evaluate the validity of a suspect's incriminating statements, admissions or confessions is a bedrock principle of law enforcement because police detectives realize that seeking corroboration during the post-admission phase of interrogation is essential to proper investigative work.[31] This is because it is a fundamental principle of police investigation that true explanations can be supported and false explanations cannot be supported (assuming no contamination has occurred), and because false explanations will not fit the facts of the crime, lead to derivative evidence or be corroborated by independent evidence.

Moreover, post-admission narrative analysis and the fit standard are central to proper criminal investigation because well-trained detectives should realize that the purpose of detective work is not to clear a crime or get a conviction, but to carefully collect evidence in a way that will lead to the arrest, prosecution and conviction of the guilty while at the same time ensuring that no innocent individual is wrongly arrested, prosecuted or convicted.

A suspect's post-admission narrative therefore provides potential evidence to the unbiased, well-trained detective who is seeking to ferret out the truth. If the suspect is guilty, the collection of a detailed post-admission narrative will allow the detective to establish the suspect's guilt beyond question, both by demonstrating the suspect's actual knowledge and by corroborating the suspect's statements with derivative evidence. Properly-trained detectives realize that the strongest form of corroboration comes through the development of new evidence using a suspect's post-admission narrative. While it is not possible to verify every post-admission narrative with the crime facts, a skillful interrogator will seek as much verifiable information about the crime as he can elicit. The more verifiable information elicited from a

---

[30] *Id.*, at 173 ("The interrogator should attempt to develop information that can be corroborated by further investigation, and he should seek from the suspect full details of the crime and also about his subsequent activities. What should be sought particularly are facts that would only be known by the guilty person (*e.g.*, information regarding the location of the murder weapon or the stolen goods, the means of entry into the building, the type of accelerant used to start the fire, and the type of clothing on the victim").

[31] Fred Inbau, John Reid, Joseph Buckley and Brian Jayne (2013). CRIMINAL INTERROGATION AND CONFESSIONS, 5th Edition (Burlington, MA: Jones & Bartlett Learning) at 354-360.

41

Steve Art, Esq.
Dan Stohr, Esq.
December 17, 2025
Page 42

suspect during the post-admission period, and the better it fits with the crime facts, the more clearly the suspect demonstrates his responsibility for the crime.

If the suspect is innocent, the detective can use the suspect's post-admission narrative to establish his lack of knowledge and thus demonstrate his likely or certain innocence. Whereas a guilty suspect can corroborate his admission because of his actual knowledge of the crime, the innocent suspect cannot. The more information the interrogator seeks, the more frequently and clearly an innocent suspect will demonstrate his ignorance of the crime. His answers will turn out either to be wrong, to defy evaluation, or to be of no value for discriminating between guilt and innocence. Assuming that neither the investigator nor the media have contaminated the suspect by transferring information about the crime facts, or that the extent of contamination is known, the likelihood that his answers will be correct should be no better than chance. Absent contamination, the only time an innocent person will contribute correct information is when he makes an unlucky guess. The likelihood of an unlucky guess diminishes as the number of possible answers to an investigator's questions grows large. If, however, his answers about missing evidence are proven wrong, he cannot supply verifiable information that should be known to the perpetrator, and he inaccurately describes verifiable crime facts, then the post-admission narrative provides evidence of innocence.

This, of course, assumes that the suspect's knowledge of the crime has not been contaminated by the media, community gossip, the police or some other source with inside knowledge about crime details. If a suspect has learned unique or non-public crime facts from one of these sources, then the fact that his confession contains these details is, of course, not indicative of pre-existing knowledge or probative of guilt. This is an important point to emphasize because an innocent suspect's confession, if contaminated, will often contain both inaccurate as well as accurate crime facts—inaccurate because the innocent suspect lacks personal knowledge of the crime details, accurate because these crime details have been suggested to him by third parties or the police interrogators, even if inadvertently. This problem is discussed in detail in the following section.

## X. The Problem of Police Interrogation Contamination and Scripting[32]

---

[32] There is a substantial empirical scientific research literature on the reliability of interrogation-induced statements, admissions and/or confessions. For reviews of this literature, see: Saul Kassin (2022), DUPED: WHY INNOCENT PEOPLE CONFESS – AND WHY WE BELIEVE THEM (Latham, MD: Prometheus Books); Gisli Gudjonsson (2021) "The Science-Based Pathways to Understanding False Confessions and Wrongful Convictions," *Frontiers in Psychology*, 12, 1-15; William Woody and Krista Forrest, UNDERSTANDING POLICE INTERROGATION: CONFESSIONS AND CONSEQUENCES (New York, NY: New York University Press); Gisli Gudjonsson (2018), THE PSYCHOLOGY OF FALSE CONFESSIONS: FORTY YEARS OF SCIENCE AND PRACTICE (Hoboken, NJ: John Wiley & Sons); Saul Kassin, Hayley Cleary, Gisli Gudjonsson, Richard A. Leo, Christian Meissner, Allison Redlich and Kyle Scherr (2025), "Police-Induced Confessions, 2.0: Risk Factors and Recommendations," Law and Human Behavior, 49, 7-53: G. Daniel Lassiter and Christian Meissner (2010), POLICE INTERROGATION AND FALSE CONFESSIONS: CURRENT RESEARCH, PRACTICE AND POLICY RECOMMENDATIONS

Steve Art, Esq.
Dan Stohr, Esq.
December 17, 2025
Page 43

Police interrogation contamination (*i.e.*, leaking and disclosing non-public case facts) and police interrogation scripting (pressuring and persuading a suspect to parrot back a police-driven narrative of how and why the crime occurred) increase the risk that a confession statement may misleadingly appear to be detailed, accurate and self-corroborating.

The confession-taking process is about more than merely eliciting information from the suspect. Investigators in practice have been observed to shape the suspect's narrative to make the confession as persuasive as possible and to enhance the chances of conviction.[33] In this way, confessions are scripted or constructed by interrogators. A persuasive crime narrative requires an explanation of why the crime happened—the motives and explanations of the suspect for committing the crime. It also should contain a statement of the suspect's emotions, not only his emotions at the time of committing the crime, but also the shame, regret, or remorse the suspect now feels for having committed the crime. Interrogators are also trained to get the suspect to cleanse the interrogation process, usually by providing statements to the effect that the confession was voluntary. Interrogators will ask the suspect, usually after the suspect's resistance has been broken down and he has been made to believe that it is in his best interests to confess, whether the suspect was treated well, given food and drink, bathroom breaks, and other comforts, and whether any promises or threats were made to the suspect. Finally, and perhaps most importantly, interrogators seek to ensure that the confession contains both general and specific crime knowledge—the details of the crime that only the true perpetrator should know. One interrogation scripting technique that stands out is known as "The Error Insertion Trick,"[34] or "Error Correction Trick"[35] in which the interrogator either intentionally inserts and/or corrects minor factual or grammatical errors, and then has the suspect initial these error corrections.[36] The purpose of "The Error Insertion Trick"/"Error Correction Trick" is to create the impression of

---

(Washington, DC: American Psychological Association; Richard A. Leo (2009). "False Confessions: Causes, Consequences and Implications" *Journal of the American Academy of Psychiatry and Law*, 37, 332-343; and Richard A. Leo (2008). POLICE INTERROGATION AND AMERICAN JUSTICE (Cambridge, MA: Harvard University Press).

[33] Richard A. Leo (2008). POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press) at 165-194.

[34] Richard A. Leo (2008). *Police Interrogation and American Justice* (Harvard University Press). Pp. 175-177.

[35] Saul Kassin (2022). *Duped: Why Innocent People Confess – and Why We Believe Their Confessions* (Prometheus Press). Pp. Pp. 165-167.

[36] As the 1986 Inbau and Reid manual instructs: "It is good practice to purposely arrange for inclusion, on each page of the confession, one or two errors, such as an incorrect name of a person or street, which will be subject to later correction by the confessor when the document is read by or to him. Any such corrections, of course, should be in the confessor's own handwriting, accompanied by his initials or signature in the margin alongside the corrections." Fred Inbau, John Reid and Joseph Buckley (1986). CRIMINAL INTERROGATION AND CONFESSIONS, 3rd Ed. At 185.

Steve Art, Esq.
Dan Stohr, Esq.
December 17, 2025
Page 44

validating a confession's voluntariness, accuracy and the confessor's guilt by appearing to demonstrate his personal knowledge of the crime facts.[37]

The problem of contamination and scripting in false confession cases arises when the interrogator pressures a suspect during the post-admission narrative phase to accept a particular account of the crime story—one that usually squares with the interrogator's theory of how the crime occurred—and then suggests crime facts to the suspect, leads or directs the suspect to infer correct answers, and sometimes even suggests plausible motives for committing the crime.[38] Because they are trained to presume the guilt of those whom they interrogate, police assume that they are interrogating suspects who already know the correct crime facts. But this is not true when they are mistakenly interrogating an innocent person.

Instead, the innocent suspect is often pressured to use facts disclosed to him by his interrogators in order to construct a plausible-sounding confession and post-admission narrative. Indeed, the presence of these details in the suspect's confession falsely gives the suspect's narrative credibility and the appearance of corroboration. After police interrogators have contaminated the suspect with non-public crime facts, they often attribute "guilty knowledge" to the suspect when he repeats back and incorporates into his confession the very facts that they first educated him about. One researcher has called these contaminated details "misleading specialized knowledge."[39] In many false confession cases, police and prosecutors argue that the suspect's confession corroborates his guilt because he "knows facts only the true perpetrator would know," even though the suspect first learned these facts from his interrogators.

Researchers have found that contamination by police regularly occurs in interrogation-induced false confession cases. In a study of the first two-hundred and fifty (250) post-conviction DNA exonerations of innocent prisoners in the American criminal justice system, Professor Brandon Garrett of the University of Virginia Law School showed that this pattern was present in 95% of the false confession cases in this data set (38 of 40 cases). In other words, in the overwhelming majority of these proven false confession cases, police interrogators fed the

---

[37]  *See* Richard A. Leo (2008).  *Police Interrogation and American Justice* (Harvard University Press).  Pp. 175-177.  There is evidence that prosecutors, like police, are also trained to use the Error Insertion/Error Correction Trick.  See Mark Godsey (2017). BLIND JUSTICE: A FORMER PROSECUTOR EXPOSES THE PSYCHOLOGY AND POLITICS OF WRONGFUL CONVICTION (University of California Press) at P. 144 ("I was also told when I started as a prosecutor not to make the various witness statements *too* in line with one another. If we did, it would give the defense attorney ammunition at trial to claim that we were telling the witnesses what to say. So, we would intentionally include in our notes incorrect information supplied by the witnesses on minor points – points that didn't matter to the case – to show that we weren't coaching them.").

[38]  Richard A. Leo (2008).  POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press).

[39]  Gisli Gudjonsson (2003).  THE PSYCHOLOGY OF INTERROGATIONS AND CONFESSIONS: A HANDBOOK (John Wiley & Sons Inc.).

Steve Art, Esq.
Dan Stohr, Esq.
December 17, 2025
Page 45

suspect unique non-public facts that "only the true perpetrator would know," but the prosecutor erroneously alleged that the suspect volunteered these facts and that the suspect thereby corroborated the reliability of his confession. But because the jury in each case mistakenly believed the prosecutor rather than the defense, each of the confessors was convicted, and in each of these cases the defendant's innocence (and the falsity of the confession) was only proven many years later by DNA.[40] In a recent follow-up study more recent false confession DNA exonerations, Garrett found that another 21 of 23 (91%) were contaminated.[41]

## XI. The Interrogation and Confession Statement of David Gecht on March 2, 1999

### A) Introduction

In this section of the report, I will apply the findings of empirical social science research literature on police interrogation and false confessions to David Gecht's account of his many hours of custody and interrogation on March 2, 1999 and discuss the implications and issues that it raises, and offer my professional expert opinions and the basis for these opinions.

### B) Risk Factors for False Confession in David Gecht's Account of His Custodial Interrogation and Statement on March 2, 1999

David Gecht describes how and why, over the course of many hours of custody and interrogation on March 2, 1999, Chicago police detectives Reynaldo Guevara, Ernest Halvorsen, Alan Pergande, and Muzupappa moved him from adamant denial to confessing involvement in the murder of Roberto Cruz, a statement that Mr. Gecht has long maintained is false. In his account of the lengthy interrogation sessions on March 2, 1999, Mr. Gecht describes interrogation techniques, methods and strategies that decades of empirical social science research has shown significantly increase the risk of eliciting false, unreliable and involuntary confessions when applied to innocent suspects. These include the following.

#### 1) *Physical Coercion and Abuse*

Once common, the historical use of physical coercion by police detectives in the United States to extract confessions has been well-documented.[42] The fact that physical coercion leads

---

[40]   Brandon Garrett (2011). CONVICTING THE INNOCENT: WHERE CRIMINAL PROSECUTIONS GO WRONG (Harvard University Press).

[41]   Brandon Garrett (2015). "Contaminated Confessions Revisited" *University of Virginia Law Review*, 101, 395-454.

[42]   See Richard A. Leo (2008). POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press).

Steve Art, Esq.
Dan Stohr, Esq.
December 17, 2025
Page 46

to false and unreliable statements, admissions, and confessions is so well-established that no one – neither police nor social scientists – disputes it, and it has been prohibited by federal constitutional law that has applied to the States for more than 80 years. Police interrogation training manuals emphatically advise police never to use any physical force or intimidation whatsoever during interrogation because it is illegal, will render a confession inadmissible and universally recognized as apt to make an innocent person falsely confess. All police officers and investigators are trained that the use of physical coercion to elicit confessions during interrogation is absolutely impermissible.

According to Mr. Gecht, Detective Guevara and Pergande struck him many times and left him with a cut in his mouth and a chipped tooth. According to Mr. Gecht, Detective Pergande hit him on his shoulder, upper chest, neck, triceps, his back and several times on his head. According to Mr. Gecht, Detective Guevera punched him in the stomach, kicked him, hit him in the face and across both cheeks, his arms, back, forehead and on the side and back of his head. According to Mr. Gecht, Detective Guevara repeatedly and persistently slapped Mr. Gecht.

There is no dispute in the scientific research community or in the empirical social science research literature that physical coercion has long been regarded as a direct cause of interrogation-induced false confessions from innocent suspects. The physical coercion David Gecht describes increased the risk of eliciting false compliance and a false statement from him.

2) *Premature and Unwarranted Presumption of Guilt and Investigative Bias*[43]

The *misclassification error*, briefly discussed earlier in this report, is born of an investigative rush to judgment that leads to a premature behavioral presumption of guilt in the interrogation room. Substantial social science research has demonstrated that a behavioral presumption of guilt leads to tunnel vision, confirmation bias, and investigative bias among police investigators, who, as a result, often end up eliciting unreliable case information.[44] When investigators rush to judgment and begin with or arrive at a premature belief in the suspect's guilt, empirical studies show that they seek to build a case against an individual whose guilt they assume *a fortiori*—rather than seeking to even-handedly collect factual information and objectively evaluate independent case evidence. Under these circumstances, investigators act as if they are seeking to prove their pre-existing theories or conclusions rather than investigate a hypothesis or go where the evidence leads them. This mental framework causes investigators to

---

[43]  *See* Saul Kassin, Christine Goldstein, and Kenneth Savitsky (2003). "Behavioral Confirmation in the Interrogation Room: On the Dangers of Presuming Guilt" *Law and Human Behavior*, 27, 187-203; C. Hill, A. Memon, and P. McGeorge (2008). "The Role of Confirmation Bias in Suspect Interviews: A systematic Evaluation" *Legal & Criminological Psychology*, 13, 357-371; and Fadia Narchet, Christian Meissner, and Melissa Russano (2011). "Modeling the Influence of Investigator Bias on the Elicitation of True and False Confessions" *Law and Human Behavior*, 35, 452-465.

[44]  *See* Carol Tavris and Elliott Aronson (2015*).* MISTAKES WERE MADE (BUT NOT BY ME), (Harcourt Books).

Steve Art, Esq.
Dan Stohr, Esq.
December 17, 2025
Page 47

disregard contradictory information and evidence, selectively [mis]characterize existing information and evidence, [mis]interpret a suspect's statements and behavior to conform to the investigators' pre-existing assumptions, and to more aggressively interrogate suspects whose guilt they presume.[45] Significantly, social science research has demonstrated that an investigative rush to judgment based on premature and pre-existing presumption of guilt puts innocent suspects at an elevated risk of making or agreeing to a false statement, admission, or confession in order to satisfy overzealous investigators and put an end to the accusatory pressures of sustained police interrogation.[46] At its worst, a premature rush to judgment and pre-existing presumption of guilt demonstrates reckless disregard for the truth.

In my professional opinion, Detectives Guevara, Halverson, Pergande and Muzupappa demonstrated an extremely reckless rush to judgment and reckless disregard for the truth based on speculation rather than any logic or evidence, a premature and unwarranted presumption of Mr. Gecht's guilt, confirmation bias and tunnel vision. If one credits the account of David Gecht, Detectives Guevara, Halvorsen, Pergande and Muzupappa attempted to pin the Roberto Cruz murder on Mr. Gecht (as well as Richard Kwil and Ruben Hernandez). Other than the interrogation-induced statements of Mr. Kwil and Mr. Hernandez, both of whom have testified that they were coerced into falsely confessing after lengthy and abusive interrogations, and if we credit Colleen Miller's recantation, (which she made during the post-conviction hearing and affirmed in her civil deposition testimony) there was no evidence indicating that Mr. Gecht was in any way connected to the murder of Mr. Cruz.

In my professional opinion, based on both Mr. Gecht's description of his lengthy custodial interrogations on March 2, 1999 as well as the quality of the detectives' pre-interrogation investigation, Detectives Guevara, Halvorsen, Pergande and Muzupappa were more interested in pinning the murder of Roberto Cruz on Mr. Gecht (and Richard Kwil and Ruben Hernandez) and closing the case than finding the truth. Absent any evidence linking Mr. Gecht to the Roberto Cruz murder, there was no logical reason for Detectives Guevara, Halvorsen, Pergande and Muzupappa to suspect Mr. Gecht of having participated in or committed it. Detectives Guevara, Halvorsen, Pergande and Muzupappa presumed Mr. Gecht's guilt, and it appears that their singular goal was to set out to prove it by building a case against him based on coerced and fabricated testimonial evidence and to close the case against him as quickly as possible without regard to his actual guilt or innocence.

Detective Guevara's, Halvorsen's, Pergande's and Muzupappa's guilt-presumptive interrogation tactics increased the risk that they would overbear Mr. Gecht's will and elicit an

---

[45] *See* Saul Kassin, Christine Goldstein, and Kenneth Savitsky (2003). "Behavioral Confirmation in the Interrogation Room: On the Dangers of Presuming Guilt." *Law and Human Behavior*, 27, 187-203.

[46] Saul Kassin, Hayley Cleary, Gisli Gudjonsson, Richard A. Leo, Christian Meissner, Allison Redlich and Kyle Scherr (2025), "Police-Induced Confessions, 2.0: Risk Factors and Recommendations" *Law and Human Behavior*, 49, 7-53.

Steve Art, Esq.
Dan Stohr, Esq.
December 17, 2025
Page 48

involuntary and false statement from him. Detective Guevara's, Halverson's, Pergande's and Muzupappa's investigative approach in this case was not to treat Mr. Gecht's possible guilt as a hypothesis to be investigated and independently corroborated or proven false depending on where the evidence took them. Detectives Guevara, Halvorsen, Pergande and Muzupappa did not investigate the Roberto Cruz murder in an even-handed manner or seek to independently gather factual information to develop a theory of how and why this brutally violent crime occurred but instead began with a theory, coercively pressured and persuaded Mr. Gecht to adopt their theory over many hours of custody and interrogation, and sought to coerce Mr. Gecht into parroting it back to them so that they could quickly close the case. Detectives Guevara, Halvorsen, Pergande and Muzupappa then treated Mr. Gecht's coerced statement as evidence confirming their pre-existing theory.

As well-established social science research has repeatedly demonstrated, once an investigator rushes to judgment about a suspect's guilt, an interrogator's guilt-presumptive or truth-presumptive investigative tactics substantially increase the risk of eliciting involuntary, false and unreliable statements, admissions and/or confessions from innocent suspects. Detective Guevara's, Halvorsen's and Pergande's unwavering presumption of Mr. Gecht's guilt and confession-driven interrogation led to investigative bias, behavioral confirmation bias and tunnel vision: Detectives Guevara, Halvorsen, Pergande and Muzupappa not only refused to accept Mr. Gecht's protestations of innocence, but also viewed his interrogation-induced compliance and incriminating statements as corroboration of their belief in Mr. Gecht's guilt, as opposed to the product of their own guilt-presumptive and psychologically coercive interrogation techniques over the course of a lengthy custodial interrogation. These types of investigative and confirmation biases have been documented in many psychological studies and in cases of police-induced false confession and erroneous conviction of the innocent.[47] Detective Guevara's, Halvorsen's, Pergande's and Muzupappa's rush to judgment, premature presumption of Mr. Gecht's guilt, tunnel vision and confirmation bias increased the risk that they would elicit false compliance and a false confession statement from Mr. Gecht.

### 3) *Lengthy (Incommunicado) Interrogation, Exhaustion and Fatigue.*

The Chicago police arrested David Gecht at approximately 12:35 a.m. on March 2, 1999, and he complied with the court-reported statement, according to the document, at 12:44 p.m. on March 2, 1999. Accordingly, Mr. Gecht's period of interrogation and custody on March 2, 1999 was approximately 12 hours.

Researchers consider the length of an interrogation to include both the time that a suspect is being questioned and/or accused as well as any breaks between questioning/accusation sessions, because breaks between accusation and questioning add to the stress and fatigue of the interrogation and sometimes are used as an interrogation technique itself. It is the total amount of

---

[47]   Keith Findley and Michael Scott (2006). "The Multiple Dimensions of Tunnel Vision in Criminal Cases" *University of Wisconsin Law Review*, 291-397.

Steve Art, Esq.
Dan Stohr, Esq.
December 17, 2025
Page 49

time in custody during interrogation that matters. Some police use a technique known as "letting the suspect stew" in which they intentionally let the suspect wait in a locked interrogation room, thinking it will raise the suspect's anxiety and contribute to the softening up (what interrogators refer to as rapport-building) process that precedes interrogations.[48] Other times, police will intentionally take breaks during interrogation as part of their strategy to elicit a confession. These breaks contribute to a suspect's fatigue and exhaustion. The amount of time that David Gecht was in custody and interrogated by detectives Guevara, Halvorsen and Pergande — more than 12 hours — was very lengthy per traditional police standards existing both in 1999 and today.

Lengthy custodial detention and accusatory interrogation leads to fatigue and exhaustion, conditions that significantly increase the risk of overbearing a suspect's will and eliciting false and unreliable statements, admissions and/or confession. Lengthy interrogation/custody is a *situational* risk factor that could overbear a suspect's will and could cause a suspect to make or agree to a false confession during police interrogation.[49] Empirical studies indicate that the overwhelming majority of routine custodial interrogations last less than one hour,[50] whereas the combined time period of custody and interrogation in most interrogations leading to a false confession is more than six hours.[51] Once again, researchers count the total amount of time during interrogation when measuring the length of an interrogation and its correlates because even time for custodial breaks or questioning after an initial admission during the interrogation process can contribute to fatigue, exhaustion, depletion of mental or physical energy, learning impairments, loss of accurate memory recall, and a decrease in one's ability to concentrate and resist pressure. The 1986 Reid and Associates police interrogation training manual (which was the current edition at the time of Mr. Gecht's interrogation) specifically recommends that police interrogate for no longer than four (4) hours absent "exceptional situations" and that "most cases require considerably fewer than four hours."[52]

Lengthy detention and interrogation is a significant risk factor for false confessions because the longer an interrogation lasts, the more likely the suspect is to become fatigued and

---

[48]   Richard A. Leo (2008). POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press).

[49]   *See* Saul Kassin, Hayley Cleary, Gisli Gudjonsson, Richard A. Leo, Christian Meissner, Allison Redlich and Kyle Scherr (2025), "Police-Induced Confessions, 2.0: Risk Factors and Recommendations," Law and Human Behavior, 49, 7-53.

[50]   Richard A. Leo (1996). "Inside the Interrogation Room" Journal of Criminal Law and Criminology, 86, 266-303. *See also* Barry Feld (2013). *Kids, Cops and Confessions: Inside the Interrogation Room* (New York, NY: New York University Press).

[51]   Steven Drizin and Richard A. Leo (2004). "The Problem of False Confessions in the Post-DNA World. *North Carolina Law Review*, 82, 891-1007.

[52]   Fred Inbau, John Reid, and Joseph Buckley (1986). CRIMINAL INTERROGATION AND CONFESSIONS, 3rd Edition (Williams & Wilkins) at 310.

Steve Art, Esq.
Dan Stohr, Esq.
December 17, 2025
Page 50

depleted of the physical and psychological resources necessary to resist the pressures and stresses of accusatory interrogation,[53] especially where interrogators use psychologically aggressive, manipulative and/or coercive methods.[54] The longer custody and interrogation last, the more pressure interrogators can bring to bear on the suspect and the more techniques and strategies they may use to move the suspect from denial to admission. Lengthy interrogation, fatigue and exhaustion increase the risk that a suspect's will could be overborne and that an innocent suspect will make or agree to a false statement, admission and/or confession.

As noted above, a 12-hour period of detention/custody and interrogation is considered extraordinarily lengthy and creates the risk of exhausting, fatiguing and psychologically weakening, if not impairing, a suspect's ability to freely choose to continue participating in the interrogation. In addition, Mr. Gecht has testified that Detective Guevara and Pergande struck him many times and left him with a cut in his mouth and a chipped tooth. According to Mr. Gecht, Detective Pergande hit him on his shoulder, upper chest, neck, triceps, his back and several times on his head. According to Mr. Gecht, Detective Guevera punched him in the stomach, kicked him, hit him in the face and across both cheeks, his arms, back, forehead and on the side and back of his head. According to Mr. Gecht, Detective Guevara repeatedly and persistently slapped Mr. Gecht. All of this occurred while
e Mr. Gecht was cuffed to a ring on the wall of the interrogation room; he was yelled at; he was threatened; he was not able to sleep during the extended period of interrogation and custody; he was not offered anything to drink, provided anything to eat or allowed to go to the bathroom until the end of the 12-hour period of interrogation and custody; and that he was promised he would be able to leave the psychologically abusive interrogation and be allowed to go home if he told Detectives Guevara, Halvorsen, Pergande and Muzupappa what they wanted to hear and repeated their rehearsed false narrative to the court reporter, all of which would have added to his fatigue and exhaustion during the lengthy interrogation. As substantial empirical research supports, lengthy interrogation, as well as the fatigue, exhaustion and depletion of psychological resources it contributes to and produce, increased the likelihood that Mr. Gecht would falsely comply and provide a false statement on March 2, 1999.

### 4) *Sleep Deprivation*

Longstanding social science research has demonstrated that sleep deprivation is another significant risk factor for false confession because the more sleep deprived the suspect is, the more likely he or she is to become fatigued and depleted of the physical and psychological

---

[53]    Deborah Davis and Richard A. Leo (2012). "Interrogation Related Regulatory Decline: Ego-Depletion, Failures of Self-Regulation and the Decision to Confess" *Psychology, Public Policy and Law*, 18, 673-704.

[54]    Saul Kassin, Hayley Cleary, Gisli Gudjonsson, Richard A. Leo, Christian Meissner, Allison Redlich and Kyle Scherr (2025), "Police-Induced Confessions, 2.0: Risk Factors and Recommendations," Law and Human Behavior, 49, 7-53.

Steve Art, Esq.
Dan Stohr, Esq.
December 17, 2025
Page 51

resources necessary to resist the pressures and stresses of accusatory interrogation,[55] especially when investigators use psychologically aggressive, manipulative and/or coercive methods.[56] Sleep deprivation heightens interrogative suggestibility by impairing decision-making abilities, such as the ability to sustain attention and flexibility of thinking as well as the ability to anticipate risks and consequences, inhibit behavioral impulses and resist suggestive questioning.[57] Sleep deprivation also impairs the ability to sustain attention and flexibility in thinking and, more generally, it diminishes a suspect's ability to resist suggestive and/or coercive influences, especially the longer an interrogation lasts. Fatigue and exhaustion increase the risk that a suspect's will could be overborne and that an innocent suspect will make or agree to a false statement, admission and/or confession.

Mr. Gecht testified at deposition that he was sleep deprived because he was not permitted, and thus not able, to sleep while being subjected to the physically and psychologically coercive interrogation by detectives Guevara, Halvorsen and Pergande. As noted above, a lengthy period of detention/custody and interrogation, especially an extraordinarily lengthy one as occurred here, creates the risk of exhausting, fatiguing and psychologically weakening, thereby increasing the risk of impairing a suspect's ability to freely choose to continue participating in the interrogation. As substantial research supports, sleep deprivation and lengthy interrogation, as well as the fatigue, exhaustion and depletion of psychological resources they contribute to and produce, significantly increased the likelihood that David Gecht would make or agree to false and unreliable statements, admissions and/or confessions on during his lengthy period of custody and interrogation on March 2, 1999. The lengthy custodial interrogation of David Gecht on March 2, 1999, as well as any sleep deprivation, fatigue and exhaustion that he experienced, substantially increased the risk of eliciting a false confession from him.

### 5) *Promises and Threats*

As discussed earlier in this report, the use of implicit and/or explicit promises (for example, of leniency, immunity and/or a tangible benefit) in exchange for compliance and confession and implicit and/or explicit threats (for example, of physical harm, a higher charge, longer sentence or harsher punishment) in the absence of compliance and confession significantly increases the risk of eliciting false and/or unreliable statements, admissions, and/or

---

[55] Deborah Davis and Richard A. Leo (2012). "Interrogation Related Regulatory Decline: Ego-Depletion, Failures of Self-Regulation and the Decision to Confess" *Psychology, Public Policy and Law*, 18, 673-704.

[56] Saul Kassin, Hayley Cleary, Gisli Gudjonsson, Richard A. Leo, Christian Meissner, Allison Redlich and Kyle Scherr (2025), "Police-Induced Confessions, 2.0: Risk Factors and Recommendations," Law and Human Behavior, 49, 7-53.

[57] Mark Blagrove (1996). "Effects of length of sleep deprivation on interrogative suggestibility" *Journal of Experimental Psychology: Applied*, 2, 48-59. *See also* Stephen Frenda, Shari R. Berkowitz, Elizabeth F. Loftus, and Kimberly M. Fenn (2016). "Sleep Deprivation and False Confessions" *Proceedings of the National Academy of Sciences*, 113, 2047-2050 (February 23, 2016).

Steve Art, Esq.
Dan Stohr, Esq.
December 17, 2025
Page 52

confessions. Empirical social science research has repeatedly demonstrated that promises of leniency and threats of harm, whether implicit or explicit, are widely associated with police-induced false confession in the modern era and are believed to be among the leading causes of false confessions.[58] Threats and promises are two sides of the same coin: Every threat implies a promise (if one complies to avoid the threat) and every promise implies a threat (if one fails to comply with the promise).

According to David Gecht, Detective Guevara and Detective Pergande repeatedly slapped, beat and hit Mr. Gecht when Mr. Gecht denied the detectives' accusations, asserted his innocence and told Detective Guevara that he did not know anything about the crime. According to Mr. Gecht, the threat of ongoing physical punishment was ever present throughout the interrogation. Mr. Gecht even feared for his life because of Detective Guevara's and Detective Pergande's abuse, not knowing whether he would walk out of the interrogation room alive if he did not comply with Detective Guevara's, Detective Halvorsen, Detective Pergande and Muzupappa's demands. Mr. Gecht testified in his deposition that Detective Guevara told him the physical abuse would end, and Mr. Gecht would stop getting beaten, if Mr. Gecht signed the statement. According to Mr. Gecht, Detective Guevara also repeatedly and explicitly promised Mr. Gecht that he would be able to go home after he signed the statement, clearly implying that Mr. Gecht would not be charged with a crime if he complied with Detective Guevara's demands.

The use of explicit and implicit threats of harm (in the absence of compliance and confession) as well as explicit and implicit promises of leniency, immunity and/or a tangible benefit (in exchange for compliance and confession) significantly increases the risk of overbearing a suspect's will and eliciting an involuntary false statement, admission, and/or confession when applied to the innocent. Indeed, as empirical social science research has repeatedly demonstrated, threats of harm or harsher punishment and promises of leniency and immunity are widely associated with police-induced false confession in the modern era and are believed to be among the leading causes. There may be no psychological interrogation technique more potent than the use of threats and promises. Threats and promises (whether implied or express) are inherently coercive because they exert substantial pressure on a suspect to comply and thus can easily overbear the will or ability of a suspect to resist an interrogator's demands or requests. Like other *high-end* inducements, threats and promises contribute to creating a sense of despair and hopelessness about a suspect's perceptions of his available options during interrogation. The explicit promises and implicit threats that David Gecht describes Detectives Guevara, Halvorsen, Pergande and Muzupappa making during his many hours of custody and interrogation on March 2, 1999 increased the likelihood of eliciting false compliance and a false confession from him.

6) *Psychological Coercion*

---

[58]     Richard A. Leo (2008).  POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press).

52

Steve Art, Esq.
Dan Stohr, Esq.
December 17, 2025
Page 53

As discussed earlier, it is well-established that psychologically coercive interrogation techniques increase the risk of eliciting false and/or involuntary incriminating statements, admissions and/or confessions.[59] In my professional opinion, the interrogation described by David Gecht on March 2, 1999 was psychologically coercive for multiple reasons.

First, as just discussed, the lengthy interrogation on March 2, 1999 by Detectives Guevara, Halvorsen, Pergande and Muzapappa, as described by David Gecht, contained promises of freedom, release from custody, and leniency/immunity (not being charged with a crime) in exchange for signing the statement, as well as threats of harm (ongoing physical abuse by Detective Guevara and the others) in the absence of confession. These interrogation techniques are regarded as inherently psychologically coercive because they are so likely to overbear a suspect's will and lead to involuntary statements. Avoiding promises of leniency or freedom in exchange for compliance and confession (whether explicit or implied), and avoiding threats in the absence of compliance/confession (whether explicit or implied) are among the most fundamental prohibitions in American police interrogation,[60] second only to the prohibition against using physical violence on suspects to elicit confessions.[61] Promises and threats are psychologically coercive and thus taint the rest of an interrogation.[62]

Second, according to David Gecht, Detective Guevara's, Halvorsen's, Pergande's and Muzupappa's interrogation methods caused him to perceive that he had no meaningful choice but to comply with, and to submit to, their demands if he wished to put an end to and be released from the physically and psychologically aggressive interrogation on March 2, 1999. Mr. Gecht describes a psychologically abusive interrogation that took away his free will and in which he was made to comply involuntarily with Detective Guevara's, Halvorsen's, Pergande's and Muzupappa's demands in order to escape the lengthy, stressful and abusive interrogation that caused him to involuntarily sign a completely false court-reported statement.

---

[59]  Saul Kassin, Hayley Cleary, Gisli Gudjonsson, Richard A. Leo, Christian Meissner, Allison Redlich and Kyle Scherr (2025), "Police-Induced Confessions, 2.0: Risk Factors and Recommendations," Law and Human Behavior, 49, 7-53: Richard A. Leo (2008). POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press); Richard Ofshe and Richard A. Leo (1997). "The Social Psychology of Police Interrogation: The Theory and Classification of True and False Confessions" *Studies in Law, Politics & Society*, 16, 189-251.

[60]  Richard A. Leo (2008). POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press)

[61]  *Id.*

[62]  Saul Kassin, Steven Drizin, Thomas Grisso, Gisli Gudjonsson, Richard A. Leo and Allison Redlich (2010). "Police-Induced Confessions: Risk Factors and Recommendations" *Law and Human Behavior*, 34, 3-38; Richard A. Leo (2008). POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press); Richard Ofshe and Richard A. Leo (1997). "The Social Psychology of Police Interrogation: The Theory and Classification of True and False Confessions" *Studies in Law, Politics & Society*, 16, 189-251.

Steve Art, Esq.
Dan Stohr, Esq.
December 17, 2025
Page 54

Third, the interrogation of David Gecht was psychologically coercive because, according to Mr. Gecht, he was never provided with *Miranda* warnings prior to signing the statement and was not allowed to terminate the Detective Guevara's, Halvorsen's, Pergande's and Muzupappa's lengthy and abusive interrogation by requesting a lawyer. This was psychologically coercive because Mr. Gecht was denied the ability to exercise his free will to no longer participate in or consent to the interrogation. According to Mr. Gecht, he told Detective Guevara multiple times that he wished to terminate Detective Guevara's, Halvorsen's, Pergande's and Muzupappa's lengthy and abusive interrogation by requesting a lawyer, even though Mr. Gecht testified that he was never provided *Miranda* rights prior to the taped recap with ASA Maguire on March 2, 1999, many hours after his interrogation had begun. In his deposition, Mr. Gecht testified that he asked not only for a lawyer (and thereby terminate the interrogation), but also asked to speak to his mother two times and was denied that request as well.

In sum, David Gecht's description of his interrogation on March 2, 1999 by Detectives Guevara, Halvorsen, Pergande and Muzupappa was psychologically coercive for multiple reasons leading to involuntary compliance and an involuntary statement. Psychologically coercive interrogation pressures and techniques substantially increase the risk that an innocent person will be forced against their will to make and/or agree to false and unreliable statements, admissions and/or confessions. The psychologically coercive and abusive interrogation pressures that Mr. Gecht describes being subjected to from Detectives Guevara, Halvorsen, Pergande and Muzupappa during his lengthy interrogation on March 2, 1999 increased his risk of falsely complying with their demands and, as a result, agreeing to and signing a statement that was completely false.

7) *Personality Traits as Risk Factors for False and/or Involuntary Confessions*

In addition to the *situational* risk factors described in Mr. Gecht's account, Mr. Gecht, who was 18 years old at the time of his lengthy custody interrogation on March 2, 1999, was at a heightened risk of making and/or agreeing to a false and/or unreliable statement because of his personality traits and characteristics (*i.e.*, *personal* risk factors), specifically his relative youth.

Youth is a risk factor for false confession because of the psychological immaturity and impulsivity that is associated with the development of the adolescent brain and its effect on juveniles' judgement and decision-making. In the last two decades, substantial neurological research has confirmed that the adolescent brain continues to develop beyond the age of 18 and into the mid-20s, blurring the line, for psychological purposes, between juveniles and young adults through their mid-20s. Juveniles and young adults are disproportionately represented in the reported false confession cases, as has been well-documented by scholars[63] and in the

---

[63]  Steven Drizin and Richard A. Leo (2004). "The Problem of False Confessions in the Post-DNA World" *North Carolina Law Review*, 82, 891-1007.

Steve Art, Esq.
Dan Stohr, Esq.
December 17, 2025
Page 55

National Registry of Exonerations.[64] They are particularly vulnerable to the pressures of psychological interrogation. Adolescence is associated not only with psychological traits such as greater psychosocial immaturity and impulsiveness, but also higher suggestibility and emotional arousability, poor decision-making, higher trust of authority figures, increased gullibility and a tendency to focus on the present rather than the future. As a result, juveniles and young adults tend to be more easily led and manipulated than adults beyond the age of 25; more naïve, gullible and suggestible; more compliant, submissive and obedient to authority; more conflict averse; more likely to engage in risky behaviors; less capable of considering long term consequences. These psychological tendencies of youth significantly increase the risk of false statements, admissions and /or confessions from juveniles and young adults. The risks are compounded by the fact that although police officers may realize that youthful suspects are easily influenced, interrogators often apply the same interrogations tactics on juveniles and young adults that they use on fully developed and older adults, as occurred during the interrogation of March 2, 1999.

All other things being equal, the empirical research would predict that it would take far less time for police interrogators to break an innocent juvenile or young adult suspect and move him from denial to admission than a fully developed adult. Because of his relative youth, Mr. Gecht was at an increased risk of making or agreeing to false statements, admissions and/or confessions in response to police interrogation pressures, especially in response to the physically and psychologically coercive pressures that Mr. Gecht describes occurring during his interrogation on March 2, 1999.

### C) Police Interrogation Contamination and Scripting: Fabricating David Gecht's Statement

As mentioned earlier, police interrogators are trained to refrain from contaminating a suspect by leaking or disclosing non-public case facts to him or her but, instead, to hold back unique case information and let the suspect volunteer case details in order to demonstrate inside knowledge of the crime details to corroborate the accuracy of any incriminating statements. The absence of contamination allows police to verify the accuracy of reliable confessions, but the presence of contamination prevents police from corroborating confessions that are true and makes confessions that are false misleadingly appear true (because they contain non-public crime scene details suggested by the interrogators, and repeated by the suspect, but police and prosecutors assert that they were volunteered by the suspect). Though police interrogation contamination may be inadvertent rather than intentional, it can make otherwise completely false confessions appear not only to be true but persuasively so.[65]

---

[64] *See National Registry of Exonerations*, http://www.law.umich.edu/special/exoneration/Pages/about.aspx (last accessed July 14, 2024).

[65] Richard A. Leo (2008). POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press).

Steve Art, Esq.
Dan Stohr, Esq.
December 17, 2025
Page 56

Related to contamination, police investigators sometimes "script" a suspect's confession by not only providing the suspect with details of the crime, but also by coaching, directing and/or leading the suspect to adopt a specific police-driven narrative of how and why he or she must have committed the crime. This is problematic when police are interrogating a suspect because, after all, the whole point of police interrogation should be to get a truthful account from the person who committed the crime, as opposed to pressuring and persuading the suspect to regurgitate back to the investigators what they want to believe occurred. Like contamination, scripting can make otherwise completely false confessions appear not only to be true but persuasively so.[66] Interrogators sometimes seek to shape and edit the suspect's narrative in order to incriminate the suspect and build a more specific case against him or her that will ensure conviction. To do so, interrogators usually try to elicit an account that is consistent with their theory of the crime. If the suspect's narrative does not fit the interrogators' pre-existing expectations about how and why the suspect must have committed the crime, interrogators continue to interrogate the suspect, often correcting and educating the suspect while pressuring and persuading him or her to adopt the interrogators' scripted version of what they believe must have happened to cause the crime and why.[67] The problem with scripting is that it is truth-presumptive and replaces what should be an investigative function (seeking the truth) with a prosecutorial function (making a case against a suspect whose guilt and guilty knowledge they presume). Instead of pursuing truthful information from someone who knows what occurred, by scripting investigators are seeking to create evidence that confirms their pre-existing assumptions, speculations, beliefs and/or theories. Just as police interrogation contamination can make otherwise completely false confessions appear not only to be true but persuasively so,[68] the same is true of police interrogation scripting.[69]

Without a recording of the interrogation, it is usually not possible to know with complete certainty whether non-public crime facts in a suspect's statement originated with the suspect or originated with police interrogators who already knew those facts and suggested them to the suspect, who then parroted them back in a statement. According to Mr. Gecht, he did not know anything about the Roberto Cruz murder prior to his interrogation by Detectives Guevara, Halvorsen, Pergande and Muzupappa on March 2,1999, but instead learned everything about the case from Detectives Guevara and Halvorsen, as well as their theory that they wanted him to parrot back. In Mr. Gecht's account of the lengthy unrecorded interrogation on March 2, 1999, Detective Guevara repeatedly fed Mr. Gecht facts about the crime and coercively scripted Mr. Gecht's statement, first pressuring him to accept the role of the shooter, then the role of the getaway driver and finally the role of the lookout. Detectives Guevara then provided ASA

---

[66]    *Id.*

[67]    *Id.*

[68]    *Id.*

[69]    *Id.*

Steve Art, Esq.
Dan Stohr, Esq.
December 17, 2025
Page 57

Brendan Maguire with their false version of Mr. Gecht's alleged role in the Roberto Cruz murder. According to Mr. Gecht, Detectives Guevara and Halvorsen showed Mr. Gecht pictures and told him, among other things, that Richard Kwil and Ruben Hernandez were allegedly involved in the crime; what the car looked like; that a tire was flattened; that the car was a rental car; and what color it was. The detectives also filled in their theory of the crime, and Mr. Hernandez's alleged involvement, but telling him what he was allegedly wearing; where he allegedly had the gun; how far away he was when he allegedly started shooting at the victim; where he put the gun after he shot the victim; and where his co-defendants were allegedly waiting for him.

As mentioned earlier in the report, one scripting technique that police interrogators use is known as "The Error Insertion/Error Correction Trick," in which the interrogator either intentionally inserts and/or corrects minor factual or grammatical errors, and then has the suspect initial these error corrections. According to Mr. Gecht, he corrected the trivial errors in his statement that he was directed to correct. Mr. Gecht's statement contains numerous corrections that were initialed by Mr. Gecht, and has testified that he did not make any of those changes to his statement. In my professional opinion, the logical inference from these facts is that Detective Guevara and Detective Halvorsen scripted these corrected error insertions. As mentioned earlier in this report, the purpose of "The Error Insertion/Correction Trick" is to create the impression of validating a confession's voluntariness, accuracy and the confessor's guilt by appearing to demonstrate his personal knowledge of the crime facts.[70]

Police interrogation contamination and scripting are not so much a risk factor for eliciting a confession as a process that makes an otherwise false statement appear to be true. Police interrogation contamination and scripting make false confessions appear true, and persuasively true, because the innocent suspect's confession is said to contain "details that only the true perpetrator would know" (erroneously since the details were supplied by the police), and it contains characteristics that most people associate with a true confession (*e.g.*, a story line, motive, explanation, emotions and an attribution of voluntariness), even though it is completely false.[71] Police interrogation contamination and scripting therefore increase the risk that once a suspect has falsely complied or falsely confessed to a crime he or she did not commit, third parties—such as prosecutors, judges, juries, the media and outside observers—will mistakenly

---

[70] *See* Richard A. Leo (2008). *Police Interrogation and American Justice* (Harvard University Press). Pp. 175-177. There is evidence that prosecutors, like police, are also trained to use the Error Insertion/Error Correction Trick. See Mark Godsey (2017). BLIND JUSTICE: A FORMER PROSECUTOR EXPOSES THE PSYCHOLOGY AND POLITICS OF WRONGFUL CONVICTION (University of California Press) at P. 144 ("I was also told when I started as a prosecutor not to make the various witness statements *too* in line with one another. If we did, it would give the defense attorney ammunition at trial to claim that we were telling the witnesses what to say. So we would intentionally include in our notes incorrect information supplied by the witnesses on minor points – points that didn't matter to the case – to show that we weren't coaching them.").

[71] Richard A. Leo (2008). POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press).

Steve Art, Esq.
Dan Stohr, Esq.
December 17, 2025
Page 58

believe that the statement is self-corroborating and therefore true and accurate. Detective Guevara's and Detective Halvorsen's interrogation contamination and scripting in this case did not increase the risk that Mr. Gecht would make or agree to a false confession as much as it increased the risk that his statement would cause third parties to erroneously believe that it contained indicia of reliability, and thus that it appeared corroborated, and as a result erroneously convict him. As described earlier, confession evidence, even when false, is extremely persuasive to third parties such as juries,[72] especially when it contains crime facts and a plausible confession narrative.

**D) Violation of National Police Interrogation Training Standards,
Protocols and Commonly Accepted Best Practices in 1999**

In David Gecht's account of his more than 12 hours of custody and interrogation on March 2, 1999, Detectives Guevara, Halvorsen, Pergande, and Muzupappa *repeatedly* violated numerous national police interrogation standards, protocols and commonly accepted practices in general as they existed in 1999.

First, American police investigators are universally trained to absolutely avoid the use of physical force and coercion in the interrogation room, which is unlawful, unconstitutional and correctly believed by law enforcement to lead to both involuntary and false confessions. As discussed above, David Gecht describes the use of physical assault by Detectives Guevara and Pergande over the course of his interrogation on March 2, 1999. According to Mr. Gecht, Detective Guevara and Pergande struck him many times: Detective Pergande hit him on his shoulder, upper chest, neck, triceps, his back and several times on his head. According to Mr. Gecht, Detective Guevera punched him in the stomach, kicked him, hit him in the face and across both cheeks, his arms, back, forehead and on the side and back of his head. According to Mr. Gecht, Detective Guevara repeatedly and persistently slapped Mr. Gecht.

Physically coercive interrogation has not only been a violation of universal American police interrogation standards since 1936, but is also illegal as all police detectives knew in 1999 and know today. As the 1986 Reid interrogation manual (which was the current edition of the leading American police interrogation training manual in 1999) instructs:

> "The clearest example of an interrogation practice that will void a confession is the infliction of physical force or pain upon the person under interrogation, because it is an uncontestable fact that harm of this nature may produce a confession of guilt from an innocent person...A threat of physical harm may have a similar effect – the extraction of confessions from innocent persons. Similarly, an interrogator's promise to a suspect that

---

[72]   See William Douglas Woody and Krista D. Forrest (2020). UNDERSTANDING POLICE INTERROGATION: CONFESSIONS AND CONSEQUENCES (New York University Press).

Steve Art, Esq.
Dan Stohr, Esq.
December 17, 2025
Page 59

if he confesses he will go free or receive only a lenient penalty will nullify the confession because such a promise may induce an innocent person to confess."[73]

Second, American police investigators are trained generally to avoid promises of leniency (whether explicit or implicit) and threats of harm (whether explicit or implicit) to elicit statements, admissions and/or confessions because threats and promises are understood by law enforcement to be psychologically coercive and thus to lead to involuntary and/or false confessions. As the 1986 Inbau and Reid police interrogation training manual (which was the current edition in 1999) taught police interrogators at the time with respect to threats and promises:

"Under no circumstances should the interrogator point out any of the possible consequences of a confession, nor should he hold out any inducement whatsoever."[74]

Elsewhere, 1986 Inbau and Reid interrogation manual instructs:

"The clearest example of an interrogation practice that will void a confession is the infliction of physical force or pain upon the person under interrogation, because it is an uncontestable fact that harm of this nature may produce a confession of guilt from an innocent person…A threat of physical harm may have a similar effect – the extraction of confessions from innocent persons. Similarly, an interrogator's promise to a suspect that if he confesses he will go free or receive only a lenient penalty will nullify the confession because such a promise may induce an innocent person to confess."[75]

As discussed above, David Gecht describes explicit threats (in the absence of compliance and confession) by Detective Guevara during his lengthy custodial interrogation on March 2, 1999. Mr. Gecht also describes promises of leniency, freedom and immunity from prosecution by Detective Guevara in exchange for regurgitating Detective Guevera, Halvorsen and Pergande's crime narrative and signing the court-reported statement. According to Mr. Gecht, the threat of ongoing physical punishment was ever present throughout the interrogation. Mr. Gecht even feared for his life because of Detective Guevara's abuse, not knowing whether he would walk out of the interrogation room alive if he did not comply with Detective Guevara's demands. "I was scared. I was afraid that if I didn't do what he told me to do that I would not be able to go home like he promised and that I would not walk out of that place alive" (Transcript of Deposition of David Gecht, Page 356). Mr. Gecht testified in his deposition that Detective Guevara told him the physical abuse would end, and Mr. Gecht would stop getting beaten, if Mr.

---

[73]  *Id*. at 214.

[74]  Fred Inbau, John Reid, and Joseph Buckley (1986). CRIMINAL INTERROGATION AND CONFESSIONS, 3rd Ed. (Baltimore: Williams & Wilkins) at 198.

[75]  *Id*. at 214.

59

Steve Art, Esq.
Dan Stohr, Esq.
December 17, 2025
Page 60

Gecht signed the statement. According to Mr. Gecht, Detective Guevara also repeatedly and explicitly promised Mr. Gecht that he would be able to go home after he signed the statement, clearly implying that Mr. Gecht would not be charged with a crime if he complied with Detective Guevara's demands The numerous promises and threats that Mr. Gecht describes occurring during his lengthy interrogation on March 2, 1999 were unlawful and violated universal American police interrogation standards as they existed in 1999.

Third, Detectives Guevara, Halvorsen, Pergande and Muzupappa violated commonly accepted standards with respect to the length of David Gecht's police detention and interrogation on March 2, 1999. As discussed earlier, the 1986 Reid and Associates police interrogation training manual (the current edition of the Reid interrogation training manual in 1999 specifically recommends that police interrogate suspects for no longer than four (4) hours absent "exceptional situations" and that "most cases require considerably fewer than four hours."[76] In addition, the 1986 Reid interrogation training manual characterized "unduly prolonged, continuous interrogation, especially by two or more interrogators working in relays"[77] for "an unreasonable period of time"[78] as "indirect physical harm"[79] and advised against this practice because it may it may "produce a confession of guilt from an innocent person"[80]:

> "This [an interrogation practice that will void a confession] is also true as regards indirect physical harm; for instance, an unduly prolonged, continuous interrogation, especially by two or more interrogators working in relays, or the deprivation of food, water, or access to the toilet facilities for an unreasonable period of time."[81]

The more 12 hours of custodial detention and interrogation that Detectives Guevara, Halvorsen and Pergande subjected Mr. Gecht to on March 2, 1999 violated American police interrogation standards and commonly accepted best practices as they existed in 1999.

Fourth, and related, American police are trained never to deprive a suspect of essential necessities such as sleep or rest, food, drink, or access to the restroom during interrogation because that is also unconstitutional and is recognized by law enforcement to lead to coerced, involuntary and/or false confessions. As discussed earlier in this report, Mr. Gecht describes being intentionally sleep deprived during his lengthy custodial interrogation on March 2, 1999.

---

[76] *Id*. at 310.

[77] *Id*. at 214.

[78] *Id*.

[79] *Id*.

[80] *Id*.

[81] *Id*.

Steve Art, Esq.
Dan Stohr, Esq.
December 17, 2025
Page 61

The intentional sleep deprivation that Mr. Gecht describes violated American police interrogation standards and commonly accepted practices as they existed in 1999. Mr. Gecht also describes that he was not provided anything to eat or drink during his many hours of custody and interrogation on March 2, 1999 until after he signed the court-reported statement. This too violated American police interrogation standards and commonly accepted practices as they existed in 1999.

Fifth, as described above, American police interrogators are trained to avoid contaminating a suspect by leaking or disclosing non-public case facts to him or her but, instead, to hold back unique case information and let the suspect volunteer case details in order to demonstrate inside knowledge of the crime details to corroborate the accuracy of any incriminating statements. According to Mr. Gecht, he did not know anything about the Roberto Cruz murder prior to his interrogation by Detectives Guevara, Halvorsen, Pergande and Muzupappa on March 2,1999, but instead learned everything about the case from Detectives Guevara and Halvorsen, as well as their theory that they wanted him to parrot back. In Mr. Gecht's account of the lengthy unrecorded interrogation on March 2, 1999, Detective Guevara repeatedly fed Mr. Gecht facts about the crime and coercively scripted Mr. Gecht's statement, first pressuring him to accept the role of the shooter, then the role of the getaway driver and finally the role of the lookout. Detectives Guevara then provided ASA Brendan Maguire with their false version of Mr. Gecht's alleged role in the Roberto Cruz murder. According to Mr. Gecht, Detectives Guevara and Halvorsen showed Mr. Gecht pictures and told him, among other things, that Richard Kwil and Ruben Hernandez were allegedly involved in the crime; what the car looked like; that a tire was flattened; that the car was a rental car; and what color it was. The detectives also filled in their theory of the crime, and Mr. Hernandez's alleged involvement, but telling him what he was allegedly wearing; where he allegedly had the gun; how far away he was when he allegedly started shooting at the victim; where he put the gun after he shot the victim; and where his co-defendants were allegedly waiting for him. Detective Guevara's and Halvorsen's contamination and scripting of David Gecht's statement violated American police interrogation standards and commonly accepted practices as they existed in 1999.

Sixth, David Gecht has testified that he was not provided *Miranda* rights prior to signing the court-reported statement, and that the interrogation was not terminated when he asserted his right to counsel by requesting an attorney. All police officers and detectives have been trained to provide proper *Miranda* warnings, and elicit a proper *Miranda* waiver, prior to commencing custodial interrogation. This was as true in 1999 as it is today. Yet Detectives Guevara, Halvorsen and Pergande completely disregarded the law and their training when they interrogated Mr. Gecht on March 2, 1999. Detectives Guevara's, Halvorsen's, Pergande's and Muzupappa's failure to provide Mr. Gecht with *Miranda* warnings, and elicit a *Miranda* waiver, was a fundamental violation of commonly accepted standard police interrogation practices as they existed in 1999. In addition, they completely disregarded the law and their training when they failed to terminate the interrogation after David Hecht invoked his right to counsel by requesting an attorney. This too was a fundamental violation of commonly accepted standard police interrogation practices as they existed in 1999.

61

Steve Art, Esq.
Dan Stohr, Esq.
December 17, 2025
Page 62

Seventh, and finally, the Reid and Associates training manuals and programs have always — from the first edition of their manual in 1942 to the current edition in 2013 — repeatedly implored police investigators not to use any interrogation technique that is "apt to make an innocent person confess."[82] Yet, according to David Gecht's description of what occurred during his lengthy detention and interrogation on March 2, 1999, Detectives Guevara, Halvorsen and Pergande used several techniques that the Reid Manual specifically teaches investigators to avoid because they are apt to cause a false confession: (1) physical coercion; (2) promises of leniency; (3) threats of harm; and (4) sleep deprivation and deprivation of water and food. Because the use of these interrogation techniques are well-known to be apt to cause an innocent suspect to confess, as the Reid manual of interrogation has always maintained, Detectives Guevara, Halvorsen and Pergande violated national training standards and commonly accepted practices as they existed in 1999 during David Gecht's interrogations on March 2, 1999.

In short, according to David Gecht's account of his interrogation on March 2, 1999, Detectives Guevara, Halvorsen, Pergande and Muzupappa coercively interrogated him and repeatedly violated numerous national police interrogation standards, protocols and commonly accepted best practices as they existed in 1999. In my professional opinion, on Mr. Gecht's account, these violations individually and cumulatively would have contributed to Mr. Gecht's perception that his situation was hopeless and that he had no meaningful choice but to sign the court-reported statement in order to finally put an end to the physically and psychologically coercive interrogation.

### E) Indicia of Unreliability in David Gecht's Court-Reported Statement on March 2, 1999

David Gecht's confession does not bear any of the traditional indicia of reliability that researchers and experts use to assess confession evidence: it is not supported or corroborated by any physical, forensic, medical or other credible independent evidence; it did not lead to new or missing evidence; it did not contain any corroborable non-public case facts that only the true perpetrator, but not the police investigators, knew; and it is inconsistent with and contradicted by numerous other case facts, logic and evidence. There is no reliable evidence linking David Gecht to the Roberto Cruz murder. Mr. Gecht has consistently maintained that his statement is false and was the product of extreme physical and psychological coercion, as detailed above.

The numerous indicia of unreliability include:

- There is no physical, scientific or forensic evidence linking Mr. Gecht to the Roberto Cruz murder;

---

[82] *See* Fred Inbau, John Reid, and Joseph Buckley (1986). CRIMINAL INTERROGATION AND CONFESSIONS, 3rd Edition at xiv (Williams & Wilkins).

Steve Art, Esq.
Dan Stohr, Esq.
December 17, 2025
Page 63

- Colleen Miller has recanted her statement that Mr. Gecht had confessed to her about the murder as false and the product of coercion, fear and threats by Detectives Guevara and Halvorsen that she would be charged as an accessory to the murder of Ruben Cruz, that her baby would be born in jail and taken to her if she did not falsely implicate David Gecht in the murder of Roberto Cruz;

- Richard Kwil and Ruben Hernandez have recanted their statements implicating Mr. Gecht as coerced and completely false;

- David Gecht did not match the description of the two men described by a bouncer angrily arguing with Mr. Curz shortly before his death (one of whom was described as Latin or Black and 350 pounds, the other was described as 5'7 and 250 pounds (Mr. Gecht is white and was approximately 5'5 and 140 pounds at the time;

- Nor did Mr. Gecht match the description of an anonymous caller to the Chicago police telling the police that two me bragged that they shot Mr. Cruz because he owed one of them $6,000, one of whom as described as 6'3 and 215 pounds; and

- Detective Guevara has invoked the Fifth Amendment in this and numerous other cases in which he has been accused of using extreme physical and psychological coercion to extract false confessions of guilt, creating the inference[83] that a truthful answer may subject him to criminal prosecution; and Detective Guevara had an established pattern and practice of coercing false and fabricated confessions from Black and Latino men in homicide cases, as will be discussed in greater detail later in this report.

In short, David Gecht's interrogation-induced statement bears numerous indicia and hallmarks of unreliability, and contains no hallmarks or indicia of reliability. A hallmark or indicia of reliability is evidence that corroborates either a suspect's knowledge of non-public crime facts not likely guessed by chance (absent contamination) or scientific, medical or physical evidence that corroborates the statement or leads to new, missing or derivative case evidence. With the recantations by Richard Kwil and Ruben Hernandez, and if we credit the recantation of Colleen Miller, there is no evidence that corroborates Mr. Gecht's interrogation-induced statement. In addition, Mr. Gecht did not supply corroborable non-public facts that only the true perpetrator (and not the police) would know, but instead has testified that he signed a court-

---

[83] "In two cases involving Detective Guevara, the Illinois Court of Appeals ruled that it is appropriate for trial courts to draw adverse inferences when police invoke the Fifth Amendment in post-conviction proceedings. *People v. Montanez*, 404 Ill. Dec. 218, 55 N.E.3d 692 (2016) and *People v Serrano*, 404 Ill. Dec. 189, 55 N.E.3d 285 (2016). See Post-Conviction Petition For Relief from Trial Court Constitutional Violations on Behalf of an Actually Innocent Petitioner, *State of Illinois v. Alfredo Gonzalez* at 27.

Steve Art, Esq.
Dan Stohr, Esq.
December 17, 2025
Page 64

written statement, and that he was told that he would be released from the lengthy and psychologically abusive interrogation and be allowed to go home. All of this indicates that Mr. Gecht's statement was more likely, if not certainly, the involuntary product of coercive and improper police interrogation methods and pressures than a reliable or trustworthy piece of evidence of criminal guilt.

### XIV. The Interrogation and Statement of Richard Kwil on March 1-2, 1999

As with David Gecht, Richard Kwil also describes how and why, over the course of a lengthy custody and interrogation on March 1-2, 1999, Chicago police detectives Reynaldo Guevara and Ernest Halvorsen moved him from adamant denial to signing a court-reported statement confessing involvement in the murder of Roberto Cruz, a statement that Mr. Kwil has also long maintained was the product of psychological coercion and is false. In his account of his lengthy interrogation on March 1-2, 1999, Mr. Kwil describes interrogation techniques, methods and strategies that decades of empirical social science research has shown significantly increase the risk of eliciting false, unreliable and involuntary confessions when applied to innocent suspects. These included:

1. *Premature and Unwarranted Presumption of Guilt and Guilty Knowledge.* There was no reason at all for police to suspect that Richard Kwil had been involved in the murder of Roberto Cruz. Detectives Guevara, Halvorsen, Pergande and Muzupappa and other Chicago police officers failed to do any meaningful investigation into Mr. Kwil's possible alleged role as a participant in the crime. Instead, the detectives presumed Mr. Kwil's guilt in the absence of any evidence supporting their theory, and then set out to prove their pre-existing speculations. According to Richard Kwil, Detective Guevara psychologically coerced Mr. Kwil to stop denying his involvement in the murder and ultimately submit to the will of Detective Guevara and agree to a signing a court-reported statement, implicating himself, David Gecht and Ruben Hernandez in the Roberto Cruz murder, that Mr. Kwil maintains is completely false and was fabricated by Detectives Guevara, Halvorsen, Pergande and Muzupappa. In my professional opinion, in his investigation of Mr. Kwil, Detectives Guevara, Halvorsen, Pergande and Muzupappa demonstrated a premature and unwarranted presumption of guilt as well as confirmation bias and tunnel vision (since there was no evidence suggesting Mr. Kwil's possible involvement and nevertheless Detectives Guevara, Halvorsen, Pergande and Muzupappa aggressively pursued a confession), and a reckless disregard for the truth, all of which increased the risk of eliciting false and unreliable statements, admissions and/or confessions from Mr. Kwil.

2. *Lengthy (Incommunicado) Interrogation, Exhaustion and Fatigue.* Based on the materials I reviewed, Mr. Kwil was held in police custody and interrogated for more than 11 hours on March 1-2, 1999 (he was arrested at 11:00 p.m. on March 1 and signed the court-reported statement at 10:35 a.m. on March 2). As discussed earlier, lengthy custodial detention and accusatory interrogation leads to fatigue and exhaustion, especially if the interrogation is

Steve Art, Esq.
Dan Stohr, Esq.
December 17, 2025
Page 65

psychologically coercive as in Mr. Kwil's account. In my professional opinion, Detective Guevara's and Halvorsen's 11-hour custodial interrogation of Richard Kwil on March 1-2, 1999 increased the risk of overpowering and overbearing Mr. Kwil's will and eliciting an involuntary, false and unreliable statement from him.

3. *Sleep Deprivation (and Other Deprivations)*. As mentioned earlier, longstanding social science research has demonstrated that sleep deprivation is another significant risk factor for false confession because the more sleep deprived the suspect is, the more likely he or she is to become fatigued and depleted of the physical and psychological resources necessary to resist the pressures and stresses of accusatory interrogation,[84] especially when investigators use psychologically aggressive, manipulative and/or coercive methods,[85] and thus the more suggestible the suspect becomes and the more likely that his decision-making abilities will be impaired.[86]

Mr. Kwil has testified that Detectives Guevara and Halvorsen intentionally kept him from sleeping during his overnight 11-hour period of custody and interrogation, the entirety of which Mr. Kwil has testified that his right hand was handcuffed to a ring in the wall in the interrogation room. Mr. Kwil testified that the detectives kept coming in and out of the interrogation room; that they would slam the door loudly, which would jolt him and keep him awake; and that they would slam a brown bag by his head. In addition, Mr. Kwil testified that in his deposition that he did not recall being provided water or a bathroom break until the end of his 11-hour interrogation on March 1-2, 1999. As noted above, a lengthy period of detention/custody and interrogation creates the risk of exhausting, fatiguing and psychologically weakening the suspect's will to resist, thereby increasing the risk of impairing a suspect's ability to freely choose to continue participating in the interrogation. The lengthy custodial interrogation of Richard Kwil, as well his sleep and other deprivations – combined with the psychologically coercive interrogation practices he described – and his resulting fatigue and exhaustion, increased the risk of eliciting false compliance and a false confession statement from him.

4. *False and Exaggerated Evidence Ploys*. Police interrogators routinely tell criminal suspects that the evidence establishes their guilt: If police possess real evidence, this is called a true evidence ploy. If police are making up, lying about, or exaggerating non-existent evidence,

---

[84] Deborah Davis and Richard A. Leo (2012). "Interrogation Related Regulatory Decline: Ego-Depletion, Failures of Self-Regulation and the Decision to Confess" *Psychology, Public Policy and Law*, 18, 673-704.

[85] Saul Kassin, Hayley Cleary, Gisli Gudjonsson, Richard A. Leo, Christian Meissner, Allison Redlich and Kyle Scherr (2025), "Police-Induced Confessions, 2.0: Risk Factors and Recommendations" *Law and Human Behavior*, 49, 7-53.

[86] Mark Blagrove (1996). "Effects of length of sleep deprivation on interrogative suggestibility" *Journal of Experimental Psychology: Applied*, 2, 48-59. *See also* Stephen Frenda, Shari R. Berkowitz, Elizabeth F. Loftus, and Kimberly M. Fenn (2016). "Sleep Deprivation and False Confessions" *Proceedings of the National Academy of Sciences*, 113, 2047-2050 (February 23, 2016).

65

Steve Art, Esq.
Dan Stohr, Esq.
December 17, 2025
Page 66

this is called a false evidence ploy. The social science research literature has demonstrated that false evidence ploys are potentially psychologically coercive techniques that are virtually always present in, and substantially likely to increase the risk of eliciting, false statements, admissions, and/or confessions. False evidence ploys are among the most well-documented *situational* risk factors for eliciting false and unreliable statements, admissions, and/or confessions, as described in the social science research literature.[87] The use of false evidence ploys can create or contribute to the suspect's perception that he is trapped, there is no way out, and/or that his conviction will be inevitable. False evidence ploys can lead the suspect to perceive that he is in a hopeless situation and thus has little choice but to agree to or negotiate the best available outcome or mitigation of punishment given the perceived, subjective reality of his situation.

According to Mr. Kwil, Detective Guevara lied when he told Mr. Kwil that he had witnesses that put Mr. Kwil at the scene of the crime. As a century of basic psychological research on misinformation effects has shown[88] (as well as decades of applied psychological research on police lying to suspects during interrogation)[89] false evidence ploys are effective at eliciting compliance,[90] confusing some suspects into believing that they have been framed or that such evidence really does exist,[91] causing some suspects to doubt themselves (deferring to interrogators' authoritative assertions of irrefutable evidence despite knowing they did not commit a crime),[92] and even causing some suspects to develop false beliefs and/or memories of committing crimes.[93] Based on well-established basic and applied social scientific research going back decades, Detective Guevara's false evidence ploy in his interrogation of Richard Kwil on March 1-2, 1999 increased the risk of eliciting a false and unreliable confession from him by

---

[87]  Saul Kassin, Hayley Cleary, Gisli Gudjonsson, Richard A. Leo, Christian Meissner, Allison Redlich and Kyle Scherr (2025), "Police-Induced Confessions, 2.0: Risk Factors and Recommendations," Law and Human Behavior, 49, 7-53.

[88]  Elizabeth Loftus (2005). "Planting Misinformation in the Human Mind: A 30 Year Investigation of the Malleability of Memory" *Learning & Memory*, 12, 361-366.

[89]  Saul Kassin, Steven Drizin, Thomas Grisso, Gisli Gudjonsson, Richard A. Leo and Allison Redlich (2010). "Police Induced Confessions: Risk Factors and Recommendations" *Law and Human Behavior*, 34, 3-38.

[90]  Richard A. Leo (2008). POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press)

[91]  Richard Ofshe and Richard A. Leo (1997). "The Social Psychology of Police Interrogation: The Theory and Classification of True and False Confessions." *Studies in Law, Politics & Society*, 16, 189-251.

[92]  Richard Ofshe and Richard A. Leo (1997). "The Social Psychology of Police Interrogation: The Theory and Classification of True and False Confessions." *Studies in Law, Politics & Society*, 16, 189-251.

[93]  Richard A. Leo (2008). POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press). *See also* Deborah Wright, Kimberly Wade and Derrick Watson (2013). "Delay and Déjà Vu: Timing and Repetition Increase the Power of False Evidence" *Psychonomic Bulletin Review*, 20, 812-818; Julia Shaw and Don Read (2015). "Constructing Rich False Memories of Committing Crime" *Psychological Science*, 291-301; and Julia Shaw (2016). THE MEMORY ILLUSION (Random House).

Steve Art, Esq.
Dan Stohr, Esq.
December 17, 2025
Page 67

contributing to the sense of hopelessness and despair that often precedes the elicitation of a false confession.[94]

5. *Threats of Harm and Promises of Leniency*. According to Mr. Kwil, he was repeatedly threatened, explicitly and implicitly, by Detective Guevara during his lengthy custodial interrogation on March 1-2, 1999. Mr. Kwil has testified that Detective Guevara scared Mr. Kwil by repeatedly threatening that he would be locked up for a long time, be taken away from his family and not get to see his daughter or the rest of his family for a long time if Mr. Kwil did not cooperate with Detective Guevara and agree to the crime narrative that Detective Guevara fed and coached him through. Mr. Kwil described this interrogation as "psychological warfare" that eventually broke him down (Transcript of Deposition of Richard Kwil, Page 197). In addition, according to Mr. Kwil, Detective Guevara promised Mr. Kwil that he would be released from the lengthy, psychologically abusive interrogation and be allowed to go home if Mr. Kwil cooperated, went along with and repeated back Detective Guevara's false scenarios and signed the court-reported statement. The numerous threats of harm and promises of freedom/leniency that Mr. Kwil describes being subjected to by Detective Guevara during his lengthy custodial interrogation on March 1-2, 1999 increased the risk of eliciting a false and unreliable statement from him.

6. *Psychological Coercion*. In my professional opinion, Detective Guevara's interrogation of Richard Kwil on March 1-2, 1999 was psychologically coercive for multiple reasons. First, Detective Guevara's numerous explicit and implicit threats of harm if Mr. Kwil did not agree to cooperate, parrot back a false narrative that he had fed, and sign a court-reported statement to the Roberto Cruz murder, as well as Detective Guevara's promise of freedom from ongoing interrogation and being able to go home in exchange for cooperating and signing a court-reported statement to participating in the murder of Roberto Cruz were inherently psychologically coercive for the reasons described earlier in this report. Second, Detective Guevara's interrogation techniques were psychologically coercive because, according to Mr. Kwil, they cumulatively had the effect of overbearing and overpowering his will and causing him to perceive that he had no meaningful choice but to involuntarily agree to sign a false statement in order to put an end to Detective Guevara's lengthy and psychologically abusive interrogation. In his deposition testimony, Mr. Kwil describes being forced to sign the confession statement (Deposition of Richard Kwil, Page 206) and that he was broken down (Deposition of Richard Kwil, Page 344). And, third, Mr. Kwil has testified that he had not been given *Miranda* warnings, depriving Mr. Kwil of any ability to freely choose or decline to participate in the extraordinarily lengthy interrogation. As with Mr. Gecht, Mr. Kwil has testified that he was never provided Miranda warnings until the time of the court-reported statement (Deposition of Richard Kwil, Page 262). These psychologically coercive interrogation techniques and practices increased the risk of eliciting false and unreliable statements from Mr. Kwil.

---

[94] Richard Ofshe and Richard A. Leo (1997). "The Social Psychology of Police Interrogation: The Theory and Classification of True and False Confessions." *Studies in Law, Politics & Society*, 16, 189-251.

Steve Art, Esq.
Dan Stohr, Esq.
December 17, 2025
Page 68

7. *Personality Traits as Risk Factors for False and/or Involuntary Confessions* In addition to the *situational* risk factors described in Mr. Kwil's account, Mr. Kwil, who was 19 years old at the time of his lengthy custody interrogation on March 1-2, 1999, was at a heightened risk of making and/or agreeing to a false and/or unreliable statement because of his personality traits and characteristics (*i.e.*, *personal* risk factors), specifically his relative youth. As mentioned above, youth is a risk factor for false confession because of the psychological immaturity and impulsivity that is associated with the development of the adolescent brain and its effect on juveniles' judgement and decision-making. In the last two decades, substantial neurological research has confirmed that the adolescent brain continues to develop beyond the age of 18 and into the mid-20s, blurring the line, for psychological purposes, between juveniles and young adults through their mid-20s. Late adolescence is associated not only with psychological traits such as greater psychosocial immaturity and impulsiveness, but also higher suggestibility and emotional arousability, poor decision-making, higher trust of authority figures, increased gullibility and a tendency to focus on the present rather than the future. Because of his relative youth, Mr. Kwil was at an increased risk of making or agreeing to false statements, admissions and/or confessions in response to police interrogation pressures, especially in response to the psychologically coercive pressures that Mr. Kwil describes occurring during his interrogation on March 1-2, 1999.

8. *Police Interrogation Contamination and Scripting*. Mr. Kwil has testified that he did not know about the Roberto Cruz homicide and learned the details (and everything about the crime) from Detective Guevara, who educated him about it. According to Mr. Kwil, Detective Guevara both contaminated him (i.e., fed him the crime facts to be incorporated into his confession) and scripted his confession (pressured Mr. Kwil to adopt Detective Guevara's false narrative theories that Mr. Kwil participated in the murder of Roberto Cruz, going from the shooter to the victim to the lookout in Detective Guevara's false and fabricated crime confession narratives), which was subsequently repeated in a court-reported statement for Mr. Kwil to sign after the lengthy psychologically coercive interrogation on March 1-2, 1999. Detective Guevara showed Mr. Kwil photographs and rehearsed Detective Guevara's crime narrative before the court reporter arrived. As with David Gecht's statement, Richard Kwil's statement contained numerous examples of the scripted "Error Insertion/Error Correction Trick." As mentioned earlier in this report, the purpose of "The Error Insertion/Error Correction Trick" is to create the impression of validating a confession's voluntariness, accuracy and the confessor's guilt by appearing to demonstrate his personal knowledge of the crime facts. Detective Guevara's contamination and scripting in the interrogation of Richard Kwil increased the risk that Mr. Kwil's statement implicating himself in the murder of Roberto Cruz would be viewed as authentic, self-corroborating and persuasive by juries and thus increased the risk that it would lead to their conviction, despite the lack of any meaningful evidence connecting Richard Kwil to the Roberto Cruz murder or corroborating his alleged involvement in it.

9. *Violation of National Police Interrogation Training Standards, Protocols and Commonly Accepted Best Practices in 1999*. As with Detective Guevara's interrogation of David Gecht, Detectives Guevara in his interrogation of Richard Kwil on March 1-2, 1999 also

Steve Art, Esq.
Dan Stohr, Esq.
December 17, 2025
Page 69

*repeatedly* violated numerous national police interrogation standards, protocols and commonly accepted practices in general as they existed in 1999. And for similar reasons: Detective Guevara repeatedly used threats of harm and promises of leniency in his interrogation of Mr. Kwil, despite universal police training to avoid such threats and promises; Detective Guevara and Halvorsen violated commonly accepted standards with respect to the length of Richard Kwil's police detention and interrogation on March 1-2, 1999; Detective Guevara and Halvorsen deprived Mr. Kwil of water and access to the bathroom, contrary to universal police interrogation protocols to the contrary; Detective Guevara fed Mr. Kwil crime facts and details, and scripted his confession narrative (which was subsequently stenographically transcribed), contrary to police interrogation training standards existing at the time; Detective Guevara failed to provide Mr. Kwil his legally required *Miranda* rights and failed to elicit a legally required *Miranda* waiver; and Detective Guevara used numerous interrogation techniques – threats, promises, and sleep deprivation – that are well known to be "apt to make an innocent person confess."[95] In short, according to Richard Kwil's account of his interrogation on March 1-2, 1999, Detective Guevara coercively interrogated him and repeatedly violated numerous national police interrogation standards, protocols and commonly accepted best practices as they existed in 1999. As with Detective Guevara's interrogation of David Gecht, Detective Guevara's numerous violations (individually and cumulatively) of nationally recognized and commonly accepted police interrogation standards and practices as they existed in 1999 would, in my professional opinion, have contributed to Mr. Kwil's perception that his situation was hopeless and that he had no meaningful choice but to sign the court-reported statement in order to finally put an end to the psychologically coercive interrogation.

10. *Indicia of Unreliability in Richard Kwil's Court-Reported Statement on March 1-2, 1999.* Richard Kwil's court-reported statement, like David Gecht's, does not bear any of the traditional indicia of reliability that researchers and experts use to assess confession evidence: it is not supported or corroborated by any physical, forensic, medical or other credible independent evidence; it did not lead to new or missing evidence; it did not contain any corroborable non-public case facts that only the true perpetrator, but not the police investigators, knew; and it is inconsistent with and contradicted by numerous other case facts, logic and evidence. There is no reliable evidence linking Richard Kwil to the Roberto Cruz homicide. Mr. Kwil has consistently maintained that his statement is false and was the product of psychological coercion, as detailed above.

The numerous indicia of unreliability include:

- There is no physical, scientific or forensic evidence linking Mr. Kwil to the Roberto Cruz murder;

---

[95] *See* Fred Inbau, John Reid, and Joseph Buckley (1986). CRIMINAL INTERROGATION AND CONFESSIONS, 3rd Edition at xiv (Williams & Wilkins).

Steve Art, Esq.
Dan Stohr, Esq.
December 17, 2025
Page 70

- Colleen Miller has recanted her statement that Mr. Gecht had confessed to her about the murder as false and the product of coercion, fear and threats by Detectives Guevara and Halvorsen that she would be charged as an accessory to the murder of Roberto Cruz, that her baby would be born in jail and taken to her if she did not falsely implicate David Gecht in the murder of Roberto Cruz;

- David Gecht and Ruben Hernandez have recanted their statements implicating Mr. Gecht as coerced and completely false;

- Richard Kwil did not match the description of the two men described by a bouncer angrily arguing with Mr. Cruz shortly before his death (one of whom was described as Latin or Black and 350 pounds, the other was described as 5'7 and 250 pounds (Mr. Kwil is light skinned Native American white and was approximately 5'10 and weighed 145 pounds at the time;

- Nor did Mr. Kwil match the description of an anonymous caller to the Chicago police telling the police that two me bragged that they shot Mr. Cruz because he owed one of them $6,000, one of whom as described as 6'3 and 215 pounds; and

- Detective Guevara has invoked the Fifth Amendment in this and numerous other cases in which he has been accused of using extreme physical and psychological coercion to extract false confessions of guilt, creating the inference[96] that a truthful answer may subject him to criminal prosecution; and Detective Guevara had an established pattern and practice of coercing false and fabricated confessions from Black and Latino men in homicide cases, as will be discussed in greater detail later in this report.

In short, Richard Kwil's court-reported statement bears numerous indicia and hallmarks of unreliability, and contains no hallmarks or indicia of reliability. With the recantations by David Gecht and Ruben Hernandez, and if we credit the recantation of Colleen Miller, there is no evidence that corroborates Mr. Kwil's interrogation-induced statement As with Mr. Gecht's court-reported statement, Richard Kwill's court-reported statement was more likely, if not certainly, the involuntary product of coercive and improper police interrogation methods and pressures than a reliable or trustworthy piece of evidence of criminal guilt.

**XV. The Interrogation and**
**Statement of Ruben Hernandez on March 1-2, 1999**

---

[96] "In two cases involving Detective Guevara, the Illinois Court of Appeals ruled that it is appropriate for trial courts to draw adverse inferences when police invoke the Fifth Amendment in post-conviction proceedings. *People v. Montanez*, 404 Ill. Dec. 218, 55 N.E.3d 692 (2016) and *People v Serrano*, 404 Ill. Dec. 189, 55 N.E.3d 285 (2016). See Post-Conviction Petition For Relief from Trial Court Constitutional Violations on Behalf of an Actually Innocent Petitioner, *State of Illinois v. Alfredo Gonzalez* at 27.

Steve Art, Esq.
Dan Stohr, Esq.
December 17, 2025
Page 71

Ruben Hernandez describes how and why Chicago police detectives Reynaldo Guevara, Ernest Halvorsen and Alan Pergande moved him from adamant denial to providing a stenographically transcribed, but unsigned, statement describing involvement in the murder of Roberto Cruz, a statement that Mr. Hernandez has also long maintained was the product of physical and psychological coercion and is false. In his account of his lengthy interrogation on March 1-2, 1999, Mr. Hernandez describes interrogation techniques, methods and strategies that decades of empirical social science research has shown significantly increase the risk of eliciting false, unreliable and involuntary confessions when applied to innocent suspects. These included:

1. *Physical Coercion and Abuse.* In my professional opinion, the interrogation described by Ruben Hernandez on March 1-2, 1999 was extremely physically coercive for multiple reasons. To begin with, Mr. Hernandez has testified that Detective Guevara hit Mr. Hernandez with a binder multiple time on his upper and upper and lower back; pulled his chair; choked him; and used physical force and violence – some of which was in ASA Hood's or Maguire's presence -- to make Mr. Hernandez sign the court-reported statement. As explained above, physical coercion is well known to lead to false and unreliable statements, admissions, and confessions and is prohibited by federal constitutional law. In fact, all police officers and investigators are trained that the use of physical coercion to elicit information or statements is absolutely impermissible. There is no dispute in the scientific research community or in the empirical social science research literature that the physical coercion that Mr. Hernandez describes over the course of his hours-long, overnight interrogation by Detectives Guevara, Halvorsen and Pergande has long been regarded as a direct cause of interrogation-induced false statements. The physical coercion and violence that Mr. Hernandez describes being repeatedly used on him by Detective Guevara would have significantly increased the risk of eliciting false compliance and a false confession statement from Mr. Hernandez, especially given his youth at the time.

2. *Premature and Unwarranted Presumption of Guilt and Guilty Knowledge.* Detectives Guevara, Halvorsen and Pergande failed to do meaningful investigation into Mr. Hernandez's possible alleged role as a participant in the crime. Instead, the detectives presumed Mr. Hernandez's guilt based on rumors on the street and, in the absence of any evidence supporting their theory, then set out to prove their pre-existing speculations. According to Ruben Hernandez, Detective Guevara physically and psychologically coerced him to stop denying his involvement in the murder of Roberto Cruz and ultimately submit to a stenographically transcribed statement, implicating himself and David Gecht and Richard Kwil in the Roberto Cruz murder—a statement that Mr. Hernandez refused to sign and that maintains is completely false and was fabricated by Detectives Guevara, Halvorsen, Pergande and ASA Maguire. In my professional opinion, in their investigation of Mr. Hernandez, Detectives Guevara, Halvorsen and Pergande demonstrated a premature and unwarranted presumption of guilt as well as confirmation bias and tunnel vision (since there was no evidence suggesting Mr. Hernandez's possible involvement and nevertheless Detective Guevara aggressively pursued a confession

71

Steve Art, Esq.
Dan Stohr, Esq.
December 17, 2025
Page 72

from him), and demonstrated a reckless disregard for the truth, all of which increased the risk of eliciting false and unreliable statements, admissions and/or confessions from Mr. Hernandez.

3. *Lengthy (Incommunicado) Interrogation, Exhaustion and Fatigue*. As best I can tell from the materials I reviewed in the file, Mr. Hernadez was brought to Area 5 at approximately 5:30 p.m. on March 1, 1999; and his court-reported statement appears to have ended at 11:16 pm on March 2, more than 17 hours later. As discussed earlier, lengthy custodial detention and accusatory interrogation leads to fatigue and exhaustion, especially if the interrogation is psychologically coercive. The amount of time Detectives Guevara, Halvorsen and Pergande held Mr. Hernandez in custody was lengthy by any metric. In my professional opinion, the more than 17-hour (or more) custodial interrogation of Ruben Hernandez on March 1-2, 1999 increased the risk of overpowering and overbearing Mr. Hernandez's will and eliciting an involuntary, false and unreliable statement from him.

4. *Sleep Deprivation and Other Deprivations*. As mentioned earlier, longstanding social science research has demonstrated that sleep deprivation is another significant risk factor for false confession because the more sleep deprived the suspect is, the more likely he or she is to become fatigued and depleted of the physical and psychological resources necessary to resist the pressures and stresses of accusatory interrogation,[97] especially when investigators use psychologically aggressive, manipulative and/or coercive methods,[98] and thus the more suggestible the suspect becomes and the more likely that his decision-making abilities will be impaired.[99] Mr. Hernandez has testified that he was unable to sleep, and thus sleep deprived, during his interrogation because he in an uncomfortable position handcuffed to a ring on the wall (he also testified that he was not provided food during the more than 17 hour interrogation. As noted earlier, sleep deprivation leads to exhaustion and fatigue that heighten suggestibility, depletes psychological resources to resist, and impairs decision-making abilities. In my professional opinion, Mr. Hernandez's sleep deprivation increased the risk of eliciting false compliance and a false confession from him.

5. *False and Exaggerated Evidence Ploys*. As mentioned above, false evidence ploys are among the most well-documented *situational* risk factors for eliciting false and unreliable statements, admissions, and/or confessions, as described in the social science research

---

[97]  Deborah Davis and Richard A. Leo (2012). "Interrogation Related Regulatory Decline: Ego-Depletion, Failures of Self-Regulation and the Decision to Confess" *Psychology, Public Policy and Law*, 18, 673-704.

[98]  Saul Kassin, Hayley Cleary, Gisli Gudjonsson, Richard A. Leo, Christian Meissner, Allison Redlich and Kyle Scherr (2025), "Police-Induced Confessions, 2.0: Risk Factors and Recommendations" *Law and Human Behavior*, 49, 7-53.

[99]  Mark Blagrove (1996). "Effects of length of sleep deprivation on interrogative suggestibility" *Journal of Experimental Psychology: Applied*, 2, 48-59. *See also* Stephen Frenda, Shari R. Berkowitz, Elizabeth F. Loftus, and Kimberly M. Fenn (2016). "Sleep Deprivation and False Confessions" *Proceedings of the National Academy of Sciences*, 113, 2047-2050 (February 23, 2016).

Steve Art, Esq.
Dan Stohr, Esq.
December 17, 2025
Page 73

literature.[100] The use of false evidence ploys can create or contribute to the suspect's perception that he is trapped, there is no way out, and/or that his conviction will be inevitable. False evidence ploys can lead the suspect to perceive that he is in a hopeless situation and thus has little choice but to agree to or negotiate the best available outcome or mitigation of punishment given the perceived, subjective reality of his situation. According to Mr. Hernandez, Detective Guevara lied when he told Mr. Hernandez that there were truthful witness statements against him of the crime. Based on well-established basic and applied social scientific research going back decades, Detective Guevara's false evidence ploy in his interrogation of Ruben Hernandez on March 1-2, 1999 increased the risk of eliciting a false and unreliable confession from him by contributing to the sense of hopelessness and despair that often precedes the elicitation of a false confession.[101]

6. *Threats of Harm and Promises of Leniency*. According to Mr. Hernandez, he was threatened, explicitly and implicitly, by Detectives Guevara and Pergande during his lengthy custodial interrogation on March 1-2, 1999. According to Mr. Hernandez, Detective Guevara threatened that Mr. Hernandez would get the electric chair, and thus the death penalty, if he did not tell a story implicating himself, David Gecht, and Richard Kwil in the murder of Roberto Cruz. In addition, Detective Pergande promised that Mr. Hernandez's armed robbery charge to away if he implicated Mr. Gecht, Mr. Kwil, and himself in the Roberto Cruz murder. According to Mr. Hernandez, Detective Guevera told Mr. Hernandez that he would get a deal if he repeated the detectives' false crime narrative and that ASA Maguire was the only one would help Mr. Hernandez. Detective Guevara's and Detective Pergande's numerous threats of harm (if Mr. Hernandez did not agree to provide a confession) and promises of leniency/freedom (if Mr. Hernandez did), increased the risk of eliciting a false and unreliable statement from him.

7. *Psychological Coercion*. In my professional opinion, Detective Guevara's, Halvorsen's and Pergande's interrogation of Ruben Hernandez on March 1-2, 1999 was psychologically coercive. First, Detective Guevara's and Detective Pergande's numerous explicit and implicit threats of harm if Mr. Hernandez did not agree to provide a confession statement to the Roberto Cruz murder as well as Detective Guevara's and Detective Pergande's promise of leniency/freedom in exchange for cooperating and providing a confession statement to participating in the crime were inherently psychologically coercive for the reasons described earlier in this report. Second, Detective Guevara's interrogation techniques were psychologically coercive because, according to Mr. Hernandez, they frightened Mr. Hernandez and cumulatively had the effect of overbearing and overpowering his will and causing him to perceive that he had no meaningful choice but to involuntarily agree to repeat the false story provided to him by

[100]   Saul Kassin, Hayley Cleary, Gisli Gudjonsson, Richard A. Leo, Christian Meissner, Allison Redlich and Kyle Scherr (2025), "Police-Induced Confessions, 2.0: Risk Factors and Recommendations," Law and Human Behavior, 49, 7-53.

[101]   Richard Ofshe and Richard A. Leo (1997). "The Social Psychology of Police Interrogation: The Theory and Classification of True and False Confessions." *Studies in Law, Politics & Society*, 16, 189-251.

Steve Art, Esq.
Dan Stohr, Esq.
December 17, 2025
Page 74

Guevara in order to put an end to Detective Guevara's lengthy and psychologically abusive interrogation. These techniques beat Mr. Hernandez down, wore him out and scared him, as he testified in his deposition. Third, Mr. Hernandez testified that he had invoked his right to remain silent but the detectives refused to accept his decline to participate in the interrogation. These psychologically coercive interrogation techniques and practices increased the risk of eliciting false and unreliable statements from Mr. Hernandez.

8. *Police Interrogation Contamination and Scripting*. Mr. Hernandez has testified that he did not know anything about the Roberto Cruz homicide and learned the details from Detective Guevara, who educated him about it, after which they rehearsed it. According to Mr. Hernandez, Detective Guevara contaminated him (i.e., fed him the crime facts to be incorporated into his court-reported statement) and scripted the false confession narrative. Mr. Hernandez refused to sign the contaminated and scripted court-reported statement (which named Mr. Gecht as the alleged shooter in the Roberto Cruz homicide, Mr. Kwil as the lookout and Mr. Hernandez as the getaway driver), testifying that these words were the Detectives and ASA Maguire's, not his. Detective Guevara's contamination and scripting in the interrogation of Ruben Hernandez increased the risk that Mr. Hernandez's statement implicating David Gecht, Richard Kwil, and himself in the Roberto Cruz homicide would be viewed as authentic, self-corroborating and persuasive by juries and thus increased the risk that it would lead to their conviction, despite the lack of any meaningful evidence connecting Ruben Hernandez (or David Gecht or Richard Kwil) to the Roberto Cruz murder or corroborating their alleged involvement in it.

9. *Violation of National Police Interrogation Training Standards, Protocols and Commonly Accepted Best Practices in 1999.* As with Detective Guevara's interrogation of David Gecht and Richard Kwil, Detective Guevara's, Detective Halvorsen's and Detective Pergande's interrogation of Ruben Hernandez on March 1-2, 1999 also *repeatedly* violated numerous national police interrogation standards, protocols and commonly accepted practices in general as they existed in 1999. And for similar reasons: The detectives physically assaulted and coerced Mr. Hernandez in violation of universally recognized laws in the United States prohibiting the use of physical coercion during police interrogation under all circumstances; repeatedly used threats of harm and promises of leniency in their interrogation of Mr. Hernandez, despite universal police training to avoid such threats and promises; the detectives violated commonly accepted standards with respect to the length of Ruben Hernandez's police detention and interrogation on March 1-2, 1999; Detective Guevara physically deprived Mr. Hernandez of sleep and food, contrary to universal police interrogation protocols to the contrary; Detective Guevara fed Mr. Hernandez crime facts and details, and scripted his confession narrative, contrary to police interrogation training standards existing at the time; and Detective Guevara used numerous interrogation techniques – threats, promises, and sleep deprivation – that are well known to be "apt to make an innocent person confess."[102] In short, according to Ruben Hernandez's account of his interrogation on March 1-2, 1999, the detectives coercively

---

[102] *See* Fred Inbau, John Reid, and Joseph Buckley (1986). CRIMINAL INTERROGATION AND CONFESSIONS, 3rd Edition at xiv (Williams & Wilkins).

Steve Art, Esq.
Dan Stohr, Esq.
December 17, 2025
Page 75

interrogated him and repeatedly violated numerous national police interrogation standards, protocols and commonly accepted best practices as they existed in 1999. As with the detective's interrogation of David Gecht and Richard Kwil, their numerous violations (individually and cumulatively) of nationally recognized and commonly accepted police interrogation standards and practices as they existed in 1999 would, in my professional opinion, have contributed to Mr. Hernandez's perception that his situation was hopeless and that he had no meaningful choice but to provide a statement, even if unsigned, in order to put an end to the psychologically coercive interrogation.

10. *Indicia of Unreliability in Ruben Hernandez's Stenographically Transcribed Statement on March 1-2, 1999*. Ruben Hernandez's statement, like David Gecht's and Richard Kwil's statements, does not bear any of the traditional indicia of reliability that researchers and experts use to assess confession evidence: it is not supported or corroborated by any physical, forensic, medical or other credible independent evidence; it did not lead to new or missing evidence; it did not contain any corroborable non-public case facts that only the true perpetrator, but not the police investigators, knew; and it is inconsistent with and contradicted by numerous other case facts, logic and evidence. There is no reliable evidence linking Ruben Hernandez to the Roberto Cruz homicide. Mr. Hernandez has consistently maintained that his statement is false and was the product of psychological coercion, as detailed above.

The numerous indicia of unreliability include:

- There is no physical, scientific or forensic evidence linking Ruben Hernandez to the Roberto Cruz murder;

- Colleen Miller has recanted her statement that Mr. Gecht had confessed to her about the murder as false and the product of coercion, fear and threats by Detectives Guevara and Halvorsen that she would be charged as an accessory to the murder of Ruberto Cruz, that her baby would be born in jail and taken to her if she did not falsely implicate David Gecht in the murder of Roberto Cruz;

- David Gecht and Richard Kwil have recanted their statements implicating Mr. Hernandez as coerced and completely false;

- Ruben Hernandez did not match the description of the two men described by a bouncer angrily arguing with Mr. Curz shortly before his death (one of whom was described as Latin or Black and 350 pounds, the other was described as 5'7 and 250 pounds Mr. Hernandez at the time was described as 5'5", 140 lbs

- Nor did Mr. Hernandez match the description of an anonymous caller to the Chicago police telling the police that two me bragged that they shot Mr. Cruz because he owed one of them $6,000, one of whom as described as 6'3 and 215 pounds; and

75

Steve Art, Esq.
Dan Stohr, Esq.
December 17, 2025
Page 76

- Detective Guevara has invoked the Fifth Amendment in this and numerous other cases in which he has been accused of using extreme physical and psychological coercion to extract false confessions of guilt, creating the inference[103] that a truthful answer may subject him to criminal prosecution; and Detective Guevara had an established pattern and practice of coercing false and fabricated confessions from Black and Latino men in homicide cases, as will be discussed in greater detail later in this report

In short, Ruben Hernandez's court-reported, but unsigned, statement bears numerous indicia and hallmarks of unreliability, and contains no hallmarks or indicia of reliability. With the recantations by David Gecht and Richard Kwil, and if we credit the recantation of Colleen Miller, there is no evidence that corroborates Hernandez's interrogation-induced statement As with Mr. Gecht's and Mr. Kwil's court-reported statements, Ruben Hernandez's statement was more likely, if not certainly, the involuntary product of coercive and improper police interrogation methods and pressures than a reliable or trustworthy piece of evidence of criminal guilt.

## XVI. The Chicago Police Department's Widespread and Systemic Pattern and Practice of Physically and Psychologically Coercive Interrogations (Especially of African-American and Latino Men) from 1972 to at Least 2000; and The City of Chicago's Continuing Notice of Systemic Physical Coercion and Abuse to Extract And Fabricate Confessions to High Ranking Officials in the City of Chicago, High-- Ranking Officials in the Chicago Police Department, and Police Command Personnel

### (A) Introduction

Starting in 1972 and continuing up to at least 2000, the City of Chicago's Police Department had a systemic practice of subjecting suspects (primarily African-American and Latino men) to physically abusive and coercive interrogations with the result of coercing and/or fabricating confession statements without regard to the interrogated suspects' actual guilt or innocence. Moreover, at least as early as February of 1982 and continuing through the 1990s, high ranking officials in the City of Chicago and the Chicago Police Department and numerous police command personnel, received continuing notice of this systemic practice of torture, physical abuse and coercion of (primarily Black and Latino) suspects resulting in coerced and fabricated confessions, including from the repeated documented allegations that accumulated against supervisors and detectives, first at Area 2 detective Division, and later at Areas 3, 4 and

---

[103] "In two cases involving Detective Guevara, the Illinois Court of Appeals ruled that it is appropriate for trial courts to draw adverse inferences when police invoke the Fifth Amendment in post-conviction proceedings. *People v. Montanez*, 404 Ill. Dec. 218, 55 N.E.3d 692 (2016) and *People v Serrano*, 404 Ill. Dec. 189, 55 N.E.3d 285 (2016). See Post-Conviction Petition For Relief from Trial Court Constitutional Violations on Behalf of an Actually Innocent Petitioner, *State of Illinois v. Alfredo Gonzalez* at 27.

Steve Art, Esq.
Dan Stohr, Esq.
December 17, 2025
Page 77

5; from the testimony of numerous criminal defendants at motion to suppress hearings and trials; from in-court admissions of city lawyers; from the findings in numerous Office of Professional Standards reports; from federal and state court decisions; from media articles, reports and editorials; from innocence pardons by the Governor of Illinois; from numerous civil lawsuits alleging physical abuse and coercion to extract and fabricate confessions; from the findings of the United Nation's Committee against Torture and from Amnesty International; and from the admissions of City officials.

In this section, I will review the evidence establishing the basis for these opinions, as well as briefly summarize many of the cases that illustrate the substantial empirical basis for these opinions. Exhibit C summarizing some of the documents supporting these opinions is attached to my report.

**(B) Systemic and Widespread Torture, Physical Abuse and
Coercive Interrogation At Area 2 Under Jon Burge, and Continuing
Notice to High Ranking Officials in the City of Chicago, High-Ranking
Officials in the Chicago Police Department, and Police Command Personnel**

It has been well documented that Jon Burge and those under his command, first at Area 2 and later at Area 3, collectively tortured at least one-hundred and twenty-five (125) suspects from 1972 to 1991. (*See* Torture Victims Chart PTP-NOTICE-000842). On May 6, 2015, the Chicago City Council passed the landmark Reparations for Burge Torture Victims Ordinance and accompanying resolution that included the creation of a Reparations fund of $5.5 million for approximately 60 living victims of police torture by Burge or those under his command, waived tuition at City Colleges, established a mandatory Public Schools curriculum to educate students about police torture under Burge, and provided for the creation of a public memorial. (PTP-NOTICE-001153-1157). On May 6, 2015, Mayor Rahm Emanuel apologized to the victims of Chicago police torture at the Chicago City Council meeting, stating:

> This is another step but an essential step in righting a wrong, removing a stain on the reputation of this great city. Chicago finally will confront its past and come to terms with it and recognize when something wrong was done and be able to be strong enough to say something was wrong. I want to thank you for your persistence. I want to thank you for never giving in and never giving up and allowing the city to join you on that journey to come face-to-face with the past and be honest enough and strong enough to say when we are wrong and try to make right what we've done wrong. This stain cannot be removed from the history of our city. But it can be used as a lesson of what not to do and the responsibility that all of us have.[104]

---

[104] Fran Spielman, City Council approves $5.5 million in reparations for Burge torture victims, CHI. SUN-TIMES (May 6, 2015); Hal Dardick & John Byrne, Mayor: Approval of Burge victims fund a step toward 'removing a stain', CHI. TRIB. (May 6, 2015).

Steve Art, Esq.
Dan Stohr, Esq.
December 17, 2025
Page 78

On February 9, 1982 CPD officers Fahey and O'Brien were murdered. Jon Burge, who was then a Lieutenant at Area 2, led the investigation of the murders of Fahey and O'Brien and the notorious manhunt looking for the perpetrators. In February of 1982, Area 2 consisted of a two-story building with a basement at 91st Street and Cottage Grove Avenue in Chicago, Illinois. *See People v. Jackie Wilson* (Circuit Court of Cook County, June 20, 2018) (PTP-NOTICE-000709-827).

Doris Byrd retired as a Sergeant in the CPD in 2004. Byrd was hired at the CPD in 1977 and was later assigned to be a detective in the Area 2 Violent Crimes Unit. According to Byrd, there were a group of detectives named the "A Team" at Area 2. This group consisted of detectives who handled mostly homicides and high publicity cases. Sammy Lacey, a former Sergeant in the CPD, testified that the "A-Team" was a euphemism for Burge's "Ass-kicking" team. According to Byrd, there was visible "camaraderie" between Lt. Burge and the "A Team", as they often socialized with each other outside of the station as well. Lacey testified that the "A-Team" had a high proportion of cases cleared through confessions, that the "A-Team" had access to torture devices at Area 2, that the building was heated through radiators which "were very hot" to the touch and Area 2 had typewriters on the second floor with plastic vinyl covering. Byrd testified that not only did Burge and his "A-Team" have access to such devices, but she actually heard people being tortured at Area 2 while she was there. For instance, Byrd heard screaming and other unusual noises coming out of the interview rooms when the midnight shift was interrogating suspects. Some of these individuals confided in Byrd that they were tortured by the "A-Team." Byrd also learned that some of these suspects were tortured with devices such as telephone books, bags, and electroshock. Detective Byrd later learned from fellow detectives and suspects that the "black box…was running rampantly through the unit up there." According to Byrd, it was an open secret that this type of torture existed at Area 2 under the supervision of Jon Burge. Three additional African American Area 2 detectives confirmed that Burge had an electric shock device at Area 2 that he used on African American suspects in the 1970s and 1980s. In the 1970's, Bill Parker saw it in use and Melvin Duncan saw it on a table, while Walter Young saw it in the early 1980s. *See People v. Jackie Wilson* (Circuit Court of Cook County, June 20, 2018).

On February 14, 1982, Burge and detectives working under his command arrested Andrew and Jackie Wilson for the murders and tortured confessions from them. On February 17, 1982, Dr. John Raba, medical director of Cermak Hospital, made an official complaint by letter to CPD Superintendent Richard Brzeczek demanding an investigation of allegations that Andrew Wilson had been tortured and abused at Area 2. The letter described numerous injuries that Dr. Raba observed on Andrew Wilson and Wilson's allegations that he had been electric shocked. PTP-GENERAL-000001-000065. On February 25, 1982, Police Superintendent Richard Brzeczek sent a later to Cook County State's Attorney (and eventually mayor) Richard Daley, informing him of Dr. John Raba's reported abuse of Andrew Wilson by Chicago police during interrogation. Daley took no action in response to the letter. (*See* PTP-NOTICE-001464-1465).

78

Steve Art, Esq.
Dan Stohr, Esq.
December 17, 2025
Page 79

During his tenure as Cook County State's Attorney, more than 50 additional cases of torture and abuse by Lt. Jon Burge and his fellow detectives came out of Area 2. (*See* Torture PTP-NOTICE-000842). Twenty years later (2002), Mr. Brzeczek would tell a Chicago Tribune reporter that, "There is no doubt in my mind that Burge and his detectives tortured some suspects. The whole situation at Area 2 [was] a disgrace and embarrassment." (Steve Mills, Chicago Tribune, April 29, 2002).

In 1982, attorney Ronald Samuels, who was President of the Cook County Bar Association, contacted the Chicago Police Department's Office of Professional Standards (the city of Chicago governmental entity tasked with oversight of the Chicago Police Department) because of the number of complaints that had been made against Chicago police officers for misconduct in their hunt for the people who killed to police officers. OPS staff informed Mr. Samuels that they had lost 120 complaints that had been made. *People v. Jackie Wilson* (Circuit Court of Cook County, June 20, 2018). As former police chief Richard Rosenthal has opined, the loss of this many police reports had to have been a deliberate act. (*See* PTP-NOTICE-003193-003223)

In January 1983, Leroy Martin Sr. was appointed Commander of Area 2 and as such was Jon Burge's direct supervisor.

In 1984, David Fogel, who at that time was the Chief Administrator of OPS, sent a report to Superintendent Fred Rice listing reports of Chicago Police Department officers who had used electrical shocking devices on prisoners over the previous 12 months. PTP-GENERAL-000001-000006; PTP-NOTICE-002277-002284)

In 1986 Andrew Wilson filed a civil case alleging torture by Burge and other Area 2 detectives.

In 1986, the CPD promoted Jon Burge to Commander, transferred him to the Bomb and Arson Unit, and replaced him at Area 2 with Lt. Phil Cline. Cline, while Lieutenant at Area 2, did no investigation nor made any inquiry concerning alleged torture at Area 2 under his predecessors.

In 1987, The Illinois appellate court reversed Andrew Wilson's criminal conviction for failure to suppress his confession due to physical abuse. The Illinois Supreme Court upheld the appellate court's reversal of Andrew Wilson's criminal conviction.

In 1989, an anonymous police source sent letters to Andrew Wilson's lawyers stating that Burge was the torture ringleader, identified his "asskickers," which included Sergeant John Byrne and Detective Peter Dignan., and stated that Melvin Jones was tortured by Area 2 police officers. In August of 1989 a federal jury in the Andrew Wilson civil case found that the CPD had a policy and practice of "allowing police officers to torture persons suspected of killing or wounding officers." (*See* PTP-NOTICE-002208-2215, 001533)

79

Steve Art, Esq.
Dan Stohr, Esq.
December 17, 2025
Page 80

In January 25, 1990 John Conroy published an article entitled, "the House of Screams" in the Chicago Reader detailing the torture of Jon Burge and others at the area 2 police station and the case of Andrew Wilson in particular.

In February of 1990, Amnesty International sent a report to Ira Raphaelson, the Acting United States Attorney for the northern District of Illinois, detailing the allegations of torture of suspects in Area 2 that it had received, focusing on Andrew Wilson's case and noting that numerous individuals alleging they had been tortured and coerced during Area 2 interrogations had to that date filed complaints with OPS. (*See* PTP-NOTICE-001522-1532)

In 1990 and 1991, the CPD's Office of Professional Standards (OPS), in its "Goldston Report," found that abuse occurred at Area 2 Police Headquarters, and that the abuse was "systematic." The Goldston Report further found:

> As to the matter of alleged physical abuse, the preponderance of the evidence is that abuse did occur and that it was systematic. The time span involved covers more than ten years. The type of abuse described was not limited to the usual beating, but went into such esoteric areas as psychological techniques and planned torture. The evidence presented by some individuals convinced juries and appellate courts that personnel assigned to Area 2 engaged in methodical abuse.

> The number of incidents in which an Area 2 command member is identified as an accused can lead to only one conclusion. Particular command members were aware of the systematic abuse and perpetuated it either by actively participating in the same or failing to take any action to bring it to an end. This conclusion is also supported by the number of incidents in which Area 2 offices are named as the location of the abuse (OPS Special Project Conclusion Reports and Findings, November 2, 1990 (Goldston Report)).

The Goldston Report was approved by OPS Director Gayle Shines and forwarded to LeRoy Martin Sr. who had been named police Superintendent in 1987. When the Goldston Report became public in 1992 pursuant to court order, Martin attempted to publicly discredit its findings as did Mayor Richard M. Daley who stated publicly that it "was just rumors."

On January 22, 1992, the City of Chicago and Police Superintendent Martin in their arguments before the Chicago Police Board made the following admissions concerning the evidentiary relevance between Burge and other Area 2 detectives' pattern and practice in torturing Anthony Holmes, Melvin Jones, George Powell, Lawrence Poree, Leroy Orange, Shadeed Mu'min and Donald White, and the torture of Andrew Wilson:

> There is no question that the similarities between [Andrew] Wilson's testimony and the similar victims' testimony is more than sufficient to meet the [Federal Rules of Evidence] 404 b standard. Burge was the main perpetrator of the torture in almost all of the cases,

Steve Art, Esq.
Dan Stohr, Esq.
December 17, 2025
Page 81

and, when he was not the principal, he was still involved. In the case of all but one of the victims, the victim was picked up and taken to Area 2 where he was then interrogated regarding his knowledge or involvement in a serious offense. Although Donald White was taken instead to Area 1, he was taken there and interrogated by Area 2 detectives. All of the victims were black and generally had significant criminal histories.

Also similar was the way in which several victims were threatened with consequences if they refused to make a statement. After an initial refusal, the punishment would begin and then would become stronger and more painful as the refusals to speak persisted. The most striking similarities, however, are found in the methods of torture used on the suspects. Wilson was electroshocked by Yucaitis using the black box and by Burge who used the black box and a curling-iron looking device, was "bagged" and beaten, and was threatened with a gun placed in his mouth. Jones, Holmes, Poree, Powell and Orange were similarly electroshocked by Burge. Holmes, Powell, White and Mumin were all "bagged" and beaten to the point where they lost or almost lost consciousness. Burge pointed a cocked gun at Jones's head, hit Poree in the head with a pistol, and placed a revolver containing one bullet at Mumin's head and snapped it three times slowly. White had a gun placed in his mouth. Additionally, each of the victims was slapped around and punched.

Burge's statements to the victims were also very similar. Burge told both Jones and Mumin that nobody would ever believe their word against his. As he did in relation to Wilson, he referred to the absence of marks on Mumin's body. He said "fun time" as he approached Wilson and Poree with the black box, and laughed when he bagged Mumin. He told Wilson he would "fry his black ass" and Jones he would "blow his black head off."

As the case law cited above aptly demonstrates, these actions or the condoning of these actions are overwhelming in their similarity. Indeed, as the testimony of similar victims shows, respondents [Burge, Yucaitis and O'Hara] counted on the fact that their testimony would be believed over that of a convict when they persisted in their pattern of torture.

(PTP-NOTICE-001466-1497)

In February of 1993 the Chicago Police Board fired Burge for torturing Andrew Wilson and this decision was affirmed on appeal. (PTP-NOTICE-001534-1622). In June of 1993, the Seventh Circuit Court of Appeals in the Wilson civil case found that "A rational jury could have inferred from the frequency of the abuse, the number of officers involved in the torture of Wilson, and the number of complaints from the black community, that Brzeczek knew that officers in Area 2 were prone to beat up suspected cop killers."

In 1993 and 1994, the CPD's Office of Professional Standards reinvestigated approximately ten cases of alleged torture by electric shock, baggings, beatings, mock

81

Steve Art, Esq.
Dan Stohr, Esq.
December 17, 2025
Page 82

executions, and other gun play that occurred at Area 2 from 1982 to 1984 that were previously found to be "not sustained" and recommended sustained findings in six cases against Area 2 detectives who worked were close Burge associates and members of the Asskickers: Lee Holmes (September 1982); Gregory Banks (October 1983); Darrell Cannon (November 1983); Thomas Craft (January 1984); Phillip Adkins (June 1984); Stanley Howard (November 1984). *See People v. Jackie Wilson* (Circuit Court of Cook County, June 20, 2018).

OPS Director Gayle Shines did not act on these sustained findings for five years, from 1993 to 1998, and kept the files in her office. After she was replaced in 1998, CPD Superintendent Terry Hillard, through his administrative assistant, Thomas Needham, summarily reversed these sustained findings.

On May 15, 1995 in *Andrew Wilson v. City of Chicago*, 86-C-2360 the City of Chicago admitted in official judicial pleadings that Melvin Jones had been electrically shocked by Jon Burge on his genitals and thigh with a device in a wooden box and threatened with a gun, while he was handcuffed to a ring in the wall in an Area 2 interview room in an attempt to coerce a confession from him.

In *U.S. ex. rel. Maxwell v. Gilmore*, 37 F.Supp.2d 1078, 1094 (N.D. Ill. 1999), Judge Milton Shadur found "It is now common knowledge that in the early to mid-1980s Chicago Police Commander Jon Burge and many officers working under him regularly engaged in the physical abuse and torture of prisoners to extract confessions. Both internal police accounts and numerous lawsuits and appeals brought by suspects alleging such abuse substantiate that those beatings and other means of torture occurred as an established practice, not just on an isolated basis."

From 2002 to 2006, retired justice Edward Egan served as a Cook County Special Prosecutor to investigate allegations of police torture to get confessions and found that Lt. Burge and the detectives under his command had likely committed torture.

On January 10, 2003, Illinois Governor George Ryan pardoned Aaron Patterson, Madison Hobley, Leroy Orange and Stanley Howard based on actual innocence, finding that they had all been physical coerced and tortured by Jon Burge and his colleagues into giving false and fabricated confessions. Governor Ryan stated:

> The category of horrors was hard to believe. If I hadn't reviewed the cases myself, I wouldn't believe it. We have evidence from four men, who did not know each other, all getting beaten and tortured and convicted on the basis of the confessions they allegedly provided. They are perfect examples of what is so terribly broken about our system.

(*See* PTP-NOTICE-002473-2489)

82

Steve Art, Esq.
Dan Stohr, Esq.
December 17, 2025
Page 83

In her concurring opinion in *Hinton v. Uchtman*, 395 F.3d 810, 822-23 (7th Cir. 2005), Seventh Circuit Court of Appeals Judge Diane Wood found:

> [T]he claim Hinton has made regarding his confession illustrates dramatically the high price our system of criminal justice pays when police abuse runs rampant: a cloud hangs over everything that the bad actors touched . . . [A] mountain of evidence indicates that torture was an ordinary occurrence at the Area 2 station of the Chicago Police Department during the exact time period pertinent to Hinton's case. Eventually, as this sorry tale came to light, the Office of Professional Standards Investigation of the Police Department looked into the allegations, and it issued a report that concluded that police torture under the command of Lt. Jon Burge — the officer in charge of Hinton's case — had been a regular part of the system for more than ten years. And, in language reminiscent of the news reports of 2004 concerning the notorious Abu Ghraib facility in Iraq, the report said that "[t]he type of abuse described was not limited to the usual beating, but went into such esoteric areas as psychological techniques and planned torture." The report detailed specific cases, such as the case of Andrew Wilson, who was taken to Area 2 on February 14, 1982. There a group led by Burge beat Wilson, stuffed a bag over his head, handcuffed him to a radiator, and repeatedly administered electric shocks to his ears, nose, and genitals. See People v. Wilson, 506 N.E.2d 571 (Ill. 1987). Burge eventually lost his job with the police, though not until 1992. See In the Matter of the Charges Filed Against Jon Burge, No. 91-1856 (Chicago Police Board, February 11, 1993). To this day, Burge has not been prosecuted for any of these actions, though it appears that he at least thinks that he may still be at some risk of prosecution. See, for example, "Cop brutality probe must be thorough, fair," Chi. Sun-Times, May 16, 2002 (editorial); Hal Dardick, "Burge repeatedly takes 5th; Former police commander stays mum on torture questions," Chi. Tribune, Sept. 2, 2004 (noting allegations that Burge or people reporting to him had tortured 108 Black and Latino suspects between August 1972 and September 1991). . . .Behavior like that attributed to Burge imposes a huge cost on society: it creates distrust of the police generally, despite the fact that most police officers would abhor such tactics, and it creates a cloud over even the valid convictions in which the problem officer played a role. Indeed, the alleged conduct is so extreme that, if proven, it would fall within the prohibitions established by the United Nations Convention Against Torture ("CAT"), which defines torture as "any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or a third person information or a confession . . .," thereby violating the fundamental human rights principles that the United States is committed to uphold.

In 2006, Chief Cook County Criminal Court Judge Paul Biebel stated that: "Over the past 30 years, the public has demanded to know why no complete investigation was ever conducted into the [torture] allegations," suggestions that these allegations were common knowledge among the public (and therefore by implication among high ranking police personnel) since at least the early 1980s, if not before. Judge Biebel went on to write that "The [Special Prosecutor's]

83

Steve Art, Esq.
Dan Stohr, Esq.
December 17, 2025
Page 84

investigation was ordered because of an open sore on the civil body of the City of Chicago which has festered for many years." (Memorandum Opinion and order of 5/19/06, Pp. 9, 17-18).

In July 2006, the Special Prosecutors issued their report, finding that Jon Burge and numerous other Area 2 Chicago Police detectives had physically abused and coerced confessions from numerous criminal suspects. The Special Prosecutor found that Lt. Jon Burge was "guilty of abusing persons with impunity" and that it therefore "necessarily follows that a number of those serving under his command recognized that if their commander could abuse persons with impunity, so could they." The Special Prosecutor found that Superintendent Brzeczek was guilty of a "dereliction of duty" and "did not act in good faith in the investigation of Andrew Wilson. Despite the fact that Brzeczek believed that officers in the Violent Crimes unit of Detective Area 2 had tortured Andrew Wilson he kept that belief to himself for over twenty years." The Special Prosecutor further found that:

> [Brzeczek] "received and believed evidence that prisoner, [Andrew Wilson] had been brutalized by the Superintendent's subordinates, that the prisoner had confessed; that those subordinates had testified under oath on a motion to suppress and before a jury and he had to believe, they testified perjuriously; that the prisoner had been sentenced to death, and that the Superintendent still remained silent. For over twenty years he not only remained silent, but he approved a unit citation for all Area 2 personnel, including Burge, on September 1, 1982, for their work on the Andrew Wilson case; and, more egregiously, he kept Burge in command at Area 2 as long as he remained Superintendent."

Two days later on July 21, 2006, Chicago Mayor Richard Daley stated that the City "strongly supported the release" of the "Special Prosecutor's Report on the practice of abuse and torture of suspects in the 1970's and 1980's at the Calumet Police District" because "the public has the right to know about this shameful episode in our history." (Daley Statement, P. 1), and that Burge and his unit participated in a "pattern of misconduct" (Daley Statement, P. 2)

In 2009, The Illinois legislature enacted the Illinois Torture and Inquiry commission "to address claims of abuse by police officers in the City of Chicago"

In *People v. Cortez Brown* (May 22, 2009), Judge Clayton Crane of the Circuit Court of Cook County vacated Brown's conviction after an evidentiary hearing and ordered a new trial based on findings that Brown had presented "staggering" and "damning" evidence that the detectives under Burge's command at Area 3, where he had been assigned as Commander in January of 1988, similarly tortured other interrogation suspects.

In *People v. Wrice*, 940 N.E.2d 102, 108-09 (1st Dist. 2010), the Illinois Appellate Court granted Area 2 torture victim Stanley Wrice, who was tortured by Area 2 "asskickers" Sgt. John Byrne and detective Peter Dignan, an evidentiary hearing on a second successive post-conviction petition on the basis of the July 2006 Special Prosecutor's Report and its findings of "widespread systematic torture of prisoners at Area 2."

Steve Art, Esq.
Dan Stohr, Esq.
December 17, 2025
Page 85

On June 28, 2010, Burge was convicted by a federal court jury of committing perjury and obstruction of justice when he denied, under oath, that he had participated in, supervised or had knowledge of the torture of suspects, including, but not limited to, Andrew Wilson, Anthony Holmes, Melvin Jones, and Shadeed Mu'min.

At Burge's sentencing hearing in January of 2011, federal Judge Joan Lefkow found that there was a "mountain of evidence" of torture, and that "When a confession is coerced the truth of the confession is called into question. When this becomes widespread, as one can infer from the accounts that have been presented here in this court, the administration of justice is undermined irreparably. How can one trust that justice will be served when the justice system has been so defiled? This is why crimes of obstructing justice and perjury, and even more so when it is about matters relating to the duties of one's office, are serious offenses."

In *U.S. v. Burge*, 711 F.3d 803, 806 (7th Cir. 2013), the Seventh Circuit Court of Appeals, while affirming Burge's conviction found:

> Former Chicago Police Commander Jon Burge presided over an interrogation regime where suspects were suffocated with plastic bags, electrocuted until they lost consciousness, held down against radiators, and had loaded guns pointed at their heads during rounds of Russian roulette. The use of this kind of torture was designed to inflict pain and instill fear while leaving minimal marks. When Burge was asked about these practices in civil interrogatories served on him years later, he lied and denied any knowledge of, or participation in, torture of suspects in police custody. But the jury heard overwhelming evidence to contradict that assertion and convicted Burge for obstruction of justice and perjury.

In *U.S. v. Burge*, the Court further discussed the history of Area 2 torture under Burge:

> For many years a cloud of suspicion loomed over the violent crimes section of the Area 2 precinct of the Chicago Police Department (CPD) located on Chicago's south side. Jon Burge joined the CPD in 1970 and rose to commanding officer of the violent crimes section in the 1980s, but his career was marked by accusations from over one hundred individuals who claimed that he and officers under his command tortured suspects in order to obtain confessions throughout the 1970s and 1980s. Burge was fired in 1993 after the Office of Professional Standards investigated the allegations, but he was not criminally charged. Years later the Circuit Court of Cook County appointed special prosecutors to investigate the allegations of torture, but due to statutes of limitation, prosecutors never brought direct charges of police brutality against Burge. Eventually, the City of Chicago began to face a series of civil lawsuits from victims seeking from victims seeking damages for the abuse they endured. It was in one of these lawsuits that Burge denied in sworn interrogatory answers that he had knowledge of, or participated in,

85

Steve Art, Esq.
Dan Stohr, Esq.
December 17, 2025
Page 86

any acts of torture or physical abuse, and these statements lead to his federal indictment and trial.

In *U.S. v. Burge*, the Court summarized the record of "decades of abuse" as follows:

At trial, the government called multiple witnesses to testify about the methods of torture and abuse used by Burge and others at Area 2 in order to establish that Burge lied when he answered the interrogatories in the Hobley case... [T]he witnesses at trial detailed a record of decades of abuse that is unquestionably horrific. The witnesses described how they were suffocated with plastic bags, electrocuted with homemade devices attached to their genitals, beaten, and had guns forced into their mouths during questioning. Burge denied all allegations of abuse, but other witnesses stated that he bragged in the 1980s about how suspects were beaten in order to extract confessions. Another witness testified that Burge told her that he did not care if those tortured were innocent or guilty, because as he saw it, every suspect had surely committed some other offense anyway.

In May of 2015, the Reparations Ordinance and Resolution as detailed above, was unanimously adopted by the Chicago City Council and Mayor Emanuel publicly apologized to the torture survivors.

In June of 2018 Cook County Circuit Court Judge William H. Hooks found that "[P]attern and practice evidence shows shocking suspects was common" at Area 2. *See People v. Jackie Wilson* (Circuit Court of Cook County, June 20, 2018) (PTP-NOTICE-000709-827). Judge Hooks further found in December of 2020 while granting Jackie Wilson a certificate of innocence that "the unparalleled nearly 39 years of unconstitutional misconduct was not an isolated occurrence. Rather, it was part of several interrelated patterns and practices of systemic torture and physical abuse of African American suspects at the Area 2 and, later, at the Area 3 Police Headquarters under Defendant Jon Burge's command and supervision." *See People v. Jackie Wilson* (Circuit Court of Cook County, December 18, 2020) PTP-GENERAL-000007-000065.

Upon the death of Jon Burge in September of 2018, soon to be elected Chicago Mayor Lori Lightfoot publicly stated that "with the passing of Jon Burge, we must reflect on the dark legacy that he embodied. So many lives shattered, and a horrible stain on the legitimacy of policing that resonates today."[105]

In sum, there is a substantial body of extensive evidence clearly establishing that, dating back to at least the early 1970s, it was well-known that the City of Chicago's Police Department had a systemic practice of subjecting African American and Latino suspects who were interrogated by detectives and supervisors to physically abusive and coercive interrogations (e.g.

---

[105] https://www.theguardian.com/us-news/2018/sep/19/chicago-cop-jon-burge-torture-dies

Steve Art, Esq.
Dan Stohr, Esq.
December 17, 2025
Page 87

beating, suffocating, electroshocks, mock executions, threatening physical violence, etc.) with the result of coercing and/or fabricating false and/or unreliable inculpatory evidence to be used against the interrogated suspects without regard to their actual guilt or innocence. There is also substantial evidence establishing that high-ranking officials in the City of Chicago (including in the Cook County Attorney's Office), the Chicago Police Department and numerous police command personnel received continuing notice of this systemic practice of physical abuse and coercion of Black and Latino suspects in order to coerce and fabricate confessions, including from the repeated documented allegations that accumulated against supervisors and detectives, at Area 2 detective Division (and later at Areas 3, 4 and 5).

### (C) Physical Abuse and Coercive Interrogation at Area 3 Involving Detectives Kill, Boudreau, Halloran and Others

The physical abuse and coercion of custodial suspects to obtain confessions was also systemic and widespread at Area 3, and repeatedly involved Detectives Kill, Boudreau, Halloran and several other Chicago Police detectives who routinely used physical coercion and abuse to extract incriminating statements and fabricate false confessions from criminal suspects during lengthy incommunicado and unlawful interrogations. Detectives Kill, Boudreau, Halloran and other Area 3 Chicago Police detectives have a long history of using physical force and psychological abuse to coerce and fabricate confession statements from suspects and manipulate witnesses during interrogation. There exists a substantial body of evidence establishing that the Detectives Kill, Boudreau and other Area 3 Chicago Police detectives engaged in systematic misconduct whose purpose was to extract through coercion (primarily in homicide cases) confessions (primarily from African American and Latino suspects) to quickly and recklessly close cases without meaningful regard guilt or innocence. The evidence comes from the repeated documented allegations that accumulated against Detectives Kill, Boudreau, Halloran and other Area 3 Chicago Police Detectives; from the testimony of numerous criminal defendants at motion to suppress hearings and trials in Area 3 cases; from federal and state court decisions in Area 3 cases; and from media articles, reports and editorials, among other sources. There are dozens of known cases establishing a pattern and practice in which detectives Kill, Boudreau, Halloran and other Area 3 Chicago Police detectives physically and psychologically abused, coerced and tortured suspects and witnesses in homicide cases and coerced false testimonial evidence from them. The following summaries represent a portion of these cases:

1. **Frank Bounds (1987)**: Detective Kelly hit Bounds on the head, tried to kick him in the groin, and threatened to bring Bounds' girlfriend into the case if he did not confess causing Bounds to falsely confess to a murder. *People v. Bounds*, 171 Ill.2d 1, 29-30 (1996). (PTP-F BOUNDS-000001-000030)

2. **Alnoraindus Burton (1989)**: Detective Kill kicked Burton in the groin, slammed his head against the wall, slapped him across the face, and told him he could kill him causing Burton to falsely confess. (PTP-NOTICE-000829-000842; PTP-A BURTON-000001-000009)

87

Steve Art, Esq.
Dan Stohr, Esq.
December 17, 2025
Page 88

3.   **Damari Clemon (1991):** Detective Boudreau and other detectives beat Mr. Clemon, electroshocked him and threatened him with a pistol. Deposition of Marcus Wiggins, June 4, 1996, *Marcus Wiggins v. Jon Burge et al.*; Complaint, *Marcus Wiggins v. Jon Burge et al.;* PTP-JESSE & DEMONI & IMARI CLEMON-000001-000026).

4.   **Nevest Coleman and Darrell Fulton (1994)**: Detective Boudreau, Detective Halloran and another Area 3 detective punched Coleman in the face repeatedly until he falsely confessed. Fulton also alleged that he was punched in the face repeatedly, that a detective told him he would put a bullet in Fulton's brain if Fulton would not implicate himself in the crime, and that if he confessed he could go home and nothing bad would happen to anyone in his family. Coleman and Fulton were excluded from male DNA on the victim's underwear (Third Amended Complaint, *Derrell Fulton v. Geri Lynn Yanow et al.*; Transcript of testimony of Nevest Colman, in *State of Illinois v. Nevest Coleman*, June 28, 1996; PTP-D FULTON-000001-000086; PTP-N COLEMAN-000042-00105)

5.   **James Coston (1988)**: Detective Kill struck him in the jaw, grabbed him around the neck and pushed him against the wall while questioning him about a murder (Coston was a witness in a murder case). PTP-J COSTON-000001-000003.

6.   **Mark Craighead (1989)**: Detective Kill and other Area 3 detectives beat Craighead and deprived him of food and water until he falsely confessed. Photographs of Craighead taken after his interrogation depict his injuries (Summary Report Digest, Complaint register No. 166416, PTP-M Craighead-000001-000004).

7.   **Arnold Day (1992)**: Detective Boudreau and another Area 3 detective choked Day and threatened to throw him out of a window until he falsely confessed to a murder. Day was acquitted after presenting his allegations of physical abuse and coercion (Affidavit of Arnold Day, February 4, 1992; Complaint, *Arnold Day v. Kenneth Boudreau*, et al.; PTP-A DAY-000001-105).

8.   **Fred Ewing and Darnell Stokes (1993)**: Detective Boudreau coerced confessions from two developmentally disabled juveniles, Fred Ewing (IQ=56) and Darnell Stokes. Both were acquitted. (Maurice Possley, Steve Mills & Ken Armstrong, *Veteran Detective's Murder Cases Unravel*, Chi. Trib., Dec. 17, 2001.; PTP-F EWING-000001-00015)

9.   **Derrick Flewellen (1995)**: Detective Boudreau and other Area 3 detectives interrogated Derrick Flewellen for more than 36 hours during which they slapped, kicked, and punched him until he signed a false confession. Flewellen was

88

Steve Art, Esq.
Dan Stohr, Esq.
December 17, 2025
Page 89

exonerated based on DNA evidence after serving close to five years in prison (Complaint, *Derrick Flewellen v. City of Chicago, et al.;* PTP-D-FLEWELLEN-000001-000015).

10. **Jerry Gillespie (1993)**: Detective Boudreau and other Area 3 detectives beat, kicked, slapped, and choked Gillespie, and threatened him with further beating, including burning him with a cigarette, if he did not sign a written confession they prepared (First Amended Petition for Post-Conviction Relief and Petition for Relief from Judgement, *State of Illinois v. Jerry Gillespie*, PTP-J Gillespie-000001-000020; Motion to Hold Appeal in Abeyance, *State of Illinois v. Jerry Gillespie*, PTP-J Gillespie-000021-000030)

11. **Oscar Gomez, Abel Gomez and Abel Quinoles (1995)**: Detective Halloran and Detective Boudreau held all three men for more than 30 hours and beat them while they were shackled to a wall. All three were acquitted. PTP-O GOMEZ & A QUINONES-000001-00043).

12. **Jason Gray and Manuel Bobe (1986)**: According to fifteen-year-old Gray, Detective Kill grabbed him, threw him on the floor, threatened him with a life sentence, and fabricated a false inculpatory statement from him. The trial judge rejected Detective Kill's trial testimony, and the appellate court upheld that ruling, finding: Detective "[K]ill's actions, and the possibility that he may have testified falsely under oath in a deposition and in many other prosecutions, has much bearing on the credibility of his testimony here." Detective Kill also coerced Gray's co-defendant, Manuel Bobe, into implicating Gray and himself in the murder. According to Bobe, Detective Kill threatened him and told him he could go home if he just signed a statement implicating Gray, punched him in his chest, slapped him on the face, and pointed a gun at Bobe's neck and threatened to shoot him (Order, *State of Illinois v. Jason Gray*; Transcript of testimony of Jason Gray at Motion to Suppress hearing, *State of Illinois v. Jason Gray*; Amended Petition for Post- Conviction Relief, *State of Illinois v. Jason Gray;* PTP-J GRAY-000001-000123; PTP-M BOBE-000001)

13. **Tyrone Hood and Wayne Washington (1993)**: Detective Boudreau coerced a false confession from Washington. Both men's convictions were subsequently overturned. PTP-T HOOD & W WASHINGTON-000001-00039

14. **Harold Hill, Dan Young, Peter Williams (1990)**: Detective Boudreau and other Area 3 detectives beat and coerced Hill, Young (whose IQ was 56), and Williams into falsely confessing to rape and murder. DNA tests subsequently proved that the men were innocent and the State dismissed all charges against them. Young and Hill were 16 years old at the time, Williams was 19 (Complaint, *L.C. Young v. City of Chicago*, February 8, 2007; Transcript of Proceedings, *People v. Dan*

89

Steve Art, Esq.
Dan Stohr, Esq.
December 17, 2025
Page 90

*Young*, September 19, 1994; PTP-D YOUNG-000001-187; PTP-H HILL-000001-000049).

15. **Joseph Jackson (1998)**: Detective Boudreau placed a book on Mr. Jackson's chest and stomach and hit the book with a blackjack. Detective Halloran placed a typewriter cover over Jackson's head and cut off his air supply. PTP-J JACKSON-000001-000003)

16. **Anthony Jakes (1991)**: Detective Boudreau slapped, punched and kicked fifteen-year-old Jakes until he falsely confessed to being the lookout during a murder. Jakes was held incommunicado for over sixteen hours, and deprived of food and water, and denied access to his aunt (Complaint, *Anthony Jakes v. Kenneth Boudreau et al.*, April 1, 2019; (PTP-A JAKES-000001-000409)

17. **Ronald Kitchen Marvin Reeves and Eric Wilson (1988)**: Detective Kill and Burge beat Ronald Kitchen until he falsely confessed to a murder. Detective Kill punched Kitchen in the face, back, chest, and groin. Kill interrogated Kitchen's cousin, Eric Wilson, about the same murder. Kill beat Wilson in the groin, chest, and head until Wilson falsely inculpated Kitchen and another man. Wilson heard Kitchen screaming and moaning in pain (Letter from Donald Hubert to Edward Egan and Robert Boyler, May 24, 2005; PTP-R KITCHEN-000001-000208)

18. **Anthony Lash (1989)**: Detective Kill and other Area 3 detectives interrogated sixteen-year-old Anthony Lash about a murder without his parents or his attorney present. Detective Kill beat Lash and slammed his head into a wall, causing him to falsely confess to the murder. *People v. Lash*, 252 Ill.App.3d 239, 245-36 (1st Dist. 1993; PTP-R LASH-000001-000011).

19. **Alfonzia Neal (1991)**: Detective Boudreau beat a murder confession out of Alfonzia Neal who had an IQ in the 40s and likely did not understand much, if anything, of the confession. (Maurice Possley, Steve Mills & Ken Armstrong, *Veteran Detective's Murder Cases Unravel*, Chi. Trib., Dec. 17, 2001.; PTP- A NEAL-000001-000008)

20. **Johnny Plummer (1991)**: Detective Boudreau and other Area 3 detectives interrogated fifteen-year-old Johnny Plummer for 36 hours, during which they denied him food and hit him in the face, stomach and side (including with a flashlight, until he falsely confessed to a murder. *See People v. Plummer*, 306 Ill. App. 3d 574, 578-79 (1st Dist. 1999); PTP- J PLUMMER-000001-000010)

21. **Tyrone Reyna, Nicholas Escamilla and Miguel Morales (1993)**: Detective Boudreau and other Area 3 detectives beat sixteen-year-old Reyna (Detective Halloran slapped him in the face and kicked him in the leg; Detective Boudreau

90

Steve Art, Esq.
Dan Stohr, Esq.
December 17, 2025
Page 91

and Detective Halloran spit on him), refused to let him contact his family, and intimidated him into confessing to a murder he did not commit. Boudreau and other Area 3 detectives also beat and threatened Reyna's co-defendants, Nicholas Escamilla and Miguel Morales, causing Escamilla to falsely confess after hours of abuse (Affidavit of Tyrone Reyna, April 22, 2004; Affidavit of Nicholas Escamilla, March 19, 2004; Affidavit of Miguel Morales, February 25, 2001; PTP-T REYNA-000001-000018)

22. **Anthony Robinson (1987)**: Detective Kill and other Area 3 detectives kicked and slapped Anthony Robinson until he falsely confessed to a murder. Robinson suffered injuries including a perforated ear. *People v. Robinson*, 238 Ill. App. 3d 48, 50-51 (1st Dist. 1992); PTP-A ROBINSON-000001-000006).

23. **Clayborn Smith (1992)**: Detective Boudreau and other Area 3 detectives hit Smith in the face and head, punched him in the ribs, grabbed his neck, pulled his hair and pulled his finger back until he falsely confessed to a murder (Complaint, *Clayborn Smith v. City of Chicago et al.*, June 19, 2003; PTP-C SMITH-000001-000010).

24. **Johnny Walker and Phillip Walker (1988)**: Detective Kill beat Johnny and Phillip Walker in the groin and face until they falsely confessed to a murder. The detectives also beat thirteen-year-old Andre Wilks until he falsely identified Phillip Walker as the shooter. Phillip Walker was acquitted and Johnny Walker was never charged with a crime (Transcript of Report of Proceedings, *State of Illinois v. Phillip Walker*, April 3, 1989; PTP-JOHNNY AND PHILLIP WALKER-000043-000050.

25. **Kilroy Watkins (1992)**: Detective Boudreau and Detective Halloran choked and punched Watkins in the face until he gave a false confession (Complaint Under the Civil Rights Act, Title 42 Section, Kilroy Watkins v. Detective J. Halloran et al., May 6, 2002; Affidavit of Kilroy Watkins, January 17, 2004); PTP-K WATKINS-000001-000015).

26. **Demond Weston (1990):** Detective Kill and other Area 3 detectives slapped, beat (Detective Moser and Detective Maslanka), choked, and threatened Weston until he falsely confessed to a murder. Detective Kill also struck, yelled at, and threatened Dwayne Macklin into falsely implicating Weston in the crime (Report of Dr. Richard A. Leo, dated August 28, 2019; PTP-D WESTON-000001-000004; and Report of Dr. Richard A. Leo dated January 22, 2024).

27. **Emmett White (1993): Detective** Boudreau and Detective O'Brien arrested Mr. White, and Detective O'Brien subsequently beat him in the head and face, threw

Steve Art, Esq.
Dan Stohr, Esq.
December 17, 2025
Page 92

him to the ground, and dragged his head across the floor of the interrogation room. PTP-E WHITE-000001-000007; PTP-N COLEMAN-000021.

28. **Marcus Wiggins, Demoni Clemon, Jesse Clemon, Imani Clemon, Dyez Owen (1991)**: Detective Kill, Detective Boudreau, and others handcuffed thirteen-year-old Marcus Wiggins to a wall, denied him access to his mother, and beat and electroshocked him until he gave a false confession. The Clemons brothers and Owen were also beaten until they confessed. Two of the confessions were suppressed and all of the defendants were either acquitted or the State declined to prosecute their cases. *People v. Clemon*, 259 Ill. App. 3d 5, 8, 10 (1st Dist. 1994); PTP-M WIGGINS-000001-000149; PTP-JESSE & DEMONI & IMARI CLEMON-000001-000276.

29. **Anthony Williams (1994)**: Detective Kill beat learning disabled Anthony Williams until he confessed to a murder and armed robbery. *People v. Williams*, 303 Ill. App. 3d 33, 43 (1st Dist. 1999); PTP-A WILLIAMS-000001-000008.

30. **Robert Wilson (1997):** Mr. Wilson reports that Detective O'Brien slapped him repeatedly, and that Mr. Wilson became fearful that he would continue to be physically assaulted if he did not agree to a false confession. Detective Halloran also slapped and threatened Mr. Wilson (Report of Dr. Richard A. Leo dated June 12, 2010) PTP-GENERAL-000066-000085.

These are some, but by no means all, of the Area 3 police torture cases. The physical abuse and coercion of custodial suspects to obtain confessions was systemic and widespread at Area 3, and repeatedly involved Detectives Kill, Boudreau, Halloran and many other Chicago Police detectives who routinely used physical coercion and abuse to extract incriminating statements and fabricate false confessions from criminal suspects during lengthy incommunicado and unlawful interrogations. Chicago police commanders and high ranking City of Chicago officials (including police command personal and the Cook County Attorney's Office) were on continuing notice since at least as early as 1986 that there was a pattern and practice of police interrogation torture and coercion to extract confessions among Area 3 detectives, particularly from (but not limited to) Detectives Kill, Boudreau and Halloran.

### (D) Physical Abuse and Coercive Interrogation at Area 4 Involving Detective Kato, Detective John Summerville, Detective Clarence Lewis, Detective John Roberts, Detective Same Cirone and Others

Chicago police commanders and high ranking City of Chicago officials (including police command personnel and the Cook County Attorney's Office) were on continuing notice since as early as 1987 that there was a pattern and practice of police interrogation torture and coercion to extract confessions among Area 4 detectives, particularly from (but not limited to) Detective Kriston Kato and the Area 4 detectives with whom he worked cases. The following summaries

92

Steve Art, Esq.
Dan Stohr, Esq.
December 17, 2025
Page 93

represent a portion of the cases in which Detective Kriston Kato has been accused of physically abusive and coercive interrogations with the result of coercing and/or fabricating false and/or unreliable inculpatory evidence to be used against the interrogated suspect without regard to his actual guilt or innocence:

1. **Tony Bey (aka Tony Steward) (1988)**: Detective Kato purportedly obtained a murder confession from Mr. Bey during an abusive interrogation. Mr. Bey alleged that Detective Kato "put a pistol in his mouth and threatened to make him 'a statistic.'" Mr. Bey also alleges that Detective Summerville physically abused him during one of his post-arrest interrogations in Area 4. Mr. Bey was treated at the hospital for multiple lacerations after the interrogation, complained of severe stomach pain, and was diagnosed with acute appendicitis. Tony Bey Complaint Register & OPS Investigation. Bey was acquitted at trial. *Steward v. Kato, et al.*, 1992 U.S. Dist. LEXIS 15690, at *8 (N.D. Ill. 1992); PTP-T SEWARD-BEY-000001-000157.

2. **Michael Cage (1988)**. Detective Kato slapped Mr. Cage in the face, while Detective Summerville read the case facts to him, and later Detective Kato connected a gadget to his chest that resembled an electric shaver with antennas attached to it. Cage felt shocked and passed out. When Mr. Cage regained consciousness, Detective Kato stretched his leg into the doorway and slammed the door on his ankle. Eventually Cage gave a confession, but it was eventually suppressed at a pre-trial hearing because the State failed to prove that the detectives had not caused Mr. Cage's injuries. Steve Bogira, *Good Cop, Bad Cop: What is it about Detective Kato that Makes Murder Suspects So Eager to Confess?*, Chicago Reader (Dec. 12, 1991); PTP-M CAGE-000001-0000063.

3. **Carl Chatman (2002)**: Mr. Chatman, who had an IQ of 68 and a long history of mental disorders, was wrongly convicted of sexually assaulting Susan Riggio in the Daley Center. *Chatman v. Chicago, et al.*, 2018 WL 1519160 (N.D. Ill. Mar. 28, 2018). Mr. Chatman was arrested, denied any involvement in the crime, and after he had been in custody for 12 hours without anything to eat or drink, Detective Kato interrogated him, threatening and abusing him while he was handcuffed to a wall, including striking him so hard that he almost lost consciousness, after which Mr. Chatman falsely confessed (Detective John Roberts had also used force and threats of force to coerce Mr. Chatman to confess). Mr. Chatman was convicted and spent more than a decade in prison, before the Cook County State's Attorney reinvestigated his case and dismissed the charges against him. Mr. Chatman was granted a certificate of innocence by the State of Illinois after his release from prison. *Id.* at *9. A Chicago police detective filed an anonymous complaint in May

Steve Art, Esq.
Dan Stohr, Esq.
December 17, 2025
Page 94

2002 with the Office of Professional Standards relating that Detective Kato had physically abused Mr. Chatman and forced him to sign a false confession. (OPS Anonymous Complaint). The detective wrote that when Detective Kato hit Mr. Chatman, "That blow I thought would kill him for sure" and said that Detective "Kato took the victim's account of the assault, word for word and laid it out for the homeless suspect to sign. The suspect didn't even read it and didn't know what he was signing." and that "It is a well-known fact from questioning and the suspect's condition that he did not commit this assault. However, Detective Kato stated that 'they wanted someone to be accountable, so I gave them someone. He's homeless anyway, at least now (laughingly) he'll get three meals a day. That's my contribution to help feed the homeless.'" *Id.*; PTP-C CHATMAN-000001-000082.

4. **Shawn Hardy (1989)**: Detective Kato accused Mr. Hardy of committing a murder, punched and kicked him in the chest, but he did not confess. Mr. Hardy was diagnosed with a chest contusion a few days after the interrogation. Command Channel Review – Complaint Register Investigation No. 171359 (PTP-S-Hardy 000001-000050)

5. **Derrick Harvey (1993)**: Harvey claimed that he adopted the confession urged by Detective Kato only because "he was struck by Detective Kato prior to giving his statement and . . . Detective Kato promised him he would be released if he gave a statement." *People v. Harvey*, 211 Ill.2d 368 (2004); PTP-D HARVEY-000001-000023.

6. **Miller Holston (1989)**: Detective Kato struck and kicked Mr. Holston, deprived him of sleep for more than 20 hours, refused him access to legal counsel, and coerced him into confessing to murder. Mr. Holston also alleged that Detective Summerville struck and kicked him. The charges against Mr. Holston were dismissed. Command Channel Review – Complaint Register Investigation No.184112, PTP- M SHOLSTON-000001-000073)

7. **Xavier Johnson (1997)**: Detective Kato and Officer Sam Cirone interrogated Mr. Johnson, who was 16-years-old, about a murder, denied him access to his family, slapped his face repeatedly, struck, kicked and kneed him in the genitals while he was handcuffed to a wall, and pushed him into a wall until he confessed. (Johnson Complaint Register & OPS Investigation; PTP-X JOHNSON-000001-000065).

8. **Harold Lucas (1989)**: Detective Kato punched Mr. Lucas, who was 15-years-old, in the stomach, slapped him, and stepped on his genitals while he was sitting down until Mr. Lucas purportedly confessed to a murder David Jackson, *Fine Line*

94

Steve Art, Esq.
Dan Stohr, Esq.
December 17, 2025
Page 95

*Between Tough Police Work, Brutality, Chicago Tribune*, at 3 (Jul 14, 1991); PTP-H LUCAS-000001-000004.

9. **Keith Mitchell (1997)**: Detective Kato interrogated Mr. Mitchell for three days and forced him to by Detective Kato and was forced to sign a witness statement for a murder he did not witness. Detective Kato elbowed him in the head, kneed him in groin, and threatened to charge him with "setting up" the victim for the murder. (Mitchell Complaint Register & OPS Investigation); PTP-K MITCHELL-000001-000034).

10. **Kevin Murray (1987)**: Detective Kato denied Mr. Murray access to the bathroom, sleep, and food and whenever Murray professed his innocence, Detective Kato repeatedly slapped him in the face, punched him in the stomach, and kicked him in the chest until Mr. Murray confessed. Area 4 Detective John Summerville slapped Mr. Murray on the side of the head and kicked him between the legs, and "backpunched" Murray when he asked for a lawyer. *People v. Murray*, 626 N.E.2d 1140 (1st Dist. 1993). In 2013, the Torture Inquiry and Relief Commission found that Murray had stated a credible claim of torture.

11. **Patrick Prince (1991)**: Detective Kato arrested Mr. Prince, took him to Area 4, held him for hours, physically abused him, and forced him to sign a written statement. *People v. Prince*, 91 CR 26365-01, Apr. 26, 2017 Order (Cir. Ct. Cook Co.); *People v. Prince*, 91 CR 26365-01, Apr. 25, 2017 Closing Memorandum (Cir. Ct. Cook Co.). In 2017, following a multi-day evidentiary hearing, Judge Thaddeus Wilson granted Prince post-conviction relief, explaining that "the testimony and submissions presented . . . seriously call into question the vitality and fidelity of the conviction, especially given the disparities, inconsistencies and newly discovered evidence presented to this Court . . . . This is a case that arose during the times, thinking, sentiments, customs and practices of the 1990s. Petitioner was just 19 years old . . . . The only evidence against Petitioner was his confession. Allegations and findings of past misconduct by police during questioning of suspects are now at an unprecedented high and we now better understand the psychology of false confession." *Id.* at 7-8. The charges against Prince were dismissed, and he was granted a certificate of innocence. (Prince Certificate of Innocence; PTP-P PRINCE-000001-000017).

12. **Angelo Rogers (1990)**: Mr. Rogers, who was 19-years-old, claimed that Detective Kato "kept him awake and unfed overnight, shoved him around and threatened him" causing him to confess to a murder he did not commit. Mr. Rogers was

Steve Art, Esq.
Dan Stohr, Esq.
December 17, 2025
Page 96

acquitted of the murder. David Jackson, *Fine Line Between Tough Police Work, Brutality, Chicago Tribune*, at 1 (Jul 14, 1991); PTP-H LUCAS-000001-000004.

13. **Frederick Seaton (1988)**: Detective Kato, Detective John Summerville and Detective Clarence Lewis (all from Area 4) interrogated Mr. Seaton for longer than a day and physically coerced (slapping, kicking, abusing and threatening) him into making a false confession. Following the interrogation, there was blood in Mr. Seaton's urine, his groin was swollen, and his face was red and sore. The Illinois Appellate Court overturned Mr. Seaton's conviction and ordered that his statement be suppressed, finding that they were the product of an illegal arrest. *People v. Seaton*, 242 Ill.App.3d 1105 (1st Dist. 1993); PTP-F SEATON-000001-000035.

14. **Gregory Shelton (1988)**: Detective Kato questioned Mr. Shelton for more than 24 hours about a murder and instructed Mr. Shelton to stand, at which point Detective "Kato kicked defendant in the groin with his left foot." Officer Jason Vucko joined Detective Kato in the interrogation and slapped Mr. Shelton, slammed his head in the wall, and promised Mr. Shelton that "the beating would stop if he confessed to the murder of [the victim]." Mr. Shelton alleged that Detective Kato refused his request for an attorney. *People v. Shelton*, 264 Ill. App.3d 763 (1st Dist. 1993); PTP-G SHELTON-000001-000006.

15. **Andre Wallace (1994)**: While Mr. Wallace, who was 15-years-old, was handcuffed in an interview room, Detective Kato slapped him, kicked him, and squeezed his testicles, and made promises of leniency, telling him he could leave if he signed a confession. Mr. Wallace's conviction was overturned on appeal and the charges against him were dismissed. *People v. Wallace*, 299 Ill.App.3d 9, 12-13, 19 (1998); (Wallace Complaint Register & OPS Investigation; PTP-A WALLACE-000001-000117).

16. **Keith Washington (1989)**: Detective Kato interrogated Mr. Washington for 28 hours, denied him food and water, punched him in the chest, "kicked [him] in [his] ankles," "hit [him] a couple times, choked [him], said, 'You see what it feels like to be strangled?'" Mr. Washington also alleges that Detective Kato slapped him on both sides of his face and kicked him in the ribs as part of Detective Kato's effort to coerce Mr. Washington to confess. Steve Bogira, *Good Cop, Bad Cop: What is it about Detective Kato that Makes Murder Suspects So Eager to Confess?*, Chicago Reader (Dec. 12, 1991); PTP-K WASHINGTON-000001-000065.

17. **Michael Waslewski and Daniel Gasca (1990)**: Mr. Waslewski claimed that, during an overnight interrogation, Detective Kato and another detective beat him in

Steve Art, Esq.
Dan Stohr, Esq.
December 17, 2025
Page 97

order to secure a confession. David Jackson, *Fine Line Between Tough Police Work, Brutality, Chicago Tribune*, at 2 (Jul 14, 1991). Gasca claimed that he was held for 26 hours, during which time Kato entered the interrogation room, told him "'You're a killer and you have no remorse,'" and when Gasca denied the accusation, Detective Kato hit the side of his head. Following the interrogations, Mr. Waslewski adopted a confession that Detective Kato provided to him, "giv[ing] a detailed statement describing how he and a friend, Daniel Gasca, stabbed [the victim] to death during a fight over money, then put [the victim's] body in the trunk of a car that they left in an alley near Cook County Jail." *Id.* The confession was shown to be false when records emerged showing that Gasca could not have been involved in the crime because he had been in prison on the night it occurred. *Id.* Wasleswki was acquitted at trial. *Waslewski v. Kato*, 1993 U.S. Dist. LEXIS 269, at *1-2 (N.D. Ill. 1993); PTP-M WASLEWSKI-000001-000006.

18. **Ronald West (1989)**: Mr. West testified that Detective Kato and Detective Summerville physically coerced him into falsely confessing to a murder. Mr. West testified "that the police slapped him around, kicked him and chopped him in the throat during the interrogation." *People v. West*, 263 Ill. App. 3d 1041(1st Dist. 1994); PTP-R WEST-000001-000008.

19. **Jeremiah Wright and Elijah Threatt (1999):** Jeremiah Wright and Elijah Threatt, who were 18 and 17-years-old, respectively, and suffered from serious cognitive deficits, were convicted of murder based on confessions elicited by Detective Kato. They testified that Detective Kato and Detective Cirone beat them, threw water on them, and refused one of them access to his inhaler unless he confessed. The Court of Appeals held that defendants' trial counsel was ineffective for failing to investigate and offer evidence of Detective Kato coercing confessions in other cases. *People v. Wright*, 2013 IL App (1st) 103052-U; PTP-JERMIAH WRIGHT & ELIJAH THREATT-000001-000007.

In short, substantial evidence exists that there was a pattern and practice of police interrogation torture and coercion to extract confessions among Area 4 detectives, particularly from (but not limited to) Detective Kriston Kato and the Area 4 detectives with whom he worked cases. These summaries represent a portion of the cases in which Detective Kriston Kato has been accused of physically abusive and coercive interrogations with the result of coercing and/or fabricating false and/or unreliable inculpatory evidence to be used against the interrogated suspect without regard to his actual guilt or innocence. Chicago police commanders and high ranking City of Chicago officials were on continuing notice since at least as early as 1987 that a pattern and practice of police interrogation torture and coercion to extract confessions among Area 4 detectives existed, particularly from (but not limited to) Detective Kriston Kato and the Area 4 detectives with whom he worked cases.

Steve Art, Esq.
Dan Stohr, Esq.
December 17, 2025
Page 98

## (E) Physical Abuse and Coercive Interrogation at Area 5
### Involving Detective Guevara, Detective Halvorson and
### Other Area 5 Chicago Police Detectives

Chicago police commanders and high ranking City of Chicago officials (including police command personnel and the Cook County Attorney's Office) were on continuing notice since as early as 1987 that there was a pattern and practice of police interrogation torture and coercion to extract confessions in Area 5 involving Detective Guevara, Detective Halvorson and other Area 5 Chicago police detectives.

In addition to the cases of David Gecht, Richard Kwil and Ruben Hernandez that are the subject of this report, more than four dozen individuals have had their convictions overturned in cases investigated by Detective Guevara. They are: Jacques Rivera, Juan Johnson, Jose Montanez, Armando Serrano, Jorge Pacheco, Roberto Almodovar, William Negron, Jose Maysonet, Angel Rodriguez, Santos Flores, Arturo DeLeon-Reyes, Gabriel Solache, Ariel Gomez, Xavier Arcos, Ricardo Rodriguez, Robert Bouto, Thomas Sierra, Geraldo Iglesias, Demetrius Johnson, Alfredo Gonzalez, David Gecht, Richard Kwil, Ruben Hernandez, Juan Hernandez, Rosendo Hernandez, Ray Munoz, David Lugo, Carlos Andino, Jaime Rios, Jose Cruz, Marilyn Mulero, Nelson Gonzalez, Johnny Flores, Adolfo Rosario, Eruby Abrego, Jeremiah Cain, Edwin Davila, Daniel Rodriguez, Gamalier Rivera, Fabian Santiago, Madeline Mendoza, Louis Robinson, Tony Gonzalez, Edwin Ortiz, Oscar Soto, David Krueger, Antonio McDowell, and Tyrece Williams.

The following summaries represent a portion of the cases in which Detective Guevara has been accused of physically abusive and coercive interrogations with the result of coercing, fabricating or otherwise creating false and/or unreliable inculpatory evidence to be used against the interrogated suspect without regard to his actual guilt or innocence:

1.  **Gloria Ortiz Bordoy (1995)**: Detective Guevara threatened to hit Gloria Ortiz Bordoy, threatened that her children would be taken by the Department of Children and Family Services, called her "the B word," and told her that she was involved in the crime and was "going down for a long time." Ms. Bordoy signed a statement that the detectives wrote out for her, without reading its contents, because she just wanted to "get out of there." Detective Guevara kept trying to make her say things she was "not aware of." (Deposition of Gloria Ortiz Bordoy, February 19, 2008, *Juan Johnson v. Reynaldo Guevara et al.*; Testimony of Reynaldo Guevara in Motion to Suppress Hearing; AR-L 148767-148860.)

2.  **Elizer Cruzado (1993)**: Detective Guevara arrested fifteen-year-old Elizer Cruzado, who could barely read and write, told him he could go home and see his family again if he agreed to make a statement implicating himself in a murder, and

Steve Art, Esq.
Dan Stohr, Esq.
December 17, 2025
Page 99

threatened him with life imprisonment if he did not make a statement (Testimony of Elizer Cruzado in Motion to Suppress Hearing, March 31, 1995; *State of Illinois v. Elizer Cruzado*, Motion to Quash Arrest and Suppress Statements, March 31, 1995; AR-L 155033-155055).

3. **Edwin Davila (1995)**: Detective Guevara cuffed Mr. Davila to the wall of an interrogation room and told him that he was going to frame him for murder. When Mr. Davila denied involvement in the murder, Detective Guevara forced him to participate in a lineup in which two witnesses falsely identified Mr. Davila as the perpetrator, despite the fact that each witness previously told the police that they had not been able to see the shooter (Deposition of Edwin Davila, Sr., February 26, 2008, *Juan Johnson v. Reynaldo Guevara*; AR-L 154814-155027)

4. **Voytek Dembski (1997)**: Detective Guevara arrested Voytek Dembski and beat, slapped, and yelled at him while he was handcuffed to a chair in an interrogation room. Detective Guevara later got another detective take a statement from Mr. Dembski in English, which Mr. Dembski signed even though he could not speak or read English (Affidavit of Jed Stone, February 20, 2008, *State of Illinois v. Gabriel Solache*; AR-L 155056-155058; April 7, 1999 Testimony of Voytek Dembski; Bluhm 034650-034753).

5. **Adrian Duta (1994)**: Detective Guevara interrogated Mr. Duta about a murder he knew nothing about, smacked him in the head with a folder, and punched him in the stomach causing Mr. Duta signed a statement prepared by Detective Guevara who promised him he could go home if he did (Affidavit of Adrian Duta, June 30, 2008; AR-L 154806-154809).

6. **Adolfo Frias (1993)**: Mr. Frias was handcuffed to a ring on the wall of the extremely cold interrogation room, slapped in the face by Detective Guevara, and beaten by two other Area 5 detectives until he agreed to implicate himself in a murder. Detective Guevara brought Mr. Frias's nephew into the room, who appeared beaten about the face and Frias could hear his wife screaming and his son crying in another room. Detective Guevara threatened Mr. Frias that if he did not confess, his wife would go to prison and his children would be taken away. Mr. Frias, who did not speak English, spoke in Spanish and Detective Guevara translated the statement so that the prosecutor could write the statement in English. Mr. Frias then signed a statement he could not read (*State of Illinois v. Arturo Reyes and Gabriel Solache*, Hearing Transcript Before James M. Obbish, April 11, 2013; AR-L 154693-154805; March 10, 2008 Affidavit of Adolfo Frias-Munoz; Bluhm-10887-10888).

99

Steve Art, Esq.
Dan Stohr, Esq.
December 17, 2025
Page 100

7.  **Arturo DeLeon-Reyes and Gabriel Solache (1998)**: The interrogation-induced signed confession statements of Arturo DeLeon-Reyes and Gabriel Solache meet the criteria for what is known as a proven false confession in the social scientific research literature. Their descriptions of what occurred during their lengthy, unrecorded custodial interrogations conducted by Detective Guevara and others on April 3-5, 1998 is consistent with the empirical social science research on the types of interrogation techniques, methods, practices and effects that lead to false confessions and contain examples of physically and psychologically coercive interrogation techniques, methods, strategies and effects that are known to cause involuntary confessions. Their convictions were set aside, their confessions were suppressed, and they were awarded certificates of innocence. (Reports of Dr. Richard Leo, *Reyes v. Guevara* and *Solache v. City of Chicago*, dated January 15, 2022 and January 31, 2023, and materials cited).

8.  **Leshurn Hunt (1983)**: Detective Guevara and other Area 5 detectives forcibly removed Leshurn Hunt from his home, brought him to the police station, and handcuffed him to a ring on the wall, where they beat him about the head, face, and body until he confessed to a murder and robbery. Mr. Hunt was detained for approximately 23 hours and deprived of food, water, and sleep. Mr. Hunt sought medical treatment for his injuries and filed a complaint with the Office of Professional Standards. The criminal court judge suppressed Mr. Hunt's confession. Hunt filed a civil lawsuit in 1985, alleging that Detective Guevara used force against him to extract a confession. The lawsuit identified "nine recent occasions on which [Guevara and other defendants] were accused of using excessive force during arrests and interrogation." *Hunt v. Jaglowski*, 85 C 1976, 665 F. Supp. 681 (July 21, 1987); (Affidavit of Leshurn Hunt, January 26, 2008 incorporating complaint by Leshurn Hunt to OPS on February 28, 1986; AR-L 545497-545501).

9.  **Jose Maysonet (1995)**: As discussed earlier in this report, Detective Guevara targeted Mr. Maysonet for arrest because Mr. Maysonet refused to pay him protection money, and that during the interrogation, Detective Guevara handcuffed him to the wall and beat him with a flashlight and phone book. Mr. Maysonet was told that his girlfriend would be put in prison and his children would be taken away if he did not cooperate. In 2016, Mr. Maysonet's conviction was vacated and prosecutors dropped all charges against Mr. Maysonet after Detective Guevara and Detective Halvorsen—among others—all alerted the court they would invoke the Fifth Amendment if they were called to the stand. Testimony of Jose Maysonet, Motion to Suppress Hearing, January 31, 1995; AR-L 537618-537792; Andy

Steve Art, Esq.
Dan Stohr, Esq.
December 17, 2025
Page 101

Grimm, *Double-murder charges dropped after 5 cops say they'll take the Fifth*, Chi. Sun-Times, Nov. 15, 2017.

10. **Daniel Pena (1986)**: Detective Guevara and two other Area 5 detectives hit Mr. Pena in the face and ribs, and beat him in the groin and thighs with flashlights until he confessed. Mr. Pena received medical treatment that corroborated his claims of abuse (*State of Illinois v. Juan Perez, Daniel Pena*, Transcript of Report of Proceedings, July 14, 1986; AR-L 154619-154687).

11. **David Rivera (1991)**: Detective Guevara coerced David Rivera into signing a confession by telling him that if he confessed and pled guilty, he would serve seven years in prison whereas if he did not confess, he would be sent away for forty to fifty years, and that if he signed a statement at the police station, he could go home. (Affidavit of David Rivera, February 22, 2008; AR-L 155028-155029).

12. **Daniel Rodriguez and David Velasquez (1991)**: On the way to the police station after Mr. Rodriguez's arrest, Detective Guevara threatened that if Rodriguez did not cooperate and make it easy on himself, Detective Guevara would raid his house and frame his girlfriend. Detective Guevara's partner, Detective Halverson, beat Mr. Rodriguez during the interrogation. Detective Guevara then coerced Mr. Rodriguez into signing a false statement implicating himself in a murder. Detective Guevara also coerced sixteen year-old David Velasquez to implicate Mr. Rodriguez in the murder by beating and threatening him. Velasquez has given multiple sworn statements over the last three decades about Detective Guevara's and Detective Halvorsen's misconduct, beginning with Mr. Rodriguez's 1993 trial. Affidavit of Daniel Rodriguez (March 25, 2008; AR-L 147462-147466; *Reynaldo Munoz v. State of Illinois*, Excerpt Report of Proceedings had before the Honorable Sophia Atcherson, July 14, 2021; AR-L 155313-15363).

13. **Victor Vera (1989)**: Detective Guevara threatened to lock up Mr. Vera's brother and parents if he did not confess, promised Mr. Vera that "nothing would come back to" him and that Detective Guevara would give him "total control over the Spanish Cobras neighborhood" if he admitted his involvement in a murder. When those methods were unsuccessful, Detective Guevara drove Mr. Vera to rival gang territory where there was a hit out on him, announced on a bullhorn that Mr. Vera was in the car, and tried to shove him out of the car causing Mr. Vera to agree to falsely confess. (Affidavit of Victor Vera, December 20, 2007; AR-L 154810-154813)

Steve Art, Esq.
Dan Stohr, Esq.
December 17, 2025
Page 102

The Chicago Police Department received numerous civilian complaints charging Detective Guevara with using physical force to coerce suspects and witnesses, including the following:

1.  **Annie and Bernard Turner (1982)**: Annie and Bernard Turner alleged that Guevara used excessive force against them for smoking on a city bus. The allegations were not sustained. CR 124631; AR-L 648760-648819.

2.  **Leshurn Hunt (1983)**: As discussed above, Detective Guevara and other Area 5 detectives forcibly removed Leshurn Hunt from his home, brought him to the police station, and handcuffed him to a ring on the wall, where they beat him about the head, face, and body until he confessed to a murder and robbery. Mr. Hunt was detained for approximately 23 hours and deprived of food, water, and sleep. Mr. Hunt sought medical treatment for his injuries and filed a complaint with the Office of Professional Standards. The criminal court judge suppressed Mr. Hunt's confession. Mr. Hunt filed a civil lawsuit in 1985, alleging that Detective Guevara used force against him to extract a confession. The lawsuit identified "nine recent occasions on which [Guevara and other defendants] were accused of using excessive force during arrests and interrogation." *Hunt v. Jaglowski*, 85 C 1976, 665 F. Supp. 681 (July 21, 1987). CR 145129; AR-L 545458-545460.

3.  **Rafael Garcia (1986)**: Mr. Garcia alleged that Detective Guevara, while off duty at a bar, accused him of dealing narcotics, cuffed him, punched him, threw him to the ground, and kicked him. After Detective Guevara uncuffed Mr. Garcia at the urging of the bar owner, Detective Guevara hit Mr. Garcia in the head, and threw him out of the bar. When Mr. Garcia found other officers and told them what Detective Guevara had done, Detective Guevara tried to have Mr. Garcia arrested again. All of Mr. Garcia's allegations against Detective Guevara were not sustained, but Detective Guevara received a 2-day suspension for failing to complete an officer battery report and failing to obtain authorization prior to releasing Mr. Garcia. CR C152902; RFC 31530-31592.

4.  **Melvin Warren (1986)**: Mr. Warren alleged that Detective Guevara punched and choked him. The allegation was "sustained" following an investigation but OPS subsequently overturned the "sustained" finding and changed it to "not sustained." CR C150473; AR-L 648889-648898.

5.  **Juanita Martinez (1995)**: Mr. Gecht alleged that Detective Guevara "physically abused" her minor son to obtain information regarding a murder. The allegations were not sustained. CR 217624; RFC 31756-31791.

102

Steve Art, Esq.
Dan Stohr, Esq.
December 17, 2025
Page 103

In other cases, individuals alleged they had been abused by Detective Guevara in attempts to obtain confessions or to provide false testimony against other suspects:

1. **Timothy Rankins and Armando Serrano/Jose Montanez (1993)**: Detective Guevara placed a phone book over Mr. Rankins' head and beat it with a flashlight, threw Mr. Rankins out of his chair, and placed Mr. Rankins in a chokehold to induce him to sign a statement that Detective Guevara had prepared implicating Serrano and Montanez in a murder. Mr. Serrano and Mr. Montanez have both received certificates of innocence (Sworn Statement of Timothy Rankins, *State of Illinois v. Armando Serrano*, April 3, 2012; AR-L 155230-155268; Corrected First Amended Complaint, *Jose Montanez v. Reynaldo Guevara, et al.*; AR-L 563644-563688; Complaint, *Armando Serrano v. Reynaldo Guevara, et al.*); AR-L 563597-563643).

2. **Jose E. Melendez and Thomas Sierra (1995)**: Witness Jose E. Melendez reported that Detective Guevara and others physically abused him and then retaliated against him when he could not provide information about a murder by charging him with a different murder. Jose E. Melendez was later acquitted of all charges. A different Jose Melendez (Jose M. Melendez)—who was with a victim during the murder of which Sierra was wrongly convicted—testified that when he went to Area 5 Detective Guevara pointed to a picture of Sierra and told him to identify that person as the shooter. Jose M. Melendez repeatedly testified that he told Detective Guevara that he did not know who the shooter was yet Mr. Melendez went along with Detective Guevara and "pointed out the one [Guevara] told me to point out." The other eyewitness in the case—Alberto Rodriguez—testified multiple times that he "couldn't give a good description" of the shooter. Detective Guevara coerced him into identifying Sierra by telling him that they "got the person or they know of the person" and that the shooter was "probably the guy in these pictures" prior to showing him the photo array. In 2018, Sierra's conviction was vacated and the State's Attorney dismissed all charges (Deposition of Jose Melendez, September 13, 2021, *Thomas Sierra v. Reynaldo Guevera et al.*); AR-L 155271-155312.

In 2013, the City of Chicago commissioned an investigation into Detective Guevara and hired former United States Attorney Scott Lassar to conduct the investigation. Reports in the investigation were completed in 2015 and concluded that at least four different men who alleged misconduct by Guevara are "most likely innocent." These men are Roberto Almodovar, Armando Serrano, Jose Montanez, and Robert Bouto. Lassar also reached conclusions in the DeLeon-Reyes and Solache cases, including that the allegations "that Guevara physically abused Solache and Reyes in an effort to coerce them to admit their involvement in the Soto murders are credible, and that it is more likely than not that Solache and Reyes were, in fact, physically abused during the course of their interrogations."

103

Steve Art, Esq.
Dan Stohr, Esq.
December 17, 2025
Page 104

In sum, Chicago police commanders and high ranking City of Chicago officials (including police command personnel) were on continuing notice since as early as 1982 that there was a pattern and practice of police interrogation torture and coercion to extract confessions in Area 5 involving Detective Guevara, Detective Halvorson and other Area 5 Chicago police detectives.

### (F) Conclusion

Dating back to the early 1970s, and at least until the early 2000's, there has been an extensive and widespread practice of torture, physical abuse and coercion during police interrogations in the Chicago Police Department, resulting in numerous coerced, fabricated, unreliable and/or false confessions. The substantial evidence I have reviewed in this report indicates that this pervasive practice of abusive police interrogations to coerce and fabricate confessions, especially from African American and Latino men, was *citywide* and existed in the different detective areas. The City of Chicago has been on notice of this widespread and extensive practice at least since the early to mid-1980s. By the time of the lengthy and psychologically coercive interrogations of David Gecht, Richard Kwil and Ruben Hernandez on March 1-2, 1999, the City of Chicago had been on notice for many years and decades of the pervasive practice of torture, abuse and coercion by Chicago Police detectives during interrogation to extract and fabricate confessions

### XVII. Conclusion

In conclusion, based on my detailed analysis above, it is my professional opinion that:

1) David Gecht's description of what occurred during his lengthy period of custodial interrogation on March 2, 1999 by Chicago police detectives Reynaldo Guevara, Ernest Halvorsen, Alan Pergande, and Muzupappa that led to his confession statement is consistent with the empirical social science research on the types of interrogation techniques, methods, and practices that explain how and why innocent individuals are moved to make and/or agree to false and unreliable confession statements.

2) David Gecht's description of what occurred during his unrecorded custodial interrogation on March 2, 1999 by detectives Guevara, Halvorsen, Pergande and Muzupappa involved physically coercive interrogation, which is known to cause false and unreliable incriminating statements, admissions and confessions.

3) According to David Gecht's description, the lengthy period of custodial interrogation on March 2, 1999 by Chicago police detectives Reynaldo Guevera, Ernest Halvorsen and Alan Pergande that led to his confession statement was guilt-presumptive, confession-driven and confirmatory. According to Mr. Gecht's description, the interrogation was structured to break down Mr. Gecht's denials of guilt and to incriminate him by coercively pressuring and

104

Steve Art, Esq.
Dan Stohr, Esq.
December 17, 2025
Page 105

persuading him to agree with, and admit to, detectives Guevara's and Halvorsen's pre-existing conclusion that he actively participated in the murder of Roberto Cruz, first as the shooter, then as the driver and eventually as the lookout. Detectives Guevara's, Halvorsen's, Pergande's and Muzupappa's guilt-presumptive interrogation sessions were not structured to assess the reliability of any information they learned from Mr. Gecht, but purely to submit him to their will and extract an incriminating statement from him; they demonstrated a reckless disregard for the truth.

4) David Gecht's description of what occurred during his lengthy period of custody and interrogation by detectives Guevara, Halvorsen, Pergande and Muzupappa on March 2, 1999 involved the use of psychological interrogation techniques, methods, and strategies that have been shown by social science research to increase the risk of eliciting false and unreliable statements, admissions and/or confessions (*i.e.*, *situational* risk factors) when misapplied to the innocent. According to Mr. Gecht's description of the interrogation, these included: physical coercion, lengthy interrogation, sleep deprivation, explicit threats of harm, explicit promises of freedom/leniency and physical and psychological coercion.

5) David Gecht's description of his lengthy period of custody and interrogation by detectives Guevera, Halvorsen, Pergande and Muzupappa on March 2, 1999 contains examples of extremely psychologically coercive interrogation techniques, methods, and strategies that have been demonstrated to cause suspects to perceive that they have no meaningful choice but to comply with the demands of their interrogators, and that are known to increase the risk of eliciting involuntary statements, admissions and/or confessions.

6) The lengthy custodial interrogation sessions on March 2, 1999 described by David Gecht involved police interrogation contamination (*i.e.*, leaking and disclosing non-public case facts) and police interrogation scripting (pressuring and persuading the suspect to accept the police narrative of how and why the alleged crime occurred), which increased the risk that Mr. Gecht's confession statement, if false, would misleadingly appear to be detailed, accurate and self-corroborating and thus increase his risk of being falsely convicted at trial.

7) The lengthy custody and interrogations by Detectives' Guevara, Halvorsen, Pergande and Muzupappa on March 2, 1999 described by David Gecht violated numerous universally accepted police investigative and interrogation national training standards, police protocols and commonly accepted best practices that existed in 1999.

8) David Gecht's interrogation-induced confession statement contains numerous indicia of unreliability associated with false confessions, and it contains no indicia of reliability. If Mr. Gecht's interrogation-induced confession statement is false, it is properly classified as what is known in the social science research literature as a *coerced-compliant* false confession.

9) Richard Kwil's description of what occurred during his lengthy period of custodial interrogation on March 1-2, 1999 by Chicago police detectives Guevara, Halvorsen, Pergande

105

Steve Art, Esq.
Dan Stohr, Esq.
December 17, 2025
Page 106

and Muzupappa that led to his confession statement is consistent with the empirical social science research on the types of interrogation techniques, methods, and practices that explain how and why innocent individuals are moved to make and/or agree to false and unreliable confession statements.

10) According to Richard Kwil's description, of his interrogation, the lengthy period of custodial interrogation on March 1-2, 1999 by Chicago police detectives Guevera, Halvorsen, Pergande and Muzupappa that led to his confession statement was guilt-presumptive, confession-driven and confirmatory. According to Mr. Kwil's description, the interrogation was structured to break down Mr. Kwil's denials of guilt and to incriminate him by coercively pressuring and persuading him to agree with, and admit to, detective Guevara's, Halvorsen's, Pergande's and Muzupappa's pre-existing conclusion that he actively participated in the murder of Roberto Cruz. Detectives Guevara's, Halvorsen's, Pergande and Muzupappa guilt-presumptive interrogation sessions were not structured to assess the reliability of any information they learned from Mr. Kwil, but purely to submit him to their will and extract an incriminating statement from him; they demonstrated a reckless disregard for the truth.

11) Richard Kwil's description of what occurred during his lengthy period of custody and interrogation by detectives Guevera, Halvorsen, Pergande and Muzupappa on March 1-2, 1999 involved the use of psychological interrogation techniques, methods, and strategies that have been shown by social science research to increase the risk of eliciting false and unreliable statements, admissions and/or confessions (*i.e.*, *situational* risk factors) when misapplied to the innocent. According to Mr. Kwil's description of the interrogation, these included: physical coercion, lengthy interrogation, sleep deprivation, false evidence ploys, explicit threats of harm, explicit promises of freedom/leniency and psychological coercion.

12) Richard Kwil's description of his lengthy period of custody and interrogation by detectives' Guevera, Halvorsen, Pergande and Muzupappa on March 1-2, 1999 contains examples of extremely psychologically coercive interrogation techniques, methods, and strategies that have been demonstrated to cause suspects to perceive that they have no meaningful choice but to comply with the demands of their interrogators, and that are known to increase the risk of eliciting involuntary statements, admissions and/or confessions.

13) The lengthy custodial interrogation sessions on March 1-2, 1999 described by Richard Kwil involved police interrogation contamination (*i.e.*, leaking and disclosing non-public case facts) and police interrogation scripting (pressuring and persuading the suspect to accept the police narrative of how and why the alleged crime occurred), which increased the risk that Mr. Kwil's confession statement, if false, would misleadingly, appear to be detailed, accurate and self-corroborating and thus increase his risk of being falsely convicted at trial.

14) The lengthy custody and interrogations by Detectives Guevera, Halvorsen, Pergande and Muzupappa on March 1-2, 1999 described by Richard Kwil violated numerous universally

Steve Art, Esq.
Dan Stohr, Esq.
December 17, 2025
Page 107

accepted police investigative and interrogation national training standards, police protocols and commonly accepted best practices that existed in 1999.

15) Richard Kwil's interrogation-induced confession statement contains numerous indicia of unreliability associated with false confessions, and it contains no indicia of reliability. If Mr. Gecht's interrogation-induced confession statement is false, it is properly classified as what is known in the social science research literature as a *coerced-compliant* false confession.

16) Ruben Hernandez's description of what occurred during his custodial interrogation on March 1-2, 1999 by Chicago police detective Reynaldo Guevara, Halvorsen, Pergande and Muzupappa that led to his confession statement is consistent with the empirical social science research on the types of interrogation techniques, methods, and practices that explain how and why innocent individuals are moved to make and/or agree to false and unreliable confession statements.

17) Ruben Hernandez's description of what occurred during his unrecorded custodial interrogation on March 1-2 by detective Guevara involved physically coercive interrogation, which is known to cause false and unreliable incriminating statements, admissions and confessions.

18) According to Ruben Hernandez's description, the interrogation on March 1-2, 1999 by Chicago police detective Reynaldo Guevera that led to his confession statement was guilt-presumptive, confession-driven and confirmatory. According to Mr. Hernandez's description, the interrogation was structured to break down Mr. Hernandez's denials of guilt and to incriminate him by coercively pressuring and persuading him to agree with, and admit to, detective Guevara's, Halvorsen's, Pergande and Muzupappa's pre-existing conclusion that he actively participated in the murder of Roberto Cruz. Detective Guevara's, Halvorsen, Pergande and Muzupappa's guilt-presumptive interrogation session was not structured to assess the reliability of any information he learned from Mr. Hernandez, but purely to submit him to his will and extract an incriminating statement from him; Guevara demonstrated a reckless disregard for the truth.

19) Ruben Hernandez's description of what occurred during his interrogation by detectives Guevara, Halvorsen, Pergande and Muzupappa on March 1-2, 1999 involved the use of psychological interrogation techniques, methods, and strategies that have been shown by social science research to increase the risk of eliciting false and unreliable statements, admissions and/or confessions (*i.e.*, *situational* risk factors) when misapplied to the innocent. According to Mr. Hernandez's description of the interrogation, these included: sleep deprivation, false evidence ploys, explicit promises of freedom/leniency and physical and psychological coercion.

20) Ruben Hernandez's description of his interrogation by detectives Guevera, Halvorsen, Pergande and Muzupappa on March 1-2, 1999 contains examples of extremely psychologically coercive interrogation techniques, methods, and strategies that have been

107

Steve Art, Esq.
Dan Stohr, Esq.
December 17, 2025
Page 108

demonstrated to cause suspects to perceive that they have no meaningful choice but to comply with the demands of their interrogators, and that are known to increase the risk of eliciting involuntary statements, admissions and/or confessions.

21) The interrogation session on March 1-2, 1999 described by Ruben Hernandez involved police interrogation contamination (*i.e.*, leaking and disclosing non-public case facts) and police interrogation scripting (pressuring and persuading the suspect to accept the police narrative of how and why the alleged crime occurred), which increased the risk that Mr. Hernandez's confession statement, if false, would misleadingly, appear to be detailed, accurate and self-corroborating and thus increase his risk of being falsely convicted at trial.

22) The interrogation by Detectives Guevara, Halvorsen, Pergande and Muzupappa on March 1-2, 1999 described by Ruben Hernandez violated numerous universally accepted police investigative and interrogation national training standards, police protocols and commonly accepted best practices that existed in 1999.

23) Ruben Hernandez's interrogation-induced confession statement contains numerous indicia of unreliability associated with false confessions, and it contains no indicia of reliability. If Mr. Hernandez's interrogation-induced confession statement is false, it is properly classified as what is known in the social science research literature as a *coerced-compliant* false confession.

24) Starting in 1972 and continuing up to at least 2000, the City of Chicago's Police Department had a systemic practice of subjecting African American and Latino suspects who were interrogated by detectives and supervisors to physically abusive and coercive interrogations with the result of coercing and/or fabricating false and/or unreliable inculpatory evidence to be used against the interrogated suspect without regard to his actual guilt or innocence.

25) At least as early as February of 1982 and continuing through the 1990s, high ranking officials in the City of Chicago and the Chicago Police Department and numerous police command personnel, received continuing notice of this systemic practice of physical abuse and coercion of Black and Latino suspects in order to coerce and fabricate confessions, including from the repeated documented allegations that accumulated against supervisors and detectives, first at the Area 2 Detective Division, and later at Areas 3, 4 and 5; from the testimony of criminal defendants at motion to suppress hearings and trials; from numerous court decisions in criminal cases; from the findings in numerous Office of Professional Standards reports; from federal and state court decisions; and from the admissions of City officials.

The opinions I express in this report are based on my own knowledge, research, and publications; research and publications in the field; and the case-specific information and evidence that has been provided to me. Should any additional information or testimony come to my attention, I reserve the right to modify any opinions expressed herein accordingly.

Steve Art, Esq.
Dan Stohr, Esq.
December 17, 2025
Page 109

If you have any questions, please do not hesitate to contact me.

Sincerely yours,

Richard A. Leo, Ph.D., J.D.
Hamill Family Professor of Law and
Social Psychology
University of San Francisco

December, 2025

**DR. RICHARD A. LEO, Ph.D, J.D.**

**CURRICULUM VITAE**

**ADDRESSES**

| | |
|---|---|
| **Professional Office (Mailing Address)** | **University Office** |
| 15 Ashbury Terrace | University of San Francisco |
| San Francisco, CA 94117 | School of Law |
| | San Francisco, CA 94117 |

| | | |
|---|---|---|
| Phone: | (415) 661-0162 | 415-422-6513 |
| FAX: | N/A | (415) 422-6433 |
| Email: | rleo@jrcsf.com | rleo@usfca.edu |

| | |
|---|---|
| Webpage: | http://www.usfca.edu/law/faculty/fulltime/leor.html |
| SSRN: | http://ssrn.com/author=1020356 |
| BePress: | http://works.bepress.com/richardleo/ |

**POSITIONS HELD**

| | |
|---|---|
| 7/06-Present | Hamill Family Professor of Law and Psychology<br>University of San Francisco |
| 7/13-6/14 | Visiting Professor of Law and<br>Co-Director, Program on Understanding Law, Science and Evidence<br>University of California, Los Angeles |
| 7/97 – 6/06 | Associate Professor of Criminology, Law and Society and<br>Associate Professor of Psychology and Social Behavior<br>University of California, Irvine |
| 8/94 - 5/97 | Assistant Professor of Sociology and Adjunct Professor of Law<br>University of Colorado, Boulder |

**EDUCATION**

| | |
|---|---|
| 8/90 - 8/94 | Ph.D. in Jurisprudence and Social Policy<br>**Specialization: Criminology and Social Psychology**<br>University of California, Berkeley |
| 8/92 - 5/94 | J.D., Boalt Hall School of Law<br>University of California, Berkeley |

1

| 9/87 - 6/89 | M.A. in Sociology |
| | University of Chicago |

| 9/81 - 5/85 | A.B. in Sociology, with Honors |
| | University of California, Berkeley |

## ACADEMIC SPECIALIZATION

Criminology/Criminal Justice     Psychology and Law     Social Psychology
Criminal Procedure/Criminal Law     Law and Social Science     Police Organization/Behavior

## RESEARCH SPECIALIZATION

Police Interrogation     Wrongful Convictions     Coercive Persuasion
False Confessions     Police Investigation     Influence and Decision-Making

## AWARDS

The Henry F. Fradella Award (2025). Western Society of Criminology. (For significant contributions to empirical scholarship on the legal aspects of criminal justice).

Distinguished Scholar Award (2017). American Society of Criminology, Division of Policing (For outstanding contributions to the field of policing).

Academic Excellence Award (2017). International Investigative Interviewing Research Group (In recognition of outstanding achievements to ethical investigative interviewing).

Lifetime Achievement Award (2014). Society for the Study of Social Problems, Crime and Juvenile Delinquency Division. (For distinguished scholarship in the fields of crime and delinquency).

Paul Tappan Lifetime Achievement Award (2014). Western Society of Criminology. (For outstanding contributions to the field of criminology).

The President's Award (2014). Western Society of Criminology. (For contributions to the field of criminology and positive influence on the current Western Society of Criminology President's career).

Fellowship, Center for the Advanced Study in the Behavioral Sciences (2014-2015). Stanford University.

William J. Chambliss Lifetime Achievement Award (2013). Society for the Study of Social Problems, Law and Society Division. (For career-spanning excellence and achievement in the area of law and society).

Guggenheim Fellowship (2011). John Simon Guggenheim Memorial Foundation. (For men and women who have already demonstrated exceptional capacity for productive scholarship or exceptional

2

creative ability in the arts).  New York, N.Y.

Edwin H. Sutherland Outstanding Scholarship Award from the Society for the Study of Social Problems, Law and Society Division (2010) for *Police Interrogation and American Justice* (Harvard University Press, 2008).  Inaugural award.

Outstanding Book Award (2010) from the Academy of Criminal Justice Sciences for *Police Interrogation and American Justice* (Harvard University Press, 2008).

Herbert Jacob Book Prize (2009) from the Law and Society Association for *Police Interrogation and American Justice* (Harvard University Press, 2008)

Distinguished Scholarship Award (2009) from the Pacific Sociological Association for *Police Interrogation and American Justice* (Harvard University Press, 2008).  Honorable Mention.

Soros Senior Justice Fellowship (2004).  Open Society Institute.  Soros Foundation.  New York, N.Y.

The Saleem Shah Career Achievement Award (2000).  Given by The American Psychology-Law Society (Division 41 of the American Psychological Association) and the American Academy of Forensic Psychology for early career excellence and contributions to psychology, law and public policy.

The Ruth Shonle Cavan Young Scholar Award (1999).  Given by The American Society of Criminology to recognize outstanding scholarly contributions to the discipline of criminology.

Distinguished Assistant Professor Award for Research (2000-2001).  University of California, Irvine. Conferred by the Academic Senate of the University of California, Irvine for distinguished research.

Faculty Career Development Award (1998-1999). University of California, Irvine.

Graduate Student Paper Award, Honorable Mention (1994) from the American Sociological Association, Crime, Law, and Deviance Section.

Outstanding Graduate Student Instructor Award (1993).  University of California, Berkeley. Department of Legal Studies.

Prosser Prize (1992), "Guggenheim Crime Policy Seminar."  University of California, Berkeley, Boalt Hall Law School.

### **ADDITIONAL HONORS AND DISTINCTIONS (SELECTIVE)**

Top Lifetime Criminal Law Scholars according to ScholarGPS (#27).  See https://scholargps.com/top-scholars?year=2024&ranking_duration=LIFETIME&discipline=Criminal+Law&p=2&e_ref=d2c8764859695ad27673#27

50 Most Downloaded U.S. Law Professors in 2022 (#31).  See
https://taxprof.typepad.com/taxprof_blog/2023/01/the-50-most-downloaded-us-law-professors-of-2022.html

50 Most Downloaded U.S. Law Professors in 2021 (#38).  See
https://taxprof.typepad.com/taxprof_blog/2022/01/the-50-most-downloaded-us-law-professors-of-2021.html#more

Most impactful and widely cited scholars of all time according to HeinOnline.  (#84 as of July 23, 2020). See https://home.heinonline.org/top_authors/

Publications have been downloaded 90,000 times on the Social Science Research Network (Top 10% of all authors). See http://www.usfca.edu/law/faculty/fulltime/leor.html

Member (Elected), American Law Institute (October, 2011-Present).

Listed in 2016 by the *Wall Street Journal* as one of 25 U.S. Law Professors whose research and publications have been cited most often by courts.  See Nick Farris, Valerie Aggerbeck, Megan McNevin, & Greg Sisk, *Judicial Impact of Law School Faculties*, http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2826048

The subject of a full-length feature article by Mark Leviton (July, 2017).  "The Whole Truth: Richard A. Leo on Why Innocent People Confess to Crimes."  *The Sun Magazine*, Pp. 6-15.  See http://thesunmagazine.org/issues/499/the-whole-truth

The subject of a *New Yorker* magazine article by Jeffrey Toobin (August 24, 2009).  See: http://www.newyorker.com/talk/2009/08/24/090824ta_talk_toobin

Listed in Brian Leiter, *Most Cited Law Professors by Specialty, 2000-2007*, Criminal Law and Procedure, (http://www.leiterrankings.com/faculty/2007faculty_impact_areas.shtml)

*Board member*, Forensic Social Sciences Association (2/14-Present).

*Member*, Scientific Advisory Board.  National Center for Reason and Justice (3/02-10/23).

Fellow, Center for the Advanced Study in the Behavioral Sciences, Stanford University (9/14-6/15).

Fellow, Institute for Legal Research, Criminal Justice Studies Program, University of California, Berkeley School of Law (8/05-3/20).

*Affiliate*, Center on Police Practices and Community (COPPAC). University of California, Santa Barbara Institute of Social, Behavioral & Economic Research (7/01-9/05).

Fellow, Earl Warren Legal Institute Criminal Justice Program, University of California, Berkeley School of Law (10/98-8/05).

*Visiting Scholar*, Boalt Hall School of Law, University of California, Berkeley (8/03-8/05).

*Visiting Professor* of Sociology, Nankai University, Tianjin, China (10/96).

## PUBLICATIONS

### BOOKS

N/A    Tom Wells and Richard A. Leo. THE INNOCENCE REVOLUTION: HOW THE INNOCENCE MOVEMENT CHANGED AMERICA (With Agent).

- Received Guggenheim Fellowship Award to co-write this book

2012    CONFESSIONS OF GUILT: FROM TORTURE TO MIRANDA AND BEYOND (with George C. Thomas III).  New York: Oxford University Press.  ISBN #: 978-0-19-533893-5.  Available at: http://www.oup.com/us/catalog/general/subject/Sociology/CriminalJustice/?view=usa&ci=9780195338935

- Translated into Chinese by SHANGHAI JIAOTONG UNIVERSITY PRESS of Shanghai (2014)

2008    POLICE INTERROGATION AND AMERICAN JUSTICE (2008).  Cambridge: Harvard University Press.  ISBN #: 0-674-02648-9.  Available at: http://www.hup.harvard.edu/catalog/LEOPOL.html  or  http://www.amazon.com/Police-Interrogation-American-Justice-Richard/dp/0674026489

- Edwin H. Sutherland Outstanding Scholarship Award. The Society for the Study of Social Problems (2010).  Inaugural award.

- Outstanding Book Award (2010).  Academy of Criminal Justice Sciences.

- Herbert Jacob Book Prize (2009).  Law and Society Association.

- Distinguished Scholarship Award (2009).  Pacific Sociological Association.  Honorable Mention.

- Excerpts reprinted in Yale Kamisar Et. Al, Eds. (2008).  *Modern Criminal Procedure: Cases, Comments, Questions*.  Twelfth Edition.  (St. Paul, MN: West Publishing).  Pp. 540, 624, 719-720

- Paperback version published in August, 2009

- Translated into Chinese by China University of Political Science and Law Press (2012)

5

- Translated into Korean by Humanitas Press (2014)

2008 THE WRONG GUYS: MURDER, FALSE CONFESSIONS AND THE NORFOLK FOUR (2008) (with Tom Wells). New York: The New Press.  ISBN #: 978-1-59558-401-4.   Available at:  http://amazon.com or http://thenewpress.com.  See also: http://www.wrongguys.com.

- Nominated for a National Book Award and a Pulitzer Prize

- The subject of a *New Yorker* magazine article by Jeffrey Toobin (August 24, 2009).  See: http://www.newyorker.com/talk/2009/08/24/090824ta_talk_toobin

- Received Soros Senior Justice Fellowship (2004) to write this book

2008 THE PROBLEM OF FALSE CONFESSIONS IN THE POST-DNA WORLD (2008) (with Steven Drizin).  Published as a book in Japan by Nippon Hyoronsha Co., LTD.  ISBN #: 978-4-535-51664-9.

1998 THE MIRANDA DEBATE: LAW, JUSTICE AND POLICING (1998) (with George C. Thomas III, Eds).  Boston: Northeastern University Press.  ISBN #: 1-55553-338-8.

1998 THE AMERICAN CRIMINAL JUSTICE SYSTEM (1998), (Ed).  (Simon & Schuster). ISBN #:  0-536-00826-4.

## ARTICLES, BOOK CHAPTERS AND OTHER PUBLICATIONS

2027 "Why Study the Causes of Wrongful Convictions." Forthcoming in Sam Poyser and Rebecca Milne, Eds (2027).  *Routledge International Handbook of Causes of Wrongful Convictions* (Routledge).

2026 "How Sleep Disruption Impacts the Evidentiary Value of Statements and Confessions: Toward Evidence-Based Standards (with Zlatan Krizan and Breanna Curran). Forthcoming in *Psychology, Public Policy and Law*.

2026 "Exonerations: Causes, Consequences and Reforms" (with Lara Bazelon).  Forthcoming in the *Annual Review of Criminology*.  Volume 9.

2026 "Coercion, Trauma and Grief in the Interrogation Room: Documenting and Analyzing Cases of False Confessions to Murder of a Family Member" (with Steven Drizin, Hayley Cleary and Samara Hoose).  Forthcoming in the *Journal of Criminal Law and Criminology*.

2026 "*Miranda* at 60: From Safeguard to Symbol." (with Sophia Lennox).  Forthcoming in the *University of San Francisco Law Review*.  Volume 60.

2025 "Police-Induced Confessions, 2.0: Risk Factors and Recommendations" (with Saul Kassin,

Hayley Cleary, Gisli Gudjonsson, Christian Meissner, Allison Redlich and Kyle Scherr). *Law and Human Behavior.* Vol. 49, No. 1, pp. 7–53. Available at: http://ssrn.com/author=1020356

2025 "Police Interrogation and False Confessions in Rape Cases." Ann Burgess and Rober Hazelwood, Eds (2025). *Practical Aspects of Rape Investigation: A Multidisciplinary Approach.* 6th Edition. (Boca Raton, Florida: CRC Press). Pp. 177-185Available at: http://ssrn.com/author=1020356

- Reprinted in Lara Bazelon, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series. University of San Francisco School of Law. Vol. 17, No. 1 (2024)

2024 "False Confessions and Miranda Waivers" (With William Follette and Deborah Davis). In Elizabeth Kelley, Ed (2024). *Representing People with Mental Disabilities: A Practical Guide for Criminal Defense Attorneys*, 2nd Edition (Chicago: American Bar Association). Pp. 159-189. Available at: http://ssrn.com/author=1020356

- Reprinted in Bill Hing, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series. University of San Francisco School of Law. Vol. 17, No. 2 (2024)

2023 "How Sleep-Related Fatigue Impacts the Evidentiary Value of Statements and Confessions" (with Zlatan Krizan). *The Champion.* (November-December, 2023). Vol XLVII, No. 8. Pp. 44-53. Available at: http://ssrn.com/author=1020356

2023 "Do Jurors Understand the Causes of False Confession, and Do They Adjust Their Perceptions of Suspects' Confessions Appropriately?" (with Deborah Davis) in Gavin Oxburgh, Trond Myklebust, Mark Fallon and Maria Hartwig, Eds. (2023). *Interviewing and Interrogations: A Review of Research and Practice since World War II* (Torkel Opsahl Academic EPublisher). Available at: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3773751

2023 "Interrogation By Proxy: The Growing Role of Lay and Undercover Interrogators in Eliciting Criminal Confessions." (with Deborah Davis, Iris Blandon-Gitlin, Hayley Cleary, Mark Costanzo and Stephen Margolis). The *Criminal Law Bulletin*, Vol. 50, No. 4. Pp. 395-479. Available at: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3773751

- Reprinted in Lara Bazelon, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series. University of San Francisco School of Law. Vol. 17, No. 1 (2024)

2023 "The Decision to Confess Falsely Twenty-Five Years Later: Windows and Walls in Psychological and Legal Scholarship." The *Denver University Law Review*. Vol. 100, Pp. 541-551. Available at: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3773751

- Reprinted in Lara Bazelon, Legal Scholarship Network (SSRN): Legal Studies

7

Research Paper Series. University of San Francisco School of Law. Vol. 17, No. 1 (2024)

2023　"Interrogation and the Infanticide Suspect: Mechanisms of Vulnerability to False Confession" (with Deborah Davis) in Keith Findley, Cyrille Rossant, Kana Sasakura, Leila Schneps, Waney Squier, and Knut Wester Eds. (2023). *Shaken Baby Syndrome: Investigating The Abusive Head Trauma Controversy* (Cambridge University Press). Pp. 179-189. Available at: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3773751

- Reprinted in Lara Bazelon, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series. University of San Francisco School of Law. Vol. 16, No. 1 (2023)

2023　"A History of Interrogation and Interrogative Suggestibility," (with Laura Nirider and Deborah Davis) in Demos Lorandos, Ed. (2023). *The Litigator's Handbook on Forensic Medicine, Psychiatry and Psychology*, Vol. 2 (West Thomson Reuters). Pp. 273-360. Available at: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3773751

- Reprinted in Alice Kaswan, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series. University of San Francisco School of Law. Vol. 14, No. 1 (2021)

2022　"Theorizing Failed Prosecutions" (with Jon B. Gould Victoria M. Smiegocki) in *Journal of Criminal Law and Criminology*. Vol. 112, Pp. 329-367. Available at: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3773751

- Reprinted in Alice Kaswan, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series. University of San Francisco School of Law. Vol. 14, No. 1 (2021)

2021　"On the Synergy Between Pretext Caller and Police Interrogator" (with Deborah Davis, Tyler Livingston and Peter Rerick) in Nadine Deslauriers-Varin and Craig Bennell, Eds. (2021). *Criminal Investigation of Sexual Offenses* (Springer). Pp. 115-130. Available at: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3773751

- Reprinted in Alice Kaswan, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series. University of San Francisco School of Law. Vol. 14, No. 1 (2021)

2020　"Science Lag and Knowledge Cumulation: Urgent Issues and Prospects in Reforming Interrogation Practices in the USA and Canada" (with Brent Snook et al.) in *Legal and Criminological Psychology*. Available at: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3669413

- Reprinted in Alice Kaswan, Legal Scholarship Network (SSRN): Legal Studies

Research Paper Series. University of San Francisco School of Law. Vol. 13, No. 1 (2020)

2020 "Structural Police Deception in American Police Interrogation: A Closer Look at Minimization and Maximization." in Lutz Eidam, Michael Lindemann, and Andreas Ransiek, Eds. (2020*). Interrogation Confession and Truth: Comparative Studies in Criminal Procedure.* (Baden-Baden, Germany: Nomos Press). Pp. 183-207. Available at: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3584817

- Reprinted in Tristin Green, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series. University of San Francisco School of Law. Vol. 13, No. 1 (2020)

2020 "The Analysis of Nonverbal Communication: The Dangers of Pseudoscience in Security and Justice Contexts" (with Vincent Denault et al.). *Annual Review of Legal Psychology*, 30, 1-12. Also simultaneously published in French (*Revue internationale de criminologie et de police technique et scientifique*) and in Spanish (*Anuario de Psicología Jurídica*).

2019 "Police Interrogation and Suspect Confessions," in Eric Miller and Tamara Lave, Eds. (2019), *The Cambridge Handbook on Policing in the United States* (Boston, MA: Cambridge University Press). Pp. 178-199. Available at: http://ssrn.com/author=1020356

- Reprinted in Tristin Green, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series. University of San Francisco School of Law. Vol. 11, No. 2 (2018)

2018 "Mental Health and False Confessions" (With William Follette and Deborah Davis). In Elizabeth Kelley, Ed (2018). *Representing People with Mental Disabilities: A Criminal Defense Lawyer's Best Practices Manual* (Chicago: American Bar Association). Pp. 95-124. Available at: http://ssrn.com/author=1020356

- Reprinted in Tristin Green, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series. University of San Francisco School of Law. Vol. 10, No. 3 (2017)

2018 "Interrogation and Confessions: Social Science, Law and Public Policy." Pp. 233-259. In Erik Luna, Ed. (2018), *Academy for Justice: Reforming Criminal Justice, Vol. 2: Policing*. Available at: http://ssrn.com/author=1020356

- Reprinted in Tristin Green, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series. University of San Francisco School of Law. Vol. 10, No. 1 (2017)

2018 "Police Interrogation and Coercion in Domestic American History: Lessons for the War on Terror" (with Alexa Koenig), in Scott Anderson and Martha Nussbaum, Eds., (2018)

*Confronting Torture: Essays on the Ethics, Legality, History, and Psychology of Torture Today*.  Pp. 146-174. (Chicago: University of Chicago Press). Available at: http://ssrn.com/author=1020356

- Reprinted in Joshua Davis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series.  University of San Francisco School of Law.  Volume 3, No. 1 (2010).

2017  "What Innocence Means Today and Why It Matters," 68 *Florida Law Review*, 1569-1596 as a larger essay entitled, "Voices on Innocence" (with Lucian Dervan, Meghan Ryan, Valena Beety, Gregory Gilchrist and William Berry).  Available at: http://ssrn.com/author=1020356

- Reprinted in Michelle Travis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series. University of San Francisco School of Law. Vol. 9, No. 2 (2016)

2017  "The *Miranda* App: Metaphor and Machine (with Andrew Guthrie Ferguson).  *Boston University Law Review*, Vol. 97.  Pp. 935-992.  Available at: http://ssrn.com/author=1020356

- Reprinted in Tristin Green, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series. University of San Francisco School of Law. Vol. 10, No. 1 (2017)

2017  "The Criminology of Wrongful Conviction: A Decade Later." *Journal of  Contemporary Criminal Justice*.  Vol. 33.  Pp. 82-106.  Available at: http://ssrn.com/author=1020356

- Reprinted in Tristin Green, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series. University of San Francisco School of Law. Vol. 9, No. 5 (2016)

2017  "Has the Innocence Movement Become an Exoneration Movement? The Risks and Rewards of Redefining Innocence," in Daniel Medwed, Ed. (2017), *Wrongful Convictions and the DNA Revolution: Twenty-Five Years of Freeing the Innocent* (Boston, MA: Cambridge University Press).  Pp. 57-83.  Available at: http://ssrn.com/author=1020356

- Reprinted in Michelle Travis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series. University of San Francisco School of Law. Vol. 9, No. 3 (2016)

2017  "Police Interrogation, False Confessions and Alleged Child Abuse Cases." *The Michigan Journal of Law Reform*, Vol. 50.  Pp. 693-721.  Available at: http://ssrn.com/author=1020356

- Reprinted in Brian Gallini, Ed. (2018). *Investigative Criminal Procedure: Inside This Century7's Most (In) Famous Cases* (West Publishing).

- Reprinted in Tristin Green, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series. University of San Francisco School of Law. Vol. 10, No. 1 (2017)

10

2017    "A Damning Cascade of Investigative Errors: Flaws in Homicide Investigation in the U.S.A." (with Deborah Davis) in Fiona Bookman, Ed. (2017). *Handbook on Homicide* (Wiley-Blackwell). Pp. 578-598.  Available at: http://ssrn.com/author=1020356

- Reprinted in Michelle Travis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series. University of San Francisco School of Law. Vol. 9, No. 1 (2016)

2017    "Police Interrogation and False Confessions in Rape Cases" in Roy Hazelwood and Ann Burgess, Eds (2017). *Practical Aspects of Rape Investigation: A Multidisciplinary Approach*. 5th Edition.  (Boca Raton, Florida: CRC Press).  Pp. 177-186.  Available at: http://ssrn.com/author=1020356

- Reprinted in Michelle Travis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series. University of San Francisco School of Law. Vol. 9, No. 2 (2016)

2016    "The Path to Exoneration" (with Jon Gould).  *Albany Law Review*.  Vol. 79, Pp. 325-372. Available at: http://ssrn.com/author=1020356

- Reprinted in Michelle Travis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series. University of San Francisco School of Law. Vol. 9, No. 1 (2016)

2016    "When Exoneration Seems Hopeless: The Special Vulnerability of Sexual Abuse Suspects to False Confession" (with Deborah Davis) in Ros Burnett, Ed. (2016). *Wrongful Allegations of Sexual and Child Abuse* (New York: Oxford University Press).  Pp. 175-190. Available at: http://ssrn.com/author=1020356

- Reprinted in Michelle Travis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series. University of San Francisco School of Law. Vol. 7, No. 5 (2014)

2016    "Analyzing Videotaped Interrogations and Confessions." *The Champion*.  Vol. XL, No. 12 (December, 2016).  Pp. 40-47.  Available at: http://ssrn.com/author=1020356

- Reprinted in Michelle Travis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series. University of San Francisco School of Law. Vol. 9, No. 1 (2016)

2016    "Her Story, His Story: Sexual Miscommunication, Motivated Remembering, and Intoxication as Pathways to Honest False Testimony Regarding Sexual Consent." (With Guillermo Villalobos and Deborah Davis) in Ros Burnett, Ed. (2016). *Wrongful Allegations of Sexual and Child Abuse* (New York: Oxford University Press).  Pp. 129-142. Available at: http://ssrn.com/author=1020356

- Reprinted in Michelle Travis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series. University of San Francisco School of Law. Vol. 7, No. 6 (2014)

2016    "False Confessions in the 21st Century" (with Brian Cutler). *The Champion*. Pp. 46-55.  Vol.

11

XL, No. 4 (May, 2016). Available at: http://ssrn.com/author=1020356

- Reprinted in Michelle Travis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series. University of San Francisco School of Law. Vol. 9, No. 1 (2016)

2015 "The Sound of Silence: *Miranda* Waivers, Selective Literalism and Social Context" in Lawrence Solan, Janet Ainsworth and Roger Shuy, Eds. (2015). *Speaking of Language and Law* (New York: Oxford University Press). Pp. 255-259. Available at: http://ssrn.com/author=1020356

- Reprinted in Michelle Travis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series. University of San Francisco School of Law. Vol. 7, No. 4 (2014)

2014 "The Justice Gap and the Promise of Criminological Research." *Criminology, Criminal Justice, Law & Society*, Vol. 15, No. 3. Pp. 1-37. Available at: http://ssrn.com/author=1020356

- Reprinted in *The Russian Journal of Law and Economics* (2022), Vol. 16, Pp. 625-665. Available at: https://www.elibrary.ru/item.asp?id=49396295

- Reprinted in Michelle Travis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series. University of San Francisco School of Law. Vol. 8, No. 1 (2015)

2014 "Predicting Erroneous Convictions" (with Jon Gould, Julia Carrano and Katie Hail-Jares). *Iowa Law Review*, Vol. 99, Pp. 471-522. Available at: http://ssrn.com/author=1020356

- Reprinted in Russell Covey and Valena Beety, Eds. (2018). *Reading Innocence: A Wrongful Convictions Reader*. (Durham: Carolina Academic Press). Pp. 358-359; 595-600.

- Reprinted in Joshua Davis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series. University of San Francisco School of Law. Volume 6, No. 3 (2013)

2014 "Disputed Interrogation Techniques in America: True and False Confessions and the Estimation and Valuation of Type I and II Errors" (with Deborah Davis) in Sarah Cooper, Ed. (2014). *Controversies in Innocence Cases in America* (Surrey, England: Ashgate Publishing Ltd). Pp. 57-72. Available at: http://ssrn.com/author=1020356

- Reprinted in Joshua Davis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series. University of San Francisco School of Law. Volume 6, No. 4 (2013)

2014 "Innocent Defendants: Divergent Case Outcomes and What They Teach Us" (with Jon Gould, Julia Carrano, and Katie Hail-Jares) in Marvin Zalman and Julia Carrano, Eds. (2014), *Wrongful Conviction and Criminal Justice Reform: Making Justice* (London: Routledge). Pp. 73-92. Available at: http://ssrn.com/author=1020356

12

- Reprinted in Joshua Davis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series.  University of San Francisco School of Law.  Volume 6, No. 4 (2013)

2014    "Interrogation and Confessions" (with Deborah Davis) in Jay Albanese, Ed. (2014).  *The Encyclopedia of Criminology and Criminal Justice*, Vol. III (New York: John Wiley & Sons).  Pp. 1199-1206.   Available at: http://ssrn.com/author=1020356

2013    "Why Interrogation Contamination Occurs," The *Ohio State Journal of Criminal Law*, Vol. 11.  Pp. 193-215.  Available at: http://ssrn.com/author=1020356

- Reprinted in Joshua Davis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series.  University of San Francisco School of Law.  Volume 6, No. 4 (2013)

2013    "Promoting Accuracy in the Use of Confession Evidence: An Argument for Pre-Trial Reliability Assessments to Prevent Wrongful Convictions" (with Peter Neufeld, Steven Drizin, and Andrew Taslitz).  *Temple Law Review*, Vol. 85, Pp. 759-838. Available at: http://ssrn.com/author=1020356

- Reprinted in Joshua Davis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series.  University of San Francisco School of Law.  Volume 6, No. 2 (2013)

2013    "False Confessions and the Constitution: Problems, Possibilities and Solutions."  John T. Parry and L. Song Richardson, Eds. (2013).  *The Constitution and the Future of Criminal Law in America* (New York: Cambridge University Press).  Pp. 169-186.  Available at: http://ssrn.com/author=1020356

- Reprinted in Joshua Davis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series.  University of San Francisco School of Law.  Volume 6, No. 1 (2013).

2013    "The Problem of Interrogation-Induced False Confession: Sources of Failure in Prevention and Detection" (with Deborah Davis) in Stephen Morewitz and Mark Goldstein, Eds. (2013).  *Handbook of Forensic Sociology and Psychology* (New York: Springer).   Pp. 47-75.  Available at: http://ssrn.com/author=1020356

- Reprinted in Ira Belkin, Chao Liu, and Amy Gao (2018).  *Questioning Police Interrogation Methods: A Comparative Study* (China: Law Press).

- Reprinted in Joshua Davis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series.  University of San Francisco School of Law.  Volume 5, No. 5 (2012).

2013    "Acute Suggestibility in Police Interrogation:  Self-Regulation Failure as a Primary Mechanism of Vulnerability" in Anne Ridley, Ed. (2013). *Suggestibility in Legal Contexts: Psychological Research and Forensic Applications*.  (Chicester: John Wiley & Sons, Ltd.).  Pp. 171-195.  Available at: http://ssrn.com/author=1020356

13

2013    "The Law of Interrogation" (with George C. Thomas III).  G.J.N. Bruinsma and D.L. Weisburd, Ed. (2013).  *Encyclopedia of Criminology & Criminal Justice* (New York: Springer).  Pp. 2835-2840.  Available at: http://ssrn.com/author=1020356

2012    "Interrogation Related Regulatory Decline: Ego-Depletion, Failures of Self-Regulation and the Decision to Confess" (with Deborah Davis).  *Psychology, Public Policy and Law*, Vol 18. Pp. 673-704.  Available at: http://ssrn.com/author=1020356

- Reprinted in Joshua Davis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series.  University of San Francisco School of Law.  Volume 4, No. 4 (2011).

2012    "To Walk in Their Shoes: The Problem of Missing, Misrepresented, and Misunderstood Context in Judging Criminal Confessions" (with Deborah Davis).  *New England Law Review*. Vol. 46, No. 4.  Pp. 737-767.  Available at: http://ssrn.com/author=1020356

- Reprinted in Joshua Davis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series.  University of San Francisco School of Law.  Volume 5, No. 4 (2012).

2012    "Interrogation Through Pragmatic Implication: Sticking to the Letter of the Law While Violating Its Intent" (with Deborah Davis) in Lawrence Solan and Peter Tiersma, Eds. (2012). *Oxford Handbook on Language and the Law* (Oxford University Press).  Pp. 354-366. Available at: http://ssrn.com/author=1020356

- Reprinted in Joshua Davis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series.  University of San Francisco School of Law.  Volume 4, No. 2 (2011).

2011    "Three Prongs of the Confession Problem: Issues and Proposed Solutions" (with Deborah Davis).  In Carol Henderson and Jules Epstein, Eds. (2011).  *The Future of Evidence: How Science and Technology Will Change The Practice of Law* (Chicago: American Bar Association Books).  Pp. 233-264.  Available at: http://ssrn.com/author=1020356

2011    "Jurors Believe Interrogation Tactics Are Not Likely to Elicit False Confessions: Will Expert Witness Testimony Inform Them Otherwise?" (With Iris Blandon-Gitlin and Kathryn Sperry). *Psychology, Crime and Law*.  Vol. 17, 239-260. Available at: http://ssrn.com/author=1020356

- Reprinted in Joshua Davis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series.  University of San Francisco School of Law.  Volume 4, No. 1 (2011).

2010    "One-Hundred Years Later: Wrongful Convictions after a Century of Research" (with Jon Gould).  *Journal of Criminal Law and Criminology*.  Vol. 100, Pp. 825-868.  Available at: http://ssrn.com/author=1020356

- Reprinted in Reprinted in Russell Covey and Valena Beety, Eds. (2018).  *Reading Innocence: A Wrongful Convictions Reader*. (Durham: Carolina Academic Press).  Pp. 69-71.

- Reprinted in Joshua Davis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series.  University of San Francisco School of Law.  Volume 3, No. 4 (2010).

2010 "The Gatehouse and Mansions: Fifty Years Later" (with Alexa Koenig).  T*he Annual Review of Law and Social Science*, Vol. 6, 323-339.  Available at: http://ssrn.com/author=1020356

- Reprinted in Joshua Davis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series.  University of San Francisco School of Law.  Volume 3, No. 3 (2010).

2010 "From False Confession to Wrongful Conviction: Seven Psychological Processes" (with Deborah Davis).  *The Journal of Psychiatry and the Law*, Vol. 38, 9-56. Available at: http://ssrn.com/author=1020356

- Excerpted in Open Access Journal of Forensic Psychology (2009), Vol. 1.  Available at: http://www.forensicpsychologyunbound.ws/

- Reprinted in Asifa Begum, Ed. (2009).  *Law and Justice – Psychology Role Play* (Amicus Books: The Icfai University Press) and in Joshua Davis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series.  University of San Francisco School of Law. Volume 2, No. 5 (2009)

2010 "White Paper Commentaries: Looking Ahead" (with Saul Kassin, Steven Drizin, Thomas Grisso, Gisli Gudjonsson and Allison Redlich).  *Law and Human Behavior*. Vol. 34, Pp. 49-52. Available at: http://ssrn.com/author=1020356

2010 "Police-Induced Confessions: Risk Factors and Recommendations" (with Saul Kassin, Steven Drizin, Thomas Grisso, Gisli Gudjonsson and Allison Redlich). *Law and Human Behavior*.Vol. 34, Pp. 3-38.  Available at: http://ssrn.com/author=1020356

- Designated a "White Paper" of the American-Psychology Law Society, Division 41 of the American Psychological Association.

- Reprinted in Reprinted in Russell Covey and Valena Beety, Eds. (2018).  *Reading Innocence: A Wrongful Convictions Reader*. (Durham: Carolina Academic Press).  Pp. 140-150.

- Reprinted in Ira Belkin, Chao Liu, and Amy Gao (2018).  *Questioning Police Interrogation Methods: A Comparative Study* (China: Law Press).

- Reprinted in Joshua Davis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series.  University of San Francisco School of Law.  Volume 3, No. 2 (2010).

2010 "The Three Errors: Pathways to False Confession and Wrongful Conviction" (with Steve Drizin) in Daniel Lassiter and Christian Meissner, Eds. (2010).  *Police Interrogations and*

15

*False Confessions: Current Research, Practice, and Policy Recommendations*. (Washington, D.C.: American Psychological Association). Pp. 9-30. Available at: http://ssrn.com/author=1020356

- *Police Interrogation and False Confessions* selected as recipient of the 2011 American Psychology-Law Society's Outstanding Book Award and the 2010 Publishers Award for Professional and Scholarly Excellence in the field of psychology

- Reprinted in Joshua Davis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series. University of San Francisco School of Law. Volume 5, No. 1 (February 29, 2012).

2010    "Selling Confession: Setting the Stage with the Sympathetic Detective with a Time-Limited Offer (with Deborah Davis and William Follette). *Journal of Contemporary Criminal Justice*, Vol. 26, Pp. 441-457. Available at: http://ssrn.com/author=1020356

- Reprinted in Joshua Davis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series. University of San Francisco School of Law. Volume 3, No. 4 (2010).

2010    "Overcoming Judicial Preferences for Person versus Situation-Based Analyses of Interrogation Induced Confessions" (with Deborah Davis). *The Journal of the American Academy of Psychiatry and the Law*, Vol. 38. Pp. 187-194. Available at: http://ssrn.com/author=1020356

- Reprinted in Joshua Davis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series. University of San Francisco School of Law. Volume 5, No. 3 (2012).

2010    "Reply to Samuel R. Gross and Barbara O'Brien" (with Jon Gould). *The Ohio State Journal of Criminal Law*, Vol. 8, Pp. 277-279. Available at: http://ssrn.com/author=1020356

2010    "Moving Targets: Placing the Good Faith Doctrine in the Context of Fragmented Policing" (with Hadar Aviram and Jeremy Seymour). *The Fordham Urban Law Journal*. Vol. 37, Pp. 709-742. Available at: http://ssrn.com/author=1020356

- Reprinted in Joshua Davis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series. University of San Francisco School of Law. Volume 5, No. 2 (2012).

2009    "Studying Wrongful Convictions: Learning from Social Science" (with Jon Gould). *The Ohio State Journal of Criminal Law,* Vol. 7, Pp. 7-30. Available at: http://ssrn.com/author=1020356

- Reprinted in Joshua Davis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series. University of San Francisco School of Law. Volume 3, No. 2 (2010).

2009    "False Confessions: Causes, Consequences and Implications." *The Journal of the American Academy of Psychiatry and the Law*, Vol. 37, Pp. 332-343. Available at: http://ssrn.com/author=1020356

- Reprinted in Joshua Davis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series.  University of San Francisco School of Law.  Volume 2, No. 2. (March 13, 2009).

2009    "What Do Potential Jurors Know About Police Interrogation and False Confessions?" (With Brittany Liu). *Behavioral Sciences and the Law*, Vol. 27, Pp. 381-399.  Available at: http://ssrn.com/author=1020356

- Reprinted in Joshua Davis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series.  University of San Francisco School of Law.  Volume 2, No. 3. (May 29, 2009).

2009    "Psychological and Cultural Aspects of Interrogations and False Confessions: Using Research to Inform Legal Decision-making" (with Mark Costanzo and Netta Shaked) in Daniel A. Krauss and Joel D. Lieberman, Eds (2009).  *Psychological Expertise in Court: Psychology in the Courtroom*.  Volume II.  (Burlington, VT: Ashgate Publishing Co).  Pp. 25-56.  *Available at*: http://ssrn.com/author=1020356

- Reprinted in Joshua Davis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series.  University of San Francisco School of Law.  Volume 4, No. 1 (2011).

2009    "Interrogation" (with Mark Costanzo) in Allan Jamieson and Andre Moenssens (Eds). The Wiley Encyclopedia of Forensic Science (London: John Wiley & Sons).  Volume 3.  Pp. 1586-1590. Available at: http://ssrn.com/author=1020356

2008    "Police Interrogation and False Confessions in Rape Cases." In Roy Hazelwood and Ann Burgess, Eds.  *Practical Rape Investigation: A Multidisciplinary Approach*.  4th Edition. (Boca Raton, Florida: CRC Press).  Pp. 211-217.

2007    "The Problem of False Confession in America."  *The Champion*.  Vol. 41, No. 10. Pp. 30-35.

2007    "Mandate the Electronic Recording of Police Interrogations" (with Kimberly D. Richman). *Crime and Public Policy*, Vol. 6, Pp. 791-798.  Available at: http://ssrn.com/author=1020356

2007    "Police Interviewing and Interrogation: A Self-Report Survey of Police Practices and Beliefs" (with Saul M. Kassin, Christian A. Meissner, Kimberly D. Richman, Lori H. Colwell, Amy Leach, and Dana LaFon).  *Law and Human Behavior*. Vol. 31, Pp. 381-400.  *Available at*: http://ssrn.com/author=1020356

- Reprinted in Joshua Davis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series.  University of San Francisco School of Law.  Volume 3, No. 2 (2010).

2007    "Mental Health Status and Vulnerability to Police Interrogation Tactics" (with William Follette and Deborah Davis).  *Criminal Justice* (A publication of the American Bar Association), Vol.

22, Pp. 42-49.

2007    "Research and Expert Testimony on Interrogation and Confessions" (with Mark Costanzo).  In Mark Costanzo, Dan Krauss and Kathy Pezdek, Eds. (2007). *Expert Psychological Testimony for the Courts*.  (New Jersey: Erlbaum).  Pp. 69-98.  *Available at*: http://ssrn.com/author=1020356

2006    "Bringing Reliability Back in: False Confessions and Legal Safeguards in the Twenty-First Century" (with Steven Drizin, Peter Neufeld, Brad Hall and Amy Vatner).  *Wisconsin Law Review*. Vol. 2006, Pp. 479-539.  *Available at*: http://ssrn.com/author=1020356

- Reprinted in Russell Covey and Valena Beety, Eds. (2018).  *Reading Innocence: A Wrongful Convictions Reader*. (Durham: Carolina Academic Press).  Pp. 135-139.

- Reprinted in Joshua Davis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series.  University of San Francisco School of Law.  Volume 2, No. 1. (January 15, 2009).

2006    "Strategies for Preventing False Confessions and Their Consequences" (with Deborah Davis). In Mark Kebbell and Graham Davies, Eds. (2006). *Practical Psychology for Forensic Investigations and Prosecutions*.  (New York: John Wiley & Sons).  Pp. 121-149.  Available at: http://ssrn.com/author=1020356

- Reprinted in Joshua Davis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series.  University of San Francisco School of Law.  Volume 4, No. 3. (July 21, 2010).

2006    "Psychological Weapons of Influence: Applications in the Interrogation Room" (with Deborah Davis).  *Nevada Lawyer*.  Pp. 14-19.

2005    "Re-Thinking the Study of Miscarriages of Justice: Developing a Criminology of Wrongful Conviction." *Journal of Contemporary Criminal Justice*.  Vol. 21, Pp. 201-223.  *Available at*: http://ssrn.com/author=1020356

2005    "Interrogating Guilty Suspects: Why Sipowicz Never Has to Admit He is Wrong" (with George C. Thomas III).  In Glenn Yeffeth, Eds (2005).  *What Would Sipowicz Do? Race, Rights and Redemption* (Dallas: BenBella Books).  Pp. 35-46.

2005    "Interrogation and Confessions," in J. Miller Mitchell & Richard A. Wright, Eds. *The Encyclopedia of Criminology* (New York: Routledge). Vol. 2, Pp. 819-825.

2004    "The Problem of False Confessions in the Post-DNA World" (with Steve Drizin).  *North Carolina Law Review*.  Vol. 82.  Pp. 891-1007.  *Available at*: http://ssrn.com/author=1020356

- Cited by United States Supreme Court in *J.D.B. v. North Carolina*, 2011 WL 2369509.

18

- Cited by United States Supreme Court in *Corley v. United States*, 129 S. Ct. 1558 (2009).

- Published as a book in Japan in 2008 by Nippon Yoronsha Co., Ltd

- Reprinted in Yale Kamisar et al. (2008). *Modern Criminal Procedure: Cases, Comments*, *Questions*. Twelfth Edition. (St. Paul, MN: West Publishing). Pp. 652 and 718. Reprinted in Andrew E. Taslitz and Margaret Paris (2007). *Constitutional Criminal Procedure*, 3rd Edition (Foundation Press).

2004 "The Third Degree and the Origins of Psychological Interrogation in America." In Daniel Lassiter, Ed. (2004). *Interrogations, Confessions and Entrapment.* Perspectives in Law and Psychology Series, Vol. 20 (New York: Kluwer Academic/Plenum Publishers). Pp. 37-84. *Available at*: http://ssrn.com/author=1020356

2004 "Beating a Bum Rap." *Contexts*. Vol. 3, Pp. 68-69.

2002 "The Effects of *Miranda v. Arizona*: Embedded in Our National Culture?" (With George C. Thomas III). In Michael Tonry, Ed. *Crime and Justice – A Review of Research, Crime and Justice*. Vol. 29, Pp. 203-271. *Available at*: http://ssrn.com/author=1020356

2002 "*Miranda*, Confessions and Justice: Lessons for Japan?" In Malcolm Feeley and Setsuo Miyazawa, Eds. (2002). *The Japanese Adversary System in Context: Controversies and Comparisons* (London: Palgrave). Pp. 200-219. *Available at*: http://ssrn.com/author=1020356

2002 "Interrogation." In David Levinson, Ed. *The Encyclopedia of Crime & Punishment* (Great Barrington, MA: Berkshire Reference Works). Pp. 927-931.

2001 "Questioning the Relevance of *Miranda* in the Twenty-First Century." *The Michigan Law Review*. Vol. 99. Pp. 1000-1029. *Available at*: http://ssrn.com/author=1020356

- Cited by the United States Supreme Court in *Missouri v. Seibert*, 124 S. Ct. 2601 (2004).

- Reprinted in Yale Kamisar, Wayne LaFave, and Jerold Israel (2002). *Modern Criminal Procedure: Cases, Comments*, *Questions*. Ninth Edition. (St. Paul, MN: West Publishing).

2001 "The Truth about False Confessions and Advocacy Scholarship" (with Richard Ofshe). *The Criminal Law Bulletin*. Vol. 37, Pp. 293-370. *Available at*: http://ssrn.com/author=1020356

2001 "False Confessions: Causes, Consequences, and Solutions." In Saundra D. Westervelt and John A. Humphrey, Eds. (2001). *Wrongly Convicted: Perspectives on Failed Justice* (Newark: Rutgers University Press). Pp. 36-54.

2001 "Police Interrogation and False Confessions in Rape Cases." In Roy Hazelwood and Ann Burgess, Eds. *Practical Rape Investigation: A Multidisciplinary Approach*. 3rd Edition.

19

(Boca Raton, Florida: CRC Press). Pp. 233-241.

2001    "Confessions" in Gillian Lindsey and Jonathan Michie, Eds. *Reader's Guide to the Social Sciences*. Vol. 1. (London: Fitzroy Dearborn Publishers). Pp. 266-267.

2000    "Autism, Rape and Arson" (with Ann Burgess, David Elkovitch, Jay Jackman). *Sexual Assault Report*. Vol. 4, Number 2. November/December. Pp. 17, 28-30.

1999    "Adapting to *Miranda*: Modern Interrogators' Strategies for Dealing with the Obstacles Posed by *Miranda*" (with Welsh S. White). *Minnesota Law Review*. Volume. 84. Pp. 397-472. *Available at*: http://ssrn.com/author=1020356

- Cited by the United States Supreme Court in *Maryland v. Shatzer*, 130 S. Ct. 1213 (2010)

1998    "Using the Innocent to Scapegoat *Miranda*: Another Reply to Paul Cassell" (with Richard Ofshe). *The Journal of Criminal Law and Criminology*. Vol. 88, Pp. 557-577. *Available at*: http://ssrn.com/author=1020356

1998    "The Consequences of False Confessions: Deprivations of Liberty and Miscarriages of Justice in the Age of Psychological Interrogation" (with Richard Ofshe). *The Journal of Criminal Law and Criminology*. Vol. 88, Pp. 429-496. *Available at*: http://ssrn.com/author=1020356

- Reprinted in Alisa Smith (2004). *Law, Social Science, and the Criminal Courts* (Durham: Carolina Academic Press). Pp. 286-295.

1998    "*Miranda* and the Problem of False Confessions." In Richard A. Leo and George C. Thomas, III. Eds. *The Miranda Debate: Law, Justice and Policing* (Boston: Northeastern University Press). Pp. 271-282.

1998    "Civil Rights and Civil Liberties: Videotaping the Police." *Criminal Justice Ethics*. Vol. 17, No. 1. Winter/Spring. Pp. 44-45.

1998    "Witness for False Confession No Expert." *The Forensic Echo: The Monthly Newsmagazine of Psychiatry, Law & Public Policy*. Vol II., No. 3 (February). Pp. 14-15.

1998    "False Confessions and Miscarriages of Justice." *The Defender* (January). Pp. 3-6.

1997    "The Social and Legal Construction of Repressed Memory." *Law & Social Inquiry*, Vol. 22, Pp. 653-693. *Available at*: http://ssrn.com/author=1020356

1997    "Missing the Forest for the Trees: A Response to Paul Cassell's 'Balanced Approach' to the False Confession Problem" (with Richard Ofshe). *Denver University Law Review*. Vol. 74, Pp. 1135-1144. *Available at*: http://ssrn.com/author=1020356

1997    "The Decision to Confess Falsely: Rational Choice and Irrational Action" (with Richard

20

Ofshe).  *Denver University Law Review*.  Vol. 74, Pp. 979-1122.  *Available at*:
http://ssrn.com/author=1020356

- Reprinted in Myron Moskovitz (2010).  *Cases and Problems in Criminal Procedure: The Police*.  5th Edition.

1997    "The Social Psychology of Police Interrogation: The Theory and Classification of True and False Confessions" (with Richard Ofshe).  *Studies in Law, Politics & Society*, Vol. 16. Pp. 189-251. Available at: http://ssrn.com/author=1020356

1997    "Some Thoughts about Police and Crime."  In Lawrence Friedman and George Fisher, Eds. (1997).  *The Crime Conundrum: Essays on Criminal Justice* (Boulder: Westview Press).  Pp. 121-125.

1997    "False Confessions and Miscarriages of Justice Today." In Richard A. Leo, Ed. (1997).  *The American Criminal Justice System* (Simon & Schuster).  Pp. 169-206.

1997    "A Historical Overview of Confession Law."  In Richard A. Leo, Ed. (1997).  *The American Criminal Justice System* (Simon & Schuster).  Pp. 151-160.

1997    "The Criminal Justice System: An Overview."  In Richard A. Leo, Ed. (1997).  *The American Criminal Justice System* (Simon & Schuster).  Pp. 1-20.

1996    "Police Scholarship for the Future: Resisting the Pull of the Policy Audience."  *Law & Society Review*, Vol. 30, Pp. 865-879.  *Available at*: http://ssrn.com/author=1020356

1996    "The Impact of *Miranda* Revisited." *The Journal of Criminal Law and Criminology*.  Volume 86, Pp. 621-692.  *Available at*: http://ssrn.com/author=1020356

- Reprinted in Richard A. Leo and George C. Thomas, III. Eds (1998).  *The Miranda Debate: Law, Justice and Crime Control* (Boston: Northeastern University Press).  Pp. 208-221.

1996    "*Miranda*'s Revenge: Police Interrogation as a Confidence Game."  *Law & Society Review*, Vol. 30, Pp. 259-288.  *Available at*: http://ssrn.com/author=1020356

- Reprinted in Ronald Allen et al. (2005).  Comprehensive Criminal Procedure (New York: Aspen Publishers).  2nd Ed.  Pp. 888-889.

1996    "Inside the Interrogation Room." *The Journal of Criminal Law and Criminology*.  Vol. 86, Pp. 266-303.  *Available at*: http://ssrn.com/author=1020356

- Reprinted in Adam M. Gershowitz (2013).  *The Wire: Crime, Law and Policy* (Durham, NC: Carolina Academic Press).  Pp. 147-161.

- Reprinted in Jeannine Bell, Ed. (2006), *Police and Policing Law*.  Ashgate Publishing Ltd.

21

Pp. 99-136.  Also reprinted in Joshua Dressler and George C. Thomas III (1999), *Cases and Materials on Criminal Procedure* (West Publishing).  Pp. 566-568, 598, 673-676.

1996    "The Ethics of Deceptive Research Roles Reconsidered: A Reply to Kai Erikson." *The American Sociologist*.  Vol. 27, Pp. 122-128.

1995    "Trial and Tribulations: Courts, Ethnography, and the Need for an Evidentiary Privilege for Academic Researchers." *The American Sociologist*.  Vol. 26, Pp. 113-134.

- Reprinted in Robert Emerson (2001), *Contemporary Field Research: Perspectives and Formulations* (Prospect Heights: Waveland Press). 2nd Edition. Pp. 260-279.

1994    "Police Interrogation and Social Control." *Social and Legal Studies*: *An International Journal*, Vol. 3, and Pp. 93-120.  *Available at*: http://ssrn.com/author=1020356

1994    "Police Interrogation in America: A Study of Violence, Civility and Social Change" (Ph.D. dissertation, University of California at Berkeley).  Available at: *https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4133882*

1993    "The Yale White-Collar Crime Project: A Review and Critique" (with David T. Johnson).  *Law And Social Inquiry*, Vol. 18, Pp. 63-99.  *Available at*: http://ssrn.com/author=1020356

- Reprinted in Michael Levi, Ed (1998). *Fraud: Organizational, Motivation, and Control*, Volume II (England: Ashgate Publishing Ltd). Pp. 51-88.

1992    "From Coercion to Deception: The Changing Nature of Police Interrogation in America." *Crime, Law, and Social Change: An International Journal*.  Vol. 18, Pp. 35-59.  *Available at*: http://ssrn.com/author=1020356

- Reprinted in Richard A. Leo and George C. Thomas, III. Eds (1998).  *The Miranda Debate: Law, Justice and Crime Control* (Boston: Northeastern University Press).  Pp. 65-74.

1992    "The Ethics of Deceptive Interrogation" (with Jerome H. Skolnick).  *Criminal Justice Ethics*.  Vol. 11, No. 1.  Winter/Spring.  Pp. 3-12.  *Available at*: http://ssrn.com/author=1020356

- Reprinted in Michael C. Braswell, Belinda R. McCarthy and Bernard J. McCarthy (2005) *Justice, Crime and Ethics*. Fifth Edition.  Pp. 69-84.  Reprinted in Jeffrey Reiman (2000), *Criminal Justice Ethics* (New York: Prentice-Hall).  Reprinted in *The Leadership Journal* (January-March, 1993). Pp. 23-27; (Cincinnati: Anderson Publishing Co). Reprinted in *The Boalt Hall Transcript*, spring, 1993. Pp. 21-23; Revised and expanded as a chapter in John Bizzack (Ed), *Issues in Policing: New Perspectives*.  (Lexington: Autumn House Publishing).  Pp. 75-95.

**OTHER WRITINGS**

22

Amicus Curiae Brief, Supreme Court of New Jersey (with Hayley Cleary, Kyle Scherr, Lucy Guarnera, Saul Kassin, Lindsay Malloy, Christian Meissner, Allison Redlich, and Melissa Russano)). *State of New Jersey v. Darryl Nieves*. Supreme Court of New Jersey. No. 088683. May 22, 2024. *Available at*: http://ssrn.com/author=1020356

Amicus Curiae Brief, Court of Appeals for the Third District of Texas at Austin (with William Iacono, Henry Yoon, Jeremy Harper, and Ben Denkinger). *The State of Texas v. Brandon James Cielencki*. February 9, 2024. *Available at*: http://ssrn.com/author=1020356

Amicus Curiae Brief, United States Supreme Court (with William J. Aceves). *Carlos Vega v. Terence B. Tekoh*. (April 6, 2022). (No. 21-2499). Sole author. *Available at*: http://ssrn.com/author=1020356

"Predicting Erroneous Convictions: A Social Science Approach to Miscarriages of Justice" (with Jon Gould, Julia Carrano and Joseph Young). Report to the National Institute of Justice. (December, 2012).

Amicus Curiae Brief, United States Supreme Court. *State of Florida v. Kevin DeWayne Powell* (October 30, 2009) (No. 08-1175). Sole author.

"Torture in Chicago: A Supplementary Report on the On-going Failure of Government Officials to Adequately Deal with the Scandal" (October 29, 2008). Contributor.

"A Report on the Failure of Special Prosecutors Edward J. Egan and Robert D. Boyle to Fairly Investigate Police Torture in Chicago" (April 24, 2007). Contributor.

## CITATION BY APPELLATE COURTS

### United States Supreme Court

*J.D.B. v. North Carolina*, 131 S. Ct. 2394 (2011)
*Maryland v. Shatzer*, 130 S. Ct. 1213 (2010)
*Corley v. United States*, 129 S. Ct. 1558 (2009)
*Missouri v. Seibert*, 124 S. Ct. 2601 (2004)

### Canadian Supreme Court

*R. v. Oickle*, [2000] 2 S.C.R. 3 (Can.).

### All Appellate Courts

2025  *Commonwealth v. Foster*, 332 A.3d 1187 (Pa. 2025)
*State v. Garrett*, 555 P.3d 1116 (Kan. 2024)
*In re N.D.*, 2024-Ohio-5779 (10th Dist.)
*Bellemare c. R.*, 2025 QCCA 822 (Can. Que.)

23

*R. v. Ordonio*, 2025 ONCA 135 (Can. Ont.)

*Barbour v. Hamm*, No. 2:01-CV-612-ECM, 2025 U.S. Dist. LEXIS 163496 (M.D. Ala. Aug. 22, 2025)

*Ex parte Roberson*, Nos. WR-63, 081-03, WR-63, 081-04, WR-63, 081-05, WR-63, 081-06, WR-63, 081-07, 2025 Tex. Crim. App. Unpub. LEXIS 315 (Oct. 9, 2025)

*Fulton v. Bartik*, No. 20 C 3118, 2025 U.S. Dist. LEXIS 43170 (N.D. Ill. Feb. 7, 2025)

*Howard v. Cnty. of Los Angeles*, No. 2:24-CV -04365-MWC-AS, 2025 U.S. Dist. LEXIS 184211 (C.D. Cal. Sep. 4, 2025)

*State v. Nieves*, 2025 N.J. LEXIS 1149 (Nov. 20, 2025)

2024    *Tekoh v. Cnty. of L.A.*, 91 F.4th 997 (9th Cir. 2024)

*Casey v. United States*, 100 F.4th 34 (1st Cir. 2024)

*State v. Nieves*, No. M-34/35, 2024 N.J. LEXIS 854 (N.J. Sup. Ct. Sept. 4, 2024)

*Barbour v. Hamm*, No. 01-cv-612-ECM, 2024 U.S. Dist. LEXIS 146871 (M.D. Ala. August 16, 2024)

*Olson v. Gomez*, No. 18 CV 2523, 2024 U.S. Dist. LEXIS 127268 (N.D. Ill. July 18, 2024)

*People v. Warner*, No. 163805, 2024 Mich. LEXIS 1280 (Mich. Sup. Ct. July 11, 2024)

*United States v. Motovich*, No. 21-CR-497, 2024 U.S. Dist. LEXIS 116769 (E.D. N.Y. July 2, 2024)

*Grimm v. Commonwealth*, 902 S.E.2d 72 (Va. Ct. App. June 18, 2024)

*People v. Garcia*, No. G061426, 2024 Cal. App. Unpub. LEXIS 2442 (Cal. Ct. App. Apr. 19, 2024)

*Carr v. Bartlett*, No. 20-cv-00491-REP, 2024 U.S. Dist. LEXIS 57238 (D. Idaho Mar. 27, 2024)

*People v. Knowles*, No. A167792, 2024 Cal. App. Unpub. LEXIS 1668 (Cal. Ct. App. Mar. 15, 2024)

*Austin v. Brown*, No. 21-cv-02682-RMR, 2024 U.S. Dist. LEXIS 68280 (D. Colo. Feb. 22, 2024)

*In re K.H.*, No. B321890, 2024 Cal. App. Unpub. LEXIS 976 (Cal. Ct. App. Feb. 16, 2024)

*Amor v. John Reid & Assoc.*, No. 20 C 1444, 2024 U.S. Dist. Unpub. LEXIS 174932 (N.D. Ill. Sep. 26, 2024)

*People v. Johnson*, No. 1-23-0172, 2024 Ill. App. Unpub. LEXIS 2306 (Ill. App. (1st) Nov. 25, 2024)

*Villegas v. City of El Paso*, No. EP-15-CV-00386-DCG, 2024 U.S. Dist. LEXIS 246752 (W.D. Tex. May 20, 2024)

2023    *People v. Russell*, No. F084646, 2023 Cal. App. Unpub. LEXIS 5801 (Cal. Ct. App. Sept. 29, 2023)

*Estate of Jones v. State*, No. 129121, 2023 NYLJ LEXIS 2963 (N.Y. Ct. Cl. October 18, 2023

*Days v. State of New York*, 78 Misc. 3d 1221(A) (2023)

*Brown v. City of Chicago*, 2023 U.S. Dist. LEXIS 45239 (2023)

*Rohr v. State*, 523 P.3d 549 (2023)

*Dotson v. State*, 2023 Tenn. LEXIS

*Benoit v. Guerin*, 357 So. 3d 434 (2023)

*Brown v. City of Chicago*, 2023 U.S. Dist. LEXIS 55305

24

*R. v. Wangler, Saskatchewan Court of King's Bench*, 2023 SKKB 141 (2023)
*People v. Eastman*, 2023 Cal. App. Unpub. LEXIS 1521 (2023)
*People v. Kourchenko*, 2023 Cal. App. Unpub. LEXIS 5500 (2023)
*R. v. McArthur,* 2023 SKKB 189, 2023 CarswellSask 681

2022   *Cage v. Montgomery*, 2022 U.S. Dist. LEXIS 236504
*Irby v. Warden of Evans Corr. Inst*., 2022 U.S. Dist. LEXIS 176030
*Wimbley v. State*, 2022 Ala. Crim. App. LEXIS 61
*Scarber v. Clark*, 2022 U.S. Dist. LEXIS 184144
*People v. Mendez*, 2022 Cal. App. Unpub. LEXIS 4252 (July 7, 2022)
*State v. Ferricci*, 2022-Ohio-1393 (Ct. App.)
*State v. Gonzalez*, Supreme Court of New Jersey, 249 N.J. 612 (2022)
*State v. Alexander*, 380 N.C. 572 (2022)
*Irby v. Warden of Evans Corr. Inst*. 2022 U.S. Dist. LEXIS 177132
*United States v. Jacobs*.  2022 U.S. Dist. LEXIS 92701.
*People v. James*.  2022 Cal. App. LEXIS 1233
*State v. Hauge*. Supreme Court of Iowa. 973 N.W.2d 453
*Smith v. Commonwealth*, Va. App. LEXIS 163 (Ct. App. May 17, 2022)
*People v. Burgund*, 2022 IL App (5th) 180378-U
*People v. Hill*. 2022 Cal. App. LEXIS 3255
*Vitasek v. Shinn*. 2022 U.S. Dist. LEXIS 111882.
*People v. Ramos-Munoz*. 2022 Cal. App. LEXIS 3251
*United States v. Jacobs*, No. 2:21-CR-053, 2022 U.S. Dist. LEXIS 91737 (SD Ohio May 23, 2022)
*Dotson v. State*, No. W2019-01059-CCA-R3-PD, 2022 Tenn. Crim. App. LEXIS 132 (Mar. 23, 2022)

2021   *Miller v. Montgomery Cty*., 2021 U.S. Dist. LEXIS 213914 (E.D., KY).
*People v. James*, 70 Cal.App.5th 1031, 262 A.3d 44 (2021)
*State v. Griffin*, 339 Conn. 631 (2021)
*Jimenez v. Madden*, 2021 U.S. Dist. LEXIS 195694
*People v. Kowalski*, 2021 Mich. App. LEXIS 5683
*Tarlton for McCollum v. Sealey*, 2021 WL 1845171 (E.D.N.C. May 7, 2021).
*Estate of Alley v. State*, 2021 WL 1828501 (Tenn. Crim. App. May 7, 2021).
*United States v. Knights*, 989 F.3d 1281 (11th Cir. 2021).
*Lucio v. Lumpkin*, 987 F.3d 451 (5th Cir. 2021).
*Montoya v. City & Cty. of Denver*, 2021 WL 1244264 (D. Colo. Mar. 4, 2021).
*Taylor v. City of Chicago*, No. 14 C 737, 2021 U.S. Dist. LEXIS 271404 (N.D. Ill. Dec. 1, 2021

2020   *State v. Baker*, 465 P.3d 860, 147 Haw. 413 (Haw. 2020)
*Bush v. Dunn*, No. 2:12-CV-345-RAH, 2020 WL 4514585 (M.D. Ala. Aug. 5, 2020).
*Rafay v. Obenland*, No. C16-1215-RAJ-MAT, 2020 WL 5984210 (W.D. Wash. Jan. 28, 2020)
*State v. Gore*, No. W201901320CCAR3CD, 2020 WL 6793393 (Tenn. Crim. App. Nov. 18, 2020).
*People v. Xiong*, 54 Cal. App. 5th 1046 (2020).

25

*United States v. Begay*, 497 F. Supp. 3d 1025 (D.N.M. 2020).

*People v. Mays*, No. E070904, 2020 WL 1983878 (Cal. Ct. App. Apr. 27, 2020).

*Andersen v. City of Chicago*, 454 F. Supp. 3d 808 (N.D. Ill. 2020)

2019    *United States v. Booker*, No. 3:18-CR-02611-GPC, 2019 WL 2717275 (S.D. Cal. June 28, 2019).

*United States v. Jumper*, 1:19 CR 5, 2019 U.S. Dist. LEXIS 195243 (W.D.N.C. Sept. 30, 2019).

*Nieves Martinez v. United States*, No. CV1300955TUCCKJLAB, 2019 WL 4785519 (D. Ariz. Sept. 30, 2019).

*State v. Matsumoto*, 145 Haw. 313, 452 P.3d 310 (2019). Opinion date = Oct. 29, 2019.

*Fontenot v. Allbaugh*, 402 F. Supp. 3d 1110 (2019). Opinion date = Aug. 21, 2019.

*People v. Lucero*, No. F072676, 2019 WL 337820 (Cal. Ct. App. Jan. 28, 2019).

*People v. Jimenez*, No. 2D CRIM. B271066, 2019 WL 1592812 (Cal. Ct. App. Apr. 15, 2019),

*People v. Chow*, No. H045576, 2019 WL 2710211 (Cal. Ct. App. June 28, 2019).

*People v. Whitley*, No. H043651, 2019 WL 6242496 (Cal. Ct. App. Nov. 22, 2019).

*People v. Scarber*, No. F068908, 2019 WL 5958004 (Cal. Ct. App. Nov. 13, 2019).

*State v. Schaetzle*, No. A-17-1050, 2019 WL 446632 (Neb. Ct. App. Feb. 5, 2019).

*State v. Young*, 9 Wash. App. 2d 1091 (2019)

*United States v. Hayat*, No. 2:05-CR-0240 GEB DB, 2019 WL 176342 (E.D. Cal. Jan. 11, 2019).

2018    *State v. Turner*, --So. 3d.--, No. 2016-KA-1841 (La. Dec. 5, 2018).

*Sanders v. Frauenheim*, No. 17-05008, 2018 WL 3777571 (N.D. Cal. Aug. 8, 2018).

*People v. Santana*, No. 2D CRIM. B261900, 2018 WL 4959443 (Cal. Ct. App. Oct. 15, 2018).

*People v. Martinez*, No. H042235, 2018 WL 3640560 (Cal. Ct. App. Aug. 1, 2018).

*People v. Torres*, 25 Cal. App. 5th 162, 235 Cal. Rptr. 3d 478 (Ct. App. 2018)

*Martinez v. United States*, No. CV1300955TUCCKJLAB, 2018 WL 3359562 (D. Ariz. July 10, 2018).

*People v. Hernandez*, No. A144628, 2018 WL 3359628 (Cal. Ct. App. July 10, 2018).

*People v. Aguilar*, No. B267955, 2018 WL 3121533 (Cal. Ct. App. June 26, 2018).

*Parmer v. Premo*, No. 6:16-CV-1090-SB, 2018 WL 3094879 (D. Or. June 20, 2018).

*People v. Tiger*, 32 N.Y.3d 91, 110 N.E.3d 509 (2018).

*Dean v. Searcey*, 893 F.3d 504 (8th Cir. 2018).

*People v. Saldana*, No. D071432, 2018 WL 387799 (Cal. Ct. App. Jan. 12, 2018).

*Harris v. City of Chicago*, No. 14 C 4391, 2018 WL 2183992 (N.D. Ill. May 11, 2018).

*United States v. Begay*, No. CR 14-074 JB, 2018 WL 1069147 (D. N.M. Feb. 23, 2018).

*Murphy v. City of Tulsa*, No. 15-CV-528-GKF-FHM, 2018 WL 468286 (N.D. Okla. Jan. 18, 2018).

2017    *Harris v. City of Chicago*, No. 14 C 4391, 2017 WL 3193585 (N.D. Ill. Jul. 27, 2017).

*United States v. Hayat*, No. 2:05-cr-0240 GEB DB, 2017 WL 6728639 (E.D. Cal. Dec. 27, 2017).

*United States v. Rodriguez-Soriano*, No. 1:17-cr-197, 2017 WL 6375970 (E.D. Va. Dec. 11, 2017).

26

*Dassey v. Dittmann*, 860 F.3d 933 (7th Cir.) (Opinion date = June 22, 2017), *vacated en banc, Dassey v. Dittmann*, 877 F.3d 297 (7th Cir. 2017) (en banc Opinion date = Dec. 8, 2017).

*Martinez v. United States*, No. CV 13-955 TUC CKJ, 2017 WL 4536177 (D. Az. Oct. 11, 2017).

*United States v. Monroe*, 264 F. Supp. 3d 376 (D. RI 2017). Opinion Date = Sept. 11, 2017

*Vega v. Montgomery*, No. 16-cv-05145-YGR, 2017 WL 4808606 (N.D. Cal. Oct. 24, 2017).

*People v. Cardman*, No. 14CA0202, 2017 WL 2806266 (Colo. App. June 29, 2017).

*People v. Wright*, No. B269217, 2017 WL 4230430 (Cal. Ct. App. Sept. 25, 2017).

*Foree v. Commonwealth*, No. 2016–CA–000599–MR, 2017 WL 3129213, (Ky. Ct. App. Jul. 21, 2017).

*People v. Cruz*, No. B276536, 2017 WL 2459874 (Cal. Ct. App. June 7, 2017).

*State v. Cardenas-Flores*, 189 Wash. 2d 243 (2017). Opinion date = Aug. 17, 2017

*People v. Davis*, No. E065184, 2017 WL 4675078 (Cal. Ct. App. Oct, 18, 2017).

*People v. Collins*, No. H042491, 2017 WL 3575190, (Cal. Ct. App. Aug. 18, 2017).

*R. v. Ururyar*, [2017] O.J. No. 3824.  Ontario Superior Court of Justice

*Gupta v. State*, 156 A.3d 785 (Md. Ct. App. 2017).

*R. v. Pike*, 2017 NLTD(G) 41.

*United States v. Hayat*, No. 2:05-cr-0240 GEB DB, 2017 WL 6728639 (E.D. Cal. Dec. 27, 2017).

*United States v. Rodriguez-Soriano*, No. 1:17-cr-197, 2017 WL 6375970 (E.D. Va. Dec. 11, 2017).

*United States v. Phillipos*, 849 F.3d 464 (1st Cir. 2017).

2016   *Dassey v. Dittmann*, 201 F. Supp. 3d 963 (E.D. Wis. 2016).

*State v. Richardson*, 210 So. 3d 340 (La. Ct. App. 2016).

*Barbee v. Davis*, No. 15-70022, 2016 WL 6902479 (5th Cir. Nov. 23, 2016).

*Floyd v. Cain*, No. 11-2819, 2016 WL 6216141 (E.D. La. Sept. 14, 2016).

*United States v. Whittle*, No. 3:13-CV-00170-JHM, 2016 WL 4433685 (W.D. Ky. Aug. 18, 2016).

*State v. Rivera*, 169 Conn. App. 343 (2016).

*Jimerson v. State*, 56 N.E.3d 117 (Ind. Ct. App. 2016)

*People v. Santana*, No. B261900, 2016 WL 5845750 (Cal. Ct. App. Oct. 6, 2016).

*People v. Cavazos*, No. F069276, 2016 WL 5404083 (Cal. Ct. App. Sept. 28, 2016).

*People v. Cardman*, No. 14CA0202, 2016 WL 5219964 (Colo. App. Sept. 22, 2016).

*State v. Jackson*, 882 N.W.2d 422 (Wis. 2016).

*United States v. Thomas*, No. 13-CR-01874, 2016 U.S. Dist. LEXIS 103533 (D.N.M. Aug. 5, 2016).

*R v. Howe*, 2016 NSSC 151.

*R v. Martin*, 2016 BCPC 337.

*R v. Isaacs*, 2016 ONSC 5272.

*State v. Leniart*, 140 A.3d 1026 (Conn. App. Ct. 2016).

*People v. Cruz*, No. HO42221, 2016 Cal. App. Unpub. LEXIS 4167 (Cal. Ct. App. June 7, 2016).

*Rhoades v. State*, 880 N.W.2d 431 (Iowa 2016).

*People v. Peoples*, 62 Cal. 4th 718 (2016).

27

*R. v. R. (M.)*, [2015] O.J. No. 3885 (Can. Ont. Ct. J.).
*People v. Cortez*, No. H041081, 2016 WL 6962539 (Cal. Ct. App. Nov. 29, 2016).
*Campos v. Stone*, 201 F. Supp. 3d 1083 (N.D. Cal. 2016).
*Campos v. Stone*, 199 F. Supp. 3d 1237 (N.D. Cal. 2016).

2015    *People v. Days*, 131 A.D.3d 972 (N.Y. App. Div. 2015).
*In re Elias V.,* 237 Cal. App. 4th 568 (2015).
*People v. Angol*, No. B259874, 2015 WL 7568947 (Cal. Ct. App. Nov. 24, 2015).
*People v. Delossantos*, No. HO40746, 2015 WL 6865701 (Cal. Ct. App. Nov. 9, 2015).
*Alcox v. Beard*, No. CV-08-1587-JVS, 2015 WL 10083966 (C.D. Cal. Nov. 3, 2015).
*People v. Wyngarden*, No. 321736, 2015 WL 4746277 (Mich. Ct. App. Aug. 11, 2015).
*In re Manuel R.*, No. GO49389, 2015 WL 4640284 (Cal. Ct. App. Aug. 5, 2015).
*Barbee v. Stephens*, No. 4:09-CV-074-Y, 2015 WL 4094055 (N.D. Tex. July 7, 2015).
*Turner v. United States*, 116 A.3d 894 (D.C. 2015).
*Commonwealth v. Bland*, 115 A.3d 854 (Pa. 2015).
*Walker v. State*, No. CR-11-0241, 2015 WL 505356 (Ala. Ct. Crim. App. Feb. 6, 2015).
*Lapointe v. Comm'r Correction*, 316 Conn. 225 (2015).
*Mullen v. Barnes*, No. 2:13-cv-0165-MCE-EFBP, 2015 WL 2000764 (E.D. Cal. Apr. 30, 2015).
*Williams v. Schmidt*, No. 3:10-cv-0025 TMB, 2015 WL 1396800 (D. Alaska March 25, 2015).
*Spence v. Beard*, No. 14-cv-1624 BAS (KSC), 2015 WL 1956436 (S.D. Cal. Apr. 29, 2015).
*People v. Vega*, 236 Cal. App. 4th 484 (2015).
*Commonwealth v.  Bland*, No. 33 EAP 2013, 2015 WL 3370266 (Pa. May 26, 2015).
*Barros v. State*, No. PM/11-5771, 2015 R.I. Super. LEXIS 66 (R.I. Super. Ct. May 18, 2015).
*Sessoms v. Grounds*, 776 F.3d 615 (9th Cir. 2015).

2014    *Gumm v. Mitchell*, No. 11-3363, 2014 WL 7247393 (6th Cir. Dec 22, 2014)
*Soffar v. Stephens*, No. H-12-3783, 2014 U.S. Dist. LEXIS 175331 (S.D. Tex. Dec. 18, 2014).
*Teleguz v. Davis*, No. 7:10CV00254, 2014 WL 3548982 (W.D. Va. July 17, 2014).
*Commonwealth v. Alicia*, 92 A.3d 753 (Penn. 2014).
*People v. Yi*, No. B251560, 2014 WL 5409066 (Cal. Ct. App. Oct. 24, 2014).
*People v. Boyce*, 59 Cal. 4th 672 (2014)
*State v. Fernandez-Torres*, 337 P.3d 691 (Kan. Ct. App. 2014)
*Commonwealth v. Scuderi*, No. CP-51-CR-1010101-1994, 2014 Phila. Ct. Com. Pl. LEXIS 140 (Phila. Ct. Com.   Pl. May 16, 2014)
*Bies v. Sheldon*, Nos. 12-3431 & 12-3457, 2014 WL 7247396 (6th Cir. Dec. 22, 2014)
*Sessoms v. Grounds*, 768 F.3d 882 (9th Cir. 2014).
*Dean v. State*, 288 Neb. 530 (2014)
*United States v. Preston*, 751 F.3d 1008 (9th Cir. 2014)
*People v. Carino*, No. B244423, 2014 WL 1256072 (Cal. Ct. App. March 27, 2014).
*People v. Mays*, No. E055989, 2014 Cal. App. Unpub. LEXIS 405 (Cal. Ct. App. Jan. 21, 2014).
*People v. Whatley*, No. G049642, 2014 WL 1499553 (Cal. Ct. App. Apr. 17, 2014).
*Woodall v. State*, 754 S.E.2d 335 (Ga. 2014).
*Commonwealth v. Hoose*, 5 N.E.3d 843 (Mass. 2014).

28

*State v. Juranek*, 844 N.W.2d 791 (Neb.2014).

*State v. Bishop*, 431 S.W.3d 22 (Tenn. 2014).

*Poventud v. City of New York*, 750 F.3d 121 (2d Cir. 2014).

*R.v. Reid*, 2014 CarswellNfld 59 (Can. Nfld.) (WL).

2013   *Livers v. Schenck*, No. 8:08CV107, 2013 WL 5676881 (D. Neb. Oct. 18, 2013).

*Steele v. Harrington*, No. LA CV 10-04872-VBF-E, 2013 WL 5441750 (C.D. Cal. Sept. 25, 2013).

*Dean v. County of Gage*, No. 4:09CV3144, 2013 U.S. Dist. LEXIS 182187 (D. Neb. Dec. 31, 2013).

*Wright v. Comm'r of Corr.*, 143 Conn. App. 274 (2013).

*People v. Sanford*, No. 291293, 2013 WL 5379673 (Mich. Ct. App. Sept. 26, 2013).

*People v. Linton*, 56 Cal. 4th 1146 (2013)

*Irwin v. Commonwealth*, 465 Mass. 834 (2013)

*Coleman v. State*, No. 14-12-00553-CR, 2013 WL 5758084 (Tx. Ct. App. Oct. 24, 2013)

*People v. Sanders*, No. A134386, 2013 WL 4470551 (Cal. Ct. App. Aug. 19, 2013).

*Shelby v. State*, 986 N.E. 2d 345 (Ind. Ct. App. 2013).

*Commonwealth v. Harrell*, 65 A.3d 420 (Pa. Super. Ct. 2013).

*U.S. v. Preston*, 706 F.3d 1106 (9th Cir. 2013).

*Caine v. Burge*, No. 11 C 8996, 2013 WL 1966381 (N.D. Ill. May 10, 2013).

*People v. Carrera*, No. E053997, 2013 WL 1883289 (Cal. Ct. App. May 7, 2013).

*People v. Ortega*, No. B235552, 2013 WL 1635909 (Cal. Ct. App. Apr. 17, 2013).

*In re Tyler S.*, No. 4-11-0540, 2013 WL 1552421, (Ill. Ct. App. Apr. 12, 2013).

*State v. Dassey*, 827 N.W.2d 928 (Wis. Ct. App. 2013).

*Dorsey v. United States*, 60 A.3d 1171 (D.C. 2013)

*State v. Perea*, 322 P.3d 624 (Utah 2013).

*State v. Lemoine*, 827 N.W.2d 589 (Wis. 2013).

*United States v. Rodriguez*, No. 12-CR-45S, 2013 WL 6057862 (W.D. NY Nov. 13, 2013).

2012   *Harris v. Thompson*, 698 F.3d 609 (7th Cir. 2012).

*U.S. v. Fugate*, No. 11-3694, 2012 WL 3893114 (6th Cir. Sept. 7, 2012).

*U.S. v. Deuman*, 892 F. Supp. 2d 881 (W.D. Mich. 2012).

*People v. Spence*, 212 Cal. App. 4th 478 (2012)

*Vent v. State*, 288 P.3d 752 (Alaska Ct. App. 2012).

*Simmons v. State*, 105 So. 2d 475 (Fla. 2012).

*Ex parte Soffar*, Nos. WR-29980-03, WR-29980-04, 2012 WL 4713562 (Tex. Crim. App. Oct. 3, 2012).

*State ex rel. A.W.*, 51 A.3d 793 (N.J. 2012).

*People v. Kowalski*, 821 N.W.2d 14 (Mich. 2012).

*State v. Stevens*, 822 N.W.2d 79 (Wis. 2012).

*United States v. Ford*, 683 F.3d 761 (7th Cir. 2012).

*State v. Rafay*, 285 P.3d 83 (Wash. Ct. App. 2012).

*People v. Perez*, 946 N.Y.S.2d 835 (N.Y. Sup. Ct. 2012).

*State v. Abdulle*, 275 P.3d 1113 (Wash. 2012).

*People v. Kinstley*, No. A130102, 2012 WL 831535 (Cal. Ct. App. Mar. 12, 2012).

*People v. Mullen*, No. C062851, 2012 WL 758145 (Cal. Ct. App. Mar. 8, 2012).
*Miner v. Neotti*, No. CV 10-07419 ODW (SS), 2012 WL 1116078 (C.D. Cal. Feb. 16, 2012).

2011    *J.D.B. v. North Carolina*, 131 S. Ct. 2394 (2011).
*Bell v Ercole*, No. 05 CV 4532(ERK), 2011 WL 5040436 (E.D.N.Y. Oct. 21, 2011)
*White v. Smith*, 808 F. Supp. 2d 1174 (D. Neb. 2011).
*Dean v. Smith*, 805 F. Supp. 2d 750 (D. Neb. 2011).
*Brown v. Blumenfeld*, 930 N.Y.S. 2d 610 (N.Y. App. Div. 2011). Decided Oct. 4, 2011.
*People v. Gaono*, No. D055290, 2011 WL 4500857 (Cal. Ct. App. Sept. 29, 2011)
*Commonwealth v. Rios*, No. 2007-1051, 2011 WL 4089553 (Mass. Super. Ct. Sept. 7, 2011)
*United States v. Michael Jacques* 784 F. Supp.2d 59 (D.Mass. 2011)
*People v. Hernandez*, No. B215707, 2011 Cal. App. Unpub. LEXIS 3039 (Apr. 25, 2011).
*People v. Dimas*, No. B223795, 2011 Cal. App. Unpub. LEXIS 2464 (Apr. 11, 2011).
*United States v. Ross*, No. CR S-99-0043 WBS EFB, 2011 WL 1253870 (E.D. Cal. Mar. 30, 2011).
*Commonwealth v. Wright,* 14 A. 3d 798 (Pa. 2011).
*People v. Sanchez*, No. 2-08-1243, 2011 Ill. App. Unpub. LEXIS 872 (Ill. App. Ct. 2/4/2011).

2010    *People v. Polk*, 942 N.E. 2d 44 (Ill. App. Ct. 2010).
*People v. Garcia*, No. B216793, 2010 WL 4868186 (Cal. Ct. App. Nov. 30, 2010).
*State v. Lockhart*, 4 A. 3d 1176 (Conn. 2010).
*United States v. Redlightning*, 624 F.3d 1090 (9th Cir. 2010).
*United States v. Slaight*, 620 F.3d 816 (7th Cir. 2010).
*People v. Kowalski*, No. 294054, 2010 WL 3389741 (Mich. Ct. App. Aug. 26, 2010).
*Dorsey v. United States*, 2 A.3d 222 (D.C. 2010).
*Crowe v. County of San Diego*, 593 F.3d 841 (9th Cir. 2010).
*Milke v. Ryan*, No. CV 98-60-PHX-RCB, 2010 WL 383412 (D. Ariz. Jan. 29, 2010).
*Kaguyutan v. Rozum*, No. 2:08-1022, 2010 WL 483791 (W.D. Pa. Feb. 5, 2010).
*Maryland v. Shatzer*, 130 S. Ct. 1213 (2010).
*Rathbun v. Scribner*, No. CV 08-3339-AG, 2010 WL 1266666 (C.D. Cal. Feb. 10, 2010).
*State v. A.N.J.*, 225 P.3d 956 (Wash. 2010).
*Wilson v. State*, 311 S.W.3d 452 (Tex. Crim. App. 2010).
*People v. Vargas*, No. G041999, 2010 WL 2525582 (Cal. Ct. App. 4th June 23, 2010).
*United States v. Brown*, 617 F.3d 857 (9th Cir. 2010).

2009    *Cason v. Hedgpeth*, No. CV 08-4576-JVS (RNB), 2009 WL 1096209 (C.D. Cal. 4/22/2009).
*Corley v. U.S.*, 129 S. Ct. 1558 (2009).
*R. v. Cech*, [2009] Q.C.C.S. 1041 (Can.).
*R. v. Edwards* [2009] CarswellOnt 6324 (Can.).
*R. v. Merceus*, [2009] Q.C.C.S. 3205 (Can.).
*R. v. T.E.*, [2009] ON.C. LEXIS 4222 (Can.).
*People v. Leon*, No. G037950, 2009 WL 249362 (Cal. Ct. App. Feb. 3, 2009).
*People v. Olague*, No. C053372, 2009 WL 924503 (Cal. Ct. App. April 7, 2009).
*State v. Fairconatue*, 773 N.W.2d 226 (Wash. Ct. App. 2009).
*State v. Riofta*, 209 P.3d 467 (Wash. 2009).

30

*Wade v. Brady*, 612 F. Supp. 2d 90 (D. Mass. April 30, 2009).

*People v. Robles*, No. G038739, 2009 WL 1364364 (Cal. Ct. App. May 15, 2009).

*Bush v. State*, No. CR-03-1902, 2009 WL 1496826 (Ala. Crim. App. May 29, 2009).

*People v. Lucas*, No. C057593, 2009 WL 2049984 (Cal. Ct. App. Aug. 4, 2009).

*Wroten v. Felker*, No. CV 08-04352-AG, 2009 WL 3171705 (C.D. Cal. Sept. 30, 2009).

*In re D.K.*, No. 289371, 2009 WL 3401152 (Mich. Ct. App. Oct. 22, 2009).

*People v. Singletary*, No. B211849, 2009 WL 3931360 (Cal. Ct. of App. Nov. 20, 2009).

2008   *People v. Madrigal*, No. F051127, 2008 WL 192310 (Cal. Ct. App. Jan. 24, 2008).

*U.S. v. Chancellor*, No. 07-20578-CR, 2008 WL 622937 (S.D. Fla. Feb. 8, 2008).

*Anthony v. State*, 980 So. 2d 610 (Fla. Dist. Ct. App. 2008).

*In re Taylor*, 144 Wash. App. 1038 (2008).

*People v. Cerda*, No. E041249, 2008 WL 2123855 (Cal. Ct. App. May 21, 2008).

*In re Detention of Law*, 144 Wash. App. 1047 (June 2, 2008).

*People v. Rosario*, 862 N.Y.S.2d 719 (2008).

*People v. Steele*, No. B193519, 2008 WL 2410394 (Cal. Ct. App. June 16, 2008).

*R. v. Choy*, [2008] 456 A.R. 177 (Can.).

*R. v. Fabas*, [2008] B.C.S.C. 677 (Can.).

*R. v. Leslie*, [2008] O.N.C.J. 666 (Can.).

*R. v. Modjani*, [2008] 458 A.R. 96 (Can.).

*Bell v. Ercole*, No. 05 CV 4532(ERK), 2008 WL 2484585 (E.D.N.Y. June 20, 2008).

*State v. Montejo*, 974 So.2d 1238 (La. 2008).

*State v. Turner*, 187 P.3d 835 (Wash. Ct. App. 2008).

*State v. Unga*, 196 P.3d 645 (Wash. 2008).

*State v. Wooden*, No. 23992, 2008 WL 2814346 (Ohio Ct. App. July 23, 2008).

2007   *People v. Cason*, No. B187189, 2007 WL 891292 (Cal. Ct. App. March 26, 2007).

*In re Bradford*, 165 P.3d 31 (Wash. Ct. App. 2007).

*In re Genaro R.*, No. A112572, 2007 WL 934886 (Cal. Ct. App. March 29, 2007).

*People v. Bean*, 847 N.Y.S.2d 903 (2007).

*People v. Villarreal*, No. H029622, 2007 WL 1556645 (Cal. Ct. App. May 30, 2007).

*People v. Rathbun*, No. B178509, 2007 WL 2391258 (Cal. Ct. App. Aug. 23, 2007).

*Doughtie v. Scribner*, No. CIV S-06-1695-FCD-CMK-P, 2007 WL 2669922 (E.D. Cal. 9/7/07)

*People v. Muratalla*, No. B192446, 2007 WL 4376374 (Cal. Ct. App. Dec. 17, 2007).

*People v. Wroten*, No. B188462, 2007 WL 4501776 (Cal. Ct. App. Dec. 26, 2007).

*R. v. Osmar*, [2007] 84 O.R.3d 321 (Can.).

*R. v. Osmar*, [2007] ONCA 50 (Can.).

*State v. Bannister*, 734 N.W.2d 892 (Wis. 2007).

*State v. Lawrence*, 920 A.2d 236 (2007).

2006   *Edmonds v. State*, 955 So. 2d 864 (Miss. Ct. App. 2006).

*People v. Doughtie*, No. C049197, 2006 WL 137426 (Cal. Ct. App. Jan. 18, 2006).

*People v. Smann*, No. D045166, 2006 WL 1075228 (Cal. Ct. App. April 25, 2006).

*R. v. Hammerstrom*, [2006] B.C.S.C. 1700 (Can.).

*R. v. Wilson*, [2006] 213 O.A.C. 207 (Can.).

31

*Alley v. State*, No. W2006-01179-CCA-R3-PD, 2006 WL 1703820 (Tenn. Crim. App. 6/ 22/06)

*People v. Fuentes*, No. B184728, 2006 WL 2102898 (Cal. Ct. App. July 31, 2006).

*Washington v. Wilmore*, No. Civ.A. 3:02CV00106, 2006 WL 2471511 (W.D. Va.8/23/2006).

*Reyes v. Duncan*, No. C 05-04078 SI, 2006 WL 2529106 (N.D. Cal. Aug. 31, 2006).

*Milke v. Schriro*, No. CV-98-0060-PHX-RCB, 2006 WL 3421318 (D. Ariz. Nov. 27, 2006).

2005    *In re Jerrell C.J.*, 699 N.W.2d 110 (Wis. 2005).

*Murray v. Earle*, 405 F.3d 278 (5th Cir. 2005).

*People v. Ford*, No. A100574, 2005 WL 236593 (Cal. Ct. App. Jan. 31, 2005).

*People v. Mora*, No. B167805, 2005 WL 1140646 (Cal. Ct. App. May 16, 2005).

*Scott v. State*, 165 S.W.3d 27 (Tex. App. 2005).

*Singletary v. Fischer*, 365 F. Supp. 2d 328 (E.D.N.Y. 2005).

*U.S. v. Bresnahan*, 62 M.J. 137 (C.A.A.F. 2005).

*In re Owens*, No. D045194, 2005 WL 2160209 (Cal. Ct. App. Oct. 7, 2005).

2004    *Commonwealth v. Cornelius*, 856 A.2d 62 (Pa. Super. Ct. 2004).

*Commonwealth v. DiGiambattista*, 813 N.E.2d 516 (Mass. 2004).

*Kerkowich v. Wwanesa Mutual Ins. Co.*, [2004] M.B.Q.B. 110 (Can.).

*Medley v. Commonwealth*, 602 S.E.2d 411 (Va. Ct. App. 2004).

*Missouri v. Seibert*, 124 S. Ct. 2601 (2004).

*People v. Ramos*, 121 Cal. App. 4th 1194 (2004).

*People v. Reyes*, No. A097648, 2004 WL 831245 (Cal. Ct. App. April 19, 2004).

*People v. Sowl*, No. A098094, 2004 WL 1080171 (Cal. Ct. App. May 14, 2004).

*People v. Ford*, No. A100574, 2004 WL 1776598 (Cal. Ct. App. Aug. 10, 2004).

*State v. Cook*, 847 A.2d 530 (N.J. 2004).

*Thorson v. State*, 895 So.2d 85 (Miss. 2005).

*Weeks v. State*, 140 S.W.3d 39 (Mo. 2004).

*West v. State*, 876 So.2d 614 (Fla. Dist. Ct. App. 2004).

*Cobb v. Bruce*, No. CIV.A. 03-3400-KHV, 2004 WL 3019345 (D. Kan. Dec. 29, 2004).

*Kerkowich v. Wawanesa Mutual Insurance Co.*, 2004 M.B.C. LEXIS 188 (Can. Man.) (Lexis).

2003    *Brown v. Crosby*, 249 F. Supp. 2d 1285 (2003).

*In re C.J.*, 674 N.W.2d 607 (Wis. Ct. App. 2003).

*People v. Martinez*, No. B157095, 2003 WL 1438802 (Cal. Ct. App. March 21, 2003).

*People v. Gonzalez*, No. B154557, 2003 WL 22977531 (Cal. Ct. App. Dec. 19, 2003).

*R v. Chalmers*, [2003] CarswellOnt 4704 (Can.).

*R. v. Watts*, [2003] B.C.S.C. 1403 (Can.).

*R. v. Wiegand*, [2003] 335 A.R. 157 (Can.).

*State v. Mauchley*, 67 P.3d 477 (Utah 2003).

*State v. Patton*, 826 A.2d 783 (N.J. Super. Ct. App. Div. 2003).

*U.S. v. Villalba-Alvarado*, 345 F.3d 1007 (8th Cir. 2003).

*Green v. City of Wenatchee*, 2003 WL 26089744 (E.D. Wash. Mar. 14, 2003)

*Vent v. State*, 67 P.3d 661 (Alaska Ct. App. 2003).

2002    *Franks v. State*, 90 S.W.3d 771 (Tex. Ct. App. 2002).

32

*People v. DeWeaver*, No. A091078, 2001 WL 1515830 (Cal. Ct. App. Feb. 27, 2002).
*Monroe v. Angelone*, No. 3:98CV254, 2002 U.S. Dist. LEXIS 26310 (E.D. Va. 3/28/2002).
*In re Jorge R.*, No. G028977, 2002 WL 31121106 (Cal. Ct. App. 2002).
*People v. Escobedo*, No. B150558, 2002 WL 31160879 (Cal. Ct. App. Sept. 30, 2002).
*People v. Smann*, No. D038219, 2002 WL 31608283 (Cal. Ct. App. Nov. 21, 2002).
*People v. Hernandez*, No. E030489, 2002 WL 31781129 (Cal. Ct. App. Dec. 13, 2002).
*R. v. MacKay*, [2002] 222 Sask. R. 259 (Can.).
*State v. Cobb*, 43 P.3d 855 (Kan. Ct. App. 2002).
*State v. Conger*, 652 N.W.2d 704 (Minn. 2002).
*U.S. v. Cantres*, No. 00 C 3555, 2002 WL 276132 (N.D. Ill. Feb. 27, 2002).
*U.S. v. Faulkingham*, 295 F.3d 85 (1st Cir. 2002).
*U.S. v. Rodgers*, 186 F. Supp. 2d 971 (E.D. Wis. 2002).

2001     *Cherrix v. Braxton*, 131 F. Supp. 2d 756 (E.D. Va. 2001).
*Monroe v. Angelone*, No. 3:98CV254, 2001 U.S. Dist. LEXIS 25216 (E.D. Va. 2001 4/18/01).
*People v. DeWeaver*, No. A091078, 2001 WL 1515830 (Cal. Ct. App. 2001).
*R. v. Tessier*, [2001] 245 N.B.R.2d 1 (Can.).
*U.S. v. Astello*, 241 F.3d 965 (8th Cir. 2001).

2000     *Hearndon v. Graham*, 767 So.2d 1179 (Fla. 2000).
*Lapointe v. Warden*, No. CV 970571161, 2000 WL 1409721 (Conn. Super. Ct. Sept. 6, 2000).
*R. v. Leahey*, [2000] 278 A.R. 201 (Can.).
*R. v. Oickle*, [2000] 2 S.C.R. 3 (Can.).
*State v. Davis*, 32 S.W.3d 603 (Mo. Ct. App. 2000).

1999     *Moriarty v. Garden Sanctuary Church of God*, 511 S.E.2d 699 (S.C. Ct. App. 1999).
*People v. Philips*, 692 N.Y.S.2d 915 (1999).
*State v. Rettenberger*, 984 P.2d 1009 (Utah 1999).
*State v. Schofield*, 97 Wash. App. 1085 (1999).

1998     *State v. Meade*, 963 P.2d 656 (Or. 1998).

## MEDIA COVERAGE, APPEARANCES, AND CITATION OF RESEARCH

| 2025 | *Austin American-Statesman* | *Calmatters* |
|---|---|---|
| | *AETV.COM* | |

| 2024 | *Los Angeles Times* | *San Francisco Chronicle* |
|---|---|---|
| | *Daily Mirror Online* | *The Marshall Project* |
| | *Labyrinths* (Podcast) | *Grunge.com* |

| 2023 | *San Francisco Chronicle* | *The Marshall Project* |
|---|---|---|
| | *The Texas Monthly* | *Bear Brook* (Podcast) |
| | *KXAN News* (Austin, TX) | *YR Media* |
| | *Just Say You're Sorry* (Podcast) | |

2022   *The Marshall Project*        *The John Oliver Show*
       *Crime Junkie* (Podcast)        *KALW Radio*
       *The Imprint*        *The Sacramento Bee*
       *The Mountain Democrat*

2021   NBC *Discovery+* 1        *Murder on Ice* (Podcast)
       *Los Angeles Times* (Podcast)        *My Favorite Murder* (Podcast)
       *Masslive.com*        *The Journalist's Resource*
       *The Crime Report*        *Grunge.com*

2020   *The San Francisco Chronicle*        *Tennessee Commercial Appeal*
       *The Intercept*        *Undisclosed* (Podcast)
       *Double Talk* (4)        *Sixth Hour* (Podcast)
       *University of Chicago Law Review Podcast*   *The Salem News*
       *Wrongful Convictions: False Confessions* (Podcast)

2019   *Washington Post*        *The Guardian*
       *Science Magazine*        *Injustice Watch*
       *The Flathead Beacon*        *The Focus*
       *Medium.com*        *The Atlantic*
       *The Salinas Californian*

2018   *Sacramento Bee*        *San Francisco Chronicle*
       *NBC 9 News Denver*        *PBS*
       *The Alton Telegraph*        *The Indiana Lawyer*
       *East Bay Times*        *The ABA Journal*
       *Netflix, The Innocent Man*        *Mic*
       *Injustice Watch*        *Capital News Service*
       *Refinery29.com*        *9 News (Jefferson County, CO)*
       *Lompoc Record*        *Showsnob.com*

2017   *San Francisco Chronicle*        *The Canadian Press*
       *The Sun Magazine*        *Benchmark Television (Australia)*
       *Al Jazeera*        *Westchester County Journal News*
       *North Shore News*        *La Tercera (Chile)*
       *Richmond Times-Dispatch*        *El Mercurio Legal (Chile)*
       *Lohud.com*        *The Crime Report*
       *The El Paso Times*        *Salon.com*
       *PBS Frontline*        *The Flathead Beacon*
       *The Seattle Weekly*        *MLive.com*

2016   *Good Morning America*        *Wall Street Journal*
       *The New Yorker*        *Chicago Sun Times*
       *ABA Journal*        *New Orleans Advocate*

34

*New Orleans Advocate*      *Charlotte Observer*
*Radio New Zealand News*      *Benchmark Television (Australia)*
*The Clarion-Ledger*      *Kokomo Tribune*
*Vice.com*      *San Luis Obispo News*
*Criminal Injustice Podcast*      *CT News Junkie*
*Santa Barbara Independent*      *Takepart*
*Santa Maria Times*      *Haaretz (Israel)*
*The Marshall Project*      *Newsweek*
*True Crime News*      *RNZ (New Zealand)*

2015      *New York Times*      *Life of the Law* (Podcast)
*Los Angeles Times*      *Slate*
*AP Online*      *Virginia Pilot*
*The Marshall Project*      *New York Law Journal*
*The Guardian*      *Peru Tribune*
*Criminal Law Reporter*      *Lancaster Online*
*The Crime Report*

2014      *Philadelphia Inquirer*      *Pittsburgh Post-Gazette*
*Beatrice Daily Sun*      *San Quentin Times*
*The Daily Times*      *Modesto Bee*
*The Buffalo News*      *Omaha World-Herald*
*The Clarion Ledger*

2013      *The New York Times*      *The Atlantic*
*The New Yorker*      *The Nation*
*The Philadelphia Inquirer*      *The San Diego Union-Tribune*
*KPIX TV* (Channel 5, San Francisco)      *KPBS Radio* (San Diego)
*Christian Science Monitor Weekly*      *The Buffalo News*
*Evansville Courier-Press*      *Connecticut Law Tribune*
*The Philadelphia Daily News*      *CBS News*
*Juvenile Justice Information Exchange*      *Science (AAAS)*

2012      *USA Today*      *New York Times*
*Chicago Tribune*      *Philadelphia Inquirer*
*Pacific Standard Magazine*      *Oregon Register-Guard*
*San Francisco Chronicle*      *San Francisco Business Times*
*Crestline Courier-News*      *Fairbanks Daily News-Miner*
*Ground Report*      *Evansville Courier Press*
*Owensboro Messenger-Inquirer*      *Inland Valley Daily Bulletin*
*The Texas Tribune*      *MLive.com*

2011      *San Francisco Chronicle*      *Detroit Free Press*
*Chicago Tribune*      *Philadelphia Inquirer*
*New York Times*      *Los Angeles Times*

35

*The Lawton Constitution*
*Vancouver Sun*
*Brooksville, FLA Hernando Today*
*Tampa Tribune*
*PBS Frontline*

*Memphis Commercial Appeal*
*Chicago Sun-Times*
*Great Falls Tribune*
*Chicago Daily Herald*

2010
*Chicago Tribune*
*The New York Times*
*Columbia Missourian*
*Houston Chronicle*
*Seattle Times*
*Oshkosh Northwestern*
*Sheboygan Press*
*Aolnews.com*
*Joplin Globe*
*Voice of America*
*New York Magazine*
*Mississippi Clarion-Ledger*
*Kansas City Star*

*KTVU News Channel 2* (San Francisco)
*Appleton Post-Crescent*
*Yakima-Herald*
*Grand Rapids Press*
*Manitowoc Herald Times Reporter*
*Wausau Daily Herald*
*Chambersburg Public Opinion*
*Green Bay Press Gazette*
*KY3 News* (Missouri)
*San Francisco Examiner*
*PBS Frontline*
*KUCI FM* (Orange County, CA)

2009
*The New Yorker*
*San Francisco Chronicle*
*Miami Herald*
*Livingston Daily News*
*Columbia Missourian*
KAOS Radio (Evergreen, WA)
*Transitions,* Syndicated NPR
*Siskiyou Daily News*
*The Ft. Collins Coloradoan*
*The Austin Chronicle*

*The Atlantic*
*St. Petersburg Times*
*The Detroit News*
*American Lawyer*
*California Lawyer*
*Boulder Daily Camera*
*The Texas Observer*
*The Virginia Pilot*
*Isthmus.com*

2008
*Columbia Missourian*
KQED Radio, San Francisco, CA
*Orlando Sentinel*
WUIS Radio, Springfield, Illinois
KPIX, Channel 5 Bay Area
*Springfield State Journal-Register*
KKSU Perspectives, Syndicated NPR
*Legal Intelligencer*
*Columbia Daily Tribune*
*Albuquerque Journal*
*Seattle Weekly*
*Broward Daily Business Review*
*Omaha World Herald*
*Style Weekly*

*Washington Post*
*The Virginia Pilot*
*San Jose Mercury News*
*Oakland Tribune*
*Fairbanks News-Miner*
KGO Radio
*Baltimore Examiner*
*KPCC Radio* Los Angeles
*Riverside Press-Enterprise*
*Justice Denied Magazine*
*Palm Beach Daily Business Review*
*Miami Daily Business Review*
*NBC Dateline*
*National Law Journal*

*Contra Costa Times*  *Arkansas Democrat-Gazette*
*Illinois Times*  *Fault Lines*
*Washington Examiner*  *Publishers Weekly*

2007  *San Francisco Chronicle*  KQED Radio, San Francisco, CA
*Arkansas Democrat-Gazette*  *The Westchester Guardian*
*New York Times*  *Chicago Tribune*
*Akron Beacon Journal*  *Wisconsin Lawyer*
*Bakersfield Californian*  *National Public Radio*
*Missoula Independent*  *Evansville Courier & Press*
*Mr. Big* (Documentary)

2006  *San Jose Mercury News*  *National Law Journal*
*Contra Costa Times*  *Los Angeles Times*
*Oprah Magazine*  *Oklahoma City Journal Record*
*Atlanta Journal-Constitution*  *New York Law Journal*
*Wisconsin State Journal*  *Connecticut Law Tribune*
*Richmond-Times Dispatch*  *Pittsburgh Post-Gazette*
*Missoula Independent*  *Palm Beach Post*
*Cox News Service*  *ABC News*
*Business Wire*  *Fulton County Daily Report*
*San Mateo County Times*  *Tennessean*
*Virginian-Pilot*  *Salon.Com*

2005  *California Lawyer*  *Wisconsin State Journal*
*Vermont Brattleboro Reformer*  *Louisville Courier-Journal*
*Arizona Republic*  *Chronicle of Higher Education*
*Chicago Reader*  *Newsday*
*New York Law Journal*  *Court TV*

2004  *San Diego Union-Tribune*  *New York Times*
*Los Angeles Times*  *Pittsburgh Post-Gazette*
*Legal Times*  *San Francisco Recorder*
*Court TV*  *Village Voice*
*Orange County Register*  *Fort Lauderdale Sun-Sentinel*
*Winston Salem Journal*  *Hayward Daily Review*
*Rochester Democrat and Chronicle*

2003  *Miami Herald*  *San Diego Union-Tribune*
*New York Times*  *Chicago Tribune*
*Los Angeles Times*  *CBS News*
*Law and Order*  *Copley News Service*
*Seattle Times*  *CNN*
*Modesto Bee*  *Amnesty International Magazine*
*USA Today*  *Arts & Entertainment Channel*

37

*San Antonio News-Express*          *Toronto Star*
*Birmingham Post-Herald*          *Orange County Register*

2002   *Miami Herald*          *San Jose Mercury News*
       *New York Times*          *National Public Radio*
       *Oprah Magazine*          *Wisconsin State Journal*
       *Pittsburgh Post-Gazette*          *Virginian-Pilot*
       *Deseret Morning News*          *Fort Lauderdale Sun-Sentinel*
       *National Public Radio, This American Life*   *Forensic Files*
       *Milwaukee Journal Sentinel*          *Harpers Magazine*
       *Austin American-Statesman*          *San Mateo County Times*
       *FBI Law Enforcement Bulletin*          *Capital Times*

2001   *New York Times*          *Pittsburgh Post-Gazette*
       *Orange County Register*          *St. Louis Post-Dispatch*
       *Forensic Files*          *Minnesota Star Tribune*
       *Detroit Free Press*          *Boston Globe*
       *Charleston Post and Courier*          *Port Huron Times Herald*
       *Grand Rapids Press*

2000   *San Jose Mercury News*          *New York Times*
       *Chicago Tribune*          *Los Angeles Times*
       *Modesto Bee*          *Boston Globe*
       *Ascribe Newswire*          *Dallas Morning News*
       *University Wire*          *Chicago Daily Law Bulletin*
       *San Francisco Examiner*          *Syracuse Post-Standard*
       *Washington Times*          *Fort-Worth Star Telegram*
       *American Prospect*          *Reason*

1999   *San Francisco Chronicle*          *Washington Post*
       *National Public Radio*          *Los Angeles Times*
       *Newsday*          *Milwaukee Journal Sentinel*
       *Rochester Democrat and Chronicle*          *Daily Press.Com*
       *New York Law Journal*          *Nation*
       *American Bar Association Journal*          *Chicago Magazine*
       *Seattle Post-Intelligencer*          *Playboy Magazine*
       *Federal News Service*          *Baltimore Sun*

1998   *Washington Post*          *Riverside Press-Enterprise*
       *San Diego Union-Tribune*          *New York Times*
       *Chicago Tribune*          *Los Angeles Times*
       *Seattle Times*          *St. Louis Post-Dispatch*
       *Dallas Morning News*          *U.S. News & World Report*
       *Hartford Courant*          *Chicago Sun-Times*
       *Baltimore Sun*          *New Orleans Times-Picayune*

38

*Raleigh News & Observer*

1997   *Boulder Daily Camera*      *Orlando Sentinel*
   *Riverside Press-Enterprise*    *San Diego Union-Tribune*
   *Newsday*           *Detroit Free Press*
   *Boston Globe*         *Charleston Post and Courier*
   *Dallas Morning News*      *Hartford Courant*
   *Denver Post*          *Maury Povich Show*
   *New York Post*         *Geraldo Rivera Live*
   *New York Daily News*      *Newark Star-Ledger*
   *Memphis Commercial Appeal*   *Memphis Commercial Appeal*
   *Vancouver Columbian*      *Indianapolis News*
   *Philadelphia Inquirer*      *Gary Post-Tribune*
   *Morristown Daily Record*     *Wilmington News Journal*
   *Belleville News-Democrat*     *Mobile Register*
   *Greenville News*        *Charleston Gazette-Mail*
   *Cleveland Plain Dealer*      *Wheeling Sunday News-Register*
   *Everett Herald*         *Augusta Chronicle*
   *Columbus Dispatch*       *Columbus Leger-Enquirer*
   *Worchester Telegram*      *Macon Telegraph*
   *Scranton Times*         *Contra Costa Times*
   *Dayton Daily News*       *Canton Repository*
   *Eugene Register-Guard*      *Tacoma News Tribune*
   *Salem Statesman Journal*     *Trenton Times*
   *Bridgewater Courier-News*     *Hackensack Record*
   *Shreveport Times*        *Orange County Network*

1996   *Los Angeles Times*       *Louisville Courier-Journal*
   *Legal Times*          *Shreveport Times*
   *New Jersey Law Journal*

1995   *Boulder Daily Camera*

## **PRESENTATIONS**

2025   "Police Interrogation, Psychological Coercion, and Unreliable Statements, Admissions and/or Confessions: Science and Litigation." National Association of Criminal Defense Attorneys. Las Vegas, NV. November, 2025.

   "The Psychology of Police Interrogation, Coercion and False Confessions." Office of Defender General. Montpelier, Vermont. November, 2025.

   "Fighting False Confessions: Looking Back and Looking Forward." Northwestern University School of Law. October, 2025

"Studying, Understanding and Solving the Problem of Wrongful Convictions: Lessons from the United States." The Innocence Project of Argentina and Bar Association of Salta. Salta, Argentina. October, 2025.

"Studying, Understanding and Solving the Problem of Wrongful Convictions: Lessons from the United States." The University of Mendoza, School of Law. Mendoza, Argentina. October, 2025.

"Studying, Understanding and Solving the Problem of Wrongful Convictions: Lessons from the United States." The University of Buenos Aires, School of Law. Buenos Aires, Argentina. October, 2025.

"Understanding Psychological Coercion and False Confessions." 2025 Ninth Circuit Investigator/Paralegal Conference. Oakland, CA. September, 2025.

"Exonerations, Error and Proof." University of Girona. 2nd Michele Taruffo Girona Evidence Conference. Girona, Spain. June, 2025.

"Exonerations: Causes, Consequences and Remedies" (with Lara Bazelon). Paper to be presented at the Annual Meeting of the Law and Society Association. Chicago, IL. May, 2025.

"How Sleep Disruption Impacts the Evidentiary Value of Statements and Confessions: Toward Science-based Standards" (with Zlatan Krivan). The Annual Meeting of the American Psychology-Law Society. San Juan, Puerto Rico. March, 2025.

"Police Interrogation, Psychological Coercion and Suspect Confessions: Science and Litigation." San Diego County Public Defender's Office. San Diego, CA. March, 2025.

2024 "Trauma in the Interrogation Room: Analyzing Cases of False Confession to Murder of a Family Member" (with Hayley Cleary and Steven Drizin). Annual Meeting of the American Society of Criminology." San Francisco, CA. November, 2024.

"Police, Politics and People: Honoring the Scholarly Legacy of Jerome Skolnick." Annual Meeting of the American Society of Criminology." San Francisco, CA. November, 2024.

"Police Interrogation, False Confessions and Wrongful Convictions of the Innocent." The Rotary Club of Burlingame. Burlingame, CA. May, 2024.

"Scientific Review Paper 2.0: Police-Induced Confessions: Risk Factors and Recommendations" (with Saul Kassin, Hayley Cleary, Gisli Gudjonsson, Christian Meissner, Allison Redlich and Kyle Scherr). American Psychological Association. Seattle, WA. August, 2024.

"False Confessions, Wrongful Convictions and Exonerations." The Rotary Club of San Mateo. San Mateo, CA. May, 2024.

"Police-Induced Confessions: Risk Factors and Recommendations" (with Saul Kassin, Hayley Cleary, Gisli Gudjonsson, Christian Meissner, Allison Redlich and Kyle Scherr). American Psychology-Law Society. Los Angeles, CA. March, 2024.

2023    "Making a Murderer: False Confessions, Wrongful Convictions" Death Penalty Focus. San Francisco, CA. December, 2023.

"Police Interrogation, Psychological Coercion and False Confessions in Sex Assault Cases." Santa Clara County Public Defender's Office. San Jose, CA. September, 2023.

"Scientific Review Paper 2.0: Police-Induced Confessions: Risk Factors and Recommendations" (with Saul Kassin, Hayley Cleary, Gisli Gudjonsson, Christian Meissner, Allison Redlich and Kyle Scherr). American Psychological Association. Washington, D.C. August, 2023.

"Confessions, Miranda and Police Interrogations." Texas Criminal Defense Lawyers Association. Austin, TX. August, 2023.

"Police-Induced Confessions: Risk Factors and Recommendations" (with Saul Kassin, Hayley Cleary, Gisli Gudjonsson, Christian Meissner, Allison Redlich and Kyle Scherr). University of Pennsylvania. The 2023 Quattrone Center Spring Symposium. Philadelphia, PA. May, 2023.

"The Decision to Confess: Police Interrogation, Psychological Coercion and False Confessions." Annual Conference of The Texas Association for Behavioral Analysis." San Antonio, TX. April, 2023.

2022    "The Social Psychology of Police Interrogation and False Confessions." Arizona Public Defenders Association 2022 Winter Conference. Tempe, AZ. December, 2022.

"Police Interrogation, False Confessions and Wrongful Convictions." Notre Dame Law School. *Notre Dame Journal of Legislation* Symposium. April, 2022.

"Interrogation By Proxy." American-Psychology Law Society. Denver, CO. March, 2022.

"Police Interrogation, Psychological Coercion, and Suspect Confessions: Science and Litigation. Metropolitan Public Defenders Office. Portland, Oregon. February, 2022

2021    "The Conflation Error: The False Equation of Factual Innocence with Legally Defined Exonerations." American Society of Criminology. Chicago, IL. November, 2021.

"The Enduring Problem of Deception in American Police Interrogation." The Deception Research Society. London, England. October, 2021

"Do Jurors Understand the Causes of False Confession, and Do They Adjust Their

41

Perceptions of Suspects' Confessions Appropriately?" (with Deborah Davis) and "Interrogation and the Infanticide Suspect" (with Deborah Davis). University of Nevada. Social Psychology Research Group. Reno, NV. August, 2021.

"Does the Scholarly Arc of Wrongful Conviction Scholarship Bend Toward Justice?" Loyola University Chicago School of Law. Conference: Criminal Justice System in Review: Accountability, Reform and Policy. Chicago, IL. April, 2021.

2020    Analyzing and Litigating Wrongful Conviction Cases Involving Coercive Interrogations and False Confessions." Exoneration Justice Project. Notre Dame Law School. Notre Dame, Indiana. November, 2020.

"Coerced and False Confessions: Psychological Science and Implications for Practice." California Attorneys for Criminal Justice/California Public Defenders Association Capital Case Defense Seminar. San Diego, CA. February, 2020.

"Police Interrogation and Suspect Interrogations." Association of American Law Schools. Washington, D.C. January, 2020.

2019    "Analyzing Involuntary and Unreliable Confessions: Science and Practice." Illinois Association of Criminal Defense Lawyers. St. Charles, IL. December, 2019.

"Double Wrongful Convictions and Second Chance Near Misses: What Does Data from the National Registry of Exonerations Teach Us?" (with Amy Shlosberg). American Society of Criminology. San Francisco, CA. November, 2019

"Interrogation, Coercion and Confessions." California Public Defenders Association. 24th Annual Felony Defense Practice Seminar. Yosemite, CA. November, 2019.

"Understanding and Litigating Interrogation-Induced Statements: Psychological Science and Practice." King County Department of Public Defense. Seattle, WA. October, 2019.

"Interrogation, Coercion, and Unreliable Testimonial Evidence." Federal Criminal Defense Practice Seminar for the Eastern District of North Carolina. Beaufort, NC. October, 2019.

"Coerced and False Confessions." Stanislaus County Public Defenders' Office. Modesto, CA. August, 2019.

"Interrogation, Confession and Truth." University of Bielefeld, School of Law. Bielefeld, Germany. May, 2019.

"From Policing to Exonerations: Understanding Practices, Changing Policies, and Pursuing Social Justice." University of California, Irvine. Department of Criminology, Law and Society. May, 2019.

42

"The Signal in the Noise: A Tribute to Sam Gross."  The National Innocence Network Conference. Atlanta, GA.  April, 2019.

"Police Interrogation, Psychological Coercion and False Confessions."  Annual Kansas Federal Criminal Defense Seminar.  Lawrence, Kansas.  April, 2019.

"Analyzing 250 New Proven False Confessions: Causes, Consequences, Solutions." Northwestern University School of Law.  Chicago, Illinois. March, 2019.

"False Confessions."  California Attorneys for Criminal Justice/California Public Defenders Association Capital Case Defense Seminar.  Monterey, CA.  February, 2019.

2018    "Analyzing Proven False Confessions in the Age of Innocence."  American Society of Criminology. Atlanta, Georgia.  November, 2018.

"Police Interrogation and False Confessions." Renmin University.  Beijing, China. May, 2018

"Police Interrogation, False Confessions and Miscarriages of Justice in the United States." People's Public Security University of China, Muxidi Campus.

"Questioning Police Interrogation Methods: A Comparative Study." Beijing Normal University.  Beijing, China.  May, 2018.

"Police Interrogation, False Confessions and Miscarriages of Justice." China University of Political Science and Law, Jimenqiao Campus.  Beijing, China.  May, 2018.

"Police Interrogation Methods and False Statements in China, the United States and the United Kingdom."  East China University of Political Science and Law.  May, 2018.  Shanghai, China.

"Police Interrogation, Psychological Coercion and False Confessions." People's Public Security University of China, Tuanhe Campus.  Beijing, China.  May, 2018

"False Confessions: The Psychological Science."  Illinois Public Defender Association. Springfield, IL.  May, 2018.

"Understanding and Litigating False Confessions."  San Francisco Public Defender's Office. San Francisco, CA.  April, 2018.

"Interrogating Suspects with Intellectual Disabilities."  Habeas Corpus Resource Center.  San Francisco, CA.  April, 2018.

"Suspect Confessions: Why Innocent Suspects Confess."  Annual Hamill Family Endowed Chair Lecture.  University of San Francisco Law School.  San Francisco, CA.  April, 2018.

"Litigating the Confession Suppression Motion."  California Attorneys for Criminal

Justice/California Public Defenders Association Capital Case Defense Seminar.  Monterey, CA.  February, 2018.

"False Confessions."  Federal Public Defender, Northern District of California.  San Francisco, CA.  February, 2018.

"Litigating Police Interrogation and False Confessions."  Alabama Criminal Defense Lawyers Association.   Annual Capital Casework Seminar.  Birmingham, AL.  January, 2018.

2017   "Theorizing Failed Prosecutions" (with Jon Gould).  Law and Society Association of Australia and New Zealand.  Dunedin, New Zealand.  December, 2017.

"The Problem of Wrongful Conviction."  The University of Diego Portales, School of Law.  Santiago, Chile.  November, 2017.

"Conviction Integrity Units."  National Public Prosecutor's Office."  Santiago, Chile.  November, 2017.

"Police Interrogation, Psychological Coercion and False Confessions."  The National Public Defender Office.  Santiago, Chile.  November, 2017.

"Wrongful Convictions: A Comparative Perspective."  U.S.-Asia Law Institute.  New York University, School of Law. New York, New York.  October, 2017.

"Police Interrogation, False Confessions and Wrongful Convictions." International Society for the Reform of Criminal Law.  San Francisco, CA.  July, 2017

"Litigating False Confessions." National Innocence Network Conference.  San Diego, CA.  March, 2017.

"Lies, More Lies and the Reid Method: Coercion, Contamination, and Cover-Up in the Interrogation of Brendan Dassey."  American Psychology-Law Society.  Seattle, WA.  March, 2017.

"How Interrogation Techniques and Suspect Vulnerabilities Interact to Produce False Confessions."  Habeas Assistance and Training Counsel Project National Seminar on Forensic Evidence and Criminal Law.  Seattle, WA.  March, 2017.

"Interrogation and Confessions."  Criminal Justice Reform Conference.  Arizona State University Law School.  Phoenix, AZ.  February, 2017.

"False Confessions: The Psychological Science."  United States Marine Core Defense Service Organization Worldwide Training Conference. San Diego, CA.  February, 2017.

"Police Interrogation and Coerced/False Confessions."  Reno Public Defender's Office.  Reno,

Nevada.  February, 2017.

"How to Avoid/Void Wrongful Convictions: False Confessions."  University of San Diego School of Law and Community Defenders, Inc. San Diego, CA.  January, 2017.

"Analyzing Proven False Confessions."  Association of American Law Schools.  San Francisco, CA.  January, 2017.

2016    "The Path to Exoneration" (with Jon Gould and Eric Martin).  American Society of Criminology.  New Orleans, LA.  November, 2016.

"The *Miranda* App" (with Andrew Ferguson).  Boston University Law School.  Boston, MA.  September, 2016.  Also presented at the Annual Meeting of the American Bar Association, Criminal Justice Section.  Washington, D.C.  November, 2016.

"The Serial Case – Social Media, and the Trial of Adnan Syed."  Bar Association of San Francisco.  San Francisco, CA.  November, 2016.

"False Confessions and Wrongful Convictions."  Harvard Law School.  American Constitution Society.  Cambridge, MA.  November, 2016.

"When Prosecutions Go Wrong – Convicting the Innocent."  Nebraska Criminal Defense Attorneys Association.  Omaha, NE.  October, 2016.

"Writing (Academic and Popular) Books."  University of San Francisco School of Law, Faculty Colloquium.   September, 2016.

"The Problem of Wrongful Conviction in America." Keynote Address. University of Auckland, Criminal Bar Association of New Zealand.  Auckland, New Zealand.  August, 2016

"Police Interrogation, Psychological Coercion and False Confessions."  University of Auckland, Criminal Bar Association of New Zealand.  Auckland, New Zealand.  August, 2016.

"What Can Be Done About Wrongful Convictions?"  Institute of Criminology, University of Sydney Law School.  Sydney, Australia.  April, 2016.

"The Problem of Confessions."  Simon Fraser University, School of Criminology.  Vancouver, Canada.  April, 2016

"*Miranda*: 50 Years Later." University of San Diego School of Law.  San Diego, CA.  April, 2016.

"The Use of Social Framework Evidence on False Confessions in Criminal Cases." American Psychology-Law Society.  Atlanta, GA.  March, 2016.

45

"Does *Miranda* Protect the Innocent?" Northern Kentucky University School of Law. Highland Heights, Kentucky. February, 2016.

"Police Interrogation and False Confessions." The Center for American and International Law. Plano, Texas. February, 2016.

"The Reid Method, Police Interrogation and Confessions." California Attorneys for Criminal Justice/California Public Defenders Association Capital Case Defense Seminar. San Diego, CA. February, 2016.

"False Confessions, Convicting the Innocent and the Troubling Case of Joseph Giarratano, Jr." Washington and Lee School of Law. Lexington, VA. February, 2016.

2015    "Successes and Failures of the Innocence Revolution." Duke University Law School. Durham, North Carolina. November, 2015.

"Reflections on a Classic Ten Years Later: Richard Leo's "Rethinking the Study of Miscarriages of Justice." American Society of Criminology. Washington, DC. November, 2015.

"Wrongful Convictions and the Death Penalty." University of San Francisco School of Law. Criminal Law Society. November, 2015.

"Police Interrogation, False Confessions, and Alleged Child Abuse Cases." University of Michigan, School of Law. Conference on Child Abuse Evidence: Perspectives from Law, Medicine, Psychology and Statistics. Ann Arbor, MI. November, 2015

"The Path to Exoneration (with Jon Gould). National Science Foundation and National Institute of Justice Conference. "Elephants in the Courtroom: Examining Overlooked Issues in Wrongful Convictions." Arlington, Virginia. October, 2015.

"Has the Innocence Movement Become an Exoneration Movement? The Risks and Rewards of Redefining Innocence "Wrongful Convictions and the DNA Revolution: 25 Years of Freeing The Innocent" Conference." Northeastern University School of Law. September, 2015.

"A Damning Cascade of Investigative Errors." Southeastern Association of Law Schools. Boca Raton, FLA. August, 2015.

"The Problem of Wrongful Conviction." Center for the Advanced Study in the Behavioral Sciences. Stanford University. Palo Alto, CA. May, 2015.

"False Confessions: The Psychological Science." American Psychology-Law Society. San Diego, CA. March, 2015.

"The Social Psychology of Police Interrogation, False Confessions and Wrongful Conviction."

Department of Psychology, Social Psychology Program.  Stanford University.  Palo Alto, CA. March, 2015.

2014    "Litigating False Confession Cases" and "Presenting Expert Testimony."  National Forensic College.  Cardozo Law School.  New York, New York.  June, 2014.

"False Confessions, Erroneous Convictions and Safeguarding the Innocent." The Rand Corporation.  Santa Monica, CA. May, 2014

"The Problem of Wrongful Conviction."  University of California, Irvine.  The Newkirk Center for Science and Society, The Center for Law, Society and Culture, and the Center for Psychology and Law.  Irvine, CA. April, 2014.

"Police Interrogation and Coerced and False Confessions."  Los Angeles Public Defender's Office. Van Nuys and Downtown Offices.  Los Angeles, CA.  April, 2014.

"False Confession and Wrongful Conviction: Causes, Consequences, and Solutions." Susquehanna University.  Arlin M. Adams Center for Law and Society Distinguished Lecture. Selinsgrove, PA.  April, 2014.

"Legal Scholarship Employing Theory: A Critique."  Northwestern University School of Law. Boston, MA.  March, 2014.

"False Confessions."  California Attorneys for Criminal Justice/California Public Defenders Association Capital Case Defense Seminar.  Monterey, CA.  February, 2014.

"The Justice Gap and the Promise of Criminological Research."  Western Society of Criminology.  Honolulu, HI.  February, 2014.

2013    "Promoting Accuracy in the Use of Confession Evidence: An Argument for Pre-Trial Reliability Hearings to Prevent Wrongful Convictions."  UCLA School of Law.  Los Angeles, CA.  August, 2013.

"Why Interrogation Contamination Occurs."  Association of American Law Schools.  Mid-year Criminal Justice Conference.  San Diego, CA.  June, 2013.

"Social Psychological Testimony Regarding Interrogations and Confessions."  American-Psychology Law Society.  Portland, OR.  March, 2013.

"To Walk in Their Shoes: The Problem of Recognizing False Confessions" (with Deborah Davis).  American-Psychology Law Society.  Portland, OR.  March, 2013.

"False Confessions."  California Attorneys for Criminal Justice/California Public Defenders Association Capital Case Defense Seminar.  Monterey, CA.  February, 2013.

47

2012   "Contaminated Confessions: Accuracy and Error in Decision-Making in the Criminal Justice Process." Duke University School of Law. Durham, North Carolina. December, 2012.

"Innocent Differences? An Empirical Study of Wrongful Convictions vs. "Near Misses" (with Jon Gould and Julia Carrano). American Society of Criminology. Chicago, IL. November, 2012.

"False Confessions: Causes, Consequences, Solutions." Roosevelt University, Department of Psychology. Wrongful Convictions Distinguished Speakers Series. Chicago, IL. November, 2012.

"Promoting Accuracy in the Use of Confession Evidence: An Argument for Pre-Trial Reliability Hearings to Prevent Wrongful Convictions." American University School of Law. Washington, D.C. September, 2012. U.C. Davis School of Law. Davis, CA. October, 2012. Temple University School of Law. Philadelphia, PA. November, 2012.

"An Early Peek at the Results: An Empirical Study of Wrongful Convictions versus "Near Misses" (with Jon Gould and Julia Carrano). Law and Society Association. Honolulu, HI. June, 2012.

"The Science of False Confessions." Washington State Courts Continuing Judicial Education Conference. Cle Elum, Washington. April, 2012.

"The Problem of Interrogation-Induced False Confession: Sources of Failure in Prevention and Detection". Western Psychological Association. San Francisco, CA. April, 2012.

"Interrogation Through Pragmatic Implication: Sticking to the Letter of the Law While Violating Its Intent." Loyola University Law School. Los Angeles, CA. April, 2012.

"Two Real-Life Studies, a Meta-Analysis, and the Effects of Unanticipated Questions." American Psychology-Law Society. San Juan, Puerto Rico. March, 2012.

"False Confessions: Understanding and Litigating the Issues." New Mexico Criminal Defense Lawyers Association. Albuquerque, NM. March, 2012.

"False Confessions." California Attorneys for Criminal Justice/California Public Defenders Association Case Defense Seminar Program. Monterey, CA. February, 2012.

2011   "The Dynamics of False Confessions." The Texas Bar, Continuing Legal Education. Dallas, Texas. December, 2011.

"Studying Wrongful Convictions: Learning from Social Science" (with Jon Gould). American Society of Criminology. Washington, D.C. November, 2011.

"False Confessions: Why Innocent People Confess." Northern California Innocence Project.

48

Santa Clara University School of Law.  Santa Clara, CA.  October, 2011.

"The Problem of Interrogation-Induced False Confession: Sources of Failure in Prevention and Detection."   Federal Public Defender, Capital Habeas Unit.  Los Angeles, CA. August, 2011.

"The Science of False Confessions."  Texas Criminal Defense Lawyers Association.  Austin, TX.  August, 2011.

"Police Interrogation Methods and False Confessions."  New York State Justice Task Force on Wrongful Convictions.  New York, NY.  June, 2011.

"Police Interrogation: Tactics, Responses and Outcomes."  University of Minnesota School of Law.  Conference on Barry Feld's book, *Police Interrogation of Juveniles: Practice and Policy*. May, 2011.

"The Truth About False Confessions: Interrogation-Related Regulatory Decline: Ego-depletion, Failures of Self-Regulation and the Decision to Confess."   Western Psychological Association Conference.  Los Angeles, CA.  April, 2011.

"False Confessions: Causes, Consequences, Solutions."  National Innocence Network Conference.  University of Cincinnati School of Law.  April, 2011.

"Police Interrogation in the Shadow of Trial."  New York University School of Law.  Hoffinger Criminal Justice Colloquium.    March, 2011.

"Confessions of the Innocent: Causes, Consequences and Solutions."  Forensic Mental Health Association of California Annual Conference.  Keynote Address.  Seaside, CA.  March, 2011.

"Three Prongs of the Confession Problem: Issues and Proposed Solutions." University of Washington School of Law.  Faculty Colloquium. Seattle, WA. January, 2011.

2010    "Purpose-Driven Scholarship, Justice Work, and the Problem of Wrongful Conviction." University of San Francisco School of Law. Justice Forum. November, 2010.

"Innocent: Recent Advances in Uncovering Wrongful Convictions." Stanford University School of Law. Shaking the Foundations Conference. October, 2010.

 "*Miranda* at 50: What Have We Learned?"  Seattle University School of Law.  Faculty Colloquium.  September, 2010.

"The Gatehouses and the Mansions: 50 Years Later."  University of San Francisco School of Law.  Faculty Brown Bag Series.  July, 2010.

 "A Doctrinal Analysis of *Miranda v. Arizona* and its Progeny: Why the Conventional Explanation is Wrong and What's Really Going On."  University of San Francisco School of

Law. Faculty Colloquium. April, 2010.

"Police Interrogation, Psychological Coercion and False Confessions: Understanding and Litigating the Issues." Los Angeles County Bar Association. April, 2010.

"When Lightning Strikes Twice: Analyzing Double Wrongful Convictions." University of California, Berkeley School of Law. Center for the Study of Law and Society Faculty Colloquium. March, 2010.

"The Psychology of Coerced and False Confessions" and "Litigating Coerced and False Confession Cases." Department of the Army, U.S. Trial Defense Service Conference. Ft. Lewis, WA. March, 2010.

"Stage Setting in Police Interrogation: Interactive Effects of a Pretext for Interrogation and Minimization" (with Osvaldo Hernandez, Deborah Davis, Crissa Draper and William Follette). American Psychology-Law Society Conference. Vancouver, Canada. March, 2010.

"When Lightning Strikes Twice: Analyzing Double Wrongful Convictions." Emory University School of Law Faculty Colloquium. February, 2010.

"Interrogation, Coercion and False Confessions: Understanding and Identifying the Issues." California Attorneys for Criminal Justice/California Public Defenders Association Case Defense Seminar Program. Monterey, CA. February, 2010.

"Interrogation Through Pragmatic Implication: Communicating Beneficence and Promises of Leniency" (with Deborah Davis and William Follette). Society for Personality and Social Psychology Conference. Las Vegas, NV. January, 2010.

"One Hundred Years of Getting It Wrong? Wrongful Convictions after a Century of Research" (with Jon Gould). Northwestern University School of Law. Conference on a Century of Criminal Law and Criminology. Chicago, IL. January, 2010

"Police Interrogation and False Confessions: A Review of the Research." The Lessons of DNA and the Innocence Revolution for the Criminal Justice system. Association of American Law Schools Annual Conference. New Orleans, LA. January, 2010.

2009    "The Wrong Guys: Author Meets Critics." American Society of Criminology Conference. Philadelphia, PA. November, 2009.

"False Confessions: Science and Research" Office of the State Appellate Defender and Illinois Institute for Continuing Legal Education Conference. Keynote Address. Springfield, IL. October, 2009.

"Police-Induced Confessions: Risk Factors and Recommendations." UC Hastings School of Law. Faculty Colloquium. San Francisco, CA. September, 2009.

50

"The Psychology of Forced Confessions" and "Litigating False Confession Cases." Indiana Public Defender Council Conference. Indianapolis, IN. August, 2009.

"Interrogation, Coercion and False Confessions: Understanding and Identifying the Issues." National Association of Criminal Defense Attorneys Conference. Santa Fe, NM. April, 2009.

"False Confessions: Challenging Police-Induced Testimonial Evidence." Illinois Institute for Continuing Legal Education Death Penalty Conference. Keynote Address. Chicago, IL. March, 2009.

"Interrogation, Coercion and False Confessions: Understanding and Identifying the Issues." Contra Costa County Public Defender's Office. Martinez, CA. March, 2009.

"False Confessions." California Attorneys for Criminal Justice/California Public Defenders Association Case Defense Seminar Program. Monterey, CA. February, 2009.

"False Confessions: Challenging Police-Induced Testimonial Evidence." San Francisco Public Defender's Office. February, 2009

"False Confessions: Causes, Consequences and Reforms." Texas Court of Criminal Appeals. Criminal Justice Integrity Unit. Austin, TX. January, 2009.

2008 "The Wrong Guys: Murder, False Confessions and the Norfolk 4." Northwestern University School of Law. Chicago, IL. November, 2008.

"Police Interrogation and American Justice: Author Meets Critics" and "When Lightning Strikes Twice: Studying Double Wrongful Convictions." American Society of Criminology Conference. St. Louis, Missouri. November, 2008.

"The Psychology of False Confessions: Causes, Consequences and Reforms." University of Illinois, Springfield. Institute for Legal and Policy Studies and Downstate Illinois Innocence Project. November, 2008.

"The Wrong Guys: Murder, False Confession and the Norfolk 4." University of San Francisco, School of Law. November, 2008.

"Police Interrogation, Psychological Coercion, and False Confessions." California Defense Investigators Association Conference. San Jose, CA. November, 2008.

"False Confessions: Causes, Consequences, and Implications." American Academy of Psychiatry and Law Conference. Keynote address. Seattle, WA. October, 2008.

"Police Interrogation and American Justice." New York University School of Law. Hoffinger Criminal Justice Colloquium. September, 2008.

51

"False Confessions and Wrongful Convictions."  Innocence Project.  New York, NY.  September, 2008.

"Police Interrogation and False Confessions."  Alaska Investigators Association and Alaska Innocence Project Conference.  Anchorage, AL.  September, 2008.

 "False Confessions, Wrongful Convictions and Legal Reform."  Association of American Law Schools.  Mid-year Meeting, Evidence Section.  Cleveland, Ohio.  June, 2008.

"False Confessions" and "Police Interrogation, False Statements and Confessions".  Habeas Corpus Resource Center Conference.  San Francisco, CA.  June, 2008

"False Confessions."  National Association of Criminal Defense Attorneys Conference.  Las Vegas, NV.  April, 2008.

"Litigating False Confession Cases." National Innocence Network Conference. University of Santa Clara School of Law.  March, 2008.

 "Recommending False Confession for the Innocent" (with Deborah Davis and William Follette).  American Psychology Law Society Conference.  Ft. Lauderdale, FL.  March, 2008.

"Police Interrogation and Coercion in Domestic American History."  University of Chicago School of Law.  Conference on Torture, Law and War.  March, 2008

"Persuaded False Confessions."  University of Chicago School of Law.  Criminal Law Faculty Colloquia.  February, 2008.

"Understanding False Confessions."  California Attorneys for Criminal Justice/California Public Defenders Association Case Defense Seminar Program.  Monterey, CA.  February, 2008.

2007    "Understanding False Confessions."  California Public Defenders' Association Conference.  Yosemite, CA.  November, 2007.

 "Persuaded False Confessions" and "Effects of Interrogation Tactics on Recommendation of False Confessions for the Innocent" (with Deborah Davis and William Follette).  University of Texas, El Paso.  "Interrogation and Confessions: A Conference Exploring Current Research, Practice and Policy."  September, 2007.

"Police Interrogation, Psychological Coercion, False Confessions."  Florida Public Defender Association Conference.  Orlando, FlA.  September, 2007.

 "Effects of Failed Polygraph Results on Perceived Wisdom of True and False Confessions" (with Deborah Davis).  American Psychological Association Conference.  San Francisco, CA.

52

August, 2007.

"Police Interrogation, Psychological Coercion, False Confessions." District of Columbia Public Defender Service. Washington, DC. June 2007.

"Understanding the Reid Method and How It Coerces Confessions." Habeas Corpus Resource Center Conference. San Francisco, CA. June, 2007.

Wrongful Convictions and False Confessions. Tel Aviv University, School of Law. Conference on New Directions in Courtroom Research. Tel Aviv, Israel. May, 2007.

"False Confessions: Causes, Consequences, Solutions." Ohio Innocence Project. University of Cincinnati School of Law. Cincinnati, OH. March, 2007.

"Wrongful Conviction: Legal and Judicial Perspectives." Academy of Criminal Justice Sciences Conference. Seattle, WA. March, 2007.

"False Confessions and the Wrongful Conviction of the Innocent." National Innocence Network Conference. Harvard University Law School. March, 2007.

"Police Interrogation, Psychological Coercion, False Confessions." National Legal Aid and Defender Association. Annual Conference on Indigent Defense. Dallas, TX. March, 2007.

"Understanding the Reid Method and How It Coerces Confessions." California Attorneys for Criminal Justice/California Public Defenders Association Case Defense Seminar Program. Monterey, CA. February, 2007.

"The Social Psychology and Consequences of Police-Induced False Confessions." Northern California Innocence Project. Santa Clara, CA. February, 2007.

"Police Interrogation, Psychological Coercion, False Confessions." Santa Clara County Public Defender's Office. San Jose, CA. February, 2007.

"Why Do Suspects Falsely Confess?" Administrative Offices of the United States Courts. Conference on Forensic Evidence and Criminal Law. New Orleans, LA. January, 2007.

2006   "Police Interrogation, False Confession and American Justice." University of Oklahoma, Department of Psychology. Faculty Colloquium. Norman, OK. December, 2006.

"Police interrogation, Psychological Coercion, False Confessions." Missouri State Public Defender System Conference. St. Louis, MO. December, 2006.

"Police Interrogation and American Justice." University of San Francisco School of Law. Faculty Colloquium. November, 2006.

"The Limits of *Miranda*." University of Colorado School of Law. Conference on the 40th Anniversary of *Miranda v. Arizona*. Boulder, CO. October, 2006.

"Interrogating Guantanamo Detainees." University of San Francisco School of Law. October, 2006.

"Coerced and False Confessions." National Child Abuse Defense & Resource Center Conference. September, 2006. Las Vegas, NV.

"False Confessions: Causes, Consequences and Solutions." California Commission on the Fair Administration of Justice. Los Angeles, CA. June, 2006.

"Sympathetic Detectives with Time Limited Offers: Effects on Perceived Consequences of Confession" (with Deborah Davis, Deborah Knaack and David Bailey). Association for Psychological Science Conference. New York, NY. May, 2006.

"Police Interrogation and Confessions." San Mateo Private Defender Program. Burlingame, CA. May, 2006.

"*Miranda*'s Past, Present and Future." Harvard University School of Law. Conference on Criminal Procedure Stories. Cambridge, MA. April, 2006.

"Incriminating Ourselves?" U.C.L.A. School of Law. Conference on the Faces of Wrongful Conviction: Examining California Justice Gone Wrong. April, 2006.

"Police Interviewing and Interrogation: Toward A National Self-Report Survey of Police Practices and Beliefs" (with Saul Kassin, Kimberly Richman, L.H., Colwell, Amy Leach, Dana La Fon, & Christian Meissner) and "Evaluating Law Enforcement Evidence Ploys when Confessions are False: Mock Juror Perceptions of Deception and Coercion" (with Jennifer A. Bienhoff, Krista D. Forrest & Brad J. Stastny) and "Evaluating Evidence Ploys: The Role of Ploy Type in Perceptions of Deception and Coercion" (with Brad Stastny, Krista Forrest & Jennifer Bienhoff). American Psychology-Law Society Conference. St. Petersburgh, FL. March, 2006.

"Police Interrogation and False Confessions: Best Practice Guidelines." Wisconsin Criminal Justice Study Commission. Milwaukee, Wisconsin. February, 2006.

"Bringing Reliability Back In: False Confessions and Legal Safeguards in the Twenty-First Century." University of San Francisco School of Law. Faculty Colloquium. January, 2006.

2005   "Preventing Wrongful Convictions: Re-Examining Fundamental Principles of Criminal Law to Protect the Innocent" (with Steve Drizin). University of Wisconsin Law School. Conference on Wrongful Convictions. November, 2005.

"Reforming Criminal Interrogation: Legal Solutions." University of Chicago Law School.

November, 2005.

"Bringing Reliability Back In: False Confessions and Legal Safeguards."  Seattle University Law School.  Faculty Colloquium. November, 2005.

"Police Interrogation and the American Adversary System."  Washington University School of Law.  Faculty Colloquium.  St. Louis, Missouri. October, 2005.

"Police Interrogation and the American Process of Justice."  Loyola University School of Law. Faculty Colloquium. Los Angeles, CA.  September, 2005.

"The Social Psychology and Consequences of Police-Induced False Confessions."  Northern California Innocence Project.  Santa Clara, CA.  July, 2005.

"Re-Thinking the Study of Wrongful Conviction."  Law and Society Association Conference. Las Vegas, NV.  June, 2005

"Beyond CSI: Psychology, Crime and Justice."   University of California, Irvine. The UCI Think Forum Series. May, 2005.

"True, False, and Suspicious Confessions: Research and Testimony on Interrogations and Confessions (with Mark Costanzo).  Symposium on Applied Social Psychology.  Claremont McKenna College.   Claremont, CA.  April, 2005.

"Proven False Confessions: What They Tell Us About Police Interrogations."  American Psychology Law Society Conference.  San Diego, CA.  March, 2005.

"Teaching Law and Society in Undergraduate Programs."  West Coast Law and Society Retreat.  University of California, Berkeley.  March, 2005.

"The Psychology of Police Interrogation and False Confessions."  California Attorneys for Criminal Justice/California Public Defenders Association Case Defense Seminar Program. Monterey, CA.  February, 2005.

"The Evidentiary Aspects of Wrongful Convictions." The Association of American Law Schools Annual Conference.  San Francisco, CA.  January, 2005.

2004    "Police Interrogation and False Confessions."  Northern California Innocence Project. University of Santa Clara.  Santa Clara, CA.  November, 2004.

"Police Interrogation, Psychological Coercion and False Confessions."  Distinguished Faculty Scholar Lecture.  University of Pittsburgh, School of Law.   November, 2004

"Psychological Coercion and Unreliable Confessions" (with Richard Ofshe). American Society of Criminology Conference.  Nashville, TN.  November, 2004.

55

"The Psychology of Police Interrogation and False Confessions: What You Need to Know." Solano County Bar Association. Fairfield, CA. November, 2004.

"Police Interrogation and False Confessions." Los Angeles County Bar Association. Los Angeles, CA. November, 2004.

"Police Interrogation and Unreliable Statements: Thinking about the James Tucker Case." Northern California Innocence Project. Golden Gate University School of Law. San Francisco, CA. September, 2004.

"Police Interrogation, Psychological Coercion and False Confessions." National Defender Investigation Association Western Regional Conference. Redondo Beach, CA. September, 2004.

"The Search for Truth." 2004 Northern District of California Judicial Conference, Ninth Circuit. Santa Cruz, CA. May, 2004.

"Interrogation, Confession and Innocence." Innocence Project, Benjamin N. Cardozo Law School. New York, N.Y. May, 2004.

"Protecting Human Subjects vs. Preserving Social Research." University of California, Berkeley, School of Law. Berkeley, CA. April, 2004.

"Police Interrogation and Confessions." Santa Clara County Public Defender's Office. San Jose, CA. March, 2004.

"Police Interrogation: A Study in Deception." San Mateo County Private Defenders Program. Burlingame, CA. January, 2004.

2003   "Confessions, Admission, and False Statements." California Attorneys for Criminal Justice Conference. San Francisco, CA. December, 2003.

"Procedures for Interrogation and Confession." The University of California, Irvine. Conference on Science and the Law of Evidence. November, 2003.

"Confessions and Coercion." Habeas Corpus Resource Center Conference. San Francisco, CA. November, 2003.

"Understanding Police Interrogation, Coercion and Confessions." San Francisco Public Defenders' Office. San Francisco, CA. October, 2003.

"Videotaping Interrogations: Does it Enhance the Jury's Ability to Distinguish True and False Confessions?" (with Saul Kassin, C. Crocker and Lindsay Holland). Psychology & Law International Interdisciplinary Conference. Edinburgh, Scotland. July, 2003.

"Exploding the Myths of False Confession: Lessons from the Central Park Jogger Case" (with Steve Drizin).  The Law and Society Association Conference.  Pittsburgh, PA.  June, 2003.

"Analyzing Confessions and Their Consequences."  The Advanced Judicial Academy for Illinois Judges."  University of Illinois.  Champaign, Illinois.  June, 2003

"The Social Psychology of Police Interrogation and False Confession."  San Diego Psychology-Law Society.  San Diego, CA.  May, 2003.

"The Psychology of Police Interrogation and False Confession."  The National Judicial Institute.  Victoria, British Columbia.  May, 2003.

"The Psychology of Police Interrogation, Coercion and False Confession."  Full day training course."  Miami Beach Police Department.  Miami Beach, FLA.  February, 2003

"False Statements."  California Attorneys for Criminal Justice/California Public Defenders Association Case Defense Seminar Program.  Monterey, CA.  February, 2003.

2002    "The Psychology of Police Interrogation and False Confession."  National Judicial Institute. Judicial Safeguards for the Prevention of Wrongful Convictions Seminar.  Ottawa, Ontario. Canada.  December, 2002.

"The Consequences of False Confessions Revisited in the DNA Age" (with Steve Drizin).  The American Society of Criminology Conference.  Chicago, IL.  November, 2002.

"Influence, Persuasion and Compliance: The Psychology of Police Interrogation and Confession Evidence."  University of California, San Diego. Department of Psychology. Faculty Colloquium.  November, 2002.

"Studying Police Interrogation and Confessions."  Long Beach Police Department.  Long Beach, CA.  November, 2002.

"The Psychology of Interrogation, Coercion and Police-Induced False Confession."  California Public Defenders Association Conference.  Rohnert Park, CA.  August, 2002

"The Psychology of Police Interrogation and False Confession." Three-day training course for investigators at the Broward County Sheriff's Office.  Ft. Lauderdale, Florida.  July, 2002.

"False Confessions."  Spokane Criminal Defense Attorneys.  Spokane, WA.  June, 2002.

"Thinking About Miscarriages of Justice." The Law and Society Association Conference. Vancouver, Canada.  May, 2002.

"Police Interrogation, False Confessions and Miscarriages of Justice."  California State

57

University, Northridge.  Department of Sociology.  Faculty Colloquium.  May, 2002.

"Public Perceptions of Interrogation Tactics in Criminal Setting" (with Jodi Quas and Brianne Beck).  The Western Psychological Association Conference.  Irvine, CA.  April, 2002.

The Psychology of Police Interrogation and False Confessions."  Invited Lecture to Military Prosecutors as part of the "Prosecuting Complex Litigation" Course Seminar.  Naval Justice School.  San Diego, CA.  April, 2002.

"Video-taping, Police-Induced False Confessions and Interrogation Reform: Defining the Problems, Finding the Solutions." National Innocence Network Conference, California Western School of Law. San Diego, CA.  January, 2002.

2001    "Police Interrogation and False Confessions." Annual Trial Defense Service Conference. United States Army.  Las Vegas, Nevada.  November, 2001.

"Analyzing False Confession Cases: How to Know Them When You See Them; What to Do When You Get Them." The Federal Defenders Program and the Illinois Association of Criminal Defense Lawyers Conference.  Chicago, IL.  October, 2001.

"How Police Induce False Confessions."  Wisconsin Public Defender Conference.  Milwaukee, WI.  October, 2001.

"Influence, Coercion and Confession: Connecting Scholarly Research and Courtroom Testimony."  The American Psychological Association Conference.  San Francisco, CA. August, 2001.

"Investigating and Correcting Official Misconduct: Preliminary Lessons from the Rampart Scandal" (with Bill Thompson and Paul Kaplan).  The Society for the Study of Social Problems Conference.  Anaheim, CA.  August, 2001.

"Police Interrogation, Coercion and False Confessions: Exposing Police Misconduct Inside the Interrogation Room and Exonerating the Innocent."  The National Association of Criminal Defense Attorneys Conference.  Minneapolis, MN.  August, 2001.

"Police Interrogation Techniques and False Confessions." New Mexico Criminal Defense Lawyers Association Seminar.  Albuquerque, NM.  July, 2001.

"Police Interrogation, Coercion and False Confessions."  Los Angeles Public Defender's Office.  Los Angeles, CA.  June, 2001.

"Thinking Critically About False Memories, False Confessions and False Accusations: Past, Present and Future."  University of California, Irvine.  Students for Science and Skepticism. May, 2001.

"Police Interrogation, Coercive Influence Techniques, and False Confessions."  Western Circuit Workshop, United States Air Force.  Travis Air Force Base.  Sacramento, CA.  March, 2001.

"Proving Your Client's Confession is False or Coerced."  Capital Case Defense Seminar. California Attorneys for Criminal Justice and the California Public Defenders Association. Monterey, California.  February, 2001.

"False Confessions."  Benjamin N. Cardozo School of Law, Innocence Project Lecture Series. New York City, N.Y.  January, 2001.

2000  "Questioning the Relevance of *Miranda* in the Twenty-First Century."  University of Michigan, School of Law.  Conference on *Miranda* After *Dickerson*: The Future of Confession Law. Ann Arbor, MI. November, 2000.

"Studying Miscarriages of Justice in the Age of DNA, Video Technology and Death Row Exonerations: Understanding and Solving the Problem."  Distinguished Faculty Lecture. University of California, Irvine.  November, 2000.

"Police Misconduct Inside the Interrogation Room" and "Police-Induced False Confessions, Wrongful Deprivations of Liberty, and Miscarriages of Justice.  The American Society of Criminology Conference.  San Francisco, CA.  November, 2000.

"Confessions: Creating New Approaches to Excluding False, Coerced and Unlawfully Obtained Statements."  San Diego County Public Defenders' Office.   November, 2000.

"The False Confession."  Orange County Public Defender's Training Seminar.  Santa Ana, California.  November, 2000.

"Miscarriages of Justice in the 21st Century: Coercion, False Confessions and the Wrongful Conviction of the Innocent." Marian Miner Cook Athenaeum Distinguished Lecture. Claremont McKenna College. Claremont, CA.  September, 2000.

"Interviewing/Interrogation."  Full day Training Session.  Cyprus Police Training Program. Ministry of Justice and Public Order of the Republic of Cyprus. Nicosia, Cyprus.  September, 2000.

"Psychological Research and Wrongful Convictions: Influence, Suggestion and Coercion." The American Psychological Association Conference.  Washington, D.C.  August, 2000.

"Obtaining Truthful Confessions, Avoiding Coerced and/or False Confessions." Training Seminar.  Law Enforcement Coordinating Committee for the Fifth Circuit.  San Antonio, TX. July, 2000.

"Going to a Different Ivory Tower."  Association of American Law Schools Mid-Year Conference on Criminal Justice.  Washington, D.C.  June, 2000.

59

"Police Interrogation Methods, Coercion, and False Confessions." West Virginia Public Defender Conference. Davis, West Virginia. June, 2000

"Police-Induced False Confessions." The Mississippi Judicial College, University of Mississippi. Tunica, Mississippi. May, 2000.

"Coercive Interrogation and False Confessions: Reflections on the Wenatchee Cases." The University of Washington, Washington Law School Foundation. Seattle, WA. April, 2000.

"The Legal Consequences of False Confessions." The American Psychology-Law Society Conference. New Orleans, LA. March, 2000.

"Suggestive Interrogation and False Confessions." University of California, Irvine. Miscarriages of Justice Conference. School of Social Ecology. March, 2000.

"Interrogations and Confessions: Implications for Attorneys and Psychologists." Half-day course for prosecutors, defense attorneys and psychologists. Sponsored by Goebel & Vigen: Clinical, Forensic & Organizational Psychology. Shreveport, Louisiana. March, 2000.

"False Confession Theory and Application." Central Circuit Defense Team Conference, United States Air Force. Randolph Air Force Base. San Antonio, Texas. January, 2000.

"Police Interrogation, Coercive Influence Techniques, and False Confessions." Federal Defenders of San Diego Conference. San Diego, CA. January, 2000.

1999   "Coerced and False Confessions." Indiana Public Defender Council Conference. Indianapolis, Indiana. December, 1999.

"False Confessions: Causes, Consequences, and Solutions." The American Society of Criminology Conference. Toronto, Canada. November, 1999.

"Coerced Confessions." The Colorado State Public Defenders' Association Conference. Crested Butte, CO. October, 1999.

"Video-taping Interrogations and Confessions." Testimony before the Illinois House of Representatives. Task Force on Videotaping Interrogation and Confessions. Chicago, IL. September, 1999.

"Litigating a False Confession Case." National Seminar on Mental Illness and the Criminal Law. The Federal Defender Training Group. Washington, D.C. June, 1999.

"Adapting to *Miranda*: Modern Interrogators' Strategies for Dealing with the Obstacles Posed by *Miranda*." University of Southern California School of Law. Faculty Colloquium. March, 1999.

60

"Analyzing Coerced and/or False Confessions."  National Association of Criminal Defense Attorneys Conference.  St. Louis, Missouri. March, 1999.

"False Confessions: Inside the Interrogation Room from Coercion to Deception."  Criminal Defense Attorneys of Michigan Conference.  Detroit, Michigan.  March, 1999.

"The Social Psychology of Police Interrogation and False Confession."  University of California, Santa Barbara. Department of Psychology.  Social Psychology Symposium. January, 1999.

"The Social Psychology of Police Interrogation and False Confession." University of California, Irvine.  Department of Psychology and Social Behavior.  Faculty Colloquium. January, 1999.

1998   "The Regulation and Memorialization of Confessions."  Northwestern University School of Law.  Conference on Wrongful Convictions and the Death Penalty.   Chicago, IL. November, 1998.

"Science in the Courtroom."  The American Society of Criminology Conference.  Washington, D.C.  November, 1998.

"Analyzing Coerced Confession Cases."  Arizona Attorneys for Criminal Justice Conference. Tucson, AZ.  September, 1998.

"The Social Psychology of False Confessions."  American Sociological Association Conference.  San Francisco, CA.  August, 1998.

"The Psychology of Confession Evidence: From the Ivory Tower to the Realities of Practice." The Law and Society Association Conference.  Aspen, CO.  June, 1998.

"*Miranda* and the Adversary System: Lessons for Japan."  University of California, Berkeley School of Law.  Center for the Study of Law and Society.  Conference on Japanese Criminal Justice.  April, 1998.

"The Truth about False Confessions: Understanding Their Causes and Consequences."  Wayne State University. Center for Legal Studies.  Faculty Colloquium.  Detroit, MI.  April, 1998.

"The Truth About False Confessions: What Criminologists Should Know."  The Academy of Criminal Justice Sciences Conference.  Albuquerque, NM.  March, 1998.

"Coerced Statements, False Confessions and Creating Memory, Parts I and II." The Federal Judicial Center Conference.  San Diego, CA and Atlanta, GA. March, 1998.

"The Causes and Consequences of False Confessions."  University of Washington, Seattle.

Department of Sociology.  Faculty Colloquium.  January, 1998.

1997    "Police Interrogation, False Confessions and Miscarriages of Justice."  The University of California, Irvine School of Social Ecology. Newport Beach, CA.  November, 1997.

"Police Interrogation, False Confessions and Expert Witnesses."  American Society of Criminology Conference.  San Diego, CA.  November, 1997.

"The Consequences of False Confessions: Deprivations of Liberty and Miscarriages of Justice in the Age of Psychological Interrogation" (with Richard Ofshe).  Law and Society Association Conference.  St. Louis, Missouri.  May, 1997.

"The Decision to Confess."  The University of Denver College of Law. Symposium on Coercion, Exploitation and the Law.  Denver, CO. March, 1997.

"Police Interrogation, False Confessions, and Expert Witnessing."  University of Colorado, Boulder.  Department of Sociology, Graduate Student Forum.  March, 1997.

"Explaining False Confessions."  The University of Colorado, Boulder School of Law.  Faculty Colloquium.  Boulder, CO. February, 1997.

"False Confessions and Miscarriages of Justice *Today*."  Conference sponsored by The Justice Committee.  Salem, MA.  January, 1997.

1996    "Coerced False Confessions."  American Society of Criminology Conference.  Chicago, Illinois.  November, 1996.

"False Confessions: Documenting, Explaining and Preventing Miscarriages of Justice." University of California, Irvine.  Department of Criminology, Law and Society.  Faculty Colloquium. November, 1996.

"Is *Miranda* Enough or Should We Video-tape All Confessions?"  Seton Hall University Law School.  Newark, NJ.  October, 1996.

"The Principles and Practices of Criminal Law in the United States."  Tsingua University School of Law. Bejing, China.  October, 1996.

"Police Interrogation in America."  Chinese People's Public Security University. Department of Criminology.  Bejing, China.  October, 1996.

"Police Interrogation and False Confessions in America."  Supreme People's Procuratorate of the People's Republic of China."  Bejing, China.  October, 1996

"Deception by Sociologists."  American Sociological Association Conference.   New York, NY.  August, 1996.

62

"Secrecy and the Interrogation of Suspects."  University of Colorado, Boulder.  Conference on George Simmel's Actual and Potential Impact on Contemporary Society.  April, 1996.

"Between Reality and Metaphor: A Friendly Critique of *The Myth of Repressed Memory*."  Pacific Sociological Association Conference.  Seattle, WA. March, 1996.

1995  "The Context and Outcome of Police Interrogation: A Quantitative Analysis."  American Society of Criminology Conference.  Boston, MA.  November, 1995.

"The Social and Legal Construction of Recovered Memories."  University of Delaware at Newark, Department of Legal Studies. November, 1995.

"False Confessions and Miscarriages of Justice: A Preliminary Study" and "The Mythology and Sociology of Recovered Memories."  Northern Arizona University, Departments of Sociology and Criminal Justice.   Flagstaff, AZ. October, 1995.

"The Social Meaning of the O.J. Simpson Case."  University of Colorado, Boulder.  Department of Sociology, Diversity Forum.  October, 1995.

"Interrogation and Surveillance: Changing Trends in Police Detection and Social Control."  American Sociological Association Conference.  Washington, D.C. August, 1995.

"False Memory, False Confession: When Police Interrogations Go Wrong."  Law & Society Association Conference.  Toronto, Canada. June, 1995.

"Trial *and* Tribulations: Courts, Ethnography, and the Need for an Evidentiary Privilege for Academic Researchers."  The Pacific Sociological Association Conference. San Francisco, CA. April, 1995.

"Police Interrogation: Empirical Observations, Legal Questions, Ethical Dilemmas." University of Colorado, Boulder School of Law.  Faculty Colloquium.  February, 1995.

"Violence, Civility and Social Change: The Case of American Police Interrogation in the Twentieth Century."  University of Minnesota, Minneapolis.  Department of Sociology.  Faculty Colloquium.  January, 1995.

1994  "Westville Revisited: A Contemporary Analysis of Order, Legality, and Crime Detection."  American Society of Criminology Conference.  Miami, FLA, November, 1994.

"The Sociologist as Detective: Reflections on the Methodology and Ethics of Fieldwork Inside the Police Interrogation Room."   University of California, Los Angeles.  Department of Sociology. October, 1994.

"The Historical Sociology of the Third Degree in America: Analyzing the Rise and Fall of a

Violent Social Practice."  American Sociological Association Conference.  Los Angeles, CA. August, 1994.

"The Impact of *Miranda* Revisited: Analyzing an Old Question with New Data."  Law & Society Association Conference.  Phoenix, AZ, June, 1994.

"Police Interrogation as a Confidence Game."  Western Society of Criminology Conference. Berkeley, CA, February, 1994.

1993    "Inside the Interrogation Room: A Participant Observation Study of Custodial Police Questioning."  American Society of Criminology Conference.  Phoenix, AZ, October, 1993.

"How to More Effectively Elicit Confessions." Presentation to the Hayward Police, CA Department, Criminal Investigation Division. August, 1993.

"Violence, Civility and Institutional Change: The Case of American Police Interrogation." University of Colorado, Boulder.  Department of Sociology.  Faculty Colloquium.  January, 1993.

1992    "Criminal Interrogation and Confessions Revisited: An Analysis and Critique of Inbau and Reid's Police Training Manuals and Courses." American Society of Criminology Conference. New Orleans, LA, November, 1992.

"Police Interrogation and Social Control."  Law and Society Association Conference. Philadelphia, PA, May, 1992.

1991    "From Coercion to Deception: An Empirical Analysis of the Changing Nature of Police Interrogation in America."  American Society of Criminology Conference.  San Francisco, CA. November, 1991.

"The Ethics of Deceptive Interrogation" (with Jerome H. Skolnick).  University of California, Berkeley, School of Law.  Faculty Colloquium. September, 1991.

"The Social Psychology of Coerced-Internalized False Confessions" (with Richard J. Ofshe). American Sociological Association Conference. Cincinnati, OH, August, 1991.

"Research on Police Interrogation: Some Thoughts and Questions About the Permissible Limits of Deception."  University of California, Berkeley.  Jurisprudence and Social Policy Program, Friday Forum.  May, 1991.

## **LEGISLATIVE, JUDICIAL AND EXECUTIVE TESTIMONY**

New York State Justice Task Force on Wrongful Convictions (2011)
Texas Court of Criminal Appeals. Criminal Justice Integrity Unit (2009)
California Commission on the Fair Administration of Justice (2006)

Wisconsin Criminal Justice Study Commission (2006)
The Illinois House of Representatives (1999)

## GRANTS AND FELLOWSHIPS

Stanford University, Center for the Advanced Study in the Behavioral Sciences (2014-2015)
Guggenheim Foundation (2011-2012)      Open Society Institute (2004-2005, 2008)
National Science Foundation (2005-2006)   Univ. of California, Irvine (1998-2002)
MacArthur Foundation (1992-1993)      Univ. of Colorado, Boulder (1994-1996)

## COURSES TAUGHT

### LAW                                     UNDERGRADUATE

Criminal Procedure                      Introduction to Criminology, Law and Society
Criminal Law                            Interrogation, Confession and the Law
Wrongful Convictions                    Miscarriages of Justice
White Collar Crime                      Influence, Memory and the Law
Interrogation and Confessions           Topics in Criminology
Law Review Workshop                     Criminal Justice in the United States: An Introduction

### GRADUATE                               American Criminal Justice System: Advanced Overview
                                        Critical Thinking
Miscarriages of Justice                 Sociology of Law
Police Organization and Behavior        Police, Law and Society
Police Scandal and Misconduct           Police Interrogation and False Confessions
Topics in Criminology                   Sociology of White-Collar Crime

## POLICE INTERROGATION TRAINING (GIVEN)

2/03    Taught 8-hour training course on interrogation methods, psychological coercion and false confessions for felony investigators in the Miami Beach Police Department.  Miami Beach, FL.

7/02    Taught three 8-hour training courses on interrogation methods, psychological coercion and false confessions for felony investigators in the Broward County Sheriff's Office.  Ft. Lauderdale, FL.

9/00    Taught a full-day training session on interview and interrogation to the Cyprus Police as part of their training program in the Ministry of Justice and Public Order.  Republic of Cyprus. Nicosia, Cyprus.

7/00    Taught training seminar on obtaining truthful confessions and avoiding coerced and/or false confessions to the Law Enforcement Coordinating Committee for the Fifth Circuit.  San Antonio, TX.

65

## POLICE INTERROGATION TRAINING (RECEIVED)

3/93   Attended and participated in one-week advanced interrogation training course taught by the Federal Law Enforcement Training Center (FLETC).  Glynco, Georgia.  Received certificate.

1/92   Attended and participated in one-week interrogation training course taught by the San Mateo Community College, Administration of Criminal Justice Department.  San Mateo, California.  Received certificate.

11/91   Attended and participated in two-day advanced interrogation training course taught by Reid &Associates.  San Francisco, California.  Received certificate.

3/91   Attended and participated in three-day introductory interrogation training course taught by Reid & Associates.  Los Angeles, California.  Received certificate.

12/90   Attended one-day in-house interrogation training course for Sergeants.  Criminal Investigation Division, Oakland Police Department.  Alameda, California.

## OTHER LAW ENFORCEMENT RELATED SERVICE WORK

10/01-6/03   Member, Academic Education and Action Research Advisory Committee to the Chief of Police, Long Beach Police Department.  Long Beach, CA.

5/84-8/84   Voluntary Internship.  San Francisco District Attorney's Office, Consumer Fraud Division.  San Francisco, CA.

## PROFESSIONAL ACTIVITIES (SELECTIVE)

Editorial Board, *Wrongful Conviction Law Review* (2019-Present)
Editorial Board, *Journal of the Forensic Social Sciences* (2019-Present)
Editorial Board, *Behavioral Sciences and the Law* (2017-Present)
Editorial Board, *Law and Society Review* (1998-2002)

Peer Reviewer, Journals:

*Criminology* (2025)
*Frontiers in Psychology* (2021)
*Law & Human Behavior* (2005-2006, 2008-2009; 2012-2013; 2017-2021)
*Psychology, Public Policy and Law* (2013-2014, 2019-2021)
*Behavioral Sciences & the Law* (2014, 2017-2020)
*Criminology and Public Policy* (2007, 2018-2019)
*Crime, Media and Culture* (2019)
*New Criminal Law Review* (2018)
*Law & Human Behavior* (2005-2006, 2008-2009; 2012-2013; 2017-2018; 2020)

*Law & Society Review* (1996-2000; 2002-2003; 2012; 2014; 2016; 2018)
*Journal of Quantitative Criminology* (2017)
*Law & Social Inquiry* (1997-1998; 2001; 2005; 2013; 2017)
*The Journal of Applied Research in Memory and Cognition* (2017)
*New Criminal Law Review* (2017)
*The American Psychologist* (2016)
*Stanford Law Review* (2015)
*Philosophy, Science and Law* (2014)
*Journal of the American Academy of Psychiatry and the Law* (2014)
*Current Directions in Psychological Science* (2014)
*Justice Quarterly* (1998, 2000, 2005, 2009, 2013)
*Sociological Quarterly* (1998, 2013)
*American Journal of Criminal Justice* (2013)
*Journal of Law and Courts* (2012)
*British Journal of Sociology* (2012)
*Basic and Applied Social Psychology* (2011)
*Psychology, Crime and Law* (2009)
*Regulation and Governance* (2009)
*Journal of Criminal Justice* (2000, 2006, 2008)
*Legal and Criminological Psychology* (2006)
*Journal of Law, Economics & Organization* (2005)
*Psychological Science* (2004)
*Psychological Science in the Public Interest* (2004)
*Law, Culture and the Humanities* (2004)
*Queen's Law Journal* (2004)
*Criminal Justice Ethics* (2003)
*Criminology* (2001-2002)
*Research in Crime & Delinquency* (1995, 1999)
*Sociological Forum* (1998-1999)
*Journal of Criminal Law and Criminology* (1996)
*Studies in Law, Politics and Society* (1996)
*Social Problems* (1996)
*American Journal of Sociology* (1995)

Peer Reviewer, Book Manuscripts:

*American Psychological Association Books* (2022)
*Rowman & Littlefield Publishers* (2022)      *University of California Press* (2014, 2017, 2021)
*Oxford University Press* (2013-2014; 2020) *Routledge, Taylor & Francis* (2020)
*New York University Press* (2006-2007, 2011-2012, 2015, 2017, 2019)
*Rowman and Littlefield Publishers* (2018)   *Hope and Life Press Books* (2017)
*Sunbury Press* (2017)                        *Ankerwycke Books* (2016)
*Lexington Books* (2011)                      *Princeton University Press* (2008)
*University of Arizona Press* (2008)          *Cornell University Press* (2006)
*University of Michigan Press* (2005)         *AltaMira Press* (2004)

67

*University of Chicago Press* (2004)  *Academic Press* (2003)
*Aspen Publishers, Inc.* (2000)  *Northeastern University Press* (1999)

Tenure and Promotion Reviews:

University of Denver, School of Law (2024)
CUNY, Department of Social Sciences, Human Services, & Criminal Justice (2023)
Virginia Commonwealth University, Department of Criminal Justice (2018)
St. Joseph's University, Department of Sociology and Criminal Justice (2018)
University of Ottawa, Faculty of Social Sciences (2017)
University of California, Riverside, Department of Psychology (2016)
University of Pittsburgh, School of Law (2015)
University of North Carolina, Greensboro, Department of Sociology (2015)
Roger Williams University, Department of Psychology (2015)
Emory University, Department of Psychology (2014)
Arizona State University, School of Criminology and Criminal Justice (2014)
University of Washington, School of Law (2013)
John Jay College of Criminal Justice (New York), Department of Psychology (2010)
UC Hastings College of Law, San Francisco, CA (2010)
University of Nevada, Reno, Department of Psychology (2004)
University of California, Berkeley, School of Law (2004)
Lafayette College (Pennsylvania), Department of Sociology (2003)
Northwestern University School of Law (2002)
Franklin and Marshall College (Pennsylvania), Department of Sociology (2001)

## PROFESSIONAL MEMBERSHIPS

American Law Institute  American Society of Criminology
American Psychological Association  American Psychology-Law Society
Association for Psychological Science  Law and Society Association
Academy of Criminal Justice Sciences  Association of American Law Schools
Society for the Study of Social Problems  The American Sociological Association
Pacific Sociological Association  Western Psychological Association
Western Society of Criminology  International Investigative Interviewing Research Group

## CONSULTATIONS (SELECTIVE)

Law Enforcement

U.S. Department of Justice, Public Integrity Section, Boise, Idaho (2025)
San Francisco, California District Attorney's Office, Innocence Commission (2021-Present)
Travis County, Texas District Attorney's Office, Conviction Integrity Unit (2023)
Pima County, AZ District Attorney's Office, Conviction and Sentence Integrity Unit (2021-2022)
U.S. Department of Justice, Criminal Section, Civil Rights Division, Washington DC (2020-2021)
Lawrence County Prosecutor's Office, Ironton, Ohio (2020)

Seattle Community Police Commission, Seattle, WA (2018)
Tempe Police Department, Tempe, AZ (2018)
State of California, Department of Justice, San Diego, CA (2002-2004; 2013)
Maricopa County Sheriff's Office, Phoenix, AZ (2011)
Riverside County Sheriff's Association, Riverside, CA (2006)
Solicitor's Office, State of South Carolina, Seventh Judicial Circuit (2005)
Wyoming Association of Correctional Employees (2005)
Miami Beach Police Department, Miami Beach, FLA (2003)
Broward County Sheriff's Office, Ft. Lauderdale, FLA (2002)

Legislative, Judicial and Executive Organizations

New York State Justice Task Force on Wrongful Convictions (2011)
Texas Criminal Justice Integrity Unit (2009)
California Commission on the Fair Administration of Justice (2006)
Wisconsin Criminal Justice Study Commission (2006)
Illinois State Legislature, Task Force on Recording of Interrogations (1999-2000)

Innocence Projects and Universities (Selective)

Innocence Project, Cardozo Law School. New York, NY (1999-2000, 2009; 2012; 2017, 2019, 2024-Present)
California Western Innocence & Justice Clinic, California Western Law School, San Diego, CA (2024-Present)
University of Kansas Paul E. Wilson Project for Innocence and Post-Conviction Remedies (2024-Present)
Korey Wise Innocence Project, University of Colorado, Boulder (2023-Present)
Innocence Project of Texas. Austin, TX (2023-Present).
Joyce Ann Brown Innocence Clinic, University of Texas, Dallas. Dallas, TX (2025)
California Innocence Project, California Western School of Law, San Diego, CA (2023-2024)
Jerome N. Frank Legal Services Organization, Yale University School of Law (2022-Present)
MacArthur Justice Center, Northwestern Law School. Chicago, IL (2009-2011; 2013; 2015-2021)
The Exoneration Justice Clinic, Notre Dame School of Law. South Bend, IN (2019-2021)
Northern California Innocence Project, Santa Clara University Law School (2004-2005; 2014-2020)
The Exoneration Project, University of Chicago School of Law (2018-2020)
Northeastern University Law School Innocence Project. Boston, MA (2018)
The Exoneration Initiative.  New York, NY (2015-2017)
Minnesota Innocence Project.  Minneapolis, MN (2011-2016)
University of Oklahoma Innocence Project (2012-2015)
Midwest Innocence Project, Kansas City, Missouri (2014)
Pennsylvania Innocence Project, Philadelphia, PA (2014)
University of Wisconsin Innocence Project (2006; 2011-2014)
PACE Univ. Law School Post-Conviction Criminal Defense Clinic. White Plains, NY (2010-2013)
University of California Davis School of Law, Immigration Clinic (2011-2012)
American University, Preventing Wrongful Convictions Project, Washington D.C. (2011-2013)

Centurion Ministries, Princeton, NJ (1998-2011)
Center for Wrongful Conviction, Northwestern University School of Law.  Chicago, IL (2011)
George Washington University, Preventing Wrongful Convictions Project. Wash., DC (2010-2011)
Mid-Atlantic Innocence Project, George Washington University Law School, Wash., D.C. (2008-2010)
Downstate Illinois Innocence Project, University of Illinois (2008-2010)
Ohio Innocence Project, University of Cincinnati Law School (2007-2010)
Bluhm Legal Clinic, Northwestern University School of Law.  Chicago, IL (2008-2010)
Innocence Project NW, Univ. of Wash. Law School. Seattle, WA (1998-1999; 2005-2006; 2008-2010)
MacArthur Justice Center, University of Chicago Law School (1999; 2005-2006)
Innocence Project, Osgoode Hall Law School, York University.  Toronto, Ontario (2000)

Law Firms (Selective)

Skadden, Arps, Slate, Meagher & Flom LLP, Washington, D.C. (2014-Present)
Harris, St. Laurent, and Wechsler, LLP, New York, NY (2024-Present)
Loevy & Loevy, LLP, Chicago, IL (2012-2013; 2015-Present)
Squire, Patton and Boggs LLP, New York, NY (2009-Present)
Brown, Goldstein & Levy, Baltimore, MD (2021-Present)
The Norton Law Firm, Oakland, CA (2023-Present)
Stinson LLP, Denver, CO (2023-2024)
McLane, Bednarski & Litt, LLP, Pasadena, CA (2022-2024)
Morrison & Foerster LLP, San Francisco, CA (2020-2024)
Gwilliam, Ivary, Chiosso, Cavalli and Brewer, Oakland, CA (2020-2024)
Wachtell, Lipton, Rosen & Katz (2024)
Larson LLP, Los Angeles, CA (2024)
Debevoise & Plimpton, LLP, New York, NY (2020-2023)
Werksman, Jackson & Quinn LLP, Los Angeles, CA (2022-2023)
Frideman, Gilbert & Gerhardstein LLC, Cleveland, OH (2022-2023)
Riley, Safer, Holmes & Cancila LLP, Chicago, IL (2020-2023)
Reed Smith LLP, San Francisco, CA (2022)
Cheshire Parker Schneider, PLLC, Raleigh, NC (2021-2022)
Hogan Lovells LLP, Washington D.C. (2019-2021)
Sidley Austin LLP, Chicago, IL (2009-2014; 2020-2021)
Morgan, Lewis and Bockius LLP, Chicago, IL (2012-2013; 2019-2020)
Drinker, Biddle & Reath LLP, Princeton, NJ (2011-2020)
Meyer, Shaffer & Stephans, PLLP. Missoula, MT (2016-2019)
Innocence Legal Team, Walnut Creek, CA (2011-2012; 2015-2017; 2018-2019)
Tyson and Mendes LLP, San Diego, CA (2018-2019)
Neufeld, Scheck and Brustin, LLP, New York, NY (2013-2014; 2016-2019)
Riordan & Horgan, San Francisco, CA (2014-2018)
Cuomo, LLC, New York, New York (2016-2018)
The Valorem Group, Chicago, IL (2015-2017)
Arnold & Porter Kaye Scholer LLP, New York, New York (2017)
Sideman Bancroft LLP, San Francisco (2015-2016)
Venable LLP, Washington D.C. (2007-2016)

Carpenter, Lipps & Leland LLP, Columbus, OH (2016)
Arent Fox, LLP, Los Angeles, CA (2015-2016)
Rudolf, Widenhouse and Fialko, Charlotte, NC (2015)
Kirkland & Ellis, LLP, Washington, DC (2013-2014)
Bingham McCutchen LLP, Boston, MA (2005-2014)
Beldock, Levine & Hoffman, LLP, New York, NY (2004-2014)
Goodwin Procter LLP, Boston, MA (2012-2013)
Williams & Connolly LLP, Washington, D.C. (2011-2012)
Reed Smith, New York, NY (2011-2012)
Fredrikson & Byron, P.A., Minneapolis, MN (2009-2012)
McGwire Woods LLP, Richmond, VA (2011)
Lane Powell, Seattle, WA (2008-2010)
Paul, Weiss, Rifkind, Wharton & Garrison LLP (2009-2010)
Sidley & Austin LLP, San Francisco, CA (2009)
Weil, Gotshal & Manges LLP, New York, N.Y. (2009)
Kirkland & Ellis LLP, New York, N.Y. (2008-2009)
Cochran, Neufeld, and Scheck LLP, New York, N.Y. (2003-2009)
Holland & Knight LLP, New York, NY (2004-2005, 2007-2009)
Goodwin Proctor LLP, New York, N.Y. (2008-2009)
Covington & Burling LLP, Washington, D.C. (2006)
O'Melveny & Myers LLP Los Angeles, CA (2003, 2005-2006)
Kelley, Drye & Warren LLP, New York (2006)
Joseph, Greenwald & Laake, PA, Greenbelt, Maryland (2005-2006)
Tamburello & Hanlon, San Francisco, CA (2005)
Hallinan, Wine & Sabelli, San Francisco, CA (2003)
Jenner & Block, Chicago, IL (2000-2001)
Jackson Walker LLP, Houston, TX (2000)
Day, Berry and Howard LLP, Hartford, CT (1999-2000)

Other (Selective)

Advisory Council of the Mendez Principles (2019-Present)
NAACP Legal Defense & Educational Fund (2022)
The Anthony Graves Foundation, Houston, Texas (2021)
Norwegian Centre for Human Rights, University of Oslo (2019-2021)
Center for Human Rights and Humanitarian Law, American University (2019-2021)
Association for Prevention of Torture (2019-2021)
Original Productions, LLC (2016, 2018)
Bay Area Book Festival (2016)
Government of Mexico (2014)
NAACP Legal Defense Fund (2007-2009)
*Good Morning America.* ABC, New York, New York (2009)
Equal Justice Institute, Montgomery, ALA (2001-2004)
Beverly Monroe Coalition for Justice, Richmond, VA (1997-2003)
*Sixty Minutes*, CBS, New York, NY (2003)

## SELECTED CASES OF EXPERT WITNESS TESTIMONY (PARTIAL LIST)

*John Fulton and Anthony Mitchell v. Robert Bartik et. al.* (Civil). Chicago, Illinois. February (2025)

*Estate of William Amor v. Naperville Police Officer Michael Cross et al.* Chicago, Illinois (2024)

*State of Arizona v. Andrew Sundberg.* Kingman, Arizona (2023)

*Ex Parte Allen Andre Causey.* Austin, Texas (2023)

*State of Illinois v. David Wright.* Chicago, Illinois (2022)

*State of Tennessee vs. Lindsey Lowe.* Gallatin, Tennessee (2022)

*United States v. Gregg Bigda.* Springfield, Massachusetts (2021)

*Henry Lee McCollum et al v. Robeson County et al.* Raleigh, North Carolina (2021)

*State of California v. Daljit Atwal et al.* Modesto, California (2019)

*United States v. Hayad Hamat.* Sacramento, California (2018)

*State of California v. Gina Bailey.* Fairfield, California (2017)

*State of New York v. Selwyn Days.* White Plains, New York (2017)

*James Dean et al v. Richard Smith et al.* Lincoln, Nebraska. (2016)

*Danial Williams et al. v. State of Virginia.* Richmond, Virginia. (2015)

*State of Tennessee v. Jimmy Rauhuff.* Maryville, Tennessee (2014)

*State of Wyoming v. John Balczewski.* Cheyenne, Wyoming (2012)

*State of Oregon v. Angelica Swartout.* Eugene, Oregon (2012)

*United States vs. Clifton Yarborough.* Washington, D.C. (2012)

*State of Washington v. Ted Bradford.* Yakima, Washington (2010)

*State of Wisconsin v. Brendan Dassey.* Manotowec, Wisconsin. (2010)

*United States vs. Debra Milke.* Phoenix, Arizona (2010)

*State of Arizona v. Daphne Henry.* Flagstaff, Arizona (2009)

*State of Missouri v. Ryan Ferguson.* Columbia, Missouri (2008)

*State of Alaska v. Eugene Vent.* Anchorage, Alaska (2008)

*State of Arkansas v. Kenneth Osborn.* Hamburg, Arkansas (2008)

*State of California v. James Dees.* Los Angeles, CA. (2007)

*State of Montana v. Barry Beach.* Deer Lodge, Montana (2007)

*United States v. Matthew Joyce.* San Diego, CA. (2006)

*State of Wisconsin v. Beth LaBatte.* Appleton, Wisconsin (2006)

*Earl Washington v. Kenneth Buraker et al.* Charlottesville, Virginia.(2006)

*State of Iowa v. Juan Macias.* Sioux City, Iowa (2005)

*State of California v. Richard Tuite.* San Diego, California (2004, 2013)

*State of Alabama v. Medell Banks.* Butler, Alabama (2003)

*State of California v. Robert Lee Salazar.* Pomona, California (2002)

*Beverly Monroe v. State of Virginia.* Richmond, Virginia (2000)

*State of Connecticut v. Richard Lapointe.* Hartford, Connecticut (2000)

*State of California v. Kenneth Cowling.* Oakland, California (2000)

*State of Washington v. Doris Green.* Wenatchee, Washington. (1999)

*State of Connecticut vs. David Saraceno.* Middletown, Connecticut. (1998)

**References Available on Request**

**CASES IN WHICH DR. RICHARD LEO HAS BEEN QUALIFIED AND TESTIFIED**
**(December 2021-December, 2025)**

**EXPERT WTINESS TESTIMONY – Pre-Trial Hearings, Trials and Post-Conviction Hearings**

*United States v. Gregg Bigda*. Trial. United States Federal District Court for the District of Massachusetts. 1st Circuit. Springfield, MA. December, 2021. (Prosecution).

*United States v. Kathleen Richard*. Suppression Hearing. Military Court, United States Coast Guard. Norfolk, VA. December, 2021.

*United States v. Kathleen Richard*. Trial. Military Court, United States Coast Guard. Norfolk, VA. January, 2022.

*State of California v. Aziel Gonzales*. Trial. Orange County Superior Court. Santa Ana, CA. February, 2022.

*State of California v. Roberto Kourchenko*. Trial. Los Angeles County Superior Court. Pomona, CA. March, 2022.

*State of California v. Jimmy Rosales*. Trial. Solano County Superior Court. Vallejo, CA. April, 2022

*State of Illinois v. David Wright*. Post-Conviction Hearing. Cook County Circuit Court. Chicago, IL. May, 2022

*State of Colorado v. Acacia Lyndarr*. Post-Conviction Hearing. Pueblo County Courthouse, 10th Judicial District. Pueblo, CO. May, 2022 and August, 2022.

*State of California v. Sidney Russell*. Trial. Tulare County Superior Court. Visalia, CA. May, 2022.

*United States v. Ronald Jacobs*. Suppression Hearing. United States District Court, Southern District of Ohio. Columbus, OH. May, 2022.

*State of California v. Robert Earl Davis*. Trial. Stanislaus County Superior Court. Modesto, CA. July, 2022

*United States v. Ramonchito Racion*. Trial. United States District Court, Fresno County. Fresno, CA. September, 2022

*State of Tennessee vs. Lindsey Lowe*. Post-Conviction Hearing. Sumner County Criminal Court. Gallatin, TN. October, 2022.

*State of California v. Roderick Knowles*. Post-Conviction Hearing. Solano County Superior Court. Vallejo, CA. October, 2022.

*Commonwealth of Kentucky v. Khalis McCullon*. Suppression Hearing.. Simpson County Circuit Court. Franklin, Kentucky. December, 2022

*State of California v. Tristan Cecil*. Suppression Hearing. San Mateo County Superior Court. Redwood City, CA. February, 2023.

*United States v. Thomas O'Hara, II*. Trial. Federal District Court. Denver, Colorado. February, 2023.

*State of Indiana v. Andrew Derouin*. Suppression Hearing (by video and audio link).Vincennes, Indiana. Knox Circuit Court. May, 2023

*State of California v. Ricardo Banuelos Villarreal*. Suppression Hearing (By video and audio link). Butte County Superior Court. Oroville, CA. September, 2023.

*Commonwealth of Kentucky v. Jason Waford*. Suppression Hearing (By video and audio link). Jessamine Circuit Court.. Nicholasville, KY. October, 2023.

*Ex Parte Allen Andre Causey*. Prosecution. Habeas Proceeding. Travis County District Court. Austin, TX. November, 2023

*State of Arizona v. Andrew Sundberg*. Trial. Mohave County Superior Court. Kingman, AZ. December, 2023.

*Samuel Jason Derrick v. Secretary, Department of Corrections, et al*. Post Conviction Hearing. Federal District Court. Middle District of Florida, Tampa Division. New Port Richey, Florida. March, 2024.

*State of California v. Delmar Ramirez*. Trial. Orange County Superior Court. Santa Ana, CA. May, 2024.

*State of California v. Jaime Valenzuela*. Post-conviction hearing. Santa Clara County Superior Court. San Jose, CA. June, 2024.

*Estate of William Amor v. Naperville Police Officer Michael Cross et al* (Civil). Federal Court. United States District Court. 7th Circuit. Chicago, Illinois. July, 2024.

*State of California v. Omar Ortiz*. Post-conviction hearing. Contra Costa County Superior Court. Pittsburg, CA. August, 2024.

*State of Kentucky v. Jason Waford*. Trial. Jessamine Circuit Court. Nicholasville, Kentucky. August, 2024

*State of New York v. Jon Pelcin*. Suppression Hearing. Orange Supreme and County Criminal Court. Goshen, New York. September, 2024.

*Commonwealth of Kentucky v. DeShawn Banks*. Trial. Jefferson County Circuit Court. Louisville, Kentucky. September, 2024.

*State of California v. Patrick Fuller*. Trial. Tulare County Superior Court. Visalia, CA. September, 2024.

*State of California v. James Hill*. Suppression Hearing. San Mateo County Superior Court. Redwood City, CA. October, 2024.

*State of California v. James Hill*. Trial. San Mateo County Superior Court. Redwood City, CA. November, 2024.

*State of California v. Andre Finlayson*. Suppression Hearing. Contra Costa County Superior Court. Martinez, CA.. January, 2025

*State of California v. Jeffrey Perez*. Trial. Ventura County Superior Court. Ventura, CA. January, 2025.

*John Fulton and Anthony Mitchell v. Robert Bartik et. al.* (Civil). Trial. Federal Court. United States District Court. 7th Circuit. Chicago, Illinois. February, 2025.

*State of California v. Lee Eigl*. Trial. Santa Clara County Superior Court. San Jose, CA. March, 2025

*State of California v. Tre Clay*. Suppression Hearing (by Video Link). Solano County Superior Court. Vallejo, CA. March, 2025

*State of California v. Lamont Tyler*. Trial. Orange County Superior Court. Santa Ana, CA. March, 2025.

*State of Oregon v. Lynn Edward Benton*. Suppression Motion. Clackamas County Superior Court. Portland, Oregon. April, 2025.

*Jose Contreras v. State of Kansas*. Post-Conviction Proceeding. Scott County District Court. Scott City, Kansas. May, 2025.

*State of California v. Jose Gutierrez*. Suppression Hearing. Santa Clara County Superior Court. San Jose, CA. May, 2025

*State of California v. Mario Vasquez Rodriguez*. Trial. Orange County Superior Court. Santa Ana, CA. July, 2025.

*United States v. Corey Spurlock*.  Trial.  Federal District Court.  Reno, Nevada.  September, 2025.

*State of California v. Andrew Garcia*. Suppression Hearing. Santa Barbara County Superior Court. Lompoc, CA.  September, 2025.

*State of California v. Francis Steele*.  Trial. Stanislaus County Superior Court.  Modesto, CA. November, 2025

*State of California v. McArvin Caringal*.  Trial. San Diego County Superior Court. San Diego, CA.  November, 2025.

## **DEPOSITIONS**

*Jesus Sanchez v. The Village of Wheeling, et al.* (Civil). January 26, 2022.

*Lamarr Monson v. Joan Gougoian, et al.*  (Civil).  March 20, 2022

*Anthony Jakes v. Kenneth Boudreau*, et al. (Civil).  June 20, 2022

*Christopher Barbour v. Michael Haley*.  Post-conviction Habeas Corpus.  July 26, 2022

*Chestnut et al. v. Kincaid, et al.* (Civil).  August 4, 2022.

*Arturo DeLeon Reyes v. Reynaldo Guevara*, et al; and *Gabriel Solache v. City of Chicago*, et al. (Civil). September 28-29, 2022

*John Horton v. City of Rockford, et al*.  Civil.  October 31, 2022.

*Victor Rosario v. Harold Waterhouse et al.*  Civil. February 2, 2023

*Arturo DeLeon Reyes v. Reynaldo Guevara*, et al; and *Gabriel Solache v. City of Chicago*, et al. (Civil). April 24, 2023.

*John Fulton v. Robert Bartik*, et al. and *Anthony Mitchell v. Robert Bartik, et al*.  (Civil). May 3, 2023

*Ex Parte James Harry Reyos*.  (Post-conviction). May 4, 2023.

*State of Missouri v. Stanley Kenaga, Jr*.  (Criminal Case). May 9, 2023.

*William Amor v. John E. Reid and Associates, Inc*.  (Civil).  June 8, 2023.

4

*Johnny Lee Savory v. Charles Cannon et al.* (Civil). August 14, 2023.

*Arnold Day v. Kenneth Boudreau et al.* (Civil). August 29, 2023.

*Ariel Gomez v. Reynaldo Guevara et al.* (Civil). October 2, 2023.

*Demond Weston v. City of Chicago, et al.* (Civil). March 1, 2024

*Joaquin Ciria v. City and County of San Francisco, et al.* (Civil). March 10, 2024.

*Baljit Athwal et al. v. County of Stanislaus et al*. (Civil). July 30, 2024.

*Alfredo Gonzalez et al. v. Reynaldo Guevara et al*. (Civil). December 1, 2025.

*Daniel Rodriguez v. Reynaldo Guevara et al.* (Civil.). December 10, 2025.

Case: Tony Bey (also known as Tony Steward)
Year: 1988
Area: 4
Report Page: 83

**Summary in Leo Report**:

Detective Kato purportedly obtained a murder confession from Mr. Bey during an abusive interrogation. Mr. Bey alleged that Detective Kato "put a pistol in his mouth and threatened to make him 'a statistic.'" Mr. Bey also alleges that Detective Summerville physically abused him during one of his post-arrest interrogations in Area 4. Mr. Bey was treated at the hospital for multiple lacerations after the interrogation, complained of severe stomach pain, and was diagnosed with acute appendicitis. Tony Bey Complaint Register & OPS Investigation. Bey was acquitted at trial. Steward v. Kato, et al., 1992 U.S. Dist. LEXIS 15690, at *8 (N.D. Ill. 1992); PTP-T SEWARD-BEY-000001-000157.

**Materials Provided Supporting Summary In Report**:

| Description | Bates Range |
| --- | --- |
| Opinion in *Steward v. Summerville, et al.* | PTP-T STEWARD-BEY-000001-4 |
| Complaint Register #165728 | PTP-T STEWARD-BEY-000005-92 |
| Complaint Register #240931 | PTP-T STEWARD-BEY-000093-000157 |

**Evidentiary Support for Summary**:

A.      Evidence of Coercion and Abuse

According to the district court opinion, Tony Bey was arrested at his home by Detective Summerville and "kicked, kneed, and scraped with a metal rod by certain defendants, while other stood by an watched." Steward v. Summerville, No. 90 C6956, 1992 U.S. Dist. LEXIS 15690, at *1 (N.D. Ill. Oct. 14, 1992).

According to the district court opinion and the Complaint Register Investigation No. 165728, Detective Kato placed a gun in Bey's mouth and threatened to "make [Bey] a statistic." Steward v. Summerville, No. 90 C6956, 1992 U.S. Dist. LEXIS 15690, at *1 (N.D. Ill. Oct. 14, 1992); Complaint Register #165728; PTP-T STEWARD-BEY-000022.

According to the Complaint Register Investigation No. 165728, Detective Cherby told Bey in the interrogation room that he "had a beating coming." Complaint Register #165728; PTP-T STEWARD-BEY-000017.

According to the Complaint Register Investigation No. 165728, Detective Summerville kneed Bey in the lower right side of Bey's abdomen and said to Bey, "You're either going to talk to me or my partner Keto." Complaint Register #165728; PTP-T STEWARD-BEY-000017.

According to the Complaint Register Investigation No. 165728, Detective Keto scrapped Bey's back with a metal rob. Complaint Register #165728; PTP-T STEWARD-BEY-000018.

According to the Complaint Register Investigation No. 165728, Bey sustained cuts on his back and a ruptured appendix, and he was treated for these injuries. Complaint Register #165728; PTP-T STEWARD-BEY-000019. According to the Complaint Register No. 165728, Cook County Hospital Records show Bey was treated for acute appendicitis after the interrogation. Complaint Register #165728; PTP-T STEWARD-BEY-000053.

According to the district court opinion, the defendant Detectives did not seriously argue that Bey's allegations did not occur, just whether they violated the Fourteenth Amendment. Steward v. Summerville, No. 90 C6956, 1992 U.S. Dist. LEXIS 15690, at *10 (N.D. Ill. Oct. 14, 1992).

Case:            Frank Bounds
Year:             1987
Report Page:   77
Location:      Area 3

**Summary in Leo Report**:

Detective Kill hit Bounds on the head, tried to kick him in the groin, and threatened to bring Bounds' girlfriend into the case if he did not confess causing Bounds to falsely confess to a murder.

**Materials Provided Supporting Summary In Report**:

| Description | Bates Range |
|---|---|
| Supreme Court of Illinois Opinion - People v. Bounds, 171 Ill.2d 1, 29-30 (1995). | PTP-F BOUNDS-000001-000030 |

**Evidentiary Support for Summary**:

A. Evidence of Coercion and Abuse

- According to a 1995 Illinois Supreme Court opinion, Bounds stated at a suppression hearing in his criminal trial that Detectives William Foley and William Kelly denied his request to speak to an attorney following his arrest, and Kelly hit him on the forehead and tried to kick him in the groin when he denied knowing anything about the crimes. PTP-F BOUNDS-000013
- Per that opinion, Bounds also asserted that Detective Michael Kill threatened that Bounds's girlfriend would lose his job if he did not sign a statement, and all three detectives—Foley, Kelly, and Kill—promised that his girlfriend's name would not be released to the media if he signed a confession statement. PTP-F BOUNDS-000013
- Per that opinion, Bounds's girlfriend, Susan Mitchnick, testified that Detective Kill and another officer questioned her at her home about Bounds, and Kill threatened to run her name "through the mud" in the media. PTP-F BOUNDS-000013.

B. Evidence of Notice to the City of Chicago

- Per the above, the City was on notice of Frank Bounds's testimony regarding alleged physical abuse by William Kelly at the time of the suppression hearing in his criminal trial and prior to 1995.

C. Evidence of Innocence
- See evidence of coercion and abuse, above.

Case:        Alnoraindus Burton
Year:        1992
Report Page:    77

**Summary in Leo Report**:

Detective Kill kicked Burton in the groin, slammed his head against the wall, slapped him across the face, and told him he could kill him causing Burton to falsely confess. (PTP-NOTICE-000829-000842; PTP-A BURTON-000001-000009)

**Materials Provided Supporting Summary In Report**:

| Description | Bates Range |
|---|---|
| Handwritten Complaint, Civil Rights §1893, Alnoraindus Burton, March 1992 | PTP-NOTICE-000829-000842 |
| Documented Burge Area 2 and 3 Torture Victims 1972-1991, Referencing Office of Professional Standards | PTP-A BURTON-000001-000009 |

**Evidentiary Support for Summary**:

### A. Evidence of Coercion and Abuse

According to the 1992 Complaint filed by Alnoraindus Burton and documentation of torture survivors in Burge Area 2 and 3, Detectives Kill and Kelly arrested and interrogated Burton regarding the homicide of Anthony Watkins around January 1989. PTP-NOTICE-000829-000842 at 4; PTP-A BURTON-000001-000009 at 12.

- According to the Complaint, one detective "pulled out a steel stick and threatened to hit [him] with it" and shortly after said "'I'm going to ask you what happened once [sic] more time then I'm going to bash your head in!'" PTP-NOTICE-000829-000842 at 5.
- According to the Complaint, a detective then hit Burton's right hand while it was handcuffed to a ring in the wall, hitting both his hands with the steel stick. PTP-NOTICE-000829-000842 at 5.
- The same detective then kicked Burton in the groin and legs, grabbed him by the neck and "bumped [his] head against the wall. PTP-NOTICE-000829-000842 at 6.
- He told Burton he "could kill [him] and tell everyone that he tried to reach at his gun and his partner shot [him]. PTP-NOTICE-000829-000842 at 6.
- The detective then "slapped [him] across [his] face const[antly] until [he] started crying for help". PTP-NOTICE-000829-000842 at 6.
- The detectives left him in the room overnight, came back the following night, removed his clothes, and then "opened the window in the middle of January" and

left him there "with just [his] shorts on until the next day" when his clothes were returned by other officers PTP-NOTICE-000829-000842 at 6.

- Documentation also notes that during this time he was beaten with a phone book and had a gun put in his mouth and called "nigger". PTP-A BURTON-000001-000009 at 12.
- Burton's complaint also noted that he suffered a broken left wrist and swollen hands from being beaten with the steel stick. PTP-NOTICE-000829-000842 at 6.

## B. Evidence of Notice to the City of Chicago

The City of Chicago would have received notice when Burton filed his § 1983 Civil Rights complaint in March 1992.

## C. Evidence of Innocence

N/A

Case:         Michael Cage
Year:         1988
Report Page:  83

**Summary in Leo Report**:

Michael Cage (1988). Detective Kato slapped Mr. Cage in the face, while Detective
Summerville read case facts to him, and later Detective Kato connected a gadget to
his chest that resembled an electric shaver with antennas attached to it. Cage felt
shocked and passed out. When Mr. Cage regained consciousness, Detective Kato
stretched his leg into the doorway and slammed the door on his ankle. Eventually
Cage gave a confession, but it was eventually suppressed at a pre-trial hearing
because the State failed to prove that the detectives had not caused Mr. Cage's
injuries. Steve Bogira, Good Cop, Bad Cop: What is it about Detective Kato that
Makes Murder Suspects So Eager to Confess?, Chicago Reader (Dec. 12, 1991);
PTP-M CAGE-000001-0000063.

**Materials Provided Supporting Summary In Report**:

| Description | Bates Range |
|---|---|
| Steve Bogira, Good Cop, Bad Cop: What is it about Detective Kato that Makes Murder Suspects So Eager to Confess?, Chicago Reader (Dec. 12, 1991) | PTP-M CAGE-000001-0000063 |

**Evidentiary Support for Summary**:

###### A. Evidence of Coercion and Abuse

According to Reader article, Detectives abused and coerced Michael Cage regarding a
homicide in December 1988, during a police interrogation. PTP-M CAGE-000001-
0000063 at 60. While in police custody, Cage made a statement confessing that one of
his friends committed the homicide. *Id.* He and two friends were convicted. *Id.* In
October 1991, the court heard a motion to suppress a confession, because Cage
alleged that the confession had been coerced. *Id.*
- At the hearing, Cage's attorney said that Cage's statement was "nothing more
  than a parroting under duress of information he had been indoctrinated with by
  the use of threats and physical abuse." *Id.*
- Cage testified at the hearing that during the 1998 interrogation, Cage denied
  knowing anything about the crime and detectives began to slap him in the face
  and read a statement regarding the circumstances. *Id.*
- Cage testified that while being interrogated, a detective entered the room, pulled
  up his sweater, and connected a machine to his chest a machine which shocked

- him to the point that he lost consciousness. When Cage regained consciousness, a detective read him the statement again. PTP-M CAGE-000001-0000063 at 60.
- Cage testified at the hearing that a detective stretched his leg into the doorway of the interview room and slammed the door on his ankle. *Id.*
- At the motion to suppress hearing, Cage's lawyer offered as evidence photos taken of Cage the day after his arrest, which showed marks on Cage's chest, believed to be blisters from the shock probes, and Cage's swollen ankle. *Id.* at 60-61

### B. Evidence of Notice to the City of Chicago

Cage filed a motion to suppress and the court heard evidence and found that Cage's injuries were sustained while in police custody. *Id.*

### C. Evidence of Innocence

The court ruled that the evidence showed Cage had sustained his injuries while in police custody and, because the state could not prove that the injuries did not lead to Cage's confession, the motion to suppress the statement was granted. *Id.* at 61.

Case:          Carl Chatman
Year:          2002
Report Page:   83
Area 4

**Summary in Leo Report**:

Carl Chatman (2002): Mr. Chatman, who had an IQ of 68 and a long history of mental disorders, was wrongly convicted of sexually assaulting Susan Riggio in the Daley Center. Chatman v. Chicago, et al., 2018 WL 1519160 (N.D. Ill. Mar. 28, 2018). Mr. Chatman was arrested, denied any involvement in the crime, and after he had been in custody for 12 hours without anything to eat or drink, Detective Kato interrogated him, threatening and abusing him while he was handcuffed to a wall, including striking him so hard that he almost lost consciousness, after which Mr. Chatman falsely confessed (Detective John Roberts had also used force and threats of force to coerce Mr. Chatman to confess).

Mr. Chatman was convicted and spent more than a decade in prison before the Cook County State's Attorney reinvestigated his case and dismissed the charges against him. Mr. Chatman was granted a certificate of innocence by the State of Illinois after his release from prison. Id. at *9. A Chicago police detective filed an anonymous complaint in May 2002 with the Office of Professional Standards relating that Detective Kato had physically abused Mr. Chatman and forced him to sign a false confession. (OPS Anonymous Complaint). The detective wrote that when Detective Kato hit Mr. Chatman, "That blow I thought would kill him for sure" and said that Detective "Kato took the victim's account of the assault, word for word and laid it out for the homeless suspect to sign. The suspect didn't even read it and didn't know what he was signing." and that "It is a well-known fact from questioning and the suspect's condition that he did not commit this assault. However Detective Kato stated that 'they wanted someone to be accountable, so I gave them someone. He's homeless anyway, at least now (laughingly) he'll get three meals a day. That's my contribution to help feed the homeless.'" Id.; PTP-C CHATMAN-000001-000082.

**Materials Provided Supporting Summary In Report**:

| Description | Bates Range |
|---|---|
| People v. Chatman Appellate Opinion | PTP-C CHATMAN-000049-82 |
| Chatman Civil Complaint<br><br>Chatman v. Chicago, et al., 2018 WL 1519160 (N.D. Ill. Mar. 28, 2018) | PTP-C CHATMAN-000001-48 |

**Evidentiary Support for Summary**:

## A. Evidence of Coercion and Abuse

- The civil complaint alleges while under arrest at Area 4, he was held for over 12 hours and not allowed to take his medication, which causes him to experience "disorganized thoughts, pressured speech, and an inability to think in a linear or logical manner". PTP-C CHATMAN-000012
- The civil complaint states that during the interrogation, Defendant Roberts used force and threats of force to coerce Mr. Chatman to confess. PTP-C CHATMAN-000012
- The civil complaint alleges that Defendants Holmes, Roberts, Midona, and Walsh took advantage of Chatman's mental instability by feeding him details of the crime and walking him through the crime scene to ensure that he had first-hand knowledge of the crime scene. These Defendants were subjectively aware that Mr. Chatman had no information about the alleged rape from his initial interrogation, and they walked him through the crime scene in order to provide him with the relevant facts and circumstances PTP-C CHATMAN-000013

## B. Evidence of Notice to the City of Chicago

- A Chicago police detective filed an anonymous complaint in May 2002 with the Office of Professional Standards relating that Detective Kato had physically abused Mr. Chatman and forced him to sign a false confession. (OPS Anonymous Complaint).

## C. Evidence of Innocence

- According to the appellate opinion and the civil complaint, Mr. Chatman was granted a certificate of innocence by the State of Illinois after his release from prison. PTP-C CHATMAN-000053, PTP-C CHATMAN-000004
- According to the appellate opinion, the State moved to vacate defendant's 2004 rape conviction and sentence in People v. Chatman, No. 02 CR 14572 (Cir. Ct. Cook Co.), and asked "that the matter be reinstated and redocketed," so that it could "move to vacate the conviction and sentence and move to nolle pros the conviction" and "request that the defendant, Carl Chatman, be released immediately from the custody of the Illinois Department of Corrections." PTP-C CHATMAN-000052
- The appellate opinion affirmed the trial court's dismissal of the motion to dismiss the petition to vacate the order granting Chatman a certificate of innocence PTP-C CHATMAN-000057
- According to the civil complaint, DNA testing revealed that neither Mr. Chatman's semen, hair, nor any other genetic material from Mr. Chatman (nor anyone else, for that matter) was found on Defendant Riggio's vagina, rectum, other body parts, or clothing PTP-C CHATMAN-000014

- The civil complaint states that Defendant Riggio's genetic material was not found anywhere on Mr. Chatman's body or clothing. Furthermore, Chatman's fingerprints were not found anywhere at the scene, even on the items he had allegedly touched PTP-C CHATMAN-000014-15

Case:          Nevest Coleman and Derrell/Darryl Fulton
Year:          1994
Report Page:     78
Area 3

**Summary in Leo Report**:

Coleman and Fulton allege that Detective Boudreau, Detective Halloran and another Area 3 detective punched Coleman in the face repeatedly until he falsely confessed. Fulton also alleged that he was punched in the face repeatedly, that a detective told him he would put a bullet in Fulton's brain if Fulton would not implicate himself in the crime, and that if he confessed he could go home and nothing bad would happen to anyone in his family.  Coleman and Fulton were excluded from male DNA on the victim's underwear. *Third Amended Complaint, Derrell Fulton v. Geri Lynn Yanow et al.; PTP-D FULTON-000001-000086; Transcript of testimony of Nevest Colman, in State of Illinois v. Nevest Coleman, June 28, 1996; PTP-N COLEMAN-000001-00010*

**Materials Provided Supporting Summary In Report**:

| Description | Bates Range |
|---|---|
| Third Amended Complaint, *Derrell Fulton v. Geri Lynn Yanow et al* | PTP-D FULTON-000001-000086 |
| Transcript of testimony of Nevest Coleman, in *State of Illinois v. Nevest Coleman*, June 28, 1996 | PTP-N COLEMAN-000042-000105<br><br>*PTP-N COLEMAN-000001-00010 (typo in Leo Report)* |

**Evidentiary Support for Summary**:

A. **Evidence of Coercion and Abuse**

- **Transcript from Coleman testimony on June 28, 1996** says
  - Coleman alleges that after he was put in the interview room, about eight officers came in to talk to Coleman about the homicide for which he was now in court. (PTP-N COLEMAN 000052)
  - Coleman alleges than an Unidentified Defendant Officer, described as a "short little white officer" (PTP-N COLEMAN 000061)  falsely told Coleman that if he just answered their questions, he would be able to go home. (PTP-D FULTON 000008)
  - Coleman alleges that Coleman lied and told the State's attorney that he was treated well by the police because Garfinkel told him all he had to do

1

is answer the questions: all he had to do was answer the questions. (PTP-N COLEMAN 000063)

- **Third Amended Complaint Says**
    - 30 minutes after being interrogated, an Unidentified Defendant Officer came into the room, called Coleman a "lying ass nigger," and then hit Coleman twice on the side of the head with a closed fist. (PTP-D FULTON-000008)
    - Later, a different Unidentified Defendant Officer falsely told Coleman that if he just answered their questions, he would be able to go home. (PTP-D FULTON 000008)
    - The Defendant officers and Defendant Garfinkel described a scenario for Coleman in which he, Plaintiff, and Eddie Taylr participated in the rape and murder of Bridgeman … they rehearsed with Coleman what he was to say in front of the court reporter. (PTP-D FULTON 000009).
    - During the course of Plaintiff's interrogation, an Unidentified Defendant Officer entered the room and hit Plaintiff in the face. The same … officer threatened to remove Plaintiff from the station and "put a bullet in his brain." (PTP-D FULTON 000010)

## B. Evidence of Notice to the City of Chicago

- **Transcript from Coleman testimony on June 28, 1996** says
    - Q: Were you ever alone with the state's attorney?
    - A: Yes, I was
    - Q: And when you were alone with the state's attorney, he asked you about how you had been treated by the police, didn't he?
    - A: No, he didn't.
    - Q: Well, when you were alone with the state's attorney, did you tell him, hey, those cops, they just hit me, that big guy just hit me?
    - A: I told him.
    - (PTP-N COLEMAN 000069)

- Q: Oh, the state's attorney asked you how you had been treated by the police?
- A: Hal Garfinkel asked me earlier in time, and I told him that the police hit me in the face several times.
- Q: Did you ever say that in the - when he was asking you in front of the court reporter?
- A: No.
- Q: Did he ever tell you not to say that in front of the court reporter?
- A: Yes, he did.
- Q: Oh, he said, by the way, don't say anything about the being hit part?
- A: He said don't bring that up because we are going to worry about this at another time.
- (PTP-N COLEMAN 000076)

2

- **Third Amended Complaint says**
  - All of the Defendant Officers, including Defendant Benoit, were aware that the Unidentified Defendant Officer entered the interrogation room to threaten and physically abuse Coleman. (PTP-D FULTON 00000-8)
  - The Defendant Officers and Defendant Garfinkel knew that Coleman's "confession" was fabricated, and that Garfinkel only gave the statement as the result of the physical and mental coercion to which they subjected him." (PTP-D FULTON 000010)
  - Policy-making officials with the Defendant City had full knowledge of detectives' widespread pattern of physically and mentally coercing criminal defendants' "confessions" and allowed it to continue by failing to adequately train, supervise, and discipline its employees for perpetuating the constitutional violations described here. (PTP-D FULTON 000016)
  - Defendant Benoit approved, assisted, condoned, and/or purposely ignored the defendant officers' and Unidentified Officers' unconstitutional conduct. (PTP-D FULTON 000023)


## C. Evidence of Innocence
- **Third Amended Complaint says**
  - At Plaintiff's trial, the only evidence connecting him to the offense was the fabricated statements and confession attributed to him by the Defendant Officers and Defendant Garfinkel. (PTP-D FULTON 000011)
  - In 2016, the Conviction Integrity Unit … submitted [to the Illinois State Police Division of Forensic Services (ISP Lab)] the sweatshirt and underwear the victim was wearing when her body was recovered, as well as her fingernail clippings. (PTP- D FULTON 000013) A partial male profile was obtained … Plaintiff, Coleman, and Eddie Taylor were all excluded from that profile. (PTP-D FULTON 000013)
  - Plaintiff has been excluded from every single piece of forensic evidence connected to the rape and murder that is capable of being tested. (PTP-D FULTON 000014)

3

Case:        James Coston
Year:        1988
Area:        Area 3
Report Page:    78

**Summary in Leo Report**:

Detective Kill struck him in the jaw, grabbed him around the neck and pushed him against the wall while questioning him about a murder (Coston was a witness in a murder case). PTP-J COSTON-000001-000003.

**Materials Provided Supporting Summary In Report**:

| Description | Bates Range |
|---|---|
| Excerpt from Kill Deposition | PTP-J COSTON-000001-000003 |

**Evidentiary Support for Summary**:

    A. **Evidence of Coercion and Abuse**
    ● **Excerpt from Kill Deposition states:**
        ○ In August of 1988, Coston alleged that in an interview at Area 3 headquarters Kill struck Coston in the jaw and grabbed him around the neck and pushed him against the wall while questioning him about a murder. (PTP-J COSTON 000001)
        ○ Kill states that the only reason he can think of that Coston made allegations against Kill is because Coston's mother and the murderer's mother were best friends, and Coston did not substantiate the murderer's alibi. (PTP-J COSTON 00002)

    B. **Evidence of Notice to the City of Chicago**
    ● **Excerpt from Kill Deposition states:**
        ○ Coston filed a Complaint Report #162922 [Exhibit 1 in the deposition]. (PTP-J COSTON 000001)
        ○ Kill signed a statement regarding the Coston complaint and gave it to OPS. (PTP-J COSTON 000003)

1

Case:            Mark Craighead
Year:            1989
Area:            Area 3
Report Page:     78

**Summary in Leo Report**:


Detective Kill and other Area 3 detectives beat Craighead and deprived him of food and water until he falsely confessed. Photographs of Craighead taken after his interrogation depict his injuries (Summary Report Digest, Complaint register No. 166416, PTP-M Craighead- 000001-000004).


**Materials Provided Supporting Summary In Report**:

| Description | Bates Range |
| --- | --- |
| Complaint Register #166416 Summary Report Digest | PTP-M CRAIGHEAD 000001-4 |

**Evidentiary Support for Summary**:

   A. **Evidence of Coercion and Abuse**
   ● **Complaint Register (July 6, 1989) states:**
      ○ Craighead alleged that on January 31, 1989, at 0700 hours, unknown detectives took him to Area #3 and 1) kept him there against his will until February 2, 1989; 2) deprived him of food and water; 3) beat him about the body. (PTP-M CRAIGHEAD 000001)
      ○ Craighead went to Cook County emergency room on February 3, 1989 at approximately 0600 hours, for treatment of injuries that he alleged were inflicted on him when he was kept at Area 3 for the past three days against his will. (PTP-M CRAIGHEAD 000002)
      ○ Photos of Mark Craighead taken on February 3, 1989 show bruises and marks on his back. It is not possible to determine from the photos if these are old or recent injuries. There is a photo of a laceration on Mark Craighead's foot. This does appear to be a recent injury. (PTP-M CRAIGHEAD 000002)
      ○ Commander of Area 3 Violent Crimes Lieutenant John Regan said that Mark Craighead …had free access to water while he was there and he assumed that Mark Craighead got his own food on January 31, 1989 since he was free to do what he wanted. (PTP-M CRAIGHEAD 000003)

1

- ○ Lieutenant Regan stated that he did not know where Mark Craighead slept other than in a chair. (PTP-M CRAIGHEAD 000003)
- ○ There was not an arrest report made out for the time that Mark Craighead claimed to be detained at Area 3 and interrogated from January 31, 1989 to February 2, 1989.  (PTP-M CRAIGHEAD 000002)

**B.  Evidence of Notice to the City of Chicago**

- ● **Complaint Register (July 6, 1989) states:**
    - ○ On February 3, 1989, at 0710 hours, Sergeant Kenneth Kudulis, star #2269, telephoned the Office of Professional Standards on the Pax and registered this complaint with Investigator Patrick Querfurth, star #72, on behalf of complainant.
    - ○ None of the detectives listed on the case report supplemental fit the description of the officer that Mark Craighead alleged beat him. It is recommended that this investigation be closed with a finding of "UNFOUNDED" against the identified detectives. (PTP-M CRAIGHEAD 000004)
    - ○ At this point it would not be in compliance with General Order 82-14 to continue this investigation. Therefore, the reporting investigator recommends that this investigation be terminated until such time that the complainant decides to cooperate and furnish this officer with sufficient information to re-open this investigation. (PTP-M CRAIGHEAD 000004)

2

Case:         Arnold Day
Year:          1992
Report Page:   78

**Summary in Leo Report**:

Detective Boudreau and another Area 3 detective choked  Day and threatened to throw him out of a window until he falsely confessed to a  murder. Day was acquitted after presenting his allegations of physical abuse and  coercion (Affidavit of Arnold Day, February 4, 1992; Complaint, Arnold Day v.  Kenneth Boudreau, et al.; PTP-A DAY-000001-105)

**Materials Provided Supporting Summary In Report**:

| Description | Bates Range |
| --- | --- |
| People v. Day Motion to Suppress Arnold Day Testimony Transcript | PTP-A DAY-000001-000037 |
| Arnold Day Illinois Torture Inquiry and Relief Commission Disposition | PTP-A DAY-000038-000052 |
| 1994 Arnold Day Sworn Affidavit | PTP-A DAY-000053-000055 |
| Complaint in Arnold Day v. Kenneth Boudreau, et al. | PTP-A DAY-000001-105 |

**Evidentiary Support for Summary**:

### A. Evidence of Coercion and Abuse

- The 2017 TIRC disposition found that there was sufficient evidence of torture of Arnold Day warranting judicial review under the TIRC act. PTP-A DAY-000052
- In his 1993 Motion to suppress testimony, Day testifies Officer Evans "stomped" him on the back of the head during his arrest." PTP-A DAY-000005
- Day also testified that during his 9 hour interrogation, while handcuffed to a wall, Det. Foley grabbed him by the collar, pushed against the wall, and threatened to throw him out of the window. Det. Boudreau was present throughout. PTP-A DAY-000007-12. In his 1994 sworn affidavit and his TIRC form referenced in the TIRC disposition, Day states he was also choked by Det. Foley (PTP-A DAY-000054,43,45).
- Day asserted his innocence throughout the interrogation, but after being choked and threatened he agreed to provide a statement written by the ASA, "fearing for his life" PTP-A DAY-000054.

- The TIRC disposition cites his 1994 testimony in the Erving murder trial, in which Day states ASA made minor corrections to the statement, which Day alleges were made to appear as though Day had made the change. PTP-A DAY-000042
- The TIRC disposition cites an interview with TIRC investigators in which Day states that he made statements based on the information and questions the officers gave him. PTP-A DAY-000045
- The 2017 TIRC disposition, Day's civil complaint, Day's 1993 suppression testimony, and his 1994 affidavit state that only after providing a statement was Day given food, allowed to make a phone call (PTP-A DAY-000016), and unhandcuffed from the wall. (PTP-A DAY-000064)

## B. Evidence of Notice to the City of Chicago

- Mr. Watson, a witness who implicated Day, recanted his statement and notified the State that the statement was false and the product of coercion from the Officers. PTP-A DAY-000048-49; PTP-A DAY-000065
- The TIRC disposition states that there is "a substantial body of evidence" suggesting that detectives Boudreau and Foley engaged in systematic conduct aimed at obtaining confessions through coercion. PTP-A DAY-000046
  - The disposition cites a 2001 Tribune article stated that Boudreau has helped get confessions from "more than a dozen" defendants in murder cases in which defendants were acquitted or charges were dropped.
  - Detectives Boudreau and Foley have been directly identified in six and seven published Illinois cases, respectively, detailing allegations of abuse against Det. them or officers working with them. PTP-A DAY-000046
  - Numerous criminal defendants have lodged formal complaints alleging he engaged in misconduct. PTP-A DAY-000046
- Day also filed an IPRA complaint against Evans, Foley, and Boudreau on November 3, 2006. IPRA found that there was "insufficient evidence" to support Day's claims. PTP-A DAY-000046
- In 2013, the CIty of Chicago paid over $6 million dollars to settle a suit brought against several officers, including Det. Foley PTP-A DAY-000046

## C. Evidence of Innocence

- The TIRC Disposition states Day was acquitted of the Raphael Garcia murder by the Jury in 1993. PTP-A DAY-000047
- TIRC Disposition also found that given the outcome of the Garcia trial, there is "credible evidence suggesting that Day's confession to the Erving murder was obtained through physical coercion". PTP-A DAY-000047
- The TIRC disposition says there are "critical inconsistencies" between Day's forced confession and the physical evidence at the scene of Erving's murder PTP-A DAY-000048
- ASA corrections made to Day's confession suggest Day did not know critical facts about the murder, and adds that "without corrections, the confession would be inconsistent with the evidence." PTP-A DAY-000048

- According to the TIRC disposition and the civil complaint, both witnesses who implicated Day recanted their statement before trial. The witnesses stated that they implicated Day to secure their release from detainment and out of fear they would be implicated by Boudreau PTP-A DAY-000048, PTP-A DAY-000061-62
- Day's civil complaint states that he was granted a Certificate of Innocence in 2019. PTP-A DAY-000057
- Day's Civil complaint states that the judge granted the State's motion to vacate Mr. Day's conviction for the murder of Jerrod Irving. PTP-A DAY-000066

Case:           Tyrone Reyna, Nicholas Escamilla and Miguel Morales
Year:           1993
Report Page:    80-81

**Summary in Leo Report**:

Tyrone Reyna, Nicholas Escamilla and Miguel Morales (1993): Detective Boudreau and other Area 3 detectives beat sixteen-year-old Reyna (Detective Halloran slapped him in the face and kicked him in the leg; Detective Boudreau and Detective Halloran spit on him), refused to let him contact his family, and intimidated him into confessing to a murder he did not commit. Boudreau and other Area 3 detectives also beat and threatened Reyna's co-defendants, Nicholas Escamilla and Miguel Morales, causing Escamilla to falsely confess after hours of abuse (Affidavit of Tyrone Reyna, April 22, 2004; Affidavit of Nicholas Escamilla, March 19, 2004; Affidavit of Miguel Morales, February 25, 2001; PTP-T REYNA-000001-000018).

**Materials Provided Supporting Summary In Report**:

| Description | Bates Range |
| --- | --- |
| Affidavit of Tyrone Reyna | PTP-T REYNA-00001-00005 |
| Affidavit of Nicholas Escamilla | PTP-T REYNA-000006-10 |
| Statement of Miguel Morales | PTP-T REYNA-000011-18 |

**Evidentiary Support for Summary**:

### A. Evidence of Coercion and Abuse

- In a signed affidavit in 2004, Reyna stated that after he was arrested by CPD detectives Halloran and O'Brien, they threatened and hit him so much during the car ride that by the time he arrived at the station that he believed they were going to kill him. PTP-T REYNA-000002-03.
- Once he was in an interrogation room, the Detectives continued to threaten and hit him, especially detective O'Brien. PTP-T REYNA-000003.
- When Reyna said he knew nothing about the murder at hand and asked for his mother, the detectives hit him harder. PTP-T REYNA-000003.
- In a signed affidavit in 2004, Escamilla stated that he was placed in an interrogation room and handcuffed to the wall for 15 hours without being able to sleep, make a phone call, or use the washroom. PTP-T REYNA-000007.
- Detectives Halloran, Boudreau, O'Brien, and Ryan screamed at him, threatened him, hit him the back, head, chest, and stomach, and spat at him. PTP-T REYNA-000009.
- When Escamilla asked to use the phone and have a lawyer present, O'Brien kicked him in the legs and slapped him in the face. PTP-T REYNA-000009.

- When he again asked for an attorney Boudreau and Halloran spat on him and hit him again.PTP-T REYNA-000009.
- Police threatened him that his daughter would be placed in DCFS custody, and his pregnant wife would go to jail. PTP-T REYNA-0000010.
- After 18 hours, he agreed to sign a false, coached statement that he was involved with the murder. PTP-T REYNA-0000010.
- In a 2001 affidavit, Miguel Morales stated that in February 1993, Chicago Police Officers handcuffed him to the wall, punched him, smacked him, and accused him of lying when he said he was not involved in the murder. PTP-T REYNA-000012-13.

## B. Evidence of Notice to the City of Chicago

Not stated in these documents.

## C. Evidence of Innocence

Not stated in these documents.

Case:            Fred Ewing and Darnell Stokes
Year:            1993
Report Page:      78

**Summary in Leo Report**:

Fred Ewing and Darnell Stokes (1993): Detective Boudreau coerced confessions from two developmentally disabled juveniles, Fred Ewing (IQ=56) and Darnell Stokes. Both were acquitted. (Maurice Possley, Steve Mills & Ken Armstrong, Veteran Detective's Murder Cases Unravel, Chi. Trib., Dec. 17, 2001.; PTP-F EWING-000001-00015).

**Materials Provided Supporting Summary In Report**:

| Description | Bates Range |
| --- | --- |
| Complaint Register #203754 | PTP-F EWING-000001-143 |
| Complaint in Ewing v. O'Brien, et al. | PTP-F EWING-000144-150 |

**Evidentiary Support for Summary**:

### A. Evidence of Coercion and Abuse

- According to his 1998 civil complaint against the City of Chicago, in September 16, 1993, Fred Ewing had a developmental delays and an IQ of 56 and was 17-years-old when he was arrested by the Chicago Police Department for two murders. PTP-F EWING-000146.
- Ewing alleged that Halloran and O'Brien took advantage of those delays to coerce a false confession through physical and psychological coercion and by withholding the exculpatory evidence that eventually exonerated him. PTP-F EWING-000146-47.
- According to the Summary Report Digest in the Complaint Register filed by Ewing's mother in October 1993, Ewing told the Chicago Police Department's Internal Affairs Division that after picking him up for questioning, CPD Detectives pulled into an alley and beat him around the chest and stomach with a police baton. PTP-F EWING-000004. Ewing stated that police detectives slapped him in the face. PTP-F EWING-00005.
- Ewing also stated that he saw detectives choking Darnell Stokes while Stokes was being questioned. PTP-F EWING-000006.
- Ewing alleged that he told detectives he would sign a statement because he was not able to read but after a detective slapped him and told him to sign it, Ewing did. PTP-F EWING-000006.
- Stokes also told the Chicago Police Department's Internal Affairs Division in a formal statement that detectives choked him and struck him on the back with a baton when they questioned him. PTP-F EWING-000006.

- Stones also alleged that he saw Detectives choke and slap Ewing and kick him when he was on the floor. PTP-F EWING-000007.
- Ewing's mother called Chicago Police Department's Internal Affairs Division on September 27, 1993, and told the investigator that Ewing had called her on September 20 and told her that investigators had beaten him and forced him to sign a confession. PTP-F EWING-0000012.
- Ewing was acquitted of these crimes.

### B. Evidence of Notice to the City of Chicago

The City of Chicago had notice of Ewing's and Stokes' allegations of abuse and torture from their September - November 1993 statements to CPD's 's Internal Affairs Division.

### C. Evidence of Innocence

Ewing and Stokes were found not guilty of both murders. PTP-F EWING-000147; Maurice Possley, Steve Mills & Ken Armstrong, Veteran Detective's Murder Cases Unravel, Chi. Trib., Dec. 17, 2001.

Case:          Derrick Flewellen
Year:          1995
Report Page:   78
Area 3

**Summary in Leo Report**:

Derrick Flewellen (1995): Detective Boudreau and other Area 3 detectives interrogated Derrick Flewellen for more than 36 hours during which they slapped, kicked, and punched him until he signed a false confession. Flewellen was exonerated based on DNA evidence after serving close to five years in prison (Complaint, Derrick Flewellen v. City of Chicago, et al.; PTP-D-FLEWELLEN-000001-000015).

**Materials Provided Supporting Summary In Report**:

| Description | Bates Range |
|---|---|
| Complaint in Derrick Flewellen v. City of Chicago, et al | PTP-D-FLEWELLEN-000001-000015) |

**Evidentiary Support for Summary**:

### A. Evidence of Coercion and Abuse

- In a complaint filed in 2000, Derrick Flewellen alleged that in November 1995, the Chicago Police Department including Detectives Boudreau and Halloran took him from the hospital where he was being treated for a foot injury and was in severe pain. ( PTP-D-FLEWELLEN-
- 00002-3.)
- Flewellyn gave an inculpatory statement regarding two separate murders after being interrogated for more than 48 hours. (PTP-D-FLEWELLEN-
- 000003-4.)
- Flewellen alleged that Chicago Police Officers Boudreau and Valadez knocked Flewellen down, choked him, stomped his injured foot and slammed a metal chair into it, kicked him, denied him pain medication for his foot, and hit him in the face. (PTP-D-FLEWELLEN-
- 000004-6).

### B. Evidence of Notice to the City of Chicago

- The City was given notice of Flewellen's allegations of torture during hearing on his motions to suppress his inculpatory statement in March 1997 and November 1998. (PTP-D-FLEWELLEN-000008).

- As of at least November 30, 1999, the City had notice of the evidence exculpating Flewellen and establishing the falsehood of his inculpatory statements with scientific evidence.
- In 2000, the City was given notice of Flewellen's allegations of coercion and torture through his civil lawsuit against them.

### C. Evidence of Innocence

- Forensic evidence showed that one victim had no semen on her body whereas Flewellen's allegedly coerced statement said that he raped her.
- DNA testing of semen from the other victim was matched to a serial killer, not to the person identified as a co-perpetrator in Flewellen's allegedly false statement. (PTP-D-FLEWELLEN-000002, 08.)
- A Judge found Flewellen not guilty of both murders on November 30, 1999. (PTP-D-FLEWELLEN-000008.)

Case:           Nevest Coleman and Derrell/Darryl Fulton
Year:           1994
Report Page:    78
Area 3

**Summary in Leo Report**:

Coleman and Fulton allege that Detective Boudreau, Detective Halloran and another Area 3 detective punched Coleman in the face repeatedly until he falsely confessed. Fulton also alleged that he was punched in the face repeatedly, that a detective told him he would put a bullet in Fulton's brain if Fulton would not implicate himself in the crime, and that if he confessed he could go home and nothing bad would happen to anyone in his family. Coleman and Fulton were excluded from male DNA on the victim's underwear. *Third Amended Complaint, Derrell Fulton v. Geri Lynn Yanow et al.; PTP-D FULTON-000001-000086; Transcript of testimony of Nevest Colman, in State of Illinois v. Nevest Coleman, June 28, 1996; PTP-N COLEMAN-000001-00010*

**Materials Provided Supporting Summary In Report**:

| Description | Bates Range |
| --- | --- |
| Third Amended Complaint, *Derrell Fulton v. Geri Lynn Yanow et al* | PTP-D FULTON-000001-000086 |
| Transcript of testimony of Nevest Coleman, in *State of Illinois v. Nevest Coleman*, June 28, 1996 | PTP-N COLEMAN-000042-000105 *PTP-N COLEMAN-000001-00010 (typo in Leo Report)* |

**Evidentiary Support for Summary**:

    A. **Evidence of Coercion and Abuse**

- **Transcript from Coleman testimony on June 28, 1996** says
  - Coleman alleges that after he was put in the interview room, about eight officers came in to talk to Coleman about the homicide for which he was now in court. (PTP-N COLEMAN 000052)
  - Coleman alleges than an Unidentified Defendant Officer, described as a "short little white officer" (PTP-N COLEMAN 000061) falsely told Coleman that if he just answered their questions, he would be able to go home. (PTP-D FULTON 000008)
  - Coleman alleges that Coleman lied and told the State's attorney that he was treated well by the police because Garfinkel told him all he had to do

1

is answer the questions: all he had to do was answer the questions. (PTP-N COLEMAN 000063)
- **Third Amended Complaint Says**
  - 30 minutes after being interrogated, an Unidentified Defendant Officer came into the room, called Coleman a "lying ass nigger," and then hit Coleman twice on the side of the head with a closed fist. (PTP-D FULTON-000008)
  - Later, a different Unidentified Defendant Officer falsely told Coleman that if he just answered their questions, he would be able to go home. (PTP-D FULTON 000008)
  - The Defendant officers and Defendant Garfinkel described a scenario for Coleman in which he, Plaintiff, and Eddie Taylr participated in the rape and murder of Bridgeman … they rehearsed with Coleman what he was to say in front of the court reporter. (PTP-D FULTON 000009).
  - During the course of Plaintiff's interrogation, an Unidentified Defendant Officer entered the room and hit Plaintiff in the face. The same … officer threatened to remove Plaintiff from the station and "put a bullet in his brain." (PTP-D FULTON 000010)

## B. <u>Evidence of Notice to the City of Chicago</u>

- **Transcript from Coleman testimony on June 28, 1996** says
  - Q: Were you ever alone with the state's attorney?
  - A: Yes, I was
  - Q: And when you were alone with the state's attorney, he asked you about how you had been treated by the police, didn't he?
  - A: No, he didn't.
  - Q: Well, when you were alone with the state's attorney, did you tell him, hey, those cops, they just hit me, that big guy just hit me?
  - A: I told him.
  - (PTP-N COLEMAN 000069)

- Q: Oh, the state's attorney asked you how you had been treated by the police?
- A: Hal Garfinkel asked me earlier in time, and I told him that the police hit me in the face several times.
- Q: Did you ever say that in the - when he was asking you in front of the court reporter?
- A: No.
- Q: Did he ever tell you not to say that in front of the court reporter?
- A: Yes, he did.
- Q: Oh, he said, by the way, don't say anything about the being hit part?
- A: He said don't bring that up because we are going to worry about this at another time.
- (PTP-N COLEMAN 000076)

2

- **Third Amended Complaint says**
  - All of the Defendant Officers, including Defendant Benoit, were aware that the Unidentified Defendant Officer entered the interrogation room to threaten and physically abuse Coleman. (PTP-D FULTON 00000-8)
  - The Defendant Officers and Defendant Garfinkel knew that Coleman's "confession" was fabricated, and that Garfinkel only gave the statement as the result of the physical and mental coercion to which they subjected him." (PTP-D FULTON 000010)
  - Policy-making officials with the Defendant City had full knowledge of detectives' widespread pattern of physically and mentally coercing criminal defendants' "confessions" and allowed it to continue by failing to adequately train, supervise, and discipline its employees for perpetuating the constitutional violations described here. (PTP-D FULTON 000016)
  - Defendant Benoit approved, assisted, condoned, and/or purposely ignored the defendant officers' and Unidentified Officers' unconstitutional conduct. (PTP-D FULTON 000023)


### C. <u>Evidence of Innocence</u>
- **Third Amended Complaint says**
  - At Plaintiff's trial, the only evidence connecting him to the offense was the fabricated statements and confession attributed to him by the Defendant Officers and Defendant Garfinkel. (PTP-D FULTON 000011)
  - In 2016, the Conviction Integrity Unit … submitted [to the Illinois State Police Division of Forensic Services (ISP Lab)] the sweatshirt and underwear the victim was wearing when her body was recovered, as well as her fingernail clippings. (PTP- D FULTON 000013) A partial male profile was obtained … Plaintiff, Coleman, and Eddie Taylor were all excluded from that profile. (PTP-D FULTON 000013)
  - Plaintiff has been excluded from every single piece of forensic evidence connected to the rape and murder that is capable of being tested. (PTP-D FULTON 000014)

3

Case:   Michael Waslewski and Daniel Gasca
Year:   1990
Report Page: 87

**Summary in Leo Report**:

Mr. Waslewski claimed that, during an overnight interrogation, Detective Kato and another detective beat him in order to secure a confession. David Jackson, Fine Line Between Tough Police Work, Brutality, Chicago Tribune, at 2 (Jul 14, 1991). Gasca claimed that he was held for 26 hours, during which time Kato entered the interrogation room, told him "'You're a killer and you have no remorse,'" and when Gasca denied the accusation, Detective Kato hit the side of his head. Following the interrogations, Mr. Waslewski adopted a confession that Detective Kato provided to him, "giv[ing] a detailed statement describing how he and a friend, Daniel Gasca, stabbed [the victim] to death during a fight over money, then put [the victim's] body in the trunk of a car that they left in an alley near Cook County Jail." Id. The confession was shown to be false when records emerged showing that Gasca could not have been involved in the crime because he had been in prison on the night it occurred. Id. Wasleswki was acquitted at trial. Waslewski v. Kato, 1993 U.S. Dist. LEXIS 269, at *1-2 (N.D. Ill. 1993); PTP-M WASLEWSKI-000001-000006.

**Materials Provided Supporting Summary In Report**:

| Description | Bates Range |
|---|---|
| Motion to Dismiss Ruling | PTP-M WASLEWSKI-000001-000006 |
| Chicago Tribune Article | PTP-H LUCAS-000001-000004 |
| Chicago Reader Article | PTP-K WASHINGTON-000001-000032 |

**Evidentiary Support for Summary**:

### A. Evidence of Coercion and Abuse

- The Chicago Reader reported that Waslewski was found not guilty of murder after presenting the defense that CPD detectives pressured him into confessing. The jury deliberated just over an hour. PTP-K WASHINGTON-000031.
- The Chicago Tribune reported that Waslewski's "murder confession," given to Det. Kato, implicated his friend Daniel Gasca in the killing, even though Gasca was in Cook County jail that night. PTP-H LUCAS-000003.
- Per the Chicago Reader, Waslewski stated that Kato assaulted him with kicks and strikes, threatened to "kick [him] in the kidneys and [he] would be pissing blood for a week," and further threatened to fabricate an account of the killing to convict him. PTP-K WASHINGTON-000031.

- The Chicago Tribune reported that Daniel Gasca, Waslewski's friend, was held for questioning for 26 hours by Kato and said that Kato hit him in the head when questioning him. PTP-H LUCAS-000003. The Reader reported that Gasca said Kato struck and choked him and screamed at him. PTP-K WASHINGTON-000031.
- The Reader reported that Waslewski and Gasca both said that Kato told them what he wanted them to say about the murder. PTP-K WASHINGTON-000031.
- Per the Tribune, Brian Kane, Gasca and Waslewski's friend, said that Kato questioned him and "pulled his hair until he cried" during the questioning. PTP-H LUCAS-000003.

## B. Evidence of Notice to the City of Chicago

- In 1991, the City received notice through news articles in the Chicago Tribune (July 14, 1991) and the Chicago Reader (Dec. 12, 1991). PTP-H LUCAS-000001; PTP-K WASHINGTON-000001.
- In 1991 and 1992, further notice was provided through Waslewski's criminal trial (Nov. 1991) and a lawsuit Waslewski filed in January 1992. PTP-M WASLEWSKI-000001.

## C. Evidence of Innocence

- As described above, Waslewski was found not guilty of the homicide he was charged with. PTP-K WASHINGTON-000031.
- As described above, Waslewski's "confession" was inconsistent with Gasca being in jail at the time of the killing. PTP-H LUCAS-000003.
- As described above, Waslewski, Gasca, and Kane all alleged physical abuse by Kato. PTP-H LUCAS-000003, PTP-K WASHINGTON-000031.
- As described above, Waslewski and Gasca both asserted that Kato tried to fabricate evidence against them. PTP-K WASHINGTON-000031.

Case:          Jerry Gillespie
Year:          1993
Report Page:   79

**Summary in Leo Report**:

Detective Boudreau and other Area 3 detectives beat, kicked, slapped, and choked Gillespie, and threatened him with further beating, including burning him with a cigarette, if he did not sign a written confession they prepared (First Amended Petition for Post-Conviction Relief and Petition for Relief from Judgement, State of Illinois v. Jerry Gillespie, PTP-J Gillespie-000001-000020; Motion to Hold Appeal in Abeyance, State of Illinois v. Jerry Gillespie, PTP-J Gillespie-000021-000030).

**Materials Provided Supporting Summary In Report**:

| Description | Bates Range |
|---|---|
| First Amended Petition for Post-Conviction Relief and Petition for Relief from Judgement, State of Illinois v. Jerry Gillespie | PTP-J Gillespie-000001-000020 |
| Motion to Hold Appeal in Abeyance, State of Illinois v. Jerry Gillespie | PTP-J Gillespie-000021-000030 |

**Evidentiary Support for Summary**:

Evidence of Coercion and Abuse

According to the first amended petition for post-conviction relief and petition for relief from judgement, Gillespie stated that he was forcibly taken into custody and questioned about the shooting of Jeffrey Rodgers. First Amended Petition for Post-Conviction Relief and Petition for Relief from Judgement, State of Illinois v. Jerry Gillespie, No. 93 C 6684, at 4–5 (Cir. Ct. Cook County, n.d.); PTP-J GILLESPIE-000004–5.

The same materials state police detained Gillespie at the Area One police station overnight after he denied any part in the shooting and gave a written statement to that effect. First Amended Petition for Post-Conviction Relief and Petition for Relief from Judgement, State of Illinois v. Jerry Gillespie, No. 93 C 6684, at 5 (Cir. Ct. Cook County, n.d.); PTP-J GILLESPIE-000005.

The same materials state Gillespie gave a court-reported statement stating he acted as a lookout during the shooting after denying his involvement over multiple days and after hours of interrogation. First Amended Petition for Post-Conviction Relief and Petition for Relief from Judgement, State of Illinois v. Jerry Gillespie, No. 93 C 6684, at 6 (Cir. Ct. Cook County, n.d.); PTP-J GILLESPIE-000006.

The same materials state Gillespie stated in motions to suppress this statement at trial that police arrested him at gun point, transported him to the Area One police station, held him against his will "without food, sleep, or use of the bathroom, and without an opportunity to contact his family or communicate with an attorney," spent more than 30 hours in custody where officers "threatened, choked and beat him," and forced him to give a statement "that conformed to their theory of what had occurred in the Rodgers murder." First Amended Petition for Post-Conviction Relief and Petition for Relief from Judgement, State of Illinois v. Jerry Gillespie, No. 93 C 6684, at 6–7 (Cir. Ct. Cook County, n.d.); PTP-J GILLESPIE-000006–7.

## B. Evidence of Notice to the City of Chicago

The same materials state that the Detectives who were involved in the Rodgers murder investigation—Boudreau, Paladino, Halloran, Foley, and O'Brien—and Gillespie's interrogation were the subjects of other motions to suppress for similar coercive conduct in the circuit court. First Amended Petition for Post-Conviction Relief and Petition for Relief from Judgement, State of Illinois v. Jerry Gillespie, No. 93 C 6684, at 7 (Cir. Ct. Cook County, n.d.); PTP-J GILLESPIE-000007.

According to the motion to hold appeal in abeyance, the Goldston Report released in September 1990 concluded that command members "were aware of the systemic abuse [in Area Two] and perpetuated it either by actively participating in it or by failing to take any action to stop it." Motion to Hold Appeal in Abeyance, State of Illinois v. Jerry Gillespie, No. 9J CR 6684, at *4 (1st Dist. 2003); PTP-J GILLESPIE-000024. According to the motion to hold appeal in abeyance, the Goldston Report implicated many of the detectives that were involved in Gillespie's case in the abuse in Area Two.  Motion to Hold Appeal in Abeyance, State of Illinois v. Jerry Gillespie, No. 9J CR 6684, at *5 (1st Dist. 2003), PTP-J GILLESPIE-000025.

## C. Evidence of Innocence

According to the first amended petition for post-conviction relief and petition for relief from judgement, Gillespie testified before a grand jury that he had no part in the murder. First Amended Petition for Post-Conviction Relief and Petition for Relief from Judgement, State of Illinois v. Jerry Gillespie, No. 93 C 6684, at 5 (Cir. Ct. Cook County, n.d.); PTP-J GILLESPIE-000005.

According to the first amended petition for post-conviction relief and petition for relief from judgement, no witness at trial placed Gillespie at the scene of the shooting. First Amended Petition for Post-Conviction Relief and Petition for Relief from Judgement, State of Illinois v. Jerry Gillespie, No. 93 C 6684, at 7 (Cir. Ct. Cook County, n.d.); PTP-J GILLESPIE-000007.

Case:        Ariel Gomez
Year:        1997
Report Page: 90
Area 5

**Summary in Leo Report**:

Ariel Gomez alleges that Detective Guevara coerced from him a false murder confession. In 2018, Mr. Gomez was exonerated after three witnesses swore under oath that Guevara repeatedly attempted to coerce them into identifying Gomez as the shooter.Three of Mr. Gomez's four co-defendants, all also interrogated by Detective Guevara, were acquitted and the fourth had his conviction thrown out by the Illinois appellate court (Complaint, Ariel Gomez v. Reynaldo Guevera et al.; AR-L 532490-532533; Verified Post-Conviction Petition (December 11, 2014); JR-L300501-300555.

**Materials Provided Supporting Summary In Report**:

| Description | Bates Range |
|---|---|
| Verified Post Conviction Petition | JR-L300501-300555 |
| Complaint | AR-L 532490-532533 |

**Evidentiary Support for Summary**:

**Evidence of Coercion and Abuse**

- Ariel Gomez was 17 years old when he was deprived of sleep, food, and physically abused at Area 5 by Det. Guevara in an attempt to get him to falsely confess to the murder of Concepcion Diaz. JR-L 300509,  JR-L 300520.
- When Gomez refused to do so, he was punched in the face. *Id*. Gomez had bruises all over one side of his body. Complaint at *9. He had blood on his face when his mother and brother saw him at area 5. JR-L 300530.
- Verified post conviction petition (and complaint) says the City knew about Det. Guevara's practice of physical abuse to garner false confessions. JR-L 300524, JR-L 300552
- Guevara has taken the 5th in this case. JR-L 300532.

**Evidence of Notice to the City of Chicago**

**Evidence of Innocence**

- The verified post conviction petition contains evidence that Plaintiff was wrongfully convicted – namely the statements of Ruth Antonetty, Debbie Daniels and Marie Castro, show that the individual was innocent and the confession was false. JR-L 300527- 528. They were all pressured by Det. Guevara to identify Gomez as the shooter when they knew he wasn't. JR-L 300527-28. Ruth Antonetty refused to identify Gomez as the shooter. *Id.*
- The verified post conviction petition contains evidence Det. Guevara showed witnesses who to choose in a photo array, including Debbie Daniels. *Id,* JR-L 300528.
- The verified post conviction petition contains evidence that the bullet from Mr. Gomez's gun did not match the bullet found at the crime scene. JR-L 300525. Further, the angle from which he was sitting in the red pathfinder and where the victim was shot could not have possibly been from his gun – the fatal shot came from someone several feet away at waist height. *Id.*
- Several of Gomez's co-defendants were acquitted at trial (Dragon Jovanovic, Paul Yalda, John Yacoub), and the sole co-defendant that was convicted (Jose Dominguez) had his conviction thrown out by Judge Bucklo who stated Ariel Gomez was innocent. JR-L 300523.

Case:           Oscar Gomez, Eric Gomez, and Abel Quinones
Year:            1994
Report Page:     79

**Summary in Leo Report**:

Oscar Gomez, Abel Gomez and Abel Quinoles (1995): Detective Halloran and Detective Boudreau held all three men for more than 30 hours and beat them while they were shackled to a wall. All three were acquitted. PTP-O GOMEZ & A QUINONES-000001-00043).

**Materials Provided Supporting Summary In Report**:

| Description | Bates Range |
|---|---|
| March 14, 2008 Deposition of Abel Quinones in Hill v. City of Chicago | PTP-O GOMEZ & A QUINONES-000001-000232 |
| March 19, 2008 Deposition of Oscar Gomez in Hill v. City of Chicago | PTP-O GOMEZ & A QUINONES-000233-438 |

**Evidentiary Support for Summary**:

### A. Evidence of Coercion and Abuse

- In a 2008 deposition in the case of Hill v. City of Chicago, Abel Quinones explained that he, Eric Gomez and Abel Quinones were questioned by police for more than 30 hours. PTP-O GOMEZ & A QUINONES-00000130.
- In a 2008 deposition in the case of Hill v. City of Chicago, Oscar Gomez testified that Halloran and Boudreau threatened Oscar Gomez' father with arrest and charges during his interrogation. PTP-O GOMEZ & A QUINONES-000329.
- Oscar Gomez testified that Detective Halloran pushed him against the wall and choked him, kicked him in the legs, and punched him in the stomach. PTP-O GOMEZ & A QUINONES-000317-18.
- Halloran kept telling him, "Just say you did it, you know, and this could be over"; they told him he could go home if he confessed. PTP-O GOMEZ & A QUINONES-000317.
- Oscar Gomez also testified that O'Brien got frustrated that he would not confess and held a gun to his head. PTP-O GOMEZ & A QUINONES-000321.
- Quinones alleged that O'Brien and Halloran both grabbed him by the throat while he was handcuffed to a bench. PTP-O GOMEZ & A QUINONES-000137.
- Halloran told Quinones that he would not walk out of there without being charged. PTP-O GOMEZ & A QUINONES-000160.

### B. Evidence of Notice to the City of Chicago

In his 1995 testimony at the hearing on his motion to suppress, Oscar Gomez testified to the coercion employed against him including being threatened with a gun by a CPD officer during his interrogation. PTP-O GOMEZ & A QUINONES-000410.

### C. Evidence of Innocence

All three men were found not guilty of this murder. PTP-O GOMEZ & A QUINONES-000404.

Case:        Shawn Hardy
Year:        1989
Report Page:  85

**Summary in Leo Report**:

Shawn Hardy (1989): Detective Kato accused Mr. Hardy of committing a murder, punched and kicked him in the chest, but he did not confess. Mr. Hardy was diagnosed with a chest contusion a few days after the interrogation. Command Channel Review – Complaint Register Investigation No. 171359 (PTP-S-Hardy 000001-000050)

**Materials Provided Supporting Summary In Report**:

| Description | Bates Range |
| --- | --- |
| Complaint Register Investigation No. 171359 | PTP-S-Hardy 000001-000050 |

**Evidentiary Support for Summary**:

### A. Evidence of Coercion and Abuse

Shawn Hardy's mother filed a Complaint with the Office of Professional Standards in October 1989, stating that a detective punched and kicked her son in the chest during an interrogation. *Id.* at 3, 5.

According to the CR file, on September 30, 1989, Shawn Hardy was subjected to abuse and coercion during an interrogation at the police station by detectives investigating a July 9, 1989 homicide. Hardy had been interrogated on July 10, 1989, and denied having any involvement in the homicide.
- During the September 30 interrogation, detectives asked if he wanted to make a statement, and when he didn't respond, one proceeded to punch him "with his fist, two quick punches to the right chest. PTP-S-Hardy 000001-000050 at 4. The detective then "kicked him in the chest as he was seated on top of a desk in front of him." *Id.* at 4.
- During an interview related to the OPS investigation, Hardy explained that the detective "asked [him] if [he] had a statement. [He] did not say anything. At this time, [detective] punched [him] in the right chest with his fist, twice. He then kicked [him] with his foot in the right side of [his] chest. *Id.* at 34.
- Shawn Hardy's mother alleged that detectives abused Hardy when his attorney was not in the room. *Id.* at 3, 6, 34–35.
- Hardy received medical treatment on October 4, 1989 following the incident and was diagnosed as having a chest wall contusion. *Id.* at 4, 8, 46.

- During his interview for the OPS investigation, Hardy said, that he was eventually released, went to receive medical help, and that "[he] had a bruise and sore right chest." *Id.* at 35.
- Medical records from Hardy's visit note that he had complained of chest pain and tenderness. PTP-S-Hardy 000001-000050 at 3, 46.

### B. Evidence of Notice to the City of Chicago

The City of Chicago would have received notice when Hardy's mother filed a Complaint with the Office of Professional Services on October 4, 1989 and detailed the allegations of the abuse Hardy endured during his September interrogation. *Id.* at 3. The City would have remained aware of the issue as the investigation proceeded over the next couple of weeks as statements and records were collected. Within two weeks of investigating the Complaint, the detective was notified by the department of the specific allegations of abuse that Hardy had endured. *Id.* at 39.

### C. Evidence of Innocence

According to investigation reports filed with the Complaint, on July 10 during the first interrogation, Hardy denied any knowledge of or involvement in the homicide that was under investigation. *Id.* at 29. He also denied arguing with the homicide victim and denied knowing him in a particularly personal capacity. *Id.*

Case:          Harold Hill, Dan Young, Peter Williams
Year:          1990
Report Page:    79

**Summary in Leo Report**:

Harold Hill, Dan Young, Peter Williams (1990): Detective Boudreau and other Area 3 detectives beat and coerced Hill, Young (whose IQ was 56), and Williams into falsely confessing to rape and murder. DNA tests subsequently proved that the men were innocent and the State dismissed all charges against them. Young and Hill were 16 years old at the time, Williams was 19 (Complaint, L.C. Young v. City of Chicago, February 8, 2007; Transcript of Proceedings, People v. Dan Young, September 19, 1994; PTP-D YOUNG-000001-187; PTP-H HILL-000001-000049).

**Materials Provided Supporting Summary In Report**:

| Description | Bates Range |
|---|---|
| Complaint in Young v. City of Chicago, et al. | PTP-D YOUNG-000001-39 |
| Excerpt of 09/19/1994 Report of Proceedings in People v. Young | PTP-D YOUNG-000040-94 |
| Excerpt of 09/19/1994 Report of Proceedings in People v. Young | PTP-D YOUNG-000095-169 |
| Excerpt of 09/19/1994 Report of Proceedings in People v. Young | PTP-D YOUNG-000170-187 |
| Appellate Opinion in Hill v. Coppelson, et al. | PTP-H HILL-000001-10 |
| Amended Complaint in Hill v. City of Chicago, et al. | PTP-H HILL-000011-46 |
| Affidavit of Peter Williams | PTP-H HILL-000047-49 |

**Evidentiary Support for Summary**:

### A. Evidence of Coercion and Abuse

- Harold Hill and Dan Young were convicted of the rape and murder of Kathy Morgan on October 14, 1990. PTP-H HILL-000002 (7th Circuit opinion).
- Harold Hill testified in his criminal trial on September 19, 1994, that during his interrogation by Chicago Police, after he told police he did not know anything about the crime, officers told him he was the murderer, described facts about the murder to him, and showed him crime scene photos. PTP-D YOUNG-000066.
- Hill testified that Detective Boudreau hit him in the face and rib many times while describing the crime scene to Hill. PTP-D YOUNG-000059, 60-61.
- Hill cried and told officers Boudreau and Halloran that he did not commit the murder. PTP-D YOUNG-000062.
- Hill testified that he signed an inculpatory statement for the murder becaues he was afriad that if he didn't, the police would kill him. PTP-D YOUNG-000068-69, 72.
- On September 19, 1994, Peter Williams testified in the trial of Harold Hill and Dan Young that Detectives Halloran and Boudreau handcuffed him to the wall and slapped him in the face, telling him that he assaulted a woman. PTP-D YOUNG-0000104.
- Williams also testified that Boudreau and Halloran showed him pictures of the crime scene and described the scene to him while they hit him and threatened him. PTP-D YOUNG-0000110.
- Williams testified that when he told Boudreau and Halloran that he was not involved in the rape and murder, the hit him around the chest and legs with a mallet. PTP-D YOUNG-0000117-18.
- Williams started crying and yelling in pain. PTP-D YOUNG-0000119.
- Because he was being hit and beaten, including on an open wound on his face, Williams gave signed statements that he participated in the rape and murder. PTP-D YOUNG-0000134-36
- Dan Young, who had a severe developmental delay, also testified on September 19, 1994, that the police hit him in the face and kicked him in the stomach. PTP-D YOUNG-0000184, PTP-D YOUNG-00005

### B. Evidence of Notice to the City of Chicago

- The City was given notice of Young's, Williams', and Hill's allegations of torture and coercion during their 1994 trial testimony.

### C. Evidence of Innocence

- According to a 2009 Seventh Circuit decision, both Hill and Young were excluded by DNA evidence from every piece of evidence at the scene of the crime. The State agreed to vacate their criminal convictions. PTP-D YOUNG-00005.
- Charges were never brought against Williams since he was in jail on the day of the murder. PTP-D YOUNG-00005.

Case:          Tyrone Hood and Wayne Washington
Year:          1993
Report Page:   79

**Summary in Leo Report**:

Tyrone Hood and Wayne Washington (1993): Detective Boudreau coerced a false confession from Washington. Both men's convictions were subsequently overturned. PTP-T HOOD & W WASHINGTON-000001-00039.

**Materials Provided Supporting Summary In Report**:

| Description | Bates Range |
|---|---|
| Tyrone Hood v. City of Chicago Plaintiff's Response to City's Motion for Summary Judgment and Plaintiff's Response to the Individual Defendant Officers | PTP-T HOOD & W WASHINGTON-000001-000396 |

**Evidentiary Support for Summary**:

### A. Evidence of Coercion and Abuse

- In a deposition in his civil case (cited within his Summary Judgment response), Tyrone Hood testified that during his interrogation for a murder, Chicago Police Detectives
  - kicked him,
  - slapped him,
  - choked him,
  - pointed a gun at him and told him to sign or they'd put five slugs in Mr. Hood,
  - beat him and stepped on his face,
  - hit him and dumped cigar ashes on him
  - threatened to lock up Hood's wife and he would never see his children again. PTP-T HOOD & W WASHINGTON-0000352.
- Mr. Hood was kept by police for two days. PTP-T HOOD & W WASHINGTON-0000350-51.
- Wayne Washington testified in a deposition that he gave a false statement implicating himself and Mr. Hood because police slapped him and told him that if he implicated Hood, he could go home. PTP-T HOOD & W WASHINGTON-0000360.
- Washington testified that he was detained by Chicago Police for two days and was not given food or water until he gave a statement implicating himself and Hood. PTP-T HOOD & W WASHINGTON-0000362-63.

### B. Evidence of Notice to the City of Chicago

According to the documents cited in Mr. Hood's summary judgment response, Mr. Hood's sister, Mertina Chaney, filed a report with the Office of Professional Standards on 5/28/93, once she learned of Mr. Hood's beating. Ex. 61 (C.R. 200855) at CITY 6973; Ex. 62 (Chaney Dep.) at 132:6-19. PTP-T HOOD & W WASHINGTON-0000352.

Washington testified that he was slapped and deprived of food at his hearing on his motion to suppress on August 24, 1995. PTP-T HOOD & W WASHINGTON-0000362 (Summary judgment response citing Motion to Suppress Transcript).

### C. Evidence of Innocence

In 2015, the Cook County State's Attorney vacated Hood's and Washington's convictions and dropped all charges against them.

Case:           Joseph Jackson
Year:           1998
Report Page:    80
Area 1
Officers:       Boudreau, Halloran, Coughlin

**Summary in Leo Report**:

Joseph Jackson (1998): Detective Boudreau placed a book on Mr. Jackson's chest and stomach and hit the book with a blackjack. Detective Halloran placed a typewriter cover over Jackson's head and cut off his air supply. (PTP-J JACKSON-000001-000004)

**Materials Provided Supporting Summary In Report**:

| Description | Bates Range |
|---|---|
| Joseph Jackson Sworn Affidavit | PTP-J JACKSON-000001-000004 |

**Evidentiary Support for Summary**:

A. Evidence of Coercion and Abuse

- Joseph Jackson's sworn affidavit states that Boudreau placed a book on his chest and stomach and hit the book with a black jack, so as not to leave visible marks on Jackson's body. PTP-J JACKSON-000002
- The sworn affidavit states that Halloran, using a torture technique referred to in the Department as "bagging," placed a typewriter cover over Jackson's head cutting off his air supply and causing him to lose consciousness, and shocked him to wake him up on two occasions PTP-J JACKSON-000002
- The sworn affidavit states that Boudreau repeatedly slapped Jackson in the face "until [he] couldn't feel his face" and that Boudreau and Halloran said they would continue to beat him until he confessed. PTP-J JACKSON-000001
- The sworn affidavit states that Jackson was denied food, water, access to the restroom, a phone call and the presence of a lawyer during his 8 hour confession PTP-J JACKSON-000001,000003
- Jackson's affidavit states that he was punched in the face when he attempted to tell ASA Groth that he was innocent and was being beaten by the officers, and the ASA willingly allowed him to continue to get beaten until he confessed PTP-J JACKSON-000002
- The affidavit states that Jackson eventually agreed to confess after the Officers threatened to frame and beat his fiancee. On the condition that Officers would not seek the death penalty they had threatened he would receive and that they would not beat or frame his fiancee, Jackson was coached by Boudreau on how to confess to ASA Groth. PTP-J JACKSON-000002, 000003

C. Evidence of Innocence

- Joseph Jackson's sworn affidavit states that he repeatedly maintained his innocence and only gave his confession out of fear for his life. PTP-J JACKSON-000002

Case:           Anthony Jakes
Year:           1994
Report Page:    80
Area 3
Officers:       Kill, Boudreau

**Summary in Leo Report**:

Anthony Jakes (1991): Detective Boudreau slapped, punched and kicked fifteen year-old Jakes until he falsely confessed to being the lookout during a murder. Jakes was held incommunicado for over sixteen hours, deprived of food and water, and denied access to his aunt (Complaint, Anthony Jakes v. Kenneth Boudreau et al., April 1, 2019; (PTP-A JAKES-000001-000409)

**Materials Provided Supporting Summary In Report**:

| Description | Bates Range |
| --- | --- |
| People v. Jakes Appellate Opinion | PTP-A JAKES-000205-219 |
| Complaint in Anthony Jakes v. Kenneth Boudreau et al. | PTP-A JAKES-000001-000037 |
| People v. Jakes Motion to Suppress Anthony Jakes Testimony | PTP- A JAKES-000038-84 |
| People v. Jakes Post Conviction Anthony Jakes Testimony (Direct) | PTP-A JAKES-000220-312 |
| Illinois Torture Inquiry and Relief Commission Disposition Anthony Jakes | PTP-A JAKES-000379-409 |
| People v. Jakes Criminal Trial Anthony Jakes Testimony | PTP-A JAKES-000313-378 |
| People v. Jakes Post Conviction Anthony Jakes Testimony (Cross) | PTP-A JAKES-000085-204 |

**Evidentiary Support for Summary**:

**A. Evidence of Coercion and Abuse**

- The 2013 People v. Jakes post-conviction appellate opinion states officers entered Anthony Jakes' home without a warrant, arrested him, and interrogated him about the murder of Rafael Garcia for over 16 hours before he singed a statement. Photographs taken on September 18, 1991, one day after Jakes signed his statement, show that Jakes had several fresh bruises on his arm, leg, side, stomach, and back. PTP-A JAKES-000206-208, PTP-A JAKES-326
- The 2013 TIRC Disposition found that there is sufficient evidence of torture to conclude that the claim is credible and merits judicial review for appropriate relief PTP-A JAKES-000379
- The TIRC disposition confirms Jake was "slapped, punched, beaten, and kicked". The disposition states he sustained injuries to his back, stomach, knee, elbow, and ribs," citing his his sworn criminal and MTS testimonies PTP-A JAKES-000379, PTP-A JAKES-000322, PTP-A JAKES-00041
- The Appellate opinion and Jakes' sworn MTS and criminal testimonies state that Kill said some Latin Kings would attack Jake's family if Kill asked them to do so. Kill also knocked Jakes on the floor and kicked him while Boudreau watched. PTP-A JAKES-000208, PTP-A JAKES-000041, PTP-A JAKES-000322
- The appellate opinion and Jakes' post-conviction testimonies state that arresting officers slammed him against a wall and handcuffed while being arrested in his home PTP-A JAKES-000207, PTP-A JAKES-000124, PTP-A JAKES-000243
- Jakes' sworn criminal and MTS testimonies state that Officer Kill threatened Jakes to "tell [ASA] what he wants to hear" or he would continue to be beaten PTP-A JAKES-000325, PTP-A JAKES-000043
- The TIRC disposition, Jakes' sworn MTS testimony, and Jakes' sworn criminal testimony state that Jakes signed the statement as a result of the coercion and threats and out of fear of further torture PTP-A JAKES-000380, PTP-A JAKES-000049, PTP-A JAKES-000323
- The TIRC disposition states that "the claim exhibits may of the standard characteristics of a coerced, false confession case" including the OPS findings of systematic and methodical torture under Jon Burge PTP-A JAKES-000382
    - a cursory confession handwritten by the ASA, with less than 3 pages devoted to the facts of the shooting
    - The prosecution's case without the confession is "almost nil" with no physical evidence implicating Jakes and no eyewitness
    - Jakes' confession contradicts that of his co defendant, Arnold Day, who also contended he was coerced by Boudreau and was also acquitted

**B. Evidence of Notice to the City of Chicago**

- The post-conviction appellate opinion and the TIRC disposition state that Kill himself in states in a sworn deposition that for the approximately 1,500 murder confessions he obtained in his career, "in 90% of those cases, defense attorneys

filed motions to suppress "based on allegations of unnecessary use of physical force." PTP-A JAKES-000217

## C. Evidence of Innocence

- The post-conviction Appellate opinion states that "Boudreau's testimony both at trial and on the motion to suppress puts his credibility in issue, and evidence that he committed perjury in other cases could significantly affect the credibility of his testimony here." PTP-A JAKES-000218
- The post-conviction Appellate opinion states that Jake's statement "included no verifiable, correct details about the crime that the police did not know before questioning Jakes." PTP-A JAKES-000209
- The Appellate opinion cites evidence showing that Jakes did not have a view of the street from his window and could not have seen Garcia dying in its opinion affirming Jake's ineffective counsel during his criminal trial PTP- A JAKES-000211
- The TIRC disposition states that Jake's confession conflicts with the statement of Day, which does not mention Jakes, a lookout, or any accomplice. No weapon was recovered from either of them PTP- A JAKES-000381
- The TIRC disposition states that there was "no eyewitness to the shooting, and there was no physical evidence linking [Jakes] to the offense."PTP- A JAKES-000381

Case:           Ronald Kitchen, Marvin Reeves, and Eric Wilson
Year:           1988
Report Page:    80
Area 3

**Summary in Leo Report**:

Detective Kill and Burge beat Ronald Kitchen until he falsely confessed to a murder. Detective Kill punched Kitchen in the face, back, chest, and groin. Kill interrogated Kitchen's cousin, Eric Wilson, about the same murder. Kill beat Wilson in the groin, chest, and head until Wilson falsely inculpated Kitchen and another man. Wilson heard Kitchen screaming and moaning in pain (Letter from Donald Hubert to Edward Egan and Robert Boyler, May 24, 2005; PTP-R KITCHEN-000001-000208)

**Materials Provided Supporting Summary In Report**:

| Description | Bates Range |
|---|---|
| Excerpt of Second Amended Petition for Post-Conviction Relief in *People v. Kitchen* | PTP-R KITCHEN-000001-178 |
| Letter from Donald Hubert to Edward Egan and Robert Boyler, May 24, 2005<br><br>Special Prosecutor Report regarding Ronald Kitchen | PTP-R KITCHEN-000179-208 |

**Evidentiary Support for Summary**:

   **A. Evidence of Coercion and Abuse**

   ● **Special Prosecutor Report (May 24, 2005) states:**
      ○ Existing medical records provide documented proof of Kitchen's groin injury and treatment. In the notes, Kitchen reported that he was hit in the groin with a nightstick, knee, and fist. (PTP-R KITCHEN 000180)
      ○ The records from Cermak Hospital reflect that on August 28, 1988, at 5:30 pm, Kitchen was brought to the hospital complaining of trauma to the groin area. The Out-Patient Progress Notes state he reported the police had hit him in the groin with a nightstick, knee, and fist. He was treated for several months. (PTP-R KITCHEN 000202)

1

- Marvin Reeves testified at Kitchen's motion to suppress. In addition to stating he heard Kitchen being beat in an adjoining room at Area 3, he testified that he was also hit, kicked, and threatened at Area 3 on August 26th sometime after 5 am. He described the police offender as 5'9", black hair, Spanish. (PTP-R KITCHEN 000204)
- Wilson testified that he was brought to the 3rd floor at 39th and California for questioning on the evening of August 25th. In addition to stating he saw Kitchen who looked beat-up, he testified that he (Wilson) was made to sit on the floor, kicked between the legs, and punched when he denied any knowledge that Kitchen or Reeves committed the murders. Wilson identified one of his attackers as a man who was wearing a white police shirt with 3 stripes and another tall, heavyset, male, Spanish police officer. (PTP-R KITCHEN 000204)

- **Second Amended Petition for Post-Conviction Relief (2008) states:**
  - After Kitchen was arrested on August 25, 1988, he was interrogated and beaten for sixteen hours at Area 3 Police Headquarters by Chicago police detectives under the supervision of Jon Burge. (PTP-R KITCHEN - 000003)
  - When Edwards (Kitchen's lawyer) arrived at Area 3, he observed Kitchen handcuffed to a wall, crying and in obvious pain. Kitchen told Edwards that Area 3 detectives had interrogated and beaten him for sixteen hours, ultimately forcing him to sign a statement confessing to five murders he did not commit. (PTP-R KITCHEN -000004)
  - Kill punched Kitchen in the face, back, chest, and groin with his fists, while Burge kicked him in his back, ribs, and groin. The first beating lasted approximately fifteen to twenty minutes. (PTP-R KITCHEN 000022).
  - Detective Byron grabbed an unattached receiver from a phone in the room and hit Kitchen on the side of the head with it. (PTP-R KITCHEN 000022)
  - Burge stood on top of a desk and kicked Kitchen out of the chair he was sitting in. Burge continued to kick Kitchen in his ribs and groin as Kitchen laid on the floor. (PTP-R KITCHEN 000023)
  - Before being placed together in a room with Kitchen, Wilson was being held by Area 3 detectives in an interrogation room adjacent to where Kitchen was being held. Wilson heard Kitchen's screams as well as the police jumping on Kitchen. Wilson personally observed Kitchen moaning, beaten and in physical pain. Later, after Wilson and Kitchen were again separated, Wilson observed Kitchen, bent over and in severe pain, in a cage. (PTP-R KITCHEN 000023)
  - Smith began beating Kitchen in the head with a telephone book and in the groin and ribs with a blackjack. As Smith beat him, Kitchen cried out that he did not know the victims of anything about what had happened to them. (PTP-R KITCHEN 000025)
  - When Kitchen answered that he did not want to speak to ASA Lukanich until his attorney arrived, Kill beat Kitchen in the ribs and the back of his

2

head. The beating lasted about five minutes, until Kitchen agreed to speak to ASA Lukanich. (PTP-R KITCHEN 000027)

- Shortly after ASA Lukanich left the room, Kill re-entered the room and repeated the threats he had made several minutes earlier. He beat Kitchen for several more minutes. Finally, because he was tired, scared, and could not endure more beatings, Kitchen agreed to go along with what Kill, Smith, Byron, and Burge wanted him to say. (PTP-R 000027)
- AKA Lukanich wrote the statement as Kill dictated its content. Kill would provide a piece of the story, ASA Lukanich would ask Kitchen if Kill's account was correct, Kitchen would respond "yes," and ASA Lukanich would record Kill's statement. This pattern continued until ASA Lukanich had written a complete statement. (PTP-R KITCHEN 000028)
- While Edwards was at Area 3 on August 26, 1988, he also saw Wilson there. When Wilson saw Edwards at Area 3, he immediately told Edwards that he had heard Kitchen being beaten by the police, and that he had been beaten by the police as well. (PTP-R KITCHEN 000030)
- The next day, when Kitchen appeared before Judge Williams at Branch 66, Judge Williams saw Kitchen's physical condition and ordered that Mr. Kitchen be taken to the hospital.
- Medical records reflect that Kitchen was diagnosed with testicular trauma which doctors treated with an anti-inflammatory painkiller and a scrotal support. Medical records also reflect that Kitchen reported to Dr. Aaron Hamb that the "police hit [him] in the groin with night stick, knee, and stick." Mr. Kitchen received treatment for his groin from August 28, 1988 to December 21, 1988. (PTP-R KITCHEN 000033).
- Wilson, Kitchen's cousin, alleged Kill kicked him in the scrotum, elbowed him in the chest, and hit him with a bat in his back, arm, and top of his head, while interrogating Wilson on the night of August 25, 1988 at Area 3. … Mary Howard, Eric Wilson's aunt, saw Wilson on August 26, 1988 and remembered Wilson being swollen and having a red stomach. The OSP "regretfully" recommended the case closed, although it found Eric Wilson "persuasive" and "credible." (PTP-R KITCHEN 000126)

## B. Evidence of Notice to the City of Chicago

- **Special Prosecutor Reports (May 24, 2005) states:**
  - A transcript of Kitchen and Reeves' second court appearance in August 29, 1988 was recreated from the original court reporter's notes. Judge Bolan inquired if Kitchen's arm was injured and Kitchen replied that "it was my groin." (PTP-R KITCHEN 000181)
  - Attorney E. Duke McNeil represented Reeves and pointed out that Reeves had a black eye and requested to be allowed to photograph it. Judge Bolan granted leave for Reeves' black eye to be photographed and ordered that Reeves could go to the hospital to see if additional medical treatment was required. (PTP-R KITCHEN 000181)

3

- **Second Amended Petition for Post-Conviction Relief (2008) states:**
  - The assistant public defender also stated "I have spoken to Mr. Reeves and Mr. Kitchen; both of these gentlemen have indicated to me that they were injured at the police station; they indicated that they were beaten by the police …" The prosecutor observed that she did not see any "visible injuries." The judge stated that he "observed that." The judge then said "they are remanded to the Sheriff's Department House of Corrections; if there is a determination by them – if they need hospitalization, they will have it determined there." (PTP-R KITCHEN 000034)
  - On August 29, 1988, Marvin Reeves' attorney told the court that his client had a black eye and that he had to go to Cermak Hospital. (PTP-R KITCHEN 000034)
  - At trial, a Corrections officer from Division 6 testified that he remembered thinking it was strange that Kitchen was sent directly to the hole, because Kitchen had not committed any disciplinary infractions. This officer also testified that when Mr. Kitchen arrived at Division 6 on August 28, 1988, he was "walking as if he was lame." (PTP-R KITCHEN 000033)

## C.  Evidence of Innocence

- **Second Amended Petition for Post-Conviction Relief (2008) states**
  - In the prosecutor [ASA John Eannace]'s own words, "Willie Williams is the only evidence to tie these [defendants] to the 5 dead bodies." (PTP-R KITCHEN 000103)
  - Post-conviction defense counsel had had several conversations with Williams in which he admitted that he did not tell the truth at trial. Williams' recorded statements indicate that Kitchen never confessed to Williams in the first place. (PTP-R KITCHEN-000004)
  - At the time of Kitchen's trial, Edwards had in his possession police reports which documented that the Chicago Police Department investigated three other suspects: Pedro Sepulveda (Debbie Sepulveda's husband); Arturo Sepulveda (Pedro Sepulveda's brother); and Victor Vieyra (the man with whom Debbie Sepulveda was having an extramarital affair). (PTP-R KITCHEN 000171)
  - Notes taken by the police during witness interviews following the murders indicate that Pedro Spulveda was rumored to have been involved in the homicide of a large-scale narcotics dealer which occurred just says before the Sepulveda/Rodriguez murders, and that the dealer's cohorts were rumored to have killed Sepulveda's family in revenge. (PTP-R KITCHEN 000055)
  - At the time the crimes were committed, Kitchen was at a pool party. (PTP-R KITCHEN 000081)

4

Case:         Anthony Lash
Year:         1989
Report Page:  80
Area 3

**Summary in Leo Report**:

Anthony Lash (1989): Detective Kill and other Area 3 detectives interrogated sixteen-year-old Anthony Lash about a murder without his parents or his attorney present. Detective Kill beat Lash and slammed his head into a wall, causing him to falsely confess to the murder. People v. Lash, 252 Ill.App.3d 239, 245-36 (1st Dist. 1993; PTP-R LASH-000001-000011).

**Materials Provided Supporting Summary In Report**:

| Description | Bates Range |
|---|---|
| People v. Lash, 252 Ill.App.3d 239 (1st 1993) | PTP-A LASH-000001-11 |

**Evidentiary Support for Summary**:

### A. Evidence of Coercion and Abuse

- According to the appellate opinion affirming Lash's conviction for murder, Lash was 16-years-old when he was questioned by police on in the September 14, 1989, without his parents or an attorney present, even though the police knew he had counsel and that his parents were working during the time of his interrogation. PTP-R LASH-000004-06.
- Lash testified that Kill pushed him against the wall during his interview. PTP-R LASH-000006.

### B. Evidence of Notice to the City of Chicago

Lash testified to coercion in the hearing on his motion to suppress sometime before 1993. PTP-R LASH-000004-05.

### C. Evidence of Innocence

Not addressed in documents.

Case:          Harold Lucas
Year:          1989
Report Page:   85

**Summary in Leo Report**:

Harold Lucas (1989): Detective Kato punched Mr. Lucas, who was 15-years-old, in the stomach, slapped him, and stepped on his genitals while he was sitting down until Mr. Lucas purportedly confessed to a murder David Jackson, Fine Line Between Tough Police Work, Brutality, Chicago Tribune, at 3 (Jul 14, 1991); PTP- H LUCAS-000001-000004.

**Materials Provided Supporting Summary In Report**:

| Description | Bates Range |
|---|---|
| Fine Line Between Tough Police Work, Brutality, Chicago Tribune, at 3 (Jul 14, 1991) | PTP- H LUCAS-000001-000004 |

**Evidentiary Support for Summary**:

### A. Evidence of Coercion and Abuse

According to a 1991 article in the Chicago Tribune, Harold Lucas Jr., who was 15 at the time, was abused and coerced into signing a sworn statement confessing to a homicide during a police investigation. PTP- H LUCAS-000001-000004 at 3.
- According to internal police records, Lucas's father and godmother saw him at the station and he told them he coughed up blood. *Id.*
- According to Lucas, a detective punched him in the stomach, slapped him, and stepped on his genitals while he was sitting down. *Id.*
- After the interrogation and abuse, Lucas signed a statement. *Id.*

### B. Evidence of Notice to the City of Chicago

Internal police records related to Lucas' interrogation noted that he was coughing up blood and police records noted that Lucas said that detective had slapped him, punched him and stepped on his genitals. *Id.*

The Tribune article was published in 1991.

### C. Evidence of Innocence

According to police records, another detective reported that Lucas "did not fit the description of the killer provided by witnesses." PTP- H LUCAS-000001-000004 at 3.

Case:           Keith Mitchell
Year:           1997
Report Page:    85

**Summary in Leo Report**:

Keith Mitchell (1997): Detective Kato interrogated Mr. Mitchell for three days and forced him to by Detective Kato and was forced to sign a witness statement for a murder he did not witness. Detective Kato elbowed him in the head, kneed him in groin, and threatened to charge him with "setting up" the victim for the murder. (Mitchell Complaint Register & OPS Investigation); PTP-K MITCHELL-000001-000034.

**Materials Provided Supporting Summary In Report**:

| Description | Bates Range |
|---|---|
| CR File – OPS Investigation | PTP-K MITCHELL-000001-000034 |

**Evidentiary Support for Summary**:

### A. Evidence of Coercion and Abuse

Note Mitchell was a witness, not a suspect. PTP-K MITCHELL-000004.

The CR file says that Mitchell made a complaint to CPD that "Detective Edward W. Kaizer and a male Oriental detective [Kato] . . . forced him to sign a witness statement regarding a murder." PTP-K MITCHELL-000004.

Mitchell also alleged that "the male Oriental handcuffed him to the wall, elbowed him on the head, and kneed him on the groin area." *Id.*

Mitchell also complained that the accused detectives "held him for three days" in the Area 4 Interview Room "until he signed the witness statement," even though "he told the accused he never witnessed the murder." *Id.*

Mitchell further alleged that the Detectives threatened to accuse him of involvement in the crime by threatening to say that he "set up the victim who was murdered." *Id.*

Detective Kaizer admitted that Mitchell was at the Area 4 Detective Division for two days – from 3/2/97 to 3/4/97 – but claimed that this was at Mitchell's request. *Id.* at 30.

### B. Evidence of Notice to the City of Chicago

Notice on 3/6/97 - date CR filed. PTP-K MITCHEL-000003.

### C. Evidence of Innocence

Not applicable. Mitchell was not a suspect in the crime. PTP-K MITCHELL-000004.

Case: Timothy Rankins and Armando Serrano/Jose Montanez
Year: 1993
Area: 5
Report Page: 93

**Summary in Leo Report**:

Detective Guevara placed a phone book over Mr. Rankins' head and beat it with a flashlight, threw Mr. Rankins out of his chair, and placed Mr. Rankins in a chokehold to induce him to sign a statement that Detective Guevara had prepared implicating Serrano and Montanez in a murder. Mr. Serrano and Mr. Montanez have both received certificates of innocence (Sworn Statement of Timothy Rankins, *State of Illinois v. Armando Serrano*, April 3, 2012; AR-L 155230-155268; Corrected First Amended Complaint, *Jose Montanez v. Reynaldo Guevara, et al.*; AR-L 563644- 563688; Complaint, *Armando Serrano v. Reynaldo Guevara, et al.*); AR-L 563597-563643).

**Materials Provided Supporting Summary In Report**:

| Description | Bates Range |
|---|---|
| Sworn Statement of Timothy Rankins, *State of Illinois v. Armando Serrano*, April 3, 2012 | AR-L 155230-155268 |
| Corrected First Amended Complaint, *Jose Montanez v. Reynaldo Guevara, et al.* | AR-L 563644- 563688 |
| Complaint, *Armando Serrano v. Reynaldo Guevara, et al.* | AR-L 563597-563643 |

**Evidentiary Support for Summary**:

.       **Evidence of Coercion and Abuse**

According to Timothy Rankins's sworn statement, Detective Guevara kicked Rankins out of his chair when he refused to testify against Serrano and Montanez. Sworn Statement of Timothy Rankins, *State of Illinois v. Armando Serrano*, April 3, 2012, at 11.

According to Timothy Rankins's sworn statement, Detective Guevara threw three pictures on the floor in front of Rankins and told him that he was "going to be the key witness," "need[ed] to study that statement," and "need[ed] to understand that [Rankins was] was going to tell what statement sa[id]." Sworn Statement of Timothy Rankins, *State of Illinois v. Armando Serrano*, April 3, 2012, at 11.

According to Timothy Rankins's sworn statement, Detective Guevara kicked Rankins in the stomach and beat him with a phone book and mag light. Sworn Statement of Timothy Rankins, *State of Illinois v. Armando Serrano*, April 3, 2012, at 13.

According to Timothy Rankins's sworn statement, Detectives Halvorsen and Mingey participated in the beating. Sworn Statement of Timothy Rankins, *State of Illinois v. Armando Serrano*, April 3, 2012, at 13.

According to Timothy Rankins sworn statement, the statement Rankins signed was in Guevara's handwriting. Sworn Statement of Timothy Rankins, *State of Illinois v. Armando Serrano*, April 3, 2012, at 15.

According to Timothy Rankins' sworn statement, Rankins would not sign the statement, and the Detectives put him in a chokehold. Sworn Statement of Timothy Rankins, *State of Illinois v. Armando Serrano*, April 3, 2012, at 18.

## B.     Evidence of Notice to the City of Chicago

According to Montanez's first amended complaint, Detectives Guevara and Halvorsen and Assistant State's Attorneys Couglan and Dillon agreed that the only way to solve the Vargas murder was to falsely implicate Montanez in the murder with coerced testimony. Corrected First Amended Complaint, *Jose Montanez v. Reynaldo Guevara, et al.*, at 6.

According to Serrano's complaint, Guevara, Halvorsen, Couglan, and Dillon attempted to coerce a witness to testify against Serrano during a meeting at the Cook County State's Attorney's office. Complaint, *Armando Serrano v. Reynaldo Guevara, et al.*, at 10.

## C.     Evidence of Innocence

According to Serrano's complaint, both Montanez and Serrano were granted Certificates of Innocence on November 2, 2016. Complaint, *Armando Serrano v. Reynaldo Guevara, et al.*, at 3.

Case:          Alfonzia Neal
Year:          1991
Report Page:   80

**Summary in Leo Report**:

Detective Boudreau beat a murder confession out of Alfonzia Neal who had an IQ in the 40s and likely did not understand much, if anything, of the confession. (Maurice Possley, Steve Mills & Ken Armstrong, *Veteran Detective's Murder Cases Unravel*, Chi. Trib., Dec. 17, 2001.; PTP- A NEAL-000001-000008)

**Materials Provided Supporting Summary In Report**:

| Description | Bates Range |
|---|---|
| *Veteran Detective's Murder Cases Unravel*, Chi. Trib., Dec. 17, 2001 | PTP- A NEAL-000001-00008 |

**Evidentiary Support for Summary**:

   A.  Evidence of Coercion and Abuse

The Chicago Tribune Article, "Veteran Detective's Murder Cases Unravel," says that Neal waived his rights and signed a handwritten statement confessing to the murder. Neal's lawyers later found that Neal "had an IQ in the 40's," and was thus "incapable of intelligently waiving his Miranda rights" before he signed the confession statement (PTP- A NEAL-000006).

   B.  Evidence of Innocence

The Chicago Tribune Article, "Veteran Detective's Murder Cases Unravel," says that a jury acquitted Neal of the murder of which he was accused (PTP- A NEAL-000006).

Case:         Johnny Plummer
Year:          1991
Report Page:    80

**Summary in Leo Report**:

Detective Boudreau and other Area 3 detectives interrogated fifteen-year-old Johnny Plummer for 36 hours, during which they denied him food and hit him in the face, stomach and side (including with a flashlight, until he falsely confessed to a murder. *See People v. Plummer*, 306 Ill. App. 3d 574, 578-79 (1st Dist. 1999); PTP- J PLUMMER-000001-000010)

**Materials Provided Supporting Summary In Report**:

| Description | Bates Range |
| --- | --- |
| People v. Plummer, 306 Ill. App. 3d 574 (1st Dist. 1999). | PTP- J PLUMMER-000001-000010 |

**Evidentiary Support for Summary**:

### A. Evidence of Coercion and Abuse

According to the 1999 appellate decision in Johnny Plummer's criminal conviction case, Detectives Kill and Boudreau were investigating an early-morning homicide on August 18, 1991 and briefly interviewed Johnny Plummer, a juvenile at the time. *People v. Plummer*, 306 Ill. App. 3d 574, 576 (1st Dist. 1999). Later that morning, Plummer was picked up and taken to the station for a witness interview related to the homicide.

- According to the defendant's testimony at trial, two detectives "took him to a police station where he was placed in a small room and handcuffed to a ring in the wall." *Id.* at 578.
- Plummer testified that his parent/guardian was not contacted before he was taken to the station. *Id.* at 578–79.
- According to his mother's testimony at trial, detectives never contacted her nor sought her permission to take him to the station. *Id.* at 579–80.
- Plummer testified that when he asked to go home or see his mother or a lawyer, Kill "laughed, hit him in the face, the stomach and in the side, pulled his hair and left the room." *Id.* at 579.
- Plummer testified that a third officer told him "he would get 40 years in prison, where he would be raped." *Id.*
- During trial, Plummer stated that "he only made his statements because he was told that he could go home if he would do so and because he was tired and afraid." *Id.*

- Plummer testified that after providing his witness statement, the detective "hit him once in the face and three times with a flashlight." *Plummer*, 306 Ill. App. 3d at 579.
- According to his testimony, when Plummer was taken to a juvenile detention center around August 20, 1991, he notified a doctor that he had been beaten. *Id.*
- Plummer's mother also testified that when she saw her son, "his back and face were swollen and…he had dark marks on his upper chest. *Id.* at 580.

### B. Evidence of Notice to the City of Chicago

There was a hearing on the motion to suppress and at Plummer's criminal trial in the 1990s. Plummer contended that his mother had not consented to the interrogation, he had not received his *Miranda* rights, and there was medical evidence that he was more vulnerable to coercion due to his mental state. *Id.* at 582.

### C. Evidence of Innocence

Plummer testified at this criminal trial that "he only made his statements because he was told that he could go home if he would do so and because he was tired and afraid." *Id.* at 579. Plummer testified that when he was told that he was identified as the shooter and asked to sign a statement (distinct from the witness statement), he did not know what was in the statement. *Id.*

Case:          Patrick Prince
Year:          1991 - murder; 1994 - convicted
Report Page:   89

**Summary in Leo Report**:

Prince alleges that Det. Kato arrested Mr. Prince, took him to Area 4, held him for hours, physically abused him, and forced him to sign a written statement. *People v. Prince, 91 CR 26365-01, Apr. 26, 2017 Order (Cir. Ct. Cook Co.); People v. Prince, 91 CR 26365-01, Apr. 25, 2017 Closing Memorandum (Cir. Ct. Cook Co.).* In 2017, following a multi-day evidentiary hearing, Judge Thaddeus Wilson granted Prince post-conviction relief, explaining that "the testimony and submissions presented . . . seriously call into question the vitality and fidelity of the conviction, especially given the disparities, inconsistencies and newly discovered evidence presented to this Court . . . . This is a case that arose during the times, thinking, sentiments, customs and practices of the 1990s. Petitioner was just 19 years old . . . . The only evidence against Petitioner was his confession. Allegations and findings of past misconduct by police during questioning of suspects are now at an unprecedented high and we now better understand the psychology of false confession." *People v. Prince, 91 CR 26365-01, Apr. 26, 2017 Order (Cir. Ct. Cook Co.), p. 7-8.* The charges against Prince were dismissed, and he was granted a certificate of innocence. *(Prince Certificate of Innocence; PTP-K MURRAY-000001-000028).*

[NOTE THE ERROR IN THE BATES REFERENCE IN THE REPORT]

**Materials Provided Supporting Summary In Report**:

| Description | Bates Range |
|---|---|
| Order in People v. Prince | PTP-P PRINCE-000001-8 |
| Petitioner's Closing Memorandum in Prince v. State of Illinois | PTP-P PRINCE-000009-16 |
| Order Granting Certificate of Innocence in People v. Prince | PTP-P PRINCE-000017 |

1

**Evidentiary Support for Summary**:

### A. Evidence of Coercion and Abuse

- **April 26, 2017 order from Judge Thaddeus Wilson** says
  - Allegations and findings of past misconduct by police during questioning of suspects are now at an unprecedented high and we now better understand the psychology of false confessions. (PTP-P PRINCE 000008)
  - This is even more troubling given the apparent concern expressed by the trial judge who heard the case regarding the quantity and quality of the evidence. (PTP-P PRINCE 000007)
- **April 25, 2017 Closing Memorandum** says
  - Petitioner has presented evidence from 22 people who, like Prince, claim that Detective Kato abused them in interrogation rooms in Area 4. (PTP-P PRINCE -000014)
  - In 2015 testimony, Detective Kato refused to say one way or the other whether he physically abused [14] people - he instead asked to see his prior testimony andor refused to deny the allegation. (PTP-P PRINCE -000013)
  - Kato's claim that he never interrogated Prince, that Prince spontaneously confessed, and that Prince was never handcuffed looks completely different in light of the fact that the First District has rejected multiple times (e.g. Frederick Seaton, Keith Washington, Andre Wallace) Kato's claim that they were at the station overnight and voluntarily." (PTP-P PRINCE -000016)

### B. Evidence of Notice to the City of Chicago

- **April 26, 2017 order from Judge Thaddeus Wilson** says
  - "This is a case that arose during the times, thinking, sentiments, customs, and practices of the 1990s." (PTP-P PRINCE-000007)

### C. Evidence of Innocence

- **June 15, 2018 Order Granting Certificate of Innocence** says
  - "The Defendant/Petitioner did not by his own conduct voluntarily cause or bring about his conviction." (PTP-P PRINCE 000017)

- **April 26, 2017 order from Judge Thaddeus Wilson** says
  - There were no eyewitnesses to the actual shooting that testified at trial. No physical evidence connects Petitioner to the crime. No forensic evidence connects Petitioner to the crime. The only evidence against the Petitioner was his confession. (PTP-P PRINCE 000007-08)
  - The testimony and submissions presented here seriously call into question the vitality and fidelity of the conviction, especially given the disparities,

2

inconsistencies, and newly discovered evidence presented to this court." (PTP-P PRINCE-000007)
- ○ "To ensure substantial justice is done, Defendant should be granted a new trial so that all of these matters can be properly flushed out, chased down, vetted, and resolved one way or the other." (PTP-P PRINCE 000008)
- **April 25, 2017 Closing Memorandum** says
  - ○ [Keith] Gunn, who was 13 years old at the time of the shooting, testified that he witnessed the shooting of Edward Porter and that the shooter was not Mr. Prince. (PTP-P PRINCE -000011)
  - ○ Mr. Gunn further testified, consistent with his affidavit, that he had anonymously called the police falsely claiming that Prince did the crime because he was jealous of Prince's girlfriend, Barbara Starling." (PTP-P PRINCE -000011)

Case:            Ronald Kitchen, Marvin Reeves, and Eric Wilson
Year:            1988
Report Page:     80
Area 3

**Summary in Leo Report**:

Detective Kill and Burge beat Ronald Kitchen until he falsely confessed to a murder. Detective Kill punched Kitchen in the face, back, chest, and groin. Kill interrogated Kitchen's cousin, Eric Wilson, about the same murder. Kill beat Wilson in the groin, chest, and head until Wilson falsely inculpated Kitchen and another man. Wilson heard Kitchen screaming and moaning in pain (Letter from Donald Hubert to Edward Egan and Robert Boyler, May 24, 2005; PTP-R KITCHEN-000001-000208)

**Materials Provided Supporting Summary In Report**:

| Description | Bates Range |
|---|---|
| Excerpt of Second Amended Petition for Post-Conviction Relief in *People v. Kitchen* | PTP-R KITCHEN-000001-178 |
| Letter from Donald Hubert to Edward Egan and Robert Boyler, May 24, 2005<br><br>Special Prosecutor Report regarding Ronald Kitchen | PTP-R KITCHEN-000179-208 |

**Evidentiary Support for Summary**:

   **A. Evidence of Coercion and Abuse**

   ● **Special Prosecutor Report (May 24, 2005) states:**
      ○ Existing medical records provide documented proof of Kitchen's groin injury and treatment. In the notes, Kitchen reported that he was hit in the groin with a nightstick, knee, and fist. (PTP-R KITCHEN 000180)
      ○ The records from Cermak Hospital reflect that on August 28, 1988, at 5:30 pm, Kitchen was brought to the hospital complaining of trauma to the groin area. The Out-Patient Progress Notes state he reported the police had hit him in the groin with a nightstick, knee, and fist. He was treated for several months. (PTP-R KITCHEN 000202)

1

- Marvin Reeves testified at Kitchen's motion to suppress. In addition to stating he heard Kitchen being beat in an adjoining room at Area 3, he testified that he was also hit, kicked, and threatened at Area 3 on August 26th sometime after 5 am. He described the police offender as 5'9", black hair, Spanish. (PTP-R KITCHEN 000204)
- Wilson testified that he was brought to the 3rd floor at 39th and California for questioning on the evening of August 25th. In addition to stating he saw Kitchen who looked beat-up, he testified that he (Wilson) was made to sit on the floor, kicked between the legs, and punched when he denied any knowledge that Kitchen or Reeves committed the murders. Wilson identified one of his attackers as a man who was wearing a white police shirt with 3 stripes and another tall, heavyset, male, Spanish police officer. (PTP-R KITCHEN 000204)

- **Second Amended Petition for Post-Conviction Relief (2008) states:**
  - After Kitchen was arrested on August 25, 1988, he was interrogated and beaten for sixteen hours at Area 3 Police Headquarters by Chicago police detectives under the supervision of Jon Burge. (PTP-R KITCHEN - 000003)
  - When Edwards (Kitchen's lawyer) arrived at Area 3, he observed Kitchen handcuffed to a wall, crying and in obvious pain. Kitchen told Edwards that Area 3 detectives had interrogated and beaten him for sixteen hours, ultimately forcing him to sign a statement confessing to five murders he did not commit. (PTP-R KITCHEN -000004)
  - Kill punched Kitchen in the face, back, chest, and groin with his fists, while Burge kicked him in his back, ribs, and groin. The first beating lasted approximately fifteen to twenty minutes. (PTP-R KITCHEN 000022).
  - Detective Byron grabbed an unattached receiver from a phone in the room and hit Kitchen on the side of the head with it. (PTP-R KITCHEN 000022)
  - Burge stood on top of a desk and kicked Kitchen out of the chair he was sitting in. Burge continued to kick Kitchen in his ribs and groin as Kitchen laid on the floor. (PTP-R KITCHEN 000023)
  - Before being placed together in a room with Kitchen, Wilson was being held by Area 3 detectives in an interrogation room adjacent to where Kitchen was being held. Wilson heard Kitchen's screams as well as the police jumping on Kitchen. Wilson personally observed Kitchen moaning, beaten and in physical pain. Later, after Wilson and Kitchen were again separated, Wilson observed Kitchen, bent over and in severe pain, in a cage. (PTP-R KITCHEN 000023)
  - Smith began beating Kitchen in the head with a telephone book and in the groin and ribs with a blackjack. As Smith beat him, Kitchen cried out that he did not know the victims of anything about what had happened to them. (PTP-R KITCHEN 000025)
  - When Kitchen answered that he did not want to speak to ASA Lukanich until his attorney arrived, Kill beat Kitchen in the ribs and the back of his

2

head. The beating lasted about five minutes, until Kitchen agreed to speak to ASA Lukanich. (PTP-R KITCHEN 000027)

○ Shortly after ASA Lukanich left the room, Kill re-entered the room and repeated the threats he had made several minutes earlier. He beat Kitchen for several more minutes. Finally, because he was tired, scared, and could not endure more beatings, Kitchen agreed to go along with what Kill, Smith, Byron, and Burge wanted him to say. (PTP-R 000027)

○ AKA Lukanich wrote the statement as Kill dictated its content. Kill would provide a piece of the story, ASA Lukanich would ask Kitchen if Kill's account was correct, Kitchen would respond "yes," and ASA Lukanich would record Kill's statement. This pattern continued until ASA Lukanich had written a complete statement. (PTP-R KITCHEN 000028)

○ While Edwards was at Area 3 on August 26, 1988, he also saw Wilson there. When Wilson saw Edwards at Area 3, he immediately told Edwards that he had heard Kitchen being beaten by the police, and that he had been beaten by the police as well. (PTP-R KITCHEN 000030)

○ The next day, when Kitchen appeared before Judge Williams at Branch 66, Judge Williams saw Kitchen's physical condition and ordered that Mr. Kitchen be taken to the hospital.

○ Medical records reflect that Kitchen was diagnosed with testicular trauma which doctors treated with an anti-inflammatory painkiller and a scrotal support. Medical records also reflect that Kitchen reported to Dr. Aaron Hamb that the "police hit [him] in the groin with night stick, knee, and stick." Mr. Kitchen received treatment for his groin from August 28, 1988 to December 21, 1988. (PTP-R KITCHEN 000033).

○ Wilson, Kitchen's cousin, alleged Kill kicked him in the scrotum, elbowed him in the chest, and hit him with a bat in his back, arm, and top of his head, while interrogating Wilson on the night of August 25, 1988 at Area 3. … Mary Howard, Eric Wilson's aunt, saw Wilson on August 26, 1988 and remembered Wilson being swollen and having a red stomach. The OSP "regretfully" recommended the case closed, although it found Eric Wilson "persuasive" and "credible." (PTP-R KITCHEN 000126)

## B. Evidence of Notice to the City of Chicago

- **Special Prosecutor Reports (May 24, 2005) states:**
    ○ A transcript of Kitchen and Reeves' second court appearance in August 29, 1988 was recreated from the original court reporter's notes. Judge Bolan inquired if Kitchen's arm was injured and Kitchen replied that "it was my groin." (PTP-R KITCHEN 000181)
    ○ Attorney E. Duke McNeil represented Reeves and pointed out that Reeves had a black eye and requested to be allowed to photograph it. Judge Bolan granted leave for Reeves' black eye to be photographed and ordered that Reeves could go to the hospital to see if additional medical treatment was required. (PTP-R KITCHEN 000181)

3

- **Second Amended Petition for Post-Conviction Relief (2008) states:**
  - The assistant public defender also stated "I have spoken to Mr. Reeves and Mr. Kitchen; both of these gentlemen have indicated to me that they were injured at the police station; they indicated that they were beaten by the police …" The prosecutor observed that she did not see any "visible injuries." The judge stated that he "observed that." The judge then said "they are remanded to the Sheriff's Department House of Corrections; if there is a determination by them – if they need hospitalization, they will have it determined there." (PTP-R KITCHEN 000034)
  - On August 29, 1988, Marvin Reeves' attorney told the court that his client had a black eye and that he had to go to Cermak Hospital. (PTP-R KITCHEN 000034)
  - At trial, a Corrections officer from Division 6 testified that he remembered thinking it was strange that Kitchen was sent directly to the hole, because Kitchen had not committed any disciplinary infractions. This officer also testified that when Mr. Kitchen arrived at Division 6 on August 28, 1988, he was "walking as if he was lame." (PTP-R KITCHEN 000033)

## C. Evidence of Innocence

- **Second Amended Petition for Post-Conviction Relief (2008) states**
  - In the prosecutor [ASA John Eannace]'s own words, "Willie Williams is the only evidence to tie these [defendants] to the 5 dead bodies." (PTP-R KITCHEN 000103)
  - Post-conviction defense counsel had had several conversations with Williams in which he admitted that he did not tell the truth at trial. Williams' recorded statements indicate that Kitchen never confessed to Williams in the first place. (PTP-R KITCHEN-000004)
  - At the time of Kitchen's trial, Edwards had in his possession police reports which documented that the Chicago Police Department investigated three other suspects: Pedro Sepulveda (Debbie Sepulveda's husband); Arturo Sepulveda (Pedro Sepulveda's brother); and Victor Vieyra (the man with whom Debbie Sepulveda was having an extramarital affair). (PTP-R KITCHEN 000171)
  - Notes taken by the police during witness interviews following the murders indicate that Pedro Spulveda was rumored to have been involved in the homicide of a large-scale narcotics dealer which occurred just says before the Sepulveda/Rodriguez murders, and that the dealer's cohorts were rumored to have killed Sepulveda's family in revenge. (PTP-R KITCHEN 000055)
  - At the time the crimes were committed, Kitchen was at a pool party. (PTP-R KITCHEN 000081)

4

Case:          Tyrone Reyna, Nicholas Escamilla and Miguel Morales
Year:           1993
Report Page:    80-81

**Summary in Leo Report**:

Tyrone Reyna, Nicholas Escamilla and Miguel Morales (1993): Detective Boudreau and other Area 3 detectives beat sixteen-year-old Reyna (Detective Halloran slapped him in the face and kicked him in the leg; Detective Boudreau and Detective Halloran spit on him), refused to let him contact his family, and intimidated him into confessing to a murder he did not commit. Boudreau and other Area 3 detectives also beat and threatened Reyna's co-defendants, Nicholas Escamilla and Miguel Morales, causing Escamilla to falsely confess after hours of abuse (Affidavit of Tyrone Reyna, April 22, 2004; Affidavit of Nicholas Escamilla, March 19, 2004; Affidavit of Miguel Morales, February 25, 2001; PTP-T REYNA-000001-000018).

**Materials Provided Supporting Summary In Report**:

| Description | Bates Range |
| --- | --- |
| Affidavit of Tyrone Reyna | PTP-T REYNA-00001-00005 |
| Affidavit of Nicholas Escamilla | PTP-T REYNA-000006-10 |
| Statement of Miguel Morales | PTP-T REYNA-000011-18 |

**Evidentiary Support for Summary**:

### A. Evidence of Coercion and Abuse

- In a signed affidavit in 2004, Reyna stated that after he was arrested by CPD detectives Halloran and O'Brien, they threatened and hit him so much during the car ride that by the time he arrived at the station that he believed they were going to kill him. PTP-T REYNA-000002-03.
- Once he was in an interrogation room, the Detectives continued to threaten and hit him, especially detective O'Brien. PTP-T REYNA-000003.
- When Reyna said he knew nothing about the murder at hand and asked for his mother, the detectives hit him harder. PTP-T REYNA-000003.
- In a signed affidavit in 2004, Escamilla stated that he was placed in an interrogation room and handcuffed to the wall for 15 hours without being able to sleep, make a phone call, or use the washroom. PTP-T REYNA-000007.
- Detectives Halloran, Boudreau, O'Brien, and Ryan screamed at him, threatened him, hit him the back, head, chest, and stomach, and spat at him. PTP-T REYNA-000009.
- When Escamilla asked to use the phone and have a lawyer present, O'Brien kicked him in the legs and slapped him in the face. PTP-T REYNA-000009.

- When he again asked for an attorney Boudreau and Halloran spat on him and hit him again.PTP-T REYNA-000009.
- Police threatened him that his daughter would be placed in DCFS custody, and his pregnant wife would go to jail. PTP-T REYNA-0000010.
- After 18 hours, he agreed to sign a false, coached statement that he was involved with the murder. PTP-T REYNA-0000010.
- In a 2001 affidavit, Miguel Morales stated that in February 1993, Chicago Police Officers handcuffed him to the wall, punched him, smacked him, and accused him of lying when he said he was not involved in the murder. PTP-T REYNA-000012-13.

### B. Evidence of Notice to the City of Chicago

Not stated in these documents.

### C. Evidence of Innocence

Not stated in these documents.

Case:          Anthony Robinson
Year:          1987
Report Page:   81

**Summary in Leo Report**:

Detective Kill and other Area 3 detectives kicked and slapped Anthony Robinson until he falsely confessed to a murder. Robinson suffered injuries including a perforated ear. *People v. Robinson*, 238 Ill. App. 3d 48, 50-51 (1st Dist. 1992); PTP-A ROBINSON-000001-000006).

**Materials Provided Supporting Summary In Report**:

| Description | Bates Range |
|---|---|
| People v. Robinson, 238 Ill. App. 3d 48 (1st Dist. 1992) | PTP-A ROBINSON-000001-A ROBINSON-000006 |

**Evidentiary Support for Summary**:

**A.     Evidence of Coercion and Abuse**

According to the appellate opinion in Anthony Robinson's case, Robinson asserted at the trial level in a motion to suppress that "he was repeatedly kicked and slapped by several police officers," at the police station and that the beating lasted for several hours," that he estimated "he was hit in the face approximately 25 to 50 times and kicked approximately 25 to 50 times," and that "he was screaming loudly and blood was splatted all over his nose, ear and clothes." *People v. Robinson*, 238 Ill. App. 3d 48, 50 (1st Dist. 1992); PTP-A ROBINSON-000002.

According to the appellate opinion, a stipulation was entered into evidence "which supported defendant's claim that he sought and received medical treatment for a perforated ear drum . . . ." *People v. Robinson*, 238 Ill. App. 3d 48, 50 (1st Dist. 1992); PTP-A ROBINSON-000003.

According to the appellate opinion, Robinson's sister testified at the suppression hearing that she heard her brother in the interrogation room "holler 'don't hit me no more'" and "observed her brother in the interrogation room handcuffed to a wall and bleeding from his nose and mouth." *People v. Robinson*, 238 Ill. App. 3d 48, 50 (1st Dist. 1992); PTP-A ROBINSON-000003.

According to the appellate opinion, Robinson's sister testified at the suppression hearing that "when the defendant returned home he was limping and said he had been kicked in the groin area." *People v. Robinson*, 238 Ill. App. 3d 48, 50 (1st Dist. 1992); PTP-A ROBINSON-000003.

According to the appellate opinion, Robinson testified at the suppression hearing that he was arrested on another occasion, "Officer Kill and another officer slapped him a few times," and he agreed to give a statement to the assistant State's attorney about the murder "[b]ecause he was frightened and felt he had no other choice . . . ." *People v. Robinson*, 238 Ill. App. 3d 48, 51 (1st Dist. 1992); PTP-A ROBINSON-000003.

Case:          Daniel Rodriguez and David Velasquez
Year:          1991
Report Page:   91
Area 5

**Summary in Leo Report**:

On the way to the police station after Mr. Rodriguez's arrest, Detective Guevara threatened that if Rodriguez did not cooperate and make it easy on himself, Detective Guevara would raid his house and frame his girlfriend. Detective Guevara's partner, Detective Halverson, beat Mr. Rodriguez during the interrogation. Detective Guevara then coerced Mr. Rodriguez into signing a false statement implicating himself in a murder. Detective Guevara also coerced sixteen year-old David Velasquez to implicate Mr. Rodriguez in the murder by beating and threatening him. Velasquez has given multiple sworn statements over the last three decades about Detective Guevara's and Detective Halvorsen's misconduct, beginning with Mr. Rodriguez's 1993 trial.

**Materials Provided Supporting Summary In Report**:

| Description | Bates Range |
| --- | --- |
| Affidavit of Daniel Rodriguez | AR-L 147462-147466 |
| *Reynaldo Munoz v. State of Illinois*, Excerpt Report of Proceedings heard before the Honorable Sophia Atcherson, July 14, 2021 | AR-L 155313-155363 |

**Evidentiary Support for Summary**:

### A. Evidence of Coercion and Abuse

- Daniel Rodriguez, in a March 25, 2008 sworn affidavit, said that Guevara coached him into making a false confession, including using a map to show him the route that Rodriguez supposedly took as the driver in a shooting. Rodriguez further swore that Halvorsen put Rodriguez's car keys in front of him and told him that he could go home if he cooperated. Affidavit at AR-L 147465.
- Rodriguez also swore in that statement that Halvorsen struck him multiple times while he was handcuffed to a wall in the police station until Rodriguez broke down and told them he would do "whatever [they] want." Affidavit at AR-L 147465.
- Rodriguez also swore that Halvorsen brought him a typed statement to sign which was prepared before Rodriguez agreed to cooperate. Affidavit at AR-L 147465.

- Rodriguez further swore that he photographed bruises on his chest from being struck by Halvorsen and sent them to his criminal defense attorney. Affidavit at AR-L 147465.
- In a court proceeding on July 14, 2021, Rodriguez testified consistently with the above. Transcript at AR-L 155330-155333 (physical violence by Halvorsen); 155335, 155340 (Halvorsen promised Rodriguez could go home if he cooperated, with Rodriguez's car keys sitting in front of him); 155335-155336 (Halvorsen told Rodriguez what to say and showed him "a piece of paper with what to say").

### B. Evidence of Notice to the City of Chicago

- In a court proceeding on July 14, 2021, Daniel Rodriguez testified that at his original criminal trial, David Velazquez testified that Guevara and Halvorsen forced him to make a statement against Daniel and a second person. Transcript at AR-L 155337.
- At that proceeding, Daniel recounted that at his original criminal trial he testified about Halvorsen beating him prior to his confession. Transcript at AR-L 155359.

### C. Evidence of Innocence

- See above - Evidence of Coercion and Abuse.

Case:            Frederick Seaton
Year:            1988
Report Page:     86
Area 4

**Summary in Leo Report**:

Frederick Seaton (1988): Detective Kato, Detective John Summerville and Detective Clarence Lewis (all from Area 4) interrogated Mr. Seaton for longer than a day and physically coerced (slapping, kicking, abusing and threatening) him into making a false confession. Following the interrogation, there was blood in Mr. Seaton's urine, his groin was swollen, and his face was red and sore. The Illinois Appellate Court overturned Mr. Seaton's conviction and ordered that his statement be suppressed, finding that they were the product of an illegal arrest. People v. Seaton, 242 Ill.App.3d 1105 (1st Dist. 1993); PTP-F SEATON-000001-000035.

**Materials Provided Supporting Summary In Report**:

| Description | Bates Range |
| --- | --- |
| Order in People v. Seaton | PTP-F SEATON-000001-12 |
| Opinion in Seaton v. Kato, et al. | PTP-F SEATON-000013-19 |
| Complaint in Seaton v. Kato, et al. | PTP-F SEATON-000020-35 |

**Evidentiary Support for Summary**:

### A. Evidence of Coercion and Abuse

- According to a 1993 appellate opinion, Seaton went to the police station at 8 p.m. on October 21, 1998 to ask about his brother.
- Seaton testified at the hearing on his motion to suppress that Chicago Police Detectives asked to question him and then shackled him to the wall and beat him. PTP-F SEATON-000002.
- Seaton testified that he agreed to sign a statement because he could not take any more abuse, but then he told the State's Attorney that Detectives had beaten him. PTP-F SEATON-000002. The State's Attorney called the Detectives back and they beat Seaton further. PTP-F SEATON-000002.
- During his arraignment, Seaton told the Court that he had blood in his urine and a painful and swollen groin from police abuse. PTP-F SEATON-000003.
- The appellate court found in 1993 that the police did not have probable cause to arrest Seaton, so his inculpatory statement should have been suppressed. PTP-F SEATON-0000010.

### B. Evidence of Notice to the City of Chicago

- Seaton filed a civil complaint against the City of Chicago in 1994 alleging that the Chicago Police Department had a code of silence to cover up police brutality. PTP-R LASH-0000014.

### C. Evidence of Innocence

After Seaton's confession was suppressed, the charges against him were dropped by the State in 1994. PTP-R LASH-0000013.

Case: Timothy Rankins and Armando Serrano/Jose Montanez
Year: 1993
Area: 5
Report Page: 93

**Summary in Leo Report**:

Detective Guevara placed a phone book over Mr. Rankins' head and beat it with a flashlight, threw Mr. Rankins out of his chair, and placed Mr. Rankins in a chokehold to induce him to sign a statement that Detective Guevara had prepared implicating Serrano and Montanez in a murder. Mr. Serrano and Mr. Montanez have both received certificates of innocence (Sworn Statement of Timothy Rankins, *State of Illinois v. Armando Serrano*, April 3, 2012; AR-L 155230-155268; Corrected First Amended Complaint, *Jose Montanez v. Reynaldo Guevara, et al.*; AR-L 563644- 563688; Complaint, *Armando Serrano v. Reynaldo Guevara, et al.*); AR-L 563597-563643).

**Materials Provided Supporting Summary In Report**:

| Description | Bates Range |
|---|---|
| Sworn Statement of Timothy Rankins, *State of Illinois v. Armando Serrano*, April 3, 2012 | AR-L 155230-155268 |
| Corrected First Amended Complaint, *Jose Montanez v. Reynaldo Guevara, et al.* | AR-L 563644- 563688 |
| Complaint, *Armando Serrano v. Reynaldo Guevara, et al.* | AR-L 563597-563643 |

**Evidentiary Support for Summary**:

.      **Evidence of Coercion and Abuse**

According to Timothy Rankins's sworn statement, Detective Guevara kicked Rankins out of his chair when he refused to testify against Serrano and Montanez. Sworn Statement of Timothy Rankins, *State of Illinois v. Armando Serrano*, April 3, 2012, at 11.

According to Timothy Rankins's sworn statement, Detective Guevara threw three pictures on the floor in front of Rankins and told him that he was "going to be the key witness," "need[ed] to study that statement," and "need[ed] to understand that [Rankins was] was going to tell what statement sa[id]." Sworn Statement of Timothy Rankins, *State of Illinois v. Armando Serrano*, April 3, 2012, at 11.

According to Timothy Rankins's sworn statement, Detective Guevara kicked Rankins in the stomach and beat him with a phone book and mag light. Sworn Statement of Timothy Rankins, *State of Illinois v. Armando Serrano*, April 3, 2012, at 13.

According to Timothy Rankins's sworn statement, Detectives Halvorsen and Mingey participated in the beating. Sworn Statement of Timothy Rankins, *State of Illinois v. Armando Serrano*, April 3, 2012, at 13.

According to Timothy Rankins sworn statement, the statement Rankins signed was in Guevara's handwriting. Sworn Statement of Timothy Rankins, *State of Illinois v. Armando Serrano*, April 3, 2012, at 15.

According to Timothy Rankins' sworn statement, Rankins would not sign the statement, and the Detectives put him in a chokehold. Sworn Statement of Timothy Rankins, *State of Illinois v. Armando Serrano*, April 3, 2012, at 18.

## B.    Evidence of Notice to the City of Chicago

According to Montanez's first amended complaint, Detectives Guevara and Halvorsen and Assistant State's Attorneys Couglan and Dillon agreed that the only way to solve the Vargas murder was to falsely implicate Montanez in the murder with coerced testimony. Corrected First Amended Complaint, *Jose Montanez v. Reynaldo Guevara, et al.*, at 6.

According to Serrano's complaint, Guevara, Halvorsen, Couglan, and Dillon attempted to coerce a witness to testify against Serrano during a meeting at the Cook County State's Attorney's office. Complaint, *Armando Serrano v. Reynaldo Guevara, et al.*, at 10.

## C.    Evidence of Innocence

According to Serrano's complaint, both Montanez and Serrano were granted Certificates of Innocence on November 2, 2016. Complaint, *Armando Serrano v. Reynaldo Guevara, et al.*, at 3.

Case: Clayborn Smith
Year: 1992
Report Page: 81
Area 3

**Summary in Leo Report**:

Detective Boudreau and other Area 3 detectives hit Smith in the face and head, punched him in the ribs, grabbed his neck, pulled his hair and pulled his finger back until he falsely confessed to a murder (Complaint, Clayborn Smith v. City of Chicago et al., June 19, 2003; PTP-C SMITH-000001-000010).

**Materials Provided Supporting Summary In Report**:

| Description | Bates Range |
| --- | --- |
| Complaint, Clayborn Smith v. City of Chicago et al., June 19, 2003 | PTP-C SMITH-000001-000010 |
| State v. Smith, No. 92 CR 25596 (1st Dist. 2022). | |

**Evidentiary Support for Summary**:

### A. Evidence of Coercion and Abuse

According to the complaint, Detectives Boudreau, Halloran, and other officers forcibly entered Smith's apartment by force, arrested him without a warrant for the murder of Miller Tims and Ruby Bivens, and transported him to Area One. Complaint, Clayborn Smith v. City of Chicago et al., at 2 (Cir. Ct. Cook County June 19, 2003), No. PTP-C SMITH-000002.

According to the complaint, Smith denied any knowledge of the murders, and Officer Halloran smacked him. Complaint, Clayborn Smith v. City of Chicago et al., at 2 (Cir. Ct. Cook County June 19, 2003), No. PTP-C SMITH-000002. According to the appellate opinion, Smith testified at the suppression hearing that Officer Halloran screamed in his face when Smith denied his involvement in the shooting. State v. Smuth, No. 92 CR 25596, at ¶ 18 (1st Dist. 2022).

According to the complaint, the Detectives placed Smith in a windowless room, handcuffed him to the wall, yelled at, called a liar for providing an alibi, and he was kicked and smacked by Officer Halloran. Complaint, Clayborn Smith v. City of Chicago et al., at 2 (Cir. Ct. Cook County June 19, 2003), No. PTP-C SMITH-000002.

According to the complaint and appellate opinion, Detective Boudreau threatened to charge Smith's pregnant girlfriend with the murder if Smith did not confess. Complaint,

Clayborn Smith v. City of Chicago et al., at 3 (Cir. Ct. Cook County June 19, 2003), No. PTP-C SMITH-000003; State v. Smuth, No. 92 CR 25596, at ¶ 20 (1st Dist. 2022). According to the complaint, Detective Boudreau told Smith that Officer Halloran was abusing Smith's girlfriend in another room. Complaint, Clayborn Smith v. City of Chicago et al., at 3 (Cir. Ct. Cook County June 19, 2003), No. PTP-C SMITH-000003.

According to the complaint, Smith requested counsel and remained silent during the interrogation. Complaint, Clayborn Smith v. City of Chicago et al., at 3 (Cir. Ct. Cook County June 19, 2003), No. PTP-C SMITH-000003.

According to the complaint and appellate opinion, Officer Halloran pulled Smith's hair, smacked his head, punched him, took his shoes, socks, and other personal items, and left Smith barefoot on the floor for approximately 37 hours. Complaint, Clayborn Smith v. City of Chicago et al., at 3 (Cir. Ct. Cook County June 19, 2003), No. PTP-C SMITH-000003; State v. Smuth, No. 92 CR 25596, at ¶ 21 (1st Dist. 2022).

According to the complaint, Detective Boudreau promised to help Smith if he confessed to an Assistant State's Attorney. Complaint, Clayborn Smith v. City of Chicago et al., at 3 (Cir. Ct. Cook County June 19, 2003), No. PTP-C SMITH-000003.

### B. Evidence of Notice to the City of Chicago

According to the complaint, Assistant State's Attorney Rosenblum attempted to get Smith to confess during the interrogation, left Smith in the room to "think about what [Rosenblum] said," and Officer Halloran came back into the room and punched Smith. Complaint, Clayborn Smith v. City of Chicago et al., at 3 (Cir. Ct. Cook County June 19, 2003), No. PTP-C SMITH-000003.

According to the complaint and appellate opinion, Assistant State's Attorney Laura Lamber was present when Detective Boudreau grabbed plaintiff around the neck and dragged him to an interview room. Complaint, Clayborn Smith v. City of Chicago et al., at 4 (Cir. Ct. Cook County June 19, 2003), No. PTP-C SMITH-000004; State v. Smuth, No. 92 CR 25596, at ¶ 26 (1st Dist. 2022).

According to the complaint, Assistant State's Attorney Laura Lamber was present when Officers O'Brien and Halloran held Smith, pulled his hair, punched him, and pulled his fingers back to make Smith confess. Complaint, Clayborn Smith v. City of Chicago et al., at 4 (Cir. Ct. Cook County June 19, 2003), No. PTP-C SMITH-000004.

According to the appellate opinion, Smith provided numerous examples where individuals claimed abuse by the officers in the complaint and received payments from the City of Chicago under the Reparations for Burge Torture Victims Ordinance. State v. Smuth, No. 92 CR 25596, at ¶ 99 (1st Dist. 2022).

Case:          Fred Ewing and Darnell Stokes
Year:          1993
Report Page:    78

**Summary in Leo Report**:

Fred Ewing and Darnell Stokes (1993): Detective Boudreau coerced confessions from two developmentally disabled juveniles, Fred Ewing (IQ=56) and Darnell Stokes. Both were acquitted. (Maurice Possley, Steve Mills & Ken Armstrong, Veteran Detective's Murder Cases Unravel, Chi. Trib., Dec. 17, 2001.; PTP-F EWING-000001-00015).

**Materials Provided Supporting Summary In Report**:

| Description | Bates Range |
| --- | --- |
| Complaint Register #203754 | PTP-F EWING-000001-143 |
| Complaint in Ewing v. O'Brien, et al. | PTP-F EWING-000144-150 |

**Evidentiary Support for Summary**:

### A. Evidence of Coercion and Abuse

- According to his 1998 civil complaint against the City of Chicago, in September 16, 1993, Fred Ewing had a developmental delays and an IQ of 56 and was 17-years-old when he was arrested by the Chicago Police Department for two murders. PTP-F EWING-000146.
- Ewing alleged that Halloran and O'Brien took advantage of those delays to coerce a false confession through physical and psychological coercion and by withholding the exculpatory evidence that eventually exonerated him. PTP-F EWING-000146-47.
- According to the Summary Report Digest in the Complaint Register filed by Ewing's mother in October 1993, Ewing told the Chicago Police Department's Internal Affairs Division that after picking him up for questioning, CPD Detectives pulled into an alley and beat him around the chest and stomach with a police baton. PTP-F EWING-000004. Ewing stated that police detectives slapped him in the face. PTP-F EWING-00005.
- Ewing also stated that he saw detectives choking Darnell Stokes while Stokes was being questioned. PTP-F EWING-000006.
- Ewing alleged that he told detectives he would sign a statement because he was not able to read but after a detective slapped him and told him to sign it, Ewing did. PTP-F EWING-000006.
- Stokes also told the Chicago Police Department's Internal Affairs Division in a formal statement that detectives choked him and struck him on the back with a baton when they questioned him. PTP-F EWING-000006.

- Stones also alleged that he saw Detectives choke and slap Ewing and kick him when he was on the floor. PTP-F EWING-000007.
- Ewing's mother called Chicago Police Department's Internal Affairs Division on September 27, 1993, and told the investigator that Ewing had called her on September 20 and told her that investigators had beaten him and forced him to sign a confession. PTP-F EWING-0000012.
- Ewing was acquitted of these crimes.

## B. Evidence of Notice to the City of Chicago

The City of Chicago had notice of Ewing's and Stokes' allegations of abuse and torture from their September - November 1993 statements to CPD's 's Internal Affairs Division.

## C. Evidence of Innocence

Ewing and Stokes were found not guilty of both murders. PTP-F EWING-000147; Maurice Possley, Steve Mills & Ken Armstrong, Veteran Detective's Murder Cases Unravel, Chi. Trib., Dec. 17, 2001.

Case:   Daniel Rodriguez and David Velasquez
Year:   1991
Report Page: 91
Area 5

**Summary in Leo Report**:

On the way to the police station after Mr. Rodriguez's arrest, Detective Guevara threatened that if Rodriguez did not cooperate and make it easy on himself, Detective Guevara would raid his house and frame his girlfriend. Detective Guevara's partner, Detective Halverson, beat Mr. Rodriguez during the interrogation. Detective Guevara then coerced Mr. Rodriguez into signing a false statement implicating himself in a murder. Detective Guevara also coerced sixteen year-old David Velasquez to implicate Mr. Rodriguez in the murder by beating and threatening him. Velasquez has given multiple sworn statements over the last three decades about Detective Guevara's and Detective Halvorsen's misconduct, beginning with Mr. Rodriguez's 1993 trial.

**Materials Provided Supporting Summary In Report**:

| Description | Bates Range |
|---|---|
| Affidavit of Daniel Rodriguez | AR-L 147462-147466 |
| *Reynaldo Munoz v. State of Illinois*, Excerpt Report of Proceedings heard before the Honorable Sophia Atcherson, July 14, 2021 | AR-L 155313-155363 |

**Evidentiary Support for Summary**:

**A. Evidence of Coercion and Abuse**

- Daniel Rodriguez, in a March 25, 2008 sworn affidavit, said that Guevara coached him into making a false confession, including using a map to show him the route that Rodriguez supposedly took as the driver in a shooting. Rodriguez further swore that Halvorsen put Rodriguez's car keys in front of him and told him that he could go home if he cooperated. Affidavit at AR-L 147465.
- Rodriguez also swore in that statement that Halvorsen struck him multiple times while he was handcuffed to a wall in the police station until Rodriguez broke down and told them he would do "whatever [they] want." Affidavit at AR-L 147465.
- Rodriguez also swore that Halvorsen brought him a typed statement to sign which was prepared before Rodriguez agreed to cooperate. Affidavit at AR-L 147465.

- Rodriguez further swore that he photographed bruises on his chest from being struck by Halvorsen and sent them to his criminal defense attorney. Affidavit at AR-L 147465.
- In a court proceeding on July 14, 2021, Rodriguez testified consistently with the above. Transcript at AR-L 155330-155333 (physical violence by Halvorsen); 155335, 155340 (Halvorsen promised Rodriguez could go home if he cooperated, with Rodriguez's car keys sitting in front of him); 155335-155336 (Halvorsen told Rodriguez what to say and showed him "a piece of paper with what to say").

### B. Evidence of Notice to the City of Chicago

- In a court proceeding on July 14, 2021, Daniel Rodriguez testified that at his original criminal trial, David Velazquez testified that Guevara and Halvorsen forced him to make a statement against Daniel and a second person. Transcript at AR-L 155337.
- At that proceeding, Daniel recounted that at his original criminal trial he testified about Halvorsen beating him prior to his confession. Transcript at AR-L 155359.

### C. Evidence of Innocence

- See above - Evidence of Coercion and Abuse.

Case: Johnny Walker and Phillip Walker
Year: 1988
Report Page: 81

**Summary in Leo Report**:

Detective Kill beat Johnny and Phillip Walker in the groin and face until they falsely confessed to a murder. The detectives also beat thirteen-year-old Andre Wilks until he falsely identified Phillip Walker as the shooter. Phillip Walker was acquitted and Johnny Walker was never charged with a crime (Transcript of Report of Proceedings, State of Illinois v. Phillip Walker, April 3, 1989; PTP-JOHNNY AND PHILLIP WALKER-000001-000042).

**Materials Provided Supporting Summary In Report**:

| Description | Bates Range |
| --- | --- |
| Transcript Report of Proceedings, State of Illinois v. Phillip Walker, No. 88 CR 01596 (Cir. Ct. Cook County April 3, 1989) | PTP-JOHNNY AND PHILLIP WALKER-000043-000050 |

**Evidentiary Support for Summary**:

    A. Evidence of Coercion and Abuse

        According to the transcript report of proceedings, a witness testified at trial that Detectives beat him repeatedly with a flashlight while trying to convince him to falsely identify Phillip Walker as the perpetrator of the crime. Transcript Report of Proceedings, State of Illinois v. Phillip Walker, No. 88 CR 01596, at 42 (Cir. Ct. Cook County April 3, 1989), 39–42; PTP-JOHNNY AND PHILLIP WALKER-000044–47

    B. Evidence of Innocence

        According to the transcript report of proceedings, a witness at trial testified at trial that Detectives tried to convince him that Phillip Walker was the perpetrator of the crime. Transcript Report of Proceedings, State of Illinois v. Phillip Walker, No. 88 CR 01596, at 42 (Cir. Ct. Cook County April 3, 1989); PTP-JOHNNY AND PHILLIP WALKER-000047. According to the transcript report of proceedings, the witness testified at trial that Phillip Walker was not the perpetrator. Transcript Report of Proceedings, State of Illinois v. Phillip Walker, No. 88 CR 01596, at 42 (Cir. Ct. Cook County April 3, 1989); PTP-JOHNNY AND PHILLIP WALKER-000047.

Case:          Andre Wallace
Year:          1994
Area:          Area 4
Report Page:   86

**Summary in Leo Report**:

While Mr. Wallace, who was 15-years-old, was handcuffed in an interview room, Detective Kato slapped him, kicked him, and squeezed his testicles, and made promises of leniency, telling him he could leave if he signed a confession. Mr. Wallace's conviction was overturned on appeal and the charges against him were dismissed. *People v. Wallace*, 299 Ill.App.3d 9, 12-13, 19 (1998); (Wallace Complaint Register & OPS Investigation; PTP-A WALLACE-000001- 000117).

**Materials Provided Supporting Summary In Report**:

| Description | Bates Range |
| --- | --- |
| 08/29/1995 Report of Proceedings in *People v. Wallace* | PTP-A WALLACE-000001-32 |
| Order in *People v. Wallace* | PTP-A WALLACE-000054-66 |
| Appellate opinion in *People v. Wallace* | PTP-A WALLACE-000033-53, PTP-A WALLACE-000073-93 |
| Complaint Register #206469 | PTP-A WALLACE-000094-117 |
| Amended Complaint in *Wallace v. Kato, et al.* | PTP-A WALLACE-000067-72 |

1

**Evidentiary Support for Summary**:

### A. Evidence of Coercion and Abuse

- Report of Proceedings on a Motion to Suppress Statements (August 29, 1995) states
  - "About an hour and a half and two hours after I arrived [to Area 4]" Detective Kato "slapped me … with his back hand … across my mouth." (PTP-A WALLACE 000005)
  - "About 2 hours after that … [Detective Kato] kicked me in my knee." (PTP-A WALLACE 000006)
  - "[Kato] squeezed my testicles … he just stuck his hand down there and he had one arm in one hand, squeez[ed] my testicles with the other … [for] a couple of seconds." (PTP-A WALLACE 000006)
  - "He told me that if – if I didn't do what he said, he was going to talk to me with his hands … [this was] probably four and a half hours [into the interrogation]." (PTP-A WALLACE 000008)
  - "He said if I cooperated and signed the statement, he would get it dropped down to second degree and I would be going home … probably about four hours [into the interrogation]." (PTP-000009)
  - From 9 pm when he arrived them until approximately 6 am, Wallace's left hand was handcuffed to a wall. (PTP-A WALLACE 000019)

- **Order in People v. Wallace (August 31, 2001)** states:
  - Jackson's statement was procured during Jackson's own illegal detention after Jackson and defendant were brought to the police station together. Jackson's statement therefore could not properly be used to attenuate the taint of defendant's illegal arrest. (PTP-A WALLACE 000065)
  - For the foregoing reasons, the judgment of the trial court is reversed and the case is remanded for a new trial in which defendant's confession must be suppressed. (PTP-A WALLACE 000066)

- **Appellate Opinion in People v. Wallace (September 21, 1998)** states:
  - Defendant was never informed that he was free to leave. (PTP-A WALLACE 000038)
  - Defendant asserts that at some point after he arrived at the Area 4 police station he was illegally detained without probable cause, and the trial court ruling to the contrary was against the manifest weight of the evidence. [The Court] agreed and reversed the trial court's order denying defendant's motion to quash his arrest. (PTP-A WALLACE 000043)
  - Defendant remained in the same room - with the door closed - from his arrival at the station (roughly 8:30 pm) until he made his

2

incriminating statement (at 4:30 am the following morning) (PTP-A WALLACE 000046)

B. <u>Evidence of Notice to the City of Chicago</u>

- **Complaint Register (May 6, 1994) states:**
  - On January 27, 1994, at 1244 hours, the complainant [Janice Wallace, Andre Wallace's mother] telephoned Civilian Employee Selena LOMACK of the Office of Professional Standards and registered this complaint on behalf of the victim. The complainant and victim alleges that [Detective KATO] while in the interview room 1) kicked the victim on his right knee, 2) grabbed the victim by the testicles and squeezed same, 3) left the interview room and returned and then slapped the victim in the mouth one time, and 4) then threatened the victim with physical harm. (PTP-A WALLACE 000096)
  - The victim claimed there were no witnesses present at the time of the alleged abuse and threats. Two detectives (Detectives ROY and RYBICKI) claimed that the victim was never questioned alone and denied the allegations made against Detective KATO. The victim did not sustain any injury as a result of the incident. Therefore, the undersigned investigator recommends that this investigation be closed with the findings of NOT SUSTAINED. (PTP-A WALLACE 000099)
  - The Office of Professional Standards conducted and completed a thorough investigation into all allegations and … after evaluating all of the available evidence, classified this Complaint Register as NOT SUSTAINED. (PTP-A WALLACE 000095)

C. **Evidence of Innocence**

- **Amended Complaint (April 28, 2004) states:**
  - After unlawfully arresting plaintiff, defendants KATO and ROY used a variety of coercive techniques to cause plaintiff to make a false confession to a murder. (PTP-A WALLACE 000067)
  - As a result of the foregoing, plaintiff made a false confession to a murder that he had not committed. (PTP-A WALLACE 000070)

3

Case: Tyrone Hood and Wayne Washington
Year: 1993
Report Page: 79

**Summary in Leo Report**:

Tyrone Hood and Wayne Washington (1993): Detective Boudreau coerced a false confession from Washington. Both men's convictions were subsequently overturned. PTP-T HOOD & W WASHINGTON-000001-00039.

**Materials Provided Supporting Summary In Report**:

| Description | Bates Range |
| --- | --- |
| Tyrone Hood v. City of Chicago Plaintiff's Response to City's Motion for Summary Judgment and Plaintiff's Response to the Individual Defendant Officers | PTP-T HOOD & W WASHINGTON-000001-000396 |

**Evidentiary Support for Summary**:

### A. Evidence of Coercion and Abuse

- In a deposition in his civil case (cited within his Summary Judgment response), Tyrone Hood testified that during his interrogation for a murder, Chicago Police Detectives
    - kicked him,
    - slapped him,
    - choked him,
    - pointed a gun at him and told him to sign or they'd put five slugs in Mr. Hood,
    - beat him and stepped on his face,
    - hit him and dumped cigar ashes on him
    - threatened to lock up Hood's wife and he would never see his children again. PTP-T HOOD & W WASHINGTON-0000352.
- Mr. Hood was kept by police for two days. PTP-T HOOD & W WASHINGTON-0000350-51.
- Wayne Washington testified in a deposition that he gave a false statement implicating himself and Mr. Hood because police slapped him and told him that if he implicated Hood, he could go home. PTP-T HOOD & W WASHINGTON-0000360.
- Washington testified that he was detained by Chicago Police for two days and was not given food or water until he gave a statement implicating himself and Hood. PTP-T HOOD & W WASHINGTON-0000362-63.

### B. Evidence of Notice to the City of Chicago

According to the documents cited in Mr. Hood's summary judgment response, Mr. Hood's sister, Mertina Chaney, filed a report with the Office of Professional Standards on 5/28/93, once she learned of Mr. Hood's beating. Ex. 61 (C.R. 200855) at CITY 6973; Ex. 62 (Chaney Dep.) at 132:6-19. PTP-T HOOD & W WASHINGTON-0000352.

Washington testified that he was slapped and deprived of food at his hearing on his motion to suppress on August 24, 1995. PTP-T HOOD & W WASHINGTON-0000362 (Summary judgment response citing Motion to Suppress Transcript).

### C. Evidence of Innocence

In 2015, the Cook County State's Attorney vacated Hood's and Washington's convictions and dropped all charges against them.

Case:          Michael Waslewski and Daniel Gasca
Year:           1990
Report Page:   87

**Summary in Leo Report**:

Mr. Waslewski claimed that, during an overnight interrogation, Detective Kato and another detective beat him in order to secure a confession. David Jackson, Fine Line Between Tough Police Work, Brutality, Chicago Tribune, at 2 (Jul 14, 1991). Gasca claimed that he was held for 26 hours, during which time Kato entered the interrogation room, told him "'You're a killer and you have no remorse,'" and when Gasca denied the accusation, Detective Kato hit the side of his head. Following the interrogations, Mr. Waslewski adopted a confession that Detective Kato provided to him, "giv[ing] a detailed statement describing how he and a friend, Daniel Gasca, stabbed [the victim] to death during a fight over money, then put [the victim's] body in the trunk of a car that they left in an alley near Cook County Jail." Id. The confession was shown to be false when records emerged showing that Gasca could not have been involved in the crime because he had been in prison on the night it occurred. Id. Wasleswki was acquitted at trial. Waslewski v. Kato, 1993 U.S. Dist. LEXIS 269, at *1-2 (N.D. Ill. 1993); PTP-M WASLEWSKI-000001-000006.

**Materials Provided Supporting Summary In Report**:

| Description | Bates Range |
| --- | --- |
| Motion to Dismiss Ruling | PTP-M WASLEWSKI-000001-000006 |
| Chicago Tribune Article | PTP-H LUCAS-000001-000004 |
| Chicago Reader Article | PTP-K WASHINGTON-000001-000032 |

**Evidentiary Support for Summary**:

### A. Evidence of Coercion and Abuse

- The Chicago Reader reported that Waslewski was found not guilty of murder after presenting the defense that CPD detectives pressured him into confessing. The jury deliberated just over an hour. PTP-K WASHINGTON-000031.
- The Chicago Tribune reported that Waslewski's "murder confession," given to Det. Kato, implicated his friend Daniel Gasca in the killing, even though Gasca was in Cook County jail that night. PTP-H LUCAS-000003.
- Per the Chicago Reader, Waslewski stated that Kato assaulted him with kicks and strikes, threatened to "kick [him] in the kidneys and [he] would be pissing blood for a week," and further threatened to fabricate an account of the killing to convict him. PTP-K WASHINGTON-000031.

- The Chicago Tribune reported that Daniel Gasca, Waslewski's friend, was held for questioning for 26 hours by Kato and said that Kato hit him in the head when questioning him. PTP-H LUCAS-000003. The Reader reported that Gasca said Kato struck and choked him and screamed at him. PTP-K WASHINGTON-000031.
- The Reader reported that Waslewski and Gasca both said that Kato told them what he wanted them to say about the murder. PTP-K WASHINGTON-000031.
- Per the Tribune, Brian Kane, Gasca and Waslewski's friend, said that Kato questioned him and "pulled his hair until he cried" during the questioning. PTP-H LUCAS-000003.

## B. Evidence of Notice to the City of Chicago

- In 1991, the City received notice through news articles in the Chicago Tribune (July 14, 1991) and the Chicago Reader (Dec. 12, 1991). PTP-H LUCAS-000001; PTP-K WASHINGTON-000001.
- In 1991 and 1992, further notice was provided through Waslewski's criminal trial (Nov. 1991) and a lawsuit Waslewski filed in January 1992. PTP-M WASLEWSKI-000001.

## C. Evidence of Innocence

- As described above, Waslewski was found not guilty of the homicide he was charged with. PTP-K WASHINGTON-000031.
- As described above, Waslewski's "confession" was inconsistent with Gasca being in jail at the time of the killing. PTP-H LUCAS-000003.
- As described above, Waslewski, Gasca, and Kane all alleged physical abuse by Kato. PTP-H LUCAS-000003, PTP-K WASHINGTON-000031.
- As described above, Waslewski and Gasca both asserted that Kato tried to fabricate evidence against them. PTP-K WASHINGTON-000031.

Case:          Kilroy Watkins
Year:           1994
Area:           Area 3
Report Page:    78

**Summary in Leo Report**:

Detective Boudreau and Detective Halloran choked and punched Watkins in the face until he gave a false confession (Complaint Under the Civil Rights Act, Title 42 Section, Kilroy Watkins v. Detective J. Halloran et al., May 6, 2002; Affidavit of Kilroy Watkins, January 17, 2004); PTP-K WATKINS-000001-000015)

**Materials Provided Supporting Summary In Report**:

| Description | Bates Range |
| --- | --- |
| Affidavit of Kilroy Watkins | PTP-K WATKINS-000015 |
| Complaint Under the Civil Rights Act, Title 42 Section, Kilroy Watkins v. Detective J. Halloran et al., May 6, 2002 | PTP-K WATKINS 000001-000014 |

**Evidentiary Support for Summary**:

    A. **Evidence of Coercion and Abuse**
    ● **Affidavit (Jan. 17, 2004) states**
        ○ Affiant was taken into custody on or about January 15, 1992 and transported to the Area Three Violent Crimes Division … the affiant was escorted into the interrogation room on the third floor by Detective Halloran and partner Boudreau. The affiant was handcuffed to a ring in the wall. (PTP-K WATKINS 000015)
        ○ Once the affiant denied any involvement in shooting incident on August 27, 1991, the affiant was physically choked and assaulted repeatedly by Det. Boudreau. (PTP-K WATKINS 000015)
        ○ Det. Halloran failed to stop or prevent abuse. (PTP-K WATKINS 000015).
        ○ As a result of Detective's physical and psychological, as well as coercive procedures, the affiant was forced into signing a false confession, which was used at trial to obtain my conviction for a crime I did not commit. (PTP-K WATKINS 000015)
    ● **Civil complaint (May 6, 2002) states**
        ○ Once Plaintiff arrived at Area Three, and some hours later, the Defendants escorted the Plaintiff to a small isolated room in the rear office on the third

1

floor, where Plaintiff was restrained to a rind in the wall. (PTP-K WATKINS 000006)
- ○ Defendant Boudreau came around the table and grabbed Plaintiff by his neck "choking" Plaintiff with one hand and "punched" the Plaintiff in the face, all while Plaintiff was handcuffed to a ring in the wall. (PTP-K WATKINS 000006)
- ○ Defendant Boudreau choked the Plaintiff repeatedly while screaming at Plaintiff to stop the "Bull-Shit" and tell [us] what you know about the murder incident on August 27, 1991. (PTP-K WATKINS 000006)
- ○ Defendant knew Plaintiff had been held in custody over 30 or so hours without any sleep or anything to eat, during the time of their interrogation. (PTP-K WATKINS 000007)
- ○ Plaintiff suffered mental, emotional, and physical abuse as a result of Defendants' actions, specifically, but not exclusively: his left side of the face, jaw area swollen, and bruised, he experienced neck pain and extreme soreness, and other mental and emotional complaints and traumas. (PTP-K WATKINS 000007)

### B. Evidence of Notice to the City of Chicago
- ● **Complaint (May 6, 2002) states**
  - ○ Plaintiff attempted to bring all allegations of coercion and physical abuse by the Defendants to the attention of his trial attorney and trial judge back in July of 1992. The police denied all allegations of flagrant misconduct and physical abuse when confronted by Watkins's attorney. (PTP-K WATKINS 000007)

### C. Evidence of Innocence

2

Case:          Marcus Wiggins, Demoni Clemon, Imari Clemon, Jesse Clemon, Dyez Clemon
Year:          1991
Report Page:

**Summary in Leo Report**: 82

Marcus Wiggins, Demoni Clemon, Jesse Clemon, Imani Clemon, Dyez Owen (1991): Detective Kill, Detective Boudreau, and others handcuffed thirteen-year old Marcus Wiggins to a wall, denied him access to his mother, and beat and electroshocked him until he gave a false confession. The Clemons brothers and Owen were also beaten until they confessed. Two of the confessions were suppressed and all of the defendants were either acquitted or the State declined to prosecute their cases. People v. Clemon, 259 Ill. App. 3d 5, 8, 10 (1st Dist. 1994); PTP-M WIGGINS-000001-000149; PTP-JESSE & DEMONI & IMARI CLEMON-000001-000276.

**Materials Provided Supporting Summary In Report**:

| Description | Bates Range |
|---|---|
| People v. Clemon, 259 Ill. App. 3d 5 (1st Dist. 1994). | |
| Volume I of Deposition of Demoni Clemon in Saunders v. City of Chicago, et al. | PTPJESSE & DEMONI & IMARI CLEMON 000001-26 |
| Deposition of Jesse Clemon in Saunders v. City of Chicago, et al. | PTP-JESSE & DEMONI & IMARI CLEMON 000027-95 |
| Volume II of Deposition of Demoni Clemon in in Saunders v. City of Chicago, et al. | PTP-JESSE & DEMONI & IMARI CLEMON 000096-276 |
| Deposition of Marcus Wiggins in Wiggins v. Burge, et al | PTP-M WIGGINS-000001-103 |
| Complaint in Wiggins v. Burge, et al. | PTP-M WIGGINS-000104-149 |

**Evidentiary Support for Summary**:

### A. Evidence of Coercion and Abuse

On September 25, 1991, eleven suspects, including Marcus Wiggins, Demoni Clemon, Imari Clemon, Jesse Clemon, and Dyez Owen, many of whom were juveniles, were in custody for the murder of Alfredo Hernandez at the same time for 12 to 13 hours. PTP-M WIGGINS-000044; *People v. Clemon*, 259 Ill. App. 3d 5, 8, 10 (1st Dist. 1994). According to the appellate opinion in Jesse Clemon's case, Criminal Court Judge Earl Strayhorn's found the atmosphere of detaining so many young suspects and witnesses so close together that they could hear each other screaming was "horrendously oppressive" and he suppressed Jess Clemon's inculpatory statement. *People v. Clemon*, 259 Ill. App. 3d 5, 8 (1st Dist. 1994). A third party witness at the scene, Myron James, whom Judge Strayhorn found "very credible", testified at Clemons' suppression hearing that he heard Marcus and Jesse screaming and saw them nursing injuries after their interrogations by police. *People v. Clemon,* 259 Ill. App. 3d 5, 7-8 (1st Dist. 1994).

In a sworn deposition in 1996 in his civil case against the Chicago Police Department, Marcus Wiggins testified that in September 1991 Chicago Police Officers hit him in the chest until he cried and called him a liar when he would not admit to Hernandez's murder. PTP-M WIGGINS-000030-31. He testified that a Chicago Police Officer shocked him until he passed out. PTP-M WIGGINS-0000033-41. He testified that he felt like he was going to die, so when the officers told him he could go home if he signed something, he signed an inculpatory statement without reading it. PTP-M WIGGINS-000041.

In a sworn deposition in 2015 in *Saunders v. City of Chicago* (Jesse Clemon Dep., PTP-Jesse & Demoni & Imari Clemon 00027-95), Jesse Clemon testified that when he was being questioned in 1991, police officers hit him on the head with a flashlight causing him to cry in pain. PTP-Jesse & Demoni & Imari Clemon 00045. According to the appellate decision, Jesse Clemon's mother also saw police officers beating him with a flashlight when he was arrested. People v. Clemon, 259 Ill. App. 3d 5, 8, 10 (1st Dist. 1994). Jesse testified that he was taken from the police station to the hospital after his interrogation and inculpatory statement to police. PTP-Jesse & Demoni & Imari Clemon 00056. He also testified that he saw Chicago police officers hit his brother Demoni in the chest while Demoni was handcuffed. PTP-Jesse & Demoni & Imari Clemon 00046. Jesse Clemons saw the police punch Marcus Wiggins. PTP-Jesse & Demoni & Imari Clemon 00044.

In sworn deposition in 2016 in *Saunders v. City of Chicago*, Demoni Clemon testified that police officers hit him with a telephone book while he was handcuffed to a chair. PTP-JESSE & DEMONI & IMARI CLEMON 0000187. Demoni also testified that an officer pointed a gun at him, spun the bullet in the barrel, and told Demoni that he would keep doing that until Demoni signed an inculpatory statement. PTP-JESSE & DEMONI & IMARI CLEMON 000192-95.

### B. Evidence of Notice to the City of Chicago

In a complaint filed by Marcus Wiggins against the City of Chicago on January 19, 1993, Wiggins described the oppressive atmosphere found by the criminal court and alleged that on September 25, 1991, when he was 13-years-old, Chicago Police Department Detective James O'Brien, prevented his mother from accompanying him in a police car to the station and then Detective O'Brien hit Wiggins in a head with the flashlight during the car. PTP-M WIGGINS-000107-08.

### C. Evidence of Innocence

Imari Clemon was never charged with the murder of Alfredo Hernandez. Demoni Clemon Deposition, PTP-JESSE & DEMONI & IMARI CLEMON 000162-63. The supposed inculpatory statements of Jess Clemon, Marcus Wiggins, Demoni Clemon, and Dyez Owens were all suppressed. PTP-M WIGGINS-000111, *People v. Clemon,* 259 Ill. App. 3d 5, 10 (1st Dist. 1994).

Case:          Robert Wilson
Year:           1997
Report Page:   82

**Summary in Leo Report**:

Robert Wilson (1997): Mr. Wilson reports that Detective O'Brien slapped him repeatedly, and that Mr. Wilson became fearful that he would continue to be physically assaulted if he did not agree to a false confession. Detective Halloran also slapped and threatened Mr. Wilson. (Report of Dr. Richard A. Leo dated June 12, 2010) PTP-GENERAL-000066-000085.

**Materials Provided Supporting Summary In Report**:

| Description | Bates Range |
|---|---|
| Report of Dr. Richard A. Leo dated June 12, 2010 | PTP-GENERAL-000066-000085. |

**Evidentiary Support for Summary**:

### A. Evidence of Coercion and Abuse

- I wrote a report in 2010 about Robert Wilson's interrogation for his civil case against the City of Chicago after reviewing extensive documents including Wilson's 1999 trial testimony and deposition testimony in his civil case. PTP-GENERAL-000066-000085.
- Wilson was detained for over 24 hours. He had high blood pressure and repeatedly told police that he needed his medication. PTP-GENERAL-000078-79.
- Wilson testified in his criminal trial in 1999 that the CPD Detective O'Brien slapped him repeatedly and he agreed to sign an inculpatory statement because he believed he would not survive a beating especially when he considered O'Brien's size. PTP-GENERAL-000077-78.

### B. Evidence of Notice to the City of Chicago

Wilson testified to the abuse during his trial in 1999.

**C. Evidence of Innocence**

- The victim who identified Wilson has recanted her identification and said she was manipulated into making it by Chicago police detectives after she told them she was not sure if Wilson was her attacker.
- Jerryco Wagner, the true perpetrator of the assault and stabbing of the victim, has since confessed to the attack and was charged with six other similar assaults.