*DeLeon-Reyes v. Guevara, et al.*
Case No. 18 CV 01028

*Solache v. Guevara, et al.*
Case No. 18 CV 02312

# EXHIBIT 8



# Transcript of Dr. Richard Leo

**Date:** August 14, 2023
**Case:** Savory -v- Cannon, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

**Page 1**

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF ILLINOIS

PEORIA DIVISION

JOHNNIE LEE SAVORY,          )
                            )
        Plaintiff,           )
                            )
vs.                          ) Case No. 23-CV-01184
                            )
WILLIAM CANNON, as           )
Special Representative       )
for the Estate of            )
CHARLES CANNON, et al.,      )
                            )
        Defendants.          )
------------------------)

REPORTER'S TRANSCRIPT

VIDEOTAPED DEPOSITION OF

DR. RICHARD LEO

MONDAY, AUGUST 14, 2023

San Francisco, California

9:36 a.m. PST

to

6:13 p.m. PST

Stenographically Reported by:
Burgundy B. Ryan, RPR,
CSR No. 11373
Job No. 499837
Pages 1-283

**Page 2**

A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFF:

        LOEVY & LOEVY
        By:  MEGAN PIERCE, Esquire
        311 North Aberdeen Street
        Third Floor
        Chicago, Illinois 60607
        312.243.5900

        PEOPLE'S LAW OFFICE
        By:  FLINT TAYLOR, Esquire
        1180 N. Milwaukee Avenue
        Chicago, Illinois 60642
        773.235.0070
        flinttaylor@peopleslawoffice.com

ON BEHALF OF THE DEFENDANTS:

        THE SATOS LAW FIRM
        By:  SARA J. SCHROEDER, Esquire
             KYLE T. CHRISTIE, Esquire
        141 W. Jackson Boulevard
        Suite 1240A
        Chicago, Illinois 60604
        630.735.3300
        sschroeder@jsotoslaw.com
        kchristie@jsotoslaw.com

ALSO PRESENT:

        JOE RAMIREZ, Videographer
        Planet Depos

**Page 3**

DEPOSITION SUPPORT INDEX

QUESTIONS INSTRUCTED NOT TO ANSWER:

PAGE    LINE

120      10

123      11

125       1

REQUEST FOR PRODUCTION OF DOCUMENTS

PAGE    LINE

(None)

STIPULATIONS

PAGE    LINE

(None)

QUESTIONS MARKED

PAGE    LINE

(None)

        REPORTER'S NOTE:

QUOTATION MARKS ARE USED FOR CLARITY AND DO NOT

NECESSARILY REFLECT A DIRECT QUOTE.

**Page 4**

I N D E X

                                          PAGE

EXAMINATION BY MS. SCHROEDER.................   7

              --o0o--

E X H I B I T S

EXHIBIT          DESCRIPTION          PAGE

  01    Subpoena Response for Dr. Richard Leo   63

              --o0o--

**5**

BE IT REMEMBERED that, pursuant to Notice of Taking Deposition, and on Monday, August 14, 2023, commencing at 9:36 a.m. PST thereof, at Regus, 1390 Market Street, San Francisco, California, before me, Burgundy B. Ryan, a Certified Shorthand Reporter in and for the State of California, personally appeared

DR. RICHARD LEO,

a witness called on behalf of DEFENDANTS, pursuant to all applicable sections of the Federal Rules of Civil Procedure, and who, having been first duly sworn by me to testify to the truth, was examined and testified as follows:

THE VIDEOGRAPHER: Here begins Media No. 1 in the videotaped deposition of Dr. Richard Leo in the matter of Savory versus Cannon, et al, in the United States District Court, for the Central District of Illinois, Peoria Division, case number 23-CV-1184.

Today's date is August 14th, 2023.

The time on the video monitor is 9:36 a.m. Pacific Standard Time.

The videographer today is Joe Ramirez, representing Planet Depos.

This video deposition is taking place at

**6**

Regus - San Francisco.

Would Counsel please voice-identify themselves and state whom they represent.

MS. SCHROEDER: This is Sarah Schroeder -- oh, sorry.

MS. PIERCE: No. Go ahead.

MS. SCHROEDER: Sara Schroeder on behalf of the Defendants.

MR. CHRISTIE: This is Kyle Christie also on behalf of the Defendants.

MS. PIERCE: And this is Megan Pierce on behalf of the Plaintiff, Johnnie Savory.

THE VIDEOGRAPHER: The court reporter today is Brooke Ryan, representing Planet Depos.

The witness will now be sworn.

MS. SCHROEDER: I'm sorry. Is Flint on also? I see the appearance there, just wanted to have him on the record if he was attending.

MS. PIERCE: It looks like he is. It looks like Flint Taylor is appearing on behalf of Plaintiff as well.

MS. SCHROEDER: Okay.

(Whereupon, the witness was sworn.)

COURT REPORTER: Thank you very much. Counsel, you may proceed.

**7**

MS. SCHROEDER: All right.

DR. RICHARD LEO,

having first been duly sworn to tell the whole truth, testified as follows:

EXAMINATION

By MS. SCHROEDER:

Q. Good morning, Dr. Leo.

A. Good morning.

Q. Thank you for attending at the court reporter's office. We really appreciate it.

Just for the record, I want to state this is the deposition of expert witness -- Plaintiff's Expert Witness Dr. Richard Leo and it's going to be taken in accordance with all the -- the appropriate Court Rules, Federal Rules of Evidence and Federal Rules of Civil Procedure.

Dr. Leo, just for the record, can you spell your first and last name, please.

A. My first name is spelled R-i-c-h-a-r-d. My last name is spelled L-e-o.

Q. Okay. And I know that you are familiar with the procedures of depositions so I'll just reiterate, if you need to take a break, let us know, we will take a break. And if you don't understand a question or there is -- you're not able to answer

**8**

it, please let me know and I will rephrase the question for you so that you can answer that. And if you do answer a question that is posed to you, then the assumption will be that you did understand the question.

Okay. So do you have a copy with you of your report that you tendered in this case?

A. I do.

Q. Okay. Great. Because that will be easier than sharing it on the screen.

So the first thing I'm going to ask is, with respect to the CV that was attached to the report, do you have any updates or have you made any updates to your CV since you've produced this report?

A. So I probably have if there have been papers that have been published that were not yet published. If there were any talks. I don't have a copy of my CV with me. It just dawns on me as you're asking this question that the report comes with a CV and a four-year testimony list, but all I have with me is the report, neither the CV nor the four-year testimony list.

Q. Okay. So then maybe then I will share that screen with you just so it's a little bit easier if

I ask a couple questions about it.

And then just so you know, the date on the report when we received it was June 9th, 2023, so that is what I'm asking about is if you had any additions since June. So what is that, like two months, if you've had any additional items that you placed on your CV in the last two months. Do you recall if that is the case?

A. I think there may be. I'd have to look at the June CV. I think there may be a couple publications -- new publications. On the other hand, they may be on the June CV, I just have to look at it.

Q. All right. So I'll put up --

A. Other than my -- other than that it should be -- it should be the same.

Q. Okay. Fine. So I'll pull it up and then you can let me know, and if you find that, yep, there are a couple things you have added to it, I'll just ask that you or Megan -- through Megan can send me an updated CV at the end of this deposition.

A. Okay.

MS. SCHROEDER: Okay. So let me share my screen here. First I'm going to get it to the page I want.

Okay. Are you guys seeing -- what are you seeing? There we go. Are you seeing Dr. Leo's CV?

MS. PIERCE: Yes.

MS. SCHROEDER: Okay. Good. All right. So I'm looking at multiple monitors here. I wanted to make sure that was the case.

By MS. SCHROEDER:

Q. Okay. So here, actually, if I look at the date here, Dr. Leo, it says up in the upper right corner, May 2023 above your CV. Does that date indicate that's the last time your CV was updated?

A. No. It's updated every month so the current version would be August 2023.

Q. Okay. But I'm saying the one that we're looking at here is from May 2023; is that correct?

A. Correct, yes.

Q. Okay. Okay. Very good. Okay. So then as we -- then we would just be looking for any additions that have happened since this May 2023 version. Excuse me.

Okay. So currently are you employed, Dr. Leo?

A. Yes.

Q. And where are you employed?

A. I'm still employed at the University of San

Francisco as a professor of law and psychology.

Q. Okay. And then in your -- for -- in the services that you provide such as this instance where you're a retained expert, do you have then a -- sort of your own consulting company that you also sort of, you know, that you work for?

A. Yes. So for tax purposes I have an S corporation. It's a one person S corporation, and the title of that S corporation is Justice Research and Consulting Incorporated.

Q. Is that operated out of your office at the University of San Francisco?

A. No. It's operated out of my house. So if you look at the top of the CV, on the top left it says professional office and then it has my home address.

Q. Okay. Very good.

A. Also, is it possible to increase the page size of that? It looks like it says 75. If you can bring it up to 100, that would make it easier for me to see. Thanks.

Q. How does that look? Is that better for you?

A. Yes. Yes. Thank you.

Q. Okay. And I can -- I can enlarge it even

more if you need to.

Okay. So then would that be the -- the one that we just talked about, the University of San Francisco, is that what I am sort of noting right here, this Hamill Family Professor of Law and Psychology?

A. Correct.

Q. Okay. And then are you -- do you actively teach classes there?

A. I do, yes.

Q. And which classes do you teach?

A. So I teach four classes, constitutional criminal procedure, criminal law, and those are both first year doctrinal courses, and then I teach seminars, two seminars, or have taught two seminars, one called wrongful convictions and the other called interrogation and confessions.

Q. Okay. Are you a licensed attorney --

A. No.

Q. -- Dr. Leo?

A. No.

Q. Okay. Have you -- have you ever received your law degree?

A. Yes. So I did receive my law degree in 1994 from UC Berkeley. It's further down the CV but

**Page 13**

it's there.

Q. Okay.

A. I did not take the bar exam, I did not practice law.

Q. Okay. How long have you had your S corporation, Justice Research and Consulting?

A. I think since August of 2013.

Q. That when you first started this consulting business that you -- you have done?

A. So the -- the S corporation was at the recommendation of an accountant. It's just for tax purposes. The -- in 2005 I had a prior S corporation, so this is a successor S corporation, again at the recommendation of an accountant. The consulting work that I do really started in 1996. The first time I testified as an expert witness was in 1997. So the work that I do as a consultant or expert witness predates either of the two S corporations.

Q. Okay. So those dates -- 1996 would be when you first started providing the services as a consultant; is that correct?

A. When I was first contacted and first started working on cases, yes.

Q. Okay. Have you -- since that time, so from

**Page 14**

1996 to present, have you consistently with, I guess, you know, I guess, has -- have you -- have you regularly been providing consulting services on the areas of your expertise?

A. Yes. However, in the first few years I did less of it than I've done since.

Q. Okay. Was that just because you were building your business up and your name in the industry?

A. Well that's not how I would characterize it. I think I became known through my publications and research and -- and after a few years I started receiving more calls than I had in -- in the prior years.

Q. Okay. I'm just going to look at your education here. So -- oh, yeah, there's your JD.

Okay. So then you have a -- I see here you have a -- a bachelor's from UC Berkeley in sociology, master's in sociology, and then a Ph.D. in Juris Prudence in social policy.

So with your Ph.D., does that make you a psychologist; is that correct?

A. Well it depends on what you mean by a psychologist. I'm trained --

Q. You can tell me so I'm not guessing.

**Page 15**

MS. PIERCE: Object to form.

THE WITNESS: So -- so I'm trained as a social psychologist. That's one branch of psychology. Social psychologists typically are research psychologists so I do research in the field of social psychology. I have been a professor of psychology when I was at UC Irvine prior to leaving for the University of San Francisco. So I would say that, yes, I am a professional social psychologist. Oftentimes people, when they think psychologist, they think therapist. I'm not a therapist. I'm not a clinician. I don't have a psychology practice. So that's why I wanted to clarify.

By MS. SCHROEDER:

Q. Got it. Okay.

And, you know, in reading your report and some of the articles also, I saw a lot of this, you know, title of -- of social science or social science research. So is that -- when you say you're a social psychologist, that research, is that the sort of subject matter that you're -- that you're I guess researching as a psychologist is this social science?

MS. PIERCE: Object to form.

THE WITNESS: Social science is much

**Page 16**

broader than social psychology or even psychology. So social science is the group of disciplines that study the social world, anthropology, political science, sociology, economics, psychology, et cetera, and then within each of those fields there are subdisciplines, and in -- in -- social psychology is a subdiscipline within the field of psychology. There is other subfields as well in the discipline of psychology. Many others. So -- so I am a social scientist because I am trained in the methods of social science and I do social science research. And I'm in the fields, the social science fields of social psychology, criminology, sociology. So those are kind of my specializations within the broader rubric of social science.

By MS. SCHROEDER:

Q. Okay. And then within those specific specialties that you just noted, are there even like more sub -- sub areas that you are honed in on as an expert?

A. Yes. So most people are generally trained in some social sciences. When they go through graduate school, they take courses, they take exams. The -- then when they get their Ph.D., most people specialize, there are very few generalists, and my

areas of expert special -- research specialization as listed on the CV are primarily police interrogation, false confessions and wrongful convictions.

Q. Okay. So -- so here on this CV where it says research specialization, it's sort of these first three that you list in here are your main specialties; is that correct?

A. Yeah.

MS. PIERCE: Object to form.

THE WITNESS: Sorry. The other ones as well but yes.

By MS. SCHROEDER:

Q. Okay. Okay. What -- is it just your -- the amount of research that you have conducted on these specific areas of police interrogation, false confessions, wrongful convictions that make you say these are the three that you -- you maybe specialize in more than the other three that are listed?

A. The other three are broader categories.

Q. Okay.

A. But my research really falls into all of these. And, yes, I think I have established these as areas of specialization through -- through research, through the publication of many articles

and many books in -- in these subfields.

Q. Any sort of licensing requirements or anything like that that you have to hold in order to maintain your title as a social psychologist?

A. There -- no, it's a research field. There's -- it's not a applied field and so there is no licensing requirements or licensing exams. The certification that one gets really is through the Ph.D. program. Many people don't finish the Ph.D. program. Ph.D.s are rigorous. They not only involve coursework --

Q. Uh-huh.

A. -- but they also involve field examinations, they involve defending one's work both before and after the work, but there is -- it's not like clinical psychology where there is a license and one has to maintain, you know, a current status on that license.

Q. All right. Very good. And then when you -- and just talking about the rigor of applying -- you know, of obtaining a Ph.D., is part of that was, if I'm, you know, correct, is that where you have to have a thesis paper at the end and then that -- that paper is sort of judged on by a panel; is that correct?

A. That's correct, I guess it's just incomplete. So usually on the way to a Ph.D. one would do a master's thesis, and that could be a large project, but the -- what I think you are referring to as a thesis is usually referred to as the dissertation and the dissertation is quite substantial. I think in my case it was 600 pages or so, and so one has to come up with a prospectus, one has to have faculty members who are willing to serve as primary and secondary mentors. One has to get it past them, one has to defend it orally, one has to -- just the prospectus. Then -- then you have to submit the chapters and revise. And then at the end it has to be approved. And usually as part of that approval process there is a defense examination at the end.

Q. For -- so in -- I see the dates here for receiving your Ph.D. So would that have been then in 1994 when you would have had to -- the culmination of -- of your dissertation exercise?

A. Correct. Yes. So -- so I believe I started the actual -- I think I turned the prospectus in in the fall of 1992. So from the fall of 1992 to the -- to the fall of 1994 I was working on and then completed my doctoral dissertation,

including the examination that --

Q. Okay.

A. -- that it culminated in. And all the members of the committee, in my case I had four, which is the standard number, sometimes people have more or -- or one less, but all of them have to approve it and sign off on it for it to be accepted.

Q. Right. And what was your -- what was the dissertation? What was the topic or the title of your dissertation?

A. It was an empirical and historical study of the practice and transformation of police interrogation in America in the 20th century and the implications of that transformation for psychology, for law, and for public policy.

Q. So when you say "empirical and historical," are those two different types of research or two different types of, what do I want to call that, like facts or data that you're relying on?

A. I think historical is one type of empirical research depending on how one does historical research but I think empirical is the broader category. So by empirical what I mean is going out and gathering data in one form or another and then

basing one's analysis on that data. So when -- when social scientists use the word empirical, they -- it often has a connotation of in the present and so that's the reason why I modified it by saying historical. But I did empirical research that was historical. I went to historical archives and studied historical documents as well as empirical, again going out and gathering data, empirical research that was at that time, in the early 1990s contemporary as well.

Q. So let me see if I understand this then. So let's -- so even now, like not just thinking of your dissertation, right, but even any articles that you've authored or even in the report where you say you relied on empirical evidence, right, or empirical research, is that the proper term, empirical research. Okay. So can you just explain to me what that means. Like when you say you are relying on or there is empirical research supporting this, and then whatever that topic is, can you just define for me then what is empirical research? Because it sounds like it can be historical, it can be contemporary, so I'm just interested to learn from you what that is.

A. So -- so it might help by giving you some examples. But just go back to the definition as you're asking. So empirical research just means research that is based on data. So going out and gathering data and then analyzing that data as part of the research. So it's not theoretical, it's not philosophical. I mean it might be theoretical, but it's not purely theoretical or purely philosophical, it's analysis of data and data points. So then, yes, okay, what is the different types of data. So one type of data is analyzing documents, real world documents, and in my case, that's the primary source of data in my research and publications. Those real world documents might be historical, like going to archives, like reading books and newspaper articles that are very old of a particular era, or they might be contemporary, might be reading trial transcripts, police reports, interrogation videos, interrogation transcripts, contemporary newspaper articles. So one source of data is documents.

Q. Got it.

A. And those documents might be historical or contemporary. Another source of data in some of my studies is based on interviews, interviews of the relevant parties. It might be, if I'm doing a study of interrogation, police interrogators or police

interrogation trainers or other members of the criminal justice system or suspects. So -- so analysis of documents, historical or contemporary, interviews. Another one is field observation, sitting in on, observing the phenomenon under study, in my case interrogations for the doctoral study, live interrogations, videotaped interrogations.

Another source of empirical data is surveys. I've been part of research that has surveyed real world jurors, mock jurors, police officers. So -- so -- but survey data is a broad form of empirical research like the others I mentioned in social science. And then experiments. I have been a part of some experiments but that's not my primary focus, but it's one of the primary methods of gathering and analyzing data in all fields of psychology. So empirical is just analyzing data, and those are the primary sources of or types of data that social scientists analyze. And so when I say in my report, empirical social science, what I'm really referring to is a body of social science research that involves the analysis and publication of those and other types of data.

Q. Okay. So then -- so not every -- let's say every study that is based on empirical research will incorporate all of those five types of data collection that you just discussed; is that correct?

A. Correct.

Q. Such as so -- right? So it can just be, oh this -- you know, this empirical research is based on the data collection of interviews and field observations. Could that be correct? Or it's limited to maybe two types of data gathering or is it a requirement that all five types that you just discussed must be incorporated into an empirical -- into a study so that it can be titled empirical research?

A. No. A study could -- could have one or more of those forms of data. And there are multi-method studies and there are single method studies, it just depends on what the source of data are and --

Q. Uh-huh.

A. -- usually there is some re -- there is some literature review or a connection of the analysis of the data in the article or book to a broader body of research that would then draw on research that might incorporate all the other forms of data. But there is no requirement that a study

needs to have one or more forms of empirical data.

Q. Okay. And so in that instance, what you just described, let me see if I understand this correctly. So you could -- so an individual, and I don't want to keep saying you, but an individual who is authoring or conducting a study or a research paper can claim -- can say that this paper is based off of empirical research but what they are relying on is this paper over here that was created and this paper over here said it was empirical research and that it could be even the next paper above that that did a multi-study of data and that's empirical research, right? So you can rely on another individual's empirical research to support your own findings or your own report; is that correct?

MS. PIERCE: Object to form.

THE WITNESS: The -- I guess in -- in the first part of your question, if -- if I do an empirical research project, I would usually have some form or one would usually have some data, original data or reanalysis of existing data. So -- so if one were merely referring to other empirical studies, you might call that a review paper, not really an original empirical project. It might be empirically based because you are going through other people's studies and analyzing that. But, yes, everybody who does research tries to connect it to and build on the prior research that's relevant, excuse me, in the field.

By MS. SCHROEDER:

Q. Okay. So then if you are relying on someone else's empirical research but you're using that to come up with -- you're just not reviewing it but you are kind of coming up with your own new assessment, new analysis, that that's something where you could -- where your authored report would be based on empirical research; is that correct? Because it's new to this paper, it's not a review of somebody else's research, you actually are taking that empirical research and then incorporating it into your analysis; is that correct?

A. I guess you could say that the analysis would be empirically based, yes.

Q. Okay. Okay. I was -- yes. Thank you so much. Okay. So now -- okay. So what is -- so you've given me an example of an empirical research or the ways that you would do it. And so what is non-empirical research or what would a study that's based on non-empirical research, what kind of data is that?

A. Well, if it's a non-empirical study, then it wouldn't be based on original data.

Q. Okay.

A. It could be a purely theoretical paper or it could be a philosophical paper or a paper or talk given just on impressions, impressionistic.

Q. Okay. And then -- so then when you're doing a -- an empirical -- do -- do you title it empirical study, am I saying that correctly or should I say a study based on empirical research? What is the right terms?

A. Well, usually it's -- usually it's understood if you present data in a paper or a book that it's empirically based. It doesn't need to be titled empirical. Empirical is just a descriptor, right?

Q. Okay. Okay. And so then the empirical data, if a -- if a study is based on empirical data, is there any sort of qualifiers for the type of data that's included? So, such as, like, it needs to be accurate, right, or it needs to be objective or, you know. Like do you have any set criteria for the types of data that you can term empirical or include in an empirical study?

MS. PIERCE: Object to form.

THE WITNESS: I'm not really sure I understand your question.

By MS. SCHROEDER:

Q. Okay. So -- so the data that you're collecting or a person is collecting to support their study, which is going to be an empirical study, are there any qualifiers that that data has to meet in order to be included in that empirical study? And by that I mean, for example, do you have to ensure -- and again I say you but I mean in your industry -- does a person have to ensure that the information they are relying on is accurate, for example?

MS. PIERCE: Object to form.

THE WITNESS: I don't think that in most articles people sign a form saying that it's accurate but there is an understanding that ethically people who do research in social science, like in the sciences, are supposed to conform to the standards of data collection and data analysis. And publications in the social sciences typically -- and the sciences typically go through a peer review process where the work is reviewed and vetted by similarly situated experts and -- and then recommendations are made to an editor who either

accepts or rejects and often adds their own peer review. Part of the peer review process might be questions about the methods of collecting the data and how, if there are any questions, about how accuracy was ensured.

By MS. SCHROEDER:

Q. Okay. So -- what might help me is you just mentioned that there -- that there are standards for data collection and analysis. So maybe that's what I'm trying to get at is what are the standards of data -- data collection?

A. Well, I guess it depends on the type of data that you're collecting, but to report the number of subjects if you do an experiment or a survey. There is often statistical methods involved when the studies are quantitative. The standards would just be to accurately report and be transparent about how you analyze your data.

Q. Okay. And then -- so transparency then, is that part of the standards of data analysis that you just referenced?

A. Well transparency is a very big word and -- and not everything can be included in an article. There might be hundreds of, you know, pages of research notes or research that is done as part of a study and ultimately the journal limits it to 15 pages or a certain number of words. So I think as a general matter, yes, that that's part of what happens in the peer review process. If the expert reviewers in the field have questions about things that were missing or seem to be missing, then, yes, they would ask those questions and that information should be provided.

Q. All right. Any other standards of data analysis aside from that type of transparency?

MS. PIERCE: Object to form.

THE WITNESS: Again, just to accurately collect the data to fairly and objectively analyze it to the extent possible.

By MS. SCHROEDER:

Q. And then what does that mean to the extent possible? Is there like other times when a researcher would be unable to objectively analyze the data that's been collected?

A. I think I would need a specific example. I think that there is an understanding in social -- in psychology and in the social sciences that we want to de-bias our research as much as possible, and in order to do that, we strive to be objective and even-handed. But at the same time, we're all humans and the whole purpose of the scientific endeavor is to create procedures that control for the possibility of human bias, both conscious and unconscious.

Q. So what are some of the safeguards then that are employed to guard against such unconscious or conscious bias when analyzing the data?

A. Well, one would be the peer review process, submitting work to other peers that lays out the methods and the data and the type of analysis typically with an explanation at the end in many social science disciplines of the limitations of the data and next steps.

Q. Are there any more besides that?

A. I'm sure there are but that's what comes to mind.

Q. Okay. How about in your analysis of data to guard against any conscious or self-conscious -- I'm sorry, any conscious or unconscious bias, do you employ any other safeguards besides peer review?

A. Well, like I said, one aspires to do research that is as free of bias as possible. Typically one describes one's methods, the source of data, limitations -- inherent limitations of that data, alternative explanations if they are reasonable. So that's what comes to mind.

Q. Okay. Are you able to -- are you able to say with certainty that the studies that you have participated in do not contain any conscious or unconscious bias?

A. What I am able to say is that in all the studies I've participated in, I, and to the best of my knowledge all of my co-authors, have done our best to be as fair minded and objective and reasonable as possible.

Q. With that qualifier, does that mean, no, you cannot guarantee that there is no bias in the studies that you've authored?

MS. PIERCE: Object to form.

THE WITNESS: I could not make that kind of a broad, sweeping claim.

By MS. SCHROEDER:

Q. Okay. So another term that I was hoping you could define for me is confirmation bias. Is that different than the -- I'm just wondering if that is a type of bias that is something that you try to guard against when coming to your conclusions with respect to your research?

A. So confirmation bias is the tendency that

33

humans have to look for evidence in their environment that confirms their pre-existing beliefs to -- to select out the evidence that does and discount or thoroughly scrutinize evidence that doesn't. The peer review process is designed to address confirmation bias and researchers are typically aware of confirmation bias. And usually you begin with hypotheses or theories or ideas and then you try to go where the evidence leads you in your analysis and conclusions. So I think any social scientist would be aware of confirmation bias. The process of peer review is designed to deal with confirmation bias, but I think also, because researchers are aware of it, they are encouraged to and by design think about it. And the real guard against confirmation bias is being open to alternative explanations and going where the data leads you as opposed to trying to prove a theory apriori.

Q. Are you able to -- well let me ask you this question: You -- you have acted as a peer reviewer of other individual's articles; is that correct?

A. Correct.

Q. Okay. So in that -- in your experience as a peer reviewer, are you able to identify by reading

34

or reviewing someone's article whether or not they have employed or inserted some sort of confirmation bias into their study?

A. I think it depends. It's hard to answer that question abstractly but that certainly is possible.

Q. Have you ever come across that in your experience as a peer reviewer?

A. As I sit here today, I don't recall a specific example but I suspect that I have.

Q. Can you think of any examples where a -- by reading someone's research that you are able to tell that -- if they are -- had some confirmation bias that's been inserted into the -- into their research?

MS. PIERCE: Object to form.

THE WITNESS: I -- I think that there are examples of that. There is a very famous sociologist named Donald Black and he usually writes books and marshals a lot of evidence that supports his theories but he never or almost never discusses evidence that doesn't support his theories. So, yeah, there are examples of people whose research I think do have confirmation bias in it.

By MS. SCHROEDER:

35

Q. Okay. And -- and in that instance, is that an example of limiting yourself to a certain set of data and not going beyond that data to incorporate into your final research conclusions?

MS. PIERCE: Object to form.

THE WITNESS: That particular example he doesn't -- I don't think he really does empirical research so much as he writes synthetic books so he analyzes secondary research in support of his theoretical and sociological framework. And so he selects from his environment of secondary studies, the universe of secondary studies, studies that support his theory and his position and does not always discuss research that's inconsistent with his theory or position.

By MS. SCHROEDER:

Q. Okay. I'm flipping through my questions here because we are going through a lot of them which is good.

What is a -- so when you're just talking about non-empirical data, is an anecdotal study non-empirical data?

A. I mean I guess I want you to tell me what you mean by anecdotal study.

Q. Well, do you ever site anecdotal studies in

36

any of your research?

A. Again, it --

MS. PIERCE: Object to form. I think he's asking for a definition of what you mean by anecdotal studies.

By MS. SCHROEDER:

Q. Yep. Well, I was just asking if instead of me defining it, have you ever cited something that you've termed anecdotal study in your research?

A. Not that I would term anecdotal study, no.

Q. Okay.

A. Not that I -- at least not that I can remember as I sit here today.

Q. Okay. So you had said history books -- or not history books but you had looked at historical documents, correct, and you reconsidered a review of historical documents could be part of empirical research; is that correct?

A. Correct. Most of my research is not historical but some of it has been. And looking at historical documents and historical data would be one form of empirical research, yes.

Q. Okay. So what about like -- so I think maybe like, you know, what I'm understanding

anecdotal to mean is data that is taken from -- an example would be like a history book, right, and you're -- you're learning from a textbook and you're -- you're gaining information from that source. That would be more anecdotal, right, where it's just a collection of information that's put together. Is that something that you would deem non-empirical?

MS. PIERCE: Object to form.

THE WITNESS: I think that we have a difference of agreement in what the term anecdote means. What I think of when I think of anecdote is like you are at a cocktail party and somebody you know tells you about their cab ride or something or tells you a story that he heard from somebody. It's a kind of passing sort of incomplete one-off description of an event that usually is brief. Historical research is not anecdotal. That's kind of derisive term. Historians are trained in methods of research. And historical research, at least academic historical research, is supposed to be systematic and thorough and often is the study of many events, not just like a single event. So I think the term anecdotal is really condescending when applied to research and what -- what we

understand it to mean, me and you may be very different. I wouldn't say that historical research is anecdotal. It might be that as part of a talk or maybe a blurb somewhere there is a story that one could call an anecdote, but what you're describing I would not characterize as anecdotal.

By MS. SCHROEDER:

Q. Okay. In going over what your description of anecdotal data is, would that be data that -- that -- it's like a -- it's like an individual's story, right, just as you said, it's -- it's the story of, you know, they are at a cocktail party and they talk about a cab ride. So it's that individual's story to the person they are speaking to. Is that what you would deem anecdotal?

A. Right. But usually data is multiple and so it would be multiple sources of descriptions of events if it was, say, interview based. Sometimes there are case studies, but even within case studies there would be multiple data points of analysis. I just don't think that anecdotes or describing social science research as anecdotes is a fair representation.

Now if you had a specific example, I'm happy to talk to you about my opinion on a specific

example, but we're talking at a very broad level of generality.

Q. Okay. So -- okay. So then I guess maybe if I can bring it into sort of this field that -- that we're specifically talking about with reverse convictions or false confessions I guess.

So when you author a paper on -- and you're looking and using information on individual's descriptions of what happened to them in an interrogation, right, that's that individual's story to you about what occurred in an interrogation, do you consider that to be anecdotal?

A. I would use the word descriptive, that somebody is describing what occurred to them in the course of an interrogation. And we know that human memory is incomplete so it's not going to be the same as if there is a videotape, but oftentimes there are other sources of data within a person's case that one can use to analyze whether there is corroboration or the lack of corroboration of that person's account or likely corroboration. But I wouldn't describe that as anecdotal. I would describe that as descriptive. But again, I would I think want to know more about the foundation of your question to really adequately answer it.

Q. Well, I'm just trying to understand the different pieces of data that are incorporated into this field of research. And so we have got documents and interviews, you know, field studies, that sort of data collection, and so one area is if you are going off of other people's research, and we talked about that, and so I guess now I'm like even trying to drill down more is to what exactly an individual's telling of his experience is in an interrogation, what type of data that would be, and so you're saying that it's called descriptive data; is that correct?

A. Well, in response to your prior question, yes. But -- so if -- if I'm reading an account of somebody's interrogation, let's say it's an unrecorded interrogation and they have test -- and it's -- it's -- their account is captured in a pretrial or trial transcript, then I would classify that as I'm analyzing a document so it would fall under analysis of documents. If I'm interviewing the person and they are describing to me what occurred to the best of their memory in their unrecorded police interrogation, then I would call that an interview. If I were doing a survey study and I asked preset questions about people's

interrogations, then that would be survey data. So that -- those would be the descriptors that I would use for the type of data depending on the source of that person's description of the unrecorded interrogation.

Q. Okay. Is there a difference between data that you or the researcher intentionally chooses to review and add to their -- to their study versus data that just comes to them at random because of a field study or a survey or something like that? Is there a difference between those two sets of data?

MS. PIERCE: Object to form.

THE WITNESS: I think your question is so vague that it's hard to answer. Usually people will say, here's my research question or here's what I want to study and then either go out and gather data or say, here is the data that I'm -- I'm looking at, right? Usually that is the same thing. So it's not like data just randomly comes to people but sometimes researchers will describe, you know, that they had an event in their personal and professional life and that caused them to think of something in a new way and as a result of that they are now embarking on this study and they are looking for certain types of data or gathering certain types of data.

By MS. SCHROEDER:

Q. Okay. So -- so I understand that point, right, that you have like a specific -- would that be where the researcher has identified a specific theory or a specific hypothesis and then they are out to collect data to determine and follow the data where it leads, whether that theory or hypothesis is correct; is that right?

MS. PIERCE: Object to form.

THE WITNESS: Yeah. Again, it's pretty vague but it could be it. It just depends.

By MS. SCHROEDER:

Q. Okay. Okay. So -- and specifically -- and I'm trying to -- sorry, I apologize, I'm trying to remember the title of the article. But there was an article that you did author, and I -- and if my memory serves me correct, it was a -- a specific number of exonerations that you had looked at from I want to say the -- The Innocence Project. Does that sound familiar to you?

A. I don't think that I've ever done a study that is just of exonerations. You might be thinking of a study I did on proven false confessions where --

Q. That might be it. Uh-huh.

A. -- where we -- where we rely on a term in the literature that -- that allows a confession to be classified as a proven false confession if it meets one of four categories and then we analyzed 125 of those proven false confessions and the patterns in them. They are not the same as exonerations because some of those people were exonerated, some never went to trial, some went to trial and were acquitted. So there is more variation than just people who were wrongly convicted and then had their conviction reversed.

Q. Okay. So thank you for that. So, yes, so then it's the proven false confession. So there, is that an example where you had a theory or a hypothesis that you wanted to explore for your research and so you went to the -- a source of information that you knew contained proven false confessions; is that correct?

MS. PIERCE: Object to form.

THE WITNESS: The research was more descriptive. I don't think we had a hypothesis going in. We wanted to collect these false confession cases, cases of false confession beyond dispute, and we wanted to look at the patterns in the data, what that told us when you go from a single case to many cases. So it wasn't really a hypothesis driven study as much as a descriptive study.

By MS. SCHROEDER:

Q. Okay. So there, even though you are choosing the specific -- what, specific stories of these individuals who have, in your terms, a proven false confession, you are still considering that data to be empirical; is that correct?

A. It is empirical data, yes, because we gather documents on all of these cases, some voluminously, some not, depending on what we and our research assistants were able to gather and so it was empirically based because it was a study based on the analysis of case materials and documents, things like police reports, pretrial transcripts, medical, psychological, psychiatric, social work, educational reports or records. In many cases not just trial transcripts but post-conviction proceedings. Sometimes there were also reports that had been written by independent organizations or some of the cases had involved -- had been written about it in the media or there had been TV shows or documentaries about the cases as well. So it was in

that sense that that study was empirical. We analyzed a variety of documents that bore on those cases.

Q. Okay. So in all of the information that you said you reviewed, how are you able to confirm that the information you're reading is an accurate portrayal of what actually occurred to the individual whose confession had been proven false?

MS. PIERCE: Object to form.

THE WITNESS: I -- I think that the level of generality of the question, the only answer can be that you're obviously looking -- we obviously looked at thousands, if not tens of thousands, of pieces of data in that study and we were cross-checking everything we possibly could against other sources of data. But it's hard to answer a question that general at other than that level of generality.

By MS. SCHROEDER:

Q. So I think -- Okay. And I think that this still answers it, but one thing that flagged for me when you were listing all the data that you reviewed were like TV shows or newspaper articles and if you are relying on information that is being trans -- transmitted through articles or through TV shows,

how are you able to ensure that that information that you are now looking at and relying on in your study is accurate?

MS. PIERCE: Object to form.

THE WITNESS: So again, this is just one piece of data. Most of the cases were not written about --

MS. SCHROEDER: Uh-huh.

THE WITNESS: -- or didn't have TV shows or documentaries made. But again, one does one's best to cross-check and validate all the information that one studies but it's not the role of the researcher to verify that every single piece of data that comes across their desk is accurate but rather to systematically review and analyze their data and cross-check it against other sources of information that corroborate or don't corroborate it. And obviously --

MS. SCHROEDER: Okay.

THE WITNESS: -- some pieces of data are far more important than other pieces of data.

By MS. SCHROEDER:

Q. Is there any type of data that you would consider personally for yourself more important than other types of data?

A. Well, it depends on the research question. For inclusion into this study, we had four criteria where you could prove a confession false. Many but not all of the cases involve DNA exonerations where DNA conclusively or dispositively demonstrated that the person did not commit the crime and so that would be a very important source of data just on the threshold question of is this a proven false confession, since the study we're talking about only involved proven false confessions and one of the four ways to prove a confession false would be through scientific evidence like DNA. So -- but in terms of the importance of data, it really just depends on what the issue is, what the research question is. It's almost impossible to answer a question like that in the abstract.

Q. With respect to those specific proven false confessions that you referenced in your study, and you said that they relied on mostly DNA evidence, is that something that you as the research, you're relying on someone else's finding of forensic evidence that found that DNA evidence proved this individual was not the guilty party; is that correct?

MS. PIERCE: Objection to form.

By MS. SCHROEDER:

Q. Essentially you're not -- sorry, Megan. Essentially you're not doing the DNA testing and findings; is that correct, Dr. Leo?

A. Yes. So just a small correction. I don't think I said most of these involved DNA exonerations. Many of them did. I would have to look at the study to see how many. But that is correct, I am relying on the totality of research and evidence in a file and I'm not personally doing the DNA analysis myself. One of the cases that was in the 2004 paper involved four men known as the Norfolk Four. They were all definitively exonerated by DNA. And I didn't obviously do the DNA analysis but there was also substantial other evidence in that case file wholly independent of the DNA that corroborated the DNA that demonstrated their innocence, that demonstrated the guilt of the person who ultimately committed the crime, whose seminal fluid was found in the victim who was raped and murdered in that case. There was a trail of evidence in that case, as in many other cases, that not only showed the innocence of the four false confessors, including DNA, but also showed the guilt of the person who had committed that crime.

Q. Are you reviewing all of that data to make the determination that the individual has been proven innocent because of the DNA findings?

A. Well, for purposes of that study, I was just -- we were just trying to say, does the case facts meet one of the four criteria of what is called a proven false confession. So it wasn't our mission to prove that person or any person's innocence. And at the time of that study, those four individuals I believe were still all incarcerated actually, even though there was a trail of evidence a mile wide that -- and a mile deep that demonstrated those confessions were false and ultimately they were pardoned and their innocence was acknowledged. There was no issue about that anymore. But it's not our mission to prove innocence, but obviously it is the mission of other organizations like the innocence projects and sometimes they do in their cases and sometimes they don't.

Q. Can your mission change with the various research studies that you -- that you lead?

MS. PIERCE: Object to form.

THE WITNESS: It depends on what you mean by mission. I mean as a researcher first and foremost I'm just trying to do research that meets the standards of social science that advances knowledge, you know, and contribute to a community of researchers and make that research and publication publicly available. So -- and then, you know, I have a teaching mission to educate, I have a service mission which is part of my job as a professor. So it really depends on what you mean by mission.

By MS. SCHROEDER:

Q. I was just going off of where you said your mission was not to prove innocence and that that might be the mission of other organizations. And so therefore I was just trying to figure out then what is your mission in these different types of studies.

MS. PIERCE: Object to form.

THE WITNESS: Well it depends on what the study is but generally it's just to add to our knowledge about a particular phenomena, whether it's police interrogation, false confessions, errors in the criminal justice system that cause innocent people to be wrongly convicted, or some other subject.

By MS. SCHROEDER:

Q. Okay. So I saw in your CV that you list consultations, that you are consulted, and then in here you're titled a retained expert. Do you in your practice see a difference between being hired as a consultant and being hired as a retained expert?

A. I see a difference between being retained or authorized as a consultant and being -- taking the next step and being an expert witness. So if -- if that's what you mean by the question. Obviously, one has to be an expert to be retained or authorized as a consultant.

Q. Okay. So then the difference as you just explained in your mind between consultant and retained, do you approach your review of the data that you have been given in a specific way when you're just a consultant versus when you've gone to that next level and now you're going to be authoring your report and submitting a report?

MS. PIERCE: Object to form.

THE WITNESS: I just want to clarify. So -- so -- so whether retained or not, that -- to me that's independent of consultant verse expert. So...

MS. SCHROEDER: Okay.

THE WITNESS: So when I am retained, either it would be privately through typically a law firm signing a contract and providing documents to analyze and review, right? But so it's not just a phone call. Somebody calls me up and says I want to run these facts by you, what do you think, right? So that's one form of retention is there is a contract in place, typically a retainer agreement. And then another form of retention is through a public agency, sometimes prosecutors but mostly for me public defenders offices or appointed counsel where -- where they provide an authorization from a judge or from their office. So that's what I mean by retention, that somebody has signed a contract or provided me a judicial or internal contract and/or authorization.

By consultant what I mean is that I'm asked to review documents and provide an expert opinion but it's understood that I may or may not be declared an expert witness for testimony purposes. And so that's what I mean by the next level, that the -- that the consultation after the initial review and opinions I've been asked to possibly testify as an expert witness. In most cases that I work on, a report is not required or requested. But it would be required --

MS. SCHROEDER: Okay.

THE WITNESS: -- or requested not in the consultation stage typically but in the next stage where they say we want to use you as an expert witness based on your opinions and analysis, can you write a report.

By MS. SCHROEDER:

Q. Okay. And is there any -- do you have any different approach to your analysis of the data that's been given to you whether it is just in this consultant's, you know, stage or whether it's now we need you to be a witness, possibly testify, and provide a report? Do you analyze the data for those two different hats, I guess I will say, or do you approach it the same?

MS. PIERCE: Object to form.

THE WITNESS: No, I -- I would systematically analyze and evaluate all of the information that I've requested and/or been provided and apply my expert knowledge from the -- the social scientific study of interrogation and confessions and arrive at my conclusions.

By MS. SCHROEDER:

Q. Okay. So then -- then is your methodology -- then I guess another way of asking, is your methodology for analyzing the data that's been provided to you either as a consultant or as the witness who may testify and has to produce a report, is the methodology of reviewing that data the same?

A. The same methodology for reviewing and analyzing data, yes.

Q. Okay. And then can you tell me what your methodology is in reviewing data when you are asked to be a -- a consultant or a witness who testifies and writes a report?

A. Again, to review all of the relevant case documents that bear on the questions that I'm addressing and to systematically analyze them and to apply the knowledge from my field of expertise the empirical social scientific study of police interrogations, psychological coercion, true and false confessions when analyzing and arriving at opinions based on those case materials.

Q. Okay. And you had said you reviewed the relevant, I think you said data or documents that bear on the question that you've been asked to review; is that -- who -- is that correct? Did I hear that correct?

A. That's typically the goal, yes.

Q. Okay. So who is providing you the question for -- for which you are trying to answer?

A. Well usually it would be the consulting party if -- the cases that I work in -- work on are -- typically involve disputed interrogations and disputed confessions, and typically the party that calls wants me to analyze interrogations and confessions. And then I will typically have a conversation about what documents -- after there is a description of the fact pattern, what documents I think would be relevant to that analysis.

Q. So aside from a document review and analyzing the data and then applying the knowledge from your field to that data, do you -- do you look or -- not look -- do you require any other types of data aside from documents in order for you to do your analysis and answer the questions that have been asked of you by the consulting party?

A. Typically I don't generate any new data in a case analysis so typically I don't interview the parties. And so typically my review involves essentially a review of all aspects of the case record or case file that are relevant to interrogations/confession issues, particularly those in dispute.

Q. And is there -- can you think of any instance where you did incorporate data outside of the documents of the case file?

MS. PIERCE: Object to form.

THE WITNESS: Well, in the early days, in the 1990s, most interrogations were not recorded and so at that time, on cases that were going to trial, oftentimes I would ask -- and these were criminal cases -- I would ask the attorney to have their client, if it's a public defender or appointed counsel, write out a description of everything they remember occurring during the interrogation and then in some of those cases I would interview the -- the defendant and ask them more questions about what they recall occurring during the unrecorded interrogation and then I would make a request through the defense counsel to allow me to interview the police officer or officers or anybody who observed the unrecorded interrogation. That's very uncommon in my work now and has been for the last one to two decades, but that was a type of data gathering I guess that went beyond the existing documents.

Q. Okay. Why did you want to in those instances, back in the early 90s which you had just

described, why would you want to do that extra data collection in your analysis?

A. Because --

MS. PIERCE: Object to form. Sorry. Go ahead.

THE WITNESS: Yeah, sorry about that.

Because -- because there was no record of what occurred during the interrogation and the only way to get at that record would be to interview the people who participated or observed the interrogation.

By MS. SCHROEDER:

Q. Okay. Are there certain types of documents in your role as a -- as an individual who is reviewing a case file with respect to a disputed confession, are there specific documents that you feel are important for you to review to obtain your final conclusions?

A. **Yes. Obviously it depends on the case, but yeah, there is obviously some documents that are central to my ability to provide an opinion on a particular case.**

Q. And so just with respect to if it's a police interrogation of an individual who confesses and now the confession is disputed, what are those central documents that you need to review?

MS. PIERCE: Object to form.

THE WITNESS: Well, of course it depends on the type of case and the history of the case. Most of the cases I work on are criminal cases. Most of them are going to trial or heading to trial whether they resolve before that or not. So only a small percentage of the cases I work on are either civil cases or post-conviction cases. In the typical criminal case, I would want a recording of the interrogation or interrogations, a transcript of that or those recordings, the police reports, and any transcripts of pretrial hearings, and any relevant educational, psychological, psychiatric, medical, or social work documents, depending on the nature of the allegations.

Post-conviction cases are different because they have a bigger body of information so oftentimes they involve trial transcripts, published appellate court opinions, additional discovery that went beyond what existed at the time of the trial. In some of those cases the defendants have been through multiple trials and so there is a voluminous body of records, court and non-court records.

Civil cases sometimes involve that as well, in addition to depositions and reports that are taken for the specific purpose of civil discovery, especially in federal civil cases. And so obviously if there was an unrecorded interrogation, the depositions would be important. And even if there were recorded interrogations, the depositions would be important. And in cases that are complex and involve experts, expert reports would also be important in my analysis

Q. When you say "expert reports," do you mean reports by other experts?

A. **Correct.**

Q. Is that correct? Okay.

A. **Yeah, yeah.**

Q. When you review another -- another expert's reports as part of your analysis, you're -- are you then relying on the accuracy of that expert report?

A. **Well, if I rely on the expert report in my opinion, yes. Usually expert reports come in the context of a very large case file and oftentimes there are multiple data points in that case file that are corroborated by other sources that are a part of the expert's analysis or there is undisputed issues. But to the best of my knowledge and ability, if I'm relying on a report, then I'm analyzing whether it is -- appears to me to be accurate in light of all the other information in the case I know and what I know about the person's expertise.**

Q. Okay. And is that something -- in this case you had listed I think -- let me see here -- two or three. And that should be on your report. You listed that you reviewed the expert report of Dr. Wright, the expert report of Dr. Spitzer and the expert report of Mr. Titterington. So is that -- for those examples then did you -- is that where you would -- you analyzed those reports to determine whether they were accurate through their various data points?

MS. PIERCE: Object to form.

THE WITNESS: I'm not sure I would put it that way. It's not my role to analyze these and say are they accurate, are they not accurate. But I did rely on those reports and -- and a lot of what is in those reports is corroborated by multiple other sources in the record and a lot of what's in those reports is not disputed, a lot of the underlying facts.

By MS. SCHROEDER:

**61**

Q. If there were various of those reports that you relied on that are later determined not accurate that then impact your conclusions where you were relying on those expert reports.

MS. PIERCE: Object to form.

THE WITNESS: Again, the question is very vague. It could or could not. It depends on the specific example. Obviously I would modify my opinions where relevant but it might be that there is a inaccuracy in a report that doesn't bear on my opinions or in light of everything else doesn't change the opinion. So again, I think we need to be more specific.

By MS. SCHROEDER:

Q. Okay. And I -- I probably will as we get deeper in, I'll point out exactly where you -- you either cited or -- or made a determination based on that report and then we can ask it at that moment.

But you say if it -- if it would hypothetically impact your -- you know, one of your opinions or your findings that you would modify your opinion where appropriate. Is that something that you've had to do at any time in the past on any expert report you've -- you've produced?

MS. PIERCE: Object to form.

**62**

THE WITNESS: Not that I recall as I sit here today. I've written hundreds of reports. I can't think of an instance where I subsequently learned a fact that caused me to change an opinion based on an expert's report that contained an inaccurate fact, but it's possible that that's happened.

By MS. SCHROEDER:

Q. Okay. And what about any other fact that you learned not just because of another person's expert report, but is there any -- has there been any instance where you've learned additional information that made you modify the opinions or findings that you had issued in your original report?

MS. PIERCE: Object to form.

THE WITNESS: Not that I recall as I sit here today but it's certainly possible.

By MS. SCHROEDER:

Q. Okay. Okay. So I'm going to show you on the screen -- we can name this -- I don't think we've done your report as an exhibit yet. So this can be Exhibit 1. This is your subpoena response to our document subpoena.

(Whereupon, Leo Exhibit 01 was marked for

**63**

identification.)

By MS. SCHROEDER:

Q. Let me share the screen. Okay. I'll make it bigger. Let me know. There.

Is that appearing on your screen, the subpoena response for Dr. Richard Leo?

A. Yeah, I see it. Thank you.

Q. Okay. Very good.

Okay. So I just want to make sure that we have everything here so hold on, let me get my -- oh, in number 2 it says here that -- at the very end, you know, last sentence right here it says, Dr. Leo reserves the right -- well first let me ask this: Do you remember receiving this document subpoena in relation to today's deposition?

A. Vaguely.

Q. Okay. But were you aware that -- that we did subpoena documents from you in relation to your expert report and today's deposition?

A. Yes.

Q. Okay. And so in number 2 here it just states here, Dr. Leo reserves the right to supplement or to amend responses and objections as appropriate with other information that becomes available. Did you -- are you aware -- as of right

**64**

now are you aware with respect to this subpoena response whether you have any documents that you need to supplement?

MS. PIERCE: Object to form.

THE WITNESS: I do not believe that I do.

By MS. SCHROEDER:

Q. Okay.

A. At the moment.

Q. Here we go. Okay. I just want to go through a couple of the answers just to make sure we have everything.

So number 6 here it says, any audio or video recording in your possession, custody, or control relating to the case, including interviews. And it states your answer, you do not have any audio or video recording in your possession and you did not conduct any interviews of plaintiff or third parties.

So did you ever have in your possession any videos or audio recordings that you listened to with respect -- that were related to this case?

A. No, not that I recall.

Q. If you had listened to any audios or videos with respect to this case, would you have identified that in your list of documents or information that

**65**

you reviewed that helped you form the basis for your opinions in this expert report?

A. Yes, it would have been listed in the expert report.

Q. Okay. And just to confirm, did you ever interview Mr. Savory in relation to this case?

A. I did not.

Q. Have you ever met Mr. Savory?

A. To my knowledge, I have not.

Q. Have you ever spoken to Mr. Savory?

A. To my knowledge, I have not.

Q. Have you ever exchanged any correspondence with Mr. Savory?

A. To my knowledge, I have not.

Q. Is there a place that you would have noted that if you had met or spoken with Mr. Savory?

A. Well, presumably in my report. I -- the reason I'm answering the questions the way I am is because from time to time I've attended events at the Northwestern Center on Wrongful Conviction and -- and so it's theoretically possible that Mr. Savory could have been at one of those events but I have no recollection of ever seeing Mr. Savory in person or ever speaking to Mr. Savory or interviewing Mr. Savory. Obviously I never did

**66**

that.

Q. Okay.

A. But if I had any direct contact with Mr. Savory, I would have noted it in the report.

Q. Okay. Is this report that you've issued in this case the only time you have written about Mr. Savory's case?

A. I believe so.

MS. PIERCE: Object to form.

MS. SCHROEDER: Continue, Doctor.

THE WITNESS: I don't believe I have written about Mr. Savory's case in any of my articles unless I'm misremembering, but I -- I don't have any recollection of having written about his case.

By MS. SCHROEDER:

Q. Is Mr. Savory's case a -- is Mr. Savory's case one that you are anticipating writing about in a future article?

MS. PIERCE: Object to form.

THE WITNESS: I'm not anticipating about writing about him in a future article although it's certainly possible.

By MS. SCHROEDER:

Q. I guess maybe then just to clarify the word

**67**

anticipating. Do you have any definitive plans to write about Mr. Savory's case outside of this report?

A. I do not.

Q. We see here in number 12 of this request it asks for all reports or declarations written by you in relation to any case that involved the allegations of coerced confession, wrongful arrest, prosecution, conviction, or incarceration of juveniles. And so part of your objection to answering that was just that you had too many to produce and that it would be burdensome and so you referred us to your report and then plaintiff's disclosures.

So I just want to ask you, do you recall any specific studies of cases with juveniles of -- where you analyzed their disputed confessions?

MS. PIERCE: Object to form.

THE WITNESS: Are you talking about research studies that I've done or are you talking about reports that I've written in cases?

By MS. SCHROEDER:

Q. Here I'm talking about reports in cases. Have you done any reports specifically on disputed confessions by juveniles?

**68**

A. I have, yes, many times.

Q. You have? How many do you recall?

A. I don't know the exact number. I know that I've written over 200 reports going back to the 1990s. I -- I would have to look at a list of those names and then I could say this one, this one, this one, not that one, not that one. But, yeah, many times with juveniles -- and these reports have not only been in civil cases, sometimes post-conviction cases, sometimes criminal cases that are going to trial or even cases that are heading toward plea bargains. But, yes, I've worked on many cases involving juveniles where there have been disputed interrogations, disputed confessions. I've reviewed the materials and written a report.

Q. All right. And do you recall in -- in those cases, multiple cases that you -- you say you did, do you recall whether you determined whether any of those confessions were true confessions?

MS. PIERCE: Object to form.

THE WITNESS: In -- in the cases that I work on, usually that's beyond the scope of why I have been retained so I haven't been asked to determine whether they were true or false confessions. That -- in the legal system, typically

69

that is for the finder of fact, not for an expert, and so that hasn't been part of my analysis.

By MS. SCHROEDER:

Q. But when you are making determinations whether or not a confession is proven false or coerced compliant false -- I guess maybe that is what I'm asking. Have you ever found then the adverse, that it's not a proven false or coerced compliant false or persuaded false, that it was actually a true confession?

MS. PIERCE: Object to form. Asked and answered.

THE WITNESS: Yeah, I mean I would give the same answer. I think there has maybe been a handful of cases that I've worked on, like less than five or at most five to ten, where I have actually been asked to opine whether a confession met the criteria for a proven false confession. But 99.9 percent of the time I'm not asked to opine about the truth or falsity of a confession or disputed statement or admission.

By MS. SCHROEDER:

Q. When you deem a confession after your analysis that it is a proven false confession or a coerced compliant false confession, how is that not

70

identifying the confession that you're reviewing as false?

MS. PIERCE: Object to form. Misrepresents his testimony.

THE WITNESS: It's -- it's simply saying that -- that this case meets the criteria of a proven false confession. For research purposes, here's what we mean in the research community. But qualifying and saying it's not my role to opine whether or not this is a true or false piece of evidence, that's ultimately for the finder of fact, only that for research purposes this meets the criteria of a proven false confession.

Now there might be, you know, the rare case where maybe I'm testifying in court and a judge says, no, I want to know or, you know, prosecutor asks, is -- do you think this is a false confession and that is allowed, but usually it's beyond the scope. I wouldn't be asked, I would be precluded from the offering that opinion, and I wouldn't have an opinion about it since I hadn't been asked.

By MS. SCHROEDER:

Q. So do you offer your opinion on the truth or falsity of a confession in an expert report? So I'm not talking about the trial testimony, I'm

71

talking about reports or consultations that you are -- are asked to review case files. Do you provide opinions on whether the confession is false or true?

MS. PIERCE: Object to form.

THE WITNESS: Typically not, no. I mean there might be some rare case where that happens, but typically not, no.

By MS. SCHROEDER:

Q. Okay. And so is it -- if I understand your testimony, you're titling a confession as proven false or titling a confession as coerced compliant false doesn't actually mean that you're saying the confession is false; is that correct?

MS. PIERCE: Object to form.

THE WITNESS: Well, I guess I -- I don't know what you mean by coerced compliant false because I don't think that I've -- I can't think of an example where I've said this meets the criteria of coerced compliant false. I can think of examples where I have -- where I've said in a report this meets the criteria of a proven false confession. But, yes, all I'm saying is that it meets the criteria as identified in the research literature but I'm also carefully qualifying and saying it's

72

not for me to determine whether or not this is a false confession.

By MS. SCHROEDER:

Q. So you're just determining whether -- so you're just determining that the information you've reviewed supports the finding of a proven false confession; is that correct?

MS. PIERCE: Object to form.

THE WITNESS: That it meets the criteria in the rare cases in which I have been asked to opine about that, yes. Most of the time I don't opine about whether something meets the criteria or doesn't meet the criteria of a proven false confession.

By MS. SCHROEDER:

Q. Don't you -- are you -- weren't you the person -- I thought you said that you and another researcher, may have been Dr. Ofshe, I'm not positive, were the persons that coined the term proven false confession; is that correct?

**A. Correct. In 1998. But I'm not --**

Q. Okay.

**A. What I thought you were asking about was in reports, not in my research and publication but in case reports.**

73

Q. Okay. So you're saying that you do not put in your reports whether or not a confession meets the criteria for a proven false confession; is that what you're saying?

A. I'm saying --

MS. PIERCE: Object to form. Asked and answered.

THE WITNESS: Typically I do not, yes.

By MS. SCHROEDER:

Q. And is -- the qualifier there, the word typically, is it then the only time -- the typical time or atypical, let's say atypical, the atypical time when you do identify a confession as proven false is because that was the question asked for you to determine by the party who had hired you as a consultant; is that correct?

A. I -- I -- I would describe it more broadly, that it was part of the discussion and analysis of -- or I should say part of the discussion with the opposing counsel, part of the call of the analysis, yes.

Q. When you say opposing counsel --

A. I'm sorry, I didn't mean opposing, I misspoke.

Q. I just wanted to make sure. Okay.

74

Okay. So let me -- let me just roll through this subpoena to make sure there is nothing else here. Okay. I did that.

So in number 15 we're asking for all peer-reviewed publications that you authored or co-authored in the last ten years related to false or coerced confessions, juvenile confessions, and some other things. I'm specifically interested in right now. Can you recall any peer-reviewed publications that you authored or co-authored which were specific to juvenile confessions?

A. Not -- not just juvenile confessions, no.

Q. Okay. And do you -- in your articles that you have -- the peer-reviewed articles that you've authored or co-authored, have you included analysis on juvenile confessions even though it might not solely be about juvenile confessions but you've included analysis about juvenile confessions?

A. Yes.

Q. Can you tell me the title of some of those articles that you can remember right now?

MS. PIERCE: Object to form.

THE WITNESS: A 2004 article with Steve Drizin. I think it's called something like "False Confessions in the Post-DNA World." A 1998

75

article called "The Consequences of False Confessions" with Richard Ofshe, O-f-s-h-e. Two 1997 articles with Richard Ofshe, O-f-s-h-e. My 2008 book, "Police Interrogation and American Justice." 2010 review essay with Saul Kassin, K-a-s-s-i-n, and others called "Police Induced Confessions: Risk Factors and Recommendations."

There are probably other publications that I'm not thinking of at the moment.

By MS. SCHROEDER:

Q. And it's fine. So these are ones that you recall included "Analysis of Juvenile Confessions;" correct?

A. Correct.

Q. Okay. And you don't have to tell me for every article if you don't recall, but if you could just explain to me how you came about the juvenile cases to analyze for these various articles.

MS. PIERCE: Object to form.

THE WITNESS: Well, in some cases we did extensive searches through legal and media databases to identify cases, including juvenile cases, and contacted attorneys and courts and other people who might have records of those -- of those case files. In other cases, we made announcements at

76

professional meetings or gave talks and people came up to us or contacted us and provided materials. In some cases, materials are publicly available online, case materials. So that would be the way we would find out typically about cases that we include in our studies that would be juvenile cases.

By MS. SCHROEDER:

Q. You had mentioned that you -- you searched databases. Which databases would you search?

A. Well, sometimes we would have research assistants do this. Sometimes we do it ourselves. Westlaw, Lexis, Google, HeinOnline. Those are the databases that I can think of at the moment. Pacer might have some stuff. There are also, you know, sometimes websites like the National Registry of Exonerations or The Innocence Project or specific innocence project websites that provide case materials or case names or case documents.

Q. With respect to the juvenile cases that you've incorporated into your various articles, do you identify where you received that juvenile case from in your article?

A. I -- I -- I don't know. You'd have to point me to the article in particular. I think that is an overbroad question.

**77**

Q. Do you -- okay. So then let me -- with respect to any cases that you analyze in your peer-reviewed articles, do you identify the source of where you obtained your information on those individual cases?

A. Probably. But again, you would have to just show me the specific article. You're asking a very broad question and I don't have a specific referent but usually I would think so.

Q. When you are looking for cases to include in your peer-reviewed articles, do you have various criteria that you want to be sure the cases have with respect to whatever the question is that you are researching?

MS. PIERCE: Object to form.

THE WITNESS: Yeah -- yes. So it depends on what the research question is. And in the article on 125 proven false confessions, the threshold criteria was is it -- does it meet one of the four criteria for a proven false confession, and so we sought out cases that we could then determine whether they met these criteria and only included ones that did.

By MS. SCHROEDER:

Q. Okay. Do you typically identify what the

**78**

threshold criteria is in each one of your peer-reviewed articles that -- you know, that kind of identifies then the types of cases you are reviewing? So let me repeat that. So in -- aside from the one specific article that you just referenced, in all of your peer-reviewed articles do you always identify the threshold criteria that needed to be met in order for a case to be reviewed for that article?

A. I think it's just hard to answer that question in such a level of generality. Sometimes there are threshold questions, sometimes there are not. I think we need to talk about specific studies. I don't want to over generalize in answering a question that is very vague and very broad.

Q. Let's see. I will stop sharing.

With respect to the various studies -- research studies that you embark on, I did notice on your CV you do list various grants that you're awarded. Is that how your research studies is mainly funded, through grants?

A. Typically not.

Q. And how -- how are your research studies funded?

**79**

A. Typically my studies are not funded.

Q. So with respect to -- when you say they're not funded, does that mean -- you know, explain to me what you mean when -- or what you're -- when you say typically your studies are not funded, explain to me what that means.

A. Well, in some areas of social science and science researchers will get grants from the federal government or from private philanthropic organizations and that's usually referred to as funded research. There was one time that I think I and a co-author got $600,000 from the National Institute of Justice. There are some -- to fund this particular research -- set of research studies. But there are some researchers whose research is typically funded in that way through grants. Mine is typically not. I have not applied for or received very many grants in my career. If I use a research assistant, I might have a small research assistant budget through my university or I might not. So typically my research is not -- it's not based on grants that I apply for and receive to fund the underlying research.

Q. Okay. Are you ever hired by an outside source to perform a research study on a specific

**80**

topic?

A. No. I can't think of an example where I have been hired by an outside source to conduct a research study. To the best of my memory, all of my studies have been through -- through -- have been as a professor at a university doing independent research, not hired by a company or an outside agency to do research or publication on their behalf.

Q. Some of the articles that I saw that you had co-authored, you know, there was a variety of individuals that had worked on the studies with you. One of them was Steve Drizin and he is in Northwestern and you are in San Francisco. So how does something like that come about? Is that -- is that type of research study something that is developed and then enacted based on your personal sort of identity of what you want to explore?

MS. PIERCE: Object to form.

THE WITNESS: Well usually it would come about in terms of a conversation that two people who work in the same field would be talking about an idea and then decide to collaborate on a study or on a project.

By MS. SCHROEDER:

Q. Okay. And in any of those research studies that you've collaborated on with other researchers outside your University of San Francisco, have you ever received payment for your work that you did on that research study?

A. I think -- I think just once. The -- the $600,000 grant that I received with a co-author. When we applied for it, we didn't know who would be the PI, which stands for I think personal investigator or primary investigator. Anyway, we decided to make him the primary investigator. And one aspect of getting the grant is that they sometimes will pay you -- either pay for part of your academic salary if you get released from a course or pay for summer salary and so I think that I got a small amount of compensation for the publications that emerged from that project as part of the grant from the National Institute of Justice. But that would be the only time that I think I received any compensation.

Now, for my publications, with the exception of books, usually there is a small amount of royalties involved in writing a book because most books by professors don't really sell that many copies, but -- so -- so that would be the other instance in which I've received compensation for my writings.

Q. Okay. And so then is your only source of income with respect to your work as a researcher in the false confession, coercion area through your employment at the University of San Francisco and the funds you bring in through your consulting and researching business?

A. I'm not sure if -- in terms of the research, I think of that as separate from the consulting or expert witness work I do, right? The consulting and expert witness work is not -- that doesn't involve typically doing new independent research. So the funds I receive for the research I do would be through the University unless there is a grant. And then the consulting and expert witness work I do is based on my research expertise and sometimes on my research studies, as well as many others' research studies, but that is not funding that I receive to do the research.

Q. Okay. So then is the -- aside from the grants, your only funding for your research would be from the University of San Francisco; is that correct?

A. Correct. Through my salary and the small

allocation for research assistants.

Q. Okay. And then funding for any -- well, wait a minute. Let me -- let me back up.

So when we say research, is that including peer-reviewed articles that you've published?

A. Usually that's the endpoint. Right? You gather the data, you analyze the data, you write it up. That all can take a long time. And then you submit it for publication typically to a peer-reviewed journal. So that would typically be the endpoint of the research and publication process.

Q. Okay. And any funding that you -- and any funding that you may have received with respect to analyzing the research and publishing those articles has been either through a grant or just as part of your position at the University of San Francisco; is that correct?

A. Correct. The base salary that allows you to do research. And then prior to the University of San Francisco I worked at the University of California Irvine, and prior to that the University of Colorado Boulder. I think that one grant may be the only grant I've ever received to do research and I think it was over a decade ago. I would have to look at the CV.

Q. Do you remember what the -- study the grant was for?

A. Yeah. I'd have to look at my CV to tell you the title, but I think it was called the Preventing Wrongful Conviction Project. And I did a few studies with professor John Gould, whose last name is spelled G-o-u-l-d. And those should be listed on my CV around 2013 to 2016.

Q. Okay. And then with respect to then consulting -- your consulting business, that is just income you receive per individual who hires you to consult on a case; is that correct?

A. Yes. Unless I am working on a case pro bono.

Q. Do you do a lot of pro bono work in that consulting business?

A. I -- I don't know that I do a lot. I guess it would depend compared to what. I used to do more but I do some.

Q. Okay. At this -- now might be a good time to take a break if we want to. I'm going to switch now to the -- to the actual report and start going through that if we want to take a break.

A. So I have a question. Sorry. Go ahead.

MS. PIERCE: No. Go ahead, Dr. Leo.

THE WITNESS: Well, so, you're obviously two hours ahead of me. I -- you know, this would be an -- a lunch -- within the lunch period but on the early side of lunch. It's -- my watch says, what, 12 -- 11:37. So I'm happy to take a lunch break or to take a small break. I probably will -- if we don't take a lunch break, I will probably start getting hungry -- hungrier in about 20, 25 minutes so I'd be perfectly fine taking a lunch break. Either way.

MS. SCHROEDER: I'm fine to do that too and if that works out with everybody else and the videographer and the court reporter, I have -- I think that is perfect.

MS. PIERCE: Yeah. That sounds good to me. If you would like to take a lunch break now, Dr. Leo, that would be fine.

THE WITNESS: Does that work for you guys?

THE VIDEOGRAPHER: Hold on. We are going off the record at 11:37 a.m.

(Lunch recess.)

THE VIDEOGRAPHER: We are back on the record. The time is 12:40 p.m.

By MS. SCHROEDER:

Q. Okay. Dr. Leo, I just wanted to follow up on just a couple of points before we move on to your report. And I just wanted to confirm, when we were discussing empirical research, in order to collect what you had defined as empirical research, do you need to have a specific research question identified in order to know which type of data to collect?

A. I think it depends on the study. Usually, there is a research question, there is simply too much data in the world otherwise, so a research question or at least a research focus allows you to narrow the scope of what you're searching for.

Q. Okay. So allowing you to narrow the scope of what you're searching for, does that also translate to identifying the data that you're looking for in order to analyze with respect to your research study?

A. It could. It depends on the study.

Q. Okay. Is there a way that you go about collecting that data in order to analyze it? So I know that you had mentioned earlier that your -- you or your research assistant may go out and, you know, collect cases from different databases or, you know, there is other sorts of ways that you can get information. But as that individual, whether it's you or your research assistant, is collecting the cases, is there a particular way that you have to obtain that data to retain its -- what do I want to say -- it's -- you know, it's -- it's authenticity?

A. I think your question is pitched at just a level of generalness and vagueness that I don't really know how to answer that without saying it depends on the type of study and the type of data.

Q. Okay.

A. I don't know that there is a general answer that can be given at the level of the generality that you're asking the question.

Q. Okay. So if you're doing -- we'll just say then to try and narrow it down -- you're doing a study such as you have on -- we will just refer back to the -- to the one study you did on the 125 proven false confessions. So when you were looking to collect the cases that you wanted to analyze in that study, did you have to employ a certain way of collecting that data to retain the authenticity of what you were going to review?

A. I don't know what you mean by retain the authenticity. I know that we searched lots of databases for disputed interrogation and confession cases, we spoke to colleagues at professional conferences, with journalists, with anybody who knew of potential false confession cases. And then we got a lot of them and we had to go through them, gather as many documents as we could on each case and screen out the ones than met the criteria of a proven false confession. Many did not. But when you say like -- the -- you know, retain the authenticity, I just don't know what you mean.

Q. I guess -- I guess maybe authenticity is not the best word. But in a way that you would maintain that what you're collecting is -- is not influenced by any individual's bias of what they want to see in a case so that the collection of the data remains objective, you're just going out, you're collecting a case, and then you're reviewing it versus somebody already having a preconceived notion of what they want to find in a case if that's what they are looking for.

MS. PIERCE: Object to form.

THE WITNESS: Well we didn't have a preconceived notion. Obviously we wanted to study proven false confessions so we had threshold criteria, and in order to do that, we had to cast the net broadly toward any disputed confession case

89

that somebody might think was false and then, like I said, we tried to gather as many documents as we could, not just documents from one side, and ideally, you know, documents that didn't reflect bias, you know. Trial transcripts, obviously you get the full picture. But other times you can't help it, you know, you get police reports, they may or may not embody bias, you get other documents that may or may not embody bias, but from the perspective of the researcher, we were trying to gather as much information as possible, as evenhandedly and objectively as possible and then evaluate it in light of our criteria. And like I said, we rejected a lot of cases that didn't meet our criteria and then ultimately settled on 125 as the data for that particular study.

Q. Okay. And so when you settled on -- after your review of all of the cases, do you recall how many total you reviewed before narrowing down to the 125?

A. I don't recall specifically. I would estimate around 250 or 300 cases.

Q. Okay.

A. Some of those cases just didn't -- many of those cases just didn't meet our criteria. They are

90

very strict and conservative criteria. It's very hard, I think, even if somebody has falsely confessed to meet a criteria of a proven false confession.

Q. And in that collection of those 125 cases that you determined were going to be included in your research, was there sort of like a systemic way that you collected that data?

A. Well, I think just what I said, you know, we -- well, I guess you're saying once we whittled down the list then, yeah, we contacted anybody who might have any information on that case, lawyers, defense lawyers, prosecutors, post-conviction lawyers, civil lawyers if they were relevant, sometimes there were journalists who had files on cases, you know, that they had gotten from attorneys. I think we -- we tried to go to courthouses sometimes through our research assistants, contact librarians. So I guess maybe not systemic but systematic. We tried to systematically cast our net as wide as possible. And some of the cases, they were published appellate court opinions, those led to additional documents sometimes. So any and all documents we could get our hands on related to these cases. And again,

91

some of them, you know, there was a long track record. Others were relatively obscure and it was hard getting a lot of information.

Q. Okay. In that instance -- and what I am trying to do also is to apply it to your other research papers but I'm just focusing in on this one as an example. But in that instance then when you are reaching out to these various sources for the information, is there -- and when I say systemic, I mean is there the same set of requests for information that are going to each source so that you are receiving the same set of information on each case that you are evaluating?

MS. PIERCE: Object to form.

THE WITNESS: Well, I -- I think so. I mean we didn't -- it's not a survey where we say, you know, answer these 14 or 40 questions, but -- but, yeah, you know, we are researchers at this university, we are studying disputed confess -- interrogations, disputed confessions. We are interested in any and all information you have about this case, including but not limited to XYZ and on and on. So I don't think there was any difference in the way we approached people about getting the information. And to the extent information was

92

available online back then, you didn't even have to approach people for some of the documents. Right?

By MS. SCHROEDER:

Q. Right. And then applying that to other research studies that you have participated in and authored, when you are collecting data to review and analyze for that research study, do you employ a systemic collection of data so that when you are going out to all the different sources you're asking for the same type of information so that you're receiving always a systematic collection of data?

A. I think as a general matter, yes, but, you know, if you want to talk about specific studies, you would have to point to those because, again, the question is at a very general level.

Q. Can you think of any research studies that you've participated in where your collection of data hasn't been systemic, right, it's been sort of not an organized way of collecting the data from various sources?

MS. PIERCE: Object to form.

THE WITNESS: Not off the top of my head, no.

By MS. SCHROEDER:

Q. When you are collecting data to include in

your research studies, you know, specifically for empirical research and -- is there a certain methods that you employ in order to receive that data so that it is done in a systemic way? For example, you said a survey. A survey, is -- is that an example of one method of a systemic collection of data to include in -- in a research paper?

**A. Well I guess systematic would be the word I might use. But, yeah, if we have a survey and it has 40 questions, then it would be administered to everybody presumably with the same 40 questions so I think that meets the definition of what you're saying.**

Q. Okay. Can you think of any other methods, systematic or systemic, that you would employ in order to call out data for your various research studies?

**A. Well, again, you know, the analysis of documents, interviews, field observations, surveys, experiments. I guess you just have to tell me what specifically you're talking about for me to answer.**

Q. Okay. So -- sure. So if you were doing an analysis of documents, and we can say you're doing an analysis of -- of documents related to a disputed confession, do you have a systematic way that you're collecting data from those documents so that you are always collecting the same set of data from the same type of documents; for example, a police report?

MS. PIERCE: Object to form.

THE WITNESS: Well, I -- I would want all the police reports, or at least all the most -- all the relevant police reports, but usually I would be overbroad in my request and try to get as much information as I could. So -- so, again, some cases would have a lot of information, other cases would not and so you wouldn't always have the same degree or depth of information on a case. But the -- the approach would be the same, to gather as much and as many documents as possible that are relevant to understanding the disputed interrogation, disputed confession, and then systematically analyze them applying my knowledge of the research literature.

By MS. SCHROEDER:

Q. Do you -- when you are reviewing a number of cases for a research study, do you ensure -- maybe ensure is not the right word -- do you require that all of those cases have the same type of documents available for you to review?

In the real world, that's not possible.

Right? So you have to go out and do the best you can. And there are some cases that have a lot of documents and other cases that don't. There's sometimes where police and laboratory technicians have mysteriously lost documents that would be probative and helpful to know. There are times when there were incomplete investigations and then there are also times where a case has a long history, capital cases, for example, tend to have more documents and homicide cases in general tend to have more documents than non-homicide cases. So when you are going out and studying the phenomena in the real world, you can't control it. You can't say I'm -- you know, every single case is going to have the same amount of documents. You just do the best you can gathering as much data as you can and as rigorously and systematically as possible analyzing that data in light of the research questions and the research issues that you're confronting.

Q. So if you're looking at cases, though, and some of them have more documents than the other, which presumably translate to more information about the case than the other, how are you able to ensure that each can be analyzed on a level playing field?

**A. I don't know what you mean by a level playing field.**

Q. Well, I mean like if you have a case that had more information, whether it's in more documents, more police reports, and you have another case that has what you described as possibly having an incomplete investigation or lost documents, how can you ensure that your analysis of those two cases is going to be -- be at the same level?

**A. Well, it depends on the purpose of the study. It might be that if you are doing quantitative coding that you have missing data from one of the cases and so you just can't code a particular variable. So if the variable is length of interrogation, for example, it might be -- and the number of cases are 125, it might be on some of those cases you just don't have length of interrogation and so when you calculate or tabulate the lengths of interrogation, the average, the median, you note that instead of 125, the number of cases that you had the interrogation -- the length of the interrogation was a smaller number than that. There might be other variables like the use of a polygraph where you're saying, okay, you know, I'm just making this up, but say 25 percent of these**

97

false confessions had polygraphs but there were a number of cases where we don't know if we were able -- if there was a polygraph. We just didn't have enough case information.

So -- so this 25 percent is a low-end estimate of the number of cases that have polygraphs in this data set, for example, and the number might actually be higher. It might be that the range of examples one chooses to illustrate some of the points, you know, you only can draw on those cases where you have sufficient data. But if, for example, one was giving three examples of a technique, like a threat of the death penalty, it might not matter that there were some cases where you didn't have enough data to know whether there was a threat of the death penalty.

So I guess what I'm trying to say is there are ways for accounting for missing data descriptively and quantitatively, but when you're studying a phenomena in the real world, you don't have control over your data. You do the best that you can do. There is really no such thing as a level playing field. You -- you do the best at generating and gathering as much data as possible and as analyzing it as systematically, as

98

rigorously, and as objectively as possible recognizing that there is never going to be a perfect data set of a phenomenon in the real world. There may be exceptions to that, but especially a phenomena having to do with police or a phenomenon having to do with a controversial or disputed activity where people might have an incentive not to create documents. And especially if you are studying a phenomena across many different jurisdictions, where some jurisdictions have practices that involve detailed recordkeeping and others do not.

Q. So in -- you know, in that -- going off of that answer that you have given, which essentially is, you know, you're not going to be able to get the same information from every case that you have chosen to analyze, how do you ensure quality control so that your findings and conclusions are based on a complete analysis of what actually occurred?

A. Well, in any study there is going to be limitations. So you want to acknowledge the limitations. Obviously in terms of the data analysis you want to be fair and rigorous and transparent and the -- the paper and research would be vetted with co-authors and through the

99

peer-review process, oftentimes in prepublication presentations as well. So the -- the issue of incomplete data is omnipresent in social science research. If we had to have the perfect data set where we had a perfect set of information on every single aspect of every single variable, we would never be able to do a study. There is very few areas where I think that's -- that is possible. That is a different issue than quality control.

Q. Okay. So -- so then are you able to replicate the same sort of method and same findings each time you do a study? So let's say you did another study of, you know, proven false confessions. Based on your answer that you are never going to get a perfect sample set, that you're going to have some cases that have more information than the others, and all of the other things that you just described, are you able to replicate a study and obtain the same results each time?

MS. PIERCE: Object to form.

THE WITNESS: Well, it depends on what you mean by replicate. Yes, you could replicate the study. And -- and I just want to point out that I would not say these are a sample of cases, I'd say they're a collection of cases. Because when we use

100

the word sample, what we mean is typically of a known universe where you randomly sample something. So, you know, you can pick up the studies of voters, right? You have a known universe of voters and you want to figure out who is going to win and within what statistical margins, you can do a sample of, you know, 1500 Cook County voters, right? But this is not the same thing because there is no known universe of false confession cases so you have to collect the data. You can't sample from a known universe.

So -- so we go -- let's say we want to replicate a study. That doesn't necessarily mean replicating the findings. So you replicate the study to see if we see the same patterns or not. We do the same things we did before that I described, although it might be easier today because more things are online, there are more databases, the world is more online, there is more case files online, or at least partial case files online. And we gather, let's say, 250 cases, we gather as much information, as many documents on all of these as possible, and then we figure out which ones meet the criteria of proven false confession. Let's say out of the 250, 150 meet it, maybe the number -- or

101

maybe it's 100, I don't know, and then -- now we have got our data set and we go through and we look at the same things, let's try to code for length of interrogation, part of the country, age of the false confessor, the source of the proven false confession.

Was it physical impossibility? Was it no crime occurred? Was a true perpetrator identified? Was it scientific evidence exculpated? How many of these resulted in dismissals, acquittals, convictions, et cetera? You know, what were the average lengths? So gathering all this data quantitatively, basic descriptive statistics, maybe some qualitative data as well and then writing up the analysis. It might be the patterns are slightly different or it might be that there is a signal but there is a variation, there is a range.

So I think in the 1998 study of 60 proven false -- 60 false confessions, I think in that case of that sample set, or I mean collection rather, 73 percent of the cases that went to trial resulted in conviction but I think in the 2004 one that we have been talking about, 125, I think 81 percent of the cases that went to trial resulted in a conviction. So in this future study, it could be 60 percent, it

102

could be 95 percent, right? The goal is not to replicate the findings, the goal is to gather another data set and see what patterns emerge and to learn from that. And it might be we get new things that are slightly different. It might be in the last 20 years, for example, hypothetically, that police have been relying more on polygraphs in the proven false confessions than they did in the prior years or vice versa. Right? It might be that certain regions of the country have a disproportionate amount that weren't present in the earlier data or the average interrogation is a lesser length or greater length or there has been a decline in DNA exonerations and there is more physical impossibility cases, right? So you just want to look at these patterns and analyze them rather than trying to replicate the findings.

Replicating the study gives you greater insight into the phenomenon because usually in science people say, you know, you -- you -- you gather data to help you answer questions and then when you have -- when you have findings, you know, they reflect the best knowledge and data available, but a new study can come along and upend some of those or change or modify some of those established

103

findings in the research literature.

Q. Okay. So with respect to -- and just staying on the one paper with respect to proven false confessions. So my understanding is in that aspect you are really just evaluating are these four criteria present in these proven false confession cases and then you're analyzing from there the different factors involved in these cases; is that correct?

A. I mean I would -- I would add to it. Yeah. I mean so the threshold condition is do they meet the criteria, and if they do, we gather all the information we possibly can and then we look for certain basic patterns, and along the way we also describe a lot of the cases that illustrate these patterns.

Q. Okay. And so then with respect to that study, did you have to operate off the assumption that the cases you were reviewing contained proven false confessions?

A. Yes, because that was by definition what we were studying so we coded all of those cases as proven false confessions for one or more of the four criteria.

Q. Have you ever participated in a research

104

study on confessions that have not yet been tagged false?

MS. PIERCE: Object to form.

THE WITNESS: Yes.

By MS. SCHROEDER:

Q. Okay. Do you remember the name of that study?

A. Well, I'm not sure what you mean by the word tagged, but I have done a lot of studies of police interrogation that haven't focused on whether the confessions were true or false. I have done studies of police interrogation that involved false confessions and cases -- confessions that may or may not have been false.

Q. Oh, in those instances when you are doing studies like one you mentioned was police interrogations that didn't focus on whether or not the confession was false, what types of criteria are you looking for in that study that would ensure that what you're evaluating in each interrogation is the same information across the board?

MS. PIERCE: Object to form.

THE WITNESS: I think you -- I think you just have to point me to a particular study. I mean you have my CV. Do you want -- do you want to

discuss specific studies? Because you are asking --
By MS. SCHROEDER:

Q. Just -- well you just mentioned a police interrogation study so I thought you could just talk to that one.

A. Okay. So one study was my doctoral dissertation which was eventually published and in that study I observed in person 122 live interrogations at the Oakland Police Department and then 60 videotaped confessions at the Vallejo and Hayward police departments, both smaller police departments in the Bay Area, and I had a coding sheet for all of the interrogations. And so for ever single case I filled out a coding sheet and then I tabulated all that data, which was reported in various tables in the dissertation, and I also took notes on what I observed and illustrated in description sometimes in the dissertation some of the points I was making. I also had access to case files.

Now, some of the case files were bigger than other case files. This was a study of felony interrogations. I don't remember what percentage of them were homicide but it was a smaller percentage than some of the other felonies, but so the -- the coding sheet was the instrument of standardization, so to speak, but the coding sheet -- you know, sometimes the case file would allow me to collect data in some cases and that data simply wasn't available in other cases. That study had nothing to do with false confessions so I was not trying to figure out whether the confession was true or false, and in many of those interrogations the person didn't even confess.

Q. Okay. And so have you done any other studies that you can recall where you had to collect data about a police interrogation that did not focus on whether or not a confession made by a suspect was false?

A. I did two papers with Richard Ofshe in the late 1990s and we looked at like 150 cases where we had interrogation tapes and transcripts, which were uncommon at that time. Most interrogations were not recorded. And we were analyzing the psychological process of interrogation -- interrogation techniques and so we studied all these interrogations and identified techniques and the psychological logic of the interrogations and illustrated our analysis throughout the paper. That was more of a qualitative analysis and we knew that some of those cases were, excuse me, false confession cases because they were provably false but our goal wasn't to analyze just proven false confessions, our goal was to analyze the interrogation process and how it and why it leads people to confess. So that would be another study that was different than the study I just mentioned.

I think we have talked about survey studies where everybody is administered the same survey instrument. I've been involved on some experimental studies where everybody is administered the same questionnaire. So again, it just depends -- it just depends on the study and how the data is being gathered and what data is being gathered.

Q. When you say -- Oh, I'm sorry. Excuse me.

You just mentioned that the study that you did with I think it's Dr. Ofshe was a qualitative analysis. Can you just define that for me, what that means?

A. Well we really didn't have a coding sheet. We were looking for patterns and then describing the patterns and the logic and psychology of the interrogations that we were observing. So there wasn't a standard coding sheet.

Q. Okay. Did you actually observe or did you watch tapes and read transcripts?

A. We watched tapes and read transcripts and we had access to other case file materials. Those were not actual observed interrogations in person.

Q. Do you remember the name of that study you're referencing now?

A. Yeah. One of them was called "The Decision to Confess Falsely" and the other I think was called "The Social Psychology of Police Interrogation" and both of those studies were published in 1997. So if you go down my CV, it's -- the publication section is organized in reverse chronological order and so you would just go down to the year 1997, the year is listed on the side before the publications, and then you could find everything published in 1997 and those would be there.

Q. Okay. With respect to then what you've learned in your various studies, how are you able to apply it to a case analysis where you might not have all of the information that you had when you -- you know, when you were doing this study? So, my example, a little bit more narrow is how would you apply what you found in the cases that you or Dr. Ofshe reviewed for interrogations where you read transcripts and tapes and case materials, how are

you able to apply what you found there to cases where you don't have all of that information, you don't have tapes, or you don't have a transcript of what occurred in the interrogation?

MS. PIERCE: Object to form.

THE WITNESS: Well, you would want to find out what the various participants and observers of the interrogation describe as occurring in the interrogation and you would want to review all the relevant case materials that go to that issue, but I guess it depends on what specific issue it is you're talking about. Maybe it's -- whether it's what techniques were used during the interview, whether it was psychologically coercive, maybe it's whether there are indicia of reliability or indicia of unreliability. Maybe it's whether there was contamination or whether there was corroboration. So sometimes you can look to other case materials to answer those questions, not just the contents of what occurred during an interrogation.

By MS. SCHROEDER:

Q. Just to quickly review your employment history. Have you ever been employed as a law officer?

A. No.

Q. Okay. Have you ever gone to any investigative training -- police investigative training?

A. Well, I mean, I have gone to police interrogation training. That is listed in the CV.

Q. Yeah.

A. Where I attended courses and participated. But beyond that, no.

Q. Okay. And how about -- so then how about as an investigator, whether a private investigator or investigator for a law enforcement agency, have you ever worked as an investigator?

A. I have never worked as an investigator, no.

Q. Okay. How about as a crime scene technician?

A. I have never worked as a crime scene technician.

Q. Okay. Do you have any experience related to the evaluation of crime scenes?

A. I've never evaluated crime scenes.

Q. Have you ever been employed as a medical examiner?

A. I have never been employed as a medical examiner.

Q. Okay. Do you have any experience or training related to identifying causes of death?

A. I do not.

Q. Okay. Do you have any training or experience that would allow you to identify whether or not a person was sexually assaulted?

A. I am not a specialist in that, no.

Q. Even -- okay. That's fine.

Have you ever worked in any form of employment that would provide you any experience with individuals who are sexually assaulted?

A. Not that I recall.

Q. Have you ever been employed as a social worker?

A. I have never been employed as a social worker.

Q. Do you have any experience -- strike that.

Okay. And then I think the last one might be the same, but do you have any -- have you ever been employed as a crime scene analyst?

A. I have never been employed as a crime scene analyst.

Q. Okay. Do you have any education or experience that would allow to you analyze a crime scene?

A. No.

Q. And last one. Have you ever been employed as a mental health worker?

A. I have not been employed as a mental health worker.

Q. Okay. And do you have any education or experience that would allow you to diagnose any mental health ailments of an individual?

A. I do not.

Q. Okay. All right. So let's turn to your report. If you want to pull it up, and then everybody else can grab it as well. And we will just start with the first page. Let's see here. Let's go down to your materials reviewed. Okay.

So with respect to the materials reviewed, is this the complete list of materials that you reviewed in preparation for writing this report?

A. It is, yes.

Q. Okay. And each document that's listed here, did you actually review every single document listed here?

A. In preparation for the report, yes. Not in preparation for today's deposition.

Q. All right. Then where you have the Bates stamps listed, so let's see here. Let me pull up an

113

example. Well here it says -- okay. You have number 27. If we look at that, it says, once -- seven materials that you reviewed is the Walter Jatkowski deposition and exhibits.

Do you see that?

A. Yes.

Q. Okay. So then does that mean that you reviewed both his deposition transcript and the exhibits that were attached to that transcript?

A. Yes, although sometimes when I was reading the depositions, I wouldn't actually go to the back and review the exhibits. Like they had been things I had already reviewed. But if it was new material or I had questions, then I would go to the back and review the exhibits.

Q. Okay. And -- but if -- if you have a deposition that is listed on here and -- but there is no exhibits, so such as number 28, it says, Martha Hammer deposition, or number 29, Johnnie Lee Savory deposition, does that mean that you did not review any exhibits?

A. Unless it was a typographical error, yeah.

Q. Would it have been a typographical error?

A. Well it could have been or it could be that

114

I wasn't provided exhibits with the deposition and I just reviewed the deposition.

Q. So are you saying that it's possible that there is errors in this list of materials reviewed, that there's -- could be materials you did review that are not listed?

A. It's certainly possible. It's certainly possible that there were exhibits for Johnnie Lee Savory's depositions, 24 and 29, for example. I was provided those, and then when I put together this list, I forgot to list the exhibits or that I wasn't provided those. But it's -- it's possible that I failed to list deposition exhibits.

Q. Is it possible that you -- so then let me ask you this: Are there any materials that you did review in preparation for writing this report that are not listed on here?

A. Not to my knowledge, no. I -- I think this is a complete list, and I went through it at the time, but it's always possible that something was inadvertently left off.

Q. So how can we double-check whether anything was or was not left off?

A. Well, I -- it would be much easier if I was at my house but I would have to go back through all

115

of the materials and just one by one, you know, check it off, check it off, check it off, check it off. And then at the end of that I would know whether or not there is anything that wasn't checked off.

Q. Okay. So I'm going to -- since you can't definitively tell me whether or not you did review the exhibits or whether or not there are items that you did review that are not listed, I'm going to ask you to -- to please do that so, to please after this deposition to go back and double-check that there are no materials that have been left off this list.

MS. PIERCE: I'm going to -- I'm going to object to this. He has given answers to the subpoena, he has given a reasonable review. He made a list, the names of everything that he looked at. He's already gone through it once. He said he thinks everything is here. I'm going to object to you instructing him to go and review all of these documents again unless you pay for his time to do all of that.

MS. SCHROEDER: And, Megan, are you assuring me that everything that is listed here is what was given to Dr. Leo to review for his report?

THE WITNESS: He has gone through it. As

116

he said, there could be something that is inadvertently left off. He has gone through it and he's made a list looking at everything he has in his report. You can't ever be 100 percent.

MS. SCHROEDER: What? Go ahead. I don't want to over speak -- speak over you.

MS. PIERCE: These are the list -- he's gone through, made a list looking at the documents we gave him of the list he gave. Nobody can ever give 100 percent certainty answer to anything. But he said to a reasonable degree he has gone through, looked at his materials and made a list of them. He can't give you assurance that there has never been a mistake in anything. He's done a reasonable effort to make this list. If wants to pay for him to go through all the documents again, he can do it, but otherwise that is going to be two times.

MS. SCHROEDER: Are you not able to tell me whether or not you sent him exhibits to review with those depositions that are listed here? I think that is something that you could do without any sort of burden.

MS. PIERCE: Right now, looking at this list --

MS. SCHROEDER: No?

117

MS. PIERCE: -- I need to go back and look as well.

MS. SCHROEDER: Okay. So when we go on a break I'm just going to ask you to go back and look at -- and I'll tell you right here, this is what I want to know, number 19, number 20, number 21, number 22, 23, 24, 25, 26, 28, all of those -- 29, all of them that have depositions with no exhibits listed because you only have one deposition on here for Walt Jatkowski where he lists deposition and exhibits so that is implying to me that in that one instance he did review the exhibits. So what I'm asking is, I just need confirmation that he didn't look at any other exhibits.

MS. PIERCE: Okay. If you want to email us the ones you want us to look back at, we will look at them as soon as we can and we will see if exhibits were sent to him with the deposition.

MS. SCHROEDER: Okay. We are going to go ahead and email that and then I would like the answer at one of the breaks because, with respect to this deposition, we were told that we were given and identified all of the materials that he had reviewed.

MS. PIERCE: And you were. You were.

118

There is always --

MS. SCHROEDER: Okay. So then --

MS. PIERCE: -- inadvertently left off. We will look at it at break when I have a moment I will look. If we have a break that has enough time, I will go back and look.

MS. SCHROEDER: I just don't believe that the answer that things could be inadvertently left off and then not having the responsibility to go back and double-check would fly if that was something that I was replying to plaintiff on a list, that here's your list, could be left off, it's your burden to figure it out.

MS. PIERCE: I don't think that is what we're saying, Sarah, but understood.

MS. SCHROEDER: Okay. Very good. Okay. All right. So let's continue on, Dr. Leo.

By MS. SCHROEDER:

Q. Do you know, Dr. Leo, with respect to the Bates stamp range that is listed after the documents, is that the entire listing of the document or is that just identifying the specific page range that you reviewed of the document?

A. These -- these are just the page ranges of the documents I reviewed.

119

Q. Okay. If we look at number 53 --

A. Yes.

Q. -- And it says, Journey for Justice, Johnnie Lee Savory story. And then it says page 4. Do you know if that means you only looked at page 4 or was that just another identifier for the article?

A. No. I -- I looked at the entire article. It was a short article I don't know why page 4 is only listed. It could be that I just had the first page. But, no, I read the whole article. I think it was two or three pages, maybe four, something like that.

Q. Okay. Did you create this list of materials reviewed?

MS. PIERCE: Object to the form. Work product. The creation of how the report was created is covered by work product.

By MS. SCHROEDER:

Q. Is the information that is contained in this report from you, Dr. Leo?

A. Yes.

MS. PIERCE: Object to form. What are you asking? Can you ask that again?

MS. SCHROEDER: I want to know if the information that is contained in this report, if

120

it's from him.

MS. PIERCE: What information are you talking about?

MS. SCHROEDER: Any information, all information. I want to know if the information on this report on these pages, where at the end on page whatever, where he has his signature, does that mean that all of the information contained in this report comes from him.

MS. PIERCE: Object to form. I'll instruct him not to answer. The draft and the report are work product.

MS. SCHROEDER: What is work product?

MS. PIERCE: The process of drafting a report is work product.

MS. SCHROEDER: I'm not asking him about the process. I'm asking him about the final report.

By MS. SCHROEDER:

Q. This final report that I'm looking at, Dr. Leo, and on page 70 it has your signature, does that mean in this final product this information is from you?

A. Yes.

Q. Were these materials that you reviewed provided to you by plaintiff's counsel?

A. Yes.

Q. Were there any materials that you reviewed that you obtained on your own?

A. Not that I recall.

Q. Are there any materials that you reviewed that were provided to you by someone other than plaintiff's counsel?

A. Not that I recall, no.

Q. Okay. So if we go down now to page 4 of your report. And it's the overview. And in the first paragraph you have in there that you are -- are providing an overview of the -- well, actually, let me -- let me start this way: Dr. Leo, what was the -- what was the relevant question that you were asked to answer with respect to this analysis of Mr. Savory's case?

A. You're asking me to comment on conversations with counsel?

Q. I'm asking you to tell me what the purpose was of this report.

A. The purpose of the report was to analyze whether there was evidence of psychological coercion, whether there was indicia of unreliability, whether there were any problems that I saw with the confessions, with the -- what interrogation techniques were used and what the research says about those, whether there were risk factors for false confessions present, and if so, what those factors -- risk factors were, whether in this case the police investigators and interrogators departed from commonly accepted standards for police interrogation and confession taking in 1977. There might be something that I'm not recalling at the moment but that was kind of the broad sweep of it.

Q. Okay. And so -- and then these -- all -- what you just listed is the -- does that encompass your full areas on what you would testify to as it relates to Mr. Savory's case?

MS. PIERCE: Object to form.

THE WITNESS: I don't know because I don't get to ask myself questions if this case goes to trial and I testify. And prior to the deposition, I assume that the scope of my testimony is embodied in the report but sometimes in depositions I'm asked questions that go beyond what is in the scope of the report and my understanding is if I -- if I answer questions that go beyond that, that would be fair game, too. And also, as I say at the end of the report, as most experts do, if I'm provided additional discovery, I reserve the right to modify

the opinions. But as you know, the scope of my testimony would not be determined by me. But at the time that I wrote the report, yes, this -- this was what at that time I thought was the full scope of my opinions in this case.

By MS. SCHROEDER:

Q. Okay. And is that a scope that you identified or was that a scope that was -- you were asked to review and opine on?

MS. PIERCE: Object to form. I'm going to instruct him not to answer about any conversations that we have had with him about drafting the report.

THE WITNESS: So because I have been doing this for so long and, you know, over three decades I have been working in this area, usually I know what to look for when retained about a case where there are potentially problems with the interrogation, problems with the confession. So ultimately I determined the scope of this, not anybody else.

By MS. SCHROEDER:

Q. So does that mean that you went into this review with just an open mind as to what you would find?

A. I go into every review with an open mind, yes.

Q. I'm trying to find one thing here. Okay.

Now part of your methodology for reviewing cases as a consultant or as a expert witness who has to provide a report and testify, you said that you would review relevant documents that bear on the questions that the consulting party usually provided to you. So without any guidance from the plaintiff's counsel, how do you know which documents were relevant to whichever question was supposed to have been answered?

MS. PIERCE: Object to form and object to the extent the question is asking for work product of alleged conversations.

THE WITNESS: Well, usually the issue is whether or not there are any -- whether, based on the scientific research in the field, I have any concerns about the interrogation process or the resulting testimonial evidence. And usually there is a conversation generally about the relevant discovery.

By MS. SCHROEDER:

Q. So are you the person that's identifying which documents are relevant?

MS. PIERCE: Object to form. I'm going to

---

**125**

instruct him not to answer about identifying what documents are relevant to his opinions. It's work product.

By MS. SCHROEDER:

Q. Okay. Dr. Leo, how am I -- how are you able to impart to an individual that you did review the relevant documents that bear on your final assessment in this report?

A. Well, all I can tell you is that generally I ask for a range of documents, and generally in the conversation I might find out about the existence of additional documents, and then I'm sent the documents. And it's always possible there were some document I could have or should have reviewed that I didn't review, but as in anything in life, I just do my best to be as comprehensive as possible. And as with the materials reviewed list, I can say I'm pretty confident that I have the full scope of necessary materials to arrive at my opinions, but I can't be absolutely sure that there doesn't exist a document out there in any case that I wouldn't -- I would have preferred to have or that could influence my opinion. But to the best of my knowledge, I have, in this case and -- and in basically any civil case, you know, these are the kinds of cases where I

**126**

have the most documentation because in civil cases the discovery is just so much better than in criminal cases.

Q. So then in your review of the documents that you do receive, do you base your opinions on the relevant documents to this case?

MS. PIERCE: Object to form.

THE WITNESS: Well, it's not like you base opinions on documents, you base opinions on the analysis and the information and the analysis of the information contained in the documents. So, yes, I went through all of these documents to the best of my abilities, analyzed them, synthesized them, and arrived at my opinions, which I did my best to describe as clearly as possible and illustrate throughout the report.

By MS. SCHROEDER:

Q. And so then what are the relevant documents that you reviewed in this case to arrive -- that you analyzed in this case to arrive at your opinions?

A. Well they would be all of the documents listed in the materials reviewed section.

Q. Okay. If you did not have in your possession a document that you believed would be relevant to your final conclusions, would you ask if

**127**

that document existed?

A. Oh, absolutely, yes.

Q. Okay. Okay. So if we look under overview of case specific opinions on page 4, you state there in the first introduction that in this report you are providing an overview of the relevant social science research on psychology of police interrogation practices techniques, on police induced false confession, risk factors for false confession, psychological coercion, police interrogation, contamination inscripting and indicia on reliability. So are those the -- I guess is -- are those the -- what do I want to say, the -- what you were reviewing and analyzing the documents for, to identify these specific areas that I just read?

A. Yeah. These are the primary areas for analysis.

Q. Okay. Then from there you applied them to the police investigation interrogations and statements of Mr. Savory on January 25th and 26th, 1997; is that correct?

A. Correct.

Q. Okay. And -- and you received that data from the 56 items of materials reviewed; is that correct?

**128**

A. Correct.

Q. Okay. So on footnote 1 you identified that because there is no recording of the interrogation or the detention from 1977, you did not have an objective record of what occurred during those interrogation sessions; is that correct?

A. Yes.

Q. Okay. And so were you definitively saying that there is nothing in your -- what you reviewed -- of the materials you reviewed that there was no objective account of what occurred during Mr. Savory's interrogation and detention on those days?

MS. PIERCE: Object to form.

Go ahead, Dr. Leo.

THE WITNESS: There is no objective account in the way there would be if there was a videotape that memorialized the whole thing that anybody could look at and see this, that and the other did or did not happen. Obviously there are different accounts, there are recollections, Mr. Savory's on the one hand and the various investigators on the other, Cannon, Fiers, Pinkney, Haynes, Brown, the polygraphers, the probation officer. There are multiple accounts but there is no objectively

129

reviewable account. Everyone is relaying their perceptions. And there is -- there is also, as Mr. Titterington I think mentions in his report, you know, there is a breakdown in documentation, the -- the interrogations. Many of the police reports don't document a lot of things that occurred. So there is no one complete objective, reviewable account for all to see that would resolve any dispute about what or what was not said in the various interviews and interrogations in the way there would be as if there were a fully recorded record.

Q. Okay. Did you -- I thought that you had said court transcripts could be an objective record; is that correct?

A. Well, I don't know if I said that earlier, but I don't -- I don't remember saying it or the context, but the record here speaks for itself. But a court transcript could be a recording of an event that objectively captures, you know, with, you know, stenographers are amazing but we have all seen, you know, syntactical or spelling or substantive errors in court transcripts that we have read, but obviously that would be a record of the event. It would be an objective recording of the event. And

130

there is no analogue to that here in the interrogations.

Q. Okay. So -- so then you're saying that court transcripts that review and discuss Mr. Savory's interrogation are not an objective record of the interrogation?

A. No, they would be an objective record of the hearing at which both sides presented their case, if both sides did, but they would not be an objective record of the interrogation itself.

Q. Okay. Well then what about the appellate court opinion that reviewed Mr. Savory's confession and overturned his first conviction? Do you consider that an objective record of Mr. Savory's confession?

MS. PIERCE: Object to form.

THE WITNESS: No, I wouldn't consider that an objective -- we don't have a record of Mr. Savory's confession other than what is orally described. There is no written confession statement and we don't have an objective record of the interrogation, the interrogations. So I would say that it's an interpretation of the interrogations and the statements.

By MS. SCHROEDER:

131

Q. Would you say that that is the same for -- for the appellate opinion that affirmed Mr. Savory's second conviction, that it's not an objective review of the interrogation and the circumstances surrounding it but just an interpretation?

MS. PIERCE: I'll object to form and objection that we switched from talking about objective records to objective review.

THE WITNESS: Yeah, that is what I was going to say, too. You had previously asked about an objective record, and objection review would mean something different than an objective record. So I would give the same answer to the question, if it's the same question, objective record.

By MS. SCHROEDER:

Q. Okay. So I guess that -- that makes me want to ask, can you do an objective review of a record that is, I guess, I think you had termed it an interpretation? So if there is no objective record of an interrogation, how -- how is a court able to do an objective review of that interrogation?

MS. PIERCE: Object to form and foundation. He is not a practicing attorney.

THE WITNESS: I think in the end courts do

132

the best with the evidence they have got. Right? There is -- so they presumably would do their best to objectively analyze the evidence before them, even if it's incomplete, imperfect, and there is no objective record of all the relevant evidence.

By MS. SCHROEDER:

Q. Okay. Do you think that type of analysis is hindered in any way if -- if that entity doesn't have an objective record of what occurred?

MS. PIERCE: Object to form and foundation. Again, he is not a practicing attorney.

THE WITNESS: Yes. I think that if you have 20 to 23 hours of interrogation and it had all been video recorded that you'd have a much better basis for analyzing what occurred than if it hadn't. I don't think that means you can't do an objective analysis. One can do an objective analysis based on the evidence of what did occur, but of course if you -- in analyzing an interrogation and the products of the interrogation, if you have a full recording of every minute, every hour, every day of those interrogations, you have much better information to work with in your analysis.

By MS. SCHROEDER:

Q. Okay. Do you believe or -- I guess scratch

**133**

that.

Did you identify any objective records in the materials you reviewed that you were able to base your final opinions on in this report.

A. I -- I do think there are objectively indisputable facts that -- that my opinions are based on. There are things that Mr. Savory says in his confession statement that are factually wrong, where the crime occurred, for example. There -- there's DNA analysis, there is laboratory analysis, there is a lot of objective stuff in this case that help us better understand in my view what likely did or did not occur in the interrogation and what problems there were with the interrogation and interrogations and with the confession statement.

Q. So are those the three objective materials that you're -- you had reviewed? So I guess what I'm saying, is that the totality of the objective materials that you reviewed?

A. This file is voluminous. I reviewed thousands and thousands of pages. I'm not going to say that there were only three objective things that I reviewed. I don't have instant recall of the thousands and thousands of pages but those are examples of objective factors. There is other

**134**

things as well, you know, where the -- there is a whole section of this report where I talk about things that are agreed upon. We can agree that he was subjected to two polygraphs, that he was given Miranda warnings at 11:30 on the 25th, that he invoked his Miranda rights. That they reapproached. So there is -- there's a universe of agreed upon facts in this case which nobody is disputing which presumably are objective. And then there is a universe of disputed facts, sometimes sharply disputed facts, and then there is overlap. So the idea that there are only three objective things in this case would be to completely mischaracterize what I was trying to communicate.

Q. So then in your footnote where you say there is no objective record, you're specifically -- are you only limiting that to the custodial interrogation sessions?

A. Yes, in this footnote, that's right, that there is no objective record.

Q. Okay.

A. And what I mean is -- is a full record of the entirety of those two interrogations. Or I should say two days of interrogations.

Q. You -- what is the difference between --

**135**

well, I guess, can you define interrogation for me, please?

A. Yeah. An interrogation is a form of information gathering in which police seek to elicit incriminating evidence, typically from a presumed guilty suspect, by using techniques of pressure and persuasion.

Q. Okay. And -- and then what is the definition of an interview?

A. An interview would be open-ended questions in which police seek to elicit information that may or may not be from a real or potential suspect that isn't directive, that isn't accusatory, that -- whose goal is not to get a confession or try to build a case and get somebody convicted. And typically it's not based on any pressure or persuasion but the opposite.

Q. Okay. And in your review of the materials you've listed here, are there any instances where Mr. Savory was speaking to the officers and it was not an interrogation?

A. In the very -- we don't have a complete record so we don't know, but in the very beginning when he was at the school and speaking to the first two officers, that might have had more of a

**136**

question/answer interview flavor, but at some point -- even if that did, at some point this became accusatorial and became a full-fledged interrogation.

Q. At what point did it turn into an interrogation?

A. I don't know because it doesn't have -- we don't have a complete record. It could have been at 3:30 when he was in the principal's office, it could have been 4:30 or 5 when they got to the police department on the 25th. This is the problem when the police don't record interrogations or fully document them. We simply don't know. There are a lot of gaps here.

Q. So are you making some assumptions with respect to the interactions between Mr. Savory and the officers beginning at 3:30?

A. I'm trying not to make assumptions. I'm trying to look at the various accounts which are by definition incomplete and do my best analysis of what's going on based on those accounts. When it shifted from an interview to an interrogation was not something that I considered that important because it -- most of it was an interrogation. And even if it was an interview in the beginning, that

**137**

was a prelude to an interrogation.

Q. How are you able to make such determinations if, as you say, what you have to review is incomplete?

A. Based on the information and evidence before us, that's how I do my analysis, that's how any expert would do their analysis. As far as cases of disputed interrogation, disputed confession that don't have a recording of the interrogation, there is a wealth of material. Here the file is voluminous. There is a lot of data, for lack of a better word, of what occurred during that interrogation or at least what the various participants report occurring during that interrogation. It was an extremely long interrogation, for one thing.

Q. So in this wealth of information that you are citing, were you not able to determine whether -- excuse me.

In that wealth of information that you are citing, how were you not able to determine when the interrogation of Mr. Savory began?

MS. PIERCE: Object to form.

THE WITNESS: Yeah. You need to re-ask that question. How am I not able to determine

**138**

something? I don't -- I don't know how to answer that.

By MS. SCHROEDER:

Q. So you -- you answered that you were unable to definitively state when the interrogation of Mr. Savory began with the officers. And so I am asking you then, with all of the wealth of information that you are now claiming that there is enough for you to evaluate and assess about this interrogation of Mr. Savory, what is missing for you to be unable to determine when his interrogation began?

MS. PIERCE: Object to form. Argumentative.

THE WITNESS: Again, I -- I -- I don't think it's a coherent question.

By MS. SCHROEDER:

Q. Well then let me point out this. I don't want you answering it in that respect.

So in footnote 1 you specifically state that you did not have an objective record of what occurred during Mr. Savory's custodial interrogation sessions that began at approximately 3:30 p.m. on January 25th, 1977, and ended at approximately 11 p.m. on January 26th, 1977.

**139**

How are you able to make that assertion that at 3:30 p.m. on January 25th is when Mr. Savory was in custody and was being interrogated?

A. Based on the entirety of the materials that I reviewed. Mr. Savory indicated initially that he didn't wish to speak to the officers or make a statement and they pressured him to make a statement and so my own assessment would be that he was in custody at that point, that he wasn't free to leave, and -- and that it was an interrogation. Now, oftentimes interrogations start in an interview format where there is question, answer and then it becomes accusatory. I don't know the point at which this became accusatory because we don't have an objective record, but my best assessment of all the materials I reviewed is that this was guilt presumptive from the start, that they had their minds made up that Johnnie Savory committed this crime, and that their goal was to prove that. And that became more explicit as the interrogation unfolded.

Q. So if you don't have a record of what occurred, aren't you just guessing that the interrogation began at 3:30 p.m. on January 25th?

MS. PIERCE: Object to form. Misrepresents

**140**

his testimony.

THE WITNESS: I don't think it's a guess. It's an analysis of all the available materials, including the published court opinions and the testimony of others involved in the case. So, no, I mean, I think it's misleading and mischaracterizing to say it's just a guess. This is my best analysis based on a wealth of materials that I've reviewed that have sought to document when this -- when this began. It's not a mere guess.

By MS. SCHROEDER:

Q. So earlier when we were talking about this you had said that you believed the initial interactions between the officers was an interview and that because we didn't have an objective record of what was discussed at that time, that you could not determine when the interrogation began. Are you now changing your testimony to say that you can determine that the interrogation began at 3:30 p.m.?

MS. PIERCE: Object to form. Misrepresents his prior testimony.

THE WITNESS: What I thought I was saying earlier was that the kind of interview style of questioning, I don't know when it turned accusatorial. So I believe this was an

141

interrogation from the beginning, or what I would characterize as an interrogation. But as I said, sometimes interrogations begin in a kind of question and answer format and then become accusatorial. One interrogation technique is rapport building, and rapport building is explicitly question and answer before they launch into the accusatory portion of the interrogation. I believe this was an interrogation from the start. I'm not changing my answer. It might have involved more question and answer before it became pressure and persuasion. I don't know the exact point at which point it became accusatory. That is what I was trying to convey earlier.

By MS. SCHROEDER:

Q. Okay. So what is the source for your definition on what an interrogation is?

A. I can't cite you to a source. I can tell you that that is my understanding of the common definition of interrogation, what I said earlier. I mean I can cite you to things I've written.

Q. This is your personal definition of interrogation; is that correct?

MS. PIERCE: Object to form. Misrepresents his testimony.

142

THE WITNESS: Well, this is something I have been studying and writing about for over three decades, so to say it's my personal definition I think is a little misleading. So I have written books and I know the social science literature in this field very well, and the common understanding in my field of expertise is that interrogation involves questioning of suspects in a guilt presumptive manner that's designed to elicit incriminating statements to help the prosecution convict a presumed guilty suspect. That involves a variety of investigation techniques that are based primarily on pressure and persuasion to move the presumed guilty suspect from denial to admission.

Now you asked about the source, and this is just my personal definition, and it's a -- it's covered in my scholarship, and the best source of that would be my 2008 book Police Interrogation and American Justice, which is published by Harvard University Press, and I would say that this definition that I've given you, a little bit more elaborately in this answer than in a prior answer, is a commonly understood definition among researchers and scholars and experts in this social science field. And so it's not my personal

143

definition. It -- it's my description of a definition that I think embodies what other experts and researchers in this field would describe. Maybe with a few more words, maybe with a few less, but it's the core of what we mean by interrogation.

As you know, in case law there is a definition of interrogation but I'm giving you the social science definition, not the case law definition.

By MS. SCHROEDER:

Q. Okay. Okay. Very good. And does this definition that you provided, when we read the word interrogation in your report, that is what you're referring to; is that correct?

A. Broadly speaking, yes.

Q. Okay. So you also had said that these investigators were guilt presumptive with respect to their interactions with Mr. Savory; is that correct?

A. Yes.

Q. Okay. How do you go about making the assessment that an officer is guilt presumptive?

A. Again, based on my analysis and review of the totality of the documents that I -- I have been provided and I've analyzed and reviewed.

144

Q. So what factors, when you review those documents, are present that would indicate to you that an officer is guilt presumptive?

A. The description of the questioning by the various participants or observers would be the basis for that conclusion. And in this report, as you know, I go through Mr. Savory's account and I go through the officers' accounts. Mr. Savory's accounts, it sounds like it became guilt presumptive very early on, if not from the very beginning, and in the various officers' accounts, at some point in their descriptions it became guilt presumptive in my opinion as well.

Q. What was it about the questions that indicated to you that the officers were guilt presumptive?

A. Well, in Mr. Savory's description, the officers were correcting him and accusing. They were accusing him of committing the crime. They were not accepting his answers. They were telling him what happened and how he did it. In my opinion, based on his description of what occurred in the interrogations, they were out to get a confession from somebody whose guilt they assumed.

Q. Is there anything else that led you to

believe that the officers were guilt presumptive?

A. Well, I mean, I write about this in my report, and it's -- it's the section on pages 29 to 32 where I go through the -- why I think they arrived at a premature presumption of guilt and presumed his guilt. And there was, in my analysis, no logical or evidentiary basis to believe that Mr. -- there was evidence that Mr. Savory committed this crime. And the analysis that I do here is -- also contained a similar analysis in Mr. -- in Chief Titterington's report where he talks also about essentially the rush to judgment or the presumption of guilt and how they failed to meaningfully investigate other suspects against whom there would be reason to think they could have committed the crime, how they didn't adequately investigate the evidence or follow up on the alleged evidence that they thought Mr. Savory was providing or tested against evidence. And Chief Titterington, like me in my report, essentially said it looked like their goal was to get Johnnie Savory. The goal was to pin the case on him and that involves a presumption of guilt. They -- for whatever reason, I couldn't decipher a good one, they believed he had committed this crime and it looked like they were just trying to get him to confess and solve the crime rather than thoroughly investigate the statements that he made, thoroughly investigate the evidence they alleged, establish his guilt, or to investigate any reason why he might be involved in the case, which also involved ignoring substantial exculpatory evidence or evidence that didn't fit their theory.

Q. So you relied on Mr. Titterington's report for part of your analysis that the officers acted -- or the officers were guilt presumptive when they started questioning Mr. Savory?

A. I wouldn't say that I relied on Chief Titterington's report. I think that if I had not read Chief Titterington's report, it would not change any aspect of my report. I think Chief Titterington's report --

Q. Okay.

A. -- provides additional, you know, it -- it provides an overlapping analysis and it supports the conclusions about the guilt presumptive nature of the interrogation in my report.

Q. Did you confer with Mr. Titterington in writing your report?

A. I did not.

Q. Okay. On page 6, in paragraph 11, the very last sentence states, Mr. Savory's interrogation induced confession statement is false. It is properly classified as a coerced compliant false confession. So I think earlier you had said you had never -- that you didn't recall identifying a confession as coerced compliant false. So can you explain to me what this is here, this coerced compliant false confession?

A. So --

MS. PIERCE: Object to form.

THE WITNESS: So --

Go ahead.

THE WITNESS: So -- so I thought you were saying that I concluded it was a coerced compliant false confession earlier in the questioning and here I'm saying, if it is a false confession, then this is how we would categorize it as a coerced compliant false confession. I'm not offering the opinion that it's a false confession, I am saying if it is a false confession, this is the type of false confession. And as I describe later in the report, a compliant false confession is a knowing false confession where somebody is distressed or coerced to the point where essentially their will is broken and just to put an end to be a highly stressful, abusive, or coercive interrogation they say what the interrogator wants them to say, falsely accepting responsibility for a crime in order to escape the abusive, coercive, distressful environment. That is the type of false confession it is as opposed to a different type of false confession which is discussed later in the report.

Q. So what's -- what would the classification be of this confession if it was true?

A. Well, it wouldn't be a false confession by definition if it was true. And there is no typology of true confessions like there is for false confessions. In false confessions we talk about voluntarily false confessions, we talk about compliant false confessions, we talk about persuaded or internalized false confessions. Those are the three different types of false confessions and that is why it's called a typology or taxonomy. For true confessions, there is no analogous taxonomy or typology. So if it were a true confession, then you would just say it's a true or reliable confession. You wouldn't say it's a type of true confession.

Q. Does this entire report hinge on -- your findings hinge on Mr. Savory's confession being false?

149

MS. PIERCE: Object to form.

THE WITNESS: I think that that is again a very general question. I don't think the entire analysis here hinges on his -- his confession being false. There is a lot of analysis in the report about techniques that are used or practices that are used that would -- would stand on their own regardless of whether or not his confession were true or false, discussions of psychological coercion or the effects of certain techniques for example.

By MS. SCHROEDER:

Q. But the classification hinges on Mr. Savory's confession being false; is that correct?

A. Well, if it's not a false confession, then the last sentence would not be an accurate sentence, right? It's a conditional sentence. If Mr. Savory's interrogation induced confession is false, it is probably classified as a coerced compliant false confession. If it's not false, then that sentence doesn't apply.

Q. Is that true for paragraph 9 where you state the interrogation contaminate -- numerous instances of police interrogation contamination making and disclosing non-public case facts which

150

increase the risk of Mr. Savory's oral confession statement, if false, would misleadingly appear to be detailed, accurate, and self-corroborating. So in that instance with that finding, if his oral confession statement is true, then that finding would not hold; is that correct?

A. No, I would disagree at least with part of what -- what you're saying. So -- so interrogation contamination is the leaking and disclosing of non-public details. It's a practice that is frowned upon in policing Right? Police are not supposed to do that in interrogation by their own training and accepted standards. And there is no question, regardless of the truth or falsity of Mr. Savory's confession, that there was rampant contamination in -- in this case. Officer Hayes -- Haynes, I believe, details it in his report. He showed Mr. Savory lots of pictures. Officer Brown Teplitz describes essentially contaminating him in her description of the non -- of parts of the non-recorded interrogation. So I would say that even if it's a true confession, there still was interrogation contamination.

So I -- I -- you know, maybe I would slightly modify number 9, I would have to think

151

about that, but with respect to the fact of the interrogation contamination, the truth or falsity of Mr. Savory's confession does not at all change the objectively identifiable police interrogation contamination in the record.

Q. But your finding in number 9 is that the confession would misleadingly appear to be detailed, accurate, and self-corroborating But if the confession is true, then those findings are not misleading; is that correct?

MS. PIERCE: Object to form.

THE WITNESS: It would depend, right, because I would have to know more about the hypothetical and Mr. Savory's alleged guilt in the hypothetical because sometimes you can have confessions from people who committed a crime that are still partially inaccurate, that some of the details incorporated into the confession narrative were supplied by the interrogator. So if Mr. Savory's confession were true hypothetically, I would have to know how true it is and whether or not any of the contaminated information was included in a true confession or it was a partially true confession.

By MS. SCHROEDER:

152

Q. So if we go back to page 5, paragraph 2, when -- and then I see it in paragraph 3 and 4, it starts out, according to Johnnie Lee Savory's description, or Johnnie Lee Savory's description of what occurred over this lengthy period of interrogation. So what are you relying on to obtain Mr. Savory's description?

A. Well, the materials I reviewed in this case, and in particular his two depositions, the description in the justice denied article. Those are the primary documents that I'm recalling where he puts forth his description of what occurred.

Q. Okay. Did you review any other news -- or I should say, did you review any other media outlets where Mr. Savory was interviewed and discussed the -- his interrogation by the Peoria police officers?

A. I did not.

Q. Okay. Did you read any blog posts that Mr. Savory posted describing his interaction with the Peoria police officers on January 25th and 26th, 1977?

A. I do not recall reading any blog posts.

Q. Did you read any letters that were written by Mr. Savory to Officer Teplitz while he was

153

incarcerated?

A. I don't recall reading any letters. If it was in the discovery materials that I reviewed, I'm just not recalling it now but I don't recall as I sit here.

Q. Did you review the photographs that you referenced that Mr. Haynes showed Mr. Savory?

A. I don't recall reviewing them but it's possible that they were in the discovery that I reviewed, either as part of the police file or exhibits to the Jatkowski deposition but I don't recall.

Q. Okay. So if they are not in the materials reviewed list, then is it safe to say you did not review those photographs?

A. Correct.

Q. Okay. Were there any photographs that you recall reviewing?

A. Not as I sit here today, no.

Q. The justice denied article, the earliest -- or I guess maybe let me ask this a different way. Is the justice denied article then the closest in time to the interrogation that you reviewed of Mr. Savory's description of events?

A. I believe so.

154

Q. Okay. You know what, let's go back. On page 5, paragraph 7, you state that the lengthy custody and interrogations on January 25th, 26th, 1977, described by Mr. Savory violated numerous universally accepted police investigative and interrogation national training standards police protocols and commonly accepted best practices that existed in 1977. Are you considered an expert in police practices and procedures?

A. I would not characterize myself as an expert in police practices and procedures generally. I would characterize myself as an expert in police interrogation practices.

Q. Have you testified in a court of law on police protocol, training standards, or accepted best practices other than police interrogations?

A. No, just on police interrogations. Those -- those areas on police interrogations and confessions.

Q. So have you ever testified on police investigation protocols?

A. Not at that level of generality. Police investigation protocols as they relate to police interrogation, police interviewing, confessions, the

155

taking of statements from witnesses and suspects, primarily suspects, but not at -- not as you've stated just police investigative protocols.

Q. When you say "universally accepted," what are you referring to?

A. Well, what everybody agrees, you don't use threats, you don't use promises, you're not supposed to contaminate. The thought leaders in training standards and case law and/or case law, you know, set forth certain standards and expectations that are not disputed in the field of police interrogation training and practice.

Q. What are your sources -- well, I guess, first can you identify for me the universally accepted police investigative standards that you believe were violated.

A. Well, yeah. I -- I do that in -- at pages 50 to 52 in the report.

Q. Okay. We can -- I can -- if you don't want, we can wait to get to that point. But do you have the sources that you relied on to determine that the standards and protocols and best practices that you identified existed in 1977? What are those sources?

A. Well the sources would be the training

156

materials and the case law that existed to that point and the leading training manual, which I cite in the report is the -- what is known as the Reid Interrogation Manual, at that point the 1967 manual, the second edition of the current series, was the primary training manual and that basically set the standards along with case law, and there were other interrogation manuals that repeated those standards. Those were the -- the guides and the training materials that enumerated, described, and reinforced those training standards.

Q. Are those the two sources then that you -- that you relied on case law and the Reid Interrogation Manual?

A. Yeah. But I would say the Reid manual and other manuals is the primary source and then case law sometimes comes into that because police are trained to follow the constitutional case law. So on something like Miranda or voluntariness or threats and promises or deprivations of food and sleep, the training standards are going to largely be drawn from police interpretation of case law.

Q. Did you identify the other manuals that you relied on in your report?

A. Not in this report. I don't believe so.

157

Q. Did you rely on those manuals in this report?

A. I relied on my knowledge of what was in other manuals at the time without specifically going back to those manuals. So I have read every published police interrogation training manual of that era, but not recently.

Q. So how am I supposed to explore what those standards are if only based off your memory?

MS. PIERCE: Object to form and argumentative.

THE WITNESS: I really don't think it would be very hard. All you would have to do is have a research assistant spend half an hour identifying every published interrogation training manual and then you could go through and figure out which edition was relevant in 1977 and then you could purchase or check out those manuals. I don't think it would be very complicated.

By MS. SCHROEDER:

Q. But how -- so my question is, do you know what you relied on to be able to identify these accepted police practices in 1977?

A. I relied --

MS. PIERCE: Object --

158

THE WITNESS: Sorry. Go ahead.

MS. PIERCE: Oh, object to form, argumentative.

THE WITNESS: I relied primarily on the Reid manual and the case law and then secondarily on my general recollection and understanding of other manuals at the time. Without --

By MS. SCHROEDER:

Q. So you cannot identify what those other manuals are; is that what you're saying?

A. I could identify them if I were at my house. I would just go to the bookshelf and pull them off. But the other ones that were manuals at the time, I don't remember the exact titles or the authors. You know, there is one by Aubre, A-u-b-r-e, and Caputo, C-a-p-u-t-o. There is one by Royal and Schutt. I think Schutt is spelled S-c-h-u-t-t or S-h-u-t-t. But I -- I -- it wouldn't take me long to say here are the other manuals that were setting the standards following the Reid manual at the time.

A lot of the stuff that I talk about in this section is very basic, right? Don't use threats, don't deprive people of food and sleep, don't interrogate for excessively long periods of

159

time, don't use techniques that -- that are out to make an innocent person confess. If somebody attempts to terminate the interrogation or invoke their rights, honor the termination or honor the invocation. This is not controversial stuff. And essentially, everything I say about the violation of common standards, interrogation standards, almost everything, if not everything, and then more is in Chief Titterington's report.

And I didn't, again, rely on that, I didn't need to rely on it, but I think it buttresses and supports this section of the report and what were the existing standards, commonly accepted best practices. There is no one saying in 1977 anywhere in police work that it's okay to make threats or promises or to have excessively long interrogations or to violate Miranda invocations, for example.

So again, I don't think this stuff is at all controversial, but if -- if -- if -- if I had wanted, I could have gone to the bookshelf and pulled off all these other interrogation training manuals and then did a string footnote as opposed to just citing the leading authoritative manual at the time.

Q. Did you review the Illinois Juvenile Court

160

Act that was in place in 1977?

A. I did not.

Q. Did you review any Illinois statutes that govern custody and interrogations in 1977?

A. I don't recall reviewing anything.

Q. Did you review any Illinois police protocols that were in place in 1977?

A. Not for this case, no.

Q. No, when you mean not for this case, does that mean you did not rely on Illinois police protocols that were enacted in 1977 to -- as the basis for your finding regarding the violations by the defendant officers?

A. Correct.

Q. Did you review any Peoria police officer or, excuse me, Peoria police department general orders that were in place in 1977?

A. Not that I recall.

Q. Did you review any Peoria police training bulletins that were in effect in 1977?

A. Not that I recall.

Q. Can did you review any Peoria police officer information bulletins that were in effect in 1977?

A. Not that I recall.

161

Q. Okay. Is your finding based on -- is your finding then that it violated what you termed as universally accepted investigative and interrogation standards, police protocols, and commonly accepted best practices but you are unable to say if these actions violated Peoria Police Department policies, protocols, and best practices; is that correct?

MS. PIERCE: Object to form. Argumentative.

THE WITNESS: Well, to the extent I'm saying the violation of best practices would also have violated the law, it's inconceivable to me that the Peoria Police Department would have had different standards. I can't imagine they would have said violate a suspect's Miranda rights or it's okay to use threats. So I would just qualify my answer by saying that.

By MS. SCHROEDER:

Q. You did not review the Peoria Police Department policies or practices in order for you to make a definitive opinion on whether or not the officers violated those policies and practices; is that correct?

A. I did not review them, correct.

Q. Now, do you have specific case law that you

162

relied on in forming your opinions related to the violations of the standard -- these police standards, protocols, and practices in 1977?

A. No, but for 17 years I've been teaching constitutional criminal procedure at a law school so I know that subject, I know the case law, at least the Supreme Court case law, the United States Supreme Court case law pretty well. But, no, I didn't have a particular case in mind. Obviously, you know, Miranda created Miranda warnings and Miranda waivers but there is also a body of post-Miranda case law and there is a body of 14th amendment case law that deals with depravations and threats and promises. So I didn't have any one particular case in mind, but I know that case law even though that is not what I'm being proffered as an expert for here.

Q. Then that body of case law that you were just referencing, are you referencing case law that was enacted prior to January 25th, 1977?

A. Yes. It's my belief that all the areas that I -- where there is an over -- where the standards are set by courts, by the Supreme Court that I'm saying is violated was in existence in 1977, January of 1977.

163

Q. I'm going to skip to page 15 of your report. Let me jump back, but we will just start here on page 15.

Okay. So here on 15 this is part of the social science research that you applied to your analysis of Mr. Savory's case; is that correct?

A. That's correct, yeah.

Q. Okay. And, you know, in -- this title here says there is three types of false confessions, and then if we look down at the -- at the footnote it says there is a substantial empirical scientific research literature on these types of false confessions. So are you by -- in that footnote stating that the citations that follow that sentence are all based on empirical scientific research?

A. Yes. Some of these citations are like reviews and syntheses of existing literature. They are not new research but they are condensing summarizing the main findings of and synthesizing, you know, thousands of articles.

Q. Then how is that -- if it's a review in synthesizing, how is that empirical research?

A. Well it's not an original empirical study but it's a description of the voluminous research that is empirical in the field.

164

Q. Okay. So what are the three types of false confessions that -- that are identified here?

A. Well, the three types would be the voluntary, the compliant, and the persuaded false confessions.

Q. Okay. And are those classifications that you created in this field of study?

A. Not really. The -- the third one, persuaded, is a term that I and some others use. It's also referred to as internalized. The typology was first created by professor Saul Kassin, K-a-s-s-i-n. So it wasn't a typology that I created per se.

Q. So you state here in this first paragraph, you're discussing there is psychological techniques of interrogation that can sometimes cause false confessions and that they typically involve one of two patterns.

Do you see that on your report?

A. Where on page 15 are you referring to?

Q. First paragraph. It's like the second sentence, the psychological techniques of interrogation --

A. Okay. Yeah.

Q. -- in number 2?

165

A. Sorry. I didn't mean to talk over you. Yeah, I see it.

Q. Okay. So you have one technique that you state crosses the line is this -- that the interrogator communicates to the suspect that they will receive a, you know, a higher charge or more severe punishment if the suspect does not provide a confession, but if the -- but if the suspect provides a confession, they get a lesser charge or a lesser punishment; and then the second pattern that you identify is that the interrogator wears down the subject until the -- the suspect until the suspect feels he has no choice but to confess.

And my question to you is, do both of these patterns have to be present for one -- do both of these patterns have to be present for an interrogator to induce a false confession?

A. No.

Q. Okay. So it can be one or the other; is that correct?

A. Correct.

Q. Okay.

A. Can we think about taking a break? I think it's been more than two hours since the last break.

166

Q. Yeah. Why don't we -- we can take a break now because -- since I'm just starting this -- this. So let's go ahead and take a break now.

THE VIDEOGRAPHER: Off the record at 2:47 p.m.

(Recess.)

THE VIDEOGRAPHER: We are back on the record. The time is 3:04 p.m.

By MS. SCHROEDER:

Q. Okay. Dr. Leo, let's continue reviewing your report here. I think I might jump ahead.

So if you could turn to page 16. And we have got a title here, the three sequential police errors that can lead to false but sometimes detailed confessions, and then you have a footnote number 19, we go down to number 19 and it begins that there is substantial empirical scientific research literature on the three sequential police errors and then you have a string cite of literature. Is this the empirical scientific research literature that you are referencing and relying on?

MS. PIERCE: Object to form.

THE WITNESS: Yes. But again, I want to make clear that these are books and articles that summarize the main findings of that research

167

literature. So whenever any scientific field develops a certain point, there is always going to be textbooks and review articles. These aren't the actual empirical studies themselves. And the reason that I cite them is because they are so comprehensive. So they review the main studies and cover it -- more territory than if they were just a single empirical study.

By MS. SCHROEDER:

Q. Okay. So did you create any empirical scientific research that supports three sequential police errors that can lead to interrogation induced false statements, admissions, or confession?

A. Well, yes. I mean I -- that typology actually comes from my research, even though others have used it, so it's my conceptualization but the -- I have done research on all three of those errors, right? So why do is that police misclassify suspects. As I say in the section, interrogation is designed only for guilty people so, you know, why -- why -- police are never supposed to interrogate innocent people, as they say in their manuals, so why does that error happen. And then, secondly, police are trained not to use any coercive techniques and they are also trained not to get

168

false confessions so why does that happen? And I have done research on how and why certain interrogation techniques lead to false confessions. And -- and then the issue of contamination inscripting, how is it that these false confessions end up appearing to be true through feeding coaching, editing, correcting that occurs in the interrogation process sometimes, and particularly in the false confession cases. I have done research on that as well. So I have done research on all three of these errors, but even though the framework comes from me and even though I have done research on all three of them, you know, I'm just one small person in this bigger body of research. You know, I have been doing it longer than almost anybody now in the field, not everybody but most, but -- but I'm just one small part of the body of research.

Q. Oh, did you actually publish any of the articles you cite here where it was specific empirical scientific research that you developed?

A. Well --

MS. PIERCE: Object to form.

THE WITNESS: -- one of the articles I cite is by me and then one of the books I cite is by me. So the article that I cite is really a review of the

169

literature and the book I cite, these are the last two cites, the book is based on the body of my research and existing research to 2008.

By MS. SCHROEDER:

Q. So are those more summaries than of the one the article says summary of the literature that is out there and the other one is a summary of your body of research?

A. Yeah. The last book is more distinctively my research and my analysis of the problem in the field. But yeah, they are all -- all of these citations are reviews and syntheses of the main findings and frameworks for understanding police interrogation and confessions in the social science research literature going back over 100 years.

Q. Okay. And then the three errors you identified are misclassifying an individual as a suspect, the coercion error, and it seems like a lack of certain actions that should be taken in a post admission phase.

Are those the three errors, am I correct, that you identify here?

A. Yeah -- yes, although I would --

Q. Generally?

A. -- I would state them a little bit

170

differently, right? Misclassifying somebody as a suspect, I would say misclassifying somebody as guilty, as arriving at a presumption of guilt and subjecting them to an interrogation when in fact they are factually innocent. And the last one I would say is contaminating the suspect's narrative by feeding the suspect facts and correcting the errors in the suspect's confession narrative.

Q. Okay. So I want to make sure. So it's not a misclassification as a suspect, it's the misclassification as a person is guilty; is that correct?

A. Yeah. Or I would say subjecting somebody to a guilt presumptive interrogation which relies on a belief that the person is guilty. The -- the leading manual, the Reid manual says only interrogate somebody after you investigate the crime thoroughly and you are, the officer, reasonably certain they committed the crime, right? So that reasonable certainty is a belief in the suspect's guilt which in the interrogation becomes a presumption of guilt, and if the person is in fact guilty, then the police have not made a misclassification error. But in the false confession cases, that's the first error they make,

171

misclassifying the person as guilty and subjecting them to a guilt presumptive interrogation. You could have somebody who is a suspect but the police nevertheless don't interrogate that person. Maybe they think, well, we don't have enough information, we need to do more re -- we need to do more investigation. So it's not -- the misclassification error is not classifying the person as a suspect, it's concluding they committed the crime and thus subjecting to a guilt presumptive interrogation.

Q. Okay. And if an officer conducts some type of investigation of the individual that they suspect is guilty, then after that investigation proceed to interrogate him, I mean is that one step of guarding against the misclassification of an individual as guilty?

A. I didn't understand -- maybe I just didn't hear part of the first part of the question.

Q. That's okay. I was putting two thoughts together.

So is one way to guard against misclassifying an individual as guilty is by investigating the crime first before interrogating an individual; is that what you're saying?

A. Well, police are trained to investigate

172

before they interrogate, and the Reid manual does say, you know, you want to have a strong factual basis, in fact don't interrogate anybody unless you are reasonably certain that they committed the crime. So I -- I think we can say inferentially from that, that if I understand your question correctly, then I agree with it, that one way to guard against the misclassification error would be to do a thorough investigation prior to subjecting somebody to an interrogation that it should be -- go ahead.

Q. Oh, go ahead. I'm sorry.

A. No, no. It's okay.

Q. Okay. And so then after that takes place and the officers interrogate the individual, then are there instances, right, that during the interrogation the officer can determine that this person is not culpable in the crime?

A. That can certainly happen, yes, but it goes against the logic of the Reid method and the logic of the way interrogation is practiced in America, that you are only supposed to interrogate somebody who you are reasonably certain is guilty. The Reid manual and other manuals and training programs teach, you know, this is not the time to evaluate

173

alibis. You have already done that. The reason they are there is because they are guilty and you are there to get the confession. And so it's possible that the investigator could determine that the person didn't commit the crime and stop interrogating and let them go but it goes against the logic of the selection criteria, the logic of only interrogating people who you are reasonably certain are guilty, and it also goes against really what the Reid method says in their manual and their training, you know. They don't really say here are things to look out for when you're interrogating, they just assume the person is guilty because of the investigation and the reasonable, quote, unquote, certain certainty that the officer is supposed to exercise before subjecting somebody to an interrogation.

Q. So are you saying that an officer should only interrogate an individual whom they have determined is guilty?

A. Well I guess what I'm saying is that is what Reid training, and most American interrogation follows Reid training. That's not my personal recommendation. You know, I -- I think I would have a different framework for evaluating this, but --

174

but that is what the Reid method and other training manuals say.

Q. One way you have noted to guard against these police errors that could lead to false confessions is by investigating an alibi; is that correct?

A. Yeah -- yes, but I would -- I would say more broadly thoroughly investigating the case and the possible suspect's involvement before subjecting them to an interrogation. In my writings, I've recommended some kind of cause standard so that you couldn't just willy-nilly interrogate somebody. You would either have to have probable cause or reasonable suspicion, some threshold of evidence that could -- that -- that a judge looking at after the fact could say, yes, you -- there was reasonable suspicion, it wasn't certainty but it's what we mean in constitutional criminal procedure that this person could have committed the crime, facts and inferences that go beyond speculation and hunches based on case investigation or probable cause, which as you know is a higher standard. And once it -- you know, wherever you set the cause standard, you have to have that met before you can subject somebody to an interrogation. That would be I think

175

a better way of dealing with this because it wouldn't just be a manual saying to a police officer, if you're certain, it would be something that the suspect -- that the police officer would have to justify after the fact to a judge. Judge would say, why did you interrogate this person? Well I thought they were guilty. Why did you think they were guilty? Well, you know, they told me some story that didn't add up. Well, okay, but did that give you reasonable suspicion or probable cause to believe that they committed the crime? No, it was just a story that had discrepancies about something that had nothing to do with the crime that didn't add up. Wouldn't be good enough. So I -- I would guard against it in a way that provided judicial oversight not that allowed the police to be the judges of their own cause.

Q. So if an officer is given the go ahead by a state's attorney to arrest an individual, would that suffice the judicial overview in meeting this standard of probable cause that you have just discussed?

MS. PIERCE: Object to form. Incomplete hypothetical.

THE WITNESS: Well it may or may not

176

because, as you know, a judge would have to review any arrest decision and a judge might throw the arrest out or the fruits of that arrest out because it was not based on probable cause. So, as you know, the state's attorney or attorney general or prosecuting authority is a member of the executive branch of the government just like the police and therefore doesn't really provide any meaningful oversight in the way we conceptualize oversight in our adversarial legal system. So, you know, it might be in a case that the attorney general, there really is probable cause but ultimately that's for a judge to decide, not for a prosecutor or an attorney -- a state's attorney general or for a police officer.

By MS. SCHROEDER:

Q. But if there is a finding that there is probable cause to hold an individual for further police investigation and interrogation by a judiciary, does that suffice for your -- your personal bar with regards to interrogating an individual?

A. In that -- in that recommendation, yes, so long as it was an accurate finding, right, that -- the idea being that it -- it created some level of

177

cause before the person was subjected to an interrogation, just like police are required to get some level of cause before they can get a search warrant to search your house. And so in theory that would be --

Q. Okay. I'm sorry.

A. Sorry. In theory that would be a protection against the misclassification error. Would it be perfect? No. Police make mistakes. Judges make mistakes. Everyone makes mistakes. But in theory it would be one possible protection against the misclassification error.

Q. But this doesn't actually exist as an accepted police practice at this time or in 1977; is that correct?

A. That is correct. You don't need to have a probable cause -- you don't need to demonstrate probable cause or reasonable suspicion in order to legally interrogate somebody if you are a police officer, correct.

Q. You rely on this notion about having probable cause established before an officer interrogates an individual when you are assessing various cases?

A. No, I don't rely on that. It came up

178

because you asked about protections against misclassification errors, and one thing that scholars do is make recommendations based on research about how to make things better and I was just suggesting that would be one way to make things better with regard to your prior question about safeguards against the misclassification error. You know, obviously no one wants these three errors to occur. Nobody wants to get false confessions.

Q. What -- what exists -- sorry. What exists then and what you evaluated in this case with respect to the misclassification error is whether a complete investigation had been done before the interrogation of Mr. Savory; is that correct?

A. Yes. Whether a thorough factual investigation of Mr. Savory's involvement had been done. And obviously I concluded it had not been done because there was no -- in my opinion based on all of these materials that I reviewed, there was no logical, factual, or empirical basis to believe that he had committed this crime and, therefore, there was absolutely no legitimate reason in my opinion to subject him to an interrogation.

Q. So part of that investigation -- thorough investigation of Mr. Savory would be investigating

179

his alibi; is that correct?

A. Part of it would be involved in investigating his alibi, part of it would be -- would involve also investigating whether there is any evidence at all that he was involved in the crime and then part of it would also be involved investigating other suspects and the evidence at the crime scene and what direction that points to.

Q. Is there evidence that he was involved -- as part of this thorough investigation, what types of evidence hypothetically would you expect an officer to be investigating prior to an interrogation?

MS. PIERCE: Object to form.

THE WITNESS: Well, it depends on the type of case, but when you have a homicide case, particularly a rape/murder, especially one as bloody as this, a double murder involving, you know, a knife and lots of blood, lots of stabbing, lots of forensic evidence, I would expect there to be some investigation of that evidence. And then there is a lot of surrounding information. So talking to people and figuring out what logically makes sense. And when police do that, they find things out that may push them in one direction or another.

180

So just to give one example. There is this dog trouble man, and everybody says this German Shepard dog is vicious and if a new person comes into the house, you know, the dog -- the dog has to be kind of put in another room or restrained and so that suggests that because the dog was in another room -- was in another part of the house at the time that that is suggestive of somebody committing the crime who knew the victims and had been to the house many times before. Right? Somebody who was familiar to the dog. So that would be one fact to consider when narrowing the range of suspects.

You have two people who are brutally murdered, one of them is 19, one of them is 14. You know, it would take a certain sized individual to be able to pull off both brutal murders and stabbings. That would also affect the analysis of who would be a reasonable possible suspect. One would like to investigate possible motives, who -- why would somebody kill these two people? And think about the range of suspects who might have a motive to do that. So there is a lot of facts that would go into a thorough factual investigation to, in my opinion, avoid committing the misclassification error especially when you have so much forensic evidence.

Q. Okay. And just to clarify again, you have no training in police investigations; is that correct?

A. Well, again, no training in police investigations but extensive training in police interrogation. I have even given police interrogation training. And police interrogation, as this whole discussion of the three errors suggests, doesn't begin with police interrogation and it doesn't end with the confession, right? So, you know, the -- the investigative process that leads to the selection of a suspect is part of what I mean by police interrogation.

You know, I -- I put on some interrogation training courses many years ago for a couple of police departments in Florida. We didn't start with the interrogation or confession, we started with the investigation that leads up to the interrogation. And when -- we didn't end with a confession. We talked about the post admission narrative, about corroboration, how to take and document a confession, what to look for, et cetera, and that's exactly what the police interrogation training manuals do. So, yes, I am not a general expert on police investigative practices. I never said I was. But I am an expert on police investigative practices as they relate to the police interrogation and confession taking process.

By MS. SCHROEDER:

Q. So are you now saying that your definition of interrogation also includes police investigation?

MS. PIERCE: Object to form. Argumentative. Misrepresents the testimony.

THE WITNESS: Strictly speaking, no. An interrogation begins at the moment of interrogation. But if you want to be a good interrogator and/or you just want to have a good understanding of confessions and how interrogations lead to true, false, coerced, voluntary confessions, you have to -- you have to start prior to the interrogation to understand that and that's why in this section that we're talking about, page 16, I talk about the three sequential errors that lead to a false confession that leads to a wrongful conviction of a factually innocent individual. The process starts prior to the interrogation.

By MS. SCHROEDER:

Q. You have mentioned a couple times about logic, right, that in a thorough investigation of an alibi, evidence, other suspects, and that you follow that where it logically makes sense. Did I just repeat that in -- in what you meant? Did I say that correctly?

A. I think so. Maybe I would have said more than that. But yeah. I mean first of all, when you say evaluate an alibi, the only reason you would evaluate somebody's alibi is if you have evidence in the first place that they are involved in a crime, right? We don't just pick people off the street and say, okay, give me your alibi, right?

Q. Uh-huh.

A. So -- and part of what I was saying was that you want to look at the factual basis for somebody's possible guilt given the crime scene and given the logic, you know, the logic of physics and the logic of evidence at the crime scene that directs you to narrow your hypothesis about the kind of person or people who could have been involved in the crime.

Q. So whose logic are you referring to?

A. Well --

Q. Who is the individual that has to be logically evaluating this?

A. Well, the investigator presumably. Right?

Q. Okay.

A. If -- you know, if -- if there is seminal fluid on a homicide victim, you wouldn't -- you would logically rule out the person -- a person -- a boy who -- and I'm not -- I'm talking hypothetically, I'm not talking about any specific case, but a male who had not reached the age where they could ejaculate as a matter of logic could not have produced the semen that was found on the body in this hypothetical I'm giving you. Right? So that -- that's all I mean by logic. That would be an example. An example of a dog who would attack anybody who the dog was not familiar with and thus the person who committed the crime, you know, the dog is roaming the house, that would be another example of logic. Or if, you know, the dead victim was 250 pounds and -- and, you know, a professional prize fighter, you would think that if they were stabbed to death, again hypothetically, you know, it would take a certain physical strength or number of individuals to pull that off. So I think you know what I'm referring to. It's not my logic, it's just the crime scene evidence the more you learn about it creates understandings that rule out certain possibilities because they wouldn't make any

185

sense.

Q. When you say "they wouldn't make any sense," you mean sense to the investigator?

A. Yes. Like the first example I gave, you can't say that a boy who hasn't reached the age where he could ejaculate seminal fluid could possibly have been the source of the seminal fluid ejaculated onto the body of, you know, my hypothetical victim.

Q. Okay. Okay. And then -- so just moving to the next error, which is coercion error, and that you describe on page 17 as techniques used by the interrogators that accuse the suspect of committing the crime persuading him that he is caught, evidence is overwhelming that establishes his guilt, and then the interrogator induces him to confess by suggesting it is the best course of action for him, and that by employing these techniques, false confessions can sometimes result from innocent suspects. Is that a correct summary of what you wrote there?

A. Yeah. Yes. You know, anything about the interrogation process that overwhelms and breaks down the will of an innocent suspect and causes them to make or agree to a false confession would fall

186

under the category of coercion error, and of course some individuals are more vulnerable than others, and so I think in my writings I also talk about the vulnerability of the individual. You know, it doesn't take the same amount of coercion to break all individuals. So -- but that is what I mean by the coercion error, how -- what was it about the interrogation process interacting with the suspect's personality that caused the person to become so desperate or fearful or broken down that they made a false confession to a crime they didn't commit or agreed to a false confession to a crime they didn't commit.

Q. Identify if a coercion error has -- has occurred, it sounds like you -- it's on an individual basis so that you would have to assess the suspect to their individuality versus a generalization of research findings; is that correct?

A. Well, I think to assess an individual's vulnerability, yeah, you would look at their personality and their age and their intellectual ability or disability, possible mental illness, suggestibility, but there are patterns that we see in the research that are well known and so threats

187

promises, excessively lengthy interrogation, deprivations, these kinds of coercive techniques are associated with and increase the risk of false confessions, as do some other techniques. So it's not just, you know, every individual has to be analyzed uniquely. That's true in terms of what they bring to the interrogation in a sense because some are more vulnerable than others but we know from well documented, well understood reasons why certain techniques and practices are psychologically coercive and are associated with and increase the risk of eliciting false and unreliable confessions.

Q. You're mentioning that individual's levels of vulnerability vary. And so if you don't know what that individual's level of vulnerability is, how are you able to make an assessment whether or not what you deemed these techniques would actually cause or coerce a false confession to happen?

A. Well there -- there are certainly times when police can't on the face of it identify an individual vulnerability. For example, we know people with low IQs are more vulnerable but oftentimes people with low IQs, particularly in the borderline intellectual functioning range, can mask

188

their intellectual disability and not come off as intellectually or cognitively impaired as they are. However, that's not true for other vulnerabilities, like age. So if police are interrogating somebody who is very young, they should know that that person is more vulnerable to psychological coercion, psychological pressure, to making or agreeing to a false confession. And also, if police use certain techniques, like threats or promises or excessively lengthy interrogations, they should know that not only are those techniques problematic from a legal point of view but they also increase the risk of eliciting false confessions. And again, this is a point that not only do I make in my report but Chief Titterington makes in his report as well.

Q. I am interested in learning how you as a researcher or expert in this case evaluating the file before you, how you're able to assess an individual's vulnerability so that you know what level of vulnerability they had when they were in the interrogation.

A. So there are three categories of individuals that are more vulnerable generally. One is people who are intellectually disabled. We used to say mentally retarded but that is not a

189

politically correct term anymore. And that is measured essentially by IQ. Right? So 70 or below, which is two standard deviations which is one to two percent of the population were mentally retarded or intellectually disabled. So if you know that somebody has an IQ in that range, you know, it's not like 70 is the magic line, it could be 74, it could be 68, you know if you know the research why they are intellectually disabled. They are slow thinking, they are slow functioning they don't understand things, they are more suggestible. Okay? So that is one group, right? And I don't make those diagnoses but I'm very familiar with the research on intellectual disability, cognitive impairment. So I would rely on either school records or medical records or psychological records which often involve testing of individuals with low IQs.

Another group is the mentally ill. Now the group within the mentally ill that are more vulnerable tend to be people with reality monitoring disorders. That may or may not be obvious in an interrogation. I am not a psychiatrist. I think there may be actually an error on the -- an inadvertent error on the response to your subpoena. I think it misidentifies me as a psychiatrist. I'm

190

a social psychologist. I'm not a psychiatrist. But obviously a psychiatrist would make -- and some other areas in psychology would make mental health diagnoses. Again, I would rely on records and reports and my knowledge of the research. So those are the first two that I'm listing of the three categories.

The third is youth. Now, there are a lot of people who are 17 or 18 who look like they are 25 but there is almost no one who is 14 and doesn't look like they are a juvenile -- aren't a juvenile, right? So that is a little bit more visually identifiable. And we have a whole body of research on development -- the development of the brain and all the reasons why juveniles are impulsive, psycho-socially immature, more easy to lead and manipulate.

Outside of those three categories of individuals, there are clinical tests for why some individuals are more suggestible and some individuals are more compliant and therefore more likely, even if they don't belong into any of these three categories, to make or agree to a false confession. Again, I would rely on psychological testing and reports. And it's fair that a police

191

officer might not know that somebody who appears to be a mentally normal adult is highly suggestible or highly compliant. They may get a sense of that in their interrogation. It's fair that they may not know somebody is intellectually disabled, although a lot of people it's pretty obvious that they're -- have low IQs and they're slow functioning And they may not know that somebody has a mentally illness that -- although in some cases that is clear, anybody could tell. But I just don't think for youth, especially as you get into the kind of 15 and younger, somebody wouldn't know that the person is a child and because they are a child, they are far more vulnerable. Any parent would know that, but especially a police officer would know that, and it's the basis I believe for a lot of these parental notification laws that don't exist in all states but exist in many states where before you can commence an interrogation, you have to contact a parent or a guardian because the person is not the same as an adult. They don't have the came capacity to function in a situation like that.

Q. And you -- in your review of the file, did you determine that Mr. Savory was intellectually disabled?

192

A. No. I didn't see any evidence that he was intellectually disabled that I recall. My concern was with his youth.

Q. Well I was just going to go through. Did you find any evidence that Mr. Savory was mentally ill in 1977?

A. Not that I recall, no.

Q. Okay. And so then is the only factor of the three categories you are basing any sort of conclusion about a coercion error would be based on Mr. Savory's age; is that correct?

A. Well, no. I mean the coercion error remember is primarily about the techniques police use, but -- and as you know from this report, I have a lot of discussion about why I think these techniques are psychologically coercive that he describes and even -- even some that are just in the record that -- that aren't described by him that aren't disputed. But in terms of his vulnerability, which is part of the coercion error, I would say the one that I'm focused on is his age. He is 14 years old --

Q. Yeah, I'm sorry.

A. -- he is in 7th grade. No, no. That is okay.

**193**

Q. I appreciate that. I misspoke. I did mean vulnerability so I appreciate that.

Did you review any school records of Mr. Savory's?

A. You know, I don't think I did. I don't recall as I sit here today reviewing school records.

Q. Okay. They would be in the materials list, though, if you did; is that correct?

A. Correct.

Q. Okay. And then did you review Mr. Savory's juvenile file?

A. I don't believe I did.

Q. Okay. And did you review any psychological assessments of Mr. Savory?

A. Not that I recall.

Q. Okay. Did you review the pre-sentence investigation that was conducted on Mr. Savory prior to his sentencing in this case?

A. If I did, I don't remember it. I don't recall reviewing the presentencing report in his case or cases since he was tried twice.

Q. Okay. So let me get back here. So now the post-admission phase I'm really curious about. So the post-admission phase which you discuss as the

**194**

process that occurs after the police have elicited an admission from the suspect.

And first what I want to ask you is, on page 17 you -- you put as an example of an admission in quotes, I did it. So are you saying that the admission is some sort of inculpatory statement that the suspect makes with regards to the crime that is being investigated?

A. Yes. Or agrees to. So, by admission, you know, just an admission to the act, and that's distinguished from the post-admission narrative because usually police press for an explanation, a story about how and why the suspect committed the crime and so the first step really toward that is admission. And when you put admission, I did X, together with the post-admission narrative, here's how and why I did X, and sometimes the suspect volunteers it, sometimes they are just agreeing with what is being suggested and sometimes it's in the middle, when you put those two together, admission plus post-admission narrative, that is sometimes what we mean by confession, right? A confession is not just saying you did a crime, it's saying why you did a crime in addition to that you did the crime.

Q. And so here, if I'm reading correctly, a

**195**

way to guard against the elicitation of a false confession is by doing this post-admission -- it looks like -- well you called it post-admission phase of the interrogation and it appears to be, and correct me if I'm wrong, that it would be to continue to ask questions of the suspect to gather information that is not known or could not be guessed by chance; is that correct?

A. That is correct. So the police manuals also say this, this was the idea that I referred to earlier, that, you know, the interrogation -- the interrogation process doesn't end with the confession. Police manuals talk about holding back non-public facts and never -- never leaking them so that if they can get the suspect to provide those non-public facts not likely guessed by chance, then that would corroborate the personal knowledge that you would expect the true perpetrator to have. And if the suspect cannot provide that information, they are guessing, they are getting things wrong, that would be evidence consistent with a false confession.

Q. Okay. And is that -- then so is the purpose of this post-admission interrogation is to -- is to gather information that corroborates the

**196**

fact that this suspect did commit the crime?

A. Well, I would put it a little bit differently. First of all I would say that once they get the admission they should go to an interview based process where they are asking open ended questions, they are not suggesting answers, they are not being accusatory. So the post-admission process should be more interview based. And then secondly, I would say it's really not the function of investigators to -- to convict somebody, right? So they should be gathering information not to prove the person's guilt but to corroborate or disconfirm the accuracy of the incriminating statement, that if it's clear the confession is false, that's just as much -- that is just as important an investigative part of the process as if they in fact prove through the post-admission interviewing that the person has non-public detailed knowledge not likely guessed by chance that corroborates the accuracy of the confession. Just like when they go out and gather physical evidence and then come back and compare it to the confession, if it lines up with the confession, great, it corroborates the confession. If it doesn't and it leads to somebody else, well,

that's too good in the sense that, you know, you have now excluded the confession and the confessor, right? The goal really is to get the truth, not to confirm the accuracy of a piece of evidence.

Q. Are -- true confessions then are typically corroborated; is that right?

A. Well, I don't know if that is a fair statement because there is a different -- there are a lot of different types of crimes. And I would say in homicide cases where there is substantial forensic evidence, yes. But, you know, in other cases that rely entirely on testimonial evidence, the answer may be no.

Q. So on page 17, the very last answer, you say, truthful confessions and statements are typically corroborated by solid physical evidence and independent knowledge of underlying case facts that have not been suggested to the suspect. False confessions and false statements are not.

So I'll just ask you again then, are you saying here in this report that truthful confessions and truthful statements are typically corroborated by physical evidence and independent knowledge of underlying case facts that were not suggested to the suspect?

A. If physical evidence exists and if the investigation is done properly, then yes. And I would say false confessions are not, although, you know, there are times, you know, where cases involving false confessions are corroborated by illusory evidence, other bogus evidence, and that leads to convictions. There is a lot of research on this. For example, jailhouse informants who are induced to falsely claim that the suspect confessed to them and then it turns out later that they recant and they were just lying. So false confessions in the cases that lead to wrongful convictions, oftentimes there is the assertion that there is corroborating evidence but it's not meaningful or accurate corroborating evidence.

Q. So then what are the -- so then what you are evaluating with respect to a post-admission interrogation -- the post-admission phase of interrogation, what are you evaluating to determine specifically in this case that the officers actually did investigate his statement in order to determine if there was corroborating evidence?

MS. PIERCE: Object to form.

THE WITNESS: Well, first of all, we don't have a recording, obviously, but my interpretation is even if you rely on Officer Teplitz-Brown's account, is that there was a lot of correction going on. First of all, Mr. Savory appears to have gotten a number of things wrong. He misdescribed the crime scene. He misdescribed the sequence and location of the events. So there is a lot of post-admission errors. There is a lot of evidence that he didn't have the personal knowledge that you would expect the true perpetrator to have, and it appears to me that the investigators were completely clueless about that because they had their minds made up and were trying to build a case against him regardless of the evidence. And there is also a lot of evidence that they were feeding and correcting him, educating him about the crime facts so that he would spit back correct facts that were not the product of personal knowledge but were the product of contamination. And then following the confession statement, it seemed to me that, as Chief Titterington mentions in his report, they really didn't do a thorough analysis of the physical evidence all of which contradicts his involvement in the crime. There is absolutely no physical evidence that links him into any -- in any way to this crime, as you know, and substantial physical evidence that dispositively excludes him as the true perpetrator. So I think they failed to do the proper post-admission narrative analysis one would expect in a case like this.

Does the post-admission narrative reveal non-public, non-likely guessable by chance knowledge that only the true perpetrator and the police would know but that the police didn't feed to the suspect, does it lead to new and missing evidence, does it fit the facts of the case, is it logically possible or probable, is it corroborated by or disconfirmed by the forensic, physical, medical, scientific evidence or not.

Q. Now when you reviewed Officer Teplitz's report that -- that memorialized the set of questions that she initially asked Mr. Savory, what about those questions made you determine that they were not appropriate post-admission interrogation questions?

MS. PIERCE: Object to form.

By MS. SCHROEDER:

Q. Do you recall those questions and reviewing them?

A. Generally, yes, I do recall them. She corrected him on a number of things, you know, could

201

it be --

Q. I'm talking about the -- I'm sorry. I'm talking about the interview before that. I'm talking about the question and answering before that.

MS. PIERCE: Sarah, I think if you want to ask him about specific reports or forensic reports you need to show it to him.

MS. SCHROEDER: Okay. I just want to make sure I have the right one here. There is no Bates stamp. Maybe it's up here. Hold on.

By MS. SCHROEDER:

Q. Dr. Leo, when you did do your assessment of -- of this -- of the -- the retelling of what occurred between Mr. Savory and the officers, did your analysis include on one hand only Mr. Savory's description and then you made an analysis and then on the other hand only the officers' description and then you made an analysis?

A. That's what I tried to do in the report. That's why I break it out that way. But there is also overlapping facts that aren't in dispute that -- you know, that may be part of both of their accounts.

Q. Okay. So in your assessment, would you

202

have done your analysis of the interrogation and the questions that were asked of Mr. Savory starting at 3:30 in the afternoon on the 25th all the way through until 11:30, I think it was, on the 26th, would you have analyzed the -- the record based solely on the officers' description?

MS. PIERCE: Object to form.

THE WITNESS: Well I tried to do that in the second part of the report, right? So I tried to give their account. Obviously there is a lot of officers. There are -- sometimes their accounts aren't entirely consistent, particularly with regard to timelines, but -- but, yeah, I tried to give their timeline narrative, what they describe, and then do an analysis of that after going through Mr. Savory's description of what he recalls occurring and doing an analysis of that.

By MS. SCHROEDER:

Q. And then your analysis of Mr. Savory's description was a description that he gave in 2023; is that correct?

MS. PIERCE: Object to form.

THE WITNESS: I think that one of his depositions was in 2022, one was in 2023, and I think that article that I read by him was in 2004

203

but I could be misremembering.

By MS. SCHROEDER:

Q. Okay. So -- so we will say at the earliest his description of what occurred was in 2004, that was your closest in time to January 25th and 26th, 1977, that you reviewed of an account that was given by Mr. Savory; is that correct?

A. Unless there is something I'm not remembering in the materials listed that I reviewed, yes, that is correct.

Q. Okay. And the police reports of the officers' description of what occurred were memorialized either on the same day or within a day of the events occurring in 1977; is that correct?

MS. PIERCE: Object to form. Foundation.

THE WITNESS: I don't recall the exact dates but I know they were -- I believe they were near in time.

By MS. SCHROEDER:

Q. Okay. So they were considerably closer in time to the actual events than Mr. Savory's description; is that correct?

MS. PIERCE: Object to form.

THE WITNESS: Correct, yes.

By MS. SCHROEDER:

204

Q. Okay. Okay. So I'm trying to find the Bates stamped version of Marcella's report, but I think I will pull that up. We will take a break instead of wasting -- not right now but when we next take a break then we can -- we can review that.

Okay. So let's go back to your report here. Okay. So just discussing the vulnerable individuals. So your next section here on page 18 discusses populations with a particular vulnerability in the interrogation room and then you have a footnote, number 25, and we looked on there and again you cited -- you state there is substantial empirical scientific research literature on individuals who are more susceptible to making or agreeing to false statements, admissions, or confessions during a police interrogation. And then you have a listing of articles and books. And so I'm just asking you, is this the empirical scientific research literature that you're relying on for this part of your report?

A. Well, these are the best summaries of that body of literature that I'm relying on. Right? These are books and articles that review the field and the main findings, including the findings on the types of individuals who are more susceptible to

making or agreeing to a false confession and individual vulnerabilities.

Q. Okay. Again -- and I may have -- is this again articles and books that are more a review of research that has been out there or is there anything in here that is empirical scientific research of which you have created with respect to this topic?

A. Well, there is.

Q. About individual vulnerability?

A. No. I think it's all review with respect to individual vulnerability.

Q. Okay.

A. Review of the literature.

Q. What is it about it -- a juvenile's age that you are relying on to say that that individual is more vulnerable than any other individual?

A. That the brain is not fully developed and, as a result, juveniles are psycho-socially immature, they are impulsive in their behavior and decision making, they are risk taking, they are more gullible and naive, they are more trusting of authorities, they are more easily led and manipulated, they tend to be more suggestible and more compliant. So there is a cluster of personality traits that make them more vulnerable to making or agreeing to a false confession.

Q. So how do you determine that those traits that you just cited are -- are -- are in existence in a particular juvenile?

MS. PIERCE: Object to form.

THE WITNESS: There is no way that I would be able to determine that. I mean these are -- these are characteristics that I think are universal to some degree or another in juveniles. Right? We know that the brain is not fully developed until the early to mid-20s. So some of these are true by definition. But the degree to which somebody is suggestible or compliant, more easily led and manipulated as a function of their age could vary by individual and -- and you would need a different kind of specialist to really assess the degree to which this is present in any particular individual. But these are such omnipresent qualities in juveniles that, you know, it's believed that they are usually present to one degree or another. A lot of social science is about tendencies and probabilities, right? It's not absolute. But this is -- these are very strong findings. And to the extent they are developmental, some of them are

invariant.

Q. Aren't you basing your findings to a degree of certainty based on your empirical science research?

MS. PIERCE: Object to form.

THE WITNESS: Well, if I understand the question, I'm -- my findings are probabilistic, right? I'm saying a juvenile at this age, 14, would be far more vulnerable to making or agreeing to a false confession based on the research and here's why. I'm not saying he made a false confession necessarily. I'm not saying he is absolutely more vulnerable. I'm saying based on this body of research, substantially more likely. Right? Smoke a pack of cigarettes a day, substantially more likely you are going to get lung cancer for well known reasons. If you are a 14-year-old and you are interrogated, particularly aggressively interrogated, substantially more likely that you are going to get a false confession for well understood reasons. Does that mean that every 14-year-old interrogated falsely confesses? No. Just like everybody who smokes a pack a day doesn't get lung cancer but there is a strong probabilistic causal connection for well researched and well understood reasons.

By MS. SCHROEDER:

Q. So this assessment then is not specific to Mr. Savory, you are making this assessment based on your generalities of 14 year olds; is that correct?

MS. PIERCE: Object to form.

THE WITNESS: Well, yes and no. You know, somebody walks into a doctor's office with a set of symptoms and the doctor says, well, based on what you're telling me, I think it's very likely you have X, Y and Z. Is that general or specific? The doctor is drawing on general expert scientific knowledge to make specific inferences that are probabilistic. So based on what I know of Mr. Savory's age, I think it's specific but I'm drawing on a body of research that generalizes and so I'm generalizing when I say, yes, a 14-year-old is more vulnerable and here's why. But the fact is he is 14. Just the like who walks into the doctor's office and says I've got symptom A, symptom B, and symptom C. That may or may not -- the body of research the doctor is drawing on to draw inferences may or may not apply to that person but he is or she is trying to apply it to that person in the same way

I'm doing here.

Q. So are -- did you make a determination that Mr. Savory was an impulsive 14-year-old?

A. I did not --

MS. PIERCE: Object to form.

THE WITNESS: Yeah. Sorry. I did not make that determination. I'm saying this is a characteristic well known of 14 year olds along with this other cluster of personality traits and characteristics that go along with being a juvenile, particularly under 15. The degree to which his -- you know, if there are psychometric or clinical tests for impulsivity, that would be for a different expert -- different type of expert to assess.

By MS. SCHROEDER:

Q. So what you're saying here is that you did not make a determination that Mr. Savory exhibited any of these traits. You are saying because he is 14 years old, he could have had these traits but there is no determination by you that he did have these traits.

MS. PIERCE: Object to form. Misrepresents his testimony.

THE WITNESS: I'm not saying that -- making a clinical determination that he is psychosocially immature, impulsive, more easily led and manipulated, naive, gullible, highly suggestible, highly compliant, but I'm saying these are traits of 14 year olds well established in the literature and that would make somebody like Mr. Savory at that time far more vulnerable to making or agreeing to a false confession.

By MS. SCHROEDER:

Q. For that to be true, the traits have to be in existence within Mr. Savory when he was 14 years old; is that correct?

MS. PIERCE: Object to form.

THE WITNESS: Yes, that is correct.

By MS. SCHROEDER:

Q. Okay. And so since --

A. Some -- some or all of them. Some or all of them, yeah.

Q. Okay. And so since you don't definitively know whether he had some or all of these traits, you aren't able to say definitively that Mr. Savory was a vulnerable, according to this definition, 14-year-old?

A. I don't think that is really true because -- because, again, going back to the source of juvenile vulnerability, the -- the development of the brain, you simply cannot say that a 14-year-old is not psychosocially immature. You just -- you just can't. They are by definition. The brain still has roughly ten more years to develop. So -- so some of the reasons why they are more vulnerable are true by definition. But I can't say how gullible, how suggestible, how naive Mr. Savory is relative to any other 14-year-old.

Q. Okay. So -- so -- so then, in essence, some 14 year olds could be more advanced than other 14 year olds with respect to their development; is that correct?

A. They could --

MS. PIERCE: Object to form.

By MS. SCHROEDER:

Q. Meaning their intellectual development, not physical.

MS. PIERCE: Object to form.

THE WITNESS: That is certainly possible. You know, there is some gender differences. Women's brains I think develop faster essentially.

By MS. SCHROEDER:

Q. Well, I'm -- I just want to talk about 14-year-old boys?

A. Right. But that was just an example. There -- there might be different life experiences that affect how people go through, how mature people are, how gullible people are. So yeah, there can be differences within 14 year, olds but I don't think there can be any dispute that the brain is under developed and that there is psychosocial immaturity in all 14 year olds and -- and that affects their suggestibility and how they would behave in a situation where they were under a lot of pressure to admit to something by a police officer over an extended period of time.

Q. But it's all on a sliding scale depending on that individual's level of this vulnerability that you have defined through these traits with respect to age.

MS. PIERCE: Object to form. Asked and answered. Mischaracterizes his testimony.

THE WITNESS: I would say there is -- there is undoubtedly variation in suggestibility and compliance and risk for false confession among juveniles, but that at its core, all juveniles, all juveniles are at greater risk by virtue of the fact that they are juveniles, especially those under the age of 14 -- or 15 rather.

By MS. SCHROEDER:

213

Q. Did you do any investigation into Mr. Savory's home life when he was 14 years old?

A. **Not any specific investigation, no. I mean, some of that was described in the police reports that I read, that he was living with his father, but I didn't do any specific investigation into his home life.**

Q. Did you do any investigation into his role as a caretaker for his disabled sister when he was 14 years old?

MS. PIERCE: Object to form.

THE WITNESS: I did not.

MS. PIERCE: Foundation.

THE WITNESS: Sorry.

By MS. SCHROEDER:

Q. Did you do any investigation into his role of maintaining the home finances when he was 14 years old?

MS. PIERCE: Object to form.

THE WITNESS: I did not.

By MS. SCHROEDER:

Q. Did you investigate his responsibilities for maintaining the -- the home when he was 14 years old?

MS. PIERCE: Object to form.

214

THE WITNESS: I did not.

By MS. SCHROEDER:

Q. Okay. Would you agree that this could be part of an assessment to determine the level of maturity that a 14-year-old could have which would affect their vulnerability?

A. **I think that's certainly possible. But again, it doesn't -- it -- I wouldn't think that it would negate the effects of age entirely, but it's certainly possible that there are some 14 year olds who by virtue of their life experience are -- are more mature than other 14 year olds.**

Q. Do you -- do you put any -- well, I guess I don't want to ask it that way.

What is your thoughts on an individual's previous experiences with police officers in relation to that individual feeling vulnerable when they are talking to an officer on a later crime? So I guess what I'm asking is, how do you weigh -- in your assessment of an individual's vulnerability with police officers, how do you weigh that individual's previous experiences with the police department, whether it be for an arrest or an investigation, that sort of thing?

MS. PIERCE: Object to form.

215

THE WITNESS: Well, I think it would depend on what exactly their experience is. I would need to know more about that.

By MS. SCHROEDER:

Q. Okay. Have you in your -- in your employment as a consultant or doing a case analysis with respect to a disputed confession, have you taken into account an individual's previous experiences with a police department?

A. **Well I'm sure I have in some cases, yes.**

Q. Do you know what you would have -- how that -- what you took it into account for? Are you trying to assess vulnerability or is there some other factor that you're trying to assess and you feel that an individual's previous contacts with the police department would affect your assessment?

A. **Well, I can't recall any specific case off the top of my head but it's possible that a suspect has had either good or bad experiences with police and that may shape their perceptions of police and how they respond to certain events or pressures. But I -- I don't -- it's a very general question and I don't have anything specific in mind so that's the best I can answer.**

Q. Generally, if an individual has had good

216

experiences with police officers, would that tend to indicate that -- that they would not be as vulnerable as an individual who had bad experiences with police officers?

MS. PIERCE: Object to form.

THE WITNESS: I think you need more information. I'm not aware of any study that says -- looks at whether somebody has had good experiences versus bad experiences and whether that makes them more or less vulnerable to false confession.

By MS. SCHROEDER:

Q. How about an individual who purposefully commits a crime to be arrested so that they can be taken out of their home? Do you see that as an individual who is viewing the police officers as let's say a more -- in a more favorable light than their family?

MS. PIERCE: Object to form. Foundation. Incomplete hypothetical.

THE WITNESS: Yeah, I mean I think you are asking me to speculate. I don't -- I'm not aware of any study that would allow me to, you know, give an answer that is anything other than speculation to that question.

217

By MS. SCHROEDER:

Q. So are those specific things though that if you knew had occurred, would that go into your assessment of -- of the level of vulnerability of Mr. Savory?

MS. PIERCE: Same objections.

THE WITNESS: It could. I don't know. I think I would need to know more. It seems like a pretty farfetched hypothetical to me.

By MS. SCHROEDER:

Q. So -- so Mr. Savory, when he was either 14 or just prior to 14, has admitted that he committed a crime and that in the -- the papers -- the court papers it states he did it because he wanted to leave his home because he didn't want to be a burden on his father; and then also in his juvenile file there are documented reports of Officer Teplitz and Mr. Savory where Officer Teplitz was investigating different crimes that Mr. Savory was suspected of. So would those instances be something that an individual should assess to determine Mr. Savory's vulnerability when he was 14 years old?

MS. PIERCE: Are you asking him to assume those facts, Sarah? I think you need to make that clear in your question. I'll object to form.

218

By MS. SCHROEDER:

Q. Yeah. I mean I'm putting it forth as if this actually happened, which we have in the record, then would these things be the type of factors that you would analyze to determine the level of vulnerability of Mr. Savory at 14 years old?

A. Well, I might take them into consideration but I'm not really determining the level of vulnerability. I'm not saying he is 70 percent or 80 percent or 90 percent vulnerable. What I'm saying is that there is developmental research on the brain and juvenile and adolescent decision making that -- that explains how and why they are more vulnerable to making or agreeing to false confessions and then applying it in this case. I don't think that changes my analysis at all. I think he still is more vulnerable by virtue of the fact of his age and his psychosocial immaturity. And I'm not aware of those facts that you're reciting And even if we assume them to be true, I don't think that changes the vulnerability.

Q. You just mentioned his psycho -- did you say psychosocial immaturity?

A. Correct.

Q. Was that correct?

219

A. Correct.

Q. Then is that -- is psychosocial immaturity, was that the factors that you had just identified for me earlier which were the impulsivity, risk taking, easily led, compliant, manipulative or is this something different?

A. The developmental psychologists talk about the development of the brain and the adolescent brain and that the -- the -- because it isn't fully developed, the person is psychosocially immature, what we mean by having the characteristics who's immature psychologically and socially, and the correlates are the things that you are talking about, impulsivity, naivety, vulnerability, heightened suggestibility, more easily led or manipulated. Right? So it -- it stems from the -- psychosocial immaturity that stems from the under development of the juvenile brain.

Q. Okay. So let's move on to the police contamination inscripting which is page 22. Here you state that the research shows that interrogation contamination, which you state is leaking and disclosing non-public case facts, and police interrogation scripting which is pressuring or persuading a suspect to parrot back a police driven

220

narrative of how and why the crime occurred, increase the risk that a confession statement may misleadingly appear to be detailed, accurate, and self-corroborating.

So my first question to you is, when you are talking about police interrogation contamination, are you specifically referencing the leaking or disclosing of non-public case facts during the interrogation to the suspect?

A. Yes. Although there can be other sources of contamination which would occur prior to or after the interrogation. You know, if the suspect for example knew somebody who committed the crime and that person provided them details or the suspect was a witness to the crime or -- or, you know, there could be other situations where somebody knew non-public details and communicated them to the -- to the suspect other than the police, although typically in false confessions the source of the contamination, at least according to the studies, is the police during the interrogation.

Q. So if someone other than the police gave the suspect this information that you would state is a contamination then of the interrogation, if it was someone other than the police, then that -- how did

that play into your analysis that the police interrogation sort of risked that a confession was misleadingly correct and accurate?

A. Well if somebody learned those details from a third party and then the police didn't know that and the prosecutors didn't know that and they took that to be inside information that only the true perpetrator would know and they themselves did not provide it and it's not likely guessed by chance, then they could mistakenly think that corroborates the guilt of the suspect even though it doesn't in this hypothetical. And so in any investigation it would be important to know what pre-existing knowledge the suspect had of the crime and crime scene facts.

Q. Okay. In the second paragraph you state, investigators in practice have been observed to shape the suspect's narrative to make the confession as persuasive as possible and enhance the chances of conviction. And then you cite, I believe -- is this your article or your -- or your book, 2008 Police Interrogation and American Justice?

A. No, no, that is a book.

Q. Okay. So -- so that's your support for this statement.

So my first question to you is, you say investigators in practice have been observed. So which investigators and how did you observe them?

MS. PIERCE: Object to form.

THE WITNESS: Well, that book was based on hundreds of interrogations that I had studied up to that point, but more specifically it also reviewed literature on interrogation contamination, and there is a scholar named Brandon Garrett, that is two Rs and two Ts, Brandon Garrett, who's cited in the section who did a study of the first 250 DNA exonerations and then the next 100, either the next 50 or the next 100, and he just looked at the confession cases where the person was dispositively shown to have falsely confessed and determined that the police investigators had supplied non-public details in those cases in I believe 90 to 95 percent of those cases. So we could go and look at those cases. They are usually on The Innocence Project's website. The Innocence Project I think also has posted documents, individual documents from some or all of those cases, but -- so those would be examples of cases where police contaminated the suspect's narrative.

Q. But in those cases is the presumption that

the individual -- the individual's confession is false?

A. Yes. The DNA established that the individual's confession was false.

Q. Have you observed any interrogations where there was not an assumption that the confession was false with respect to this book that you published?

A. Yes. I mean there -- the cases that I analyzed and studied over the years, many of them are not false confessions and so there is no assumption that all the confessions are false.

Q. And those confessions, if they were false, were they true?

A. Well, they are either true or they are in -- you know, I don't know if they are true or not. Or they could be partially reliable and partially unreliable which would make them true in some ways and not true in others.

Q. So are you saying that in your research you've only been able to definitively determine whether or not a confession is provably false?

A. No.

MS. PIERCE: Object to form.

THE WITNESS: No, I'm not saying that.

By MS. SCHROEDER:

Q. So you've been able to determine when a confession is probably true?

A. In some cases, yes, I think there is substantial corroborating evidence and it would be reasonable to conclude that the confession is true. In other cases, likely true.

Q. Okay. So in this specific study, this Police Interrogation and American Justice, what was the specific question that the study had sought to answer?

A. Well there are a lot of questions but it was a big comprehensive book on the nature and practice of police interrogation. I think in the introduction to the book I list a bunch of questions, big questions, and the book seeks to answer.

Q. Do you remember those questions?

A. Not literally. But, you know, how is police interrogation practiced in America? How has it changed? What is the psychology and logic of it? How has it developed historically? What are the tensions and contradictions in practice and in law? How well does the law regulate it? What sorts of policy reforms should be in place to improve the

accuracy of confession evidence? Under what conditions do interrogations sometimes lead to false or coerced confessions when we know about those? Under what conditions do false and/or coerced confessions lead to wrongful convictions? What do we know about that?

So, you know, a book has many chapters. I think it's a 300 plus page book that covered a lot of subjects. It was very comprehensive.

Q. Did you include any discussion on the -- what you would consider interrogation tactics that guard against false confession?

A. I'm sure there was a discussion of that. There was a discussion of -- my recollection is better and less better practices so to speak. So by focusing on the risk factors or techniques or practices that lead to false confession, you know, the things that aren't highlighted in that group are things that tend to be associated with true or more likely be associated with true or reliable confessions.

Q. Have you done any empirical research on whether the tactics that you have identified that would guard against a false confession actually do guard against false confessions?

A. Well, I don't think so, but I don't know what you mean by guard against. I mean I guess the way I think about it is there is certain techniques that are more likely to lead to a false confession and others that are less likely. Is that the same as guarding against a false confession? Maybe. It depends what you mean by guarding against. But I -- I have not done the type of study that I think you're asking, you know, studying specific techniques and whether they are more likely to be correlated with true confessions.

Q. So does contamination inscripting only come into play if the suspect is providing information after the police interrogator is asking for that information?

MS. PIERCE: Object to form.

THE WITNESS: Well, I guess objectively, if the police are leaking or disclosing non-public information, then it's contamination by definition. In terms of scripting, what I often see is in the post-admission portion of the interrogation, if the suspect is volunteering a narrative of how and why the crime occurred, then there is really no need for scripting right? Scripting is when the police pressure a suspect to adopt their narrative or a

narrative they believe or want to believe is how the crime likely occurred. You tend to see that more in false confession than true confession cases because -- or a non-false confession -- or in non-false confession cases because if a suspect is providing the narrative, there is no need to script.

By MS. SCHROEDER:

Q. Okay. So then essentially it is contaminated or scripting -- contamination or scripting only arises after that information has been provided to the individual; is that correct? When I say individual --

A. Can -- can you ask -- yeah, correct. Because if the police contaminate and that gets regurgitated into the confession, that would occur after the contamination. And if the suspect shifts the narrative or adopts the narrative of the police, that would be interrogation scripting that would -- the effect would be after -- the police have to do it first. It comes from the police, not from the suspect even if it's regurgitated by the suspect into the confession narrative.

Q. Okay.

A. Can we -- can we take a -- sorry. Go ahead.

Q. Oh. Yes. We can take a break after this question.

So then -- so then just to confirm, the -- if the suspect is offering information that they did not get from some outside party then that is not contaminated or scripted information; is that correct?

MS. PIERCE: Object to form.

THE WITNESS: Well, if -- if they are offering information that was not told to them by the police or some outside party, non-public case details, then it's not the product of contamination. It could be a lucky guess. It could be the product of --

By MS. SCHROEDER:

Q. Well I thought it was information that you couldn't guess. I thought that that was the definition of the information. That contaminated or disclosing non-public case facts or scripting had to be information that could not be guessed.

A. Well, if you --

MS. PIERCE: Object to form.

THE WITNESS: We have to separate contamination and scripting. I thought you asked in

229

your prior question if they have information and it wasn't provided to them by the police or an outside source then it can't be contamination, and I was just suggesting what it could be. Right? You said information. If they have non-public facts not likely guessed by chance and those non-public facts not likely guessed by chance were not provided by the police or any outside party, then -- then, yes, it's not the product of contamination and -- and it could be an indication of guilty knowledge, it could be a lucky guess, it could be that it was not -- not non-public, in fact it was public and people just thought it was non-public.

In terms of scripting, scripting is about a narrative. It's not about necessary non-public facts, and usually the police pressure and -- when scripting occurs. If they are not pressuring the suspect to adopt a narrative, the suspect might be adopting one on his own or her own or guessing or providing an accurate narrative if it's a true confession.

By MS. SCHROEDER:

Q. Okay. I just want to -- with respect to -- to close out contamination and scripting on page 23, the -- at the last paragraph -- well, the

230

second-to-last, I guess, because there is a sentence there. In that paragraph you're talking about the problem of contamination inscripting and false confession cases and that it arises when an interrogator pressures a suspect during the post-admission phase to accept a particular account of a particular crime story.

And then you state in your next sentence talking about these interrogators you state, because they are trained to presume the guilt of those who they interrogate, police assume that they are interrogating suspects who already know the correct crime facts.

So my question to you is, what training are you referring to that you are asserting interrogators are trained to presume the guilt of people they interrogate.

A. Well --

MS. PIERCE: Object to form.

THE WITNESS: -- the Reid training they say don't interrogate something unless you are reasonably certain of their guilt, and all the other -- well, not all, but virtually all of the other American interrogation training firms teach the same thing, that interrogation is a guilt

231

presumptive process.

By MS. SCHROEDER:

Q. When you say other -- did you say other interrogation firms? Is that --

A. Well I should say other interrogation manuals and training materials that I have reviewed.

Q. That you don't know the names of? Or they were, well, identified in your report; is that correct?

A. They were identified in the report, yeah. I mean I do know the names. I would -- you know, like I said earlier, if I could look at my bookshelf and go back to 1977, I could identify which manuals were current at that time. And the Reid manual is the leading manual, was then, is now, but it's not that different from other interrogation training manuals for the most part.

Q. Are you asserting this training was established in 1977?

A. I'm sorry, I didn't hear the first part of the question.

Q. Are you asserting that this specific type of training was established in 1977?

A. Yes.

232

Q. And is your description of this training is essentially that the Reid manual says an officer should not interrogate an individual unless they are reasonably certain of that individual's guilt; is that correct?

A. That's --

MS. PIERCE: Object to form.

THE WITNESS: That's part of what they advocate, yes.

By MS. SCHROEDER:

Q. You cite in your report where you relied on the Reid manual with respect to officers' training?

A. In many places of the report I do, yes.

Q. Okay. So if you are talking about an officer's training and you don't cite the Reid report, are you relying on some other source for that assertion?

A. We would have to go to the particular places in the report but...

Q. Well let's look at page 23 which we just reviewed. We were talking about the interrogators and you say, because they are trained to presume the guilt of those whom they interrogate, police assume they are interrogating suspects who already know the

233

correct crime facts, but there is no citation for that particular assertion.

You do refer previous to that to your 2008 book, but with respect to police training, what is your source for this particular statement?

A. Well, I -- if I had to footnote it, I would footnote the Reid manual and I would footnote my book, Police Interrogation and American Justice.

Q. Do you do -- did you read any news articles that were published prior to Mr. Savory's interaction with the police officers on January 25th, 1977?

A. I don't believe I did.

MS. PIERCE: Object to form.

THE WITNESS: I don't believe I did.

By MS. SCHROEDER:

Q. Okay. Do you know if Mr. Savory read any newspaper articles prior to his answering questions by the police officers -- from the police officers on January 25th and 26th, 1977?

A. I don't recall if -- if he had read any news articles. I thought he had heard about it maybe through television news but I don't recall --

Q. Okay.

A. -- what the source was.

234

Q. I think you were asking for a break, and I'm -- I'm done with this specific subject right now if you want to take another break.

A. Yeah, that would be great.

MS. PIERCE: Before we --

THE WITNESS: Sorry.

MS. PIERCE: And just before we go off the record, we've confirmed that with regards to the depositions the only one we sent with exhibits was Jatkowski. The rest were just --

MS. SCHROEDER: I appreciate that.

THE WITNESS: The only set of exhibits they sent were Jatkowski's deposition. The rest of the depositions did not have any exhibits.

So shall we say until 5 o'clock Pacific, 7 o'clock central?

MS. PIERCE: That's fine for me.

THE VIDEOGRAPHER: We're going off the record. The time is 4:47 p.m.

(Recess.)

THE VIDEOGRAPHER: Back on the record. The time is 5:01 p.m.

By MS. SCHROEDER:

Q. Dr. Leo, I just wanted to ask you with respect to the post-narrative interrogation

235

analysis. Are there certain documents that you require to be able to review in order to make an assessment of the post-narrative analysis?

A. Well, ideally you would have a transcript, a recording and transcript of the interrogation. But if you don't have that, then you would want to, you know, look at all the other relevant case materials, the police reports, and anything that establishes information that the suspect was exposed to as well as evidence that corroborates or fails to corroborate the suspect's confession statement.

Q. Okay. So would that be crime scene photos?

A. Well, crime scene photos could be helpful depending on what it is in the analysis that is relevant. If there is a police report describing what was shown in the crime scene photos like, for example, a kind of nail polish and then the suspect volunteers that kind of nail polish, you don't really need to see the crime scene photo to know that the suspect got the nail polish right because they were -- they were shown a picture of it, even if you don't see a picture of it yourself if that is the case.

Q. Then let me just make sure I ask it in the

236

correct manner.

I'm looking from your assessment, what should the interrogator be reviewing in their post-narrative analysis in order to meet this threshold of -- of, you know, ensuring that what the suspect said was true?

A. Well, first they shouldn't be suggesting any answers to the suspect, right. So they should revert to the interviewing style that I referred to and try to get the suspect to volunteer the details in the narrative.

Q. All right.

A. Second, if the suspect -- second, they should make sure that they don't provide any non-public case facts and that no one else in the interrogation has provided any non-public case facts. And third --

Q. So would that mean that they just have to ensure that facts that were provided by the suspect -- that certain facts were not made public previous and were not fed to the suspect during the initial interrogation?

A. Right. Or -- or if the suspect --

Q. Okay.

A. -- volunteers non-public case facts to make

**237**

sure that the suspect didn't learn them through somebody who was present or had knowledge of the crime.

Q. Okay.

A. The interrogator should also be familiar with the physical evidence and compare it and other solid evidence to the suspect's narrative to make sure that it corroborates as opposed to disconfirms the accuracy --

Q. And could it -- oh, I'm sorry. Go ahead.

A. -- the accuracy of the suspect's post-admission narrative or establishes the inaccuracy of the post-admission -- suspect's post-admission narrative.

Q. Okay. Would one of the ways that an officer does that is to compare what the suspect said in their confession to crime scene photos?

A. If the suspect has not been shown the crime scene photos and if the crime scene photos are dispositive of certain facts, then yes.

Q. What about knowing the location of the victim's stab wounds, would that be something that the interrogator would need to review to determine whether the post-narrative analysis the suspect was telling the truth?

**238**

A. I think that that would be an indicia of reliability or unreliability to the extent that it's not likely guessed by chance and not the product of contamination. But one of the problems with this is that the studies show that police interrogators don't realize that they are contaminating suspect. So if there is no record of the interrogation, then they are simply not going to know that. You really need a record of the interrogation so you can see what was told to the suspect by whom or not during the interrogation. Over and over again --

Q. How would you know if there is no record? How are you able to determine then that exact question if you have no record to review?

MS. PIERCE: Object to form.

THE WITNESS: I think they are different -- slightly different issues, right? The police investigators -- often in innocence cases -- demonstrable innocence cases will say we didn't feed them facts. You go back to the trial testimony and they say we didn't feed them, and then the DNA shows the person is innocent and their conviction is reversed and they are exonerated. And there is only two possibilities, these non-public facts not likely guessed by chance, sorry, either came from the

**239**

suspect or they came from the police -- I mean the true perpetrator or the police. And we just ruled out that the suspect is not the true perpetrator in these provable innocence cases. So you can show -- studies have shown that police do not realize that they inadvertently contaminate.

Now you asked me then how is it that I can tell whether there is contamination, and I can't always tell whether there is contamination, but in some cases like this one, I can tell that there is contamination as I describe in the report because they showed -- Officer Haynes showed Mr. Savory photographs that contained elaborate crime scene details visually. That is a source of contamination. And also you can tell in Officer Brown Teplitz's, T-e-p-l-i-t-z -- sorry, I should have spelled that earlier -- Teplitz's report because, if I'm recalling correctly, she describes correcting, you know, could it have been in this room, could you have seen this, what about that. Where she doesn't think she is contaminating him because she presumes his guilt, is my interpretation, but in fact she is leaving the fingerprints or footprints of contamination in the report. So there are ways of telling that a suspect

**240**

has been contaminated through the descriptions of the police behavior but that doesn't mean it is all of the contamination and that doesn't mean police will necessarily describe their contamination and that is why you need an objective record to know for sure the full amount of contamination or to establish the absence of contamination

Q. Okay. And you just mentioned that one of the factors that you are relying on to -- for your opinion that the officers contaminated this interrogation were the crime scene photos that were shown to Mr. Savory; is that correct?

A. Correct. It's textbook police interrogation contamination.

Q. Do you know what these photos showed?

A. Yes. I think it's in my report. Officer Haynes describes it in one of his reports. So I think that he bullet points it and then I bullet point it in the report. So I think if we go to that section of my report, if I'm remembering correctly, we should be able to see exactly what he said he con -- what the pictures showed. Now I could be misremembering but that's what I thought. All right. So --

Q. It's on page 46 is the contamination

241

finding.

A. Yeah. Well, I don't see it there. It might be in the contamination section later in the report. Let me see if I see it there. Hold on just a second.

Okay. So on page 65 of the report I think I'm quoting from Officer Haynes report in the six bullet points here that describe the content of those photographs that Officer Haynes showed Mr. Savory I believe on the first day of the interrogation, if I'm remembering correctly.

Q. Okay. Did you -- do you -- did you determine why Mr. Haynes -- or Officer Haynes showed these photographs to Mr. Savory?

A. I don't recall what Officer Haynes described as his motivation, if he did, during his deposition.

Q. Do you know what Mr. Savory had told Mr. Haynes prior to Mr. Haynes showing him these photographs?

A. I don't think we know entirely because there is no objective record. We know some things I think that occurred prior to this but not everything, no.

Q. Did you read any police reports from

242

Mr. Haynes that indicated what Mr. Savory had told him prior to him showing these photographs?

A. I might -- I might have, but if you want to ask me about those, you need to show those to me to refresh my recollection.

Q. So if -- in these bullet points that you listed here on page 65, you -- the first one is a scene of a living room with a television set, a metal rod, telephone stand, a can of beer, brown nightstick, a living room with a telephone stand. There is more details in those descriptions, I'm just giving a -- the first few words of each one.

Did you take this -- I'm assuming you took this straight from Mr. -- or Officer Haynes's report since you did not actually see the photographs; is that correct?

A. I believe that I did. And, yes, I don't recall seeing the photographs, though it's possible they were in the discovery that I reviewed.

Q. Okay. And -- and so as we look at these descriptions, this is the information that you have about the photographs, is that they -- there is no description of the victims or how the victims were killed or where they were killed or what they are wearing; is that correct?

243

A. Not -- not here there is no description, not in these -- not in Officer Haynes' description of the photographs that he showed Mr. Savory, correct.

Q. Okay. And so based on this information that you have in front of you on these descriptors, then no information -- if you are asserting that these photographs contaminated Mr. Savory's statements, that contamination would not extend to the information that was not reflected in the photographs, such as the victims, the wounds, where the victims were killed, what the victims were wearing; is that correct?

MS. PIERCE: Object to form.

THE WITNESS: From those photographs. But like I said earlier, there was other contamination by Officer Teplitz Brown where she described, either in her reports or in her testimony, asking if it was possible if Mr. Savory -- if the stabbing occurred in the bedroom, not the living room. I think he had said it occurred in the living room but in fact it occurred in the bedroom. If Mr. Savory recalled a vacuum cleaner in the house; if he recalled moving the child to another room; if he recalled that Ms. Cooper was stabbed and found in the bedroom. So

244

that would be another source of documented contamination that's not in the photographs but comes from the police that covers some but not all of the categories that you mentioned.

By MS. SCHROEDER:

Q. Okay. So but I just want to focus on the photographs. And so the photographs are specifically to Mr. Haynes and the information that is contained in these photographs.

And so -- and so what I'm saying is that based on what you have here in this report, that is the information that you have on what these photographs portrayed and they have no information about the victims, the wounds, what the victims were wearing, or where the victims were killed; is that correct?

MS. PIERCE: Object to form.

THE WITNESS: I think it's correct but I think it's a compound question, right, so I'm just trying to break it down in my mind. So I think we should take it one at a time.

All right. So --

By MS. SCHROEDER:

Q. Can I just -- this might be easier.

Did you include in this report what you --

245

the information you have of what the crime scene photographs that were shown to Mr. Savory, what those photographs included?

A. No, I think just here, I just described them here based on Officer Haynes' report and testimony. And of course this is a section in the report that tries to analyze the account of the police by --

Q. Okay. And you -- so were you -- in your review of the documents, do you recall that Mr. Savory provided a description of the living room and other aspects of the house as the police found the house on the morning the victims were discovered killed -- or excuse me, the -- the early evening when the victims were discovered killed?

A. I believe that the police reports do indicate that they -- they say that Mr. Savory provided a description of the living room. I think Mr. Savory says he was just repeating back details that they provided him.

Q. Okay. And then are you aware in the Reid manual does it permit an officer to show a suspect a photograph of a crime scene to confirm previous statements made by that suspect who maybe provides information about certain anomalies of the crime

246

scene?

MS. PIERCE: Object to form.

THE WITNESS: You're asking if the suspect has already provided details is it okay to show the photograph? Is that what you're asking?

I -- I would have to review the manual. I don't know if in that specific situation they would say that's okay. They do say don't feed details, don't educate the suspect about the non-public crime facts not likely guessed by chance. So that's why I believe they would be -- they would be critical of what happened here.

By MS. SCHROEDER:

Q. So in your review, the Reid manual with respect to police training for interrogations of suspects, do you recall that the Reid manual instructs interrogators to show the suspects crime photos after the suspects had provided specific information about the crime scene in a way to confirm that that is what the suspect was referring to?

MS. PIERCE: Object to form and also asked and answered.

THE WITNESS: I don't recall specifically. I would have to go back and look at the Reid manual.

247

I do recall the general principle of don't contaminate the suspect. And I do believe that there is a dispute here that Mr. Savory would say he did not provide these details prior to the pictures being shown to him.

By MS. SCHROEDER:

Q. Okay. And are you crediting Mr. Savory's version of when he was shown the crime scene photos?

A. No. I don't believe I was crediting anybody's version of when he was shown the crime scene photos.

Q. So if you learned that he was shown the crime scene photos that described specific anomalies of the living room that he had given earlier in the day and that this was done in accordance with the Reid manual's training, would that change your assessment on the conclusion that these specific crime scene photographs contaminated Mr. Savory's statements?

MS. PIERCE: Object to form. Compound question.

THE WITNESS: If -- if he had all -- if hypothetically he had already revealed those facts, this was not new information, and if in fact the

248

Reid manual says that, but I think there is a dispute about whether he had already revealed those facts is what I'm saying.

By MS. SCHROEDER:

Q. How can you make an assessment or conclusion on a disputed fact without assuming one side of the dispute is correct and one side of the dispute is not correct?

A. Well it depends on what the facts are. What I tried to do is review both sets of accounts and say here's what the social science says. Like I said, there is a lot of overlap. There is a lot of points of agreement relative to many other civil cases like this that I've worked on and then there is also a lot of other case information that persuades me that one account is more likely to be accurate than the other account. But it depends specifically --

Q. On this -- oh, go ahead. I'm sorry.

A. It depends specifically on what the issue in dispute is. On this, I don't recall as I sit here the police reports indicating that prior to showing Mr. Savory these pictures he had already provided these details. But if you have police reports that you want me to review to refresh my

recollection, I'm happy to do that.

Q. Is that something that would have been part of your analysis if you did in fact review that police report which did state Mr. Savory had provided a statement describing the -- the living room and the -- and the house on the day that the victims were discovered dead?

MS. PIERCE: Sarah, I think if you are asking him if he considered a report, we got to show it to him otherwise he can't answer that question.

By MS. SCHROEDER:

Q. Well let me -- then let me flip that.

Do you cite the reports that you are relying on to make your determination that showing these photographs was a contamination of the interrogation?

MS. PIERCE: Object to form. Cite where?

MS. SCHROEDER: Well in his report obviously.

MS. PIERCE: You mean in the materials reviewed or like anywhere? Your question is vague.

MS. SCHROEDER: Specifically in his report when he is asserting a conclusion or an opinion, is he citing the specific reports he is relying on.

By MS. SCHROEDER:

Q. Dr. Leo, do you understand my question?

A. I think so. The --

Q. Okay.

A. -- reports that I'm relying on are listed in the materials reviewed but they are not specifically cited, for example, on page 65.

Q. Okay. Okay. So just with respect to the post-narrative analysis, and going off of what you had identified as the purpose of the post-narrative analysis, is there -- have you ever come across a instance where a true confession did not perfectly fit the crime that occurred?

A. I mean perfect is a strong word, but I -- I -- I can't -- off the top of my head I can't think -- I would -- I can't think of an example to answer your question. So maybe I did, maybe I didn't. I don't know.

Q. So do you -- then when you say perfect is a strong word, is it your findings in all of your research and in the history of your studying this -- these confessions and interrogations, is it your finding that no confession is, quote, unquote, perfectly matched to the crime?

MS. PIERCE: Object to form.

THE WITNESS: I think that you're looking for absolutes. I -- I'm sure there are post-admission narratives that match perfectly or close to perfectly and others that don't in true confessions. I simply can't at this late hour like off the top of my head think of cases with which to answer your question. It's possible that there are minor mistakes in the post-admission narrative of a -- a true confession.

By MS. SCHROEDER:

Q. So I guess that would be leaning towards your indicia of reliability or unreliability, would that be right, to determine whether or not a confession actually fits the crime that occurred?

A. You could speak of it in terms of indicia of reliability and unreliability. Obviously part of the post-admission narrative analysis is the corroboration of physical evidence, like DNA evidence which is the gold standard. Not all cases come with DNA evidence. So some post-admission narratives are more easily corroboratable or discorroboratable, if that is a word, and other times there is less information to measure the post-admission narrative against the crime facts to assess indicia of reliability and indicia of unreliability. And as you know, I do an extensive analysis here of the post-admission narrative fit or lack of fit and the indicia of unreliability in this case in my analysis.

Q. Well in that analysis, is there a -- did you employ some sort of like of quantitative method to determine whether or not Mr. Savory's confession passed the post-narrative analysis?

A. No. You can't reduce it to a number like 7.67 or 5.3. There is no scale. It's not, like I said, you get one point for this or two points for that. What I can tell you is that I think this is one of the strongest cases of indicia of unreliability or among the strongest or the top one percent of the strongest. I mean this -- to me, in my career studying thousands of interrogations and post-admission narratives, hundreds and hundreds of false confessions, some proven, some not, I -- I think the indicia of unreliability here is extreme.

Q. That's based solely on the documents you reviewed; is that correct?

A. Correct.

Q. Okay. And so if there is no scale for you to count and evaluate whether or not a suspect's

253

confession passes the post-narrative analysis, what are you employing in order to make that determination?

A. Well, first there is the principles, right? Does the suspect have non-public -- inside non-public not likely guessed by chance knowledge that we can definitively rule out is the source of contamination; and secondly, does the confession fit logic, does it fit the facts of the case, is it supported by the physical, medical, scientific, and other credible evidence in the case or is it not supported by, that does it lead to new or missing evidence? And what is striking to me about this case is -- is the physical evidence and the DNA evidence, that this was an incredibly bloody crime scene, and we know that the perpetrator left a lot of physical evidence, not just bloody fingerprints, and all of it excludes Johnnie Lee Savory. The -- none of it matches, his clothes, his knife, the items found at his house, all of it excludes Johnnie Lee Savory. There is not only no evidence linking him to the crime but all of it is dispositively exculpatory and that is really striking because most confession cases don't come with this wealth of physical evidence that is

254

dispositively exculpatory.

Q. You are relying on to say that -- that evidence was determined dispositive.

A. Well, I'm relying obviously on the materials that I reviewed, and especially --

Q. Specifically the DNA -- when you say the DNA findings were exculpatory, what are you relying on?

A. Well, most specifically the report by Dr. Reich, R-e-i-c-h, of Independent Forensics dated June 9th, 2023, where he describes in great detail that none of the physical evidence, none of the forensic DNA evidence, none of the DNA profiles, none of the laboratory testing links Mr. Savory to the sexual assault or the homicide in this case.

Q. Okay. So did you -- were you aware that Mr. Savory was first brought to the police station nearly a week after the murders had occurred?

A. Yes.

Q. Okay. What are you relying on to say there was a bloody fingerprint that excluded Mr. Savory?

A. I think it was a bloody palm print. I don't recall specifically. It was on the light switch. Maybe it wasn't -- there was some blood believed to be left by the true perpetrator, if I'm

255

remembering correctly, on a light switch that dispositively was not Mr. Savory's. On page 8 of Dr. Reich's report, he lists all the DNA that was tested and all of it excluded Mr. Savory. And it looks like about two-thirds of the way down on page 8 he says, item 15, collection from edge of light switch cover, Mr. Savory excluded as contributor.

Q. Okay. So you're -- so your assertion that Mr. Savory was definitively excluded as the perpetrator is based on Dr. Reich's findings; is that correct?

A. Well, it's based on my analysis of the case, which includes Dr. Reich's findings, it include Dr. Spitzer's findings, and the analysis in both of those reports. I think there may have been some other documents, maybe it came up in depositions, that also went over the substantial dispositive exculpatory evidence that you would expect if Mr. Savory committed the crime would have linked him to the crime but dispositively, 100 percent, did not link him to the crime.

Q. So then are you -- are you asserting that Mr. Savory's confession is false?

A. Well, again, it's not my role to determine whether a confession is false or not but certainly

256

all of this evidence is consistent with a false confession.

Q. So are you saying that based on this evidence you -- you cannot make a determination whether Mr. Savory's confession is actually false?

A. Not for expert witness purposes. It's the province of the finder of fact, not the province of an expert typically and so it's not what I was asked to do when I was retained, it's beyond the scope of why I was retained. In a different role, if I were including this case in a research document, then I could do that analysis or would do that analysis but I'm not doing that analysis here.

Q. All right. So if we look at page 24 in your starting on the interrogation and oral confession of Mr. Savory for the 25th through the 26th and you start out with an -- or excuse me -- an introduction and your -- your second sentence there states that as a result, because there was no electronic recording of the interrogation, there is no objective record of the interrogation that resulted, which we've already discussed, but then you go on to say, the only -- and then you specifically say, highly imperfect record that exists of Mr. Savory's interrogation sessions are

257

the recollections of various participants as captured in the reports, pretrial, trial, post-conviction, and deposition testimony, and then you list a number of individuals that you reviewed. Based on only having a highly imperfect record to review, how does that impact the reliability of your assessment?

**A.  I don't think it impacts the reliability at all because the -- what occurred during the interrogation would explain whether or not the interrogation was coercive and whether or not the techniques and practices used increased the risk of eliciting false confessions and why, but to evaluate indicia of unreliability, you have to get outside the interrogation.  You could have the worst interrogation techniques and still get a true confession.  It's less likely, but in order to evaluate the likely reliability, you have to look at the post-admission narrative and especially at the physical evidence, and this case has boat loads of exculpatory evidence that is consistent with innocence or consistent with the confession being false, I should say, on -- unreliable, rather, indicia of unreliability, and as far as I can tell, zero indicia of reliability, zero evidence, credible**

258

**evidence that is consistent with a reliable confession.**

Q.  So your opinions are limited to the highly imperfect record that you reviewed; is that correct?

**A.  My opinions with regard to certain opinions.  I think that the evidence for evaluating the reliability or unreliability of the statements is extraordinarily good, actually, even though the evidence for evaluating what occurred during the interrogation, because there is no -- there is no recording, is highly imperfect.  So they are two different things.**

Q.  So how is your evaluation of the unreliability of the statements actually very good when you do not have -- when you state here you have a highly imperfect record of what actually occurred when those statements were made?

MS. PIERCE:  Object to form. Argumentative.

THE WITNESS:  So what I was trying to say in my prior answer was that the highly imperfect record is what occurred during the interrogation. The indicia of reliability and unreliability is not what occurred in the interrogation but rather the

259

physical and forensic evidence and the evidence that Dr. -- that Dr. Spitzer and Dr. Reich review in my view is substantial and is extraordinary in terms of independent evidence to evaluate the likely reliability or unreliability of a confession statement, independent of why that confession statement was made, in a homicide investigation.

Most cases that I study and analyze don't come with all of this evidence.  Even though a lot of evidence was lost and is missing, this is a treasure trove in my view of physical evidence with which to evaluate the likely reliability or unreliability of Mr. Savory's confession statement and it all points in one direction.

Q.  What direction?

**A.  Consistent with indicia of unreliability.**

Q.  So if you are pointing to the physical forensic evidence that has been analyzed by other individuals, aren't you giving weight to that evidence --

**A.  Well --**

Q.  -- in order to make --

**A.  Sorry.**

Q.  -- your determination here?

MS. PIERCE:  Object to form.

260

THE WITNESS:  Yeah.  Experts rely on other expert opinions within their body of expertise to make professional judgments.  This is no different. I am relying on those reports, as indicated in my report and analysis, as well as other information that I gathered and analyzed in this case.  If there was other facts that you want me to consider, I'm happy to consider those facts.  It's not my role to be the finder of fact, obviously, but as an expert rendering expert opinions, I have to evaluate the evidence that I'm provided and make the judgments that I believe are called for based on my expertise based on that evidence that I reviewed.

By MS. SCHROEDER:

Q.  So that goes to the reliability of the confession.  But what about the coerciveness of the interrogation?  How are you able to -- strike that.

With respect to the coerciveness of the interrogation, how are you able to make a final opinion based on this highly imperfect record that was presented to you?

MS. PIERCE:  Object to form.  Asked and answered.

THE WITNESS:  Well --

MS. SCHROEDER:  No, this is different,

Megan, this is about the interrogation itself, not on the reliability of the confession.

MS. PIERCE: Yeah. I still think it's asked and answered. Keep my objection.

THE WITNESS: So I review Mr. Savory's account and then I make conclusions based on that account and then I review the police officers probation officers, polygraphers account, and then make conclusions based on that, and one of the conclusions I make reviewing their account is that it was psychologically coercive. So I think that judgment can be made independent of Mr. Savory's account.

Now Mr. Savory's account contains a lot that their account does not and that is why I go through both accounts separately but there is overlap and there is the officers' account and so that's why I have got two sets of overlapping but different at times conclusions.

By MS. SCHROEDER:

Q. Okay. Okay. So going to page 25, section B where we are reviewing Mr. Savory's description of his interrogation.

A. Okay.

Q. Okay. And so you look there at the first paragraph that we're reading describes that the officers had come to Mr. Savory's school and asked to speak with him. Were you aware of how the officers learned of Mr. Savory or why they wanted to speak with him?

A. I am aware of that. I'm blanking at the moment. I think that they thought he had been at the house the night before and so he might have been the last person to be at the house other than the parents and the baby that was not murdered before the crime occurred.

Q. That -- that's correct. That was one of the reasons. And so is it your assessment then that as the officers went to speak with Mr. Savory they were already presuming he was guilty?

A. At some point when they spoke to him they definitely presumed his guilt. The exact point at which that occurred in the unrecorded interrogation I don't know. But from his description and their description, it occurred, it just -- it was at a different point that it occurred.

Q. So at some point you're saying then it was -- they did not presume he was guilty; is that correct? That that presumption was -- was -- became sort of on to these officers after they started speaking with Mr. Savory?

MS. PIERCE: Object to form.

THE WITNESS: I don't know whether they presumed his guilt the moment they met up with him or whether they developed a presumption of guilt shortly thereafter. I can't tell you the exact time. But when you look at the totality of their description and his description and the surrounding case facts, at some point they did presume his guilt. And in his account, it would be earlier than in their account.

By MS. SCHROEDER:

Q. And you are basing that specifically on the fact that they interrogated Mr. Savory; is that correct?

A. I would say that I'm basing it on the totality of facts, not just that they interrogated him but they also --

Q. So what are the totality of facts that you are relying on to determine that at some point shortly after officers Pinkney and Haynes spoke with Mr. Savory they presumed he was guilty?

MS. PIERCE: Object to form.

THE WITNESS: Well the next page, page 26, Mr. Savory -- I quote Mr. Savory describe -- describing being accused of lying. That's a telltale sign of a presumption of guilt, that when you're asked about a crime and you deny committing the crime and you're accused of lying, that that's because they presume your guilt.

By MS. SCHROEDER:

Q. Aren't you stating here that he was asked if he committed the crime and he stated no and so that was what he was accused of lying?

A. I would have to go back through his deposition and see if that's accurate but that's my understanding, that at some point in the interrogation not only was he accused of lying but he was also accused of committing the crime. And he describes that --

Q. Oh, you're -- you're -- is it then your finding that when he was accused of lying is when the presumption of guilt was evident by the officers?

MS. PIERCE: Object to form.

THE WITNESS: It may have been the first point, it may have been a different point. I don't know the exact point. This is the problem when you don't have a full recording and different accounts of what occurred. But I think it's undeniable that

265

at some point in the interrogation, and in Mr. Savory's account early on, and even in their account the first day, that they presumed his guilt.

By MS. SCHROEDER:

Q. So when you -- do you know at which point in the day you can definitively say that the officers presumed the guilt of Mr. Savory?

MS. PIERCE: Object to form. Asked and answered.

THE WITNESS: I don't know the exact point, but one of the appellate court opinions, the second one that is dated May 5th, 1982, they say -- and I'm trying to find the page number for you here. It's not clear from the Westlaw printout. It looks like it's page 742. They say, referring to the first day, we conclude that at the third session -- interrogation session or questioning session on the first day, which they say started at 6 o'clock, that when the officers who testified they then knew the defendant was not being truthful with them so informed him and pointed out discrepancies between defendant's version and their own information, he was in custody and should have been given Miranda warnings. I think that at the very least at that

266

point 6 o'clock the first day, January 25th, 1977, that there would have been a presumption of guilt. And I think one can reasonably infer that from what the court is describing. But I don't know if it was earlier and I -- again, I can't tell you what exact point they started presuming his guilt. It might have been much earlier than that.

By MS. SCHROEDER:

Q. You reviewed that appellate opinion in -- in preparing this report?

**A. I don't recall if I reviewed it in preparing this report. I think I reviewed it --**

Q. Why do you have it now then with respect to your deposition on this report?

**A. Well I reviewed it in preparation for the deposition. I -- I think that I reviewed at least one, maybe two, but possibly only one of the two appellate court opinions. But I -- I also reviewed additional information for this deposition in addition to some of the materials that I reviewed for the report.**

Q. Reviewed information for this deposition that is not listed on your -- on your expert report?

**A. Correct.**

Q. And so can you list those materials that

267

you reviewed for this deposition today?

**A. So I think one -- possibly one of the appellate court opinions. I think that in the materials listed there was one appellate court opinion, I could be wrong, and I reviewed two. And then -- so -- so if I'm wrong, then both of the appellate court opinions, one dated April 4th, 1980, and one dated May 5th, 1982, would be documents that I reviewed that were not in the materials reviewed for the report. And then the other materials that I reviewed that were not reviewed for the report were the depositions and affidavits of the items. And I think that's it.**

Q. When did you review those?

**A. Over the weekend.**

Q. Who provided those to you?

**A. Counsel.**

Q. Okay. All right. So with respect to Mr. Savory's description that you list here -- so now we're on page 25 again -- and Mr. Savory's recount, if you look at that last sentence, is Mr. Savory answered their questions truthfully and believed he was trying to help the officers find out who killed his friend.

So -- so then in your assessment of

268

Mr. Savory's description, are you then accounting that he was providing truthful answers to the officers?

**A. I'm not trying to vouch for the truthfulness of his answers. I'm saying that in his description that's what he says. Just like I believe later in my description of the officers' accounts, you know, they say he is lying. Right? I'm not trying to vouch for the truthfulness, I'm just trying to describe what these parties are saying.**

Q. Okay. And so -- but you're basing your opinions on your review of what Mr. Savory's description is and what the officers' description is; is that correct?

**A. Correct --**

MS. PIERCE: Object to form.

THE WITNESS: -- in each of these sessions.

MS. SCHROEDER: Okay. Okay.

By MS. SCHROEDER:

Q. And so if you continue down on this page, it says one, two -- like after the second quote it says there after a couple hours interrogation they asked if he was hungry, he said yes, they gave him a

269

candy bar and root beer. And when he asked if he could go home, they did not respond. And then later on that next -- at the end of that same paragraph when Mr. Savory indicated he would agree to take a polygraph test if he were allowed to go home, Mr. Savory said the investigators did not respond. So in these two instances, no promises of doing this and you can go home were made to Mr. Savory --

A. In his --

Q. -- according to Mr. Savory; is that correct?

MS. PIERCE: Object to form.

THE WITNESS: In these two instances according to Mr. Savory the officers did not explicitly say he could go home if he took the polygraph, correct.

By MS. SCHROEDER:

Q. And then if you continue down in the last paragraph, Mr. Savory states that the investigators read him his Miranda rights and he invoked his right to silence. And then he said that he told the officers he didn't want to speak to them. And then if we skip to the next sentence, Mr. Savory again asked if he could go home and the officers instead told him that they were going to keep him overnight

270

at the Gift Avenue Detention Center.

So in that instance again, according to Mr. Savory, no officer promised him or told him he was going to go home; is that correct?

MS. PIERCE: Object to form.

THE WITNESS: That's my recollection of his description of the first day.

By MS. SCHROEDER:

Q. You would have accurately reported whether an officer promised Mr. Savory he could go home because that would be part of your analysis of a coercive interrogation; is that correct?

MS. PIERCE: Object to form.

THE WITNESS: What I was trying to do here was describe his account of the first day. And I would like to think that if he described that, that I would have put it in this description here. It's possible that I inadvertently missed it but yes, that is what I probably would have done.

By MS. SCHROEDER:

Q. Okay. And then it says here, he says he went to bed at 1:30 in the morning and that the next day the officers came and got him at 8 a.m. And I know you have made mentions of lack of sleep could be part of a psychological coercion induced by

271

officers. Do you believe that this amount of time here that he fell asleep at 1:30 a.m. and then was taken to the detention center -- or taken from the detention center at 8 a.m., do you believe that that timeframe of sleep is not sufficient?

A. Yes, because there is all kinds of research and sleep science that shows that teenagers need like eight to ten hours of sleep a night and so this would have been -- I'm not saying that this is necessarily intentional but this would have been -- this would have qualified as sleep deprivation that would have increased his risk of -- of making or agreeing to a false confession for the reasons that I state in the report.

Q. You rely on empirical research to show that this amount of sleep that Mr. Savory had is classified as sleep deprivation?

A. I believe there is empirical research to show that. I recently wrote an article, not an academic article but kind of for a trade journal, with a sleep scientist about sleep deprivation in interrogations and how that increases the risk for police eliciting unreliable evidence. And in the course of that I had a lot of conversations with the sleep scientist and my understanding is that a sleep

272

scientist would characterize even one night of sleep disruption like this as sleep deprivation.

Q. Was this study done specifically on juveniles?

A. No. And it wasn't really a study, it was more an application of the research literature on sleep science and sleep deprivation to certain evidence gathering processes by police like interrogation that can lead to compromised evidence because of the effects that people who are sleep deprived -- because of the effects of sleep deprivation on the sources of that evidence.

Q. So you need somebody to make a finding that an individual was sleep deprived -- excuse me, sleep deprived and in order for you then to use that finding to -- to assert that that is a criteria for a coercive interrogation; is that correct?

MS. PIERCE: Object to form.

THE WITNESS: Well, I mean, in effect this is my conclusion. I'm not -- I'm not relying on somebody else's finding. It's my conclusion based on my knowledge of sleep science and in particular the -- the specific literature on sleep deprivation and false confessions born of police interrogation and the risk of false confessions based on sleep

273

deprivation because of the effects that sleep deprivation has on perceptions, on memory, on suggestibility, on what is called executive functioning, on ability to resist pressure. I mean the list just goes on and on.

By MS. SCHROEDER:

Q. Okay. So then is it your opinion that Mr. Savory was sleep deprived on January 26th?

A. Based on what I know, yes.

Q. What you know is that he went to sleep at 1:30 a.m. and he was, according to Mr. Savory, picked up at 8 a.m. by the police department; is that correct?

A. Correct. So based on Mr. Savory's account, yes.

Q. Are you making this opinion only on the amount of hours that he slept?

A. Or the amount of hours that he could have slept, yes. Right? Logically he could have only slept -- if his account is accurate, right, six-and-a-half hours or slightly less. And based on my knowledge of the sleep science, a teenager of his age who only got six hours -- six-and-a-half hours -- up to six-and-a-half hours of sleep would have been sleep deprived. Now obviously sleep

274

deprivation is a matter of degree and this is one night but still there are effects to sleep deprivation like I described that increase the risk of false confession.

Q. All right. So in your assessment of the reliability or unreliability of Mr. Savory's confession, did you have to employ certain assumptions in order to make your final opinions?

A. I wouldn't say assumptions so much as analyzing the evidence that was provided to me and relying on that evidence. So, as I've said, Dr. Reich's findings and analysis, Dr. Spitzer's findings and analysis, I rely on those in my conclusions but that's corroborated by other stuff in the record as well. I -- I think if you think I'm making an assumption then, I don't know, you can point it out to me. I'm not sure what you are getting at.

Q. What about the assault of Connie Cooper? Are you -- in your assessment are you assuming that she was sexually assaulted?

A. Well, I'm concluding based on the description that Dr. Reich and Dr. Spitzer described that there was trauma to the genitalia yeah and there was also evidence consistent with a sexual

275

assault. I think the vaginal fluid indicated a male profile. So I -- I think my assessment, though I'm not an expert on those subjects but I'm relying on the expertise of others, is that there is evidence in the record that this was a sexual assault, that it was a rape murder, not just a double murder or not just a murder of -- of -- of Connie.

Q. Your finding that there was a sexual assault is based on your own assessment of the evidence in the case and the findings of Dr. Reich and Mr. Spitzer?

A. I don't want to say that it's a finding because that makes it sound like I'm a medical doctor or pathologist and I'm not. What I'm saying is that experts rely on other experts, and in my analysis, I -- I concluded that I believe this was a sexual assault based on their analysis, the basis for their analysis, as well as other data or evidence in the record. It seems to me that this crime was consistent with a sexual assault for the reasons that they elaborate and for the evidence that they put forth to support that so...

Q. Didn't you state earlier that you have no training or education in determining whether an individual has been sexually assaulted?

276

A. I did, yes, and that is why I said in my answer here that I'm relying on their expertise and their analysis. This issue comes up in a lot of the cases I've studied and I rely on the opinions and expertise of other experts as well as my own analysis of the supporting or not supporting evidence in the case file.

Q. That's what keeps confusing me because then you add your own analysis of what is in the file. So what are you analyzing that is making you come to the conclusion that Connie Cooper was raped?

MS. PIERCE: Object to form. Argumentative.

THE WITNESS: I thought I was just answering that question. I mean, what am I relying on?

By MS. SCHROEDER:

Q. Aside from the expert reports I want to know what are you -- aside from Dr. Spitzer and Dr. Reich, what are you relying on for you to make the determination that Connie Cooper was raped

A. I would have to review some of these documents but I think I was relying also on the autopsy report, but I'd have to review that to refresh my memorandum recollection. I think I may

have been relying on the Jatkowski deposition but I would have to review that to make sure I'm accurately remembering that. I think I may also have been relying on parts of information contained in the trial transcript as well as the motion for DNA testing and the PC hearing transcripts. I should say trial transcripts. The motion for DNA testing and possibly other evidence in the case file, possibly the Gunsowski (phonetic) deposition transcript as well. These are, with the exception of the expert reports, documents that I did not review in preparation for the deposition, but when I was reading the Reich -- rereading the Reich and the Spitzer reports, I -- which I did for this deposition, unlike the documents I just mentioned, a lot of it sounded very familiar to me from prior documents I had reviewed in the case file.

By MS. SCHROEDER:

Q. Okay. Thank you for that list of documents you relied on.

Your next finding is that with respect to unreliability is that Mr. Savory who was 5 foot 5 and 135 could not simultaneously kill and rape a 19-year-old 125 female and kill another 14-year-old male. How are you able to make that determination of -- so that you are asserting this opinion that this 14-year-old boy who was 5 foot 5 and 135 could not murder two individuals?

A. I thought what I was saying is that that is an indicia of unreliability because of the unlikelihood. I didn't think I was saying, and maybe you can point me to the place in the report you're thinking of, if -- if -- if that is not accurate. I think I was saying it's highly unlikely just given the physics of it, that somebody that size could pull off two murders like that. Not that it was impossible. And also I -- I -- I hope at the end of this question we can just pause for a second and see how much time there is left on the record.

So if you want to point me to where I say this. I don't think I overstated, I think I said it was not likely, but if I did overstate it, then I would like to see it and correct the record.

Q. Well you say -- you are correct, you say highly unlikely, it's on page 45 in the third bullet point, but you say this is based on the physics of it. So what was your methodology to determine that the physics made it highly unlikely that Mr. Savory could kill these two individuals?

MS. PIERCE: Dr. Leo, did you find the spot she was referring to?

THE WITNESS: Well you said page 45. Let me -- I think you're saying -- okay, so -- I'm just going to read it. So it's the third bullet point my page 45. Sometimes the pagination is off in these reports but I think we have the same pagination. The State's proposed theory that Mr. Savory, a mere 14-year-old who is 5 feet 5 inches tall and 135 pounds at the time simultaneously killing and raping a 19-year-old 125 pound female and, in caps, killing another 14-year-old male seems highly unlikely, if not next to impossible, especially when one considers the complete lack of physical evidence linking Mr. Savory to the crime. So the methodology is the same as anything else, just reviewing the case facts and applying logic and evidence and expert knowledge to make that inference. It seems like a pretty straightforward inference, whether you agree with it or not. And then of course the second part is that there is no evidence linking Mr. Savory to these crimes.

So I just want to pause before the next question just to see how much time we have left, if any. Can the videographer please tell us?

THE VIDEOGRAPHER: We are at seven hours exactly.

MS. SCHROEDER: I just have -- I just want to finish like two questions on this topic if --

MS. PIERCE: That is up to Dr. Leo whether or not he wants to stay.

THE WITNESS: Yeah, I'm happy to answer two more questions. I just don't want the two questions to turn into 20 subquestions. But yeah.

MS. SCHROEDER: No, that is fine.

By MS. SCHROEDER:

Q. So with respect to your findings on the highly unlikeliness of Mr. Savory being able to commit those murders, aren't you in essence forming a conclusion based on crime scene evidence, physical evidence that is what you would consider should be present and is not and the physics of a 14-year-old who is the height and weight of Mr. Savory and the physics of his ability to be able to kill these two individuals?

MS. PIERCE: Object to form.

THE WITNESS: I would say it maybe a little bit more simply. I just think as a matter of logic, if not physics, it's highly unlikely, as I say here. And, you know, these are indicia of unreliability. Obviously this is my analysis. But, you know, you

281

can take this out and there would still be overwhelming indicia of unreliability, and in my analysis, no indicia of reliability in his account based on how experts in my field -- excuse me -- evaluate indicia of reliability of interrogation induced statements and confessions.

By MS. SCHROEDER:

Q. Okay. And my last question is, in your review of Mr. Savory's version of what occurred and the officers' versions of what occurred, did you find any indicia of reliability of his confession?

A. Not that I recall. When we talk about indicia of reliability, we talk about controlling for contamination. So if somebody said, well, you know, he put -- he volunteered, and of course we don't know because there is no record what he volunteered, right, we only have a description of his oral confession, but if somebody said he volunteered this highly unique non-public fact, we can't rule out contamination. Right? So I did not find in my review of the documents any highly unlikely guess by chance non-public facts that only the true perpetrator not the police -- and the police, rather, would have known that -- that could not have been the product of contamination or any

282

physical evidence, any at all corroborating or supporting his confession statement. So in my analysis, I did not find any indicia of reliability at all.

MS. SCHROEDER: Okay. Okay. I think that is all I have for today.

MS. PIERCE: I have nothing.

MS. SCHROEDER: Thank you so much for --

MS. PIERCE: No, go ahead.

MS. SCHROEDER: I was just going to say thank you so much, Dr. Leo, for answering all my questions. I appreciate it.

THE WITNESS: Thank you.

MS. PIERCE: And I have no follow-up questions. But for the court reporter, we will reserve signature.

THE VIDEOGRAPHER: This marks the end of the deposition of Dr. Richard Leo.

We are going off the record at 6:13 p.m.

(Proceedings concluded.)

---o0o---

283

CERTIFICATE OF STENOGRAPHIC REPORTER

I, BURGUNDY B. RYAN, a Certified Shorthand Reporter, hereby certify that the witness in the foregoing deposition,

DR. RICHARD LEO,

was by me duly sworn to tell the truth, the whole truth, and nothing but the truth, in the within-entitled cause; that said deposition was taken at the time and place therein named; that the testimony of said witness was stenographically reported by me, a disinterested person, and was thereafter transcribed into typewriting.

I further certify that I am not of counsel or attorney for either or any of the parties to said deposition, nor in any way interested in the outcome of the cause named in said caption.

DATED: Monday, August 28, 2023.

_____
Burgundy B. Ryan, CSR No. 11373, RPR

| **A** | abstractly | accountant | acknowledged |
|---|---|---|---|
| | 34:5 | 13:11, 13:14 | 49:15 |

**a-u-b-r-e**
158:16
**aberdeen**
2:6
**abilities**
126:13
**ability**
57:21, 60:1,
186:23, 273:4,
280:18
**able**
7:25, 32:3,
32:7, 33:20,
33:25, 34:12,
44:14, 45:5,
46:1, 95:23,
97:3, 98:15,
99:7, 99:10,
99:18, 108:18,
109:1, 116:18,
125:6, 131:21,
133:3, 137:2,
137:18, 137:21,
137:25, 139:1,
157:22, 180:16,
187:17, 188:18,
206:8, 210:20,
223:21, 224:2,
235:2, 238:13,
240:21, 260:17,
260:19, 277:25,
280:12, 280:18
**above**
10:10, 25:11
**absence**
240:7
**absolute**
206:23
**absolutely**
125:20, 127:2,
178:22, 199:23,
207:12
**absolutes**
251:2
**abstract**
47:16

**abstractly**
34:5
**abusive**
148:1, 148:4
**academic**
37:21, 81:14,
271:20
**accept**
230:6
**accepted**
20:8, 122:6,
150:13, 154:5,
154:7, 154:16,
155:4, 155:15,
157:23, 159:13,
161:3, 161:4,
177:14
**accepting**
144:20, 148:2
**accepts**
29:1
**access**
105:19, 108:3
**accordance**
7:14, 247:16
**according**
152:3, 210:21,
220:20, 269:10,
269:14, 270:2,
273:11
**account**
39:21, 40:14,
40:17, 128:11,
128:16, 129:1,
129:8, 144:7,
199:2, 202:10,
203:6, 215:8,
215:12, 230:6,
245:7, 248:16,
248:17, 261:6,
261:7, 261:8,
261:10, 261:13,
261:14, 261:15,
261:17, 263:10,
263:11, 265:2,
265:3, 270:15,
273:14, 273:20,
281:3

**accountant**
13:11, 13:14
**accounting**
97:18, 268:1
**accounts**
128:20, 128:25,
136:19, 136:21,
144:8, 144:9,
144:11, 201:24,
202:11, 248:10,
261:16, 264:24,
268:8
**accuracy**
29:5, 59:17,
196:13, 196:20,
197:4, 225:1,
237:9, 237:11
**accurate**
27:21, 28:12,
28:17, 45:6,
46:3, 46:14,
60:3, 60:14,
60:19, 61:2,
149:16, 150:3,
151:8, 176:24,
198:15, 220:3,
221:3, 229:20,
248:17, 264:11,
273:20, 278:9
**accurately**
29:17, 30:12,
270:9, 277:3
**accusatorial**
136:3, 140:25,
141:4
**accusatory**
135:13, 139:13,
139:14, 141:7,
141:13, 196:7
**accuse**
185:13
**accused**
264:1, 264:4,
264:9, 264:13,
264:14, 264:17
**accusing**
144:18, 144:19
**acknowledge**
98:21

**acknowledged**
49:15
**acquittals**
101:10
**acquitted**
43:10
**across**
34:7, 46:14,
98:9, 104:21,
250:11
**act**
160:1, 194:10
**acted**
33:21, 146:9
**action**
185:17
**actions**
161:6, 169:19
**actively**
12:8
**activity**
98:7
**actual**
19:22, 84:23,
108:4, 167:4,
203:21
**actually**
10:8, 26:14,
45:7, 49:11,
69:10, 69:16,
71:13, 97:8,
98:19, 107:25,
112:20, 113:11,
121:12, 167:15,
168:18, 177:13,
187:18, 189:23,
198:20, 218:3,
225:24, 242:15,
251:14, 256:5,
258:9, 258:15,
258:17
**add**
41:8, 50:18,
103:10, 175:9,
175:14, 276:9
**added**
9:19
**addition**
59:1, 194:24,

266:20

**additional**
9:6, 58:20,
62:12, 90:23,
122:25, 125:12,
146:18, 266:19

**additions**
9:5, 10:19

**address**
11:16, 33:6

**addressing**
54:14

**adds**
29:1

**adequately**
39:25, 145:16

**administered**
93:10, 107:9,
107:11

**admission**
69:21, 142:14,
169:20, 181:20,
194:2, 194:4,
194:6, 194:9,
194:10, 194:15,
194:20, 196:4

**admissions**
167:13, 204:15

**admit**
212:10

**admitted**
217:12

**adolescent**
218:12, 219:8

**adopt**
226:25, 229:18

**adopting**
229:19

**adopts**
227:18

**adult**
191:2, 191:21

**advanced**
211:10

**advances**
50:2

**adversarial**
176:10

**adverse**
69:8

**advocate**
232:9

**affect**
180:17, 212:2,
214:6, 215:16

**affects**
212:7

**affidavits**
267:12

**affirmed**
131:2

**after**
14:12, 18:15,
52:21, 55:9,
69:23, 89:17,
115:10, 118:20,
170:17, 171:13,
172:14, 174:15,
175:5, 194:1,
202:15, 220:11,
226:14, 227:11,
227:17, 227:20,
228:2, 246:18,
254:18, 262:25,
263:21, 268:23,
268:24

**afternoon**
202:3

**again**
13:14, 21:8,
28:10, 30:12,
36:2, 39:23,
42:11, 46:5,
46:10, 54:12,
61:6, 61:12,
77:6, 90:25,
92:14, 93:18,
94:10, 107:12,
115:20, 116:16,
119:23, 132:11,
138:15, 143:23,
149:2, 159:10,
159:18, 166:23,
181:1, 181:4,
184:19, 188:13,
190:4, 190:24,

197:20, 204:12,
205:3, 205:4,
210:24, 214:8,
238:11, 255:24,
266:5, 267:20,
269:23, 270:2

**against**
31:6, 31:18,
32:23, 33:16,
45:15, 46:16,
145:14, 145:19,
171:15, 171:21,
172:8, 172:20,
173:6, 173:9,
174:3, 175:15,
177:8, 177:12,
178:1, 178:7,
195:1, 199:12,
225:12, 225:24,
225:25, 226:2,
226:6, 226:7,
251:24

**age**
101:4, 184:7,
185:5, 186:22,
188:4, 192:11,
192:21, 205:15,
206:15, 207:8,
208:16, 212:15,
212:24, 214:9,
218:18, 273:23

**agency**
52:9, 80:8,
110:11

**aggressively**
207:18

**ago**
83:25, 181:15

**agree**
134:3, 172:7,
185:25, 190:23,
214:3, 269:4,
279:19

**agreed**
134:3, 134:7,
186:12

**agreeing**
188:7, 194:18,

204:15, 205:1,
206:1, 207:9,
210:6, 218:14,
271:13

**agreement**
37:11, 52:7,
248:13

**agrees**
155:6, 194:9

**ahead**
6:6, 57:5,
84:25, 85:1,
85:3, 116:5,
117:20, 128:15,
147:12, 158:1,
166:3, 166:11,
172:11, 172:12,
175:18, 228:1,
237:10, 248:19,
282:9

**ailments**
112:8

**al**
1:13, 5:16

**alibi**
174:5, 179:1,
179:3, 183:1,
183:7, 183:8,
183:11

**alibis**
173:1

**allegations**
58:16, 67:8

**alleged**
124:14, 145:17,
146:4, 151:14

**allocation**
83:1

**allow**
56:17, 106:3,
111:5, 111:24,
112:7, 216:23

**allowed**
70:18, 175:16,
269:5

**allowing**
86:13

**allows**
43:3, 83:19,

86:11
**almost**
34:21, 47:15,
159:7, 168:15,
190:10
**along**
102:24, 103:14,
156:7, 209:8,
209:10
**already**
88:17, 113:13,
115:17, 173:1,
230:12, 232:25,
246:4, 247:24,
248:2, 248:23,
256:22, 262:15
**also**
2:27, 6:9,
6:17, 11:6,
11:18, 15:17,
18:13, 33:13,
44:21, 48:15,
48:24, 59:8,
71:25, 76:14,
86:14, 91:5,
95:8, 103:14,
105:16, 105:19,
122:23, 129:2,
143:16, 145:10,
145:11, 146:6,
161:11, 162:11,
164:10, 167:25,
173:9, 179:4,
179:6, 180:17,
182:6, 186:3,
188:8, 188:12,
195:10, 199:13,
201:22, 217:16,
222:7, 222:20,
237:5, 239:15,
246:22, 248:15,
255:17, 263:18,
264:14, 266:18,
274:25, 276:23,
277:3, 278:12
**alternative**
32:1, 33:17
**although**
66:22, 100:17,

113:10, 169:23,
191:5, 191:9,
198:3, 220:10,
220:18
**always**
35:14, 78:7,
92:11, 94:3,
94:12, 114:20,
118:1, 125:13,
167:2, 239:9
**amazing**
129:21
**amend**
63:23
**amendment**
162:13
**america**
20:14, 172:21,
224:20
**american**
75:4, 142:19,
173:22, 221:22,
224:9, 230:24,
233:8
**among**
142:23, 212:20,
252:14
**amount**
17:15, 81:16,
81:22, 95:15,
102:11, 186:5,
240:6, 271:1,
271:16, 273:17,
273:18
**analogous**
148:19
**analogue**
130:1
**analyst**
111:20, 111:22
**analyze**
23:19, 29:18,
30:13, 30:18,
39:19, 46:15,
52:3, 53:13,
53:18, 54:14,
55:7, 60:18,
75:18, 77:2,

83:7, 86:16,
86:20, 87:19,
92:7, 94:17,
98:17, 102:16,
107:3, 107:4,
111:24, 121:21,
132:3, 218:5,
245:7, 259:8
**analyzed**
43:5, 45:2,
60:13, 67:17,
95:24, 126:13,
126:20, 143:25,
187:6, 202:5,
223:10, 259:18,
260:6
**analyzes**
35:9
**analyzing**
22:4, 22:10,
23:16, 23:18,
26:1, 31:7,
40:19, 54:1,
54:7, 54:18,
55:13, 60:2,
83:15, 95:17,
97:25, 103:7,
106:19, 127:14,
132:15, 132:19,
274:10, 276:10
**anecdotal**
35:21, 35:24,
35:25, 36:5,
36:9, 36:10,
37:1, 37:5,
37:18, 37:24,
38:3, 38:6,
38:9, 38:15,
39:12, 39:22
**anecdote**
37:11, 37:12,
38:5
**anecdotes**
38:21, 38:22
**announcements**
75:25
**anomalies**
245:25, 247:14

**another**
20:25, 22:22,
23:4, 23:8,
25:13, 32:19,
52:8, 53:25,
59:15, 62:10,
72:17, 96:5,
99:13, 102:3,
107:6, 119:6,
179:25, 180:5,
180:6, 180:7,
184:15, 189:18,
206:10, 206:21,
234:3, 243:24,
244:1, 277:24,
279:11
**answer**
3:3, 7:25, 8:2,
8:3, 34:4,
39:25, 41:14,
45:11, 45:16,
47:15, 55:2,
55:17, 64:15,
69:14, 78:10,
87:8, 87:11,
91:17, 93:22,
98:14, 99:14,
102:21, 109:19,
116:10, 117:21,
118:8, 120:11,
121:15, 122:21,
123:11, 125:1,
131:13, 136:1,
138:1, 139:12,
141:4, 141:6,
141:10, 141:11,
142:22, 161:17,
197:13, 197:14,
215:24, 216:24,
224:11, 224:17,
249:10, 250:17,
251:7, 258:22,
276:2, 280:6
**answered**
69:12, 73:7,
124:11, 138:4,
212:17, 246:23,
260:23, 261:4,

265:10, 267:22

**answering**
65:18, 67:11,
78:15, 138:19,
201:4, 233:18,
276:15, 282:11

**answers**
45:21, 64:10,
115:14, 144:20,
196:6, 236:8,
268:2, 268:5

**anthropology**
16:3

**anticipating**
66:18, 66:21,
67:1

**anybody**
56:18, 88:2,
90:11, 123:20,
128:18, 168:15,
172:3, 184:13,
191:10

**anybody's**
247:11

**anymore**
49:16, 189:1

**anything**
18:3, 114:22,
115:4, 116:10,
116:14, 125:15,
144:25, 160:5,
185:22, 205:6,
215:23, 216:24,
235:8, 279:15

**anyway**
81:10

**anywhere**
159:14, 249:21

**apologize**
42:15

**appear**
150:2, 151:7,
220:3

**appearance**
6:17

**appeared**
5:7

**appearing**
6:20, 63:5,

168:6

**appears**
60:2, 191:1,
195:4, 199:3,
199:9

**appellate**
58:19, 90:22,
130:11, 131:2,
265:12, 266:9,
266:18, 267:3,
267:4, 267:7

**applicable**
5:10

**application**
272:6

**applied**
18:6, 37:25,
79:17, 81:8,
127:18, 163:5

**apply**
53:20, 54:15,
79:22, 91:5,
108:19, 108:23,
109:1, 149:21,
208:24, 208:25

**applying**
18:21, 55:13,
92:4, 94:18,
218:15, 279:16

**appointed**
52:10, 56:10

**appreciate**
7:10, 193:1,
193:2, 234:11,
282:12

**approach**
51:14, 53:9,
53:15, 92:2,
94:14

**approached**
91:24

**appropriate**
7:14, 61:22,
63:24, 200:18

**approval**
19:15

**approve**
20:7

**approved**
19:14

**approximately**
138:23, 138:24

**april**
267:7

**apriori**
33:19

**archives**
21:6, 22:14

**area**
40:5, 82:5,
105:12, 123:16

**areas**
14:4, 16:19,
17:1, 17:16,
17:24, 79:7,
99:8, 122:12,
127:15, 127:16,
154:19, 162:21,
190:3

**aren't**
139:23, 167:3,
190:11, 192:18,
192:19, 201:22,
202:12, 207:2,
210:20, 225:18,
259:19, 264:7,
280:13

**argumentative**
138:14, 157:11,
158:3, 161:9,
182:9, 258:20,
276:13

**arises**
227:11, 230:4

**around**
84:9, 89:22

**arrest**
67:8, 175:19,
176:2, 176:3,
214:23

**arrested**
216:14

**arrive**
53:22, 125:19,
126:19, 126:20

**arrived**
126:14, 145:5

**arriving**
54:18, 170:3

**article**
24:22, 29:23,
34:1, 42:16,
42:17, 66:19,
66:22, 74:23,
75:1, 75:16,
76:22, 76:24,
77:7, 77:18,
78:5, 78:9,
119:6, 119:7,
119:8, 119:10,
152:10, 153:20,
153:22, 168:25,
169:6, 202:25,
221:21, 271:19,
271:20

**articles**
15:17, 17:25,
21:13, 22:14,
22:18, 28:16,
33:22, 45:23,
45:25, 66:13,
74:13, 74:14,
74:21, 75:3,
75:18, 76:20,
77:3, 77:11,
78:2, 78:6,
80:10, 83:5,
83:15, 163:20,
166:24, 167:3,
168:19, 168:23,
204:17, 204:23,
205:4, 233:9,
233:18, 233:22

**aside**
30:10, 55:12,
55:16, 78:4,
82:21, 276:18,
276:19

**asked**
40:25, 52:16,
52:22, 54:9,
54:22, 55:18,
68:23, 69:11,
69:17, 69:19,
70:19, 70:21,

71:2, 72:10,
73:6, 73:14,
121:15, 122:19,
123:9, 131:10,
142:15, 178:1,
200:16, 202:2,
212:16, 228:25,
239:7, 246:22,
256:8, 260:22,
261:4, 262:2,
264:3, 264:7,
265:9, 268:25,
269:1, 269:24

**asking**
8:20, 9:4,
22:2, 36:4,
36:7, 53:25,
69:7, 72:23,
74:4, 77:7,
87:13, 92:9,
105:1, 117:13,
119:23, 120:16,
120:17, 121:17,
121:19, 124:13,
138:7, 196:5,
204:18, 214:19,
216:22, 217:23,
226:9, 226:14,
234:1, 243:18,
246:3, 246:5,
249:9

**asks**
67:6, 70:17

**asleep**
271:2

**aspect**
81:12, 99:6,
103:5, 146:15

**aspects**
55:22, 245:12

**aspires**
31:22

**assault**
254:15, 274:19,
275:1, 275:5,
275:9, 275:17,
275:20

**assaulted**
111:6, 111:11,

274:21, 275:25

**assert**
272:16

**asserting**
230:15, 231:19,
231:23, 243:7,
249:24, 255:22,
278:1

**assertion**
139:1, 198:13,
232:18, 233:2,
255:8

**assess**
138:9, 186:16,
186:20, 188:18,
206:17, 209:14,
215:13, 215:14,
217:21, 251:25

**assessing**
177:23

**assessment**
26:10, 125:8,
139:8, 139:15,
143:22, 187:17,
201:13, 201:25,
208:3, 208:4,
214:4, 214:20,
215:16, 217:4,
235:3, 236:2,
247:18, 248:5,
257:7, 262:13,
267:25, 274:5,
274:20, 275:2,
275:9

**assessments**
193:15

**assistant**
79:19, 79:20,
86:22, 87:1,
157:14

**assistants**
44:14, 76:11,
83:1, 90:19

**associated**
187:3, 187:11,
225:19, 225:20

**assume**
122:18, 173:13,

217:23, 218:20,
230:11, 232:24

**assumed**
144:24

**assuming**
242:13, 248:6,
274:20

**assumption**
8:4, 103:18,
223:6, 223:12,
274:16

**assumptions**
136:15, 136:18,
274:8, 274:9

**assurance**
116:13

**assuring**
115:23

**attached**
8:12, 113:9

**attack**
184:12

**attempts**
159:3

**attended**
65:19, 110:7

**attending**
6:18, 7:9

**attorney**
12:18, 56:9,
131:24, 132:11,
175:19, 176:5,
176:11, 176:14,
283:16

**attorneys**
75:23, 90:17

**atypical**
73:12

**aubre**
158:15

**audio**
64:12, 64:15,
64:20

**audios**
64:23

**august**
1:21, 5:2,
5:20, 10:13,

13:7, 283:20

**authenticity**
87:5, 87:21,
87:24, 88:9,
88:10

**author**
39:7, 42:17

**authored**
21:14, 26:11,
32:14, 74:5,
74:10, 74:15,
92:6

**authoring**
25:6, 51:17

**authoritative**
159:23

**authorities**
205:22

**authority**
176:6

**authorization**
52:11, 52:15

**authorized**
51:7, 51:10

**authors**
158:15

**autopsy**
276:24

**available**
50:5, 63:25,
76:3, 92:1,
94:24, 102:23,
106:5, 140:3

**avenue**
2:13, 270:1

**average**
96:19, 101:12,
102:12

**avoid**
180:24

**awarded**
78:21

**aware**
33:7, 33:11,
33:14, 63:17,
63:25, 64:1,
216:7, 216:22,
218:19, 245:21,

254:16, 262:3,
262:6

**B**

**baby**
262:10
**bachelor's**
14:18
**back**
22:1, 56:25,
68:4, 83:3,
85:23, 87:16,
92:1, 113:11,
113:14, 114:25,
115:11, 117:1,
117:4, 117:16,
118:6, 118:10,
152:1, 154:1,
157:5, 163:2,
166:7, 169:15,
193:23, 195:13,
196:22, 199:16,
204:6, 210:24,
219:25, 231:14,
234:21, 238:20,
245:19, 246:25,
264:10
**bad**
215:19, 216:3,
216:9
**bar**
13:3, 176:21,
269:1
**bargains**
68:12
**base**
83:19, 126:5,
126:8, 126:9,
133:4
**based**
22:3, 22:23,
23:25, 24:6,
25:7, 25:25,
26:12, 26:18,
26:24, 27:2,
27:10, 27:14,
27:18, 38:18,
44:15, 53:5,

54:19, 61:17,
62:5, 79:22,
80:17, 82:17,
98:18, 99:14,
124:16, 132:17,
133:7, 135:16,
136:21, 137:5,
139:4, 140:8,
142:12, 143:23,
144:22, 157:9,
161:1, 163:15,
169:2, 174:21,
176:4, 178:3,
178:18, 192:10,
196:5, 196:9,
202:5, 207:3,
207:10, 207:13,
208:4, 208:10,
208:15, 222:5,
243:5, 244:11,
245:5, 252:21,
255:10, 255:12,
256:3, 257:5,
260:12, 260:13,
260:20, 261:6,
261:9, 272:21,
272:25, 273:9,
273:14, 273:21,
274:22, 275:9,
275:17, 278:21,
280:14, 281:4
**basic**
101:13, 103:14,
158:23
**basically**
125:24, 156:6
**basing**
21:1, 192:9,
207:2, 263:13,
263:16, 268:12
**basis**
65:1, 132:15,
144:5, 145:7,
160:12, 172:3,
178:20, 183:14,
186:16, 191:16,
275:17
**bates**
112:24, 118:20,

201:10, 204:2
**bay**
105:12
**bear**
54:13, 54:22,
61:10, 124:6,
125:7
**became**
14:11, 136:2,
136:3, 139:14,
139:20, 141:11,
141:12, 144:9,
144:12, 262:24
**because**
8:9, 14:7,
16:10, 21:22,
25:25, 26:13,
33:14, 35:18,
41:9, 43:8,
44:11, 44:15,
49:3, 57:3,
57:7, 58:17,
62:10, 65:19,
71:18, 73:14,
81:23, 92:14,
99:25, 100:8,
100:17, 102:19,
103:21, 105:1,
107:2, 117:9,
117:21, 122:15,
123:14, 126:1,
128:3, 136:7,
136:24, 139:14,
140:15, 151:13,
151:15, 156:17,
166:2, 167:5,
173:2, 173:13,
175:1, 176:1,
176:3, 178:1,
178:18, 180:6,
184:25, 187:7,
191:13, 191:20,
194:12, 197:8,
199:11, 209:18,
210:24, 217:14,
217:15, 219:9,
227:4, 227:5,
227:15, 230:1,

230:9, 232:23,
235:21, 239:11,
239:18, 239:22,
241:21, 253:24,
256:19, 257:9,
258:11, 264:5,
270:11, 271:6,
272:10, 272:11,
273:1, 275:13,
276:8, 278:5,
281:16
**become**
141:4, 186:9
**becomes**
63:24, 139:13,
170:21
**bed**
270:22
**bedroom**
243:20, 243:22,
243:25
**beer**
242:9, 269:1
**before**
5:5, 18:15,
58:7, 86:2,
89:19, 100:16,
108:14, 132:3,
137:6, 141:7,
141:11, 171:23,
172:1, 173:16,
174:9, 174:24,
177:1, 177:3,
177:22, 178:13,
180:10, 188:18,
191:18, 201:3,
201:4, 234:5,
234:7, 262:8,
262:10, 279:22
**began**
137:22, 138:6,
138:12, 138:23,
139:24, 140:10,
140:17, 140:19
**begin**
33:8, 141:3,
181:9
**beginning**
135:23, 136:17,

**begins**
5:14, 166:16,
182:11

**behalf**
2:3, 2:17, 5:9,
6:7, 6:10, 6:12,
6:20, 80:9

**behave**
212:8

**behavior**
205:20, 240:2

**being**
33:16, 45:24,
51:3, 51:4,
51:6, 51:7,
51:8, 107:13,
107:14, 139:3,
148:24, 149:4,
149:13, 162:16,
176:25, 194:8,
194:19, 196:7,
209:10, 247:5,
257:22, 264:1,
265:21, 280:12

**belief**
162:21, 170:15,
170:20

**beliefs**
33:2

**believe**
19:21, 49:10,
64:5, 66:8,
66:11, 118:7,
132:25, 140:25,
141:8, 145:1,
145:7, 150:17,
153:25, 155:16,
156:25, 175:11,
178:20, 191:16,
193:13, 203:17,
221:20, 222:17,
227:1, 233:13,
233:15, 241:10,
242:17, 245:16,
246:11, 247:2,
247:10, 260:12,

136:25, 141:1,
144:10

268:7, 271:1,
271:4, 271:18,
275:16

**believed**
126:24, 140:13,
145:24, 206:20,
254:25, 267:23

**belong**
190:22

**below**
189:2

**berkeley**
12:25, 14:18

**besides**
31:14, 31:20

**best**
32:8, 32:10,
40:22, 46:10,
59:25, 80:4,
88:11, 95:1,
95:15, 97:21,
97:23, 102:23,
125:16, 125:23,
126:12, 126:14,
132:1, 132:2,
136:20, 139:15,
140:7, 142:17,
154:7, 154:17,
155:22, 159:13,
161:5, 161:7,
161:11, 185:17,
204:21, 215:24

**better**
11:22, 126:2,
132:14, 132:22,
133:12, 137:12,
175:1, 178:4,
178:6, 225:15

**between**
41:6, 41:11,
51:3, 51:6,
51:13, 134:25,
136:16, 140:14,
201:15, 265:22

**beyond**
35:3, 43:24,
56:22, 58:21,
68:22, 70:18,

110:8, 122:20,
122:22, 174:20,
256:9

**bias**
31:3, 31:7,
31:19, 31:23,
32:6, 32:13,
32:20, 32:22,
32:25, 33:6,
33:7, 33:12,
33:13, 33:16,
34:3, 34:13,
34:24, 88:13,
89:5, 89:8, 89:9

**big**
29:22, 224:13,
224:16

**bigger**
58:18, 63:4,
105:21, 168:14

**bit**
8:25, 108:22,
142:21, 169:25,
190:12, 196:2,
280:22

**black**
34:19

**blanking**
262:6

**blog**
152:19, 152:23

**blood**
179:19, 254:24

**bloody**
179:17, 253:15,
253:17, 254:21,
254:22

**blurb**
38:4

**board**
104:21

**boat**
257:20

**body**
23:21, 24:23,
58:18, 58:23,
162:11, 162:12,
162:18, 168:14,

168:17, 169:2,
169:8, 184:9,
185:8, 190:13,
204:22, 207:13,
208:17, 208:22,
260:2

**bogus**
198:6

**bono**
84:15, 84:16

**book**
24:22, 27:13,
37:2, 75:4,
81:23, 142:18,
169:1, 169:2,
169:9, 221:21,
221:23, 222:5,
223:7, 224:13,
224:15, 224:16,
225:7, 225:8,
233:4, 233:8

**books**
18:1, 22:14,
34:20, 35:8,
36:15, 36:16,
81:22, 81:24,
142:5, 166:24,
168:24, 204:17,
204:23, 205:4

**bookshelf**
158:12, 159:20,
231:13

**borderline**
187:25

**bore**
45:2

**born**
272:24

**both**
12:13, 18:14,
31:3, 105:11,
108:10, 113:8,
130:8, 130:9,
165:14, 165:15,
180:16, 201:23,
248:10, 255:15,
261:16, 267:6

**boulder**
83:23

**boulevard**
2:21
**boy**
184:5, 185:5,
278:2
**boys**
211:24
**brain**
190:14, 205:18,
206:11, 211:1,
211:3, 212:5,
218:12, 219:8,
219:9, 219:18
**brains**
211:21
**branch**
15:3, 176:7
**brandon**
222:9, 222:10
**break**
7:23, 7:24,
84:22, 84:24,
85:6, 85:7,
85:8, 85:10,
85:17, 117:4,
118:4, 118:5,
165:23, 165:25,
166:1, 166:3,
186:5, 201:21,
204:3, 204:5,
228:2, 234:1,
234:3, 244:20
**breakdown**
129:4
**breaks**
117:21, 185:23
**brief**
37:17
**bring**
11:20, 39:4,
82:7, 187:7
**broad**
23:11, 32:17,
39:1, 77:8,
78:16, 122:9
**broader**
16:1, 16:15,
17:20, 20:23,

24:23
**broadly**
73:17, 88:25,
143:15, 174:8
**broken**
147:24, 186:10
**brooke**
6:14
**brought**
254:17
**brown**
128:23, 150:18,
239:16, 242:9,
243:17
**brutal**
180:16
**brutally**
180:13
**budget**
79:20
**build**
26:3, 135:15,
199:12
**building**
14:8, 141:5,
141:6
**bullet**
240:18, 240:19,
241:8, 242:6,
278:20, 279:4
**bulletins**
160:20, 160:23
**bunch**
224:15
**burden**
116:22, 118:13,
217:15
**burdensome**
67:12
**burgundy**
1:30, 5:5,
283:4, 283:23
**business**
13:9, 14:8,
82:8, 84:11,
84:17
**buttresses**
159:11

**C**

**c-a-p-u-t-o**
158:16
**cab**
37:14, 38:13
**calculate**
96:18
**california**
1:22, 5:4, 5:6,
83:22
**call**
20:19, 25:23,
38:5, 40:23,
52:4, 73:20,
93:16
**called**
5:9, 12:16,
40:11, 49:7,
74:24, 75:1,
75:6, 84:5,
108:7, 108:8,
148:18, 195:3,
260:12, 273:3
**calls**
14:13, 52:4,
55:7
**came**
75:17, 76:1,
177:25, 191:21,
238:25, 239:1,
255:16, 270:23
**can't**
62:3, 71:18,
80:2, 89:6,
95:13, 96:13,
100:10, 115:6,
116:4, 116:13,
125:20, 132:16,
141:18, 161:14,
185:5, 187:21,
211:3, 211:6,
215:17, 229:3,
239:8, 249:10,
250:15, 250:16,
251:5, 252:9,
263:6, 266:5,
281:20

**cancer**
207:16, 207:24
**candy**
269:1
**cannon**
1:10, 1:13,
5:16, 128:23
**cannot**
32:13, 158:9,
195:19, 211:1,
256:4
**capacity**
191:21
**capital**
95:9
**caps**
279:10
**caption**
283:18
**captured**
40:17, 257:2
**captures**
129:20
**caputo**
158:16
**career**
79:18, 252:16
**carefully**
71:25
**caretaker**
213:9
**cast**
88:24, 90:21
**categories**
17:20, 43:5,
188:22, 190:7,
190:18, 190:23,
192:9, 244:4
**categorize**
147:17
**category**
20:24, 186:1
**caught**
185:14
**causal**
207:24
**cause**
50:21, 164:16,

174:11, 174:13, 174:21, 174:23, 175:10, 175:17, 175:21, 176:4, 176:12, 176:18, 177:1, 177:3, 177:17, 177:18, 177:22, 187:19, 283:10, 283:18

**caused**
41:22, 62:4, 186:9

**causes**
111:2, 185:24

**center**
65:20, 270:1, 271:3, 271:4

**central**
1:2, 5:17, 57:21, 58:1, 234:16

**century**
20:14

**certain**
30:2, 35:2, 41:25, 57:13, 87:20, 93:2, 102:10, 103:14, 149:10, 155:10, 167:2, 168:2, 169:19, 170:19, 172:4, 172:23, 173:9, 173:15, 175:3, 180:15, 184:20, 184:24, 187:10, 188:8, 215:21, 226:3, 230:22, 232:4, 235:1, 236:20, 237:20, 245:25, 258:6, 272:7, 274:7

**certainly**
34:5, 62:18, 66:23, 114:7, 172:19, 187:20, 211:19, 214:7, 214:10, 255:25

**certainty**
32:4, 116:10, 170:20, 173:15, 174:17, 207:3

**certificate**
283:1

**certification**
18:8

**certified**
5:5, 283:4

**certify**
283:5, 283:15

**cetera**
16:5, 101:11, 181:22

**chance**
195:8, 195:16, 196:20, 200:6, 221:9, 229:6, 229:7, 238:3, 238:25, 246:10, 253:6, 281:22

**chances**
221:19

**change**
49:21, 61:12, 62:4, 102:25, 146:15, 151:3, 247:17

**changed**
224:21

**changes**
218:16, 218:21

**changing**
140:18, 141:9

**chapters**
19:13, 225:7

**characteristic**
209:8

**characteristics**
206:9, 209:10, 219:11

**characterize**
14:10, 38:6, 141:2, 154:11, 154:13, 272:1

**charge**
165:6, 165:9

**charles**
1:13

**check**
115:2, 157:18

**checked**
115:4

**chicago**
2:8, 2:14, 2:23

**chief**
145:10, 145:19, 146:12, 146:14, 146:15, 159:9, 188:14, 199:19

**child**
191:13, 243:24

**choice**
165:13

**chooses**
41:7, 97:9

**choosing**
44:7

**chosen**
98:17

**christie**
2:20, 6:9

**chronological**
108:12

**cigarettes**
207:15

**circumstances**
131:4

**citation**
233:1

**citations**
163:14, 163:16, 169:12

**cite**
141:18, 141:21, 156:2, 166:19, 167:5, 168:19, 168:23, 168:24, 168:25, 169:1, 221:20, 232:11, 232:16, 249:13, 249:17

**cited**
36:8, 61:17, 204:12, 206:4,

222:10, 250:7

**cites**
169:2

**citing**
137:18, 137:21, 159:23, 249:25

**civil**
5:11, 7:16, 58:8, 58:25, 59:2, 59:3, 68:9, 90:14, 125:24, 126:1, 248:13

**claim**
25:7, 32:17, 198:9

**claiming**
138:8

**clarify**
15:13, 51:20, 66:25, 181:1

**clarity**
3:24

**classes**
12:9, 12:11, 12:12

**classification**
148:8, 149:12

**classifications**
164:6

**classified**
43:4, 147:3, 149:19, 271:17

**classify**
40:18

**classifying**
171:8

**cleaner**
243:23

**clear**
166:24, 191:9, 196:14, 217:25, 265:15

**clearly**
126:15

**client**
56:10

**clinical**
18:16, 190:19,

209:12, 209:25
**clinician**
15:12
**close**
229:24, 251:4
**closer**
203:20
**closest**
153:23, 203:5
**clothes**
253:19
**clueless**
199:10
**cluster**
205:25, 209:9
**co-author**
79:12, 81:7
**co-authored**
74:6, 74:10,
74:15, 80:11
**co-authors**
32:9, 98:25
**coaching**
168:7
**cocktail**
37:13, 38:12
**code**
96:13, 101:3
**coded**
103:22
**coding**
96:12, 105:12,
105:14, 106:1,
106:2, 107:20,
107:24
**coerce**
187:19
**coerced**
67:8, 69:6,
69:8, 69:25,
71:12, 71:17,
71:20, 74:7,
147:3, 147:6,
147:7, 147:14,
147:17, 147:23,
149:19, 182:15,
225:3, 225:4
**coercion**
54:17, 82:5,

121:23, 127:10,
149:9, 169:18,
185:11, 186:1,
186:5, 186:7,
186:14, 188:6,
192:10, 192:12,
192:20, 270:25
**coercive**
109:14, 148:1,
148:4, 167:24,
187:2, 187:11,
192:16, 257:11,
261:11, 270:12,
272:17
**coerciveness**
260:16, 260:18
**cognitive**
189:14
**cognitively**
188:2
**coherent**
138:16
**coined**
72:19
**collaborate**
80:23
**collaborated**
81:2
**colleagues**
88:1
**collect**
30:13, 42:7,
43:23, 86:4,
86:7, 86:23,
87:19, 100:10,
106:3, 106:11
**collected**
30:19, 90:8
**collecting**
28:5, 29:3,
29:13, 86:20,
87:1, 87:21,
88:12, 88:16,
92:6, 92:19,
92:25, 94:2,
94:3
**collection**
24:2, 24:7,

28:20, 29:9,
29:11, 37:6,
40:5, 57:2,
88:14, 90:5,
92:8, 92:11,
92:17, 93:6,
99:25, 101:20,
255:6
**colorado**
83:23
**com**
2:16, 2:25,
2:26
**come**
19:8, 26:8,
34:7, 59:20,
80:15, 80:20,
102:24, 188:1,
196:22, 226:12,
250:11, 251:20,
253:24, 259:9,
262:2, 276:10
**comes**
8:20, 31:15,
32:2, 41:9,
41:19, 46:13,
120:9, 156:17,
167:15, 168:11,
180:3, 227:21,
244:3, 276:3
**coming**
26:9, 32:23
**commence**
191:18
**commencing**
5:3
**comment**
121:17
**commit**
47:6, 173:5,
186:11, 186:13,
196:1, 280:13
**commits**
216:14
**committed**
48:19, 48:25,
139:18, 145:8,
145:15, 145:24,

151:16, 170:19,
171:9, 172:4,
174:19, 175:11,
178:21, 184:14,
194:13, 217:12,
220:13, 255:19,
264:8
**committee**
20:4
**committing**
144:19, 180:8,
180:24, 185:13,
264:3, 264:14
**common**
141:19, 142:6,
159:7
**commonly**
122:6, 142:23,
154:7, 159:13,
161:4
**communicate**
134:14
**communicated**
220:17
**communicates**
165:5
**community**
50:3, 70:8
**company**
11:5, 80:7
**compare**
196:22, 237:6,
237:16
**compared**
84:19
**compensation**
81:16, 81:20,
82:1
**complete**
98:19, 112:16,
114:19, 129:7,
135:22, 136:8,
178:13, 279:13
**completed**
19:25
**completely**
134:13, 199:10
**complex**
59:7

| | | | |
|---|---|---|---|
| **compliance** 212:20 | 35:4, 53:22, 57:18, 61:3, 98:18, 126:25, 146:20, 261:6, 261:9, 261:10, 261:19, 274:14 | 86:3, 197:4, 228:4, 245:23, 246:20 | 249:9 |
| **compliant** 69:6, 69:9, 69:25, 71:12, 71:17, 71:20, 147:3, 147:6, 147:8, 147:14, 147:17, 147:22, 148:15, 149:20, 164:4, 190:21, 191:3, 205:24, 206:14, 210:3, 219:5 | | **confirmation** 32:20, 32:25, 33:6, 33:7, 33:11, 33:13, 33:16, 34:2, 34:13, 34:24, 117:13 | **considering** 44:9 |
| | **conclusively** 47:5 | | **considers** 279:13 |
| | **condensing** 163:18 | **confirmed** 234:8 | **consistent** 195:21, 202:12, 256:1, 257:21, 257:22, 258:1, 259:16, 274:25, 275:20 |
| | **condescending** 37:24 | **confirms** 33:2 | |
| | **condition** 103:11 | **conform** 28:19 | |
| **complicated** 157:19 | **conditional** 149:17 | **confronting** 95:19 | **consistently** 14:1 |
| **compound** 244:19, 247:21 | **conditions** 225:2, 225:4 | **confusing** 276:8 | **constitutional** 12:12, 156:18, 162:5, 174:18 |
| **comprehensive** 125:16, 167:6, 224:13, 225:9 | **conduct** 64:17, 80:3 | **connect** 26:2 | **consult** 84:13 |
| **compromised** 272:9 | **conducted** 17:15, 193:18 | **connection** 24:21, 207:25 | **consultant** 13:17, 13:22, 51:4, 51:7, 51:11, 51:13, 51:16, 51:22, 52:16, 54:2, 54:10, 73:16, 124:4, 215:6 |
| **con** 240:22 | **conducting** 25:6 | **connie** 274:19, 275:7, 276:11, 276:21 | |
| **conceptualization** 167:16 | **conducts** 171:11 | **connotation** 21:3 | |
| **conceptualize** 176:9 | **confer** 146:22 | **conscious** 31:3, 31:7, 31:18, 31:19, 32:5 | **consultant's** 53:11 |
| **concern** 192:2 | **conferences** 88:2 | | **consultation** 52:21, 53:3 |
| **concerns** 124:18 | **confess** 91:19, 106:9, 107:5, 108:8, 146:1, 159:2, 165:13, 185:16 | **consequences** 75:1 | **consultations** 51:1, 71:1 |
| **conclude** 224:6, 265:17 | | **conservative** 90:1 | **consulted** 51:1 |
| **concluded** 147:14, 178:17, 275:16, 282:20 | **confessed** 90:3, 198:9, 222:15 | **consider** 39:12, 46:24, 130:14, 130:17, 180:12, 225:11, 260:7, 260:8, 280:15 | **consulting** 11:5, 11:10, 13:6, 13:8, 13:15, 14:3, 55:3, 55:18, 82:7, 82:11, 82:12, 82:16, 84:11, 84:17, 124:7 |
| **concluding** 171:9, 274:22 | **confesses** 57:24, 207:22 | | |
| **conclusion** 144:6, 192:10, 247:18, 248:6, 249:24, 272:20, 272:21, 276:11, 280:14 | **confessor** 101:5, 197:2 | | |
| | **confessors** 48:24 | **considerably** 203:20 | |
| | **confident** 125:18 | **consideration** 218:7 | **contact** 66:3, 90:19, 191:19 |
| **conclusions** 32:23, 33:10, | **confirm** 45:5, 65:5, | **considered** 136:23, 154:9, | **contacted** 13:23, 75:23, |

76:2, 90:11
**contacts**
215:15
**contain**
32:5
**contained**
43:18, 62:5,
103:19, 119:19,
119:25, 120:8,
126:11, 145:10,
239:13, 244:9,
277:4
**contains**
261:14
**contaminate**
149:23, 155:8,
227:15, 239:6,
247:2
**contaminated**
151:22, 222:23,
227:10, 228:7,
228:19, 240:1,
240:10, 243:8,
247:19
**contaminating**
150:19, 170:6,
238:6, 239:21
**contamination**
109:17, 127:11,
149:24, 150:9,
150:15, 150:23,
151:2, 151:5,
168:4, 199:18,
219:20, 219:22,
220:7, 220:11,
220:20, 220:24,
222:8, 226:12,
226:19, 227:10,
227:17, 228:13,
228:25, 229:3,
229:9, 229:24,
230:3, 238:4,
239:8, 239:9,
239:11, 239:15,
239:24, 240:3,
240:4, 240:6,
240:7, 240:14,
240:25, 241:3,

243:9, 243:16,
244:2, 249:15,
253:8, 281:14,
281:20, 281:25
**contemporary**
21:10, 21:23,
22:16, 22:18,
22:22, 23:3
**content**
241:8
**contents**
109:19
**context**
59:21, 129:18
**continue**
66:10, 118:17,
166:10, 195:6,
268:22, 269:18
**contract**
52:2, 52:7,
52:13, 52:14
**contradictions**
224:23
**contradicts**
199:22
**contribute**
50:3
**contributor**
255:7
**control**
31:2, 64:14,
95:13, 97:21,
98:17, 99:9
**controlling**
281:13
**controversial**
98:6, 159:5,
159:19
**conversation**
55:9, 80:21,
124:20, 125:11
**conversations**
121:18, 123:11,
124:14, 271:24
**convey**
141:13
**convict**
142:11, 196:10

**convicted**
43:12, 50:22,
135:15
**conviction**
43:12, 65:20,
67:9, 84:6,
101:22, 101:24,
130:13, 131:3,
182:20, 221:20,
238:22
**convictions**
12:16, 17:4,
17:17, 39:6,
101:11, 198:7,
198:12, 225:5
**cook**
100:7
**cooper**
243:25, 274:19,
276:11, 276:21
**copies**
81:25
**copy**
8:6, 8:19
**core**
143:5, 212:21
**corner**
10:10
**corporation**
11:8, 11:9,
13:6, 13:10,
13:13
**corporations**
13:19
**corrected**
200:25
**correcting**
144:18, 168:7,
170:7, 199:14,
239:19
**correction**
48:5, 199:2
**correctly**
25:4, 27:9,
172:7, 183:4,
194:25, 239:18,
240:21, 241:11,
255:1

**correlated**
226:11
**correlates**
219:13
**correspondence**
65:12
**corroboratable**
251:21
**corroborate**
46:17, 195:17,
196:13, 235:11
**corroborated**
48:17, 59:23,
60:21, 197:6,
197:16, 197:22,
198:5, 200:11,
274:14
**corroborates**
195:25, 196:20,
196:24, 221:10,
235:10, 237:8
**corroborating**
198:14, 198:15,
198:22, 224:5,
282:1
**corroboration**
39:20, 39:21,
109:17, 181:21,
251:18
**couldn't**
145:23, 174:12,
228:18
**counsel**
6:2, 6:25,
52:10, 56:11,
56:17, 73:20,
73:22, 120:25,
121:7, 121:18,
124:9, 267:17,
283:15
**count**
252:25
**country**
101:4, 102:10
**county**
100:7
**couple**
9:1, 9:10,

9:19, 64:10,
86:2, 181:15,
182:24, 268:24
**course**
39:15, 58:3,
81:15, 132:18,
185:17, 186:1,
245:6, 271:24,
279:19, 281:15
**courses**
12:14, 16:23,
110:7, 181:15
**coursework**
18:11
**court**
1:1, 5:17,
6:13, 6:24, 7:9,
7:15, 58:20,
58:24, 70:15,
85:14, 90:23,
129:14, 129:19,
129:23, 130:4,
130:12, 131:20,
140:4, 154:15,
159:25, 162:7,
162:8, 162:23,
217:13, 265:12,
266:4, 266:18,
267:3, 267:4,
267:7, 282:15
**courthouses**
90:18
**courts**
75:23, 131:25,
162:23
**cover**
167:7, 255:7
**covered**
119:17, 142:17,
225:8
**covers**
244:3
**create**
31:2, 98:8,
119:13, 167:10
**created**
25:9, 119:16,
162:10, 164:7,

164:11, 164:12,
176:25, 205:7
**creates**
184:24
**creation**
119:16
**credible**
253:11, 257:25
**crediting**
247:7, 247:10
**crimes**
197:9, 217:19,
279:21
**criminal**
12:13, 23:2,
50:21, 56:8,
58:5, 58:10,
68:10, 126:3,
162:5, 174:18
**criminology**
16:13
**criteria**
27:22, 47:2,
49:6, 69:17,
70:6, 70:13,
71:19, 71:22,
71:24, 72:9,
72:12, 72:13,
73:3, 77:12,
77:19, 77:20,
77:22, 78:1,
78:7, 88:6,
88:24, 89:13,
89:14, 89:25,
90:1, 90:3,
100:24, 103:6,
103:12, 103:24,
104:18, 173:7,
272:16
**critical**
246:11
**cross-check**
46:11, 46:16
**cross-checking**
45:15
**crosses**
165:4
**csr**
1:31, 283:23

**culminated**
20:3
**culmination**
19:20
**culpable**
172:18
**curious**
193:24
**current**
10:13, 18:17,
156:5, 231:15
**currently**
10:21
**custodial**
134:17, 138:22
**custody**
64:13, 139:3,
139:9, 154:3,
160:4, 265:24
**cv**
1:8, 5:19,
8:12, 8:14,
8:19, 8:21,
8:22, 9:7, 9:10,
9:12, 9:21,
10:2, 10:10,
10:11, 11:14,
12:25, 17:2,
17:5, 50:25,
78:20, 84:1,
84:4, 84:9,
104:25, 108:11,
110:5

---

**D**

**databases**
75:21, 76:9,
76:13, 86:23,
87:25, 100:18
**date**
5:20, 9:2,
10:9, 10:10
**dated**
254:10, 265:13,
267:7, 267:8,
283:20
**dates**
13:20, 19:17,

203:17
**dawns**
8:19
**day**
132:21, 203:13,
207:15, 207:23,
241:10, 247:16,
249:6, 265:3,
265:7, 265:17,
265:19, 266:1,
270:7, 270:15,
270:23
**days**
56:5, 128:13,
134:24
**de-bias**
30:23
**dead**
184:16, 249:7
**deal**
33:13
**dealing**
175:1
**deals**
162:13
**death**
97:13, 97:16,
111:2, 184:19
**decade**
83:25
**decades**
56:21, 123:15,
142:3
**decide**
80:23, 176:13
**decided**
81:11
**decipher**
145:24
**decision**
108:7, 176:2,
205:20, 218:12
**declarations**
67:6
**declared**
52:19
**decline**
102:14

**deem**
37:7, 38:15, 69:23
**deemed**
187:18
**deep**
49:12
**deeper**
61:16
**defend**
19:11
**defendant**
56:14, 160:13, 265:21
**defendant's**
265:23
**defendants**
1:15, 2:17, 5:9, 6:8, 6:10, 58:22
**defender**
56:10
**defenders**
52:10
**defending**
18:14
**defense**
19:15, 56:17, 90:13
**define**
21:21, 32:20, 107:18, 135:1
**defined**
86:5, 212:14
**defining**
36:8
**definitely**
262:17
**definition**
22:1, 36:4, 93:12, 103:21, 135:9, 136:20, 141:17, 141:20, 141:22, 142:3, 142:16, 142:21, 142:23, 143:1, 143:2, 143:7, 143:8, 143:9,

143:12, 148:11, 182:5, 206:13, 210:21, 211:3, 211:6, 226:19, 228:19
**definitive**
67:1, 161:21
**definitively**
48:13, 115:7, 128:8, 138:5, 210:18, 210:20, 223:21, 253:7, 255:9, 265:7
**degree**
12:23, 12:24, 94:12, 116:11, 206:10, 206:13, 206:17, 206:21, 207:2, 209:11, 274:1
**demonstrable**
238:19
**demonstrate**
177:17
**demonstrated**
47:5, 48:17, 48:18, 49:13
**denial**
142:14
**denied**
152:10, 153:20, 153:22
**deny**
264:3
**departed**
122:6
**department**
105:9, 136:11, 160:16, 161:6, 161:13, 161:20, 214:23, 215:9, 215:16, 273:12
**departments**
105:11, 105:12, 181:16
**depend**
84:19, 151:12, 215:1

**depending**
20:22, 41:3, 44:13, 58:15, 212:12, 235:15
**depends**
14:23, 24:17, 29:12, 34:4, 42:12, 47:1, 47:14, 49:24, 50:8, 50:17, 57:19, 58:3, 61:7, 77:16, 86:8, 86:18, 87:9, 96:10, 99:21, 107:12, 107:13, 109:11, 179:15, 226:7, 248:9, 248:17, 248:20
**depos**
2:29, 5:24, 6:14
**deposition**
1:19, 3:1, 5:2, 5:15, 5:25, 7:12, 9:21, 63:15, 63:19, 112:23, 113:4, 113:8, 113:17, 113:19, 113:20, 114:1, 114:2, 114:13, 115:11, 117:9, 117:10, 117:18, 117:22, 122:17, 153:11, 234:13, 241:17, 257:3, 264:11, 266:14, 266:16, 266:19, 266:22, 267:1, 277:1, 277:9, 277:12, 277:15, 282:18, 283:6, 283:10, 283:17
**depositions**
7:22, 59:1, 59:5, 59:6, 113:11, 114:9,

116:20, 117:8, 122:19, 152:9, 202:24, 234:9, 234:14, 255:17, 267:12
**depravations**
162:13
**deprivation**
271:11, 271:17, 271:21, 272:2, 272:7, 272:12, 272:23, 273:1, 273:2, 274:1, 274:3
**deprivations**
156:20, 187:2
**deprive**
158:24
**deprived**
272:11, 272:14, 272:15, 273:8, 273:25
**depth**
94:13
**derisive**
37:19
**describe**
39:22, 39:23, 41:20, 73:17, 103:15, 109:8, 126:15, 143:3, 147:21, 185:12, 202:14, 239:11, 240:4, 241:8, 263:25, 268:10, 270:15
**described**
25:3, 57:1, 96:6, 99:18, 100:16, 130:20, 154:4, 156:10, 192:18, 213:4, 241:16, 243:17, 245:4, 247:14, 270:16, 274:3, 274:23
**describes**
31:24, 150:19,

192:17, 239:18,
240:17, 254:11,
262:1, 264:15

**describing**
38:5, 38:21,
39:14, 40:21,
107:21, 152:20,
235:16, 249:5,
264:1, 266:4

**description**
4:8, 37:17,
38:8, 41:4,
55:10, 56:11,
105:18, 143:1,
144:4, 144:17,
144:22, 150:20,
152:4, 152:7,
152:10, 152:12,
153:24, 163:24,
201:17, 201:18,
202:6, 202:16,
202:20, 203:4,
203:12, 203:22,
232:1, 242:23,
243:1, 243:2,
245:11, 245:18,
261:22, 262:19,
262:20, 263:8,
267:19, 268:1,
268:6, 268:7,
268:14, 270:7,
270:17, 274:23,
281:17

**descriptions**
38:17, 39:9,
144:12, 240:1,
242:11, 242:21

**descriptive**
39:13, 39:23,
40:11, 43:22,
44:3, 101:13

**descriptively**
97:19

**descriptor**
27:15

**descriptors**
41:2, 243:6

**design**
33:15

**designed**
33:5, 33:12,
142:9, 167:20

**desk**
46:14

**desperate**
186:10

**detail**
254:11

**detailed**
98:11, 150:3,
151:7, 166:14,
196:19, 220:3

**details**
150:10, 150:17,
151:18, 220:14,
220:17, 221:4,
222:17, 228:13,
236:10, 239:14,
242:11, 245:19,
246:4, 246:8,
247:4, 248:24

**detention**
128:4, 128:12,
270:1, 271:3,
271:4

**determination**
49:2, 61:17,
209:2, 209:7,
209:17, 209:20,
209:25, 249:14,
253:3, 256:4,
259:24, 276:21,
277:25

**determinations**
69:4, 137:3

**determine**
42:7, 60:13,
68:24, 72:1,
73:15, 77:21,
137:18, 137:21,
137:25, 138:11,
140:17, 140:19,
155:21, 172:17,
173:4, 191:24,
198:19, 198:21,
200:17, 206:3,
206:8, 214:4,

217:21, 218:5,
223:21, 224:2,
237:23, 238:13,
241:13, 251:13,
252:7, 255:24,
263:20, 278:22

**determined**
61:2, 68:18,
90:6, 123:2,
123:20, 173:20,
222:15, 254:3

**determining**
72:4, 72:5,
218:8, 275:24

**develop**
211:4, 211:21

**developed**
80:17, 168:20,
205:18, 206:11,
212:6, 219:10,
224:22, 263:5

**development**
190:14, 210:25,
211:11, 211:16,
219:8, 219:18

**developmental**
206:25, 218:11,
219:7

**develops**
167:2

**deviations**
189:3

**diagnose**
112:7

**diagnoses**
189:13, 190:4

**difference**
37:11, 41:6,
41:11, 51:3,
51:6, 51:12,
91:23, 134:25

**differences**
211:20, 212:4

**different**
20:18, 20:19,
22:9, 32:21,
38:2, 40:2,
50:15, 53:9,

53:14, 58:17,
86:23, 92:9,
98:9, 99:9,
101:16, 102:5,
103:8, 107:6,
128:20, 131:12,
148:6, 148:17,
153:21, 161:14,
173:25, 197:8,
197:9, 206:16,
209:13, 209:14,
212:1, 217:19,
219:6, 231:17,
238:16, 238:17,
256:10, 258:13,
260:3, 260:25,
261:19, 262:21,
264:22, 264:24

**differently**
170:1, 196:3

**direct**
3:25, 66:3

**direction**
179:8, 179:25,
259:14, 259:15

**directive**
135:13

**directs**
183:18

**disability**
186:23, 188:1,
189:14

**disabled**
188:24, 189:5,
189:9, 191:5,
191:25, 192:2,
213:9

**disagree**
150:7

**discipline**
16:9

**disciplines**
16:2, 31:12

**disclosing**
149:25, 150:9,
219:23, 220:8,
226:18, 228:20

**disclosures**
67:14

**disconfirm**
196:13
**disconfirmed**
200:11
**disconfirms**
237:8
**discorroboratable**
251:22
**discount**
33:4
**discovered**
245:13, 245:15,
249:7
**discovery**
58:20, 59:2,
122:25, 124:21,
126:2, 153:3,
153:9, 242:19
**discrepancies**
175:12, 265:22
**discuss**
35:14, 105:1,
130:4, 193:25
**discussed**
24:2, 24:11,
140:16, 148:7,
152:15, 175:22,
256:22
**discusses**
34:21, 204:9
**discussing**
86:4, 164:15,
204:7
**discussion**
73:18, 73:19,
181:8, 192:15,
225:10, 225:13,
225:14
**discussions**
149:9
**disinterested**
283:13
**dismissals**
101:10
**disorders**
189:21
**dispositive**
237:20, 254:3,

255:18
**dispositively**
47:5, 200:1,
222:14, 253:23,
254:1, 255:2,
255:20
**disproportionate**
102:11
**dispute**
43:25, 55:25,
129:9, 201:22,
212:5, 247:3,
248:2, 248:7,
248:8, 248:21
**disputed**
55:5, 55:6,
57:15, 57:25,
60:23, 67:17,
67:24, 68:13,
68:14, 69:20,
87:25, 88:25,
91:19, 91:20,
93:25, 94:16,
98:6, 134:10,
134:11, 137:8,
155:11, 192:19,
215:7, 248:6
**disputing**
134:8
**disruption**
272:2
**dissertation**
19:6, 19:20,
19:25, 20:10,
20:11, 21:13,
105:7, 105:16,
105:18
**distinctively**
169:9
**distinguished**
194:11
**distressed**
147:23
**distressful**
148:4
**district**
1:1, 1:2, 5:17,
5:18

**division**
1:3, 5:18
**dna**
47:4, 47:5,
47:12, 47:19,
47:22, 48:3,
48:6, 48:11,
48:14, 48:16,
48:17, 48:24,
49:3, 102:14,
133:10, 222:11,
223:3, 238:21,
251:18, 251:20,
253:14, 254:6,
254:7, 254:13,
255:3, 277:6,
277:7
**doctor**
66:10, 208:10,
208:13, 208:23,
275:14
**doctor's**
208:9, 208:20
**doctoral**
19:25, 23:6,
105:6
**doctrinal**
12:14
**document**
40:19, 55:12,
62:24, 63:14,
112:19, 112:20,
118:22, 118:23,
125:14, 125:21,
126:24, 127:1,
129:6, 136:13,
140:9, 181:21,
256:11
**documentaries**
44:25, 46:10
**documentation**
126:1, 129:4
**documented**
187:9, 217:17,
244:1
**documents**
3:9, 21:7,
22:10, 22:11,

22:13, 22:19,
22:21, 23:3,
36:17, 36:18,
36:22, 40:4,
40:20, 44:12,
44:16, 45:2,
52:2, 52:17,
54:13, 54:21,
55:9, 55:10,
55:16, 56:3,
56:23, 57:13,
57:16, 57:20,
58:1, 58:15,
63:18, 64:2,
64:25, 76:18,
88:5, 89:2,
89:3, 89:4,
89:8, 90:23,
90:24, 92:2,
93:19, 93:24,
93:25, 94:2,
94:4, 94:15,
94:24, 95:3,
95:5, 95:10,
95:11, 95:15,
95:21, 96:5,
96:7, 98:8,
100:22, 115:20,
116:8, 116:16,
118:21, 118:25,
124:6, 124:9,
124:24, 125:2,
125:7, 125:10,
125:12, 125:13,
126:4, 126:6,
126:9, 126:11,
126:12, 126:18,
126:21, 127:14,
143:24, 144:2,
152:11, 222:21,
235:1, 245:10,
252:21, 255:16,
267:8, 276:23,
277:11, 277:15,
277:17, 277:19,
281:21
**dog**
180:2, 180:3,

180:4, 180:6,
180:11, 184:12,
184:13, 184:15

**doing**
22:24, 27:8,
40:24, 48:3,
48:10, 80:6,
82:13, 87:14,
87:15, 93:23,
93:24, 96:11,
104:15, 108:21,
123:14, 168:15,
195:2, 202:17,
209:1, 215:6,
256:13, 269:7

**donald**
34:19

**done**
13:9, 14:6,
29:25, 32:9,
42:22, 62:22,
67:20, 67:24,
93:4, 104:9,
104:11, 106:10,
116:14, 167:17,
168:2, 168:9,
168:10, 168:12,
173:1, 178:13,
178:17, 178:18,
198:2, 202:1,
225:22, 226:8,
234:2, 247:16,
270:19, 272:3

**double**
179:18, 275:6

**double-check**
114:22, 115:11,
118:10

**down**
12:25, 40:8,
87:15, 89:19,
90:11, 108:11,
108:13, 112:14,
121:9, 163:10,
165:11, 166:16,
185:24, 186:10,
244:20, 255:5,
268:22, 269:18

**dr**
1:20, 4:9, 5:8,
5:15, 7:2, 7:7,
7:13, 7:17,
10:2, 10:9,
10:22, 12:20,
48:4, 60:10,
63:6, 63:13,
63:22, 72:18,
85:1, 85:18,
86:1, 107:17,
108:24, 115:24,
118:17, 118:19,
119:20, 120:20,
121:13, 125:5,
128:15, 166:10,
201:13, 234:24,
250:2, 254:10,
255:3, 255:10,
255:13, 255:14,
259:2, 274:12,
274:23, 275:10,
276:19, 276:20,
278:25, 280:4,
282:11, 282:18,
283:7

**draft**
120:11

**drafting**
120:14, 123:12

**draw**
24:23, 97:10,
208:23

**drawing**
208:13, 208:17,
208:23

**drawn**
156:22

**drill**
40:8

**driven**
44:3, 219:25

**drizin**
74:24, 80:13

**duly**
5:11, 7:3,
283:8

**during**
56:12, 56:15,

57:8, 109:13,
109:20, 128:5,
128:11, 137:12,
137:14, 138:22,
172:16, 204:16,
220:9, 220:21,
230:5, 236:21,
238:10, 241:16,
257:9, 258:10,
258:23

**E**

**each**
16:5, 78:1,
88:5, 91:11,
91:13, 95:24,
99:12, 99:19,
104:20, 112:19,
242:12, 268:18

**earlier**
86:21, 102:12,
129:16, 140:12,
140:23, 141:14,
141:20, 147:4,
147:15, 195:11,
219:4, 231:13,
239:17, 243:16,
247:15, 263:10,
266:5, 266:7,
275:23

**earliest**
153:20, 203:3

**early**
21:9, 56:5,
56:25, 85:5,
144:10, 206:12,
245:14, 265:2

**easier**
8:9, 8:25,
11:20, 100:17,
114:24, 244:24

**easily**
205:23, 206:14,
210:1, 219:5,
219:15, 251:21

**easy**
190:16

**economics**
16:4

**edge**
255:6

**editing**
168:7

**edition**
156:5, 157:17

**editor**
28:25

**educate**
50:6, 246:9

**educating**
199:15

**education**
14:16, 111:23,
112:6, 275:24

**educational**
44:19, 58:14

**effect**
160:20, 160:23,
227:20, 272:19

**effects**
149:10, 214:9,
272:10, 272:11,
273:1, 274:2

**effort**
116:14

**eight**
271:8

**either**
13:18, 28:25,
41:16, 51:25,
54:2, 58:8,
61:17, 81:13,
83:16, 85:11,
153:10, 174:13,
189:15, 203:13,
215:19, 217:11,
222:12, 223:15,
238:25, 243:17,
283:16

**ejaculate**
184:8, 185:6

**ejaculated**
185:8

**elaborate**
239:13, 275:21

**elaborately**
142:22

electronic
256:20
elicit
135:4, 135:11,
142:9
elicitation
195:1
elicited
194:1
eliciting
187:12, 188:13,
257:13, 271:23
else
61:11, 74:3,
85:13, 112:12,
123:20, 144:25,
196:25, 236:15,
279:15
else's
26:7, 26:14,
47:21, 272:21
email
117:15, 117:20
embark
78:19
embarking
41:24
embodied
122:18
embodies
143:2
embody
89:8, 89:9
emerge
102:3
emerged
81:17
empirical
20:12, 20:17,
20:21, 20:23,
20:24, 21:2,
21:5, 21:7,
21:8, 21:15,
21:16, 21:17,
21:19, 21:21,
22:2, 23:8,
23:12, 23:17,
23:20, 23:25,

24:6, 24:11,
24:12, 25:1,
25:8, 25:10,
25:12, 25:14,
25:19, 25:22,
25:24, 26:7,
26:12, 26:15,
26:21, 27:8,
27:9, 27:10,
27:15, 27:17,
27:18, 27:23,
27:24, 28:6,
28:8, 35:7,
36:18, 36:23,
44:10, 44:11,
45:1, 54:16,
86:4, 86:5,
93:2, 163:11,
163:15, 163:22,
163:23, 163:25,
166:17, 166:20,
167:4, 167:8,
167:10, 168:20,
178:20, 204:13,
204:18, 205:6,
207:3, 225:22,
271:15, 271:18
empirically
25:25, 26:18,
27:14, 44:15
employ
31:20, 87:20,
92:7, 93:3,
93:15, 252:6,
274:7
employed
10:21, 10:24,
10:25, 31:6,
34:2, 109:23,
110:22, 110:24,
111:13, 111:15,
111:20, 111:21,
112:2, 112:4
employing
185:18, 253:2
employment
82:6, 109:22,
111:10, 215:6

enacted
80:17, 160:11,
162:20
encompass
122:11
encouraged
33:15
end
9:21, 18:23,
19:13, 19:16,
31:11, 63:12,
115:3, 120:6,
122:23, 131:25,
147:25, 168:6,
181:10, 181:19,
195:12, 269:3,
278:13, 282:17
endeavor
31:1
ended
138:24, 196:6
endpoint
83:6, 83:11
enforcement
110:11
enhance
221:19
enlarge
11:25
enough
97:4, 97:15,
118:5, 138:9,
171:5, 175:14
ensure
28:10, 28:11,
46:1, 94:21,
94:22, 95:23,
96:8, 98:17,
104:19, 236:19
ensured
29:5
ensuring
236:5
entire
118:21, 119:7,
148:23, 149:3
entirely
197:12, 202:12,

214:9, 241:21
entirety
134:23, 139:4
entity
132:8
enumerated
156:10
environment
33:2, 35:11,
148:4
era
22:15, 157:7
error
113:22, 113:24,
167:23, 169:18,
170:24, 170:25,
171:8, 172:8,
177:8, 177:12,
178:7, 178:12,
180:24, 185:11,
186:1, 186:7,
186:14, 189:23,
189:24, 192:10,
192:12, 192:20
errors
50:20, 114:4,
129:22, 166:14,
166:18, 167:12,
167:18, 168:11,
169:16, 169:21,
170:8, 174:4,
178:2, 178:8,
181:8, 182:19,
199:7
escape
148:3
especially
59:3, 98:4,
98:8, 179:17,
180:25, 191:11,
191:15, 212:23,
254:5, 257:19,
279:12
esquire
2:5, 2:12,
2:19, 2:20
essay
75:5

**essence**
211:9, 280:13
**essentially**
48:2, 48:3,
55:22, 98:14,
145:12, 145:20,
147:24, 150:19,
159:6, 189:2,
211:21, 227:9,
232:2
**establish**
146:4, 240:7
**established**
17:23, 102:25,
177:22, 210:4,
223:3, 231:20,
231:24
**establishes**
185:15, 235:9,
237:12
**estate**
1:12
**estimate**
89:22, 97:6
**et**
1:13, 5:16,
16:4, 101:11,
181:22
**ethically**
28:18
**evaluate**
53:18, 89:12,
138:9, 172:25,
183:7, 183:8,
252:25, 257:13,
257:18, 259:4,
259:12, 260:10,
281:5
**evaluated**
110:21, 178:11
**evaluating**
91:13, 103:5,
104:20, 173:25,
183:24, 188:17,
198:17, 198:19,
258:7, 258:10
**evaluation**
110:20, 258:14

**even**
11:25, 16:1,
16:18, 21:12,
21:13, 21:14,
25:11, 38:19,
40:7, 44:6,
49:11, 59:5,
68:11, 74:16,
90:2, 92:1,
106:9, 111:8,
132:4, 136:2,
136:25, 150:22,
162:16, 167:15,
168:11, 168:12,
181:6, 190:22,
192:17, 199:1,
218:20, 221:11,
227:22, 235:22,
258:9, 259:9,
265:2, 272:1
**even-handed**
30:25
**evenhandedly**
89:11
**evening**
245:14
**event**
37:17, 37:23,
41:21, 129:19,
129:24, 129:25
**events**
37:23, 38:18,
65:19, 65:22,
153:24, 199:6,
203:14, 203:21,
215:21
**eventually**
105:7
**ever**
12:22, 34:7,
35:25, 36:8,
42:22, 64:19,
65:5, 65:8,
65:10, 65:12,
65:23, 65:24,
69:7, 79:24,
81:4, 83:24,
103:25, 105:14,

109:23, 110:1,
110:12, 110:22,
111:9, 111:13,
111:19, 112:2,
116:4, 116:9,
154:21, 250:11
**every**
10:12, 23:24,
23:25, 46:13,
75:16, 95:14,
98:16, 99:5,
99:6, 112:20,
123:25, 132:21,
157:5, 157:15,
187:5, 207:21
**everybody**
26:2, 85:13,
93:11, 107:9,
107:11, 112:12,
155:6, 168:16,
180:2, 207:23
**everyone**
129:1, 177:10
**everything**
29:23, 45:15,
56:11, 61:11,
63:10, 64:11,
108:15, 115:16,
115:18, 115:23,
116:3, 159:6,
159:8, 241:24
**evident**
264:18
**evidentiary**
145:7
**exact**
68:3, 141:12,
158:14, 203:16,
238:13, 262:17,
263:6, 264:23,
265:11, 266:5
**exactly**
40:8, 61:16,
181:23, 215:2,
240:21, 280:1
**exam**
13:3
**examination**
4:3, 7:5,

19:15, 20:1
**examinations**
18:14
**examined**
5:12
**examiner**
110:23, 110:25
**example**
26:21, 28:9,
28:13, 30:20,
34:10, 35:2,
35:6, 37:2,
38:24, 39:1,
43:15, 61:8,
71:19, 80:2,
91:7, 93:4,
93:5, 94:4,
95:9, 96:15,
97:7, 97:12,
102:6, 108:22,
113:1, 114:9,
133:9, 149:10,
159:17, 180:1,
184:12, 184:16,
185:4, 187:22,
194:4, 198:8,
211:25, 220:13,
235:18, 250:7,
250:16
**examples**
22:1, 34:11,
34:18, 34:23,
60:12, 71:20,
97:9, 97:12,
133:25, 222:23
**exams**
16:23, 18:7
**exception**
81:22, 277:10
**exceptions**
98:4
**excessively**
158:25, 159:16,
187:1, 188:9
**exchanged**
65:12
**excluded**
197:2, 254:21,

**255:4, 255:7,
255:9**
**excludes**
200:1, 253:18,
253:20
**exculpated**
101:9
**exculpatory**
146:6, 253:23,
254:1, 254:7,
255:18, 257:21
**excuse**
10:20, 26:4,
107:1, 107:15,
137:19, 160:16,
245:14, 256:17,
272:14, 281:4
**executive**
176:6, 273:3
**exercise**
19:20, 173:16
**exhibit**
4:8, 62:22,
62:23, 62:25
**exhibited**
209:17
**exhibits**
113:4, 113:9,
113:12, 113:15,
113:18, 113:21,
114:1, 114:8,
114:11, 114:13,
115:8, 116:19,
117:8, 117:11,
117:12, 117:14,
117:18, 153:11,
234:9, 234:12,
234:14
**exist**
125:20, 177:13,
191:17, 191:18
**existed**
58:21, 127:1,
154:8, 155:23,
156:1
**existence**
125:11, 162:24,
206:4, 210:10

**existing**
25:21, 56:22,
159:13, 163:17,
169:3
**exists**
178:10, 198:1,
256:25
**exonerated**
43:9, 48:13,
238:23
**exonerations**
42:19, 42:23,
43:8, 47:4,
48:7, 76:16,
102:14, 222:12
**expect**
179:11, 179:20,
195:18, 199:8,
200:3, 255:19
**expectations**
155:10
**experience**
33:24, 34:8,
40:9, 110:19,
111:1, 111:5,
111:10, 111:17,
111:24, 112:7,
214:11, 215:2
**experiences**
212:1, 214:16,
214:22, 215:9,
215:19, 216:1,
216:3, 216:9
**experiment**
29:14
**experimental**
107:10
**experiments**
23:13, 23:14,
93:20
**expert**
7:12, 7:13,
11:4, 13:16,
13:18, 16:20,
17:1, 30:4,
51:2, 51:5,
51:8, 51:10,
51:22, 52:17,

52:19, 52:23,
53:4, 53:20,
59:8, 59:10,
59:17, 59:19,
59:20, 60:9,
60:10, 60:11,
61:4, 61:24,
62:11, 63:19,
65:2, 65:4,
69:1, 70:24,
82:11, 82:12,
82:16, 124:4,
137:7, 154:9,
154:12, 154:13,
162:17, 181:24,
182:1, 188:17,
208:13, 209:14,
256:6, 256:8,
260:2, 260:9,
260:10, 266:23,
275:3, 276:18,
277:11, 279:17
**expert's**
59:15, 59:24,
62:5
**expertise**
14:4, 54:15,
60:5, 82:17,
142:7, 260:2,
260:12, 275:4,
276:2, 276:5
**experts**
28:24, 59:8,
59:11, 122:24,
142:24, 143:2,
260:1, 275:15,
276:5, 281:4
**explain**
21:17, 75:17,
79:3, 79:5,
147:7, 257:10
**explained**
51:13
**explains**
218:13
**explanation**
31:11, 194:12
**explanations**
32:1, 33:17

**explicit**
139:20
**explicitly**
141:6, 269:15
**explore**
43:16, 80:18,
157:8
**exposed**
235:9
**extend**
243:9
**extended**
212:11
**extensive**
75:21, 181:5,
252:1
**extent**
30:14, 30:16,
91:25, 124:13,
161:10, 206:25,
238:2
**extra**
57:1
**extraordinarily**
258:9
**extraordinary**
259:3
**extreme**
252:20
**extremely**
137:15

**F**

**face**
187:21
**fact**
55:10, 62:4,
62:6, 62:9,
69:1, 70:11,
151:1, 170:4,
170:22, 172:3,
174:16, 175:5,
180:11, 196:1,
196:17, 208:19,
212:22, 218:18,
229:12, 239:23,
243:21, 247:25,
248:6, 249:3,

256:7, 260:9,
263:14, 281:19
**factor**
192:8, 215:14
**factors**
75:7, 103:8,
122:3, 122:4,
127:9, 133:25,
144:1, 218:4,
219:3, 225:16,
240:9
**facts**
20:20, 49:6,
52:5, 60:24,
133:6, 134:8,
134:10, 134:11,
149:25, 170:7,
174:19, 180:22,
195:14, 195:16,
197:17, 197:24,
199:15, 199:16,
200:10, 201:22,
217:24, 218:19,
219:23, 220:8,
221:15, 228:20,
229:5, 229:6,
229:16, 230:13,
233:1, 236:15,
236:17, 236:19,
236:20, 236:25,
237:20, 238:20,
238:24, 246:10,
247:24, 248:3,
248:9, 251:24,
253:9, 260:7,
260:8, 263:9,
263:17, 263:19,
279:16, 281:22
**factual**
172:2, 178:15,
178:20, 180:23,
183:14
**factually**
133:8, 170:5,
182:21
**faculty**
19:9
**failed**
114:13, 145:13,

200:2
**fails**
235:10
**fair**
32:10, 38:22,
98:23, 122:22,
190:25, 191:4,
197:7
**fairly**
30:13
**fall**
19:23, 19:24,
40:19, 185:25
**falls**
17:22
**falsely**
90:2, 108:8,
148:2, 198:9,
207:22, 222:15
**falsity**
69:20, 70:24,
150:14, 151:2
**familiar**
7:21, 42:21,
180:11, 184:13,
189:13, 237:5,
277:16
**family**
12:5, 216:18
**famous**
34:18
**far**
46:21, 137:7,
191:13, 207:9,
210:6, 257:24
**farfetched**
217:9
**faster**
211:21
**father**
213:6, 217:16
**favorable**
216:17
**fearful**
186:10
**fed**
236:21
**federal**
5:10, 7:15,

59:3, 79:8
**feed**
200:8, 238:19,
238:21, 246:8
**feeding**
168:6, 170:7,
199:14
**feel**
57:17, 215:15
**feeling**
214:17
**feels**
165:13
**feet**
279:8
**fell**
271:2
**felonies**
105:25
**felony**
105:22
**female**
277:24, 279:10
**few**
14:5, 14:12,
16:25, 84:7,
99:7, 143:4,
242:12
**field**
15:5, 16:7,
18:5, 18:6,
18:13, 23:4,
24:7, 26:4,
30:5, 39:4,
40:3, 40:4,
41:10, 54:15,
55:14, 80:22,
93:19, 95:25,
96:2, 97:23,
124:17, 142:6,
142:7, 142:25,
143:3, 155:11,
163:25, 164:7,
167:1, 168:16,
169:11, 204:23,
281:4
**fields**
16:5, 16:12,

16:13, 23:17
**fiers**
128:23
**fighter**
184:18
**figure**
50:14, 100:5,
100:23, 106:7,
118:13, 157:16
**figuring**
179:23
**file**
48:10, 48:16,
55:23, 56:3,
57:15, 59:21,
59:22, 106:3,
108:3, 133:20,
137:10, 153:10,
188:18, 191:23,
193:12, 217:16,
276:7, 276:9,
277:9, 277:17
**files**
71:2, 75:24,
90:15, 100:19,
100:20, 105:20,
105:21, 105:22
**filled**
105:14
**final**
35:4, 57:18,
120:17, 120:19,
120:21, 125:7,
126:25, 133:4,
260:19, 274:8
**finances**
213:17
**find**
9:18, 76:5,
88:18, 108:15,
109:6, 123:24,
124:2, 125:11,
179:24, 192:5,
204:1, 265:14,
267:23, 278:25,
281:11, 281:21,
282:3
**finder**
69:1, 70:11,

256:7, 260:9
**finding**
47:21, 72:6,
150:4, 150:5,
151:6, 160:12,
161:1, 161:2,
176:17, 176:24,
241:1, 250:23,
264:17, 272:13,
272:16, 272:21,
275:8, 275:12,
277:21
**findings**
25:15, 48:4,
49:3, 61:21,
62:14, 98:18,
99:11, 100:14,
102:2, 102:17,
102:22, 103:1,
148:24, 151:9,
163:19, 166:25,
169:13, 186:18,
204:24, 206:24,
207:2, 207:7,
250:20, 254:7,
255:10, 255:13,
255:14, 274:12,
274:13, 275:10,
280:11
**fine**
9:17, 75:11,
85:10, 85:12,
85:18, 111:8,
234:17, 280:9
**fingerprint**
254:21
**fingerprints**
239:24, 253:17
**finish**
18:9, 280:3
**firm**
2:18, 52:1
**firms**
230:24, 231:4
**first**
5:11, 7:3,
7:18, 7:19,
8:11, 9:24,

12:14, 13:8,
13:16, 13:21,
13:23, 14:5,
17:7, 25:18,
49:25, 63:13,
112:13, 119:9,
121:11, 127:5,
130:13, 135:24,
155:14, 164:11,
164:14, 164:21,
170:25, 171:18,
171:23, 183:6,
183:9, 185:4,
190:6, 194:3,
194:14, 196:3,
198:24, 199:3,
220:5, 222:1,
222:11, 227:21,
231:21, 236:7,
241:10, 242:7,
242:12, 253:4,
254:17, 261:25,
264:21, 265:3,
265:16, 265:19,
266:1, 270:7,
270:15
**fit**
146:7, 200:10,
250:13, 252:2,
252:3, 253:8,
253:9
**fits**
251:14
**five**
24:1, 24:10,
69:15, 69:16
**flagged**
45:21
**flavor**
136:1
**flint**
2:12, 6:16,
6:20
**flinttaylor@peop-
leslawoffice**
2:16
**flip**
249:12

**flipping**
35:17
**floor**
2:7
**florida**
181:16
**fluid**
48:20, 184:3,
185:6, 185:7,
275:1
**fly**
118:10
**focus**
23:15, 86:11,
104:17, 106:12,
244:6
**focused**
104:10, 192:21
**focusing**
91:6, 225:16
**follow**
42:7, 86:1,
145:17, 156:18,
163:14, 183:1
**follow-up**
282:14
**following**
158:20, 199:18
**follows**
5:13, 7:4,
173:23
**food**
156:20, 158:24
**foot**
277:22, 278:2
**footnote**
128:2, 134:15,
134:19, 138:20,
159:22, 163:10,
163:13, 166:15,
204:11, 233:6,
233:7
**footprints**
239:24
**foregoing**
283:6
**foremost**
50:1

**forensic**
47:21, 179:20,
180:25, 197:11,
200:12, 201:7,
254:13, 259:1,
259:18
**forensics**
254:10
**forgot**
114:11
**format**
139:12, 141:4
**forming**
162:1, 280:13
**forms**
24:15, 24:24,
25:1
**forth**
152:12, 155:10,
218:2, 275:22
**found**
47:22, 48:20,
69:7, 108:23,
109:1, 184:9,
243:25, 245:12,
253:20
**foundation**
39:24, 131:23,
132:10, 203:15,
213:13, 216:19
**four**
12:12, 20:4,
43:5, 47:2,
47:11, 48:12,
48:13, 48:23,
49:6, 49:10,
77:20, 103:5,
103:23, 119:11
**four-year**
8:21, 8:23
**framework**
35:10, 168:11,
173:25
**frameworks**
169:13
**francisco**
1:22, 5:4, 6:1,
11:1, 11:12,

12:4, 15:8,
80:14, 81:3,
82:6, 82:23,
83:17, 83:21
**free**
31:23, 139:9
**friend**
267:24
**front**
243:6
**frowned**
150:10
**fruits**
176:3
**full**
89:6, 122:12,
123:4, 125:18,
132:20, 134:22,
240:6, 264:24
**full-fledged**
136:3
**fully**
129:11, 136:12,
205:18, 206:11,
219:9
**function**
191:22, 196:10,
206:15
**functioning**
187:25, 189:10,
191:7, 273:4
**fund**
79:13, 79:22
**funded**
78:22, 78:25,
79:1, 79:3,
79:5, 79:11,
79:16
**funding**
82:19, 82:22,
83:2, 83:13,
83:14
**funds**
82:7, 82:14
**further**
12:25, 176:18,
283:15
**future**
66:19, 66:22,

101:25

**G**

**g-o-u-l-d**
84:8
**gaining**
37:4
**game**
122:23
**gaps**
136:14
**garrett**
222:9, 222:10
**gather**
41:16, 44:12,
44:14, 83:7,
88:5, 89:2,
89:10, 94:14,
100:21, 102:2,
102:21, 103:12,
195:6, 195:25,
196:21
**gathered**
107:14, 260:6
**gathering**
20:25, 21:8,
22:4, 23:16,
24:9, 41:25,
56:22, 95:16,
97:24, 101:12,
135:4, 196:11,
272:8
**gave**
76:1, 116:9,
185:4, 202:20,
220:22, 268:25
**gender**
211:20
**general**
30:3, 45:17,
87:11, 92:12,
92:15, 95:10,
149:3, 158:6,
160:16, 176:5,
176:11, 176:14,
181:24, 208:12,
208:13, 215:22,
247:1

**generalists**
16:25
**generalities**
208:5
**generality**
39:2, 45:11,
45:18, 78:11,
87:12, 154:23
**generalization**
186:18
**generalize**
78:14
**generalizes**
208:17
**generalizing**
208:18
**generally**
16:21, 50:18,
124:20, 125:9,
125:10, 154:12,
169:24, 188:23,
200:24, 215:25
**generalness**
87:7
**generate**
55:19
**generating**
97:24
**genitalia**
274:24
**german**
180:2
**getting**
81:12, 85:9,
91:3, 91:24,
195:20, 274:18
**gift**
270:1
**give**
69:13, 116:10,
116:13, 131:13,
175:10, 180:1,
183:11, 202:10,
202:13, 216:23
**given**
26:21, 27:6,
51:15, 53:10,
87:12, 98:14,

115:14, 115:15,
115:24, 117:22,
134:4, 142:21,
175:18, 181:6,
183:15, 183:16,
203:6, 247:15,
265:24, 278:10
**gives**
102:18
**giving**
21:25, 97:12,
143:7, 184:10,
242:12, 259:19
**go**
6:6, 10:2,
16:22, 22:1,
28:22, 33:9,
41:16, 44:1,
57:4, 64:9,
84:25, 85:1,
86:19, 86:22,
88:4, 90:17,
95:1, 100:12,
101:2, 108:11,
108:13, 109:10,
112:14, 113:11,
113:14, 114:25,
115:11, 115:19,
116:5, 116:15,
117:1, 117:3,
117:4, 117:19,
118:6, 118:9,
121:9, 122:20,
122:22, 123:25,
128:15, 143:21,
144:7, 145:4,
147:12, 152:1,
154:1, 157:16,
158:1, 158:12,
166:3, 166:16,
172:10, 172:12,
173:6, 174:20,
175:18, 180:22,
192:4, 196:4,
196:21, 204:6,
209:10, 212:2,
217:3, 222:18,
227:25, 231:14,

232:19, 234:7,
237:10, 238:20,
240:19, 246:25,
248:19, 256:23,
261:15, 264:10,
269:2, 269:5,
269:8, 269:15,
269:24, 270:4,
270:10, 282:9

**goal**
54:25, 102:1,
102:2, 107:2,
107:3, 135:14,
139:19, 145:21,
197:3

**goes**
122:16, 172:19,
173:6, 173:9,
260:15, 273:5

**going**
7:13, 8:11,
9:24, 14:15,
20:24, 21:8,
22:3, 22:13,
25:25, 28:6,
33:17, 35:3,
35:18, 38:8,
39:16, 40:6,
43:23, 50:11,
51:17, 56:7,
58:6, 62:20,
68:4, 68:10,
84:22, 84:23,
85:20, 87:22,
88:15, 90:6,
91:11, 92:9,
95:12, 95:14,
96:9, 98:2,
98:13, 98:15,
98:20, 99:15,
99:16, 100:5,
115:6, 115:9,
115:13, 115:18,
116:17, 117:4,
117:19, 123:10,
124:25, 131:10,
133:21, 136:21,
156:21, 157:4,

163:1, 167:2,
169:15, 192:4,
199:2, 202:15,
207:16, 207:20,
210:24, 234:18,
238:8, 250:9,
261:21, 269:25,
270:4, 279:4,
282:10, 282:19

**gold**
251:19

**gone**
51:16, 110:1,
110:4, 115:17,
115:25, 116:2,
116:8, 116:11,
159:20

**good**
7:7, 7:8, 10:4,
10:17, 11:17,
18:19, 35:19,
63:8, 84:21,
85:16, 118:16,
143:11, 145:24,
175:14, 182:12,
182:13, 197:1,
215:19, 215:25,
216:8, 258:9,
258:15

**google**
76:12

**gotten**
90:16, 199:3

**gould**
84:7

**govern**
160:4

**government**
79:9, 176:7

**grab**
112:12

**grade**
192:24

**graduate**
16:23

**grant**
81:7, 81:12,
81:18, 82:16,

83:16, 83:23,
83:24, 84:2

**grants**
78:20, 78:22,
79:8, 79:16,
79:18, 79:22,
82:22

**great**
8:9, 196:24,
234:4, 254:11

**greater**
102:13, 102:18,
212:22

**group**
16:2, 189:12,
189:18, 189:19,
225:18

**guarantee**
32:13

**guard**
31:6, 31:18,
32:23, 33:16,
171:21, 172:8,
174:3, 175:15,
195:1, 225:12,
225:24, 225:25,
226:2

**guardian**
191:20

**guarding**
171:14, 226:6,
226:7

**guess**
14:2, 15:22,
19:1, 25:17,
26:17, 29:12,
35:23, 39:3,
39:6, 40:7,
53:14, 53:25,
56:22, 66:25,
69:6, 71:16,
84:18, 88:10,
90:10, 90:19,
93:8, 93:20,
97:17, 109:11,
127:12, 131:16,
131:18, 132:25,
133:17, 135:1,

140:2, 140:7,
140:10, 153:21,
155:13, 173:21,
214:13, 214:19,
226:2, 226:17,
228:14, 228:18,
229:11, 230:1,
251:11, 281:22

**guessable**
200:6

**guessed**
195:8, 195:16,
196:19, 221:9,
228:21, 229:6,
229:7, 238:3,
238:25, 246:10,
253:6

**guessing**
14:25, 139:23,
195:20, 229:19

**guidance**
124:8

**guides**
156:9

**guilt**
48:18, 48:24,
139:16, 142:8,
143:17, 143:22,
144:3, 144:9,
144:12, 144:15,
144:24, 145:1,
145:5, 145:6,
145:13, 145:23,
146:4, 146:10,
146:20, 151:14,
170:3, 170:14,
170:21, 170:22,
171:2, 171:10,
183:15, 185:15,
196:12, 221:11,
230:10, 230:16,
230:22, 230:25,
232:4, 232:24,
239:22, 262:17,
263:4, 263:5,
263:10, 264:2,
264:5, 264:18,
265:4, 265:8,

266:2, 266:6

**guilty**
47:23, 135:6,
142:11, 142:14,
167:20, 170:3,
170:11, 170:15,
170:23, 171:1,
171:13, 171:16,
171:22, 172:23,
173:2, 173:9,
173:13, 173:20,
175:7, 175:8,
229:10, 262:15,
262:23, 263:22

**gullible**
205:21, 210:2,
211:7, 212:3

**gunsowski**
277:9

**guys**
10:1, 85:19

**H**

**half**
157:14

**hamill**
12:5

**hammer**
113:19

**hand**
9:12, 128:22,
201:16, 201:18

**handful**
69:14

**hands**
90:25

**happen**
128:20, 167:23,
168:1, 172:19,
187:19

**happened**
10:19, 39:9,
62:7, 144:21,
218:3, 246:12

**happens**
30:4, 71:7

**happy**
38:25, 85:6,

249:1, 260:8,
280:6

**hard**
34:4, 41:14,
45:16, 78:10,
90:2, 91:3,
157:13

**harvard**
142:19

**hats**
53:14

**hayes**
150:16

**haynes**
128:23, 150:16,
153:7, 239:12,
240:17, 241:7,
241:9, 241:13,
241:15, 241:19,
242:1, 243:2,
244:8, 245:5,
263:21

**haynes's**
242:14

**hayward**
105:11

**head**
92:22, 215:18,
250:15, 251:6

**heading**
58:6, 68:11

**health**
112:3, 112:4,
112:8, 190:3

**hear**
54:24, 171:18,
231:21

**heard**
37:15, 233:22

**hearing**
130:8, 277:6

**hearings**
58:13

**height**
280:17

**heightened**
219:15

**heinonline**
76:12

**help**
21:25, 29:7,
89:7, 102:21,
133:12, 142:10,
267:23

**helped**
65:1

**helpful**
95:6, 235:14

**here's**
41:15, 70:8,
118:12, 194:16,
207:10, 208:19,
248:11

**hereby**
283:5

**higher**
97:8, 165:6,
174:22

**highlighted**
225:18

**highly**
147:25, 191:2,
191:3, 210:2,
210:3, 256:24,
257:5, 258:3,
258:12, 258:17,
258:22, 260:20,
278:9, 278:20,
278:23, 279:11,
280:12, 280:23,
281:19, 281:21

**hindered**
132:8

**hinge**
148:23, 148:24

**hinges**
149:4, 149:12

**hired**
51:3, 51:4,
73:15, 79:24,
80:3, 80:7

**hires**
84:12

**historians**
37:19

**historical**
20:12, 20:17,

20:21, 20:22,
21:5, 21:6,
21:7, 21:22,
22:13, 22:21,
23:3, 36:16,
36:18, 36:21,
36:22, 37:18,
37:20, 37:21,
38:2

**historically**
224:22

**history**
36:15, 36:16,
37:2, 58:4,
95:8, 109:23,
250:21

**hold**
18:3, 63:10,
85:20, 150:6,
176:18, 201:11,
241:4

**holding**
195:13

**home**
11:15, 213:2,
213:7, 213:17,
213:23, 216:15,
217:15, 269:2,
269:5, 269:8,
269:15, 269:24,
270:4, 270:10

**homicide**
95:10, 105:24,
179:16, 184:3,
197:10, 254:15,
259:7

**honed**
16:19

**honor**
159:4

**hope**
278:12

**hoping**
32:19

**hour**
132:21, 157:14,
251:5

**hours**
85:3, 132:13,

165:24, 268:24,
271:8, 273:17,
273:18, 273:21,
273:23, 273:24,
279:25
**house**
11:13, 114:25,
158:12, 177:4,
180:4, 180:7,
180:9, 184:15,
243:23, 245:12,
245:13, 249:6,
253:20, 262:8,
262:9
**however**
14:5, 188:3
**human**
31:3, 39:15
**humans**
30:25, 33:1
**hunches**
174:20
**hundreds**
29:24, 62:2,
222:6, 252:17
**hungrier**
85:9
**hungry**
85:9, 268:25
**hypotheses**
33:8
**hypothesis**
42:6, 42:8,
43:16, 43:22,
44:3, 183:18
**hypothetical**
151:14, 151:15,
175:24, 184:10,
185:9, 216:20,
217:9, 221:12
**hypothetically**
61:20, 102:6,
151:20, 179:11,
184:6, 184:19,
247:24

**I**

**idea**
80:23, 134:12,

176:25, 195:10
**ideally**
89:4, 235:4
**ideas**
33:8
**identifiable**
151:4, 190:13
**identification**
63:1
**identified**
42:5, 64:24,
71:24, 86:6,
101:8, 106:22,
117:23, 123:8,
128:2, 155:23,
164:2, 169:17,
219:3, 225:23,
231:9, 231:11,
250:10
**identifier**
119:6
**identifies**
78:3
**identify**
33:25, 73:13,
75:22, 76:21,
77:3, 77:25,
78:7, 111:5,
127:15, 133:2,
155:14, 156:23,
157:22, 158:9,
158:11, 165:11,
169:22, 186:14,
187:21, 231:14
**identifying**
70:1, 86:15,
111:2, 118:22,
124:23, 125:1,
147:5, 157:14
**identity**
80:18
**ignoring**
146:6
**ill**
189:18, 189:19,
192:6
**illinois**
1:2, 2:8, 2:14,

2:23, 5:18,
159:25, 160:3,
160:6, 160:10
**illness**
186:23, 191:8
**illusory**
198:6
**illustrate**
97:9, 103:15,
126:15
**illustrated**
105:17, 106:23
**imagine**
161:14
**immature**
190:16, 205:19,
210:1, 211:2,
219:10, 219:12
**immaturity**
212:6, 218:18,
218:23, 219:2,
219:17
**impact**
61:3, 61:20,
257:6
**impacts**
257:8
**impaired**
188:2
**impairment**
189:14
**impart**
125:6
**imperfect**
132:4, 256:24,
257:5, 258:4,
258:12, 258:17,
258:22, 260:20
**implications**
20:15
**implying**
117:11
**importance**
47:13
**important**
46:21, 46:24,
47:7, 57:17,
59:5, 59:7,

59:9, 136:23,
196:16, 221:13
**impossibility**
101:7, 102:15
**impossible**
47:15, 278:12,
279:12
**impressionistic**
27:6
**impressions**
27:6
**improve**
224:25
**impulsive**
190:15, 205:20,
209:3, 210:1
**impulsivity**
209:13, 219:4,
219:14
**inaccuracy**
61:10, 237:13
**inaccurate**
62:6, 151:17
**inadvertent**
189:24
**inadvertently**
114:21, 116:2,
118:3, 118:8,
239:6, 270:18
**incarcerated**
49:11, 153:1
**incarceration**
67:9
**incentive**
98:7
**inches**
279:8
**include**
27:23, 76:5,
77:10, 92:25,
93:7, 201:16,
225:10, 244:25,
255:14
**included**
27:20, 28:8,
29:23, 74:15,
74:18, 75:12,
77:22, 90:6,

151:22, 245:3

**includes**
182:6, 255:13

**including**
20:1, 48:24,
64:14, 75:22,
83:4, 91:22,
140:4, 204:24,
256:11

**inclusion**
47:2

**income**
82:4, 84:12

**incomplete**
19:2, 37:16,
39:16, 95:7,
96:7, 99:3,
132:4, 136:20,
137:4, 175:23,
216:20

**inconceivable**
161:12

**inconsistent**
35:14

**incorporate**
24:1, 24:24,
35:3, 56:2

**incorporated**
11:10, 24:11,
40:2, 76:20,
151:18

**incorporating**
26:15

**increase**
11:18, 150:1,
187:3, 187:11,
188:12, 220:2,
274:3

**increased**
257:12, 271:12

**increases**
271:22

**incredibly**
253:15

**incriminating**
135:5, 142:10,
196:14

**inculpatory**
194:6

**independent**
44:22, 48:16,
51:22, 80:6,
82:13, 197:17,
197:23, 254:10,
259:4, 259:6,
261:12

**index**
3:1

**indicate**
10:11, 144:2,
216:2, 245:17

**indicated**
139:5, 144:15,
242:1, 260:4,
269:4, 275:1

**indicating**
248:22

**indication**
229:10

**indicia**
109:15, 121:23,
127:11, 238:1,
251:12, 251:15,
251:25, 252:3,
252:13, 252:19,
257:14, 257:24,
257:25, 258:24,
259:16, 278:5,
280:24, 281:2,
281:3, 281:5,
281:11, 281:13,
282:3

**indisputable**
133:6

**individual**
25:4, 25:5,
45:8, 47:23,
49:2, 57:14,
57:24, 77:5,
84:12, 86:25,
112:8, 125:6,
169:17, 171:12,
171:15, 171:22,
171:24, 172:15,
173:19, 175:19,
176:18, 176:22,
177:23, 180:15,

182:21, 183:23,
186:4, 186:16,
187:5, 187:22,
205:2, 205:10,
205:12, 205:16,
205:17, 206:16,
206:18, 214:17,
215:25, 216:3,
216:13, 216:16,
217:21, 222:21,
223:1, 227:12,
227:13, 232:3,
272:14, 275:25

**individual's**
25:14, 33:22,
38:10, 38:14,
39:8, 39:10,
40:9, 88:13,
186:20, 187:14,
187:16, 188:19,
212:13, 214:15,
214:20, 214:22,
215:8, 215:15,
223:1, 223:4,
232:4

**individuality**
186:17

**individuals**
44:8, 49:10,
80:12, 111:11,
184:21, 186:2,
186:6, 188:23,
189:17, 190:19,
190:20, 190:21,
204:8, 204:14,
204:25, 257:4,
259:19, 278:3,
278:24, 280:19

**induce**
165:17

**induced**
75:6, 127:9,
147:2, 149:18,
167:12, 198:9,
270:25, 281:6

**induces**
185:16

**industry**
14:9, 28:11

**infer**
266:3

**inference**
279:17, 279:18

**inferences**
174:20, 208:14,
208:23

**inferentially**
172:5

**influence**
125:22

**influenced**
88:13

**informants**
198:8

**informed**
265:22

**inherent**
31:25

**initial**
52:21, 140:13,
236:22

**initially**
139:5, 200:16

**innocence**
42:20, 48:18,
48:23, 49:9,
49:14, 49:17,
49:18, 50:12,
76:16, 76:17,
222:19, 222:20,
238:18, 238:19,
239:4, 257:22

**innocent**
49:3, 50:21,
159:2, 167:22,
170:5, 182:21,
185:19, 185:24,
238:22

**inscripting**
127:11, 168:5,
219:20, 226:12,
230:3

**inserted**
34:2, 34:14

**inside**
221:7, 253:5

**insight**
102:19

instance
11:3, 25:2,
35:1, 56:2,
62:3, 62:12,
82:1, 91:4,
91:7, 117:12,
150:4, 250:12,
270:2
instances
56:25, 104:15,
135:19, 149:24,
172:16, 217:20,
269:7, 269:13
instant
133:23
instead
36:7, 96:20,
204:4, 269:24
institute
79:13, 81:18
instruct
120:10, 123:11,
125:1
instructed
3:3
instructing
115:19
instructs
246:17
instrument
106:1, 107:10
intellectual
186:22, 187:25,
188:1, 189:14,
211:16
intellectually
188:2, 188:24,
189:5, 189:9,
191:5, 191:24,
192:2
intentional
271:10
intentionally
41:7
interacting
186:8
interaction
152:20, 233:11

interactions
136:16, 140:14,
143:18
interested
21:23, 74:8,
91:21, 188:16,
283:17
internal
52:14
internalized
148:16, 164:10
interpretation
130:23, 131:5,
131:19, 156:22,
198:25, 239:23
interrogate
158:25, 167:21,
170:17, 171:4,
171:14, 172:1,
172:3, 172:15,
172:22, 173:19,
174:12, 175:6,
177:19, 230:11,
230:17, 230:21,
232:3, 232:24
interrogated
139:3, 207:18,
207:19, 207:22,
263:14, 263:17
interrogates
177:23
interrogating
171:23, 173:6,
173:8, 173:12,
176:21, 188:4,
230:12, 232:25
interrogations
23:6, 23:7,
41:1, 54:17,
55:5, 55:7,
55:24, 56:6,
58:11, 59:6,
68:14, 91:20,
104:17, 105:9,
105:13, 105:23,
106:8, 106:18,
106:21, 106:23,
107:23, 108:4,

108:24, 127:19,
129:5, 129:10,
130:2, 130:22,
130:23, 132:22,
133:15, 134:23,
134:24, 136:12,
139:11, 141:3,
144:23, 154:3,
154:17, 154:18,
154:19, 159:16,
160:4, 182:14,
188:10, 222:6,
223:5, 225:2,
246:15, 250:22,
252:16, 271:22
interrogator
148:2, 151:19,
165:5, 165:11,
165:17, 182:12,
185:16, 226:14,
230:5, 236:3,
237:5, 237:23
interrogators
22:25, 122:5,
185:13, 230:9,
230:16, 232:22,
238:5, 246:17
interview
38:18, 40:24,
55:20, 56:13,
56:17, 57:9,
65:6, 109:13,
135:9, 135:10,
136:1, 136:22,
136:25, 139:11,
140:14, 140:23,
196:5, 196:8,
201:3
interviewed
152:15
interviewing
40:20, 65:25,
154:25, 196:18,
236:9
interviews
22:23, 23:4,
24:7, 40:4,
64:14, 64:17,

93:19, 129:10
introduction
127:5, 224:15,
256:18
invariant
207:1
investigate
145:14, 145:16,
146:2, 146:3,
146:4, 170:17,
171:25, 180:19,
198:21, 213:22
investigated
194:8
investigating
171:23, 174:5,
174:8, 178:25,
179:3, 179:4,
179:7, 179:12,
217:18
investigation
96:7, 127:19,
142:12, 154:22,
154:24, 171:7,
171:12, 171:13,
172:9, 173:14,
174:21, 176:19,
178:13, 178:16,
178:24, 178:25,
179:10, 179:21,
180:23, 181:18,
182:7, 182:25,
193:18, 198:2,
213:1, 213:3,
213:6, 213:8,
213:16, 214:24,
221:12, 259:7
investigations
95:7, 181:2,
181:5
investigative
110:2, 154:5,
155:3, 155:15,
161:3, 181:11,
181:25, 182:1,
196:16
investigator
81:10, 81:11,

110:10, 110:11,
110:12, 110:13,
173:4, 183:25,
185:3
**investigators**
122:5, 128:22,
143:17, 196:10,
199:10, 221:17,
222:2, 222:3,
222:16, 238:18,
269:6, 269:19
**invocation**
159:5
**invocations**
159:17
**invoke**
159:3
**invoked**
134:6, 269:20
**involve**
18:11, 18:13,
18:14, 47:4,
55:5, 58:19,
58:25, 59:8,
82:13, 98:11,
164:17, 179:4,
189:16
**involved**
29:15, 44:23,
47:10, 48:6,
48:12, 67:7,
81:23, 103:8,
104:12, 107:10,
140:5, 141:10,
146:5, 146:6,
179:2, 179:5,
179:6, 179:9,
183:9, 183:19
**involvement**
174:9, 178:16,
199:22
**involves**
23:22, 55:21,
142:8, 142:11,
145:22
**involving**
68:13, 179:18,
198:5

**iq**
189:2, 189:6
**iqs**
187:23, 187:24,
189:17, 191:7
**irvine**
15:7, 83:22
**issue**
47:14, 49:15,
99:2, 99:9,
109:10, 109:11,
124:15, 168:4,
248:20, 276:3
**issued**
62:14, 66:5
**issues**
55:24, 59:25,
95:19, 238:17
**item**
255:6
**items**
9:6, 115:8,
127:24, 253:20,
267:12
**itself**
129:18, 130:10,
261:1

**J**

**jackson**
2:21
**jailhouse**
198:8
**january**
127:20, 138:24,
138:25, 139:2,
139:24, 152:21,
154:3, 162:20,
162:25, 203:5,
233:12, 233:20,
266:1, 273:8
**jatkowski**
113:4, 117:10,
153:11, 234:10,
277:1
**jatkowski's**
234:13
**jd**
14:16

**job**
1:32, 50:7
**joe**
2:28, 5:23
**john**
84:7
**johnnie**
1:5, 6:12,
113:19, 114:8,
119:4, 139:18,
145:21, 152:3,
152:4, 253:18,
253:21
**journal**
30:1, 83:10,
271:20
**journalists**
88:2, 90:15
**journey**
119:3
**judge**
52:12, 70:15,
174:15, 175:5,
176:1, 176:2,
176:13
**judged**
18:24
**judges**
175:17, 177:10
**judgment**
145:12, 261:12
**judgments**
260:3, 260:11
**judicial**
52:14, 175:15,
175:20
**judiciary**
176:20
**jump**
163:2, 166:11
**june**
9:3, 9:5, 9:10,
9:12, 254:11
**juris**
14:20
**jurisdictions**
98:10
**jurors**
23:10

**justice**
11:9, 13:6,
23:2, 50:21,
75:5, 79:13,
81:18, 119:3,
142:19, 152:10,
153:20, 153:22,
221:22, 224:9,
233:8
**justify**
175:5
**juvenile**
74:7, 74:11,
74:12, 74:16,
74:17, 74:18,
75:12, 75:17,
75:22, 76:6,
76:19, 76:21,
159:25, 190:11,
193:12, 206:5,
207:8, 209:10,
210:25, 217:16,
218:12, 219:18
**juvenile's**
205:15
**juveniles**
67:10, 67:16,
67:25, 68:8,
68:13, 190:15,
205:19, 206:10,
206:20, 212:21,
212:22, 212:23,
272:4

**K**

**k-a-s-s-i-n**
75:6, 164:12
**kassin**
75:5, 164:11
**kchristie@jsotos-
law**
2:26
**keep**
25:5, 261:4,
269:25
**keeps**
276:8
**kill**
180:20, 277:23,

277:24, 278:24,
280:18

**killed**
242:24, 243:12,
244:15, 245:14,
245:15, 267:24

**killing**
279:9, 279:10

**kind**
16:14, 26:9,
26:24, 32:16,
37:16, 37:18,
78:2, 122:9,
140:23, 141:3,
174:11, 180:5,
183:18, 191:11,
206:17, 235:18,
235:19, 271:20

**kinds**
125:25, 187:2,
271:6

**knew**
43:18, 88:2,
106:25, 180:9,
217:3, 220:13,
220:16, 265:20

**knife**
179:19, 253:19

**knowing**
147:22, 237:21

**knowledge**
32:9, 50:3,
50:19, 53:20,
54:15, 55:13,
59:25, 65:9,
65:11, 65:14,
94:18, 102:23,
114:18, 125:23,
157:3, 190:5,
195:17, 196:19,
197:17, 197:23,
199:8, 199:17,
200:6, 208:14,
221:14, 229:10,
237:2, 253:6,
272:22, 273:22,
279:17

**known**
14:11, 48:12,

100:2, 100:4,
100:8, 100:10,
156:3, 186:25,
195:7, 207:17,
209:8, 281:24

**kyle**
2:20, 6:9

## L

**l-e-o**
7:20

**laboratory**
95:4, 133:10,
254:14

**lack**
39:20, 137:11,
169:19, 252:3,
270:24, 279:13

**large**
19:4, 59:21

**largely**
156:21

**last**
7:18, 7:20,
9:7, 10:11,
56:20, 63:12,
74:6, 84:7,
102:6, 111:18,
112:2, 147:1,
149:16, 165:24,
169:1, 169:9,
170:5, 197:14,
229:25, 262:9,
267:21, 269:18,
281:8

**late**
106:16, 251:5

**later**
61:2, 147:21,
148:7, 198:10,
214:18, 241:3,
268:7, 269:2

**launch**
141:7

**law**
2:11, 2:18,
11:1, 12:5,
12:13, 12:23,

12:24, 13:4,
20:16, 52:1,
109:23, 110:11,
143:6, 143:8,
154:15, 155:9,
156:1, 156:7,
156:13, 156:17,
156:18, 156:22,
158:5, 161:12,
161:25, 162:5,
162:6, 162:7,
162:8, 162:12,
162:13, 162:15,
162:18, 162:19,
224:23, 224:24

**laws**
191:17

**lawyers**
90:12, 90:13,
90:14

**lays**
31:9

**lead**
49:22, 166:14,
167:12, 168:3,
174:4, 182:14,
182:19, 190:16,
198:12, 200:9,
225:2, 225:5,
225:17, 226:4,
253:12, 272:9

**leaders**
155:8

**leading**
156:2, 159:23,
170:16, 231:16

**leads**
33:9, 33:18,
42:8, 107:5,
181:12, 181:18,
182:20, 196:25,
198:7

**leaking**
150:9, 195:14,
219:22, 220:8,
226:18

**leaning**
251:11

**learn**
21:23, 102:4,
184:23, 237:1

**learned**
62:4, 62:10,
62:12, 108:18,
221:4, 247:13,
262:4

**learning**
37:3, 188:16

**least**
36:13, 37:20,
86:11, 94:7,
100:20, 137:13,
150:7, 162:6,
220:20, 265:25,
266:16

**leave**
139:9, 217:15

**leaving**
15:7, 239:23

**led**
90:23, 144:25,
205:23, 206:14,
210:1, 219:5,
219:15

**lee**
1:5, 113:19,
114:8, 119:4,
152:3, 152:4,
253:18, 253:21

**left**
11:14, 114:21,
114:23, 115:12,
116:2, 118:3,
118:8, 118:12,
253:16, 254:25,
278:14, 279:23

**legal**
68:25, 75:21,
176:10, 188:11

**legally**
177:19

**legitimate**
178:22

**length**
96:14, 96:17,
96:21, 101:3,

102:13
**lengths**
96:19, 101:12
**lengthy**
152:5, 154:3,
187:1, 188:10
**leo**
1:20, 4:9, 5:8,
5:15, 7:2, 7:7,
7:13, 7:17,
10:9, 10:22,
12:20, 48:4,
62:25, 63:6,
63:13, 63:22,
85:1, 85:18,
86:1, 115:24,
118:17, 118:19,
119:20, 120:20,
121:13, 125:5,
128:15, 166:10,
201:13, 234:24,
250:2, 278:25,
280:4, 282:11,
282:18, 283:7
**leo's**
10:2
**less**
14:6, 20:6,
69:15, 143:4,
216:10, 225:15,
226:5, 251:23,
257:17, 273:21
**lesser**
102:13, 165:9,
165:10
**let's**
21:12, 23:24,
40:15, 73:12,
78:17, 99:12,
100:12, 100:21,
100:24, 101:3,
112:10, 112:13,
112:14, 112:25,
118:17, 154:1,
166:3, 166:10,
204:6, 216:17,
219:19, 232:21
**letters**
152:24, 153:2

**level**
39:1, 45:10,
45:17, 51:17,
52:20, 78:11,
87:7, 87:12,
92:15, 95:24,
96:1, 96:9,
97:23, 154:23,
176:25, 177:3,
187:16, 188:20,
212:13, 214:4,
217:4, 218:5,
218:8
**levels**
187:14
**lexis**
76:12
**librarians**
90:19
**license**
18:16, 18:18
**licensed**
12:18
**licensing**
18:2, 18:7
**life**
41:22, 125:15,
212:1, 213:2,
213:7, 214:11
**light**
60:3, 61:11,
89:13, 95:18,
216:17, 254:23,
255:1, 255:6
**likely**
39:21, 133:12,
190:22, 195:16,
196:19, 207:14,
207:16, 207:19,
208:11, 221:9,
224:7, 225:20,
226:4, 226:5,
226:10, 227:2,
229:6, 229:7,
238:3, 238:24,
246:10, 248:16,
253:6, 257:17,
257:18, 259:4,

259:12, 278:17
**limitations**
31:12, 31:25,
98:21, 98:22
**limited**
24:9, 91:22,
258:3
**limiting**
35:2, 134:17
**limits**
30:1
**line**
3:4, 3:10,
3:15, 3:20,
165:4, 189:7
**lines**
196:23
**link**
255:21
**linked**
255:20
**linking**
253:22, 279:14,
279:20
**links**
199:24, 254:14
**list**
8:21, 8:23,
17:7, 50:25,
64:25, 68:5,
78:20, 90:11,
112:16, 114:4,
114:11, 114:13,
114:19, 115:12,
115:16, 116:3,
116:7, 116:8,
116:9, 116:12,
116:15, 116:24,
118:12, 119:13,
125:17, 153:14,
193:8, 224:15,
257:4, 266:25,
267:19, 273:5,
277:19
**listed**
17:2, 17:19,
60:7, 60:9,
65:3, 84:9,

108:14, 110:5,
112:19, 112:21,
112:25, 113:17,
114:6, 114:17,
115:9, 115:23,
116:20, 117:9,
118:20, 119:9,
122:11, 126:22,
135:19, 203:9,
242:7, 250:5,
266:23, 267:4
**listened**
64:20, 64:23
**listing**
45:22, 118:21,
190:6, 204:17
**lists**
117:10, 255:3
**literally**
224:19
**literature**
24:21, 43:3,
71:24, 94:18,
103:1, 142:5,
163:12, 163:17,
166:17, 166:19,
166:20, 167:1,
169:1, 169:6,
169:15, 204:13,
204:19, 204:22,
205:14, 210:4,
222:8, 272:6,
272:23
**little**
8:25, 108:22,
142:4, 142:21,
169:25, 190:12,
196:2, 280:21
**live**
23:7, 105:8
**living**
213:5, 242:8,
242:10, 243:20,
243:21, 245:11,
245:18, 247:15,
249:5
**loads**
257:20

| | | | |
|---|---|---|---|
| **location**<br>199:5, 237:21<br>**loevy**<br>2:4<br>**logic**<br>106:22, 107:22,<br>172:20, 173:7,<br>182:25, 183:16,<br>183:17, 183:21,<br>184:8, 184:11,<br>184:16, 184:22,<br>224:21, 253:9,<br>279:16, 280:22<br>**logical**<br>145:7, 178:20<br>**logically**<br>179:23, 183:2,<br>183:24, 184:4,<br>200:10, 273:19<br>**long**<br>13:5, 83:8,<br>91:1, 95:8,<br>123:15, 137:15,<br>158:19, 158:25,<br>159:16, 176:24<br>**longer**<br>168:15<br>**look**<br>9:9, 9:13,<br>10:8, 11:14,<br>11:22, 14:15,<br>33:1, 43:25,<br>48:8, 55:14,<br>55:15, 68:5,<br>84:1, 84:4,<br>101:2, 102:16,<br>103:13, 109:18,<br>113:2, 117:1,<br>117:4, 117:14,<br>117:16, 118:4,<br>118:5, 118:6,<br>119:1, 123:17,<br>127:3, 128:19,<br>136:19, 163:10,<br>173:12, 181:22,<br>183:14, 186:21,<br>190:9, 190:11,<br>222:18, 231:13, | 232:21, 235:7,<br>242:20, 246:25,<br>256:14, 257:18,<br>261:25, 263:7,<br>267:21<br>**looked**<br>36:16, 42:19,<br>45:13, 106:16,<br>115:16, 116:12,<br>119:5, 119:7,<br>145:20, 145:25,<br>204:11, 222:13<br>**looking**<br>10:5, 10:15,<br>10:18, 36:21,<br>39:8, 41:17,<br>41:24, 45:12,<br>46:2, 77:10,<br>86:16, 87:18,<br>88:19, 95:20,<br>104:19, 107:21,<br>116:3, 116:8,<br>116:23, 120:19,<br>174:15, 236:2,<br>251:1<br>**looks**<br>6:19, 11:19,<br>195:3, 216:8,<br>255:5, 265:15<br>**lost**<br>95:5, 96:7,<br>259:10<br>**lot**<br>15:17, 34:20,<br>35:18, 60:20,<br>60:22, 60:23,<br>84:16, 84:18,<br>88:4, 89:14,<br>91:3, 94:11,<br>95:2, 103:15,<br>104:9, 129:6,<br>133:11, 136:14,<br>137:11, 149:5,<br>158:22, 179:22,<br>180:22, 190:8,<br>191:6, 191:16,<br>192:15, 197:9,<br>198:7, 199:2, | 199:6, 199:7,<br>199:13, 202:10,<br>206:21, 212:9,<br>224:12, 225:8,<br>248:12, 248:15,<br>253:16, 259:9,<br>261:14, 271:24,<br>276:3, 277:16<br>**lots**<br>87:24, 150:18,<br>179:19<br>**low**<br>187:23, 187:24,<br>189:17, 191:7<br>**low-end**<br>97:5<br>**lucky**<br>228:14, 229:11<br>**lunch**<br>85:4, 85:5,<br>85:6, 85:8,<br>85:10, 85:17,<br>85:22<br>**lung**<br>207:16, 207:23<br>**lying**<br>198:11, 264:1,<br>264:4, 264:9,<br>264:13, 264:17,<br>268:8<br><br>**M**<br><br>**made**<br>8:13, 28:25,<br>46:10, 61:17,<br>62:13, 75:25,<br>106:13, 115:15,<br>116:3, 116:8,<br>116:12, 139:18,<br>146:3, 170:23,<br>186:10, 199:11,<br>200:17, 201:17,<br>201:19, 207:11,<br>236:20, 245:24,<br>258:18, 259:7,<br>261:12, 269:8,<br>270:24, 278:23<br>**magic**<br>189:7 | **main**<br>17:7, 163:19,<br>166:25, 167:6,<br>169:12, 204:24<br>**mainly**<br>78:22<br>**maintain**<br>18:4, 18:17,<br>88:12<br>**maintaining**<br>213:17, 213:23<br>**make**<br>10:6, 11:20,<br>14:21, 17:17,<br>32:16, 49:1,<br>50:4, 56:16,<br>63:3, 63:9,<br>64:10, 73:25,<br>74:2, 81:11,<br>116:15, 136:18,<br>137:2, 139:1,<br>139:6, 139:7,<br>159:2, 159:15,<br>161:21, 166:24,<br>170:9, 170:25,<br>177:9, 177:10,<br>178:3, 178:4,<br>178:5, 184:25,<br>185:2, 185:25,<br>187:17, 188:14,<br>189:12, 190:2,<br>190:3, 190:23,<br>201:9, 205:25,<br>208:14, 209:2,<br>209:6, 209:17,<br>210:5, 217:24,<br>221:18, 223:18,<br>235:2, 235:25,<br>236:14, 236:25,<br>237:7, 248:5,<br>249:14, 253:2,<br>256:4, 259:22,<br>260:3, 260:11,<br>260:19, 261:6,<br>261:9, 261:10,<br>272:13, 274:8,<br>276:20, 277:2,<br>277:25, 279:17 |

**makes**
131:16, 177:10,
179:23, 183:2,
188:15, 194:7,
216:10, 275:13

**making**
69:4, 96:25,
105:19, 136:15,
143:21, 149:25,
188:7, 204:14,
205:1, 205:21,
206:1, 207:9,
208:4, 209:24,
210:6, 218:13,
218:14, 271:12,
273:16, 274:16,
276:10

**male**
184:7, 275:1,
277:25, 279:11

**man**
180:2

**manipulate**
190:17

**manipulated**
205:23, 206:15,
210:2, 219:16

**manipulative**
219:5

**manner**
142:9, 236:1

**manual**
156:2, 156:4,
156:6, 156:14,
156:15, 157:6,
157:15, 158:5,
158:20, 159:23,
170:16, 172:1,
172:24, 173:10,
175:2, 231:15,
231:16, 232:2,
232:12, 233:7,
245:22, 246:6,
246:14, 246:16,
246:25, 248:1

**manual's**
247:17

**manuals**
156:8, 156:16,

156:23, 157:1,
157:4, 157:5,
157:18, 158:7,
158:10, 158:13,
158:19, 159:22,
167:22, 172:24,
174:2, 181:24,
195:9, 195:13,
231:6, 231:14,
231:18

**many**
16:9, 17:25,
18:1, 18:9,
31:11, 37:23,
44:2, 44:19,
47:3, 48:7,
48:8, 48:22,
67:11, 68:1,
68:2, 68:7,
68:12, 79:18,
81:24, 82:18,
88:5, 88:7,
89:2, 89:19,
89:24, 94:15,
98:9, 100:22,
101:9, 106:8,
129:5, 180:10,
181:15, 191:18,
223:10, 225:7,
232:14, 248:13

**marcella's**
204:2

**margins**
100:6

**marked**
3:19, 62:25

**market**
5:4

**marks**
3:24, 282:17

**marshals**
34:20

**martha**
113:19

**mask**
187:25

**master's**
14:19, 19:3

**match**
251:3

**matched**
250:24

**matches**
253:19

**material**
113:13, 137:10

**materials**
44:16, 54:19,
68:15, 76:2,
76:3, 76:4,
76:18, 108:3,
108:25, 109:10,
109:18, 112:14,
112:15, 112:16,
113:3, 114:4,
114:5, 114:15,
115:1, 115:12,
116:12, 117:23,
119:14, 120:24,
121:2, 121:5,
125:17, 125:19,
126:22, 127:24,
128:10, 133:3,
133:16, 133:19,
135:18, 139:4,
139:16, 140:3,
140:8, 152:8,
153:3, 153:13,
156:1, 156:10,
178:19, 193:8,
203:9, 231:6,
235:8, 249:20,
250:6, 254:5,
266:20, 266:25,
267:4, 267:9,
267:10

**matter**
5:16, 15:21,
30:3, 92:12,
97:14, 184:8,
274:1, 280:22

**mature**
212:2, 214:12

**maturity**
214:5

**maybe**
8:24, 17:18,

24:9, 29:9,
36:25, 38:4,
39:3, 66:25,
69:6, 69:14,
70:15, 88:10,
90:19, 94:22,
100:25, 101:1,
101:13, 109:12,
109:14, 109:16,
119:11, 143:3,
143:4, 150:24,
153:21, 171:4,
171:17, 183:5,
201:11, 226:6,
233:23, 245:24,
250:17, 254:24,
255:16, 266:17,
278:7, 280:21

**mean**
14:23, 20:24,
22:6, 28:9,
28:10, 30:16,
32:12, 35:23,
35:24, 36:4,
37:1, 38:1,
49:24, 49:25,
50:8, 51:9,
52:12, 52:16,
52:20, 59:10,
69:13, 70:8,
71:6, 71:13,
71:17, 73:23,
79:3, 79:4,
87:23, 88:9,
91:10, 91:16,
96:1, 96:3,
99:22, 100:1,
100:13, 101:20,
103:10, 103:11,
104:8, 104:24,
110:4, 113:7,
113:20, 120:7,
120:21, 123:22,
131:11, 134:22,
140:6, 141:21,
143:5, 145:2,
160:9, 160:10,
165:1, 167:14,

171:14, 174:17,
181:13, 183:6,
184:11, 185:3,
186:6, 192:12,
193:1, 194:22,
206:8, 207:21,
213:4, 216:21,
218:2, 219:11,
223:9, 226:2,
226:7, 231:12,
236:18, 239:1,
240:2, 240:3,
249:20, 250:14,
252:15, 272:19,
273:4, 276:15
**meaning**
211:16
**meaningful**
176:8, 198:14
**meaningfully**
145:13
**means**
21:18, 22:2,
37:12, 79:6,
107:19, 119:5,
132:16
**meant**
183:3
**measure**
251:23
**measured**
189:2
**media**
5:14, 44:24,
75:21, 152:14
**median**
96:20
**medical**
44:18, 58:15,
110:22, 110:24,
189:15, 200:12,
253:10, 275:13
**meet**
28:8, 49:6,
72:13, 77:19,
89:14, 89:25,
90:3, 100:23,
100:25, 103:11,

236:4
**meeting**
175:20
**meetings**
76:1
**meets**
43:5, 50:1,
70:6, 70:12,
71:19, 71:22,
71:23, 72:9,
72:12, 73:2,
93:12
**megan**
2:5, 6:11,
9:20, 48:2,
115:22, 261:1
**member**
176:6
**members**
19:9, 20:4,
23:1
**memorandum**
276:25
**memorialized**
128:18, 200:15,
203:13
**memory**
39:16, 40:22,
42:18, 80:4,
157:9, 273:2
**men**
48:12
**mental**
112:3, 112:4,
112:8, 186:23,
190:3
**mentally**
188:25, 189:4,
189:18, 189:19,
191:2, 191:8,
192:5
**mentioned**
23:13, 29:8,
76:8, 86:21,
104:16, 105:3,
107:7, 107:16,
182:24, 218:22,
240:8, 244:4,

277:15
**mentioning**
187:14
**mentions**
129:3, 199:20,
270:24
**mentors**
19:10
**mere**
140:10, 279:7
**merely**
25:22
**met**
65:8, 65:16,
69:17, 77:22,
78:8, 88:6,
174:24, 263:4
**metal**
242:9
**method**
24:16, 93:6,
99:11, 172:20,
173:10, 174:1,
252:6
**methodology**
53:25, 54:1,
54:4, 54:6,
54:9, 124:3,
278:22, 279:14
**methods**
16:11, 23:16,
29:3, 29:15,
31:10, 31:24,
37:19, 93:2,
93:14
**mid-s**
206:12
**middle**
194:20
**might**
21:25, 22:6,
22:13, 22:15,
22:16, 22:21,
22:24, 24:24,
25:23, 25:24,
29:2, 29:7,
29:24, 38:3,
42:23, 43:1,

50:13, 61:9,
70:14, 71:7,
74:16, 75:24,
76:14, 79:19,
79:20, 84:21,
89:1, 90:12,
93:9, 96:11,
96:15, 96:16,
96:23, 97:7,
97:8, 97:14,
98:7, 100:17,
101:15, 101:16,
102:4, 102:5,
102:9, 108:19,
111:18, 122:8,
125:11, 135:25,
141:10, 146:5,
166:11, 176:2,
176:11, 180:21,
191:1, 212:1,
218:7, 229:18,
241:3, 242:3,
244:24, 262:8,
266:6
**mile**
49:12
**milwaukee**
2:13
**mind**
31:16, 32:2,
51:13, 123:23,
123:25, 162:9,
162:15, 215:23,
244:20
**minded**
32:10
**minds**
139:18, 199:11
**mine**
79:16
**minor**
251:8
**minute**
83:3, 132:21
**minutes**
85:9
**miranda**
134:5, 134:6,

156:19, 159:17,
161:15, 162:10,
162:11, 265:24,
269:20

**mischaracterize**
134:13

**mischaracterizes**
212:17

**mischaracterizing**
140:6

**misclassification**
170:10, 170:11,
170:24, 171:7,
171:15, 172:8,
177:8, 177:12,
178:2, 178:7,
178:12, 180:24

**misclassify**
167:18

**misclassifying**
169:17, 170:1,
170:2, 171:1,
171:22

**misdescribed**
199:4, 199:5

**misidentifies**
189:25

**misleading**
140:6, 142:4,
151:10

**misleadingly**
150:2, 151:7,
220:3, 221:3

**misremembering**
66:13, 203:1,
240:23

**misrepresents**
70:3, 139:25,
140:20, 141:24,
182:9, 209:22

**missed**
270:18

**missing**
30:6, 96:12,
97:18, 138:10,
200:9, 253:12,
259:10

**mission**
49:8, 49:16,

49:17, 49:21,
49:25, 50:6,
50:7, 50:9,
50:12, 50:13,
50:15

**misspoke**
73:24, 193:1

**mistake**
116:14

**mistakenly**
221:10

**mistakes**
177:9, 177:10,
251:8

**mock**
23:10

**modified**
21:4

**modify**
61:8, 61:21,
62:13, 102:25,
122:25, 150:25

**moment**
61:18, 64:8,
75:9, 76:13,
118:4, 122:9,
182:11, 262:7,
263:4

**monday**
1:21, 5:2,
283:20

**monitor**
5:21

**monitoring**
189:20

**monitors**
10:5

**month**
10:12

**months**
9:6, 9:7

**morning**
7:7, 7:8,
245:13, 270:22

**most**
16:21, 16:24,
28:15, 36:20,
46:6, 48:6,

52:23, 56:6,
58:4, 58:5,
69:16, 72:11,
81:23, 94:7,
106:18, 122:24,
126:1, 136:24,
168:16, 173:22,
231:18, 253:24,
254:9, 259:8

**mostly**
47:19, 52:9

**motion**
277:5, 277:7

**motivation**
241:16

**motive**
180:21

**motives**
180:19

**move**
86:2, 142:13,
219:19

**moving**
185:10, 243:23

**much**
6:24, 15:25,
26:20, 30:23,
35:8, 44:3,
86:10, 89:10,
94:9, 94:14,
95:16, 97:24,
100:21, 114:24,
126:2, 132:14,
132:22, 180:25,
196:15, 266:7,
274:9, 278:14,
279:23, 282:8,
282:11

**multi-method**
24:16

**multi-study**
25:12

**multiple**
10:5, 38:16,
38:17, 38:20,
58:23, 59:22,
60:21, 68:17,
128:25

**murder**
179:17, 179:18,
275:6, 275:7,
278:3

**murdered**
48:21, 180:14,
262:10

**murders**
180:16, 254:18,
278:11, 280:13

**must**
24:11

**myself**
48:11, 122:16,
154:11, 154:13

**mysteriously**
95:5

---
**N**
---

**nail**
235:18, 235:19,
235:21

**naive**
205:22, 210:2,
211:7

**naivety**
219:14

**name**
7:18, 7:19,
7:20, 14:8,
62:21, 84:8,
104:6, 108:5

**named**
34:19, 222:9,
283:11, 283:18

**names**
68:6, 76:18,
115:16, 231:8,
231:12

**narrative**
151:18, 170:6,
170:8, 181:20,
194:11, 194:16,
194:21, 200:3,
200:5, 202:14,
220:1, 221:18,
222:24, 226:22,
226:25, 227:1,

227:6, 227:18,
227:23, 229:15,
229:18, 229:20,
236:11, 237:7,
237:12, 237:14,
251:8, 251:17,
251:24, 252:2,
257:19
**narratives**
251:3, 251:21,
252:17
**narrow**
86:12, 86:13,
87:15, 108:22,
183:18
**narrowing**
89:19, 180:12
**national**
76:15, 79:12,
81:18, 154:6
**nature**
58:16, 146:20,
224:13
**near**
203:18
**nearly**
254:18
**necessarily**
3:25, 100:13,
207:12, 240:4,
271:10
**necessary**
125:19, 229:15
**need**
7:23, 12:1,
27:14, 30:20,
53:12, 58:1,
61:12, 64:3,
78:13, 86:6,
117:1, 117:13,
137:24, 159:11,
171:6, 177:16,
177:17, 201:8,
206:16, 215:2,
216:6, 217:8,
217:24, 226:23,
227:6, 235:20,
237:23, 238:9,

240:5, 242:4,
271:7, 272:13
**needed**
78:8
**needs**
25:1, 27:20,
27:21
**negate**
214:9
**neither**
8:22
**net**
88:25, 90:21
**never**
34:21, 43:9,
65:25, 98:2,
99:7, 99:15,
110:13, 110:17,
110:21, 110:24,
111:15, 111:21,
116:13, 147:5,
167:21, 181:25,
195:14
**nevertheless**
171:4
**new**
9:11, 26:9,
26:10, 26:13,
41:23, 55:19,
82:13, 102:4,
102:24, 113:13,
163:18, 180:3,
200:9, 247:25,
253:12
**news**
152:13, 233:9,
233:22, 233:23
**newspaper**
22:14, 22:18,
45:23, 233:18
**next**
25:11, 31:13,
51:8, 51:17,
52:20, 53:3,
185:11, 204:4,
204:8, 222:12,
222:13, 230:8,
263:24, 269:3,

269:23, 270:22,
277:21, 279:12,
279:22
**night**
262:8, 271:8,
272:1, 274:2
**nightstick**
242:10
**nobody**
116:9, 134:8,
178:9
**non**
150:20
**non-court**
58:24
**non-empirical**
26:23, 26:24,
27:1, 35:21,
35:22, 37:8
**non-false**
227:4, 227:5
**non-homicide**
95:11
**non-likely**
200:6
**non-public**
149:25, 150:10,
195:14, 195:16,
196:19, 200:6,
219:23, 220:8,
220:17, 222:16,
226:18, 228:12,
228:20, 229:5,
229:6, 229:12,
229:13, 229:15,
236:15, 236:16,
236:25, 238:24,
246:9, 253:5,
253:6, 281:19,
281:22
**non-recorded**
150:21
**none**
3:11, 3:16,
3:21, 253:19,
254:12, 254:13,
254:14
**norfolk**
48:13

**normal**
191:2
**north**
2:6
**northwestern**
65:20, 80:14
**note**
3:23, 96:20
**noted**
16:18, 65:15,
66:4, 174:3
**notes**
29:25, 105:17
**nothing**
74:2, 106:5,
128:9, 175:13,
282:7, 283:9
**notice**
5:1, 78:19
**notification**
191:17
**noting**
12:4
**notion**
88:18, 88:22,
177:21
**number**
5:18, 20:5,
29:14, 30:2,
42:19, 63:11,
63:21, 64:12,
67:5, 68:3,
74:4, 94:20,
96:16, 96:20,
96:22, 97:2,
97:6, 97:7,
100:25, 113:2,
113:18, 113:19,
117:6, 117:7,
119:1, 150:25,
151:6, 164:25,
166:15, 166:16,
184:20, 199:4,
200:25, 204:11,
252:9, 257:4,
265:14
**numerous**
149:23, 154:5

## O

**o'clock**
234:15, 234:16,
265:19, 266:1
**o-f-s-h-e**
75:2, 75:3
**oakland**
105:9
**objection**
47:25, 67:10,
131:7, 131:11,
261:4
**objections**
63:23, 217:6
**objective**
27:21, 30:24,
32:10, 88:15,
128:5, 128:11,
128:16, 129:7,
129:14, 129:25,
130:5, 130:7,
130:10, 130:14,
130:18, 130:21,
131:3, 131:8,
131:11, 131:12,
131:14, 131:17,
131:19, 131:21,
132:5, 132:9,
132:16, 132:17,
133:2, 133:11,
133:16, 133:18,
133:22, 133:25,
134:9, 134:12,
134:16, 134:20,
138:21, 139:15,
140:15, 240:5,
241:22, 256:21
**objectively**
30:13, 30:18,
89:12, 98:1,
128:25, 129:20,
132:3, 133:5,
151:4, 226:17
**obscure**
91:2
**observation**
23:4

**observations**
24:8, 93:19
**observe**
107:25, 222:3
**observed**
56:19, 57:10,
105:8, 105:17,
108:4, 221:17,
222:2, 223:5
**observers**
109:7, 144:5
**observing**
23:5, 107:23
**obtain**
57:17, 87:3,
99:19, 152:6
**obtained**
77:4, 121:3
**obtaining**
18:21
**obvious**
189:21, 191:6
**obviously**
45:12, 46:18,
48:14, 49:17,
51:9, 57:19,
57:20, 59:3,
61:8, 65:25,
85:2, 88:22,
89:5, 98:22,
128:20, 129:24,
162:9, 178:8,
178:17, 190:2,
198:25, 202:10,
249:19, 251:16,
254:4, 260:9,
273:25, 280:25
**occur**
132:18, 133:13,
178:9, 220:11,
227:16
**occurred**
39:11, 39:14,
40:22, 45:7,
57:8, 98:19,
101:8, 109:4,
109:20, 128:5,
128:11, 129:6,

132:9, 132:15,
133:9, 137:12,
138:22, 139:23,
144:22, 152:5,
152:12, 186:15,
201:15, 203:4,
203:12, 217:3,
220:1, 226:23,
227:2, 241:23,
243:19, 243:21,
243:22, 250:13,
251:14, 254:18,
257:9, 258:10,
258:17, 258:23,
258:25, 262:11,
262:18, 262:20,
262:21, 264:25,
281:9, 281:10
**occurring**
56:12, 56:15,
109:8, 137:14,
202:17, 203:14
**occurs**
168:7, 194:1,
229:17
**offer**
70:23
**offering**
70:20, 147:18,
228:5, 228:11
**office**
2:11, 7:10,
11:11, 11:15,
52:12, 136:9,
208:9, 208:21
**officer**
56:18, 109:24,
128:24, 143:22,
144:3, 150:16,
150:18, 152:25,
160:15, 160:23,
170:18, 171:11,
172:17, 173:15,
173:18, 175:3,
175:4, 175:18,
176:15, 177:20,
177:22, 179:12,
191:1, 191:15,

199:1, 200:14,
212:10, 214:18,
217:17, 217:18,
232:2, 237:16,
239:12, 239:16,
240:17, 241:7,
241:9, 241:13,
241:15, 242:14,
243:2, 243:17,
245:5, 245:22,
270:3, 270:10
**officer's**
232:16
**officers**
23:11, 56:18,
135:20, 135:25,
136:17, 138:6,
139:6, 140:14,
144:8, 144:11,
144:15, 144:18,
145:1, 146:9,
146:10, 152:17,
152:21, 160:13,
161:22, 172:15,
198:20, 201:15,
201:18, 202:6,
202:11, 203:12,
214:16, 214:21,
216:1, 216:4,
216:16, 232:12,
233:11, 233:19,
240:10, 261:7,
261:8, 261:17,
262:2, 262:4,
262:14, 262:25,
263:21, 264:19,
265:8, 265:20,
267:23, 268:3,
268:7, 268:14,
269:14, 269:22,
269:24, 270:23,
271:1, 281:10
**offices**
52:10
**ofshe**
72:18, 75:2,
75:3, 106:15,
107:17, 108:24

**often**
21:3, 29:1,
29:15, 37:22,
189:16, 226:20,
238:18
**oftentimes**
15:10, 39:17,
56:8, 58:18,
59:21, 99:1,
139:11, 187:24,
198:13
**oh**
6:5, 14:16,
24:5, 63:11,
104:15, 107:15,
127:2, 158:2,
168:18, 172:12,
228:2, 237:10,
248:19, 264:16
**old**
22:15, 192:22,
209:19, 210:11,
213:2, 213:10,
213:18, 213:24,
217:22, 218:6
**olds**
208:5, 209:8,
210:4, 211:10,
211:11, 212:4,
212:7, 214:10,
214:12
**omnipresent**
99:3, 206:19
**once**
81:6, 90:10,
113:2, 115:17,
174:22, 196:3
**one's**
18:14, 21:1,
31:24, 46:10
**one-off**
37:16
**ones**
17:11, 75:11,
77:23, 88:6,
100:23, 117:16,
158:13
**online**
76:3, 92:1,

100:18, 100:19,
100:20
**only**
18:10, 45:11,
47:9, 48:23,
57:8, 58:7,
66:6, 68:9,
70:12, 73:11,
77:22, 81:19,
82:3, 82:22,
83:24, 97:10,
117:9, 119:5,
119:9, 133:22,
134:12, 134:17,
157:9, 167:20,
170:16, 172:22,
173:8, 173:19,
183:7, 188:11,
188:14, 192:8,
200:7, 201:16,
201:18, 221:7,
223:21, 226:12,
227:11, 234:9,
234:12, 238:23,
253:21, 256:23,
257:5, 264:13,
266:17, 273:16,
273:19, 273:23,
281:17, 281:22
**open**
33:16, 123:23,
123:25, 196:5
**open-ended**
135:10
**operate**
103:18
**operated**
11:11, 11:13
**opine**
69:17, 69:19,
70:9, 72:10,
72:11, 123:9
**opinion**
38:25, 52:17,
57:21, 59:20,
61:12, 61:22,
62:4, 70:20,
70:21, 70:23,

125:23, 130:12,
131:2, 144:13,
144:21, 147:18,
161:21, 178:18,
178:22, 180:23,
240:10, 249:24,
260:20, 266:9,
267:5, 273:7,
273:16, 278:1
**opinions**
52:22, 53:5,
54:19, 58:20,
61:9, 61:11,
61:21, 62:13,
65:2, 71:3,
90:23, 123:1,
123:5, 125:2,
125:19, 126:5,
126:9, 126:14,
126:20, 127:4,
133:4, 133:6,
140:4, 162:1,
258:3, 258:6,
258:7, 260:2,
260:10, 265:12,
266:18, 267:3,
267:7, 268:13,
274:8, 276:4
**opposed**
33:18, 148:5,
159:22, 237:8
**opposing**
73:20, 73:22,
73:23
**opposite**
135:17
**oral**
150:1, 150:4,
256:15, 281:18
**orally**
19:11, 130:19
**order**
18:3, 28:8,
30:24, 55:16,
78:8, 86:4,
86:7, 86:16,
86:20, 88:24,
93:3, 93:16,

108:12, 148:3,
161:20, 177:18,
198:21, 235:2,
236:4, 253:2,
257:17, 259:22,
272:15, 274:8
**orders**
160:17
**organizations**
44:22, 49:18,
50:13, 79:10
**organized**
92:19, 108:12
**original**
25:21, 25:24,
27:2, 62:14,
163:23
**others**
16:9, 23:12,
75:6, 82:19,
91:2, 98:12,
99:17, 140:5,
164:9, 167:15,
186:2, 187:8,
223:19, 226:5,
251:4, 275:4
**otherwise**
86:10, 116:17,
249:10
**ourselves**
76:11
**out**
11:11, 11:13,
20:24, 21:8,
22:3, 31:9,
33:3, 41:16,
42:7, 50:14,
56:11, 61:16,
76:5, 77:21,
85:13, 86:22,
88:6, 88:15,
91:8, 92:9,
93:16, 95:1,
95:12, 99:23,
100:5, 100:23,
100:24, 105:14,
106:7, 109:7,
118:13, 125:11,

125:21, 138:18, 144:23, 152:3, 157:16, 157:18, 159:1, 169:7, 173:12, 176:3, 179:23, 179:24, 184:4, 184:24, 196:21, 198:10, 201:21, 205:5, 216:15, 229:24, 239:3, 253:7, 256:17, 265:22, 267:23, 274:17, 281:1, 281:20

**outcome**
283:17

**outlets**
152:14

**outside**
56:2, 67:2, 79:24, 80:3, 80:7, 81:3, 190:18, 228:6, 228:12, 229:2, 229:8, 257:14

**over**
25:9, 25:10, 38:8, 68:4, 78:14, 83:25, 97:21, 116:6, 123:15, 142:2, 152:5, 162:22, 165:1, 169:15, 212:10, 223:10, 238:11, 255:17, 267:15

**overbroad**
76:25, 94:9

**overlap**
134:11, 248:12, 261:17

**overlapping**
146:19, 201:22, 261:18

**overnight**
269:25

**oversight**
175:16, 176:9

**overstate**
278:17

**overstated**
278:16

**overturned**
130:13

**overview**
121:10, 121:12, 127:3, 127:6, 175:20

**overwhelming**
185:15, 281:2

**overwhelms**
185:23

**own**
11:5, 25:14, 25:15, 26:9, 29:1, 121:3, 139:8, 149:7, 150:12, 175:17, 229:19, 265:23, 275:9, 276:5, 276:9

**P**

**pacer**
76:13

**pacific**
5:22, 234:15

**pack**
207:15, 207:23

**page**
3:4, 3:10, 3:15, 3:20, 4:2, 4:8, 9:24, 11:18, 112:13, 118:23, 118:24, 119:4, 119:5, 119:8, 119:10, 120:6, 120:20, 121:9, 127:4, 146:25, 152:1, 154:2, 163:1, 163:3, 164:20, 166:12, 182:18, 185:12, 194:4, 197:14, 204:8, 219:20, 225:8,

229:24, 232:21, 240:25, 241:6, 242:7, 250:7, 255:2, 255:5, 256:14, 261:21, 263:24, 265:14, 265:16, 267:20, 268:22, 278:20, 279:2, 279:5

**pages**
1:33, 19:7, 29:24, 30:2, 119:11, 120:6, 133:21, 133:24, 145:3, 155:17

**pagination**
279:5, 279:6

**palm**
254:22

**panel**
18:25

**paper**
18:23, 18:24, 25:7, 25:9, 25:10, 25:11, 25:23, 26:13, 27:4, 27:5, 27:13, 39:7, 48:12, 93:7, 98:24, 103:3, 106:24

**papers**
8:17, 91:6, 106:15, 217:13, 217:14

**paragraph**
121:11, 146:25, 149:22, 152:1, 152:2, 154:2, 164:14, 164:21, 221:16, 229:25, 230:2, 262:1, 269:3, 269:19

**pardoned**
49:14

**parent**
191:14, 191:19

**parental**
191:16

**parents**
262:10

**parrot**
219:25

**part**
18:21, 19:14, 22:4, 23:9, 23:14, 25:18, 29:2, 29:20, 29:25, 30:3, 36:18, 38:3, 50:7, 59:16, 59:24, 67:10, 69:2, 73:18, 73:19, 73:20, 81:13, 81:17, 83:16, 101:4, 124:3, 146:9, 150:7, 153:10, 163:4, 168:17, 171:18, 178:24, 179:2, 179:3, 179:6, 179:10, 180:7, 181:12, 183:13, 192:20, 196:16, 201:23, 202:9, 204:20, 214:4, 231:18, 231:21, 232:8, 249:2, 251:16, 270:11, 270:25, 279:20

**partial**
100:20

**partially**
151:17, 151:23, 223:17, 223:18

**participants**
109:7, 137:14, 144:5, 257:1

**participated**
32:5, 32:8, 57:10, 92:5, 92:17, 103:25, 110:7

**particular**
22:15, 35:6, 50:19, 57:22,

76:24, 79:14,
87:2, 89:16,
96:14, 104:24,
152:9, 162:9,
162:15, 204:9,
206:5, 206:18,
230:6, 230:7,
232:19, 233:2,
233:5, 272:22

**particularly**
55:24, 168:8,
179:17, 187:24,
202:12, 207:18,
209:11

**parties**
22:24, 55:21,
64:18, 268:10,
283:16

**parts**
150:20, 277:4

**party**
37:13, 38:12,
47:23, 55:4,
55:6, 55:18,
73:15, 124:7,
221:5, 228:6,
228:12, 229:8

**passed**
252:8

**passes**
253:1

**passing**
37:16

**past**
19:11, 61:23

**pathologist**
275:14

**pattern**
55:10, 165:10

**patterns**
43:7, 43:25,
100:15, 101:15,
102:3, 102:16,
103:14, 103:16,
107:21, 107:22,
164:18, 165:15,
165:16, 186:24

**pause**
278:13, 279:22

**pay**
81:13, 81:15,
115:20, 116:15

**payment**
81:4

**pc**
277:6

**peer**
28:22, 29:1,
29:2, 30:4,
31:8, 31:20,
33:5, 33:12,
33:21, 33:25,
34:8

**peer-review**
99:1

**peer-reviewed**
74:5, 74:9,
74:14, 77:3,
77:11, 78:2,
78:6, 83:5,
83:10

**peers**
31:9

**penalty**
97:13, 97:16

**people**
15:10, 16:21,
16:24, 18:9,
20:5, 28:16,
28:18, 34:23,
41:14, 41:19,
43:8, 43:11,
50:22, 57:10,
75:23, 76:1,
80:21, 91:24,
92:2, 98:7,
102:20, 107:5,
151:16, 158:24,
167:20, 167:22,
173:8, 179:23,
180:13, 180:20,
183:10, 183:19,
187:23, 187:24,
188:24, 189:20,
190:9, 191:6,
212:2, 212:3,
229:12, 230:17,

272:10

**people's**
2:11, 26:1,
40:6, 40:25

**peoria**
1:3, 5:18,
152:16, 152:21,
160:15, 160:16,
160:19, 160:22,
161:6, 161:13,
161:19

**percent**
69:18, 96:25,
97:5, 101:21,
101:23, 101:25,
102:1, 116:4,
116:10, 189:4,
218:9, 218:10,
222:17, 252:15,
255:21

**percentage**
58:8, 105:23,
105:24

**perceptions**
129:2, 215:20,
273:2

**perfect**
85:15, 98:3,
99:4, 99:5,
99:15, 177:9,
250:14, 250:19

**perfectly**
85:10, 250:12,
250:24, 251:3,
251:4

**perform**
79:25

**period**
85:4, 152:5,
212:11

**periods**
158:25

**permit**
245:22

**perpetrator**
101:8, 195:18,
199:9, 200:1,
200:7, 221:8,

239:2, 239:3,
253:16, 254:25,
255:10, 281:23

**person**
11:8, 28:5,
28:11, 38:14,
40:21, 47:6,
48:18, 48:25,
49:8, 65:24,
72:17, 105:8,
106:8, 108:4,
111:6, 124:23,
159:2, 168:13,
170:11, 170:15,
170:22, 171:1,
171:4, 171:8,
172:18, 173:5,
173:13, 174:19,
175:6, 177:1,
180:3, 183:19,
184:4, 184:14,
186:9, 188:5,
191:12, 191:20,
196:18, 208:24,
208:25, 219:10,
220:14, 222:14,
238:22, 262:9,
283:13

**person's**
39:18, 39:21,
41:4, 49:8,
60:4, 62:10,
196:12

**personal**
41:21, 80:17,
81:9, 141:22,
142:3, 142:16,
142:25, 173:23,
176:21, 195:17,
199:8, 199:17

**personality**
186:9, 186:22,
205:25, 209:9

**personally**
5:7, 46:24,
48:10

**persons**
72:19

perspective
89:9
persuaded
69:9, 148:15,
164:4, 164:9
persuades
248:16
persuading
185:14, 219:25
persuasion
135:7, 135:17,
141:11, 142:13
persuasive
221:19
ph
14:19, 14:21,
16:24, 18:9,
18:10, 18:21,
19:2, 19:18
phase
169:20, 193:24,
193:25, 195:4,
198:18, 230:6
phenomena
50:19, 95:12,
97:20, 98:5,
98:9
phenomenon
23:5, 98:3,
98:5, 102:19
philanthropic
79:9
philosophical
22:6, 22:7,
27:5
phone
52:4
phonetic
277:9
photo
235:20
photograph
245:23, 246:5
photographs
153:6, 153:15,
153:17, 239:13,
241:9, 241:14,
241:20, 242:2,

242:15, 242:18,
242:22, 243:3,
243:8, 243:11,
243:15, 244:2,
244:7, 244:9,
244:13, 245:2,
245:3, 247:19,
249:15
photos
235:13, 235:14,
235:17, 237:17,
237:19, 240:11,
240:15, 246:18,
247:9, 247:12,
247:14
physical
101:7, 102:15,
184:20, 196:22,
197:16, 197:23,
198:1, 199:21,
199:23, 199:25,
200:12, 211:17,
237:6, 251:18,
253:10, 253:14,
253:17, 253:25,
254:12, 257:20,
259:1, 259:11,
259:17, 279:13,
280:14, 282:1
physics
183:16, 278:10,
278:21, 278:23,
280:16, 280:18,
280:23
pi
81:9
pick
100:3, 183:10
picked
273:12
picture
89:6, 235:22,
235:23
pictures
150:18, 240:22,
247:4, 248:23
piece
46:6, 46:13,

70:10, 197:4
pieces
40:2, 45:14,
46:20, 46:21
pin
145:21
pinkney
128:23, 263:21
pitched
87:6
place
5:25, 52:7,
65:15, 160:1,
160:7, 160:17,
172:14, 183:9,
224:25, 278:7,
283:11
placed
9:7
places
232:14, 232:20
plaintiff
1:7, 2:3, 6:12,
6:21, 64:17,
118:11
plaintiff's
7:12, 67:13,
120:25, 121:7,
124:9
planet
2:29, 5:24,
6:14
plans
67:1
play
221:1, 226:13
playing
95:24, 96:2,
97:23
plea
68:11
please
6:2, 7:18, 8:1,
115:10, 135:2,
279:24
plus
194:21, 225:8
point
42:3, 61:16,

76:24, 92:14,
99:23, 104:24,
136:2, 136:5,
138:18, 139:9,
139:13, 141:12,
144:11, 147:24,
155:20, 156:2,
156:4, 167:2,
188:12, 188:14,
222:7, 240:19,
252:11, 262:16,
262:17, 262:21,
262:22, 263:9,
263:20, 264:12,
264:22, 264:23,
265:1, 265:6,
265:11, 266:1,
266:6, 274:17,
278:7, 278:15,
278:21, 279:4
pointed
265:22
pointing
259:17
points
22:8, 38:20,
59:22, 60:15,
86:2, 97:10,
105:19, 179:8,
240:18, 241:8,
242:6, 248:13,
252:11, 259:14
policies
161:6, 161:20,
161:22
policing
150:11
policy
14:20, 20:16,
224:25
polish
235:18, 235:19,
235:21
political
16:3
politically
189:1
polygraph
96:24, 97:3,

269:5, 269:16
**polygraphers**
128:24, 261:8
**polygraphs**
97:1, 97:6,
102:7, 134:4
**population**
189:4
**populations**
204:9
**portion**
141:7, 226:21
**portrayal**
45:7
**portrayed**
244:13
**posed**
8:3
**position**
35:13, 35:15,
83:17
**positive**
72:19
**possession**
64:13, 64:16,
64:19, 126:24
**possibilities**
184:25, 238:24
**possibility**
31:3
**possible**
11:18, 30:14,
30:17, 30:23,
31:23, 32:11,
34:6, 62:6,
62:18, 65:21,
66:23, 89:11,
89:12, 90:21,
94:15, 94:25,
95:17, 97:24,
98:1, 99:8,
100:23, 114:3,
114:7, 114:8,
114:12, 114:14,
114:20, 125:13,
125:16, 126:15,
153:9, 173:4,
174:9, 177:11,

180:18, 180:19,
183:15, 186:23,
200:10, 211:19,
214:7, 214:10,
215:18, 221:19,
242:18, 243:19,
251:7, 270:18
**possibly**
45:15, 52:22,
53:12, 96:6,
103:13, 185:7,
266:17, 267:2,
277:8, 277:9
**post**
169:20, 181:20
**post-admission**
193:24, 193:25,
194:11, 194:16,
194:21, 195:2,
195:3, 195:24,
196:8, 196:18,
198:17, 198:18,
199:6, 200:3,
200:5, 200:18,
226:21, 230:6,
237:12, 237:13,
237:14, 251:3,
251:8, 251:17,
251:20, 251:24,
252:2, 252:17,
257:19
**post-conviction**
44:20, 58:9,
58:17, 68:9,
90:13, 257:3
**post-dna**
74:25
**post-miranda**
162:12
**post-narrative**
234:25, 235:3,
236:4, 237:24,
250:9, 250:10,
252:8, 253:1
**posted**
152:20, 222:21
**posts**
152:19, 152:23

**potential**
88:3, 135:12
**potentially**
123:18
**pound**
279:10
**pounds**
184:17, 279:9
**practice**
13:4, 15:12,
20:13, 51:3,
150:10, 155:12,
177:14, 221:17,
222:2, 224:14,
224:23
**practiced**
172:21, 224:20
**practices**
98:11, 127:8,
149:6, 154:7,
154:10, 154:12,
154:14, 154:17,
155:22, 157:23,
159:14, 161:5,
161:7, 161:11,
161:20, 161:22,
162:3, 181:25,
182:1, 187:10,
225:15, 225:17,
257:12
**practicing**
131:24, 132:11
**pre-existing**
33:2, 221:13
**pre-sentence**
193:17
**precluded**
70:19
**preconceived**
88:17, 88:22
**predates**
13:18
**preferred**
125:22
**prelude**
137:1
**premature**
145:5

**preparation**
112:17, 112:22,
112:23, 114:16,
266:15, 277:12
**preparing**
266:10, 266:12
**prepublication**
99:1
**present**
2:27, 14:1,
21:3, 27:13,
102:11, 103:6,
122:3, 144:2,
165:15, 165:16,
206:18, 206:21,
237:2, 280:16
**presentations**
99:2
**presented**
130:8, 260:21
**presentencing**
193:21
**preset**
40:25
**press**
142:20, 194:12
**pressure**
135:6, 135:16,
141:11, 142:13,
188:7, 212:9,
226:25, 229:16,
273:4
**pressured**
139:7
**pressures**
215:21, 230:5
**pressuring**
219:24, 229:17
**presumably**
65:17, 93:11,
95:22, 132:2,
134:9, 183:25
**presume**
230:10, 230:16,
232:23, 262:23,
263:9, 264:5
**presumed**
135:5, 142:11,

142:14, 145:6,
262:17, 263:4,
263:22, 265:3,
265:8
**presumes**
239:22
**presuming**
262:15, 266:6
**presumption**
145:5, 145:12,
145:22, 170:3,
170:22, 222:25,
262:24, 263:5,
264:2, 264:18,
266:2
**presumptive**
139:17, 142:9,
143:17, 143:22,
144:3, 144:9,
144:12, 144:16,
145:1, 146:10,
146:20, 170:14,
171:2, 171:10,
231:1
**pretrial**
40:18, 44:17,
58:13, 257:2
**pretty**
42:11, 125:18,
162:8, 191:6,
217:9, 279:18
**preventing**
84:6
**previous**
214:16, 214:22,
215:8, 215:15,
233:3, 236:21,
245:23
**previously**
131:10
**primarily**
17:2, 142:13,
155:2, 158:4,
192:13
**primary**
19:10, 22:11,
23:15, 23:18,
81:10, 81:11,

127:16, 152:11,
156:6, 156:16
**principal's**
136:9
**principle**
247:1
**principles**
253:4
**print**
254:22
**printout**
265:15
**prior**
13:12, 14:13,
15:7, 26:3,
40:13, 83:20,
83:22, 102:8,
122:17, 140:21,
142:22, 162:20,
172:9, 178:6,
179:12, 182:16,
182:22, 193:18,
217:12, 220:11,
229:1, 233:10,
233:18, 241:19,
241:23, 242:2,
247:4, 248:22,
258:22, 277:16
**private**
79:9, 110:10
**privately**
52:1
**prize**
184:18
**pro**
84:14, 84:16
**probabilistic**
207:7, 207:24,
208:15
**probabilities**
206:23
**probable**
174:13, 174:21,
175:10, 175:21,
176:4, 176:12,
176:18, 177:17,
177:18, 177:22,
200:11

**probably**
8:16, 61:15,
75:8, 77:6,
85:7, 85:8,
149:19, 224:3,
270:19
**probation**
128:24, 261:8
**probative**
95:6
**problem**
136:11, 169:10,
230:3, 264:23
**problematic**
188:11
**problems**
121:24, 123:18,
123:19, 133:14,
238:4
**procedure**
5:11, 7:16,
12:13, 162:5,
174:18
**procedures**
7:22, 31:2,
154:10, 154:12
**proceed**
6:25, 171:13
**proceedings**
44:21, 282:20
**process**
19:15, 28:23,
29:2, 30:4,
31:8, 33:5,
33:12, 83:12,
99:1, 106:20,
107:4, 120:14,
120:17, 124:18,
168:8, 181:11,
182:3, 182:21,
185:23, 186:8,
194:1, 195:12,
196:5, 196:8,
196:17, 231:1
**processes**
272:8
**produce**
54:3, 67:12

**produced**
8:14, 61:24,
184:9
**product**
119:16, 119:17,
120:12, 120:13,
120:15, 120:21,
124:13, 125:3,
199:16, 199:17,
228:13, 228:14,
229:9, 238:3,
281:25
**production**
3:9
**products**
132:20
**professional**
11:15, 15:9,
41:21, 76:1,
88:1, 184:17,
260:3
**professor**
11:1, 12:5,
15:6, 50:8,
80:6, 84:7,
164:11
**professors**
81:24
**proffered**
162:16
**profile**
275:2
**profiles**
254:13
**program**
18:9, 18:10
**programs**
172:24
**project**
19:4, 25:19,
25:24, 42:20,
76:16, 76:17,
80:24, 81:17,
84:6, 222:20
**project's**
222:19
**projects**
49:18

**promised**
270:3, 270:10
**promises**
155:7, 156:20,
159:16, 162:14,
187:1, 188:9,
269:7
**proper**
21:16, 200:2
**properly**
147:3, 198:2
**proposed**
279:7
**prosecuting**
176:6
**prosecution**
67:9, 142:10
**prosecutor**
70:16, 176:13
**prosecutors**
52:9, 90:13,
221:6
**prospectus**
19:8, 19:12,
19:23
**protection**
177:8, 177:11
**protections**
178:1
**protocol**
154:16
**protocols**
154:7, 154:22,
154:24, 155:3,
155:22, 160:7,
160:11, 161:4,
161:7, 162:3
**provable**
239:4
**provably**
107:2, 223:22
**prove**
33:18, 47:3,
47:11, 49:8,
49:16, 50:12,
139:19, 196:12,
196:17
**proved**
47:22

**proven**
42:24, 43:4,
43:6, 43:14,
43:18, 44:8,
45:8, 47:8,
47:10, 47:17,
49:3, 49:7,
69:5, 69:8,
69:18, 69:24,
70:7, 70:13,
71:11, 71:22,
72:6, 72:13,
72:20, 73:3,
73:13, 77:18,
77:20, 87:17,
88:7, 88:23,
90:3, 99:13,
100:24, 101:5,
101:18, 102:8,
103:3, 103:6,
103:19, 103:23,
107:3, 252:18
**provide**
11:3, 52:11,
52:17, 53:13,
57:21, 71:3,
76:17, 111:10,
124:5, 165:7,
176:8, 195:15,
195:19, 221:9,
236:14, 247:4
**provided**
30:8, 52:14,
53:19, 54:2,
76:2, 114:1,
114:10, 114:12,
120:25, 121:6,
122:24, 124:7,
143:12, 143:25,
175:15, 220:14,
227:12, 229:2,
229:7, 236:16,
236:19, 245:11,
245:18, 245:20,
246:4, 246:18,
248:24, 249:5,
260:11, 267:16,
274:10

**provides**
146:18, 146:19,
165:9, 245:24
**providing**
13:21, 14:3,
52:2, 55:1,
121:12, 127:6,
145:18, 226:13,
227:6, 229:20,
268:2
**province**
256:7
**prudence**
14:20
**pst**
1:24, 1:26, 5:3
**psychiatric**
44:18, 58:14
**psychiatrist**
189:22, 189:25,
190:1, 190:2
**psycho**
218:22
**psycho-socially**
190:16, 205:19
**psychological**
44:18, 54:17,
58:14, 106:19,
106:22, 121:22,
127:10, 149:9,
164:15, 164:22,
188:6, 188:7,
189:16, 190:24,
193:14, 270:25
**psychologically**
109:14, 187:10,
192:16, 219:12,
261:11
**psychologist**
14:22, 14:24,
15:3, 15:9,
15:10, 15:20,
15:22, 18:4,
190:1
**psychologists**
15:4, 15:5,
219:7
**psychology**
11:1, 12:6,

15:4, 15:6,
15:7, 15:12,
16:1, 16:4,
16:7, 16:8,
16:9, 16:13,
18:16, 20:15,
23:17, 30:22,
107:22, 108:9,
127:7, 190:3,
224:21
**psychometric**
209:12
**psychosocial**
212:6, 218:18,
218:23, 219:2,
219:17
**psychosocially**
209:25, 211:2,
219:10
**public**
20:16, 52:9,
52:10, 56:10,
229:12, 236:20
**publication**
17:25, 23:23,
50:5, 72:24,
80:8, 83:9,
83:11, 108:11
**publications**
9:11, 14:11,
22:12, 28:21,
74:5, 74:10,
75:8, 81:17,
81:21, 108:14
**publicly**
50:5, 76:3
**publish**
168:18
**published**
8:17, 8:18,
58:19, 83:5,
90:22, 105:7,
108:10, 108:15,
140:4, 142:19,
157:6, 157:15,
223:8, 233:10
**publishing**
83:15

| | | | |
|---|---|---|---|
| **pull**<br>9:17, 112:11,<br>112:25, 158:12,<br>180:16, 184:21,<br>204:3, 278:11<br>**pulled**<br>159:21<br>**punishment**<br>165:7, 165:10<br>**purchase**<br>157:18<br>**purely**<br>22:7, 27:4<br>**purpose**<br>31:1, 59:2,<br>96:10, 121:19,<br>121:21, 195:24,<br>250:10<br>**purposefully**<br>216:13<br>**purposes**<br>11:7, 13:12,<br>49:4, 52:19,<br>70:7, 70:12,<br>256:6<br>**pursuant**<br>5:1, 5:9<br>**push**<br>179:25<br>**put**<br>9:14, 37:6,<br>60:17, 73:1,<br>114:10, 147:25,<br>180:5, 181:14,<br>194:4, 194:15,<br>194:20, 196:2,<br>214:13, 270:17,<br>275:22, 281:15<br>**puts**<br>152:12<br>**putting**<br>171:19, 218:2 | **qualifiers**<br>27:19, 28:7<br>**qualify**<br>161:16<br>**qualifying**<br>70:9, 71:25<br>**qualitative**<br>101:14, 106:25,<br>107:17<br>**qualities**<br>206:19<br>**quality**<br>98:17, 99:9<br>**quantitative**<br>29:16, 96:12,<br>252:6<br>**quantitatively**<br>97:19, 101:13<br>**question**<br>7:25, 8:2, 8:3,<br>8:5, 8:20,<br>25:18, 28:2,<br>33:21, 34:5,<br>39:25, 40:13,<br>41:13, 41:15,<br>45:11, 45:17,<br>47:1, 47:8,<br>47:15, 47:16,<br>51:9, 54:22,<br>55:1, 61:6,<br>73:14, 76:25,<br>77:8, 77:13,<br>77:17, 78:11,<br>78:15, 84:25,<br>86:6, 86:9,<br>86:11, 87:6,<br>87:13, 92:15,<br>121:14, 124:10,<br>124:13, 131:13,<br>131:14, 136:1,<br>137:25, 138:16,<br>139:12, 141:3,<br>141:6, 141:10,<br>149:3, 150:13,<br>157:21, 165:14,<br>171:18, 172:6,<br>178:6, 201:4,<br>207:7, 215:22, | 216:25, 217:25,<br>220:5, 222:1,<br>224:10, 228:3,<br>229:1, 230:14,<br>231:22, 238:14,<br>244:19, 247:22,<br>249:10, 249:21,<br>250:2, 250:17,<br>251:7, 276:15,<br>278:13, 279:23,<br>281:8<br>**questioning**<br>140:24, 142:8,<br>144:4, 146:11,<br>147:15, 265:18<br>**questionnaire**<br>107:12<br>**questions**<br>3:3, 3:19, 9:1,<br>29:3, 29:4,<br>30:5, 30:7,<br>35:17, 40:25,<br>54:13, 55:17,<br>56:14, 65:18,<br>78:12, 91:17,<br>93:10, 93:11,<br>95:18, 102:21,<br>109:19, 113:14,<br>122:16, 122:20,<br>122:22, 124:7,<br>135:10, 144:14,<br>195:6, 196:6,<br>200:16, 200:17,<br>200:19, 200:22,<br>202:2, 224:12,<br>224:16, 224:18,<br>233:18, 267:22,<br>280:3, 280:7,<br>282:12, 282:15<br>**quickly**<br>109:22<br>**quite**<br>19:6<br>**quotation**<br>3:24<br>**quote**<br>3:25, 173:14,<br>250:23, 263:25, | 268:23<br>**quotes**<br>194:5<br>**quoting**<br>241:7<br><br>**R**<br><br>**r-e-i-c-h**<br>254:10<br>**r-i-c-h-a-r-d**<br>7:19<br>**ramirez**<br>2:28, 5:23<br>**rampant**<br>150:15<br>**random**<br>41:9<br>**randomly**<br>41:19, 100:2<br>**range**<br>97:8, 101:17,<br>118:20, 118:23,<br>125:10, 180:12,<br>180:21, 187:25,<br>189:6<br>**ranges**<br>118:24<br>**rape**<br>179:17, 275:6,<br>277:23<br>**raped**<br>48:20, 276:11,<br>276:21<br>**raping**<br>279:9<br>**rapport**<br>141:5, 141:6<br>**rare**<br>70:14, 71:7,<br>72:10<br>**rather**<br>46:14, 101:20,<br>102:17, 146:1,<br>212:24, 257:23,<br>258:25, 281:24<br>**re-ask**<br>137:24<br>**reached**<br>184:7, 185:5 |

**Q**

**qualified**
271:11
**qualifier**
32:12, 73:10

**reaching**
91:8
**read**
108:1, 108:2,
108:24, 119:10,
127:15, 129:23,
143:12, 146:14,
152:19, 152:24,
157:5, 202:25,
213:5, 233:9,
233:17, 233:21,
241:25, 269:20,
279:4
**reading**
15:16, 22:14,
22:16, 33:25,
34:12, 40:14,
45:6, 113:10,
152:23, 153:2,
194:25, 262:1,
277:13
**real**
22:10, 22:12,
23:10, 33:16,
94:25, 95:12,
97:20, 98:3,
135:12
**reality**
189:20
**realize**
238:6, 239:5
**really**
7:10, 13:15,
17:22, 18:8,
23:21, 25:24,
28:1, 35:7,
37:24, 39:25,
44:2, 47:13,
50:8, 81:24,
87:8, 97:22,
103:5, 107:20,
157:12, 164:8,
168:25, 173:9,
173:11, 176:8,
176:12, 193:24,
194:14, 196:9,
197:3, 199:20,
206:17, 210:23,

218:8, 226:23,
235:20, 238:8,
253:23, 272:5
**reanalysis**
25:21
**reapproached**
134:6
**reason**
21:4, 65:18,
145:15, 145:23,
146:5, 167:4,
173:1, 178:22,
183:7
**reasonable**
32:2, 32:11,
115:15, 116:11,
116:14, 170:20,
173:14, 174:14,
174:16, 175:10,
177:18, 180:18,
224:6
**reasonably**
170:18, 172:4,
172:23, 173:8,
230:22, 232:4,
266:3
**reasons**
187:9, 190:15,
207:17, 207:21,
208:1, 211:5,
262:13, 271:13,
275:21
**recall**
9:8, 34:9,
56:15, 62:1,
62:17, 64:22,
67:15, 68:2,
68:16, 68:18,
74:9, 75:12,
75:16, 89:18,
89:21, 106:11,
111:12, 121:4,
121:8, 133:23,
147:5, 152:23,
153:2, 153:4,
153:8, 153:12,
153:18, 160:5,
160:18, 160:21,

160:25, 192:2,
192:7, 193:6,
193:16, 193:21,
200:22, 200:24,
203:16, 215:17,
233:21, 233:23,
241:15, 242:18,
245:10, 246:16,
246:24, 247:1,
248:21, 254:23,
266:11, 281:12
**recalled**
243:22, 243:23,
243:24
**recalling**
122:8, 152:11,
153:4, 239:18
**recalls**
202:16
**recant**
198:10
**receive**
12:24, 79:22,
82:14, 82:20,
84:12, 93:3,
126:5, 165:6
**received**
9:3, 12:22,
76:21, 79:18,
81:4, 81:7,
81:20, 82:1,
83:14, 83:24,
127:23
**receiving**
14:13, 19:18,
63:14, 91:12,
92:11
**recently**
157:7, 271:19
**recess**
85:22, 166:6,
234:20
**reciting**
218:20
**recognizing**
98:2
**recollection**
65:23, 66:14,

158:6, 225:14,
242:5, 249:1,
270:6, 276:25
**recollections**
128:21, 257:1
**recommendation**
13:11, 13:14,
173:24, 176:23
**recommendations**
28:25, 75:7,
178:3
**recommended**
174:11
**reconsidered**
36:17
**record**
6:18, 7:11,
7:17, 55:23,
57:7, 57:9,
60:22, 85:21,
85:24, 91:2,
128:5, 129:12,
129:14, 129:18,
129:24, 130:6,
130:7, 130:10,
130:14, 130:18,
130:21, 131:11,
131:12, 131:14,
131:18, 131:20,
132:5, 132:9,
134:16, 134:20,
134:22, 135:23,
136:8, 136:12,
138:21, 139:15,
139:22, 140:15,
151:5, 166:4,
166:8, 192:18,
202:5, 218:3,
234:8, 234:19,
234:21, 238:7,
238:9, 238:12,
238:14, 240:5,
241:22, 256:21,
256:24, 257:5,
258:4, 258:17,
258:23, 260:20,
274:15, 275:5,
275:19, 278:14,

278:18, 281:16,
282:19

**recorded**
56:6, 59:6,
106:19, 129:11,
132:14

**recording**
58:10, 64:13,
64:16, 128:3,
129:19, 129:25,
132:21, 137:9,
198:25, 235:5,
256:20, 258:12,
264:24

**recordings**
58:12, 64:20

**recordkeeping**
98:11

**records**
44:19, 58:24,
75:24, 131:8,
133:2, 189:15,
189:16, 190:4,
193:3, 193:7

**recount**
267:21

**reduce**
252:9

**refer**
87:16, 233:3

**referenced**
29:21, 47:18,
78:6, 153:7

**referencing**
108:6, 162:19,
166:21, 220:7

**referent**
77:9

**referred**
19:5, 67:13,
79:10, 164:10,
195:10, 236:9

**referring**
19:5, 23:21,
25:22, 143:14,
155:5, 164:20,
183:21, 184:22,
230:15, 246:20,

265:16, 279:1

**reflect**
3:25, 89:4,
102:23

**reflected**
243:10

**reforms**
224:25

**refresh**
242:5, 248:25,
276:25

**regard**
178:6, 202:12,
258:6

**regarding**
160:12

**regardless**
149:8, 150:14,
199:12

**regards**
176:21, 194:7,
234:8

**regions**
102:10

**registry**
76:15

**regularly**
14:3

**regulate**
224:24

**regurgitated**
227:16, 227:22

**regus**
5:3, 6:1

**reich**
254:10, 259:2,
274:23, 275:10,
276:20, 277:13

**reich's**
255:3, 255:10,
255:13, 274:12

**reid**
156:3, 156:13,
156:15, 158:5,
158:20, 170:16,
172:1, 172:20,
172:23, 173:10,
173:22, 173:23,

174:1, 230:20,
231:15, 232:2,
232:12, 232:16,
233:7, 245:21,
246:14, 246:16,
246:25, 247:17,
248:1

**reinforced**
156:10

**reiterate**
7:23

**rejected**
89:13

**rejects**
29:1

**relate**
154:24, 182:2

**related**
64:21, 74:6,
90:25, 93:25,
110:19, 111:2,
162:1

**relates**
122:13

**relating**
64:14

**relation**
63:15, 63:18,
65:6, 67:7,
214:17

**relative**
211:8, 248:13

**relatively**
91:2

**relaying**
129:1

**released**
81:14

**relevant**
22:24, 26:3,
54:12, 54:21,
55:11, 55:23,
58:14, 61:9,
90:14, 94:8,
94:15, 109:10,
121:14, 124:6,
124:10, 124:20,
124:24, 125:2,

125:7, 126:6,
126:18, 126:25,
127:6, 132:5,
157:17, 235:7,
235:16

**reliability**
109:15, 127:12,
238:2, 251:12,
251:16, 251:25,
257:6, 257:8,
257:18, 257:25,
258:8, 258:24,
259:5, 259:12,
260:15, 261:2,
274:6, 281:3,
281:5, 281:11,
281:13, 282:3

**reliable**
148:21, 223:17,
225:20, 258:1

**relied**
21:15, 47:19,
61:2, 146:8,
146:12, 155:21,
156:13, 156:24,
157:3, 157:22,
157:24, 158:4,
162:1, 232:11,
277:20

**relies**
170:14

**rely**
25:13, 43:2,
59:19, 60:20,
157:1, 159:10,
159:11, 160:10,
177:21, 177:25,
189:15, 190:4,
190:24, 197:12,
199:1, 260:1,
271:15, 274:13,
275:15, 276:4

**relying**
20:20, 21:19,
25:8, 26:6,
28:12, 45:24,
46:2, 47:21,
48:9, 59:17,

60:1, 61:4,
102:7, 152:6,
166:21, 204:19,
204:22, 205:16,
232:17, 240:9,
249:14, 249:25,
250:5, 254:2,
254:4, 254:7,
254:20, 260:4,
263:20, 272:20,
274:11, 275:3,
276:2, 276:15,
276:20, 276:23,
277:1, 277:4
**remains**
88:15
**remember**
36:14, 42:16,
56:12, 63:14,
74:21, 84:2,
104:6, 105:23,
108:5, 129:17,
158:14, 192:13,
193:20, 224:18
**remembered**
5:1
**remembering**
203:9, 240:20,
241:11, 255:1,
277:3
**rendering**
260:10
**repeat**
78:4, 183:3
**repeated**
156:8
**repeating**
245:19
**rephrase**
8:1
**replicate**
99:11, 99:18,
99:22, 100:13,
100:14, 102:2,
102:17
**replicating**
100:14, 102:18
**replying**
118:11

**reported**
1:29, 105:15,
270:9, 283:13
**reporter**
5:6, 6:13,
6:24, 85:14,
282:15, 283:1,
283:5
**reporter's**
1:18, 3:23,
7:10
**reports**
22:17, 44:17,
44:19, 44:21,
58:12, 59:1,
59:8, 59:10,
59:11, 59:16,
59:20, 60:13,
60:20, 60:21,
60:23, 61:1,
61:4, 62:2,
67:6, 67:21,
67:23, 67:24,
68:4, 68:8,
71:1, 72:24,
72:25, 73:2,
89:7, 94:7,
94:8, 96:5,
129:5, 190:5,
190:25, 201:7,
203:11, 213:5,
217:17, 235:8,
240:17, 241:25,
243:18, 245:16,
248:22, 248:25,
249:13, 249:25,
250:5, 255:15,
257:2, 260:4,
276:18, 277:11,
277:14, 279:6
**represent**
6:3
**representation**
38:23
**representative**
1:11
**representing**
5:24, 6:14

**request**
3:9, 56:16,
67:5, 94:9
**requested**
52:24, 53:2,
53:19
**requests**
91:10
**require**
55:15, 94:22,
235:2
**required**
52:24, 52:25,
177:2
**requirement**
24:10, 24:25
**requirements**
18:2, 18:7
**rereading**
277:13
**researched**
207:25
**researcher**
30:18, 41:7,
42:5, 46:12,
49:25, 72:18,
82:4, 89:10,
188:17
**researchers**
33:6, 33:14,
41:20, 50:4,
79:8, 79:15,
81:2, 91:18,
142:24, 143:3
**researching**
15:22, 77:14,
82:8
**reserve**
122:25, 282:16
**reserves**
63:13, 63:22
**resist**
273:4
**resolve**
58:7, 129:8
**respect**
8:12, 32:24,
47:17, 57:15,

57:23, 64:1,
64:21, 64:24,
76:19, 77:2,
77:13, 78:18,
79:2, 82:4,
83:14, 84:10,
86:16, 103:2,
103:3, 103:17,
108:17, 112:15,
117:21, 118:19,
121:15, 136:16,
138:19, 143:17,
151:1, 178:12,
198:17, 205:7,
205:11, 211:11,
212:15, 215:7,
223:7, 229:23,
232:12, 233:4,
234:25, 246:15,
250:8, 260:18,
266:13, 267:18,
277:21, 280:11
**respond**
215:21, 269:2,
269:6
**response**
4:9, 40:13,
62:23, 63:6,
64:2, 189:24
**responses**
63:23
**responsibilities**
213:22
**responsibility**
118:9, 148:3
**rest**
234:10, 234:13
**restrained**
180:5
**result**
41:23, 185:19,
205:19, 256:19
**resulted**
101:10, 101:21,
101:24, 256:22
**resulting**
124:19
**results**
99:19

**retain**
87:3, 87:21,
87:23, 88:8
**retained**
11:4, 51:2,
51:4, 51:6,
51:10, 51:14,
51:21, 51:25,
68:23, 123:17,
256:9, 256:10
**retainer**
52:7
**retarded**
188:25, 189:4
**retelling**
201:14
**retention**
52:6, 52:8,
52:13
**reveal**
200:5
**revealed**
247:24, 248:2
**reverse**
39:5, 108:12
**reversed**
43:12, 238:23
**revert**
236:9
**reviewable**
129:1, 129:7
**reviewed**
28:23, 45:5,
45:22, 54:20,
60:9, 65:1,
68:14, 72:6,
78:8, 89:19,
108:24, 112:14,
112:15, 112:17,
113:3, 113:8,
113:13, 114:2,
114:4, 117:24,
118:23, 118:25,
119:14, 120:24,
121:2, 121:5,
125:14, 125:17,
126:19, 126:22,
127:24, 128:10,

130:12, 133:3,
133:17, 133:19,
133:20, 133:23,
139:5, 139:16,
140:8, 143:25,
152:8, 153:3,
153:10, 153:14,
153:24, 178:19,
200:14, 203:6,
203:9, 222:7,
231:7, 232:22,
242:19, 249:21,
250:6, 252:22,
254:5, 257:4,
258:4, 260:13,
266:9, 266:11,
266:12, 266:15,
266:16, 266:18,
266:20, 266:22,
267:1, 267:5,
267:9, 267:11,
277:17
**reviewer**
33:21, 33:25,
34:8
**reviewers**
30:5
**reviewing**
26:8, 34:1,
49:1, 54:4,
54:6, 54:9,
57:15, 70:1,
78:4, 88:16,
94:20, 103:19,
124:3, 127:14,
153:8, 153:18,
160:5, 166:10,
193:6, 193:21,
200:22, 236:3,
261:10, 261:22,
279:15
**reviews**
163:17, 169:12
**revise**
19:13
**richard**
1:20, 4:9, 5:8,
5:15, 7:2, 7:13,

63:6, 75:2,
75:3, 106:15,
282:18, 283:7
**ride**
37:14, 38:13
**rights**
134:6, 159:4,
161:15, 269:20
**rigor**
18:20
**rigorous**
18:10, 98:23
**rigorously**
95:17, 98:1
**risk**
75:7, 122:2,
122:4, 127:9,
150:1, 187:3,
187:12, 188:12,
205:21, 212:20,
212:22, 219:4,
220:2, 225:16,
257:12, 271:12,
271:22, 272:25,
274:3
**risked**
221:2
**roaming**
184:15
**rod**
242:9
**role**
46:12, 57:14,
60:18, 70:9,
213:8, 213:16,
255:24, 256:10,
260:8
**roll**
74:1
**room**
180:5, 180:7,
204:10, 239:20,
242:8, 242:10,
243:20, 243:21,
243:24, 245:11,
245:18, 247:15,
249:6
**root**
269:1

**roughly**
211:4
**royal**
158:17
**royalties**
81:23
**rpr**
1:30, 283:23
**rs**
222:9
**rubric**
16:15
**rule**
184:4, 184:24,
253:7, 281:20
**ruled**
239:2
**rules**
5:10, 7:15,
7:16
**run**
52:5
**rush**
145:12
**ryan**
1:30, 5:5,
6:14, 283:4,
283:23

**S**

**s-c-h-u-t-t**
158:18
**s-h-u-t-t**
158:18
**safe**
153:14
**safeguards**
31:5, 31:20,
178:7
**said**
25:10, 31:22,
36:15, 38:11,
45:5, 47:19,
48:6, 50:11,
54:20, 54:21,
71:19, 71:21,
72:17, 89:2,
89:13, 90:9,

93:5, 115:17,
116:1, 116:11,
124:5, 129:9,
129:14, 129:16,
140:13, 141:2,
141:20, 143:16,
145:20, 147:4,
161:15, 181:25,
183:5, 229:4,
231:13, 236:6,
237:17, 240:22,
243:16, 243:21,
248:12, 252:11,
268:25, 269:6,
269:21, 274:11,
276:1, 278:16,
279:2, 281:14,
281:18, 283:10,
283:12, 283:16,
283:18
**salary**
81:14, 81:15,
82:25, 83:19
**same**
9:16, 30:25,
39:17, 41:18,
43:7, 53:15,
54:5, 54:6,
69:14, 80:22,
91:10, 91:12,
92:10, 93:11,
94:3, 94:12,
94:14, 94:23,
95:15, 96:9,
98:16, 99:11,
99:19, 100:8,
100:15, 100:16,
101:3, 104:21,
107:9, 107:11,
111:19, 131:1,
131:13, 131:14,
186:5, 191:20,
203:13, 208:25,
217:6, 226:5,
230:25, 269:3,
279:6, 279:15
**sample**
99:15, 99:24,

100:1, 100:2,
100:6, 100:10,
101:20
**san**
1:22, 5:4, 6:1,
10:25, 11:12,
12:3, 15:8,
80:14, 81:3,
82:6, 82:23,
83:17, 83:21
**sara**
2:19, 6:7
**sarah**
6:4, 118:15,
201:6, 217:24,
249:8
**satos**
2:18
**saul**
75:5, 164:11
**savory's**
66:7, 66:12,
66:17, 67:2,
114:9, 121:16,
122:13, 128:12,
128:21, 130:5,
130:12, 130:14,
130:19, 131:2,
138:22, 144:7,
144:8, 144:17,
147:1, 148:24,
149:13, 149:18,
150:1, 150:14,
151:3, 151:14,
151:20, 152:3,
152:4, 152:7,
153:24, 163:6,
178:16, 192:11,
193:4, 193:11,
201:16, 202:16,
202:19, 203:21,
208:16, 213:2,
217:21, 233:10,
243:8, 247:7,
247:19, 252:7,
255:2, 255:23,
256:5, 256:25,
259:13, 261:5,

261:12, 261:14,
261:22, 262:2,
265:2, 267:19,
267:20, 268:1,
268:13, 273:14,
274:6, 281:9
**saw**
15:17, 50:25,
80:10, 121:25
**saying**
10:14, 21:4,
25:5, 27:9,
28:16, 40:11,
70:5, 70:9,
71:13, 71:23,
71:25, 73:1,
73:4, 73:5,
87:8, 90:10,
93:13, 96:24,
114:3, 118:15,
128:8, 129:17,
130:3, 133:18,
140:22, 147:14,
147:16, 147:19,
150:8, 158:10,
159:14, 161:11,
161:17, 162:24,
171:24, 173:18,
173:21, 175:2,
182:5, 183:13,
194:5, 194:23,
197:21, 207:8,
207:11, 207:12,
207:13, 209:7,
209:16, 209:18,
209:24, 210:3,
218:9, 218:11,
223:20, 223:25,
244:10, 248:3,
256:3, 262:22,
268:5, 268:11,
271:9, 275:14,
278:4, 278:6,
278:9, 279:3
**says**
10:9, 11:15,
11:19, 17:6,
52:4, 63:11,

63:12, 64:12,
70:16, 85:5,
113:1, 113:2,
113:18, 119:3,
119:4, 122:2,
133:7, 163:9,
163:11, 169:6,
170:16, 173:10,
180:2, 208:10,
208:21, 216:8,
232:2, 245:19,
248:1, 248:11,
255:6, 268:6,
268:23, 268:24,
270:21
**scale**
212:12, 252:10,
252:24
**scene**
110:15, 110:17,
111:20, 111:21,
111:25, 179:8,
183:15, 183:17,
184:23, 199:5,
221:15, 235:12,
235:14, 235:17,
235:20, 237:17,
237:19, 239:13,
240:11, 242:8,
245:1, 245:23,
246:1, 246:19,
247:8, 247:12,
247:14, 247:19,
253:16, 280:14
**scenes**
110:20, 110:21
**scholar**
222:9
**scholars**
142:24, 178:3
**scholarship**
142:17
**school**
16:23, 135:24,
162:5, 189:15,
193:3, 193:6,
262:2
**schutt**
158:17

**science**
15:18, 15:19,
15:23, 15:25,
16:2, 16:4,
16:11, 16:12,
16:15, 23:13,
23:21, 23:22,
28:18, 31:12,
38:22, 50:2,
79:7, 79:8,
99:3, 102:20,
127:7, 142:5,
142:25, 143:8,
163:5, 169:14,
206:22, 207:3,
248:11, 271:7,
272:7, 272:22,
273:22
**sciences**
16:22, 28:19,
28:21, 28:22,
30:22
**scientific**
31:1, 47:12,
53:21, 54:16,
101:9, 124:17,
163:11, 163:15,
166:17, 166:20,
167:1, 167:11,
168:20, 200:12,
204:13, 204:19,
205:6, 208:13,
253:10
**scientist**
16:10, 33:11,
271:21, 271:25,
272:1
**scientists**
21:2, 23:19
**scope**
68:22, 70:19,
86:12, 86:13,
122:18, 122:20,
123:1, 123:4,
123:7, 123:8,
123:20, 125:18,
256:9
**scratch**
132:25

**screen**
8:10, 8:25,
9:24, 62:21,
63:3, 63:5, 88:6
**script**
227:7
**scripted**
228:7
**scripting**
219:24, 226:20,
226:24, 227:10,
227:11, 227:19,
228:20, 228:25,
229:14, 229:17,
229:24
**scrutinize**
33:4
**se**
164:13
**search**
76:9, 177:3,
177:4
**searched**
76:8, 87:24
**searches**
75:21
**searching**
86:12, 86:14
**second**
131:3, 156:5,
164:21, 165:10,
202:9, 221:16,
236:13, 241:5,
256:18, 265:12,
268:23, 278:13,
279:19
**second-to-last**
230:1
**secondarily**
158:5
**secondary**
19:10, 35:9,
35:11, 35:12
**secondly**
167:23, 196:9,
253:8
**section**
108:11, 126:22,

134:2, 145:3,
158:23, 159:12,
167:19, 182:17,
204:8, 222:11,
240:20, 241:3,
245:6, 261:21
**sections**
5:10
**see**
6:17, 11:21,
14:17, 19:17,
21:11, 25:3,
48:8, 51:3,
51:6, 60:7,
63:7, 67:5,
78:17, 88:14,
100:15, 102:3,
112:13, 112:25,
113:5, 117:17,
128:19, 129:8,
152:2, 164:19,
165:2, 186:24,
192:1, 216:15,
226:20, 227:2,
235:20, 235:23,
238:9, 240:21,
241:2, 241:4,
242:15, 264:11,
278:14, 278:18,
279:23
**seeing**
10:1, 10:2,
65:23, 242:18
**seek**
135:4, 135:11
**seeks**
224:16
**seem**
30:6
**seemed**
199:19
**seems**
169:18, 217:8,
275:19, 279:11,
279:17
**seen**
129:21, 239:20
**select**
33:3

**selection**
173:7, 181:12
**selects**
35:11
**self-conscious**
31:18
**self-corroborati-
ng**
150:3, 151:8,
220:4
**sell**
81:24
**semen**
184:9
**seminal**
48:19, 184:2,
185:6, 185:7
**seminars**
12:15
**send**
9:20
**sense**
45:1, 179:23,
183:2, 185:1,
185:3, 187:7,
191:3, 197:1
**sent**
116:19, 117:18,
125:12, 234:9,
234:13
**sentence**
63:12, 147:1,
149:16, 149:17,
149:21, 163:14,
164:22, 230:1,
230:8, 256:18,
267:21, 269:23
**sentencing**
193:19
**separate**
82:10, 228:24
**separately**
261:16
**sequence**
199:5
**sequential**
166:13, 166:18,
167:11, 182:19

**series**
156:5
**serve**
19:9
**serves**
42:18
**service**
50:7
**services**
11:3, 13:21,
14:3
**session**
265:17, 265:18
**sessions**
128:6, 134:18,
138:23, 256:25,
268:19
**set**
27:22, 35:2,
79:14, 91:10,
91:12, 94:3,
97:7, 98:3,
99:4, 99:5,
99:15, 101:2,
101:20, 102:3,
155:10, 156:6,
162:23, 174:23,
200:15, 208:9,
234:12, 242:8
**sets**
41:11, 248:10,
261:18
**setting**
158:20
**settled**
89:15, 89:17
**seven**
113:3, 279:25
**severe**
165:7
**sexual**
254:15, 274:25,
275:5, 275:8,
275:17, 275:20
**sexually**
111:6, 111:11,
274:21, 275:25
**shall**
234:15

**shape**
215:20, 221:18
**share**
8:24, 9:23,
63:3
**sharing**
8:10, 78:17
**sharply**
134:10
**sheet**
105:13, 105:14,
106:1, 106:2,
107:20, 107:24
**shepard**
180:3
**shifted**
136:22
**shifts**
227:17
**short**
119:8
**shorthand**
5:5, 283:4
**shortly**
263:6, 263:21
**should**
9:15, 9:16,
27:10, 30:8,
60:8, 73:19,
84:8, 125:14,
134:24, 152:14,
169:19, 172:10,
173:18, 188:5,
188:10, 196:4,
196:8, 196:11,
217:21, 224:25,
231:5, 232:3,
236:3, 236:8,
236:14, 237:5,
239:17, 240:21,
244:21, 257:23,
265:24, 277:7,
280:15
**shouldn't**
236:7
**show**
62:20, 77:7,
201:8, 238:5,

239:4, 242:4,
245:22, 246:4,
246:17, 249:9,
271:15, 271:19
**showed**
48:23, 48:24,
150:17, 153:7,
239:12, 240:15,
240:22, 241:9,
241:13, 243:3
**showing**
241:19, 242:2,
248:23, 249:14
**shown**
222:15, 235:17,
235:22, 237:18,
239:5, 240:12,
245:2, 247:5,
247:8, 247:11,
247:13
**shows**
44:24, 45:23,
45:25, 46:9,
219:21, 238:21,
271:7
**side**
85:5, 89:3,
108:14, 248:7
**sides**
130:8, 130:9
**sign**
20:7, 28:16,
264:2
**signal**
101:16
**signature**
120:7, 120:20,
282:16
**signature-b7fzp**
283:21
**signed**
52:13
**signing**
52:2
**silence**
269:21
**similar**
145:10

**similarly**
28:24
**simply**
70:5, 86:9,
106:4, 136:13,
211:1, 238:8,
251:5, 280:22
**simultaneously**
277:23, 279:9
**since**
8:14, 9:5,
10:19, 13:7,
13:25, 14:6,
47:9, 70:21,
115:6, 165:24,
166:2, 193:22,
210:15, 210:18,
242:15
**single**
24:16, 37:23,
44:2, 46:13,
95:14, 99:6,
105:14, 112:20,
167:8
**sister**
213:9
**sit**
34:9, 36:14,
62:1, 62:17,
153:5, 153:19,
193:6, 248:21
**site**
35:25
**sitting**
23:5
**situated**
28:24
**situation**
191:22, 212:9,
246:7
**situations**
220:16
**six**
241:7, 273:23
**six-and-a-half**
273:21, 273:23,
273:24
**size**
11:19, 278:11

**sized**
180:15
**skip**
163:1, 269:23
**sleep**
156:21, 158:24,
270:24, 271:5,
271:7, 271:8,
271:11, 271:16,
271:17, 271:21,
271:25, 272:1,
272:2, 272:7,
272:10, 272:11,
272:14, 272:22,
272:23, 272:25,
273:1, 273:8,
273:10, 273:22,
273:24, 273:25,
274:2
**slept**
273:17, 273:19,
273:20
**sliding**
212:12
**slightly**
101:15, 102:5,
150:25, 238:17,
273:21
**slow**
189:9, 189:10,
191:7
**small**
48:5, 58:7,
79:19, 81:16,
81:22, 82:25,
85:7, 168:13,
168:17
**smaller**
96:22, 105:11,
105:24
**smoke**
207:14
**smokes**
207:23
**social**
14:20, 15:3,
15:4, 15:6,
15:9, 15:18,

15:20, 15:22,
15:25, 16:1,
16:2, 16:3,
16:6, 16:10,
16:11, 16:12,
16:13, 16:15,
16:22, 18:4,
21:2, 23:13,
23:19, 23:20,
23:22, 28:18,
28:21, 30:21,
30:22, 31:12,
33:11, 38:21,
44:18, 50:2,
53:20, 54:16,
58:15, 79:7,
99:3, 108:9,
111:13, 111:15,
127:6, 142:5,
142:24, 143:8,
163:5, 169:14,
190:1, 206:22,
248:11
**socially**
219:12
**sociological**
35:10
**sociologist**
34:19
**sociology**
14:19, 16:4,
16:13
**solely**
74:17, 202:6,
252:21
**solid**
197:16, 237:7
**solve**
146:1
**somebody**
26:14, 37:13,
37:15, 39:14,
52:4, 52:13,
88:17, 89:1,
90:2, 135:15,
144:24, 147:23,
159:2, 170:1,
170:2, 170:13,

170:17, 171:3,
172:10, 172:22,
173:16, 174:12,
174:25, 177:19,
180:8, 180:10,
180:20, 188:4,
189:6, 191:1,
191:5, 191:8,
191:12, 196:11,
196:25, 206:13,
208:9, 210:5,
216:8, 220:13,
220:16, 221:4,
237:2, 272:13,
272:21, 278:10,
281:14, 281:18
**somebody's**
40:15, 183:8,
183:15
**someone**
26:7, 47:21,
121:6, 220:22,
220:25
**someone's**
34:1, 34:12
**something**
26:10, 32:22,
36:8, 37:7,
37:14, 41:10,
41:22, 47:20,
60:6, 61:22,
72:12, 74:24,
80:15, 80:16,
100:2, 114:20,
116:1, 116:21,
118:11, 119:11,
122:8, 131:12,
136:23, 138:1,
142:1, 156:19,
175:3, 175:12,
203:8, 212:10,
217:20, 219:6,
230:21, 237:22,
249:2
**sometimes**
20:5, 38:18,
41:20, 44:21,
49:19, 52:9,

58:25, 68:9,
68:10, 76:10,
76:11, 76:15,
78:11, 78:12,
81:13, 82:18,
90:15, 90:18,
90:24, 95:4,
105:18, 106:3,
109:18, 113:10,
122:19, 134:10,
141:3, 151:15,
156:17, 164:16,
166:14, 168:8,
185:19, 194:17,
194:18, 194:19,
194:21, 202:11,
225:2, 279:5
**somewhere**
38:4
**soon**
117:17
**sorry**
6:5, 6:16,
17:11, 31:19,
42:15, 48:2,
57:4, 57:6,
73:23, 84:25,
107:15, 158:1,
165:1, 172:12,
177:6, 177:7,
178:10, 192:23,
201:2, 209:6,
213:14, 227:25,
231:21, 234:6,
237:10, 238:25,
239:16, 248:19,
259:23
**sort**
11:5, 11:6,
12:4, 15:21,
17:6, 18:2,
18:24, 27:19,
34:2, 37:16,
39:4, 40:5,
80:18, 90:7,
92:18, 99:11,
116:21, 192:9,
194:6, 214:24,

221:2, 252:6,
262:25
**sorts**
86:24, 224:24
**sought**
77:21, 140:9,
224:10
**sound**
42:21, 275:13
**sounded**
277:16
**sounds**
21:22, 85:16,
144:9, 186:15
**source**
22:11, 22:19,
22:22, 23:8,
24:17, 31:24,
37:5, 41:3,
43:17, 47:7,
77:3, 79:25,
80:3, 82:3,
91:11, 101:5,
141:16, 141:18,
142:15, 142:17,
156:16, 185:7,
210:24, 220:19,
229:3, 232:17,
233:5, 233:25,
239:14, 244:1,
253:7
**sources**
23:18, 38:17,
39:18, 45:16,
46:16, 59:23,
60:22, 91:8,
92:9, 92:20,
155:13, 155:21,
155:24, 155:25,
156:12, 220:10,
272:12
**speak**
106:2, 116:6,
139:6, 225:15,
251:15, 262:3,
262:5, 262:14,
269:22
**speaking**
38:14, 65:24,

135:20, 135:24,
143:15, 182:10,
263:1
**speaks**
129:18
**special**
1:11, 17:1
**specialist**
111:7, 206:17
**specialization**
17:1, 17:6,
17:24
**specializations**
16:14
**specialize**
16:25, 17:18
**specialties**
16:18, 17:8
**specific**
16:17, 17:16,
30:20, 34:10,
38:24, 38:25,
42:4, 42:5,
42:6, 42:18,
44:7, 47:17,
51:15, 57:16,
59:2, 61:8,
61:13, 67:16,
74:11, 76:16,
77:7, 77:8,
78:5, 78:13,
79:25, 86:6,
92:13, 105:1,
109:11, 118:22,
127:4, 127:15,
161:25, 168:19,
184:6, 201:7,
208:3, 208:12,
208:14, 208:16,
213:3, 213:6,
215:17, 215:23,
217:2, 224:8,
224:10, 226:9,
231:23, 234:2,
246:7, 246:18,
247:14, 247:18,
249:25, 272:23
**specifically**
39:5, 42:14,

67:24, 74:8,
89:21, 93:1,
93:21, 134:16,
138:20, 157:4,
198:20, 220:7,
222:7, 244:8,
246:24, 248:18,
248:20, 249:23,
250:7, 254:6,
254:9, 254:23,
256:24, 263:13,
272:3
**speculate**
216:22
**speculation**
174:20, 216:24
**spell**
7:17
**spelled**
7:19, 7:20,
84:8, 158:17,
239:17
**spelling**
129:22
**spend**
157:14
**spit**
199:16
**spitzer**
60:10, 259:2,
274:23, 275:11,
276:19, 277:14
**spitzer's**
255:14, 274:12
**spoke**
88:1, 262:16,
263:21
**spoken**
65:10, 65:16
**spot**
278:25
**sschroeder@jsoto-
slaw**
2:25
**stab**
237:22
**stabbed**
184:19, 243:25

**stabbing**
179:19, 243:19
**stabbings**
180:16
**stage**
53:3, 53:11
**stamp**
118:20, 201:11
**stamped**
204:2
**stamps**
112:25
**stand**
149:7, 242:9,
242:10
**standard**
5:22, 20:5,
107:24, 162:2,
174:11, 174:22,
174:23, 175:21,
189:3, 251:19
**standardization**
106:1
**standards**
28:20, 29:8,
29:10, 29:16,
29:20, 30:9,
50:2, 122:6,
150:13, 154:6,
154:16, 155:9,
155:10, 155:15,
155:22, 156:7,
156:8, 156:11,
156:21, 157:9,
158:20, 159:7,
159:13, 161:4,
161:14, 162:3,
162:23
**stands**
81:9
**start**
84:23, 85:8,
112:13, 121:13,
139:11, 139:17,
141:9, 163:2,
181:16, 182:16,
256:17
**started**
13:8, 13:15,

13:21, 13:24,
14:12, 19:22,
146:11, 181:17,
262:25, 265:19,
266:6
**starting**
166:2, 202:2,
256:15
**starts**
152:3, 182:21
**state**
5:6, 6:3, 7:11,
127:4, 138:5,
138:20, 149:23,
154:2, 164:14,
165:4, 169:25,
204:12, 219:21,
219:22, 220:23,
221:16, 230:8,
230:9, 249:4,
258:16, 271:14,
275:23
**state's**
175:19, 176:5,
176:14, 279:7
**stated**
155:3, 264:8
**statement**
69:20, 130:20,
133:8, 133:15,
139:7, 147:2,
150:2, 150:5,
194:6, 196:14,
197:8, 198:21,
199:19, 220:2,
221:25, 233:5,
235:11, 249:5,
259:6, 259:7,
259:13, 282:2
**statements**
127:20, 130:24,
142:10, 146:2,
155:1, 167:13,
197:15, 197:19,
197:22, 204:15,
243:9, 245:24,
247:20, 258:8,
258:15, 258:18,

281:6
**states**
1:1, 5:17,
63:22, 64:15,
147:1, 162:7,
191:17, 191:18,
217:14, 256:19,
269:19
**stating**
163:14, 264:7
**station**
254:17
**statistical**
29:15, 100:6
**statistics**
101:13
**status**
18:17
**statutes**
160:3
**stay**
280:5
**staying**
103:3
**stems**
219:16, 219:17
**stenographers**
129:21
**stenographic**
283:1
**stenographically**
1:29, 283:12
**step**
51:8, 171:14,
194:14
**steps**
31:13
**steve**
74:24, 80:13
**still**
10:25, 44:9,
45:21, 49:10,
150:22, 151:17,
211:4, 218:17,
257:16, 261:3,
274:2, 281:1
**stipulations**
3:14

**stop**
78:17, 173:5
**stories**
44:7
**story**
37:15, 38:4,
38:11, 38:12,
38:14, 39:10,
119:4, 175:9,
175:12, 194:13,
230:7
**straight**
242:14
**straightforward**
279:18
**street**
2:6, 5:4,
183:10
**strength**
184:20
**stressful**
147:25
**strict**
90:1
**strictly**
182:10
**strike**
111:17, 260:17
**striking**
253:13, 253:24
**string**
159:22, 166:19
**strive**
30:24
**strong**
172:2, 206:24,
207:24, 250:14,
250:20
**strongest**
252:13, 252:14,
252:15
**studied**
21:7, 106:21,
222:6, 223:10,
276:4
**studies**
22:23, 24:16,
24:17, 25:23,

26:1, 29:16,
32:4, 32:8,
32:14, 35:11,
35:12, 35:25,
36:5, 38:19,
40:4, 46:12,
49:22, 50:15,
67:16, 67:20,
76:6, 78:14,
78:18, 78:19,
78:21, 78:24,
79:1, 79:5,
79:14, 80:5,
80:12, 81:1,
82:18, 82:19,
84:7, 92:5,
92:13, 92:16,
93:1, 93:17,
100:3, 104:9,
104:12, 104:16,
105:1, 106:11,
107:8, 107:11,
108:10, 108:18,
167:4, 167:6,
220:20, 238:5,
239:5
**studying**
91:19, 95:12,
97:20, 98:9,
103:22, 142:2,
226:9, 250:21,
252:16
**stuff**
76:14, 133:11,
158:22, 159:5,
159:18, 274:14
**style**
140:23, 236:9
**sub**
16:19
**subdiscipline**
16:7
**subdisciplines**
16:6
**subfields**
16:8, 18:1
**subject**
15:21, 50:23,

162:6, 165:12, 174:24, 178:23, 234:2

**subjected**
134:4, 177:1

**subjecting**
170:4, 170:13, 171:1, 171:10, 172:9, 173:16, 174:9

**subjects**
29:14, 225:9, 275:3

**submit**
19:13, 83:9

**submitting**
31:9, 51:18

**subpoena**
4:9, 62:23, 62:24, 63:6, 63:15, 63:18, 64:1, 74:2, 115:15, 189:24

**subquestions**
280:8

**subsequently**
62:3

**substantial**
19:7, 48:15, 146:6, 163:11, 166:17, 197:10, 199:25, 204:13, 224:5, 255:17, 259:3

**substantially**
207:14, 207:15, 207:19

**substantive**
129:22

**successor**
13:13

**suffice**
175:20, 176:20

**sufficient**
97:11, 271:5

**suggested**
194:19, 197:18, 197:24

**suggestibility**
186:24, 212:8, 212:19, 219:15, 273:3

**suggestible**
189:11, 190:20, 191:2, 205:24, 206:14, 210:2, 211:7

**suggesting**
178:5, 185:17, 196:6, 229:4, 236:7

**suggestive**
180:8

**suggests**
180:6, 181:9

**suite**
2:22

**summaries**
169:5, 204:21

**summarize**
166:25

**summarizing**
163:19

**summary**
169:6, 169:7, 185:20

**summer**
81:15

**supplement**
63:23, 64:3

**supplied**
151:19, 222:16

**support**
3:1, 25:14, 28:5, 34:22, 35:9, 35:13, 221:24, 275:22

**supported**
253:10, 253:12

**supporting**
21:19, 276:6, 282:2

**supports**
34:20, 72:6, 146:19, 159:12, 167:11

**supposed**
28:19, 37:21, 124:10, 150:11, 155:7, 157:8, 167:21, 172:22, 173:15

**supreme**
162:7, 162:8, 162:23

**sure**
10:6, 28:1, 31:15, 60:17, 63:9, 64:10, 73:25, 74:2, 77:12, 82:9, 93:23, 104:8, 125:20, 170:9, 201:10, 215:10, 225:13, 235:25, 236:14, 237:1, 237:8, 240:6, 251:2, 274:17, 277:2

**surrounding**
131:5, 179:22, 263:8

**survey**
23:11, 29:15, 40:24, 41:1, 41:10, 91:16, 93:5, 93:9, 107:8, 107:9

**surveyed**
23:10

**surveys**
23:9, 93:19

**susceptible**
204:14, 204:25

**suspect**
34:10, 106:13, 135:6, 135:12, 142:11, 142:14, 165:5, 165:7, 165:8, 165:12, 169:18, 170:2, 170:7, 170:10, 171:3, 171:8, 171:12, 175:4,

180:18, 181:12, 185:13, 185:24, 186:17, 194:2, 194:7, 194:13, 194:17, 195:6, 195:15, 195:19, 196:1, 197:18, 197:25, 198:9, 200:8, 215:18, 219:25, 220:9, 220:12, 220:14, 220:18, 220:23, 221:11, 221:14, 226:13, 226:22, 226:25, 227:5, 227:17, 227:22, 228:5, 229:18, 230:5, 235:9, 235:18, 235:21, 236:6, 236:8, 236:10, 236:13, 236:20, 236:21, 236:23, 237:1, 237:16, 237:18, 237:24, 238:6, 238:10, 239:1, 239:3, 239:25, 245:22, 245:24, 246:3, 246:9, 246:20, 247:2, 253:5

**suspect's**
161:15, 170:6, 170:8, 170:20, 174:9, 186:8, 221:18, 222:24, 235:11, 237:7, 237:11, 237:13, 252:25

**suspected**
217:19

**suspects**
23:2, 142:8, 145:14, 155:1, 155:2, 167:19, 179:7, 180:12, 180:21, 183:1, 185:20, 230:12,

232:25, 246:16,
246:17, 246:18
**suspicion**
174:14, 174:17,
175:10, 177:18
**sweep**
122:9
**sweeping**
32:17
**switch**
84:22, 254:24,
255:1, 255:7
**switched**
131:7
**sworn**
5:12, 6:15,
6:23, 7:3, 283:8
**symptom**
208:21, 208:22
**symptoms**
208:10
**syntactical**
129:22
**syntheses**
163:17, 169:12
**synthesized**
126:13
**synthesizing**
163:19, 163:22
**synthetic**
35:8
**system**
23:2, 50:21,
68:25, 176:10
**systematic**
37:22, 90:20,
92:11, 93:8,
93:15, 94:1
**systematically**
46:15, 53:18,
54:14, 90:21,
94:17, 95:17,
97:25
**systemic**
90:7, 90:20,
91:9, 92:8,
92:18, 93:4,
93:6, 93:15

**T**

**t-e-p-l-i-t-z**
239:16
**tables**
105:16
**tabulate**
96:18
**tabulated**
105:15
**tactics**
225:11, 225:23
**tagged**
104:1, 104:9
**take**
7:23, 7:24,
13:3, 16:23,
83:8, 84:22,
84:24, 85:6,
85:7, 85:8,
85:17, 158:19,
166:1, 166:3,
180:15, 181:21,
184:20, 186:5,
204:3, 204:5,
218:7, 227:25,
228:2, 234:3,
242:13, 244:21,
269:4, 281:1
**taken**
7:14, 37:1,
59:2, 169:19,
215:8, 216:15,
271:3, 283:11
**takes**
172:14
**taking**
5:2, 5:25,
26:14, 51:7,
85:10, 122:7,
155:1, 165:23,
182:3, 205:21,
219:5
**talk**
27:5, 38:3,
38:13, 38:25,
78:13, 92:13,
105:4, 134:2,

148:13, 148:14,
148:15, 158:22,
165:1, 182:18,
186:3, 195:13,
211:23, 219:7,
281:12, 281:13
**talked**
12:3, 40:7,
107:8, 181:20
**talking**
18:20, 35:20,
39:1, 39:5,
47:9, 67:19,
67:20, 67:23,
70:25, 71:1,
80:22, 93:21,
101:23, 109:12,
120:3, 131:7,
140:12, 179:22,
182:18, 184:5,
184:6, 201:2,
201:3, 201:4,
214:18, 219:13,
220:6, 230:2,
230:9, 232:15,
232:22
**talks**
8:18, 76:1,
145:11
**tall**
279:8
**tapes**
106:17, 108:1,
108:2, 108:25,
109:3
**taught**
12:15
**tax**
11:7, 13:11
**taxonomy**
148:18, 148:19
**taylor**
2:12, 6:20
**teach**
12:9, 12:11,
12:12, 12:14,
172:25, 230:24
**teaching**
50:6, 162:4

**technician**
110:16, 110:18
**technicians**
95:4
**technique**
97:13, 141:5,
165:3
**techniques**
106:20, 106:22,
109:13, 122:1,
127:8, 135:6,
142:12, 149:6,
149:10, 159:1,
164:15, 164:22,
167:25, 168:3,
185:12, 185:18,
187:2, 187:4,
187:10, 187:18,
188:9, 188:11,
192:13, 192:16,
225:16, 226:3,
226:10, 257:12,
257:16
**teenager**
273:22
**teenagers**
271:7
**telephone**
242:9, 242:10
**television**
233:23, 242:8
**tell**
7:3, 14:25,
34:12, 35:23,
54:8, 74:20,
75:15, 84:4,
93:20, 115:7,
116:18, 117:5,
121:19, 125:9,
141:18, 191:10,
239:8, 239:9,
239:10, 239:15,
252:12, 257:24,
263:6, 266:5,
279:24, 283:8
**telling**
40:9, 144:20,
208:11, 237:25,

239:25
**tells**
37:14, 37:15
**telltale**
264:2
**ten**
69:16, 74:6,
211:4, 271:8
**tend**
95:9, 95:10,
189:20, 205:23,
216:1, 225:19,
227:2
**tendencies**
206:22
**tendency**
32:25
**tendered**
8:7
**tens**
45:13
**tensions**
224:23
**teplitz**
150:18, 152:25,
217:17, 217:18,
243:17
**teplitz's**
200:14, 239:16,
239:17
**teplitz-brown's**
199:1
**term**
21:16, 27:23,
32:19, 36:10,
37:11, 37:19,
37:24, 43:2,
72:19, 164:9,
189:1
**termed**
36:9, 131:18,
161:2
**terminate**
159:3
**termination**
159:4
**terms**
27:11, 44:8,

47:13, 80:21,
82:9, 98:22,
187:6, 192:19,
226:20, 229:14,
251:15, 259:3
**territory**
167:7
**test**
40:16, 269:5
**tested**
145:18, 255:4
**testified**
5:13, 7:4,
13:16, 154:15,
154:21, 265:20
**testifies**
54:10
**testify**
5:12, 52:23,
53:12, 54:3,
122:12, 122:17,
124:5
**testifying**
70:15
**testimonial**
124:19, 197:12
**testimony**
8:21, 8:23,
52:19, 70:4,
70:25, 71:11,
122:18, 123:2,
140:1, 140:5,
140:18, 140:21,
141:25, 182:9,
209:23, 212:17,
238:20, 243:18,
245:6, 257:3,
283:12
**testing**
48:4, 189:17,
190:25, 254:14,
277:6, 277:8
**tests**
190:19, 209:13
**textbook**
37:3, 240:13
**textbooks**
167:3

**th**
5:20, 20:14,
127:20, 134:5,
136:11, 138:24,
138:25, 139:2,
139:24, 152:21,
154:3, 154:4,
162:12, 162:20,
202:3, 202:4,
203:5, 233:12,
233:20, 256:16,
256:17, 266:1,
273:8
**thank**
6:24, 7:9,
11:24, 26:19,
43:13, 63:7,
277:19, 282:8,
282:11, 282:13
**thanks**
11:21
**themselves**
6:3, 167:4,
221:8
**theoretical**
22:5, 22:6,
22:7, 27:4,
35:10
**theoretically**
65:21
**theories**
33:8, 34:21,
34:22
**theory**
33:18, 35:13,
35:15, 42:6,
42:8, 43:15,
146:7, 177:4,
177:7, 177:11,
279:7
**therapist**
15:11
**thereafter**
263:6, 283:14
**therefore**
50:14, 176:8,
178:21, 190:21
**therein**
283:11

**thereof**
5:3
**thesis**
18:23, 19:3,
19:5
**thing**
8:11, 41:18,
45:21, 97:22,
100:8, 124:2,
128:18, 137:16,
178:2, 214:24,
230:25
**things**
9:19, 30:5,
44:17, 74:8,
99:17, 100:16,
100:18, 101:3,
102:4, 113:12,
118:8, 129:6,
133:7, 133:22,
134:1, 134:3,
134:12, 141:21,
173:12, 178:4,
178:5, 179:24,
189:11, 195:20,
199:4, 200:25,
217:2, 218:4,
219:13, 225:18,
225:19, 241:22,
258:13
**thinking**
21:12, 42:23,
75:9, 189:10,
278:8
**thinks**
115:18
**third**
2:7, 64:17,
164:8, 190:8,
221:5, 236:17,
265:17, 278:20,
279:4
**thorough**
37:22, 172:9,
178:15, 178:24,
179:10, 180:23,
182:25, 199:21
**thoroughly**
33:4, 146:2,

146:3, 170:18,
174:8

**thought**
72:17, 72:23,
105:4, 123:4,
129:13, 140:22,
145:18, 147:13,
155:8, 175:7,
228:17, 228:18,
228:25, 229:13,
233:22, 240:23,
262:7, 276:14,
278:4

**thoughts**
171:19, 214:15

**thousands**
45:13, 133:21,
133:24, 163:20,
252:16

**threat**
97:13, 97:16

**threats**
155:7, 156:20,
158:24, 159:15,
161:16, 162:14,
186:25, 188:9

**three**
17:7, 17:18,
17:19, 17:20,
60:8, 97:12,
119:11, 123:15,
133:16, 133:22,
134:12, 142:2,
148:17, 163:9,
164:1, 164:3,
166:13, 166:18,
167:11, 167:17,
168:10, 168:13,
169:16, 169:21,
178:8, 181:8,
182:19, 188:22,
190:6, 190:18,
190:23, 192:9

**threshold**
47:8, 77:19,
78:1, 78:7,
78:12, 88:23,
103:11, 174:14,

236:5

**through**
9:20, 14:11,
16:22, 17:24,
17:25, 18:8,
25:25, 28:22,
35:17, 35:18,
45:25, 47:12,
52:1, 52:8,
56:17, 58:22,
60:14, 64:10,
74:2, 75:21,
78:22, 79:16,
79:20, 80:5,
82:5, 82:7,
82:15, 82:25,
83:16, 84:24,
88:4, 90:18,
98:25, 101:2,
114:19, 114:25,
115:17, 115:25,
116:2, 116:8,
116:11, 116:16,
126:12, 144:7,
144:8, 145:4,
157:16, 168:6,
192:4, 196:17,
202:4, 202:15,
212:2, 212:14,
233:23, 237:1,
240:1, 256:16,
261:16, 264:10

**throughout**
106:24, 126:16

**throw**
176:2

**time**
5:21, 5:22,
10:11, 13:16,
13:25, 21:9,
30:25, 49:9,
56:7, 58:21,
61:23, 65:19,
66:6, 69:19,
72:11, 73:11,
73:12, 73:13,
79:11, 81:19,
83:8, 84:21,

85:24, 99:12,
99:19, 106:18,
114:20, 115:20,
118:5, 123:3,
123:4, 140:16,
153:23, 157:4,
158:7, 158:14,
158:21, 159:1,
159:24, 166:8,
172:25, 177:14,
180:7, 203:5,
203:18, 203:21,
210:6, 212:11,
231:15, 234:19,
234:22, 244:21,
263:7, 271:1,
278:14, 279:9,
279:23, 283:11

**timeframe**
271:5

**timeline**
202:14

**timelines**
202:13

**times**
30:17, 68:1,
68:8, 89:6,
95:6, 95:8,
116:17, 180:10,
182:24, 187:20,
198:4, 251:23,
261:19

**title**
11:9, 15:18,
18:4, 20:10,
27:8, 42:16,
74:20, 84:5,
163:8, 166:13

**titled**
24:12, 27:15,
51:2

**titles**
158:14

**titling**
71:11, 71:12

**titterington**
60:11, 129:3,
145:19, 146:22,

188:15, 199:20

**titterington's**
145:11, 146:8,
146:13, 146:14,
146:16, 159:9

**today**
5:23, 6:13,
34:9, 36:14,
62:2, 62:18,
100:17, 153:19,
193:6, 267:1,
282:6

**today's**
5:20, 63:15,
63:19, 112:23

**together**
37:7, 114:10,
171:20, 194:16,
194:20

**told**
44:1, 117:22,
175:8, 228:11,
238:10, 241:18,
242:1, 269:21,
269:25, 270:3

**took**
105:17, 215:12,
221:6, 242:13,
269:15

**top**
11:14, 92:22,
215:18, 250:15,
251:6, 252:14

**topic**
20:10, 21:20,
80:1, 205:8,
280:3

**total**
89:19

**totality**
48:9, 133:18,
143:24, 263:7,
263:17, 263:19

**toward**
68:11, 88:25,
194:14

**towards**
251:11

**track**
91:1
**trade**
271:20
**trail**
48:21, 49:11
**trained**
14:24, 15:2,
16:10, 16:21,
37:19, 156:18,
167:24, 167:25,
171:25, 230:10,
230:16, 232:23
**trainers**
23:1
**training**
110:2, 110:3,
110:5, 111:2,
111:4, 150:12,
154:6, 154:16,
155:8, 155:12,
155:25, 156:2,
156:6, 156:9,
156:11, 156:21,
157:6, 157:15,
159:21, 160:19,
172:24, 173:11,
173:22, 173:23,
174:1, 181:2,
181:4, 181:5,
181:7, 181:15,
181:23, 230:14,
230:20, 230:24,
231:6, 231:17,
231:19, 231:24,
232:1, 232:13,
232:16, 233:4,
246:15, 247:17,
275:24
**traits**
205:25, 206:3,
209:9, 209:18,
209:19, 209:21,
210:3, 210:9,
210:19, 212:14
**trans**
45:24
**transcribed**
283:14

**transcript**
1:18, 40:18,
58:11, 109:3,
113:8, 113:9,
129:19, 235:4,
235:5, 277:5,
277:10
**transcripts**
22:16, 22:18,
44:17, 44:20,
58:13, 58:19,
89:5, 106:17,
108:1, 108:2,
108:25, 129:14,
129:23, 130:4,
277:6, 277:7
**transformation**
20:13, 20:15
**translate**
86:15, 95:22
**transmitted**
45:25
**transparency**
29:19, 29:22,
30:10
**transparent**
29:18, 98:24
**trauma**
274:24
**treasure**
259:11
**trial**
22:16, 40:18,
43:9, 43:10,
44:20, 56:7,
58:6, 58:19,
58:21, 68:11,
70:25, 89:5,
101:21, 101:24,
122:17, 238:20,
257:2, 277:5,
277:7
**trials**
58:23
**tried**
89:2, 90:17,
90:20, 193:22,
201:20, 202:8,

202:9, 202:13,
248:10
**tries**
26:2, 245:7
**trouble**
180:2
**trove**
259:11
**true**
54:17, 68:19,
68:24, 69:10,
70:10, 71:4,
101:8, 104:11,
106:7, 148:9,
148:11, 148:12,
148:18, 148:20,
148:21, 148:22,
149:9, 149:22,
150:5, 150:22,
151:9, 151:20,
151:21, 151:23,
168:6, 182:14,
187:6, 188:3,
195:18, 197:5,
199:9, 200:1,
200:7, 206:12,
210:9, 210:23,
211:6, 218:20,
221:7, 223:14,
223:15, 223:16,
223:18, 223:19,
224:3, 224:6,
224:7, 225:19,
225:20, 226:11,
227:3, 229:20,
236:6, 239:2,
239:3, 250:12,
251:4, 251:9,
254:25, 257:16,
281:23
**trusting**
205:22
**truth**
5:12, 7:4,
69:19, 70:23,
150:14, 151:2,
197:3, 237:25,
283:8, 283:9

**truthful**
197:15, 197:21,
197:22, 265:21,
268:2
**truthfully**
267:22
**truthfulness**
268:5, 268:9
**try**
32:23, 33:9,
87:15, 94:9,
101:3, 135:14,
236:10
**trying**
29:10, 33:18,
40:1, 40:8,
42:15, 49:5,
50:1, 50:14,
55:2, 89:10,
91:5, 97:17,
102:17, 106:6,
124:2, 134:14,
136:18, 136:19,
141:13, 145:25,
199:12, 204:1,
208:25, 215:13,
215:14, 244:20,
258:21, 265:14,
267:23, 268:4,
268:9, 268:10,
270:14
**ts**
222:10
**turn**
112:10, 136:5,
166:12, 280:8
**turned**
19:22, 140:24
**turns**
198:10
**tv**
44:24, 45:23,
45:25, 46:9
**twice**
193:22
**two**
9:5, 9:7,
12:15, 13:18,

20:18, 24:9,
41:11, 53:14,
56:21, 60:8,
75:2, 80:21,
85:3, 96:8,
106:15, 116:17,
119:11, 134:4,
134:23, 134:24,
135:25, 152:9,
156:12, 164:18,
165:24, 169:2,
171:19, 180:13,
180:20, 189:3,
190:6, 194:20,
222:9, 222:10,
238:24, 252:11,
258:12, 261:18,
266:17, 267:5,
268:23, 269:7,
269:13, 278:3,
278:11, 278:24,
280:3, 280:6,
280:7, 280:18
**two-thirds**
255:5
**type**
20:21, 22:10,
27:19, 29:12,
30:10, 31:10,
32:22, 40:10,
41:3, 46:23,
56:21, 58:4,
80:16, 86:7,
87:9, 92:10,
94:4, 94:23,
132:7, 147:20,
148:5, 148:6,
148:22, 171:11,
179:15, 209:14,
218:4, 226:8,
231:23
**types**
20:18, 20:19,
22:9, 23:19,
23:23, 24:1,
24:9, 24:10,
27:23, 41:25,
46:25, 50:15,

55:15, 57:13,
78:3, 104:18,
148:17, 163:9,
163:12, 164:1,
164:3, 179:10,
197:9, 204:25
**typewriting**
283:14
**typical**
58:9, 73:11
**typically**
15:4, 28:21,
28:22, 31:11,
31:24, 33:7,
52:1, 52:7,
53:3, 54:25,
55:5, 55:6,
55:8, 55:19,
55:20, 55:21,
68:25, 71:6,
71:8, 73:8,
73:11, 76:5,
77:25, 78:23,
79:1, 79:5,
79:16, 79:17,
79:21, 82:13,
83:9, 83:10,
100:1, 135:5,
135:16, 164:17,
197:5, 197:16,
197:22, 220:19,
256:8
**typographical**
113:22, 113:24
**typology**
148:11, 148:18,
148:20, 164:10,
164:12, 167:14

---
**U**
---

**uc**
12:25, 14:18,
15:7
**uh-huh**
18:12, 24:19,
43:1, 46:8,
183:12
**ultimately**
30:1, 48:19,

49:14, 70:11,
89:15, 123:19,
176:12
**unable**
30:18, 138:4,
138:11, 161:5
**uncommon**
56:20, 106:18
**unconscious**
31:4, 31:6,
31:19, 32:6
**undeniable**
264:25
**under**
23:5, 40:20,
127:3, 186:1,
209:11, 212:5,
212:9, 212:23,
219:17, 225:1,
225:4
**underlying**
60:23, 79:23,
197:17, 197:24
**understand**
7:24, 8:4,
21:11, 25:3,
28:2, 38:1,
40:1, 42:3,
71:10, 133:12,
171:17, 172:6,
182:17, 189:11,
207:6, 250:2
**understanding**
28:17, 30:21,
36:25, 94:16,
103:4, 122:21,
141:19, 142:6,
158:6, 169:13,
182:13, 264:12,
271:25
**understandings**
184:24
**understood**
27:13, 52:18,
118:15, 142:23,
187:9, 207:20,
207:25
**undisputed**
59:24

**undoubtedly**
212:19
**unfolded**
139:21
**unique**
281:19
**uniquely**
187:6
**united**
1:1, 5:17,
162:7
**universal**
206:9
**universally**
154:5, 155:4,
155:14, 161:3
**universe**
35:12, 100:2,
100:4, 100:9,
100:11, 134:7,
134:10
**university**
10:25, 11:12,
12:3, 15:8,
79:20, 80:6,
81:3, 82:6,
82:15, 82:23,
83:17, 83:20,
83:21, 83:22,
91:19, 142:20
**unless**
66:13, 82:15,
84:14, 113:22,
115:20, 172:3,
203:8, 230:21,
232:3
**unlike**
277:15
**unlikelihood**
278:6
**unlikeliness**
280:12
**unlikely**
278:9, 278:20,
278:23, 279:11,
280:23, 281:22
**unquote**
173:14, 250:23

**unrecorded**
40:16, 40:23,
41:4, 56:15,
56:19, 59:4,
262:18
**unreliability**
109:16, 121:24,
238:2, 251:12,
251:16, 252:1,
252:3, 252:14,
252:19, 257:14,
257:24, 258:8,
258:15, 258:24,
259:5, 259:13,
259:16, 274:6,
277:22, 278:5,
280:24, 281:2
**unreliable**
187:12, 223:18,
257:23, 271:23
**until**
165:12, 202:4,
206:11, 234:15
**updated**
9:21, 10:11,
10:12
**updates**
8:13, 8:14
**upend**
102:24
**upper**
10:9
**use**
21:2, 39:13,
39:19, 41:3,
53:4, 79:18,
93:9, 96:23,
99:25, 155:6,
155:7, 158:23,
159:1, 161:16,
164:9, 167:24,
188:8, 192:14,
272:15
**using**
26:7, 39:8,
135:6
**usually**
19:2, 19:5,

19:14, 24:20,
25:19, 25:20,
27:12, 33:7,
34:19, 37:17,
38:16, 41:14,
41:18, 55:3,
59:20, 68:22,
70:18, 77:9,
79:10, 80:20,
81:22, 83:6,
86:8, 94:8,
102:19, 123:16,
124:7, 124:15,
124:19, 194:12,
206:21, 222:19,
229:16

**V**

**vacuum**
243:23
**vaginal**
275:1
**vague**
41:14, 42:12,
61:7, 78:15,
249:22
**vaguely**
63:16
**vagueness**
87:7
**validate**
46:11
**vallejo**
105:10
**variable**
96:14, 99:6
**variables**
96:23
**variation**
43:11, 101:17,
212:19
**variety**
45:2, 80:11,
142:12
**various**
49:21, 60:14,
61:1, 75:18,
76:20, 77:11,

78:18, 78:20,
91:8, 92:19,
93:16, 105:16,
108:18, 109:7,
128:22, 129:10,
136:19, 137:13,
144:5, 144:11,
177:24, 257:1
**vary**
187:15, 206:15
**verify**
46:13
**versa**
102:9
**verse**
51:22
**version**
10:13, 10:20,
204:2, 247:8,
247:11, 265:23,
281:9
**versions**
281:10
**versus**
5:16, 41:8,
51:16, 88:17,
186:17, 216:9
**vetted**
28:23, 98:25
**vice**
102:9
**vicious**
180:3
**victim**
48:20, 184:3,
184:16, 185:9
**victim's**
237:22
**victims**
180:9, 242:23,
243:11, 243:12,
244:14, 244:15,
245:13, 245:15,
249:7
**video**
5:21, 5:25,
64:13, 64:16,
132:14

**videographer**
2:28, 5:14,
5:23, 6:13,
85:14, 85:20,
85:23, 166:4,
166:7, 234:18,
234:21, 279:24,
279:25, 282:17
**videos**
22:17, 64:20,
64:23
**videotape**
39:17, 128:17
**videotaped**
1:19, 5:15,
23:7, 105:10
**view**
133:12, 188:12,
259:3, 259:11
**viewing**
216:16
**violate**
159:17, 161:15
**violated**
154:4, 155:16,
161:2, 161:6,
161:12, 161:22,
162:24
**violation**
159:6, 161:11
**violations**
160:12, 162:2
**virtually**
230:23
**virtue**
212:22, 214:11,
218:17
**visually**
190:12, 239:14
**voice-identify**
6:2
**voluminous**
58:23, 133:20,
137:11, 163:24
**voluminously**
44:13
**voluntarily**
148:14

**voluntariness**
156:19
**voluntary**
164:4, 182:15
**volunteer**
236:10
**volunteered**
281:15, 281:17, 281:19
**volunteering**
226:22
**volunteers**
194:18, 235:19, 236:25
**voters**
100:3, 100:4, 100:7
**vouch**
268:4, 268:9
**vs**
1:8
**vulnerabilities**
188:3, 205:2
**vulnerability**
186:4, 186:21, 187:15, 187:16, 187:22, 188:19, 188:20, 192:19, 193:2, 204:10, 205:10, 205:12, 210:25, 212:13, 214:6, 214:20, 215:13, 217:4, 217:22, 218:6, 218:9, 218:21, 219:14
**vulnerable**
186:2, 187:8, 187:23, 188:6, 188:23, 189:20, 191:14, 204:7, 205:17, 206:1, 207:9, 207:13, 208:19, 210:6, 210:21, 211:5, 214:17, 216:3, 216:10, 218:10, 218:14, 218:17

| W |
| --- |

**wait**
83:3, 155:20
**waivers**
162:11
**walks**
208:9, 208:20
**walt**
117:10
**walter**
113:3
**want**
7:11, 9:25, 20:19, 25:5, 30:22, 35:23, 39:24, 41:16, 42:20, 51:20, 52:4, 53:4, 56:24, 57:1, 58:10, 63:9, 64:9, 67:15, 70:16, 77:12, 78:14, 80:18, 84:22, 84:24, 87:3, 88:14, 88:18, 92:13, 94:6, 98:21, 98:23, 99:23, 100:5, 100:12, 102:16, 104:25, 109:6, 109:9, 112:11, 116:6, 117:6, 117:15, 117:16, 119:24, 120:5, 127:13, 131:17, 138:19, 155:20, 166:23, 170:9, 172:2, 182:12, 182:13, 183:14, 194:3, 201:6, 201:9, 211:23, 214:14, 217:15, 227:1, 229:23, 234:3, 235:6, 242:3, 244:6, 248:25, 260:7, 269:22,

275:12, 276:18, 278:15, 279:22, 280:2, 280:7
**wanted**
6:17, 10:5, 15:13, 43:16, 43:23, 43:25, 73:25, 86:1, 86:3, 87:19, 88:22, 159:20, 217:14, 234:24, 262:4
**wants**
55:7, 116:15, 148:2, 178:8, 178:9, 280:5
**warnings**
134:5, 162:10, 265:25
**warrant**
177:4
**wasting**
204:4
**watch**
85:5, 108:1
**watched**
108:2
**way**
19:2, 41:23, 51:15, 53:25, 57:9, 60:18, 65:18, 76:4, 79:16, 85:11, 86:19, 87:2, 87:20, 88:11, 90:7, 91:24, 92:19, 93:4, 94:1, 103:14, 121:13, 128:17, 129:10, 132:8, 153:21, 171:21, 172:7, 172:21, 174:3, 175:1, 175:15, 176:9, 178:5, 195:1, 199:24, 201:21, 202:3, 206:7, 208:25, 214:14,

226:3, 246:19, 255:5, 283:17
**ways**
26:22, 47:11, 86:24, 97:18, 223:19, 237:15, 239:25
**we'll**
87:14
**we're**
10:14, 30:25, 39:1, 39:5, 47:9, 74:4, 118:15, 182:18, 234:18, 262:1, 267:20
**we've**
62:22, 234:8, 256:22
**wealth**
137:10, 137:17, 137:20, 138:7, 140:8, 253:25
**wearing**
242:25, 243:13, 244:15
**wears**
165:11
**website**
222:20
**websites**
76:15, 76:17
**week**
254:18
**weekend**
267:15
**weigh**
214:19, 214:21
**weight**
259:19, 280:17
**went**
21:6, 43:9, 43:17, 56:22, 58:20, 101:21, 101:24, 114:19, 123:22, 126:12, 255:17, 262:14, 270:22, 273:10

**weren't**
72:16, 102:11
**westlaw**
76:12, 265:15
**whatever**
21:20, 77:13,
120:7, 145:23
**whenever**
167:1
**whereupon**
6:23, 62:25
**wherever**
174:23
**whether**
34:1, 39:19,
42:8, 50:19,
51:21, 53:10,
53:11, 58:6,
60:2, 60:14,
64:2, 68:18,
68:24, 69:5,
69:17, 70:10,
71:3, 72:1,
72:4, 72:12,
73:2, 77:22,
86:25, 96:4,
97:15, 104:10,
104:17, 106:7,
106:13, 109:12,
109:13, 109:14,
109:16, 109:17,
110:10, 111:5,
114:22, 115:4,
115:7, 115:8,
116:19, 121:22,
121:23, 121:24,
122:2, 122:4,
124:16, 137:19,
149:8, 151:21,
161:21, 178:12,
178:15, 179:4,
187:17, 210:19,
214:23, 216:8,
216:9, 223:22,
225:23, 226:10,
237:24, 239:8,
239:9, 248:2,
251:13, 252:7,

252:25, 255:25,
256:5, 257:10,
257:11, 263:3,
263:5, 270:9,
275:24, 279:18,
280:4
**whichever**
124:10
**whittled**
90:10
**whole**
7:3, 31:1,
119:10, 128:18,
134:2, 181:8,
190:13, 283:8
**wholly**
48:16
**wide**
49:12, 90:21
**william**
1:10
**willing**
19:9
**willy-nilly**
174:12
**win**
100:5
**wish**
139:6
**within**
16:5, 16:7,
16:14, 16:17,
38:19, 39:18,
85:4, 100:5,
189:19, 203:13,
210:10, 212:4,
260:2
**within-entitled**
283:10
**without**
87:8, 116:21,
124:8, 157:4,
158:7, 248:6
**witnesses**
155:1
**women's**
211:20
**wondering**
32:21

**word**
21:2, 29:22,
39:13, 66:25,
73:10, 88:11,
93:8, 94:22,
100:1, 104:9,
137:12, 143:12,
250:14, 250:20,
251:22
**words**
30:2, 143:4,
242:12
**work**
11:6, 13:15,
13:17, 18:14,
18:15, 28:23,
31:9, 44:18,
52:24, 55:4,
56:20, 58:5,
58:8, 58:15,
68:22, 80:22,
81:4, 82:4,
82:11, 82:12,
82:17, 84:16,
85:19, 119:15,
119:17, 120:12,
120:13, 120:15,
124:13, 125:2,
132:23, 159:15
**worked**
68:12, 69:15,
80:12, 83:21,
110:12, 110:13,
110:17, 111:9,
248:14
**worker**
111:14, 111:16,
112:3, 112:5
**working**
13:24, 19:24,
84:14, 123:16
**works**
85:13
**world**
16:3, 22:10,
22:13, 23:10,
74:25, 86:10,
94:25, 95:13,

97:20, 98:3,
100:19
**worst**
257:15
**wouldn't**
27:2, 38:2,
39:22, 70:19,
70:20, 94:12,
113:11, 125:21,
130:17, 146:12,
148:10, 148:22,
158:18, 175:2,
175:14, 184:3,
184:25, 185:2,
191:12, 214:8,
274:9
**wounds**
237:22, 243:11,
244:14
**wright**
60:10
**write**
53:6, 56:11,
67:2, 83:7,
145:2
**writes**
34:19, 35:8,
54:11
**writing**
66:18, 66:22,
81:23, 101:14,
112:17, 114:16,
142:2, 146:23
**writings**
82:2, 174:10,
186:3
**written**
44:22, 44:23,
46:6, 62:2,
66:6, 66:12,
66:14, 67:6,
67:21, 68:4,
68:15, 130:20,
141:21, 142:4,
152:24
**wrong**
133:8, 195:5,
195:20, 199:4,

267:5, 267:6
**wrongful**
12:16, 17:3,
17:17, 65:20,
67:8, 84:6,
182:20, 198:12,
225:5
**wrongly**
43:11, 50:22
**wrote**
123:3, 185:21,
271:19

**X**

**xyz**
91:22

**Y**

**yeah**
14:16, 17:9,
34:23, 42:11,
57:6, 57:20,
59:14, 63:7,
68:7, 69:13,
77:16, 84:4,
85:16, 90:11,
91:18, 93:9,
103:10, 108:7,
110:6, 113:23,
127:16, 131:9,
135:3, 137:24,
155:17, 156:15,
163:7, 164:24,
165:2, 166:1,
169:9, 169:11,
169:23, 170:13,
174:7, 183:6,
185:22, 186:21,
192:23, 202:13,
209:6, 210:17,
212:3, 216:21,
218:2, 227:14,
231:11, 234:4,
241:2, 260:1,
261:3, 274:24,
280:6, 280:8
**year**
12:14, 108:13,

208:5, 209:8,
210:4, 211:10,
211:11, 212:4,
212:7, 214:10,
214:12
**year-old**
207:17, 207:21,
208:18, 209:3,
210:22, 211:1,
211:8, 211:24,
214:5, 277:24,
278:2, 279:8,
279:10, 279:11,
280:16
**years**
14:5, 14:12,
14:14, 74:6,
102:6, 102:9,
162:4, 169:15,
181:15, 192:21,
209:19, 210:10,
211:4, 213:2,
213:10, 213:18,
213:23, 217:22,
218:6, 223:10
**yep**
9:18, 36:7
**young**
188:5
**younger**
191:12
**yourself**
35:2, 46:24,
235:23
**youth**
190:8, 191:11,
192:3

**Z**

**zero**
257:25

**$**

**$600,000**
79:12, 81:7

**.**

**.0070**
2:15

**.3300**
2:24
**.5900**
2:9

**0**

**01**
4:9, 62:25,
234:22
**01184**
1:8
**04**
166:8

**1**

**1**
1:33, 270:22,
271:2, 273:11
**10**
3:5
**100**
11:20, 101:1,
116:4, 116:10,
169:15, 222:12,
222:13, 255:20
**11**
3:6, 85:6,
85:21, 134:5,
138:24, 146:25,
202:4
**11373**
1:31, 283:23
**1180**
2:13
**1184**
5:19
**12**
67:5, 85:6,
85:24
**120**
3:5
**122**
105:8
**123**
3:6
**1240**
2:22
**125**
3:7, 43:6,

77:18, 87:17,
89:15, 89:20,
90:5, 96:16,
96:20, 101:23,
277:24, 279:10
**13**
1:26, 282:19
**135**
277:23, 278:2,
279:8
**1390**
5:4
**14**
1:21, 5:2,
5:20, 91:17,
162:12, 180:14,
190:10, 192:21,
207:8, 207:17,
207:21, 208:5,
208:18, 208:20,
209:3, 209:8,
209:19, 210:4,
210:10, 210:22,
211:1, 211:8,
211:10, 211:11,
211:24, 212:4,
212:7, 212:24,
213:2, 213:10,
213:17, 213:23,
214:5, 214:10,
214:12, 217:11,
217:12, 217:22,
218:6, 277:24,
278:2, 279:8,
279:11, 280:16
**141**
2:21
**15**
30:1, 74:4,
163:1, 163:3,
163:4, 164:20,
191:11, 209:11,
212:24, 255:6
**150**
100:25, 106:16
**1500**
100:7
**16**
166:12, 182:18

**17**
162:4, 185:12,
190:9, 194:4,
197:14
**18**
190:9, 204:8
**19**
117:6, 166:15,
166:16, 180:14,
277:24, 279:10
**1967**
156:4
**1977**
122:7, 128:4,
138:24, 138:25,
152:22, 154:4,
154:8, 155:23,
157:17, 157:23,
159:14, 160:1,
160:4, 160:7,
160:11, 160:17,
160:20, 160:24,
162:3, 162:20,
162:25, 177:14,
192:6, 203:6,
203:14, 231:14,
231:20, 231:24,
233:12, 233:20,
266:1
**1980**
267:7
**1982**
265:13, 267:8
**1990**
21:9, 56:6,
68:5, 106:16
**1992**
19:23, 19:24
**1994**
12:25, 19:19,
19:24
**1996**
13:15, 13:20,
14:1
**1997**
13:17, 75:3,
108:10, 108:13,
108:15, 127:21

**1998**
72:21, 74:25,
101:18

---
**2**
---

**2**
166:5
**20**
20:14, 85:9,
102:6, 117:6,
132:13, 206:12,
280:8
**200**
68:4
**2004**
48:12, 74:23,
101:22, 202:25,
203:4
**2005**
13:12
**2008**
75:4, 142:18,
169:3, 221:21,
233:3
**2010**
75:5
**2013**
13:7, 84:9
**2016**
84:9
**2022**
202:24
**2023**
1:21, 5:3,
5:20, 9:3,
10:10, 10:13,
10:15, 10:19,
202:20, 202:24,
254:11, 283:20
**21**
117:6
**22**
117:7, 219:20
**23**
1:8, 5:19,
117:7, 132:13,
229:24, 232:21
**24**
114:9, 117:7,

256:14
**25**
85:9, 96:25,
97:5, 117:7,
127:20, 134:5,
136:11, 138:24,
139:2, 139:24,
152:21, 154:3,
162:20, 190:9,
202:3, 203:5,
204:11, 233:12,
233:20, 256:16,
261:21, 266:1,
267:20
**250**
89:22, 100:21,
100:25, 184:17,
222:11
**26**
117:7, 127:20,
138:25, 152:21,
154:4, 202:4,
203:5, 233:20,
256:17, 263:24,
273:8
**27**
113:2
**28**
113:18, 117:7,
283:20
**283**
1:33
**29**
113:19, 114:9,
117:7, 145:3

---
**3**
---

**3**
136:9, 136:17,
138:23, 139:2,
139:24, 140:19,
166:8, 202:3
**30**
134:5, 136:9,
136:10, 136:17,
138:23, 139:2,
139:24, 140:19,
202:3, 202:4,

270:22, 271:2,
273:11
**300**
89:22, 225:8
**311**
2:6
**312.243**
2:9
**32**
145:4
**36**
1:24, 5:3, 5:21
**37**
85:6, 85:21

---
**4**
---

**4**
136:10, 234:19
**40**
85:24, 91:17,
93:10, 93:11
**45**
278:20, 279:2,
279:5
**46**
240:25
**47**
166:5, 234:19
**499837**
1:32
**4th**
267:7

---
**5**
---

**5**
234:22
**5.3**
252:10
**50**
155:18, 222:13
**52**
155:18
**53**
119:1
**56**
127:24
**5th**
265:13, 267:8

| 6 | 9 |
|---|---|
| **6** | **9** |
| 1:26, 282:19 | 1:24, 5:3, 5:21 |
| **60** | **90** |
| 101:18, 101:19, | 56:25, 218:10, |
| 101:25, 105:10 | 222:17 |
| **600** | **95** |
| 19:7 | 102:1, 222:17 |
| **60604** | **99.9** |
| 2:23 | 69:18 |
| **60607** | **9th** |
| 2:8 | 9:3, 254:11 |
| **60642** | |
| 2:14 | |
| **63** | |
| 4:9 | |
| **630.735** | |
| 2:24 | |
| **65** | |
| 241:6, 242:7, | |
| 250:7 | |
| **68** | |
| 189:8 | |

| 7 |
|---|
| **7.67** |
| 252:10 |
| **70** |
| 120:20, 189:2, |
| 189:7, 218:9 |
| **73** |
| 101:20 |
| **74** |
| 189:7 |
| **742** |
| 265:16 |
| **75** |
| 11:19 |
| **773.235** |
| 2:15 |
| **7th** |
| 192:24 |

| 8 |
|---|
| **80** |
| 218:10 |
| **81** |
| 101:23 |