Case: 1:18-cv-01028 Document #: 868-9 Filed: 03/25/26 Page 1 of 97 PageID #:115962

*DeLeon-Reyes v. Guevara, et al.*
Case No. 18 CV 01028

*Solache v. Guevara, et al.*
Case No. 18 CV 02312

# EXHIBIT 9

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

DANIEL RODRIGUEZ,                        )
                                         )
        Plaintiff,                       )
                                         )
        -vs-                             ) No. 1:22-cv-06141
                                         )
REYNALDO GUEVARA, et al.,                )
                                         )
        Defendants.                      )

The videotaped videoconference deposition of RICHARD A. LEO, Ph.D., J.D., taken remotely before JUNE M. STEARNS, CSR, RMR, and Notary Public, pursuant to the Federal Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, commencing at 10:11 a.m. on December 10, 2025.

Page 2

There were present via videoconference at the taking of this deposition the following counsel:

LOEVY & LOEVY by
MR. SEAN STARR
311 North Aberdeen Street, 3rd Floor
Chicago, Illinois 60607
312.243.5900
sean@loevy.com
   on behalf of the Plaintiff;
BORKAN & SCAHILL, LTD. by
MR. DREW WYCOFF
20 South Clark Street, Suite 1700
Chicago, Illinois 60603
312.580.1030
dwycoff@borkanscahill.com

   on behalf of Defendant Reynaldo Guevara;

ROCK FUSCO & CONNELLY, LLC by
MS. THERESA BEROUSEK CARNEY
333 West Wacker Drive, 19th Floor
Chicago, Illinois 60606
312.494.1000 | 312.494.1001 (fax)
tcarney@rfclaw.com
   on behalf of Defendant City of Chicago;
SOTOS LAW FIRM, PC by
MR. KYLE T. CHRISTIE
141 West Jackson Boulevard, Suite 1240A
Chicago, Illinois 60604
630.735.3300 | 630.773.0980 (fax)
kchristie@jsotoslaw.com

   on behalf of the Defendant Officers.

Page 4

DEPOSITION OF RICHARD A. LEO, Ph.D., J.D.
   TAKEN DECEMBER 10, 2025

| EXAMINATION BY | PAGE |
|---|---|
| Mr. Kyle T. Christie | 7 |
| Ms. Theresa Berousek Carney | 159 |
| Mr. Sean Starr | 161 |

EXHIBITS
                              PAGE

EXHIBIT 1                        9
   Expert Report of Richard Leo,
   Ph.D., M.D.
EXHIBIT 2                       19
   Invoices
   Bates Leo 1430-1435
EXHIBIT 3                       37
   Law Review Article, January 1997

EXHIBIT 4                       61
   Statement of Daniel Rodriguez,
   5/11/91
   Bates CPD 2505-2513
EXHIBIT 5                       62
   Report of Proceedings, 7/22/93
   Bates D. Rodriguez 5793-5895
EXHIBIT 6                       76
   Article "The Problem of False
   Confessions in the Post-DNA World"
EXHIBIT 7                       95
   Abstract of "Mobilization and
   Resistance in Response to
   Interrogation Threat"
EXHIBIT 8                      122
   Article "How Sleep-Related Fatigue
   Impacts the Evidentiary Value of
   Statements and Confessions"

   NOTE: Exhibits were not provided for inclusion
      with deposition transcripts.

Page 3

CONT'D:
ALSO PRESENT:
   MR. DAVE YOUNG, Videographer
   MR. ADDITYA TOLAPPA, Justice Fellow, Loevy & Loevy

   MS. VALERIE BARAJAS, Paralegal, Loevy & Loevy

Page 5

THE VIDEOGRAPHER: Good morning. We're going on the record at 10:11 a.m. on December 10th, 2025.

Please note that this deposition is being conducted virtually. Quality of recording depends on quality of camera and the internet connection of participants. What is seen from the witness and heard on the screen is what will be recorded.

Audio and video recording will continue to take place unless all parties agree to go off the record.

This is Media Unit 1 of the video-recorded deposition of Dr. Richard Leo taken by counsel for the defendants in the matter of Daniel Rodriguez versus Reynaldo Guevara, et al., filed in the United States District Court for the Northern District of Illinois, Eastern Division, Case Number 1:22-cv-06141.

My name is Dave Young. I'm the videographer. Our court reporter today is June Stearns. We are both representing Veritext Legal Solutions.

I am not related to any party in this

2 (Pages 2 - 5)

Page 6

action, nor am I financially interested in the outcome.

If there are any objections to this proceeding, please state them at the time of your appearance.

Will counsel now state their appearances and affiliations for the record, beginning with the noticing attorney.

MR. CHRISTIE: Good morning. Kyle Christie on behalf of the defendant officers appearing via Zoom in Chicago.

MR. WYCOFF: Good morning. Drew Wycoff appearing via Zoom in Chicago on behalf of defendant Reynaldo Guevara.

MS. CARNEY: Theresa Carney on behalf of the City of Chicago.

MR. STARR: Sean Starr on behalf of plaintiff Daniel Rodriguez appearing remotely from the city of Chicago via Zoom. Also present in my office is my paralegal, Valerie Barajas, but she's not on the Zoom and is not connected to the audio.

THE VIDEOGRAPHER: And will the court reporter please swear in the witness and then we can proceed.

Page 7

(Whereupon the witness was duly sworn.)

THE REPORTER: Thank you. Please proceed.

RICHARD A. LEO, Ph.D., J.D. witness herein, called for examination, having been first duly sworn via videoconference, was examined and testified as follows:

EXAMINATION

BY MR. CHRISTIE:

Q   All right. Good morning, Doctor. How are you doing?

A   I'm doing okay. Let me just lower my hand real quick.

Thank you. All right. Now I'm good.

Q   We'll just get straight to it. What did you do today to prepare for your deposition?

A   Well, I reviewed my report this morning, if you're asking just about today, and I also had a brief conversation with Mr. Starr.

Q   Okay. And then just outside of today what in general have you done to prepare for your deposition?

A   Well, I've had a conversation with

Page 8

Mr. Starr and counsel at Loevy & Loevy. I reviewed my report, I reviewed the depositions of Jason Rivera and David Velazquez, and I reviewed a few other documents. Do you want me to list those documents?

Q   If you recall them off the top of your head, yes, please.

A   I believe I reviewed portions of the deposition of Detective Halvorsen in the Montanez/Serrano case. I reviewed an affidavit of David Velazquez. I reviewed an affidavit of Timothy Bennett. And I reviewed another document that I'm blanking on. I think it was an interview of Mr. Velazquez in the Laureano case prepared by Mr. Laureano's counsel.

There may be another document or two that I reviewed that I'm blanking on, but I believe those are the main documents that I've reviewed in the last couple days.

Q   Okay. If you do recall any other documents, just please let me know.

A   Okay.

Q   Now before we went on record I asked if you had any documents in front of you, and you

Page 9

noted that you had a clean copy of your report; is that right?

A   Yes, I have a clean copy of my report in front of me in the Rodriguez case and I have a blank yellow pad. I have no other documents in front of me from this case.

Q   Okay. The expert report, is that the entirety or is it just the first 90 or so pages before you get to the exhibits?

A   It's just the first 91 pages, yes.

(Document was marked Exhibit 1 for identification.)

BY MR. CHRISTIE:

Q   I'll just briefly put it on the screen and then we'll take it down for the remainder of the dep, but I'm going to introduce what we'll title Exhibit No. 1.

Dr. Leo, let me know when you can see that on the screen.

A   I need to sneeze. Hold on a second.

Q   Gesundheit.

A   Okay. Yeah, I see Exhibit No. 1.

Q   And pages 1 to the 91 are the pages in front of you?

3 (Pages 6 - 9)

Page 10

A That is correct, yes. And I think --

Q Oh, go ahead.

A Sorry. I think that's 91. Yeah, 91 looks like the last page of the clean report I have in front of me that you have on the screen.

Q And is that your signature on page 91?

A It is, yes.

Q All right. And so page 1 through 91, that is your expert report in the Daniel Rodriguez matter?

A Correct.

Q Okay. And the remaining pages all the way up to 69 are attachments to that report, correct?

A I believe so. I didn't find that in my file so you'll have to show me what those are, but I believe they would be the CV and the last four years of testimony. That's typically what is attached to my report, but maybe there's something else I'm not remembering.

Q Sure. I'll stop sharing this for the time being because I know you have at least that main part in front of you.

If you go to page 2 of your report.

Page 11

A Yes.

Q Do you see where it says the exhibits attached are your CV and a list of testimony in this -- the last four years?

A Yes. Yes. So that's correct, okay. So that's what I believe was attached.

Q Okay. And I believe there's also the other attachment that's been attached to other reports discussing your police practices opinions?

A I'm sorry. Can you repeat that question? I didn't hear it.

Q Sure. Another attachment would be that list of cases that you reviewed in reaching your opinions about the policies and practices?

A I believe so, yeah.

MR. STARR: Objection.

THE WITNESS: Those are testimonial aids. Sorry.

MR. STARR: Just objection to -- belated objection to form.

Go ahead.

MR. CHRISTIE: Fair.

BY MR. CHRISTIE:

Q All right. Doctor, with respect to the

Page 12

first page of your report where you say you testified 430 times in state, federal, and military courts?

A Yes.

Q Do you see that there?

A Yes.

Q Of those 430 times, do you know if that's -- how many have been criminal and how many have been in civil matters?

A I -- I could look it up if you want. I would estimate that the civil matters are 10 to 20 cases max and the criminal matters would be the rest, although there was one administrative hearing, but I'd have to look it up. The vast majority are criminal cases, not civil cases.

Q Understood. For those criminal cases, were you retained ever as an expert for the prosecution?

A I have been in the cases in which I've testified five times. So, yes, I've testified five times on behalf of the prosecution in the criminal cases.

Q Of those five times, have any been in the past four years?

Page 13

A Yes, I believe two of them have been in the past four years.

Q Do you recall which of those cases that you were retained by the prosecution in the last four years were?

A Yes. So there was a case in federal court in Massachusetts in I believe the First Circuit. The defendant's name was Bigda, B-i-g-d-a, and so it was the United States versus Gregg Bigda in Springfield, Massachusetts, and I believe that was around four years ago. It might have been five years, it might have been three years, but in that range. I think 2021, maybe 2020.

And then the second case was in Austin, Texas, which I think is Harris County, Texas, and it was a post-conviction case and I believe it was 2023, and I'm blanking on the name of the case but I'm sure it's on my list.

Q Sure.

A Andre Allen -- it's either Andre -- Allen Andre Causey, C-a-u-s-e-y, so I forget whether Andre is his first name or Allen is his first name. I think it's Allen, but he goes by Andre.

4 (Pages 10 - 13)

Page 14

So that was the Travis -- did I say Harris County? It's the Travis County. Sorry. I think Harris County might be Houston. Travis County District Attorney's Office in that post-conviction case.

Q Understood. It is Travis County.

For the federal case with the U.S. v. Bigda where you testified on behalf of the prosecution, do you recall if you opined about whether the confession was a coerced-compliant confession or not?

A So, yes, I did not opine about the confession. It was a police interrogation practices and standards case. So a state police officer was being prosecuted for essentially psychologically torturing an individual in a State interrogation in violation, if I'm recalling correctly, of a federal statute as interpreted by the U.S. Attorney's Office.

So the issue wasn't whether it was a coerced confession or not. The defendant was the police officer, not the individual who had been interrogated. And so I was there to testify about the history of interrogation and police

Page 15

interrogation practices and standards and commonly accepted best practices, and in particular prohibitions in police training and practice against not only psychological coercion, threats of violence, threats of harm during interrogation but also physical threats and physical violence.

Q And this was a criminal case against a former state police officer?

A Correct, and the state police officer may not have been former. I'm not sure if he was fired. He may have retired. I don't think there was any local disciplinary action within the police department or the local prosecutor's office, and so I think that's why, if I'm remembering correctly, the federal government stepped in and prosecuted him.

Q Understood. Do you recall what the outcome of that case was?

A My recollection is that he was acquitted.

Q And then for the case where you testified in Travis County for Allen or Andrew "Casuney," do you recall what you opined on in that case?

A Yes. So it's Causey, and for the court reporter --

Page 16

Q Causey.

A Yeah.

-- (continued) C-a-u-s-e-y.

Yes. So he had been many years earlier convicted based on a confession and he -- I believe he had served his time and the DA was trying to vacate the conviction, and I wrote an extensive report in that case and the -- the opinions that I testified to were that based on my review there were risk factors for false confession, that there were substantial indicia of unreliability, and in that case, if I'm recalling correctly, I reviewed a number of documents in other cases in Austin, Texas, in the 1990s.

There was a detective there named Hector Polanco who was sort of notorious locally for coercing false confessions in other cases, and so if I'm remembering correctly in that case, at least in my report but probably also in my testimony, I went through other cases and I discussed a pattern and practice of psychological and physical abuse and specific cases of false confession that Polanco, who was in a leadership role in the Austin Police Department, and other

Page 17

detectives that he had worked with had used to elicit those false and unreliable confessions, many of which were provable.

Q Do you recall what the outcome was of this post-conviction hearing involving Mr. Causey?

A Yes. So the judge issued a ruling, so there is a written outcome. My recollection, but I'd have to verify it against that written ruling, is that the conviction was vacated. And so in a legal sense he was exonerated, but the judge refused to go the extra step and declare him innocent.

So the conviction was vacated, he was formally exonerated, but he was not declared innocent in the written opinion.

Q Understood. Now you noted that the vast majority of the cases that you're retained on for the 430 times you've testified in state, federal, and military courts were criminal, and I want to go to the civil matters. How many times have you testified on behalf of civil defendants?

A I really need to look at my records. I know there's at least one or two cases where I've testified on behalf of civil defendants, I don't

5 (Pages 14 - 17)

Page 18

think ever in a 1983 case but in other civil cases. I can remember one civil case that I testified on behalf of an individual defendant.

So I just have to look at my records, but I think the majority of those times have been on behalf of defendants but I'd have to refresh my recollection.

Q   Sure. Have you ever testified on behalf of a civil defendant in the past four years?

A   Well, if I had -- I don't think I have but -- wait, civil defendant. I don't think I have, but if I had it would be on that list. If you wanted to put that list on the screen I can tell you in the last four years, if you're interested, which of those cases are civil cases and on whose behalf I had testified.

Q   Sure. You just don't recall without seeing that list; is that fair to say?

A   Correct. To the best of my recollection, I don't believe I've testified on behalf of a civil defendant in the last four years.

Q   If you could flip to page 2 of your expert report.

A   Yes.

Page 19

Q   And do you see where it says you're being compensated for my time at the rate of $525 per hour?

A   Yes.

Q   Okay. And did you submit invoices to the law firm Loevy & Loevy for your retention in this matter?

A   I believe I would have, yes. I'd have to double-check my records, but to the best of my recollection I would have submitted two invoices, a retainer invoice and then after completing the report a second invoice but, again, I'd have to double-check my records.

(Document was marked Exhibit 2 for identification.)

BY MR. CHRISTIE:

Q   Sure. I'm going to mark this Exhibit No. 2, and, Dr. Leo, let me know when you see it on your screen.

A   Okay. Yeah, so I see it on the screen. I'm not sure I see all of it, just part of it, but that looks like the second invoice and it's dated August 15th, 2025, as you can see, and so I believe that would have been the invoice I would have

Page 20

submitted after completing the report in this case, which, as you know, is dated August 8th. I don't believe I've submitted any more invoices in this case.

Q   And just for the record, this is Leo 1430 to Leo 1435, and, Dr. Leo, I know you saw the first page was your first invoice. If I go to page 4 do you see that's invoice number 1 in this matter?

A   Yeah, so that -- sorry. Go ahead.

MR. STARR: Yeah. I'm sorry. Objection; form, foundation.

Kyle, I think you inverted the two different invoices. You showed him the second one first.

BY MR. CHRISTIE:

Q   Oh, I apologize. So I showed you the second invoice, Dr. Leo, first. Do you see on page 4 invoice number 1?

A   Yes.

Q   Okay. And this was your retainer fee of $15,000; is that right?

A   Correct.

Q   Okay. And so the total you billed would be -- would that be the $34,912 you see on the

Page 21

bottom of page 3, which would be invoice number 2?

A   I believe so because the $15,000 was accounted for, but I'm wondering if there was a mathematical mistake there. But I think that's the total, yes.

Q   Now you know this is the invoices you submitted after you completed your report on August 8th, 2025; is that right?

A   To the best of my recollection, yes.

Q   Okay. And you have not submitted any invoices since then; is that right?

A   Correct.

Q   Okay. But you have done some work on this matter from the time you submitted your second invoice to your prep -- to today for your deposition; is that fair?

A   Yes. Yes. The work that I've done since then is review of materials in preparation for the deposition and consultation with counsel.

Q   And can you just give me an estimate of how many hours that was?

A   I would say maybe five hours, maybe 10 hours, something in that range.

Q   Okay. So between five to 10 hours?

6 (Pages 18 - 21)

Page 22

A   Possibly a little bit less, but I think that's the range, yeah.

Q   Okay.  And now, sir, staying on page 2 of your report, do you see where it's titled Materials Reviewed?

A   Yes.

Q   Okay.  And the materials reviewed goes from page 2 of your report to page 10 of your report, item 253 is the last item?

A   Yeah, I'm just catching up to you.  Hold on just a second.

Q   Sure.  Take your time.

A   Yes.  Yes, yes.  Page 10.

Q   Now if we were to focus on the materials reviewed from pages 1, items 1 through 21, onto page 2 -- or onto page 3, sorry, items 22 to 31, do you see where it ends with 1, Sepulveda mug shots?

A   Sepulveda.  Yeah, yeah.  Number 31, I do see that, yes.

Q   Okay.  And then every record after that do you see where it's PTP production?

A   Yes.

Q   Okay.  So is it fair to say that items 1 through 31 are the documents you reviewed to reach

Page 23

your opinions about the interrogation of Mr. Daniel Rodriguez?

MR. STARR:  Objection to form and foundation.

Go ahead.

THE WITNESS:  Yes, in preparation of this report, unless I inadvertently excluded or forgot to include any of the documents, and then, of course, in this report there are depositions, as you know, that I've reviewed which are listed 6 through 13 on page 2 as well as number 21 on page 2 and 22 and 24 on page 3 that include exhibits which were not individually listed.

BY MR. CHRISTIE:

Q   And just so it's clear for the record, if you flip to page 10 of your report where it's titled Overview of Case-Specific Opinions?

A   Yes.

Q   Okay.  And so from page 10 of your report to page 12 of your report you have 11 opinions summarized; is that fair to say?

A   Yes.  Yes.

Q   Okay.  And then for opinions 1 through 9, that relates to the Daniel Rodriguez matter

Page 24

specifically?

A   Correct.

Q   And then the opinions 10 through 11 relate to your opinions on the Chicago Police Department's practices?

A   Pattern and practice, yes.

Q   Okay.  And so when I referred you to the documents reviewed, documents 1 through 31, those are the documents you relied on for opinions 1 through 9; is that fair to say?

A   Yes.

MR. STARR:  Objection to form, foundation, asked and answered.

THE WITNESS:  Oh, sorry.

BY MR. CHRISTIE:

Q   Okay.

A   Yes, again, unless I inadvertently excluded any of the documents that I reviewed.

Q   And you mentioned in preparation for today's deposition that you reviewed a few -- a few depositions, including David Velazquez's, Jason Rivera's, and a portion of Mr. Halvorsen's from the Serrano/Montanez matter; is that right?

A   Correct.  Yes.

Page 25

Q   Do you recall which deposition you reviewed of David Velazquez, in what matter it was in?

A   I thought it was in this matter.

Q   Okay.  Do you see on page 2 of your report, items 21 there's a deposition of David Velazquez, and then on page 3 of your report there's two more notations -- I'm sorry, three more notations of Mr. Velazquez providing deposition testimony or trial testimony?

A   Yes.

Q   Okay.  Do you recall seeing items 21 through 24 which of these items you reviewed in preparation for today's deposition?

A   I believe it was 21.

MR. STARR:  Asked and answered.

BY MR. CHRISTIE:

Q   Okay.

A   Sorry.

Q   And then for the deposition of Jason Rivera that you reviewed prior to today's deposition, do you recall which of those deposition testimonies you reviewed?

A   I believe it was number 11, the one in

7 (Pages 22 - 25)

Page 26

January of 2025.

Q Okay. And that was Mr. Rivera's deposition in the Rodriguez matter?

A Correct.

Q Okay. And then for Mr. Halvorsen's deposition, do you see that listed in items 1 through 31 in your report on page 2 and 3?

A I do not see it listed unless it was one of the exhibits to one of the other depositions, and I don't recall that it was, but I -- I do believe I had reviewed this, at least that's my recollection, at the time that I prepared the report. So I may have forgot to mention it in the materials reviewed when I prepared the report.

Q So fair to say, then, your opinions in your report did not change when reviewing a portion of Mr. Halvorsen's deposition testimony in Serrano/Montanez before today's deposition?

A Correct.

Q You also noted that you reviewed the affidavit of Mr. Velazquez. Do you recall if that was part of the exhibits in his deposition testimony?

A I thought it was. I thought I had

Page 27

reviewed that as well in preparation of the report. It's -- as you know, I've done a number of these reports and there's been a number of exhibits, and so I may have also reviewed that in another case.

Q Let me just rephrase it, I guess, a different way and we can make this pretty simple.
In reviewing the affidavits of Mr. Velazquez, Timothy Bennett, and the interview of Mr. Rivera's counsel -- of Mr. Rivera, did that alter any of your opinions in this report?

MR. STARR: Objection to form.

THE WITNESS: No.

BY MR. CHRISTIE:

Q And, sir, did you review the deposition testimony of the trial prosecutor in this matter, ASA Coghlan?

A I see the deposition of Patrick Walsh, but I do not see the deposition of Coghlan in the materials that I reviewed and I did not review that in preparation today for the deposition.

Q Do you recall if you reviewed it at all before you prepared your report and may have mistakenly omitted it from your materials reviewed?

A I don't recall. I'd have to go through

Page 28

all the materials I was sent and see. If it was in those materials I would have reviewed it, and it was my mistake. I just don't recall if it was in the materials I was provided.

Q Did you review a pre-sentence investigation report of Mr. Rodriguez?

A If it was included as a deposition exhibit, then I would have reviewed it. I didn't review it in preparation for today.

Q And if it wasn't included as an exhibit in any of these deposition testimonies, would that indicate that you did not review it?

MR. STARR: Objection to form, foundation.

THE WITNESS: Correct, unless I was provided it, I reviewed it, I forgot to put it in the materials reviewed, and I'm just not remembering.

BY MR. CHRISTIE:

Q Were the documents itemized 1 through 31 all provided to you by counsel at Loevy & Loevy?

A Correct.

Q Okay. Were you ever directed to any specific facts by Mr. Rodriguez's counsel?

Page 29

MR. STARR: Objection to form, foundation. And to the extent that you're asking for attorney work product I would object on privilege grounds, but I think he can answer this.
Go ahead.

THE WITNESS: Well, in conversation with counsel there's always discussion of facts in a case, so I would say in any case, especially a civil case, especially a case in which I prepare a report, that depending on how we interpret the word "direct" that, yes, there would be a discussion of facts in the case.

BY MR. CHRISTIE:

Q Yeah. Sir, I appreciate the request to kind of clarify my question. I understand that there was general conversations about the case and factual matters. I'm curious if you were specifically pointed to any facts in general, like a page of a deposition testimony or a page within a report, if you were directed to any specific page.

MR. STARR: I'm going to object to form, foundation, and to the extent that you're seeking to invade conversations that we had with Mr. -- Dr. Leo.

8 (Pages 26 - 29)

Page 30

I mean, I think it's a little unclear what you're asking, Kyle, and I'm worried that you're starting to, you know, intrude upon attorney work product and conversations -- privileged conversations. So I think he can answer this again, but I'm just trying to seek some clarity here on what your question actually --

MR. CHRISTIE: Yeah. I mean --

MR. STARR: Is it about conversations? Is it about page numbers?

MR. CHRISTIE: I appreciate that because I know there's -- I understand your privilege objection. I know there's exceptions, though, if he was specifically directed to a document to look at in forming his opinion, specifically like look at page 322 of deposition Y in forming this opinion, not general conversations about documents or facts but specifics.

MR. STARR: If Dr. Leo can answer this without invading upon privileged conversations I think that that's fine, but the question itself is -- I think the form objection is my primary objection and I think there's a privilege objection, I'm just not totally sure, but go ahead,

Page 31

Dr. Leo.

THE WITNESS: I don't have any specific recollection of being directed in any specific places, but I think in all cases that I work on, especially civil cases which, as I think you know, are incredibly document-heavy relative to and fact-intensive relative to the criminal cases that I work on, I would be directed to places.

I might have questions. I might be given portions of a deposition, for example, and told the answer to your question is in this place, or there's all sorts of possibilities in which the retaining attorneys would say, you know, look at this document to answer your question or, you know, here's the materials that we've provided you to form your opinion, right?

So I think the answer has to be yes but yes in all cases, but I don't have any specific recollection in this case of being directed to a particular page in a particular document for a particular reason.

BY MR. CHRISTIE:

Q Okay. You mentioned that you might have been provided portions of deposition testimony, and

Page 32

let me know if I misheard you, but for the depositions listed within items 1 through 31 were those complete depositions or were they just portions of depositions?

A I think they --

MR. STARR: Objection; form, foundation, mischaracterizes his prior testimony.

Go ahead.

THE WITNESS: Yeah; sorry.

No, these were to the best of my recollection complete depositions. I think what I said was that I had read a portion of Detective Halvorsen's deposition in the Montanez/Serrano case, but I had been provided the entire deposition of Detective Halvorsen in that case.

BY MR. CHRISTIE:

Q Did you ever make request for any records that weren't provided to you?

A I don't recall if I did, but it's very possible.

Q Do you take notes, by the way, when preparing for an expert report?

MR. STARR: Objection to form.

THE WITNESS: I underline depositions and

Page 33

sometimes other materials and I might make abbreviated notations in those documents, but I don't usually take notes.

BY MR. CHRISTIE:

Q Do you take any notes on a yellow pad or on your computer in relation to your retention in this matter?

MR. STARR: Form.

THE WITNESS: The only notes that I would have taken would have been notes of conversations with counsel.

BY MR. CHRISTIE:

Q So no notes were taken when you reviewed any documents on a yellow pad or separate medium other than the document itself --

A Not that I recall, no.

MR. STARR: Objection; form, asked and answered.

THE WITNESS: Sorry.

THE REPORTER: I'm sorry. I didn't hear the end of the question.

MR. CHRISTIE: Via annotations I think is how I ended it.

MR. STARR: And then I made a form, asked

9 (Pages 30 - 33)

Page 34

and answered objection.

THE WITNESS: Not that I recall. I'd have to double-check my file, but not that I recall.

BY MR. CHRISTIE:

Q Did any grad students assist you in preparing for this report?

A No. I would never do that. I'm aware that some other experts do that in my field, but I would never do that and I have never done that.

Q And then, sir, if you flip back to page 10 of your report where you summarize your opinions.

A Yes.

Q All right. And is this a fair summary of all the opinions that you intend to express in the Daniel Rodriguez matter?

MR. STARR: Form.

THE WITNESS: To the best of my knowledge, yes, but, of course, you know, if this case goes to trial and I testify I don't get to ask myself questions but to the best of my knowledge, yes.

BY MR. CHRISTIE:

Q Then I want to direct you to footnote 1

Page 35

on page 10 of your report. Do you see where it says, quote: Because there's no recording of Daniel Rodriguez's five and a half hours of custody and interrogation on May 11th, 1991, we do not have objective record of what occurred during his custodial detention and interrogation sessions?

A Yes.

Q So fair to say it's -- this case is basically a classic swearing contest between Mr. Rodriguez and the defendants on what occurred during his interrogation?

MR. STARR: Objection; form.

THE WITNESS: So a swearing contest, of course, means that one side is representing a certain set of facts occurred during an event that wasn't recorded and the other side is representing a different set of facts, and so, yes, that is my understanding.

BY MR. CHRISTIE:

Q So despite there not being an objective record you were still able to ascertain whether Mr. Rodriguez's confession was voluntary and/or reliable with a reasonable degree of certainty?

MR. STARR: Objection to form.

Page 36

THE WITNESS: Well, I want to discuss both of those separately. So with respect to reliability, of course, as you know, I'm not a fact witness, it's not the province of an expert to opine about the reliability of another piece of evidence or in particular of someone's confession statement, so I'm not offering an opinion about whether this is or is not a reliable confession statement. That's obviously for the fact finder and in this case, if it goes to trial, the civil jury.

With regard to voluntariness, I haven't -- that is a legal concept, as you know, and I haven't opined about voluntariness. If we credit Mr. Rodriguez's account and other accounts in the record, then that's the basis for the opinions that I express in this report, as I think you know.

BY MR. CHRISTIE:

Q Would you agree that human memory on issues of interrogation is limited and the recall is selective due to the position bias of the participant?

MR. STARR: Objection to form and

Page 37

foundation.

THE WITNESS: I would agree in general that, yes, human memory is incomplete and it is selective and no one could probably remember the entirety of every single thing that occurred in an interrogation, especially a long one, especially many years ago, but also that people tend to remember very salient events in their life, and so that would be a qualification on the general statement.

BY MR. CHRISTIE:

Q You've previously stated that a lack of objective record makes it potentially impossible to ever ascertain whether a confession may be voluntary or reliable; is that fair?

A Well --

MR. STARR: Objection; form.

THE WITNESS: Sorry. I would just request that if you're going to ask me about things I previously stated if you could just show them first so I could see them and then, of course, I'd answer your question.

(Document was marked Exhibit 3 for identification.)

10 (Pages 34 - 37)

Page 38

BY MR. CHRISTIE:

Q   Sir, I'm going to open up what we'll title Exhibit No. 3, and let me know when you see that on your screen.

A   Okay.

Q   All right.  And this is a January 1997 Law Review article that you and Dr. Ofshe wrote?

A   Correct.

Q   Okay.  And if I were to direct you to page 6 of this article, PDF page 6, the article page is 1138 -- I'm sorry, page 5, page 1137, do you see where it says "first" and there's a paragraph?

A   Yes.

Q   Okay.  And then the last sentence of that paragraph -- or, sorry, last few sentences say:  Any attempt to reconstruct what occurred during an interrogation and what a suspect independently knew is necessarily undermined by the lack of a record.  Human memory for conversation is limited and recall is selective due to the position bias of the participant.  In many disputed cases, then, it may not be possible ever to ascertain whether the confession was voluntary and/or reliable with any

Page 39

reasonable degree of certainty.

Did I read that correctly, sir?

A   Yes.  Thank you for showing that to me.

Q   Sure.  And is that part of the article you wrote that in -- or with Dr. Ofshe?

A   Correct, in 1997, yes, or 1996 and it was published in 1997, yes.

Q   Do you still agree that in many disputed confession cases where there's a lack of an objective record it may not be possible to ever ascertain whether the confession was voluntary and/or reliable with any reasonable degree of certainty?

MR. STARR:  Objection to form.

THE WITNESS:  I would agree that in some cases it may not be possible to ascertain the voluntariness without crediting one side or the other's account.  With respect to the reliability of the confession, I would say that one needs to look at the evidence outside of the interrogation that corroborates or is consistent with the reliability or accuracy of the confession and evidence that is inconsistent with, and so I would modify that with respect to the assessing the

Page 40

reliability of the confession statement.

BY MR. CHRISTIE:

Q   In assessing the voluntariness of the confession do you think you should also look to outside evidence to corroborate one's account or another account?

MR. STARR:  Objection to form and foundation.

THE WITNESS:  Well, yes, if that outside evidence exists, of course, but typically interrogations just involve a police officer or two and a suspect and so the key piece of evidence would be a full recording of the interrogation.  That would be the most probative and direct piece of evidence.

BY MR. CHRISTIE:

Q   Would evidence such as photographs taken during the interrogation be helpful in determining or evaluating the voluntariness of the confession?

MR. STARR:  Form, foundation, calls for speculation.

THE WITNESS:  Well, they could be depending on the allegations.  There's typically -- in most interrogations in the United States after

Page 41

the 1950s there aren't accusations of physical abuse.  Chicago is unique in that respect.  And if there was an allegation of physical abuse a photograph could corroborate that if it showed physical abuse, but the inverse is not necessarily true since somebody could have been physically abused, depending on the type of physical abuse, and a photograph could be taken and that's not determinative or conclusive of whether the abuse occurred.

So, yes, I think a photograph could be potentially helpful depending on the allegation, but I don't think it would necessarily be dispositive or conclusive.

BY MR. CHRISTIE:

Q   Similar line of questioning, are you familiar with the intake forms filled out by Cook County jailers when a detainee comes into the jail?

A   Not specifically, but usually there are intake forms filled out by jailers.

Q   And just so we're on the same page, those intake forms describe injuries; is that what your understanding is?

MR. STARR:  Objection to form,

11 (Pages 38 - 41)

Page 42

foundation.

THE WITNESS: Well, my understanding is an intake form would describe a number of things, and if the particular form asks about injuries then, yes, the jailer would describe any visual injuries that they see presumably.

BY MR. CHRISTIE:

Q   Document any visual injuries they see and any injuries reported by the detainee; is that fair?

