*DeLeon-Reyes v. Guevara, et al.*
Case No. 18 CV 01028

*Solache v. Guevara, et al.*
Case No. 18 CV 02312

# EXHIBIT 10

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JOHN MARTINEZ,                          )
                                        )
                  Plaintiff,            )
                                        )
        vs.                             ) No. 23 CV 1741
                                        )
REYNALDO GUEVARA, et al.,               )
                                        )
                  Defendants.           )
_____ )
                                        )
JOSE TINAJERO,                          )
                                        )
                  Plaintiff,            )
                                        )
        vs.                             ) No. 24 CV 1598
                                        )
REYNALDO GUEVARA, et al.,               )
                                        )
                  Defendants.           )
_____ )
                                        )
THOMAS KELLY,                           )
                                        )
                  Plaintiff,            )
                                        )
        vs.                             ) No. 24 CV 05354
                                        )
REYNALDO GUEVARA, et al.,               )
                                        )
                  Defendants.           )

        The videotaped deposition of RICHARD LEO, PHD, taken under oath on Tuesday, March 3, 2026, via Zoom, pursuant to the Federal Rules of Civil Procedure, before Riley A. Moran, Certified Shorthand Reporter No. 084-004945, commencing at 11:32 a.m., pursuant to notice.

Page 2

APPEARANCES:

KENNETH N. FLAXMAN, P.C., by
MR. JOEL A. FLAXMAN and
MS. INAARA TAJUDDIN
(200 South Michigan Avenue, Suite 201
Chicago, IL 60604
(312)427-3200
jaf@kenlaw.com)
appeared on behalf of the plaintiff Jose
Tinajero;

LOEVY & LOEVY, by
MR. STEVE ART
(311 North Aberdeen Street, 3rd Floor
Chicago, IL 60607
(312)243-5900
steve@loevy.com)
appeared on behalf of the plaintiffs John
Martinez and Thomas Kelly;

BORKAN & SCAHILL, by
MS. CHRISTIANE MURRAY
(20 South Clark Street, Suite 1700
Chicago, IL 60603
(312)580-1030
cmurray@borkanscahill.com)
appeared on behalf of the defendant Reynaldo
Guevara;

THE SOTOS LAW FIRM, P.C., by
MR. KYLE T. CHRISTIE
(141 West Jackson Boulevard, Suite 1240A
Chicago, IL 60604
(630)735-3300
kchristie@jsotoslaw.com)
appeared on behalf of the defendant
officers;

Page 3

APPEARANCES: (Cont'd)

ROCK FUSCO & CONNELLY LLC, by
MS. THERESA B. CARNEY
(333 West Wacker Drive, 19th Floor
Chicago, IL 60606
(312)494-1000
tcarney@rfclaw.com)
appeared on behalf of the defendant City of
Chicago;

O'CONNOR & BATTLE, LLP, by
MS. MICHELE J. BRAUN
(111 West Jackson Boulevard, Suite 1700
Chicago, IL 60604
(312)786-4600
mbraun@mokblaw.com)
appeared on behalf of the defendant Jake
Rubinstein.

ALSO PRESENT: Mr. Nick Trotta
Certified Legal Videographer
* * * * * * *

I N D E X

Witness:                                  Page

Richard Leo, PhD

Examination by:

Mr. Christie .......................7

Ms. Carney .......................122

Page 4

E X H I B I T S

No.  Description                    Marked/Referenced

1   Dr. Leo's report, CV, and case list .....7

2   Missing the Forest for the Trees: A ....22
    Response to Paul Cassell's Balanced
    Approach to the False Confession
    Problem

3   Behavioral Confirmation in the .........39
    Interrogation Room: On the Dangers
    of Presuming Guilt, LEO 148-164

4   The Role of Confirmation Bias in .......43
    Suspect Interviews: A Systematic
    Evaluation, LEO 546-560

5   Modeling the Influence of ..............49
    Investigator Bias on the Elicitation
    of True and False Confessions

6   The Combined Effects of Questioning ....54
    Technique and Interviewer Manner on
    False Confessions

7   How Sleep-Related Fatigue Impacts ......81
    the Evidentiary Value of Statements
    and Confessions

8   Mr. Tinajero's 3/21/25 deposition ......86
    transcript

9   People v. John Martinez ................96
    post-conviction review

10  Affidavit of Eladio Valdez, ...........98
    Martinez 5-6

11  Retainer invoice, Leo 1442-1444 .......120

(Exhibits scanned/attached.)

Page 5

THE VIDEOGRAPHER: Good morning. This is the beginning of Media Unit 1. We are now on the video record at 11:32 a.m. Central Standard Time. This is the videotaped discovery deposition of Richard Leo, PhD, being taken on March 3rd, 2026. This deposition is being taken on behalf of the defendant in the matter of John Martinez versus Reynaldo Guevara, et al. The case number is 23 CV 1741 with consolidated cases filed in the United States District Court for the Northern District of Illinois, Eastern Division.

My name is Nick Trotta, certified legal videographer representing Urlaub Bowen & Associates with offices at 20 North Clark Street, Suite 600, Chicago, Illinois. The court reporter today is Riley Moran, also of Urlaub Bowen & Associates.

Counsel, please identify yourselves for the video record and the parties which you represent, starting with the questioning attorney.

MR. CHRISTIE: Good morning. Kyle Christie on behalf of the defendant officers appearing via Zoom in Chicago.

MS. CARNEY: Theresa Carney on behalf of the City of Chicago appearing via Zoom from Chicago.

MR. FLAXMAN: Joel Flaxman for Plaintiff Tinajero.

RICHARD LEO, PHD, 03/03/2026                                    Page 6..9

Page 6

MR. BRAUN: Michele Braun on behalf of Jake Rubinstein.

MS. TAJUDDIN: Inaara Tajuddin on behalf of Plaintiff Tinajero.

MR. ART: Steve Art for Plaintiffs Martinez and Kelly.

MS. MURRAY: Probably not.

MS. CARNEY: Oh, Christiane, are you going to -- I'll put her appearance on the record. She's in the middle of something. Christiane Murray on behalf of Defendant Guevara.

THE VIDEOGRAPHER: All right. Will the court reporter please swear in the witness.

(Witness sworn.)

MR. FLAXMAN: And sorry. I want to just say that Michele Braun is also on Zoom. She's for Defendant Rubinstein.

MR. BRAUN: I already did it by myself.

MR. FLAXMAN: Oh, I'm sorry. I must --

MR. BRAUN: Thanks anyhow.

MR. FLAXMAN: -- have not been listening. I apologize.

MR. CHRISTIE: All right. Good morning, Dr. Leo.

MS. MURRAY: Sorry. I don't think I identified

Page 7

myself. Christiane Murray on behalf of Defendant Reynaldo Guevara.

MS. CARNEY: I got you, Christiane. I put your appearance on.

MS. MURRAY: Thank you, Theresa. Doing too much at once.

Take it away, Kyle.

Richard Leo, PhD, called as a witness herein, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. CHRISTIE:

Q. All right. Good morning, Dr. Leo. How are you doing?

A. Good. Thank you.

Q. Now, I understand from a brief conversation before we went on the record that you have your -- a printout copy of your report produced in the Martinez-Kelly matter on November 25th, 2025?

A. I do, yes.

(Deposition Exhibit Number 1, Witness Leo, was marked for identification 3/3/26.)

Page 8

BY MR. CHRISTIE:

Q. And I meant to say Martinez-Kelly-Tinajero. I'm just going to lay the exhibit out real quickly, but we'll just rely on your hard copy and my hard copy afterwards. So I'm going to share my screen with you. We'll label this Exhibit Number 1, and do you see the first page of your report appear on your screen?

A. I do.

Q. Okay. And if we go to page 98, is that your signature on the bottom of page 98?

A. Yes.

Q. Okay. And this 98 pages is the report that you prepared in the Martinez-Kelly-Tinajero case?

A. Correct.

Q. Okay. And then afterwards there's an additional addendum that you identify in your report?

A. You're talking about, like, the CV and the four-year testimony list? Yes.

Q. Yeah. The remaining 200 -- 180 pages or so of this report.

A. I believe so. I don't know the exact number, but yes.

Q. Yeah. Okay. That way I don't have to share my screen because I know it annoys both of us. All

Page 9

right. If you could flip to page 15 of your report.

A. Okay.

Q. All right. Is this the beginning, page 15, all the way to page 19 that identifies the 26 summaries of your opinions that you intend to provide in this case?

A. They are the summary of my opinions that I provided in the report, yes.

Q. And are these a summary of all the opinions you intend to express in the Martinez, Kelly, and Tinajero matter?

MR. FLAXMAN: Objection; form.

Go ahead.

THE WITNESS: Well, I don't get to ask myself questions, but I assume so.

BY MR. CHRISTIE:

Q. I'm going to direct you to the summary of your opinions, number 1 through number 8, and ask if these opinions deal with the questioning by CPD and the Cook County State's Attorney's Office of John Martinez in the Garcia homicide investigation?

A. Yes.

Q. Okay. And opinions 9 through 16 are similarly opinions related to Thomas Kelly's questioning by CPD and the state's attorney's office related to the

Page 10

Garcia homicide investigation?

A. Correct.

Q. Okay. And then opinions 17 through 24 are your opinions related to Jose Tinajero's questioning by CPD and the state's attorney's office as it relates to the Garcia homicide investigation?

A. Correct.

Q. And the last two of your summary opinions, 25 and 26, relate to CPD practices; is that correct?

A. Pattern and practice, yes.

Q. Pattern and practices. Thank you. Now, if I were to direct your attention to page 2 of your report where you start with the materials reviewed --

A. Yes.

Q. -- and from page 2 to page 15 identifies all the materials you reviewed in preparing for your opinions in this matter?

A. In preparing the report, yes.

Q. Okay. And if I were to identify the materials reviewed, number 1 through 42, are those the records you reviewed when preparing your opinions related to Mr. Tinajero's, Kelly's, and Martinez's questioning by CPD and state's attorney's office?

A. Yes.

Page 11

Q. Okay. And from 43 onward, that relates to the pattern and practice opinions?

A. Sorry. Just give me a second here.

Q. Sure. Take your time.

A. Yes.

Q. Now, directing your attention to page 3, so the middle part of your Materials Reviewed section, you start identifying some of the depositions you reviewed, and that bleeds onto page 4. Do you see those --

A. Yes.

Q. -- items 23 to 34?

A. Correct, yes.

Q. Okay. Now, in reviewing records for this report, did you review ASA Durkin's deposition? She's the individual who took the court-reported statement of Jose Tinajero.

A. It does not appear that I did. If I --

Q. Okay.

A. -- did, I would have fail -- I failed to list it, but I don't recall reviewing --

Q. Sure. And I understand that happens. If this record -- if you did review this record or any records I'm about to ask, if during a break you could inform me whether there is a mistake or clear that up, I

Page 12

would appreciate that. So similar question. Did you review the deposition of the court reporter who took Mr. Tinajero's statement, Joseph Szybist, Z -- or S-z-y-b-i-s-t?

A. Not according to the materials reviewed. I can check during the break, but I don't recall reviewing that.

Q. Okay. I would appreciate that. And then did you review the deposition of the ASA, Brian Suth, S-u-t-h, who was present during the court-reported statement of Jose Tinajero?

MR. FLAXMAN: Objection to form.

Go ahead.

THE WITNESS: Not that I recall. It's not on the list, but I will check during the break.

BY MR. CHRISTIE:

Q. Did you review any of the Cook County Jail records or intake records of either Mr. Tinajero, Kelly, or Martinez?

A. Give me a second.

Q. Sure.

A. I don't believe so, unless they would have been in the investigative file, which is not likely, or the post-conviction materials, but I don't believe that I

Page 13

did.

Q. And then turning to page 4, do you see number 34 you identify the deposition of John DeLeon?

A. Yes.

Q. And do you understand him to be the criminal defense attorney or trial attorney for Mr. Martinez?

A. Yes.

Q. Okay. Did you review the defense attorney depositions for -- sorry. Strike that.

Did you review the depositions of Dennis Giovannini or Larry, or Lawrence, Summers, who were the defense attorneys for Mr. Kelly and Tinajero respectively?

A. Can you give me the second name? Dennis Giovannini and who was the other person?

Q. Yeah. Lawrence Summers or Larry Summers?

A. Not that I recall, but I can check during the break.

Q. Sure. Appreciate that. And these documents, specifically the ones listed number 1 through 42, were those all provided to you by Plaintiff's counsel?

A. Yes.

Q. Now, did Plaintiff's counsel direct you to make any assumptions or factual assumptions?

Page 14

A.   No.

Q.   And I take it you reviewed all these records, number 1 through 42?

A.   In preparation of the report, yeah.

Q.   Okay.  And in preparing for the deposition that you're here for today, what did you do to prepare?

A.   Well, I spoke to counsel, and I reviewed my report, and I reviewed the three statements -- the two prosecutor-written statements and the court-reported statement -- and I also reviewed Melloney Parker's deposition, mostly skimming it.  Yeah.

Q.   After reviewing Melloney Parker's deposition to prepare for the deposition today, did you identify any mistakes in your report that you submitted after reviewing that deposition?

A.   Not that I recall, no.

Q.   Okay.  And then when you said you spoke to counsel, I'm assuming that's counsel for Tinajero and Kelly and Martinez, Loevy & Loevy and Flaxman's office?

A.   Correct.

Q.   Okay.  And how many times did you speak to counsel?

A.   One time in preparation for the deposition.

Q.   And when was that?

Page 15

A.   I believe it was on Sunday.

Q.   And how long if you recall or estimate?

A.   I think it was a little bit over an hour. That's my best recollection.

Q.   And do you recall who was present?

A.   Yes.  Mr. Flaxman and Mr. Art.

Q.   Okay.  Anyone else?

A.   No.

Q.   Let's dig into the substance here.  If I direct your attention to page 37 of your report where you start with The Interrogation and Confession Statement of John Martinez --

MR. FLAXMAN:  Sorry, Kyle.  Did you say 7?

MR. CHRISTIE:  37.

MR. FLAXMAN:  37.  Thank you.

THE WITNESS:  Yeah.  Our paginations may be slightly different.  I'm on 36 but --

BY MR. CHRISTIE:

Q.   Okay.  Yeah.  It might have been the way mine printed out or something, but either way, you're there where -- section XI of your report, The Interrogation and Confession Statement of John Martinez?

A.   Yes.

Q.   Okay.  And you start out with identifying the

Page 16

situational risk factors that led to what you identify as a coerced-compliant confession?

A.   If it's a false confession, yes.

Q.   And I want to focus first on the first factor you identified here, physical coercion and abuse.  Do you see that there?

A.   Yes.

Q.   Okay.  And in concluding that there was physical abuse present, are you relying on Mr. Martinez's deposition testimony?

A.   Yes, but I'm not concluding that it -- sorry. Did you want to object?

MR. FLAXMAN:  Go ahead.  No.  Go ahead.  Sorry.

THE WITNESS:  I'm not concluding -- I'm not a fact witness.  I'm not concluding what did or did not happen. I'm saying this is his account, and if we credit that account, then here's what we know, and here's what we can conclude.  But, yes, I am -- I am relying on his account here in my analysis.

BY MR. CHRISTIE:

Q.   Yeah.  And I should probably clarify my question.  In identifying what his account is, the records that support his account, is that the deposition testimony that he provided in this case?

Page 17

A.   That's where he describes his account, yes.

Q.   Okay.  Did you rely on any other records in which Mr. Martinez described his account of his confession statement during the February 7th through 9th interrogation?

A.   I don't recall if he testified pretrial or at trial in the documents I reviewed.  If he did, I would have relied on those too.

Q.   Sure.  And you kind of explained this earlier in your previous answer, but there's a dispute between whether Mr. Martinez was or was not physically abused depending on which account is credited by the fact finder?

A.   Correct.

Q.   So it's a classic swearing contest as you've previously, I think, put in other reports and other testimonies?

A.   Yeah.  That's an academic term that's sometimes used to describe disputes between police and defendants when there's no record -- when the police haven't created a record or recorded the interaction.

Q.   In other words, there's no objective record like a video camera that you can rely on when expressing your report -- or your opinions in your report?

RICHARD LEO, PHD, 03/03/2026                                    Page 18..21

Page 18

A.   Correct.  There's no -- there's no video recording or audio recording.

Q.   And if I direct you to page 15, footnote 1 of your report, you state that?

A.   Correct.

Q.   Now, in an article you published in 1997, you noted that, quote, "Any attempt to reconstruct what occurred during an interrogation and what a suspect independently knew is necessarily undermined by the lack of a record:  Human memory for conversation is limited and recall is selective due to the position bias of the participant.  In many disputed confession cases then, it may not be possible ever to ascertain whether the confession was voluntary and/or reliable with any reasonable degree of certainty."  Do you recall making that statement in a publication in 1997?

A.   I mean, no, I don't recall it, but I don't doubt that it exists.  If you want to show it to me, I can verify it, but I don't remember what I wrote 30 years ago in an article.

Q.   Sure.  Let me rephrase the question.  Do you disagree that in, quote, "many disputed confession cases then, it may not be possible ever to ascertain whether the confession was voluntary and/or reliable with any

Page 19

reasonable degree of certainty"?

MR. FLAXMAN:  Objection; outside the scope.

THE WITNESS:  I would agree with that statement with some qualifications, yes.

BY MR. CHRISTIE:

Q.   What qualifications are those?

A.   So if you don't have a record and that's all you know -- there's an interrogation without a recording -- then, yes, you can say you have two different accounts, if you do have two different accounts.

But if you have other evidence, let's say of a detective who has a history of coercion or a history of beating suspects or a history of fabricating evidence and it's well documented, and you have, for example, appellate court opinions pointing out how well documented it is, and you have dozens of other people saying, He did this to me too, then you could say that's different than just the simple situation that I was writing about there.

So the qualification that I would put is just -- because I was -- there I was writing about a typical criminal case, you know, a kind of one-shot encounter where there's no record, and back in 1997 recording was not the norm as it is now.  But if there is

Page 20

a case where there's substantial outside evidence, then that could change the analysis.

Q.   And I have a feeling I understand where you're getting at with that exception.  In respect to -- well, strike that.

There are several defendants in this case.  You're aware of that?

A.   Yes.

Q.   Okay.  For Defendant Randy Troche, are you aware of any history of coercion that he has been -- I mean, strike that.

Are you aware of any documented history of coercion by CPD Detective Randy Troche?

MR. FLAXMAN:  Objection; outside the scope of the expert's opinion.

THE WITNESS:  I don't recall from the materials I reviewed whether there's a documented history for Detective Troche.  I'd have to review more materials.

BY MR. CHRISTIE:

Q.   And similar --

A.   Or rereview materials.  Sorry.

Q.   No.  You're fine.  Sorry.  I didn't mean to interrupt.  And similar question:  Did you see a documented history of coercion by CPD Detective Hector

Page 21

Vergara?

MR. FLAXMAN:  Objection; outside the scope.

THE WITNESS:  Not that I recall from my review of those documents, but I would want to rereview them as well.

BY MR. CHRISTIE:

Q.   Now back to the statement I asked you about in which, in many disputed cases, that it may not be possible ever to ascertain whether the confession was voluntary and/or reliable with any degree of certainty.  You noted that there might be some qualifications.  You identified one qualification -- a history of coercion by a CPD or other officer.  Is there another qualification other than that?

A.   I would just say the record -- the outside record, if there's other evidence that bears on that question.

Q.   Now, you noted in that article -- and I'll read it for you -- that "human memory for conversation is limited and recall is selective due to the position bias of the participant."  Do you disagree with that statement?

A.   I think -- I think we're going to have to create the ground rule that you show me everything you

RICHARD LEO, PHD, 03/03/2026                                    Page 22..25

Page 22

quote because I'm not going to be able to remember everything in the quote, especially if it's read fast. So I should have requested that earlier -- I apologize -- but if you could just share the screen for anything I've written that you are asking me about, that would be very helpful to me.

Q.   Give me one second.  I was reading off my paper; so I didn't pull it up.  So if you'd give me one moment here.  Here we go.  All right, Dr. Leo.  I'm going to identify what we'll label Exhibit Number 2.

(Deposition Exhibit Number 2, Witness Leo, was marked for identification 3/3/26.)

MR. FLAXMAN:  Did you -- did you mark the report as 1?

MR. CHRISTIE:  Yes.

MR. FLAXMAN:  Okay.

MR. CHRISTIE:  If I didn't, I apologize, but let's mark Dr. Leo's expert report as Exhibit Number 1 in case I didn't do that earlier.

BY MR. CHRISTIE:

Q.   Let me know when that appears on your screen. Do you see --

A.   Great.

Page 23

Q.   -- page 1 of this article?  Okay.  And this is an article titled "Missing the Forest for the Trees: A Response to Paul Cassell's Balanced Approach to the False Confession Problem" written by you and Richard Ofshe; is that right?

A.   Correct.  Thank you.

Q.   Uh-huh.  If I were to direct your attention to page 5 of this article, and where I was quoting was in the first paragraph, and I'll highlight that section for you so you can see it more easily.

A.   Thank you.

Q.   And so the last part of the -- my last question dealing with this article, I was quoting the first sentence I have highlighted here where it ends with "Human memory for conversation is limited and recall is selective due to the position bias of the participant."

A.   Yes.

Q.   Okay.  And does that apply to both the interrogator and the person being interrogated when you say "participant"?

A.   Yes.

Q.   Okay.  And so going back to the qualifications you have with trying to find an objective record, you said outside records might be another place

Page 24

you could find a record, and I'm just curious if that includes deposition testimonies provided decades after the incident?

A.   I'm not sure I agree with the way you summarized my prior answer, but, yes, I said there's -- other evidence may bear on the question, and it would include deposition testimony, yes.

Q.   Okay.  Even if it's from participants of the interrogation?

A.   Yes.

Q.   Okay.  So how do you square that then with your statement in this article where you say, "Any attempt to reconstruct what occurred during an interrogation and what a suspect independently knew is necessarily undermined by the lack of a record:  Human memory for conversation is limited and recall is selective due to the -- due to the position bias of the participant"?

MR. FLAXMAN:  I'll object to the form of the question.

THE WITNESS:  So what I would say is that, if you have a record -- a recording of the entire interrogation, then you have essentially a perfect record; right?  And what we're getting at here is that, any time you don't

Page 25

have a recording and you're relying on people to reconstruct it, it's going to be an imperfect record. There's no way somebody could remember everything that occurred in an interrogation 100 percent, especially with, you know, complete -- especially the longer the interrogation goes.

So what I was saying is, since you were referring earlier to swearing contests where there's a dispute, and sometimes you might have a very stark dispute about the most salient aspects of an interrogation, that you would expect somebody to remember, like, whether somebody was physically abused or not -- that there may be outside evidence that may help us analyze those disparate accounts.

And so that's all I was really saying. So I don't see what I'm saying here or was saying in a prior answer as contradicting this statement here but rather, as I mentioned before, just as qualifying it a little bit.

BY MR. CHRISTIE:

Q.   Okay.

A.   Some cases --

Q.   And so just maybe to pin this down a little bit more, with cases in which there's an imperfect

Urlaub Bowen & Associates, Inc.    312-781-9586

Page 26

record, are you able to ascertain whether the confession was voluntary or reliable with any reasonable degree of certainty?

(Simultaneous speaking.)

THE WITNESS: Sorry.

MR. FLAXMAN: Objection; outside the scope of the expert's opinion.

Go ahead.

THE WITNESS: Well, I think -- I mean, I think it depends on the case; right? So, for example, if you have a DNA exoneration -- there are many cases like this that are many years later -- and the prosecution and defense attorney hold a conference, and the attorney general might be there issuing a pardon or talking about a pardon, and everyone agrees that the person falsely confessed many years ago; the person's innocent; the DNA led to the true perpetrator; right?

In a case like that, I think you could with reasonable certainty say, even though there was two conflicting accounts at the time, that the confession is 100 percent unreliable, that -- even though there was no record -- that we have indisputable DNA evidence; led to the true perpetrator; everyone agrees, no question.

And then if you look at a case like that,

Page 27

for example, and the person was interrogated for 16 hours and they describe all sorts of things that were psychologically coercive that the police denied, I think you might be able to also reasonably infer -- I think you asked with a reasonable degree of certainty -- that that interrogation was probably psychologically coercive.

BY MR. CHRISTIE:

Q. Okay. I'm going to --

A. So I think it depends.

Q. Okay. I appreciate that example. Maybe just to backtrack here, you'd agree this case does not have a perfect record. It's an imperfect record; right?

A. Correct. Most cases have an imperfect record, yes.

Q. Okay. And this case, there's no DNA evidence compared to the example you provided in your previous answer?

A. Correct.

Q. Okay. So applying the circumstances of this case, the evidence we have, knowing that it's an imperfect record and given what you said in 1997 in this article, are you able to ascertain whether the confessions in this case were voluntary or reliable with any degree of reasonable certain -- sorry -- with any

Page 28

reasonable degree of certainty?

A. Well, it's not really my role to evaluate that -- you know, whether or not they're voluntary or reliable. I would say if we rely on the accounts of the three individuals -- Martinez, Tinajero, and Kelly -- then they are describing very psychologically coercive accounts that are involuntary, if we credit their accounts of the unrecorded interrogations as I describe in great depth in the report.

And then as to the second part of that, I would say there's substantial indicia of unreliability, and for the indicia of unreliability, we don't have to rely on their accounts because what I write about in each section -- like, for example, the inconsistencies between the confessions, the recantations, the lack of any physical or other evidence -- all those things that I write about in the indicia of unreliability sections -- or almost all of them -- don't rely on anything that Mr. Tinajero, Mr. Kelly, and Mr. Martinez allege occurred during the interrogations.

Q. All right. I'm going to stop sharing my screen, and we'll be getting to the indicia of reliability analysis later on, but before we do, if I could direct your attention to page 20 of your report

Page 29

just briefly, and I'll direct you specifically to the line in which you say, quote, "Significantly these principles, methods, and findings are generally accepted in the social science community, beyond common knowledge, and, therefore, numerous courts have repeatedly accepted expert testimony in criminal and civil rights litigation."

A. Yes.

Q. Okay. I want to focus on the line "beyond common knowledge," and with respect to Martinez's claim that he was physically coerced, is it beyond common knowledge to a layperson that physical coercion could lead to a false confession?

A. As a general matter, no, I would say not physical coercion.

Q. And with respect to Mr. Martinez's account of the physical coercion that occurred during his questioning on February 7th and 9th -- through 9th in 1999, you identify on page 38 of your report -- it might be 37 of yours -- that he was smacked with a rolled up piece of paper and flicked in the eye for a period of time, 15 to 20 minutes, by Detective Guevara?

A. I believe that's what he described, yes.

Q. Okay. And aside from his description, did

RICHARD LEO, PHD, 03/03/2026                    Page 30..33

Page 30

you see any photographs showing that Mr. Martinez was physically abused or hit?

A.   Not that I recall.

Q.   And then the intake forms or any medical forms that Mr. Martinez may have received when he was transferred to Cook County Jail, did you see any reports indicating that he had any markings or showings of physical abuse?

A.   Not that I recall.

Q.   Okay.  I want to now transition to guilt presumption or, as I think you also kind of label it, the misclassification error; is that fair?

A.   Well, yes.  I believe I talk about -- like, on that page, 37, premature and unwarranted presumption of guilt and investigative bias, and that often leads to, yes, the misclassification error in these cases when there's a false -- ultimately a false confession.

Q.   And is there a methodology that you apply when evaluating whether a police officer or an interrogator misclassified or -- misclassified a suspect as guilty when they were innocent or did a guilt-presumptive interrogation?

A.   Well, yes.  It would be analyzing all the documents that I'm provided, all of the ones in the case

Page 31

that are relevant that I have, and applying my cumulative knowledge based on my research, training, experience, publications, education, and then drawing my conclusions based on the body of scientific expertise and publication and knowledge that is the basis for my expertise.

