*DeLeon-Reyes v. Guevara, et al.*
Case No. 18 CV 01028

*Solache v. Guevara, et al.*
Case No. 18 CV 02312

# EXHIBIT 11

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ALFREDO GONZALEZ,           )
                            )
            Plaintiff,      )
                            )
    vs.                     ) No. 22 CV 06496
                            )
REYNALDO GUEVARA, et al.,   )
                            )
            Defendants.     )


            Videotaped videoconference

deposition of RICHARD LEO, Ph.D., taken pursuant to

the Federal Rules of Civil Procedure, taken

remotely before Rhonda Rae Carr, CSR No. 84-3371,

on December 1, 2025, at 10:01 a.m.

RICHARD LEO, PHD, 12/01/2025

**Page 2**

PRESENT:

Loevy & Loevy, by
Mr. Steve Art
(311 North Aberdeen Street, 3rd Floor
Chicago, Illinois 60607
312.243.5900
steve@loevy.com)
    Appeared on behalf of Plaintiff;
Borkan & Scahill, Ltd., by
Ms. Molly Boekeloo
(20 South Clark Street, Suite 1700
Chicago, Illinois 60603
312.580.1030
mboekeloo@borkanscahill.com)
    Appeared on behalf of Defendant Reynaldo
    Guevara;

The Sotos Law Firm, P.C., by
Mr. Kyle T. Christie
(141 West Jackson Boulevard, Suite 1240A
Chicago, Illinois 60604
630.735.3300
kchristie@sotoslaw.com)
    Appeared on behalf of Defendants Mingey,
    Epplen Montilla, Paulnitsky, Schak,
    Yanow & Gawrys;

Rock Fusco & Connelly, LLC, by
Ms. Eileen Ellen Rosen
(333 West Wacker Drive, 19th Floor
Chicago, Illinois 60610
312.494.1000
erosen@rfclaw.com)
    Appeared on behalf of Defendant City of
    Chicago.
ALSO PRESENT:
    Mr. Nick Trotta, Legal Videographer
                    - - -

**Page 3**

                I N D E X
WITNESS
RICHARD LEO, Ph.D.
EXAMINATION BY:                     Page    Line
  MR. CHRISTIE...................... 5      15
  MR. ROSEN.......................207      10

EXHIBITS:
  Leo Exhibit No. 1.................15      21
  Leo Exhibit No. 2.................11      24
  Leo Exhibit No. 3................47      13
  Leo Exhibit No. 4................61      24
  Leo Exhibit No. 5................81      14
  Leo Exhibit No. 6...............101      22
  Leo Exhibit No. 7...............109      22
  Leo Exhibit No. 8...............129      18
  Leo Exhibit No. 9...............132      19
  Leo Exhibit No. 10..............138      11
  Leo Exhibit No. 10..............191      18
  Leo Exhibit Nos. 11 and 12.......200      22
  Leo Exhibit No. 13..............201      17

**Page 4**

THE VIDEOGRAPHER: Good morning. This is the beginning of Media Unit 1. We are now on the video record at 10:01 a.m.

This is the videotaped discovery deposition of Richard Leo, Ph.D., being taken on December 1, 2025. This deposition is being taken on behalf of the defendant in the matter of Alfredo Gonzalez vs. Reynaldo Guevara, et al. The case number is 22 CV 6496 filed in the United States District Court for the Northern District of Illinois, Eastern Division.

My name is Nick Trotta, certified legal videographer, representing Urlaub Bowen & Associates with offices at 20 North Clark Street, Suite 600, Chicago, Illinois.

The court reporter today is Rhonda Carr, also of Urlaub Bowen & Associates.

Please identify yourselves -- counsel, please identify yourselves for the video record and the parties which you represent starting with the questioning attorney.

MR. CHRISTIE: Good morning. Kyle Christie on behalf of defendant officers, attending via Zoom in Chicago.

**Page 5**

MS. ROSEN: Eileen Rosen on behalf of Defendant City of Chicago attending via Zoom in Chicago.

MS. BOEKELOO: Molly Boekeloo on behalf of Ray Guevara attending remotely in Chicagoland.

MR. ART: Steve Art for the plaintiff attending remotely in Chicago.

THE VIDEOGRAPHER: All right. Will the court reporter please swear in the witness.

(Witness sworn.)

RICHARD LEO, Ph.D.,
called as a witness herein, having been first duly sworn, was examined and testified as follows:

EXAMINATION
BY MR. CHRISTIE:

Q. Good morning, Dr. Leo. How are you doing today?

A. Good. Thank you.

Q. I'm just going to drive straight into it. What did you do today to prepare for your deposition?

A. Today?

Q. Right.

A. I reviewed my report.

Page 6

Q. So what did you do to prepare for your deposition today that would occur today? I should have rephrased that question.

A. I just reviewed my report. It's two earlier here in California.

Q. Fair enough. Did you do anything else to prepare for your deposition?

A. Well, I spoke to counsel yesterday.

Q. How long did -- who was the counsel you spoke with?

A. Steve Art and Sean Starr.

Q. Okay. How long was that conversation for?

A. I believe around 45 minutes.

Q. All right. Anything else you did -- anything else that you did to prepare for today's deposition?

A. No, that was it.

Q. Okay. Do you have any documents in front of you right now?

A. I do. I have two documents in front of me. I have my report from October 22. I think it's misdated. I think it's October 22 -- well, it says October 22, 2025. Maybe it's not misdated.

Page 7

And then I have just a list of the sources of pattern and practice materials that I reviewed for the second half of the report. Those are the two documents I have in front of me.

Q. Okay. You said October 22?

A. The report I'm looking at says August 22. I'm sorry. I misspoke.

Q. No worries. I just wanted to make sure I wasn't missing something on my end. Does that --

MS. ROSEN: I'm sorry. I'm sorry, Kyle. Can you tell me what the second document is?

THE WITNESS: Yes. It's a document that I created that's entitled sources of pattern and practice, and it just has ten items. These are items that are identified in the report. They're just categories of items that I reviewed for the pattern practice portion of the report.

MS. ROSEN: When did you create that document?

THE WITNESS: Last night.

MR. ART: We're going to produce it to you, Eileen.

MS. ROSEN: Thank you.

Page 8

BY MR. CHRISTIE:

Q. Dr. Leo, your August 22 report, does it have annotations or highlights on it?

A. Yes. Yes. I went back through and I annotated and highlighted as memory refreshers last night and this morning.

Q. Do you have a clean copy of that report available to you?

A. I would have to print out a clean copy, yes.

Q. All right.

MR. ART: Dr. Leo, let's do that; okay? We had had some communication about that in advance of the deposition. So if you can print a clean copy of report and put the one with annotations and highlighting to the side, I think that that's probably easier for us.

THE WITNESS: Okay. Yeah. This -- I have a high-speed printer, so this should be --

MR. ART: Okay. So let's go off the record and we'll come back in five minutes?

MR. CHRISTIE: Sounds good.

MR. ART: And when we're off, Dr. Leo, just make sure you mute; okay?

Page 9

THE WITNESS: Okay. Thank you.

THE VIDEOGRAPHER: Going off the record at 10:06 a.m.

(Discussion off the record.)

THE VIDEOGRAPHER: This is the continuation of Media Unit 1. We're going back on the record at 10:10 a.m.

BY MR. CHRISTIE:

Q. All right. Dr. Leo, we took a short break, and you printed out a clean copy of your August 22, 2025, report; is that right?

A. Yes.

Q. All right. And the two other documents you had in front of you earlier, the annotated report and then the synthesis of the pattern and practice, are those documents still in front of you?

A. The pattern and practices is. I thought you wanted me to put away the annotated report, so I put that -- the sources of pattern and practices, and so I put away the annotated report.

Q. Okay. Great. I appreciate that. Yeah. You can put away the pattern and practice document too and just have the clean copy in front

RICHARD LEO, PHD, 12/01/2025      Page 10..13

Page 10

of you. I would appreciate that.

MR. ART: I'm going to -- I'm going to send you the pattern and practice one-page thing, and he'll just have that in front of him, and you can ask him questions about it.

MR. CHRISTIE: All right. Thanks, Steve. I I don't have any questions. That will probably be for Eileen, but appreciate it.

BY MR. CHRISTIE:

Q. All right. I just want to set the foundation for this report very briefly. If you will turn to Page 2 of your report where it starts with the paragraph my qualifications?

A. Yes.

Q. Let me know when you see that.

A. Okay.

Q. In that paragraph it mentions three exhibits are attached; is that right?

A. I just printed out the copy of my report that doesn't have the attached exhibits, so I --

Q. That's perfectly fine.

A. Okay.

Q. Sorry to cut you off.

Page 11

Now that report you have, minus the exhibits, that's about 101 pages long; is that right?

A. Hold on. Yeah. I mean, my version is -- is a hundred pages, but I printed a Word version. I think the PDF is 101, yes.

A. Yeah. I think the signature just bleeds off on that 101st page. Okay. Great.

A. And this is your report that you provided in the Alfredo Gonzalez vs. Reynaldo Guevara matter?

A. Yes.

Q. And you've been retained by plaintiff's counsel; is that right?

A. Correct.

Q. And your billable rate for your time is $525 an hour?

A. Correct.

Q. Okay. And did you provide an invoice to plaintiff's counsel for your work in the Gonzalez matter?

A. Yes.

Q. We'll make this Exhibit No. 2.

(Leo Exhibit No. 2 marked.)

Page 12

BY MR. CHRISTIE:

Q. And this one I will show on my computer, but hopefully we won't have many exhibits to show on my computer.

All right. Dr. Leo, let me know when that document appears on your screen.

A. Okay. See -- I see the document.

Q. Okay. And is this the invoice that you produced to plaintiff's counsel in the Gonzalez matter? I can zoom in if you need me to.

A. Well, it's -- it's -- okay. Can you go up to the top?

Q. Sure.

A. It is an invoice that I -- it looks like an invoice that I produced.

Q. Okay. So do you have more than one invoice that you have produced?

A. Yes. So if you look at the very top, it says Invoice No. 3.

Q. Okay.

A. So I -- I didn't review my invoices prior to today's deposition, but I would have numbered the third invoice 3-Gonzalez.

MR. CHRISTIE: Okay. Steve, we only have, to

Page 13

my knowledge, Invoice No. 3. If you could send us over the first two, I would appreciate that.

MR. ART: Yeah. Let me look into it.

MR. CHRISTIE: Sounds good.

MR. CHRISTIE: Do you want to go to something different while I look into it?

MR. ART: Yeah. No. We'll continue on. No worries.

BY MR. CHRISTIE:

Q. And, Dr. Leo, this is via Zoom. Do you have multiple monitors in front of you?

A. No, I just have one monitor.

Q. Okay. And, obviously, the Zoom is up. Are there any other tabs open in front of you?

A. There's no tabs open. My email is -- is open but not visible, but that's it.

Q. Okay. I appreciate that. If we could keep it that way for the remainder of the deposition while we're on the record, I would appreciate that.

A. Of course. Yeah.

Q. All right. Dr. Leo, if you could flip to Page 12 of your report, and let me know when you're there.

Page 14

A.   I'm there.

Q.   Okay.  This part of the report says overview of case specific opinions; is that right?

A.   Yes.

Q.   Okay.  And this section is from Page 12 to Page 15?

A.   Yes.

Q.   And this section provides 26 summaries of opinions; is that right?

A.   Yes, case specific opinions.

Q.   Okay.  And is this the summary of all the opinions that you express in your report?

A.   I believe so, yes.

Q.   Does your report contain all the opinions you intend to express in the Gonzalez matter?

A.   To the best of my knowledge.

Q.   All right.  I want to break down these 26 summaries briefly.  Is it fair to say that Opinions 1 through 8 refer to Alfredo Gonzalez's questioning by police in the Wiley murder case?

A.   Yes.

Q.   Okay.  And similar question.  Do summary of Paragraph 9 through 15 refer to Jose

Page 15

Maisonet's questioning in the Wiley brothers' case?

A.   Yes.

Q.   And then similar question again, does Paragraph 16 through 20 -- I'm sorry, 22 refer to the Justino Cruz's police questioning in the Wiley brothers' homicide case?

A.   Yes.

Q.   And then Paragraphs 23 and 24 refer to the interviews or interrogations of Rosa Bella or Bello?

A.   Correct.

Q.   And then Paragraphs 25 and 26, does that refer to the policies and practices opinions?

A.   The pattern and practice opinions.

Q.   Sorry.  Pattern and practice opinions.  Thank you.

     I don't know if I did this already, but if we could just mark Dr. Leo's report Pages 1 through 101 or 100 as Exhibit No. 1.  I'll send that to the court reporter after this deposition.

     (Leo Exhibit No. 1 marked.)

BY MR. CHRISTIE:

Q.   All right.  Dr. Leo, we'll go back to this section, but I want to fast-forward briefly --

Page 16

or I guess not fast-forward but rewind to Pages 2 of your report.

A.   Okay.

Q.   And do you see that's the materials that you reviewed in this case?

A.   Yes.

Q.   Okay.  And that's -- goes from Pages 2 to 11; is that right?

A.   2 to 12 on my copy.

Q.   I'm sorry.  2 to 12.  264 items documented?

A.   Yes.

Q.   Okay.  And are all -- are these all the documents that you reviewed in preparation for this report?

A.   Unless I made a mistake, yes.

Q.   All right.  Now, for the opinions that are not related to the practices -- pattern and practices, do you see doc- -- Documents 1 through 41, are all those the documents that refer to the opinions not related to pattern and practices?

A.   I think it's 1 through 42 --

Q.   Okay.

A.   -- if I'm correct.  Either 1 through 41

Page 17

or 1 through 42.

Q.   Okay.  Gotcha.  So either the first 41 or 42 documents are the bases for the first 24 opinions in your report?

A.   Correct.

Q.   Is that right?

     Okay.  And then the remaining documents referenced here, either 42 to 264 or 43 to 264 relate to the pattern and practices?

A.   Correct.

Q.   All right.  Now, I just want to ask you a few questions about the documents that you reviewed, starting with number -- Items No. 2 through 5, the jury trial transcripts; do you see that there?

A.   Yes.

Q.   And is that referring to the -- Mr. Gonzalez's trial transcripts?

A.   I believe so.  I mean, I would have to look at them to verify, but I believe so.

Q.   Okay.  In part of those transcripts, did you review Mr. Gonzalez's trial testimony?

A.   I believe so.

Q.   Okay.  And then Item 6 through 7, do

Page 18

you see those motions to suppress statements?

A. Yes.

Q. Okay. And does that indicate that those motions to suppress statement were in the Cruz and Maysonet matters, criminal proceedings?

A. Correct. Yes.

Q. Okay. Did you see any motions to suppress filed by Mr. Gonzalez in his criminal proceedings?

A. I don't recall.

Q. Okay. Now, for the motions to suppress statements by Maisonet, did you review his motions to suppress hearing testimony?

A. I believe so, but I would have to look at the document to refresh my recollection to make sure.

Q. And by "document," you mean the first 46 paragraphs -- or 42 items listed?

A. Well, possibly. But I thought you were referring to Item No. 7 and the pages referenced in there, but I'm not sure if that's what you were referring to.

Q. Yeah. So Item 7 is the motion to suppress statements, and that's about a four-page

Page 19

document; right?

A. Yes.

Q. Okay. Now, I'm referring to the motion to suppress hearing, which is a couple dozens of pages, and whether you received the actual hearing of Mr. Maisonet's motion to suppress?

A. I don't recall if I did.

Q. All right. Do you see it listed within the first 41 or 42 items documented in Pages 2 and 3 of this report?

A. It's possible because Items 26 through 35, with the exception of Item 30, are all depositions that contain exhibits, and the exhibits are not listed. But if they were -- if it was one of the exhibits that attended the -- those depositions, then I would have reviewed it.

Q. And if it wasn't, then you would not have reviewed it?

A. Unless it was contained in the other Items 1 through 43 -- or 42, rather, or I made a mistake and I didn't include it in the index.

Q. Okay. Do you recall reviewing testimony from Mr. Maisonet in his criminal proceedings?

Page 20

A. Right now, no, I don't. Whether -- I don't recall whether I did or I didn't.

Q. Would you agree that it would be important to review Mr. Maisonet's motion to suppress testimony as it involves testimony regarding his interrogation?

MR. ART: Objection to form.

BY THE WITNESS:

A. I agree that it's relevant or potentially relevant.

BY MR. CHRISTIE:

Q. Now, Item No. 12, do you see where it says Gonzalez's court-reported statement?

A. Yes.

Q. Okay. Do you recall if that court-reported statement you reviewed included a Polaroid photograph, front and back, of Mr. Gonzalez on the date that he provided his court-reported statement?

A. I do not. I would have to review the document.

Q. Do you recall seeing any picture of Mr. Gonzalez -- sorry. Strike that.

Do you recall seeing any Polaroid

Page 21

photo of Mr. Gonzalez?

A. As I sit here today, I don't recall whether I did or not when I reviewed these documents.

Q. Would a photograph of Mr. Gonzalez taken after or around the time that he provided his court-reported statement be relevant to your analysis?

MR. ART: Objection to form.

BY THE WITNESS:

A. Well, it could potentially be relevant.

BY MR. CHRISTIE:

Q. Okay. As a brief overview, Mr. Gonzalez has claimed that he was physically coerced; is that correct?

A. Yes.

Q. So would it be helpful to see a photograph of him at the time that he provided his court-reported statement after the alleged abuse occurred?

A. Again, it could be relevant. I don't think it would be dispositive or conclusive in any way.

Q. And I understand that it might not be

Page 22

dispositive or conclusive. Why would it be relevant?

A.   Well, if it showed evidence of physical injuries, that would corroborate the injuries. But oftentimes, when people are beaten in interrogation rooms, the photographs don't show or don't necessarily show the physical injuries.

So it could be corroborating evidence, but the absence of any injuries would not demonstrate that the physical abuse didn't occur.

Q.   And do you -- did you review -- strike that.

Did you review any photos of Mr. Gonzalez corroborating that he was physically abused?

A.   Again, I don't recall, as I sit here today, whether they were in the materials provided and I reviewed them or not.

Q.   For Items No. 20 and 21 that refer to Maisonet's court-reported statement and Justino Cruz's handwritten statement, do you see that there?

A.   Yes.

Q.   And similar question, did you review

Page 23

the Polaroid photos taken of these two individuals after or during the time their statements were taken?

A.   Again, I don't recall, as I sit here today, whether I did or did not review them at the time that I reviewed the discovery in this case.

Q.   Okay.  And similar questions as before. Mr. Maysonet and Mr. Cruz are both alleging physical abuse; is that right?

A.   Yes.

Q.   Okay.  And that would be -- a photograph of them taken at the time or after their statements were taken could be relevant?

A.   It could potentially be relevant, yes.

Q.   For Item 28, do you see the deposition of Rosa Bello?

A.   Yes.

Q.   And that was in the Gonzalez matter?

A.   I believe so.

Q.   Okay.  Did you review Ms. Bello's deposition in the Maisonet matter?

A.   I don't recall whether I did or not.

Q.   Do you recall that Ms. Bello's testimony in the Gonzalez matter referred to her

Page 24

testimony in the Maisonet matter frequently?

MR. ART:  Objection to form.

Go ahead.

BY THE WITNESS:

A.   Well, I haven't reviewed her deposition recently, so I would have to re-review it to answer your question about what's in it.

BY MR. CHRISTIE:

Q.   All right.  Let me ask a different question then.  If you saw reference to other deposition testimony by Ms. Bello related to the Wiley brothers' investigation, would you have wanted to review that?

MR. ART:  Objection to the form of the question.

Go ahead.

BY THE WITNESS:

A.   Well, it depends if it -- if it added anything that the other deposition did not add, it could, again, be relevant.

BY MR. CHRISTIE:

Q.   Okay.  We can go back to that later. Did you review any phone calls -- strike that.

Did you review any phone call

Page 25

transcripts from the Illinois Department of Corrections containing phone calls of Mr. Gonzalez and other witnesses?

A.   I don't recall if I did.

Q.   And no phone call transcripts or phone calls from IDOC are reported in Items 1 through 42; is that right?

A.   Unless they are exhibits to those depositions, I don't see that listed there.

Q.   Okay.  Did you review Mr. Gonzalez's appellate brief in this matter, his direct appeal briefing?

A.   Again, I don't recall if it's one of the exhibits or whether I reviewed it in preparation -- in reviewing the discovery in this case in preparation for the report.

Q.   Aside from it being a potential exhibit, do you see it listed here at all in documents Items 1 through 42?

A.   I do not.

Q.   Okay.  Did you review his appellate opinion by the appellate court?

A.   Again, unless it's one of the exhibits to the depositions, I don't see it listed here, so

RICHARD LEO, PHD, 12/01/2025          Page 26..29

Page 26

I presume that I did not unless there was a mistake in the items listed.

Q. Understood. Did you review Mr. Gonzalez's habeas petition?

A. I would give the same answer. Unless it's one of the exhibits to one of the depositions or there was a mistake, I -- I didn't -- I wouldn't have reviewed it.

Q. Okay. Now, for all those documents I just mentioned, the phone calls, direct appeal, and habeas petition, if Mr. Gonzalez was discussing his statement, would that be relevant for your review?

A. Potentially, it could be relevant, but I wouldn't know unless I reviewed it.

Q. Did you review any records from the Cook County jail, any intake records from the Cook County jail regarding Mr. Gonzalez's, Maysonet's, or Cruz's intake?

A. Unless they were contained in the exhibits to the depositions or there was a mistake in the materials reviewed, I don't see it listed here, so I would assume I did not.

Q. Are you familiar with the term brew (phonetic) sheet or the intake form that Cook

Page 27

County jail fills out when an individual comes in to be taken into custody?

A. Not with the first term you used, but with the second, yes.

Q. Okay. And so with the second term, just so we're on the same page, that intake form do you recall -- or do you recognize it as a document kind of identifies any injuries that that individual might have when they're coming into Cook County jail?

A. Well, it's certainly possible that an intake form could --

Q. Well, have you seen --

A. -- if that's what you're asking, yeah.

Q. I'm trying to understand if you recognize that document, if you've seen it before in other matters involving Cook County?

A. Yeah. I thought you were asking a general question. I don't recall if I've seen it in other matters.

Q. Okay. And do you recall seeing an intake form in this matter involving Mr. Gonzalez, Maysonet, or Cruz?

A. As I sit here today, I don't recall

Page 28

whether I reviewed that document or not.

Q. Do you see it listed in Items 1 through 42?

A. Not unless it's one of the exhibits to one of the depositions.

Q. All right. And if that intake form documented any injuries or did not document any injuries within 48 hours of all three of these individuals' statements, would that be relevant to your report?

A. Well, it could be relevant. But, again, it's not conclusive or dispositive or even disconfirming.

Q. And I guess my question is -- I understand it's not dispositive or confirming, but just whether it's relevant or not. Do you agree that those documents would be relevant?

A. Potentially relevant.

Q. Did you review the Sony review folder -- or strike that.

Are you familiar with what a felony review folder is in Cook County?

A. Well, I think so. I mean, it's just part of the police reports, I assume.

Page 29

Q. Have you seen cases involving a felony review state's attorney where they fill out their own notes? It's like a manilla envelope style document?

A. I probably have, but I don't recall.

Q. Okay. Did you review any document here that was titled a felony review folder by ASA Borowitz?

A. I would have to go through the documents to see. I don't know --

Q. Okay. And, again --

A. -- as of today.

Q. And Items 1 through 42 doesn't reference any felony review folder?

A. Correct. Unless it's one of the exhibits, yes.

Q. Okay. And similar question -- well, strike that.

Did you see Item 38 where it says deposition of Jennifer Borowitz?

A. Yes.

Q. And you understand Jennifer Borowitz was a Sony review ASA in this matter?

A. Correct. Yes.

Page 30

Q. And Item 38 does not indicate that any exhibits were attached to it; is that right?

A. Yes.

Q. Okay. So if a felony review folder was attached to her deposition, you would not have reviewed it --

A. Unless there --

Q. -- as part of Item 38?

A. Sorry. Unless there was a mistake in the materials review section of my report, yes.

Q. All right. And similar question, you're familiar that Frank DiFranco is a felony review ASA who took Jose Maysonet's court-reported statement?

A. Yes.

Q. Okay. Did you review any felony review folder by Frank DiFranco?

A. I don't recall whether I did.

Q. Okay. And, again, Item 39 indicates that you reviewed the deposition of Frank DiFranco?

A. Correct.

Q. All right. But it does not indicate that there were exhibits attached to that deposition?

Page 31

A. Correct.

Q. Okay. And so if Mr. DiFranco's felony review folder was an exhibit in his deposition, according to this report, you would have not reviewed it unless it was a mistake?

A. Yeah, or it was attached to a different deposition as an exhibit.

Q. Did you review Mr. Gonzalez's pre-sentence investigation report?

A. I don't know whether it was among the materials reviewed, as I sit here today.

Q. All right. And I will note it was an exhibit in Mr. Gonzalez's deposition testimony in this matter -- or, sorry, in the Maysonet matter. And if you look at Item No. 26, do you see where it says Alfredo Gonzalez's deposition was reviewed?

A. Yes.

Q. And that was with exhibits?

A. Correct.

Q. So if I am telling the truth and Mr. -- if I'm being accurate in saying that Mr. Gonzalez's post-sentence investigation report was attached as an exhibit, you would have reviewed that?

A. Correct.

Page 32

Q. Okay. And are you familiar with what a pre-sentencing investigation report is?

A. Generally, yes.

Q. Okay. What's your general understanding of what a pre-sentencing investigation report is?

A. Well, that the Court orders an investigation for sentencing purposes into the person's background that is then presented to the Court as part of its decision about what sentence to lay down.

Q. And as part of that background, that would include an educational background; is that your understanding?

A. Often it does, yes.

Q. Okay.

A. That would be noted.

Q. Often, does it include mental health background?

A. In my experience, yes.

Q. Does it also include if the defendant -- criminal defendant -- their story of what occurred or their story of events?

A. Yes, that -- I've seen pre-sentence

Page 33

reports that have that, yes.

Q. Okay. And we'll get a little bit more into this later, but there's a distinction that you draw between personal risk factors and situational risk factors; is that right?

A. Correct.

Q. Okay. And can you just briefly lay out to me what personal risk factors are?

A. Characteristics or personality traits of the individuals that put them at greater risk for making or agreeing to false or coerced confessions during an interrogation.

Q. So would that include like educational limitations?

A. Well, as that's relevant to intellectual abilities or disabilities, yes.

Q. Okay. And so do you mention age as part of personal risk factors?

A. Correct.

Q. Okay. So intellectual disabilities, age. Did I miss any?

A. Well, certain forms of mental illness also are considered risk factors, and then there's sometimes specific testing for personality traits

RICHARD LEO, PHD, 12/01/2025      Page 34..37

Page 34

that are associated with an increased risk of false confession for suggestibility, for compliance, things like that.

Q. Can you just briefly explain to me what personalities traits might be relevant to the subject matter coerce- -- or sorry.

Can you please explain to me or identify to me personality traits that might lead someone to provide a false and coerced confession?

A. Well, it's not the personality traits lead someone to provide a coerced or false confession, it's that they make somebody more vulnerable to interrogation pressure or stress or coercion, and so they increase the risk.

So I'm not -- so that's just kind of -- the premise of the question, I'm not sure if I answered the question. Can you repeat the question?

Q. No, I appreciate that clarification. So can you identify to me what personality traits -- personality traits make someone more vulnerable to providing a false and coerced confession?

A. So there be age. There be intellectual

Page 35

ability/disability. There would be mental illness. And then there would be other personality traits such as what's called suggestibility and compliance. Those would be the main categories that make someone more vulnerable to making or agreeing to a false confession in response to interrogation pressure, stress, or coercion.

Q. Gotcha. And you indicate that there might need to be some testing done in order to indicate whether someone has these personality traits. Is that -- did I understand that correctly?

A. Not exactly. What I'm saying is that there is sometimes specialized testing, particularly for people who don't fall into the age demographic or have intellectual disabilities or have forms of mental illness, and so they're not in those categories. And sometimes forensic psychologists will test those individuals or can test individuals in those categories for personality traits that are called suggestibility, incompliance that are associated with an increased risk of making or agreeing to a false confession.

And so those tests can be revealing

Page 36

or helpful particularly if someone is not one of the three categories, but even if somebody is.

Q. Were any of those tests conducted on Mr. Gonzalez?

A. To my knowledge, no.

Q. Okay. Have you performed those tests yourself in other matters?

A. No. I'm a social psychologist. Those tests would have to be performed by a licensed forensic or clinical psychologist.

Q. So do you have any data that Mr. Gonzalez was subject to suggestibility or compliance?

A. Testing, no, I don't.

Q. Okay.

A. Not that I recall.

Q. Okay. And in this matter, Mr. Gonzalez was in his mid-20s during the time of -- strike that.

In 1990, Mr. Gonzalez was in his mid-20s?

A. Okay. I didn't recall his specific age. Where in his mid-20s?

Q. I think he was born in 1970, but give

Page 37

me one second here. Well, let me strike this.

For the age issue, in terms of personality -- or strike that.

For the age factor that's relevant for personal factors, what age, specifically, does a person have to be -- fall into in order to be subject to -- to that personal risk factor?

A. Well, primarily, 18 and under. But in the last couple decades, there's been research that the brain continues to develop into the early and mid-20s, and so it could be relevant at that age because the development of the brain is associated with psychosocial immaturity, which is the basis for the personality traits of somebody who is a juvenile that makes them at greater risk as a general matter.

Q. And I was somewhat misspoken earlier. Mr. Gonzalez was age 31 at the time of this criminal investigation. So being at age 31, does he fall under the prism of being -- of age being a personality risk factor?

A. No.

Q. Okay. Did Mr. Gonzalez have an intellectual disability?

Page 38

A. I -- I don't recall if I reviewed any documents indicating that.

Q. Did you identify any mental disability that Mr. Gonzalez suffered in your report?

A. I don't believe so.

Q. Okay. And similar question, did Mr. Gonzalez have a mental illness?

A. Not that I recall.

Q. Okay. Did you identify any personality -- I'm sorry. Strike that.

Do you identify any personal risk factors for Mr. Gonzalez?

A. I'm just reviewing the first eight opinions. Give me just a second.

Q. Sure. Take your time.

A. I did not.

Q. All right. Did you review any of the criminal proceedings of Mr. Cruz's case?

A. Unless they were exhibits to the depositions, I -- I don't recall reviewing them.

Q. Okay. Do you recall that Mr. Cruz pled guilty to the -- participating in the Wiley brothers' murder?

A. Yes.

Page 39

Q. Are you aware if that conviction has been overturned or not?

A. No. As I sit here today, I don't recall whether it has been overturned.

Q. Have you seen any documents indicating that that conviction is not -- is no longer intact?

A. I don't recall unless these documents were in the exhibits.

Q. Now, before we move on to another section, you mention that there's a potential mis- -- there could be potential mistakes in the materials reviewed, basically, that there might be documents that you did review but were not specifically mentioned in this report; is that a fair summary?

A. It's certainly possible. It's possible in any report that I do, yes.

Q. Okay.

A. I'm not aggravating mistakes, but it's a possibility.

Q. Do you often mistakenly leave out documents reviewed in your reports?

A. To my knowledge, no.

Q. Okay. So fair to say that Section 2 is

Page 40

a -- very likely be an accurate reflection of all the documents you reviewed?

A. That would be my presumption, yes.

Q. All right. We can move on, Dr. Leo. If you could turn to Page 20 for me of your report. Let me know when you're there.

A. Okay. I'm there.

Q. All right. I'm just going to read the first sentence of that first paragraph, and let me know if I read it correctly. You say, Police interrogation is a cumulative, structured, and time-sequenced process in which defendants draw on an arsenal of psychological techniques in order to overcome a suspect's denials and elicit incriminating statements, admissions, and/or confessions; did I read that correctly?

A. Yes.

Q. Okay. I want to focus on the last part of that sentence where you say incriminating statements, admissions, and/or confessions. Do each of those phrases, statements, admissions, and confessions have different definitions?

A. Yeah, they do. An incriminating statement is less than an admission, which is less

Page 41

than full confession.

Q. Okay. Can you just generally define for me what a confession is?

A. Yeah. To a social scientist, a confession would be an admission, I did X, the underlying act, plus an explanation or narrative account of how and why the person did that underlying act.

Q. And that's a generally accepted definition in your field; is that fair?

A. To my knowledge, yes.

Q. And, similarly, can you provide a definition of what an admission is?

A. An admission would be saying I did X, the act, the under- --

Q. Oh, go ahead. Sorry. I didn't mean to cut you off.

A. Yeah. Just the underlying act, I did X, the underlying act.

Q. Okay. So it does not include that second part that is often found in a confession?

A. Correct.

Q. Okay. And then can you please define for me what a statement is -- or incriminating

RICHARD LEO, PHD, 12/01/2025                    Page 42..45

Page 42

statement, I'm sorry?

A. Yeah. An incriminating statement would be a statement from which it could be inferred, maybe clearly, maybe ambiguously, that what the person is saying tends to show or can be inferred to show their involvement in the crime or guilty knowledge and/or participation in a crime.

Q. So involvement in a crime, guilty knowledge, or participation in a crime, did I read -- or did I understand that last part of your explanation correctly?

A. Yes.

Q. What do you mean by "guilty knowledge"?

A. Well, that the person might have knowledge or details that can plausibly be inferred as circumstantial evidence of their involvement in or knowledge of a crime.

Q. Okay. All right. If you could turn to Page 34 of your report, please. And just let me know when you're there.

A. I am there.

Q. You're quicker than I am. And this is the beginning section that describes your first opinions; is that fair?

Page 43

A. Yes, though our pagination may be slightly off, but yeah.

Q. Okay. It starts with Section X, The Interrogation Oral Confession Statement of Alfredo Gonzalez on August 23 and 24th, 1990?

A. Yes.

Q. Okay. I want to draw your attention to the first sentence of Section B, Section B being Risk Factors for False Confession in Alfredo Gonzalez's Account; do you see that?

A. Yes.

Q. Okay. So let me know if I read this correctly. Alfredo Gonzalez describes how and why, over the course of approximately 21 hours of custody and interrogation on August 23 and 24th, 1990, Chicago police detectives Reynaldo Guevara and Ernest Halvorsen moved him from adamant denial to orally confessing involvement in the Wiley double murder, a confession statement that Mr. Gonzalez has maintained is false from immediately after his interrogation to the present day. Did I read that correctly?

A. Yes.

Q. Okay. So you are classifying

Page 44

Mr. Gonzalez's court-reported statement as a confession?

A. That's how I'm describing it in the report, yes.

Q. Okay. That's how you're describing the report -- well, let me just ask you more bluntly. Is Mr. Gonzalez's court-reported statement a confession?

MR. ART: Objection to form.

Go ahead.

BY THE WITNESS:

A. You could call it a confession or a confession statement. When I answered the prior question and you asked me about the difference between incriminating statement, admission, or confession, I gave you literal definitions. But the word confession has two possible meaning. One is the description I gave you, an admission plus a narrative that explains how and why the person committed the crime that they admitted. But sometimes the word confession or a confession statement can be an umbrella term that refers to all three of those or any three of those. So it has a double meaning, at least in social science.

Page 45

So whether we call it an incriminating statement or an admission or a confession statement doesn't really matter because, at the very least, it would meet the second definition.

BY MR. CHRISTIE:

Q. The second definition being admission?

A. No, the second definition being that the term confession can be an umbrella term that refers to either incriminating statement or admission or a confession.

Q. Understood. Okay. I just want to get a little bit more precise then so we're on the same page. Under the definition of confession that you provided earlier, and applying that to Mr. Gonzalez's court-reported statement, did Mr. Gonzalez state that he killed the Wiley brothers?

A. No. My recollection --

Q. Okay.

A. -- is he did not.

Q. Okay. So under the definition of strictly confession, Mr. Gonzalez's court-reported statement would not apply to that definition?

A. The way I think about it is that you

Page 46

could have confession with a small C or a confession with a big C. I think you're referring to confession with a small C. So, yes. Under the confession with a small C definition, it -- he doesn't admit to the act of killing and explain how and why he killed the victims.

Under the capital C definition of confession, yes, it's still a confession or a confession statement.

Q. All right. Now I want to go to the, I guess, lower case A for admission. Did Mr. Gonzalez admit and provide any admission of committing the Wiley brother murders in his court-reported statement?

MR. ART: Objection to form. Calls for a legal conclusion.

Go ahead.

BY THE WITNESS:

A. Yeah. My recollection is he did not.

BY MR. CHRISTIE:

Q. So to the third category, incriminating statements, are you indicating that Mr. Gonzalez made incriminating statements in his court-reported statement?

Page 47

A. Statements that could be interpreted and were interpreted as incriminating, yes.

Q. Okay. What statements were interpreted as incriminating in his court-reported statement? And I could pull it up if you need me to.

A. Yeah. I would need to review the document to answer the question.

MR. ART: Objection to the form of the question as well.

