*DeLeon-Reyes v. Guevara, et al.*
Case No. 18 CV 01028

*Solache v. Guevara, et al.*
Case No. 18 CV 02312

# EXHIBIT 12



## NORTH CAROLINA LAW REVIEW

Volume 82 | Number 3

Article 3

3-1-2004

# The Problem of False Confessions in the Post-DNA World

Steven A. Drizin

Richard A. Leo



Follow this and additional works at: http://scholarship.law.unc.edu/nclr

Part of the Law Commons

## Recommended Citation

Steven A. Drizin & Richard A. Leo, *The Problem of False Confessions in the Post-DNA World*, 82 N.C. L. Rev. 891 (2004). Available at: http://scholarship.law.unc.edu/nclr/vol82/iss3/3

This Article is brought to you for free and open access by Carolina Law Scholarship Repository. It has been accepted for inclusion in North Carolina Law Review by an authorized administrator of Carolina Law Scholarship Repository. For more information, please contact law_repository@unc.edu.

Case: 1:18-cv-01028 Document #: 868-12 Filed: 03/25/26 Page 3 of 120 PageID #:116205

# THE PROBLEM OF FALSE CONFESSIONS IN THE POST-DNA WORLD*

STEVEN A. DRIZIN** & RICHARD A. LEO***

*In recent years, numerous individuals who confessed to and were convicted of serious felony crimes have been released from prison—some after many years of incarceration—and declared factually innocent, often as a result of DNA tests that were not possible at the time of arrest, prosecution, and conviction. DNA testing has also exonerated numerous individuals who confessed to serious crimes before their cases went to trial. Numerous others have been released from prison and declared factually innocent in cases that did not involve DNA tests, but instead may have occurred because authorities discovered that the crime never occurred or that it was physically impossible for the (wrongly) convicted defendant to have committed the crime, or because the true perpetrator of the crime was identified, apprehended, and convicted. In this Article, we analyze 125 recent cases of proven interrogation-induced false confessions (i.e., cases in which indisputably innocent individuals confessed to crimes they did not commit) and how these cases were treated by officials in the criminal justice system.*

*This Article has three goals. First, we provide and analyze basic demographic, legal, and case-specific descriptive data from these 125 cases. This is significant because this is the largest cohort of interrogation-induced false confession cases ever identified and studied in the research literature.*

*The authors' names are listed in alphabetical order. Professors Drizin and Leo would like to thank the many law students for their invaluable research assistance in this project, including Beth Colgan, Kate Shank, Masato Ishibashi, Colleen Ryan, Jason Christopher, Alice Decker, Megan Chmura, and Eric Jehl. A special thanks is due to Kylie Pak for her assistance in both researching and cite checking the Article. We would also like to thank Welsh White for helpful comments on an earlier draft.

**Clinical Professor of Law, Northwestern University School of Law. B.A., 1983, Haverford College; J.D., 1986, Northwestern University School of Law.

***Associate Professor of Criminology, Law and Society, and Associate Professor of Psychology and Social Behavior, University of California, Irvine. B.A., 1985, University of California, Berkeley; M.A., 1989, University of Chicago; J.D., 1994, University of California, Berkeley; Ph.D., 1994, University of California, Berkeley.

*Second, we analyze the role that (false) confession evidence played in these cases and how the defendants in these cases were treated by the criminal justice system. In particular, this Article focuses on how criminal justice officials and triers-of-fact respond to confession evidence, whether it biases their evaluations and overwhelms other evidence (particularly evidence of innocence), and how likely false confessions are to lead to the wrongful arrest, prosecution, conviction, and incarceration of the innocent. Analysis of the aforementioned questions leads to the conclusion that the problem of interrogation-induced false confession in the American criminal justice system is far more significant than previously supposed. Furthermore, the problem of interrogation-induced false confessions has profound implications for the study of miscarriages of justice as well as the proper administration of justice.*

*Third, and finally, this Article suggests that several promising policy reforms, particularly mandatory electronic recording of police interrogations, will minimize the number of false confessions and thereby inject a much needed dose of justice into the American criminal justice system.*

INTRODUCTION ................................................................................894

I. THE ROLE OF FALSE CONFESSION IN THE STUDY OF WRONGFUL CONVICTION ...........................................................901

II. THE SOCIAL PSYCHOLOGY OF POLICE INTERROGATION AND FALSE CONFESSION ...............................................................907

III. METHODOLOGY AND SOURCES OF DATA ...............................924

IV. FALSE CONFESSIONS AND CASE OUTCOMES: QUANTITATIVE TRENDS..................................................................932

    A. *The False Confession Cases*[1] ...............................................932

---

1. BLACK'S LAW DICTIONARY defines a "confession" as "a statement admitting or acknowledging all facts necessary for conviction of a crime." A "confession" is distinguished from an "admission" which is "an acknowledgment of a fact or facts tending to prove guilt which falls short of an acknowledgment of all essential elements of the crime." In the eyes of police and prosecutors, however, a confession has a much broader meaning, encompassing any statements which tend to incriminate a suspect or a defendant in a crime. BLACK'S LAW DICTIONARY 269 (5th ed. 1979). For example, statements placing a defendant at a crime scene are often treated as "confessions," as are "hypothetical statements" in which a suspect is asked by an interrogator to describe how a crime might have been committed. Also considered confessions are "dream statements" in which a defendant is asked to recount a dream he has had about a crime. There are several cases in our database in which defendants fell short of giving police a full confession. We have included these cases, at the risk of offending suspects or defendants who insist that they never confessed, because the consequences of these inculpatory

  B. *Demographic Data*..........................................................944
  C. *Case Characteristics* ....................................................946
  D. *Case Outcomes*...............................................................949
  E. *Sources of Exoneration*................................................955
  F. *Risk of Miscarriage of Justice* ...................................959
IV. FALSE CONFESSIONS AND CASE OUTCOMES:
  QUALITATIVE TRENDS ...........................................................963
  A. *Vulnerable Populations:  Children* ...........................963
    1. Ryan Harris.................................................................964
  B. *Vulnerable Populations: Juveniles*............................968
    1. Allen Jacob Chesnet....................................................969
  C. *Vulnerable Populations: Mentally Retarded*............970
    1. Michael Gayles ...........................................................971
  D. *Vulnerable Populations:  Mentally Ill* .......................973
    1. Colleen Blue ................................................................974
  E. *Multiplying Effect of False Confessions*....................974
    1. Multiple False Confessions to the Same Crime...........974
      a. Frank Kuecken and Jonathan Kaled .....................977
    2. Multiple Innocent Defendants Arrested, Charged,
      and Convicted Based on Co-Defendant's False
      Confession...................................................................981
      a. Calvin Ollins, Larry Ollins, Marcellus Bradford,
        and Omar Saunders.................................................981
    3. Multiple False Confessions from Same Defendants
      to Multiple Crimes:  The So-called Serial Killer
      Cases...........................................................................985
      a. Innocents Who Falsely Confess to Crimes
        Committed by Serial Killers...................................986
        i. Jerry Frank Townsend, Frank Lee Smith,
          and Eddie Lee Mosley.....................................986
      b. Closing Open Cases by Falsely Attributing
        Unsolved Murders to Guilty Defendants...............992
        i. Hubert Geralds, Derrick Flewellen, and
          Andre Crawford ...............................................992
  F. *Prosecuting the False Confessor* .................................993
    1. David Saraceno ...........................................................994
    2. Teresa Sornberger.......................................................994
CONCLUSION .................................................................................995

statements are the same as if the suspect confessed.   Police officers relied on these statements as the basis for an arrest, prosecutors relied on them to charge the defendants, and judges and juries often relied on them to convict defendants.

*NORTH CAROLINA LAW REVIEW*     [Vol. 82

## INTRODUCTION

In April 1989, a young woman was attacked while jogging in New York City's Central Park. The jogger entered the park near 84th Street shortly after 9:00 p.m., traveled north along the East Drive, and then turned onto the 102nd Street Crossdrive heading west. At approximately 9:15 p.m.,[2] she was knocked down and dragged into a ravine where she was raped and sodomized. She was beaten so severely, particularly in the area of her left eye, that she lost nearly eighty percent of her blood.[3]

On the same evening, a large group of teenage boys, with estimates ranging as high as forty to fifty boys, entered Central Park near East 110th Street in Harlem and began walking south along the park's East Drive. The boys subsequently encountered Antonio Diaz, who was eating dinner and drinking beer in the park that night. Some of the boys proceeded to beat up Diaz and dragged him into a nearby thicket of bushes.[4] This group of boys then continued heading south on East Drive, harassing several cyclists along the way.[5] Sometime thereafter, a police car passed the group, causing them to break up temporarily before regrouping near some ball fields in the park's North Meadow. According to Jermain Robinson, who was one of the boys in the group that night, the group then left the ball fields, went south toward 97th Street, squirmed through a hole in the fence, and hid in some bushes in close proximity to the northern edge of the reservoir. While concealing themselves in the bushes, the boys waited for joggers to pass.[6]

Sometime before 9:30 p.m., five of the boys tried to assault David Lewis as he jogged near the reservoir. As Lewis sped past the boys' hiding place, one of the boys struck him on the elbow with a blunt

---

2. TIMOTHY SULLIVAN, UNEQUAL VERDICTS 243 (1992). Based on the jogger's own estimates of the time she entered the park and how fast she was running, on cross-examination, she estimated she would have arrived at the spot where she was attacked at around 9:15 p.m. *Id.* at 42.

3. *Id.* at 50.

4. *Id.* at 23.

5. *Id.* at 23, 114–17.

6. *Id.* at 73. Jermain Robinson's testimony is crucial to understanding why the confessions of the five who confessed are false. Robinson, in exchange for a plea deal allowing him to admit to a single count of robbery, agreed to cooperate with the prosecutors. He became their tour guide of the mayhem which took place in the park on the night of the attack on the jogger, walking with them along the path that the boys took through the park and describing in detail the assaults even though he had everything to gain from implicating the others in the rape, Robinson consistently denied knowing anything about a rape. The route he claimed the boys had taken took the boys south through the park towards the reservoir, not north towards the secluded area where the jogger was raped. *Id.*

object. A second jogger, David Good, claimed that he was chased by a group of ten African-American youths who threw stones at him as he ran past them. Robert Garner, a third jogger, was chased and caught by fifteen to twenty youths on the reservoir's northern edge. As they assaulted Garner, the mob made demands for his money. When Garner said that he had none, they released him. Finally, a fourth jogger, John Loughlin, a six-foot-four-inch ex-Marine, seeing that Garner was in trouble, approached the group. Loughlin was unable to render assistance, however, due to a blow to the head with a blunt object, later thought to be a solid metal pipe, which left him temporarily unconscious.[7]

Two plain-clothes officers, Eric Reynolds and Robert Powers, responding to complaints about the mayhem, spotted fifteen to twenty boys on Central Park West near 100th Street at around 10:15 p.m.[8] As their squad car approached the group, all but two of the boys scattered. Steven Lopez, age fifteen, and Raymond Santana, age fourteen, remained at the scene and answered Officer Reynolds's questions, insisting that they were not part of the larger group.[9] Reynolds and a third officer, Ivelisse Flores, ran after the boys who had fled, eventually catching Kevin Richards and Clarence Thomas, both of whom were fourteen years old at the time.[10] When Richardson and Thomas both identified Lopez and Santana as being part of their group, all four boys were arrested.[11] A fifth boy, Lamont McCall, age thirteen, was also among the first arrestees.[12]

Shortly before 1:00 a.m., two men, Benicio Moore and Carlos Colon discovered the body of the female jogger. The men were walking home when, after hearing moaning sounds in the darkness, they went to investigate the source of the noise.[13] Prior to this discovery, the police officers had been focusing only on the Diaz assault, the attempted assaults on the cyclists, and the attacks on the joggers. Because the jogger's body was discovered near the location where Diaz and the cyclists had been accosted, however, the police suspected that the boys involved in those crimes were also responsible

---

7. *Id.* at 119–24.
8. *Id.* at 321; *see also* HARLAN LEVY, AND THE BLOOD CRIED OUT:   A PROSECUTOR'S SPELLBINDING ACCOUNT OF THE POWER OF DNA 67–68 (1999) (examining the history of DNA evidence in the courtroom).
9. *Id.* at 84.
10. *Id.* at 85.
11. *Id.*
12. *Id.* at 118.
13. *Id.* at 127.

for raping and beating the female jogger.[14] Throughout the night and the next day, Manhattan North Homicide detectives interrogated the boys already in custody and apprehended others who had been named as accomplices. Antron McRay, age fifteen, was taken into custody at 11:00 a.m., and Yusef Salaam, age fifteen, and Kharey Wise, age sixteen, were both brought in at 10:00 p.m. on the next day.[15] Two hours before the arrest of Salaam and Wise, prosecutors Elizabeth Lederer and Linda Fairstein arrived at the station to assist the detectives in the interrogations. Lederer and Fairstein worked in the Sex Crimes Unit of the District Attorney's Office, and their involvement at this early stage of the investigation indicated that the D.A.'s office also believed the boys to be responsible for the sexual assault. Their arrival also coincided with the next phase of the investigation: videotaping the boys' confessions to the rape of the Central Park Jogger.[16]

Ultimately, prosecutors were able to obtain five confessions to the rape of the Central Park Jogger; four of these confessions were captured on videotape and the fifth was an alleged "oral confession." A sixth defendant, Steve Lopez, who had been identified as a ringleader by all of the other boys, refused to admit to any participation in the rape. Although the confessions were videotaped and most of the boys confessed in the presence of their parents,[17] the earlier interrogation sessions had not been taped.

Precisely what happened during the hours of police interrogations was a matter of great dispute both in pre-trial motions and at trial. The boys and their parents claimed that the interrogations were highly coercive, alleging that officers slapped the

---

14. LEVY, *supra* note 8, at 71.

15. *Id.* at 321.

16. Manhattan's District Attorney, Robert M. Morgenthau, was a pioneer in the use of videotaping to memorialize confessions. After NYPD detectives had secured confessions from suspects, Mr. Morgenthau's District Attorneys would attempt to get the suspects to repeat their confessions on videotape. In a Wall Street Journal article written at the time of the Central Park Jogger case, Mr. Morgenthau called videotaping the "most significant advance in law enforcement in 20 years." L. Gordon Crovitz, *Rule of Jogger Case Shows Confession Is Good for More Than the Soul*, WALL ST. J., Aug. 22, 1990, at A9.

17. Because Kharey Wise was sixteen at the time of this arrest, he was considered an adult under New York law and authorities did not have to attempt to locate his parents before interrogating him. The fact that parents were present for these confessions and not only allowed police to question their children but also encouraged their children to cooperate, is compelling proof that parents often fail to protect their children's rights during the interrogation process, a fact which has been observed in psychological studies. *See* Thomas Grisso & Melissa Ring, *Parents' Attitudes Toward Juveniles' Rights in Interrogation*, 6 CRIM. JUST. & BEHAV. 211, 221 (1979).

boys,[18] yelled and cursed at them, and called them liars. Several boys claimed that they were told that they were being questioned as mere "witnesses" and that they would be released from custody if they only confessed.[19] The police officers denied that they used coercive tactics, although one detective did admit that he lied to Yusef Salaam when he told Salaam that his fingerprints would be found on the victim's jogging shorts.[20] After hearing both accounts of what transpired during hearings for the defendants' pre-trial motions to suppress their confessions, Judge Thomas Galligan found that the police detectives were more credible than the defense witnesses and ruled that the defendants' statements were admissible in their trials.[21]

Five of the Central Park defendants took their cases to trial. The first trial's defendants were Raymond Santana, Yusef Salaam, and Antron McCray; the second involved Kharey Wise and Kevin Richardson. All five defendants were convicted of participating in the rape of the jogger and the assaults on several of the cyclists and the other joggers. Jurors found Kharey Wise, who gave two conflicting taped confessions, not guilty of the rape but guilty of a lesser charge of sex abuse for "playing with the jogger's legs."[22] Only Kevin Richardson, who had hair consistent with the jogger's on his clothing and who was named as one of the boys who beat the jogger with a rock, was found guilty of attempted murder.[23] All the boys who went to trial were sentenced to between five and fifteen years in prison.[24] Steve Lopez was never brought to trial on the rape but pled guilty to one of the assaults near the reservoir.[25]

---

18. Kharey Wise, for example, claimed that he was slapped by a detective in the head four times, causing a temporary hearing problem, and also testified that detectives promised him he could go home if he confessed. SULLIVAN, *supra* note 2, at 80, 280–81.

19. At the trial of their son Antron, both Bobby and Linda McCray testified that detectives yelled at their son, called him a liar, and told him he would be treated as a witness if he admitted his participation in the rape. *Id.* at 182–87. Kevin Richardson's mother, Grace Cuffee, testified that she heard police curse at her son and accuse him of raping the jogger. *Id.* at 268.

20. *Id.* at 24. Detective Thomas McKenna later wrote about this ruse in a book about his life as a homicide detective in Manhattan. *See* THOMAS MCKENNA, MANHATTAN NORTH HOMICIDE 11 (1991).

21. MCKENNA, *supra* note 20, at 92–93.

22. SULLIVAN, *supra* note 2, at 301.

23. *Id.* at 290, 302.

24. *Id.* at 319–20.

25. *Id.* at 306–12. Five other defendants were charged in connection with the events of April 19th: Jermain Robinson, age fifteen, Michael Briscoe, age seventeen, Antonio Montalvo, age eighteen, Orlando Escobar, age sixteen, and Clarence Thomas, age fourteen. Briscoe pled guilty to assaulting jogger David Lewis, Robinson pled guilty to participating in the beating and robbery of John Loughlin, and Montalvo pled guilty to the robbery of Antonio Diaz. All charges against Clarence Thomas were dismissed. *Id.* at

In January 2002, a convict named Matias Reyes contacted authorities and informed them that he, acting alone, had raped the Central Park Jogger. Reyes was one of New York City's most notorious serial rapists. Between June 1989 and his apprehension in August of that year, Reyes terrorized the Upper East Side, raping four women, one of whom, a pregnant woman, he killed after raping her in front of her children.[26] More significantly, when Reyes's DNA was compared to that recovered from the Central Park Jogger crime scene, there was a match: semen stains on the jogger's sock were proven to have come from Reyes. This newly discovered evidence prompted the Manhattan District Attorney's Office to launch a reinvestigation of the case.

In the Fall of 2002, attorneys retained by three of the boys learned that DNA testing tended to exonerate their clients of the rape and filed a motion to vacate the convictions.[27] Meanwhile, Reyes gave a nationally televised interview in which he provided a detailed description of the assault and rape of the jogger, going so far as to draw a map of the area in which the attack took place.[28] Reyes also claimed in the interview that he did not know any of the boys who were convicted of the rape.[29] After an exhaustive eleven-month investigation, the Manhattan District Attorney's Office was unable to establish any link between Reyes and any of the five defendants.[30]

Additional new evidence emerged, much of which tended to undermine the validity of the boys' convictions. At both trials, the

---

320; *see* Affirmation of Nancy E. Ryan, Assistant District Attorney, County of New York, in Response to Motion to Vacate Conviction, ¶¶ 13–18 (No. 4762/89) [hereinafter Manhattan DA's Report].

26. LEVY, *supra* note 8, at 1–16. Levy, a former Assistant District Attorney for the Manhattan District Attorney's Office, describes Reyes's arrest, interrogation, and conviction in these assaults in the first chapter of his book about the power of DNA evidence. Ironically, in a later chapter, Levy devotes a full chapter to the Central Park Jogger trial, describing how he and Elizabeth Lederer dealt with the bad news when DNA test results of semen taken from a vaginal swab and from the jogger's socks did not match any of the teenage boys. *Id.* at 59–85.

27. Alice McQuillan, *Jogger Case Confession*, N.Y. DAILY NEWS, Sept. 4, 2002, at 5, *available at* 2002 WL 2482732.

28. Reyes's interview aired on September 26, 2002 on ABC's evening news magazine show "Primetime Live." *Primetime Live* (ABC television broadcast, Sept. 26, 2002) (on file with the North Carolina Law Review).

29. *Id.*

30. Testimony of James M. Kindler, Chief District Attorney, New York County District Attorney's Office, before The Council of the City of New York, Committee on Public Safety, Jan. 30, 2003, at 3 ("[I]nvestigators have been unable to find any evidence that, as of 1989, Reyes knew or associated with the defendants or any of the individuals known to have been in the park with them on April 19, 1989.") (on file with the North Carolina Law Review).

prosecutors had stated that "hair consistent with the jogger's" was found on Kevin Richardson's clothing.[31]   Mitochondrial DNA testing—a technique not scientifically possible at the time of the trials—later demonstrated that the hairs were probably not the jogger's.[32] Similarly, hair and blood recovered from a rock found near the crime scene which prosecutors suggested was the murder weapon was found not to have been the jogger's.[33]

In light of this exculpatory evidence, the District Attorney's Office ultimately decided to join the motion to vacate the boys' convictions.[34] The District Attorney's fifty-eight page memorandum in support of the defense motion outlines why prosecutors chose to believe Reyes's confession that he acted alone and why they gave it greater weight than the boys' videotaped confessions.[35]   On December 19, 2002, Judge Charles Tejada of the New York Supreme Court (a trial court) granted the motion and vacated all of the convictions of the original Central Park Jogger defendants.[36]

District Attorney Robert M. Morgenthau, and attorneys in his office, deserve credit for reinvestigating the jogger case when compelling evidence of the boys' innocence first came to light. Rather than re-investigate such claims, police and prosecutors often vigorously defend the conviction, using the fact that a jury or judge must have found the confessions to be reliable in order to convict as justification for refusing to reopen the case.[37]   Indeed, District Attorney Morgenthau's decision to support the defense motion to vacate the convictions was sharply criticized by former prosecutors from his office, police officers involved in the original investigation, and others connected to the case.[38] In fact, the New York City Police

---

31. Manhattan DA's Report, *supra* note 25, ¶¶ 74–76.

32. *Id.*

33. *Id.* ¶¶ 76–78.

34. Karen Freifeld, *Convictions Tossed, Judge Clears Verdicts of Central Park Five,* NEWSDAY, Dec. 20, 2002, at A03.

35. *Id.*

36. *Id.*

37. *See* Steve Mills and Maurice Possley, *Officials Often Insist Ex-inmates Are Guilty,* CHI. TRIB., Oct. 27, 2003, at A1; Maurice Possley and Steve Mills, *Crimes Go Unsolved As DNA Tool Ignored: Genetic Profiles in Rapes, Slayings Not Sent to FBI,* CHI. TRIB., Oct. 26, 2003, at A1.

38. *See, e.g.,* Karen Freifeld, *Cops' Jogger Scenario / Report: 5 Cleared in Case Probably Joined in Attack,* NEWSDAY, Jan. 28, 2003, at A7 (noting criticism from the police department), *available at* 2003 WL 3286581; Leonard Levitt, *Kelly: DA Hindered Cops' Investigation,* NEWSDAY, Dec. 20, 2002, at A4 (describing criticism from the police department), *available at* 2002 WL 103519503; Alice McQuillan, *NYPD Jogger Theory Ripped: Top Morgy Prosecutor: Evidence Backs Lone Attacker,* N.Y. DAILY NEWS, Jan. 31, 2003, at 8 (noting criticism from other prosecutors), *available at* 2003 WL 4063820;

Department conducted its own investigation and released its own report.[39] Although ultimately concurring with the D.A.'s decision to join in the motion to vacate, the NYPD report took issue with many of the D.A.'s factual findings, attacked the credibility of Matias Reyes's statements, and advanced several theories in which both Reyes and the original defendants could have participated in the assaults.[40]

The discovery that Matias Reyes's DNA matched the DNA taken from a sock found at the Central Park crime scene triggered the re-investigation of the Central Park jogger case.[41] This Article will examine how DNA testing has changed our understanding of wrongful prosecution and conviction in America, focusing specifically on the phenomena of interrogation-induced false confession. This Article will document and analyze more than 125 false confessions, the largest such cohort ever assembled. Unlike previous studies of false confessions, however, the confessions considered in this Article have been *proven* to be false. The Central Park Jogger case is representative of many of the trends we have observed in the cohort, including issues of youth, mental disability, multiple false confessions in a single case, and the utility of DNA testing in overcoming resistance to the notion of false confession.

In a development that can be traced directly to the increased use of DNA testing, most of the confessions in the cohort have been proven false in the past five years.[42] Primarily as a result of DNA testing, approximately two-thirds of the exonerations have occurred pre-trial, rather than post-conviction.[43] In this way, DNA testing has helped to minimize the consequences of false confessions.

This Article proceeds as follows: Part I discusses, from a

---

Editorial, *Morgy's Rush to Judgment*, N.Y. POST, Dec. 23, 2002, at 26 (criticizing the prosecutor from relying too heavily on Reyes's uncorroborated testimony), *available at* 2002 WL 104583934; *see also* Statement of Linda Fairstein, Former Prosecutor in Charge of the Sex Crimes Unit, Manhattan District Attorney's Office, for the Public Safety Committee of the New York City Council, Jan. 30, 2003 (describing "the factual basis of the DA Office's recommendation to vacate the convictions" as "replete with internal inconsistencies") (on file with the North Carolina Law Review).

39. Executive Summary, Central Park Jogger Case Panel Report (2003), *at* http://home.nyc.gov/html/nypd/html/dcpi/executivesumm_cpjc.html (on file with the North Carolina Law Review); *see also* Phil Hirschkorn, *Police Panel Slams Decision to Absolve Men in Central Park Jogger Case*, Jan. 28, 2003, *at* http://us.cnn.com/2003/LAW/01/27/nyjogger.report/ (noting the police department's skepticism that the boys were not involved) (on file with the North Carolina Law Review).

40. Hirschkorn, *supra* note 39.

41. Manhattan DA's Report, *supra* note 25, ¶40.

42. *See* Table 8, *infra*.

43. *Id.*

historical perspective, the study of wrongful convictions and the prominent role that false confessions have played in such studies. Part I also discusses the development of DNA testing and its role in renewing interest in the study of wrongful convictions.    Part II highlights the connection between police interrogation methods and false confessions, focusing principally on the social psychology of false confessions and research on the causes and consequences of false confessions.  Part III discusses the methodology used to compile and analyze the false confessions that make up this Article's cohort, defines critical terms, and discusses the limitations of the data.  Part IV sets forth the quantitative findings gleaned from the cohort.  Part V takes a more qualitative approach to the data set, highlighting some of the common themes and trends that emerge from the cohort cases and describing illustrative cases in some detail.   Finally, Part VI concludes this Article with several policy recommendations suggested by the aforementioned findings, and highlights some recent positive developments which suggest that reforms designed to reduce the frequency of false confessions may stand a better chance of being implemented now than ever before.

## I. THE ROLE OF FALSE CONFESSION IN THE STUDY OF WRONGFUL CONVICTION

The study of miscarriages of justice (i.e., wrongful conviction) in America begins with Edwin Borchard's pioneering book, *Convicting the Innocent*.[44]    Arguing against the conventional wisdom that innocent people are never convicted in the American criminal justice system, Borchard detailed sixty-five convictions in which innocent individuals were wrongfully prosecuted, convicted, and incarcerated.[45] The thrust of Borchard's then-pioneering research was to shift the research question away from *whether* factually innocent individuals are wrongfully convicted in the American criminal justice system to the questions of *why* they are wrongfully convicted and what can be done to remedy the problem.  Borchard identified a number of causes of wrongful conviction—e.g., eyewitness misidentification, perjured testimony, and police and prosecutorial misconduct—as well as policy solutions to reduce the frequency of wrongful conviction.[46]

Subsequent empirical studies of error in the administration of criminal justice have elaborated on the multiple causes of wrongful

---

44. EDWIN M. BORCHARD, CONVICTING THE INNOCENT:  SIXTY FIVE ACTUAL ERRORS OF CRIMINAL JUSTICE (1932).
45. *Id.*
46. *Id.* at 367–78.

conviction first identified by Borchard.[47] In all of these studies, the problem of false confession has been featured prominently as one among many of the leading causes of wrongful conviction. As discussed in more depth below, however, more recent studies have identified false confession as the leading or primary cause of wrongful conviction in anywhere from 14–25% of the sample cases studied. To a large extent, Borchard's pioneering study laid down the template that subsequent empirical studies of miscarriages of justice would follow for many years to come. From the time Borchard published his book in the early 1930s until the advent of DNA testing in the late 1980s, there was typically one book or major article published every decade or so on the subject of miscarriages of justice, often following the same general format and repeating the same arguments but with newer (and sometimes even more compelling) cases. Although Borchard identified sixty-five cases of wrongful conviction, his book was primarily descriptive rather than analytical: Borchard briefly described how the error occurred, how it was later discovered, and how the original case against the innocent defendant subsequently unraveled. However, Borchard did not quantify, tabulate, or systematically analyze the causes of error in the cases he studied. Similarly, Erle Stanley Gardner's *The Court of Last Resort*,[48] Jerome and Barbara Frank's *Not Guilty*,[49] and S. Radhakrishnan's *The Innocents*,[50] all follow the same format as Borchard's classic, documenting and describing cases in which the State mistakenly prosecuted, convicted, and incarcerated the wrong man. In all three works, the specific causes of wrongful conviction—including the problem of false confession—are discussed in relation to the cases that are presented, but the authors make no attempt to quantify or systematically study the number and characteristics of false confessions (or other errors that they describe).

Until the late 1980s, there was no systematic, social scientific study of the causes, patterns, and consequences of miscarriages of justice in America. This changed with Hugo Bedau and Michael Radelet's 1987 watershed study, "Miscarriages of Justice in Potentially Capital Cases," published in the *Stanford Law Review*.[51]

---

47. JEROME FRANK & BARBARA FRANK, NOT GUILTY *passim* (1957); S. RADHAKRISHNAN, THE INNOCENTS/EDWARD D. RADIN (1964); Hugo Adam Bedau & Michael L. Radelet, *Miscarriages of Justice in Potentially Capital Cases*, 40 STAN. L. REV. 21, 56–64 (1987).

48. ERLE STANLEY GARDNER, THE COURT OF LAST RESORT (1952).

49. FRANK & FRANK, *supra* note 47.

50. RADHAKRISHNAN, *supra* note 47.

51. Bedau & Radelet, *supra* note 47, at 56–64.

Identifying 350 cases of wrongful conviction in potentially capital cases in America from 1900–1987, Bedau and Radelet systematically analyzed the causes of these errors, the sources of discovery of the error, and the number of innocents who had been executed.[52] Significantly, Bedau and Radelet's sample found that false confessions played a causal role in 49 of the 350 miscarriages of justice studied, approximately 14% of the cases in their sample. Bedau and Radelet's article has been influential for a number of reasons. Most fundamentally, it introduced the largest and most compelling data set on wrongful convictions into the literature; that at least 350 individuals have been wrongfully convicted of capital crimes in the twentieth century is highly disturbing, if not downright horrifying.[53] Moreover, approximately 90% of the 350 wrongful convictions that Bedau and Radelet documented were based on official declarations of innocence.[54] Thus, even if one disputes Bedau and Radelet's conclusion in any particular case, it would be difficult to meaningfully dispute the larger pattern of their findings. Bedau and Radelet have influenced numerous others to research and write about the causes and consequences of wrongful conviction;[55] they have inspired others to reanalyze and extend the insights offered by their data;[56] and they have continued to collect, analyze, and publish studies of wrongful convictions in capital cases.[57]

Following Bedau and Radelet's widely cited *Stanford Law Review* article, the 1990s were a period of renewed energy and activism in the study of miscarriages of justice. Unlike in the preceding six decades, journalists, lawyers, and scholars published a number of books in the 1990s on the problem of wrongful prosecution

---

52. *Id.*

53. Bedau and Radelet's catalogue of innocents convicted in potentially capital cases increased to 416 by 1992. *See* MICHAEL L. RADELET, HUGO ADAM BEDAU & CONSTANCE E. PUTNAM, IN SPITE OF INNOCENCE: ERRONEOUS CONVICTIONS IN CAPITAL CASES 272 (1992).

54. *Id.* at 274.

55. *See* WRONGLY CONVICTED: PERSPECTIVES ON FAILED JUSTICE 17–77 (Saundra O. Westervelt & John A. Humphrey eds., 2001) [hereinafter WRONGLY CONVICTED].

56. *See generally* Samuel Gross, *The Risks of Death: Why Erroneous Convictions Are Common in Capital Cases*, 44 BUFF. L. REV. 469 (1996) (highlighting the frequency of wrongful convictions).

57. *See generally* RADELET, BEDAU & PUTNAM, *supra* note 53 (describing the problems of false confessions); Michael Radelet & Hugo Bedau, *The Execution of the Innocent*, LAW & CONTEMP. PROBS., 105, 110–16 (1998) (analyzing data on wrongful convictions); Michael Radelet, William S. Loftquist & Hugo Adam Bedau, *Prisoners Released from Death Rows Since 1970 Because of Doubts About Their Guilt*, 13 T.M. COOLEY L. REV, 907 (1996) (chronicling the experiences of wrongfully convicted prisoners).

*NORTH CAROLINA LAW REVIEW* [Vol. 82

and conviction,[58] signaling a new and deepening interest in the study of miscarriages of justice. To be sure, most of the articles and books published in the 1990s were in the Borchard tradition of case description and policy prescription[59] or, alternatively, were individual case studies.[60] Nonetheless, these works created an emerging and expanding critical mass in the study of wrongful conviction, calling attention to old issues in new ways (or at least with newer cases), and laying the groundwork for the biggest, and potentially most significant, development yet in the academic study of miscarriages of justice.

The most significant development in wrongful conviction scholarship in the 1990s was the advent of increasingly sophisticated forms of DNA testing and the application of this new technology to criminal investigation, particularly in post-conviction cases in which a defendant had long claimed his conviction was erroneous and there remained biological evidence from the crime with which to conclusively test the convicted prisoner's claim. DNA testing has established the fact of wrongful conviction in scores of cases, including capital cases.[61] The earliest statement of DNA testing's ability to conclusively establish the fact of wrongful conviction was contained in Edward Connors, Thomas Lundregan, Neil Miller and Tom McEwen's study of twenty-eight wrongful convictions[62] in which the testing of DNA evidence subsequently established the incarcerated prisoner's innocence. In this study, approximately 18% (5/28) of the convictions were attributable to false confessions.[63] In

---

58. *See, e.g.*, RADELET, BEDAU & PUTNAM, *supra* note 53, at 102–20. *See generally* MARTIN YANT, PRESUMED GUILTY (1991) (describing the toll wrongful prosecutions take on the American criminal justice system); CONVICTING THE INNOCENT (Donald Connery ed., 1996) (detailing the struggles of one man wrongfully convicted after his false confession); MISCARRIAGES OF JUSTICE: A REVIEW OF JUSTICE IN ERROR (Clive Walker & Keir Starmer eds., 1999) (examining the various steps within the criminal justice system which have resulted in the conviction of the innocent).

59. *See* RONALD HUFF, ARYE RATTNER & EDWARD SAGARIN, CONVICTED BUT INNOCENT 21–32, 142–60 (1996); YANT, *supra* note 58, at 2.

60. *See* JIM FISHER, FALL GUYS: FALSE CONFESSIONS AND THE POLITICS OF MURDER (1996); EDWARD HUMES, MEAN JUSTICE (1999); ROGER PARLOFF, TRIPLE JEOPARDY: A STORY OF LAW AT ITS BEST—AND WORST (1996); DAVID PROTESS & ROB WARDEN, A PROMISE OF JUSTICE (1998).

61. *See* Innocence Project, Case Profiles, *at* http://www.innocenceproject.org/case/index.php (last visited Feb. 13, 2004) [hereinafter Innocence Project] (providing a summary for each of the postconviction DNA exonerations in the U.S.) (on file with the North Carolina Law Review).

62. EDWARD CONNOR ET AL., CONVICTED BY JURIES, EXONERATED BY SCIENCE: CASE STUDIES IN THE USE OF DNA EVIDENCE TO ESTABLISH INNOCENCE AFTER TRIAL (1996).

63. *Id.* at 16–17.

the eight years since the publication of the Connors study, DNA testing has become increasingly sophisticated,[64] and numerous other wrongfully convicted individuals have been exonerated, declared innocent, and released from prison.[65]    Barry Scheck and Peter Neufeld, co-founders of the Innocence Project at the Cardozo School of Law, and others, have continued to work on cases in which DNA testing has established factual innocence and led to the release of wrongfully convicted prisoners.[66]  As of the year 2000, when Scheck and Neufeld (along with *New York Times* journalist Jim Dwyer) published *Actual Innocence:   Five Days to Execution and Other Dispatches from the Wrongly Convicted*, sixty-two factually innocent individuals had been exonerated by DNA evidence.[67]  Of those cases, approximately 24% (15/62) involved false confessions.[68]  At the time of this writing 140 wrongly convicted prisoners have been exonerated and released as a result of DNA testing.   Approximately 25% (35/140) of these wrongful convictions were caused by false confession.[69]

The advent of DNA testing and the window it opened onto the errors of the legal system has permanently altered the nature and study of miscarriages of justice in America. Most importantly, DNA testing has established factual innocence with certainty in numerous post-conviction cases, so much so that it has now become widely accepted, in the space of just a few years, that wrongful convictions occur with regular and troubling frequency in the American criminal justice system, despite our high-minded ideals and the numerous constitutional rights that are meant to procedurally safeguard the innocent against wrongful conviction. It is one thing for Bedau and Radelet to argue, based on their own judgment of the totality of the facts and documentary record in individual cases, that hundreds of innocent individuals have been wrongfully convicted and incarcerated; it is quite another thing for DNA testing to establish prisoners' factual innocence in case after case.   Notwithstanding judgments of innocence from criminal justice and/or political officials, the former can always be disputed and impugned as the "subjective" interpretation of the scholar; the latter can be established conclusively

---

64. BARRY SCHECK, PETER NEUFELD & JIM DWYER, ACTUAL INNOCENCE 262 (2000).
    65. *See* Innocence Project, *supra* note 61.
    66. *See id.*
    67. *See id.*
    68. *See* SCHECK ET AL., *supra* note 64, at 254–56.
    69. *See* Innocence Project, *supra* note 61. These updated numbers are based upon figures provided by Sara Tofte, a policy analyst at the Innocence Project.

and beyond dispute. More so than at any time since Borchard's seminal book in 1932, the advent of DNA testing in the 1990s has established the problem as not whether, or how frequently, miscarriages of justice occur, but *why* they occur so frequently and what can be done to prevent and remedy them.[70]

As we have seen from this cursory review of the miscarriage of justice literature, only a few studies have systematically aggregated, quantified, and analyzed the causal role of false confession in wrongful conviction cases. These studies report that the number of false confessions range from 8–25% of the total miscarriages of justices studied, thus establishing the problem of false confessions as a leading cause of the wrongful convictions of the innocent in America. Table 1 below lists these studies. If we remove the findings from one methodologically flawed (and otherwise questionable) study,[71] the

---

70. Unfortunately, though, the ability of DNA testing to resolve factual disputes about innocence is limited, for most crimes do not involve biological evidence (such as blood, semen, hair, fingerprints, skin or other tissue) with which to test claims of innocence, and in most post-conviction cases involving biological evidence in which the prisoner has claimed innocence, the biological material has been destroyed. *See* SCHECK ET AL., *supra* note 64, at 36.

