*DeLeon-Reyes v. Guevara, et al.*
Case No. 18 CV 01028

*Solache v. Guevara, et al.*
Case No. 18 CV 02312

# EXHIBIT 14

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION


ARTURO DELEON-REYES,              )
                                  )
            Plaintiff,            )
                                  )
            vs.                   )  No. 18-CV-01028
                                  )
REYNALDO GUEVARA, et al.,         )
                                  )
            Defendants.           )
-----------------------------     )
GABRIEL SOLACHE,                  )
                                  )
            Plaintiff,            )
                                  )
            vs.                   )  No. 18-CV-02312
                                  )
REYNALDO GUEVARA, et al.,         )
                                  )
            Defendants.           )


Volume 1
Pages 1 - 259


        The videotaped deposition of RICHARD A.

LEO, Ph.D., J.D., conducted via Zoom, taken before

GREG S. WEILAND, CSR, RMR, CRR, pursuant to the

Federal Rules of Civil Procedure for the United

States District Court pertaining to the taking of

depositions, commencing at 11:02 o'clock a.m.

Central Daylight Time, on the 28th day of September,

2022.

RICHARD A. LEO, PHD, JD, 09/28/2022                    Page 2..5

Page 2

PRESENT (via Zoom):
    LOEVY & LOEVY, by
    MR. STEVE ART and
    MR. SEAN C. STARR
    (311 North Aberdeen Street, 3rd Floor
    Chicago, Illinois 60607
    312.243.5900
    sean@loevy.com, steve@loevy.com)
    Appeared on behalf of the plaintiff
    Arturo Deleon-Reyes;
    PEOPLE'S LAW OFFICE, by
    MR. BEN H. ELSON and
    MS. JAN SUSLER
    (1180 North Milwaukee Avenue
    Chicago, Illinois 60622
    771.235.0070
    ben@peopleslawoffice.com,
    jsusler@peopleslawoffice.com)
    appeared on behalf of the plaintiff
    Gabriel Solache;

    LEINENWEBER BARONI & DAFFADA, LLC, by
    MS. MEGAN K. McGRATH
    (120 North LaSalle Street, Suite 2000
    Chicago, Illinois 60603
    866.786.3705
    mkm@ilesq.com)
    appeared on behalf of the defendant
    Reynaldo Guevara;
    THE SOTOS LAW FIRM, PC, by
    MS. CAROLINE JAMIESON GOLDEN
    (141 West Jackson Boulevard, Suite 1240A
    Chicago, Illinois 60604
    630.735.3305
    cgolden@jsotoslaw.com)
    appeared on behalf of the individual
    police officer defendants;

Page 3

PRESENT (CONTINUED):
    ROCK FUSCO & CONNELLY, LLC, by
    MS. EILEEN E. ROSEN
    MS. CATHERINE M. BARBER
    MS. JESSICA ZEHNER and
    MS. ERICA FATIMA
    (333 West Wacker Drive, 19th Floor,
    Chicago, Illinois 60606
    312.494.1000
    erosen@rfclaw.com, cbarber@rfclaw.com,
    jzehner@rfclaw.com, efatima@rfclaw.com)
    appeared on behalf of the defendant
    City of Chicago.

ALSO PRESENT:
    MS. RACHEL WELLING, The Videographer
    MS. ROBYN FALASZ, Exhibit Technician

Page 4

INDEX

September 28th, 2022

TESTIMONY OF RICHARD A. LEO, Ph.D., J.D.

                                                    PAGE

Examination by Mr. Rosen ...........................6

DEPOSITION EXHIBITS

| NUMBER | DESCRIPTION | PAGE |
| --- | --- | --- |
| Exhibit 1 | Letter dated January 15, 2022, from Leo to Elson attaching disclosure, 167 pages | 9 |
| Exhibit 2 | Article, The Problem of False Confessions in the Post-DNA World, by Drizin and Leo, 119 pages | 95 |
| Exhibit 3 | Article, Inside the Interrogation Room, by Robert A. Leo, 39 pages | 98 |

Page 5

THE VIDEOGRAPHER: This is the beginning of Media Unit 1, and we are now on the video record at 11:02 a.m.

This is the videotaped, videoconferenced deposition of Richard Leo being taken on September 28th, 2022. This deposition is being taken on behalf of the defendant in the matter of Arturo DeLeon-Reyes versus Reynaldo Guevara, et al. The case number is 18-CV-1028 consolidated with 18-CV-2312, filed in the United States District Court for the Northern District of Illinois, Eastern Division.

My name is Rachel Welling, certified legal videographer, representing Urlaub Bowen & Associates with offices at 20 North Clark Street, Suite 600, Chicago, Illinois.

The court reporter today is Greg Weiland, also of Urlaub Bowen & Associates.

Counsel, please identify yourselves for the video record and the parties which you represent.

MR. ART: Steve Art and Sean Starr for plaintiff Arturo Reyes.

Page 6

MR. ELSON: Ben Elson for plaintiff Gabriel Solache.

MS. ROSEN: Eileen Rosen and Katie Barber on behalf of defendant City of Chicago. And then we have two lawyers from our office, Jessica Zehner and Erica Fatima, who are observing.

MS. GOLDEN: Caroline Golden for the individual officer defendants.

MS. McGRATH: Megan McGrath on behalf of defendant Guevara.

THE VIDEOGRAPHER: Will the court reporter please swear in the witness.

(Witness sworn.)

RICHARD A. LEO, Ph.D., J.D. after being first duly sworn, testified as follows:

EXAMINATION

BY MS. ROSEN:

Q. Good morning, Dr. Leo. How are you?

A. Good. Good morning. Thank you.

Q. I had asked -- I had sent an email this morning asking plaintiffs' counsel to make sure that you had a copy of your report, a hard copy in front of you.

Page 7

Did they convey that message to you?

A. I have a hard copy of my report in front of me.

Q. Perfect. We will be, you know, marking it as an exhibit and using it on the screen, but sometimes, because it's so long, it's easier if you have the hard copy in front of you.

You provided these disclosures back in January of 2022, so just a housekeeping matter. I want to turn to your curriculum vitae, which is at Page 99 of the report, and check in with you to see if there are any significant -- well, any updates at all. And if there are, then we can talk about them.

A. I would have -- I just have the report. I don't have the CV. But the CV is 99 percent or more the same from January. The only updates would be if I published any more articles or given any more presentations or been quoted in any more newspapers or appellate court opinions.

Q. Have you published any more articles since January of 2022?

A. I'm going to have to print out both, both CVs and just compare them.

Q. Off the top of your head, you don't know?

Page 8

A. I don't think there was anything new. There might have been articles or book chapters listed that were in process that now are formally published, but there's -- there's nothing substantive.

Q. Perhaps an easier way to do it is if you just send an updated version of your CV to plaintiffs' counsel, and then they can just forward it to us. If you'd do that at some point today, and then we can take just a quick look at it just to -- in the event that there's something new on there that we have questions about.

MR. ELSON: And, Eileen, just so you know, we sent an email on August 8th with some -- with a supplement to his CV, including the depositions he has been involved in since his disclosure and court testimony since his disclosure.

MS. ROSEN: Yeah, I got the email about the depositions. I'm just -- I'm just focusing for the moment on the CV just to make sure that we have the most current version.

Are you saying that there's -- that the August version is the most current?

Page 9

MR. ELSON: No. I was just trying to make sure that you had that information to the extent you didn't. You can proceed.

MS. ROSEN: I appreciate it. Thank you.

THE WITNESS: I just sent -- I just sent the September CV.

BY MS. ROSEN:

Q. Perfect. Thank you.

All right. And, Dr. Leo, what is your current employment?

A. I'm a professor of law and psychology at the University of San Francisco.

Q. And are you currently teaching any classes?

A. I am, yes. I've teaching a seminar on interrogation and confessions this semester, and that's the only class I'm teaching this semester.

Q. All righty. Also looking at -- you know, why don't we go ahead and just mark this.

So can we mark as Exhibit Number 1 Dr. Leo's January 2022 disclosure.

(Exhibit 1 was marked for identification.)

RICHARD A. LEO, PHD, JD, 09/28/2022                    Page 10..13

**Page 10**

BY MS. ROSEN:

Q. And if we now go to Page 157 of the disclosure, the PDF page, not the enumerated page, it indicates on Page -- well, you have it paginated as Page 59.

You've listed here police interrogation training that you've received --

A. Correct.

Q. -- is that fair?

Is that current and up to date?

A. Yes.

Q. So it's accurate to say that the last time you received any police interrogation training was in March of 1993?

A. Correct.

Q. Okay. And then on the same page at the bottom, you indicate peer -- you have a heading called Peer Reviewer, Journals?

A. Correct.

Q. And then you have a list of publications underneath that.

What does it mean to be a peer reviewer?

A. The editor of the journal sends me an article if it's a journal or a book manuscript if

**Page 11**

it's a university press, and then they ask me to review it anonymously. They usually ask a number of questions -- some of them have longer form questions than others -- about the importance of the topic, the appropriateness of the data to answer the questions that the book or article poses, the methodology, whether it's original, whether I recommend it for publication, I don't recommend it, or I recommend revisions.

So it's -- it's to assess the competence and quality and originality and scientific merit and research contribution of the submitted article or book manuscript.

Q. And as a peer reviewer, if you're provided an article or a book or a book chapter, whatever it is, are there multiple peer reviewers that do that type of evaluation of the -- of the article?

A. Typically, yes. So it varies, but it's usually around three or four. And most of the journals, when the peer-review process is complete, will send you other peer reviewers', or at least some of them will, the other peer reviewers' comments. So you'll see whether or not there were two, three, four, or five peer reviewers.

**Page 12**

MS. ZEHNER: I think Eileen is experiencing some technical difficulties, so it might be a minute.

THE VIDEOGRAPHER: Folks, do you want to go off the record?

MS. GOLDEN: I think that's probably a good idea.

THE VIDEOGRAPHER: We're off the record at 11:12 a.m.

(Whereupon, a recess was taken from 11:12 a.m. to 11:17 a.m.)

THE VIDEOGRAPHER: We're back on the video record at 11:17 a.m.

BY MS. ROSEN:

Q. Okay. I think where I lost you was I was asking about whether or not there were -- whether you are the sole peer reviewer on a particular piece or if there are other peer reviewers that are assigned to a particular piece.

A. I am typically not the sole peer reviewer, so typically there would be anywhere from two to five peer reviewers. The standard number seems to be three to four in university press books and social science peer-reviewed articles.

**Page 13**

I want to make clear that when I submit my peer review, I'm not doing it in conjunction with anyone else. So I review the materials. I analyze them. I write up the peer review. Each of the, let's say, three or four peer reviewers do it individually.

So even though there are multiple peer reviewers, they're all -- they all provide individual peer reviews to the editor, who then makes a decision about whether to publish the article, not publish the article or book, or to seek revisions responsive to the peer reviews from the author or to just reject it outright.

Q. And what is your understanding of the purpose of this peer-review process?

A. The purpose of peer review is to -- it's essentially a quality control mechanism. It's how science and social science regulate or try to regulate research that doesn't meet the standards of the discipline from not being published.

So the idea -- and remember my prior answer, I discussed or one of my prior answers I discussed the various areas that are typically covered in a peer review, from originality to

RICHARD A. LEO, PHD, JD, 09/28/2022                              Page 14..17

Page 14

competent literature review to appropriate methods and data analysis. The purpose is to weed out research that is inadequate or doesn't meet the standards in the eyes of the peer reviewer of the discipline.

And so it becomes, like I said, a quality control mechanism to ensure that when research is published it's high-quality, original, with the appropriate methods, et cetera.

Q. Okay. And when you say "appropriate methods," can you be a little more specific about what types of methods you're referring to for the pieces that you are called upon to peer review?

A. Well, it would depend on the piece. The traditional methods of social science are experiments, field observation, interview of subjects, analysis of documents, which can be contemporary or historical.

I think that's it. I think I said surveys.

Anyway, it might be that the method is appropriate but the peer reviewer suggests that, let's say, in a survey a particular question should have been answered or a couple of the questions are

Page 15

duplicative or the analysis goes beyond what the data revealed, or there might be a suggestion about a different kind of statistical test if it's a quantitative article.

So there's -- there can be a variety of methodological concerns. It might not just be that the right method was used but how the method was used.

Q. And then in terms of data analysis, can you be a little more specific about what types of data analysis you look at when you're peer reviewing a particular piece?

A. Well, you always look at what you're presented with, and usually in social scientific articles and scientific articles there's a section where, if it's a paper based on original data, that data would be presented in the article; we observed 300 interrogations over this period of time, you know, and then they would go and describe it. This is just a hypothetical example.

And so that's the information that you have, what's presented in the article, and that's the information that you have to analyze unless you think something is missing and make an inquiry about

Page 16

that, or there's something in the article that is referred to that's data that's not in the data presentation section.

Q. And does the peer-reviewing process that you participate in when doing the data analysis and analyzing the original data presented, do you look at that data and make sure that you can replicate the writer or researcher's results?

A. No. It not usually possible to do that. They might have spent months collecting data. You typically don't have access to their dataset. A peer reviewer wouldn't be expected to spend that much time.

There might be subsequent studies that replicate the findings maybe with a different dataset, but the peer reviewer, a peer reviewer doesn't reanalyze the data of an article.

Now, it could be, if there was a case study article, it could be that the peer reviewer was very familiar with that case, or if it's a small end article there's just a few cases. I can't think of an article that I've reviewed off the top of my head that was like that, but it's possible that some peer reviewers are more familiar with some datasets

Page 17

than others.

Q. And are -- in your experience, are law review articles the type of articles that are peer reviewed?

A. Sometimes they are. They can be peer reviewed at a different level.

So some law reviews have a board of scholars, experts in a field or a discipline, and submit the law review submissions to those experts. Other law review -- and then get peer reviews back.

Other law reviews will individually seek out experts. So I've been sought out by some law reviews on a particular article in my area where they contact me individually and say we'd like you to review this, and we want to ask you some questions about it or, excuse me, fill out this form.

And other law reviews are not peer reviewed in the traditional sense. It's student editors. I should say some law reviews, instead of relying on national experts, rely on faculty at that law school, and then some law reviews only rely on students or law review editors.

So it depends on the law review. It's

RICHARD A. LEO, PHD, JD, 09/28/2022                    Page 18..21

Page 18

typically a different kind of peer-review process, if it's a peer-review process.

Q. Okay. If we go to Page 159 of your disclosure, at the bottom of the page, you have a heading that's called Consultations (Selective).

A. Yes.

Q. And it lists some law enforcement agencies.

First of all, why selective? Why have you presented it in that way?

A. If you go further down, there's other categories, and there's just -- there's just too many, too many to list, all right. So I've just highlighted some.

For example, I've probably consulted on cases where I've reviewed the cases and offered an opinion for hundreds of public defender offices across the country, and so it wouldn't make sense to list all of them.

And so I put "selective" there just so the reader knows that this is just a partial list. And obviously this is a long CV, so that's the reason why I put "selective."

Q. And when you say "consultations," do

Page 19

you -- what do you mean by the use of that word? What are you -- what are you doing to assist these agencies that you've listed here or the others that you have not?

A. Okay. So in your question, are you just asking about law enforcement, or are you asking about beyond the law enforcement category?

Q. I'm only asking about the law enforcement category.

A. Okay. I've reviewed cases in some of these. In one of the cases, I've -- actually in several of the cases I've testified, two of the offices I've testified in four cases; or I've reviewed training materials or I've talked to them about training materials or -- and I think -- I think that there's at least one listed below, the Miami Beach Police Department, the bottom on the list, or I've put on training sessions, yeah, to the Broward County Sheriff's Office and the Miami Beach Police Department.

So either reviewing cases and/or testifying or reviewing training materials and providing input or teaching classes.

Q. In the circumstance where your -- where

Page 20

you have reviewed cases and testified, would we find those cases further down in your CV where you've identified cases where you've testified, or not necessarily?

A. I would have to look at the cases on the CV because I only list a small number of them, but they might have been the cases. I just have to review the document if you want to go further down.

Q. No, I'm just trying to get a sense of what we can glean from reviewing your CV.

A. Right, but I couldn't answer that question without seeing the rest of the CV.

Q. Okay. In the circumstances where you're reviewing cases but not testifying, what is the purpose of -- what's your understanding of why you've been asked to review the cases, generally speaking?

A. Well, generally speaking, when I -- now, are you talking just about the law enforcement?

Q. I am, and I'm going to --

A. Okay.

Q. And when I switch, I'll be sure to signal you that I'm switching.

A. It varies. It depends on the needs of the

Page 21

particular case.

So in one case, the Lawrence County Prosecutor's Office case that's listed in 2020, the prosecutor there said the defense has raised some concerns about the voluntariness or reliability of this statement that was produced through interrogation, and I don't know whether I'm going to prosecute this case. I think it might have been dismissed and refiled or a hung jury; I'm not sure. I'd have to refresh my recollection. But he basically said I want your opinion, and that's going to help me decide whether to reprosecute this case.

In another case, the one with the U.S. Department of Justice Civil Rights Division, the Department of Justice was prosecuting a police officer in Massachusetts for violating federal statutes about making threats of violence against a prisoner in a recorded interrogation. And he wanted me to testify about police interrogation standards, police interrogation practices, best practices, and I did. I reviewed the materials, gave him my opinion. He asked me to testify.

There are other cases where I testified that are different. So the case with the State of

Urlaub Bowen & Associates, Inc.   312-781-9586

RICHARD A. LEO, PHD, JD, 09/28/2022 Page 22..25

Page 22

California Department of Justice, that was three cases, or I should say one case three times. And the prosecutors, the state attorney general, wanted me to educate the jury about three false confessions that were given by somebody, by three boys, juveniles who were not charged, who were not the defendant in the case, because the defense was that they did it, the three boys who had falsely confessed.

There were other cases on that list where I did not testify because even though the purpose of the consultation was to review materials and offer an opinion, I couldn't be helpful.

Q. Okay. In the case that you were just talking about where the prosecutor, the State of California Department of Justice case where you were asked to educate the jury about three false confessions of three individuals who were not charged, were you permitted to -- was that a jury case, or was it a judge only, a bench trial?

A. No, no, it was -- it went to trial twice, and it was a jury case, and I testified at a motion to suppress in the first trial outside the presence of the jury and then subsequently in both trials at

Page 23

trial.

Q. And were you permitted to testify that the three confessions of the noncharged or not charged individuals were actually false confessions?

A. No. That was beyond the scope of the testimony.

Q. So you didn't actually educate the jury about the fact that these confessions from these three uncharged individuals was false, right?

A. Right, right. I didn't offer that opinion. I did educate the jury about the science on police interrogation and false confessions and proven false confessions.

Q. Okay. While we're on that topic, have you ever been allowed to testify that a particular confession was false?

MR. ELSON: Objection to the form of the question.

BY MS. ROSEN:

Q. You can answer.

A. I don't think so. I can't recall a case in which I have been permitted to testify that a confession in my opinion is false. However, I have testified in cases, not many, where there was no

Page 24

dispute about the falsity of the confession. So it was just taken as a given because both sides recognized that the confession was false, and that wasn't the sole issue in the litigation.

Q. Right.

A. It's possible -- it's possible that I have testified in a post-conviction proceeding or in a case where I've been allowed to offer that opinion. I can't recall off the top of my head, but if so, it would be rare.

There are some states, like the State of Oklahoma, which does allow experts to offer ultimate opinions, though most do not.

Q. And have you ever in -- have you ever provided an opinion in Oklahoma that a particular confession was false?

A. Not that I recall.

MR. ART: Eileen, can we have a stipulation that Reyes is joining all of Solache's objections and vice versa?

MS. ROSEN: Yes, of course. No problem.

BY MS. ROSEN:

Q. Okay. Have you ever -- let me strike that.

Page 25

To your knowledge, has any party that has hired you attempted to introduce evidence regarding your opinion that a particular confession was false and had a court deny that, that request or motion?

MR. ART: Objection to form.

THE WITNESS: I can't recall any case where that has happened off the top of my head.

BY MS. ROSEN:

Q. Can you tell us how many times that you have actually provided an opinion that a particular confession was false?

MR. ART: Objection to form. Are we talking about in disclosed reports, Eileen?

MS. ROSEN: Yeah, let me rephrase that question.

BY MS. ROSEN:

Q. How often do you think you've been hired, Dr. Leo, as an expert to evaluate confessions?

A. Well, I -- I keep a running list. I've consulted on over 2200 cases at this point, going back to 1996, so a lot of cases.

Q. Where do you keep that list?

A. In my computer.

Q. So it's readily available to you?

RICHARD A. LEO, PHD, JD, 09/28/2022                    Page 26..29

Page 26

A.  Correct.

Q.  And in those 2200 cases that you've consulted, out of those 2200, how many times have you testified?

A.  395 times.

Q.  And you keep that -- you keep that list as well?  Is that why you're so sure that the number is 395?

A.  Correct.

Q.  Is today 395, or will today be 396?

A.  I don't count depositions as testimony. What I thought you were asking -- nor would I count admissibility hearings as testimony.

So my list is solely when I've been qualified and testified in court, either at pretrial hearings that are not admissibility hearings, so pretrial suppression hearings or a motion in limine, they're typically the same thing, or at trial, whether it's a bench trial or jury trial, or an administrative proceeding, which would be less often, or in a post-conviction hearing like a habeas hearing.

So I have a separate list of depositions, and I think I've testified maybe 45 times in

Page 27

depositions going back to probably around 2000.  But I don't merge those two times.

So to come back to the first part of your question, until I testify in a pretrial suppression or motion in limine hearing or at a trial or an administrative proceeding or in a post-conviction hearing, again, it would be 395.  Today would not affect that number.

Q.  Okay.  So let me just be sure I understand how you're counting.

So the 2200 cases, the list that you have of 2200 cases where you have consulted, would we find Solache and Reyes on that list?

A.  Yes.

Q.  Okay.

A.  So what I mean by "consultation" is that somebody has retained me or in public cases gotten me an authorization or if I've agreed to do the work pro bono, and then I review materials and offer an opinion responsive to questions or issues that I've been directed to.

And so that is the list of 2200 cases, and any case where that's happened would be on the list, including Mr. Reyes' case and Mr. Solache's case.

Page 28

Q.  Okay.  And then the 395, the number 395 is only where you have been qualified to testify at a pretrial suppression hearing or something akin to that in a criminal case or a motion in limine hearing in a civil case or something like that?

MR. ART:  Objection to form.

THE WITNESS:  Yeah, I need to be more precise than your question asks.

So there might be a situation where I am qualified in the legal sense, and then the case resolves and I never testify or something else happens and I don't testify, right.

So the way you asked the question isn't -- doesn't correspond to the answer that I gave previously.  It's not a matter of being qualified.  It's a matter of testifying.  Of course, legally, one is qualified prior to testimony.

So the 395 are the times that I have testified in any one of those three or four situations that I mentioned, excluding admissibility hearings.  The admissibility hearings don't occur in most cases, so there aren't a great number of those.

Page 29

So the 395 is just when I've testified in person or by video in any of those three or four kinds of hearings or trials that I've mentioned.

BY MS. ROSEN:

Q.  Okay.  And when you say "admissibility hearings," what are you referring to exactly?

A.  Prior to my testimony, when -- most of the cases I work on I would say I would estimate to be 90 to 95 percent, probably closer to 95 percent, are criminal cases.  And in most of those cases, I consult with and, if I testify, I testify on behalf of the defense.  It's rare that prosecutors contact me.

And in some of those cases, prior to my testimony or the proffer of my testimony, the prosecution typically will ask for a pretrial admissibility hearing, and they might file a motion. It might be rejected out of hand.  The judge might make a decision to admit the testimony without a hearing, or there might be a hearing without my testimony, or there might be a hearing with my testimony.

So I was just referring to the

RICHARD A. LEO, PHD, JD, 09/28/2022                    Page 30..33

Page 30

circumstance in which I would testify when there is a hearing to determine whether my testimony is admissible and, if the testimony is admissible, with what limits, if the parties do not agree on the limits.

Q. Okay. And you are not counting those types of admissibility hearings, as you refer to them, in the 395 number, correct?

A. Correct.

Q. Okay. Do you also keep a list of how many times you have been not permitted to testify for any reason?

A. I do not.

Q. Do you keep a list of the number of times that your testimony has been limited in any way?

A. I do not.

Q. And why don't you keep a list of the number of times you have not been permitted to testify?

A. I just never thought to do it. It didn't seem particularly relevant to what I do. It's the exception, not the rule, and increasingly rare, but it just didn't seem worth keeping a list. Keeping all of these lists takes time and updating them

Page 31

regularly, and it just never crossed my mind to start doing that many years ago.

Q. And when you say "it's the exception, not the rule," can you put a percentage on it, like can you provide us any -- you obviously have drawn the conclusion that it's the exception, not the rule. So I'm just trying to understand what your basis is for saying that.

MR. ART: Objection to form.

THE WITNESS: Yes, I remember some or most of the cases in which I was excluded. There's really not that many of them, I think maybe a half dozen to 18. There might be a few less; there might be a few more. That would be my estimate. So if you take that number, it's less than 5 percent if you compare it to the 395.

And so that's my estimate, that in 95 percent or more of the cases, the testimony is admitted.

And when the testimony is not admitted, it's usually because of something not having to do with me. The judge might determine that it's not relevant given the facts at hand, or

Page 32

there might be other issues, problems with the defense or with the attorney.

So when I say it's rare, what I mean by that is that something that occurs less than 5 percent of the time in this context I would consider rare.

And I would also say that it's increasingly rare. In my experience, most of the exclusions or at least my recollection is that most of the times when I was excluded was in the 1990s and the 2000s, and that in the last ten years especially but maybe going back more than that, it's been increasingly rare that a judge would exclude my testimony, my expert witness testimony in one of these cases.

BY MS. ROSEN:

Q. How about limited, what percentage do you think of the time your testimony has been limited in scope?

A. Well, the testimony is always limited in the sense that the judge always wants to make clear, and usually counsel make it clear to the judge, that I will not be offering any ultimate opinions.

And so that limitation is usually -- even

Page 33

though it's well understood by all the parties, it's usually articulated you will not testify; do you understand, Dr. Leo, that you will not be testifying in your opinion that this is a false confession or partially false confession. And that's outside of the scope of why I was retained to begin with.

So if we frame that as a limitation, every single case would be limited in that way.

Now, there are some cases where the attorney retaining me only wants me to give general educational testimony, and there are other cases where they want me to give case-specific testimony. And by "case-specific testimony," that typically means -- again, in criminal cases I'm talking about. That typically means going through an interrogation transcript -- most cases are recorded that I work on, at least in the last 15 years in criminal cases -- and identifying interrogation techniques and talking about what the research shows about those techniques.

In some cases, I don't know the percentage, the defense attorney might want me to testify about that, about case specifics, and the judge might say no, I'm just going to limit you to

RICHARD A. LEO, PHD, JD, 09/28/2022 Page 34..37

Page 34

general testimony.

And other times, things just happen in the moment. So, for example, the first case that I testified for for the State of California Department of Justice in 2004 at trial, the one I mentioned earlier with the three false -- boys who had falsely confessed, the judge had allowed me, my recollection is, to give case-specific testimony. But when I was called to testify, the attorney said, look, this case has gone on a long time, everyone is tired, we need to cut your testimony a little short, so you're just going to testify generally.

Now, I don't recall if that was the product of a conversation with the judge out of the presence of the jury, so there's variability.

I don't know the number of cases where the defense or if it's the prosecution wants me to testify case specifically and the judge limits it to general. I just don't know what -- I would be guessing to tell you what that number is.

Q. In the circumstances where you are retained to do case-specific analysis, as you've just been describing, regarding the circumstances of a particular statement or a confession, how many

Page 35

times have you reached the conclusion that the statement was false or the confession was false?

MR. ART: Objection to form.

THE WITNESS: You said false, right? So I don't know, but the overwhelming majority of the cases, probably more than 95 percent, maybe 99 percent, I haven't been asked to opine about whether I -- in the consultation whether I think the confession is false. I might be asked to analyze indicia of unreliability. I might be asked whether I think, based on the materials I've reviewed, that testimony about the scientific literature on police interrogations and false confessions could be helpful in this case or at a suppression hearing.

But very rarely would I be asked in a consultation whether I think a particular confession is facilities. It would be more likely to occur in a post-conviction case, and I haven't been retained in a lot of those cases.

BY MS. ROSEN:

Q. Do you distinguish between the phrase

Page 36

"false confession" and "proven false confession" as you use it in your report in this case?

A. For purposes of this case, yes, in the sense that I'm not offering an opinion here and, like I said, I would not offer an opinion or even be asked other than in an exceptional circumstance that this is a false confession. I am merely saying in the report that it meets the criteria of what is known in the research literature as a proven false confession. And why it does or they do in this case is ultimately for a jury or finder of fact to make factual determinations. I'm not making a factual determination. I'm applying what we know from the research literature in my analysis to the materials that have been provided.

So I would make a distinction between offering the opinion that the criteria for what is called in the research literature "proven false confession" has been met from the opinion that I am saying this is a false confession. I am not saying one way or another that this is a false confession because that goes beyond my role in this case and most cases.

Q. How often have you offered the opinion

Page 37

that a -- in any of the cases where you have been consulted that the particular confession that you are analyzing meet criteria for proven false confession as you're using that term?

A. I would say very infrequently. My guess would be a dozen to two dozen times at most in the over 2,000 cases that I've worked on. It's very difficult to meet the criteria of a proven false confession. To prove a confession false is essentially to prove the negative, and that's why, as I mention in the report, there's only four ways you can do that; physical impossibility, proving that the crime didn't occur, scientific exculpation, and identifying the true perpetrator.

So somebody could be a hundred percent factually innocent and not be able to prove their confession false because the crime occurred, it wasn't physically impossible in the sense that they lived in the same city or they weren't somewhere else when the crime occurred that made it physically impossible. There is no scientific or DNA evidence that can rule them out. Very few cases percentage-wise have DNA, and the true perpetrator hasn't been identified or confessed.

RICHARD A. LEO, PHD, JD, 09/28/2022                    Page 38..41

Page 38

So it's very rare that you can prove a confession false even if there are substantial indicia of unreliability, and that's why I would estimate a dozen to two dozen cases of the 2200.

I should say, though, just again that there are some cases where everybody agrees the confession is false, and I wouldn't be offering the opinion that it's a proven false confession because both sides, though they might not use the language of proven false confession or refer to the four criteria, have accepted it's a false confession, and that's not the subject at issue in the litigation.

Q. So I am not at all interested in any of my questions about the circumstances where everybody admits that the confession is false.

So unless I specifically ask you about that circumstance, you don't need to qualify any of your answers with that going forward because I'm not at all interested in that scenario.

Okay?

MR. ART: Objection to form. And I object to that instruction. To the extent that the expert needs to offer an explanation to complete his answer, he should do it.

Page 39

THE WITNESS: I'm sorry, go ahead.
BY MS. ROSEN:
Q. Did you understand my point, Dr. Leo?
A. Yeah. I mean, I think the question was "okay," and so my answer would be yes.
Q. Is it possible for somebody to be 100 percent guilty and still meet criteria for a proven false confession as you have used the term?
A. I don't see how that's possible.
Q. And so in effect, when you are providing an opinion that the case or the statement meets criteria for a proven false confession, as you use the term, you are, in fact, saying that there is -- it is impossible that the individual is guilty factually of the crime?
MR. ELSON: Objection to the form.
THE WITNESS: Unless there has been a mistake in the analysis.
BY MS. ROSEN:
Q. Okay. You -- when we talked about the phrase "proven false confession," you said, you qualified it or described it as described in the research literature or something like that.
Do you know what I'm referring to?

Page 40

A. Yes.
Q. When you say as referred to in the research literature, what do you mean?
A. Well, as I mentioned in the report, in 1998, Richard Ofshe and I coined this term, and we laid out the criteria, and it's been referred to in other articles by other scholars.

And so it's an accepted term or concept with criteria in the social science research literature that studies police interrogation and false confessions going back now 24 years.
Q. And how is it that -- well, let me strike that.

Based on your testimony that you and Dr. Ofshe coined the term, I take it that prior to 1998 that term was not used by any researchers or scholars in the area, correct?
A. That specific term was not used, yes. I mean, the idea was there, but nobody had put it together in the way that we did.
Q. And you've already mentioned that there are four criteria that are -- that need to be met, one of four criteria that need to be met for a particular statement to qualify as a proven false

Page 41

confession, as you've coined the term.

How did you come up -- how did you and Dr. Ofshe come up with those criteria?
A. So in a 1998 article that we published, the research for that article started a few years earlier. We were looking for cases of false confession. And if my memory is correct, we gathered materials on around 250 cases. We ended up analyzing in that article 60 cases, and I think 34 of them were proven false confessions.

And essentially we were looking for patterns across the cases and identifying patterns, and we noticed that some of the cases came with better evidence that the confession was false than others. Some of the cases we thought were false but we couldn't prove that were false, and others we thought were proveably false.

And so we -- looking for these patterns, connecting the dots, we realized that there were four ways you could prove a confession false to near or absolute certainty, and we identified those four ways based on the patterns that we saw in our data looking at the 250 cases, the overwhelming majority of which did not fall into the proven false

Urlaub Bowen & Associates, Inc.   312-781-9586

RICHARD A. LEO, PHD, JD, 09/28/2022                    Page 42..45

Page 42

confession category.

Q. How did you look for patterns across the 250? How did you and Dr. Ofshe look for patterns across the 250 cases?

A. By analyzing -- first we had to gather data. So we tried to get as many materials as we could on all of these cases. This was a different era than today where there's a lot more available on the internet or at least, you know, you could find out on the internet who the attorneys are more easily and get original case documents more easily as well as original case documents sometimes from databases on the internet that are available electronically.

So first step is gathering data, gathering as many case materials, court filings, police reports, media articles, investigative reports, whatever we could gather and, in some cases, talking to people where we could talk to people if they would speak to us or we were able to find out the parties involved.

And then, as any trained social scientist would do, simply analyzing the data, looking for commonalities, looking for certain factors that were

Page 43

overrepresented, looking for things that were or were not widespread in the cases, and then we noticed those patterns.

And one of the patterns was that some of the cases, it was simply physically impossible. The person was in jail at the time the crime occurred or they were at an ATM machine in another state and they had an objective record, you know, or some other place where there was an objective record documenting that they physically couldn't have been in the place of the crime at the time of the crime.

We also noticed some patterns of no crime occurring. Some of the cases, not many, you could prove that there was no crime. And then, of course, there were the DNA cases, and there were patterns in those cases too. And, of course, DNA had just emerged a little more than a decade earlier as the gold standard of evidence in criminal cases where it was available. And so a number of people were getting officially exonerated who had been convicted and in prison. Many of our cases, our early cases were from that.

And then we also noticed the pattern, which is actually the most common pattern in the

Page 44

data of the proven false confession cases, that a true perpetrator was subsequently identified, and the charges were dropped, and that person was prosecuted or maybe they were already in prison for something else.

So it was just a matter of applying basic social science training to analyze data points and look for commonalities, differences, through lines, and what sorts of things popped up more than one would expect and why.

Q. Okay. When you talked about the physical impossibility, that particular criteria, you described examples of where the individual was in jail at the time of the crime or was -- had objective proof of being at another location at the time of the crime.

Did I get that right?

A. Those were the examples I gave, yeah. But those aren't the only examples.

Q. Yeah, I just want to make sure I understood the example.

But the example is what makes it physically impossible is that the person can prove they were elsewhere at the time of the crime, right?

Page 45

A. Right, or that they couldn't have -- from the point at which they were, they couldn't have gotten to the crime scene in time to do the crime given how the crime was done.

Q. All right. And with respect to the gathering of the data and the materials, how did you identify the 250 cases that you looked at?

A. Well, we did extensive Lexis and Westlaw media database searches. We had research assistants as well.

We also would give talks to various professional organizations and would advertise that we were looking for any case where anybody thought there was a false confession stemming from an interrogation, if they had any materials. We made announcements at professional societies. We sometimes would speak to or be interviewed by journalists, and we would tell them if you're aware of any cases, please let us know.

Attorneys that we worked with, at that time I had just started doing -- working as consulting on cases, and I hadn't worked on that many, but Dr. Ofshe had been doing it for some years prior, and so he knew a lot of attorneys,

Urlaub Bowen & Associates, Inc.    312-781-9586

RICHARD A. LEO, PHD, JD, 09/28/2022                    Page 46..49

Page 46

prosecutors as well as defense attorneys who he reached out to if they were aware of any cases.

He also was more commonly at that time interviewed by journalists, and so he would ask them.

The Innocence Projects were coming across a lot of cases, and we were in touch with The Innocence Project in New York and sometimes reviewed cases for them as well prior to their doing any DNA testing.

So we tried to cast as wide a net as possible to find out possible cases, and then, when we gathered that data, to analyze the data.

Q. So but the net you were casting was for cases where individuals, whether they be the individual themselves who had been charged with the crime or lawyers representing them or anybody else where there was an allegation that the confession was false, right?

A. Correct. If anybody thought that the confession was or might be false, we wanted to gather materials so we could analyze those case materials ourselves.

Q. And have you ever pooled together yourself

Page 47

data relating to confessions where there is no allegation that the confession is false to measure in the same way you're discussing here the patterns related to any of the criteria that you're talking about in connection with a proven false confession?

MR. ELSON: Objection to the form.

THE WITNESS: I don't really understand how one would do that, so I'm not sure I understand the logic behind your question.

Do you mean did I ever say I just want to look at cases of confessions to see whether or not some of them are proven false confessions? Is that your question? Or is it a different question?

BY MS. ROSEN:

Q. My question is, it sounds like your work and your analysis has focused on cases where there is an allegation of the confession being false, right?

A. Well, when you say "your work," we're really talking right now just about one article. I've done other articles and gathered other data on police interrogation cases or confession cases that are not -- where the subject is not false

Page 48

confessions or proven false confessions.

So I'm just talking about this particular research project --

Q. Okay.

A. -- and others on proven false confessions.

Q. Okay. So let's -- fine. That's fair. Let's keep focus on this particular article.

So the universe that you were looking at, the pool that you were looking at were allegations of false confessions, and whatever that original list was got whittled down to 250 cases approximately, right?

A. Well, no. It got whittled down to 60 cases, which were analyzed in the article.

So once we had -- we were done collecting the possible cases and the materials, it was 250. It didn't really get whittled down to 250.

Q. So when you put this call out that you described earlier to the various organizations that you were speaking at and that Dr. Ofshe was connected with for cases, what you ended up with was approximately 250 cases? Is that what you're saying?

A. That's my recollection, yes. And we also

Page 49

reached out to other researchers as well in addition to what I previously mentioned.

Q. Okay. So you ended up with approximately 250 cases. And then if I understood you correctly, you started to gather the data for those -- and case materials and media articles and all the other things you listed for those 250 cases to begin your analysis, correct?

A. Correct.

Q. Okay. And of the approximately 250 cases that you were initially -- well, let me strike that.

Of the approximately 250 cases that you were analyzing, how many cases did you have court materials, like criminal trial transcripts and police reports and things like that?

A. I -- I don't recall the specific number of cases.

Q. Is it -- is there anywhere today that we can find that, that data about how many cases of the 250 you had that type of data to work with, court materials, criminal trial transcripts, pleadings, police reports, things of that nature?

A. No, because I wouldn't have saved the materials, most of which would have been in paper

RICHARD A. LEO, PHD, JD, 09/28/2022                    Page 50..53

Page 50

form back then, for the cases that weren't -- that didn't become the subject of the article.

So if there were 250, 190 of those cases we never wrote about, weren't included in the article, and I no longer have any of the materials from any of those cases.

Q. Do you have materials from the 60 cases?

A. I might have some materials from a few of those cases, but most of them I would not have materials from.

All of the cases in that article, all 60 cases, were identified in the article by name. And so, you know, one could gather materials on those cases now. It's not like that's hidden.

But I don't think I saved materials on most of those cases, just on some of them.

Q. But we couldn't gather the materials that you have, right? I could just independently gather materials related to those cases?

A. Correct, but there might be overlap, right. So, you know, I might have had the trial transcript in the case, and you might be able to get the trial transcript, but we don't know.

Q. Right. Okay. And then did you -- you

Page 51

talked about finding data points and patterns.

Was there some coding that you did when you were analyzing the materials that you were reviewing?

A. I think there was some coding. The article was, as the title suggests, looking at the consequences of false confessions.

So I think one thing we coded was whether it was a proven false confession or whether we thought it was a false confession that didn't meet the criteria of a proven false confession based on the materials that we reviewed.

I think we coded the number of cases that didn't go to trial, the number of cases that involved a plea bargain, the number of cases that went to trial and resulted in conviction versus acquittal.

I think we coded which of the four criteria were met that -- on the proven false confession cases, but I may be misremembering. I'd have to look at the article. I think we coded length of sentence. We might have coded type of crime.

So there was some basic descriptive

Page 52

coding, and all of that, everything we coded for would be presented in the article.

Q. Okay. And in the article, would we find the citations to the support for the coding that you did?

A. There are -- you know, the journal is a hybrid social science/law review, so it's -- it was fully peer reviewed as a social science journal by an editorial board but -- or members of the editorial board, but it's in the law review format of footnotes, and so it's extensively footnoted.

But if -- I think we found -- I'm just going to answer your question by way of this example. I think it's going to be responsive to your question. I think we found that the percentage of individuals who went to trial and were convicted was 73 percent.

Now, all of those cases would have citations, but if -- you know, that 73 percent number, if somebody wanted to check our statistics, they'd have to go back through and tabulate, right. So there isn't a table saying, to my recollection, here are the 7 -- you know, of the 73 percent, here they are, right. That would have been coding that's

Page 53

not in the data, though the result of that is in the data. And all the names are there, and citations to all the cases are there.

So somebody would be able to replicate the work we did I think fairly easily.

Q. Okay. And in that particular article that you are talking about, the 1998 article with Dr. Ofshe, you talked about proven false confessions, but then I think you had used another phrase, "probable false confessions."

Is that right?

A. Right. So yeah, we used in that article two other phrases, "highly probable false confession" and "probable false confession." We haven't used that language since. But that was to recognize that some of the cases that didn't meet the criteria of a proven false confession we believed, based on our analysis, that they were false confessions nonetheless but to a lesser level of certainty.

Q. And why have you -- why have you since abandoned the "highly probable" and the "probable" labels?

MR. ART: Objection, form.

RICHARD A. LEO, PHD, JD, 09/28/2022

Page 54..57

Page 54

THE WITNESS: When we do studies of false confessions, sometimes -- I mean, it's happened once, but Professor Cassell at the University of Utah wrote an article, and he's the only one who did this, criticizing the cases, and he said we were wrong about 9 of the 60 cases. And one of those cases was a proven false confession. The other 8 were in the lower categories.

And so this led to a back and forth where we published subsequently a 2001 article going through these nine cases, why Professor Cassell was wrong about all of them, as well as all the false and misleading things he had said in his 1999 non-peer-reviewed article about us. And it seemed that that was largely a waste of time, that the importance of the 1998 study and subsequent studies is what it tells us about false confessions and especially about wrongful convictions of the innocent, that this is what many believe is the worst possible harm in our system.

And so we're trying to provide the academic community, the legal community, the

Page 55

policy community, journalists who are interested, data from this study, and we're in this back and forth about the minutia of nine cases, which was an enormous amount of time responding to his false and misleading statements.

And so my belief is that if you just focus on the proven false confession cases, you can avoid these kinds of meaningless back and forths, because in my experience, even cases that are 100 percent proven, there's always going to be a police officer or a prosecutor who is going to continue to argue that that person is guilty despite all reason, all logic, all evidence.

And so by just focusing on proven false confession cases, as Professor Drizin and I did in our 2004 article, we don't get sidetracked into these disputes about whether somebody's case is really false or not because everybody realizes the proven false confession -- every reasonable person realizes unless there has been a mistake in the analysis, that the proven false confession cases are proven false. And

Page 56

not surprisingly, neither Professor Cassell nor anyone else has challenged any of the cases in the 2004 article on proven false confessions.

So it detracts from the import and purpose and significance and contribution of the research to get in those skirmishes, so we want to be conservative. Even though just focusing on the proven false confession cases understates the problem, it gives us a dataset that nobody or almost nobody at least in the scholarly community will challenge.

BY MS. ROSEN:

Q. Did you say somewhere in that explanation that when it's a proven false confession that meets one of the four criteria, that in that circumstance every reasonable person would agree that the confession is false?

MR. ART: Objection to form.

THE WITNESS: Yes, unless there -- unless there is a mistake in the analysis, yes, every reasonable person. And the one case that Professor Cassell challenged, even the prosecutor in the case said it was a false confession, and it was a physical impossibility

Page 57

case where the person simply could not have gotten, if my memory is correct, could not have gotten to the crime scene in time to have committed the time. Nonetheless, Professor Cassell in my opinion was completely unreasonable there, and we've written about it.

I am not aware of a proven false confession that has been challenged other than that one in the academic literature. And, of course, Professor Cassell is not a social scientist, and he published his critique in a non-peer-reviewed journal.

BY MS. ROSEN:

Q. You indicated that there were subsequent studies that also addressed proven false confessions and the criteria, the four criteria. I know about the 2004 article that you and Steve Drizin wrote.

Are there -- is there something else you were referring to when you made mention of subsequent studies?

A. Yeah, I mean, an article that I'm still analyzing the data for but have not finished analyzing the data or written up.

There are other articles that mention

Urlaub Bowen & Associates, Inc.   312-781-9586

RICHARD A. LEO, PHD, JD, 09/28/2022      Page 58..61

Page 58

cases as proven false confessions, but these are the only two studies to date though, the one that I did with Professor Ofshe and Professor Drizin that had been published, and then there are other studies where other authors use other criteria for -- they write about false confessions and why they think a case is a false confession without necessarily using that criteria.

Q. Did you say other authors use different criteria?

A. Well, I'm thinking of a 1987 article by Bedau and Radelet where they did use a different criteria. They were looking at cases, capital cases in which they believed the person was innocent, and, of course, this was before our 1998 article. And they had 350 capital cases across the 20th century to 1985, and they used different criteria, but I think 49 of their 350 cases they classified as false confessions.

I did a 2013 article with some researchers where we had 110 cases of false confession. I made sure the cases were proven false confessions, but those -- there wasn't a discussion of proven false confessions, to my recollection, in the article.

Page 59

The article was 460 cases, so only a quarter of them were false confession cases, and the nonfalse confession cases, there were different criteria applied to.

Q. What is the -- what's the 2013 article you're referring to?

A. I think -- I don't recall the title off the top of my head.

If you move up to the articles published on the CV, which are organized by year, and you just focus on 2013-2014, I can point you to that article.

Q. It's at Page 40 --

A. Probably like 20 pages in, something like that.

Q. It's Page 40 of this part, so yeah. You went too far.

A. Yeah, yeah, yeah, yeah. So if you go down a little bit. Okay. So stop. Let's see. It might have been 2014.

Okay. I think it's 2014. Let's see. Can you just go up just a little bit to see? Oh, these are presentations, no. You need to go to the articles, not the presentations. That's why I said my guess is it's 20 pages in.

Page 60

When we were speaking earlier, I had printed out the current CV that I had then emailed to counsel, and I'm going to look for it myself on that CV.

Okay. So at the top of my Page 11 -- the pagination might be slightly different for you; I don't know -- it's called Predicting Erroneous Convictions with Jon Gould, Julia Carrano and Katie Hail-Jares, okay.

So in that article, there was also 110 proven false confessions.

Q. And how did you determine -- so that article, you said it -- but it doesn't discuss proven false confessions?

A. Yeah. I think the lead author wrote something up about, you know, we chose these 460 cases when we had indisputable evidence of innocence. But I have to look at the article, but I don't think there was any mention of proven false confessions, the four categories that you've been asking about, in that article.

Q. You just recall that of the 460, 110 were proven false confessions?

A. Correct.

Page 61

Q. Okay. And then with respect to the 2004 article -- wait, hold on a second.

The 110 cases, were those new cases separate and apart from the cases that were analyzed by you and Dr. Ofshe and you and Mr. Drizin?

A. I think some were new and some were old.

Q. So there's overlap?

A. Yes, I do think there's some overlap.

Q. Do you know how much overlap?

A. I do not. And I need to say something about this study.

So Professor Gould and I had gotten a 600-some-odd-thousand dollar grant to conduct this study. The National Institute of Justice had put out a call. And when we got the grant, we were able to hire research teams. But one of the conditions of the grant was a certificate of confidentiality.

So there's an act of Congress that says we could not reveal the data sources because of the certificate of confidentiality that was required pursuant to the grant.

And so the names of those individuals are not in the article, and they cannot be in the article.

RICHARD A. LEO, PHD, JD, 09/28/2022                                 Page 62..65

Page 62

The 1998 study I did with Professor Ofshe and the 2004 study I did with Professor Drizin, those, there was no grants, and so that's why we published the names of all the individuals in that study -- in those studies.

Q.   And so --

A.   -- but not in this study.

Q.   Sorry.  So with respect to the 2014 article, you are prohibited from giving us the names, right?

A.   Correct.  And not just you, anybody.

Q.   Yes, anybody.  Okay.

Was there overlap between the cases you and Mr. Drizin looked at in 2004 or for the 2004 article and the cases you and Dr. Ofshe looked at?

A.   No.

Q.   Okay.  With respect to the 2004 article that you did with Mr. Drizin, how did you get the cases that you ultimately analyzed?

A.   So it would be the same way as I did with Dr. Ofshe, the difference being that Steve Drizin was far more connected to the outside world than Dr. Ofshe in the sense that he -- I think he had a Listserv on false confessions at the time, or maybe

Page 63

it was a blog.  I think he interacted more with journalists and with professional legal societies as a member in addition to giving talks.

Professor Drizin also ran a couple clinics at Northwestern and was very connected to Innocence Projects and The Innocence Project there at the center on the study on wrongful conviction.

So I think he had kind of a broader swathe of people to reach out to, but it was the same thing, Innocence Projects, journalists, researchers, professional societies, scientific societies, anyone and everyone who had a case that they thought was a false confession.

And in that study, because we knew from the beginning we were just going to focus on proven false confessions, that's what we were looking for, if -- you know, if somebody had an allegation, saying, you know, you should investigate this case, you know, I'm a journalist in Houston, and somebody wrote about this case ten years ago in a neighboring county, here's the name, you should investigate it, it wasn't just the allegation, you know; is there evidence that meets one of these four criteria.

So we tried to screen out cases initially

Page 64

where it was clear one of those four criteria wouldn't be met, whereas in the '98 study we hadn't formulated the criteria yet when we were gathering the data.

Q.   And how many cases did you end up analyzing in the -- for the 2004 article that you wrote with Mr. Drizin?

A.   I don't remember the exact number, but I would estimate the same number, around 250.  That would be my best estimate.

Q.   And you analyzed the data in the same way that you did for the 1998 article, right?

A.   Correct.  So now we had the four criteria, so -- but, again, we were looking for patterns and in particular, you know, which of the four criteria were met.  And then once the case is included, now the same kinds of things I answered earlier; what percentage were in which category, how many people took plea bargains, how many got convicted, what were the sentences, et cetera.

Q.   Okay.  And then you also testified that you're analyzing some data currently?

A.   Correct, yes.

Q.   And can you -- what kind of data are you

Page 65

currently analyzing?

A.   Well, so we're doing another article on proven false confessions.  And so we've collected cases since the 2004 study, and we're doing the same thing.  If they meet the criteria of a proven false confession, then they will be in the study.  We -- we've gathered materials, and we're still coding these cases.

And then we will -- once we're finished coding the cases, we will write up the article, analyzing the data in the same way we did in the '98 -- in the 2004 study and that I did previously in the '98 study.

Q.   For the 1998 study, did you and Dr. Ofshe do the coding yourselves, or did you have research assistants and others to help you with the coding?

A.   No, we did the coding ourselves for the tables in that article, yes.

Q.   And with respect to the 2004 article, did you do -- did you and Mr. Drizin do the coding, or did you have others help you?

A.   I think we did the coding ourselves.

Q.   And then currently?

A.   Yes, the current article is, again,

RICHARD A. LEO, PHD, JD, 09/28/2022                    Page 66..69

Page 66

Professor Drizin and I, yes.

Q.   And are you --

A.   That's my recollection.  This project has been going on for a long time.

Q.   How long?

A.   Probably since 2010, possibly earlier.

Q.   Why is it taking so long?

MR. ART:  Object to the form.

THE WITNESS:  It just seems everything takes longer these days.  People get busier in their careers and in their personal lives than they once were, especially after having kids.

BY MS. ROSEN:

Q.   And are you and Mr. Drizin coding these cases yourselves, or do you have research assistants or others helping you?

A.   No, we're coding these cases ourselves.  We do have research assistants.  We have had over the years research assistants helping us.

Q.   To do what?

A.   You know, I think one of them may have coded some of the cases too actually.

Well, the research assistants have helped us gather data, basically contacting attorneys,

Page 67

getting materials.  And I think one of them actually did some of the coding.  I have to go back through.  I haven't looked at this -- I haven't looked at this in -- what are we in, September?  I haven't looked at this in three and a half years.  I haven't looked at the coding in three and a half years.

Q.   I see.  Okay.  Let's turn to the first page of your report -- your report.  Excuse me.  Obviously this report is dated January 15th, 2022, which is when it was ordered by the court to be produced.

When did you first start working on this particular case?

A.   I don't recall.  Most likely, I mean, I think you have billing records and dates on the billing records, so I just have to look at that.  There's no point in me speculating because we could answer that question.

Q.   Okay.  But as you sit here today, you don't recall?

A.   I don't recall specifically.

Q.   Okay.  And then if we could go to Page 2 of the report, so that last paragraph there indicates that your rate that you're being

Page 68

compensated at in this particular case is $400 an hour.

Do you see that there?

A.   I do, yeah.

Q.   And as you previously mentioned, we have invoices, your invoices.  We have invoices in this case, and we have invoices in other cases where you've been hired by the same attorneys that represent Mr. Solache and Mr. Reyes, and I noticed that your hourly rate is inconsistent.

For example, in the Sanchez matter with Mr. Elson and his firm, you charged an hourly rate of $375 an hour.  In a couple other cases where you were hired by Loevy & Loevy, you've charged 450 an hour and 475 an hour.

So I'm just wondering why -- all within the same general time frame.

So I'm just wondering why your hourly rate varies so much.

MR. ART:  Objection to form.

THE WITNESS:  So my hourly rate does change sometimes every year, right.  So it might go up 25 or $50.

And there might also be times when I'm

Page 69

more or less busy, and I'm charging more in a particular year just because I have less capacity to take on new cases, and other times, though not especially recently, when I have more capacity and I charge a slightly lower rate.

That would be my best analysis of why the rates vary, but I know that I have -- I think I have raised the rates every year for like the last four or five years.

BY MS. ROSEN:

Q.   So if somebody were to reach out to you today for a case like this one, what would your hourly rate be?

A.   Well, so right now my typical private hourly rate is 500 an hour.

Q.   Did you say 500?

A.   Correct, yeah.  So 2022, typically it's 500 an hour for privately retained cases and typically a little lower, 400 an hour, for public defender appointed cases.

Q.   Okay.  And then the next, beginning at Page 2 and going all the way to Page 12, is a list of the materials that you reviewed in this case; is

RICHARD A. LEO, PHD, JD, 09/28/2022                    Page 70..73

Page 70

that correct?

A.  That is correct, unless I made a mistake and excluded inadvertently a document that I've reviewed or I've reviewed any documents since.

Q.  Have you reviewed any documents since providing your report in January of 2022?

MR. ART:  Objection to form.

THE WITNESS:  Yeah, I have reviewed at least one document that's not on this list. This is an opinion in The People of the State of Illinois versus Clayborn Smith.  So that would be the only document that I have reviewed since that's -- to my recollection that is not on this list.

BY MS. ROSEN:

Q.  And why did you review the Illinois opinion, People versus Clayborn Smith?

A.  It was one of the cases that I discussed in the report, and this was just updated material that I was provided.

Q.  Who provided it to you?

A.  Counsel, defense -- no, plaintiff, sorry, plaintiff counsel provided it to me.

Q.  When did they provide it to you?

Page 71

A.  I believe sometime within the last week.

Q.  Any other materials that you can think of that you were provided since tendering your report in January of 2022?

A.  No.

MR. ART:  Objection to form.

THE WITNESS:  Not that I recall, no.

BY MS. ROSEN:

Q.  Okay.  And do you know what a Chicago Police Department investigative file is?

MR. ART:  Objection to form, vague as to the term "investigative file."

THE WITNESS:  Yeah, I think you mean the file that a police -- the Chicago police keep when they open a criminal investigation into a case, if I understand your question.

BY MS. ROSEN:

Q.  Well, my question is specific, so -- and I don't want you to speculate or guess at what I'm asking.

So the specific question is, do you know what a Chicago Police Department investigative file is?

MR. ART:  Objection to form.

Page 72

THE WITNESS:  I just gave you my best understanding, so I think I know what it is based on that understanding.

BY MS. ROSEN:

Q.  And what is your understanding based on?

A.  Based on all the cases I've worked on, criminal and civil, in the City of Chicago where I've been provided portions of police files.  In the criminal cases, you know, that's usually police reports and interrogation tapes and transcripts when they exist, and I assume that comes from something called an investigative file.

So that's my best understanding of the term.

Q.  Do you know what a Chicago Police Department Records Division file is?

A.  Well, I know I've reviewed materials from -- that have had those words on them, or at least I think I have.  So I think I know what they are, files, police reports, but that would be my best understanding.

Q.  Do you know the difference between a Chicago Police Department investigative file and a Chicago Police Department Records Division file?

Page 73

MR. ART:  Objection to form.

THE WITNESS:  My understanding would be they maybe just come from different divisions, but if there's a difference other than that, I'm not thinking of it right now.

BY MS. ROSEN:

Q.  Were you provided in this case any documents that you believe made up entire investigative files other than perhaps files related to Mr. Solache and Mr. Reyes?

MR. ART:  Objection to form.

THE WITNESS:  I don't know the answer to your question, but I think that the materials are so voluminous that I was not provided the entire file on any case.  But, you know, I analyzed what I provided, and everything I was provided, with that one exception of the Clayborn Smith recent published opinion, is listed here.

BY MS. ROSEN:

Q.  Would you be able to review a complete investigative file and based on -- let me strike that.

Would you be able to review if you were

RICHARD A. LEO, PHD, JD, 09/28/2022                                    Page 74..77

Page 74

provided a complete Chicago Police Department investigative file and ascertain from a review of that file whether or not a particular statement or confession was coerced?

MR. ART: Objection to form.

THE WITNESS: It would obviously depend on what is in the file. So there's no way of answering that without first seeing what would be in that particular file.

BY MS. ROSEN:

Q. What is your understanding of what types of materials are contained within a Chicago Police Department investigative file?

MR. ART: Objection to form, foundation.

THE WITNESS: I assume police reports and anything else related to the police investigation, including statements by witnesses or victims or suspects, and anything else that's relevant to the investigation by the police or that they think is relevant.

BY MS. ROSEN:

Q. Have you ever in your career been provided complete Chicago Police Department investigative files so that you could review them and analyze them

Page 75

regarding the falsity or not of a particular confession or statement?

MR. ART: Objection to form.

THE WITNESS: I don't know if I've ever been provided the entirety of a Chicago Police Department investigative file. In any of the criminal or civil cases in which I've consulted or testified, I simply don't know if every document was provided to me.

BY MS. ROSEN:

Q. Is there a difference between a general progress report and a supplementary report?

A. I would assume that the supplementary report is a follow-up, but my understanding is they're both police reports, and general progress report is just how they're identified. Some police reports or progress reports are identified in -- by Chicago police.

MS. ROSEN: Okay. Why don't we take a short break here, although I guess maybe it's 1:00 o'clock here in Chicago. I don't know if people are ready for a lunch break or not.

MR. ART: Dr. Leo?

THE WITNESS: I'm fine with a lunch break

Page 76

if you want to take a lunch break. I would just ask that we try to keep it to 30 minutes. If you don't need a lunch break, I would probably request a lunch break around 2:00 o'clock your time or 2:30 your time.

So I realize that for some of you, you know, you may be hungry now, and so I'm happy to take a lunch break now, if you prefer, but if not, I'm happy to go to 12:30 with a five- or ten-minute break now, 12:30 my time, 2:30 your time, whatever the consensus is.

MS. ROSEN: Rachel, let's go off the record.

THE VIDEOGRAPHER: We're off the video record at 12:52 p.m.

(Whereupon, a lunch recess was taken from 12:52 p.m. to 1:30 p.m.)

THE VIDEOGRAPHER: We are back on the video record at 1:30 p.m.

BY MS. ROSEN:

Q. Okay. If we could put Exhibit Number 1 back up on the screen, Robyn, I would appreciate it.

With respect to the materials that you

Page 77

reviewed in connection with the work that you did for Mr. Solache and Mr. Reyes in this case, I assume that the materials that are listed on Pages 2 through 12 of your report were provided to you by plaintiffs' counsel, correct?

A. Correct.

Q. And you did not do any independent research or investigation outside of what counsel provided to you, correct?

A. Correct.

Q. Okay. If we could take a look at Item 66, which is on Page 4, it says "Deposition transcript of Adriana Mejia."

Do you see that there?

A. Yes.

Q. Do you know -- it's not dated.

Do you know which deposition transcript you were provided and that you're referring to in Item 66?

A. I could go to my binder and find it and let you know if you'd like, but off the top of my head, I don't know what the date is.

Q. Do you recall if you received one or two deposition transcripts from -- with testimony of

RICHARD A. LEO, PHD, JD, 09/28/2022                    Page 78..81

Page 78

Adriana Mejia?

A. I know I received at least one, but I don't recall if I received two.

Q. In the testimony that you reviewed, did Adriana Mejia answer questions about her involvement in the Soto murder and Mr. Solache and Mr. Reyes' involvement in the Soto murder?

A. I'd have to look at the document. I don't want to give you a misrecollection. I haven't looked at this in, you know, nine months at least.

Q. So as you sit here today, you do not recall whether or not Ms. Mejia testified in the deposition transcript you were provided about her involvement in the crime and Mr. Solache and Mr. Reyes' involvement in the Soto murder and the kidnapping of their two children?

A. My recollection is that she did, but what I'm telling you is I'm not confident in my memory, and we could get an answer to that question by me going back and reviewing the document. And I don't feel comfortable testifying about a document when I don't have it in front of me.

Q. My question is more general than that.

So as you sit here today, do you recall

Page 79

that in the deposition transcript that you reviewed Adriana Mejia testified about her own involvement and Mr. Solache and Mr. Reyes' involvement in the Soto murders and the kidnapping of their two children?

A. I'd need to review the document.

Q. So I take it as you sit here today, you don't recall one way or the other whether or not Adriana Mejia testified about her involvement in the Soto murders and kidnapping of their two children and Mr. Solache and Mr. Reyes' involvement in the murder of the Sotos and the kidnapping of their two children, correct?

MR. ART: Objection to form, mischaracterizes testimony.

THE WITNESS: No, what I'm saying -- no, that's not correct. What I'm saying is that my best recollection is that it was not one of those depositions where the person took the Fifth all the time and refused to answer questions. But given how many months have passed since I reviewed the document, I don't have full confidence in that recollection, and that's why I was requesting that I find the

Page 80

document to answer your question.

I can only tell you my best recollection at this time, but if I wanted to know whether that was an accurate recollection, I would have to cross-check the document.

BY MS. ROSEN:

Q. Who is Adriana Mejia? What's your recollection of her role in the Soto murders?

A. Adriana Mejia was one of the convicted defendants. She was the one who had both babies, and she was the one who participated in and committed this crime. We know that through DNA evidence. And she was interrogated by Detective Guevara and reports being physically assaulted and psychologically coerced in similar ways to the other defendants as well as her husband, Rosauro Mejia.

Q. If we go to Page 5, so the next page, beginning at Lines Item 79 and then all the way through Page 12, which ends with Item 283, am I correct that all of the materials that are listed there are not related to the actual homicide and kidnapping of the Soto family, correct?

A. Correct. These are materials on other

Page 81

cases.

Q. Okay. And many of the materials have a Bates number that begin PTP.

Do you know what --

A. Correct.

Q. -- PTP means?

A. I do not.

Q. Okay. And I take it, as with the other materials, all of these materials were provided to you by plaintiffs' counsel, correct?

A. Correct.

Q. Do you know whether or not you were provided all of the materials in plaintiffs' counsels' possession related to all of these various cases?

MR. ART: Objection to form.

THE WITNESS: I can't imagine that I was. The files are so voluminous that I imagine plaintiffs' counsel has far more materials than I was provided, that it wouldn't have been humanly possible for me to review all the documents in plaintiffs' counsel file.

BY MS. ROSEN:

Q. And why would you imagine that they had --

Urlaub Bowen & Associates, Inc.  312-781-9586

RICHARD A. LEO, PHD, JD, 09/28/2022                    Page 82..85

Page 82

that plaintiffs' counsels' files are voluminous with respect to all of these different cases that are listed beginning at Page 5 of your report?

MR. ELSON: Objection to the form.

THE WITNESS: Because I've worked on so many cases, and I know that in the cases that I work on, I'm usually only provided a portion of the file, and civil cases have much larger files. And many of these cases involve pretrial, trial, conviction, reversal, second trial, or maybe not second trial, post-conviction, and the torture and innocence inquiry commission, and some of them involve certificate of innocence hearings.

So these are -- many of these are very old cases going back decades. So I assume they are large files, and I never or almost never get the entire file because I'm just an expert about one piece of a report.

What I assume is that I'm sent the relevant materials, and I reviewed a substantial amount of materials here on a number of cases.

Page 83

BY MS. ROSEN:

Q. And you were satisfied that the materials that you received were sufficient for you to reach the conclusions that you reach in this case, correct?

A. Yes, based on these materials. If there are new materials you would like me to consider, I'm happy to look at those materials. But I'm confident in the opinions I expressed based on the materials that I reviewed.

Q. If we could go to Page 12 now of his report, Exhibit Number 1.

If you can scroll so we can see the bottom of the page. Great.

You begin this report by indicating that you will provide an overview, sorry, of the relevant social science research on the psychology of police interrogation practices and techniques, et cetera, et cetera.

Do you see that there in the beginning of your report?

A. Yes.

Q. When you referred to the relevant social science research, what are you referring to?

Page 84

A. The body of research on the subjects, empirical research, and reviews on the psychology and practice of police interrogation, police interrogation techniques, psychological influence, deception, manipulation and/or coercion, the research on risk factors for false confession, the research on good and bad practices, and on indicia of unreliability and false confessions.

And, of course, I'm also including sometimes in the discussion things that the manuals say, which are a form of evidence, not scholarship, about how police think and practice interrogation.

Q. When you say "manuals," what are you referring to?

A. Well, there are occasions in the report, I believe, where I refer to the Reid manual, a police interrogation training manual that goes back decades and sort of sets the standard for best practices, and they have trained hundreds of thousands of police. Their manual is considered the Bible of interrogation, at least in American police work.

Q. What is your basis for saying that the Reid manual is considered the Bible for U.S. policing?

Page 85

A. It's the scholarly consensus. Numerous people have written about that. It's consistent with empirical research I did on the history of police interrogation and wrote about in one of my books in America. Others have noted the same thing.

There's nobody that disputes that they are the leading police interrogation training firm, no academic researcher I'm aware of or anyone, the leading interrogation training firm and that their manual is the leading interrogation training manual in the United States and has been for decades.

Q. Does the Chicago Police Department train the Reid method?

A. I don't know if they use Reid materials.

Q. When you say -- you used the term "empirical research."

What do you mean?

A. Empirical just means going out into the world and getting data. So we talked earlier about a variety of methods, surveys, experiments, field observation, interviews, analysis of research documents, whether they're historical or contemporary, like police reports or interrogation tapes and transcripts.

RICHARD A. LEO, PHD, JD, 09/28/2022                    Page 86..89

Page 86

That's what I mean by empirical, going out, gathering data, and then analyzing that data in light of research questions and publishing studies based on that data.

Q. I think I forgot to ask you.

Was the 1998 article that you wrote with Dr. Ofshe, was that peer reviewed?

A. Yes.

Q. And the 2004 article with Steve Drizin, was that peer reviewed?

A. It was in a law review, the North Carolina Law Review, so it wasn't the traditional form of peer review. I do believe that the editors solicited an outside opinion or two, so it would have been a modified form of peer review, not the traditional social science peer review.

Q. What's the basis for your belief that the editors reached out and --

A. It's just my recollection. So obviously this is two decades later, but that's what I recall.

Q. Okay. In Point 1 of your opinion, your report, you indicate that Mr. Reyes and Mr. Solache's signed confessions meet criteria for what is known as proven false confessions in the

Page 87

social scientific research literature.

Do you see that?

A. Yes.

Q. And when you referred to the social science research literature, is there something in particular you're referencing there?

A. Well, again, in the 1998 study, which is part of that literature, I and Professor Ofshe created the term. The term has been used, you know. The article I did with Professor Ofshe and Professor Drizin have been cited many times and described in many other articles.

And so -- and the term "proven false confession," I believe, has also been used.

So that's what I mean is the same answer to your prior question, the body of social science research on the topics of interrogation, coercion, confession, false confession.

Q. Okay. Then if we move down to Number 2, it says Arturo DeLeon-Reyes' description of what occurred, et cetera, et cetera.

What are you citing to with respect to Mr. Reyes' description of what occurred, what specifically?

Page 88

MR. ART: Objection to form.

THE WITNESS: Well, his testimony anywhere in the documents that I mention from motion to suppress to trial to posttrial to deposition, every place where he testified, I reviewed that testimony, and I summarize and describe that testimony later in the report.

BY MS. ROSEN:

Q. And do you believe that his testimony at the motion to suppress, the trial, the posttrial, and his deposition were all consistent regarding the circumstances of his confession?

A. My recollection is yes, they were generally consistent. There might have been some minor differences or inconsistencies but that generally they were consistent.

Q. Can we take a look at the next page of your report, Bullet Point 4, Item 4. You indicate Arturo DeLeon-Reyes' description of what occurred are known to cause involuntarily confessions.

Do you see that there? I didn't read the whole thing, but that's the gist is that his description reflected techniques that are known to cause involuntary confessions, right?

Page 89

A. Yeah, Number 4, yes.

MR. ART: Objection to form.

BY MS. ROSEN:

Q. And do you know how often the use of the different techniques that you itemize in Number 4 actually cause false confessions?

MR. ELSON: Objection to the form.

THE WITNESS: No, I don't know the exact number. You can't really put an exact number and say if you use this technique, you'll get X percent false confessions. It's not possible to know that with -- be able to know that, especially since these techniques often work together.

BY MS. ROSEN:

Q. And why is it impossible to know how often the use of these techniques lead to involuntary confessions?

A. Well, the government doesn't maintain a database of all cases of interrogation, nor does any private organization, and you'd have to have all the interrogations warehoused and then be able to randomly sample them and then have to determine, be able to determine based on a large enough sample

RICHARD A. LEO, PHD, JD, 09/28/2022                Page 90..93

Page 90

which ones are likely true, which ones are likely false, and code them and do a sophisticated statistical analysis.

So because there's no database for us to even access the cases, and even if there were, it would take substantial resources to do that kind of research project, we can't say 5 percent of the time when a threat is used you've got a false confession or an involuntary confession, you know; 90 percent of the time when there's physical violence, you get a false or an involuntary confession.

Q. Do you use the phrase "involuntary confession" interchangeably with the phrase "false confession"?

A. No, I think they're two different but related things.

Q. Okay. So in Item 4 you say "involuntary," right?

A. Correct, but I thought your last question asked about false, but I maybe misremembered.

Q. Different point. I'm making a different point.

A. Okay.

Q. I'm just asking you, you used it

Page 91

interchangeably, I thought, in a sentence, so I'm just trying to understand your terminology.

So not -- can you describe for me the relationship between an involuntary confession and a false confession in your view?

A. Well, an involuntary confession is one where a person perceives they have no choice and they feel it's forced out of them, and so it's not given freely or voluntarily. A false confession is a confession that is factually false in whole or in part.

And so the relationship is that usually interrogation methods that are psychologically coercive are what are responsible for the false confession, but you could have a psychologically coercive interrogation leading to an involuntary confession that is true or partially true.

Q. So not all involuntary confessions are false confessions. Is that what you're saying?

A. Correct.

Q. Okay. And the same is true -- well, strike that.

And not all false confessions are involuntary confessions, right?

Page 92

A. Not necessarily correct.

Q. Okay. Okay. And if we look at Item 5 in your report, you discuss situational risk factors for false confessions?

A. Yes.

Q. Okay. So you're making a different point here than involuntary confessions, right?

A. Correct.

Q. Okay. And you identify the length -- no. You identify lengthy interrogations as a situational risk factor for false confessions, correct?

A. Correct.

Q. And how do you define lengthy interrogation?

A. Well, it's -- there's no magic line between nonlengthy and lengthy. The longer it goes, the more lengthy it is.

In the body of the report, I talk about the Reid method, the Reid manual saying don't go beyond four hours. The 2004 article with Steve Drizin, I believe more than half of those proven false confessions went beyond six hours. So certainly more than four or more than six would be a

Page 93

lengthy interrogation.

But I also think that it's a mistake to think about either lengthy or not, you know. I also mention in this report that 95 percent of interrogations are less than two hours when you just look at routine felony interrogations.

So if we had to have a dividing line, I would say anything over two hours statistically is lengthy, but the length -- the longer it goes, the lengthier it is. And as you know from the body of the report in this specific section describing that, we also include the time somebody is in an interrogation room between questioning because that is a technique in some departments, and that adds to the length or exhaustion or fatigue that the suspect is experiencing, which is the reason why that is a risk factor.

Q. Right. But right here, you're not -- you don't say lengthy interrogation and time in custody. You're limiting it here to lengthy interrogation. I assume that's deliberate, correct?

A. Yeah, because these are summary overview opinions, and obviously I can't, you know, write paragraphs for each one, at least in the structure

RICHARD A. LEO, PHD, JD, 09/28/2022                     Page 94..97

Page 94

of how I do my reports.

So each of these opinions, as I think you know, are fleshed out in more detail elsewhere. These are just the bullet points.

Q. And when you were telling me that the 2004 article discussed greater than six hours of interrogation, that means interrogation, right, not interrogation and custody?

A. No, that would be custody during interrogation or interrogation during custody.

So if somebody is deposited into a room and then 15 minutes later the person is interrogated for three hours, then they're left alone for two hours, then the person is interrogated for another two hours, we would add all those times up and say that is the length of the interrogation.

I should have given a better hypothetical example, but there were two rest periods in that and two interrogation periods. If each of those four periods were two hours, a person is deposited in the room, interrogator comes two hours later, interrogation session 1 is two hours, there's a two-hour break, and interrogation session 2 is another two hours, that would be four hours of

Page 95

questioning or accusation, but we would count that as eight hours of interrogation because the person was in the interrogation room for the entire period of time.

Q. So are you saying that your reference earlier about what you concluded from the 2004 article was not focusing only on interrogation time? It included custodial time?

A. Custodial time during the interrogation. If the person is deposited in the bullpen or jail overnight, after this eight-hour interrogation, right, or before it, we wouldn't count that custodial time. It's custodial time in the interrogation room that we count.

(Exhibit 2 was marked for identification.)

BY MS. ROSEN:

Q. Could we mark as Exhibit Number 2 Dr. Leo's 2004 article. It's called The Problem of False Confessions in the Post-DNA World.

A. I'm going to get that article real quick, if that's okay with you. It will take two seconds.

Q. Sure. And if we could go to Page -- oh, shoot, it's numbered 948 in the article. I don't

Page 96

know what page it is of the PDF.

A. Okay.

Q. 60, I think, of the PDF. Back one.

MS. GOLDEN: This is 2?

MS. ROSEN: Yes, this is Exhibit Number 2. And if we go to the next page. Yes, that's fine. Are you back? There you are.

BY MS. ROSEN:

Q. Do you have the article in front of you? So it's Page 948 of your article.

A. I do. I do. Thank you.

Q. Okay. And if we look at the second paragraph that begins, Of the cases in which the length of interrogation was either reported or could be determined, 16 percent lasted less than six hours; 34 percent between six and twelve; 39 percent between twelve and twenty-four; 7 percent between twenty-four and forty-eight; 2 percent between forty-eight and seventy-two; and 2 percent between seventy-two and ninety-six, that portion of the article.

A. Yes.

Q. And are you telling me that when you say "length of interrogation," that counts custody time

Page 97

as you previously were describing?

A. Yeah, the way I was using the word "custody," yes.

Q. Can you tell me where in the article that's explained?

A. No. I'd have to look through the article. And it may or may not be explained in the article. I mean, if you want me to review the article, I can look through the article.

Q. No. Well, why wouldn't you explain that in the article?

A. If it's not explained, it's just because this is such a long article, and this is the standard way of defining length of interrogation in the field.

Q. Standard by who? Who in the field has determined that length of interrogation means interrogation and custody as you previously defined it?

A. Well, the term is "custodial interrogation," and it's just my understanding of scholars in the field. If you're in an interrogation room for six hours but you're only questioned for one hour, it's still six hours in the

RICHARD A. LEO, PHD, JD, 09/28/2022                    Page 98..101

Page 98

custodial interrogation.

So it's just my understanding of how the terms are defined and understood in the research community.

Q.   Can you point me to a single article that explains that?

A.   Off the top of my head, no, but I do explain it in the report.  I would just have to look through articles to see if anybody has explained that.

So off the top of my head, no.

MS. ROSEN:  Can you mark as Exhibit Number 2 [sic] Dr. Leo's article inside the interrogation room.

MR. ELSON:  Is this Exhibit 3?

MS. ROSEN:  Number 3.  Sorry.  I misspoke.

(Exhibit 3 was marked for identification.)

BY MS. ROSEN:

Q.   Now, in this study that you did, this was your dissertation, right?

A.   Well, the data was -- this is not my literal dissertation, but the data was gathered from my dissertation research.

Page 99

Q.   So this is an article -- so you gathered the data to prepare your dissertation, and then this was one of the articles that you wrote after --

A.   Correct.

Q.   -- that summarized in part the data?

A.   Correct.

Q.   Okay.  And in this -- in this article, you also discuss length of interrogation, correct?

A.   Correct.

Q.   And if we look at Page 15 of the PDF, Table 6, it says Length of Interrogation Only Where an Interrogation Occurred.

Do you see that there?

A.   Yeah.

Q.   And you say less than 30 minutes, 53; out of the total 31 to 60 minutes, 56; one to two hours, 32; more than two hours, 12.

Do you see that there?

A.   Yeah.

Q.   And am I correct that that is counting actual interrogation time?

A.   I thought it would have counted time in interrogation room as well, at least that's my recollection.

Page 100

And when I say length of interrogation, only where an interrogation occurred, because some of the people invoke their Miranda rights, and so there was no interrogation.

Q.   And so you're saying that in this -- in the table where you indicate less than 30 minutes, that's counting an interrogation and how long the person was in the interrogation room?

A.   Correct.

Q.   And can you tell me where in this article you lay that out?

A.   No.  I'd have to look at the article, and I don't even know if I did.

Q.   Okay.  You can take down -- we can go back to Exhibit Number 1.

Okay.  If we go back to situational risk factors, with respect to -- it's Item Number 4, yeah.  There you go.

With respect to lengthy interrogations, however you're currently defining it, do we know how often a lengthy interrogation -- how much -- let me rephrase that.

With respect to your current definition of lengthy interrogations, how often does a lengthy

Page 101

interrogation lead to a false confession?

MR. ART:  Objection to form.

THE WITNESS:  Well, first of all, like I said, it's not a binary variable, lengthy or not lengthy.

But secondly, we can't put a precise number on it.  What we know is that there's a pattern, right.  You've just shown two studies, and one is of routine interrogations, and the other is of interrogations leading to false confessions, and you see a clear pattern that the ones leading to proven false confessions are on average far longer.  But we can't put a precise number on how long does a particular period of time, whatever you want to arbitrarily call it, two, four, six, eight, lead to false confessions.  There's simply no way of quantifying that in a scientifically meaningful way.  We can establish the pattern; we can explain the pattern; we can replicate the pattern.  But we can't reduce it to a number that you're looking for.

BY MS. ROSEN:

Q.   With respect to what you just said about

RICHARD A. LEO, PHD, JD, 09/28/2022                    Page 102..105

Page 102

routine investigations, so you're talking about the one we looked at inside the interrogation room, right?

A. Right. So those were all felony interrogations, and -- correct, and that's why I said routine felony interrogations.

Q. How many of those confessions were false confessions?

A. Well, I don't know because I did -- that wasn't the purpose of the study. It wasn't a study of false confessions. It was a study of interrogation techniques.

So I didn't seek to gather the data on whether or not any of these were false confessions because it wasn't within the scope of that research budget.

Q. So you don't know whether or not -- let's go back to inside the interrogation room for a second, which is Exhibit Number 3.

So you don't know how many of the 53 interrogations that lasted 30 minutes led to a false confession, right?

A. I don't know if any of them led to a false confession. And also, not all of these even led to

Page 103

a confession, period.

Q. Okay. Well, of the ones that led to a confession.

A. Yeah, I don't know how many were true or how many were false.

Q. In any of the ones that you observed, right?

A. Correct, because I didn't seek to answer that research question in this study.

Q. And this is an occasion where you actually observed interrogations, correct?

A. Correct.

Q. Both live as they were happening and then you also viewed videotaped confessions, correct?

A. Correct.

Q. Or interrogations. I'm sorry.

A. Interrogations, correct, in one department live and two departments videotaped.

Q. Okay. And if we look at Table 5 of Inside the Interrogation Room, Page 14, here you identify interrogation tactics that were used, correct?

A. Yes.

Q. And you are identifying patterns, right, that you observed?

Page 104

A. Correct.

Q. Much in the same way that you talked about identifying patterns both in the 1998 review you did with Dr. Ofshe and the 2004 review you did with Mr. Drizin, correct?

A. Yes.

Q. And, in fact, here you even identified how often suspects were confronted with false evidence of guilt.

Do you see that there?

A. Correct.

Q. And you would call that now a false evidence ploy, right?

A. Well, I guess what I see is confronted with existing evidence of guilt.

Okay. Further down, yeah, confront suspects with false evidence of guilt. Yes, so in 2007, one year after this article, we coined the term "false evidence ploy," Professor Ofshe and I, and that's now a standard team in the research literature.

Q. And that's one of the situational risks that you identify in your report, right? In fact, in this Paragraph 5 that we were just looking at,

Page 105

it's one of the situational risks that you identify?

A. Correct.

Q. And so in these interrogations that you observed, it looks like, if I'm reading this right, in 30 percent of the cases, 30 percent of the cases, false evidence ploys were used, right?

A. Correct.

Q. But there's no way for you to tell us whether any of these cases led to a confession that was false, right?

A. Or true, correct.

Q. Okay. We can go back to Exhibit Number 1.

Another situational risk factor you identify in Paragraph 5 has to do with sleep deprivation.

Do you see that there?

A. Yes, sleep deprivation, yes.

Q. And can you tell me how you define sleep deprivation?

A. Yeah, as any interruption of one's normal level of sleep.

Q. Do you know what Mr. Solache's normal level of sleep was back in April of 1998?

A. No.

RICHARD A. LEO, PHD, JD, 09/28/2022        Page 106..109

Page 106

Q. Do you know what Mr. Reyes' normal level of sleep was back in April of 1998?

A. No.

Q. Okay. Another situational risk factor that you identify is a premature rush to judgment.

Do you see that?

A. Yes.

Q. And can you explain for me what you mean there?

A. Premature conclusion of guilt without adequate investigation to base that conclusion of guilt on.

Q. And how do you as the researcher evaluate that?

A. Well, I've read a lot of police manuals and a lot of books on policing and taught courses on policing, including to police, and I evaluate the materials that I -- are put in front of me in light of the standards that I'm aware of for what constitutes an adequate investigation prior to interrogation.

The Reid manual says investigate before you interrogate or thoroughly investigate before you interrogate, and in this case, there was in my

Page 107

analysis of the materials I reviewed no real investigation prior to the interrogation, the interrogations described at least by Mr. Reyes and Mr. Solache.

So as always, based on what I know and what I review, I'm doing an analysis.

Q. When you say there was no real investigation done before Mr. Solache and Mr. Reyes were interrogated, can you be more specific?

A. Well, according to Mr. Reyes, he was immediately kind of roughed up. And so it appeared that there was -- my analysis of these materials is that it appeared that Detective Guevara just sort of assumed that because they showed up with the child they were the ones who did the crime. And at least in the account given by Mr. Reyes and later Mr. Solache, it just appears he went -- Detective Guevara went into guilt presumption mode without trying to sort out the facts and figure out whether, in fact, Mr. Reyes was guilty and Mr. Solache was guilty.

Q. And in order -- that conclusion credits Mr. Reyes' version of events wherein he testified that Mr. Guevara walked into the room and

Page 108

immediately hit him, correct?

A. Yeah.

MR. ELSON: Objection to the form.

THE WITNESS: Yeah, I'm not trying to say whose account is more credible or not. I'm saying based on Mr. Reyes' account, yes.

BY MS. ROSEN:

Q. Okay. So let's take Mr. Reyes' account, that Detective Guevara walked into the room and immediately slapped him.

What, if any, investigation had been done up until that moment in time?

MR. ART: Objection to form.

THE WITNESS: My recollection is very little or none.

BY MS. ROSEN:

Q. When did the crime occur, what date?

A. I don't -- I don't recall the specific date. I'd have to -- I'd have to look in the records. I don't want to guess. These are objective facts that are easily determinable.

I think it was March 28th, but I'm not a hundred percent sure. I'd have to look in the record.

Page 109

Q. And so what is your understanding of what the police investigation did between the time that the murders occurred and the time that Mr. Solache and Mr. Reyes were in the police station?

MR. ART: Objection to form, foundation.

THE WITNESS: Opened an investigation. That's my recollection.

BY MS. ROSEN:

Q. What's your understanding of what evidence was collected or what individuals were spoken to prior to Detective Guevara walking into the room the first time and speaking with Mr. Reyes?

MR. ART: Objection to form.

THE WITNESS: Sorry, go ahead.

MR. ART: Objection to form.

Go ahead.

THE WITNESS: Sorry, I didn't know if you were going to say why.

BY MS. ROSEN:

Q. I think he had a form objection, but you can answer.

A. Yeah, I don't recall specifically. I'd have to review the police reports. I don't recall specifically as I sit here.

RICHARD A. LEO, PHD, JD, 09/28/2022 Page 110..113

Page 110

Q. So is your conclusion that this was a, with respect to Mr. Reyes, a guilt-presumptive interrogation based solely on the fact that Mr. Reyes claims that Mr. Guevara walked into the room and slapped him?

MR. ART: Objection to form.

THE WITNESS: Yes, it's based on Mr. Reyes' description where he describes being automatically presumed guilty and then a violent interrogation ensuing trying to extract from him an admission of guilt based on that description.

BY MS. ROSEN:

Q. Irrespective of whatever other investigation preceded Detective Guevara walking into the room, right?

MR. ART: Objection to form.

THE WITNESS: Yes, because the automatic presumption of guilt was with respect to Mr. Reyes, and prior to Mr. Reyes and Mr. Solache arriving at the police station, they weren't on the police officers' radar, and so -- to my recollection.

So that's what -- it's their arriving at

Page 111

the station with the child that triggered Detective Guevara in Mr. Reyes' account, and there was no adequate investigation of Mr. Reyes prior to his guilt-presumptive and psychologically and physically coercive interrogation that he describes.

BY MS. ROSEN:

Q. You also identify as a situational risk factor in Paragraph 5 or Point 5 false evidence ploys.

Do you see that?

A. Yes.

Q. What are the false evidence ploys that were utilized against Mr. Reyes?

A. Well, I describe it on Page 41, so I essentially discuss two things. One is Adriana Mejia's accusation that he participated with her in the double homicide, and then secondly, that there were witnesses accusing him of committing -- witnesses, plural, accusing him of committing the murder.

Q. And why is it that you have concluded that the use -- that Adriana Mejia's accusation was a false evidence ploy?

Page 112

A. Because the confession that he signed, that Mr. Reyes signed, meets the criteria of a proven false confession and because the DNA evidence excludes him in my opinion definitively; and, therefore, her assertion would be factually false, and he's confronted with that assertion as a piece of evidence.

Q. So you are concluding that Adriana Mejia's accusation against Mr. Reyes is factually false?

A. Based on the proven false confession, then yes, it would be a false evidence ploy.

Q. So if you're wrong about Mr. Reyes' confession meeting criteria for a proven false confession, then your conclusion about Adriana Mejia's accusation being a false evidence ploy falls apart, correct?

MR. ART: Objection to form.

THE WITNESS: Well, okay. So if I am wrong about his case meeting the criteria of a proven false confession, then either it is a true evidence ploy or it's a false evidence ploy. It depends on what else you add to that sentence.

If you want me to assume that for purposes

Page 113

of the question that Mr. Reyes is factually guilty, then yes, this is not a false evidence ploy. But because this meets the criteria of a proven false confession, I'm not assuming that hypothetical.

BY MS. ROSEN:

Q. And is it your position that the detectives, the police officers were the ones who created the false evidence, meaning they forced Adriana Mejia to falsely accuse Mr. Reyes?

A. Well, we don't have a recording of their interrogation of Adriana Mejia. She alleges that she was physically assaulted just like everybody else, Rosauro, Mr. Reyes, Mr. Solache, but I would have to see the interrogation to know whether she admitted it or they made it up -- or I shouldn't say they made it up.

I would need to look at the interrogation to see the circumstances under which that arose, and we don't have a recording of those circumstances.

Q. What does Adriana Mejia say about it?

A. Well, she continues to assert that Mr. Reyes and Mr. Solache were involved in the crime with her is my understanding.

Urlaub Bowen & Associates, Inc. 312-781-9586

RICHARD A. LEO, PHD, JD, 09/28/2022                    Page 114..117

Page 114

Q.  And does she ever testify that, in fact, the police officers are the ones that made her falsely accuse Mr. Reyes and Mr. Solache?

MR. ART:  Objection to form.

THE WITNESS:  I don't recall her saying that in the testimony that I've read.

BY MS. ROSEN:

Q.  And so why aren't you crediting that testimony?

MR. ELSON:  Objection to the form.

THE WITNESS:  I think the DNA evidence dispositively shows that Mr. -- Mr. Reyes' and Mr. Solache's confessions as written meet the criteria of a proven false confession.

BY MS. ROSEN:

Q.  And why do you see the DNA evidence dispositively shows that both Mr. Solache and Mr. Reyes' confession meet criteria for a proven false confession?

A.  Because there was so much evidence at the crime scene that it's inconceivable to me that Mr. Reyes or Mr. Solache would not have had DNA on them or their DNA would not have been found at the crime scene.

Page 115

So we have Mariano and Jacinta Soto who were stabbed more than 50 times, so the crime scene was soaked in their blood.  The police find two bloody knives, a butcher's block with blood on it, blood-stained clothing, blood-stained bed coverings.

Q.  Can you share with us where you're reading from your report?

A.  Yeah, I can.  Hold on just a second.  I'm not actually reading from my report.  I was reading from notes that I made from my report.

But the section where this is discussed is on the bottom of Page 30, the last paragraph.

Q.  So do you have notes in front of you?

MR. ART:  I don't think the witness had finished his prior answer.  You interrupted it while he was in the middle of it.

Do you want to finish the prior answer, Dr. Leo?

MS. ROSEN:  I want to know if he has notes in front of him that he's reading from before he finishes his prior answer.

MR. ART:  You're not going to interrupt his answers and then ask him a different question and not let him finish the answer --

Page 116

the answer to the question that you've asked.

So please continue, Dr. Leo, if you have more to say on the last question.

THE WITNESS:  I did want to finish my answer, and then I can answer any other question you want.

There were shoe prints dried in blood.  There was blood spatter on the bedroom wall.  There were defensive wounds on the back of Mariano Soto's hands.  There were hairs; there were fingerprints throughout the house.

And so what I was describing is that this scene is soaked in blood, soaked in DNA, and the basis of -- I think whoever committed these crimes, it's inconceivable to me that their DNA would not have been at the crime scene or that some of the DNA would not have been on them.  And there isn't any DNA or other forensic evidence at the crime scene linking Mr. Reyes or Mr. Solache to that bloody, brutal double murder.  And the DNA testing, in my view, excludes them as the source of any evidence at that crime scene.

So that's contrasted to Adriana Mejia's

Page 117

blood, which was found at the crime scene in multiple places.

So the victims' DNA is linked to her, and her DNA is linked to the crime scene, and that's not true for Mr. Reyes or Mr. Mejia.  And having analyzed hundreds of these cases, proven false confession cases, in the 2004 article, I believe 81 percent of them are homicide cases, a disproportionate number of these proven false confession cases are homicide cases, I just cannot conceive of how the perpetrators of this crime would not have had DNA, their DNA at the crime scene or some of the crime victims' DNA on them.

So that's my answer to the prior, prior question.

BY MS. ROSEN:

Q.  What notes do you have in front of you?

MR. ART:  I object to the extent that that question calls for information protected from disclosure and protected by privilege.

Dr. Leo, you can answer the question whether or not you have notes and whether or not you've made notes in connection with your

RICHARD A. LEO, PHD, JD, 09/28/2022                    Page 118..121

Page 118

authoring your report or preparing for your deposition, but you should not testify about the substance of those notes.

MS. ROSEN: Steve, he would not be allowed to have notes in front of him to read from if we were in the same room, so you don't get to cloak it in work product because we're not in the same room.

MR. ART: And I object. I don't think that you have a right to know what notes he has made on his reports. If you don't want him looking at notes while he's testifying, you can say that. But I think those notes that he makes in drafting his report and as preparing for his deposition are work product, and they're not subject to disclosure under Rule 26(a)(2).

To the extent that you don't want him to use aids that he has made to -- you know, based on what's in his report to testify, you can say that, and we will ask him to put those to the side.

But I think with, you know, a report like this and, you know, the extensive nature of

Page 119

this deposition, him having notes to refresh his recollection about where things are in his report or what is in his report is permissible and that those notes are not subject to disclosure.

So that's our position.

MS. ROSEN: So I want to know what notes you were just reading from because he was reading from notes. And if you're reading from notes to answer a question, those are discoverable.

He couldn't -- he would not be allowed to read from notes in a room without me seeing what notes he was reading, and just because he's on Zoom doesn't prevent me from asking that question.

So I want to know specifically what notes he was reading from to answer my question.

MR. ART: So we have the same objection.

Dr. Leo, you can testify about what the notes are without testifying about the substance of those.

MS. ROSEN: He just read the substance of the notes. How can you make that objection?

Page 120

MR. ART: I understand that we have different positions. Let's take it one question at a time.

BY MS. ROSEN:

Q. Dr. Leo, what notes do you have in front of you that you were just reading from?

A. Okay. So I prepared notes on this issue from my report and from documents in my case files. So most of what I was reading from was verbatim from what is in my report.

This is a 100-page report condensing a substantial amount of information. It's the longest report I've ever written in all of the 2200 plus cases I've worked on.

And so I prepared this just to assist me in the deposition on this question, the evidence of a proven false confession from a DNA exclusion. Most of it comes from literally verbatim from my report. All of it comes from the materials I reviewed in this case.

MS. ROSEN: It's our position that we're entitled to the notes that he was reading from to answer my question. And we're going to ask -- we ask for those notes. We ask that you

Page 121

produce those notes.

MR. ART: We do not think those notes are discoverable, but we can continue to confer about that issue, I think, without wasting deposition time.

MS. ROSEN: Well, with the caveat that depending on whether or not I'm right and whether I get the notes, then he may have to come back.

MR. ART: We certainly do not agree to that. The defendants already have 14 hours of deposition time in this case, and we think that this -- you know, his materials that are his own notes are properly protected work product and not subject to disclosure under Rule 26, and we certainly will not agree to bring him back whatever the result of our disagreement about that issue.

MS. ROSEN: Well, I'm just telling you depending on what's in the notes that I may ask to bring him back, so you should consider that when you're considering whatever it is you're considering. But we can move on.

RICHARD A. LEO, PHD, JD, 09/28/2022                    Page 122..125

Page 122

BY MS. ROSEN:

Q. Okay. So I want to take the -- your position on the DNA a little further and ask you some more questions about that.

What exactly is your training with respect to DNA evidence?

A. Well, I'm not an expert in DNA evidence if you mean, you know, forensic, population, the science of population genetics that underlies DNA evidence and the forensic application or forensic testing of DNA evidence. The expertise is on analyzing cases involving confessions, including false confessions, and this case fits a pattern of many proven false confession cases.

It's hard for me to even -- off the top of my head, I can't think of a case that was so loaded with so much crime scene DNA.

So my expertise is not in forensic DNA testing, population genetics. It's in the analysis of DNA evidence and confession -- I should say in the analysis of case evidence in confession cases, particularly false confession cases.

MR. ART: I'm sorry to interrupt, Eileen. Whenever you have a moment, if we could have a

Page 123

brief restroom break, that would be great.

MS. ROSEN: Sure. Just give me a couple more questions.

BY MS. ROSEN:

Q. With respect to the DNA evidence, what training do you have with respect to the circumstances where it is likely that an individual will leave behind DNA evidence?

MR. ELSON: Objection to the form.

THE WITNESS: I don't really understand the question. Training with respect to the likelihood that somebody would leave behind DNA evidence?

BY MS. ROSEN:

Q. Correct.

A. I -- I don't even think that's a thing.

Q. You don't think that's a thing?

A. No, no. I mean, the like -- yeah, I don't think there's training in that. I think it's a weird question.

There might be a study on that. I doubt it, but that's -- training is in a substantive field, right. It's either in genetics or it's in biology or it's in forensic DNA or forensic science,

Page 124

right.

So that's why I don't understand the question. That's not a field. People are trained in fields.

Q. What training do you have with respect to the possibilities that an individual who walks into a room would leave their DNA behind?

MR. ELSON: Objection to the form.

THE WITNESS: Yeah, I mean, if that's a field, I don't have any training in that field.

BY MS. ROSEN:

Q. Okay. And what is the basis of your conclusion that if Mr. Reyes wasn't the actual perpetrator, he had to have left his DNA behind?

MR. ART: Objection to form.

THE WITNESS: That there is so much DNA evidence at the crime scene, including Ms. Mejia's and an unknown male contributor, it's -- like I said before, it's just inconceivable that the people who committed this crime did not leave behind their DNA. People shed DNA through hair, and there was so much -- fingerprints. There was so much blood here. It's left on items, and that's the

Page 125

reason why I gave you that long answer because on item after item after item as well as the number of times they were stabbed.

So what I'm saying is I've analyzed hundreds of proven false confessions, many of them involving DNA, and this fits a pattern, a pattern of DNA exoneration that you see in many of these proven false confession cases, and there's more DNA here.

So all I can tell you is it's my interpretation based on my study of proven false confession cases with DNA that this ranks as extremely high, and I don't understand how it's possible that the perpetrators did not leave their DNA at the crime scene or have DNA on them. That's my interpretation.

BY MS. ROSEN:

Q. But you know that with respect to didn't have DNA on them, you know that about a week went by between the time of the crime and the time that the individuals were at the police station, correct?

MR. ELSON: Objection to the form.

THE WITNESS: Correct, but sometimes what happens in cases like that where there's a hit

RICHARD A. LEO, PHD, JD, 09/28/2022                    Page 126..129

Page 126

is the person's house is searched, and there's DNA found on items in the house, even though some amount of time, or apartment, some amount of time has passed.

BY MS. ROSEN:

Q. But what if the individuals had disposed of the clothing they were wearing in the one week's time between the crime occurred and they went to the police station and then their home was searched? Then there would be no DNA on any of their clothing, right?

A. It's hypothetically possible. In a crime this bloody, it seems extremely unlikely. And you still have all the DNA at the crime scene. But that's not the evidence that was put before me.

Q. You didn't see the interview of Adriana Mejia where she said that -- where she told Scott Lazar and his interviewers that Mr. Solache and Mr. Reyes got rid of all the clothes they were wearing and their shoes, and she asked if she should do the same, and they told her that she didn't need to? You didn't see that interview?

MR. ART: Objection to the form of the question.

Page 127

THE WITNESS: I -- I may have seen the interview. I just don't recall that specific statement.

BY MS. ROSEN:

Q. Do you know what, what type of DNA was found that was associated with Adriana Mejia at the crime scene?

MR. ART: Objection to form.

THE WITNESS: I thought that her blood was found on one of the knives at the Soto home as well as a towel that was found in the car and that Mariano Soto's blood was found on her pants and her shoes. That's what I thought.

BY MS. ROSEN:

Q. Are you reading from your report or from your notes?

A. From my notes.

Q. Okay. And that's the same notes you were reading from before, right?

MR. ART: We have the same objections to him answering questions about the substance of the notes as was stated before.

But you can answer that question, Dr. Leo.

THE WITNESS: Correct.

Page 128

So, Ms. Rosen, whenever there's a good breaking point, I think I'm going to need maybe 15 just because this is the time of day that I feed my dog, and I need to take a restroom break. It's fine if you want to ask more questions, but I just want to kind of get us focused on a 15-minute break sooner rather than later, especially in light of Mr. Art's request for a break.

MS. ROSEN: Yes. If you can just give me a couple more questions, and then we will take the 15-minute break.

BY MS. ROSEN:

Q. With respect to your notes, are they notes that you've written on your report or are they separate? Is it a separate document?

MR. ART: We have the same objections to him answering that question.

But, Dr. Leo, you can answer that question about whether the notes are on your report or on a separate document.

THE WITNESS: On a separate document.

BY MS. ROSEN:

Q. And how many pages are the notes?

Page 129

MR. ART: Same objections, but you can answer that question.

THE WITNESS: Two pages or a page and a half.

BY MS. ROSEN:

Q. Okay. And with respect to the DNA, the blood DNA that was found of Adriana Mejia at the crime scene, obviously in order for there to be blood DNA found at the crime scene, she had to have been cut, right? She had to have been bleeding?

A. Her DNA, yes.

Q. Correct. Is there any evidence that Mr. Reyes or Mr. Solache were bleeding while they were at the crime scene?

MR. ART: Objection to form.

THE WITNESS: No, there's no evidence that they were at the crime scene at all.

BY MS. ROSEN:

Q. Other than evidence from blood, DNA evidence from blood, what other types of DNA would you have expected Mr. Solache or Mr. Reyes to have deposited at the crime scene?

A. Well, hairs, fingerprints, possibly other bodily fluids, you know. There's touch DNA.

RICHARD A. LEO, PHD, JD, 09/28/2022          Page 130..133

Page 130

Possibly -- I guess that comes under fingerprints, but touch, hair, fingerprints.

Q.  Well, fingerprints aren't DNA, right? That's a different kind of evidence, right?

MR. ART:  Objection to form.

THE WITNESS:  Yeah, I mean, touch DNA, DNA that you can get from essentially fingerprints, I mean, traces of touch that were left behind at the crime scene.

BY MS. ROSEN:

Q.  And how would that touch DNA have been collected at the crime scene that was covered in blood, as you say?

A.  I don't know how to answer your question. Because there was so much physical evidence, I assume a police investigative technician would have collected any and all hair, fiber, fingerprint, blood evidence following their investigative protocols.

Q.  And what's that assumption based on?

A.  Cases that I've studied where when there is a murder, here we have a double murder, and the crime scene is discovered, there's a thorough forensic collection of evidence at the crime scene

Page 131

to try to link to possible suspects and perpetrators.

MS. ROSEN:  Okay.  This is a good place to take a 15-minute break.

THE WITNESS:  Okay.  So maybe we come back at what would be 1:00 my time, 3:00 your time?

MS. ROSEN:  Sure.  Can we go off the record?

THE VIDEOGRAPHER:  Okay.  We're off the video record.  We're off the video record at 2:42 p.m.

(Whereupon, a recess was taken from 2:42 p.m. to 3:01 p.m.)

THE VIDEOGRAPHER:  We are back on the video record at 3:01 p.m.

BY MS. ROSEN:

Q.  Okeydoke.  When we took the break, we were talking about the DNA evidence, and your testimony was that it was inconceivable to you that Mr. Reyes or Mr. Solache could have participated in the crime because neither one of them left any DNA at the crime scene, and neither one of them had the victims' DNA on either their person or their clothing or anything else associated with them,

Page 132

correct?

A.  Correct.  I would just add the qualification that this is based on materials that I've reviewed.  If you show me or I review materials that contradict that, I'm open to, of course, reviewing any and all materials.

And, you know, I mean, I suppose if they had a HAZMAT suit on, right, I mean, evidence emerged there might be a conceivable situation.

Based on what I've reviewed and based on my expertise in analyzing these cases, I think it's either inconceivable or virtually inconceivable, but I want to leave open the possibility that if you provide me with new evidence or information, I could be wrong.  I just don't see how based on what I reviewed.

Q.  Is it your understanding that the Soto crime scene -- when I say "Soto crime scene," I mean the inside of their apartment.

Was it your understanding that the entire apartment was swabbed for DNA evidence?

A.  I don't know if the entire apartment was swabbed.

Q.  Is it -- was it your understanding that

Page 133

the entire apartment was investigated for fingerprint evidence?

A.  I don't recall.

Q.  Was it your understanding that the entire apartment was scoured for hair samples?

A.  I don't know if the entire apartment was scoured for hair samples.  My understanding is that there was -- there was a thorough investigation of the crime scene, and that's my -- the limit of my understanding.

Q.  Okay.  With respect to the criteria that you have determined allow you to conclude that certain confessions are proven false confessions with respect to cases that involve DNA exclusions, in the 1998 article and analysis that you did with Dr. Ofshe, how many cases do you recall that involved DNA exclusions?

A.  Some.  I don't recall the exact number.

Q.  And did you count as a DNA exclusion in that 1998 study circumstances where, based on the crime scene, you would have expected the individual to leave their DNA behind?

A.  I believe so, but I would have to review the article.

RICHARD A. LEO, PHD, JD, 09/28/2022                    Page 134..137

Page 134

Q. And did you also include within those cases the circumstance where you would have expected that the individual's DNA would have been found on their person or their clothing or their car or their home or something like that?

A. Yeah, I need to review the article. Can I just take a moment to get it and give it a quick look?

Q. No, we're not going to do that at this time. If you can't answer the question, you can just tell me you can't answer the question.

A. Well, you can't ask me a question about a document and then not let me review the document.

Q. I can. We can go off the record if you'd like to go review the document. I'm not going to --

MR. ART: We're not going off the record to -- if you're going to ask him about articles, he is asking for the opportunity to review. We're not going to do it off the record. If you want him to review articles and answer questions, we will do it on the record.

MS. ROSEN: I'm asking for his recollection. If he doesn't recall, he can just say he doesn't recall.

Page 135

MR. ART: So, Dr. Leo, the record being clear that you're not going to be provided with these documents to answer the questions about the documents, you can say whether or not you recall without the aid of the document.

THE WITNESS: That is my recollection without the aid of the document, though I would have liked to have reviewed the document to be a hundred percent sure.

BY MS. ROSEN:

Q. And with respect to the 2004 analysis that you did with Mr. Drizin with respect to the cases that you identified as constituting proven false confessions because they met one of the criteria as you have identified them in the category of DNA evidence, were there cases where you identified cases as having met criteria because the scientific evidence dispositively established the confessor's innocence in a circumstance where you expected DNA evidence to have been left behind at the crime scene?

A. That is my recollection, but, again, I would have to review the document.

Q. And then with respect to the 2004 analysis

Page 136

that you did with Mr. Drizin, were there certain cases involving DNA where you concluded that the scientific evidence dispositively established the confessor's innocence because, based on the crime scene, you would have expected DNA from the crime scene to be on the individual's person or clothing or car or home or something like that?

A. That is my recollection, yes.

Q. Okay. If we can turn to Page 16 of the report, Exhibit Number 1. Yeah. Okay.

All right. At Page 16 of the report, you list out the criteria for proven false confessions, correct?

A. Yes.

Q. Okay. And we talked about -- we talked about this a little bit earlier, but just to be clear, there are four criteria that are laid out on Page 16 of your report, correct?

A. Correct.

Q. And in this case, you believe Mr. Reyes fits which criteria?

A. Well, as discussed in the report, Criteria Number 2 with respect to physical impossibility and then Criteria Number 4 with

Page 137

respect to DNA scientific evidence.

Q. Okay. And with respect to Mr. Solache, what criteria have you determined that you believe he meets?

A. I would give the same answer, a physical -- as discussed in the report, the physical impossibility and the scientific evidence, Number 2 and Number 4.

Q. Okay. And at this point in your report, if we look at Footnote 5, you cite to the 2004 article, right?

A. Correct.

Q. And you describe it as the largest published study of false confessions to date; is that correct?

A. Correct.

Q. And is that still true?

A. Correct, yes.

Q. And remind me again. How many cases did you look at?

A. I don't recall the specific number, but I believe 250, approximately 250 in both the '98 study and in the 2004 study.

Q. So when you referred to the size of the

RICHARD A. LEO, PHD, JD, 09/28/2022                    Page 138..141

Page 138

study, you're referring to the total number of cases that you looked at, not the number of proven false confessions that you identified?

A.  No, I misunderstood your question.  The number of proven false confessions in the '98 study was 34 at the time; and then in the 2004 study, it is 125.

Q.  Okay.  So it's really my -- my question is when you say largest published study, what do you mean?  Is that a reference to the 125?

A.  Correct.

Q.  Okay.  And you have not published anything further on -- that illustrates or -- let me start over.

You talked about earlier that you're working on another study, is that right, with Mr. Drizin?

A.  Correct.

Q.  Other than the one you're working on, you have not done any other studies of false confessions, is that correct --

A.  Well --

Q.  -- other than the one referenced in Footnote 5 and the 1998 study?

Page 139

A.  Well, the article I mentioned with Professor Gould and coauthors wasn't a study on false confessions, but 110 of the 460 cases involved proven false confessions.

There have been other papers and studies I've done, but these are -- in terms of aggregating false confession cases, yes, these are the primary studies.

Q.  And the Gould article, that's the 2014 one that we talked about earlier?

A.  Correct.

Q.  The 110 cases that you're referencing, did you analyze each of those cases and determine that they met criteria for proven false confessions?

A.  Yes.

Q.  But that, that finding is not set forth in the 2014 article, if I'm understanding you correctly?

A.  Correct, because I think we just said -- the article said, you know, we only included cases of factual innocence where the evidence was overwhelming.  Most of the cases, the other 350 cases were not false confession cases.

Q.  Okay.  Let's talk about for a second the

Page 140

physical impossibility criteria that you say both Mr. Solache and Mr. Reyes meet.

Can you explain to me with respect to Mr. Reyes how it is that you drew the conclusion that it was physically impossible for Mr. Reyes to have committed the crime?

A.  I think the conclusion that I drew is that it was physically impossible for his confession to be factually true given what we know about his work records.

So my recollection is that the confessions say that Mr. Solache picked up Mr. Reyes around 1:30 a.m. in his car.  They picked up Ms. Mejia around 2:00.  They drove around for a while.

The work records, my recollection is, indicate that Mr. Solache was at work at that time, and Mr. Reyes had -- was either in route to his house having just left work or had arrived at his house.

So the work records don't square with the confession statement, and the -- my recollection is that the police reports, the closing report says the crime occurred around 7:30, but an earlier report or reports listed a different time.

Page 141

So we have multiple inconsistencies here.  There's no way that, if the confession is accurate, the confession statement, there's no way they could have committed the crime at the time that they say because the work records indicate one of them was at work and other had just left work shortly or was coming back from work.

Q.  So I understood -- I understand Criteria Number 2 to be the circumstance that you say in Criteria Number 2 on Page 16 of your report and that you say in the 2004 article and that you say in the 1998 article, which is when it can be objectively established that it would have been physically impossible for the confessor to have committed the crime, there is nothing there that says physically impossible for the confession to be factually true, which is a different point, correct?

A.  Well, I mean, above the four criteria, it says four which -- four ways, you know, the last sentence, you know, before the criteria, there are four ways in which a disputed confession can be classified as proven beyond any doubt to be false.

So yeah, we're saying there proven false confession, and here you're right, physically

RICHARD A. LEO, PHD, JD, 09/28/2022

Page 142

impossible for the confessor to have committed the crime.

So there's a little ambiguity there, but, you know, I think the idea is still there that the confession is factually false, that it usually follows that the person is -- it's impossible to prove their guilt if the confession is all the evidence you have or the main evidence.

But yeah, I mean, I think that these are -- I think there's ambiguity. I don't think there's contradiction.

Q. Well, but you have gone to great lengths to talk about the criteria that you have testified you adhere to in order to draw the conclusion that a particular confession can be categorized as a proven false confession.

And so Criteria Number 2 explicitly states when it can be objectively established that it would have been physically impossible for the confessor to have committed the crime, not physically impossible for the confession to be factually true, correct?

MR. ART: Objection to form.

THE WITNESS: Yeah, that's what it states, but we could add to that as described in the

Page 143

confession, and we still have the same meaning because the whole idea of a proven false confession is you're proving the confession false.

BY MS. ROSEN:

Q. But you started this deposition by saying in a proven false confession, that any person that believed -- let me start that over.

At the beginning of the day, I specifically asked you whether or not you could envision a scenario where somebody would meet criteria for a proven false confession but be factually guilty, and you told me there was -- that you could not envision that scenario.

Do you recall that line of testimony?

A. Yes. I've never --

MR. ART: Object to form.

THE WITNESS: Sorry about that. I've never encountered that. I've never come across a case that is a proven false confession case where there is evidence that convinced me that they were -- in my research that they were guilty despite a factually proven false confession that I can think of.

Page 144

BY MS. ROSEN:

Q. Okay. But now you're talking about you are diluting Criteria Number 2 by saying that what you meant or mean is that it could be physically impossible for the confession to be factually true is the same as to have -- for the confessor to have committed the crime. Those are completely different concepts.

MR. ART: Is there a question?

BY MS. ROSEN:

Q. Aren't those completely different concepts?

MR. ART: Objection to form.

THE WITNESS: No, I don't think so. I think you could qualify it and say for the false confessor to have committed the crime as described in the confession. I don't think they are completely different concepts.

I think it's just a qualification. It's just an elaboration.

BY MS. ROSEN:

Q. Is that how you qualified it in the 1998 study?

A. Probably not because I wasn't deposed in

Page 145

an adversarial setting like this, so probably not.

Q. So are you saying that in the 1998 study, when you and Dr. Ofshe concluded that certain individuals met criteria for a proven false confession based on the fact that they -- that it could be objectively established that it would have been physically impossible for the confessor to have committed the crime that you included that type of qualification?

MR. ART: Objection to form.

THE WITNESS: So yeah, I'm just going to have to say, you know, if you want me to answer a question about the 1998 article or the 2004 article or any article, I have to see the document.

BY MS. ROSEN:

Q. So as you sit here today, you do not recall whether or not Criteria Number 2 regarding objectively establishing that it would be physically impossible for the confessor to have committed the crime, you cannot answer the question sitting here today whether or not in the 1998 study you included individuals who -- with the qualification that you are describing here, which is physically impossible

RICHARD A. LEO, PHD, JD, 09/28/2022                    Page 146..149

Page 146

for the confession to be factually true?

MR. ART: Objection to form.

THE WITNESS: Again, if you want me to answer a question about the 1998 article, I'm going to have to look at it.

BY MS. ROSEN:

Q. So your answer is you don't recall as you sit here today; is that right?

A. No. My answer is I'm going to have to look at the document.

Q. So you're refusing to answer my question without looking at a document; is that what you're saying?

MR. ART: Object to the form. I think he has answered the question now multiple times and made his position clear that if you want to ask him about the content of his report and whether --

MS. ROSEN: I heard him. No speaking objections, Steve.

MR. ART: I'm making my record.

MS. ROSEN: No, you're making a speaking objection, and you're wasting time. So no speaking objections. I heard what he had to

Page 147

say.

MR. ART: Let me know when you're ready for me to make my record because I'm going to make it before you ask the next question.

MS. ROSEN: Go ahead. Waste time.

MR. ART: Okay. I'm not wasting time. What I'm saying is you're asking him questions about whether there are instances in a published past study where he has set out the criteria for a proven false confession that's in Number 2 on the page of his report that we're looking at in a similar way to the testimony he has given today. He is asking to review his report to answer that question. You are refusing to let him review the report to answer the question, and so he is saying he cannot answer it.

MS. ROSEN: Are you done?

MR. ART: Yes.

BY MS. ROSEN:

Q. Okay. And you testified earlier that there was some information in the police reports that indicated that the crime occurred at, I think you said, 7:30, and then there was some information

Page 148

that the crime had happened at an earlier time.

Do you recall that testimony?

A. What was placed -- what was written in the police reports, yes.

Q. Right. And if, in fact, the crime occurred at 7:30 in the morning or some time earlier, 6:30 or something like that, would you still conclude -- if that were accurate, factually accurate, would you still conclude that Mr. Reyes and Mr. Solache fit criteria for Item Number 2, physically impossible for the confessor to have committed the crime based on their work records?

A. In the hypothetical, not physically impossible for them to have committed the crime but still proving the confession -- the confession is still false. What they state about when they committed the crime in the confession would still be false.

Q. But that doesn't make it a proven false confession, right?

A. It depends on how you interpret Number 2.

Q. Well, they're your criteria here.

A. We also have Number 4.

Q. Well, I'm done with -- I'm not talking

Page 149

about Number 4. I'm talking about Number 2.

A. Yeah, but your question is that doesn't make it a proven false confession, and I'm telling you that there are two bases for my opinion, and even if we knocked out Number 2, there's still Number 4.

But again, if you take the literal term "proven false confession," the confession statement is proveably false if the work records are accurate, and there's no reason to dispute the accuracy of the work records.

Q. And is that how you define proven false confession, in the way that you just described, in your 1998 study and in your 2004 study?

A. Again, I'd have to look at the -- you'd have to let me look at how I defined it in the study if you want me to answer a question about those studies. Both documents I have readily at hand.

Q. So are you telling me that it's possible that the term "proven false confession" as you're using it in this report has a different definition than the definition that you used in the 1998 and the 2004 study?

MR. ART: Objection to form,

Page 150

mischaracterizes testimony.

BY MS. ROSEN:

Q.  You can answer.

A.  I believe the definitions are the same, but I would have to look at the documents to confirm that.

Q.  Can we scroll up a little bit, yeah, on this page.

I'm going to read the sentence before you detail the criteria, and it says, "As a result, Richard Ofshe and I coined the term 'proven false confession' in 1998," and then there's a Footnote 6 to the 1998 study.

Does that help you to answer my question about whether or not the definition you're using for a proven false confession in your report in this case is the same as it was in 1998?

MR. ART:  Objection to form, asked and answered.

Go ahead.

THE WITNESS:  No, I have -- I assume it to be the same, but I'd have to look at the report to confirm -- I'm sorry, the document to confirm.

Page 151

BY MS. ROSEN:

Q.  So the fact that you cite your own research to support the proposition of what constitutes a proven false confession is not sufficient without you going back and reviewing the article, right?

MR. ART:  Same objections.

THE WITNESS:  It's possible that the language is not verbatim, and we have -- you and I have an interpretive disagreement about the language.

So if I wanted to a hundred percent answer your question, I would have -- this article was written, what, 24 years ago.  That's a long time.

And also the reason I cite it is because it's the seminal article that defines the concept.

BY MS. ROSEN:

Q.  So presumably you would be relying on the same definition as the seminal article that defines the concept, right, since you are one of the people that defined the concept?

A.  Yes.  I think in substance it's the same.

Page 152

I don't know whether it's verbatim the same.

Q.  If we can go to Page 17 of your report.  The first full paragraph on the page discusses the subject of police interrogation and false confessions is beyond -- let me start over.

The first sentence of that paragraph reads, "The subject of police interrogation and false confessions is beyond common knowledge and highly counterintuitive."

Do you see that there?

A.  Yes.

Q.  Are you aware of the 2018 survey that was published regarding jurors and their views on -- their current views on false confessions?

MR. ART:  Objection to form.

THE WITNESS:  I am aware of a 2018 study, yes.

BY MS. ROSEN:

Q.  And are you aware of the conclusions that were drawn in the 2018 study?

A.  It has a lot of, a lot of data and a number of conclusions, but I would have to review that document if you want to ask me about it.

Q.  What is your definition of psychologically

Page 153

coercive?

A.  An interrogation technique or techniques or environment or combination thereof that causes a suspect to perceive that he or she has no meaningful choice but to comply and/or confess with the interrogator's demands and/or requests.

MS. ROSEN:  Can I ask that his answer be read back, please.

(Answer read.)

MS. ROSEN:  Thank you.

BY MS. ROSEN:

Q.  And where does that definition come from?

A.  I think it's a generally accepted definition and well understood in the field.  I can't think of a particular place where it comes from.  I know it's been described in research articles by me and others.

Q.  When you say "well understood in the field," what field are you referring to?

A.  The social scientific study, the empirical social scientific study of interrogation, confessions, going back a hundred years to 1908, I think I mentioned in the article, but the bulk of it going back to the 1980s.

RICHARD A. LEO, PHD, JD, 09/28/2022                    Page 154..157

Page 154

Q.  Can you point me to any particular study that defines physical coercion in the way that you just defined it?

A.  Okay.  So I thought you asked me about psychological coercion.

Q.  Oh, I'm sorry, I meant psychological.

A.  I don't recall a specific study that defines it that way.  I think the articles I did in the 1990s with Richard Ofshe in 1997, not the one we've been talking about, would have discussed it. My 2008 book would have discussed it.  There are probably other articles that discuss it.

The idea is so basic that it would be either discussed or taken for granted in a lot of books and articles.

Q.  What is a high-end inducement?

A.  In 1997, Dr. Ofshe and I talked about inducements along a spectrum.  Inducements are appeals to self-interest, efforts to persuade a suspect that it's in their best interest to stop denying and start admitting, or that they will benefit.

And so we talked about a range from low end to high end.  At the low end would be more

Page 155

intangible moral or psychological appeals.  In the middle would be implicit or references to the system or how the suspect might benefit in the processing of their case.  And toward the high end of the spectrum would be techniques that involve promises or threats implicit or explicit.

That's what that idea is meant to refer to.

Q.  And specifically, a high-end inducement, what is that?

A.  Well, I just answered that one.

Q.  A high-end inducement?  I thought you were talking about a spectrum.  Maybe I misunderstood the answer.

A.  Right.  So the threats and promises about bad things happening or not happening to a suspect would be examples of what's at the high end of the continuum of inducements, a more tangible, more potent inducement or effort to persuade the suspect or coerce the suspect into thinking they're better off, it's in their self-interest if they stop denying and start admitting.

Q.  Is a low-end inducement psychologically coercive?

Page 156

A.  Typically not, by itself at least.

Q.  And is a high-end inducement psychologically coercive?

A.  Typically, yes.  Threats and promises are very potent and are regarded as sort of inherently coercive because of their power to scare and intimidate people into feeling like they have no choice and that they have to comply with the demands or requests of the interrogator.

Q.  And can you give me some examples of what you categorize as high-end inducements?

A.  Yeah, threats about receiving the death penalty if you don't confess or threats of harm to one's family members or taking away one's children or having one's girlfriend prosecuted for a crime, or being told you can go home if you confess or told that you won't be prosecuted or you'll receive, you know, a 6-month sentence instead of 25 years or some kind of leniency in terms of the charges you receive or the sentence you get.

Q.  And how often do high-end inducements lead to a false confession?

A.  Again, there's no way of determining the exact percentage, and typically when you have

Page 157

high-end inducements, you have other techniques as well.

Q.  What do you mean?

A.  Well, you know, as in many of the cases that I describe elsewhere in the report, you have the suspects describing, for example, being yelled at, being threatened, being beaten, being held for a long period of time.

So it's sometimes artificial to just talk about one technique out of context because there are other things going on.

Q.  If we could go to Page 24 of the report.

The first paragraph of this portion of your report describes what you set forth as the third important decision point in the interrogation process.

Do you see that?

A.  Yes.

Q.  And you discuss a scenario where after the police have elicited an admission, and then you say, an I didn't -- an "I did it" statement from the suspect.

Do you see that there?

A.  Yes.

RICHARD A. LEO, PHD, JD, 09/28/2022      Page 158..161

Page 158

Q. And what do you mean by that exactly?

A. What do I mean by the third decision point or "I did it" statement or what?

Q. That sentence. What are you describing as having occurred in the interrogation process?

A. Yeah, so at the beginning of the section on the prior page, 23, the first sentence, there are three important decision points in the interrogation process that are known to be linked to false confessions or false statements, and what I'm trying to do here, I think, is set up the discussion of contamination elsewhere.

So when people say, well, why do false confessions occur, the way I think about it, big picture, is police make three sequential errors. One error is the misclassification error, which I mention in this section; an innocent person is presumed to be guilty. And then the second is what we call the coercion error; techniques are used that cause that innocent person to make a false confession.

And then to your question, the third is what we call the contamination error where police leak and disclose nonpublic case facts, and then the

Page 159

coerced innocent suspect incorporates those facts into the confession statement or they are incorporated by the police, who, if they write up the confession, or in very rare jurisdictions like Chicago in my experience where the prosecutors get involved in the interrogation and confession process, and they, police-prosecutors, claim that those nonpublic details that allegedly only the true perpetrator could have known because they couldn't have been guessed by chance originated with the suspect, and the suspect says no, I was fed or educated or told about those details.

Q. That doesn't really answer the question that I asked, so let me try that again.

The sentence on the -- in the first paragraph on Page 24 reads, "The third important decision point in the interrogation process occurs after the police have elicited an admission -- an 'I did it' statement -- from the suspect." I'm zeroing in on that sentence.

So please explain to me what you mean to be describing there that occurs in the interrogation process that you're trying to point out there.

MR. ART: Objection, asked and answered.

Page 160

THE WITNESS: Yeah, I'm just trying to point out the third step is where the contamination occurs or the third error.

BY MS. ROSEN:

Q. Are you saying that the circumstance is that after the interrogation, the individual says "I did it" or words to the effect, and then after that admission is obtained, then this contamination phase occurs?

A. Well, analytically I want to separate out the three points, but you could have the contamination occur at any stage of the interrogation. It could occur prior to the admission, prior to the "I did it" statement. The incorporation of the details presumably would occur after that.

Q. And why do you say that?

A. Well, because in normal interrogations, when the person says "I did it," that's when police ask about or tell the suspect the details -- I should say ask about the details.

So in normal interrogations, a detective would seek to flesh out the narrative of the admission, "I did it," after they get the admission.

Page 161

Q. And what is your basis for saying that that's the normal circumstance?

A. It's just the typical circumstance in my experience of the thousands of interrogations that I've seen that the first step is to move the suspect from denial to admission. The second step is to then get a detailed narrative of how and why that admission occurred.

Q. I see. If we could go to Page 25 of the report.

The first sentence in the first paragraph reads, "In addition to studying the psychology of police interrogation and the correlates and causes of false confessions from the innocent, scientific researchers have also analyzed the patterns, characteristics, and indicia of reliability in true and false confessions."

Do you see that there?

A. Yes.

Q. And then the citation -- actually, no.

When you say "scientific researchers," who are you referring to?

A. Social psychologists, criminologists, sociologists, and other researchers who have studied

RICHARD A. LEO, PHD, JD, 09/28/2022                    Page 162..165

Page 162

and written about false confessions and true confessions from a research or social science perspective.

Q. Okay. And can you identify any studies that were conducted that analyzed the patterns, characteristics, and indicia of reliability in true confession cases?

A. Just true confession cases, no. The -- there are articles that analyze both, but I can't recall an article that just looked at true confession cases to analyze why those confessions were true or the consequences of just those true confessions.

Q. And how did the researchers conclude that the confessions that they were evaluating in that circumstance were factually true?

A. Presumably based on their judgment and analysis of the evidence.

Q. And you can't identify any study like that for me, right?

A. No. There are two studies in 1997 where Richard Ofshe and I were analyzing the interrogation process, one of which is cited here on Footnote 21 where we had a collection of cases that we thought

Page 163

were both true and false confession cases, and we were analyzing the interrogation process.

But we didn't set out a formal definition of why we thought some cases were true, why we thought some cases were false. It was based on our analysis of the evidence. And the point wasn't that they were true or false but to understand the process.

Q. Okay. And then the next sentence reads, "To evaluate the likely reliability or unreliability of an incriminating statement, admission, or full confession from a suspect, scientific researchers analyzed the fit between the suspect's post-admission narrative and the crime facts and/or corroborating evidence derived from the confession."

Do you see that?

A. Yes.

Q. Have you ever been allowed to testify to that in court, specifically the fit?

A. Yes.

Q. On how many occasions?

A. I don't know what percentage of the 395 cases.

Q. More or less than 50 percent?

Page 164

A. I would just be guessing. Probably less than 50 percent because a third of the cases roughly are pretrial suppression hearings where I testify, and the issue there is typically not the reliability analysis.

Q. At the bottom of this page, it says, "The well-established and widely accepted social science research principle of using the fit standard."

Who calls it a fit standard?

A. Well, I do. Professor Ofshe does. And others, some others do too.

Q. Can you name anybody other than you and Dr. Ofshe?

A. I mean, Professor Drizin. I'd have to look through articles to see if people use that exact language, but I know I've seen it elsewhere.

Q. And if we go to Page 26 of your report, it says, "Moreover, post-admission narrative analysis and the fit standard are central to proper criminal investigation because a well-trained detective should realize that the purpose of detective work is not to clear a crime or get a conviction but to carefully collect evidence in a way that will lead to the arrest, prosecution, and conviction of the

Page 165

guilty while at the same time ensuring that no innocent individual is wrongly arrested, prosecuted, or convicted."

Do you see that there?

A. Yes.

Q. When you say "post-admission narrative analysis," what are you referring to there?

A. The narrative of how and why the person committed the crime that is contained in the confession statement --

Q. Okay.

A. -- whether the confession statement is true or false.

Q. And is it your view that every, every fact contained in the confession statement must be corroborated in order to ensure its reliability?

A. Well, I mean, there's -- there can be a ton of factual statements, but factual statements in the confession statement that go to the elements of the crime charged, yes.

Q. Okay. Let's go to Page 28 of the report. Towards the bottom of the first paragraph in parenthesis, there's something called The Error Insertion Trick.

RICHARD A. LEO, PHD, JD, 09/28/2022                  Page 166..169

Page 166

Do you see that there?

A. Correct.

Q. What is that?

A. That's where police, typically, but in Chicago police and prosecutors in many of the cases that I've studied fraudulently insert trivial errors into a police-written or prosecutor-written confession and then ask, direct, or demand the suspect to initial corrections that are typically made by the police or the prosecutors in Chicago, elsewhere usually by the police, and then represent that those errors were recognized and/or made by the suspect in order to be able to represent later on in court that the confession was voluntarily made because the person took such -- the suspect took such care as to recognize these multiple trivial errors and voluntarily and knowingly initialed these errors.

So it's an interrogation technique that doesn't go to getting the confession. It's an interrogation technique that goes to creating the impression that the confession was voluntary and knowing -- it was voluntarily made and directed by the suspect, not directed by the interrogators.

Page 167

Q. And did you coin that phrase, "the error insertion trick"?

A. I did coin the phrase, but this is -- I believe in my 2008 book Police Interrogation and American Justice, but this has been in the Reid manual of interrogation going back decades, I think to the original manual.

So on a prior page, near one of the places you asked me about, I had listed out the years of that manual, '42, '48, '53, '62. So this is right in that manual I believe going back to the beginning or close to the beginning where the Reid authors of the Reid manual say insert these trivial errors, get the suspect to initial them, and this will help you show in court that the confession was voluntary because they were correcting errors and initialing, recognizing and correcting those errors.

Q. Okay. Let's move to Page 29 of your report. If we go to the bottom of the page, you make a representation that handheld tape recorders were readily available at the time.

Do you see that there?

A. We're on Page 29 or 28?

Q. Yes, 29.

Page 168

A. Okay. Where on 29 are we?

Q. The very last --

A. Oh, yeah, yeah, yeah, yeah, right, that in 1998, handheld tape recorders were readily available, yeah.

Q. So is that your point, that in the year 1998, handheld tape recorders were readily available?

A. Well, that's part of the point. The point is that they could have easily electronically recorded the interrogation if they so desired.

Q. Well, what were the policies and procedures of the Chicago Police Department in 1998 regarding electronically recording interviews or statements?

MR. ART: Objection to form.

THE WITNESS: I don't recall seeing a document about the policies and procedures of the Chicago Police Department in 1998 with respect to recording or not recording interrogation.

BY MS. ROSEN:

Q. Okay. And if we go to the Page 30 of your report, at the top, we're talking about Mr. Reyes,

Page 169

just so we have context.

And you indicate during the more than 40-hour period of custody and interrogation, do you see that?

A. Yes.

Q. And how did you come up with 40 hours? What was the calculation, from what date and time to what date and time?

A. Early in the morning on April 3rd to, I believe, the signed confession statements early in the morning on April 5th --

Q. Okay.

A. -- that time range.

Q. So are you counting from the time that Mr. Reyes got to Area 5? Is that the start?

A. Yeah, to the time that they were put in interrogation rooms.

Q. Okay. Until the time of the signed -- and I want to take Mr. Reyes alone first, okay.

A. Okay.

Q. So I know that Mr. Reyes and Mr. Solache went to the police station together, but I just want to keep them separate for the moment.

So -- and the way you're counting, though,

Page 170

is from the time Mr. Reyes got to Area 1 [sic] and was put in an interrogation room until he signed the handwritten statement?  Is that the calculation?

A.  I believe so.

Q.  Okay.  And how much of that time, that period of time, how much time was he spent being interrogated?

A.  Well, we don't know because there's not an objective record, so we can't -- we don't know.  And there is documentation by the police about their various visits in and out, but we don't know whether that's accurate either.

Q.  Based on Mr. Reyes' testimony, do you have any sense of how long -- how much time in the 40 hours that he was at Area 5 he was being interrogated?

A.  As opposed to just being in the room handcuffed to the wall with the door closed by himself, no, I don't think -- I don't think Mr. Reyes or Mr. Solache would know because there's no way to keep track of time unless you're looking at a clock and writing it down or you have a record to review.

Q.  And once again, I'm going to ask you,

Page 171

please, just keep your answers focused on Mr. Reyes at this point so that the record is not confused.  We will talk about Mr. Solache when we finish talking about Mr. Reyes.

So with respect to the amount of time that Mr. Reyes was being talked to by any police officer, there was no way from you -- for you to glean from his testimony how much of the -- what percentage of time while he was in the police station he was left alone in the interrogation room, correct?

A.  Yes, I think it would just be speculation because there's no objective record.

Q.  Did you notice whether or not he testified to that at all or was asked questions about that in his testimony?

A.  I don't recall, but my point stands.

Q.  If we look to the first paragraph below Section B of your report, the last sentence of the first paragraph in that section reads, "A confession is proven false if it meets any one of these four criteria," and you're referencing above.

A.  Can you tell me what page you're on? Sorry.

Q.  Same page.  Just scroll down to the -- so

Page 172

we were on 40 hours, Page 30.

A.  Okay.

Q.  And then it's Section B, and now we're in the first paragraph --

A.  Okay.

Q.  -- of Section B.

A.  Okay.

Q.  Okay.  And then the last sentence says, "These four criteria," referencing the four criteria you had set out above, "are not mutually exclusive.  A confession is proven false if it meets any one of these four criteria.  Mr. DeLeon-Reyes' confession meets at least two (and possibly three) of these four criteria, and contains additional indicia of unreliability as well."

Do you see that there?

A.  Yes.

Q.  When you say "and possibly three," what are you referring to?

A.  The true perpetrator identified.

Q.  Who was that?

A.  Well, I -- it would be Ms. Mejia.

Q.  Ms. Mejia is the true perpetrator identified?

Page 173

A.  Well, it says possibly.  I mean, obviously the DNA evidence links her to the crime pretty, pretty convincingly or conclusively, but the word "possibly" is meant as a qualification and is not central to the main point.

Q.  Okay.  And then, again, just to highlight it, you identified Criteria Number 2 in that paragraph and say, "if the case evidence establishes that it would have been physically impossible for the confessor to have committed the crime," right, repeating the language from earlier in the report, correct?

A.  Correct.

Q.  Okay.  And we've already talked about this, but I just want to ask a couple more questions.

The last sentence, the last sentence on this page says, "The true perpetrator or perpetrators who committed this crime would have left their own DNA at the crime scene, and DNA from the crime scene would have been left on them."

Do you see that there?

A.  Yes.

Q.  Okay.  And other than what you've already

RICHARD A. LEO, PHD, JD, 09/28/2022                    Page 174..177

Page 174

testified to, do you have any other basis to support the conclusion that the true perpetrator or perpetrators who committed this crime would have left their own DNA at the crime scene, and DNA from the crime scene would have been left on them?

MR. ART: Objection to form. Are you talking about what he testified about earlier in the dep?

MS. ROSEN: Yes.

MR. ART: Objection to form.

You can go ahead and answer.

THE WITNESS: Yeah, I would just give the same answer I gave before. So I think this has been asked and answered. I don't know if you want me to answer it again.

BY MS. ROSEN:

Q. No. My question is, other than what you've already testified to, is there anything else that you would like to add on this point?

A. I don't believe so.

Q. Okay. And if we go to the next page of your report, the top of the page, 31, the middle of the paragraph, the sentence that begins, "In other words," it says, "In other words, the DNA evidence

Page 175

and DNA testing excluded both Mr. DeLeon-Reyes and Mr. Solache as the source of any of the physical evidence left by the true perpetrator or perpetrators at the crime scene."

Do you see that?

A. I'm not seeing it. This is on Page 31? Sorry.

Q. Yeah. It's the top paragraph. It's the middle of the paragraph.

A. Oh, yes. Now I see it, yes.

Q. Is that the same point that we were just talking about, or is that a different point?

A. No, it's the same point, that there's so much DNA here, none of it links to them. You would expect it to link to them. It links to Ms. Mejia and another unknown male perpetrator, or contributor, rather, and, therefore, I interpret this as a DNA exclusion.

So it's just making the same, the same point in a different way.

Q. Okay. Based on the materials that you reviewed, do you have an understanding of when Adriana Mejia was interviewed first by police in relation to the interviews that were conducted of

Page 176

Mr. Reyes and Mr. Solache?

A. No, I'd have to refresh my recollection. My recollection is they were all placed in separate interrogation rooms along with Rosauro, and then the police moved between those rooms. But I don't recall the exact sequence without reviewing more records and refreshing my recollection.

And I have to tell you, my dog needs to go to the bathroom, so at some point in the next five or ten minutes, I think we should take a short break.

MS. ROSEN: Okay. We can just do it now if that's better. This is an okay place to break.

THE WITNESS: Okay. All right. So what do we do?

MS. ROSEN: How much time do you want? It's your call.

THE WITNESS: Well, five might be unrealistic, so I would say ten.

MS. ROSEN: Okay. So back at 4:18 my time, 2:18 your time?

THE WITNESS: That sounds like a good aspiration.

Page 177

THE VIDEOGRAPHER: Okay.

THE WITNESS: Thanks.

THE VIDEOGRAPHER: We're off the video record at 4:08 p.m.

(Whereupon, a recess was taken from 4:08 p.m. to 4:20 p.m.)

THE VIDEOGRAPHER: We're back on the video record at 4:20 p.m.

BY MS. ROSEN:

Q. Okeydoke. Looking at Page 31 of your report, the bottom of the page, five lines from the bottom, there's a sentence that begins, "Mr. Solache's confession says he stabbed Mariano Soto while he was face up, but no blood was found on Mr. Solache."

Do you see that there?

A. Yes.

THE VIDEOGRAPHER: Excuse me. Could the witness show himself on screen for the video?

THE WITNESS: Oh, I'm sorry. I'm sorry.

THE VIDEOGRAPHER: That's okay.

THE WITNESS: I didn't -- it says you cannot start your video because the host has stopped it.

RICHARD A. LEO, PHD, JD, 09/28/2022                    Page 178..181

Page 178

THE VIDEOGRAPHER: Oh. Hold on.

THE WITNESS: Okay. Thanks.

THE VIDEOGRAPHER: Great. Thank you.

BY MS. ROSEN:

Q. Okay. So at the bottom of Page 31, "Mr. Solache's confession says that he stabbed Mariano Soto while he was face up, but no blood was found on Mr. Solache."

Right?

A. Yes.

Q. And did you find it unusual that no blood would have been found on Mr. Solache five or six days after the crime occurred?

A. No blood was found on him or on any of his clothes related to the victims, so I could have clarified that in the sentence.

Q. Okay. And then reading at the bottom of the page, it starts, "Another example: Mr. Solache's confession statement states that Jacinta Soto was near the front door being stabbed and screaming while Mariano was asleep in the back bedroom of the apartment and sleeping through his wife's brutal, bloody, and loud murder. This does not logically cohere."

Page 179

Do you see that there?

A. Yes.

Q. And what is the basis for your conclusion that the murder was loud?

A. That was my interpretation that if somebody is being stabbed repeatedly and screaming, that it would be loud.

Q. Okay. And is that what you mean by "this does not logically cohere"?

A. Yes, that you wouldn't expect him to be sleeping through that.

Q. Okay. And then it says, "Another aspect of the confession statements by Mr. DeLeon-Reyes and Mr. Solache that does not logically cohere is the motive that was imputed to them in their police-directed statements, as occurs in many police-induced false confession cases."

What do you mean by there, "as occurs in many police-induced false confession statements"?

A. That what you often see in proven false confession cases is that the narrative that explains how and why the person allegedly committed the crime was suggested by the police. That's what we mean by scripting in an earlier part of the report. And

Page 180

that just doesn't really add up. It doesn't make sense.

It's hard to believe, not impossible, but hard to believe that somebody would kill a baby for $600. It's not a motive that you typically see in a brutal double murder and double abduction or a crime of that seriousness.

And if I remember correctly, I think the Lasser report also commented on that.

Q. You go on to say, "Mr. Solache had only lived with Adriana Mejia for two and a half months."

Do you see that?

A. Yes.

Q. Where is that coming from?

A. Well, I don't know what specific document in the mass of documents I reviewed almost a year ago when I was preparing the report, but -- so I can't name the exact source, but it presumably would have come from some document that I reviewed in the case.

Q. You reviewed Mr. Solache's deposition testimony, right?

A. Correct.

Q. Do you recall him testifying that he

Page 181

actually had known Adriana Mejia from when they were both in Mexico as children and that he had had, in fact, been living in the Mejia house for approximately two years before the murder?

A. No, I do not recall that as I sit here today.

Q. And then you say that Mr. DeLeon-Reyes did not know Adriana Mejia, her, which is a reference to Adriana Mejia.

Do you see that there?

A. Yes.

Q. And does that mean didn't know her at all, like had never met her? What does that mean?

A. Well, I don't recall what I was thinking when I wrote that. My recollection is he just didn't know her.

Q. Were you aware that he lived in her home?

A. I think so, yes. Maybe I meant he didn't know her well.

Q. On the same floor that she lived, right?

A. I don't recall specifically.

Q. Do you recall that the Mejia home -- in the Mejia home, in the basement of the Mejia home, Adriana Mejia's sister-in-law and brother-in-law

RICHARD A. LEO, PHD, JD, 09/28/2022                    Page 182..185

Page 182

lived in the basement, and then on the first floor Adriana lived with her husband Rosauro and Mr. Solache and Mr. Reyes and her brother Carlos Martinez? Do you recall that?

A. Some of that but not all of that. I don't recall the exact living arrangements.

Q. In any event, as you sit here today, you're not entirely clear what you meant to say when you said Mr. DeLeon-Reyes did not know her, right?

A. Yeah, I don't -- I don't recall.

Q. And then you conclude with, "And yet they were alleged to have been part of an elaborate scheme to kidnap a baby for and commit murders in exchange for $600."

Do you see that there?

A. Yes.

Q. And your basis -- and then you conclude, "As confessions go, this is not a strong motive to commit a double murder and double child abduction."

Do you see that?

A. Correct.

Q. What's your basis for that, that conclusion?

A. Again, it would be the -- the basis would

Page 183

be the confessions and the cases that I've studied, you typically don't get a crime like that for something as inconsequential as $600. And, again, the Lasser report, if I'm recalling correctly, made the same observation.

Q. Well, the Lasser report did not include that Mr. Solache and Mr. Reyes were likely innocent, correct?

MR. ART: Objection to form.

THE WITNESS: Yeah, that's not what I was saying. What I was saying is in their analysis, they found this to be a weak motive incongruous with the enormity of the crime. And so when they were going through things that sort of weighed in favor of their belief that the confessions were more likely than not false, they mentioned this as one reason.

BY MS. ROSEN:

Q. But ultimately, they didn't conclude that the confessions were more likely false, right?

A. Right. I meant more likely that Guevara had physically abused them. Sorry, I misspoke.

Q. Is there a particular reason when you start discussing the particular facts of the case

Page 184

that you don't actually cite to the record where you're -- where you're getting the facts that you rely on?

MR. ART: Objection to form.

THE WITNESS: The reason I don't do that is just because of the time that it takes to do that when drafting and going through multiple drafts. Obviously there's constraints on time.

BY MS. ROSEN:

Q. If we go to the second paragraph of the section that begins under C, Section C, you indicate, "Sometime after that," meaning after the -- Mr. Reyes, Gabriel Solache and Rosauro Mejia went to Area 5, "Sometime after that but still in the morning of on April 3rd, Detective Reynaldo Guevara, according to Mr. DeLeon-Reyes, entered the interrogation room, took off the hat on Mr. DeLeon-Reyes' head, slapped him hard across the face, and asked Mr. DeLeon-Reyes why he did it."

Do you see that?

A. Yes.

Q. And is it your understanding that at that moment in time, when Detective Guevara walked into the room, that he had no information about

Page 185

Mr. Reyes' potential role in the case other than he had shown up to a police station with the three-year-old Santiago Soto?

A. Well, at that point, just to be clear, according to Mr. Reyes, he would have been at the police station for some number of hours. So he would have had the information since he was at the police station.

But I don't recall reviewing any information that there was an investigation into Mr. Reyes prior to his showing up at the police station.

Q. And does it seem odd to you in any way that a police officer would walk into a room and take off an individual's hat and slap them hard across the face and ask them why they did it as the opener to an interrogation?

MR. ART: Objection to form.

THE WITNESS: As a general matter, if I was asked the question generally like you've asked it, I would say yeah, that sounds very odd. But in the context of the Chicago Police Department and especially in the context of Detective Guevara, it doesn't seem odd at all

RICHARD A. LEO, PHD, JD, 09/28/2022                    Page 186..189

Page 186

to me. It seems closer to standard practice or at least a pattern of practice for Detective Guevara that has been alleged across many, many cases.

And when I say that, I don't mean slapping somebody across the head, the narrow category of that. I mean physical assault and physical abuse that allegations of which are documented in many other cases in this report.

BY MS. ROSEN:

Q. To procure confessions though, right?

A. Correct, or in Detective Guevara's case, to coerce witnesses into identifying third parties in addition to coercing confessions.

Q. If we go down to the last paragraph, the first sentence says, "Eventually Detective Guevara came back into the interrogation room, bringing a form for Mr. DeLeon-Reyes to sign -- permission to search his house -- ordering and screaming at Mr. Reyes to sign it."

Do you see that?

A. Yes.

Q. And where did that, the ordering and screaming, come from, do you recall?

Page 187

A. My recollection is it would have come from any one of the places where Mr. Reyes testified, but I don't recall specifically whether it was his deposition or trial testimony or pretrial testimony.

Q. Did -- did you review any photographs that were taken of Mr. Reyes and Mr. Solache while they were in the police station at Area 5 on April 3rd, 4th, and 5th?

A. If they were in materials, the materials I reviewed, I would have reviewed them, but I don't recall as I sit here today reviewing any photographs.

Q. Did you review any photographs of Mr. Solache or Mr. Reyes that were taken of them when they got to Cook County Jail and were inputted into the Cook County Jail system?

A. Again, if they were in the materials I reviewed for the preparation of the report, I would have, but I don't recall as I sit here today.

Q. Okay. And if we go to Page 33, on the last paragraph, it says, At some point after this, the first sentence, Detective Guevara left the room. He returned with Adriana Mejia, who, at Detective Guevara's instruction, accused

Page 188

Mr. DeLeon-Reyes of having participated in a double murder/child abduction.

Do you see that there?

A. Yes.

Q. And when you say at Detective Guevara's instruction, what do you mean specifically?

A. That Detective Guevara instructed Ms. Mejia to confront Mr. Reyes.

Q. Do you mean that Detective Guevara told her in front of Mr. Reyes to accuse him specifically, or do you mean something else?

A. I don't -- I don't recall if it was in front of him, if he's alleging it was in front of him or not.

Q. Okay. And I think I asked you this before, but it's getting late in the day, so I apologize if I did.

But is it your opinion that Detective Guevara or any of the other officers instructed or coerced Adriana Mejia to falsely accuse Mr. Reyes or Mr. Solache?

A. Well, they may have believed that Mr. Solache was or Mr. Reyes was involved in the crime and, thus, not instructed her to falsely

Page 189

accuse him, but if they didn't commit the crime, then it would be a false accusation.

So I just want to make sure I have your question right.

Q. So Adriana Mejia, it's your understanding, right, that Adriana Mejia on the night -- in the days that she was in the police station told the detectives that she, along with Mr. Reyes and Mr. Solache, committed the double murders and kidnapping, right?

A. Correct.

Q. And is it your opinion that that accusation that Adriana Mejia leveled against Mr. Reyes and Mr. Solache was a creation of the detectives?

A. I think that's a factual question. What I'm doing at this part of the report is describing what Mr. Reyes describes.

Q. That question is not being asked in the context of what you're describing in this section of the report. This is a standalone question.

I'm trying to understand if it's your opinion that the accusation that Adriana leveled while she was at Area 5 on April 3rd, 4th, and

Urlaub Bowen & Associates, Inc.   312-781-9586

Page 190

5th against Solache and Reyes regarding their participation in the crime, whether that was a creation of the detectives or whether that was simply something that she on her own stated to police.

MR. ART: Objection to form.

THE WITNESS: Okay. I -- I am interpreting you to be asking me a factual question. You're calling it an opinion, but I'm only relaying what the various parties alleged.

I don't know whether that occurred or not at Detective Reyes' [sic] instigation or at Ms. Mejia's instigation.

BY MS. ROSEN:

Q. So you don't know one way or the other?

A. Yeah. Her interrogation was not recorded either.

Q. Right. But you read about her interrogation, right --

A. Correct.

Q. -- in arriving at your opinions?

A. Correct.

Q. I'm just trying to get your understanding

Page 191

of the -- of the facts related to her accusation when I'm asking the question about whether or not you understood the accusation to be originating with her or at the instigation of police.

And what I think you said is you don't know?

A. Correct, because there's no objective record of her interrogation, and my understanding is that Mr. Reyes said it, but I can't opine about it because I wasn't there. I'm just relaying his account.

Q. The next sentence reads, "Detective Guevara also told Mr. DeLeon-Reyes that there were witnesses (plural) accusing him of having committed the double murder."

Do you see that?

A. Yes.

Q. What other -- what other witnesses did Detective Guevara inform Mr. Reyes were accusing Reyes of the double murder?

A. My recollection is that Mr. Reyes did not specify that, that in his description, he was saying he was told there were multiple witnesses. I don't recall that he specified Detective Guevara saying

Page 192

the names of those witnesses.

Q. And you don't recall which testimony you're referring to, whether it was the motion to suppress, the trial, the post-conviction, or his deposition transcript, right?

A. Correct.

Q. Okay. All right. If we go to the next page, Page 34, at the top, you say, "Mr. DeLeon-Reyes reports he was unable to sleep."

Do you see that there?

A. Yes.

Q. And does that come from either the motion to suppress, the trial, the post-conviction, or the deposition testimony?

A. Yes.

Q. And is it your understanding that he did not sleep at all while he was in police custody?

A. I don't recall if he was able -- if he said he was able to get some sleep or not.

Q. If we look at Section D, it's called Risk Factors for False Confession in Arturo DeLeon-Reyes' Account.

Do you see that there?

A. Yes.

Page 193

Q. What exactly is the point of this discussion if you have already concluded that the confession meets two criteria to establish proven false -- a proven false confession?

A. Well, it's part of the analysis of why somebody would make a false confession.

Q. If we go to Page 35 of your report, first, at the top paragraph where it says "Third," it's about the middle of the paragraph, "Third, numerous other suspects and witnesses in other cases have accused Detective Guevara of physically coercing their statements and confessions during his interrogations of them," do you see that there?

A. Yes.

Q. Are any of those proven false confessions as you and Dr. Ofshe coined the term?

A. I don't know. I'd have to go through the list and see if I recognize any of them as proven false confessions.

Q. Where -- is the list somewhere in your report?

A. Well, there is in the report area -- there's Area 5 cases in which he was alleged to have abused people, and there is a list of those cases,

RICHARD A. LEO, PHD, JD, 09/28/2022                    Page 194..197

Page 194

some of the cases.

So that would be on Page -- starting on Page 88 of the report.

Q. Okay. We don't need to move there just yet in the exhibit.

So is that what you're referring to when you say "numerous other suspects and witnesses in other cases have accused Detective Guevara of physically coercing their statements and confessions during his interrogations of them"?

A. Yes. This is the listing of some of those individuals.

Q. Right. But I'm trying to -- so I'm trying to find the support for the -- for your sentence that reads on Page 35 "numerous other suspects and witnesses in other cases have accused Detective Guevara of physically coercing their statements and confessions during his interrogations of them."

So my question is, are all of the individuals that you're referencing in this sentence listed beginning at Page 88 of your report?

MR. ART: Objection to form.

THE WITNESS: I don't think so because I

Page 195

think there have been media reports of other cases that are not listed in my report.

BY MS. ROSEN:

Q. Okay. And when I asked you if these other cases met criteria for a proven false confession, you said you'd need to look at the list.

So what list are you referring to?

A. Well, the list of cases that are on Page 88. I don't know if any of those cases meet the criteria. I haven't analyzed them in enough depth for purposes of that portion of the report. I don't recognize any cases that I have analyzed in my research as proven false confessions on this list on Page 88.

Q. Have you analyzed Guevara cases in your research to determine whether or not they meet criteria for a proven false confession?

MR. ART: Objection to form.

THE WITNESS: Not Guevara cases. I haven't set out to analyze Guevara cases specifically, no.

BY MS. ROSEN:

Q. Okay. So then let me ask the question again.

Page 196

In the sentence on Page 35 where you refer to numerous other suspects and witnesses in other cases having accused Detective Guevara of physically coercing their statements and confessions during his interrogations of them, have you analyzed any of those cases that you're referencing there and concluded that any of those confessions meet criteria for a proven false confession?

MR. ART: Objection to form. Other than the Solache and Reyes cases?

MS. ROSEN: Yeah.

THE WITNESS: Yeah, other than Mr. Solache and Mr. Reyes' case, I have not looked at the other cases with an eye to whether or not they meet the criteria for the proven false confession category.

BY MS. ROSEN:

Q. Okay. And then if we go to the third paragraph on the page, it says, "There is no dispute that the physical coercion that Mr. DeLeon-Reyes describes has long been regarded as a direct cause of interrogation-induced false confessions from innocent suspects in the empirical social science research literature."

Page 197

Do you see that there?

A. Yes.

Q. And when you say "direct cause," what specifically do you mean?

A. That it's the primary cause when people -- or often the primary case when people who have falsely confessed were physically abused. They often describe that as the main or one of the main reasons why they confessed falsely.

Q. Okay. If we look at Section 2 here about Lengthy (Incommunicado) Interrogation, Sleep Deprivation, Exhaustion and Fatigue, in the middle of the paragraph, you write, "Some police use a technique known as 'letting the suspect stew' in which they intentionally let the suspect wait in a locked interrogation room, thinking it will raise the suspect's anxiety and contribute to the softening up (what interrogators refer to as rapport-building) process that precedes interrogations."

Do you see that there?

A. Yes.

Q. And so can you tell me what the data is that you were relying on to conclude that police use

Page 198

a technique known as "letting the suspect stew"?

A. I recall being told this in interviews I did for my doctoral dissertation, and I think I've also come across it in, occasionally, not often but occasionally, in unpublished police training manuals, of which I've read and accumulated many over the years.

Q. Do you have any CPD police training manuals?

A. I do have a CPD training manual from a different case, yes.

Q. From what time period?

A. I don't recall. The '80s or the '90s.

Q. Okay. All right. So you recall being told about this technique when you were sitting in on those interviews at whichever police facility for your dissertation. Is that what you said?

A. Yeah. So the Oakland Police Department where I sat in on the live interrogations from '91 to '93, when I was doing my dissertation, part of the data there was sitting in on the interrogations, but, also, most of the time I wasn't there -- I was there, I wasn't sitting in on interrogations. And some of that time, I was conducting formal

Page 199

interviews with the detectives, the felony detectives. And I believe this came -- this came out from the interviews with felony detectives who identified the name of this technique and described it to me.

Q. Okay. And then in the parenthetical, the reference to "what interrogators referred to as rapport-building," what do you mean there?

A. All I meant is that this term, "softening up," is sometimes referred to as rapport-building by police and some researchers, and others will say it's softening up.

So the same kind of -- the same underlying activity goes by different names depending on who's describing it sometimes.

Q. Okay. And then you go on to say, "Other times, police will intentionally take breaks during interrogation as part of their strategy to elicit a confession. These breaks contribute to a suspect's fatigue and exhaustion."

Do you see that?

A. Yes.

Q. And what is your basis for -- what is your basis of knowledge regarding that particular

Page 200

technique that you're describing there?

A. Again, I believe it came out in my interviews with Oakland police detectives and my dissertation research. It may have come out in interviews with other detectives since.

Q. In what circumstance have you interviewed other detectives since your dissertation in Oakland -- well, since your dissertation, period?

A. Well, it's listed on my CV the times that I've taught and lectured to police, and usually in those settings I've been able to informally speak to and interview police interrogators.

There's a meeting that I sometimes go to, a conference, the International Investigative Interviewer Research group, and most of the attendees, or at least many of them, are police detectives and interviewers and interrogators from a number of countries.

Also, at one or two of the academic conferences that I go to pretty regularly, the American Psychology-Law Society and the American Society of Criminology meetings, sometimes there's police there, not many, but sometimes there are who I speak to.

Page 201

So those would have been the settings in which I would have spoken to or interviewed other police.

Q. And that would have been the setting where they might have shared this technique with you regarding intentionally taking breaks during the interrogation?

A. Correct.

Q. Okay. And then the conclusion that these breaks contribute to a suspect's fatigue and exhaustion, what is the basis for that conclusion?

A. Well, in a lot of the cases I've studied and worked on, there are interviews with the suspect or testimony by the suspect where they express their exhaustion and fatigue. And about a decade ago, I cowrote an article about how police are -- I'm sorry, how suspects can be depleted and fatigued and exhausted the longer the interrogation goes. And there's other research on that as well.

Q. What's the article that you're referring to? What's the name of it?

A. I'm just looking at my current CV.

It's on Page 12 of this one. It's called Interrogation -- I'm sorry, Interrogation Related

RICHARD A. LEO, PHD, JD, 09/28/2022                Page 202..205

Page 202

Regulatory Decline: Ego-Depletion, Failures of Self-Regulation and the Decision to Confess.

Q. Okay. And then you go on to say, The amount of time (over 40 hours) that Mr. DeLeon-Reyes was either detained or in custody and interrogated on April 3rd through the 5th was extraordinarily lengthy per traditional police standards existing both then and now.

Do you see that?

A. Are we on 36 or 37?

Q. 35 going into 36, the bottom of the --

A. Oh, I'm sorry. Yeah, yeah. Okay. Sorry. I was ahead of you.

Yes, I do see that sentence.

Q. Okay. When you say that -- and what you're counting there is the amount of time that Mr. Reyes was in custody and interrogated, right, the whole time period?

A. In custody at the police station, yes.

Q. Okay. And when you say that it was extraordinarily lengthy per traditional police standards existing both then and now, what police standards are you referring to?

A. The ones I mention in the next paragraph

Page 203

from Reid and Associates. The 1986 manual was the current manual in 1988, but earlier editions of that manual say the same thing and so do subsequent editions. Don't interrogate somebody for longer than four hours because the individuals may assert that they were coerced, and the confession might get thrown out.

Q. But that's interrogating, not interrogate plus custody, right? Reid is talking about interrogation time, correct?

A. I'm not sure that they specify that. So that might be a reasonable interpretation of what they are saying, but I don't -- I'd have to look at the manual to see whether they make that distinction.

Q. Are you relying on anything else other than Reid for the conclusion that having somebody in custody for 40 hours and interrogating them, at some point or points during that 40-hour period constitutes an extraordinary lengthy period of time?

A. Well, I think it says lengthy period per traditional police standards. So in terms of police standards, 40 hours, to be interrogated over the course of 40 hours is extraordinarily lengthy per

Page 204

the Reid standard. I'm not relying on anybody else.

Q. And Reid, you don't know if they mean -- with respect to Reid, you don't know if they're -- when they talk about four hours, you don't know if they're including custody time, correct?

A. I don't know if they are including police custody over the course of the interrogation time. I do not know.

Q. And what about case law, right? There's case law on the length, the appropriate length of interrogations and the appropriate length of keeping people in custody before taking them to court.

Do you have any understanding of what time frames are set out in the case law?

A. I don't think there's any case law that discusses the appropriate length of an interrogation. There's a 1944 Supreme Court case that I think, if I'm recalling correctly, says that it's 36 hours of interrogation, but I may be wrong, continuous interrogation violates the Fourteenth Amendment, and I don't recall whether that was entirely continuous, but the case is Ashcraft v. Tennessee.

So I think, I think it might have been --

Page 205

actually I'm not remembering -- I don't recall if it was 36 hours or 44 hours, but it was something in the day-and-a-half to two-day period where it said if you interrogate for this length of time, it violates the Fourteenth Amendment, and the confession should be suppressed. I'd have to look at that opinion to refresh my recollection on the exact number.

But I think your question may have been about a Supreme Court case called McLaughlin that I think says you had 48 hours to bring somebody to court after you've arrested them. And if I'm correct that that's what your question was asking about, that's not really relevant to these case facts.

Q. Why isn't that relevant?

A. If my recollection of that case is correct, and I would have to look at that too, because that has to do with how long you could hold somebody before formally bringing them to court or charging them or arresting them, it doesn't have to do with how long you can or should interrogate them. The courts have been reluctant to lay down any bright lines about what is and is not an appropriate

Page 206

period of custodial detention and interrogation.

Q. One second. Okay. If we go to Page 37 of the report, the last sentence in the first paragraph says, "Mr. DeLeon-Reyes reports that he was unable to sleep during his two days and two nights of custody and interrogation at the Area 5 police station."

Do you see that there?

A. Yes.

Q. And again, you can't identify which -- you can't identify the specific testimony where he related that, correct?

A. Not without reviewing the documents.

Q. Okay. And then the middle of the next paragraph, the sentence that begins, In addition, Mr. DeLeon-Reyes was already exhausted from a long day of labor on April 2nd, 1998, and had only a couple hours of sleep prior to arriving at the District 8 police station at approximately 4:00 a.m. on April 3rd and from his lengthy interrogation on April 3rd through 5th.

Do you see that there?

A. Yes.

Q. What is the basis for your statement that

Page 207

he was already exhausted from a long day of labor on April 2nd and had only a couple hours of sleep prior to arriving at the District 8 police station?

MR. ART: Objection to form.

THE WITNESS: It would be something -- he would have described that in some document that I had read of his testimony. And it stands to reason that if you only had a couple hours of sleep the night before and you worked a full day that you would be tired.

BY MS. ROSEN:

Q. Right. But you already told me earlier today you know nothing about Mr. Reyes' sleep habits, right?

A. Yeah, I don't recall specifically, but I think any human being would be tired under those circumstances.

Q. And do you know why Mr. Reyes went to the police station, the District 8, the eighth district, after only a couple of hours of sleep?

MR. ART: Objection to form.

THE WITNESS: Well, my understanding is that because Mr. Rosauro, somebody recognized the baby, and they wanted to bring the baby to

Page 208

the police station, and he went along.

BY MS. ROSEN:

Q. Do you know why he went along?

A. I don't recall specifically. I thought it was in support of Rosauro Mejia and his decision to go to the police station.

Q. Okay. And the last sentence is, "As substantial and empirical research supports, lengthy interrogation, as well as the fatigue, exhaustion and depletion of psychological resources it contributes to and produce, substantially increased the likelihood that Mr. DeLeon-Reyes would falsely comply and falsely confess on April 3rd through 5th, 1998."

Do you see that there?

A. Yes.

Q. Was it your understanding that Mr. Reyes knew that he was confessing when he signed the handwritten statement?

MR. ART: Objection to form.

THE WITNESS: Well, he didn't read English, so I don't think he knew what he was signing. But his description is that he had been yelled at, beaten, abused, and told that

Page 209

he did this.

So yes, it is my understanding that he understood that he was signing a statement to what the detectives or Detective Guevara wanted in order to avoid the ongoing coercion and also responsive to what Officer Trevino was telling as well.

BY MS. ROSEN:

Q. Officer Trevino was in the room with him and the assistant state's attorney at the time that the handwritten statement was memorialized, correct?

A. Yes, memorialized, written by ASA O'Malley.

Q. Right. And was it your understanding that when ASA O'Malley and Detective Trevino and Mr. Reyes were in the room as ASA O'Malley was preparing the handwritten statement that Mr. Reyes had an understanding of what was being written in the document and what he ultimately signed to?

MR. ART: Objection to form, asked and answered.

THE WITNESS: I don't think he knew, again, because he couldn't read the document, and it was in English. But it's my

RICHARD A. LEO, PHD, JD, 09/28/2022                    Page 210..213

Page 210

understanding that, based on the abuse he experienced from Detective Guevara and the lengthy interrogation, that he knew what they were -- what Detective Guevara was getting at, what he was expected to say in order to put an end to that abuse.

BY MS. ROSEN:

Q. Okay. Let's go to Page 38 of your report. Under the section that reads Rush to Judgment based on a Premature Presumption of Guilt, Presumption of Guilty Knowledge, and Investigative Bias, the second sentence of that paragraph reads, "Substantial social science research has demonstrated that a behavioral presumption of guilt leads to tunnel vision, confirmation bias, and investigative bias among police investigators, who, as a result, often end up eliciting unreliable case information."

Do you see that there?

A. Yes.

Q. You cite to an article called Mistakes Were Made (But Not By Me).

Do you see that?

A. Yeah. It's actually a book.

Page 211

Q. Oh, a book. I see.

And other than -- and I assume that that book discusses these concepts; is that right?

A. Yes.

Q. Do you have any other experience with these concepts other than what's set forth in this particular book that you cite?

A. Yes. This has been written about a lot.

So the citations in Footnote 43, two footnotes above, those all make the same point, as does the citation below, Citation 45 and 46.

There's also an article by Keith Findley, spelled F-i-n-d-l-e-y, on tunnel vision which goes through this. I think that article has been cited in the report, but I'd have to find where, or I could do a word search.

And then I also discuss the research on which that's based in my 2008 book, Police Interrogation and American Justice, which is also cited throughout the report.

Q. And you go on to say in the next paragraph, "In my professional opinion, Detective Guevara demonstrated a breathtakingly reckless and incompetent disregard for the truth

Page 212

from the very beginning of his investigation of the murders of Mariano and Jacinta Soto and the abduction of their two children."

Do you see that?

A. Yes.

Q. And you use the words "breathtakingly reckless and incompetent."

Do you see that?

A. Yes.

Q. And is that based solely on Mr. Reyes and Mr. Solache's accounts of what occurred?

A. Yes.

Q. And then you say, "Detective Guevara simply presumed the guilt of Arturo DeLeon-Reyes (as well as the guilt of Gabriel Solache and Rosauro Mejia) for these crimes without any basis for, or evidence supporting, his reckless conjectures, as if his goal was merely to close the high-profile double murder/double abduction case as quickly as possible without regard to actual guilt or innocence."

Do you see that?

A. Yes.

Q. Okay. So tell me about Rosauro Mejia.

Page 213

What happened to Rosauro Mejia?

A. Well, Mr. Mejia also alleges that he was physically abused and beaten by Detective Guevara, though, unlike Mr. Reyes and Mr. Solache, he was apparently able to withstand the pressure without falsely confessing.

And I would just say that, you know, my prior sentence and this sentence, they're based on Mr. Reyes' and Mr. Solache's descriptions but also the other materials that I've reviewed in this case.

Q. What other material?

A. Well, there's pages and pages of materials. I don't recall seeing anything in the materials that suggested there was any investigation of Mr. Reyes or Mr. Solache prior to their showing up at the police station. Even if they were not interrogated for the majority of time, they were in -- they were custodially detained for interrogation. That's an extraordinary amount of time.

And as I say later in the report, Detective Guevara's account of what occurred during their interrogations doesn't really add up. It doesn't fit with the social science research

RICHARD A. LEO, PHD, JD, 09/28/2022                    Page 214..217

Page 214

literature.

So based on all the materials I reviewed in this case, I don't recall seeing anything that led me to believe this was anything other than a breathtakingly reckless and incompetent disregard for the truth from the very start and an attempt to simply beat out of Mr. Reyes and Mr. Solache admissions to the double murder and the double abduction.

Now, I'm happy to have my recollection refreshed if you want to show me documents I've reviewed that you think contradict that or to look at other documents, but I don't recall anything in the file that contradicted or was inconsistent with this conclusion.

This case, among the dozens and dozens of bad Chicago cases, stands out in my opinion. Usually when I describe cases that I believe there was a reckless disregard for the truth, I don't use the word "breathtakingly." This seemed to me to be breathtaking, or maybe "brazen" would be the word, because of the way it unfolded according to Mr. Reyes and Mr. Solache and, I believe, corroborated by other sources.

Page 215

Q. Do you know who any of the detectives spoke with before any interview with Mr. Solache or Mr. Reyes?

A. I -- no. I think that in this report I described, Detective Rutherford, Detective Dickinson, he may have spoken -- Mr. Reyes may have been spoken to Detective Rutherford and Detective Dickinson prior to speaking to Mr. Guevara. I don't recall the specific sequence.

Q. Do you know when Adriana was spoken to, Adriana Mejia was spoken to in this sequence?

A. No. Again, I don't recall the exact sequence. I think I mentioned earlier I recall that they were all -- Adriana, Rosauro, Mr. Reyes, Mr. Solache, they were all separated out into interrogation rooms. I think that they had to get Adriana Mejia, since she didn't initially come with Mr. Mejia and Mr. Reyes and Mr. Solache, but I don't recall the exact sequence.

Q. Do you know who Guadalupe Mejia is?

A. I don't recall specifically, no.

Q. Do you know who Jorge Mejia is?

A. I believe he was the brother of Adriana Mejia or Mr. Rosauro.

Page 216

Q. Do you know whether or not the police talked to Guadalupe Mejia during the course of their investigation?

A. I'd have to refresh my recollection.

Q. In any event, you don't mention Guadalupe Mejia anywhere in your report, correct?

A. Correct.

Q. Do you know if police talked to Jorge Mejia during the course of their investigation?

A. I believe they did. I believe that's described in the Lasser report, if I'm remembering correctly.

Q. If we go to Page 39 of your report, towards the bottom. If we could scroll up just a little bit more. Yeah.

It says "After the 40-hour interrogation." Do you see that there?

A. Yes.

Q. You mean to say interrogation and custody, right? That's -- that includes both?

A. Yeah, or I could have said custodial interrogation, correct.

Q. So when you use the phrase "custodial

Page 217

interrogation," we are to infer that you mean interrogation that occurs during the course of somebody being in custody but may not be continuous interrogation?

MR. ART: Objection to form.

THE WITNESS: Correct, in police custody. Sorry.

BY MS. ROSEN:

Q. Okay.

A. And also police custody for purposes of questioning.

Q. And then you go on to say, The detectives failed to conduct any follow-up investigation to test or attempt to test or corroborate the accuracy of their theory about Mr. DeLeon-Reyes' involvement for example, the detectives never investigated Adriana Mejia's family members to see if any of them could have been involved as Ms. Mejia's accomplices to the double murder/double child abduction; nor, to take another example, did the detectives take DNA samples from Rosauro Mejia or Carlos Martinez; nor did they fully investigate Norma Salazar as a potential accomplice to Adriana Mejia, who, unlike Mr. DeLeon-Reyes and Mr. Solache, left her DNA and

Page 218

blood at the crime scene; nor did they ever attempt to get Mr. DeLeon-Reyes to submit to a polygraph exam as they did with Adriana.

Q. Do you see that there?

A. Yes.

Q. When you say that they didn't investigate Adriana's family members, are there family members other than Rosauro and Carlos that you're referencing?

A. No. I said they didn't take DNA samples. I don't think I said they didn't -- oh, I'm sorry, I'm maybe looking at the wrong sentence.

Okay.

Q. Here's a better question.

When you say they didn't -- the detectives never investigated Adriana Mejia's family members, who are you referring to?

A. Presumably all of her family members.

Q. Family members that lived in her home? Family members that lived in Mexico? Can you, like, narrow it in any way?

A. Family members who lived in her home.

Q. Okay. But you know that they did talk to Guadalupe Mejia and Jorge Mejia, right? You said

Page 219

that?

A. Correct, Jorge Mejia, yes.

Q. And what was the purpose of talking to Guadalupe Mejia and Jorge Mejia, do you know?

A. I don't recall.

Q. And then you say the detectives didn't take DNA samples from Rosauro Mejia or Carlos Martinez.

What is your understanding of what is necessary for police to take DNA samples from individuals such as Rosauro Mejia or Carlos Martinez?

A. Well, either a person voluntarily submits and provides DNA samples or police have to get a court order to obtain the DNA.

Q. Okay. And who is Norma Salazar?

A. Norma Salazar is the woman who Adriana Mejia alleges she got the boy from at the hospital.

Q. And you say they didn't fully investigate Norma Salazar.

What did they do to investigate Norma Salazar?

A. My recollection is all they did is asked

Page 220

her about Norma Salazar, but I would have to review the reports to see if there's anything I'm not recalling as I sit here today.

Q. Do you recall that they picked up a Norma Salazar and put her in a lineup, and Adriana Mejia testified -- said that that wasn't the person she was referring to?

A. That's correct. Thank you for refreshing my recollection. I do recall that now.

Q. What more should they have done once Adriana said that's not the person?

A. My recollection is they didn't really spend much time questioning Norma Salazar.

Q. Why would they question Norma Salazar if Adriana Mejia said that wasn't the person?

A. Because she had initially said that was the person and because she's quite clearly involved in the crime, and Norma Salazar is the person that she said she got the boy from.

Q. Did the police know when they were interviewing Adriana Mejia April 3rd, 4th, and 5th that her DNA was found at the crime scene and that the victims' DNA was found on her clothing?

A. I believe at that time they didn't know

Page 221

yet.

Q. Okay. So they -- the police had no more surety that Adriana was involved in the crime than anybody else, right, based on the physical evidence?

A. Right, but Adriana was the one who showed up with the child and who we know came back with the child, according to other accounts. And once they got the DNA match with Adriana, it would have logically made sense to test the DNA of Ms. Salazar and possibly others.

Q. Well, if Adriana Mejia said that's not the woman I'm talking about, what basis would the police have to test her DNA?

A. Because she said there was a Norma Salazar who she got the baby from, maybe they -- maybe the Norma Salazar in the lineup is a different Norma Salazar; or maybe when they get the DNA hit on Adriana Mejia, they think she could have been lying and protecting Norma Salazar.

Q. Sorry. No, go ahead.

A. No, that was it.

Q. When did they get the DNA hit on Adriana?

A. I don't recall specifically.

Q. Then you make reference to the polygraph

Page 222

exam that they did with Adriana and they didn't do one with Mr. Reyes.

A. Yes.

Q. Do you recall when in the process they took Adriana to do a polygraph?

A. I do not.

Q. Do you recall the result of the polygraph?

A. I do not.

Q. Going to the next page of your opinion at the top of Page 40, it says, "Since Mr. DeLeon-Reyes meets the criteria for a proven false confession, as discussed above, it is my opinion that Detective Guevara made a misclassification error."

Do you see that?

A. Yes.

Q. If you're wrong about the fact that the confession meets criteria for a proven false confession, then that undermines your conclusion that Detective Guevara made a misclassification error, right?

A. I don't think I would agree with the question as stated, so let me say what I think.

So if I was wrong that it doesn't meet the criteria of a proven false confession, it could

Page 223

still be a false confession, and it would mean there was less support for the conclusion that it was a misclassification error.

Q. Okay. And then we go to the last sentence of that paragraph. "Detective Guevara, Officer Trevino, Detective Dickinson, Detective Rutherford and ASA O'Malley were not gathering evidence against Mr. DeLeon-Reyes; instead, they were creating and fabricating it."

Do you see that?

A. Yes.

Q. And what evidence were they creating and fabricating?

A. Well, the confession statement that was written in English, which Mr. Reyes couldn't read since he doesn't read English, that ASA O'Malley wrote up and that, in Mr. Reyes' description, was the product of what he was being told happened, not that he had any prior knowledge of the crime.

So based on Mr. Reyes' account, the entire thing is a police and prosecution creation and fabrication.

Q. And then if we go to the bottom of the page, there's a -- you start your discussion about

Page 224

false evidence ploys, and I think we've already talked about that.

The false evidence ploy was Adriana Mejia's accusation, correct?

A. Correct. That's what I analyze on Page 41, and we did talk about this earlier.

Q. Yes. And then in the middle of the second paragraph there, you say, "Since Arturo DeLeon-Reyes' confession statement is proveably false, it follows as a matter of logic that Adriana Mejia's accusation that he participated with her in the double homicide of Mariano and Jacinto Soto was factually false."

Do you see that?

A. Yes.

Q. So based on your conclusion that the confession was a proven false confession based on the fact that it met criteria, you draw the conclusion that Adriana's accusation that he participated with her in the double murder was factually false, right?

MR. ART: Objection to form.

BY MS. ROSEN:

Q. Is that right?

Page 225

A. Correct.

Q. So -- and if you're wrong about that, if you're wrong that the confession meets criteria to establish it as a proven false confession, then you can no longer draw the conclusion that Adriana's accusation was factually false, correct?

MR. ART: Objection to form.

THE WITNESS: I would say it doesn't necessarily follow as a matter of logic if the -- if the criteria for a proven false confession are not met. However, there still may be substantial support for it.

BY MS. ROSEN:

Q. And do you believe you should be allowed to testify to a jury in this case that Adriana Mejia's accusation that Mr. Solache and Mr. Reyes participated with her in the double homicide of Mariano and Jacinta Soto and the kidnapping of their children was factually false?

MR. ART: Objection to form.

THE WITNESS: It's not really a decision for me to make.

BY MS. ROSEN:

Q. So you have no opinion on that, whether

RICHARD A. LEO, PHD, JD, 09/28/2022                    Page 226..229

Page 226

you should be allowed to testify to that fact?

MR. ART: Objection to form. Are you asking if he is offering an opinion or if he has an opinion about the question?

MS. ROSEN: He's offering the opinion. I want to know if he thinks he should be permitted to offer the opinion.

MR. ART: I object to the form and the characterization of the opinions that he's offering.

BY MS. ROSEN:

Q. Are you offering the opinion in your report that since Mr. Reyes' confession statement is proveably false, it follows as a matter of logic that Adriana Mejia's accusation that he participated with her in the double homicide of Mariano and Jacinta Soto was factually false? Is that an opinion you're offering in this case?

A. I guess the way I think of the opinions is that I articulate however many opinions at the front of the report, and then I develop and support the bases for those opinions.

So I don't think of this as a separate opinion. I think of this as support for the

Page 227

analysis that goes to one of the opinions. And the opinion itself is Mr. Reyes describes false evidence ploys. False evidence ploys, as scientific research shows, increase the risk of eliciting a false confession, and here's the reason why according to the research.

So the way I think about this is it's not a separate opinion. It's part of the reasoning and analysis for a different opinion, or I should say the opinion about false evidence ploys, not an opinion about a fact in the case.

Q. And the reason that you are using this as an example of a false evidence ploy is because of your conclusion that her accusation is factually false?

A. Correct.

MR. ART: Objection to form.

THE WITNESS: Sorry. Go ahead.

BY MS. ROSEN:

Q. Did we get his answer?

A. Yeah, so I would say correct. And even if we take this out, they still used another false evidence ploy.

Q. The accusation that there were witnesses

Page 228

accusing him of committing the murder?

A. Correct. Based on my review of the materials, I did not -- I do not recall seeing that there were witnesses, plural, accusing him.

Q. Did Solache at one point accuse Mr. Reyes of being involved in the murder?

MR. ART: Objection to form.

THE WITNESS: Yes, but, of course, you know Mr. Solache's account is that he was also beaten and brutalized into making and agreeing to false statements, including that one.

BY MS. ROSEN:

Q. If we go to Page 43 of your report, the last sentence of the first paragraph says, "Indeed, Mr. DeLeon-Reyes states that Detective Guevara's physical abuse, and ultimately Mr. DeLeon-Reyes' desire to put an end to it, is why he signed the false confession statement written by ASA O'Malley."

Do you see that?

A. Yes.

Q. I assume, as with all the other questions related to where Mr. Reyes said what, you can't identify for me any particular transcript or testimony? It's just from something you read,

Page 229

correct?

MR. ART: Objection to form, mischaracterizes prior testimony.

THE WITNESS: If I took the time to go through the materials that I reviewed, then I would seek to identify it. But by -- off memory, no.

BY MS. ROSEN:

Q. Okay. If we go to Page 44 of your report, at the bottom of Page 44, it says, "Mr. DeLeon-Reyes was also likely more vulnerable to the physical and psychological coercion he describes because of his personal background."

Do you see that?

A. Yes.

Q. Did you interview Mr. DeLeon-Reyes?

A. I did not.

Q. Did you interview Mr. Solache?

A. I did not.

Q. Did you seek to interview either Mr. Reyes or Mr. Solache?

A. I did not.

Q. Do you ever interview the confessors to get details about their personal background that

RICHARD A. LEO, PHD, JD, 09/28/2022                    Page 230..233

Page 230

might inform your opinions?

A. Not -- not to get details about their personal backgrounds that would inform my opinions, no.

Q. Do you ever interview confessors?

A. I have interviewed confessors, and I sometimes do interview confessors in cases where there was not a recorded interrogation and there's no account in the record by the confessor of what occurred during the unrecorded interrogation. In those cases, they are cases going to trial.

So they wouldn't be cases -- excuse me -- where somebody had been interrogated 20 or 30 years earlier, and they wouldn't be cases typically where there's a record of the person saying what they recall occurring.

Q. You say here that his language barriers and inability to comprehend what was going on during the interrogation he describes.

What are you referring to when you say "his inability to comprehend"?

A. My understanding from the materials I reviewed, his testimony, is he didn't always fully understand what was being said to him because of the

Page 231

language difficulty, and that added to his confusion and his stress.

Q. Let's go to Page 45 of your opinion. At the top of the page, you say he was never informed that he had a right to silence or a right to counsel or a right to contact the Mexican consulate.

Do you see that there?

A. Yes.

Q. And the conclusion about his -- he was never informed that he had a right to silence or a right to counsel, that's based on Mr. Reyes' recitation of the facts, right?

A. Correct.

Q. The officers and the state's attorney indicate that he was given his Miranda warnings, the right to silence, told about the right to silence and the right to counsel, correct?

A. Right, but the ASA showed up kind of late in the process, so the ASA's representation would be at that later stage in the process.

Q. Okay.

A. And it's disputed.

Q. It's disputed, right.

A. Yes.

Page 232

Q. But you're not -- you're not crediting one side or the other, right?

A. Yeah. I'm not a fact finder here, so I'm just saying based on his account, this is why it would have been psychologically coercive, and this is one of the reasons.

Q. And then the issue about the right to contact the Mexican consulate, what is your understanding of Mr. Reyes' right to contact the Mexican consulate?

A. My understanding is that when a Mexican national is interrogated, they have a right to contact the Mexican consulate prior to the interrogation and --

Q. That was -- oh, sorry. I thought you were done.

A. And the police are supposed to inform them of that.

Q. That issue was litigated, right, in Mr. Reyes' and Mr. Solache's criminal prosecution? There was a motion to suppress brought on the failure to contact the Mexican consulate, correct?

A. Correct.

MR. ART: Objection to form.

Page 233

BY MS. ROSEN:

Q. And the court ruled on that motion, correct?

A. That's my recollection, yes.

Q. And the court denied that motion, correct?

A. Correct.

Q. Okay. With respect to the issue we were talking about that shows up on the previous page about Mr. Reyes' language barrier and inability to comprehend what was going on, are there any studies that support the conclusion that individuals who have particular language barriers or express an inability to understand what's happening are at a heightened risk for providing involuntary and/or false confessions?

MR. ART: Objection, form, compound.

BY MS. ROSEN:

Q. You can answer.

A. I believe there are, but I can't recall off the top of my head the exact studies. I'd have to double-check to confirm with respect to language barrier.

Q. And you don't cite anything in that paragraph, right, in your report?

RICHARD A. LEO, PHD, JD, 09/28/2022                    Page 234..237

Page 234

A. Correct.

Q. Okay. Let's go to Page 46 of your report. If we go to the middle paragraph, you state, "According to Mr. Reyes-Deleon, he did not know anything about the crime, not even who Mariano and Jacinta Soto were, let alone they had been -- let alone that they had been murdered or how. Nor did he know their children or that they had been abducted."

When you say "nor did he know their children," do you mean that he had never met the children before going to the police station on April 3rd?

A. I think this is a typo. I think what I meant to say was nor did he know that their children had been abducted. So I think it's just, you know, a rewrite of a sentence where I delete -- forgot to delete a few of the words.

Q. Okay. So it should read, "nor did he know that their children" --

A. "Had been abducted," that's what I think the sentence was meant to indicate.

Q. Well, he knew that Santiago had been abducted, which is why he brought him to the police

Page 235

station with Rosauro and Mr. Solache, correct?

MR. ART: Objection to form.

THE WITNESS: I'm not sure he knew necessarily that they had been abducted, that Santiago had been abducted.

BY MS. ROSEN:

Q. Okay. If we go to Page 47 of your report, in the middle of the paragraph, excuse me, in the middle of the paragraph, there's a sentence that begins, "The interrogation of Arturo DeLeon-Reyes (and the interrogation of Gabriel Solache, to be discussed below) is perhaps the most egregious example of the Error Insertion Trick that I've ever seen since Mr. DeLeon-Reyes could not have read or understood the errors in his statement created by Officer Trevino or ASA O'Malley since Mr. DeLeon-Reyes did not read English."

Do you see that?

A. Yes.

Q. And that, of course, credits Mr. Reyes' recitation of how the handwritten statement was memorialized and the circumstances surrounding the preparation of the handwritten statement, correct?

A. Right. It's based on his description,

Page 236

that is correct.

Q. If, in fact, Detective Trevino and former ASA O'Malley's account is correct generally speaking where the statement was translated to Mr. Reyes from English to Spanish accurately, then certainly, to the extent there were errors in the handwritten statement, Mr. Reyes could have made those corrections, correct?

A. It's theoretically possible, but what you see across these Chicago cases is the use of the error insertion trick in case after case after case.

So if Mr. Reyes -- if ASA O'Malley's and Officer Trevino's account is accurate, then, yes, Mr. Reyes might have been told here's a mistake, and Mr. Reyes might have corrected it. But I don't think that negates the use of the error insertion trick. This is something that police are trained to do and that prosecutors, police and prosecutors have done in numerous Chicago cases that I've seen.

So I think this is coming from Officer Trevino and ASA O'Malley, but if what they say is accurate, I would not say it's the most egregious example. I would just say it's another example.

Page 237

Q. Well, Detective Trevino and ASA O'Malley did not testify that they deliberately inserted errors in the report so that they could effectuate what you call the error insertion trick, right? That's not their version of events?

A. Right. But what I'm saying is that this is something police are trained to do. This is something that police and prosecutors do in virtually all the confession cases, false confession cases I've looked at in Chicago. This is not something that I've ever, ever, ever seen a suspect do on their own.

So when we put together the various pieces of this, it makes no sense to me that Mr. Reyes or Mr. Solache would have on their own discovered or initialed the errors.

Now, if we assume ASA O'Malley's and Officer Trevino's account to be true, to be not just that it was correctly translated but that Mr. Trevino -- I'm sorry, Mr. Reyes is the one who corrected them, who inserted the errors? He didn't write the confession. They were the ones who inserted the errors, even on their own account.

Q. What types of errors were in Mr. Reyes'

RICHARD A. LEO, PHD, JD, 09/28/2022      Page 238..241

Page 238

statement?

A. I don't recall specifically.

Q. How about Mr. Solache's statement, what types of errors were in Mr. Solache's statement?

A. Again, I don't recall specifically. They're typically trivial errors, and I believe that's -- the nature of the errors were discussed in the testimony, errors in spelling, errors in address, errors in time frames, typo-type errors.

Q. You're calling errors in time frames trivial?

A. No, actually I misspoke. I don't think errors in time frame -- I'm sorry. I misspoke. Typically, they are grammatical or spelling errors, not time frame errors.

Q. Okay. Go to Page 48 of your report. The top of the paragraph, it's discussing Violation of National Police Interrogation Training Standards, Protocols and Best Practices. I think we talked about this earlier. You claim that 40 hours of custody and interrogation violated national police interrogation standards, protocols, and best practices as they existed in 1998, but you have no cite there.

Page 239

So what standards are you referring to?

A. Well, again, earlier in the report, I cited to the Reid manual, so that would be a standard.

Q. You make reference to the fact that Mr. Reyes and Mr. Solache were held incommunicado. What does that mean?

A. Well, they weren't able to contact the outside world.

Q. Do they say that?

A. I don't recall anywhere in the materials I reviewed that they had access to the outside world through a phone or any other means of communication.

Q. Okay. Let's go to Page 50. So at Page 50 of the report, Section E is entitled Detective Reynaldo Guevara's, Youth Officer Daniel Trevino's, Detective Robert Rutherford's, Detective Edwin Dickinson's, and Assistant State's Attorney Thomas' -- Thomas O'Malley's Account of the Lengthy and Unrecorded Multiple Custodial Interrogation Sessions of Arturo DeLeon-Reyes on April 3rd through 5th, 1998. Do you see that there?

A. Yes. Thank you.

Page 240

Q. Okay. And this section is your attempt to detail the police and state's attorney version of the investigation and interrogation that occurred over the time period of April 3rd through 5th, correct?

A. Primarily the interrogation leading -- and custody leading to the statement.

Q. And why didn't you detail the investigation that led up to Mr. Reyes' statement?

A. Well, I don't recall much investigation since they showed up with the child, and then they were put in rooms and questioned, right, for the 40-hour period or over the 40-hour period. But my focus primarily is on the questioning or interrogation and what produces the statement, not the investigation that precedes it primarily.

Q. So according to Detective Guevara, he first went into the interrogation room to speak with Mr. Reyes at 11:30 p.m. on April 3rd, correct?

A. Yes.

Q. And Mr. Reyes doesn't dispute that, correct?

A. Not to my knowledge.

Q. Okay. So what we -- what we know that is

Page 241

undisputed is that Detective Guevara first went to speak to Mr. Reyes at 11:30 p.m. on April 3rd, right?

A. Or presumably around 11:30 p.m., yes.

Q. Okay.

A. There's no way that Mr. Guevara -- Mr. Reyes would likely know the exact time.

Q. Right, okay. So around 11:30 p.m. on April 3rd. So Mr. Reyes had been in the police station the whole day by this point, right?

A. By this point, yes.

Q. And Adriana Mejia had been brought to the police station by this point, right?

A. I believe so.

Q. And Adriana Mejia had been spoken with by this point, correct?

A. I believe so.

Q. Do you know how many times Adriana Mejia had been spoken with by the time -- by 11:30 p.m. on April 3rd?

MR. ART: Objection to form.

THE WITNESS: I do not recall.

Page 242

BY MS. ROSEN:

Q. And with respect to your opinions regarding a rush to judgment and tunnel vision, isn't it -- wouldn't it have been important for you to analyze and record in your report all of the information that Detective Guevara had before he walked into the room at 11:30 p.m. on April 3rd?

A. No, not all of the information. My recollection is he really didn't have anything other than Adriana Mejia's statement, which even she asserts is the product of physical abuse and coercion.

Q. What was the physical abuse and coercion that Adriana Mejia was subjected to?

A. My recollection is she was slapped, but I would have to review her testimony to see if I'm remembering that correctly, if there was more or a variation on being hit.

Q. And has Adriana Mejia ever said in anything that you reviewed that the reason that she falsely accused Reyes and Solache was because she was slapped?

A. Not that I recall.

Q. Okay. And then, of course, according to

Page 243

Detective Guevara's version of events, he did Mirandize Mr. Reyes in Spanish when he first spoke with him at 11:30 p.m. on April 3rd, right?

A. Correct.

Q. And then according to Detective Guevara, Mr. Reyes was not handcuffed, and this particular interview only lasted 15 minutes?

A. Correct.

Q. And in this 15-minute interview, according to Detective Guevara, he told Mr. Reyes that Adriana Mejia had implicated him in the double murder and double abduction, right?

A. I'm sorry. I got a little distracted by my kids entering, the sound of my kids entering.

Q. Do you want me to repeat the question?

A. Yeah. If you could repeat the question, that would be helpful.

Q. Yeah, sure. During this what Detective Guevara describes as a 15-minute interview with Mr. Reyes, he related to Mr. Reyes that Adriana Mejia had provided police with a statement implicating Mr. Reyes in the double murder of the Sotos and the double abduction of their children, right?

Page 244

A. Correct.

Q. And then according to Detective Guevara's version of events, the next time he spoke with Mr. Reyes was at 3:00 p.m. the next day, April 4th, almost 16 years later, right?

A. Correct.

Q. And do you -- and you don't recount here what investigative activities were taking place between 11:30 p.m. on April 3rd and 3:00 p.m. on April 4th, right?

A. Correct.

Q. And why didn't you do that?

A. Well, because I'm focused on the interrogation, and to my knowledge, to my best recollection, the only evidence he had that suggested Mr. Reyes' involvement was the statement from Ms. Mejia, which, again, was the product of physical abuse according to her, at least with respect to her involvement.

Q. But not according to Detective Guevara?

A. Not but according to Detective Guevara, correct.

Q. So if you're recounting -- if this section is purportedly detailing the police account, then

Page 245

you have to correctly detail the police account, right?

A. Right, but I'm primarily focused on the account of the interrogation sessions, and I don't recall anything significant to me implicating Mr. Reyes through Detective Guevara's actions in that 16-hour period.

Q. Okay. And then according to Detective Guevara, he asked Mr. Reyes if he remembered his Miranda rights and that Mr. Reyes indicated he still understood them and that he was willing to speak to Detective Guevara, correct?

A. Correct.

Q. And according to Detective Guevara, this particular interview lasted about 30 minutes, and this is when Mr. Reyes first admits some involvement in the crimes, right?

A. Correct.

Q. So if you credit Detective Guevara's version of events, Mr. Reyes starts providing an inculpatory statement after approximately 45 minutes of interviews over the course of being in custody for 30 hours or something like that, 32 hours, right?

Page 246

A. Correct.

Q. Okay. And then according to Detective Guevara, again, at approximately 6:00 p.m., he goes to speak to Mr. Reyes, and he brings him into this larger conference room where Detective Rutherford, Detective Dickinson, and Youth Officer Trevino were present, right?

A. Correct.

Q. And Detective Guevara indicated that he was in and out during this investigation, which lasted approximately another half hour and involved Youth Officer Trevino drawing on a blackboard and Mr. Reyes indicating what he had done on the blackboard, correct?

A. Correct.

Q. Okay. And then at this point, Officer Trevino indicates that he also provided Mr. Reyes with his Miranda warning in Spanish, and Mr. Reyes gave a knowing and voluntary waiver, right?

A. Correct.

Q. And then as with the two prior interviews, Detective Guevara states that Mr. Reyes was not handcuffed at all and denies ever handcuffing

Page 247

Mr. Reyes to a wall, right?

A. Correct.

Q. Okay. And then Detective Guevara stated that he checked in on Mr. Reyes at 3:00 a.m. on the morning of April 4th, and Mr. Reyes was sleeping, correct?

A. Correct.

Q. Mr. Guevara denies physically abusing Mr. Reyes or making any threats?

A. Correct.

Q. Okay. Then you go -- at the bottom of this page, in the last paragraph, you say, "The interview Detectives Guevara, Dickinson, Rutherford, and Officer Trevino conducted with Mr. Reyes is documented on a handwritten Chicago Police Department general progress report."

Do you see that there?

A. I do. Thank you.

Q. And I'm going to represent to you that I do not see any general progress reports listed in the materials reviewed in the front portion of your report.

Can you provide any more detail about the general progress reports that you've reviewed other

Page 248

than what's written in the body of your report?

A. I think there's a mistake in the report and I just forgot to list some of the general progress reports that I reviewed if they're not listed here.

Other than that, I would just have to -- which, since we're going a second day, I think I can do, I just have to check through the records and see if that's correct and then provide you with the Bates stamps numbers, because I don't see any general progress reports listed here either.

Q. Okay. That would be great.

And as you sit here today, you can't describe them any further than how you have them described here, right?

A. Correct.

Q. Okay. And then you say, reading on, the last sentence at the bottom of the page, "These handwritten police notes, which purported to have been composed shortly before Arturo DeLeon-Reyes' and Gabriel Solache's statements were taken, contain many factual inconsistencies when compared to Mr. DeLeon-Reyes' and Mr. Solache's statements."

Do you see that there?

Page 249

A. Yes.

Q. Okay. So why do you use the word "purported to have been composed shortly before Mr. Reyes' and Mr. Solache's statements"?

A. It -- I'm sorry. It wasn't clear to me that they really had been, so maybe I was expressing some skepticism there.

Q. And why wasn't it -- so what wasn't clear to you?

MR. ART: Objection to form.

THE WITNESS: My best recollection, you know, nine months after writing this report is that I may have been skeptical about whether they were really composed at the time Mr. -- I'm sorry, Detective Guevara -- at the time Detective Guevara listed on the handwritten report.

BY MS. ROSEN:

Q. And what's the basis of the skepticism?

A. I -- I would have to review it to tell you. I just don't call as I sit here.

Q. In any event, you don't describe any basis in your report for any skepticism?

MR. ART: Objection to form.

RICHARD A. LEO, PHD, JD, 09/28/2022                    Page 250..253

Page 250

THE WITNESS: With respect to that, yes, correct.

BY MS. ROSEN:

Q. Correct. Okay. And then going on, moving on to Page 51, you -- at the top of the page, you say, "While this might have been done to corroborate and lend credibility to Detective Guevara's interrogations, the inconsistencies suggest that the detectives were still in the process of scripting what the story of the crime would be."

Do you see that?

A. Yes.

Q. Can you explain the basis for your conclusion that the inconsistencies suggest that the detectives were still in the process of scripting what the story of the crime would be?

A. I would have to review it. The -- as I mentioned earlier, I think there was inconsistencies in the report with regard to the timing of the crime, that the closing report said the murder occurred at 7:30, but one of the earlier reports had said it occurred at a different time, but I would have to review the materials to give you a better explanation or a fuller explanation of this.

Page 251

Q. Is there any empirical evidence that you can rely on to support the conclusion that the inconsistencies suggest that the detectives were still in the process of scripting what the story of the crime would be?

A. Again, I would have to review the materials.

Q. Does the fact that you don't cite to any empirical research or studies to support that conclusion suggest to you that there are none?

MR. ART: Objection to form.

THE WITNESS: No, I thought you were asking about the police reports, not empirical studies.

So there are studies that describe the process of scripting, but maybe I'm not fully understanding your question.

BY MS. ROSEN:

Q. Well, you're drawing a conclusion that the inconsistencies between the notes of the interviews that were conducted and the ultimate statement that was -- the ultimate handwritten statements that were taken, that those inconsistencies suggest that the detectives were still in the process of scripting

Page 252

what the story of the crime would be, and I wanted to know whether or not there's any empirical evidence or studies that support the notion that the inconsistencies that might appear in the memorialization of statements of suspects taking -- taken over time indicate that detectives were still in the process of scripting what the story of the crime would be.

A. I don't think there are empirical studies that are about this case, so the question seems a little disjointed to me.

So no, there are no empirical studies that demonstrate this is what happened in this case.

Q. You're drawing a conclusion that you are noting that there are factual inconsistencies between Mr. Solache's and Mr. Reyes' statements as memorialized in the GPRs with the handwritten statements.

Do I have that correct?

A. Yes.

Q. So in other words, what Mr. Solache and Mr. Reyes told the detectives that was written down in the GPRs is different in some way than the information that was taken down in the handwritten

Page 253

statements, correct?

A. Yes.

Q. Okay. And from that, you are drawing the conclusion that the inconsistencies suggest that the detectives were still in the process of scripting, right?

A. That they might have been, yes.

Q. Suggests, so might have been.

So I'm just trying to probe the basis for your inference that the inconsistencies show that the detectives were still in the process of scripting.

A. Well, I mean -- I'm sorry, go ahead.

Q. That's okay. And in that vein, I want to know if there are studies out there that show when police officers take statements from individuals over time and there are inconsistencies in those statements, if there's support for your conclusion in this case that that's evidence of scripting.

A. If I understand your question, no. I've seen this occur in other cases where the detectives' statements -- the detectives' theories evolved, and so what they write in police reports doesn't match fully an earlier taken statement from a suspect.

Urlaub Bowen & Associates, Inc.   312-781-9586

Page 254

But, if I understand your question, I'm not relying on a study here to draw that conclusion.

Q. Okay.

A. I suggest that possibility.

Q. Okay. And in the next paragraph, you go on to note that the handwritten statement -- it starts about six lines down -- was taken at 2:00 a.m. on April 5th, that ASA O'Malley read the statement line by line, and Officer Trevino translated it into Spanish line by line, and that corrections were made to the statement during the process.

And then it also further down indicates that Mr. Reyes indicated he had had a sandwich to eat and pop to drink at that time and that he was able to use the bathroom.

Do you see that there?

A. Yes.

Q. Okay. And then it indicates that Officer Trevino denied ever seeing Detective Guevara or anybody else assault Mr. Reyes or make any threats or make any promises of help or leniency or a threat of execution by the electric chair.

And then you conclude the section by

Page 255

saying when testifying under oath and asked in post-conviction proceedings in 2013 and in his deposition in 2020 about what occurred, that Detective Guevara invoked the Fifth Amendment.

Do you see that there?

A. Correct.

Q. And why do you include that there in this version -- in this section of your report?

A. Just that he declined when being questioned. In two proceedings, he declined to answer questions. So we're only left with his testimony at the pretrial suppression hearings and at the trials.

Q. And the conclusion we're to draw from that, if any?

A. Well, I'm not drawing a conclusion here because what I'm trying to do in this section is describe the account. But I do think it's fair to draw a conclusion or at least an inference in the pattern and practice section of the report about the significance of Detective Guevara invoking his Fifth Amendment when asked about his interrogations in those cases.

Q. Okay. And then if we go to the bottom of

Page 256

the report, the section is called comparing Mr. Reyes' statement to the law enforcement accounts, and you note that the two versions are dramatically different and diverge on virtually every key factual detail, right?

A. Correct. There are some undisputed facts, but most of the significant ones in my opinion are disputed.

Q. Okay. And you -- we've talked about this already, but you know that you aren't permitted to make credibility assessments in this case for the jury, right?

A. Correct.

Q. Okay. And you go on to repeat that if Mr. Reyes' -- in Mr. Reyes' version of events, you detail the myriad of things that are problematic and impermissible with respect to the way the interrogations were conducted. And then you summarize the law enforcement version.

And then you draw a conclusion in the third paragraph that says, In my professional opinion, Mr. Reyes' more robust and detailed account of the lengthy, unrecorded interrogation sessions on April 3rd through 5th, 1998, fits with the findings

Page 257

of the empirical and scientific research literature on how and why individuals can be moved to make or agree to false compliance and give a proven false confession.

Do you see that there?

A. Yes.

Q. Okay. And if you are -- your analysis regarding the -- whether or not the confession meets any criteria for a proven false confession, then how is this particular opinion affected?

A. Apart from the proven false confession, so if I understand your question correctly, if it didn't meet the criteria for a proven false confession, I would still say, as I do in that part of the report, there's substantial indicia of unreliability, and I would say that the -- Mr. Reyes' account better fits with the research on how and why confessions with substantial indicia of unreliability or confessions that are alleged to be false with substantial indicia of unreliability come about.

MS. ROSEN: Okay. Can we see -- Rachel, can you tell us -- let's go off the record for a second, and can you tell me how much time we

RICHARD A. LEO, PHD, JD, 09/28/2022                    Page 258..259

Page 258

have on the record.

THE VIDEOGRAPHER:  We're off the video record at 6:21 p.m.

(Whereupon, the deposition was adjourned at 6:21 p.m. and continued to Thursday, September 29, 2022, at 9:00 a.m. Central Daylight Time.)

Page 259

C E R T I F I C A T E

The within and foregoing deposition of the witness, RICHARD A. LEO, Ph.D., J.D., conducted via Zoom, was taken before GREG S. WEILAND, CSR, RMR, CRR, commencing at 11:02 o'clock a.m., on the 28th day of September, 2022.

The said witness was first duly sworn and was then examined upon oral interrogatories; the questions and answers were taken down in shorthand by the undersigned, acting as stenographer; and the within and foregoing is a true, accurate and complete record of all the questions asked of and answers made by the aforementioned witness at the time and place hereinabove referred to.

The signature of the witness was not waived, to be determined at the conclusion of the deposition.

The undersigned is not interested in the within case, nor of kin or counsel to any of the parties.

Witness my signature on this 13th day of October, 2022.

_____

GREG S. WEILAND, CSR, RMR, CRR

License No. 084-003472

Urlaub Bowen & Associates, Inc.   312-781-9586

Index: $375-300

RICHARD A. LEO, PHD, JD, 09/28/2022

**Exhibits**

**1 Leo 092822-1** 4:9 9:20,22 76:22 83:12 100:15 105:12 136:10

**2 Leo 092822-2** 4:12 95:15,18 96:5 98:12,13

**3 Leo 092822-3** 4:16 98:15,17 102:19

**$**

**$375** 68:13

**$400** 68:1

**$50** 68:23

**$600** 180:5 182:14 183:3

**1**

**1** 5:2 9:20,22 76:22 83:12 86:21 94:22 100:15 105:12 136:10 170:1

**100** 39:7 55:11

**100-page** 120:11

**11** 60:5

**110** 58:21 60:10,22 61:3 139:3,12

**11:02** 5:3

**11:12** 12:9,11

**11:17** 12:11,13

**11:30** 240:19 241:2,4,8,20 242:7 243:3 244:9

**12** 69:23 77:4 80:20 83:11 99:17 201:23

**125** 138:7,10

**12:30** 76:9,10

**12:52** 76:15,17

**14** 103:20 121:11

**15** 33:17 94:12 99:10 128:3 243:7

**15-minute** 128:7,12 131:4 243:9, 19

**157** 10:2

**159** 18:3

**15th** 67:9

**16** 96:15 136:9,11,18 141:10 244:5

**16-hour** 245:7

**17** 152:2

**18** 31:13

**18-CV-1028** 5:9

**18-CV-2312** 5:10

**190** 50:3

**1908** 153:22

**1944** 204:17

**1980s** 153:24

**1985** 58:17

**1986** 203:1

**1987** 58:11

**1988** 203:2

**1990s** 32:11 154:9

**1993** 10:14

**1996** 25:21

**1997** 154:9,17 162:21

**1998** 40:5,16 41:4 53:7 54:17 58:15 62:1 64:12 65:14 86:6 87:7 104:3 105:23 106:2 133:15,20 138:24 141:12 144:22 145:2,13,22 146:4 149:14,22 150:12,13,17 168:4,7,13,19 206:17 208:14 238:24 239:22 256:24

**1999** 54:15

**1:00** 75:21 131:6

**1:30** 76:18,20 140:13

**2**

**2** 67:22 69:23 77:3 87:19 94:23 95:15,18 96:4,5,18,19 98:13 136:23 137:7 141:9,10 142:17 144:3 145:18 147:11 148:10,21 149:1,5 173:7 197:10

**2,000** 37:7

**20** 5:16 59:13,24 230:13

**2000** 27:1

**2000s** 32:11

**2001** 54:11

**2004** 34:5 55:18 56:3 57:17 61:1 62:2,14,17 64:6 65:4,12,19 86:9 92:21 94:5 95:6,19 104:4 117:7

135:11,24 137:10,23 138:6 141:11 145:13 149:14,23

**2007** 104:18

**2008** 154:11 167:4 211:18

**2010** 66:6

**2013** 58:20 59:5 255:2

**2013-2014** 59:11

**2014** 59:19,20 62:8 139:9,17

**2018** 152:12,16,20

**2020** 21:3 255:3

**2022** 5:6 7:9,21 9:21 67:9 69:18 70:6 71:4 258:7

**20th** 58:16

**21** 162:23

**2200** 25:20 26:2,3 27:11,12,22 38:4 120:13

**23** 158:7

**24** 40:11 151:14 157:12 159:16

**25** 68:23 156:18 161:9

**250** 41:8,23 42:3,4 45:7 48:11,16, 17,22 49:4,7,10,12,20 50:3 64:9 137:22

**26** 121:15 164:17

**26(a)(2)** 118:17

**28** 165:21 167:23

**283** 80:20

**28th** 5:6 108:22

**29** 167:18,23,24 168:1 258:7

**2:00** 76:4 140:14 254:8

**2:18** 176:22

**2:30** 76:5,10

**2:42** 131:11,13

**2nd** 206:17 207:2

**3**

**3** 98:15,16,17 102:19

**30** 76:2 99:15 100:6 102:21 105:5 115:12 168:23 172:1 230:13 245:15,23

**300** 15:18

RICHARD A. LEO, PHD, JD, 09/28/2022

**31** 99:16 174:22 175:6 177:10 178:5

**32** 99:17 245:23

**33** 187:20

**34** 41:9 96:16 138:6 192:8

**35** 193:7 194:15 196:1 202:11

**350** 58:16,18 139:22

**36** 202:10,11 204:19 205:2

**37** 202:10 206:2

**38** 210:8

**39** 96:17 216:14

**395** 26:5,8,10 27:7 28:1,19 29:1 30:8 31:17 163:23

**396** 26:10

**3:00** 131:6 244:4,9 247:4

**3:01** 131:13,15

**3rd** 169:9 184:15 187:7 189:24 202:6 206:20,21 208:13 220:21 234:13 239:22 240:4,19 241:2,9,21 242:7 243:3 244:9 256:24

---

**4**

**4** 77:12 88:18 89:1,5 90:17 100:17 136:24 137:8 148:23 149:1,6

**40** 59:12,15 169:6 170:15 172:1 202:4 203:18,23,24 222:10 238:21

**40-hour** 169:3 203:19 216:17 240:13

**400** 69:20

**41** 111:15 224:6

**42** 167:10

**43** 211:9 228:13

**44** 205:2 229:9,10

**45** 26:24 211:11 231:3 245:21

**450** 68:14

**46** 211:11 234:2

**460** 59:1 60:16,22 139:3

**47** 235:7

**475** 68:15

**48** 167:10 205:11 238:16

**49** 58:18

**4:00** 206:19

**4:08** 177:4,6

**4:18** 176:21

**4:20** 177:6,8

**4th** 187:8 189:24 220:21 244:4,10 247:5

---

**5**

**5** 31:16 32:5 80:18 82:3 90:7 92:2 103:19 104:24 105:14 111:9 137:10 138:24 169:15 170:15 184:14 187:7 189:24 193:23 206:6

**50** 115:2 163:24 164:2 239:14,15

**500** 69:16,17,19

**51** 250:5

**53** 99:15 102:20 167:10

**56** 99:16

**59** 10:5

**5th** 169:11 187:8 190:1 202:6 206:21 208:13 220:22 239:22 240:4 254:8 256:24

---

**6**

**6** 99:11 150:12

**6-month** 156:18

**60** 41:9 48:14 50:7,11 54:6 96:3 99:16

**600** 5:16

**600-some-odd-thousand** 61:13

**62** 167:10

**66** 77:11,19

**6:00** 246:4

**6:21** 258:3,5

**6:30** 148:7

---

**7**

**7** 52:23 96:17

**73** 52:17,19,23

**79** 80:19

**7:30** 140:23 147:24 148:6 250:21

---

**8**

**8** 54:8 206:19 207:3,19

**80s** 198:13

**81** 117:8

**88** 194:3,22 195:9,14

**8th** 8:14

---

**9**

**9** 54:6

**90** 29:10 90:9

**90s** 198:13

**91** 198:19

**93** 198:20

**948** 95:24 96:10

**95** 29:10 31:19 35:6 93:4

**98** 64:2 65:12,13 137:22 138:5

**99** 7:11,15 35:7

**9:00** 258:7

---

**A**

**a.m.** 5:3 12:9,11,13 140:13 206:19 247:4 254:8 258:7

**abandoned** 53:22

**abducted** 234:9,16,21,24 235:4,5

**abduction** 180:6 182:19 188:2 212:3,19 214:9 217:19 243:12,23

**absolute** 41:21

**abuse** 186:8 210:1,6 228:16 242:11,13 244:18

**abused** 183:22 193:24 197:7 208:24 213:3

**abusing** 247:8

**academic** 54:24 57:9 85:8 200:19

**accepted** 38:11 40:8 153:13 164:7

**access** 16:11 90:5 239:12

**accomplice** 217:23

**accomplices** 217:18

RICHARD A. LEO, PHD, JD, 09/28/2022

**account** 107:16 108:5,6,8 111:2 191:11 192:22 213:22 223:20 228:9 230:9 232:4 236:3,13 237:18,23 239:19 244:24 245:1,4 255:18 256:22 257:17

**accounts** 212:11 221:7 256:3

**accumulated** 198:6

**accuracy** 149:10 217:14

**accurate** 10:12 80:4 141:2 148:8,9 149:9 170:12 236:13,22

**accurately** 236:5

**accusation** 95:1 111:17,23 112:9, 15 189:2,13,23 191:1,3 224:4,11, 19 225:6,16 226:15 227:14,24

**accuse** 113:10 114:3 188:10,21 189:1 228:5

**accused** 187:24 193:11 194:8,16 196:3 242:21

**accusing** 111:19,20 191:14,19 228:1,4

**acquittal** 51:17

**act** 61:18

**actions** 245:6

**activities** 244:8

**activity** 199:14

**actual** 80:22 99:21 124:13 212:20

**add** 94:15 112:22 132:2 142:24 174:19 180:1 213:23

**added** 231:1

**addition** 49:1 63:3 161:12 186:14 206:15

**additional** 172:14

**address** 238:9

**addressed** 57:15

**adds** 93:14

**adequate** 106:11,20 111:3

**adhere** 142:14

**adjourned** 258:5

**administrative** 26:20 27:6

**admissibility** 26:13,16 28:22 29:6,18 30:7

**admissible** 30:3

**admission** 110:11 157:20 159:18 160:8,14,24 161:6,8 163:11

**admissions** 214:8

**admit** 29:20

**admits** 38:15 245:16

**admitted** 31:20,21 113:16

**admitting** 154:21 155:22

**Adriana** 77:13 78:1,5 79:2,9 80:7,9 111:17,23 112:8,15 113:10,12,21 116:24 126:17 127:6 129:7 175:23 180:11 181:1,8,9,24 182:2 187:23 188:20 189:5,6,13,23 215:10,11, 14,17,24 217:17,23 218:3,16 219:18 220:6,11,15,21 221:3,5,8, 11,18,22 222:1,5 224:4,11 225:16 226:15 241:13,16,19 242:10,14,19 243:11,21

**Adriana's** 218:7 224:19 225:5

**adversarial** 145:1

**advertise** 45:12

**affect** 27:8

**affected** 257:10

**agencies** 18:8 19:3

**aggregating** 139:6

**agree** 30:4 56:16 121:10,16 222:21 257:3

**agreed** 27:18

**agreeing** 228:10

**agrees** 38:6

**ahead** 9:19 39:1 109:14,16 147:5 150:20 174:11 202:13 221:20 227:18 253:13

**aid** 135:5,7

**aids** 118:19

**akin** 28:3

**allegation** 46:18 47:2,18 63:17,22

**allegations** 48:9 186:8

**alleged** 182:12 186:3 190:11 193:23 257:19

**allegedly** 159:8 179:22

**alleges** 113:12 213:2 219:18

**alleging** 188:13

**allowed** 23:15 24:8 34:7 118:4

119:12 163:18 225:14 226:1

**ambiguity** 142:3,10

**Amendment** 204:21 205:5 255:4, 22

**America** 85:5

**American** 84:21 167:5 200:21 211:19

**amount** 55:4 82:22 120:12 126:3 171:5 202:4,16 213:19

**analysis** 14:2,17 15:1,9,11 16:5 34:22 36:14 39:18 47:17 49:8 53:18 55:23 56:20 69:7 85:21 90:3 107:1,6,12 122:19,21 133:15 135:11,24 162:18 163:6 164:5,18 165:7 183:12 193:5 227:1,9 257:7

**analytically** 160:10

**analyze** 13:3 15:23 35:10 44:7 46:13,22 74:24 139:13 162:9,11 195:20 224:5 242:5

**analyzed** 48:14 61:4 62:19 64:11 73:16 117:6 125:4 161:15 162:5 163:13 195:10,12,15 196:5

**analyzing** 16:6 37:3 41:9 42:5,23 49:13 51:3 57:22,23 64:6,22 65:1, 11 86:2 122:12 132:11 162:22 163:2

**and/or** 19:21 84:5 153:5,6 163:14 166:12 233:14

**announcements** 45:16

**anonymously** 11:2

**answering** 74:8 127:21 128:18

**answers** 13:22 38:18 115:23 171:1

**anxiety** 197:17

**apartment** 126:3 132:19,21,22 133:1,5,6 178:22

**apologize** 188:17

**apparently** 213:5

**appeals** 154:19 155:1

**appeared** 107:11,13

**appears** 107:17

**appellate** 7:19

**application** 122:10

**applied** 59:4

**applying** 36:13 44:6

**appointed** 69:21

**appropriateness** 11:5

**approximately** 48:12,22 49:3,10, 12 137:22 181:4 206:19 245:21 246:3,11

**April** 105:23 106:2 169:9,11 184:15 187:7 189:24 202:6 206:17, 20,21 207:2 208:13 220:21 234:13 239:22 240:4,19 241:2,9,21 242:7 243:3 244:4,9,10 247:5 254:8 256:24

**arbitrarily** 101:16

**area** 17:13 40:17 169:15 170:1,15 184:14 187:7 189:24 193:22,23 206:6

**areas** 13:23

**argue** 55:13

**arose** 113:19

**arrangements** 182:6

**arrest** 164:24

**arrested** 165:2 205:12

**arresting** 205:21

**arrived** 140:18

**arriving** 110:21,24 190:22 206:18 207:3

**Art** 5:23 24:18 25:5,12 28:6 31:9 35:3 38:21 53:24 56:18 66:8 68:20 70:7 71:6,11,24 73:1,11 74:5,14 75:3,23 79:14 81:16 88:1 89:2 101:2 108:13 109:5,13,15 110:6,17 112:17 114:4 115:14,22 117:19 118:9 119:19 120:1 121:2,10 122:23 124:15 126:23 127:8,20 128:17 129:1,15 130:5 134:16 135:1 142:22 143:17 144:9,13 145:10 146:2,14,21 147:2,6,19 149:24 150:18 151:7 152:15 159:24 168:16 174:6,10 183:9 184:4 185:18 190:6 194:23 195:18 196:9 207:4,21 208:20 209:20 217:5 224:22 225:7,20 226:2,8 227:17 228:7 229:2 232:24 233:16 235:2 241:22 249:10,24 251:11

**Art's** 128:8

**article** 10:24 11:6,12,15,17 13:11 15:4,17,22 16:1,17,19,21,22 17:13 41:4,5,9 47:21 48:7,14 50:2,5,11, 12 51:6,21 52:2,3 53:6,7,12 54:4, 11,15 55:18 56:3 57:17,21 58:11, 15,20,24 59:1,5,11 60:10,13,18,21 61:2,23,24 62:9,15,17 64:6,12 65:2,10,18,19,24 86:6,9 87:10 92:21 94:6 95:7,19,21,24 96:9,10, 21 97:4,6,7,8,9,11,13 98:5,13 99:1, 7 100:10,12 104:18 117:8 133:15, 24 134:6 137:11 139:1,9,17,20 141:11,12 145:13,14 146:4 151:6, 13,17,21 153:23 162:10 201:16,20 210:21 211:12,14

**articles** 7:17,20 8:2 12:24 15:15 17:3 40:7 42:17 47:22 49:6 57:24 59:9,23 87:12 98:9 99:3 134:18,20 153:17 154:8,12,15 162:9 164:15

**articulate** 226:20

**articulated** 33:2

**artificial** 157:9

**Arturo** 5:8,24 87:20 88:19 192:21 212:14 224:9 235:10 239:21 248:20

**ASA** 209:13,15,16 223:7,16 228:18 231:18 235:16 236:3,12,21 237:1, 17 254:8

**ASA's** 231:19

**ascertain** 74:2

**Ashcraft** 204:22

**asks** 28:8

**asleep** 178:21

**aspect** 179:12

**aspiration** 176:24

**assault** 186:7 254:21

**assaulted** 80:15 113:13

**assert** 113:22 203:5

**assertion** 112:5,6

**asserts** 242:11

**assess** 11:10

**assessments** 256:11

**assigned** 12:19

**assist** 19:2 120:15

**assistant** 209:10 239:18

**assistants** 45:9 65:16 66:15,18, 19,23

**Associates** 5:15,19 203:1

**assume** 72:11 74:15 75:13 77:2 82:16,20 93:21 112:24 130:16 150:21 211:2 228:21 237:17

**assumed** 107:14

**assuming** 113:4

**assumption** 130:20

**ATM** 43:7

**attempt** 214:6 217:14 218:1 240:1

**attempted** 25:2

**attendees** 200:16

**attorney** 22:3 32:2 33:10,22 34:9 209:10 231:14 239:19 240:2

**attorneys** 42:10 45:20,24 46:1 66:24 68:8

**August** 8:14,24

**author** 13:13 60:15

**authoring** 118:1

**authorization** 27:18

**authors** 58:5,9 167:12

**automatic** 110:18

**automatically** 110:9

**average** 101:13

**avoid** 55:9 209:5

**aware** 45:18 46:2 57:7 85:8 106:19 152:12,16,19 181:17

**B**

**babies** 80:10

**baby** 180:4 182:13 207:24 221:15

**back** 7:8 12:12 17:10 25:21 27:1,3 32:12 40:11 50:1 52:21 54:10 55:3, 9 67:2 76:19,23 78:20 82:16 84:17 96:3,7 100:14,16 102:18 105:12,23 106:2 116:9 121:9,17,21 131:5,14 141:7 151:5 153:8,22,24 167:6,11 176:21 177:7 178:21 186:17 221:6

**background** 229:13,24

**backgrounds** 230:3

**bad** 84:7 155:16 214:17

**Barber** 6:3

RICHARD A. LEO, PHD, JD, 09/28/2022

**bargain** 51:15

**bargains** 64:19

**barrier** 233:9,22

**barriers** 230:17 233:12

**base** 106:11

**based** 15:16 35:11 40:14 41:22 51:11 53:18 72:3,5,6 73:22 83:6,9 86:4 89:24 107:5 108:6 110:3,7,11 112:10 118:19 125:11 130:20 132:3,10,15 133:20 136:4 145:5 148:12 162:17 163:5 170:13 175:21 210:1,10 211:18 212:10 213:8 214:2 221:4 223:20 224:16, 17 228:2 231:11 232:4 235:24

**basement** 181:23 182:1

**bases** 149:4 226:22

**basic** 44:6 51:24 154:13

**basically** 21:11 66:24

**basis** 31:7 84:22 86:17 116:14 124:12 161:1 174:1 179:3 182:17, 22,24 199:23,24 201:11 206:24 212:16 221:12 249:19,22 250:13 253:9

**Bates** 81:3 248:10

**bathroom** 176:9 254:16

**Beach** 19:17,19

**beat** 214:7

**beaten** 157:7 208:24 213:3 228:10

**bed** 115:5

**Bedau** 58:12

**bedroom** 116:8 178:22

**begin** 33:6 49:7 81:3 83:15

**beginning** 5:1 63:15 69:22 80:19 82:3 83:20 143:9 158:6 167:11,12 194:22 212:1

**begins** 96:13 174:23 177:12 184:11 206:15 235:10

**behalf** 5:7 6:4,10 29:12

**behavioral** 210:14

**belief** 55:7 86:17 183:15

**believed** 53:18 58:14 143:8 188:22

**Ben** 6:1

**bench** 22:20 26:19

**benefit** 154:22 155:3

**bias** 210:12,15,16

**Bible** 84:20,23

**big** 158:14

**billing** 67:15,16

**binary** 101:4

**binder** 77:20

**biology** 123:24

**bit** 59:18,21 136:16 150:7 216:16

**blackboard** 246:12,14

**bleeding** 129:10,13

**block** 115:4

**blog** 63:1

**blood** 115:3,4 116:7,8,13 117:1 124:23 127:9,12 129:7,9,19,20 130:13,18 177:14 178:7,11,14 218:1

**blood-stained** 115:5

**bloody** 115:4 116:20 126:13 178:23

**board** 17:7 52:9,10

**bodily** 129:24

**body** 84:1 87:16 92:19 93:10 248:1

**bono** 27:19

**book** 8:2 10:24 11:6,13,15 13:11 154:11 167:4 210:24 211:1,3,7,18

**books** 12:23 85:5 106:16 154:15

**bottom** 10:17 18:4 19:17 83:13 115:12 164:6 165:22 167:19 177:11,12 178:5,17 202:11 216:15 223:23 229:10 247:11 248:18 255:24

**Bowen** 5:15,19

**boy** 219:18 220:19

**boys** 22:5,8 34:6

**brazen** 214:21

**break** 75:20,22,24 76:1,3,4,8,10 94:23 123:1 128:5,7,9,12 131:4,17 176:11,14

**breaking** 128:2

**breaks** 199:17,19 201:6,10

**breathtaking** 214:21

**breathtakingly** 211:23 212:6 214:5,20

**bright** 205:24

**bring** 121:16,21 205:11 207:24

**bringing** 186:17 205:20

**brings** 246:5

**broader** 63:8

**brother** 182:3 215:23

**brother-in-law** 181:24

**brought** 232:21 234:24 241:13

**Broward** 19:19

**brutal** 116:20 178:23 180:6

**brutalized** 228:10

**budget** 102:16

**bulk** 153:23

**bullet** 88:18 94:4

**bullpen** 95:10

**busier** 66:10

**busy** 69:1

**butcher's** 115:4

---

**C**

---

**calculation** 169:7 170:3

**California** 22:1,16 34:4

**call** 48:18 61:15 101:16 104:12 158:19,23 176:18 237:4 249:21

**called** 10:18 14:13 18:5 34:9 36:18 60:7 72:12 95:19 165:23 192:20 201:23 205:10 210:21 256:1

**calling** 190:9 238:10

**calls** 117:20 164:9

**capacity** 69:3,5

**capital** 58:13,16

**car** 127:11 134:4 136:7 140:13

**care** 166:16

**career** 74:22

**careers** 66:11

**carefully** 164:23

RICHARD A. LEO, PHD, JD, 09/28/2022

**Carlos** 182:4 217:21 218:8 219:8, 12

**Carolina** 86:11

**Caroline** 6:8

**Carrano** 60:8

**case** 5:9 16:18,20 21:1,2,3,8,12, 13,24 22:2,7,14,16,20,22 23:21 24:8 25:6 27:23,24 28:4,5,10 33:8, 23 34:3,10,18 35:15,20 36:2,3,10, 22 39:11 42:11,12,16 45:13 46:22 49:5 50:22 55:20 56:21,23 57:1 58:7 63:12,18,20 64:16 67:13 68:1, 7 69:13,24 71:16 73:7,15 77:2 83:4 106:24 112:19 120:8,20 121:12 122:13,16,21 136:20 143:20 150:17 155:4 158:24 173:8 180:20 183:24 185:1 186:12 196:13 197:6 198:11 204:9,10,14,15,17,22 205:10,14,17 210:17 212:19 213:10 214:3,16 225:15 226:18 227:11 236:11 252:10,13 253:19 256:11

**case-specific** 33:12,13 34:8,22

**cases** 16:21 18:16 19:10,11,12,13, 21 20:1,2,3,5,7,14,16 21:23 22:2, 10 23:24 25:20,21 26:2 27:11,12, 17,22 28:23 29:9,11,15 31:11,19 32:15 33:9,11,14,16,18,21 34:16 35:6,22 36:23 37:1,7,22 38:4,6 41:6,8,9,12,13,15,23 42:4,7,18 43:2,5,13,15,16,18,21 44:1 45:7, 19,22 46:2,7,9,12,15 47:11,17,23 48:11,14,16,21,22 49:4,7,10,12,13, 17,19 50:1,3,6,7,9,11,12,14,16,19 51:13,14,15,20 52:18 53:3,16 54:5, 6,7,12 55:4,8,10,17,24 56:2,8 58:1, 13,16,18,21,22 59:1,2,3 60:17 61:3,4 62:13,15,19 63:24 64:5 65:4,8,10 66:15,17,22 68:7,13 69:3,19,21 70:18 72:6,9 75:7 81:1, 15 82:2,6,8,9,16,23 89:20 90:5 96:13 105:5,9 117:6,7,9,10,11 120:14 122:12,14,21,22 125:8,12, 24 130:21 132:11 133:14,16 134:2 135:12,16,17 136:2 137:19 138:1 139:3,7,12,13,20,22,23 157:4 162:7,8,11,24 163:1,4,5,23 164:2 166:5 179:17,21 183:1 186:4,9 193:10,23,24 194:1,8,16 195:2,5,8, 9,12,15,19,20 196:3,6,10,14 201:12 214:17,18 230:7,11,12,14 236:10,19 237:9,10 253:21 255:23

**Cassell** 54:3,12 56:1,22 57:5,10

**cast** 46:11

**casting** 46:14

**categories** 18:12 54:9 60:20

**categorize** 156:11

**categorized** 142:15

**category** 19:7,9 42:1 64:18 135:15 186:6 196:16

**caveat** 121:6

**center** 63:7

**central** 164:19 173:5 258:8

**century** 58:16

**certainty** 41:21 53:20

**certificate** 61:17,20 82:14

**certified** 5:13

**cetera** 14:9 64:20 83:18,19 87:21

**chair** 254:23

**challenge** 56:11

**challenged** 56:2,22 57:8

**chance** 159:10

**change** 68:22

**chapter** 11:15

**chapters** 8:2

**characteristics** 161:16 162:6

**characterization** 226:9

**charge** 69:5

**charged** 22:6,19 23:3 46:16 68:12, 14 165:20

**charges** 44:3 156:19

**charging** 69:1 205:21

**check** 7:11 52:20 248:8

**checked** 247:4

**Chicago** 5:16 6:4 71:9,14,22 72:7, 15,23,24 74:1,12,23 75:5,18,21 85:12 159:5 166:5,10 168:13,19 185:22 214:17 236:10,19 237:10 247:15

**child** 107:14 111:1 182:19 217:19 221:6,7 240:11

**children** 78:16 79:5,10,13 156:14 181:2 212:3 225:19 234:8,11,12, 15,20 243:23

**choice** 91:7 153:5 156:8

**chose** 60:16

**circumstance** 19:24 30:1 36:6 38:17 56:15 134:2 135:19 141:9 160:5 161:2,3 162:16 200:6

**circumstances** 20:13 34:21,23 38:14 88:12 113:19,20 123:7 133:20 207:17 235:22

**citation** 161:20 211:11

**citations** 52:4,19 53:2 211:9

**cite** 137:10 151:2,16 184:1 210:21 211:7 233:23 238:24 251:8

**cited** 87:11 162:23 211:14,20 239:3

**citing** 87:22

**city** 6:4 37:19 72:7

**civil** 21:14 28:5 72:7 75:7 82:8

**claim** 159:7 238:21

**claims** 110:4

**clarified** 178:16

**Clark** 5:16

**class** 9:17

**classes** 9:14 19:23

**classified** 58:18 141:22

**Clayborn** 70:11,17 73:18

**clear** 13:1 32:21,22 64:1 101:11 135:2 136:17 146:16 164:22 182:8 185:4 249:5,8

**clinics** 63:4

**cloak** 118:7

**clock** 170:22

**close** 167:12 212:18

**closed** 170:18

**closer** 29:10 186:1

**closing** 140:22 250:20

**clothes** 126:19 178:15

**clothing** 115:5 126:7,10 131:24 134:4 136:6 220:23

**coauthors** 139:2

**code** 90:2

**coded** 51:8,13,18,21,22 52:1 66:22

Index: coding-confidentiality

RICHARD A. LEO, PHD, JD, 09/28/2022

**coding** 51:2,5 52:1,4,24 65:7,10, 15,16,17,20,22 66:14,17 67:2,6

**coerce** 155:20 186:13

**coerced** 74:4 80:15 159:1 188:20 203:6

**coercing** 186:14 193:11 194:9,17 196:4

**coercion** 84:5 87:17 154:2,5 158:19 196:20 209:5 229:12 242:12,13

**coercive** 91:14,16 111:5 153:1 155:24 156:3,6 232:5

**cohere** 178:24 179:9,14

**coin** 167:1,3

**coined** 40:5,15 41:1 104:18 150:11 193:16

**collect** 164:23

**collected** 65:3 109:10 130:12,17

**collecting** 16:10 48:15

**collection** 130:24 162:24

**combination** 153:3

**comfortable** 78:21

**commented** 180:9

**comments** 11:23

**commission** 82:13

**commit** 182:13,19 189:1

**committed** 57:4 80:12 116:14 124:20 140:6 141:4,15 142:1,20 144:7,16 145:8,20 148:12,14,17 165:9 173:10,19 174:3 179:22 189:9 191:15

**committing** 111:19,20 228:1

**common** 43:24 152:8

**commonalities** 42:24 44:8

**commonly** 46:3

**communication** 239:13

**community** 54:24 55:1 56:11 98:4

**compare** 7:23 31:16

**compared** 248:22

**comparing** 256:1

**compensated** 68:1

**competence** 11:10

**competent** 14:1

**complete** 11:20 38:24 73:21 74:1, 23

**completely** 57:5 144:7,11,18

**compliance** 257:3

**comply** 153:5 156:8 208:13

**composed** 248:20 249:3,14

**compound** 233:16

**comprehend** 230:18,21 233:10

**computer** 25:23

**conceivable** 132:9

**conceive** 117:11

**concept** 40:8 151:18,22,23

**concepts** 144:8,12,18 211:3,6

**concerns** 15:6 21:5

**conclude** 133:12 148:8,9 162:14 182:11,17 183:19 197:24 254:24

**concluded** 95:6 111:22 136:2 145:3 193:2 196:7

**concluding** 112:8

**conclusion** 31:6 35:1 106:10,11 107:22 110:1 112:14 124:13 140:4, 7 142:14 174:2 179:3 182:23 201:9,11 203:17 214:15 222:18 223:2 224:16,19 225:5 227:14 231:9 233:11 250:14 251:2,10,19 252:14 253:4,18 254:2 255:14,16, 19 256:20

**conclusions** 83:4 152:19,22

**conclusively** 173:3

**condensing** 120:11

**conditions** 61:16

**conduct** 61:13 217:13

**conducted** 162:5 175:24 247:14 251:21 256:18

**conducting** 198:24

**confer** 121:3

**conference** 200:14 246:5

**conferences** 200:20

**confess** 153:5 156:13,16 202:2 208:13

**confessed** 22:9 34:7 37:24 197:7, 9

**confessing** 208:18 213:6

**confession** 23:16,23 24:1,3,16 25:3,11 33:4,5 34:24 35:2,9,19 36:1,7,10,19,20,21 37:2,4,9,17 38:2,7,8,10,11,15 39:8,12,21 41:1, 7,14,20 42:1 44:1 45:14 46:18,21 47:2,5,18,23 51:9,10,11,20 53:14, 17 54:8 55:8,17,21,24 56:8,14,17, 24 57:8 58:7,21 59:2,3 63:13 65:6 74:4 75:2 84:6 87:14,18 88:12 90:8,9,11,13,14 91:4,5,6,9,10,15, 17 101:1 102:22,24 103:1,3 105:9 112:1,3,10,13,14,20 113:4 114:14, 18,19 117:7,10 120:17 122:14,20, 21,22 125:8,12 139:7,23 140:8,21 141:2,3,16,21,24 142:5,7,15,16,21 143:1,3,7,12,20,24 144:5,17 145:5 146:1 147:10 148:15,17,20 149:3, 8,13,20 150:16 151:4 156:22 158:21 159:2,4,6 162:7,8,11 163:1, 12,15 165:10,12,15,19 166:8,14, 20,22 167:15 169:10 171:19 172:11,12 177:13 178:6,19 179:13, 17,19,21 192:21 193:3,4,6 195:5, 17 196:8,16 199:19 203:6 205:6 222:11,17,18,24 223:1,14 224:9,17 225:3,4,11 226:13 227:5 228:18 237:9,22 257:4,8,9,11,14

**confession'** 150:12

**confessions** 9:16 22:4,18 23:3,4, 8,12,13 25:18 35:14 40:11 41:10 47:1,11,12 48:1,5,10 51:7 53:9,10, 19 54:2,19 56:3 57:15 58:1,6,19, 22,24 60:11,14,20,23 62:24 63:16 65:3 84:8 86:23,24 88:20,24 89:6, 11,18 91:18,19,23,24 92:4,7,11,23 95:20 101:11,12,17 102:7,8,11,14 103:14 114:13 122:12,13 125:5 133:13 135:14 136:12 137:14 138:3,5,21 139:3,4,14 140:11 152:5,8,14 153:22 158:10,14 161:14,17 162:1,2,11,13,15 182:18 183:1,16,20 186:11,14 193:12,15, 19 194:9,18 195:13 196:4,7,22 233:15 257:18,19

**confessor** 141:14 142:1,19 144:6, 16 145:7,20 148:11 173:10 230:9

**confessor's** 135:18 136:4

**confessors** 229:23 230:5,6,7

**confidence** 79:23

**confident** 78:18 83:8

**confidentiality** 61:17,20

RICHARD A. LEO, PHD, JD, 09/28/2022

**confirm** 150:5,23,24 233:21

**confirmation** 210:15

**confront** 104:16 188:8

**confronted** 104:8,14 112:6

**confused** 171:2

**confusion** 231:1

**Congress** 61:18

**conjectures** 212:18

**conjunction** 13:2

**connected** 48:21 62:22 63:5

**connecting** 41:19

**connection** 47:5 77:1 117:24

**consensus** 76:11 85:1

**consequences** 51:7 162:12

**conservative** 56:7

**considered** 84:20,23

**consistent** 85:2 88:11,14,16

**consolidated** 5:10

**constitutes** 106:20 151:4 203:20

**constituting** 135:13

**constraints** 184:8

**consulate** 231:6 232:8,10,13,22

**consult** 29:12

**consultation** 22:12 27:16 35:8,18

**consultations** 18:5,24

**consulted** 18:15 25:20 26:3 27:12 37:2 75:7

**consulting** 45:22

**contact** 17:14 29:13 231:6 232:8, 9,13,22 239:8

**contacting** 66:24

**contained** 74:12 165:9,15

**contamination** 158:12,23 160:3, 8,12

**contemporary** 14:18 85:23

**content** 146:17

**context** 32:5 157:10 169:1 185:22, 23 189:20

**continue** 55:13 116:2 121:3

**continued** 258:6

**continues** 113:22

**continuous** 204:20,22 217:3

**continuum** 155:18

**contradict** 132:5 214:12

**contradicted** 214:14

**contradiction** 142:11

**contrasted** 116:24

**contribute** 197:17 199:19 201:10

**contributes** 208:11

**contribution** 11:12 56:5

**contributor** 124:18 175:17

**control** 13:17 14:7

**conversation** 34:14

**convey** 7:1

**convicted** 43:20 52:16 64:19 80:9 165:3

**conviction** 51:16 63:7 82:10 164:22,24

**convictions** 54:20 60:8

**convinced** 143:21

**convincingly** 173:3

**Cook** 187:15,16

**copy** 6:23 7:2,7

**correct** 10:8,15,19 26:1,9 30:8,9 40:17 41:7 46:20 49:8,9 50:20 57:2 60:24 62:11 64:13,23 69:18 70:1,2 77:5,6,9,10 79:13,17 80:21,23,24 81:5,10,11 83:5 90:19 91:20 92:1, 8,12,13 93:21 99:4,6,8,9,20 100:9 102:5 103:8,11,12,14,15,17,21 104:1,5,11 105:2,7,11 108:1 112:16 123:15 125:21,23 127:24 129:12 132:1,2 136:13,18,19 137:12,15,16,18 138:11,18,21 139:11,19 141:17 142:21 166:2 171:10 173:12,13 180:23 182:21 183:8 186:12 189:11 190:21,23 191:7 192:6 201:8 203:10 204:5 205:13,18 206:12 209:11 216:6,7, 23 217:6 219:2 220:8 224:4,5 225:1,6 227:16,21 228:2 229:1 231:13,17 232:22,23 233:3,5,6 234:1 235:1,23 236:1,3,8 240:5,19, 22 241:17 243:4,8 244:1,6,11,22 245:12,13,18 246:1,8,14,15,21

247:2,6,7,10 248:9,16 250:2,4 252:19 253:1 255:6 256:6,13

**corrected** 236:15 237:21

**correcting** 167:16,17

**corrections** 166:9 236:8 254:11

**correctly** 49:4 139:18 180:8 183:4 204:18 216:13 237:19 242:17 245:1 257:12

**correlates** 161:13

**correspond** 28:14

**corroborate** 217:14 250:6

**corroborated** 165:16 214:24

**corroborating** 163:15

**counsel** 5:20 6:22 8:8 32:22 60:3 70:22,23 77:5,8 81:10,19,22 231:5, 11,17

**counsels'** 81:14 82:1

**count** 26:11,12 95:1,12,14 133:19

**counted** 99:22

**counterintuitive** 152:9

**counting** 27:10 30:6 99:20 100:7 169:14,24 202:16

**countries** 200:18

**country** 18:18

**counts** 96:24

**county** 19:19 21:2 63:21 187:15, 16

**couple** 14:24 63:4 68:13 123:2 128:11 173:15 206:18 207:2,8,20

**courses** 106:16

**court** 5:11,18 6:12 7:19 8:17 25:4 26:15 42:16 49:13,20 67:10 163:19 166:14 167:15 204:12,17 205:10, 12,20 219:15 233:2,5

**courts** 205:23

**covered** 13:24 130:12

**coverings** 115:5

**cowrote** 201:16

**CPD** 198:8,10

**created** 87:9 113:9 235:15

**creating** 166:21 223:9,12

**creation** 189:14 190:3 223:21

Index: credibility-department

RICHARD A. LEO, PHD, JD, 09/28/2022

**credibility** 250:7 256:11

**credible** 108:5

**credit** 245:19

**crediting** 114:8 232:1

**credits** 107:22 235:20

**crime** 37:13,17,20 39:15 43:6,11, 12,14 44:14,16,24 45:3,4 46:17 51:23 57:3 78:14 80:12 107:15 108:17 113:23 114:21,24 115:2 116:16,19,23 117:1,4,12,13,14 122:17 124:17,21 125:15,20 126:8, 12,14 127:7 129:8,9,14,17,22 130:9,12,23,24 131:20,22 132:18 133:9,21 135:20 136:4,5 140:6,23 141:4,15 142:2,20 144:7,16 145:8, 21 147:23 148:1,5,12,14,17 156:15 163:14 164:22 165:9,20 173:2,10, 19,20,21 174:3,4,5 175:4 178:13 179:22 180:6 183:2,13 188:24 189:1 190:2 218:1 220:18,22 221:3 223:19 234:5 250:10,16,20 251:5 252:1,8

**crimes** 116:15 212:16 245:17

**criminal** 28:4 29:11 33:14,17 43:18 49:14,21 71:15 72:7,9 75:7 164:19 232:20

**criminologists** 161:23

**Criminology** 200:22

**criteria** 36:8,17 37:3,8 38:11 39:7, 12 40:6,9,22,23 41:3 44:12 47:4 51:11,19 53:17 56:15 57:16 58:5,8, 10,13,17 59:3 63:23 64:1,3,13,15 65:5 86:23 112:2,13,19 113:3 114:14,18 133:11 135:14,17 136:12,17,21,23,24 137:3 139:14 140:1 141:9,10,18,20 142:13,17 143:12 144:3 145:4,18 147:10 148:10,22 150:10 171:21 172:9,12, 14 173:7 193:3 195:5,10,17 196:8, 15 222:11,17,24 224:18 225:3,10 257:9,13

**criticizing** 54:5

**critique** 57:11

**cross-check** 80:5

**crossed** 31:1

**current** 8:22,24 9:10 10:10 60:2 65:24 100:23 152:14 201:22 203:2

**curriculum** 7:10

**custodial** 95:8,9,13 97:20 98:1 206:1 216:22,24 239:20

**custodially** 213:18

**custody** 93:19 94:8,9,10 96:24 97:3,18 169:3 192:17 202:5,17,19 203:9,18 204:5,7,12 206:6 216:20 217:3,6,10 238:21 240:7 245:22

**cut** 34:11 129:10

**CV** 7:15 8:7,15,21 9:6 18:22 20:2,6, 10,12 59:10 60:2,4 200:9 201:22

**CVS** 7:23

---

**D**

**Daniel** 239:17

**data** 11:5 14:2 15:2,9,11,16,17 16:2,5,6,7,10,17 41:22 42:6,15,23 44:1,7 45:6 46:13 47:1,22 49:5,19, 20 51:1 53:1,2 55:2 57:22,23 61:19 64:4,11,22,24 65:11 66:24 85:19 86:2,4 98:22,23 99:2,5 102:13 152:21 197:23 198:21

**database** 45:9 89:20 90:4

**databases** 42:13

**dataset** 16:11,16 56:9

**datasets** 16:24

**date** 10:10 58:2 77:22 108:17,19 137:14 169:7,8

**dated** 67:9 77:16

**dates** 67:15

**day** 128:3 143:9 188:16 206:17 207:1,10 241:11 244:4 248:7

**day-and-a-half** 205:3

**Daylight** 258:8

**days** 66:10 178:13 189:7 206:5

**death** 156:12

**decade** 43:17 201:15

**decades** 82:16 84:17 85:11 86:20 167:6

**deception** 84:5

**decide** 21:12

**decision** 13:10 29:20 157:15 158:2,8 159:17 202:2 208:5 225:21

**Decline** 202:1

**declined** 255:9,10

**defendant** 5:7 6:4,11 22:7

**defendants** 6:9 80:10,16 121:11

**defender** 18:17 69:21

**defense** 21:4 22:7 29:13 32:2 33:22 34:17 46:1 70:22

**defensive** 116:9

**define** 92:14 105:18 149:12

**defined** 97:18 98:3 149:16 151:23 154:3

**defines** 151:17,21 154:2,8

**defining** 97:14 100:20

**definition** 100:23 149:21,22 150:15 151:21 152:24 153:12,14 163:3

**definitions** 150:4

**definitively** 112:4

**Deleon-reyes** 5:8 175:1 179:13 181:7 182:9 184:16,19 186:18 188:1 191:13 192:9 196:20 202:4 206:4,16 208:12 212:14 217:24 218:2 222:10 223:8 228:15 229:10, 16 235:10,14,17 239:21

**Deleon-reyes'** 87:20 88:19 172:12 184:18 192:21 217:15 224:9 228:16 248:20,23

**delete** 234:17,18

**deliberate** 93:21

**deliberately** 237:2

**demand** 166:8

**demands** 153:6 156:8

**demonstrate** 252:13

**demonstrated** 210:14 211:23

**denial** 161:6

**denied** 233:5 254:20

**denies** 246:24 247:8

**deny** 25:4

**denying** 154:21 155:22

**dep** 174:8

**department** 19:17,20 21:14,15 22:1,16 34:4 71:10,22 72:16,23,24 74:1,13,23 75:6 85:12 103:17 168:13,19 185:23 198:18 247:16

RICHARD A. LEO, PHD, JD, 09/28/2022

**departments** 93:14 103:18

**depend** 14:14 74:6

**depending** 121:7,20 199:14

**depends** 17:24 20:24 112:22 148:21

**depleted** 201:17

**depletion** 208:10

**deposed** 144:24

**deposited** 94:11,20 95:10 129:22

**deposition** 5:5,6 77:12,17,24 78:13 79:1 88:4,11 118:2,15 119:1 120:16 121:5,12 143:6 180:21 187:4 192:5,14 255:3 258:4

**depositions** 8:16,20 26:11,23 27:1 79:19

**deprivation** 105:15,17,19 197:12

**depth** 195:11

**derived** 163:15

**describe** 15:19 88:6 91:3 111:15 137:13 157:5 197:8 214:18 248:14 249:22 251:15 255:18

**describes** 110:8 111:6 157:14 189:18 196:21 227:2 229:12 230:19 243:19

**describing** 34:23 93:11 97:1 116:12 145:24 157:6 158:4 159:22 189:17,20 199:15 200:1

**description** 87:20,23 88:19,23 110:8,12 191:22 208:23 223:17 235:24

**descriptions** 213:9

**descriptive** 51:24

**desire** 228:17

**desired** 168:11

**detail** 94:3 150:10 240:2,8 245:1 247:23 256:5,16

**detailed** 161:7 256:22

**detailing** 244:24

**details** 159:8,12 160:15,20,21 229:24 230:2

**detained** 202:5 213:18

**detective** 80:14 107:13,18 108:9 109:11 110:15 111:2 160:22 164:20,21 184:15,23 185:24 186:3,

12,16 187:22,24 188:5,7,9,19 190:13 191:13,19,24 193:11 194:8, 17 196:3 209:4,15 210:2,4 211:23 212:13 213:3,22 215:5,6,7,8 222:13,19 223:5,6,7 228:15 236:2 237:1 239:16,17,18 240:17 241:1 242:6 243:1,5,10,19 244:2,20,21 245:6,9,12,14,19 246:3,6,9,23 247:3 249:15,16 250:7 254:20 255:4,21

**detectives** 113:8 189:8,15 190:3 199:1,2,3 200:3,5,7,17 209:4 215:1 217:12,16,20 218:15 219:6 247:13 250:9,15 251:3,24 252:6,22 253:5, 11

**detectives'** 253:21,22

**detention** 206:1

**determinable** 108:21

**determination** 36:13

**determinations** 36:12

**determine** 30:2 31:23 60:12 89:23,24 139:13 195:16

**determined** 96:15 97:17 133:12 137:3

**determining** 156:23

**detracts** 56:4

**develop** 226:21

**Dickinson** 215:6,8 223:6 246:6 247:13

**Dickinson's** 239:18

**difference** 62:21 72:22 73:4 75:11

**differences** 44:8 88:15

**difficult** 37:8

**difficulties** 12:2

**difficulty** 231:1

**diluting** 144:3

**direct** 166:8 196:21 197:3

**directed** 27:21 166:23,24

**disagreement** 121:17 151:10

**discipline** 13:20 14:5 17:8

**disclose** 158:24

**disclosed** 25:13

**disclosure** 8:17,18 9:21 10:3 18:4 117:21 118:16 119:5 121:15

**disclosures** 7:8

**discoverable** 119:11 121:3

**discovered** 130:23 237:15

**discuss** 60:13 92:3 99:8 111:16 154:12 157:19 211:17

**discussed** 13:22,23 70:18 94:6 115:11 136:22 137:6 154:10,11,14 222:12 235:12 238:7

**discusses** 152:3 204:16 211:3

**discussing** 47:3 183:24 238:17

**discussion** 58:23 84:10 158:11 193:2 223:24

**disjointed** 252:11

**dismissed** 21:9

**disposed** 126:6

**dispositively** 114:12,17 135:18 136:3

**disproportionate** 117:9

**dispute** 24:1 149:10 196:19 240:21

**disputed** 141:21 231:22,23 256:8

**disputes** 55:19 85:6

**disregard** 211:24 214:5,19

**dissertation** 98:21,23,24 99:2 198:3,17,20 200:4,7,8

**distinction** 36:16 203:15

**distinguish** 35:24

**distracted** 243:13

**district** 5:11,12 206:19 207:3,19

**diverge** 256:4

**dividing** 93:7

**Division** 5:12 21:14 72:16,24

**divisions** 73:3

**DNA** 37:21,23 43:15,16 46:9 80:12 112:3 114:11,16,22,23 116:13,15, 17,18,21 117:3,4,13,14 120:17 122:3,6,7,9,11,17,18,20 123:5,8, 12,24 124:7,14,16,21,22 125:6,7,9, 12,15,19 126:2,10,14 127:5 129:6, 7,9,11,19,20,24 130:3,6,11 131:18, 21,23 132:21 133:14,17,19,22 134:3 135:15,19 136:2,5 137:1 173:2,20 174:4,24 175:1,14,18 217:20,24 218:10 219:7,10,14,15

RICHARD A. LEO, PHD, JD, 09/28/2022

220:22,23 221:8,9,13,17,22

**doctoral** 198:3

**document** 20:8 70:3,9,12 75:9 78:8,20,21 79:6,22 80:1,5 128:16, 21,22 134:13,15 135:5,7,8,23 145:15 146:10,12 150:23 152:23 168:18 180:15,19 207:6 209:19,23

**documentation** 170:10

**documented** 186:8 247:15

**documenting** 43:10

**documents** 14:17 42:11,12 70:4,5 73:8 81:22 85:22 88:3 120:8 135:3, 4 149:18 150:5 180:16 206:13 214:11,13

**dog** 128:4 176:8

**dollar** 61:13

**door** 170:18 178:20

**dots** 41:19

**double** 111:18 116:20 130:22 180:6 182:19 188:1 189:9 191:15, 20 212:19 214:8 217:19 224:12,20 225:17 226:16 243:11,12,22,23

**double-check** 233:21

**doubt** 123:21 141:22

**dozen** 31:13 37:6 38:4

**dozens** 214:16

**drafting** 118:14 184:7

**drafts** 184:8

**dramatically** 256:4

**draw** 142:14 224:18 225:5 254:2 255:14,19 256:20

**drawing** 246:12 251:19 252:14 253:3 255:16

**drawn** 31:5 152:20

**drew** 140:4,7

**dried** 116:7

**drink** 254:15

**Drizin** 55:17 57:17 58:3 61:5 62:2, 14,18,21 63:4 64:7 65:20 66:1,14 86:9 87:11 92:22 104:5 135:12 136:1 138:17 164:14

**dropped** 44:3

**drove** 140:14

**duly** 6:16

**duplicative** 15:1

---

**E**

**earlier** 34:6 41:6 43:17 48:19 60:1 64:17 66:6 85:19 95:6 136:16 138:15 139:10 140:23 147:21 148:1,7 173:11 174:7 179:24 203:2 207:12 215:13 224:6 230:14 238:20 239:2 250:18,21 253:24

**early** 43:21 169:9,10

**easier** 7:6 8:6

**easily** 42:11 53:5 108:21 168:10

**Eastern** 5:12

**eat** 254:15

**editions** 203:2,4

**editor** 10:23 13:9

**editorial** 52:9,10

**editors** 17:20,23 86:13,18

**educate** 22:4,17 23:7,11

**educated** 159:12

**educational** 33:11

**Edwin** 239:18

**effect** 39:10 160:7

**effectuate** 237:3

**effort** 155:19

**efforts** 154:19

**Ego-depletion** 202:1

**egregious** 235:12 236:23

**eight-hour** 95:11

**eighth** 207:19

**Eileen** 6:3 8:13 12:1 24:18 25:13 122:23

**elaborate** 182:12

**elaboration** 144:20

**electric** 254:23

**electronically** 42:14 168:10,14

**elements** 165:19

**elicit** 199:18

**elicited** 157:20 159:18

**eliciting** 210:17 227:4

**Elson** 6:1 8:13 9:1 23:17 39:16 47:6 68:12 82:4 89:7 98:15 108:3 114:10 123:9 124:8 125:22

**email** 6:21 8:14,19

**emailed** 60:2

**emerged** 43:17 132:9

**empirical** 84:2 85:3,16,18 86:1 153:20 196:23 208:8 251:1,9,13 252:2,9,12 257:1

**employment** 9:10

**encountered** 143:19

**end** 16:21 64:5 154:24 155:4,17 210:6,17 228:17

**ended** 41:8 48:21 49:3

**ends** 80:20

**enforcement** 18:7 19:6,7,8 20:19 256:2,19

**English** 208:22 209:24 223:15,16 235:17 236:5

**enormity** 183:13

**enormous** 55:4

**ensuing** 110:10

**ensure** 14:7 165:16

**ensuring** 165:1

**entered** 184:16

**entering** 243:14

**entire** 73:8,15 82:18 95:3 132:20, 22 133:1,4,6 223:20

**entirety** 75:5

**entitled** 120:22 239:16

**enumerated** 10:3

**environment** 153:3

**envision** 143:11,14

**era** 42:8

**Erica** 6:6

**Erroneous** 60:7

**error** 158:16,19,23 160:3 165:23 167:1 222:13,20 223:3 235:13 236:11,16 237:4

**errors** 158:15 166:6,12,17,18 167:13,16,17 235:15 236:6 237:3,

RICHARD A. LEO, PHD, JD, 09/28/2022

16,21,23,24 238:4,6,7,8,9,10,13,15

**essentially** 13:17 37:10 41:11 111:16 130:7

**establish** 101:19 193:3 225:4

**established** 135:18 136:3 141:13 142:18 145:6

**establishes** 173:8

**establishing** 145:19

**estimate** 29:9 31:15,18 38:4 64:9, 10

**et al** 5:9

**evaluate** 25:18 106:13,17 163:10

**evaluating** 162:15

**evaluation** 11:17

**event** 8:11 182:7 216:5 249:22

**events** 107:23 237:5 243:1 244:3 245:20 256:15

**Eventually** 186:16

**evidence** 25:2 37:21 41:14 43:18 55:15 60:17 63:23 80:13 84:11 104:8,13,15,17,19 105:6 109:9 111:9,13,24 112:3,7,11,15,21 113:2,9 114:11,16,20 116:19,22 120:16 122:6,7,10,11,20,21 123:5, 8,13 124:17 126:15 129:12,16,19, 20 130:4,15,18,24 131:18 132:8, 14,21 133:2 135:16,18,20 136:3 137:1,7 139:21 142:8 143:21 162:18 163:6,15 164:23 173:2,8 174:24 175:3 212:17 221:4 223:8, 12 224:1,3 227:2,3,10,13,23 244:15 251:1 252:3 253:19

**evolved** 253:22

**exact** 64:8 89:8,9 133:18 156:24 164:16 176:6 180:18 182:6 205:8 215:12,19 233:20 241:7

**exam** 218:3 222:1

**EXAMINATION** 6:17

**examples** 44:13,18,19 155:17 156:10

**exception** 30:22 31:3,6 73:17

**exceptional** 36:6

**exchange** 182:14

**exclude** 32:14

**excluded** 31:11 32:10 70:3 175:1

**excludes** 112:4 116:22

**excluding** 28:21

**exclusion** 120:17 133:19 175:18

**exclusions** 32:9 133:14,17

**exclusive** 172:10

**exculpation** 37:13

**excuse** 17:16 67:8 177:18 230:12 235:8

**execution** 254:23

**exhausted** 201:18 206:16 207:1

**exhaustion** 93:15 197:12 199:20 201:11,15 208:9

**exhibit** 7:5 9:20,22 76:22 83:12 95:15,18 96:5 98:12,15,17 100:15 102:19 105:12 136:10 194:5

**exist** 72:11

**existed** 238:24

**existing** 104:15 202:7,22

**exonerated** 43:20

**exoneration** 125:7

**expect** 44:10 175:15 179:10

**expected** 16:12 129:21 133:21 134:2 135:19 136:5 210:5

**experience** 17:2 32:8 55:10 159:5 161:4 211:5

**experienced** 210:2

**experiencing** 12:2 93:16

**experiments** 14:16 85:20

**expert** 25:18 32:15 38:23 82:18 122:7

**expertise** 122:11,18 132:11

**experts** 17:8,9,12,21 24:12

**explain** 97:10 98:8 101:20 106:8 140:3 159:21 250:13

**explained** 97:5,7,12 98:9

**explains** 98:6 179:21

**explanation** 38:23 56:13 250:24

**explicit** 155:6

**explicitly** 142:17

**express** 201:14 233:12

**expressed** 83:9

**expressing** 249:6

**extensive** 45:8 118:24

**extensively** 52:11

**extent** 9:3 38:22 117:19 118:18 236:6

**extract** 110:10

**extraordinarily** 202:6,21 203:24

**extraordinary** 203:20 213:19

**extremely** 125:13 126:13

**eye** 196:14

**eyes** 14:4

---

**F**

---

**F-I-N-D-L-E-Y** 211:13

**fabricating** 223:9,13

**fabrication** 223:22

**face** 177:14 178:7 184:19 185:16

**facilities** 35:19

**facility** 198:16

**fact** 23:8 36:11 39:13 104:7,23 107:20 110:3 114:1 145:5 148:5 151:2 165:14 181:3 222:16 224:18 226:1 227:11 232:3 236:2 239:5 251:8

**factor** 92:11 93:17 105:13 106:4 111:9

**factors** 42:24 84:6 92:3 100:17 192:21

**facts** 31:24 107:19 108:21 158:24 159:1 163:14 183:24 184:2 191:1 205:15 231:12 256:6

**factual** 36:12 139:21 165:18 189:16 190:8 248:22 252:15 256:5

**factually** 37:16 39:15 91:10 112:5, 9 113:1 140:9 141:17 142:5,21 143:13,23 144:5 146:1 148:8 162:16 224:13,21 225:6,19 226:17 227:14

**faculty** 17:21

**failed** 217:13

**failure** 232:22

**Failures** 202:1

**fair** 10:9 48:6 255:18

**fairly** 53:5

**fall** 41:24

**falls** 112:16

**false** 22:4,17 23:4,9,12,13,16,23 24:3,16 25:3,11 33:4,5 34:6 35:2,4, 9,14 36:1,7,9,18,20,21 37:3,8,9,17 38:2,7,8,10,11,15 39:8,12,21 40:11,24 41:6,10,14,15,16,17,20, 24 44:1 45:14 46:19,21 47:2,5,12, 18,24 48:1,5,10 51:7,9,10,11,19 53:8,10,13,14,17,19 54:1,7,14,19 55:5,8,16,20,21,24 56:3,8,14,17,23 57:7,15 58:1,6,7,18,21,22,23 59:2 60:11,14,19,23 62:24 63:13,16 65:3,5 84:6,8 86:24 87:13,18 89:6, 11 90:2,8,11,13,20 91:5,9,10,14, 19,23 92:4,11,23 95:20 101:1,10, 12,17 102:7,11,14,21,23 103:5 104:8,12,17,19 105:6,10 111:9,13, 24 112:3,5,9,10,11,13,15,20,21 113:2,4,9 114:14,19 117:7,10 120:17 122:13,14,22 125:5,8,12 133:13 135:13 136:12 137:14 138:2,5,20 139:3,4,7,14,23 141:22, 23 142:5,16 143:2,4,7,12,20,23 144:16 145:4 147:10 148:16,18,19 149:3,8,9,12,20 150:11,16 151:4 152:4,8,14 156:22 158:9,10,13,20 161:14,17 162:1 163:1,5,7 165:13 171:20 172:11 179:17,19,20 183:17,20 189:2 192:21 193:4,6, 15,19 195:5,13,17 196:8,15,22 222:11,17,24 223:1 224:1,3,10,13, 17,21 225:4,6,10,19 226:14,17 227:2,3,4,10,13,15,22 228:11,18 233:15 237:9 257:3,9,11,13,20

**falsely** 22:8 34:6 113:10 114:3 188:20,24 197:7,9 208:12,13 213:6 242:21

**falsity** 24:1 75:1

**familiar** 16:20,24

**family** 80:23 156:14 217:17 218:7, 16,18,19,20,22

**fatigue** 93:15 197:12 199:20 201:10,15 208:9

**fatigued** 201:17

**Fatima** 6:6

**favor** 183:15

**fed** 159:11

**federal** 21:16

**feed** 128:4

**feel** 78:21 91:8

**feeling** 156:7

**felony** 93:6 102:4,6 199:1,3

**fiber** 130:17

**field** 14:16 17:8 85:20 97:15,16,22 123:23 124:3,10 153:14,19

**fields** 124:4

**figure** 107:19

**file** 29:18 71:10,12,14,22 72:12,16, 23,24 73:15,22 74:2,3,7,9,13 75:6 81:22 82:8,18 214:14

**filed** 5:10

**files** 72:8,20 73:9 74:24 81:18 82:1,9,17 120:8

**filings** 42:16

**fill** 17:16

**find** 20:1 27:13 42:9,20 46:12 49:19 52:3 77:20 79:24 115:3 178:11 194:14 211:15

**finder** 36:11 232:3

**finding** 51:1 139:16

**findings** 16:15 256:24

**Findley** 211:12

**fine** 48:6 75:24 96:7 128:5

**fingerprint** 130:17 133:2

**fingerprints** 116:11 124:23 129:23 130:1,2,3,7

**finish** 115:17,24 116:4 171:3

**finished** 57:22 65:9 115:15

**finishes** 115:21

**firm** 68:12 85:7,9

**fit** 148:10 163:13,19 164:8,9,19 213:24

**fits** 122:13 125:6 136:21 256:24 257:17

**five-** 76:9

**flesh** 160:23

**fleshed** 94:3

**floor** 181:20 182:1

**fluids** 129:24

**focus** 48:7 55:7 59:11 63:15 240:14

**focused** 47:17 128:7 171:1 244:13 245:3

**focusing** 8:20 55:16 56:7 95:7

**Folks** 12:4

**follow** 225:9

**follow-up** 75:14 217:13

**Footnote** 137:10 138:24 150:12 162:23 211:9

**footnoted** 52:11

**footnotes** 52:11 211:10

**forced** 91:8 113:9

**forensic** 116:18 122:8,10,18 123:24 130:24

**forgot** 86:5 234:17 248:3

**form** 11:3 17:17 23:17 25:5,12 28:6 31:9 35:3 38:21 39:16 47:6 50:1 53:24 56:18 66:8 68:20 70:7 71:6, 11,24 73:1,11 74:5,14 75:3 79:14 81:16 82:4 84:11 86:12,15 88:1 89:2,7 101:2 108:3,13 109:5,13,15, 20 110:6,17 112:17 114:4,10 123:9 124:8,15 125:22 126:23 127:8 129:15 130:5 142:22 143:17 144:13 145:10 146:2,14 149:24 150:18 152:15 168:16 174:6,10 183:9 184:4 185:18 186:18 190:6 194:23 195:18 196:9 207:4,21 208:20 209:20 217:5 224:22 225:7, 20 226:2,8 227:17 228:7 229:2 232:24 233:16 235:2 241:22 249:10,24 251:11

**formal** 163:3 198:24

**formally** 8:3 205:20

**format** 52:10

**formulated** 64:3

**forths** 55:10

**forty-eight** 96:18,19

**forward** 8:8 38:18

**found** 52:12,15 114:23 117:1 126:2 127:6,10,11,12 129:7,9 134:3 177:15 178:8,12,14 183:12 220:22,23

**foundation** 74:14 109:5

RICHARD A. LEO, PHD, JD, 09/28/2022

**Fourteenth** 204:20 205:5

**frame** 33:7 68:17 238:13,15

**frames** 204:14 238:9,10

**Francisco** 9:12

**fraudulently** 166:6

**freely** 91:9

**front** 6:23 7:2,7 78:22 96:9 106:18 115:13,20 117:18 118:5 120:5 178:20 188:10,13 226:20 247:21

**full** 79:23 152:3 163:11 207:9

**fuller** 250:24

**fully** 52:8 217:22 219:20 230:23 251:16 253:24

### G

**Gabriel** 6:2 184:13 212:15 235:11 248:21

**gather** 42:5,18 46:22 49:5 50:13, 17,18 66:24 102:13

**gathered** 41:8 46:13 47:22 65:7 98:23 99:1

**gathering** 42:15 45:6 64:3 86:2 223:8

**gave** 21:21 28:14 44:18 72:1 125:1 174:13 246:19

**general** 22:3 33:10 34:1,19 68:17 75:11,15 78:23 185:19 247:16,20, 24 248:3,11

**generally** 20:16,18 34:12 88:14,16 153:13 185:20 236:3

**genetics** 122:9,19 123:23

**girlfriend** 156:15

**gist** 88:22

**give** 33:10,12 34:8 45:11 78:9 123:2 128:10 134:7 137:5 156:10 174:12 250:23 257:3

**giving** 62:9 63:3

**glean** 20:10 171:7

**goal** 212:18

**gold** 43:18

**Golden** 6:8 12:6 96:4

**good** 6:19,20 12:7 84:7 128:1 131:3 176:23

**Gould** 60:8 61:12 139:2,9

**government** 89:19

**GPRS** 252:17,23

**grammatical** 238:14

**grant** 61:13,15,17,21

**granted** 154:14

**grants** 62:3

**great** 28:24 83:14 123:1 142:12 178:3 248:12

**greater** 94:6

**Greg** 5:18

**group** 200:15

**Guadalupe** 215:20 216:2,6 218:24 219:4

**guess** 37:5 59:24 71:19 75:20 104:14 108:20 130:1 226:19

**guessed** 159:10

**guessing** 34:20 164:1

**Guevara** 5:8 6:11 80:14 107:13, 18,24 108:9 109:11 110:4,15 111:2 183:21 184:16,23 185:24 186:3,16 187:22 188:7,9,19 191:13,19,24 193:11 194:8,17 195:15,19,20 196:3 209:4 210:2,4 211:23 212:13 213:3 215:9 222:13,19 223:5 240:17 241:1,6 242:6 243:5,10,19 244:20,21 245:9,12,14 246:3,9,23 247:3,8,13 249:15,16 254:20 255:4,21

**Guevara's** 186:12 187:24 188:5 213:22 228:15 239:16 243:1 244:2 245:6,19 250:7

**guilt** 104:9,15,17 106:10,12 107:18 110:11,19 142:7 210:10,14 212:14, 15,20

**guilt-presumptive** 110:2 111:4

**guilty** 39:7,14 55:14 107:20,21 110:9 113:2 143:13,23 158:18 165:1 210:11

### H

**habeas** 26:21

**habits** 207:14

**Hail-jares** 60:9

**hair** 124:22 130:2,17 133:5,7

**hairs** 116:10 129:23

**half** 31:13 67:5,6 92:22 129:4 180:11 246:11

**hand** 29:19 31:24 149:18

**handcuffed** 170:18 243:6 246:24

**handcuffing** 246:24

**handheld** 167:20 168:4,7

**hands** 116:10

**handwritten** 170:3 208:19 209:11, 17 235:21,23 236:6 247:15 248:19 249:16 251:22 252:17,24 254:6

**happen** 34:2

**happened** 25:7 27:23 54:2 148:1 213:1 223:18 252:13

**happening** 103:13 155:16 233:13

**happy** 76:7,9 83:8 214:10

**hard** 6:23 7:2,7 122:15 180:3,4 184:18 185:15

**harm** 54:21 156:13

**hat** 184:17 185:15

**HAZMAT** 132:8

**head** 7:24 16:23 24:9 25:7 59:8 77:22 98:7,11 122:16 184:18 186:6 233:20

**heading** 10:17 18:5

**heard** 146:19,24

**hearing** 26:21,22 27:5,7 28:3,5 29:18,21,22 30:2 35:16

**hearings** 26:13,16,17 28:22,23 29:3,7 30:7 82:14 164:3 255:12

**heightened** 233:14

**held** 157:7 239:6

**helped** 66:23

**helpful** 22:13 35:15 243:17

**helping** 66:16,19

**hidden** 50:14

**high** 125:13 154:24 155:4,17

**high-end** 154:16 155:9,12 156:2, 11,21 157:1

**high-profile** 212:19

RICHARD A. LEO, PHD, JD, 09/28/2022

**high-quality** 14:8

**highlight** 173:6

**highlighted** 18:14

**highly** 53:13,22 152:9

**hire** 61:16

**hired** 25:2,17 68:8,14

**historical** 14:18 85:22

**history** 85:3

**hit** 108:1 125:24 221:17,22 242:18

**hold** 61:2 115:8 178:1 205:19

**home** 126:9 127:10 134:5 136:7 156:16 181:17,22,23 218:19,22

**homicide** 80:22 111:18 117:9,11 224:12 225:18 226:16

**hospital** 219:19

**host** 177:23

**hour** 68:2,13,15 69:16,19,20 97:24 246:11

**hourly** 68:10,12,18,21 69:14,16

**hours** 92:21,23 93:5,8 94:6,13,14, 15,20,21,22,24 95:2 96:16 97:23, 24 99:16,17 121:11 169:6 170:15 172:1 185:6 202:4 203:5,18,23,24 204:4,19 205:2,11 206:18 207:2,8, 20 238:21 245:23

**house** 116:11 126:1,2 140:18,19 181:3 186:19

**housekeeping** 7:9

**Houston** 63:19

**human** 207:16

**humanly** 81:21

**hundred** 37:15 108:23 135:9 151:12 153:22

**hundreds** 18:17 84:19 117:6 125:5

**hung** 21:9

**hungry** 76:7

**husband** 80:16 182:2

**hydrid** 52:7

**hypothetical** 15:20 94:17 113:5 148:13

**hypothetically** 126:12

---

**I**

---

**idea** 12:7 13:21 40:19 142:4 143:2 154:13 155:7

**identification** 9:23 95:16 98:18

**identified** 20:3 37:24 41:21 44:2 50:12 75:16,17 104:7 135:13,15,16 138:3 172:20,24 173:7 199:4

**identify** 5:20 45:7 92:9,10 103:20 104:23 105:1,14 106:5 111:8 162:4,19 206:10,11 228:23 229:6

**identifying** 33:18 37:14 41:12 103:23 104:3 186:13

**Illinois** 5:12,17 70:11,16

**illustrates** 138:13

**imagine** 81:17,18,24

**immediately** 107:11 108:1,10

**impermissible** 256:17

**implicated** 243:11

**implicating** 243:22 245:5

**implicit** 155:2,6

**import** 56:4

**importance** 11:4 54:17

**important** 157:15 158:8 159:16 242:4

**impossibility** 37:12 44:12 56:24 136:24 137:7 140:1

**impossible** 37:18,21 39:14 43:5 44:23 89:16 140:5,8 141:14,16 142:1,6,19,20 144:5 145:7,20,24 148:11,14 173:9 180:3

**impression** 166:22

**imputed** 179:15

**inability** 230:18,21 233:9,13

**inadequate** 14:3

**inadvertently** 70:3

**include** 93:12 134:1 183:6 255:7

**included** 50:4 64:16 95:8 139:20 145:8,22

**includes** 216:21

**including** 8:15 27:24 74:17 84:9 106:17 122:12 124:17 204:5,6 228:11

**incommunicado** 197:11 239:6

**incompetent** 211:24 212:7 214:5

**inconceivable** 114:21 116:15 124:20 131:19 132:12

**incongruous** 183:13

**inconsequential** 183:3

**inconsistencies** 88:15 141:1 248:22 250:8,14,18 251:3,20,23 252:4,15 253:4,10,17

**inconsistent** 68:10 214:14

**incorporated** 159:3

**incorporates** 159:1

**incorporation** 160:15

**increase** 227:4

**increased** 208:11

**increasingly** 30:22 32:8,13

**incriminating** 163:11

**inculpatory** 245:21

**independent** 77:7

**independently** 50:18

**indicating** 83:15 246:13

**indicia** 35:10 38:3 84:7 161:16 162:6 172:14 257:15,18,20

**indisputable** 60:17

**individual** 6:9 13:9 39:14 44:13 46:16 123:7 124:6 133:21 160:6 165:2

**individual's** 134:3 136:6 185:15

**individually** 13:6 17:11,14

**individuals** 22:18 23:4,9 46:15 52:16 61:22 62:4 109:10 125:21 126:6 145:4,23 194:12,21 203:5 219:11 233:11 253:16 257:2

**inducement** 154:16 155:9,12,19, 23 156:2

**inducements** 154:18 155:18 156:11,21 157:1

**infer** 217:1

**inference** 253:10 255:19

**influence** 84:4

**inform** 191:19 230:1,3 232:17

**informally** 200:11

RICHARD A. LEO, PHD, JD, 09/28/2022

**information** 9:2 15:21,23 117:20 120:12 132:14 147:22,24 184:24 185:7,10 210:18 242:6,8 252:24

**informed** 231:4,10

**infrequently** 37:5

**inherently** 156:5

**initial** 166:9 167:14

**initialed** 166:17 237:16

**initialing** 167:16

**initially** 49:11 63:24 215:17 220:16

**innocence** 46:6,8 60:18 63:5,6,10 82:12,14 135:19 136:4 139:21 212:21

**innocent** 37:16 54:20 58:14 158:17,20 159:1 161:14 165:2 183:7 196:23

**input** 19:23

**inputted** 187:15

**inquiry** 15:24 82:13

**insert** 166:6 167:13

**inserted** 237:2,21,23

**insertion** 165:24 167:2 235:13 236:11,16 237:4

**inside** 98:13 102:2,18 103:19 132:19

**instances** 147:8

**instigation** 190:13,14 191:4

**Institute** 61:14

**instructed** 188:7,20,24

**instruction** 38:22 187:24 188:6

**intangible** 155:1

**intentionally** 197:15 199:17 201:6

**interacted** 63:1

**interchangeably** 90:13 91:1

**interest** 154:20

**interested** 38:13,19 55:2

**International** 200:14

**internet** 42:9,10,13

**interpret** 148:21 175:17

**interpretation** 125:11,16 179:5 203:12

**interpreting** 190:8

**interpretive** 151:10

**interrogate** 106:23,24 203:4,8 205:4,22

**interrogated** 80:13 94:12,14 107:9 170:7,16 202:5,17 203:23 213:17 230:13 232:12

**interrogating** 203:8,18

**interrogation** 9:16 10:6,13 21:7, 18,19,20 23:12 33:15,18 40:10 45:15 47:23 72:10 83:18 84:3,4,12, 17,21 85:4,7,9,10,23 87:17 89:20 91:13,16 92:15 93:1,13,19,20 94:7, 8,10,16,19,22,23 95:2,3,7,9,11,14 96:14,24 97:14,17,18,21,23 98:1, 14 99:8,11,12,21,23 100:1,2,4,7,8, 21 101:1 102:2,12,18 103:20,21 106:21 107:2 110:3,10 111:6 113:12,15,18 152:4,7 153:2,21 157:15 158:5,8 159:6,17,22 160:6, 13 161:13 162:22 163:2 166:19,21 167:4,6 168:11,21 169:3,17 170:2 171:10 176:4 184:17 185:17 186:17 190:17,20 191:8 197:11,16 199:18 201:7,18,24 203:10 204:7, 17,19,20 206:1,6,20 208:9 210:3 211:19 213:19 215:16 216:17,20, 23 217:1,2,4 230:8,10,19 232:14 235:10,11 238:18,22 239:21 240:3, 6,15,18 244:14 245:4 256:23

**interrogation-induced** 196:22

**interrogations** 15:18 35:14 89:22 92:10 93:5,6 100:19,24 101:9,10 102:5,6,21 103:11,16,17 105:3 107:3 160:18,22 161:4 193:13 194:10,18 196:5 197:20 198:19,21, 23 204:11 213:23 250:8 255:22 256:18

**interrogator** 94:21 156:9

**interrogator's** 153:6

**interrogators** 166:24 197:18 199:7 200:12,17

**interrupt** 115:22 122:23

**interrupted** 115:15

**interruption** 105:20

**interview** 14:16 126:16,22 127:2 200:12 215:2 229:16,18,20,23 230:5,7 243:7,9,19 245:15 247:13

**interviewed** 45:17 46:4 175:23 200:6 201:2 230:6

**Interviewer** 200:15

**interviewers** 126:18 200:17

**interviewing** 220:21

**interviews** 85:21 168:14 175:24 198:2,16 199:1,3 200:3,5 201:13 245:22 246:22 251:20

**intimidate** 156:7

**introduce** 25:2

**investigate** 63:18,21 106:22,23 217:22 218:6 219:20,22

**investigated** 133:1 217:16 218:16

**investigation** 71:15 74:17,19 77:8 106:11,20 107:2,8 108:11 109:2,6 110:15 111:3 133:8 164:20 185:10 212:1 213:14 216:3,10 217:13 240:3,9,10,16 246:10

**investigations** 102:1

**investigative** 42:17 71:10,12,22 72:12,23 73:9,22 74:2,13,23 75:6 130:16,18 200:14 210:11,16 244:8

**investigators** 210:16

**invoices** 68:6,7

**invoke** 100:3

**invoked** 255:4

**invoking** 255:21

**involuntarily** 88:20

**involuntary** 88:24 89:17 90:9,11, 12,17 91:4,6,16,18,24 92:7 233:14

**involve** 82:9,13 133:14 155:5

**involved** 8:16 42:21 51:15 113:23 133:17 139:3 159:6 188:23 217:18 220:17 221:3 228:6 246:11

**involvement** 78:5,7,14,15 79:2,3, 9,11 217:15 244:16,19 245:16

**involving** 122:12 125:6 136:2

**Irrespective** 110:14

**issue** 24:4 38:12 120:7 121:4,18 164:4 232:7,19 233:7

**issues** 27:20 32:1

**it'** 159:19

**item** 77:11,19 80:19,20 88:18 90:17 92:2 100:17 125:2 148:10

**itemize** 89:5

RICHARD A. LEO, PHD, JD, 09/28/2022

**items** 124:24 126:2

### J

**J.D.** 6:15

**Jacinta** 115:1 178:20 212:2 225:18 226:17 234:6

**Jacinto** 224:13

**jail** 43:6 44:14 95:10 187:15,16

**January** 7:9,16,21 9:21 67:9 70:6 71:4

**Jessica** 6:6

**joining** 24:19

**Jon** 60:8

**Jorge** 215:22 216:9 218:24 219:2, 4

**journal** 10:23,24 52:6,8 57:12

**journalist** 63:19

**journalists** 45:18 46:4 55:1 63:2, 10

**journals** 10:18 11:20

**judge** 22:20 29:19 31:23 32:14,21, 22 33:24 34:7,14,18

**judgment** 106:5 162:17 210:10 242:3

**Julia** 60:8

**jurisdictions** 159:4

**jurors** 152:13

**jury** 21:9 22:4,17,19,22,24 23:7,11 26:19 34:15 36:11 225:15 256:12

**Justice** 21:14,15 22:1,16 34:5 61:14 167:5 211:19

**juveniles** 22:6

### K

**Katie** 6:3 60:9

**keeping** 30:23 204:11

**Keith** 211:12

**key** 256:5

**kidnap** 182:13

**kidnapping** 78:16 79:4,10,12 80:23 189:10 225:19

**kids** 66:12 243:14

**kill** 180:4

**kind** 15:3 18:1 63:8 64:24 90:6 107:11 128:6 130:4 156:19 199:13 231:18

**kinds** 29:3 55:9 64:17

**knew** 45:24 63:14 208:18,22 209:22 210:3 234:23 235:3

**knives** 115:4 127:10

**knocked** 149:5

**knowing** 166:23 246:19

**knowingly** 166:17

**knowledge** 25:1 152:8 199:24 210:11 223:19 240:23 244:14

### L

**labels** 53:23

**labor** 206:17 207:1

**laid** 40:6 136:17

**language** 38:9 53:15 151:9,11 164:16 173:11 230:17 231:1 233:9, 12,21

**large** 82:17 89:24

**largely** 54:16

**larger** 82:8 246:5

**largest** 137:13 138:9

**Lasser** 180:9 183:4,6 216:12

**lasted** 96:15 102:21 243:7 245:15 246:11

**late** 188:16 231:18

**law** 9:11 17:2,7,9,10,11,12,18,20, 22,23,24 18:7 19:6,7,8 20:19 52:10 86:11,12 204:9,10,14,15 256:2,19

**Lawrence** 21:2

**lawyers** 6:5 46:17

**lay** 100:11 205:23

**Lazar** 126:18

**lead** 60:15 89:17 101:1,17 156:21 164:23

**leading** 85:7,9,10 91:16 101:10,12 240:6,7

**leads** 210:15

**leak** 158:24

**leave** 123:8,12 124:7,21 125:15 132:13 133:22

**lectured** 200:10

**led** 54:10 102:21,23,24 103:2 105:9 214:4 240:9

**left** 94:13 124:14,24 130:8 131:21 135:20 140:18 141:6 171:9 173:20, 21 174:4,5 175:3 187:22 217:24 255:11

**legal** 5:13 28:10 54:24 63:2

**legally** 28:17

**lend** 250:7

**length** 51:22 92:9 93:9,15 94:16 96:14,24 97:14,17 99:8,11 100:1 204:10,11,16 205:4

**lengthier** 93:10

**lengths** 142:12

**lengthy** 92:10,14,17,18 93:1,3,9, 19,20 100:19,21,24 101:4,5 197:11 202:7,21 203:20,21,24 206:20 208:8 210:3 239:20 256:23

**leniency** 156:19 254:22

**Leo** 5:5 6:15,19 9:9 25:18 33:3 39:3 75:23 115:18 116:2 117:22 119:20 120:5 127:23 128:19 135:1

**Leo's** 9:21 95:19 98:13

**lesser** 53:19

**let alone** 234:6

**letting** 197:14 198:1

**level** 17:6 53:19 105:21,23 106:1

**leveled** 189:13,23

**Lexis** 45:8

**light** 86:3 106:18 128:8

**likelihood** 123:12 208:12

**limine** 26:17 27:5 28:4

**limit** 33:24 133:9

**limitation** 32:24 33:7

**limited** 30:15 32:17,18,20 33:8

**limiting** 93:20

**limits** 30:4,5 34:18

RICHARD A. LEO, PHD, JD, 09/28/2022

**lines** 44:8 80:19 177:11 205:24 254:7

**lineup** 220:5 221:16

**link** 131:1 175:15

**linked** 117:3,4 158:9

**linking** 116:19

**links** 173:2 175:14,15

**list** 10:20 18:13,19,21 19:18 20:6 22:10 25:19,22 26:6,14,23 27:11, 13,22,23 30:10,14,17,23 48:11 69:23 70:9,14 136:12 193:18,20,24 195:6,7,8,13 248:3

**listed** 8:3 10:6 19:3,16 21:3 49:7 73:19 77:3 80:21 82:3 140:24 167:9 194:22 195:2 200:9 247:20 248:5,11 249:16

**listing** 194:11

**lists** 18:7 30:24

**Listserv** 62:24

**literal** 98:23 149:7

**literally** 120:18

**literature** 14:1 35:13 36:9,14,18 39:23 40:3,10 57:9 87:1,5,8 104:21 196:24 214:1 257:1

**litigated** 232:19

**litigation** 24:4 38:12

**live** 103:13,18 198:19

**lived** 37:19 180:11 181:17,20 182:1,2 218:19,20,22

**lives** 66:11

**living** 181:3 182:6

**loaded** 122:16

**location** 44:15

**locked** 197:16

**Loevy** 68:14

**logic** 47:9 55:14 224:10 225:9 226:14

**logically** 178:24 179:9,14 221:9

**long** 7:6 18:22 34:10 66:4,5,7 97:13 100:7 101:14 125:1 151:14 157:8 170:14 196:21 205:19,22 206:16 207:1

**longer** 11:3 50:5 66:10 92:17 93:9 101:13 201:18 203:4 225:5

**longest** 120:12

**looked** 45:7 62:14,15 67:3,4,5 78:10 102:2 138:2 162:10 196:13 237:10

**lost** 12:15

**lot** 25:21 35:21 42:8 45:24 46:7 106:15,16 152:21 154:14 201:12 211:8

**loud** 178:23 179:4,7

**low** 154:23,24

**low-end** 155:23

**lower** 54:8 69:5,20

**lunch** 75:22,24 76:1,3,4,8,16

**lying** 221:18

**M**

**machine** 43:7

**made** 37:20 45:15 57:19 58:21 70:2 73:8 113:16,17 114:2 115:10 117:24 118:11,19 146:16 166:10, 12,14,23 183:4 210:22 221:9 222:13,19 236:7 254:11

**magic** 92:16

**main** 142:8 173:5 197:8

**maintain** 89:19

**majority** 35:5 41:23 213:17

**make** 6:22 8:21 9:1 13:1 15:24 16:7 18:18 29:20 32:21,22 36:11, 16 44:20 119:24 147:3,4 148:19 149:3 158:15,20 167:20 180:1 189:3 193:6 203:14 211:10 221:24 225:22 239:5 254:21,22 256:11 257:2

**makes** 13:10 44:22 118:14 237:14

**making** 21:17 36:12 90:21 92:6 146:21,22 175:19 228:10 247:9

**male** 124:18 175:16

**manipulation** 84:5

**manual** 84:16,17,20,23 85:10 92:20 106:22 167:6,7,10,11,13 198:10 203:1,2,3,14 239:3

**manuals** 84:10,13 106:15 198:6,9

**manuscript** 10:24 11:13

**March** 10:14 108:22

**Mariano** 115:1 116:10 127:12 177:14 178:7,21 212:2 224:12 225:18 226:16 234:5

**mark** 9:19,20 95:18 98:12

**marked** 9:22 95:15 98:17

**marking** 7:4

**Martinez** 182:4 217:21 219:8,12

**mass** 180:16

**Massachusetts** 21:16

**match** 221:8 253:23

**material** 70:19 213:11

**materials** 13:3 19:14,15,22 21:21 22:12 27:19 35:12 36:14 41:8 42:6, 16 45:6,15 46:22,23 48:16 49:6,14, 21,24 50:5,7,8,10,13,15,17,19 51:3,12 65:7 67:1 69:24 71:2 72:17 73:13 74:12 76:24 77:3 80:21,24 81:2,9,13,19 82:21,22 83:2,6,7,8,9 85:14 106:18 107:1,12 120:19 121:13 132:3,4,6 175:21 187:9,17 213:10,13,14 214:2 228:3 229:5 230:22 239:11 247:21 250:23 251:7

**matter** 5:7 7:9 28:15,16 44:6 68:11 185:19 224:10 225:9 226:14

**Mcgrath** 6:10

**Mclaughlin** 205:10

**meaning** 113:9 143:1 184:12

**meaningful** 101:19 153:4

**meaningless** 55:9

**means** 33:14,15 81:6 85:18 94:7 97:17 239:13

**meant** 144:4 154:6 155:7 173:4 181:18 182:8 183:21 199:9 234:15, 22

**measure** 47:2

**mechanism** 13:17 14:7

**media** 5:2 42:17 45:9 49:6 195:1

**meet** 13:19 14:3 37:3,8 39:7 51:10 53:16 65:5 86:23 114:13,18 140:2 143:11 195:9,16 196:7,15 222:23 257:13

**meeting** 112:13,19 200:13

**meetings** 200:22

**meets** 36:8 39:11 56:14 63:23

RICHARD A. LEO, PHD, JD, 09/28/2022

112:2 113:3 137:4 171:20 172:11, 13 193:3 222:11,17 225:3 257:8

**Megan** 6:10

**Mejia** 77:13 78:1,5,12 79:2,9 80:7, 9,17 113:10,12,21 117:5 126:17 127:6 129:7 140:13 172:22,23 175:15,23 180:11 181:1,3,8,9,22, 23 184:13 187:23 188:8,20 189:5, 6,13 208:5 212:16,24 213:1,2 215:11,17,18,20,22,24 216:2,6,9 217:21,23 218:24 219:2,4,7,11,18 220:6,15,21 221:11,18 241:13,16, 19 242:14,19 243:11,21 244:17

**Mejia's** 111:17,23 112:8,15 116:24 124:18 181:24 190:14 217:17,18 218:16 224:4,11 225:16 226:15 242:10

**member** 63:3

**members** 52:9 156:14 217:17 218:7,16,18,19,20,22

**memorialization** 252:5

**memorialized** 209:11,12 235:22 252:17

**memory** 41:7 57:2 78:18 229:7

**mention** 37:11 57:19,24 60:19 88:3 93:4 158:17 202:24 216:5

**mentioned** 28:21 29:4 34:5 40:4, 21 49:2 68:5 139:1 153:23 183:17 215:13 250:18

**merge** 27:2

**merit** 11:11

**message** 7:1

**met** 36:19 40:22,23 51:19 64:2,16 135:14,17 139:14 145:4 181:13 195:5 224:18 225:11 234:11

**method** 14:21 15:7 85:13 92:20

**methodological** 15:6

**methodology** 11:7

**methods** 14:1,9,11,12,15 85:20 91:13

**Mexican** 231:6 232:8,10,11,13,22

**Mexico** 181:2 218:20

**Miami** 19:17,19

**middle** 115:16 155:2 174:22 175:9 193:9 197:12 206:14 224:7 234:3 235:8,9

**mind** 31:1

**minor** 88:15

**minute** 12:3

**minutes** 76:2 94:12 99:15,16 100:6 102:21 176:10 243:7 245:15, 21

**minutia** 55:3

**Miranda** 100:3 231:15 245:10 246:18

**Mirandize** 243:2

**mischaracterizes** 79:15 150:1 229:3

**misclassification** 158:16 222:13, 19 223:3

**misleading** 54:14 55:5

**misrecollection** 78:9

**misremembered** 90:20

**misremembering** 51:20

**missing** 15:24

**misspoke** 98:16 183:22 238:12,13

**mistake** 39:18 55:23 56:20 70:2 93:2 236:14 248:2

**Mistakes** 210:21

**misunderstood** 138:4 155:13

**mode** 107:18

**modified** 86:15

**moment** 8:21 34:3 108:12 122:24 134:7 169:23 184:23

**months** 16:10 78:10 79:21 180:11 249:12

**moral** 155:1

**morning** 6:19,20,22 148:6 169:9, 11 184:15 247:5

**motion** 22:22 25:4 26:17 27:5 28:4 29:18 88:3,10 192:3,12 232:21 233:2,5

**motive** 179:15 180:5 182:18 183:12

**move** 59:9 87:19 121:23 161:5 167:18 194:4

**moved** 176:5 257:2

**moving** 250:4

**multiple** 11:16 13:7 117:2 141:1 146:15 166:16 184:7 191:23 239:20

**murder** 78:6,7,15 79:12 111:21 116:21 130:22 178:23 179:4 180:6 181:4 182:19 191:15,20 214:8 224:20 228:1,6 243:12,22 250:20

**murder/child** 188:2

**murder/double** 212:19 217:19

**murdered** 234:7

**murders** 79:4,10 80:8 109:3 182:13 189:9 212:2

**mutually** 172:10

**myriad** 256:16

---

**N**

---

**names** 53:2 61:22 62:4,10 192:1 199:14

**narrative** 160:23 161:7 163:14 164:18 165:6,8 179:21

**narrow** 186:6 218:21

**national** 17:21 61:14 232:12 238:18,22

**nature** 49:22 118:24 238:7

**necessarily** 20:4 58:7 92:1 225:9 235:4

**negates** 236:16

**negative** 37:10

**neighboring** 63:20

**net** 46:11,14

**newspapers** 7:18

**night** 189:6 207:9

**nights** 206:5

**ninety-six** 96:20

**non-peer-reviewed** 54:15 57:12

**noncharged** 23:3

**nonetheless** 53:19 57:4

**nonfalse** 59:2

**nonlengthy** 92:17

**nonpublic** 158:24 159:8

**Norma** 217:22 219:16,17,21,23 220:1,5,13,14,18 221:14,16,17,19

Index: normal–originating

RICHARD A. LEO, PHD, JD, 09/28/2022

**normal** 105:20,22 106:1 160:18,22 161:2

**North** 5:16 86:11

**Northern** 5:11

**Northwestern** 63:5

**note** 254:6 256:3

**noted** 85:5

**notes** 115:10,13,19 117:18,23,24 118:3,5,10,12,13 119:1,4,7,9,10, 13,14,17,21,24 120:5,7,22,24 121:1,2,8,14,20 127:16,17,18,22 128:14,20,24 248:19 251:20

**notice** 171:13

**noticed** 41:13 43:3,12,23 68:9

**noting** 252:15

**notion** 252:3

**number** 5:9 9:20 11:2 12:22 20:6 26:7 27:8 28:1,24 30:8,14,18 31:15 34:16,20 43:19 49:16 51:13,14,15 52:20 64:8,9 76:22 81:3 82:23 83:12 87:19 89:1,5,9 95:18 96:5 98:13,16 100:15,17 101:7,14,22 102:19 105:12 117:9 125:3 133:18 136:10,23,24 137:7,8,21 138:1,2,5 141:9,10 142:17 144:3 145:18 147:11 148:10,21,23 149:1,5,6 152:22 173:7 185:6 200:18 205:8

**numbered** 95:24

**numbers** 248:10

**numerous** 85:1 193:9 194:7,15 196:2 236:19

**O**

**O'MALLEY** 209:13,15,16 223:7,16 228:18 235:16 236:21 237:1 254:8

**O'Malley's** 236:3,12 237:17 239:19

**Oakland** 198:18 200:3,8

**oath** 255:1

**object** 38:21 66:8 117:19 118:9 143:17 146:14 226:8

**objection** 23:17 25:5,12 28:6 31:9 35:3 38:21 39:16 47:6 53:24 56:18 68:20 70:7 71:6,11,24 73:1,11 74:5,14 75:3 79:14 81:16 82:4 88:1 89:2,7 101:2 108:3,13 109:5,13,15,

20 110:6,17 112:17 114:4,10 119:19,24 123:9 124:8,15 125:22 126:23 127:8 129:15 130:5 142:22 144:13 145:10 146:2,23 149:24 150:18 152:15 159:24 168:16 174:6,10 183:9 184:4 185:18 190:6 194:23 195:18 196:9 207:4,21 208:20 209:20 217:5 224:22 225:7, 20 226:2 227:17 228:7 229:2 232:24 233:16 235:2 241:22 249:10,24 251:11

**objections** 24:20 127:20 128:17 129:1 146:20,24 151:7

**objective** 43:8,9 44:15 108:21 170:9 171:12 191:7

**objectively** 141:13 142:18 145:6, 19

**observation** 14:16 85:21 183:5

**observed** 15:17 103:6,11,24 105:4

**observing** 6:7

**obtain** 219:15

**obtained** 160:8

**occasion** 103:10

**occasionally** 198:4,5

**occasions** 84:15 163:21

**occur** 28:23 35:20 37:13 108:17 158:14 160:12,13,15 253:21

**occurred** 37:17,20 43:6 87:21,23 88:19 99:12 100:2 109:3 126:8 140:23 147:23 148:6 158:5 161:8 178:13 190:12 212:11 213:22 230:10 240:3 250:21,22 255:3

**occurring** 43:13 230:16

**occurs** 32:4 159:17,22 160:3,9 179:16,18 217:2

**odd** 185:13,22,24

**offer** 22:12 23:10 24:8,12 27:19 36:5 38:23 226:7

**offered** 18:16 36:24

**offering** 32:23 36:4,17 38:7 226:3, 5,10,12,18

**office** 6:5 19:19 21:3

**officer** 6:9 21:16 55:12 171:6 185:14 209:6,9 223:6 235:16 236:13,21 237:18 239:16 246:7,12, 17 247:14 254:9,20

**officers** 113:8 114:2 188:19 231:14 253:16

**officers'** 110:22

**offices** 5:15 18:17 19:13

**officially** 43:20

**Ofshe** 40:5,15 41:3 42:3 45:23 48:20 53:8 58:3 61:5 62:1,15,21,23 65:14 86:7 87:8,10 104:4,19 133:16 145:3 150:11 154:9,17 162:22 164:10,13 193:16

**Okeydoke** 131:17 177:10

**Oklahoma** 24:12,15

**one's** 105:20 156:14,15

**ongoing** 209:5

**open** 71:15 132:5,13

**Opened** 109:6

**opener** 185:17

**opine** 35:7 191:9

**opinion** 18:17 21:11,22 22:13 23:11,23 24:8,15 25:3,10 27:20 33:4 36:4,5,17,19,24 38:8 39:11 57:5 70:10,17 73:18 86:14,21 112:4 149:4 188:18 189:12,23 190:9 205:7 211:22 214:17 222:9, 12 225:24 226:3,4,5,7,12,18,24 227:2,8,9,10,11 231:3 256:7,22 257:10

**opinions** 7:19 24:13 32:23 83:9 93:23 94:2 190:22 226:9,19,20,22 227:1 230:1,3 242:2

**opportunity** 134:18

**opposed** 170:17

**order** 107:22 129:8 142:14 165:16 166:13 209:5 210:5 219:15

**ordered** 67:10

**ordering** 186:19,23

**organization** 89:21

**organizations** 45:12 48:19

**organized** 59:10

**original** 11:7 14:8 15:16 16:6 42:11,12 48:10 167:7

**originality** 11:11 13:24

**originated** 159:10

**originating** 191:3

Index: outright-ploys

RICHARD A. LEO, PHD, JD, 09/28/2022

**outright** 13:13

**overlap** 50:20 61:7,8,9 62:13

**overnight** 95:11

**overrepresented** 43:1

**overview** 83:16 93:22

**overwhelming** 35:5 41:23 139:22

**P**

**p.m.** 76:15,17,18,20 131:11,13,15 177:4,6,8 240:19 241:2,4,8,20 242:7 243:3 244:4,9 246:4 258:3,5

**pages** 59:13,24 77:3 128:24 129:3 213:12

**paginated** 10:4

**pagination** 60:6

**pants** 127:13

**paper** 15:16 49:24

**papers** 139:5

**paragraph** 67:23 96:13 104:24 105:14 111:9 115:12 152:3,6 157:13 159:16 161:11 165:22 171:17,19 172:4 173:8 174:23 175:8,9 184:10 186:15 187:21 193:8,9 196:19 197:13 202:24 206:3,15 210:12 211:22 223:5 224:8 228:14 233:24 234:3 235:8,9 238:17 247:12 254:5 256:21

**paragraphs** 93:24

**parenthesis** 165:23

**parenthetical** 199:6

**part** 27:3 59:15 87:8 91:11 99:5 168:9 179:24 182:12 189:17 193:5 198:20 199:18 227:8 257:14

**partial** 18:21

**partially** 33:5 91:17

**participate** 16:5

**participated** 80:11 111:17 131:20 188:1 224:11,20 225:17 226:15

**participation** 190:2

**parties** 5:21 30:4 33:1 42:21 186:13 190:10

**party** 25:1

**passed** 79:22 126:4

**past** 147:9

**pattern** 43:23,24 101:8,11,19,20, 21 122:13 125:6,7 186:2 255:20

**patterns** 41:12,18,22 42:2,3 43:3, 4,12,15 47:3 51:1 64:14 103:23 104:3 161:15 162:5

**PDF** 10:3 96:1,3 99:10

**peer** 10:17,18,22 11:14,16,21,22, 24 12:17,18,20,22 13:2,4,5,7,9,12, 16,24 14:4,13,22 15:11 16:12,16, 19,24 17:3,5,10,18 52:8 86:7,10, 13,15,16

**peer-review** 11:20 13:15 18:1,2

**peer-reviewed** 12:24

**peer-reviewing** 16:4

**penalty** 156:13

**people** 42:19 43:19 63:9 64:18 66:10 70:10,17 75:22 85:2 100:3 124:3,20,22 151:22 156:7 158:13 164:15 193:24 197:5,6 204:12

**perceive** 153:4

**perceives** 91:7

**percent** 7:15 29:10 31:16,19 32:5 35:6,7 37:15 39:7 52:17,19,23 55:11 89:11 90:7,9 93:4 96:15,16, 17,18,19 105:5 108:23 117:8 135:9 151:12 163:24 164:2

**percentage** 31:4 32:17 33:22 52:15 64:18 156:24 163:22 171:8

**percentage-wise** 37:23

**Perfect** 7:4 9:8

**period** 15:18 95:3 101:15 103:1 157:8 169:3 170:6 198:12 200:8 202:18 203:19,20,21 205:3 206:1 240:4,13 245:7

**periods** 94:18,19,20

**permissible** 119:3

**permission** 186:18

**permitted** 22:19 23:2,22 30:11,18 226:7 256:10

**perpetrator** 37:14,23 44:2 124:14 159:9 172:20,23 173:18 174:2 175:3,16

**perpetrators** 117:12 125:14 131:2 173:19 174:3 175:4

**person** 29:2 43:6 44:3,23 55:14,22 56:16,21 57:1 58:14 79:19 91:7 94:12,14,20 95:2,10 100:8 131:23 134:4 136:6 142:6 143:7 158:17,20 160:19 165:8 166:15 179:22 219:13 220:7,11,15,17,18 230:15

**person's** 126:1

**personal** 66:11 229:13,24 230:3

**perspective** 162:3

**persuade** 154:19 155:19

**Ph.d.** 6:15

**phase** 160:8

**phone** 239:13

**photographs** 187:5,12,13

**phrase** 35:24 39:21 53:10 90:12, 13 167:1,3 216:24

**phrases** 53:13

**physical** 37:12 44:11 56:24 90:10 130:15 136:23 137:6 140:1 154:2 175:2 186:7 196:20 221:4 228:16 229:11 242:11,13 244:18

**physically** 37:18,20 43:5,10 44:23 80:14 111:5 113:13 140:5,8 141:14,16,24 142:19,20 144:4 145:7,19,24 148:11,13 173:9 183:22 193:11 194:9,17 196:3 197:7 213:3 247:8

**picked** 140:12,13 220:4

**picture** 158:15

**piece** 12:17,19 14:14 15:12 82:19 112:6

**pieces** 14:13 237:13

**place** 43:9,11 88:5 131:3 153:15 176:13 244:8

**places** 117:2 167:8 187:2

**plaintiff** 5:24 6:1 70:22,23

**plaintiffs'** 6:22 8:8 77:5 81:10,13, 19,22 82:1

**plea** 51:15 64:19

**pleadings** 49:21

**ploy** 104:13,19 111:24 112:11,16, 21,22 113:3 224:3 227:13,23

**ploys** 105:6 111:10,13 224:1 227:3,10

**plural** 111:20 191:14 228:4

**point** 8:9 25:20 39:3 45:2 59:11 67:17 86:21 88:18 90:21,22 92:6 98:5 111:9 128:2 137:9 141:17 154:1 157:15 158:2 159:17,23 160:2 163:6 168:6,9 171:2,16 173:5 174:19 175:11,12,13,20 176:9 185:4 187:21 193:1 203:19 211:10 228:5 241:11,12,14,17 246:16

**points** 44:7 51:1 94:4 158:8 160:11 203:19

**police** 10:6,13 19:17,20 21:15,19, 20 23:12 35:13 40:10 42:16 47:23 49:15,22 55:12 71:10,14,22 72:8,9, 15,20,23,24 74:1,12,15,16,20,23 75:5,15,16,18 83:17 84:3,12,16,20, 21 85:4,7,12,23 106:15,17 109:2,4, 23 110:21,22 113:8 114:2 115:3 125:21 126:9 130:16 140:22 147:22 148:4 152:4,7 157:20 158:15,23 159:3,18 160:19 161:13 166:4,5,10,11 167:4 168:13,19 169:22 170:10 171:6,9 175:23 176:5 179:23 185:2,6,8,11,14,22 187:7 189:7 190:5 191:4 192:17 197:13,24 198:5,8,16,18 199:11,17 200:3,10,12,16,23 201:3,16 202:7, 19,21,22 203:22 204:6 206:6,19 207:3,19 208:1,6 210:16 211:18 213:16 216:1,8 217:6,10 219:10,14 220:20 221:2,12 223:21 232:17 234:12,24 236:17,18 237:7,8 238:18,22 240:2 241:10,14 243:21 244:24 245:1 247:15 248:19 251:13 253:16,23

**police-directed** 179:16

**police-induced** 179:17,19

**police-prosecutors** 159:7

**police-written** 166:7

**policies** 168:12,18

**policing** 84:24 106:16,17

**policy** 55:1

**polygraph** 218:2 221:24 222:5,7

**pool** 48:9

**pooled** 46:24

**pop** 254:15

**popped** 44:9

**population** 122:8,9,19

**portion** 82:7 96:20 157:13 195:11 247:21

**portions** 72:8

**poses** 11:6

**position** 113:7 119:6 120:21 122:3 146:16

**positions** 120:2

**possession** 81:14

**possibilities** 124:6

**possibility** 132:13 254:4

**possibly** 66:6 129:23 130:1 172:13,18 173:1,4 221:10

**post-admission** 163:14 164:18 165:6

**post-conviction** 24:7 26:21 27:6 35:20 82:12 192:4,13 255:2

**Post-dna** 95:20

**posttrial** 88:4,10

**potent** 155:19 156:5

**potential** 185:1 217:23

**power** 156:6

**practice** 84:3,12 186:1,2 255:20

**practices** 21:20 83:18 84:7,18 238:19,23

**preceded** 110:15

**precedes** 197:19 240:16

**precise** 28:8 101:6,14

**Predicting** 60:7

**prefer** 76:8

**premature** 106:5,10 210:10

**preparation** 187:18 235:23

**prepare** 99:2

**prepared** 120:7,15

**preparing** 118:1,14 180:17 209:17

**presence** 22:23 34:15

**present** 246:7

**presentation** 16:3

**presentations** 7:18 59:22,23

**presented** 15:14,17,22 16:6 18:10 52:2

**press** 11:1 12:23

**pressure** 213:5

**presumed** 110:9 158:18 212:14

**presumption** 107:18 110:19 210:10,11,14

**pretrial** 26:15,17 27:4 28:3 29:17 82:10 164:3 187:4 255:12

**pretty** 173:2,3 200:20

**prevent** 119:15

**previous** 233:8

**previously** 28:15 49:2 65:12 68:5 97:1,18

**primarily** 240:6,14,16 245:3

**primary** 139:7 197:5,6

**principle** 164:8

**print** 7:22

**printed** 60:2

**prints** 116:7

**prior** 13:21,22 28:17 29:8,15 40:15 45:24 46:9 87:16 106:20 107:2 109:11 110:20 111:4 115:15,17,21 117:15 158:7 160:13,14 167:8 185:11 206:18 207:2 213:8,15 215:8 223:19 229:3 232:13 246:22

**prison** 43:21 44:4

**prisoner** 21:18

**private** 69:15 89:21

**privately** 69:19

**privilege** 117:21

**pro** 27:19

**probable** 53:10,13,14,22

**probe** 253:9

**problem** 24:21 56:9 95:19

**problematic** 256:16

**problems** 32:1

**procedures** 168:13,18

**proceed** 9:3

**proceeding** 24:7 26:20 27:6

**proceedings** 255:2,10

**process** 8:3 11:20 13:15 16:4 18:1,2 157:16 158:5,9 159:7,17,23 162:23 163:2,8 197:19 222:4

RICHARD A. LEO, PHD, JD, 09/28/2022

231:19,20 250:9,15 251:4,16,24 252:7 253:5,11 254:12

**processing** 155:3

**procure** 186:11

**produce** 121:1 208:11

**produced** 21:6 67:11

**produces** 240:15

**product** 34:14 118:7,15 121:14 223:18 242:11 244:17

**professional** 45:12,16 63:2,11 211:22 256:21

**professor** 9:11 54:3,12 55:17 56:1,22 57:5,10 58:3 61:12 62:1,2 63:4 66:1 87:8,10,11 104:19 139:2 164:10,14

**proffer** 29:16

**progress** 75:12,15,17 247:16,20, 24 248:4,11

**prohibited** 62:9

**project** 46:8 48:3 63:6 66:3 90:7

**Projects** 46:6 63:6,10

**promises** 155:5,15 156:4 254:22

**proof** 44:15

**proper** 164:19

**properly** 121:14

**proposition** 151:3

**prosecute** 21:8

**prosecuted** 44:4 156:15,17 165:2

**prosecuting** 21:15

**prosecution** 29:17 34:17 164:24 223:21 232:20

**prosecutor** 21:4 22:15 55:12 56:23

**Prosecutor's** 21:3

**prosecutor-written** 166:7

**prosecutors** 22:3 29:13 46:1 159:5 166:5,10 236:18 237:8

**protected** 117:20,21 121:14

**protecting** 221:19

**protocols** 130:19 238:19,23

**prove** 37:9,10,16 38:1 41:16,20 43:14 44:23 142:7

**proveably** 41:17 149:9 224:10 226:14

**proven** 23:13 36:1,9,18 37:3,8 38:8,10 39:8,12,21 40:24 41:10,24 44:1 47:5,12 48:1,5 51:9,11,19 53:8,17 54:7 55:8,11,16,21,23,24 56:3,8,14 57:7,15 58:1,22,23 60:11,14,19,23 63:15 65:3,5 86:24 87:13 92:23 101:12 112:3,10,13,20 113:4 114:14,18 117:7,10 120:17 122:14 125:5,8,11 133:13 135:13 136:12 138:2,5 139:4,14 141:22,23 142:15 143:2,7,12,20,23 145:4 147:10 148:19 149:3,8,12,20 150:11,16 151:4 171:20 172:11 179:20 193:3,4,15,18 195:5,13,17 196:8,15 222:11,17,24 224:17 225:4,10 257:3,9,11,13

**provide** 13:8 31:5 54:23 70:24 83:16 132:14 247:23 248:9

**provided** 7:8 11:14 24:15 25:10 36:15 70:20,21,23 71:3 72:8 73:7, 14,16,17 74:1,22 75:5,9 77:4,9,18 78:13 81:9,13,20 82:7 135:2 243:21 246:17

**providing** 19:23 39:10 70:6 233:14 245:20

**proving** 37:12 143:3 148:15

**psychological** 84:4 154:5,6 155:1 208:10 229:12

**psychologically** 80:15 91:13,15 111:5 152:24 155:23 156:3 232:5

**psychologists** 161:23

**psychology** 9:11 83:17 84:2 161:12

**Psychology-law** 200:21

**PTP** 81:3,6

**public** 18:17 27:17 69:20

**publication** 11:8

**publications** 10:20

**publish** 13:10,11

**published** 7:17,20 8:4 13:20 14:8 41:4 54:11 57:11 58:4 59:9 62:4 73:18 137:14 138:9,12 147:9 152:13

**publishing** 86:3

**purported** 248:19 249:3

**purportedly** 244:24

**purpose** 13:15,16 14:2 20:15 22:11 56:4 102:10 164:21 219:3

**purposes** 36:3 112:24 195:11 217:10

**pursuant** 61:21

**put** 18:20,23 19:18 31:4 40:19 48:18 61:14 76:22 89:9 101:6,13 106:18 118:21 126:15 169:16 170:2 210:5 220:5 228:17 237:13 240:12

---

## Q

**qualification** 132:3 144:19 145:9, 23 173:4

**qualified** 26:15 28:2,10,16,17 39:22 144:22

**qualify** 38:17 40:24 144:15

**quality** 11:11 13:17 14:6

**quantifying** 101:18

**quantitative** 15:4

**quarter** 59:1

**question** 14:23 19:5 20:11 23:18 25:15 27:4 28:8,13 39:4 47:9,13, 14,16 52:13,15 67:18 71:16,18,21 73:13 78:19,23 80:1 87:16 90:19 103:9 113:1 115:24 116:1,3,6 117:16,20,22 119:10,16,18 120:3, 16,23 123:11,20 124:3 126:24 127:23 128:18,19 129:2 130:14 134:10,11,12 138:4,8 144:9 145:13,21 146:4,11,15 147:4,14,16 149:2,17 150:14 151:13 158:22 159:13 174:17 185:20 189:4,16,19, 21 190:9 191:2 194:20 195:23 205:9,13 218:14 220:14 222:22 226:4 243:15,16 251:17 252:10 253:20 254:1 257:12

**questioned** 97:24 240:12 255:10

**questioning** 93:13 95:1 217:11 220:13 240:14

**questions** 8:12 11:3,6 14:24 17:16 27:20 38:14 78:5 79:21 86:3 122:4 123:3 127:21 128:6,11 134:21 135:3 147:7 171:14 173:16 228:21 255:11

**quick** 8:10 95:21 134:7

RICHARD A. LEO, PHD, JD, 09/28/2022

**quickly** 212:20

**quoted** 7:18

---

**R**

---

**Rachel** 5:13 76:12 257:22

**radar** 110:22

**Radelet** 58:12

**raise** 197:16

**raised** 21:4 69:9

**ran** 63:4

**randomly** 89:23

**range** 154:23 169:13

**ranks** 125:12

**rapport-building** 197:19 199:8,10

**rare** 24:10 29:13 30:22 32:3,6,8,13
 38:1 159:4

**rarely** 35:17

**rate** 67:24 68:10,12,18,21 69:6,14,
 16

**rates** 69:8,9

**reach** 63:9 69:12 83:3,4

**reached** 35:1 46:2 49:1 86:18

**read** 88:21 106:15 114:6 118:5
 119:13,23 150:9 153:8,9 190:19
 198:6 207:7 208:21 209:23 223:15,
 16 228:24 234:19 235:14,17 254:8

**reader** 18:21

**readily** 25:24 149:18 167:21
 168:4,7

**reading** 105:4 115:6,9,20 119:8,9,
 14,18 120:6,9,22 127:15,19 178:17
 248:17

**reads** 152:7 159:16 161:12 163:9
 171:19 191:12 194:15 210:9,12

**ready** 75:22 147:2

**real** 95:21 107:1,7

**realize** 76:6 164:21

**realized** 41:19

**realizes** 55:21,22

**reanalyze** 16:17

**reason** 18:22 30:12 55:14 93:16

125:1 149:10 151:16 183:17,23
 184:5 207:8 227:5,12 242:20

**reasonable** 55:22 56:16,21
 203:12

**reasoning** 227:8

**reasons** 197:9 232:6

**recall** 23:21 24:9,17 25:6 34:13
 49:16 59:7 60:22 67:14,20,21 71:7
 77:23 78:3,12,24 79:8 86:20
 108:18 109:22,23 114:5 127:2
 133:3,16,18 134:23,24 135:5
 137:21 143:15 145:18 146:7 148:2
 154:7 162:10 168:17 171:16 176:6
 180:24 181:5,14,21,22 182:4,6,10
 185:9 186:24 187:3,11,19 188:12
 191:24 192:2,18 198:2,13,14
 204:21 205:1 207:15 208:4 213:13
 214:3,13 215:9,12,13,19,21 219:5
 220:4,9 221:23 222:4,7 228:3
 230:16 233:19 238:2,5 239:11
 240:10 241:23 242:23 245:5

**recalling** 183:4 204:18 220:3

**receive** 156:17,19

**received** 10:7,13 77:23 78:2,3
 83:3

**receiving** 156:12

**recent** 73:18

**recently** 69:4

**recess** 12:10 76:16 131:12 177:5

**recitation** 231:12 235:21

**reckless** 211:24 212:7,17 214:5,
 19

**recognize** 53:16 166:16 193:18
 195:12

**recognized** 24:3 166:12 207:23

**recognizing** 167:17

**recollection** 21:10 32:9 34:7
 48:24 52:22 58:24 66:3 70:13
 78:17 79:18,23 80:2,4,8 86:19
 88:13 99:24 108:14 109:7 110:23
 119:2 134:23 135:6,22 136:8
 140:11,15,21 176:2,3,7 181:15
 187:1 191:21 205:7,17 214:10
 216:4 219:24 220:9,12 233:4
 242:9,15 244:15 249:11

**recommend** 11:8,9

**record** 5:3,21 12:5,8,13 43:8,9
 76:13,15,20 108:24 131:8,10,15

134:14,16,20,21 135:1 146:21
 147:3 170:9,22 171:2,12 177:4,8
 184:1 191:8 230:9,15 242:5 257:23
 258:1,3

**recorded** 21:18 33:16 168:11
 190:17 230:8

**recorders** 167:20 168:4,7

**recording** 113:11,20 168:14,20

**records** 67:15,16 72:16,24 108:20
 140:10,15,20 141:5 148:12 149:9,
 11 176:7 248:8

**recount** 244:7

**recounting** 244:23

**reduce** 101:21

**refer** 30:7 38:10 84:16 155:7 196:1
 197:18

**reference** 95:5 138:10 181:8
 199:7 221:24 239:5

**referenced** 138:23

**references** 155:2

**referencing** 87:6 139:12 171:21
 172:9 194:21 196:6 218:9

**referred** 16:2 40:2,6 83:23 87:4
 137:24 199:7,10

**referring** 14:12 29:7,24 39:24
 57:19 59:6 77:18 83:24 84:14
 138:1 153:19 161:22 165:7 172:19
 192:3 194:6 195:7 201:20 202:23
 218:17 220:7 230:20 239:1

**refiled** 21:9

**reflected** 88:23

**refresh** 21:10 119:1 176:2 205:7
 216:4

**refreshed** 214:11

**refreshing** 176:7 220:8

**refused** 79:20

**refusing** 146:11 147:15

**regard** 212:20 250:19

**regarded** 156:5 196:21

**regularly** 31:1 200:20

**regulate** 13:18,19

**Regulatory** 202:1

**Reid** 84:16,23 85:13,14 92:20
 106:22 167:5,12,13 203:1,9,17

RICHARD A. LEO, PHD, JD, 09/28/2022

204:1,2,3 239:3

**reject** 13:13

**rejected** 29:19

**related** 47:4 50:19 73:9 74:16 80:22 81:14 90:16 178:15 191:1 201:24 206:12 228:22 243:20

**relating** 47:1

**relation** 175:24

**relationship** 91:4,12

**relaying** 190:10 191:10

**relevant** 30:21 31:24 74:19,20 82:21 83:16,23 205:14,16

**reliability** 21:5 161:16 162:6 163:10 164:4 165:16

**reluctant** 205:23

**rely** 17:21,22 184:3 251:2

**relying** 17:21 151:20 197:24 203:16 204:1 254:1

**remember** 13:21 31:10 64:8 180:8

**remembered** 245:10

**remembering** 205:1 216:12 242:17

**remind** 137:19

**repeat** 243:15,16 256:14

**repeatedly** 179:6

**repeating** 173:11

**rephrase** 25:14 100:22

**replicate** 16:7,15 53:4 101:20

**report** 6:23 7:2,11,14 36:2,8 37:11 40:4 67:8,9,23 70:6,19 71:3 75:12, 14,16 77:4 82:3,19 83:12,15,21 84:15 86:22 88:7,18 92:3,19 93:4, 11 98:8 104:23 115:7,9,10 118:1, 14,20,23 119:3 120:8,10,11,13,19 127:15 128:15,20 136:10,11,18,22 137:6,9 140:22,23 141:10 146:17 147:11,14,15 149:21 150:16,22 152:2 157:5,12,14 161:10 164:17 165:21 167:19 168:24 171:18 173:11 174:22 177:11 179:24 180:9,17 183:4,6 186:9 187:18 189:17,21 193:7,21,22 194:3,22 195:2,11 206:3 210:8 211:15,20 213:21 215:4 216:6,12,14 226:13, 21 228:13 229:9 233:24 234:2 235:7 237:3 238:16 239:2,15 242:5

247:16,22 248:1,2 249:12,17,23 250:19,20 255:8,20 256:1 257:15

**reported** 96:14

**reporter** 5:18 6:12

**reports** 25:13 42:17 49:15,22 72:10,20 74:15 75:15,17 80:14 85:23 94:1 109:23 118:11 140:22, 24 147:22 148:4 192:9 195:1 206:4 220:2 247:20,24 248:4,11 250:21 251:13 253:23

**represent** 5:22 68:9 166:11,13 247:19

**representation** 167:20 231:19

**representing** 5:14 46:17

**reprosecute** 21:12

**request** 25:4 76:4 128:8

**requesting** 79:24

**requests** 153:6 156:9

**required** 61:20

**research** 11:12 13:19 14:3,7 33:19 36:9,14,18 39:23 40:3,9 41:5 45:9 48:3 56:6 61:16 65:15 66:15,18,19, 23 77:8 83:17,24 84:1,2,6,7 85:3, 16,21 86:3 87:1,5,17 90:7 98:3,24 102:15 103:9 104:20 143:22 151:3 153:16 162:2 164:8 195:13,16 196:24 200:4,15 201:19 208:8 210:13 211:17 213:24 227:3,6 251:9 257:1,17

**researcher** 85:8 106:13

**researcher's** 16:8

**researchers** 40:16 49:1 58:20 63:10 161:15,21,24 162:14 163:12 199:11

**resolves** 28:11

**resources** 90:6 208:10

**respect** 45:5 61:1 62:8,17 65:19 76:24 82:2 87:22 100:17,19,23 101:24 110:2,19 122:5 123:5,6,11 124:5 125:18 128:14 129:6 133:11, 14 135:11,12,24 136:23 137:1,2 140:3 168:20 171:5 204:3 233:7,21 242:2 244:19 250:1 256:17

**responding** 55:5

**responsible** 91:14

**responsive** 13:12 27:20 52:14 209:6

**rest** 20:12 94:18

**restroom** 123:1 128:4

**result** 53:1 121:17 150:10 210:17 222:7

**resulted** 51:16

**results** 16:8

**retained** 27:17 33:6 34:22 35:21 69:19

**retaining** 33:10

**returned** 187:23

**reveal** 61:19

**revealed** 15:2

**reversal** 82:10

**review** 11:2 13:2,3,4,16,24 14:1,13 17:3,9,10,15,23,24 20:8,16 22:12 27:19 52:7,10 70:16 73:21,24 74:2, 24 79:6 81:21 86:11,12,13,15,16 97:8 104:3,4 107:6 109:23 132:4 133:23 134:6,13,15,19,20 135:23 147:14,15 152:22 170:23 187:5,13 220:1 228:2 242:16 249:20 250:17, 23 251:6

**reviewed** 16:22 17:4,6,19 18:16 19:10,14 20:1 21:21 35:12 46:8 51:12 52:8 69:24 70:4,5,8,12 72:17 77:1 78:4 79:1,22 82:21 83:10 86:7,10 88:5 107:1 120:20 132:4, 10,16 135:8 175:22 180:16,19,21 187:10,18 213:10 214:2,12 229:5 230:23 239:12 242:20 247:21,24 248:4

**reviewer** 10:18,22 11:14 12:17,20 14:4,22 16:12,16,19

**reviewers** 11:16,24 12:18,22 13:5, 8 16:24

**reviewers'** 11:21,22

**reviewing** 15:11 19:21,22 20:10, 14 51:4 78:20 132:6 151:5 176:6 185:9 187:11 206:13

**reviews** 13:9,12 17:7,10,11,13,18, 20,22 84:2

**revisions** 11:9 13:12

**rewrite** 234:17

**Reyes** 5:24 24:19 27:13 68:9 73:10 77:2 86:22 107:3,8,10,16,20 109:4, 12 110:2,4,20 111:4,14 112:2,9 113:1,10,14,23 114:3,22 116:19

RICHARD A. LEO, PHD, JD, 09/28/2022

117:5 124:13 126:19 129:13,21 131:19 136:20 140:2,4,5,12,17 148:9 168:24 169:15,19,21 170:1, 20 171:1,4,6 176:1 182:3 183:7 184:13 185:5,11 186:20 187:2,6,14 188:8,10,21,23 189:8,14,18 190:1 191:9,19,20,21 196:10 202:17 207:18 208:17 209:16,17 212:10 213:4,15 214:7,23 215:3,6,14,18 222:2 223:15 225:17 227:2 228:5, 22 229:20 236:4,7,12,14,15 237:14,20 239:6 240:19,21 241:2, 7,10 242:21 243:2,6,10,20,22 244:4 245:6,9,10,16,20 246:4,13, 18,19,23 247:1,4,5,9,14 252:22 254:14,21

**Reyes'** 27:24 78:6,15 79:3,11 87:23 106:1 107:23 108:6,8 110:8 111:2 112:12 114:12,18 170:13 185:1 190:13 196:13 207:13 213:9 223:17,20 226:13 231:11 232:9,20 233:9 235:20 237:24 240:9 244:16 249:4 252:16 256:2,15,22 257:17

**Reyes-deleon** 234:4

**Reynaldo** 5:8 184:15 239:16

**Richard** 5:5 6:15 40:5 150:11 154:9 162:22

**rid** 126:19

**rights** 21:14 100:3 245:10

**righty** 9:18

**risk** 84:6 92:3,11 93:17 100:16 105:13 106:4 111:8 192:20 227:4 233:14

**risks** 104:22 105:1

**Robert** 239:17

**robust** 256:22

**Robyn** 76:23

**role** 36:22 80:8 185:1

**room** 93:13 94:11,21 95:3,14 97:23 98:14 99:23 100:8 102:2,18 103:20 107:24 108:9 109:11 110:5, 16 118:6,8 119:13 124:7 170:2,17 171:10 184:17,24 185:14 186:17 187:22 197:16 209:9,16 240:18 242:7 246:5

**rooms** 169:17 176:4,5 215:16 240:12

**Rosauro** 80:17 113:14 176:4 182:2 184:13 207:23 208:5 212:16,

24 213:1 215:14,24 217:21 218:8 219:7,11 235:1

**Rosen** 6:3,18 8:19 9:4,7 10:1 12:14 23:19 24:21,22 25:8,14,16 29:5 32:16 35:23 39:2,19 47:15 56:12 57:13 66:13 69:11 70:15 71:8,17 72:4 73:6,20 74:10,21 75:10,19 76:12,21 80:6 81:23 83:1 88:8 89:3,15 95:17 96:5,8 98:12, 16,19 101:23 108:7,16 109:8,19 110:13 111:7 113:6 114:7,15 115:19 117:17 118:4 119:7,23 120:4,21 121:6,19 122:1 123:2,4, 14 124:11 125:17 126:5 127:4,14 128:1,10,13,23 129:5,18 130:10 131:3,7,16 134:22 135:10 143:5 144:1,10,21 145:16 146:6,19,22 147:5,18,20 150:2 151:1,19 152:18 153:7,10,11 160:4 168:22 174:9,16 176:12,17,21 177:9 178:4 183:18 184:9 186:10 190:15 195:3,22 196:11,17 207:11 208:2 209:8 210:7 217:8 224:23 225:13,23 226:5,11 227:19 228:12 229:8 233:1,17 235:6 242:1 249:18 250:3 251:18 257:22

**roughed** 107:11

**roughly** 164:2

**route** 140:17

**routine** 93:6 101:9 102:1,6

**rule** 30:22 31:4,6 37:22 118:17 121:15

**ruled** 233:2

**running** 25:19

**rush** 106:5 210:9 242:3

**Rutherford** 215:5,7 223:7 246:6 247:13

**Rutherford's** 239:17

---

**S**

---

**Salazar** 217:22 219:16,17,21,23 220:1,5,13,14,18 221:9,14,16,17, 19

**sample** 89:23,24

**samples** 133:5,7 217:21 218:10 219:7,10,14

**San** 9:12

**Sanchez** 68:11

**sandwich** 254:14

**Santiago** 185:3 234:23 235:5

**sat** 198:19

**satisfied** 83:2

**saved** 49:23 50:15

**scare** 156:6

**scenario** 38:19 143:11,14 157:19

**scene** 45:3 57:3 114:21,24 115:2 116:13,16,19,23 117:1,4,13 122:17 124:17 125:15 126:14 127:7 129:8, 9,14,17,22 130:9,12,23,24 131:22 132:18 133:9,21 135:21 136:5,6 173:20,21 174:4,5 175:4 218:1 220:22

**scheme** 182:13

**scholarly** 56:11 85:1

**scholars** 17:8 40:7,17 97:22

**scholarship** 84:11

**school** 17:22

**science** 12:24 13:18 14:15 23:11 40:9 44:7 52:8 83:17,24 86:16 87:5,16 122:9 123:24 162:2 164:7 196:23 210:13 213:24

**science/law** 52:7

**scientific** 11:11 15:14,15 35:13 37:13,21 63:11 87:1 135:17 136:3 137:1,7 153:20,21 161:14,21 163:12 227:3 257:1

**scientifically** 101:18

**scientist** 42:22 57:11

**scope** 23:5 32:19 33:6 102:15

**Scott** 126:18

**scoured** 133:5,7

**screaming** 178:21 179:6 186:19, 24

**screen** 7:5 63:24 76:23 177:19

**scripting** 179:24 250:9,15 251:4, 16,24 252:7 253:5,12,19

**scroll** 83:13 150:7 171:24 216:15

**Sean** 5:23

**search** 186:19 211:16

**searched** 126:1,9

**searches** 45:9

RICHARD A. LEO, PHD, JD, 09/28/2022

**seconds** 95:22

**section** 15:15 16:3 93:11 115:11 158:6,17 171:18,19 172:3,6 184:11 189:20 192:20 197:10 210:9 239:15 240:1 244:23 254:24 255:8, 17,20 256:1

**seek** 13:11 17:11 102:13 103:8 160:23 229:6,20

**selective** 18:5,9,20,23

**self-interest** 154:19 155:21

**Self-regulation** 202:2

**semester** 9:16,17

**seminal** 151:17,21

**seminar** 9:15

**send** 8:7 11:21

**sends** 10:23

**sense** 17:19 18:18 20:9 28:10 32:21 36:4 37:18 62:23 170:14 180:2 221:9 237:14

**sentence** 51:22 91:1 112:23 141:20 150:9 152:6 156:18,20 158:4,7 159:15,20 161:11 163:9 171:18 172:8 173:17 174:23 177:12 178:16 186:16 187:22 191:12 194:14,21 196:1 202:14 206:3,15 208:7 210:12 213:8 218:12 223:4 228:14 234:17,22 235:9 248:18

**sentences** 64:20

**separate** 26:23 61:4 128:16,21,22 160:10 169:23 176:3 226:23 227:8

**separated** 215:15

**September** 5:6 9:6 67:4 258:7

**sequence** 176:6 215:9,11,13,19

**sequential** 158:15

**seriousness** 180:7

**session** 94:22,23

**sessions** 19:18 239:21 245:4 256:23

**set** 139:16 147:9 157:14 158:11 163:3 172:10 195:20 204:14 211:6

**sets** 84:18

**setting** 145:1 201:4

**settings** 200:11 201:1

**seventy-two** 96:19,20

**share** 115:6

**shared** 201:5

**shed** 124:22

**Sheriff's** 19:19

**shoe** 116:7

**shoes** 126:20 127:13

**shoot** 95:24

**short** 34:11 75:20 176:10

**shortly** 141:6 248:20 249:3

**show** 132:4 167:15 177:19 214:11 253:10,15

**showed** 107:14 221:5 231:18 240:11

**showing** 185:11 213:15

**shown** 101:8 185:2

**shows** 33:19 114:12,17 227:4 233:8

**sic** 98:13 170:1 190:13

**side** 118:22 232:2

**sides** 24:2 38:9

**sidetracked** 55:18

**sign** 186:18,20

**signal** 20:22

**signed** 86:23 112:1,2 169:10,18 170:2 208:18 209:19 228:17

**significance** 56:5 255:21

**significant** 7:12 245:5 256:7

**signing** 208:23 209:3

**silence** 231:5,10,16

**similar** 80:15 147:12

**simply** 42:23 43:5 57:1 75:8 101:17 190:4 212:14 214:7

**single** 33:8 98:5

**sister-in-law** 181:24

**sit** 67:19 78:11,24 79:7 109:24 145:17 146:8 181:5 182:7 187:11, 19 220:3 248:13 249:21

**sitting** 145:21 198:15,21,23

**situation** 28:9 132:9

**situational** 92:3,11 100:16 104:22 105:1,13 106:4 111:8

**situations** 28:21

**size** 137:24

**skeptical** 249:13

**skepticism** 249:7,19,23

**skirmishes** 56:6

**slap** 185:15

**slapped** 108:10 110:5 184:18 242:15,22

**slapping** 186:5

**sleep** 105:14,17,18,21,23 106:2 192:9,17,19 197:11 206:5,18 207:2,9,13,20

**sleeping** 178:22 179:11 247:5

**slightly** 60:6 69:5

**small** 16:20 20:6

**Smith** 70:11,17 73:18

**soaked** 115:3 116:13

**social** 12:24 13:18 14:15 15:14 40:9 42:22 44:7 52:7,8 57:10 83:17,23 86:16 87:1,4,16 153:20, 21 161:23 162:2 164:7 196:23 210:13 213:24

**societies** 45:16 63:2,11

**Society** 200:21,22

**sociologists** 161:24

**softening** 197:18 199:9,12

**Solache** 6:2 27:13 68:9 73:10 77:2 78:6,14 79:3,11 107:4,8,17,21 109:3 110:21 113:14,23 114:3,17, 22 116:20 126:18 129:13,21 131:20 137:2 140:2,12,16 148:10 169:21 170:20 171:3 175:2 176:1 177:15 178:8,12 179:14 180:10 182:3 183:7 184:13 187:6,14 188:21,23 189:9,14 190:1 196:10, 12 212:15 213:4,15 214:7,23 215:2,15,18 217:24 225:16 228:5 229:18,21 235:1,11 237:15 239:6 242:21 252:21

**Solache's** 24:20 27:24 86:23 105:22 114:13 177:13 178:6,19 180:21 212:11 213:9 228:9 232:20 238:3,4 248:21,23 249:4 252:16

**sole** 12:17,20 24:4

Urlaub Bowen & Associates, Inc.   312-781-9586

RICHARD A. LEO, PHD, JD, 09/28/2022

**solely** 26:14 110:3 212:10

**solicited** 86:14

**somebody's** 55:19

**sooner** 128:7

**sophisticated** 90:2

**sort** 84:18 107:13,19 156:5 183:15

**sorts** 44:9

**Soto** 78:6,7,15 79:4,10 80:8,23 115:1 127:10 132:17,18 177:14 178:7,20 185:3 212:2 224:13 225:18 226:17 234:6

**Soto's** 116:10 127:12

**Sotos** 79:12 243:23

**sought** 17:12

**sound** 243:14

**sounds** 47:16 176:23 185:21

**source** 116:22 175:2 180:18

**sources** 61:19 214:24

**Spanish** 236:5 243:2 246:18 254:10

**spatter** 116:8

**speak** 42:20 45:17 200:11,24 240:18 241:2 245:12 246:4

**speaking** 20:17,18 48:20 60:1 109:12 146:19,22,24 215:8 236:3

**specific** 14:11 15:10 40:18 49:16 71:18,21 93:11 107:9 108:18 127:2 137:21 154:7 180:15 206:11 215:9

**specifically** 34:18 38:16 67:21 87:24 109:22,24 119:17 143:10 155:9 163:19 181:21 187:3 188:6, 11 195:21 197:4 207:15 208:4 215:21 221:23 238:2,5

**specifics** 33:23

**spectrum** 154:18 155:5,13

**speculate** 71:19

**speculating** 67:17

**speculation** 171:11

**spelled** 211:13

**spelling** 238:8,15

**spend** 16:12 220:13

**spent** 16:10 170:6

**spoke** 215:2 243:2 244:3

**spoken** 109:10 201:2 215:6,7,10, 11 241:16,20

**square** 140:20

**stabbed** 115:2 125:3 177:13 178:6,20 179:6

**stage** 160:12 231:20

**stamps** 248:10

**standalone** 189:21

**standard** 12:22 43:18 84:18 97:14, 16 104:20 164:8,9,19 186:1 204:1 239:4

**standards** 13:19 14:4 21:19 106:19 202:7,22,23 203:22,23 238:18,23 239:1

**stands** 171:16 207:7 214:17

**Starr** 5:23

**start** 31:2 67:12 138:13 143:8 152:5 154:21 155:22 169:15 177:23 183:24 214:6 223:24

**started** 41:5 45:21 49:5 143:6

**starting** 194:2

**starts** 178:18 245:20 254:7

**state** 21:24 22:3,15 24:11 34:4 43:7 70:10 148:16 234:3

**state's** 209:10 231:14 239:18 240:2

**stated** 127:22 190:4 222:22 247:3

**statement** 21:6 34:24 35:2 39:11 40:24 74:3 75:2 127:3 140:21 141:3 149:8 157:21 158:3 159:2,19 160:14 163:11 165:10,12,15,19 170:3 178:19 206:24 208:19 209:3, 11,17 223:14 224:9 226:13 228:18 235:15,21,23 236:4,7 238:1,3,4 240:7,9,15 242:10 243:21 244:16 245:21 251:21 253:24 254:6,9,11 256:2

**statements** 55:6 74:17 158:10 165:18 168:15 169:10 179:13,16, 19 193:12 194:9,18 196:4 228:11 248:21,23 249:4 251:22 252:5,16, 18 253:1,16,18,22

**states** 5:11 24:11 85:11 142:17,23 178:19 228:15 246:23

**station** 109:4 110:21 111:1 125:21 126:9 169:22 171:9 185:2,6,8,12

187:7 189:7 202:19 206:7,19 207:3,19 208:1,6 213:16 234:12 235:1 241:11,14

**statistical** 15:3 90:3

**statistically** 93:8

**statistics** 52:20

**statutes** 21:17

**stemming** 45:14

**step** 42:15 160:2 161:5,6

**Steve** 5:23 57:17 62:21 86:9 92:22 118:4 146:20

**stew** 197:14 198:1

**stipulation** 24:19

**stop** 59:18 154:20 155:21

**stopped** 177:24

**story** 250:10,16 251:4 252:1,7

**strategy** 199:18

**Street** 5:16

**stress** 231:2

**strike** 24:23 40:12 49:11 73:22 91:22

**strong** 182:18

**structure** 93:24

**student** 17:19

**students** 17:23

**studied** 130:21 161:24 166:6 183:1 201:12

**studies** 16:14 40:10 54:1,18 57:15,20 58:2,4 62:5 86:3 101:8 138:20 139:5,8 149:18 162:4,21 233:10,20 251:9,14,15 252:3,9,12 253:15

**study** 16:19 54:17 55:2 61:11,14 62:1,2,5,7 63:7,14 64:2 65:4,6,12, 13,14 87:7 98:20 102:10,11 103:9 123:21 125:11 133:20 137:14,22, 23 138:1,5,6,9,16,24 139:2 144:23 145:2,22 147:9 149:14,16,23 150:13 152:16,20 153:20,21 154:1, 7 162:19 254:2

**studying** 161:12

**subject** 38:12 47:24 50:2 118:16 119:4 121:15 152:4,7

**subjected** 242:14

**subjects** 14:17 84:1

**submissions** 17:9

**submit** 13:1 17:9 218:2

**submits** 219:13

**submitted** 11:12

**subsequent** 16:14 54:18 57:14,20 203:3

**subsequently** 22:24 44:2 54:11

**substance** 118:3 119:22,23 127:21 151:24

**substantial** 38:2 82:22 90:6 120:12 208:8 210:13 225:12 257:15,18,20

**substantially** 208:11

**substantive** 8:5 123:22

**sufficient** 83:3 151:5

**suggest** 250:8,14 251:3,10,23 253:4 254:4

**suggested** 179:23 213:14 244:16

**suggestion** 15:2

**suggests** 14:22 51:6 253:8

**suit** 132:8

**Suite** 5:16

**summarize** 88:6 256:19

**summarized** 99:5

**summary** 93:22

**supplement** 8:15

**supplementary** 75:12,13

**support** 52:4 151:3 174:1 194:14 208:5 223:2 225:12 226:21,24 233:11 251:2,9 252:3 253:18

**supporting** 212:17

**supports** 208:8

**suppose** 132:7

**supposed** 232:17

**suppress** 22:23 88:4,10 192:4,13 232:21

**suppressed** 205:6

**suppression** 26:17 27:4 28:3 35:15 164:3 255:12

**Supreme** 204:17 205:10

**surety** 221:3

**surprisingly** 56:1

**surrounding** 235:22

**survey** 14:23 152:12

**surveys** 14:20 85:20

**suspect** 93:15 153:4 154:20 155:3,16,19,20 157:22 159:1,11,19 160:20 161:5 163:12 166:9,13,15, 24 167:14 197:14,15 198:1 201:13, 14 237:11 253:24

**suspect's** 163:13 197:17 199:19 201:10

**suspects** 74:18 104:8,17 131:1 157:6 193:10 194:7,15 196:2,23 201:17 252:5

**swabbed** 132:21,23

**swathe** 63:8

**swear** 6:13

**switch** 20:22

**switching** 20:23

**sworn** 6:14,16

**system** 54:22 155:2 187:16

———————

**T**

———————

**table** 52:22 99:11 100:6 103:19

**tables** 65:18

**tabulate** 52:21

**tactics** 103:21

**takes** 30:24 66:10 184:6

**taking** 66:7 156:14 201:6 204:12 244:8 252:5

**talk** 7:13 42:19 92:19 139:24 142:13 157:9 171:3 204:4 218:23 224:6

**talked** 19:14 39:20 44:11 51:1 53:8 85:19 104:2 136:15 138:15 139:10 154:17,23 171:6 173:14 216:2,8 224:2 238:19 256:9

**talking** 20:19 22:15 25:13 33:14,19 42:18 47:4,21 48:2 53:7 102:1 131:18 144:2 148:24 149:1 154:10 155:13 168:24 171:4 174:7 175:12 203:9 219:3 221:12 233:8

**talks** 45:11 63:3

**tangible** 155:18

**tape** 167:20 168:4,7

**tapes** 72:10 85:24

**taught** 106:16 200:10

**teaching** 9:13,15,17 19:23

**team** 104:20

**teams** 61:16

**technical** 12:2

**technician** 130:16

**technique** 89:10 93:14 153:2 157:10 166:19,21 197:14 198:1,15 199:4 200:1 201:5

**techniques** 33:18,20 83:18 84:4 88:23 89:5,13,17 102:12 153:2 155:5 157:1 158:19

**telling** 78:18 94:5 96:23 121:19 149:3,19 209:6

**tells** 54:18

**ten** 32:12 63:20 176:10,20

**ten-minute** 76:10

**tendering** 71:3

**Tennessee** 204:23

**term** 37:4 39:8,13 40:5,8,15,16,18 41:1 71:12 72:14 85:15 87:9,13 97:20 104:19 149:7,20 150:11 193:16 199:9

**terminology** 91:2

**terms** 15:9 98:3 139:6 156:19 203:22

**test** 15:3 217:14 221:9,13

**testified** 6:16 19:12,13 20:1,3 21:23 22:22 23:24 24:7 26:4,15,24 28:20 29:1 34:4 64:21 75:8 78:12 79:2,9 88:5 107:23 142:13 147:21 171:13 174:1,7,18 187:2 220:6

**testify** 21:19,22 22:11 23:2,15,22 27:4 28:2,11,12 29:12 30:1,11,19 33:2,23 34:9,12,18 114:1 118:2,20 119:20 163:18 164:3 225:15 226:1 237:2

**testifying** 19:22 20:14 28:16 33:3 78:21 118:12 119:21 180:24 255:1

**testimony** 8:17 23:6 26:11,13 28:18 29:8,16,20,22,23 30:2,3,15 31:19,21 32:14,15,18,20 33:11,12,

RICHARD A. LEO, PHD, JD, 09/28/2022

13 34:1,8,11 35:12 40:14 77:24 78:4 79:15 88:2,6,7,9 114:6,9 131:18 143:15 147:13 148:2 150:1 170:13 171:8,15 180:22 187:4 192:2,14 201:14 206:11 207:7 228:24 229:3 230:23 238:8 242:16 255:12

**testing** 46:10 116:21 122:11,19 175:1

**theoretically** 236:9

**theories** 253:22

**theory** 217:15

**thereof** 153:3

**thing** 26:18 51:8 63:10 65:5 85:5 88:22 123:16,17 203:3 223:21

**things** 34:2 43:1 44:9 49:7,15,22 54:14 64:17 84:10 90:16 111:16 119:2 155:16 157:11 183:14 256:16

**thinking** 58:11 73:5 155:20 181:14 197:16

**thinks** 226:6

**Thomas** 239:19

**Thomas'** 239:19

**thought** 26:12 30:20 41:15,17 45:13 46:20 51:10 63:12 90:19 91:1 99:22 127:9,13 154:4 155:12 162:24 163:4,5 208:4 232:15 251:12

**thousands** 84:19 161:4

**threat** 90:8 254:23

**threatened** 157:7

**threats** 21:17 155:6,15 156:4,12, 13 247:9 254:22

**three-year-old** 185:3

**thrown** 203:7

**Thursday** 258:6

**time** 10:12 15:18 16:13 30:24 32:5, 18 34:10 43:6,11 44:14,16,24 45:3, 21 46:3 54:17 55:4 57:3,4 62:24 66:4 68:17 76:5,10,11 79:20 80:3 90:7,10 93:12,19 95:4,7,8,9,13 96:24 99:21,22 101:15 108:12 109:2,3,12 120:3 121:5,12 125:20 126:3,4,8 128:3 131:6 134:10 138:6 140:16,24 141:4 146:23 147:5,6 148:1,6 151:15 157:8

165:1 167:21 169:7,8,13,14,16,18 170:1,5,6,14,21 171:5,9 176:17,22 184:6,8,23 198:12,22,24 202:4,16, 18 203:10,20 204:5,7,13 205:4 209:10 213:17,20 220:13,24 229:4 238:9,10,13,15 240:4 241:7,20 244:3 249:14,15 250:22 252:6 253:17 254:15 257:24 258:8

**times** 22:2 25:9 26:3,5,24 27:2 28:19 30:11,14,18 32:10 34:2 35:1 37:6 68:24 69:3 87:11 94:15 115:2 125:3 146:15 199:17 200:9 241:19

**timing** 250:19

**tired** 34:10 207:10,16

**title** 51:6 59:7

**today** 5:18 8:9 26:10 27:7 42:8 49:18 67:19 69:13 78:11,24 79:7 145:17,22 146:8 147:13 181:6 182:7 187:11,19 207:13 220:3 248:13

**told** 126:17,21 143:13 156:16 159:12 188:9 189:7 191:13,23 198:2,15 207:12 208:24 223:18 231:16 236:14 243:10 252:22

**ton** 165:18

**top** 7:24 16:22 24:9 25:7 59:8 60:5 77:21 98:7,11 122:15 168:24 174:22 175:8 192:8 193:8 222:10 231:4 233:20 238:17 250:5

**topic** 11:4 23:14

**topics** 87:17

**torture** 82:12

**total** 99:16 138:1

**touch** 46:7 129:24 130:2,6,8,11

**towel** 127:11

**traces** 130:8

**track** 170:21

**traditional** 14:15 17:19 86:12,16 202:7,21 203:22

**train** 85:12

**trained** 42:22 84:19 124:3 236:17 237:7

**training** 10:7,13 19:14,15,18,22 44:7 84:17 85:7,9,10 122:5 123:6, 11,19,22 124:5,10 198:5,8,10 238:18

**transcript** 33:16 50:22,23 77:12, 17 78:13 79:1 192:5 228:23

**transcripts** 49:14,21 72:10 77:24 85:24

**translated** 236:4 237:19 254:10

**Trevino** 209:6,9,15 223:6 235:16 236:2,21 237:1,20 246:7,12,17 247:14 254:9,20

**Trevino's** 236:13 237:18 239:17

**trial** 22:20,21,23 23:1 26:18,19 27:5 34:5 49:14,21 50:21,23 51:14, 16 52:16 82:10,11 88:4,10 187:4 192:4,13 230:11

**trials** 22:24 29:3 255:13

**trick** 165:24 167:2 235:13 236:11, 17 237:4

**triggered** 111:1

**trivial** 166:6,16 167:13 238:6,11

**true** 37:14,23 44:2 90:1 91:17,21 103:4 105:11 112:21 117:5 137:17 140:9 141:17 142:21 144:5 146:1 159:8 161:16 162:1,6,8,10,12,16 163:1,4,7 165:13 172:20,23 173:18 174:2 175:3 237:18

**truth** 211:24 214:6,19

**tunnel** 210:15 211:13 242:3

**turn** 7:10 67:7 136:9

**twelve** 96:16,17

**twenty-four** 96:17,18

**two-day** 205:3

**two-hour** 94:23

**type** 11:17 17:3 49:20 51:22 127:5 145:8

**types** 14:12 15:10 30:7 74:11 129:20 237:24 238:4

**typical** 69:15 161:3

**typically** 11:18 12:20,21 13:23 16:11 18:1 26:18 29:17 33:13,15 69:18,20 156:1,4,24 164:4 166:4,9 180:5 183:2 230:14 238:6,14

**typo** 234:14

**typo-type** 238:9

Index: U.S-.well-established

RICHARD A. LEO, PHD, JD, 09/28/2022

**U**

**U.S.** 21:13 84:23

**ultimate** 24:12 32:23 251:21,22

**ultimately** 36:11 62:19 183:19 209:19 228:16

**unable** 192:9 206:4

**uncharged** 23:9

**underlies** 122:9

**underlying** 199:13

**undermines** 222:18

**underneath** 10:21

**understand** 27:9 31:7 33:3 39:3 47:7,9 71:16 91:2 120:1 123:10 124:2 125:13 141:8 163:7 189:22 230:24 233:13 253:20 254:1 257:12

**understanding** 13:14 20:15 72:2, 3,5,13,21 73:2 74:11 75:14 97:21 98:2 109:1,9 113:24 132:17,20,24 133:4,7,10 139:17 175:22 184:22 189:5 190:24 191:8 192:16 204:13 207:22 208:17 209:2,14,18 210:1 219:9 230:22 232:9,11 251:17

**understates** 56:9

**understood** 33:1 44:21 49:4 98:3 141:8 153:14,18 191:3 209:3 235:15 245:11

**undisputed** 241:1 256:6

**unfolded** 214:22

**Unit** 5:2

**United** 5:11 85:11

**universe** 48:8

**university** 9:12 11:1 12:23 54:3

**unknown** 124:18 175:16

**unlike** 213:4 217:23

**unpublished** 198:5

**unrealistic** 176:20

**unreasonable** 57:6

**unrecorded** 230:10 239:20 256:23

**unreliability** 35:10 38:3 84:8 163:10 172:15 257:16,19,20

**unreliable** 210:17

**unusual** 178:11

**updated** 8:7 70:19

**updates** 7:12,16

**updating** 30:24

**Urlaub** 5:15,19

**Utah** 54:4

**utilized** 111:14

**V**

**vague** 71:11

**variability** 34:15

**variable** 101:4

**variation** 242:18

**varies** 11:18 20:24 68:19

**variety** 15:5 85:20

**vary** 69:8

**vein** 253:14

**verbatim** 120:9,18 151:9 152:1

**versa** 24:20

**version** 8:7,22,24 107:23 237:5 240:2 243:1 244:3 245:20 255:8 256:15,19

**versions** 256:3

**versus** 5:8 51:16 70:11,17

**vice** 24:20

**victims** 74:18 178:15

**victims'** 117:3,14 131:23 220:23

**video** 5:2,21 12:12 29:2 76:14,20 131:10,15 177:3,7,19,23 258:2

**videoconferenced** 5:4

**view** 91:5 116:21 165:14

**viewed** 103:14

**views** 152:13,14

**violated** 238:22

**violates** 204:20 205:5

**violating** 21:16

**Violation** 238:17

**violence** 21:17 90:10

**violent** 110:10

**virtually** 132:12 237:9 256:4

**vision** 210:15 211:13 242:3

**visits** 170:11

**vitae** 7:10

**voluminous** 73:14 81:18 82:1

**voluntarily** 91:9 166:14,17,23 219:13

**voluntariness** 21:5

**voluntary** 166:22 167:15 246:19

**vulnerable** 229:11

**W**

**wait** 61:2 197:15

**waiver** 246:19

**walk** 185:14

**walked** 107:24 108:9 110:4 184:23 242:7

**walking** 109:11 110:15

**walks** 124:6

**wall** 116:8 170:18 247:1

**wanted** 21:18 22:3 46:21 52:20 80:3 151:12 207:24 209:4 252:1

**warehoused** 89:22

**warning** 246:18

**warnings** 231:15

**waste** 54:16 147:5

**wasting** 121:4 146:23 147:6

**ways** 37:11 41:20,22 80:16 141:19, 21

**weak** 183:12

**wearing** 126:7,20

**weed** 14:2

**week** 71:1 125:19

**week's** 126:7

**weighed** 183:15

**Weiland** 5:18

**weird** 123:20

**well-established** 164:7

RICHARD A. LEO, PHD, JD, 09/28/2022

**well-trained** 164:20

**Welling** 5:13

**Westlaw** 45:8

**whichever** 198:16

**whittled** 48:11,13,17

**wide** 46:11

**widely** 164:7

**widespread** 43:2

**wife's** 178:23

**withstand** 213:5

**witnesses** 74:18 111:19,20
186:13 191:14,18,23 192:1 193:10
194:7,16 196:2 227:24 228:4

**woman** 219:17 221:12

**wondering** 68:16,18

**word** 19:1 97:2 173:3 211:16
214:20,21 249:2

**words** 72:18 160:7 174:24 212:6
234:18 252:21

**work** 27:18 29:9 33:16 47:16,20
49:20 53:5 77:1 82:7 84:21 89:13
118:7,15 121:14 140:9,15,16,18,20
141:5,6,7 148:12 149:9,11 164:21

**worked** 37:7 45:20,22 72:6 82:5
120:14 201:13 207:9

**working** 45:21 67:12 138:16,19

**world** 62:22 85:19 95:20 239:9,12

**worst** 54:21

**worth** 30:23

**wounds** 116:9

**write** 13:4 58:6 65:10 93:23 159:3
197:13 237:22 253:23

**writer** 16:8

**writing** 170:22 249:12

**written** 57:6,23 85:2 114:13
120:13 128:15 148:3 151:14 162:1
209:12,18 211:8 223:15 228:18
248:1 252:22

**wrong** 54:6,13 112:12,19 132:15
204:19 218:12 222:16,23 225:2,3

**wrongful** 54:19 63:7

**wrongly** 165:2

**wrote** 50:4 54:4 57:17 60:15 63:20
64:7 85:4 86:6 99:3 181:15 223:17

---

**Y**

**year** 59:10 68:22 69:2,9 104:18
168:6 180:16

**years** 31:2 32:12 33:17 40:11 41:5
45:23 63:20 66:19 67:5,6 69:10
151:14 153:22 156:18 167:9 181:4
198:7 230:13 244:5

**yelled** 157:6 208:24

**York** 46:8

**Youth** 239:16 246:6,12

---

**Z**

**Zehner** 6:6 12:1

**zeroing** 159:19

**Zoom** 119:15