MR. STARR: Objection to form.

THE WITNESS: If the form asks for that or that's the custom and practice of the jailing agency, then I would assume so.

BY MR. CHRISTIE:

Q   And would that be relevant or potentially probative in evaluating the voluntariness of a confession?

MR. STARR: Objection to form, foundation, asked and answered, calls for speculation.

Go ahead.

THE WITNESS: I would give the same answer I gave before that if there are injuries

Page 43

consistent with the allegation of physical abuse then that could be probative, but depending on the allegation or type of allegation of physical abuse it wouldn't be dispositive if there was no reporting of visual inspection of or being told about those injuries.

BY MR. CHRISTIE:

Q   Are you familiar with what a Gerstein hearing is or a bond hearing within 48 hours of detention?

A   Yes. Yes.

Q   Just so we're on the same page, basically someone is brought before a judge within about 48 hours of being detained to assess whether they should be released on bond or not?

A   Yes.

Q   Okay. Would a hearing of that transcript be potentially probative in assessing the voluntariness of a confession?

MR. STARR: Form, foundation, calls for speculation.

THE WITNESS: I imagine it could be, but I don't think it usually would because typically a defendant would not -- a criminal defendant would

Page 44

not testify at one of those hearings and the purpose wouldn't be to inquire about what occurred during that defendant's interrogation if there's statement evidence that was elicited during the interrogation that then may eventually be used in the criminal case.

So I'm going to need to take a five-minute, we can make it 10, just restroom and caffeine break. So I think I can do it in five but --

MR. CHRISTIE: No, let's take a 10-minute -- or let's take a five-, 10-minute break. Let's come back at 11:10 Central Time, which would be, I think, 9:10 your time, Dr. Leo?

THE WITNESS: Yeah, I think that's good because it's now 9:01 according to my computer.

THE VIDEOGRAPHER: Hold on. We are going off the record. Time now is 11:01.

(Whereupon, a recess was taken at 11:01 a.m. and resumed at 11:10 a.m. as follows:)

THE VIDEOGRAPHER: We are back on the record. This is the start of Media Number 2. The time is 11:10.

Page 45

BY MR. CHRISTIE:

Q   All right. Dr. Leo, before we took a break we were talking about whether it would be helpful to get transcript testimony from a bond or Gerstein hearing. Do you recall that line of questioning?

A   Yes.

Q   Okay. Sticking to similar line of questioning, are you familiar with a practice by the public defender's office in the 1990s to ask suspects whether they had been subject to any police misconduct such as physical coercion before their Gerstein hearing?

MR. STARR: Objection to form, foundation, calls for speculation.

THE WITNESS: I am not familiar with that practice or policy.

BY MR. CHRISTIE:

Q   If there was a form taken by a public defender within the period of the Gerstein hearing that indicated whether a suspect was subject to any physical coercion by police, would that be helpful in evaluating the voluntariness of a confession?

MR. STARR: Same objections.

12 (Pages 42 - 45)

Page 46

THE WITNESS: Again, I think that could be relevant, but I don't think it would be necessarily conclusive or dispositive.

BY MR. CHRISTIE:

Q And then similarly, any testimony, whether trial testimony or deposition testimony, from the public defender that filled out that form, would that be potentially relevant for determining the voluntariness of a confession?

MR. STARR: Same objections.

THE WITNESS: I think it would be potentially relevant but, again, not dispositive or conclusive.

BY MR. CHRISTIE:

Q So when analyzing the -- Strike that.

You concluded that Mr. Rodriguez, according to Mr. Rodriguez, was subject to a coerced-compliant confession; is that right?

MR. STARR: Form.

THE WITNESS: I don't recall if I used the word coerced-compliant in the report, I'd have to look in the report, but I do agree that if he gave a -- if it is a false confession then, yes, it would be of the coerced-compliant type.

Page 47

BY MR. CHRISTIE:

Q If you turn to page 11 of your report.

A Yes.

Q And I'll direct you to opinion number 7. Do you see where it says: If Mr. Rodriguez's interrogation-induced confession statement is false, it is properly classified as what is known in the social science research literature as a coerced-compliant false confession?

A Yes. Thank you for refreshing my recollection. That is correct.

Q Sure. Okay.

Generally speaking, what evidence did you rely on to come to the conclusion that if Mr. Rodriguez's interrogation-induced confession statement is false and his description is credited that it would be a coerced-compliant false confession?

A Well, it would be all of his accounts of what occurred during the interrogation. I believe he gave trial testimony and then there also would be the deposition, and what he's describing is a classic coerced-compliant false confession where somebody is coerced to the point that they will say

Page 48

or do whatever the interrogator is demanding that they do to put an end to the interrogation, what he describes, as you know, as a very physically and psychologically coercive and abusive and overbearing interrogation.

Q Aside from Mr. Rodriguez's trial and deposition testimonies along with any affidavits he signed, was there any other evidence you relied on to come to that conclusion?

MR. STARR: Objection to form.

BY MR. CHRISTIE:

Q If you need to look at the materials you reviewed on page 2 and 3 of your report, please do.

A Okay. Thank you.

Again, I'm saying in that opinion if it's a false confession then it is of the coerced-compliant type, and what I relied on for that opinion would be his descriptions of what occurred during the interrogation.

Now there's a separate issue of indicia of unreliability where I relied on other documents as well, but in terms of what type of false confession would it be, if it is a false confession, it would be his accounts and

Page 49

description of the psychological process that led him to falsely confess.

Q And just so I understand this correctly, when you mentioned indicia of reliability is that assessing more of the truthful or falsity of the confession and not the voluntariness of it?

A Well, it's not for an expert obviously to assess the truthfulness of an interrogation -- or, I'm sorry, of a confession statement or the falsity, but the indicia of unreliability would be indicators of unreliability or indicators of reliability and that is related to but different from what you're asking about, if I understand your question, voluntariness.

Q Okay. Maybe I can phrase this a different way.

So you outline several situational and personal risk factors that might lead someone to provide a false and coerced confession; is that right?

A Yes.

Q Does indicia of unreliability fall within that paradigm of situational or personal risk factors?

13 (Pages 46 - 49)

Page 50

MR. STARR: Form.

THE WITNESS: No. The concepts are independent, they could be related, but the risk factors in the research that have been identified and studied, as you know, are particular interrogation techniques or practices, situational, or characteristics or traits of the individual, personal, that increase the risk that somebody will make or agree to a false confession.

Now if somebody does make or agree to a false confession obviously that's an unreliable confession, but those risk factors have to do with what occurs in the interrogation room, situational, and the person's personality. The indicia of unreliability has to do with case evidence and suspect's knowledge or lack of knowledge that go to whether the confession statement is likely accurate or inaccurate.

So the indicia of unrelia -- the risk factors are not themselves typically considered indicia of unreliability, and indicia of unreliability may include physical or psychological coercion but primarily focuses on extrinsic evidence that is consistent with or not consistent

Page 51

with the reliability of the confession and what the suspect knows or doesn't know absent police or other contamination or feeding of details.

BY MR. CHRISTIE:

Q And in this matter if you go, again, to page 10 and 11 of your report, the summary of your opinions, you outline several situational risk factors and then a personal risk factor that led, in your opinion, Mr. Rodriguez to provide a coerced-compliant confession; is that a fair summary?

A I would just say that the form of the question is a little problematic because you're implying that I'm saying he gave a coerced -- I'm sorry, a coerced-compliant false confession, and I'm not making a factual determination here.

So but I would say, yes, these situational risk factors that he identified in his description would have explained why he would have given a coerced-compliant false confession if it is a coerced-compliant false confession.

MR. STARR: And I'll make a belated objection to form.

Page 52

BY MR. CHRISTIE:

Q And that's, I guess, what I just want to get down to. I don't want to try to trap you in this issue of credibility determinations. I just want to know if your conclusion that according to Mr. Rodriguez's description it was a coerced-compliant false confession, was that based on -- was that only based on Mr. Rodriguez's testimonies and affidavit?

MR. STARR: Objection; asked and answered, form, foundation.

THE WITNESS: Yes, because there's two kinds of police-induced false confessions, one of which, the most common, is coerced-compliant, and the difference is in the psychological process that leads one to falsely confess, and he's describing a classic coerced-compliant false confession.

So whether it's a coerced-compliant false confession, assuming it's a false confession, or the other type, which is sometimes called a persuaded or coerced-persuaded sometimes or an internalized or coerced-internalized sometimes, whether it's the first compliant or the second, persuaded-internalized, one has to understand the

Page 53

psychological process that's going on with the individual.

Now if there was an objective record of the interrogation, then I would have taken that into account as well because there would have been things in that record that would help make the determination of, again, assuming that it's a false confession, is it more of the coerced-compliant type or of this persuaded-internalized type.

So, yes, those are the primary documents and to the best of my knowledge the only documents that I would have relied on in terms of what type of false confession is it, if it is a false confession, what is his account of what occurred during that interrogation.

There may be other evidence in the record that is consistent with that, but to classify the type of false confession, given the evidence that is in the record or at least the evidence I reviewed, that's primarily what I relied on.

BY MR. CHRISTIE:

Q I appreciate that.

So fair to say if there was an objective record, a video recording of the entire

14 (Pages 50 - 53)

Page 54

interrogation, you would be able to reach with some reasonable degree of certainty whether the confession was classified as coerced-compliant or voluntary, along those lines; is that fair?

MR. STARR: Objection to form.

THE WITNESS: So when you use the word "voluntary," just to clarify, that is the third type of false confession in the literature, that's what it's called, and that's a nonpolice-induced false confession, not to be confused with the legal concept of voluntariness, right?

So I'm understanding your question to use the word "voluntary" as the third type of false confession in the literature, albeit nonpolice-induced, not the legal determination of voluntariness.

So if there was an objective record, a full recording of what occurred during the interrogation, and if we assume or it was proven that the confession was false and all I had was that record, I didn't have any trial testimony, any deposition testimony, any affidavit testimony by the defendant, the criminal defendant, assuming a criminal case, I would probably be able to classify

Page 55

it as a coerced-compliant or a coerced-persuaded or coerced-internalized false confession. Probably. It would depend on what is in that record of the interrogation.

BY MR. CHRISTIE:

Q For example, you would still probably need to know age or any behavioral issues that might not be in that record, as examples?

A I don't think that I would have to know that. I think it's just helpful to clarify the difference here.

So when somebody gives a coerced-compliant false confession they knowingly falsely confess because they have been coerced, and so they are confessing falsely knowingly to put an end to the interrogation which they would describe as coerced or abusive or overbearing.

In the other type of false confession that's the product of interrogation, which, like I've said, is sometimes called persuaded, it's sometimes called internalized, the person loses confidence in their memory typically as a result of the interrogation. So they come to think it's possible they committed the crime without

Page 56

remembering it and, again, as a result of the interrogator's techniques typically, and so they are searching for memories typically, they're speculating about what might or could have or they think did happen, they're using hedging or speculative or hypothetical language since they're not drawing on actual memory or personal knowledge when confessing, and they're in this uncertain belief state. So instead of knowingly lying or I should say knowingly falsely confessing in the coerced-compliant type, in the persuaded-internalized type they are either convinced they must have done it outside of conscious memory or that they probably did it.

And so it depends on what is in the record, if you have a full objective recording, I might or might not be able to identify which type of false confession that would be.

Q All right. I want to switch topics here, and particularly if I could direct your attention to page 23 of your report.

A Yes.

Q And do you see where it starts or there's a Section 8, Populations with Particular

Page 57

Vulnerability in the Interrogation Room?

A Yes.

Q And is this where you lay out personal risk factors, explaining what it means and what they are?

A Yes, this is the general portion of the report where I do a very brief overview of well-known personal or individual or sometimes called dispositional risk factors for false confession.

Q And if we flip to the next page, page 24 of your report, you lay out some examples such as individuals that are mentally ill, juveniles, and individuals with low IQ; is that right?

A Yes.

Q Okay. Is that the three kind of main areas of personal risk factors, age, IQ, and mental illness?

A Yes. I would just -- I would just describe it slightly different, but I would say yes. Age or youthfulness, one category, like you've said; another category, not just IQ but intellectual disability and IQ; and then the third category, mental illness or forms of mental

15 (Pages 54 - 57)

Page 58

illness, yes.

Q   And then if we flip to page 44 of your report, is this where you analyze whether Mr. Rodriguez had personal risk factors that may have subjected him to providing a coerced-compliant confession?

A   Yes.  Sorry.

MR. STARR:  Can I just ask that when you direct the witness to a page you let him get there before you ask the question just so he's not confused?

MR. CHRISTIE:  Sure.  Sure.  Fair enough.

MR. STARR:  Thanks.

MR. CHRISTIE:  I'll try my best.  I can't promise.

MR. STARR:  Yeah, no, I get it.  I get it.  I understand you're in a rhythm.  I didn't mean to interrupt.  I just -- it was a little confusing for me to find it and hear the question at the same time.

MR. CHRISTIE:  No, I understand.

BY MR. CHRISTIE:

Q   Now in this section, Dr. Leo, page 44, do you see where it's titled Personality Traits as

Page 59

Risk Factors for False and/or Involuntary Confessions?

A   Yes.

Q   Okay.  And you identify Mr. Rodriguez's relative youth as a risk factor?

A   Yes.

Q   Okay.  Did he have any mental illness that you were able to ascertain in preparing your report?

MR. STARR:  Objection; foundation.

THE WITNESS:  Not that I recall.

BY MR. CHRISTIE:

Q   Okay.  So fair to say that was not a personal risk factor for Mr. Rodriguez?

MR. STARR:  Same objections.

THE WITNESS:  Not that I recall seeing in the record, correct.

BY MR. CHRISTIE:

Q   And similar question, did you see anywhere in the record Mr. Rodriguez's IQ level or IQ score?

A   I don't recall seeing any of that in the materials I reviewed.

Q   So based on the materials you reviewed,

Page 60

IQ was not an issue or personal risk factor for Mr. Rodriguez?

MR. STARR:  Objection; foundation.

THE WITNESS:  Not that I recall, correct.

BY MR. CHRISTIE:

Q   So it was his relative youth that was the primary and only personal risk factor?

A   Personal risk factor to the best of my recollection, yes.

Q   Okay.  And you identified that Mr. Rodriguez is age 19 in your report?

A   At the time of his interrogation, correct.

Q   And could that be mistaken and that he was actually 21 years old at the time of this interrogation?

A   It's certainly possible.

Q   Would reviewing his court reported statement where he identifies his date of birth be helpful in determining whether -- what his exact age was?

A   It certainly could be, yes, especially if it's consistent with other places where -- documenting the date of birth so that it's not, you

Page 61

know, an inadvertent transcription error, for example.

(Document was marked Exhibit 4 for identification.)

BY MR. CHRISTIE:

Q   Sure.  Okay.  So I'm going to open up what we'll title Exhibit No. 4, Dr. Leo, if you could let me know if you see this on your screen.

A   Okay.

Q   And do you see where it says --

A   Thank you.  I see it, yes.

Q   Do you see where it says Statement of Daniel Rodriguez?

A   Yes.

Q   Do you need me to zoom in?

A   Sorry.  Yes, I see it.

Q   Okay.  Do you need me to zoom in at all or can you see the text?

A   No, no, no.  I can read it.  My eyes just went to a different part of the document.  That's why I hesitated.

Q   Sure; no worries.  And just for the record, this is CPD 2505 to 2513.

And, Dr. Leo, drawing your attention

16 (Pages 58 - 61)

Page 62

to page 2 of this report, CPD 2506, do you see where it says:

Question: How old are you?

Answer: 21?

A   Yes.

Q   Question: What is your date of birth?

Answer: 10/27/69?

A   Yes.

Q   Okay. And according to this report, then, Mr. Rodriguez was actually 21 years old at the time of his interrogation?

A   Yes.

MR. STARR: Objection --

THE WITNESS: Sorry.

MR. STARR: -- foundation.

Go ahead.

BY MR. CHRISTIE:

Q   And just so -- and you mentioned earlier that there could have been a transcription error? Is that a yes?

A   I'm sorry. Yes.

(Document was marked Exhibit 5 for identification.)

Page 63

BY MR. CHRISTIE:

Q   Okay. So just so we're clear, this is what we'll mark as Exhibit No. 5. And for the record, this is D. Rodriguez 5793 to 5895.

Turning your attention to page 1, Dr. Leo, do you see where this is a Report of Proceedings on July 22nd, 1993, in the Daniel Rodriguez matter?

A   Yes.

Q   Do you where it says on the top right corner Exhibit No. 3?

A   Yes.

Q   I'll just let you know that this was an exhibit to Mr. Rodriguez's deposition in this matter, so does that mean that you would have reviewed this testimony?

A   Prior to writing my report, yes.

Q   Okay. Now if I could direct your attention to page D. Rodriguez 5856, and this is the testimony of Mr. Rodriguez, do you see where it says:

Question: Your date of birth is 10/27/69. Do you remember being asked that question, giving that answer?

Page 64

Answer: Yes.

Question: Was that true at the time?

Answer: Yes.

Do you see that?

A   Yes.

Q   Does that help clarify then that Mr. Rodriguez was 21 years old at the time of his interrogation on May 11th, 1991?

A   It would appear to.

Q   Okay. Now you note -- going back to page 44 of your report, do you still have that page in front of you?

A   Yes.

Q   Okay. So I'm going to direct you middle of the way down to the last paragraph on this page where it starts with "As a result, juveniles." Let me know when you're there.

A   Okay. Yes.

Q   Okay. And you see where it says, quote: As a result, juveniles and young adults tend to be more easily led and manipulated than adults beyond the age of 25, more naive, gullible, and suggestible, more compliant, submissive, and obedient to authority, more conflict-averse, more

Page 65

likely to engage in risky behaviors, less capable of considering long-term consequences?

A   Yes.

Q   Okay. Now does a juvenile or young adult's suggestibility, compliance, or more conflict adversity change depending on their exact age and so a 15-year-old compared to a 21-year-old?

MR. STARR: Objection to form.

THE WITNESS: My understanding is, yes, that it changes as the brain develops, but the brain isn't fully developed until in the mid 20s, though now there's some recent research that suggests even later than that.

So, yes, the older one is in that age range, the less suggestible and compliant. Conversely the younger as well.

So I think of it as a continuum. What is sometimes called late adolescence or what I'm referring to here as young adults is still within the risk factor category but less so the older one gets.

BY MR. CHRISTIE:

Q   Now directing your attention to page 44 again of your report where you note in that section

17 (Pages 62 - 65)

Page 66

I read earlier that these individuals, juveniles and young adults, are less capable of considering long-term consequences, now can you just please explain to me what you mean by the inability to foresee the consequences of their actions?

MR. STARR: Objection to form.

THE WITNESS: Again, it's -- I think of it more as a continuum, but because of the development of their brain or the lack of full development of their brain juveniles tend to be more immature, or I should say people who are in adolescence or late adolescence, and more impulsive. And so they are more in the moment and engage in more risky behaviors and make decisions more impulsively in the immediate situation, and so they don't think or reflect as much on long-term consequences generally as people who are beyond late adolescence and have a fully developed adult brain.

BY MR. CHRISTIE:

Q Is there a method that you can employ to determine if a specific individual such as Mr. Rodriguez, who is 21, is unable to foresee the consequences of his actions?

Page 67

MR. STARR: Objection to form.

THE WITNESS: Well, the consequences may or may not be the result of one's own actions. It may be consequences in a situation, making a decision in a situation that are dictated by others, not by oneself, and it's not so much incapability of perceiving long-term consequences. It's the weight that one makes in one's perceptions and decision-making on that.

So, again, I don't see it as a black and white. I see it more as a continuum.

But the spirit of your question, if I understand it, I'm not a forensic or clinical forensic psychologist, and so I'm not making a particular diagnosis here or judgment about his specific reasoning abilities or perceptual abilities or decision-making processes.

BY MR. CHRISTIE:

Q Okay. Maybe I could phrase this, then, in a different way.

Is there a test or a method that can be done to determine if Mr. Rodriguez was, for example, more likely to be suggestible?

MR. STARR: Objection to form and

Page 68

foundation.

THE WITNESS: There is a test that clinicians use to assess individual suggestibility, and I'm going to spell it for the court reporter. The first word is G-u-d-j-o-n-s-s-o-n, pronounced Gudjonsson or Gudjonsson, and it's called the Gudjonsson Suggestibility Scales and it's sometimes abbreviated GSS, and sometimes, but not always, when clinical or forensic clinical psychologists are involved in disputed interrogation and confession cases they might be asked to administer this test.

Now that would have been very rare in 1991, and in my experience it's still not typical in a disputed case that -- confession case that's going to trial, but it is a test of suggestibility in the clinical psychological literature that can be administered not just to adolescents or juveniles or people in early adulthood but to anybody.

It's not a test of youthfulness or adolescent decision-making. It's a test of suggestibility and -- a clinical test and, of course, as you probably know, just to clarify, I'm

Page 69

a social psychologist, a research psychologist. I'm not a clinical or licensed psychologist. So even though I know a lot about this test and have read a lot about it, studied it, have worked on a lot of cases where clinicians have administered it, it's not a test that I would ever administer.

BY MR. CHRISTIE:

Q Do you know if Mr. Rodriguez was administered the GSS test?

A I don't recall seeing that he was in the materials that I reviewed.

Q A similar line of questions, where you say that adolescents are more likely to have increased gullibility and arousability, do you see that there kind of in the middle of the paragraph on page 44, last paragraph?

A Yes.

MR. STARR: Page 44 again, Kyle?

MR. CHRISTIE: Yeah, page 44. It's the last paragraph kind of in the middle.

MR. STARR: Okay.

BY MR. CHRISTIE:

Q And, Dr. Leo, is there a test to assess whether Mr. Rodriguez was more gullible and aroused

18 (Pages 66 - 69)

Page 70

or easily aroused?

MR. STARR: Objection to form and foundation.

THE WITNESS: With respect to what we mean by the word "gullibility" typically, which I think is more of a lay term, I think that the primary test would be, again, the Gudjonsson Suggestibility Scales, and there's a second test that's also a Gudjonsson test that goes by the name of the Gudjonsson Compliance Test or the Gudjonsson Compliance Questionnaire and I know that sometimes that is also administered by clinicians. So that might go to gullibility as well, but the suggestibility scales, the GSS, I think would be the primary test.

Now in terms of gullibility and arousability, I've read many reports by forensic clinical psychologists where they also administer other tests like the PAI and sometimes the MMPI and then IQ tests or sub-IQ tests that get into verbal and cognitive and intellectual and perceptual and temporal and spatial reasoning and abilities, and so it's possible that those could also go to arousability.

Page 71

There are other tests I've seen or just clinical opinions and interviews, sometimes even by forensic psychiatrists, where they will either administer a test or they will opine based on their interview or review of records that somebody is more excitable or more impulsive or has coping strategies borne of their life experiences or traumas that make them more arousable, but I'm not aware of, because this is not my specific expertise, of which tests a clinician or forensic psychologist or forensic psychiatrist would administer for measuring emotional arousability.

But in the general neurological or neurodevelopmental psychological literature it is well documented that these are general developmental traits that youthful people have, people of adolescence or younger or late adolescence into early adulthood, but, again, I think the primary tests, to the best of my knowledge, would be the Gudjonsson tests that I mentioned.

BY MR. CHRISTIE:

Q And with respect to the Gudjonsson compliance test, the other tests you mentioned, the

Page 72

PAI, MMPI, IQ test, verbal and nonverbal tests, did you see that any of those tests were given to Mr. Rodriguez at any point?

A Not that I --

MR. STARR: Objection.

THE WITNESS: Sorry.

MR. STARR: Yeah, objection to foundation.

I'm sorry, Richard. Go ahead.

THE WITNESS: Not that I recall.

BY MR. CHRISTIE:

Q Okay. Now moving a little bit up in this paragraph, the last paragraph on page 44, do you see where it says: Juveniles and young adults are disproportionately represented in the reported false confession cases, as has been well documented by scholars and in the National Registry of Exonerations?

A Yes.

Q Okay. Now I want to focus on Mr. Rodriguez's cohort, individuals in the age-group of 21. Are you indicating that individuals in the age-group of 21 are disproportionately represented in the report of

Page 73

false confession cases?

MR. STARR: Objection to form.

THE WITNESS: My recollection is that I was looking at 18 and younger.

BY MR. CHRISTIE:

Q Okay. So do you know, then, if individuals that are age 21 are disproportionately represented in the report of false confession cases or in the National Registry of Exonerations?

A Specifically age 21 I do not know. I'd have to see if that data is available from the National Registry of Exonerations, and I'd have to refresh my recollection on some of the academic studies that talk about age and it might be that the age categories are broken down not into like age 21, age 20, age 22 but 18 and younger and then, for example, 18 to 25.

But the answer to your question is I don't know. I'd have to look into it.

Q Okay. And for this section you're relying on the article you wrote with Steve Drizin published in the Carolina Law Review -- North Carolina Law Review called "The Problem of False Confessions in the Post-DNA World"?

19 (Pages 70 - 73)

Page 74

MR. STARR: Objection to form. Are you talking about the entire paragraph that you were just referencing or the citation to the one footnote number 17?

MR. CHRISTIE: The citation to the one footnote in the sentence that I read.

MR. STARR: Okay. Thank you for clarifying.

MR. CHRISTIE: Yeah. Appreciate it.

THE WITNESS: I would just make a slight qualification to or clarification in my answer to your question that I wouldn't say that I'm only relying on this, but I am citing it here as an example of empirical research that documents the disproportionate representation of juveniles.

BY MR. CHRISTIE:

Q And the core of my question or inquiry is just to determine whether directing you to that document and the specific reference to age-groups would help refresh your memory as to whether individuals within the age-group of 21 or within that cohort were disproportionately represented in the report of false confession cases.

A If you would like to --

Page 75

MR. STARR: Form.

THE WITNESS: Sorry. If you would like to direct me to that document I'm happy to answer that question with respect to that document, but I'm going to have to apologize here. I have been drinking a lot of tea this morning, and I do need to take it could be a two-minute bathroom break.

MR. CHRISTIE: No, that's all right.

THE WITNESS: It could be a five-minute bathroom break, but I do need to have a very quick bathroom break.

MR. CHRISTIE: No, that's fine. Let's go off the record, and then let's just do, I don't know, five minutes. Is that okay with everybody?

THE WITNESS: That's fine.

THE VIDEOGRAPHER: We are going off the record. Time now is 11:50.

(Whereupon, a recess was taken at 11:50 a.m. and resumed at 12:04 p.m. as follows:)

THE VIDEOGRAPHER: We are back on the record. This is the start to Media Number 3. The time is 12:04.

Page 76

BY MR. CHRISTIE:

Q All right. Dr. Leo, before we went on break I think I began asking you questions about yours and Mr. Drizin's article titled "The Problem of False Confessions in the Post-DNA World." Do you recall that?

A Yes.

(Document was marked Exhibit 6 for identification.)

BY MR. CHRISTIE:

Q Okay. So I'm going to pull that up as an exhibit, and this will be Exhibit No. 6. You just let me know when it appears on your screen.

A I do see it. Yes. Thank you.

Q All right. And just for the record, this is -- Exhibit No. 6 is "The Problem of False Confessions in the Post-DNA World" by Steven Drizin and Richard A. Leo, 105-page document.

So, Dr. Leo, I want to first direct your attention to page 38 to 46 of this PDF, which would be starting on page 928 of the actual document, and do you see where there's a Table 2 on page 928?

A I do.

Page 77

Q Okay. And if I were to just scroll through page 928 for the next six pages to 936, there's 125 items listed under Table 2; is that fair?

A Yes.

Q And these are the 125 proven false confessions that you analyzed as part of your data sample for this report?

A Yes.

Q Okay. And just to understand, you see how there's footnotes by each of these numbers, 125, footnote 344?

A Yes.

Q Okay. And are those footnotes the dataset that you relied on for -- to get the information of these individuals in numbers 1 through 125?

A They are not the dataset. They would have been included in the dataset. But the Law Review editors wanted a citation for each of these cases, and given LexisNexis and Westlaw at the time it was easier to provide citations to documents that were electronically available.

So we had more documents than just

20 (Pages 74 - 77)

Page 78

what was cited, but the purpose of the footnotes was just to cite to the case so people could recognize the case and look more into it if they wanted and so that the Law Review editors were satisfied as well.

Q   Understood.  The datasets that aren't in these footnotes, is it documented anywhere else in this report of the complete dataset that you relied on for these 125 false confessions?

A   No, because we had case materials on each of these cases and in some cases a lot and in other cases not very much.  So, no, there's no -- it's not like the materials reviewed section of my report where somewhere we list all the materials in each of the cases that comprised our dataset, so to speak.

Q   Now directing you to the actual substance on page 936, the first paragraph, do you see where it says:  In fact, juveniles comprise approximately one-third of our sample.  More than half the juvenile confessors in our sample group are ages 15 and under, suggesting that children of this age-group may be especially vulnerable to the pressures of interrogation and the possibility of

Page 79

false confession?

A   Yes.

Q   Okay.  And, of course, Mr. Rodriguez is age 21, so he doesn't fall within that cohort; is that fair?

A   Correct.

Q   Now I'm going to direct you now to page 47 where there's a table, Table 3.  Do you see that table?

A   Yes.

Q   And does this table document the ages of these proven false confessions into certain cohorts, so ages under 10, 10 to 13, 14 to 15, so on and so forth?

A   Yes.

Q   Okay.  And the cohort Mr. Rodriguez would fall under would be the ages of 18 to 24?

A   Correct.

Q   Okay.  Do you see where it says 31 of the proven false confessions that you were able to determine the age on fell within that cohort?

A   Yes.

MR. STARR:  Form.

Page 80

BY MR. CHRISTIE:

Q   So it would be 27 percent according to this table?

A   Yes.

Q   Okay.  And now going back to page 44 of your report, making sure everyone is there before I ask my question, where it says juveniles and young adults are disproportionately represented in the reported false confession cases, after reviewing that document are you able to determine if Mr. Rodriguez's cohort, 18 to 24, him falling in age 21, is disproportionately represented?

MR. STARR:  Objection; form.

THE WITNESS:  It certainly appears to be that it is because there's 31 of the 113, which I think was, what, 27 percent or something, versus 40 of 18 and -- or under 18.  So the numbers are pretty close, so it does appear to me that they are -- that that age bracket is disproportionately represented.

BY MR. CHRISTIE:

Q   And I'm trying now to understand disproportionate to what.  So is it disproportionate to just the overall false

Page 81

confessions that you analyzed in this report or is it disproportionate to the rate at which individuals in these age cohorts commit crimes and provide confessions?

MR. STARR:  Objection to form and foundation.

THE WITNESS:  I'd have to review the article to be completely sure, but I think it's disproportionate within the known universe of false confessors.  So there's not an even distribution that it clumps higher at certain age ranges, right?  Younger people, especially under 18 but also 24 -- 18 to 24.

So that's my best recollection and belief now, but I'd have to look at the article to be a hundred percent sure.

BY MR. CHRISTIE:

Q   Okay.  Are you familiar with the age-crime curve?

A   Generally, yes.

Q   Okay.  And what's your general understanding of the age-crime curve?

A   Well, that crime goes down as a function of age, particularly after the age of 25 if I'm

21 (Pages 78 - 81)

Page 82

remembering correctly.

Q   Okay.  And if I were to tell you that the age-crime curve spikes at ages 21 to 23, does that seem to be fair in your understanding of the age-crime curve?

MR. STARR:  Objection to the form and the foundation of that question.

THE WITNESS:  It wouldn't surprise me.

BY MR. CHRISTIE:

Q   Okay.  And the reason I'm trying to inquire is just to understand if the disproportionality of young adults in the proven false confession cases is proportional or disproportional to the number of crimes committed by individuals of ages 21 to 23.

MR. STARR:  Objection to form.

THE WITNESS:  To the best of my recollection we did not in that article make that comparison, and so we were talking about disproportionate representation within the known universe of false confessors.  One could do that exercise and then talk about a different -- essentially a different ratio or proportion of representation, but that's not what I think we were

Page 83

doing in this article.

BY MR. CHRISTIE:

Q   Okay.  Doctor, I'm going to direct you to the physical coercion section of your report, which was page 31, and I'll wait for people to get there.

MR. STARR:  Can you say the page number again, Kyle?  31?

MR. CHRISTIE:  Sure.  31.

MR. STARR:  Thank you.

THE WITNESS:  Okay.  I am at page 31.

BY MR. CHRISTIE:

Q   I'm going to not spend too much time on this section, but do you see the second paragraph, last sentence, where it says:  Mr. Rodriguez had taken photos of his injuries which were entered into evidence at his trial?

A   Yes.

Q   Did you review those photographs?

A   I do not believe they were in the record of materials I reviewed.  My understanding is that they were shown to him by defense counsel at his trial but somehow they got lost in the record and so they weren't available at the time that I was retained to consult in this case and asked to

Page 84

review documents.

Q   And then if I could direct you to page 13 of your report.

A   Page 13.

Q   Yes.

A   I am there.

Q   Okay.  And do you see where it says:  Significantly, these principles, methods, and findings are generally accepted in the social science community beyond common knowledge and, therefore, numerous courts have repeatedly accepted expert testimony in criminal and civil rights litigation?

A   Yes.

Q   Now, we spent quite a bit of time on this in the Gonzalez deposition, but I want to focus on that phrase "beyond common knowledge."  Would you agree that it is not beyond common knowledge to a layperson that physical coercion could lead to a coerced confession?