Q.   Maybe another question.  Are there specific criteria you look for to identify whether a confession contained a guilt-presumptive interrogation or not?

A.   Well, yes.  You would look at the -- if there's a record of it, you would look at the interrogation techniques that were used and the assumptions and accusations and approach that the interrogator took, and if there wasn't, one would analyze the accounts that were given by both parties.  And if we credit one account, here's what follows; if we credit the other account, here's what follows.

Q.   Okay.  So the first section that you mentioned, are there certain questions or certain styles or -- strike that.

Are there specific tactics or questioning styles that you identify as showing a guilt-presumptive interrogation?

A.   Well, there can be, yes.  Sometimes it's very clear when there's a live victim -- for example, in a

Page 32

non-homicide case -- that the interrogator begins with the assumption that the victim's account is accurate, and the whole goal of the interrogation you can see through the questions, the accusations, the approach is to get the suspects to repeat the victim's allegations rather than to independently investigate them.

Sometimes in other cases, whether or not it's a case involving a live victim, it's very clear that the interrogator has a theory from the questions, the accusations, the approach that they take in the interrogation and that their goal is to prove that theory, even when the suspect is denying that any of that occurred or is accurate and even when there's outside evidence that contradicts it or is inconsistent with it.

So, yes, there's definitely patterns one sees in interrogations that indicate that they're guilt-presumptive; that they're based on a presumption of guilt; that the goal is to get a confession of guilt, not to independently evaluate the statements and denials that the suspect is making that are inconsistent with the detective's theory of the suspect's guilt.

Q.   Okay.  And maybe we can identify some examples here.  So would one example be a detective or interrogator using leading questions versus open-ended

Page 33

questioning of a suspect?

A.   It could be, yes.

Q.   Okay.  I think you identified another one where the interrogator makes accusations towards the suspect such as accusing them of committing the murder that the victim is allege -- or strike that -- of committing the crime that the victim is alleging they committed?

A.   Yes.  It could be, yes.

Q.   Okay.  And would those two examples -- can you identify a few other examples just so we're on the same page of what factors or examples you look to to determine if an interrogation is a guilt-presumptive interrogation?

A.   Well, I think I've already answered part of the question, but another example would be a common thing you see in some interrogations:  We're not here to discuss whether you did it.  That's established.  We're here to discuss why.  We need to know why, or, you know, accusations of lying.  You know, we're not going to entertain this anymore.  We're beyond that.  We know you did it.  It's not a matter of whether you did it.  It's a matter of why and how.

There's also -- you know, I describe in

Page 34

the report the scripting and the contamination. That's often a giveaway of a guilt-presumptive interrogation as well, as are evidence ploys, particularly false evidence ploys; right? I mean, the method of modern American interrogation is often inherently guilt-presumptive. That doesn't mean it has to necessarily always be guilt-presumptive, but there are many giveaways that the interrogator's already decided the suspect is guilty, and the point is to incriminate them really in the manner of a prosecutor as opposed to an investigator, not to analyze hypotheses of innocence or guilt and where does the direct -- where does the evidence lead them.

So there would be many other -- there are many other possible examples of techniques or questions that are said in interrogations that are evidence of a guilt-presumptive approach.

Q. Perfect. And that's what I was looking for. I appreciate that answer. Now I'm on page 39 of your report, and I am looking at the first basically full sentence of that section that starts with, quote, "Significantly, social science research has demonstrated that an investigative rush to judgment based on premature and preexisting presumption of guilt puts innocent suspects at an elevated risk of making or agreeing to a

Page 35

false statement, admission, or confession," and it goes on, but I'm going to end it there.

A. Yeah. The problem is I think we might have slight paginations -- so can you tell me -- does the sentence begin with the word significantly?

Q. Yes. It's after footnote 43.

A. Oh, okay. After footnote 43. Thank you.

Q. Uh-huh.

A. Okay. All right. All right. So this is on my page 38. All right. So yes. Now I'm just going to read that sentence; right? That's what you just quoted; right?

Q. Yes. And I'm just specifically directing you to where you say that guilt-presumptive interrogations create an elevated risk of making or agreeing to a false statement, admission, or confession; is that a fair characterization?

A. Yeah. And -- yeah. And then I say on premature and preexisting guilt-presumptive -- preexisting -- so premature and preexisting presumption of guilt, yes.

Q. Okay. And I'm turning to the next page. It's the last paragraph of this section starting with "As well-established social science research has repeatedly

Page 36

demonstrated."

A. Okay. Good.

Q. And I want to direct you specifically to where it says, "An interrogator's guilt-presumptive or truth-presumptive investigative tactics substantially increase the risk of eliciting involuntary, false, and unreliable statements, admissions, and/or confessions from innocent suspects." Do you see that there?

A. Yes.

Q. So fair to say your opinion is that guilt-presumptive interrogations elevate the risk or substantially increase the risk of obtaining a false confession; is that fair?

A. Yes, with qualifications, I would say. If it's a premature presumption of guilt, yes. As I said on the prior page, premature and unwarranted presumption of guilt, yes.

Q. And are you able to quantify the degree to which a guilt-presumptive interrogation increases the risk of causing a false confession, statement, or admission of an innocent suspect?

A. As a general matter, no. I think there are some studies that experimentally study this, and in those studies there would be quantification, but outside of

Page 37

those studies, no.

Q. And are some of those studies or maybe all of those studies identified in footnote 41 of your report, which is my page 38, might be your page 37?

A. These are some of the studies. I don't know that they're all of the studies. Yes.

Q. And in footnote 41 you identify three studies specifically; is that fair?

A. Yes.

Q. Okay. And I know you said it might not be all, but these are the studies you cite in support of that position -- that a guilt-presumptive interrogation increases the risk or substantially increases the risk of a guilt-presumptive -- or of a false confession?

A. Yeah. A premature and unwarranted one, yes.

Q. And I have these studies pulled up so -- and I will direct you to them if you need to or if I might be directing you to a quote, and let me know if you need to look at them anytime during these questions. But for these three studies, these are all experimental studies involving college students; is that your understanding?

A. Yes.

Q. Okay. And they are slightly different method -- or different manners in which that study is

RICHARD LEO, PHD, 03/03/2026                    Page 38..41

Page 38

conducted with college students. Some involve cheating by -- a confederate accusing someone of cheating. Others are people watching videos, stuff like that?

A.   Yes.

Q.   Okay. I know that was a poor synopsis of those three studies but -- and none of the participants in that study were trained detectives; is that fair?

A.   That's my best recollection, yes.

Q.   Okay. And again, I can direct you to the study itself too if that helps, but in all these studies, was your understanding that there was a statement either by a confederate or by the -- one of the partic -- or the overseers of the study informing the interrogators that this person's guilty or this person is lying?

A.   I believe so.

Q.   Okay. Or in other words, that it -- the participants of the study, specifically the interrogators, were not relying on any evidence developed through an investigation to reach the conclusion that a person is innocent or guilty?

A.   I just don't recall in response to your question.

Q.   Okay.

A.   I'd have to review the studies to answer that

Page 39

question.

MS. MURRAY: I think, Dr. Leo, your microphone is picking up some feedback from outside your office.

THE WITNESS: Yeah. So unfortunately I have some workers outside my office who are doing some painting and -- priming and painting. The door is shut, but it's possible that we will hear some background noise as a result. If you can't hear me at any time clearly, please do let me know, and I can ask them to try to be more quiet.

MR. CHRISTIE: As long as -- I'm fine, and I hope -- as long as the court reporter is fine, I think that's the most important person.

(Deposition Exhibit Number 3, Witness Leo, was marked for identification 3/3/26.)

BY MR. CHRISTIE:

Q.   So, Dr. Leo, I'm going to pull up the first study listed on footnote 41, which is the 2003 study involving Kassin, et al. Let me know when that appears on your screen. Direct your attention to page 1. Do you see that study --

A.   Yes.

Q.   -- on your screen? Okay. And I'll direct

Page 40

you to page 5 specifically of the report for -- or I guess I should say Leo 000151 and 152, and do you see where it identifies the procedure or part of the procedure in which this experiment is taking place?

A.   Yes.

Q.   Okay. And I'm going to direct you to Leo 152, the second paragraph. Is that where it identifies that the interrogators were quote, unquote, "manipulated" in the sense that they were told 80 percent of the suspects were guilty -- or sorry; strike that -- they were told who was guilty and who was innocent?

A.   To answer your question, I'm just going to have to read it.

Q.   Sure. Yeah. Take your time.

A.   I think you're referring to the second sentence of the first full paragraph?

Q.   Yes.

A.   Okay. Yes.

Q.   And I guess basically my question goes back to the one I asked earlier -- that the interrogators didn't reach their -- any guilt-presumptive interrogation through evidence developed through investigation but were manipulated through it by inducement; right? Artificial inducement using social science experiments?

Page 41

A.   When you say artificial inducement, you mean that the suspects were told the expectations? Is that -- is that what you're referring to?

Q.   The interrogators. The interrogators were told, We think these people are guilty; we think these people are innocent?

A.   Yes.

Q.   Okay. And that was in order to kind of create the guilt-presumptive stage; right? Or create the guilt-presumptive finding?

(Simultaneous speaking.)

THE WITNESS: Yes.

(Reporter clarification.)

THE WITNESS: I'm sorry about any cross-talk. I think the answer was yes. I forgot what I said after that.

BY MR. CHRISTIE:

Q.   Now, for this study do you recall whether they concluded whether guilt-presumptive interrogations caused false confessions?

A.   I don't think there was a causal analysis, if that's what you're asking, but I would have to review the study. I think it was more a discussion of effects and as a risk factor.

RICHARD LEO, PHD, 03/03/2026                                    Page 42..45

Page 42

Q. So I'll direct your attention to page Leo 160 of this article, and I'll specifically direct your attention to -- let me find it. Here we go. It's the second-to-last paragraph. Do you see where it says, "Paralleling Snyder and Swann's observation that a confirmatory approach to questioning constrains a target's response opinions [sic], suspects in the guilty expectations conditions became noticeably more defensive. It is not clear what aspects of their behavior gave rise to this impression, but it is not hard to imagine, as our result -- that people trapped in coercive interrogations may look away, slouch, sigh in despair," et cetera, et cetera. Do you see that there?

A. Yes.

Q. And basically it was -- fair to say the conclusion of the study or one of the conclusions was that guilt-presumptive interrogations creates -- makes suspects noticeably more defensive or antagonistic towards interrogators?

A. I don't know if they said antagonistic. I'd have to review the article if they used that word, but, yes, here they are saying that the guilt-presumptive approach led to more defensive reactions from suspects.

Q. And again, they didn't draw in this study

Page 43

specifically any conclusion about what effect that has on creating false confessions or causing false confessions?

A. Well, I don't think they discussed causation. If I remember correctly, it was more the effects and how this can ultimately contribute to false and unreliable confessions and why unwarranted or premature guilt-presumptive interrogation can lead to other misunderstandings by police and increase the risk of a false confession.

Q. I'm going to direct your attention now to the second study cited in your report, The Role of Confirmation Bias in Suspect Interviews by Hill.

MR. FLAXMAN: Kyle, are you marking these as exhibits?

MR. CHRISTIE: Oh, yeah. Sorry. That last one should be Exhibit 3 -- thanks, Joel -- and this one will be Exhibit 4.

(Deposition Exhibit Number 4, Witness Leo, was marked for identification 3/3/26.)

BY MR. CHRISTIE:

Q. And, Dr. Leo, let me know when you see this article appear on your screen.

A. Okay. Yes, I see it on the screen.

Page 44

Q. All right. And this, again, was another college experiment, and fair to say that it was a similar, although slightly different, test than the article we just looked at from 2003?

A. Yes.

Q. Okay. And I'm going to first direct your attention to page Leo 558, and do you see where it says, "Police officers, on the other hand, will often have some form of evidence indicating the suspects' guilt before questioning them" --

A. Yes.

Q. -- "regardless of how weak the evidence is"? Okay. So this case -- or this experiment again dealt with the interrogators being told that a certain suspect they believe is guilty or innocent not based on evidence gathered during the investigation?

A. I believe so, if I recall correctly.

Q. Okay. And do you recall what the conclusion of this study was with respect to whether guilt-presumptive interrogations have an effect -- causal effect on creating false confessions or resulting in false confessions?

A. Given the very specific language of your question, I'd have to review the study.

Page 45

Q. Okay. I'll direct you to page Leo 554. Do you see where it starts with the discussion of the analysis of the -- of the experiment?

A. Yeah. Up to that point in the article, yeah. Sometimes articles are broken down into experiment, analysis, discussion, the next experiment, which it looks like this article was. So I don't think it's a discussion of the whole article, but I do see that, yes.

Q. I'm going to direct you to the first paragraph here of that section. Do you see where it says, quote, "While the guilt or innocence of suspects was associated with whether they confessed or denied cheating on the task, the style of questioning was not associated with confession or denial rates. Therefore, it appears that a guilt-presumptive questioning style is not associated with more confessions than a neutral questioning style." Do you see that there?

A. Yes.

Q. Okay. And fair to say that's a conclusion that was reached in this report?

A. I think there's a problem with the way you're asking the question. Are you saying -- so you just quoted something from an article, and now are you asking me about my report?

Urlaub Bowen & Associates, Inc.   312-781-9586

Page 46

Q. No. Yeah. That's fair. Let me clarify. This article is saying that a guilt-presumptive questioning style is not associated with more confessions than a neutral questioning style; right?

A. In this particular -- again, I'd have to review. It's been -- it's been a long time since I read this article, but it may -- it appears to me -- I'm not sure; I'd have to review the article -- that it's discussing one of the experiments in the study. So I don't know if that's a global conclusion or not of the article.

Q. Okay. Directing your attention to Leo 557, there's another general discussion here. Do you see that?

A. Yes.

Q. Okay. And I'm going to direct your attention specifically to the last sentence on this page and -- or sorry -- second-to-last sentence on this page. Do you see where it says, "Given previous research findings of false confession rates between 8 and 20.3 percent in studies utilizing similar paradigms, it appears that the use of guilt-presumptive questions in the absence of other interrogation techniques is not sufficient to elicit false confessions. It also appears that the use

Page 47

of guilt-presumptive questions does not increase genuine confessions." Do you see that there?

A. Yes.

Q. Okay. So when you say -- back to your report in this case, the Martinez-Tinajero-Kelly report, where you say guilt-presumptive interrogations substantially increase the likelihood of a false -- of eliciting a false confession, do you disagree that the article I just showed you does not support that conclusion?

THE WITNESS: I don't think it --

MR. FLAXMAN: Objection to form. You're asking him about one conclusion in the article. It's an improper question.

Go ahead.

THE WITNESS: Yeah. Again, I haven't reviewed the article but -- recently, but it seemed to me that the part you just quoted said a guilt-presumptive approach in the absence of other techniques, and usually what you see in the false confessions is a lot of techniques or at least a number of them; and so I don't think it necessarily undermines the conclusion that I wrote in the article for at least that reason because I was writing about many techniques, and usually there are many techniques in false confession cases.

Page 48

And so the presumption of guilt works with other techniques, and it contributes to a behavioral confirmation bias, or what's called tunnel vision, which in combination with other techniques, is well-recognized to increase the risk of false confession.

BY MR. CHRISTIE:

Q. Okay. Just so I understand, this case, that was just isolating guilt-presumptive -- the effect guilt-presumptive interrogations alone have on eliciting false confessions, whereas you're saying it has to be kind of in combination where other interrogation techniques are applied?

MR. FLAXMAN: Objection; misstates his testimony.

THE WITNESS: Yeah. I didn't say it has to be. What I was saying is that that statement in the article doesn't, in my view, necessarily contradict anything I wrote because it said only when that approach -- a guilt-presumptive approach is used, and it may have just been for one of the studies in the article -- when it's used without other interrogation techniques, and what I'm saying is that the guilt-presumptive approach is always used with other interrogation techniques, especially -- unless somebody spontaneously confesses -- especially in the cases involving false and unreliable confessions.

Page 49

(Deposition Exhibit Number 5, Witness Leo, was marked for identification 3/3/26.)

BY MR. CHRISTIE:

Q. So I want to direct you now then to the third study you cited in footnote 41, which would be the Narch -- I'm going to mispronounce it -- Narchet, Narchet?

A. I think that's right.

Q. Modeling the Influence of -- okay.

A. I think that's right.

Q. Modeling the Influence of Investigator Bias?

A. Yes.

Q. Okay. And do you recall just off the top of your head what this study -- or can you describe the general framework of this study, or do you want me to show you the actual section which discusses the method and manner?

A. Well, I can describe what I recall. I haven't read the study in a while, but, yeah, if you want to show it to me, that's probably the better -- the better way to --

Q. Sure. And if you can, just provide a brief description so we're all on the same page here of this --

RICHARD LEO, PHD, 03/03/2026                    Page 50..53

Page 50

of this study to the best of your recollection.

A.   Okay.  Do you want to go maybe to the first page of the study where it has an abstract --

Q.   Sure.

A.   -- that summarizes the study so I can just quickly review that?

Q.   Yeah.  Take your time.  I think it bleeds onto page 2.

A.   So it's an experimental study that is looking at some interrogation techniques and their likelihood of increasing or not false confessions relative to true confessions, and one of the things it focuses on is the effect of guilt-presumptive bias and -- that increases the use of certain techniques that are associated with and known to increase false relative to true confessions, and they describe minimization as an example of that.

Q.   Okay.  And do you recall what the results of this study were and -- or strike that.

Do you recall whether the authors of this study reached a conclusion of the effect guilt-presumptive interrogations have on eliciting false confessions?

A.   I thought they concluded -- I'd have to review it again -- but I thought they concluded that it

Page 51

increased the risk, and one way it increased the risk was by leading to more minimization techniques, but other than those general statements, I'd have to review the article to give you more specific -- a more specific recollection.

Q.   All right.  I'm going to direct your attention to page 460 -- by the way, this is Exhibit Number 5 of the deposition.  Directing your attention to page 460 of the report, do you see where it says, "While the manipulation of investigator bias of this study had only a marginally significant direct effect on the elicitation of false confessions, the impact of investigator bias appeared to have been moderated by its effect on the increased use of minimization techniques, which both directly and indirectly through participants' perceptions of pressure was associated with an increased likelihood of false confessions"?

A.   Yes.

Q.   Okay.  So taking this first part here, the finding of investigator bias had only a marginally significant direct effect on the elicitation of false confessions --

A.   Yes.

Q.   -- right?  That's the conclusion?  Okay.

Page 52

A.   Well, it's not -- it's a statement --

Q.   Or the finding?

A.   -- in the article.  It's not the conclusion of the article, and it's only part of the sentence.

Q.   Okay.  And then adding on to that second part is when it's coupled with other techniques.  Do you see that there?  That they're saying that it "was associated with an increased likelihood of false confessions"?

A.   Yes, yes.

Q.   So alone guilt-presumptive interrogations is only a marginally significant increase?

A.   In terms of a direct effect, yeah, but it triggers other techniques that, combined with a guilt-presumptive approach or bias, I believe the article says, increase the risk of false confession.

Q.   Okay.  It does not say -- and I guess you might have to review the entire report again -- but it does not say it substantially increases the risk of eliciting an involuntary, false, and unreliable confession?

A.   I don't know if they use the word substantially, but it does lead to more use of minimization, and minimization increases the risk, and I believe there's tables in this article that would show

Page 53

how much minimization increases the risk.  So it could still be the case that it substantially increases the risk, not as what social scientists call a direct fact, i.e., by itself directly on the outcome, but because it contributes or leads to a greater use of this other technique, which in combination substantially increases the risk.

Now, if we're done with that article, can we just -- can I just take a brief -- very brief bathroom break?

Q.   Sure.

A.   I was just waiting -- I was just waiting for a good breaking point.  I can be back in two minutes or less.

Q.   No.  Let's take a -- this is a good breaking point.  We've been going for over an hour.  Let's take a ten-minute break.  Does that work for everybody?  12:50 our time.  I think that would be, Dr. Leo, 10:50 your time.

A.   Excellent.  Okay.  Thank you.  Thank you so much.

THE VIDEOGRAPHER:  Going off the record at 12:40 p.m. Central Standard Time.

(Recess taken.)

RICHARD LEO, PHD, 03/03/2026                    Page 54..57

Page 54

THE VIDEOGRAPHER: This is the beginning of Media Unit 2. We're going back on the record at 12:52 p.m. Central Standard Time.

BY MR. CHRISTIE:

Q. All right, Dr. Leo. Before we went on break, we were reviewing some of the studies cited in footnote 41 of your report. I want to ask you whether you're familiar with the study titled The Combined Effects of Questioning Technique and Interviewer Manner on False Confessions by Wendy Paton, et al., published in 2018?

A. It doesn't ring a bell. Maybe you could show me the first -- the first page of it.

(Deposition Exhibit Number 6, Witness Leo, was marked for identification 3/3/26.)

BY MR. CHRISTIE:

Q. Sure. We'll identify this as Exhibit 6, and let me know when it's on your screen.

A. I don't recall if I've read this article or not.

Q. Are you familiar with any of the researchers who authored this article such as Wendy Paton or Stella Bain?

Page 55

A. I don't think I've ever met them or -- no. They don't -- they don't ring a bell.

Q. Okay. Do you see that this article was published in the Journal of Investigative Psychology Offender Profile?

A. Yeah.

Q. Okay. Are you -- are you familiar with this publication?

A. Not personally, no.

Q. Okay. Do you know it to be -- whether it's a reputable publication?

A. No. I'd have -- I'd have to do some research to figure out if it's a reputable publication.

Q. Okay. I'm going to direct your attention to the abstract of this study where it says, starting on the first line, quote, "Although it is known that interrogation tactics can elicit false confessions and interviewer manner may determine the outcome of an interview, the combined effects of questioning technique and interviewer manner on false confessions have not been examined empirically." Do you see that there?

A. Yes.

Q. Okay. And in this article they say, quote, "Following a false accusation of theft, participants were

Page 56

interviewed in one of four questioning conditions," in parentheses, "(minimization, repetitive questioning, leading questions, and nonleading questions) in which interviewers adopted a stern or friendly manner." Do you see that there?

A. Yes.

Q. Okay. And in the other studies that we looked at on footnote 41, those did not involve accusations of committing a crime; is that right?

A. Yeah. I don't -- I don't think they did.

Q. Okay. Some, like, involved cheating on an exam or survey of some sort?

A. Correct.

Q. Okay. And this abstract at least that you're seeing in front of you indicates that the participants were being accused of theft, which is a type of crime; is that fair?

A. Uh-huh.

Q. Okay. And because you're not familiar with this article, I'm assuming you're not familiar with the conclusions or findings of this article?

A. Correct. I'd have to review the article. I don't recall if I read this article at the time or not.

Q. Okay. Let's see when it was published. I

Page 57

know it was published several years ago. So I'm going to direct your attention to page 344 of this article where the discussion section begins and see if this helps jog your memory. Specifically on the first paragraph, the last two sentences, do you see where it says, "It was hypothesized that coercive questioning and a stern interviewer manner would elicit more false confessions and higher ratings of perceived pressure to confess" --

A. Yes.

Q. -- "than when non" -- okay. And it says, "Contrary to predictions, in the current study, the nonleading question condition appeared to elicit the greatest number of false confessions." Do you see that there?

A. Yes.

Q. And I know I used the word antagonistic earlier. I know now where I got that from. I'm going to direct your attention to the second-to-last paragraph here where it says, "Despite the coercive nature of repetitive questioning, which is attributed to verified false confession cases, the current findings suggest that repetitive questioning may have an antagonistic effect. From this perspective it appears that repetitive questioning may increase resistance to altering

RICHARD LEO, PHD, 03/03/2026                                Page 58..61

Page 58

responses, thereby reducing the risk of false confessions. The current finding was unexpected, and further research examining repetitive questioning as a predictor of false confessions appears warranted." Do you see that there?

A. Yes.

Q. Okay. And by reading parts of this discussion, does that help jog your memory as to whether you reviewed this article or not?

A. No.

Q. Okay. Do you find it surprising that there was a finding that shows that a guilt-presumptive questioning style may have reduced the risk of false confessions versus more open questioning?

MR. FLAXMAN: Objection; form.

THE WITNESS: I'm not sure that really -- that's -- it wasn't clear to me that's what the article said. You said antagonistic and nonleading. Those were the words that I think you read from the article, but, yes, if that were the finding, then that would be a complete outlier in the literature and wouldn't really make sense in relation to all the other findings that -- including real world find -- real world studies that would find the opposite.

Page 59

Essentially, it seems like what you may be saying is that more interview-based techniques as opposed to interrogation-based techniques are more likely to lead to false confessions, and that just doesn't make any sense and would be completely contradicted by the rest of the empirical literature. But again, I'd have to review the article to see -- you know, to put it, you know, kind of into mental context and answer specific questions about it.

BY MR. CHRISTIE:

Q. Okay. I do have one more question, and I took this down too early. I'm on the next page of what I was showing you earlier, page 345 --

A. Yeah.

Q. -- and I'm going to direct your attention to the middle of the report where it says, "However, the present findings suggest that exposure to an interviewer perceived as hostile and rude may increase resistance to making a false confession."

A. Okay.

Q. "Thus, in the present study, the stern manner, which appears to have elicited feelings of annoyance and disrespect, appears to have reduced the likelihood of corroboration when asked to sign a false

Page 60

confession."

A. Yes.

Q. Okay. And so this finding in this report published in 2018 is counter to the studies you cited -- or sorry -- is counter to your opinion that guilt-presumptive interrogation techniques substantially increase the likelihood of eliciting a false confession?

A. No. I would disagree with that. It didn't -- it didn't say guilt-presumptive. It said hostile; right?

Q. Well --

A. Then they're -- the guilt-presumptive approach is not necessarily hostile. They are not necessarily the same thing.

Q. All right. I guess when we were talking earlier, we identified some examples of what a guilt-presumptive interrogation might look like. I think we identified leading questions. Let me find my notes. Well, I guess first, do you think -- so is it your -- are you saying that a hostile interrogation technique is not a factor that shows a guilt-presumptive interrogation?

A. I'm saying they're not necessarily the same thing. You could have a guilt-presumptive interrogation that is not hostile, or you could have a

Page 61

guilt-presumptive approach that is hostile, but they're not necessarily the same thing. So when you ask isn't this inconsistent with what I wrote, it seems to me that it's talking about something different that may or may not be related, and so, no, it's not inconsistent with what I wrote.

Q. Okay.

THE REPORTER: We lost Mr. Art.

MR. FLAXMAN: It's okay. We can keep going.

THE REPORTER: Okay, okay.

MR. FLAXMAN: He's just going to be gone for a sec. Thank you.

THE REPORTER: Sorry for interrupting.

MR. FLAXMAN: No. I appreciate it.

BY MR. CHRISTIE:

Q. So I have in my notes here about what were some factors that I have written down that may identify a guilt-presumptive interrogation, and correct me if I got this wrong, but I have accusations of guilt or accusations of committing the crime, leading questions, not wanting to evaluate the actual statement of what the suspect is saying, rejecting or overcoming denials. Is that some of the factors that you had identified earlier?

A. Yes.

RICHARD LEO, PHD, 03/03/2026                    Page 62..65

Page 62

Q.   Okay.  I think minimization was also one of them?

A.   Well, minimization is a technique, right, that is used to move somebody from denial to admission. Typically in a guilt-presumptive interrogation, though, I was careful earlier to say premature conclusion or unwarranted presumption of guilt.

Q.   Is the use of open-ended questions an indicator of a guilt-presumptive interrogation?

A.   Usually not.

Q.   Okay.  So the finding that I showed you earlier that the open-ended questionings led to more false confessions than the leading questionings would be counter to the -- or countervailing to your findings that guilt-presumptive interrogations lead to or may elicit false confessions?

A.   Well, what I was saying is it was a risk factor; right?  So -- but if that's all we know, yes.  I want to know more in the article, but if that's all we know, yes.