BY MR. CHRISTIE:

Q. All right. This is going to be titled Exhibit No. 3.

(Leo Exhibit No. 3 marked.)

BY MR. CHRISTIE:

Q. Dr. Leo, let me know when this document appears on your screen

A. Okay. It's appearing on the screen, but it's blank.

Q. Understood. And I'm just going to put this on the record very quickly. This is CCSAO727 to 736. This is an exhibit from Mr. Gonzalez's court-reported statement -- or sorry, exhibit used during his deposition testimony.

Now, I'm just going to direct you

Page 48

first to Page 2. Do you recall, now seeing a picture on your screen, reviewing this picture in preparation for your report?

A. If it was in the document, I would have reviewed it, but I don't recall as I sit here seeing this picture.

Q. Okay. And same question, you didn't -- you don't recall seeing the back side of that Polaroid photograph with several signatures and a date and time on it?

MR. ART: Objection to form.

BY THE WITNESS:

A. Again, if -- if it's in, I would have reviewed this, but I -- do I recall every single page? No.

BY MR. CHRISTIE:

Q. Now, starting on Page CCSAO30, the court-reported statement, do you recall reviewing this document?

A. Yes.

Q. Okay. And now my initial question before I pulled up this document is for you to identify what statements were interpreted as incriminating for Dr. -- or for Mr. Gonzalez. So

Page 49

I'll just let you review this document, and then you can answer my question when you're done reviewing it; okay?

MR. ART: Objection to the form.

Go ahead.

BY THE WITNESS:

A. But -- I will do that. But the way you phrase the question I can't answer it because you're asking me to interpret how others would have interpreted this as incriminating, and I can't get in their minds. So I could -- I could answer a different question after reviewing the document, but I can't speak for others and how they interpreted the document.

BY MR. CHRISTIE:

Q. Okay. So you can't get into their state of minds on how they interpreted Mr. Gonzalez's court-reported statement; is that fair?

A. Correct. As you've asked the question, yeah.

Q. Okay.

A. Now, there's evidence in the record of how it was represented at his trial, right, how it

RICHARD LEO, PHD, 12/01/2025     Page 50..53

Page 50

was characterized by others, which might be evidence of how they interpreted it, but I can't presume to speak for other people how they interpreted things other than their own words and verbalizations, which are not included in this document.

Q. All right. Before reviewing that document, I just had to pause and ask you a few questions based on your last answer. You mentioned how it was used at Mr. Gonzalez's trial; is that right?

A. Well, how it would have been represented at pretrial and trial, yes, or even post conviction.

Q. Okay. Did the State introduce Mr. Gonzalez's court-reported statement in their case in chief?

MR. CHRISTIE: Objection to form.
    Go ahead.

BY THE WITNESS:

A. I don't recall whether it was introduced in the case in chief.

BY MR. CHRISTIE:

Q. Do you recall that Mr. Gonzalez,

Page 51

though, testified at his own trial?

A. That's my recollection, yes.

Q. Okay. Do you recall whether his testimony was similar to his court-reported statement?

MR. ART: Objection to form.
    Go ahead.

BY THE WITNESS:

A. Well, yes and no. I would have to review them to point out the similarities and differences.

BY MR. CHRISTIE:

Q. All right. And let's go back to the court-reported statement specifically on the issue of whether it contained incriminating statements. Now, you can't identify what others might perceive as incriminating statements, but are you able to identify incriminating statements if I show you that court-reported statement?

A. Yes. But remember, when I gave the definition, I said incriminating statements are statements that could be inferred plausibly as incriminating. So, yes, I can identify statements in the document that could plausibly be inferred as

Page 52

incriminating.

Q. Okay. I'm resharing my screen, and on the screen is Exhibit 3, Mr. Gonzalez's court-reported statement. And, Dr. Leo, just take your time. Let me know when you're done reading the page, and I'll move it down.

A. Okay. I'm gone with Page 1.

Q. Okay. I can get most of Page 2 on there. I can zoom out if you want me to, but it might be hard to read.

A. Yeah. This is fine. Where Mr. Gonzalez says yes, is that the beginning of Page 2?

Q. Yes.

A. Okay. Good. Okay.

Q. And then a little bit left of Page 2 is the last three lines.

A. Okay.

Q. Now, is there anything incriminating on the first two pages that you've seen?

MR. ART: Objection to form.

BY THE WITNESS:

A. Not -- not that I would interpret, no.

Page 53

BY MR. CHRISTIE:

Q. Okay. Moving on to Page 3 starting with, I seen a blue car, and then I'll scroll down to the end when you're done with this section.

A. Okay.

Q. I think there's two or three more lines on Page 3.

A. Okay. Yeah. And now I've read these.

Q. Okay. Were any of things incriminating?

A. I wouldn't interpret them as incriminating.

Q. Page 4 of his court-reported statement. Let me know when you're done reviewing most of that, and I can scroll down for the rest.

A. Okay.

Q. And I think it ends with two more lines. I don't know if you got to read those.

A. Yes.

Q. Okay. Move down to page -- actually, before I move down to Page 5, any incriminating statements in this -- on Page 4?

A. I wouldn't interpret anything incriminating here.

RICHARD LEO, PHD, 12/01/2025                    Page 54..57

Page 54

Q.  Okay.  And then Page 5.

A.  Okay.

Q.  And last three lines there.

A.  Okay.

Q.  Are there any incriminating statements in Page 5?

A.  I personally wouldn't interpret anything as incriminating, but I do think this calls for a legal conclusion because "pull the hoodie up" suggests knowledge that -- that the two other individuals or three other individuals were going to kill somebody, and that might meet an element of a crime that involves vicarious criminal liability, and that's outside my area of expertise.

Q.  Okay.  Fair enough.  In this statement, though, those hoods were not up until after Jose and Fro left the car, and Mr. Gonzalez was still in the car; is that right?

A.  Correct.

Q.  So even if they signaled that it was their intent to kill, Mr. Gonzalez would not have known that until they left the car?

A.  I think that's a plausible inference, yes.

Page 55

Q.  All right.  And then I think we're almost done here.  All right.  Yep.  Two more pages.  If you just read this section for me.

A.  Okay.  I think I read that.

Q.  Yeah.  I think there's maybe one or two more lines.

A.  Okay.

Q.  And similar questions as before.  Any incriminating statements on Page 6 of Mr. Gonzalez's court-reported statement?

MR. ART:  Objection to form.

BY THE WITNESS:

A.  If I -- if I was interpreting this as a fact-finder in the case, no.  But, again, there may -- what he said about the hoodie could be interpreted, depending on the law of crimes involving vicarious criminal liability, as incriminating.

BY MR. CHRISTIE:

Q.  Okay.  Anything else aside from the hoodies?

A.  Anything that could be interpreted of knowledge of what they were going to do could plausibly be interpreted, but I can't speak for

Page 56

others.  And, again, I don't want to opine about the criminal law.

Q.  Okay.  Then Page 7 is the end of the report.  If you just want to give that a read.

A.  Okay.

Q.  All right.  And anything on Page 7 that stands out to you as incriminating?

A.  Not to me, no, but I think the being driven home, somebody else might have inferred guilty knowledge or participation from that line.  But personally, I would not have.

Q.  Okay.  So after reviewing Mr. Gonzalez's court-reported statement to refresh your memory, he didn't at all state that he actually shot the gun that killed the Wiley brothers; is that right?

A.  Correct.

Q.  He didn't have any knowledge that Jose, Fro, and Tino were going to kill the Wiley brothers or kill anybody that night?

A.  Not -- not -- not as represented on the statement, no.

Q.  Okay.  Did he indicate he was in the car the entire time when the murders occurred?

Page 57

A.  Yes.

Q.  In fact, he didn't even see anyone -- anyone get shot, he just heard shots; is that right?

A.  Correct.

Q.  So going back to your report, Page 34 where it indicates that Mr. Gonzalez went from adamant denial to orally confessing involvement in the Wiley double murder, I'm just trying to understand.  Where did he confess involvement in the murder?  Where did you get that from?

A.  I wouldn't say it's a small-C confession, but it was treated as an incriminating statement, obviously used as part of the prosecution's case against him, so that's what I was referring to.

Q.  So your understanding is that the prosecution used Mr. Gonzalez's confession against him?

A.  Unless I'm mistaken, that's my recollection, yes.

Q.  Okay.  I asked you earlier if you recall Mr. Gonzalez testifying at trial similar to his statement, and you referred to you don't

RICHARD LEO, PHD, 12/01/2025                              Page 58..61

**Page 58**

recall?

A.   I don't recall the exacts without reviewing it, but I do believe he testified consistently with it, if I'm recalling correctly.

Q.   Okay.  So if that's -- if your recollection is accurate, then it wasn't the prosecution but Mr. Gonzalez that used his statement at his trial; is that right?

A.   Again, I don't recall who introduced the statement.

Q.   Okay.  Let me -- a better question -- maybe a better question is how did the prosecution use Mr. Gonzalez's court-reported statement against him to further their prosecution of him?

A.   I don't recall specifically without reviewing the trial transcript.

Q.   On your second part of this sentence on Page 34 where it says a confession statement that Mr. Gonzalez has maintained as false from immediately after his interrogation to the present day; do you see that there?

A.   Yes.

Q.   Okay.  Where are you getting -- what evidence are you relying on that he maintained it

**Page 59**

was false immediately after his interrogation to the present day?

A.   That was just my conclusion after reviewing all the documents.  I don't recall, among all the documents I reviewed, where -- you know, what I was basing that on.  Most likely his deposition and probably other documents in the records that I reviewed as well where he's asserted his innocence.

Q.   And -- but at trial, he did not maintain that statement as false if he testified consistent with it; is that right?

MR. ART:  Objection to form.

BY THE WITNESS:

A.   He maintained -- my recollection is he maintained he had no knowledge or participation in this crime.

BY MR. CHRISTIE:

Q.   My question is a little bit different.  Your statement says a confession statement that Mr. Gonzalez has maintained as false from immediately after his interrogation.  And I'm trying to ask whether that's true because Mr. Gonzalez testified consistent with his

**Page 60**

confession statement at trial?

MR. ART:  Objection to form.  Asked and answered.

Go ahead.

BY THE WITNESS:

A.   My recollection -- but, again, I would have to review it -- is that he did testify consistently with the statement at trial but that he also maintained his innocence.

BY MR. CHRISTIE:

Q.   So would you interpret the statement then as exculpatory if he's maintained his innocence and testifying consistently with it?

A.   Personally, to me, there's nothing incriminating in that statement.  But in the context of the trial, that statement was treated as incriminating evidence of his guilt, at least that's my recollection.  And I can't control how others interpret that statement in the broader context of the trial.

Q.   Do you recall what the State's theory was that trial -- or strike that.

Do you recall what the State's theory was in regards to Mr. Gonzalez's role in the

**Page 61**

Wiley brothers' murder?

MR. ART:  Objection to form.

BY THE WITNESS:

A.   Not specifically, no.  I would have to review the document.

BY MR. CHRISTIE:

Q.   All right.  Well, do you recall if they identified him as the actual shooter?

A.   My recollection is they did not.  But, again, I have to review the document.

Q.   And then earlier I mentioned Mr. Gonzalez's pre-sentence investigation.  Do you recall Mr. Gonzalez indicating that report that -- or strike that.

We talked earlier about Mr. Gonzalez's pre-sentence investigation.  Do you recall reviewing that report?

A.   I -- I don't recall whether it was one of the exhibits in the depositions that I reviewed or not.

Q.   All right.  Let me pull this up then and make it easier on both of us.  This will be Exhibit No. 4.

(Leo Exhibit No. 4 marked.)

Urlaub Bowen & Associates, Inc.   312-781-9586

Page 62

BY MR. CHRISTIE:

Q. Dr. Leo, let me know when that document appears on your screen.

A. Okay. I see the first -- the first top of the page.

Q. Okay. And for the record, this is CCSAO706 to 714. Going to Page 1, do you see where it says Exhibit 2, Gonzalez, 2/7/23?

A. Yes.

Q. So if this was attached as an exhibit to Mr. Gonzalez's deposition testimony in the Maysonet matter, you would have reviewed it?

A. Okay. So Mr. Gonzalez's deposition in the Maysonet matter, that's the question?

Q. That's right. Correct.

A. I'm just reviewing the materials reviewed. Yes. All right. So you're talking about Item 26. This is an exhibit to Item 26; is that correct?

Q. That's right.

A. Okay. Yeah. Yes.

Q. You would have reviewed then?

A. I would have reviewed it, yes.

Q. Okay. And as we discussed earlier,

Page 63

you're familiar with these pre-sentence investigation reports; is that right?

A. Yes, I've read many of them over the years.

Q. Okay. I'm going to direct your attention to Page 5 of the PSI or pre-sentence investigation report. If you would just give that a read, and let me know when you've read it.

A. Okay, I've read it.

Q. Okay. I'm going to stop sharing my screen now. Does that refresh your memory as to what Mr. Gonzalez told the probation officer in preparation of drafting the pre-sentence investigation report?

MR. ART: Objection. Form.

BY THE WITNESS:

A. As represented by the -- by the officer who wrote the report, yes.

BY MR. CHRISTIE:

Q. Okay. And according to defendant's version, Mr. Gonzalez's version, is it fair to say that that version is similar to his court-reported statement?

A. Yes.

Page 64

MR. ART: Objection to form.

BY THE WITNESS:

A. Broadly.

BY MR. CHRISTIE:

Q. Broadly. Okay. It's a much shorter summary; is that fair?

A. Yes.

Q. So, again, going back to Page 34 of your report where it says he maintained that statement as false, according to this PSI, he had yet to recant his actual testimony; is that right?

A. Unless, in a different place in the PSI, which I don't believe there is, yes --

Q. Okay.

A. -- to the probation officer.

Q. Do you know when Mr. Gonzalez first said that his statement was false?

A. No, I don't -- I do not know exactly when he said that.

Q. Okay. When you reviewed the documents as indicated in your report in Section 2, do you recall which document indicates the first time Mr. Gonzalez claimed his statement was false?

A. I do not recall, no, but I know that I

Page 65

would have been relying, at least in part, on the -- on his deposition testimony.

Q. Okay. Which was -- and his deposition testimony was several decades after the murder; is that right?

A. Correct.

MR. CHRISTIE: All right. Doctor, we've been going for a little bit over an hour here. I think it might be time to take a quick -- about ten-minute bathroom break, if that's okay with everybody, come back at 11:25 central. I think that's 9:25 your time, Dr. Leo?

THE WITNESS: Yeah, that sounds good to me.

MR. CHRISTIE: All right. Sounds good.

MS. ROSEN: And can I --

THE WITNESS: Thank you.

MS. ROSEN: Can I just -- we can go off the record.

MR. CHRISTIE: All right.

MS. ROSEN: But I'm going to need to take a break at noon for a call that should last about 15 minutes.

MR. ART: Whenever you need to take breaks is fine with us.

RICHARD LEO, PHD, 12/01/2025                Page 66..69

Page 66

MS. ROSEN: Okay.

THE VIDEOGRAPHER: Going off the record at 11:16 a.m.

(Whereupon, a short break was taken.)

THE VIDEOGRAPHER: This is the beginning of Media Unit 2. We're going back on the record at 11:27 a.m.

BY MR. CHRISTIE:

Q. All right. Dr. Leo, before we went on break, we were referencing the first paragraph in Section XB, and I just had a few more questions on that part, specifically where you say, Gonzalez's, quote, moved him from adamant denial to orally confessing involvement in the Wiley double murder. Where -- what evidence are you relying on to indicate that he orally confessed involvement?

A. I'm sorry. What --

Q. Page 34.

A. -- page are we on? Okay. So which paragraph on Page 4 -- 34, rather, are you on?

Q. It's the first paragraph after Section B starting with Alfredo Gonzalez describes. Just to repeat my question, I'm trying to

Page 67

understand where it says, quote, moved him from adamant denial to orally confessing involvement in the Wiley double murder, end quote, where you're -- what evidence you're relying on to indicate that Mr. Gonzalez orally confessed involvement?

A. Well, he didn't confess involvement in that statement, but it was -- my understanding is it was interpreted as evidence of involvement in the crime which, according to his deposition, he had adamantly denied in the beginning of his very long interrogation. So he was moved to make a statement that he said was false as a result of the interrogation that I believe was -- was considered evidence against him even though he denied any involvement in the crime.

Q. Okay. Who were you referring to when you say they interpreted it as his involvement in the Wiley murders?

A. I don't know. I said it could have been interpreted as having -- his having involvement or knowledge in the Wiley murders.

Q. Okay. So you don't know if the prosecuting attorney, ASA Marek, interpreted it as involvement in the Wiley double murder?

Page 68

MR. ART: Objection to form.

BY THE WITNESS:

A. I don't recall, yeah.

BY MR. CHRISTIE:

Q. A similar question, you don't know if ASA Borowitz, who took his court-reported -- court-reported statement, interpreted it as him confessing involvement in the Wiley double murder?

MR. ART: Objection. Form.

BY THE WITNESS:

A. Correct, I don't recall.

BY MR. CHRISTIE:

Q. And for Ernest Halvorsen, do you know if he interpreted it as involvement in the Wiley double murder?

MR. ART: Objection to form.

BY THE WITNESS:

A. I don't recall.

BY MR. CHRISTIE:

Q. Did you see any -- did you review any testimony by Mr. Halvorsen indicating that -- or sorry. Strike that.

Did you review any testimony from Mr. Halvorsen discussing Mr. Gonzalez's confession?

Page 69

A. I don't believe I reviewed any testimony from Detective Halvorsen unless it was in the trial transcript --

Q. Okay.

A. -- or one of the exhibits to one of the depositions that I did review. But, you know, I'm happy to review it, if you want to put it up on screen, and answer any questions about it, if it exists?

Q. It doesn't, not that particular part. So we will move on. Going to -- because we have a lot to go through, and I don't want to be here all day. So I want to go to the next section. I think we spent enough time on Section B. And do you see where it says physical coercion and abuse?

A. Yes.

Q. Okay. And for this section, physical abuse -- coercion and abuse, which is Pages 35 to 30 -- ending on 36; is that right?

A. Again, our paginations are slightly different. The reason I didn't print out the PDF is because it had all the exhibits. So I printed out a Word version of the document. I can print that out, or maybe when Eileen has her phone call

RICHARD LEO, PHD, 12/01/2025 Page 70..73

Page 70

I'll just print that out so in 28 -- after we resume, after 28 more minutes of questioning, I'll be on the exact pagination as you. But it should be identical.

Q. Yeah. That's fine. I mean, this section starts with once common; is that right?

A. Yes. Yes. So Section 1 -- Subsection 1 of 10B, yes, begins like that, and then it goes until Subsection 2 of Section 10B.

Q. And that Section B1 ends with the physical coercion and violence that Alfredo Gonzalez describes?

A. Yes.

Q. Okay. So we're on the same page. All right.

A. Yes.

Q. For this section regarding physical coercion and abuse, you identify several instances on Page 35 in which Mr. Gonzalez states that he was pushed, hit, punched, struck, and slapped and stomped on by either Detective Guevara and -- or Detective Halvorsen; is that right?

A. Right. Yes.

Q. Okay. For all of these instances, what

Page 71

evidence are you relying on?

A. Well, I'm relying on his account and specifically his account in his depositions. Now, there may have been some exhibits too that I was relying on. I would have to review a list of the exhibits. But I believe I was relying primarily on his deposition -- depositions that I reviewed.

Q. All right. And if you want to, you can go to Page 12, but you indicate in a footnote that there's no objective record of this interrogation; is that right?

A. Correct.

Q. Okay. So for the section on physical abuse, fair to say it's a swearing contest between Gonzalez and the defendants?

A. That's how it might be described academically. But, of course, I'm not a fact witness. I don't know what happened, and I'm saying if we credit Mr. Gonzalez's account, here's what he's describing and here's -- here's what we know based on a body of research about how it could have led to or increased the risk of leading to false compliance and false statements.

Q. Okay. And, again, for this section

Page 72

Mr. Gonzalez's -- you relied on Mr. Gonzalez's deposition testimony taken in the 2020s?

A. Correct.

Q. Okay.

A. But, again, I'm not making any factual determinations here. I'm not a fact witness, as you know.

Q. Yeah. Understood. I appreciate that. I'm trying to understand is there any methodology that you apply to accessory liability of someone who asserts for the first time in a recorded statement that they were physically abused by police officers during an interrogation that occurred well over 25 years ago?

MR. ART: Objection to form.
Answer it if you can.

BY THE WITNESS:

A. Well, I think the question is misleading because I'm not asser- -- or the premise of it. I'm not assessing whether he's reliable or not. That's why I said I'm not a fact witness. I'm simply saying if we credit his account, here's what he says. And then more broadly, here's what we can infer from that based on the body of social

Page 73

science research that I'm an expert in.
So I'm not -- I'm not here to assess the reliability or unreliability of his account. That's beyond the scope of my role in this case.

BY MR. CHRISTIE:

Q. Okay. Fair enough. Let me ask it slightly differently then. Do you look for any corroborating evidence when evaluating Mr. Gonzalez's claim that he was physically abused before reaching your opinion?

A. Well, if there were corroborating evidence, it could be relevant. But I don't look for corroborating evidence in the sense of trying to adjudicate one account versus another.

Q. Now, we're going to come back to this section a little bit later, but I'm going to ask you to skip forward to I believe it's Page 44, which is Subsection 6, threats and promises.

A. Okay. Yes.

Q. And in this section you say that threats and promises significantly increase the risk of eliciting a false and/or unreliable statement, admission, and/or confession; is that right?

RICHARD LEO, PHD, 12/01/2025                              Page 74..77

Page 74

A.   Yes.

Q.   Okay.  How do you -- is there a way to quantify -- strike that.

So you say the term "significantly increases."  How do you reach that quantifiable language?

A.   Well, significantly is really qualitative.  But in the studies of proven false confessions, virtually all of them report some threats or promises, whether explicit, oftentimes, or implicit.  So that's -- that would be the basis, the hundreds of documented false confessions.

Q.   Is there a qualitative scale that determines whether a single threat or promise increases, significantly increases, or extremely increases the likelihood of eliciting a false confession?

A.   No, I think -- if there was a scale, it would be quantitative, and there's no quantitative scale.

Q.   Okay.  So maybe you already answered it, but how do you reach the conclusion then that it significantly increased the risk of eliciting a false or unreliable confession?

Page 75

A.   Based on the research on proven false confessions where we see threats over and over are reported often as the primary or leading factor that lead the individual to falsely confess in response to the interrogation.

Q.   Let me just get this clear.  Is there any methodology that you can apply to a single case to determine whether a single threat, several threats increase or significantly increase the likelihood of a false or unreliable confession?

A.   The methodology is to apply the body of research and its findings and conclusions and what is generally accepted knowledge and then to interpret them in the context of the facts of this case if -- if one version is credited.

Q.   Maybe I'm understanding this incorrect, but when you say it significantly increases the likelihood of a false or unreliable statement, are there certain promises that are more likely to increase the likelihood of a false confession versus other promises?

A.   Well, I would certainly think so, yes.

Q.   Okay.  So when evaluating a single case or several cases where there's different types of

Page 76

promises being made, are you able to distinguish which one is more likely than the other to increase the likelihood of a false and/or unreliable confession?

A.   Well, it would depend on the promises.  But the way you're asking the question, I can imagine benign promises that aren't tangible, and then I can imagine promises that are very coercive.

And also, when you say promises, promises are the flip side of threats.  So whenever you have a threat, you have a promise.  And whenever you have a promise, you have a threat.  Even if one is explicit, the other, at the very least, is very implicit.  So they go together.  And that's why the subheading is threats and promises here.

And so it really would depend on what threats and what promises you're talking about.  They can be arranged along a continuum where some are minimal and trivial and others are extreme.  So, of course, one could distinguish.  But factually, I would have to know what you're -- what you're asking me to compare to answer the question.

Page 77

Q.   Well, I'm just trying to understand if there's a way to measure whether one promise or threat is more likely to increase the -- eliciting a false and unreliable confession versus another promise or threat?

MR. ART:  Objection to form.

Go ahead.

BY THE WITNESS:

A.   There's no mathematical scale or formula, if that's what you're asking.  But, of course, in social science, we look for patterns and we look for data and evidence and correlations and explanations.  And so there is a pattern of the kinds of threats and the kinds of promises that you see -- we see in false confessions.  And based on that, yeah, I'm making a qualitative assessment, applying that knowledge, and that's the methodology.

BY MR. CHRISTIE:

Q.   Now, going back to Mr. Gonzalez's case itself, you describe in the coming pages several threats or promises that were made to him; is that right?

A.   Yes.

RICHARD LEO, PHD, 12/01/2025                                    Page 78..81

Page 78

Q.   Okay.  And one of those threats was that he -- that Detective Guevara would torture Mr. Gonzalez's family?

A.   Well, let's be precise.  Can you direct me to specifically where in the report just so I can see what you're referring to?

Q.   Yeah, sure.  It's Page 46, according to Mr. Gonzalez, that section right there.

A.   Okay.  So what I -- please correct me if I'm wrong.  Where -- because our pagination is slightly off, and I'll correct that during the break.  According to Mr. Gonzalez, Detective Guevara also threatened to physically assault and abuse, are you referring to that sentence?

Q.   Yes, I am.

A.   Okay.  All right.  Yes.

Q.   All right.  And on the scale of significantly harsh threats or promises versus more lenient threats or promises, how would this threat rank?

A.   Well, again, I would say there's no mathematical formula.  But I think this is an extreme threat to physically assault or abuse a

Page 79

family member.  Yeah, I would say this is pretty extreme.  So pretty high up.

Q.   Okay.  Now, Dr. Leo, I'm going to ask you to maybe flip back quite a bit to starting on Page 17 of your report.  Let me know when you're there.

A.   Okay.  Yes, I am here.

Q.   Okay.  And do you see the sentence that says, Significantly, these principles, methods, and findings are generally accepted in the social science community, beyond common knowledge, and therefore numerous courts have repeatedly accepted expert testimony in criminal and civil rights litigation?

A.   Yes.

Q.   All right.  And for the notation where he says -- say it's beyond common knowledge, you cite an article by Saul Kassin, The Psychology of Confessions, a Comparison of Expert and Lay Opinions?

A.   Okay.  Yeah.  So he's one of the authors.  I think he's the fifth author or sixth author on this article.  Yeah.  But you're talking about footnote for where the first author is

Page 80

Alceste, A-l-c-e-s-t-e; is that correct?

A.   Yeah.  I intentionally used Kassin because I did not want to pronounce the first author's name, but I appreciate your clarification on that matter.

     Now, I also want you to flip to Page 19, and let me know when you're there.

A.   Okay.  Yes.

Q.   And do you see the paragraph that starts with, The subject of police interrogation in false confessions is beyond common knowledge and highly counterintuitive?

A.   Yes.

Q.   And then it has a footnote 10; is that right?

A.   Yes.

Q.   And that footnote cites to several articles --

A.   Yes.

Q.   -- and I think maybe a book or two?

A.   Yes.

Q.   Okay.  Now my question is is it beyond common knowledge for a lay person to know that physical torture could lead to a false confession?

Page 81

A.   Not just torture, no.

Q.   Okay.  In fact, fair to say that if we were to go back to footnote 4, where you reference that one article, that that study indicates that lay persons are quite familiar that torture might lead to a coerced confession?

A.   I would have to review that study to confirm that what you're saying is accurate.  It wouldn't surprise me, but I would just have to review it.

Q.   Um-hm.  Give me one second here.  Okay.  Dr. Leo, I'm going to open up what we'll entitle Exhibit No. 5.

     (Leo Exhibit No. 5 marked.)
BY MR. CHRISTIE:

Q.   All right.  Do you see this document on your screen?

A.   Yes.

Q.   And is this the study that you are referencing in footnote 4 of your report?

A.   Yes.

Q.   Do you recall, generally, what this study discussed and the methodology?

A.   Yes.  My recollection is that -- that

RICHARD LEO, PHD, 12/01/2025                                      Page 82..85

Page 82

experts were surveyed in the field, and so -- and they opin- -- their expert opinions were reported in percentages, and it was compared to -- it was compared to what we know about lay opinions on false confessions from survey studies.

Q.   And do you know what the purpose of that study was for?

A.   The purpose was to discern or at least provide data discerning the difference between expert opinion and lay opinion on the psychology of interrogations, psychological coercion, and false confessions.

Q.   Before I open up this report, fair to say you don't recall the exact analysis on the issue of physical coercion or torture?

A.   Yeah.  There were 30 items, I believe, so I would have to review them, yes.

Q.   Okay.

A.   And I would prefer not to rely on my memory when we could just look at the article and I could answer your factual question.

Q.   Right.  And so if I turn to Page 4, that's the survey that was used to -- that was provided to the lay people; is that right?

Page 83

A.   It's not the actual survey.  It's a summary of items on the survey.

Q.   Understood.  And Item No. 28, that refers to enhanced interrogation on torture?

A.   Correct.

Q.   Okay.  So one of the issues that was evaluated was lay persons' opinions compared to experts on the issue of enhanced interrogation or torture?

A.   Correct.

Q.   Yes.  If we go to Page 10.  Sometimes it's just -- all right.  So if I look at Page 10, it states, It is particularly worthy of note, for example, that although they understood the risk of coercion and physical torture and explicit threats of harm and punishment, participants were significantly less likely than experts to appreciate the risk of other techniques.  Is that a fair summary of that report -- that sentence says?

A.   Yeah.  But I don't know why you're referring to it as Page 10.  It's Page 48 of the article; right?

Q.   Oh, I apologize.  Page 10 of the PDF. That's why.  Page 48 --

Page 84

A.   Oh, okay.

Q.   -- of the article.  I thank you. Appreciate that.

A.   Yeah.  I think -- I think you read that part of the sentence correctly.  I don't recall if you read the whole sentence, but, yes.

Q.   Yeah.  I only read part of it because it's rather long.  That indicates that jurors are familiar that torture could lead to coerced confessions?

A.   More familiar, yes.

Q.   And then same with the issue of threats, explicit threats?

A.   Well, explicit threats of harm and punishment as worded there, yes.

Q.   Okay.  And so in Mr. Gonzalez's case, there was an explicit threat of punishment towards family members; is that right?

A.   Yes.  Yes.

Q.   Okay.  So the study would indicate that jurors would understand that that explicit threat may lead to a coerced confession?

A.   I don't think that's right because I think -- I think that we're talking here about

Page 85

explicit threats of physical torture and punishment on the individual, not necessarily on family members.  And, also, there would be a percentage reported earlier in the report -- in the article, and I don't -- I don't know what that percentage is or whether the -- the physical torture -- without reviewing it, the physical enhanced interrogation or physical torture part is broken out separately from explicit threats and promises or the nature of those threats and promises.

Q.   Yeah.  And I will be glad to show you that chart in a sec.  So maybe just let me clarify one issue.  Is it your understanding that explicit threats of harm towards family members is beyond the common knowledge of lay persons in determining that that might lead to a false and coerced confession?

A.   It could be beyond common knowledge or it might not be.  Yeah.  I mean, that -- that's what I would say.

Q.   Do you know of any study that indicates that lay people don't appreciate that a threat to torture a family member might lead the suspect to falsely confess?

Page 86

A. Not specifically, although there are other studies I believe that indicate that only physical torture or certain forms of mental illness make sense to people when they think about why somebody like themselves would -- or people they know would falsely confess in a police interrogation.

Q. Those studies include explicit threats to torture a family member?

A. Not that I recall a specific setting just on that point.

Q. And then I did promise I would show you the chart. Okay. Do you see Page 44 of the article, Page 6 on my PDF?

A. I do, yes. Yes.

Q. All right. And enhanced interrogations are highlighted there. Do you see that?

A. Yeah. Yes, in the middle, yes.

Q. All right. And that had 84 percent of the lay people indicated that that would be a factor that may cause a coerced confession?

A. I don't recall if it said coerced confession. The percentages reported -- the propositions for -- does it say coerced confession

Page 87

in the study or does it say false confession?

Q. Well, I don't want to mince words, but --

A. I'm just trying to get the language of the study.

Q. Sure. I guess I'm just trying to understand that this study indicates that lay persons are familiar that enhanced interrogations may lead to either a false or coerced confession?

A. I believe so, yeah, but the specific language would be in the study. So if it says that, then, yes. We've got 84.1 percent lay people indicating enhanced interrogations and 92.3 percent of the experts, yes.

Q. Okay. And that's one of the smallest differentials between the lay people and experts, according to this study?

A. Yes, it is.

Q. Okay. And then upwards is explicit threats were 81.5 percent of participants responded that that might lead to a coerced or false confession?

A. Correct.

Q. Okay. So fair to say it's pretty

Page 88

common knowledge amongst lay people that a coerced -- physical coercion may lead to a false confession?

A. Yes. I mean, that's one data point, yes.

Q. Okay. And that's -- that's one of the data points you cited --

A. Correct.

Q. -- in your report?

A. Correct.

Q. And similarly, it's pretty common knowledge amongst lay persons that explicit threats of harm may lead to a false confession?

A. Yeah. Can you put that back up real quick?

Q. Which, the report?

A. No, no, the -- the -- what you were just showing me, the chart of the article.

Q. Sure. Give me one sec. Exhibit 5 is on your screen.

A. Yeah.

Q. And explicit threats right here, I'll highlight it for you. Do you see that?

A. Yes. So -- right. So explicit threats

Page 89

81.5, yes. Yes.

Q. Okay.

A. On this -- based on this -- yes. This data point, this study provides a data point, and I cited this study in my report.

MR. CHRISTIE: Eileen, you indicated you have a call at 12:00?

MS. ROSEN: I do.

MR. CHRISTIE: Okay. I'm at -- I'm going to be transitioning to a whole different topic.

MS. ROSEN: Okay.

MR. CHRISTIE: I don't know if this is a -- would this be a good time to take a lunch break? I know, Dr. Leo, it's kind of early for you though. Maybe it's an early break- -- or a late breakfast for you. We can go off the record, by the way.

THE VIDEOGRAPHER: Going off the record at 11:57 a.m.

(Discussion off the record.)

THE VIDEOGRAPHER: This is the beginning of Media Unit 3. We're going back on the record at 12:26 p.m. central standard time.

Page 90

BY MR. CHRISTIE:

Q. All right. Dr. Leo, I want to touch on a slightly different subject now. On Page 1 and 2 of your report, you mention that you have consulted on 2,400 cases involving disputed confessions and/or interrogations and you are an expert in over 430 cases; is that fair to say? Oh, you're on mute, Dr. Leo.

A. Sorry about that. Yes. And those numbers go back to 1996 and 1997.

Q. Okay. And do you recall, in any of those cases, if the criminal defendant whose interrogation or confession you were evaluating testified in their own defense consistent with their disputed confession?

MR. ART: Objection to form.

BY THE WITNESS:

A. I would have to go through those cases. It wouldn't surprise me. But off the top of my head, I can't name a case in which that happened.

BY MR. CHRISTIE:

Q. Okay. In your complete report with the attachments, you attached, as required by the rules, the past four years of cases that you have

Page 91

been an expert on; is that right?

A. Yes.

Q. Okay. And I think you do not have that in front of you; is that right?

A. Correct, I do not.

Q. No worries. And I can pull that document up for you, but in any of those cases that you listed that was a part of your report, were -- do any of those cases include a criminal defendant testifying consistent with their disputed confession?

MR. ART: Objection to form.

BY THE WITNESS:

A. I don't know off the top of my head. I'm not looking at that document. But I know that in some of these Chicago police torture cases that I've reviewed, sometimes the criminal defense attorney has advised the client, according to the client's deposition, to testify consistently with the confession statement.

BY MR. CHRISTIE:

Q. All right. I'm going to open what has been marked as Exhibit 1 with the attachments, which is your report. And let me know when that

Page 92

appears on your screen.

A. Okay. I see it, yes.

Q. Okay. And it starts on Page 173 of the PDF, and it goes to Page 177 of the PDF.

A. Okay.

Q. Now, I'm just going to scroll through, and let me know when you have a chance to look at the cases and just see if those help refresh your memory as to whether any of these cases involved a criminal defendant testifying consistently at trial in their own defense with their disputed confession.

MR. ART: Objection to form. Go ahead.

BY THE WITNESS:

A. I just -- I mean, I would have to review the records of these cases. Off the top of my head, I don't know -- I don't remember whether -- which ones testified and which ones testified consistently or inconsistently with the confession just because there's so many cases.

BY MR. CHRISTIE:

Q. None stand out to you at this point if we were to scroll through the cases?

MR. ART: Objection to form.

Page 93

BY THE WITNESS:

A. I didn't hear the first part of your question.

BY MR. CHRISTIE:

Q. Yeah. Do any stand out to you viewing this document?

A. Well, it depends on what you mean by "stand out." Some of these cases I remember better than others because I spent more time studying them, but I don't recall that specific question. I would have to review these cases to even refresh my recollections about which ones of these individuals testified at trial. And one of these cases, where I testified for the prosecution in federal court, it was -- there was no confession. It was about an interrogation.