71. Based on a study of 205 alleged wrongful convictions, Ronald Huff, Arye Rattner and Edward Sagarin's book CONVICTED BUT INNOCENT reports a false confession rate of 8% in their alleged sample. *See* HUFF ET AL., *supra* note 59, at 142. This study, however, is both methodologically flawed and highly questionable. In our opinion it should be disregarded because the authors count only what they believe to be the single major source of error for each case, thus failing to count a false confession in any case it occurred where they did not deem it to be the primary source of error leading to a wrongful conviction. This is surprising because the authors acknowledge that most wrongful conviction cases consist of multiple errors and that that their own approach is thus "insufficient" and their reported findings are therefore "a gross oversimplification." *Id.* at 64–65. As a result of their admittedly insufficient and grossly oversimplified approach and findings, Huff et al. surely underestimate the percentage of false confessions in the cases they studied. We tried to figure out what percentage of Huff et al.'s cases involved false confessions but, unfortunately, were not able to do so because, contrary to the established practice in all other miscarriage of justice studies (and in the social science more generally), Huff et al. failed to list or cite the names of the cases in their database. In all other studies, there is typically an appendix or table listing the case names and the sources that verify the fact of the wrongful conviction as well as the factual assertions of the author(s). We subsequently contacted both living authors, Ronald Huff and Arye Rattner, asking if they could provide us the names of the 205 cases that they assert forms the basis of the quantitative tabulations in their book, but neither author possessed or could point us to the data set for their tabulations, which was never documented in the first place. Regrettably, Huff et al.'s failure to document the case names in their study deprives scholars of verifying or re-analyzing their stated findings. This fact alone, in our judgment, makes any of the reported findings in the Huff et al study suspect. In assessing whether Huff et al.'s findings are credible, one must rely on faith alone, which is an insufficient form of proof either in social science generally or more specifically in the Huff et al.'s study, especially in light of their admission that their methodology is insufficient and their findings are grossly oversimplified. *Id.* at 64–65. As a result, the Huff finding of

percentage of false confession in the miscarriages of justice studies ranges from 14–25%.

**TABLE 1**

**THE PERCENTAGE OF FALSE CONFESSIONS IN PRIOR STUDIES OF WRONGFUL CONVICTIONS**

| Authors and Year | Number of False Confessions | Percentage of Cases Studied |
|---|---|---|
| Bedau and Radelet (1987)[72] | 49/350 | 14% |
| Connors, Lundregan, Miller & McEwen (1996)[73] | 5/28 | 18% |
| Scheck, Neufeld & Dwyer (2000)[74] | 15/62 | 24% |
| Innocence Project (2003)[75] | 35/140 | 25% |

## II. THE SOCIAL PSYCHOLOGY OF POLICE INTERROGATION AND FALSE CONFESSION

Apart from the popular and academic literature on miscarriages of justice, there exists a well-established psychological and sociological literature on the causes, characteristics, and consequences of police interrogation and false confession.[76] This literature focuses

---

8% should be excluded from any credible discussion of the percentage of false confessions in the academic studies of miscarriages of justice, and it is therefore excluded from Table 1.

72. *See* Bedau & Radelet, *supra* note 47, at 57.

73. *See* CONNOR ET AL., *supra* note 62, at 16–17.

74. *See* SCHECK ET AL., *supra* note 64, at 262.

75. *See* Innocence Project, *supra* note 61.

76. For articles discussing the impact of psychological research and expert testimony on legal changes, police practice, and legal judgments in the U.S. and overseas, see generally GISLI GUDJONSSON, THE PSYCHOLOGY OF INTERROGATIONS AND CONFESSIONS (2003); Saul Kassin, *The Psychology of Confession Evidence*, 52 AM. PSYCHOL. 221 (1997); Saul Kassin & Katherine Neumann, *On the Power of Confession Evidence: An Experimental Test of the Fundamental Difference Hypothesis*, 21 LAW & HUM. BEHAV. 469 (1997); Saul Kassin & Holly Sukel, *Coerced Confessions and the Jury: An Experimental Test of the "Harmless Error" Rule*, 21 LAW & HUM. BEHAV. 27 (1997); Richard A. Leo, *Inside the Interrogation Room*, 86 J. CRIM. L. & CRIMINOLOGY 300 (1996) [hereinafter Leo, *Inside the Interrogation Room*]; Richard A. Leo & Richard J.

on the techniques and strategies of modern police interrogation, which rely on psychological influence, persuasion, deception and/or coercion to achieve their desired objectives;[77] how these techniques are designed, taught, and practiced in the real world of police questioning;[78] the effect(s) these techniques have on the perceptions and behavior of custodial suspects during interrogation;[79] how and why these techniques often lead the guilty to confess truthfully, as well as how and why these same techniques sometimes lead the innocent to confess falsely;[80] the different types of false confession and their characteristics;[81] the psychological traits and characteristics that make some individuals more vulnerable to the pressures of psychological interrogation;[82] and the effect of confession evidence on judges and juries in their assessment of the voluntariness and/or reliability of a defendant's interrogation-induced statements, admissions and/or confessions.[83]

In earlier eras, the problem of, and potential for, interrogation-induced false confession was more obvious and understandable than it is today. Through the nineteenth century and into the first one-third of the twentieth century, American police routinely relied on the infliction of bodily pain and psychological torment—the so-called "third degree"—to extract confessions from custodial suspects.[84]

---

Ofshe, *The Consequences of False Confessions: Deprivations of Liberty and Miscarriages of Justice in the Age of Psychological Interrogation*, 88 J. CRIM. L. & CRIMINOLOGY 429 (1998) [hereinafter Leo & Ofshe, *Consequences*]; Richard A. Leo & Richard J. Ofshe, *The Social Psychology of Police Interrogation: The Theory and Classification of True and False Confessions*, 16 STUD. L. POL. & SOC'Y 189 (1997) [hereinafter Ofshe & Leo, *Social Psychology of Police Interrogation*]; Richard J. Ofshe & Richard A. Leo, *The Decision to Confess Falsely: Rational Choice and Irrational Action.* 74 DEN. L. REV. 979 (1997) [hereinafter Ofshe & Leo, *Decision to Confess Falsely*].

77. *See* Kassin, *supra* note 76, at 221–28; Leo, *Inside the Interrogation Room*, *supra* note 76, at 273–301.

78. *See* Kassin, *supra* note 76, at 221–28.

79. *See* Ofshe & Leo, *Social Psychology of Police Interrogation*, *supra* note 76, at 200–07.

80. *See* Leo & Ofshe, *Consequences*, *supra* note 76, at 491–92; Ofshe & Leo, *Social Psychology of Police Interrogation*, *supra* note 76, at 200–07.

81. *See* Kassin, *supra* note 76, at 221–28.

82. *See id.*

83. *See* Kassin & Neumann, *supra* note 76, at 481; Kassin & Sukel, *supra* note 76, at 42.

84. NAT'L COMM'N ON LAW OBSERVANCE AND ENFORCEMENT, REPORT ON LAWLESSNESS IN LAW ENFORCEMENT, H.R. Rep. No. 71-252, at 19 (1931) [hereinafter WICKERSHAM COMMISSION REPORT]; *see also* Richard A. Leo, Police Interrogation in America: A Study of Violence, Civility and Social Change (1994) (unpublished Ph.D. dissertation, University of California, Berkeley) [hereinafter Leo, Police Interrogation in America] (detailing common torture methods used in the early twentieth century) (on file with the North Carolina Law Review). It should be noted that the third degree did not die

These techniques ranged from the direct and explicit use of physical violence (such as beating, punching, kicking or mauling a suspect) to more elaborate strategies of torture (such as the "sweat box,"[85] the "water cure,"[86] and the "electric monkey"[87]) to physically and psychologically coercive techniques that did not leave marks (such as the use of a rubber hose, suffocation, extended incommunicado interrogation, or food and sleep deprivation) to lesser forms of psychological duress such as threats of harm and promises of leniency.[88] As Ernest Jerome Hopkins wrote in the heyday of the third degree, "there are a thousand forms of compulsion; our police show great ingenuity in the variety employed."[89] The manifold and varied techniques of third degree violence were commonplace in an era when American police departments were systemically brutal and corrupt, controlled by political machines rather than an independent judiciary and had yet to be professionalized.[90] In the wake of the Wickersham Commission Report[91] and several U.S. Supreme Court decisions in the 1930s and 1940s,[92] American police forces began to

out entirely after the first third of the twentieth century. In the 1970s, the Philadelphia Police Department became embroiled in a scandal that revealed the extensive use of the third degree or torture techniques during interrogation. In the 1980s and 1990s, the Chicago police department too became embroiled in a third degree fiasco. The Chicago Police Department's own Office of Professional Standards found that Lieutenant Jon Burge, commanding officer of the Area 2 Violent Crimes Unit, had systematically tortured numerous criminal suspects. Eventually Burge was fired from the Chicago Police Department. JOHN CONROY, UNSPEAKABLE ACTS, ORDINARY PEOPLE: THE DYNAMICS OF TORTURE 231 (2000). Though both of these third degree police scandals have receded in time, a number of American scholars and commentators have suggested that American police might be allowed to once again employ, in limited circumstances, third degree interrogation techniques in light of the September 11th attacks on the World Trade Center and the Pentagon. *See* Alan Dershowitz, *Should the Ticking Bomb Terrorist be Tortured?*, *in* WHY TERRORISM WORKS 131, 131–63 (2002); Eyal Press, *In Torture We Trust*, THE NATION, Mar. 31, 2003, at 11–16.

85. The "Sweat Box" involved placing a suspect in a small, dark cell next to a stove that produced scorching heat and pungent odors. *See* Leo, Police Interrogation in America, *supra* note 84, at 31–32.

86. The "Water Cure" involved holding a suspect's head in water until he almost drowned, placing a water hose into or down his mouth, or forcing a suspect to lay on his back while pouring water into his nostrils. *Id.* at 32.

87. The "Electric Monkey" involved connecting one pole of a storage battery to a suspect's spine, another pole of the storage batter to a suspect's hands, and then charging currents through the suspect's body. *Id.* at 33.

88. *Id.*

89. ERNEST JEROME HOPKINS, OUR LAWLESS POLICE 194 (1931).

90. Leo, Police Interrogation in America, *supra* note 84, at 201.

91. WICKERSHAM COMMISSION REPORT, *supra* note 84, at 49.

92. Brown v. Mississippi, 297 U.S. 278 (1936); *see also* Ashcraft v. Tennessee, 322 U.S. 143 (1944) (holding that the admission of a confession obtained after a brutal interrogation was improper).

reform their interrogation practices, developing psychological techniques and strategies that were believed to be more effective, professional, and humane than the third degree.[93] As psychological methods of interrogation have evolved over the years, they have become increasingly sophisticated, relying on more subtle forms of manipulation, deception, and coercion. As a result, it is no longer as apparent how or why police interrogation techniques might lead the innocent to confess falsely—particularly to crimes that carry the possibility of lengthy prison sentences or execution.

Indeed, in the era of psychological interrogation, the phenomenon of false confession has become counter-intuitive.[94] Because police interrogation is beyond the common knowledge of individuals who have neither experienced it firsthand as a criminal suspect nor performed it as a trained police officer—i.e., the vast majority of the American public—most people are ignorant of the psychologically manipulative methods and strategies of police interrogators. Most people do not appear to know that interrogation-induced false confessions even exist, let alone that police detectives are sent to specialized training schools to learn the techniques of interrogation or how and why they are designed to manipulate the perceptions, reasoning, and decision-making of a custodial suspect and thus lead to the decision to confess.[95] Like many criminal justice officials, most people appear to believe in what one of the authors has labeled "the myth of psychological interrogation": that an innocent person will not falsely confess to a serious crime unless he is physically tortured or mentally ill.[96] This myth is, of course, easily dispelled by the literature on miscarriages of justice[97] as well as the psychological and sociological literature on coercive persuasion[98] and interrogation-induced false confession.[99] Social scientists and legal scholars have amply documented that contemporary methods of

---

93. Richard A. Leo, *From Coercion to Deception: The Changing Nature of Police Interrogation in America*, 18 CRIME, L. & SOC. CHANGE 35, 40 (1992).

94. Welsh S. White, *False Confessions and the Constitution: Safeguards Against Untrustworthy Confessions*, 32 HARV. C.R.-C.L. REV. 105, 108 (1997); *see also* Richard A. Leo, *False Confessions: Causes, Consequences, and Solutions, in* WRONGLY CONVICTED, *supra* note 55, at 81 (describing the public's faith in the criminal justice system, constitutional safeguards, and due process).

95. Leo, *supra* note 94, at 37.

96. *See id.*; Kassin & Neumann, *supra* note 76, at 482.

97. *See* YANT, *supra* note 58, at 16; Bedau & Radelet, *supra* note 47, at 47–56.

98. *See* Richard Ofshe, *Coercive Persuasion and Attitude Change, in* ENCYCLOPEDIA OF SOCIOLOGY 212, 220–21 (Edgar F. Borgatta & Marie L. Borgatta eds., 1992); GUDJONSSON, *supra* note 76, at 24–25, 47–49.

99. *See* GUDJONSSON, *supra* note 76, at 205–58; Kassin, *supra* note 76, at 224–25; Leo & Ofshe, *Consequences, supra* note 76, at 492.

psychological interrogation can, and sometimes do, lead innocent individuals to confess falsely to serious felony crimes.[100] The social psychological literature has thus sought to explain the reasons how and why the strategies of psychological interrogation sometimes lead individuals to confess to crimes they did not commit.[101]

Interrogation is different than interviewing: whereas the goal of interviewing is to obtain the truth through non-accusatorial, open-ended questioning in order to gather general information in the early stages of a criminal investigation, the goal of interrogation is to elicit incriminating statements, admissions and/or confessions through the use of psychological methods that are explicitly confrontational, manipulative, and suggestive.[102] The purpose of interrogation is not to determine whether a suspect is guilty; rather, police are trained to interrogate only those suspects whose guilt they presume or believe they have already established.[103] The purpose of interrogation, therefore, is not to investigate or evaluate a suspect's alibi or denials.[104] Nor is the purpose of interrogation necessarily to elicit or determine the truth.[105] Rather, the singular purpose of American police interrogation is to elicit incriminating statements and admissions—ideally a full confession—in order to assist the State in its prosecution of the defendant.[106] Because it is designed to break the anticipated resistance of an individual who is presumed guilty, police interrogation is stress-inducing by design; it is intentionally structured to promote isolation, anxiety, fear, powerlessness, and hopelessness.[107] Police interrogation involves the use of numerous psychological techniques, primary among them isolation, accusation,

---

100. *See* GUDJONSSON, *supra* note 76, at 205–58; Kassin, *supra* note 76, at 224–25; Leo & Ofshe, *Consequences, supra* note 76, at 440–49; Ofshe & Leo, *Decision to Confess Falsely, supra* note 76, at 981–1001; Ofshe & Leo, *Social Psychology of Police Interrogation, supra* note 76, at 191–94.

101. *See* Kassin, *supra* note 76, at 221–28; Ofshe & Leo, *Decision to Confess Falsely, supra* note 76, at 1001–122.

102. *See* NATHAN GORDON & WILLIAM FLEISHER, EFFECTIVE INTERVIEWING & INTERROGATION TECHNIQUES 27–36 (2002); FRED INBAU ET AL., CRIMINAL INTERROGATION AND CONFESSION 209–347 (4th ed. 2001); Ofshe & Leo, *Decision to Confess Falsely, supra* note 76, at 1001–06.

103. *See* GORDON & FLEISHER, *supra* note 102, at 35; INBAU ET AL., *supra* note 102, at 243.

104. *See* Ofshe & Leo, *Decision to Confess Falsely, supra* note 76, at 1001–22.

105. *See* GORDON & FLEISHER, *supra* note 102, at 37; INBAU ET AL., *supra* note 102, at 249.

106. *See* Ofshe & Leo, *Decision to Confess Falsely, supra* note 76, at 1001–22.

107. *See* Kassin, *supra* note 76, at 221–24; Ofshe & Leo, *Decision to Confess Falsely, supra* note76, at 1003–50; Ofshe & Leo, *Social Psychology of Police Interrogation, supra* note 76, at 199–203.

*NORTH CAROLINA LAW REVIEW* [Vol. 82

attacks on the suspect's alibi, cutting off of denials, confrontation with true or false incriminating evidence, the use of "themes" (so-called scenarios that recast the suspect's behavior so that he is no longer morally and/or legally culpable), and inducements.[108]  Thus, police interrogation can be described as a two-sided process, involving techniques that rely on negative incentives (i.e., tactics that suggest the suspect should confess because no other course of action is plausible, such as confronting suspects with real or invented evidence, identifying contradictions in the suspect's account, and refusing to credit his denials or alibi) and positive incentives (i.e., tactics that suggest the suspect will in some way feel better or benefit if he confesses, such as appealing to the suspect's self-interest or minimizing the seriousness of the offense).[109]  Similarly, social psychologist Saul Kassin has observed that interrogation techniques involve both "maximization" (scare tactics that are designed to intimidate a suspect by making him believe that the magnitude of the charges and the seriousness of the offense will be exaggerated if he does not confess) and "minimization" (tactics that are designed to lull a suspect into believing that the magnitude of the charges and the seriousness of the offense will be downplayed or lessened if he confesses).[110]

The interrogation training manuals, as well as some empirical scholarship, provide a laundry list of contemporary police interrogation techniques.[111]  In order to fully understand the psychology of interrogation and confession, however, researchers need a psychological model that explains the step-by-step process and logic through which the social influence techniques of interrogation overcome a suspect's resistance, manipulate his perceptions and reasoning, and ultimately move him from denial (which is in his self-interest, whether he is guilty or innocent) to admission (which is always against his self-interest).  There are a number of psychological

108. *See* GORDON & FLEISHER, *supra* note 102, at 27–36; INBAU ET AL., *supra* note 102, at 209–397; Kassin, *supra* note 76, at 221–24; Ofshe & Leo, *Decision to Confess Falsely, supra* note 76, at 1002–06.

109. Leo, *Inside the Interrogation Room, supra* note 76, at 300.

110. Saul Kassin & Karlyn McNall, *Police Interrogations and Confessions: Communicating Promises and Threats by Pragmatic Implication*, 15 LAW & HUM. BEHAV. 233, 234–35 (1991); *see also* Ofshe & Leo, *Decision to Confess Falsely, supra* note 76, at 1051–106 (describing methods of eliciting an admission); Ofshe & Leo, *Social Psychology of Police Interrogation, supra* note 76, at 194–207 (detailing psychological tactics for changing denials to admissions).

111. *See* INBAU ET AL., *supra* note 102, at 209–397; GORDON & FLEISHER, *supra* note 102, 27–36; Kassin, *supra* note 76, at 221–24; Leo, Police Interrogation in America, *supra* note 84, at 203–19; Ofshe & Leo, *Decision to Confess Falsely, supra* note 76, at 1002–06.

models or paradigms that purport to explain the psychology of interrogation and the decision to confess.[112] The most widely accepted paradigm of the psychology of interrogation and confession is what Gudjonsson has called the Decision-Making Model of Confession.[113] Drawing on more than fifty years of theoretical and empirical research on rational choice approaches to decision-making, both in social psychology and microeconomics,[114] the Decision-Making Model posits that a suspect's decision-making during interrogation is shaped by (1) how the social influence techniques of interrogation cause him to perceive his available courses of action, (2) the suspect's subjective perception of the probability of each course of action actually occurring, and (3) the utility values or benefits (as well as corresponding harms) associated with each course of action.[115] In short, the decision model focuses on how the interrogator's efforts at persuasion influence a suspect's perception and analysis of his immediate situation, the options available to him, and the likely consequences of each possible course of action. According to this model, the interrogator's goal is to persuade the suspect that the act of admission is in his self-interest and therefore the most rational course of action, just as the act of continued denial is against his self-interest and therefore the least rational course of action.

The most thorough analysis of rational choice decision theory as it applies to the phenomenon of interrogation and confession can be found in two lengthy articles by social psychologists Richard Ofshe and Richard Leo.[116] Building not only on the theoretical research in rational choice and game theory, but also on earlier applied research

---

112. In his literature review, Gudjonsson posits five psychological models of interrogation and confession that seek to explain why individuals confess. Gudjonsson describes these models as the "Reid Model of Confession"; a "Decision-Making Model of Confession"; "Psychoanalytic Models of Confession"; "An Interaction Process Model of Confession"; and a "Cognitive-Behavioral Model of Confession". *See* GUDJONSSON, *supra* note 76, at 61–72.

113. *Id.* at 120–22; *see also* Ofshe & Leo, *Decision to Confess Falsely*, *supra* note 76, 1001–06 (providing a detailed illustration of the Decision-Making Model); Ofshe & Leo, *Social Psychology of Police Interrogation*, *supra* note 76, at 194–207 (explaining the model's ability to elicit a response).

114. *See* REID HASTIE & ROBYN DAWES, RATIONAL CHOICE IN AN UNCERTAIN WORLD: THE PSYCHOLOGY OF JUDGMENT AND DECISION-MAKING (2001); ANATOL M. RAPOPORT & ALBERT M. CHAMMAH, PRISONER'S DILEMMA (1965); JOHN VON NEUMANN & OSKAR MORGENSTERN, THEORY OF GAMES AND ECONOMIC BEHAVIOR (1944).

115. *See* Ofshe & Leo, *Decision to Confess Falsely*, *supra* note 76, at 985–86.

116. *Id.* at 981–1122; Ofshe & Leo, *Social Psychology of Police Interrogation*, *supra* note 76, 194–207.

by Hilgendorf, Irving, and others,[117] Ofshe and Leo write:

> Psychological interrogation is effective at eliciting confessions because of a fundamental fact of human decision-making—people make optimizing choices given the alternatives they consider. Psychologically-based interrogation works effectively by controlling the alternatives a person considers and by influencing how those alternatives are understood. The techniques interrogators use have been selected to limit a person's attention to certain issues, to manipulate his perceptions of his present situation and to bias his evaluation of the choices before him. The techniques used to accomplish these manipulations are so effective that if misused they can result in decisions to confess from the guilty and innocent alike. Police elicit the decision to confess from the guilty by leading them to believe that the evidence against them is overwhelming, that their fate is certain (whether or not they confess), and that there are advantages that follow if they confess. Investigators elicit the decision to confess from the innocent in one of two ways: either by leading them to believe that their situation, though unjust, is hopeless and will only be improved by confessing; or by persuading them that they probably committed a crime about which they have no memory and that confessing is the proper and optimal course of action.[118]

Ofshe and Leo argue that modern police interrogation is a two-step process of psychological manipulation.[119] The first step of interrogation is designed to reduce a suspect's subjective self-confidence that he will survive the interrogation without being arrested by persuading him that he has been caught because the evidence incontrovertibly establishes his guilt, that no reasonable person could come to any other conclusion, and thus that there is no way out of his predicament.[120] Once the investigator has convinced the suspect that he is powerless to change his situation—because his denials will not be accepted and he cannot change the overwhelming incriminating evidence that the police claim to possess—the

---

117. E. Linden Hilgendorf & Barrie Irving, *A Decision-Making Model of Confessions*, *in* PSYCHOLOGY IN LEGAL CONTEXTS: APPLICATIONS AND LIMITATIONS (Sally Lloyd-Bostock ed., 1981).

118. Ofshe & Leo, *Decision to Confess Falsely*, *supra* note 76, at 985–86.

119. *Id.* at 989–90.

120. *Id.* at 1004–50.

investigator offers the suspect inducements (i.e., reasons to confess) that are designed to persuade him that he is psychologically, materially and/or legally better off by cooperating with police and confessing than he is by continuing to deny any role in the crime.[121]

Ofshe and Leo point out that in the first step of interrogation—shifting a suspect from confident to hopeless—the investigator usually relies on several well-known interrogation techniques and strategies to persuade the suspect that he is caught and that he is powerless to change this situation.[122] The investigator is likely to accuse the suspect of having committed the crime, cut off the suspect's denials, roll past the suspect's objections, and interrupt or ignore the suspect's assertions of innocence.[123] If the suspect offers an alibi, the interrogator will attack it as inconsistent, contradicted by all of the case evidence, implausible and/or simply impossible—even if none of these assertions is true.[124] The most effective technique used to persuade a suspect that his situation is hopeless is to confront him with seemingly objective and incontrovertible evidence of his guilt, whether or not any actually exists.[125] American police often confront suspects with fabricated evidence, such as nonexistent eyewitnesses, false fingerprints, make-believe videotapes, fake polygraph results, and so on.[126] If police already possess evidence of the suspect's guilt, they are likely to exaggerate the type, amount and/or strength of such evidence.[127] The purpose of this technique is to convince the suspect that the State's case against him is so compelling and immutable that his guilt can be established beyond any possible doubt and that arrest, prosecution, and conviction are therefore inevitable. These techniques—accusation, cutting off of denials, attacking alibis, and confronting the suspect with real or non-existent evidence—are often repeated as the pressures of interrogation escalate.[128] Over and over again, the investigator conveys the message that the suspect has no meaningful choice but to admit to some version of the crime because continued resistance—in light of the extensive and irrefutable evidence against him—is simply futile. These techniques are thus

---

121. *Id.* at 1050–106.
122. *Id.* at 1004–50.
123. *Id.*
124. *Id.*
125. Stephen Moston et al., *The Effects of Case Characteristics on Suspect Behavior During Police Questioning*, 32 BRIT. J. CRIMINOLOGY 23, 34–39 (1992).
126. *See* Leo, *supra* note 93, at 41; Leo, *Inside the Interrogation Room, supra* note 76, at 278; Richard A. Leo, *Miranda's Revenge: Police Interrogation As a Confidence Game*, 30 LAW & SOC'Y. REV. 259 (1996).
127. Ofshe & Leo, *Decision to Confess Falsely, supra* note 76, at 1004–50.
128. *See id.* at 1001–06.

designed to persuade the suspect to perceive his situation, and thus his options, much differently than when he first entered the interrogation room.

Ofshe and Leo point out that in the second step of interrogation (eliciting the admission) the investigator seeks to persuade the suspect that the benefits of compliance and confession outweigh the costs of resistance and denial—and thus that the only way to improve his otherwise hopeless situation is by admitting to some version of the offense.[129] In this phase of the interrogation process, the investigator presents the suspect with inducements that communicate that he will receive some personal, moral, communal, procedural, material, legal and/or other benefit if he confesses, but that he will experience some corresponding personal, moral, communal, procedural, material, legal and/or other cost if he fails to confess.[130] Ofshe and Leo argue that the interrogator's inducements can be arrayed along a continuum ranging from appeals to morality (at the low end) to appeals to how the criminal justice system is likely to react to the suspect's denial versus confession (in the mid-range) to implicit and/or explicit threats and promises (at the high end).[131] *Low end inducements* refer to self-image, interpersonal, or moral appeals that suggest the suspect will feel better or improve his social standing if he confesses.[132] For example, an interrogator may suggest that by confessing the suspect will experience catharsis and thus get it off his chest or tell the suspect that only the truth will set him free or state that only by confessing will he earn the forgiveness of God, the victim(s), and/or the suspect's own family. *Systemic inducements* refer to appeals that seek to lead the suspect to reason that his case will be processed more favorably by all actors in the criminal justice system if he admits to some version of the offense, but that he will be treated less favorably if he continues to deny involvement.[133] For example, an interrogator may tell a suspect that he can only be the suspect's ally if the suspect first admits guilt or may ask the suspect how he expects the prosecutor, judge and/or jury will react if the suspect does not demonstrate remorse and admit to the offense. *High end inducements* either implicitly or explicitly communicate the message that the suspect will receive less punishment, a lower prison sentence, or some form of investigative, prosecutorial, judicial, or juror leniency or clemency if

---

129. *Id.* at 1050–106.
130. *Id.*
131. *Id.* at 1051–56.
132. *Id.* at 1056–60.
133. *Id.* at 1060–72.

he confesses, but that the suspect will receive a higher charge or longer prison sentence if he does not confess.[134] For example, in homicide cases, interrogators often suggest that if the suspect admits to the crime it will be framed as an unintentional accident[135] or as an act of justifiable self-defense,[136] but that if he continues to deny guilt, his actions will be portrayed in their worst possible light—as premeditated, cold-blooded murder. This is a familiar variant of the "maximization"/"minimization" technique first described by Saul Kassin.[137] This technique is intended to communicate through "pragmatic implication"[138] that the suspect will receive more lenient treatment if he confesses but harsher punishment if he does not. Of course, investigators will sometimes also rely on blatant threats of harsher punishment (such as death penalty threats)[139] and explicit promises of leniency (such as offers of outright release from custody)[140] to extract a confession.

---

134. *Id.* at 1077–88.

135. By portraying the suspect's behavior as an accident, the interrogator communicates the message that the suspect did not intend to harm the victim, that the act was not a crime or was a significantly lower level of crime, and that the suspect will therefore receive little or not punishment if she agrees to this minimized version of what the interrogator is suggesting might have happened. *See* Ofshe & Leo, *Decision to Confess Falsely, supra* note 76, at 1088–106.

136. By portraying the suspect's behavior as self-defense, the interrogator communicates that no crime occurred and that the suspect will receive no punishment if he agrees to the interrogator's self-defense "theme" since self-defense is not a crime but a legally excused and/or justified response to physical aggression. *See* Ofshe & Leo, *Decision to Confess Falsely, supra* note 76, at 1096–106.

137. Kassin & McNall, *supra* note 110, at 234–35.

138. "Pragmatic Implication" refers to the sending and processing of implicit meanings in communication, as occurs when an individual "reads between the lines" or when information or meaning is inferred from what a speaker is saying or suggesting. *See* Kassin & McNall, *supra* note 110, at 239; *see also* Richard J. Harris & Gregory E. Monaco, *Psychology of Pragmatic Implication: Information Processing Between the Lines,* 107 J. EXPERIMENTAL PSYCHOL. 1, 1–20 (1978) (reviewing the literature dealing with pragmatic implication); Richard E. Nisbett & Timothy DeCamp Wilson, *Telling More Than We Can Know: Verbal Reports on Mental Processes,* 84 PSYCHOL. REV. 231 (1977) (noting that people can be completely unaware of these perceptions).

139. Police in Greensboro, N.C., told Tim Laney that he could face the death penalty if he did not admit that he was the man in a surveillance photo using the ATM card of the murder victim. Erika Bolstad & Paula Christian, *Freed Suspects Say They Feared Police Tactics: The Two Men Who Were Charged in the Stabbing Death of a Greensboro Record Store Owner Say Their Lives Will Never Be the Same,* NEWS & RECORD (Greensboro, N.C.), Nov. 7, 1999, at A1.

140. Calvin Ollins, a fourteen-year-old with mental limitations, claimed that he confessed to killing Illinois medical student Lori Roscetti, only after Chicago detectives told him he could go home if he confessed:

> They threatened to do things and got me thinking they could do them . . . One said he would smack me in the mouth if I didn't cooperate. Another said they would put me in jail. . . Then they told me I would go home if I gave them what they

Modern psychological interrogation is a gradual yet cumulative process; each technique builds on the next as the investigator seeks to emphasize the overriding strength of the State's case and the futility of the suspect's denials.[141]   Intended for the guilty, modern interrogation techniques are psychologically powerful enough to elicit confessions from the innocent.[142] Investigators successfully elicit true confessions by persuading the guilty that the evidence against them is so compelling that they have no meaningful choice but to cooperate with the authorities and hope for favorable treatment.[143]   Using the same interrogation methods, investigators sometimes elicit confessions from the innocent (who do not know that police are legally permitted to fabricate evidence and lie during interrogation) either by (1) persuading them that their situation is hopeless (since, they are told, no reasonable person will believe their assertions of innocence in light of the evidence) and that the only way to save themselves from the worst possible case outcome or punishment is by admitting to the minimized or less exculpatory version of the offense that the detective is suggesting; or (2) persuading the innocent suspect that the evidence is so overwhelming that he must have committed the crime in the absence of any memory of having done so and there is a legitimate explanation for his amnesia, a less common type of interrogation-induced false confession that will be discussed in more depth below.[144]  Though it may be unintentional, police interrogators usually elicit false confessions through the use of coercive inducements that either implicitly or explicitly threaten harm and/or promise leniency;[145] the innocent suspect typically confesses only after the techniques and strategies of the interrogator have persuaded him that—in light of what he perceives to be his limited options and the consequences of choosing denial over silence—confession is the most rational course of action.[146]

The primary psychological cause of most false confessions is, therefore, the investigator's use of improper, coercive interrogation techniques.  Although the phenomenon of interrogation-induced false

wanted.  I thought I knew the streets a little bit, but it turned out I was just a little kid who didn't know nothing . . . . They got me good.

Ken Armstrong, Steve Mills & Maurice Possley, *Coercive and Illegal Tactics Torpedo Scores of Cook County Murder Cases*, CHI. TRIB., Dec. 16, 2001, § 1, at 1, *available at* 2001 WL 30802598.

141.  Ofshe & Leo, *Decision to Confess Falsely, supra* note 76, at 1088–106.

142.  Kassin, *supra* note 76, at 221.

143.  Ofshe & Leo, *Decision to Confess Falsely, supra* note 76, at 1001–106.

144.  *Id.* at 997–1000.

145.  *Id.* at 989–99.

146.  *Id.* at 999.

confessions is counter-intuitive, it can be easily understood once the techniques, logic, and effect of modern interrogation are methodically analyzed and explained.[147] The genius or mind trick of modern interrogation is that it makes the irrational (admitting to a crime that will likely lead to punishment) appear rational (if the suspect believes that he is inextricably caught or perceives his situation as hopeless and cooperating with authorities as the only viable course of conduct). Regretfully, most interrogation training manuals—including the widely used and influential manual by Fred Inbau, John Reid, Joseph Buckley, and Brian Jayne[148]—give no thought to how the methods they advocate communicate psychologically coercive messages and sometimes lead the innocent to confess. Instead, they assume, in the face of empirical evidence, that their methods will produce only voluntary confessions from the guilty and dismiss the well-established social science research on interrogation-induced false confession by mischaracterizing the authors of leadings studies as "opponents" or "critics" of interrogation.[149]

Notwithstanding the role of psychological coercion as the primary cause of interrogation-induced false confession,[150] some individuals—particularly the mentally retarded and juveniles—are more vulnerable to the pressures of interrogation and therefore less likely to possess or be able to muster the psychological resources or perspective necessary to withstand accusatorial police questioning.[151] As James Ellis, Ruth Luckasson, Morgan Cloud, and others have documented and explained, the mentally retarded possess personality characteristics that increase their risk of interrogation-induced false confession.[152] Because of their cognitive deficits and limited social

---

147. *See* GUDJONSSON, *supra* note 76, at 225–26; Kassin, *supra* note 76, at 225–26; Ofshe & Leo, *Decision to Confess Falsely*, *supra* note 76, at 983.

148. INBAU ET AL., *supra* note 102.

149. *Id.* at 411–47.

150. One of the most well-established findings in all of social psychology is that the more powerful, compelling, or sweeping the situation, the less individual personality matters in explaining a behavioral outcome; conversely, the less powerful, compelling, or sweeping the situation, the more individual personality matters in explaining a behavioral outcome. *See* DOUGLAS KENRICK ET AL., SOCIAL PSYCHOLOGY: UNRAVELLING THE MYSTERY 150–229 (2d ed. 2002).

151. *See* GUDJONSSON, *supra* note 76, at 57–74.

152. *See* Morgan Cloud et al., *Words Without Meaning: The Constitution, Confessions, and Mentally Retarded Suspects*, 69 U. CHI. L. REV. 495, 499–516 (2002); James W. Ellis & Ruth A. Luckasson, *Mentally Retarded Criminal Defendants*, 53 GEO. WASH. L. REV. 414, 445–52 (1985); Paul Hourihan, *Earl Washington's Confession: Mental Retardation and the Law of Confessions*, 81 VA. L. REV 1471, 1491–94 (1995); *see also* GUDJONSSON, *supra* note 76, at 285 (recommending the use of broad, general questions to avoid suggestibility and acquiescence).

skills, the mentally retarded are slow thinking, easily confused, concrete (as opposed to abstract) thinkers, often lack the ability to appreciate the seriousness of a situation, may not understand the long term consequences of their actions, and tend to have short attention spans, poor memory, and poor impulse control.[153]   The mentally retarded tend also to be highly submissive (especially eager to please authority figures), compliant, suggestible, and responsive to stress and pressure.[154]   As a result, people with mental retardation are disproportionately represented in the reported false confession cases.[155] Notwithstanding this fact, it bears emphasizing that the vast majority of reported false confessions are from cognitively and intellectually normal individuals.[156]

Interrogation-induced false confession has always been a leading cause of miscarriages of justice in the United States.[157] As mentioned earlier, the methodologically sound studies that have systematically aggregated and quantified case data have found false confession to be the primary cause of wrongful conviction in 14–25% of the documented cases.[158]  While it is not presently possible to provide a valid quantitative estimate of the incidence or prevalence of interrogation-induced false confessions in America,[159] the research literature has established that such confessions occur with alarming

---

153.  *See* GUDJONSSON, *supra* note 76, at 285.