A   If that's all you had, yes.

Q   And similar question, would you agree that it's not beyond common knowledge of the layperson to understand that explicit threats of

Page 85

harm to the individual suspect may lead to a coerced confession?

A   I'd have to refresh my recollection on the survey studies and what they say about that.

MR. STARR:  I can't hear anything.  I'm sorry.  Can we hang on one second?  My audio is not working all of a sudden.

THE VIDEOGRAPHER:  Do you want to go off the record?

Kyle, do you want to go off the record?

MR. CHRISTIE:  Yes.  Yeah, we can go off the record.

MR. STARR:  I'm going to log off and log back in.  I apologize.  Can we go off the record?  I can't hear you guys.

THE VIDEOGRAPHER:  We are going off the record.  Time now is 12:15.

(Whereupon a discussion was held outside the record.)

THE VIDEOGRAPHER:  We are back on the record.  Time now is 12:17.

MR. STARR:  Yeah, and I'll just represent that I asked the court reporter to read the last

22 (Pages 82 - 85)

Page 86

question and whether it's the full or truncated answer that Richard gave because my audio went out. I was not even aware that there was a question being asked, so I apologize.

THE REPORTER: One moment, please.

(Whereupon the record was read by the reporter as follows:

"Question: And similar question, would you agree that it's not beyond common knowledge of the layperson to understand that explicit threats of harm to the individual suspect may lead to a coerced confession?

"Answer: I'd have to refresh my recollection on the survey studies and what they say about that.")

MR. STARR: Okay. Thank you very much for that. I appreciate it.

BY MR. CHRISTIE:

Q    And, Dr. Leo, I think I understood when we were off the record that you might not have been

Page 87

able to finish your question. Was that your complete answer or do you want to add onto that?

A    Thank you. What I would add onto that is I believe there is a recent study that is one data point that suggests that's not beyond common knowledge, but my understanding, and, again, I'd have to review, is that there are other studies that do.

Q    Okay. I'd show you an article of the Gonzalez deposition, but I cannot seem to find it so we will have to move on.

MR. STARR: Excuse me.

BY MR. CHRISTIE:

Q    All right. Doctor, let's just take a step back. Can you explain to me what the purpose of a police interrogation is?

A    Well, scholars who study this believe the purpose of the police interrogation is to get an incrim -- in America is to get incriminating statements, admissions, and/or confessions as testimonial evidence that police can give to prosecutors to help the State convict somebody who police believe to be guilty of a crime. Police will say sometimes that the purpose of an

Page 88

interrogation is to get the truth, but because interrogation in America is guilt-presumptive primarily that doesn't seem accurate.

The Reid manual that goes back to the 1940s had said for over five decades that the purpose of interrogation was to get a confession, which is what scholars believe it to be, and in the 1990s, and I believe around 1997, the date of that article, one of the articles I did with Richard Ofshe at the time, we started saying in our articles the purpose of interrogation is, as Reid & Associates and other police trainers say, to get a confession, not necessarily get the truth, and when Reid & Associates found out about that they changed -- in subsequent manuals they changed the sentence to the purpose of interrogation is to get the truth from the purpose of interrogation was to get a confession but they didn't change anything else about their manuals.

So our belief based on our studies, which include the police interrogation training literature and manuals, is that, and our studies support this, the primary purpose of an interrogation is to get incriminating statements,

Page 89

from the police perspective ideally a full confession narrative, from somebody whom they presume to be guilty to move that person from denial to admission and to elicit incriminating testimonial evidence that can be used to prosecute them at trial.

Q    Just so I understand you correctly, do you agree or disagree that in the United States the point of interrogation is to get a truthful account of what -- from the person who committed the crime? Excuse me.

MR. STARR: Objection; form, foundation.

Go ahead.

THE WITNESS: I think it's a little bit more nuanced than that, so I would say police will say the purpose of an interrogation is to get the truth but what I believe is that the primary purpose of an interrogation is to get incriminating statements, admissions, and/or confessions that may or may not be true. That overrides the purpose of getting the truth.

Because of the way American interrogation is structured, the primary goal is to get testimonial evidence of guilt which may or may

23 (Pages 86 - 89)

Page 90

not be inconsistent with getting the truth.

BY MR. CHRISTIE:

Q    Now on the next layer of that, is there empirical research that explains why guilty people do confess?

A    There's discussion of that, yes.

Q    Okay.  Would one of those be Gudjonsson's 1999 article?

A    You're going to have to show me that.  I know that Gudjonsson, and it's spelled the same way as before, he's written more articles than anybody in this field going back longer than anybody, so I'm guessing he's written like over 200 articles. I do recall reading some of his research on this.

So if you show me that and want to refresh my recollection I'm happy to talk about it, but I believe he has written about that.

Q    Maybe if I --

A    I just don't know -- sorry.  I don't mean to interrupt you.  I just don't know if it's a 1999 article, a 1989 article, a 2019 article by Gudjonsson.  He's incredibly prolific, even in his retirement.

Q    Maybe if I phrase it this way, then.  Are

Page 91

you familiar with a Gudjonsson article that based on survey data explain that guilty suspects confess because of either external pressure, internal pressure, and/or the perception of proof?

A    Yes, at --

MR. STARR:  Objection.

THE WITNESS:  Sorry.

MR. STARR:  Go ahead.

THE WITNESS:  Yes, at some point in my career I believe I read about his research on that. I just don't recall which article or when.  So I am familiar generally, but if you're going to ask me specific questions I hope you'll show me what you're referring to just to refresh my recollection.

BY MR. CHRISTIE:

Q    Sure.  Have you found in your own research and expertise whether perception of proof is a factor as to why guilty individuals confess?

A    I believe I've relied on the research of -- on others for that.

Q    Have you done any research on what are the most effective police tactics in getting guilty people to confess?

Page 92

A    Well, I have done research on tactics associated with confession in routine felony police interrogations where there -- the issue was not whether or not they were true or false confessions and if those were all or mostly true confessions then, yes, the techniques that are associated with that would be described in a couple of 1996 articles that I wrote, but I would have to refresh my recollection on that as well if you wanted to ask me specific questions about those techniques and those articles.

Q    Would you agree that a suspect's conscience, flattery, moral justifications, and then police officers identifying contradictions in a suspect's statements were some of the most effective tactics in obtaining confessions?

MR. STARR:  Objection to form and foundation.

THE WITNESS:  I think, but I don't know for sure, that you're referring to a table in one of my 1996 articles about which techniques I observed that were most significantly correlated with getting confessions in the studies that I published in 1996 that were based on 182

Page 93

interrogations I observed either inside of the police department or by videotape along with files that I studied in those cases in three northern California police departments.

I think that's what you're referring to, but I would -- you know, I could be wrong without -- without documentation or confirmation.

BY MR. CHRISTIE:

Q    I am referring to your 1996 article, so I'm just trying to understand if that's what your memory is as to why individuals may have provided confessions to interrogators but I want to move on to a different question.

Are you -- are you aware of any empirical research that studies how suspects react and the effectiveness of interrogators using high threat or experiencing high threats or explicit threats?

MR. STARR:  Objection; form.

THE WITNESS:  What we see this in the false confession studies, right, that there almost always are threats in the false confession cases. So that's one data point, the studies of proven false confessions like the study that you just

24 (Pages 90 - 93)

Page 94

mentioned, the 2004 Drizin study, as well as other studies of proven false confession cases.

BY MR. CHRISTIE:

Q   Are you familiar with research that shows that experiencing a high threat can increase a suspect's resistance to interrogation pressures to self-incriminate?

MR. STARR:  Form.

THE WITNESS:  Not off -- sorry.  Go ahead.  I think there's an objection.

MR. STARR:  Yeah, there is an objection to the form of the question.  I apologize for simultaneously talking.

THE WITNESS:  So I just didn't hear it, so I was waiting for the objection.  I thought I just heard objection.  I didn't hear the actual objection.

Off the top of my head I'm not familiar with that research.

BY MR. CHRISTIE:

Q   Are you familiar with a researcher by the name of Guyll, G-u-y-l-l?

A   Yes.

Q   And is he an individual that does

Page 95

research on areas of coerced and false confessions?

A   I don't know that he does research on coerced and false confessions.  I have read a number of his papers that have been about physiological reactions that people experience in the interrogation room and I think more generally in police investigations.  I just have to refresh my recollection on whether any of those are about false confessions as opposed to the physiological stress of the interrogation process that elicits confessions, whether true, false, or indeterminate.

MR. CHRISTIE:  Are we on Exhibit No. 7?

THE REPORTER:  Yes.

(Document was marked Exhibit 7 for identification.)

BY MR. CHRISTIE:

Q   Okay.  Exhibit No. 7, Dr. Leo, will pop up on your screen.  This is just an abstract of a study titled "Mobilization and Resistance in Response to Interrogation Threat."  There are several authors, including Max Guyll.

Do you see that on your screen?

A   Yes.

Q   Okay.  Have you reviewed this research?

Page 96

MR. STARR:  Objection to form, foundation.

Has he reviewed the abstract?  Has he reviewed the underlying research that is referenced in the abstract?

MR. CHRISTIE:  Yeah.  Appreciate that, Sean.

BY MR. CHRISTIE:

Q   Have you reviewed the underlying article, the entirety of it, not just the abstract that is on this screen?

A   So this article crossed my desk in 2019. It's a very well-known journal that I subscribe to, and I would have at that time either only read the abstract or read the entire article, I'm not -- I can't recall right now which one, before filing it in my filing cabinet.

It's possible I read the whole article.  It's possible I just read the abstract. It's possible that I skimmed the article.

Q   Okay.  Do you see on the last sentence of this abstract where it says, quote:  Results suggest that the more threat that suspects experience, the more they will be mobilized to cope

Page 97

with interrogation demands and resist interpersonal pressure to self-incriminate, at least initially?

A   I do see that, yes.

Q   Okay.  Aside from this research article that I have up, are you aware of any other research articles that stand for the same proposition, that the more threat that a suspect experiences the more they are likely to resist interpersonal pressure to self-incriminate?

MR. STARR:  Objection; form, foundation, and I think asked and answered but, if not, I apologize.

Go ahead.

THE WITNESS:  So I think the "at least initially" part of that is also an important part of that sentence, but I would say off the top of my head no.  If I looked in my files and gave it more thought there may be other articles, but I can't think of any that stand for the same proposition off the top of my head.

BY MR. CHRISTIE:

Q   Okay.  Maybe I should just pop this article up very quickly just for my next line of questioning.

25 (Pages 94 - 97)

Page 98

And do you see where it says: An experimenter then accused all participants of misconduct in either a threatening or nonthreatening way. High threat produced a broad pattern of mobilization entailing psychological, cognitive, and --

THE REPORTER: Can you slow down for me a little bit, please?

MR. CHRISTIE: Sure. Sorry. Sorry.

BY MR. CHRISTIE:

Q   High threat produced a broad pattern of mobilization entailing physiological, cognitive, and behavioral components.

Do you see that there, Dr. Leo?

A   Yes.

MR. STARR: Kyle, can I ask that this and any other either articles or abstracts that are not previously produced from Dr. Leo, if you're using them if you could produce them at some point today I'd appreciate that.

MR. CHRISTIE: Sure.

MR. STARR: Because I don't have like access to the Law of Human Behavior Journal.

MR. CHRISTIE: Fair enough. If not today

Page 99

I'll do it tomorrow just depending on where we are, but, yeah, I'll get those over to you.

MR. STARR: Okay.

BY MR. CHRISTIE:

Q   And, Dr. Leo, now going back to the facts of this case, was Mr. Rodriguez presented with high threats at the beginning of his interrogation, at least as defined in the article I just showed you by Max Guyll?

MR. STARR: Objection to form and foundation.

THE WITNESS: Yes, he describes being threatened, I believe, when he was arrested as well as being repeatedly threatened during the interrogation, and the threats that he describes I would definitely classify as high end or extreme threats, threats of physical violence, threats of harm to himself, to his family. Yes.

BY MR. CHRISTIE:

Q   And would that also include accusations that he did commit or did participate in the murder of Mr. Hernandez?

MR. STARR: Objection to form.

THE WITNESS: Yes, but accusations are

Page 100

not necessarily threats. Typically they're not.

BY MR. CHRISTIE:

Q   So at least according to this study I just showed you, at least initially Mr. Rodriguez was more likely to resist interpersonal pressure to self-incriminate because of those high threats?

MR. STARR: Objection to form and foundation, calls for speculation.

THE WITNESS: Well, as I understand that abstract, initially many or most of the subjects in the study did and if Mr. Rodriguez is like those participants then it would follow that, yes, but I'm sure there was variation in the data and, of course, as you know, Mr. Rodriguez was interrogated and in custody for approximately five and a half hours.

BY MR. CHRISTIE:

Q   So this is actually a good segue into the length of interrogation section of your report, so if you could flip to page 35 of your report.

A   Yes. Thank you. I'm there.

Q   And page 35 there's a subsection 3 titled Lengthy Incommunicado Interrogation Exhaustion and Fatigue. Do you see that?

Page 101

A   Yes.

Q   And you found that Mr. Rodriguez was arrested around 4:00 p.m. on May 11th, 1991, placed in custody around 4:15 p.m., and then they interrogated Mr. Rodriguez off and on until 9:23 p.m. on May 11th, 1991?

A   Correct.

Q   So what time based on what we're reading under subsection 3 are you indicating was the start time of Mr. Rodriguez's interrogation?

A   Well, from the time of arrest around 4:00 p.m. until the conclusion of -- of when I believe he -- when his statement was concluded at 9:23 p.m.

Q   How come you're not applying when he was placed in custody at 4:15 as the start time?

A   Because his description is that essentially he was accused upon arrest. So my analysis of his description of what occurred during his arrest, which is not always the case, is that basically he was interrogated, interrogation techniques were applied to him during the arrest very aggressively in that 15-minute period or approximately 15-minute period.

Q   Sir, I'm going to reopen what was titled

26 (Pages 98 - 101)

Page 102

Exhibit No. 5, which was Mr. Rodriguez's testimony at his motion to suppress.

Okay. Do you see that on your screen, sir?

A   I do, yes.

Q   Okay. I'm going to direct you to PDF page 5 starting at D. Rodriguez 5833, and if you could just read this page and then I'll scroll down to the next page for you to read and just let me know when you're finished.

A   Okay. So I'm reading the entire page?

Q   Yes, please.

A   Okay.

Q   Then all the way to the end of this page, page 5834.

MR. STARR: Do you want him to read the rest of the second page?

BY MR. CHRISTIE:

Q   Yeah. I guess to line 19 really or 20.

A   Okay.

Q   Okay. Now, so I'm trying to understand when Mr. Rodriguez was arrested what you're relying on to indicate that he was interrogated at the time of his arrest but before he was placed in custody,

Page 103

and specifically on page 5833 do you see where it just says:

Did you, did they tell you what you were under arrest for?

And the answer: They told me I was wanted for questioning for the murder of Genito Hernandez?

A   Right. I think I was referring to his testimony which would have been in his deposition, might have been in his trial testimony and affidavits, where he said, and I describe this on page 32 of the report, that Halvorsen said, guess what, Bart, you won, and he's told about Genito's murder, you won Genito's murder, and that on the top of page 33 I described Detective Guevara threatened Mr. Rodriguez with what would happen to his fiancée and child if he did not admit to participation in that murder.

So I'm not relying on the portion that you just mentioned, although that's not inconsistent with what he says elsewhere.

Q   And what you're referencing on page 33 of your report and 34, if you just want to flip there.

MR. STARR: I think he said 32, Kyle.

Page 104

BY MR. CHRISTIE:

Q   Oh, 32. Thank you. Sorry.

32 and 33 of your report, the last two sentences or so on page 32, and you're referring to the deposition of Daniel Rodriguez in this civil matter, right?

A   Yes. It's cited -- I'm sorry; I didn't see that. It's cited in the text at the bottom of page 32 onto page 33.

Q   So that's what you relied on to indicate that the interrogation started at the time of his arrest?

A   I may have relied on other materials, too, in the -- in the record that I reviewed, but that's his description, yes.

Q   Okay. And then if we flip back to page 35 of your report where you are again discussing the length of the interrogation, you mention that Mr. Rodriguez was interrogated off and on until 9:23 p.m. Do you see that there, sir?

A   Yes.

Q   Okay. What are you relying on to indicate that that's when the confession or the interrogation ended?

Page 105

A   I don't recall specifically. I'd have to look at -- I'd have to review some documents in the record of materials I reviewed.

Q   Okay. And I'll just show you very quickly the court reported statement of Mr. Rodriguez, which was Exhibit 4 to this deposition.

Do you see that on your screen, sir?

A   Yes.

Q   I was going to go to page 9, and you see at the end where it says the time is now 9:23 p.m.?

A   Yes.

Q   Does that help refresh your recollection as to how you came to that determination?

A   Yes, I believe that is the document I was relying on, although there may have been other documents as well.

Q   So for length of interrogation is it just the entire time of the interrogation or the time when the person confesses that is how you determine the total time?

A   It would be --

MR. STARR: Objection to form.

THE WITNESS: I'm sorry.

27 (Pages 102 - 105)

Page 106

MR. STARR: I'm sorry. Objection to form.

Go ahead.

THE WITNESS: It would be the period of time one is in custody for purposes of interrogation, and so it would be the entire time, not just the time of the confession statement.

BY MR. CHRISTIE:

Q So if Mr. Rodriguez had confessed earlier to the State's Attorney prior to his court reported statement that would not be the end time, it would be the time when the court reported statement had been completed?

A Correct. Assuming that's the end time of all questioning, yes.

Q Okay. So then from 4:00 p.m. approximately to 9:23 p.m., that's about five hours and 23 minutes or, as you put it, five and a half hours?

A Roughly, yeah.

Q And we've gone over this, I think, at many depositions at this point, but you do include the total time of in custody and time interrogated as the total length of interrogation?

Page 107

A Yes. So long as the custody is for purposes of interrogation, yes.

Q And you would agree, though, that Mr. Rodriguez was left alone for a couple hours here and there during the interrogation according to his own testimony?

A That's my recollection, yes.

Q And can you just explain to me again, I know we've done it in the past, but why you include those periods of time where the suspect is left alone as part of the total interrogation time?

A Well, I think there are two reasons which I think are mentioned in the report. One is that in some police departments it's an intentional technique. They say -- they call it letting him stew, and so it's part of the interrogation strategy. And then secondly, that time over the course of an interrogation contributes to a suspect's exhaustion, fatigue, depletion of psychological or mental resources to resist.

So it seems to me as being a more accurate reflection of what's going on than to just count the literal time of how long somebody is being accused and/or questioned directly by an

Page 108

interrogator; in other words, the times that they're in the interrogation room with the suspect.

Q Do you know if the interrogating officers here took breaks to intentionally let Mr. Rodriguez stew?

MR. STARR: Objection; form, foundation.

THE WITNESS: I don't recall reading anything in the record where that was discussed.

BY MR. CHRISTIE:

Q Do you find that there's a difference between an interrogation going on for five and a half hours straight versus an interrogation that is in total five and a half hours but includes multiple breaks in between?

MR. STARR: Objection to form and foundation.

THE WITNESS: Well, there could be a difference. It could be that the five-and-a-half-hour straight is more intense than the five-and-a-half-hour with breaks, but it really depends on what occurred in those five and a half hours with or without breaks.

BY MR. CHRISTIE:

Q And then back to page 35 of your report,

Page 109

it's the last full paragraph, and I'm going to direct you to the middle of that paragraph where you say, quote: Some police use a technique known as letting the suspect stew in which they intentionally let the suspect wait in a locked interrogation room thinking it will raise the suspect's anxiety and contribute to the softening up of what interrogators refer to as rapport-building process that precedes interrogations.

Did I read that correctly?

A Yes. Thank you.

Q Okay. And specifically on the issue of raising a suspect's anxiety -- give me one second here -- are you familiar with researchers Cleary and Bull?

A Yes.

Q Okay. Are you familiar with an empirical study in which they analyze 57 video-recorded interrogations of suspects under the age of 18 and that reveal during pauses in the interrogation most suspects just sat around or slept and only three exhibited signs of extreme distress?

MR. STARR: Objection to form,

28 (Pages 106 - 109)

Page 110

foundation, compound, vague, calls for speculation I believe as well.

Go ahead.

THE WITNESS: I believe at some point I read that study, but I don't remember the details so I'd have to review it. I don't recall, for example, the number of subjects in the study or the specific findings that you just mentioned. I'd have to review it.

BY MR. CHRISTIE:

Q Okay. But whether on page 35 of your report, whether letting a suspect -- giving a suspect a break, whether it raises a suspect's anxiety or not, do you have any answers to whether there's empirical research on that, the likelihood of it increasing a suspect's anxiety?

MR. STARR: Form.

THE WITNESS: Not that I'm aware of that there would be a study just on letting -- the tactic of letting them stew and then some kind of physiological measurement of whether or not it raises their anxiety. I can't think of a study off the top of my head that's just limited to that.

As I mentioned here, I'm drawing on

Page 111

empirical observation of police using that technique and teaching that technique, not empirical studies of the effect of that technique.

BY MR. CHRISTIE:

Q Would you agree that most suspects when left alone in an interrogation room just sit around or sleep?

MR. STARR: Objection; form and foundation, calls for speculation.

THE WITNESS: I don't think I would agree with that as stated. So usually in the cases I've studied when somebody is left in an interrogation room they don't have the opportunity of leaving, so, yes, they would be sitting around. They may be experiencing anxiety while they sit around.

In some cases, and especially in the Chicago cases that I reviewed, when suspects describe this they describe typically being chained to a ring -- you know, to something on the wall, so they're immobilized.

There have been many over the years interrogations that I've observed where the suspect appears to be sleep-deprived and does, yes, try to sleep and/or fall asleep, especially in overnight

Page 112

interrogations.

BY MR. CHRISTIE:

Q Now I want to direct you to the next page of your report, page 36. Do you see in the middle, first paragraph, where you say after footnote 49 the combined time period of custody and interrogation in most interrogations leading to a false confession is more than six hours?

A Yes.

Q Okay. Now, Mr. Rodriguez's was under five -- six hours; is that right?

A Correct.

Q And for this portion of your report you're referring back again to your article and Mr. Drizin's article that was previously labeled Exhibit 6?

A Correct.

Q Do you know what the average length of those interrogations were that were analyzed in a -- in your Drizin and Leo article?

A I believe it was 16 hours for the cases that we were able to get a time measure on.

Q And do you recall what the median length of time was for those interrogations that you were

Page 113

able to determine the length of interrogation on?

A I do not. I'd have to review the article for the median time.

Q I'm going to pop back open Exhibit No. 5. Dr. Leo, I'm directing you to page 940 of your Leo and Drizin 2004 article. Do you see that on your screen?

A Yes.

Q And if I were to highlight a part of the second paragraph where it says the average length of interrogation was 16.3 hours and the median length of interrogation was 12 hours, does that help refresh your recollection?

A Yes. Yes.

Q So the median length of those interrogations was 12 hours?

A Yes.

Q Okay. And do you recall how many of the 125 confessions you analyzed in that article you were able to ascertain a time for?

A If I'm recalling correctly, it was around 47.

Q And do you recall of those 47 how many involved individuals -- involved juveniles,

29 (Pages 110 - 113)

Page 114

individuals under the age of 18?

A   I do not.

Q   And so do you not recall, then, how many of those individuals fell in the cohort of ages 18 to 24?

A   Of those 47 in the study, no, I don't recall.

Q   Do you recall of those 47 in the study how many exhibited other personal risk factors, specifically limited IQ or mental health issues?

A   I do not.

Q   Is it fair to say that Mr. Rodriguez's five-and-a-half-hour interrogation as measured by you on page 35 would fall within the small or the other end of -- or strike that line of questioning. Let me rephrase that.

You would agree that Mr. Rodriguez's five-and-a-half-hour interrogation as measured by your calculation would fall well under the median time of interrogation found in your 2004 article?

A   Yes, under that time.  I forget the exact number that were in the one- to six-hour range, but it's reported in the article.  There were many, but it was less than the majority.

Page 115

Q   Sure.  And this will make it easy because I am going to ask that question.

This is page 941 of the 2004 article. Do you see that on your screen, sir?

A   Yes.  Thank you.

Q   And do you see where it says only 16 percent involved less than six hours?

A   I do; thank you.  Yes.

Q   So Mr. Rodriguez's five-and-a-half-hour interrogation would fall into that less than six hours category?

A   Correct.  Yeah.

Q   Which was the minority of the total -- or strike that.

THE VIDEOGRAPHER:  Hold on.  I think we lost Sean.

MR. CHRISTIE:  Oh.  Let's go off the record.

THE VIDEOGRAPHER:  We are going off the record.  Time now is 12:56.

(Whereupon a discussion was held outside the record.)

THE VIDEOGRAPHER:  We are back on the record.  Time now is 12:58.

Page 116

MR. STARR:  Yeah.  As I was mentioning off the record, I lost the signal, I dropped off the Zoom for a moment and I'm back, and the last question-and-answer sequence that I was present for was the one related to Mr. Rodriguez's time in interrogation relative to the median length of time in Mr. Leo's article that we were looking at.

So if the court reporter could read back the last question asked -- any questions that were asked after that sequence I would appreciate it.

THE REPORTER:  Yes.  One moment, please. I will read that question with the word "median" in it and go on after that.

(Whereupon the record was read by the reporter as follows:

"Question:  You would agree that Mr. Rodriguez's five-and-a-half-hour interrogation as measured by your calculation would fall well under the median time of interrogation found in your 2004 article?

Page 117

"Answer:  Yes, under that time. I forget the exact number that were in the one- to six-hour range, but it's reported in the article.  There were many, but it was less than the majority.

"Question:  Sure.  And this will make it easy because I am going to ask that question.

This is page 941 of the 2004 article.  Do you see that on your screen, sir?

"Answer:  Yes.  Thank you.

"Question:  And do you see where it says only 16 percent involved less than six hours?

"Answer:  I do; thank you.  Yes.

"Question:  So Mr. Rodriguez's five-and-a-half-hour interrogation would fall into that less than six hours category?

"Answer:  Correct.  Yeah.

"Question:  Which was the

30 (Pages 114 - 117)

Page 118

minority of the total -- or strike that.")

THE REPORTER: And then I have you jumping in, Mr. Videographer.

MR. STARR: Okay. So that last question was not answered then, correct?

THE REPORTER: Correct.

MR. STARR: Okay. Then I have no objections based on that.

MR. CHRISTIE: Let's go off the record. Then we can take our lunch break.

THE VIDEOGRAPHER: We are going off the record. Time now is 1:00 o'clock.

(Whereupon, a recess was taken at 1:00 p.m. and resumed at 1:39 p.m. as follows:)

THE VIDEOGRAPHER: We are back on the record. This is the start to Media Number 4. The time is 1:39.

BY MR. CHRISTIE:

Q    All right. Dr. Leo, before we went on our lunch break we were talking about length of interrogations. Do you recall that line of questioning?

Page 119

A    Yes.

Q    Okay. I'm going to direct you back to page 35 of your report. If you could just let me know when you're there.

A    Okay. I'm here.

Q    And then on the last sentence of page 35 where it says, quote: Lengthy custodial detention and accusatory interrogation leads to fatigue and exhaustion, conditions that significantly increase the risk of overbearing a suspect's will and eliciting false and unreliable statements, admissions, and/or confession.

Do you see that there?

A    Yes.

Q    Now, when I showed you your 2004 article you saw that only 16 percent of the proven false confessions you analyzed were less than six hours?

A    Correct.

Q    I can pull that back up if you need it.

A    No, no, no. I remember.

Q    Okay. And that was only seven of the interrogations you were able assign time for that were less than six hours?

A    47, yes. Yes.

Page 120

Q    And of those forty -- 47 or 44, only seven of those were less than six hours?

A    Yes.

Q    Okay. Are you able to determine with respect to interrogations that are the length of Mr. Rodriguez's, so about five and a half hours long, how much more likely they are to produce a false and coerced confession versus a true confession?

MR. STARR: Objection to form and foundation of that question.

THE WITNESS: Not quantitatively, no.

BY MR. CHRISTIE:

Q    And then when you say again on page 35 of your report length of interrogation or detention significantly increases the risk of overbearing suspects?

A    Uh-huh.

Q    You'd agree that that rate is much higher for individuals that are kept for 12 hours or 16 hours versus five and a half hours?

A    All other things being equal, which, of course, they're not, then yes.

Q    Dr. Leo, I want to now go to the sleep

Page 121

deprivation part of your report, which is on page 37.

A    Thanks.

Q    And you identify sleep deprivation as another significant risk factor for a false confession; is that right?

A    Yes.

Q    Okay. Is there a methodology that you employ to determine if a certain individual was sleep-deprived?

A    Well, I would just be relying on my analysis of the facts of the case, and in this case he described being sleep-deprived.

Q    You wrote an article titled "How Sleep-Related Fatigue Impacts the Evidentiary Value of Statements and Confessions," right?

A    Co-wrote, yes.

Q    Co-wrote, okay. In that article did you explain that there are three steps to analyzing sleep deprivation which includes the sleep-wake cycle, the current sleep state of the individual, and then the individual's background?

A    I believe so.

Q    Okay. So would that be a proper

Veritext Legal Solutions

www.veritext.com                                                        888-391-3376

Page 122

methodology to employ to determine if an individual is sleep-deprived?

MR. STARR: Objection (inaudible).

THE REPORTER: Excuse me. Please repeat the objection.

THE WITNESS: Sorry.

MR. STARR: I'm sorry. It was objection to form.

THE WITNESS: My recollection is that's not a methodology, that's just a description.

MR. CHRISTIE: Okay. Are we on Exhibit 8 or 9?

THE REPORTER: 8.

MR. CHRISTIE: Thank you.

(Document was marked Exhibit 8 for identification.)

BY MR. CHRISTIE:

Q All right. Dr. Leo, I'm going to open up what's titled Exhibit No. 8 on your screen, and do you see the article on your screen titled "How Sleep-Related Fatigue Impacts the Evidentiary Value of Statements and Confessions"?

A Yes.

Q And just, again, you co-wrote this

Page 123

article?

A Correct. I was the second author, not the lead author.

Q And if you look at the first -- or the top of the screen was the lead author Zlatan Krizan?

A Yes, Zlatan Krizan.

Q Zlatan Krizan. Thank you. The Z is silent. Gotcha.

Directing your attention to page 5 of the PDF, do you see a section titled Integrating Fatigue Information?

A Yes.

Q Okay. And it starts with: To comprehensively evaluate fatigue, attorneys thus need to appraise clients' sleep-wake history, current psychological state, and overall background.

Do you see that there?

A Yes.

Q Do you agree that that same comprehensive evaluation should be applied when preparing an expert report on evaluating whether a suspect was sleep-deprived during an interrogation?

Page 124

MR. STARR: Objection to foundation, form of the question.

THE WITNESS: If that information is available, but that information is not always available.

BY MR. CHRISTIE:

Q When that information is not available how are you able to determine if someone is sleep-deprived?

A Well, whether somebody is sleep-deprived would be a question of fact, right? I was going on Mr. -- I was crediting Mr. Rodriguez's account where he was describing being sleep-deprived because he hadn't gotten any sleep the night before.

Q But you would agree there is no bright line in the case law about the exact -- exact extent when sleep deprivation will render an interrogation involuntary?

A Well, my understanding is that there is a case called Ashcroft or Ashcraft v. Tennessee from 1944 in which the Supreme Court drew a line, the United States Supreme Court, at 36 hours of interrogation and said that is excessive. So my

Page 125

interpretation of that case was if you get at that point one could invoke that case as precedent for a bright-line rule, but that's an extraordinarily lengthy amount of time and short of that I'm not aware of any bright-line rule in law that beyond which a confession is deemed involuntary.

Q And maybe I could rephrase my question by just directing you back to Exhibit 8, page 17 of the article. Do you see where it says, aside from the 36 hours that you just mentioned, quote: However, there is no other bright line in the constitutional case law with respect to the length of interrogation or amount of sleep deprivation that will render an interrogation-induced confession statement involuntary.

Do you see that there?

A Yes.

Q And do you agree with that statement?

A To the best of my knowledge, yes.

Q Okay. So aside from, then, the case law, do you have a number based on empirical research on the number of hours someone must be sleep-deprived before sleep deprivation impacts a suspect's statement or confession?

32 (Pages 122 - 125)

Page 126

A   There's no magic number, no.  It's always a matter of degree.

Q   Okay.  So then with respect to Mr. Rodriguez's case, how were you able to determine that his interview from 4:00 p.m. -- approximately 4:00 p.m. to approximately 9:23 p.m. included Mr. Rodriguez being sleep-deprived?

A   Because by his account he had been up for I think 36 or nearly 36 to 48 straight hours at that point, and so if we credit his account his sleep-wake cycle would have been significantly disrupted and he would meet the definition of sleep deprivation.

And, again, it's a matter of degree, but that would have been -- it would have been inevitable that he would have been deprived, as any of us would have been if we hadn't slept the night before.

Q   Okay.  So going back to the data, if someone is without sleep for 24 hours would you agree that that level of fatigue could impact a subject's reasoning about consequences or their willingness to cooperate but is unlikely to induce disorientation or psychosis?

Page 127

MR. STARR:  Objection to form, foundation, speculation.