Q.   All right.  I want to turn back to your actual article now -- or sorry -- your actual report.

A.   Okay.

Q.   Back to I think page 37 for you, 38 for me,

Page 63

where you analyze the guilt presumption as applied to this case, and I'll specifically direct you to the paragraph starting, "In my professional opinion, Defendants Guevara and Troche demonstrated an extremely reckless rush to judgment."

A.   Yes.

Q.   Okay.  So correct me if I'm wrong, but if crediting Martinez's account, you're concluding that this was a guilt-presumptive interrogation?

A.   On his description, yes.

Q.   Okay.  And in that paragraph I'm directing you to, it's the last sentence, and it says, "Other than the interrogation-induced statements of Mr. Kelly and Tinajero, both of whom have testified that they were physically" -- "psychologically coerced into falsely confessing after lengthy and abusive interrogations," comma, "and if we credit Melloney Parker's recantation, there was no evidence indicating that Mr. Martinez was in any way connected to the murder of Mr. Garcia."  Did I read that correctly?

A.   Yes.

Q.   Okay.  Where are you getting the finding that "if we credit Melloney Parker's recantation"?

A.   Well, from my review of the materials.  I

Page 64

thought --

Q.   Okay.

A.   -- in some post-conviction proceedings she had recanted and said that the only reason that she made these identifications was because she was threatened by Guevara of being arrested on an arrest warrant and that he lied to her and said that there were bloody boots indicating that the then defendants or suspects had committed the crime or that there were witnesses.

So at some point she recanted her identifications, and, of course, there's also evidence in the record, Dr. Loftus's report, which is discussed in the appellate court opinion, that the conditions of her being able to view it were not conducive to a reliable identification.

Q.   Okay.  Specifically, though, with respect to the statement "Melloney Parker's recantation" -- I want to focus on that and not on any reliability analysis. You read Ms. Parker's deposition testimony; right?

A.   Yes, I have.  I skimmed it in preparation, but I read it previously.

Q.   Okay.  And so did you read where she said that her trial testimony was truthful?

A.   Yes, but she's all over the place, but, yes,

Page 65

I did read that.

Q.   Okay.  Did you read -- did she say that she recanted her identifications in her -- in her deposition testimony?

A.   Not in her deposition, to the best of my recollection.

Q.   Okay.  And did she say that her statement to -- or strike that.

Did she say that the statement prepared by Jake Rubinstein in which she reviewed and signed was truthful, or do you recall any testimony on that matter?

A.   My recollection is she didn't disavow it in the deposition.

Q.   Okay.  So with respect to Melloney Parker's recantation, your citation is to some post-conviction -- or sorry -- posttrial proceeding?

A.   That's my recollection of where she recanted. At some point she did recant and describe -- my recollection is that she did recant and describe that she was coerced, threatened, lied to, and that she just told Guevara these things because he pressured her and that they weren't true; that she did not -- she didn't see the three suspects involved in this murder.

Q.   And just so we take a step back here, Parker

RICHARD LEO, PHD, 03/03/2026     Page 66..69

Page 66

made some identifications of the suspects, including of Kelly and Tinajero, initially at trial just so -- is that right?

A. Initially, yes.

Q. Okay. And there are also identifications by two individuals who were with Garcia that night -- Esteban Rodriguez and Jesus Fuentes. Do you recall seeing that in the reports and testimony?

A. They disavowed any identifications. They made it clear they didn't see anyone, and they too described being pressured by Guevara at one point and being lied to, and the appellate court opinion clearly describes what they said and didn't say and discredits the imputation that they made any identifications.

Q. Just so I -- maybe I misheard you. Are you saying that there's evidence that Esteban Rodriguez recanted his identifications?

A. Or that they were never -- or that they were never made, yes. They -- my recollection is that Fuentes and Rodriguez were very clear on multiple occasions that they did not see -- they could not identify the assailants.

Q. Okay.

A. That they were not -- they did not testify at

Page 67

trial. They did not testify -- if my recollection is correct; I'd have to review it -- that they did not testify at trial; that there's mention of this in the police reports. That assertion was completely discredited in the record.

Q. Do you not recall reviewing any testimony by Jesus Fuentes at these three individuals' trial?

A. Do I recall? No. I would have reviewed it in preparation of the report in November, but I didn't review it in preparation for today's deposition.

Q. Well, if I represent to you that Jesus Fuentes and Esteban Rodriguez identified the three plaintiffs in this case at trial and that Melloney Parker did not recant through any test -- any of her testimony, would that change your analysis that this was a guilt-presumptive interrogation?

MR. FLAXMAN: Objection; compound; misstates the record.

BY MR. CHRISTIE:

Q. Well, how did -- yeah. Let me strike that. Never mind. Just answer -- if you could answer the question, Dr. Leo.

A. Okay. So if it's a compound question, can you just break it down into two?

Page 68

Q. Sure, sure. If Melloney Parker did not recant her identifications of the suspects who she identified at trial, would that change your analysis of whether this was a guilt-presumptive interrogation?

A. No. I think it's still a guilt-presumptive interrogation.

Q. Okay. If Esteban Rodriguez did not recant his identifications of the three plaintiffs which he testified to at trial, would that change your analysis that this was a guilt-presumptive interrogation?

MR. FLAXMAN: Objection; form; misstates the testimony.

Go ahead.

THE WITNESS: Not if we -- not in my report; not if we credit the accounts of the individuals Mr. Martinez, Mr. Tinajero, and Mr. Kelly. No, that wouldn't change my opinion.

BY MR. CHRISTIE:

Q. Okay. So similar question. If Jesus Fuentes identified the three plaintiffs as participating in the Garcia beating and testified to that effect at trial, would that change your opinion that this was a guilt-presumptive interrogation?

A. No. Based on the descriptions, no, it would

Page 69

not.

Q. Okay. And then are you familiar with the witness Margarita Casiano?

A. Yes. I recall her.

Q. Okay. And do you recall reviewing reports in which she informed detectives that the three plaintiffs, along with Mr. Serrano, made some incriminating statements about beating up a Mexican individual in the alley of Whipple and Armitage?

A. Yes.

Q. Okay. And she provided some testimony at trial. Do you recall reviewing that testimony?

A. In preparation for the report but not in the four months or five months since then.

Q. Okay. Does her statements to the police and the testimony that she provided at trial affect your opinion that this was a guilt-presumptive interrogation?

A. No.

Q. So still on page 39 or maybe page 38 for you. It's the next paragraph also starting "In my professional opinion." Do you see the line where it says, "Absent any evidence linking Mr. Martinez to the Daniel Garcia murder, there was no logical reason for Detectives Guevara, Halvorsen, and Troche to suspect Mr. Martinez of

RICHARD LEO, PHD, 03/03/2026                                Page 70..73

Page 70

having participated in or committed it"?

A.   Correct, yes.

Q.   And you reached similar opinions for Mr. Kelly and Mr. Tinajero; right?

A.   Correct.

Q.   Okay.  But if there -- but as I just noted with these identifications such as, for example, starting with Ms. Parker's identifications that -- of two of the individuals, there was evidence there for linking Mr. Martinez to the Garcia homicide based on her identification?

MR. FLAXMAN:  Objection; form.  What's the question?

MR. CHRISTIE:  Well, yeah.  Fair enough.

BY MR. CHRISTIE:

Q.   You're saying, "absent any evidence linking Mr. Martinez to the Daniel Garcia murder."  Do you see that there?  There's no logical reason for them -- for these guys then to suspect Mr. Martinez of having participated in or committed it?

A.   Yes.

Q.   Okay.  But if Melloney Parker's identification was not recanted, she maintains those identifications, that would be evidence linking Martinez

Page 71

to the Garcia murder and, therefore, would be a logical reason for the defendants to suspect Martinez as having participated in or committed it; is that right?

A.   Hypothetically, yes, if that -- if that is credible evidence.

Q.   Okay.  And the same would apply then for the identifications by Jesus Fuentes of the three plaintiffs?  That there would be evidence linking Mr. Martinez and the other two plaintiffs to the Garcia murder and, therefore, would be a logical reason for the defendants in this case to suspect them of committing the crime?

MR. FLAXMAN:  Objection; form.

THE WITNESS:  Hypothetically.  That's not my reading of the record, but on those facts, which I think are hypothetical facts, then yes.

BY MR. CHRISTIE:

Q.   Okay.  If you turn back to your Materials Reviewed section, did you review any deposition testimony by Jesus Fuentes or Esteban Rodriguez?

MR. FLAXMAN:  Objection; no good faith basis to ask that question.

THE WITNESS:  If they were deposed, no, I didn't review it.

Page 72

BY MR. CHRISTIE:

Q.   Okay.  And I'll let you -- I'll inform you that there was no deposition testimony by them.  You didn't review any affidavits by them either recanting their testimony in the Martinez-Kelly-Tinajero trial?

MR. FLAXMAN:  Objection; no good faith basis to ask him about evidence that doesn't exist.

THE WITNESS:  No.  I didn't review those -- I don't recall reviewing those documents.

BY MR. CHRISTIE:

Q.   Okay.  So we're having different interpretations of the reading of the record, but I'm just trying to understand again where you're getting this -- your findings that Jesus Fuentes and Esteban Rodriguez recanted their identifications of the plaintiffs.

A.   Well --

MR. FLAXMAN:  Objection --

THE WITNESS:  Go ahead.

MR. FLAXMAN:  -- you're misstating his testimony.

THE WITNESS:  My recollection, which I want to verify, is that there was an appellate court opinion published in 2021 that went through why they repeatedly -- that they repeatedly said that they never

Page 73

got a view of the people who committed this crime; that they never did identify the people who did.

And in that published appellate court opinion, if my recollection is correct, there was a discussion about Detective Guevara's history of falsifying witness accounts, falsifying police reports, coercing and threatening witnesses, and making up facts that never occurred, and so that's one source where I got this information.  There may have been other sources in the materials that I reviewed as well.

BY MR. CHRISTIE:

Q.   So no testimonial or affidavit evidence from either Parker, Jesus Fuentes, or Esteban Rodriguez?

MR. FLAXMAN:  Objection; form.

THE WITNESS:  Not that I recall specifically.  I'd have to go back through the record to see if there was any of that that I relied on when preparing the report.

BY MR. CHRISTIE:

Q.   Okay.  Now, is there empirical research indicating, out of all the guilt-presumptive interrogations, what percentage produces false confessions?

A.   No, because we don't have a database of all the interrogations in the United States.  So there would

Urlaub Bowen & Associates, Inc.   312-781-9586

RICHARD LEO, PHD, 03/03/2026                                    Page 74..77

Page 74

be no way to generate that number.

Q. Okay. Is there empirical research indicating a generalization of how many guilt-presumptive interrogations lead to false confessions?

A. Again, there's no way to reliably estimate that because there's no database of every interrogation or every false confession.

Q. Moving on to the next section of your report describing length of interrogation.

A. What page are you looking at?

Q. Fair question. It's page 40 of my report.

A. Okay. Great.

Q. Or -- sorry -- your report that I have in front of me.

A. Thanks.

Q. And fair to say you conclude for all three plaintiffs that the length of interrogation may have increased the likelihood of a false confession?

A. Correct.

Q. Okay. And now the hours differ for each of them. Mr. Martinez, for example, was 34 hours as you identified on page 40 of your report?

A. Correct.

Q. And I think, if I'm correct, you identified

Page 75

Tinajero was about 17 hours, and that's page 63 of your report?

A. Yes.

Q. Okay. And then I think Kelly you say 47 hours?

A. Correct.

Q. Okay. And you state that researchers consider the length of an interrogation to include both the time that a suspect is being questioned and while they're being just in custody, including breaks?

A. Correct.

Q. Okay. And we've gone over this, I know, in prior depositions. Is there a definition identifying what interrogation means? Or strike that.

Can you identify a research article that explains the definition of interrogation to mean both time being interrogated and time in custody?

A. Off the top of my head, I'd just have to look and see if there are articles that describe that or define that, but I know I've done it in my articles before, and I know other scholars have as well.

Q. Do you know of police agencies or departments that define interrogation to mean both time questioning and then time where the suspect is alone, either taking a

Page 76

break or napping or stewing, as you put it?

A. Or handcuffed to the wall? No, I don't know how police departments would count that.

Q. What about case law? Do you -- have you reviewed any case law that defines interrogations to mean both time in interrogation and time spent in custody?

MR. FLAXMAN: Objection; form.

THE WITNESS: Well, the definition of an interrogation would be when police seek to elicit incriminating information, but what I don't know is, no, if somebody was in a room for 47 hours and they were chained to a wall the whole time except for bathroom breaks, which were infrequent, and the police said that there was only an hour and a half of questioning or four hours, I don't know if the court -- I just don't know how courts would count that -- if they would count it as four hours or 47 hours or something different.

BY MR. CHRISTIE:

Q. Okay. But you counted it as both in your report -- both interrogation or questioning time and time in custody?

A. Yes, but I would say more specifically time in custody for purpose of interrogation. So when somebody's locked in a room for 17 or 34 or 47 hours and

Page 77

police are coming in and out at different intervals, the whole thing is an interrogation or custody for the purpose of interrogation, more specifically, and exerts a similar effect on the suspect's ability to resist on their fatigue, on their exhaustion, on their stress.

Q. Okay. Yeah. So on that point right there, the end of your statement, how it affects fatigue and stress, if a suspect is sleeping while -- during a break of an interro -- of questioning, do you count that time -- the time that they are sleeping as part of the total time of the interrogation?

A. If they are in custody for the purpose of interrogation, yes, I would count that, although under these kinds of conditions, it would be very difficult to sleep, and as you know, the individuals -- some of these individuals said they couldn't get any sleep and even said their sleep was intentionally disrupted or their --

Q. Yeah.

A. -- efforts to sleep.

Q. Sorry. I didn't mean to interrupt you. And then you understand that these individuals were taken out of the interview rooms or interrogation rooms and placed in a lineup at some point during their custody?

A. Yeah. I don't recall specifically, but at

RICHARD LEO, PHD, 03/03/2026                                    Page 78..81

Page 78

some point.

Q. Okay. Are those -- the times that they were kind of placed outside of the interrogation room and placed in a lineup, does that include -- or do you include that as part of the total time in interrogation?

A. If it's part of the time during which they were in custody for the purpose of interrogation, yes.

Q. Okay. Now, I understand that, to your point earlier, if credited, Mr. Martinez and Mr. Kelly both say that they were deprived of sleep or constantly being woken up to prevent them from sleeping; right?

A. Yes.

Q. Okay. Now, you're familiar with a study of observing juveniles in an interrogation room, and when they were left alone, that most of them except for three would fall asleep?

A. I'm not sure if you're referring to a study by Barry Feld or a different study.

Q. It's a Cleary --

A. You'd have to refresh my recollection.

Q. Yeah. And that was probably a poor synopsis anyways. It was the Cleary and Bull --

A. Right.

Q. -- 2011 study, I believe. Let me -- give me

Page 79

one second here. All right. I'll have to turn back to that. I can't find that article right now. Let's move on to sleep deprivation, which for Mr. Martinez starts on page 42 of your report.

A. Okay.

Q. All right. And when evaluating the sleep deprivation, you indicate it's a significant risk factor for causing or eliciting false confessions --

A. Yes.

Q. -- is that right? Okay. Now, is there a certain methodology you apply to assess whether an individual is sleep deprived that may result in the increased likelihood of eliciting a false confession?

A. Well, in this case they describe being sleep deprived, and so I'm relying on their accounts, and the objective facts of the length of time they were in custody for purposes of interrogation and they described being handcuffed to a wall in their interrogation rooms would support that.

So that's what I'm relying on in terms of my application of the research, which is, you know, well-grounded. There's a sleep science that goes back a long time and that has medically and scientifically documented the effects of sleep deprivation, and then

Page 80

there are the studies that show it to be associated with false confessions.

Q. Maybe a different question then. Is there a comprehensive way to evaluate whether a specific individual is exhibiting sleep deprivation based on empirical research?

A. Well, empirical researchers talk about any disturbance in the cycle -- in one's sleep cycle as indicating deprivation of sleep, and then, of course, there's different degrees of sleep deprivation.

Q. Let's see. You wrote an article titled How Sleep-Related Fatigue Impacts the Evidentiary Value of Statements and Confessions; is that right?

A. I cowrote it, yes.

Q. Cowrote it. And I can pull up that article if you need me to, but in that article did you identify three criteria that should be analyzed to evaluate whether an individual is sleep deprived and may elicit a false or unreliable confession?

A. Yeah. Can you refresh my recollection and show me what you're referring to?

Q. Sure.

(Mr. Art joined the Zoom meeting.)

Page 81

(Deposition Exhibit Number 7,
    Witness Leo, was marked for
    identification 3/3/26.)

BY MR. CHRISTIE:

Q. This will be Exhibit 7, and let me pull that up for your screen so you see it. All right. Dr. Leo, do you see that article on your screen?

A. Okay. Yes. Now -- so thank you. But if there's a specific place in the article that your question's predicated on, can you just show me where that is?

Q. So this is page 20 of the article, and do you see where it's titled Interrogate -- or Integrating Fatigue Information?

A. Yes, yes.

Q. Okay. And I'm just directing you to this quote here: "To comprehensively evaluate fatigue, attorneys thus need to appraise clients' sleep-wake history, current psychological state, and overall background."

A. Yes.

Q. Okay. I know this article is directing it to attorneys -- I'm assuming defense attorneys specifically. Do you conduct a similar evaluation when reaching an

Urlaub Bowen & Associates, Inc.   312-781-9586

Page 82

opinion that a certain individual was sleep deprived?

A. No, I did not do that in this particular case, if that's what you're asking.

Q. Yes. So do you know either Martinez, Kelly's, or Tinajero's sleep-wake history?

A. I do not.

Q. Okay. And so there was, in the depositions that they provided, some evidence of their current sleep state; that's right?

A. I'm not sure what you're specifically referring to.

Q. Sure. Like, Mr. Tinajero identified when he went to bed the night before he was arrested?

A. Okay.

Q. Or I guess -- so that would be the current sleep state or evidence of current sleep state?

A. Well, prior to the interrogation, yes.

Q. Okay.

A. Or the amount of sleep prior to the day that began the interrogation, yes.

Q. Okay. Does the second factor, the current sleep state, does that also include any sleep that the suspects had while in custody?

A. It could again, as the article says, to

Page 83

evaluate the level of fatigue, sure.

Q. Okay. And then the third factor you list here is overall background, and I understand that to be, like, environmental factors and stuff like that; is that fair?

A. Yes.

Q. Okay. And do you know any of these -- sleep background of any of these three plaintiffs?

A. Not that I recall, no.

Q. Okay. Is there a certain threshold that needs to be reached for an individual to qualify as being sleep deprived?

A. My understanding is any disruption of the normal sleep style -- cycle. So again, if, you know, somebody gets eight hours of sleep a night; they go to bed at 10:00, wake up at 6:00, and then one night they go to bed at midnight and they get six hours of sleep, that would still be some level of sleep deprivation that -- there could be varying degrees of sleep deprivation.

And, of course, what you just quoted was about fatigue, which is a symptom of sleep deprivation, not sleep deprivation itself, and that it too can vary widely. In this case, of course, they describe a lot of sleep deprivation, and the length of the interrogations

Page 84

and the number of nights that they were interrogated would indicate -- would seem to indicate that they were severely sleep deprived.

Q. Now directing your attention back to this article. Let me find the quote here. Pulling back Exhibit Number 7 and directing you to the same page but on the first half -- or first third of the left-hand side. Do you see where it says, "First, 24 hours without sleep"?

A. Yes.

Q. Okay. And the conclusion here is "While this level of fatigue could impact subjects' reasoning about consequences or their willingness to cooperate, it is unlikely to induce disorientation or psychosis"?

A. Yes.

Q. Okay. And you put it another way. It's basically, like, being slightly drunk?

A. Yes.

Q. Okay. And that changes when it goes to 48 hours without sleep?

A. Yes.

Q. And then after 72 hours it's significantly different?

A. Yes. These are just some of the symptoms

Page 85

that attend those amounts of sleep deprivation, yes.

Q. Okay. And for Mr. Martinez --

A. Or time -- I should say time without sleep. Right. Yeah.

Q. Sorry. I didn't mean to interrupt you there. Now I want to focus on Plaintiff Tinajero, and I'll direct you to page 63 of the report I have in front of me. It might be 62.

A. Okay. Okay.

Q. And let me know when you're there.

A. Oh, yeah. I'm there.

Q. Okay. And it's the middle of the paragraph where you say, "Mr. Tinajero has testified that he was asleep" -- "he was sleep deprived during his interrogation because he was picked up by Chicago police between 2:00 a.m. and 3:00 a.m. after having gone to sleep at midnight on February 7th, 1999" --

A. Yes.

Q. -- is that right?

A. Yes.

Q. Okay. So he had about two to three hours of sleep before he was brought to Area 5?

A. Correct.

Q. Okay. And then you don't mention in here any

RICHARD LEO, PHD, 03/03/2026                          Page 86..89

Page 86

sleep he received or had while he was at Area 5; is that right?

A. Correct.

Q. Would that be important to consider if he had a couple of hours of sleep at Area 5?

A. I don't think it would undermine any of the conclusions that I make about his asserted sleep deprivations or their effects.

Q. So he gave -- you're saying he said 17 hours of interrogation; so approximately 17 hours of going without sleep?

A. I don't recall if he testified he had any sleep during the interrogation, but, yes, approximately 17 hours.

Q. Okay. In other words, it's under that 24-hour threshold where an individual might feel slightly impaired, similar to being slightly drunk?

A. I think that what you quoted in that article was about somebody who goes 24 hours without any sleep. So, yes, he hadn't gone 24 hours without any sleep, but he was still sleep deprived.

(Deposition Exhibit Number 8, Witness Leo, was marked for identification 3/3/26.)

Page 87

BY MR. CHRISTIE:

Q. I'm going to pull up Mr. Tinajero's deposition, and I'll identify it as Exhibit Number 8, and I'm going to direct your attention to page 121 of his deposition. All right. Let me know when you see that on your screen.

A. Okay. Great.

Q. All right. And if you could just read to yourself page 121 -- and I'll scroll down -- all the way up to page 124 of this deposition where he describes whether he slept at Area 5 or not. I'll scroll down once you get to the bottom.

A. Yeah.

Q. Okay.

A. Okay. I've read it. Okay. I've read that too. Okay.

Q. I think this is 124. Up to line 19.

A. Yes.

Q. Okay. And so in his testimony he indicates that he had slept at Area 5?

A. He said he had fallen asleep, yes.

Q. Okay. And he doesn't recall how long that was?

A. He doesn't, no --

Page 88

Q. Okay.

A. -- according to the testimony.

Q. All right. But he did have some sleep?

A. Yes.

Q. Okay. Without knowing how many hours he slept, are you able to conclude then whether he was sleep fatigued or not?

A. Well, he's describing being sleep deprived. He describes being fatigued. So he is describing the symptoms of sleep deprivation, and it would appear that he was sleep deprived or at least there was sleep disturbance that would qualify for some level of sleep deprivation.

Q. So his statements of being sleep deprived or fatigued are sufficient for you to conclude that he was sleep deprived?

A. If we credit his statements, yes.

Q. Okay. So you don't need to know how many hours he actually slept?

A. Well, I don't think we can know that this many hours later -- I mean -- I'm sorry. This many years later, I don't think we can know that, no. So, yes, I'm crediting his account in this conclusion. I don't think we know -- I don't think we have access to that

Page 89

information this many years later. I don't think it was documented by the police, and, of course, the conditions of his sleep would have been radically different at the police station than at his home.

Q. And you don't know his sleep-wake history?

A. Do I know his sleep-wake history? No.

Q. Okay. And you don't know any environmental conditions or that third factor, the background information, that might affect his sleep schedule -- or sleep deprivation?

A. I guess it depends on what we mean by background factors, but I don't think so.

Q. Okay. So you're relying just basically solely on his account for your conclusion that he was sleep deprived?

A. Well, I'm crediting his account, yes. He describes being sleep deprived, but we also have the hours in which he was picked up and then interrogated, which would seem to corroborate that a person picked up at that time and held for that length and interrogated would be sleep deprived.

Q. And you understand that there's a dispute in the record as to what time Mr. Tinajero was, in fact, picked up? He describes around 2:00 or 3:00 a.m., and

RICHARD LEO, PHD, 03/03/2026                    Page 90..93

Page 90

reports indicate around 5:00 a.m.?

A.   I don't recall specifically.  That was probably in the materials I reviewed.

Q.   Okay.  But you're relying on his account that he had about two to three hours of sleep that night from midnight to about 2:00 or 3:00 a.m.?

MR. FLAXMAN:  Objection; form.

THE WITNESS:  Yes.  If we credit his account, then I think he clearly was sleep deprived, and he describes the symptoms of and the effects of sleep deprivation.

BY MR. CHRISTIE:

Q.   Okay.  All right.  Let's move on to false evidence ploys, and I'll direct you to page 43 of your report, and this is where you discuss Mr. Martinez -- or your analysis that Mr. Martinez -- or the effect false evidence ploys had on Mr. Martinez's confession if his account is credited?

A.   Yes.

Q.   Okay.  And you indicate it is substantially likely to increase the risk of eliciting a false confession?

A.   Yes.

Q.   Are you able to quantify the increase that a false confess -- or a false evidence ploy has in

Page 91

resulting or eliciting a false confession?

A.   In the absence of any context, no.

Q.   How about in this context?  Are you able to quantify, in Mr. Martinez's account, the likelihood -- or the likely increase of eliciting a false confession?

A.   No, we couldn't put a number on it.  There's studies that show it increases the risk, but we couldn't generalize from that to a number meaningfully in this case.

Q.   And turning to the next page where it says, "According to Mr. Martinez, Detective Guevara told him that multiple witnesses said he participated in the beating of Daniel Garcia, even though that was not true"?

A.   Yes.

Q.   Okay.  And that's the false evidence ploy that you're identifying was used against Mr. Martinez?

A.   Yes.

Q.   Okay.  And those witnesses -- are you -- the multiple witnesses you're referring to, is that Parker, Esteban Rodriguez, and Jesus Fuentes?

A.   I don't recall if he says in his interrogation he was told the names of the witnesses -- just that he was told there were multiple witnesses.

Q.   And if those witnesses have not, in fact,

Page 92

recanted their identifications, that would not be a false evidence ploy?

MR. FLAXMAN:  Objection; form.

THE WITNESS:  It would be a false evidence ploy if the witness didn't exist at the time of the interrogation.

BY MR. CHRISTIE:

Q.   Okay.  Let me ask it this way.  It's not improper for detectives to inform a suspect that they were identified in a lineup if that, in fact, occurred?

A.   Correct.

Q.   Okay.  That would be a truth evidence ploy?

A.   Correct, yeah.

Q.   And that's a proper interrogation technique?

MR. FLAXMAN:  Objection; beyond the scope.

Go ahead.

THE WITNESS:  It's not an improper interrogation technique.

BY MR. CHRISTIE:

Q.   And you would agree that perception of proof, such as being informed that you were identified in a lineup, is a factor that causes people to confess?

A.   It influences people's decision to confess, yes.

Page 93

Q.   That was in a Gudjonsson article of 1999?

A.   Yes.

Q.   So in other words, if these identifications were correct and these plaintiffs were informed of them, that would be a reason why they might have truthfully confessed?

MR. FLAXMAN:  Objection; form; misstates the evidence.

THE WITNESS:  I guess I'll take your question as a hypothetical because, given the substantial indicia of unreliability -- in the absence of any indicia of unreliability, we have to -- you'd have to say hypothetically, if they truthfully confessed, yes, if there were true and accurate evidence ploys.

But again, my mind goes back to the 2021, if I'm remembering the year correctly, published appellate court opinion that did a recitation of the facts of the case and systematically took apart all of the alleged witness identifications and basically suggested they were falsified by a corrupt detective who had a history of falsifying, among other things, witness identifications.