So anyway, without -- without reviewing these documents, I couldn't really -- at least in the cases pictured on the first page, and probably on the rest of them, I -- I -- without reviewing the documents, I would not be able to answer the question. I would need to refresh my recollection.

Q. Okay. Is it fair to say that

RICHARD LEO, PHD, 12/01/2025      Page 94..97

Page 94

Mr. Gonzalez's situation is unique in that he testified at his trial and his defense consistently with his court-reported statement?

MR. ART: Objection to form.

BY THE WITNESS:

A. I do not think it's unique for these Chicago civil cases that were criminal cases in the '80s and '90s and even early 2000s because I've seen this before. It might be unique in other parts of the country. I don't know. But in my experience, it's not unique in -- in Chicago.

BY MR. CHRISTIE:

Q. Okay. We can move on now to the section you have titled rush to judgment, I believe, on Page 37 of your report.

A. Yes.

Q. Let me know when you're there.

A. Yes.

Q. Sorry. 36 of your report titled premature and unwarranted and investigation bias.

A. Yes.

Q. Now -- and it's mostly on Page 37. You opine, quote, In my professional opinion, Detective Guevara and Halvorsen demonstrated an

Page 95

extremely rush to judgment and reckless disregard to the truth based on speculation rather than any logic or evidence, a premature and unwarranted presumption of Mr. Gonzalez's guilt, confirmation bias, and tunnel vision. Did I say that correctly?

A. Yes.

Q. Okay. Do you have a methodology applied in the social science circles that led you to this conclusion?

A. Well, yes. Again, the same methodology. I evaluated all the documents that I reviewed. And if we credit Mr. Gonzalez's account and we also credit the accounts of Justino Cruz and Mr. Maysonet and Ms. Bello, all of whom said they were coerced, as documented in the report, all of whom have recanted their statements, there was nothing there.

And there's also a pattern that one sees in the Guevara cases where reports don't mention things or reports appear many months later after the initial interrogation or investigation.

So, yeah, the methodology is reviewing all of the materials and applying my knowledge of the social science literature to the

Page 96

facts of this case, crediting one account or sets of accounts, and then -- and then analyzing and arriving at the conclusions that I do.

Q. Okay. Now, you use the term extremely reckless, and this is going to be similar to my earlier questions, but is there a qualitative scale that you rely on to reach the conclusion that it was extremely reckless?

MR. ART: Objection to form.

BY THE WITNESS:

A. Well, as I mentioned earlier, if there's a scale, it wouldn't be qualitative, it would be quantitative, right, it would be a number, whereas this is an adjective. And, no, I would just say, in my opinion, this is extremely reckless. And I would base that on more than 30 years of experience and not -- you know, of the 2,400-cases that I've consulted on, that's a small portion of the cases that I've studied.

And when I said consult in that part the report, I don't mean phone calls. I mean, like, there's more than 2,400 cases where I've reviewed materials as a consultant or expert witness, and then there's all the the other cases

Page 97

in the last 30 years, hundreds if not thousands, that I've studied. And these really stand out. It can't be emphasized enough how extreme the Chicago situation is.

And so when I say extremely reckless, it's my professional judgment. It's not a mathematical thing, it's not based on some quantitative scale, it's based on the totality of my knowledge and my experience and my research and my publications. And I have no doubt that this is extreme. What happened in Chicago in the last three decades in so many cases, dozens, hundreds of cases with all these allegations is absolutely extreme.

BY MR. CHRISTIE:

Q. So is part of your analysis then in reaching the conclusion that Detective Guevara and Halvorsen's conduct was extremely reckless relying on other pattern and practice evidence?

A. Well, no. So, again, I'm not a fact witness. I just want to make that clear. I'm relying on what occurred in this case. But I'm saying if you look at it more broadly, then there's no question that there's a pattern here, and that

RICHARD LEO, PHD, 12/01/2025                    Page 98..101

Page 98

pattern is extreme.

But this conclusion right here precedes the pattern and practice section. So just on the accounts of Mr. -- Mr. Gonzalez, Mr. Maysonet, Mr. Cruz, and Ms. Bello, and focusing here specifically on Mr. Gonzalez, in my opinion this was extremely reckless. There was no fact basis independent of these individuals alleging extreme coercion. There was no independent evidence linking Mr. Gonzalez in any way to this crime, and that's what one normally sees in a criminal investigation, some clear, meaningful evidence or potential evidence that draws somebody into an investigation.

Q. Now, I want to move to the second sentence of this page, Page 37, where it starts with, If one credits. Do you see that?

A. Yes.

Q. Okay. So in part of your routine, the conclusion that there was a rush to judgment, relies on if a jury credits the accounts of Gonzalez, Cruz, Goossens, Maysonet, and Bello; is that right?

A. Well, yeah. But in the report I didn't

Page 99

say if a jury credits, I say if one credits; right?

Q. The fact -- which, in this case, would be the fact-finder; right?

A. Right. I just didn't know in your question if you were kind of using the word jury historically in the sense of the criminal trial. I -- it didn't dawn on me that you were -- you're referring to a future jury if this case goes to trial?

Q. Yeah. And I appreciate that clarification. Yeah. I'm referring to a future fact-finder presumably --

A. Okay.

Q. -- a jury, if this -- if it -- if they, the jury in the future, would credit Mr. Gonzalez, Cruz, Goossens, Maysonet, and Bello's testimony; is that right?

A. That would still be my opinion, yes.

Q. Okay. And for all these individuals you've named, are you referring to their deposition testimony provided in the Maysonet and/or Gonzalez matter?

A. I believe so, unless there are other relevant materials in the materials reviewed that I

Page 100

was considering when I wrote the report. But those were the primary bases for -- for their accounts.

Q. Okay. And then the rest of this paragraph goes on to list some evidence that you have identified, which led to the conclusion that this was a rush to judgment; is that a fair characterization?

A. Yes.

Q. Okay. So I kind of want to take this piece by piece. You mentioned midway through the paragraph, same quote, The only witnesses to the murder of Torrence and Kevin Wiley were earwitnesses, not eyewitnesses, Alma Precero and Carmen Macias, who were sisters; is that --

A. Yes.

Q. -- right?

Okay. And according to the next sentence, all they heard was some arguing, someone say Lulu or Lulu Dog, and I'm going to kill you first; is that right?

A. That's what's written, yes.

Q. Now, you make some mention of this issue of Lulu Dog, who is Lulu Dog; is that right?

A. Yes. I don't recall who Lulu Dog is,

Page 101

but I -- but, yes, that they heard some mention of either Lulu or Lulu Dog or and Lulu Dog.

Q. All right. And in your -- the next sentence says, quote, Yolanda Wiley, the Wiley brothers' sister, provided police with an address for someone known as Lulu who lived in the vicinity; do you see that there?

A. Yes.

Q. Where are you getting that evidence from?

A. I don't recall specifically, but I thought it was in the record of materials -- the massive record of materials that I reviewed when I prepared this report.

MR. CHRISTIE: Okay. I think we're on Exhibit 6; is that right?

CERTIFIED STENOGRAPHER: Yes.

BY MR. CHRISTIE:

Q. Okay. Dr. Leo, I'm going to open what is entitled Exhibit 6 once my computer cooperates with me.

(Leo Exhibit No. 6 marked.)

BY MR. CHRISTIE:

Q. Dr. Leo, do you see Exhibit 6 on your

RICHARD LEO, PHD, 12/01/2025 — Page 102..105

Page 102

screen?

A. I do, yes.

Q. Okay. And this is, for the record, CCSAO52 or JGS Maysonet 1711. Is this the document that you refer to in reaching the conclusion that Yolanda Wiley provided an address for someone named Lulu?

A. I don't recall if this was the document that I was referring to or not or that was the basis for my sentence in that report.

Q. Is there any way to help refresh your memory as to what you relied on to reach the basis of that sentence?

A. I don't think so because -- without going through all the materials again.

Q. Okay. And do you see here though in this GPR where it says Lulu?

A. Yes.

Q. And it mentions an address; right?

A. Yes.

Q. Okay. And then there's two witnesses, Kevin Wiley and Yolanda Wiley?

A. Yes.

Q. Okay. Does the report indicate who

Page 103

provided this address, either Kevin or Yolanda?

MR. ART: Objection to form. Foundation.

BY THE WITNESS:

A. No. The report does not indicate who -- oh, it says Yolanda Wiley provided police with the address for someone known as Lulu.

BY MR. CHRISTIE:

Q. Where does it say in the report?

A. I thought -- well, it's buried deep in the middle of this long paragraph. There's a sentence that says, Yolanda Wiley, comma, the Wiley brothers' sister -- it looks like it's 10 or 15 sentences down from -- I now -- I now printed out the copy that you're referring to, so our pagination should be identical but 10 or -- so the paragraph begins at Page 37 of the report, right, and 10 or 15 sentences down, halfway into the sentence, there's a sentence that -- that says, Yolanda Wiley -- it begins with Yolanda Wiley, the Wiley brothers' sister, provided police with an address for someone known as Lulu who lived in the vicinity.

Q. Right. And I'm trying to understand where the basis -- or strike that.

Page 104

I'm trying to understand what evidence you relied on to base -- to form that sentence that it was Yolanda that provided police with an address for someone known as Lulu?

A. Yeah. I'm sorry. I wish I could help you. But just given the massive amount of materials and how long ago I reviewed them, I don't remember. And if you show me a document like this one, I just don't remember whether it's what I relied on or I relied on something else for that sentence.

Q. I just enclosed it, but you did see in the GPR I pulled up for you, it did provide an address? It was 1925 North Drake? I can show it to you again if you need to.

A. Yeah. I saw there was an address. I don't remember what it was.

Q. Okay. And -- because in the next sentence of your report, on Page 37, it says, Detective Guevara and Halvorsen did not go to this address or do any investigation into anyone named Lulu or Lulu Dog; do you see that?

A. Yes.

Q. And then the next sentence is, Despite

Page 105

the declaration from Richard Wiley Wortham stating that his sister Yolanda's nickname is Lulu, there's nothing in the police reports to indicate that the police investigation ever learned or established that fact?

A. I see that, yes.

Q. Okay. Now, the address that was on the GPR I just showed you, does that match the address of Yolanda Wiley, in supplemental reports, ones that indicate that the police did know or had some reason to infer that Yolanda's nickname was Lulu?

A. Not necessarily, no.

Q. So it's unreasonable to infer that?

A. I'm a little confused by the question. I think that's a hypothesis, but I don't think it's an inevitable inference.

Q. Okay. So just to backtrack here, and I'll show this to you again. This is Exhibit 6, the GPR. And it says, Lulu, appears to be the last seven digits of a phone number and 1925 North Drake; do you see that there?

A. Yes.

Q. Okay. And does that match the same address as Yolanda in the supp reports? Isn't it

Page 106

reasonable to infer that Yolanda is Lulu?

A. I don't think so because I -- so I -- I don't have enough information to infer anything. I mean, it could be that she lives with 12 other people, hypothetically, and Lulu is one of them; right? Like, there's alternative hypotheses that one can generate from that limited information, and so we can't infer, necessarily, just one thing without more information.

Q. I appreciate that. I'm not asking if there's multiple inferences, I'm just asking if this is one reasonable inference that can be drawn?

A. Right. But when you say "inference," I would just say it's a hypothesis. Because inference sounds like you're reaching a conclusion that that is supported, and I think it's too ambiguous to say that that's -- I think it's more accurate to describe it as a hypothesis in the absence of more information.

Q. All right. Well, back to your point then. What is the basis of you saying that Halvorsen and Guevara did not do any investigation to anyone named Lulu or Lulu Dog?

A. The materials that I reviewed didn't

Page 107

indicate to me that they had. That was the basis.

Q. Okay. And I should just in general say is there basis that the police did not do any investigation anyone named Lulu or Lulu Dog?

A. I don't recall.

Q. Okay. And this Richard Wortham declaration saying that Yolanda's nickname was Lulu, that doesn't help indicate that the Yolanda was Lulu?

A. There's nothing in the police report. I don't recall at what stage the declaration from Richard Wiley Wortham was elicited, so -- but I don't think so because I think it was later in the investigation, but -- or in the evolution of the case.

Q. So your opinion is that the police should have done more to determine this Lulu Dog, even though the address provided in the GPR for Lulu was the same address for Yolanda?

A. Yes, it is my opinion they should have done more.

Q. And what is the basis of that opinion?

A. Well, you're asking me if that's my opinion. The broader opinion is that -- is that

Page 108

they didn't do any meaningful investigation and they rushed the judgment. And the basis for that opinion is that the two earwitnesses heard peo- -- two men arguing loudly with Puerto Rican accents and one mentioning Lulu and Lulu Dog, and so that would seem to be something that should have been investigated.

Q. You said Carmen heard two Puerto Rican voices?

A. I'm just looking at my report. Ms. Precero and Ms. Macias gave -- I'm reading from the middle of that paragraph -- gave detailed accounts of hearing two men with Puerto Rican accents arguing loudly for close to an hour mentioning Lulu and Lulu Dog.

Q. Okay. And that's significant because the Wiley brothers were black. So, presumably, these Puerto Ricans were potential suspects; is that the inference you're drawing?

A. Well, the earwitnesses, yeah, heard -- heard the crime being -- or potentially the crime being committed. I'm not sure what it has to do with race, but they heard these words being exchanged, and that could have been related to why

Page 109

the crime occurred and who committed the crime.

Q. Okay. Well, I'm just trying to understand what the significance of her -- of you reporting that these were Puerto Rican voices.

A. I think it was just part of the description.

Q. All right. Your documents reviewed indicated that you reviewed an investigative report in this case, which was RFC 1 to 66?

A. I don't recall off the top of my head. But if it's listed or it was one of the exhibits, then yes.

Q. All right. Let's go to Page 2 so we're on the same page here. I'm sorry, Page 3, Item No. 24; do you see that there?

A. Yes.

Q. Okay. And that's the investigative file RFC 1 to 66?

A. Yes.

Q. Okay. I'm going to open up what will be titled Exhibit 7.

(Leo Exhibit No. 7 marked.)

BY MR. CHRISTIE:

Q. And just for the record, this is

RICHARD LEO, PHD, 12/01/2025                    Page 110..113

Page 110

RFC-AGonzalez 1 to AGonzalez 66. And I'm going to direct your attention to Page 55. Do you see this supp report on your screen, sir?

A. Yes. Yes.

Q. Yeah. And according to this supp report, it documents interviews with Carmen Macias, Macias (different pronunciations)?

A. Yes.

Q. Is this the document that you're referencing to to support your assertion that these individuals heard two Puerto Rican voices yelling, including saying Lulu or Lulu Dog?

A. Well, the answer would be no because I wasn't referencing any document when I put that in my -- in the page we were just at in the report.

Q. Do you know what record you're relying on for that assertion in your report?

A. No. As I said earlier, I don't remember specifically which document or documents I was relying on when I wrote that.

Q. Okay. If you -- but you did, in fact, review this document because it's part of the documents you stated you reviewed in your report; right?

Page 111

A. Correct.

Q. Okay. And do you see here where it says, Carmen Macias, quote, related that she was awakened around 2400 hours, 24 May '90, by the sound of two black -- two male blacks having an argument. One had a very calm voice. The second had a loud, abrasive-type voice and sounded as if he may have been drunk. Do you see that there?

A. Yes.

Q. Okay. So this report is indicating two male blacks were having an argument, whereas your report indicated that they sounded Puerto Rican?

A. Okay.

Q. So I'm trying to understand where you got the Puerto Rican from.

A. I -- I don't recall where specifically in the record I was drawing from. It's possible that I was wrong, but I just don't recall where in the record I was drawing from that.

Q. Now, the next sentence in your report, on Page 37, says, Nor did Detectives Guevara or Halvorsen follow up with Carmen Macias and Alma Precero or interview the Wiley Brothers' siblings or family members, despite initial reports

Page 112

indicating that the police had gotten the siblings' contact information. Do you see that there?

A. Yeah. Just give me a second. Yes.

Q. Okay. So I just showed you a report indicating that detectives, not Guevara or Halvorsen, but detectives interviewed Carmen and Alma. Are you saying that Guevara and Halvorsen should have done another interview with them?

A. I just don't recall in that report seeing that they had done an interview with them, and I'm not recalling if there was other evidence in the record that they had not been inter- -- that they alleged they had not been interviewed.

Q. Okay. Just so we're clear, the report I showed you indicated that Carmen Macias was interviewed by a Detective Kondal and Ware. Are you saying that --

A. Well, so there was -- I'm sorry. Go ahead. I didn't mean to interrupt you.

Q. No, sorry. You can go ahead.

A. All right. So I'm just a little bit confused. So I guess what I wrote here was that Detectives Guevara and Halvorsen didn't follow up or interview them, right, and now you're saying

Page 113

that a different set of detectives interviewed them.

Q. Correct. I'm just trying to understand the bases of why you're opining that Guevara and Halvorsen should have done follow-up interviews with these witnesses who had already been interviewed.

A. Well, they were the lead detectives on the case; right? I would have to know -- or have my recollection refreshed more too about -- about the interview that was done by the other two detectives. I didn't read that whole report when you put it on the screen.

Q. Well, I mean, another question, what investigative purpose would have been served by interviewing those two witnesses -- re-interviewing those two witnesses?

A. I just don't recall what the first -- what you're saying the interview by the other detectives revealed. But usually homicide detectives who are the lead detectives on a case will interview key witnesses, and these are definitely key witnesses in this -- in this crime. And so I would have to know more about what was

Page 114

revealed from the first interview.

Q. And your basis that they're key witnesses is what -- is based on what they heard?

A. Yes. Because there were no eyewitnesses, and they were the only earwitnesses to the crime.

Q. All right. So they could not have identified anybody as a suspect, based on what they had reported?

A. Well, I don't know. I mean, maybe they could have if -- if there was an earwitness line-up. I -- it's certainly theoretically possible. They might have --

MR. ART: I'm so sorry, Dr. Leo. Go ahead.

BY THE WITNESS:

A. No, no. I was just going to say that they also might have provided -- been able to provide more information. That was it.

MR. ART: I'm going to need to take a five-to-ten-minute break whenever is convenient, Kyle.

MR. CHRISTIE: No, this is fine. We'll pick up from where we left off.

MR. ART: Okay. So it's 1:00 central now.

Page 115

Let's say -- let's say 1:10 central?

MR. CHRISTIE: Sure. That's fine with me.

MR. ART: Great. Thanks, everyone.

THE VIDEOGRAPHER: Going off the record at 12:58 p.m.

(Recess taken.)

THE VIDEOGRAPHER: This is the beginning of Media Unit 4. We're going back on the record at 1:11 p.m. central standard time.

MR. ART: And just before you get started, Kyle, we produced the one-page doc- -- I produced the one-page document that Dr. Leo had in front of him, and then during that break our firm produced the other two invoices.

MR. CHRISTIE: Gotcha. Thank you, Steve. I'll introduce those when I'm done with my questioning.

MR. ART: Okay.

MR. CHRISTIE: Thanks.

BY MR. CHRISTIE:

Q. Dr. Leo, before we went --

(Technical difficulties.)

BY MR. CHRISTIE:

Q. -- the break, Page 37 of your report,

Page 116

Exhibit 1, midway through the paragraph we were mentioning that Halvorsen and Guevara did not follow up with Carmen Macias and Alma Precero --

A. Yes.

Q. -- do you recall that?

Okay. And then the next part of that sentence says, Nor did they, quote, interview the Wiley brothers' siblings or family members, despite initial reports indicating that the police had gotten the siblings' contact information, closed quote. Do you see that there?

A. Yes.

Q. Okay. Did you see any reports with interviews of the Wiley brothers' siblings or family members?

A. I don't recall.

Q. I'll just open up Exhibit -- I think it's 7 again, the investigative file. And, Dr. Leo, do you see that report -- or do you see that exhibit on your screen?

A. Yes.

Q. Okay. And I'm going to direct you to the supplemental report that's RFC 57 and 58, and would you have reviewed this report --

Page 117

A. Yes.

Q. -- is that right?

Okay. And do you see where it indicates interviews with the Wiley siblings?

A. Yes.

Q. Okay. I'm trying to understand, back to your report, why you claim that Detective Guevara and Halvorsen should have asked -- should have re-interviewed the Wiley brother family members?

A. It looks like the -- from this report that very little information was gathered, and potentially there would have been more information. And, again, Halvorsen and Guevara were the lead defendants on this homicide -- double homicide case. So to me, it supported my opinion that they didn't really do any meaningful investigation. They just rushed to judgment and assumed they knew who were involved and then relied on very lengthy interrogations to elicit testimonial evidence, all of which has been recanted.

Q. Okay. Have you seen -- you said potentially -- or that they might have potentially provided more information?

RICHARD LEO, PHD, 12/01/2025                    Page 118..121

Page 118

A. Correct.

Q. Okay. Have you seen any reports or testimony indicating that they did, in fact, provide any helpful and additional information?

A. I don't recall. I mean, I saw what you just refreshed my recollection on, which was very little information.

Q. Okay. So you don't know what information they could have provided, outside of the report I just showed you, if Guevara and Halvorsen did follow up with another interview?

A. Give me just a second. Well, there might have been information that they could have -- they might have had ideas of who might have been out to kill their brothers.

Q. So if the report that I just showed you says Yolanda Wiley does not know who would do this to her brothers, you still believe that there should have been follow-up interviews to see if she did, in fact, know something about who murdered her brothers?

A. Can you put the report back up on the screen?

Q. Sure. I'll highlight the language,

Page 119

too, which I'm referring to. This section right here.

A. I -- I think they could have provided more -- I think that Halvorsen and Guevara could have gotten more information. But, of course, this was not re- -- this was not interviewed -- this was not recorded, so I don't know how long this interview lasted, I don't know what questions were asked. But a key source of information in any homicide is going to be family members of the victims. And from the brief write-up, this appears to have been very cursory.

Q. All right. In the next sentence you say, Nor did detectives Guevara and Halvorsen ever look for a gun that matched the four bullet cartridges found at the crime scene, and it goes on, but I'll get to the next part later. Did I read that first half of the sentence correctly?

A. Yes.

Q. All right. Did you see a report that other detectives did a canvass of the crime scene?

A. I don't recall.

Q. Okay. So if other defendants did a

Page 120

canvass of the crime scene -- or strike that.

Do you know when detectives Guevara and Halvorsen became detectives on this case?

A. I don't recall. Sorry.

MR. ART: Objection. Form.

BY MR. CHRISTIE:

Q. Okay. Do you recall if it was months after the homicide took place?

A. I don't recall. No, you have to refresh my recollection.

Q. Well, if they did come on months after the homicide, and if there was a canvass already done at the scene, what other steps could they have taken to locate a gun in a city of several million people?

A. I don't know. I would have to review the discovery to refresh my recollection on what I was thinking when I wrote that.

Q. The last part of this sentence says, or run DNA testing on a beer can recovered at the crime scene; do you see that there?

A. Yes.

Q. Okay. Now, the State did not request DNA testing on this beer can; right?

Page 121

A. That's my recollection, right.

Q. Did Mr. Gonzalez's criminal defense attorney request DNA testing on a beer can?

A. No. But usually it's the State since the State have the burden of proving guilt, and police are trained to see corroborating evidence of a confession, not to take it as face value. So you would expect the State to do that, not -- not the criminal defense.

Q. Did you see, in any of Mr. Gonzalez's post-conviction proceedings, a request for DNA testing on the beer can?

A. I don't recall.

Q. So why are you saying that Guevara and Halvorsen should have run DNA testing on a beer can?

A. Because if you have a key piece of evidence like that, DNA testing is the gold standard. It's the most probative physical evidence that there is. And, of course, this is a very serious crime. It's a double homicide. Police have resources in those cases they don't have in lesser crimes. So it just seems like an obvious thing that should have been done,

Page 122

especially given the absence of eyewitness testimony.

Q. What evidence from the record are you relying on to indicate that that DNA testing of the beer can could have provided inculpatory evidence of another suspect -- or exculpatory evidence for Mr. Gonzalez?

A. Well, I don't recall what specific document I'm relying on, but we wouldn't know unless the beer can was tested. But the beer can might have yielded information that could have led to suspects that excluded Mr. Gonzalez.

Q. Okay. For several of these pieces of evidence you identify in this paragraph, you don't cite where in the record you obtained these assertions. Is there a reason why you don't cite to the record?

A. These reports take a long period of time, and they're very expensive. And if I cited for every single factual assertion in the report, it would just add a lot of time and a lot of money to the expense of the report, and I personally don't think it's necessary.

The record is what the record is,

Page 123

and I'm not a fact witness, I'm an expert witness, and I'm making opinions based on my understanding of the facts and crediting certain accounts. And if the facts change or there are facts that I get wrong or new facts develop, I'm always happy to consider those and reconsider the opinions that I offer.

So it just -- if I were to cite where I get every single fact in this over-a-hundred-page report, it would just add enormous expense and enormous time that I just don't think is necessary in an expert report from an expert like me.

Q. Okay. But if you did make a mistake in a factual assertion, how are you supposed to be corrected if we cannot show you the record that you relied on?

A. Well, you could show me the factual mistake.

Q. Well, we've gone through some of the records here, and you have mentioned several times that you would have to review the entire record because it's unclear whether you reviewed the GPR or other records to obtain these assertions. So

Page 124

I'm just trying to understand how can he correct you without you reviewing the entirety of the record?

MR. ART: Objection. Form of the question.

Go ahead and answer.

BY THE WITNESS:

A. Well, if I were an attorney, I would -- and I was working on this case on either side, I would know this backwards and forwards. You know, I would have spent thousands of hours, probably, on this case. As you'll see from my billing records, I'm not even sure I spent a hundred hours on this case.

And so if I were an attorney questioning a witness, I would know the records so well that I think I would be able to point to places and say that you made a mistake here or you made a mistake there. That just seems obvious to me. Because experts don't spend as much time getting to know the detailed facts of the case in the way attorneys do.

BY MR. CHRISTIE:

Q. Okay.

A. Also, you know, you're the one

Page 125

questioning me; right? So if you think I made a mistake, the burden is really on you to show that.

Q. Okay. So I want to go back then to this sentence where you say, Yolanda Wiley, the Wiley brothers' sister, provided police with an address of someone known as Lulu, who lived in the vicinity. Do you see that there?

A. Okay. Yeah. You're reading a little fast. Let me just catch up with you.

Q. Apologies.

Apologies to the court reporter too.

A. So Yolanda Wiley, the Wiley brothers' sister, provided police with an add- -- that's the sentence you're reading from?

Q. Yes.

A. Okay. Sorry. Yeah. Who lived in the vicinity. Okay. Sorry. I just wanted to digest that sentence for a second. Go ahead.

Q. All right. And I showed this GPR earlier, and I'll pull it back up. Do you see that on your screen?

A. Yes.

Q. Okay. And that, again, mentions Lulu and an address, and then Kevin Wiley and Yolanda

RICHARD LEO, PHD, 12/01/2025                    Page 126..129

Page 126

Wiley; do you see that?

A.   Yes.

Q.   And I asked is this report that you got the inference that Yolanda said to police that she has an address for someone known as Lulu; do you recall that questioning?

A.   Yes.

Q.   Okay.  And my understanding is you don't recall if this was a report that you relied on?

A.   Correct.

Q.   Is that right?

A.   Correct.

Q.   Okay.  And if this is the only report that indicates where this Lulu lived, would that mean that this is a report that you, in fact, relied on?

A.   I'm sorry.  I didn't catch the first part of your question.

Q.   Okay.  If this is the only report that indicates where Lulu lived and also mentions Yolanda, does that mean that this is the report that you relied on for this assertion in your report on Page 37?

Page 127

A.   Not necessarily, because interpreting your question literally, I don't know that I relied on a report.  It may have been I relied on deposition testimony.  Right?  So only part of the record are reports.

Q.   Okay.  In your materials reviewed, was there a deposition testimony by Yolanda Wiley?

A.   No, I don't see the deposition -- deposition testimony of Yolanda Wiley.  I -- I do see deposition testimony of some of the detectives.  Right?  So it's possible the information came from one of those depositions, but I don't recall, or edits to the deposition.

Q.   Okay.  We can go back to Page 37 where it says, detectives Guevara and Halvorsen single-mindedly presumed Mr. Gonzalez's guilt in the absence of any supporting -- in the absence of any evidence supporting it and set out to prove their presumption of their guilt -- or his guilt through psychologically coercing Jose Maysonet, Justino Cruz, and Rosa Bello into telling them what they wanted to hear; did I read that correctly?

A.   I'm trying to find where in the page you are because I flipped to the materials

Page 128

reviewed.

Q.   Sure.  Page 37.

A.   Right, right.  But where on Page 37?

Q.   Sure.  It's the last sentence of the first paragraph.

A.   Okay.  Very long paragraph.  Yes.

Q.   Okay.

A.   Yes.  It was my -- based on the materials I reviewed, that was my -- that was my opinion.

Q.   How did you conclude that that was the state of mind of Detective Guevara and Detective Halvorsen?

A.   I'm not really making your comment about their state of mind so much as what all the evidence I interpreted showed that -- that they were working backwards from a conclusion.

Q.   Okay.  I want to direct your attention to the last sentence on Page 37, and it bleeds on to Page 38.  Do you see where it says, Mr. Gonzalez had a verifiable alibi on the night of the double murder --

A.   Yes.

Q.   -- at 1:00 a.m.?

Page 129

A.   Oops.

Q.   Okay.  All right.  And then you end that sentence saying that detectives Guevara and Halvorsen never bothered to investigate?

A.   Yes.

Q.   Okay.  Where in the record does it indicate Mr. Gonzalez told detectives Guevara and Halvorsen about this alibi?

A.   Well, the interrogation was not recorded, and I don't recall that that -- this information was put in their police report.

So I have to review.  So according to Mr. Gonzalez, if my memory is accurate, he said he told them during the unrecorded interrogation.

MR. CHRISTIE:  Are we on Exhibit 8?

CERTIFIED STENOGRAPHER:  Yes.

MR. CHRISTIE:  All right.

(Leo Exhibit No. 8 marked.)

BY MR. CHRISTIE:

Q.   All right.  I'm going to show you Exhibit 8, Dr. Leo.  Just for reference, this is Mr. Gonzalez's deposition testimony in the Maysonet matter; do you see that on Page 1?

A.   Yes.

Urlaub Bowen & Associates, Inc.   312-781-9586

RICHARD LEO, PHD, 12/01/2025                    Page 130..133

Page 130

Q. And this is a document you reviewed; correct?

A. Yes.

Q. I'm going to direct your attention to Page 182 and 183 of this deposition. All right. Do you see -- can you please just read to yourself Page 182, and I'll scroll down to Page 183.

A. Okay. This is Mr. Gonzalez, yes, being questioned. Okay. Go ahead.

Q. All right. On to Page 183, and we'll end it on lines -- 183 to Line 19 should be enough.

A. Okay. Yeah. So he doesn't recall, correct --

Q. Okay.

A. -- in his deposition many years later.

Q. All right. And if there's -- okay. Aside from his deposition testimony, do you recall where else you get the assertion that detectives Guevara and Halvorsen knew about Mr. Gonzalez's alibi?

A. No, I don't recall.

Q. Okay. So if they weren't told by Mr. Gonzalez, they could not have investigated this alibi; is that fair?

Page 131

A. If they weren't told, correct, and nobody knew about it, yes.

Q. Okay. Did you see any disclosures by Mr. Gonzalez's attorney disclosing these alibis?

A. Not that I recall.

Q. Okay. Indeed, Mr. Gonzalez testified consistent with his statement that he was present when the murder occurred?

A. At his attorney's direction, yes.

Q. Right. Which is counter to what his alibi is today?

A. Correct.

Q. Okay. You also mentioned that Rosa Bello's statement that she provided to police was false; is that right?

A. Well, she -- that she's recanted the statement. Again, I'm not a fact witness. I'm not here to opine about which statements are true or false.

Q. Yeah. When reviewing Mr. Gonzalez's trial transcripts, you noted that Ms. Bello testified in -- against him?

A. Correct.

Q. Okay. And she testified relatively

Page 132

consistent with her statement; is that right?

A. That's my recollection.

Q. Okay. Where are you getting the assertion that Ms. Bello recanted her statement and testimony that she provided in Mr. Gonzalez's prosecution?

A. I don't recall specifically in which document, but my recollection is that she said she was coerced, that she was threatened that her children would be taken away, and she was at the police station for a very long time before she exceeded to the coercive demands of Detective Guevara and that she subsequently recanted and said she falsely implicated Mr. Gonzalez and it was because of Detective Guevara's threats.

Q. Okay. Dr. Leo, I'm going to show you what's Exhibit 9.

(Leo Exhibit No. 9 marked.)

BY MR. CHRISTIE:

Q. Let me know when you see it on your screen.

A. Okay, I see it.

Q. All right. And do you see this to the

Page 133

deposition of Ms. Bello -- or her last name's not Ms. Bello, Melendez --

A. Correct.

Q. -- May 16, 2024, in the Gonzalez matter?

A. I do. Thank you.

Q. Okay. And according to your report you reviewed this deposition testimony?

A. I believe so. Give me just a second.

Q. Sure.

A. Okay. Yes. 6/16/24. Well, the report says 6/16/24. This says 5/16/24.

Q. Could that have been a potential typo on your part?

A. It could have been if this is the Gonzalez matter, yeah.

Q. I can tell you that this is the only deposition testimony from Ms. Bello in the Gonzalez matter. She testified a few years earlier in the Maysonet matter.

A. Okay.

Q. I'm going to direct your attention to Page 31 of the deposition. This is the condensed version.

Page 134

A.   Okay.

Q.   All right.  And directing your attention to Lines 4 through 12.  Can you please read that to yourself?

A.   Yes.  Okay.  I've read that.

Q.   Okay.  According to Ms. Bello's testimony in the Gonzalez matter, she said that her trial testimony at Mr. Gonzalez's criminal trial was true; is that right?

A.   That's what it seems to say, yeah.  I think it was a poorly worded question.  But, yeah, that's what it seems to say.

Q.   Okay.

A.   The reason I say I think it's a poorly worded question because one could -- it's possible she is just saying she testified truthfully in the deposition.  But I'm not -- I'm not here to argue one interpretation over another.  So I take your question.

Q.   Okay.  So, again, I'm just going to try and understand where you get the assertion that Ms. Bello recanted her statement and testimony against Mr. Gonzalez when her last time she testified she indicated that that testimony was

Page 135

truthful.

A.   I don't recall.  Sorry.  Go ahead.

MR. ART: Objection.  Form.  Asked and answered.

BY MR. CHRISTIE:

Q.   And your answer is you don't recall; is that right?

A.   Correct.

Q.   All right.  If we could turn now to the next section of your report talking about -- it's on Page 39, Section 3, titled Lengthy, in parentheses, Incommunicado Interrogation, Exhaustion and Fatigue; do you see that?

A.   Yes.

Q.   Okay.  And you concluded that Mr. Gonzalez's period of interrogation and custody was approximately 21 hours?

A.   Correct.

Q.   Okay.  And what records are you relying on to reach that conclusion that his -- or strike that.

Before I get to that question, the next line says -- next paragraph starts with saying, quote, Researchers consider the length of

Page 136

an interrogation to include both the time that a suspect is being questioned and/or accused as well as any breaks between questioning/accusation sessions, because breaks between accusation and questioning add to the stress and fatigue of the interrogation and sometimes are used as an interrogation technique itself; do you see that there?

A.   Yes.

Q.   Okay.  And what research are you relying on for the position that researchers consider time in custody and time questioning as the total length of interrogation?

A.   It's just my understanding of other researchers, including myself, in the field how we counted.  I can think of some of the studies I've done, but I think other researchers have saved the same thing.

Q.   Would one of the studies be Inside the Interrogation Room, an article by you published in 1996?

MR. ART:  Objection to form.

BY THE WITNESS:

A.   Probably.

Page 137

BY MR. CHRISTIE:

Q.   Would -- maybe I shouldn't assume.  What research articles have you written in which you define that interrogation includes time in custody and plus time of questioning?

A.   I did a 2004 article with Steve Drizin on 125 proven false confessions.  That's -- that's the one that comes to mind most prominently.

Q.   Okay.  I'm sorry.  How many, quote, unquote, proven false confessions did you review in that study?

A.   125.

Q.   Okay.  Of those 125, do you know how many were you able to determine the exact length of time of the interrogation?

A.   I believe it was about a third.  So there were a lot of them where we didn't have sufficient records.

Q.   Okay.  And do you know what the evidence you relied on for those 50 or so cases to determine the length of interrogation?

A.   Well, it would have been case files that we had on those cases, which varied.  So that would have included police reports, pretrial

RICHARD LEO, PHD, 12/01/2025                    Page 138..141

Page 138

hearing transcripts, trial transcripts, post-conviction materials, potentially. Some files we had more information on than others.

Q. Do you recall if you defined in that article that interrogation means -- interrogation time means the questioning and breaks?

A. I do not recall. I would have to review the article.

Q. All right. I'm going to pull open I think it's Exhibit 10 now.

(Leo Exhibit No. 10 marked.)