154.  *See* Hourihan, *supra* note 152, at 1491–94.

155.  Twenty-seven percent of the false confessors in the Leo & Ofshe study were mentally handicapped. *See* Leo & Ofshe, *Consequences, supra* note 76, at 213–14; *see also* Richard A. Leo & Richard J. Ofshe, *The Truth About False Confessions and Advocacy Scholarship*, 37 CRIM. L. BULL. 293, 303 n.45 (2001) (discussing the impact of coercion on the mentally handicapped) [hereinafter Leo & Ofshe, *Truth About False Confessions*]. At least 22% (27/125) of the proven false confessors in our study were mentally retarded, though this figure surely underestimates the actual percentage of those who were mentally retarded in our study since we were unable to obtain records on the IQ level of many of the proven false confessors in this study.

156.  At least one misguided legal advocate has tried to blame the mentally retarded for the problem of interrogation-induced false confession. Paul Cassell, *The Guilty and the Innocent: An Examination of Alleged Cases of Wrongful Conviction from False Confessions*, 22 HARV. J.L. & PUB. POL'Y 523, 584 (1999) ("For the most part, false confessions are caused not by police questioning techniques in general but rather by the application of those techniques to certain narrow, mentally limited populations"). Such rhetoric is not only false and misleading, but also perpetuates the myth that only individuals who are either tortured or mentally defective will make false confessions during police interrogation. Leo & Ofshe, *Truth About False Confessions, supra* note 155, at 300.

157.  Bedau & Radelet, *supra* note 47, at 49; Leo & Ofshe, *Consequences, supra* note 76, at 491–96.

158.  *See* Leo & Ofshe, *Consequences, supra* note 76, at 491–96.

159.  Ofshe & Leo, *Social Psychology of Police Interrogation, supra* note 76, at 191.

frequency.[160] Social psychologists, criminologists, sociologists, legal scholars, and independent writers have documented so many examples of interrogation-induced false confession in recent years that there is no longer any dispute about their occurrence. Nevertheless, there is good reason to believe that the documented cases of interrogation-induced false confession understate the true nature and extent of the phenomenon. Most false confessions are not easily discovered and are rarely publicized: they are likely to go unnoticed by researchers, unacknowledged by police and prosecutors, and unreported by the media. As many have pointed out, the documented cases of interrogation-induced false confession are therefore likely to represent only the tip of a much larger iceberg.[161]

Indeed, the data reported in this Article suggest that interrogation-induced false confession may be a bigger problem for the American criminal justice system than ever before.[162] Although we do not presently know the frequency with which police elicit confessions from the innocent, researchers have discovered and documented far more cases of false confession in recent years than in any previous time period.

Regardless of how often police elicit confessions from the innocent, the social science literature strongly suggests that interrogation-induced false confessions are highly likely to lead to the wrongful conviction of the innocent, perhaps more so than any other type of erroneous evidence.[163] This is due to the strong effect that confession evidence exerts on the perceptions and decision-making of criminal justice officials and lay jurors.[164] With the exception of being captured during the commission of a crime (whether by physical apprehension or electronically on videotape), a confession is the most incriminating and persuasive evidence of guilt that the State can bring against a defendant.[165] It therefore stands to reason that with the exception of being falsely captured during the commission of a crime, a false confession is the most incriminating and persuasive *false* evidence of guilt that the State can bring against a defendant.

As Leo, Ofshe and others have argued, a suspect's confession

---

160. *See* GUDJONSSON, *supra* note 76, at 205–12; Leo & Ofshe, *Consequences*, *supra* note 76, at 444–49.

161. Ofshe & Leo, *Social Psychology of Police Interrogation*, *supra* note 76, at 191.

162. *See infra* Part IV.

163. *See* Kassin & Neumann, *supra* note 76, at 481; Kassin & Sukel, *supra* note 76, at 42–44; Leo & Ofshe, *Consequences*, *supra* note 76, at 491–96.

164. *See* Kassin & Sukel, *supra* note 76, at 42–44.

165. Kassin, *supra* note 76, at 221, 228–30; Leo & Ofshe, *Consequences*, *supra* note 76, at 429.

sets in motion a virtually irrefutable presumption of guilt among criminal justice officials, the media, the public and lay jurors.[166] A suspect who confesses—whether truthfully or falsely—will be treated more harshly at every stage of the criminal justice process.[167] Once police obtain a confession, they typically close the investigation, clear the case as solved, and make no effort to pursue other possible leads—even if the confession is internally inconsistent, contradicted by external evidence or the result of coercive interrogation.[168] Like police, prosecutors rarely consider the possibility that an entirely innocent suspect has been made to confess falsely through the use of psychologically coercive and/or improper interrogation methods.[169] When there is a confession, prosecutors tend to charge the defendant with the highest number and types of offenses and are far less likely to initiate or accept a plea bargain to a reduced charge.[170] Suspects who confess will experience greater difficulty making bail (especially in serious cases), a disadvantage that significantly reduces a criminal defendant's likelihood of acquittal.[171] Defense attorneys are more likely to pressure their clients who have confessed to waive their constitutional right to a trial and accept a guilty plea to a lesser charge.[172] Judges are conditioned to disbelieve claims of innocence and almost never suppress confessions, even highly questionable ones.[173] If the defendant's case goes to trial, the jury will treat the confession as more probative of the defendant's guilt than virtually any other type of evidence,[174] especially if—as in virtually all high profile cases—the confession receives negative pre-trial publicity.[175]

---

166. *See* Gail Johnson, *False Confessions and Fundamental Fairness: The Need for Electronic Recording of Custodial Interrogations*, 6 B.U. PUB. INT. L.J. 719, 741–43 (1997); Leo & Ofshe, *Consequences*, *supra* note 76, at 429, 440–44; Ofshe & Leo, *Social Psychology of Police Interrogation*, *supra* note 76, at 193–94.

167. *See* Leo, *Inside the Interrogation Room*, *supra* note 76, at 298; Ofshe & Leo, *Social Psychology of Police Interrogation*, *supra* note 76, at 193–94.

168. Ofshe & Leo, *Decision to Confess Falsely*, *supra* note 76, at 984.

169. *Id.*

170. Paul G. Cassell & Bret Hayman, *Police Interrogation in the 1990s: An Empirical Study of the Effects of* Miranda, 43 UCLA L. REV. 839, 905–12 (1996).

171. Ofshe & Leo, *Decision to Confess Falsely*, *supra* note 76, at 984.

172. *Id.*

173. Daniel Givelber, *Meaningless Acquittals, Meaningful Convictions: Do We Reliably Acquit the Innocent?*, 49 RUTGERS L. REV. 1317, 1329–30 (1997) [hereinafter Givelber, *Meaningless Acquittals*].

174. *See* Kassin & Neumann, *supra* note 76, at 481–83; Kassin & Sukel, *supra* note 76, at 42–44; Leo & Ofshe, *Consequences*, *supra* note 76, at 491–96; Gerald R. Miller & F. Joseph Boster, *Three Images of the Trial: Their Implications for Psychology Research*, *in* PSYCHOLOGY AND THE LEGAL PROCESS 19, 21–22 (Bruce Sales ed., 1977).

175. ANTHONY R. PRATKANIS & ELLIOTT ARONSON, AGE OF PROPAGANDA: THE EVERYDAY USE AND ABUSE OF PERSUASION (1991).

Confession evidence (regardless of how it was obtained) is so biasing that juries will convict on the basis of confession alone, even when no significant or credible evidence confirms the disputed confession and considerable significant and credible evidence disconfirms it.[176]

Sadly, if a false confessor is convicted, he will almost certainly be sentenced more harshly. At sentencing, trial judges are conditioned to punish defendants for claiming innocence (the logical extension of not accepting the prosecutor's plea bargain and sparing the State the expense of a jury trial) and for failing to express remorse or apologize for his wrongdoings.[177] Once a defendant is convicted and imprisoned, it is exceedingly rare that criminal justice officials will take seriously the innocent prisoner's insistent claim that he confessed falsely and was wrongfully convicted.[178] (In fact, until recently—with the advent of DNA—virtually no one in the criminal justice system took seriously any innocent prisoner's claim that he was wrongly convicted, especially if the conviction was based on a confession to police). As Gudjonsson points out,[179] the criminal justice system is poor at discovering, admitting to, or remedying its errors. Moreover, mistakes made in the administration of criminal justice become increasingly difficult to correct as a case progresses through the system.[180] Thus, one biased piece of evidence, such as a false confession, is likely to contaminate the perception and treatment of a case as it makes its way through the entire criminal justice process. As George Castelle and Elizabeth Loftus point out, such failure in one part of the investigative process can shape the development of the case later on, even coloring the perception of other pieces of evidence.[181]

---

176. *See* Kassin & Neumann, *supra* note 76, at 481–83; Kassin & Sukel, *supra* note 76, at 42–44; Leo & Ofshe, *Consequences, supra* note 76, at 491–96; Miller & Boster, *supra* note 174, at 21–22.

177. Daniel Givelber, *The Adversary System and Historical Accuracy: Can We Do Better?, in* WRONGLY CONVICTED, *supra* note 55, at 264–65.

178. *See* Ofshe & Leo, *Social Psychology of Police Interrogation, supra* note 76, at 193–94.

179. GUDJONSSON, *supra* note 76, at 163.

180. *See* RADELET ET AL., *supra* note 53, at 271–81; Steven Wisotsky, *Miscarriages of Justice: Their Causes and Cures*, 9 ST. THOMAS L. REV. 547, 565 (1997).

181. George Castelle & Elizabeth Loftus, *Misinformation and Wrongful Convictions, in* WRONGLY CONVICTED, *supra* note 55, at 30 ("The knowledge that a suspect has failed a lie detector test, confessed, or knows something 'that only the real killer could know'— whether accurate or not—can color the perceptions of other pieces of evidence.").

*NORTH CAROLINA LAW REVIEW* [Vol. 82

### III. METHODOLOGY AND SOURCES OF DATA

The present study breaks new ground as the largest collection of interrogation-induced[182] false confession cases ever assembled and analyzed in the research literature. This Article aggregates 125 false confessions. To assemble this cohort, the authors systematically identified disputed confessions primarily through electronic media and legal database searches and secondarily from other sources of information—such as police reports, trial transcripts, articles, and books discovered directly or brought to the authors' attention by others. Once the authors identified a disputed confession case, we attempted to compile as much source material on the case as possible. In all cases, the authors made an attempt to locate and then contact the confessor's attorney and, in some cases, the courthouse in which the case went to trial (if, in fact, it did go to trial). In some cases, we were able to compile vast amounts of information on the disputed confession, such as interrogation transcripts and (audio or video) tapes, police reports, preliminary hearing and other pre-trial hearing transcripts, interviews with police interrogators and suspects, trial transcripts, depositions, published appellate court decisions, and other case materials. In other cases, we were left only with the facts reported in newspaper stories, despite our determined efforts to acquire more information about the case.[183]

Only one other study in the research literature—Richard Leo and Richard Ofshe's 1998 analysis of the consequences of sixty false confession cases—has compiled a database comparable to the one in

---

182. Although we believe that the role of the police officers was a critical contributing factor in inducing the false confessions, there are two cases in our database in which it would not be fair to say that police alone "induced" the confessions. Michael Scott Bottoms and John Jeffers initially brought suspicion on themselves by coming to authorities with information that inculpated them in the crime. After Jeffers and Bottoms came forward, however, authorities interrogated them and emerged with detailed confessions containing some information which only the true perpetrators could have known. In these cases, police may not have "induced" the confession initially, but once the defendants were in the interrogation room, police interrogation tactics necessarily influenced the final confession product.

183. We have made every effort to independently verify and cite check the facts in the 125 proven false confessions reported in this paper. Regretfully, however, there were many cases—particularly ones in which police and prosecutors acknowledged that the confession was false and thus no trial occurred—for which we were unable to locate any other materials. In addition, many attorneys did not return phone calls seeking additional information on the false confession cases that we discovered. In those cases in which our phone calls were returned, some attorneys either had removed their files or were not able to locate them without great difficulty or expense. Even where old case files were accessible to the attorneys, the cost of reproducing case files was often prohibitive.

2004]    *FALSE CONFESSIONS IN THE POST-DNA WORLD*    925

this Article.[184]  This study, however, differs from Leo and Ofshe's in two significant ways:  first, this Article includes more than twice as many cases of interrogation-induced false confession as Leo and Ofshe; and second, unlike Leo and Ofshe, this Article includes only interrogation-induced false confessions that can be classified as "proven"—that is, confessions that are indisputably false because at least one piece of dispositive evidence objectively establishes, beyond any doubt, that the confessor could not possibly have been the perpetrator of the crime.  By contrast, Leo and Ofshe included not only "proven" false confessions,[185] but also "highly probable"[186] and "probable" false confessions (interrogation-induced false confessions that they classified at lower levels of certainty).[187]

There are only four ways (or types of situations) in which a disputed confession can be classified as "proven" beyond any doubt to be indisputably false.  Thus, all the "proven" false confessions included in this study fell into one of the following four categories.

The first situation occurs when it can be objectively established that the suspect confessed to a crime that did not happen.[188]  This is what happened in the case of Dianne Tucker, Medell Banks, and Victoria Banks, three mentally retarded defendants who were convicted by an Alabama jury of killing Banks's newborn child.  After the three had served several years in prison, scientific testing determined that Ms. Banks was incapable of giving birth to a child; she had a tubal ligation operation which prevented her from getting pregnant.[189]

The second type of situation that can result in a disputed false confession being classified as a "proven" false confessions occurs when it can be objectively established that the defendant could not have committed the crime—that it would have been, in effect, physically impossible for the suspect to have committed the crime.[190]

---

184. Leo & Ofshe, *Consequences, supra* note 76, at 492.

185. *Id.* at 449–55.

186. *Id.* at 455–66.

187. *Id.* at 466–72.

188. *Id.* at 449–50.

189. Another recent example of a proven false confession in which a suspect confessed to a crime that never happened involved Glenville Smith, a twenty-eight-year-old New York man who convinced the police that he had abducted and murdered his girlfriend's thirteen-year-old daughter.  She later turned up alive and well.  We have not included Smith in the database because the accounts of his confession suggest that he was a mentally ill man who confessed voluntarily without police inducement or persuasion.  Mike McAlary, *Confessed Murderer Spared by His Victim,* N.Y. DAILY NEWS, Jan. 23, 1998, at 16.

190. Leo & Ofshe, *Consequences, supra* note 76, at 450–51.

For example, in three different Chicago cases—Mario Hayes,[191] Miguel Castillo,[192] and Peter Williams-[193] jail records proved that the defendants were in jail at the time the crimes were committed.

The third type of situation in which a disputed confession can be classified as a "proven" false confession occurs when the true perpetrator of a crime is identified and his guilt can be objectively established.[194] The case of Christopher Ochoa is a prime example on point. Ochoa, a former high school honor student, confessed to the rape and murder of Nancy DePriest in an Austin, Texas Pizza Hut in 1988. He was freed in 2001 when Achim Marino, a convict with a conscience, came forward and admitted that he, and not Ochoa, killed DePriest. Marino led authorities to the weapon used in the crime and the bag in which he placed the money and DNA testing matched his semen to that found at the crime scene.[195]

The fourth and final type of situation in which a disputed confession can be classified as a proven false confession occurs when scientific evidence—in recent years, most commonly DNA evidence—dispositively establishes the false confessor's innocence.[196] For example, three teenage boys—Michael Crowe, Joshua Treadway, and Aaron Houser—were set to stand trial for the 1998 murder of Michael's twelve-year-old sister Stephanie in Escondido, California, when DNA testing proved that blood found on the sweatshirt of Richard Tuite, a mentally ill drifter who had been acting strangely and knocking on doors near Stephanie's home on the night of her murder, was Stephanie's. Charges against the boys were dropped and Tuite has been indicted for Stephanie's murder.[197]

The authors' decision to include only "proven" false confessions in this Article introduces a conservative bias into our sample, for only a small number of cases involving a disputed confession come with independent case evidence that allows the suspect to prove his or her innocence beyond dispute. Most do not. Actual innocence, as commentators have repeatedly pointed out, is very difficult to

---

191. *See infra* note 273 and accompanying text.
192. *See infra* note 241 and accompanying text.
193. *See infra* note 334 and accompanying text.
194. Leo & Ofshe, *Consequences, supra* note 76, at 452–53.
195. Anita Clark, *Group Rides to the Rescue When Scales of Justice Fail: The Wisconsin Innocence Project is Fighting to Exonerate the Wrongfully Convicted*, WIS. ST. J., Jan. 14, 2001, at A1.
196. Leo & Ofshe, *Consequences, supra* note 76, at 454–55.
197. Mark Sauer, *Tuite Ordered to Stand Trial in Crowe Case*, SAN DIEGO UNION TRIB., Mar. 4, 2001, at B1.

verify.[198]   It is the rare disputed confession that can be proven indisputably false because attempting to do so is akin to the proverbially difficult task of proving the negative. In the typical case a crime did in fact occur, and it was not physically impossible for the confessor to have committed the crime, even if the facts and evidence suggest that it is extremely unlikely that confessor did or even could have done so. Moreover, it is rare to find scientific evidence that proves the confessor's factual innocence absolutely, even if there is considerable scientific evidence tending to show that the suspect did not commit the crime, and even if there is other substantial evidence that contradicts or casts doubt on the suspect's confession. Specifically, in most disputed confession cases, there is no DNA evidence available to compare with the confessor's DNA, and in many disputed confession cases, DNA evidence that could have definitively resolved the reliability of the confession was not preserved. Finally, it is the rare perpetrator who comes forward to acknowledge his own guilt in order to exonerate the innocent, wrongly convicted false confessor. And on the rare occasion when a true perpetrator comes forward to implicate himself and exonerate the innocent false confessor, such claims are rarely believed by police and prosecutors (who have a vested interest in maintaining that they arrested, prosecuted, and convicted the right person the first time around) and typically only credited when an overwhelming amount of independent evidence makes acknowledging the false confessor's innocence unavoidable.[199] This too is rare.

It is only in a small minority of cases, then, that the factually innocent defendant even has the opportunity to prove indisputably that his confession was false. The external circumstances that allow a suspect to do so are fortuitous since an innocent suspect—who is falsely accused and then made to falsely confess—has no control over whether these independent circumstances (physical impossibility, scientific evidence with which to exonerate, etc.) are present in his particular case. In the vast majority of alleged false confession cases,

---

198. Givelber, *Meaningless Acquittals, supra* note 173, at 1322.

199. The case of Christopher Ochoa, mentioned briefly earlier in this Article, is a case in point. Achim Marino, the real killer of Nancy DePriest, wrote authorities, including then-Governor George Bush, numerous letters in which he claimed responsibility for the murder, offered to lead police to evidence of the crime, and agreed to submit to DNA testing. Although authorities ultimately did some investigation into Marino's claims, Ochoa and his co-defendant William Danziger still languished in jail for several years until Ochoa's attorneys for the Wisconsin Innocence Project, John Pray and Keith Findley, managed to persuade authorities to compare Marino's DNA with that found at the crime scene. *See* Clark, *supra* note 195.

it is therefore impossible to completely remove any possible doubt about the confessor's innocence, even if all the credible case evidence strongly suggests that the suspect's confession is false and none of it suggests that the suspect's confession is true. As a result of our extremely conservative bias for case inclusion in this Article, we have excluded dozens of disputed confessions in which we believe a majority of neutral observers (with access to the evidence we reviewed) would have unequivocally judged the confessor to be innocent.[200]

However, we have chosen to include only those cases that meet the high standard of "proven false confession" in order to head off the potential criticism that one or a few of the cases in our study might involve true confessions from the guilty rather than false confessions from the innocent. We believe that such criticism has the potential to be helpful if it is based on a genuine attempt to correct errors or oversights in the analysis. If, however, such criticism is motivated by ideological advocacy and is based on false and misleading assertions, distortions of fact, statements presented out of context, or indefensibly selective presentation of case materials, then it has the potential to be more damaging than helpful.[201] For such criticism of aggregated case studies, even when it is erroneous, diverts attention away from the goal of improving our understanding of the

---

200. The Anthony Moody case from Chicago is a case in point. Moody was jailed for three years on charges that he raped and murdered his girlfriend. After spending twenty-four hours in police custody, Moody confessed to choking his girlfriend to death and leaving her body in an abandoned building on Chicago's South Side. He later claimed that the confession was coerced. On the eve of trial, DNA test revealed light traces of Moody's DNA in his girlfriend's body (Moody claimed he had slept with her a few days before her death) and much heavier traces of DNA from another man whom police had in custody on other rape and murder charges. Prosecutors dropped murder charges against Moody in exchange for Moody's plea to aggravated battery and a recommended sentence of five years, a sentence with which credit for time served would allow for Moody to be released in a matter of weeks or months. To reconcile Moody's confession with the DNA evidence of another sexual predator, Cook County prosecutors claimed that the second attacker raped and assaulted the victim after Moody's attack. Without any statistics to back up this farfetched claim, Bob Benjamin, spokesperson for the Cook County State's Attorney's Office, was quoted as saying that such scenarios "happen[] all the time . . . [p]articularly in sexual attacks, a woman is lying there helpless [and] another predator comes along and sees an opportunity and takes it." Vanessa Gezari, *Murder Charge Reduced As DNA Points to Different Man*, CHI. TRIB., Apr. 4, 2000, § 2, at 1. Ironically, this same theory has been cited by some of the police officers in the Central Park Jogger investigation for continuing to doubt the innocence of the five exonerated defendants. Because of the presence of Moody's DNA inside the victim and the failure of authorities to charge the as-of-yet-unnamed perpetrator with the crime, we have classified Moody's case as a "highly probable" false confession, rather than a "proven false confession."

201. *See* George Thomas III & Richard A. Leo, *The Effects of* Miranda v. Arizona: *Embedded in Our National Culture?*, 29 CRIME & JUST.: ANN. REV. 203, 244–45 (2002).

causes of, and solutions for, the miscarriage of justice problem in America.[202]  Such criticism may have the negative effect of focusing attention on the merits and demerits of a small number of individual cases and thus shifting the academic and policy discussion away from the larger patterned causes and consequences of interrogation-induced false confessions and miscarriages of justice in the American criminal justice system.  To avoid such criticism this Article includes only cases in which the falsity of the interrogation-induced confession is beyond reproach.

The Leo and Ofshe study reported on sixty false confession cases, thirty-four of which were classified as proven false confessions, in the post-*Miranda* era.[203]  Like Leo and Ofshe, this Article limits its attention to only those false confession cases occurring in the post-*Miranda* era.  That said, the vast majority of interrogation-induced false confession cases included in our study have occurred in the last decade, though this may not be that surprising given the direct relationship between advances in DNA technology and exonerations of the innocent.  In order to avoid duplicating efforts with the Leo and Ofshe study, this Article excludes from its cohort of proven false confession cases included in the Leo and Ofshe study.[204]  The 125 proven false confessions reported and analyzed in this Article therefore represent a completely new cohort of proven false confession cases in the post-*Miranda* era.

---

202.  Paul Cassell has written that Leo & Ofshe inaccurately classified nine cases in their sample of sixty interrogation-induced false confessions. *See* Cassell, *supra* note 156, at 525.  Cassell asserts that these nine individuals were actually guilty of the crimes to which they confessed, despite the compelling, and at times overwhelming, evidence of their innocence.  Leo & Ofshe have demonstrated that Cassell's assertions are false and misleading in a subsequent point-by-point refutation of Cassell's claims.  Leo & Ofshe, *Truth About False Confessions, supra* note 155.  As Leo & Ofshe point out:

> Numerous social scientists and legal scholars have strongly criticized Cassell for his bias; reliance on flawed methods, studies, and data; inaccurate and incomplete summaries; sources and quotes out of context; arbitrary, speculative and exaggerated statistical estimates; and indefensibly selective reporting of data . . . .  In our view, Cassell's commentary on [Leo & Ofshe, *Consequences, supra* note 76] exemplifies and repeats all of these problems:  Cassell's commentary is largely based on factual errors, misleading assertions, critical omissions, unwarranted inferences and arguments, statements presented out of context, and/or partisan presentations of case materials.

*Id.* at 295–97.

203.  *Miranda* marked the end of third degree interrogation and the establishment of a new era of psychological interrogation techniques and strategies.  *See* Leo & Ofshe, *Consequences, supra* note 76, at 434 n.10.

204.  We have, however, included one case from the Leo & Ofshe study (Gary Gauger) that was classified by Leo & Ofshe in 1998 as a "highly probable" false confession, but that we believe, on the basis of information that we have collected that was not available to Leo & Ofshe in 1998, now can be properly classified as a proven false confession.

Like Leo and Ofshe, we have gathered data on our cases from the electronic and print media, a fertile source of data for the study of wrongful conviction, as Dan Givelber has suggested.[205]  Where possible, we have accumulated additional case materials (such as interrogation transcripts, police reports, trial transcripts, and published appellate court decisions) and verified the factual assertions contained in the media descriptions of our cases.  However, we wish to emphasize that in our cases there either is or should be no dispute about the factual innocence of the false confessor, and therefore our citation to media articles should not be problematic. No one is reasonably asserting guilt in the cases included in our sample.  In all of the cases included in this Article, the confessor's innocence can be conclusively proven because the crime did not occur, it was physically impossible for the suspect to have committed the crime, scientific evidence dispositively established the suspect's innocence, and/or the true perpetrator was identified.  We arrived at these conclusions based on our analysis of a multiplicity of original and secondary sources and materials in the cohort of cases in this study.

This Article's collection of proven false confessions was not obtained through a random sample of police interrogation cases. Indeed, it is not even possible to randomly sample police interrogation cases since American police forces do not systematically collect, quantify, or tabulate data on the annual number or frequency of their interrogations.[206]  In fact, no organization in America collects such data.  Additionally, as Bedau and Radelet have pointed out, "most state officials are apparently not eager to assist investigators in identifying such cases from whatever records they might have available."[207] As a result, there is no existing universe or database of police interrogation cases from which researchers would be able to draw a random sample.  Moreover, even if such a database existed, it would make as much sense for someone studying the causes and consequences of interrogation-induced false confessions to randomly sample police interrogations as it would for someone studying the causes and consequences of lung cancer to randomly sample healthy individuals.  The appropriate universe of cases for this study is

---

205. *See* Givelber, *Meaningless Acquittals, supra* note 173, at 1317–28. ("Judging from claims in the media, convictions of innocent parties represent a pressing problem for this country's criminal justice system.  The Supreme Court of the United States takes the opposite view.  The media is correct, the Supreme Court in error."). *Id.* at 1320–21.

206. Even if they did collect such data on police interrogation and confessions, it is not clear that American police would permit academic researchers access to it.

207. Bedau & Radelet, *supra* note 47, at 28.

interrogation-induced false confessions, not all police interrogations. Since no organization collects data or keeps statistics on false confessions, it is also not possible for researchers to draw a random sample of such cases.

For the same reasons, scholars do not know how frequently interrogation-induced false confessions occur or how frequently (or what percentage of) interrogation-induced false confessions lead to the wrongful conviction of the innocent. As Leo and Ofshe have pointed out, this is not only because no organization collects data on the annual number of interrogations and confessions, but also because most interrogations are not recorded (thus preventing researchers from obtaining an objective record of the cause of the disputed confession).[208] It is therefore difficult, if not impossible, in some cases to authoritatively determine the underlying truth or falsity of the confession.[209] Until these barriers are overcome, researchers will not be able to provide a scientific or authoritative estimate either of the frequency of interrogation-induced false confessions or of the rate at which they lead to miscarriages of justice.

That researchers are not presently able to estimate the frequency of interrogation-induced false confession, however, does not make the academic study of police interrogation and false confession any less scientific or important. What is most important from a scientific perspective is to be able to understand and explain how and why a particular phenomenon occurs, not to estimate its rate of occurrence. The social scientific study of police interrogation and false confession meets this standard. Dating back almost one hundred years,[210] the psychological and criminological research on these topics is well-established.[211] Employing a number of recognized scientific methods (e.g., laboratory experimentation,[212] participant observation,[213] interviews,[214] surveys[215] and analysis of archival and documentary

208. Leo & Ofshe, *Consequences, supra* note 76, at 431–32.

209. *Id.*

210. HUGO MUNSTERBERG, ON THE WITNESS STAND (1908).

211. GUDJONSSON, *supra* note 76, at 93.

212. *See* Kassin & Neumann, *supra* note 76, at 480; Kassin & Sukel, *supra* note 76, at 40.

213. Leo, *Inside the Interrogation Room, supra* note 76, at 305; *see also* GUDJONSSON, *supra* note 76, at 89 (tracing the scientific advances and relevant cases regarding false confessions).

214. Leo, Police Interrogation in America, *supra* note 84; *see also* GUDJONSSON, *supra* note 76, at 92 (tracing the scientific advances and relevant cases regarding false confessions).

215. Jerome Skolnick & Richard A. Leo, *The Ethics of Deceptive Interrogation, in* ISSUES IN POLICING: NEW PERSPECTIVES 75 (John Bizzack ed., 1992).

records[216]) psychologists, criminologists, and other social scientists have generated a rich scientific literature and body of knowledge on the study of interrogation and confession, with generally accepted methods, theories, and findings. This Article seeks to make a positive contribution to this literature, as well as to the policy debates regarding how best to minimize the problem of interrogation-induced false confession and the miscarriages of justice that they undoubtedly cause.

## IV. FALSE CONFESSIONS AND CASE OUTCOMES: QUANTITATIVE TRENDS

### A.  The False Confession Cases[217]

The *proven* false confessions that comprise the original data set analyzed in this Article are presented below in Table 2. This data set consists of 125 *proven* false confessions. The 125 false confessions are more than three times the number of *proven*, and more than twice the number of total (whether *proven*, *highly probable* or *probable*) false confessions that have been presented or analyzed in any previous American study.[218]  The *proven* false confessions in this Article occurred between the years of 1971 and 2002, though 31% of them occurred in the last five years (1998–2003) and 55% occurred in the last ten years (1993–2003). The data on false confessions presented in this study (as well as in the 1998 study by Leo and Ofshe of 60 false confessions)[219] appear to suggest either that the number of interrogation-induced false confessions have risen in recent years or that they are now being discovered more frequently.

---

216. *See* Ofshe & Leo, *Decision to Confess Falsely*, *supra* note 76, at 986; Leo, Police Interrogation in America, *supra* note 84, at 91–130.

217. *See supra* note 1 (distinguishing a confession from an admission).

218. Leo & Ofshe, *Consequences*, *supra* note 76, at 490.

219. *Id.*

## TABLE 2
## PROVEN FALSE CONFESSIONS (N=125)

| Case ID# | False Confessor | Year of Confession |
|----------|-----------------|--------------------|
| 1 | Omar Aguirre | 1997[220] |
| 2 | David Baldwin | 1993[221] |
| 3 | Medell Banks | 1999[222] |
| 4 | Victoria Banks | 1999[223] |
| 5 | Leonard Barco | 1985[224] |
| 6 | Corey Beale | 2001[225] |
| 7 | Corethian Bell | 2000[226] |
| 8 | Anthony Benn | 1987[227] |
| 9 | Melvin Bennett | 1990[228] |
| 10 | George Blome | 1997[229] |

220. *See* David Heinzmann & Jeff Coen, *Jailed by Lies, Freed by Truth*, CHI. TRIB., Dec. 22, 2002, § 1, at 1.

221. *See* Patricia Manson, *LR Will Pay 3 Accused $100,000; 3 Other Men Convicted of 1993 Stabbing Death*, ARK. DEMOCRAT-GAZETTE, Dec. 5, 1996, at 2B; Linda Satter, *3 Sentenced in LR Slaying-Robbery; One Man Gets 10 Years, the Other Two—20 in Plea Agreements*, ARK. DEMOCRAT-GAZETTE, July 28, 1995, at 5B.

222. *See* Michael Luo, *Justice in a Small Town*, AP NEWSWIRES, July 7, 2002; *Court Dismisses Guilty Plea in Baby's Death*, N.Y. TIMES, Aug. 12, 2002, at A9.

223. *See* Luo, *supra* note 222, at 9.

224. *See Man Spends Eight Months in Jail, Trial Begins in 'Murder' That Never Occurred*, AP NEWSWIRES, Jan. 10, 1986, *available at* 1986 WL 3043884; *Suspect Becomes Victim; 8 Months for Killing Woman Who Drank Herself to Death*, THE RECORD (Hackensack, N.J.), Jan. 12, 1986, at A3, *available at* 1986 WL 4618858.

225. *See* Michael Amon, *Waldorf Man Pleads Guilty in Stabbing Death*, WASH. POST, July 3, 2002, at B09; April Witt & Ruben Castaneda, *FBI to Probe Prince George's Interrogations; 3 Confessions Raise Civil Rights Questions*, WASH. POST, June 8, 2001, at A01; *Beale's Changing Statements*, WASH. POST, June 4, 2001, at A08.

226. *See* Lucio Guerrero, *Wrongfully Accused Man Sues Cops*, CHI. SUN-TIMES, July 16, 2002, at A03; Steve Mills, *Man Sues Police, Alleging Coercion*, CHI. TRIB., July 16, 2002, § 1, at 1; Kirsten Scharnberg & Steve Mills, *DNA Voids Murder Confession*, CHI. TRIB., Jan. 5, 2002, § 4, at 1.

227. *See* Tim Bryant, *Ex-Suspect Hopes to Clear His Name*, ST. LOUIS POST-DISPATCH, Sept. 15, 1990, at 3A; Louis J. Rose, *3 Men Arrested, Released in National Case File*, ST. LOUIS POST-DISPATCH, May 5, 1989, at 9B; Bill Smith & Carolyn Tuft, *Other Counties Are Not Immune to Making Mistakes, Convicting the Innocent*, ST. LOUIS POST-DISPATCH, Apr. 12, 1998, at A7.

228. *See* Lorraine Ahearn, *Rough Justice: Bad Cases Make Good Lawyers*, NEWS & RECORD (Greensboro, N.C.), Nov. 15, 1998, at B1, *available at* LEXIS, News Library, Nwsrec File.

229. *See* Jose Luis Jimenez, *DNA Tests Clear Suspect in Year-Old Murder Case; Evidence Thought to Implicate the Man in the Death Clears Him*, SARASOTA HERALD-TRIB., Apr. 29, 1998, at 1A, *available at* LEXIS, News Library, Sarhtr File.

| 11 | Colleen Blue | 2001[230] |
| 12 | Michael Bottoms | 1992[231] |
| 13 | Christopher Bowman | 1998[232] |
| 14 | Bruce Bowser | 1992[233] |
| 15 | Marcellius Bradford | 1986[234] |
| 16 | Keith Brown | 1991[235] |
| 17 | Rodney Brown | 1990[236] |
| 18 | Timothy Brown | 1990[237] |
| 19 | Brenton Butler | 2001[238] |

230. *See* Tony Gordon, *Woman Charged with Murder Denies Leaving Baby Behind Store to Die*, CHI. DAILY HERALD, Sept. 19, 2001, at 18, *available at* 2001 WL 28539673; Jerry Lawrence, *Woman Cleared in Baby's Death: DNA Tests Prove Suspect Not Mom*, CHI. TRIB., Oct. 27, 2001, § 1, at 15; Amanda Vogt, *Mom Charged in Baby's Death*, CHI. TRIB., Sept. 19, 2001, § 2, at 2.

231. *See* John-Henry Doucette, *A Lean, Agonizing Work of Stirring Beauty*, VIRGINIAN-PILOT (Norfolk, Va.), Jan. 21, 2001, at E3, *available at* LEXIS, News Library, Vapilt File; Erika Reif, *DNA Tests Bring Arrests in Long-Ago Murders*, VIRGINIAN-PILOT (Norfolk, Va.), Aug. 31, 1999, at B2, *available at* LEXIS, News Library, Vapilt File.

232. *See* Joseph Berger, *A Suspect's Confession Fits the Crimes, but He's the Wrong Man*, N.Y. TIMES, Mar. 19, 1998, at B1.

233. *See* Kimberly Garcia, *The Tactics of Interrogation: Techniques that Rely on Subterfuge Can Backfire, Experts Say*, AUSTIN AM.-STATESMAN, Nov. 15, 1992, at A22, *available at* 1992 WL 4747116; Jim Phillips, *Murder Trial Clouded by Discounted Confession*, AUSTIN AM.-STATESMAN, Oct. 31, 1992, at B1, *available at* 1992 WL 4744978.

234. *See* Frank Main, *They Weren't the Right Ones*, CHI. SUN-TIMES, May 27, 2001, at 4, *available at* 2001 WL 7232369; Steve Mills & Maurice Possley, *Final Roscetti DNA Test Clears 4*, CHI. TRIB., Dec. 4, 2001, § 1, at 1, *available at* LEXIS, News Library, Chtrib File; Steve Mills & Maurice Possley, *Report Alleges Crime Lab Fraud: Scientist is Accused of Providing False Testimony*, CHI. TRIB., Jan. 14, 2001, § 1, at 1, *available at* 2001 WL 4030052; Steve Mills & Maurice Possley, *New Evidence Stirs Doubt over Murder Convictions: DNA, Recantations Suggest 4 Inmates Innocent in '86 Case*, CHI. TRIB., May 2, 2001, § 1, at 1, *available at* 2001 WL 4068766.

235. *See DNA Analysis 6 Years Later Reverses Fortunes*, TAMPA TRIB., July 8, 1997, at B2, *available at* LEXIS, News Library, Tamtrb File; *Prosecutors Say They Did Not Railroad Man in Rape Case*, HERALD SUN (Durham, N.C.), July 10, 1997, at C9.

236. *See* Robert Kelly, *Judge Rejects Withdrawal of Guilty Plea*, ST. LOUIS POST-DISPATCH, Sept. 7, 1990, at 9A; Robert Kelly, *Probe Continues into Teens' Confessions*, ST. LOUIS POST-DISPATCH, July 31, 1990, at 6A; Michael D. Sorkin, *Teens Cleared of Killing Homeless Man in Alton*, ST. LOUIS POST-DISPATCH, July 17, 1990, at 1A.