Go ahead.

THE WITNESS:  Yes.  I mean, I'm an expert on interrogation and confessions, not on psychosis or disorientation, but, yes, I would agree with that.

BY MR. CHRISTIE:

Q   And, in fact, in the article I just showed you you equated 24 hours without sleep to basically having the blood alcohol level of about .1; is that right?

A   I believe so, yes.

Q   Okay.  So slightly above the legal drinking limit?

A   Correct.

Q   And then, however, someone's without sleep for over 48 hours that would be kind of at the level of cognitive and emotional disturbances that are likely to produce disorientation and psychosis?

A   Yes.

Q   Okay.  And your understanding is that Mr. Rodriguez was up for about 36 to 48 hours?

Page 128

A   Yes.  I don't recall if he got no sleep the night before or very little sleep very late into the morning.

Q   Okay.

A   But, yes, that he was significantly deprived if we credit his account.

Q   If he testified that he had about five hours of sleep, fair to say that that would not qualify then of a sleep deprivation?

A   Well, it might qualify as significantly less sleep deprivation.

Q   Okay.  Let's back that up.  Is someone sleep-deprived if they only had five hours of sleep the night before?

A   I think it depends.  They could be since most people require seven to nine hours of sleep.

Q   But you would have to understand that person's prior sleep history for the past several days, correct?

A   That would be relevant, yes.

Q   Okay.  Along with any background information about their sleep patterns, too, sleep history?

A   That would be relevant, too, yes.

Page 129

Q   So I'm going to direct you back to Exhibit 5, the motion to suppress testimony.

Okay.  So this is, again, Mr. Rodriguez's testimony at the motion to suppress hearing, and do you see on lines 15 to 18 where it says:

Question:  Sure.  At this time of the arrest how much sleep had you gotten prior to being arrested?

Answer:  Exactly about five hours.

I'll go on:

Question:  Had you taken any narcotics or alcohol prior to your arrest?

Answer:  Yes.  The night before I was up all night drinking and getting high.

Do you see that there, sir?

A   Yes.

Q   So that indicates that he had about five hours of sleep the evening -- or the day -- the day he was arrested?

MR. STARR:  Objection; form, foundation, assumes facts not in evidence.

Go ahead.

THE WITNESS:  I think that's an inference

33 (Pages 126 - 129)

Page 130

one could draw just reading that that it looks like he's saying he got no sleep the night before but since it was 4:00 in the afternoon approximately that he was arrested that he had gotten five hours between the morning and the afternoon of that day.

BY MR. CHRISTIE:

Q   And you're unaware of what Mr. Rodriguez's normal sleep schedule is, if he stays up all night and sleeps during the day, something along those lines?

MR. STARR:  Objection; form, foundation, speculation.

THE WITNESS:  Correct.

BY MR. CHRISTIE:

Q   So without knowing Mr. Rodriguez's sleep history except for the night before where he testified he had about five hours of sleep before his arrest, what are you relying on, what research are you relying on, to find that he was sleep-deprived?

MR. STARR:  Objection to form, asked and answered.

Go ahead.

THE WITNESS:  I'm not relying on research

Page 131

to find that he's sleep-deprived.  I'm relying on his own description, which includes what he says in the deposition.  The research describes what the effects of sleep deprivation are.

So to answer your question, I'm relying on his description of his own state of sleep deprivation.

BY MR. CHRISTIE:

Q   Okay.  Let me ask a different question.

According to the research, what effects of sleep deprivation are Mr. Rodriguez going through based on his testimony that he had five hours of sleep the night before and without any information about what his sleep cycle was before that?

MR. STARR:  Objection to form and foundation.

THE WITNESS:  I think that that's slightly misstating what he said in the exhibit that you showed me.  I thought he had no sleep the night before but instead got five hours before his arrest, which could have been in the afternoon and late morning and would have kind of had to have been in the morning at least since he said he got

Page 132

no sleep the night before.

So if his sleep-wake cycle was significantly disrupted then he would have experienced sleep deprivation, and, yes, I don't know what his sleeping patterns were but he described himself as being very tired, if I recall correctly, and sleep-deprived in his deposition.

BY MR. CHRISTIE:

Q   So basically you're just relying on how he described his feelings of being tired to determine that he was sleep-deprived?

A   Yes, I'm --

MR. STARR:  Objection.

THE WITNESS:  Sorry.  Go ahead.

BY MR. CHRISTIE:

Q   Sorry.  Go ahead.

A   Crediting his -- if we credit his account describing his tiredness and sleep deprivation, yes.

I don't know why my hand is up, so I just lowered it.

Q   Okay.  I want to move on to the next portion of your report on page 38 titled False and Exaggerated Evidence Ploys.

Page 133

A   Yes.

Q   And if we go to the second paragraph of that section starting with "According to Mr. Rodriguez, Detectives Halvorsen and Guevara repeatedly told Mr. Rodriguez that his friends had snitched on him and they showed him, Mr. Rodriguez, written statements from David Velazquez and Jason Rivera implicating him in the murder of Jose Hernandez as they implored him to confess to it," do you see that there?

A   Yes.

Q   So the false evidence ploys that you identified were the statements of David Velazquez and Jason Rivera; is that right?

A   If they are false, yes, and, as you know, Mr. Velazquez has repeatedly testified that they were false and coerced.

Q   Yeah.  And if we turn to page 39 of your report, fair to say you do indicate if Mr. Velazquez's testimony recanting his statements and if Mr. Rivera also recanted along with his custody time, so those are the ifs that you're depending upon?

A   Yes, but remember also that Mr. Velazquez

34 (Pages 130 - 133)

Page 134

says that what Mr. Rivera said was false, that they never witnessed it together, and so it's not just if Mr. Rivera says his statement is false.

Q   Right.  And focusing on that section, we'll take this, I think, piece by piece starting with the part where it says "if Mr. Rivera was in custody at the time that Jose Hernandez was murdered as Attorney Lisa Brenn has stated Mr. Rivera told her and Joanne Garcia in 1992," do you see that there?

A   Yes.

Q   Did you see any corroboration that Mr. Rivera was, in fact, in custody at the time of Jose Hernandez's murder?

A   Not that I recall.

Q   Did you review any testimony by Mr. Coghlan, the prosecutor in the case, indicating that he verified that Mr. Rivera was, in fact, not in custody at the time of Jose Hernandez's murder?

MR. STARR:  Objection to form, asked and answered.

THE WITNESS:  I don't recall if I reviewed that.

Page 135

BY MR. CHRISTIE:

Q   Would that be an important piece of information to review to determine whether Mr. Rivera was, in fact, not in custody?

MR. STARR:  Objection to form, foundation, also speculation.

THE WITNESS:  I think it would be a relevant piece of evidence or potentially relevant piece of evidence.

BY MR. CHRISTIE:

Q   Now, I understand you noted that Mr. Velazquez has testified that his testimony and Mr. Rivera's testimony was false.  You reviewed Mr. Rivera's multiple deposition testimonies, right?

A   Yes, but only the most recent one for today's deposition.

Q   Okay.  And you analyze this on your -- in your report that Mr. Rivera basically does not recall one way or the other if he testified or testified truthfully at his trial, Mr. Rodriguez's trial?

A   Among other things, yes, he seems to recall nothing in his most recent deposition that

Page 136

he showed up for.

Q   Do you recall what he testified to in his deposition in the Solache/Reyes matter?

A   Well, that's a very general question.

Q   Let me rephrase.  That's fair.

Do you recall whether or not he testified that his testimony at Mr. Rodriguez's trial was truthful or not in his deposition testimony in the Solache/Reyes matter?

A   No, I'd have to refresh my recollection on that.

Q   Do you recall Mr. Rivera testifying that he had to move several times out of fear of retaliation for his testimony in Mr. Rodriguez's matter?

MR. STARR:  Objection; form.

THE WITNESS:  I don't recall if or where he testified to that.

BY MR. CHRISTIE:

Q   Do you recall -- fair to say that this was a gang-related homicide?

A   I'm sorry.  I didn't hear the whole question.  Can you repeat it?

Q   Yeah, sure.  Fair to say this is a

Page 137

gang-related homicide?

A   It may be.

MR. STARR:  Objection; form, foundation.

Sorry, Richard.  Form and foundation.

BY MR. CHRISTIE:

Q   Okay.  You know that Mr. Rodriguez was a member of the Spanish Cobras street gang?

A   Yes.

Q   And Mr. Hernandez was a member of a rival street gang?

A   Yes.

Q   And you're aware that street gangs intimidate witnesses into recanting their testimony; is that right?

MR. STARR:  Objection; form and foundation.

THE WITNESS:  I know that that has happened.  I don't know how commonly that happens.

BY MR. CHRISTIE:

Q   When evaluating Mr. Rivera's deposition testimony did you determine whether the influence of street gang retaliation played a role in his forgetfulness during his deposition testimony in the Rodriguez matter?

35 (Pages 134 - 137)

Page 138

MR. STARR: Objection to form, foundation, mischaracterizes facts in evidence, calls for speculation.

Go ahead, Richard.

THE WITNESS: So you're asking me, just I want to be clear, whether his deposition testimony in 2025 could have been borne of fear of gang retaliation for a murder that happened in 1991, 34 years earlier?

BY MR. CHRISTIE:

Q Yeah. Did you see any testimony in his -- did you see him testify in his deposition his fear of gang retaliation?

MR. STARR: Form.

THE WITNESS: I don't recall specifically -- sorry.

MR. STARR: No, just go ahead. That's fine.

THE WITNESS: I don't recall specifically in his deposition if he testified about that. I'd have to refresh.

BY MR. CHRISTIE:

Q Okay. Now earlier we talked about how, for example, Mr. "Cassen's" research that evidence

Page 139

implicating an individual is a reason they might -- a guilty individual might confess?

A I think you were talking about Gudjonsson, not "Cassen," and you were talking about proof, perception of proof.

Q Okay. Yeah, sorry. You're right. Gudjonsson. Thank you.

Perception of proof is a reason that someone might -- a guilty person might confess?

A Correct.

Q Okay. So in this circumstance if Mr. Rivera's statement was true that would be -- that would fall under the category of evidence pointing to Mr. Rodriguez's guilt that might compel him to provide a confession?

A I just want to make sure I understand the question. So you're asking me --

Q Let me rephrase. That was bad.

Mr. Rodriguez's statement that was shown to Mr. Rodriguez during his interrogation if true would be a perception of proof that might lend itself as an explanation why Mr. Rodriguez confessed?

MR. STARR: Objection to form,

Page 140

foundation, compound, vague, calls for speculation.

Go ahead.

THE WITNESS: Yes, if that statement were true then that would be evidence, and confronting Mr. Rodriguez with it in an interrogation would have been what we call in your hypothetical here a true evidence ploy and that could have influenced Mr. Rodriguez's decision to confess.

BY MR. CHRISTIE:

Q It's not a hypothetical. Mr. Rodriguez was indeed shown Mr. Rivera's statement, right?

A That's true, but I thought you were asking the hypothetical question of we're assuming that the statement is true and accurate in its contents and that that would explain why in your hypothetical Mr. Rodriguez could have truthfully confessed.

Q Okay. But we're both in agreement that Mr. Rodriguez was shown Mr. Rivera's statement?

A Yes.

Q Okay.

MR. STARR: Objection; form, foundation.

BY MR. CHRISTIE:

Q And if that was a true evidence ploy that

Page 141

would be a proper interrogation technique, correct?

A Yes.

Q Aside from Mr. Velazquez's and Mr. Rivera's statements, were there any other false evidence ploys that you identified Mr. Rodriguez being shown?

A In the report I believe those are the only two that I mentioned.

Q I'm going to direct you to page 49 of your expert report.

A Okay.

Q And this section general, is it fair to say you're talking about the contamination/ scripting portion of Mr. Rodriguez's interrogation?

A Yes.

Q Okay. And specifically on page 49, the last paragraph, do you see where you mention the error insertion trick?

A Yes.

Q Okay. And you define the error insertion trick as when an interrogator writes out the suspect's confession statement, intentionally inserts minor factual or grammatical errors, and then has the suspect correct and initial these

36 (Pages 138 - 141)

Page 142

errors?

A    That's how I describe it in the report, yes.  I wouldn't say define but describe.

Q    Okay.  And in this Mr. Rodriguez provided a court reported statement, right?

A    Correct.

Q    So fair to say the interrogator did not write out Mr. Rodriguez's statement?

A    Correct.

Q    And so for there to be minor factual or grammatical errors it would have had to have been the court reporter that inserted those in there?

MR. STARR:  Objection; form, foundation, calls for speculation.

THE WITNESS:  Well, I guess it depends on what we mean by the word "insert."  For there to be errors they would have to be created by the court reporter, which could have been intentional or unintentional.

BY MR. CHRISTIE:

Q    Fair to say the defendants could not have intentionally inserted errors into the court reporter's statement because they're not the ones that wrote it?

Page 143

A    Correct.

MR. STARR:  Objection -- I'm sorry.  Form and foundation to that.

THE WITNESS:  I mean, in the realm of possibility they could have directed the court reporter to make -- to make grammatical mistakes or maybe they expected that there would be typos, but if they did not type the statement, as you're asking, then they would not have inserted the typos into the statement.

BY MR. CHRISTIE:

Q    Did you see any testimony from in your review ASA Mr. Walsh or the court reporter indicating that there was intentional errors put into Mr. Rodriguez's court reported statement?

MR. STARR:  Form.

THE WITNESS:  Not that I recall.

BY MR. CHRISTIE:

Q    Now, would you agree that it's proper for police to go over a statement with a suspect after it has been written out?

A    I don't think it's improper.

Q    Okay.  Do you think it's helpful if there are errors in there that the suspect has an

Page 144

opportunity to correct them?

A    It certainly could be.

Q    Is it improper?

A    Well, as you've asked the question, no, it's not improper.  What I'm talking about here is a recognized interrogation tactic, you know, as we've discussed before, that police are trained to use and have been observed to use --

Q    Sure.

A    -- that is not per se improper according to the courts but is highly misleading.

Q    So I understand that police have been trained to do what you called an error insertion trick.  Did you see evidence that it was used here, the error insertion trick?

A    Well, there was correcting of errors here.  It appeared to me that there was -- if we look at that document there were some weird correcting of errors.  Some statements, I think, were corrected back to prior statements that had been corrected or were recognized as incorrect.

So it appears to me that there were some error correction going on that's consistent with part of this technique even if the police did

Page 145

not intentionally insert those errors into the stenographically typewritten document.  And there's something about it that just doesn't make sense on its face, like they were trying to correct and they miscorrected, and so it appears that they were trying to use the error insertion or error correction idea.

And if you show me the document, I can tell you what I mean.

Q    Sure.  And, yeah, I'll show you the document.  I'm sure it's referring to page 2 of the court reported statement, and let me know when you see that on your screen.

A    Yes.  I see it, yes.

Q    And just so we're on the same page, it's these corrections where the statement says Dan Juan or Don Juan and it's sometimes fixed to Dan One or Don Juan.  Do you see that there?

A    Yes.  That's what I find confusing.  They correct Dan Juan to Dan One in the middle but the very next line they don't correct it.  Then in the line after that they seem to correct it again, but they're just writing it back to what it previously was the first time.  And then the next time they

37 (Pages 142 - 145)

Page 146

correct it to Dan One, which is not consistent with the prior correction two words before to Dan Juan.

So it's kind of confusing. It seems inconsistent. Seems like maybe they were looking for things to correct.

Q  Okay. And if we were to pull up Mr. Rodriguez's motion to suppress testimony, and specifically page D. Rodriguez 5855, do you see where he's describing in his testimony those corrections that I just showed you in the court reported statement?

A  I think so, yes. I haven't read the whole thing.

Q  Okay. But he's identified that it is true that there was issues with whether his name was Don Juan or Don One?

A  Or Dan One.

Q  Or Dan One?

A  Yes.

Q  Okay. And he's indicating that those were truthful corrections?

MR. STARR: Objection to form. Do you want to indicate where you're asking Mr. -- or Dr. Leo to look?

Page 147

MR. CHRISTIE: Yeah, sure. I could direct him to specifically lines 8 to 13.

THE WITNESS: All right. Let me just read those. I was reading below.

BY MR. CHRISTIE:

Q  Sure.

A  Okay. So I thought that one of the Dan Ones was corrected to Dan Juan, so he's saying here he answered Dan One but I thought that -- if that's a correct answer I thought the correct answer was changed to Dan Juan as well.

Q  Yeah. And if you read, lines 14 through 17 indicates that he's sometimes called Dan One or Don Juan, so he goes back and forth?

A  Yes.

Q  Okay. And they sound similar, Dan One, Don One, Dan Juan?

A  Yes.

Q  Might have even made some mistakes myself. Okay.

So aside from that, in terms of your error insertion trick report were there any other areas where you saw that there being intentionally scripted errors?

Page 148

A  I'd have to look at the rest of the document.

Q  Sure.

A  And I assume you're asking just about this document.

Q  The court reported statement, right?

A  Of Mr. Rodriguez, yes.

Q  Yes, because that would be the statement you're referring to where the error insertion trick would apply?

A  Here, yes, in the report, in this section of the report, yes.

Q  Okay. If we go down to page 3 do you see that there is one correction made, "the" was spelled incorrectly?

A  Yes. So t-e-h is changed to "the," yes.

Q  And you don't recall reviewing any testimony by the court reporter or ASA Walsh that that was intentionally misspelled?

A  Correct.

Q  And then if we go to page 4, there appears to have been a correction towards the bottom third of the page, appears to be switching a potential period with a comma?

Page 149

A  Yes. I can't tell what's written above that. It might just be initials.

Q  Okay. Did you review any evidence or testimony indicating that that error was inserted intentionally?

A  Not that I recall, no.

Q  Okay. And I'm just scrolling through the rest here, and then if we get to page 7 about halfway down we see the correction "Answer: Rolled down," and then there's crossed out and it looks like it says "up or down" or "down or up"?

A  Yes.

Q  Okay. Did you review any evidence or testimony that indicated this error was inserted intentionally?

A  Well, usually police don't describe inserting errors intentionally, so I don't recall reading anything that said this was inserted intentionally.

Q  And, again, the individual here asking the questions was ASA Walsh, right?

A  Yes.

Q  And the person taking it down was the court reporter, correct?

38 (Pages 146 - 149)

Page 150

A   Correct.

Q   Okay. And I'm just scrolling through the rest of the document. Did you see any other errors in those last two pages?

A   No.

Q   Okay. Almost done here. If we could flip to the guilt presumption part of your report, which is page 32.

A   Okay. I'm at page 32.

Q   All right. And you opine that Detective Halvorsen and Guevara administered an extremely reckless disregard for the truth in their investigation of the Jose Hernandez murder and selection of Daniel Rodriguez as a suspect?

A   If we credit Mr. --

MR. STARR: Objection.

THE WITNESS: I'm sorry. Did you want to make an objection?

MR. STARR: Objection, form, yes. Thank you.

BY MR. CHRISTIE:

Q   So what was your answer, Dr. Leo?

A   Yes, if we credit Mr. Rodriguez's account it appeared that they immediately designated him

Page 151

guilty of the crime upon arrest.

Q   So in making this or in analyzing this guilt presumption you are starting at the time of Mr. Rodriguez's arrest and not any prior investigative steps taken?

A   Well, obviously they confronted him with these statements and one of them has been stridently recanted multiple times and the other is all over the place, and so if those statements implicating him are false then they had no evidence against him. They had no physical, forensic, or scientific evidence, and if those statements are false they had no testimonial evidence either.

And so there was zero evidence that I'm aware of that they would have had at the time of his arrest and, remember, police are trained and were trained back then to do a thorough investigation prior to interrogating and only interrogate people who they're reasonably certain committed the crime, and what I'm saying here is there really was no basis for that in my opinion.

Q   All right. I appreciate that. I should rephrase my question differently.

You reviewed the investigative file in

Page 152

this case, correct?

A   Prior to preparing the report, yes.

Q   Okay. And do you recall that there were steps taken to investigate alternative suspects?

MR. STARR: Objection to form, foundation, assumes facts not in evidence to a degree.

Go ahead.

BY MR. CHRISTIE:

Q   Let me rephrase my question.

Prior to Mr. Rodriguez's arrest did you review -- did you see in the investigative file that other investigative steps had been taken into the Hernandez brother homicide?

MR. STARR: Objection to form.

THE WITNESS: I would need to refresh.

MR. STARR: Kyle, I think that you maybe want to rephrase it. You said the Hernandez brothers.

MR. CHRISTIE: I still have the Gonzalez case on my mind, so I mixed the two. Appreciate it.

BY MR. CHRISTIE:

Q   When reviewing the investigative file did

Page 153

you see that there were investigative steps taken prior to the arrest of Mr. Rodriguez into the Hernandez murder?

A   I would have to refresh my recollection to know what you're specifically referring to.

Q   I guess put another way, is it important to your guilt presumption analysis to evaluate whether prior investigative steps had been taken before Mr. Rodriguez's arrest?

A   Well, it could be. It depends on what -- what that information would reveal. If somebody -- if the police investigate somebody else and then discard that person as a suspect and then immediately fix on somebody with no evidence or basis and then subject them to an interrogation, the prior investigation was not relevant. If the prior investigation turned up relevant evidence on that person that they subsequently interrogate, then it could be a different answer.

MR. CHRISTIE: Okay. Let's take like a 10-minute break. I'm just going to go over my outline. I think I'm almost done.

MR. STARR: Okay.

THE VIDEOGRAPHER: We are going off the

39 (Pages 150 - 153)

Page 154

record. Time now is 2:25.

(Whereupon, a recess was taken at 2:25 p.m. and resumed at 2:34 p.m. as follows:)

THE VIDEOGRAPHER: We are back on the record. The time now is 2:34.

BY MR. CHRISTIE:

Q All right. Dr. Leo, I just have a few more questions on your analysis under the guilt presumption part of your report.

A Okay.

Q Directing you to page 33.

A Okay.

Q And then I want to direct your attention towards the bottom third of that page do you see where it says: Mr. Rivera subsequently testified against Mr. Rodriguez at his trial?

A Yes.

Q Okay. And then it goes on to say: But recent records show that Mr. Rivera repeatedly received cash payments from the State after agreeing to testify at Mr. Rodriguez's trial and that he may have made a deal to implicate Mr. Rodriguez and Mr. Laureano in exchange for not

Page 155

being prosecuted in another homicide?

A Yes.

Q Do you agree that those two actions took place after Mr. Rodriguez's interrogation?

A Specifically the two actions of the cash payments and the possibility of a deal in the -- in the homicide case.

Q Yes.

A I don't recall if they did or not, when they did.

Q If they occurred after Mr. Rodriguez's interrogation, is that still -- is that significant in determining whether they're relevant to your guilt presumption analysis?

MR. STARR: Form.

THE WITNESS: Well, this is part of the analysis of the guilt presumption. They might be relevant to subsequent statements he made in the case, yes, but if it occurred after, these wouldn't be directly relevant to the guilt presumption upon arrest if that's what you're asking.

BY MR. CHRISTIE:

Q Yeah. So on pages 32 and 33 you indicate according to Mr. Rodriguez's account that Detective

Page 156

Guevara and Detective Halvorsen showed guilt presumption; is that fair?

A Yes.

Q Okay. But then the fact that I'm pointing out here where Mr. Rivera received cash payments from the State, you're referring to the State's Attorney's Office; is that right?

A Yes.

Q So that would not be Detective Halvorsen or Guevara?

A Correct.

Q And then the second part, a deal to implicate Mr. Rodriguez and Mr. Laureano in exchange for not being prosecuted, was that also a deal between the State's Attorney's Office and Mr. Rivera?

MR. STARR: Objection to form, foundation.

THE WITNESS: Well, presumably, yes, but that might have been something that was mentioned to him as a possibility by detectives as well.

BY MR. CHRISTIE:

Q Okay. You don't recall one way or the other?

Page 157

A Without refreshing my recollection of the materials, no.

Q Okay. If these were actions taken by the State's Attorney's Office after Mr. Rodriguez had testified -- or had confessed in his court reported statement, would you agree that those are not relevant then to the guilt presumption analysis?

A Upon arrest, yes.

Q Okay. My final question or line of questions, are you familiar with a researcher David Ortiz, David G. Ortiz?

A It doesn't ring a bell.

Q Yeah, he's not in the false confessions area but he's more on sociology, especially international affairs. I'm not sure if you're familiar with him or not.

A No.

Q Okay. Would you agree with his claim that newspaper data often do not reach acceptable standards for event analysis and that using them can distort findings and misguide theorizing?

MR. STARR: Objection to form and foundation, vague, calls for speculation.

Go ahead.

40 (Pages 154 - 157)

Page 158

THE WITNESS: Can you read that statement again to me one more time?

BY MR. CHRISTIE:

Q Sure. That newspaper data often do not reach acceptable standards for event analysis and that using them can distort findings and misguide theorizing.

MR. STARR: Same objections.

THE WITNESS: I think that's certainly possible, but it's a very general statement so I'd want to -- I'd want to know more specifically what he's referring to.

BY MR. CHRISTIE:

Q Okay. You agree that your 2004 article that you wrote with Mr. Drizin relied in part on newspaper articles?

A Well, it relied on case files that sometimes newspaper articles were part of, yes.

Q In some of the cases analyzed in your 2004 article fair to say that all you were able to obtain were newspaper accounts?

A It's possible that in some of the cases, but I don't recall. I think in the vast majority we had more than just newspaper articles. It's

Page 159

possible we had in all of them, but I don't recall how many we just would have had newspaper articles for, if any.

MR. CHRISTIE: All right. Dr. Leo, that is all the questions I have. I think I went under my four hours on the record, so I appreciate your time.

I think Ms. Carney has a handful of questions for you.

THE WITNESS: Okay.

EXAMINATION

BY MS. CARNEY:

Q Hi, Dr. Leo. My name is Theresa Carney, and I represent the City of Chicago. I have just one or two questions depending.

In your report in the Dan Rodriguez case starting at page 61, which I believe you have in front of you, you have -- it looks like that's where your opinions regarding the Chicago Police Department, specifically the Chicago Police Department's widespread and systematic pattern and practice opinions begin; is that correct?

A Yes.

Q Okay. And those are opinions you've

Page 160

offered before in several cases; is that correct?

A Correct.

Q And am I correct in saying -- am I correct when I -- well, let me rephrase that.

The opinions that are contained regarding the Chicago Police Department's policies and practices starting at page 61, are those the same opinions that you recently opined in the Alfredo Gonzalez case?

A Yes.

Q Okay. And then it's my understanding prior to that Alfredo Gonzalez deposition you had created some notes or summaries that have now been produced; is that correct?

A Yes, these are testimonial aids.

Q Okay. Did you create any additional testimonial aids, notes, or summaries prior to this deposition as it relates to your policy opinions contained starting at page 61 of your report?

A No.

MS. CARNEY: Okay. That is all I have.

MR. WYCOFF: Nothing from me.

MR. STARR: Could I just get a five-minute break to take a look at my notes real

Page 161

quick? I don't think I have anything, but I just want to double-check.

MS. CARNEY: Yeah.

MR. CHRISTIE: Yeah, sure. No problem.

THE VIDEOGRAPHER: We are going off the record. Time now is 2:42.

(Whereupon, a recess was taken at 2:42 p.m. and resumed at 2:46 p.m. as follows:)

THE VIDEOGRAPHER: We are back on the record. Time now is 2:46.

MR. STARR: Thank you.

EXAMINATION

BY MR. STARR:

Q I think I only have one question for you, Dr. Leo. First of all, thank you for being here today. I appreciate it.

Earlier in the deposition Mr. Christie asked you about the part of your report where you talk about Mr. Rodriguez's sleep deprivation. Do you recall that line of questions?

A Yes.

Q Okay. And I think at one point, I think I wrote down that you said that you were crediting

41 (Pages 158 - 161)

Page 162

Mr. Rodriguez's account when he said he had not gotten any sleep the night before. My question is did -- in writing your report did you credit Mr. Rodriguez's account as being truthful or were you just taking what he had said in the record into account?

A Yes, if I said I credited his account then I misspoke. I'm not the trier of fact, and whether to credit or not credit his account factually would be up to the trier of fact. If I said that, then what I meant to say was if one credits his account then he was, in my opinion, sleep-deprived.

MR. STARR: Okay. Thank you. Thank you for the clarification.

I have no further questions.

MR. CHRISTIE: Nothing from me. I'm assuming reserve?

MR. STARR: Yeah.

MR. CHRISTIE: All right. Reserve signature.

We'll take a copy. I guess we can go off the record, though.

THE VIDEOGRAPHER: We are going off the

Page 163

record. Time now is 2:48 p.m.

(Whereupon a discussion was held outside the record.)

THE REPORTER: Before we all leave, could I have clarification on transcript orders, please?

MR. CHRISTIE: I will take one. Thank you.

MR. WYCOFF: Nothing for me.

MS. CARNEY: Nothing for me.

MR. STARR: Not at this time.

THE REPORTER: Very good. Thank you.

(Whereupon the deposition was concluded at 2:48 p.m.)

Page 164

STATE OF ILLINOIS     )
                      ) SS.
COUNTY OF K A N E     )

The within and foregoing videoconference deposition of the aforementioned witness was reported remotely by JUNE M. STEARNS, CSR, RMR, and Notary Public, on the date and time aforementioned.

There were present via videoconference during the taking of the deposition the previously named counsel.

The said witness was first duly sworn via videoconference and was then examined upon oral interrogatories; the questions and answers were taken down in shorthand by the undersigned, acting as stenographer and Notary Public; and the within and foregoing is a true, accurate and complete record of all of the questions asked of and answers made by the aforementioned witness, on the date and time hereinabove referred to.

The signature of the witness was not waived, and the deposition was submitted, pursuant to the applicable rules, to the deponent for signature.

The undersigned is not interested in the within case, nor of kin or counsel to any of the

Page 165

parties.

Witness my official signature and seal as Notary Public in and for Kane County, Illinois, on the 24th day of December, A.D. 2025.

JUNE M. STEARNS, CSR, RMR
Notary Public
License No. 084-003024
One North Franklin Street, Suite 3000
Chicago, Illinois 60606
Phone: (312) 442-9087

42 (Pages 162 - 165)

Page 166

Veritext Legal Solutions
1100 Superior Ave
Suite 1820
Cleveland, Ohio 44114
Phone: 216-523-1313

December 24, 2025

Richard A. Leo , Ph.D., J.D.
rleo@jrcsf.com

Case Name: Rodriguez, Daniel v. Guevara, Reynaldo Et El.

Veritext Reference Number: 7793030

Deposition Date: 12/10/2025

Dear Dr. Leo,

Enclosed you will find a transcript of your deposition.

As the reading and signing have not been expressly

waived, please review the transcript and note any

changes or corrections on the errata sheet

included, indicating the page, line number, change and

reason for the change. Sign at the bottom of the sheet

in the presence of a notary and forward the errata sheet

back to us at the address shown above or email to

production-midwest@veritext.com.

If the errata is not returned within thirty days of your receipt of

this letter, the reading and signing will be deemed waived.

Sincerely,

Production Department

NO NOTARY REQUIRED IN CA

Page 167

DEPOSITION REVIEW
CERTIFICATION OF WITNESS

ASSIGNMENT REFERENCE NO: 7793030
CASE NAME: Rodriguez, Daniel v. Guevara, Reynaldo Et El.
DATE OF DEPOSITION: 12/10/2025
WITNESS' NAME: Richard A. Leo , Ph.D., J.D.
In accordance with the Rules of Civil
Procedure, I have read the entire transcript of
my testimony or it has been read to me.
I have made no changes to the testimony
as transcribed by the court reporter.

_____    _____
Date                Richard A. Leo , Ph.D., J.D.
Sworn to and subscribed before me, a
Notary Public in and for the State and County,
the referenced witness did personally appear
and acknowledge that:

They have read the transcript;
They signed the foregoing Sworn
Statement; and
Their execution of this Statement is of
their free act and deed.

I have affixed my name and official seal

this _____ day of_____, 20____.

_____
Notary Public
_____
Commission Expiration Date

Page 168

DEPOSITION REVIEW
CERTIFICATION OF WITNESS

ASSIGNMENT REFERENCE NO: 7793030
CASE NAME: Rodriguez, Daniel v. Guevara, Reynaldo Et El.
DATE OF DEPOSITION: 12/10/2025
WITNESS' NAME: Richard A. Leo , Ph.D., J..D.
In accordance with the Rules of Civil
Procedure, I have read the entire transcript of
my testimony or it has been read to me.
I have listed my changes on the attached
Errata Sheet, listing page and line numbers as
well as the reason(s) for the change(s).
I request that these changes be entered
as part of the record of my testimony.

I have executed the Errata Sheet, as well
as this Certificate, and request and authorize
that both be appended to the transcript of my
testimony and be incorporated therein.

_____    _____
Date                Richard A. Leo , Ph.D., J..D.

Sworn to and subscribed before me, a
Notary Public in and for the State and County,
the referenced witness did personally appear
and acknowledge that:
They have read the transcript;
They have listed all of their corrections
in the appended Errata Sheet;
They signed the foregoing Sworn
Statement; and
Their execution of this Statement is of
their free act and deed.
I have affixed my name and official seal
this _____ day of_____, 20____.