So I take this as a purely hypothetical question in light of what I recall about what I reviewed

Urlaub Bowen & Associates, Inc.    312-781-9586

RICHARD LEO, PHD, 03/03/2026                    Page 94..97

Page 94

in this case, but, yes, I'm also crediting their account where they said they were told this, and my review of the record is that these witness statements didn't -- either didn't exist or were recanted or were considered not conducive to reliability based on expert analyses.

Q.   Doctor, this might be a good stopping point. I think we've been going for an hour. I'm going to be moving on to the next two subject matters -- threats and promises and psychological coercion -- personality traits after that. Is it okay for a ten-minute break? Does that work for you or --

A.   That would work, yeah. I mean, at some point I need to take a lunch. I mean, obviously I'm behind. So I don't know if you guys need to take a lunch more urgently than me. So we could do a ten-minute break, or we can do, you know, a lunch break. Whatever people want.

MR. CHRISTIE: Let's go off the record.

THE VIDEOGRAPHER: Yep. Going off the record at 1:48 p.m. Central Standard Time.

(Recess taken.)

THE VIDEOGRAPHER: This is the beginning of Media Unit 3. We're going back on the record at 2:32 p.m. Central Standard Time.

Page 95

BY MR. CHRISTIE:

Q.   Dr. Leo, before we went on break, we were talking about false evidence ploys. Do you recall that?

A.   Yes.

Q.   And one of the ploys that was referenced was Melloney Parker and then potentially her recantation. Do you recall that?

A.   Yes.

Q.   And you noted, if I'm not mistaken, that you got that information from an appellate court opinion that was rendered during the post-conviction proceedings?

A.   Yes. There might have been some post-conviction testimony by Melloney Parker as well or an affidavit. I'd have to go back through the records, but, yes, at one point she did recant is my recollection. And in addition to recanting, she also -- sorry -- she also described being lied to, being coerced, being pressured and manipulated into making false -- a false identification.

Q.   I'm going to ask you then if this was the appellate opinion you reviewed. This will be labeled Exhibit Number 9, and actually, before I do, was that -- the opinion you reviewed, was that a document provided to you by counsel, or was that something you found online

Page 96

through online research?

A.   I believe it was provided to me by counsel, but I don't recall.

Q.   Okay. And I could be wrong -- mistaken. I don't see it on the materials reviewed for the 1 through 42, but it could be maybe somewhere else here.

A.   It's possible that I made a mistake and didn't include it. Yeah.

(Deposition Exhibit Number 9, Witness Leo, was marked for identification 3/3/26.)

BY MR. CHRISTIE:

Q.   Okay. So I'm going to be showing you what was published on Westlaw and see if this was the same opinion that you reviewed. So this is Exhibit Number 9. Okay. And do you see where it says this is a 2021 opinion in the matter of People versus John Martinez?

A.   Yeah.

Q.   Okay. So was that -- the 2021 opinion is the one that you reviewed?

A.   I believe so.

Q.   Okay. And maybe if you read, like, the first paragraph or two, that would help refresh your memory, starting "On October 12th, 1998." Do you see that there?

Page 97

A.   Yeah.

Q.   Okay. And if you review the first paragraph or two, does that help refresh your recollection as to whether that's the opinion you reviewed or not?

A.   I don't think it changes anything. My recollection is it was a 2021 opinion, and it was --

Q.   Okay.

A.   -- by the Illinois Appellate Court. So I think this is it.

Q.   All right. If this is the only 2021 appellate opinion in the matter of John Martinez versus the People of Illinois, this would be then the opinion --

A.   Yes.

Q.   -- that you reviewed?

A.   Yes.

Q.   Okay.

A.   Yes. Unless there was one in the case of Mr. Tinajero or Mr. Kelly. Yes.

Q.   Okay. And you mentioned either potentially some post-conviction testimony or an affidavit?

A.   Yes.

Q.   Okay. Do you know if that was an affidavit by an investigator at The Exoneration Project named Eladio Valdez? And I can show you the affidavit itself,

Urlaub Bowen & Associates, Inc.   312-781-9586

Case: 1:18-cv-01028 Document #: 868-10 Filed: 03/25/26 Page 27 of 61 PageID #:116085

Page 98

if that helps.

MR. FLAXMAN: Do you want to show him the opinion where that's discussed? That's what he says that he remembered.

MR. CHRISTIE: I'll do both.

(Deposition Exhibit Number 10, Witness Leo, was marked for identification 3/3/26.)

BY MR. CHRISTIE:

Q. I have the affidavit. We'll just do this as Exhibit 10 and then just see if this is the one that you reviewed, and I'll note for the record that this was a deposition exhibit in Parker's deposition; so I'm assuming you reviewed it.

A. Yes.

Q. Do you see Exhibit 10 on your screen?

A. Yes.

Q. Okay. And do you see it's the affidavit of Eladio Valdez?

A. Yes. I know that I did review this, yes.

Q. Okay. And if this is the affidavit that was referenced in the appellate opinion as to Ms. Parker's recantation, is that where you're getting this information from?

Page 99

A. Well, I don't -- I thought of them as independent, not as the same thing. So I'd have to review the opinion, but if the opinion says that it got it from this, then yes, but I reviewed both.

Q. Okay. Give me one moment here. If you see -- it might not appear on your screen, but my computer is frozen.

A. Okay.

Q. So see -- yeah. There we go. All right. I'm going to reopen Exhibit Number 9, which is the appellate opinion, and specifically direct you to what is PDF page 15, and do you see where it says, "according to Valdez"?

A. Yes.

Q. Okay. And if you'd read that paragraph there and let me know if that's the information you're relying on regarding Parker's purported recantation.

A. I could be misremembering, but I thought that elsewhere in this opinion the Court went through all the witnesses and all their problems. So it wasn't merely saying, like, Okay, you know, here's what somebody said, but the Court actually analyzed the witness statements or alleged witness statements, and so I was remembering that in my prior answers.

Page 100

Q. All right.

A. I mean, if you want me to go through my file and find it and then look at it, I could tell you what I was, you know, referring to.

Q. No. That's fine. I mean, if that's -- if that's the appellate opinion, you know, I can read it later on, but I'm just trying to understand here. Then I guess first question, is it a common practice in your field to rely on court opinions for findings of evidence rather than deposition testimony?

MR. FLAXMAN: Objection to form.

THE WITNESS: Well, I guess when you say in my field, I'm thinking in research. Maybe you mean in expert witness or litigation work, but in the context of research, one would rely on a number of primary sources and secondary sources and look for corroboration and analyze consistencies and patterns. So in my research I would rely on both.

BY MR. CHRISTIE:

Q. Okay. What about as an expert? Is it common in your field of false confession expertise to rely on appellate court opinions for --

A. Yes.

Q. -- findings of fact of what a witness has

Page 101

said -- witness says?

A. Well, not just that but also for the analysis of the court, but yes. Oftentimes opinions will state findings of fact and findings of law and will analyze different pieces of evidence in context, which is what my recollection was this Court opinion did.

Q. Okay. And this Court opinion being in 2021, you understand that Melloney Parker testified at her deposition, which occurred years after that?

A. Yes.

Q. Years after -- okay. And in her deposition did she say that she recanted her identifications?

A. I don't recall that she did.

Q. Okay.

A. And that's why I said if we credit her recantation earlier in the report.

Q. That being the one described in the appellate opinion?

A. A prior recantation, yes.

Q. Okay. Moving on to Promises and Threats --

MS. MURRAY: Real quick -- hold on, Kyle, real quick.

Mr. Flaxman, are we supposed to wait for Mr. Art? I didn't see he logged back on.

Page 102

MR. FLAXMAN: Yeah. He said we can go on without him. Thanks for checking.

MS. MURRAY: Okay. Thank you.

BY MR. CHRISTIE:

Q.   Moving on to Promises and Threats, which I'll direct your attention to page 45. It might be 44 of your -- of your report.

A.   Okay. Thank you.

Q.   Uh-huh. And this is where you describe promises and threats; correct? Or --

A.   Yes.

Q.   Okay. And you note that a promise or a threat significantly increases the risk of eliciting a false and/or unreliable statement, admission, or confession?

A.   Yes.

Q.   Okay. Are you able to quantify the degree in which a promise or threat increases the risk of eliciting a false or unreliable statement, admission, or confession?

A.   No. To attach a number that would always apply, no.

Q.   Okay. All right. Let's move on then to the next part here, Personality Traits, starting on page 47

Page 103

of the report I have. It might be 46 of yours.

A.   Yes.

Q.   All right. And personality traits are personal risk factors. Is it fair to say that deals with age, cognitive ability, intellectual ability, stuff like that?

A.   Yes.

Q.   Okay. And in this case for Mr. Martinez, it has to do specifically with his youth?

A.   Yes.

Q.   Okay. That's the only situa -- or personal risk factor that you identified for Mr. Martinez; is that right?

A.   Correct.

Q.   Okay. And for -- and that's based on the fact that he's 18 years old?

A.   Correct.

Q.   And for Mr. Kelly, which if you go to page 59 or 58 of your report --

A.   Yes.

Q.   Okay. And you also identify youth being a personal risk factor?

A.   Yes.

Q.   And that's because he's age 17?

Page 104

A.   Correct.

Q.   And he has no other personal risk factors that you have identified?

A.   Correct.

Q.   Okay. And for Tinajero I'll generally direct your attention to page 64, maybe 63. You don't identify any personal risk factors for Mr. Tinajero; is that right?

A.   Correct.

Q.   Okay. So then focusing on youth or individual juvenile status, you explained that juveniles are more suggestible, susceptible, give in to peer pressure, factors such as those that might elicit a false confession?

A.   Well, would increase the risk of eliciting a false confession, yes.

Q.   All right. Thank you. Are certain juveniles more susceptible or suggestible than other juvenile?

A.   As a general matter, yes, the younger one's age, and then there might be other personal risk factors -- juveniles with intellectual disabilities versus some without. So there could be a variation.

Q.   So it's a range; is that fair to say?

A.   Presumably it would be a range, yes.

Page 105

Q.   Okay. Do you take in other factors such as a juvenile's prior criminal history?

A.   No, I don't think that's a risk factor.

Q.   Or a factor in evaluating their suggestibility or susceptibility as a juvenile? Do you take their experience with law enforcement or prior criminal record as part of your analysis?

A.   That's not relevant to the analysis that I'm doing here, no.

Q.   Okay. And applying specifically to Mr. Martinez, aside from him being 18, are you able to evaluate -- strike that.

Are you able to evaluate an individual's suggestibility?

A.   No. I'm a social psychologist by training, not a clinical psychologist; so I don't administer tests, and so in order to evaluate one's suggestibility, you'd have to -- individual suggestibility, you'd have to administer tests. So I don't do that, and so what I was writing here was general, and, of course, I'm familiar with the research as well on this, but any specific observations about an individual's level of suggestibility or compliance, you know, would have to come from a clinical evaluation by a clinical or forensic

RICHARD LEO, PHD, 03/03/2026                    Page 106..109

Page 106

psychologist.

Q.   And I know I directed that question to you specifically, but as a general matter, clinical psychologists can evaluate someone's suggestibility?

A.   If they apply -- if they are trained to apply the right tests or know to apply the right tests, yes.

Q.   Okay.  And did you see any testing of Mr. Martinez's suggestibility in this case?

A.   Not that I recall.

Q.   Okay.  And similar question for Mr. Kelly. Did you see any testing of his suggestibility?

A.   Not that I recall.

Q.   Okay.  Did you see any clinical testing of Mr. Martinez that would shed a greater light on his susceptibility or willingness to give into police officers' coercive techniques because of his age?

A.   Individually, no.

Q.   Okay.  And same with Mr. Kelly?

A.   Correct.

Q.   Okay.  So are you then just applying the general -- or strike that.

So are you able then to identify how suggestible Mr. Martinez or Kelly were based on their age?

Page 107

A.   No.  I'm not -- I'm not administering the tests; so I don't have a specific clinical indication of their level of suggestibility relative to others.

Q.   Okay.  If we turn to -- I think it's the next page on your report.  It's the Police Interrogation Contamination and Scripting section.

A.   Yes.

Q.   Okay.  And am I correct that this is not a situational risk factor?

A.   For false confession, correct.  Yes.

Q.   Okay.  And obviously it's not a personal risk factor either?

A.   Correct.

Q.   Okay.  And I want to direct your attention specifically to the section -- and it's actually on the next page -- where you talk about the error insertion trick.

A.   Correct, yeah.

Q.   And the paragraph starts with, "As mentioned earlier in the report, one scripting technique that police interrogators use is known as 'The Error Insertion Trick'"?

A.   Yeah.  Sometimes called the error correction trick too, but yes.

Page 108

Q.   Okay.  And you explain that that's where the interrogator writes out the suspect's statement and intentionally inserts minor errors that the suspect corrects?

A.   Correct, and that they're trained to do that. It's a recognized interrogation technique.

Q.   Yeah.  Now, in this case Mr. Martinez's statement was written out by ASA Rubinstein --

A.   Correct.

Q.   -- is that right?

A.   Correct.

Q.   So not the police?

A.   Correct.

Q.   And same with Mr. Kelly?  It was written out by Mr. Rubinstein?

A.   Correct.

Q.   And then the -- Tinajero's court-reported statement, that was typed by a court reporter but elicited through the questioning of ASA Durkin?

A.   Correct.

Q.   Okay.  So that does not apply to the police officers in this case?

A.   Correct.

Q.   Okay.  And do you know if ASA Rubinstein was

Page 109

trained on the error insertion trick or what other similar name it might be used for?

A.   I don't know if he received training on the error insertion trick.  It is -- it is mentioned in the Reid Method, R-e-i-d, in their manuals going back many years.  I don't know whether he received any training in that, but they are Chicago-based, as you probably know.

Q.   Uh-huh.  And it's a similar question.  Do you know if ASA Durkin received training on the error insertion trick or whatever similar term might be used?

A.   I do not.

Q.   Okay.  Now, you reviewed the statements of Kelly, Martinez, and Tinajero in this case?

A.   I did, yes.

Q.   And you did notice that there were some corrections throughout each of their reports?

A.   For the prosecutor-written statements, yes, in Mr. Martinez's case and Mr. Kelly's case.  I don't believe there was any in the court-reported statement for Mr. Tinajero.

Q.   Okay.  I think -- yeah.  Sorry.  Thank you for that clarification.  And you're not saying there's -- there's nothing wrong with going through a statement with a suspect and identifying any mistakes that they might --

Page 110

that might have been made?

A. Well, there's nothing inherently wrong with that, yes, if that's all we know.

Q. Okay. Moving on to the section titled Violation of National Police Interrogation Training Standards, which begins on page 50. I don't have too many questions on this. You were never a sworn police officer; is that right?

A. Correct.

Q. Okay. You've never investigated a criminal case before?

A. Correct.

Q. Okay. You're relying on sources, including the Reid manual, for your opinion in this matter?

A. Correct.

Q. Is that the source you're relying on to indicate what was an established practice -- established police practice in 1999?

A. I think it's the best -- I think it's the best guide since it's the leading interrogation training manual, and they have been the industry leaders in police interrogation for decades, but I'm also relying to some extent on the academic research, literature, and my background and knowledge.

Page 111

(Mr. Art joined the Zoom meeting.)

BY MR. CHRISTIE:

Q. But in section D, which starts on page 50 for me, all the way to page 54, are you -- you're only citing to let's call it John Reid and then also a William Douglas Woody and Krista Forrest? Are those the two articles you're relying on?

A. Yeah. That one's a book. You're talking about footnote 78?

Q. Yes.

A. Yeah.

Q. Which is cited Id. on footnote 79, and from there it's footnote 80 with the Reid manual --

A. Yes, yes.

Q. -- or Reid book?

A. Yes.

Q. All right. Are there any other materials that you're relying on to reach your opinions on part D of this report?

A. Well, not that I cite.

Q. Okay.

A. But again, there would be background materials. I mean, we can go through it one by one, and I can tell you other materials that would support the

Page 112

opinions, and so in a sense I relied on those, but I'm not sure if that's what you're asking.

Q. No. I just -- those are the -- those are the materials you cited, and I might have asked a poor question, but those are the two materials --

A. Correct.

Q. -- you cited for this opinion? Okay.

A. Correct, yeah.

Q. Moving on to Indicia of Unreliability, which for Mr. Martinez begins on page 54.

A. Yes.

Q. And you come to the conclusion that, if Martinez, Kelly, and Tinajero's accounts are all credited, their statements have numerous indicia of unreliability?

A. Correct.

Q. Okay. I want to just go through a few of these. One of them is -- that you're relying on is Parker's recantation; is that right?

A. I'm not sure. I mean, it looks like I relied on some of what she said about what she could see as well as Dr. Loftus's report about her account of what she could see being not conducive to eyewitness identification -- reliable eyewitness identification. I

Page 113

don't know that I mentioned recantation in this section. I don't think I did.

Q. It's at -- sorry. I should have directed you to it. Page 55. It's the last paragraph of this section. It's kind of in the middle. It starts with "With the recantations by" --

A. I see.

Q. Yeah. Okay.

A. All right. Sorry. I was looking at the bullet points.

Q. No. That's fine. And again, that's the recantation that you got from the appellate opinion and some post-conviction materials?

A. Yes.

Q. Okay.

A. To the best of my recollection.

Q. Yeah. Fair enough. You also note the incon -- this is the third bullet point. It's the first bullet point on this page 55 -- the inconsistencies between the statements of Kelly, Tinajero, and Martinez?

A. Yes.

Q. Okay. You're familiar that with individuals who confess minimize or may minimize their role in the actual crime, even if they did, in fact, confess to it?

RICHARD LEO, PHD, 03/03/2026      Page 114..117

Page 114

A. They may minimize. That's true. Sometimes they're responding to police minimization, but yes.

Q. Okay. And if the suspects are minimizing their roles in the case, that could create inconsistencies amongst their statements?

A. It could, but you wouldn't expect the kinds of inconsistencies you see here where certain people aren't present in other people's account and nonincriminating facts don't match up in terms of the sequence of events and then motivations don't match up and who is doing what doesn't match up. So, yes, what you're saying is true, but I think this goes beyond that.

Q. Okay. And you noted where we just briefly talked about this earlier, if we credit the plaintiffs' accounts, they described that the police scripted their confessions and contaminated their confession?

A. And coerced their confessions, yes.

Q. Right. And so in the indicia of reliability analysis, again if crediting the plaintiffs' account, that means that they scripted confessions that were inconsistent; is that correct?

A. Yes.

Q. Okay.

A. I mean, interrogations involve more than just

Page 115

scripting. Even when there is scripting present, individuals are sometimes -- who are innocent are guessing facts and replying with answers that they think the interrogator wants. So it's not like the thing was 100 percent scripted. There is an interaction going on, but they all describe being fed facts and being pressured to come up with a narrative that would satisfy the investigators.

And then, you know, in some investigations there's a more thorough investigation prior to the interrogation, and then there's interrogations where the interrogator's playing it fast and loose, and that would affect the quality of the scripting, so to speak, as well.

Q. Now, in this case, obviously Tinajero provided his court-reported statement first prior to Kelly and Martinez; is that right?

A. Correct. In time, yes.

Q. Yeah. Right. And for Mr. Martinez, he claims that Rubinstein wrote out the statement and then handed it to him, or Troche handed it to him. So he was not present for it actually being written out; am I --

A. I'm sorry. Go ahead. Oh, I thought I heard an objection. To the best of my recollection.

Page 116

Q. Okay. And it was similar for Mr. Kelly too -- that it was written by the prosecutor outside of his presence?

A. I don't recall.

Q. Okay. But in terms of contamination of scripting, basically the entire confe -- or statement of Martinez was scripted because it was written by Rubinstein outside of Martinez's presence?

A. In that sense, yes, but there was also pre-interroga -- you know, prior to that when they're -- according to Mr. Martinez's account and Mr. Kelly's account and even Mr. Tinajero's account, they were all fed facts. They were all educated about the police theory; right? And then my understanding or my best recollection is that there was interaction also between ASA Rubinstein and the detectives. So there's more going on in terms of the scripting than just what appears on the written page of the prosecutor-written confessions.

Q. And just to put a pin in this indicia of unreliability analysis, you don't mention the trial testimonies of Jesus Fuentes; is that right?

A. Correct.

Q. Trial testimony of Esteban Rodriguez is also not mentioned?

Page 117

A. In that section, correct. Yeah.

Q. Okay. And also the testimony of Margarita Casiano?

A. Correct.

Q. Okay. And I apologize. I missed the section on psychological coercion. So let's go back to that, which I believe is on page 45 or 46 of your report.

A. Uh-huh.

Q. That's where it starts.

A. Yes.

Q. And is there empirical research that specifically defines psychological coercion the same way so that way, when researchers are using it, they're understanding it or applying it in the same exact manner as you are here?

A. I believe other researchers are. I'd have to look at a particular piece of psychological research to answer your question specifically.

Q. Well, are there other definitions of psychological coercion that have been used by researchers in your field of false confession expertise?

A. There might be, but I think they all revolve around the same core concept, and I can't think of any off the top of my head.

Page 118

Q.   For Mr. Martinez you identify kind of three major categories that you denote was psychologically coercive; is that fair?

A.   Yes.

Q.   Okay.  And the first one being the length of the interrogation?

A.   Yes.

Q.   Okay.

A.   Well, wait a minute.  No.  I don't think that's right.

Q.   Sorry.  Maybe I'm mistaken.  I'm looking at page 46 where it says, "First, as just discussed," and what you mention, the lengthy interrogation -- oh, I'm sorry.  Promises for -- of leniency, promises to go home, and threats of harm?

A.   Correct.  I think that was the basis for the first one.

Q.   Okay.  And those bases are all the situational risk factors that you had already previously described?

A.   They are situational risk factors, yeah, but they're also likely to overbear a suspect's will, as I mentioned in the report.

Q.   Okay.  And that's what you describe on

Page 119

paragraph -- the second paragraph where you identify "Second, according to John Martinez"?

A.   Yeah.  That in his description he basically was saying he had no choice.  He caved or gave in because he perceived his situation as hopeless, and that was the only way to extricate himself from it.

Q.   Okay.  And then the third one is that he was never provided a Miranda according to his account?

A.   In his account, yes.

Q.   So those are the three main subjects or three main factors you're relying on to conclude that his interrogation was psychologically coercive?

A.   Yes.

Q.   Okay.  And the same applies for Mr. Kelly?  And I'll direct you to page 58.

A.   Okay.

Q.   Is that basically the same three categories of analysis that were applied for Mr. Martinez?

A.   Yes.

Q.   Okay.  And now for Mr. Tinajero, I think it's only two, and you do not mention Miranda, and I'll direct you specifically to page 64 of your report.

A.   Correct.

Q.   Okay.  With Miranda -- to your understanding,

Page 120

Mr. Tinajero was read Miranda at some point during his interrogation?

A.   I don't recall as I sit here specifically.

Q.   Okay.  All right.  Does the absence of him not -- or strike that.

Does him being provided Miranda make his interrogation less psychologically coercive than Martinez's and Kelly's who did not receive their Miranda warnings?

A.   Not necessarily.  I mean, if you want to talk about more or less psychologically coercive, you have to look at everything, not just the presence or absence of Miranda warnings.

Q.   Okay.  So is there then a way to quantify how psychologically coercive an interrogation is?

A.   I don't think we can assign a number to it, no.

Q.   Okay.

A.   I think we can talk about degrees of it or why and which types of psychological coercion, but I don't think we can assign a number to it.

(Deposition Exhibit Number 11, Witness Leo, was marked for identification 3/3/26.)

Page 121

BY MR. CHRISTIE:

Q.   All right.  Dr. Leo, I'm almost done here. I'm just going to show you one more exhibit, which is your invoice in this matter, and this will be Exhibit Number 11.  Let me know when you see it on your screen. Dr. Leo, do you see Exhibit Number 11 on your screen?

A.   Not yet.  Okay.  Yeah.  So this is my retainer invoice it looks like.

Q.   And I'll just scroll down.  It's Leo 1442 to Leo 1444.  Did you submit another invoice in this matter?

A.   I did, yes, after I completed my report.

Q.   Okay.  And I might have missed it.  I have not seen it in our record.

MR. FLAXMAN:  We'll update it, Kyle.  Sorry about that.

MR. CHRISTIE:  Okay.  I appreciate that.

BY MR. CHRISTIE:

Q.   Just -- do you know an estimate of how much your second retainer was?

MR. FLAXMAN:  You mean second invoice, not retainer.

THE WITNESS:  Oh, yeah.  Yeah.  It wasn't a retainer.  I thought that I spent 70 or 80 hours total reviewing the file, but I don't recall what the number

RICHARD LEO, PHD, 03/03/2026           Page 122..125

Page 122

was.  It would be multiplied by the hourly rate, subtracting the retainer invoice.

BY MR. CHRISTIE:

Q.   Okay.  So somewhere in the ballpark of, like, under $50,000?

A.   That would be my best guess, yeah.

MR. CHRISTIE:  Okay.  Dr. Leo, I don't have any further questions for you.  I know my colleague, though, Theresa Carney will have about 20 or so minutes of questions.  Thank you for your time.

THE WITNESS:  Okay.  Great.  Thank you.

EXAMINATION

BY MS. CARNEY:

Q.   Hi, Dr. Leo.  Do you need to take a break before we keep going or --

A.   I'm good unless you'd like to take a break. If others would, that's fine with me.

Q.   No.  I think we just went back on; so I think we should be okay.  Let me just grab my notes.  Okay.  In the beginning of the deposition, you and -- or Kyle was showing you a lot of various research articles and journal articles, and so I wanted to kind of take a step back and ask you a couple more global questions about journal articles and the peer review process for those.

Page 123

Could you walk me through how the peer review process works for -- to get a journal article published?

A.   So in a peer review journal, the way it normally works is that there's an editor of the journal, and there's an editorial board of scholars; and the article would be submitted to the journal, and then the editor would choose peer reviewers.  They might choose some of the board members, or more likely they would choose ad hoc peer reviewers, people in the research community with expertise that's directly relevant to the subject of the article.  And then if the people who are asked to peer review agree, it would be sent out to those individuals to read the article and then to answer specific questions or provide an overview of their assessment of the article.

So the specific questions would be things like, Is this an original article?  Does it make a contribution to the literature?  Are the methods adequate to the task?  What's your assessment of the quality of the analysis?  And things like that.  And it could be anywhere from two to four reviewers typically, and the reviewers would write up this analysis of essentially the strengths and weaknesses of the article in their perception with regard to the importance, the

Page 124

originality, the adequacy of the data collection, the adequacy of the methods, the adequacy of the analysis and reasoning and conclusions, the contribution to the field that it makes, any problems in the article that they see.

And typically they would either recommend -- each reviewer would either recommend wholesale rejection, wholesale admission, or that the -- that the author revise and resubmit; and then the editor would collect all these and typically summarize them and issue their decision -- either reject or accept or conditionally accept or not give any indication of acceptation and say, Here's what the reviewers have said. They've identified these issues or problems.  You need to address these.  If you would like to resubmit it with no guarantee of acceptance, you can do that.

And then if the author is in that situation and they resubmit, the editor -- after making revisions the editor might rely on the same reviewers, or they may rely on other reviewers or a combination; and then ultimately the editor decides whether to accept or reject the article based on the peer reviews, the editor's own analysis and, if it's gone through a revision, subsequent peer reviews and the editor's analysis of that.

Page 125

So a lot of articles don't make it through the peer review process.  Some journals are more selective than others.  The theory of peer review, as you probably know, is that it weeds out articles that don't -- and research that doesn't meet the standards of the discipline, that is substandard, or that is weak in some perceived way and that the article that survives peer -- the articles that survive peer review are strengthened, are more likely to have sort of been methodologically tested or at least reviewed and assessed by trained social scientists, and so that would give us more confidence, in theory, in their analysis and conclusions and contribution to the field.

Q.   Okay.  So that was a lot.  I appreciate it. Thank you.  So I'm going to try to step back and ask a couple more pointed questions about the overview.  So you had said the editor -- there's an editor of the journal, and then there's a board of scholars.  Those are two different sets of people?