BY MR. CHRISTIE:

Q. This is the -- is this the 2004 article titled "The Problem of False Confessions in the Post-DNA World" that you were referring to?

A. Yes.

Q. And if we were to go to Page 50 and 51, I'm going to direct your attention to Footnote 355 which starts on Page 50. I guess I should say it's Page 940 of the actual report. Can you just please read that footnote for me, and I can move out once you're finished?

A. Yeah. I mean, I can read that part of the -- I've already read that part of the footnote.

Page 139

Q. Okay. And let me move on to the next part. Let me know when you're finished.

A. Yes. So I've -- give me just a second here.

Q. Sure. Take your time.

A. Yes. Okay.

Q. Okay. And I want to direct your attention to one sentence in that footnote that says, quote, One potential that concerned us is that lawyers will sometimes report the length of time in custody as the length of actual interrogation; do you see that there?

A. Yes.

Q. So in this report there you're drawing a distinction between time in custody and length of actual interrogation?

A. Yes.

Q. Okay. So this report distinguishes the two; is that fair to say?

A. When you say "this report," are you referring to the article?

Q. Let me rephrase the question. I appreciate the request for clarification. This article is distinguishing between the time in

Page 140

custody versus the time of actual interrogation; is that right?

A. Right.

Q. Yeah. So when you say, Research -- so back to your report on Page 39. When you say, Researchers consider the length of interrogation to include both the time that suspect is being questioned, dot, dot, dot, as well as breaks, that does not appear to be the case in the 2004 article I just showed you; is that right?

A. I don't think so. I think what we're referring to, if my memory is accurate, is that it's the period of custody over which a suspect is being interrogated. So sometimes you'll see situations where somebody is -- is brought into a jail and they're arrested and then two days later the police bring them up to the interrogation room and interrogate them as opposed to a situation where somebody is brought up to the interrogation room and left in there for two days. We would count those differently in terms of the length of the interrogation.

So it's really the period of custody over which the person is being interrogated that I

Page 141

believe researchers are counting. And some that would include time in the interrogation room but not necessarily all times since arrest.

Q. Okay. So the clock starts ticking when the suspect is placed in the interrogation room?

A. Basically, yes.

Q. Okay. Now, in this matter, Mr. Gonzalez reported that he was taken out of the interrogation room either to be filler or to actually participate in the line-up implicating him in a crime. Does that include time in the interrogation too since --

MR. ART: Objection --

BY MR. CHRISTIE:

Q. -- he's outside of the interrogation room?

MR. CHRISTIE: Sorry, Steve.

MR. ART: Objection to form.

BY THE WITNESS:

A. I would say yes because my recollection is that he said he was very sleep-deprived and that -- that he was not allowed to sleep. And so I interpreted it as one continuous process, that there wasn't an artificial break there.

RICHARD LEO, PHD, 12/01/2025                    Page 142..145

Page 142

BY MR. CHRISTIE:

Q. Do you recall somewhere in his deposition testimony that he had several hours of break?

A. I don't recall. I would have to review it, but --

Q. Okay.

A. -- I still interpret it as one continuous interrogation or period of custody for purposes of interrogation.

Q. So if I understand correctly, if he's placed in the interrogation room and provided a couple hours to sleep or nod off, that is included in the total interrogation time?

A. Yeah. Especially in a situation like this where he said he couldn't sleep, where he was in the interrogation room for a long time. And I believe he was cuffed to a chain, a wall or part of a wall for either the whole time or a long period of that time, at least in his account.

Q. Okay. But if he was taken out of the interrogation room for the same amount of hours that he was provided to sleep, that would break off the time of interrogation?

Page 143

A. Potentially. We would have to fill in that hypothetical a little bit more.

Q. Well, if he was placed in a bullpen, would that create a separation, or would that still include time in interrogation?

MR. ART: Objection to form.

BY THE WITNESS:

A. Depends what you mean by a "bullpen." But if somebody is placed in a jail cell and there's a break in the interrogation, then it could be counted separately, but that's not the situation that I interpreted here based on the materials that I reviewed.

And this situation, any way you slice it, is extraordinary. Because in other parts of the country this just doesn't happen the way it happens in Chicago over and over and over again, especially in cases in which Detective Guevara is involved.

BY MR. CHRISTIE:

Q. Okay. And I just want to go back to the question I had asked earlier as to where, in any research article, do you clearly define that police interrogation includes time being questioned

Page 144

and time in custody, including in the actual interrogation room?

MR. ART: Objection to form.

Go ahead.

BY THE WITNESS:

A. I mean, I would have to look it up. I would have to look at some of the articles that I think I might have discussed that, and then I would have to find the page, and then I would have to tell you. Off the top of my head, I don't recall specifically just because I have written so many articles, and some of them are much older than others.

BY MR. CHRISTIE:

Q. Okay. You understand that courts distinguish between time in custody and time in interrogation; right?

A. Well, yes and no. There might be. It depends on which court, it depends on which case, it depends on what factual circumstances. So I don't think it's just black and white as you're saying.

Q. All right. I want to move on to the next paragraph on Page 39, middle of the way there

Page 145

where it says, Empirical studies indicate that the overwhelming majority of routine custodial interrogations last less than one hour; do you see that there?

A. Yes.

Q. And that's cites to Footnote 46, which is your 1996 article, "Inside the Interrogation Room"?

A. Correct, and then another one as well, yes.

Q. Right. A book by Barry Feld?

A. Yes.

Q. Okay. Referring to your article, how many -- did you review -- or strike that.

In that article, is it fair to say you observed several interrogations?

A. Yeah. There were 182 either in person or by videotape.

Q. And do you recall how many police departments of those 182 interviews -- or strike that.

Other than the 182 interviews, how many police departments were involved?

A. Well, three police departments were

Page 146

involved, but they were -- they were interrogations. I wouldn't count them is interviews.

Q.   Fair enough. Were all those police departments in California?

A.   Northern California, correct, yeah.

Q.   Did any of those 182 interviews include violent crimes, such as homicides, arson, robbery?

A.   Yeah. They were all felony interrogations. In the article it breaks it out, I think, by what types of crimes they were, from homicide to sexual assault, kidnapping, physical assault, burglary, robbery, the major felony crime categories.

Q.   Okay. And you concluded in that article, in part, that most interrogations last less than an hour; is that right?

A.   I believe so, yes.

Q.   Okay. And were you accounting for both time in custody and time of questioning?

A.   I was accounting for -- my recollection is time in custody for the purpose of interrogation. So when I said in the report that sometimes letting them stew is a technique, if somebody was brought into the interrogation room

Page 147

and deposited there for 45 minutes and then the detectives come back and interrogate for another 45 minutes, I would count that as an hour-and-a-half, not 45 minutes.

Q.   And then in the next sentence, on Page 39, you say, quote, whereas the combined period of custody and interrogation in most interrogations leading to a false confession is more than six hours; is that right?

A.   Yes.

Q.   And, again, that cites to the 2004 article that I have previously shown on the screen as Exhibit 9?

A.   Correct.

Q.   And you've reached that conclusion based upon about 50 or so of the 187 confessions you analyzed?

A.   Well, that's the citation. There may be other articles supporting that as well.

Q.   All right. I'm referring, though, to this citation. Fair to say that that citation refers to approximately 50 interviews in which you're able to get some sense of how long the interrogation was?

Page 148

A.   Correct. Again, those were interrogations, but yes.

Q.   Okay. And some of those times were based on newspaper articles?

A.   I -- I don't think they were based only on newspaper articles. I think the footnote mentioned that, but I'm not sure we made that judgment just based on newspaper articles. In many of the cases, there were newspaper articles and there were other documents.

Q.   Yeah. And maybe I didn't phrase my question clearly enough. In some of those 50 cases, you obtained the length in time from newspaper articles; is that accurate?

A.   Well, yes. Some of the newspaper articles reported that, but that doesn't mean that we relied on the newspaper articles when coding the cases.

Q.   Let me pull open this article again. Let me direct you to the footnote that we had just previously looked at. I'm just highlighting the language here. In other cases, however, we were only able to -- we were only able to obtain newspaper accounts of the reported length of their

Page 149

interrogation and were not able to independently verify their accuracy. Did I read that correctly?

A.   That's correct. And my read of that sentence is that we did not rely on the newspaper articles because we weren't able to independently verify their accuracy.

Q.   So the 50 or so cases in which you came to the conclusion that false confessions occur when it's more than six hours, that did not include the times you obtained only from newspaper articles --

MR. ART:  Objection.

BY MR. CHRISTIE:

Q.   -- and were unable to verify?

A.   That's my recollection, but -- yeah. I forgot the first part of your -- the first sentence in your question. Can you just read that back or -- what the first part of the -- just the whole question, can I hear that back again?

Q.   I'll just rephrase it because I think it was poorly worded. So on Page 39, you stated that, Interrogations that lead to false confessions -- or strike that.

The combined time period of custody interrogation in most confessions leading to a

Page 150

false confession is more than six hours; right?

A.   Yes.

Q.   Okay.  And you obtained that time, more than six hours, based on the article that I've shown you, the 2004 article; correct?

A.   It's the citation for the assertion that empirical studies indicate, yes.

Q.   Okay.  And that time is based on 50 or so of the 187 false confessions you analyzed, none of which relied on newspaper articles alone for the time of interrogation?

A.   Yes.  Approximately 50 of the 125 cases, and that's my recollection, that we didn't rely on newspaper accounts alone.

Q.   All right.  If you turn to Page 40 for me of this report.

A.   Okay.

Q.   It's the full paragraph that starts with, Lengthy detention and interrogation is a significant risk factor; do you see that there?

A.   Yes.

Q.   And this is going to be similar to my other questions, but is there a methodology that you could apply to come to that quantitative

Page 151

determination that it was a significant risk versus a -- just a risk or a very high risk?

A.   Well, lengthy interrogation is associated with sleep deprivation, which has been written about for decades, as a well-known risk factor for false confession, and it's correlated in these cases, these proven false-confession cases.

And there are also some experimental studies that induce sleep deprivation and get people to make false statements against self-interest.  And then there's a long literature on the effects of sleep deprivation that would explain why people's decision-making and memories and perceptions are weakened and impaired in ways that would make them more susceptible.

And so in my view, it is a significant risk factor.  But there's no mathematical formula, there's no quantitative scale that distinguishes that qualitative conclusion, significant risk factor verse just risk factor.

Q.   Dr. Leo, can you fast-forward to Page 42 of your report, Section 5, discussing false and exaggerated evidence ploys?

A.   Yes.

Page 152

Q.   This is another situational risk factor; is that right?

A.   Correct.

Q.   And you identified a few false -- or strike that.

Can you please define for me what a false evidence ploy is first?

A.   Well, lying to a suspect about evidence that doesn't exist or exaggerating the significance of evidence that doesn't exist or nonexistent evidence.

Q.   So lying or exaggerating about evidence that does or may not exist?

A.   Correct.

Q.   Okay.  Okay.  In this matter Mr. Gonzalez was told about the confessions of -- strike that.

According to Mr. Gonzalez, he was told that the other suspects, Mr. Maysonet, Mr. Cruz, and Mr. Goossens, were identifying him as the shooter?

A.   Correct.

Q.   Okay.  And is that one of the false evidence ploys that you're pointing to?

Page 153

A.   If their accounts of being coerced and falsely implicating him are accurate, we credit those, then yes.

Q.   Okay.  So if Mr. Maysonet was, in fact, telling the truth and police showed Mr. Gonzalez Mr. Maysonet's statement, would that not be a false evidence ploy?

A.   Correct.

Q.   Okay.  And same applied for Mr. Cruz and Mr. Goossens?

A.   Correct.

Q.   So it depends on who the jury believes is telling the truth, Mr. Maysonet or police?

A.   Well, I wouldn't say it depends on who -- okay.  So you're talking about the future jury, not the past jury.  Sorry.  I --

Q.   Correct.

A.   Okay.  So, yes.  If the case goes to trial, ultimately the jury would be the finder of fact.  And so which facts they credit would determine whether or not these were false evidence ploys or not.

Q.   Okay.

A.   For purposes of their decision-making.

RICHARD LEO, PHD, 12/01/2025                                    Page 154..157

Page 154

Q. And are truth -- are truth evidence ploys proper police interrogation tactics, in your opinion?

A. Yeah. We would call them true evi- -- true evidence ploys, yes.

Q. True evidence ploys. Okay.

A. But assuming that they were properly elicited, yes.

Q. Understood. And it is your opinion that it's outside lay people's knowledge that if police lie to them about other statements they obtained from suspects to the suspect that they are questioning that they don't -- that a lay person wouldn't understand that to be coercive?

A. There's certainly some evidence that exists, yes, that lay people don't think of false evidence ploys. I wouldn't say it's coercive, but it has risk factors for false confessions.

Q. And we had looked at some articles earlier about common knowledge or what lay people know and don't know about risk factors. Is that the research you're referencing?

A. Well, that's one piece of research. I would have to review that specifically on this

Page 155

point. But there's -- there's -- that research relied on surveys of lay people and compared it to a survey of experts. There's other research that is surveys of lay people.

Q. Okay.

A. So that article is just one article in a line of research that has an interesting development in it that wasn't present in the prior articles.

Q. Okay. Were you a participant in any of those research articles? Or strike that.

Were you an author or -- of one of those research articles?

A. There's -- yeah. There's a couple of research articles that I was an author in, yes, a couple survey studies, I believe.

At some point I do need to take a lunch break. I don't know, you know, if -- if -- if you have, like, 15 more minutes or -- you know, we could go then. We could close it out. Or we could -- even if you have way more than 15 more minutes, I could still go longer, but at some point I do need to take a meaningful lunch break.

Q. Yeah, I understand. Give me one second

Page 156

here. I can hopefully provide -- I know other attorneys will have some questions. So I'm sure we'll want to take a break. Because at this point I have questions about contamination scripting, your indicia of reliability analysis. So I don't know if it would be a good time to take a 30 -- how much -- how long do you want for a lunch break?

We can go off the record, by the way.

THE VIDEOGRAPHER: We're going off the record at 2:03 p.m.

(Lunch recess taken.)

THE VIDEOGRAPHER: This is the beginning of Media Unit 5. We're going back on the record at 2:54 p.m. central standard time.

BY MR. CHRISTIE:

Q. All right. Dr. Leo, we were on a long break here, but I would like to move on to Page 47 of your report, Subsection 7, titled Psychological Coercion. Let me know when you're there.

A. Okay. I'm there.

Q. Okay. Now, fair to say you used the term psychological coercion several times throughout your report?

Page 157

A. Yes.

Q. Do you know who coined the term psychological coercion?

A. No.

Q. Do you know when it was first used?

A. No. I'm assuming you're referring to human history?

Q. Fair enough. What is -- how do you define the term psychological coercion?

A. If the techniques are such that they are likely to cause a suspect to perceive he or she has no meaningful choice but to comply with the demands or requests of the interrogator or interrogators.

Q. Is there any empirical research that establishes the term psychological coercion so that when you use it you're defining it in the same way that other professional colleagues would define it?

A. I think it's commonly understood. So I'm not sure there is any article that defines it so that everybody uses the same definition. I think it's a widely understood generally accepted definition.

Q. So are you aware whether or not

RICHARD LEO, PHD, 12/01/2025                    Page 158..161

Page 158

different definitions for the term psychological coercion have been used by different -- by researchers in different publications?

A. It's certainly possible.

Q. Okay.

A. It's so well-established that it's not usually the case that a researcher would stop and define the term.

Q. Now, looking at Page 47, you identify one reason psychological coercion was present here, and then if you flip to the next page you provide two more reasons; is that correct?

A. Yes.

Q. Okay. I want to focus first on the first reason that Mr. Gonzalez's confession contained repeated explicit threats and promises --

A. Correct.

Q. -- is that right?

A. In his case.

Q. Okay. That was my next question is to clarify. That's based on Mr. Gonzalez's deposition testimony?

A. Correct.

Q. Okay. And is that the same -- is that

Page 159

repetitive of the earlier sections that talked about explicit threats and promises?

A. Yes, insofar as I'm drawing on that section to explain my conclusion here.

Q. Okay. And if you flip to Page 48. No. 2 has to deal with threats to Mr. Gonzalez specifically by Detective Guevara, that he will end up on death row if he refuses to comply and other perceived threats from Detective Guevara and Halvorsen to Mr. Gonzalez; is that right?

A. Yeah. So you're talking about the end of the second sentence in the second -- in the first full paragraph on Page 48?

Q. Yeah, the one that starts with second.

A. Yeah.

Q. Okay. And, again, is that repetitive of the earlier section discussing threats and promises?

A. Well, incorporated by reference and explained is how I would say it.

Q. Okay. And then the third reason that Mr. Gonzalez asked Detective Guevara and Halvorsen multiple times for a lawyer that was never provided --

Page 160

A. Yes. He was very provided the Miranda warnings, and his -- he describes repeatedly requesting a lawyer and not being provided one.

Q. In his court-reported statement, did you see him request an attorney?

A. No.

Q. Did you see Mr. Gonzalez provide any reason why he could not -- why he did not ask for a lawyer during his court-reported statement?

A. Well, he provided a reason in his deposition for why he didn't or couldn't in his court-reported statement, yes.

Q. Do you recall what that reason was?

A. That he was terrified of Guevara and getting physically assaulted again, and his family had been threatened, and he was broken.

Q. Okay. So your understanding is he requested an attorney multiple times, except for the one time that he was being -- that there was a court-reported statement being taken?

A. At the end -- yes, at the end of the 21 hours, yes.

Q. Do you recall that Mr. Gonzalez indicated in his deposition testimony that he told

Page 161

ASA Borowitz that he wanted an attorney?

A. I don't recall whether he told ASA Borowitz that.

Q. And, again, you didn't review -- or strike that.

You don't recall if you reviewed her felony review folder?

A. Only if it was an exhibit to one of the depositions or included in any of the other materials that I reviewed.

Q. Is the repeated denial of a criminal defendant -- or criminal suspect's request for an attorney considered an area outside the knowledge of a lay person that might lead to an innocent person providing a false and unreliable statement?

A. I don't know if there's been any research on that question in particular. Usually, when we talk about risk factors for false confessions, the denial of an attorney doesn't come up because usually people waive their Miranda rights. And usually when they invoke them, the interrogation is terminated. And we know that because most of the interrogation, among other reasons, are -- in the last 15 years have been

Page 162

recorded. We have a rich body of data, and we have data on the -- prior to that.

So when we think about reasons why people falsely confess, the denial of an attorney is not one of the prominent risk factors. What this really goes to is the issue of psychological coercion, in Mr. Gonzalez's account, and the inability to affect one's will and how that can break somebody down and make them feel hopeless, like they don't have meaningful choice, like they're forced into an act that they don't -- wouldn't otherwise do or say.

Q. And you did not see any motion to suppress filed by Mr. Gonzalez or specifically Mr. Gonzalez's criminal defense attorney; is that right?

A. Correct.

Q. And then in his trial testimony, he, again, did not say that he asked for an attorney during the statement?

A. Correct. He was advised to testify consistently with his statement.

Q. Okay. What coercion tech- -- or did you determine what course of techniques his

Page 163

attorney applied to make him testify falsely to his statement?

A. Well, that's kind of a snarky question. I have no idea what his attorney did or did not do, other than give him advice and what he's reported about that.

Q. Okay. Well, I guess I'm trying to understand because you're saying that Detective Halvorsen and Guevara overbore Mr. Gonzalez's will from denials and compelled him to provide a false statement; is that right?

A. That's his account, yes.

Q. And I'm just trying to understand if you determined if there was any situational risk factors that compelled Mr. Gonzalez to testify to that same false and coerced statement that he alleges?

A. Well, the situational risk factors refer to the interrogation and techniques or practices in an interrogation that increased the risk of eliciting false or unreliable statements. They don't really apply to attorney-client meetings except maybe by analogy.

But, obviously, if you compare the

Page 164

two situations, they're very different. Mr. Gonzalez reports physical abuse, physical threats, threats to his family. He's lied, in his account, repeatedly. He was sleep-deprived. It went on for hours and hours and hours. He was chained to a wall.

So that's dramatically different from the legal situation and any meetings he would have had with his attorney where none of that would have happened, and there would have been a different set of considerations.

So the two situations are not analogous, either in research or in the application to this particular case. And so it's kind of a false analogy to even ask that kind of question.

Q. Was Mr. Gonzalez required to testify at his criminal trial?

A. Well, of course he was not required to. But he's not an especially sophisticated person, and so it's not surprising that he describes following his attorney's advice. And we all know how the quality of attorneys can vary, especially in criminal cases.

Q. Do you know whether Mr. Weiner, his

Page 165

criminal defense attorney, was a competent attorney or not?

A. I -- I didn't -- no, I don't have the information to know whether he was a competent attorney or not.

Q. In fact, he was a privately retained attorney by Mr. Gonzalez; correct?

A. That is correct. But there's conventional wisdom in the field of criminal defense that you rarely put your clients on the stand. And so he might have been bucking that conventional wisdom. I don't know. And there's plenty of examples of criminal defense attorneys who are very good and who are very bad. So that fact alone really isn't that significant.

Q. Well, if he was a really bad defense attorney, Mr. Gonzalez could have just hired a better one, right, since it's --

A. I don't know.

Q. -- private attorney.

You don't know? Okay.

A. Well, I don't know his situation, and I don't know his legal sophistication, so I don't know what resources he had or how well he would be

RICHARD LEO, PHD, 12/01/2025                    Page 166..169

Page 166

able to tell whether or not he had a good criminal defense attorney in the way that all of us would if we ever had to hire a criminal defense attorney. I just don't know. But I don't think people necessarily have that choice. It depends on their financial resources.

Q.   If you could turn to Page 56 of your report, and let me know when you're there.

A.   Okay, 56. Yes.

Q.   All right. And directing your attention to the last paragraph where it says, In addition, one scripting technique that police interrogators use is known as the error insertion trick --

A.   Correct.

Q.   -- in which the interrogator writes out the suspect's confession statement, intentionally inserts minor factual or grammatical errors and then has the suspect correct and initial these errors?

A.   Yes.

Q.   Okay. Did you coin the term "the error insertion trick"?

A.   I did, yes. Yeah.

Page 167

Q.   Okay. When -- oh, sorry. I was going to ask when did you term it?

A.   I think it was in 2008 in the book that I cite there. But people have referred to the same thing, just without that term.

Now, it's possible that I -- it's possible that I -- I believe I coined it in the 2008 book. I would have to double-check. It's possible Richard Ofshe and I might have coined it in the 1990s, but I think it was in this 2008 book.

And for the court reporter, Ofshe is spelled O-f-s-h-e.

Q.   What did you rely on to come up with that term, the error insertion trick?

A.   Well, at that point, in 2008, I had -- you know, I had been two decades into my career as a researcher and professor in this field, and I had reviewed thousands of interrogations, and it was the analysis of those interrogations empirically.

But this is also something that's been recommended in police training manuals, and so they've been very explicit about it. I believe it's in the Reid, R-e-i-d, Manual, which, of course, is the leading manual, going back decades

Page 168

saying to do this.

And, of course, as you know, probably, Reid is Chicago-based. So whether we call is the error insertion trick or we call it something else or we don't call it anything, it's, A, been part of police training -- police interrogation training -- leading police interrogation training for decades; and, B, empirically observed in studies by scholars. And in my case, in hundreds of interrogations --

Q.   Okay.

A.   -- of the many thousands I had reviewed up to that point and since.

Q.   All right. And you continue on in that paragraph saying, In my professional opinion, the only logical inference from these facts is Detective Guevara, Detective Halvorsen, and ASA Borowitz intentionally scripted these corrected error insertions into Mr. Gonzalez's statement. Did I read that correctly?

A.   Yes.

Q.   Okay. Now, neither Guevara, Halvorsen, or Borowitz typed up Mr. Gonzalez's court-reported statement; correct?

Page 169

A.   Can you repeat that question?

Q.   Yeah. Neither Guevara, Halvorsen, or ASA Borowitz typed up Mr. Gonzalez's court-reported statement; correct?

A.   Correct. The court reporter did, yeah.

Q.   Okay. Did you see any testimony from the court reporter indicating that he or she intentionally injected errors into the statement?

A.   Well, no, but the court reporter is not the one that does it. They're not the one who's trained to do it. It would be -- it would be the police or possibly prosecutors.

Q.   But if the court reporter is the one typing up the statement, they would have to be the one that also intentionally makes incorrect parts; right?

A.   No, no, no. Because the error insertion trick is written corrections. Right? So the written corrections after the statement is typed up that the interrogator reviews with the suspect and then has the suspect initial.

Q.   Right. But that would be -- they are correcting statements that are misspellings or incorrect terms; right?

Page 170

A. Right.

Q. So that was -- incorrect spellings or terms would have to be done by the court reporter?

A. Well, it could be the correct spelling. It could just be a different type of correction. But, yes, if it's -- they're correcting something on the statement.

Q. Okay. Is there any --

A. It could be the correct -- it could, for example, the correct transcription of an address, but it's the wrong address, and so it's scratched out and a new address is written in. That's just a hypothetical example.

But the proof is in the pudding. Let's look at the statement and go through it, and then we can talk about it. And let's look at the other statements too because it happened in all of these.

Q. So I will open up Exhibit No. 3, which is the Gonzalez court-reported statement. I'm just going to jump straight to Page 2 of the statement, which is CCSAO731. Do you see that on your screen?

A. Yes.

Q. All right. And the correction is on

Page 171

the bottom third of the page where it says, What were yo doing, with yo crossed out and you being written in?

A. Yes.

Q. And is that an example of an error insertion trick?

A. I think it probably is, but I also think we need to look at the whole document.

Q. All right. But as for this example, where it says yo, the court reporter, if this was an error insertion trick, would have to have intentionally misspelled you?

A. Not necessarily. It could have just been a typo.

Q. Okay. So if it was just a typo, then this was a fair mistake to correct?

A. Yeah, it's a fair mistake to correct. But the point is that the police are trained to do this, and they do it, especially in Chicago, especially in these types of cases.

Q. Right.

A. And --

Q. And I -- oh, go ahead. I don't want to cut you off.

Page 172

A. No. I'm sorry. So, yes. So this could have been an innocent correction. But I think if you look at the pattern, you look at the totality, I think it's unmistakable in this case and the other ones that I write about in the report, and the other reports, other cases I've done on Guevara, that this almost invariably comes up.

Q. Okay. I --

A. Things are not true by chance, even if one of them is. So this one, yeah, this could be an innocent correction. That's possible.

Q. Okay.

A. But it doesn't change my opinion.

Q. I just want to focus on Mr. Gonzalez's court-reported statement for right now and not the totality of the statements taken in Chicago police history. So this is one error that's corrected. I want to make sure I didn't skip over any.

Okay. And then the next one is on Page 3 of the report, CCSAO 732. Do you see it's about halfway down where it says --

A. Yes.

Q. -- dark-glue hoodie and glue is crossed

Page 173

out and blue is put in?

A. Yes.

Q. Okay. And is this an example of an error insertion trick?

A. It could be.

Q. Okay. So you don't know if the court reporter intentionally wrote glue when he or she should have wrote blue?

A. Correct. I don't know.

Q. Nothing on Page 4 of the report. And then Page 5 of report there's a correction on the top-third where it says when yougot. And when yougot, there's no space in between that; right?

A. Correct.

Q. And next to it is tothe, and tothe does not have a space; correct?

A. Correct.

Q. Is this an error insertion trick?

A. Could be.

Q. Okay. So the court reporter would have to intentionally fail to put spaces in between those two words?

A. No. No, no. I don't think it -- I don't think it requires any- -- anything on the

Page 174

part of the court reporter necessarily.

Q. Well, how are police who are trained to do these error insertion tricks -- how are they supposed to do it if they don't have the cooperation of the court reporter to make errors?

A. Well, they either make -- they either find errors or they insert errors. And they get the initials. Because as they're trained in the -- in their training manuals, they want to use this to say that the concession was both voluntary and reliable.

Q. Okay. So they either find errors or they insert them --

A. Correct.

Q. -- did I hear that correctly?

Okay. Did they insert any errors here, since you're not the ones that typed up the court-reported statement?

A. Well, it wasn't necessary to draw those lines between those two words. Yeah, they're typos, but to me this suggests they were looking for typos to replicate error insertions for the same reason that they're trained to use the error insertion trick.

Page 175

Q. And you indicate that the police are trained on this method; right?

A. The -- yeah, police are trained on this technique, yes.

Q. What about Cook County state's attorneys? Are they trained on this technique?

A. I don't know if Cook County state attorneys are trained or trained at the time on this or if they learned it or did not learn it from the -- the police that -- whose investigation they became part of when they coopted, in part, the taking of confession statements, which is traditionally an investigative function, not a prosecutorial function.

Q. Gotcha. But you indicate, on Page 56 of your report, that it was Guevara, Halvorsen, and ASA Borowitz that intentionally scripted these corrected errors; right?

A. Yes.

Q. So did you see any testimony from ASA Borowitz that she intentionally scripted these corrected errors?

A. I don't recall.

Q. Okay. And if you look on the exhibit

Page 176

on your screen, the court-reported statement, for this error you see two initials; correct?

A. Yes.

Q. Okay. AG for Alfredo Gonzalez?

A. Okay.

Q. And then do you see the ones of Ms. Borowitz, ending with B?

A. I can't really read it. Is it JB; is that what it is?

Q. Or does it look like Guevara's? Does it look like a G for Guevara?

A. I can't even tell what it is.

Q. All right. I'm just trying to understand. You're saying this is a police technique, but I don't see the police officer's initials here, and I'm not --

A. I just -- sorry. I didn't mean to cut you off.

MR. ART: Wait. Hold on a second. Objection to form. Is there a question?

MR. CHRISTIE: Yeah. I -- Maybe I should rephrase it.

BY MR. CHRISTIE:

Q. But it seems like you didn't

Page 177

understand, so you were going to ask for clarification, Dr. Leo?

A. Yeah. I -- yeah. I was just confused. If -- if -- if you are presuming that that's somebody's signature that can read or initials, then just if you could let me know, because I -- I was just guessing at what those letters are.

Q. Sure. Well, if ASA Borowitz testified that that was her initials, that would indicate that those are Alfredo Gonzalez and Jennifer Borowitz's initials and not anywhere on that statement is Guevara's initials that I'm showing you; is that right?

MR. ART: Objection to form.

BY THE WITNESS:

A. Presumably, that would indicate it's hers, yes, not his.

BY MR. CHRISTIE:

Q. Okay. So, again, I'm just trying to understand what evidence you're relying on that Detective Guevara or Halvorsen intentionally scripted these corrected errors into Mr. Gonzalez's statement when it is ASA making these corrections?

A. I think that the "and" in that sentence

Page 178

was meant to be an and/or. That's my best recollection. And so I think that would explain the discrepancies.

Q. Okay. And back to that statement. You're saying the only logical inference from these facts is Guevara, Halvorsen, and/or Borowitz intentionally scripted these corrected errors?

A. That's what I wrote, yes.

Q. Okay. But we just discussed that some of these errors actually just might be mistakes?

A. They might be typographical mistakes that were looked for and replicated error insertions, yes.

Q. So that's -- to your point that this is the only logical inference, you would agree that there's actually another inference that could be drawn too?

A. I would, yes.

Q. Okay.

A. I still -- I still think that that's a reasonable inference, but, yes, that's certainly possible.

Q. Okay. Briefly, have you ever investigated a crime before?

Page 179

A. No. I'm not a police officer.

Q. Okay. Aside from issues involving confessions, have you published any articles regarding police investigations more generally?

A. Not more generally. Police investigation is part of the -- in the context of police interrogation and confession taking and wrongful convictions and errors that police make at multiple stages of police investigation. But something just independently on police investigation, out- -- outside of those contexts, no, that I can recall.

Q. We're almost done here. If you could turn to Page 61 of your report. And this is the indicia of unreliability analysis of Mr. Gonzalez's oral confession statement?

A. Yes.

Q. All right. And can you just please explain to me the methodology you apply when conducting this indicia of unreliability analysis?

A. Well, in the first paragraph there on Page 61, under Section E, I describe what researchers and experts use in the field to assess the likely reliability or likely unreliability of

Page 180

interrogation-induced statements. And then -- and then we just apply that in evaluating the case. So it's an application of, essentially, that standard to the facts of the particular case, and that's what I did here.

Q. We went over some of these facts earlier, such as bullet point 3, discussing Lulu Dog; is that right?

A. Yes.

Q. And next bullet point discusses Mr. Maysonet's and Mr. Cruz's recanted confessions; correct?

A. Yes.

Q. Now, you're relying on their recantations, as discussed in their deposition testimony, to indicate that Mr. Gonzalez's testimony -- or Mr. Gonzalez's confession is unreliable?

A. Yeah. But I'm not opining that his confession is unreliable. I'm opining that -- their indicia unreliability. And, yes, this is if we credit Mr. Maysonet and Mr. Mr. Cruz's accounts, yes.

Q. Okay. And for Ms. Bello, indicates

Page 181

that she has recanted her statement implicating Mr. Gonzalez?

A. I recall in the materials I reviewed that she had, yes. I'm aware that you asked me about that deposition question, and you -- deposition expert. My recollection is there's other evidence in the record where she clearly did recant the statement implicating Mr. Gonzalez as the product of coercion and is false.

Q. Okay. If Ms. Bello does stand by her criminal trial testimony, would that be an indicia of reliability for Mr. Gonzalez's statement?

A. Yes, if -- it would be if -- if she stood -- if she said that, that would be. But then we would have to look at the circumstances of the situation in which that statement was made and evaluate whether or not it was likely reliable or not. So I would say possibly, yes.

Q. And I'm sorry. The last part you said the reliability on which it was made, did I hear that correctly?

A. Yes. So I'm just thinking about eyewitness-identification-type statements or statements that are elicited by police after

Page 182

12 hours of overnight interviewing/interrogation. And just thinking about the eyewitness context, we know that just because somebody says they witnessed something -- and here I'm talking abstractly to explain why I answered the prior question the way I did. Just because somebody says they're an eyewitness doesn't really tell you that that's an indicia of un- -- of reliability, right, because it could have been they were right there five feet away, and they've known the person all their lives. Or it could be, you know, they didn't have their glasses on, they have 20/200 vision, it was at night, they were 65 feet away, it was somebody of the opposite race.

So the mere fact of an eyewitness identification, or even a police-induced statement, doesn't automatically tell you it's reliable. And so that's why, in thinking through my answer to your question, I said potential indicia of reliability.

If, at the civil trial, if the case goes to trial, she were to say -- she were to implicate Mr. Gonzalez, then, yes, I would -- I would want to evaluate the circumstances from which

Page 183

that statement was elicited before I said it's automatically an indicia of reliability.

Q. Okay. And then if you turn to Page 62, you make a note about comparing the statements from Mr. Maysonet and Mr. Cruz to Gonzalez and finding that there was inconsistencies within those statements?

A. Yes.

Q. For example, Maysonet and Cruz identify Gonzalez as one of the participants, or the shooter, whereas Gonzalez says he was in the car?

A. Yes.

Q. Okay. In your practice, do you find it common that suspects minimize their role or point to other co-offenders to exaggerate their roles?

A. Well, that presumes they're guilty. And, yes, sometimes that happens, and sometimes it's the product of police minimization in the interrogation. But a lot of the proven false confessions, I think it was 30 percent in that 2004 article, are multi-defendant proven-false-confession cases.

And in those cases, one of the indicia you often see is one person's incriminating

Page 184

or inculpatory statement does not match up with the others, sometimes even on very small details. And so that's why I think this is an indicia of unreliability, if we credit those accounts. It fits a pattern that's recognized elsewhere.

Q. Okay. It's your understanding, based on the accounts of Mr. Maysonet, Cruz, and Gonzalez, is that they were physically tortured, along with other situational risk factors, to provide false yet inconsistent statements?

A. Yes, partially inconsistent statements. Their accounts are they were physically assaulted, physically abused, and that their statements were fabricated, and that fabrication was the product of feeding and coaching and scripting by Detective Guevara, primarily, and that those accounts were not entirely consistent.

Q. Would your conclusion be any different if all of their statements were similar?

A. Well, if all of their statements were identical, then I -- I don't think I would say that's an indicia of unreliability. If they explained in their account that all of their statements were identical because they were coached

Page 185

identically, then I would say, if we credit their account, this is an example of contamination and scripting. But I -- I -- if they were identical, I don't think I would have put it in this section as an indicia of unreliability. And, of course, there's many indicia of unreliability that I list, in addition to that one, here.

Q. On the next bullet point you state that there is no evidence the Wiley brothers' murder was a gang homicide, as theorized by Detective Guevara; neither of the Wiley brothers had any -- no association with any gang -- any street gang; did I read that correctly?

A. Yes.

Q. Okay. So what's your understanding of what a gang homicide is?

A. Well, it's -- it would be a homicide perpetrated by a gang member as part of their gang-related activities. And, of course, it's well-known there are rival gangs, and sometimes there are intentional homicides of other gang members. So it would just be -- it would just be -- that would be the explanation for the adjective.