237. *See* Paula McMahon, *Deputy's Resignation Questioned: Attorneys for Convicted Killer Tim Brown Hope Data Released on the Detective Will Weaken Testimony*, SUN-SENTINEL (Ft. Lauderdale, Fla.), July 30, 2002, at 1B, *available at* LEXIS, News Library, Sunsen File; Paula McMahon, *Justice Can Elude Mentally Impaired: Validity of Their Confessions Produces More Legal Challenges*, SUN-SENTINEL (Ft. Lauderdale, Fla.), Mar. 24, 2002, at 1A; Paula McMahon & Ardy Friedberg, *Prisoner Says Confession Forced: Man Convicted in 1990 Shooting of Deputy Alleges Officers Beat and Threatened Him*, SUN-SENTINEL (Ft. Lauderdale, Fla.), Feb. 22, 2002, at 1B, *available at* LEXIS, News Library, Sunsen file; Paula McMahon, Jeff Shields & Rafael Olmeda, *Sheriff Reopens Investigation into Deputy's Slaying in 1990*, SUN-SENTINEL (Ft. Lauderdale, Fla.), Feb. 9, 2002, at 1A, *available at* LEXIS, News Library, Sunsen File.

238. *See* Paul Pinkham, *Police Charge 2 Men in Killing of Tourist: Fingerprint Surfaces*

2004]    *FALSE CONFESSIONS IN THE POST-DNA WORLD*    935

| 20 | Luis Conde | 1996[239] |
| 21 | Michael Terrell Carter | 1989[240] |
| 22 | Miguel Castillo | 1989[241] |
| 23 | Kevin W. Cherry | 1999[242] |
| 24 | Allen Jacob Chesnet | 1998[243] |
| 25 | Antwon Coleman | 1990[244] |
| 26 | Diane Colwell | 1994[245] |
| 27 | Michael Crowe | 1998[246] |
| 28 | Rolando Cruz | 1983[247] |

After Butler Acquittal, FLA. TIMES-UNION, Mar. 13, 2001, at A1, *available at* 2001 WL 7005542; Paul Pinkham & Rich Tucker, *Butler Suit Faults Cops on Training*, FLA. TIMES-UNION, Oct. 18, 2001, at B1, *available at* 2001 WL 25999868.

239. *See* Linda Loyd, *Innocent Man Who Confessed to Jeweler's Murder Is Freed: An Attorney for Luis Conde Said Fear Led Him to Tell Police He Was Involved*, PHILA. INQUIRER., Aug. 22, 1996, at B03; Jim Nolan & Jack McGuire, *3 are Held in Carjack Murder; Family's Grief Rekindled 10 Months After Crime*, PHILA. DAILY NEWS, Aug. 12, 1996, at A03.

240. *See* Curt Eysink, *Panel Recommends $50,000 Settlement in Wrongful Arrest*, BATON ROUGE ADVOC., Dec. 2, 1993, at 10E, *available at* LEXIS, News Library, Batonr File; Tim Talley, *Jury Ruling Set on Carter Confession*, BATON ROUGE ADVOC., June 1, 1989, at 1B, *available at* 1989 WL 2851120.

241. *See* Steve Mills & Ken Armstrong, *Judge Under Fire Takes Himself Off Murder Appeal: Morrissey Once Called Convict's Lawyers 'Idiots'*, CHI. TRIB., Jan. 15, 2000, § 1, at 1, *available at* LEXIS, News library, Chtrib File; Maurice Possley, *Man Wrongly Imprisoned in '88 Murder Sues City, 3 Officers: Lawsuit Says Cops Beat Suspect, Gave False Trial Testimony*, CHI. TRIB., Jan. 31, 2001, § 2, at 6, *available at* LEXIS, News Library, Chtrib File.

242. *See* Brendan Lyons, *He's Not the Man After All*, TIMES UNION (Albany, N.Y.), Apr. 4, 2000, at A1, *available at* 2000 WL 6738759; Brendan Lyons, *His Trial Ends, but Questions Linger*, TIMES UNION (Albany, N.Y.), Apr. 9, 2000, at A1, *available at* 2000 WL 6739753.

243. *See* Todd Richissin, *Held Without Proof, Boy Free: He's Jailed 6 Months, Even After DNA Test Debunks Evidence*, BALTIMORE SUN, Nov. 20, 1998, at 1A, *available at* LEXIS, News Library, Baltsun File; Del Quentin Wilber, *Teen Tormented by an Erroneous Charge of Murder: Jailed Six Months in Woman's Killing, He Seeks $18 Million*, BALTIMORE SUN, Apr. 23, 2001, at 1A, *available at* 2001 WL 6157446.

244. *See* Michael D. Sorkin, *Sixth Teen Charged in Killing in Alton*, ST. LOUIS POST-DISPATCH, June 26, 1990, at 1A.

245. *See* Darlene Himmelspach, *Murder Charge Dismissed Against Caregiver in Death of Her 76-Year-Old Patient*, SAN DIEGO UNION-TRIB., May 6, 1995, at B3, *available at* LEXIS, News Library, Sdut File; Mark Sauer, *Some Strange Cases Examined of Innocents Who Confess to Murder*, SAN DIEGO UNION-TRIB., July 27, 1996, at B10, *available at* LEXIS, News Library, Sdut File.

246. *See* Mark Sauer, *Crowe Case Milestone Brings No Closure: Three Teens Moving on but Still Are Suspects*, SAN DIEGO UNION-TRIB., Feb. 24, 2001, at NC1 [hereinafter Sauer, *Crowe Case*], *available at* 2001 WL 6444761; Mark Sauer, *Suit Brings Crowes to Next Stop on Legal Journey*, SAN DIEGO UNION-TRIB., July 16, 2000, at B1, *available at* 2000 WL 13975951; John Wilkens & Mark Sauer, *Tuite Charged: Prosecutors Disclose New Blood Evidence*, SAN DIEGO UNION-TRIB., May 16, 2002, at A1, *available at* LEXIS, News Library, Sdut File.

247. *See generally* THOMAS FRISBIE & RANDY GARRETT, VICTIMS OF JUSTICE (1998)

936                    NORTH CAROLINA LAW REVIEW              [Vol. 82

| 29 | Ricky Cullipher | 1996[248] |
| 30 | Tom Cummins | 1995[249] |
| 31 | Peter Dallas | 1990[250] |
| 32 | Gerald Delay | 1995[251] |
| 33 | Joseph Dick | 1998[252] |
| 34 | John Dixon | 1991[253] |
| 35 | Carl Dorr | 1997[254] |
| 36 | Eugene "Rufus" Dykes | 1999[255] |
| 37 | Robert Farnsworth Jr. | 1999[256] |
| 38 | Michael Fitzpatrick | 1999[257] |
| 39 | Derrick Flewellen | 1995[258] |

(recounting the plight of two innocent men who were found guilty of raping, kidnapping, and murdering a child). Summaries of the cases of Rolando Cruz and his co-defendant can be found at the website of the Innocence Project at the Benjamin N. Cardozo School of Law. *See* The Innocence Project, Rolando Cruz, *at* http://www.innocenceproject.org/case/display_profile.php?id=07 (last visited Feb. 13, 2004) (on file with the North Carolina Law Review).

248. *See* Kimberly Lenz, *Culliphers File Suit Against Attorney*, DAILY PRESS (Hampton Roads, Va.), June 8, 2001, at A1. Holly Roberson & Kimberly Lenz, *Ricky Free: Judge Says Cullipher Deserves New Trial; Prosecutor Drops Case*, DAILY PRESS (Hampton Roads, Va.), May 25, 2001, at A1.

249. *See* Tim Bryant, *Wrongly Held in Two Deaths, Man Settles Suit*, ST. LOUIS POST-DISPATCH, Apr. 7, 1995, at 1C.

250. *See 7-Year Quest Ends: Father Sees Son's Killer Convicted in Murder*, SUN-SENTINEL (Ft. Lauderdale, Fla.), July 2, 1993, at 1B; Trevor Jensen, *Ex-Suspect in Murder Cites Frame-Up, Files Suit Now Freed, Man Seeks Damages from Detectives*, SUN-SENTINEL (Ft. Lauderdale, Fla.), July 15, 1993, at 1B, *available at* LEXIS, News Library, Sunsen File; Trevor Jensen, *Trial Opens in 1986 Murder Case*, SUN-SENTINEL (Ft. Lauderdale, Fla.), June 8, 1993, at 3B.

251. *See* Joseph P. Shapiro, *Innocent, and Free at Last*, U.S. NEWS & WORLD REP., Oct. 9, 1995, at 41, 43.

252. *See* Tice v. Comm'n., 563 S.E.2d 412 (Va. Ct. App. 2002).

253. *See* Jim Dwyer, *Cornered Minds, False Confessions*, N.Y. TIMES, Dec. 9, 2001, § 4, at 14; Guy Sterling, *Once a Confessor, Soon a Free Man: DNA Test Clears Newark Man Who Served 10 Years for Christmas Rape-Robbery*, STAR-LEDGER (Newark, N.J.), Nov. 29, 2001, at A23, *available at* 2001 WL 30233099.

254. *See* Paul Duggan, *Prime Suspects*, WASH. POST, Aug. 10, 1997, § 6 (Magazine), at W10; Katherine Shaver & Steven Gray, *'Too Heavy a Burden': Clark Told Inmates-Then Police-Where He Left Michele Dorr*, WASH. POST, Jan. 8, 2000, at A1.

255. *See* Christine Hanley, *Man Says He Misled FBI in Yosemite Deaths*, COLUMBIAN (Vancouver, Wash.), Aug. 6, 1999, at A4, *available at* LEXIS, News Library, Colmbu File; Christine Hanley, *Stayner Pleads Not Guilty in Yosemite Killing*, COLUMBIAN (Vancouver, Wash.), Aug. 7, 1999, at A8, *available at* LEXIS, News Library, Colmbu File.

256. *See Bank Finds "Thief's" Money Bag in Vault*, GRAND RAPIDS PRESS (Mich.), Mar. 8, 2000, at B7, *available at* 2000 WL 6642837.

257. *See* Sean Kirst, *DeWitt Man Explores Secret World*, POST-STANDARD (Syracuse, N.Y.), Sept. 29, 1999, at A1, *available at* 1999 WL 4705130; John O'Brien, *Accused Worried About His Job: Police Chief: "I've Never Had a Case Like This"*, POST-STANDARD (Syracuse, N.Y.), Sept. 22, 1999, at A1, *available at* 1999 WL 4704327.

258. *See* Maurice Possley, *DNA Topples Case Built on Confessions*, CHI. TRIB., Dec. 1,

| 40 | Johnnie Frederick | 1971[259] |
| 41 | Ralph Frye | 1988[260] |
| 42 | Gary Gauger | 1993[261] |
| 43 | Michael Gayles | 2000[262] |
| 44 | Hubert Geralds | 1997[263] |
| 45 | Connie Gibbs | 1991[264] |
| 46 | William Don Gibson | 1995[265] |
| 47 | Bruce Godschalk | 1986[266] |
| 48 | Bently Louis Grant | 2000[267] |
| 49 | Paula Gray | 1978[268] |
| 50 | Anthony Gray Jr. | 1991[269] |

1999, § 1, at 1.

259. *See* Martin Dyckman, *Innocent Lives Depend on Luck to Save Them*, ST. PETERSBURG TIMES, June 18, 2000, at 3D, *available at* 2000 WL 5619717.

260. *See* Jeffrey Bils, *Death Row Battle Ends with Freedom*, CHI. TRIB., Sept. 9, 1994, § 1, at 1; Jeffrey Bils, *Death Row Case Focuses on Tape*, CHI. TRIB., July 29, 1994, § 2, at 3; Jeffrey Bils, *Man Settles Lawsuit in Wrongful Jailing*, CHI. TRIB., Aug. 13, 1997, § 2, at 9.

261. *See* Bill Cole, *A Price on Freedom: Cleared of Charges, Man Says County Should Pay*, CHI. DAILY HERALD, Oct. 7, 1999, at B2; *Cleared of Charges, Man Now Seeks Compensation*, AP NEWSWIRES, Oct. 8, 1999, *available at* WL, News and Business Library.

262. *See* David G. Grant & Hawke Fracassa, *DNA May Link Suspect to Rape-Slaying*, DETROIT NEWS, Nov. 27, 2001, at 10D, *available at* LEXIS, News Library, Detnws File; Norman Sinclair, *Detroit Police Inquiry Expands*, DETROIT NEWS, Apr. 16, 2001, at 1A, *available at* LEXIS, News Library, Detnws File.

263. *See* Janan Hanna & Terry Wilson, *Questions Arise over Links Made in Serial Killings: Roseland Slayings Put Focus on Methods Used in Investigation*, CHI. TRIB., July 5, 2000, § 2, at 1; Steve Mills & Terry Wilson, *State Says It Convicted the Wrong Serial Killer*, CHI. TRIB., Feb. 11, 2000, § 1, at 1; Maurice Possley, *Murder Defendant's Mental State Argued*, CHI. TRIB., Nov. 11, 1997, § 2, at 3.

264. *See* Mitch Gelman, *The Wrong Man*, NEWSDAY, June 7, 1992, at 4, *available at* 1992 WL 7537604; David Kocieniewski, *Slain Cop's Dad Says System Betrayed Son*, NEWSDAY, Jan. 15, 1993, at 31, *available at* 1993 WL 11348002; *4 Arrested in Cop's Slaying*, RECORD (Bergen County, N.J.), May 8, 1992, at A04, *available at* 1992 WL 9429522.

265. *See* Veronica Alaniz, *Wylie Man Charged in Sexual Assault, Kidnapping*, DALLAS MORNING NEWS, Sept. 9, 1995, at 38A, *available at* LEXIS, News Library, Dalnws File; Michael Saul, *DNA Evidence Helps Clear Man Who Confessed to Rape*, DALLAS MORNING NEWS, June 1, 1996, at 33A, *available at* LEXIS, News Library, Dalnws File.

266. *See* Sara Rimer, *DNA Testing in Rape Cases Frees Prisoner After 15 Years*, N.Y. TIMES, Feb. 15, 2002, at A12; *Defense Lawyer: DNA Legislation Needed to Help Clear Wrongly-Convicted Inmates*, PENN. L. WEEKLY, Feb. 11, 2002, at 16.

267. *See* Katherine Finkelstein, *Judge Orders Release of a Suspect in Concrete Attack*, N.Y. TIMES, July 26, 2000, at B1; Edward Wong, *Man Held in Concrete Attack on Woman*, N.Y. TIMES, July 21, 2000, at B3.

268. *See* Dennis William & Verneal Jimerson, *Lessons from 13 Innocent Men*, ST. LOUIS POST-DISPATCH, Apr. 30, 2000, at B3; *The Exonerated: Paula Gray*, Center for Wrongful Convictions, Northwestern University School of Law, Bluhm Legal Clinic, *at* www.law.northwestern.edu/depts/clinic/wrongful/exonerations/Gray.htm. (last visited Feb. 13, 2004) (on file with the North Carolina Law Review).

938 *NORTH CAROLINA LAW REVIEW* [Vol. 82

| | | |
|---|---|---|
| 51 | Dennis Deonte Green | 2000[270] |
| 52 | Sammie Charles Green | 1994[271] |
| 53 | Charles Wade Hampton | 1996[272] |
| 54 | Mario Hayes | 1996[273] |
| 55 | Eric Henley | 1990[274] |
| 56 | Alejandro Hernandez | 1983[275] |
| 57 | Jorge Hernandez | 2002[276] |
| 58 | Abdallah Higazy | 2002[277] |
| 59 | Leroy Hoggard | 1990[278] |
| 60 | Aaron Houser | 1998[279] |
| 61 | Eddie Huggins | 1998[280] |
| 62 | Edward Humphrey | 1990[281] |

269. *See* Todd Richissin & Matthew Mosk, *Bill Would Pay $7.5 Million to Man Falsely Imprisoned: Delegate Says State Responsible for Mistake*, BALT. SUN, Mar. 11, 1999, at 5B; Todd Richissin, *Trying to Right an Injustice*, BALT. SUN, Feb. 6, 1999, at 1A.

270. *See* April Witt, *Police Bend, Suspend Rules: Pr. George's Officers Deny Suspects Lawyers, Observers Say*, WASH. POST, June 5, 2001, at A1.

271. *See* Dianna Hunt, *No Match on DNA Test Frees Confessed Rapist*, HOUSTON CHRON., Dec. 1, 1994, at A29.

272. *See* Lisa Frederick, *Molester Remains at Large: Porterdale Uneasy After Suspect Cleared*, ATL. J.-CONST., Dec. 5, 1996, at 1R; *Accused Molester's Rights Violated, His Lawyer Says*, ATL. J.-CONST., Sept. 7, 1996, at 7C.

273. *See* James Hill, *Evidence in Murder Case Too Flawed to Suit Jury*, CHI. TRIB., June 8, 1999, § 2, at 1; Steve Mills, *"Killer" in Jail When Crime Committed; Teen Accuses Cops of Coercing Him into Admitting Guilt*, CHI. TRIB., Apr. 29, 1998, § 1, at 1; Steve Mills, *2nd Check Confirms Accused Killer's Story: He Was in Jail at Time of Murder*, CHI. TRIB., May 5, 1998, § 1, at 1; Maurice Possley & Steve Mills, *Little Adds Up in Murder Case: Youth Admits Stabbing, Autopsy Shows No Knife Wounds*, CHI. TRIB., Mar. 21, 1999, § 1, at 1.

274. *See* Sorkin, *supra* note 236.

275. *See* Innocence Project, Alejandro Hernandez, *at* http://www.innocenceproject.org/ case/display_profile.php?id=29 (last visited Feb. 13, 2004) (on file with the North Carolina Law Review).

276. *See* Sean Webby & Kristen Berry, *DNA Test Clears PA Man in Rape of 94-Year-Old*, MERCURY-NEWS (San Jose, CA), Aug. 10, 2002, at 1A; Sean Webby, *Teen Admits Rape, or Did He? False Confession Debate Ensues*, MERCURY-NEWS (San Jose, CA) Aug. 9, 2002, at 1B.

277. *See* Benjamin Weiser, *FBI Faces Inquiry on a False Confession from an Egyptian Student*, N.Y. TIMES, Aug. 6, 2002, at B4; Benjamin Weiser, *Judge Considers an Inquiry on Radio Case Confession*, N.Y. TIMES, June 29, 2002, at B3.

278. Joe Jackson & Thomas Huang, *Police Transfers Followed Teens' False Confessions*, VIRGINIAN-PILOT (Norfolk, VA.), Dec. 16, 1990, at B1.

279. *See* Sauer, *Crowe Case*, *supra* note 246.

280. *See* James Hill & Steve Mills, *Judge Rejects "Confession" of Teen to Murder*, CHI. TRIB., Apr. 30, 1999, § 1, at 1; James Hill, *Teen in Puzzling Case Free on Bond: Suspect in '98 Murder Held More than Year*, CHI. TRIB., Mar. 30, 1999, § 1, at 1; Maurice Possley & Steve Mills, *Little Adds Up in Murder Case; Youth Admits Stabbings*, CHI. TRIB., Mar. 21, 1999, § 1, at 2.

281. *See* Chris Lavin & Jeffrey Good, *Lives Go On, but the Past is Present*, ST. PETERSBURG TIMES, Aug. 25, 1991, at 1B; Jim Leusner, *Still Unanswered: How, Why*

| 63 | John Jeffers | 1977[282] |
|----|--------------|-----------|
| 64 | Anthony Johnson | 1998[283] |
| 65 | Wardell Johnson | 1994[284] |
| 66 | Andre Jones | 1979[285] |
| 67 | Ronald Jones | 1985[286] |
| 68 | Jonathan Kaled | 2001[287] |
| 69 | David Keaton | 1971[288] |
| 70 | Charles B. King | 1992[289] |
| 71 | Keith King | 1990[290] |
| 72 | Frank Kuecken | 2001[291] |
| 73 | Tim Laney | 1999[292] |

*Killer Chose His Victims*, SUN-SENTINEL (Ft. Lauderdale, Fla.), Feb. 16, 1994, at 4A; Ronald Smothers, *Left Behind in Murder Inquiry but Still Behind Bars*, N.Y. TIMES, Feb. 3, 1991, at 18L.

282. *See* John Yates & Kevin Lynch, *Confession Leads to 2 Arrests in '75 Killing*, CHI. TRIB., Aug. 29, 2002, § 1, at 1.

283. *See* Angie Brunkow, *Boy Once Suspect in Slaying: I Confessed So I Could Leave*, OMAHA WORLD-HERALD, Aug. 14, 1999, at 15; Patrick Strawbridge, *Boy, 11, Retracted Leu Slaying Confession; Mother Criticizes Length of Police Interrogation: Son was "Scared"*, OMAHA WORLD-HERALD, Apr. 2, 1998, at 19.

284. *See* Brian Wheeler, *Edgewater Man Sentenced for Party Shooting*, CAPITAL (Annapolis, MD), May 4, 1995, at B1; Brian Wheeler, *Despite Confession, Grand Jury Indicts Another Man in Triple Shooting Case*, CAPITAL (Annapolis, MD), Nov. 30, 1994, at A16.

285. *See* Roy Malone, *Ex-Convict was Suspect in Beheading in 1978: Man Investigated in Recent Decapitations Was Questioned in Earlier E. St. Louis Case*, ST. LOUIS POST-DISPATCH, Aug. 5, 1992, at 6A; Bill Smith & Charles Bosworth Jr., *Deputy's Tactics Spurred Questions*, ST. LOUIS POST-DISPATCH, Feb. 25, 1999, at B1.

286. *See* Caitlin Lovinger, *Life After Death Row*, N.Y. TIMES, Aug. 22, 1999, at 4; Raoul Mowatt, *Ex-Con Hits System That Put Him on Death Row*, CHI. TRIB., Mar. 3, 2000, § 2, at 5.

287. *See* Amber Hunt, *Confession May Free Pair*, TIMES HERALD (Port Huron, Mich.), Apr. 19, 2001, at 1A; Tony Scotta & Chad Halcom, *Confession Controversy*, MACOMB DAILY (Macomb, Mich.), Apr. 22, 2001, at A12, *available at* http://www.zwire.com.site/news.cfm?newsid=1711049&BRD=988&PAG=461&dept_id=141265&rfi=8 (on file with the North Carolina Law Review).

288. *See* Dyckman, *supra* note 259; Sydney Freedberg, *Freed from Death Row*, ST. PETERSBURG TIMES, July 4, 1999, at 1A, *available at* 1999 WL 3329162.

289. *See* Roy Malone & Harry Levins, *Police Say Man Has Confessed to 5 Killings*, ST. LOUIS POST-DISPATCH, Aug. 29, 1993, at 1D; *Confession of Multiple Child Killer Frees Retarded Man After Year of Confinement*, ST. LOUIS POST- DISPATCH, Apr. 12, 1998, at A7.

290. *See* Paula McMahon & Ardy Friedberg, *Deputy's Resignation Questioned; Attorneys for Convicted Killer Tim Brown Hope Data Released on Detective Will Weaken Testimony*, SUN-SENTINEL (Ft. Lauderdale, Fla.), July 30, 2002, at 1B, *available at* LEXIS, News Library, Sunsen File; McMahon & Friedberg, *supra* note 237; McMahon et al., *supra* note 237.

291. *See* Hunt, *supra* note 287.

292. *See* Erika Bolstad & Paula Christian, *Freed Suspects Say They Feared Police Tactics*, NEWS & RECORD (Greensboro, NC), Nov. 7, 1999, at A1.

| 74 | Jermel Lewis | 2001[293] |
| 75 | Jason Ligon | 1997[294] |
| 76 | Eddie Lloyd | 1985[295] |
| 77 | Keith Longtin | 1999[296] |
| 78 | Jose Anibal Martinez | 2001[297] |
| 79 | Michael Martinez | 1995[298] |
| 80 | Johnny Massingale | 1984[299] |
| 81 | Antron McCray | 1989[300] |
| 82 | Geoffrey Meyers | 2000[301] |
| 83 | Robert Lee Miller | 1987[302] |
| 84 | Anthony Moore | 1993[303] |
| 85 | Antonio Myers | 2000[304] |
| 86 | Christopher Ochoa | 1988[305] |
| 87 | Calvin Ollins | 1986[306] |
| 88 | Don Olmetti | 1997[307] |

293. *See* Jacqueline Soteropoulos, *Witness Shakes Up Lex St. Case; Investigators Must Reexamine a Confession They Earlier Had Scrapped. Prosecutors Will Decide on Monday How to Proceed*, PHILA. INQUIRER, June 9, 2002, at B1; *2 Charged in Deaths of 7 at Drug House*, ATL. J.-CONST., Jan. 13, 2001, at 3R.

294. *See* Karen Freifeld, *DA: Man's Murder Confession False*, NEWSDAY, June 16, 2000, at A23.

295. *See* Jodie Wilgoren, *Confession Had His Signature: DNA Did Not*, N.Y. TIMES, Aug. 26, 2002, at A1.

296. *See* Witt & Castenada, *supra* note 225.

297. *See* Theresa Vargas, *Jailed, Then Freed in Murder Probe*, NEWSDAY, Jan. 10, 2002, at A3; Theresa Vargas, *Probe in Confession Case*, NEWSDAY, Jan. 11, 2002, at A25.

298. *See* Nora Lopez, *Police Free Two in July Killing Spree; Third Man Accused of All Five Slayings*, DALLAS MORNING NEWS, Oct. 14, 1995, at 1A; Steve Scott, *Survivor of Fatal Spree Identifies Suspect: 2 Men's Cases Sent to Grand Jury*, DALLAS MORNING NEWS, July 21, 1995, at 30A.

299. *See* Scott Harris, *Suspect in 2 Slayings Leaves Jail: Attorneys Say Evidence Points Toward Man Held in 3 Other Throat-Slashings*, L.A. TIMES, Jan. 5, 1985, at 23; Ed Jahn & Richard Ruane, *Man Cleared of 2 Slayings*, SAN DIEGO UNION-TRIB., Jan. 5, 1985, at 2B.

300. *See* People v. Salaam, 83 N.Y.2d 51, 629 N.E.2d 371 (N.Y. 1993); People v. McCray, 604 N.Y.S.2d 93 (N.Y.App. Div. 1993); SULLIVAN, *supra* note 2, at 211.

301. *See* Pamela J. Podger, *Convicted Arsonist Cleared in Sonoma Fire: He Recants Confession After Story Disproved*, S.F. CHRON., Feb. 8, 2000, at A19.

302. *See* Jan Hoffman, *Police Refine Methods So Potent, Even the Innocent Have Confessed*, N.Y. TIMES, Mar. 30, 1998, at A1.

303. *See* Barbara Ross, Alice McQuillan & Henri Cauvin, *Flawed Slay Probe Led to Wrong Men*, N.Y. DAILY NEWS, Jan. 7, 1998, at 17.

304. *See* Craig Whitlock & Ruben Castaneda, *Prince George's Prosecutor Accuses Police of Coverup: Suspect's False Confession Was Concealed While Another Man Was Convicted, State's Attorney Says*, WASH. POST, Sept. 15, 2001, at B1.

305. *See* Paul Duggan, *Falsely Accused Texas Man Freed from Life Term*, WASH. POST, Jan. 17, 2001, at A3; Henry Weinstein, *DNA Testing Clears Texas Murderer and "Accomplice"*, L.A. TIMES, Oct. 14, 2000, at A10; Jim Yardley, *Texas Inmate's Confession Slips Through the Cracks*, N.Y. TIMES, Oct. 17, 2000, at A1.

306. *See infra* notes 533–67 and accompanying text.

| 89 | Ronald Paccagnella | 1995[308] |
| 90 | David Payton | 1980[309] |
| 91 | Dustin Pennington | 1988[310] |
| 92 | Kevin Richardson | 1989[311] |
| 93 | Kim Rogers | 1991[312] |
| 94 | Johnny Ross | 1975[313] |
| 95 | William Rupp | 1976[314] |
| 96 | Yusef Salaam | 1989[315] |
| 97 | Raymond Santana | 1989[316] |
| 98 | David Saraceno | 1995[317] |
| 99 | Dan Scott | 1993[318] |

307. *See* Diane Struzzi, *Murder Case Dropped, Teen Still Held; Questions Remain 2 Years After Arrest*, CHI. TRIB., May 18, 1999, § 1, at 1; Annie Sweeney, *Student Charged in Teacher Slaying: Police Say 16-Year-Old Killed to Steal Just $4*, CHI. TRIB., Apr. 4, 1997, § 1, at 1.

308. *See* David Doege, *Man Gets 50-Year Term in Slaying*, MILWAUKEE J. SENTINEL, Jan. 22, 1997, at News 1; David Doege, *Mental Competency Evaluation Ordered*, MILWAUKEE J. SENTINEL, Nov. 28, 1995, at News 1; Kathy Khang & David Doege, *Cudahy Murder Unravels, Man Jailed for 10 Months To Be Freed: Police Arrest New Suspect*, MILWAUKEE J. SENTINEL, Oct. 1, 1996 at 1A.

309. *See* Bonnie DeSimone, *Payton Tries to Rebuild a Shattered Life*, DETROIT NEWS, July 21, 1991, at 5A; *$1 Million Awarded in False-Arrest Case*, CHI. TRIB., July 17, 1991, at M3.

310. Robert Kelly & Safir Ahmed, *Tape Uncovers Pact to Take Murder Rap*, ST. LOUIS POST-DISPATCH, Jan. 26, 1989, at 1I.

311. *See* People v. Richardson, 608 N.Y.S.2d 627, 628 (App. Div. 1994); SULLIVAN, *supra* note 2, at 254.

312. *See* James Bennet, *3 Held in Shooting Death of Sergeant Are Freed*, N.Y. TIMES, May 8, 1992, at B3; Emily Sachar, *Wrong 3 Held in Cop Death*, NEWSDAY, May 8, 1992, at 21, *available at* 1992 WL 7531808.

313. *See* Harry Connick, *Five Not Railroaded, DA Says*, TIMES-PICAYUNE (New Orleans, La.), Jan. 20, 2001, at B6, *available at* 2001 WL 9380065; James Gill, Editorial, *Frame Ups Coming Back to Haunt the Law*, TIMES-PICAYUNE (New Orleans, La.), Jan. 5, 2001, at B7, *available at* 2001 WL 9377512; *Innocence and Execution*, WASH. POST, Apr. 17, 1993, at A22.

314. *See* Thomas Maier and Rex Smith, *Confessions: Reliance on Getting Confessions Tied to Abuses, Weakened Cases*, NEWSDAY, Dec. 7, 1986, at 5, *available at* 1986 WL 2405416; Thomas Maier, *Confessions: An Innocent Man Who Was Made to "Confess" to Murder*, NEWSDAY, Dec. 8, 1986, at 26, *available at* 1986 WL 2405720.

315. *See* People v. Salaam, 629 N.E.2d 371, 371 (N.Y. 1983); SULLIVAN, *supra* note 2, at 23–24.

316. *See* Salaam, 629 N.E.2d at 371; SULLIVAN, *supra* note 2, at 33–35.

317. *See* Gary Libow, *Suspect Cleared in Bus Arson: Haddam Man Pleads to a Lesser Charge Ending 5-Year Drama*, HARTFORD COURANT, Dec. 10, 1999, at A1, *available at* 1999 WL 30056765; Joseph O'Brien, *Man Says Confession Was False; Defendant Claims Fear of Jail Led to Lies in Bus Burning Case*, HARTFORD COURANT, June 2, 1995, at B1 [hereinafter, O'Brien, *Man Says Confession Was False*], *available at* 1995 WL 8664548; Joseph O'Brien, *Questioning of Suspect Criticized; Police Action Faulted in School Bus Action Case*, HARTFORD COURANT, June 1, 1995, at B1, *available at* 1995 WL 8664027.

318. *See* Mark Silk, *DeKalb Sued After Rape Case Against Boy Dropped*, ATL. J.-

942          *NORTH CAROLINA LAW REVIEW*          [Vol. 82

| 100 | Kenny Shannon | 1990[319] |
| 101 | Roderick Singleton | 1990[320] |
| 102 | Frank Lee Smith | 1986[321] |
| 103 | Patrick Smith | 1996[322] |
| 104 | Teresa Sornberger | 2000[323] |
| 105 | Derek Tice | 1998[324] |
| 106 | Jerry Frank Townsend | 1979[325] |
| 107 | Joshua Treadway | 1998[326] |
| 108 | Dianne Tucker | 1999[327] |
| 109 | Frederick Walrath | 1997[328] |
| 110 | Stevie Ray Weaver | 1999[329] |
| 111 | Jennifer Wilkinson | 1998[330] |

CONST., Dec. 4, 1993, at B3.

319. *See* Joe Jackson & Thomas Huang, *Police Transfers Followed Teens' False Confessions*, VIRGINIAN-PILOT (Norfolk, Va.), Dec. 16, 1990, at B1.

320. *See* Sorkin, *supra* note 236.

321. *See* Sydney Freedberg, *He Didn't Do It*, ST. PETERSBURG TIMES, Jan. 7, 2001, at 1A, *available at* 2001 WL 6956127; Dan Malone, *DNA Test Clears Man After Death: Condemned Inmate's Case May Prompt More Reviews*, DALLAS MORNING NEWS, Dec. 16, 2000, at 1A, *available at* LEXIS, News Library, Dalnews File.

322. *See* John Caher, *State Police Lose Three Rights-Violation Cases*, 223 N.Y. L.J. 1, 1 (2000).

323. *See* Karen McDonald, *Woman Made False Confession*, PEORIA J. STAR (Peoria, Ill.), May 12, 2000, at A1, *available at* 2000 WL 20637256; *Robbery Charges Dropped Against Couple After Four Months in Jail*, AP NEWSWIRES, May 10, 2000, *available at* Westlaw, APWIRES 20:36:00.

324. *See* Tice v. Commonwealth, 563 S.E.2d 412, 415 (Va. Ct. App. 2002).

325. *See* Freedberg, *supra* note 288; Ardy Friedberg, *Ex-Detective Hunted Suspect for 20 Years: Charges Bring Vindication for Investigator*, SUN-SENTINEL (Ft. Lauderdale, Fla.), Dec. 16, 2000, at 8A, *available at* 2000 WL 28996583; Ardy Friedberg & Jason Smith, *Townsend Released; Judge Cites "An Enormous Tragedy"; Attorneys Say Suspect Was Easily Led to Confess*, SUN-SENTINEL (Ft. Lauderdale, Fla.), June 16, 2001, at 1A, *available at* 2001 WL 22739186; Paula McMahon & Ardy Friedberg, *DNA Clears 21-Year Inmate; Review Reverses 2 Murder Cases; 4 Others Await*, SUN-SENTINEL (Ft. Lauderdale, Fla.), Apr. 28, 2001, at 1A, *available at* 2001 WL 2674405; Paula McMahon & Ardy Friedberg, *Evidence Could Free Inmate; After 21 Years, Jerry Frank Townsend Will See His 4 Broward Convictions Vacated*, SUN-SENTINEL (Ft. Lauderdale, Fla.), May 8, 2001, at 1B, *available at* 2001 WL 2676206.

326. *See* Sauer, *Crowe Case*, *supra* note 246.

327. *See Court Dismisses Guilty Plea in Baby's Death*, N.Y. TIMES, Aug. 12, 2002, at A9; *Woman Freed Amid Doubt "Victim" Existed*, N.Y. TIMES, July 18, 2002, at A13.

328. *See* Erick Gill, *Police Release Tape of Man's Call to 911*, PORT ST. LUCIE NEWS (Stuart, Fla.), Aug. 5, 1997, at A1, *available at* LEXIS, News Library, Stunws File; *Man Charged with Killing Wife Released for Lack of Evidence*, FORT PIERCE NEWS (Fort Pierce, Fla.), Sept. 5, 1997, at A2, *available at* LEXIS, News Library, Fpnews File.

329. *See* Will Anderson, *Barrow Files Charge Against "Railroad Killer"; Georgia Man Cleared of Murder in the 1998 Slaying of Woman Who Lived Near Railroad Tracks*, ATL. J.-CONST., Aug. 27, 2000, at 1F, *available at* LEXIS, News Library, AJC File.

330. *See Arrest Made in Deadly Pampano Home Invasion*, SUN-SENTINEL (Ft. Lauderdale, Fla.), Nov. 18, 1998, at 3B, *available at* 1998 WL 12841412; *Ault to Plead*

| 112 | Robert "Reds" Wilkinson | 1975[331] |
| 113 | Daniel Williams | 1998[332] |
| 114 | Fred Williams | 1990[333] |
| 115 | Peter Williams | 1992[334] |
| 116 | Ricky Williams | 1987[335] |
| 117 | Eric Wilson | 1998[336] |
| 118 | Kharey Wise | 1989[337] |
| 119 | John "Woody" Wood | 1990[338] |
| 120 | Aaron Wright | 1994[339] |
| 121 | Unnamed Juvenile 1 | 1998[340] |
| 122 | Unnamed Juvenile 2 | 1997[341] |
| 123 | Unnamed Juvenile 3 | 1996[342] |
| 124 | Unnamed Juvenile 4 | 1995[343] |
| 125 | Unnamed Juvenile 5 | 1998[344] |

*Guilty to Two More Felonies*, SUN-SENTINEL (Ft. Lauderdale, Fla.), Nov. 6, 1999, at 19B, *available at* 1999 WL 20292831.

331. *See Detectives in Prison*, WASH. POST, Nov. 9, 1979, at C1.

332. *See* Tice v. Commonwealth, 563 S.E.2d 412, 415 (Va. Ct. App. 2002).

333. *See* Jackson & Huang, *supra* note 278.

334. *See* Maurice Possley et al., *Veteran Detective's Murder Cases Unravel; Some Statements Cop Has Extracted Stand Out for Way They Fall Through*, CHI. TRIB., Dec. 17, 2001, § 1, at 1; *When Jail is No Alibi in Murders*, CHI. TRIB., Dec. 19, 2001, § 1, at 1.