_____
Notary Public

_____
Commission Expiration Date

Page 169

ERRATA SHEET
VERITEXT LEGAL SOLUTIONS MIDWEST
ASSIGNMENT NO: 7793030
PAGE/LINE(S) /      CHANGE      /REASON
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

_____    _____
Date                Richard A. Leo , Ph.D., J..D.
SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
DAY OF _____, 20_____ .
_____
Notary Public

_____
Commission Expiration Date

43 (Pages 166 - 169)

**[& - 2004]**                                                          Page 1

| & | | | |
|---|---|---|---|
| **&** | **11** 23:20 24:3 | **141** 2:19 | **1990s** 16:14 |

**&**

**&** 2:4,9,13 3:4 3:5 8:1 19:6 28:21 88:11,14

**0**

**06141** 1:6 5:19
**084-003024** 165:7

**1**

**1** 4:6 5:13 9:11 9:17,22,23 10:8 20:8,18 22:15,15,17,23 23:23 24:8,9 26:6 28:20 32:2 34:24 63:5 77:16 127:12
**10** 1:18 4:1 12:11 21:22,24 22:8,13 23:16 23:19 24:3 34:12 35:1 44:8,12,12 51:6 79:13,13 153:21
**10/27/69** 62:7 63:23
**105** 76:18
**10:11** 1:18 5:2
**10th** 5:2

**11** 23:20 24:3 25:24 47:2 51:6
**1100** 166:1
**113** 80:15
**1137** 38:11
**1138** 38:11
**11:01** 44:18,20
**11:10** 44:13,21 44:24
**11:50** 75:17,19
**11th** 35:4 64:8 101:3,6
**12** 23:20 113:12,16 120:20
**12/10/2025** 166:8 167:3 168:3
**122** 4:20
**1240a** 2:19
**125** 77:3,6,12 77:17 78:9 113:19
**12:04** 75:20,23
**12:15** 85:18
**12:17** 85:22
**12:56** 115:20
**12:58** 115:24
**13** 23:11 79:13 84:2,4 147:2
**14** 79:13 147:12

**141** 2:19
**1430** 20:5
**1430-1435** 4:9
**1435** 20:6
**15** 65:7 78:21 79:13 101:22 101:23 129:5
**15,000** 20:21 21:2
**159** 4:3
**15th** 19:23
**16** 112:21 115:6 117:15 119:16 120:20
**16.3** 113:11
**161** 4:4
**17** 74:4 125:8 147:13
**1700** 2:10
**18** 73:4,16,17 79:17 80:11,17 80:17 81:12,13 109:20 114:1,4 129:5
**182** 92:24
**1820** 166:2
**19** 4:8 60:11 102:19
**1940s** 88:5
**1944** 124:22
**1950s** 41:1
**1983** 18:1
**1989** 90:21

**1990s** 16:14 45:10 88:8
**1991** 35:4 64:8 68:14 101:3,6 138:8
**1992** 134:9
**1993** 63:7
**1996** 39:6 92:7 92:21,24 93:9
**1997** 4:10 38:6 39:6,7 88:8
**1999** 90:8,20
**19th** 2:14
**1:00** 118:13,15
**1:22** 1:6 5:19
**1:39** 118:16,19

**2**

**2** 4:8 10:24 18:22 19:14,18 21:1 22:3,8,16 23:11,11 25:5 26:7 44:23 48:13 62:1 76:22 77:3 145:11
**20** 2:10 12:11 73:16 102:19 167:16 168:22 169:22
**200** 90:13
**2004** 94:1 113:6 114:20 115:3 116:24

**[2004 - 5833]**                                                      Page 2

117:11 119:15 158:14,20
**20091** 165:5
**2019** 90:21 96:12
**2020** 13:14
**2021** 13:13
**2023** 13:18
**2025** 1:18 4:1 5:3 19:23 21:8 26:1 138:7 165:4 166:4
**20s** 65:11
**21** 22:15 23:11 25:6,12,15 60:15 62:4,10 64:7 65:7 66:23 72:22,23 73:7,10,16 74:21 79:4 80:12 82:3,15
**216-523-1313** 166:3
**22** 22:16 23:12 73:16
**22nd** 63:7
**23** 56:21 82:3 82:15 106:18
**24** 23:12 25:13 57:11 79:17 80:11 81:12,13 114:5 126:20 127:10 166:4

**24th** 165:4
**25** 64:22 73:17 81:24
**2505** 61:23
**2505-2513** 4:13
**2506** 62:1
**2513** 61:23
**253** 22:9
**27** 80:2,16
**2:25** 154:1,3
**2:34** 154:4,6
**2:42** 161:6,8
**2:46** 161:9,11
**2:48** 163:1,13

**3**

**3** 4:10 21:1 22:16 23:12 25:7 26:7 37:23 38:3 48:13 63:11 75:22 79:8 100:22 101:9 148:13
**3000** 165:7
**31** 22:16,18,24 24:8 26:7 28:20 32:2 79:19 80:15 83:5,7,8,10
**311** 2:5
**312** 165:8
**312.243.5900** 2:6

**312.494.1000** 2:15
**312.494.1001** 2:15
**312.580.1030** 2:11
**32** 103:12,24 104:2,3,4,9 150:8,9 155:23
**322** 30:16
**33** 103:15,22 104:3,9 154:12 155:23
**333** 2:14
**34** 103:23 138:8
**34,912** 20:24
**344** 77:12
**35** 100:20,22 104:17 108:24 110:11 114:14 119:3,6 120:14
**36** 112:4 124:23 125:10 126:9,9 127:24
**37** 4:10 121:2
**38** 76:20 132:23
**39** 133:18
**3rd** 2:5

**4**

**4** 4:11 20:7,18 61:3,7 105:6

118:18 148:21
**40** 80:16
**430** 12:2,7 17:18
**44** 58:2,23 64:11 65:23 69:16,18,19 72:13 80:5 120:1
**44114** 166:2
**442-9087** 165:8
**46** 76:20
**47** 79:8 113:22 113:23 114:6,8 119:24 120:1
**48** 43:9,13 126:9 127:18 127:24
**49** 112:5 141:9 141:16
**4:15** 101:4,15

**5**

**5** 4:14 38:11 62:22 63:3 102:1,7 113:4 123:10 129:2
**5/11/91** 4:12
**525** 19:2
**57** 109:19
**5793** 63:4
**5793-5895** 4:15
**5833** 102:7 103:1

**[5834 - actually]**

| | |
|---|---|
| **5834** 102:15 | |
| **5855** 146:8 | |
| **5856** 63:19 | |
| **5895** 63:4 | |

**6**

**6** 4:16 23:10 38:10,10 76:8 76:12,16 112:16
**60603** 2:10
**60604** 2:19
**60606** 2:15 165:8
**60607** 2:6
**61** 4:11 159:17 160:7,19
**62** 4:14
**630.735.3300** 2:20
**630.773.0980** 2:20
**69** 10:13

**7**

**7** 4:3,18 47:4 95:12,14,17 149:8
**7/22/93** 4:14
**76** 4:16
**7793030** 166:7 167:2 168:2 169:2

**8**

**8** 4:20 56:24 122:11,13,15 122:19 125:8 147:2
**8th** 20:2 21:8

**9**

**9** 4:6 23:23 24:10 105:10 122:12
**90** 9:8
**91** 9:10,23 10:3 10:3,6,8
**928** 76:21,23 77:2
**936** 77:2 78:18
**940** 113:5
**941** 115:3 117:10
**95** 4:18
**9:01** 44:16
**9:10** 44:14

**a**

**a.d.** 165:4
**a.m.** 1:18 5:2 44:20,21 75:19
**abbreviated** 33:2 68:8
**aberdeen** 2:5
**abilities** 67:16 67:17 70:22

**able** 35:21 54:1 54:24 56:17 59:8 79:20 80:10 87:1 112:22 113:1 113:20 119:22 120:4 124:8 126:4 158:20
**above** 127:14 149:1 166:17
**absent** 51:2
**abstract** 4:18 95:18 96:3,5 96:10,15,19,22 100:10
**abstracts** 98:17
**abuse** 16:22 41:2,3,5,7,9 43:1,3
**abused** 41:7
**abusive** 48:4 55:17
**academic** 73:13
**acceptable** 157:19 158:5
**accepted** 15:2 84:9,11
**access** 98:23
**accordance** 167:5 168:5
**account** 36:15 39:18 40:5,6 53:5,14 89:9 124:12 126:8

126:10 128:6 132:17 150:23 155:24 162:1,4 162:6,7,9,12
**accounted** 21:3
**accounts** 36:15 47:19 48:24 158:21
**accuracy** 39:22
**accurate** 50:17 88:3 107:22 140:14 164:15
**accusations** 41:1 99:20,24
**accusatory** 119:8
**accused** 98:2 101:17 107:24
**acknowledge** 167:11 168:16
**acquitted** 15:19
**act** 167:14 168:20
**acting** 164:13
**action** 6:1 15:12
**actions** 66:5,24 67:3 155:3,5 157:3
**actual** 56:7 76:21 78:17 94:16
**actually** 30:7 60:15 62:10

**[actually - analyzing]** Page 4

100:18

**add** 87:2,3

**additional** 160:16

**additya** 3:4

**address** 166:17

**administer** 68:11 69:6 70:18 71:4,12

**administered** 68:18 69:5,9 70:12

**administrated** 150:11

**administrative** 12:13

**admission** 89:4

**admissions** 87:20 89:19 119:12

**admit** 103:17

**adolescence** 65:18 66:12,12 66:18 71:17,18

**adolescent** 68:22

**adolescents** 68:18 69:13

**adult** 66:18

**adult's** 65:5

**adulthood** 68:19 71:18

**adults** 64:20,21 65:19 66:2

72:14 80:8 82:12

**adversity** 65:6

**affairs** 157:15

**affidavit** 8:10 8:11 26:21 52:9 54:22

**affidavits** 27:7 48:7 103:11

**affiliations** 6:7

**affixed** 167:15 168:21

**aforemention...** 164:4,6,17

**afternoon** 130:3,5 131:22

**age** 55:7 57:17 57:21 60:11,21 64:22 65:7,14 72:22,23 73:7 73:10,14,15,16 73:16,16 74:19 74:21 78:23 79:4,21 80:12 80:19 81:3,11 81:19,22,24,24 82:3,5 109:20 114:1

**agency** 42:14

**ages** 78:21 79:11,13,17 82:3,15 114:4

**aggressively** 101:22

**ago** 13:11 37:7

**agree** 5:11 36:20 37:2 39:8,15 46:22 50:9,10 84:18 84:22 86:9 89:8 92:12 107:3 111:5,10 114:17 116:17 120:19 123:21 124:16 125:18 126:21 127:6 143:19 155:3 157:6,18 158:14

**agreeing** 154:22

**agreement** 140:18

**ahead** 10:2 11:21 20:9 23:5 29:5 30:24 32:8 42:22 62:16 72:9 89:13 91:8 94:10 97:13 106:3 110:3 127:3 129:23 130:23 132:14,16 138:4,17 140:2 152:8 157:24

**aids** 11:17 160:15,17

**al** 1:7 5:16

**albeit** 54:14

**alcohol** 127:11 129:13

**alfredo** 160:9 160:12

**allegation** 41:3 41:12 43:1,3,3

**allegations** 40:23

**allen** 13:21,21 13:23,24 15:21

**alter** 27:10

**alternative** 152:4

**america** 87:19 88:2

**american** 89:22

**amount** 125:4 125:13

**analysis** 101:18 121:12 153:7 154:9 155:14 155:17 157:7 157:20 158:5

**analyze** 58:3 109:19 135:18

**analyzed** 77:7 81:1 112:19 113:19 119:17 158:19

**analyzing** 46:15 121:19 151:2

**[andre - asked]** Page 5

**andre** 13:21,21 13:22,23,24
**andrew** 15:21
**annotations** 33:22
**answer** 29:4 30:5,19 31:11 31:14,17 37:22 42:24 62:4,7 63:24 64:1,3 73:18 74:11 75:3 86:2,16 87:2 103:5 116:4 117:1,13 117:17,23 129:10,14 131:5 147:10 147:10 149:9 150:22 153:19
**answered** 24:13 25:16 33:18 34:1 42:20 52:11 97:11 118:6 130:22 134:21 147:9
**answers** 110:14 164:12,16
**anxiety** 109:7 109:14 110:14 110:16,22 111:15
**anybody** 68:20 90:11,12

**apologize** 20:16 75:5 85:15 86:4 94:12 97:12
**appear** 64:9 80:18 167:11 168:15
**appearance** 6:5
**appearances** 6:7
**appeared** 144:17 150:24
**appearing** 6:11 6:13,18
**appears** 76:13 80:14 111:23 144:22 145:5 148:22,23
**appended** 168:11,18
**applicable** 164:21
**applied** 101:21 123:22
**apply** 148:10
**applying** 101:14
**appraise** 123:16
**appreciate** 29:14 30:11 53:22 74:9 86:21 96:6 98:20 116:10

151:22 152:21 159:6 161:17
**approximately** 78:19 100:15 101:23 106:17 126:6,6 130:3
**area** 157:14
**areas** 57:17 95:1 147:23
**arousability** 69:14 70:17,24 71:12
**arousable** 71:8
**aroused** 69:24 70:1
**arrest** 101:11 101:17,19,21 102:24 103:4 104:12 129:8 129:13 130:18 131:22 151:1,4 151:16 152:11 153:2,9 155:21 157:8
**arrested** 99:13 101:3 102:22 129:9,20 130:4
**article** 4:10,16 4:21 38:7,10 38:10 39:4 73:21 76:4 81:8,15 82:18 83:1 87:9 88:9 90:8,21,21,21

91:1,11 93:9 96:9,12,15,19 96:20 97:4,23 99:8 112:14,15 112:20 113:2,6 113:19 114:20 114:23 115:3 116:7,24 117:5 117:11 119:15 121:14,18 122:20 123:1 125:9 127:9 158:14,20
**articles** 88:9,11 90:11,13 92:8 92:11,21 97:6 97:18 98:17 158:16,18,24 159:2
**asa** 27:16 143:13 148:18 149:21
**ascertain** 35:21 37:14 38:23 39:11,16 59:8 113:20
**ashcraft** 124:21
**ashcroft** 124:21
**aside** 48:6 97:4 125:9,20 141:3 147:21
**asked** 8:23 24:13 25:16 33:17,24 42:20

**[asked - behavioral]** Page 6

52:10 63:23 68:11 83:24 85:24 86:4 97:11 116:9,10 130:21 134:20 144:4 161:19 164:16

**asking** 7:19 29:2 30:2 49:13 76:3 138:5 139:17 140:13 143:9 146:23 148:4 149:20 155:21

**asks** 42:4,12

**asleep** 111:24

**assess** 43:14 49:8 68:3 69:23

**assessing** 39:24 40:3 43:18 49:5

**assign** 119:22

**assignment** 167:2 168:2 169:2

**assist** 34:6

**associated** 92:2 92:6

**associates** 88:12,14

**assume** 42:14 54:19 148:4

**assumes** 129:22 152:6

**assuming** 52:19 53:7 54:23 106:14 140:13 162:18

**attached** 10:19 11:3,6,8 168:7

**attachment** 11:8,12

**attachments** 10:13

**attempt** 38:17

**attention** 56:20 61:24 63:5,19 65:23 76:20 123:10 154:14

**attorney** 6:8 29:3 30:3 106:10 134:8

**attorney's** 14:4 14:19 156:7,15 157:4

**attorneys** 31:13 123:15

**audio** 5:10 6:21 85:6 86:2

**august** 19:23 20:2 21:8

**austin** 13:16 16:14,24

**author** 123:2,3 123:5

**authority** 64:24

**authorize** 168:11

**authors** 95:21

**available** 73:11 77:23 83:23 124:4,5,7

**ave** 166:1

**average** 112:18 113:10

**averse** 64:24

**aware** 34:8 71:9 86:3 93:14 97:5 110:18 125:5 137:12 151:15

**b**

**b** 13:9

**back** 34:11 44:13,22 64:10 75:21 80:5 85:15,21 87:15 88:4 90:12 99:5 104:16 108:24 112:14 113:4 115:23 116:3,9 118:17 119:2,19 125:8 126:19 128:12 129:1 144:20 145:23 147:14 151:17 154:5 161:10 166:17

**background** 121:22 123:18 128:21

**bad** 139:18

**barajas** 3:5 6:20

**bart** 103:13

**based** 16:5,9 52:7,8 59:24 71:4 88:20 91:1 92:24 101:8 118:9 125:21 131:12

**basically** 35:9 43:12 101:20 127:11 132:9 135:19

**basis** 36:16 151:21 153:15

**bates** 4:9,13,15

**bathroom** 75:7 75:10,11

**began** 76:3

**beginning** 6:8 99:7

**behalf** 2:8,12 2:17,21 6:10 6:13,15,17 12:21 14:8 17:21,24 18:3 18:6,8,16,20

**behavior** 98:23

**behavioral** 55:7 98:13

**behaviors** 65:1 66:14
**belated** 11:19 51:22
**belief** 56:9 81:15 88:20
**believe** 8:8,17 10:15,17 11:6 11:7,15 13:1,7 13:11,18 16:6 18:20 19:8,23 20:3 21:2 25:15,24 26:11 47:20 83:19 87:4,17,23 88:7,8 89:17 90:17 91:10,20 99:13 101:12 105:15 110:2,4 112:21 121:23 127:13 141:7 159:17
**bell** 157:12
**bennett** 8:12 27:8
**berousek** 2:14 4:3
**best** 15:2 18:19 19:9 21:9 32:10 34:18,21 53:11 58:14 60:8 71:19 81:14 82:17 125:19

**beyond** 64:21 66:17 84:10,17 84:18,23 86:10 87:5 125:5
**bias** 36:22 38:21
**bigda** 13:8,10 14:8
**billed** 20:23
**birth** 60:19,24 62:6 63:22
**bit** 22:1 72:12 84:15 89:14 98:8
**black** 67:10
**blank** 9:5
**blanking** 8:13 8:17 13:18
**blood** 127:11
**bond** 43:9,15 45:4
**borkan** 2:9
**borkanscahill...** 2:11
**borne** 71:7 138:7
**bottom** 21:1 104:8 148:23 154:15 166:15
**boulevard** 2:19
**bracket** 80:19
**brain** 65:10,11 66:9,10,19

**break** 44:9,13 45:3 75:7,10 75:11 76:3 110:13 118:11 118:22 153:21 160:24
**breaks** 108:4 108:14,20,22
**brenn** 134:8
**brief** 7:20 57:7
**briefly** 9:14
**bright** 124:16 125:3,5,11
**broad** 98:4,11
**broken** 73:15
**brother** 152:14
**brothers** 152:19
**brought** 43:13
**building** 109:9
**bull** 109:16

**c**

**c** 13:22 16:3
**ca** 166:24
**cabinet** 96:17
**caffeine** 44:9
**calculation** 114:19 116:21
**california** 93:4
**call** 107:15 140:6
**called** 7:6 52:20 54:9 55:20,21

57:9 65:18 68:6 73:23 124:21 144:13 147:13
**calls** 40:20 42:20 43:20 45:15 100:8 110:1 111:9 138:3 140:1 142:14 157:23
**camera** 5:6
**capable** 65:1 66:2
**career** 91:10
**carney** 2:14 4:3 6:15,15 159:8 159:12,13 160:21 161:3 163:9
**carolina** 73:22 73:23
**case** 5:19 8:10 8:14 9:4,6 13:6 13:15,17,19 14:5,7,14 15:7 15:18,20,22 16:8,12,18 18:1,2 20:1,4 23:17 27:4 29:8,8,9,9,12 29:16 31:19 32:14,15 34:20 35:8 36:10 44:6 50:15

**[case - christie]** Page 8

54:24 68:15,15 78:2,3,10 83:24 99:6 101:19 121:12 121:12 124:17 124:21 125:1,2 125:12,20 126:4 134:17 152:1,21 155:7 155:19 158:17 159:17 160:9 164:24 166:6 167:3 168:3

**cases** 11:13 12:12,15,15,16 12:19,22 13:3 16:14,17,20,22 17:17,23 18:1 18:15,15 31:4 31:5,7,18 38:22 39:9,16 68:11 69:5 72:16 73:1,8 74:23 77:21 78:11,11,12,15 80:9 82:13 93:3,22 94:2 111:11,16,17 112:21 158:19 158:22 160:1

**cash** 154:21 155:5 156:5

**cassen** 139:4

**cassen's** 138:24

**casuney** 15:21

**catching** 22:10

**categories** 73:15

**category** 57:21 57:22,24 65:20 115:11 117:22 139:13

**causey** 13:22 15:23 16:1 17:5

**central** 44:13

**certain** 35:15 79:12 81:11 121:9 151:19

**certainly** 60:17 60:22 80:14 144:2 158:9

**certainty** 35:23 39:1,13 54:2

**certificate** 168:11

**certification** 167:1 168:1

**chained** 111:18

**change** 26:16 65:6 88:18 166:14,15 168:8 169:3

**changed** 88:15 88:15 147:11 148:16

**changes** 65:10 166:13 167:7 168:7,9

**characteristics** 50:7

**check** 19:9,13 34:3 161:2

**chicago** 2:6,10 2:15,17,19 6:11,13,16,19 24:4 41:2 111:17 159:14 159:19,20 160:6 165:8

**child** 103:17

**children** 78:22

**christie** 2:18 4:3 6:9,10 7:10 9:13 11:22,23 19:16 20:15 23:14 24:15 25:17 27:13 28:19 29:13 30:8,11 31:22 32:16 33:4,12 33:22 34:5,23 35:19 36:19 37:11 38:1 40:2,16 41:15 42:7,15 43:7 44:11 45:1,18 46:4,14 47:1 48:11 51:4 52:1 53:21

55:5 58:12,14 58:21,22 59:12 59:18 60:5 61:5 62:17 63:1 65:22 66:20 67:18 69:7,19,22 71:22 72:11 73:5 74:5,9,16 75:8,12 76:1 76:10 80:1,21 81:17 82:9 83:2,8,11 85:12 86:22 87:13 90:2 91:16 93:8 94:3,20 95:12 95:16 96:6,8 97:21 98:9,10 98:21,24 99:4 99:19 100:2,17 102:18 104:1 106:8 108:9,23 110:10 111:4 112:2 115:17 118:10,20 120:13 122:11 122:14,17 124:6 127:8 130:6,14 131:8 132:8,15 135:1 135:10 136:19 137:5,19 138:10,22

140:9,23
142:20 143:11
143:18 147:1,5
150:21 152:9
152:20,23
153:20 154:7
155:22 156:22
158:3,13 159:4
161:4,18
162:17,20
163:6

**circuit** 13:8
**circumstance**
139:11
**citation** 74:3,5
77:20
**citations** 77:22
**cite** 78:2
**cited** 78:1
104:7,8
**citing** 74:13
**city** 2:17 6:16
6:19 159:14
**civil** 1:15 12:9
12:11,15 17:20
17:21,24 18:1
18:2,9,11,15,20
29:9 31:5
36:10 84:12
104:5 167:5
168:5
**claim** 157:18
**clarification**
74:11 162:15

163:5
**clarify** 29:15
54:7 55:10
64:6 68:24
**clarifying** 74:8
**clarity** 30:6
**clark** 2:10
**classic** 35:9
47:23 52:17
**classified** 47:7
54:3
**classify** 53:17
54:24 99:16
**clean** 9:1,3 10:4
**clear** 23:15
63:2 138:6
**cleary** 109:15
**cleveland** 166:2
**clients** 123:16
**clinical** 67:13
68:9,9,17,23
69:2 70:18
71:2
**clinician** 71:10
**clinicians** 68:3
69:5 70:12
**close** 80:18
**clumps** 81:11
**cobras** 137:7
**coerced** 14:10
14:21 46:18,21
46:24 47:9,17
47:23,24 48:17
49:19 51:10,14

51:15,20,21
52:7,14,17,18
52:21,22 53:8
54:3 55:1,1,2
55:13,14,17
56:11 58:5
84:20 85:2
86:15 95:1,3
120:8 133:17
**coercing** 16:17
**coercion** 15:4
45:12,22 50:23
83:4 84:19
**coercive** 48:4
**coghlan** 27:16
27:18 134:17
**cognitive** 70:21
98:6,12 127:19
**cohort** 72:21
74:22 79:4,16
79:21 80:11
114:4
**cohorts** 79:13
81:3
**combined**
112:6
**come** 44:13
47:14 48:9
55:23 101:14
**comes** 41:18
**comma** 148:24
**commencing**
1:17

**commission**
167:19 168:25
169:25
**commit** 81:3
99:21
**committed**
55:24 82:14
89:10 151:20
**common** 52:14
84:10,17,18,23
86:10 87:5
**commonly** 15:1
137:18
**community**
84:10
**compared** 65:7
**comparison**
82:19
**compel** 139:14
**compensated**
19:2
**complete** 32:3
32:11 78:8
87:2 164:15
**completed** 21:7
106:13
**completely**
81:8
**completing**
19:11 20:1
**compliance**
65:5 70:10,11
71:24

**[compliant - consistent]** Page 10

| | | | |
|---|---|---|---|
| **compliant** | **conditions** | 55:2,13,18 | **confidence** |
| 14:10 46:18,21 | 119:9 | 56:18 57:10 | 55:22 |
| 46:24 47:9,17 | **conducted** 5:5 | 58:6 68:11,15 | **confirmation** |
| 47:23 48:17 | **confess** 49:2 | 72:16 73:1,8 | 93:7 |
| 51:10,15,20,21 | 52:16 55:14 | 74:23 79:1 | **conflict** 64:24 |
| 52:7,14,17,18 | 90:5 91:2,19 | 80:9 82:13 | 65:6 |
| 52:23 53:8 | 91:24 133:10 | 84:20 85:2 | **confronted** |
| 54:3 55:1,13 | 139:2,9 140:8 | 86:15 88:6,13 | 151:6 |
| 56:11 58:5 | **confessed** | 88:18 89:2 | **confronting** |
| 64:23 65:15 | 106:9 139:23 | 92:2 93:21,22 | 140:4 |
| **components** | 140:17 157:5 | 94:2 104:23 | **confused** 54:10 |
| 98:13 | **confesses** | 106:7 112:8 | 58:11 |
| **compound** | 105:20 | 119:12 120:8,9 | **confusing** |
| 110:1 140:1 | **confessing** | 121:6 125:6,15 | 58:19 145:19 |
| **comprehensive** | 55:15 56:8,10 | 125:24 139:15 | 146:3 |
| 123:21 | **confession** | 141:22 | **connected** 6:21 |
| **comprehensi...** | 14:10,11,13,21 | **confessions** | **connection** 5:7 |
| 123:15 | 16:5,11,23 | 4:17,22 16:17 | **connelly** 2:13 |
| **comprise** 78:19 | 35:22 36:6,8 | 17:2 52:13 | **conscience** |
| **comprised** | 37:14 38:24 | 59:2 73:24 | 92:13 |
| 78:15 | 39:9,11,19,22 | 76:5,17 77:7 | **conscious** |
| **computer** 33:6 | 40:1,4,19 | 78:9 79:12,20 | 56:14 |
| 44:16 | 42:18 43:19 | 81:1,4 87:20 | **consequences** |
| **concept** 36:13 | 45:23 46:9,18 | 89:19 92:4,5 | 65:2 66:3,5,17 |
| 54:11 | 46:23 47:6,9 | 92:16,23 93:12 | 66:24 67:2,4,7 |
| **concepts** 50:2 | 47:15,18,23 | 93:24 95:1,3,9 | 126:22 |
| **concluded** | 48:16,23,24 | 95:11 113:19 | **considered** |
| 46:16 101:13 | 49:6,9,19 50:9 | 119:17 121:16 | 50:20 |
| 163:13 | 50:11,12,17 | 122:22 127:5 | **considering** |
| **conclusion** | 51:1,10,15,20 | 157:13 | 65:2 66:2 |
| 47:14 48:9 | 51:21 52:7,17 | **confessors** | **consistent** |
| 52:5 101:12 | 52:19,19 53:8 | 78:21 81:10 | 39:21 43:1 |
| **conclusive** 41:9 | 53:13,14,18 | 82:21 | 50:24,24 53:17 |
| 41:14 46:3,13 | 54:3,8,10,14,20 | | 60:23 144:23 |

**[consistent - court]** Page 11

146:1
**constitutional**
125:12
**consult** 83:24
**consultation**
21:19
**cont'd** 3:1
**contained**
160:5,19
**contamination**
51:3 141:13
**contents**
140:15
**contest** 35:9,13
**continue** 5:11
**continued** 16:3
**continuum**
65:17 66:8
67:11
**contradictions**
92:14
**contribute**
109:7
**contributes**
107:18
**conversation**
7:20,24 29:6
38:20
**conversations**
29:16,23 30:4
30:5,9,17,20
33:10
**conversely**
65:16

**convict** 87:22
**convicted** 16:5
**conviction**
13:17 14:5
16:7 17:5,9,13
**convinced**
56:13
**cook** 41:17
**cooperate**
126:23
**cope** 96:24
**coping** 71:7
**copy** 9:1,3
162:22
**core** 74:17
**corner** 63:11
**correct** 10:1,11
10:14 11:5
15:9 18:19
20:22 21:12
24:2,24 26:4
26:19 28:15,22
38:8 39:6
47:11 59:17
60:4,13 79:6
79:18 101:7
106:14 112:12
112:17 115:12
117:23 118:6,7
119:18 123:2
127:16 128:19
130:13 139:10
141:1,24 142:6
142:9 143:1

144:1 145:4,20
145:21,22
146:1,5 147:10
147:10 148:20
149:24 150:1
152:1 156:11
159:22 160:1,2
160:3,4,14
**corrected**
144:20,21
147:8
**correcting**
144:16,19
**correction**
144:23 145:7
146:2 148:14
148:22 149:9
**corrections**
145:16 146:10
146:21 166:13
168:17
**correctly** 14:18
15:14 16:13,18
39:2 49:3 82:1
89:7 109:11
113:21 132:7
**correlated**
92:22
**corroborate**
40:5 41:4
**corroborates**
39:21
**corroboration**
134:12

**counsel** 2:3
5:15 6:6 8:1,15
21:19 27:9
28:21,24 29:7
33:11 83:21
164:9,24
**count** 107:23
**county** 13:16
14:2,2,3,4,6
15:21 41:18
164:2 165:3
167:10 168:15
**couple** 8:19
92:7 107:4
**course** 23:9
34:19 35:14
36:3 37:21
40:10 68:24
79:3 100:14
107:18 120:23
**court** 1:1 5:17
5:21 6:22 13:7
15:23 60:18
68:4 85:24
105:5 106:10
106:12 116:8
124:22,23
142:5,12,17,22
143:5,13,15
145:12 146:10
148:6,18
149:24 157:5
167:7