A.   Yes.

Q.   Okay.  And when an article is submitted, it's the editor that chooses the peer review?

A.   Typically the peer reviewers.  They might go to the board disproportionately because that's one of the

Page 126

obligations of being on the board of a journal.

Q. Okay. And could you -- you had said, I believe, that the editor chooses, and it can be an ad hoc group of people in the community, or it could be something else. How does the editor decide who is chosen to be part of the peer review process?

A. Well, I mean, I've never been an editor myself, but I think what the editor tries to do, in theory, is find people who have similar expertise; and so if we had an eyewitness identification researcher, for example, typically those people have substantive expertise in the psychology of memory, in cognitive psychology, and so the editor would try to find somebody who's an expert in memory, cognitive psychology, eye witnesses identification science.

And then it might be that they can't find enough people in that, and so maybe the fourth reviewer might be someone who has general familiarity but isn't an -- isn't an expert researcher in eyewitness, but maybe they're still trained in cognitive psychology or in the psychology of memory. But ultimately it's the editor trying to find people who are experts in the field and willing to do the peer reviews. When you peer review, you don't get paid. So sometimes people say yes;

Page 127

sometimes people say no.

Q. That was going to be my next question: Do peer reviewers typically get paid by the journals? That's a no?

A. Yeah. They don't get paid by the journals. When you're asked to peer review a book manuscript, sometimes they will either offer you, you know, a trivial amount of money or a slightly more than trivial amount of credit toward purchase of books from that university press; but typically for journal articles, there's -- it's understood that there's a professional obligation that you should do peer review because, you know, you benefit from peer review, and so -- and there's a recognition, at least at research universities, that that's part of your job, to be a peer reviewer when called upon, but you don't get paid.

Q. Okay. And I think you said that some of the ways that the peer reviewers -- so the peer reviewers submit their analysis of the journal. Is that kind of how it works?

A. Yes. And these days typically they're asked very directed questions --

Q. Okay.

A. -- and then they are offered the opportunity

Page 128

to say anything else they want to say.

Q. Okay. And I think you said that there is a handful of different options: wholesale rejection, wholesale admission, and revise and resubmit? Are those the three basic options --

A. Yeah.

Q. -- for after a peer review?

A. Yes. But sometimes -- yes, they are, but the revise-and-resubmit category can be a little bit broader because it could be that -- sometimes they say, There's no guarantee that, if you revise and resubmit, we will accept it; and other times they might indicate that, If you address these issues, then there's a good likelihood we'll accept, or we would be likely inclined to accept. So there can be different degrees of revise and resubmit, but, yes, those are the three basic categories: accept, reject, or revise and resubmit.

Q. Okay. And then I think you said that the general purpose of this is to weed out articles that don't meet the -- meet the standard of the discipline; is that right?

A. Correct, and I really kind of meant research. The research that -- or I should say articles. But if they are research-based or empirical articles, then

Page 129

yes -- that they don't meet the standards that are expected for publication in the journal like the one that's being submitted to.

Q. Who -- if you know, who sets the standards within the discipline? Is it -- are they standards set by the journal itself? Is it standards set by -- I guess that's the question. Who sets these standards of the discipline?

A. Well, you know, it's interesting. It's not like, you know, the ABA that has, like, these professional model rules of conduct, and you're, like, you know, 3.812(a). It's not like there's a booklet out there. You know, here are our standards for the discipline. It's more that in all these social sciences, when you get a PhD, you're trained in methods of data acquisition, methods of data analysis.

And so the standards are really set there in the sense that you learn how to do, you know, observational research, experimental research, survey research. You learn how to do statistical analysis. You learn how to do research projects. You take classes evaluating methodologically flawed and methodologically successful studies.

So it's really in graduate schools in the

RICHARD LEO, PHD, 03/03/2026                    Page 130..133

Page 130

disciplines that future researchers learn the methodological standards, and then -- and then people become experts in specialized areas, and so they are familiar with the body of knowledge and, you know, what the conventional wisdom is, what is known, what is not known, what would be an original or important contribution verse what is a rehash of what we already know.

So I think that's the best I can really say, and it varies to some extent by discipline. Anthropologists spend a lot more time on field observation. Psychologists spend a lot more time teaching and doing studies based on experiments. In economics there's a lot more statistical modeling as opposed to data gathering, right, so -- or in some parts of economics. So that's kind of how the standards are conveyed in the disciplines.

Q. So in a -- so it's -- the standards of the discipline are kind of -- I think, if I'm understanding you correct, they're set within the graduate schools within the -- I think you said within the -- within the social sciences themselves and how to do the research and how to put the analysis together in a way that is then published in these articles? Is that kind of, like, a --

Page 131

is that a bad way -- I'm just trying to kind of distill it down a little bit for myself here.

A. Yeah. I guess it depends on what we're talking about specifically, but yeah. When we talk about, like, the standards for appropriate data gathering or the proper use of different methods, that's all trained in graduate school.

Q. Okay.

A. People with PhDs in their disciplines are taking classes on research design, on methods, on data analysis, and that's where they learn the methodological standards of a discipline; and then they specialize and would learn more about, you know, where the gaps in knowledge are in a field, what we already know, and then they generate research questions to advance that field.

And so when somebody evaluates the substantive contribution as opposed to the methodological issues, they're usually from a place of knowing something about that field and what would be an important or original contribution, what we already know, you know, how --

Q. Okay.

A. -- it relates to prior research, things like that.

Page 132

Q. So presumably once somebody obtains a PhD -- the PhD -- or their PhD, they have gone through this process of learning the methodological standards that are necessary within their discipline?

A. Presumably, yeah. I mean, a PhD is a research degree after all. Many, if not most, PhDs go on to become teachers, and most teachers in universities or colleges are not researchers, but, yes, in theory, anybody who's gotten a PhD from a reputable institution and passed their classes should have taken classes on research design and on methods and data analysis and should be competently trained to do data analysis.

Q. Okay. How many -- I understand that you have served as a peer reviewer before. Can you approximate how many journals you -- let me ask it two different ways -- how many different journals you've served as a peer reviewer for?

A. So there is a list buried deep in my CV of all the peer reviews that I've done going back to 1995, I believe. I got my PhD in 1994. I'm guessing there's, like, 30 journals on that list, but we could go there, and we could count it; and then there are some journals that, you know, have hit me up once in 30 years and other journals that have hit me up, you know, many times.

Page 133

So -- but that would be my estimate, but it's there in the CV.

Q. Okay.

A. And there's also university press books as well.

Q. Okay. And then of those 30 different journals, do you think -- do you think you can estimate how many different articles or research articles that you've served as a peer reviewer for?

A. Probably 40 or 50, but I think that would -- yeah. That would be my -- that's my best estimate, but if I went --

Q. That's fine.

A. -- through that, I might modify that estimate.

Q. That's fine. I'm not asking for exact numbers. I'm just trying --

A. Okay.

Q. -- to get a sense. And do you have a recollection of any articles or research articles that you peer-reviewed that you said -- that you found didn't meet the standard of the discipline and didn't give, like, one of the specific contributions to the field that you thought needed to either be whole -- sorry. Now I'm

Page 134

getting into a compound question. I see Joel's face saying, What are you doing there?

So let me start with this. Out of the 40 to 50 journal articles that you've served as a peer reviewer, can you sitting here today remember any that you thought needed to be wholsaley rejected from being part of the particular journal?

A. Yeah. I just reviewed one just a couple weeks ago, and I think it was plagiarized by AI, and that wasn't the only problem with it, but yeah. I just -- not only did I recommend rejection, I recommended that whoever submitted it be brought up for research misconduct because it was so clearly -- there were such clear hallmarks of AI and plagiarism, but that's the only time that's happened.

I know there have been other times when I've recommended rejection of articles, but I'd kind of have to go through and look at the old reviews to refresh my recollection because, prior to this most recent article, I don't think I had done any peer reviews for a few years.

Q. Okay. Do you -- oh, I just lost my train of thought. Sorry about that. When you serve -- or let me ask you this. Do the original -- do the authors of the

Page 135

peer review article know who the peer reviewers are at the time that the research article is in the peer review process?

A. They're not supposed to. You're supposed to -- it's supposed to be a blind process, and if you have a conflict of interest, then you're supposed to let the editor know. And I've done that before, you know, where an article lands on my desk, and I'm like, I know who this is; and you're not supposed to have -- people you've coauthored with, you're not supposed to peer review their articles. They're not supposed to peer review yours.

So sometimes you can just tell. You know, people write in a particular style, or they're describing an ongoing research project. You can just tell who they are, and you're supposed to absent yourself, and the articles are, of course, sent anonymously. You know, the name of the authors are not provided in the -- when the article is given to the -- to the peer reviewers.

Q. Okay. And when you say things like conflict of interest, I guess I have a question along those lines as it relates to one of the specific questions that a peer reviewer is supposed to be looking for, which I

Page 136

think you said is contributions to the discipline; right? And is there any concern as a peer reviewer that there might be a conflict of interest if a new original article or research is published that contradicts the peer reviewer's previous work and -- I'll end it there.

A. Well, it would be incumbent upon the peer reviewer to say, I feel like I have a conflict of interest here. I can't be neutral or biased -- you know, I can't be neutral, and so I would recommend that you have somebody else do this.

But the way scientists think about evidence usually is that, you know, we're all contributing to this body of knowledge, and sometimes there will be studies that are inconsistent with past studies, that we want to build this knowledge base, and sometimes there will be new information that causes us to revise our understandings.

And so, even though it would be incumbent upon a peer reviewer to declare bias or conflict of interest or, you know, the feeling that they could be perceived as not being, even if they think they could be, neutral and objective, the broader ethos of science is, you know, we go into this to build a knowledge base, and if future research causes us to no longer believe in

Page 137

findings from past research or put weight on them, that that's not necessarily a conflict. That's a good thing if we have confidence in the future findings. There's new methods, new ways of studying or testing things.

Q. Okay. I promise I won't belabor too much more. Just a couple more questions. Do you -- I know you said that it's a list -- there's a list in your CV, and so I'll go back and take a look, but just out of curiosity if you can remember siting here today if you'd ever acted as a peer reviewer for the Journal of Criminology?

A. Well, there is a journal called Criminology.

Q. Is it just Criminology?

A. Yeah, yeah, yeah. I think I have.

Q. Okay.

A. Yes. Yes, I think I have. It's --

Q. Do you --

A. Go ahead. Sorry.

Q. Sorry. Do you recall when the last time you would have reviewed an article out of Criminology or that was being submitted to Criminology was?

A. I think it was a couple years ago, and then there may have been another time in the past before that that I don't recall, but again, it would be on the CV

RICHARD LEO, PHD, 03/03/2026                    Page 138..141

Page 138

because -- 

Q.   On your CV?

A.   -- because -- yeah, yeah.  Because not only do I list the journals, but I also list the years in which I reviewed.  So --

Q.   Okay.  Great.

A.   -- so if we looked at that, we can find out.

Q.   No.  Like I said, I'm not trying to, like, make you remember all these things.  I'm just -- and I'll go back and look.  I'm just --

A.   Okay.

Q.   As we're going through, I just -- and then what about the Journal of Criminal Justice?  Do you recall if you've ever served as a peer reviewer for an article submitted to that journal?

A.   I do not think I have, and I do not think -- if I'm misremembering, I don't think I would have recently.

Q.   Okay.  Have you ever heard the term scientific consensus?

A.   Yes.

Q.   What is the definition of -- what is the definition of a scientific consensus?

A.   Well, I guess it would be that the scientists

Page 139

in the field for the most part agree on a core concept or core findings.  You know, it might be the same -- you know, an example of it might be a medical consensus.  Smoking causes lung cancer.  Everyone agrees.  Of course, causation is probabilistic.  So not everyone who smokes gets lung cancer; not everyone who gets lung cancer has smoked.

But just general agreement.  The scientific consensus doesn't have to be always 100 percent but just general agreement.  I think there's a -- I don't think scientific consensus is really any different than nonscientific consensus; right?  I mean, I think it's a term we can all understand at some level.

Q.   Okay.  That's kind of what I was going to -- was going to ask you next -- is, like, what percentage would be a consensus.  You said obviously it doesn't need to be 100 percent.  Is there a thought about what percentage needs to be in agreement for scientific consensus?

A.   I don't -- I'm not familiar with any definitive standard saying, you know, if 95 percent say this, then it's a consensus versus 80 percent versus 75.  I don't -- I just can't recall anybody suggesting a number that would indicate consensus versus lack of

Page 140

consensus.

Q.   Okay.  And then going back to the -- to the review process and the ability to, say, like, revise -- the ability of a peer reviewer to suggest revisions, is it possible for an editor to say, you know, four out of -- three out of the four peer reviewers have no issues; one peer reviewer has revise and resubmit, and then the editor chooses to go with the three versus revise and resubmit?  Is that some -- or do all four or however many peer reviewers there are have to be in agreement?

A.   In my experience the editor has a lot of discretion, and the editor might also think that some of the reviews are higher quality than others, and so the editor, you know, could have two recommending publication, two recommending not, and be swayed by the two recommending; or in the example you gave, say, you know, I'm going to accept this, but I'd like you to address this thing over here; or I'm just going to accept it, and you don't have to address this because I don't -- I, Editor, don't agree with it.

So the editors have discretion.  Another way of putting it is they don't have to put the same weight on all the peer reviews.  They get to exercise

Page 141

their independent judgment about what weight to put on the peer reviews and ultimately what decision to make based on the peer reviewers.

MS. CARNEY:  Okay.  I think I might be done, but if we can take a quick five minutes to just take a look at my notes if everyone's okay with that?

MR. FLAXMAN:  Yes.

THE WITNESS:  That'd be great.

THE VIDEOGRAPHER:  All right.  Going off the record at 3:30 p.m. Central Standard Time.

(Recess taken.)

THE VIDEOGRAPHER:  This is the beginning of Media Unit 4.  We're going back on the record at 3:35 p.m. Central Standard Time.

MS. CARNEY:  All right.  Good news, Dr. Leo.  I have no other questions.  Thank you.  Just thought I'd leave you hanging there for a second.

MR. FLAXMAN:  You left us all hanging.  Any other defense counsel have questions?

MS. MURRAY:  No questions.

THE WITNESS:  I have a question.  We can go off the record, though.

MS. CARNEY:  Let's see what else we've got.  Michele, do you have anything?

RICHARD LEO, PHD, 03/03/2026                                      Page 142..145

Page 142

MR. BRAUN: Well, Joel, are you going to object to my asking questions in light of our --

THE WITNESS: Sorry. That's great.

MR. BRAUN: -- potential settlement?

MR. FLAXMAN: I mean, I think it's a big waste of all of our time, Michele.

MR. BRAUN: Well, the paperwork just hasn't been finalized, but, yeah, I won't ask questions. That's okay.

MR. FLAXMAN: Thank you. I appreciate it.

MR. BRAUN: You're welcome.

MR. CHRISTIE: All right. I think we can go off the record, Nick.

MR. FLAXMAN: Nothing for Plaintiff. We'll reserve signature.

MR. CHRISTIE: Sorry, Joel.

MR. FLAXMAN: That's okay.

THE VIDEOGRAPHER: All right. I'll take us off. This concludes today's video deposition of Richard Leo, PhD. We're going off the record at 3:36 p.m. Central Standard Time.

(The deposition concluded at
3:36 p.m.)

Page 144

No errata sheets submitted (Please initial)

Number of errata sheets submitted _____ pages

Subscribed and sworn to

before me this _____ day

of _____ 2026.

_____

Notary Public

Page 143

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JOHN MARTINEZ,                    )
                                  )
            Plaintiff,            )
                                  )
      vs.                         ) No. 23 CV 1741
                                  )
REYNALDO GUEVARA, et al.,         )
                                  )
            Defendants.           )
_____ )
                                  )
JOSE TINAJERO,                    )
                                  )
            Plaintiff,            )
                                  )
      vs.                         ) No. 24 CV 1598
                                  )
REYNALDO GUEVARA, et al.,         )
                                  )
            Defendants.           )
_____ )
                                  )
THOMAS KELLY,                     )
                                  )
            Plaintiff,            )
                                  )
      vs.                         ) No. 24 CV 05354
                                  )
REYNALDO GUEVARA, et al.,         )
                                  )
            Defendants.           )

This is to certify that I have read my deposition taken on Tuesday, March 3, 2026, in the foregoing cause and that the foregoing transcript accurately states the questions asked and the answers given by me, with the changes or corrections, if any, made on the Errata Sheet attached hereto.

_____
            RICHARD LEO, PHD

Page 145

REPORTER'S CERTIFICATE

I, Riley A. Moran, do herby certify that RICHARD LEO, PHD, was duly sworn by me to testify the whole truth, that the foregoing deposition was recorded stenographically by me and was reduced to computerized transcript under my direction, and that said deposition constitutes a true record of the testimony given by said witness.

I further certify that the reading and signing of the deposition was not waived, and that the deposition was submitted to Mr. Joel Flaxman, Plaintiff's counsel, for signature. Pursuant to Rule 207(a) of the Supreme Court of Illinois, if deponent does not appear or read and sign the deposition within 28 days, the deposition may be used fully as though signed, and this certificate will then evidence such failure to appear as the reason for signature not being obtained.

I further certify that I am not a relative or employee or attorney or counsel of any of the parties, or a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my seal of office at Chicago, Illinois, this 17th day of March 2026.

Riley Moran

Illinois CSR No. 084-004945

RICHARD LEO, PHD, 03/03/2026                                          Page

Errata Sheet

NAME OF CASE: JOHN MARTINEZ vs REYNALDO GUEVARA, et al.

DATE OF DEPOSITION: 03/03/2026

NAME OF WITNESS: Richard Leo, PhD

Reason Codes:

    1. To clarify the record.

    2. To conform to the facts.

    3. To correct transcription errors.

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

                        _____

RICHARD LEO, PHD, 03/03/2026

**Exhibits**

**1 Leo 030326-1** 7:21 8:6 22:19

**2 Leo 030326-2** 22:10,11

**3 Leo 030326-3** 39:14 43:16

**4 Leo 030326-4** 43:17,18

**5 Leo 030326-5** 49:1 51:7,8

**6 Leo 030326-6** 54:14,18

**7 Leo 030326-7** 81:1,5 84:6

**8 Leo 030326-8** 86:22 87:3

**9 Leo 030326-9** 95:22 96:9,15 99:10

**10 Leo 030326-10** 98:6,11,16

**11 Leo 030326-11** 120:22 121:4, 5,6

**$**

**$50,000** 122:5

**0**

**000151** 40:2

**1**

**1** 5:2 7:21 8:6 9:17 10:20 13:20 14:3 18:3 22:15,19 23:1 39:21 96:5

**10** 98:6,11,16

**100** 25:4 26:21 115:5 139:10,17

**10:00** 83:16

**10:50** 53:18

**11** 120:22 121:5,6

**11:32** 5:3

**121** 87:4,9

**124** 87:10,17

**12:40** 53:23

**12:50** 53:17

**12:52** 54:2

**12th** 96:24

**1442** 121:9

**1444** 121:10

**15** 9:1,3 10:15 18:3 29:22 99:12

**152** 40:2,7

**16** 9:22 27:1

**160** 42:1

**17** 10:3 75:1 76:24 86:9,10,14 103:24

**1741** 5:8

**18** 103:16 105:11

**180** 8:19

**19** 9:4 87:17

**1994** 132:20

**1995** 132:19

**1997** 18:6,16 19:23 27:21

**1998** 96:24

**1999** 29:19 85:17 93:1 110:18

**1:48** 94:20

**2**

**2** 10:12,15 22:10,11 50:8 54:2

**20** 5:13 28:24 29:22 81:12 122:9

**20.3** 46:20

**200** 8:19

**2003** 39:19 44:4

**2011** 78:24

**2018** 54:11 60:4

**2021** 72:23 93:15 96:16,19 97:6,10 101:7

**2025** 7:19

**2026** 5:5

**23** 5:8 11:11

**24** 10:3 84:8 86:19,20

**24-hour** 86:16

**25** 10:8

**25th** 7:19

**26** 9:4 10:9

**2:00** 85:16 89:24 90:6

**2:32** 94:23

**3**

**3** 11:6 39:14 43:16 94:23

**3.812(a)** 129:12

**3/3/26** 7:23 22:13 39:16 43:20 49:3 54:16 81:3 86:24 96:11 98:8 120:24

**30** 18:19 132:21,23 133:6

**34** 11:11 13:3 74:21 76:24

**344** 57:2

**345** 59:13

**36** 15:17

**37** 15:10,14,15 29:20 30:14 37:4 62:24

**38** 29:19 35:10 37:4 62:24 69:19

**39** 34:18 69:19

**3:00** 85:16 89:24 90:6

**3:30** 141:10

**3:35** 141:13

**3:36** 142:20,23

**3rd** 5:5

**4**

**4** 11:9 13:2 43:17,18 141:13

**40** 74:11,22 133:10 134:3

**41** 37:3,7 39:19 49:6 54:7 56:8

**42** 10:20 13:20 14:3 79:4 96:6

**43** 11:1 35:6,7 90:13

**44** 102:6

**45** 102:6 117:7

**46** 103:1 117:7 118:12

**460** 51:7,9

**47** 75:5 76:11,17,24 102:24

**48** 84:20

**5**

**5** 23:8 40:1 49:1 51:8 85:22 86:1,5 87:11,20

**50** 110:6 111:3 133:10 134:4

RICHARD LEO, PHD, 03/03/2026

**54** 111:4 112:10

**55** 113:4,19

**554** 45:1

**557** 46:12

**558** 44:7

**58** 103:19 119:15

**59** 103:18

**5:00** 90:1

**6**

**6** 54:14,18

**600** 5:13

**62** 85:8

**63** 75:1 85:7 104:6

**64** 104:6 119:22

**6:00** 83:16

**7**

**7** 15:13 81:1,5 84:6

**70** 121:23

**72** 84:22

**75** 139:22

**78** 111:9

**79** 111:12

**7th** 17:4 29:18 85:17

**8**

**8** 9:17 46:20 86:22 87:3

**80** 40:9 111:13 121:23 139:22

**9**

**9** 9:22 95:22 96:9,15 99:10

**95** 139:21

**98** 8:9,10,12

**9th** 17:4 29:18

**A**

**a.m.** 5:3 85:16 89:24 90:1,6

**ABA** 129:10

**ability** 77:4 103:5 140:3,4

**absence** 46:22 47:18 91:2 93:11 120:4,12

**absent** 69:21 70:16 135:16

**abstract** 50:3 55:15 56:14

**abuse** 16:5,9 30:8

**abused** 17:11 25:12 30:2

**abusive** 63:16

**academic** 17:18 110:23

**accept** 124:10,11,20 128:12,14,16 140:18,19

**acceptance** 124:15

**acceptation** 124:12

**accepted** 29:3,5

**access** 88:24

**account** 16:16,17,18,22,23 17:1,3, 12 29:16 31:15,16 32:2 63:8 88:23 89:14,16 90:4,8,17 91:4 94:1 112:22 114:8,19 116:11,12 119:8,9

**accounts** 19:10,11 25:14 26:20 28:4,7,8,13 31:14 68:15 73:6 79:15 112:13 114:15

**accurate** 32:2,13 93:14

**accusation** 55:24

**accusations** 31:12 32:4,10 33:4, 20 56:9 61:19,20

**accused** 56:16

**accusing** 33:5 38:2

**acquisition** 129:16

**acted** 137:10

**actual** 49:17 61:21 62:22 113:24

**ad** 123:9 126:3

**addendum** 8:16

**adding** 52:5

**addition** 95:16

**additional** 8:16

**address** 124:14 128:13 140:19,20

**adequacy** 124:1,2

**adequate** 123:18

**administer** 105:16,19

**administering** 107:1

**admission** 35:1,16 36:21 62:4 102:14,19 124:7 128:4

**admissions** 36:7

**adopted** 56:4

**advance** 131:15

**affect** 69:16 89:9 115:13

**affects** 77:7

**affidavit** 73:12 95:14 97:20,22,24 98:10,18,21

**affidavits** 72:4

**age** 103:5,24 104:20 106:16,24

**agencies** 75:22

**agree** 19:3 24:4 27:11 92:20 123:12 139:1 140:21

**agreeing** 34:24 35:15

**agreement** 139:8,10,18 140:11

**agrees** 26:15,23 139:4

**ahead** 9:12 12:13 16:13 26:8 47:14 68:13 72:19 92:16 115:23 137:18

**AI** 134:9,14

**allegations** 32:5

**allege** 28:19 33:6

**alleged** 93:19 99:23

**alleging** 33:7

**alley** 69:9

**altering** 57:24

**American** 34:4

**amount** 82:19 127:8

**amounts** 85:1

**analyses** 94:5

**analysis** 16:19 20:2 28:23 41:21 45:3,6 64:18 67:15 68:3,9 90:15 101:2 105:7,8 114:19 116:20 119:18 123:20,22 124:2,22,24 125:12 127:19 129:16,20 130:23 131:11 132:11,12

**analyze** 25:14 31:13 34:11 63:1 100:17 101:4

**analyzed** 80:17 99:22

**analyzing** 30:23

**and/or** 18:14,24 21:10 36:7 102:14

**annoyance** 59:23

**annoys** 8:24

**anonymously** 135:18

**answers** 99:24 115:3

**antagonistic** 42:18,20 57:16,22 58:18

**Anthropologists** 130:11

**anymore** 33:21

**anytime** 37:19

**apologize** 6:22 22:3,18 117:5

**appearance** 6:9 7:4

**appeared** 51:13 57:12

**appearing** 5:20,23

**appears** 22:22 39:20 45:15 46:7, 21,24 57:23 58:4 59:22,23 116:17

**appellate** 19:16 64:13 66:12 72:22 73:3 93:17 95:10,21 97:8,11 98:22 99:11 100:6,22 101:17 113:12

**application** 79:21

**applied** 48:12 63:1 119:18

**applies** 119:14

**apply** 23:18 30:18 71:6 79:11 102:22 106:5,6 108:21

**applying** 27:19 31:1 105:10 106:20 117:14

**appraise** 81:18

**approach** 23:3 31:12 32:4,10 34:16 42:6,23 47:17 48:17,18,21 52:14 60:13 61:1

**approximate** 132:14

**approximately** 86:10,13

**Area** 85:22 86:1,5 87:11,20

**areas** 130:3

**Armitage** 69:9

**arrest** 64:6

**arrested** 64:6 82:13

**Art** 6:5 15:6 61:8 80:23 101:24 111:1

**article** 18:6,20 21:18 23:1,2,8,13 24:12 27:22 42:2,21 43:23 44:4 45:4,7,8,23 46:2,7,8,11 47:8,12,16,

22 48:15,19 51:4 52:3,4,14,24 53:8 54:20,23 55:3,23 56:20,21,22,23 57:2 58:9,17,19 59:7 62:19,22 75:15 79:2 80:11,15,16 81:7,9,12, 22 82:24 84:5 86:18 93:1 123:2,6, 11,13,15,17,23 124:4,21 125:7,21 134:20 135:1,2,8,19 136:3 137:20 138:15

**articles** 45:5 75:19,20 111:7 122:21,22,24 125:1,4,8 127:10 128:19,23,24 130:24 133:8,20 134:4,17 135:11,17

**artificial** 40:23 41:1

**ASA** 11:14 12:9 108:8,19,24 109:9 116:16

**ascertain** 18:13,23 21:9 26:1 27:22

**asleep** 78:16 85:14 87:21

**aspects** 25:10 42:9

**assailants** 66:22

**asserted** 86:7

**assertion** 67:4

**assess** 79:11

**assessed** 125:10

**assessment** 123:15,19

**assign** 120:16,21

**Associates** 5:12,15

**assume** 9:14

**assuming** 14:18 56:20 81:23 98:14

**assumption** 32:2

**assumptions** 13:24 31:12

**attach** 102:21

**attempt** 18:7 24:13

**attend** 85:1

**attention** 10:12 11:6 15:10 23:7 28:24 39:21 42:1,3 43:10 44:7 46:12,16 51:7,8 55:14 57:2,18 59:15 84:4 87:4 102:6 104:6 107:14