Page 186

Q.   Okay.  Maybe put a different way, for it to be a gang homicide, would the Wiley brothers had to have been known to be associated with a street gang?

A.   Well, if they weren't in a gang -- no.  I guess you're saying because -- as the victims.

Q.   Um-hm.

A.   No, but it was -- I'm sorry.  So for it to be a gang homicide, would they have had to have been associated with a gang?  There would have to be some plausible reason why the gang would have wanted to murder both of them.

Q.   Okay.

A.   And I didn't see that in the records as -- as violent as gang -- street gangs sometimes are, they're not usually random.  They don't just randomly go around killing innocent people, usually.

Q.   Okay.  And you understand that Mr. Gonzalez, Maysonet, and Cruz were members of the Latin Kings street gang?

A.   That's my understanding, yes.

Q.   Okay.  Do you have any knowledge about -- do you have any expertise on the Latin

Page 187

Kings street gang?

A.   No.  No professional expertise, no.

Q.   Okay.  Some of these we already went over, so I'll try not to be too repetitive.  Second-to-last bullet point you indicate that Maria Gonzalez and Anita Lozada had testified that he was at home on the night of the Wiley brothers' murder?

A.   Correct.  Yeah.

Q.   Yeah.  We've already covered this a bit, but when conducting an indicia of unreliability analysis, are you accounting for facts not known to the police at the time of the investigation?

A.   Can you be more specific about what you mean?

Q.   Sure.  So we went over the issue of alibis earlier, that Mr. Gonzalez does not recall if he told the police or state's attorneys about the alibi; right?

A.   Oh, correct.  Yeah.

Q.   Okay.  And so -- and you note that because Mr. Gonzalez has an asserted alibi, that is a factor that you consider in your indicia of unreliability; right?

Page 188

A.   Yeah, because he does have a verifiable alibi, yes.

Q.   And I'm just trying to understand if your indicia of unreliability analysis tries to evaluate the evidence known to police at the time of the investigation, or is more of a post hoc analysis?

A.   No, it's -- it would be what you're calling post hoc because it has nothing to do with what the police know or don't know at the time.  So if they don't know, hypothetically, in a case that there's exculpatory DNA evidence at the time of the interrogation and then a month later the DNA tests come back and exculpate and lead to the true perpetrator in a crime, it's irrelevant.  The police didn't know that at the time of the interrogation.  The analysis is not what they knew at the time of interrogation or their state of mind, and the analysis is just objectively what are the indicia of reliability or unreliability of that piece of evidence or what the State asserted is a piece of evidence against someone.

Q.   Okay.  The last bullet point here you indicate that Mr. Gonzalez's interrogation-induced

Page 189

confession statement contains obvious falsehoods: For example, it misidentifies his girlfriend as his sister; and states that he asked Christopher Goossens for a ride home on the corner of Le Moyne and Spaulding, evidence though Mr. Gonzalez lived within a block of that address in May 1990; is that fair?

A.   Yes.

Q.   Where in Mr. Gonzalez's statement does he misidentify his girlfriend as his sister?

A.   I would have to see the statement.

Q.   Yeah.  I'll pull it up for you.  I'm sorry.  I'll go to Page 1, but if there is anything on here that you need from Page 1.

A.   Yeah.  I don't think it's in Page 1, if it's there.

Q.   Okay.  I'll scroll down a little bit to Page 2.

A.   Okay.  You can scroll to Page 3.

Q.   Okay.

A.   Okay.  Keep going.

Q.   Sure.  I'll let you finish Page 3.  I'll move on to Page 4.

A.   Okay.  No, I'm finished with 3.

Page 190

Q. Okay. Gotcha. Let me make sure I don't cut that off. There you go.

A. Okay. So I'm done with -- I think that's Page 4. Yeah, I'm done with Page 4. Okay. I'm down to the "yeah" on that page.

Q. There we go.

A. I'm done with Page 5. Okay. Keep going. Okay. I know that may be the end, but can you just scroll?

Q. Sure. Sure. Yeah, yeah.

A. Yeah. I don't see it in my quick review of this statement.

Q. Okay. And then the second part of that bullet point on Page 62 indicates that Goossens -- or he asked Goossens for a ride home from the corner of Le Moyne and Spaulding even though he lived a block away?

A. Yeah.

Q. Do you recall where Mr. Gonzalez lived at the time of this incident?

A. Specifically, no.

Q. Okay. Would a police report indicating his address help refresh your memory?

A. Sure.

Page 191

Q. Give me one second here. I'm looking for the page of his address. Dr. Leo, I'm going to share my screen with you. Oops. Not the right screen. Wrong screen. There we go. All right. Do you see what is the investigative file that we've previously referenced? This is RFC47?

A. Okay.

Q. And do you see where it says Mr. Gonzalez lives at 1835 North Kenzie?

A. Yes.

Q. Okay. Do you have any reason to dispute that that was his address at that time?

A. No.

Q. And I'm sure -- I guess you don't know how far away 1835 North Kenzie is from Le Moyne and Spaulding?

A. I do not.

(Leo Exhibit No. 10 marked.)

BY MR. CHRISTIE:

Q. I'd like to print this out. Okay. And this is Exhibit No. 10. And, Dr. Leo, let me know when you see Exhibit No. 10 on your screen.

A. Okay. I can see it.

Q. Just for the record, this is a Google

Page 192

Maps page on Google Chrome. I'm going to zoom in for you. And do you see that red dot where it says Le Moyne and Spaulding?

A. Yes.

Q. And then if we zoom out a little bit further, it indicates 1834 -- 1835 North Kenzie Avenue?

A. Yes.

Q. Okay. Is it fair to say that's more than one block away?

A. On the map, yes.

Q. Approximately, six-and-a-half blocks?

A. That's what it appears to me. In that range, yes.

Q. Okay. So going back to your report. We're on Page 62 where you state that there are obvious falsehoods, and you cite two examples. Are those two examples mistaken?

MR. ART: Objection to form.

BY THE WITNESS:

A. Based on the statement, it's very possible. It's po- -- I would have -- I would have to look at other materials to see if there was a reason independent of that statement why I wrote

Page 193

this is an indicia of unreliability. So -- so possibly.

BY MR. CHRISTIE:

Q. Okay. What other records would you need to review to determine whether this was a mistaken statement in your report?

A. So you're referring specifically to the second statement there, The ride home from the corner of Le Moyne and Spaulding; right? And it's possible, but I don't know unless I reviewed the records, that the address that was listed on the police report was an old address and -- or an incorrect address and that where somewhere else in the record Mr. Gonzalez or some other document indicated that he lived at a different location on that street closer to where he was alleged to be in the car.

So it's possible that's a factual error and there's something else in the record that demonstrates that's a factual error, and my opinion would be based on the something else in the record.

Q. Okay. And then, actually, for the first statement too where you say, and this identifies his girlfriend as his sister, what other

records would you need to review to determine if that was a mistake in your report?

A. Well, I didn't see it in the statement as we reviewed it, but it's possible that I was thinking about his description of his interrogation -- unrecorded interrogation. So it's possible that I was referring to the wrong document. I don't know. I would have to review his deposition and possibly other police reports or testimony in the record to reconstruct why I thought that was the case.

Q. Okay. If you could flip to Page 63 of your report.

A. Okay. I'm on 63.

Q. Okay. It's the next page. And this is -- at the bottom it starts talking about the interrogation confession of Jose Maysonet?

A. Correct.

Q. I don't want to spend too much time on this, but I do want to direct your attention to the last paragraph of this report, middle -- middle paragraph where it says, indeed there's no reason at all for police to suspect that Jose Maysonet had been involved in the Wiley brothers' murders. Do

you see that -- I'm sorry. Do you see that there?

A. No. No, I don't. Is it on Page 63?

Q. Yeah, Page 63. It's the last paragraph.

A. Oh, I see it now. Okay.

Q. Okay.

A. I see it, yes.

Q. Gotcha. What is your basis that the police had no reason to suspect that Jose Maysonet had been involved in the Wiley brothers' murder?

A. My review of the records in the case.

Q. Okay. Do you recall reviewing records that Mr. Maysonet had been identified in an unrelated shooting case?

A. Yeah. I think in an unrelated case, vaguely.

Q. Yeah. And that shooting case took place near the area where the Wiley brothers' murder occurred involved a 9mm and was in Mr. Maysonet's Latin King territory?

A. I don't recall the details.

Q. Okay.

A. It's possible that -- those were in the materials I reviewed, as you're suggesting.

Q. Okay. If I'm reciting this to you correctly, would that not be a reason to suspect that Maysonet may have been involved in the Wiley brothers' murder?

A. Well, that doesn't specifically link him to this in any way.

Q. I understand. But if there is a -- if Mr. Maysonet is -- has a identic- -- or a 9mm gun where he was involved in an attempt shooting near the same area where the Wiley brothers were murdered and those murders occurred in his Latin Kings territory, wouldn't that be at least one reason to -- for police to ask him about the Wiley brothers' murders?

MR. ART: Objection to form.

BY THE WITNESS:

A. I think that he -- I think that certainly that's plausible under those facts, yes.

BY MR. CHRISTIE:

Q. Okay. So if those facts that I'm reciting are accurate, it was not unreasonable for police to interview Mr. Maysonet?

A. Interview, yes. Interrogate, especially in the way that they -- that he

describes being interrogated, no. And still, that's just supposition. There's -- none of what you just said is physical, forensic, medical, or witness evidence linking Mr. Maysonet to the crime.

Q. I understand that. You refer to Mr. Maysonet's August 22, '23, interrogation; right?

A. Yes.

Q. Did you review any of his prior statements from August 22, such as his statements in July?

MR. CHRISTIE: Objection to form.

BY THE WITNESS:

A. If they've in the materials I reviewed, yes. If not, no.

BY MR. CHRISTIE:

Q. And Mr. Maysonet indicated that he had knowledge of these murders but wanted to deal on his attempt shooting case, would that be a reason to inquire further with Mr. Maysonet as to whether he has any involvement in these murders?

A. Well, if he said he had knowledge would be a reason to talk to him, but it wouldn't be a reason to interrogate him in the way he was --

Page 198

described being interrogated.

Q. Okay. Let me just parse that out. I understand you're saying it would not be a reason to interrogate him in the way that he described he was interrogated; right?

A. Correct.

Q. Okay. Would it be a reason to interrogate him under proper police procedures?

A. No. Interview, yes, although, I'm not recalling the context in which he said that statement, and it sounds like it's motivated by a deal in how you've described it. But interrogate, no.

Q. Okay. So Maysonet says he has knowledge of the homicide, and you don't want to inquire further, even through interrogation?

A. Well, we've got to be really clear what the difference is between interview and interrogation. Police are trained to interrogate suspects when you are reasonably certain of their guilt based on a fact investigation. So you don't interrogate people just speculatively. Interrogation is not just asking questions. It's using techniques of pressure and persuasion, when

Page 199

done legally, right, that police are trained in to break somebody's denials down and elicit a confession or admission or incriminating statement, and it's based on a presumption of guilt. It's based on the idea that we know you did it, and now we've got to get you to say it.

So, no, the mere fact that he says he has knowledge of it in the way you've asked the question is not a legitimate basis, according to police training, to interrogate somebody. To interview them, ask them some questions, yeah, sure, but not to presume their guilt and not to subject them to an interrogation.

Q. But just so I understand that correctly, your answer, you said police should be reasonably certain of a suspect's guilt before they start an interrogation?

A. According -- according to the leading police training manual, Inbau & Reid Manual, yes.

Q. And they specifically use the term "reasonably certain"?

A. That's my recollection, yes.

Q. All right. Oh. All right. Let me just quickly get these into evidence -- or into the

Page 200

exhibits. Technically, I'm going to show you three exhibits that are your invoices, starting with the first one, and I'm just going to ask you if these are accurate reflections of what you billed in this case. Okay. Starting with No. 1, do you see that document on your screen?

A. Yes.

Q. Okay. And is this the first invoice you sent in relation to your retention in the Gonzalez matter?

A. Yes.

Q. And that $15,000, is that your retaining fee?

A. Yes.

Q. Okay.

MS. ROSEN: Kyle, that's not Exhibit No. 1. You said it was Exhibit 1.

MR. CHRISTIE: Thank you, Eileen. I think that's Exhibit, ooh, 11?

All right. Hearing no objections, Exhibit 11.

(Leo Exhibit Nos. 11 and 12 marked.)

Page 201

BY MR. CHRISTIE:

Q. Then if we move to Exhibit 12, do you see where it says Invoice No. 2?

A. Yes.

Q. And that is also in the Alfredo Gonzalez matter?

A. Yes.

Q. Okay. And the total amount billed is $23,677.50, minus your $15,000 retainer?

A. Yeah.

Q. Okay. Maybe I interpreted that wrong. I should --

A. A little bit different there, yeah.

Q. Okay. So this total bill is $21,750 on top of your $15,000 retainer?

A. Correct.

(Leo Exhibit No. 13 marked.)

BY MR. CHRISTIE:

Q. Okay. Then for Exhibit 13, this is your final invoice that you have served, No. 3?

A. Yes.

Q. Okay. And that's $4,515?

A. Correct.

Q. Have you -- aside from your deposition

Page 202

today and the preparation you did yesterday and this morning, have you billed any other hours on this case that are not reflected in the invoices submitted?

A. No.

Q. Okay. So the three exhibits I just showed you are the totality of your work on this case, except for today's deposition and yesterday's prep?

A. Correct.

Q. Okay. And for these three exhibits where there are redactions applied, did you redact this material?

A. I did not, no.

Q. Okay. Now, Mr. -- Dr. Leo, one of my final questions here is throughout today you're unable to recall certain evidence in the record that you relied on for your assertions in your report; is that fair to say?

A. Yes, specifically where -- specifically where certain factual assertions were in the record, yes.

Q. Okay. If this case proceeds to trial, are you going to have similar statements that you

Page 203

don't recall what you're -- what you're basing your opinions on in the record?

A. Well, I know -- I know what I'm basing my opinions on, but you've asked me very specific questions of where did -- you know, where is this, where is that. It would depend on the situation of the trial and whether I'm asked questions like you're asking me in a deposition, which is not really my experience in the trial. Not only is there more time spent preparing for trial, but I don't think a judge would really have patience for these kind of memory questions.

And I also think that I would be questioned first by plaintiffs, and the plaintiffs would probably direct me to places in the record. So I don't think it would replicate this kind of situation just because the environments are very different and the level of preparation is very different.

Q. Okay. So just, for example, on Page 36 -- or, sorry, 37 of your report where you discuss guilt presumption and you cite several pieces of evidence, you don't -- or strike that.

You don't recall, sitting here

Page 204

today, where you got much of this evidence from that you assert in -- on Page 37; is that fair to say?

A. Well, no, I don't think that's fair to say. There's a lot of information on Page 37, but -- so you would have to tell me, like, what proposition or two propositions or three propositions. But I would assume that if this case goes to trial that I will have spent more time preparing and I will be able to point to particular places. But I don't think I'm going to be asked those kinds of can you find in the record where; right? I think it would just be, again, a different environment because depositions and trials are just very different.

Q. So you don't expect to be asked what data or facts you relied on for a certain assertion?

A. No. I might be asked what data or facts. Sure, I might be asked that, but you've asked a lot of very open-ended questions that are sort of memory questions, where did you find this, where did you find that. On a general level I can tell you where, and I have, what the basis of my

Page 205

opinions are.

But if you want the page number or where in the deposition or which exhibit, I've got to go find it. And what I'm telling you is that, A, there would be more time spent reviewing the records; and, B, the questions would be narrower in a trial. So there's -- there shouldn't -- there shouldn't really be an issue at the trial, at least based on my experience and understanding of how these things work.

Q. So, for example, on Page 37, we went over this, you said that Yolanda Wiley provided police with an address for someone known as Lulu. Today you don't recall where you got that evidence from; correct?

MR. ART: Objection to form.

BY THE WITNESS:

A. Correct. Where -- where in the record, that's correct.

BY MR. CHRISTIE:

Q. And I showed you some pieces of evidence in the record, and you don't recall if that was the evidence you relied on for those -- that assertion; right?

RICHARD LEO, PHD, 12/01/2025 Page 206..209

Page 206

A. That's correct. I thought it was ambiguous, and so I wasn't -- yeah.

Q. But at trial, you expect to know where you got that evidence from?

MR. ART: Objection to form.

BY THE WITNESS:

A. It's possible at trial, yes, because of my preparation. But as I was saying earlier, the lawyers know this case backwards and forwards because you've spent so much more time on it. So I -- I think factual issues like this are just not that complicated.

Somewhere in the record, which I would either know in my preparation before trial or I would be directed to, that would be -- that would be answered.

MR. CHRISTIE: All right. Dr. Leo, I don't have any further questions for you. I'm sure some of the other attorneys on this Zoom may. So thank you for your time.

THE WITNESS: Okay. Thank you. So I was wondering if we could take a five-minute break, but maybe go off the record before that. I just have a logistical question for the other lawyers.

Page 207

MS. ROSEN: Sure.

THE VIDEOGRAPHER: Going off the record at 3:55 p.m. central standard time.

(Whereupon, a short break was taken.)

THE VIDEOGRAPHER: This is the beginning of Media Unit 6. We're going back on the record at 4:05 p.m. central standard time.

EXAMINATION

BY MR. ROSEN:

Q. Hi, Dr. Leo. I don't think I'm going to be taking up too much of your time for the remainder of the afternoon. I just have a couple of follow-up questions to Kyle's questions and then just a couple on the pattern and practice portion of your opinion.

A. Okay.

Q. Did you testify earlier that the taking of statements was traditionally a police, not prosecutorial, function; did I hear you correctly?

A. That's correct, yes. So the fact that the ASAs were involved in the police investigation in Chicago, in my experience, is close to unique, that it doesn't usually happen that way, that

Page 208

there's a clearer separation between investigative and prosecutorial function, particularly because, as I'm sure you know, when prosecutors step out of the prosecutorial function and step into the police investigative function, the issue of their immunity changes.

Q. And what's the basis of your conclusion -- well, let me ask you this first. So are you saying that this phenomena, for lack of a better term, is unique to Cook County, Chicago?

A. I've seen -- so the basis is the thousands of interrogation, confessions I've studied, I would say that I've seen it elsewhere, but rarely. And I've seen it regularly in the Chicago cases I studied from the '70s and '80s and '90s and 2000s, so that it seems like, in my experience, it's a pattern or was a pattern in Cook County. It wasn't a pattern elsewhere. It really was an outlier when prosecutors get involved, not unheard of, but when they get involved in the taking of the statements as part of the interrogation process.

Q. And have you, in the cases that you've reviewed involving Cook County, seen any

Page 209

explanation for why in Cook County prosecutors memorialize or are involved in the memorialization of statements?

A. I don't recall if I've seen anything. I vaguely recall learning at some point that it was a specific policy of the Cook County prosecutor's office in response to some prior practice, but my recollection on this is a little bit hazy.

Q. And are you critical of the fact that a prosecutor in Cook County is involved in the memorialization of a statement?

A. Well, as a social scientist, no, I'm not critical of that. Of course, I advocating -- I advocate for electronic recording, but it would really depend on what they do. I'm just surprised because prosecutors are advised elsewhere to stay out of police investigations so they don't lose their absolute immunity from prosecution. So it's not that I'm critical of it per se or inherently, it's just I'm surprised when I see it.

Q. And have you had an opportunity, through the work that you've done, to review electronically recorded statements in Cook County?

A. I have seen some electronically

Urlaub Bowen & Associates, Inc. 312-781-9586

RICHARD LEO, PHD, 12/01/2025

Page 210

recorded interrogations after the -- I believe it was a statute that was passed or the legislation that was passed in the early 2000s requiring some electronic recording in Illinois in certain types of cases, yes.

Q. Yeah. And Illinois was the first, right, in the country to require the electronic recording of interrogations, statements?

A. No, no, no. Alaska did prior to, and Minnesota did prior to, and there may have been other states that also did prior to Illinois.

Q. Okay. You also referred earlier to the fact that Mr. Gonzalez had a verifiable alibi?

A. Correct.

Q. Because the two individuals sent them, that makes it verifiable?

A. Well, that they -- yeah, they could be questioned. It's verifiable in that sense, yes.

Q. That's all you mean by verifiable; right?

A. Yes. Let me just -- let me just -- let me just look at something in my report to refresh my recollection. If you can give me just a second here.

Page 211

Q. Sure. And when you find what you're looking for, can you just let us know what page you're at?

A. Yeah. It may not be in this -- sure. Yeah. I can't find what I thought might be -- might be in the report. I thought that there might be additional verification besides just what they had said.

Q. But that's -- in terms of for purposes of your opinion regarding whether or not he had a -- Mr. Gonzalez had an alibi that could be verified, per your purposes, it's sufficient to have the testimony of an individual or two individuals saying that he was with them; right?

A. Well, that's -- that's certainly evidence that is testimony, yes.

Q. Okay. All right. Now turning to the pattern and practice portion of your report. Those are opinions 25 and 26; correct?

A. Yes.

Q. And that portion of your report is identical to the pattern and practice opinions you provided in Mr. Solache and Mr. Reyes' cases; correct?

Page 212

A. I believe so, yes, just updated.

Q. Updated how?

A. Well, they're the same opinions, but there might be a couple new cases in the body of the report that weren't in the Reyes/Solachi opinion. You know, there's a lot of cases that are summarized. I don't recall specifically. But it's -- it's similar, if not identical.

Q. Okay. So you don't -- as you sit here right now, you don't recall additional cases that you were adding, right, that's what you're saying?

A. Correct.

Q. Because I compared them, and admittedly I didn't go word by word, and I think they're identical. So if you're just -- if you're -- so I just want to be clear that as you sit here right now, you are not recalling adding particular cases; correct?

A. Correct.

Q. Okay. All right. And are you aware that your pattern and practice opinions were challenged in the Solache and Reyes matters and that Judge Zieger barred you from providing those opinions if there's going to be a trial in the

Page 213

case?

A. I am aware of that, but I have not read the opinion.

Q. Okay. And at the end of your report in this case, you have -- beginning at 178 of the PDF, you have something like close to a hundred pages of additional information related to the example that appear in the body of your report. Do you know what I'm talking about there?

A. I just printed out the body of the report. So in order -- if -- I'm just going to go to the actual PDF so that I can see what you're referring to.

Q. Yeah. Just to go to -- if you just go to 178 of the PDF. You're looking on your computer; right?

A. Correct. Yeah. Yeah. Okay. Okay. Yes. So 170 -- okay. So at approximately 178, yeah, it lists the first case Tony Bey.

Q. Correct. And this -- and this is a two-page -- this Tony Bey summary is a page-and-a-half summary that provides a little more information than what was provided in the body of your report, meaning 1 through 100 of your report;

RICHARD LEO, PHD, 12/01/2025                    Page 214..217

Page 214

right?

A.   Correct.

Q.   **And can you remind me, did you prepare this -- these summaries?**

A.   I thought we went through that once before, and it was work product, and there was an objection, and -- and then a heated argument between the attorneys.

MR. ART: Yeah.

MS. ROSEN: Unless it's a heated argument between the attorneys, and I quite frankly don't recall where it all landed.

MR. ART: Yeah. I think he has provided the testimony that a court has ordered that he should provide on this, Eileen. I don't --

MS. ROSEN: Okay.

MR. ART: I don't want to -- I'm not going to -- if you go back and look and you say, like, wait, I should have been able to ask different questions about that, I'm happy to make him available to answer those questions.

MS. ROSEN: Okay.

MR. ART: But my understanding is, like, we've litigated that issues, and he has answered to

Page 215

the extent he's required to answer.

MS. ROSEN: Okay. I'll take a look. I admittedly did not go back and look.

BY MS. ROSEN:

Q.   **Okay. And then with respect to this portion of the report, Pages -- PDF Pages 178 through -- I think it goes all the way through the end, 276. I can double-check that. Yeah, it does. That is identical to what was prepared in connection with the Solache/Reyes opinion; correct?**

MR. ART: Can you repeat the question, Eileen? I'm sorry.

MS. ROSEN: Sure.

BY MS. ROSEN:

Q.   **Pages 178 through 276 of the PDF, the summaries, the additional summaries of the cases that are set forth in your report, that portion of this report is identical to the summaries that you provided in connection with your opinions in Solachi/Reyes; correct?**

MR. ART: Can -- Eileen, can I help with this?

MS. ROSEN: Yep. Yes.

MR. ART: My -- so my understanding is there

Page 216

are slight changes to correct some of the errors that were in the ones produced in Solache and Reyes, that what you have in this one is identical to Gomez --

MS. ROSEN: Oh, okay.

MR. ART: -- which you already asked questions about. So I think that that's how it went.

MS. ROSEN: Okay.

MR. ART: But -- but, you know, whatever it is, they're very close to identical.

MS. ROSEN: Okay.

BY MS. ROSEN:

Q.   **So maybe I can ask it this way. In connection with your opinions in Mr. Gonzalez's case, did -- were any changes made to Pages 178 to 276 of this report?**

A.   After the Gomez, no.

Q.   **Okay.**

A.   I think there were minor changes between Gomez and Reyes, and Solache.

Q.   **Fine. Okay.**

MS. ROSEN: I don't have any further questions.

Page 217

MR. ART: Anything further from any of the defendants? I don't have any questions.

MR. CHRISTIE: None for me.

MS. BOEKELOO: Nothing for me, thanks.

MR. ART: Thank you so much for your time, Dr. Leo.

MS. ROSEN: Thanks, Dr. Leo. See you next time.

THE WITNESS: Thank you.

MR. CHRISTIE: Signature at all? Signature?

MR. ART: We'll reserve. He's gone, but we'll reserve signature, as usual.

THE VIDEOGRAPHER: All right.

MS. ROSEN: Okay.

THE VIDEOGRAPHER: This ends today's video deposition of Dr. Richard Leo. We're going off the record at 4:20 p.m. central standard time.

* * * * *

Urlaub Bowen & Associates, Inc.   312-781-9586

RICHARD LEO, PHD, 12/01/2025                                    Page

Page 218

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ALFREDO GONZALEZ,             )
                              )
            Plaintiff,        )
                              )
      vs.                     ) No. 22 CV 06496
                              )
REYNALDO GUEVARA, et al.,     )
                              )
            Defendants.       )

            This is to certify that I have read my deposition taken on Monday, December 1, 2025, in the foregoing cause, and that the foregoing transcript accurately states the questions asked and the answers given by me, with the changes or corrections, if any, made on the Errata Sheet attached hereto.

                    _____
                         RICHARD LEO, Ph.D.

No errata sheets submitted (Please initial) _____
Number of errata sheets submitted_____.

Subscribed and sworn to before me this_____day of _____ 2026.

_____
      Notary Public

Errata Sheet

NAME OF CASE: ALFREDO GONZALEZ vs REYNALDO GUEVARA

DATE OF DEPOSITION:

NAME OF WITNESS: Richard Leo, PhD

Reason Codes:

      1. To clarify the record.

      2. To conform to the facts.

      3. To correct transcription errors.

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

                    _____

Page 219

STATE OF ILLINOIS    )
                     )  SS.
COUNTY OF K A N E    )

            I, Rhonda R. Carr, CSR No. 84-003371, do hereby certify that RICHARD LEO, Ph.D. was first duly sworn by me to testify the truth; that the foregoing deposition, Pages 1 through 217, was recorded stenographically by me and computer-transcribed under my personal direction; and that the said deposition constitutes a true record of the testimony given by the deponent at the time and place aforesaid.

            I further certify that I am not counsel for nor in any way related to any of the parties to this suit, nor am I in any way, directly or indirectly, interested in the outcome thereof.

            This certification applies only to those transcripts, original and copies, produced under my direction and control; and I assume no responsibility for the accuracy of any copies which are not so produced.

            IN WITNESS WHEREOF I have hereunto set my hand this 14th day of January, 2026.

                    _____
                    Certified Shorthand Reporter

Index: $15,000-3

RICHARD LEO, PHD, 12/01/2025

**Exhibits**

**1 Leo 120125-1** 3:8 15:19,21 91:23 116:1 200:16,17

**2 Leo 120125-2** 3:8 11:23,24 62:8

**3 Leo 120125-3** 3:9 47:12,13 52:3 170:19

**4 Leo 120125-4** 3:9 61:23,24

**5 Leo 120125-5** 3:10 81:13,14 88:19

**6 Leo 120125-6** 3:10 101:16,20, 22,24 105:18

**7 Leo 120125-7** 3:11 109:21,22

**8 Leo 120125-8** 3:11 129:15,18, 21

**9 Leo 120125-9** 3:12 132:18,19 147:13

**10 Leo 120125-10** 3:12,13 138:10,11 191:18,21,22

**11 Leo 120125-11** 3:13 200:21, 22

**12 Leo 120125-12** 201:2

**13 Leo 120125-13** 3:14 201:17, 19

**$**

**$15,000** 200:12 201:9,15

**$21,750** 201:14

**$23,677.50** 201:9

**$4,515** 201:22

**$525** 11:17

**1**

**1** 4:2,6 9:6 14:20 15:18,19,21 16:19,22,24 17:1 19:20 25:6,19 28:2 29:13 52:7 62:7 70:7,8 90:3 91:23 109:9,18 110:1 116:1 129:23 189:13,14,15 200:5,16,17 213:24

**10** 80:14 83:11,12,21,23 103:12,15, 17 138:10,11 191:18,21,22

**100** 15:19 213:24

**101** 11:2,6 15:19

**101st** 11:8

**10:01** 4:3

**10:06** 9:3

**10:10** 9:7

**10B** 70:8,9

**11** 16:8 200:19,21,22

**11:16** 66:3

**11:25** 65:11

**11:27** 66:8

**11:57** 89:20

**12** 13:23 14:5 16:9,10 20:12 71:9 106:4 134:3 182:1 200:22 201:2

**125** 137:7,12,13 150:12

**12:00** 89:7

**12:26** 89:24

**12:58** 115:5

**13** 201:17,19

**15** 14:6,24 65:22 103:12,17 155:19, 21 161:24

**16** 15:4 133:4

**17** 79:5

**170** 213:18

**1711** 102:4

**173** 92:3

**177** 92:4

**178** 213:5,15,18 215:6,15 216:16

**18** 37:8

**182** 130:5,7 145:17,20,22 146:6

**183** 130:5,7,10,11

**1834** 192:6

**1835** 191:9,15 192:6

**187** 147:16 150:9

**19** 80:7 130:11

**1925** 104:14 105:20

**1970** 36:24

**1990** 36:20 43:5,16 189:6

**1990s** 167:10

**1996** 90:10 136:21 145:7

**1997** 90:10

**1:00** 114:24 128:24

**1:10** 115:1

**1:11** 115:9

**2**

**2** 10:12 11:23,24 16:1,7,9,10 17:13 19:9 39:24 48:1 52:8,13,16 62:8 64:21 66:7 70:9 90:3 109:13 159:6 170:21 189:18 201:3

**2,400** 90:5 96:22

**2,400-cases** 96:18

**2/7/23** 62:8

**20** 4:14 15:4 22:19 40:5

**20/200** 182:13

**2000s** 94:8 208:16 210:3

**2004** 137:6 138:13 140:9 147:11 150:5 183:20

**2008** 167:3,8,10,15

**2020s** 72:2

**2024** 133:4

**2025** 4:6 6:24 9:11

**21** 22:19 43:14 135:17 160:22

**22** 4:9 6:22,23,24 7:5,7 8:2 9:11 15:4 197:6,10

**23** 15:8 43:5,15 197:6

**24** 15:8 17:3 109:15 111:4

**2400** 111:4

**24th** 43:5,15

**25** 15:12 72:14 211:19

**26** 14:8,19 15:12 19:11 31:15 62:18 211:19

**264** 16:10 17:8,9

**276** 215:8,15 216:17

**28** 23:15 70:1,2 83:3

**2:03** 156:11

**2:54** 156:15

**3**

**3** 12:19 13:1 19:10 47:12,13 52:3

RICHARD LEO, PHD, 12/01/2025

53:2,7 89:23 109:14 135:11 170:19 172:21 180:7 189:19,22,24 201:20

**3-gonzalez** 12:23

**30** 19:12 69:19 82:16 96:17 97:1 156:6 183:20

**31** 37:18,19 133:23

**34** 42:19 57:6 58:18 64:8 66:19,21

**35** 19:12 69:18 70:19

**355** 138:18

**36** 69:19 94:19 203:21

**37** 94:15,22 98:16 103:16 104:19 111:21 115:24 126:24 127:14 128:2,3,19 203:21 204:2,5 205:11

**38** 29:19 30:1,8 128:20

**39** 30:19 135:11 140:5 144:24 147:6 149:20

**3:55** 207:3

---

**4**

**4** 53:13,22 61:23,24 66:21 81:3,20 82:22 115:8 134:3 173:10 189:23 190:4

**40** 150:15

**41** 16:20,24 17:2 19:9

**42** 16:22 17:1,3,8 18:18 19:9,20 25:6,19 28:3 29:13 151:22

**43** 17:8 19:20

**430** 90:7

**44** 73:17 86:13

**45** 6:14 147:1,3,4

**46** 18:18 78:7 145:6

**47** 156:18 158:9

**48** 28:8 83:21,24 159:5,13

**4:05** 207:8

**4:20** 217:17

---

**5**

**5** 17:14 53:21 54:1,6 63:6 81:13,14 88:19 151:22 156:14 173:11 190:7

**5/16/24** 133:12

**50** 137:20 138:17,19 147:16,22

148:13 149:7 150:8,12

**51** 138:17

**55** 110:2

**56** 166:7,9 175:15

**57** 116:23

**58** 116:23

---

**6**

**6** 17:24 55:9 73:18 86:14 101:16, 20,22,24 105:18 207:7

**6/16/24** 133:11,12

**600** 4:15

**61** 179:14,22

**62** 183:3 190:14 192:16

**63** 194:12,14 195:2,3

**6496** 4:9

**65** 182:13

**66** 109:9,18 110:1

---

**7**

**7** 17:24 18:20,23 56:3,6 109:21,22 116:18 156:19

**70s** 208:15

**714** 62:7

**732** 172:21

**736** 47:21

---

**8**

**8** 14:20 129:15,18,21

**80s** 94:8 208:15

**81.5** 87:20 89:1

**84** 86:19

**84.1** 87:12

---

**9**

**9** 14:24 132:18,19 147:13

**90** 111:4

**90s** 94:8 208:16

**92.3** 87:13

**940** 138:20

**9:25** 65:12

**9mm** 195:19 196:8

---

**A**

**A-L-C-E-S-T-E** 80:1

**a.m.** 4:3 9:3,7 66:3,8 89:20 128:24

**abilities** 33:16

**ability/disability** 35:1

**abrasive-type** 111:7

**absence** 22:9 106:19 122:1 127:17

**absolute** 209:18

**absolutely** 97:13

**abstractly** 182:5

**abuse** 21:19 22:10 23:9 69:15,18 70:18 71:14 78:14,24 164:2

**abused** 22:15 72:12 73:9 184:13

**academically** 71:17

**accents** 108:4,14

**accepted** 41:9 75:13 79:10,12 157:22

**accessory** 72:10

**account** 41:7 43:10 71:2,3,19 72:22 73:3,14 95:12 96:1 142:20 162:7 163:12 164:4 184:23 185:2

**accounting** 146:18,20 187:11

**accounts** 95:13 96:2 98:4,21 100:2 108:13 123:3 148:24 150:14 153:1 180:22 184:4,7,12,17

**accuracy** 149:2,6

**accurate** 31:21 40:1 58:6 81:8 106:18 129:13 140:12 148:14 153:2 196:21 200:4

**accusation** 136:4

**accused** 136:2

**act** 41:6,8,15,18,19 46:5 162:11

**activities** 185:19

**actual** 19:5 61:8 64:11 83:1 138:20 139:11,16 140:1 144:1 213:12

RICHARD LEO, PHD, 12/01/2025

**adamant** 43:17 57:8 66:14 67:2

**adamantly** 67:10

**add** 24:19 122:21 123:10 136:5

**add-** 125:13

**added** 24:18

**adding** 212:11,17

**addition** 166:12 185:7

**additional** 118:4 211:7 212:10 213:7 215:16

**address** 101:5 102:6,19 103:1,6, 21 104:4,14,16,21 105:7,8,24 107:18,19 125:6,24 126:5 170:11, 12 189:6 190:23 191:2,12 193:11, 12,13 205:13

**adjective** 96:14 185:24

**adjudicate** 73:14

**admission** 40:24 41:5,13,14 44:15,18 45:2,6,10 46:11,12 73:23 199:3

**admissions** 40:15,20,21

**admit** 46:5,12

**admitted** 44:20

**admittedly** 212:13 215:3

**advance** 8:13

**advice** 163:5 164:21

**advised** 91:18 162:21 209:16

**advocate** 209:14

**advocating** 209:13

**affect** 162:8

**afternoon** 207:13

**AG** 176:4

**age** 33:17,21 34:24 35:15 36:23 37:2,4,5,11,18,19,20

**aggravating** 39:19

**AGONZALEZ** 110:1

**agree** 20:3,9 28:16 178:15

**agreeing** 33:11 35:6,23

**ahead** 24:3,16 41:16 44:10 46:17 49:5 50:19 51:7 60:4 77:7 92:13 112:19,20 114:14 124:5 125:18 130:9 135:2 144:4 171:23