335. *See* Andre Jackson, *Chapter Closes in National Killings Case*, ST. LOUIS POST-DISPATCH, Apr. 30, 1989, at D1; Tim Poor, *Innocent Suspects in Mass Murder Settle Suit with Police Board*, ST. LOUIS POST-DISPATCH, Sept. 14, 1990, at A1.

336. *See Tice*, 563 S.E.2d at 412.

337. *See* People v. Wise, 752 N.Y.S.2d 837, 846 (Sup. Ct. 2002); People v. Wise, 612 N.Y.S.2d 117, 117 (App. Div. 1994); SULLIVAN, *supra* note 2, at 19–20.

338. *See* Daniel de Vise & Wanda DeMarzo, *Behan Case Confession Key to Trial*, MIAMI HERALD, Sept. 25, 2002, at 4B; Daniel de Vise & Wanda DeMarzo, *Cops Accused of Coercing Confessions*, MIAMI HERALD, Sept. 26, 2002, at 1B.

339. *See* April Witt, *Police Tactics Taint Court Rulings, Victims' Lives*, WASH. POST, June 6, 2001, at A1.

340. *See* Noreen S. Ahmed-Ullah, *Youth Justice Study Urges Reforms*, CHI. TRIB., Apr. 12, 2001, § 4, at 1; Maurice Possley, *Files in Ryan Harris Case Shed New Light*, CHI. TRIB., Jan. 30, 2001, § 2, at 1.

341. *See* Ben Chanco, *Charges Filed in Year-Old Homicide; St. Paul Authorities Credit Witness's Help*, St. PAUL PIONEER PRESS, Mar. 21, 1998, at 1G, *available at* Westlaw, SP-PPD database; Heron Marquez Estrada, *Man Arrested in Fatal Beating That May Be Tied to Robbery*, STAR-TRIBUNE (Twin Cities, Minn.), Mar. 20, 1998, at B7.

342. *See* Karen Lee Ziner, *2 Boys in Court on Arson Charges*, PROVIDENCE J.- BULL., Oct. 29, 1996, at B01, *available at* 1996 WL 12471736; Karen Lee Ziner, *2 14-year-old Boys Arrested in Mill Fire*, PROVIDENCE J.-BULL., Oct. 27, 1996, at A01, *available at* 1996 WL 12472173.

343. *See* Kevin Moran, *New Charge Filed Against Arson Suspect/Confession Clears Boy Who Claimed He Set Fire*, HOUSTON CHRON., June 6, 1995, at A1, *available at* 1995 WL 5907221.

344. *See* Lawrence Hammack, *Despite Confessions, Boy Acquitted of Setting Fire Is Acquitted, Suspicion Is Not Proof, Judge Tells Him*, ROANOKE TIMES (Roanoke, Va.),

*B. Demographic Data*

Table 3 below presents the age breakdown of the false confessors in our study. Consistent with previous research,[345] juveniles, defined as persons under the age of eighteen, are over-represented in our sample of false confessions. In fact, juveniles comprise approximately one-third (33%) of our sample. More than half of the juvenile false confessors in our sample are ages fifteen and under (22/40), suggesting that children of this age group may be especially vulnerable to the pressures of interrogation and the possibility of false confession.[346] At the same time, the vast majority of juvenile false confessors in our sample (33/40) are ages fourteen to seventeen, the age range at which many alleged juvenile offenders are tried as adults.

There are good reasons why juveniles may be more vulnerable to police pressure during interrogations. Juveniles are, of course, less mature than adults and have less life experience on which to draw. As a result, they tend to be more naïve and more easily intimidated by police power, persuasion, or coercion. They are thus less equipped to cope with stressful police interrogation and less likely to possess the psychological resources to resist the pressures of accusatorial police questioning.[347] As a result, juveniles tend to be more ready to confess in response to police interrogation, especially coercive interrogation.[348]

When one looks beyond the juveniles in our sample, however, it

Sept. 22, 1998, at A1, *available at* LEXIS, News Library, Roanok File.

345. *See* GUDJONSSON, *supra* note 76, at 143.

346. One study has found that there is a correlation between age, the presentation of false evidence, suggestibility, and the proclivity to accept responsibility for an act not committed. Allison D. Redlich & Gail S. Goodman, *Taking Responsibility for an Act Not Committed: The Influence of Age and Suggestibility*, 27 LAW & HUM. BEHAV. 141, 156 (2003).

347. The United States Supreme Court has recognized that children and teenagers, due to their immaturity, lack of knowledge, and lack of experience, are more vulnerable to coercive police interrogation tactics. *See, e.g., In re Gault*, 387 U.S. 1, 55 (1967) (holding that "the greatest care must be taken to assure that [a minor's] confession was voluntary in the sense that it was not coerced or suggested, but also that it was not the product of ignorance of rights, or adolescent fantasy, fright, or despair"); Gallegos v. Colorado, 370 U.S. 49, 54 (1962) (finding statements of a fourteen-year-old to be involuntary and recognizing that minors have a lesser capacity to understand, much less exercise, their rights); Haley v. Ohio, 332 U.S. 596, 599–600 (1948) (finding confession of a fifteen year old, taken outside the presence of parents to be involuntary because "a lad of tender years is no match for the police"). *Cf.* Fare v. Michael C., 442 U.S. 707 (1979) (finding that statement of criminally sophisticated sixteen-year old was voluntary under the totality of the circumstances).

348. *See* GUDJONNSON, *supra* note 76, at 140–51.

is clear that an age bias persists.  Most false confessions in our sample come from the young.  The vast majority of false confessors are young adults in their twenties or thirties; it is comparatively rare in our sample that middle aged individuals confess falsely.  More than half of the false confessors in our sample were under the age of twenty-five (71/113 or 63%).  Virtually the entire false confession problem in our sample is limited to individuals under forty (104/113 or 92% of our sample).  Only 8% of the false confessors in our sample are over the age of forty.  To the extent that our sample is representative, this suggests that suspect's age is strongly correlated with the likelihood of eliciting a false confession.  Equally interesting, the overwhelming majority of our sample (116/125 false confessors or 93% of the false confessors) were men, a finding that is consistent with earlier studies.[349]

### TABLE 3
### AGE OF PROVEN FALSE CONFESSORS (N=113)[350]

| Age Range | # People | % |
| --- | --- | --- |
| Under 10 | 2 | 2% |
| 10–13 | 5 | 4% |
| 14–15 | 15 | 13% |
| 16–17 | 18 | 16% |
| 18–24 | 31 | 27% |
| 25–39 | 34 | 30% |
| 40–54 | 7 | 6% |
| Over 55 | 1 | 1% |

Table 4 presents the region of the country in which the false confessions occurred.  As the data demonstrate, the fewest false confessions occur in the Western (7%) and Northeastern (20%) areas, while the largest percentage of false confessions occur in the Southern (41%) and Mid-western (32%) areas.[351]  Interestingly, the

---

349. Leo & Ofshe, *Consequences*, *supra* note 76, at 444–49.

350. We were unable to obtain the age of the defendant for twelve false confessors, approximately 10% of our sample.

351. The regions in our study are identical to those used by the FBI in its annual reporting on crime statistics. *See* FBI, U.S. DEP'T OF JUSTICE, CRIME IN THE UNITED STATES 2002: UNIFORM CRIME REPORTS app. III, at 457, http://www.fbi.gov/ucr/cius-02/pdf/7back.pdf (last visited Mar. 3, 2004) (on file with the North Carolina Law Review). The states in the region are as follows: Northeastern (Connecticut, Maine, Massachusetts,

false confession problem in our sample is dominated by several states: twenty-seven (or 22%) of the false confessions occurred in the State of Illinois (fourteen coming from the city of Chicago); seventeen (or 14%) of the false confessions occurred in the State of New York; thirteen (or 10%) of the false confessions occurred in the State of Florida; and ten (or 8%) of the false confession cases occurred in the State of Virginia; and eight (or 6% of the false confessions) occurred in California and Maryland.

### TABLE 4
### REGION OF THE COUNTRY (N=125)

| Region | # People | % |
|---|---|---|
| Midwestern | 40 | 32% |
| Northeastern | 25 | 20% |
| Southern | 51 | 41% |
| Western | 9 | 7% |

### C. Case Characteristics

Table 5 below presents the most serious reported crime in which the individual who falsely confessed was involved. As can be seen, the overwhelming majority of false confessions (81%) occur in murder cases. The second largest category is rape (9%) followed by arson (3%). Not surprisingly, false confessions tend to be concentrated in the most serious and high profile cases, lending credence to the argument that false confessions—as well as wrongful convictions based on false confession—are more likely to occur in the most serious cases because there is more pressure on police to solve such cases.[352]

---

New Hampshire, New Jersey, New York, Pennsylvania, Rhode Island, and Vermont), Midwestern (Illinois, Indiana, Iowa, Kansas, Michigan, Minnesota, Missouri, Nebraska, North Dakota, Ohio, South Dakota, and Wisconsin), Southern (Alabama, Arkansas, Delaware, District of Columbia, Florida, Georgia, Kentucky, Louisiana, Maryland, Mississippi, North Carolina, Oklahoma, South Carolina, Texas, Virginia, and West Virginia) and Western (Alaska, Arizona, California, Colorado, Hawaii, Idaho, Montana, Nevada, New Mexico, Oregon, Utah, Washington, and Wyoming).

352. *See* Gross, *supra* note 56, at 475–79.

**TABLE 5**
**MOST SERIOUS REPORTED CRIME TO**
**WHICH INDIVIDUAL FALSELY CONFESSED (N=125)**

| Crime | # People | % |
|---|---|---|
| Murder | 101 | 81% |
| Attempted Murder | 2 | 2% |
| Rape | 11 | 9% |
| Armed Robbery | 2 | 2% |
| Arson | 4 | 2% |
| Assault | 2 | 2% |
| Kidnapping | 1 | 1% |
| Theft | 1 | 1% |
| Terrorism | 1 | 1% |

However, as Table 6 below indicates, in the cases in which the suspect confessed falsely to multiple crimes, a significant percentage of the suspects also confessed to rape (approximately 26% of the false confessors in the sample) and robbery (approximately 18% of the false confessors in the sample).

**TABLE 6**
**ALL REPORTED CRIMES TO**
**WHICH INDIVIDUAL FALSELY CONFESSED (N>125)**

| Crime | # People | % |
|---|---|---|
| Murder | 101 | 81% |
| Rape | 33 | 26% |
| Robbery | 23 | 18% |
| Arson | 7 | 6% |
| Assault | 4 | 3% |
| Kidnapping | 2 | 2% |
| Theft | 2 | 2% |

Table 7 presents the length of reported interrogation in the cases in which, based on the materials we were able to obtain, it could be determined. Unfortunately, the length of interrogation either was not reported or could not be determined in almost two-thirds (65%) of the sample. This results, in part, from the almost complete failure of the police to record the interrogations in these proven false confession cases. This is regrettable considering how frequently in these cases the police and the suspect subsequently disputed what occurred during the interrogation and how these disputes, when the case went to trial, became the classic "swearing contest," pitting the suspect's recollections against the interrogators' and thus forcing the judge and/or the jury to make factual and legal inferences based on credibility judgments rather than on the objective and undisputed record that would have existed had the interrogator(s) chosen to memorialize the questioning on tape. As can be seen clearly in these cases after the confession was eventually proven false, the interrogator's version of what occurred turned out to be far less accurate than the confessor's.

Of the cases in which the length of interrogation was either reported or could be determined, 16% lasted less than six hours; 34% between six and twelve hours; 39% between twelve and twenty-four hours; 7% between twenty-four to forty-eight hours; 2% between forty-eight and seventy-two hours; and 2% between seventy-two and ninety-six hours. These numbers are staggering. More than 80% of the false confessors were interrogated for more than six hours, and 50% of the false confessors were interrogated for more than twelve hours. The average length of interrogation was 16.3 hours, and the median length of interrogation was twelve hours. These figures are especially striking when they are compared to studies of routine police interrogations in America, which suggest that more than 90% of normal interrogations last less than two hours.[353] These figures supports the observations of many researchers that interrogation-induced false confessions tend to be correlated with lengthy interrogations in which the innocent suspect's resistance is worn down, coercive techniques are used, and the suspect is made to feel hopeless, regardless of his innocence.[354]

---

353. Leo, *Inside the Interrogation Room*, *supra* note 76, at 279.

354. *See* Johnson, *supra* note 166, at 732; Ofshe & Leo, *Decision to Confess Falsely*, *supra* note 76, at 997–98; White, *supra* note 94, at 143–45.

### TABLE 7
### LENGTH OF REPORTED INTERROGATION (N=44)[355]

| Length | # People | % |
|---|---|---|
| Less than 6 hours | 7 | 16% |
| 6 to 12 hours | 15 | 34% |
| 12 to 24 hours | 17 | 39% |
| 24 to 48 hours | 3 | 7% |
| 48 to 72 hours | 1 | 2% |
| 72 to 96 hours | 1 | 2% |

#### D.   Case Outcomes

As Leo and Ofshe have pointed out, virtually all false confessions result in some deprivation of the false confessor's liberty.[356] Some scholars have focused only on false confession cases leading to wrongful conviction,[357] but this neglects the amount of harm the system imposes on those who are not convicted. Individuals who are coerced into falsely confessing but ultimately not convicted may still lose their freedom for extended periods of time and suffer a number of other significant corollary harms as well: the stigma of criminal accusation (particularly if the person has falsely confessed to serious crimes such as murder or rape), the ongoing damage to their personal and professional reputation (even if charges are dropped or the innocent defendant is eventually acquitted), loss of income, savings, a

---

355. We were only able to obtain the length of reported interrogation in slightly more than one-third of the cases we studied. In some of these cases, we possessed case records from which we could deduce the length of actual interrogation. In other cases, however, we were only able to obtain newspaper accounts of the reported length of the interrogation and were not able to independently verify their accuracy. One potential problem that concerned us is that lawyers will sometimes report the length of time in custody as the length of actual interrogation. As a result, the length of interrogation may be disputed between the parties. Of course, some police departments intentionally let suspects "stew" in custody as part of their interrogation strategy. *See* Richard A. Leo, *The Impact of Miranda Revisited*, 86 J. CRIM. L. & CRIMINOLOGY 621, 661 (1996). If police electronically recorded interrogations from start to finish, there would be no disputes about how long the suspect was questioned.

356. Leo & Ofshe, *Truth About False Confessions*, *supra* note 155, at 310.

357. Stanley Fisher, *Convictions of Innocent Persons in Massachusetts: An Overview*, 12 B.U. PUB. INT. L.J. 1 (2002).

job or career (sometimes resulting in bankruptcy), and the emotional strain of being apart from one's friends and family (which sometimes results in marital separation or divorce). To those innocents who suffer these unjust fates, the assertion by some scholars[358] that only false confessions leading to wrongful convictions should count for scholarly inquiry or public policy reform or that only false confessions leading to wrongful convictions impose any meaningful harm is obviously misguided and myopic, if not downright cruel. As Leo and Ofshe have pointed out in another context, "all of these individuals spent an avoidable, unjustified and sometimes lengthy period of time deprived of their liberty by the State. All suffered inexcusably only because they were made to falsely confess by police."[359] When police wrongly arrest an individual, when police use psychologically coercive or prohibited techniques to extract a false confession from an innocent individual, and when prosecutors wrongly charge and prosecute an innocent individual who has been made to falsely confess, the system's errors have imposed significant harm on innocent individuals—harms that deserve to be taken seriously by scholars and policy-makers.

One metric for measuring the harm suffered by false confessors in this sample is the extent of the deprivation of liberty. The length of deprivation may vary from a brief arrest to pre-trial incarceration pending trial to imprisonment for years to lifelong incarceration or even the death penalty. Table 8 below provides a broad overview of the magnitude of this type of harm suffered across the cases in this sample, showing the points in the criminal process where individuals dropped out or landed. Interestingly, ten (8%) of the false confessors were arrested and detained, but never charged, because the police or prosecutors realized their errors before the charging decision. Another sixty-four individuals (more than 50% of the sample) were indicted, but charges were dropped prior to trial. In these cases, prosecutors either chose to drop charges because they eventually realized the defendant's factual innocence or they were forced to drop charges because a trial judge suppressed the confession as involuntary, leaving the prosecution with no evidence with which to proceed forward against the factually innocent defendant. Adding the percentages for these two groups (the false confessors who were never charged and the false confessors for whom charges were dropped prior to trial) reveals one of the more interesting findings of this data set: *approximately 60% of the false confessors in this sample*

---

358. *See* Cassell, *supra* note 156.
359. Leo & Ofshe, *Truth About False Confessions*, *supra* note 155, at 310.

*were never taken to trial or forced to take a plea bargain*, a figure that is striking when compared to the Leo and Ofshe study (wherein only 23/60 or 38% of the false confessors were not taken to trial or forced to take a plea bargain).[360]

There are at least two important observations to make at this point: first, unlike Leo and Ofshe's study of sixty false confessions, our sample of 125 includes only *proven* false confessions, not *highly probable* or *probable* ones.[361] As a result, the higher level of certainty in our study may translate into earlier detection and dismissal of the false confessions because unambiguously false confessions cases should, in theory, be easier to detect at earlier stages in the criminal justice process: whereas approximately two-thirds (65%) of our sample did not result in convictions, approximately one-half (52%) of Leo and Ofshe's sample did not result in convictions. Second, to the extent that our sample is representative, it appears that false confessions are being recognized as such earlier in the criminal justice process than in previous years, most likely as a result of advances in DNA technology but possibly also as a result of the increasing use of audio and video recording during interrogation. In addition to the seventy-four individuals who were not charged or against whom charges were dropped, seven false confessors (or 6% of the sample) were prosecuted but nevertheless acquitted. Thus, eighty-one false confessors (approximately two-thirds of our sample) were never convicted.

The remaining forty-four cases (comprising 35% or slightly more than one-third of the sample) resulted in conviction and incarceration: in these cases, the police arrested a factually innocent individual; the police then chose to subject that individual to a psychologically coercive interrogation that resulted in a false confession; the prosecution filed charges against the false confessor, convincing a judge that probable cause existed to believe the factually innocent defendant had committed the crime or crimes (typically murder) for which there was no meaningful evidence other than a questionable confession; pre-trial motions by defense counsel (when they were brought) failed to result in suppression of the false confession (despite the fact that the confession was subsequently proven false); and a jury (typically of twelve) unanimously agreed that the factually innocent defendant was guilty of the accused

---

360. Leo & Ofshe, *Consequences, supra* note 76, at 472–73.

361. Thirty-four of the sixty false confessions in Leo & Ofshe's study were *proven* false confessions. Of these proven false confessions, eighteen (or 53%) were not forced to take their case to trial or enter a plea bargain, and fifteen (44%) were convicted. *See id.* at 483.

crime(s) beyond any reasonable doubts. The process that produces this outcome, as well as the outcome itself, is, in a word, stunning. Though we are accustomed, in the age of DNA, to witnessing factually innocent but wrongfully convicted individuals walk out of prison on a regular basis, the production of a wrongful conviction is anything but mundane. These forty-four cases (as well as all wrongful conviction cases) represent a complete failure, if not breakdown, in the procedural safeguards and discretionary decision-making of the criminal justice system. This outcome can only occur if there are multiple and conjunctural errors made by numerous criminal justice officials and triers of fact, who, at every stage of the criminal process, fail to identify and reverse the errors that occurred at earlier stages in the process. In the cases of wrongful conviction in our sample, 80% (35/44) of the false confessors received prison sentences of longer than ten years. While the length of sentence may not be surprising in light of the severity of the crimes for which they were convicted, this finding underscores the potential risk of putting a false confession before a trier of fact even though the defendant is factually innocent. Although no false confessor in our sample was executed (unlike in the earlier Leo and Ofshe study), nine (or more than 21% of the false confessors who were wrongfully convicted, for whom such data was available) were sentenced to death.[362]

---

362. The following individuals in our database were sentenced to death: Rolando Cruz, Gary Gauger, Hubert Geralds, Alejandro Hernandez, Ronald Jones, David Keaton, Robert Lee Miller, Johnny Ross, and Frank Lee Smith.

## TABLE 8
### MAGNITUDE OF HARM RESULTING FROM FALSE CONFESSION
### (N=125)

| Degree of Deprivation of Liberty (N=125) | Total | Percentage (N=125) |
|---|---|---|
| Arrest and Detention—Never Charged | 10 | 8% |
| Prosecutions (unsuccessful) | 71 | 57% |
| Convicted | 44 | 35% |
| | | |
| **Unsuccessful Prosecutions (N=71)** | | **(N=71)** |
| Charges Dropped Before Trial | 64 | 90% |
| Acquitted | 7 | 10% |
| | | |
| **Convictions (N=44)** | | **(N=44)** |
| Guilty Plea | 14 | 32% |
| Jury | 28 | 64% |
| Judge | 2 | 5% |
| | | |
| **Sentences (N=44)** | | **(N=44)[363]** |
| Less than 5 years | 3 | 7% |
| 5–10 years | 6 | 14% |
| 10–20 years | 8 | 18% |
| More than 20 years | 8 | 18% |
| Life | 10 | 23% |
| Death Penalty | 9 | 20% |

363. In a few of the cases in our database, the individual was first convicted of and sentenced for a serious felony crime (such as murder or arson) before their factual innocence was discovered or acknowledged, at which point the prosecutor offered only to dismiss charges or release the defendant if he or she pled to a lesser crime, such as the misdemeanor of "hindering prosecution by falsely confessing" or the misdemeanor of "tampering with physical evidence." See, for example, the cases of Medell Banks, *supra* note 222 and accompanying text, and David Saraceno, *infra* notes 657–64 and accompanying text. In these types of cases, we coded the length of the sentence to which the individual was initially sentenced.

954          *NORTH CAROLINA LAW REVIEW*          [Vol. 82

Tables 9 and 10 below list the amount of time served by two distinctly different subgroups of our sample of false confessors. Table 9 lists the length of pre-trial incarceration (or liberty deprived) for false confessors who were never convicted. We were able to obtain data on fifty of the eighty-two individuals who were never convicted (approximately two-thirds of the relevant sample). Of that group, almost one-third (32%) spent less than a month in pre-trial custody. Thirty percent of this group spent between one and six months in pre-trial custody, and 38% of this group spent more than seven months in pre-trial custody. Surprisingly, almost one-fourth (24%) of the sample spent more than one year in pre-trial custody. As argued above, these figures underscore the obvious and important point that even false confessors who are not wrongfully convicted suffer a significant deprivation of liberty on the road to the dismissal of their case.

**TABLE 9**
**LENGTH OF PRE-TRIAL CUSTODY**
**FOR INDIVIDUALS NEVER CONVICTED (N=50)**

| Months/Years | # People | % |
|---|---|---|
| Less than 1 month | 16 | 32% |
| 1 to 2 months | 4 | 8% |
| 2 to 6 months | 11 | 22% |
| 7 months to 1 year | 7 | 14% |
| More than 1 year | 12 | 24% |

Table 10 notes the length of post-conviction incarceration for those false confessors who were wrongly convicted (for whom we could obtain such data). While Table 8 above lists the sentence received for the false confessors who were wrongfully convicted, Table 10 below lists the amount of time that they actually served. While only 9% served less than a year, approximately one-third of the sample (30%) of this group of individuals served between one and five years in prison, and slightly more than one-third of this sample (34%) served between six and ten years in prison for crimes they did not commit. Another 25% of this sample served between eleven and twenty years before their factual innocence was established and/or they were released from prison. All told, more than two-thirds (73%)

of the false confessors who were convicted (and for whom we could obtain data) served less than ten years in prison, while a little less than one-third of this group (27%) served more than ten years in prison.   One individual, Jerry Frank Townsend, served more than twenty years in prison before it was discovered that several murders which he had confessed to were actually committed by a serial killer named Eddie Lee Moseley.   For all of the false confessors who are reduced to statistics in Table 10, the safeguards built into the criminal justice system failed to prevent wrongful prosecution and conviction, lengthy incarceration, and, in some instances, years on death row.

## TABLE 10
### LENGTH OF INCARCERATION
### FOR INDIVIDUALS WHO WERE CONVICTED (N=44)

| Years | # People | % |
|---|---|---|
| Less than 1 year | 4 | 9% |
| 1 to 5 years | 13 | 30% |
| 6 to 10 years | 15 | 34% |
| 11 to 20 years | 11 | 25% |
| Greater than 20 years | 1 | 2% |

### E.   Sources of Exoneration

Scholars who study miscarriages of justice are interested not only in the causes and consequences of wrongful conviction, but also the sources that lead to the exoneration of the factually innocent.[364]   As mentioned earlier,[365] there are only four ways in which a defendant can prove his confession false beyond any reasonable doubt.   As Table 11 below indicates, in the case of eight individuals (6% of the sample), the confession was proven false because it could be demonstrated that no crime occurred.   For example, Medell Banks, Victoria Banks, and Dianne Tucker all falsely confessed to killing a baby that could not have been born and thus did not exist.   In the case of eleven individuals (9% of the sample), the confession was proven false because it could be demonstrated that it was physically impossible for the confessor to have committed the crime.   For

---

364.   Bedau & Radelet, *supra* note 47, at 64–71.
365.   *See supra* notes 188–97 and accompanying text.

example, Miguel Castillo could not have committed the murder he confessed to because he was in the Cook County jail at the time the victim was killed. In the case of fifty-seven individuals (46% of the sample), scientific evidence demonstrated that the confession was false. For example, Frank Kuecken and Jonathan Kaled were cleared when ballistics evidence linked a gun found in the possession of two other men to the murder of Justin Mello, the crime to which both Kuecken and Kaled had confessed.[366] In forty-six of these cases (37% of the sample, 81% of the scientific exonerations), DNA was the scientific evidence by which the confession was proven false. Finally, the largest number of individuals (92/125 or 74% of the sample) had their confession proven false because the true perpetrator was identified. For example, Gary Gauger, who was convicted and sentenced to die for the murder of his parents Morris and Ruth Gauger, was exonerated when federal authorities overheard a member of the Outlaws motorcycle gang on tape bragging about killing Gauger's parents.[367]

### TABLE 11
### SOURCE OF EXONERATION (N=125)

| Type of Exoneration | # People | %[368] |
| --- | --- | --- |
| No Crime Occurred | 8 | 6% |
| Physical Impossibility | 11 | 9% |
| Scientific Evidence | 57 | 46% |
| True Perpetrator Identified | 92 | 74% |

Table 12 below summarizes the fates of false confessors in our sample. As can be seen, ten false confessors (8% of the sample) were exonerated prior to being charged (either police chose not to persuade the prosecutor to file charges or the prosecutor chose not to file charges despite the wishes of police); sixty-four false confessors (more than 50% of the sample) had their charges dropped prior to trial (either the prosecutor dismissed charges on his own or after the

---

366. *See* Hunt, *supra* note 287; Scotta & Halcom, *supra* note 287.

367. *See* Cole, *supra* note 261; *Cleared of Charges, Man Now Seeks Compensation*, AP NEWSWIRES, Oct. 8, 1999, *available at* Westlaw, AP Wires 02:13:00.

368. The percentages exceed 100% because some of the cases had more than one source of exoneration.

2004] *FALSE CONFESSIONS IN THE POST-DNA WORLD* 957

confession was suppressed by the judge); seven false confessors (6% of the sample) were acquitted at trial; fourteen false confessors (11% of the sample) chose to enter a plea bargain, despite their innocence; and thirty false confessors (24% of the sample) were convicted at trial. Altogether, then, eighty-one false confessors (65% or approximately two-thirds of the sample) were exonerated without first being convicted, while more than one-third of the sample (forty-four individuals) were wrongfully convicted.

## TABLE 12
### FATE OF FALSE CONFESSORS IN THE CRIMINAL PROCESS (N=125)

| Fate of False Confessor | # People | % |
| --- | --- | --- |
| Defendant Never Charged | 10 | 8% |
| Charges Dropped Pre-trial | 64 | 51% |
| Defendant Acquitted | 7 | 6% |
| Defendant Pled Guilty | 14 | 11% |
| Defendant Convicted at Trial | 30 | 24% |

Table 13 lists the fate of those individuals who were convicted, most of whom have been officially exonerated. Thirty-seven of the false confessors who were wrongfully convicted have subsequently been officially exonerated and/or released from prison for the crimes to which they falsely confessed, two false confessors, tragically, died in prison while serving time for crimes they did not commit (John Jeffers[369] and Frank Lee Smith[370]) while five convicted false confessors (Victoria Banks,[371] Joseph Dick,[372] Derek Tice,[373] Daniel Williams,[374] and Eric Wilson[375]) still remain incarcerated despite the undeniably dispositive evidence of their innocence. At least three others remain incarcerated on other crimes (Hubert Geralds,[376] Andre Jones,[377] Stevie Ray Weaver[378]).

---

369. *See supra* note 282 and accompanying text
370. *See supra* note 321 and accompanying text.
371. *See supra* note 223 and accompanying text.
372. *See supra* note 252 and accompanying text.
373. *See supra* note 324 and accompanying text.
374. *See supra* note 332 and accompanying text.
375. *See supra* note 336 and accompanying text.
376. *See supra* note 263 and accompanying text.
377. *See supra* note 285 and accompanying text.
378. *See supra* note 329 and accompanying text.

### TABLE 13
### FATE OF FALSE CONFESSORS POST-CONVICTION (N=44)

| Fate of False Confessor | # People | % |
|---|---|---|
| Remains Incarcerated | 5 | 11% |
| Died in Prison | 2 | 5% |
| Released | 37 | 84% |

Table 14 indicates the reasons for the convicted false confessors' releases. Of the thirty-seven convicted false confessors who were released from prison, fifteen had their convictions overturned by an appellate court, while thirteen convicted false confessors were released from prison early, and thus officially exonerated, for non-judicial reasons—typically because DNA testing established their factual innocence. Nine convicted false confessors served their sentences and were never officially exonerated, despite the fact that their factual innocence was subsequently proven. Several convicted false confessors—such as the five juveniles who were wrongfully convicted in the Central Park Jogger Case—served their full prison sentence before their factual innocence was established and they were officially exonerated.

### TABLE 14
### REASONS FOR RELEASE OF CONVICTED FALSE CONFESSORS (N=37)

| | # People | % of People |
|---|---|---|
| Appellate Court Overturned Conviction | 15 | 41% |
| Defendant Released for Non-judicial Reasons | 13 | 35% |
| Defendant Served Full Sentence | 9 | 24% |

### F.   Risk of Miscarriage of Justice

The advent of DNA technology and its application to the criminal justice system has now demonstrated beyond any doubt that wrongful convictions occur in America, that they occur with troubling frequency and regularity (despite all the so-called procedural safeguards in the American adversary system),[379] and that the main causes of wrongful conviction have been identified. As research prior to the development of DNA technology[380] also indicated, it is clear that eyewitness misidentification is the most common cause of miscarriages of justice. In Scheck et al.'s study of the first sixty-two DNA exoneration cases, mistaken eyewitness identifications were involved in 84% of these cases,[381] followed by several other errors that occurred more commonly in Scheck et al.'s sample than did false confession: serology inclusion,[382] (62%), police misconduct (50%),[383] prosecutorial misconduct (42%),[384] defective or fraudulent science (34%),[385] microscopic hair comparison (29%),[386] and incompetent or ineffective legal representation (17%).[387] In Scheck et al.'s study, false confessions occurred in 24% of the cases of wrongful conviction,[388] a figure that, as we have seen above, is roughly consistent with earlier studies.[389]

But not all sources of error are created equal. Just because an error may occur more commonly does not necessarily mean that it is more likely to lead to a wrongful conviction when it does occur; some errors may lead to high rates of prosecution and conviction, no matter how frequently or infrequently they occur, while others may not. To put it differently, not all sources of error create the same risk of wrongful conviction. Unfortunately, because we do not know the underlying incidence of wrongful convictions, we do not know what percentage of the time any particular error (such as an eyewitness

---

379.  *See* WRONGLY CONVICTED, *supra* note 55, at 246–48.

380.  *See* BORCHARD, *supra* note 44, at 367; FRANK & FRANK, *supra* note 47, at 199–249.

381.  *See* SCHECK ET AL., *supra* note 64, at 263.

382.  " 'Serology inclusion' refers to ABO and protein blood typing of semen, saliva, and bloodstains." *Id.* at 263.

383.  *Id.*

384.  *Id.*

385.  *Id.*

386.  *Id.*

387.  *Id.*

388.  *Id.*

389.  *See supra* notes 47–57 and accompanying text.

misidentification or false confession) is likely to lead to a miscarriage of justice. However, based on earlier experimental[390] and field research[391] on the impact of confession evidence, there is very good reason to believe that false confessions, when they occur, are very likely to lead to the wrongful prosecution, conviction, and incarceration of the factually innocent—that, as Kassin and Neumann have found in experimental studies, confessions may be "uniquely potent"[392] relative to other forms of (falsely) incriminating evidence in their ability to cause wrongful convictions.

Table 15 below captures the risks of justice miscarrying in our sample of 125 proven false confession cases. Interrogation-induced false confessions may lead to wrongful conviction either when a suspect pleads guilty to avoid an anticipated harsher punishment or when a judge or jury convicts the false confessor at trial. Table 15 reports the risk of conviction that false confessors face if they choose to take their case to trial. As we have already seen, seventy-four (59%) of the false confessors in our sample did not have to decide whether to take their cases to trial because the prosecutor either did not file charges (8% of the false confessions) or the prosecutor chose, or was forced, to dismiss charges prior to going to trial (51% of the false confessors in our sample). In the remaining fifty-one false confessions (41% of our sample), fourteen (11% of the entire sample) chose to plead guilty rather than take their case to trial and face the harshest possible punishment despite the fact that they were innocent, while the remaining thirty-seven false confessors (30% of the entire sample) chose to take their cases to trial. Of the thirty-seven false confessors (30% of the entire sample) who took their case to trial, thirty (24% of the entire sample) were convicted. As Table 14 indicates, however, 81% of the false confessors who chose to take their case to trial (30/37) were wrongfully convicted. In other words, approximately four out of every five innocent individuals who chose to take their case which was typically based on nothing more than a confession that was subsequently *proven* false—were wrongfully convicted!

These deeply troubling figures reflect one of the most serious

---

390. *See generally* Kassin & Neumann, *supra* note 76, at 480 (arguing that experimental results indicate that confession is seen as the most incriminating type of evidence); Kassin & Sukel, *supra* note 76, at 35 (arguing that empirical evidence suggests that confessions increase conviction rate, regardless of whether the confession is seen as coerced).

391. *See generally* Leo & Ofshe, *Consequences, supra* note 76, at 440 (arguing that confession evidence biases the trier of fact's evaluation of the case, favoring prosecution and conviction).

392. Kassin & Neumann, *supra* note 76, at 469.

aspects of the false confession problem in America. Consistent with both earlier experimental[393] and field research,[394] these figures suggest that confession evidence is inherently prejudicial and highly damaging to a defendant, even if it is the product of coercive interrogation, even if it is supported by no other evidence, and even if it is ultimately proven false beyond any reasonable doubt. In other words, in the overwhelming majority of cases that go to trial, confessions (even if they are demonstrably false) almost always seal the defendant's fate—either by leading the innocent defendant to choose to accept a plea bargain or, more commonly, by leading a judge or jury to wrongfully convict the factually innocent defendant. It is remarkable that more than four-fifths of the false confessors in our sample who chose to take their case to trial were convicted. To put it another way, if our sample is representative of the underlying population of false confessors in America, a false confessor who chooses to take his case to trial stands more than an 80% chance of conviction, despite the fact that he is officially presumed innocent, that he is in fact innocent, and that there is no reliable evidence confirming or supporting his false confession. Moreover, this figure does not appear to be anomalous since it is consistent with Leo and Ofshe's finding that 73% of the false confessors (in their study of sixty cases) who chose to take their cases to trial were also wrongfully convicted.[395]

These figures are all the more remarkable when we consider the number of false confessors in both studies—seven (or 12%) in Leo and Ofshe's sample of sixty, fourteen (or 11%) in our sample of 125—who chose to plead guilty rather than take their case to trial. As Leo and Ofshe have pointed out, "if it seems counter-intuitive that an innocent person would confess falsely, the specter of an innocent false confessor pleading guilty seems fantastic. Yet this is not uncommon."[396] If we consider all the false confessors in our sample whose cases were not dismissed prior to trial, more than 85% (44/51) resulted in conviction (either by plea bargain or by trial)—despite the fact that there was no reliable evidence supporting their guilt, that their confession was typically internally inconsistent and/or externally contradicted, and that their innocence was ultimately proven. In other words, fifty-one false confessors who were factually innocent

---

393. *See* Kassin & Neumann, *supra* note 76, at 480; Kassin & Sukel, *supra* note 76, at 41.

394. *See* Leo & Ofshe, *Consequences*, *supra* note 76, at 440.

395. *Id.* at 483.

396. *Id.* at 478. Leo & Ofshe cite Michael Radelet et al., *supra* note 53 (documenting nearly twenty cases in which individuals entered guilty pleas to capital (or potentially capital) crimes of which they were entirely innocent).

had to make a decision about whether to take a plea bargain and agree to a reduced sentence (despite their obvious innocence) or to take their case to trial and face the harshest possible punishment (typically the death penalty).

Even in the age of DNA testing, perhaps it should not be surprising that police interrogators continue to extract demonstrably false confessions (despite the *Miranda* warnings and a host of other procedural safeguards), that prosecutors continue to erroneously indict and prosecute the innocent, and that judges and juries continue to convict factually innocent individuals based on uncorroborated and ultimately false confession evidence. The findings reported in Table 15 demonstrate that, as Leo and Ofshe have noted,[397] a false confession is always a potentially dangerous piece of evidence to put before a trier of fact, even when the defendant is factually innocent. These figures underscore the observation that criminal justice officials and lay jurors often treat confession evidence as dispositive or uniquely persuasive, so much so that they will allow it to outweigh even strong evidence of a suspect's factual innocence. As Kassin and his colleagues have demonstrated in the laboratory,[398] confession evidence substantially biases the trier of fact's evaluation of the case in favor of the prosecution and conviction—exercising profound and context-resistant impact on jurors[399]—even when the defendant's uncorroborated confession was elicited by coercive methods and the other case evidence strongly supports his innocence. Like Leo and Ofshe's study, this Article's findings indicate that real-world jurors simply fail to appropriately discount false confession evidence and thus that false confession evidence is highly, if not inherently, prejudicial to the fate of any innocent defendant in the American criminal justice system.