**[courts - defendants]**

**courts** 1:16 12:3 17:19 84:11 144:11

**cpd** 4:13 61:23 62:1

**create** 160:16

**created** 142:17 160:13

**credibility** 52:4

**credit** 36:15 126:10 128:6 132:17 150:15 150:23 162:3,9 162:9

**credited** 47:16 162:7

**crediting** 39:17 124:12 132:17 161:24

**credits** 162:12

**crime** 55:24 81:19,22,23 82:3,5 87:23 89:10 151:1,20

**crimes** 81:3 82:14

**criminal** 12:8 12:12,15,16,21 15:7 17:19 31:7 43:24 44:6 54:23,24 84:12

**crossed** 96:12 149:10

**csr** 1:14 164:5 165:6

**curious** 29:17

**current** 121:21 123:17

**curve** 81:19,22 82:3,5

**custodial** 35:6 119:7

**custody** 35:3 100:15 101:4 101:15 102:24 106:5,23 107:1 112:6 133:22 134:7,13,19 135:4

**custom** 42:13

**cv** 1:6 5:19 10:17 11:3

**cycle** 121:21 126:11 131:14 132:2

**d**

**d** 4:15 13:9 63:4,19 68:5 102:7 146:8 167:4,9 168:4 168:13 169:20

**da** 16:6

**dan** 145:16,17 145:20,20 146:1,2,17,18 147:7,8,9,11,13

147:16,17 159:16

**daniel** 1:4 4:12 5:16 6:18 10:9 23:1,24 34:16 35:3 61:13 63:7 104:5 150:14 166:6 167:3 168:3

**data** 73:11 77:7 87:4 91:2 93:23 100:13 126:19 157:19 158:4

**dataset** 77:15 77:18,19 78:8 78:15

**datasets** 78:6

**date** 60:19,24 62:6 63:22 88:8 164:6,17 166:8 167:3,9 167:19 168:3 168:13,25 169:20,25

**dated** 19:22 20:2

**dave** 3:3 5:20

**david** 8:3,11 24:21 25:2,6 133:7,13 157:10,11

**day** 129:19,19 130:5,9 165:4

167:16 168:22 169:22

**days** 8:19 128:19 166:19

**deal** 154:23 155:6 156:12 156:15

**dear** 166:9

**decades** 88:5

**december** 1:18 4:1 5:2 165:4 166:4

**decision** 67:5,9 67:17 68:22 140:8

**decisions** 66:14

**declare** 17:11

**declared** 17:14

**deed** 167:14 168:20

**deemed** 125:6 166:20

**defendant** 2:12 2:17,21 6:10 6:14 14:21 18:3,9,11,21 43:24,24 54:23 54:23

**defendant's** 13:8 44:3

**defendants** 1:8 5:15 17:21,24 18:6 35:10 142:21

| | | | |
|---|---|---|---|
| **defender** 45:20 46:7 | **depends** 5:6 56:15 108:21 128:15 142:15 153:10 | **depositions** 1:17 8:2 23:9 24:21 26:9 32:2,3,4,11,24 106:22 | 124:13 132:18 146:9 |
| **defender's** 45:10 | | | **description** 47:16 49:1 |
| **defense** 83:21 | **depletion** 107:19 | | 51:19 52:6 |
| **define** 141:20 142:3 | **deponent** 164:21 | **deprivation** 121:1,4,20 124:18 125:13 | 101:16,18 104:15 122:10 131:2,6 |
| **defined** 99:8 | **deposition** 1:12 2:2 4:1,24 5:4 | 125:23 126:13 128:9,11 131:4 | **descriptions** 48:18 |
| **definitely** 99:16 | 5:14 7:17,23 | 131:7,11 132:4 | **designated** |
| **definition** 126:12 | 8:9 21:16,19 24:20 25:1,6,9 | 132:18 161:20 | 150:24 |
| **degree** 35:23 39:1,12 54:2 | 25:14,20,22,22 26:3,6,17,18,22 | **deprived** 111:23 121:10 | **desk** 96:12 |
| 126:2,14 152:7 | 27:14,17,18,20 | 121:13 122:2 | **despite** 35:20 |
| **demanding** 48:1 | 28:7,11 29:19 30:16 31:10,24 | 123:24 124:9 124:10,13 | **details** 51:3 110:5 |
| **demands** 97:1 | 32:13,14 46:6 | 125:22 126:7 | **detained** 43:14 |
| **denial** 89:4 | 47:22 48:7 | 126:16 128:6 | **detainee** 41:18 42:9 |
| **dep** 9:16 | 54:22 63:14 | 128:13 130:20 | **detective** 8:9 |
| **department** 15:13 16:24 | 84:16 87:10 103:9 104:5 | 131:1 132:7,11 162:13 | 16:15 32:12,15 103:15 150:10 |
| 93:2 159:20 166:22 | 105:7 131:3 132:7 135:14 | **describe** 41:22 42:3,5 55:16 | 155:24 156:1,9 |
| **department's** 24:5 159:21 | 135:17,24 136:3,8 137:20 | 57:20 103:11 111:18,18 | **detectives** 17:1 133:4 156:21 |
| 160:6 | 137:23 138:6 | 142:2,3 149:16 | **detention** 35:6 |
| **departments** 93:4 107:14 | 138:12,20 160:12,18 | **described** 92:7 103:15 121:13 | 43:10 119:7 120:15 |
| **depend** 55:3 | 161:18 163:12 164:4,8,20 | 132:6,10 | **determination** 51:16 53:7 |
| **depending** 29:10 40:23 | 166:8,10 167:1 167:3 168:1,3 | **describes** 48:3 99:12,15 131:3 | 54:15 105:14 |
| 41:7,12 43:2 | | **describing** | **determinations** 52:4 |
| 65:6 99:1 133:23 159:15 | | 47:22 52:16 | |

**[determinative - documents]** Page 14

**determinative**
41:9
**determine**
66:22 67:22
74:18 79:21
80:10 105:20
113:1 120:4
121:9 122:1
124:8 126:5
132:11 135:3
137:21
**determining**
40:18 46:8
60:20 155:13
**developed**
65:11 66:18
**development**
66:9,10
**developmental**
71:16
**develops** 65:10
**diagnosis** 67:15
**dictated** 67:5
**difference**
52:15 55:11
108:10,18
**different** 20:13
27:6 35:17
49:12,16 57:20
61:20 67:20
82:22,23 93:13
131:9 153:19
**differently**
151:23

**direct** 29:11
34:24 38:9
40:14 47:4
56:20 58:9
63:18 64:14
75:3 76:19
79:7 83:3 84:2
102:6 109:2
112:3 119:2
129:1 141:9
147:2 154:14
**directed** 28:23
29:20 30:14
31:3,8,19
143:5
**directing** 65:23
74:18 78:17
113:5 123:10
125:8 154:12
**directly** 107:24
155:20
**disability** 57:23
**disagree** 89:8
**discard** 153:13
**disciplinary**
15:12
**discuss** 36:1
**discussed** 16:21
108:8 144:7
**discussing** 11:9
104:17
**discussion** 29:7
29:11 85:19
90:6 115:21

163:2
**disorientation**
126:24 127:6
127:20
**dispositional**
57:9
**dispositive**
41:14 43:4
46:3,12
**disproportional**
82:14
**disproportion...**
82:12
**disproportion...**
74:15 80:23,24
81:2,9 82:20
**disproportion...**
72:15,24 73:7
74:22 80:8,12
80:19
**disputed** 38:22
39:8 68:10,15
**disregard**
150:12
**disrupted**
126:12 132:3
**distort** 157:21
158:6
**distress** 109:23
**distribution**
81:10
**district** 1:1,1
1:16 5:17,18
14:4

**disturbances**
127:19
**division** 1:2
5:18
**dna** 4:17 73:24
76:5,17
**doctor** 7:11
11:24 83:3
87:14
**document** 8:12
8:16 9:11
19:14 30:14
31:6,14,20
33:15 37:23
42:8 61:3,20
62:22 74:19
75:3,4 76:8,18
76:22 79:11
80:10 95:14
105:15 122:15
144:18 145:2,8
145:11 148:2,5
150:3
**documentation**
93:7
**documented**
71:15 72:16
78:7
**documenting**
60:24
**documents** 8:4
8:5,18,21,24
9:5 16:13
22:24 23:8

**[documents - especially]**

24:8,8,9,18 28:20 30:17 33:2,14 48:22 53:11,12 74:14 77:22,24 84:1 105:2,17

**doing** 7:12,13 83:1

**don** 145:17,18 146:16,16 147:14,17

**double** 19:9,13 34:3 161:2

**dr** 5:14 9:18 19:18 20:6,17 29:24 30:19 31:1 38:7 39:5 44:14 45:2 58:23 61:7,24 63:6 69:23 76:2,19 86:23 95:17 98:14,18 99:5 113:5 118:21 120:24 122:18 146:24 150:22 154:8 159:4,13 161:16 166:9

**draw** 130:1

**drawing** 56:7 61:24 110:24

**drew** 2:9 6:12 124:22

**drinking** 75:6 127:15 129:15

**drive** 2:14

**drizin** 73:21 76:17 94:1 112:20 113:6 158:15

**drizin's** 76:4 112:15

**dropped** 116:2

**due** 36:22 38:21

**duly** 7:2,7 164:10

**dwycoff** 2:11

**e**

**e** 13:22 16:3 148:16 164:2

**earlier** 16:5 62:18 66:1 106:9 138:9,23 161:18

**early** 68:19 71:18

**easier** 77:22

**easily** 64:21 70:1

**eastern** 1:2 5:18

**easy** 115:1 117:8

**editors** 77:20 78:4

**effect** 111:3

**effective** 91:23 92:16

**effectiveness** 93:16

**effects** 131:4,11

**either** 13:21 56:12 71:4 91:3 93:1 96:14 98:3,17 151:13

**el** 166:6 167:3 168:3

**electronically** 77:23

**elicit** 17:2 89:4

**elicited** 44:4

**eliciting** 119:11

**elicits** 95:10

**email** 166:17

**emotional** 71:12 127:19

**empirical** 74:14 90:4 93:15 109:18 110:15 111:1,3 125:21

**employ** 66:21 121:9 122:1

**enclosed** 166:10

**ended** 33:23 104:24

**ends** 22:17

**engage** 65:1 66:14

**entailing** 98:5 98:12

**entered** 83:15 168:9

**entire** 32:14 53:24 74:2 96:15 102:11 105:19 106:6 167:5 168:5

**entirety** 9:8 37:5 96:10

**equal** 120:22

**equated** 127:10

**errata** 166:13 166:16,19 168:7,10,18 169:1

**error** 61:1 62:19 141:18 141:20 144:13 144:15,23 145:6,6 147:22 148:9 149:4,14

**errors** 141:23 142:1,11,17,22 143:14,24 144:16,19 145:1 147:24 149:17 150:3

**especially** 29:8 29:9 31:5 37:6 37:6 60:22

**[especially - expiration]**

78:23 81:12 111:16,24 157:14

**essentially** 14:15 82:23 101:17

**estimate** 12:11 21:20

**et** 1:7 5:16 166:6 167:3 168:3

**evaluate** 123:15 153:7

**evaluating** 40:19 42:17 45:23 123:23 137:20

**evaluation** 123:22

**evening** 129:19

**event** 35:15 157:20 158:5

**events** 37:8

**eventually** 44:5

**everybody** 75:14

**evidence** 36:6 39:20,23 40:5 40:10,12,15,17 44:4 47:13 48:8 50:15,24 53:16,18,19 83:16 87:21 89:5,24 129:22

132:24 133:12 135:8,9 138:2 138:24 139:13 140:4,7,24 141:5 144:14 149:3,13 151:10,12,13 151:14 152:6 153:14,17

**evidentiary** 4:21 121:15 122:21

**exact** 60:20 65:6 114:21 117:2 124:17 124:17

**exactly** 129:10

**exaggerated** 132:24

**examination** 4:2 7:6,9 159:11 161:13

**examined** 7:7 164:11

**example** 31:10 55:6 61:2 67:23 73:17 74:14 110:7 138:24

**examples** 55:8 57:12

**except** 130:16

**exceptions** 30:13

**excessive** 124:24

**exchange** 154:24 156:14

**excitable** 71:6

**excluded** 23:7 24:18

**excuse** 87:12 89:11 122:4

**executed** 168:10

**execution** 167:14 168:19

**exercise** 82:22

**exhaustion** 100:23 107:19 119:9

**exhibit** 4:6,8,10 4:11,14,16,18 4:20 9:11,17 9:22 19:14,17 28:8,10 37:23 38:3 61:3,7 62:22 63:3,11 63:14 76:8,12 76:12,16 95:12 95:14,17 102:1 105:6 112:16 113:4 122:11 122:15,19 125:8 129:2 131:19

**exhibited** 109:23 114:9

**exhibits** 4:5,23 9:9 11:2 23:12 26:9,22 27:3

**exists** 40:10

**exonerated** 17:10,14

**exonerations** 72:18 73:9,12

**expected** 143:7

**experience** 68:14 95:5 96:24

**experienced** 132:4

**experiences** 71:7 97:7

**experiencing** 93:17 94:5 111:15

**experimenter** 98:2

**expert** 4:6 9:7 10:9 12:17 18:23 32:22 36:4 49:7 84:12 123:23 127:4 141:10

**expertise** 71:10 91:18

**experts** 34:9

**expiration** 167:19 168:25 169:25

**[explain - feeding]** Page 17

explain  66:4
  87:15 91:2
  107:8 121:19
  140:15
explained
  51:19
explaining  57:4
explains  90:4
explanation
  139:22
explicit  84:24
  86:12 93:17
express  34:15
  36:17
expressly
  166:11
extensive  16:8
extent  29:2,22
  124:18
external  91:3
extra  17:11
extraordinarily
  125:3
extreme  99:16
  109:23
extremely
  150:11
extrinsic  50:23
eyes  61:19

**f**

face  145:4
fact  31:7 36:3,9
  78:19 124:11

127:9 134:13
134:18 135:4
156:4 162:8,10
factor  51:8
  59:5,14 60:1,7
  60:8 65:20
  91:19 121:5
factors  16:10
  49:18,24 50:4
  50:12,20 51:8
  51:18 57:4,9
  57:17 58:4
  59:1 114:9
facts  28:24
  29:7,12,18
  30:18 35:15,17
  99:5 121:12
  129:22 138:2
  152:6
factual  29:17
  51:16 141:23
  142:10
factually
  162:10
fair  11:22
  18:18 21:16
  22:23 23:21
  24:10 26:15
  34:14 35:8
  37:15 42:10
  51:10 53:23
  54:4 58:12
  59:13 77:4
  79:5 82:4

98:24 114:12
128:8 133:19
136:5,20,24
141:12 142:7
142:21 156:2
158:20
fall  49:22 79:4
  79:17 111:24
  114:14,19
  115:10 116:21
  117:20 139:13
falling  80:11
false  4:16 16:10
  16:17,22 17:2
  46:23 47:7,9
  47:16,17,23
  48:16,23,23
  49:19 50:9,11
  51:15,20,21
  52:7,13,17,19
  52:19 53:7,13
  53:14,18 54:8
  54:10,13,20
  55:2,13,18
  56:18 57:9
  59:1 72:16
  73:1,8,23
  74:23 76:5,16
  77:6 78:9 79:1
  79:12,20 80:9
  80:24 81:9
  82:13,21 92:4
  93:21,22,24
  94:2 95:1,3,9

95:11 112:8
119:11,16
120:8 121:5
132:23 133:12
133:15,17
134:1,3 135:13
141:4 151:10
151:13 157:13
falsely  49:2
  52:16 55:14,15
  56:10
falsity  49:5,10
familiar  41:17
  43:8 45:9,16
  81:18 91:1,12
  94:4,19,21
  109:15,18
  157:10,16
family  99:18
fatigue  4:21
  100:24 107:19
  119:8 121:15
  122:21 123:12
  123:15 126:21
fax  2:15,20
fear  136:13
  138:7,12
federal  1:15
  12:2 13:6 14:7
  14:18 15:15
  17:18
fee  20:20
feeding  51:3

**[feelings - form]** Page 18

feelings 132:10
fell 79:21 114:4
fellow 3:4
felony 92:2
fiancée 103:17
field 34:9 90:12
file 10:16 34:3
151:24 152:12
152:24
filed 5:17
files 93:2 97:17
158:17
filing 96:16,17
filled 41:17,20
46:7
final 157:9
financially 6:1
find 10:15
58:19 87:10
108:10 130:19
131:1 145:19
166:10
finder 36:9
findings 84:9
110:8 157:21
158:6
fine 30:21
75:12,15
138:18
finish 87:1
finished 102:10
fired 15:11
firm 2:18 19:6

first 7:7 9:8,10
12:1 13:7,23
13:23 20:6,7
20:14,17 37:21
38:12 52:23
68:5 76:19
78:18 112:5
123:4 145:24
161:16 164:10
five 12:20,20
12:23 13:12
21:22,24 35:3
44:8,9,12 75:9
75:14 88:5
100:15 106:17
106:18 108:11
108:13,19,20
108:21 112:11
114:13,18
115:9 116:19
117:19 120:6
120:21 128:7
128:13 129:10
129:18 130:4
130:17 131:13
131:21 160:24
fix 153:14
fixed 145:17
flattery 92:13
flip 18:22 23:16
34:11 57:11
58:2 100:20
103:23 104:16
150:7

floor 2:5,14
focus 22:14
72:20 84:16
focuses 50:23
focusing 134:4
follow 100:12
following 2:2
follows 7:8
44:21 75:20
86:7 116:16
118:16 154:4
161:9
footnote 34:24
74:4,6 77:12
112:5
footnotes 77:11
77:14 78:1,7
foregoing
164:3,15
167:13 168:18
forensic 67:13
67:14 68:9
70:17 71:3,10
71:11 151:11
foresee 66:5,23
forget 13:22
114:21 117:2
forgetfulness
137:23
forgot 23:7
26:13 28:16
form 11:20
20:11 23:3
24:12 27:11

28:13 29:1,21
30:22 31:16
32:6,23 33:8
33:17,24 34:17
35:12,24 36:24
37:17 39:14
40:7,20 41:24
42:3,4,11,12,19
43:20 45:14,19
46:7,19 48:10
50:1 51:12,23
52:11 54:5
65:8 66:6 67:1
67:24 70:2
73:2 74:1 75:1
79:23 80:13
81:5 82:6,16
89:12 92:17
93:19 94:8,12
96:1 97:10
99:10,23 100:7
105:23 106:2
108:6,15
109:24 110:17
111:8 120:10
122:8 124:1
127:1 129:21
130:11,21
131:16 134:20
135:5 136:16
137:3,4,15
138:1,14
139:24 140:22
142:13 143:2

**[form - going]** Page 19

143:16 146:22
150:19 152:5
152:15 155:15
156:17 157:22
**formally** 17:14
**former** 15:8,10
**forming** 30:15
30:16
**forms** 41:17,20
41:22 57:24
**forth** 79:14
147:14
**forty** 120:1
**forward** 166:16
**found** 88:14
91:17 101:2
114:20 116:23
**foundation**
20:11 23:4
24:13 28:14
29:2,22 32:6
37:1 40:8,20
42:1,20 43:20
45:15 52:11
59:10 60:3
62:15 68:1
70:3 72:8 81:6
82:7 89:12
92:18 96:2
97:10 99:11
100:8 108:6,16
110:1 111:9
120:11 124:1
127:2 129:21

130:11 131:17
135:6 137:3,4
137:16 138:2
140:1,22
142:13 143:3
152:6 156:18
157:23
**four** 10:17 11:4
12:24 13:2,5
13:11 18:9,14
18:21 159:6
**franklin** 165:7
**free** 167:14
168:20
**friends** 133:5
**front** 8:24 9:4,6
9:24 10:5,23
64:12 159:18
**full** 40:13 54:18
56:16 66:9
86:1 89:1
109:1
**fully** 65:11
66:18
**function** 81:23
**further** 162:16
**fusco** 2:13

**g**

**g** 13:9 68:5
94:22 157:11
**gang** 136:21
137:1,7,10,22
138:7,13

**gangs** 137:12
**garcia** 134:9
**general** 7:22
29:16,18 30:17
37:2,9 57:6
71:13,15 81:21
136:4 141:12
158:10
**generally** 47:13
66:17 81:20
84:9 91:12
95:6
**genito** 103:7
**genito's** 103:13
103:14
**gerstein** 43:8
45:5,13,20
**gesundheit**
9:21
**getting** 89:21
90:1 91:23
92:23 129:15
**give** 21:20
42:23 87:21
109:14
**given** 31:10
51:20 53:18
72:2 77:21
**gives** 55:12
**giving** 63:24
110:12
**go** 5:12 10:2,24
11:21 17:11,19
20:7,9 23:5

27:24 29:5
30:24 32:8
42:22 50:16
51:5 62:16
70:13,23 72:9
75:12 85:8,10
85:12,15 89:13
91:8 94:9
97:13 105:10
106:3 110:3
115:17 116:14
118:10 120:24
127:3 129:11
129:23 130:23
132:14,16
133:2 138:4,17
140:2 143:20
148:13,21
152:8 153:21
157:24 162:22
**goal** 89:23
**goes** 13:24 22:7
34:20 36:10
70:9 81:23
88:4 147:14
154:19
**going** 5:2 9:16
19:17 29:21
37:19 38:2
44:7,17 53:1
61:6 64:10,14
68:4,16 75:5
75:16 76:11
79:7 80:5 83:3

83:12 85:14,17 90:9,12 91:12 99:5 101:24 102:6 105:10 107:22 108:11 109:1 113:4 115:2,19 117:9 118:12 119:2 122:18 124:11 126:19 129:1 131:12 141:9 144:23 153:21 153:24 161:5 162:24

**gonzalez** 84:16 87:10 152:20 160:9,12

**good** 5:1 6:9,12 7:11,15 44:15 100:18 163:11

**gotcha** 123:9

**gotten** 124:14 129:8 130:4 162:2

**government** 15:15

**grad** 34:6

**grammatical** 141:23 142:11 143:6

**gregg** 13:10

**grounds** 29:4

**group** 72:22,23 74:21 78:21,23

**groups** 74:19

**gss** 68:8 69:9 70:14

**gudjonsson** 68:6,6,7 70:7,9 70:10,10 71:20 71:23 90:10,22 91:1 139:4,7

**gudjonsson's** 90:7

**guess** 27:5 52:2 102:19 103:12 142:15 153:6 162:22

**guessing** 90:13

**guevara** 1:7 2:12 5:16 6:14 103:15 133:4 150:11 156:1 156:10 166:6 167:3 168:3

**guilt** 88:2 89:24 139:14 150:7 151:3 153:7 154:9 155:14 155:17,20 156:1 157:7

**guilty** 87:23 89:3 90:4 91:2 91:19,23 139:2 139:9 151:1

**gullibility** 69:14 70:5,13 70:16

**gullible** 64:22 69:24

**guyll** 94:22 95:21 99:9

**guys** 85:16

**h**

**h** 148:16

**half** 35:3 78:20 100:15 106:18 108:12,13,19 108:20,21 114:13,18 115:9 116:19 117:19 120:6 120:21

**halfway** 149:9

**halvorsen** 8:9 32:15 103:12 133:4 150:11 156:1,9

**halvorsen's** 24:22 26:5,17 32:13

**hand** 7:14 132:20

**handful** 159:8

**hang** 85:6

**happen** 56:5 103:16

**happened** 137:18 138:8

**happens** 137:18

**happy** 75:3 90:16

**harm** 15:5 85:1 86:13 99:18

**harris** 13:16 14:2,3

**head** 8:7 94:18 97:17,20 110:23

**health** 114:10

**hear** 11:11 33:20 58:19 85:5,16 94:14 94:16 136:22

**heard** 5:8 94:16

**hearing** 12:14 17:5 43:9,9,17 45:5,13,20 129:5

**hearings** 44:1

**heavy** 31:6

**hector** 16:16

**hedging** 56:5

**held** 85:20 115:22 163:3

**help** 53:6 64:6 74:20 87:22 105:13 113:13

**helpful** 40:18 41:12 45:4,22 55:10 60:20 143:23

**hereinabove** 164:18

**[hernandez - included]** Page 21

**hernandez** 99:22 103:7 133:9 134:7 137:9 150:13 152:14,18 153:3

**hernandez's** 134:14,19

**hesitated** 61:21

**hi** 159:13

**high** 93:16,17 94:5 98:4,11 99:6,16 100:6 129:15

**higher** 81:11 120:19

**highlight** 113:9

**highly** 144:11

**history** 14:24 123:16 128:18 128:23 130:16

**hold** 9:20 22:10 44:17 115:15

**homicide** 136:21 137:1 152:14 155:1,7

**hope** 91:13

**hour** 19:3 108:19,20 114:13,18,22 115:9 116:19 117:3,19

**hours** 21:21,22 21:23,24 35:3

43:9,14 100:16 106:17,19 107:4 108:12 108:13,22 112:8,11,21 113:11,12,16 115:7,11 117:16,21 119:17,23 120:2,6,20,21 120:21 124:23 125:10,22 126:9,20 127:10,18,24 128:8,13,16 129:10,19 130:4,17 131:13,21 159:6

**houston** 14:3

**huh** 120:18

**human** 36:20 37:3 38:20 98:23

**hundred** 81:16

**hypothetical** 56:6 140:6,10 140:13,16

**i**

**idea** 145:7

**ideally** 89:1

**identification** 9:12 19:15

37:24 61:4 62:23 76:9 95:15 122:16

**identified** 50:4 51:18 60:10 133:13 141:5 146:14

**identifies** 60:19

**identify** 56:17 59:4 121:4

**identifying** 92:14

**ifs** 133:22

**illinois** 1:1 2:6 2:10,15,19 5:18 164:1 165:3,8

**illness** 57:18,24 58:1 59:7

**imagine** 43:22

**immature** 66:11

**immediate** 66:15

**immediately** 150:24 153:14

**immobilized** 111:20

**impact** 126:21

**impacts** 4:21 121:15 122:21 125:23

**implicate** 154:23 156:13

**implicating** 133:8 139:1 151:10

**implored** 133:9

**implying** 51:14

**important** 97:15 135:2 153:6

**impossible** 37:13

**improper** 143:22 144:3,5 144:10

**impulsive** 66:13 71:6

**impulsively** 66:15

**inability** 66:4

**inaccurate** 50:18

**inadvertent** 61:1

**inadvertently** 23:7 24:17

**inaudible** 122:3

**incapability** 67:7

**include** 23:8,12 50:22 88:21 99:20 106:22 107:9

**included** 28:7 28:10 77:19 126:7 166:14

**includes** 108:13 121:20 131:2
**including** 24:21 95:21
**inclusion** 4:23
**incommunica...** 100:23
**incomplete** 37:3
**inconsistent** 39:23 90:1 103:21 146:4
**incorporated** 168:12
**incorrect** 144:21
**incorrectly** 148:15
**increase** 50:8 94:5 119:9
**increased** 69:14
**increases** 120:16
**increasing** 110:16
**incredibly** 31:6 90:22
**incrim** 87:19
**incriminate** 94:7 97:2,9 100:6
**incriminating** 87:19 88:24

89:4,18
**independent** 50:3
**independently** 38:18
**indeterminate** 95:11
**indicate** 28:12 102:23 104:10 104:23 133:19 146:23 155:23
**indicated** 45:21 149:14
**indicates** 129:18 147:13
**indicating** 72:22 101:9 134:17 143:14 146:20 149:4 166:14
**indicators** 49:11,11
**indicia** 16:11 48:21 49:4,10 49:22 50:14,19 50:21,21
**individual** 14:16,22 18:3 50:7 53:2 57:8 66:22 68:3 85:1 86:14 94:24 121:9,21 122:1 139:1,2 149:20

**individual's** 121:22
**individually** 23:13
**individuals** 57:13,14 66:1 72:21,23 73:7 74:21 77:16 81:3 82:15 91:19 93:11 113:24 114:1,4 120:20
**induce** 126:23
**induced** 47:6 47:15 52:13 54:9,15 125:14
**inevitable** 126:16
**inference** 129:24
**influence** 137:21
**influenced** 140:7
**information** 77:16 123:12 124:3,4,7 128:22 131:14 135:3 153:11
**initial** 141:24
**initially** 97:2 97:15 100:4,10
**initials** 149:2

**injuries** 41:22 42:4,6,8,9,24 43:6 83:15
**innocent** 17:12 17:15
**inquire** 44:2 82:11
**inquiry** 74:17
**insert** 142:16 145:1
**inserted** 142:12 142:22 143:9 149:4,14,18
**inserting** 149:17
**insertion** 141:18,20 144:13,15 145:6 147:22 148:9
**inserts** 141:23
**inside** 93:1
**inspection** 43:5
**intake** 41:17,20 41:22 42:3
**integrating** 123:11
**intellectual** 57:23 70:21
**intend** 34:15
**intense** 108:19
**intensive** 31:7
**intentional** 107:14 142:18

143:14

**intentionally**
108:4 109:5
141:22 142:22
145:1 147:23
148:19 149:5
149:15,17,19

**interested** 6:1
18:15 164:23

**internal** 91:3

**internalized**
52:22,22,24
53:9 55:2,21
56:12

**international**
157:15

**internet** 5:6

**interpersonal**
97:1,8 100:5

**interpret** 29:10

**interpretation**
125:1

**interpreted**
14:18

**interrogate**
151:19 153:18

**interrogated**
14:23 100:14
101:5,20
102:23 104:19
106:23

**interrogating**
108:3 151:18

**interrogation**
4:19 14:13,17
14:24 15:1,5
23:1 35:4,6,11
36:21 37:6
38:18 39:20
40:13,18 44:3
44:5 47:6,15
47:20 48:2,5
48:19 49:8
50:6,13 53:4
53:15 54:1,19
55:4,16,19,23
57:1 60:12,16
62:11 64:8
68:10 78:24
87:16,18 88:1
88:2,6,11,16,17
88:21,24 89:9
89:16,18,23
94:6 95:6,10
95:20 97:1
99:7,15 100:19
100:23 101:10
101:20 104:11
104:18,24
105:18,19
106:6,24 107:2
107:5,11,16,18
108:2,11,12
109:6,21 111:6
111:12 112:7
113:1,11,12
114:13,18,20

115:10 116:6
116:20,23
117:20 119:8
120:15 123:24
124:19,24
125:13,14
127:5 139:20
140:5 141:1,14
144:6 153:15
155:4,12

**interrogations**
40:11,24 92:3
93:1 109:10,20
111:22 112:1,7
112:19,24
113:16 118:23
119:22 120:5

**interrogator**
48:1 108:1
141:21 142:7

**interrogator's**
56:2

**interrogatories**
164:12

**interrogators**
93:12,16 109:8

**interrupt** 58:18
90:20

**interview** 8:13
27:8 71:5
126:5

**interviews** 71:2

**intimidate**
137:13

**introduce** 9:16

**intrude** 30:3

**invade** 29:23

**invading** 30:20

**inverse** 41:5

**inverted** 20:12

**investigate**
152:4 153:12

**investigation**
28:6 150:13
151:18 153:16
153:17

**investigations**
95:7

**investigative**
151:5,24
152:12,13,24
153:1,8

**invoice** 19:11
19:12,22,24
20:7,8,17,18
21:1,15

**invoices** 4:8
19:5,10 20:3
20:13 21:6,11

**invoke** 125:2

**involuntary**
59:1 124:19
125:6,15

**involve** 40:11

**involved** 68:10
113:24,24
115:7 117:16

**involving** 17:5
**iq** 57:14,17,22
  57:23 59:20,21
  60:1 70:20,20
  72:1 114:10
**issue** 14:20
  48:20 52:4
  60:1 92:3
  109:13
**issued** 17:6
**issues** 36:21
  55:7 114:10
  146:15
**item** 22:9,9
**itemized** 28:20
**items** 22:15,16
  22:23 25:6,12
  25:13 26:6
  32:2 77:3

**j**

**j** 68:5 167:4,9
  168:4,13
  169:20
**j.d.** 1:13 4:1 7:5
  166:5
**jackson** 2:19
**jail** 41:18
**jailer** 42:5
**jailers** 41:18,20
**jailing** 42:13
**january** 4:10
  26:1 38:6

**jason** 8:2 24:21
  25:20 133:8,14
**joanne** 134:9
**jose** 133:9
  134:7,14,19
  150:13
**journal** 96:13
  98:23
**jrcsf.com** 166:5
**jsotoslaw.com**
  2:20
**juan** 145:16,17
  145:18,20
  146:2,16 147:8
  147:11,14,17
**judge** 17:6,10
  43:13
**judgment**
  67:15
**july** 63:7
**jumping** 118:4
**june** 1:14 5:21
  164:5 165:6
**jury** 36:11
**justice** 3:4
**justifications**
  92:13
**juvenile** 65:4
  78:21
**juveniles** 57:13
  64:16,20 66:1
  66:10 68:19
  72:14 74:15
  78:19 80:7

113:24

**k**

**k** 164:2
**kane** 165:3
**kchristie** 2:20
**kept** 120:20
**key** 40:12
**kin** 164:24
**kind** 29:15
  57:16 69:15,20
  110:20 127:18
  131:23 146:3
**kinds** 52:13
**knew** 38:18
**know** 8:21 9:18
  10:22 12:7
  17:23 19:18
  20:2,6 21:6
  23:10 27:2
  30:3,12,13
  31:5,13,14
  32:1 34:19
  36:3,13,18
  38:3 48:3 50:5
  51:2 52:5 55:7
  55:9 61:1,8
  63:13 64:17
  68:24 69:3,8
  70:11 73:6,10
  73:19 75:14
  76:13 90:10,19
  90:20 92:19
  93:6 95:2

100:14 102:10
  107:9 108:3
  111:19 112:18
  119:4 132:5,20
  133:15 137:6
  137:17,18
  144:6 145:12
  153:5 158:11
**knowing**
  130:15
**knowingly**
  55:13,15 56:9
  56:10
**knowledge**
  34:19,21 50:16
  50:16 53:11
  56:7 71:20
  84:10,17,18,23
  86:11 87:6
  125:19
**known** 47:7
  57:8 81:9
  82:20 96:13
  109:3
**knows** 51:2
**krizan** 123:6,7
  123:8
**kyle** 2:18 4:3
  6:9 20:12 30:2
  69:18 83:7
  85:10 98:16
  103:24 152:17

**[l - loevy]** Page 25

**l**

**l** 94:22,22
**labeled** 112:15
**lack** 37:12 38:19 39:9 50:16 66:9
**language** 56:6
**late** 65:18 66:12,18 71:17 128:2 131:23
**laureano** 8:14 154:24 156:13
**laureano's** 8:15
**law** 2:18 4:10 19:6 38:7 73:22,23 77:19 78:4 98:23 124:17 125:5 125:12,20
**lay** 57:3,12 70:6
**layer** 90:3
**layperson** 84:19,24 86:11
**lead** 49:18 84:19 85:1 86:14 123:3,5
**leadership** 16:23
**leading** 112:7
**leads** 52:16 119:8

**leave** 163:4
**leaving** 111:13
**led** 49:1 51:8 64:21
**left** 107:4,10 111:6,12
**legal** 5:22 17:10 36:13 54:10,15 127:14 166:1 169:1
**lend** 139:21
**length** 100:19 104:18 105:18 106:24 112:18 112:23 113:1 113:10,12,15 116:6 118:22 120:5,15 125:12
**lengthy** 100:23 119:7 125:4
**leo** 1:13 4:1,6,9 5:14 7:5 9:18 19:18 20:5,6,6 20:17 29:24 30:19 31:1 44:14 45:2 58:23 61:7,24 63:6 69:23 76:2,18,19 86:23 95:17 98:14,18 99:5 112:20 113:5,6