**attorney** 5:18 13:6,8 26:13

**attorney's** 9:19,24 10:5,23

**attorneys** 13:12 81:18,23

**attributed** 57:20

**audio** 18:2

**author** 124:8,16

**authored** 54:23

**authors** 50:19 134:24 135:18

**aware** 20:7,10,12

---

**B**

---

**back** 19:23 21:7 23:22 40:19 47:4 53:13 54:2 62:21,24 65:24 71:17 73:16 79:1,22 84:4,5 93:15 94:23 95:14 101:24 109:5 117:6 122:18, 23 125:15 132:19 137:8 138:10 140:2 141:13

**background** 39:7 81:20 83:3,8 89:8,12 110:24 111:22

**backtrack** 27:11

**bad** 131:1

**Bain** 54:24

**Balanced** 23:3

**ballpark** 122:4

**Barry** 78:18

**base** 136:15,23

**based** 31:2,4 32:17 34:22 44:15 68:24 70:10 80:5 94:5 103:15 106:23 124:21 130:13 141:3

**bases** 118:18

**basic** 128:5,16

**basically** 34:19 40:19 42:15 84:17 89:13 93:19 116:6 119:3,17

**basis** 31:5 71:20 72:6 118:16

**bathroom** 53:9 76:12

**bear** 24:6

**bears** 21:16

**beating** 19:14 68:21 69:8 91:13

**bed** 82:13 83:16,17

**began** 82:20

**begin** 35:5

**beginning** 5:2 9:3 54:1 94:22 122:20 141:12

**begins** 32:1 57:3 110:6 112:10

**behalf** 5:6,20,22 6:1,3,10 7:1

RICHARD LEO, PHD, 03/03/2026

**behavior** 42:9

**behavioral** 48:2

**belabor** 137:5

**bell** 54:12 55:2

**benefit** 127:13

**bias** 18:11 21:20 23:16 24:17 30:15 43:12 48:3 49:12 50:13 51:10,13,20 52:14 136:19

**biased** 136:8

**big** 142:5

**bit** 15:3 25:19,24 128:9 131:2

**bleeds** 11:9 50:7

**blind** 135:5

**bloody** 64:7

**board** 123:5,8 125:18,24 126:1

**body** 31:4 130:4 136:13

**book** 111:8,15 127:6

**booklet** 129:12

**books** 127:9 133:4

**boots** 64:7

**bottom** 8:10 87:12

**Bowen** 5:12,15

**Braun** 6:1,16,18,20 142:1,4,7,11

**break** 11:23 12:6,15 13:18 53:10, 17 54:5 67:24 76:1 77:8 94:10,15, 16 95:2 122:14,16

**breaking** 53:13,15

**breaks** 75:10 76:13

**Brian** 12:9

**briefly** 29:1 114:13

**broader** 128:9 136:22

**broken** 45:5

**brought** 85:22 134:12

**build** 136:15,23

**Bull** 78:22

**bullet** 113:10,18,19

**buried** 132:18

---
**C**
---

**call** 53:3 111:5

**called** 7:9 48:3 107:23 127:16 137:12

**camera** 17:23

**cancer** 139:4,6

**careful** 62:6

**Carney** 5:22 6:8 7:3 122:9,13 141:4,15,23

**case** 5:7 8:13 9:5 16:24 19:22 20:1,7 22:19 26:10,18,24 27:11,15, 20,23 30:24 32:1,8 44:13 47:5 48:7 53:2 63:2 67:13 71:10 76:4,5 79:14 82:3 83:23 91:9 93:18 94:1 97:17 103:8 106:8 108:7,22 109:13,18 110:11 114:4 115:15

**cases** 5:8 18:12,22 21:8 25:22,24 26:11 27:13 30:16 32:7 47:24 48:24 57:21

**Casiano** 69:3 117:3

**Cassell's** 23:3

**categories** 118:2 119:17 128:16

**category** 128:9

**causal** 41:21 44:20

**causation** 43:3 139:5

**caused** 41:20

**causing** 36:20 43:2 79:8

**caved** 119:4

**Central** 5:3 53:23 54:3 94:20,24 141:10,14 142:20

**certainty** 18:15 19:1 21:10 26:3,19 27:5 28:1

**certified** 5:11

**cetera** 42:12,13

**chained** 76:12

**change** 20:2 67:15 68:3,9,16,22

**characterization** 35:17

**cheating** 38:1,2 45:13 56:11

**check** 12:6,15 13:17

**checking** 102:2

**Chicago** 5:13,21,23 85:15

**Chicago-based** 109:7

**choice** 119:4

**choose** 123:7,9

**chooses** 125:22 126:3 140:8

**chosen** 126:5

**Christiane** 6:8,10 7:1,3

**Christie** 5:19 6:23 7:12 8:1 9:15 12:16 15:14,18 16:20 19:5 20:19 21:6 22:16,18,21 25:20 27:7 39:11, 17 41:17 43:15,21 48:6 49:4 54:4, 17 59:10 61:15 67:19 68:18 70:14, 15 71:16 72:1,10 73:11,18 76:18 81:4 87:1 90:11 92:7,19 94:18 95:1 96:12 98:5,9 100:19 102:4 111:2 121:1,16,17 122:3,7 142:12,16

**circumstances** 27:19

**citation** 65:15

**cite** 37:11 111:20

**cited** 43:11 49:6 54:6 60:4 111:12 112:4,7

**citing** 111:4

**City** 5:22

**civil** 29:6

**claim** 29:10

**claims** 115:20

**clarification** 41:13 109:22

**clarify** 16:21 46:1

**Clark** 5:13

**classes** 129:21 131:10 132:10

**classic** 17:15

**clear** 11:24 31:24 32:8 42:9 58:17 66:10,20 134:14

**Cleary** 78:19,22

**clients'** 81:18

**clinical** 105:16,24 106:3,13 107:2

**coauthored** 135:10

**coerced** 29:11 63:15 65:20 95:17 114:17

**coerced-compliant** 16:2

**coercing** 73:7

**coercion** 16:5 19:13 20:10,13,24 21:12 29:12,15,17 94:9 117:6,12, 20 120:20

RICHARD LEO, PHD, 03/03/2026

**coercive** 27:3,6 28:6 42:11 57:6, 19 106:16 118:3 119:12 120:7,11, 15

**cognitive** 103:5 126:12,14,20

**colleague** 122:8

**collect** 124:9

**collection** 124:1

**college** 37:21 38:1 44:2

**colleges** 132:8

**combination** 48:4,11 53:6 124:19

**combined** 52:13 54:8 55:19

**comma** 63:17

**committed** 33:8 64:9 70:1,20 71:3 73:1

**committing** 33:5,7 56:9 61:20 71:11

**common** 29:4,10,11 33:16 100:8, 20

**community** 29:4 123:10 126:4

**compared** 27:16

**competently** 132:12

**complete** 25:5 58:20

**completed** 121:11

**completely** 59:5 67:4

**compliance** 105:23

**compound** 67:17,23 134:1

**comprehensive** 80:4

**comprehensively** 81:17

**computer** 99:7

**concept** 117:23 139:1

**concern** 136:2

**conclude** 16:18 74:16 88:6,15 119:11

**concluded** 41:19 50:23,24 142:22

**concludes** 142:19

**concluding** 16:8,11,14,15 63:8

**conclusion** 38:19 42:16 43:1 44:18 45:19 46:10 47:9,12,21 50:20 51:24 52:3 62:6 84:11 88:23 89:14 112:12

**conclusions** 31:3 42:16 56:21 86:7 124:3 125:13

**condition** 57:12

**conditionally** 124:11

**conditions** 42:8 56:1 64:13 77:14 89:2,8

**conducive** 64:14 94:5 112:23

**conduct** 81:24 129:11

**conducted** 38:1

**confe** 116:6

**confederate** 38:2,12

**conference** 26:13

**confess** 57:8 90:24 92:22,23 113:23,24

**confessed** 26:16 45:12 93:6,13

**confesses** 48:23

**confessing** 63:16

**confession** 15:11,22 16:2,3 17:4 18:12,14,22,24 21:9 23:4 26:1,20 29:13 30:17 31:7 32:18 35:1,16 36:13,20 37:14 43:9 45:14 46:20 47:8,24 48:5 52:15,20 57:21 59:19 60:1,7 74:7,18 79:13 80:19 90:16, 21 91:1,5 100:21 102:15,20 104:14,16 107:10 114:16 117:21

**confessions** 27:23 28:15 36:7 41:20 43:2,6 44:21,22 45:16 46:3, 24 47:2,19 48:10,24 50:11,12,15, 22 51:12,17,22 52:8 54:10 55:17, 20 57:7,13 58:2,4,14 59:4 62:13,16 73:22 74:4 79:8 80:2,13 114:16,17, 20 116:18

**confidence** 125:12 137:3

**confirmation** 43:12 48:3

**confirmatory** 42:6

**conflict** 135:6,21 136:3,7,19 137:2

**conflicting** 26:20

**connected** 63:19

**consensus** 138:20,23 139:3,9,11, 12,16,19,22,24 140:1

**consequences** 84:13

**considered** 94:4

**consistencies** 100:17

**consolidated** 5:8

**constantly** 78:10

**constrains** 42:6

**contained** 31:8

**contaminated** 114:16

**contamination** 34:1 107:6 116:5

**contest** 17:15

**contests** 25:8

**context** 59:8 91:2,3 100:14 101:5

**contradict** 48:16

**contradicted** 59:5

**contradicting** 25:17

**contradicts** 32:14 136:4

**Contrary** 57:11

**contribute** 43:5

**contributes** 48:2 53:5

**contributing** 136:13

**contribution** 123:18 124:3 125:13 130:7 131:17,20

**contributions** 133:23 136:1

**conventional** 130:5

**conversation** 7:16 18:10 21:19 23:15 24:16

**conveyed** 130:17

**Cook** 9:19 12:17 30:6

**cooperate** 84:13

**copy** 7:18 8:4

**core** 117:23 139:1,2

**correct** 8:14 10:2,7,9 11:12 14:20 17:14 18:1,5 23:6 27:13,18 56:13, 22 61:18 63:7 67:2 70:2,5 73:4 74:19,23,24 75:6,11 85:23 86:3 92:11,13 93:4 102:10 103:14,17 104:1,4,9 106:19 107:8,10,13,18 108:5,9,11,13,16,20,23 110:9,12, 15 112:6,8,16 114:21 115:18 116:22 117:1,4 118:16 119:23 128:22 130:20

**correction** 107:23

**corrections** 109:16

**correctly** 43:4 44:17 63:20 93:16

**corrects** 108:4

**corroborate** 89:19

**corroboration** 59:24 100:16

RICHARD LEO, PHD, 03/03/2026

**corrupt** 93:20

**counsel** 5:16 13:21,23 14:7,18,22 95:24 96:2 141:19

**count** 76:3,16 77:9,13 132:22

**counted** 76:19

**counter** 60:4,5 62:14

**countervailing** 62:14

**County** 9:19 12:17 30:6

**couple** 86:5 122:23 125:16 134:8 137:6,22

**coupled** 52:6

**court** 5:9,14 6:12 12:2 19:16 39:12 64:13 66:12 72:22 73:3 76:15 93:17 95:10 97:8 99:19,22 100:9, 22 101:3,6,7 108:18

**court-reported** 11:15 12:10 14:9 108:17 109:19 115:16

**courts** 29:5 76:16

**cowrote** 80:14,15

**CPD** 9:18,24 10:5,9,23 20:13,24 21:13

**create** 21:24 35:15 41:9 114:4

**created** 17:21

**creates** 42:17

**creating** 43:2 44:21

**credible** 71:5

**credit** 16:16 28:7 31:15 63:17,23 68:15 88:17 90:8 101:15 114:14 127:9

**credited** 17:12 78:9 90:17 112:14

**crediting** 63:8 88:23 89:16 94:1 114:19

**crime** 33:7 56:9,16 61:20 64:9 71:11 73:1 113:24

**criminal** 13:5 19:22 29:6 105:2,7 110:10 138:13

**Criminology** 137:11,12,13,20,21

**criteria** 31:7 80:17

**cross-talk** 41:14

**cumulative** 31:1

**curiosity** 137:9

**curious** 24:1

**current** 57:11,21 58:2 81:19 82:8, 15,16,21

**custody** 75:10,17 76:6,21,23 77:2, 12,23 78:7 79:17 82:23

**CV** 5:8 8:17 132:18 133:2 137:7,24 138:2

**cycle** 80:8 83:14

---

**D**

**Daniel** 69:22 70:17 91:13

**data** 124:1 129:15,16 130:15 131:5,10 132:11,12

**database** 73:23 74:6

**day** 82:19

**days** 127:21

**deal** 9:18

**dealing** 23:13

**deals** 103:4

**dealt** 44:13

**decades** 24:2 110:22

**decide** 126:5

**decided** 34:8

**decides** 124:20

**decision** 92:23 124:10 141:2

**declare** 136:19

**deep** 132:18

**defendant** 5:6,20 6:11,16 7:1 20:9

**defendants** 17:20 20:6 63:4 64:8 71:2,10

**defense** 13:6,8,12 26:12 81:23 141:19

**defensive** 42:8,18,23

**define** 75:20,23

**defines** 76:5 117:12

**definition** 75:13,16 76:8 138:22, 23

**definitions** 117:19

**definitive** 139:21

**degree** 18:15 19:1 21:10 26:2 27:5,24 28:1 36:18 102:17 132:6

**degrees** 80:10 83:19 120:19 128:15

**Deleon** 13:3

**demonstrated** 34:21 36:1 63:4

**denial** 45:14 62:4

**denials** 32:19 61:22

**denied** 27:3 45:12

**Dennis** 13:10,14

**denote** 118:2

**denying** 32:12

**departments** 75:22 76:3

**depending** 17:12

**depends** 26:10 27:9 89:11 131:3

**deposed** 71:22

**deposition** 5:4,5 7:21 11:14 12:2, 9 13:3 14:5,11,12,13,15,23 16:10, 23 22:11 24:2,7 39:14 43:18 49:1 51:8 54:14 64:19 65:3,5,13 67:10 71:18 72:3 81:1 86:22 87:3,5,10 96:9 98:6,13 100:10 101:9,11 120:22 122:20 142:19,22

**depositions** 11:8 13:9,10 75:13 82:7

**deprivation** 79:3,7,24 80:5,9,10 83:18,19,21,22,24 85:1 88:10,13 89:10 90:10

**deprivations** 86:8

**deprived** 78:10 79:12,15 80:18 82:1 83:12 84:3 85:14 86:21 88:8, 11,14,16 89:15,17,21 90:9

**depth** 28:9

**describe** 17:19 27:2 28:8 33:24 49:15,19 50:16 65:18,19 75:19 79:14 83:23 102:9 115:6 118:24

**describes** 17:1 66:13 87:10 88:9 89:17,24 90:9

**describing** 28:6 74:9 88:8,9 135:15

**description** 29:24 49:24 63:10 119:3

**descriptions** 68:24

**design** 131:10 132:11

**desk** 135:8

**despair** 42:12

RICHARD LEO, PHD, 03/03/2026

**detective** 19:13 20:13,18,24 29:22 32:23 73:5 91:11 93:20

**detective's** 32:21

**detectives** 38:7 69:6,23 92:9 116:16

**determine** 33:13 55:18

**developed** 38:18 40:22

**differ** 74:20

**difficult** 77:14

**dig** 15:9

**direct** 9:16 10:12 13:23 15:10 18:3 23:7 28:24 29:1 34:12 36:3 37:17 38:9 39:21,24 40:6 42:1,2 43:10 44:6 45:1,9 46:16 49:5 51:6,11,21 52:12 53:3 55:14 57:2,18 59:15 63:2 85:7 87:4 90:13 99:11 102:6 104:5 107:14 119:15,21

**directed** 106:2 113:3 127:22

**directing** 11:6 35:13 37:18 46:12 51:8 63:11 81:16,22 84:4,6

**directly** 51:15 53:4 123:10

**disabilities** 104:21

**disagree** 18:22 21:21 47:8 60:8

**disavow** 65:12

**disavowed** 66:9

**discipline** 125:6 128:20 129:5,8, 14 130:10,19 131:12 132:4 133:22 136:1

**disciplines** 130:1,17 131:9

**discovery** 5:4

**discredited** 67:5

**discredits** 66:13

**discretion** 140:13,22

**discuss** 33:18,19 90:14

**discussed** 43:3 64:12 98:3 118:12

**discusses** 49:17

**discussing** 46:9

**discussion** 41:23 45:2,6,8 46:13 57:3 58:8 73:5

**disorientation** 84:14

**disparate** 25:14

**disproportionately** 125:24

**dispute** 17:10 25:9,10 89:22

**disputed** 18:12,22 21:8

**disputes** 17:19

**disrespect** 59:23

**disrupted** 77:17

**disruption** 83:13

**distill** 131:1

**District** 5:9

**disturbance** 80:8 88:12

**Division** 5:10

**DNA** 26:11,16,22 27:15

**Doctor** 94:6

**document** 95:23

**documented** 19:15,16 20:12,17, 24 79:24 89:2

**documents** 13:19 17:7 21:4 30:24 72:9

**door** 39:6

**doubt** 18:18

**Douglas** 111:6

**dozens** 19:17

**draw** 42:24

**drawing** 31:3

**drunk** 84:17 86:17

**due** 18:11 21:20 23:16 24:17

**duly** 7:9

**Durkin** 108:19 109:9

**Durkin's** 11:14

**E**

**earlier** 17:9 22:3,20 25:8 40:20 57:17 59:13 60:16 61:23 62:6,12 78:9 101:16 107:20 114:14

**early** 59:12

**easily** 23:10

**Eastern** 5:10

**economics** 130:14,16

**editor** 123:4,7 124:8,17,18,20 125:17,22 126:3,5,7,8,13,21 135:7 140:5,8,12,13,15,21

**editor's** 124:22,23

**editorial** 123:5

**editors** 140:22

**educated** 116:13

**education** 31:3

**effect** 43:1 44:20,21 48:8 50:13,20 51:11,14,21 52:12 57:22 68:21 77:4 90:15

**effects** 41:23 43:4 54:9 55:19 79:24 86:8 90:10

**efforts** 77:19

**Eladio** 97:24 98:19

**elevate** 36:11

**elevated** 34:24 35:15

**elicit** 46:24 55:17 57:7,12 62:15 76:9 80:18 104:13

**elicitation** 51:12,21

**elicited** 59:22 108:19

**eliciting** 36:6 47:7 48:9 50:21 52:19 60:7 79:8,13 90:20 91:1,5 102:13,18 104:15

**empirical** 59:6 73:19 74:2 80:6,7 117:11 128:24

**empirically** 55:21

**encounter** 19:23

**end** 35:2 77:7 136:5

**ends** 23:14

**enforcement** 105:6

**entertain** 33:21

**entire** 24:22 52:17 116:6

**environmental** 83:4 89:7

**error** 30:12,16 107:16,21,23 109:1, 4,9

**errors** 108:3

**essentially** 24:23 59:1 123:22

**established** 33:18 110:17

**Esteban** 66:7,16 67:12 68:7 71:19 72:14 73:13 91:20 116:23

**estimate** 15:2 74:5 121:18 133:1, 7,11,15

**et al** 5:7 39:20 54:10

RICHARD LEO, PHD, 03/03/2026

**ethos** 136:22

**evaluate** 28:2 32:19 61:21 80:4,17 81:17 83:1 105:12,13,17 106:4

**evaluates** 131:16

**evaluating** 30:19 79:6 105:4 129:22

**evaluation** 81:24 105:24

**events** 114:10

**everyone's** 141:6

**evidence** 19:12,14 20:1 21:16 24:6 25:13 26:22 27:15,20 28:16 32:14 34:3,12,15 38:18 40:22 44:9, 12,15 63:18 64:11 66:16 69:22 70:9,16,24 71:5,8 72:7 73:12 82:8, 16 90:13,16,24 91:15 92:2,4,12 93:8,14 95:3 100:9 101:5 136:12

**Evidentiary** 80:12

**exact** 8:21 117:14 133:16

**exam** 56:12

**EXAMINATION** 7:11 122:12

**examined** 7:10 55:21

**examining** 58:3

**examples** 32:23 33:10,11,12 34:14 60:16

**Excellent** 53:20

**exception** 20:4

**exercise** 140:24

**exerts** 77:3

**exhaustion** 77:5

**exhibit** 7:21 8:3,6 22:10,11,19 39:14 43:16,17,18 49:1 51:7 54:14, 18 81:1,5 84:6 86:22 87:3 95:22 96:9,15 98:6,11,13,16 99:10 120:22 121:3,4,6

**exhibiting** 80:5

**exhibits** 43:14

**exist** 72:7 92:5 94:4

**exists** 18:18

**exoneration** 26:11 97:23

**expect** 25:11 114:6

**expectations** 41:2 42:8

**expected** 129:2

**experience** 31:2 105:6 140:12

**experiment** 40:4 44:2,13 45:3,5,6

**experimental** 37:20 50:9 129:19

**experimentally** 36:23

**experiments** 40:24 46:9 130:13

**expert** 22:19 29:6 94:5 100:14,20 126:14,19

**expert's** 20:15 26:7

**expertise** 31:4,5 100:21 117:21 123:10 126:9,12

**experts** 126:22 130:3

**explain** 108:1

**explained** 17:9 104:11

**explains** 75:16

**exposure** 59:17

**express** 9:9

**expressing** 17:23

**extent** 110:23 130:10

**extremely** 63:4

**extricate** 119:6

**eye** 29:21 126:14

**eyewitness** 112:23,24 126:10,19

———————————————

**F**

———————————————

**fabricating** 19:14

**face** 134:1

**fact** 16:14 17:12 53:3 89:23 91:24 92:10 100:24 101:4 103:16 113:24

**factor** 16:4 41:24 60:21 62:18 79:7 82:21 83:2 89:8 92:22 103:12,22 105:3,4 107:9,12

**factors** 16:1 33:12 61:17,23 83:4 89:12 103:4 104:2,7,13,21 105:1 118:19,21 119:11

**facts** 71:14,15 73:7 79:16 93:18 114:9 115:3,6 116:13

**factual** 13:24

**fail** 11:19

**failed** 11:19

**fair** 30:12 35:16 36:10,13 37:8 38:7 42:15 44:2 45:19 46:1 56:17 70:14

74:11,16 83:5 103:4 104:23 113:17 118:3

**faith** 71:20 72:6

**fall** 78:16

**fallen** 87:21

**false** 16:3 23:3 29:13 30:17 34:3 35:1,15 36:6,12,20 37:14 41:20 43:2,5,9 44:21,22 46:20,24 47:7,8, 19,24 48:5,10,24 50:11,15,21 51:12,17,21 52:8,15,19 54:10 55:17,20,24 57:7,13,21 58:1,4,13 59:4,19,24 60:7 62:13,16 73:21 74:4,7,18 79:8,13 80:2,19 90:12, 15,20,24 91:1,5,15 92:1,4 95:3,18 100:21 102:14,19 104:13,16 107:10 117:21

**falsely** 26:15 63:15

**falsified** 93:20

**falsifying** 73:6 93:21

**familiar** 54:8,22 55:7 56:19,20 69:2 78:13 105:20 113:22 130:4 139:20

**familiarity** 126:18

**fast** 22:2 115:12

**fatigue** 77:5,7 80:12 81:14,17 83:1,21 84:12

**fatigued** 88:7,9,15

**February** 17:4 29:18 85:17

**fed** 115:6 116:13

**feedback** 39:3

**feel** 86:16 136:7

**feeling** 20:3 136:20

**feelings** 59:22

**Feld** 78:18

**field** 100:9,13,21 117:21 124:3 125:13 126:22 130:11 131:14,15, 19 133:23 139:1

**figure** 55:13

**file** 12:23 100:2 121:24

**filed** 5:8

**finalized** 142:8

**find** 23:23 24:1 42:3 58:11,23 60:18 79:2 84:5 100:3 126:9,13,16, 22 138:7

RICHARD LEO, PHD, 03/03/2026

**finder** 17:13

**finding** 41:10 51:20 52:2 58:2,12, 20 60:3 62:11 63:22

**findings** 29:3 46:19 56:21 57:21 58:22 59:17 62:14 72:14 100:9,24 101:4 137:1,3 139:2

**fine** 20:22 39:11,12 100:5 113:11 122:17 133:13,16

**flawed** 129:22

**Flaxman** 5:24 6:15,19,21 9:11 12:12 15:6,13,15 16:13 19:2 20:14 21:2 22:14,17 24:19 26:6 43:13 47:11 48:13 58:15 61:9,11,14 67:17 68:11 70:12 71:12,20 72:6, 18,20 73:14 76:7 90:7 92:3,15 93:7 98:2 100:11 101:23 102:1 121:14, 20 141:7,18 142:5,10,14,17

**Flaxman's** 14:19

**flicked** 29:21

**flip** 9:1

**focus** 16:4 29:9 64:18 85:6

**focuses** 50:12

**focusing** 104:10

**footnote** 18:3 35:6,7 37:3,7 39:19 49:6 54:7 56:8 111:9,12,13

**forensic** 105:24

**Forest** 23:2

**forgot** 41:15

**form** 9:11 12:12 24:19 44:9 47:11 58:15 68:11 70:12 71:12 73:14 76:7 90:7 92:3 93:7 100:11

**forms** 30:4,5

**Forrest** 111:6

**found** 95:24 133:21

**four-year** 8:18

**fourth** 126:17

**framework** 49:16

**friendly** 56:4

**front** 56:15 74:14 85:7

**frozen** 99:7

**Fuentes** 66:7,19 67:7,12 68:19 71:7,19 72:14 73:13 91:20 116:21

**full** 34:19 40:16

**future** 130:1 136:24 137:3

---

**G**

---

**gaps** 131:13

**Garcia** 9:20 10:1,6 63:19 66:6 68:21 69:22 70:10,17 71:1,9 91:13

**gathered** 44:16

**gathering** 130:15 131:5

**gave** 42:9 86:9 119:4 140:17

**general** 26:13 29:14 36:22 46:13 49:16 51:3 104:19 105:20 106:3,21 126:18 128:19 139:8,10

**generalization** 74:3

**generalize** 91:8

**generally** 29:3 104:5

**generate** 74:1 131:15

**genuine** 47:1

**Giovannini** 13:11,15

**give** 11:3 12:20 13:14 22:7,8 51:4 78:24 99:5 104:12 106:15 124:11 125:11 133:22

**giveaway** 34:2

**giveaways** 34:7

**global** 46:10 122:23

**goal** 32:3,11,18

**good** 5:1,19 6:23 7:13,15 36:2 53:13,15 71:20 72:6 94:6 122:16 128:13 137:2 141:15

**grab** 122:19

**graduate** 129:24 130:20 131:7

**great** 22:24 28:9 74:12 87:7 122:11 138:6 141:8 142:3

**greater** 53:5 106:14

**greatest** 57:13

**ground** 21:24

**group** 126:4

**guarantee** 124:15 128:11

**Gudjonsson** 93:1

**guess** 40:2,19 52:16 60:15,19 82:15 89:11 93:9 100:8,12 122:6 129:6 131:3 135:22 138:24

**guessing** 115:3 132:20

**Guevara** 5:7 6:11 7:2 29:22 63:4 64:6 65:21 66:11 69:24 91:11

**Guevara's** 73:5

**guide** 110:20

**guilt** 30:10,15 32:18,21 34:11,23 35:21 36:15,17 44:9 45:11 48:1 61:19 62:7 63:1

**guilt-presumptive** 30:22 31:8,21 32:17 33:13 34:2,5,7,16 35:14,19 36:4,11,19 37:12,14 40:21 41:9,10, 19 42:17,22 43:7 44:20 45:15 46:2, 22 47:1,6,17 48:8,9,18,21 50:13,21 52:10,14 58:12 60:6,9,12,17,21,23 61:1,18 62:5,9,15 63:9 67:16 68:4, 5,10,23 69:17 73:20 74:3