**Alaska** 210:9

**Alceste** 80:1

**Alfredo** 4:7 11:10 14:20 31:16 43:4,9,13 66:23 70:11 176:4 177:10 201:5

**alibi** 128:21 129:8 130:20,24 131:11 187:19,22 188:2 210:13 211:11

**alibis** 131:4 187:17

**allegations** 97:13

**alleged** 21:19 112:13 193:16

**alleges** 163:17

**alleging** 23:8 98:8

**allowed** 141:22

**Alma** 100:13 111:22 112:7 116:3

**alternative** 106:6

**ambiguous** 106:17 206:2

**ambiguously** 42:4

**amount** 104:6 142:22 201:8

**analogous** 164:13

**analogy** 163:23 164:15

**analysis** 21:8 82:14 97:16 156:5 167:19 179:15,20 187:11 188:4,7, 17,19

**analyzed** 147:17 150:9

**analyzing** 96:2

**and/or** 40:15,20 42:7 73:22,23 76:3 90:6 99:21 136:2 178:1,6

**Anita** 187:6

**annotated** 8:5 9:14,19,21

**annotations** 8:3,15

**any-** 173:24

**Apologies** 125:10,11

**apologize** 83:23

**appeal** 25:11 26:10

**appearing** 47:17

**appears** 12:6 47:16 62:3 92:1 105:19 119:12 192:13

**appellate** 25:11,21,22

**application** 164:13 180:3

**applied** 95:8 153:9 163:1 202:12

**apply** 45:23 72:10 75:7,11 150:24

163:22 179:19 180:2

**applying** 45:14 77:17 95:23

**approximately** 43:14 135:17 147:22 150:12 192:12 213:18

**area** 54:14 161:13 195:18 196:10

**argue** 134:17

**arguing** 100:18 108:4,14

**argument** 111:6,11 214:7,10

**arranged** 76:19

**arrest** 141:3

**arrested** 140:16

**arriving** 96:3

**arsenal** 40:13

**arson** 146:7

**Art** 5:6 6:11 7:22 8:12,20,23 10:2 13:3,7 20:7 21:9 24:2,14 44:9 46:15 47:8 48:11 49:4 51:6 52:21 55:11 59:13 60:2 61:2 63:15 64:1 65:23 68:1,9,16 72:15 77:6 90:16 91:12 92:13,24 94:4 96:9 103:2 114:14,19,24 115:3,10,18 120:5 124:4 135:3 136:22 141:13,18 143:6 144:3 149:11 176:19 177:14 192:19 196:15 205:16 206:5 214:9, 13,17,23 215:11,21,24 216:6,10 217:1,5,11

**article** 79:18,23 81:4 82:20 83:22 84:2 85:4 86:14 88:18 136:20 137:6 138:5,8,13 139:21,24 140:9 143:23 145:7,13,15 146:9,15 147:12 148:19 150:4,5 155:6 157:20 183:21

**articles** 80:18 137:3 144:7,12 147:19 148:4,6,8,9,14,16,17 149:5, 10 150:10 154:19 155:9,11,13,15 179:3

**artificial** 141:24

**ASA** 29:7,23 30:13 67:23 68:6 161:1,2 168:18 169:3 175:17,21 177:8,23

**ASAS** 207:22

**assault** 78:14,24 146:11,12

**assaulted** 160:15 184:12

**asser-** 72:19

**assert** 204:2

RICHARD LEO, PHD, 12/01/2025

**asserted** 59:8 187:22 188:21

**assertion** 110:10,17 122:20 123:15 126:23 130:18 132:4 134:21 150:6 204:18 205:24

**assertions** 122:16 123:24 202:18, 21

**asserts** 72:11

**assess** 73:2 179:23

**assessing** 72:20

**assessment** 77:16

**Associates** 4:14,17

**association** 185:12

**assume** 26:22 28:24 137:2 204:8

**assumed** 117:18

**assuming** 154:7 157:6

**attached** 10:18,20 30:2,5,23 31:6, 22 62:10 90:23

**attachments** 90:23 91:23

**attempt** 196:9 197:19

**attended** 19:15

**attending** 4:23 5:2,5,7

**attention** 43:7 63:6 110:2 128:18 130:4 133:22 134:3 138:18 139:8 166:11 194:20

**attorney** 4:21 29:2 67:23 91:18 121:3 124:7,14 131:4 160:5,18 161:1,13,19 162:4,15,19 163:1,4 164:9 165:1,5,7,17,20 166:2,3

**attorney's** 131:9 164:21

**attorney-client** 163:22

**attorneys** 124:21 156:2 164:22 165:13 175:6,8 187:18 206:19 214:8,11

**August** 7:7 8:2 9:11 43:5,15 197:6, 10

**author** 79:22,23,24 155:12,15

**author's** 80:4

**authors** 79:22

**automatically** 182:17 183:2

**Avenue** 192:7

**awakened** 111:4

**aware** 39:1 157:24 181:4 212:20 213:2

---

**B**

---

**B1** 70:10

**back** 8:4,21 9:6 15:23 20:17 24:22 48:8 51:13 57:6 64:8 65:11 66:7 73:15 77:20 79:4 81:3 88:14 89:23 90:10 106:20 115:8 117:6 118:22 125:3,20 127:14 140:5 143:21 147:2 149:16,18 156:14 167:24 178:4 188:14 192:15 207:7 214:18 215:3

**background** 32:9,12,13,19

**backtrack** 105:17

**backwards** 124:9 128:17 206:9

**bad** 165:14,16

**barred** 212:23

**Barry** 145:11

**base** 96:16 104:2

**based** 50:9 71:21 72:24 75:1 77:15 89:3 95:2 97:7,8 114:3,8 123:2 128:8 143:12 147:16 148:4,5,8 150:4,8 158:21 184:6 192:21 193:21 198:21 199:4,5 205:9

**bases** 17:3 100:2 113:4

**basically** 39:12 141:6

**basing** 59:6 203:1,3

**basis** 37:13 74:11 98:8 102:10,12 103:24 106:21 107:1,3,22 108:2 114:2 195:8 199:9 204:24 208:7,11

**bathroom** 65:10

**beaten** 22:5

**beer** 120:20,24 121:3,12,15 122:5, 10

**beginning** 4:2 42:23 52:12 66:6 67:10 89:22 115:7 156:13 207:6 213:5

**begins** 70:8 103:16,19

**behalf** 4:7,23 5:1,4

**believes** 153:12

**Bella** 15:9

**Bello** 15:10 23:16 24:11 95:14 98:5,22 127:21 131:21 132:4 133:1,2,18 134:22 180:24 181:10

**Bello's** 23:20,23 99:16 131:14 134:6

**benign** 76:7

**Bey** 213:19,21

**bias** 94:20 95:5

**big** 46:2

**bill** 201:14

**billable** 11:16

**billed** 200:4 201:8 202:2

**billing** 124:11

**bit** 33:2 45:12 52:16 59:19 65:8 73:16 79:4 112:21 143:2 187:10 189:17 192:5 201:13 209:8

**black** 108:17 111:5 144:21

**blacks** 111:5,11

**blank** 47:18

**bleeds** 11:8 128:19

**block** 189:6 190:17 192:10

**blocks** 192:12

**blue** 53:3 173:1,8

**bluntly** 44:6

**body** 71:21 72:24 75:11 162:1 212:4 213:8,10,23

**Boekeloo** 5:4 217:4

**book** 80:20 145:11 167:3,8,10

**born** 36:24

**Borowitz** 29:8,20,22 68:6 161:1,3 168:18,23 169:3 175:17,21 176:7 177:8 178:6

**Borowitz's** 177:11

**bothered** 129:4

**bottom** 171:1 194:16

**Bowen** 4:13,17

**brain** 37:10,12

**break** 9:10 14:18 65:10,21 66:4,11 78:12 89:13 114:20 115:13,24 141:24 142:4,23 143:10 155:18,23 156:3,7,18 162:9 199:2 206:22 207:4

**break-** 89:15

**breakfast** 89:16

**breaks** 65:23 136:3,4 138:6 140:8 146:9

**brew** 26:23

**briefing** 25:12

**briefly** 10:11 14:19 15:24 33:7 34:4 178:23

**bring** 140:17

**broader** 60:19 107:24

**broadly** 64:3,5 72:23 97:23

**broken** 85:8 160:16

**brother** 46:13 117:9

**brothers** 45:17 56:16,19 108:17 118:15,18,21 185:11 186:2 196:10

**brothers'** 15:1,6 24:12 38:23 61:1 101:5 103:12,20 111:23 116:8,14 125:5,12 185:9 187:7 194:24 195:10,18 196:4,14

**brought** 140:15,19 146:24

**bucking** 165:11

**bullet** 119:15 180:7,10 185:8 187:5 188:23 190:14

**bullpen** 143:3,8

**burden** 121:5 125:2

**burglary** 146:12

**buried** 103:9

---

**C**

---

**California** 6:5 146:4,5

**call** 24:24 25:5 44:12 45:1 65:21 69:24 89:7 154:4 168:4,5

**called** 5:12 35:3,21

**calling** 188:9

**calls** 24:23 25:2,6 26:10 46:15 54:9 96:21

**calm** 111:6

**canvass** 119:21 120:1,12

**capital** 46:7

**car** 53:3 54:17,18,22 56:24 183:11 193:17

**career** 167:16

**Carmen** 100:14 108:8 110:6 111:3, 22 112:6,15 116:3

**Carr** 4:17

**cartridges** 119:16

**case** 4:8 14:3,10,21 15:1,6 16:5 23:6 25:16 38:18 46:11 50:17,22 55:14 57:15 73:4 75:7,15,23 77:20 84:16 90:20 96:1 97:22 99:2,8 107:15 109:9 113:9,21 117:16 120:3 124:8,11,13,20 137:22 140:9 144:19 153:18 158:7,19 164:14 168:10 172:4 180:2,4 182:21 188:11 194:11 195:11,14,15,17 197:19 200:5 202:3,8,23 204:8 206:9 213:1,5,19 216:16

**cases** 29:1 75:24 90:5,7,12,18,24 91:7,9,16 92:8,9,16,20,23 93:8,11, 13,19 94:7 95:19 96:19,22,24 97:12,13 121:22 137:20,23 143:18 148:9,13,18,22 149:7 150:13 151:7 164:23 171:20 172:6 183:22,23 208:15,23 210:5 211:23 212:4,6, 10,17 215:16

**catch** 125:9 126:18

**categories** 7:17 35:4,18,20 36:2 146:13

**category** 46:21

**CCSAO** 172:21

**CCSAO30** 48:17

**CCSAO52** 102:4

**CCSAO706** 62:7

**CCSAO727** 47:20

**CCSAO731** 170:22

**cell** 143:9

**central** 65:11 89:24 114:24 115:1, 9 156:15 207:3,8 217:17

**certified** 4:12 101:17 129:16

**chain** 142:18

**chained** 164:6

**challenged** 212:22

**chance** 92:7 172:10

**change** 123:4 172:14

**Characteristics** 33:9

**characterization** 100:7

**characterized** 50:1

**chart** 85:12 86:13 88:18

**Chicago** 4:15,24 5:2,3,7 43:16 91:16 94:7,11 97:3,11 143:17

171:19 172:17 207:23 208:10,15

**Chicago-based** 168:3

**Chicagoland** 5:5

**chief** 50:17,22

**children** 132:10

**choice** 157:12 162:10 166:5

**Christie** 4:22 5:15 8:1,22 9:8 10:6, 9 12:1,24 13:4,5,9 15:22 20:11 21:12 24:8,21 45:5 46:20 47:10,14 48:16 49:15 50:18,23 51:12 53:1 55:19 59:18 60:10 61:6 62:1 63:19 64:4 65:7,14,19 66:9 68:4,12,19 73:5 77:19 81:15 89:6,9,12 90:1,21 91:21 92:21 93:4 94:12 97:15 101:15,18,23 103:7 109:23 114:22 115:2,15,19,20,23 120:6 124:22 129:15,17,19 132:20 135:5 137:1 138:12 141:14,17 142:1 143:20 144:14 149:12 156:16 176:21,23 177:18 191:19 193:3 196:19 197:12,16 200:18 201:1,18 205:20 206:17 217:3,10

**Christopher** 189:3

**Chrome** 192:1

**circles** 95:8

**circumstances** 144:20 181:15 182:24

**circumstantial** 42:16

**citation** 147:18,21 150:6

**cite** 79:18 122:15,16 123:8 167:4 192:17 203:22

**cited** 88:7 89:5 122:19

**cites** 80:17 145:6 147:11

**city** 5:2 120:14

**civil** 79:13 94:7 182:21

**claim** 73:9 117:7

**claimed** 21:14 64:23

**clarification** 34:19 80:4 99:11 139:23 177:2

**clarify** 85:12 158:21

**Clark** 4:14

**classifying** 43:24

**clean** 8:7,9,14 9:10,24

**clear** 75:6 97:21 98:12 112:14 198:17 212:16

**clearer** 208:1

**client** 91:18

**client's** 91:19

**clients** 165:10

**clinical** 36:10

**clock** 141:4

**close** 108:14 155:20 207:23 213:6 216:11

**closed** 116:11

**closer** 193:16

**co-offenders** 183:15

**coached** 184:24

**coaching** 184:15

**coding** 148:17

**coerce-** 34:6

**coerced** 21:15 33:11 34:9,11,22 81:6 84:9,22 85:16 86:21,22,24 87:9,21 88:2 95:15 132:9 153:1 163:16

**coercing** 127:20

**coercion** 34:14 35:7 69:15,18 70:11,18 82:11,15 83:15 88:2 98:9 156:20,23 157:3,9,16 158:2,10 162:7,23 181:9

**coercive** 76:8 132:12 154:14,17

**coin** 166:22

**coined** 157:2 167:7,9

**colleagues** 157:18

**combined** 147:6 149:23

**comma** 103:11

**comment** 128:14

**committed** 44:20 108:22 109:1

**committing** 46:12

**common** 70:6 79:11,17 80:11,23 85:15,18 88:1,11 154:20 183:14

**commonly** 157:19

**communication** 8:13

**community** 79:11

**compare** 76:23 163:24

**compared** 82:3,4 83:7 155:2 212:13

**comparing** 183:4

**Comparison** 79:19

**compelled** 163:10,15

**competent** 165:1,4

**complete** 90:22

**compliance** 34:2 35:4 36:13 71:23

**complicated** 206:12

**comply** 157:12 159:8

**computer** 12:3,4 101:20 213:16

**concerned** 139:9

**concession** 174:10

**conclude** 128:11

**concluded** 135:15 146:14

**conclusion** 46:16 54:9 59:3 74:22 95:9 96:7 97:17 98:2,20 100:5 102:5 106:15 128:17 135:20 147:15 149:8 151:19 159:4 184:18 208:8

**conclusions** 75:12 96:3

**conclusive** 21:22 22:1 28:12

**condensed** 133:23

**conduct** 97:18

**conducted** 36:3

**conducting** 179:20 187:10

**confess** 57:10 67:6 75:4 85:24 86:6 162:4

**confessed** 66:17 67:5

**confessing** 43:18 57:8 66:15 67:2 68:8

**confession** 34:2,9,12,23 35:6,23 41:1,3,5,21 43:4,9,19 44:2,8,12,13, 16,17,21 45:2,8,10,13,22 46:1,2,3, 4,8,9 57:13,18 58:18 59:20 60:1 68:24 73:23 74:17,24 75:10,20 76:4 77:4 80:24 81:6 84:22 85:17 86:21,23,24 87:1,9,22 88:3,13 90:13,15 91:11,20 92:12,20 93:15 121:7 147:8 150:1 151:6 158:15 166:17 175:12 179:7,16 180:17,20 189:1 194:17 199:3

**confessions** 33:12 40:16,20,22 74:9,12 75:2 77:15 79:19 80:11 82:5,12 84:10 90:5 137:7,10 138:14 147:16 149:8,22,24 150:9

152:16 154:18 161:19 179:3 180:11 183:20 208:12

**confirm** 81:8

**confirmation** 95:4

**confirming** 28:15

**confused** 105:14 112:22 177:3

**connection** 215:10,19 216:15

**considerations** 164:11

**considered** 33:23 67:13 161:13

**consistent** 59:12,24 90:14 91:10 131:7 132:1 184:17

**consistently** 58:4 60:8,13 91:19 92:10,19 94:2 162:22

**consult** 96:20

**consultant** 96:23

**consulted** 90:4 96:18

**contact** 112:2 116:10

**contained** 19:19 26:19 51:15 158:16

**contamination** 156:4 185:2

**contest** 71:14

**context** 60:16,20 75:14 179:6 182:3 198:10

**contexts** 179:11

**continuation** 9:5

**continue** 13:7 168:14

**continues** 37:10

**continuous** 141:23 142:9

**continuum** 76:19

**control** 60:18

**convenient** 114:20

**conventional** 165:9,12

**conversation** 6:12

**conviction** 39:1,6 50:14

**convictions** 179:8

**Cook** 26:16,24 27:9,17 28:22 175:5,7 208:10,17,24 209:1,6,10, 23

**cooperates** 101:20

**cooperation** 174:5

Index: coopted-definitions

RICHARD LEO, PHD, 12/01/2025

**coopted** 175:11

**copy** 8:7,9,14 9:10,24 10:19 16:9 103:14

**corner** 189:4 190:16 193:9

**correct** 11:15,18 15:11 16:24 17:5, 10 18:6 21:15 29:15,24 30:21 31:1, 19,24 33:6,19 41:22 49:20 54:19 56:17 57:5 62:15,19 65:6 68:11 71:12 72:3 78:9,11 80:1 83:5,10 87:23 88:8,10 91:5 111:1 113:3 118:1 124:1 126:11,13 130:2,13 131:1,12,23 133:3 135:8,18 145:9 146:5 147:14 148:1 149:3 150:5 152:3,14,22 153:8,11,17 158:12, 17,23 162:17,21 165:7,8 166:15,19 168:24 169:4,5 170:4,9,10 171:16, 17 173:9,14,16,17 174:14 176:2 180:12 187:8,20 194:18 198:6 201:16,23 202:10 205:15,18,19 206:1 207:21 210:14 211:19,24 212:12,18,19 213:17,20 214:2 215:10,20 216:1

**corrected** 123:16 168:18 172:18 175:18,22 177:22 178:7

**correcting** 169:23 170:6

**correction** 170:5,24 172:2,12 173:11

**corrections** 25:2 169:18,19 177:23

**correctly** 35:12 40:10,16 42:11 43:13,22 58:4 84:5 95:5 119:18 127:22 142:11 149:2 168:20 174:15 181:21 185:13 196:2 199:15 207:20

**correlated** 151:6

**correlations** 77:12

**corroborate** 22:4

**corroborating** 22:8,14 73:8,11,13 121:6

**counsel** 4:19 6:8,9 11:14,20 12:9

**count** 140:21 146:2 147:3

**counted** 136:16 143:11

**counter** 131:10

**counterintuitive** 80:12

**counting** 141:1

**country** 94:10 143:16 210:7

**County** 26:16,17 27:1,10,17 28:22

175:5,7 208:10,18,24 209:1,6,10, 23

**couple** 19:4 37:9 142:13 155:14,16 207:13,15 212:4

**court** 4:10,16 5:8 15:20 25:22 32:7,10 93:14 125:11 144:19 167:11 169:5,7,9,13 170:3 171:10 173:6,20 174:1,5 214:14

**court-reported** 20:13,16,19 21:7, 19 22:20 30:13 44:1,7 45:15,22 46:13,23 47:4,22 48:18 49:18 50:16 51:4,14,19 52:4 53:13 55:10 56:13 58:13 63:22 68:6,7 94:3 160:4,9,12,20 168:23 169:3 170:20 172:16 174:18 176:1

**courts** 79:12 144:15

**covered** 187:9

**create** 7:19 143:4

**created** 7:14

**credit** 71:19 72:22 95:12,13 99:15 153:2,20 180:22 184:4 185:1

**credited** 75:15

**crediting** 96:1 123:3

**credits** 98:17,21 99:1

**crime** 42:6,7,8,9,17 44:20 54:13 59:17 67:9,15 98:11 108:21 109:1 113:23 114:6 119:16,21 120:1,21 121:21 141:11 146:12 178:24 188:15 197:4

**crimes** 55:16 121:23 146:7,10

**criminal** 18:5,8 19:23 32:22 37:19 38:18 54:13 55:17 56:2 79:13 90:12 91:9,17 92:10 94:7 98:12 99:6 121:2,9 134:8 161:11,12 162:15 164:17,23 165:1,9,13 166:1,3 181:11

**critical** 209:9,13,19

**crossed** 171:2 172:24

**Cruz** 18:5 23:8 27:23 38:21 95:13 98:5,22 99:16 127:21 152:20 153:9 183:5,9 184:7 186:20

**Cruz's** 15:5 22:21 26:18 38:18 180:11,22

**cuffed** 142:18

**cumulative** 40:11

**cursory** 119:12

**custodial** 145:2

**custody** 27:2 43:15 135:16 136:12 137:5 139:11,15 140:1,13,23 142:9 144:1,16 146:19,21 147:7 149:23

**cut** 10:24 41:17 171:24 176:17 190:2

**CV** 4:9

---

**D**

**dark-glue** 172:24

**data** 36:11 77:12 82:9 88:4,7 89:4 162:1,2 204:17,19

**date** 20:18 48:10

**dawn** 99:7

**day** 43:22 58:21 59:2 69:13

**days** 140:16,20

**deal** 159:6 197:18 198:12

**death** 159:8

**decades** 37:9 65:4 97:12 151:5 167:16,24 168:8

**December** 4:6

**decision** 32:10

**decision-making** 151:13 153:24

**declaration** 105:1 107:7,11

**deep** 103:9

**defendant** 4:7,23 5:2 32:22 90:12 91:9 92:10 161:12

**defendant's** 63:20

**defendants** 40:12 71:15 117:15 119:24 217:2

**defense** 90:14 91:17 92:11 94:2 121:2,9 162:15 165:1,10,13,16 166:2,3

**define** 41:2,23 137:4 143:23 152:6 157:9,18 158:8

**defined** 138:4

**defines** 157:20

**defining** 157:17

**definition** 41:10,13 45:4,6,7,13, 21,23 46:4,7 51:21 157:21,23

**definitions** 40:22 44:16 158:1

RICHARD LEO, PHD, 12/01/2025

**demands** 132:12 157:13

**demographic** 35:16

**demonstrate** 22:10

**demonstrated** 94:24

**demonstrates** 193:20

**denial** 43:17 57:8 66:14 67:2
161:11,19 162:4

**denials** 40:14 163:10 199:2

**denied** 67:10,14

**Department** 25:1

**departments** 145:20,23,24 146:4

**depend** 76:5,17 203:6 209:15

**depending** 55:16

**depends** 24:18 93:7 143:8 144:19,
20 153:12,14 166:5

**deposited** 147:1

**deposition** 4:5,6 5:21 6:2,7,17
8:14 12:22 13:19 15:20 23:15,21
24:5,11,19 29:20 30:5,20,24 31:3,
7,13,16 47:23 59:7 62:11,13 65:2,3
67:9 71:7 72:2 91:19 99:20 127:4,
7,8,9,10,13 129:22 130:5,15,17
133:1,8,18,23 134:17 142:3 158:21
160:11,24 180:15 181:5,6 194:9
201:24 202:8 203:8 205:3 217:16

**depositions** 19:13,16 25:9,24
26:6,20 28:5 38:20 61:19 69:6
71:3,7 127:12 161:9 204:14

**deprivation** 151:4,9,12

**describe** 77:21 106:18 179:22

**describes** 42:23 43:13 66:23
70:12 160:2 164:20 197:1

**describing** 44:3,5 71:20

**description** 44:18 109:6 194:5

**detailed** 108:12 124:20

**details** 42:15 184:2 195:21

**Detective** 69:2 70:21,22 78:2,13
94:24 97:17 104:20 112:16 117:7
128:12 132:13,16 143:18 159:7,9,
22 163:8 168:17 177:21 184:16
185:10

**detectives** 43:16 111:21 112:5,6,
23 113:1,8,12,20,21 119:14,21
120:2,3 127:10,15 129:3,7 130:18
147:2

**detention** 150:19

**determination** 151:1

**determinations** 72:6

**determine** 75:8 107:17 137:14,21
153:21 162:24 193:5 194:1

**determined** 163:14

**determines** 74:14

**determining** 85:15

**develop** 37:10 123:5

**development** 37:12 155:8

**difference** 44:14 82:9 198:18

**differences** 51:11

**differentials** 87:16

**differently** 73:7 140:21

**difficulties** 115:22

**Difranco** 30:12,17,20

**Difranco's** 31:2

**digest** 125:17

**digits** 105:20

**direct** 25:11 26:10 47:24 63:5 78:4
110:2 116:22 128:18 130:4 133:22
138:18 139:7 148:20 194:20
203:15

**directed** 206:15

**directing** 134:2 166:10

**direction** 131:9

**disabilities** 33:16,20 35:16

**disability** 37:24 38:3

**discern** 82:8

**discerning** 82:9

**disclosing** 131:4

**disclosures** 131:3

**disconfirming** 28:13

**discovery** 4:4 23:6 25:15 120:17

**discrepancies** 178:3

**discuss** 203:22

**discussed** 62:24 81:23 144:8
178:9 180:15

**discusses** 180:10

**discussing** 26:11 68:24 151:22

159:17 180:7

**discussion** 9:4 89:21

**dispositive** 21:22 22:1 28:12,15

**dispute** 191:12

**disputed** 90:5,15 91:10 92:11

**disregard** 95:1

**distinction** 33:3 139:15

**distinguish** 76:1,21 144:16

**distinguishes** 139:18 151:19

**distinguishing** 139:24

**District** 4:10

**Division** 4:11

**DNA** 120:20,24 121:3,11,15,18
122:4 188:12,13

**doc-** 16:19 115:11

**Doctor** 65:7

**document** 7:12,13,20 9:24 12:6,7
18:15,17 19:1 20:21 27:7,16 28:1,7
29:4,6 47:7,15 48:4,19,22 49:1,12,
14 50:6,8 51:24 61:5,10 62:2 64:22
69:23 81:16 91:7,15 93:6 102:4,8
104:8 110:9,14,19,22 115:12 122:9
130:1 132:8 171:8 193:14 194:8
200:6

**documented** 16:11 19:9 28:7
74:12 95:15

**documents** 6:19,21 7:4 9:13,16
16:14,19,20 17:3,8,12 21:4 25:19
26:9 28:17 29:10 38:2 39:5,7,13,22
40:2 59:4,5,7 64:20 93:18,21 95:11
109:7 110:6,19,23 148:10

**Dog** 100:19,23,24 101:2 104:22
106:23 107:4,17 108:5,15 110:12
180:8

**dot** 140:8 192:2

**double** 43:19 44:24 57:9 66:15
67:3,24 68:8,15 117:15 121:21
128:21

**double-check** 167:8 215:8

**doubt** 97:10

**dozens** 19:4 97:12

**drafting** 63:13

**Drake** 104:14 105:21

**dramatically** 164:7

RICHARD LEO, PHD, 12/01/2025

**draw** 33:4 40:12 43:7 174:19

**drawing** 108:19 111:17,19 139:14 159:3

**drawn** 106:12 178:17

**draws** 98:13

**drive** 5:19

**driven** 56:9

**Drizin** 137:6

**drunk** 111:8

**duly** 5:12

## E

**earlier** 6:5 9:14 37:17 45:14 57:22 61:11,15 62:24 85:4 96:6,11 110:18 125:20 133:19 143:22 154:20 159:1,17 180:7 187:17 206:8 207:18 210:12

**early** 37:10 89:14,15 94:8 210:3

**earwitness** 114:11

**earwitnesses** 100:13 108:3,20 114:5

**easier** 8:17 61:22

**Eastern** 4:11

**edits** 127:13

**educational** 32:13 33:13

**effects** 151:12

**Eileen** 5:1 7:23 10:8 69:24 89:6 200:18 214:15 215:12,21

**electronic** 209:14 210:4,7

**electronically** 209:23,24

**element** 54:13

**elicit** 40:14 117:20 199:2

**elicited** 107:12 154:8 181:24 183:1

**eliciting** 73:22 74:16,23 77:3 163:21

**email** 13:15

**emphasized** 97:3

**empirical** 145:1 150:7 157:15

**empirically** 167:19 168:9

**enclosed** 104:12

**end** 7:9 53:4 56:3 67:3 129:2 130:11 159:7,11 160:21 190:8 213:4 215:8

**ending** 69:19 176:7

**ends** 53:17 70:10 217:15

**enhanced** 83:4,8 85:7 86:16 87:8, 13

**enormous** 123:11

**entire** 56:24 123:22

**entirety** 124:2

**entitle** 81:12

**entitled** 7:14 101:20

**envelope** 29:3

**environment** 204:14

**environments** 203:17

**Ernest** 43:17 68:13

**error** 166:13,22 167:14 168:4,19 169:17 171:5,11 172:18 173:4,18 174:3,22,23 176:2 178:12 193:19, 20

**errors** 166:18,20 169:8 174:5,7,12, 16 175:18,22 177:22 178:7,10 179:8 216:1

**essentially** 180:3

**established** 105:4

**establishes** 157:16

**et al** 4:8

**evaluate** 181:17 182:24 188:5

**evaluated** 83:7 95:11

**evaluating** 73:8 75:23 90:13 180:2

**events** 32:23

**evi-** 154:5

**evidence** 22:3,9 42:16 49:23 50:2 58:24 60:17 66:16 67:4,8,14 71:1 73:8,12,13 77:12 95:3 97:19 98:10, 13 100:4 101:9 104:2 112:11 117:20 121:6,18,20 122:3,5,6,14 127:18 128:16 137:20 151:23 152:7,8,10,11,12,24 153:7,21 154:1,5,6,15,17 177:20 181:7 185:9 188:5,12,21,22 189:5 197:4 199:24 202:17 203:23 204:1 205:14,22,23 206:4 211:16

**evolution** 107:14

**exact** 70:3 82:14 137:14

**exacts** 58:2

**exaggerate** 183:15

**exaggerated** 151:23

**exaggerating** 152:9,12

**EXAMINATION** 5:14 207:9

**examined** 5:13

**examples** 165:13 192:17,18

**exceeded** 132:12

**exception** 19:12

**exchanged** 108:24

**excluded** 122:12

**exculpate** 188:14

**exculpatory** 60:12 122:6 188:12

**Exhaustion** 135:13

**exhibit** 11:23,24 15:19,21 25:18 31:3,7,13,23 47:12,13,21,22 52:3 61:23,24 62:8,10,18 81:13,14 88:19 91:23 101:16,20,22,24 105:18 109:21,22 116:1,17,20 129:15,18,21 132:18,19 138:10,11 147:13 161:8 170:19 175:24 191:18,21,22 200:16,17,19,21,22 201:2,17,19 205:3

**exhibits** 10:18,20 11:2 12:3 19:13, 15 25:8,14,23 26:6,20 28:4 29:16 30:2,23 31:18 38:19 39:8 61:19 69:5,22 71:4,6 109:11 200:1,2 202:6,11

**exist** 152:9,10,13

**exists** 69:9 154:16

**expect** 121:8 204:16 206:3

**expense** 122:22 123:11

**expensive** 122:19

**experience** 32:20 94:11 96:17 97:9 203:9 205:9 207:23 208:17

**experimental** 151:8

**expert** 73:1 79:13,19 82:2,10 90:6 91:1 96:23 123:1,12,13 181:6

**expertise** 54:14 186:24 187:2

**experts** 82:1 83:8,17 87:14,16 124:19 155:3 179:23

**explain** 34:4,7 46:5 151:13 159:4 178:2 179:19 182:5

**explained** 159:20 184:23

**explains** 44:19

**explanation** 41:6 42:11 185:23 209:1

**explanations** 77:13

**explicit** 74:10 76:13 83:15 84:13, 14,17,21 85:1,9,13 86:8 87:19 88:12,22,24 158:16 159:2 167:22

**express** 14:12,15

**extent** 215:1

**extraordinary** 143:15

**extreme** 76:21 78:24 79:2 97:3,11, 14 98:1,9

**extremely** 74:15 95:1 96:4,8,15 97:5,18 98:7

**eyewitness** 122:1 182:3,7,15

**eyewitness-identification-type** 181:23

**eyewitnesses** 100:13 114:5

---

**F**

---

**fabricated** 184:14

**fabrication** 184:14

**face** 121:7

**fact** 57:2 71:17 72:6,21 81:2 97:20 98:7 99:2 105:5 110:21 118:3,20 123:1,9 126:16 131:17 153:4,20 165:6,15 182:15 198:21 199:7 207:21 209:9 210:13

**fact-finder** 55:14 99:3,12

**factor** 37:4,7,21 75:3 86:21 150:20 151:6,17,20 152:2 187:23

**factors** 33:4,5,8,18,23 37:5 38:12 43:9 154:18,21 161:18 162:5 163:15,18 184:9

**facts** 75:14 96:1 123:3,4,5 124:20 153:20 168:16 178:6 180:4,6 187:12 196:18,20 204:17,20

**factual** 72:5 82:21 122:20 123:15, 18 144:20 166:18 193:18,20 202:21 206:11

**factually** 76:22

**fail** 173:21

**fair** 6:6 14:19 39:15,24 41:10 42:24

49:19 54:15 63:21 64:6 71:14 73:6 81:2 82:13 83:19 87:24 90:7 93:24 100:6 130:24 139:19 145:15 146:3 147:21 156:22 157:8 171:16,17 189:7 192:9 202:19 204:2,4

**fall** 35:15 37:6,20

**false** 33:11 34:1,9,11,22 35:6,23 43:9,20 58:19 59:1,11,21 64:10,17, 23 67:12 71:23 73:22 74:8,12,16, 24 75:1,10,18,20 76:3 77:4,15 80:11,24 82:5,11 85:16 87:1,9,21 88:2,13 131:15,19 137:7,10 138:14 147:8 149:8,21 150:1,9 151:6,10, 22 152:4,7,23 153:6,21 154:16,18 161:15,18 163:10,16,21 164:15 181:9 183:19 184:10

**false-confession** 151:7

**falsehoods** 189:1 192:17

**falsely** 75:4 85:24 86:6 132:14 153:2 162:4 163:1

**familiar** 26:23 28:21 30:12 32:1 63:1 81:5 84:9,11 87:8

**family** 78:3 79:1 84:18 85:2,14,23 86:9 111:24 116:8,15 117:9 119:10 160:15 164:3

**fast** 125:9

**fast-forward** 15:24 16:1 151:21

**fatigue** 135:13 136:5

**federal** 93:14

**fee** 200:13

**feeding** 184:15

**feel** 162:9

**feet** 182:10,13

**Feld** 145:11

**felony** 28:21 29:1,7,14 30:4,12,16 31:2 146:8,12 161:7

**field** 41:10 82:1 136:15 165:9 167:17 179:23

**file** 109:18 116:18 191:5

**filed** 4:9 18:8 162:14

**files** 137:22 138:2

**fill** 29:2 143:1

**filler** 141:9

**fills** 27:1

**final** 201:20 202:16

**financial** 166:6

**find** 127:23 144:9 174:7,12 183:13 204:12,22,23 205:4 211:1,5

**finder** 153:19

**finding** 183:5

**findings** 75:12 79:10

**fine** 10:22 52:11 65:24 70:5 114:22 115:2 216:22

**finish** 189:22

**finished** 138:22 139:2 189:24

**firm** 115:13

**fits** 184:5

**five-minute** 206:22

**five-to-ten-minute** 114:20

**flip** 13:22 76:10 79:4 80:6 158:11 159:5 194:12

**flipped** 127:24

**focus** 40:18 158:14 172:15

**focusing** 98:5

**folder** 28:20,22 29:7,14 30:4,17 31:3 161:7

**follow** 111:22 112:23 116:3 118:11

**follow-up** 113:5 118:19 207:14

**footnote** 71:9 79:24 80:14,17 81:3,20 138:18,21,24 139:8 145:6 148:6,20

**forced** 162:11

**forensic** 35:18 36:10 197:3

**forgot** 149:15

**form** 20:7 21:9 24:2,14 26:24 27:6, 12,22 28:6 44:9 46:15 47:8 48:11 49:4 50:18 51:6 52:21 55:11 59:13 60:2 61:2 63:15 64:1 68:1,9,16 72:15 77:6 90:16 91:12 92:13,24 94:4 96:9 103:2 104:2 120:5 124:4 135:3 136:22 141:18 143:6 144:3 176:20 177:14 192:19 196:15 197:12 205:16 206:5