---

397. *See* Leo & Ofshe, *Consequences, supra* note 76, at 444–49.

398. *See* Kassin & Neumann, *supra* note 76, at 475–76, 478, 480–81; Kassin & Sukel, *supra* note 76, at 38–41.

399. *See* Kassin & Neumann, *supra* note 76, at 481–83; Kassin & Sukel, *supra* note 76, at 42.

2004]   *FALSE CONFESSIONS IN THE POST-DNA WORLD*   963

### TABLE 15
### RISK OF A MISCARRIAGE ATTRIBUTABLE TO A FALSE CONFESSION
### (N=125)

| Outcome of Confessor | Number | Risk of a Miscarriage | Risk of Conviction at Trial |
|---|---|---|---|
| Released Prior to Decision | 74 (59%) | | |
| Pled Guilty | 14 (11%) | 11% | |
| Acquitted at Trial | 7 (6%) | | 19% |
| Convicted at Trial | 30 (24%) | 24% | 81% |
| Totals | 125 (100%) | 35% | |

## IV. FALSE CONFESSIONS AND CASE OUTCOMES: QUALITATIVE TRENDS

### A.   *Vulnerable Populations: Children*

One of the most troubling findings in our study concerns the number of young children who falsely confessed to serious crimes they did not commit. In our sample, we found seven children under the age of fourteen who were the victims of interrogation-induced confessions. Authorities in Providence, Rhode Island, pressured a nine-year-old boy to confess[400] to setting a fire which destroyed the town's American Tubing and Webbing Factory; a ten-year-old boy in Salem, Virginia, falsely confessed to setting a series of fires,[401] as did a ten-year-old in Galveston, Texas,[402] who was charged with both arson and murder before authorities arrested the real perpetrator. In Omaha, Nebraska, in 1998, police coerced a false confession from Anthony Johnson, an eleven-year-old boy, to the murder of his eighty-three-year-old neighbor, Sally Leu.[403] Another boy, Jeremy

---

400. *See supra* note 342.

401. Laurence Hammack, *Despite Confessions, Boy Acquitted of Setting Fire*, ROANOKE TIMES (Roanoke, Va.), Sept. 22, 1998, at A1, *available at* 1998 WL 5908531.

402. Kevin Moran, *Jury Clears Policemen of Forcing Confession*, HOUSTON CHRONICLE, Aug. 2, 1995, at A20, *available at* 1995 WL 9396851.

403. *See supra* note 283. Police interrogated the boy for over seven hours during the middle of the night, repeatedly accusing him of lying, and denying his requests to see his mother. *Id.*

Garner, later confessed, was convicted, and sentenced to life in prison.[404]

Of all the proven false confessions involving very young children,[405] perhaps the most notorious case involves two boys, aged seven and eight, who were charged with the murder of eleven-year-old Ryan Harris in the summer of 1998, only to be exonerated when DNA evidence later identified the true perpetrator. It is this case to which we now turn.

### 1. Ryan Harris

On July 27, 1998, an eleven-year-old girl named Ryan Harris, living with her godmother for the summer in Chicago's Englewood neighborhood so she could attend summer camp, disappeared.[406] She was last seen riding her shiny blue Road Warrior bike away from her

---

404. *Id.* The Nebraska Supreme Court later specifically condemned the police tactics which led to Johnson's false confession. *See* Nebraska v. Garner, 614 N.W.2d 319, 325 (Neb. 2000).

405. Four other confessions involving pre-teens fell just short of our standards for "proven false confessions," but illustrate the dangers of using coercive interrogation tactics on very young children. B.M.B., a ten-year-old black boy in Kansas, was convicted of the digital rape of a five-year-old white girl, after he confessed to authorities under highly suggestive questioning that he might have "accidentally" touched the girl's vagina when he was playing in a sandbox with her. *In re* B.M.B., 955 P.2d 1302, 1309 (Kan. 1998). Lacresha Murray, an eleven-year-old black girl from Austin, Texas, was twice convicted of killing Jayla Belton, a two-year-old girl who was visiting her home. *In re* L.M., 993 S.W.2d 276, 281 (Tex. App. 1999). Authorities persuaded Belton to admit, after several hours of coercive tactics, that she might have accidentally "dropped" and "kicked" the girl as she was carrying her. *Id.* at 285. Anthony Harris, a twelve-year-old black boy with no prior criminal record, confessed to and was convicted of murdering his five-year-old white neighbor Devan Duniver in New Philadelphia, Ohio. *In re* Harris, No. 1999 AP 030013, 2000 WL 748087, at *4 (Ohio Ct. App. June 7, 2000). An audio tape of the interrogation revealed that none of the details of how the murder was committed were known by Harris; instead, these details were supplied to Harris through the leading questions of his interrogator. *Id.* at *8. In Chicago, in 1994, an eleven-year-old black child known only as A.M. was convicted of brutally murdering his eighty-four- year-old elderly white neighbor when he was only ten years old. *See* United States *ex rel.* A.M. v. Butler, No. 98 C 5625, 2002 WL 1348605, at *8 (N.D. Ill. June 19, 2002); Steve Mills, *Boy's Conviction Thrown Out: His Confession to 1993 Killing Ruled Improper*, CHI. TRIB., June 21, 2002, at § 1, 1. Maurice Possley, *Officer in Harris Case Coaxed Similar Confession in '94*, CHI. TRIB., Sept. 10, 1999, at A1. A.M. has been a client of Professor Drizin's since the winter of 1995 after his conviction. According to his oral confession, which did not coincide with the facts of the crime, A.M. beat, tied up, and slit the throat of the elderly woman because she had called him a "nigger." *See Butler*, 2002 WL 1348605, at *6. We have reviewed transcripts and /or case files of the interrogations of these four pre-teenage children and conclude that their confessions bear many of the hallmarks of false confessions, including the presence of major inconsistencies between the known and observable facts of the crime and those facts which the children purportedly gave in their confessions.

406. Marla Donato, *2 Boys, 7 and 8, Cited in Killing*, CHI. TRIB., Aug. 10, 1998, § 1, at 1.

godmother's home.[407] After her godmother filed a missing person's report and had fliers printed with her picture, she and others from the community searched the area near her home.[408] Ryan's body was discovered less than twenty-four hours later among tall weeds in the back yard of an occupied two-story building located only two blocks from where she was last seen.[409] She had been badly beaten about the head, her underpants stuffed in her mouth in an apparent attempt to gag her, and there was evidence she had been sexually assaulted.[410] Police reported finding leaves and pieces of bushes in her mouth.[411]

On Sunday, August 9, 1998, the Chicago Police arrested two boys, aged seven and eight, in connection with the murder of Ryan Harris. Exactly what happened when the two boys were questioned at the police station remains unclear.[412] Based on oral statements

407. Rosalind Rossi & Brenda Warner Rotzoll, *Boys' Ordeal Leaves Searing Questions*, CHI. SUN-TIMES, Sept. 6, 1998, at 8, *available at* 1998 WL 55966291.

408. *See* Donato, *supra* note 406; Maurice Possley, *Police Reports Could Aid Boys: How Cops Built Case*, CHI. TRIB., Aug. 16, 1998, § 1, at 1, *available at* 1998 WL 2886101.

409. *See* Donato, *supra* note 406.

410. Possley, *supra* note 408.

411. *Metro Briefs*, CHI. SUN-TIMES, July 30, 1998, *available at* LEXIS, News Library, Chisun File.

412. Although it was the policy in Cook County that confessions in all murder cases be court-reported, the alleged confessions in the Ryan Harris case were not court-reported. According to David Erickson, First Assistant State's Attorney of Cook County, "the defendant has to agree to give a court-reported statement. If the defendant doesn't agree to give that court-reported statement, then there is no court-reported statement." What is known can be gathered from the cursory notes taken by officers that interrogated the boys. *Interrogating Officers' Notes of the Seven-Year-Old Boy* [hereinafter *Notes of Seven*] (on file with the authors); *Interrogating Officers' Notes of the Eight-Year-Old Boy* [hereinafter *Notes of Eight*] (on file with the authors). In each interrogation room were three detectives and two youth officers. Maurice Possley, *Police Say Suspects Not Too Small to Kill*, CHI. TRIB., Aug. 11, 1998, § 1, at 1, *available at* 1998 WL 2884666. One officer wrote: "[t]o lie was wrong—Good Boys Don't Lie. Good Boy? Said yes." *Notes of Eight*, *supra*. The officers also reportedly fed the children Happy Meals and "held hands because they were all 'friends.'" John Carpenter & Lorraine Forte, *How Cops Quizzed Boys in Murder*, CHI. SUN-TIMES, Aug. 29, 1998, § 1, at 1, *available at* 1998 WL 5595520. Anne Graffam Walker, a forensic linguist, stated at a Northwestern University School of Law conference, "Protecting Children, Preserving the Truth," that this was inappropriate and that detectives should "never hold hands with a child during an interview." Jeanne Galatzer-Levy, *Harris Case a "Wakeup Call" on Kids' Confessions*, CHI. TRIB., Mar. 22, 2000, § 5, at 1. Walker further explained that, "[t]his approach is only likely to *raise* the pressure of the interrogation on the child." *Id.* (emphasis added). Such efforts to create a friendly atmosphere often are a standard feature of preinterrogation police interviews:

> Once investigators identify a likely or possible suspect, they often conduct what appears to be an interview. This session may truly be an investigative interview or it may be an opening move in what the investigator intends to develop into an interrogation. At this point investigators neither take a hostile tone nor tell the individual that he is a suspect. Instead, they treat him respectfully and are likely to say they need his help in solving the crime. Under the non-threatening guise of

allegedly obtained from the boys, the police believed that the girl had been hit on the head with a brick because the boys had wanted her bike.[413] The police theorized that the seven-year-old had hit Ryan in the head with a rock, causing her to fall from her bike.[414] The boys then presumably dragged her into the weeds.[415] The seven-year-old supposedly told the police that the boys removed her shorts, then played with her body, "softly" rubbing leaves around her eyes and mouth.[416] The eight-year-old "said he got on his bike and rode off to go home to watch cartoons."[417] The boys were charged because of their statements and because "[i]n their statements, there [were] elements of this case that would only be known to the detectives or the perpetrators."[418] Although there was evidence that the girl had been sexually assaulted with a foreign object, neither boy was charged with a sex crime.[419] Instead, both boys were charged in a delinquency petition with first-degree murder[420] and taken to a psychiatric hospital pending their appearance in court the next day.

The next morning, based on the testimony of one police officer who summarized the boys' statements, the trial court found probable cause to believe that the boys had murdered Ryan Harris.[421] The court refused to release the boys, instead deciding to keep them confined in the psychiatric hospital until mental health professionals could evaluate them.[422] Three days later, two experts, a psychiatrist

---

information-gathering, the interrogator typically begins by obtaining an account of the suspect's relations with the victim, his knowledge of the offense, and his whereabouts at the time of the crime. The goal is to obtain information that elevates the person into a likely or principal suspect and ties him to a baseline account that establishes his knowledge of, and alibi for, the crime.

Ofshe & Leo, *Decision to Confess Falsely*, *supra* note 76, at 987.

413. *Notes of Seven*, *supra* note 412; *Notes of Eight*, *supra* note 412; *see also* John Carpenter & Curtis Lawrence, *Boys Linked to Murder: Girl, 11, May Have Been Killed for Bike*, CHI. SUN-TIMES, Aug. 10, 1998, at 1, *available at* 1998 WL 5593062 (quoting Police Sergeant Stan Zaborac as saying, "[T]he disappearance of the bicycle would suggest a motive").

414. The eight-year-old allegedly said that the seven-year-old had hit her with a rock. *Notes of Eight*, *supra* note 412.

415. *See Notes of Seven*, *supra* note 412; *Notes of Eight*, *supra* note 412.

416. *See Notes of Seven*, *supra* note 412; *see also* Possley, *supra* note 412 (quoting testimony of Detective Allen Nathaniel).

417. Possley, *supra* note 412 (quoting testimony of Detective Allen Nathaniel); *Notes of Eight*, *supra* note 412.

418. Possley, *supra* note 412 (quoting Police Sergeant Stan Zaborac); Carpenter & Lawrence, *supra* note 413.

419. Possley, *supra* note 412.

420. Donato, *supra* note 406.

421. Possley, *supra* note 412; Lindsey Tanner, *Kids Charged in Beating Death*, ASSOCIATED PRESS, Aug. 10, 1998, at 2B, *available at* 1998 WL 6706317.

422. Lorraine Forte & John Carpenter, *Tests Ordered for Child Suspects*, CHI. SUN-

and a psychologist, recommended that they be released, finding that the boys were not a danger to others.[423]  The judge released the boys to their parents but ordered them held on home confinement pending trial.[424]  He also placed them on electronic monitoring; special electronic ankle bracelets had to be custom made to fit the small boys.[425]

Three weeks later, in a surprising move, prosecutors announced that they were dropping charges against the boys because the crime lab had discovered semen on the girl's underpants.[426]  Both Chicago Police Superintendent Terry Hillard and Cook County State's Attorney Richard Devine, however, stopped short of declaring the boys innocent and clearing them of charges. In fact, Superintendent Hillard still maintained that the boys were involved in the crime, insisting that the "facts take us to these young boys."[427] Superintendent Hillard and State's Attorney Devine refused to exonerate the boys even after DNA found on Ryan Harris was later shown to match perfectly with the DNA of Floyd M. Durr, an adult already charged with sexually assaulting three other young girls in the

---

TIMES, Aug. 12, 1998; at 2, *available at* 1998 WL 5593275; Maurice Possley & Judy Peres, *Fight Looms over Boys' Confessions: 7 and 8 Year Old's Grasp of Police Questioning at Issue in Slaying*, CHI. TRIB., Aug. 10, 1998 at § 1, at 1 *available at* 1998 WL 2884792; Shelia Washington, *What Now for Accused Killers?*, CHI. DEFENDER, Aug. 12, 1998, at 1.

423. Psychologist Maisha Hamilton-Bennett testified as to one of the boys' conditions. She stated that the eight-year-old "is not a danger to others. He's going through a very traumatic experience, but he's not in need of hospitalization, and should be released and returned to his parents." Lorraine Forte, *Young Suspects Go Home*, CHI. SUN-TIMES, Aug. 14, 1998, at 1, *available at* 1998 WL 5593437. Psychiatrist Louis James Kraus also testified that the seven-year-old "would be best off if he was with his mother and father" and "could be at . . . risk of psychic harm" if he stayed at the psychiatric hospital. *Id.* In spite of this recommendation, prosecutors requested that the children be held in a shelter. *See id.*

424. *See id.*; *Two Chicago Boys Accused in Slaying of Girl, 11, Released*, PHILA. INQUIRER, Aug. 14, 1998, at A3.

425. *See* Forte & Carpenter, *supra* note 422.  A week later, the electronic ankle bracelets were ordered removed, and the children were allowed to go outside with either a parent or grandparent. Maurice Possley, *Young Suspects Become Freer*, CHI. TRIB., Aug. 21, 1998, § 1, at 1.

426. Jeremy Manier & Sue Ellen Christian, *Crime Lab Findings All in a Day's Work*, CHI. TRIB., Sept. 6, 1998, § 1, at 14; Maurice Possley & Steve Mills, *Tests Find Semen on Girl's Clothes*, CHI. TRIB., Sept. 5, 1998, § 1, at 1.  As it is extremely unlikely for boys so young to have produced the semen, proceeding under the charges would have been difficult at best.

427. *See* Possley & Mills, *supra* note 426.  Even when plans to create a videotaping program were announced, Cook County State's Attorney Richard Devine "insisted that the changes [were] not an acknowledgement that the authorities bungled the Harris investigation . . . ."  Flynn McRoberts & Judy Peres, *Homicide Suspects May Go to Videotape Confessions on Camera*, CHI. TRIB., Oct 2, 1998, § 1, at 1.

Englewood neighborhoods.[428]

Police and prosecutors also adamantly defended the conduct of the detectives involved.[429]  State's Attorney Devine was quoted as saying that "the police acted in good faith and conducted a thorough investigation."[430]  Over the course of the next few days, the Mayor publicly stood by his police officers, defending their actions and saying that he believed his police put "their heart and soul into the investigation."[431]  He was also quoted as saying: "There is no apology here.  This is a tragedy."[432]

### B.  *Vulnerable Populations: Juveniles*

There are forty false confessions in this Article's database from suspects who were under the age of eighteen at the time they confessed.[433]  Precisely why these young people falsely confessed is

428.  *See* Peter Annin & John McCormick, *Who Killed Ryan Harris?*, NEWSWEEK, Oct. 5, 1998, at 42; Pam Belluck, *Boys' Release in a Murder Doesn't End a City's Pain*, N.Y. TIMES, Sept. 26, 1998, at A8. Mayor Daley also specifically stated that the arrest of Durr did not clear the two boys. *See* Chinta Strausberg, *Daley: Harris Witness Doesn't Absolve Kids*, CHI. DEFENDER, Oct. 13, 1998, at 1. He did not officially apologize for the botched investigation until April 1999. Chinta Strausberg, *City Admits Errors in Harris Case*, CHI. DEFENDER, Apr. 26, 1999, at 1. What made this stance by city and county officials even more baffling was the fact that there was also significant evidence that pointed away from the boys and did not match with their confessions. Steve Mills & Maurice Possley, *Cops Ignored Clues that Case Was Weak*, CHI. TRIB., Sept. 6, 1998, § 1, at 1. Further, Durr has since been convicted of three counts of predatory criminal sexual assault and one count of aggravated kidnapping for his attack on a ten-year-old girl on Jan. 14, 1998. Janan Hanna, *Ryan Harris Suspect Guilty in Another Case*, CHI. TRIB., May 12, 2000, § 2, at 1. This case shows the inherent difficulty in allowing the definition of "innocence" to hinge on an official proclamation of innocence by police and prosecutors. The two young confessors in this case could not physically have committed the sexual assault, and another person who matches the DNA has been charged with the crime. It is difficult to see how these boys could be described as anything but innocent.

429.  Possley & Mills, *supra* note 426. Leon Pitt & Curtis Lawrence, *Boy Saw Murder, Mom Says*, CHI. SUN-TIMES, Sept. 5, 1998, at 1, *available at* 1998 WL 5596455.

430.  Possley & Mills, *supra* note 426.

431.  Chinta Strausberg, *Daley Defends Police in Harris Case*, CHI. DEFENDER, Sept. 10, 1998, at 3.

432.  *See id.*; John Kass, Editorial, *It's Time for Daley to Take Action to Heal the Ryan Harris Rift*, CHI. TRIB., Sept. 7, 1998, § 1, at 3.

433.  The names and ages of the forty in alphabetical order are: Corey Beale (17), Marcellus Bradford (15), Rodney Brown (15), Tim Brown (15), Brenton Butler (15), Allen Chesnet (16), Antwon Coleman (15), Michael Crowe (14), Ricky Cullipher (16), Paula Gray (17), Dennis Deonte Green (17), Mario Hayes (17), Eric Henley (17), Leroy Hoggard (15), Aaron Houser (14), Eddie Huggins (15), John Jeffers (17), Anthony Johnson (11), Wardell Johnson (16), Charles King (17), Antron McCray, (15), Calvin Ollins (14), Don Olmetti (16), Dustan Pennington (16), Kevin Richardson (14), Johnny Ross (16), Yusef Salaam (15), Raymond Santana (14), Dan Scott (13), Roderick Singleton (15), Patrick Smith (16), Joshua Treadway (15), Fred Williams (17), Peter Williams (17), Kharey Wise (16), Unamed Juvenile (7), Unnamed Juvenile (13), Unnamed Juvenile (9),

not always clear. In most of the false confessions, we do not have audiotapes or videotapes of the interrogations, making it difficult to ascertain whether a particular police tactic triggered the false confession. In the absence of such research, we must rely on the juvenile confessor's account of why he confessed and the particular tactics used by police which triggered or contributed to the false confession. Although we do not have explanations in every case, one of the most common reasons cited by teenage false confessors is the belief that by confessing, they would be able to go home.[434] One such case involved sixteen-year-old Allen Jacob Chesnet.

### 1. Allen Jacob Chesnet

Allen Jacob Chesnet, a learning disabled sixteen-year-old, was sitting on his porch, his hand wrapped in a towel, waiting for a ride to the hospital. He had cut his hand when a tool fell on it while he was doing some work in the basement. A television news team, investigating the murder of a woman who lived down the street, approached him for directions, but Allen did not know where the victim lived. Noticing that his hand was bleeding, the reporter later told the police about Allen, and the police brought him in for questioning. Some fifteen hours later, the Cecil County, Maryland, sheriff arrested Allen and charged him with the murder of Belulah Honaker.[435] Their only evidence against Allen was his confession.[436]

In order to get Allen to confess to the crime, the authorities fed him details of the crime by showing him crime scene photos of the victim's body, her clothing, and the physical make-up of the apartment.[437] Then they lied.[438] The lead detective faked a call from the state crime lab and told Allen that the lab had matched Allen's DNA to the blood found at the crime scene.[439] According to police reports, Allen just put his head down and began to cry. Soon thereafter, Allen began telling police officers what he thought they wanted to hear.[440] He told them that he went to visit Honaker and she

---

Unnamed Juvenile (10), and Unnamed Juvenile (10).

434. *See* Patricia Smith, *Brenton Butler Didn't Do It*, SCHOLASTIC UPDATE, Sept. 1, 2003, at 8, *available at* 2003 WL 11975167; *see also* Alexandra Perina, *"I Confess"*, PSYCHOL. TODAY, Mar. 1, 2003, at 11 (comparing false confessions to an escape hatch), *available at* 2003 WL 9995818.

435. *See* Wilber, *supra* note 243.

436. *Id.*

437. *Id.*

438. *Id.*

439. *Id.*

440. *Id.*

became angry when he refused to have sex with her. He claimed that she had stabbed him and that he wrestled with her for the knife, took the knife from her, and then stabbed her once. The details of the confession were at odds with the evidence police had uncovered (the victim was stabbed numerous times, she was strangled with her bra strap, the killer had smashed a porcelain figure on her head), but this did not deter officers from arresting Allen.

Several weeks after the arrest, police learned that Allen's blood did not match blood stains found in the apartment.[441] By September, further reports confirmed this result.[442] The District Attorney, in the midst of an election, continued to keep Allen in custody. In late November, after the District Attorney had won the election, Allen was finally released.[443] In December, the District Attorney formally dropped the charges against Allen, and announced the arrest of another man, Christopher Thomas, whose fingerprints were found at the crime scene and who was linked to the crime by DNA evidence, and had confessed to the crime.[444] Thomas later pleaded guilty and is serving a forty-year sentence.[445] According to Allen, in the time frame between the discovery that the blood at the crime scene was not his and the time of his release, he was stabbed once and raped twice in the adult county jail where he was being held.[446] In an interview after he was released, Allen explained why he confessed to a crime he did not commit: "They kept telling me I know you did it so why are you lying to me. They had me so upset I wasn't thinking right . . . [I]f I said, yeah, I did it, I could go home. If I said I didn't do it, I could go to jail so I said I did it and I want to see my parents and everything."[447]

## C. *Vulnerable Populations: Mentally Retarded*

In *Atkins v. Virginia*,[448] the United States Supreme Court held that the Constitution prohibited the application of the death penalty

441. *Id.*
442. *Id.*
443. *Id.*
444. *Id.*
445. *Id.*
446. *See* Carl Hamilton, *Convicted Killer Wants to Change Guilty Plea*, THE CECIL WHIG (Cecil County, MD) Oct. 21, 1999, *available at* 1999 WL 3379613; Todd Richissin, *Held Without Proof, Boy Free; He's Jailed 6 Months, Even After DNA Test Debunks Evidence*, BALT. SUN, Nov. 20, 1998, at 1A; Del Quentin Wilber, *Teen Tormented by an Erroneous Charge of Murder*, BALT. SUN, Apr. 23, 2001, at 1A.
447. *20-20* (ABC television broadcast, Mar. 15, 2002).
448. 536 U.S. 304 (2002).

to mentally retarded persons.[449] One of the reasons cited by the Court for banning this practice was that "[m]entally retarded defendants in the aggregate face a special risk of wrongful execution;" in particular, the Court noted two such cases in a footnote, both of which involved "mentally retarded persons who unwittingly confessed to crimes they did not commit."[450] The unique vulnerability of the mentally retarded to psychological interrogation techniques and the risk that such techniques when applied to the mentally retarded may produce false confessions is well-documented in the false confession literature.[451] Not surprisingly, there are at least twenty-eight[452] cases in our data set that involve mentally retarded defendants.[453] One such case, the case of Michael Gayles, is reported below.

### 1. Michael Gayles

In the early morning hours of August 31, 2000, a mother ran out of her Detroit home screaming "someone's raping my baby."[454] By the time police arrived, twelve-year-old J'Nai Glasker, a seventh grade student who was active in the glee club, choir, and Peacemakers, a student conflict-resolution group, was dead.[455] The Wayne County Medical Examiner's Office listed her cause of death as blunt trauma;[456] it was later determined that she had been raped.[457]

Within forty-eight hours of the attack on Glasker, Detroit police had obtained a signed confession from Michael Gayles, a mentally disabled eighteen-year-old. Gayles, who had an I.Q. of seventy-one

---

449. *Id.* at 2252.

450. *Id.* at 2252 n.25.

451. *See generally* Morgan Cloud et al., *Words Without Meaning: The Constitution, Confessions, and Mentally Retarded Suspects*, 69 U. CHI. L. REV. 495 (2002) (arguing that mentally retarded people do not understand *Miranda* warnings, nor do they understand the context in which interrogation occurs and the consequences of confessing).

452. This number probably underestimates the actual number because information regarding each false confessor's mental acumen was not available or reported in most of the cases in our data set.

453. The names of the mentally retarded suspects who falsely confessed in alphabetical order are: Medell Banks, Victoria Banks, Leonard Barco, Corey Beale, Corethian Bell, Melvin Bennett, Keith Brown, Rodney Brown, Timothy Brown, Allen Chesnet, Antwon Coleman, Ricky Cullipher, Gerald Delay, Michael Fitzpatrick, Michael Gayles, Hubert Geralds, Anthony Gray, Paula Gray, Charles King, Johnny Massingale, Calvin Ollins, Don Olmetti, Ronald Paccagnella, Patrick Smith, Jerry Frank Townsend, Dianne Tucker, Robert Wilkinson, and Fred Williams.

454. Ben Schmidt, *Intruder Kills Girls at Home*, DETROIT FREE PRESS, Sept. 1, 2000, at 1B, *available at* LEXIS, News Library, Detfp Database.

455. *Id.*

456. *Id.*

457. Jack Kresnak, *Rape-Slaying Suspect Had Troubled Life*, DETROIT FREE PRESS, Sept. 6, 2000, at 1B, *available at* LEXIS, News Library, Detfp Database.

and was learning disabled, signed two other additional written confessions during the thirty-six hours he spent in police custody. Gayles, who lived three blocks away from Glasker, became a suspect after police received a tip about his involvement in the crime.[458] At the time of his arrest, Gayles's mother claims to have told police: "He's under disability, his comprehension is real low, he's unable to read beyond the sixth grade level."[459] Gayles's first statement was nearly incomprehensible, but his later two statements, typed up by detectives in question and answer format, gave more and more detail.[460] In his second statement, Gayles allegedly told police that Glasker had consented to sex but screamed when her mother entered the room. "I don't know how many hits I put in her head, then when I looked at her, then I knew she was dead, I panicked and ran," said the second statement.[461] Gayles's third statement, taken by yet another detective, supplied a motive for the murder, "I was jealous because she (J'Nai) seemed to have a perfect happy life,"[462] and went so far as to implicate his mother, who was later charged and released, in the coverup. "I love her, she want to protect me, she helped me clean up some blood on my hands, on the bottom of my shoes, on my face, and all over my body ... I was real bloody."[463] In addition to the confessions, J'Nai's mother and another eyewitness identified Gayles in a lineup and police learned that Gayles had a prior juvenile conviction for a sex crime involving a relative.[464]

Yet within two weeks, the case against Gayles had fallen apart, and the charges against him were dismissed and he was released.[465] DNA evidence taken from Glasker's body failed to match Gayles, causing his lawyer, Mark Satawa, to remark, "But for the grace of DNA, Michael Gayles would probably have served life in prison."[466] Because the interrogations and confessions were not taped,[467] little is known about what caused Gayles to confess to a crime he did not commit. It was reported, however, that for three hours, under intense questioning outside the presence of his mother (because Gayles was

---

458. Jack Kresnak, *Anatomy of a False Confession*, DETROIT FREE PRESS, Feb. 27, 2001, at 1B, *available at* LEXIS, News Library, Detfp Database.
459. *Id.*
460. *Id.*
461. *Id.*
462. *Id.*
463. *Id.*
464. *Id.*
465. Jack Kresnak, *Suspect in Slay, Rape Case to Go Free*, DETROIT FREE PRESS, Sept. 14, 2000, at 1B, *available at* LEXIS, News Library Detfp Database.
466. *Id.*
467. *Id.*

eighteen, she had no right to be present), Gayles had insisted he was innocent.[468] It was only after Gayles was administered a polygraph test and told he had flunked it by the examiner, that Gayles confessed.[469]

In response to the dismissal of the charges, Detroit police officers assumed no responsibility for the wrongful arrest.[470] Instead, Commander Dennis Richardson of the Major Crimes Division was quoted as saying:

> I think that the city should be very proud of their police department. This was a case where if we wanted to, we could have just hidden the facts or continued forward. We didn't want to do that. We want to find the person who is responsible for hurting that little girl.[471]

On January 9, 2002, Detroit police found that man, charging Ricardo Stubbs, a twenty-two year-old Detroit man, with Glasker's murder.[472] Stubbs had been arrested in Memphis, Tennessee, after another Detroit woman he had sexually assaulted and beaten with a metal object had identified him.[473] While waiting trial on this rape and assault charge and another such charge involving a Detroit woman in the spring of 2000, police linked Stubbs to Glasker's murder through DNA testing.[474] Subsequently, he confessed.[475] Gayles filed a civil lawsuit against the Detroit police officers who obtained his false confession, ultimately settling the suit out of court for $800,000.[476]

### D. *Vulnerable Populations: Mentally Ill*

In this Article's database, at least twelve false confessors were mentally ill, a figure which again probably is an underestimate because mental illness is not a fact that appears with frequency in the news accounts of false confessions.[477] The case of Colleen Blue, a

---

468. Kresnak, *supra* note 458.

469. *Id.*

470. Kresnak, *supra* note 465.

471. *Id.*

472. Dan Shine, *Charges Filed in Deadly Attack on Girl Man Admits Raping, Killing 12-Year-Old*, DETROIT FREE PRESS, Jan. 9, 2002, at 1B, *available at* LEXIS, News Library, Detfp Database.

473. *Id.*

474. *Id.*

475. *Id.*

476. Jack Kresnak, *Detroit Is To Pay $800,000 over False Confession*, DETROIT FREE PRESS, Aug. 5, 2003, at 1B, *available at* LEXIS, News Library, Detfp Database.

477. The names of the mentally ill persons who falsely confessed are: Corethian Bell, George Blome, Colleen Blue, Michael Bottoms, Christopher Bowman, Charles Wade Hampton, Edward Humphrey, Geoffrey Meyers, Antonio Myers, Ronald Paccagnella,

974          *NORTH CAROLINA LAW REVIEW*          [Vol. 82

mentally-ill woman who falsely confessed to killing her child, is reported below.

### 1. Colleen Blue

A nine-and-one-half pound newborn baby boy's body was discovered near a dumpster behind a Dominick's grocery store in Round Lake Beach, Illinois in August 2001. There were no witnesses to the baby's death, and, in order to solve the crime, the Lake County Major Crimes Task Force had to find the baby's mother.[478] Investigators soon began to focus their attention on Colleen Blue, a homeless woman with a history of psychiatric problems.[479] Blue had disappeared around the time of the baby's death.[480] Furthermore, word on the street was that she had told several people she was pregnant prior to her disappearance.[481] On September 16, 2001, Blue resurfaced.[482] During an interrogation by Lake County detectives, Blue confessed to the baby's murder.[483] Allegedly, she told police that she delivered the baby near the Dominick's, cut the umbilical cord with scissors, placed the still-crying baby in a large bag, covered him with clothing, and left the bag next to a dumpster—all facts which only the true perpetrator would have known.[484] On the basis of this confession, the Lake County State's Attorney's Office charged Blue with first degree murder, and she was held in the Waukegan County Jail until October 26, 2001.[485] On that date, however, all charges were dismissed because DNA taken from the dead baby did not match Blue's, thereby conclusively proving that she was not the baby's mother.[486]

### E. *Multiplying Effect of False Confessions*

#### 1. Multiple False Confessions to the Same Crime

Another trend which emerges from our database is the number

---

Frank Lee Smith, and Jerry Frank Townsend.

478. Jerry Lawrence, *Woman Cleared in Baby's Death*, CHI. TRIB. Oct. 27, 2001, § 1, at 15.

479. *Id.*

480. *Id.*

481. *Id.*

482. *Id.*

483. *Id.*

484. *Id.*

485. *Id.*

486. Tony Gordon, *DNA Tests Clear Woman of Abandoning Baby*, DAILY HERALD (Chicago, Ill.), Oct. 28, 2001, at 1, *available at* LEXIS, News Library, Chdly File.

of cases in which more than one defendant falsely confesses to the same brutal crime. There are thirty-eight cases in our database in which this phenomenon has occurred. *This represents more than 30% of our sample.* Of the thirty-eight cases involving multiple false confessions, nineteen, or 50% of these confessions, involve juveniles. Although the Central Park Jogger case contains the highest number of false confessions in a single case with five, there are several cases in our database with four false confessions,[487] three cases with three,[488]

---

487. In Norfolk, Virginia, detectives charged eight men with the murder and rape of Michelle Ann Bosko, a Navy wife, who was killed while her husband was at sea. Four of the men confessed—Joseph Dick, Daniel Williams, Derek Tice, and Eric Wilson, two of whom pled guilty (Dick and Williams). Charges were dropped against three other men who refused to plead guilty. Wilson went to trial but was convicted only of rape. Prior to Tice's trial, an eighth man, Omar Ballard surfaced and confessed to the crime and to committing it alone. Only Ballard's DNA was found at the crime scene, and his description of the murder and the events leading up to it more closely matched the objectively knowable facts of the crime. None of the men had any history of sex crimes, while Ballard went on to rape two other women in the weeks following the Bosko killing. Prosecutors also could not establish any links between Ballard and any of the other defendants, none of whom ever mentioned Ballard in their confessions. Derrick Tice was convicted and sentenced to life in prison. After Tice was convicted, prosecutors tried and convicted Ballard of the crime. Tice's conviction was recently overturned, in part because the trial court unreasonably restricted Tice's ability to use Ballard's confession to exonerate himself. However, Tice was subsequently convicted in a re-trial in which the judge excluded expert witness testimony on police interrogation techniques and false confessions, as well as evidence that the detective who had elicited Tice's confession had elicited false confessions in other cases. *See* Tice v. Commonwealth of Virginia, Petition for Appeal (on file with the North Carolina Law Review). Dick and Williams have since recanted their confessions and have sought, unsuccessfully, to vacate their guilty pleas; Wilson, meanwhile, is also challenging his conviction and continues to maintain his innocence. *See* Tice v. Commonwealth, 563 S.E.2d 412, 415 (Va. Ct. App. 2002). A second case involving four false confessions took place in Alton, Illinois, in April 1990. Five teenagers were arrested, and after being interrogated, four of the five confessed to the murder of a homeless man found in an Alton cemetery. The four teenagers who confessed—Antwon Coleman, Rodney Brown, Eric Hensley, and Rodney Singleton—ranged in age between fourteen and seventeen years old, and at least one of the boys was learning disabled. Charges were dropped against the five when a private investigator hired by their lawyers obtained a written confession from one of the actual killers the following July. In actuality, the five boys merely happened upon the victim after two other teenagers had beaten him to death. They then stole the victim's truck. One of the two actual killers pled guilty to the charges; charges against the others were dropped after the prosecutor was caught on videotape promising him immunity. Investigations by the State's Attorney into the interrogation procedures used were complicated by comments made by an assistant State's Attorney, Don Weber, who stated that the youths were a "segment of black people who are liars." After his resignation, an investigation was completed, resulting in no recommended changes to police interrogation procedures. For a while, before the boys were cleared, police and prosecutors contended that the "Alton 5" and the two new suspects were both guilty of the crime. They hypothesized that the victim had been robbed and beaten twice, by independent groups of young men. "You could say he was killed twice," said the prosecutor, Don Weber. *See* Robert Kelly, *Judge Rejects Withdrawal of Guilty Plea*, ST. LOUIS POST-DISPATCH, Sept. 7, 1990, at 9A,

and numerous others with two.[489]  In remarking on the Central Park Jogger case, Saul Kassin noted that once detectives obtain one false confession from a suspect, they then use that confession to coerce other false confessions from co-defendants: "If the first person to implicate the others is giving a false statement, and then the first leads to the second, and the first two are used to leverage the third, then certainly you're building a house of cards."[490]  One of the cases in which police obtained false confessions from two suspects and tried unsuccessfully to obtain a false confession from a third—the murder case of Justin Mello—is discussed below.

---

*available at* LEXIS, News Library, SLPD File; Robert Kelly, *Probe Continues into Teens' Confessions,* ST. LOUIS POST-DISPATCH, July 31, 1990, at 6A, *available at* LEXIS, News Library, SLPD File; Roy Malone, *4 Detectives Sued over Alton Arrest,* ST. LOUIS POST-DISPATCH Aug. 5, 1992, at 6A, *available at* LEXIS, News Library, SLPD File; Michael D. Sorkin, *Prosecutor Rips Freed Teens,* ST. LOUIS POST-DISPATCH, July 22, 1990, at 2A, *available at* LEXIS, News Library, SLPD File; Michael D. Sorkin, *Sixth Teen Charged in Killing in Alton,* ST. LOUIS POST-DISPATCH, June 26, 1990, at 1A, *available at* LEXIS, News Library, SLPD File; Michael D. Sorkin, *Teens Cleared of Killing Homeless Man in Alton,* ST. LOUIS POST-DISPATCH, July 17, 1990, at 1A, *available at* LEXIS, News Library, SLPD File.