118:21 120:24 122:18 146:24 150:22 154:8 159:4,13 161:16 166:5,9 167:4,9 168:4 168:13 169:20
**leo's** 116:7
**letter** 166:20
**letting** 107:15 109:4 110:12 110:19,20
**level** 59:20 126:21 127:11 127:19
**lexisnexis** 77:21
**license** 165:7
**licensed** 69:2
**life** 37:8 71:7
**likelihood** 110:15
**likely** 50:17 65:1 67:23 69:13 97:8 100:5 120:7 127:20
**limit** 127:15
**limited** 36:21 38:20 110:23 114:10
**line** 41:16 45:5 45:8 69:12 97:23 102:19

114:15 118:23 124:17,22 125:3,5,11 145:21,22 157:9 161:21 166:14 168:7 169:3
**lines** 54:4 129:5 130:10 147:2 147:12
**lisa** 134:8
**list** 8:4 11:3,13 13:19 18:12,13 18:18 78:14
**listed** 23:10,13 26:6,8 32:2 77:3 168:7,17
**listing** 168:7
**literal** 107:23
**literature** 47:8 54:8,14 68:17 71:14 88:22
**litigation** 84:13
**little** 22:1 30:1 51:13 58:18 72:12 89:14 98:8 128:2
**llc** 2:13
**local** 15:12,13
**locally** 16:16
**locked** 109:5
**loevy** 2:4,4 3:4 3:4,5,5 8:1,1 19:6,6 28:21

**[loevy - meet]** Page 26

28:21
**loevy.com** 2:7
**log** 85:14,14
**long** 37:6 65:2
66:3,16 67:7
107:1,23 120:7
**longer** 90:12
**look** 12:10,14
17:22 18:4
30:14,15 31:13
39:20 40:4
46:22 48:12
73:19 78:3
81:15 105:2
123:4 144:18
146:24 148:1
160:24
**looked** 97:17
**looking** 73:4
116:7 146:4
**looks** 10:4
19:22 130:1
149:10 159:18
**loses** 55:21
**lost** 83:22
115:16 116:2
**lot** 69:3,4,5
75:6 78:11
**low** 57:14
**lower** 7:13
**lowered** 132:21
**lunch** 118:11
118:22

**lying** 56:9

**m**

**m** 1:14 164:5
165:6
**m.d.** 4:7
**made** 33:24
147:19 148:14
154:23 155:18
164:17 167:7
**magic** 126:1
**main** 8:18
10:23 57:16
**majority** 12:15
17:17 18:5
114:24 117:6
158:23
**make** 27:6
32:17 33:1
44:8 50:9,10
51:22 53:6
66:14 71:8
74:10 82:18
115:1 117:8
139:16 143:6,6
145:3 150:18
**makes** 37:13
67:8
**making** 51:16
67:4,9,14,17
68:22 80:6
151:2
**manipulated**
64:21

**manual** 88:4
**manuals** 88:15
88:19,22
**mark** 19:17
63:3
**marked** 9:11
19:14 37:23
61:3 62:22
76:8 95:14
122:15
**massachusetts**
13:7,10
**materials** 21:18
22:4,7,14
26:14 27:19,23
28:1,2,4,17
31:15 33:1
48:12 59:23,24
69:11 78:10,13
78:14 83:20
104:13 105:3
157:2
**mathematical**
21:4
**matter** 5:15
10:10 19:7
20:8 21:14
23:24 24:23
25:2,4 26:3
27:15 33:7
34:16 51:5
63:8,15 104:6
126:2,14 136:3
136:9,15

137:24
**matters** 12:9,11
12:12 17:20
29:17
**max** 12:12
95:21 99:9
**mean** 30:1,8
58:18 63:15
66:4 70:5
90:19 127:4
142:16 143:4
145:9
**means** 35:14
57:4
**meant** 162:11
**measure**
112:22
**measured**
114:13,18
116:20
**measurement**
110:21
**measuring**
71:12
**media** 5:13
44:23 75:22
118:18
**median** 112:23
113:3,11,15
114:19 116:6
116:14,22
**medium** 33:14
**meet** 126:12

**[member - need]** Page 27

| | | | |
|---|---|---|---|
| **member** 137:7 137:9 | **military** 12:2 17:19 | **mistakes** 143:6 147:19 | 133:9 134:14 134:19 138:8 |
| **memories** 56:3 | **mind** 152:21 | **mixed** 152:21 | 150:13 153:3 |
| **memory** 36:20 37:3 38:20 55:22 56:7,14 74:20 93:11 | **minor** 141:23 142:10 | **mmpi** 70:19 72:1 | **murdered** 134:8 |
| | **minority** 115:13 118:1 | **mobilization** 4:18 95:19 98:5,12 | **n** |
| **mental** 57:17 57:24,24 59:7 107:20 114:10 | **minute** 44:8,12 44:12 75:7,9 101:22,23 153:21 160:24 | **mobilized** 96:24 | **n** 68:5,5 164:2 **naive** 64:22 **name** 5:20 13:8 13:18,23,23 70:9 94:22 146:15 159:13 166:6 167:3,4 167:15 168:3,4 168:21 |
| **mentally** 57:13 | **minutes** 75:14 106:18 | **modify** 39:24 | |
| **mention** 26:13 104:18 141:17 | **mischaracteri...** 32:7 138:2 | **moment** 66:13 86:5 116:3,12 | |
| **mentioned** 24:19 31:23 49:4 62:18 71:21,24 94:1 103:20 107:13 110:8,24 125:10 141:8 156:20 | **misconduct** 45:12 98:3 | **montanez** 8:10 24:23 26:18 32:13 | **named** 16:15 164:9 |
| | **miscorrected** 145:5 | **moral** 92:13 | **narcotics** 129:12 |
| | **misguide** 157:21 158:6 | **morning** 5:1 6:9,12 7:11,18 75:6 128:3 130:5 131:23 131:24 | **narrative** 89:2 **national** 72:17 73:9,12 |
| **mentioning** 116:1 | **misheard** 32:1 | **motion** 102:2 129:2,4 146:7 | **nearly** 126:9 **necessarily** 38:19 41:5,13 46:3 88:13 100:1 |
| **method** 66:21 67:21 | **misleading** 144:11 | **move** 87:11 89:3 93:12 132:22 136:13 | |
| **methodology** 121:8 122:1,10 | **misspelled** 148:19 | **moving** 72:12 | |
| **methods** 84:8 | **misspoke** 162:8 | **mug** 22:17 | **need** 9:20 17:22 44:7 48:12 55:7 61:15,17 75:6,10 119:19 123:16 152:16 |
| **mid** 65:11 | **misstating** 131:19 | **multiple** 108:14 135:14 151:8 | |
| **middle** 64:14 69:15,20 109:2 112:4 145:20 | **mistake** 21:4 28:3 | | |
| | **mistaken** 60:14 | **murder** 99:21 103:6,14,14,18 | |
| **midwest** 166:18 169:1 | **mistakenly** 27:23 | | |

**[needs - obviously]**

**needs** 39:19

**neurodevelop...** 71:14

**neurological** 71:13

**never** 34:8,10 34:10 134:2

**newspaper** 157:19 158:4 158:16,18,21 158:24 159:2

**night** 124:14 126:17 128:2 128:14 129:14 129:15 130:2,9 130:16 131:13 131:21 132:1 162:2

**nine** 128:16

**nonpolice** 54:9 54:15

**nonthreatening** 98:4

**nonverbal** 72:1

**normal** 130:8

**north** 2:5 73:22 165:7

**northern** 1:1 5:18 93:3

**notary** 1:14 164:6,14 165:3 165:6 166:16 166:24 167:10 167:18 168:15

168:23 169:23

**notations** 25:8 25:9 33:2

**note** 4:23 5:4 64:10 65:24 166:12

**noted** 9:1 17:16 26:20 135:11

**notes** 32:21 33:3,5,9,10,13 160:13,17,24

**noticing** 6:8

**notorious** 16:16

**nuanced** 89:15

**number** 5:19 16:13 20:8,18 21:1 22:18 23:11 25:24 27:2,3 42:3 44:23 47:4 74:4 75:22 82:14 83:6 95:4 110:7 114:22 117:2 118:18 125:21 125:22 126:1 166:7,14

**numbers** 30:10 77:11,16 80:17 168:7

**numerous** 84:11

**o**

**o** 68:5,5

**o'clock** 118:13

**obedient** 64:24

**object** 29:3,21

**objection** 11:16 11:19,20 20:10 23:3 24:12 27:11 28:13 29:1 30:13,22 30:23,24 32:6 32:23 33:17 34:1 35:12,24 36:24 37:17 39:14 40:7 41:24 42:11,19 45:14 48:10 51:23 52:10 54:5 59:10 60:3 62:13 65:8 66:6 67:1 67:24 70:2 72:5,7 73:2 74:1 80:13 81:5 82:6,16 89:12 91:6 92:17 93:19 94:10,11,15,16 94:17 96:1 97:10 99:10,23 100:7 105:23 106:1 108:6,15 109:24 111:8

120:10 122:3,5 122:7 124:1 127:1 129:21 130:11,21 131:16 132:13 134:20 135:5 136:16 137:3 137:15 138:1 139:24 140:22 142:13 143:2 146:22 150:16 150:18,19 152:5,15 156:17 157:22

**objections** 6:3 45:24 46:10 59:15 118:9 158:8

**objective** 35:5 35:20 37:13 39:10 53:3,24 54:17 56:16

**observation** 111:1

**observed** 92:22 93:1 111:22 144:8

**obtain** 158:21

**obtaining** 92:16

**obviously** 36:9 49:7 50:11 151:6

**[occurred - outcome]** Page 29

**occurred** 35:5 35:10,15 37:5 38:17 41:10 44:2 47:20 48:19 53:15 54:18 101:18 108:21 155:11 155:19
**occurs** 50:13
**offered** 160:1
**offering** 36:7
**office** 6:20 14:4 14:19 15:13 45:10 156:7,15 157:4
**officer** 14:15,22 15:8,9 40:11
**officers** 2:21 6:10 92:14 108:3
**official** 165:2 167:15 168:21
**ofshe** 38:7 39:5 88:10
**oh** 10:2 20:16 24:14 104:2 115:17
**ohio** 166:2
**okay** 7:13,21 8:20,22 9:7,22 10:12 11:5,7 19:5,20 20:20 20:23 21:10,13 21:24 22:3,7

22:20,23 23:19 23:23 24:7,16 25:5,12,18 26:2,5 28:23 31:23 38:5,9 38:15 43:17 45:8 47:12 48:14 49:15 57:16 59:4,7 59:13 60:10 61:6,9,17 62:9 63:2,18 64:10 64:14,18,19 65:4 67:19 69:21 72:12,20 73:6,20 74:7 75:14 76:11 77:1,10,14 79:3,16,19 80:5 81:18,21 82:2,10 83:3 83:10 84:7 86:20 87:9 90:7 95:17,24 96:21 97:4,22 99:3 102:3,6 102:11,13,20 102:21 104:16 104:22 105:4 106:16 109:13 109:18 110:11 112:10 113:18 118:5,8 119:2 119:5,21 120:4

121:8,18,24 122:11 123:14 125:20 126:3 126:19 127:14 127:23 128:4 128:12,21 129:3 131:9 132:22 135:18 137:6 138:23 139:6,11 140:18,21 141:11,16,20 142:4 143:23 146:6,14,20 147:7,16,20 148:13 149:3,7 149:13 150:2,6 150:9 152:3 153:20,23 154:11,13,19 156:4,23 157:3 157:9,18 158:14 159:10 159:24 160:11 160:16,21 161:23 162:14
**old** 60:15 62:3 62:10 64:7 65:7,7
**older** 65:14,20
**omitted** 27:23
**one's** 40:5 67:3 67:8

**ones** 142:23 147:8
**oneself** 67:6
**open** 38:2 61:6 113:4 122:18
**opine** 14:12 36:5 71:4 150:10
**opined** 14:9 15:22 36:14 160:8
**opinion** 17:15 30:15,17 31:16 36:7 47:4 48:15,18 51:9 151:21 162:12
**opinions** 11:9 11:14 16:9 23:1,17,20,23 24:3,4,9 26:15 27:10 34:12,15 36:17 51:7 71:2 159:19,22 159:24 160:5,8 160:18
**opportunity** 111:13 144:1
**opposed** 95:9
**oral** 164:11
**orders** 163:5
**ortiz** 157:11,11
**outcome** 6:2 15:18 17:4,7

**[outline - payments]** Page 30

| | | | |
|---|---|---|---|
| **outline** 49:17 51:7 153:22 | 22:16 23:11,11 23:12,16,19,20 | 145:15 146:8 148:13,21,23 | 158:15,18 161:19 168:9 |
| **outside** 7:21 39:20 40:5,9 56:13 85:20 115:22 163:3 | 25:5,7 26:7 29:19,19,20 30:10,16 31:20 34:11 35:1 | 149:8 150:8,9 154:12,15 159:17 160:7 160:19 166:14 | **participant** 36:23 38:22 **participants** 5:7 98:2 |
| **overall** 80:24 123:17 | 38:10,10,11,11 38:11 41:21 | 168:7 169:3 **pages** 9:8,10,23 | 100:12 **participate** |
| **overbearing** 48:5 55:17 119:10 120:16 | 43:12 47:2 48:13 51:6 56:21 57:11,11 | 9:23 10:12 22:15 77:2 150:4 155:23 | 99:21 **participation** 103:18 |
| **overnight** 111:24 | 58:2,9,23 62:1 63:5,19 64:10 | **pai** 70:19 72:1 **papers** 95:4 | **particular** 15:2 31:20,20,21 |
| **overrides** 89:20 **overview** 23:17 57:7 | 64:11,15 65:23 69:16,18,19 72:13 76:18,20 | **paradigm** 49:23 **paragraph** | 36:6 42:4 50:5 56:24 67:15 **particularly** |
| **own** 67:3 91:17 107:6 131:2,6 | 76:21,23 77:2 78:18 79:7 80:5 83:5,6,10 | 38:13,16 64:15 69:15,16,20 72:13,13 74:2 | 56:20 81:24 **parties** 5:11 165:1 |
| **p** | 84:2,4 100:20 100:22 102:7,8 | 78:18 83:13 109:1,2 112:5 | **party** 5:24 **past** 12:24 13:2 |
| **p.m.** 75:20 101:3,4,6,12,13 104:20 105:11 | 102:9,11,14,15 102:17 103:1 103:12,15,22 | 113:10 133:2 141:17 **paralegal** 3:5 | 18:9 107:9 128:18 **patrick** 27:17 |
| 106:16,17 118:15,16 126:5,6,6 | 104:4,9,9,16 105:10 108:24 110:11 112:3,4 | 6:20 **part** 10:23 19:21 26:22 | **pattern** 16:21 24:6 98:5,11 159:21 |
| 154:3,4 161:8 161:9 163:1,13 | 113:5 114:14 115:3 117:10 | 39:4 61:20 77:7 97:15,15 | **patterns** 128:22 132:5 |
| **pad** 9:5 33:5,14 **page** 4:2,5 10:4 | 119:3,6 120:14 121:1 123:10 125:8 132:23 | 107:11,16 113:9 121:1 134:6 144:24 | **pauses** 109:21 **payments** 154:21 155:6 |
| 10:6,8,24 12:1 18:22 20:7,7 20:17 21:1 22:3,8,8,13,16 | 133:18 141:9 141:16 145:11 | 150:7 154:10 155:16 156:12 | 156:6 |

**pc** 2:18
**pdf** 38:10 76:20
  102:6 123:11
**people** 37:7
  66:11,17 68:19
  71:16,17 78:2
  81:12 83:5
  90:4 91:24
  95:5 128:16
  151:19
**perceiving** 67:7
**percent** 80:2,16
  81:16 115:7
  117:15 119:16
**perception**
  91:4,18 139:5
  139:8,21
**perceptions**
  67:8
**perceptual**
  67:16 70:21
**period** 45:20
  101:22,23
  106:4 112:6
  148:24
**periods** 107:10
**person** 55:21
  89:3,10 105:20
  139:9 149:23
  153:13,18
**person's** 50:14
  128:18
**personal** 49:18
  49:23 50:8

51:8 56:7 57:3
57:8,17 58:4
59:14 60:1,7,8
114:9
**personality**
  50:14 58:24
**personally**
  167:11 168:15
**perspective**
  89:1
**persuaded**
  52:21,21,24
  53:9 55:1,20
  56:12
**pertaining** 1:17
**ph.d.** 1:13 4:1,7
  7:5 166:5
  167:4,9 168:4
  168:13 169:20
**phone** 165:8
  166:3
**photograph**
  41:4,8,11
**photographs**
  40:17 83:18
**photos** 83:15
**phrase** 49:15
  67:19 84:17
  90:24
**physical** 15:6,6
  16:22 41:1,3,5
  41:7 43:1,3
  45:12,22 50:22
  83:4 84:19

99:17 151:11
**physically** 41:6
  48:3
**physiological**
  95:5,9 98:12
  110:21
**piece** 36:5
  40:12,14 134:5
  134:5 135:2,8
  135:9
**place** 5:11
  31:11 151:9
  155:4
**placed** 101:3,15
  102:24
**places** 31:4,8
  60:23
**plaintiff** 1:5 2:8
  6:18
**played** 137:22
**please** 5:4 6:4
  6:23 7:3 8:7,21
  48:13 66:3
  86:5 98:8
  102:12 116:12
  122:4 163:5
  166:12
**ploy** 140:7,24
**ploys** 132:24
  133:12 141:5
**point** 47:24
  72:3 87:5 89:9
  91:9 93:23
  98:19 106:22

110:4 125:2
126:10 161:23
**pointed** 29:18
**pointing**
  139:14 156:5
**polanco** 16:16
  16:23
**police** 11:9
  14:13,14,22,24
  15:3,8,9,12
  16:24 24:4
  40:11 45:12,22
  51:2 52:13
  87:16,18,21,23
  87:23 88:12,21
  89:1,15 91:23
  92:2,14 93:2,4
  95:7 107:14
  109:3 111:1
  143:20 144:7
  144:12,24
  149:16 151:16
  153:12 159:19
  159:20 160:6
**policies** 11:14
  160:6
**policy** 45:17
  160:18
**pop** 95:17
  97:22 113:4
**populations**
  56:24
**portion** 24:22
  26:16 32:12

57:6 103:19 112:13 132:23 141:14

**portions** 8:8 31:10,24 32:4

**position** 36:22 38:21

**possibilities** 31:12

**possibility** 78:24 143:5 155:6 156:21

**possible** 32:20 38:23 39:10,16 55:24 60:17 70:23 96:18,19 96:20 158:10 158:22 159:1

**possibly** 22:1

**post** 4:17 13:17 14:5 17:5 73:24 76:5,17

**potential** 148:24

**potentially** 37:13 41:12 42:16 43:18 46:8,12 135:8

**practice** 15:3 16:21 24:6 42:13 45:9,17 159:22

**practices** 11:9 11:14 14:14

15:1,2 24:5 50:6 160:7

**pre** 28:5

**precedent** 125:2

**precedes** 109:9

**prep** 21:15

**preparation** 21:18 23:6 24:19 25:14 27:1,20 28:9

**prepare** 7:17 7:22 29:9

**prepared** 8:14 26:12,14 27:22

**preparing** 32:22 34:7 59:8 123:22 152:2

**presence** 166:16

**present** 2:1 3:2 6:19 116:4 164:7

**presented** 99:6

**pressure** 91:3,4 97:2,8 100:5

**pressures** 78:24 94:6

**presumably** 42:6 156:19

**presume** 89:3

**presumption** 150:7 151:3

153:7 154:10 155:14,17,20 156:2 157:7

**presumptive** 88:2

**pretty** 27:6 80:18

**previously** 37:12,20 98:18 112:15 145:23 164:8

**primarily** 50:23 53:20 88:3

**primary** 30:22 53:10 60:7 70:7,15 71:19 88:23 89:17,23

**principles** 84:8

**prior** 25:21 32:7 63:17 106:10 128:18 129:8,13 144:20 146:2 151:4,18 152:2 152:11 153:2,8 153:16,17 160:12,17

**privilege** 29:4 30:12,23

**privileged** 30:4 30:20

**probably** 16:19 37:4 54:24

55:2,6 56:14 68:24

**probative** 40:14 42:17 43:2,18

**problem** 4:16 73:23 76:4,16 161:4

**problematic** 51:13

**procedure** 1:16 167:5 168:5

**proceed** 6:24 7:4

**proceeding** 6:4

**proceedings** 4:14 63:7

**process** 49:1 52:15 53:1 95:10 109:9

**processes** 67:17

**produce** 98:19 120:7 127:20

**produced** 98:4 98:11,18 160:14

**product** 29:3 30:4 55:19

**production** 22:21 166:18 166:22

**prohibitions** 15:3

**[prolific - questionnaire]**

**prolific** 90:22
**promise** 58:15
**pronounced** 68:5
**proof** 91:4,18 139:5,5,8,21
**proper** 121:24 141:1 143:19
**properly** 47:7
**proportion** 82:23
**proportional** 82:13
**proposition** 97:6,19
**prosecute** 89:5
**prosecuted** 14:15 15:15 155:1 156:14
**prosecution** 12:18,21 13:4 14:9
**prosecutor** 27:15 134:17
**prosecutor's** 15:13
**prosecutors** 87:22
**provable** 17:3
**proven** 54:19 77:6 79:12,20 82:12 93:23 94:2 119:16

**provide** 49:19 51:9 77:22 81:4 139:15
**provided** 4:23 28:4,16,21 31:15,24 32:14 32:18 93:11 142:4
**providing** 25:9 58:5
**province** 36:4
**psychiatrist** 71:11
**psychiatrists** 71:3
**psychological** 15:4 16:21 49:1 50:22 52:15 53:1 68:17 71:14 98:5 107:20 123:17
**psychologica...** 14:16 48:4
**psychologist** 67:14 69:1,1,2 71:11
**psychologists** 68:9 70:18
**psychosis** 126:24 127:5 127:21
**ptp** 22:21

**public** 1:15 45:10,19 46:7 164:6,14 165:3 165:6 167:10 167:18 168:15 168:23 169:23
**published** 39:7 73:22 92:24
**pull** 76:11 119:19 146:6
**purpose** 44:2 78:1 87:15,18 87:24 88:6,11 88:16,17,23 89:16,18,20
**purposes** 106:5 107:2
**pursuant** 1:15 164:20
**put** 9:14 18:13 28:16 48:2 55:15 106:18 143:14 153:6

**q**

**qualification** 37:9 74:11
**qualify** 128:9 128:10
**quality** 5:5,6
**quantitatively** 120:12
**question** 11:10 29:15 30:7,21

31:11,14 33:21 37:22 49:14 51:13 54:12 58:10,19 59:19 62:3,6 63:22 63:24 64:2 67:12 73:18 74:12,17 75:4 80:7 82:7 84:22 86:1,3,8 86:9 87:1 93:13 94:12 115:2 116:4,9 116:13,17 117:7,9,14,18 117:24 118:5 120:11 124:2 124:11 125:7 129:7,12 131:5 131:9 136:4,23 139:17 140:13 144:4 151:23 152:10 157:9 161:15 162:2
**questioned** 107:24
**questioning** 41:16 45:6,9 97:24 103:6 106:15 114:15 118:24
**questionnaire** 70:11

**questions** 31:9 34:21 69:12 76:3 91:13 92:10 116:9 149:21 154:9 157:10 159:5,9 159:15 161:21 162:16 164:12 164:16

**quick** 7:14 75:10 161:1

**quickly** 97:23 105:5

**quite** 84:15

**quote** 35:2 64:19 96:22 109:3 119:7 125:10

**r**

**raise** 109:6

**raises** 110:13 110:22

**raising** 109:14

**range** 13:13 21:23 22:2 65:15 114:22 117:4

**ranges** 81:11

**rapport** 109:9

**rare** 68:13

**rate** 19:2 81:2 120:19

**ratio** 82:23

**reach** 22:24 54:1 157:19 158:5

**reaching** 11:13

**react** 93:15

**reactions** 95:5

**read** 32:12 39:2 61:19 66:1 69:4 70:17 74:6 85:24 86:6 91:10 95:3 96:14,15 96:18,19 102:8 102:9,16 109:11 110:5 116:8,13,15 146:12 147:4 147:12 158:1 167:5,6,12 168:5,6,17

**reading** 90:14 101:8 102:11 108:7 130:1 147:4 149:18 166:11,20

**real** 7:14 160:24

**really** 17:22 102:19 108:20 151:21

**realm** 143:4

**reason** 31:21 82:10 139:1,8

166:15 168:8 169:3

**reasonable** 35:23 39:1,12 54:2

**reasonably** 151:19

**reasoning** 67:16 70:22 126:22

**reasons** 107:12

**recall** 8:6,20 13:3 14:9 15:17,22 17:4 18:17 25:1,12 25:22 26:10,21 27:21,24 28:3 32:19 33:16 34:2,4 36:21 38:20 45:5 46:20 59:11,16 59:22 60:4 69:10 72:10 76:6 90:14 91:11 96:16 105:1 108:7 110:6 112:23 113:18,23 114:3,7,8 118:23 128:1 132:6 134:15 134:22 135:20 135:24 136:2,6 136:12,17,20

138:15,19 143:17 148:17 149:6,17 152:3 155:9 156:23 158:23 159:1 161:21

**recalling** 14:17 16:12 113:21

**recanted** 133:21 151:8

**recanting** 133:20 137:13

**receipt** 166:19

**received** 154:21 156:5

**recent** 65:12 87:4 135:16,24 154:20

**recently** 160:8

**recess** 44:19 75:18 118:14 154:2 161:7

**reckless** 150:12

**recognize** 78:3

**recognized** 144:6,21

**recollection** 15:19 17:7 18:7,19 19:10 21:9 26:12 31:3,19 32:11 47:11 60:9 73:3,13 81:14 82:18 85:3

86:17 90:16 91:15 92:9 95:8 105:13 107:7 113:13 122:9 136:10 153:4 157:1

**reconstruct** 38:17

**record** 5:2,12 6:7 8:23 20:5 22:20 23:15 35:5,21 36:16 37:13 38:19 39:10 44:18,23 53:3,6,17,19,24 54:17,21 55:3 55:8 56:16 59:17,20 61:23 63:4 75:13,17 75:22 76:15 83:19,22 85:9 85:11,13,15,18 85:20,22 86:6 86:24 104:14 105:3 108:8 115:18,20,22 115:24 116:2 116:15 118:10 118:13,18 154:1,6 159:6 161:6,11 162:5 162:23 163:1,3 164:16 168:9

**recorded** 5:9 5:14 35:16 109:19

**recording** 5:5 5:10 35:2 40:13 53:24 54:18 56:16

**records** 17:22 18:4 19:9,13 32:17 71:5 154:20

**refer** 109:8

**reference** 74:19 166:7 167:2 168:2

**referenced** 96:4 167:11 168:15

**referencing** 74:3 103:22

**referred** 24:7 164:18

**referring** 65:19 91:14 92:20 93:5,9 103:8 104:4 112:14 145:11 148:9 153:5 156:6 158:12

**reflect** 66:16

**reflection** 107:22

**refresh** 18:6 73:13 74:20 85:3 86:16

90:16 91:14 92:8 95:7 105:13 113:13 136:10 138:21 152:16 153:4

**refreshing** 47:10 157:1

**refused** 17:11

**regard** 36:12

**regarding** 159:19 160:6

**registry** 72:17 73:9,12

**reid** 88:4,11,14

**relate** 24:4

**related** 4:21 5:24 49:12 50:3 116:5 121:15 122:21 136:21 137:1

**relates** 23:24 160:18

**relation** 33:6

**relative** 31:6,7 59:5 60:6 116:6

**released** 43:15

**relevant** 42:16 46:2,8,12 128:20,24 135:8,8 153:16 153:17 155:13 155:18,20 157:7

**reliability** 36:3 36:5 39:18,22 40:1 49:4,12 51:1

**reliable** 35:23 36:8 37:15 38:24 39:12

**relied** 24:9 48:8 48:17,21 53:12 53:20 77:15 78:8 91:20 104:10,13 158:15,17

**rely** 47:14

**relying** 73:21 74:13 102:22 103:19 104:22 105:16 121:11 130:18,19,24 131:1,6 132:9

**remainder** 9:15

**remaining** 10:12

**remember** 18:2 37:4,8 63:23 110:5 119:20 133:24 151:16

**remembering** 10:20 15:14 16:18 28:18 56:1 82:1

**remotely** 1:13 6:18 164:5

**render** 124:18 125:14

**reopen** 101:24

**repeat** 11:10 122:4 136:23

**repeatedly** 84:11 99:14 133:5,16 154:20

**rephrase** 27:5 114:16 125:7 136:5 139:18 151:23 152:10 152:18 160:4

**report** 4:6,14 7:18 8:2 9:1,3 9:7 10:4,9,13 10:19,24 12:1 16:8,19 18:23 19:12 20:1 21:7 22:4,8,9 23:7,9,16,19,20 25:6,7 26:7,13 26:14,16 27:1 27:10,22 28:6 29:10,20 32:22 34:7,12 35:1 36:17 46:21,22 47:2 48:13 51:6 56:21 57:7,12 58:3 59:9 60:11 62:1,9 63:6,17 64:11 65:24

72:24 73:8 74:23 77:8 78:8,14 80:6 81:1 83:4 84:3 100:19,20 103:12,23 104:3,17 107:13 108:24 110:12 112:4 112:13 119:3 120:15 121:1 123:23 132:23 133:19 135:19 141:7,10 142:2 147:22 148:11 148:12 150:7 152:2 154:10 159:16 160:19 161:19 162:3

**reported** 42:9 60:18 72:15 80:9 105:5 106:10,12 114:23 117:4 142:5 143:15 145:12 146:11 148:6 157:5 164:5

**reporter** 5:21 6:23 7:3 15:24 33:20 68:4 85:24 86:5,7 95:13 98:7 116:8,12,16

118:3,7 122:4 122:13 142:12 142:18 143:6 143:13 148:18 149:24 163:4 163:11 167:7

**reporter's** 142:23

**reporting** 43:5

**reports** 11:9 27:3 70:17

**represent** 85:23 159:14

**representation** 74:15 82:20,24

**represented** 72:15,24 73:8 74:22 80:8,12 80:20

**representing** 5:22 35:14,16

**request** 29:14 32:17 37:19 168:9,11

**require** 128:16

**required** 166:24

**research** 47:8 50:4 65:12 69:1 74:14 90:4,14 91:10 91:18,20,22 92:1 93:15 94:4,19 95:1,2

95:24 96:4 97:4,5 110:15 125:21 130:18 130:24 131:3 131:10 138:24

**researcher** 94:21 157:10

**researchers** 109:15

**reserve** 162:18 162:20

**resist** 97:1,8 100:5 107:20

**resistance** 4:19 94:6 95:19

**resources** 107:20

**respect** 11:24 36:2 39:18,24 41:2 70:4 71:23 75:4 120:5 125:12 126:3

**response** 4:19 95:20

**rest** 12:13 102:17 148:1 149:8 150:3

**restroom** 44:8

**result** 55:22 56:1 64:16,20 67:3

**results** 96:22

**[resumed - rodriguez]**

**resumed** 44:20 75:19 118:15 154:3 161:8

**retained** 12:17 13:4 17:17 83:24

**retainer** 19:11 20:20

**retaining** 31:13

**retaliation** 136:14 137:22 138:8,13

**retention** 19:6 33:6

**retired** 15:11

**retirement** 90:23

**returned** 166:19

**reveal** 109:21 153:11

**review** 4:10 16:10 21:18 27:14,19 28:5 28:9,12 38:7 71:5 73:22,23 77:20 78:4 81:7 83:18 84:1 87:7 105:2 110:6,9 113:2 134:16 135:3 143:13 149:3,13 152:12 166:12

167:1 168:1

**reviewed** 7:18 8:1,2,3,8,10,11 8:12,17,18 11:13 16:13 22:5,7,15,24 23:10 24:8,18 24:20 25:2,13 25:21,23 26:11 26:14,20 27:1 27:4,19,21,23 28:2,8,16,17 33:13 48:13 53:20 59:23,24 63:16 69:11 78:13 83:20 95:24 96:3,4,9 104:14 105:3 111:17 134:23 135:13 151:24

**reviewing** 26:16 27:7 60:18 80:9 148:17 152:24

**reyes** 136:3,9

**reynaldo** 1:7 2:12 5:16 6:14 166:6 167:3 168:3

**rfclaw.com** 2:16

**rhythm** 58:17

**richard** 1:13 4:1,6 5:14 7:5

72:9 76:18 86:2 88:9 137:4 138:4 166:5 167:4,9 168:4,13 169:20

**right** 7:11,15 9:2 10:8 11:24 20:21 21:8,11 24:23 31:16 34:14 38:6 45:2 46:18 49:20 54:11 56:19 57:14 63:10 75:8 76:2,15 81:11 87:14 93:21 96:16 103:8 104:6 112:11 118:21 121:6 121:16 122:18 124:11 127:12 133:14 134:4 135:15 137:14 139:6 140:11 142:5 147:3 148:6 149:21 150:10 151:22 154:8 156:7 159:4 162:20

**rights** 84:12

**ring** 111:19 157:12

**risk** 16:10 49:18,23 50:3 50:8,12,19 51:7,8,18 57:4 57:9,17 58:4 59:1,5,14 60:1 60:7,8 65:20 114:9 119:10 120:16 121:5