**guilty** 30:21 34:8 38:14,20 40:10, 11 41:5 42:7 44:15

**guys** 70:19 94:14

---

**H**

---

**half** 76:14 84:7

**hallmarks** 134:14

**Halvorsen** 69:24

**hand** 44:8

**handcuffed** 76:2 79:18

**handed** 115:21

**handful** 128:3

**hanging** 141:17,18

**happen** 16:15

**happened** 134:15

**hard** 8:4 42:10

**harm** 118:15

**head** 49:15 75:18 117:24

**hear** 39:7,8

**heard** 115:23 138:19

**Hector** 20:24

**held** 89:20

**helpful** 22:6

**helps** 38:10 57:3 98:1

**higher** 57:8 140:14

RICHARD LEO, PHD, 03/03/2026

**highlight** 23:9

**highlighted** 23:14

**Hill** 43:12

**history** 19:13,14 20:10,12,17,24 21:12 73:5 81:19 82:5 89:5,6 93:21 105:2

**hit** 30:2 132:23,24

**hoc** 123:9 126:3

**hold** 26:13 101:21

**home** 89:4 118:14

**homicide** 9:20 10:1,6 70:10

**hope** 39:12

**hopeless** 119:5

**hostile** 59:18 60:10,13,20,24 61:1

**hour** 15:3 53:16 76:14 94:7

**hourly** 122:1

**hours** 27:1 74:20,21 75:1,5 76:11, 15,17,24 83:15,17 84:8,20,22 85:21 86:5,9,10,14,19,20 88:5,19, 21 89:18 90:5 121:23

**human** 18:10 21:19 23:15 24:15

**hypotheses** 34:11

**hypothesized** 57:6

**hypothetical** 71:15 93:10,23

**hypothetically** 71:4,13 93:13

————————————————
I
————————————————

**i.e.** 53:4

**Id** 111:12

**identification** 7:23 22:13 39:16 43:20 49:3 54:16 64:15 70:11,23 81:3 86:24 95:19 96:11 98:8 112:24 120:24 126:10,15

**identifications** 64:5,11 65:3 66:1, 5,9,14,17 68:2,8 70:7,8,24 71:7 72:15 92:1 93:3,19,22 101:12

**identified** 6:24 16:5 21:12 33:3 37:3 60:16,18 61:23 67:12 68:3,20 74:22,24 82:12 92:10,21 103:12 104:3 124:13

**identifies** 9:4 10:15 40:3,7

**identify** 5:16 8:16 10:19 13:3 14:13 16:1 22:10 29:19 31:7,21

32:22 33:11 37:7 54:18 61:17 66:21 73:2 75:15 80:16 87:3 103:21 104:6 106:22 118:1 119:1

**identifying** 11:8 15:24 16:22 75:13 91:16 109:24

**Illinois** 5:10,14 97:8,12

**imagine** 42:10

**impact** 51:12 84:12

**Impacts** 80:12

**impaired** 86:17

**imperfect** 25:2,24 27:12,13,21

**importance** 123:24

**important** 39:13 86:4 130:6 131:19

**impression** 42:10

**improper** 47:12 92:9,17

**imputation** 66:14

**Inaara** 6:3

**incident** 24:3

**inclined** 128:14

**include** 24:7 75:8 78:4,5 82:22 96:8

**includes** 24:2

**including** 58:22 66:1 75:10 110:13

**incon** 113:18

**inconsistencies** 28:14 113:19 114:5,7

**inconsistent** 32:14,20 61:3,5 114:21 136:14

**increase** 36:6,12 43:8 47:1,7 48:5 50:15 52:11,15 57:24 59:18 60:7 90:20,23 91:5 104:15

**increased** 51:1,14,16 52:8 74:18 79:13

**increases** 36:19 37:13 50:13 52:18,23 53:1,2,6 91:7 102:13,18

**increasing** 50:11

**incriminate** 34:9

**incriminating** 69:7 76:10

**incumbent** 136:6,18

**independent** 99:2 141:1

**independently** 18:9 24:14 32:6,

19

**indicating** 30:7 44:9 63:18 64:8 73:20 74:2 80:9

**indication** 107:2 124:11

**indicator** 62:9

**indicia** 28:11,12,17,22 93:10,11 112:9,14 114:18 116:19

**indirectly** 51:15

**indisputable** 26:22

**individual** 11:15 69:8 79:12 80:5, 18 82:1 83:11 86:16 104:11 105:18

**individual's** 105:13,22

**Individually** 106:17

**individuals** 28:5 66:6 68:15 70:9 77:15,16,21 113:22 115:2 123:13

**individuals'** 67:7

**induce** 84:14

**inducement** 40:23,24 41:1

**industry** 110:21

**infer** 27:4

**Influence** 49:10,12

**influences** 92:23

**inform** 11:24 72:2 92:9

**information** 73:9 76:10 81:14 89:1,9 95:10 98:24 99:16 136:16

**informed** 69:6 92:21 93:4

**informing** 38:13

**infrequent** 76:13

**inherently** 34:5 110:2

**initially** 66:2,4

**innocence** 34:11 45:11

**innocent** 26:16 30:21 34:23 36:8, 21 38:20 40:11 41:6 44:15 115:2

**insertion** 107:16,21 109:1,4,10

**inserts** 108:3

**institution** 132:9

**intake** 12:18 30:4

**Integrating** 81:13

**intellectual** 103:5 104:21

**intend** 9:5,9

RICHARD LEO, PHD, 03/03/2026

**intentionally** 77:17 108:3

**interaction** 17:21 115:5 116:15

**interest** 135:6,22 136:3,8,20

**interesting** 129:9

**interpretations** 72:12

**interro** 77:9

**Interrogate** 81:13

**interrogated** 23:19 27:1 75:17 84:1 89:18,20

**interrogation** 15:11,21 17:5 18:8 19:8 24:9,14,22 25:4,6,11 27:6 30:22 31:8,11,22 32:3,11 33:13,14 34:2,5 36:19 37:12 40:21 43:7 46:23 48:11,20,22 50:10 55:17 60:6,17,20,21,23 61:18 62:5,9 63:9 67:16 68:4,6,10,23 69:17 74:6,9,17 75:8,14,16,23 76:6,9,20,23 77:2,3, 11,13,22 78:3,5,7,14 79:17,18 82:17,20 85:15 86:10,13 91:22 92:6,14,17 107:5 108:6 110:5,20, 22 115:11 118:6,13 119:12 120:2, 7,15

**interrogation-based** 59:3

**interrogation-induced** 63:13

**interrogations** 28:8,20 32:16 33:17 34:15 35:14 36:11 41:19 42:11,17 44:20 47:6 48:9 50:21 52:10 62:15 63:16 73:21,24 74:4 76:5 83:24 114:24 115:12

**interrogator** 23:19 30:20 31:13 32:1,9,24 33:4 108:2 115:4

**interrogator's** 34:8 36:4 115:12

**interrogators** 38:13,18 40:8,20 41:4 42:19 44:14 107:21

**interrupt** 20:23 77:20 85:5

**interrupting** 61:13

**intervals** 77:1

**interview** 55:19 77:22

**interview-based** 59:2

**interviewed** 56:1

**interviewer** 54:9 55:18,20 57:7 59:17

**interviewers** 56:4

**Interviews** 43:12

**investigate** 32:6

**investigated** 110:10

**investigation** 9:20 10:1,6 38:19 40:22 44:16 115:10

**investigations** 115:10

**investigative** 12:23 30:15 34:22 36:5 55:4

**investigator** 34:10 49:12 51:10, 13,20 97:23

**investigators** 115:8

**invoice** 121:4,8,10,20 122:2

**involuntary** 28:7 36:6 52:19

**involve** 38:1 56:8 114:24

**involved** 56:11 65:23

**involving** 32:8 37:21 39:20 48:24

**isolating** 48:8

**issue** 124:10

**issues** 124:13 128:13 131:18 140:7

**issuing** 26:14

**items** 11:11

---

**J**

**Jail** 12:17 30:6

**Jake** 6:1 65:10

**Jesus** 66:7 67:7,11 68:19 71:7,19 72:14 73:13 91:20 116:21

**job** 127:15

**Joel** 5:24 43:16 142:1,16

**Joel's** 134:1

**jog** 57:3 58:8

**John** 5:6 9:19 13:3 15:12,22 96:17 97:11 111:5 119:2

**joined** 80:23 111:1

**Jose** 10:4 11:16 12:11

**Joseph** 12:3

**journal** 55:4 122:22,24 123:2,3,4,6 125:17 126:1 127:10,19 129:2,6 134:4,7 137:10,12 138:13,15

**journals** 125:2 127:3,5 132:15,16, 21,22,24 133:7 138:4

**judgment** 34:22 63:5 141:1

**Justice** 138:13

**juvenile** 104:11,18 105:5

**juvenile's** 105:2

**juveniles** 78:14 104:11,17,21

---

**K**

**Kassin** 39:20

**Kelly** 6:6 9:9 12:18 13:12 14:19 28:5,19 63:13 66:2 68:16 70:4 75:4 78:9 97:18 103:18 106:10,18,23 108:14 109:13 112:13 113:20 115:17 116:1 119:14

**Kelly's** 9:23 10:22 82:5 109:18 116:11 120:8

**kind** 17:9 19:22 30:11 41:8 48:11 59:8 78:3 113:5 118:1 122:22 127:19 128:22 130:16,19,24 131:1 134:17 139:14

**kinds** 77:14 114:6

**knew** 18:9 24:14

**knowing** 27:20 88:5 131:18

**knowledge** 29:4,10,12 31:2,5 110:24 130:4 131:14 136:13,15,23

**Krista** 111:6

**Kyle** 5:19 7:7 15:13 43:13 101:21 121:14 122:20

---

**L**

**label** 8:6 22:10 30:11

**labeled** 95:21

**lack** 18:9 24:15 28:15 139:24

**lands** 135:8

**language** 44:23

**Larry** 13:11,16

**law** 76:4,5 101:4 105:6

**Lawrence** 13:11,16

**lay** 8:3

**layperson** 29:12

**lead** 29:13 34:12 43:7 52:22 59:4 62:15 74:4

**leaders** 110:21

RICHARD LEO, PHD, 03/03/2026

**leading** 32:24 51:2 56:3 60:18 61:20 62:13 110:20

**leads** 30:15 53:5

**learn** 129:18,20,21 130:1 131:11, 13

**learning** 132:3

**leave** 141:17

**led** 16:1 26:17,22 42:23 62:12

**left** 78:15 141:18

**left-hand** 84:7

**legal** 5:11

**length** 74:9,17 75:8 79:16 83:24 89:20 118:5

**lengthy** 63:16 118:13

**leniency** 118:14

**Leo** 5:4 6:23 7:8,13,22 22:9,12 39:2,15,18 40:2,6 42:1 43:19,22 44:7 45:1 46:12 49:2 53:18 54:5,15 67:22 81:2,6 86:23 95:2 96:10 98:7 120:23 121:2,6,9,10 122:7,14 141:15 142:19

**Leo's** 22:19

**level** 83:1,18 84:12 88:12 105:22 107:3 139:13

**lied** 64:7 65:20 66:12 95:17

**light** 93:24 106:14 142:2

**likelihood** 47:7 50:10 51:17 52:8 59:24 60:7 74:18 79:13 91:4 128:13

**limited** 18:10 21:20 23:15 24:16

**lines** 135:22

**lineup** 77:23 78:4 92:10,22

**linking** 69:22 70:9,16,24 71:8

**list** 8:18 11:19 12:15 83:2 132:18, 21 137:7 138:4

**listed** 13:20 39:19

**listening** 6:21

**literature** 58:21 59:6 110:23 123:18

**litigation** 29:7 100:14

**live** 31:24 32:8

**locked** 76:24

**Loevy** 14:19

**Loftus's** 64:12 112:22

**logged** 101:24

**logical** 69:23 70:18 71:1,10

**long** 15:2 39:11,12 46:6 79:23 87:22

**longer** 25:5 136:24

**looked** 44:4 56:8 138:7

**loose** 115:13

**lost** 61:8 134:22

**lot** 47:19 83:23 122:21 125:1,14 130:11,12,14 140:12

**lunch** 94:13,14,16

**lung** 139:4,6

**lying** 33:20 38:14

---

**M**

---

**made** 64:4 66:1,10,14,19 69:7 96:7 110:1

**main** 119:10,11

**maintains** 70:23

**major** 118:2

**make** 13:24 58:21 59:4 86:7 120:6 123:17 125:1 138:9 141:2

**makes** 33:4 42:17 124:4

**making** 18:15 32:20 34:24 35:15 59:19 73:7 95:18 124:17

**manipulated** 40:8,23 95:18

**manipulation** 51:10

**manner** 34:9 49:18 54:9 55:18,20 56:4 57:7 59:22 117:14

**manners** 37:24

**manual** 110:14,21 111:13

**manuals** 109:5

**manuscript** 127:6

**March** 5:5

**Margarita** 69:3 117:2

**marginally** 51:11,20 52:11

**mark** 22:14,19

**marked** 7:22 22:12 39:15 43:19

49:2 54:15 81:2 86:23 96:10 98:7 120:23

**marking** 43:13

**markings** 30:7

**Martinez** 5:7 6:5 9:9,19 12:19 13:6 14:19 15:12,22 17:3,11 28:5,19 30:1,5 63:18 68:15 69:22,24 70:10, 17,19,24 71:2,8 74:21 78:9 79:3 82:4 85:2 90:14,15 91:11,16 96:17 97:11 103:8,12 105:11 106:14,23 109:13 112:10,13 113:20 115:17, 19 116:7 118:1 119:2,18

**Martinez's** 10:22 16:9 29:10,16 63:8 90:16 91:4 106:8 108:7 109:18 116:8,11 120:8

**Martinez-kelly** 7:19

**Martinez-kelly-tinajero** 8:2,13 72:5

**Martinez-tinajero-kelly** 47:5

**match** 114:9,10,11

**materials** 10:13,16,20 11:7 12:5, 24 20:16,18,21 63:24 71:17 73:10 90:3 96:5 111:17,23,24 112:4,5 113:13

**matter** 5:6 7:19 9:10 10:17 29:14 33:22,23 36:22 65:11 96:17 97:11 104:19 106:3 110:14 121:4,10

**matters** 94:8

**meaningfully** 91:8

**means** 75:14 114:20

**meant** 8:2 128:22

**Media** 5:2 54:1 94:22 141:12

**medical** 30:4 139:3

**medically** 79:23

**meet** 125:5 128:20 129:1 133:22

**meeting** 80:23 111:1

**Melloney** 14:10,12 63:17,23 64:17 65:14 67:13 68:1 70:22 95:6,13 101:8

**members** 123:8

**memory** 18:10 21:19 23:15 24:16 57:4 58:8 96:23 126:12,14,21

**mental** 59:8

**mention** 67:3 85:24 116:20 118:13 119:21

RICHARD LEO, PHD, 03/03/2026

**mentioned** 25:18 31:18 97:19 107:19 109:4 113:1 116:24 118:23

**met** 55:1

**method** 34:4 37:24 49:17 109:5

**methodological** 130:2 131:11,17 132:3

**methodologically** 125:10 129:22

**methodology** 30:18 79:11

**methods** 29:3 123:18 124:2 129:15,16 131:6,10 132:11 137:4

**Mexican** 69:8

**Michele** 6:1,16 141:24 142:6

**microphone** 39:2

**middle** 6:10 11:7 59:16 85:12 113:5

**midnight** 83:17 85:17 90:6

**mind** 67:21 93:15

**mine** 15:19

**minimization** 50:16 51:2,14 52:23 53:1 56:2 62:1,3 114:2

**minimize** 113:23 114:1

**minimizing** 114:3

**minor** 108:3

**minute** 118:9

**minutes** 29:22 53:13 122:9 141:5

**Miranda** 119:8,21,24 120:1,6,8,13

**misclassification** 30:12,16

**misclassified** 30:20

**misconduct** 134:13

**misheard** 66:15

**mispronounce** 49:7

**misremembering** 99:18 138:17

**missed** 117:5 121:12

**Missing** 23:2

**misstates** 48:13 67:17 68:11 93:7

**misstating** 72:20

**mistake** 11:24 96:7

**mistaken** 95:9 96:4 118:11

**mistakes** 14:14 109:24

**misunderstandings** 43:8

**model** 129:11

**modeling** 49:10,12 130:14

**moderated** 51:13

**modern** 34:4

**modify** 133:14

**moment** 22:9 99:5

**money** 127:8

**months** 69:14

**Moran** 5:14

**morning** 5:1,19 6:23 7:13

**motivations** 114:10

**move** 62:4 79:2 90:12 102:23

**moving** 74:8 94:8 101:20 102:5 110:4 112:9

**multiple** 66:20 91:12,19,23

**multiplied** 122:1

**murder** 33:5 63:19 65:23 69:23 70:17 71:1,9

**Murray** 6:7,10,24 7:1,5 39:2 101:21 102:3 141:20

---

**N**

---

**named** 97:23

**names** 91:22

**napping** 76:1

**Narch** 49:7

**Narchet** 49:7,8

**narrative** 115:7

**National** 110:5

**nature** 57:19

**necessarily** 18:9 24:15 34:6 47:21 48:16 60:13,14,22 61:2 120:10 137:2

**needed** 133:24 134:6

**neutral** 45:16 46:4 136:8,9,22

**news** 141:15

**Nick** 5:11 142:13

**night** 66:6 82:13 83:15,16 90:5

**nights** 84:1

**noise** 39:7

**non-homicide** 32:1

**nonincriminating** 114:9

**nonleading** 56:3 57:12 58:18

**nonscientific** 139:12

**norm** 19:24

**normal** 83:14

**North** 5:13

**Northern** 5:9

**note** 98:12 102:12 113:17

**noted** 18:7 21:11,18 70:6 95:9 114:13

**notes** 60:18 61:16 122:19 141:6

**notice** 109:15

**noticeably** 42:8,18

**November** 7:19 67:9

**number** 5:7 7:21 8:6,21 9:17 10:20 13:3,20 14:3 22:10,11,19 39:14 43:18 47:20 49:1 51:8 54:14 57:13 74:1 81:1 84:1,6 86:22 87:3 91:6,8 95:22 96:9,15 98:6 99:10 100:15 102:21 120:16,21,22 121:5,6,24 139:24

**numbers** 133:17

**numerous** 29:5 112:14

---

**O**

---

**object** 16:12 24:19 142:1

**objection** 9:11 12:12 19:2 20:14 21:2 26:6 47:11 48:13 58:15 67:17 68:11 70:12 71:12,20 72:6,18 73:14 76:7 90:7 92:3,15 93:7 100:11 115:24

**objective** 17:22 23:23 79:16 136:22

**obligation** 127:11

**obligations** 126:1

**observation** 42:5 130:12

**observational** 129:19

**observations** 105:22

**observing** 78:14

**obtaining** 36:12

RICHARD LEO, PHD, 03/03/2026

**obtains** 132:1

**occasions** 66:20

**occurred** 18:8 24:13 25:4 28:19 29:17 32:13 73:8 92:10 101:9

**October** 96:24

**Offender** 55:5

**offer** 127:7

**offered** 127:24

**office** 9:19,24 10:5,23 14:19 39:3,5

**officer** 21:13 30:19 110:8

**officers** 5:20 44:8 108:22

**officers'** 106:16

**offices** 5:13

**Ofshe** 23:4

**Oftentimes** 101:3

**one's** 80:8 104:19 105:17 111:8

**one-shot** 19:22

**ongoing** 135:15

**online** 95:24 96:1

**onward** 11:1

**open** 58:14

**open-ended** 32:24 62:8,12

**opinion** 20:15 26:7 36:10 60:5 63:3 64:13 66:12 68:17,22 69:17, 21 72:22 73:4 82:1 93:17 95:10,21, 23 96:15,17,19 97:4,6,11,12 98:2, 22 99:3,11,19 100:6 101:6,7,18 110:14 112:7 113:12

**opinions** 9:5,6,8,17,18,22,23 10:3, 4,8,16,21 11:2 17:24 19:16 42:7 70:3 100:9,22 101:3 111:18 112:1

**opportunity** 127:24

**opposed** 34:10 59:3 130:15 131:17

**opposite** 58:24

**options** 128:3,5

**order** 41:8 105:17

**original** 123:17 130:6 131:20 134:24 136:3

**originality** 124:1

**outcome** 53:4 55:18

**outlier** 58:20

**overbear** 118:22

**overcoming** 61:22

**overseers** 38:13

**overview** 123:14 125:16

---

**P**

**p.m.** 53:23 54:2 94:20,23 141:10, 13 142:20,23

**pages** 8:12,19

**paginations** 15:16 35:4

**paid** 126:24 127:3,5,16

**painting** 39:5,6

**paper** 22:8 29:21

**paperwork** 142:7

**paradigms** 46:21

**paragraph** 23:9 35:23 40:7,16 42:4 45:10 57:4,18 63:3,11 69:20 85:12 96:23 97:2 99:15 107:19 113:4 119:1

**Paralleling** 42:5

**pardon** 26:14,15

**parentheses** 56:2

**Parker** 65:24 67:13 68:1 73:13 91:19 95:6,13 101:8

**Parker's** 14:10,12 63:17,23 64:17, 19 65:14 70:8,22 98:13,22 99:17 112:19

**part** 11:7 23:12 28:10 33:15 40:3 47:17 51:19 52:4,5 77:10 78:5,6 102:24 105:7 111:18 126:6 127:15 134:7 139:1

**partic** 38:12

**participant** 18:12 21:21 23:16,20 24:18

**participants** 24:8 38:6,17 55:24 56:15

**participants'** 51:15

**participated** 70:1,20 71:3 91:12

**participating** 68:20

**parties** 5:17 31:14

**parts** 58:7 130:15

**passed** 132:10

**past** 136:14 137:1,23

**Paton** 54:10,23

**pattern** 10:10,11 11:2

**patterns** 32:15 100:17

**Paul** 23:3

**PDF** 99:12

**peer** 104:12 122:24 123:1,3,7,9,12 124:21,23 125:2,3,8,22,23 126:6, 23 127:3,6,12,13,15,18 128:7 132:14,17,19 133:9 134:4,20 135:1,2,10,11,20,24 136:2,4,6,19 137:10 138:14 140:4,6,7,10,24 141:2,3

**peer-reviewed** 133:21

**people** 19:17 25:1 38:3 41:5,6 42:11 73:1,2 92:22 94:16 96:17 97:12 114:7 123:9,11 125:19 126:4,9,11,17,22,24 127:1 130:2 131:9 135:9,14

**people's** 92:23 114:8

**perceived** 57:8 59:18 119:5 125:7 136:21

**percent** 25:4 26:21 40:9 46:20 115:5 139:10,17,21,22

**percentage** 73:21 139:15,18

**perception** 92:20 123:24

**perceptions** 51:16

**perfect** 24:23 27:12 34:17

**period** 29:21

**perpetrator** 26:17,23

**person** 13:15 23:19 26:15 27:1 38:14,20 39:13 89:19

**person's** 26:16 38:14

**personal** 103:4,11,22 104:2,7,20 107:11

**personality** 94:9 102:24 103:3

**personally** 55:9

**perspective** 57:23

**Phd** 5:4 7:8 129:15 132:1,2,5,9,20 142:20

**Phds** 131:9 132:6

**photographs** 30:1

Index: physical-purchase

RICHARD LEO, PHD, 03/03/2026

**physical** 16:5,9 28:16 29:12,15,17 30:8

**physically** 17:11 25:12 29:11 30:2 63:15

**picked** 85:15 89:18,19,24

**picking** 39:3

**piece** 29:21 117:17

**pieces** 101:5

**pin** 25:23 116:19

**place** 23:24 40:4 64:24 81:9 131:18

**plagiarism** 134:14

**plagiarized** 134:9

**Plaintiff** 5:24 6:4 85:6 142:14

**Plaintiff's** 13:21,23

**plaintiffs** 6:5 67:13 68:8,20 69:6 71:7,9 72:16 74:17 83:8 93:4

**plaintiffs'** 114:14,19

**playing** 115:12

**ploy** 90:24 91:15 92:2,4,12

**ploys** 34:3,4 90:13,16 93:14 95:3,5

**point** 34:9 45:4 53:13,16 64:10 65:18 66:11 77:6,23 78:1,8 94:6,12 95:15 113:18,19 120:1

**pointed** 125:16

**pointing** 19:16

**points** 113:10

**police** 17:19,20 27:3 30:19 43:8 44:8 67:4 69:15 73:6 75:22 76:3,9, 13 77:1 85:15 89:2,4 106:15 107:5, 21 108:12,21 110:5,7,18,21 114:2, 15 116:13

**poor** 38:5 78:21 112:4

**position** 18:11 21:20 23:16 24:17 37:12

**post-conviction** 12:24 64:3 65:15 95:11,13 97:20 113:13

**posttrial** 65:16

**potential** 142:4

**potentially** 95:6 97:19

**practice** 10:10 11:2 100:8 110:17, 18

**practices** 10:9,11

**pre-interroga** 116:10

**predicated** 81:10

**predictions** 57:11

**predictor** 58:4

**preexisting** 34:23 35:19,20

**premature** 30:14 34:22 35:19,20 36:15,16 37:15 43:6 62:6

**preparation** 14:4,23 64:20 67:9, 10 69:13

**prepare** 14:6,13

**prepared** 8:13 65:9

**preparing** 10:16,18,21 14:5 73:17

**presence** 116:3,8 120:12

**present** 12:10 15:5 16:9 59:17,21 114:8 115:1,22

**press** 127:10 133:4

**pressure** 51:16 57:8 104:13

**pressured** 65:21 66:11 95:18 115:6

**presumption** 30:11,14 32:17 34:23 35:20 36:15,16 48:1 62:7 63:1

**pretrial** 17:6

**prevent** 78:11

**previous** 17:10 27:16 46:19 136:5

**previously** 17:16 64:21 118:19

**primary** 100:15

**priming** 39:6

**principles** 29:3

**printed** 15:20

**printout** 7:18

**prior** 24:5 25:17 36:16 75:13 82:17,19 99:24 101:19 105:2,6 115:11,16 116:10 131:23 134:19

**probabilistic** 139:5

**problem** 23:4 35:3 45:21 134:10

**problems** 99:20 124:4,13

**procedure** 40:3,4

**proceeding** 65:16

**proceedings** 64:3 95:11

**process** 122:24 123:1 125:2 126:6 132:3 135:3,5 140:3

**produced** 7:18

**produces** 73:21

**professional** 63:3 69:20 127:11 129:11

**Profile** 55:5

**project** 97:23 135:15

**projects** 129:21

**promise** 102:12,18 137:5

**promises** 94:9 101:20 102:5,10 118:14

**proof** 92:20

**proper** 92:14 131:6

**prosecution** 26:12

**prosecutor** 34:10 116:2

**prosecutor-written** 14:9 109:17 116:18

**prove** 32:11

**provide** 9:5 49:23 123:14

**provided** 9:7 13:21 16:24 24:2 27:16 30:24 69:11,16 82:8 95:23 96:2 115:16 119:8 120:6 135:19

**psychological** 81:19 94:9 117:6, 12,17,20 120:20

**psychologically** 27:3,6 28:6 63:15 118:2 119:12 120:7,11,15

**psychologist** 105:15,16 106:1

**psychologists** 106:4 130:12

**psychology** 55:4 126:12,13,14, 20,21

**psychosis** 84:14

**publication** 18:16 31:4 55:8,11,13 129:2 140:16

**publications** 31:3

**published** 18:6 54:10 55:4 56:24 57:1 60:4 72:23 73:3 93:16 96:14 123:2 130:24 136:4

**pull** 22:8 39:18 80:15 81:5 87:2

**pulled** 37:16

**Pulling** 84:5

**purchase** 127:9

RICHARD LEO, PHD, 03/03/2026

**purely** 93:23

**purported** 99:17

**purpose** 76:23 77:3,12 78:7 128:19

**purposes** 79:17

**put** 6:9 7:3 17:16 19:20 59:7 76:1 84:16 91:6 116:19 130:23 137:1 140:23 141:1

**puts** 34:23

**putting** 140:23

---

**Q**

**qualification** 19:20 21:12,13

**qualifications** 19:4,6 21:11 23:23 36:14

**qualify** 83:11 88:12

**qualifying** 25:18

**quality** 115:13 123:19 140:14

**quantification** 36:24

**quantify** 36:18 91:4 102:17 120:14

**quantity** 90:23

**question** 12:1 16:22 18:21 20:23 21:17 23:13 24:6,20 26:23 31:6 33:16 38:22 39:1 40:12,19 44:24 45:22 47:13 57:12 59:11 67:22,23 68:19 70:13 71:21 74:11 80:3 93:9, 24 100:8 106:2,10 109:8 112:5 117:18 127:2 129:7 134:1 135:22 141:21