**forms** 33:22 35:17 86:3

**formula** 77:10 78:23 151:18

**forward** 73:17

**forwards** 124:9 206:9

RICHARD LEO, PHD, 12/01/2025

**found** 41:21 119:16

**foundation** 10:11 103:2

**four-page** 18:24

**Frank** 30:12,17,20

**frankly** 214:11

**frequently** 24:1

**Fro** 54:17 56:19

**front** 6:20,21 7:4 9:14,16,24 10:4 13:11,14 20:17 91:4 115:12

**full** 41:1 150:18 159:13

**function** 175:13,14 207:20 208:2, 4,5

**future** 99:8,11,15 153:15

### G

**gang** 185:10,12,16,18,21 186:2,4, 5,9,10,11,15,21 187:1

**gang-related** 185:19

**gangs** 185:20 186:15

**gathered** 117:12

**gave** 44:16,18 51:20 108:11,12

**general** 27:19 32:4 37:16 107:2 204:23

**generally** 32:3 41:2,9 75:13 79:10 81:22 157:22 179:4,5

**generate** 106:7

**girlfriend** 189:2,10 193:24

**give** 26:5 36:24 38:14 56:4 63:7 81:11 88:19 112:3 118:12 133:9 139:3 155:24 163:5 191:1 210:23

**glad** 85:11

**glasses** 182:12

**glue** 172:24 173:7

**gold** 121:18

**Gomez** 216:4,18,21

**Gonzalez** 4:8 11:10,21 12:9 14:15 18:8 20:18,23 21:1,5,14 22:14 23:18,24 25:2 26:11 27:22 36:4,12, 17,20 37:18,23 38:4,7,12 43:5,13, 20 45:16 46:11,22 48:24 50:24 52:12 54:17,21 57:7,23 58:7,19 59:21,24 61:13 62:8 63:12 64:16, 23 66:23 67:5 70:12,19 71:15 78:8,

12 98:4,6,10,22 99:15,21 122:7,12 128:20 129:7,13 130:8,23 131:6 132:15 133:4,16,18 134:7,23 141:8 152:16,18 153:5 159:6,10,22 160:7,23 162:14 163:15 164:2,16 165:7,17 170:20 176:4 177:10 181:2,8 182:23 183:5,10,11 184:8 186:20 187:6,17,22 189:5 190:19 191:9 193:14 200:10 201:6 210:13 211:11

**Gonzalez's** 14:20 17:18,22 20:13 25:10 26:4,17 31:8,13,16,21 43:10 44:1,7 45:15,22 47:21 49:18 50:10, 16 52:3 55:10 56:13 57:18 58:13 60:24 61:12,16 62:11,13 63:21 66:13 68:24 71:19 72:1 73:9 77:20 78:3 84:16 94:1 95:4,12 121:2,10 127:16 129:22 130:19 131:4,20 132:5 134:8 135:16 158:15,21 162:7,15 163:9 168:19,23 169:3 172:15 177:22 179:15 180:16,17 181:12 188:24 189:9 216:15

**good** 4:1,22 5:16,18 8:22 13:4 52:15 65:13,14 89:13 156:6 165:14 166:1

**Google** 191:24 192:1

**Goossens** 98:22 99:16 152:20 153:10 189:4 190:14,15

**Gotcha** 17:2 35:8 115:15 175:15 190:1 195:8

**GPR** 102:17 104:13 105:8,19 107:18 123:23 125:19

**grammatical** 166:18

**Great** 9:22 11:8 115:3

**greater** 33:10 37:15

**guess** 16:1 28:14 46:11 87:6 112:22 138:19 163:7 186:6 191:14

**guessing** 177:7

**Guevara** 4:8 5:5 11:11 43:16 70:21 78:2,13 94:24 95:19 97:17 104:20 106:22 111:21 112:5,7,23 113:4 116:2 117:8,14 118:10 119:4,14 120:2 121:14 127:15 128:12 129:3,7 130:19 132:13 143:18 159:7,9,22 160:14 163:9 168:17,22 169:2 172:7 175:16 176:11 177:21 178:6 184:16 185:10

**Guevara's** 132:16 176:10 177:12

**guilt** 60:17 95:4 121:5 127:16,19 198:21 199:4,12,16 203:22

**guilty** 38:22 42:6,8,13 56:10 183:16

**gun** 56:15 119:15 120:14 196:8

### H

**habeas** 26:4,11

**half** 7:3 119:18

**halfway** 103:17 172:22

**Halvorsen** 43:17 68:13,21,24 69:2 70:22 94:24 104:20 106:22 111:22 112:6,7,23 113:5 116:2 117:8,14 118:11 119:4,14 120:3 121:15 127:15 128:13 129:4,8 130:19 159:10,22 163:9 168:17,22 169:2 175:16 177:21 178:6

**Halvorsen's** 97:18

**handwritten** 22:21

**happen** 143:16 207:24

**happened** 71:18 90:20 97:11 164:10 170:17

**happy** 69:7 123:5 214:20

**hard** 52:10

**harm** 83:16 84:14 85:14 88:13

**harsh** 78:19

**hazy** 209:8

**he'll** 10:4

**head** 90:20 91:14 92:17 109:10 144:10

**health** 32:18

**hear** 93:2 127:22 149:18 174:15 181:20 207:20

**heard** 57:3 100:18 101:1 108:3,8, 20,21,23 110:11 114:3

**hearing** 18:13 19:4,5 108:13 138:1 200:20

**heated** 214:7,10

**helpful** 21:17 36:1 118:4

**high** 79:2 151:2

**high-speed** 8:19

**highlight** 88:23 118:24

**highlighted** 8:5 86:17

**highlighting** 8:16 148:21

RICHARD LEO, PHD, 12/01/2025

**highlights** 8:3

**highly** 80:12

**hire** 166:3

**hired** 165:17

**historically** 99:6

**history** 157:7 172:18

**hit** 70:20

**hoc** 188:6,9

**Hold** 11:4 176:19

**home** 56:9 187:7 189:4 190:15 193:8

**homicide** 15:6 113:20 117:15 119:10 120:8,12 121:21 146:11 185:10,16,17 186:2,9 198:15

**homicides** 146:7 185:21

**hoodie** 54:10 55:15 172:24

**hoodies** 55:21

**hoods** 54:16

**hopeless** 162:9

**hour** 11:17 65:8 108:14 145:3 146:16

**hour-and-a-half** 147:4

**hours** 28:8 43:14 111:4 124:10,12 135:17 142:3,13,22 147:9 149:9 150:1,4 160:22 164:5 182:1 202:2

**human** 157:7

**hundred** 11:5 124:12 213:6

**hundreds** 74:12 97:1,12 168:10

**hypotheses** 106:6

**hypothesis** 105:15 106:14,18

**hypothetical** 143:2 170:13

**hypothetically** 106:5 188:11

_____

I

**idea** 163:4 199:5

**ideas** 118:14

**identic-** 196:8

**identical** 70:4 103:15 184:21,24 185:3 211:22 212:8,15 215:9,18 216:3,11

**identically** 185:1

**identification** 182:16

**identified** 7:16 61:8 100:5 114:8 152:4 195:13

**identifies** 27:8 193:24

**identify** 4:18,19 34:8,20 38:3,9,11 48:23 51:16,18,23 70:18 122:14 158:9 183:9

**identifying** 152:20

**IDOC** 25:6

**Illinois** 4:11,15 25:1 210:4,6,11

**illness** 33:22 35:1,17 38:7 86:3

**imagine** 76:7,8

**immaturity** 37:13

**immediately** 43:21 58:20 59:1,22

**immunity** 208:5 209:18

**impaired** 151:14

**implicate** 182:23

**implicated** 132:14

**implicating** 141:10 153:2 181:1,8

**implicit** 74:11 76:14

**important** 20:4

**inability** 162:8

**Inbau** 199:19

**incident** 190:20

**include** 19:21 32:13,18,21 33:13 41:20 86:8 91:9 136:1 140:7 141:2, 11 143:5 146:6 149:9

**included** 20:16 50:5 137:24 142:13 161:9

**includes** 137:4 143:24

**including** 110:12 136:15 144:1

**Incommunicado** 135:12

**incompliance** 35:22

**inconsistencies** 183:6

**inconsistent** 184:10,11

**inconsistently** 92:19

**incorporated** 159:19

**incorrect** 75:16 169:15,24 170:2 193:13

**increase** 34:14 73:21 75:9,20 76:2 77:3

**increased** 34:1 35:22 71:22 74:23 163:20

**increases** 74:5,15,16 75:17

**incriminating** 40:15,19,23 41:24 42:2 44:15 45:1,9 46:21,23 47:2,4 48:24 49:10 51:15,17,18,21,23 52:1,19 53:10,12,21,24 54:5,8 55:9,18 56:7 57:13 60:15,17 183:24 199:3

**inculpatory** 122:5 184:1

**independent** 98:8,9 192:24

**independently** 149:1,5 179:10

**index** 19:21

**indicating** 38:2 39:5 46:22 61:13 68:21 87:13 111:10 112:1,5 116:9 118:3 169:7 190:22

**indicia** 156:5 179:15,20 180:21 181:11 182:8,19 183:2,24 184:3,22 185:5,6 187:10,23 188:4,20 193:1

**individual** 27:1,9 75:4 85:2 211:13

**individuals** 23:1 33:10 35:19,20 54:11 93:12 98:8 99:19 110:11 210:15 211:14

**individuals'** 28:9

**induce** 151:9

**inevitable** 105:16

**infer** 72:24 105:11,13 106:1,3,8

**inference** 54:23 105:16 106:12,13, 15 108:19 126:4 168:16 178:5,15, 16,21

**inferences** 106:11

**inferred** 42:3,5,15 51:22,24 56:9

**information** 106:3,7,9,19 112:2 114:18 116:10 117:12,13,24 118:4, 7,9,13 119:5,10 122:11 127:11 129:11 138:3 165:4 204:5 213:7,23

**inherently** 209:19

**initial** 48:21 95:21 111:24 116:9 166:19 169:21

**initials** 174:8 176:2,16 177:5,9,11, 12

**injected** 169:8

**injuries** 22:4,7,9 27:8 28:7,8

RICHARD LEO, PHD, 12/01/2025

**innocence** 59:9 60:9,13

**innocent** 161:14 172:2,12 186:17

**inquire** 197:20 198:16

**insert** 174:7,13,16

**insertion** 166:13,23 167:14 168:4 169:18 171:6,11 173:4,18 174:3,24

**insertions** 168:19 174:22 178:13

**inserts** 166:18

**Inside** 136:19 145:7

**instances** 70:18,24

**intact** 39:6

**intake** 26:16,18,24 27:6,12,22 28:6

**intellectual** 33:16,20 34:24 35:16 37:24

**intend** 14:15

**intent** 54:21

**intentional** 185:21

**intentionally** 80:2 166:17 168:18 169:8,15 171:12 173:7,21 175:17, 21 177:21 178:7

**inter-** 112:12

**interesting** 155:7

**interpret** 49:9 52:23 53:11,23 54:7 60:11,19 75:14 142:8

**interpretation** 134:18

**interpreted** 47:1,2,3 48:23 49:10, 14,17 50:2,4 55:16,22,24 67:8,17, 20,23 68:7,14 128:16 141:23 143:12 201:11

**interpreting** 55:13 127:1

**interrogate** 140:18 147:2 196:23 197:24 198:4,8,12,19,22 199:10

**interrogated** 140:14,24 197:1 198:1,5

**interrogation** 20:6 22:5 33:12 34:13 35:7 40:11 43:4,15,21 58:20 59:1,22 67:11,13 71:10 72:13 75:5 80:10 83:4,8 85:7 86:7 90:13 93:16 95:21 129:9,14 135:12,16 136:1,6, 7,13,20 137:4,15,21 138:5 139:12, 16 140:1,6,17,19,22 141:2,5,9,12, 15 142:9,10,12,14,17,22,24 143:5, 10,24 144:2,17 145:7 146:22,24 147:7,24 149:1,24 150:11,19 151:3 154:2 161:22,23 163:19,20 168:7,8

179:7 183:19 188:13,17,18 194:6, 17 197:6 198:16,19,23 199:13,17 208:12,22

**interrogation-induced** 180:1 188:24

**interrogations** 15:9 82:11 86:16 87:8,13 90:6 117:20 145:3,16 146:2,9,15 147:8 148:2 149:21 167:18,19 168:10 210:1,8

**interrogator** 157:13 166:16 169:20

**interrogators** 157:14 166:13

**interrupt** 112:19

**interview** 111:23 112:8,10,24 113:11,19,22 114:1 116:7 118:11 119:8 196:22,23 198:9,18 199:11

**interviewed** 112:6,13,16 113:1,7 119:7

**interviewing** 113:16

**interviewing/interrogation** 182:1

**interviews** 15:9 110:6 113:5 116:14 117:4 118:19 145:20,22 146:2,6 147:22

**introduce** 50:15 115:16

**introduced** 50:22 58:9

**invariably** 172:7

**investigate** 129:4

**investigated** 108:7 130:23 178:24

**investigation** 24:12 31:9,22 32:2, 6,8 37:19 61:12,16 63:2,7,14 94:20 95:21 98:12,14 104:21 105:4 106:22 107:4,14 108:1 117:17 175:10 179:6,9,11 187:13 188:6 198:21 207:22

**investigations** 179:4 209:17

**investigative** 109:8,17 113:15 116:18 175:13 191:5 208:1,5

**invoice** 11:19 12:8,14,15,17,19,23 13:1 200:8 201:3,20

**invoices** 12:21 115:14 200:2 202:3

**invoke** 161:21

**involved** 92:9 117:19 143:19 145:23 146:1 194:24 195:10,19 196:3,9 207:22 208:19,20 209:2,10

**involvement** 42:6,8,16 43:18 57:8,10 66:15,17 67:2,5,6,8,15,17, 21,24 68:8,14 197:21

**involves** 20:5 54:13

**involving** 27:17,22 29:1 55:17 90:5 179:2 208:24

**irrelevant** 188:15

**issue** 37:2 51:14 82:15 83:8 84:12 85:13 100:23 162:6 187:16 205:8 208:5

**issues** 83:6 179:2 206:11 214:24

**Item** 17:24 18:20,23 19:12 20:12 23:15 29:19 30:1,8,19 31:15 62:18 83:3 109:14

**items** 7:15,16,17 16:10 17:13 18:18 19:9,11,20 22:19 25:6,19 26:2 28:2 29:13 82:16 83:2

---

**J**

**jail** 26:16,17 27:1,10 140:16 143:9

**JB** 176:8

**Jennifer** 29:20,22 177:10

**JGS** 102:4

**Jose** 14:24 30:13 54:16 56:18 127:20 194:17,23 195:9

**judge** 203:11 212:23

**judgment** 94:14 95:1 97:6 98:20 100:6 108:2 117:18 148:8

**July** 197:11

**jump** 170:21

**jurors** 84:8,21

**jury** 17:14 98:21 99:1,5,8,14,15 153:12,16,19

**Justino** 15:5 22:20 95:13 127:21

**juvenile** 37:15

---

**K**

**Kassin** 79:18 80:2

**Kenzie** 191:9,15 192:6

**Kevin** 100:12 102:22 103:1 125:24

**key** 113:22,23 114:2 119:9 121:17

**kidnapping** 146:11

RICHARD LEO, PHD, 12/01/2025

**kill** 54:12,21 56:19,20 100:19 118:15

**killed** 45:16 46:6 56:15

**killing** 46:5 186:17

**kind** 27:8 34:15 89:14 99:5 100:9 163:3 164:14,15 203:12,16

**kinds** 77:14 204:12

**King** 195:20

**Kings** 186:21 187:1 196:12

**knew** 117:18 130:19 131:2 188:17

**knowledge** 13:1 14:17 36:5 39:23 41:11 42:7,9,13,15,17 54:10 55:23 56:10,18 59:16 67:21 75:13 77:17 79:11,17 80:11,23 85:15,18 88:1, 12 95:24 97:9 154:10,20 161:13 186:23 197:18,22 198:15 199:8

**Kondal** 112:16

**Kyle** 4:22 7:10 114:21 115:11 200:16

**Kyle's** 207:14

---

**L**

**lack** 208:9

**landed** 214:12

**language** 74:6 87:4,11 118:24 148:22

**lasted** 119:8

**late** 89:16

**Latin** 186:21,24 195:20 196:11

**law** 55:16 56:2

**lawyer** 159:23 160:3,9

**lawyers** 139:10 206:9,24

**lay** 32:11 33:7 79:19 80:23 81:5 82:4,10,24 83:7 85:15,22 86:20 87:7,12,16 88:1,12 154:10,13,16, 20 155:2,4 161:14

**Le** 189:4 190:16 191:15 192:3 193:9

**lead** 34:8,11 75:4 80:24 81:6 84:9, 22 85:16,23 87:9,21 88:2,13 113:8, 21 117:14 149:21 161:14 188:14

**leading** 71:22 75:3 147:8 149:24 167:24 168:7 199:18

**learn** 175:9

**learned** 105:4 175:9

**learning** 209:5

**leave** 39:21

**led** 71:22 95:8 100:5 122:11

**left** 52:16 54:17,22 114:23 140:20

**legal** 4:13 46:16 54:9 164:8 165:23

**legally** 199:1

**legislation** 210:2

**legitimate** 199:9

**length** 135:24 136:13 137:14,21 139:10,11,15 140:6,21 148:13,24

**lengthy** 117:19 135:11 150:19 151:3

**lenient** 78:20

**leo** 4:5 5:11,16 8:2,12,23 9:9 11:24 12:5 13:10,22 15:21,23 40:4 47:13, 15 52:4 61:24 62:2 65:12 66:10 79:3 81:12,14 89:14 90:2,8 101:19, 22,24 109:22 114:14 115:12,21 116:19 129:18,21 132:17,19 138:11 151:21 156:17 177:2 191:2, 18,21 200:22 201:17 202:15 206:17 207:11 217:6,7,16

**Leo's** 15:18

**lesser** 121:23

**letters** 177:7

**letting** 146:23

**level** 203:18 204:23

**liability** 54:14 55:17 72:10

**licensed** 36:9

**lie** 154:11

**lied** 164:3

**likelihood** 74:16 75:10,18,20 76:3

**limitations** 33:14

**limited** 106:7

**line-up** 114:12 141:10

**lines** 52:17 53:6,18 54:3 55:6 130:11 134:3 174:20

**link** 196:5

**linking** 98:10 197:4

**list** 7:1 71:5 100:4 185:6

**listed** 18:18 19:8,14 25:9,18,24 26:2,21 28:2 91:8 109:11 193:11

**lists** 213:19

**literal** 44:16

**literally** 127:2

**literature** 95:24 151:11

**litigated** 214:24

**litigation** 79:14

**lived** 101:6 103:21 125:6,16 126:15,21 189:5 190:17,19 193:15

**lives** 106:4 182:11 191:9

**locate** 120:14

**location** 193:15

**logic** 95:3

**logical** 168:16 178:5,15

**logistical** 206:24

**long** 6:9,12 11:2 67:11 84:8 103:10 104:7 119:8 122:18 128:6 132:11 142:17,19 147:23 151:11 156:7,17

**longer** 39:6 155:22

**looked** 148:21 154:19 178:12

**lose** 209:17

**lot** 69:12 122:21 137:17 183:19 204:5,21 212:6

**loud** 111:7

**loudly** 108:4,14

**lower** 46:11

**Lozada** 187:6

**Lulu** 100:19,23,24 101:2,6 102:7, 17 103:6,21 104:4,22 105:2,11,19 106:1,5,23 107:4,8,9,17,19 108:5, 15 110:12 125:6,23 126:5,15,21 180:7 205:13

**lunch** 89:13 155:18,23 156:7,12

**lying** 152:8,12

---

**M**

**Macias** 100:14 108:11 110:6,7 111:3,22 112:15 116:3

**made** 16:16 19:20 46:23 76:1 77:22 124:17,18 125:1 148:7 181:16,20 216:16

**main** 35:4

**maintain** 59:11

**maintained** 43:20 58:19,24 59:15, 16,21 60:9,12 64:9

**Maisonet** 18:12 19:23 23:21 24:1

**Maisonet's** 15:1 19:6 20:4 22:20

**major** 146:12

**majority** 145:2

**make** 7:8 8:24 11:23 18:15 34:12, 21 35:5 61:22 67:11 86:4 97:21 100:22 123:14 151:10,15 162:9 163:1 172:19 174:5,6 179:8 183:4 190:1 214:20

**makes** 37:15 169:15 210:16

**making** 33:11 35:5,23 72:5 77:16 123:2 128:14 177:23

**male** 111:5,11

**manilla** 29:3

**manual** 167:23,24 199:19

**manuals** 167:21 174:9

**map** 192:11

**Maps** 192:1

**Marek** 67:23

**Maria** 187:5

**mark** 15:18

**marked** 11:24 15:21 47:13 61:24 81:14 91:23 101:22 109:22 129:18 132:19 138:11 191:18 200:23 201:17

**massive** 101:13 104:6

**match** 105:8,23 184:1

**matched** 119:15

**material** 202:13

**materials** 7:2 16:4 22:17 26:21 30:10 31:11 39:12 62:16 95:23 96:23 99:24 101:12,13 102:15 104:7 106:24 127:6,24 128:9 138:2 143:12 161:10 181:3 192:23 195:24 197:14

**mathematical** 77:9 78:23 97:7 151:18

**matter** 4:7 11:11,21 12:10 14:16 23:18,21,24 24:1 25:11 27:22 29:23 31:14 34:6 36:17 37:16 45:3

62:12,14 80:5 99:22 129:23 133:5, 16,19,20 134:7 141:7 152:15 200:10 201:6

**matters** 18:5 27:17,20 36:7 212:22

**Maysonet** 18:5 23:8 27:23 31:14 62:12,14 95:14 98:5,22 99:16,21 102:4 127:20 129:22 133:20 152:19 153:4,13 180:22 183:5,9 184:7 186:20 194:17,23 195:9,13 196:3,8,22 197:4,17,20 198:14

**Maysonet's** 26:17 30:13 153:6 180:11 195:20 197:6

**meaning** 44:17,24 213:24

**meaningful** 98:12 108:1 117:17 155:23 157:12 162:10

**means** 138:5,6

**meant** 178:1

**measure** 77:2

**Media** 4:2 9:6 66:7 89:23 115:8 156:14 207:7

**medical** 197:3

**meet** 45:4 54:12

**meetings** 163:22 164:8

**Melendez** 133:2

**member** 79:1 85:23 86:9 185:18

**members** 84:18 85:3,14 111:24 116:8,15 117:10 119:11 185:22 186:20

**memorialization** 209:2,11

**memorialize** 209:2

**memories** 151:13

**memory** 8:5 56:14 63:11 82:20 92:9 102:12 129:13 140:12 190:23 203:12 204:22

**men** 108:4,13

**mental** 32:18 33:22 35:1,17 38:3,7 86:3

**mention** 33:17 39:10 90:4 95:20 100:22 101:1

**mentioned** 26:10 39:14 50:9 61:11 96:11 100:10 123:21 131:13 148:7

**mentioning** 108:5,15 116:2

**mentions** 10:17 102:19 125:23 126:21

**mere** 182:15 199:7

**method** 175:2

**methodology** 72:9 75:7,11 77:18 81:23 95:7,11,22 150:23 179:19

**methods** 79:9

**mid-20s** 36:18,21,23 37:11

**middle** 86:18 103:10 108:12 144:24 194:21

**midway** 100:10 116:1

**million** 120:14

**mince** 87:2

**mind** 128:12,15 137:8 188:19

**minds** 49:11,17

**minimal** 76:20

**minimization** 183:18

**minimize** 183:14

**Minnesota** 210:10

**minor** 166:18 216:20

**minus** 11:1 201:9

**minutes** 6:14 8:21 65:22 70:2 147:1,3,4 155:19,22

**Miranda** 160:1 161:20

**mis-** 39:11

**misdated** 6:23,24

**misidentifies** 189:2

**misidentify** 189:10

**misleading** 72:19

**missing** 7:9

**misspelled** 171:12

**misspellings** 169:23

**misspoke** 7:7

**misspoken** 37:17

**mistake** 16:16 19:21 26:1,7,20 30:9 31:5 123:14,19 124:17,18 125:2 171:16,17 194:2

**mistaken** 57:20 192:18 193:6

**mistakenly** 39:21

**mistakes** 39:11,19 178:10,11

**Molly** 5:4

**money** 122:21

RICHARD LEO, PHD, 12/01/2025

**monitor** 13:12

**monitors** 13:11

**month** 188:13

**months** 95:20 120:7,11

**morning** 4:1,22 5:16 8:6 202:2

**motion** 18:23 19:3,6 20:4 162:13

**motions** 18:1,4,7,11,12

**motivated** 198:11

**move** 39:9 40:4 52:6 53:20,21 69:11 94:13 98:15 138:21 139:1 144:23 156:18 189:23 201:2

**moved** 43:17 66:14 67:1,11

**Moving** 53:2

**Moyne** 189:4 190:16 191:15 192:3 193:9

**multi-defendant** 183:21

**multiple** 13:11 106:11 159:23 160:18 179:9

**murder** 14:21 38:23 43:19 57:9,11 61:1 65:4 66:15 67:3,24 68:8,15 100:12 128:22 131:8 185:9 186:12 187:7 195:10,19 196:4

**murdered** 118:20 196:11

**murders** 46:13 56:24 67:18,21 194:24 196:11,14 197:18,21

**mute** 8:24 90:8

**N**

**name's** 133:1

**named** 99:20 102:6 104:21 106:23 107:4

**narrative** 41:6 44:19

**narrower** 205:6

**nature** 85:9

**necessarily** 22:7 85:2 105:12 106:8 127:1 141:3 166:5 171:13 174:1

**newspaper** 148:4,6,8,9,14,15,17, 24 149:4,10 150:10,14

**Nick** 4:12

**nickname** 105:2,11 107:7

**night** 7:21 8:6 56:20 128:21 182:13

187:7

**nod** 142:13

**nonexistent** 152:10

**noon** 65:21

**North** 4:14 104:14 105:20 191:9,15 192:6

**Northern** 4:10 146:5

**Nos** 200:22

**notation** 79:16

**note** 31:12 83:13 183:4 187:21

**noted** 32:17 131:21

**notes** 29:3

**number** 4:9 17:13 96:13 105:20 205:2

**numbered** 12:23

**numbers** 90:10

**numerous** 79:12

**O**

**O-F-S-H-E** 167:12

**objection** 20:7 21:9 24:2,14 44:9 46:15 47:8 48:11 49:4 50:18 51:6 52:21 55:11 59:13 60:2 61:2 63:15 64:1 68:1,9,16 72:15 77:6 90:16 91:12 92:13,24 94:4 96:9 103:2 120:5 124:4 135:3 136:22 141:13, 18 143:6 144:3 149:11 176:19 177:14 192:19 196:15 197:12 205:16 206:5 214:7

**objections** 200:20

**objective** 71:10

**objectively** 188:19

**observed** 145:16 168:9

**obtain** 123:24 148:23

**obtained** 122:15 148:13 149:10 150:3 154:12

**obvious** 121:24 124:18 189:1 192:17

**occur** 6:2 22:10 149:8

**occurred** 21:20 32:23 56:24 72:14 97:22 109:1 131:8 195:19 196:11

**October** 6:22,23,24 7:5

**offer** 123:7

**office** 209:7

**officer** 63:12,17 64:15 179:1

**officer's** 176:15

**officers** 4:23 72:13

**offices** 4:14

**Ofshe** 167:9,11

**oftentimes** 22:5 74:10

**older** 144:12

**one's** 162:8

**one-page** 10:3 115:11,12

**ooh** 200:19

**Oops** 129:1 191:3

**open** 13:14,15,16 81:12 82:13 91:22 101:19 109:20 116:17 138:9 148:19 170:19

**open-ended** 204:21

**opin-** 82:2

**opine** 56:1 94:23 131:18

**opining** 113:4 180:19,20

**opinion** 25:22 73:10 82:10 94:23 96:15 98:6 99:18 107:16,20,22,24 108:3 117:16 128:10 154:3,9 168:15 172:14 193:20 207:16 211:10 212:6 213:3 215:10

**opinions** 14:3,9,10,12,15,20 15:13,14,15 16:17,21 17:4 38:14 42:24 79:20 82:2,4 83:7 123:2,6 203:2,4 205:1 211:19,22 212:3,21, 24 215:19 216:15

**opportunity** 209:21

**opposed** 140:18

**opposite** 182:14

**oral** 43:4 179:16

**orally** 43:18 57:8 66:14,17 67:2,5

**order** 35:9 37:6 40:13 213:11

**ordered** 214:14

**orders** 32:7

**out-** 179:11

**outlier** 208:19

**over-a-hundred-page** 123:10

RICHARD LEO, PHD, 12/01/2025

**overbore** 163:9

**overcome** 40:14

**overnight** 182:1

**overturned** 39:2,4

**overview** 14:3 21:13

**overwhelming** 145:2

---

**P**

**p.m.** 89:24 115:5,9 156:11,15 207:3,8 217:17

**page-and-a-half** 213:22

**pages** 11:2,5 15:18 16:1,7 18:20 19:5,9 52:20 55:3 69:18 77:21 213:6 215:6,15 216:16

**pagination** 43:1 70:3 78:10 103:15

**paginations** 69:20

**paragraph** 10:13,17 14:24 15:4 40:9 66:11,21,22 80:9 100:4,11 103:10,16 108:12 116:1 122:14 128:5,6 135:23 144:24 150:18 159:13 166:11 168:15 179:21 194:21,22 195:4

**paragraphs** 15:8,12 18:18

**parentheses** 135:12

**parse** 198:2

**part** 14:2 17:21 28:24 30:8 32:10, 12 33:18 40:18 41:21 42:10 57:14 58:17 65:1 66:13 69:10 84:5,7 85:8 91:8 93:2 96:20 97:16 98:19 109:5 110:22 116:6 119:17 120:19 126:19 127:4 133:14 138:23,24 139:2 142:18 146:15 149:15,17 168:6 174:1 175:11 179:6 181:19 185:18 190:13 208:21

**partially** 184:11

**participant** 155:10

**participants** 83:16 87:20 183:10

**participate** 141:10

**participating** 38:22

**participation** 42:7,9 56:10 59:16

**parties** 4:20

**parts** 94:10 143:15 169:15

**passed** 210:2,3

**past** 90:24 153:16

**patience** 203:11

**pattern** 7:2,14,18 9:15,18,20,23 10:3 15:14,15 16:18,21 17:9 77:13 95:18 97:19,24 98:1,3 172:3 184:5 207:15 208:17,18 211:18,22 212:21

**patterns** 77:11

**pause** 50:8

**PDF** 11:6 69:21 83:23 86:14 92:4 213:5,12,15 215:6,15

**peo-** 108:3

**people** 22:5 35:15 50:3 82:24 85:22 86:4,5,20 87:12,16 88:1 106:5 120:15 151:10 154:16,20 155:2,4 161:20 162:4 166:4 167:4 186:17 198:22

**people's** 151:13 154:10

**perceive** 51:16 157:11

**perceived** 159:9

**percent** 86:19 87:12,13,20 183:20

**percentage** 85:3,5

**percentages** 82:3 86:23

**perceptions** 151:14

**perfectly** 10:22

**performed** 36:6,9

**period** 122:18 135:16 140:13,23 142:9,19 147:7 149:23

**perpetrated** 185:18

**perpetrator** 188:15

**person** 37:6 41:7 42:5,14 44:19 80:23 140:24 145:17 154:13 161:14,15 164:19 182:11

**person's** 32:9 183:24

**personal** 33:4,8,18 37:5,7 38:11

**personalities** 34:5

**personality** 33:9,24 34:8,10,20,21 35:2,10,21 37:3,14,21 38:10

**personally** 54:7 56:11 60:14 122:22

**persons** 81:5 85:15 87:8 88:12

**persons'** 83:7

**persuasion** 198:24

**petition** 26:4,11

**Ph.d.** 4:5 5:11

**phenomena** 208:9

**phone** 24:23,24 25:2,5 26:10 69:24 96:21 105:20

**phonetic** 26:24

**photo** 21:1

**photograph** 20:17 21:5,18 23:12 48:9

**photographs** 22:6

**photos** 22:13 23:1

**phrase** 49:8 148:11

**phrases** 40:21

**physical** 22:3,7,10 23:9 69:15,17 70:11,17 71:13 80:24 82:15 83:15 85:1,6,7,8 86:3 88:2 121:19 146:11 164:2 197:3

**physically** 21:14 22:14 72:12 73:9 78:13,24 160:15 184:8,12,13

**pick** 114:22

**picture** 20:22 48:2,6

**pictured** 93:19

**piece** 100:10 121:17 154:23 188:21,22

**pieces** 122:13 203:23 205:21

**place** 64:12 120:8 195:18

**places** 124:17 203:15 204:11

**plaintiff** 5:6

**plaintiff's** 11:13,20 12:9

**plaintiffs** 203:14

**plausible** 54:23 186:11 196:18

**plausibly** 42:15 51:22,24 55:24

**pled** 38:21

**plenty** 165:13

**ploy** 152:7 153:7

**ploys** 151:23 152:24 153:22 154:2, 5,6,17

**po-** 192:22

**point** 51:10 86:11 88:4 89:4 92:22 106:20 124:16 155:1,17,22 156:3 167:15 168:13 171:18 178:14 180:7,10 183:14 185:8 187:5

RICHARD LEO, PHD, 12/01/2025

188:23 190:14 204:10 209:5

**pointing** 152:24

**points** 88:7

**Polaroid** 20:17,24 23:1 48:9

**police** 14:21 15:5 28:24 40:10 43:16 72:13 80:10 86:6 91:16 101:5 103:5,20 104:3 105:3,4,10 107:3,10,16 112:1 116:9 121:6,22 125:5,13 126:4 129:11 131:14 132:11 137:24 140:17 143:24 145:19,23,24 146:3 153:5,13 154:2,11 166:12 167:21 168:6,7 169:12 171:18 172:17 174:2 175:1, 3,10 176:14,15 179:1,4,5,7,8,9,10 181:24 183:18 187:12,18 188:5,10, 16 190:22 193:12 194:9,23 195:9 196:13,22 198:8,19 199:1,10,15,19 205:13 207:19,22 208:4 209:17

**police-induced** 182:16

**policies** 15:13

**policy** 209:6

**poorly** 134:11,14 149:20

**portion** 7:18 96:19 207:15 211:18, 21 215:6,17

**position** 136:11

**possibility** 39:20

**possibly** 18:19 169:12 181:18 193:2 194:9

**post** 50:14 188:6,9

**post-conviction** 121:11 138:2

**Post-dna** 138:15

**post-sentence** 31:22

**potential** 25:17 39:10,11 98:13 108:18 133:13 139:9 182:19

**potentially** 20:10 21:11 23:14 26:13 28:18 108:21 117:13,23 138:2 143:1

**practice** 7:2,15,18 9:16,23 10:3 15:14,15 97:19 98:3 183:13 207:15 209:7 211:18,22 212:21

**practices** 9:18,21 15:13 16:18,19, 21 17:9 163:20

**pre-sentence** 31:9 32:24 61:12,16 63:1,6,13

**pre-sentencing** 32:2,5

**precedes** 98:3

**Precero** 100:13 108:11 111:23 116:3

**precise** 45:12 78:4

**prefer** 82:19

**premature** 94:20 95:3

**premise** 34:16 72:19

**prep** 202:9

**preparation** 16:14 25:15,16 48:3 63:13 202:1 203:18 206:8,14

**prepare** 5:20 6:1,7,16 214:3

**prepared** 101:14 215:9

**preparing** 203:10 204:10

**present** 43:21 58:20 59:2 131:7 155:8 158:10

**presented** 32:9

**pressure** 34:13 35:7 198:24

**presume** 26:1 50:3 199:12

**presumed** 127:16

**presumes** 183:16

**presuming** 177:4

**presumption** 40:3 95:4 127:19 199:4 203:22

**pretrial** 50:13 137:24

**pretty** 79:1,2 87:24 88:11

**previously** 147:12 148:21 191:6

**primarily** 37:8 71:6 184:16

**primary** 75:3 100:2

**principles** 79:9

**print** 8:9,14 69:21,23 70:1 191:20

**printed** 9:10 10:19 11:5 69:22 103:13 213:10

**printer** 8:19

**prior** 12:22 44:13 155:8 162:2 182:6 197:9 209:7 210:9,10,11

**prism** 37:20

**private** 165:20

**privately** 165:6

**probation** 63:12 64:15

**probative** 121:19

**Problem** 138:14

**procedures** 198:8

**proceedings** 18:5,9 19:24 38:18 121:11

**proceeds** 202:23

**process** 40:12 141:23 208:22

**produce** 7:22

**produced** 12:9,15,17 115:11,13 216:2

**product** 181:9 183:18 184:14 214:6

**professional** 94:23 97:6 157:18 168:15 187:2

**professor** 167:17

**prominent** 162:5

**prominently** 137:8

**promise** 74:14 76:11,12 77:2,5 86:12

**promises** 73:18,21 74:10 75:19,21 76:1,5,7,8,9,10,15,18 77:14,22 78:19,20 85:9,10 158:16 159:2,18

**pronounce** 80:3

**pronunciations** 110:7

**proof** 170:14

**proper** 154:2 198:8

**properly** 154:7

**proposition** 204:7

**propositions** 86:24 204:7,8

**prosecuting** 67:23

**prosecution** 57:18 58:7,12,14 93:14 132:6 209:18

**prosecution's** 57:15

**prosecutor** 209:10

**prosecutor's** 209:6

**prosecutorial** 175:14 207:20 208:2,4

**prosecutors** 169:12 208:3,19 209:1,16

**prove** 127:18

**proven** 74:8 75:1 137:7,10 151:7 183:19

**proven-false-confession**

RICHARD LEO, PHD, 12/01/2025

183:22

**provide** 11:19 34:9,11 41:12 46:12 82:9 104:13 114:18 118:4 156:1 158:11 160:7 163:10 184:10 214:15

**provided** 11:10 20:18 21:6,18 22:17 45:14 82:24 99:21 101:5 102:6 103:1,5,20 104:3 107:18 114:17 117:24 118:9 119:4 122:5 125:5,13 131:14 132:5 142:12,23 159:24 160:1,3,10 205:12 211:23 213:23 214:13 215:19