488. In 1999, Victoria Banks, her estranged husband Medell Banks, and her sister, Dianne Tucker, were interrogated for the murder of a child that never existed. All three adults are mentally retarded. They pled guilty to manslaughter charges and were each sentenced to fifteen years in prison. Following her conviction, Victoria Banks underwent an X-ray exam that proved she was unable to conceive or give birth to a child after her tubal ligation in 1995. *See* Luo, *supra* note 222. In another case, Michael Crowe, age fourteen, with two friends, Aaron Houser and Joshua Treadway, confessed to the murder of Michael's sister, Stephanie Crowe, age twelve, who was found stabbed to death in Escondido, California. Later, DNA testing proved that a sweatshirt confiscated from a transient with a serious mental illness, Richard Tuite, was covered in Stephanie's blood. The boys were released and publicly declared innocent. *See* Sauer, *supra* note 246. Finally, in another case occurring in Norfolk, Virginia, Kenny Shannon, age nineteen, Leroy Hoggard, age fifteen, and Fred Williams, age seventeen, were coerced into falsely confessing their involvement in the murder of bar owner, Jeffrey Kampsen, who was killed by a shotgun blast in 1990. *See* Jackson & Huang, *supra* note 278.

489. Some cases where two defendants falsely confess to the same crime include: Rolando Cruz and Alejandro Hernandez for the rape and murder of Jeanine Nicarico, *supra* notes 247 and 275; Anthony Benn and Ricky Williams for the murder of five people at a St. Louis grocery store, *supra* note 227; Marcellius Bradford, age seventeen, and Calvin Ollins, age fourteen, for the rape and murder of medical student, Lori Roscetti, *supra* notes 234 and 306; Timothy Brown and Keith King, *supra* notes 237 and 290, for the murder of Sheriff's Deputy Patrick Behan; Johnnie Frederick and Dave Keaton, *supra* notes 259 and 288, for the murder of Sheriff's Deputy Thomas Revel; Connie Gibbs and Kim Rogers for a robbery at an ATM, *supra* notes 264 and 312, and Jonathon Kaled and Frank Kuecken for the shooting of Justin Mello, *supra* notes 287 and 291.

490. *See Experts Say Interrogation Techniques Can Encourage False Confession, at* http://abcnews.go.com/sections/primetime/DailyNews/centralpark_confessions_020926.ht ml. (last visited Nov. 19, 2003) (on file with the North Carolina Law Review).

### a.  Frank Kuecken and Jonathan Kaled

Justin Mello was a typical teenager:  he attended high school, played soccer on his high school's team, and worked a part-time job at Mancino's Pizza and Grinders in New Baltimore, Michigan.[491]  On October 21, 2000, Justin and a nineteen-year-old co-worker received a call for a pizza delivery sometime around 11 p.m.[492]  Justin had just begun to drive, so his parents told him that they did not want him to make deliveries, because it was too dangerous.[493]  So, Justin's co-worker went to deliver the pizza, and Justin stayed to watch the store.[494]  Police suspect that the call was a set-up to make the robbery of Mancino's easier.[495]  Once his co-worker found out that the delivery call was bogus, he returned to Mancino's to find Justin kneeling in the store's walk-in cooler shot once in the back of the head.[496]  Mancino's cash register had been raided, netting the robber or robbers a few hundred dollars.[497]

Mello's murder shocked the small New Baltimore community, which had not seen a fatal shooting in more than thirty years.[498]  Justin's soccer coach voiced the sentiments of its residents: "It was a senseless killing with no rhyme or reason.  It shouldn't have happened to a fine young man like Justin."[499]  Public pressure soon mounted to find Justin's killer(s), and within days of the murder, working on tips from people associated with Mancino's, the police quickly arrested three young local men for Justin's murder:  Jonathan Kaled, eighteen, Matthew Daniels, sixteen, and Frank Kuecken, nineteen.[500]  The three suspects were charged with felony first-degree murder, armed robbery, and conspiracy to commit murder.[501]

Kaled and Kuecken initially confessed to the crimes, but they later recanted, claiming that the police coerced them.[502]  Based on these confessions, the New Baltimore police pieced together a story of the

491.  Deanna Weniger, *"He Was Just a Little Boy" Dad Says of Slain Teen Shooting Victim*, TIMES HERALD (Port Huron, Mich.), Oct. 24, 2000, at 1A, *available at* LEXIS, News Library, Timhld File.

492.  *Id.*

493.  *Id.*

494.  *Id.*

495.  *Id.*

496.  *Id.*

497.  *Id.*

498.  Hannah Newton, *Authorities Search for Teen's Killer*, TIMES HERALD (Port Huron, Mich.), Oct. 20, 2000, *available at* LEXIS, News Library, Timhld File.

499.  *Id.*

500.  Lori Paionk, *Three Arrested in Teen's Slaying*, TIMES HERALD (Port Huron, Mich.), Oct. 28, 2000, at 2A, *available at* LEXIS, News Library, Timhld File.

501.  *Id.*

502.  Amber Hunt, *Macomb Studies Perjury Charges in Mello Slaying*, TIMES HERALD (Port Huron, Mich.), Nov. 29, 2000, at 1A, *available at* LEXIS, News Library, Timhld File.

crime in which one of the three made the false delivery call to Mancino's, then Kuecken drove Kaled to the restaurant, where he killed Justin Mello with a gun provided by Daniels.[503] In light of the confessions, claims of individuals that the three men had all been present at the same party miles away from New Baltimore at the time of the murder were not taken seriously, and police threatened those coming forward with alibis with obstruction of justice charges.[504] New Baltimore police had corroborated alibis for all three and none of the suspects could provide information as to the whereabouts of the murder weapon, but they nonetheless focused solely on Kaled and Kuecken's confessions.[505]

After a preliminary hearing, charges were dropped against Daniels for lack of evidence, after he had spent about a month in jail for Mello's slaying.[506] The testimony of two witnesses who were to implicate Daniels quickly fell apart on the stand as one claimed to have been coerced by police into giving false testimony and the other took the Fifth Amendment.[507] The two other suspects, however, were held over for trial.[508] Judge Paul A. Cassidy, presiding over the case, revealed the community's bias when after setting Daniels free, he stated:   "I personally find that (Mr. Daniels), too, is guilty. After today, Matthew Daniels and his supporters will be free to claim his innocence and the injustice of his arrest, but we who have been here present throughout the testimony will know the truth to be otherwise."[509]

At his hearing on his motion to suppress, Kaled testified that he confessed, in part, because he knew that police would not be able to find any additional evidence against him and then would have to let him go.[510] Further, he claimed that police yelled at him, threatened him, promised him leniency, and told him that he would not last long in prison, because other inmates do not like little kids like him in prison.[511]

---

503. *See* Paionk, *supra* note 500.

504. Amber Hunt, *Police Tactics Criticized in Mello Investigation*, TIMES HERALD (Port Huron, Mich.), Nov. 2, 2000, at 2A, *available at* LEXIS, News Library, Timhld File.

505. *Id.*

506. Amber Hunt, *Witnesses Shake Up Prosecutor*, TIMES HERALD (Port Huron, Mich.), Nov. 18, 2000, at 1A, *available at* LEXIS, News Library, Timhld File.

507. *Id.*

508. *Id.*

509. Amber Hunt, *The Judge Won't Hear Daniels Drug Case*, TIMES HERALD (Port Huron, Mich.), Jan. 25, 2002, at 3A, *available at* LEXIS, News Library, Timhld File. The Michigan State Judicial Tenure Commission subsequently reprimanded the judge for making such prejudicial statements. *See id.*

510. Amber Hunt, *Kaled: Confession Was Forced*, TIMES HERALD (Port Huron, Mich.), Feb. 2, 2001, at 1A, *available at* LEXIS, News Library, Timhld File.

511. *Id.*

Kuecken made similar claims as to how he was coerced into confessing, but he also claimed that the police convinced him that he must have blocked the traumatic events out of his mind.[512] The presiding judge, however, refused to believe that two men would confess to crimes they did not commit, and ruled that their confessions were not coerced and, consequently, admissible at trial.[513]

As prosecutors and defense attorneys prepared for the boys' trials, the arrests of two other men in Kentucky, David Baumann, twenty, and Dennis Bryan, nineteen, quickly threw a wrench into the case.[514] Police soon discovered that Bryan and Baumann were involved in a thirty-seven state crime spree, which began with the embezzlement of at least $20,000 from a restaurant in New Baltimore where both had worked and ended in the deaths of at least three people.[515] Strangely, both men had previously worked at Mancino's, another nearby franchise of the restaurant where Justin was killed.[516] However, even stranger was the fact that one of the crimes for which Bryan and Baumann were being held mimicked that of Justin Mello's murder.[517] A Subway restaurant store clerk in St. Augustine, Florida, was led into the walk-in refrigerator, forced to kneel, and shot in the back of the head.[518] Despite the similarities between the two killings and the link between the two and Mancino's, New Baltimore police and prosecutors still insisted that they had the right men in Kaled and Kuecken.[519]

Initially, police ruled out Bryan and Baumann as possible suspects on the grounds that the bullet that killed Justin did not match any of the guns the pair had in their possession when they were arrested.[520] Ultimately, however, ballistics testing matched the gun used in the murder of Justin Mello to one found in the possession of Bryan and Baumann.[521] Police were also able to identify the gun as one of many

---

512. Amber Hunt, *Suspect: Police Said "I Just Blocked It Out of My Mind"*, TIMES HERALD (Port Huron, Mich.), Feb. 3, 2001, at 3A, *available at* LEXIS, News Library, Timhld File.

513. Jason Cody, *Deadly Spree Comes in Focus; Gun Is Critical Link with New Baltimore Slaying*, TIMES HERALD (Port Huron, Mich.), Mar. 9, 2001, at 2A, *available at* LEXIS, News Library, Timhld File.

514. Jason Cody, *Fair Haven Murder Suspect Extradited to Virginia*, TIMES HERALD (Port Huron, Mich.), Jan. 17, 2001, at 3A, *available at* LEXIS, News Library, Timhld File.

515. *Id.*

516. *Id.*

517. *Id.*

518. *Id.*

519. *Id.*

520. Amber Hunt, *For Families of 2 Boys Accused of Murder, Everything Depends on Credibility of Their Sons, Their Accusers*, TIMES HERALD (Port Huron, Mich.), Jan. 7, 2001, at 1A, *available at* LEXIS, News Library, Timhld File.

521. *See* Cody, *supra* note 513.

stolen in the murder and robbery of a gun shop owner committed by Bryan and Baumann in Virginia.[522] With the evidence mounting against Bryan and Baumann, New Baltimore police still refused to concede that Kaled's and Kuecken's confessions could be false, and continued forward with their charges against the two under a new theory. Police surmised that the gun was stolen in Virginia by Baumann and Bryan, driven back by them to Michigan, and transferred to Kaled who then used it in the murder of Justin Mello.[523] According to this theory, Bryan and Baumann then retrieved the gun and used it in the botched robbery attempt in Kentucky for which they were arrested.[524] Kuecken and Kaled, however, insisted they did not know the other two suspects, and police could not establish that Bryan and Baumann knew Kuecken and Kaled.[525]

While the local police repeatedly assured the public that they had the right men in custody for the murder of Justin Mello, it was the mothers of Kaled, Kuecken, and Daniels whose investigative work led to the dismissal of charges against their sons.[526] In April 2001, all three women traveled to Kentucky, where Baumann and Bryan were arrested, and then to Virginia, where they were being held for the murder of a store clerk, to follow the pair's trail of crime.[527] The women were assured by attorneys and law enforcement officers in both locations that their children were not guilty.[528] Just two weeks after the mothers' trip, Baumann confessed to the murder of Justin Mello to Michigan authorities.[529] Finally, in April 2001, charges were dropped against Kuecken and Kaled.[530] It was the confession of Baumann that ultimately led prosecutors to drop charges against the pair, after they had already spent over six months in jail awaiting trial for the murder and robbery.[531]

In October 2001, Kaled, Daniels and the late Frank Kuecken (who was killed in October 2001 in an unrelated stabbing) filed lawsuits against the law enforcement agencies and municipalities involved in

---

522. *Id.*
523. *Id.*
524. *Id.*
525. *Id.*
526. *See* Hunt, *supra* note 520.
527. *Id.*
528. *Id.*
529. Amber Hunt, *They Spent Months in Jail as the Prime Suspects in a Brutal Killing. Then a Year Ago, Their Names Were Cleared or So They Thought,* TIMES HERALD (Port Huron, Mich.), Apr. 20, 2002, at 2A, *available at* LEXIS, News Library, Timhld File.
530. Amber Hunt, *Daniels, Parents Face Drug Charges,* TIMES HERALD (Port Huron, Mich.), Jan. 11, 2002, at 3A, *available at* LEXIS, News Library, Timhld File.
531. *Id.*

2004]  *FALSE CONFESSIONS IN THE POST-DNA WORLD*  981

their ordeals.[532]

### 2. Multiple Innocent Defendants Arrested, Charged, and Convicted Based on Co-Defendant's False Confession

In several of the cases in our database, a false confession not only led to the wrongful arrest, prosecution, and conviction of the confessor, it also led to the wrongful arrest, prosecution, and conviction of co-defendants who were named in the false confession. In this way, a single false confession can have a cascade-like effect, embroiling numerous other innocents in its net. Perhaps the most dramatic example of this is the Lori Roscetti murder and rape case in Chicago.

#### a. Calvin Ollins, Larry Ollins, Marcellus Bradford, and Omar Saunders

Lori Roscetti, a medical student at the University of Illinois-Chicago's Rush Medical School, was raped and murdered on October 18, 1986.[533] She was last seen driving to her West Side apartment about 1:00 a.m. after a late night of studying for exams.[534] Four hours later, her body was found by a Chicago & Northwestern Railway Officer on a desolate stretch of access road near the ABLA Homes public housing development.[535] Roscetti's face had been nearly destroyed by a chunk of concrete and an autopsy later revealed that she had been kicked so hard and so many times that most of her ribs had been fractured.[536] Tests later determined that she had also been sexually assaulted.[537]

The sheer savagery of the crime sent shock waves throughout greater Chicago and created intense pressure on the Chicago police to solve the crime, pressure which reached a fever pitch as days, then weeks, and then months passed without an arrest.[538] Nearly three months after Roscetti's death, and seemingly out of leads, Chicago detectives turned to a noted FBI profiler, Robert Ressler, and asked

---

532. Amber Hunt, *Mello Family Sues Restaurant Owner*, TIMES HERALD (Port Huron, Mich.), Jan. 9, 2002, at 1A, *available at* LEXIS, News Library, Timhld File.

533. Maurice Possley & Steve Mills, *New Evidence Stirs Doubt over Murder Convictions DNA, Recantations Suggest 4 Inmates Innocent in '86 Case*, CHI. TRIB., May 2, 2001, § 1, at 1, *available at* 2001 WL 4068766.

534. *Id.*

535. *Id.*

536. *Id.*

537. *Id.*

538. *Id.*

*NORTH CAROLINA LAW REVIEW* [Vol. 82

him to create a profile of the man or men who had killed Roscetti.[539] His review of the evidence led Ressler to conclude that the crime was committed by between three and six young black males, ages fifteen to twenty, who had previously been incarcerated and lived close to the scene of the abduction and the spot where Roscetti's body had been found.[540] Ressler theorized that these young men had blocked the path of Roscetti's car, opened a car door, forced Roscetti out of the driver's seat, and then took her to the access road where they raped and killed her.[541]

Using Ressler's profile, the Chicago police zeroed in on three black teenagers, Marcellus Bradford, Larry Ollins, and Omar Saunders, all of whom lived in the nearby housing project and had spent some time in juvenile facilities.[542] On January 27, detectives brought the young men in for questioning.[543] Over fifteen hours later, in the early morning hours of January 28, police claim that Bradford confessed, implicating himself, Larry Ollins, and Larry's cousin, Calvin Ollins, a fourteen-year-old who lived outside of the neighborhood at the Cabrini Green housing project on Chicago's Near North Side.[544] The alleged motive for the murder and rape: a robbery to obtain bus fare so that Calvin could return home to Cabrini Green.[545] Detectives then immediately went to Calvin Ollins's home, woke him up, took the learning disabled boy to the stationhouse, and grilled him until they obtained a confession.[546]

There are no recordings of the interrogations of Bradford or Ollins, but both have since maintained that police officers threatened them, beat them, lied to them about the strength of the evidence against them, and then presented them with papers containing details of how the police theorized the murder took place and rehearsed the story with them before bringing in a prosecutor to memorialize their statements.[547] Bradford agreed to sign the statement and to testify against Larry Ollins, because he was promised a twelve-year sentence instead of a life sentence, a deal which prosecutors later honored and one that ultimately allowed Bradford to be released after serving only

---

539. *Id.*
540. *Id.*
541. *Id.*
542. *Id.*
543. *Id.*
544. *Id.*
545. *Id.*
546. *Id.*
547. *Id.*

about six years in prison.[548]  Calvin Ollins claimed he signed the statement because he was first shown his cousin and told that Larry had fingered him in the murder and then led to believe he would be allowed to go home if he signed the statement.[549]

Bradford, age seventeen, testified against Larry Ollins at Ollins's trial.[550]  Based largely on Bradford's testimony, which he has since admitted was a lie, Larry Ollins was convicted and sentenced to life in prison.[551]  Omar Saunders and Calvin Ollins were also convicted and sentenced to life in prison.[552]  In addition to the statements, the convictions were secured through erroneous and possibly perjurious testimony by Pamela Fish, a lab analyst at the Chicago crime lab, who testified that semen samples could have come from the defendants. Fish gave this testimony knowing that the recovered samples indicated that the perpetrators were "secretors," meaning their blood type could be determined from the semen and other bodily excretions like saliva and not just their blood, and that the defendants were all "non-secretors."[553]  Police also secured the testimony of two "snitch" witnesses, Sam Busch and Anthony Gilty, to build their case against the boys.[554]  Busch testified that Saunders, before he was arrested, had admitted to him that he was involved in the killing.[555]  Similarly, Gilty testified that Larry Ollins told him at a party that he was involved in Roscetti's murder.[556]  Both have since recanted, with Busch claiming he only agreed to testify falsely against Saunders when police threatened to trump up charges against him, and Gilty claiming that police threatened to charge him with Roscetti's murder and then prosecutors agreed to grant him leniency on pending burglary charges.[557]  In words which would later turn out to be prophetic, Calvin Ollins, made a final statement in open court, before being led away to serve a life sentence: "I want to say that I was found guilty for something that I didn't do.  And I always tell myself that I will be out one day and that God will do something for me."[558]

After serving nearly fifteen years in prison for the murder of Lori

---

548. Eric Zorn, *Birkett's Offer in Lemak Case May Haunt Him*, CHI. TRIB., Dec. 6, 2001, § 1, at 1.
549. *See* Possley & Mills, *supra* note 533.
550. *Id.*
551. *Id.*
552. *Id.*
553. *Id.*
554. *Id.*
555. *Id.*
556. *Id.*
557. *Id.*
558. *Id.*

Roscetti, new DNA testing, which confirmed the inaccuracy of Fish's testimony and failed to link any of the four men to the murder and rape of Roscetti, led prosecutors to agree that the four should be released.[559] On December 6, 2001, Calvin Ollins, Larry Ollins, and Omar Saunders were freed from prison.[560] After the first DNA test results appeared to exonerate the four men, Chicago Police Department Deputy James Maurer, the commander of the homicide unit that investigated Roscetti's murder, still insisted to reporters that the men were guilty: "Perhaps they wore condoms or perhaps they didn't ejaculate in her. Whether they left evidence, that I don't know. I'm very confident that they got the right guys."[561] Maurer also speculated that a fifth man might have been involved, a statement which directly contradicted the trial testimony of one of the lead detectives who deemed such a possibility a "fiction."[562] Patrick O'Brien, the former Cook County State's Attorney who prosecuted the men in 1988, told reporters on the day the men were released: "There is always the possibility of false confessions . . . but in my mind they confessed because they did it."[563]

It took only thirty-seven days after the men were released for Maurer and O'Brien to be proven wrong.[564] Acting on a tip from the brother of one of the true perpetrators, police arrested Duane Roach and Eddie "Bo" Harris. Prosecutors charged the men with the murder and rape of Roscetti after the men gave videotaped confessions.[565] DNA and fingerprint evidence later linked them to the crime scene.[566] Larry Ollins, Calvin Ollins, Omar Saunders, and Marcellus Bradford have since filed a wrongful conviction lawsuit against the City of Chicago and individual police officers and prosecutors who were involved in the initial Roscetti murder

---

559. Frank Main & Carlos Sadovi, *Trio Wrongly Jailed 15 Years Taste Freedom*, CHI. SUN-TIMES, Dec. 6, 2001, § 1, at 11, *available at* 2001 WL 7259384.

560. *Id.*

561. Maurice Possley & Steve Mills, *No DNA Link for 4 Inmates: Tests Raise Doubt on Convictions in Student's '86 Death*, CHI. TRIB., May 27, 2001, § 1, at 1, *available at* 2001 WL 4077042.

562. Steve Mills & Maurice Possley, *4 Find New Hope in DNA Results: Despite Evidence Inmates May Still Face Legal Battle*, CHI. TRIB., May 30, 2001, § 1, at 1, *available at* 2001 WL 4078258.

563. Steve Mills, Maurice Possley & Kim Barker, *3 Roscetti Inmates Walk Free: After 15 Years, New World Greets Them as Judge Tosses Convictions*, CHI. TRIB., Dec. 6, 2001, § 1, at 1, *available at* 2001 WL 30799037.

564. Maurice Possley, Eric Ferkenhoff & Steve Mills, *Police Arrest 2 in Roscetti Case: Officials Say Tip Led Them to Pair, Who Confessed*, CHI. TRIB., Feb. 8, 2002, § 1, at 1, *available at* 2002 WL 2621491.

565. *Id.*

566. *Id.*

investigation.[567]

### 3. Multiple False Confessions from Same Defendants to Multiple Crimes: The So-called Serial Killer Cases

So-called serial killings played a critical role in several of the false confession cases studied in the course of this Article's preparation. Specifically, the belief that a serial killer was at large had a corrupting effect on police investigations in at least two ways: (1) police officers labeled innocent men as serial killers after obtaining false confessions from them to multiple killings, only to learn later that the true perpetrator was a serial killer who had remained at large; (2) police officers obtained "true confessions" to murders and rapes from suspects and then attempted to close cases by pinning other unsolved crimes on the suspect; in several of these cases, the so-called serial killer was not guilty of one or more of the crimes to which he had confessed.[568] Perhaps the most dramatic case in the first category is the case of Jerry Frank Townsend, a mentally disabled man who spent twenty-two years in the Florida prison system for murders and rapes committed by another man, serial killer and rapist Eddie Lee Mosley. Another man, Frank Lee Smith, was also wrongfully convicted of a rape-murder since attributed to Mosley. Smith was not as lucky as Townsend; he died of cancer on Florida's death row before he could taste his freedom.

---

567. Abdon M. Pallasch, *Men Freed in Roscetti Case Sue Prosecutors: 4 Say They Were Framed in Student's Murder*, CHI. SUN-TIMES, Jan. 19, 2002, at 4, *available at* 2002 WL 6444778.

568. Illinois is the home of all of the cases in the second category. An Illinois false confession case that fits in this category is the case of Andre Jones. In September, 1979, Andre Jones, a man already on Illinois's death row for a murder, confessed to another murder in St. Clair County. Jones later claimed that that the police officer who conducted the interrogation, Robert Miller, made veiled threats against Jones's family and a girlfriend, bribed him with money added to his jail account, and gave him Valium. He alleges that Miller showed him autopsy and police reports that enabled Jones to give details which matched the crime in part. The confession, handwritten by Miller, was extremely detailed. Ironically, the level of detail helped Jones in the end as a grand jury did not believe the confession because so many of those details did not match the facts of the crime. In 1985, a St. Louis man, Glennon E. Engleman, pled guilty to the murder. *See* Smith & Bosworth, *supra* note 285.

a.   Innocents Who Falsely Confess to Crimes Committed by Serial Killers

i. Jerry Frank Townsend, Frank Lee Smith, and Eddie Lee Mosley

Jerry Frank Townsend was born in Greensville, Mississippi, the son of a sharecropper. At fourteen, Townsend, who has an IQ of between fifty and sixty, quit school in the fifth grade and went to the fields to pick cotton, beans, and corn.[569] As he grew older, he took odd jobs washing cars, lifting freight, doing janitorial work, and traveling with Hoxie Brothers Circus as a laborer.[570] Bosses repeatedly said he was a good, hard worker.[571] He had a wife and a daughter in Chicago, but lived in Hallandale Beach, Florida and washed cars for a living.[572] In 1979, at age twenty-seven, he worked at a Miami equipment company, opening boxes.[573]

In the summer of 1979, four women were murdered in four weeks in Broward County and Miami-Dade County Florida.[574] The victims, all black females, were attacked in or near their homes and on the street.[575] Some were on their way to work, or returning from parties or choir practice.[576] Most of them were raped and then strangled.[577] Young women responded to the deaths by arming themselves with switchblades, and young men formed vigilante mobs.[578] After the daylight rape of a woman on a Miami-Dade sidewalk on September 5, 1979, the police arrested Jerry Frank Townsend.[579] The victim and two witnesses identified Townsend a block away from the incident.[580] Although the victim had a criminal history, declined to go to a rape treatment center following the alleged incident, and never testified against Townsend,[581] Townsend

569. Meg Laughlin & Elinor J. Brecher, *Relatives of Murder Victims Experience Conflicting Emotions*, MIAMI HERALD, June 15, 2001, at 34A.
570. *Id.*
571. *Id.*
572. *Id.*
573. *Id.*
574. Wanda J. DeMarzo & Daniel de Vise, *Two Serial Killers or One Miscarriage of Justice?*, MIAMI HERALD, Apr. 22, 2001, at 1L.
575. *Id.*
576. *Id.*
577. *Id.*
578. *Id.*
579. *See* Laughlin & Brecher, *supra* note 569.
580. *Id.*
581. Paula McMahon & Ardy Friedberg, *Police Want to Question Man Who Falsely Confessed to Broward Murders*, SUN-SENTINEL (Ft. Lauderdale, Fla.), May 24, 2001, at 1B, *available at* LEXIS, News Library, Sunsen File.

quickly became a suspect in several unsolved murders.[582]

Detectives investigating the rape asked Townsend about unsolved murders in Miami and Fort Lauderdale.[583] At the end of four days of questioning, Townsend had implicated himself in about twenty homicides in Fort Lauderdale, Miami, Tampa and San Francisco.[584] Although prosecutors did not pursue most of Townsend's confessions because there was evidence that he could not have committed them, he was still charged with six murders.[585] No physical evidence ever linked Townsend to any murder,[586] and his rambling, confused confessions on audiotape showed telltale signs he was led and coerced by his interrogators.[587] According to one expert, the frequent stop and start interruptions of the tapes, as well as the detectives' frequent prompts and correction of Townsend on tape, render Townsend's statements so flawed as to be "worthless" for establishing guilt.[588] Many of the details he included were wrong, including giving the inaccurate races and ages of some of the victims. He was also six years off on the date of one murder and wrongly described some of the victims' clothing.[589] In one interview, on September 9, 1979, Townsend described killing several women in orange groves near Tampa, telling police he strangled one with his hands, another with her bra, and cut the throat of a third.[590] The next day, again on tape, Townsend completely changed the manner of death, telling detectives he shot all three.[591] "This guy [Townsend] was capable of confessing to just about anything," said Dennis Urbano, who was a public defender in Miami-Dade at the time and defended Townsend on his Miami-Dade charges.[592] "We tried it out and we could get him to confess to anything."[593] "Police led Townsend through the confessions after spending hours talking to him about the

---

582. *See* Laughlin & Brecher, *supra* note 569.
583. Friedberg & Smith, *supra* note 325.
584. *Id.*
585. Paula McMahon & Ardy Friedberg, *Evidence Could Free Inmate*, SUN-SENTINEL (Ft. Lauderdale, Fla.), May 8, 2001, at 1B, *available at* LEXIS, News Library, Sunsen File.
586. *See* DeMarzo & de Vise, *supra* note 574.
587. *See* Friedberg & Smith, *supra* note 325.
588. Amy Driscoll, *Taped Confessions So Flawed They're "Worthless" Expert Says*, MIAMI HERALD, June 15, 2001, at 33A.
589. *Id.*
590. *Id.*
591. *Id.*
592. Paula McMahon & Ardy Friedberg, *DNA Review in Murders Leads Away from Convict*, SUN-SENTINEL (Ft. Lauderdale, Fla.), Apr. 21, 2001, at 1A, *available at* LEXIS, News Library, Sunsen File.
593. *Id.*

cases," Urbano said.[594] "They wanted to clean out the cold case files on him."[595] At moments in the taped confession, Townsend seemed to be recounting crime details while looking at crime-scene photos provided by police.[596] Detectives also took Townsend to Dillard High School in 1979 to talk about the murder of thirteen-year-old Sonja Yvette Marion.[597] "Townsend said it was a white female and he did it at night," said Doug Evans, a retired police detective who worked on the Marion murder.[598] "But it was a black child and it was during the day. I knew he didn't do it."[599]

In 1980, Townsend stood trial for three first-degree murders, the 1973 deaths of Thelma Jean Bell, Naomi Gamble, and Barbara Ann Brown.[600] At trial, the judge allowed prosecutors to introduce evidence from two murders from 1979, including the Sonja Yvette Marion murder, as part of a "pattern theory."[601] After a four-week trial, on July 30, 1980, based almost entirely on his flawed confessions, the jury found Townsend guilty of the first-degree murders of Gamble and Brown, and not guilty of the Bell murder.[602] He was given two consecutive life sentences with twenty-five year minimums before consideration for parole.[603] On October 4, 1982, he pleaded no-contest to the second-degree murders of Terry Cummings and Cathy Moore.[604] He also pleaded guilty on December 6, 1982 to the 1977 murder of Dorothy Gibson and the 1979 murder of Wanda Virga in Miami.[605] Finally, Townsend pleaded guilty to a rape in Miami, primarily because investigators told him he would get the death penalty if he refused to confess.[606] In total, Townsend was held responsible for six murders, four in Broward County and two in

---

594. *Id.*

595. *Id.*

596. *See* DeMarzo & de Vise, *supra* note 574.

597. Ardy Friedberg, *Ex-Detective Hunted Suspect for 20 Years; Charges Bring Vindication for Investigator*, SUN-SENTINEL (Ft. Lauderdale, Fla.), Dec. 16, 2000, at 8A, *available at* LEXIS, News Library, Sunsen File.

598. *Id.*

599. *Id.*

600. *See* Townsend v. State, 420 S.2d 615, 620 (Fla. Dist. Ct. App. 1982) (affirming Townsend's 1980 conviction because the collateral crime evidence of other murders was relevant to prove identity, modus operandi, and motive).

601. *See id.*; DeMarzo & de Vise, *supra* note 574.

602. *See* DeMarzo & de Vise, *supra* note 574.

603. *Id.*

604. Plaintiff's Complaint, Townsend v. Jenne, No. 02018346-03 (Fla. Broward County Ct.) [hereinafter Plaintiff's Complaint].

605. *Id.*

606. *Id.*

Miami-Dade County, and was serving seven life sentences.[607]

After reviewing crime scene evidence in 1998, Detective John Curcio of the Fort Lauderdale Police Department reopened three closed 1979 murder cases that had been pinned on Jerry Frank Townsend.[608] Detective Curcio requested that the Broward County Sheriff's Crime Lab examine DNA evidence from the crime scenes.[609] Curcio sought the testing because he had long suspected that the rapes and murders for which Townsend was convicted were the work of Eddie Lee Mosely, a man whom Broward County authorities had labeled "The Rape Man" and whom they believed was responsible for approximately forty-one rapes and seventeen rape murders between 1973 and 1987.[610] Although it took two years to locate and test the DNA evidence, Curcio's suspicions proved to be true.[611] The DNA in the cases of the 1973 murder of Naomi Gable and the 1979 slaying of Terry Cummings cleared Townsend and implicated Mosley.[612] Mosley, and not Townsend, also raped and killed Sonja Yvette Marion.[613] Three other murders attributed to Townsend were re-examined, but no DNA could be found for testing.[614]

Faced with the DNA evidence, a Broward County judge cleared Townsend of the four Broward County murders, prompting Broward County Sheriff Ken Jenne to offer Townsend a personal apology.[615] Although Miami-Dade State's Attorney Katherine Fernandez Rundle released a statement saying, in part, that she still believed that Townsend was a rapist and a murderer based on evidence she reviewed,[616] a Miami-Dade judge eventually vacated Townsend's three convictions in Miami, calling the sentence an "enormous tragedy."[617] Townsend was released on June 16, 2001, after twenty-two years in prison.[618]

Eddie Lee Mosley's modus operandi was to rape women and

607. *Id.*

608. *Id.*

609. *Id.*

610. *Id.*

611. *Id.*

612. Daniel de Vise, *Prolonged Struggle Leads Toward Release*, MIAMI HERALD, June 15, 2001, at 1A.

613. Sydney P. Freedberg, *He Didn't Do It*, ST. PETERSBURG TIMES, Jan. 7, 2001, at 1A, *available at* 2001 WL 6956127.

614. *Id.*

615. Meg Laughlin & Daniel de Vise, *Former Convict Is Overwhelmed by His Freedom*, MIAMI HERALD, July 7, 2001, at 11A.

616. Manny Garcia & Amy Driscoll, *Prosecutor's Own Files Raise Questions of His Objectivity*, MIAMI HERALD, June 28, 2001, at 1A.

617. *See* Laughlin & de Vise, *supra* note 615.

618. *Id.*

strangle them with an article of clothing.[619] Most of the victims lived within a mile of where Mosley lived with his mother.[620] Although Broward police knew of Mosley's location, they were unable to send him to prison.[621] In 1974, a judge sent Mosley to a mental hospital after he was ruled incompetent to stand trial on a 1973 rape charge.[622] On June 4, 1979, Mosley was released from an institution for the criminally insane and within months the string of rapes and killings started again.[623] Lisa Wakeman, a Miami rape victim, tentatively identified Mosley, not Townsend, as her attacker in a photo lineup, further remarking that her attacker had "nice teeth,"[624] an important piece of evidence in light of the fact that Townsend was missing many of his.[625] In court, Wakeman waffled, first denying that Townsend looked like her attacker and then insisting he was the man: "I can't be sure, but he looks like him. If he was a little darker, I'd say it was him."[626] Later, she was asked if Townsend was the man and she said, "I don't know."[627] Mosley was charged with rape again in 1980 and 1984, but again he beat the charges.[628] At least nine other women were raped and murdered after Townsend was arrested in 1979,[629] including twenty-two-year-old Teresa Giles, raped and strangled in December 1984, and fifty-four-year-old Emma Cook, found raped and strangled in a deserted concrete shed on Christmas Eve, 1983.[630]

During his incarceration, Townsend lived in constant fear for his life.[631] He was classified as a maximum security prisoner, requiring that he be handcuffed during any activity and that all the activities outside his cell be extremely limited.[632] Perhaps more importantly, his convictions involved the rape and murder of a child, a crime that guards and inmates especially disliked.[633] As a sex offender, prison

619. *See* Freedberg, *supra* note 613.
620. *Id.*
621. *Id.*
622. *Id.*
623. *Id.*
624. *See* DeMarzo & de Vise, *supra* note 574.
625. *Id.*
626. *Id.*
627. *See* McMahon & Friedberg, *supra* note 581.
628. *See* Freedberg, *supra* note 613.
629. Paula McMahon & Ardy Friedberg, *They Just Wanted to Get Somebody: DNA Testing Proved What Neighborhood Barber Said He Knew All Along*, SUN-SENTINEL (Ft. Lauderdale, Fla.), May 19, 2001, at 1A, *available at* LEXIS, Newslibrary, Sunsen File.
630. Daniel de Vise, *DNA Test Links Accused Killer to Broward Woman's '84 Slaying*, MIAMI HERALD, May 3, 2001, at 6B.
631. *See* Plaintiff's Complaint, *supra* note 604, at 32.
632. *Id.*
633. *See* Laughlin & de Vise, *supra* note 615.

regulations limited visitations with family members and barred any visits with his young daughter.[634] After his release on June 15, 2001, he showed signs of being affected by twenty-two years in prison.[635] He now walks slowly with his head down and his shoulders stooped.[636] He constantly looks behind him as if he expects to be ambushed.[637]

When eight-year-old Shandra Whitehead was found raped and murdered in her home in 1986, police used sketchy and conflicting eyewitness accounts to pick up Frank Lee Smith, an "eccentric man" living near the scene of the crime.[638] Smith, previously convicted of two murders (one at age thirteen, one at eighteen), was somewhat infamous in the neighborhood and seemed to be the perfect suspect.[639] An interrogation by two decorated police detectives was neither videotaped or tape recorded and no notes were found from the interview.[640] According to the detectives' statements, however, Smith made "several very damning admissions."[641] One detective, Richard Scheff, later testified that when he and his partner lied to Smith, saying that the victim's brother had seen the murderer, Smith said "No way that kid could have seen me, it was too dark."[642] This supposed confession was used to convict Smith for Whitehead's murder in spite of the fact that no physical evidence implicated him and information given by eyewitnesses made it highly improbable that Smith could have been the perpetrator (i.e., Smith was legally blind and could not have hopped a fence without his glasses; several witnesses swore the perpetrator was not wearing glasses). In 2000, Smith died of cancer while on death row.[643]   FBI DNA tests exonerated Smith one year later and implicated Eddie Lee Mosley, then an inpatient in a state mental institution.[644]

---

634. *See* Plaintiff's Complaint, *supra* note 604.
635. *See* Laughlin & de Vise, *supra* note 615.
636. *Id.*
637. *Id.*
638. Dan Malone, *DNA Test Clears Man After Death: Condemned Inmate's Case May Prompt More Reviews*, DALLAS MORNING NEWS, Dec. 16, 2000, at 1A, *available at* LEXIS, News Library, Dalnews File.
639. *Id.*
640. *Id.*
641. *Id.*
642. *Id.*
643. *Id.*
644. *Id.*

b.    Closing Open Cases by Falsely Attributing Unsolved
Murders to Guilty Defendants

The second category of false confessions involving serial killers
contains cases in which interrogators persuade a defendant who has
killed to confess falsely to one or more other unsolved slayings.
Although such confessions may close cases, they may do so with
tragic consequences.    For when the wrong perpetrator is
apprehended, the real perpetrator is left free to roam the streets and
victimize others.  This appears to have been the case in the Chicago
cases discussed below.

i. Hubert Geralds, Derrick Flewellen, and Andre Crawford

Hubert Geralds, a mildly mentally retarded man, whose I.Q. has
been tested as low as fifty-nine, was convicted of six murders in 1997
and sentenced to death.[645]  Convictions for two of those murders
(including the murder of Rhonda King) were based solely on his
confessions.  In February 2000, the Cook County State Attorney's
office vacated Geralds's death sentence and convictions, saying he
would be retried for all of the murders except that of Rhonda King.
The charges against Geralds were dropped when a new serial killer
emerged, Andre Crawford, who confessed on videotape in greater
detail to the murder of King.[646] Crawford was eventually charged with
ten rape-murders in Chicago's Englewood neighborhood.[647]

Although Geralds was exonerated of the King murder, he was
later implicated through DNA testing to the murder of Lovie Ford, a
crime to which another man, Derrick Flewellen, had falsely
confessed.  In June 1995, thirty-year-old Derrick Flewellen, was
walking out of a hospital where he had been treated for a dislocated
toe when he was approached by two Chicago detectives who asked
him to accompany them to the police station.[648]   After an
interrogation which lasted more than thirty-six hours, the detectives
obtained a signed confession from Flewellen to the murders of Lovie

645. Janan Hanna & Terry Wilson, *Questions Arise over Links Made in Serial Killings:
Roseland Slayings Put Focus on Methods Used in Investigation*, CHI. TRIB., July 5, 2000,
§ 1, at 1.