**risky** 65:1 66:14

**rival** 137:9

**rivera** 8:3 25:21 27:9 133:8,14,21 134:1,3,6,9,13 134:18 135:4 135:19 136:12 154:16,20 156:5,16

**rivera's** 24:22 26:2 27:9 135:13,14 137:20 139:12 140:11,19 141:4

**rleo** 166:5

**rmr** 1:14 164:5 165:6

**rock** 2:13

**rodriguez** 1:4 4:12,15 5:16 6:18 9:4 10:9 23:2,24 26:3

28:6 34:16
35:10 46:16,17
51:9 58:4
59:14 60:2,11
61:13 62:10
63:4,8,19,20
64:7 66:23
67:22 69:8,24
72:3 79:3,16
83:14 99:6
100:4,11,14
101:2,5 102:7
102:22 103:16
104:5,19 105:6
106:9 107:4
108:4 126:7
127:24 131:11
133:4,5,7
137:6,24
139:20,22
140:5,10,16,19
141:5 142:4
146:8 148:7
150:14 153:2
154:17,24
156:13 157:4
159:16 166:6
167:3 168:3
**rodriguez's**
28:24 35:3,22
36:15 47:5,15
48:6 52:6,8
59:4,20 63:14
72:21 80:11

101:10 102:1
112:10 114:12
114:17 115:9
116:5,18
117:18 120:6
124:12 126:4
129:4 130:8,15
135:21 136:7
136:14 139:14
139:19 140:8
141:14 142:8
143:15 146:7
150:23 151:4
152:11 153:9
154:22 155:4
155:11,24
161:20 162:1,4
**role** 16:24
137:22
**rolled** 149:9
**room** 50:13
57:1 95:6
108:2 109:6
111:6,13
**roughly** 106:20
**routine** 92:2
**rule** 125:3,5
**rules** 1:15
164:21 167:5
168:5
**ruling** 17:6,8

**s**

**s** 13:22 16:3
68:5,5 168:8,8
169:3
**salient** 37:8
**sample** 77:8
78:20,21
**sat** 109:22
**satisfied** 78:5
**saw** 20:6
119:16 147:23
**saying** 48:15
51:14 88:10
130:2 147:8
151:20 160:3
**says** 11:2 19:1
35:2 38:12
47:5 61:10,12
62:2 63:10,21
64:19 72:14
78:19 79:19
80:7 83:14
84:7 96:22
98:1 103:2,21
105:11 113:10
115:6 117:15
119:7 125:9
129:6 131:2
134:1,3,6
145:16 149:11
154:16
**scahill** 2:9

**scales** 68:7 70:8
70:14
**schedule** 130:8
**scholars** 72:17
87:17 88:7
**science** 47:8
84:10
**scientific**
151:12
**score** 59:21
**screen** 5:8 9:14
9:19 10:5
18:13 19:19,20
38:4 61:8
76:13 95:18,22
96:11 102:3
105:8 113:7
115:4 117:12
122:19,20
123:5 145:13
**scripted** 147:24
**scripting**
141:14
**scroll** 77:1
102:8
**scrolling** 149:7
150:2
**se** 144:10
**seal** 165:2
167:15 168:21
**sean** 2:5,7 4:4
6:17 96:7
115:16

**[searching - shows]**

| | | | |
|---|---|---|---|
| **searching** 56:3 | 69:14 72:2,14 | **seems** 107:21 | **seven** 119:21 |
| **second** 9:20 | 73:11 76:14,22 | 135:23 146:3,4 | 120:2 128:16 |
| 13:15 19:12,22 | 77:10 78:18 | **seen** 5:7 71:1 | **several** 49:17 |
| 20:13,17 21:14 | 79:8,19 83:13 | **segue** 100:18 | 51:7 95:21 |
| 22:11 52:23 | 84:7 93:20 | **selection** | 128:18 136:13 |
| 70:8 83:13 | 95:22 96:21 | 150:14 | 160:1 |
| 85:6 102:17 | 97:3 98:1,14 | **selective** 36:22 | **sharing** 10:21 |
| 109:14 113:10 | 100:24 102:3 | 37:4 38:21 | **sheet** 166:13,15 |
| 123:2 133:2 | 103:1 104:8,20 | **self** 94:7 97:2,9 | 166:16 168:7 |
| 156:12 | 105:8,10 112:4 | 100:6 | 168:10,18 |
| **secondly** | 113:6 115:4,6 | **sense** 17:10 | 169:1 |
| 107:17 | 117:11,14 | 145:3 | **short** 125:4 |
| **section** 56:24 | 119:13 122:20 | **sent** 28:1 | **shorthand** |
| 58:23 65:24 | 123:11,19 | **sentence** 28:5 | 164:13 |
| 73:20 78:13 | 125:9,16 129:5 | 38:15 74:6 | **shots** 22:17 |
| 83:4,13 100:19 | 129:16 133:10 | 83:14 88:16 | **show** 10:16 |
| 123:11 133:3 | 134:10,12 | 96:21 97:16 | 37:20 87:9 |
| 134:4 141:12 | 138:11,12 | 119:6 | 90:9,15 91:13 |
| 148:11 | 141:17 143:12 | **sentences** 38:16 | 105:4 145:8,10 |
| **see** 9:18,22 | 144:14 145:13 | 104:4 | 154:20 |
| 11:2 12:5 19:1 | 145:14,18 | **separate** 33:14 | **showed** 20:13 |
| 19:18,20,21,23 | 146:8 148:13 | 48:20 | 20:16 41:4 |
| 20:8,17,24 | 149:9 150:3 | **separately** 36:2 | 99:8 100:4 |
| 22:4,17,19,21 | 152:12 153:1 | **sepulveda** | 119:15 127:10 |
| 25:5 26:6,8 | 154:15 | 22:17,18 | 131:20 133:6 |
| 27:17,18 28:1 | **seeing** 18:18 | **sequence** 116:4 | 136:1 146:10 |
| 35:1 37:21 | 25:12 59:16,22 | 116:10 | 156:1 |
| 38:3,12 42:6,8 | 69:10 | **serrano** 8:10 | **showing** 39:3 |
| 47:5 56:23 | **seek** 30:6 | 24:23 26:18 | **shown** 83:21 |
| 58:24 59:19 | **seeking** 29:22 | 32:13 | 139:20 140:11 |
| 61:8,10,11,12 | **seem** 82:4 | **served** 16:6 | 140:19 141:6 |
| 61:16,18 62:1 | 87:10 88:3 | **sessions** 35:6 | 166:17 |
| 63:6,20 64:4 | 145:22 | **set** 35:15,17 | **shows** 94:4 |
| 64:19 67:10,11 | | | |

**[side - specific]** Page 40

| | | | |
|---|---|---|---|
| **side** 35:14,16 39:17 | 101:24 102:4 104:20 105:8 115:4 117:12 129:16 | 130:8,15,17,20 131:1,4,7,11,13 131:14,20 132:1,2,4,7,11 | **sorry** 10:3 11:10,18 14:2 20:9,10 22:16 24:14 25:8,19 |
| **sign** 166:15 | | 132:18 161:20 | 32:9 33:19,20 |
| **signal** 116:2 | **sit** 111:6,15 | 162:2,13 | 37:18 38:11,16 |
| **signature** 10:6 162:21 164:19 164:22 165:2,5 | **sitting** 111:14 **situation** 66:15 67:4,5 | **sleeping** 132:5 **sleeps** 130:9 **slept** 109:22 | 49:9 51:15 58:7 61:16 62:14,21 72:6 |
| **signed** 48:8 167:13 168:18 | **situational** 49:17,23 50:6 | 126:17 **slight** 74:10 | 72:9 75:2 85:6 90:19 91:7 |
| **significant** 121:5 155:12 | 50:13 51:7,18 **six** 77:2 112:8 | **slightly** 57:20 127:14 131:19 | 94:9 98:9,9 104:2,7 105:24 |
| **significantly** 84:8 92:22 119:9 120:16 126:11 128:5 128:10 132:3 | 112:11 114:22 115:7,10 117:3 117:16,21 119:17,23 120:2 | **slow** 98:7 **small** 114:14 **sneeze** 9:20 **snitched** 133:6 **social** 47:8 69:1 | 106:1 122:6,7 132:14,16 136:22 137:4 138:16 139:6 143:2 150:17 |
| **signing** 166:11 166:20 | **skimmed** 96:20 | 84:9 | **sort** 16:16 |
| **signs** 109:23 | **sleep** 4:21 | **sociology** | **sorts** 31:12 |
| **silent** 123:9 | 111:7,23,24 | 157:14 | **sotos** 2:18 |
| **similar** 41:16 45:8 59:19 | 120:24 121:4 121:10,13,15 | **softening** 109:7 **solache** 136:3,9 | **sound** 147:16 **south** 2:10 |
| 69:12 84:22 86:8 147:16 | 121:20,20,21 122:2,21 | **solutions** 5:23 166:1 169:1 | **spanish** 137:7 **spatial** 70:22 |
| **similarly** 46:5 | 123:16,24 | **somebody** 41:6 | **speak** 78:16 |
| **simple** 27:6 | 124:9,10,13,14 | 47:24 50:8,10 | **speaking** 47:13 |
| **simultaneously** 94:13 | 124:18 125:13 125:22,23 | 55:12 71:6 87:22 89:2 | **specific** 16:22 23:17 28:24 |
| **sincerely** 166:21 | 126:7,11,12,20 127:10,18 | 107:23 111:12 124:10 153:11 | 29:20 31:2,3 31:18 66:22 |
| **single** 37:5 | 128:1,2,8,9,11 | 153:12,14 | 67:16 71:9 |
| **sir** 22:3 27:14 29:14 34:11 38:2 39:2 | 128:13,13,16 128:18,22,22 129:8,19 130:2 | **someone's** 36:6 127:17 | 74:19 91:13 92:10 110:8 |

**[specifically - statement]** Page 41

| | | | |
|---|---|---|---|
| **specifically** 24:1 29:18 30:14,15 41:19 73:10 103:1 105:1 109:13 114:10 138:16 138:19 141:16 146:8 147:2 153:5 155:5 158:11 159:20 | **stand** 97:6,19 **standards** 14:14 15:1 157:20 158:5 **starr** 2:5 4:4 6:17,17 7:20 8:1 11:16,19 20:10 23:3 24:12 25:16 27:11 28:13 | 93:19 94:8,11 96:1 97:10 98:16,22 99:3 99:10,23 100:7 102:16 103:24 105:23 106:1 108:6,15 109:24 110:17 111:8 116:1 118:5,8 120:10 | **starting** 30:3 76:21 102:7 133:3 134:5 151:3 159:17 160:7,19 **starts** 56:23 64:16 123:14 **state** 6:4,6 12:2 14:14,16 15:8 15:9 17:18 |
| **specifics** 30:18 | 29:1,21 30:9 | 122:3,7 124:1 | 56:9 87:22 |
| **speculating** 56:4 | 30:19 32:6,23 33:8,17,24 | 127:1 129:21 130:11,21 | 121:21 123:17 131:6 154:21 |
| **speculation** 40:21 42:21 43:21 45:15 100:8 110:1 111:9 127:2 130:12 135:6 138:3 140:1 142:14 157:23 | 34:17 35:12,24 36:24 37:17 39:14 40:7,20 41:24 42:11,19 43:20 45:14,24 46:10,19 48:10 50:1 51:22 52:10 54:5 58:8,13,16 | 131:16 132:13 134:20 135:5 136:16 137:3 137:15 138:1 138:14,17 139:24 140:22 142:13 143:2 143:16 146:22 150:16,19 | 156:6 164:1 167:10 168:15 **state's** 106:10 156:7,15 157:4 **stated** 37:12,20 111:11 134:8 **statement** 4:12 36:7,9 37:10 40:1 44:4 47:6 |
| **speculative** 56:6 | 59:10,15 60:3 62:13,15 65:8 | 152:5,15,17 153:23 155:15 | 47:16 49:9 50:17 60:19 |
| **spell** 68:4 | 66:6 67:1,24 | 156:17 157:22 | 61:12 101:13 |
| **spelled** 90:10 148:15 | 69:18,21 70:2 72:5,7 73:2 | 158:8 160:23 161:12,14 | 105:5 106:7,11 106:12 125:15 |
| **spend** 83:12 | 74:1,7 75:1 | 162:14,19 | 125:18,24 |
| **spent** 84:15 | 79:23 80:13 | 163:10 | 134:3 139:12 |
| **spikes** 82:3 | 81:5 82:6,16 | **start** 44:23 | 139:19 140:3 |
| **spirit** 67:12 | 83:6,9 85:5,14 | 75:22 101:9,15 | 140:11,14,19 |
| **springfield** 13:10 | 85:23 86:20 | 118:18 | 141:22 142:5,8 |
| **ss** 164:1 | 87:12 89:12 91:6,8 92:17 | **started** 88:10 104:11 | 142:23 143:8 143:10,15,20 |

145:12,16 146:11 148:6,8 157:6 158:1,10 167:13,14 168:19,19

**statements** 4:22 87:20 88:24 89:19 92:15 119:11 121:16 122:22 133:7,13,20 141:4 144:19 144:20 151:7,9 151:12 155:18

**states** 1:1,16 5:17 13:9 40:24 89:8 124:23

**statute** 14:18

**staying** 22:3

**stays** 130:9

**stearns** 1:14 5:22 164:5 165:6

**stenographer** 164:14

**stenographic...** 145:2

**step** 17:11 87:15

**stepped** 15:15

**steps** 121:19 151:5 152:4,13 153:1,8

**steve** 73:21

**steven** 76:17

**stew** 107:16 108:5 109:4 110:20

**sticking** 45:8

**stop** 10:21

**straight** 7:16 108:12,19 126:9

**strategies** 71:7

**strategy** 107:17

**street** 2:5,10 137:7,10,12,22 165:7

**stress** 95:10

**stridently** 151:8

**strike** 46:15 114:15 115:14 118:2

**structured** 89:23

**students** 34:6

**studied** 50:5 69:4 93:3 111:12

**studies** 73:14 85:4 86:18 87:7 88:20,22 92:23 93:15,21 93:23 94:2 111:3

**study** 87:4,17 93:24 94:1 95:19 100:3,11 109:19 110:5,7 110:19,22 114:6,8

**sub** 70:20

**subject** 45:11 45:21 46:17 153:15

**subject's** 126:22

**subjected** 58:5

**subjects** 100:10 110:7

**submissive** 64:23

**submit** 19:5

**submitted** 19:10 20:1,3 21:7,10,14 164:20

**subscribe** 96:13

**subscribed** 167:10 168:14 169:21

**subsection** 100:22 101:9

**subsequent** 88:15 155:18

**subsequently** 153:18 154:16

**substance** 78:17

**substantial** 16:11

**sudden** 85:7

**suggest** 96:23

**suggestibility** 65:5 68:3,7,16 68:23 70:8,14

**suggestible** 64:23 65:15 67:23

**suggesting** 78:22

**suggests** 65:13 87:5

**suite** 2:10,19 165:7 166:2

**summaries** 160:13,17

**summarize** 34:12

**summarized** 23:21

**summary** 34:14 51:6,11

**superior** 166:1

**support** 88:23

**suppress** 102:2 129:2,4 146:7

**supreme** 124:22,23

**sure** 10:21 11:12 13:19,20

**[sure - testify]**

15:10 18:8,17 19:17,21 22:12 30:24 39:4 47:12 58:12,12 61:6,22 80:6 81:8,16 83:8 91:17 92:20 98:9,21 100:13 115:1 117:7 129:7 136:24 139:16 144:9 145:10,11 147:1,6 148:3 157:15 158:4 161:4

**surprise** 82:8

**survey** 85:4 86:17 91:2

**suspect** 38:18 40:12 45:21 51:2 85:1 86:14 97:7 107:10 108:2 109:4,5 110:12 110:13 111:22 123:23 141:24 143:20,24 150:14 153:13

**suspect's** 50:16 92:12,15 94:6 107:19 109:7 109:14 110:13 110:16 119:10 125:23 141:22

**suspects** 45:11 91:2 93:15 96:23 109:20 109:22 111:5 111:17 120:17 152:4

**swear** 6:23

**swearing** 35:9 35:13

**switch** 56:19

**switching** 148:23

**sworn** 7:2,7 164:10 167:10 167:13 168:14 168:18 169:21

**systematic** 159:21

**t**

**t** 2:18 4:3 148:16

**table** 76:22 77:3 79:8,8,9 79:11 80:3 92:20

**tactic** 110:20 144:6

**tactics** 91:23 92:1,16

**take** 5:11 9:15 22:12 32:21 33:3,5 44:7,11 44:12 75:7

87:14 118:11 134:5 153:20 160:24 162:22 163:6

**taken** 1:13 4:1 5:14 33:10,13 40:17 41:8 44:19 45:19 53:4 75:18 83:15 118:14 129:12 151:5 152:4,13 153:1 153:8 154:2 157:3 161:7 164:13

**talk** 73:14 82:22 90:16 161:20

**talked** 138:23

**talking** 45:3 74:2 82:19 94:13 118:22 139:3,4 141:13 144:5

**tcarney** 2:16

**tea** 75:6

**teaching** 111:2

**technique** 107:15 109:3 111:2,2,3 141:1 144:24

**techniques** 50:6 56:2 92:6 92:10,21

101:21

**tell** 18:14 82:2 103:3 145:9 149:1

**temporal** 70:22

**tend** 37:7 64:20 66:10

**tennessee** 124:21

**term** 65:2 66:3 66:16 67:7 70:6

**terms** 48:22 53:12 70:16 147:21

**test** 67:21 68:2 68:12,16,21,22 68:23 69:3,6,9 69:23 70:7,8,9 70:10,15 71:4 71:24 72:1

**testified** 7:8 12:2,20,20 14:8 15:20 16:9 17:18,21 17:24 18:2,8 18:16,20 128:7 130:17 133:16 135:12,20,21 136:2,7,18 138:20 154:16 157:5

**testify** 14:23 34:20 44:1

**[testify - time]** Page 44

138:12 154:22
**testifying**
  136:12
**testimonial**
  11:17 87:21
  89:5,24 151:13
  160:15,17
**testimonies**
  25:23 28:11
  48:7 52:9
  135:14
**testimony**
  10:18 11:3
  16:20 25:10,10
  26:17,23 27:15
  29:19 31:24
  32:7 45:4 46:5
  46:6,6 47:21
  54:21,22,22
  63:16,20 84:12
  102:1 103:9,10
  107:6 129:2,4
  131:12 133:20
  134:16 135:12
  135:13 136:7,9
  136:14 137:14
  137:21,23
  138:6,11
  143:12 146:7,9
  148:18 149:4
  149:14 167:6,7
  168:6,9,12
**tests**  70:19,20
  70:20 71:1,10

71:19,20,24
  72:1,2
**texas**  13:16,17
  16:14
**text**  61:18
  104:8
**thank**  7:3,15
  39:3 47:10
  48:14 61:11
  74:7 76:14
  83:9 86:20
  87:3 100:21
  104:2 109:12
  115:5,8 117:13
  117:17 122:14
  123:8 139:7
  150:19 161:12
  161:16 162:14
  162:14 163:6
  163:11
**thanks**  58:13
  121:3
**theorizing**
  157:21 158:7
**theresa**  2:14
  4:3 6:15
  159:13
**thing**  37:5
  146:13
**things**  37:19
  42:3 53:6
  120:22 135:23
  146:5

**think**  8:13 10:1
  10:3 13:13,16
  13:24 14:3
  15:11,14 18:1
  18:5,10,11
  20:12 21:4
  22:1 29:4 30:1
  30:5,21,22,23
  31:4,5,17 32:5
  32:11 33:22
  36:17 40:4
  41:11,13 43:23
  44:9,14,15
  46:1,2,11 55:9
  55:10,23 56:5
  65:17 66:7,16
  70:6,6,14
  71:19 76:3
  80:16 81:8
  82:24 86:23
  89:14 92:19
  93:5 94:10
  95:6 97:11,14
  97:19 103:8,24
  106:21 107:12
  107:13 110:22
  111:10 115:15
  126:9 128:15
  129:24 131:18
  134:5 135:7
  139:3 143:22
  143:23 144:19
  146:12 152:17
  153:22 158:9

158:23 159:5,8
  161:1,15,23,23
**thinking**  109:6
**third**  54:7,13
  57:23 78:20
  148:23 154:15
**thirty**  166:19
**thorough**
  151:17
**thought**  25:4
  26:24,24 94:15
  97:18 131:20
  140:12 147:7,9
  147:10
**threat**  4:19
  93:17 94:5
  95:20 96:23
  97:7 98:4,11
**threatened**
  99:13,14
  103:16
**threatening**
  98:3
**threats**  15:4,5,6
  84:24 86:13
  93:17,18,22
  99:7,15,17,17
  99:17 100:1,6
**three**  13:12
  25:8 57:16
  93:3 109:22
  121:19
**time**  6:4 10:22
  16:6 19:2

21:14 22:12 26:12 44:13,14 44:18,24 58:20 60:12,15 62:11 64:2,7 75:17 75:23 77:21 83:12,23 84:15 85:18,22 88:10 96:14 101:8,10 101:11,15 102:23 104:11 105:11,19,19 105:21 106:5,6 106:7,11,12,14 106:23,23 107:10,11,17 107:23 112:6 112:22,24 113:3,20 114:20,21 115:20,24 116:5,6,22 117:1 118:13 118:19 119:22 125:4 129:7 133:22 134:7 134:13,19 145:24,24 151:3,15 154:1 154:6 158:2 159:7 161:6,11 163:1,10 164:6 164:18

**times** 12:2,7,20 12:21,23 17:18 17:20 18:5 108:1 136:13 151:8
**timothy** 8:12 27:8
**tired** 132:6,10
**tiredness** 132:18
**title** 9:17 38:3 61:7
**titled** 22:4 23:17 58:24 76:4 95:19 100:22 101:24 121:14 122:19 122:20 123:11 132:23
**today** 5:21 7:17 7:19,21 21:15 27:20 28:9 98:19,24 161:17
**today's** 24:20 25:14,21 26:18 135:17
**together** 134:2
**tolappa** 3:4
**told** 31:11 43:5 103:5,13 133:5 134:9
**tomorrow** 99:1

**took** 45:2 108:4 155:3
**top** 8:6 63:10 94:18 97:16,20 103:15 110:23 123:5
**topics** 56:19
**torturing** 14:16
**total** 20:23 21:5 105:21 106:23 106:24 107:11 108:13 115:13 118:1
**totally** 30:24
**towards** 148:22 154:15
**trained** 144:7 144:13 151:16 151:17
**trainers** 88:12
**training** 15:3 88:21
**traits** 50:7 58:24 71:16
**transcribed** 167:7
**transcript** 43:17 45:4 163:5 166:10 166:12 167:5 167:12 168:5 168:11,17
**transcription** 61:1 62:19

**transcripts** 4:24
**trap** 52:3
**traumas** 71:8
**travis** 14:1,2,3 14:6 15:21
**trial** 25:10 27:15 34:20 36:10 46:6 47:21 48:6 54:21 68:16 83:16,22 89:6 103:10 135:21 135:22 136:8 154:17,22
**trick** 141:18,21 144:14,15 147:22 148:9
**trier** 162:8,10
**true** 41:6 64:2 89:20 92:4,5 95:11 120:8 139:12,21 140:4,7,12,14 140:24 146:15 164:15
**truncated** 86:1
**truth** 88:1,13 88:17 89:17,21 90:1 150:12
**truthful** 49:5 89:9 136:8 146:21 162:4

**[truthfully - variation]** Page 46

**truthfully** 135:21 140:16

**truthfulness** 49:8

**try** 52:3 58:14 111:23

**trying** 16:7 30:6 80:22 82:10 93:10 102:21 145:4,6

**turn** 47:2 133:18

**turned** 153:17

**turning** 63:5

**two** 8:16 13:1 17:23 19:10 20:12 25:8 40:11 52:12 75:7 104:3 107:12 141:8 146:2 150:4 152:21 155:3,5 159:15

**type** 41:7 43:3 46:24 48:17,22 52:20 53:9,9 53:13,18 54:8 54:13 55:18 56:11,12,17 143:8

**typewritten** 145:2

**typical** 68:14

**typically** 10:18 40:10,23 43:23 50:20 55:22 56:2,3 70:5 100:1 111:18

**typos** 143:7,9

**u**

**u** 13:22 16:3 68:5 94:22

**u.s.** 14:7,19

**uh** 120:18

**unable** 66:23

**unaware** 130:7

**uncertain** 56:8

**unclear** 30:1

**under** 77:3 78:22 79:13,17 80:17 81:12 101:9 103:4 109:20 112:10 114:1,19,21 116:22 117:1 139:13 154:9 159:5

**underline** 32:24

**underlying** 96:4,9

**undermined** 38:19

**undersigned** 164:13,23

**understand** 29:15 30:12 49:3,13 52:24 58:17,21 67:13 77:10 80:22 82:11 84:24 86:12 89:7 93:10 100:9 102:21 128:17 135:11 139:16 144:12

**understanding** 35:18 41:23 42:2 54:12 65:9 81:22 82:4 83:20 87:6 124:20 127:23 160:11

**understood** 12:16 14:6 15:17 17:16 78:6 86:23

**unintentional** 142:19

**unique** 41:2

**unit** 5:13

**united** 1:1,16 5:17 13:9 40:24 89:8 124:23

**universe** 81:9 82:21

**unrelia** 50:19

**unreliability** 16:12 48:21 49:10,11,22 50:15,21,22

**unreliable** 17:2 50:11 119:11

**use** 54:6,13 68:3 109:3 144:8,8 145:6

**used** 17:1 44:5 46:20 89:5 144:14

**using** 56:5 93:16 98:18 111:1 157:20 158:6

**usually** 33:3 41:19 43:23 111:11 149:16

**v**

**v** 14:7 124:21 166:6 167:3 168:3

**vacate** 16:7

**vacated** 17:9,13

**vague** 110:1 140:1 157:23

**valerie** 3:5 6:20

**value** 4:21 121:15 122:21

**variation** 100:13

**[vast - witness]**

**vast** 12:14 17:16 158:23

**velazquez** 8:3 8:11,14 25:2,7 25:9 26:21 27:8 133:8,13 133:16,24 135:12

**velazquez's** 24:21 133:20 141:3

**verbal** 70:20 72:1

**verified** 134:18

**verify** 17:8

**veritext** 5:22 166:1,7 169:1

**veritext.com.** 166:18

**versus** 5:16 13:9 80:16 108:12 120:8 120:21

**video** 5:10,14 53:24 109:19

**videoconfere...** 1:12 2:1 7:7 164:3,7,11

**videographer** 3:3 5:1,21 6:22 44:17,22 75:16 75:21 85:8,17 85:21 115:15 115:19,23

118:4,12,17 153:24 154:5 161:5,10 162:24

**videotape** 93:2

**videotaped** 1:12

**violation** 14:17

**violence** 15:5,6 99:17

**virtually** 5:5

**visual** 42:5,8 43:5

**voluntariness** 36:12,14 39:17 40:3,19 42:17 43:19 45:23 46:9 49:6,14 54:11,16

**voluntary** 35:22 37:15 38:24 39:11 54:4,7,13

**vs** 1:6

**vulnerability** 57:1

**vulnerable** 78:23

---

**w**

**wacker** 2:14

**wait** 18:11 83:5 109:5

**waiting** 94:15

**waived** 164:20 166:12,20

**wake** 121:20 123:16 126:11 132:2

**wall** 111:19

**walsh** 27:17 143:13 148:18 149:21

**want** 8:4 12:10 17:19 34:24 36:1 52:2,3,5 56:19 72:20 76:19 84:16 85:8,10 87:2 90:15 93:12 102:16 103:23 112:3 120:24 132:22 138:6 139:16 146:23 150:17 152:18 154:14 158:11 158:11 161:2

**wanted** 18:13 77:20 78:4 92:9 103:6

**way** 10:13 27:6 32:21 49:16 64:15 67:20 89:22 90:10,24 98:4 102:14 135:20 153:6 156:23

**we've** 31:15 106:21 107:9 144:7

**weight** 67:8

**weird** 144:18

**went** 8:23 16:20 61:20 76:2 86:2 118:21 159:5

**west** 2:14,19

**westlaw** 77:21

**white** 67:11

**widespread** 159:21

**willingness** 126:23

**witness** 5:8 6:23 7:1,6 11:17 23:6 24:14 27:12 28:15 29:6 31:2 32:9,24 33:9,19 34:2 34:18 35:13 36:1,4 37:2,18 39:15 40:9,22 42:2,12,23 43:22 44:15 45:16 46:1,11 46:20 50:2 52:12 54:6 58:9 59:11,16 60:4 62:14 65:9 66:7 67:2

**[witness - zoom]** Page 48

68:2 70:4 72:6 72:10 73:3 74:10 75:2,9 75:15 80:14 81:7 82:8,17 83:10 89:14 91:7,9 92:19 93:20 94:9,14 97:14 99:12,24 100:9 105:24 106:4 108:7,17 110:4,18 111:10 120:12 122:6,9 124:3 127:4 129:24 130:13,24 131:18 132:14 134:22 135:7 136:17 137:17 138:5,15,19 140:3 142:15 143:4,17 147:3 150:17 152:16 155:16 156:19 158:1,9 159:10 164:4,10,17,19 165:2 167:1,4 167:11 168:1,4 168:15

**witnessed** 134:2

**witnesses** 137:13

**won** 103:13,14

**wondering** 21:3

**word** 29:10 46:21 54:6,13 68:5 70:5 116:14 142:16

**words** 108:1 146:2

**work** 21:13,17 29:3 30:4 31:4 31:8

**worked** 17:1 69:4

**working** 85:7

**world** 4:17 73:24 76:5,17

**worried** 30:2

**worries** 61:22

**write** 142:8

**writes** 141:21

**writing** 63:17 145:23 162:3

**written** 17:7,8 17:15 90:11,13 90:17 133:7 143:21 149:1

**wrong** 93:6

**wrote** 16:7 38:7 39:5 73:21 92:8 121:14,17 121:18 122:24 142:24 158:15 161:24

**wycoff** 2:9 6:12 6:12 160:22 163:8

**y**

**y** 13:22 16:3 30:16 94:22

**yeah** 9:22 10:3 11:15 16:2 19:20 20:9,10 22:2,10,18,18 29:14 30:8 32:9 44:15 58:16 69:19 72:7 74:9 85:12,23 94:11 96:6 99:2 102:19 106:20 115:12 116:1 117:23 133:18 136:24 138:11 139:6 145:10 147:1,12 155:23 157:13 161:3,4 162:19

**year** 65:7,7

**years** 10:18 11:4 12:24 13:2,5,11,12,13 16:4 18:9,14 18:21 37:7 60:15 62:10 64:7 111:21 138:9

**yellow** 9:5 33:5 33:14

**young** 3:3 5:20 64:20 65:4,19 66:2 72:14 80:7 82:12

**younger** 65:16 71:17 73:4,16 81:12

**youth** 59:5 60:6

**youthful** 71:16

**youthfulness** 57:21 68:21

**z**

**z** 123:8

**zero** 151:14

**zlatan** 123:5,7 123:8

**zoom** 6:11,13 6:19,21 61:15 61:17 116:3

Veritext Legal Solutions

www.veritext.com                    888-391-3376

Illinois Code of Civil Procedure

Article II, Part E

Rule 207, Signing and Filing Depositions

**Signing and Filing Depositions**

(a) Submission to Deponent; Changes; Signing.
Unless signature is waived by the deponent, the
officer shall instruct the deponent that if the
testimony is transcribed the deponent will be
afforded an opportunity to examine the deposition
at the office of the officer or reporter, or
elsewhere, by reasonable arrangement at the
deponent's expense, and that corrections based on
errors in reporting or transcription which the
deponent desires to make will be entered upon the
deposition with a statement by the deponent that
the reporter erred in reporting or transcribing the
answer or answers involved. The deponent may not
otherwise change either the form or substance of
his or her answers. The deponent shall provide the
officer with an electronic or physical address to
which notice is to be sent when the transcript is
available for examination and signing. When the
deposition is fully transcribed, the officer shall
deliver to the deponent, at the address supplied,

notice that it is available and may be examined at a stated place at stated times, or pursuant to arrangement. After the deponent has examined the deposition, the officer shall enter upon it any changes the deponent desires to make, with the reasons the deponent gives for making them. If the deponent does not appear at the place specified in the notice within 28 days after the mailing of the notice, or within the same 28 days make other arrangements for examination of the deposition, or after examining the deposition refuses to sign it, or after it has been made available to the deponent by arrangement it remains unsigned for 28 days, the officer's certificate shall state the reason for the omission of the signature, including any reason given by the deponent for a refusal to sign. The deposition may then be used as fully as though signed, unless on a motion to suppress under Rule 211(d) the court holds that the reasons given by the deponent for a refusal to sign require rejection of the deposition in whole or in part.

(b) Certification, Filing, and Notice of Filing. (1)If the testimony is transcribed, the officer

shall certify within the deposition transcript that the deponent was duly sworn by the officer and that the deposition is a true record of the testimony given by the deponent. A deposition so certified requires no further proof of authenticity

(2) Deposition transcripts shall not be filed with the clerk of the court as a matter of course. The party filing a deposition shall promptly serve notice thereof on the other parties and shall file the transcript and any exhibits in the form and manner specified by local rule.

DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE STATE RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.