**question's** 81:10

**questioned** 75:9

**questioning** 5:18 9:18,23 10:4,22 29:18 31:20 33:1 42:6 44:10 45:13, 15,17 46:3,4 54:9 55:19 56:1,2 57:6,20,22,24 58:3,13,14 75:23 76:14,20 77:9 108:19

**questionings** 62:12,13

**questions** 9:14 31:18 32:4,9,24 34:14 37:19 46:22 47:1 56:3 59:9 60:18 61:20 62:8 110:7 122:8,10, 23 123:14,16 125:16 127:22 131:15 135:23 137:6 141:16,19,20 142:2,8

**quick** 101:21,22 141:5

**quickly** 8:3 50:6

**quiet** 39:10

**quote** 18:7,22 22:1,2 29:2 34:20 37:18 40:8 45:11 55:16,23 81:17 84:5

**quoted** 35:11 45:23 47:17 83:20 86:18

**quoting** 23:8,13

---

**R**

**R-E-I-D** 109:5

**radically** 89:3

**Randy** 20:9,13

**range** 104:23,24

**rate** 122:1

**rates** 45:14 46:20

**ratings** 57:8

**reach** 38:19 40:21 111:18

**reached** 45:20 50:20 70:3 83:11

**reaching** 81:24

**reactions** 42:23

**read** 21:19 22:2 35:11 40:13 46:6 49:20 54:20 56:23 58:19 63:20 64:19,21,22 65:1,2 87:8,15 96:22 99:15 100:6 120:1 123:13

**reading** 22:7 58:7 71:14 72:12

**real** 8:3 58:22,23 101:21

**reason** 47:22 64:4 69:23 70:18 71:2,10 93:5

**reasonable** 18:15 19:1 26:2,19 27:5,24 28:1

**reasoning** 84:12 124:3

**recall** 11:20 12:6,14 13:17 14:16 15:2,5 17:6 18:11,15,17 20:16 21:3,20 23:15 24:16 30:3,9 38:21 41:18 44:17,18 49:14,19 50:17,19 54:20 56:23 65:11 66:7 67:6,8 69:4,5,12 72:9 73:15 77:24 83:9 86:12 87:22 90:2 91:21 93:24 95:3, 7 96:3 101:13 106:9,12 116:4 120:3 121:24 137:19,24 138:14 139:23

**recant** 65:18,19 67:14 68:2,7 95:15

**recantation** 63:17,23 64:17 65:15 95:6 98:23 99:17 101:16,19 112:19

113:1,12

**recantations** 28:15 113:6

**recanted** 64:4,10 65:3,17 66:17 70:23 72:15 92:1 94:4 101:12

**recanting** 72:4 95:16

**receive** 120:8

**received** 30:5 86:1 109:3,6,9

**recent** 134:19

**recently** 47:16 138:18

**recess** 53:24 94:21 141:11

**recitation** 93:17

**reckless** 63:5

**recognition** 127:14

**recognized** 108:6

**recollection** 15:4 38:8 50:1 51:5 65:6,12,17,19 66:19 67:1 72:21 73:4 78:20 80:20 95:15 97:3,6 101:6 113:16 115:24 116:15 133:20 134:19

**recommend** 124:6 134:11 136:9

**recommended** 134:11,17

**recommending** 140:15,16,17

**reconstruct** 18:7 24:13 25:2

**record** 5:3,17 6:9 7:17 11:22 17:20,21,22 18:10 19:7,23 21:15, 16 23:24 24:1,15,22,23 25:2 26:1, 22 27:12,14,21 31:10 53:22 54:2 64:12 67:5,18 71:14 72:12 73:16 89:23 94:3,18,19,23 98:12 105:7 121:13 141:9,13,22 142:13,20

**recorded** 17:21

**recording** 18:2 19:9,24 24:22 25:1

**records** 10:21 11:13,23 12:18 14:2 16:23 17:2 23:24 95:14

**reduced** 58:13 59:23

**reducing** 58:1

**referenced** 95:5 98:22

**referring** 25:8 40:15 41:3 78:17 80:21 82:11 91:19 100:4

**refresh** 78:20 80:20 96:23 97:3 134:18

**regard** 123:24

**rehash** 130:7

RICHARD LEO, PHD, 03/03/2026

**Reid** 109:5 110:14 111:5,13,15

**reject** 124:10,21 128:17

**rejected** 134:6

**rejecting** 61:22

**rejection** 124:7 128:3 134:11,17

**relate** 10:9

**related** 9:23,24 10:4,21 61:5

**relates** 10:5 11:1 131:23 135:23

**relation** 58:22

**relative** 50:11,15 107:3

**relevant** 31:1 105:8 123:10

**reliability** 28:23 64:18 94:5 114:18

**reliable** 18:14,24 21:10 26:2 27:23 28:4 64:14 112:24

**reliably** 74:5

**relied** 17:8 73:17 112:1,20

**rely** 8:4 17:2,23 28:4,13,18 100:9, 15,18,21 124:18,19

**relying** 16:9,18 25:1 38:18 79:15, 20 89:13 90:4 99:16 110:13,16,22 111:7,18 112:18 119:11

**remaining** 8:19

**remember** 18:19 22:1 25:3,12 43:4 134:5 137:9 138:9

**remembered** 98:4

**remembering** 93:16 99:23

**rendered** 95:11

**reopen** 99:10

**repeat** 32:5

**repeatedly** 29:5 35:24 72:24

**repetitive** 56:2 57:20,22,23 58:3

**rephrase** 18:21

**replying** 115:3

**report** 7:18 8:7,12,16,20 9:1,7 10:12,18 11:14 14:4,8,14 15:10,21 17:24 18:4 22:14,19 28:9,24 29:19 34:1,19 37:3 40:1 43:11 45:20,24 47:4,5 51:9 52:17 54:7 59:16 60:3 62:22 64:12 67:9 68:14 69:13 73:17 74:8,11,13,22 75:2 76:20 79:4 85:7 90:14 101:16 102:7 103:1,19 107:5,20 111:19 112:22 117:7 118:23 119:22 121:11

**reporter** 5:14 6:13 12:2 39:12 41:13 61:8,10,13 108:18

**reports** 17:16 30:6 66:8 67:4 69:5 73:6 90:1 109:16

**represent** 5:17 67:11

**representing** 5:12

**reputable** 55:11,13 132:9

**requested** 22:3

**rereview** 20:21 21:4

**research** 31:2 34:21 35:24 46:19 55:12 58:3 73:19 74:2 75:15 79:21 80:6 96:1 100:13,15,17 105:21 110:23 117:11,17 122:21 123:9 125:5 127:14 128:22,23 129:19,20, 21 130:22 131:10,15,23 132:6,11 133:8,20 134:12 135:2,15 136:4,24 137:1

**research-based** 128:24

**researcher** 126:10,19

**researchers** 54:22 75:7 80:7 117:13,16,20 130:1 132:8

**reserve** 142:14

**resist** 77:4

**resistance** 57:24 59:18

**respect** 20:4 29:10,16 44:19 64:16 65:14

**responding** 114:2

**response** 23:3 38:21 42:7

**responses** 58:1

**rest** 59:6

**resubmit** 124:8,14,17 128:4,11,15, 17 140:7,9

**result** 39:8 42:11 79:12

**resulting** 44:21 91:1

**results** 50:17

**retainer** 121:8,19,21,23 122:2

**review** 11:14,22 12:2,9,17 13:8,10 20:18 21:3 38:24 41:22 42:21 44:24 46:6,8 50:6,24 51:3 52:17 56:22 59:7 63:24 67:2,10 71:18,23 72:4,8 94:2 97:2 98:20 99:3 122:24 123:1,3,12 125:2,3,8,22 126:6,23 127:6,12,13 128:7 135:1,2,11,12 140:3

**reviewed** 10:13,16,20,21 11:7,8 12:5 14:2,7,8,10 17:7 20:17 47:15 58:9 65:10 67:8 71:18 73:10 76:5 90:3 93:24 95:21,23 96:5,15,20 97:4,14 98:12,14 99:4 109:12 125:10 134:8 137:20 138:5

**reviewer** 124:6 126:17 127:15 132:14,17 133:9 134:5 135:24 136:2,7,19 137:10 138:14 140:4,7

**reviewer's** 136:5

**reviewers** 123:7,9,21,22 124:12, 18,19 125:23 127:3,18 135:1,20 140:6,10 141:3

**reviewing** 11:13,20 12:6 14:12,15 54:6 67:6 69:5,12 72:9 121:24

**reviews** 124:21,23 126:23 132:19 134:18,20 140:14,24 141:2

**revise** 124:8 128:4,11,15,17 136:17 140:3,7,9

**revise-and-resubmit** 128:9

**revision** 124:23

**revisions** 124:18 140:4

**revolve** 117:22

**Reynaldo** 5:7 7:2

**Richard** 5:4 7:8 23:4 142:19

**rights** 29:6

**Riley** 5:14

**ring** 54:12 55:2

**rise** 42:9

**risk** 16:1 34:24 35:15 36:6,11,12, 20 37:13 41:24 43:8 48:5 51:1 52:15,18,23 53:1,3,7 58:1,13 62:17 79:7 90:20 91:7 102:13,18 103:4, 12,22 104:2,7,15,20 105:3 107:9, 11 118:19,21

**Rodriguez** 66:7,16,20 67:12 68:7 71:19 72:15 73:13 91:20 116:23

**role** 28:2 43:11 113:23

**roles** 114:4

**rolled** 29:20

**room** 76:11,24 78:3,14

**rooms** 77:22 79:18

**Rubinstein** 6:2,17 65:10 108:8,15, 24 115:20 116:8,16

RICHARD LEO, PHD, 03/03/2026

**rude** 59:18

**rule** 21:24

**rules** 129:11

**rush** 34:22 63:5

---

**S**

**S-U-T-H** 12:10

**S-Z-Y-B-I-S-T** 12:4

**salient** 25:10

**satisfy** 115:7

**schedule** 89:9

**scholars** 75:21 123:5 125:18

**school** 131:7

**schools** 129:24 130:20

**science** 29:4 34:21 35:24 40:24 79:22 126:15 136:22

**sciences** 129:14 130:22

**scientific** 31:4 138:20,23 139:9, 11,18

**scientifically** 79:23

**scientists** 53:3 125:11 136:11 138:24

**scope** 19:2 20:14 21:2 26:6 92:15

**screen** 8:5,7,24 22:4,22 28:22 39:21,24 43:23,24 54:19 81:6,7 87:6 98:16 99:6 121:5,6

**scripted** 114:15,20 115:5 116:7

**scripting** 34:1 107:6,20 115:1,14 116:6,17

**scroll** 87:9,11 121:9

**sec** 61:11

**second-to-last** 42:4 46:18 57:18

**secondary** 100:16

**section** 11:7 15:21 23:9 28:14 31:17 34:20 35:23 45:10 49:17 57:3 71:18 74:8 107:6,15 110:4 111:3 113:1,5 117:1,5

**sections** 28:17

**seek** 76:9

**sees** 32:16

**selective** 18:11 21:20 23:16 24:17

125:3

**sense** 40:9 58:21 59:5 112:1 116:9 129:18 133:19

**sentence** 23:14 34:20 35:5,11 40:16 46:17,18 52:4 63:12

**sentences** 57:5

**sequence** 114:10

**Serrano** 69:7

**serve** 134:23

**served** 132:14,16 133:9 134:4 138:14

**set** 129:5,6,17 130:20

**sets** 125:19 129:4,7

**settlement** 142:4

**severely** 84:3

**share** 8:5,23 22:4

**sharing** 28:21

**shed** 106:14

**show** 18:18 21:24 49:17,21 52:24 54:12 80:1,21 81:10 91:7 97:24 98:2 121:3

**showed** 47:9 62:11

**showing** 30:1 31:21 59:13 96:13 122:21

**showings** 30:7

**shows** 58:12 60:21

**shut** 39:6

**sic** 42:7

**side** 84:8

**sigh** 42:12

**sign** 59:24

**signature** 8:10 142:15

**signed** 65:10

**significant** 51:11,21 52:11 79:7

**significantly** 29:2 34:21 35:5 84:22 102:13

**similar** 12:1 20:20,23 44:3 46:21 68:19 70:3 77:4 81:24 86:17 106:10 109:2,8,10 116:1 126:9

**similarly** 9:23

**simple** 19:19

**simultaneous** 26:4 41:11

**sit** 120:3

**siting** 137:9

**sitting** 134:5

**situa** 103:11

**situation** 19:19 119:5 124:17

**situational** 16:1 107:9 118:19,21

**skimmed** 64:20

**skimming** 14:11

**sleep** 77:15,16,17,19 78:10 79:3,6, 12,14,22,24 80:5,8,9,10,18 82:1,8, 16,19,22 83:7,12,14,15,17,18,19, 21,22,24 84:3,9,20 85:1,3,14,17,22 86:1,5,7,11,13,19,20,21 88:3,6,8, 10,11,12,14,16 89:3,9,10,15,17,21 90:5,9,10

**Sleep-related** 80:12

**sleep-wake** 81:18 82:5 89:5,6

**sleeping** 77:8,10 78:11

**slept** 87:11,20 88:6,19

**slight** 35:4

**slightly** 15:17 37:23 44:3 84:17 86:16,17 127:8

**slouch** 42:12

**smacked** 29:20

**smoked** 139:7

**smokes** 139:5

**Smoking** 139:4

**Snyder** 42:5

**social** 29:4 34:21 35:24 40:24 53:3 105:15 125:11 129:14 130:22

**solely** 89:14

**somebody's** 76:24

**someone's** 106:4

**sort** 56:12 125:9

**sorts** 27:2

**source** 73:8 110:16

**sources** 73:9 100:15,16 110:13

**speak** 14:21 115:14

**speaking** 26:4 41:11

**specialize** 131:12

RICHARD LEO, PHD, 03/03/2026

**specialized** 130:3

**specific** 31:6,20 44:23 51:4 59:8 80:4 81:9 105:21 107:2 123:14,16 133:23 135:23

**specifically** 13:20 29:1 35:13 36:3 37:8 38:17 40:1 42:2 43:1 46:17 57:4 63:2 64:16 73:15 76:22 77:3, 24 81:23 82:10 90:2 99:11 103:9 105:10 106:3 107:15 117:12,18 119:22 120:3 131:4

**spend** 130:11,12

**spent** 76:6 121:23

**spoke** 14:7,17

**spontaneously** 48:23

**square** 24:11

**stage** 41:9

**standard** 5:3 53:23 54:3 94:20,24 128:20 133:22 139:21 141:10,14 142:21

**standards** 110:6 125:5 129:1,4,5, 6,7,13,17 130:2,16,18 131:5,12 132:3

**stark** 25:9

**start** 10:13 11:8 15:11,24 134:3

**starting** 5:18 35:23 55:15 63:3 69:20 70:7 96:24 102:24

**starts** 34:20 45:2 79:3 107:19 111:3 113:5 117:9

**state** 18:4 75:7 81:19 82:9,16,22 101:3

**state's** 9:19,24 10:5,23

**statement** 11:15 12:3,11 14:10 15:11,22 17:4 18:16 19:3 21:7,22 24:12 25:17 35:1,16 36:20 38:11 48:15 52:1 61:21 64:17 65:7,9 77:7 102:14,19 108:2,8,18 109:19,23 115:16,20 116:6

**statements** 14:8,9 32:19 36:7 51:3 63:13 69:8,15 80:13 88:14,17 94:3 99:22,23 109:12,17 112:14 113:20 114:5

**States** 5:9 73:24

**station** 89:4

**statistical** 129:20 130:14

**status** 104:11

**Stella** 54:23

**step** 65:24 122:22 125:15

**stern** 56:4 57:6 59:21

**Steve** 6:5

**stewing** 76:1

**stop** 28:21

**stopping** 94:6

**Street** 5:13

**strengthened** 125:9

**strengths** 123:23

**stress** 77:5,8

**strike** 13:9 20:5,11 31:19 33:6 40:10 50:18 65:8 67:20 75:14 105:12 106:21 120:5

**students** 37:21 38:1

**studies** 36:23,24 37:1,2,3,5,6,7, 11,16,20 38:6,10,24 46:21 48:19 54:6 56:7 58:23 60:4 80:1 91:7 129:23 130:13 136:14,15

**study** 36:23 37:24 38:7,10,13,17 39:19,22 41:18,23 42:16,24 43:11 44:19,24 46:9 49:6,15,16,20 50:1, 3,5,9,18,20 51:10 54:8 55:15 57:11 59:21 78:13,17,18,24

**studying** 137:4

**stuff** 38:3 83:4 103:5

**style** 45:13,15,17 46:3,4 58:13 83:14 135:14

**styles** 31:18,21

**subject** 94:8 123:11

**subjects** 119:10

**subjects'** 84:12

**submit** 121:10 127:19

**submitted** 14:14 123:6 125:21 129:3 134:12 137:21 138:15

**subsequent** 124:23

**substance** 15:9

**substandard** 125:6

**substantial** 20:1 28:11 93:10

**substantially** 36:5,12 37:13 47:6 52:18,22 53:2,6 60:6 90:19

**substantive** 126:11 131:17

**subtracting** 122:2

**successful** 129:23

**sufficient** 46:23 88:15

**suggest** 57:21 59:17 140:4

**suggested** 93:20

**suggestibility** 105:5,14,17,18,23 106:4,8,11 107:3

**suggestible** 104:12,18 106:23

**suggesting** 139:23

**Suite** 5:13

**summaries** 9:4

**summarize** 124:9

**summarized** 24:5

**summarizes** 50:5

**summary** 9:6,8,16 10:8

**Summers** 13:11,16

**Sunday** 15:1

**support** 16:23 37:11 47:9 79:19 111:24

**supposed** 101:23 135:4,5,6,9,10, 11,16,24

**surprising** 58:11

**survey** 56:12 129:19

**survive** 125:8

**survives** 125:7

**susceptibility** 105:5 106:15

**susceptible** 104:12,18

**suspect** 18:8 24:14 30:20 32:12, 20 33:1,5 34:8 36:21 43:12 44:14 61:22 69:24 70:19 71:2,11 75:9,24 77:8 92:9 108:3 109:24

**suspect's** 32:21 77:4 108:2 118:22

**suspects** 19:14 32:5 34:24 36:8 40:10 41:2 42:7,18,23 45:11 64:8 65:23 66:1 68:2 82:23 114:3

**suspects'** 44:9

**Suth** 12:9

**Swann's** 42:5

**swayed** 140:16

**swear** 6:13

**swearing** 17:15 25:8

**sworn** 6:14 7:9 110:7

**symptom** 83:21

**symptoms** 84:24 88:10 90:10

**synopsis** 38:5 78:21

**systematically** 93:18

**Szybist** 12:3

**T**

**tables** 52:24

**tactics** 31:20 36:5 55:17

**Tajuddin** 6:3

**taking** 40:4 51:19 75:24 131:10

**talk** 30:13 80:7 107:16 120:10,19 131:4

**talked** 114:14

**talking** 8:17 26:14 60:15 61:4 95:3 111:8 131:4

**target's** 42:7

**task** 45:13 123:19

**teachers** 132:7

**teaching** 130:13

**technique** 53:6 54:9 55:19 60:20 62:3 92:14,18 107:20 108:6

**techniques** 31:11 34:14 46:23 47:18,19,23,24 48:2,4,12,20,22 50:10,14 51:2,14 52:6,13 59:2,3 60:6 106:16

**ten-minute** 53:17 94:10,15

**term** 17:18 109:10 138:19 139:13

**terms** 52:12 79:20 114:9 116:5,17

**test** 44:3 67:14

**tested** 125:10

**testified** 7:10 17:6 63:14 68:9,21 85:13 86:12 101:8

**testify** 66:24 67:1,3

**testimonial** 73:12

**testimonies** 17:17 24:2 116:21

**testimony** 8:18 16:10,24 24:7 29:6 48:13 64:19,23 65:4,11 66:8 67:6, 14 68:12 69:11,12,16 71:18 72:3,5,

20 87:19 88:2 95:13 97:20 100:10 116:23 117:2

**testing** 106:7,11,13 137:4

**tests** 105:16,19 106:6 107:2

**That'd** 141:8

**theft** 55:24 56:16

**theory** 32:9,12,21 116:14 125:3,12 126:9 132:8

**Theresa** 5:22 7:5 122:9

**thing** 33:16 60:14,23 61:2 77:2 99:2 115:4 137:2 140:19

**things** 27:2 28:16 50:12 65:21 93:21 123:16,20 131:23 135:21 137:4 138:9

**thinking** 100:13

**Thomas** 9:23

**thought** 50:23,24 64:1 99:1,18 115:23 121:23 133:24 134:6,23 139:17 141:16

**threat** 102:13,18

**threatened** 64:5 65:20

**threatening** 73:7

**threats** 94:8 101:20 102:5,10 118:15

**threshold** 83:10 86:16

**time** 5:3 11:4 14:23 24:24 26:20 29:22 39:8 40:14 46:6 50:7 53:18, 19,23 54:3 56:23 75:9,17,23,24 76:6,12,20,22 77:10,11 78:5,6 79:16,23 85:3 89:20,23 92:5 94:20, 24 115:18 122:10 130:11,12 134:15 135:2 137:19,23 141:10,14 142:6,21

**times** 14:21 78:2 128:12 132:24 134:16

**Tinajero** 5:24 6:4 9:10 11:16 12:11,18 13:12 14:18 28:5,19 63:14 66:2 68:16 70:4 75:1 82:12 85:6,13 89:23 97:18 104:5,7 109:13,20 113:20 115:15 119:20 120:1

**Tinajero's** 10:4,22 12:3 82:5 87:2 108:17 112:13 116:12

**titled** 23:2 54:8 80:11 81:13 110:4

**today** 5:14 14:6,13 134:5 137:9

**today's** 67:10 142:19

**told** 40:9,11 41:2,5 44:14 65:20 91:11,22,23 94:2

**top** 49:14 75:18 117:24

**total** 77:11 78:5 121:23

**train** 134:22

**trained** 38:7 106:5 108:5 109:1 125:11 126:20 129:15 131:7 132:12

**training** 31:2 105:15 109:3,6,9 110:5,20

**traits** 94:9 102:24 103:3

**transferred** 30:6

**transition** 30:10

**trapped** 42:11

**Trees** 23:2

**trial** 13:6 17:7 64:23 66:2 67:1,3,7, 13 68:3,9,21 69:12,16 72:5 116:20, 23

**trick** 107:17,24 109:1,4,10

**Trick'** 107:22

**triggers** 52:13

**trivial** 127:7,8

**Troche** 20:9,13,18 63:4 69:24 115:21

**Trotta** 5:11

**true** 26:17,23 50:11,15 65:22 91:13 93:14 114:1,12

**truth** 92:12

**truth-presumptive** 36:5

**truthful** 64:23 65:11

**truthfully** 93:5,13

**tunnel** 48:3

**turn** 62:21 71:17 79:1 107:4

**turning** 13:2 35:22 91:10

**type** 56:16

**typed** 108:18

**types** 120:20

**typical** 19:22

**typically** 62:5 123:21 124:5,9 125:23 126:11 127:3,10,21

**U**

**Uh-huh** 23:7 35:8 56:18 102:9 109:8 117:8

**ultimately** 30:17 43:5 124:20 126:21 141:2

**undermine** 86:6

**undermined** 18:9 24:15

**undermines** 47:21

**understand** 7:16 11:21 13:5 20:3 48:7 72:13 77:21 78:8 83:3 89:22 100:7 101:8 132:13 139:13

**understanding** 37:21 38:11 83:13 116:14 117:14 119:24 130:19

**understandings** 136:17

**understood** 127:11

**unexpected** 58:2

**Unit** 5:2 54:2 94:23 141:13

**United** 5:8 73:24

**universities** 127:14 132:7

**university** 127:9 133:4

**unquote** 40:8

**unrecorded** 28:8

**unreliability** 28:11,12,17 93:11,12 112:9,15 116:20

**unreliable** 26:21 36:7 43:5 48:24 52:19 80:19 102:14,19

**unwarranted** 30:14 36:16 37:15 43:6 62:7

**update** 121:14

**urgently** 94:15

**Urlaub** 5:12,15

**utilizing** 46:21

**V**

**Valdez** 97:24 98:19 99:13

**variation** 104:22

**varies** 130:10

**vary** 83:22

**varying** 83:19

**Vergara** 21:1

**verified** 57:20

**verify** 18:19 72:22

**verse** 130:7

**versus** 5:7 32:24 58:14 96:17 97:11 104:22 139:22,24 140:8

**victim** 31:24 32:8 33:6,7

**victim's** 32:2,5

**video** 5:2,17 17:23 18:1 142:19

**videos** 38:3

**view** 48:16 64:14 73:1

**Violation** 110:5

**vision** 48:3

**voluntary** 18:14,24 21:10 26:2 27:23 28:3

**W**

**wait** 101:23 118:9

**waiting** 53:12

**wake** 83:16

**walk** 123:1

**wall** 76:2,12 79:18

**wanted** 122:22

**wanting** 61:21

**warnings** 120:9,13

**warrant** 64:6

**warranted** 58:4

**waste** 142:5

**watching** 38:3

**ways** 127:18 132:16 137:4

**weak** 44:12 125:6

**weaknesses** 123:23

**weed** 128:19

**weeds** 125:4

**weeks** 134:9

**weight** 137:1 140:24 141:1

**well-established** 35:24

**well-grounded** 79:22

**well-recognized** 48:4

**Wendy** 54:10,23

**Westlaw** 96:14

**Whipple** 69:9

**wholesale** 124:7 128:3,4

**wholesaley** 134:6

**widely** 83:23

**William** 111:5

**willingness** 84:13 106:15

**wisdom** 130:5

**witnesses** 64:9 73:7 91:12,18,19, 22,23,24 99:20 126:15

**woken** 78:11

**Woody** 111:6

**word** 35:5 42:21 52:21 57:16

**words** 17:22 38:16 58:18 86:15 93:3

**work** 53:17 94:11,12 100:14 136:5

**workers** 39:5

**works** 48:1 123:2,4 127:20

**world** 58:23

**write** 28:13,17 123:22 135:14

**writes** 108:2

**writing** 19:19,21 47:22 105:20

**written** 22:5 23:4 61:17 108:8,14 115:22 116:2,7,18

**wrong** 61:19 63:7 96:4 109:23 110:2

**wrote** 18:19 47:21 48:17 61:3,6 80:11 115:20

**X**

**XI** 15:21

**Y**

**year** 93:16

**years** 18:19 26:12,16 57:1 88:21 89:1 101:9,11 103:16 109:6 132:23 134:21 137:22 138:4

**younger** 104:19

Urlaub Bowen & Associates, Inc.   312-781-9586

RICHARD LEO, PHD, 03/03/2026

**youth** 103:9,21 104:10

---
**Z**
---

**Zoom** 5:20,23 6:16 80:23 111:1