**providing** 34:22 161:15 212:23

**proving** 121:5

**PSI** 63:6 64:10,13

**psychological** 40:13 82:11 156:19,23 157:3,9,16 158:1,10 162:6

**psychologically** 127:20

**psychologist** 36:8,10

**psychologists** 35:19

**psychology** 79:18 82:10

**psychosocial** 37:13

**publications** 97:10 158:3

**published** 136:20 179:3

**pudding** 170:14

**Puerto** 108:4,8,13,18 109:4 110:11 111:12,15

**pull** 47:5 54:9 61:21 91:6 125:20 138:9 148:19 189:12

**pulled** 48:22 104:13

**punched** 70:20

**punishment** 83:16 84:15,17 85:1

**purpose** 82:6,8 113:15 146:21

**purposes** 32:8 142:10 153:24 211:9,12

**pushed** 70:20

**put** 8:15 9:19,20,21,23 33:10 47:19 69:7 88:14 110:14 113:13 118:22 129:11 165:10 173:1,21 185:4 186:1

## Q

**qualifications** 10:13

**qualitative** 74:8,13 77:16 96:6,12 151:19

**quality** 164:22

**quantifiable** 74:5

**quantify** 74:3

**quantitative** 74:19 96:13 97:8 150:24 151:18

**question** 6:3 14:23 15:3 22:24 24:7,10,15 27:19 28:14 29:17 30:11 34:16,17,18 38:6 44:14 47:7, 9 48:7,21 49:2,8,12,20 58:11,12 59:19 62:14 66:24 68:5 72:18 76:6, 24 80:22 82:21 93:3,10,22 97:24 99:5 105:14 113:14 124:4 126:19 127:2 134:11,15,19 135:22 139:22 143:22 148:12 149:16,18 158:20 161:17 163:3 164:15 169:1 176:20 181:5 182:6,19 199:9 206:24 215:11

**questioned** 130:9 136:2 140:8 143:24 203:14 210:18

**questioning** 4:21 14:21 15:1,5 70:2 115:17 124:15 125:1 126:6 136:5,12 137:5 138:6 146:19 154:13

**questioning/accusation** 136:3

**questions** 10:5,7 17:12 23:7 50:9 55:8 66:12 69:8 96:6 119:9 150:23 156:2,4 198:23 199:11 202:16 203:5,7,12 204:21,22 205:6 206:18 207:14 214:20,21 216:7,24 217:2

**quick** 65:9 88:15 190:11

**quicker** 42:22

**quickly** 47:20 199:24

**quote** 66:14 67:1,3 94:23 100:11 101:4 111:3 116:7,11 135:24 137:9 139:9 147:6

## R

**R-E-I-D** 167:23

**race** 108:23 182:14

**random** 186:16

**randomly** 186:17

**range** 192:14

**rank** 78:21

**rarely** 165:10 208:14

**rate** 11:16

**Ray** 5:5

**re-** 119:6

**re-interviewed** 117:9

**re-interviewing** 113:16

**re-review** 24:6

**reach** 74:5,22 96:7 102:12 135:20

**reached** 147:15

**reaching** 73:10 97:17 102:5 106:15

**read** 40:8,10,16 42:10 43:12,22 52:10 53:8,18 55:3,4 56:4 63:3,8,9 84:4,6,7 113:12 119:18 127:22 130:6 134:4,5 138:21,23,24 149:2, 3,16 168:20 176:8 177:5 185:13 213:2

**reading** 52:5 108:11 125:8,14

**real** 88:14

**reason** 69:21 105:11 122:16 134:14 158:10,15 159:21 160:8,10, 13 174:23 186:11 191:11 192:24 194:22 195:9 196:2,13 197:19,23, 24 198:3,7

**reasonable** 106:1,12 178:21

**reasons** 158:12 161:24 162:3

**recall** 18:10 19:7,22 20:2,15,22,24 21:2 22:16 23:4,22,23 25:4,13 27:7,19,21,24 29:5 30:18 36:16,22 38:1,8,20,21 39:4,7 48:1,5,8,14,18 50:21,24 51:3 57:23 58:1,2,9,15 59:4 60:21,23 61:7,13,17,18 64:22, 24 68:3,11,18 81:22 82:14 84:5 86:10,22 90:11 93:10 100:24 101:11 102:8 107:5,11 109:10 111:16,18 112:9 113:18 116:5,16 118:5 119:23 120:4,7,9 121:13 122:8 126:6,9 127:12 129:10 130:12,17,21 131:5 132:7 135:2,6 138:4,7 142:2,5 144:10 145:19 160:13,23 161:2,6 175:23 179:12 181:3 187:17 190:19 195:12,21 202:17 203:1,24 205:14,22 209:4,5 212:7,10 214:12

**recalling** 58:4 112:11 198:10 212:17

**recant** 64:11 181:8

**recantations** 180:15

RICHARD LEO, PHD, 12/01/2025

**recanted** 95:16 117:21 131:16 132:4,14 134:22 180:11 181:1

**received** 19:5

**recently** 24:6

**recess** 115:6 156:12

**reciting** 196:1,21

**reckless** 95:1 96:5,8,16 97:6,18 98:7

**recognize** 27:7,16

**recognized** 184:5

**recollection** 18:15 45:18 46:19 51:2 57:21 58:6 59:15 60:6,18 61:9 81:24 93:23 113:10 118:6 120:10, 17 121:1 132:2,8 141:20 146:20 149:14 150:13 178:2 181:6 199:22 209:8 210:23

**recollections** 93:12

**recommended** 167:21

**reconsider** 123:6

**reconstruct** 194:10

**record** 4:3,20 8:20 9:2,4,6 13:19 47:20 49:23 62:6 65:18 66:2,7 71:10 89:17,19,21,23 101:12,13 102:3 109:24 110:16 111:17,19 112:12 115:4,8 122:3,15,17,24 123:16,22 124:3 127:5 129:6 156:8,10,14 181:7 191:24 193:14, 19,21 194:10 202:17,22 203:2,15 204:12 205:18,22 206:13,23 207:2, 7 217:17

**recorded** 72:11 119:7 129:10 162:1 209:23 210:1

**recording** 209:14 210:4,8

**records** 26:15,16 59:8 92:16 123:21,24 124:11,15 135:19 137:18 186:14 193:4,11 194:1 195:11,12 205:6

**recovered** 120:20

**red** 192:2

**redact** 202:12

**redactions** 202:12

**refer** 14:20,24 15:4,8,13 16:20 22:19 102:5 163:19 197:5

**reference** 24:10 29:14 81:3 129:21 159:19

**referenced** 17:8 18:20 191:6

**referencing** 66:11 81:20 110:10, 14 154:22

**referred** 23:24 57:24 167:4 210:12

**referring** 17:17 18:20,22 19:3 46:2 57:16 67:16 78:6,14 83:21 99:8,11, 20 102:9 103:14 119:1 138:15 139:21 140:12 145:13 147:20 157:6 193:7 194:7 213:13

**refers** 44:22 45:9 83:4 147:22

**reflected** 202:3

**reflection** 40:1

**reflections** 200:4

**refresh** 18:15 56:13 63:11 92:8 93:11,22 102:11 120:10,17 190:23 210:22

**refreshed** 113:10 118:6

**refreshers** 8:5

**refuses** 159:8

**regularly** 208:14

**Reid** 167:23 168:3 199:19

**relate** 17:9

**related** 16:18,21 24:11 108:24 111:3 213:7

**relation** 200:9

**relevant** 20:9,10 21:7,11,21 22:2 23:13,14 24:20 26:12,13 28:9,11, 16,17,18 33:15 34:5 37:4,11 73:12 99:24

**reliability** 73:3 156:5 179:24 181:12,20 182:9,20 183:2 188:20

**reliable** 72:20 174:11 181:17 182:17

**relied** 72:1 102:12 104:2,10 117:19 123:17 126:9,17,23 127:2,3 137:20 148:17 150:10 155:2 202:18 204:17 205:23

**relies** 98:21

**rely** 82:19 96:7 149:4 150:14 167:13

**relying** 58:24 65:1 66:16 67:4 71:1,2,5,6 97:18,22 110:16,20 122:4,9 135:19 136:11 177:20 180:14

**remainder** 13:18 207:13

**remaining** 17:7

**remember** 51:20 92:17 93:8 104:8,9,17 110:19

**remind** 214:3

**remotely** 5:5,7

**repeat** 34:17 66:24 169:1 215:11

**repeated** 158:16 161:11

**repeatedly** 79:12 160:2 164:4

**repetitive** 159:1,16 187:4

**rephrase** 139:22 149:19 176:22

**rephrased** 6:3

**replicate** 174:22 203:16

**replicated** 178:12

**report** 5:24 6:4,22 7:3,6,16,18 8:2, 7,15 9:11,15,20,21 10:11,12,20 11:1,9 13:23 14:2,12,14 15:18 16:2,15 17:4 19:10 25:16 28:10 30:10 31:4,9,22 32:2,6 38:4 39:14, 17 40:5 42:19 44:4,6 48:3 56:4 57:6 61:13,17 63:7,14,18 64:9,21 74:9 78:5 79:5 81:20 82:13 83:19 85:4 88:9,16 89:5 90:4,22 91:8,24 94:15,19 95:15 96:21 98:24 100:1 101:14 102:10,24 103:4,8,16 104:19 107:10 108:10 109:8 110:3, 6,15,17,23 111:10,12,20 112:4,9, 14 113:12 115:24 116:19,23,24 117:7,11 118:10,16,22 119:20 122:20,22 123:10,12 126:3,9,14, 16,20,22,24 127:3 129:11 133:7,11 135:10 138:20 139:10,14,18,20 140:5 146:22 150:16 151:22 156:19,24 166:8 172:6,21 173:10, 11 175:16 179:14 190:22 192:15 193:6,12 194:2,13,21 202:19 203:21 210:22 211:6,18,21 212:5 213:4,8,11,24 215:6,17,18 216:17

**reported** 25:6 75:3 82:2 85:4 86:23 114:9 141:8 148:16,24 163:5

**reporter** 4:16 5:9 15:20 125:11 167:11 169:5,7,9,13 170:3 171:10 173:7,20 174:1,5

**reporting** 109:4

**reports** 28:24 33:1 39:22 63:2 95:19,20 105:3,9,24 111:24 116:9, 13 118:2 122:18 127:5 137:24 164:2 172:6 194:9

**represent** 4:20

RICHARD LEO, PHD, 12/01/2025

**represented** 49:24 50:13 56:21 63:17

**representing** 4:13

**request** 120:23 121:3,11 139:23 160:5 161:12

**requested** 160:18

**requesting** 160:3

**requests** 157:13

**require** 210:7

**required** 90:23 164:16,18 215:1

**requires** 173:24

**requiring** 210:3

**research** 37:9 71:21 73:1 75:1,12 97:9 136:10 137:3 140:4 143:23 154:22,23 155:1,3,7,11,13,15 157:15 161:17 164:13

**researcher** 158:7 167:17

**researchers** 135:24 136:11,15,17 140:6 141:1 158:3 179:23

**reserve** 217:11,12

**resharing** 52:2

**resources** 121:22 165:24 166:6

**respect** 215:5

**responded** 87:20

**response** 35:6 75:5 209:7

**rest** 53:15 93:20 100:3

**result** 67:12

**resume** 70:2

**retained** 11:13 165:6

**retainer** 201:9,15

**retaining** 200:13

**retention** 200:9

**revealed** 113:20 114:1

**revealing** 35:24

**review** 12:21 17:22 18:12 20:4,20 22:11,13,24 23:5,20 24:13,23,24 25:10,21 26:3,12,15 28:19,22 29:2, 6,7,14,23 30:4,10,13,16 31:3,8 38:17 39:13 47:6 49:1 51:10 60:7 61:5,10 68:20,23 69:6,7 71:5 81:7, 10 82:17 92:16 93:11 110:22 120:16 123:22 129:12 137:10 138:8 142:5 145:14 154:24 161:4,7

190:12 193:5 194:1,8 195:11 197:9 209:22

**reviewed** 5:24 6:4 7:2,17 16:5,14 17:13 19:16,18 20:16 21:3 22:18 23:6 24:5 25:14 26:8,14,21 28:1 30:6,20 31:5,11,16,23 38:1 39:12, 22 40:2 48:5,14 59:5,8 61:19 62:12,17,22,23 64:20 69:1 71:7 91:17 95:12 96:23 99:24 101:13 104:7 106:24 109:7,8 110:23 116:24 123:23 127:6 128:1,9 130:1 133:8 143:13 161:6,10 167:18 168:12 181:3 193:10 194:4 195:24 197:14 208:24

**reviewing** 19:22 25:15 38:13,20 48:2,18 49:3,12 50:7 53:14 56:12 58:3,16 59:4 61:17 62:16 85:7 93:18,21 95:23 124:2 131:20 195:12 205:5

**reviews** 169:20

**rewind** 16:1

**Reyes** 212:22 216:3,21

**Reyes'** 211:23

**Reyes/solachi** 212:5

**Reynaldo** 4:8 11:10 43:16

**RFC** 109:9,18 116:23

**RFC-AGONZALEZ** 110:1

**RFC47** 191:6

**Rhonda** 4:16

**Rican** 108:4,8,13 109:4 110:11 111:12,15

**Ricans** 108:18

**rich** 162:1

**Richard** 4:5 5:11 105:1 107:6,12 167:9 217:16

**ride** 189:4 190:15 193:8

**rights** 79:13 161:21

**risk** 33:4,5,8,10,18,23 34:1,14 35:23 37:7,15,21 38:11 43:9 71:22 73:22 74:23 83:14,18 150:20 151:1,2,5,17,20 152:1 154:18,21 161:18 162:5 163:14,18,21 184:9

**rival** 185:20

**robbery** 146:7,12

**role** 60:24 73:4 183:14

**roles** 183:15

**room** 136:20 140:17,20 141:2,5,9, 16 142:12,17,22 144:2 145:8 146:24

**rooms** 22:6

**Rosa** 15:9 23:16 127:21 131:13

**Rosen** 5:1 7:10,19,24 65:15,17,20 66:1 89:8,11 200:16 207:1,10 214:10,16,22 215:2,4,13,14,23 216:5,9,12,13,23 217:7,14

**routine** 98:19 145:2

**row** 159:8

**rules** 90:24

**run** 120:20 121:15

**rush** 94:14 95:1 98:20 100:6

**rushed** 108:2 117:18

---

**S**

**Saul** 79:18

**saved** 136:17

**scale** 74:13,18,20 77:9 78:18 96:6, 12 97:8 151:18

**scene** 119:16,22 120:1,13,21

**scholars** 168:9

**science** 44:24 73:1 77:11 79:11 95:8,24

**scientist** 41:4 209:12

**scope** 73:4

**scratched** 170:12

**screen** 12:6 47:16,17 48:2 52:2,3 62:3 63:11 69:8 81:17 88:20 92:1 102:1 110:3 113:13 116:20 118:23 125:21 132:22 147:12 170:22 176:1 191:3,4,22 200:6

**scripted** 168:18 175:17,21 177:22 178:7

**scripting** 156:4 166:12 184:15 185:3

**scroll** 53:3,15 92:6,23 130:7 189:17,19 190:9

**Sean** 6:11

**sec** 85:12 88:19

RICHARD LEO, PHD, 12/01/2025

**Second-to-last** 187:5

**section** 14:5,8 15:24 30:10 39:10, 24 42:23 43:3,8 53:4 55:3 64:21 66:12,23 69:13,14,17 70:6,7,9,10, 17 71:13,24 73:16,20 78:8 94:14 98:3 119:1 135:10,11 151:22 159:4,17 179:22 185:4

**sections** 159:1

**sees** 95:19 98:11

**self-interest** 151:11

**send** 10:2 13:1 15:19

**sense** 73:13 86:4 99:6 147:23 210:18

**sentence** 32:10 40:9,19 43:8 58:17 78:15 79:8 83:19 84:5,6 98:16 100:18 101:4 102:10,13 103:11,18 104:3,11,19,24 111:20 116:7 119:13,18 120:19 125:4,14, 18 128:4,19 129:3 139:8 147:5 149:4,15 159:12 177:24

**sentences** 103:13,17

**sentencing** 32:8

**separately** 85:8 143:11

**separation** 143:4 208:1

**served** 113:15 201:20

**sessions** 136:4

**set** 10:10 113:1 127:18 164:11 215:17

**sets** 96:1

**setting** 86:10

**sexual** 146:11

**share** 191:3

**sharing** 63:10

**sheet** 26:24

**shooter** 61:8 152:21 183:11

**shooting** 195:14,17 196:9 197:19

**short** 9:9 66:4 207:4

**shorter** 64:5

**shot** 56:15 57:3

**shots** 57:3

**show** 12:2,4 22:6,7 42:5,6 51:18 85:11 86:12 104:8,14 105:18 123:16,18 125:2 129:20 132:17 200:1

**showed** 22:3 105:8 112:4,15 118:10,16 125:19 128:16 140:10 153:5 202:7 205:21

**showing** 88:18 177:12

**shown** 147:12 150:5

**siblings** 111:23 116:8,14 117:4

**siblings'** 112:1 116:10

**side** 8:16 48:8 76:10 124:8

**signaled** 54:20

**signature** 11:7 177:5 217:10,12

**signatures** 48:9

**significance** 109:3 152:9

**significant** 108:16 150:20 151:1, 17,20 165:15

**significantly** 73:21 74:4,7,15,23 75:9,17 78:19 79:9 83:17

**similar** 14:23 15:3 22:24 23:7 29:17 30:11 38:6 51:4 55:8 57:23 63:22 68:5 96:5 150:22 184:19 202:24 212:8

**similarities** 51:10

**similarly** 41:12 88:11

**simply** 72:22

**single** 48:14 74:14 75:7,8,23 122:20 123:9

**single-mindedly** 127:16

**sir** 110:3

**sister** 101:5 103:12,20 105:2 125:5,13 189:3,10 193:24

**sisters** 100:14

**sit** 21:2 22:16 23:4 27:24 31:11 39:3 48:5 212:9,16

**sitting** 203:24

**situation** 94:1 97:4 140:18 142:15 143:11,14 164:8 165:22 181:16 203:6,17

**situational** 33:4 152:1 163:14,18 184:9

**situations** 140:15 164:1,12

**six-and-a-half** 192:12

**sixth** 79:22

**skip** 73:17 172:19

**slapped** 70:20

**sleep** 141:22 142:13,16,23 151:4, 9,12

**sleep-deprived** 141:21 164:4

**slice** 143:15

**slight** 216:1

**slightly** 43:2 69:20 73:7 78:11 90:3

**small** 46:1,3,4 96:18 184:2

**small-c** 57:12

**smallest** 87:15

**snarky** 163:3

**social** 36:8 41:4 44:24 72:24 77:11 79:10 95:8,24 209:12

**Solache** 211:23 212:22 216:2,21

**Solache/reyes** 215:10

**Solachi/reyes** 215:20

**somebody's** 177:5 199:2

**Sony** 28:19 29:23

**sophisticated** 164:19

**sophistication** 165:23

**sort** 204:22

**sound** 111:5

**sounded** 111:7,12

**sounds** 8:22 13:4 65:13,14 106:15 198:11

**source** 119:9

**sources** 7:1,14 9:20

**space** 173:13,16

**spaces** 173:21

**Spaulding** 189:5 190:16 191:16 192:3 193:9

**speak** 49:13 50:3 55:24

**specialized** 35:14

**specific** 14:3,10 33:24 36:22 86:10 87:10 93:10 122:8 187:14 203:4 209:6

**specifically** 37:5 39:14 51:14 58:15 61:4 66:13 71:3 78:5 86:1 98:6 101:11 110:19 111:16 132:7 144:11 154:24 159:7 162:14 190:21 193:7 196:5 199:20 202:20

RICHARD LEO, PHD, 12/01/2025

212:7

**speculation** 95:2

**speculatively** 198:22

**spelled** 167:12

**spelling** 170:4

**spellings** 170:2

**spend** 124:19 194:19

**spent** 69:14 93:9 124:10,12 203:10 204:9 205:5 206:10

**spoke** 6:8,10

**stage** 107:11

**stages** 179:9

**stand** 92:22 93:5,8 97:2 165:11 181:10

**standard** 89:24 115:9 121:19 156:15 180:3 207:3,8 217:17

**stands** 56:7

**Starr** 6:11

**start** 199:17

**started** 115:10

**starting** 4:20 17:13 48:17 53:2 66:23 79:4 200:2,5

**starts** 10:12 43:3 70:6 80:10 92:3 98:16 135:23 138:19 141:4 150:18 159:14 194:16

**state** 45:16 49:17 50:15 56:14 120:23 121:4,5,8 128:12,15 175:7 185:8 188:18,21 192:16

**state's** 29:2 60:21,23 175:5 187:18

**stated** 110:23 149:20

**statement** 18:4 20:13,16,19 21:7, 19 22:20,21 26:12 30:14 40:24 41:24 42:1,2,3 43:4,19 44:1,7,13, 15,22 45:1,2,9,15,23 46:9,14,24 47:4,22 48:18 49:18 50:16 51:5,14, 19 52:4 53:13 54:15 55:10 56:13, 22 57:14,24 58:8,10,13,18 59:11, 20 60:1,8,11,15,16,19 63:23 64:10, 17,23 67:7,12 68:7 72:12 73:23 75:18 91:20 94:3 131:7,14,17 132:1,4 134:22 153:6 160:4,9,12, 20 161:15 162:20,22 163:2,11,16 166:17 168:19,24 169:4,8,14,19 170:7,15,20,21 172:16 174:18 176:1 177:12,23 178:4 179:16 181:1,8,12,16 182:16 183:1 184:1

189:1,9,11 190:12 192:21,24 193:6,8,23 194:3 198:11 199:3 209:11

**statements** 18:1,12,24 23:2,13 28:9 40:15,20,21 46:22,23 47:1,3 48:23 51:15,17,18,21,22,23 53:22 54:5 55:9 71:23 95:16 131:18 151:10 154:11 163:21 169:23 170:17 172:17 175:12 180:1 181:23,24 183:4,7 184:10,11,13, 19,20,24 197:10 202:24 207:19 208:21 209:3,23 210:8

**states** 4:9 70:19 83:13 189:3 210:11

**stating** 105:1

**station** 132:11

**statute** 210:2

**stay** 209:16

**STENOGRAPHER** 101:17 129:16

**step** 208:3,4

**steps** 120:13

**Steve** 5:6 6:11 10:6 12:24 115:15 137:6 141:17

**stew** 146:23

**stomped** 70:21

**stood** 181:14

**stop** 63:10 158:7

**story** 32:22,23

**straight** 5:19 170:21

**street** 4:14 185:12 186:4,15,21 187:1 193:16

**stress** 34:13 35:7 136:5

**strictly** 45:22

**strike** 20:23 22:11 24:23 28:20 29:18 36:18 37:1,3 38:10 60:22 61:14 68:22 74:3 103:24 120:1 135:20 145:14,20 149:22 152:5,17 155:11 161:5 203:23

**struck** 70:20

**structured** 40:11

**studied** 96:19 97:2 208:13,15

**studies** 74:8 82:5 86:2,8 136:16, 19 145:1 150:7 151:9 155:16 168:9

**study** 81:4,7,19,23 82:7 84:20 85:21 87:1,5,7,11,17 89:4,5 137:11

**studying** 93:9

**style** 29:3

**subheading** 76:15

**subject** 34:6 36:12 37:7 80:10 90:3 199:13

**submitted** 202:4

**Subsection** 70:8,9 73:18 156:19

**subsequently** 132:13

**suffered** 38:4

**sufficient** 137:18 211:12

**suggestibility** 34:2 35:3,21 36:12

**suggesting** 195:24

**suggests** 54:10 174:21

**Suite** 4:15

**summaries** 14:8,19 214:4 215:16, 18

**summarized** 212:7

**summary** 14:11,24 39:15 64:6 83:2,19 213:21,22

**supp** 105:24 110:3,5

**supplemental** 105:9 116:23

**support** 110:10

**supported** 106:16 117:16

**supporting** 127:17,18 147:19

**supposed** 123:15 174:4

**supposition** 197:2

**suppress** 18:1,4,8,11,13,24 19:4,6 20:5 162:14

**surprise** 81:9 90:19

**surprised** 209:15,20

**surprising** 164:20

**survey** 82:5,23 83:1,2 155:3,16

**surveyed** 82:1

**surveys** 155:2,4

**susceptible** 151:15

**suspect** 85:23 114:8 122:6 136:2 140:7,13 141:5 152:8 154:12 157:11 166:19 169:21 194:23 195:9 196:2

**suspect's** 40:14 161:12 166:17 199:16

RICHARD LEO, PHD, 12/01/2025

**suspects** 108:18 122:12 152:19 154:12 183:14 198:20

**swear** 5:9

**swearing** 71:14

**sworn** 5:10,13

**synthesis** 9:15

---

**T**

---

**tabs** 13:14,15

**tactics** 154:2

**taking** 175:12 179:7 207:12,18 208:21

**talk** 161:18 170:16 197:23

**talked** 61:15 159:1

**talking** 62:17 76:18 79:23 84:24 135:10 153:15 159:11 182:5 194:16 213:9

**tangible** 76:7

**tech-** 162:23

**technical** 115:22

**Technically** 200:1

**technique** 136:7 146:23 166:12 175:4,6 176:15

**techniques** 40:13 83:18 157:10 162:24 163:19 198:24

**telling** 31:20 127:21 153:5,13 205:4

**ten** 7:15

**ten-minute** 65:10

**term** 26:23 27:3,5 44:22 45:8 74:4 96:4 156:23 157:2,9,16 158:1,8 166:22 167:2,5,14 199:20 208:10

**terminated** 161:22

**terms** 37:2 140:21 169:24 170:3 211:9

**terrified** 160:14

**territory** 195:20 196:12

**test** 35:19,20

**tested** 122:10

**testified** 5:13 51:1 58:3 59:11,24 90:14 92:18,19 93:13,14 94:2 131:6,22,24 133:19 134:16,24

177:8 187:6

**testify** 60:7 91:19 162:21 163:1,15 164:16 207:18

**testifying** 57:23 60:13 91:10 92:10

**testimonial** 117:20

**testimony** 17:22 18:13 19:23 20:5 23:24 24:1,11 31:13 47:23 51:4 62:11 64:11 65:2,4 68:21,23 69:2 72:2 79:13 99:16,21 118:3 122:2 127:4,7,9,10 129:22 130:17 132:5 133:8,18 134:7,8,22,24 142:3 158:22 160:24 162:18 169:6 175:20 180:16,17 181:11 194:10 211:13,16 214:14

**testing** 33:24 35:9,14 36:14 120:20,24 121:3,12,15,18 122:4

**tests** 35:24 36:3,6,9 188:13

**theoretically** 114:12

**theorized** 185:10

**theory** 60:21,24

**thing** 10:3 97:7 106:8 121:24 136:18 167:5

**things** 34:3 50:4 53:9 95:20 172:10 205:10

**thinking** 120:18 181:22 182:2,18 194:5

**thought** 9:19 18:19 27:18 101:12 103:9 194:11 206:1 211:5,6 214:5

**thousands** 97:1 124:10 167:18 168:12 208:12

**threat** 74:14 75:8 76:11,12 77:3,5 78:20,24 84:17,21 85:22

**threatened** 78:13 132:9 160:16

**threats** 73:18,21 74:10 75:2,9 76:10,15,18 77:14,22 78:1,19,20 83:15 84:13,14 85:1,9,10,14 86:8 87:20 88:12,22,24 132:16 158:16 159:2,6,9,17 164:3

**ticking** 141:4

**time** 11:16 21:6,18 23:2,6,12 36:18 37:18 38:15 48:10 52:5 56:24 64:22 65:9,12 69:14 72:11 89:13, 24 93:9 115:9 122:19,21 123:11 124:19 132:11 134:23 136:1,12 137:4,5,15 138:6 139:5,11,15,24 140:1,7 141:2,11 142:14,17,19,20, 24 143:5,24 144:1,16 146:19,21 148:13 149:23 150:3,8,11 156:6,15

160:19 175:8 187:12 188:5,10,12, 16,18 190:20 191:12 194:19 203:10 204:9 205:5 206:10,20 207:3,8,12 217:5,8,17

**time-sequenced** 40:12

**times** 123:21 141:3 148:3 149:10 156:23 159:23 160:18

**Tino** 56:19

**titled** 29:7 47:11 94:14,19 109:21 135:11 138:14 156:19

**today** 4:16 5:17,20,22 6:2 21:2 22:17 23:5 27:24 29:12 31:11 39:3 131:11 202:1,16 204:1 205:14

**today's** 6:16 12:22 202:8 217:15

**told** 63:12 129:7,14 130:22 131:1 152:16,19 160:24 161:2 187:18

**Tony** 213:19,21

**top** 12:12,18 62:4 90:19 91:14 92:16 109:10 144:10 201:15

**top-third** 173:12

**topic** 89:10

**Torrence** 100:12

**torture** 78:2 80:24 81:1,5 82:15 83:4,9,15 84:9 85:1,6,8,23 86:3,9 91:16

**tortured** 184:8

**total** 136:13 142:14 201:8,14

**totality** 97:8 172:4,17 202:7

**tothe** 173:15

**touch** 90:2

**traditionally** 175:13 207:19

**trained** 121:6 169:11 171:18 174:2,8,23 175:2,3,6,8 198:19 199:1

**training** 167:21 168:6,7,8 174:9 199:10,19

**traits** 33:9,24 34:5,8,10,21 35:2,11, 21 37:14

**transcript** 58:16 69:3

**transcription** 170:10

**transcripts** 17:14,18,21 25:1,5 131:21 138:1

**transitioning** 89:10

RICHARD LEO, PHD, 12/01/2025

**treated** 57:13 60:16

**trial** 17:14,18,22 49:24 50:10,13 51:1 57:23 58:8,16 59:10 60:1,8, 16,20,22 69:3 92:10 93:13 94:2 99:6,9 131:21 134:8 138:1 153:19 162:18 164:17 181:11 182:21,22 202:23 203:7,9,10 204:9 205:7,8 206:3,7,14 212:24

**trials** 204:15

**trick** 166:14,23 167:14 168:4 169:18 171:6,11 173:4,18 174:24

**tricks** 174:3

**trivial** 76:20

**Trotta** 4:12

**true** 59:23 131:18 134:9 154:4,5,6 172:10 188:14

**truth** 31:20 95:2 153:5,13 154:1

**truthful** 135:1

**truthfully** 134:16

**tunnel** 95:5

**turn** 10:12 40:5 42:18 82:22 135:9 150:15 166:7 179:14 183:3

**turning** 211:17

**two-page** 213:21

**type** 170:5

**typed** 168:23 169:3,20 174:17

**types** 75:24 146:10 171:20 210:4

**typing** 169:14

**typo** 133:13 171:14,15

**typographical** 178:11

**typos** 174:21,22

**U**

**ultimately** 153:19

**Um-hm** 81:11 186:7

**umbrella** 44:22 45:8

**un-** 182:8

**unable** 149:13 202:17

**unclear** 123:23

**under-** 41:15

**underlying** 41:6,8,18,19

**understand** 21:24 27:15 28:15 29:22 35:11 42:10 57:10 67:1 72:9 77:1 84:21 87:7 103:23 104:1 109:3 111:14 113:3 117:6 124:1 134:21 142:11 144:15 154:14 155:24 163:8,13 176:14 177:1,20 186:19 188:3 196:7 197:5 198:3 199:14

**understanding** 32:5,14 57:17 67:7 75:16 85:13 123:2 126:8 136:14 160:17 184:6 185:15 186:22 205:9 214:23 215:24

**understood** 26:3 45:11 47:19 72:8 83:3,14 154:9 157:19,22

**unheard** 208:20

**unique** 94:1,6,9,11 207:23 208:10

**Unit** 4:2 9:6 66:7 89:23 115:8 156:14 207:7

**United** 4:9

**unmistakable** 172:4

**unquote** 137:10

**unreasonable** 105:13 196:21

**unrecorded** 129:14 194:6

**unrelated** 195:14,15

**unreliability** 73:3 179:15,20,24 180:21 184:4,22 185:5,6 187:11,24 188:4,20 193:1

**unreliable** 73:22 74:24 75:10,18 76:3 77:4 161:15 163:21 180:18,20

**unwarranted** 94:20 95:3

**updated** 212:1,2

**upwards** 87:19

**Urlaub** 4:13,17

**usual** 217:12

**V**

**vaguely** 195:16 209:5

**varied** 137:23

**vary** 164:22

**verbalizations** 50:5

**verifiable** 128:21 188:1 210:13,16, 18,19

**verification** 211:7

**verified** 211:12

**verify** 17:20 149:2,6,13

**verse** 151:20

**version** 11:4,6 63:21,22 69:23 75:15 133:24

**versus** 73:14 75:21 77:4 78:19 140:1 151:1

**vicarious** 54:13 55:17

**vicinity** 101:7 103:22 125:7,17

**victims** 46:6 119:11 186:6

**video** 4:2,19 217:15

**videotape** 145:18

**view** 151:16

**viewing** 93:5

**violence** 70:11

**violent** 146:7 186:15

**virtually** 74:9

**visible** 13:16

**vision** 95:5 182:13

**voice** 111:6,7

**voices** 108:9 109:4 110:11

**voluntary** 174:10

**vulnerable** 34:13,22 35:5

**W**

**wait** 176:19 214:19

**waive** 161:20

**wall** 142:18,19 164:6

**wanted** 7:8 9:19 24:13 125:17 127:22 161:1 186:12 197:18

**Ware** 112:16

**warnings** 160:2

**ways** 151:14

**weakened** 151:14

**Weiner** 164:24

**well-established** 158:6

**well-known** 151:5 185:20

**white** 144:21

**widely** 157:22

RICHARD LEO, PHD, 12/01/2025

**Wiley** 14:21 15:1,5 24:12 38:22 43:18 45:16 46:13 56:15,19 57:9 61:1 66:15 67:3,18,21,24 68:8,14 100:12 101:4 102:6,22 103:5,11, 19,20 105:1,9 107:12 108:17 111:23 116:8,14 117:4,9 118:17 125:4,5,12,24 126:1 127:7,9 185:9, 11 186:2 187:7 194:24 195:10,18 196:3,10,13 205:12

**wisdom** 165:9,12

**witnessed** 182:4

**witnesses** 25:3 100:11 102:21 113:6,16,17,22,23 114:3

**wondering** 206:22

**word** 11:5 44:17,21 69:23 99:5 212:14

**worded** 84:15 134:11,15 149:20

**words** 50:4 87:2 108:23 173:22 174:20

**work** 11:20 202:7 205:10 209:22 214:6

**working** 124:8 128:17

**World** 138:15

**worries** 7:8 13:8 91:6

**Wortham** 105:1 107:6,12

**worthy** 83:13

**write** 172:5

**write-up** 119:11

**writes** 166:16

**written** 100:21 137:3 144:11 151:5 169:18,19 170:12 171:3

**wrong** 78:10 111:18 123:5 170:11 191:4 194:7 201:11

**wrongful** 179:8

**wrote** 63:18 100:1 110:20 112:22 120:18 173:7,8 178:8 192:24

**X**

**XB** 66:12

**Y**

**years** 63:4 72:14 90:24 96:17 97:1 130:15 133:19 161:24

**yelling** 110:11

**yesterday** 6:8 202:1

**yesterday's** 202:8

**yielded** 122:11

**yo** 171:2,10

**Yolanda** 101:4 102:6,22 103:1,5, 11,19 104:3 105:9,24 106:1 107:8, 19 118:17 125:4,12,24 126:4,22 127:7,9 205:12

**Yolanda's** 105:2,11 107:7

**yougot** 173:12,13

**Z**

**Zieger** 212:23

**zoom** 4:23 5:2 12:10 13:10,13 52:9 192:1,5 206:19