646. *Id.*

647. *See id.*; Steve Mills & Terry Wilson, *State Says It Convicted Wrong Killer*, CHI.
TRIB., Feb. 11, 2000, § 1, at 1; Maurice Possley, *Murder Defendant's Mental State Argued*,
CHI. TRIB., Nov. 11, 1997, § 2, at 3.

648. Maurice Possley, *DNA Topples Case Built on Confessions*, CHI. TRIB., Dec. 1,
1999, § 1, at 1.

Ford and Sherry Hunt.[649]  The only evidence linking Flewellen to these crimes were confessions that Flewellen claims were obtained through violence.  A friend who was outside of the interrogation room during Flewellen's interrogation claimed to have heard screaming and noises consistent with Flewellen's allegations of coercive violence.[650]  No DNA evidence linked him to either crime even though Flewellen's confession stated that the murders were committed after sexual intercourse.[651]  A test of semen taken from Ms. Ford, however, was matched in late 1999 to Geralds.[652]  Despite the DNA evidence linking Geralds to the crime, prosecutors took Flewellen to trial, arguing that Flewellen gave eight oral statements and a final written statement confessing to the crimes.[653]  Given the DNA evidence, however, Judge Marcus Salone acquitted Flewellen in November 1999.[654]  Flewellen filed a civil lawsuit against the City of Chicago and seven police officers, claiming that the officers framed him for the 1995 deaths of two women.[655]  The City of Chicago paid Flewellen $250,000 to settle his lawsuit.[656]

### F.  Prosecuting the False Confessor

When evidence of a false confession comes to light, the integrity of the justice system is implicated.  Also at stake is the integrity of the police officers who obtained the false confession and the prosecutors who charged and sometimes convicted the false confessor.  Rather than admitting their errors, apologizing to the wronged parties, and officially exonerating the defendants, in several of the cases discussed herein, law enforcement officials continued to insist that the false confessors were guilty.  In other cases, the authorities acknowledged that a false confession was obtained, but refused to accept any responsibility for the false confession.  But perhaps the most egregious response to a false confession occurs when prosecutors bring obstruction of justice charges against false confessors or pressure innocent defendants into pleading guilty to lesser crimes in

---

649. *Id.*
650. *Id.*
651. *Id.*
652. *Id.*
653. *Id.*
654. *Id.*
655. *See* Maurice Possley, Steve Mills, & Ken Armstrong, *Veteran Detective's Murder Cases Unravel,* CHI. TRIB., Dec. 17, 2001, § 1, at 1; *Ex-Suspect Says Police Beat Him,* CHI. SUN-TIMES, June 2, 2000, at 3A; *Man Sues, Says Police Framed Him,* CHI. SUN-TIMES, June 2, 2000, at 6A.
656. Maurice Possley & Gary Washburn, *City to Settle with Man Forced to Confess,* CHI. TRIB., June 14, 2002, § 2, at 3.

order to gain their release. There are several instances of such police and prosecutorial misconduct in our database, two of which are discussed below.

### 1. David Saraceno

As an eighteen-year-old troublemaker with a history of vandalism, David Saraceno was a likely suspect in the burning of a fleet of fifteen school buses in Haddam, Connecticut.[657] Detectives brought him into the station and interrogated him for over ten hours until they finally obtained a confession from Saraceno that he and several accomplices torched the buses.[658] As it turned out, the confession was false, coerced by tactics which apparently included threats that Saraceno would be locked up in an adult jail where he would be raped.[659] After his conviction on arson charges, and while his appeal was pending, private investigators discovered evidence implicating other suspects whom the State chose to protect rather than disclose to the defense.[660] A new trial was ordered and the State allowed the statute of limitations to run out before charging the new suspects, one of whom had given a credible and detailed confession without coercion, to Saraceno's private investigator.[661] Rather than dismiss the charges against Saraceno, prosecutors offered him a deal, agreeing to remove the specter of further prosecution in exchange for his "no-contest" plea to a lesser bus-fire charge.[662] When Saraceno refused, they offered him a deal which required he plea to "hindering prosecution by falsely confessing."[663] To get his life back on track and to stop draining his parent's finances, Saraceno, now twenty-three and a University of Connecticut student, took the deal.[664]

### 2. Teresa Sornberger

One day after a bank was robbed, Teresa and Scott Sornberger were arrested and charged, based in part on an identification of Scott (a bank patron) as the robber in the videotape surveillance.[665] Teresa

---

657. *See* O'Brien, *Man Says Confession Was False, supra* note 317.

658. *Id.*

659. *Id.*

660. *Id.*

661. *Id.*

662. *Id.*

663. *Id.*

664. Editorial, *A Disgraceful End to the Bus-Burning Case*, HARTFORD COURANT, Dec. 17, 1999 at A21, *available at* 1999 WL 30058262.

665. *See* Karen McDonald, *Couple Cleared in Heist*, PEORIA J. STAR (Peoria, Ill.), May 11, 2000, at A1, *available at* 2000 WL 20632718.

2004]   *FALSE CONFESSIONS IN THE POST-DNA WORLD*   995

was brought in for questioning and confessed that her husband had committed the robbery and she had driven the getaway car.[666] Scott Sornberger maintained his innocence throughout the investigation, and no other evidence linked either of them to the crime.[667] In the end, the Sornbergers were freed on a fluke.[668] A local legislator, by chance, saw a television newscast about a bank robbery in a nearby town in which the suspect bore a striking resemblance to Sornberger.[669] The FBI investigated this information and discovered from surveillance tapes that the same man had robbed both banks.[670] The man, though resembling Sornberger, was not Sornberger.[671] The two were freed after having spent a total of 118 days in jail.[672] Sornberger, who recanted her confession, soon after her arrest, claimed she had confessed only after police threatened to call child welfare authorities to have her children removed from her custody.[673] The judge disbelieved this testimony and admitted the confession into evidence.[674] After the truth came to light, Knox County State's Attorney Paul Mangieri announced that Sornberger's case "shows the system works."[675] Before she was released, however, Sornberger had to plead guilty to obstructing justice for giving false information to authorities.[676]

## CONCLUSION

The 125 *proven* false confessions analyzed in this study should put to rest any doubts that modern psychological interrogation techniques can cause innocent suspects to confess. Like other studies,[677] our research demonstrates the potentially deleterious and fateful consequences of confession evidence—even coerced, uncorroborated and ultimately *false* confession evidence—when put before a trier of fact. One of the most significant findings in this study

666. *Id.*
667. *Id.*
668. *Id.*
669. *Id.*
670. *Id.*
671. *Id.*
672. *Id.*
673. *Id.*
674. *Id.*
675. *Id.*
676. *See* Karen McDonald, *Not Telling the Truth: False Confessions Happen for a Variety of Reasons*, PEORIA J. STAR (Peoria, Ill.), May 27, 2000, at A1, *available at* 2000 WL 20638998; Editorial, *False Confession Demands Review of Interviewing Tactics*, PEORIA J. STAR (Peoria, Ill.), May 15, 2000, at A4, *available at* 2000 WL 20637666.
677. *See* Kassin & Neumann, *supra* note 76, at 481; Kassin & Sukel, *supra* note 76, at 42–44; and Leo & Ofshe, *Consequences*, *supra* note 76, at 491–92.

is that more than four-fifths (81%) of the innocent defendants who chose to take their case to trial were wrongfully convicted "beyond a reasonable doubt" even though their confession was ultimately demonstrated to be false. In other words, the factually innocent defendant who took his case to trial was approximately four times more likely to be convicted than acquitted, despite the many procedural safeguards of trial rights of American criminal defendants. An additional fourteen false confessors in this study (11% of the entire sample) chose to accept a plea bargain rather than take their case to trial—despite their factual innocence—typically to avoid the death penalty.[678] Remarkably, then, 86% (or almost nine of every ten) of the individuals in our sample whose false confessions were not discovered by police or dismissed by prosecutors before trial were eventually convicted.

That false confessions are likely to lead to wrongful deprivations of liberty and convictions may no longer be a novel finding. This study adds to a growing body of research[679] demonstrating the power of confession evidence to substantially prejudice a trier of fact's ability to even-handedly evaluate a criminal defendant's culpability. As both experimental and field studies have demonstrated,[680] criminal officials and jurors often place almost blind faith in the evidentiary value of confession evidence—even when, as in all the cases in this study, the confession was not accompanied by any credible corroboration and there was compelling evidence of the defendant's factual innocence. Criminal justice officials and lay jurors who prosecute and convict false confessors in such high percentages appear to treat confession evidence as more probative than any other piece of case evidence and thus as essentially dispositive of the defendant's guilt—even when the confession lacks corroboration and is almost certainly the product of psychological coercion and/or police misconduct.

The 125 *proven* false confession cases analyzed in this Article demonstrate that interrogation-induced false confessions may be a more serious problem than previously imagined. These cases ought to compel all who care about the credibility of the American criminal justice system to devise better ways to reduce or eliminate the number of false confessions and the risks they pose for the innocent. It behooves criminal justice officials not only to acknowledge and better understand the role that false confessions play in creating and

---

678. *See* Table 8, *supra* note 363 and accompanying text.
679. *See* Table 1, *supra* notes 72–75 and accompanying text.
680. *Id.*

perpetuating miscarriages of justice, but also to introduce meaningful reforms that will prevent false confessions from occurring or leading to the wrongful conviction and/or incarceration of the innocent.

The risk of harm caused by false confessions could be greatly reduced if police were required to electronically record the entirety of all custodial interrogations of suspects.[681]   Unlike some potential reforms, the recording of police interrogation is not an adversarial policy suggestion; it favors neither the defense nor the prosecution, but only the pursuit of reliable and accurate fact-finding. For at least three reasons, American police should be required to electronically record the entirety of their interrogations.

First, taping interrogations creates an objective, comprehensive, and reviewable record of the interrogation. With taping, it is no longer necessary to rely on subjective credibility judgments to resolve "swearing contests" between the police and the defendant about what occurred during interrogation.   Unlike the testimony of two disputants, the videotape does not suffer from the fallibility and biases of human memory and judgment, but, instead, preserves a record of the interrogation that is complete and factually accurate. A videotape will capture any police abuses and/or improprieties as well as protect detectives from false accusations.   By preserving the record, taping removes the secrecy of interrogation and makes it accessible to criminal justice officials and triers of fact, thus rendering the fact finding process more accurate and reliable.[682]

Second, taping leads to a higher level of scrutiny (by police officials as well as others) that will deter police misconduct during interrogation, improve the quality of interrogation practices and thus increase the ability of police to separate the innocent from the guilty. Interrogators are less likely to resort to improper interrogation

---

681. Shockingly,    in    only    two—Joshua    Treadway's    and    Aaron    Houser's interrogations—of the 125 proven false confessions described in this Article did police videotape the entirety of the suspect's interrogation. In fifteen other proven false confessions in this Article, police partially videotaped the interrogation.

682. More than forty years ago, in a landmark law review article, Bernard Weisberg, then General Counsel for the Illinois chapter of the American Civil Liberties Union and later a United States Magistrate Judge for the Northern District of Illinois, railed against the problems of secrecy during the interrogation process and first argued that the solution is "a record from start to finish of any interrogation in a police station." Bernard Weisberg, *Police Interrogation of Arrested Persons: A Skeptical View*, 52 J. CRIM. L. CRIMINOLOGY. & POL. SCI. 21, 45 (1961); *see also Equal Justice in the Gatehouses and Mansions of American Criminal Procedure, in* Y. KAMISAR ET AL., CRIMINAL JUSTICE IN OUR TIME 85–87 (1965) (citing Weisberg and maintaining that no rule pertaining to warnings or waiver of rights would amount to anything unless police interrogation were stripped of its characteristic secrecy).

*NORTH CAROLINA LAW REVIEW* [Vol. 82

practices when the camera is rolling and thus they are less likely to coerce an innocent suspect into falsely confessing.

Third, a taping requirement creates the opportunity for various criminal justice officials to more closely monitor both the quality of police interrogation and the reliability of confession statements. With taping, detectives, police managers, prosecutors, and judges are able to more easily detect false confessions and thus more easily prevent their admission into evidence. Inevitably, however, some unreliable confessions will still make it into evidence at trial. A videotaping requirement, however, allows jurors to make a more informed evaluation of the quality of the interrogation and the reliability of the defendant's confession, and thus to make a more informed decision about what weight to place on confession evidence.

As others have demonstrated,[683] virtually all false confessions in America occur because of psychologically coercive interrogation methods and strategies, police overreaching and/or police misconduct[684]—which, in the types of cases analyzed in this Article, is usually alleged but almost never memorialized.[685] While there is no better way for police officers, prosecutors, judges, and juries to learn the truth of what occurred in the interrogation room than to see a videotape of the entire interrogation process, presently only three states, Alaska, Minnesota, and Illinois, require that police electronically record interrogations.[686] In both Alaska and Minnesota, the taping requirement was imposed by each state's supreme court.[687] In July 2003, Illinois became the first state to mandate legislatively the electronic recording of interrogations, when Governor Rod Blagojevich signed into law a bill that will require law enforcement officers to tape interrogations in homicide cases beginning in July, 2005.[688] Although Illinois was the only state to pass such a law in the last legislative session, many other states introduced legislation in this area in the last legislative session and, in the wake of Illinois's action, editorial boards from newspapers from around the country have called for taping.[689]

---

683. *See* Kassin, *supra* note 76, at 221; Ofshe & Leo, *Decision to Confess Falsely, supra* note 76, at 983.

684. *See* Kassin, *supra* note 76, at 221; Ofshe & Leo, *Decision to Confess Falsely, supra* note 76, at 983.

685. *See* Kassin, *supra* note 76, at 221; Ofshe & Leo, *Decision to Confess Falsely, supra* note 76, at 983.

686. *See* Stephan v. State, 711 P.2d 1156, 1159 (Alaska 1985); Steve Mills, *Law Mandates Taping of Police Interrogations*, CHI. TRIB., July 18, 2003, § 1, at 1.

687. See State v. Scales, 518 N.W.2d 587, 589 (Minn. 1994).

688. *See* Mills, *supra* note 686.

689. *See, e.g.*, Editorial, *Reforming the Death Penalty in Illinois, Taping Should Protect*

2004]    *FALSE CONFESSIONS IN THE POST-DNA WORLD*    999

More progress has been made regarding taping of interrogations at the local level.   In April of 2001, a series of articles in the *Washington Post* highlighting several false confessions obtained by Prince Georges County, Maryland, police officers led County Attorney Jack Johnson to insist that all interrogations in serious felonies be tape-recorded.[690] After some initial opposition, the Prince Georges County, Maryland, Police Department agreed to implement the taping policy.[691]   A similar expose in the *Miami Herald* in December 2002 spotlighted a problem of false confessions obtained by the Broward County Sheriff's Office.[692] The series led Broward County State's Attorney Michael Satz to pressure local police officers to start taping interrogations.[693]   First, Fort Lauderdale's Police Department announced plans to start taping interrogations[694] and shortly thereafter, Broward County Sheriff Ken Jenne, who just days before had opposed taping, shifted gears and announced that his department would begin taping all interrogations in seventeen of the most serious felonies.[695]   A few days later, Miami Police Chief John Timoney announced that his officers would follow Broward's lead and institute a taping policy.[696]

In Chicago, a series of high profile false confession cases, including the Ryan Harris case, and the Lori Roscetti case, spurred calls for a statewide bill to mandate taping of interrogations.[697] These

*Police as Well as Murder Suspects*; OMAHA WORLD HERALD, July 21, 2003, at 6B, *available at* 2003 WL 5277097; Editorial, *Taping Interrogations Would Promote Justice*, SAN ANTONIO EXPRESS NEWS, Aug. 6, 2003, at 6B, *available at* 2003 WL 58416751; Editorial, *Videotape Homicide Confessions*, HARTFORD COURANT, Aug. 4, 2003, at 6A, *available at* 2003 WL 59294938.

690.  *See* April Witt, *Pr. George's Police to Install Video Cameras; Interrogation Tapings to Begin by Mar. 31*, WASH. POST., Feb, 1, 2002, at B4; April Witt & Paul Schwartzman, *Prince George's Prosecutor Acts to Check Police Tactics*, WASH. POST., June 7, 2001, at B1.

691.  *See* Witt, *supra* note 690.

692.  The *Miami Herald* series entitled *Spotlight on False Confessions* ran on page one for three days.  *See* Wanda J. DeMarzo & Daniel de Vise, *Experts: Tape Police Interrogations*, MIAMI HERALD, Dec. 24, 2002, at A1; Wanda J. DeMarzo & Daniel de Vise, *Police Ignored Glaring Defects in Murder Cases*, MIAMI HERALD, Dec. 23, 2002, at A1; Wanda J. DeMarzo & Daniel de Vise, *Zealous Grilling by Police Tainted 38 Murder Cases*, MIAMI HERALD, Dec. 22, 2002, at A1.

693.  Michael McGuire, *Taped Police Interrogations Gain Momentum in Florida*, CHI. TRIB., Mar. 8, 2003, at C1, *available at* 2003 WL 15976343.

694.  Wanda DeMarzo & Daniel de Vise, *Ft. Lauderdale to Tape All Homicide Interrogations*, MIAMI HERALD, at A1, *available at* 2003 WL 2573774.

695.  Paula McMahon & Ardy Friedberg, *Sheriff to Tape Felony Inquiries*, SUN-SENTINEL (Ft. Lauderdale, Fla.), Feb. 11, 2003, at 1A, *available at* 2003 WL 11555119.

696.  Wanda DeMarzo & Daniel de Vise, *Miami Police Plan to Videotape Interrogations*, MIAMI HERALD, Feb. 13, 2002, at B1 *available at* 2003 WL 13342381.

697.  *See* Steven A. Drizin & Beth A. Colgan, *Let the Cameras Roll: Mandatory*

calls grew to a fever pitch after the *Chicago Tribune* published a series on false confessions in December 2001.[698] In response to the Ryan Harris case, Cook County State's Attorney Richard Devine instituted a program in which his prosecutors obtained suspects' confessions on videotape.[699] The flaws of taping only the final confession became evident, however, in December, 2001, when the first videotaped false confession surfaced in the murder case of Corethian Bell.[700] After some fifty hours of interrogation, Chicago police officers got Bell to confess on videotape to the murder and sexual assault of his own mother.[701] When DNA test results exonerated Bell and implicated another man who had a history of sexually assaulting women in Bell's neighborhood, Cook County prosecutors were forced to drop charges against Bell and agree to his release.[702] The Bell case, the Roscetti case, the Ryan Harris case and several others finally led Cook County State's Attorney Devine to endorse a bill which would require all Illinois police officers to tape custodial interrogations of suspects in homicide cases.[703] With the support of the Cook County State's Attorney, the bill passed the Illinois Senate by a vote of 58 to 0, and the Illinois House by a vote of 109 to 7.[704] With such overwhelming legislative support, Governor Blagojevich, a former prosecutor, was hard pressed to veto the bill, even though he had opposed videotaping interrogations during his run for governor. Blagojevich had supported the taping only of

---

*Videotaping of Interrogations is the Solution to Illinois' Problem of False Confessions*, 32 LOY. U. CHI. L.J. 337, 343–45 (2001).

698. *See* Ken Armstrong, Steve Mills, & Maurice Possley, *Coercive and Illegal Tactics Torpedo Scores of Cook County Murder Cases*, CHI. TRIB., Dec. 16, 2002, § 1, at 1, *available at* 2001 WL 30802598; Ken Armstrong, *Illegal Arrests Yield False Confessions*, CHI. TRIB., Dec. 17, 2002, § 1, at 11, *available at* 2001 WL 30802890; Ken Armstrong, Maurice Possley & Steve Mills, CHI. TRIB., Dec. 18. 2001, § 1, at 1; Ken Armstrong, *Officers Ignore Laws Set Up to Guard Kids*, CHI. TRIB., Dec. 18, 2001, § 1, at 1, *available at* 2001 WL 30803197; Ken Armstrong, *Veteran Detective's Murder Cases Unravel*, CHI. TRIB, Dec. 17, 2002, § 1, at 1 *available at* 2001 WL 30802883; Ken Armstrong, Maurice Possley & Steve Mills, *When Jail Is No Alibi in Murders*, CHI. TRIB., Dec. 19, 2001, § 1, at 1, *available at* 2001 WL 30803625.

699. *See* Lorraine Forte, *Cops Prepare to Videotape Confessions*, CHI. SUN-TIMES, Oct. 2, 1998, at 1, *available at* 1998 WL 5601347; Flynn McRoberts & Judy Peres, *Homicide Suspects May Go to Videotape Confessions on Camera*, CHI. TRIB, Oct. 2, 1998, § 1, at 1, *available at* 1998 WL 2893015.

700. *See* Lucio Guerrero, *Wrongfully Accused Man Sues Cops*, CHI. SUN-TIMES, July 16, 2002, at A3.

701. *Id.*

702. See *supra* note 226.

703. Christi Parsons & Kate McCann, *Taped Confessions Bill Passes*, CHI. TRIB., May 9, 2003, § 1, at 1, *available at* 2003 WL 20235186.

704. *Id.*

confessions, fearing that a policy of taping interrogations would make it more difficult for police officers to obtain confessions from suspects.[705] He acknowledged his change of heart when he signed the bill into law, citing the fact that he became persuaded that taping would "help us make sure that the evidence we have is more reliable and more accurate and give us a better chance of doing justice."[706]

We also recommend greater education and training of American police about the causes, indicia, and consequences of false confessions. American police are poorly trained to understand the psychology of interrogation, suspect decision-making, and confession; to evaluate the likely unreliability of confession statements; and to recognize and prevent false confessions. Because they are not properly trained, most interrogators do not realize how their commonly taught and practiced methods of psychological interrogation can set up an innocent person to make a false confession. To reduce the number of false confessions, police interrogation training needs to be significantly improved in at least four ways.

First, contrary to their current training and practice, interrogators need to be taught they cannot reliably intuit whether a suspect is innocent or guilty based on hunches about the meaning of a suspect's demeanor, body language and/or non-verbal behaviors. Regrettably, American police interrogators have created a folk psychology of human lie-detection that is based on myth, superstition, and pseudo-science, a folk psychology that is more akin to the witchfinding techniques of the 1690s than to the methods of modern science. Contrary to the police interrogation industry's beliefs, the scientific research literature has repeatedly and unequivocally demonstrated that interrogators' deception-detection training materials are flawed, that their detection-deception judgments are highly prone to error, and—perhaps not surprisingly—that interrogators cannot accurately assess their own lie detection skills.[707] Despite this, interrogators' pseudo-scientific training in "behavior

---

705. Transcript of the Tavis Smiley Show (National Public Radio, July 22, 2003), *available at* 2003 WL 7629369.

706. *Id.*

707. *See* Saul M. Kassin & Christina T. Fong, *"I'm Innocent!": Effects of Training and Judgments of Truth and Deception in the Interrogation Room*, 23 LAW & HUM. BEHAV. 499, 507–17 (1999); *see also* Paul Ekman & Maureen O'Sullivan, *Who Can Catch A Liar?*, 46 AM. PSYCHOL. 913, 913 (1991) (examining the ability to analyze truthfulness amongst various occupational groups); Saul M. Kassin et al., *Behavioral Confirmation in the Interrogation Room: On the Dangers of Presuming Guilt*, 27 LAW & HUM. BEHAV. 187, 188–89 (2003) (examining the effect of the presumption of guilt on ability to assess truthfulness).

analysis" falsely increases their confidence in their lie-detection skills (rendering them even more certain in their erroneous beliefs), even though it does not increase their ability to discern truth from deception.[708]

This is significant because interrogators wrongly (but confidently) presume a suspect must be guilty merely because of his non-verbal behavior during their initial interaction (rather than because of any reasonable evidence linking the suspect to the crime). Because the interrogator falsely assumes that the suspect is behaving in ways indicative of guilt, he subjects the innocent suspect to the manipulative methods of modern accusatorial interrogation. Once the interrogator elicits a confession, he treats the fact that the suspect has confessed as confirming his initial presumption of the suspect's guilt—even if the interrogator relied on psychologically coercive methods to extract the confession and/or the resulting statement does not fit the facts of the crime. And once there is a confession, the innocent suspect may be well on his way to a wrongful conviction. Because the psychological methods of modern interrogation are sufficiently powerful to induce false confessions from the innocent, no individual should ever be interrogated unless there is a reasonable basis for believing in the probability of his guilt. Police interrogators need to be properly trained to understand that they are not human lie detectors, and that they endanger the innocent when, based merely on their guesses about the meaning of a person's demeanor, they subject him to high pressure custodial interrogation.

Second, detectives need to receive better training about the existence, variety, and causes of false confessions (the logic of modern interrogation and how it works). Contrary to current practice, interrogation trainers (and training manuals) must stop perpetuating the main myth of psychological interrogation: interrogators need to be taught that their psychological interrogation techniques can and do cause innocent suspects (who are cognitively normal) to falsely confess. More importantly, interrogators need to be shown why their commonly taught and commonly practiced interrogation methods—such as maximization and minimization strategies—lead to the decision to confess, from the guilty as well as the innocent. If interrogators are taught the logic, principles, and effects of their psychological methods, they will not only be more knowledgeable about the causes of false confessions, but they will be more effective at eliciting truthful ones. In addition to receiving better education

---

708. *See* Kassin et al., *supra* note 707, at 188–89.

and training about the psychology of interrogation and confession, detectives need to be taught about the different types of false confession, their distinguishing characteristics, and how to prevent them.

Third, interrogators need to receive better training about the indicia of reliable and unreliable statements and how to properly distinguish them. It has long been a generally accepted principle in law enforcement (as well as among social scientists and legal scholars) that valid confessions will be supported by logic and evidence, whereas false ones will not be.[709]  In practice, however, detectives virtually always treat a suspect's "I did it" statement as if it is automatically self-validating—even if it fails to be supported by logic or evidence—merely because it validates their own presumption of the suspect's guilt. As Ofshe and Leo have pointed out, a suspect's "I did it" statement may turn out to be either evidence of innocence or evidence of guilt; initially it should be treated as a neutral hypothesis to be objectively tested against the case facts.[710] Detectives need to be taught that the proper way to assess the likely reliability of a suspect's confession is by analyzing the fit of the suspect's post-admission narrative against the underlying crime facts to determine whether it reveals guilty knowledge and is corroborated by existing evidence.[711] Assuming no contamination, a guilty suspect's post-admission narrative will reveal knowledge that is known only to the true perpetrator and/or police, lead to new or derivative evidence, explain seeming anomalies or otherwise inexplicable crime facts, and be corroborated by existing physical and medical evidence.[712]  An innocent suspect's post-admission narrative will reveal the opposite. Police interrogators need to be trained to recognize their own confirmation biases, to initially treat admission statements as neutral hypotheses to be tested against objective case facts, and to systematically analyze the probative value of a suspect's post-admission narrative if they are to reduce the likelihood of false confessions leading to wrongful deprivations of liberty and miscarriages of justice in the first place.

Finally, interrogators need to receive specialized training in how to interrogate persons with developmental disabilities and juveniles,

---

709. Corey Ayling, Comment, *Corroborating Confessions*, 40 WIS. L. REV. 1121, 1130 (1984) (discussing the importance of corroboration between the evidence and the confession).

710. Ofshe & Leo, *Decision to Confess Falsely*, *supra* note 76, at 990–97.

711. *Id.*

712. *Id.*

two subgroups of suspects who appear to be particularly vulnerable to falsely confessing when police apply psychological interrogation techniques to them. In Broward County, Florida, for example, several false confessions involving developmentally disabled suspects led Sheriff Ken Jenne to adopt new policies for interrogating such suspects.[713] Pursuant to this new policy, each Broward County detective must annually receive specialized training to assist them in recognizing the characteristics of a developmentally disabled suspect and on how to properly question them to avoid or minimize the risk of false confessions. Before questioning a developmentally disabled suspect, Broward County detectives are instructed to immediately notify their supervisors and to make a reasonable effort to notify and afford an appropriate adult the opportunity to be present during all questioning.[714] Interrogators are also instructed to take special care in advising developmentally disabled suspects of their constitutional rights, requiring them to "speak slowly and clearly and ask subjects to explain their response rather than simply answer yes or no."[715] Because the developmentally disabled are "easily persuaded" and "eager to please authority figures," detectives are trained to avoid leading or suggestive questions and questions that "tell the suspect the answer the detectives expect."[716] As a final check against false confessions, before a developmentally disabled suspect can be charged with a crime, each confession taken from a developmentally disabled suspect must undergo a thorough "Post Confession Analysis" by a unit supervisor, or, if there is no evidence corroborating the confession, by a team consisting of a psychologist, an assistant state's attorney, and a Criminal Investigation commander.[717] This evaluation involves weighing numerous factors, including whether the suspect was able to provide an accurate description of the major and minor details of the crime and its scene, whether the suspect was able to identify unusual or unique elements of the crime or its scene which were not publicly known, and whether the suspect provided information to the police that led to the

---

713. General Order 01-33 defines "developmentally disabled" as a "person who is in a state of arrested or incomplete development of mind, which originates during the developmental period and is associated with recognizable significant impairment of intelligence and social functioning. Policy and Procedures Manual of Broward County Sheriff's Department, Interrogation of Suspects With Developmental Disabilities, General Order 01–33, para. 13.2.15 et seq. (2001) (on file with authors).

714. *Id.* at 13.2.15(D)(3).

715. *Id.* at 13.2.15(D)(6),(10)(b).

716. *Id.* at 13.2.15(D)(10)(a),(d),(f),(h).

717. *Id.* at 13.2.15(E)(1)-(3).

discovery of other previously unknown evidence.[718]

Because juvenile suspects share many of the same characteristics as the developmentally disabled, notably their eagerness to comply with adult authority figures, impulsivity, immature judgment, and inability to recognize and weigh risks in decision-making,[719] and appear to be at a greater risk of falsely confessing when subjected to psychological interrogation techniques,[720] the same protections should be afforded to juveniles. In fact, in the wake of the Ryan Harris case and several other false confessions involving children and teenagers in Chicago,[721] Illinois enacted a law requiring that all children under age thirteen be provided access to attorneys before their interrogations in murder and sex offense cases.[722] Moreover, the Cook County State's Attorney's Office convened the Juvenile Court Competency Commission, a panel of experts from many disciplines, including child development specialists, child psychiatrists and psychologists, service providers, law enforcement personnel, prosecutors, judges, defenders, disability advocates, and educators, to study the ability of young people to understand and meaningfully participate in the interrogation process and court proceedings.[723] The Commission recommended even broader reforms, including barring the State from using any uncounseled statements against children under age seventeen in any proceedings in which children face potential adult punishments, a requirement that the entire custodial interrogation of juveniles charged with felonies be videotaped, and that more effective procedures be developed to ensure that a minor's parent or guardian is present during police questioning.[724]

---

718. *Id.*

719. *See* Thomas Grisso, *Juvenile's Competence to Stand Trial: A Comparison of Adolescents' and Adults' Capacities As Trial Defendants*, 27 LAW & HUM. BEHAV. 333–57 (2003); Thomas Grisso & Carolyn Pomicter, *Interrogation of Juveniles: An Empirical Study of Procedures, Safeguards and Rights Waiver*, 1 LAW & HUM. BEHAV. 321, 339 (1977); Laurence Steinberg & Elizabeth Scott, *Less Guilty by Reason of Adolescence*, AM. PSYCHOL. (in press). For a comparison of the unique vulnerabilities of juveniles and the mentally retarded, see generally Victor L. Streib, *Adolescence, Mental Retardation, and the Death Penalty: The Siren Call of* Atkins v. Virginia, 33 N.M. L. REV. 183 (2003).

720. *See* Allison D. Redlich & Gail S. Goodman, *Taking Responsibility for an Act Committed: The Influence of Age and Other Individual Difference Factors*, 27 LAW & HUM. BEHAV. 141, 141 (2003).

721. *See supra* notes 406–32 and accompanying text.

722. *See* 705 Ill. Comp. Stat. 405/5-160 (2001); *see also* Jennifer J. Walters, Comment, *Illinois' Weakened Attempt to Prevent False Confessions by Juveniles: The Requirement of Counsel for the Interrogations of Some Juveniles*, 33 LOY. U. CHI. L.J. 487, 490 (2002).

723. JUVENILE COMPETENCY COMMISSION, FINAL REPORT, Aug. 2001, *at* http://www.luc.edu/law/academics/special/center/child/JCC.pdf (on file with the North Carolina Law Review).

724. *See id.*

Prosecutors and judges should also receive the training that we are recommending for police personnel. Armed with this knowledge, both judges and prosecutors could act as a check against the admission of false confession evidence in court proceedings. The earlier that a false confession is detected, the less damage it will do to the defendant, the credibility of police and prosecutors, and the integrity of the justice system.

Because of the revelatory power of DNA technology to expose confessions as false, or at the very least as untrustworthy,[725] we recommend that DNA testing be conducted as soon as possible in all confession cases in which there is evidence to test. At the very least, the testing should be conducted before pre-trial motions to suppress confessions are litigated.[726] Once a judge determines that a confession is admissible in evidence against the defendant, the chances of gaining a conviction for police and prosecutors, even in cases in which the confession is demonstrably false, increases significantly. The fact that a conviction is virtually assured can blind some prosecutors to their ethical obligation to pursue the truth and seek justice. Requiring DNA testing before motions to suppress are litigated not only will minimize the chances that false confession evidence will lead to wrongful convictions, it might also act as a check against over-zealous prosecutions.

Although the existence of false confessions will spur reform efforts, the more likely impetus for reform, however, will be pressure from within the ranks of law enforcement, particularly from prosecutors and other police groups. As the number of these reform-

725. Of course the mere fact that DNA testing excludes a suspect as the source of genetic material found at the crime scene does not necessarily mean that the suspect is innocent of the charged crime. In a rape case, for example, it is possible that the suspect was present at the crime scene but did not ejaculate, wore a condom, or was guilty as an accomplice to the rape. Nevertheless, depending upon the facts of the case and the details of the confession, a DNA exclusion will be powerful evidence both of the unreliability of the confession and of actual innocence. For example, if the suspect claims to have raped the victim by himself in his confession, the presence of another man's semen inside the victim undercuts the reliability of the confession.

726. Professor George C. Thomas III of Rutgers University School of Law, recently suggested that due process should require that police refrain from interrogating a suspect until DNA testing is completed. *See* George C. Thomas III, Miranda*'s Illusion: Telling Stories in the Police Interrogation Room*, 81 TEX. L. REV. 1091, 1116–17 (2003) (reviewing WELSH S. WHITE, *MIRANDA'S WANING PROTECTIONS* (2001)). Such a requirement, however, may interfere with law enforcement's ability to solve crimes. In many cases, it is essential for detectives to interview witnesses and suspects shortly after the crime is discovered. Witnesses disappear or scatter, memories fade, and cases can be more difficult to solve as time passes. Requiring that DNA testing be conducted before motions to suppress are heard balances the suspect's right to a reliable determination of voluntariness and guilt against the investigatory pressures placed on police.

minded law enforcement agencies grows, those that continue to resist reform will become increasingly isolated.

On January 30, 2003, James M. Kindler, the Deputy Assistant District Attorney from the Manhattan District Attorney's Office, testified before a subcommittee of the New York City Council about the Office's lengthy reinvestigation of the Central Park Jogger case.[727] In testimony that was long on what went wrong but short on details about how to prevent such tragedies from recurring, Kindler stated: "[w]hatever else may be said, it is a simple fact that even the best detectives and prosecutors need all the help they can get to arrive at the truth which may be elusive."[728] The reforms we have suggested give police, prosecutors, judges, and juries the tools they need to discover that truth.

---

727. *See* Manhattan DA's Report, *supra* note 25, at 5.
728. *Id.*

1008        *NORTH CAROLINA LAW REVIEW*        [Vol. 82