*DeLeon-Reyes v. Guevara, et al.*
Case No. 18 CV 01028

*Solache v. Guevara, et al.*
Case No. 18 CV 02312

# EXHIBIT 1

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

JAIME RIOS,
            Plaintiff,

     v.

REYNALDO GUEVARA *et al.*,
            Defendants.

No. 22-cv-03973

Judge Jeremy C. Daniel

## ORDER

This order memorializes and expands on some of the rulings the Court made at the final pretrial conference on January 22, 2026. The parties must file their proposal concerning peremptory strikes on or before January 28, 2026. The parties shall exchange any exhibits they intend to show during opening arguments on or before January 28, 2026, and file any objections to opening exhibits on or before January 30, 2026. The parties shall file any designations, whether from a deposition or court transcript, on or before January 28, 2026. A party will not be able to affirmatively introduce designations at trial that it has not identified by this deadline. The parties shall file any objections or counter-designations on or before January 30, 2026. The plaintiff shall disclose his anticipated questions for defendant Guevara on or before January 30, 2026. The Court anticipates issuing a written order concerning its 404(b) rulings by January 28, 2026. The Court also anticipates distributing its draft jury instructions, verdict form, and voir dire questions by July 29, 2026.

With respect to pending motions: the Court granted the defendants' motion for leave to file a successive motion for summary judgment (R. 226); the plaintiff's motion to admit Dr. Russano's testimony [244, 246] is granted in part and denied in part; the plaintiff's motion to admit Dr. Loftus's testimony [245] is granted in part and denied in part; the plaintiff's motion to preclude Dr. Schafer's testimony [247] is denied; the defendant's motions in limine [248] are granted in part and denied in part; the plaintiff's motions in limine [249] are granted in part and denied in part; the plaintiff's motion to allow William Dorsch to testify remotely [261] is denied as moot; the plaintiff's motion to allow defendant Guevara to testify remotely [262] is granted.

## STATEMENT

Time limits. Each side will have up to 30 hours to present their respective cases. The clock will run when a party examines a witness or presents argument. The clock will not run during jury selection or for any matter addressed outside of the jury's presence.

Peremptory strikes. The Court instructed the parties to confer on the number of peremptory strikes each side should have. The Court further instructs the parties to consider the appropriate number of strikes per side, as the Court will consider the defendants as a single party under 28 U.S.C. § 1870.

Statement of the case. The Court will read the following statement of the case to prospective jurors prior to voir dire:

> The plaintiff, Jaime Rios, alleges that the defendants, Reynaldo Guevara, Michael Mason, and Ernest Halvorsen, violated the plaintiff's civil rights. The defendants are former Chicago police officers. Defendant Halvorsen is deceased. His widow, Joann Halvorsen represents him in this case. The plaintiff alleges that defendant Guevara coerced his confession, fabricated evidence, suppressed exculpatory evidence, and maliciously prosecuted him. The plaintiff further alleges that defendants Mason and Halvorsen coerced his confessions and acted in concert with defendant Guevara. The plaintiff further alleges that the defendants' actions led to the plaintiff's wrongful conviction for murder in 1990. The plaintiff seeks money damages for harms caused by the defendants' alleged conduct. The defendants deny all of these allegations and deny that the plaintiff is entitled to any damages.

Experts. Fed. R. Civ. P. 702 "provides that a qualified expert witness may offer an opinion only if the proponent demonstrates that: (a) the expert's scientific, technical, or other specialized knowledge will be helpful to the jury; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts." *Artis v. Santos*, 95 F.4th 518, 525 (7th Cir. 2024). District courts must ensure that "any proposed expert testimony is not only relevant, but reliable." *Id.* (quotations and citation omitted). To do so, district courts consider whether the proponent established that the witness would testify to valid scientific, technical, or other specialized knowledge and whether the testimony will assist the trier of fact. *See Robinson v. Davol Inc.*, 913 F.3d 690, 695 (7th Cir. 2019).

The plaintiff intends to call two experts at trial. The first is Dr. Melissa Russano, a professor of criminal justice who has a Ph.D. in Psychology. Dr. Russano offers opinions concerning interrogations and false confessions. Those opinions include her views on empirical research and articles published on those topics. From that research, Dr. Russano identifies factors associated with false confessions, the effect false confessions can have, and things one may consider when assessing whether a confession is false one. Dr. Russano then reviews materials specific to this case and concludes that "Mr. Rios's confession raises serious concerns about the extent to which fact-finders can confidently rely on his statement."

That last step is too far. "Expert testimony is unnecessary—and may even be properly excluded—if people of common understanding, are as capable of comprehending the primary facts and of drawing correct conclusions from them as are witnesses possessed of special or peculiar training, experience, or observation in respect of the subject under investigation." *United States v. Dewitt*, 943 F.3d 1092, 1096 (7th Cir. 2019) (quotations and citations omitted). In her report, Dr. Russano repeatedly invades the province of the jury by making factual findings. For instance, she identifies "several details that were consistent with the objective evidence in the case," identifies "numerous inconsistencies between Mr. Rios' statement and the objective evidence in this case," and concludes that "there are a number of serious risk factors for false confessions present in this case."

2

Whether something is consistent or inconsistent, or even present, implicates findings that the jury in this case needs to—and is qualified to—make.

It does not take specialized knowledge to determine whether any of the factors associated with false confessions were present in the underlying criminal case. All one has to do, after learning what factors research suggests are relevant, is review the case materials. That is what Dr. Russano did; she reviewed the case file through the lens of research in the field of false confessions.

Nothing in Dr. Russano's report points to any methodology used to reach that opinion. Dr. Russano writes, "It is my opinion to a reasonable degree of scientific certainty in the field of psychology that the questioning conditions and techniques that Mr. Rios described could lead an innocent person (or one that lacks guilty knowledge) to provide a false statement in a homicide case." Contrary to her reference to "a reasonable degree of scientific certainty," that is not a scientific process that led her to that conclusion. She reviewed the case file, which is exactly what this jury will do. As such, Dr. Russano may not testify about the specifics of this case. Dr. Russano may testify about her research in the fields of interrogations and false confessions. This will provide the jury with context for false confessions. With that framework in place, the jury, to the extent it accepts Dr. Russano's testimony, will have what it needs to analyze the evidence.

The plaintiff also intends to call Geoffrey Loftus, a professor of psychology with a Ph.D. in psychology. Dr. Loftus offers opinions concerning the reliability of eyewitness testimony. As with Dr. Russano, Dr. Loftus may testify about his research in this area, but he cannot testify about the specifics of this case. In his report, Dr. Loftus concludes that, "Mr. Huertas viewed the shooter under poor lighting conditions," "Mr. Huertas had reason to be stressed," and "Mr. Huertas . . . would have had multiple things competing for his attention." "As gatekeeper, the district court must decide whether putative opinions are offered ipse dixit." *Turubchuk v. S. Illinois Asphalt Co., Inc.*, 958 F.3d 541, 554. There is no way for Dr. Loftus to know these things. Rather, he reviewed the record and made factual determinations based on the record and inferences he drew from the record. That is for the jury to do. Dr. Loftus may testify to what the research has shown to be relevant factors in assessing the reliability of eyewitness identification. He may not, however, share his thoughts on the record in this case.

The defendants intend to call one expert witness, Jack Schafer, as a rebuttal witness to Dr. Russano. Dr. Schafer is a former special agent with the Federal Bureau of Investigation and has a Ph.D. in psychology. The plaintiff's challenge Dr. Schafer's qualifications. Dr. Schafer holds a Ph.D. in psychology. The plaintiff fails to explain why someone with a doctorate in a field is not qualified to review the literature in that field. The plaintiff also claims that Dr. Schafer's experience as a special agent, which included interrogating individuals, does not qualify him as an expert in this case. The plaintiff offers no credible argument in this respect. The plaintiff's reference to *Harris v. City of Chicago*, No. 14 C 4391, 2017 WL 3142755, at *1-6 (N.D. Ill. July 25, 2017) ignores Dr. Schafer's education in psychology, which the proffered expert in *Harris* did not have. And the plaintiff's reference to Dr. Schafer's views being at odds with literature is a question of weight, not admissibility. Therefore, the defendants may call Dr. Schafer in rebuttal to Dr. Russano.

Certificate of Innocence. The Court grants the plaintiff's motion in limine No. 2 in part and denies it in part. The plaintiff seeks to admit his petition for a certificate of innocence, the certificate of

innocence, and the transcript of the hearing on the petition for a certificate of innocence. The plaintiff has a state law malicious prosecution claim against defendant Guevara. That claim requires proof that the underlying criminal case "was favorably terminated in a manner indicative of innocence." *See Patrick v. City of Chicago*, 974 F.3d 824, 832 (7th Cir. 2020). That makes the certificate of innocence directly relevant to the plaintiff's claim. That is not the case for the petition or the transcript, and the plaintiff has not bothered to explain how they are relevant. Therefore, the Court denies the plaintiff's motion with respect to the petition and the transcript.

The Court is not persuaded by the defendants' willingness to stipulate to the favorable termination element. The defendants cannot dictate to the plaintiff how the plaintiff will present his case.

The defendants argue that the certificate of innocence is hearsay. It is not. The certificate of innocence's significance lies in the fact that a court issued it. *See* Fed. R. Evid. 801(c), Advisory Committee Note C ("If the significance of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, and the statement is not hearsay."). And the Court will instruct the jury accordingly. To the extent the defendants intend to present evidence that the plaintiff committed the offense he was charged with, and to the extent the plaintiff seeks to rebut that evidence, the Court will instruct the jury that the certificate of innocence plays no role in determining that matter. The Court will also instruct the jury consistent with *Patrick*, 974 F.3d at 833 (referencing the jury instruction in *Harris v. City of Chicago*, 2018 WL 2183992, at *4–6 (N.D. Ill. May 11, 2018)).

The defendants also argue that the certificate of innocence must be barred under Fed. R. Evid. 403. While the Court acknowledges the potential unfair prejudice a certificate of innocence may cause, "[w]ell-crafted jury instructions can guard against the risk of unfair prejudice or confusion of the issues." *Patrick*, 974 F.3d at 833.

Motions in limine. The Court will issue a separate order on the plaintiff's 404(b) motions (Plaintiff's MILs Nos. 4-11). The following is a tally of the Court's oral rulings on the parties' motions in limine.

| Plaintiff's MIL No. | Description | Ruling |
|---|---|---|
| 1 | Preclude plaintiff's 1990 and 1995 convictions | Granted as to Fed. R. Evid. 609. This is without prejudice to the defendants' seeking admission on other grounds. |
| 2 | Admit the plaintiff's certificate of innocence | Granted in part and denied in part. |
| 3 | Call defendant Guevara to testify | Granted. Defendant Guevara intends to invoke his Fifth Amendment rights. As such, the plaintiff shall disclose his questions for defendant Guevara on or before January 30, 2026. Defendant Guevara may testify remotely. |

4

| 4-11 | Allow Maysonet, Rankins, Melendez, Mejia, Diaz, Bordoy, Dorsch, and Solache to testify. | Denied. The Court will issue a written order concerning its ruling. |
|---|---|---|
| Defendants' MIL No. | | |
| 1 | Exclude the plaintiff's certificate of innocence | Granted in part and denied in part. |
| 2 | Bar Any Evidence or Argument About Suggestiveness or Coercion Leading to Any Identifications in this Case or Failure to Inform Prosecutors of Same | Denied. |
| 3 | Bar Evidence or Argument Contradicting Admissions Made During Summary Judgment Proceedings | Denied. |
| 4 | Bar Any Evidence or Reference to Allegedly False Testimony of Any Defendant at Plaintiff's Criminal Trial | Denied. |
| 5 | Bar Prior Evidence or Argument Concerning Prior Claims of Misconduct, Citizen Complaints, and Lawsuits, and the testimony of Plaintiff's Proffered Fed. R. Evid. 404(b) Witnesses against Guevara | Granted in part and denied in part. The plaintiff may testify to his knowledge of defendant Guevara to the extent that it influenced the plaintiff's conduct in dealing with Guevara. |
| 6 | Bar Geoffrey Loftus | Granted in part and denied in part. |
| 7 | Bar Evidence of Fifth Amendment Invocation, or in the Alternative, To Bar Live Elicitation of Fifth Amendment Invocation of Defendant Guevara and/or Limit the Number and Nature of Questions Designed to Elicit Such Invocation | Denied in part. |
| 8 | Bar Any Attempt To Elicit a Fifth Amendment Invocation From Defendant Guevara Without First Establishing The Existence of Such Facts Through Independent Evidence | Granted. The plaintiff has agreed to disclose his questions for defendant Guevara. To the extent any questions are not supported by the anticipated evidence at trial, the Court will hear objections to those questions. |
| 9 | Bar Any Attempt to Elicit a Fifth Amendment Invocation From Defendant Guevara on Matters Already Adjudicated Against Plaintiff on Summary Judgment | Denied. |
| 10 | Bar Any Evidence, Argument or Inquiry Relating to Any Judicial | Granted. |

| | Commentary on the Credibility of Defendant Guevara or Other Matters Relating to Other Cases Involving Defendant Guevara | |
|---|---|---|
| 11 | Bar Imputing Any Inference from Guevara's Assertion of the Fifth Amendment to Defendants Halvorsen and Mason | Granted as agreed. |
| 12 | Bar Evidence or Argument Related to Halvorsen's Disavowed Fifth Amendment Invocation in Unrelated Litigation | Granted as agreed. |
| 13 | Bar Any Testimony by Criminal Defense Attorneys or Other Witnesses Speculating on the Outcome of Criminal Trial | Granted in part and denied in part. The criminal defense attorney can testify about how his or her view of the case influenced his or her conduct with respect to the case. The criminal defense attorney cannot testify about predictive outcomes beyond the effect they had on his or her conduct. |
| 14 | Bar Any Testimony Regarding Rios's Friends and Family's Personal Feelings, Emotional Status, and/or Suffering after Plaintiff's Arrest | Denied without prejudice. |
| 15 | Bar Evidence or Argument Regarding Any Alleged Abuse or Illegal Conditions of Confinement Experienced or Witnessed by Plaintiff While Incarcerated | Granted. |
| 16 | Bar Any Argument or Questioning Regarding the Failure to Record Interrogations, Witness Statements or Identification Procedures | Denied without prejudice. |
| 17 | Bar Any Evidence or Argument Concerning Sufficiency of Investigation | Denied. |
| 18 | Bar Chicago Police Department Policy or Practice Violations by Defendant Officer | Denied without prejudice. |
| 19 | Bar General Evidence or Argument Regarding Alleged Code of Silence | Denied without prejudice. |
| 20 | Bar Plaintiff's False Confession Expert Melissa Russano | Granted in part and denied in part. |
| 21 | Bar Prior Evidence or Argument Concerning Prior Claims of Misconduct, Citizen Complaints, and | Granted as agreed. |

6

| | | |
|---|---|---|
| | Lawsuits against Halvorsen, Mason and Non-Party CPD Witnesses | |
| 22 | Bar References to Highly Publicized Cases of Police Misconduct | Granted. The Court understands that expert witnesses will likely discuss the underlying facts of highly publicized misconduct cases found in the literature in the expert's field. |
| 23 | Bar Plaintiff from Arguing or Referring to "Constitutional Rights" as a Category of Damages | Granted. |
| 24 | Bar Any "Golden Rule" Arguments | Granted. |
| 25 | Motion to Admit Felony Convictions of Plaintiff's Witnesses Benjamin Carrero, Cristino Garcia and Lamont Burr | The defendants may admit Garcia's and Burr's convictions that occurred within the last ten years. The defendants may introduce the fact of conviction for Garcia and Burr for convictions that would have been admissible in the underlying criminal case. The defendants may introduce the fact that the plaintiff and Carrero were incarcerated together, but no details concerning Carrero's conviction. |
| 26 | Exclude the City of Chicago on the Verdict Form, Jury Instructions and Case Caption | Granted. |

Date: January 26, 2026

JEREMY C. DANIEL
United States District Judge

7

*DeLeon-Reyes v. Guevara, et al.*
Case No. 18 CV 01028

*Solache v. Guevara, et al.*
Case No. 18 CV 02312

# EXHIBIT 2



## Planet Depos
### We Make It *Happen*™

# Transcript of Reynaldo Guevara

**Date:** October 21, 2020
**Case:** DeLeon-Reyes & Solache -v- Guevara, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
**www.planetdepos.com**

Transcript of Reynaldo Guevara
Conducted on October 21, 2020

1 (1 to 4)

---

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

--------------------------x

ARTURO DeLEON-REYES,        : Case No.:

    Plaintiff,        : 1:18-CV-01028

v.                          :

REYNALDO GUEVARA, et al.,   :

    Defendants.        :

--------------------------x

GABRIEL SOLACHE,            : Case No.:

    Plaintiff,        : 1:18-cv-2312

v.                          :

CITY OF CHICAGO, et al.,    :

    Defendants.        :

--------------------------x

Videotaped Deposition of

REYNALDO GUEVARA

Chicago, Illinois

Wednesday, October 21, 2020

10:08 a.m.

Job: 330621

Pages: 1 - 74

Transcribed by: Molly Bugher

---

**Page 2**

Deposition of REYNALDO GUEVARA held,

electronically, at the offices of:

    LOEVY & LOEVY

    311 North Aberdeen Street, 3rd Floor

    Chicago, Illinois 60607

    Phone: (312) 243-5900

    Pursuant to agreement, before Darrell Lowe,

Notary Public in and for the State of Illinois.

---

**Page 3**

A P P E A R A N C E S

(Via Zoom Videoconference)

ON BEHALF OF THE PLAINTIFF DeLEON-REYES:

    ANAND SWAMINATHAN, ESQUIRE

    SEAN STARR, ESQUIRE

    STEVEN ART, ESQUIRE

    JOHN HAZINSKI, ESQUIRE

    LOEVY & LOEVY

    311 North Aberdeen Street,

    3rd Floor

    Chicago, Illinois 60607

    Phone: (312) 243-5900

ON BEHALF OF THE PLAINTIFF SOLACHE:

    JAN SUSLER, ESQUIRE

    PEOPLE'S LAW OFFICE

    1180 North Milwaukee Avenue

    3rd Floor

    Chicago, Illinois 60642

    Phone: (773) 235-0070

///

///

///

---

**Page 4**

A P P E A R A N C E S

(Via Zoom Videoconference)

(Cont'd)

ON BEHALF OF THE DEFENDANT GUEVARA:

    THOMAS MORE LEINENWEBER, ESQUIRE (via phone)

    JAMES V. DAFFADA, ESQUIRE, By Telephone

    Leinenweber, Baroni & Daffada, LLC

    120 North LaSalle Street

    Suite 2000

    Chicago, Illinois 60602

    Phone: (866) 786-3705

ON BEHALF OF DEFENDANTS DICKINSON, RUTHERFORD,

STANKUS, NAUJOKAS, HARVEY, TREVINO, MINGEY,

BIEBEL:

    JOSH ENGQUIST, ESQUIRE

    THE SOTOS LAW FIRM, PC

    141 West Jackson

    Suite 1240A

    Chicago, Illinois 60604

    Phone: (630) 735-3314

///

///

---

A P P E A R A N C E S

(Via Zoom Videoconference)

(Cont'd)

ON BEHALF OF DEFENDANTS WEHRLE, BRUALDI,

VARGA, O'MALLEY and COOK COUNTY:

EDWARD M. BRENER, ESQUIRE

COOK COUNTY STATE'S ATTORNEY'S OFFICE

500 Richard J. Daley Center

Chicago, Illinois 60602

Phone:  (312) 603-5971

ON BEHALF OF DEFENDANT NAVARRO:

DANIEL J. BURNS, ESQUIRE, (via phone)

REITER BURNS LLP

311 South Wacker Drive, Suite 5200

Chicago, Illinois 60606

Phone:  (312) 982-0090

ON BEHALF OF DEFENDANT CITY OF CHICAGO:

CATHERINE M. BARBER, ESQUIRE

ROCK FUSCO & CONNELLY, LLC

321 North Clark Street, Suite 2200

Chicago, Illinois 60654

Phone:  (312) 494-1000

A P P E A R A N C E S

(Cont'd)

ALSO PRESENT:

JEAN ZISCH, Videographer

C O N T E N T S

PAGE

EXAMINATION OF REYNALDO GUEVARA

By Mr. Swaminathan                    10

E X H I B I T S

(None)

P R O C E E D I N G S

THE VIDEOGRAPHER:  Here is the beginning of media number one of the videotaped deposition of Reynaldo Guevara in the matter of Arturo DeLeon, et al vs. Reynaldo Guevara, et al in the U.S. District Court, Northern District of Illinois, Eastern Division, case number 118-cv-01 -- excuse me -- 01028.  Today is October 21, 2020.  The time on the video monitor is 10:08 a.m. The certified videographer today is Jean Zisch representing Planet Depo.

This video deposition is taking place remotely.  Would all counsel please identify yourself and state whom you are represent.

MR. SWAMINATHAN:  This is Anand Swaminathan for Plaintiff, Arturo DeLeon Reyes.

MR. ART:  Steve Art for Plaintiff Reyes.

MR. DAFFADA:  James Daffada for Defendant Guevara.

MR. LEINENWEBER:  Leinenweber for Defendant Guevara.

MR. ENQUIST:  Thomas Enquist on behalf of Defendants Dickinson, Rutherford, Stankus, Harvey, Trevino, Mingey, Biebel and the estates of

Transcript of Reynaldo Guevara
Conducted on October 21, 2020

Capitelli, Halverson, and Carilo.

MS. BARBER: Catherine --

MR. BRENNER: And this is Edward -- oh, go ahead Cathy.

MS. BARBER: Catherine Barber for Defendant, City of Chicago.

MR. BRENNER: Edward Brenner for Defendants O'Malley, Brualdi, Varga, Wehrle, and Cook County.

MR. BURNS: Dan Burns on behalf of Defendant Navarro.

MS. SUSLER: Jan Susler on behalf of Plaintiff Gabriel Solache. And I need to call to your attention that this deposition is also in the case of Gabriel Solache vs. the City of Chicago. And the case number is 18CV2312.

MR. STARR: Sean Starr on behalf of Plaintiff Reyes.

MR. HAZINSKI: John Hazinski on behalf of Plaintiff Reyes as well.

THE VIDEOGRAPHER: Okay then. The court reporter today is Darrell Lowe representing Planet Depo. Would the court reporter, please swear in the witness?

THE REPORTER: Okay. You may begin.

REYNALDO GUEVARA, a witness, having been duly sworn or affirmed was examined and testified as follows:

EXAMINATION BY ATTORNEY FOR PLAINTIFF ARTURO DeLEON-REYES

BY MR. SWAMINATHAN:

Q Mr. Guevara, good morning.

A Good morning.

Q Could you please state and spell your name again for the record?

A Reynaldo Guevara spelled, the first name; R-E-Y-N-A-L-D-O. Last name; G-U-E-V-A-R-A.

Q Sir, do you have any medical issues that would prevent you from being able to understand my questions today?

MS. BARBER: Anand, I'm just going to object before you get in detail with your questions. It looks like there's four lawyers on this deposition for Plaintiff Reyes. And I'm sure, as you know, that this witness is likely to assert his Fifth Amendment rights. I'm not sure why there is for lawyers from your firm on this deposition. But should Plaintiff be entitled to

seek fees in this case, the city would object of course to paying fees for four lawyers on this dep.

MR. SWAMINATHAN: Objection is noted. I will ask my question again.

BY MR. SWAMINATHAN:

Q Mr. Guevara, do you have any medical issues that would prevent you from being able to understand my questions today?

A I don't think so.

Q Do you have any medical issues that would prevent you from giving truthful testimony today?

A No.

Q Sir, are you taking any medications that would prevent you from being able to understand my questions today?

A No.

Q Are you taking any medications that would prevent you from giving truthful testimony today?

A No.

Q Is there anything that you believe would prevent you from been up to understand and answer my questions today?

A I don't think so.

Q Your deposition is being sought in a number of cases. Do you have any health issues that might impact your ability to sit for a deposition in the coming months?

A No, I don't think so.

Q Sir, where do you currently live?

MR. DAFFADA: City and state.

A In San Antonio, Texas.

Q Is that where you currently are for this deposition?

A Yes.

Q You previously lived in Chicago, correct?

A Yes.

Q Did you move from Chicago directly to San Antonio?

A Yes.

Q Why did you move to San Antonio?

MR. DAFFADA: Objection. Form. You can answer Rey.

A No specific reason.

Q What were the general reasons?

Transcript of Reynaldo Guevara
Conducted on October 21, 2020

4 (13 to 16)

A The weather.
Q Anything else?
A No.
Q Are you currently living with anyone?
A My wife.
Q Anyone else?
A No.
Q Can you tell us your wife's name, please?
A Magneset Guevara.
Q Do you have any family in San Antonio?
A Yes.
Q What family?
A My son.
Q Anyone else?
A No.
Q How often do you see your son in San Antonio?
MR. DAFFADA:: Objection, relevance. You can answer Rey.
A Not much, but I do see him.
Q When you say not much, do you mean once a week? Once a month? Once a year? Give us a sense.

A Maybe once a month, months, a couple of months or so.
Q Okay, and what's his name?
A This -- excuse me. Does this have any relevance to this case, suit, or whatever?
Q I'm intending to move on shortly here, but I need to get some basic background information on where you are at today in life. So could you just tell me your son's name, please?
MR. DAFFADA: Rey --
A Juan Guevara.
MR. SWAMINATHAN: Court reporter, did you get that?
THE REPORTER: I did not. Could you repeat, please?
A Juan Guevara.
Q Mr. Guevara, what do you do for a living?
A Retired.
Q Are you currently working in any form?
A No.
Q Do you currently have any sources of income?
A Retirement.

Q Do you have any sources of income in retirement?
MR. DAFFADA: Objection. Form.
MR. SWAMINATHAN: Strike that.
Q When you say retired, are you referring -- what are you referring to?
A Retired from the City of Chicago.
Q In other words, you're collecting a pension; is that correct?
A Yes.
Q Okay. And that's a pension for your work from the Chicago Police Department; is that correct?
A Yes.
Q Do you have any other sources of income other than the pension you are getting from the Chicago Police Department?
A Social Security.
Q Anything else?
A I have a Park District.
Q Excuse me. Say that again?
A Chicago Park District.
Q And what income do you receive from the Chicago Park District?

A Retired from there too.
Q And is that a pension that you have from the Park District?
A Yes.
Q How long did you work for the Park District?
A About 10 years.
Q Was that after you retired from the Chicago Police Department?
A While I was in the Chicago Police Department.
Q What was the period of time in which you worked for the Chicago Park District?
A I don't understand your question, sir.
Q What years was it that you worked in the park district?
A I can't answer that because I don't recall. I don't remember.
Q Was it sometime in the '80s? The '90s? 2000s? Can you give me a general sense?
A Again, I don't remember exactly, sir.
Q Was it while you were a homicide detective?
A Yes.

Transcript of Reynaldo Guevara
Conducted on October 21, 2020

MR. DAFFADA: Objection. Foundation.

BY MR. SWAMINATHAN:

Q Was it also for a period of time during which you were a gang crimes officer?

A No, I don't think so.

Q So would it be fair to say that the period of time in which you worked in the Park District was during a period of time in which you were a homicide detective?

A Yes.

Q When you worked for the park district, was it a part-time job or full-time job?

A Part-time.

Q Did the Police Department know that you had a second job at the Park District?

A I don't know if they did or not.

Q How many hours did you work for the Park District per week?

MR. DAFFADA: Objection. Foundation.

A A few -- a few hours.

Q And where did you work for the park district? In what areas of the city?

MR. DAFFADA: Objection. Form.

A The north side of Chicago.

Q And did you work at any specific parks or buildings?

A Yes, the Broadway Avenue.

Q Anywhere else?

A No, I don't recall.

Q How much is the pension that you receive from the Park District per year?

A $600.

Q $600 per year?

A No, $600 -- well, I -- $600 a month I believe.

Q Okay. How much is the pension that you receive from Chicago Police Department per month or per year?

A $5,000, something like that.

Q $5,000 per month?

A Yes, something like that.

Q Other than your Social Security and income you receive from your pensions with the Chicago Police Department and Park District, do you have any other sources of income currently?

A No, I do not.

Q Sir, do you ever go back to visit Chicago?

A Yes.

Q How often do you go back to Chicago?

A I just came back from there.

Q How long were you there when you were there most recently?

A A couple of weeks.

Q Do you have a residence in Chicago?

A Yes, my son lives in --

MR. DAFFADA: Objection. Form.

Q How many residences do you have in Chicago?

MR. DAFFADA: Objection. Form, no foundation. You can answer.

A One. One.

Q And do you -- is that a single-family home?

A Yes, it is.

Q And is that where you stayed when you went back to Chicago very recently?

A Yes.

Q Who lives in that home other than your son?

A My grandkids.

Q Anyone else?

A His wife.

Q Anyone else?

A No.

Q Before that, when was the last time you were back in Chicago?

A Two years ago.

Q How many times have you been back to Chicago since you moved to San Antonio?

MR. DAFFADA: Objection. Foundation. Form. You can answer.

A Twice.

Q All right. Let's move on, sir. When did you retire from the Chicago Police Department?

A 2005.

Q And the job you had -- what was the last job you had at the Chicago Department?

A I don't remember.

Q Did you have any positions in the Chicago Police Department after being a homicide detective?

A No.

Q So your last job in the Police Department was homicide detectives; is that fair?

A Yes.

Transcript of Reynaldo Guevara
Conducted on October 21, 2020

6 (21 to 24)

**21**

Q   Were you always a homicide detective at Area 5?

MS. BARBER:  Objection.  Form.

**A   I would say so.**

Q   How long were you a homicide detective?

**A   I don't really remember.  A few years.**

Q   At the time you retired, who was your partner?

MR. DAFFADA:  Objection.  Foundation. You can answer.

**A   Ernest Halverson.**

Q   And did you have any other partners while you were a homicide detective?

**A   Yes.**

Q   Who were your other partners?

**A   Detective Steve Gawrys.**

Q   Anyone else?

**A   Not that I recall.**

Q   When Mr. Gawrys and Mr. Halverson were out of the office, were there any other homicide detectives you worked with as partners?

**A   I don't think so, no.**

Q   Was there a point in time that you switched from being partners with Mr. Gawrys to

**22**

Mr. Halverson?

**A   No.**

Q   Were you partners with Mr. Gawrys first before you became partners with Mr. Halverson?

**A   Yes.**

Q   Okay.  Do you know when you were partners -- switched from Gawrys to Halverson?

**A   No.**

Q   Before you were a homicide detective, you were a gang crimes officer, correct?

**A   Gang crime specialist, yes.**

Q   Okay.  And was that based out of Gang Crimes North?

**A   Correct.**

Q   Did you have any partners when you are in gang crimes?

**A   Steve Gawrys.**

Q   Anyone else?

**A   Oh, I had a few of them, but I don't remember exactly who it was.**

Q   Can you remember --

MR. SWAMINATHAN:  Strike that.

Q   Who were some of the other partners that you can remember now?

**23**

**A   Daniel Noon.**

THE REPORTER:  What is that?  Daniel --

MR. SWAMINATHAN:  Noon; N-O-O-N.

**A   Daniel Noon; N-O-O-N.**

THE REPORTER:  Thank you.

**A   And, oh man.  I can't remember the other guy's name.**

Q   Was it -- can you -- so you had Noon and then you eventually went from Noon to Gawrys; is that right?

**A   Yes.**

Q   Okay.  And then the other person, was that before Noon?

**A   Before Noon, yes.**

Q   Okay.  And can you remember who that was?

**A   No, not off the top of my head I can't.**

Q   While you were working in gang crimes, where were you -- where was your office based?

MR. DAFFADA:  Objection.  Foundation.

**A   It was --**

Q   Sorry.  Go ahead.

MR. DAFFADA:  You can answer.

**A   It was first in the 14 District upstairs**

**24**

**in the old 14 District.  And then it went to Area 6 at that time.**

Q   Okay.  And so there was gang crimes -- there was a gang crimes office at the 14th District and then at Area 6?

**A   Yes.**

Q   Okay.  And so the gang crimes officers and gang crimes of the North would work out of the Area 6 office?

**A   Yes.**

Q   Is that where you always keep a desk?

**A   Yes.**

Q   Is that where you all would keep files?

MR. DAFFADA:  Objection.  Form.  You can answer.

**A   Files?  No, I don't remember whether we had files there or not.**

Q   Well, when -- like notes and things that you took, where would you keep those?  Would you keep them with you at the gang crimes office?

MS. BARBER:  Objection.  Form. Foundation.

**A   I didn't keep any notes and files that I remember.**

Q   Did you ever take --

A   I said, I don't remember keeping any files.

Q   I see.  You took notes as a police officer though, right?

MS. BARBER:  Objection.  Form. Foundation.

A   Sometimes.

Q   And then what would you do with those notes?

A   Throw them out.

MS. BARBER:  Objection.  Form. Foundation.

Q   Would you ever keep notes in the gang crimes office?

MS. BARBER:  Objection.  Form. Foundation.

A   No.

Q   You took notes --

MR. SWAMINATHAN:  Strike that.

Q   Did you take notes as a homicide detective as well, sir?

MS. BARBER:  Objection.  Form. Foundation.

A   Sometimes, yes.

Q   Would you take notes on GPRs or on something else?

MS. BARBER:  Objection.  Form. Foundation.

A   Just some paper.

Q   Was that -- and when you were in gang crimes and you took notes, would you do that on GPRs or something else?

MS. BARBER:  Objection.  Form. Foundation.

A   The same way.

Q   And did you say you destroyed the notes at some point after you had taken them?

MS. BARBER:  Objection.  Form. Foundation.

A   Yes, I would throw them away.

Q   Why was that?

MS. BARBER:  Objection.  Form. Foundation.

A   Didn't have any reason to keep them.

Q   In terms of throwing away notes, would you do that both with your notes as a gang crimes officer and as a homicide detective?

MR. DAFFADA:  Objection.  Form.

MS. BARBER:  Objection.  Form. Foundation.

A   Yes.

Q   Would you --

MS. BARBER:  I'm sorry.  I need to take a break.

MR. SWAMINATHAN:  What's the reason for the break?

MS. BARBER:  I just -- I need a break.

MR. SWAMINATHAN:  Okay.  I would like to state for the record I'm not sure why we would be taking a break right now.

MS. BARBER:  That's fine, but I need a break.

MR. SWAMINATHAN:  You need a break for yourself or is it because you want to be able to consult with the witness?

MS. BARBER:  No, I don't want to consult with the witness.

MR. SWAMINATHAN:  Are you intending to consult with the witness or his counsel?

MS. BARBER:  I don't know at that -- right now, but right now I want to take a break.

MR. SWAMINATHAN:  Okay.  And then after this I intend to ask whether you -- were you consulting with the witness or counsel.  Thank you.

(Recess)

MR. SWAMINATHAN:  Okay.  I just want to note we took an unexpected break there.  Catie, as I indicated; did you consult with the witness at all during the break?

MS. BARBER:  No.

MR. SWAMINATHAN:  Did you consult with Mr. Daffada at the break?

MS. BARBER:  No, I didn't.

MR. SWAMINATHAN:  Okay, thank you.

BY MR. SWAMINATHAN:

Q   Mr. Guevara, did you consult with your counsel about -- without telling me the substance of any --

MR. SWAMINATHAN:  Strike that.  Let me start over.

Q   Mr. Guevara, without telling me the substance of any communication, just a yes, no question, did you during this break, consult with your counsel about your testimony in this depo.

**29**

A  No.

Q  All right. I want to turn back to your career as a Chicago police officer. We talked a little bit about your time as a homicide detective and as a gang crimes officer. I wanted to just ask you; when you were at -- you indicated you had -- gang crimes had been based out of 14th Street -- 14th District for a period of time. Where was 14th District?

A  14th District, at that time, was in the -- on California.

Q  And then was that California and Shakespeare?

A  Shakespeare, yes.

Q  Okay. And then when you --

THE REPORTER: What was that? California and --

MR. SWAMINATHAN: Shakespeare.

THE REPORTER: Thank you.

Q  And then when you said gang crimes went the Area 6, was that Belmont and Western?

A  Yes.

Q  Okay. And then did gang crimes ever go over to Maxwell Street?

**30**

MS. BARBER: Objection. Form. Foundation.

MR. DAFFADA: You can answer if you know.

A  I believe that's where they started.

BY MR. SWAMINATHAN:

Q  Where they started, you said?

A  Yes, the gang crimes office.

Q  Did you ever work under the Maxwell Street office for gang crimes?

A  No.

Q  Did you ever work on Maxwell Street during your career?

A  I don't recall.

Q  During the time you were a homicide detective, did you work with gang crimes officers who were based out of Maxwell Street?

MR. DAFFADA: Objection. Form. Foundation.

A  No.

Q  And if I understand correctly, gang crimes at some point went from Area 6. Did it then to on to Maxwell Street after Area 6?

A  No, the first, Maxwell Street.

**31**

Q  Then to 14th District, then to Area 6?

A  Yes.

Q  Then after Area 6, where did it go?

A  I have no idea.

Q  Going back to the subject of your notes, you indicated that you would destroy your notes. When is it that you would destroy them? Would it be before a case was cleared or after a case was cleared?

MR. DAFFADA: Objection.

MS. BARBER: Objection. Form. Foundation.

MR. DAFFADA: Same.

A  From this point on, I'm going to invoke my rights under the Fifth Amendment.

Q  What would -- would you destroy your notes before a case was cleared or after a case was cleared?

A  Take the Fifth.

Q  Would you destroy your notes before you had written any reports or after you had written reports?

MR. DAFFADA: Objection. Form. Foundation.

**32**

MS. BARBER: Objection. Form. Foundation.

A  Take the Fifth.

MR. DAFFADA: If one party objects, can we just have it so it's an objection for all parties and not --

MR. SWAMINATHAN: Sure.

MR. DAFFADA: Or do you want --

MR. SWAMINATHAN: That's fine. And in terms of Fifth Amendment assertions, I think we've had this conversation in the past. We can have him go through the whole process of laying out the complete assertion of the Fifth, but I think in the past we have agreed that when he makes clear he is asserting his Fifth Amendment rights, we understand that to be an indication of his complete assertion of the Fifth Amendment privilege in order to provide testimony that might otherwise incriminate you. Do we understand that?

MR. DAFFADA: Agreed.

MR. SWAMINATHAN: All right. Court reporter, could you read back my last question? I'm not sure we got an answer. Could you read that back?

**33**

THE REPORTER: Okay. Hold please.

(Previous question played back.)

THE REPORTER: I think that was your last question.

BY MR. SWAMINATHAN:

Q   Okay. And when you say take the Fifth, are you asserting your Fifth amendment right not to answer the question?

MR. DAFFADA: Rey.

A   Invoke the Fifth.

MR. SWAMINATHAN: And Jim, we agreed an answer like the one he had just given is going to be -- is going to constitute a complete invocation of the Fifth Amendment based on his desire not to incriminate himself?

MR. DAFFADA: Agreed.

Q   Okay. Mr. Guevara, do you --

MR. SWAMINATHAN: Strike that.

Q   Mr. Guevara, would you destroy your notes before the criminal proceedings would begin?

A   Take the Fifth.

Q   Sir, I want to go back to just a few other background points. During the time that you were a homicide detective, you had supervisors,

**34**

correct?

MR. DAFFADA: You can answer that Rey.

A   Yes.

Q   Was Sgt. Ed Mingey one of your supervisors as a homicide detective?

THE REPORTER: What was the name?

A   Yeah.

MR. SWAMINATHAN: Ed Mingey; M-I-N-G-E-Y.

THE REPORTER: Thank you.

BY MR. SWAMINATHAN:

Q   Go ahead Mr. Guevara.

A   Yes.

Q   Was he also a supervisor of yours when you worked in gang crimes?

A   Yes.

Q   And when you were a homicide detective, did you have other supervisors, supervising sergeants in the homicide unit?

A   I believe all the sergeants; they were there in Area 5 were my supervisors.

Q   And when you were in gang crimes you indicated that Mr. Mingey was one of your supervisors, correct?

**35**

A   Yes.

Q   Did you have other supervisors when you were in gang crimes?

A   Sgt. Biebel.

Q   Anyone else?

A   Probably the ones who were working at that time.

Q   Do you remember any of their names?

A   Not really.

Q   Were there some that you worked with more closely than others?

MR. DAFFADA: Objection. Form and foundation.

THE REPORTER: How do you spell Sgt. Biebel?

MR. SWAMINATHAN: B-I-E-B-E-L.

MR. DAFFADA: If you know the answer you can answer Rey.

A   I would work with Biebel and Mingey most of the time.

Q   Would you say you worked pretty closely with Mr. Mingey?

MR. DAFFADA: Objection -- sorry.

A   I was close to all of them.

**36**

Q   You had testified earlier that one of your partners was Steve Gawrys and another one was Daniel Noon and that there might be another one, but you couldn't remember the name, correct?

A   Yes.

Q   Did you work with Joseph Sparks in gang crimes?

A   No, they were in the gang crimes, but as far as partners, no.

Q   Okay. But that was someone you -- that was someone you -- was that someone you worked with but was not a partner?

MR. DAFFADA: Objection. Form. Foundation.

MR. SWAMINATHAN: Strike that. Let me ask a better question, Mr. Guevara. Sorry.

Q   In gang crimes, you had a partner, but you also worked with other gang crimes officers who weren't necessarily your partner; is that fair?

A   Yes.

Q   Okay. Was Mr. Sparks someone you worked with?

A   He was in gang crimes, yes.

Transcript of Reynaldo Guevara
Conducted on October 21, 2020

10 (37 to 40)

37

Q    And so you would work with him?

A    **Maybe occasionally.**

Q    But he was not your partner at any point; is that right?

A    **No.**

Q    Paul Zacharias, was he someone you worked with in gang crimes?

A    **He was in gang crimes, but I didn't work with him.**

Q    Mr. Fallon, is he someone you worked with in gang crimes?

MR. DAFFADA: Objection.  Form.

A    **He was Sparks partner.**

Q    Was -- so you would work with them sometimes, but he was never your partner; is that fair?

MR. DAFFADA: Objection.  Form. Foundation.

A    **Yes.**

Q    John Guzman, was he someone you worked with in gang crimes?

A    **There were a lot of officers in gang crimes.  If we work together, you know, might have, but I don't remember.**

38

Q    Did you work with a lot of different officers in gang crimes beyond just your partner?

A    **Sometimes, yes.**

Q    Did you work a certain shift during the time you were in gang crimes?

MR. DAFFADA: Objection.  Form -- no. Objection.  Foundation.

A    **I worked the evening shift.**

Q    Is that first, second, or third shift?

A    **That would be the third shift.**

Q    Okay.  How many people worked the third shift?

A    **I don't know.**

MR. DAFFADA: Objection.  Form. Foundation.

Q    Would it be four or five people?  Would it be 10 people?  40 people?  Can you give me a general sense?

MR. DAFFADA: Objection.  Foundation.

A    **No, I can't.**

Q    Who else worked in the evening shift other than you and your partners?  Do you remember any of the folks who worked with on that evening shift?

39

MR. DAFFADA: Objection.  Foundation.

A    **No.  No.**

BY MR. SWAMINATHAN:

Q    Other than your partner, who were some of the folks you worked with most closely in gang crimes?

MR. DAFFADA: Objection.  Form.

A    **Steve Gawrys.**

Q    Anyone else?

A    **No, I don't remember.**

Q    Do you remember anyone else who worked on the same shift as you in gang crimes other than your partner?

A    **Specifically?  No.**

Q    Did you work with Joe Maginowski in gang crimes?

MS. BARBER: Objection.  Form. Foundation.

A    **He was in gang crimes, but I don't recall working with him.**

Q    So you never worked with Maginowski?

A    **I don't recall.**

MR. DAFFADA: Objection.  Argumentative.

Q    Did you have any cases that you would

40

investigate with Mr. Maginowski?

MR. DAFFADA: Objection.  Asked and answered.  He doesn't remember.

A    **Don't remember.**

BY MR. SWAMINATHAN:

Q    Did Mr. Maginowski and you ever work the same shift?

MR. DAFFADA: Objection.  Form, argumentative, foundation.

A    **I don't recall.**

Q    Did you ever work with an officer named John Galligan?

A    **Who?**

Q    John Galligan.

MR. DAFFADA: Objection.  Foundation.

A    **No.**

Q    Do you remember Maginowski had a partner?  Do you remember that partner's name?

A    **I think it was -- I think it was Galligan.  I'm not sure.**

Q    Okay.  And did you and Mr. Galligan work the same shift?

A    **I believe so.**

Q    Did you ever work cases with Mr.

41

Galligan?

MS. BARBER: Objection. Form --

MR. DAFFADA: Same.

A    No, I don't recall.

BY MR. SWAMINATHAN:

Q    Given that you both worked the same shift, would it be fair to say that given the nature of your work as a gang crimes officer, you would have worked some cases together?

MR. DAFFADA: Objection. Foundation.

MS. BARBER: Objection. Form. Foundation.

A    Don't recall.

Q    Do you have any reason to believe you wouldn't have worked cases with Mr. Galligan if you worked on the same shift?

MR. DAFFADA: Objection, argumentative, form.

A    You know, I don't remember. So I am going to say that I'm going to invoke my amendment, the Fifth Amendment rights on the case for now, regardless of the question.

Q    Did you ever commit crimes with Joe Maginowski?

42

A    I take the Fifth.

Q    Did you ever commit crimes with John Galligan?

A    Take the Fifth.

Q    Sir, do you stay in touch with anyone from the Chicago Police Department anymore?

A    What was that?

Q    Sorry. Let me ask it again. Do you stay in touch with anyone from the Chicago Police Department?

MR. DAFFADA: Objection.

A    No.

Q    I didn't get the answer, sorry.

A    No.

Q    Do you stay in touch with Steve Gawrys at all?

MR. DAFFADA: Objection. Asked and answered. You can answer.

A    No.

Q    When was the last time you communicated with Steve Gawrys?

A    Don't remember.

THE REPORTER: How is that last name spelled?

43

MR. SWAMINATHAN: I believe it's; G-A-W-R-Y-S.

THE REPORTER: Thank you.

BY MR. SWAMINATHAN:

Q    You spent time with Mr. Gawrys in person during the trial of Jacques Rivera, correct?

MR. SWAMINATHAN: Strike that. Let me ask -- let me ask a better question.

Q    You spent time with Steve Gawrys during a trial in a lawsuit brought by Jacques Rivera, correct?

MR. DAFFADA: Objection. Form.

A    I will take the Fifth.

Q    Did you have any communications with Mr. Gawrys during that period about any of your prior investigations?

A    Take the Fifth.

Q    Did you have any communications with Mr. Gawrys at that time about your work as a Chicago police officer?

A    Take the Fifth.

Q    Have you had any communications with Mr. Gawrys since the end of that trial?

A    Take the Fifth.

44

Q    Have you had any communications with Ed Mingey since the end of that trial?

A    Take the Fifth.

Q    Did you have any communications with Mr. Mingey during that trial about your work as a Chicago police officer?

A    Take the Fifth.

Q    Have you had any communications with Ernest -- did you have any communications with Ernest Halverson since the time of the Jacques Rivera trial?

A    Plead the Fifth.

Q    Did you have -- when was the last time you communicated with Ernest Halverson?

A    I don't remember at all.

Q    Have you communicated with anyone from the --

MR. SWAMINATHAN: Strike that.

Q    When was the last time you saw Ernest Halverson?

A    When I left the Chicago Police Department.

Q    You haven't seen him at all after you retired from the Chicago Police Department; is

Transcript of Reynaldo Guevara
Conducted on October 21, 2020

---

**45**

that right?

MR. DAFFADA: Objection. Argumentative.

A   Yes.

BY MR. SWAMINATHAN:

Q   Why not?  He -- why not?

MR. DAFFADA: Objection.  Form.

A   Didn't have no reason to see him.

Q   Did you consider him a friend?

A   I consider him as a partner.

Q   And you guys were partners for a number of years, correct?

A   Yes.

Q   And you spent a lot of time together as partners, correct?

A   As partners, yes.

Q   Okay.  And you didn't become friends over that time?

MS. BARBER: Objection.  Form. Argumentative.

A   I don't consider to have friends, just partners.

Q   Did you have anybody who you considered a friend from your time in the Chicago Police Department.

---

**46**

MS. BARBER: Objection.  Form.

MR. DAFFADA:  Object.

A   No.

BY MR. SWAMINATHAN:

Q   Did you ever have anybody who you --

MR. SWAMINATHAN:  Strike that.

Q   Did you ever have any friends in the Chicago Police Department?

MR. DAFFADA: Objection.  Foundation, form.

A   No.

Q   When was the last time you communicate with anyone from the Chicago Police Department?

MR. DAFFADA: Objection.  Asked and answered.  Form.  Foundation.

A   I don't remember.

Q   Have you communicated with anyone who you previously worked with from the Chicago Police Department in the last year?

MR. DAFFADA: Objection.  Asked and answered.

A   Don't recall.

Q   Sir, did you -- sir, are you aware that Ernest Halverson passed away?

---

**47**

A   Really I found out, yes, but that's it.

Q   How did you hear about that?

A   I don't remember how I heard about it, but I found out.

MR. DAFFADA:  Anan, can we take a break, real quick?

MR. SWAMINATHAN:  Yes.

(Recess)

CONTINUED EXAMINATION BY ATTORNEY FOR PLAINTIFF, ARTURO DeLEON

BY MR. SWAMINATHAN:

Q   Mr. Guevara, do you have a cell phone?

A   Take the Fifth.

Q   Sir, are you -- is it your intention to plead the Fifth with regard to the question of whether you have a cell phone because a truthful -- because you believe a truthful answer would incriminate you?

A   I take the Fifth.

Q   Do you use -- do you communicate by text message on your cell phone?

A   Take the Fifth.

Q   Do you have a computer, Mr. Guevara?

A   Take the Fifth.

---

**48**

Q   Do you have a personal email account?

A   Take the Fifth.

Q   Do you communicate using emails with other people?

A   Take the Fifth.

Q   Have you communicated with anyone that you used to work with by text?

A   Plead the Fifth.

Q   And let me ask a better question; I'm sorry.  Have you communicated with anyone you worked with in the Chicago Police Department by text?

MR. DAFFADA: Objection.  Foundation.

A   Plead the -- plead the Fifth.

Q   Have you communicated with anyone you worked with in the Chicago Police Department by email?

MR. DAFFADA: Objection.  Foundation.

A   Plead the Fifth.

Q   All right.  I want to go back to just some background stuff a little bit.  What year was it that you started with the Chicago Police Department?

MR. DAFFADA:  And you can answer that,

---

Rey.

A   I -- I don't remember.

BY MR. SWAMINATHAN:

Q   When you went to the police -- you went to the police academy, correct?

MR. DAFFADA:  You can answer.

A   Yes.

Q   And you got training when you went through the police academy?

MR. DAFFADA: Objection.  Foundation. Form.  You can answer.

A   Yes.

Q   Did you get training on the use of firearms?

A   Yes.

Q   Did you get training on report writing?

MR. DAFFADA: Objection.  Form. Foundation.  You can take Five on that, Rey. Rey, you can take the Fifth on that.

A   Yes, I did.  Oh, sorry.

Q   Your training you -- of the training you got on report --

MR. SWAMINATHAN:  Strike that.

Q   Did you get training on talking to witnesses?

A   I plead the Fifth.

Q   The training you got on report writing, did you get training that it's important to write reports?

MR. DAFFADA: Objection.  Foundation and form.

A   I plead the Fifth.

Q   Did you get training on the importance of taking notes --

MR. SWAMINATHAN:  Strike that.

Q   Did you get training on the importance of taking notes?

MR. DAFFADA: Objection.  Foundation and form.

A   Plead the Fifth.

Q   Did you get training that it was important to take notes in order to help ensure that you wrote accurate reports?

MR. DAFFADA: Objection.  Foundation.

A   Plead the Fifth.

Q   Sir, were you ever part of an early intervention system?  Was there ever any intervention by the Chicago Police Department

during the course of your career based on your actions?

MR. DAFFADA: Objection.  Foundation. And form.

A   Plead the Fifth.

Q   Did you ever get any counseling from the Chicago Police Department?

MR. DAFFADA: Objection.  Foundation and form.

A   Plead the Fifth.

Q   Did you ever get any counseling from the Chicago Police Department about anger issues?

MR. DAFFADA: Objection.  Foundation and form.

A   Plead the Fifth.

Q   Did you ever get any counseling from the Chicago Police Department because you had a temper?

MR. DAFFADA: Objection.  Foundation and form.

A   Plead the Fifth.

Q   Sir, you do have a temper, right?

MR. DAFFADA: Objection.  Foundation and form.

A   Plead the Fifth.

BY MR. SWAMINATHAN:

Q   When you were a Chicago police officer did you have a temper?

MR. DAFFADA: Objection.  Foundation and form.

A   Plead the Fifth.

Q   Would it be fair to say that other officers --

MR. SWAMINATHAN:  Strike that.

Q   Would it be fair to say that you had a reputation with other officers of having a temper?

MR. DAFFADA: Objection.  Foundation.

A   Plead the Fifth.

MR. SWAMINATHAN:  Sorry, I just got to find my notes here.  Okay.

Q   Sir, do you remember a man named Arturo Reyes?

A   Plead the --

MR. DAFFADA: Sorry.  What's the name? I didn't hear that name.

MR. SWAMINATHAN: Sorry.  I'll ask it again.

Q   Mr. Guevara, do you remember a man named

Transcript of Reynaldo Guevara
Conducted on October 21, 2020

53

Arturo Reyes?

A    Plead the Fifth.

Q    What about a man named Gabriel Solache; do you remember him?

A    Plead the Fifth.

Q    You understand you're here today for a deposition and lawsuits that were filed by Mr. Reyes and Mr. Solache, correct?

A    Plead the Fifth.

Q    Did you frame Mr. Reyes and Mr. Solache for a crime they did not commit?

MR. DAFFADA: Objection. Foundation and form.

A    Plead the Fifth.

Q    Did you physically abuse them?

MR. DAFFADA: Objection. Foundation.

A    Plead the Fifth.

Q    Did you threaten them?

MR. DAFFADA: Objection. Foundation.

A    Plead the Fifth.

Q    Did you beat them into confessing to a crime they did not commit?

MR. DAFFADA: Objection. Foundation and form. Argumentative.

54

A    Plead the Fifth.

Q    Did you also physically abuse and manipulate other witnesses in order to fabricate a case against Mr. Reyes and Mr. Solache?

MR. DAFFADA: Objection. Form and foundation. Argument.

A    Plead the Fifth.

Q    In the case of Mr. Reyes and Mr. Solache you fabricated evidence, right?

MR. DAFFADA: Objection. Foundation. Form.

A    Plead the Fifth.

Q    And you suppressed exculpatory evidence, correct?

MR. DAFFADA: Objection. Foundation and form.

A    Plead the Fifth.

Q    Sir, this is not the first case in which you've been accused of such conduct; is it?

MR. DAFFADA: Objection. Form.

A    Plead the Fifth.

Q    And it is not the first case in which you've engaged in such conduct; is it?

MR. DAFFADA: Objection. Foundation and

55

form.

A    Plead the Fifth.

Q    Sir, in 20 other homicide cases you investigated an individual conviction was later thrown out by the Illinois courts, correct?

MR. DAFFADA: Objection. Foundation.

A    Plead the Fifth.

Q    You tried to frame those 20 men, correct?

MR. DAFFADA: Objection. Foundation.

A    Plead the Fifth.

Q    You took steps to get false charges approved against those 20 men, correct?

MR. DAFFADA: Objection. Foundation. Form.

A    Plead the Fifth.

Q    And you took steps to ensure their false convictions, correct?

MR. DAFFADA: Objection. Foundation and form.

A    Plead the Fifth.

Q    You committed serious investigative misconduct in each of those cases in order to close cases and send innocent men to prison,

56

correct?

MR. DAFFADA: Objection. Foundation and form.

A    Plead the Fifth.

Q    And in some of those 20 cases you threatened and physically abused young men until they agreed to confess to crimes they did not commit, correct?

MR. DAFFADA: Objection. Foundation and form.

A    Plead the Fifth.

Q    Mr. Guevara, why did you do that?

MR. DAFFADA: Objection. Form.

A    Plead the Fifth.

Q    Sir, were you a member of a gang at any point?

MR. DAFFADA: Objection. Foundation and form.

A    Plead the Fifth.

Q    Were you working with certain gangs?

MR. DAFFADA: Objection. Foundation and form.

A    Plead the Fifth.

Q    Were you part of a criminal enterprise?

Transcript of Reynaldo Guevara
Conducted on October 21, 2020

57

MR. DAFFADA: Objection. Foundation and form.

A   Plead the Fifth.

Q   Were you part of a criminal enterprise with other Chicago police officers?

MR. DAFFADA: Objection. Foundation and form.

A   Take the Fifth.

Q   Sir, do you frame innocent men for money?

MR. DAFFADA: Objection. Foundation. Form. Argumentative.

A   Take the Fifth.

Q   Would you accept payments to steer homicide investigations away from a certain suspect?

MR. DAFFADA: Objection. Foundation and form.

A   Take the Fifth.

Q   And in doing so, would you then steer the investigations toward someone else?

MR. DAFFADA: Objection. Foundation and form.

A   Take the Fifth.

58

Q   And in doing so, would you steer the investigation towards persons who were innocent of the crimes?

MR. DAFFADA: Objection. Foundation and form.

A   Take the Fifth.

Q   Sir, the more you closed cases the more overtime you got for going to court, correct?

MR. DAFFADA: Objection. Foundation and form.

A   Take the Fifth.

Q   Is that a reason that you framed innocent men?

MR. DAFFADA: Objection. Foundation and form.

A   Take the Fifth.

Q   Sir, you were having financial troubles in the 1990s, correct?

A   Take the Fifth.

MR. DAFFADA: Objection. Foundation and form.

Q   Go ahead Mr. Guevara.

A   Take the Fifth.

Q   You borrowed money from other officers,

59

correct?

MR. DAFFADA: Objection. Foundation and form.

A   Take the Fifth.

Q   You even borrowed money from Ed Mingey, your supervisor, correct?

MR. DAFFADA: Objection. Foundation.

A   The Fifth.

Q   All right. I want to ask you about some of the other cases in which you've been accused of the same sort of conduct your accused of in this case. But first, I want to ask you some questions about your invocation of the Fifth.

Mr. Guevara, do you understand you may only invoke your Fifth Amendment right against self-incrimination if you have a reasonable fear that truthful testimony in response to my questions may expose you to criminal prosecution?

MR. DAFFADA: Objection. Foundation and form.

A   Take the Fifth.

Q   Are you intending to rely on the advice of Counsel with regard to your decision to invoke the Fifth Amendment?

60

MR. DAFFADA: Objection. Foundation.

A   Take the Fifth.

Q   Your decision to invoke the Fifth Amendment; is that a choice you made on your own?

MR. DAFFADA: Objection. Foundation.

A   Take the Fifth.

Q   Your decision to invoke the Fifth Amendment is a choice that you have made on your own, correct?

MR. DAFFADA: Objection. Foundation.

A   Take the Fifth.

Q   And it's your decision to invoke the Fifth Amendment in this case, correct?

A   Take the Fifth.

Q   Sir, do you intend to answer any questions today about your time in the Chicago Police Department and the investigations you conducted?

A   Take the Fifth.

Q   Is it your understanding that if you testify today, without invoking the Fifth Amendment, that you risk prosecution based on your conduct as a Chicago police officer?

MR. DAFFADA: Objection. Foundation and

form.

A    Take the Fifth.

Q    Is it your understanding that if you testify today you risk prosecution because of the 20 cases in which men were falsely convicted, and later had their convictions thrown out based on your misconduct?

MR. DAFFADA: Objection. Form and foundation.

A    Take the Fifth.

Q    Sir, have you been told that you could be prosecuted for framing these 20 innocent men?

A    Take the Fifth.

Q    Are there any subjects that you can identify, as you sit here today, in which you can provide truthful testimony without incriminating yourself?

MR. DAFFADA: Objection. Form.

A    Take the Fifth.

Q    Are there subjects related to your work as a Chicago police officer that you could identify, as you sit here today, on which you could provide truthful testimony without incriminating yourself?

MR. DAFFADA: Objection. Form and foundation.

A    Take the Fifth.

Q    Sir, why do you fear prosecution if you answer questions about your work as a Chicago police officer?

MR. DAFFADA: Objection. Form.

A    Take the Fifth.

Q    Do you fear prosecution by state authorities or federal authorities?

MR. DAFFADA: Objection.

A    Take the Fifth. Take the Fifth.

Q    Do you fear prosecution for perjury?

MR. DAFFADA: Objection. Form. Foundation.

A    Take the Fifth.

Q    Do you fear prosecution for lies you told under oath in the past?

MR. DAFFADA: Objection. Foundation. Argumentative.

A    Take the Fifth.

Q    Do you --

MR. SWAMINATHAN: Strike that.

Q    Do you fear prosecution for lies you

intend to tell in this case under oath?

MR. DAFFADA: Objection. Foundation.

A    Take the Fifth.

Q    Do you fear prosecution for obstruction of justice?

MR. DAFFADA: Objection. Foundation.

A    Take the Fifth.

Q    Do you fear prosecution for participation in a criminal conspiracy?

MR. DAFFADA: Objection. Foundation. Form.

A    Take the Fifth.

Q    Do you fear prosecution for bribery?

MR. DAFFADA: Objection. Foundation and form.

A    Take the Fifth.

Q    Do you fear prosecution for mail and wire fraud?

MR. DAFFADA: Objection. Foundation and form.

A    Take the Fifth.

Q    Do you fear prosecution for criminal violations of federal civil rights laws?

MR. DAFFADA: Objection. Foundation and

form.

A    Take the Fifth.

Q    Sir, when did you decide that in this case you would invoke your Fifth Amendment right?

A    Take the Fifth.

Q    Sir, if called to testify at trial in this case, do you intend to assert your Fifth Amendment rights not to incriminate yourself?

A    Take the Fifth.

Q    And sir, you understand by that --

MR. SWAMINATHAN: Strike that.

Q    You understand by not testifying in this case you're preventing a plaintiff from conducting discovery and the facts of the case, correct?

MR. DAFFADA: Objection. Foundation and form.

A    Take the Fifth.

Q    Sir, are you the subject of any grand jury proceedings related to your conduct as a Chicago police officer?

A    Take the Fifth.

Q    Have you ever been the subject of any grand jury proceedings related to your conduct as a Chicago police officer?

65

A    Take the Fifth.

Q    Sir, is it your --

MR. SWAMINATHAN:  Strike that.

Q    Sir, is it your understanding that state or federal prosecutors are currently conducting a criminal investigation into your conduct as a Chicago police officer?

MR. DAFFADA:  Objection.  Form.

A    Take the Fifth.

Q    Sir, let me just ask you; what lawyers did you speak with about your decision to assert your Fifth Amendment right?

A    Take the Fifth.

MR. DAFFADA:  Objection.  Privilege.

A    Take the Fifth.

Q    Sir, what advice did you receive about your decision to assert the Fifth Amendment?

MR. DAFFADA:  Objection.  Privileged.  Foundation.

A    Take the Fifth.

MR. SWAMINATHAN:  Jim, are you instructing him not to answer?  I wanted to make -- I wanted to flag that question for you.

MR. DAFFADA:  Are you asking him for

66

privileged information?

MR. SWAMINATHAN:  I am -- I'll ask my question again and then, Jim, I'll let you weigh in if you -- however you choose to instruct him.

BY MR. SWAMINATHAN:

Q    Sir, what advice did you receive about your decision to assert the Fifth Amendment?

MR. DAFFADA:  Don't answer that, Rey.

Q    Sir, are you going to follow your attorney's advice and refuse to answer that question?

I think that one you can answer yes or no.

MR. DAFFADA:  Rey.

Q    I'll ask it again.  Sir, are you going to follow your attorney's instruction not to answer that question?

MR. DAFFADA:  To the extent it calls for privileged information, he doesn't need to answer that.

Q    Mr. Guevara, are you going to follow your attorney's instruction and not answer the question?

Is that a yes?

67

MR. SWAMINATHAN:  Jim, do you want to assist on this?  I'm basically asking just to be clear that that you've instructed him not to answer.  I want to make clear that he's not going to answer.  That the --

MR. DAFFADA:  I wonder if we could take a break now and I'll talk to him.

MR. SWAMINATHAN:  Yes, go ahead.

(Recess)

MR. SWAMINATHAN:  Jim, I'll ask the question --

THE VIDEOGRAPHER:  Just a minute.

MR. SWAMINATHAN:  -- here again now.

MR. DAFFADA:  Okay.  You don't need to re-ask it, it's on the record.

MR. SWAMINATHAN:  Okay.

MR. DAFFADA:  If you want to read it back --

THE VIDEOGRAPHER:  Just a minute.  It is 11:31 a.m. we are back on the record.

BY MR. SWAMINATHAN:

Q    Mr. Guevara, are you going to follow your attorney's advice --

MR. SWAMINATHAN:  Strike that.

68

Q    Mr. Guevara, are you going to follow your attorney's instruction and not answer my question?

MR. DAFFADA:  My instruction is don't answer it, Rey.  So let him know.

A    On the advice of my counselor, I am not answering the question.

MR. DAFFADA:  Okay.  Now, Anand?

MR. SWAMINATHAN:  Yes.

MR. DAFFADA:  We spoke to Rey during the break.  And I'm reluctant to do this, but we feel we have to.  Rey needs to have us down there.  We can't do a Zoom dep like this.  It's not -- he needs to be able to speak to us more freely.  And so we'd like to suspended the dep.  I'm happy to -- I guess I'll fly down there and get Covid, but I -- it's fine.  We're going to do what we've got to do to be in person.

MR. SWAMINATHAN:  Yeah, Jim, can you just -- I mean obviously, you -- let me do this.  Obviously, we object to that.  I am -- actually was ready to move on to the other lines of questioning on which we had moved quite smoothly and I -- it's not clear to me why it would be a

69

problem to move forward on those topics.

We could also -- given that I am moving to topics which we have generally moved very smoothly, I -- it doesn't seem to me we would have an issue, and I'm happy to start asking questions and you can tell me if it's a problem on these different sections. But if -- otherwise, I guess I'll ask you to put your position on the record.

MR. DAFFADA: Okay. I'll put my position on the record.

Mr. Guevara is not comfortable without having counsel present during his deposition, physically present, so he can confer with counsel. And, you know, it's very clumsy to try to do it the way we're doing it. Our communication with Mr. Guevara is not great by cell phone so I am not going to -- we won't delay, and will reschedule it promptly, and we'll fly down and sit with him during his dep.

MR. SWAMINATHAN: Jim, can we get a commitment that we are going to get this deposition scheduled here in the next two to three weeks?

MR. DAFFADA: Yeah. That's fine.

70

MR. SWAMINATHAN: And I -- okay. I think we had already blocked off a day for Mr. Gomez on November --

MR. DAFFADA: The 9th, something like that.

MR. SWAMINATHAN: Yeah, let me just check for the date. What we could do is try to do -- we could just go back, to back, to back with days there and get it done. Can we do that?

MR. DAFFADA: That would be good for me.

MR. SWAMINATHAN: Okay. We have Gomez on the 11th.

MR. DAFFADA: The 11th.

MR. SWAMINATHAN: So we can do the 9th, 10th, and 11th, or 10th, 11th, and 12th.

MR. DAFFADA: That should not be a problem. I don't want to make a 100 percent commitment until I check my family calendar. I'm willing to do that. If there's something that just can't be canceled, I'm willing to do that. That would be fine with me. So I'll give you an answer today.

MR. SWAMINATHAN: All right. Give me just one moment. Let's stay on the record and

71

give me one moment. Okay?

So let me just say on the record. We do object to suspending the deposition. We believe it is appropriate to go forward and that we can go forward. Mr. Daffada has put his position on the record. Understanding that, you know, we don't have the ability to force the witness to stay and continue to answer questions if he's, you know, insisting on suspending the deposition.

We have asked Counsel to commit to having the deposition take place remotely or with counsel, but ensuring that whatever they need to do on their end can coordinated so that the deposition goes forward, at the latest at the time of the Gomez deposition on November 11th, that week.

MR. DAFFADA: I think so. I think we can do it at the same time.

You know, I just don't know if it's going to be the 10th or the 12th.

MR. SWAMINATHAN: Okay. That week, you tell us what ever date that week and we'll -- we ask that we get his dep done that week of both Mr. Reyes and Mr. Gomez.

72

MR. DAFFADA: Okay.

MR. SWAMINATHAN: All right. Thank you everybody.

(Off the record at 11:37 a.m.)

CERTIFICATE OF COURT REPORTER - NOTARY PUBLIC

I, Darrell Lowe, the officer before whom the foregoing deposition was taken, do hereby certify that said proceedings were electronically recorded by me; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 26th day of October 2020.

_____

DARRELL LOWE, Notary Public

For the State of Illinois

CERTIFICATE OF TRANSCRIBER

I, Molly Bugher, do hereby certify that the foregoing transcript is a true and correct record of the recorded proceedings; that said proceedings were transcribed to the best of my ability from the audio recording and supporting information; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

_____

Molly Bugher, CDLT-161

DATE: October 26, 2020

Transcript of Reynaldo Guevara
Conducted on October 21, 2020                    20

| **A** | | | |
|---|---|---|---|
| **aberdeen** | **after** | 32:10, 32:15, | 11:11, 11:15, |
| 2:4, 3:10 | 16:8, 20:19, | 32:17, 33:7, | 11:19, 12:4, |
| **ability** | 26:14, 28:1, | 33:14, 41:21, | 13:11, 14:4, |
| 12:5, 71:7, | 30:23, 31:3, | 59:15, 59:24, | 14:20, 14:22, |
| 74:6 | 31:8, 31:17, | 60:4, 60:8, | 15:1, 15:15, |
| **able** | 31:21, 44:23 | 60:13, 60:22, | 18:1, 18:21, |
| 10:15, 11:8, | **again** | 64:4, 64:8, | 20:18, 21:12, |
| 11:16, 27:17, | 10:11, 11:5, | 65:12, 65:17, | 21:20, 22:15, |
| 68:14 | 15:21, 16:21, | 66:7 | 24:23, 25:2, |
| **about** | 42:8, 52:23, | **anan** | 26:21, 28:18, |
| 16:7, 28:17, | 66:3, 66:15, | 47:5 | 28:22, 31:21, |
| 28:24, 29:4, | 67:13 | **anand** | 35:8, 37:3, |
| 43:15, 43:19, | **against** | 3:5, 8:15, | 38:23, 39:24, |
| 44:5, 47:2, | 54:4, 55:13, | 10:17, 68:8 | 41:14, 43:14, |
| 47:3, 51:12, | 59:15 | **anger** | 43:15, 43:18, |
| 53:3, 59:9, | **ago** | 51:12 | 43:22, 44:1, |
| 59:13, 60:16, | 20:6 | **another** | 44:4, 44:8, |
| 62:5, 65:11, | **agreed** | 36:2, 36:3 | 44:9, 46:7, |
| 65:16, 66:6 | 32:14, 32:20, | **answer** | 50:23, 51:6, |
| **abuse** | 33:11, 33:16, | 11:24, 12:22, | 51:11, 51:16, |
| 53:15, 54:2 | 56:7 | 13:20, 16:17, | 56:15, 60:15, |
| **abused** | **agreement** | 19:13, 20:10, | 61:14, 64:18, |
| 56:6 | 2:10 | 21:10, 23:23, | 64:22, 73:6, |
| **academy** | **ahead** | 24:15, 30:3, | 74:8 |
| 49:5, 49:9 | 9:4, 23:22, | 32:23, 33:8, | **anybody** |
| **accept** | 34:12, 58:22, | 33:12, 34:2, | 45:22, 46:5 |
| 57:14 | 67:8 | 35:17, 35:18, | **anymore** |
| **account** | **al** | 42:13, 42:18, | 42:6 |
| 48:1 | 1:8, 1:14, 8:5 | 47:17, 48:24, | **anyone** |
| **accurate** | **all** | 49:6, 49:11, | 13:4, 13:6, |
| 50:19 | 8:13, 20:12, | 60:15, 62:5, | 13:15, 19:24, |
| **accused** | 24:13, 28:9, | 65:22, 66:8, | 20:2, 21:17, |
| 54:19, 59:10, | 29:2, 32:5, | 66:10, 66:12, | 22:18, 35:5, |
| 59:11 | 32:21, 34:20, | 66:17, 66:19, | 39:9, 39:11, |
| **actions** | 35:24, 42:16, | 66:22, 67:4, | 42:5, 42:9, |
| 51:2 | 44:15, 44:23, | 67:5, 68:2, | 44:16, 46:13, |
| **actually** | 48:20, 59:9, | 68:5, 70:22, | 46:17, 48:6, |
| 68:21 | 70:23, 72:2 | 71:8 | 48:10, 48:15 |
| **advice** | **already** | **answered** | **anything** |
| 59:22, 65:16, | 70:2 | 40:3, 42:18, | 11:23, 13:2, |
| 66:6, 66:10, | **also** | 46:15, 46:21 | 15:19 |
| 67:23, 68:6 | 6:3, 9:14, | **answering** | **anywhere** |
| **affirmed** | 17:3, 34:14, | 68:7 | 18:4 |
| 10:3 | 36:18, 54:2, | **antonio** | **appropriate** |
| **affixed** | 69:2 | 12:10, 12:18, | 71:4 |
| 73:10 | **always** | 12:20, 13:11, | **approved** |
| | 21:1, 24:11 | 13:18, 20:8 | 55:13 |
| | **amendment** | **any** | **area** |
| | 10:22, 31:15, | 10:14, 11:7, | 21:2, 24:1, |

24:5, 24:9,
29:21, 30:22,
30:23, 31:1,
31:3, 34:21
**areas**
17:22
**argument**
54:6
**argumentative**
39:23, 40:9,
41:17, 45:2,
45:19, 53:24,
57:12, 62:20
**art**
3:7, 8:17
**arturo**
1:5, 8:4, 8:16,
10:6, 47:10,
52:17, 53:1
**asked**
40:2, 42:17,
46:14, 46:20,
71:10
**asking**
65:24, 67:2,
69:5
**assert**
10:22, 64:7,
65:11, 65:17,
66:7
**asserting**
32:15, 33:7
**assertion**
32:13, 32:17
**assertions**
32:10
**assist**
67:2
**attention**
9:14
**attorney**
10:5, 47:9
**attorney's**
5:7, 66:10,
66:16, 66:22,
67:23, 68:2
**audio**
74:6

**authorities**
62:10
**avenue**
3:18, 18:3
**aware**
46:23
**away**
26:17, 26:22,
46:24, 57:15

**B**

**b-i-e-b-e-l**
35:16
**back**
18:23, 19:2,
19:3, 19:19,
20:5, 20:7,
29:2, 31:5,
32:22, 32:24,
33:2, 33:22,
48:20, 67:18,
67:20, 70:8
**background**
14:7, 33:23,
48:21
**barber**
5:20, 9:2, 9:5,
10:17, 21:3,
24:21, 25:6,
25:12, 25:16,
25:23, 26:4,
26:10, 26:15,
26:19, 27:2,
27:6, 27:10,
27:14, 27:19,
27:23, 28:10,
28:13, 30:1,
31:11, 32:1,
39:17, 41:2,
41:11, 45:18,
46:1
**baroni**
4:8
**based**
22:12, 23:19,
29:7, 30:17,
33:14, 51:1,
60:22, 61:6

**basic**
14:7
**basically**
67:2
**beat**
53:21
**became**
22:4
**because**
16:17, 27:17,
47:16, 47:17,
51:17, 61:4
**become**
45:16
**been**
10:3, 11:24,
20:7, 29:7,
54:19, 59:10,
61:11, 64:22
**before**
2:10, 10:18,
20:4, 22:4,
22:9, 23:13,
23:14, 31:8,
31:17, 31:20,
33:20, 73:2
**begin**
10:1, 33:20
**beginning**
8:2
**behalf**
3:4, 3:15, 4:5,
4:14, 5:4, 5:12,
5:19, 8:22,
9:10, 9:12,
9:17, 9:19
**being**
10:15, 11:8,
11:16, 12:3,
20:19, 21:24
**believe**
11:23, 18:11,
30:5, 34:20,
40:23, 41:14,
43:1, 47:17,
71:3
**belmont**
29:21

**best**
74:5
**better**
36:16, 43:8,
48:9
**beyond**
38:2
**biebel**
4:16, 8:24,
35:4, 35:15,
35:19
**bit**
29:4, 48:21
**blocked**
70:2
**borrowed**
58:24, 59:5
**both**
26:23, 41:6,
71:23
**break**
27:7, 27:9,
27:10, 27:13,
27:15, 27:16,
27:24, 28:7,
28:9, 28:12,
28:23, 47:5,
67:7, 68:11
**brener**
5:6
**brenner**
9:3, 9:7
**bribery**
63:13
**broadway**
18:3
**brought**
43:10
**brualdi**
5:4, 9:8
**bugher**
1:25, 74:2,
74:14
**buildings**
18:2
**burns**
5:13, 5:14,
9:10

Transcript of Reynaldo Guevara
Conducted on October 21, 2020                          22

| C |
| --- |

**calendar**
70:18
**california**
29:11, 29:12,
29:17
**call**
9:13
**called**
64:6
**calls**
66:18
**came**
19:3
**can't**
16:17, 23:6,
23:17, 38:20,
68:13, 70:20
**canceled**
70:20
**capitelli**
9:1
**career**
29:3, 30:13,
51:1
**carilo**
9:1
**case**
1:5, 1:11, 8:7,
9:15, 9:16,
11:1, 14:5,
31:8, 31:17,
41:21, 54:4,
54:8, 54:18,
54:22, 59:12,
60:13, 63:1,
64:4, 64:7,
64:13, 64:14,
73:7, 74:9
**cases**
12:4, 39:24,
40:24, 41:9,
41:15, 55:3,
55:23, 55:24,
56:5, 58:7,
59:10, 61:5
**catherine**
5:20, 9:2, 9:5

**cathy**
9:4
**catie**
28:7
**cdlt**
74:14
**cell**
47:12, 47:16,
47:21, 69:16
**center**
5:8
**certain**
38:4, 56:20,
57:15
**certificate**
73:1, 74:1
**certified**
8:10
**certify**
73:4, 74:2
**charges**
55:12
**check**
70:7, 70:18
**chicago**
1:14, 1:19,
2:5, 3:12, 3:20,
4:11, 4:21, 5:9,
5:16, 5:19,
5:23, 9:6, 9:15,
12:14, 12:17,
15:7, 15:12,
15:17, 15:22,
15:24, 16:9,
16:10, 16:13,
17:24, 18:13,
18:20, 18:24,
19:2, 19:7,
19:11, 19:19,
20:5, 20:8,
20:13, 20:16,
20:19, 29:3,
42:6, 42:9,
43:19, 44:6,
44:21, 44:24,
45:23, 46:8,
46:13, 46:18,
48:11, 48:16,

48:22, 50:24,
51:7, 51:12,
51:17, 52:3,
57:5, 60:16,
60:23, 61:21,
62:5, 64:20,
64:24, 65:7
**choice**
60:4, 60:8
**choose**
66:4
**city**
1:14, 5:19,
9:6, 9:15, 11:1,
12:9, 15:7,
17:22
**civil**
63:23
**clark**
5:22
**clear**
32:14, 67:3,
67:4, 68:24
**cleared**
31:8, 31:9,
31:17, 31:18
**close**
35:24, 55:24
**closed**
58:7
**closely**
35:11, 35:21,
39:5
**clumsy**
69:14
**collecting**
15:8
**comfortable**
69:11
**coming**
12:6
**commit**
41:23, 42:2,
53:11, 53:22,
56:8, 71:10
**commitment**
69:21, 70:18
**committed**
55:22

**communicate**
46:12, 47:20,
48:3
**communicated**
42:20, 44:14,
44:16, 46:17,
48:6, 48:10,
48:15
**communication**
28:22, 69:15
**communications**
43:14, 43:18,
43:22, 44:1,
44:4, 44:8, 44:9
**complete**
32:13, 32:17,
33:13
**computer**
47:23
**conduct**
54:19, 54:23,
59:11, 60:23,
64:19, 64:23,
65:6
**conducted**
60:18
**conducting**
64:13, 65:5
**confer**
69:13
**confess**
56:7
**confessing**
53:21
**connelly**
5:21
**consider**
45:8, 45:9,
45:20
**considered**
45:22
**conspiracy**
63:9
**constitute**
33:13
**consult**
27:18, 27:19,
27:22, 28:8,

Transcript of Reynaldo Guevara
Conducted on October 21, 2020                                    23

28:11, 28:16,
28:23
**consulting**
28:3
**cont'd**
4:3, 5:3, 6:2
**continue**
71:8
**continued**
47:9
**conversation**
32:11
**convicted**
61:5
**conviction**
55:4
**convictions**
55:18, 61:6
**cook**
5:5, 5:7, 9:9
**coordinated**
71:13
**correct**
12:15, 15:9,
15:13, 22:10,
22:14, 34:1,
34:24, 36:4,
43:6, 43:11,
45:11, 45:14,
49:5, 53:8,
54:14, 55:5,
55:9, 55:13,
55:18, 56:1,
56:8, 58:8,
58:18, 59:1,
59:6, 60:9,
60:13, 64:14,
74:3
**correctly**
30:21
**could**
10:10, 14:9,
14:14, 32:22,
32:23, 61:11,
61:21, 61:23,
67:6, 69:2,
70:7, 70:8
**couldn't**
36:4

**counsel**
8:13, 27:22,
28:3, 28:17,
28:24, 59:23,
69:12, 69:13,
71:10, 71:12,
73:5, 74:7
**counseling**
51:6, 51:11,
51:16
**counselor**
68:6
**county**
5:5, 5:7, 9:9
**couple**
14:1, 19:6
**course**
11:2, 51:1
**court**
1:1, 8:6, 9:21,
9:23, 14:12,
32:21, 58:8,
73:1
**courts**
55:5
**covid**
68:16
**crime**
22:11, 53:11,
53:22
**crimes**
17:4, 22:10,
22:13, 22:16,
23:18, 24:3,
24:4, 24:7,
24:8, 24:20,
25:15, 26:8,
26:23, 29:5,
29:7, 29:20,
29:23, 30:8,
30:10, 30:16,
30:22, 34:15,
34:22, 35:3,
36:7, 36:8,
36:17, 36:18,
36:24, 37:7,
37:8, 37:11,
37:21, 37:23,

38:2, 38:5,
39:6, 39:12,
39:16, 39:19,
41:8, 41:23,
42:2, 56:7, 58:3
**criminal**
33:20, 56:24,
57:4, 59:18,
63:9, 63:22,
65:6
**currently**
12:8, 12:11,
13:4, 14:20,
14:22, 18:21,
65:5
**cv**
8:7, 9:16

**D**

**daffada:**
13:19
**daley**
5:8
**dan**
9:10
**daniel**
5:13, 23:1,
23:2, 23:4, 36:3
**darrell**
2:10, 9:22,
73:2, 73:16
**date**
70:7, 71:22,
74:15
**day**
70:2, 73:11
**days**
70:9
**decide**
64:3
**decision**
59:23, 60:3,
60:7, 60:12,
65:11, 65:17,
66:7
**defendant**
4:5, 5:12,
5:19, 8:19,

8:21, 9:6, 9:11
**defendants**
1:9, 1:15,
4:14, 5:4, 8:23,
9:8
**delay**
69:17
**deleon**
8:5, 8:16,
47:10
**deleon-reyes**
1:5, 3:4, 10:6
**dep**
11:3, 68:13,
68:15, 69:19,
71:23
**department**
15:12, 15:17,
16:9, 16:11,
17:14, 18:13,
18:20, 20:13,
20:16, 20:19,
20:23, 42:6,
42:10, 44:22,
44:24, 45:24,
46:8, 46:13,
46:19, 48:11,
48:16, 48:23,
50:24, 51:7,
51:12, 51:17,
60:17
**depo**
8:11, 9:23,
28:24
**deposition**
1:17, 2:1, 8:3,
8:12, 9:14,
10:20, 10:24,
12:3, 12:6,
12:12, 53:7,
69:12, 69:22,
71:3, 71:9,
71:11, 71:14,
71:15, 73:3
**desire**
33:14
**desk**
24:11

Transcript of Reynaldo Guevara
Conducted on October 21, 2020

24

destroy
31:6, 31:7, 31:16, 31:20, 33:19
destroyed
26:13
detail
10:18
detective
16:23, 17:9, 20:20, 21:1, 21:5, 21:13, 21:16, 22:9, 25:22, 26:24, 29:4, 30:16, 33:24, 34:5, 34:17
detectives
20:23, 21:21
dickinson
4:14, 8:23
different
38:1, 69:7
directly
12:17
discovery
64:14
district
1:1, 1:2, 8:6, 15:20, 15:22, 15:24, 16:3, 16:6, 16:13, 16:16, 17:8, 17:11, 17:15, 17:18, 17:22, 18:7, 18:20, 23:24, 24:1, 24:5, 29:8, 29:9, 29:10, 31:1
division
1:3, 8:7
doing
57:20, 58:1, 69:15
done
70:9, 71:23
down
68:12, 68:16,

69:18
drive
5:15
duly
10:3
during
17:3, 17:8, 28:9, 28:23, 30:13, 30:15, 33:23, 38:4, 43:6, 43:9, 43:15, 44:5, 51:1, 68:10, 69:12, 69:19

**E**

each
55:23
earlier
36:1
early
50:22
eastern
1:3, 8:7
ed
34:4, 34:8, 44:1, 59:5
edward
5:6, 9:3, 9:7
electronically
2:2, 73:4
else
13:2, 13:6, 13:15, 15:19, 18:4, 19:24, 20:2, 21:17, 22:18, 26:3, 26:9, 35:5, 38:21, 39:9, 39:11, 57:21
email
48:1, 48:17
emails
48:3
employed
73:6, 74:8
end
43:23, 44:2,

71:13
engaged
54:23
engquist
4:17
enquist
8:22
ensure
50:18, 55:17
ensuring
71:12
enterprise
56:24, 57:4
entitled
10:24
ernest
21:11, 44:9, 44:10, 44:14, 44:19, 46:24
esquire
3:5, 3:6, 3:7, 3:8, 3:16, 4:6, 4:7, 4:17, 5:6, 5:13, 5:20
estates
8:24
et
1:8, 1:14, 8:5
even
59:5
evening
38:8, 38:21, 38:23
eventually
23:9
ever
18:23, 25:1, 25:14, 29:23, 30:9, 30:12, 40:6, 40:11, 40:24, 41:23, 42:2, 46:5, 46:7, 50:22, 50:23, 51:6, 51:11, 51:16, 64:22, 71:22
everybody
72:3

evidence
54:9, 54:13
exactly
16:21, 22:20
examination
7:3, 10:5, 47:9
examined
10:4
exculpatory
54:13
excuse
8:8, 14:4, 15:21
expose
59:18
extent
66:18

**F**

fabricate
54:3
fabricated
54:9
facts
64:14
fair
17:6, 20:23, 36:20, 37:16, 41:7, 52:8, 52:11
fallon
37:10
false
55:12, 55:17
falsely
61:5
family
13:11, 13:13, 70:18
far
36:9
fear
59:16, 62:4, 62:9, 62:13, 62:17, 62:24, 63:4, 63:8, 63:13, 63:17, 63:22

Transcript of Reynaldo Guevara
Conducted on October 21, 2020          25

**federal**
62:10, 63:23, 65:5
**feel**
68:11
**fees**
11:1, 11:2
**few**
17:20, 21:6, 22:19, 33:22
**filed**
53:7
**files**
24:13, 24:16, 24:17, 24:23, 25:3
**financial**
58:17, 73:7, 74:9
**find**
52:16
**fine**
27:14, 32:9, 68:17, 69:24, 70:21
**firearms**
49:14
**firm**
4:18, 10:23
**first**
10:12, 22:3, 23:24, 30:24, 38:9, 54:18, 54:22, 59:12
**five**
38:16, 49:18
**flag**
65:23
**floor**
2:4, 3:11, 3:19
**fly**
68:16, 69:18
**folks**
38:23, 39:5
**follow**
66:9, 66:16, 66:21, 67:22, 68:1

**follows**
10:4
**force**
71:7
**foregoing**
73:3, 74:3
**form**
12:21, 14:20, 15:3, 17:23, 19:9, 19:12, 20:10, 21:3, 24:14, 24:21, 25:6, 25:12, 25:16, 25:23, 26:4, 26:10, 26:15, 26:19, 27:1, 27:2, 30:1, 30:18, 31:11, 31:23, 32:1, 35:12, 36:13, 37:12, 37:17, 38:6, 38:14, 39:7, 39:17, 40:8, 41:2, 41:11, 41:18, 43:12, 45:6, 45:18, 46:1, 46:10, 46:15, 49:11, 49:17, 50:7, 50:15, 51:4, 51:9, 51:14, 51:20, 51:24, 52:6, 53:13, 53:24, 54:5, 54:11, 54:16, 54:20, 55:1, 55:15, 55:20, 56:3, 56:10, 56:13, 56:18, 56:22, 57:2, 57:7, 57:12, 57:18, 57:23, 58:5, 58:10, 58:15, 58:21, 59:3, 59:20, 61:1, 61:8, 61:18, 62:1,

62:7, 62:14, 63:11, 63:15, 63:20, 64:1, 64:16, 65:8
**forward**
69:1, 71:4, 71:5, 71:14
**found**
47:1, 47:4
**foundation**
17:1, 17:19, 19:13, 20:9, 21:9, 23:20, 24:22, 25:7, 25:13, 25:17, 25:24, 26:5, 26:11, 26:16, 26:20, 27:3, 30:2, 30:19, 31:12, 31:24, 32:2, 35:13, 36:14, 37:18, 38:7, 38:15, 38:19, 39:1, 39:18, 40:9, 40:15, 41:10, 41:12, 46:9, 46:15, 48:13, 48:18, 49:10, 49:18, 50:6, 50:14, 50:20, 51:3, 51:8, 51:13, 51:19, 51:23, 52:5, 52:13, 53:12, 53:16, 53:19, 53:23, 54:6, 54:10, 54:15, 54:24, 55:6, 55:10, 55:14, 55:19, 56:2, 56:9, 56:17, 56:21, 57:1, 57:6, 57:11, 57:17, 57:22, 58:4, 58:9, 58:14, 58:20, 59:2, 59:7,

59:19, 60:1, 60:5, 60:10, 60:24, 61:9, 62:2, 62:15, 62:19, 63:2, 63:6, 63:10, 63:14, 63:19, 63:24, 64:15, 65:19
**four**
10:19, 11:2, 38:16
**frame**
53:10, 55:8, 57:9
**framed**
58:12
**framing**
61:12
**fraud**
63:18
**freely**
68:14
**friend**
45:8, 45:23
**friends**
45:16, 45:20, 46:7
**full-time**
17:12
**fusco**
5:21

_____
**G**
_____
**g-a-w-r-y-s**
43:2
**g-u-e-v-a-r-a**
10:13
**gabriel**
1:11, 9:13, 9:15, 53:3
**galligan**
40:12, 40:14, 40:20, 40:21, 41:1, 41:15, 42:3
**gang**
17:4, 22:10,

Transcript of Reynaldo Guevara
Conducted on October 21, 2020

26

22:11, 22:12,
22:16, 23:18,
24:3, 24:4,
24:7, 24:8,
24:20, 25:14,
26:7, 26:23,
29:5, 29:7,
29:20, 29:23,
30:8, 30:10,
30:16, 30:21,
34:15, 34:22,
35:3, 36:6,
36:8, 36:17,
36:18, 36:24,
37:7, 37:8,
37:11, 37:21,
37:22, 38:2,
38:5, 39:5,
39:12, 39:15,
39:19, 41:8,
56:15

**gangs**
56:20

**gawrys**
21:16, 21:19,
21:24, 22:3,
22:7, 22:17,
23:9, 36:2,
39:8, 42:15,
42:21, 43:5,
43:9, 43:15,
43:19, 43:23

**general**
12:24, 16:20,
38:18

**generally**
69:3

**getting**
15:16

**give**
13:23, 16:20,
38:17, 70:21,
70:23, 71:1

**given**
33:12, 41:6,
41:7, 69:2

**giving**
11:12, 11:20

**go**
9:4, 18:23,
19:2, 23:22,
29:23, 31:3,
32:12, 33:22,
34:12, 48:20,
58:22, 67:8,
70:8, 71:4

**goes**
71:14

**going**
10:17, 31:5,
31:14, 33:12,
33:13, 41:20,
58:8, 66:9,
66:15, 66:21,
67:4, 67:22,
68:1, 68:17,
69:17, 69:21,
71:20

**gomez**
70:3, 70:11,
71:15, 71:24

**good**
10:8, 10:9,
70:10

**gprs**
26:2, 26:9

**grand**
64:18, 64:23

**grandkids**
19:23

**great**
69:16

**guess**
68:16, 69:7

**guevara**
1:8, 1:18, 2:1,
4:5, 7:3, 8:4,
8:5, 8:19, 8:21,
10:2, 10:8,
10:12, 11:7,
13:10, 14:11,
14:16, 14:17,
28:16, 28:21,
33:17, 33:19,
34:12, 36:16,
47:12, 47:23,

52:24, 56:12,
58:22, 59:14,
66:21, 67:22,
68:1, 69:11,
69:16

**guy's**
23:7

**guys**
45:10

**guzman**
37:20

### H

**halverson**
9:1, 21:11,
21:19, 22:1,
22:4, 22:7,
44:10, 44:14,
44:20, 46:24

**hand**
73:10

**happy**
68:15, 69:5

**harvey**
4:15, 8:24

**hazinski**
3:8, 9:19

**head**
23:17

**health**
12:4

**hear**
47:2, 52:21

**heard**
47:3

**held**
2:1

**help**
50:18

**here**
8:2, 14:6,
52:16, 53:6,
61:15, 61:22,
67:13, 69:22

**hereby**
73:3, 74:2

**hereunto**
73:9

**himself**
33:15

**hold**
33:1

**home**
19:16, 19:21

**homicide**
16:22, 17:9,
20:19, 20:23,
21:1, 21:5,
21:13, 21:20,
22:9, 25:21,
26:24, 29:4,
30:15, 33:24,
34:5, 34:17,
34:19, 55:3,
57:15

**hours**
17:17, 17:20

**however**
66:4

### I

**idea**
31:4

**identify**
8:13, 61:15,
61:22

**illinois**
1:2, 1:19, 2:5,
2:11, 3:12,
3:20, 4:11,
4:21, 5:9, 5:16,
5:23, 8:7, 55:5,
73:17

**impact**
12:5

**importance**
50:9, 50:12

**important**
50:4, 50:18

**income**
14:23, 15:1,
15:15, 15:23,
18:19, 18:21

**incriminate**
32:19, 33:15,
47:18, 64:8

**incriminating**
61:16, 61:24
**indicated**
28:8, 29:6,
31:6, 34:23
**indication**
32:16
**individual**
55:4
**information**
14:8, 66:1,
66:19, 74:7
**innocent**
55:24, 57:9,
58:2, 58:13,
61:12
**insisting**
71:9
**instruct**
66:4
**instructed**
67:3
**instructing**
65:22
**instruction**
66:16, 66:22,
68:2, 68:4
**intend**
28:2, 60:15,
63:1, 64:7
**intending**
14:6, 27:21,
59:22
**intention**
47:14
**interest**
73:7, 74:9
**intervention**
50:23, 50:24
**investigate**
40:1
**investigated**
55:4
**investigation**
58:2, 65:6
**investigations**
43:16, 57:15,
57:21, 60:17

**investigative**
55:22
**invocation**
33:13, 59:13
**invoke**
31:14, 33:10,
41:20, 59:15,
59:23, 60:3,
60:7, 60:12,
64:4
**invoking**
60:21
**issue**
69:5
**issues**
10:14, 11:8,
11:11, 12:4,
51:12

**J**

**jackson**
4:19
**jacques**
43:6, 43:10,
44:10
**james**
4:7, 8:18
**jan**
3:16, 9:12
**jean**
6:4, 8:10
**jim**
33:11, 65:21,
66:3, 67:1,
67:10, 68:19,
69:20
**job**
1:23, 17:12,
17:15, 20:15,
20:16, 20:22
**joe**
39:15, 41:23
**john**
3:8, 9:19,
37:20, 40:12,
40:14, 42:2
**joseph**
36:6

**josh**
4:17
**juan**
14:11, 14:16
**jury**
64:19, 64:23
**justice**
63:5

**K**

**keep**
24:11, 24:13,
24:19, 24:20,
24:23, 25:14,
26:21
**keeping**
25:2
**know**
10:21, 17:14,
17:16, 22:6,
27:23, 30:4,
35:17, 37:23,
38:13, 41:19,
68:5, 69:14,
71:6, 71:8,
71:19

**L**

**lasalle**
4:9
**last**
10:13, 20:4,
20:15, 20:22,
32:22, 33:4,
42:20, 42:23,
44:13, 44:19,
46:12, 46:19
**later**
55:4, 61:6
**latest**
71:14
**law**
3:17, 4:18
**laws**
63:23
**lawsuit**
43:10
**lawsuits**
53:7

**lawyers**
10:19, 10:23,
11:2, 65:10
**laying**
32:12
**left**
44:21
**leinenweber**
4:6, 4:8, 8:20
**let's**
20:12, 70:24
**lies**
62:17, 62:24
**life**
14:8
**likely**
10:21
**lines**
68:22
**little**
29:4, 48:21
**live**
12:8
**lived**
12:14
**lives**
19:8, 19:21
**living**
13:4, 14:18
**llc**
4:8, 5:21
**llp**
5:14
**loevy**
2:3, 3:9
**long**
16:5, 19:4,
21:5
**looks**
10:19
**lot**
37:22, 38:1,
45:13
**lowe**
2:10, 9:22,
73:2, 73:16

**M**

**m-i-n-g-e-y**
34:9

**made**
60:4, 60:8
**maginowski**
39:15, 39:21,
40:1, 40:6,
40:17, 41:24
**magneset**
13:10
**mail**
63:17
**make**
65:23, 67:4,
70:17
**makes**
32:14
**man**
23:6, 52:17,
52:24, 53:3
**manipulate**
54:3
**many**
17:17, 19:10,
20:7, 38:11
**matter**
8:4
**maxwell**
29:24, 30:9,
30:12, 30:17,
30:23, 30:24
**maybe**
14:1, 37:2
**mean**
13:22, 68:20
**media**
8:3
**medical**
10:14, 11:7,
11:11
**medications**
11:15, 11:19
**member**
56:15
**men**
55:8, 55:13,
55:24, 56:6,
57:9, 58:13,
61:5, 61:12
**message**
47:21

**might**
12:5, 32:18,
36:3, 37:23
**milwaukee**
3:18
**mingey**
4:15, 8:24,
34:4, 34:8,
34:23, 35:19,
35:22, 44:2,
44:5, 59:5
**minute**
67:12, 67:19
**misconduct**
55:23, 61:7
**molly**
1:25, 74:2,
74:14
**moment**
70:24, 71:1
**money**
57:10, 58:24,
59:5
**monitor**
8:9
**month**
13:23, 14:1,
18:10, 18:13,
18:16
**months**
12:6, 14:1,
14:2
**more**
4:6, 35:11,
58:7, 68:14
**morning**
10:8, 10:9
**most**
19:5, 35:19,
39:5
**move**
12:17, 12:20,
14:6, 20:12,
68:22, 69:1
**moved**
20:8, 68:23,
69:3
**moving**
69:2

**much**
13:21, 13:22,
18:6, 18:12

**N**

**n-o-o-n**
23:3, 23:4
**name**
10:11, 10:13,
13:8, 14:3,
14:9, 23:7,
34:6, 36:4,
40:18, 42:23,
52:20, 52:21
**named**
40:11, 52:17,
52:24, 53:3
**names**
35:8
**nature**
41:8
**naujokas**
4:15
**navarro**
5:12, 9:11
**necessarily**
36:19
**need**
9:13, 14:7,
27:6, 27:10,
27:14, 27:16,
66:19, 67:14,
71:12
**needs**
68:12, 68:14
**neither**
73:5, 74:7
**never**
37:15, 39:21
**next**
69:22
**none**
7:7
**noon**
23:1, 23:3,
23:4, 23:8,
23:9, 23:13,
23:14, 36:3

**north**
2:4, 3:10,
3:18, 4:9, 5:22,
17:24, 22:13,
24:8
**northern**
1:2, 8:6
**notarial**
73:10
**notary**
2:11, 73:1,
73:16
**note**
28:7
**noted**
11:4
**notes**
24:18, 24:23,
25:4, 25:10,
25:14, 25:19,
25:21, 26:2,
26:8, 26:13,
26:22, 26:23,
31:5, 31:6,
31:17, 31:20,
33:20, 50:10,
50:13, 50:18,
52:16
**november**
70:3, 71:15
**number**
8:3, 8:7, 9:16,
12:4, 45:10

**O**

**o'malley**
5:5, 9:8
**oath**
62:18, 63:1
**object**
10:18, 11:1,
46:2, 68:21,
71:3
**objects**
32:4
**obstruction**
63:4
**obviously**
68:20, 68:21

Transcript of Reynaldo Guevara
Conducted on October 21, 2020                               29

| | | | |
|---|---|---|---|
| **occasionally** 37:2 **october** 1:20, 8:8, 73:11, 74:15 **office** 3:17, 5:7, 21:20, 23:19, 24:4, 24:9, 24:20, 25:15, 30:8, 30:10 **officer** 17:4, 22:10, 25:5, 26:24, 29:3, 29:5, 40:11, 41:8, 43:20, 44:6, 52:3, 60:23, 61:21, 62:6, 64:20, 64:24, 65:7, 73:2 **officers** 24:7, 30:16, 36:18, 37:22, 38:2, 52:9, 52:12, 57:5, 58:24 **offices** 2:2 **often** 13:17, 19:2 **oh** 9:3, 22:19, 23:6, 49:20 **okay** 9:21, 10:1, 14:3, 15:11, 18:12, 22:6, 22:12, 23:12, 23:15, 24:3, 24:7, 27:11, 28:1, 28:6, 28:14, 29:15, 29:23, 33:1, 33:6, 33:17, 36:10, 36:22, 38:11, 40:21, 45:16, 52:16, | 67:14, 67:16, 68:8, 69:9, 70:1, 70:11, 71:1, 71:21, 72:1 **old** 24:1 **once** 13:22, 13:23, 14:1 **one** 8:3, 19:14, 32:4, 33:12, 34:4, 34:23, 36:1, 36:2, 36:3, 66:12, 70:24, 71:1 **ones** 35:6 **only** 59:15 **order** 32:18, 50:18, 54:3, 55:23 **other** 15:8, 15:15, 15:16, 18:18, 18:21, 19:21, 21:12, 21:15, 21:20, 22:23, 23:6, 23:12, 33:23, 34:18, 35:2, 36:18, 38:22, 39:4, 39:12, 48:4, 52:8, 52:12, 54:3, 55:3, 57:5, 58:24, 59:10, 68:22 **others** 35:11 **otherwise** 32:19, 69:7, 73:8, 74:10 **out** 21:20, 22:12, 24:8, 25:11, 29:7, 30:17, | 32:12, 47:1, 47:4, 55:5, 61:6 **outcome** 73:8, 74:10 **over** 28:20, 29:24, 45:17 **overtime** 58:8 **own** 60:4, 60:9 ──────── P ──────── **page** 7:2 **pages** 1:24 **paper** 26:6 **park** 15:20, 15:22, 15:24, 16:3, 16:5, 16:13, 16:16, 17:7, 17:11, 17:15, 17:17, 17:21, 18:7, 18:20 **parks** 18:1 **part** 50:22, 56:24, 57:4 **part-time** 17:12, 17:13 **participation** 63:9 **parties** 32:6, 73:6, 74:8 **partner** 21:8, 36:12, 36:17, 36:19, 37:3, 37:13, 37:15, 38:2, 39:4, 39:13, 40:18, 45:9 **partner's** 40:18 | **partners** 21:12, 21:15, 21:21, 21:24, 22:3, 22:4, 22:7, 22:15, 22:23, 36:2, 36:9, 38:22, 45:10, 45:14, 45:15, 45:21 **party** 32:4 **passed** 46:24 **past** 32:11, 32:14, 62:18 **paul** 37:6 **paying** 11:2 **payments** 57:14 **pc** 4:18 **pension** 15:9, 15:11, 15:16, 16:2, 18:6, 18:12 **pensions** 18:19 **people** 38:11, 38:16, 38:17, 48:4 **people's** 3:17 **percent** 70:17 **period** 16:12, 17:3, 17:7, 17:8, 29:8, 43:15 **perjury** 62:13 **person** 23:12, 43:5, 68:18 **personal** 48:1 |

Transcript of Reynaldo Guevara
Conducted on October 21, 2020

30

persons
58:2
phone
2:6, 3:13,
3:21, 4:6, 4:12,
4:22, 5:10,
5:13, 5:17,
5:24, 47:12,
47:16, 47:21,
69:16
physically
53:15, 54:2,
56:6, 69:13
place
8:12, 71:11
plaintiff
1:6, 1:12, 3:4,
3:15, 8:16,
8:17, 9:13,
9:18, 9:20,
10:5, 10:20,
10:24, 47:9,
64:13
planet
8:11, 9:22
played
33:2
plead
44:12, 47:15,
48:8, 48:14,
48:19, 50:2,
50:8, 50:16,
50:21, 51:5,
51:10, 51:15,
51:21, 52:1,
52:7, 52:14,
52:19, 53:2,
53:5, 53:9,
53:14, 53:17,
53:20, 54:1,
54:7, 54:12,
54:17, 54:21,
55:2, 55:7,
55:11, 55:16,
55:21, 56:4,
56:11, 56:14,
56:19, 56:23,
57:3

please
8:13, 9:23,
10:10, 13:9,
14:9, 14:15,
33:1
point
21:23, 26:14,
30:22, 31:14,
37:4, 56:16
points
33:23
police
15:12, 15:17,
16:9, 16:10,
17:14, 18:13,
18:20, 20:13,
20:19, 20:22,
25:4, 29:3,
42:6, 42:9,
43:20, 44:6,
44:21, 44:24,
45:23, 46:8,
46:13, 46:18,
48:11, 48:16,
48:22, 49:4,
49:5, 49:9,
50:24, 51:7,
51:12, 51:17,
52:3, 57:5,
60:17, 60:23,
61:21, 62:6,
64:20, 64:24,
65:7
position
69:8, 69:10,
71:5
positions
20:18
present
6:3, 69:12,
69:13
pretty
35:21
prevent
10:15, 11:8,
11:12, 11:16,
11:20, 11:24
preventing
64:13

previous
33:2
previously
12:14, 46:18
prior
43:15
prison
55:24
privilege
32:18, 65:14
privileged
65:18, 66:1,
66:19
probably
35:6
problem
69:1, 69:6,
70:17
proceedings
33:20, 64:19,
64:23, 73:4,
74:4, 74:5
process
32:12
promptly
69:18
prosecuted
61:12
prosecution
59:18, 60:22,
61:4, 62:4,
62:9, 62:13,
62:17, 62:24,
63:4, 63:8,
63:13, 63:17,
63:22
prosecutors
65:5
provide
32:18, 61:16,
61:23
public
2:11, 73:1,
73:16
pursuant
2:10
put
69:8, 69:9,

71:5

**Q**

question
11:5, 16:14,
28:23, 32:22,
33:2, 33:4,
33:8, 36:16,
41:22, 43:8,
47:15, 48:9,
65:23, 66:3,
66:11, 66:17,
66:23, 67:11,
68:3, 68:7
questioning
68:23
questions
10:16, 10:19,
11:9, 11:17,
12:1, 59:12,
59:18, 60:16,
62:5, 69:5, 71:8
quick
47:6
quite
68:23

**R**

r-e-y-n-a-l-d-o
10:13
re-ask
67:15
read
32:22, 32:23,
67:17
ready
68:22
real
47:6
really
21:6, 35:9,
47:1
reason
12:23, 26:21,
27:8, 41:14,
45:7, 58:12
reasonable
59:16

Transcript of Reynaldo Guevara
Conducted on October 21, 2020                                31

| | | | |
|---|---|---|---|
| **reasons**<br>12:24<br>**recall**<br>16:18, 18:5,<br>21:18, 30:14,<br>39:20, 39:22,<br>40:10, 41:4,<br>41:13, 46:22<br>**receive**<br>15:23, 18:6,<br>18:13, 18:19,<br>65:16, 66:6<br>**recently**<br>19:5, 19:19<br>**recess**<br>28:5, 47:8,<br>67:9<br>**record**<br>10:11, 27:12,<br>67:15, 67:20,<br>69:8, 69:10,<br>70:24, 71:2,<br>71:6, 72:4, 74:4<br>**recorded**<br>73:5, 74:4<br>**recording**<br>74:6<br>**referring**<br>15:6<br>**refuse**<br>66:10<br>**regard**<br>47:15, 59:23<br>**regardless**<br>41:22<br>**reiter**<br>5:14<br>**related**<br>61:20, 64:19,<br>64:23, 73:6,<br>74:8<br>**relevance**<br>13:19, 14:5<br>**reluctant**<br>68:11<br>**rely**<br>59:22<br>**remember**<br>16:18, 16:21, | 20:17, 21:6,<br>22:20, 22:21,<br>22:24, 23:6,<br>23:15, 24:16,<br>24:24, 25:2,<br>35:8, 36:4,<br>37:24, 38:22,<br>39:10, 39:11,<br>40:3, 40:4,<br>40:17, 40:18,<br>41:19, 42:22,<br>44:15, 46:16,<br>47:3, 49:2,<br>52:17, 52:24,<br>53:4<br>**remotely**<br>8:13, 71:11<br>**repeat**<br>14:15<br>**report**<br>49:16, 49:22,<br>50:3<br>**reporter**<br>9:22, 9:23,<br>10:1, 14:12,<br>14:14, 23:2,<br>23:5, 29:16,<br>29:19, 32:22,<br>33:1, 33:3,<br>34:6, 34:10,<br>35:14, 42:23,<br>43:3, 73:1<br>**reports**<br>31:21, 31:22,<br>50:5, 50:19<br>**represent**<br>8:14<br>**representing**<br>8:11, 9:22<br>**reputation**<br>52:12<br>**reschedule**<br>69:17<br>**residence**<br>19:7<br>**residences**<br>19:10<br>**response**<br>59:17 | **retire**<br>20:13<br>**retired**<br>14:19, 15:5,<br>15:7, 16:1,<br>16:8, 21:7,<br>44:24<br>**retirement**<br>14:24, 15:2<br>**rey**<br>12:22, 13:20,<br>14:10, 33:9,<br>34:2, 35:18,<br>49:1, 49:18,<br>49:19, 66:8,<br>66:14, 68:5,<br>68:10, 68:12<br>**reyes**<br>8:16, 8:17,<br>9:18, 9:20,<br>10:20, 52:18,<br>53:1, 53:8,<br>53:10, 54:4,<br>54:8, 71:24<br>**reynaldo**<br>1:8, 1:18, 2:1,<br>7:3, 8:4, 8:5,<br>10:2, 10:12<br>**richard**<br>5:8<br>**right**<br>20:12, 23:10,<br>25:5, 27:13,<br>27:24, 29:2,<br>32:21, 33:7,<br>37:4, 45:1,<br>48:20, 51:22,<br>54:9, 59:9,<br>59:15, 64:4,<br>65:12, 70:23,<br>72:2<br>**rights**<br>10:22, 31:15,<br>32:15, 41:21,<br>63:23, 64:8<br>**risk**<br>60:22, 61:4<br>**rivera**<br>43:6, 43:10, | 44:11<br>**rock**<br>5:21<br>**rutherford**<br>4:14, 8:23<br><br>————— **S** —————<br><br>**s**<br>16:19<br>**said**<br>25:2, 29:20,<br>30:7, 73:4, 74:4<br>**same**<br>26:12, 31:13,<br>39:12, 40:7,<br>40:22, 41:3,<br>41:6, 41:16,<br>59:11, 71:18<br>**san**<br>12:10, 12:18,<br>12:20, 13:11,<br>13:17, 20:8<br>**saw**<br>44:19<br>**say**<br>13:22, 15:5,<br>15:21, 17:6,<br>21:4, 26:13,<br>33:6, 35:21,<br>41:7, 41:20,<br>52:8, 52:11,<br>71:2<br>**scheduled**<br>69:22<br>**seal**<br>73:10<br>**sean**<br>3:6, 9:17<br>**second**<br>17:15, 38:9<br>**sections**<br>69:7<br>**security**<br>15:18, 18:18<br>**see**<br>13:17, 13:21,<br>25:4, 45:7<br>**seek**<br>11:1 |

Transcript of Reynaldo Guevara
Conducted on October 21, 2020

32

**seem**
69:4
**seen**
44:23
**self-incriminati-**
**on**
59:16
**send**
55:24
**sense**
13:24, 16:20,
38:18
**sergeants**
34:19, 34:20
**serious**
55:22
**set**
73:9
**sgt**
34:4, 35:4,
35:14
**shakespeare**
29:13, 29:14,
29:18
**shift**
38:4, 38:8,
38:9, 38:10,
38:12, 38:21,
38:24, 39:12,
40:7, 40:22,
41:7, 41:16
**shortly**
14:6
**should**
10:24, 70:16
**side**
17:24
**signature-jq9ex**
74:12
**signature-wg5xh**
73:14
**since**
20:8, 43:23,
44:2, 44:10
**single-family**
19:15
**sir**
10:14, 11:15,

12:8, 16:14,
16:21, 18:23,
20:12, 25:22,
33:22, 42:5,
46:23, 47:14,
50:22, 51:22,
52:17, 54:18,
55:3, 56:15,
57:9, 58:7,
58:17, 60:15,
61:11, 62:4,
64:3, 64:6,
64:10, 64:18,
65:2, 65:4,
65:10, 65:16,
66:6, 66:9,
66:15
**sit**
12:5, 61:15,
61:22, 69:18
**smoothly**
68:23, 69:4
**social**
15:18, 18:18
**solache**
1:11, 3:15,
9:13, 9:15,
53:3, 53:8,
53:10, 54:4,
54:8
**some**
14:7, 22:23,
26:6, 26:14,
30:22, 35:10,
39:4, 41:9,
48:21, 56:5,
59:9, 59:12
**someone**
36:10, 36:11,
36:22, 37:6,
37:10, 37:20,
57:21
**something**
18:15, 18:17,
26:3, 26:9,
70:4, 70:19
**sometime**
16:19

**sometimes**
25:8, 26:1,
37:15, 38:3
**son**
13:14, 13:17,
19:8, 19:22
**son's**
14:9
**sorry**
23:22, 27:6,
35:23, 36:16,
42:8, 42:13,
48:10, 49:20,
52:15, 52:20,
52:22
**sort**
59:11
**sotos**
4:18
**sought**
12:3
**sources**
14:22, 15:1,
15:15, 18:21
**south**
5:15
**sparks**
36:6, 36:22,
37:13
**speak**
65:11, 68:14
**specialist**
22:11
**specific**
12:23, 18:1
**specifically**
39:14
**spell**
10:10, 35:14
**spelled**
10:12, 42:24
**spent**
43:5, 43:9,
45:13
**spoke**
68:10
**stankus**
4:15, 8:23

**starr**
3:6, 9:17
**start**
28:20, 69:5
**started**
30:5, 30:7,
48:22
**state**
2:11, 8:14,
10:10, 12:9,
27:12, 62:9,
65:4, 73:17
**state's**
5:7
**states**
1:1
**stay**
42:5, 42:9,
42:15, 70:24,
71:7
**stayed**
19:18
**steer**
57:14, 57:20,
58:1
**steps**
55:12, 55:17
**steve**
8:17, 21:16,
22:17, 36:2,
39:8, 42:15,
42:21, 43:9
**steven**
3:7
**street**
2:4, 3:10, 4:9,
5:22, 29:8,
29:24, 30:10,
30:12, 30:17,
30:23, 30:24
**strike**
15:4, 22:22,
25:20, 28:19,
33:18, 36:15,
43:7, 44:18,
46:6, 49:23,
50:11, 52:10,
62:23, 64:11,

Transcript of Reynaldo Guevara
Conducted on October 21, 2020

33

65:3, 67:24
**stuff**
48:21
**subject**
31:5, 64:18,
64:22
**subjects**
61:14, 61:20
**substance**
28:17, 28:22
**suit**
14:5
**suite**
4:10, 4:20,
5:15, 5:22
**supervising**
34:18
**supervisor**
34:14, 59:6
**supervisors**
33:24, 34:5,
34:18, 34:21,
34:24, 35:2
**supporting**
74:6
**suppressed**
54:13
**sure**
10:21, 10:22,
27:12, 32:7,
32:23, 40:20
**susler**
3:16, 9:12
**suspect**
57:16
**suspended**
68:15
**suspending**
71:3, 71:9
**swaminathan**
3:5, 7:4, 8:15,
8:16, 10:7,
11:4, 11:6,
14:12, 15:4,
17:2, 22:22,
23:3, 25:20,
27:8, 27:11,
27:16, 27:21,

28:1, 28:6,
28:11, 28:14,
28:15, 28:19,
29:18, 30:6,
32:7, 32:9,
32:21, 33:5,
33:11, 33:18,
34:8, 34:11,
35:16, 36:15,
39:3, 40:5,
41:5, 43:1,
43:4, 43:7,
44:18, 45:4,
46:4, 46:6,
47:7, 47:11,
49:3, 49:23,
50:11, 52:2,
52:10, 52:15,
52:22, 62:23,
64:11, 65:3,
65:21, 66:2,
66:5, 67:1,
67:8, 67:10,
67:13, 67:16,
67:21, 67:24,
68:9, 68:19,
69:20, 70:1,
70:6, 70:11,
70:14, 70:23,
71:21, 72:2
**swear**
9:23
**switched**
21:24, 22:7
**sworn**
10:3
**system**
50:23

**T**

**take**
25:1, 25:21,
26:2, 27:6,
27:24, 31:19,
32:3, 33:6,
33:21, 42:1,
42:4, 43:13,
43:17, 43:21,

43:24, 44:3,
44:7, 47:5,
47:13, 47:19,
47:22, 47:24,
48:2, 48:5,
49:18, 49:19,
50:18, 57:8,
57:13, 57:19,
57:24, 58:6,
58:11, 58:16,
58:19, 58:23,
59:4, 59:21,
60:2, 60:6,
60:11, 60:14,
60:19, 61:2,
61:10, 61:13,
61:19, 62:3,
62:8, 62:12,
62:16, 62:21,
63:3, 63:7,
63:12, 63:16,
63:21, 64:2,
64:5, 64:9,
64:17, 64:21,
65:1, 65:9,
65:13, 65:15,
65:20, 67:6,
71:11
**taken**
26:14, 73:3
**taking**
8:12, 11:15,
11:19, 27:13,
50:10, 50:13
**talk**
67:7
**talked**
29:3
**talking**
49:24
**telephone**
4:7
**tell**
13:8, 14:9,
63:1, 69:6,
71:22
**telling**
28:17, 28:21

**temper**
51:18, 51:22,
52:4, 52:12
**terms**
26:22, 32:10
**testified**
10:4, 36:1
**testify**
60:21, 61:4,
64:6
**testifying**
64:12
**testimony**
11:12, 11:20,
28:24, 32:18,
59:17, 61:16,
61:23
**texas**
12:10
**text**
47:20, 48:7,
48:12
**th**
24:4, 29:7,
29:8, 29:9,
29:10, 31:1,
70:12, 70:13,
70:15, 71:15,
71:20, 73:10
**thank**
23:5, 28:3,
28:14, 29:19,
34:10, 43:3,
72:2
**things**
24:18
**think**
11:10, 12:2,
12:7, 17:5,
21:22, 32:10,
32:13, 33:3,
40:19, 66:12,
70:2, 71:17
**third**
38:9, 38:10,
38:11
**thomas**
4:6, 8:22

Transcript of Reynaldo Guevara
Conducted on October 21, 2020

34

| | | | |
|---|---|---|---|
| **threaten** 53:18 | **took** 24:19, 25:4, 25:19, 26:8, 28:7, 55:12, 55:17 | **twice** 20:11 | **videotaped** 1:17, 8:3 |
| **threatened** 56:6 | | **two** 20:6, 69:22 | **violations** 63:23 |
| **three** 69:22 | **top** 23:17 | **U** | **visit** 18:23 |
| **through** 32:12, 49:9 | **topics** 69:1, 69:3 | **under** 30:9, 31:15, 62:18, 63:1 | **vs** 8:5, 9:15 |
| **throw** 25:11, 26:17 | **touch** 42:5, 42:9, 42:15 | **understand** 10:15, 11:9, 11:16, 11:24, 16:14, 30:21, 32:16, 32:19, 53:6, 59:14, 64:10, 64:12 | **W** |
| **throwing** 26:22 | **toward** 57:21 | | **wacker** 5:15 |
| **thrown** 55:5, 61:6 | **towards** 58:2 | | **want** 27:17, 27:19, 27:24, 28:6, 29:2, 32:8, 33:22, 48:20, 59:9, 59:12, 67:1, 67:4, 67:17, 70:17 |
| **time** 8:9, 16:12, 17:3, 17:7, 17:8, 20:4, 21:7, 21:23, 24:2, 29:4, 29:8, 29:10, 30:15, 33:23, 35:7, 35:20, 38:5, 42:20, 43:5, 43:9, 43:19, 44:10, 44:13, 44:19, 45:13, 45:17, 45:23, 46:12, 60:16, 71:14, 71:18 | **training** 49:8, 49:13, 49:16, 49:21, 49:24, 50:3, 50:4, 50:9, 50:12, 50:17 | **understanding** 60:20, 61:3, 65:4, 71:6 | |
| | **transcribed** 1:25, 74:5 | **unexpected** 28:7 | **wanted** 29:5, 65:22, 65:23 |
| | **transcriber** 74:1 | **unit** 34:19 | **way** 26:12, 69:15 |
| | **transcript** 74:3 | **united** 1:1 | **we'll** 69:18, 71:22 |
| | **trevino** 4:15, 8:24 | **until** 56:6, 70:18 | **we're** 68:17, 69:15 |
| | **trial** 43:6, 43:10, 43:23, 44:2, 44:5, 44:11, 64:6 | **upstairs** 23:24 | **we've** 32:10, 68:17 |
| **times** 20:7 | | **use** 47:20, 49:13 | **weather** 13:1 |
| **today** 8:8, 8:10, 9:22, 10:16, 11:9, 11:13, 11:17, 11:21, 12:1, 14:8, 53:6, 60:16, 60:21, 61:4, 61:15, 61:22, 70:22 | **tried** 55:8 | **using** 48:3 | **wednesday** 1:20 |
| | **troubles** 58:17 | **V** | **week** 13:23, 17:18, 71:16, 71:21, 71:22, 71:23 |
| | **true** 74:3 | **varga** 5:5, 9:8 | |
| | **truthful** 11:12, 11:20, 47:17, 59:17, 61:16, 61:23 | **via** 3:2, 4:2, 4:6, 5:2, 5:13 | **weeks** 19:6, 69:23 |
| **together** 37:23, 41:9, 45:13 | | **video** 8:9, 8:12 | **wehrle** 5:4, 9:8 |
| | **try** 69:14, 70:7 | **videoconference** 3:2, 4:2, 5:2 | **weigh** 66:3 |
| **told** 61:11, 62:18 | **turn** 29:2 | **videographer** 6:4, 8:2, 8:10, 9:21, 67:12, 67:19 | **went** 19:19, 23:9, 24:1, 29:20, |

30:22, 49:4,
49:8
**weren't**
36:19
**west**
4:19
**western**
29:21
**whatever**
14:5, 71:12
**whereof**
73:9
**whether**
24:16, 28:2,
47:16
**whole**
32:12
**wife**
13:5, 20:1
**wife's**
13:8
**willing**
70:19, 70:20
**wire**
63:18
**without**
28:17, 28:21,
60:21, 61:16,
61:23, 69:11
**witness**
9:24, 10:3,
10:21, 27:18,
27:20, 27:22,
28:3, 28:8,
71:7, 73:9
**witnesses**
50:1, 54:3
**wonder**
67:6
**words**
15:8
**work**
15:12, 16:5,
17:17, 17:21,
18:1, 24:8,
30:9, 30:12,
30:16, 35:19,
36:6, 37:1,

37:8, 37:14,
37:23, 38:1,
38:4, 39:15,
40:6, 40:11,
40:21, 40:24,
41:8, 43:19,
44:5, 48:7,
61:20, 62:5
**worked**
16:13, 16:15,
17:7, 17:11,
21:21, 34:15,
35:10, 35:21,
36:11, 36:18,
36:22, 37:7,
37:10, 37:20,
38:8, 38:11,
38:21, 38:23,
39:5, 39:11,
39:21, 41:6,
41:9, 41:15,
41:16, 46:18,
48:11, 48:16
**working**
14:20, 23:18,
35:6, 39:20,
56:20
**wouldn't**
41:15
**write**
50:4
**writing**
49:16, 50:3
**written**
31:21
**wrote**
50:19

**Y**

**yeah**
34:7, 68:19,
69:24, 70:6
**year**
13:23, 18:7,
18:9, 18:14,
46:19, 48:21
**years**
16:7, 16:15,

20:6, 21:6,
45:11
**young**
56:6
**yourself**
8:14, 27:17,
61:17, 61:24,
64:8

**Z**

**zacharias**
37:6
**zisch**
6:4, 8:10
**zoom**
3:2, 4:2, 5:2,
68:13

**$**

**$5,000**
18:15, 18:16
**$600**
18:8, 18:9,
18:10

**0**

**0070**
3:21
**0090**
5:17
**01**
8:8
**01028**
1:6, 8:8
**028**
8:8
**08**
1:21, 8:9

**1**

**10**
1:21, 7:4, 8:9,
16:7, 38:17,
70:15, 71:20
**100**
70:17
**1000**
5:24

**11**
67:20, 70:12,
70:13, 70:15,
71:15, 72:4
**118**
8:7
**1180**
3:18
**12**
70:15, 71:20
**120**
4:9
**1240**
4:20
**14**
23:24, 24:1,
24:4, 29:7,
29:8, 29:9,
29:10, 31:1
**141**
4:19
**161**
74:14
**18**
1:6, 1:12, 9:16
**1990**
58:18
**1:-cv**
1:6, 1:12

**2**

**20**
55:3, 55:8,
55:13, 56:5,
61:5, 61:12
**2000**
4:10, 16:20
**2005**
20:14
**2020**
1:20, 8:9,
73:11, 74:15
**21**
1:20, 8:8
**2200**
5:22
**2312**
1:12, 9:16

**235**
3:21
**243**
2:6, 3:13
**26**
73:10, 74:15

**3**

**31**
67:20
**311**
2:4, 3:10, 5:15
**312**
2:6, 3:13,
5:10, 5:17, 5:24
**321**
5:22
**330621**
1:23
**3314**
4:22
**37**
72:4
**3705**
4:12
**3rd**
2:4, 3:11, 3:19

**4**

**40**
38:17
**494**
5:24

**5**

**500**
5:8
**5200**
5:15
**5900**
2:6, 3:13
**5971**
5:10

**6**

**603**
5:10
**60602**
4:11, 5:9

**60604**
4:21
**60606**
5:16
**60607**
2:5, 3:12
**60642**
3:20
**60654**
5:23
**630**
4:22

**7**

**735**
4:22
**74**
1:24
**773**
3:21
**786**
4:12

**8**

**80**
16:19
**866**
4:12

**9**

**90**
16:19
**982**
5:17
**9th**
70:4, 70:14

*DeLeon-Reyes v. Guevara, et al.*
Case No. 18 CV 01028

*Solache v. Guevara, et al.*
Case No. 18 CV 02312

# EXHIBIT 3



# Transcript of Ernest Halvorsen

**Date:** April 20, 2018
**Case:** Montanez -v- Guevara, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
**www.planetdepos.com**

**1**

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

JOSE MONTANEZ,                    )

      Plaintiff,        )

  -vs-                          ) No. 17 CV 4560

REYNALDO GUEVARA, et al.,  )

     Defendants.        )

--------------------------

ARMANDO SERRANO,                  )

     Plaintiff,         )

  -vs-                          ) No. 17 CV 2869

REYNALDO GUEVARA, et al.,  )

     Defendants.        )

Deposition of ERNEST HALVORSEN

Chicago, Illinois

Friday, April 20, 2018

10:14 A.M.

Job No: 182444

Pages: 1 - 420

Reported By: Aneesha L. Williams, CSR

**2**

Deposition of ERNEST HALVORSEN, held at the offices of:

LOEVY & LOEVY

311 North Aberdeen Street,

3rd Floor

Chicago, Illinois 60607

(312) 243-5900

Pursuant to notice before Aneesha L. Williams, Certified Shorthand Reporter and Notary Public, to and for the State of Illinois.

**3**

APPEARANCES:

ON BEHALF OF THE PLAINTIFF, JOSE MONTANEZ:

    MS. JENNIFER BONJEAN

    BONJEAN LAW GROUP, PLLC

    1000 Dean Street, Suite 422

    Brooklyn, New York 11238

    (718) 875-1850

ON BEHALF OF THE PLAINTIFF, ARMANDO SERRANO:

    MS. ELIZABETH MAZUR

    LOEVY & LOEVY LLC

    311 North Aberdeen Street, 3rd Floor

    Chicago, Illinois 60607

    (312) 243-5900

ON BEHALF OF THE DEFENDANT, REYNALDO GUEVARA:

    MR. JEFFREY N. GIVEN

    THE SOTOS LAW FIRM, P.C.

    550 East Devon Street, Suite 150

    Itasca, Illinois 60143

    (630) 735-3300

**4**

APPEARANCES:

ON BEHALF OF THE DEFENDANT, ANDT:

    MS. TAMMY WENDT

    HERBERT LAW FIRM

    206 South Jefferson Street,

    Suite 100

    Chicago, Illinois 60661

    (312) 655-7660

ON BEHALF OF THE DEFENDANT, MATTHEW COGHLAN:

    MS. KRISTINA KATZ CERCONE

    JONES DAY

    77 West Wacker Drive

    Chicago, Illinois 60601

    (312) 782-3939

ON BEHALF OF THE DEFENDANT, COOK COUNTY and JOHN DILLON:

    MR. MICHAEL P. GORMAN

    ASSISTANT STATE'S ATTORNEY

    500 Richard J. Daley Center

    Chicago, Illinois 60602

    (312) 603-4366

APPEARANCES:

ON BEHALF OF THE DEFENDANT, CITY OF CHICAGO:

MS. CATHERINE M. BARBER

ROCK FUSCO & CONNELLY, LLC

321 North Clark Street, Suite 2200

Chicago, Illinois 60654

(312) 494-1000

ALSO PRESENT:  Rick Hasberg, Videographer

I N D E X

WITNESSERNEST HALVORSEN                    PAGE
EXAMINATION
BY MS. BONJEAN ............................ 8
BY MS. MAZUR ............................ 282
BY MS. BONJEAN ......................... 330

E X H I B I T S
DEPOSITION EXHIBIT          MARKED FOR ID
Guevara No. 1
Log of Criminal History Records .......... 56
Guevara No. 2
Log of Criminal History Records .......... 58
Guevara No. 3
Supplemental Report .................... 164
Halvorsen No. 1
Transcript of 07/01/93 .................. 195
Halvorsen No. 2
Transcript of Record Appeal ............. 206
Guevara No. 7
Affidavit of Francisco Vicente .......... 246
Halvorsen No. 3
Supplementary Report .................... 337
Halvorsen No. 4
Area 5 Supplemental Report .............. 370

THE VIDEOGRAPHER:  This is the video deposition of Ernest Halvorsen taken by Loevy & Loevy in the matter of Montanez v. Guevara, et al., case number 17 CV 4560; and Serrano vs. Guevara, et al., case number 17 CV 2869, held at Loevy & Loevy, 311 North Aberdeen Street, Chicago, Illinois.

Today is April 20th, 2018.  The time is 10:14.  The court reporter is Aneesha Williams, Planet Depos, and the videographer is Rick Hasberg.

The counsel will now introduce themselves, and the court reporter is free to administer the oath.

MS. BONJEAN:  Good morning.  My name is Jennifer Bonjean.  That's B-O-N-J-E-A-N.  I represent Armando Serrano.  I will be taking this deposition today along with Loevy & Loevy.  My law firm is the Bonjean Law Group.

MS. MAZUR:  My name is Elizabeth Mazur, and I'm here for Loevy & Loevy representing Jose -- plaintiff, Jose Montanez.

MR. GORMAN:  Assistant State's Attorney Michael Gorman on behalf of John Dillon and Cook County.

MS. CERCONE:  Kristina Cercone on behalf of Matthew Coghlan.

MS. BARBER:  Catherine Barber for Defendant, City of Chicago:

MR. GIVEN:  Jeff Given on behalf of the individual defendant officers and Mr. Halvorsen at the dep today.

MS. WENDT:  Tammy Wendt for the ANDT from the Herbert Law Firm on behalf of Mr. Halvorsen.

(Witness sworn.)

ERNEST HALVORSEN, called as a witness herein, having been first duly sworn, was examined and testified as follows:

EXAMINATION
BY MS. BONJEAN:

Q.  Good morning, Mr. Halvorsen.  My name is Jennifer Bonjean, and I represent the Plaintiff, Armando Serrano, in this matter, and I'm going to begin by questioning you here today.

Do you understand that?

Transcript of Ernest Halvorsen
Conducted on April 20, 2018

3 (9 to 12)

9

**A.  Yes.**
Q.  Okay.  Sir, can you please state your full name for the record?
**A.  Ernest Halvorsen.**
Q.  And, sir, are you a Chicago police officer?
**A.  I was.**
Q.  And when did you become a Chicago police officer?
**A.  23 October 1972.**
Q.  And when did you retire from the Chicago Police Department?
**A.  16 April 2010.**
Q.  And, sir, how long were you a Chicago police officer, if you could do the math for me?
**A.  A little less than 38 years.**
Q.  And at what rank did you retire from the Chicago Police Department?
MR. GIVEN:  Objection; form.  You can answer.
THE WITNESS:  Detective.
BY MS. BONJEAN:
Q.  And, sir, did you at some point in

10

your career investigate the murder of Rodrigo Vargas?
**A.  Yes.**
Q.  Okay.
MR. GIVEN:  Go ahead.
MS. BONJEAN:  You want to take a second?
MR. GIVEN:  Sure.
MS. BONJEAN:  Okay.
MR. GIVEN:  This will literally take about 30 seconds.
MS. BONJEAN:  Okay.
MS. CERCONE:  Can we agree that one objection is joined by all?  That one objection is joined by all.
MR. GIVEN:  It's okay with me.
MS. BONJEAN:  I'm okay with it.
MS. MAZUR:  That's fine.
MR. GIVEN:  Can you ask him that question again, please?
MS. BONJEAN:  Sure.
BY MS. BONJEAN:
Q.  Mr. Halvorsen, at some point in your career, did you investigate the murder of Rodrigo Vargas?

11

**A.  The Fifth Amendment protects the innocent, as well as the guilty.  On advice of counsel, I choose to exercise my constitutional right to remain silent.**
Q.  Okay.  Tell me everything you did to investigate the Vargas murder.
**A.  Oh, my God.  I forgot it already.**
**On advice of counsel, I assert my Fifth Amendment.**
Q.  Tell me every person that you interviewed during the course of your investigation of the Vargas murder.
**A.  On advice of counsel, I assert my Fifth Amendment.**
Q.  Identify every document that was contained in the Vargas investigative file when you last saw it.
**A.  On advice of counsel, I assert my Fifth Amendment.**
Q.  Identify all reports that you authored or affixed your signature to that were produced in the investigation of the Vargas murder.
**A.  On the advice of counsel, I assert**

12

my Fifth Amendment.
Q.  Tell me all steps you took to determine that Mr. Serrano, Mr. Montanez, and Mr. Pacheco were guilty of the murder of Rodrigo Vargas.
**A.  On advice of counsel, I assert my Fifth Amendment.**
Q.  Your misconduct in the Vargas investigations violated Mr. Montanez, Mr. Serrano, and Mr. Pacheco's constitutional rights to due process; isn't that true?
MR. GIVEN:  Objection; form.  You can answer.
THE WITNESS:  On advice of counsel, I assert my Fifth Amendment.
BY MS. BONJEAN:
Q.  In fact, you violated Mr. Montanez, Mr. Serrano, and Mr. Pacheco's constitutional rights to due process as part of a conspiracy with your partner, Detective Guevara, your supervisor, Sergeant Mingy, and Assistant State's Attorneys Coghlan and Dillon.
MS. CERCONE:  Object to form.
MR. GIVEN:  Objection; form.

Transcript of Ernest Halvorsen
Conducted on April 20, 2018

13

THE WITNESS: On advice of counsel, I assert my Fifth Amendment.

BY MS. BONJEAN:

Q. Your misconduct in the Vargas investigation violated Montanez, Serrano, and Pacheco's constitutional rights protected by the Fourth Amendment; isn't that correct?

MR. GIVEN: Objection; form.

THE WITNESS: On advice of counsel, I assert the Fifth Amendment.

BY MS. BONJEAN:

Q. You violated Mr. Montanez, Serrano and Pacheco's constitutional rights protected by the Fourth Amendment as part of a conspiracy with Guevara, Mingy, Coghlan, and Dillon.

MS. CERCONE: Objection; form.

MR. GIVEN: Objection; form.

THE WITNESS: On advice of counsel, I assert the Fifth Amendment.

BY MS. BONJEAN:

Q. Isn't it true, sir, that you conspired with your partner, Detective Guevara, Sergeant Mingy, Assistant State's

14

Attorneys Coghlan and Dillon reaching an agreement to frame Mr. Montanez, Mr. Serrano, and Mr. Pacheco for the murder of Rodrigo Vargas?

MS. CERCONE: Object to form.

THE WITNESS: On advice of counsel, I assert the Fifth Amendment.

BY MS. BONJEAN:

Q. In fact, sir, isn't it true that you conspired with Mr. Guevara, Sergeant Mingy, Coghlan and Dillon to frame Montanez, Serrano, and Pacheco before any of those offi- -- strike that.

Isn't true that you conspired with Detective Guevara, Sergeant Mingy, Assistant State's Attorneys Coghlan and Dillon to frame Mr. Montanez, Serrano, and Pacheco before Montanez, Serrano, and Pacheco were arrested or charged with the murder of Rodrigo Vargas?

MS. CERCONE: Objection --

MR. GIVEN: Objection; form.

THE WITNESS: On advice of counsel, I assert the Fifth Amendment.

15

BY MS. BONJEAN:

Q. In fact, you, sir, knew that your fellow officers, specifically Detective Guevara and Sergeant Mingy, were committing acts of misconduct that violated the constitutional rights of Montanez, Serrano, and Pacheco, and you did nothing to stop that misconduct?

MR. GIVEN: Objection; form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment.

BY MS. BONJEAN:

Q. Indeed, sir, isn't it true that you caused Mr. Montanez, Mr. Serrano, and Mr. Pacheco to be prosecuted for murder and ensured that the prosecution was seen through to their wrongful convictions --

MR. GIVEN: Objection.

BY MS. BONJEAN:

Q. -- despite knowing that there was no probable cause to arrest them?

MR. GIVEN: Objection; form, calls for a legal conclusion.

THE WITNESS: On the advice of counsel,

16

I assert the Fifth Amendment.

BY MS. BONJEAN:

Q. In fact, sir, you had no probable cause to believe that Mr. Montanez, Mr. Serrano, or Mr. Pacheco were involved in any way in the Rodrigo Vargas's murder?

A. On advice of counsel, I assert the Fifth Amendment.

Q. And isn't it true that you intentionally framed Jose Montanez for the murder that he did not commit, that of Rodrigo Vargas?

A. On advice of counsel, I assert the Fifth Amendment.

Q. And isn't it true that you intentionally framed Armando Serrano for the murder of Rodrigo Vargas, a murder that he did not commit?

A. On advice of counsel, I assert the Fifth Amendment.

Q. And isn't it true that you intentionally framed Jordan Pacheco for the murder of Rodrigo Vargas, a murder he did not commit?

Transcript of Ernest Halvorsen
Conducted on April 20, 2018

17

MR. GIVEN: Objection; form and foundation.

THE WITNESS: On advice of counsel, I assert the Fifth Amendment.

BY MS. BONJEAN:

Q. And as a result of your misconduct and the misconduct of your fellow Chicago police officers, Jose Montanez and Armando Serrano were convicted of Rodrigo Vargas's murder?

MR. GIVEN: Objection; form, legal conclusion, calls for speculation.

You can answer.

THE WITNESS: On advice of counsel, I assert the Fifth Amendment.

BY MS. BONJEAN:

Q. And from February 1993 till July 1993, isn't it true that you conspired with other officers to falsely charge Mr. Montanez, Serrano, and Pacheco for the murder of Rodrigo Vargas?

A. On advice of counsel, I assert the Fifth Amendment.

Q. And to be clear, sir, you were

18

assigned to investigate the murder of Rodrigo Vargas along with your partner, Detective Reynaldo Guevara, correct?

A. On advice of counsel, I assert the Fifth Amendment.

Q. And your supervisor on the Vargas case was Sergeant Edward Mingy?

A. On advice of counsel, I assert the Fifth Amendment.

Q. And isn't it true that the three of you consulted regularly and shared all information about the progress of the Vargas investigation?

A. On advice of counsel, I assert the Fifth Amendment.

Q. You discussed all aspects of the investigation with your partner, Detective Guevara, along with your supervisor, Sergeant Mingy; isn't that right?

A. On advice of counsel, I assert the Fifth Amendment.

Q. And you knew when you started the investigation into the murder of Rodrigo Vargas that neither Montanez nor Serrano nor

19

Pacheco were involved in the shooting?

MR. GIVEN: Objection; form.

THE WITNESS: On advice of counsel, I assert the Fifth Amendment.

BY MS. BONJEAN:

Q. You knew that there was absolutely no physical evidence indicating that Montanez, Serrano, and Pacheco had any connection to the murder, correct?

A. On advice of counsel, I assert the Fifth Amendment.

Q. And instead you decided to frame Montanez, Serrano, and Pacheco by fabricating false evidence; isn't that correct?

A. On advice of counsel, I assert the Fifth Amendment.

Q. Specifically, Francisco Vicente told you and Detective Guevara that he had no knowledge about the murder of Rodrigo Vargas; isn't that right?

A. On advice of counsel, I assert the Fifth Amendment.

Q. You had absolutely no reason to believe that Francisco Vicente possessed any

20

information or knowledge about the Rodrigo Vargas murder; isn't that right?

A. On advice of counsel, I assert the Fifth Amendment.

Q. And, in fact, Vicente told you and Detective Guevara that he had no information to suggest that either Serrano, Montanez, nor Pacheco were involved in any way with the murder of Rodrigo Vargas?

MR. GIVEN: Objection; form.

THE WITNESS: On advice of counsel, I assert the Fifth Amendment.

BY MS. BONJEAN:

Q. And isn't it true that Vicente actually told you that Guevara -- strike that.

Isn't it true that Vicente told you and Detective Guevara that Mr. Montanez, Mr. Serrano, and Mr. Pacheco were actually and factually innocent of the murder of Rodrigo Vargas?

A. On advice of counsel, I assert the Fifth Amendment.

Q. And despite Vicente's

Transcript of Ernest Halvorsen
Conducted on April 20, 2018

representations to you, you and your fellow officer, Detective Guevara, told Mr. Vicente facts about the Vargas murder; isn't that right?

A. On advice of counsel, I assert the Fifth Amendment.

Q. And, in fact, your purpose and the purpose of your partner, Detective Guevara, was to feed information to Vicente so that he could reiterate it back to you and you could pretend that there was information to suggest that Serrano, Montanez, and Pacheco were responsible for the murder?

MR. GIVEN: Objection; form, foundation, speculation.

You can answer.

THE WITNESS: On advice of counsel, I assert the Fifth Amendment.

BY MS. BONJEAN:

Q. And, in fact, you actually used psychological and physical coercion against Vicente to falsely implicate Montanez, Serrano, and Pacheco?

A. On advice of counsel, I assert the Fifth Amendment.

Q. You, Detective Guevara, Sergeant Mingy, and Assistant State's Attorneys Dillon and Coghlan all conspired jointly to frame Mr. Montanez, Mr. Serrano, and Mr. Pacheco for the Vargas murder?

MS. CERCONE: Object to form.

THE WITNESS: On advice of counsel, I assert the Fifth Amendment.

BY MS. BONJEAN:

Q. And isn't it true that you, along with Detective Guevara, Sergeant Mingy, and Assistant State's Attorneys Dillon and Coghlan all conspired to jointly frame Mr. Montanez, Serrano, and Pacheco for the Vargas murder, specifically, by coercing Francisco Vicente and Timothy Rankins to falsely implicate them in that crime?

MR. GIVEN: Objection; form.

THE WITNESS: On advice of counsel, I assert the Fifth Amendment.

BY MS. BONJEAN:

Q. In fact, sir, isn't it true that you committed perjury by testifying

falsely at Mr. Montanez, Mr. Serrano, and Mr. Pacheco's criminal trials?

MR. GIVEN: Objection; form, calls for a legal conclusion.

THE WITNESS: On the advice of counsel, I assert the Fifth Amendment.

BY MS. BONJEAN:

Q. And, in fact, you knowingly gave false testimony at the criminal trials of Mr. Montanez, Serrano, and Pacheco knowing that your false testimony would lead to their wrongful convictions?

MR. GIVEN: Objection; form and foundation.

THE WITNESS: On advice on counsel, I assert the Fifth Amendment.

BY MS. BONJEAN:

Q. And from February 5th, 1993 and to the present day you have concealed your misconduct and the misconduct of your fellow officers; isn't that right?

A. On the advice of counsel, I assert the Fifth Amendment.

Q. Now, specifically, with regard to the Vargas investigation, sir, isn't it true that Rodrigo Vargas was murdered in the early morning hours of February 5th, 1993?

A. On the advice of counsel, I assert the Fifth Amendment.

Q. And you learned at some point that Mr. Vargas was murdered inside his van outside of his home; isn't that correct?

A. On the advice of counsel, I assert the Fifth Amendment.

Q. And you were assigned to investigate the Vargas murder a couple days after it occurred; isn't that correct?

A. On the advice of counsel, I assert the Fifth Amendment.

Q. And you, along with your partner, Detective Guevara, spoke with the victim's wife, a woman by the name of Wilda Vargas, shortly after you were assigned to investigate the case, correct?

MR. GIVEN: Objection; form.

THE WITNESS: On the advice of counsel, I assert the Fifth Amendment.

Transcript of Ernest Halvorsen
Conducted on April 20, 2018

25

BY MS. BONJEAN:

Q. In fact, Wilda Vargas was a Spanish-speaking woman who communicated primarily through Detective Guevara, who was also Spanish-speaking, correct?

**A. On the advice of counsel, I assert the Fifth Amendment.**

Q. But as was your routine with Detective Guevara, he always communicated to you what any witness or victim may have said if they were speaking in the Spanish language; is that right?

MR. GIVEN: Objection; form.

THE WITNESS: On the advice of counsel, I assert the Fifth Amendment.

BY MS. BONJEAN:

Q. And during the month of February 1993, isn't it true that Detective Guevara and yourself frequently communicated with Ms. Vargas?

MR. GIVEN: Objection; form.

THE WITNESS: On the advice of counsel, I assert the Fifth Amendment.

26

BY MS. BONJEAN:

Q. And isn't it true that Detective Guevara had somewhat of a cozy relationship with Wilda Vargas?

MR. GIVEN: Objection; form.

THE WITNESS: On the advice of counsel, I assert the Fifth Amendment.

BY MS. BONJEAN:

Q. In fact, Detective Guevara told you that he had tried to initiate or was initiating a romantic relationship with Wilda Vargas; isn't that right?

**A. On the advice of counsel, I assert the Fifth Amendment.**

Q. Now, during this period of time in which you and Detective Guevara interviewed Ms. Vargas in February of 1993, isn't it true that Ms. Vargas told you about what actions she and Rodrigo Vargas, her husband, took on the day leading up to his murder?

MR. GIVEN: Objection; form.

THE WITNESS: On the advice of counsel, I assert the Fifth Amendment.

27

BY MS. BONJEAN:

Q. And, in fact, isn't it true that you and Detective Guevara asked Ms. Vargas to tell you specifically everything she did and everything Rodrigo Vargas did in the 24 hours prior to his murder?

MR. GIVEN: Form.

THE WITNESS: On the advice of counsel, I assert the Fifth Amendment.

BY MS. BONJEAN:

Q. And isn't it true that you and Detective Guevara told Wilda Vargas no detail was too small, you wanted to hear every step they took in the 24 hours prior to his murder?

MR. GIVEN: Form.

THE WITNESS: On the advice of counsel, I assert the Fifth Amendment.

BY MS. BONJEAN:

Q. And isn't it true that she provided you with information about what transpired during her day and in the 24 hours prior to Mr. Vargas's murder?

MR. GIVEN: Form.

28

THE WITNESS: On the advice of counsel, I assert the Fifth Amendment.

BY MS. BONJEAN:

Q. And isn't it true that Wilda Vargas recounted to you that the night before the murder of her husband, she and Rodrigo had been to the bank where he had obtained some cash related to his business dealings?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert the Fifth Amendment.

BY MS. BONJEAN:

Q. And isn't it true that Wilda Vargas told you and Detective Guevara that after stopping at the bank, they stopped at a gas station?

**A. On advice of counsel, I assert the Fifth Amendment.**

Q. And Ms. Vargas relayed to you that she recalled a minor incident at that gas station where Mr. Vargas, her husband, had honked at a tan car that contained three Latino men; isn't that correct?

MR. GIVEN: Form.

Transcript of Ernest Halvorsen
Conducted on April 20, 2018

29

THE WITNESS: On advice of counsel, I assert the Fifth Amendment.

BY MS. BONJEAN:

Q. And isn't it true that this incident at the gas station was something that you learned almost immediately after being assigned to the case after interviewing Wilda Vargas?

**A. On advice of counsel, I assert the Fifth Amendment.**

Q. And isn't it true that you and Detective Guevara failed to investigate any legitimate leads into the murder of Rodrigo Vargas?

MR. GIVEN: Objection; form, foundation.

THE WITNESS: On advice of counsel, I assert the Fifth Amendment.

BY MS. BONJEAN:

Q. In fact, actually investigating that case was just far too much work, wasn't it?

MR. GIVEN: Objection; form.

THE WITNESS: On advice of counsel, I assert the Fifth Amendment.

30

BY MS. BONJEAN:

Q. In fact, you and Detective Guevara had an unspoken understanding, that the way you cleared cases was to frame Latino men in the Humboldt Park the area, correct?

**A. On advice of counsel, I assert the Fifth Amendment.**

Q. And it didn't matter much to you or Detective Guevara which Latino men you framed because they were all sort of the same in your book; isn't that right?

MR. GIVEN: Objection; form.

THE WITNESS: On advice of counsel, I assert the Fifth Amendment.

BY MS. BONJEAN:

Q. And as a result, after learning of the murder of Rodrigo Vargas and speaking with Wilda Vargas, you decided that you wanted to frame three Latino men for the murder of Rodrigo Vargas rather than legitimately investigate the case, correct?

MR. GIVEN: Objection; form.

THE WITNESS: On advice of counsel, I assert the Fifth Amendment.

31

BY MS. BONJEAN:

Q. What exactly did you do to investigate the case once you were assigned to the case in February of 1993?

**A. On advice of counsel, I assert the Fifth Amendment.**

Q. And did you prepare any general progress reports whatsoever that memorialized your investigation of the Vargas murder after your assignment?

**A. On advice of counsel, I assert the Fifth Amendment.**

Q. What police reports did you author or prepare that memorialized the steps you took to legitimately investigate the case and the murder of Rodrigo Vargas?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert the Fifth Amendment.

BY MS. BONJEAN:

Q. In fact, sir, it's true, isn't it, that you did not investigate any lead into the Vargas murder between February and June of 1993?

32

**A. On advice of counsel, I assert the Fifth Amendment.**

Q. At this moment, Detective Halvorsen -- or Mr. Halvorsen, I'd like to discuss with you the murder of Salvador Ruvalcaba and your introduction to Francisco Vicente.

MR. GIVEN: Objection to the extent that's not a question.

MS. BONJEAN: Well, just for the benefit of yourself and others, I was --

MR. GIVEN: I understand.

MS. BONJEAN: -- going to let you know where I was headed.

MR. GIVEN: I was making my record.

BY MS. BONJEAN:

Q. Mr. Halvorsen, isn't it true that on May 14th, 1993, you investigated the murder of Salvador Ruvalcaba?

**A. On the advice of counsel, I assert my Fifth Amendment.**

Q. And as part of the Ruvalcaba investigation, you decided to falsely target Robert Buto for that murder, even though you

Transcript of Ernest Halvorsen
Conducted on April 20, 2018

33

knew he was innocent; isn't that right?

A. On advice of counsel, I assert the Fifth Amendment.

Q. Isn't it true that you improperly influenced Carl Richmond, Ray Lozada, and Frank Escobar to falsely implicate Buto for the Ruvalcaba murder?

MR. GIVEN: Objection; form, foundation, compound.

MS. BONJEAN: Okay. And Ruvalcaba, by the way, is R-U-V-A-L-C-A-B-A.

BY MS. BONJEAN:

Q. Isn't it true that on May 14th, 1993, you were informed by Assistant State's Attorney Kevin Hughes that his supervisor, Assistant State's Attorney Sally Gray, would not agree to lodge charges against Mr. Buto?

MR. GIVEN: Objection; form.

THE WITNESS: On advice of counsel, I assert the Fifth Amendment.

BY MS. BONJEAN:

Q. Notwithstanding the fact that a supervisor in the Assistant State's Attorney office declined to lodge any charges against

34

Mr. Buto, you and along with Detective Guevara decided you wanted to falsely charge Buto with the murder?

A. On advice of counsel, I assert the Fifth Amendment.

Q. And as a result of your agreement with Detective Guevara to frame Mr. Buto for the murder of Ruvalcaba, you decided to use a man named Francisco Vicente, who was already in the lock-up at Area 5; isn't that correct?

MR. GIVEN: Objection; form, foundation, compound.

THE WITNESS: On advice of counsel, i assert the Fifth Amendment.

BY MS. BONJEAN:

Q. And, in fact, it was a common tactic of yours and Detective Guevara to use individuals who were already in police custody as witnesses in your cases in order to frame suspects for murders, correct?

A. On advice of counsel, I assert the Fifth Amendment.

Q. In fact, you couldn't even bother to go get people off the streets to be

35

witnesses in the cases where you wanted to frame people. You sometimes just took them right out of the lock-up; isn't that righted?

MR. GIVEN: Objection; form, foundation, harassing, oppressive. You can answer.

THE WITNESS: On advice of counsel, I assert the Fifth Amendment.

BY MS. BONJEAN:

Q. Mr. Halvorsen, you discovered on May 14th, 1993, that Robert Buto was talking to a man named Francisco Vicente, who was in the lock-up at Area 5; isn't that correct?

A. On advice of counsel, I assert the Fifth Amendment.

Q. And you and Detective Guevara decided you wanted to use Vicente to falsely implicate Buto in the Ruvalcaba murder; isn't that correct?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert the Fifth Amendment.

BY MS. BONJEAN:

Q. And isn't it true that you instructed the lock-up keepers to bring

36

Mr. Vicente to you on May 14th, 1993?

A. On advice of counsel, I assert the Fifth Amendment.

Q. And Mr. Vicente came up from the lock-up, he sat and had a conversation with you and Detective Guevara; isn't that right?

A. On advice of counsel, I assert the Fifth Amendment.

Q. You already knew at that point that Mr. Vicente had four felony charges pending against him; isn't that right?

A. On advice of counsel, I assert the Fifth Amendment.

Q. In fact, isn't it true that you knew that Mr. Vicente had been charged with a simple robbery and three separate armed robberies; isn't that correct?

A. On advice of counsel, I assert the Fifth Amendment.

Q. And you told Mr. Vicente that he was looking at a sentence that would amount to natural life in prison if he was found guilty of those armed robberies; isn't that right?

**37**

A. On advice of counsel, I assert the Fifth Amendment.

Q. You also knew that Francisco Vicente was a heroin addict; isn't that correct?

A. On advice of counsel, I assert the Fifth Amendment.

Q. And on May 14th, 1993, you knew that Mr. Vicente was actually actively going through heroin withdrawal while he was in police custody at Grand and Central?

A. On advice of counsel, I assert the Fifth Amendment.

Q. You had some passing familiarity with the symptoms people suffered when they went through heroin withdrawal and knew that he was in very vulnerable state; isn't that correct?

MR. GIVEN: Instead of asking you to re-read it, I will work off memory and object as to form.

MS. BONJEAN: Okay.

MR. GIVEN: You can answer.

THE WITNESS: On advice of counsel, I

**38**

assert the Fifth Amendment.

BY MS. BONJEAN:

Q. And isn't it true that you brought Mr. Vicente candy bars in order to help him with his withdrawal symptoms?

A. On advice of counsel, I assert the Fifth Amendment.

Q. And isn't it true that you had some understanding that candy would actually help with those withdrawal symptoms and used that as a means to manipulate Mr. Vicente?

A. On advice of counsel, I assert the Fifth Amendment.

Q. And isn't it true that you frequently played the role of good cop in interviewing witnesses while Detective Guevara played the role of bad cop?

MR. GIVEN: Objection; form.

THE WITNESS: On advice of counsel, I assert the Fifth Amendment.

BY MS. BONJEAN:

Q. In fact, isn't it true that you frequently employed the tactic where Detective Guevara would physically abuse

**39**

witnesses or suspects in custody, and then after that physical abuse, you would come in and try to use kinder methods to gain their cooperation?

MR. GIVEN: Objection; form.

THE WITNESS: On advice of counsel, I assert the Fifth Amendment.

BY MS. BONJEAN:

Q. Isn't it true that you told Francisco Vicente on May 14th, 1993 that you wanted his help in framing Robert Buto for the Ruvalcaba murder?

A. On advice of counsel, I assert the Fifth Amendment.

Q. You and Detective Guevara asked Vicente about Buto's gang affiliation; isn't that correct?

A. On advice of counsel, I assert the Fifth Amendment.

Q. And you asked Mr. Vicente about his gang affiliation in hopes that you might be able to use that information and use him to frame Buto for the Ruvalcaba murder?

A. On advice of counsel, I assert the

**40**

Fifth Amendment.

Q. You hoped that Vicente would be willing to frame an opposing gang member for a murder, and that's why you asked for his gang affiliation; isn't that right?

MR. GIVEN: Objection; form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment.

BY MS. BONJEAN:

Q. And Francisco Vicente -- strike that.

Isn't it true that you told Francisco Vicente to say that Buto confessed to the shooting -- the shooting of someone near Roosevelt High School; isn't that right?

A. On advice of counsel, I assert my Fifth Amendment.

Q. And you told Vicente that, "We can -- "We can make this hard for you or we can make this easy for you," or words to that effect; isn't that correct?

A. On advice of counsel, I assert the Fifth Amendment.

Q. And isn't it true that Francisco

Vicente initially told you that he would not falsely implicate Robert Buto in the murder of Ruvalcaba -- Ruvalcaba's murder?

A. **On advice of counsel, I assert the Fifth Amendment.**

Q. And isn't it true that you and Detective Guevara told Francisco Vicente that you would help him with his pending armed robbery charges if he assisted you in framing Buto for the Ruvalcaba murder?

A. **On advice of counsel, I assert the Fifth Amendment.**

Q. And, specifically, isn't it true that you and Detective Guevara told Francisco Vicente that you could get him a deal, a deal of leniency in his armed robbery cases, if he only agreed to frame Robert Buto for the murder of Ruvalcaba?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert the Fifth Amendment.

BY MS. BONJEAN:

Q. And you were present when Detective Guevara expressly told Vicente that he would come to court and speak on Vicente's behalf if Vicente lied and said that Buto confessed to him?

A. **On behalf --**

MR. GIVEN: On advice.

THE WITNESS: I forgot. On behalf of counsel, I assert my Fifth Amendment.

MR. GIVEN: For the record, he means "on advice of counsel."

THE WITNESS: Advice, yes. I'm sorry.

MS. BONJEAN: That's okay.

BY MS. BONJEAN:

Q. Isn't it true that despite those representations by Detective Guevara and yourself, Vicente still refused to falsely implicate Robert Buto?

A. **On advice of counsel, I assert the Fifth Amendment.**

Q. Isn't it true that Vicente told you and Detective Guevara he didn't really trust you to get a deal for him; isn't that correct?

A. **On advice of counsel, I assert the Fifth Amendment.**

Q. And at that point Detective Guevara then began to use physical violence against Francisco Vicente to gain his cooperation; isn't that right?

MR. GIVEN: Objection; form and foundation, calls for speculation.

THE WITNESS: On advice of counsel, I assert the Fifth Amendment.

BY MS. BONJEAN:

Q. Mr. Halvorsen, it's true that you saw Detective Guevara strike Vicente in the back of the head multiple times; isn't that right?

A. **On advice of counsel, I assert the Fifth Amendment.**

Q. Isn't it true that you saw Detective Guevara strike Mr. Vicente with a rolled up -- like a small, rolled up telephone book?

A. **On advice of counsel, I assert the Fifth Amendment.**

Q. Isn't it true that Detective Guevara actually walked around with a small telephone book rolled up -- he often had that on his person?

MR. GIVEN: Objection; form, foundation, competence.

THE WITNESS: On advice of counsel, I assert the Fifth Amendment.

BY MS. BONJEAN:

Q. Isn't it true that you heard that -- you heard Detective Guevara call Vicente a stupid son of a bitch?

A. **On advice of counsel, I assert the Fifth Amendment.**

Q. And isn't it true that you observed Detective Guevara hit Vicente in the back of the head multiple times with this skinny phone book?

A. **On advice of counsel, I assert the Fifth Amendment.**

Q. Did you and Detective Guevara discuss specifically how you would get Vicente to falsely implicate Buto?

A. **On advice of counsel, I assert the Fifth Amendment.**

Q. And isn't it true that the reason that Detective Guevara would use a phone book

Transcript of Ernest Halvorsen
Conducted on April 20, 2018

---

45

to strike witnesses because it wouldn't leave visible marks?

MR. GIVEN: Objection; form, foundation, competence.

THE WITNESS: On advice of counsel, I assert the Fifth Amendment.

BY MS. BONJEAN:

Q. In fact, it was well known amongst the Area 5 Chicago police detectives, including yourself, that the use of a phone book in beating suspects was a good tool because it didn't leave marks that could be later detected or used to corroborate claims of abuse?

MR. GIVEN: Same objections.

THE WITNESS: On advice of counsel, I assert the Fifth Amendment.

BY MS. BONJEAN:

Q. And isn't it true, sir, that you had the opportunity to stop Detective Guevara from hitting Vicente?

A. On advice of counsel, I assert the Fifth Amendment.

Q. And isn't it true that rather than

---

46

stop Detective Guevara from hitting Vicente, you permitted Guevara to do so in your presence and knowing that it was going on outside of your presence?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert the Fifth Amendment.

BY MS. BONJEAN:

Q. Isn't it true that at a certain point during this interrogation of Francisco Vicente, you left the room so that Detective Guevara could be alone with Mr. Vicente?

A. On advice of counsel, I assert the Fifth Amendment.

Q. And isn't it true that you heard Detective Guevara striking Vicente while you were outside of the room?

A. On advice of counsel, I assert the Fifth Amendment.

Q. Eventually, sir, after physical abuse by Detective Guevara and promises of benefits and leniency, Francisco Vicente eventually agreed to cooperate with framing Mr. Buto?

---

47

MR. GIVEN: Objection; form, foundation, competence.

THE WITNESS: On advice of counsel, I assert the Fifth Amendment.

BY MS. BONJEAN:

Q. Isn't it true that Vicente only agreed to frame Buto after you promised help on his pending criminal charges and after he was physically abused by Detective Guevara?

MR. GIVEN: Same objections.

THE WITNESS: On advice of counsel, I assert the Fifth Amendment.

BY MS. BONJEAN:

Q. And it's true, sir, isn't it, that you and Detective Guevara told Francisco Vicente that he could not tell anyone about the tactics that you and Detective Guevara used to gain his cooperation in the frame-up of Robert Buto?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert the Fifth Amendment.

BY MS. BONJEAN:

Q. And isn't it true that you told

---

48

Francisco Vicente that you would make sure that he received the minimum sentence for his string of armed robberies and robberies in exchange for his cooperation with framing Robert Buto?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert the Fifth Amendment.

BY MS. BONJEAN:

Q. Isn't it true that one of the tactics that you and Detective Guevara had discussed is that you were going to put Vicente in line-ups, and that would be used as an explanation for why he was absent from the lock-up?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert the Fifth Amendment.

BY MS. BONJEAN:

Q. And isn't it true that the motive for doing this was so that Vicente could tell Buto that the reason he had been pulled out of the lock-up was to be placed in line-ups?

MR. GIVEN: Form.

49

THE WITNESS: On advice of counsel, I assert the Fifth Amendment.

BY MS. BONJEAN:

Q. And isn't it true that you and Guevara told Vicente to tell Buto that he was being placed in line-ups as a false explanation for why Vicente was being removed and returned to the lock-up?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert the Fifth Amendment.

BY MS. BONJEAN:

Q. And isn't it true that you and Detective Guevara told Vicente to get Buto to talk to him as much as possible so that it would be plausible that he would confess to Vicente in the lock-up?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert the Fifth Amendment.

BY MS. BONJEAN:

Q. And isn't it true that you reminded Francisco Vicente that if he told anyone about what had transpired, that he would be

50

labeled a rat, a snitch, a stoolie, and that he would be in physical danger if that information was revealed to the streets?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert the Fifth Amendment.

BY MS. BONJEAN:

Q. And isn't it true that you and Detective Guevara coached Vicente on what he should tell the Assistant State's Attorney who would take the false statement implicating Robert Buto in the Ruvalcaba murder?

A. On advice of counsel, I assert the Fifth Amendment.

Q. Isn't it true that you practiced with Frankie Vicente what false statement he would provide to the Assistant State's Attorney when she came to take the statement that was going to be used to frame Robert Buto?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert the Fifth Amendment.

51

BY MS. BONJEAN:

Q. Now, at some point isn't it true that you decided that you could get more use out of Francisco Vicente as a witness in other murder investigations that had not been cleared?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert the Fifth Amendment.

BY MS. BONJEAN:

Q. And isn't it true that you and Detective Guevara and your supervisor, Sergeant Mingy, along with State's Attorneys Coghlan and Dillon, decided that you would frame Mr. Montanez, Mr. Serrano, and Mr. Pacheco for the Vargas murder with the help of Frankie Vicente?

MS. CERCONE: Object to form.

THE WITNESS: On advice of counsel, I assert the Fifth Amendment.

BY MS. BONJEAN:

Q. Now, as part of your plan, along with Detective Guevara, to frame Mr. Montanez, Mr. Serrano, and Mr. Pacheco

52

for the murder of Rodrigo Vargas, isn't it true that you and Detective Guevara decided to gather the criminal history reports for Montanez, Serrano, and Pacheco in May of 1993?

A. On advice of counsel, I assert the Fifth Amendment.

Q. In May of 1993, you had absolutely no reason to believe that Mr. Montanez, Mr. Serrano, and Mr. Pacheco had any involvement in the murder of Rodrigo Vargas?

A. On advice of counsel, I assert the Fifth Amendment.

Q. And notwithstanding the fact that there was no evidence whatsoever to suggest their involvement in Vargas's murder, you along Detective Guevara, decided that you would frame those three individuals for this murder, correct?

A. On advice of counsel, I assert the Fifth Amendment.

Q. But before you could frame an individual for a murder that had happened many months earlier, it was important to make

53

sure that they weren't in custody at the time of the murder; isn't that right?

MR. GIVEN: Objection, form.

THE WITNESS: On advice of counsel, I assert the Fifth Amendment.

BY MS. BONJEAN:

Q. In fact, Detective Guevara and yourself was kind of sloppy at times, and at times you actually tried to frame people who were in custody; isn't that right?

MR. GIVEN: Objection; form, harassing oppressive.

THE WITNESS: On advice of counsel, I assert the Fifth Amendment.

BY MS. BONJEAN:

Q. Well, isn't it true that you actually tried to frame Efrain Cruz and Francisco Veras for the murders of the Wiley brothers, but you had to let them go because they were actually in police custody at the time of the murders?

MR. GIVEN: Hold on a second. Objection; form, foundation, also object to the fact that Efrain -- that the Wiley

54

brothers' murders is the subject of a different lawsuit that's currently pending; and I object to the use of this deposition to ask questions about another lawsuit.

You can answer.

THE WITNESS: On advice of counsel, I assert the Fifth Amendment.

BY MS. BONJEAN:

Q. And isn't it true that at one point Detective Guevara and yourself attempted to frame George Laureano for a murder that he did not commit but --

MR. GIVEN: Objection; form, foundation.

I'm sorry. Were you done?

MS. BONJEAN: Sort of. Go ahead. You can answer.

THE WITNESS: On advice of counsel, I assert the Fifth Amendment.

BY MS. BONJEAN:

Q. And on one occasion, you learned that George Laureano actually had an airtight alibi, as he was visiting someone else in the Illinois Department of Corrections, and you couldn't frame him for that murder, correct?

55

MR. GIVEN: Objection; form and foundation.

THE WITNESS: On advice of counsel, I assert the Fifth Amendment.

BY MS. BONJEAN:

Q. So by 1993, you realized that you probably should check the criminal histories of the defendants you -- strike that.

By 1993, you knew that you had to check the criminal history of an individual who you wanted to frame for a murder to make sure that they weren't in custody at the time of the murder; isn't that right?

MR. GIVEN: Objection; form.

THE WITNESS: On advice of counsel, I assert the Fifth Amendment.

BY MS. BONJEAN:

Q. So I am going to hand you what has been previously marked as, I believe, Montanez 1.

MR. GIVEN: Why don't we call it Guevara 1.

MS. BONJEAN: It was just 1, right?

MR. GIVEN: Well --

56

MS. BONJEAN: Yeah, we'll call it Guevara 1. That's fine.

MR. GIVEN: Well, only because it was used in the Guevara dep, and things will get really --

MS. BONJEAN: I just don't remember what it was called in the Guevara dep.

MR. GIVEN: I wrote it as Guevara No. 1.

MS. BONJEAN: Okay. Fine.

MR. GIVEN: Is what I wrote it as.

But I think if you identify it for the record with its Bates stamp, then we'll be good.

MS. BONJEAN: Sure. Okay.

BY MS. BONJEAN:

Q. I'm going to hand you what's been previously marked Exhibit 1 or Guevara 1, we'll call it. It has a Bates stamp RFC-Serrano/Montanez 000222.

I'm going to have you look at what's been marked Guevara 1, and if you could look specifically at the line that is four up from the bottom. Isn't it true, sir, that on May 20th, 1993, a person named

Transcript of Ernest Halvorsen

Conducted on April 20, 2018

57

Detective Reynaldo Guevara requested the criminal records for the individual with the IR number 736499?

MR. GIVEN: Objection; form, foundation, and competence.

THE WITNESS: On advice of counsel, I assert the Fifth Amendment.

BY MS. BONJEAN:

Q. And you knew that Detective Guevara was going to obtain the criminal arrest history for the person with IR number 736499 to ensure that he was not in custody on that day and, therefore, would not have an alibi for the murder of Rodrigo Vargas?

MR. GIVEN: Form; foundation and competence.

THE WITNESS: On advice of counsel, I assert the Fifth Amendment.

BY MS. BONJEAN:

Q. And isn't it true that Jose Montanez, one of the plaintiffs in this matter, has an IR number that is 736499?

**A. On advice of counsel, I assert the Fifth Amendment.**

58

Q. I'm going to hand you now what has been previously marked Guevara 2. It has a Bates stamp that is RFC-Serrano/Montanez 000226.

Mr. Halvorsen, I'm handing you what's been marked Guevara 2. I'd like you to look at the entry on this log of criminal history records, four up from the bottom.

Sir, do you see that on May 24th, 1993 Detective Reynaldo Guevara requested the criminal history of an individual with the IR number 874175?

MR. GIVEN: Objection; form, foundation, and competence.

THE WITNESS: On advice of counsel, I assert the Fifth Amendment.

BY MS. BONJEAN:

Q. Isn't it true that these documents that you've looked at, Exhibits 1 and 2, are logs of criminal history records that were issued during the date that is reflected on the log?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I

59

assert the Fifth Amendment.

BY MS. BONJEAN:

Q. And on May 24th, 1993, Detective Guevara requested the criminal history of Armando Serrano, whose IR number is reflected up the upper right-hand corner of this exhibit, 874175?

MR. GIVEN: Form, foundation, competence.

THE WITNESS: On the advice of counsel, I assert the Fifth Amendment.

BY MS. BONJEAN:

Q. Isn't it true, sir, that you also -- strike that.

Isn't it true that Detective Guevara also requested the history -- criminal history of Jordan Pacheco in May of 19- -- May of 1993?

MR. GIVEN: Same objections.

THE WITNESS: On the advice of counsel, I assert the Fifth Amendment.

BY MS. BONJEAN:

Q. And isn't it true that you, Guevara, and Mingy decided to gather the

60

criminal histories of Montanez, Serrano, and Pacheco in May of 1993 before there was any suggestion that those three men had any involvement whatsoever in the murder of Rodrigo Vargas?

**A. On the advice counsel, I assert the Fifth Amendment.**

Q. Isn't it true, sir, that you and Detective Guevara and Sergeant Mingy decided to gather the criminal history reports for Montanez, Serrano, and Pacheco in May of 1993 so that you could ensure that none of the men were in custody on February 5th, 1993, which would provide an alibi for the Vargas murder?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert the Fifth Amendment.

BY MS. BONJEAN:

Q. And isn't it true that you, along with Detective Guevara and Sergeant Mingy, decided to gather the criminal history reports for Montanez, Serrano, and Pacheco in May of 1993 all as part of a plan to frame those three men for the murder of Rodrigo

**61**

Vargas?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert the Fifth Amendment.

BY MS. BONJEAN:

Q. After you determined, along with Detective Guevara, that neither Mr. Montanez, Mr. Serrano, and Mr. Pacheco were, in fact, in custody at the time of Rodrigo Vargas's on February 5th, 1993, you took additional efforts to advance your plan to frame those three individuals for his murder; isn't that right?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert the Fifth Amendment.

BY MS. BONJEAN:

Q. And one of the methods that you and Detective Guevara used in order to execute a plan to frame an individual was to take facts that you knew to be true about the case so that you could incorporate them later on to give credibility to fabricated evidence; isn't that right?

**62**

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert the Fifth Amendment.

BY MS. BONJEAN:

Q. So just as by way of example in this particular case, you took information that was provided by Wilda Vargas that you knew to be true -- that you knew to be true that occurred on the day before the murder, and you used those facts in order to develop a narrative that would be used to frame Montanez, Serrano, and Pacheco for the murders of Rodrigo Vargas?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert the Fifth Amendment.

BY MS. BONJEAN:

Q. In fact, you decided that a good motive for this murder of Rodrigo Vargas would be a robbery gone bad; is that right?

**A. On advice of counsel, I assert the Fifth Amendment.**

Q. You and Detective Guevara and Sergeant Mingy decided that you would use a

**63**

robbery gone bad motive despite the fact that there was no evidence whatsoever that anything was taken from the victim?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert the Fifth Amendment.

BY MS. BONJEAN:

Q. And as part of your plan to contrive a motive for the murder of Vargas, you used information that had been provided to you by Wilda Vargas, namely, that the day before Mr. Vargas's murder, he had gone to the bank and obtained some money?

**A. On advice of counsel, I assert the Fifth Amendment.**

Q. In fact, sir, isn't it true that you used the information that Ms. Vargas provided you about this incident -- episode at the gas station as a basis to create a motive for the murder of Rodrigo Vargas?

MR. GIVEN: Objection; form, asked and answered.

THE WITNESS: On advice of counsel, I assert the Fifth Amendment.

**64**

BY MS. BONJEAN:

Q. And you and Detective Guevara had done this numerous times in the past, where you would learn innocuous but truthful information from the victims or witnesses that you would then incorporate into fabricated evidence to give it the appearance of credibility?

MR. GIVEN: Form and foundation.

THE WITNESS: On advice of counsel, I assert the Fifth Amendment.

BY MS. BONJEAN:

Q. Now, Mr. Halvorsen, on June 2nd, 1993, you brought Francisco Vicente to the Cook County State's Attorney's office gang crimes unit to meet with Defendants Dillon and Coghlan, correct?

MS. CERCONE: Object to form.

THE WITNESS: On advice of counsel, I assert the Fifth Amendment.

BY MS. BONJEAN:

Q. And, actually, you arranged for Mr. Vicente to come to the Cook County State's Attorney's office gang crimes unit to

meet with Defendants Dillon and Coghlan on June 2nd, 1993?

MS. CERCONE: Object to form.

THE WITNESS: On advice of counsel, I assert the Fifth Amendment.

BY MS. BONJEAN:

Q. In fact, you and Detective Guevara spoke specifically with Assistant State's Attorneys Dillon and Coghlan about the plan to bring Vicente to the gang crimes unit at the Cook County State's Attorney office, correct?

MS. CERCONE: Object to form.

THE WITNESS: On advice of counsel, I assert the Fifth Amendment.

BY MS. BONJEAN:

Q. And, in fact, Assistant State's Attorneys Dillon and Coghlan actually made the arrangements for Mr. Vicente to come from the Cook County Jail where he was being housed in general population over to the Cook County State's Attorney's offices, right?

MS. CERCONE: Object to form.

THE WITNESS: On advice of counsel, I assert the Fifth Amendment.

BY MS. BONJEAN:

Q. And the plan that you had entered into with Detective Guevara and Assistant State's Attorneys Cogh -- Assistant State's Attorneys Dillon and Coghlan is that you wanted Vicente to invent a story that Buto's lawyer had tried to offer him money not to testify against Buto; isn't that correct?

MS. CERCONE: Object to form.

THE WITNESS: On advice of counsel, I assert the Fifth Amendment.

BY MS. BONJEAN:

Q. And, in fact, Buto's lawyer had met with Francisco Vicente in the Cook County jail, and you learned of that, right?

THE WITNESS: On advice of counsel, I assert the Fifth Amendment.

BY MS. BONJEAN:

Q. And you were concerned, weren't you, that Francisco Vicente was going to come clean and tell someone about your misconduct and the misconduct your fellow officers, Detective Guevara and Sergeant Mingy,

correct?

MR. GIVEN: Objection; form.

THE WITNESS: On advice of counsel, I assert the Fifth Amendment.

BY MS. BONJEAN:

Q. And that concern prompted you to let Assistant State's Attorneys Coghlan and Dillon know about this -- about the fact that Vicente had met with Buto's lawyer, right?

MS. CERCONE: Object to form.

THE WITNESS: On advice of counsel, I assert the Fifth Amendment.

BY MS. BONJEAN:

Q. And together the four of you decided how you were going to discredit Vicente -- strike that -- discredit Buto's lawyer by falsely claiming that Vicente -- that he had tried to offer Vicente money to change his testimony?

MS. CERCONE: Object to form.

THE WITNESS: On advice of counsel, I assert the Fifth Amendment.

BY MS. BONJEAN:

Q. And, in fact, you know that Buto's lawyer never tried to offer Vicente money not to testify against Buto; isn't that right?

**A. On advice of counsel, I assert the Fifth Amendment.**

Q. And after Francisco Vicente was brought over to the gang crimes unit of the Assistant State's Attorney offices, you, Detective Guevara, and Assistant State's Attorneys Dillon and Coghlan met with him; isn't that right?

MS. CERCONE: Object to form.

THE WITNESS: On the advice of counsel, I assert the Fifth Amendment.

BY MS. BONJEAN:

Q. And while Francisco Vicente was in the gang crimes unit at the Cook County State's Attorney on June 2nd, 1993, you showed Mr. Vicente crime scene photos of the Vargas homicide; isn't that right?

**A. On the advice of counsel, I assert the Fifth Amendment.**

Q. You knew that Francisco Vicente had no information about the Vargas murder, but you decided, nonetheless, to show him

Transcript of Ernest Halvorsen
Conducted on April 20, 2018

---

**69**

photographs of the murder; isn't that correct?

A. On the advice of counsel, I assert the Fifth Amendment.

Q. And you showed Mr. Vicente photographs of the murder of Rodrigo Vargas in the presence of fellow officers Detective Reynaldo Guevara and Assistant State's Attorneys Coghlan and Dillon; isn't that correct?

MS. CERCONE: Object to form.

THE WITNESS: On the advice of counsel, I assert the Fifth Amendment.

BY MS. BONJEAN:

Q. And isn't it true that the purpose in showing Vicente the Vargas crime scene photos was to make it appear as if he had firsthand knowledge of the murder, even though you knew that he knew nothing about the murder?

MR. GIVEN: Form.

THE WITNESS: On the advice of counsel, I assert the Fifth Amendment.

---

**70**

BY MS. BONJEAN:

Q. By giving Francisco Vicente the photographs of the crime scene photos, you gave him information about that murder that he could then utilize in this fabricated statement; is that right?

A. On advice of counsel, I assert the Fifth Amendment.

Q. And by utilizing actual information that might be truthful or accurate, it gave the appearance that the other aspects of Francisco Vicente's statements were truthful and accurate; isn't that right?

MR. GIVEN: Form, foundation, competence.

THE WITNESS: On the advice of counsel, I assert the Fifth Amendment.

BY MS. BONJEAN:

Q. Isn't it true, Mr. Halvorsen, that you, along with Detective Guevara and Assistant State's Attorneys Dillon and Coghlan, knew that Mr. Vicente did not witness the Vargas homicide?

MS. CERCONE: Object to form.

---

**71**

THE WITNESS: On the advice of counsel, I assert the Fifth Amendment.

BY MS. BONJEAN:

Q. And isn't it true that Frankie Vicente never even mentioned the Vargas homicide until you first raised it with him?

A. On the advice of counsel, I assert the Fifth Amendment.

Q. And it's also true, sir, that you knew that neither Mr. Montanez, Mr. Serrano, or Mr. Pacheco had anything to do with the Vargas murder when you raised questions about that murder with Francisco Vicente?

MR. GIVEN: Form and foundation.

THE WITNESS: On advice of counsel, I assert the Fifth Amendment.

BY MS. BONJEAN:

Q. And isn't it true that while you were showing Vicente photographs of the Vargas crime scene, Detective Guevara told him in sum and substance, "You're an IG. This is what we want you to do"?

A. On advice of counsel, I assert Fifth Amendment.

---

**72**

Q. And isn't it true that you and Detective Guevara fed information to Mr. Vicente, including the fact that the victim was shot inside a van, and that the murder was part of a robbery?

A. On advice of counsel, I assert the Fifth Amendment.

Q. And isn't it true that you fed information to Mr. Vicente so that that information could be used to fabricate a story that would falsely implicate Montanez, Serrano, and Pacheco?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert the Fifth Amendment.

BY MS. BONJEAN:

Q. And isn't it true that you told Vicente while you were feeding him facts about the Vargas murder and showing him crime seen photos, that this was the way of telling him that the word on the street was that Pistol Pete, Armando, and Jordan had committed the murder?

MR. GIVEN: Form.

---

Transcript of Ernest Halvorsen
Conducted on April 20, 2018

THE WITNESS: On advice of counsel, I assert the Fifth Amendment.

BY MS. BONJEAN:

Q. And isn't it true that by telling Vicente that the word on the street was that Pacheco, Serrano, and Montanez were the offenders of the Vargas murder, that you wanted him to implicate them in that murder?

**A. On the advice of counsel, I assert the Fifth Amendment.**

Q. And isn't it true that you, Defendants Guevara and Assistant State's Attorneys Coghlan and Dillon essentially brainstormed a factual narrative that you would then -- that you then fed to Frankie Vicente?

MR. GIVEN: Form.

MS. CERCONE: Object to form.

THE WITNESS: On the advice of counsel, I assert the Fifth Amendment.

BY MS. BONJEAN:

Q. And you, Defendant Guevara, and Assistant State's Attorneys Coghlan and Dillon were all feeding Vicente facts about the Vicente (sic) murder in the gang crimes unit at the State's Attorney office on June 2nd, 1993?

MS. CERCONE: Object to form.

THE WITNESS: On the advice of counsel, I assert the Fifth Amendment.

BY MS. BONJEAN:

Q. Isn't it true that you had the opportunity to stop your fellow defendants from feeding facts to Vicente; isn't that right?

MS. CERCONE: Object to form.

THE WITNESS: On the advice of counsel, I assert the Fifth Amendment.

BY MS. BONJEAN:

Q. And isn't it true that you had the opportunity to stop Defendants Guevara and Assistant State's Attorneys Coghlan and Dillon from feeding facts to Vicente that you knew were going to be used to frame Montanez, Serrano, and Pacheco for the murder of Rodrigo Vargas?

MS. CERCONE: Object to form.

THE WITNESS: On the advice of counsel,

I assert the Fifth Amendment.

BY MS. BONJEAN:

Q. Now, isn't it true that Detective Guevara and yourself and Assistant State's Attorneys Coghlan and Dillon first wanted Vicente to claim that he was an eyewitness to the murder?

MS. CERCONE: Object to form.

THE WITNESS: On advice of counsel, I assert the Fifth Amendment.

BY MS. BONJEAN:

Q. You initially told Vicente that you wanted him to falsely claim that he witnessed the murder when he drove the car Montanez, Serrano, Pacheco were supposedly using as the getaway car, correct?

**A. On advice of counsel, I assert the Fifth Amendment.**

Q. And you wanted Vicente to essentially agree to make himself the getaway driver, even though you knew that he had neither witnessed the murder, had acted as a getaway driver, or had any information about the Vargas murder?

**A. On advice of counsel, I assert the Fifth Amendment.**

Q. And isn't it true that you wanted Vicente to claim that he had witnessed Montanez, Serrano, and Pacheco commit the Vargas murder because you wanted to frame Montanez, Serrano, and Pacheco for that crime?

**A. On advice of counsel, I assert the Fifth Amendment.**

Q. And isn't it true that Frankie Vicente refused to say that he was actually present for the Vargas murder?

**A. On advice of counsel, I assert the Fifth Amendment.**

Q. Isn't it true that Frankie Vicente told you all that he didn't really trust you, that you might now turn around and charge him with the crime if he admitted he was present?

**A. On advice of counsel, I assert the Fifth Amendment.**

Q. And isn't it true that Detective Guevara and yourself tried to reassure Frankie Vicente that he would not be charged

**77**

with the crime if he admitted that he was present for the Vargas murder?

A. **On advice of counsel, I assert the Fifth Amendment.**

Q. And isn't it true that you were present when Assistant State's Attorneys Coghlan and Dillon reassured Mr. Vicente that they would make sure he was not charged with the Vargas murder if he admitted that he had witnessed it?

MS. CERCONE: Object to form.

THE WITNESS: On advice of counsel, I assert the Fifth Amendment.

BY MS. BONJEAN:

Q. And despite those reassurances, isn't it true that Frankie Vicente still refused to falsely claim that he was present when Rodrigo Vargas was murdered?

MS. CERCONE: Object to form.

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert the Fifth Amendment.

BY MS. BONJEAN:

Q. During these conversations that you

**78**

had with Frankie Vicente with Detective Guevara and Assistant State's Attorneys Dillon and Coghlan also present, isn't it true that it was represented to him that he would be moved to the witness head- -- witness quarters, otherwise known as "the Q" for his protection if he agreed to act as a witness in the Vargas murder?

MR. GIVEN: Form.

MS. CERCONE: Object to form.

THE WITNESS: On advice of counsel, I assert the Fifth Amendment.

BY MS. BONJEAN:

Q. Isn't it true that you, along Detective Guevara and Assistant State's Attorneys Dillon Coghlan, tried to convince Vicente to falsely claim that after the Vargas murder he met up with Montanez, Serrano, and Pacheco, and they gave him the murder weapon?

MS. CERCONE: Object to form.

THE WITNESS: On advice of counsel, I assert the Fifth Amendment.

**79**

BY MS. BONJEAN:

Q. You knew this also to be a false narrative but offered it as a compromise to Frankie Vicente so that he could avoid saying he was actually present at the time of Vargas's murder; isn't that right?

A. **On advice of counsel, I assert the Fifth Amendment.**

Q. And isn't it true that Frankie Vicente insisted that he would not make himself involved in the actual crime in any way, shape, or form?

A. **On the advice of counsel, I assert the Fifth Amendment.**

Q. And isn't it true that Frankie Vicente told you and Detective Guevara, along with Assistant State's Attorneys Coghlan and Dillon, that he would not falsely state that he was given the murder weapon?

MS. CERCONE: Object to form.

THE WITNESS: On the advice of counsel, I assert the Fifth Amendment.

BY MS. BONJEAN:

Q. And isn't it true that during the

**80**

meeting with Frankie Vicente in the gang crimes unit of the Cook County State's Attorney office, you and Detective Guevara either pushed him in the head or poked him in the head during the course of that interrogation?

MR. GIVEN: Form and foundation.

THE WITNESS: On the advice of counsel, I assert the Fifth Amendment.

BY MS. BONJEAN:

Q. And that while you were trying to get Vicente to tell false stories that you were feeding him, you were also actually poking him in the head and telling him, "You need to do this," or words to that effect?

A. **On the advice of counsel, I assert the Fifth Amendment.**

Q. And isn't it true that every time you or Detective Guevara used force against Frankie Vicente, there was no justification for that use of force?

A. **On the advice of counsel, I assert the Fifth Amendment.**

Q. And isn't it true that when you

81

used force against Frankie Vicente and when Detective Guevara used force against Frankie Vicente while feeding him false information, your purpose was to coerce Vicente to falsely implicate Montanez, Serrano, and Pacheco?

MR. GIVEN: Form and foundation.

THE WITNESS: On the advice of counsel, I assert the Fifth Amendment.

BY MS. BONJEAN:

Q. Isn't it true that finally after Vicente refused to go along with these stories that had been proposed by yourself and Detective Guevara and Assistant State's Attorneys Coghlan and Dillon, you offered a third fabricated story that you wanted Vicente to regurgitate?

MS. CERCONE: Object to form.

THE WITNESS: On advice of counsel, I assert the Fifth Amendment.

BY MS. BONJEAN:

Q. Isn't it true that you told Frankie Vicente that you wanted him to falsely claim that Montanez, Serrano, and Pacheco had

82

confessed to him after the murder?

A. On advice of counsel, I assert the Fifth Amendment.

MS. BONJEAN: At any point, sir, you want to take a break, please let me know, and we can do that.

MR. GIVEN: Thanks. It's been about an hour. Are you okay?

THE WITNESS: I can take a little break.

MS. BONJEAN: Sure. No problem.

MR. GIVEN: By the way, just for everybody, I don't think we'll be taking like an extended lunch break today.

MS. BONJEAN: Yeah, that's fine.

THE VIDEOGRAPHER: Off the record at 11:22.

(A recess was taken.)

THE VIDEOGRAPHER: Back on the record, 11:36.

BY MS. BONJEAN:

Q. Mr. Halvorsen, isn't it true that on June 2nd, 1993, while in the offices of the gang crimes unit of the Cook County State's Attorney office, you, along with

83

Detective Guevara and Assistant State's Attorneys Dillon and Coghlan, contrived a story that you then fed to Francisco Vicente?

MS. CERCONE: Object to form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. Eventually, when Frankie Vicente decided that he would give a statement in which he falsely claimed Montanez, Serrano, and Pacheco confessed to him, isn't it true that you, along with Guevara, Dillon, and Coghlan, fabricated a detailed narrative that you wanted Mr. Vicente to repeat?

MS. CERCONE: Object to form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And isn't it true that you told Vicente to claim that he was at Harding, H-A-R-D-I-N-G, and Altgeld on the morning of February 5th, 1993?

A. On advice of counsel, I assert my Fifth Amendment rights.

84

Q. And isn't it true that you told Vicente that you wanted him to falsely claim that while he was at Harding and Altgeld, Montanez, Serrano, and Pacheco told him that they had seen Vargas at a gas station the night before?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And isn't it true that you told Frankie Vicente that you wanted him to falsely claim that Montanez, Serrano, and Pacheco told him that after seeing Vargas at the gas station, they decided that he would be a good target to rob?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And isn't it true that you and Detective Guevara obtained the information about the gas station previously from Wilda Vargas?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. You and Detective Guevara knew already as of June 2nd, 1993, that Wilda

Transcript of Ernest Halvorsen
Conducted on April 20, 2018

85

Vargas had, in fact, been at a gas station prior -- on the night prior to her husband's murder; is that right?

A. **On advice of counsel, I assert my Fifth Amendment rights.**

Q. You also knew as of June 2nd, 1993, from your conversations and Detective Guevara's conversations with Wild Vargas, that there had been some type of minor incident at that gas station where Rodrigo Vargas had beeped the horn at three Latino men in a tan car, correct?

MR. GIVEN: Objection, form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And it is those facts you and Detective Guevara decided to utilize in your construction of a fabricated story to give credibility to that fabricated story?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

86

BY MS. BONJEAN:

Q. And in so doing, you told Vicente to falsely claim that Montanez, Serrano, and Pacheco reported to him that they didn't rob Mr. Vargas on that night because he had his wife and kids with him at the time, correct?

A. **On advice of counsel, I assert my Fifth Amendment rights.**

Q. And isn't it true that you told Vicente to falsely claim that Montanez, Serrano, and Pacheco told Vicente that they waited by his house until 5:00 a.m., correct?

A. **On advice of counsel, I assert my Fifth Amendment rights.**

Q. And the reason that you fed that fact to Mr. Vicente is because you knew that Mr. Vargas had been murdered in the early morning hours of February 5th, 1993, correct?

A. **On advice of counsel, I assert my Fifth Amendment rights.**

Q. Isn't it further true that you told Vicente to falsely claim that Montanez, Serrano, and Pacheco told Vicente that they tried to rob the victim but "Mondo fucked up"

87

and that they had to kill the guy?

A. **On advice of counsel, I assert my Fifth Amendment rights.**

Q. Isn't it true that you told Vicente to falsely state that had Montanez, Serrano, and Pacheco had a gun with them when they were relaying this information to him?

A. **On advice of counsel, I assert my Fifth Amendment rights.**

Q. And, further, isn't it true that you told Vicente to say that the gun was a nine millimeter gun?

A. **On advice of counsel, I assert my Fifth Amendment rights.**

Q. And isn't it true that you told Vicente to say that the gun was a nine millimeter gun because you already knew that nine millimeter bullet casings had been found at the crime scene?

A. **On advice of counsel, I assert my Fifth Amendment rights.**

Q. And, again, this was part of your methodology in framing individuals, by using facts that you knew already to be true and

88

incorporating them into fabricated statements of witnesses so that those statements would have the appearance of veracity and credibility?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And, sir, isn't it true that you told Vicente to falsely claim that he saw the gun when he got into the car with Montanez, Serrano, and Pacheco, and that they drove to a pawn shop to sell some jewelry that Montanez, Serrano, and Pacheco had supposedly stolen that day when they unsuccessfully attempted to rob Mr. Vargas?

MR. GIVEN: Form and foundation.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And isn't it true that it was part of your methodology, along with that of Detective Guevara, to incorporate unique facts into fabricated statements, again, to

Transcript of Ernest Halvorsen

Conducted on April 20, 2018

give the appearance that those statements had veracity and credibility?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And you told Vicente to say that Montanez, Serrano, and Pacheco went to a pawn shop because they needed money to feed their heroin addiction; isn't that correct?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. Mr. Halvorsen, you did also tell Vicente to falsely claim that Montanez told him that damage to his car had occurred while he was driving away from the Vargas murder scene and crashed into a parked car; isn't that right?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. Isn't it true that you already knew that Mr. Montanez's car had some damage to it; isn't that right?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And, in fact, sir, isn't it true that you knew who Mr. Montanez was and you knew what type of car he drove, correct?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And part of your plan to frame Mr. Montanez and Mr. Serrano and Mr. Pacheco was, again, to derive information that you knew to be true and then utilize that information as part of a -- the fabricated statement that was fed to Mr. Vicente, correct?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And isn't it true that none of -- nothing of which you told Mr. Vicente was, in fact, true?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. In fact, you knew, along with -- strike that. You knew, Detective Guevara knew, and Assistant State's Attorneys Coghlan and Dillon knew that Vicente had never met with Montanez, Serrano, and Pacheco on

February 5th, 1993, correct?

MS. CERCONE: Object to form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And isn't it true that you and the other defendants in this case knew that Montanez, Serrano, and Pacheco had not confessed to Vicente, correct?

MS. CERCONE: Object to form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And you, along with your fellow defendants knew that Montanez, Serrano, and Pacheco had nothing to do with the murder of Rodrigo Vargas?

MS. CERCONE: Object to form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. Did you know who actually committed the murder of Rodrigo Vargas?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. Did you and Detective Guevara protect the guilty person who was responsible for the Vargas murder?

MR. GIVEN: Objection; form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. Was the murder of Rodrigo Vargas related to any drug activity of which neither you, Detective Guevara, or Joseph Majinowski were benefitting financially?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. Did you protect the true murderer of Rodrigo Vargas and frame innocent people so that you could protect a drug operation that you were benefitting from financially?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. Now, in order to get Vicente to go along with the story that you and your fellow

Transcript of Ernest Halvorsen
Conducted on April 20, 2018

93

defendants fabricated and fed to him, isn't it true that Vicente was told by yourself and others that he would not be charged in connection with the felony -- with the -- with the murder of Rodrigo Vargas?

MS. CERCONE: Object to form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. Isn't it true that you and Detective Guevara told Mr. Vicente that he had already committed to being a snitch in the Robert Buto case and he may as well go all the way?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. And isn't it true that you told him that he was already going to be labeled a snitch and a rat, so he may as well get as much benefit out of that arrangement as he could?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. And part of that agreement with

94

Vicente is that so long as he continued to help and you and Detective Guevara and the Assistant State's Attorneys Dillon and Coghlan on murder cases, that he would get certain benefits throughout his stay in the Cook County jail?

MS. CERCONE: Object to form.

MR. GIVEN: Form and foundation.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And isn't it true that for the whole process of feeding Vicente the story about Montanez, Serrano, and Pacheco confessing to him, Defendants Guevara and Assistant State's Attorneys Coghlan and Dillon were also present?

MS. CERCONE: Object to form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And isn't it also true that you and Detective Guevara spoke with Sergeant Mingy about how you had decided to utilize Frankie

95

Vicente in the frame-up of Montanez, Serrano, and Pacheco?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. Isn't it true that while you were coercing Vicente to fabricate a false story against plaintiffs, Defendants Coghlan and Dillon were either directly in the room with you or had positioned themselves right outside the room where they would have been able to hear everything that was being said and done?

MS. CERCONE: Form.

MR. GIVEN: Form. Form, foundation, competence.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And isn't it further true that Frankie Vicente confessed to you that he was back on heroin again on June 2nd, 1993 when you were fabricating a statement that you wanted him to falsely repeat?

**A. On advice of counsel, I assert my**

96

**Fifth Amendment rights.**

Q. And isn't it true that the way in which you fed a false narrative to Frankie Vicente was to say, "Didn't you say that Mr. Montanez told you this?"

MR. GIVEN: Objection; form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. Isn't it true that you fed Mr. Vicente the false narrative by giving him "didn't you say" statements?

MR. GIVEN: Objection; form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And then after you would give him "didn't you say" statements, he would agree that he had said those things to you, correct?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

Transcript of Ernest Halvorsen
Conducted on April 20, 2018

97

BY MS. BONJEAN:

Q. And while you were giving Mr. Vicente the "didn't you say" statements and he was agreeing that he had made those statements, Assistant State's Attorneys Coghlan and Dillon were writing down the statement?

MS. CERCONE: Object to form.

MR. GIVEN: And just so I can stop saying it, to the extent that you continue to use the phrase, "didn't you say statements" I'll just have a standing objection to that as to form. Go ahead.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. Isn't it true that neither Assistant State's Attorney Dillon nor Coghlan told you or Detective Guevara to stop coaching Mr. Vicente?

MS. CERCONE: Object to form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

98

BY MS. BONJEAN:

Q. Now, after the June 2nd, 1993 meeting in the Cook County State's Attorney office gang crime unit, isn't it true that Assistant State's Attorney Coghlan and Dillon arranged for Mr. Vincent to be placed in the witness quarters or otherwise known as "the Q"?

MS. CERCONE: Object to form.

MR. GIVEN: Foundation and competence.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And while Mr. Vicente was housed in the Q, isn't it true that you and Detective Guevara arranged for him to get between $200 -- 200 and $300 in cash at various points to ensure his continued cooperation in the scheme to frame the plaintiffs in this case?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. Isn't it true that you and Detective Guevara arranged for Mr. Vicente to

99

also get drugs and alcohol while he was in the Q in order to ensure his continued cooperation in the scheme to frame the plaintiffs?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. Isn't it true that Assistant State's Attorneys Coghlan and Dillon would call you on occasion to express concern that Vicente wanted to back out of being a witness against Buto and the plaintiffs in this case?

MS. CERCONE: Object to form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And after Assistant State's Attorneys Coghlan and Dillon would call and express their concern, isn't it true that you and Detective Guevara would go have a talk with Frankie Vicente to ensure that he would maintain his cooperation in the scheme to frame, not only Robert Buto, but the plaintiffs in this case?

MS. CERCONE: Object to form.

100

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. Isn't it true that you and Detective Guevara decided that you would use Frankie Vicente in, yet, a third murder as a snitch witness?

MR. GIVEN: Objection; form, foundation.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. Sir, isn't it true that you, Detective Guevara, along with Assistant State's Attorneys Coghlan and Dillon, decided that you would use or wanted to use Frankie Vicente in the murder case against a defendant by the name Geraldo Iglesias?

MS. CERCONE: Object to form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. Isn't it true that even after the June 2nd, 1993 meeting in the gang crimes unit, Mr. Vicente was frequently brought up

Transcript of Ernest Halvorsen
Conducted on April 20, 2018

26 (101 to 104)

101

to the Cook County State's Attorney gang crimes unit so he could memorize and work on his statements against three different -- well, strike that -- five different defendants in criminal murder investi- -- criminal murder cases?

MR. GIVEN: Objection; form and foundation.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. Isn't it true that Assistant State's Attorneys Dillon and Coghlan and yourself came up with a theory that you wanted Mr. Vicente to, again, claim that Iglesias had confessed to murder in his presence and in the bullpen?

MS. CERCONE: Object to form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. Isn't it true that Detective Guevara showed Frankie Vicente a photograph of Geraldo Iglesias, who went by the

102

nickname Snake, so that he could identify Mr. Iglesias?

MR. GIVEN: Hold on just a second. I'm going to repeat and just have a standing objection to -- for the same reasons that I mentioned earlier regarding questions about another case that's not related to the underlying case in this lawsuit.

MS. BONJEAN: Okay.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. Isn't it true that Detective Guevara showed Frankie Vicente a photograph of Geraldo Iglesias because Vicente didn't know what Iglesias looked like? He had never met him, correct?

MR. GIVEN: Objection; form, foundation.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. Isn't it true that Detective Guevara and yourself fed information to Frankie Vicente about the murder for which

103

Iglesias had been charged?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. Isn't it true that you and Detective Guevara and the Assistant State's Attorneys discussed the fact that it would be suspicious that Frankie Vicente would have been a witness to five different defendants confessing to him?

MS. CERCONE: Object to form.

MR. GIVEN: Foundation.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And even as of June 2nd, 1993, wasn't it true that the four of you, the four defendants in this case, discussed the fact that it was not ideal that Frankie Vicente would be sort of a key witness in -- in this -- in the murder prosecution against Serrano, Montanez, and Pacheco, correct?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

104

BY MS. BONJEAN:

Q. And, in fact, the goal was to actually get a different witness who would implicate Serrano, Montanez, and Pacheco in the case; isn't that right?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And, in fact, the four of you, being yourself, Detective Guevara, and Assistant State's Attorneys Coghlan and Dillon, recognized that one witness who claimed to have heard a statement by the defendants would not actually satisfy the State's burden of proof?

MS. CERCONE: Object to form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And also wasn't it true that one of the reasons that you relied on -- strike that. Another reason that you fabricated a statement that was attributed to Frankie

105

Vicente was so that you could create probable cause in order to make an arrest in the case?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. We'll get back to that in a second.

After June 2nd, 200- -- strike that. After June 2nd, 1993, isn't it true that you and Detective Guevara decided that you would continue to manipulate the victim in this case, Wilda Vargas, to persuade her that Serrano, Montanez, and Pacheco had murdered her husband, Rodrigo Vargas?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. And, in fact, part of your plan, along with Detective Guevara and Assistant State's Attorneys Coghlan and Dillon, was to manipulate Vargas in a way so that her statements would corroborate Vicente's story?

MS. CERCONE: Object to form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

106

BY MS. BONJEAN:

Q. Isn't it true that you, Guevara, Mena, Dillon and Coghlan decided that you would manipulate her in a way that she would falsely implicate Montanez's car as the car she saw in the gas station the night before the murder?

MS. CERCONE: Object to form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And isn't it true that you and Detective Guevara, Sergeant Mingy, and Assistant State's Attorneys Dillon and Coghlan decided to manipulate Wilda Vargas to get her to falsely implicate Montanez and Serrano as the men she saw at the gas station the night before her husband's murder?

MS. CERCONE: Object to form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And isn't it true that on June 6, 1993, a few days after this meeting on June

107

2nd, you and Detective Guevara picked up Wilda Vargas at her home and brought her to a location where Mr. Montanez's car was parked?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. The purpose in bringing Wilda Vargas to view Mr. Montanez's car parked on the street was to get her to identify the car as the car that she saw at the gas station the night before her husband's murder; isn't that right?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. And isn't it true that Wilda Vargas viewed the car and told you and Detective Guevara that it looked kind of like the car that she had seen at the gas station?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. Isn't it true that Wilda Vargas told you and Detective Guevara that she could not say whether it was the same car, but that it had a similar color?

**A. On advice of counsel, I assert my**

108

**Fifth Amendment rights.**

Q. And isn't it true that and you and Detective Guevara then falsely told Ms. Vargas that evidence found at the crime scene matched forensic evidence from Montanez's car?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. And to put a fine point on it, isn't it true that you pointed out on Mr. Montanez's car what appeared to be a bullet hole in the side of the car?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And isn't it true that you told Ms. Vargas that evidence taken from that bullet hole on Montanez's car matched firearms evidence that was recovered from the scene of her husband's murder?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. And isn't it true that you and

Transcript of Ernest Halvorsen
Conducted on April 20, 2018

**109**

Detective Guevara falsely told Ms. Vargas that the evidence taken from the bullet hole on Montanez's car matched ballistic evidence at the crime scene in order to convince her that that was the car she had seen at the gas station?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And, sir, isn't it true that it was a fabricated statement that was made up from whole cloth that there was any firearms evidence that matched Mr. Montanez's car collected from the crime scene?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. Isn't it true that Wilda -- Wilda Vargas never told you that the car that was parked on the street that you brought her to see was the same car that she had seen at the gas station?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. In fact, you did not drive Wilda around the neighborhood so that she might be

**110**

able to legitimately try to identify a car that she had seen at the gas station the night before the murder, right?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And, in fact, you didn't put together any type of array or photograph array of different types of cars to see if she could identify which one looked like the car she had seen at the gas station, right?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And when you authored a police report in which you claim that you and Guevara drove Wilda Vargas around the neighborhood of the 3900 block of West Dickens, that was, in fact, a false statement, correct?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And, in fact, you and Detective Guevara brought Ms. Vargas directly to Montanez's car and told her that was the car that had been used in her husband's murder,

**111**

right?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And you -- And neither you nor Detective Guevara had any basis whatsoever to believe that Mr. Montanez's car had any involvement in the murder of Rodrigo Vargas, right?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And, in fact, you and Detective Guevara had no basis to believe whatsoever that Mr. Montanez's car had been at a gas station on the night before the murder of Rodrigo Vargas, right?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. You had prior knowledge that Mr. Montanez's car had some damage to the fender, and you used those facts in order to manipulate Ms. Vargas into believing that that was the car that she had seen at the gas station, right?

A. On advice of counsel, I assert my

**112**

Fifth Amendment rights.

Q. Now, I'm going to have you look at what has been previously marked as Guevara Exhibit 3. It's a collection of documents from RFC-Serrano/Montanez 1 through 148.

MR. GIVEN: The original for him, right?

MS. BONJEAN: Yes.

BY MS. BONJEAN:

Q. Mr. Halvorsen, I'm handing you what has been previously marked as Exhibit 3, which purports to be the complete investigative file for the Rodrigo Vargas murder. It is Bates stamped RFC-Serrano/Montanez 1 through 148. I'd ask please, sir, that you turn your attention, if you would, to the Bates stamp 96, which is towards the end of the document.

MR. GIVEN: And let me just state -- Go ahead. You can point it out to him.

MS. BONJEAN: Okay. You can make your...

MR. GIVEN: I'll just state for the record and tell the witness, Mr. Halvorsen, pay attention to me when Ms. Bonjean is

Transcript of Ernest Halvorsen
Conducted on April 20, 2018

113

getting you to the page. When you are directed to a document, you should feel free to review the document to the extent necessary -- to the extent you feel necessary in order to understand and answer the question; and that will apply as we go through the rest of the day.

BY MS. BONJEAN:

Q. Now, Mr. Halvorsen, I'd like to draw your attention to the supplemental police report that begins at the Bates stamp 96 and goes through 99 and that bears your signature at the bottom of Page 96.

Do you see that, sir?

A. Yes.

MR. GIVEN: Okay. That's fine. Go ahead.

BY MS. BONJEAN:

Q. Sir, at the page -- At the bottom of Page 96, is that your signature underneath the typewritten entry that says "Detective E. Halvorsen, Star No. 20692"?

A. On advice of counsel, I assert my Fifth Amendment rights.

114

Q. And, sir, do you see next to that entry another officer's name that reflects "Detective R. Guevara, Star No. 20861 that has his signature or purported signature beneath it? Do you see that, sir?

MR. GIVEN: Objection; form and compound: You can answer.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. Sir, isn't it true that frequently you -- strike that.

Isn't it true almost -- almost always you were responsible for authoring police reports on cases where you and Detective Guevara worked together?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And, in fact, isn't it true that you had previously said that you both -- you and Detective Guevara had different skill sets in your policing abilities?

115

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And isn't it true that Detective Guevara was someone who had a lot of knowledge about the streets and, specifically, about the gangs in Humboldt Park?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And you viewed yourself as someone who had skills in writing police reports? You were sort of the brains behind the operation, right?

MR. GIVEN: Form. Sorry, Form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And, in fact, Detective Guevara was not much of a writer, was he?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

116

BY MS. BONJEAN:

Q. In fact, isn't it true that Detective Guevara didn't really write competent police reports?

MR. GIVEN: Form, foundation.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And that usually when you were investigating a case with Detective Guevara, you would be the responsible party for authoring the police reports, and he would be the more hands-on officer in the field, correct?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And that was the case when this supplemental report that has been marked already and is before you was prepared, right?

MR. GIVEN: Form. And with that, I don't mean to do a speaking objection; but

117

when you say "that was the case," I'm not sure what you're referring to.

MS. BONJEAN: Sure. I'll -- I'll -- I will rephrase.

BY MS. BONJEAN:

Q. Sir, isn't it true that the supplemental report that's before you that has the Bates stamp 96 through 99 as part of Exhibit 3 is a supplemental report that you, in fact, authored?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And even though the report has Detective Guevara's name on it as well, you actually typed his name in there and signed his name, didn't you?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. In fact, you frequently signed Detective Guevara's name to police reports; isn't that correct?

MR. GIVEN: Form and foundation.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

118

BY MS. BONJEAN:

Q. Now, this police report indicates, sir, that it was submitted on June 2nd, 1993; isn't that right?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. In fact, that is untrue, isn't it? This police report was not submitted on June 2nd, 1993, was it?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And, in fact, if you look at Page 99, the last page of the supplemental report, the narrative contains facts that occurred on June 6th, 1993; isn't that correct?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And you would agree, sir, that June 6th, 1993 actually comes after June 2nd, 1993 chronologically?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. Now, in this police report that you authored, sir, isn't it true that you

119

memorialized the meeting that occurred with Frankie Vicente on June 2nd, 1993 at the gang crimes unit of the Cook County State's Attorney's office?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And isn't it true that you did not name Frankie Vicente by name in the supplemental police report but identified him as a circumstantial witness; isn't that correct?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And isn't it true that you claim in your police report that you did so for his safety so that he could remain anonymous since he was giving information about a crime? But that was, in fact, the reason why you called him a confidential witness -- a circumstantial witness, is it?

MR. GIVEN: Objection; form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

120

BY MS. BONJEAN:

Q. Isn't it true that because Frankie Vicente was already being used in the Robert Buto case, it was your hope that you would be able to find a better witness than Frankie Vicente to use in the frame-up of the plaintiffs in this matter, correct?

MR. GIVEN: Objection; form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. But this served as a basis that -- strike that.

But isn't it true that you, nonetheless, reported the meeting with Frankie Vicente in the gang crimes unit so that you could use Frankie Vicente, if necessary, as witness at trial against the plaintiffs?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And, now, I'd ask you to look at Page 97 of the second, I guess, full paragraph that begins with "He is a member of

Transcript of Ernest Halvorsen
Conducted on April 20, 2018

Imperial Gangsters street gang."

Sir, isn't it true that you wrote in this report on Friday, the -- Friday, February 5th, 1993, "He was hanging out by a dope spot at Hamlin and Altgeld. Between 8:30 and 9:00, a car arrived at this location. He recognized the driver of the car as being Pistol Pete. Also in the car were Jordan and Mondo. He recognized all three of these guys, as they were also members of the Imperial Gangsters."

Do you see that statement, sir, that you drafted in this report?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And isn't it true that when you authored this report, you knew that Mr. Vicente had not been hanging out at a dope spot on Hamlin and Altgeld on February 5th, 1993?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And, in fact, when you authored this report, sir, you knew that it was untrue that Mr. Vicente had recognized the driver of the car as Pistol Pete and that Jordan and Mondo were in the car; isn't that correct?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. In fact, you knew these were false statements that had been fed to Frankie Vicente on June 2nd, 1993, correct?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And these false statements you then took and placed in a police report representing that Mr. Vicente had made these statements when, in fact, he had merely repeated a story that you had fed to him, along with Detective Guevara and Assistant State's Attorneys Coghlan and Dillon?

MS. CERCONE: Object to form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And, sir, isn't it true that you also falsely reported in this supplemental police report that Vicente told you and Detective Guevara that the plaintiffs in this matter, Mr. Montanez, Mr. Serrano, and Mr. Pacheco were riding a tan-colored Buick Regal, and that he recognized -- that he recognized as being Pistol Pete's car, that Jordan and Mondo got out of the car, and that Pistol Pete sat in the car playing around with a bag of dope?

Isn't it true that that is a statement, sir, that was falsely -- It was contrived falsely by yourself, Detective Guevara, Assistant's State's Attorneys Dillon and Coghlan?

Ms. CERCONE: Object to form.

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And isn't it true that you included this false statement in your police report that you authored sometime after June 6th, 1993?

MR. GIVEN: Form; foundation.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. Isn't it true, sir, that you also included a false statement in this police report that Vicente told you the following: "The three of them were talking about a robbery that they had just done that had gone bad and that Pistol Pete had stated that Mondo fucked up and that he had went at the guy wrong and he would -- he would've never did what he did if Mondo had not fucked up and that Jordan stood around laughing at Pistol Pete yelling at Mondo."

Isn't it true, sir, that that, too, was a false statement that you included in the supplemental police report?

MR. GIVEN: Objection; form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And isn't it true that Frankie Vicente never told you these statements that we have just read, that the three of them were talking about a robbery that they had

125

done that had gone bad, and that Pistol Pete had stated that Mondo fucked up and he went at the guy wrong?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. Isn't it true, sir, that the entire narrative that is contained on Page 97, if you could take a look there, was a false narrative that you attributed to Frankie Vicente?

MR. GIVEN: Objection; form.

Just Page 97 or --

MS. BONJEAN: Yeah, just stop there. Yes.

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And isn't it true that there is no statement on Page 97 through 98 in which Vicente admits -- strike that. Just stay on 97 so you don't have to keep looking back and

126

forth. Let me start over.

Sir, isn't it true that every statement that is contained on 97 that -- in which Vicente alleges that Mr. Serrano, Mr. Montanez, or Mr. Pacheco made admissions regarding their involvement in the Vargas murder is, in fact, false?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. And the narrative that is contained on Page 97 is a narrative that -- a false narrative that was fed to Frankie Vicente by yourself, Detective Guevara, and Assistant State's Attorneys Dillon and Coghlan; isn't that right?

MS. CERCONE: Object to form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And the false narrative that is contained on Page 97 of this exhibit is a false narrative that you then incorporated into this supplemental report, correct?

**A. On advice of counsel, I assert my**

127

**Fifth Amendment rights.**

Q. And at no point did you put in the supplemental report any information about how the narrative had been fed to Frankie Vicente by yourself, Detective Guevara, and Assistant State's Attorneys Dillon and Coghlan?

MS. CERCONE: Form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And isn't it true, sir, that you never reported in this supplemental report or any other that Frankie Vicente had no knowledge about the murder of Rodrigo Vargas and was merely regurgitating a story that had been fed to him by yourself and your fellow defendants?

MS. CERCONE: Object to form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And isn't it true that if you turn the page, sir, on Page 98 of Exhibit 3, you authored statements alleged -- allegedly made

128

by Frankie Vicente during the meeting that occurred on June 2nd, 1993, correct?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. And, again, the statements that are contained on Page 98 of Exhibit 3 are also false statements that were attributed to Frankie Vicente, correct?

MR. GIVEN: Objection; form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And isn't it true that Frankie Vicente did not make any of these statements contained in this police report, both on Page 97 and 98, that you report as being truthful reflections of what he told you on June 2nd?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And, in fact, this entire statement that has been attributed to Frankie Vicente in the supplemental police report that you

129

authored was actually contrived by yourself, Detective Guevara, Assistant State's Attorneys Dillon and Coghlan and falsely attributed to Frankie Vicente, correct?

MS. CERCONE: Object to form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And when you wrote this police report, you knew that Frankie Vicente had not been present at any point when the plaintiffs confessed their involvement in the murder of Rodrigo Vargas, right?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. You also included in this police report at the bottom of Page 98 a statement by Wilda Vargas; isn't that correct?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And this statement that is attributed to Wilda Vargas is pertaining to the gas station episode; isn't that correct?

A. On advice of counsel, I assert my

130

Fifth Amendment rights.

Q. And when I say "the gas station episode," I'm talking about the gas station incident on February 4th, 1993 where Ms. Vargas had reported that she had gone to the gas station with her husband after they had gone to the bank, and that they had got into like a beeping -- beeping cars at each other incident there with three Latino men in a tan car?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And although, sir, you included this statement of Wilda Vargas in this June 2nd, 1993 police report, you had information about the gas station episode almost immediately after you were assigned to the case on February 1993; isn't that right?

A. On advice --

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. In fact, you and Detective Guevara

131

certainly interviewed the victim shortly after you were assigned to the case in February of 1993; and you, in fact, interviewed her about the 24-hour period preceding her husband's murder; isn't that right?

MR. GIVEN: Objection. You said victim.

MS. BONJEAN: Okay. Let me start over. I'm doing a lot of work here.

MR. GIVEN: All you have to do is read it off the page.

MS. BONJEAN: No, I'm not -- I actually --

MR. GIVEN: You have a script right over there. I see it.

MS. BONJEAN: Well, keep up. We're talking about timing here.

MR. GIVEN: Go ahead. Anyway, I don't think anybody interviewed the victim was my -- the point, so...

MS. BONJEAN: Yeah, that's a good point. Thank you. I don't think I would have caught that.

132

BY MS. BONJEAN:

Q. Anyway, Mr. Halvorsen, isn't it true that you and Detective Guevara were able to obtain information about the gas station incident that occurred on February 4th, 1993 when you interviewed the victim's wife in this case in February of 1993?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And, in fact, you had that information that you did not report, but you had it from having -- you did not report in any GPR, right?

MR. GIVEN: Objection; form, foundation.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. After you had put into motion your plan to frame Mr. Serrano, Mr. Montanez, and Mr. Pacheco, you utilized that information to give credibility to Frankie Vicente's fabricated story, correct?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I

Transcript of Ernest Halvorsen
Conducted on April 20, 2018

133

assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And, in fact, sir, you also report in this June 2nd, 1993 supplemental report that Detective Guevara showed Ms. Vargas a photo array consisting of eight identification photos in that she identified Mr. Montanez, Mr. Serrano, and Mr. Pacheco as those individuals she saw at the gas station on February 4th of 1993, correct?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. But that, too, was a false statement that you included in your supplemental report, correct?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. In fact, at no point did you or Detective Guevara show Ms. Vargas a photo array consisting of eight photographs, did

134

you or did he?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. Rather, you and Detective Guevara told Ms. Vargas that you had determined who the individuals at the gas station were, correct?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And, in fact, isn't it true, sir, that you and Detective Guevara actually showed Ms. Vargas three Polaroid photographs of the plaintiffs in this case?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And rather than ask Ms. Vargas to actually make an identification of the individuals she saw at the gas station, you told her who was at the gas station and identified Mr. Serrano, Montanez, and Pacheco as those three Latino men in the tan car?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And, sir, isn't it true also that

135

you falsely reported in your supplemental report that you had Ms. Vargas drive around the neighborhood of the 3900 block of West Dickens on June 6th, 1993 to see if she could recognize the car from the gas station?

MR. GIVEN: Objection; form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And, sir, you reported in this police report that she positively identified a 1984 Buick Regal belonging to Jose Montanez as the car that followed her from the gas station, correct?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. When, in fact, sir, you and Detective Guevara actually brought Ms. Vargas to Mr. Montanez's car and told her that that was the car that had been at the gas station, correct?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. You further falsely told Ms. Vargas

136

that that was the car that had been connected to her husband's murder on February 5th of 1993, correct?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And the statements that you included in this supplemental report regarding Ms. Vargas identifying the car without your prompting were false statements, correct?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. You certainly didn't report in your supplemental report that you had drove Ms. Vargas to look at Jose Montanez's car, correct?

A. On advice of --

MR. GIVEN: Form. Sorry, form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And, in fact, this supplemental

137

report that you authored is devoid of any information that you -- that Ms. Vargas was unable to identify the tan car as the car she saw at the gas station, right?

A. Form.

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And you failed to report in this police report that you falsely told Ms. Vargas that the damage to Mr. Montanez's car and the bullet hole was somehow connected to firearms evidence that was found at the murder scene, right?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And you took all of these actions in order to execute the plan to frame Mr. Serrano, Mr. Montanez, and Mr. Pacheco for the murder of Rodrigo Vargas, correct?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

138

BY MS. BONJEAN:

Q. You also prepared this police report with the state- -- with these statements in order to justify an arrest of Armando Serrano, correct?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. In fact, isn't it true, sir, that you and Detective Guevara arranged for Mr. Serrano to be arrested on June 8th of 1993?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And, in fact, Mr. Serrano was brought to Grand and Central on June 8th, 1993 in connection with the murder of Rodrigo Vargas, right?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. Isn't it true that you and Detective Guevara discussed that you wanted to bring Mr. Serrano in for questioning in

139

hopes that he would make an inculpatory statement against himself, correct?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. Or, alternatively, you wanted to bring Mr. Serrano in in hopes that he might point the finger at another party, maybe Mr. Montanez or Mr. Pacheco, correct?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. In fact, you wanted to fabricate more evidence in order to frame these three individuals, the plaintiffs in this case, because you didn't want to rely solely on Frankie Vicente's statements, right?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. You didn't want to use Vicente as the key witness in the murder prosecution of Rodrigo Vargas because he was already being used in another murder case, correct?

MR. GIVEN: Form; foundation.

140

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And isn't it true that it was highly suspicious that one snitch witness would be used in three separate murder cases? And you knew that that would be looked at as scams by the Court, correct?

MR. GIVEN: Form; foundation, competence, speculation.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And isn't it true that there was absolutely no probable cause to believe that Mr. Serrano had been involved in the murder of Rodrigo Vargas when you arranged for him to be arrested on June 8th, 1993, correct?

MR. GIVEN: Objection; form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. The only evidence against Mr. Serrano that existed at the time that he

Transcript of Ernest Halvorsen
Conducted on April 20, 2018

141

was arrested on June 8th, 1993 was evidence that you fabricated and fed to Mr. Vicente and reported in your June 2nd, 1993 report, correct?

A. **On advice of counsel, I assert my Fifth Amendment rights.**

Q. In fact, the only basis for the arrest of Mr. Serrano on June 8th, 1993 was false and fabricated evidence that had been developed by yourself, Detective Guevara, and Assistant State's Attorneys Dillon and Coghlan?

MS. CERCONE: Object to form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. Now, after Mr. Serrano was brought to Grand and Central on February 8th of 199- -- strike that.

After Mr. Serrano was brought to Grand and Central on June 8th of 1993, he was interrogated for a period of about 24 hours; isn't that right?

A. **On advice of counsel, I assert my**

142

**Fifth Amendment rights.**

Q. And you and Detective Guevara did as you often did and played tag team in the interrogation of Mr. Serrano, correct?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And as was your routine, you played the good cop while Ray played the bad cop, right?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And the way this played out on June 8th of 1993 is that Detective Guevara would come in the interrogation room and physically abuse Mr. Serrano; isn't that correct?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

143

BY MS. BONJEAN:

Q. In fact, isn't it true, sir, that Mr. Guevara slapped plaintiff repeatedly and accused him of killing Rodrigo Vargas while he was held in this interrogation for a 24-hour period?

A. **On advice of counsel, I assert my Fifth Amendment rights.**

Q. In fact, isn't it true that you either witnessed Detective Guevara slapping plaintiff in the face or heard Detective Guevara slapping plaintiff repeatedly during the course of the 24-hour period?

A. **On advice of counsel, I assert my Fifth Amendment rights.**

Q. And after Detective Guevara would physically abuse Plaintiff Serrano by slapping him, he would sometimes leave the room and let you come in and do your good cop thing, right?

MR. GIVEN: Objection; form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

144

BY MS. BONJEAN:

Q. And, in fact, sir, you did come in and question Mr. Serrano on a number of occasions during this 24-hour period to try to gain his cooperation in -- in the case by using less aggressive methods, right?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. Isn't it true that you told Plaintiff Serrano that if he just admitted his involvement, you could -- you could -- you could help him get leniency in the case?

A. **On advice of counsel, I assert my Fifth Amendment rights.**

Q. Isn't it true that you told Plaintiff Serrano that you already knew that he and Montanez and Pacheco did it, and if he just pointed the finger at Montanez and Pacheco, you would make sure that he got a benefit or a deal for his involvement in the murder of Vargas?

A. **On advice of counsel, I assert my**

Transcript of Ernest Halvorsen
Conducted on April 20, 2018

Fifth Amendment rights.

Q. And then after your friendlier methods were unsuccessful in obtaining cooperation form Mr. Serrano, isn't it true that Detective Guevara would return to the interrogation room would where he would, again, use physical force to extract a statement from Mr. Serrano?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. But isn't it true, sir, that during that 24-hour period, your method -- your methods and Detective Guevara's methods didn't work, did they?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. You and Detective Guevara couldn't get Mr. Serrano to confess, could you?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And isn't it true that neither you or Detective Guevara could even get Mr. Serrano to implicate third parties in the murder of Rodrigo Vargas, right?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. But, sir, isn't it true that you had probable cause to arrest Mr. Serrano?

MR. GIVEN: Object. Go ahead.

MS. BONJEAN: Let me start over. Let me strike that.

BY MS. BONJEAN:

Q. Isn't it true that you had prepared a report that reflected that you had probable cause to arrest Mr. Serrano?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And, in fact, you and Detective Guevara were already relying on false statements by Vicente and could have used that information to arrest Mr. Serrano, right?

MR. GIVEN: Objection; form, incomplete hypothetical, calls for speculation.

You can answer.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. Well, the point is, sir, that you didn't actually arrest or charge Mr. Serrano on February 8th, 1993; isn't that correct?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. Despite claiming that you had a witness who had heard Mr. Serrano confess to the crime and had a witness who identified Mr. Serrano at the gas station, you did not, in fact, charge Mr. Serrano with the murder of Rodrigo Vargas on February 8th, 1993, correct?

MR. GIVEN: Objection; form and foundation.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. In fact, you released Mr. Serrano on February 9th, 1993, correct?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And you released Mr. Serrano on February 9th, 1993 because you knew Vicente's statements were going to be problems -- be a problem in the future, right?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. You wanted to develop more false evidence in order to successfully frame Mr. Serrano, Mr. Montanez, and Mr. Pacheco in the murder of Rodrigo Vargas, correct?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And you had hoped that Mr. Serrano might provide some statements, either implicating himself or implicating others that could be used, but that plan did not work out, correct?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. So you were forced to release Mr. Serrano on February -- on June 9th, 1993, correct?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And, in fact, at that point, sir, you decided that you would cultivate another witness to act as a witness in the Vargas murder, right?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. Did you prepare any police reports regarding your arrest and interrogation of Mr. Serrano on February 8th of 1993?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. Did you prepare any GPRs that reflected that Mr. Serrano had not made any statements implicating himself or others in the murder of Rodrigo Vargas?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And did you ensure that any of those police reports or GPRs were tendered to Mr. Serrano's attorneys after he was charged with the murder of Rodrigo Vargas?

MR. GIVEN: Objection; form, foundation, competence.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. Now, isn't it true, Mr. Halvorsen, that on June 11th of 1993, a person by the name of Timothy Rankins was brought into Area 5, otherwise known as Grand and Central?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. Isn't it true that you, along with Detective Guevara and your supervisor, Sergeant Mingy, decided that you would cultivate Mr. Rankins as a witness in the murder of Rodrigo Vargas?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. You were concerned, sir, isn't it true, that Vicente wouldn't be able to tell a credible story implicating Montanez, Serrano, and Pacheco in the Vargas homicide?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And isn't it true that you and Detective Guevara spoke with your supervisor, Sergeant Mingy, along with Assistant State's Attorneys Dillon and Coghlan about the need to get another witness to corroborate Vicente's testimony against Montanez, Serrano, and Pacheco?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. Isn't it true that you talked to Defendants Mingy, Dillon, and Coghlan about the need to get another witness to play the role that you initially wanted Vicente to plea -- play, that is, as an eyewitness to the Vargas murder who would falsely claim to have seen Montanez, Serrano, and Pacheco commit that murder?

MS. CERCONE: Object to form.

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. How exactly, sir, did you come into contact with Timothy Rankins on June 11th of 1993?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. Isn't it true actually that Mr. Rankins was brought into Area 5 by Sergeant Mingy and yourself?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And isn't it true that you and Defendant Serrano -- I'm sorry. Strike that. You, Defendant Guevara, and Defendant Mingy told Rankins that Montanez, Serrano, and Pacheco had testified against his brother in another case?

A. On advice of counsel, I assert my

153

Fifth Amendment rights.

Q. And you told Mr. Rankins that the plaintiffs in this matter had testified against his brother in order to get him to cooperate in falsely implicating the plaintiffs in the murder of Rodrigo Vargas, right?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And isn't it true that you and Detective Guevara and Sergeant Mingy all agreed that you would either coerce or entice Mr. Rankins, whatever it took, to falsely implicate Montanez, Serrano, and Pacheco in the Vargas murder?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And isn't it true that in your presence, Defendant Mingy told Rankins that the reason he wanted to frame Montanez, Serrano, and Pacheco is because he couldn't catch them on a case, but he knew that they

154

were selling drugs?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And isn't it true that you evenly -- you evenly tried to get Rankins to falsely implicate two brothers by the name of Rico and Marlo in a separate murder?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And in attempting to get Mr. Rankins to implicate this -- these people, Rico and Marlo in this other murder, you also told Rankins that they had testified against his brother in another case, correct crick?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. Isn't it true that you also told Rankins that if he did you this favor and falsely implicated the plaintiffs in the murder of Rodrigo Vargas, you could get his robbery charge dismissed?

A. On advice of counsel, I assert my Fifth Amendment rights.

155

Q. And isn't it true that you told Rankins that you needed him to testify that he actually saw the Plaintiffs Serrano, Montanez, and Pacheco murder Rodrigo Vargas?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And isn't it true that when Mr. Rankins initially declined to assist you, you also told him that you may just frame him for the murder of Rodrigo Vargas?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And isn't it true that you and Detective Guevara were present in an interview room when Detective Guevara kicked Mr. Rankins out of a chair that he was seated in while his hands were cuffed behind him?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. Isn't it true that you were also present when Detective Guevara and Sergeant Mingy kicked Mr. Rankins in the stomach and the back while he was in custody at Grand and Central?

156

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And isn't it true that you observed Detective Guevara place a phonebook on Rankins's head and strike the phonebook with a flashlight while he was in custody at Grand and Central?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And, in fact, isn't it true that that was a method that Detective Guevara had used frequently when he was using physical coercion against suspects, that is, using a phonebook that he would then hit with a flashlight?

MR. GIVEN: Form and foundation.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. Isn't it true that in your experience that when an officer hits a suspect with a flashlight while using a phonebook as a barrier, that avoids leaving marks on the body of the person that's being

157

beaten?

MR. GIVEN: Form, foundation, competence, and speculation.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. Isn't it true that while you were making promises, as well as threats of violence against Mr. Rankins, Guevara and Mingy were also present?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. And at no point during the interrogation of Mr. Rankins did you tell Mr. Detective to stop beating him; isn't that correct?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. And the reason that you told Rankins that you could help him with his robbery case and also separately threatened to charge him with the murder was because you wanted to coerce him into fabricating a story that implicated Montanez, Serrano, and

158

Pacheco in the Vargas murder?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. And, in fact, eventually you were successful in getting Mr. Rankins to provide a false statement that implicated Mr. Montanez, Mr. Serrano, and Mr. Pacheco in the Vargas murder?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. And, in fact, you had Mr. Rankins in custody for almost 24 hours, isn't that right, while you helped him prepare a false statement that he was going to give to an Assistant State's Attorney, correct?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And isn't it true that you told Rankins to falsely tell the State's Attorney that Stripes and Barrel Belly pulled up in a car and said they wanted him to do a drug deal with them?

159

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. Isn't it true that you told Rankins to falsely say the people would want him on a drug deal because he's a fast runner?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. And isn't it true that you told Rankins to falsely say that he was at a park, and then Stripes, Barrel Belly, and Joker said, "Let's do this," and then they drove to Springfield and Cortland?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. And isn't it true that you told Rankins to falsely say that Joker, Barrel Belly, and Stripes got out of the car while he stayed inside of the car to wait?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. And isn't it true that you told Rankins to falsely say that Joker, Barrel Belly, and Stripes got on either side of the gate and that Stripes said, "Do him, do him,"

160

and Barrel Belly said, "Go ahead," and that Joker supposedly opened fire with a nine millimeter gun?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And isn't it true that you told Rankins to falsely say that Stripes told him that if he talked about the murder, they would do the same thing to him?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. Isn't it true that you provided Rankins with photographs of Montanez, Serrano, and Pacheco so that he could know who they were and what they looked like?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. And isn't it true that you, Detective Guevara, and Sergeant Mingy fed information to Rankins despite knowing that Rankins had no personal knowledge about the Vargas murder?

161

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And isn't it true that you, Guevara, and Mingy fed information to Rankins despite the fact that you knew that neither Mr. Montanez, Mr. Serrano, nor Mr. Pacheco were involved in any way in the Vargas murder?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And, sir, I'm going to have you look at Exhibit 3, please again, if you would. I'm going to have you look at Page 81. I'll give it to you.

Sir, Pages 81 through 85 purports to be a statement of Timothy Rankins taken on June 11th, 1993 at 11:35 p.m.

Do you see that statement in front of you, sir?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. According to this handwritten statement, also present was ASA John King and yourself, Detective Ernest Halvorsen; isn't

162

that correct?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. Isn't it true, sir, that the statement contained in this handwritten statement at 81 through 85 contains a false narrative that you and Detective Guevara and Sergeant Mingy fed to Timothy Rankins?

MR. GIVEN: Form. Go ahead.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. In fact, isn't it true that the statements contained in this handwritten statement in which Rankins claims to have been present for the murder of Rodrigo Vargas and witnessed Montanez, Serrano, and Pacheco participate in the murder of Rodrigo Vargas was false in its entirety?

A. On advice of counsel, I assert my Fifth Amendment rights it.

Q. And that Mr. -- Mr. Rankins didn't write out this statement; isn't that fair to say?

163

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. In fact, this was a statement that was attributed to him by yourself, correct?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And through physical coercion and promises of leniency, you successfully obtained cooperation from Timothy Rankins, in that he signed this statement, even though its contents were completely false?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. In fact, isn't it true that you did not tell the Assistant State's Attorney John King that Mr. Rankins never made any statements to you regarding his knowledge about the murder of Rodrigo Vargas?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And isn't it true that you did not tell Assistant State's Attorney John King

164

that you, Detective Guevara, and Sergeant Mingy had contrived a false narrative that you persuaded Timothy Rankins to adopt through physical coercion and promises of leniency?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And isn't it true that you lied in your supplemental police report about the circumstances of your first meeting with Rankins to make it appear that Rankins was voluntarily truthfully implicating Montanez, Serrano, and Pacheco?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. I'm going to have you, sir, look at Page 68 through 72. I'm having you look at Page 68 through 72 of Exhibit 3 or Guevara 3 that purports to be a supplemental police report prepared on June 14th, 1993.

Do you see that, sir?

A. On advice of counsel, I assert my

165

Fifth Amendment rights.

Q. And this is a said report that you authored, and it bears your signature at the bottom of Page 68, correct?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And, again, sir, it also bears the signature of Detective Reynaldo Guevara, who was your partner in the investigation of the Vargas murder, right?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. But, in fact, it's true, sir, that Mr. Guevara didn't actually sign this supplemental report? You signed his name at the bottom there, right?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And in this report that you authored, you indicated, sir, that Sergeant Mingy interviewed Timothy Rankins regarding his knowledge about an unrelated shooting involving a woman by the name of Monica Roman, right?

166

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And you also reported, sir, that during this interview, Mr. Rankins revealed to Sergeant Mingy that he was a witness to the Vargas murder on February 5th of 1993, right?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. But, sir, Mr. Rankins never told Sergeant Mingy he was a witness to the Vargas murder, correct?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. Rather, you and Sergeant Mingy and Detective Guevara decided that since you had Mr. Rankins in custody on an offense, that you would be able to use him as a witness in the Vargas murder, correct?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And in this report that you prepared, you summarized the statement that Timothy Rankins purportedly made to yourself

167

and later to Assistant State's Attorney King, right?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And apart from any background information about Mr. Rankins, the statements that are contained in this supplemental report in which Mr. Rankins purportedly admitted to being a witness to the murder of Rodrigo Vargas are false; isn't that correct?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. Isn't it true that the statements that you included in this supplemental report regarding -- strike that. Let me start over.

You fabricated the statements in this report, sir, and then attributed those statements to Mr. Rankins, right?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

168

BY MS. BONJEAN:

Q. You knew that Mr. Rankins had no knowledge about the murder of Rodrigo Vargas when you authored this report and included false statements in this report, correct?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. You knew there was no reason to believe that Mr. Serrano, Mr. Montanez, and Mr. Pacheco had any involvement in the Rodrigo Vargas murder when you authored this report and included false statements purportedly made by Timothy Rankins, right?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. You knew that Timothy Rankins had not witnessed the murder of Rodrigo Vargas, nor had he seen Montanez, Serrano, and Pacheco on February 4th, 1993?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. You also falsely reported that

Transcript of Ernest Halvorsen
Conducted on April 20, 2018

169

Timothy Rankins was shown a photo array consisting of eight Polaroid color photos, correct?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. You also -- You falsely reported that Timothy Rankins identified Mr. Serrano as the person known to him as Joker, identified Jorge Pacheco as the person known to him as Stripes, and identified Jose Montanez as the person known to him as Barrel Belly, correct?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And, in fact, isn't it true that you and Detective Guevara merely showed Mr. Rankins Polaroid photos of the plaintiffs in the case when you fed the story to him that you wanted him to repeat for the Assistant State's Attorney?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

170

BY MS. BONJEAN:

Q. Sir, isn't it true that you knew that Rankins did not know Sergeant Mingy before his arrest on June 10th, 1993?

MR. GIVEN: Form, foundation, competence, speculation.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And it's true, sir, that you wrote the supplementary report that Rankins -- that you wrote in your supplemental report that Rankins did, in fact, know Sergeant Mingy prior to his arrest in June of 1993?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And you lied in your supplementary report that Rankins knew Defendant Mingy prior to June of 1993?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And you did so so it would be more plausible -- well, strike that.

Isn't it true that you falsely

171

claimed that Rankins knew Defendant Mingy to try to come up with a false story for why you were discussing the Vargas murder with Rankins in the first place?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And after you coerced Rankins into telling the story to ASA King, you also brought Rankins to later see Defendant Coghlan, correct?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And isn't it true that in your presence Rankins told Assistant State's Attorney Coghlan that he was beaten by the police in an effort to get him to implicate Montanez, Serrano, and Pacheco?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And isn't it true, sir, that you also brought Mr. Rankins to the crime scene where Mr. Vargas had been murdered so that he

172

could more credibly tell the false story that you had fabricated and fed to him?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And isn't it true that you coerced Mr. Rankins into falsely implicating Mr. Montanez, Serrano, and Pacheco, along with Mr. Mingy and Detective Guevara because you wanted to frame the plaintiffs for the murder of Rodrigo Vargas?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And, in fact, the supplemental report that you authored, purportedly on June 14th, 1993, which is in Exhibit 3, Bates stamp No. 68 through 72, contains false and fabricated statements that were never made by Timothy Rankins, correct?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And you did not include in your report at any point that you had used any type of misconduct to obtain these false statements from Timothy Rankins, right?

173

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And you did not report that you had used misconduct -- strike that.

You did not report that Detective Guevara had used any physical abuse or other forms of misconduct to secure these false statements from Mr. Rankins, right?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And, yet, you, Detective Guevara, and Sergeant Mingy all knew that Mr. Rankins's story about having witnessed the murder of Rodrigo Vargas was false in its entirety, correct?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. Now, sir, after securing this false and fabricated statement from Mr. Rankins, you and Detective Guevara went and arrested Mr. Serrano a second time, correct?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. In fact, you and Detective Guevara

174

went to Mr. Serrano's house yourself and arrested Mr. Serrano at his home, correct?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And you did this on June 11th, 1993 after securing the false statement from Timothy Rankins, correct?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And isn't it true that either you or Detective Guevara told Mr. Serrano in sum and substance, "This time you're not going home"?

A. On advice of counsel, I assert my Fifth Amendment rights.

MR. GIVEN: Jennifer?

MS. BONJEAN: Yes.

MR. GIVEN: Whenever you get to a natural stopping --

MS. BONJEAN: Yeah, it's good.

MR. GIVEN: Okay. Why don't we just take a short break. It's been an hour and a half.

MS. BONJEAN: Yeah, sure.

175

THE VIDEOGRAPHER: Off the record at 1:05.

(A recess was taken.)

THE VIDEOGRAPHER: Back on the record, 1:19.

BY MS. BONJEAN:

Q. Mr. Halvorsen, isn't it true that you, Detective Guevara, Sergeant Mingy, and Assistant State's Attorneys Coghlan and Dillon jointly discussed getting Wilda Vargas to falsely identify Montanez and Serrano as the men she had seen at the gas station?

MS. CERCONE: Object to form.

MR. GIVEN: Asked and answered, I think. Go ahead.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. Isn't it true that you, Detective Guevara, Sergeant Mingy, and Assistant State's Attorneys Coghlan and Dillon jointly discussed getting Wilda Vargas to falsely identify Montanez and Serrano from a live lineup as the men she had seen at the gas

176

station?

MS. CERCONE: Object to form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And, in fact, you and Detective Guevara, Sergeant Mingy, and Coghlan and Dillon jointly discussed getting Wilda Vargas to falsely identify Montanez and Serrano as the men she had seen at the gas station in order to bolster your shaky case against them?

MR. GIVEN: Objection; form.

MS. CERCONE: Object to form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And isn't it true that Wilda Vargas was unable to describe any of the three men that she had seen at the gas station in any way prior to June 11th of 1993?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And isn't it true that she told you

Transcript of Ernest Halvorsen
Conducted on April 20, 2018

177

previously that she had paid very little attention to the men, and that had she doubted she could identify them, correct?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. Did you, Detective Guevara, and Sergeant Mingy conduct an impermissibly suggestive lineup that contained Armando Serrano and was viewed by Wilda on July -- I'm sorry, on June 11th, 1993?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. Isn't it rue that you and Detective Guevara suggested to Wilda Vargas that she should select Mr. Serrano from that lineup on June 11th, 1993?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. Isn't it true that Wilda Vargas was unable to actually make an independent identification of Mr. Serrano as the person she saw at the gas station on June 11th, 1993?

MR. GIVEN: Form.

178

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And isn't it true that you and Detective Guevara made comments to Wilda Vargas that suggested that she should select Mr. Serrano from that lineup -- that she should select Mr. Serrano from that lineup and identify him as one of the individuals she saw at the gas station the day before her husband's murder?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And isn't it true that you and Detective Guevara actually told Ms. Vargas that you had individuals in custody who were responsible for her husband's murder prior to her viewing the lineup on June 11th, 1993?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And, specifically, you and Detective Guevara told Wilda Vargas that you

179

had Mr. Serrano in custody, and that you had information that he was, in fact, the person responsible for her husband's murder prior to her viewing the lineup on June 11th, 1993?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. Did you, Guevara, and Mingy conduct an impermissibly suggestive lineup that contained Jose Montanez and was viewed by Wilda on July 9th of 1993?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. Did you and Guevara suggest to Wilda Vargas that she should select Mr. Montanez from this live lineup on July 9th of 1993?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And did you and Guevara tell Wilda Vargas who to pick out of that lineup that contained Mr. Montanez on July 9th of 1993?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And isn't it true that Wilda

180

Vargas was unable to independently identify Mr. Montanez from a lineup on July 9th, 1993?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And isn't it true Wilda Vargas told you that she could not identify the people from the gas station because she did not pay close attention to them when she saw them on February 4th, 1993?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And did you and Guevara and Sergeant Mingy falsely claim that Wilda Vargas had identified Mr. Montanez from the lineup on July 9th of 1993?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. In fact, isn't it true that you, Detective Guevara, and Sergeant Mingy falsely claimed that Wilda had identified Mr. Serrano from a live lineup on June 11th, of 1993? Yes, June 11th, 1993.

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. Did you and Detective Guevara make comments to Wilda Vargas during the lineup on July 9th of 1993 that suggested to her that she should pick out Mr. Montanez as one of the individuals she saw at the gas station?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And did you and Guevara tell Wilda Vargas that you had someone in custody for the Vargas murder before the lineup that she viewed on July 9th, 1993?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. Specifically, you and Detective Guevara told Wilda Vargas that you had Mr. Montanez in custody for the Vargas murder prior to her viewing the lineup on July 9th, 1993, right?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And you falsely told Ms. Vargas prior to her viewing the lineup on July 9th, 1993 that you had developed evidence showing that Jose Montanez was the person or one of the people responsible for her husband's murder, correct?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. Isn't it true that you appeared before Judge Spitzer to get arrest warrants for Jose Montanez and Jorge Pacheco?

MR. GIVEN: Objection; foundation.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And isn't it true that you lied to Judge Spitzer about the evidence against Jose Montanez and Jorge Pacheco?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And isn't it true that you lied to Judge Spitzer about the evidence against Jose Montanez and Jorge Pacheco so that you would be able to obtain an arrest warrant for them, even though you knew there was no probable cause to justify their arrest?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And is it true, sir, that you lied to Judge Spitzer about the evidence against Jose Montanez and Jorge Pacheco so that you would be able to obtain arrest warrants for them because you knew that Judge Spitzer would not approve the arrest warrants without your lie?

MR. GIVEN: Objection. Never mind. Go ahead.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And isn't it true that you and Detective Guevara lied to Assistant State's Attorneys to get them to approve charges against Montanez, Serrano, and Pacheco?

A. On the advice of --

MR. GIVEN: Object; foundation.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. I'd like to have you look, sir, at Pages 54 through 55 of Exhibit 3. I will get you there. Actually, 53 through -- Did I say that, 53 through 55?

MR. GIVEN: You said 54.

MS. BONJEAN: It's actually 53.

BY MS. BONJEAN:

Q. Mr. Halvorsen, I'm having you look at what's been previously identified as Guevara 3, Bates stamp 53 through 59. This purports to be a supplemental report authored by yourself on July 3rd, 1993, isn't it?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And, again, sir, your signature is affixed at the bottom of 53, along with your partner, Detective Reynaldo Guevara, correct?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And this is a supplemental report that you authored yourself, correct?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And although Ray Guevara's signature appears at the bottom, it is, in fact, your signature, or it is your handwriting purporting to be Ray Guevara's

**185**

signature, correct?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And according to the supplemental report that you prepared, sir, you and Detective Guevara brought Timothy Rankins to testify before the Cook County Grand Jury, correct? And that's on Page 54, if you would like to see that.

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And isn't it true that prior to bringing Timothy Rankins before the Grand Jury, you had him review the statement -- the handwritten statement that you had previously coerced him into signing and adopting, correct?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And, in fact, you practiced with Timothy Rankins about what his testimony would be before the Grand Jury, correct?

A. On advice of counsel, I assert my Fifth Amendment rights.

**186**

Q. And you knew that Timothy Rankins was going to testify consistent with his handwritten statement that you had fabricated and fed to him prior to him adopting it, correct?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. You further knew that the statements that Timothy Rankins was going to give under oath at the Grand Jury implicating Montanez, Serrano, and Pacheco in the murder of Rodrigo Vargas were, in fact, false, correct?

MR. GIVEN: Objection; form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And you had secured Mr. Rankins's cooperation in not only giving the false handwritten statement but also testifying falsely before the Grand Jury through threats of physical violence, actual use of physical violence, and also promises of leniency, correct?

**187**

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And, in fact, you knew that Timothy Rankins had no personal knowledge about the murder of Rodrigo Vargas, correct?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And you knew that Timothy Rankins's statement before the Grand Jury and his testimony under oath claiming to have been a witness to the Vargas murder were false?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And you also knew that Timothy Rankins had no knowledge whatsoever to believe that Montanez, Serrano, and Pacheco were involved in the murder of Rodrigo Vargas, correct?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And you also knew that the statements that -- strike that -- that the statements and testimony that Mr. Rankins gave before the Grand Jury, in which he

**188**

implicated Montanez, Serrano, and Pacheco in the murder of Rodrigo Vargas were false in their entirety, correct?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. You, nonetheless, secured the false testimony from Mr. Rankins so that indictments would be issued charging Mr. Pacheco, Mr. Serrano, and Mr. Montanez with the murder of Rodrigo Vargas?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And after having secured Timothy Rankins's false Grand Jury testimony and prior handwritten statement, you and Detective Guevara decided also that you would memorialize Francisco Vicente's false narrative in a handwritten statement, right?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And, in fact, on June 28th of 1993, isn't it true, sir, that you and Detective

Transcript of Ernest Halvorsen
Conducted on April 20, 2018

Guevara and Assistant State's Attorneys Dillon and Coghlan, again, arranged for Francisco Vicente to be transferred from the Cook County jail to the gang prosecution unit at the Cook County State's Attorney office?

MS. CERCONE: Object to form.

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And it was at that point on June 28th of 1993, you and the other defendants in this case decided that the fabricated story that you all had contrived on June 2nd, 1993 would be memorialized in a handwritten statement that you would have Mr. Vicente sign and adopt, correct?

MS. CERCONE: Objection to form.

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And, in fact, Mr. Vicente gave a statement on June 28th, 1993 at 2 o'clock.

Also present was yourself and an Assistant State's Attorney by the name of Solita Pandit, correct?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. And, in fact, Assistant State's Attorneys Coghlan and Dillon declined to be present for the taking of this formal statement of Vicente because -- because they wanted to distance themselves from this fabricated statement that would then be used to wrongfully convict the plaintiffs, correct?

MS. CERCONE: Object to form.

MR. GIVEN: Form, foundation, competence, and speculation.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And, in fact, the Assistant State's Attorney Solita Pandit that was brought in to take the statement of Mr. Vicente on June 28th, 1993 was unaware of the -- strike that.

Let me ask it this way: Do you know whether Assistant State's Attorney Solita Pandit was aware -- was aware of the meeting that took place in those offices on June 2nd, 1993 during which you, Detective Guevara, and Assistant State's Attorneys Coghlan and Dillon fabricated a false statement for Francisco Vicente that he ultimately adopted?

MS. CERCONE: Object to form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. In fact, you did not tell Assistant State's Attorney Pandit, did you, that you, Detective Guevara, and Assistant State's Attorneys Coghlan and Dillon had manufactured the false story on June 2nd, 1993 that was ultimately memorialized in this handwritten statement by Francisco Vicente on June 28th, 1993?

MS. CERCONE: Object to form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And your supplemental report also does not contain any information -- strike that. Your supplemental report dated July 3rd of 1993 contains no information revealing that the statement that Francisco Vicente signed on June 28th, 1993 was actually the product of a prior meeting on June 2nd, 1993 where you, Defendants Guevara, Coghlan, and Dillon had manufactured this statement?

MS. CERCONE: Object to form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. Isn't it true that you knew that the facts of the Vargas murder were similar to the shooting investigated in RD number T, as in Tom, 018247?

MR. GIVEN: Form and foundation.

I'm sorry. What was the RD number?

MS. BONJEAN: T, as in Tom, 018247.

MR. GIVEN: Go ahead.

THE WITNESS: On advice of counsel, I

193

assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. In fact, isn't it true that you knew evidence from RD number T018247 would be important evidence for Montanez, Serrano, and Pacheco at their murder trial?

MR. GIVEN: Form and foundation, speculation, competence.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. In fact, there was a shooting investigated that bore the RD number T018247 that would have been of particular interest to Montanez, Serrano, and Pacheco's attorneys, as it bore many similarities to the Vargas shooting, correct?

MR. GIVEN: Same objection.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And isn't it true that you removed from the file the RD number -- strike that.

Isn't it true that you removed from

194

the file police reports associated with RD T018247 before it was available to be subpoenaed by either the State or the defense?

MR. GIVEN: Objection; form and foundation.

When you say "removed from the file," you mean this file?

MS. BONJEAN: Yeah, I'll ask it -- strike that. Let me start over so we can...

BY MS. BONJEAN:

Q. Isn't it true that you removed police reports and information related to RD T018247 from the Vargas investigative file before that file was available to be subpoenaed by either the State or the defense?

MR. GIVEN: Objection; form, foundation, competence, and speculation.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And isn't it true that you removed

195

the file or the police reports associated with file RD number T018247 from the Vargas investigative file because it was available -- because if it was available to be subpoenaed, you knew it would be helpful to Montanez, Serrano, and Pacheco's defense?

MR. GIVEN: Same objections.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

MS. BONJEAN: Can you mark this, please, as -- How do you want to do this?

MR. GIVEN: Well, so this is where the rubber hits the road. We had talked the last time about trying to do continuous numbers and pointed out that usually doesn't work very well. So we either designate this as Halvorsen 1 or --

MS. BONJEAN: I think Halvorsen makes sense.

MR. GIVEN: I do too.

(Halvorsen Deposition Exhibit No. 1 was marked for identification.)

BY MS. BONJEAN:

Q. Mr. Halvorsen, I'm going to hand

196

you what I marked as Halvorsen 1 for identification purposes -- I'm sorry. I'm going to hand you what I've marked as Halvorsen 1.

MR. GIVEN: Which I will try to give you a trick question and tell you to identify it by Bates stamp for the record, but you would not be able to do that.

MS. BONJEAN: No, I wouldn't. And I know it's been produced, but I honestly don't have an explanation because the fine people here at Loevy & Loevy made the copies for me, and I don't -- So I apologize, but this is -- I will represent for the record that this is a transcript of Grand Jury testimony in the matter of People versus Armando Serrano, Grand Jury number 336, and Criminal Indictment number 93 CR 15871, and this exhibit itself is four pages, although it's double-sided, okay.

MR. GIVEN: I think that will identify it sufficiently.

MS. BONJEAN: Good.

Transcript of Ernest Halvorsen
Conducted on April 20, 2018

197

BY MS. BONJEAN:

Q. Mr. Halvorsen, isn't it true that you gave testimony at the Grand Jury or before the Grand Jury in connection with the criminal prosecution of Mr. Serrano and all the plaintiffs in this matter?

A. **On advice of counsel, I assert my Fifth Amendment rights.**

Q. And, in fact, sir, you gave testimony on July 1st of 1993 before the Grand Jury; isn't that right?

A. **On advice of counsel, I assert my Fifth Amendment rights.**

Q. And, sir, Page 3 up in the right-hand corner, you'll see you were asked a question by an Assistant State's Attorney by the name of Daniel Gallivan (phonetic), a question, "Did your investigation show that the defendant, Armando Serrano, was also present at that time?"

Do you see that?

A. **On advice of counsel, I assert my Fifth Amendment rights.**

Q. I'm going to back up so we have

198

some context as well, okay.

Prior to that, the Assistant State's Attorney asked you, "Did your investigation show that Rodrigo Vargas was in the area of 1838 North Springfield at approximately 5:30 a.m. on February 5th of 1993?" And you answered, "That's correct," correct?

A. **On advice of counsel, I assert my Fifth Amendment rights.**

Q. You further testified in response to the question, "Did your investigation show that the Defendant Armando Serrano was also present at that time?" You answered, "That's correct."

Isn't that true, Mr. Halvorsen?

A. **On advice of counsel, I assert my Fifth Amendment rights.**

Q. But, sir, that testimony was knowingly false, correct?

A. **On advice of counsel, I assert my Fifth Amendment rights.**

Q. Your expression did not show that Defendant Armando Serrano was present at

199

1838 North Springfield at 5:30 a.m. on February 5th of 1993; isn't that right?

A. **On advice of counsel, I assert my Fifth Amendment rights.**

Q. In fact, you did not actually conduct an investigation that showed that Mr. Serrano was present at the crime scene at 1838 North Springfield on February 5th of 1993, right?

A. **On advice of counsel, I assert my Fifth Amendment rights.**

Q. Rather, you along with your defendant -- strike that.

Rather, you along with Defendants Guevara and Assistant State's Attorneys Dillon and Coghlan fabricated and fed false stories to Mr. Vicente and Mr. Rankins that suggested that Mr. Serrano and his co-defendants were present at the murder scene on the morning of February 5th of 1993, right?

MR. GIVEN: Object to form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

200

BY MS. BONJEAN:

Q. And that you knowingly gave false testimony before the Grand Jury to secure an indictment against Mr. Serrano for the murder of Rodrigo Vargas, correct?

A. **On advice of counsel, I assert my Fifth Amendment rights.**

Q. You were also asked the following questions by the Assistant State's Attorney: "Did your investigation show that Defendant Armando Serrano was armed with a handgun?" You answered, "That's correct."

You were also asked the question, "What did your investigation show as to the type of handgun he was armed with at that time?" Your answer, "A 9 millimeter semi-automatic pistol."

Do you remember being asked those questions and giving those answers, sir?

A. **On advice of counsel, I assert my Fifth Amendment rights.**

Q. Isn't it true that testimony that you provided before the Grand Jury was knowingly false testimony, correct?

201

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. Your investigation did not show that Armando Serrano was armed with handgun, specifically, a nine millimeter gun on the morning of February 5th of 1993 at 1838 North Springfield Avenue; isn't that right?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. In fact, that fact or those facts were actually fabricated by yourself, Detective Guevara, Assistant State's Attorneys Coghlan and -- Coghlan and Dillon, and fed to your witnesses, Mr. Vicente and Mr. Rankins, correct?

MS. CERCONE: Object to form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. You were also asked, "What did your investigation show occurred at approximately 5:30 a.m. at 1838 North Springfield?" And you responded, Answer: "Rodrigo Vargas just walked out of his house going to work at

202

approximately 5:30. As he walked out the front gate, he was stopped by three persons, one of the persons being Armando Serrano. They attempted to take money and a car radio that he had in his hand. He was able to run and get in his van, which was parked across the street. He closed that van door and locked it. Armando Serrano ran up to the van, shot through the window hitting Rodrigo Vargas five times and killing Rodrigo Vargas."

You provided that testimony before the Grand Jury on July 1st of 1993, correct?

A. On advice of counsel, I assert my Fifth Amendment right.

Q. And that testimony was knowingly false testimony, wasn't it, Mr. Halvorsen?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. That testimony came from evidence that you, Detective Guevara, Assistant State's Attorneys Dillon and Coghlan fabricated and fed to your witnesses, Frankie Vicente and Timothy Rankins, right?

203

A. On advice --

MS. CERCONE: Object to form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And, in fact, you knew that Mr. Serrano was nowhere near 1838 North Springfield on the morning of February 5th, 1993, right?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. You also knew that neither Mr. Montanez or Mr. Pacheco were with Mr. Serrano at 1838 North Springfield on the morning of February 5th of 1993; isn't that correct?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And you knew that neither Mr. Vicente nor Mr. Rankins had any personal knowledge about Mr. Montanez, Pacheco, or Serrano being at the crime scene located at 1838 North Springfield on the morning of February 5th of 1993, correct?

204

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And you gave this false testimony before the Grand Jury for the purpose of securing an indictment against Mr. Serrano, correct?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And securing an indictment against Mr. Serrano was just one of the steps that you took in order to frame him for the murder of Rodrigo Vargas and cause his wrongful conviction, correct?

MR. GIVEN: Objection; form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And you were asked at the end of your examination on Page 5, Question: "Did you learn the facts to which you testified today through police records, interviews of witnesses, and statements?" And you said, "That is correct."

Isn't that right, Mr. Halvorsen?

205

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. But isn't it true that the facts that you testified to that you learned through police records were police reports you fabricated?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And the fact that you testified too that you learned through the interviews of witnesses were actually statements by witnesses who you had coerced into regurgitating false stories that you gave and provided to them?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. In addition to providing false testimony before the Grand Jury, you provided false testimony at the trial of Mr. Pacheco, Mr. Montanez, and Mr. Serrano?

A. On advice of counsel, I assert my Fifth Amendment rights.

MS. BONJEAN: I ask that we mark that as Halvorsen 2.

206

(Halvorsen Deposition Exhibit No. 2 was marked for identification.)

BY MS. BONJEAN:

Q. Mr. Halvorsen, I'm going to hand you what's been marked as Halvorsen 2 and bears a caption of "People of the State of Illinois versus Jose Montanez." I will represent that it bears Bates stamps JRL04985 through JRL05100, 5100, okay.

Mr. Halvorsen, did you provide testimony at the trial -- bench trial of Mr. Serrano, Mr. Montanez, and Mr. Pacheco?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. Isn't it true prior to giving testimony at their bench trials, you sat down with Assistant State's Attorney Coghlan to discuss your testimony?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And you, along with Assistant State's Attorney Coghlan discussed how you would testify falsely about the circumstances under which Franco -- Frankie Vicente and

207

Mr. Rankins made statements implicating Pacheco, Montanez, and Serrano in the murder of Vargas?

MS. CERCONE: Object to form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. Now, I'm going to have you look at page -- I'll use the page numbers that are at the very bottom of the page and the center of the page. We'll start with Page 80.

Assistant State's Attorney Defendant Coghlan asked you about the meeting that you had on June 2nd of 1993 at the Cook County State's Attorney gang prosecution unit on the 13th floor, and you admitted, sir, that you were present for that meeting, correct?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And, sir, Mr. Coghlan asked you who else was present besides yourself and Mr. Vicente, and you answered, "Just the two of us"; isn't that right?

208

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And that testimony was knowingly false testimony, wasn't it, sir?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. In fact, it wasn't just you and Vicente who was present for this meeting. It was also Detective Guevara and Assistant State's Attorneys Coghlan and Dillon, correct?

MS. CERCONE: Object to form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. Assistant State's Attorney Coghlan told you that you needed to lie about who was present for this meeting because it would reflect poorly on him and Assistant State's Attorney Dillon if it was known to the judge that they were present for a meeting with Vicente prior to Mr. Serrano or Mr. Montanez or Mr. Pacheco's arrest?

MS. CERCONE: Object to form.

Transcript of Ernest Halvorsen
Conducted on April 20, 2018

MR. GIVEN: Foundation, competence, and speculation.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. Assistant State's Attorney Coghlan told you, "Hey, you can't say I was there at this meeting. You understand that Ernie, right?"

MR. GIVEN: Object to form.

BY MS. BONJEAN:

Q. Or something to that effect?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And you agreed to lie in front of the judge when you stated that it was just you and Frankie Vicente in the gang crimes unit of the prosecutors's office, correct?

MS. CERCONE: Object to form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And, in fact, you falsely testified that you had alone brought Mr. Vicente up to the gang prosecution office to talk to him about the case, right?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And you falsely stated that you brought him up because he was involved in another one of your investigations, right?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And while it was true that he had been coerced into implicating Robert Buto in the murder of Ruvalcaba, he was not involved in any legitimate investigation of yours, correct?

MR. GIVEN: Form and foundation.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And, sir, you testified that Frankie Vicente indicated to you that he had information regarding the Vargas murder during this meeting that took place on June 2nd, 1993 in the prosecutor's office, correct?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And, again, sir, that was false testimony because Mr. Vicente never told you he had information regarding the Vargas murder, right?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. In fact, it was you, Detective Guevara, and Assistant State's Attorneys Dillon and Coghlan who told Vicente that you wanted him to implicate Montanez, Serrano, and Pacheco in the Vargas murder, right?

MS. CERCONE: Object to form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. Now, you told -- You testified -- You testified before Judge Bolan that you had heard of rumors on the street that a guy by the name of Pistol Pete was involved in the murder of Rodrigo Vargas, right?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And isn't it true that Assistant State's Attorney Coghlan told you to testify to that knowing full well that it would be objectionable evidence?

MS. CERCONE: Object to form, foundation.

MR. GIVEN: Competence and speculation, calls for a legal conclusion.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. Well, by 1993, sir, you were a pretty seasoned detective, and you knew something called -- you knew something about the rule of hearsay, right?

MR. GIVEN: Form, foundation.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And you knew, generally speaking, that you couldn't get in front of a jury or any trier of fact and say, "Oh, I heard rumors on the street that someone did it," correct?

213

MR. GIVEN: Form, foundation, competence, speculation, incomplete hypothetical.

You can answer.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And, certainly, the former Cook County State's Attorney, Matthew Coghlan, now the esteemed Judge Coghlan told you, "I'm not going to be able to ask you about rumors you heard on the street legitimately. So I need you to just blurt it out so the judge can hear it," right?

MR. GIVEN: So --

MS. CERCONE: Objection to form, foundation, harassing.

MR. GIVEN: Objection. I adopt what she says.

MS. BONJEAN: Okay.

MR. GIVEN: You've been doing a great job so far.

MS. BONJEAN: Jeff?

MR. GIVEN: Go ahead.

214

MS. BONJEAN: It makes my day when you compliment me. I really -- I really don't know what I would do without your affirmations. Thank you.

MR. GIVEN: You're welcome. I would think of it more as a backhanded compliment myself, but...

MS. BONJEAN: Yes, and your backhanded compliments mean the world to me. What would I do?

THE WITNESS: I don't really care.

MS. BONJEAN: Anyway.

MR. GIVEN: Is there a question to be answered here.

MS. BONJEAN: There will be.

Are you going to answer it?

MR. GIVEN: He's waiting for a question. He's answered every question you've asked, so let's just continue.

BY MS. BONJEAN:

Q. Now, after Assistant State's Attorney Coghlan told you that he wanted you to blurt out in testimony that you had heard rumors on the street that a guy named Pistol

215

Pete was involved in the crime, you agreed to do that, right?

MS. CERCONE: Object to form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And Assistant State's Attorney Coghlan questioned you or asked you, "So did you ask Francisco Vicente regarding Pistol Pete?" And you answered that you did do that, correct?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And isn't it true that you testified that you did that because you knew Francisco Vicente when he was arrested, and he was arrested with a second offender who had a nickname of Pistol Pete, and "I was curious whether or not Francisco might be able to assist me in the investigation of the murder of Rodrigo Vargas," right?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And that testimony, sir, was

216

knowingly false testimony, correct?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And that was knowingly false testimony that you prepped the Assistant State's Attorney Matthew Coghlan prior to you taking the stand, wasn't it?

MS. CERCONE: Object to form, foundation.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And, in fact, isn't it true that you never asked Vicente whether he would be able to assist you in the investigation of Vargas? Rather, you told Vicente what you wanted him to say regarding the Vargas murder, right?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. You testified, sir, on Page 83 that Francisco Vicente gave you a lengthy

217

statement about what he knew about the murder of Rodrigo Vargas, and that he had supplied you with the three nicknames Pistol Pete, Mondo, and Jordan, and that you checked the nicknames in your file and saw that Pistol Pete was Jose Montanez and Armando Serrano was Mondo and that Jordan was George or Jorge Pacheco, and that you had dealt with those persons in past investigations, correct?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And, in fact, sir, that testimony was false testimony, correct?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And that was false testimony that you practiced with Assistant State's Attorney Matt Coghlan before you took the stand and testified under oath, correct?

MS. CERCONE: Object to form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And, in fact, isn't it true that

218

Francisco Vicente never gave you any type of statement about the murder of Rodrigo Vargas? Rather, you gave him a statement to repeat about the murder of Rodrigo Vargas, right?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. Mr. Vicente didn't give you the names Pistol Pete, Mondo, and Jordan. Rather. You, Detective Guevara, Assistant State's Attorneys Dillon and Coghlan provided those names to Francisco Vicente and coerced him into repeating or regurgitating those names in the form of a false statement that was later used against the plaintiffs in this case, correct?

MS. CERCONE: Object to form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. You testified that after you got those names -- strike that.

You falsely testified before you

219

received these names of Pistol Pete, Mondo, and Jordan, that you hooked up with Jose Montanez, Armando Serrano, and Jorge Pacheco, that you went and you obtained three black-and-white Chicago Police Department photos of them, right?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And, in fact, you testified that you apparently left 26th Street and went over back to Area 5, and you brought -- got those photos, and then you brought them back to the building so you could show them to Frankie Vicente, correct?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. Mr. Halvorsen, that was knowingly false testimony; isn't that correct?

A. On advice of counsel, I assert my Fifth Amendment rights.

220

Q. You never went back to Grand and Central to obtain these three photographs because you already you had them with you when you interviewed Mr. Vicente at the gang crimes unit on June 2nd of 1995 -- 1993, correct?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. In fact, you showed Mr. Vicente the photographs of Serrano, Montanez, and Pacheco almost from the start of your interview on June 2nd of 1993 at the gang crimes unit, right?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. Further, sir, you testified that Mr. Vicente identified the photographs of Serrano, Montanez, and Pacheco as individuals that he recognized, correct?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And you testified that you went to work at 3 o'clock that day and then you informed your partner, Detective Guevara, of

221

the statement that you had gotten from Frankie Vicente, correct?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And that was false testimony -- also false testimony that was prepared and practiced with Assistant State's Attorney Matt Coghlan prior to you taking the stand and testifying, correct?

MS. CERCONE: Object to form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. In fact, Detective Guevara was present at the gang crimes unit on June 2nd of 1993; isn't that right?

A. On advice of counsel --

MR. GIVEN: Objection; form. Go ahead.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. You testified that Detective Guevara then immediately got on the telephone and called the wife of Mr. Vargas, Wilda

222

Vargas, and questioned her on the telephone, and that after you questioned -- he questioned Ms. Vargas on the phone, that you and Detective Guevara then drove to Ms. Vargas's home with these three black-and-white photographs, along with a filler photograph to show Ms. Vargas a photo array, correct?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And, sir, that also was false testimony that you provided to the judge in this case, Judge Bolan (phonetic), with the preparation and practicing -- with preparation by Assistant State's Attorney Matt Coghlan prior to taking the stand, right?

MS. CERCONE: Objection to form.

THE WITNESS: On advice -- On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And, in fact, you never brought a photo array to Ms. Vargas to view, correct?

A. On advice of counsel, I assert my

223

Fifth Amendment rights.

Q. Rather, you provided three photographs to Ms. Vargas and told her that those were the individuals responsible for her husband's murder, and that they were the individuals who had been at the gas station the night before his murder, correct?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. You provided that information, that false information, to Ms. Vargas because you wanted to manipulate her into believing that she had seen those -- the offenders of her husband's murder at the gas station prior to his murder on February 5th of 1993?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. You testified that that same day you drove to the gas station at Central Park and North Avenue with Ms. Vargas, and

224

Ms. Vargas explained in Spanish to Detective Guevara the events that had taken place at the gas station the day before her husband's murder.

Do you remember testifying to that?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. That testimony was false as well, testimony that was prepared with the assistance of the Assistant State's Attorney Matt Coghlan prior to you taking the stand, correct?

MS. CERCONE: Object to form.

MR. GIVEN: Compound.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. In fact, you, Detective Guevara, and Assistant State's Attorneys Coghlan and Dillon had determined that it was important that you testify in a manner that would lead the trier of fact to believe that Wilda Vargas provided the gas station information after Mr. Vicente had provided that

information, correct?

MS. CERCONE: Objection; form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. It was important, according to yourself, Detective Guevara, and the Assistant State's Attorneys that the trier of fact be misled into believing that Ms. Vargas provided this information after Vicente because otherwise -- strike that.

It was important to you, Detective Guevara, Assistant State's Attorneys Coghlan and Dillon that the trier of fact be misled into believing that Vargas provided this information after Vicente so as to leave the trier of fact with the impression that Vicente was aware of independent information that nobody would have known but someone -- but Ms. Vargas or Mr. Vargas?

MS. CERCONE: Object to form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And that Mr. Vicente could have only gotten that information from the offenders at the gas station, right?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. But in reality, you and Detective Guevara had learned from Ms. Vargas very early on in the investigation that she had been at the gas station prior to her husband's murder, and you used that information with Vicente, again, to give the false impression that there was some veracity to his statement, right?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. Now, you also testified that on June 6th, 1993, you and Detective Guevara drove over to the 3900 block of West Dickens and saw a beige-colored 1984 Buick Regal four-door that had damage to the left front fender, and there was a bullet hole in the

trunk, correct?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. You testified that you went and got Wilda Vargas, and you and Detective Guevara went and got Wilda Vargas and that Guevara instructed Ms. Vargas in Spanish that you are going to drive down some streets, and if she saw the car that she saw at the gas station that day before her husband was killed, that she was to point it out; is that correct?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And you also testified that you drove down a number of streets eventually driving down the 3900 block of Dickens, and she spontaneously pointed to a car that you had previously determined belonged to Jose Montanez, correct?

MR. GIVEN: Objection; misstates the document that you're purporting to read from.

Go ahead.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. Well, you testified that you drove down a number of streets, eventually driving down the 3900 block of Dickens, "And I saw her" -- that being Wilda Vargas -- "indicate to Detective Guevara that she was pointing to the car that we had previously looked at."

You gave that testimony, right?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. But that, too, was false testimony; isn't that correct?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. That was false testimony that you prepared with Assistant State's Attorney Matt Coghlan prior to taking the bench, correct? Prior to taking the stand, correct?

MS. CERCONE: Object to form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And, in fact, you never took Wilda Vargas along different blocks and have her

229

identify or try to identify the car from the gas station, correct?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. Rather, you took Wilda Vargas exactly to Jose Montanez's car, you told her it was the car of the offenders, and that forensic evidence connected the car to the crime scene; isn't that right?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. You falsely told Ms. Vargas this information in an attempt to manipulate her testimony and persuade her, coerce her, or trick her into identifying the car as the car that she saw at the gas station on February 4th of 1993, right?

MR. GIVEN: Objection; form, asked and answered.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And you, Detective Guevara, and Assistant State's Attorney Matthew Coghlan

230

and Assistant State's Attorney Dillon, along with your supervisor, Sergeant Mingy, were fully aware that you had taken Ms. Vargas directly to Ms. Montanez's car and suggested and manipulated her into believing that that was the car that he saw at the gas station on February 4th, 1993, correct?

MR. GIVEN: Object to form.

THE WITNESS: On advice of --

MR. GIVEN: Foundation. Go ahead.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. Now, you testified that on June 11th of 1993 you received a call from Sergeant Mingy in which he reported to you that he had Timothy Rankins in custody and that he was an eyewitness to the murder of Mr. Vargas; isn't that right?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. Now, prior to you taking the stand and giving testimony in this criminal prosecution, you discussed with Assistant

231

State's Attorney Matt Coghlan that Timothy Rankins was not going to be an available witness at this -- at the trial, correct?

MS. CERCONE: Object to form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. In fact, you knew that Mr. Rankins was MIA or sort of missing in action at the time of the criminal prosecution of Serrano, Pacheco, and Montanez, correct?

MR. GIVEN: Objection; form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And as a result, you knew, along with Detective Guevara and the Assistant State's Attorney that Rankins wasn't going to come in and testify falsely that he had seen Serrano, Montanez, and Pacheco murder Rodrigo Vargas, correct?

MS. CERCONE: Object to form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

232

BY MS. BONJEAN:

Q. But that didn't stop Assistant State's Attorney Matthew Coghlan from wanting to get that evidence in before the trier of fact, correct?

MS. CERCONE: Object to form, foundation.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. In fact, prior to you taking the stand, Assistant State's Attorney Matt Coghlan practiced with you how you could testify about the statement that Rankins made to you in order to get that information in front of the judge, even though it was inadmissible?

MS. CERCONE: Object to form.

MR. GIVEN: And foundation, competence, and speculation.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. You testified that you went along

Transcript of Ernest Halvorsen

Conducted on April 20, 2018

your partner, Detective Guevara, to Area 5 located at 5555 West Grand Avenue at approximately 2 o'clock in the afternoon to interview Timothy Rankins.

This would have been, I believe, on June 11th, 1993, correct?

A. **On advice of counsel, I assert my Fifth Amendment rights.**

Q. You testified that you and Detective Guevara placed Rankins in a car and drove to the corner of North Avenue and Springfield and -- isn't that right?

A. **On advice of counsel, I assert my Fifth Amendment rights.**

Q. And then Assistant State's Attorney Matt Coghlan asked you the question, "And what happened next?" And you answered, "I told Timothy Rankins I wanted to believe what he was telling me, but he was going to have to prove to me" -- before you were interrupted by an objection.

Do you remember giving that testimony?

A. **On advice of counsel, I assert my Fifth Amendment rights.**

Q. And that was an answer that you had to practice with Assistant State's Attorney Matt Coghlan in order to try to get this inadmissible, incompetent evidence before the trier of fact, right?

MS. CERCONE: Object to form, foundation.

MR. GIVEN: Competence, speculation.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And Judge Bolan, who apparently didn't know the rules of evidence any better than Assistant State's Attorney Matt Coghlan, allowed you to testify about statements that were made to you by Mr. Rankins, right?

MS. CERCONE: Object to form.

MR. GIVEN: Object to form.

MS. CERCONE: Move to strike.

MR. GIVEN: Yes. That's a fairly outrageous comment, but par for the course.

Go ahead.

MS. BONJEAN: Why? Are you protecting

Judge Bolan, or are you protecting your client?

MR. GIVEN: I'm not protecting anybody. I'm making objections. If you want to make obnoxious comments like that, go right ahead.

MS. BONJEAN: What's obnoxious is the transcript, what happened here. That's obnoxious, 23 years go by with someone wrongfully convicted.

MR. GIVEN: You know, we're not here to hear your speeches.

MS. BONJEAN: You're the one speaking, Mr. Given. What don't you zip it? Zip it.

MR. GIVEN: Why don't you ask a question --

MS. BONJEAN: Why don't you zip it, and then I'll ask a question.

MR. GIVEN: That's why we're here.

MS. BONJEAN: Zip it, and I'll ask a question.

MR. GIVEN: I don't even know what you mean by "zip it." What a ridiculous statement. Why don't you be professional?

MS. BONJEAN: Why don't you be professional?

MR. GIVEN: And ask your question.

MS. BONJEAN: Why don't you be professional?

MR. GIVEN: I am.

MS. BONJEAN: It doesn't sound like it. I will move along if you close your mouth.

MR. GIVEN: Close your mouth? You want to put that on the video so we can all see your act?

MS. BONJEAN: Are you finished?

MR. GIVEN: I am. Are you? Are you going to ask a question?

MS. BONJEAN: I'm waiting for you to be quiet.

MR. GIVEN: Go right ahead.

BY MS. BONJEAN:

Q. Okay. Now, you answered that question after some back and forth, that you were at the corner of North Avenue and Springfield, and you told Timothy Rankins, "I wanted to believe the information he was providing me, but he's going to have to demonstrate to me that he actually had

Transcript of Ernest Halvorsen
Conducted on April 20, 2018

evidence of this. I told him that I was going to drive north on Springfield, and he was going to have to show me that he knew exactly where this crime took place."

After a question, "What happened next?" You answered, "I then started driving slowly on Springfield from North Avenue. As he drove past 1838 North Springfield, Rankins pointed to a house and a fence. I recognized this house and fence as being the home of the victim, Rodrigo Vargas."

You testified, "We returned him, T. Rankins, to my office at Area 5 Violent Crimes, and we went out looking for the first defendant, Armando Serrano."

Do you remember giving that testimony?

A. **On advice of counsel, I assert my Fifth Amendment rights.**

Q. And that testimony, sir, was false in its entirety, wasn't it?

A. **On advice of counsel, I assert my Fifth Amendment rights.**

Q. And, in fact, that testimony that you provided was testimony that you practiced with Assistant State's Attorney Matthew Coghlan prior to taking the stand; is that correct?

MS. CERCONE: Objection; form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And, in fact, Mr. Rankins never pointed out to you where the murder of Rodrigo Vargas took place, correct?

A. **On advice of counsel, I assert my Fifth Amendment rights.**

Q. Instead, you told Mr. Rankins where the murder of Rodrigo Vargas took place, correct?

A. **On advice of counsel, I assert my Fifth Amendment rights.**

Q. And, in fact, you fed the entire statement to Timothy Rankins that you later then claimed was the basis for believing that Montanez, Serrano, and Pacheco were responsible for the murder of Rodrigo Vargas, correct?

MR. GIVEN: Objection; form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And you gave this false testimony at the trial of Mr. Montanez, Mr. Pacheco, and Mr. Serrano in part because you wanted to secure a wrongful conviction against Mr. Montanez, Serrano, and Pacheco, correct?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. In fact, if the trier of fact, Judge Bolan, believed that there was a witness out there who had identified Mr. Serrano, Mr. Montanez, and Mr. Pacheco as the offender -- offenders of Rodrigo Vargas, it would assist the State in meeting its burden -- burden of proof, correct?

MR. GIVEN: Objection; form, foundation, competence, speculation.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And, in fact, you, Detective Guevara, and Assistant State's Attorney Coghlan and Dillon knew that the case that you had against Serrano, Montanez, and Pacheco was a very shaky case, correct?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. In fact, the case against Mr. Serrano, Pacheco, and Montanez hinged entirely on Francisco Vicente's testimony regarding what he heard them admit to, right?

MR. GIVEN: Form, foundation.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And you no longer had an eyewitness to this crime, correct?

MR. GIVEN: Objection; form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

Transcript of Ernest Halvorsen
Conducted on April 20, 2018

61 (241 to 244)

241

BY MS. BONJEAN:

Q. So with the assistance and preparation of Assistant State's Attorney Matthew Coghlan, you testified before the trier of fact to testimony that Rankins had implicated Serrano in this case, correct?

MS. CERCONE: Objection; form, foundation.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. You testified further, sir, if you want to look at Page 95, that you put together a lineup on June 11th of 1993 that you had viewed by Timothy Rankins and Wilda Vargas, correct?

A. On advice of counsel, I assert my Fifth Amendment rights.

MR. GIVEN: Objection; form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. Isn't it true, sir, that Mr. Rankins never looked at a live lineup

242

that contained the plaintiffs in this matter, correct?

A. On advice of counsel --

MR. GIVEN: Form. Go ahead.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And Wilda Vargas, when she viewed the lineup, indicated to you and Detective Guevara that she did not have a recollection of who the individuals were at the gas station, correct?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And you testified that she viewed the lineup and made identification of -- an identification of Armando Serrano as one of the people at the gas station, right?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And that was false testimony, correct?

A. On advice of counsel, I assert my Fifth Amendment rights.

243

Q. And on July 9th of 1993 -- strike that.

You testified about the lineup that was conducted on July 9th of 1993, and that would be at Page 97, correct?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. You also had Wilda Vargas view that lineup that contained Jose Montanez, correct?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And, again, Wilda Vargas told you that she could not identify any of the individuals who were at the gas station because she had not gotten a good look at them, correct?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And notwithstanding the fact that she had told you that, you instructed or directed her to pick out Jose Montanez as one of the individuals who was at the gas station, correct?

A. On advice of counsel, I assert my

244

Fifth Amendment rights.

Q. And when you testified that she identified Jose Montanez from that lineup, that was false testimony, right?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And that was false testimony that you practiced with Assistant State's Attorney Matthew Coghlan prior to taking the stand, correct?

MS. CERCONE: Object to form, foundation.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And the false testimony that you provided at the trial of Mr. Serrano and Mr. Montanez and Mr. Pacheco was used to secure wrongful convictions against the plaintiffs, correct?

MR. GIVEN: Objection; form, foundation, competence, speculation.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

Transcript of Ernest Halvorsen
Conducted on April 20, 2018

245

BY MS. BONJEAN:

Q. After you testified falsely at the trial of Mr. Serrano and Mr. Montanez and Mr. Pacheco, Mr. Serrano and Mr. Montanez were convicted of the murder of Rodrigo Vargas, correct?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And you never told the judge that your testimony was a bald-faced lie, did you?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And you never told anyone, even after the wrongful conviction of Mr. Montanez and Mr. Serrano that the testimony you provided at their trial was false, did you?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. Do you have any regret for testifying falsely against Mr. Montanez, Mr. Serrano, and Mr. Pacheco and causing their 23-year wrongful convictions?

246

MR. GIVEN: Objection; form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. I'm going to have you look at what's previously marked as Guevara 7.

Mr. Halvorsen, handing you what's been marked as Guevara 7, which is an affidavit of Francisco Vicente. It was executed on May 26th of 2004.

Have you ever seen this affidavit before, sir?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. I want to draw your attention to provision 4 or No. 4 of this affidavit, in which Francisco Vicente affirms that his testimony was false in all respect. While attributing his acquaintance with each of the of defendants, he did not see any of them on February 5th, 1993. At no point then or thereafter did Serrano, Pacheco, or Montanez speak to him -- speak to Vicente about the murder or any knowledge they may have had

247

concerning the death of Rodrigo Vargas.

Do you see that, sir?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And, in fact, Francisco Vicente's statement that he made on May 26th, 2004 is in fact, truthful testimony; isn't that right? Or a truthful statement?

MR. GIVEN: Objection; form and foundation.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And he went on to say that his false testimony was given as a result of threats, intimidation, and physical abuse by Detective Reynaldo Guevara, and this began during the time period that he was incarcerated at Cook County jail following his arrest for armed robbery. Do you see that?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And, sir, you were aware and knew

248

that Mr. Vicente had suffered intimidation and physical abuse by Detective Reynaldo Guevara, correct?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. I'd like you to actually take a look at this affidavit. If you can, just take the opportunity to read it at your convenience and identify for me any statement in this affidavit that you know to be false by Francisco Vicente.

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. Isn't it true, Mr. Halvorsen, at some point prior to Mr. Vicente's own sentencing hearing that in his armed robbery cases, that he realized that he was not actually going to get that six-year minimum deal that he had been promised by you and Detective Guevara?

MR. GIVEN: Form, foundation, competence, speculation.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

Transcript of Ernest Halvorsen
Conducted on April 20, 2018

63 (249 to 252)

249

BY MS. BONJEAN:

Q. At some point Francisco Vicente learned that he was not eligible for the minimum a of six -- a six-year sentence because one of his rob -- well, three of his armed robberies were committed while he was on bond for another robbery, correct?

MR. GIVEN: Same objection.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And he was angry at you and Detective Guevara and the Assistant State's Attorney because a six-year sentence was an illegal sentence? He wasn't going to be able to get it, and that the mandatory minimum sentence was actually nine years, right?

MR. GIVEN: Same objections.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And isn't it true that he was angry that he was now going to have to do a nine-year sentence, and he told you as much,

250

correct?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. And he felt that he had been double crossed by you and Detective Guevara and the Assistant State's Attorneys when he learned that the mandatory minimum sentence that he would have to serve for his four robbery cases was actually nine years and not six years, correct?

MR. GIVEN: Same objections.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And isn't it true that you, Detective Guevara and Assistant State's Attorneys Dillon and Coghlan decided that you would try to make it up to him by getting him pretrial custody time to which he wasn't entitled?

MS. CERCONE: Objection; form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

251

BY MS. BONJEAN:

Q. In fact, you knew that at Frankie Vicente's sentencing hearing on September 23rd, 1996 Assistant State's Attorney Dillon stood up before Judge Surrea (phonetic) on that sentencing proceeding or at that sentencing proceeding, correct?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. And, in fact, Assistant State's Attorney John Dillon drafted the sentencing order that was presented to Judge Surrea to be signed that reflected the pretrial custody time to which Mr. Vicente was entitled, correct?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And between May 14th, 1993, the date of Mr. Vicente's arrest, and the date of his sentencing hearing on September 23rd, 1996, he was actually entitled to 1,132 days of pretrial custody; isn't that correct?

252

MR. GIVEN: Objection; form, foundation, competence, speculation.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And notwithstanding the fact that he was only entitled to 1,132 days of pretrial custody credit, Assistant State's Attorney John Dillon wrote in the proposed sentencing order that he had spent 1,476 days in custody pretrial, correct?

MR. GIVEN: Form, foundation.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And taking into account day-for-day credit, Assistant State's Attorney John Dillon essentially gave Mr. Vicente an extra two years of good time, correct?

MR. GIVEN: Form, foundation, speculation, competence.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

253

BY MS. BONJEAN:

Q. And Assistant State's Attorney Dillon gave Mr. Vicente over 300 days of additional pretrial custody time in order to make up for the fact that they had forgotten that he couldn't get a six-year sentence but was going to have to take a nine-year sentence because of the bond-on-bond crime that he had committed?

MR. GIVEN: Same objection.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And, in fact, Mr. Vicente served about three-and-a-half years of real time on that nine-year sentence; isn't that correct?

MR. GIVEN: Same objections.

THE WITNESS: On advice.

MR. GIVEN: Hold on.

Form and foundation. Yeah, same objections. Competence and foundation and speculation as well.

Go ahead.

THE WITNESS: On advice of counsel, I

254

assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And isn't it true, Mr. Halvorsen, that Mr. Vicente was back on the streets approximately a month after he pled guilty on September 23rd of 1996?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. And that within a few months, you actually arrested him again for an armed robbery for which he ended up doing 20 years in prison?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. Mr. Halvorsen, you framed Mr. Montanez, Serrano, and Pacheco pursuant to an official policy or practice whereby the Chicago Police Department put dozens of innocent individuals in prison for crimes they did not commit, correct?

MS. CERCONE: Objection; form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

255

BY MS. BONJEAN:

Q. You framed Montanez, Serrano and Pacheco pursuant to an official policy or practice whereby members of Chicago Police Department manipulated and coerced eyewitness -- eyewitnesses to obtain false photo and in-person identifications; isn't that right?

MS. CERCONE: Objection; form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. You framed Montanez, Serrano, and Pacheco pursuant to an official policy or practice whereby members of the Chicago Police Department manipulated and coerced witness testimony, correct?

MS. CERCONE: Objection; form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. You framed Mr. Montanez, Serrano, and Pacheco pursuant to an official policy or practice whereby members of the Chicago

256

Police Department fabricated false evidence, including false police reports?

MS. CERCONE: Objection; form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And you framed Mr. Montanez, Serrano, and Pacheco pursuant to an official policy or practice whereby members of the Chicago Police Department fabricated false evidence, including false police reports?

MS. CERCONE: Objection; form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. You framed Mr. Montanez, Mr. Serrano, and Mr. Pacheco pursuant to an official policy or practice whereby members of the Chicago Police Department kept clandestine files that contained exculpatory evidence that would never be shared with the criminal defendants or State prosecutors; isn't that right?

MS. CERCONE: Objection; form.

Transcript of Ernest Halvorsen
Conducted on April 20, 2018

257

MR. GIVEN: Foundation, competence.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. You framed Mr. Montanez, Mr. Serrano, and Mr. Pacheco pursuant to an official policy or practice whereby members of the Chicago Police Department destroyed evidence suggesting that suspects and criminal defendants were, in fact, not guilty, correct?

MS. CERCONE: Objection; form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. You framed Mr. Montanez, Serrano, and Pacheco pursuant to an official policy or practice whereby members of the Chicago Police Department concealed material exculpatory evidence from suspects, criminal defendants, their lawyers, and State prosecutors, including materials that could be used to impeach State witnesses; isn't that right?

258

MS. CERCONE: Objection; form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. You framed Mr. Montanez, Mr. Serrano, and Pacheco pursuant to an official policy or practice whereby members of the Chicago Police Department lied in criminal trials about investigations they had been involved in?

MS. CERCONE: Objection; form.

BY MS. BONJEAN:

Q. Correct?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. And you framed Mr. Montanez, Mr. Serrano, and Mr. Pacheco pursuant to an official policy or practice whereby members of the Chicago Police Department lied and covered up misconduct committed by their colleagues pursuant to a code of silence, correct?

MS. CERCONE: Objection; form.

THE WITNESS: On advice of counsel, I

259

assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. You framed Mr. Montanez, Mr. Serrano, and Mr. Pacheco pursuant to an official policy or practice whereby members of the Chicago Police Department were never disciplined for this type of misconduct creating an environment of lawlessness; isn't that right?

MS. CERCONE: Objection; form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. You used unconstitutionally coercive tactics, including excessive force, you manipulated eyewitnesses and eyewitness identifications, and you framed innocent individuals for crimes they did not commit more than three dozen times during the course of your employment with the Chicago Police Department; isn't that right?

MR. GIVEN: Form; foundation.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

260

BY MS. BONJEAN:

Q. Sir, you engaged in this misconduct repeatedly because you knew you would never be disciplined for this misconduct, correct?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. In fact, you were never disciplined for framing people for crimes they did not commit, correct?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. And, instead, you received a merit promotion to detective; isn't that right?

MS. CERCONE: Objection.

MR. GIVEN: Form.

MS. BARBER: Join.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. Mr. Halvorsen, you understand that you alone and not your lawyers control your Fifth Amendment rights, don't you?

Transcript of Ernest Halvorsen
Conducted on April 20, 2018

261

MR. GIVEN: Object to form. You can answer.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. Sir, why have you asserted your Fifth Amendment right not to incriminate yourself in this deposition?

MR. GIVEN: Objection; calls for attorney client priv- -- Calls for matters that are covered by the attorney-client privilege, and I would instruct him not to answer that question to the extent that it covers attorney-client privilege.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. Do you intend to assert the Fifth to all questions asked at this deposition?

MR. GIVEN: Objection; form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. Has it been and is it your

262

intention to assert the Fifth Amendment to all questions asked to you about the Vargas murder investigation?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. Has it been and is it your intention to assert the Fifth Amendment to all questions asked to you about any murder investigation in which you participated?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. Has it been and is it your intention to assert the Fifth Amendment to all questions asked about you regarding any witness that you have interviewed, interacted with, or any suspect whom you've interrogated through the course of your career?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

263

BY MS. BONJEAN:

Q. Do you intend to assert the Fifth Amendment to all questions asked about your employment with the Chicago Police Department?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. Are there any subjects that you can identify as you sit here today on which you are willing to give binding testimony?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. Has it been your intention and is it your intention to assert your Fifth Amendment rights to any and all questions?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. Mr. Halvorsen, in order to assert

264

your Fifth Amendment right not incriminate yourself, sir, you do understand that you might -- you must have a reasonable fear of future prosecution based on that testimony that you might otherwise give today, correct?

MR. GIVEN: Form, and I object to you giving legal advice to my client.

You can answer.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. Mr. Halvorsen, what crime do you fear that you might be prosecuted for in connection with your testimony here today?

MR. GIVEN: Objection; form. And to the extent that an answer would implicate attorney-client privilege, I would instruct him not to answer.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. Do you fear prosecution by state authorities or federal authorities?

MR. GIVEN: Same objections.

Transcript of Ernest Halvorsen
Conducted on April 20, 2018

265

You can answer.

THE WITNESS: On advice of counsel, I assert -- I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. Do you fear prosecution for perjury?

MR. GIVEN: Same objections.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. Do you fear prosecution for lies you have told in the past under oath or for lies you intend to tell in this case under oath?

MR. GIVEN: Same objections.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. Do you fear prosecution for lying under oath?

MR. GIVEN: Same objections.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

266

BY MS. BONJEAN:

Q. Do you fear prosecution for obstruction of justice?

MR. GIVEN: Same objections.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. Do you fear prosecution for any RICO violations?

MR. GIVEN: Same objections.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. Do you fear prosecution for any Hobbs Act violations?

MR. GIVEN: Same objections.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. Do you fear prosecution for bribery?

MR. GIVEN: Same objections.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

267

BY MS. BONJEAN:

Q. Do you fear prosecution for fraud?

MR. GIVEN: Same objections.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. Do you fear prosecution for mail fraud?

MR. GIVEN: Same objections.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. Do you fear prosecution for assault or battery?

MR. GIVEN: Same objections.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. Do you fear prosecution for violation of federal civil rights criminal laws?

MR. GIVEN: Same objections.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

268

BY MS. BONJEAN:

Q. When in this litigation did you determine that you would assert your Fifth Amendment right not to incriminate yourself?

MR. GIVEN: Same objections.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. Why did you determine that you should assert your Fifth Amendment right not to incriminate yourself in this case?

MR. GIVEN: Same objections.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And isn't it true that it is because you committed the constitutional violations that Montanez and Serrano allege in their complaints?

MR. GIVEN: I'm sorry. Could you read that?

BY MS. BONJEAN:

Q. Isn't it true that you are asserting your Fifth Amendment right not to

incriminate yourself here today because you did, in fact, commit the constitutional violations that Montanez and Serrano allege in their complaints?

MR. GIVEN: Same objections.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. Are you asserting your Fifth Amendment rights in this case in order to deprive plaintiffs of discovery in this case?

MR. GIVEN: Same objections.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. Do you intend to assert your Fifth Amendment right not to incriminate yourself in this case if you are called upon to testify at trial?

MR. GIVEN: Same objections.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. Is it your decision to assert your Fifth Amendment right not to incriminate yourself your own choice -- Is it your decision -- Is your decision to assert your Fifth Amendment right not to incriminate yourself your own choice or an instruction given to you by your lawyer?

MR. GIVEN: Same objections.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. You do realize, sir, that if at some later point you wish to give testimony under oath at trial or at any other proceeding, that the plaintiffs will object if you do not give testimony here today?

MR. GIVEN: Are you done?

MS. BONJEAN: Yes.

MR. GIVEN: Same objections, plus speculation. I don't know how he can imagine knowing what plaintiffs intend to do, but same objections.

You can answer.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. Well, sir, you do realize that if at a later point you indicate that you wish to give testimony in a proceeding and seek to blame prior attorneys for having given you the advice to plead your Fifth Amendment right, the plaintiffs will, in fact, object and move to bar your testimony if you do not provide testimony here today regarding the advice you were provided by your counsel?

Do you understand that?

MR. GIVEN: Same objections.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. Did you rely on all -- Did you rely on the advice of your counsel in your decision to assert your Fifth Amendment rights?

MR. GIVEN: Same objections.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And, sir, I'm going to, again, instruct you that if you refuse to answer questions about the legal advice that you relied upon, we will move to bar you from later claiming that you relied upon advice of counsel as an explanation for your statements here today.

Do you understand that?

MR. GIVEN: Same objections.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. What lawyers did you speak to about asserting your Fifth Amendment right not to incriminate yourself?

MS. BONJEAN: You can answer.

THE WITNESS: Jeff Given and Dan Herbert.

BY MS. BONJEAN:

Q. Did you speak with Mr. Soto?

A. What's his first name?

Q. James.

A. I think I did.

Q. What about Ms. Golden?

A. I don't remember.

Transcript of Ernest Halvorsen
Conducted on April 20, 2018

69 (273 to 276)

273

Q. Mr. Grille (phonetic)?

A. I don't remember.

Q. Do you remember speaking to any other members of the Sotos law firm aside from Mr. Sotos and Mr. Given?

MR. GIVEN: About?

BY MS. BONJEAN:

Q. About the advice that you were -- Well, about asserting your Fifth Amendment right not to incriminate yourself?

A. No.

Q. Did you speak with any attorney outside of the Sotos law firm aside from Mr. Herbert about asserting your Fifth Amendment right not to incriminate yourself?

A. No.

Q. Did you speak with any attorney from the law firm of Rock & Fusco or Rock Fusco?

A. No.

Q. Did you speak with Ms. Eileen Rosen from Rock Fusco regarding your assertion of your Fifth Amendment right here today?

A. No.

274

MR. GIVEN: Don't look at me.

THE WITNESS: I don't know. Are these Fifth Amendment questions? I don't know.

MR. GIVEN: I will tell when it's a Fifth Amendment question again.

THE WITNESS: Okay.

BY MS. BONJEAN:

Q. Did you speak with any attorney from the Chicago law department?

A. No.

Q. Did you speak with any attorney from the Cook County State's Attorneys office?

A. No.

Q. Did you speak with any attorney associated with the Fraternal Order of Police?

MR. GIVEN: With regard to his Fifth Amendment?

MS. BONJEAN: With regard to anything.

THE WITNESS: I believe Dan Herbert is the FOP lawyer.

BY MS. BONJEAN:

Q. Okay. Aside from Dan Herbert, did

275

you speak with any other attorneys with the Fraternal Order of Police?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. What other attorneys have represented you in the past two years?

A. None.

MS. BONJEAN: Give me one second.

BY MS. BONJEAN:

Q. The lawyer that you identified regarding advice around the Fifth Amendment issue, what advice did those lawyers give to you that you assert as part of your advice of counsel defense?

MR. GIVEN: Same objections as before. That calls for attorney-client privilege. To the extent that your answer would implicate attorney-client privilege, I will instruct you not to answer. If it doesn't, you can answer otherwise.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. You are not asserting your advice

276

of counsel defense in this case, correct?

MR. GIVEN: Objection; form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. What advice did your lawyers give you that you assert as part of your advice of counsel defense?

MR. GIVEN: Same objections, assumes a fact not in evidence. You can answer.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. Did your attorneys give you advice about whether your conduct in connection with plaintiffs or the Vargas investigation violated the constitution?

MR. GIVEN: Same objections.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. Did they give you advice about whether your conduct in connection with plaintiffs or the Vargas investigation

277

violated state law?

MR. GIVEN: Same objections.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. Or did they simply just give you advice generally about asserting Fifth Amendment rights in this case?

MR. GIVEN: Same objections.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. Are you prepared to answer in any way, shape, or form why your attorneys told you that you should assert your rights -- your Fifth Amendment rights in this case?

MR. GIVEN: Same objections.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. Did any lawyer give you any advice at all relating to any of your interactions with Montanez, Serrano, and Pacheco prior to this lawsuit?

278

MR. GIVEN: Same objections.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. Did any lawyer give you any advice at all during the course of the Vargas investigation?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. When you testified at plaintiffs' criminal trial, did any lawyer there give you any advice about whether to testify?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And apart from Assistant State's Attorney Matt Coghlan, did any attorney give you advice at plaintiffs' criminal trial about how to testify?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. Have you received any other advice at any point in time from any attorney or legal authority about the investigation of the Vargas murder or Montanez, Serrano, and

279

Pacheco?

MR. GIVEN: Object to the extent that you're asking about attorney-client privilege. I would instruct him not to answer to the extent an answer would implicate that. Otherwise, you can answer.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. Isn't it true that you were contacted by the attorneys at Sidley & Austin in December of 2013, who sought to interview you about your investigation in the Serrano and Montanez case, along with other cases?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. You agreed to meet with the attorneys from Sidley & Austin, specifically, Daniel Greenfield and Fred Stewart; isn't that right?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And during that meeting, you continued to provide false statements to

280

Mr. Greenfield and Mr. Stewart to cover up your misconduct and that of your fellow officers; isn't that correct?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. In fact, you continued to lie about the investigation because you hoped to protect the wrongful convictions of Mr. Serrano and Mr. Montanez, right?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. You falsely told Mr. Greenfield and Mr. Stewart that Vicente admitted on May 14th, 1993 that he had been with the guy who did the Vargas murder, correct?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And you continued to provide false statements claiming that Vicente had told you that Mr. Serrano and Mr. Montanez had admitted to their involvement in the Vargas murder, correct?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I

281

assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. At no point did you tell the attorneys for Sidley & Austin that you had framed Mr. Serrano and Mr. Montanez, correct?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. In fact, you did not tell the attorneys from Sidley & Austin that you and Detective Guevara had helped fabricate statements from Francisco Vicente and Timothy Rankins that were later used to convict Serrano and Montanez for the murder of Rodrigo Vargas, did you?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

MS. BONJEAN: Give me a second.

MR. GIVEN: Do you got a whole new line --

MS. BONJEAN: Yeah.

MR. GIVEN: Why don't we take a break?

MS. BONJEAN: Okay.

THE VIDEOGRAPHER: Off the record, 2:57.

(A recess was taken.)

282

THE VIDEOGRAPHER: Back on the record, 3:08.

MS. MAZUR: As I introduced myself this morning, I am Elizabeth Mazur. I'm just going to go ahead and ask some questions today.

EXAMINATION

BY MS. MAZUR:

Q. First, did you frame Thomas Sierra for the May 23rd, 1995 murder of Noel Andahar in Logan Square?

MR. GIVEN: Objection; form and foundation. Also, I object to you asking questions -- using this deposition to ask questions about other cases. I don't think that's proper. And to the extent that -- I'm not going to instruct him not to answer; but to the extent you're using this deposition to ask questions about other cases, I may well object in those cases to further depositions of this witness in those.

I'll just keep that as a standing objection.

MS. MAZUR: Sure.

283

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. MAZUR:

Q. During the first day that you joined the Andahar investigation on May 24, 1995, you developed no evidence to suggest that Sierra was involved in the crime, correct?

MR. GIVEN: Same objection.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. MAZUR:

Q. Did you fabricate a story about having seen Sierra in a Buick Park Avenue three days before the Andahar murder in an effort to connect Sierra to the crime?

MR. GIVEN: I'm sorry. Maybe I -- I may have made this clear or I may have said it, but I just don't remember. Standing objections to all these questions.

MS. MAZUR: Sure.

MR. GIVEN: Apart from any specific objection that I may raise, but the one I made earlier will be standing.

284

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. MAZUR:

Q. You showed eyewitness Albert Rodriguez a live lineup containing Sierra on May 30th, 1995, correct?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. During that lineup, you showed Rodriguez who he should pick from the lineup, correct?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. Before the lineup, you showed Rodriguez a photo array that contained Sierra's photo, correct?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

MR. GIVEN: Liz, can you keep your voice up a little?

MS. MAZUR: Oh, sure. Sorry.

MR. GIVEN: We might be able to hear you like this, but you're talking down in your laptop.

Transcript of Ernest Halvorsen
Conducted on April 20, 2018

285

MS. MAZUR: Okay, can you read back my last question? I'm sorry.

(The question was read as requested.)

BY MS. MAZUR:

Q. During that photo array, you told Rodriguez to identify Sierra's photo, correct?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. You told Rodriguez that Sierra was probably the shooter during that photo array, correct?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. Before the lineup, Rodriguez had informed you that he could not identify the shooter, correct?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. Before the photo array, Rodriguez had informed you that he could not identify the shooter, correct?

A. On advice of counsel, I assert my Fifth Amendment rights.

286

Q. Before the identification procedure, you told Rodriguez that you believed that you had "got the person" and "knew the person who did the shooting," correct?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. You showed eyewitness Jose Melendez a live lineup containing Sierra on May 30th, 1995, correct?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. During that lineup up, you showed Melendez who he should pick from the lineup, correct?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. Before the lineup, you showed Melendez a photo array that contained Sierra's photo, correct?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. During that photo array, you told Melendez to identify Sierra's photo, correct?

287

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. You pointed to a picture of Sierra in the photo array, correct?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And you told Melendez that you "had reason to believe that this was the guy" while pointing at the photo, correct?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. Before the lineup, Melendez had informed you that he could not identify the shooter, correct?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. Before the photo array, Melendez had informed you that he could not identify the shooter, correct?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. You showed Jose Melendez a Buick Park Avenue in the parking lot of Area 5 on May 30th, 1995, correct?

288

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And you asked him to identify it as the car the shooter had been driving on the night of the murder, correct?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And Melendez told you it was not the car that the shooter had been driving on the night of the murder, correct?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. But you wrote a report falsely stating that Melendez had identified the car as the shooter's vehicle, correct?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. You wrote a false report on Melendez's purported identification of Sierra, correct?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. You wrote a false report on Rodriguez's purported identification of

289

Sierra, correct?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. You provided false testimony at Sierra's trial, correct?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And at the time of Sierra's trial, eyewitness Melendez was represented by Richard Boyke, correct?

MR. GIVEN: Objection; foundation and competence.

You can answer.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. MAZUR:

Q. And you had conversations about Melendez's testimony at Sierra's trial, correct?

MR. GIVEN: Objection; form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. MAZUR:

Q. And you asked Boyke to prevent

290

Melendez from testifying at Sierra's trial?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. Isn't it true that you framed Geraldo Iglesias for the shooting death of Monica Roman on the night of June 7th, 1993?

A. On advice of counsel, I assert my Fifth Amendment rights.

MR. GIVEN: And also -- I'm late in the game on this one. Same standing objection with regard to the other cases that we've mentioned.

BY MS. MAZUR:

Q. Isn't it true that you conspired with other Chicago police officers to frame Geraldo Iglesias for the shooting death of Monica Roman on the night of June 7th, 1993?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. Isn't it true that you knew Geraldo Iglesias did not shoot Monica Roman while you were investigating the Roman shooting?

A. On advice of counsel, I assert my Fifth Amendment rights.

291

Q. Isn't it true that you fabricated evidence, including falsifying police reports, as part of the Roman homicide investigation in June of 1993?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. Isn't it true that during the Roman homicide investigation, you withheld exculpatory evidence from prosecutors, criminal defendants, and their attorneys?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. Isn't it true that during the Roman homicide investigation in June 1993, you coerced witnesses in order to obtain manipulated and false photographic and live lineup identification of Geraldo Iglesias?

MR. GIVEN: Objection; form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. MAZUR:

Q. Isn't it true that you never received a call on June 21st, 1993 or any other date from any confidential informant

292

claiming that Geraldo Iglesias was involved in the shooting of Monica Roman?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. Isn't it true that you and your partner, Reynaldo Guevara, routinely fabricated claims that an anonymous informant provided the name of a suspect when, in fact, no such anonymous informant ever existed?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. MAZUR:

Q. Isn't it true that you and Detective Ernest Halvorsen -- Wait, sorry.

Isn't it true that Rosendo Ochoa could not make an identification of the shooter, and so you told him to pick Geraldo Iglesias in June 1993?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. Isn't it true that Rosendo Ochoa told you that he could hot identify the shooter from the photo array on June 22nd,

Transcript of Ernest Halvorsen
Conducted on April 20, 2018

293

1993 or from the live lineup on June 23rd, 1993?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. Did Rosendo Ochoa initially select someone other than Mr. Iglesias from the photo array on June 22nd, 1993?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. Did Rosendo Ochoa initially select someone other Mr. Iglesias from the lineup on June 23rd, 1993?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. Did you make any comment to Rosendo Ochoa to improperly influence his decision on who to pick from the photo array you showed him on June 22nd, 1993?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. Did you make comments to Rosendo Ochoa to improperly influence his decision on who to pick from the lineup you showed him on June 23rd, 1993?

294

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. Isn't it true that you used threats and incentives related to Rosendo Ochoa's own legal problems to coerce him into falsely identifying and testifying against Geraldo Iglesias in June 1993?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. MAZUR:

Q. Isn't it true that you and Detective Reynaldo Guevara coerced an eyewitness named Hugo Rodriguez into falsely identifying Geraldo Iglesias from a photo array and from a live lineup on June 24th, 1993?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. Isn't it true that Hugo Rodriguez could not make an identification of the shooter, and so you told him to pick Geraldo Iglesias on June 24th, 1993?

A. On advice of counsel, I assert my

295

Fifth Amendment rights.

Q. Isn't it true that Hugo Rodriguez told you that he could not identify the shooter from the photo array or the live lineup on June 24th, 1993?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. Did Hugo Rodriguez initially select someone other than Mr. Iglesias from the photo array on June 24th, 1993?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. Did Hugo Rodriguez initially select someone other Mr. Iglesias from the lineup on June 24th, 1993?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. Did you make comments to Hugo Rodriguez to improperly influence his decision on whom to pick from the photo array you showed him on June 24th, 1993?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. Did you make comments to Hugo

296

Rodrigo to improperly influence his decision on whom to pick from the lineup you showed him on June 24th, 1993?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. Isn't it true that you used threats and incentives related to Hugo Rodriguez's own legal problems to coerce him into falsely identifying and testifying against Geraldo Iglesias in June 1993?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. Isn't it true that on June 25th, 1993 or July 1st, 1993, you convinced Francisco Vicente to make up a false story that Geraldo Iglesias confessed to him about shooting Monica Roman?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. Isn't it true that you used threats and incentives related to Francisco Vicente's own legal problems to pressure him into falsely identifying and testifying against Geraldo Iglesias in the summer of 1993?

Transcript of Ernest Halvorsen
Conducted on April 20, 2018

297

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. Isn't it true that at the trial of Geraldo Iglesias for the murder of Monica Roman, you gave false testimony, including regarding your investigation of the crime and manipulation of witnesses?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. Isn't it true that your partner, Detective Guevara, told you that he was going to lie at Iglesias's trial about whether Iglesias's claims -- about where Iglesias claimed to be at the time of the murder?

A. On advice of counsel, I assert my Fifth Amendment rights.

MS. MAZUR: Hold on a second. Can we go off the record for just one second?

THE VIDEOGRAPHER: Off the record, 3:23.

(A recess was taken.)

THE VIDEOGRAPHER: Back on the record, 3:23.

MS. MAZUR: I'm about to ask a question that contains a name that I'm not sure how to

298

pronounce. So maybe I'll spell it for the court reporter first and go from there.

The name is -- I think it's Jaime Alvarez, J-A-I-M-E, Alvarez, A-L-V-A-R-E-Z.

BY MS. MAZUR:

Q. Isn't it true that you were assigned to investigate the murder of Jaime Alvarez in June 1995 alongside your partner, Detective Guevara?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. Isn't it true that when you questioned Michael Ybarra -- I'll spell it, Y-B-A-R-R-A -- on July 2nd, 1995 regarding the Alvarez murder, he told you that he did not see who had shot him and Alvarez?

A. On advice of counsel, I assert my Fifth Amendment rights.

MR. GIVEN: Can I interrupt for a second?

Is Ybarra -- Is he the suspect in this? Here is why I'm asking: Are you moving -- I'm assuming that you are now asking about a different --

299

MS. MAZUR: Yes, yes.

MR. GIVEN: -- case.

So I will reassert my same --

MS. MAZUR: Sure.

MR. GIVEN: -- standing objections that I had previously. I don't know if this is a --

MS. MAZUR: It's a different one, yes.

MR. GIVEN: Is it a civil lawsuit, a case that is intended to be a civil lawsuit or is, in fact, a criminal case that's in some form of post conviction? But I'd object to using this deposition for any or all of those situations.

MS. MAZUR: Noted. And I -- I also don't know, but I imagine Russell does. So that's fair.

MR. GIVEN: Do you know, Jennifer?

MS. BONJEAN: What's that?

MR. GIVEN: Is Ybarra the suspect?

MS. BONJEAN: No, I think Edwin Davilla.

MS. MAZUR: It's the Edwin Davilla case.

MR. GIVEN: Got it. Thanks.

MS. BONJEAN: The witness is Ybarra.

300

MS. MAZUR: Did we get an answer on the last one?

MR. GIVEN: If we did, I can guess what it would be, what it was. You can answer again.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. MAZUR:

Q. Isn't it true that when you questioned Michael Ybarra on July 2nd, 1995 regarding the Alvarez murder, he could not tell you anything about the shooter, either a description or even if he had been in the car that Ybarra had been chasing or not?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. Isn't it true that when you questioned Ivara (phonetic) Valasco, V-A-L-A-S-C-O, on July 9th, 1995 regarding the Alvarez murder, he told you that did he not see who had killed Alvarez?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. Isn't it true that when you

Transcript of Ernest Halvorsen
Conducted on April 20, 2018

301

questioned Ivara Valasco on July 9th, 1995 regarding the Alvarez murder, he could not tell you anything about the shooter, either a description or even if he had been in the car that Ybarra had been chasing?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. Isn't it true that no one provided any information whatsoever to suggest that Mr. Davilla had anything to do with the Alvarez murder before you showed Mr. Davilla's photograph to Ybarra and Valasco?

A. On advice of counsel, I assert my Fifth Amendment rights.

MR. GIVEN: You know, by the way, let me just -- Before you go on to your next question, that question reminds me that I would like to add to my standing objections. Both retroactively and moving forward, in addition to everything I've already said, the fact that you're asking about these without any documentation showing the witness, I think, creates a foundation problem that is

302

more than the usual foundation objection.

So with that said, I'll add that to the standing objections and then let you go on.

BY MS. MAZUR:

Q. Isn't it true that the people you spoke with on July 9th, 1995 said nothing about Mr. Davilla having anything to do with the Alvarez murder?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. Isn't it true that the children -- I'm sorry. Isn't it true that the people you spoke with on July 9th, 1995 said nothing about Mr. Davilla having anything to do with any criminal activity whatsoever?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. Isn't it true that you did not have probable cause to suspect Mr. Davilla in the Alvarez murder or any other crime in July of 1995?

A. On advice of counsel, I assert my Fifth Amendment rights.

303

Q. Isn't it true that Ybarra did not voluntarily identify Mr. Davilla from a photo array as the shooter in the Alvarez case?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. An isn't it true that Valasco did not voluntarily identify Mr. Davilla from a photo array as the shooter in the Alvarez case?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. Isn't it true that you showed Mr. Davilla's photograph to Ybarra and Valasco because you were trying to frame Mr. Davilla for the Alvarez murder?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. Isn't it true that you knew Davilla had nothing to do with the Alvarez murder while you were investigating it?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. Isn't it true that you lied in your July 11th, 1995 general progress report in

304

which you claim that Ybarra and Valasco identified Mr. Davilla from a photo array?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. Isn't it true that you told Valasco and Ybarra who to select from the photo array you showed them in July of 1995?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. Did you help construct the lineup that Ybarra and Valasco viewed in July 1995?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. Did you instruct Mr. Davilla to turn around during his lineup to expose his gang tattoo on his back?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. Did you instruct only Mr. Davilla to turn around during his lineup in order to expose his gang tattoo on his back?

A. On advice of counsel, I assert my Fifth Amendment rights.

305

BY MS. MAZUR:

Q. Did you instruct only Mr. Davilla to turn around during his lineup so that Ybarra and Valasco would falsely implicate him in the Alvarez murder?

A. **On advice of counsel, I assert my Fifth Amendment rights.**

Q. Isn't it true that you conspired with Guevara, Detective Garz (phonetic), and Bill Johnson to frame Mr. Davilla for the Alvarez murder?

A. **On advice of counsel, I assert my Fifth Amendment rights.**

Q. Moving on to another area regarding David Colon. Maybe I'll pose the question.

MR. GIVEN: Is David Colon the suspect?

MS. MAZUR: Yes. He's the accused -- the wrongly convicted, I should say.

BY MS. MAZUR:

Q. Okay. So the first question is: Isn't it true you were assigned to investigate the murder --

MR. GIVEN: I'm sorry. I have the same standing objections.

306

MS. MAZUR: Do you want me to just do the question first, and you can -- .

MS. BONJEAN: What is the value of standing objections to always repeat --

MR. GIVEN: So that I don't have to say it to every single question. Do you not understand the concept of a standing objection?

MS. BONJEAN: A standing objection is a standing objection. I understood it the first time you said it.

MR. GIVEN: Well, then -- I'm sorry. I didn't mean to interrupt your question. I just have a -- I don't need your question. I will have a standing objection to presumably all of your questions about Mr. Colon.

BY MS. MAZUR:

Q. Isn't it true that you were assigned to investigate the murder of Michael Velez, V-E-L-E-Z, in 1992?

A. **On advice of counsel, I assert my Fifth Amendment rights.**

Q. Isn't it true that you had no reason to suspect David Colon, C-O-L-O-N, in

307

the murder of Michael Velez?

A. **On advice of counsel, I assert my Fifth Amendment rights.**

Q. And isn't it true that Efrain, E-F-R-A-I-N, Sanchez, told you that he could not see the shooter's face because the shooter never looked up at him?

A. **On advice of counsel, I assert my Fifth Amendment rights.**

Q. And isn't it true that when you brought Julio Sanchez to view photos and a lineup as part of the Velez homicide investigation on September 8th, 1993, Julio was obviously intoxicated?

A. **On advice of counsel, I assert my Fifth Amendment rights.**

Q. Isn't it true that in 1992 you knew a gang member nicknamed "Mallo," M-A-L-L-O, who was not David Colon, committed the Velez murder?

A. **On advice of counsel, I assert my Fifth Amendment rights.**

Q. Isn't it true that you improperly influenced Julio Sanchez to pick David Colon

308

out of a photo array?

A. **On advice of counsel, I assert my Fifth Amendment rights.**

Q. Isn't it true that you improperly influenced Efrain Sanchez to pick David Colon out of a photo array?

A. **On advice of counsel, I assert my Fifth Amendment rights.**

Q. Isn't it true that you told Efrain Sanchez to pick David Colon out of a lineup on September 8th, 1992?

A. **On advice of counsel, I assert my Fifth Amendment rights.**

Q. Isn't it true that you told Efrain Sanchez to pick David Colon out of a lineup on September 8th by telling him to pick No. 5 from that lineup?

A. **On advice of counsel, I assert my Fifth Amendment rights.**

Q. Isn't it true that you told Julio Sanchez to pick David Colon out of a lineup?

A. **On advice of counsel, I assert my Fifth Amendment rights.**

Q. Isn't it true that you told Julio

Sanchez to pick David Colon out of a lineup on September 8th, 1992 by telling him to pick the person in spot No. 5?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. Isn't it true that you showed Julio Sanchez a single photo of David Colon before Julio viewed a lineup?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. Isn't it true that you showed Julio Sanchez a single photo of David Colon before Julio viewed a lineup and told Julio to pick the person depicted in the photo from the lineup?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. Isn't it true that you told Julio Sanchez to pick the same person he selected from the photo array from the lineup he was about to view on September 8th, 1992?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. Isn't it true that Julio Sanchez told you that he did not know who the shooter was and did not get a good look at him?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. Isn't it true that you conspired with Defendant Guevara to falsely charge David Colon with murder?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. Isn't it true that you falsified police reports in Navella's (phonetic) homicide investigation to make it appear that David Colon was guilty?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. Isn't it true that you withheld documents establishing David Colon's innocence in the Navella murder, such that the documents would not be available to either the State's Attorney or Mr. Colon or his attorneys?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. Isn't it true that you framed David

Colon for murder?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. Moving on to a different matter. I guess -- I think the suspect here is Manuel Rivera.

Isn't it true that you assisted in the investigation of the murder of Marlon, M-A-R-L-O-N, Wade, in October 1989?

MR. GIVEN: And for the record, I will repeat my standing objections to questions about Rivera.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. MAZUR:

Q. Isn't it true that all available information about the Wade murder stated that the perpetrator was a member of the Latin Eagles gang?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. Isn't it true that you knew in 1989 Manuel Rivera had nothing to do with the Wade murder?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. Isn't it true that the Latin Eagles and the Spanish Cobras were involved in a gang war in September and October 1989?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. Isn't it true that the Latin Eagles and the Spanish Cobras were involved a gang war in September and October 1989 arising, in part, from the murder of Little Rook, R-O-O-K, in September 1989?

MR. GIVEN: Objection; competence, speculation. You can answer.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. MAZUR:

Q. Isn't it true that Detective Guevara had told you that he had used Sal, S-A-L, Ortiz to help frame Juan and Henry Johnson for the murder of Little Rook?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. Isn't it true that Detective

Transcript of Ernest Halvorsen
Conducted on April 20, 2018

313

Guevara knew Sal Ortiz in October 1989?

MR. GIVEN: Objection; competence.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. MAZUR:

Q. Isn't it true that Detective Guevara admitted to you that he lied at Manuel Rivera's trial when he claimed not to know who Sal Ortiz was?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. Isn't it true that you, Defendant Guevara, Detective Villardita, V-I-L-L-A-R-D-I-T-A, and Steve Garz conspired to frame Manuel Rivera for the Wade murder?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. Isn't it true that Detective Guevara told you during the Wade homicide investigation that he fabricated his account that an anonymous informant implicated Manuel Rivera in the Wade murder?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

314

Q. Isn't it true that you never had any legitimate reason to suspect Manuel Rivera in the Wade murder?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. Isn't it true that you improperly influenced Loretta, Helean, H-E-L-E-A-N, into falsely implicating Mr. Rivera in the Wade murder?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. Isn't it true that you conspired with Detective Guevara, Detective Villardita, Steven Garz -- and Steven Garz to improperly influence Loretta Helean into falsely implicating Mr. Rivera in the Wade murder?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. Isn't it true that you and Defendant Guevara, Detective Villardita, and Steven Garz conspired to get Virgilio, V-I-R-G-I-L-I-O, Muniz, M-U-N-I-Z, to falsely implicate Manuel Rivera in the Wade murder?

**A. On advice of counsel, I assert my**

315

**Fifth Amendment rights.**

Q. Isn't it true that Detective Guevara in your presence showed Virgilio Muniz a photo of Manuel Rivera and told him to falsely implicate Manuel Rivera in the murder?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. Isn't it true that Defendant Guevara in your presence told Virgilio Muniz that if he did not implicate Manuel Rivera in the Wade murder, then Guevara would charge Muniz with the Wade murder?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. Isn't it true that Tran, T-R-A-N, Brown told you that he could not identify the shooter in the Wade homicide because he ducked when the shots were being fired, and he did not see the shooter?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. Isn't it true that you improperly influenced Tran Brown to falsely implicate

316

Manuel Rivera in the Wade homicide?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. Isn't it true that you conspired with Detective Guevara, Detective Villardita, and Steve Garz to get Tran Brown to falsely implicate Manuel Rivera in the Wade homicide?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. Isn't it true that no one ever said a member of the Spanish Cobras committed the Wade homicide?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. Isn't it true that you knew that Loretta Helean, Tran Brown, and Virgilio Muniz's identification of Manuel Rivera were fabricated?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. Moving on again. The subjects of the next line of questioning are Rosendo Hernandez and Juan Hernandez, R-O-S-E-N-D-O H-E-R-N-A-N-D-E-Z, and Juan, J-U-A-N.

317

MR. GIVEN: Thank you. And I will assert, again, for the record, my standing objections to using this deposition for Mr. Hernandez, and Mr. Hernandez who, I believe, just recently filed a post conviction proceeding. So I object specifically to this deposition being used to get evidence for that case.

MS. MAZUR: Okay.

BY MS. MAZUR:

Q. Isn't it true that you and Detective Guevara conspired to frame Rosendo Hernandez and Juan Hernandez for the murder of -- I believe, it's Jorge, J-O-R-G-E, Gonzalez in June 1997?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. Isn't it true that you and Detective Guevara intentionally placed Rosendo and Juan Hernandez in unduly suggestive lineups?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. Isn't it true that you and

318

Detective Guevara intentionally placed Rosendo and Juan Hernandez in unduly suggestive lineups by having them be the only one in the lineup with booking numbers on their hands?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. There is one more area -- two more; but the next one, I believe, the suspect is Jacqueline Montanez.

MR. GIVEN: Jacqueline?

MS. MAZUR: Yes, J-A-C-Q-U-E-L-I-N-E.

MR. GIVEN: Montanez?

MS. MAZUR: Yes, M-O-N-T-A-N-E-Z.

MR. GIVEN: Thank you.

Same standing objections.

BY MS. MAZUR:

Q. Isn't it true that on May 13th, 1992, you and Detective Guevara conspired to frame Jacqueline Montanez for murder?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. Isn't it true that on May 13th, 1992, you and Detective Guevara conspired to

319

coerce Jacqueline Montanez to provide a false confession?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. Isn't it true that you knew that Jacqueline Montanez was a juvenile when you interrogated her in 1992?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. Isn't it true that you knew that Jacqueline Montanez, a juvenile, would be more susceptible to coercion during her interrogation?

MR. GIVEN: Objection; form, foundation competence, speculation, assumes facts not in evidence.

Go ahead.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. MAZUR:

Q. And isn't it true that you interrogated Jacqueline Montanez without a youth officer present so that you could coerce her to falsely confess?

320

**A. On advice of counsel, I assert my Fifth Amendment rights.**

MS. MAZUR: My last page is titled, "A Bunch of Randoms."

MR. GIVEN: Is that the suspect or the victim?

MS. MAZUR: Vomit from Russell's brain, but we'll run through this and take a break.

MR. GIVEN: Great.

BY MS. MAZUR:

Q. Isn't it true that you and Detective Guevara conspired to frame Charles Ellison, E-L-L-I-S-O-N, for a crime he did not commit?

MR. GIVEN: Same standing objections.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. MAZUR:

Q. Isn't it true that you and Detective Guevara conspired to frame Daniel Rodrigo for a crime he did not commit?

MR. GIVEN: Same standing objections.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

Transcript of Ernest Halvorsen
Conducted on April 20, 2018

BY MS. MAZUR:

Q. Isn't it true that you and Detective Guevara conspired to frame Santos Flores, S-A-N-T-O-S F-L-O-R-E-S, for a crime he did not commit?

MR. GIVEN: Same standing objections.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. MAZUR:

Q. Isn't it true that you and Detective Guevara conspired to frame Angel Diaz, A-N-G-E-L D-I-A-Z for a crime he did not commit?

A. On advice of counsel, I assert my Fifth Amendment rights.

MR. GIVEN: Same objections.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. MAZUR:

Q. Isn't it true that you and Detective Guevara conspired to from Freddie Santiago, S-A-N-T-I-A-G-O, for a crime he did not commit?

MR. GIVEN: Same objections.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. MAZUR:

Q. Isn't it true that you and Detective Guevara conspired to frame Reynaldo Munoz for a crime he did not commit?

MR. GIVEN: Same objections.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. MAZUR:

Q. Isn't it true that you and Detective Guevara conspired to frame Adolfo Frias, A-D-O-L-F-O F-R-I-A-S, for a crime he did not commit?

MR. GIVEN: Same objections.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. MAZUR:

Q. Isn't it true you and Detective Guevara conspired to frame Alfredo A-L-F-R-E-D-O, Gonzalez, G-O-N-Z-A-L-E-Z, for a crime he did not commit?

MR. GIVEN: Same objections.

THE WITNESS: On advice of counsel, I

assert my Fifth Amendment rights.

BY MS. MAZUR:

Q. And isn't it true that you and Detective Guevara conspired to frame Carlos Andino, A-N-D-I-N-O, for a crime he did not commit?

MR. GIVEN: Same objections.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. MAZUR:

Q. And isn't it true that you and Detective Guevara conspired to frame Angel Gaya, A-N-G-E-L G-A-Y-A, for a crime he did not commit?

MR. GIVEN: Same objections.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

MS. MAZUR: Let me just confer about this last section, and then I'll probably hand it back over to --

MR. GIVEN: Can we just stay on the record, rather than go off and on?

MS. MAZUR: That's fine. I'm going to talk to her outside.

I've got one last area. Counsel did ask some questions about Robert Buto earlier, but they were more general, and these are a few more specific things that she did not ask.

MR. GIVEN: If there's anything objectionable, guess what? I'll object.

MS. MAZUR: Got it.

BY MS. MAZUR:

Q. So a name that I will use in the first question, which I'll just spell now is Salvador, S-A-L-V-A-D-O-R, Ruvalcaba, R-U-V-A-L-C-A-B-A.

Isn't it true that the man who shot Salvador Ruvalcaba on May 14th, 1993 was described by all of the witnesses as having a ponytail?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. Isn't it true that Robert Buto, B-U-T-O, did not have a ponytail on May 14th, 1993?

A. On advice of counsel, I assert my Fifth Amendment rights.

Transcript of Ernest Halvorsen
Conducted on April 20, 2018

325

Q. Isn't it true that you knew that Robert Buto had nothing to do with the Ruvalcaba murder?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. Isn't it true that you wanted to frame Robert Buto for the Ruvalcaba murder despite his innocence?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. Isn't it true that on May 14th, 1993, you allowed Frankie Escobar, Ray Lozada, Jacob Lozada, and Carl Richmond to see Robert Buto in the police station in handcuffs before these witnesses viewed a lineup?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. Isn't it true that you knew it was improper to allow witnesses to see a suspect in the police station in handcuffs before the witnesses viewed a lineup?

A. On advice of counsel, I assert my Fifth Amendment rights.

326

Q. Isn't it true that on May 14th, 1993, you allowed Carl Richmond to see Mr. Buto in handcuffs in the bathroom before Richmond viewed a lineup on that day?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. Isn't it true that you allowed Frankie Escobar, Ray Lozada, Jacob Lozada, and Carl Richmond to view a Polaroid photograph of Mr. Buto before these witnesses viewed a lineup on May 14th, 1993?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. Isn't it true that your partner. Reynaldo Guevara told Frank Escobar, Ray Lozada, Jacob Lozada, and Carl Richmond to pick Mr. Buto out of a lineup on May 14th, 1993?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. Isn't it true that you and Detective Guevara intentionally placed Mr. Buto in a lineup where the suspect was described as wearing a hooded shirt, and he

327

was the only person in the lineup wearing a hooded shirt?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. Isn't it true that you and Detective Guevara knew that placing Mr. Buto into a lineup in which he was the only person wearing a hooded shirt was impermissibly unfair because the witnesses did see the shooter's face and were trying to identify the suspect based on his clothing?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. Isn't it true that you and Detective Guevara placed Mr. Buto in an impermissibly suggestive lineup because you wanted Michael and Margaret Fleming to falsely identify Mr. Buto?

MR. GIVEN: Objection; form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. MAZUR:

Q. Did you make comments to Margaret and Michael Fleming to unfairly get them to

328

falsely identify Mr. Buto from a lineup?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. Tell me everything you did to investigate the Ruvalcaba murder.

MR. GIVEN: Objection; form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. MAZUR:

Q. You and Defendant Guevara harassed Carl Richmond in an effort to get him to falsely implicate Mr. Buto at trial, correct?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. You and Detective Guevara told Richmond that if he did not implicate Mr. Buto, you would place false criminal charges against Richmond, correct?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. Isn't it true that you knew that Ray Lozada and Carl Richmond were lying when they implicated Mr. Buto?

A. On advice of counsel, I assert my

Transcript of Ernest Halvorsen
Conducted on April 20, 2018

83 (329 to 332)

329

Fifth Amendment rights.

Q. Isn't it true that you fabricated evidence in your police reports in the Ruvalcaba homicide investigation in order to make it appear that witnesses had voluntarily and accurately implicated Mr. Buto in that homicide?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. Isn't it true that you withheld exculpatory and material evidence from your police reports in the Ruvalcaba homicide investigation in order to withhold the truth about how the witnesses came to implicate Mr. Buto in the Ruvalcaba murder?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. Isn't it true that you and Defendant Guevara and Defendant Mingy worked jointly to frame Mr. Buto for the Ruvalcaba murder?

A. On advice of counsel, I assert my Fifth Amendment rights.

MS. MAZUR: That's all I've got.

330

MR. GIVEN: By the way, I didn't say it at the beginning, but I will say it at end. I have the same standing objections to all those questions about Mr. Buto.

MS. BONJEAN: No one needs a break, right?

MR. GIVEN: No.

MS. BONJEAN: If you need one -- Does the deponent need one?

MR. GIVEN: You all right?

THE WITNESS: Yes.

FURTHER EXAMINATION

BY MS. BONJEAN:

Q. Mr. Halvorsen, when did you first meet Detective Guevara?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. When did you actually become partners with Detective Guevara?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. I want to draw your attention to, I'll say, the late 1980s, maybe 1988, approximately.

331

Were you aware that Mr. Guevara had a relationship with Richard Boyke that involved Mr. Boyke paying Detective Guevara to allow certain people to buy their way out of trouble in the late '80s?

A. On advice --

MR. GIVEN: Form and foundation.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. You knew Richard Boyke from the Assistant State's Attorney office from the mid '80s, right?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. Did you have an arrangement with Mr. Boyke as well where he would pay you to let people out of trouble?

MR. GIVEN: Objection; form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And isn't it true that Detective Guevara routinely would allow gang members to

332

buy their way out of trouble with either drugs, guns, or money?

MR. GIVEN: Form, foundation, competence.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. There were a number of occasions where you observed firsthand Detective Guevara accepting either guns, drugs, or money in exchange for letting gang members out of trouble for various things, such as gang activity or drug selling, right?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. Did you also have an arrangement with gang members on the streets of Humboldt Park, that you allowed people to buy their way out trouble if they gave you guns, drugs, or money?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

Transcript of Ernest Halvorsen
Conducted on April 20, 2018

333

BY MS. BONJEAN:

Q. Did you participate in the arrest of Abraham Omar for a murder that occurred on a CTA bus sometime in the late 1980s?

MR. GIVEN: Same standing objections with regard to questions about Mr. Omar.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. While Mr. Omar was in custody, were you present when a witness to that murder identified Mr. Omar from a lineup as the person who had committed the -- strike that -- the murder on the CTA bus?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. And isn't it true that at a later point Detective Guevara arranged for Mr. Omar to be released from custody after Mr. Omar obtained representation from Richard Boyke?

MR. GIVEN: Form, foundation, competence.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

334

BY MS. BONJEAN:

Q. Did you receive any of the $20,000 that Mr. Omar paid Mr. Boyke that secured his release from custody after he was identified as being the person responsible for committing a murder on a CTA bus in the late 1980s?

MR. GIVEN: Form, foundation, competence.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And, in fact, Mr. Guevara and Mr. Boyke were close friends, weren't they?

MR. GIVEN: Form, foundation, competence.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. Did Mr. Boyke represent you in any of your personal legal matters over the coerce of your career?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

335

Q. And with respect to the murder that occurred on the CTA bus, isn't it true that after Boyke secured release of Abraham Omar, you and Detective Guevara conspired to frame another individual for that murder?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. And, in fact, you and Detective Guevara determined that you would frame George Laureano for the murder that occurred on the CTA bus; isn't that right?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. You knew that George Laureano was innocent of that crime, but you had actually -- because Detective Guevara had actually released the real offender, you needed to close the case, and you decided to do so by framing George Laureano, right?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. But you were unable to frame George

336

Laureano for that because he had an alibi for the time that the murder happened, right?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. In fact, his alibi involved him being at the Illinois Department of Corrections at the institution called the Vienna facility, and that was about Seventh hours away from the City of Chicago, right?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. So who did you and Detective Guevara actually end up framing for the CTA bus murder in the late 1980s?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. How many times did you and Detective Guevara allow a person who was actually guilty to buy their way out of trouble?

337

MR. GIVEN: Form and foundation.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. Now, in 1985, you were assigned to investigate the murder of Ivan Mena, weren't you?

MR. GIVEN: Could you spell that one for me?

MS. BONJEAN: Yeah. It's I-V-A-N M-E-N-A.

MR. GIVEN: Thank you.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

MS. BONJEAN: I'm going to actually mark this as Halvorsen 3.

(Halvorsen Deposition Exhibit No. 3 was marked for identification.)

MR. GIVEN: I'm going to assert my standing objections to questions involving this case and maybe Reynaldo Munoz. Is he the suspect?

MS. BONJEAN: Yes. He's the wrongfully convicted.

338

MR. GIVEN: Same standing objections. Go ahead.

MS. BARBER: This one doesn't have a Bates stamp, right, or am I missing it?

MS. BONJEAN: No. No, it does not have a Bates stamp.

MR. GIVEN: Has this been produced?

MS. BONJEAN: I believe it has been produced, but don't hold me to that. But since you had objected earlier to him not any being given any paper to look at, I thought it was better to --

MR. GIVEN: Well, I'll just have the object- -- I'm not going to instruct him to not answer based on the fact that it doesn't have Bates stamps; but if you could --

If it hasn't been produced --

MS. BONJEAN: Sure.

MR. GIVEN: -- if you could produce it with Bates stamps after the deposition, that would be appropriate.

MS. BONJEAN: Absolutely.

BY MS. BONJEAN:

Q. Mr. Halvorsen, I'm handing you what

339

has been marked as Halvorsen 3. I represent that that's a supplemental police report that bears your signature at the bottom of that, Detective E. Halvorsen, Star 6036.

That is you, correct, sir?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And, in fact, this was a case that you were assigned to with Detective Dickinson, Star No. 4588, right?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And the supervisor on this case was Sergeant Epplen, correct?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And isn't it true, sir, that you framed Reynaldo Munoz for the murder of Ivan Mena and the attempted murder of Beubea (phonetic) Bobby Garcia that occurred on September 8th, 1985?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And, in fact, sir, you were not

340

originally assigned to investigate the murder of Ivan Mena that occurred on September 8th, 1985; isn't that right?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And, in fact, the investigation was carried out originally by a number detectives who were unable to close the case because they could not identify who was responsible for the murder of Ivan Mena and the attempt murder of Mr. Garcia, right?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And Sergeant Epplen decided that he would then assign you, Detective Halvorsen, and Detective Dickinson, to investigate this case several weeks later; isn't that right?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And now isn't it true that you knew Reynaldo Munoz as someone who was a member of the so-called Unknown street gang who went by the name of Scooby prior to September 27th, 1985?

Transcript of Ernest Halvorsen
Conducted on April 20, 2018

341

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And you, along with Detective Dickinson and Sergeant Epplen, determined that you would frame Mr. Munoz for the murder of Mena since the previous detectives were unable to identify who was responsible for that shooting, correct?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And, in fact, on September 26th, 1989, you contacted the complainant, one of the complainants, the living complainant, Beubea Garcia, and told him to come to Area 5 or Grand and Central to identify the person who shot him, right?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And you knew that prior to September 26th, 1985 that Mr. Garcia was unable to describe the individual who had shot at him and killed his -- killed his

342

friend, Ivan Mena, right?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And you knew that Mr. Garcia had told detectives from Area 5 that he could not make an identification of the offender because he did not get a look at the offender who had shot at him and killed his friend, Ivan Mena, on September 8th, 1985?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And notwithstanding the fact that Mr. Garcia had consistently indicated to detectives at Area 5 that he was unable to describe the shooter you, nonetheless, directed that he be brought into Area 5 so that you could persuade him, manipulate him to make an identification of Reynaldo Munoz as the shooter in the murder of Ivan Mena, correct?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

343

BY MS. BONJEAN:

Q. And on September 26th, 1985, Mr. Munoz was arrested and brought into Area 5, correct?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And you interviewed Mr. Garcia when he came into Area 5, and he told you that he didn't get a good look at the person who was responsible for the shooting, right?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And isn't it true that you persuaded Mr. Garcia that you had learned from the streets that Reynaldo Munoz was the person who committed the shooting on September 8th, 1985 that resulted in the death of his friend -- in the death of Garcia's friend, Ivan Mena, right?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And, in fact, Mr. Garcia told you

344

that he knew who Mr. Munoz was from the streets, right?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And Mr. Garcia also told you that he had seen Mr. Munoz earlier on the night of the murder at a party where he had actually -- he and Ivan Mena had broken up a fight between Mr. Munoz and another individual, correct?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And Mr. Beubea Garcia told you expressly that he had no reason to believe that Mr. Munoz had anything to do with the shooting that occurred on September 8th, 1985 that resulted in the murder of Ivan Mena; isn't that right?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And, yet, you told Mr. Garcia that you had developed evidence that Mr. Munoz was responsible, and you just needed Mr. Garcia to pick him out of a lineup; isn't that

345

right?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And, in fact, you did construct a lineup in which Mr. Munoz was one of the participants in the line up, and you had Mr. Mena -- strike that -- Mr. Garcia view that lineup up; isn't that right?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And isn't it true that Mr. Garcia viewed that lineup up and told you that he had no reason to believe that Munoz had shot and murdered his friend, Ivan Mena, right?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And you, nonetheless, directed him to identify Mr. Munoz as the culprit, correct?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And you reassured -- you reassured Mr. Garcia that you had the right guy, and that it was, in fact, Reynaldo Munoz; isn't

346

that right?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And Mr. Garcia, whose good friend had been murdered and he, himself, shot, agreed to cooperate with you because he believed you when you told him falsely that you had evidence that Munoz was the responsible party; isn't that right?

MR. GIVEN: Form, foundation, competence.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And, in fact, after that identification was purportedly made, you prepared a police report that is now part of -- is Halvorsen 3 that you're now presently looking at; isn't that correct?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And you wrote in this police report that reporting detective contacted Beubea Garcia, who stated that he was able to

347

identify the person who shot him and Mena; isn't that right?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And, in fact, that statement that you have -- that you authored and is contained in this supplemental report was a false statement because Mr. Garcia never stated that he could identify who shot him and Mena, right?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. You also reported that Garcia told you that he kept the information about Munoz having committed the murder because he was fearful that Scooby, otherwise known as Reynaldo Munoz, and his friends who killed Garcia? You recorded that here, didn't you?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And that statement was a false statement because Mr. Garcia never told you that he was afraid to identify Munoz as the offender; isn't that correct?

348

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. You fabricated the statement that Mr. Garcia was afraid of Mr. Munoz in order to justify and explain plausibly why Mr. Garcia never previously identified Mr. Munoz as the offender; isn't that right?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. What specifically did you tell Bobby Garcia to persuade him to identify Reynaldo Munoz as the shooter?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. Isn't it true that you and Detective Dickinson together jointly determined that you would close this case by framing 16-year-old Reynaldo Munoz because he was a known gang banger on the streets?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And you framed Mr. Munoz

349

specifically by coercing and/or manipulating the only witness to the crime, Bobby Beubea Garcia, into falsely identifying Mr. Munoz as the shooter?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. Now, sir, after you secured a fabricated identification of Mr. Munoz, you cleared this case; isn't that right?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. But on October 4th, 1989, a witness by the name of Hermeno or Hermino Molina, a male, aged approximately 46 years old, who work at the grocery store as a butcher, came into Area 5 to report that he had actually seen the shooting and that Mr. Munoz was not the culprit?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. I'm going to have you look at -- It's going to be Page 5 of this report. I'll

350

give you a chance to look at it.

MR. GIVEN: I'm sorry. Page...

MS. BONJEAN: Page 5.

MR. GIVEN: I'm sorry. I'm not tracking it. Sorry, I've got --

MS. BONJEAN: You just have to count to five starting on the fifth page --

MR. GIVEN: Oh, as opposed to looking at the document that has page numbers on them?

MS. BONJEAN: It's two different reports, two different reports. This is the page right here. You can rip them apart, if you'd like.

BY MS. BONJEAN:

Q. I'm going to show you what is a supplemental report that is dated October 14th, 1985 that bears your signature at the end. Do you see that, sir?

And this is a supplemental report that you actually prepared, authored, and then signed; isn't that correct?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. And this reflected an interview

351

that you conducted with a witness by the name of Hermena Molina; isn't that right?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

MR. GIVEN: You know what? He's trying to listen to your question and look at the document at the same time.

MS. BONJEAN: If you want to take your time, look at the document. Whenever you're...

THE WITNESS: Okay.

BY MS. BONJEAN:

Q. Isn't it true that Mr. Molina told you that he knew who the victim was and that he had seen the shooting on September 8th, 1985?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. And isn't it true that Mr. Molina told you that a boy by the name of Shorty from the neighborhood did the murder and that it wasn't Scooby, otherwise known by his legal as Reynaldo Munoz?

**A. On advice of counsel, I assert my**

352

**Fifth Amendment rights.**

Q. And isn't it true that Mr. Molina told you that he recognized Shorty out on the street when the shooting occurred, and that it was not Scooby?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. Isn't it true that you immediately disregarded Mr. Molina's statement to you because you had committed yourself to framing Mr. Munoz for the murder of Ivan Mena?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. In fact, you didn't go out and try to find Shorty to determine whether he had an alibi at the time of the shooting, correct?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. What efforts did you take to identify who Shorty was in order to determine whether he may have had some involvement in the murder of Ivan Mena?

Transcript of Ernest Halvorsen
Conducted on April 20, 2018

353

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. Did you and Detective Dickinson together jointly agree that you would make no efforts to follow up on the statement that Mr. Molina provided because you were committed to framing Mr. Munoz for the murder of Ivan Mena?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. How many juveniles did you frame during the late 1980s and 1990s for crimes they did not commit?

MR. GIVEN: Objection; form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. You knew that Mr. Munoz was merely 16 years old when you framed him for the murder of Ivan Mena; isn't that right?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And you and Detective Dickinson, after being assigned to the case for less

354

than 24 hours, were able to solve this crime where your follow detectives were unable to solve the crime; isn't that correct?

MR. GIVEN: Objection; form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. What special powers did you have that allowed you to determine that Mr. Munoz was responsible for the murder of Ivan Mena?

MR. GIVEN: Form, harassment, oppressive.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. Prior to bringing Mr. Beubea Garcia in to view a lineup with Mr. Munoz in it, what information did you have that led you to believe that Mr. Munoz was responsible for the shooting death of Mr. Mena?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. So you knew that a woman by the name of Sonia Blevin had witnessed the

355

shooting that occurred on September 8th, 1985 at 4218 West Potomac, right?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And you didn't contact Sonia Blevin to determine whether or not she could identify Reynaldo Munoz as the person who had committed the shooting, right?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. Or did you contact Ms. Blevin, and she told you that it wasn't Mr. Munoz?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. Sir, did you not have Mr. -- strike that. Did you avoid having Ms. Blevin look at the lineup that contained Mr. Munoz because you knew Mr. Munoz was not responsible for this murder?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And you knew Sonia Blevin would not be able to identify Mr. Munoz as the shooter of Ivan Mena and Bobby Garcia because he was,

356

in fact, innocent of that crime, correct?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. Isn't it true that you and Detective Reynaldo Guevara conspired together to frame Daniel Rodriguez for the murder of Jose Hernandez, otherwise known as Gernito, that occurred on March 17th, 1991?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And isn't it true that you and Detective Guevara knew that Daniel Rodriguez had an alibi for the time that Mr. Hernandez had been murdered, and you disregarded that alibi because you wanted to frame Mr. Rodriguez for Gernito's murder?

MR. GIVEN: At this point I'll reassert my standing objections to this line of questioning about Mr. Rodriguez. Go ahead.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

357

BY MS. BONJEAN:

Q. Isn't it true on May 11th, 1991, you and Detective Guevara pulled Daniel Rodriguez over in his car near the College of Bryn Mawr?

A. On the advice of counsel, I assert my Fifth Amendment rights.

Q. Perhaps you remember this: Mr. Rodriguez was wearing a Bart Simpson T-shirt when you arrested -- Hold on -- when you arrested him. Do you remember that?

MR. GIVEN: Objection; form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And isn't it true that when you arrested had Mr. Rodriguez, you said to him, "Guess what, Bart Simpson? You won."

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And isn't it true that Daniel Rodriguez responded by saying, "Won what?"

A. On advice of counsel, I assert my Fifth Amendment rights.

358

Q. And isn't it true that you responded to Daniel Rodriguez by saying, "You got Gernito's murder"?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. Isn't it true, sir, that that's routinely how you and Detective Guevara closed cases during the 1990s in the Humboldt Park area?

MR. GIVEN: Objection; form, foundation.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. You randomly decided which gang bangers you were going to frame for murders that occurred in Humbolt Park; isn't that correct?

MR. GIVEN: Form and foundation.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. You had no reason to believe that Daniel Rodriguez was actually responsible for the murder of Gernito; isn't that correct?

359

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. You, nonetheless, decided, along with Detective Guevara, that you were going to frame Daniel Rodriguez for Gernito's murder?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. You and Detective Guevara also decided you were going to frame George Laureano for Gernito's murder, right?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. You had been unsuccessful at framing George Laureano for the murder from the CTA bus, so it was sort of his time to get framed, right?

MR. GIVEN: Objection; form and foundation.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. But George Laureano did what smart people on the West Side in the Humboldt Park

360

did when they got charged with a murder involving Detective Guevara; isn't that true?

MR. GIVEN: Objection, form, foundation, and possible to even answer that. Go ahead.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. Well, isn't it true that George Laureano went out and hired Rick Boyke to be his counsel for the murder involving Gernito?

MR. GIVEN: Objection; form, foundation, competence.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And isn't it true that Detective Guevara -- strike that. And Detective Guevara told you that George Laureano paid him $20,000 to beat the case, the case involving Gernito?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And this $20,000 was above and beyond whatever the fee was that he was

361

paying Mr. Boyke, correct?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And isn't it true that the case was assigned to Mr. Boyke's good friend, Judge Reyna?

MR. GIVEN: Objection; form, foundation, competence.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And isn't it true that George Laureano beat that case in a bench trial before Judge Reyna?

MR. GIVEN: Same objections.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. Do you know how much money Detective Guevara paid Judge Reyna in order to beat the case?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. Or were Judge Reyna and Rick Boyke

362

such good friends that he didn't actually need to pay Judge Reyna money in order to beat the case?

MR. GIVEN: Objection; form, foundation, competence.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. In any event, Daniel Rodriguez wasn't fortunate enough to beat his case because he didn't have Rick Boyke as an attorney; isn't that correct?

MR. GIVEN: Objection; form, foundation, competence.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. Isn't it true that Daniel Rodriguez was convicted based on a confession that you and Detective Guevara had coerced from him?

MR. GIVEN: Objection; form, foundation, competence.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

363

BY MS. BONJEAN:

Q. Isn't it true that you and Detective Guevara also framed an individual by the name of Tony Gonzalez for the murder of Hector Rivera and the attempt murders of two individuals by the name of Luis Marrero and Illuminata Nieves?

MR. GIVEN: I'll reassert my standing objection to this line of questioning for reasons previously stated.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. Now, you were aware that -- strike that. You and Detective Guevara were assigned to the murder of Hector Rivera that occurred at 2647 West Crystal in the Humbolt Park area of Chicago, correct?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. I'm sorry. I'm going to strike that. I actually got the address wrong. Let's start over.

You and Detective Guevara were

364

assigned to investigate a murder that occurred at 1215 North Washtenaw in Chicago, correct?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. The date of this murder was July 24th, 1998 --

THE COURT REPORTER: I'm sorry, Counsel. Hold on.

MS. BONJEAN: Sure.

BY MS. BONJEAN:

Q. And when you were assigned to the case, you read the general offense case report, correct?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. You knew that there was a young teenage girl by the name of Yesenia Rodriguez who had witnessed the murder of Hector Rivera and the attempt murders of Luis Marrero and Illumunata Nieves, right?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And isn't it true that you and

365

Detective Guevara read the police report that reflected an interview with Ms. Rodriguez immediately after the shooting or shortly after the shooting?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. And within hours of the shooting, Yesenia Rodriguez reported that although she had witnessed the shooting, she was unable to describe the shooter because his face was concealed by a black T-shirt that was wrapped around his face; isn't that correct?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. And despite having read that report, you and Detective Guevara decided to go speak with Yesenia Rodriguez to determine whether or not you might be able to use her to frame another person in Humboldt Park, right?

MR. GIVEN: Objection; form, foundation, oppressive. You can answer.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

366

BY MS. BONJEAN:

Q. And Yesenia Rodriguez was a young girl, a crime victim, and a Spanish-speaking young woman, right?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. And you and Detective Guevara had been highly successful at manipulating statements and identifications from young people, particularly, young women who were Spanish speakers and were victims of crimes; isn't that correct?

MR. GIVEN: Form and foundation.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And isn't it true that Detective Guevara and yourself brought Ms. Rodriguez to Grand and Central to look through a book that contained mugshots of Spanish Cobras?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. You and Detective Guevara decided you were going to frame a Spanish Cobra for

367

the murder of Hector Rivera, correct?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. You didn't care much which Spanish Cobra it was because eventually your goal, along with Detective Guevara's goal, was to make sure all Spanish Cobras were incarcerated; isn't that correct?

MR. GIVEN: Objection; form, foundation oppressive, and go ahead.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. Isn't it true that Yesenia Rodriguez told Detective Guevara that she could not see the shooter because his face was concealed by a black T-shirt that was wrapped around everything but his eyes?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. And isn't it true that Detective Guevara and yourself told Ms. Rodriguez just to look through the Spanish Cobras book and see if she could recognize anybody in the

368

book?

MR. GIVEN: Objection; form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And the young girl did as she was told and started looking through the Spanish Cobra book for anyone that she might be able to identify; isn't that correct?

MR. GIVEN: Objection; form, foundation, and competence.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. Isn't it true Ms. Rodriguez told you and Detective Guevara that she recognized Tony Gonzalez from somewhere on the street?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. Yesenia Rodriguez never told you or Detective Guevara that Tony Gonzalez was the person that she saw commit the shooting at 1215 North Washtenaw; isn't that right?

**A. On advice of counsel, I assert my**

Transcript of Ernest Halvorsen
Conducted on April 20, 2018

369

Fifth Amendment rights.

Q. She only identified someone she recognized, as was the instruction that was given to her by you and Detective Guevara, correct?

MR. GIVEN: Objection; form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And she also never told you that the offender made any gang announcements during the murder, correct?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. But you and Detective Guevara decided to fabricate a statement in which Yesenia Rodriguez purportedly said that the shooter had said, "Jiver killer," right?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And Yesenia Rodriguez never told you that the offender who shot at Luis Marrero in the alley of 1215 North Washtenaw said, "Jiver killer," correct?

370

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And after you asked Ms. Rodriguez to identify someone from the Spanish Cobra book that she recognized, you prepared a police report on July 27th, 1998; isn't that correct?

MR. GIVEN: Objection; form.

(Halvorsen Deposition Exhibit No. 4 was marked for identification.)

MS. BARBER: I'm just noting for the record this one does not appear to be Bates stamped either.

MS. BONJEAN: I'll represent that if it has not been produced, I will make sure it is, but I believe it was. I could be wrong.

BY MS. BONJEAN:

Q. Mr. Halvorsen, I'm handing you what's been marked as Halvorsen 4. This is a supplemental report that bears your signature at the bottom, along with Detective Guevara. And this is also a supplemental police report that you prepared or authored; isn't that correct?

371

MR. GIVEN: Objection; form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And if you'll look at the second page of this police report, there is a summary of a statement by Yesenia Rodriguez that was purportedly made on July, I guess, 27th, 1998 or -- strike that. On July 25th, 1998, correct?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And this would have been the day after the shooting, in which you conducted this interview of Ms. Rodriguez and showed her photos of Spanish Cobra gang members, right?

MR. GIVEN: Objection; form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And on Page 3 of this police report, you reported --

MR. GIVEN: Just to be clear, when you

372

say Page 3, you mean the page that's marked Page 3 and not where I actually count the pages?

MS. BONJEAN: They're the same this time.

MR. GIVEN: Not on mine. I actually have blank pages.

MS. BONJEAN: I didn't do the copying. I don't know what happened.

MR. GIVEN: Okay. I just want to be clear since the last time you said a page, and it was not marked the right way, and you told me I was wrong for not counting the number of pages rather than looking at the page numbers.

MS. BONJEAN: I didn't tell you you were wrong. I was trying to clarify for you.

MR. GIVEN: Well, I'm just trying to clarify as well.

MS. BONJEAN: That's fine.

MR. GIVEN: Page 3 that says Page 3?

MS. BONJEAN: That's 3. I didn't realize your copy had a blank page.

Transcript of Ernest Halvorsen
Conducted on April 20, 2018

BY MS. BONJEAN:

Q. Now that we're on the same page -- no punt intended -- I'll have you look, sir, at the top of that Page 3.

You reported that Ms. Rodriguez told you that the offender was male, white Hispanic, age 18 through 22, 5'7 to 5'10, thin build, medium complexion; isn't that correct?

A. **On advice of counsel, I assert my Fifth Amendment rights.**

Q. And, in fact, Ms. Rodriguez never told you that the offender was a male, white Hispanic, age 18 to 22, 5'7 to 5'10 in build, medium complexion, correct?

A. **On advice of counsel, I assert my Fifth Amendment rights.**

Q. In fact, she told you -- the first responding detectives, that the offender was a dark Hispanic -- a dark-skinned Hispanic, correct?

A. **On advice of counsel, I assert my Fifth Amendment rights.**

Q. You attributed a false statement to her that matched a photograph of Tony Gonzalez that was contained in the Spanish Cobra mug book, correct?

MR. GIVEN: Objection; form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. You also falsely reported that Ms. Rodriguez told you that the offender had a white T-shirt on his head that did not cover his face and that she got a good look at the offender's face but had never seen him before?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And, in fact, that statement was false too. Ms. Rodriguez never told you that the offender had a white T-shirt on his head that did not cover his face, correct?

A. **On advice of counsel, I assert my Fifth Amendment rights.**

Q. She also never told you that she got a good look at the offender's face, rather, she told you that she did not get a good look at the offender's face because his face was concealed by a black T-shirt; isn't that correct?

A. **On advice of counsel, I assert my Fifth Amendment rights.**

Q. But you and Detective Guevara jointly decided that you would attribute false statements to Ms. Rodriguez, and you included those false statements in this supplemental report that you authored on July 28th, 1998?

A. **On advice of counsel, I assert my Fifth Amendment rights.**

Q. And then after interviewing Ms. Rodriguez, you took the photo of Tony Gonzalez, and you brought it to Mr. Marrero, who was convalescing in a hospital, correct?

A. **On advice of counsel, I assert my Fifth Amendment rights.**

Q. And isn't it true that you told Mr. Marrero that you had identified or determined who the shooter was and showed him a photograph of Tony Gonzalez?

A. **On advice of counsel, I assert my Fifth Amendment rights.**

Q. And isn't it true that you put together a so-called photo array, in which Mr. Gonzalez stood out by virtue of the fact that the background of his photograph was white, and he had a placard in front of him, whereas, the other individuals in the photo array had a black background with no placard?

MR. GIVEN: Objection; form and foundation.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And you show Luis Marrero this photo array -- this suggestive photo array, so that he could identify Mr. Gonzalez as the shooter?

A. **On advice of counsel, I assert my Fifth Amendment rights.**

Q. And you tricked and manipulated Luis Marrero into believing that Tony Gonzalez was the person who shot him and

Transcript of Ernest Halvorsen

Conducted on April 20, 2018

377

killed his friend, Hector Rivera, as you had done in the past in a number of cases, correct?

MR. GIVEN: Form, foundation, competence.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. Isn't it true that you and Detective Guevara gave false testimony at Mr. Gonzalez's trial in order to secure his wrongful conviction?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. You never told the State or Mr. Rodriguez's -- strike that.

You never told the State, who was prosecuting Hector Rivera's murder or the defense attorneys who were representing Tony Gonzalez that you and Detective Guevara had showed Ms. Rodriguez a book of Spanish Cobras and told her just to identify anyone she recognized from that book, correct?

MR. GIVEN: Form.

378

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. You did not tell the State prosecutors or the defense attorneys for Mr. Gonzalez that you and Detective Guevara had fabricated Ms. Rodriguez's statement, that she actually did get a good look at the offender?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And isn't it true that you never told the State prosecutors or the defense attorney for Tony Gonzalez that Luis Marrero who he should identify from this suggested photo array?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And, in fact, you knew that Luis Marrero was highly intoxicated at the time of the shooting, right?

A. On advice of counsel, I assert my

379

Fifth Amendment rights.

Q. You further knew Luis Marrero said he could not make an identification because his back was turned when the shooting occurred, it was dark, and in an alley and he was intoxicated, correct?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. But after you and Detective Guevara interviewed Mr. Rivera, you were able to persuade him that he should identify Tony Gonzalez as the offender, correct?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. What exactly did you say to Luis Marrero to get him to identify Tony Gonzalez as the shooter when Luis Marrero had no idea and had not seen the person who shot him and his friend, Hector Rivera?

MR. GIVEN: Sorry. Form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

380

BY MS. BONJEAN:

Q. Why did you and Detective Guevara frame Tony Gonzalez for the murder of Hector Rivera?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. In fact, Tony Gonzalez wasn't even a Spanish Cobra; isn't that correct? Not one that you were familiar with, right?

MR. GIVEN: Form, foundation, competence.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

MR. GIVEN: Do you want to take a break?

MS. BONJEAN: Yes.

THE VIDEOGRAPHER: Off the record at 4:45.

(A recess was taken.)

THE VIDEOGRAPHER: Back on the record, 4:53.

BY MS. BONJEAN:

Q. Mr. Halvorsen, isn't it true that

you framed Jose Juan Masonette, Jr. (phonetic) for the murders of a Kevin and Torrence Wiley that occurred on May 24th, 1990?

MR. GIVEN: Same standing objections as I've previously stated with regard to questions about this case, this Masonette case.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. Isn't it true that you framed Alfredo Gonzalez for the murders of Kevin and Torrence Wiley that occurred on May 24th, 1990?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. Isn't it true that you framed Jose -- strike that. Isn't it true that you framed co-defendant, Justino Cruz and Christopher Goosens, for the murders of Kevin and Torrence Wiley that occurred on May 24th, 1990?

MR. GIVEN: And just for the record, same standing objections with regard to Mr. Gonzalez Cruzen?

MS. BONJEAN: Cruz.

MR. GIVEN: Justino Cruz and --

MS. BONJEAN: And Christopher Goosens.

MR. GIVEN: Goosens, whatever. Okay.

MS. BONJEAN: G-O-O-S-E-N-S.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And isn't it true, sir, that you you conspired with your fellow officers, Detective Pawlnisky (phonetic), Detective Montias (phonetic), Detective Guevara, and Sergeants Mingy and Epplen to frame both Jose Masonette, Alfredo Gonzalez, Justino Cruz, and Christopher Goosens for the murders of Kevin and Torrence Wiley that occurred on May 24th, 1990.

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. Isn't it true that you also conspired with Assistant State's Attorney DeFranco in order to secure fabricated statements from Jose Juan Masonette and Alfred Gonzalez that would later be used against them to secure their wrongful convictions?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. You were aware that Mr. Masonette was arrested on July 3rd of 1990 in connection with an unrelated -- with an unrelated murder; isn't that correct? Strike that. That's not accurate. My apologies.

Isn't it true you that you were aware that on July 3rd of 1990 Mr. Masonette was arrested in connection with an unrelated shooting that occurred in Humboldt Park?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. And you were aware that Roland Pawlniski had arrested Mr. Masonette for the shooting that occurred on July 3rd, 1990; and while Mr. Masonette was in custody at Area 5, he was questioned about any knowledge he had about the Wiley brothers murders, correct?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. And that on July 3rd, 1990, Mr. Masonette told Sergeant Mingy and Detective Montia that he had no knowledge about the Wiley brothers murders that occurred on North Avenue, murders that occurred on, let's see, May 20th -- No, I'm sorry -- May 25th of 1990, correct?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. Now, originally, Detective Guevara and yourself decided that you were going to -- strike that.

You and Detective Guevara, Sergeant Mingy, and Sergeant Epplen determined that you were going to frame Latin Kings for the murder that occurred on North Avenue of Torrence and Kevin Wiley, correct?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. And you and your fellow officers determined to frame Latin Kings because North

Transcript of Ernest Halvorsen
Conducted on April 20, 2018

Avenue at that location was King territory, correct?

MR. GIVEN: Objection; form and foundation.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And, in fact, initially, you had conspired with Detective Guevara and your fellow officers to frame two individuals who were Latin Kings by the name of Efrain Cruz and Francisco Vera, correct?

A. On advice --

MR. GIVEN: Objection; form. I'm sorry. Go ahead.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And, in fact, you arrested -- you and your fellow officer arrested Mr. Vera and Mr. Cruz, Efrain Cruz, and brought them to Grand and Central for questioning about the Wiley brothers murders?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. You ultimately had to release Mr. Vera and Mr. Cruz from custody because it was determined that they were actually in police custody on the early morning hours of May 25th, 1990 when with the murders occurred, correct?

MR. GIVEN: Objection, form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. So shortly after that, Detective Guevara told you he wanted to frame Jose Masonette for the murders of the Wiley brothers, correct?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And you were aware, sir, weren't you, that Mr. Masonette had been paying protection money to Detective Guevara up until around May 20th of 1990?

A. On advice --

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And, in fact, isn't it true, sir, that Detective Guevara told you that Masonette had stopped make protection payments to him because he was angry at him related to the frame-up of another friend whose name is Santiago Sanchez?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. So isn't it true that on August 22nd, 1990 you learned from Detective Pawlniski and your fellow officers that Mr. Masonette had made bond on the attempted murder case that he had been previously arrested for on July 3rd?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And you learned that Detective Pawlnisky had arrested Mr. Masonette at 26th and California outside of Room 101 and had brought him to Grand and Central in the morning, correct, of August 22nd, 1990?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And you and Detective Guevara was starting your shift on the evening -- or the early evening of August 22nd, 1990; isn't that correct?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And that after coming to Grand and Central, you and Detective Guevara discussed the fact that Detective Guevara was going to interrogate Mr. Masonette in order to get him to falsely confess to the murders of the Wiley brothers, right?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And over the course of approximately 13 hours, sir, isn't it true that Detective Guevara intermittently would -- strike that.

Over the course of the next 13 hours, Detective Guevara used physical abuse to extract an inculpatory statement from Mr. Masonette?

MR. GIVEN: Objection; form, foundation.

Transcript of Ernest Halvorsen
Conducted on April 20, 2018

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And by -- I mean, over the course of 13 hours -- it wasn't necessarily 13 hours straight, but Mr. Guevara would come in and out of the interrogation room and intermittently beat Mr. Masonette about his body, genitals, and head with a telephone book and a flashlight, correct?

MR. GIVEN: Form and foundation.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. You did nothing to stop Mr. Guevara from physically abusing Mr. Masonette in order to secure an inculpatory statement that you would later use against him in order to secure his wrongful conviction, correct?

MR. GIVEN: Form and foundation.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. After approximately 13 hours of intermittent beatings, isn't it true that Detective Guevara told you that Masonette was ready to "cooperate"?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And by "cooperate," Detective Guevara that meant he was ready to repeat a false narrative or a false story that implicated himself and others, including Alfredo Gonzalez and Justino Cruz, in the murders of Torrence and Kevin Wiley?

MR. GIVEN: Form, foundation competence.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And as a result, you and Detective Guevara contacted Assistant State's Attorney Frankie DeFranco and told him to come to Area 5 so that he could take a statement from Mr. Masonette that had been secured through physical abuse by Detective Guevara?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And isn't it true that Assistant's State's Attorney DeFranco came to Area 5, and together with Detective Guevara and yourself and Detective Montia, you agreed to contrive a story that involved Mr. Masonette implicating himself as the driver of the car that was involved in the murders of Kevin and Torrence Wiley, correct?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And Detective Guevara had persuaded Mr. Masonette to falsely allege that Alfred Gonzalez was the shooter of Torrence and Kevin Wiley, correct?

MR. GIVEN: Form and foundation.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And at approximately August 23rd, 1990 at 9:28 a.m., you are aware, sir, that Mr. Masonette falsely confessed to the Wiley brothers murders that occurred on May 20th, 1990, correct?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And isn't it true, sir, that Mr. Masonette also falsely implicated Alfred Gonzalez in the crime?

MR. GIVEN: Objection; form and foundation.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. Specifically, isn't it true, sir, that Mr. Masonette falsely told the Assistant State's Attorney, as well as Detective Montia that Alfredo Gonzalez had asked him to hide a nine millimeter pistol at his home located at 1320 North Homan?

MR. GIVEN: Form and foundation.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And isn't it true that Masonette falsely stated that Alfred Gonzalez came to his home between 11:30 p.m. and 12 o'clock a.m. on May 24th, 1990 with two other Latin

393

Kings by the name of Christopher Hernandez, who went by the nickname Fro and Tino, whose real name was Justino Cruz; and that they came to Mr. Masonette's home, again, at that hour just before May 25th, 1990?

MR. GIVEN: Form and foundation.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. Isn't it true that Mr. Masonette falsely told the detective and the Assistant State's Attorney that Alfred Gonzalez, Fro, and Tino had told him that they got two guys on Drake and North Avenue waiting for some dope, and that Masonette falsely stated that he drove to Drake and North Avenue with Alfred Gonzalez, Fro, and Tino?

MR. GIVEN: Form and foundation.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And isn't it true, sir, that Mr. Masonette falsely told you and other detectives, as well as Assistant State's

394

Attorney DeFranco that Alfred Gonzalez was in the passenger seat with a gun and that Fro and Tino were in the back; and that when they got to the area that Masonette waited in the car while Alfred Gonzalez, Fro, and Tino approached the two black men on North Avenue, and that he could hear them talking?

MR. GIVEN: Form and foundation.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. Isn't it true, sir, you knew Mr. Masonette falsely claimed that he heard five or six shots and then saw the two men on the ground and Alfred Gonzalez pointing the nine millimeter gun at them?

MR. GIVEN: Form and foundation.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. You knew that Mr. Masonette's statement that he made, both to Detective Guevara and later to Assistant State's Attorney DeFranco and Detective Montia, was

395

in its entirety false, and that Mr. Masonette had no involvement in the murder of the Wiley brothers, nor did his co-defendants, Alfredo Gonzalez, Christopher Goosens, and Justino Cruz, correct?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. After Mr. Gonzalez -- strike that. After Mr. -- strike that one more time.

And isn't it true also that you, Detective Guevara, and Detective Montia jointly decided to manipulate or coerce Mr. Masonette's girlfriend into making a statement that implicated Alfred Gonzalez and Jose Masonette and Justino Cruz in the murders of the Wiley brothers?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. In fact, on August 23rd, 1990 at 2 o'clock p.m., Jose Masonette's girlfriend, Rosa Bellow provided a handwritten statement in which she falsely stated that Gonzalez,

396

Fro, and Tino came to her house that she shared with Mr. Masonette and retrieved a nine millimeter weapon at roughly 11:30 p.m. on May 24th, 1990, correct?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. In fact, Detective Guevara and yourself threatened Ms. Bellow by telling her that if she did not cooperate and state what you wanted her to state, that you would arrange to have her children taken away by DCFS, correct?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. In fact, Ms. Bellow spent approximately 24 hours at the police station and eventually agreed to sign a statement that had been written out by an Assistant State's Attorney and a detective that prepared it, correct?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And you and Detective Guevara, as well as the Assistant State's Attorney knew

Transcript of Ernest Halvorsen
Conducted on April 20, 2018

397

that the statement that Ms. Bellow had signed was false, and that she only signed that statement out of fear of losing custody of her children?

MR. GIVEN: Form, foundation, and competence.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. Now, isn't it true, sir, that after Mr. Masonette was charged with the murder -- murders of the Wiley brothers, you and Detective Guevara and your supervising sergeant realized that there was no probable cause to justify the arrest of Mr. Masonette in the first place?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And as a result, you authored a police report that contained false statements attributing false oral statements to Mr. Masonette to justify his arrest, correct?

A. On advice of counsel, I assert my Fifth Amendment rights.

398

Q. With the collaboration of the other detectives in the case, including Guevara, Montia, Sergeant Mingy, as well as Assistant State's Attorney DeFranco, you put your report writing skills to work and began drafting supplemental police reports that had a number of false and fabricated statements in it that served to justify plaintiff's unlawful arrest, correct?

MR. GIVEN: Objection; form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. Specifically, you included a statement in this police report that you authored claiming that Mr. Masonette made inculpatory statements to Defendants Mingy and Montia on July 15th, 1990 when he was in custody for the murder that occurred on July 3rd, 1390 -- for the attempt murder that occurred on July 3rd of 1990, correct?

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

399

BY MS. BONJEAN:

Q. Isn't it true that you had reason to believe that Mr. Masonette had made any statements acknowledging knowledge about the murders of the Wiley Brothers on July 15th, 1990?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And notwithstanding the fact that you had no factual basis to believe that Mr. Masonette had ever made any statements implicating himself or any others or suggesting that he had any knowledge about the Wiley brothers murders, you falsely reported in the supplemental report prepared on August 24th, 1990 that Mr. Masonette had told Mingy and Montia that he did have knowledge of the murders?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. You also falsely reported that Mr. Masonette told Montia and Mingy on August 1st, 1990 that he was involved in the murders of the Wiley brothers, correct?

400

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. You claimed that Mr. Masonette made an oral statement to Mingy and Montia in Cook County jail on August 1st, 1990 in which he claimed to have some involvement in the murders of the Wiley brothers, correct?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And that oral statement that is contained in the August 24th, 1990 supplemental police report is a false statement that you authored, correct?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And, in fact, those oral statements that were attributed to Mr. Masonette were later used in the criminal trial that resulted in his conviction for the murders of the Wiley brothers and natural life sentence, correct?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And, in fact, the statement that

Transcript of Ernest Halvorsen
Conducted on April 20, 2018

101 (401 to 404)

---

401

was coerced by Rosa Bella -- Bellow, was later used to force Ms. Bellow to testify at the criminal trial of Alfred Gonzalez; isn't that correct?

MR. GIVEN: Form, foundation, and competence.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. You knew that Mr. Masonette and Mr. Alfredo Gonzalez, Mr. Cruz, and Mr. Goosens had nothing to do with the Wiley brothers murders; isn't that fair?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. But you and Detective Guevara decided that you would frame those four individuals for those murders, and Detective Guevara, specifically, was eager to frame Mr. Masonette for the murders?

A. On advice of counsel, I assert my Fifth Amendment rights.

MS. BONJEAN: I'm going to move on to the last --

---

402

MR. GIVEN: Okay. Let me just say that just for the record, that all of those questions that you just asked about the Masonette case appear to be re-reading paragraphs from the complaint and then asking isn't it true or not, that's perfectly fine in order to do that; but I just wanted to state for the record, yet, again, that I will object to re-deposing this witness in the Masonette case because you've just deposed him in this case on those very same issues.

MS. BONJEAN: Okay. I don't know -- Unless you the ability to read my notes, I can assure you that this is not the complaint. There are portions of the complaint that were incorporated in my notes to remind me of dates and times, but this is not Mr. Masonette's complaint. In fact, I referenced it in a number of different cases in here.

MR. GIVEN: Well, fair enough. We'll have this fight in front of the judge on another day.

So who are we moving on to now?

---

403

MS. BONJEAN: And for the record, I have in no way exhausted my questioning of Halvorsen. It wouldn't be possible within the time period, so --

MR. GIVEN: Oh, it would certainly be possible. You would choose not to do it. It's certainly possible.

MS. BONJEAN: Well, when you spend two decades framing people, it's kind of hard to get to everybody.

MR. GIVEN: That statement is, of course, highly oppressive and would be cause, in fact, for me to cancel this dep at this point; but I'm not going to do that. Why don't you move on to the next set of questions.

MS. BONJEAN: Well, for the record, to be clear, these questions are being asked because there's certainly an argument that plaintiff could make at a later date that certain evidence pursuant to Federal Rules of Evidence 404(b) would be admissible at a trial; and that is the area that we're exploring because it would lead potentially

---

404

to discoverable evidence, and it's not overly burdensome since we have Mr. Halvorsen here.

MR. GIVEN: Well, we're here to answer your questions today. So you and I can have this discussion another time.

MS. BONJEAN: Okay.

MR. GIVEN: You want to get going, and he wants to get going.

BY MS. BONJEAN:

Q. Isn't it true you, along with Detective Guevara, and Officer Mark O'Shefsky (phonetic) framed Roberto Almodovar, A-L-M-O-D-O-V-A-R, and William Negron for the murders of Amy Merkez (phonetic), George Rodriguez, and the attempt murders of Jacqueline Grande and Conetti Sayez (phonetic).

MR. GIVEN: Same standing objections with regard to this line of questioning about Mr. Almodovar and Negron that I've previously stated.

You can answer.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

---

Transcript of Ernest Halvorsen
Conducted on April 20, 2018

405

BY MS. BONJEAN:

Q. Isn't it true, sir, that you and Detective Guevara were assigned to the murders -- were assigned to investigate the murders of George Rodriguez and Amy Merkez that occurred on the early morning hours of September 1st, 1994?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. And, sir, you were aware that Rodriguez and Merkez were outside a building located at 3920 West Cortland Street, along with Mr. Sayez and Ms. Grande in the early morning of September 1st, 1994 when a blue car pulled up and started shooting at the group of young people standing outside or hanging outside on a stoop in front of this apartment building, correct?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. And isn't it true that this blue car, which was described as a blue Oldsmobile, contained three individuals, but that none of the living witnesses were able

406

to give any description of who was in that -- any description of the offenders in the vehicle?

MR. GIVEN: Objection; form and foundation.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. In fact, you were aware that Jacqueline Grande told a police officer, Detective Gembowski (phonetic), that the assailants were three male Hispanics, that the driver was tall and thin, dark hair, light complexion, that the front passenger had a thin, long face with a light complexion, black jacket, red hat, and that the back -- the back seat passenger was skinny, dark hair, medium complexion, clean-looking, all teens and early 20s, correct?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. And that was the extent of the description that Ms. Grande was able to

407

provide to the detective on September 1st of 1994, correct?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. And Conelli Sayez was interviewed at the police station after the shooting and could only describe the offenders as three male Latinos in this blue car, correct?

MR. GIVEN: Objection; form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And despite the fact that those were the only descriptions that were provided by the witnesses/victims of the crime, you and Detective Guevara determined that you would close the case by framing individuals who were members of the Insane Dragon gang, correct?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. You were aware that the Insane

408

Dragons or you thought you were aware that the Insane Dragons were in some type of gang war with the gang to which Mr. Rodriguez and Mr. Sayez belonged, and, thus, made sense to frame an individual from the Insane Dragons under the theory that the victims' gang, the Maniac Latin Disciples were retaliating -- strike that. Let me start over.

You theorized that the Maniac Latin Disciples, the victims' gang, and the Insane Dragons were at war with one another and, therefore, the shooting on Cortland was actually in retaliation for the murder of an Insane Dragon that had taken place actually about the seven blocks away, correct?

MR. GIVEN: Form.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And you and Detective Guevara decided to consult with Mark O'Shefsky about which Insane Dragons you should frame for this murder because Mr. O'Shefsky had a particular -- a knowledge and disdain for the

409

Insane Dragons, correct?

A. On advice of counsel, I assert the Fifth Amendment right.

Q. In fact, Mark O'Shefsky told you and Detective Guevara that he had a particular Insane Dragon that he wanted to frame, and that was Robert Almodovar, correct?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. But because Mr. Almodovar had not been arrested previously for any serious crimes, there were no photographs at Grand and Central of Mr. Almodovar, and, therefore, Detective O'Shefsky told you and Guevara that he would get a Polaroid photo of Mr. Almodovar, right?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And Mr. O'Shefsky and his partner actually did a pretextual arrest of Mr. Almodovar while he was at his cousin's house and brought him in to Area 5 for the sole purpose of taking a Polaroid photo of

410

him that would later be used to show the individuals in this case, correct?

MR. GIVEN: Form, foundation, competence.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And, in fact, you and Detective Guevara also asked O'Shefsky to provide a photo of another Insane Dragon who you could frame for the murders that occurred on Cortland, correct?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And with no factual basis whatsoever, O'Shefsky gave you a picture of William Negron and identified him as an "associate of Mr. Almodovar," right?

MR. GIVEN: Objection; form, foundation, competence.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. You and Detective Guevara had no

411

factual basis to believe that Robert Almodovar or William Negron were involved in the murders of George Rodriguez or Amy Merkez, correct?

A. On advice of counsel, I assert my Fifth Amendment rights.

Q. And notwithstanding the fact there was no factual basis to believe that Mr. Almodovar or Mr. Negron were involved in those murders. Detective Guevara took those Polaroid photos and brought them to the victim, the living victim, Jacqueline Grande, for her to view, correct?

MR. GIVEN: Form and foundation.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And Detective Guevara told Jacqueline Grande, who had just been released from the hospital, that Robert Almodovar and William Negron were the persons responsible for shooting her and killing her best friend?

MR. GIVEN: Objection; form.

THE WITNESS: On advice of counsel, I

412

assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And, in fact, Detective Guevara, manipulated this young girl, who was traumatized by having been a crime victim and watching her two friends murdered, that he was confident that Almodovar and Negron were responsible and that she should look at the photos and carefully -- and that he was confident that she would be able to identify them as the people who committed the murder on Cortland street -- murders?

MR. GIVEN: Form and foundation.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And through manipulation and persuasion, Detective Guevara was able to get Ms. Grande to agree that Mr. Almodovar and Mr. Negron were in that blue Oldsmobile that shot at her and her friends in the early morning hours of September 1st, 1994, correct?

MR. GIVEN: Form and foundation.

Transcript of Ernest Halvorsen

104 (413 to 416)

Conducted on April 20, 2018

413

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And, relatedly, Detective Guevara was able to use Ms. Grande and these photographs just to persuade Mr. Sayez also to agree that Almodovar and Negron were in that blue Oldsmobile that shot and killed their friends in the early morning hours of September 1st of 1994?

MR. GIVEN: Form and foundation.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And Detective Guevara told Ms. Grande and Mr. Sayez that he was going to take them to look at a live lineup that contained Mr. Almodovar and Mr. Negron at Grand and Central, correct?

MR. GIVEN: Form and foundation.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And he had Ms. Grande and Mr. Sayez

414

look at a live lineup that contained Mr. Almodovar and Mr. Negron after having showed both of those witnesses Polaroid photos of Mr. Almodovar and Mr. Negron, correct?

MR. GIVEN: Form and foundation.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And Detective Guevara told you, did he not, that he advised Sayez and Grande not to mention that he had shown them the Polaroid photos prior to them viewing the live lineup?

MR. GIVEN: Form and foundation.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And, in fact, Mr. Sayez and Ms. Grande did, in fact, view a live lineup in which they identified Mr. Almodovar and Mr. Negron as two of the offenders from the shooting on September 1st, 1994?

**A. On advice of counsel, I assert my**

415

**Fifth Amendment rights.**

Q. And isn't it true that it was a result of Detective Guevara's misconduct that -- strike that.

Isn't it true that as a result of your misconduct, Detective Guevara's misconduct, and Detective O'Shefsky's misconduct that Ms. Grande and Mr. Sayez made false identifications of Mr. Almodovar and Mr. Negron.

MR. GIVEN: Form, foundation, competence.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

BY MS. BONJEAN:

Q. And those false identifications were later repeated in court when Mr. Almodovar and Mr. Negron were criminally prosecuted for the murders of George Rodriguez and Amy Merkez?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. And a result of those fabricated identifications that you, Detective Guevara,

416

Mark O'Shefsky, and your supervising sergeant, Epplen, secured from Mr. Sayez and Ms. Grande, isn't it true that Mr. Almodovar and Mr. Negron were wrongfully convicted of the murders of George Rodriguez and Amy Merkez?

**A. On advice of counsel, I assert my Fifth Amendment rights.**

Q. And isn't it true that you never told any State prosecutors or attorneys for Mr. Almodovar or Mr. Negron that Detective and Guevara and yourself had utilized improper identification methods in order to secure false identifications from Mr. Sayez and Ms. Grande?

MR. GIVEN: Form and foundation.

THE WITNESS: On advice of counsel, I assert my Fifth Amendment rights.

MS. BONJEAN: I have nothing further.

MR. GORMAN: Nothing from me.

MS. BARBER: I have nothing.

MS. CERCONE: I have no questions.

MR. GIVEN: Nothing from me. We'll reserve signature.

417

THE VIDEOGRAPHER:  This concludes the video deposition of Mr. Halvorsen, 5:30.

(The deposition proceedings were concluded at 5:30 p.m.)

418

ACKNOWLEDGMENT OF DEPONENT

I, Ernest Halvorsen, being first duly sworn, on oath say that I am the deponent in the aforesaid transcript of my deposition taken April 20, 2018, consisting of pages 1 through 415, whatever inclusive, taken at the aforesaid time and place and that the foregoing is a true and correct transcript of my testimony so given.

_____ Corrections have been submitted

_____ No corrections have been submitted

_____

Ernest Halvorsen, Deponent

SUBSCRIBED AND SWORN TO before me this _____ day of _____, A.D., 2018.

_____

Notary Public

419

STATE OF ILLINOIS   )
            ) SS:
COUNTY OF COOK     )

I, Aneesha L. Williams, Certified Shorthand Reporter in and for the County of Cook, State of Illinois, do hereby certify that on the 20th day of April, A.D., 2018, the deposition of witness, ERNEST HALVORSEN, called by the Plaintiff, was taken before me, reported stenographically and was thereafter reduced to typewriting through computer-aided transcription.

The said witness, ERNEST HALVORSEN, was first duly sworn to tell the truth, the whole truth, and nothing but the truth, and was then examined upon oral interrogatories.

I further certify that the foregoing is a true, accurate and complete record of the questions asked of and answers made by the said witness, at the time and place hereinabove referred to.

The signature of the witness was not waived by agreement.

Pursuant to Rule 207(a) of the Rules of

420

the Supreme Court of Illinois, if deponent fails to read and sign this deposition transcript within 30 days or make other arrangements for reading and signing thereof, this deposition transcript may be used as fully as though signed, and the instant certificate will then evidence such failure to read and sign this deposition transcript as the reason for signature being waived  .

The undersigned is not interested in the within case, nor of kin or counsel to any of the parties.

Witness my official signature as a Certified Shorthand Reporter, in and for Cook County, Illinois on this 8th day of May, 2018.

_____
Aneesha L. Williams,
Certified Shorthand Reporter
License No. 084-004443

Transcript of Ernest Halvorsen
Conducted on April 20, 2018                                    106

**A**

**a-d-o-l-f-o**
322:13
**a-l-f-r-e-d-o**
322:21
**a-l-m-o-d-o-v-a-r**
404:13
**a-l-v-a-r-e-z**
298:4
**a-n-d-i-n-o**
323:5
**a-n-g-e-l**
321:12, 323:13
**aberdeen**
2:5, 3:13, 7:7
**abilities**
114:24
**ability**
402:13
**able**
39:22, 95:11,
110:1, 120:5,
132:3, 151:5,
166:18, 182:20,
183:4, 196:8,
202:5, 213:11,
215:20, 216:15,
249:15, 284:22,
346:24, 354:1,
355:23, 365:18,
368:8, 379:10,
405:24, 406:24,
412:10, 412:18,
413:5
**above**
360:23
**abraham**
333:3, 335:3
**absent**
48:14
**absolutely**
19:6, 19:23,
52:8, 140:15,
338:22
**abuse**
38:24, 39:2,
45:14, 46:21,

142:19, 143:17,
173:6, 247:16,
248:2, 388:21,
390:21
**abused**
47:9
**abusing**
389:16
**accepting**
332:10
**according**
161:22, 185:4,
225:6
**account**
252:16, 313:20
**accurate**
70:10, 70:13,
383:13, 419:18
**accurately**
329:6
**accused**
143:4, 305:17
**acknowledging**
399:4
**acknowledgment**
418:1
**acquaintance**
246:19
**across**
202:6
**act**
78:7, 149:11,
236:10, 266:15
**acted**
75:22
**action**
231:9
**actions**
26:18, 137:18
**actively**
37:9
**activity**
92:10, 302:16,
332:13
**acts**
15:5
**actual**
70:9, 79:11,

186:22
**actually**
20:15, 20:19,
21:20, 29:19,
37:9, 38:9,
43:23, 53:9,
53:17, 53:20,
54:21, 64:22,
65:18, 76:12,
79:5, 80:13,
91:22, 104:3,
104:15, 117:15,
118:19, 129:1,
131:13, 134:11,
134:17, 135:18,
147:6, 152:13,
155:3, 165:14,
177:20, 178:17,
183:24, 184:3,
192:8, 199:5,
201:11, 205:11,
236:24, 248:6,
248:18, 249:17,
250:9, 251:23,
254:10, 330:18,
335:16, 335:17,
336:15, 336:23,
337:15, 344:8,
349:18, 350:20,
358:23, 362:1,
363:22, 372:2,
372:6, 378:8,
386:4, 408:13,
408:14, 409:21
**add**
301:19, 302:2
**addict**
37:4
**addiction**
89:10
**addition**
205:17, 301:21
**additional**
61:10, 253:4
**address**
363:22
**administer**
7:14

**admissible**
403:22
**admissions**
126:5
**admit**
240:14
**admits**
125:23
**admitted**
76:19, 77:1,
77:9, 144:12,
167:9, 207:16,
280:13, 280:21,
313:7
**adolfo**
322:12
**adopt**
164:3, 189:17,
213:18
**adopted**
191:9
**adopting**
185:17, 186:4
**advance**
61:11
**advised**
414:11
**affidavit**
6:20, 246:9,
246:11, 246:16,
248:7, 248:10
**affiliation**
39:16, 39:21,
40:5
**affirmations**
214:4
**affirms**
246:17
**affixed**
11:21, 184:13
**aforesaid**
418:5, 418:8
**afraid**
347:23, 348:4
**after**
24:13, 24:19,
28:14, 29:6,
29:7, 30:16,

31:9, 39:2,
46:20, 47:7,
47:8, 61:6,
68:5, 78:17,
81:11, 82:1,
84:12, 96:17,
98:2, 99:16,
100:22, 105:8,
105:9, 106:24,
118:19, 123:21,
130:6, 130:17,
131:2, 132:18,
141:17, 141:20,
143:16, 145:2,
150:6, 171:9,
173:18, 174:6,
188:15, 214:21,
218:22, 222:2,
224:24, 225:10,
225:16, 236:19,
237:5, 245:2,
245:16, 254:5,
333:19, 334:4,
335:3, 338:20,
346:15, 349:9,
353:24, 365:3,
365:4, 370:3,
371:14, 375:16,
379:9, 386:12,
388:8, 389:24,
395:8, 395:9,
397:10, 407:6,
414:2

**afternoon**
233:3

**again**
10:19, 87:22,
88:24, 90:9,
95:21, 101:15,
128:5, 145:7,
161:12, 165:7,
184:12, 189:2,
211:3, 226:12,
243:12, 254:10,
271:24, 274:5,
300:5, 316:21,
317:2, 393:4,
402:8

**against**
21:21, 33:17,
33:24, 36:11,
43:2, 66:9,
68:2, 80:19,
81:1, 81:2,
95:7, 99:11,
100:16, 101:3,
103:20, 120:18,
139:2, 140:23,
151:15, 152:22,
153:4, 154:14,
156:13, 157:9,
176:11, 182:13,
182:18, 183:2,
183:16, 200:4,
204:5, 204:9,
218:16, 239:8,
240:5, 240:11,
244:19, 245:22,
294:6, 296:9,
296:23, 328:18,
383:3, 389:18

**age**
373:7, 373:14

**aged**
349:16

**aggressive**
144:6

**agree**
10:12, 33:17,
75:20, 96:18,
118:18, 353:4,
412:19, 413:7

**agreed**
41:17, 46:23,
47:7, 78:7,
153:12, 209:15,
215:1, 279:17,
346:6, 391:3,
396:17

**agreeing**
97:4

**agreement**
14:2, 34:6,
93:24, 419:23

**ahead**
10:5, 54:15,

97:13, 112:19,
113:17, 131:18,
146:9, 160:1,
162:9, 175:15,
183:9, 192:23,
213:24, 221:18,
227:22, 230:10,
234:23, 235:5,
236:16, 242:4,
253:23, 282:5,
319:17, 338:2,
356:21, 360:4,
367:10, 385:15

**airtight**
54:21

**al**
1:7, 1:13, 7:4,
7:5

**albert**
284:4

**alcohol**
99:1

**alfred**
383:2, 391:13,
392:4, 392:22,
393:12, 393:17,
394:1, 394:5,
394:15, 395:14,
401:3

**alfredo**
322:20, 381:13,
382:16, 390:10,
392:14, 395:3,
401:11

**alibi**
54:22, 57:13,
60:14, 336:1,
336:5, 352:18,
356:15, 356:17

**all**
10:13, 10:14,
11:20, 12:2,
18:11, 18:16,
22:4, 22:14,
30:10, 60:23,
73:24, 76:17,
93:14, 121:9,
131:10, 137:18,

153:11, 173:12,
189:14, 197:5,
236:9, 246:18,
261:19, 262:2,
262:10, 262:18,
263:3, 263:19,
271:16, 277:22,
278:6, 283:20,
299:13, 306:16,
311:16, 324:16,
329:24, 330:3,
330:10, 367:7,
402:2, 406:19

**allege**
268:18, 269:3,
391:13

**alleged**
127:24

**allegedly**
127:24

**alleges**
126:4

**alley**
369:23, 379:5

**allow**
325:20, 331:4,
331:24, 336:22

**allowed**
234:16, 325:12,
326:2, 326:7,
332:18, 354:9

**almodovar**
404:12, 404:20,
409:7, 409:11,
409:14, 409:17,
409:22, 410:18,
411:2, 411:9,
411:20, 412:7,
412:19, 413:7,
413:18, 414:2,
414:4, 414:21,
415:9, 415:18,
416:3, 416:11

**almost**
29:6, 114:13,
130:17, 158:12,
220:11

**alone**
46:12, 209:24,

Transcript of Ernest Halvorsen
Conducted on April 20, 2018                    108

260:23
**along**
7:18, 18:2,
18:18, 22:11,
24:16, 34:1,
51:13, 51:22,
52:17, 60:19,
61:6, 70:20,
78:14, 79:16,
81:12, 82:24,
83:12, 88:22,
90:20, 91:14,
92:24, 100:13,
105:18, 122:16,
150:19, 151:12,
172:7, 184:13,
199:12, 199:14,
206:21, 222:6,
228:24, 230:1,
231:16, 232:24,
236:7, 279:14,
341:5, 359:3,
367:6, 370:21,
404:10, 405:12
**alongside**
298:8
**already**
11:7, 34:9,
34:18, 36:9,
84:24, 87:17,
87:24, 89:21,
93:12, 93:18,
116:21, 120:3,
139:22, 144:18,
146:19, 220:3,
301:21
**also**
5:10, 25:5,
37:3, 53:23,
59:14, 59:16,
71:9, 78:3,
79:2, 80:13,
85:6, 89:13,
94:17, 94:22,
99:1, 104:21,
121:8, 121:10,
122:23, 124:3,
128:6, 129:16,

133:3, 134:24,
138:2, 154:13,
154:18, 155:9,
155:20, 157:10,
157:21, 161:23,
165:7, 166:3,
168:24, 169:6,
171:10, 171:23,
186:20, 186:23,
187:14, 187:21,
188:18, 190:1,
192:2, 197:19,
198:13, 200:8,
200:13, 201:20,
203:12, 208:9,
221:6, 222:11,
226:19, 227:14,
243:8, 282:13,
290:9, 299:15,
332:16, 344:5,
347:13, 359:9,
363:3, 369:10,
370:22, 374:8,
374:24, 382:22,
392:4, 395:10,
399:21, 410:9,
413:6
**alternatively**
139:5
**altgeld**
83:21, 84:3,
121:5, 121:19
**although**
130:13, 184:21,
196:19, 365:8
**alvarez**
298:4, 298:8,
298:15, 298:16,
300:11, 300:20,
300:21, 301:2,
301:11, 302:9,
302:21, 303:3,
303:8, 303:15,
303:19, 305:5,
305:11
**always**
25:9, 114:14,
306:4

**amongst**
45:8
**amount**
36:21
**amy**
404:14, 405:5,
411:3, 415:20,
416:5
**andahar**
282:10, 283:5,
283:15
**andino**
323:5
**andt**
4:3, 8:9
**aneesha**
1:24, 2:11,
7:9, 419:4,
420:21
**angel**
321:11, 323:12
**angry**
249:12, 249:22,
387:6
**announcements**
369:11
**anonymous**
119:16, 292:7,
292:9, 313:21
**another**
54:4, 102:7,
104:23, 114:2,
139:7, 139:23,
149:10, 151:14,
151:21, 152:23,
154:14, 210:7,
249:7, 305:14,
335:5, 344:9,
365:19, 387:7,
402:23, 404:5,
408:11, 410:10
**answer**
9:21, 12:13,
17:13, 21:16,
35:5, 37:23,
54:5, 54:16,
113:5, 114:7,
147:1, 200:16,

201:23, 213:4,
214:16, 234:2,
261:2, 261:13,
264:8, 264:16,
264:18, 265:1,
270:22, 272:1,
272:15, 275:17,
275:19, 275:20,
276:10, 277:13,
279:5, 279:6,
282:17, 289:13,
300:1, 300:4,
312:14, 338:15,
360:4, 365:22,
404:3, 404:22
**answered**
63:22, 175:14,
198:7, 198:14,
200:12, 207:23,
214:14, 214:18,
215:10, 229:19,
233:17, 236:18,
237:6
**answers**
200:19, 419:19
**any**
14:12, 16:6,
19:8, 19:24,
20:8, 25:10,
29:12, 31:7,
31:22, 33:24,
52:10, 60:2,
60:3, 75:23,
79:11, 82:4,
92:10, 109:11,
110:7, 111:5,
111:6, 127:3,
127:13, 128:14,
129:11, 132:13,
137:1, 149:17,
149:22, 149:23,
150:4, 161:7,
163:18, 167:5,
168:10, 172:22,
173:6, 176:19,
176:20, 192:3,
203:20, 210:13,
212:22, 218:1,

234:14, 243:13, 245:21, 246:20, 246:24, 248:9, 262:10, 262:18, 262:20, 263:10, 263:19, 266:8, 266:14, 270:13, 273:3, 273:12, 273:17, 274:8, 274:11, 274:15, 275:1, 277:13, 277:21, 277:22, 278:5, 278:11, 278:12, 278:16, 278:21, 278:22, 283:22, 291:23, 291:24, 293:15, 299:13, 301:9, 301:23, 302:16, 302:21, 314:2, 334:2, 334:20, 338:10, 338:11, 362:9, 369:11, 383:24, 399:3, 399:11, 399:12, 399:13, 406:1, 406:2, 409:12, 416:10, 420:11

**anybody**
131:19, 235:3, 367:24

**anyone**
47:16, 49:23, 245:15, 368:8, 377:22

**anything**
63:3, 71:11, 274:20, 300:12, 301:3, 301:10, 302:8, 302:15, 324:6, 344:15

**anyway**
131:18, 132:2, 214:12

**apart**
167:5, 278:15, 283:22, 350:12

**apartment**
405:18

**apologies**
383:13

**apologize**
196:13

**apparently**
219:12, 234:13

**appeal**
6:18

**appear**
69:17, 164:13, 310:12, 329:5, 370:12, 402:4

**appearance**
64:7, 70:11, 88:3, 89:1

**appearances**
3:1, 4:1, 5:1

**appeared**
108:11, 182:5

**appears**
184:22

**apply**
113:6

**approached**
394:6

**appropriate**
338:21

**approve**
183:6, 183:15

**approximately**
198:6, 201:21, 202:1, 233:3, 254:5, 330:24, 349:16, 388:17, 389:24, 391:20, 396:16

**april**
1:18, 7:8, 9:13, 418:6, 419:7

**area**
6:24, 30:5, 34:10, 35:12, 45:9, 150:16, 152:14, 198:5, 219:13, 233:1, 237:13, 287:23, 305:14, 318:8,

324:1, 341:16, 342:5, 342:14, 342:16, 343:4, 343:8, 349:18, 358:9, 363:18, 383:23, 390:18, 391:1, 394:4, 403:23, 409:23

**argument**
403:19

**arising**
312:10

**armando**
1:10, 3:10, 7:17, 8:21, 16:16, 17:8, 59:5, 72:22, 138:5, 177:8, 196:16, 197:19, 198:13, 198:24, 200:11, 201:4, 202:3, 202:8, 217:6, 219:3, 237:15, 242:17

**armed**
36:16, 36:23, 41:8, 41:16, 48:3, 200:11, 200:15, 201:4, 247:20, 248:16, 249:6, 254:10

**around**
43:23, 76:18, 109:24, 110:15, 123:7, 124:12, 135:2, 275:11, 304:15, 304:20, 305:3, 365:12, 367:18, 386:21

**arrange**
396:11

**arranged**
64:22, 98:6, 98:16, 98:24, 138:9, 140:17, 189:2, 333:18

**arrangement**
93:20, 331:16,

332:16

**arrangements**
65:19, 420:4

**array**
110:7, 110:8, 133:6, 133:24, 169:1, 222:8, 222:23, 284:15, 285:5, 285:11, 285:20, 286:19, 286:23, 287:4, 287:17, 292:24, 293:7, 293:17, 294:16, 295:4, 295:10, 295:20, 303:3, 303:8, 304:2, 304:6, 308:1, 308:6, 309:20, 376:5, 376:10, 376:17, 378:16

**arrest**
15:21, 57:10, 105:2, 138:4, 141:8, 146:8, 146:15, 146:21, 147:6, 149:18, 170:4, 170:14, 182:6, 182:20, 182:22, 183:4, 183:6, 208:23, 247:20, 251:21, 333:2, 397:15, 397:22, 398:9, 409:21

**arrested**
14:19, 138:10, 140:18, 141:1, 173:20, 174:2, 215:16, 215:17, 254:10, 343:3, 357:10, 357:11, 357:17, 383:10, 383:16, 383:21, 385:19, 385:20, 387:16, 387:20, 409:12

**arrived**
121:6

Transcript of Ernest Halvorsen
Conducted on April 20, 2018

110

**asa**
161:23, 171:10
**aside**
273:4, 273:13,
274:24
**ask**
10:18, 54:4,
112:14, 120:22,
134:16, 191:1,
194:9, 205:23,
213:11, 215:9,
235:14, 235:17,
235:19, 236:2,
236:13, 282:5,
282:14, 282:19,
297:23, 324:2,
324:5
**asked**
27:3, 39:15,
39:20, 40:4,
63:21, 175:14,
197:15, 198:3,
200:8, 200:13,
200:18, 201:20,
204:18, 207:13,
207:21, 214:18,
215:8, 216:14,
229:18, 233:16,
261:19, 262:2,
262:10, 262:18,
263:3, 288:3,
289:24, 370:3,
392:14, 402:3,
403:18, 410:9,
419:19
**asking**
37:19, 279:3,
282:13, 298:22,
298:24, 301:22,
402:5
**aspects**
18:16, 70:11
**assailants**
406:12
**assault**
267:13
**asserted**
261:6

**asserting**
268:24, 269:9,
272:13, 273:9,
273:14, 275:24,
277:7
**assertion**
273:22
**assign**
340:15
**assigned**
18:1, 24:11,
24:19, 29:7,
31:3, 130:17,
131:2, 298:7,
305:21, 306:19,
337:5, 339:9,
340:1, 353:24,
361:5, 363:16,
364:1, 364:12,
405:3, 405:4
**assignment**
31:10
**assist**
155:8, 215:20,
216:15, 239:19
**assistance**
224:10, 241:2
**assistant's**
123:12, 390:24
**assisted**
41:9, 311:7
**associate**
410:18
**associated**
194:1, 195:1,
274:16
**assumes**
276:9, 319:15
**assuming**
298:23
**assure**
402:14
**attempt**
229:13, 340:10,
363:5, 364:20,
398:20, 404:15
**attempted**
54:10, 88:16,

202:4, 339:19,
387:14
**attempting**
154:10
**attention**
112:15, 112:24,
113:10, 177:2,
180:8, 246:15,
330:22
**attorney**
4:21, 7:23,
33:15, 33:16,
33:23, 50:10,
50:19, 65:11,
68:7, 68:17,
74:2, 80:3,
82:24, 97:18,
98:3, 98:5,
101:1, 158:15,
158:21, 163:17,
163:24, 167:1,
169:20, 171:17,
189:5, 190:2,
190:21, 191:2,
191:15, 197:16,
198:3, 200:9,
206:17, 206:22,
207:12, 207:15,
208:16, 208:20,
209:6, 212:2,
213:9, 214:22,
215:7, 216:6,
217:17, 221:7,
222:15, 224:10,
228:16, 229:24,
230:1, 231:1,
231:18, 232:3,
232:12, 233:15,
234:3, 234:15,
238:2, 240:3,
241:3, 244:8,
249:14, 251:5,
251:11, 252:9,
252:17, 253:2,
261:10, 273:12,
273:17, 274:8,
274:11, 274:15,
278:16, 278:22,

310:20, 331:12,
362:12, 378:14,
382:23, 390:17,
391:1, 392:13,
393:12, 394:1,
394:24, 396:19,
396:24, 398:4
**attorney's**
64:15, 64:24,
65:22, 119:4
**attorney-client**
261:11, 261:14,
264:17, 275:16,
275:18, 279:3
**attorneys**
12:22, 14:1,
14:16, 22:3,
22:13, 51:13,
65:9, 65:18,
66:5, 66:6,
67:7, 68:9,
69:9, 70:21,
73:13, 73:23,
74:18, 75:5,
77:6, 78:2,
78:16, 79:17,
81:15, 83:2,
90:22, 94:3,
94:16, 97:5,
99:8, 99:17,
100:14, 101:13,
103:6, 104:12,
105:19, 106:14,
122:17, 123:12,
126:14, 127:6,
129:3, 141:11,
150:6, 151:13,
175:9, 175:21,
183:15, 189:1,
190:7, 191:6,
191:17, 193:16,
199:15, 201:13,
202:22, 208:10,
211:10, 218:12,
224:19, 225:8,
225:13, 250:6,
250:17, 271:5,
274:12, 275:1,

275:5, 276:14, 277:14, 279:11, 279:18, 281:4, 281:9, 291:10, 310:21, 377:19, 378:5, 416:10

**attribute**
375:9

**attributed**
104:24, 125:11, 128:7, 128:23, 129:4, 129:22, 163:4, 167:19, 373:24, 400:17

**attributing**
246:19, 397:21

**august**
387:12, 387:23, 388:4, 391:20, 395:21, 399:16, 399:23, 400:5, 400:11

**austin**
279:11, 279:18, 281:4, 281:9

**author**
31:13

**authored**
11:21, 110:13, 117:10, 118:24, 121:17, 121:23, 123:21, 127:24, 129:1, 137:1, 165:3, 165:20, 168:4, 168:11, 172:14, 184:8, 184:18, 347:6, 350:20, 370:23, 375:12, 397:19, 398:16, 400:13

**authoring**
114:14, 116:12

**authorities**
264:23

**authority**
278:23

**available**
194:2, 194:16,

195:4, 231:2, 310:19, 311:16

**avenue**
201:7, 223:24, 233:2, 233:11, 236:20, 237:7, 283:14, 287:23, 384:8, 384:19, 385:1, 393:14, 393:16, 394:6

**avoid**
79:4, 355:16

**avoids**
156:23

**aware**
191:3, 225:18, 230:3, 247:24, 331:1, 363:14, 383:9, 383:15, 383:20, 386:18, 391:21, 405:10, 406:9, 407:24, 408:1

**away**
89:16, 336:9, 396:11, 408:15

**B**

**b**
403:22

**b-o-n-j-e-a-n**
7:16

**b-u-t-o**
324:21

**back**
21:10, 43:12, 44:13, 82:18, 95:21, 99:10, 105:7, 125:24, 155:23, 175:4, 197:24, 219:13, 219:14, 220:1, 236:19, 254:4, 282:1, 285:1, 297:21, 304:16, 304:21, 323:20, 379:4, 380:21, 394:3, 406:17

**background**
167:5, 376:7, 376:10

**backhanded**
214:6, 214:8

**bad**
38:17, 62:20, 63:1, 124:8, 125:1, 142:10

**bag**
123:8

**bald-faced**
245:12

**ballistic**
109:3

**banger**
348:21

**bangers**
358:15

**bank**
28:7, 28:15, 63:13, 130:7

**bar**
271:8, 272:3

**barber**
5:4, 8:4, 260:18, 338:3, 370:11, 416:21

**barrel**
158:22, 159:10, 159:16, 159:22, 160:1, 169:12

**barrier**
156:23

**bars**
38:4

**bart**
357:9, 357:18

**based**
264:4, 327:11, 338:15, 362:19

**basis**
63:19, 111:5, 111:12, 120:12, 141:7, 238:21, 399:10, 410:15, 411:1, 411:8

**bates**
56:12, 56:18,

58:3, 112:13, 112:16, 113:11, 117:8, 172:15, 184:7, 196:7, 206:8, 338:4, 338:6, 338:16, 338:20, 370:12

**bathroom**
326:3

**battery**
267:14

**bears**
113:12, 165:3, 165:7, 206:6, 206:8, 339:3, 350:17, 370:20

**beat**
360:19, 361:13, 361:21, 362:3, 362:10, 389:8

**beaten**
157:1, 171:17

**beating**
45:11, 157:15

**beatings**
390:1

**because**
30:10, 45:1, 45:12, 53:19, 56:3, 76:6, 86:5, 86:16, 87:17, 89:9, 102:15, 120:2, 139:14, 139:22, 148:3, 153:23, 157:22, 159:5, 172:8, 180:7, 183:5, 190:9, 195:3, 195:4, 196:11, 208:18, 210:6, 211:4, 215:15, 220:3, 223:13, 225:11, 239:7, 243:15, 249:5, 249:14, 253:8, 260:3, 268:17, 269:1, 280:7, 303:14,

Transcript of Ernest Halvorsen
Conducted on April 20, 2018

112

307:6, 315:18, 327:9, 327:16, 335:16, 336:1, 340:8, 342:7, 346:6, 347:8, 347:15, 347:22, 348:20, 352:10, 353:6, 355:18, 355:24, 356:17, 362:11, 365:10, 367:5, 367:16, 375:3, 379:3, 384:24, 386:3, 387:6, 402:10, 403:19, 403:24, 408:23, 409:11

**become**
9:8, 330:18

**been**
8:14, 28:7, 36:15, 48:22, 51:5, 55:19, 56:16, 56:21, 58:2, 58:6, 63:10, 81:13, 82:7, 85:1, 85:9, 86:17, 87:18, 95:10, 103:1, 103:8, 110:24, 111:13, 112:3, 112:10, 116:20, 121:18, 122:7, 127:4, 127:16, 128:23, 129:11, 135:20, 136:1, 140:16, 141:9, 162:16, 171:24, 174:22, 184:6, 187:10, 193:14, 196:10, 206:5, 210:11, 213:21, 223:6, 226:10, 233:5, 246:8, 248:19, 250:4, 258:10, 261:24, 262:8, 262:16, 263:17, 280:14, 288:4,

288:9, 300:13, 300:14, 301:4, 301:5, 338:7, 338:8, 338:17, 339:1, 346:5, 356:16, 359:14, 366:8, 370:15, 370:19, 371:13, 386:19, 387:15, 390:20, 396:18, 409:12, 411:19, 412:5, 418:11, 418:12

**beeped**
85:11

**beeping**
130:8

**before**
2:11, 14:12, 14:18, 28:5, 52:22, 60:2, 62:9, 63:12, 84:6, 106:6, 106:18, 107:10, 110:3, 111:14, 116:21, 117:7, 170:4, 178:10, 181:10, 182:6, 185:7, 185:13, 185:22, 186:21, 187:9, 187:24, 194:2, 194:16, 197:4, 197:10, 200:3, 200:23, 202:12, 204:4, 205:18, 211:19, 217:18, 218:24, 223:7, 224:3, 227:10, 232:4, 233:20, 234:5, 241:4, 246:12, 251:5, 275:15, 283:15, 284:14, 285:15, 285:20, 286:1, 286:18, 287:12, 287:17, 301:11, 301:17, 309:7, 309:12,

325:15, 325:21, 326:3, 326:10, 361:14, 374:13, 393:5, 418:20, 419:9

**began**
43:2, 247:17, 398:5

**begin**
8:22

**beginning**
330:2

**begins**
113:11, 120:24

**behalf**
3:3, 3:10, 3:17, 4:3, 4:11, 4:18, 5:3, 7:24, 8:2, 8:6, 8:10, 42:1, 42:4, 42:6

**behind**
115:14, 155:17

**beige-colored**
226:22

**being**
29:7, 49:6, 49:7, 65:20, 93:12, 95:11, 99:10, 104:11, 120:3, 121:8, 123:5, 128:16, 139:22, 156:24, 167:9, 200:18, 202:3, 203:22, 228:5, 237:10, 315:19, 317:7, 334:5, 336:6, 338:11, 353:24, 403:18, 418:3, 420:9

**believe**
16:4, 19:24, 52:9, 55:19, 111:6, 111:12, 140:15, 168:9, 187:16, 224:22, 233:5, 233:18, 236:22, 274:21,

287:8, 317:5, 317:14, 318:9, 338:8, 344:14, 345:13, 354:19, 358:22, 370:16, 399:3, 399:10, 411:1, 411:8

**believed**
239:15, 286:3, 346:7

**believing**
111:21, 223:14, 225:9, 225:15, 230:5, 238:21, 376:23

**bella**
401:1

**bellow**
395:23, 396:8, 396:15, 397:1, 401:1, 401:2

**belly**
158:22, 159:10, 159:17, 159:23, 160:1, 169:12

**belonged**
227:18, 408:4

**belonging**
135:12

**bench**
206:11, 206:16, 228:17, 361:13

**beneath**
114:5

**benefit**
32:10, 93:20, 144:22

**benefits**
46:22, 94:5

**benefitting**
92:12, 92:20

**besides**
207:22

**best**
411:22

**better**
120:5, 234:14, 338:12

Transcript of Ernest Halvorsen
Conducted on April 20, 2018

113

**between**
31:23, 98:16,
121:5, 251:20,
344:9, 392:23
**beubea**
339:19, 341:16,
344:13, 346:23,
349:2, 354:16
**beyond**
360:24
**bill**
305:10
**binding**
263:12
**bitch**
44:9
**black**
365:11, 367:17,
375:4, 376:10,
394:6, 406:16
**black-and-white**
219:5, 222:6
**blame**
271:5
**blank**
372:7, 372:23
**blevin**
354:24, 355:5,
355:11, 355:16,
355:22
**block**
110:16, 135:3,
226:21, 227:16,
228:4
**blocks**
228:24, 408:15
**blue**
405:14, 405:21,
405:22, 407:8,
412:20, 413:8
**blurt**
213:13, 214:23
**bobby**
339:20, 348:13,
349:2, 355:24
**body**
156:24, 389:9
**bolan**
211:19, 222:13,

234:13, 235:1,
239:15
**bolster**
176:11
**bond**
249:7, 387:14
**bond-on-bond**
253:8
**book**
30:11, 43:19,
43:24, 44:15,
44:24, 45:11,
366:19, 367:23,
368:1, 368:8,
370:5, 374:3,
377:21, 377:23,
389:10
**booking**
318:4
**bore**
193:13, 193:16
**both**
114:22, 128:15,
301:20, 382:15,
394:22, 414:3
**bother**
34:23
**bottom**
56:23, 58:8,
113:13, 113:19,
129:17, 165:4,
165:16, 184:13,
184:22, 207:10,
339:3, 370:21
**boy**
351:20
**boyke**
289:10, 289:24,
331:2, 331:3,
331:11, 331:17,
333:20, 334:3,
334:14, 334:20,
335:3, 360:9,
361:1, 361:24,
362:11
**boyke's**
361:5
**brain**
320:7

**brains**
115:14
**brainstormed**
73:14
**break**
82:5, 82:9,
82:13, 174:22,
281:21, 320:8,
330:5, 380:16
**bribery**
266:21
**bring**
35:24, 65:10,
138:24, 139:6
**bringing**
107:6, 185:13,
354:16
**broken**
344:8
**brooklyn**
3:7
**brother**
152:22, 153:4,
154:14
**brothers**
53:19, 54:1,
154:6, 384:1,
384:7, 385:23,
386:15, 388:13,
391:23, 395:3,
395:16, 397:12,
399:5, 399:14,
399:24, 400:7,
400:20, 401:13
**brought**
38:3, 64:14,
68:6, 100:24,
107:2, 109:18,
110:22, 135:18,
138:17, 141:17,
141:20, 150:15,
152:14, 171:11,
171:23, 185:6,
190:21, 209:24,
210:6, 219:13,
219:14, 222:22,
307:11, 342:16,
343:3, 366:18,

375:18, 385:21,
387:22, 409:23,
411:11
**brown**
315:17, 315:24,
316:6, 316:16
**bryn**
357:5
**buick**
123:3, 135:12,
226:22, 283:14,
287:22
**build**
373:8, 373:14
**building**
219:15, 405:11,
405:18
**bullet**
87:18, 108:12,
108:19, 109:2,
137:13, 226:24
**bullpen**
101:17
**bunch**
320:4
**burden**
104:16, 239:20
**burdensome**
404:2
**bus**
333:4, 333:14,
334:6, 335:2,
335:11, 336:16,
359:16
**business**
28:8
**butcher**
349:17
**buto**
32:24, 33:6,
33:17, 34:1,
34:3, 34:7,
35:10, 35:17,
39:11, 39:23,
40:13, 41:2,
41:10, 41:17,
42:2, 42:16,
44:20, 46:24,

47:7, 47:19,
48:5, 48:22,
49:5, 49:14,
50:12, 50:21,
66:9, 68:2,
93:13, 99:11,
99:22, 120:4,
210:11, 324:2,
324:20, 325:2,
325:7, 325:14,
326:3, 326:10,
326:17, 326:23,
327:6, 327:15,
327:18, 328:1,
328:12, 328:17,
328:23, 329:6,
329:15, 329:20,
330:4

**buto's**
39:16, 66:7,
66:14, 67:9,
67:16, 67:24

**buy**
331:4, 332:1,
332:18, 336:23

**C**

**c-o-l-o-n**
306:24

**california**
387:21

**call**
44:8, 55:21,
56:1, 56:18,
99:9, 99:17,
230:15, 291:23

**called**
8:14, 56:7,
119:19, 212:14,
221:24, 269:18,
336:7, 419:9

**calls**
15:22, 17:12,
23:3, 43:6,
146:24, 212:8,
261:9, 261:10,
275:16

**came**
36:4, 50:19,

101:14, 202:20,
329:14, 343:8,
349:17, 391:1,
392:22, 393:4,
396:1

**can**
9:2, 9:20,
10:12, 10:18,
12:12, 17:13,
21:16, 35:5,
37:23, 40:19,
40:20, 54:5,
54:16, 82:6,
82:9, 97:9,
112:19, 112:20,
114:7, 147:1,
194:11, 195:10,
213:4, 213:13,
236:9, 248:7,
261:1, 263:10,
264:8, 265:1,
270:19, 270:22,
272:15, 275:19,
276:10, 279:6,
284:19, 285:1,
289:13, 297:17,
298:19, 300:3,
300:4, 306:2,
312:14, 323:21,
350:12, 365:22,
402:14, 404:4,
404:22

**can't**
209:7

**cancel**
403:13

**candy**
38:4, 38:9

**caption**
206:6

**car**
28:22, 75:14,
75:16, 85:12,
88:11, 89:15,
89:17, 89:22,
90:4, 106:5,
107:3, 107:7,
107:8, 107:9,

107:15, 107:16,
107:22, 108:6,
108:11, 108:12,
108:19, 109:3,
109:5, 109:12,
109:17, 109:19,
110:1, 110:10,
110:23, 111:6,
111:13, 111:19,
111:22, 121:6,
121:8, 122:2,
122:3, 123:5,
123:6, 123:7,
130:10, 134:21,
135:5, 135:13,
135:19, 135:20,
136:1, 136:8,
136:17, 137:3,
137:13, 158:23,
159:17, 159:18,
202:4, 227:9,
227:17, 228:7,
229:1, 229:6,
229:7, 229:8,
229:15, 230:4,
230:6, 233:10,
288:4, 288:9,
288:14, 300:13,
301:4, 357:4,
391:5, 394:5,
405:15, 405:22,
407:8

**care**
214:11, 367:4

**career**
10:1, 10:23,
262:21, 334:22

**carefully**
412:9

**carl**
33:5, 325:13,
326:2, 326:9,
326:16, 328:11,
328:22

**carlos**
323:4

**carried**
340:7

**cars**
110:8, 130:8

**case**
7:4, 7:5, 18:7,
24:20, 29:7,
29:20, 30:21,
31:3, 31:4,
31:15, 61:21,
62:6, 91:7,
93:13, 98:20,
99:11, 99:23,
100:16, 102:7,
102:8, 103:17,
104:5, 105:2,
105:12, 116:10,
116:19, 117:1,
120:4, 130:18,
131:2, 132:7,
134:13, 139:13,
139:23, 144:5,
144:14, 152:23,
153:24, 154:14,
157:21, 169:18,
176:11, 189:13,
210:2, 218:17,
222:13, 240:4,
240:6, 240:11,
241:6, 265:13,
268:11, 269:10,
269:11, 269:18,
276:1, 277:8,
277:16, 279:14,
299:2, 299:10,
299:11, 299:22,
303:3, 303:9,
317:8, 335:18,
337:21, 339:8,
339:13, 340:8,
340:17, 348:19,
349:11, 353:24,
360:19, 361:4,
361:13, 361:21,
362:3, 362:10,
364:13, 381:7,
381:8, 387:15,
398:2, 402:4,
402:10, 402:11,
407:17, 410:2,

Transcript of Ernest Halvorsen
Conducted on April 20, 2018                                    115

420:11
**cases**
30:4, 34:19,
35:1, 41:16,
94:4, 101:6,
114:15, 140:6,
248:17, 250:9,
279:14, 282:15,
282:19, 282:20,
290:11, 358:8,
377:2, 402:19
**cash**
28:8, 98:17
**casings**
87:18
**catch**
153:24
**catherine**
5:4, 8:4
**caught**
131:22
**cause**
15:21, 16:4,
105:2, 140:15,
146:8, 146:15,
182:22, 204:12,
302:20, 397:15,
403:12
**caused**
15:14
**causing**
245:23
**center**
4:22, 207:10
**central**
37:11, 138:17,
141:18, 141:21,
150:16, 155:24,
156:7, 220:2,
223:23, 341:17,
366:19, 385:22,
387:22, 388:9,
409:14, 413:19
**certain**
46:9, 94:5,
331:4, 403:21
**certainly**
131:1, 136:15,

213:8, 403:5,
403:7, 403:19
**certificate**
420:7
**certified**
2:12, 419:4,
420:14, 420:22
**certify**
419:6, 419:17
**chair**
155:16
**chance**
350:1
**change**
67:19
**charge**
17:19, 34:2,
76:18, 147:6,
147:14, 154:22,
157:22, 310:6,
315:12
**charged**
14:19, 36:15,
76:24, 77:8,
93:3, 103:1,
150:6, 360:1,
397:11
**charges**
33:17, 33:24,
36:10, 41:9,
47:8, 183:15,
328:18
**charging**
188:8
**charles**
320:12
**chasing**
300:14, 301:5
**check**
55:7, 55:10
**checked**
217:4
**chicago**
1:17, 2:7,
3:14, 4:8, 4:15,
4:23, 5:3, 5:7,
7:7, 8:5, 9:5,
9:8, 9:12, 9:15,

9:19, 17:7,
45:9, 219:5,
254:18, 255:4,
255:15, 255:24,
256:10, 256:19,
257:8, 257:18,
258:8, 258:19,
259:6, 259:20,
263:4, 274:9,
290:15, 336:9,
363:18, 364:2
**children**
302:12, 396:11,
397:4
**choice**
270:2, 270:5
**choose**
11:3, 403:6
**christopher**
381:21, 382:5,
382:17, 393:1,
395:4
**chronologically**
118:20
**circumstances**
164:12, 206:23
**circumstantial**
119:10, 119:20
**city**
5:3, 8:5, 336:9
**civil**
267:20, 299:9,
299:10
**claim**
75:6, 75:13,
76:4, 77:17,
78:17, 81:23,
83:20, 84:2,
84:11, 86:3,
86:10, 86:22,
88:10, 89:14,
101:15, 110:14,
119:14, 151:24,
180:13, 304:1
**claimed**
83:10, 104:14,
171:1, 180:20,
238:21, 297:14,

313:8, 394:13,
400:3, 400:6
**claiming**
67:17, 147:10,
187:10, 272:4,
280:19, 292:1,
398:16
**claims**
45:13, 162:15,
292:7, 297:13
**clandestine**
256:20
**clarify**
372:17, 372:19
**clark**
5:6
**clean**
66:22
**clean-looking**
406:19
**clear**
17:24, 283:18,
371:24, 372:11,
403:18
**cleared**
30:4, 51:6,
349:11
**client**
235:2, 261:10,
264:7
**close**
180:8, 236:7,
236:8, 334:14,
335:18, 340:8,
348:19, 407:17
**closed**
202:7, 358:8
**cloth**
109:11
**clothing**
327:11
**co-defendant**
381:20
**co-defendants**
199:19, 395:3
**coached**
50:9
**coaching**
97:20

Transcript of Ernest Halvorsen
Conducted on April 20, 2018

116

**cobra**
366:24, 367:5, 368:8, 370:4, 371:16, 374:3, 380:10
**cobras**
312:4, 312:9, 316:11, 366:20, 367:7, 367:23, 377:21
**code**
258:21
**coerce**
81:4, 153:12, 157:23, 229:14, 294:5, 296:8, 319:1, 319:24, 334:22, 395:12
**coerced**
171:9, 172:6, 185:16, 205:12, 210:11, 218:13, 255:5, 255:16, 291:15, 294:13, 362:20, 401:1
**coercing**
22:16, 95:6, 349:1
**coercion**
21:21, 156:13, 163:7, 164:4, 319:12
**coercive**
259:15
**cogh**
66:5
**collaboration**
398:1
**colleagues**
258:21
**collected**
109:13
**collection**
112:4
**college**
357:4
**colon**
305:15, 305:16,

306:16, 306:24, 307:19, 307:24, 308:5, 308:10, 308:15, 308:21, 309:1, 309:7, 309:12, 310:7, 310:13, 310:20, 311:1
**colon's**
310:17
**color**
107:23, 169:2
**come**
39:2, 42:1, 64:23, 65:19, 66:21, 142:18, 143:19, 144:2, 152:8, 171:2, 231:19, 341:16, 389:6, 390:18
**comes**
118:19
**coming**
388:8
**comment**
234:22, 293:15
**comments**
178:5, 181:2, 235:5, 293:21, 295:18, 295:24, 327:23
**commit**
16:11, 16:18, 16:24, 54:12, 76:5, 152:2, 254:20, 259:18, 260:11, 269:2, 320:14, 320:21, 321:5, 321:13, 321:23, 322:6, 322:14, 322:22, 323:6, 323:14, 353:13, 368:22
**committed**
22:24, 72:23, 91:22, 93:12, 249:6, 253:9, 258:20, 268:17,

307:19, 316:11, 333:13, 343:16, 347:15, 352:10, 353:7, 355:8, 412:11
**committing**
15:4, 334:6
**common**
34:16
**communicated**
25:3, 25:9, 25:19
**competence**
44:3, 45:4, 47:2, 57:5, 57:16, 58:14, 59:9, 70:15, 95:15, 98:10, 140:10, 150:9, 157:3, 170:6, 190:16, 193:8, 194:20, 209:1, 212:7, 213:2, 232:19, 234:9, 239:22, 244:22, 248:22, 252:2, 252:21, 253:21, 257:1, 289:12, 312:13, 313:2, 319:15, 332:4, 333:22, 334:9, 334:16, 346:11, 360:12, 361:8, 362:5, 362:14, 362:22, 368:11, 377:5, 380:13, 390:12, 397:6, 401:6, 410:4, 410:20, 415:12
**competent**
116:4
**complainant**
341:14, 341:15
**complainants**
341:15
**complaint**
402:5, 402:15, 402:16, 402:18

**complaints**
268:19, 269:4
**complete**
112:11, 419:18
**completely**
163:11
**complexion**
373:8, 373:15, 406:14, 406:16, 406:18
**compliment**
214:2, 214:6
**compliments**
214:9
**compound**
33:9, 34:12, 114:7, 224:14
**compromise**
79:3
**computer-aided**
419:11
**concealed**
23:19, 257:19, 365:11, 367:17, 375:4
**concept**
306:7
**concern**
67:6, 99:9, 99:18
**concerned**
66:20, 151:4
**concerning**
247:1
**concluded**
417:4
**concludes**
417:1
**conclusion**
15:23, 17:12, 23:4, 212:8
**conduct**
177:7, 179:7, 199:6, 276:15, 276:23
**conducted**
243:4, 351:1, 371:14

Transcript of Ernest Halvorsen
Conducted on April 20, 2018

117

**conelli**
407:5
**conetti**
404:16
**confer**
323:18
**confess**
49:16, 145:22,
147:11, 319:24,
388:12
**confessed**
40:13, 42:2,
82:1, 83:11,
91:9, 95:20,
101:16, 129:12,
296:16, 391:22
**confessing**
94:15, 103:9
**confession**
319:2, 362:19
**confident**
412:7, 412:10
**confidential**
119:19, 291:24
**connect**
283:16
**connected**
136:1, 137:13,
229:8
**connection**
19:9, 93:4,
138:18, 197:4,
264:14, 276:15,
276:23, 383:11,
383:16
**connelly**
5:5
**consistent**
186:2
**consistently**
342:13
**consisting**
133:6, 133:24,
169:2, 418:6
**conspiracy**
12:19, 13:15
**conspired**
13:23, 14:10,

14:14, 17:18,
22:4, 22:14,
290:14, 305:8,
310:5, 313:14,
314:12, 314:21,
316:4, 317:12,
318:19, 318:24,
320:12, 320:20,
321:3, 321:11,
321:21, 322:5,
322:12, 322:20,
323:4, 323:12,
335:4, 356:7,
382:12, 382:23,
385:9
**constitution**
276:17
**constitutional**
11:4, 12:10,
12:18, 13:6,
13:13, 15:6,
268:17, 269:2
**construct**
304:10, 345:4
**construction**
85:19
**consult**
408:21
**consulted**
18:11
**contact**
152:9, 355:5,
355:11
**contacted**
279:11, 341:14,
346:23, 390:17
**contain**
192:3
**contained**
11:16, 28:22,
125:9, 126:3,
126:10, 126:21,
128:6, 128:15,
162:5, 162:14,
167:7, 177:8,
179:9, 179:21,
242:1, 243:9,
256:20, 284:15,

286:19, 347:7,
355:17, 366:20,
374:2, 397:20,
400:11, 405:23,
413:18, 414:1
**containing**
284:5, 286:9
**contains**
118:14, 162:6,
172:16, 192:5,
297:24
**contents**
163:11
**context**
198:1
**continue**
97:10, 105:11,
214:19
**continued**
94:1, 98:18,
99:2, 279:24,
280:6, 280:18
**continuous**
195:14
**contrive**
63:9, 391:3
**contrived**
83:2, 123:11,
129:1, 164:2,
189:14
**control**
260:23
**convalescing**
375:19
**convenience**
248:9
**conversation**
36:5
**conversations**
77:24, 85:7,
85:8, 289:17
**convict**
190:12, 281:12
**convicted**
17:9, 235:9,
245:5, 305:18,
337:24, 362:19,
416:4

**conviction**
204:13, 239:8,
245:16, 299:12,
317:6, 377:12,
389:19, 400:19
**convictions**
15:17, 23:12,
244:19, 245:24,
280:8, 383:4
**convince**
78:16, 109:4
**convinced**
296:14
**cook**
4:18, 8:1,
64:15, 64:23,
65:11, 65:20,
65:21, 66:15,
68:16, 80:2,
82:23, 94:6,
98:3, 101:1,
119:3, 185:7,
189:4, 189:5,
207:14, 213:8,
247:19, 274:12,
400:4, 419:3,
419:6, 420:15
**cooperate**
46:23, 153:5,
346:6, 390:3,
390:6, 396:9
**cooperation**
39:4, 43:3,
47:18, 48:4,
98:18, 99:3,
99:21, 144:5,
145:4, 163:9,
186:19
**cop**
38:15, 38:17,
142:10, 143:19
**copies**
196:12
**copy**
372:23
**copying**
372:8
**corner**
59:6, 197:15,

Transcript of Ernest Halvorsen
Conducted on April 20, 2018

118

233:11, 236:20
**corrections**
54:23, 336:7,
418:11, 418:12
**corroborate**
45:13, 105:21,
151:14
**cortland**
159:12, 405:12,
408:12, 410:12,
412:12
**could**
9:15, 21:10,
41:15, 45:12,
46:12, 47:16,
48:21, 51:3,
52:22, 56:22,
60:12, 61:22,
70:5, 72:10,
79:4, 92:19,
93:21, 101:2,
102:1, 105:1,
107:21, 110:9,
119:16, 120:17,
125:10, 135:4,
144:13, 144:14,
145:22, 146:2,
146:20, 148:19,
154:21, 157:20,
160:16, 172:1,
177:3, 180:6,
219:15, 226:2,
232:13, 243:13,
257:22, 268:20,
285:16, 285:21,
287:13, 287:18,
292:17, 292:23,
294:21, 295:3,
300:11, 301:2,
307:5, 315:17,
319:23, 337:8,
338:16, 338:19,
340:9, 342:5,
342:17, 347:9,
355:6, 367:16,
367:24, 370:16,
376:18, 379:3,
390:19, 394:7,

403:20, 407:7,
410:10
**couldn't**
34:23, 54:24,
145:21, 153:23,
212:21, 253:6
**count**
350:6, 372:2
**counting**
372:13
**county**
4:18, 8:1,
64:15, 64:23,
65:11, 65:20,
65:22, 66:15,
68:16, 80:2,
82:23, 94:6,
98:3, 101:1,
119:3, 185:7,
189:4, 189:5,
207:15, 213:9,
247:19, 274:12,
400:5, 419:3,
419:5, 420:15
**couple**
24:12
**course**
11:11, 80:5,
143:13, 234:22,
259:19, 262:21,
278:6, 388:16,
388:20, 389:4,
403:12
**court**
1:1, 7:9, 7:13,
42:1, 140:8,
298:2, 364:8,
415:17, 420:1
**cousin's**
409:22
**cover**
280:1, 374:11,
374:21
**covered**
258:20, 261:11
**covers**
261:14
**cozy**
26:3

**cr**
196:18
**crashed**
89:17
**create**
63:19, 105:1
**creates**
301:24
**creating**
259:8
**credibility**
61:23, 64:8,
85:20, 88:4,
89:2, 132:21
**credible**
151:6
**credibly**
172:1
**credit**
252:8, 252:17
**crick**
154:15
**crime**
22:18, 68:18,
69:16, 70:3,
71:20, 72:19,
76:8, 76:19,
77:1, 79:11,
87:19, 98:4,
108:4, 109:4,
109:13, 119:18,
147:12, 171:23,
199:7, 203:22,
215:1, 229:9,
237:4, 240:20,
253:8, 264:12,
283:7, 283:16,
297:6, 302:21,
320:13, 320:21,
321:4, 321:12,
321:22, 322:6,
322:13, 322:22,
323:5, 323:13,
335:15, 349:2,
354:1, 354:3,
356:1, 366:3,
392:5, 407:15,
412:5

**crimes**
64:16, 64:24,
65:10, 68:6,
68:16, 74:1,
80:2, 82:23,
100:23, 101:2,
119:3, 120:16,
209:17, 220:5,
220:12, 221:15,
237:14, 254:19,
259:18, 260:10,
353:12, 366:11,
409:13
**criminal**
6:10, 6:12,
23:2, 23:9,
47:8, 52:3,
55:7, 55:10,
57:2, 57:10,
58:7, 58:11,
58:20, 59:4,
59:17, 60:1,
60:10, 60:21,
101:5, 101:6,
196:17, 197:5,
230:23, 231:10,
256:22, 257:10,
257:20, 258:9,
267:20, 278:11,
278:17, 291:10,
299:11, 302:16,
328:17, 400:18,
401:3
**criminally**
415:18
**crossed**
250:5
**cruz**
53:17, 381:20,
382:3, 382:4,
382:16, 385:11,
385:21, 386:3,
390:10, 393:3,
395:5, 395:15,
401:11
**cruzen**
382:2
**crystal**
363:17

csr
1:24
cta
333:4, 333:14,
334:6, 335:2,
335:11, 336:15,
359:16
cuffed
155:17
culprit
345:18, 349:20
cultivate
149:10, 150:22
curious
215:19
currently
54:2
custody
34:19, 37:11,
39:1, 53:1,
53:10, 53:20,
55:12, 57:12,
60:13, 61:9,
155:23, 156:6,
158:12, 166:17,
178:18, 179:1,
181:9, 181:16,
230:17, 250:19,
251:13, 251:24,
252:8, 252:11,
253:4, 333:10,
333:19, 334:4,
383:23, 386:3,
386:5, 397:3,
398:19
cv
1:6, 1:12, 7:4,
7:6

**D**

d-i-a-z
321:12
daley
4:22
damage
89:15, 89:22,
111:19, 137:12,
226:23

dan
272:16, 274:21,
274:24
danger
50:2
daniel
197:17, 279:19,
320:20, 356:8,
356:14, 357:3,
357:21, 358:2,
358:23, 359:5,
362:9, 362:18
dark
373:20, 379:5,
406:13, 406:18
dark-skinned
373:20
date
58:21, 251:21,
291:24, 364:6,
403:20
dated
192:4, 350:16
dates
402:17
david
305:15, 305:16,
306:24, 307:19,
307:24, 308:5,
308:10, 308:15,
308:21, 309:1,
309:7, 309:12,
310:7, 310:13,
310:17, 310:24
davilla
299:21, 299:22,
301:10, 302:8,
302:15, 302:20,
303:2, 303:7,
303:15, 303:18,
304:2, 304:14,
304:19, 305:2,
305:10
davilla's
301:12, 303:13
day
4:13, 23:19,
26:20, 27:22,

57:13, 62:9,
63:11, 88:15,
113:7, 178:10,
214:1, 220:23,
223:22, 224:3,
227:10, 283:4,
326:4, 371:13,
402:23, 418:20,
419:7, 420:15
day-for-day
252:16
days
24:12, 106:24,
251:23, 252:7,
252:10, 253:3,
283:15, 420:3
dcfs
396:12
deal
41:15, 42:21,
144:22, 158:24,
159:5, 248:19
dealings
28:8
dealt
217:8
dean
3:6
death
247:1, 290:5,
290:16, 343:18,
354:20
decades
403:9
december
279:12
decided
19:12, 30:18,
32:23, 34:2,
34:8, 35:16,
51:3, 51:14,
52:2, 52:17,
59:24, 60:9,
60:21, 62:18,
62:24, 67:15,
68:24, 83:9,
84:13, 85:18,
94:24, 100:5,

100:14, 105:10,
106:3, 106:15,
149:10, 150:21,
166:16, 188:18,
189:13, 250:17,
335:18, 340:14,
358:14, 359:3,
359:10, 365:16,
366:23, 369:16,
375:9, 384:14,
395:12, 401:17,
408:21
decision
269:24, 270:3,
271:18, 293:16,
293:22, 295:20,
296:1
declined
33:24, 155:8,
190:7
defendant
3:17, 4:3,
4:11, 4:18, 5:3,
8:5, 8:7, 73:22,
100:17, 152:19,
152:20, 153:21,
170:18, 171:1,
171:11, 197:19,
198:13, 198:24,
199:13, 200:10,
207:13, 237:15,
310:6, 313:12,
314:20, 315:9,
328:10, 329:19
defendants
1:8, 1:14,
55:8, 64:16,
65:1, 73:12,
74:9, 74:17,
91:7, 91:15,
93:1, 94:15,
95:7, 101:5,
103:8, 103:17,
104:15, 127:17,
151:20, 189:13,
192:9, 199:14,
246:20, 256:22,
257:10, 257:21,

291:10, 398:17
**defense**
194:4, 194:18,
195:6, 275:14,
276:1, 276:8,
377:19, 378:5,
378:13
**defranco**
382:24, 390:18,
391:1, 394:1,
394:24, 398:4
**demonstrate**
236:24
**dep**
8:8, 56:4,
56:7, 403:13
**department**
9:12, 9:19,
54:23, 219:5,
254:18, 255:5,
255:16, 256:1,
256:10, 256:19,
257:8, 257:19,
258:8, 258:19,
259:6, 259:21,
263:5, 274:9,
336:6
**depicted**
309:14
**deponent**
330:9, 418:1,
418:5, 418:17,
420:1
**depos**
7:10
**deposed**
402:10
**deposition**
1:16, 2:1, 6:8,
7:2, 7:18, 54:3,
195:21, 206:1,
261:8, 261:19,
282:14, 282:18,
299:13, 317:3,
317:7, 337:17,
338:20, 370:9,
417:2, 417:3,
418:6, 419:8,

420:2, 420:5,
420:8
**depositions**
282:20
**deprive**
269:11
**derive**
90:9
**describe**
176:19, 341:23,
342:15, 365:10,
407:7
**described**
324:16, 326:24,
405:22
**description**
300:13, 301:4,
406:1, 406:2,
406:24
**descriptions**
407:14
**designate**
195:16
**despite**
15:20, 20:24,
42:13, 63:1,
77:15, 147:10,
160:22, 161:5,
325:8, 365:15,
407:13
**destroyed**
257:8
**detail**
27:12
**detailed**
83:13
**detected**
45:13
**detectives**
45:9, 340:7,
341:8, 342:5,
342:14, 354:2,
373:19, 393:24,
398:2
**determine**
12:3, 268:3,
268:9, 352:17,
352:22, 354:9,

355:6, 365:17
**determined**
61:6, 134:5,
224:20, 227:18,
335:9, 341:6,
348:19, 375:24,
384:17, 384:24,
386:4, 407:16
**develop**
62:10, 148:10
**developed**
141:10, 181:23,
283:6, 344:22
**devoid**
137:1
**devon**
3:20
**diaz**
321:12
**dickens**
110:17, 135:4,
226:21, 227:16,
228:4
**dickinson**
339:10, 340:16,
341:6, 348:18,
353:3, 353:23
**didn't**
30:8, 42:20,
45:12, 76:17,
86:4, 96:4,
96:12, 96:18,
97:3, 97:11,
102:15, 110:6,
116:3, 117:16,
136:15, 139:14,
139:20, 145:16,
147:6, 162:22,
165:14, 218:9,
232:2, 234:14,
306:13, 330:1,
343:9, 347:18,
352:16, 355:5,
362:1, 362:11,
367:4, 372:8,
372:16, 372:22
**different**
54:2, 101:3,

101:4, 103:8,
104:3, 110:8,
114:23, 228:24,
298:24, 299:8,
311:4, 350:10,
350:11, 402:19
**dillon**
4:19, 7:24,
12:22, 13:16,
14:1, 14:11,
14:16, 22:3,
22:13, 51:14,
64:16, 65:1,
65:9, 65:18,
66:6, 67:8,
68:9, 69:9,
70:21, 73:13,
73:24, 74:19,
75:5, 77:7,
78:3, 78:16,
79:18, 81:15,
83:2, 83:12,
90:23, 94:3,
94:17, 95:8,
97:6, 97:18,
98:5, 99:8,
99:17, 100:14,
101:13, 104:13,
105:19, 106:3,
106:14, 122:17,
123:12, 126:14,
127:6, 129:3,
141:11, 151:13,
151:20, 175:10,
175:21, 176:8,
189:2, 190:7,
191:7, 191:17,
192:10, 199:16,
201:13, 202:22,
208:10, 208:20,
211:11, 218:12,
224:20, 225:14,
230:1, 240:4,
250:17, 251:5,
251:11, 252:9,
252:18, 253:3
**directed**
113:2, 243:21,

Transcript of Ernest Halvorsen
Conducted on April 20, 2018                              121

342:16, 345:17
**directly**
95:8, 110:22,
230:4
**disciples**
408:7, 408:10
**disciplined**
259:7, 260:4,
260:9
**discoverable**
404:1
**discovered**
35:9
**discovery**
269:11
**discredit**
67:15, 67:16
**discuss**
32:5, 44:19,
206:18
**discussed**
18:16, 48:12,
103:6, 103:17,
138:23, 175:10,
175:22, 176:8,
206:22, 230:24,
388:9
**discussing**
171:3
**discussion**
404:5
**disdain**
408:24
**dismissed**
154:22
**disregarded**
352:9, 356:16
**distance**
190:10
**district**
1:1, 1:2
**document**
11:15, 112:17,
113:2, 113:3,
227:21, 350:9,
351:7, 351:9
**documentation**
301:23

**documents**
58:18, 112:4,
310:17, 310:19
**does**
192:3, 299:16,
330:8, 338:5,
370:12
**doesn't**
195:15, 236:6,
275:19, 338:3,
338:15
**doing**
48:21, 86:2,
131:9, 213:21,
254:11
**don't**
55:21, 56:6,
82:12, 116:24,
125:24, 131:18,
131:22, 174:21,
196:10, 196:13,
214:2, 214:11,
235:13, 235:14,
235:16, 235:21,
235:23, 235:24,
236:3, 260:24,
270:19, 272:24,
273:2, 274:1,
274:2, 274:3,
281:21, 282:15,
283:19, 299:6,
299:16, 306:5,
306:14, 338:9,
372:9, 402:12,
403:15
**done**
54:14, 64:3,
95:12, 124:7,
125:1, 270:16,
377:2
**door**
202:7
**dope**
121:5, 121:19,
123:8, 393:15
**double**
250:4
**double-sided**
196:20

**doubted**
177:3
**down**
97:6, 206:16,
227:8, 227:15,
227:16, 228:3,
228:4, 284:23
**dozen**
259:19
**dozens**
254:18
**drafted**
121:13, 251:11
**drafting**
398:6
**dragon**
407:18, 408:14,
409:6, 410:10
**dragons**
408:1, 408:2,
408:5, 408:11,
408:22, 409:1
**drake**
393:14, 393:16
**draw**
113:10, 246:15,
330:22
**drive**
4:14, 109:23,
135:2, 227:8,
237:2
**driver**
75:21, 75:23,
121:7, 122:1,
391:5, 406:13
**driving**
89:16, 227:16,
228:3, 237:6,
288:4, 288:9
**drove**
75:14, 88:12,
90:4, 110:15,
136:16, 159:11,
222:4, 223:23,
226:21, 227:15,
228:2, 233:11,
237:8, 393:16
**drug**
92:10, 92:19,

158:23, 159:5,
332:13
**drugs**
99:1, 154:1,
332:2, 332:10,
332:19
**ducked**
315:19
**due**
12:11, 12:19
**duly**
8:15, 418:4,
419:14
**during**
11:11, 25:17,
26:15, 27:22,
46:10, 58:21,
77:24, 79:24,
80:5, 128:1,
143:12, 144:4,
145:13, 157:13,
166:4, 181:2,
191:5, 210:22,
247:18, 259:19,
278:6, 279:23,
283:4, 284:9,
285:5, 285:11,
286:13, 286:23,
291:7, 291:13,
304:15, 304:20,
305:3, 313:19,
319:12, 353:12,
358:8, 369:12

**E**

**e-f-r-a-i-n**
307:5
**e-l-l-i-s-o-n**
320:13
**each**
130:8, 246:19
**eager**
401:19
**eagles**
311:19, 312:3,
312:8
**earlier**
52:24, 102:6,

283:24, 324:3,
338:10, 344:6
**early**
24:2, 86:17,
226:9, 386:5,
388:4, 405:6,
405:13, 406:19,
412:21, 413:9
**east**
3:20
**easy**
40:20
**edward**
18:7
**edwin**
299:21, 299:22
**effect**
40:21, 80:15,
209:12
**effort**
171:18, 283:16,
328:11
**efforts**
61:11, 352:21,
353:5
**efrain**
53:17, 53:24,
307:4, 308:5,
308:9, 308:14,
385:11, 385:21
**eight**
133:6, 133:24,
169:2
**eileen**
273:21
**either**
20:7, 80:4,
95:8, 143:10,
148:17, 153:12,
159:23, 174:10,
194:3, 194:17,
195:16, 300:12,
301:3, 310:20,
332:1, 332:10,
370:13
**eligible**
249:3
**elizabeth**
3:11, 7:20,

282:4
**ellison**
320:13
**else**
54:22, 207:22
**employed**
38:23
**employment**
259:20, 263:4
**end**
112:17, 204:18,
330:2, 336:15,
350:18
**ended**
254:11
**engaged**
260:2
**enough**
362:10, 402:21
**ensure**
57:12, 60:12,
98:18, 99:2,
99:20, 150:4
**ensured**
15:16
**entered**
66:3
**entice**
153:12
**entire**
125:8, 128:22,
238:19
**entirely**
240:13
**entirety**
162:19, 173:15,
188:3, 237:21,
395:1
**entitled**
250:20, 251:14,
251:23, 252:7
**entry**
58:7, 113:21,
114:2
**environment**
259:8
**episode**
63:18, 129:23,

130:3, 130:16
**epplen**
339:14, 340:14,
341:6, 382:15,
384:17, 416:2
**ernest**
1:16, 2:1, 7:2,
8:13, 9:4,
161:24, 292:15,
418:3, 418:17,
419:8, 419:13
**ernie**
209:8
**escobar**
33:6, 325:12,
326:8, 326:15
**essentially**
73:13, 75:20,
252:18
**establishing**
310:17
**esteemed**
213:10
**et**
1:7, 1:13, 7:4,
7:5
**even**
32:24, 34:23,
69:18, 71:5,
75:21, 100:22,
103:15, 117:13,
146:2, 163:10,
182:21, 232:16,
235:21, 245:15,
300:13, 301:4,
360:4, 380:9
**evening**
388:3, 388:4
**evenly**
154:5
**event**
362:9
**events**
224:2
**eventually**
46:20, 46:23,
83:8, 158:4,
227:15, 228:3,

367:5, 396:17
**ever**
246:11, 292:9,
316:10, 399:11
**every**
11:10, 11:15,
27:13, 80:18,
126:2, 214:18,
306:6
**everybody**
82:12, 403:10
**everything**
11:5, 27:4,
27:5, 95:11,
301:21, 328:4,
367:18
**evidence**
19:7, 19:14,
52:15, 61:23,
63:2, 64:7,
108:4, 108:5,
108:18, 108:20,
109:2, 109:3,
109:12, 137:14,
139:12, 140:23,
141:1, 141:9,
148:11, 181:23,
182:13, 182:18,
183:2, 193:4,
193:5, 202:20,
212:4, 229:8,
232:4, 234:5,
234:14, 237:1,
256:1, 256:11,
256:21, 257:9,
257:20, 276:10,
283:6, 291:2,
291:9, 317:8,
319:16, 329:3,
329:11, 344:22,
346:8, 403:21,
403:22, 404:1,
420:7
**exactly**
31:2, 152:8,
229:6, 237:4,
379:17
**examination**
6:3, 8:17,

204:19, 282:7,
330:12
**examined**
8:15, 419:16
**example**
62:5
**excessive**
259:15
**exchange**
48:4, 332:11
**exculpatory**
256:20, 257:20,
291:9, 329:11
**execute**
61:19, 137:19
**executed**
246:10
**exercise**
11:3
**exhausted**
403:2
**exhibit**
6:8, 56:17,
59:7, 112:4,
112:10, 117:9,
126:21, 127:23,
128:6, 161:12,
164:20, 172:15,
183:23, 195:21,
196:19, 206:1,
337:17, 370:9
**exhibits**
58:19
**existed**
140:24, 292:9
**experience**
156:21
**explain**
348:5
**explained**
224:1
**explanation**
48:14, 49:7,
196:11, 272:5
**exploring**
403:24
**expose**
304:15, 304:21

**express**
99:9, 99:18
**expression**
198:23
**expressly**
41:24, 344:14
**extended**
82:13
**extent**
32:8, 97:10,
113:3, 113:4,
261:13, 264:16,
275:17, 279:2,
279:5, 282:16,
282:18, 406:23
**extra**
252:18
**extract**
145:7, 388:22
**eyes**
367:18
**eyewitness**
75:6, 151:23,
230:18, 240:19,
255:6, 259:16,
284:4, 286:8,
289:9, 294:14
**eyewitnesses**
255:6, 259:16

**F**

**f-l-o-r-e-s**
321:4
**f-r-i-a-s**
322:13
**fabricate**
72:10, 95:6,
139:11, 281:10,
283:13, 369:16
**fabricated**
61:23, 64:7,
70:5, 81:16,
83:13, 85:19,
85:20, 88:1,
88:24, 90:11,
93:1, 104:23,
109:10, 132:22,
141:2, 141:9,

167:18, 172:2,
172:17, 173:19,
186:3, 189:14,
190:11, 191:7,
199:16, 201:11,
202:23, 205:6,
256:1, 256:10,
291:1, 292:7,
313:20, 316:18,
329:2, 348:3,
349:10, 378:7,
382:24, 398:7,
415:23
**fabricating**
19:13, 95:22,
157:23
**face**
143:11, 307:6,
327:10, 365:10,
365:12, 367:16,
374:11, 374:12,
374:21, 375:1,
375:3, 375:4,
406:15
**facility**
336:8
**facts**
21:3, 61:20,
62:10, 72:18,
73:24, 74:10,
74:19, 85:17,
87:24, 88:24,
111:20, 118:14,
192:17, 201:10,
204:20, 205:3,
319:15
**factual**
73:14, 399:10,
410:15, 411:1,
411:8
**factually**
20:20
**failed**
29:12, 137:10
**fails**
420:2
**failure**
420:7

**fair**
162:23, 299:17,
401:13, 402:21
**fairly**
234:21
**falsified**
310:10
**falsifying**
291:2
**familiar**
380:11
**familiarity**
37:14
**far**
29:20, 213:22
**fast**
159:5
**favor**
154:19
**fear**
264:3, 264:13,
264:22, 265:5,
265:11, 265:19,
266:2, 266:8,
266:14, 266:20,
267:2, 267:7,
267:13, 267:19,
397:3
**fearful**
347:16
**february**
17:17, 23:18,
24:3, 25:17,
26:17, 31:4,
31:23, 60:13,
61:10, 83:22,
86:18, 91:1,
121:4, 121:20,
130:4, 130:18,
131:3, 132:5,
132:7, 133:10,
136:2, 141:18,
147:7, 147:15,
147:23, 148:3,
149:3, 149:19,
166:6, 168:21,
180:9, 198:6,
199:2, 199:8,

Transcript of Ernest Halvorsen
Conducted on April 20, 2018

124

199:20, 201:6,
203:8, 203:15,
203:24, 223:17,
229:16, 230:7,
246:21
**fed**
72:2, 72:8,
73:15, 83:3,
86:15, 90:12,
93:1, 96:3,
96:10, 102:23,
122:7, 122:15,
126:12, 127:4,
127:16, 141:2,
160:21, 161:4,
162:8, 169:18,
172:2, 186:4,
199:16, 201:14,
202:23, 238:19
**federal**
264:23, 267:20,
403:21
**fee**
360:24
**feed**
21:9, 89:9
**feeding**
72:18, 73:24,
74:10, 74:19,
80:13, 81:3,
94:13
**feel**
113:2, 113:4
**fellow**
15:3, 17:7,
21:1, 23:20,
66:23, 69:7,
74:9, 91:14,
92:24, 127:16,
280:2, 382:12,
384:23, 385:10,
385:20, 387:13
**felony**
36:10, 93:4
**felt**
250:4
**fence**
237:9, 237:10

**fender**
111:20, 226:24
**few**
106:24, 254:9,
324:4
**field**
116:13
**fight**
344:9, 402:22
**file**
11:16, 112:12,
193:23, 194:1,
194:8, 194:15,
194:16, 195:1,
195:2, 195:3,
217:5
**filed**
317:5
**files**
256:20
**filler**
222:7
**finally**
81:11
**financially**
92:12, 92:20
**find**
120:5, 352:17
**fine**
10:17, 56:2,
56:9, 82:14,
108:9, 113:16,
196:11, 323:23,
372:20, 402:6
**finger**
139:7, 144:20
**finished**
236:11
**fire**
160:2
**firearms**
108:20, 109:11,
137:14
**fired**
315:19
**firm**
3:19, 4:5,
7:19, 8:10,

273:4, 273:13,
273:18
**first**
8:14, 71:6,
75:5, 164:12,
171:4, 237:14,
272:20, 282:9,
283:4, 298:2,
305:20, 306:2,
306:11, 324:11,
330:14, 373:18,
397:16, 418:3,
419:14
**firsthand**
69:18, 332:9
**five**
101:4, 103:8,
202:10, 350:7,
394:14
**flashlight**
156:6, 156:15,
156:22, 389:10
**fleming**
327:17, 327:24
**floor**
2:6, 3:13,
207:16
**flores**
321:4
**follow**
353:5, 354:2
**followed**
135:13
**following**
124:5, 200:8,
247:19
**follows**
8:16
**fop**
274:22
**force**
80:19, 80:21,
81:1, 81:2,
145:7, 259:15,
401:2
**forced**
149:2
**foregoing**
418:9, 419:17

**forensic**
108:5, 229:8
**forgot**
11:7, 42:6
**forgotten**
253:5
**formal**
190:8
**former**
213:8
**forms**
173:7
**forth**
126:1, 236:19
**fortunate**
362:10
**forward**
301:20
**found**
36:22, 87:18,
108:4, 137:14
**four**
36:10, 56:23,
58:8, 67:14,
103:16, 104:10,
196:19, 250:8,
401:17
**four-door**
226:23
**fourth**
13:7, 13:14
**frame**
14:2, 14:11,
14:17, 19:12,
22:4, 22:14,
30:4, 30:19,
34:7, 34:20,
35:2, 39:23,
40:3, 41:17,
47:7, 50:20,
51:15, 51:23,
52:18, 52:22,
53:9, 53:17,
54:11, 54:24,
55:11, 60:23,
61:11, 61:20,
62:11, 74:20,
76:6, 90:7,

92:18, 98:19,
99:3, 99:22,
132:19, 137:19,
139:12, 148:11,
153:22, 155:9,
172:9, 204:11,
282:9, 290:15,
303:14, 305:10,
312:20, 313:15,
317:12, 318:20,
320:12, 320:20,
321:3, 321:11,
322:5, 322:12,
322:20, 323:4,
323:12, 325:7,
329:20, 335:4,
335:9, 335:24,
341:7, 353:11,
356:8, 356:17,
358:15, 359:5,
359:10, 365:19,
366:24, 380:3,
382:15, 384:18,
384:24, 385:10,
386:13, 401:17,
401:19, 408:5,
408:22, 409:7,
410:11
**frame-up**
47:18, 95:1,
120:6, 387:7
**framed**
16:10, 16:16,
16:22, 30:9,
254:15, 255:2,
255:13, 255:22,
256:7, 256:16,
257:5, 257:16,
258:5, 258:16,
259:3, 259:17,
281:5, 290:4,
310:24, 339:18,
348:24, 353:19,
359:17, 363:3,
381:1, 381:12,
381:18, 381:20,
404:12
**framing**
39:11, 41:9,

46:23, 48:4,
87:23, 260:10,
335:19, 336:15,
348:20, 352:10,
353:7, 359:15,
403:9, 407:17
**francisco**
6:20, 19:17,
19:24, 22:17,
32:6, 34:9,
35:11, 37:3,
39:10, 40:10,
40:13, 40:24,
41:7, 41:14,
43:3, 46:10,
46:22, 47:15,
48:1, 49:23,
51:4, 53:18,
64:14, 66:15,
66:21, 68:5,
68:15, 68:22,
70:2, 70:12,
71:13, 83:3,
188:19, 189:3,
191:8, 191:20,
192:6, 215:9,
215:16, 215:19,
216:24, 218:1,
218:13, 240:13,
246:9, 246:17,
247:5, 248:11,
249:2, 281:11,
296:15, 296:21,
385:12
**franco**
206:24
**frank**
33:6, 326:15
**frankie**
50:17, 51:17,
71:4, 73:15,
76:11, 76:16,
76:24, 77:16,
78:1, 79:4,
79:9, 79:15,
80:1, 80:20,
81:1, 81:3,
81:22, 83:8,

84:10, 94:24,
95:20, 96:3,
99:20, 100:6,
100:15, 101:23,
102:14, 102:24,
103:7, 103:18,
104:24, 119:2,
119:8, 120:2,
120:5, 120:16,
120:17, 122:7,
124:21, 125:11,
126:12, 127:4,
127:13, 128:1,
128:8, 128:13,
128:23, 129:4,
129:10, 132:21,
139:15, 202:23,
206:24, 209:17,
210:20, 219:15,
221:2, 251:2,
325:12, 326:8,
390:18
**fraternal**
274:16, 275:2
**fraud**
267:2, 267:8
**fred**
279:19
**freddie**
321:21
**free**
7:13, 113:2
**frequently**
25:19, 38:15,
38:23, 100:24,
114:11, 117:19,
156:12
**frias**
322:13
**friday**
1:18, 121:3
**friend**
342:1, 342:8,
343:18, 343:19,
345:14, 346:4,
361:5, 377:1,
379:21, 387:7,
411:22

**friendlier**
145:2
**friends**
334:14, 347:17,
362:1, 412:6,
412:21, 413:9
**fro**
393:2, 393:12,
393:17, 394:2,
394:5, 396:1
**front**
161:18, 202:2,
209:15, 212:21,
226:23, 232:16,
376:8, 402:22,
405:17, 406:14
**fucked**
86:24, 124:9,
124:11, 125:2
**full**
9:3, 120:23,
212:3
**fully**
230:3, 420:6
**further**
86:21, 87:10,
95:19, 135:24,
186:8, 198:11,
220:16, 241:12,
282:20, 330:12,
379:2, 416:19,
419:17
**fusco**
5:5, 273:18,
273:19, 273:22
**future**
148:5, 264:4

G

**g-a-y-a**
323:13
**g-o-n-z-a-l-e-z**
322:21
**g-o-o-s-e-n-s**
382:7
**gain**
39:3, 43:3,
47:18, 144:5

Transcript of Ernest Halvorsen
Conducted on April 20, 2018

126

**gallivan**
197:17
**game**
290:10
**gang**
39:16, 39:21,
40:3, 40:5,
64:15, 64:24,
65:10, 68:6,
68:16, 74:1,
80:1, 82:23,
98:4, 100:23,
101:1, 119:2,
120:16, 121:1,
189:4, 207:15,
209:17, 210:1,
220:4, 220:12,
221:15, 304:16,
304:21, 307:18,
311:19, 312:5,
312:9, 331:24,
332:11, 332:13,
332:17, 340:22,
348:21, 358:14,
369:11, 371:16,
407:18, 408:2,
408:3, 408:6,
408:10
**gangs**
115:8
**gangsters**
121:1, 121:11
**garcia**
339:20, 340:11,
341:16, 341:22,
342:4, 342:13,
343:7, 343:14,
343:24, 344:5,
344:13, 344:21,
344:23, 345:7,
345:11, 345:23,
346:4, 346:24,
347:8, 347:13,
347:18, 347:22,
348:4, 348:6,
348:13, 349:3,
354:16, 355:24
**garcia's**
343:19

**garz**
305:9, 313:14,
314:14, 314:21,
316:6
**gas**
28:15, 28:20,
29:5, 63:19,
84:5, 84:13,
84:19, 85:1,
85:10, 106:6,
106:17, 107:9,
107:17, 109:6,
109:20, 110:2,
110:10, 111:13,
111:22, 129:23,
130:2, 130:3,
130:6, 130:16,
132:4, 133:9,
134:6, 134:18,
134:19, 135:5,
135:13, 135:20,
137:4, 147:13,
175:12, 175:24,
176:10, 176:20,
177:22, 178:10,
180:7, 181:5,
223:6, 223:16,
223:23, 224:3,
224:23, 226:4,
226:10, 227:9,
229:2, 229:16,
230:6, 242:11,
242:18, 243:14,
243:22
**gate**
159:24, 202:2
**gather**
52:3, 59:24,
60:10, 60:21
**gave**
23:8, 70:4,
70:10, 78:19,
187:24, 189:23,
197:3, 197:9,
200:2, 204:3,
205:13, 216:24,
218:1, 218:3,
228:8, 239:5,

252:18, 253:3,
297:5, 332:19,
377:10, 410:16
**gaya**
323:13
**gembowski**
406:11
**general**
31:7, 65:21,
303:24, 324:3,
364:13
**generally**
212:20, 277:7
**genitals**
389:9
**george**
54:11, 54:21,
217:7, 335:10,
335:14, 335:19,
335:24, 359:10,
359:15, 359:23,
360:8, 360:18,
361:12, 404:14,
405:5, 411:3,
415:19, 416:5
**geraldo**
100:17, 101:24,
102:15, 290:5,
290:16, 290:20,
291:17, 292:1,
292:18, 294:6,
294:15, 294:22,
296:9, 296:16,
296:24, 297:4
**gernito**
356:9, 358:24,
360:10, 360:20
**gernito's**
356:18, 358:3,
359:5, 359:11
**get**
34:24, 41:15,
42:21, 44:19,
49:14, 51:3,
56:4, 80:12,
92:23, 93:19,
94:4, 98:16,
99:1, 104:3,

105:7, 106:16,
107:8, 144:14,
145:22, 146:2,
151:14, 151:21,
153:4, 154:5,
154:10, 154:21,
171:18, 174:18,
182:6, 183:15,
183:23, 202:6,
212:21, 232:4,
232:15, 234:4,
248:18, 249:16,
253:6, 300:1,
310:2, 314:21,
316:6, 317:8,
327:24, 328:11,
342:7, 343:9,
359:17, 375:2,
378:8, 379:18,
388:11, 403:10,
404:7, 404:8,
409:16, 412:18
**getaway**
75:16, 75:20,
75:23
**getting**
113:1, 158:5,
175:10, 175:22,
176:8, 250:18
**girl**
364:18, 366:3,
368:6, 412:4
**girlfriend**
395:13, 395:22
**give**
61:23, 64:7,
83:9, 85:19,
89:1, 96:17,
132:21, 158:14,
161:14, 186:10,
196:5, 218:9,
226:12, 263:12,
264:5, 270:12,
270:15, 271:4,
275:8, 275:12,
276:6, 276:14,
276:22, 277:6,
277:21, 278:5,

278:11, 278:16,
281:17, 350:1,
406:1

**giving**
70:2, 96:11,
97:2, 119:17,
186:19, 200:19,
206:15, 230:23,
233:22, 237:16,
264:7

**go**
10:5, 34:24,
53:19, 54:15,
81:12, 92:23,
93:13, 97:13,
99:19, 112:18,
113:6, 113:16,
131:18, 146:9,
160:1, 162:9,
175:15, 183:8,
192:23, 213:24,
221:18, 227:22,
230:10, 234:23,
235:5, 235:8,
236:16, 242:4,
253:23, 282:5,
297:17, 298:2,
301:17, 302:3,
319:17, 323:22,
338:2, 352:16,
356:21, 360:4,
365:17, 367:10,
385:15

**goal**
104:2, 367:5,
367:6

**god**
11:7

**goes**
113:12

**going**
8:22, 32:13,
37:9, 46:3,
48:12, 50:20,
55:18, 56:16,
56:20, 57:10,
58:1, 66:21,
67:15, 74:20,

93:18, 102:4,
112:2, 148:4,
158:14, 161:11,
161:13, 164:18,
174:12, 186:2,
186:9, 195:24,
196:3, 197:24,
201:24, 206:4,
207:8, 213:11,
214:16, 227:8,
231:2, 231:18,
233:19, 236:13,
236:23, 237:2,
237:3, 246:5,
248:18, 249:15,
249:23, 253:7,
271:24, 282:5,
282:17, 297:11,
323:23, 337:15,
337:19, 338:14,
349:23, 349:24,
350:15, 358:15,
359:4, 359:10,
363:21, 366:24,
384:14, 384:18,
388:10, 401:23,
403:14, 404:7,
404:8, 413:16

**golden**
272:23

**gone**
62:20, 63:1,
63:12, 124:7,
125:1, 130:5,
130:7

**gonzalez**
317:15, 322:21,
363:4, 368:17,
368:21, 374:2,
375:18, 376:1,
376:6, 376:18,
376:24, 377:20,
378:6, 378:14,
379:12, 379:18,
380:3, 380:9,
381:13, 382:2,
382:16, 383:2,
390:10, 391:14,

392:5, 392:14,
392:22, 393:12,
393:17, 394:1,
394:5, 394:15,
395:4, 395:8,
395:14, 395:24,
401:3, 401:11

**gonzalez's**
377:11

**good**
7:15, 8:19,
38:15, 45:11,
56:13, 62:18,
84:14, 131:21,
142:10, 143:19,
174:20, 196:23,
243:15, 252:19,
310:2, 343:9,
346:4, 361:5,
362:1, 374:11,
375:1, 375:3,
378:8

**goosens**
381:21, 382:5,
382:6, 382:17,
395:4, 401:12

**gorman**
4:20, 7:23,
7:24, 416:20

**got**
88:11, 123:6,
130:7, 144:21,
159:17, 159:23,
218:22, 219:13,
221:23, 227:4,
227:6, 281:18,
286:3, 299:23,
324:1, 324:8,
329:24, 350:5,
358:3, 360:1,
363:22, 374:11,
375:1, 393:13,
394:4

**gotten**
221:1, 226:3,
243:15

**gpr**
132:13

**gprs**
149:22, 150:5

**grand**
37:11, 138:17,
141:18, 141:21,
150:16, 155:23,
156:6, 185:7,
185:13, 185:22,
186:10, 186:21,
187:9, 187:24,
188:16, 196:15,
196:17, 197:3,
197:4, 197:11,
200:3, 200:23,
202:13, 204:4,
205:18, 220:1,
233:2, 341:17,
366:19, 385:22,
387:22, 388:8,
409:13, 413:19

**grande**
404:16, 405:13,
406:10, 406:24,
411:12, 411:19,
412:19, 413:5,
413:16, 413:24,
414:11, 414:20,
415:8, 416:3,
416:15

**gray**
33:16

**great**
213:21, 320:9

**greenfield**
279:19, 280:1,
280:12

**grille**
273:1

**grocery**
349:17

**ground**
394:15

**group**
3:5, 7:19,
405:16

**guess**
120:23, 300:3,
311:5, 324:7,

Transcript of Ernest Halvorsen
Conducted on April 20, 2018

128

357:18, 371:8
**guevara's**
85:8, 117:14,
117:20, 145:15,
184:21, 184:24,
367:6, 415:3,
415:6
**guilty**
11:2, 12:4,
36:23, 92:3,
254:5, 257:11,
310:13, 336:23
**gun**
87:6, 87:11,
87:12, 87:16,
87:17, 88:11,
160:3, 201:5,
394:2, 394:16
**guns**
332:2, 332:10,
332:19
**guy**
87:1, 124:10,
125:3, 211:20,
214:24, 280:14,
287:8, 345:23
**guys**
121:10, 393:13

**H**

**h-a-r-d-i-n-g**
83:21
**h-e-l-e-a-n**
314:7
**h-e-r-n-a-n-d-e-z**
316:24
**hair**
406:13, 406:18
**half**
174:23
**halvorsen**
1:16, 2:1, 6:2,
6:15, 6:17,
6:21, 6:23, 7:2,
8:8, 8:11, 8:13,
8:19, 9:4,
10:22, 32:4,
32:17, 35:9,

43:10, 58:5,
64:13, 70:19,
82:21, 89:13,
112:9, 112:23,
113:9, 113:22,
132:2, 150:13,
161:24, 175:7,
184:5, 195:17,
195:18, 195:21,
195:24, 196:1,
196:4, 197:2,
198:16, 202:17,
204:24, 205:24,
206:1, 206:4,
206:5, 206:10,
219:21, 246:7,
248:14, 254:3,
254:15, 260:22,
263:24, 264:12,
292:15, 330:14,
337:16, 337:17,
338:24, 339:1,
339:4, 340:15,
346:18, 370:9,
370:18, 370:19,
380:24, 403:3,
404:2, 417:2,
418:3, 418:17,
419:8, 419:13
**hamlin**
121:5, 121:19
**hand**
55:18, 56:16,
58:1, 195:24,
196:3, 202:5,
206:4, 323:20
**handcuffs**
325:15, 325:21,
326:3
**handgun**
200:11, 200:15,
201:4
**handing**
58:5, 112:9,
246:7, 338:24,
370:18
**hands**
155:17, 318:5

**hands-on**
116:13
**handwriting**
184:24
**handwritten**
161:22, 162:5,
162:14, 185:15,
186:3, 186:20,
188:17, 188:20,
189:16, 191:19,
395:23
**hanging**
121:4, 121:18,
405:17
**happened**
52:23, 233:17,
235:7, 237:5,
336:2, 372:9
**harassed**
328:10
**harassing**
35:5, 53:11,
213:17
**harassment**
354:11
**hard**
40:19, 403:9
**harding**
83:20, 84:3
**has**
55:18, 56:18,
57:22, 58:1,
58:2, 112:3,
112:10, 114:4,
116:20, 117:8,
117:13, 128:23,
261:24, 262:8,
262:16, 263:17,
338:7, 338:8,
339:1, 350:9,
370:15
**hasberg**
5:10, 7:11
**hasn't**
338:17
**hat**
406:16
**have**
23:19, 25:10,

56:20, 57:13,
88:3, 95:10,
97:12, 99:19,
102:4, 103:7,
104:14, 112:2,
124:23, 125:24,
131:10, 131:14,
131:22, 146:20,
152:1, 161:11,
161:13, 162:15,
164:18, 183:22,
187:10, 189:16,
193:14, 196:11,
197:24, 207:8,
225:19, 226:2,
228:24, 233:5,
233:19, 236:23,
237:3, 242:10,
245:21, 246:5,
246:11, 246:24,
249:23, 250:8,
253:7, 261:6,
262:19, 264:3,
265:12, 275:5,
278:21, 283:18,
302:19, 305:23,
306:5, 306:14,
306:15, 324:21,
330:3, 331:16,
332:16, 338:3,
338:5, 338:13,
338:16, 347:6,
349:23, 350:6,
352:23, 354:8,
354:18, 355:15,
362:11, 371:13,
372:7, 373:3,
396:11, 399:17,
400:6, 402:22,
403:1, 404:2,
404:4, 416:19,
416:21, 416:22,
418:11, 418:12
**having**
8:14, 132:12,
164:19, 173:13,
184:5, 188:15,
271:5, 283:14,

Transcript of Ernest Halvorsen
Conducted on April 20, 2018                    129

302:8, 302:15,
318:3, 324:16,
347:15, 355:16,
365:15, 412:5,
414:2
**he's**
159:5, 214:17,
214:18, 236:23,
305:17, 337:23,
351:5
**head**
43:12, 44:14,
78:5, 80:4,
80:5, 80:14,
156:5, 374:10,
374:20, 389:9
**headed**
32:14
**hear**
27:13, 95:11,
213:14, 235:11,
284:22, 394:7
**heard**
44:7, 44:8,
46:15, 104:14,
143:11, 147:11,
211:20, 212:22,
213:12, 214:23,
240:14, 394:13
**hearing**
248:16, 251:3,
251:22
**hearsay**
212:15
**hector**
363:5, 363:16,
364:19, 367:1,
377:1, 377:18,
379:21, 380:3
**held**
2:1, 7:6, 143:5
**helean**
314:7, 314:15,
316:16
**help**
38:4, 38:9,
39:11, 41:8,
47:7, 51:17,

94:2, 144:14,
157:20, 304:10,
312:20
**helped**
158:13, 281:10
**helpful**
195:5
**henry**
312:20
**her**
26:19, 27:22,
28:6, 28:21,
85:2, 105:12,
105:14, 105:20,
106:4, 106:16,
106:18, 107:2,
107:8, 107:10,
108:21, 109:4,
109:18, 110:23,
110:24, 130:6,
131:4, 131:5,
134:19, 135:13,
135:19, 136:2,
178:10, 178:19,
178:20, 179:3,
179:4, 181:3,
181:17, 181:22,
182:1, 222:1,
223:3, 223:5,
223:14, 223:15,
224:3, 226:10,
227:10, 228:5,
228:24, 229:6,
229:13, 229:14,
229:15, 230:5,
243:21, 319:7,
319:12, 319:24,
323:24, 365:18,
369:4, 371:16,
374:1, 377:22,
396:1, 396:8,
396:10, 396:11,
397:4, 411:13,
411:22, 412:6,
412:21
**herbert**
4:5, 8:10,
272:17, 273:14,

274:21, 274:24
**here**
7:21, 8:23,
131:9, 131:17,
196:12, 214:14,
235:7, 235:10,
235:18, 263:11,
264:14, 269:1,
270:15, 271:9,
272:6, 273:23,
298:22, 311:5,
347:18, 350:12,
402:20, 404:2,
404:3
**hereby**
419:6
**herein**
8:14
**hereinabove**
419:21
**hermena**
351:2
**hermeno**
349:15
**hermino**
349:15
**hernandez**
316:23, 317:4,
317:13, 317:20,
318:2, 356:9,
356:15, 393:1
**heroin**
37:4, 37:10,
37:16, 89:10,
95:21
**hey**
209:7
**hide**
392:14
**high**
40:15
**highly**
140:5, 366:8,
378:22, 403:12
**himself**
75:20, 79:11,
139:2, 148:18,
149:24, 346:5,

390:9, 391:5,
399:12
**hinged**
240:12
**hired**
360:9
**hispanic**
373:7, 373:14,
373:20
**hispanics**
406:12
**histories**
55:7, 60:1
**history**
6:10, 6:12,
52:3, 55:10,
57:11, 58:8,
58:11, 58:20,
59:4, 59:16,
59:17, 60:10,
60:21
**hit**
44:13, 156:14
**hits**
156:21, 195:13
**hitting**
45:21, 46:1,
202:9
**hobbs**
266:15
**hold**
53:22, 102:3,
253:19, 297:17,
338:9, 357:10,
364:9
**hole**
108:12, 108:19,
109:2, 137:13,
226:24
**homan**
392:16
**home**
24:8, 107:2,
174:2, 174:13,
222:5, 237:10,
392:15, 392:23,
393:4
**homicide**
68:19, 70:23,

Transcript of Ernest Halvorsen
Conducted on April 20, 2018

130

71:6, 151:7, 291:3, 291:8, 291:14, 307:12, 310:12, 313:19, 315:18, 316:1, 316:7, 316:12, 329:4, 329:7, 329:12

**honestly**
196:10

**honked**
28:22

**hooded**
326:24, 327:2, 327:8

**hooked**
219:2

**hope**
120:4

**hoped**
40:2, 148:16, 280:7

**hopes**
39:21, 139:1, 139:6

**horn**
85:11

**hospital**
375:19, 411:20

**hot**
292:23

**hour**
82:8, 131:4, 143:6, 143:13, 144:4, 145:14, 174:22, 393:5

**hours**
24:3, 27:5, 27:14, 27:22, 86:18, 141:22, 158:12, 336:9, 354:1, 365:7, 386:5, 388:17, 388:21, 389:5, 389:24, 396:16, 405:6, 412:22, 413:9

**house**
86:12, 174:1,

201:24, 237:9, 237:10, 396:1, 409:23

**housed**
65:21, 98:14

**how**
9:14, 44:19, 67:15, 94:24, 127:3, 152:8, 195:11, 206:22, 232:13, 270:19, 278:18, 297:24, 329:14, 336:21, 353:11, 358:7, 361:19

**hughes**
33:15

**hugo**
294:14, 294:20, 295:2, 295:8, 295:13, 295:18, 295:24, 296:7

**humboldt**
30:5, 115:8, 332:17, 358:8, 359:24, 365:19, 383:17

**humbolt**
358:16, 363:17

**husband**
26:19, 28:6, 28:21, 105:14, 130:6, 227:10

**husband's**
85:2, 106:18, 107:10, 108:21, 110:24, 131:5, 136:2, 178:11, 178:19, 179:3, 182:1, 223:5, 223:16, 224:3, 226:11

**hypothetical**
146:24, 213:3

**I**

**i'll**
97:12, 112:22,

117:3, 161:14, 194:9, 207:9, 235:17, 235:19, 282:22, 298:1, 298:13, 302:2, 305:15, 323:19, 324:7, 324:11, 330:23, 338:13, 349:24, 356:19, 363:8, 370:14, 373:3

**i've**
196:3, 301:21, 324:1, 329:24, 350:5, 381:6, 404:20

**i-v-a-n**
337:10

**id**
6:8

**idea**
379:19

**ideal**
103:18

**identification**
133:7, 134:17, 177:21, 195:22, 196:2, 206:2, 242:16, 242:17, 286:1, 288:19, 288:24, 291:17, 292:17, 294:21, 316:17, 337:18, 342:6, 342:18, 346:16, 349:10, 370:10, 379:3, 416:13

**identifications**
255:7, 259:17, 366:9, 415:9, 415:16, 415:24, 416:14

**identified**
119:9, 133:7, 134:20, 135:11, 147:12, 169:7, 169:9, 169:10, 180:14, 180:20,

184:6, 220:17, 239:16, 244:3, 275:10, 288:14, 304:2, 333:12, 334:4, 348:6, 369:2, 375:23, 410:17, 414:21

**identify**
11:15, 11:20, 56:11, 102:1, 107:8, 110:1, 110:9, 137:3, 175:11, 175:23, 176:9, 177:3, 178:9, 180:1, 180:6, 196:6, 196:21, 229:1, 243:13, 248:9, 263:11, 285:6, 285:16, 285:21, 286:24, 287:13, 287:18, 288:3, 292:23, 295:3, 303:2, 303:7, 315:17, 327:10, 327:18, 328:1, 340:9, 341:9, 341:17, 345:18, 347:1, 347:9, 347:23, 348:13, 352:22, 355:7, 355:23, 368:9, 370:4, 376:18, 377:22, 378:15, 379:11, 379:18, 412:10

**identifying**
136:8, 229:15, 294:6, 294:15, 296:9, 296:23, 349:3

**ig**
71:21

**iglesias**
100:17, 101:16, 101:24, 102:2, 102:15, 102:16, 103:1, 290:5,

290:16, 290:21, 291:17, 292:1, 292:19, 293:6, 293:11, 294:7, 294:15, 294:23, 295:9, 295:14, 296:10, 296:16, 296:24, 297:4, 297:13

**iglesias's**
297:12, 297:13

**illegal**
249:15

**illimunata**
364:21

**illinois**
1:2, 1:17, 2:7, 2:14, 3:14, 3:21, 4:8, 4:15, 4:23, 5:7, 7:7, 54:23, 206:7, 336:6, 419:1, 419:6, 420:1, 420:15

**illuminata**
363:7

**imagine**
270:19, 299:16

**immediately**
29:6, 130:17, 221:23, 352:8, 365:3

**impeach**
257:23

**imperial**
121:1, 121:11

**impermissibly**
177:7, 179:8, 327:8, 327:16

**implicate**
21:22, 22:18, 33:6, 35:17, 41:2, 42:16, 44:20, 72:11, 73:8, 81:5, 104:4, 106:5, 106:16, 146:3, 153:14, 154:6,

154:11, 171:18, 211:12, 264:16, 275:17, 279:6, 305:4, 314:23, 315:5, 315:11, 315:24, 316:7, 328:12, 328:16, 329:14

**implicated**
154:20, 157:24, 158:6, 188:1, 241:6, 313:21, 328:23, 329:6, 390:9, 392:4, 395:14

**implicating**
50:12, 148:18, 149:24, 151:6, 153:5, 164:14, 172:6, 186:10, 207:1, 210:11, 314:8, 314:16, 391:5, 399:12

**important**
52:24, 193:5, 224:20, 225:6, 225:12

**impression**
225:17, 226:13

**improper**
325:20, 416:13

**improperly**
33:4, 293:16, 293:22, 295:19, 296:1, 307:23, 308:4, 314:6, 314:14, 315:23

**in-person**
255:7

**inadmissible**
232:17, 234:5

**incarcerated**
247:19, 367:8

**incentives**
294:4, 296:7, 296:21

**incident**
28:20, 29:5,

63:18, 85:10, 130:4, 130:9, 132:5

**include**
172:21

**included**
123:19, 124:4, 124:15, 129:16, 130:13, 133:16, 136:7, 167:16, 168:4, 168:12, 375:11, 398:14

**including**
45:10, 72:3, 256:2, 256:11, 257:22, 259:15, 291:2, 297:5, 390:9, 398:2

**inclusive**
418:7

**incompetent**
234:5

**incomplete**
146:23, 213:2

**incorporate**
61:22, 64:6, 88:23

**incorporated**
126:22, 402:16

**incorporating**
88:1

**incriminate**
261:7, 264:1, 268:4, 268:11, 269:1, 269:17, 270:1, 270:4, 272:14, 273:10, 273:15

**inculpatory**
139:1, 388:22, 389:17, 398:17

**indeed**
15:13

**independent**
177:20, 225:18

**independently**
180:1

**indicate**
228:5, 271:3

**indicated**
165:20, 210:20, 242:9, 342:13

**indicates**
118:2

**indicating**
19:7

**indictment**
196:18, 200:4, 204:5, 204:9

**indictments**
188:8

**individual**
8:7, 52:23, 55:10, 57:2, 58:11, 61:20, 335:5, 341:23, 344:10, 363:3, 408:5

**individuals**
34:18, 52:18, 61:12, 87:23, 133:9, 134:6, 134:18, 139:13, 178:9, 178:18, 181:5, 220:18, 223:4, 223:6, 242:11, 243:14, 243:22, 254:19, 259:18, 363:6, 376:9, 385:10, 401:18, 405:23, 407:17, 410:2

**influence**
293:16, 293:22, 295:19, 296:1, 314:15

**influenced**
33:5, 307:24, 308:5, 314:7, 315:24

**informant**
291:24, 292:7, 292:9, 313:21

**information**
18:12, 20:1, 20:6, 21:9, 21:11, 27:21,

Transcript of Ernest Halvorsen
Conducted on April 20, 2018                    132

39:22, 50:3,
62:6, 63:10,
63:17, 64:5,
68:23, 70:4,
70:9, 72:2,
72:9, 72:10,
75:23, 81:4,
84:18, 87:7,
90:9, 90:10,
102:23, 119:17,
127:3, 130:16,
132:4, 132:11,
132:20, 137:2,
146:21, 160:22,
161:4, 167:6,
179:2, 192:3,
192:5, 194:14,
210:21, 211:5,
223:12, 223:13,
224:23, 225:1,
225:10, 225:16,
225:18, 226:3,
226:12, 229:13,
232:15, 236:22,
301:9, 311:17,
347:14, 354:18
**informed**
33:14, 220:24,
285:16, 285:21,
287:13, 287:18
**initially**
41:1, 75:12,
151:22, 155:8,
293:5, 293:10,
295:8, 295:13,
385:8
**initiate**
26:10
**initiating**
26:11
**innocence**
310:18, 325:8
**innocent**
11:2, 20:20,
33:1, 92:18,
254:19, 259:17,
335:15, 356:1
**innocuous**
64:4

**insane**
407:18, 407:24,
408:2, 408:5,
408:10, 408:14,
408:22, 409:1,
409:6, 410:10
**inside**
24:7, 72:4,
159:18
**insisted**
79:10
**instant**
420:6
**instead**
19:12, 37:19,
238:14, 260:14
**institution**
336:7
**instruct**
261:12, 264:17,
272:1, 275:18,
279:4, 282:17,
304:14, 304:19,
305:2, 338:14
**instructed**
35:24, 227:7,
243:20
**instruction**
270:5, 369:3
**intend**
261:18, 263:2,
265:13, 269:16,
270:20
**intended**
299:10, 373:3
**intention**
262:1, 262:9,
262:17, 263:17,
263:18
**intentionally**
16:10, 16:16,
16:22, 317:19,
318:1, 326:22
**interacted**
262:19
**interactions**
277:22
**interest**
193:14

**interested**
420:10
**intermittent**
390:1
**intermittently**
388:18, 389:8
**interrogate**
388:11
**interrogated**
141:22, 262:20,
319:7, 319:22
**interrogation**
46:10, 80:6,
142:4, 142:18,
143:5, 145:6,
149:18, 157:14,
319:13, 389:7
**interrogatories**
419:16
**interrupt**
298:19, 306:13
**interrupted**
233:21
**interview**
155:15, 166:4,
220:11, 233:4,
279:12, 350:24,
365:2, 371:15
**interviewed**
11:11, 26:16,
131:1, 131:4,
131:19, 132:6,
165:21, 220:4,
262:19, 343:7,
379:10, 407:5
**interviewing**
29:7, 38:16,
375:16
**interviews**
204:21, 205:10
**intimidation**
247:16, 248:1
**into**
18:23, 29:13,
31:22, 64:6,
66:4, 88:1,
88:11, 88:24,
89:17, 111:21,

126:23, 130:8,
132:18, 150:15,
152:8, 152:14,
157:23, 171:9,
172:6, 185:16,
205:12, 210:11,
218:14, 223:14,
225:9, 225:15,
229:15, 230:5,
252:16, 294:5,
294:14, 296:8,
296:22, 314:7,
314:15, 327:7,
342:16, 343:3,
343:8, 349:3,
349:18, 376:23,
395:13
**intoxicated**
307:14, 378:22,
379:6
**introduce**
7:12
**introduced**
282:3
**introduction**
32:6
**invent**
66:7
**investi**
101:5
**investigate**
10:1, 10:23,
11:6, 18:1,
24:12, 24:20,
29:12, 30:21,
31:3, 31:15,
31:22, 298:7,
305:22, 306:19,
328:5, 337:6,
340:1, 340:16,
364:1, 405:4
**investigated**
32:18, 192:18,
193:13
**investigating**
29:19, 116:10,
290:22, 303:20
**investigation**
11:12, 11:22,

Transcript of Ernest Halvorsen
Conducted on April 20, 2018                         133

13:5, 18:13,
18:17, 18:23,
24:1, 31:9,
32:23, 165:9,
197:18, 198:4,
198:12, 199:6,
200:10, 200:14,
201:3, 201:21,
210:13, 215:20,
216:15, 226:9,
262:3, 262:11,
276:16, 276:24,
278:7, 278:23,
279:13, 280:7,
283:5, 291:4,
291:8, 291:14,
297:6, 307:13,
310:12, 311:8,
313:20, 329:4,
329:13, 340:6
**investigations**
12:9, 51:5,
210:7, 217:9,
258:9
**investigative**
11:16, 112:12,
194:15, 195:3
**involved**
16:5, 19:1,
20:8, 79:11,
140:16, 161:7,
187:17, 210:6,
210:12, 211:21,
215:1, 258:10,
283:7, 292:1,
312:4, 312:9,
331:3, 336:5,
391:4, 391:6,
399:23, 411:2,
411:9
**involvement**
52:11, 52:16,
60:4, 111:7,
126:6, 129:12,
144:13, 144:22,
168:10, 280:21,
352:23, 395:2,
400:6

**involving**
165:23, 337:20,
360:2, 360:10,
360:20
**ir**
57:3, 57:11,
57:22, 58:12,
59:5
**issue**
275:12
**issued**
58:21, 188:8
**issues**
402:11
**it's**
10:15, 31:21,
43:10, 47:14,
71:9, 82:7,
112:4, 165:13,
170:10, 174:20,
174:22, 184:3,
196:10, 196:19,
274:4, 298:3,
299:8, 299:22,
317:14, 337:10,
349:24, 350:10,
403:7, 403:9,
404:1
**itasca**
3:21
**its**
56:12, 162:19,
163:11, 173:14,
237:21, 239:19,
395:1
**itself**
196:19
**ivan**
337:6, 339:18,
340:2, 340:10,
342:1, 342:9,
342:19, 343:19,
344:8, 344:17,
345:14, 352:11,
352:24, 353:8,
353:20, 354:10,
355:24
**ivara**
300:18, 301:1

**J**

**j-a-c-q-u-e-l-i--**
**n-e**
318:12
**j-a-i-m-e**
298:4
**j-o-r-g-e**
317:14
**j-u-a-n**
316:24
**jacket**
406:16
**jacob**
325:13, 326:8,
326:16
**jacqueline**
318:10, 318:11,
318:20, 319:1,
319:6, 319:11,
319:22, 404:16,
406:10, 411:12,
411:19
**jail**
65:20, 66:16,
94:6, 189:4,
247:19, 400:5
**jaime**
298:3, 298:7
**james**
272:21
**jeff**
8:6, 213:23,
272:16
**jefferson**
4:6
**jeffrey**
3:18
**jennifer**
3:4, 7:16,
8:20, 174:16,
299:18
**jewelry**
88:13
**jiver**
369:18, 369:24
**job**
1:22, 213:22

**john**
4:19, 7:24,
161:23, 163:17,
163:24, 251:11,
252:9, 252:17
**johnson**
305:10, 312:21
**join**
260:18
**joined**
10:13, 10:14,
283:5
**jointly**
22:4, 22:14,
175:10, 175:21,
176:8, 329:20,
348:18, 353:4,
375:9, 395:12
**joker**
159:10, 159:16,
159:22, 160:2,
169:8
**jones**
4:13
**jordan**
16:22, 59:17,
72:22, 121:9,
122:2, 123:6,
124:12, 217:4,
217:7, 218:10,
219:2
**jorge**
169:9, 182:7,
182:14, 182:19,
183:3, 217:7,
219:3, 317:14
**jose**
1:4, 3:3, 7:22,
16:10, 17:8,
57:20, 135:12,
136:17, 169:10,
179:9, 181:24,
182:7, 182:13,
182:18, 183:3,
206:7, 217:6,
219:2, 227:18,
229:6, 243:9,
243:21, 244:3,

Transcript of Ernest Halvorsen
Conducted on April 20, 2018

134

286:8, 287:22,
356:9, 381:1,
381:19, 382:15,
383:1, 386:13,
395:15, 395:22

**joseph**
92:11

**jr**
381:1

**jrl**
206:8, 206:9

**juan**
312:20, 316:23,
316:24, 317:13,
317:20, 318:2,
381:1, 383:1

**judge**
182:6, 182:13,
182:18, 183:2,
183:5, 208:20,
209:16, 211:19,
213:10, 213:13,
222:12, 222:13,
232:16, 234:13,
235:1, 239:15,
245:11, 251:5,
251:12, 361:5,
361:14, 361:20,
361:24, 362:2,
402:22

**julio**
307:11, 307:13,
307:24, 308:20,
308:24, 309:6,
309:8, 309:11,
309:13, 309:18,
309:24

**july**
17:18, 177:9,
179:10, 179:16,
179:21, 180:2,
180:15, 181:3,
181:11, 181:17,
181:22, 184:9,
192:5, 197:10,
202:13, 243:1,
243:4, 296:14,
298:14, 300:10,

300:19, 301:1,
302:7, 302:14,
302:21, 303:24,
304:7, 304:11,
364:7, 370:6,
371:8, 371:9,
375:13, 383:10,
383:15, 383:22,
384:4, 387:16,
398:18, 398:20,
398:21, 399:5

**june**
31:23, 64:13,
65:2, 68:17,
74:3, 82:22,
84:24, 85:6,
95:21, 98:2,
100:23, 103:15,
105:8, 105:9,
106:23, 106:24,
118:3, 118:9,
118:15, 118:19,
118:20, 119:2,
122:8, 123:21,
128:2, 128:17,
130:15, 133:4,
135:4, 138:10,
138:17, 140:18,
141:1, 141:3,
141:8, 141:21,
142:17, 149:3,
150:14, 152:9,
161:17, 164:22,
170:4, 170:14,
170:19, 172:15,
174:5, 176:21,
177:10, 177:16,
177:22, 178:20,
179:4, 180:21,
180:22, 188:23,
189:12, 189:15,
189:24, 190:23,
191:5, 191:18,
191:20, 192:7,
192:9, 207:14,
210:23, 220:5,
220:12, 221:15,
226:20, 230:14,

233:6, 241:14,
290:6, 290:17,
291:4, 291:14,
291:23, 292:19,
292:24, 293:1,
293:7, 293:12,
293:18, 293:24,
294:7, 294:16,
294:23, 295:5,
295:10, 295:15,
295:21, 296:3,
296:10, 296:13,
298:8, 317:15

**jury**
185:7, 185:14,
185:22, 186:10,
186:21, 187:9,
187:24, 188:16,
196:15, 196:17,
197:3, 197:4,
197:11, 200:3,
200:23, 202:13,
204:4, 205:18,
212:21

**just**
29:20, 32:10,
35:2, 55:23,
56:6, 62:5,
82:11, 97:9,
97:12, 102:3,
102:4, 112:18,
112:22, 124:7,
124:23, 125:14,
125:15, 125:23,
144:12, 144:20,
155:9, 174:21,
201:23, 204:10,
207:23, 208:7,
209:16, 213:13,
214:19, 248:7,
277:6, 282:4,
282:22, 283:19,
297:18, 301:17,
306:1, 306:14,
317:5, 323:18,
323:21, 324:11,
338:13, 344:23,
350:6, 367:22,

370:11, 371:24,
372:10, 372:18,
377:22, 381:24,
393:5, 402:1,
402:2, 402:3,
402:7, 402:10,
411:19, 413:6

**justice**
266:3

**justification**
80:20

**justify**
138:4, 182:22,
348:5, 397:15,
397:22, 398:8

**justino**
381:20, 382:4,
382:16, 390:10,
393:3, 395:4,
395:15

**juvenile**
319:6, 319:11

**juveniles**
353:11

**K**

**katz**
4:12

**keep**
125:24, 131:16,
282:22, 284:19

**keepers**
35:24

**kept**
256:19, 347:14

**kevin**
33:15, 381:2,
381:13, 381:21,
382:18, 384:20,
390:11, 391:6,
391:15

**key**
103:19, 139:21

**kicked**
155:15, 155:22

**kids**
86:6

**kill**
87:1

Transcript of Ernest Halvorsen
Conducted on April 20, 2018

135

**killed**
227:10, 300:21,
341:24, 342:8,
347:17, 377:1,
413:8
**killer**
369:18, 369:24
**killing**
143:4, 202:10,
411:22
**kin**
420:11
**kind**
53:8, 107:16,
403:9
**kinder**
39:3
**king**
161:23, 163:18,
163:24, 167:1,
171:10, 385:1
**kings**
384:18, 384:24,
385:11, 393:1
**know**
32:13, 67:8,
67:24, 82:5,
91:22, 102:16,
160:16, 170:3,
170:13, 191:2,
196:10, 214:3,
234:14, 235:10,
235:21, 248:10,
270:19, 274:2,
274:3, 299:6,
299:16, 299:18,
301:16, 310:1,
313:9, 351:5,
361:19, 372:9,
402:12
**knowing**
15:20, 23:10,
46:3, 160:22,
212:3, 270:20
**knowingly**
23:8, 198:20,
200:2, 200:24,
202:16, 208:3,

216:1, 216:4,
219:21
**knowledge**
19:19, 20:1,
69:18, 111:18,
115:7, 127:14,
160:23, 163:19,
165:22, 168:3,
187:4, 187:15,
203:21, 246:24,
383:24, 384:6,
399:4, 399:13,
399:18, 408:24
**known**
45:8, 78:6,
98:7, 150:16,
169:8, 169:9,
169:11, 208:20,
225:19, 347:16,
348:21, 351:22,
356:9
**kristina**
4:12, 8:2

**L**

**labeled**
50:1, 93:18
**language**
25:12
**laptop**
284:24
**last**
11:17, 118:13,
195:13, 285:2,
300:2, 320:3,
323:19, 324:1,
372:11, 401:24
**late**
290:9, 330:23,
331:5, 333:4,
334:6, 336:16,
353:12
**later**
45:13, 61:22,
167:1, 171:11,
218:16, 238:20,
270:12, 271:3,
272:4, 281:12,

333:17, 340:17,
383:2, 389:18,
394:23, 400:18,
401:2, 403:20,
410:1, 415:17
**latin**
311:18, 312:3,
312:8, 384:18,
384:24, 385:11,
392:24, 408:7,
408:9
**latino**
28:23, 30:4,
30:9, 30:19,
85:11, 130:9,
134:21
**latinos**
407:8
**laughing**
124:12
**laureano**
54:11, 54:21,
335:10, 335:14,
335:19, 336:1,
359:11, 359:15,
359:23, 360:9,
360:18, 361:13
**law**
3:5, 3:19, 4:5,
7:19, 8:10,
273:4, 273:13,
273:18, 274:9,
277:1
**lawlessness**
259:8
**laws**
267:21
**lawsuit**
54:2, 54:4,
102:8, 277:24,
299:9, 299:10
**lawyer**
66:8, 66:14,
67:9, 67:17,
68:1, 270:6,
274:22, 275:10,
277:21, 278:5,
278:11

**lawyers**
257:21, 260:23,
272:12, 275:12,
276:6
**lead**
23:11, 31:22,
224:21, 403:24
**leading**
26:20
**leads**
29:13
**learn**
64:4, 204:20
**learned**
24:6, 29:6,
54:20, 66:16,
205:4, 205:10,
226:8, 249:3,
250:6, 343:14,
387:12, 387:19
**learning**
30:16
**leave**
45:1, 45:12,
143:18, 225:16
**leaving**
156:23
**led**
354:18
**left**
46:11, 219:12,
226:23
**legal**
15:23, 17:11,
23:4, 212:8,
264:7, 272:2,
278:23, 294:5,
296:8, 296:22,
334:21, 351:23
**legitimate**
29:13, 210:13,
314:2
**legitimately**
30:21, 31:15,
110:1, 213:12
**lengthy**
216:24
**leniency**
41:16, 46:22,

144:14, 163:8,
164:5, 186:23
**less**
9:17, 144:6,
353:24
**let**
32:13, 53:19,
67:7, 82:5,
112:18, 126:1,
131:8, 143:19,
146:10, 167:17,
191:1, 194:10,
301:16, 302:3,
323:18, 331:18,
402:1, 408:8
**let's**
159:11, 214:19,
363:23, 384:9
**letting**
332:11
**license**
420:23
**lie**
183:7, 208:17,
209:15, 245:12,
280:6, 297:12
**lied**
42:2, 164:10,
170:17, 182:12,
182:17, 183:1,
183:14, 258:8,
258:19, 303:23,
313:7
**lies**
265:11, 265:13
**life**
36:22, 400:20
**light**
406:14, 406:15
**like**
32:4, 43:18,
58:6, 82:12,
102:16, 107:16,
110:9, 113:9,
130:8, 160:17,
183:22, 185:9,
235:5, 236:6,
248:6, 284:23,

301:19, 350:13
**line**
56:22, 281:19,
316:22, 345:6,
356:20, 363:9,
404:19
**line-ups**
48:13, 48:23,
49:6
**lineup**
175:24, 177:8,
177:16, 178:7,
178:8, 178:20,
179:4, 179:8,
179:15, 179:20,
180:2, 180:15,
180:21, 181:2,
181:10, 181:17,
181:22, 241:14,
241:24, 242:9,
242:16, 243:3,
243:9, 244:3,
284:5, 284:9,
284:10, 284:14,
285:15, 286:9,
286:13, 286:14,
286:18, 287:12,
291:17, 293:1,
293:11, 293:23,
294:16, 295:5,
295:14, 296:2,
304:10, 304:15,
304:20, 305:3,
307:12, 308:10,
308:15, 308:17,
308:21, 309:1,
309:8, 309:13,
309:15, 309:20,
318:4, 325:16,
325:22, 326:4,
326:11, 326:17,
326:23, 327:1,
327:7, 327:16,
328:1, 333:12,
344:24, 345:5,
345:8, 345:12,
354:17, 355:17,
413:17, 414:1,

414:14, 414:20
**lineups**
317:21, 318:3
**listen**
351:6
**literally**
10:9
**litigation**
268:2
**little**
9:17, 82:9,
177:1, 284:20,
312:11, 312:21
**live**
175:23, 179:15,
180:21, 241:24,
284:5, 286:9,
291:16, 293:1,
294:16, 295:4,
413:17, 414:1,
414:14, 414:20
**living**
341:15, 405:24,
411:12
**liz**
284:19
**llc**
3:12, 5:5
**located**
203:22, 233:2,
392:15, 405:12
**location**
107:3, 121:7,
385:1
**lock-up**
34:10, 35:3,
35:12, 35:24,
36:5, 48:15,
48:23, 49:8,
49:17
**locked**
202:8
**lodge**
33:17, 33:24
**loevy**
2:4, 3:12, 7:3,
7:6, 7:18, 7:19,
7:21, 196:12

**log**
6:10, 6:12,
58:7, 58:22
**logan**
282:11
**logs**
58:20
**long**
9:14, 94:1,
406:15
**longer**
240:19
**look**
56:20, 56:22,
58:7, 112:2,
118:12, 120:22,
125:10, 136:17,
161:12, 161:13,
164:18, 164:19,
183:22, 184:5,
207:8, 241:13,
243:15, 246:5,
248:7, 274:1,
310:2, 338:11,
342:7, 343:9,
349:23, 350:1,
351:6, 351:9,
355:16, 366:19,
367:23, 371:5,
373:3, 374:11,
375:1, 375:3,
378:8, 412:8,
413:17, 414:1
**looked**
58:19, 102:16,
107:16, 110:9,
140:7, 160:17,
228:7, 241:24,
307:7
**looking**
36:21, 125:24,
237:14, 346:19,
350:8, 368:7,
372:14
**loretta**
314:7, 314:15,
316:16
**losing**
397:3

Transcript of Ernest Halvorsen
Conducted on April 20, 2018

137

**lot**
115:6, 131:9,
287:23
**lozada**
33:5, 325:13,
326:8, 326:16,
328:22
**luis**
363:6, 364:20,
369:22, 376:16,
376:23, 378:14,
378:21, 379:2,
379:17, 379:19
**lunch**
82:13
**lying**
265:19, 328:22

**M**

**m-a-l-l-o**
307:18
**m-a-r-l-o-n**
311:9
**m-e-n-a**
337:11
**m-o-n-t-a-n-e-z**
318:14
**m-u-n-i-z**
314:22
**made**
65:18, 97:4,
109:10, 122:13,
126:5, 127:24,
149:23, 163:18,
166:24, 168:13,
172:17, 178:5,
196:12, 207:1,
232:14, 234:17,
242:16, 247:6,
283:18, 283:24,
346:16, 369:11,
371:8, 387:14,
394:22, 398:16,
399:3, 399:11,
400:3, 408:4,
415:8, 419:19
**mail**
267:7

**maintain**
99:21
**majinowski**
92:11
**make**
40:19, 40:20,
48:1, 52:24,
55:11, 69:17,
75:20, 77:8,
79:10, 105:2,
112:20, 128:14,
134:17, 139:1,
144:21, 164:13,
177:20, 181:1,
235:4, 250:18,
253:5, 292:17,
293:15, 293:21,
294:21, 295:18,
295:24, 296:15,
310:12, 327:23,
329:5, 342:6,
342:18, 353:4,
367:7, 370:15,
379:3, 387:5,
403:20, 420:3
**makes**
195:18, 214:1
**making**
32:15, 157:8,
235:4, 395:13
**male**
349:16, 373:6,
373:13, 406:12,
407:8
**mallo**
307:18
**man**
34:9, 35:11,
324:14
**mandatory**
249:16, 250:7
**maniac**
408:7, 408:9
**manipulate**
38:11, 105:11,
105:20, 106:4,
106:15, 111:21,
223:14, 229:13,

342:17, 395:12
**manipulated**
230:5, 255:5,
255:16, 259:16,
291:16, 376:22,
412:4
**manipulating**
349:1, 366:8
**manipulation**
297:7, 412:17
**manner**
224:21
**manuel**
311:5, 311:23,
313:8, 313:15,
313:21, 314:2,
314:23, 315:4,
315:5, 315:11,
316:1, 316:7,
316:17
**manufactured**
191:17, 192:10
**many**
52:24, 193:16,
336:21, 353:11
**march**
356:10
**margaret**
327:17, 327:23
**mark**
195:10, 205:23,
337:15, 404:11,
408:21, 409:4,
416:1
**marked**
6:8, 55:19,
56:17, 56:21,
58:2, 58:6,
112:3, 112:10,
116:20, 195:22,
196:1, 196:3,
206:2, 206:5,
246:6, 246:8,
337:18, 339:1,
370:10, 370:19,
372:1, 372:12
**marks**
45:2, 45:12,

156:24
**marlo**
154:7, 154:12
**marlon**
311:8
**marrero**
363:6, 364:20,
369:23, 375:18,
375:23, 376:16,
376:23, 378:14,
378:22, 379:2,
379:18, 379:19
**masonette**
381:1, 381:7,
382:16, 383:1,
383:9, 383:15,
383:21, 383:23,
384:5, 386:14,
386:19, 387:5,
387:14, 387:20,
388:11, 388:23,
389:8, 389:16,
390:2, 390:20,
391:4, 391:13,
391:22, 392:4,
392:12, 392:21,
393:10, 393:15,
393:23, 394:4,
394:13, 395:1,
395:15, 396:2,
397:11, 397:15,
397:22, 398:16,
399:3, 399:11,
399:16, 399:22,
400:3, 400:17,
401:10, 401:20,
402:4, 402:10
**masonette's**
393:4, 394:21,
395:13, 395:22,
402:18
**matched**
108:5, 108:19,
109:3, 109:12,
374:1
**material**
257:19, 329:11
**materials**
257:22

Transcript of Ernest Halvorsen
Conducted on April 20, 2018                    138

**math**
9:16
**matt**
217:18, 221:8,
222:16, 224:11,
228:16, 231:1,
232:12, 233:16,
234:4, 234:15,
278:16
**matter**
7:3, 8:21,
30:8, 57:22,
120:7, 123:2,
153:3, 196:16,
197:6, 242:1,
311:4
**matters**
261:10, 334:21
**matthew**
4:11, 8:3,
213:9, 216:6,
229:24, 232:3,
238:2, 241:4,
244:9
**mawr**
357:5
**may**
25:10, 32:18,
33:13, 35:10,
36:1, 37:8,
39:10, 52:4,
52:8, 56:24,
58:9, 59:3,
59:17, 59:18,
60:2, 60:11,
60:23, 93:13,
93:19, 155:9,
246:10, 246:24,
247:6, 251:20,
280:14, 282:10,
282:19, 283:5,
283:17, 283:18,
283:23, 284:6,
286:9, 287:24,
318:18, 318:23,
324:15, 324:21,
325:11, 326:1,
326:11, 326:17,

352:23, 357:2,
381:3, 381:14,
381:22, 382:18,
384:9, 384:10,
386:6, 386:21,
391:23, 392:24,
393:5, 396:4,
420:5, 420:16
**maybe**
139:7, 283:17,
298:1, 305:15,
330:23, 337:21
**mazur**
3:11, 6:5,
7:20, 10:17,
282:3, 282:4,
282:8, 282:24,
283:3, 283:12,
283:21, 284:3,
284:21, 285:1,
285:4, 289:16,
289:23, 290:13,
291:21, 292:13,
294:11, 297:17,
297:23, 298:5,
299:1, 299:4,
299:8, 299:15,
299:22, 300:1,
300:8, 302:5,
305:1, 305:17,
305:19, 306:1,
306:17, 311:15,
312:17, 313:5,
317:9, 317:10,
318:12, 318:14,
318:17, 319:20,
320:3, 320:7,
320:10, 320:18,
321:1, 321:9,
321:19, 322:3,
322:10, 322:18,
323:2, 323:10,
323:18, 323:23,
324:8, 324:9,
327:22, 328:9,
329:24
**mean**
116:24, 194:8,

214:9, 235:22,
306:13, 372:1,
389:4
**means**
38:11, 42:8
**meant**
390:7
**medium**
373:8, 373:15,
406:18
**meet**
64:16, 65:1,
279:17, 330:15
**meeting**
80:1, 98:3,
100:23, 106:24,
119:1, 120:15,
128:1, 164:12,
191:4, 192:8,
207:13, 207:17,
208:8, 208:18,
208:21, 209:8,
210:22, 239:19,
279:23
**melendez**
286:8, 286:14,
286:19, 286:24,
287:7, 287:12,
287:17, 287:22,
288:8, 288:14,
289:9, 290:1
**melendez's**
288:19, 289:18
**member**
40:3, 120:24,
307:18, 311:18,
316:11, 340:21
**members**
121:11, 255:4,
255:15, 255:24,
256:9, 256:18,
257:7, 257:18,
258:7, 258:18,
259:5, 273:4,
331:24, 332:11,
332:17, 371:16,
407:18
**memorialize**
188:19

**memorialized**
31:8, 31:14,
119:1, 189:15,
191:19
**memorize**
101:2
**memory**
37:20
**men**
28:23, 30:4,
30:9, 30:19,
60:3, 60:12,
60:24, 85:12,
106:17, 130:9,
134:21, 175:12,
175:24, 176:10,
176:19, 177:2,
394:6, 394:14
**mena**
106:3, 337:6,
339:19, 340:2,
340:10, 341:8,
342:1, 342:9,
342:19, 343:19,
344:8, 344:17,
345:7, 345:14,
347:1, 347:10,
352:11, 352:24,
353:8, 353:20,
354:10, 354:20,
355:24
**mention**
414:12
**mentioned**
71:5, 102:6,
290:12
**merely**
122:14, 127:15,
169:16, 353:18
**merit**
260:14
**merkez**
404:14, 405:5,
405:11, 411:4,
415:20, 416:6
**met**
66:14, 67:9,
68:9, 78:18,

Transcript of Ernest Halvorsen
Conducted on April 20, 2018

139

90:23, 102:17
**method**
145:14, 156:11
**methodology**
87:23, 88:22
**methods**
39:3, 61:18,
144:6, 145:3,
145:15, 416:13
**mia**
231:9
**michael**
4:20, 7:24,
298:13, 300:10,
306:19, 307:1,
327:17, 327:24
**mid**
331:13
**might**
39:21, 70:10,
76:18, 109:24,
139:6, 148:17,
215:19, 264:3,
264:5, 264:13,
284:22, 365:18,
368:8
**millimeter**
87:12, 87:17,
87:18, 160:3,
200:16, 201:5,
392:15, 394:16,
396:3
**mind**
183:8
**mine**
372:6
**mingy**
12:21, 13:15,
13:24, 14:11,
14:15, 15:4,
18:7, 18:19,
22:3, 22:12,
51:13, 59:24,
60:9, 60:20,
62:24, 66:24,
94:23, 106:13,
150:21, 151:12,
151:20, 152:15,

152:21, 153:11,
153:21, 155:22,
157:10, 160:21,
161:4, 162:8,
164:2, 165:21,
166:5, 166:11,
166:15, 170:3,
170:14, 170:18,
171:1, 172:8,
173:12, 175:8,
175:20, 176:7,
177:7, 179:7,
180:13, 180:19,
230:2, 230:16,
329:19, 382:15,
384:5, 384:17,
398:3, 398:17,
399:17, 399:22,
400:4
**minimum**
48:2, 248:18,
249:4, 249:16,
250:7
**minor**
28:20, 85:9
**misconduct**
12:8, 13:4,
15:5, 15:8,
17:6, 17:7,
23:20, 66:22,
66:23, 172:23,
173:4, 173:7,
258:20, 259:7,
260:2, 260:4,
280:2, 415:3,
415:6, 415:7,
415:8
**misled**
225:9, 225:14
**missing**
231:9, 338:4
**misstates**
227:20
**molina**
349:15, 351:2,
351:13, 351:19,
352:2, 353:6
**molina's**
352:9

**moment**
32:3
**mondo**
86:24, 121:9,
122:3, 123:6,
124:9, 124:11,
124:13, 125:2,
217:4, 217:7,
218:10, 219:1
**money**
63:13, 66:8,
67:18, 68:1,
89:9, 202:4,
332:2, 332:11,
332:20, 361:19,
362:2, 386:20
**monica**
165:23, 290:6,
290:17, 290:21,
292:2, 296:17,
297:4
**montanez's**
89:22, 106:5,
107:3, 107:7,
108:6, 108:11,
108:19, 109:3,
109:12, 110:23,
111:6, 111:13,
111:19, 135:19,
136:17, 137:12,
229:6, 230:4
**month**
25:17, 254:5
**months**
52:24, 254:9
**montia**
384:6, 391:3,
392:13, 394:24,
395:11, 398:3,
398:18, 399:17,
399:22, 400:4
**montias**
382:14
**more**
51:3, 116:13,
139:12, 148:10,
170:22, 172:1,
214:6, 259:19,

302:1, 318:8,
319:12, 324:3,
324:4, 395:9
**morning**
7:15, 8:19,
24:3, 83:21,
86:18, 199:20,
201:6, 203:8,
203:15, 203:23,
282:4, 386:5,
387:23, 405:6,
405:14, 412:22,
413:9
**motion**
132:18
**motive**
48:20, 62:19,
63:1, 63:9,
63:20
**mouth**
236:7, 236:8
**move**
234:20, 236:7,
271:8, 272:3,
401:23, 403:15
**moved**
78:5
**moving**
298:23, 301:20,
305:14, 311:4,
316:21, 402:24
**much**
29:20, 30:8,
49:15, 93:20,
115:21, 249:24,
361:19, 367:4
**mug**
374:3
**mugshots**
366:20
**multiple**
43:12, 44:14
**muniz**
314:22, 315:4,
315:10, 315:13
**muniz's**
316:17
**munoz**
322:6, 337:21,

Transcript of Ernest Halvorsen
Conducted on April 20, 2018

140

339:18, 340:21, 341:7, 342:18, 343:3, 343:15, 344:1, 344:6, 344:9, 344:15, 344:22, 345:5, 345:13, 345:18, 345:24, 346:8, 347:14, 347:17, 347:23, 348:4, 348:7, 348:14, 348:20, 348:24, 349:3, 349:10, 349:19, 351:23, 352:11, 353:7, 353:18, 354:9, 354:17, 354:19, 355:7, 355:12, 355:17, 355:18, 355:23

**murdered**
24:2, 24:7, 77:18, 86:17, 105:14, 171:24, 345:14, 346:5, 356:16, 412:6

**murderer**
92:17

**murders**
34:20, 53:18, 53:21, 54:1, 62:13, 358:15, 363:5, 364:20, 381:2, 381:13, 381:21, 382:17, 384:1, 384:7, 384:8, 385:23, 386:6, 386:14, 388:12, 390:11, 391:6, 391:23, 395:16, 397:12, 399:5, 399:14, 399:18, 399:24, 400:7, 400:19, 401:13, 401:18, 401:20, 404:14, 404:15, 405:4, 405:5, 410:11,

411:3, 411:10, 412:12, 415:19, 416:5

**must**
264:3

**myself**
214:7, 282:3

**N**

**name**
7:15, 7:20, 8:20, 9:3, 24:18, 100:17, 114:2, 117:14, 117:15, 117:16, 117:20, 119:8, 150:15, 154:6, 165:15, 165:23, 190:2, 197:17, 211:21, 272:20, 292:8, 297:24, 298:3, 324:10, 340:23, 349:15, 351:1, 351:20, 354:24, 363:4, 363:6, 364:18, 385:11, 387:8, 393:1, 393:3

**named**
34:9, 35:11, 56:24, 214:24, 294:14

**namely**
63:11

**names**
218:10, 218:13, 218:15, 218:23, 219:1

**narrative**
62:11, 73:14, 79:3, 83:13, 96:3, 96:11, 118:14, 125:9, 125:11, 126:10, 126:11, 126:12, 126:20, 126:22, 127:4, 162:7, 164:2, 188:20,

390:8

**natural**
36:22, 174:19, 400:20

**navella**
310:18

**navella's**
310:11

**nd**
292:24, 293:7, 293:18, 387:12, 387:23, 388:4

**near**
40:15, 203:7, 357:4

**necessarily**
389:5

**necessary**
113:4, 120:18

**need**
80:15, 151:13, 151:21, 213:12, 306:14, 330:8, 330:9, 362:2

**needed**
89:9, 155:2, 208:17, 335:18, 344:23

**needs**
330:5

**negron**
404:13, 404:20, 410:17, 411:2, 411:9, 411:21, 412:7, 412:20, 413:7, 413:18, 414:2, 414:4, 414:22, 415:10, 415:18, 416:4, 416:11

**neighborhood**
109:24, 110:16, 135:3, 351:21

**neither**
18:24, 61:7, 71:10, 75:22, 92:10, 97:17, 111:4, 146:1,

161:5, 203:12, 203:19

**never**
68:1, 71:5, 90:23, 102:16, 109:17, 124:10, 124:22, 127:12, 163:18, 166:10, 172:17, 183:8, 211:4, 216:14, 218:1, 220:1, 222:22, 228:23, 238:9, 241:24, 245:11, 245:15, 256:21, 259:6, 260:3, 260:9, 291:22, 307:7, 314:1, 347:8, 347:22, 348:6, 368:20, 369:10, 369:21, 373:12, 374:12, 374:19, 374:24, 377:15, 377:17, 378:12, 416:9

**new**
3:7, 281:18

**next**
114:1, 233:17, 237:6, 301:17, 316:22, 318:9, 388:20, 403:15

**nickname**
102:1, 215:18, 393:2

**nicknamed**
307:18

**nicknames**
217:3, 217:5

**nieves**
363:7, 364:21

**night**
28:5, 84:6, 85:2, 86:5, 106:6, 106:18, 107:10, 110:3, 111:14, 223:7, 288:5, 288:10,

290:6, 290:17,
344:6

**nine**
87:12, 87:16,
87:18, 160:2,
201:5, 249:17,
250:9, 392:15,
394:16, 396:3

**nine-year**
249:24, 253:7,
253:16

**nobody**
225:19

**noel**
282:10

**none**
60:12, 90:15,
275:7, 405:24

**nonetheless**
68:24, 120:15,
188:6, 342:15,
345:17, 359:3

**nor**
18:24, 20:7,
97:18, 111:4,
161:6, 168:20,
203:20, 395:3,
420:11

**north**
2:5, 3:13, 5:6,
7:6, 198:5,
199:1, 199:8,
201:6, 201:22,
203:7, 203:14,
203:23, 223:24,
233:11, 236:20,
237:2, 237:7,
237:8, 364:2,
368:23, 369:23,
384:8, 384:19,
384:24, 392:16,
393:14, 393:16,
394:6

**northern**
1:2

**notary**
2:13, 418:24

**noted**
299:15

**notes**
402:13, 402:16

**nothing**
15:7, 69:19,
90:16, 91:16,
302:7, 302:14,
303:19, 311:23,
325:2, 389:15,
401:12, 416:19,
416:20, 416:21,
416:23, 419:15

**notice**
2:11

**noting**
370:11

**notwithstanding**
33:22, 52:14,
243:19, 252:6,
342:12, 399:9,
411:7

**now**
7:12, 23:24,
26:15, 51:2,
51:22, 58:1,
64:13, 75:3,
76:18, 92:23,
98:2, 112:2,
113:9, 118:2,
118:23, 120:22,
141:17, 150:13,
173:18, 207:8,
211:18, 213:9,
214:21, 226:19,
230:14, 230:22,
236:18, 249:23,
298:23, 324:11,
337:5, 340:20,
346:17, 346:18,
349:9, 363:14,
373:2, 384:13,
397:10, 402:24

**nowhere**
203:7

**number**
7:4, 7:5, 57:3,
57:11, 57:22,
58:12, 59:5,
144:3, 192:18,

192:21, 193:4,
193:13, 193:23,
195:2, 196:17,
196:18, 227:15,
228:3, 332:8,
340:7, 372:14,
377:2, 398:7,
402:19

**numbers**
195:14, 207:9,
318:4, 350:9,
372:15

**numerous**
64:3

**O**

**o'clock**
189:24, 220:23,
233:3, 392:23,
395:22

**o'shefsky**
404:11, 408:21,
408:23, 409:4,
409:15, 409:20,
410:9, 410:16,
416:1

**o'shefsky's**
415:7

**oath**
7:14, 186:10,
187:10, 217:19,
265:12, 265:14,
265:20, 270:13,
418:4

**objected**
338:10

**objectionable**
212:4, 324:7

**objections**
45:15, 47:10,
59:19, 195:7,
235:4, 249:18,
250:11, 253:17,
253:21, 264:24,
265:7, 265:15,
265:21, 266:4,
266:10, 266:16,
266:22, 267:3,

267:9, 267:15,
267:22, 268:5,
268:12, 269:5,
269:12, 269:20,
270:7, 270:18,
270:21, 271:12,
271:20, 272:8,
275:15, 276:9,
276:18, 277:2,
277:9, 277:17,
278:1, 283:20,
299:5, 301:19,
302:3, 305:24,
306:4, 311:11,
317:3, 318:16,
320:15, 320:22,
321:6, 321:16,
321:24, 322:7,
322:15, 322:23,
323:7, 323:15,
330:3, 333:5,
337:20, 338:1,
356:20, 361:15,
381:5, 382:1,
404:18

**obnoxious**
235:5, 235:6,
235:8

**observed**
44:12, 156:3,
332:9

**obstruction**
266:3

**obtain**
57:10, 132:4,
172:23, 182:20,
183:4, 220:2,
255:6, 291:15

**obtained**
28:7, 63:13,
84:18, 163:9,
219:4, 333:20

**obtaining**
145:3

**obviously**
307:14

**occasion**
54:20, 99:9

Transcript of Ernest Halvorsen
Conducted on April 20, 2018

142

**occasions**
144:4, 332:8
**occurred**
24:13, 62:9,
89:15, 118:14,
119:1, 128:2,
132:5, 201:21,
333:3, 335:2,
335:10, 339:20,
340:2, 344:16,
352:4, 355:1,
356:10, 358:16,
363:17, 364:2,
379:5, 381:3,
381:14, 381:22,
382:18, 383:17,
383:22, 384:8,
384:9, 384:19,
386:7, 391:23,
398:19, 398:21,
405:6, 410:11
**ochoa**
292:16, 292:22,
293:5, 293:10,
293:16, 293:22
**ochoa's**
294:4
**october**
9:10, 311:9,
312:5, 312:10,
313:1, 349:14,
350:17
**off**
34:24, 37:20,
82:15, 131:11,
175:1, 281:23,
297:18, 297:19,
323:22, 380:18
**offender**
215:17, 239:18,
335:17, 342:6,
342:7, 347:24,
348:7, 369:11,
369:22, 373:6,
373:13, 373:19,
374:9, 374:20,
378:9, 379:12
**offender's**
374:12, 375:1,

375:3
**offenders**
73:7, 223:15,
226:4, 229:7,
239:18, 406:2,
407:7, 414:22
**offense**
166:17, 364:13
**offer**
66:8, 67:18,
68:1
**offered**
79:3, 81:15
**offi**
14:13
**office**
33:24, 64:15,
64:24, 65:11,
74:2, 80:3,
82:24, 98:4,
119:4, 189:5,
209:18, 210:1,
210:23, 237:13,
274:13, 331:12
**officer**
9:6, 9:9, 9:15,
21:2, 116:13,
156:21, 319:23,
385:20, 404:11,
406:10
**officer's**
114:2
**officers**
8:7, 15:3,
17:8, 17:19,
23:21, 66:23,
69:7, 280:3,
290:15, 382:12,
384:23, 385:10,
387:13
**offices**
2:2, 65:22,
68:7, 82:22,
191:4
**official**
254:17, 255:3,
255:14, 255:23,
256:8, 256:18,

257:7, 257:17,
258:7, 258:18,
259:5, 420:13
**often**
43:24, 142:3
**oh**
11:7, 212:22,
284:21, 350:8,
403:5
**okay**
9:2, 10:4,
10:8, 10:11,
10:15, 10:16,
11:5, 33:10,
37:22, 42:11,
56:9, 56:14,
82:8, 102:9,
112:20, 113:16,
131:8, 174:21,
196:20, 198:1,
206:9, 213:20,
236:18, 274:6,
274:24, 281:22,
285:1, 305:20,
317:9, 351:11,
372:10, 382:6,
402:1, 402:12,
404:6
**old**
349:16, 353:19
**oldsmobile**
405:23, 412:20,
413:8
**omar**
333:3, 333:6,
333:10, 333:12,
333:18, 333:19,
334:3, 335:3
**once**
31:3
**one**
10:12, 10:13,
48:10, 54:9,
54:20, 57:21,
61:18, 104:13,
104:21, 110:9,
140:5, 178:9,
181:4, 181:24,

202:3, 204:10,
210:7, 235:12,
242:17, 243:21,
249:5, 275:8,
283:23, 290:10,
297:18, 299:8,
300:2, 301:8,
316:10, 318:4,
318:8, 318:9,
324:1, 330:5,
330:8, 330:9,
337:8, 338:3,
341:14, 345:5,
370:12, 380:10,
395:9, 408:11
**only**
41:17, 47:6,
56:3, 99:22,
140:23, 141:7,
186:19, 226:3,
252:7, 304:19,
305:2, 318:3,
327:1, 327:7,
349:2, 369:2,
397:2, 407:7,
407:14
**opened**
160:2
**operation**
92:19, 115:15
**opportunity**
45:20, 74:9,
74:17, 248:8
**opposed**
350:8
**opposing**
40:3
**oppressive**
35:5, 53:12,
354:12, 365:22,
367:10, 403:12
**oral**
397:21, 400:4,
400:10, 400:16,
419:16
**order**
34:19, 38:4,
61:19, 62:10,

Transcript of Ernest Halvorsen
Conducted on April 20, 2018                                         143

92:23, 99:2,
105:2, 109:4,
111:20, 113:5,
137:19, 138:4,
139:12, 148:11,
153:4, 176:11,
204:11, 232:15,
234:4, 251:12,
252:10, 253:4,
263:24, 269:10,
274:16, 275:2,
291:15, 304:20,
329:4, 329:13,
348:4, 352:22,
361:20, 362:2,
377:11, 382:24,
388:11, 389:17,
389:18, 402:7,
416:13

**original**
112:6

**originally**
340:1, 340:7,
384:13

**ortiz**
312:20, 313:1,
313:9

**other**
17:19, 51:5,
70:11, 91:7,
127:13, 130:9,
154:12, 173:6,
189:12, 270:13,
273:4, 275:1,
275:5, 278:21,
279:14, 282:15,
282:19, 290:11,
290:15, 291:24,
293:6, 293:11,
295:9, 295:14,
302:21, 376:9,
392:24, 393:23,
398:1, 420:3

**others**
32:11, 93:3,
148:18, 149:24,
390:9, 399:12

**otherwise**
78:6, 98:7,

150:16, 225:11,
264:5, 275:20,
279:6, 347:16,
351:22, 356:9

**out**
35:3, 48:22,
51:4, 93:20,
99:10, 108:10,
112:19, 121:4,
121:18, 123:6,
142:16, 148:20,
155:16, 159:17,
162:23, 179:20,
181:4, 195:15,
201:24, 202:1,
213:13, 214:23,
227:11, 237:14,
238:10, 239:16,
243:21, 308:1,
308:6, 308:10,
308:15, 308:21,
309:1, 326:17,
331:4, 331:18,
332:1, 332:12,
332:19, 336:23,
340:7, 344:24,
352:3, 352:16,
360:9, 376:6,
389:7, 396:18,
397:3

**outrageous**
234:22

**outside**
24:8, 46:4,
46:17, 95:10,
273:13, 323:24,
387:21, 405:11,
405:16, 405:17

**over**
65:21, 68:6,
126:1, 131:8,
131:14, 146:10,
167:17, 194:10,
219:12, 226:21,
253:3, 323:20,
334:21, 357:4,
363:23, 388:16,
388:20, 389:4,

408:8

**overly**
404:1

**own**
248:15, 270:2,
270:5, 294:4,
296:8, 296:22

---
                   **P**

**pacheco's**
12:10, 12:18,
13:6, 13:13,
23:2, 193:15,
195:6, 208:23

**page**
6:2, 113:1,
113:13, 113:19,
113:20, 118:12,
118:13, 120:23,
125:9, 125:14,
125:22, 126:11,
126:21, 127:23,
128:6, 128:15,
129:17, 131:11,
161:13, 164:19,
164:20, 165:4,
185:8, 197:14,
204:19, 207:9,
207:10, 207:11,
216:23, 241:13,
243:5, 320:3,
349:24, 350:2,
350:3, 350:7,
350:9, 350:12,
371:6, 371:22,
372:1, 372:2,
372:11, 372:15,
372:21, 372:23,
373:2, 373:4

**pages**
1:23, 161:15,
183:23, 196:19,
372:3, 372:7,
372:14, 418:7

**paid**
177:1, 334:3,
360:18, 361:20

**pandit**
190:3, 190:21,

191:3, 191:15

**paper**
338:11

**par**
234:22

**paragraph**
120:24

**paragraphs**
402:5

**park**
30:5, 115:9,
159:9, 223:23,
283:14, 287:23,
332:18, 358:9,
358:16, 359:24,
363:18, 365:19,
383:17

**parked**
89:17, 107:3,
107:7, 109:18,
202:6

**parking**
287:23

**part**
12:19, 13:14,
32:22, 51:22,
60:23, 63:8,
72:5, 87:22,
88:21, 90:7,
90:11, 93:24,
105:17, 117:8,
239:7, 275:13,
276:7, 291:3,
307:12, 312:11,
346:17

**participants**
345:6

**participate**
162:18, 333:2

**participated**
262:11

**particular**
62:6, 193:14,
408:24, 409:6

**particularly**
366:10

**parties**
146:3, 420:12

Transcript of Ernest Halvorsen
Conducted on April 20, 2018                                    144

**partner**
12:20, 13:23,
18:2, 18:17,
21:8, 24:16,
165:9, 184:14,
220:24, 233:1,
292:6, 297:10,
298:8, 326:14,
409:20
**partners**
330:19
**party**
116:11, 139:7,
344:7, 346:9
**passenger**
394:2, 406:14,
406:17
**passing**
37:14
**past**
64:3, 217:9,
237:8, 265:12,
275:6, 377:2
**pawlniski**
383:21, 387:13
**pawlnisky**
382:13, 387:20
**pawn**
88:13, 89:8
**pay**
112:24, 180:7,
331:17, 362:2
**paying**
331:3, 361:1,
386:19
**payments**
387:6
**pending**
36:10, 41:8,
47:8, 54:2
**people**
34:24, 35:2,
37:15, 53:9,
92:18, 154:12,
159:4, 180:6,
182:1, 196:11,
196:16, 206:6,
242:18, 260:10,

302:6, 302:13,
331:4, 331:18,
332:18, 359:24,
366:10, 403:9,
405:16, 412:11
**perfectly**
402:6
**perhaps**
357:8
**period**
26:15, 131:4,
141:22, 143:6,
143:13, 144:4,
145:14, 247:18,
403:4
**perjury**
22:24, 265:6
**permitted**
46:2
**perpetrator**
311:18
**person**
11:10, 44:1,
56:24, 57:11,
92:3, 150:14,
156:24, 169:8,
169:9, 169:11,
177:21, 179:2,
181:24, 286:3,
286:4, 309:3,
309:14, 309:19,
327:1, 327:7,
333:13, 334:5,
336:22, 341:17,
343:9, 343:16,
347:1, 355:7,
365:19, 368:22,
376:24, 379:20
**personal**
160:23, 187:4,
203:20, 334:21
**persons**
202:2, 202:3,
217:9, 411:21
**persuade**
105:12, 229:14,
342:17, 348:13,
379:11, 413:6

**persuaded**
164:3, 343:14,
391:12
**persuasion**
412:18
**pertaining**
129:22
**pete**
72:22, 121:8,
122:2, 123:7,
124:8, 124:13,
125:1, 211:21,
215:1, 215:10,
215:18, 217:3,
217:6, 218:10,
219:1
**pete's**
123:5
**phone**
44:15, 44:24,
45:10, 222:3
**phonebook**
156:4, 156:5,
156:14, 156:23
**phonetic**
197:17, 222:13,
251:6, 273:1,
300:18, 305:9,
310:11, 339:20,
381:2, 382:13,
382:14, 404:12,
404:14, 404:17,
406:11
**photo**
133:6, 133:23,
169:1, 222:7,
222:23, 255:7,
284:15, 284:16,
285:5, 285:6,
285:11, 285:20,
286:19, 286:20,
286:23, 286:24,
287:4, 287:9,
287:17, 292:24,
293:7, 293:17,
294:15, 295:4,
295:10, 295:20,
303:2, 303:8,

304:2, 304:6,
308:1, 308:6,
309:7, 309:12,
309:14, 309:20,
315:4, 375:17,
376:5, 376:9,
376:17, 378:16,
409:16, 409:24,
410:10
**photograph**
101:23, 102:14,
110:7, 222:7,
301:12, 303:13,
326:10, 374:1,
376:1, 376:7
**photographic**
291:16
**photographs**
69:1, 69:6,
70:3, 71:19,
133:24, 134:12,
160:15, 220:2,
220:10, 220:17,
222:6, 223:3,
409:13, 413:6
**photos**
68:18, 69:17,
70:3, 72:20,
133:7, 169:2,
169:17, 219:6,
219:14, 307:11,
371:16, 411:11,
412:9, 414:4,
414:13
**phrase**
97:11
**physical**
19:7, 21:21,
39:2, 43:2,
46:20, 50:2,
145:7, 156:12,
163:7, 164:4,
173:6, 186:22,
247:16, 248:2,
388:21, 390:21
**physically**
38:24, 47:9,
142:19, 143:17,

**pick**
179:20, 181:4,
243:21, 284:10,
286:14, 292:18,
293:17, 293:23,
294:22, 295:20,
296:2, 307:24,
308:5, 308:10,
308:15, 308:16,
308:21, 309:1,
309:2, 309:13,
309:19, 326:17,
344:24
**picked**
107:1
**picture**
287:3, 410:16
**pistol**
72:22, 121:8,
122:2, 123:5,
123:7, 124:8,
124:13, 125:1,
200:17, 211:21,
214:24, 215:9,
215:18, 217:3,
217:5, 218:10,
219:1, 392:15
**placard**
376:8, 376:10
**place**
156:4, 171:4,
191:4, 210:22,
224:2, 237:4,
238:11, 238:15,
328:17, 397:16,
408:14, 418:8,
419:20
**placed**
48:23, 49:6,
98:6, 122:12,
233:10, 317:19,
318:1, 326:22,
327:15
**placing**
327:6
**plaintiff**
1:5, 1:11, 3:3,

3:10, 7:22,
8:21, 143:3,
143:11, 143:12,
143:17, 144:12,
144:18, 403:20,
419:9
**plaintiff's**
398:8
**plaintiffs**
57:21, 95:7,
98:19, 99:4,
99:11, 99:23,
120:7, 120:19,
123:1, 129:11,
134:13, 139:13,
153:3, 153:6,
154:20, 155:3,
169:17, 172:9,
190:12, 197:6,
218:16, 242:1,
244:20, 269:11,
270:14, 270:20,
271:7, 276:16,
276:24, 278:10,
278:17
**plan**
51:22, 60:23,
61:11, 61:20,
63:8, 65:9,
66:3, 90:7,
105:17, 132:19,
137:19, 148:19
**planet**
7:10
**plausible**
49:16, 170:23
**plausibly**
348:5
**play**
151:21, 151:23
**played**
38:15, 38:17,
142:3, 142:9,
142:10, 142:16
**playing**
123:7
**plea**
151:23

**plead**
271:6
**please**
9:2, 10:19,
82:5, 112:15,
161:12, 195:10
**pled**
254:5
**pllc**
3:5
**plus**
270:18
**point**
9:24, 10:22,
24:6, 36:9,
43:1, 46:10,
51:2, 54:9,
82:4, 108:9,
112:19, 127:2,
129:11, 131:20,
131:21, 133:22,
139:7, 147:5,
149:9, 157:13,
172:22, 189:11,
227:11, 246:21,
248:15, 249:2,
270:12, 271:3,
278:22, 281:3,
333:18, 356:19,
403:14
**pointed**
108:10, 144:20,
195:15, 227:17,
237:9, 238:10,
287:3
**pointing**
228:6, 287:9,
394:15
**points**
98:18
**poked**
80:4
**poking**
80:14
**polaroid**
134:12, 169:2,
169:17, 326:9,
409:16, 409:24,

411:11, 414:3,
414:13
**police**
9:5, 9:9, 9:12,
9:15, 9:19,
17:8, 31:13,
34:18, 37:11,
45:9, 53:20,
110:13, 113:11,
114:15, 115:13,
116:4, 116:12,
117:20, 118:2,
118:8, 118:23,
119:9, 119:15,
122:12, 122:24,
123:20, 124:4,
124:16, 128:15,
128:24, 129:9,
129:16, 130:15,
135:11, 137:11,
138:2, 149:17,
150:5, 164:11,
164:21, 171:18,
194:1, 194:14,
195:1, 204:21,
205:5, 219:5,
254:18, 255:4,
255:16, 256:1,
256:2, 256:10,
256:11, 256:19,
257:8, 257:19,
258:8, 258:19,
259:6, 259:20,
263:4, 274:17,
275:2, 290:15,
291:2, 310:11,
325:14, 325:21,
329:3, 329:12,
339:2, 346:17,
346:22, 365:1,
370:6, 370:22,
371:6, 371:22,
386:5, 396:16,
397:20, 398:6,
398:15, 400:12,
406:10, 407:6
**policing**
114:24

389:16

Transcript of Ernest Halvorsen
Conducted on April 20, 2018                    146

policy
254:17, 255:3,
255:14, 255:23,
256:9, 256:18,
257:7, 257:17,
258:7, 258:18,
259:5
ponytail
324:17, 324:21
poorly
208:19
population
65:21
portions
402:15
pose
305:15
positioned
95:9
positively
135:11
possessed
19:24
possible
49:15, 360:4,
403:3, 403:6,
403:7
post
299:12, 317:5
potentially
403:24
potomac
355:2
powers
354:8
practice
234:3, 254:17,
255:4, 255:15,
255:24, 256:9,
256:18, 257:7,
257:18, 258:7,
258:18, 259:5
practiced
50:16, 185:20,
217:17, 221:7,
232:13, 238:1,
244:8
practicing
222:14

preceding
131:5
preparation
222:14, 222:15,
241:3
prepare
31:7, 31:14,
149:17, 149:22,
158:13
prepared
116:21, 138:2,
146:13, 164:22,
166:23, 185:5,
221:6, 224:9,
228:16, 277:13,
346:17, 350:20,
370:5, 370:23,
396:20, 399:15
prepped
216:5
presence
46:3, 46:4,
69:7, 101:17,
153:21, 171:16,
315:3, 315:10
present
5:10, 23:19,
41:23, 76:13,
76:19, 77:2,
77:6, 77:17,
78:3, 79:5,
94:17, 129:11,
155:14, 155:21,
157:10, 161:23,
162:16, 190:1,
190:8, 197:20,
198:14, 198:24,
199:7, 199:19,
207:17, 207:22,
208:8, 208:18,
208:21, 221:15,
319:23, 333:11
presented
251:12
presently
346:19
pressure
296:22

presumably
306:15
pretend
21:11
pretextual
409:21
pretrial
250:19, 251:13,
251:24, 252:8,
252:11, 253:4
pretty
212:13
prevent
289:24
previous
341:8
previously
55:19, 56:17,
58:2, 84:19,
112:3, 112:10,
114:22, 177:1,
184:6, 185:16,
227:18, 228:7,
246:6, 299:6,
348:6, 363:10,
381:6, 387:15,
404:20, 409:12
primarily
25:4
prior
27:6, 27:14,
27:22, 85:2,
111:18, 170:14,
170:19, 176:21,
178:19, 179:3,
181:17, 181:22,
185:12, 186:4,
188:17, 192:8,
198:2, 206:15,
208:22, 216:6,
221:8, 222:16,
223:16, 224:11,
226:10, 228:17,
228:18, 230:22,
232:11, 238:3,
244:9, 248:15,
271:5, 277:23,
340:23, 341:21,

354:16, 414:13
prison
36:22, 254:12,
254:19
priv
261:10
privilege
261:12, 261:14,
264:17, 275:16,
275:18, 279:4
probable
15:21, 16:3,
105:1, 140:15,
146:8, 146:14,
182:21, 302:20,
397:14
probably
55:7, 285:11,
323:19
problem
82:10, 148:5,
301:24
problems
148:4, 294:5,
296:8, 296:22
procedure
286:2
proceeding
251:6, 251:7,
270:14, 271:4,
317:6
proceedings
417:3
process
12:11, 12:19,
94:13
produce
338:19
produced
11:22, 196:10,
338:7, 338:9,
338:17, 370:15
product
192:8
professional
235:23, 236:1,
236:4
progress
18:12, 31:8,

Transcript of Ernest Halvorsen
Conducted on April 20, 2018

147

303:24
**promised**
47:7, 248:19
**promises**
46:21, 157:8,
163:8, 164:4,
186:23
**promotion**
260:15
**prompted**
67:6
**prompting**
136:9
**pronounce**
298:1
**proof**
104:16, 239:20
**proper**
282:16
**proposed**
81:13, 252:9
**prosecuted**
15:15, 264:13,
415:19
**prosecuting**
377:18
**prosecution**
15:16, 103:20,
139:21, 189:4,
197:5, 207:15,
210:1, 230:24,
231:10, 264:4,
264:22, 265:5,
265:11, 265:19,
266:2, 266:8,
266:14, 266:20,
267:2, 267:7,
267:13, 267:19
**prosecutor's**
210:23
**prosecutors**
256:22, 257:22,
291:9, 378:5,
378:13, 416:10
**prosecutors's**
209:18
**protect**
92:3, 92:17,

92:19, 280:8
**protected**
13:6, 13:13
**protecting**
234:24, 235:1,
235:3
**protection**
78:7, 386:20,
387:5
**protects**
11:1
**prove**
233:20
**provide**
50:18, 60:14,
148:17, 158:5,
206:10, 271:9,
279:24, 280:18,
319:1, 407:1,
410:9
**provided**
27:20, 62:7,
63:10, 63:18,
160:14, 200:23,
202:12, 205:14,
205:18, 218:12,
222:12, 223:2,
223:12, 224:23,
224:24, 225:10,
225:15, 238:1,
244:17, 245:18,
271:10, 289:4,
292:8, 301:8,
353:6, 395:23,
407:14
**providing**
205:17, 236:23
**provision**
246:16
**psychological**
21:21
**public**
2:13, 418:24
**pulled**
48:22, 158:22,
357:3, 405:15
**punt**
373:3

**purported**
114:4, 288:19,
288:24
**purportedly**
166:24, 167:8,
168:13, 172:14,
346:16, 369:17,
371:8
**purporting**
184:24, 227:21
**purports**
112:11, 161:15,
164:21, 184:8
**purpose**
21:7, 21:8,
69:15, 81:4,
107:6, 204:4,
409:24
**purposes**
196:2
**pursuant**
2:11, 254:16,
255:3, 255:14,
255:23, 256:8,
256:17, 257:6,
257:17, 258:6,
258:17, 258:21,
259:4, 403:21,
419:24
**pushed**
80:4
**put**
48:12, 108:9,
110:6, 127:2,
132:18, 236:9,
241:13, 254:18,
376:4, 398:4

Q

**quarters**
78:6, 98:7
**question**
10:19, 32:9,
113:6, 144:3,
196:6, 197:16,
197:18, 198:12,
200:13, 204:19,
214:13, 214:17,

214:18, 233:16,
235:15, 235:17,
235:20, 236:2,
236:13, 236:19,
237:5, 261:13,
274:5, 285:2,
285:3, 297:23,
301:18, 305:15,
305:20, 306:2,
306:6, 306:13,
306:14, 324:11,
351:6
**questioned**
215:8, 222:1,
222:2, 222:3,
298:13, 300:10,
300:18, 301:1,
383:24
**questioning**
8:22, 138:24,
316:22, 356:21,
363:9, 385:22,
403:2, 404:19
**questions**
54:4, 71:12,
102:6, 200:9,
200:19, 261:19,
262:2, 262:10,
262:18, 263:3,
263:19, 272:2,
274:3, 282:5,
282:14, 282:15,
282:19, 283:20,
306:16, 311:11,
324:2, 330:4,
333:6, 337:20,
381:7, 402:3,
403:16, 403:18,
404:4, 416:22,
419:19
**quiet**
236:15

R

**r-o-o-k**
312:12
**r-o-s-e-n-d-o**
316:23

| | | | |
|---|---|---|---|
| **r-u-v-a-l-c-a-b-a** | **re-read** | **reassert** | 402:2, 402:8, |
| 33:11, 324:13 | 37:20 | 299:3, 356:19, | 403:1, 403:17, |
| **radio** | **re-reading** | 363:8 | 419:18 |
| 202:4 | 402:4 | **reassurances** | **recorded** |
| **raise** | **reaching** | 77:15 | 347:18 |
| 283:23 | 14:1 | **reassure** | **records** |
| **raised** | **read** | 76:23 | 6:10, 6:12, |
| 71:6, 71:12 | 124:23, 131:10, | **reassured** | 57:2, 58:8, |
| **ran** | 227:21, 248:8, | 77:7, 345:22 | 58:20, 204:21, |
| 202:8 | 268:20, 285:1, | **recalled** | 205:5 |
| **randomly** | 285:3, 364:13, | 28:20 | **recounted** |
| 358:14 | 365:1, 365:15, | **receive** | 28:5 |
| **randoms** | 402:13, 420:2, | 334:2 | **recovered** |
| 320:4 | 420:8 | **received** | 108:20 |
| **rank** | **reading** | 48:2, 219:1, | **red** |
| 9:18 | 420:4 | 230:15, 260:14, | 406:16 |
| **rankins's** | **ready** | 278:21, 291:23 | **reduced** |
| 156:5, 173:13, | 390:3, 390:7 | **recently** | 419:11 |
| 186:18, 187:8, | **real** | 317:5 | **referenced** |
| 188:16 | 253:15, 335:17, | **recess** | 402:19 |
| **rat** | 393:3 | 82:17, 175:3, | **referred** |
| 50:1, 93:19 | **reality** | 281:24, 297:20, | 419:21 |
| **rather** | 226:7 | 380:20 | **referring** |
| 30:20, 45:24, | **realize** | **recognize** | 117:2 |
| 134:4, 134:16, | 270:11, 271:2, | 135:5, 367:24 | **reflect** |
| 166:15, 199:12, | 372:23 | **recognized** | 208:19 |
| 199:14, 216:16, | **realized** | 104:13, 121:7, | **reflected** |
| 218:3, 218:11, | 55:6, 248:17, | 121:9, 122:1, | 58:21, 59:5, |
| 223:2, 229:5, | 397:14 | 123:4, 123:5, | 146:14, 149:23, |
| 323:22, 372:14, | **really** | 220:19, 237:9, | 251:13, 350:24, |
| 375:2 | 42:20, 56:5, | 352:3, 368:16, | 365:2 |
| **ray** | 76:17, 116:3, | 369:3, 370:5, | **reflections** |
| 33:5, 142:10, | 214:2, 214:11 | 377:23 | 128:17 |
| 184:21, 184:24, | **reason** | **recollection** | **reflects** |
| 325:12, 326:8, | 19:23, 44:23, | 242:10 | 114:2 |
| 326:15, 328:22 | 48:22, 52:9, | **record** | **refuse** |
| **rd** | 86:15, 104:23, | 6:18, 9:3, | 272:1 |
| 192:18, 192:21, | 119:18, 153:22, | 32:15, 42:8, | **refused** |
| 193:4, 193:13, | 157:19, 168:8, | 56:12, 82:15, | 42:15, 76:12, |
| 193:23, 194:2, | 287:8, 306:24, | 82:18, 112:23, | 77:17, 81:12 |
| 194:15, 195:2, | 314:2, 344:14, | 175:1, 175:4, | **regal** |
| 251:4, 251:22, | 345:13, 358:22, | 196:7, 196:14, | 123:4, 135:12, |
| 254:6, 282:10, | 399:2, 420:9 | 281:23, 282:1, | 226:22 |
| 293:1, 293:12, | **reasonable** | 297:18, 297:19, | **regard** |
| 293:24, 391:20, | 264:3 | 297:21, 311:10, | 23:24, 274:18, |
| 395:21 | **reasons** | 317:2, 323:22, | 274:20, 290:11, |
| **re-deposing** | 102:5, 104:22, | 370:12, 380:18, | 333:6, 381:6, |
| 402:9 | 363:10 | 380:21, 381:24, | 382:1, 404:19 |

Transcript of Ernest Halvorsen
Conducted on April 20, 2018

149

**regarding**
102:6, 126:6, 136:8, 149:18, 163:19, 165:21, 167:17, 210:21, 211:5, 215:9, 216:17, 240:14, 262:18, 271:9, 273:22, 275:11, 297:6, 298:14, 300:11, 300:19, 301:2, 305:14
**regret**
245:21
**regularly**
18:11
**regurgitate**
81:17
**regurgitating**
127:15, 205:13, 218:14
**reiterate**
21:10
**related**
28:8, 92:10, 102:7, 194:14, 294:4, 296:7, 296:21, 387:7
**relatedly**
413:4
**relating**
277:22
**relationship**
26:3, 26:11, 331:2
**relayed**
28:19
**relaying**
87:7
**release**
149:2, 334:4, 335:3, 386:2
**released**
147:22, 148:2, 333:19, 335:17, 411:19
**relied**
104:22, 272:3,

272:4
**rely**
139:14, 271:16
**relying**
146:19
**remain**
11:4, 119:16
**remember**
56:6, 200:18, 224:5, 233:22, 237:16, 272:24, 273:2, 273:3, 283:19, 357:8, 357:11
**remind**
402:17
**reminded**
49:22
**reminds**
301:18
**removed**
49:7, 193:22, 193:24, 194:7, 194:13, 194:24
**repeat**
83:14, 95:23, 102:4, 169:19, 218:3, 306:4, 311:11, 390:7
**repeated**
122:15, 415:17
**repeatedly**
143:3, 143:12, 260:3
**repeating**
218:14
**rephrase**
117:4
**report**
6:14, 6:22, 6:24, 110:14, 113:11, 116:20, 117:7, 117:9, 117:13, 118:2, 118:8, 118:13, 118:23, 119:9, 119:15, 121:3, 121:13, 121:17,

121:24, 122:12, 122:24, 123:20, 124:5, 124:16, 126:23, 127:3, 127:12, 128:15, 128:16, 128:24, 129:10, 129:17, 130:15, 132:11, 132:12, 133:3, 133:4, 133:17, 135:2, 135:11, 136:7, 136:15, 136:16, 137:1, 137:10, 137:11, 138:3, 141:3, 146:14, 164:11, 164:22, 165:2, 165:15, 165:19, 166:22, 167:8, 167:16, 167:19, 168:4, 168:5, 168:12, 170:11, 170:12, 170:18, 172:14, 172:22, 173:3, 173:5, 184:8, 184:17, 185:5, 192:2, 192:4, 288:13, 288:18, 288:23, 303:24, 339:2, 346:17, 346:22, 347:7, 349:18, 349:24, 350:16, 350:19, 364:14, 365:1, 365:16, 370:6, 370:20, 370:22, 371:6, 371:23, 375:12, 397:20, 398:5, 398:15, 399:15, 400:12
**reported**
1:24, 86:4, 120:15, 122:23, 127:12, 130:5, 135:1, 135:10, 141:3, 166:3, 168:24, 169:6,

230:16, 347:13, 365:8, 371:23, 373:5, 374:8, 399:15, 399:21, 419:10
**reporter**
2:12, 7:9, 7:13, 298:2, 364:8, 419:5, 420:14, 420:22
**reporting**
346:23
**reports**
11:20, 31:8, 31:13, 52:3, 60:10, 60:22, 114:15, 115:13, 116:4, 116:12, 117:20, 149:17, 150:5, 194:1, 194:14, 195:1, 205:5, 256:2, 256:11, 291:3, 310:11, 329:3, 329:12, 350:11, 398:6
**represent**
7:17, 8:20, 196:14, 206:8, 334:20, 339:1, 370:14
**representation**
333:20
**representations**
21:1, 42:14
**represented**
78:4, 275:6, 289:9
**representing**
7:21, 122:13, 377:19
**requested**
57:1, 58:10, 59:4, 59:16, 285:3
**reserve**
416:24
**respect**
246:18, 335:1

Transcript of Ernest Halvorsen
Conducted on April 20, 2018

150

**responded**
201:23, 357:22, 358:2
**responding**
373:19
**response**
198:11
**responsible**
21:13, 92:3, 114:14, 116:11, 178:19, 179:3, 182:1, 223:4, 238:23, 334:5, 340:9, 341:9, 343:10, 344:23, 346:9, 354:10, 354:19, 355:19, 358:23, 411:21, 412:8
**rest**
113:7
**result**
17:6, 30:16, 34:6, 231:16, 247:15, 390:16, 397:19, 415:3, 415:5, 415:23
**resulted**
343:17, 344:17, 400:19
**retaliating**
408:7
**retaliation**
408:13
**retire**
9:11, 9:18
**retrieved**
396:2
**retroactively**
301:20
**return**
145:5
**returned**
49:8, 237:12
**revealed**
50:3, 166:4
**revealing**
192:6

**review**
113:3, 185:14
**reyna**
361:6, 361:14, 361:20, 361:24, 362:2
**reynaldo**
1:7, 1:13, 3:17, 18:3, 57:1, 58:10, 69:8, 165:8, 184:14, 247:17, 248:2, 292:6, 294:13, 322:5, 326:15, 337:21, 339:18, 340:21, 342:18, 343:15, 345:24, 347:17, 348:14, 348:20, 351:23, 355:7, 356:7
**rfc-serrano**
56:19, 58:3, 112:5, 112:14
**richard**
4:22, 289:10, 331:2, 331:11, 333:20
**richmond**
33:5, 325:13, 326:2, 326:4, 326:9, 326:16, 328:11, 328:16, 328:18, 328:22
**rick**
5:10, 7:11, 360:9, 361:24, 362:11
**rico**
154:7, 154:12, 266:9
**ridiculous**
235:22
**riding**
123:3
**right-hand**
59:6, 197:15
**righted**
35:3

**rip**
350:12
**rivera**
311:6, 311:12, 311:23, 313:15, 313:22, 314:3, 314:8, 314:16, 314:23, 315:4, 315:5, 315:11, 316:1, 316:7, 316:17, 363:5, 363:16, 364:19, 367:1, 377:1, 379:10, 379:21, 380:4
**rivera's**
313:8, 377:18
**road**
195:13
**rob**
84:14, 86:4, 86:24, 88:16, 249:5
**robberies**
36:17, 36:23, 48:3, 249:6
**robbery**
36:16, 41:9, 41:16, 62:20, 63:1, 72:5, 124:7, 124:24, 154:22, 157:21, 247:20, 248:16, 249:7, 250:8, 254:11
**robert**
32:24, 35:10, 39:11, 41:2, 41:17, 42:16, 47:19, 48:5, 50:12, 50:20, 93:13, 99:22, 120:3, 210:11, 324:2, 324:20, 325:2, 325:7, 325:14, 409:7, 411:1, 411:20
**roberto**
404:12

**rock**
5:5, 273:18, 273:22
**rodrigo**
10:1, 10:24, 12:5, 14:3, 14:20, 16:6, 16:12, 16:17, 16:23, 17:9, 17:21, 18:1, 18:23, 19:19, 20:1, 20:9, 20:21, 24:2, 26:19, 27:5, 28:6, 29:13, 30:17, 30:20, 31:16, 52:1, 52:11, 57:14, 60:5, 60:24, 61:9, 62:13, 62:19, 63:20, 69:6, 74:22, 77:18, 85:10, 91:17, 91:23, 92:9, 92:18, 93:5, 105:14, 111:7, 111:15, 112:12, 127:14, 129:13, 137:21, 138:18, 139:22, 140:17, 143:4, 146:4, 147:15, 148:13, 150:1, 150:7, 150:23, 153:6, 154:21, 155:4, 155:10, 162:16, 162:18, 163:20, 167:10, 168:3, 168:11, 168:19, 172:10, 173:14, 186:12, 187:5, 187:17, 188:2, 188:10, 198:4, 200:5, 201:23, 202:9, 202:10, 204:12, 211:22, 215:21, 217:2, 218:2,

218:4, 231:20, 237:11, 238:11, 238:15, 238:23, 239:18, 245:5, 247:1, 281:14, 296:1, 320:21

**rodriguez**
284:5, 284:10, 284:15, 285:6, 285:10, 285:15, 285:20, 286:2, 294:14, 294:20, 295:2, 295:8, 295:13, 295:19, 356:8, 356:14, 356:18, 356:21, 357:4, 357:9, 357:17, 357:22, 358:2, 358:23, 359:5, 362:9, 362:18, 364:18, 365:2, 365:8, 365:17, 366:2, 366:18, 367:15, 367:22, 368:15, 368:20, 369:17, 369:21, 370:3, 371:7, 371:15, 373:5, 373:12, 374:9, 374:19, 375:10, 375:17, 377:21, 404:15, 405:5, 405:11, 408:3, 411:3, 415:20, 416:5

**rodriguez's**
288:24, 296:7, 377:16, 378:7

**roland**
383:20

**role**
38:15, 38:17, 151:22

**rolled**
43:18, 43:24

**roman**
165:24, 290:6, 290:17, 290:21,

290:22, 291:3, 291:7, 291:13, 292:2, 296:17, 297:5

**romantic**
26:11

**rook**
312:11, 312:21

**room**
46:11, 46:17, 95:8, 95:10, 142:18, 143:19, 145:6, 155:15, 387:21, 389:7

**roosevelt**
40:15

**rosa**
395:23, 401:1

**rosen**
273:21

**rosendo**
292:16, 292:22, 293:5, 293:10, 293:15, 293:21, 294:4, 316:22, 317:12, 317:20, 318:2

**roughly**
396:3

**routine**
25:8, 142:9

**routinely**
292:6, 331:24, 358:7

**rubber**
195:13

**rue**
177:13

**rule**
212:15, 419:24

**rules**
234:14, 403:21, 419:24

**rumors**
211:20, 212:23, 213:11, 214:24

**run**
202:5, 320:8

**runner**
159:5

**russell**
299:16

**russell's**
320:7

**ruvalcaba**
32:6, 32:19, 32:22, 33:7, 33:10, 34:8, 35:17, 39:12, 39:23, 41:3, 41:10, 41:18, 50:12, 210:12, 324:12, 324:15, 325:3, 325:7, 328:5, 329:4, 329:12, 329:15, 329:20

**ruvalcaba's**
41:3

**S**

**s**
331:5, 331:13

**s-a-l**
312:20

**s-a-l-v-a-d-o-r**
324:12

**s-a-n-t-i-a-g-o**
321:22

**s-a-n-t-o-s**
321:4

**safety**
119:16

**said**
25:10, 42:2, 95:11, 96:19, 114:22, 131:7, 158:23, 159:11, 159:24, 160:1, 165:2, 184:2, 204:22, 283:18, 301:21, 302:2, 302:7, 302:14, 306:11, 316:10, 357:17, 369:17, 369:18, 369:24,

372:11, 379:2, 419:13, 419:20

**sal**
312:19, 313:1, 313:9

**sally**
33:16

**salvador**
32:5, 32:19, 324:12, 324:15

**same**
30:10, 45:15, 47:10, 59:19, 102:5, 107:22, 109:19, 160:11, 193:18, 195:7, 223:22, 249:8, 249:18, 250:11, 253:10, 253:17, 253:20, 264:24, 265:7, 265:15, 265:21, 266:4, 266:10, 266:16, 266:22, 267:3, 267:9, 267:15, 267:22, 268:5, 268:12, 269:5, 269:12, 269:20, 270:7, 270:18, 270:21, 271:12, 271:20, 272:8, 275:15, 276:9, 276:18, 277:2, 277:9, 277:17, 278:1, 283:9, 290:10, 299:3, 305:23, 309:19, 318:16, 320:15, 320:22, 321:6, 321:16, 321:24, 322:7, 322:15, 322:23, 323:7, 323:15, 330:3, 333:5, 338:1, 351:7, 361:15, 372:4, 373:2, 381:5, 382:1, 402:11, 404:18

Transcript of Ernest Halvorsen
Conducted on April 20, 2018

152

**sanchez**
307:5, 307:11, 307:24, 308:5, 308:10, 308:15, 308:21, 309:1, 309:7, 309:12, 309:19, 309:24, 387:8
**santiago**
321:22, 387:8
**santos**
321:3
**sat**
36:5, 123:7, 206:16
**satisfy**
104:15
**saw**
11:17, 43:11, 43:16, 88:10, 106:6, 106:17, 107:9, 133:9, 134:18, 137:4, 155:3, 177:22, 178:10, 180:8, 181:5, 217:5, 226:22, 227:9, 228:4, 229:16, 230:6, 368:22, 394:14
**say**
40:13, 76:12, 87:11, 87:16, 89:7, 96:4, 96:12, 96:18, 97:3, 97:11, 107:22, 117:1, 130:2, 159:4, 159:9, 159:16, 159:22, 160:9, 162:24, 183:24, 194:7, 209:7, 212:22, 216:17, 247:14, 305:18, 306:5, 330:1, 330:2, 330:23, 372:1, 379:17, 402:1, 418:4

**sayez**
404:16, 405:13, 407:5, 408:4, 413:6, 413:16, 413:24, 414:11, 414:19, 415:8, 416:2, 416:14
**saying**
79:4, 97:10, 357:22, 358:2
**says**
113:21, 213:19, 372:21
**scams**
140:8
**scene**
68:18, 69:16, 70:3, 71:20, 87:19, 89:17, 108:5, 108:21, 109:4, 109:13, 137:15, 171:23, 199:7, 199:20, 203:22, 229:9
**scheme**
98:19, 99:3, 99:21
**school**
40:15
**scooby**
340:23, 347:16, 351:22, 352:5
**script**
131:14
**seasoned**
212:13
**seat**
394:2, 406:17
**seated**
155:16
**second**
10:6, 53:22, 102:3, 105:7, 120:23, 173:21, 215:17, 275:8, 281:17, 297:17, 297:18, 298:20, 371:5

**seconds**
10:10
**section**
323:19
**secure**
173:7, 200:3, 239:8, 244:19, 377:11, 382:24, 383:3, 389:17, 389:19, 416:14
**secured**
186:18, 188:6, 188:15, 334:3, 335:3, 349:9, 390:20, 416:2
**securing**
173:18, 174:6, 204:5, 204:9
**see**
58:9, 109:19, 110:8, 113:14, 114:1, 114:5, 121:12, 131:15, 135:4, 161:18, 164:23, 171:11, 185:9, 197:15, 197:21, 236:9, 246:20, 247:2, 247:20, 298:16, 300:21, 307:6, 315:20, 325:14, 325:20, 326:2, 327:9, 350:18, 367:16, 367:24, 384:9
**seeing**
84:12
**seek**
271:4
**seen**
15:16, 72:20, 84:5, 107:17, 109:5, 109:19, 110:2, 110:10, 111:22, 152:1, 168:20, 175:12, 175:24, 176:10, 176:20, 223:15,

231:19, 246:11, 283:14, 344:6, 349:19, 351:15, 374:12, 379:20
**select**
177:15, 178:6, 178:8, 179:14, 293:5, 293:10, 295:8, 295:13, 304:6
**selected**
309:19
**sell**
88:13
**selling**
154:1, 332:13
**semi-automatic**
200:17
**sense**
195:19, 408:4
**sentence**
36:21, 48:2, 249:4, 249:14, 249:15, 249:17, 249:24, 250:7, 253:6, 253:8, 253:16, 400:20
**sentencing**
248:16, 251:3, 251:6, 251:7, 251:11, 251:22, 252:10
**separate**
36:16, 140:6, 154:7
**separately**
157:21
**september**
251:4, 251:22, 254:6, 307:13, 308:11, 308:16, 309:2, 309:21, 312:5, 312:10, 312:12, 339:21, 340:2, 340:23, 341:13, 341:22, 342:9, 343:2, 343:17, 344:16,

351:15, 355:1, 405:7, 405:14, 407:1, 412:22, 413:10, 414:23

**sergeant**
12:21, 13:24, 14:10, 14:15, 15:4, 18:7, 18:18, 22:2, 22:12, 51:13, 60:9, 60:20, 62:24, 66:24, 94:23, 106:13, 150:21, 151:12, 152:15, 153:11, 155:21, 160:21, 162:8, 164:1, 165:20, 166:5, 166:11, 166:15, 170:3, 170:13, 173:12, 175:8, 175:20, 176:7, 177:7, 180:13, 180:19, 230:2, 230:16, 339:14, 340:14, 341:6, 384:5, 384:16, 384:17, 397:14, 398:3, 416:2

**sergeants**
382:15

**serious**
409:12

**serrano's**
150:6, 174:1

**serve**
250:8

**served**
120:12, 253:14, 398:8

**set**
403:15

**sets**
114:24

**seven**
408:15

**seventh**
336:8

**several**
340:17

**shaky**
176:11, 240:6

**shape**
79:12, 277:14

**shared**
18:11, 256:21, 396:2

**she**
26:19, 27:4, 27:20, 28:6, 28:20, 50:19, 106:4, 106:6, 106:17, 107:9, 107:17, 107:21, 109:5, 109:19, 109:24, 110:2, 110:9, 110:10, 111:22, 130:5, 133:7, 133:9, 134:18, 135:4, 135:11, 137:3, 175:12, 175:24, 176:10, 176:20, 176:24, 177:1, 177:2, 177:3, 177:15, 177:22, 178:6, 178:7, 178:10, 179:14, 180:6, 180:7, 180:8, 181:4, 181:5, 181:10, 213:18, 223:15, 226:9, 227:8, 227:9, 227:11, 227:17, 228:6, 229:16, 242:8, 242:10, 242:15, 243:13, 243:15, 243:20, 244:2, 324:4, 355:6, 355:12, 365:8, 365:9, 367:15, 367:24, 368:6, 368:8, 368:16, 368:22, 369:2, 369:10, 370:5,

373:18, 374:11, 374:24, 375:2, 377:22, 378:8, 395:24, 396:1, 396:9, 397:2, 412:8, 412:10

**shift**
388:3

**shirt**
326:24, 327:2, 327:8

**shoot**
290:21

**shooter**
285:11, 285:17, 285:22, 287:14, 287:19, 288:4, 288:9, 292:18, 292:24, 294:22, 295:4, 300:12, 301:3, 303:3, 303:8, 307:7, 310:1, 315:18, 315:20, 342:15, 342:19, 348:14, 349:4, 355:23, 365:10, 367:16, 369:18, 375:24, 376:19, 379:19, 391:14

**shooter's**
288:15, 307:6, 327:10

**shooting**
19:1, 40:14, 165:22, 192:18, 193:12, 193:17, 286:4, 290:5, 290:16, 290:22, 292:2, 296:17, 341:10, 343:10, 343:16, 344:16, 349:19, 351:15, 352:4, 352:18, 354:20, 355:1, 355:8, 365:3, 365:4, 365:7, 365:9, 368:22,

371:14, 378:23, 379:4, 383:17, 383:22, 405:15, 407:6, 408:12, 411:22, 414:23

**shop**
88:13, 89:9

**short**
174:22

**shorthand**
2:12, 419:5, 420:14, 420:22

**shortly**
24:19, 131:1, 365:3, 386:12

**shorty**
351:20, 352:3, 352:17, 352:22

**shot**
72:4, 202:9, 298:16, 324:14, 341:18, 341:24, 342:8, 345:13, 346:5, 347:1, 347:9, 369:22, 376:24, 379:20, 412:21, 413:8

**shots**
315:19, 394:14

**should**
50:10, 55:7, 113:2, 177:15, 178:6, 178:8, 179:14, 181:4, 268:10, 277:15, 284:10, 286:14, 305:18, 378:15, 379:11, 408:22, 412:8

**show**
68:24, 133:23, 197:18, 198:4, 198:12, 198:23, 200:10, 200:14, 201:3, 201:21, 219:15, 222:7, 237:3, 350:15, 376:16, 410:1

Transcript of Ernest Halvorsen
Conducted on April 20, 2018

154

**showed**
68:18, 69:5,
101:23, 102:14,
133:5, 134:12,
169:16, 199:6,
220:9, 284:4,
284:9, 284:14,
286:8, 286:13,
286:18, 287:22,
293:17, 293:23,
295:21, 296:2,
301:11, 303:12,
304:7, 309:6,
309:11, 315:3,
371:15, 375:24,
377:21, 414:3
**showing**
69:16, 71:19,
72:19, 181:23,
301:23
**shown**
169:1, 414:12
**sic**
74:1
**side**
108:12, 159:23,
359:24
**sidley**
279:11, 279:18,
281:4, 281:9
**sierra**
282:9, 283:7,
283:14, 283:16,
284:5, 285:10,
286:9, 287:3,
288:20, 289:1
**sierra's**
284:16, 285:6,
286:20, 286:24,
289:5, 289:8,
289:18, 290:1
**sign**
165:14, 189:17,
396:17, 420:2,
420:8
**signature**
11:21, 113:13,
113:20, 114:4,

165:3, 165:8,
184:12, 184:22,
184:23, 185:1,
339:3, 350:17,
370:20, 416:24,
419:22, 420:9,
420:13
**signature-emhzk**
420:18
**signed**
117:15, 117:19,
163:10, 165:15,
192:7, 251:13,
350:21, 397:1,
397:2, 420:6
**signing**
185:16, 420:4
**silence**
258:21
**silent**
11:4
**similar**
107:23, 192:17
**similarities**
193:16
**simple**
36:16
**simply**
277:6
**simpson**
357:9, 357:18
**since**
119:17, 166:16,
338:10, 341:8,
372:11, 404:2
**single**
306:6, 309:7,
309:12
**sit**
263:11
**situations**
299:14
**six**
249:4, 250:9,
394:14
**six-year**
248:18, 249:4,
249:14, 253:6

**skill**
114:23
**skills**
115:13, 398:5
**skinny**
44:14, 406:18
**slapped**
143:3
**slapping**
143:10, 143:12,
143:18
**sloppy**
53:8
**slowly**
237:7
**small**
27:13, 43:18,
43:23
**smart**
359:23
**snake**
102:1
**snitch**
50:1, 93:12,
93:19, 100:7,
140:5
**so-called**
340:22, 376:5
**sole**
409:24
**solely**
139:14
**solita**
190:2, 190:21,
191:3
**solve**
354:1, 354:3
**some**
9:24, 10:22,
24:6, 28:7,
37:14, 38:8,
51:2, 63:13,
85:9, 88:13,
89:22, 111:19,
148:17, 198:1,
226:13, 227:8,
236:19, 248:15,
249:2, 270:12,

282:5, 299:12,
324:2, 352:23,
393:14, 400:6,
408:2
**somehow**
137:13
**someone**
40:14, 54:22,
66:22, 115:6,
115:12, 181:9,
212:23, 225:19,
235:8, 293:6,
293:11, 295:9,
295:14, 340:21,
369:2, 370:4
**something**
29:5, 209:12,
212:14
**sometime**
123:21, 333:4
**sometimes**
35:2, 143:18
**somewhat**
26:3
**somewhere**
368:17
**son**
44:9
**sonia**
354:24, 355:5,
355:22
**sorry**
42:10, 54:14,
115:16, 136:20,
152:19, 177:10,
192:21, 196:2,
268:20, 283:17,
284:21, 285:2,
292:15, 302:13,
305:23, 306:12,
350:2, 350:4,
350:5, 363:21,
364:8, 379:22,
384:10, 385:14
**sort**
30:10, 54:15,
103:19, 115:14,
231:9, 359:16

Transcript of Ernest Halvorsen
Conducted on April 20, 2018

155

**soto**
272:19
**sotos**
3:19, 273:4,
273:5, 273:13
**sought**
279:12
**sound**
236:6
**south**
4:6
**spanish**
25:11, 224:1,
227:7, 312:4,
312:9, 316:11,
366:11, 366:20,
366:24, 367:4,
367:7, 367:23,
368:7, 370:4,
371:16, 374:2,
377:21, 380:10
**spanish-speaking**
25:3, 25:5,
366:3
**speak**
42:1, 246:23,
272:12, 272:19,
273:12, 273:17,
273:21, 274:8,
274:11, 274:15,
275:1, 365:17
**speakers**
366:11
**speaking**
25:11, 30:17,
116:24, 212:20,
235:12, 273:3
**special**
354:8
**specific**
283:22, 324:4
**specifically**
15:3, 19:17,
22:16, 23:24,
27:4, 41:13,
44:19, 56:22,
65:8, 115:8,
178:23, 181:14,

201:5, 279:18,
317:7, 348:12,
349:1, 392:11,
398:14, 401:19
**speculation**
17:12, 21:15,
43:6, 140:10,
146:24, 157:3,
170:6, 190:16,
193:8, 194:20,
209:2, 212:7,
213:2, 232:20,
234:9, 239:22,
244:22, 248:22,
252:2, 252:21,
253:22, 270:19,
312:14, 319:15
**speeches**
235:11
**spell**
298:1, 298:13,
324:11, 337:8
**spend**
403:8
**spent**
252:10, 396:15
**spitzer**
182:6, 182:13,
182:18, 183:2,
183:5
**spoke**
24:17, 65:8,
94:23, 151:11,
302:7, 302:14
**spontaneously**
227:17
**spot**
121:5, 121:19,
309:3
**springfield**
159:12, 198:5,
199:1, 199:8,
201:7, 201:22,
203:8, 203:14,
203:23, 233:12,
236:21, 237:2,
237:7, 237:8
**square**
282:11

**ss**
419:2
**st**
291:23
**stamp**
56:12, 56:18,
58:3, 112:16,
113:11, 117:8,
172:16, 184:7,
196:7, 338:4,
338:6
**stamped**
112:13, 370:13
**stamps**
206:8, 338:16,
338:20
**stand**
216:7, 217:18,
221:8, 222:16,
224:11, 228:18,
230:22, 232:12,
238:3, 244:9
**standing**
97:12, 102:4,
282:22, 283:19,
283:24, 290:10,
299:5, 301:19,
302:3, 305:24,
306:4, 306:7,
306:9, 306:10,
306:15, 311:11,
317:2, 318:16,
320:15, 320:22,
321:6, 330:3,
333:5, 337:20,
338:1, 356:20,
363:8, 381:5,
382:1, 404:18,
405:16
**star**
113:22, 114:3,
339:4, 339:10
**start**
126:1, 131:8,
146:10, 167:17,
194:10, 207:11,
220:11, 363:23,
408:8

**started**
18:22, 237:6,
368:7, 405:15
**starting**
350:7, 388:3
**state**
2:13, 9:2,
37:17, 79:18,
87:5, 112:18,
112:22, 138:3,
194:3, 194:17,
206:6, 239:19,
256:22, 257:21,
257:23, 264:22,
277:1, 377:15,
377:17, 378:4,
378:13, 396:9,
396:10, 402:8,
416:10, 419:1,
419:6
**stated**
124:8, 125:2,
209:16, 210:5,
311:17, 346:24,
347:9, 363:10,
381:6, 392:22,
393:15, 395:24,
404:21
**statement**
50:11, 50:17,
50:19, 70:6,
83:9, 90:11,
95:22, 97:7,
104:14, 104:24,
109:10, 110:18,
121:12, 123:10,
123:20, 124:4,
124:15, 125:22,
126:3, 128:22,
129:17, 129:21,
130:14, 133:16,
139:2, 145:8,
158:6, 158:14,
161:16, 161:18,
161:23, 162:5,
162:6, 162:15,
162:23, 163:3,
163:10, 166:23,

Transcript of Ernest Halvorsen
Conducted on April 20, 2018

156

173:19, 174:6, 185:14, 185:15, 186:3, 186:20, 187:9, 188:17, 188:20, 189:16, 189:24, 190:9, 190:11, 190:22, 191:8, 191:20, 192:6, 192:11, 217:1, 218:2, 218:3, 218:15, 221:1, 226:14, 232:14, 235:23, 238:20, 247:6, 247:8, 248:9, 347:5, 347:8, 347:21, 347:22, 348:3, 352:9, 353:5, 369:16, 371:7, 373:24, 374:18, 378:7, 388:22, 389:17, 390:19, 394:22, 395:14, 395:23, 396:17, 397:1, 397:3, 398:15, 400:4, 400:10, 400:13, 400:24, 403:11

**statements**
70:12, 88:1, 88:2, 88:24, 89:1, 96:12, 96:18, 97:3, 97:5, 97:11, 101:3, 105:21, 122:7, 122:11, 122:14, 124:22, 127:24, 128:5, 128:7, 128:14, 136:6, 136:9, 138:4, 139:15, 146:20, 148:4, 148:17, 149:24, 162:14, 163:19, 167:6, 167:15, 167:18, 167:20, 168:5, 168:12,

172:17, 172:24, 173:8, 186:9, 187:22, 187:23, 204:22, 205:11, 207:1, 234:16, 272:5, 279:24, 280:19, 281:11, 366:9, 375:10, 375:11, 383:1, 397:20, 397:21, 398:7, 398:17, 399:4, 399:11, 400:16

**states**
1:1

**stating**
288:14

**station**
28:16, 28:21, 29:5, 63:19, 84:5, 84:13, 84:19, 85:1, 85:10, 106:6, 106:17, 107:9, 107:17, 109:6, 109:20, 110:2, 110:10, 111:14, 111:23, 129:23, 130:2, 130:3, 130:6, 130:16, 132:4, 133:9, 134:6, 134:18, 134:19, 135:5, 135:14, 135:20, 137:4, 147:13, 175:12, 176:1, 176:10, 176:20, 177:22, 178:10, 180:7, 181:5, 223:6, 223:16, 223:23, 224:3, 224:23, 226:4, 226:10, 227:9, 229:2, 229:16, 230:6, 242:12, 242:18, 243:14, 243:23, 325:14, 325:21, 396:16,

407:6
**stay**
94:5, 125:23, 323:21
**stayed**
159:18
**stenographically**
419:10
**step**
27:13
**steps**
12:2, 31:14, 204:10
**steve**
313:14, 316:6
**steven**
314:14, 314:21
**stewart**
279:19, 280:1, 280:13
**still**
42:15, 77:16
**stolen**
88:15
**stomach**
155:22
**stood**
124:12, 251:5, 376:6
**stoolie**
50:1
**stoop**
405:17
**stop**
15:7, 45:20, 46:1, 74:9, 74:17, 97:9, 97:19, 125:15, 157:15, 232:2, 389:15
**stopped**
28:15, 202:2, 387:5
**stopping**
28:15, 174:19
**store**
349:17
**stories**
80:12, 81:13,

199:17, 205:13
**story**
66:7, 72:11, 81:16, 83:3, 85:19, 85:20, 92:24, 94:13, 95:6, 105:21, 122:15, 127:15, 132:22, 151:6, 157:23, 169:18, 171:2, 171:10, 172:1, 173:13, 189:14, 191:18, 283:13, 296:15, 390:8, 391:4
**straight**
389:6
**street**
2:5, 3:6, 3:13, 3:20, 4:6, 5:6, 7:7, 72:21, 73:5, 107:8, 109:18, 121:1, 202:7, 211:20, 212:23, 213:12, 214:24, 219:12, 340:22, 352:4, 368:17, 405:12, 412:12
**streets**
34:24, 50:3, 115:7, 227:8, 227:15, 228:3, 254:4, 332:17, 343:15, 344:2, 348:21
**strike**
14:13, 20:15, 40:10, 43:11, 43:17, 45:1, 55:8, 59:14, 67:16, 90:21, 101:4, 104:22, 105:8, 114:12, 120:13, 125:23, 141:19, 146:11, 152:19, 156:5, 167:17, 170:23,

Transcript of Ernest Halvorsen
Conducted on April 20, 2018

157

173:4, 187:22, 190:23, 192:3, 193:23, 194:10, 199:13, 218:23, 225:11, 234:20, 243:1, 333:13, 345:7, 355:15, 360:17, 363:14, 363:21, 371:9, 377:16, 381:19, 383:12, 384:15, 388:19, 395:8, 395:9, 408:8, 415:4

**striking**
46:16

**string**
48:3

**stripes**
158:22, 159:10, 159:17, 159:23, 159:24, 160:9, 169:10

**stupid**
44:9

**subject**
54:1

**subjects**
263:10, 316:21

**submitted**
118:3, 118:8, 418:11, 418:12

**subpoenaed**
194:3, 194:17, 195:5

**subscribed**
418:19

**substance**
71:21, 174:12

**successful**
158:5, 366:8

**successfully**
148:11, 163:8

**such**
292:9, 310:18, 332:12, 362:1, 420:7

**suffered**
37:15, 248:1

**sufficiently**
196:22

**suggest**
20:7, 21:11, 52:15, 179:13, 283:6, 301:9

**suggested**
177:14, 178:6, 181:3, 199:18, 230:4, 378:15

**suggesting**
257:9, 399:13

**suggestion**
60:3

**suggestive**
177:8, 179:8, 317:21, 318:3, 327:16, 376:17

**suite**
3:6, 3:20, 4:7, 5:6

**sum**
71:21, 174:11

**summarized**
166:23

**summary**
371:7

**summer**
296:24

**supervising**
397:13, 416:1

**supervisor**
12:21, 18:6, 18:18, 33:15, 33:23, 51:12, 150:20, 151:11, 230:2, 339:13

**supplemental**
6:14, 6:24, 113:10, 116:20, 117:7, 117:9, 118:13, 119:9, 122:23, 124:16, 126:23, 127:3, 127:12, 128:24, 133:4, 133:17, 135:1, 136:7, 136:16, 136:24,

164:11, 164:21, 165:15, 167:7, 167:16, 170:12, 172:13, 184:8, 184:17, 185:4, 192:2, 192:4, 339:2, 347:7, 350:16, 350:19, 370:20, 370:22, 375:12, 398:6, 399:15, 400:12

**supplementary**
6:22, 170:11, 170:17

**supplied**
217:2

**supposedly**
75:15, 88:14, 160:2

**supreme**
420:1

**sure**
10:7, 10:20, 48:1, 53:1, 55:12, 56:14, 77:8, 82:10, 117:2, 117:3, 144:21, 174:24, 282:24, 283:21, 284:21, 297:24, 299:4, 338:18, 364:10, 367:7, 370:15

**surrea**
251:5, 251:12

**susceptible**
319:12

**suspect**
156:22, 262:20, 292:8, 298:21, 299:20, 302:20, 305:16, 306:24, 311:5, 314:2, 318:9, 320:5, 325:20, 326:23, 327:11, 337:22

**suspects**
34:20, 39:1,

45:11, 156:13, 257:9, 257:20

**suspicious**
103:7, 140:5

**sworn**
8:12, 8:15, 418:4, 418:19, 419:14

**symptoms**
37:15, 38:5, 38:10

**T**

**t-r-a-n**
315:16

**t-shirt**
357:10, 365:11, 367:17, 374:10, 374:20, 375:4

**tactic**
34:17, 38:23

**tactics**
47:17, 48:11, 259:15

**tag**
142:3

**take**
10:6, 10:9, 50:11, 50:19, 61:20, 82:5, 82:9, 125:10, 174:22, 190:22, 202:4, 248:6, 248:8, 253:7, 281:21, 320:8, 351:8, 352:21, 380:16, 390:19, 413:17

**taken**
7:2, 63:3, 82:17, 108:18, 109:2, 161:16, 175:3, 224:2, 230:3, 281:24, 297:20, 380:20, 396:11, 408:14, 418:6, 418:8, 419:9

**taking**
7:17, 82:12, 190:8, 216:7, 221:8, 222:16, 224:11, 228:17, 228:18, 230:22, 232:11, 238:3, 244:9, 252:16, 409:24

**talk**
49:15, 99:19, 210:1, 323:24

**talked**
151:19, 160:10, 195:13

**talking**
35:10, 124:6, 124:24, 130:3, 131:17, 284:23, 394:7

**tall**
406:13

**tammy**
4:4, 8:9

**tan**
28:22, 85:12, 130:10, 134:21, 137:3

**tan-colored**
123:3

**target**
32:23, 84:14

**tattoo**
304:16, 304:21

**team**
142:3

**teenage**
364:18

**teens**
406:19

**telephone**
43:19, 43:24, 221:23, 222:1, 389:9

**tell**
11:5, 11:10, 12:2, 27:4, 47:16, 48:21,

49:5, 50:10, 66:22, 80:12, 89:13, 112:23, 151:5, 157:14, 158:21, 163:17, 163:24, 172:1, 179:19, 181:8, 191:14, 196:6, 265:13, 274:4, 281:3, 281:8, 300:12, 301:3, 328:4, 348:12, 372:16, 378:4, 419:14

**telling**
72:20, 73:4, 80:14, 171:10, 233:19, 308:16, 309:2, 396:8

**tendered**
150:5

**territory**
385:1

**testified**
8:15, 152:22, 153:3, 154:13, 198:11, 204:20, 205:4, 205:9, 209:23, 210:19, 211:18, 211:19, 215:15, 216:23, 217:19, 218:22, 218:24, 219:11, 220:16, 220:22, 221:22, 223:22, 226:19, 227:4, 227:14, 228:2, 230:14, 232:24, 233:9, 237:12, 241:4, 241:12, 242:15, 243:3, 244:2, 245:2, 278:10

**testify**
66:9, 68:2, 155:2, 185:7, 186:2, 206:23, 212:2, 224:21,

231:19, 232:14, 234:16, 269:19, 278:12, 278:18, 401:2

**testifying**
22:24, 186:20, 221:9, 224:5, 245:22, 290:1, 294:6, 296:9, 296:23

**testimony**
23:9, 23:11, 67:19, 151:15, 185:21, 187:10, 187:23, 188:7, 188:16, 196:15, 197:3, 197:10, 198:19, 200:3, 200:22, 200:24, 202:12, 202:16, 202:17, 202:20, 204:3, 205:18, 205:19, 206:11, 206:16, 206:18, 208:3, 208:4, 211:4, 214:23, 215:24, 216:1, 216:5, 217:12, 217:13, 217:16, 219:22, 221:5, 221:6, 222:12, 224:8, 224:9, 228:8, 228:11, 228:15, 229:14, 230:23, 233:23, 237:17, 237:20, 237:24, 238:1, 239:5, 240:13, 241:5, 242:21, 244:4, 244:7, 244:16, 245:12, 245:17, 246:18, 247:7, 247:15, 255:17, 263:12, 264:4, 264:14, 270:12, 270:15, 271:4, 271:8, 271:9, 289:4,

289:18, 297:5, 377:10, 418:10

**th**
7:8, 32:18, 33:13, 35:10, 36:1, 37:8, 39:10, 56:24, 58:9, 59:3, 150:14, 152:9, 161:17, 164:22, 170:4, 172:15, 174:5, 176:21, 177:10, 177:16, 177:22, 178:20, 179:4, 180:21, 180:22, 188:23, 189:12, 189:24, 190:23, 191:20, 192:7, 207:16, 219:12, 230:15, 233:6, 241:14, 246:10, 247:6, 251:20, 280:14, 284:6, 286:9, 287:24, 294:16, 294:23, 295:5, 295:10, 295:15, 295:21, 296:3, 296:13, 303:24, 318:18, 318:23, 324:15, 324:21, 325:11, 326:1, 326:11, 326:17, 340:23, 341:13, 341:22, 343:2, 350:17, 356:10, 357:2, 364:7, 370:6, 371:9, 375:13, 381:3, 381:14, 381:22, 382:19, 384:9, 384:10, 386:6, 386:21, 387:20, 391:23, 392:24, 393:5, 396:4, 398:18, 399:5, 399:16, 400:11, 419:7

**than**
9:17, 30:20, 45:24, 120:5, 134:16, 234:15, 259:19, 293:6, 295:9, 302:1, 323:22, 354:1, 372:14

**thank**
131:22, 214:4, 317:1, 318:15, 337:12

**thanks**
82:7, 299:23

**that's**
7:16, 10:17, 32:9, 40:4, 42:11, 54:2, 56:2, 82:14, 102:7, 113:16, 117:7, 131:21, 156:24, 185:8, 198:7, 198:14, 200:12, 234:21, 235:7, 235:18, 282:16, 299:11, 299:17, 323:23, 329:24, 339:2, 358:6, 372:1, 372:20, 372:22, 383:13, 402:6

**their**
15:17, 23:11, 39:3, 52:16, 89:9, 99:18, 126:6, 129:12, 182:22, 188:3, 193:6, 206:16, 245:18, 245:24, 257:21, 258:20, 268:19, 269:4, 280:21, 291:10, 318:5, 331:4, 332:1, 332:18, 336:23, 383:3, 413:9

**them**
15:21, 22:18,

35:2, 53:19, 61:22, 73:8, 87:6, 88:1, 124:6, 124:23, 153:24, 158:24, 176:12, 177:3, 180:8, 182:20, 183:5, 183:15, 205:14, 219:6, 219:14, 219:15, 220:3, 240:14, 243:16, 246:20, 304:7, 318:3, 327:24, 350:9, 350:12, 383:3, 385:21, 394:7, 394:16, 411:11, 412:11, 413:17, 414:12, 414:13

**themselves**
7:13, 95:9, 190:10

**then**
39:1, 43:2, 56:12, 64:6, 70:5, 73:15, 83:3, 90:10, 96:17, 108:3, 122:11, 126:22, 145:2, 156:14, 159:10, 159:11, 167:19, 190:11, 219:14, 220:23, 221:23, 222:4, 233:15, 235:17, 237:6, 238:21, 246:21, 302:3, 306:12, 315:12, 323:19, 340:15, 350:21, 375:16, 394:14, 402:5, 419:16, 420:7

**theorized**
408:9

**theory**
101:14, 408:6

**there**
15:20, 19:6,

21:11, 52:15, 60:2, 63:2, 80:20, 85:9, 109:11, 117:15, 125:10, 125:15, 125:21, 130:9, 131:15, 140:14, 165:16, 168:8, 182:21, 183:24, 193:12, 209:7, 214:13, 214:15, 226:13, 226:24, 239:15, 239:16, 263:10, 278:11, 298:2, 318:8, 332:8, 364:17, 371:6, 397:14, 402:15, 409:13, 411:7

**there's**
324:6, 403:19

**thereafter**
246:22, 419:10

**therefore**
57:13, 408:12, 409:14

**thereof**
420:4

**these**
58:18, 77:24, 81:12, 121:10, 122:6, 122:11, 122:13, 124:22, 128:14, 137:18, 138:3, 139:12, 154:11, 172:23, 173:7, 219:1, 220:2, 222:5, 274:2, 283:20, 301:22, 324:4, 325:15, 326:10, 403:18, 413:5

**they**
25:11, 27:14, 28:15, 30:10, 37:15, 53:1, 53:20, 55:12, 77:8, 78:19,

84:5, 84:13, 86:4, 86:11, 86:23, 87:1, 87:6, 88:12, 88:15, 89:9, 95:10, 121:10, 124:7, 124:24, 130:6, 130:7, 145:16, 153:24, 154:13, 158:23, 159:11, 160:10, 160:17, 190:9, 202:4, 208:21, 223:5, 246:24, 253:5, 254:20, 258:9, 259:18, 260:10, 276:22, 277:6, 324:3, 328:23, 332:19, 334:14, 340:9, 353:13, 360:1, 386:4, 393:3, 393:13, 394:3, 414:21

**they're**
372:4

**thin**
373:8, 406:13, 406:15

**thing**
143:20, 160:11

**things**
56:4, 96:19, 324:4, 332:12

**think**
56:11, 82:12, 131:19, 131:22, 175:14, 195:18, 196:21, 214:6, 272:22, 282:15, 298:3, 299:21, 301:24, 311:5

**third**
81:16, 100:6, 146:3

**thomas**
282:9

**those**
14:12, 36:23,

Transcript of Ernest Halvorsen
Conducted on April 20, 2018

160

38:10, 42:13,
52:18, 60:3,
60:24, 61:11,
62:10, 77:15,
85:17, 88:2,
89:1, 96:19,
97:4, 111:20,
133:9, 134:21,
150:5, 167:19,
191:4, 200:18,
200:19, 201:10,
217:8, 218:13,
218:14, 218:23,
219:13, 223:4,
223:15, 275:12,
282:20, 282:21,
299:14, 330:4,
375:11, 400:16,
401:17, 401:18,
402:2, 402:11,
407:13, 411:10,
414:3, 415:16,
415:23
**though**
32:24, 69:19,
75:21, 117:13,
163:10, 182:21,
232:16, 420:6
**thought**
338:11, 408:1
**threatened**
157:21, 396:8
**threats**
157:8, 186:21,
247:16, 294:3,
296:6, 296:20
**three**
18:10, 28:22,
30:19, 36:16,
52:18, 60:3,
60:24, 61:12,
85:11, 101:3,
121:10, 124:6,
124:23, 130:9,
134:12, 134:21,
139:12, 140:6,
176:19, 202:2,
217:3, 219:4,

220:2, 222:5,
223:2, 249:5,
259:19, 283:15,
405:23, 406:12,
407:7
**three-and-a-half**
253:15
**through**
15:16, 25:4,
37:10, 37:16,
112:5, 112:14,
113:7, 113:12,
117:8, 125:22,
161:15, 162:6,
163:7, 164:4,
164:19, 164:20,
172:16, 183:23,
183:24, 184:1,
184:7, 186:21,
202:9, 204:21,
205:5, 205:10,
206:9, 262:21,
320:8, 366:19,
367:23, 368:7,
373:7, 390:20,
412:17, 418:7,
419:11
**throughout**
94:5
**thus**
408:4
**till**
17:17
**time**
7:9, 26:15,
53:1, 53:21,
55:12, 61:9,
79:5, 80:18,
86:6, 140:24,
173:21, 174:12,
195:14, 197:20,
198:14, 200:16,
231:10, 247:18,
250:19, 251:14,
252:19, 253:4,
253:15, 278:22,
289:8, 297:14,
306:11, 336:2,

351:7, 351:9,
352:18, 356:15,
359:16, 372:5,
372:11, 378:22,
395:9, 403:4,
404:5, 418:8,
419:20
**times**
43:12, 44:14,
53:8, 53:9,
64:3, 202:10,
259:19, 336:21,
402:17
**timing**
131:17
**timothy**
22:17, 150:15,
152:9, 161:16,
162:8, 163:9,
164:3, 165:21,
166:24, 168:13,
168:18, 169:1,
169:7, 172:18,
172:24, 174:7,
185:6, 185:13,
185:21, 186:1,
186:9, 187:3,
187:8, 187:14,
188:15, 202:24,
230:17, 231:1,
233:4, 233:18,
236:21, 238:20,
241:15, 281:11
**tino**
393:2, 393:13,
393:17, 394:3,
394:5, 396:1
**titled**
320:3
**today**
7:8, 7:18, 8:8,
8:23, 82:13,
204:21, 263:11,
264:5, 264:14,
269:1, 270:15,
271:9, 272:6,
273:23, 282:6,
404:4

**together**
67:14, 110:7,
114:16, 241:14,
348:18, 353:4,
356:7, 376:5,
391:2
**tom**
192:19, 192:22
**tony**
363:4, 368:17,
368:21, 374:1,
375:17, 376:1,
376:23, 377:19,
378:14, 379:11,
379:18, 380:3,
380:9
**too**
27:13, 29:20,
124:14, 133:15,
195:20, 205:9,
228:11, 374:19
**took**
12:2, 26:19,
27:14, 31:15,
35:2, 61:10,
62:6, 122:12,
137:18, 153:13,
191:4, 204:11,
210:22, 217:18,
228:23, 229:5,
237:4, 238:11,
238:15, 375:17,
411:10
**tool**
45:11
**top**
373:4
**torrence**
381:3, 381:14,
381:22, 382:18,
384:20, 390:11,
391:7, 391:14
**towards**
112:17
**tracking**
350:4
**tran**
315:16, 315:24,

Transcript of Ernest Halvorsen
Conducted on April 20, 2018

161

316:6, 316:16
**transcript**
6:16, 6:18,
196:15, 235:7,
418:5, 418:10,
420:3, 420:5,
420:8
**transcription**
419:12
**transferred**
189:3
**transpired**
27:21, 49:24
**traumatized**
412:5
**trial**
120:18, 193:6,
205:19, 206:11,
231:3, 239:6,
244:17, 245:3,
245:18, 269:19,
270:13, 278:11,
278:17, 289:5,
289:8, 289:18,
290:1, 297:3,
297:12, 313:8,
328:12, 361:13,
377:11, 400:18,
401:3, 403:23
**trials**
23:2, 23:9,
206:16, 258:9
**trick**
196:6, 229:15
**tricked**
376:22
**tried**
26:10, 53:9,
53:17, 66:8,
67:18, 68:1,
76:23, 78:16,
86:24, 154:5
**trier**
212:22, 224:22,
225:8, 225:14,
225:17, 232:4,
234:6, 239:14,
241:5

**trouble**
331:5, 331:18,
332:1, 332:12,
332:19, 336:24
**trunk**
227:1
**trust**
42:20, 76:17
**truth**
329:13, 419:14,
419:15
**truthful**
64:4, 70:10,
70:12, 128:16,
247:7, 247:8
**truthfully**
164:14
**try**
39:3, 110:1,
144:4, 171:2,
196:5, 229:1,
234:4, 250:18,
352:16
**trying**
80:11, 195:14,
303:14, 327:10,
351:5, 372:17,
372:18
**turn**
76:18, 112:15,
127:22, 304:15,
304:20, 305:3
**turned**
379:4
**two**
154:6, 207:23,
252:19, 275:6,
318:8, 350:10,
350:11, 363:6,
385:10, 392:24,
393:13, 394:6,
394:14, 403:8,
412:6, 414:22
**type**
85:9, 90:4,
110:7, 172:23,
200:15, 218:1,
259:7, 408:2

**typed**
117:15
**types**
110:8
**typewriting**
419:11
**typewritten**
113:21

**U**

**ultimately**
191:9, 191:19,
386:2
**unable**
137:3, 176:19,
177:20, 180:1,
335:24, 340:8,
341:9, 341:23,
342:14, 354:2,
365:9
**unaware**
190:23
**unconstitutional-
ly**
259:14
**under**
186:10, 187:10,
206:24, 217:19,
265:12, 265:13,
265:20, 270:13,
408:6
**underlying**
102:8
**underneath**
113:20
**undersigned**
420:10
**understand**
8:24, 32:12,
113:5, 209:8,
260:22, 264:2,
271:11, 272:7,
306:7
**understanding**
30:3, 38:9
**understood**
306:10
**unduly**
317:20, 318:2

**unfair**
327:9
**unfairly**
327:24
**unique**
88:23
**unit**
64:16, 64:24,
65:10, 68:6,
68:16, 74:2,
80:2, 82:23,
98:4, 100:24,
101:2, 119:3,
120:16, 189:4,
207:15, 209:18,
220:5, 220:12,
221:15
**united**
1:1
**unknown**
340:22
**unlawful**
398:9
**unless**
402:13
**unrelated**
165:22, 383:11,
383:12, 383:16
**unspoken**
30:3
**unsuccessful**
145:3, 359:14
**unsuccessfully**
88:15
**until**
71:6, 86:12,
386:21
**untrue**
118:7, 121:24
**upon**
269:18, 272:3,
272:4, 419:16
**upper**
59:6
**us"**
207:24
**use**
34:8, 34:17,

35:16, 39:3, 39:22, 43:2, 44:24, 45:10, 51:3, 54:3, 62:24, 80:21, 97:11, 100:5, 100:15, 120:6, 120:17, 139:20, 145:7, 166:18, 186:22, 207:9, 324:10, 365:18, 389:18, 413:5

**used**
21:20, 38:10, 45:13, 47:18, 48:13, 50:20, 56:4, 61:19, 62:10, 62:11, 63:10, 63:17, 72:10, 74:20, 80:19, 81:1, 81:2, 110:24, 111:20, 120:3, 139:23, 140:6, 146:20, 148:19, 156:12, 172:22, 173:4, 173:6, 190:11, 218:16, 226:11, 244:18, 257:23, 259:14, 281:12, 294:3, 296:6, 296:20, 312:19, 317:7, 383:2, 388:21, 400:18, 401:2, 410:1, 420:5

**using**
75:15, 87:23, 144:6, 156:12, 156:13, 156:22, 282:14, 282:18, 299:13, 317:3

**usual**
302:1

**usually**
116:9, 195:15

**utilize**
70:5, 85:18,

90:10, 94:24

**utilized**
132:20, 416:12

**utilizing**
70:9

### V

**v-a-l-a-s-c-o**
300:19

**v-e-l-e-z**
306:20

**v-i-l-l-a-r-d-i--t-a**
313:14

**v-i-r-g-i-l-i-o**
314:22

**valasco**
300:18, 301:1, 301:13, 303:6, 303:14, 304:1, 304:5, 304:11, 305:4

**value**
306:3

**van**
24:7, 72:4, 202:6, 202:7, 202:9

**vargas's**
16:6, 17:9, 27:23, 52:16, 61:9, 63:12, 79:6, 222:5

**various**
98:17, 332:12

**vehicle**
288:15, 406:3

**velez**
306:20, 307:1, 307:12, 307:19

**vera**
385:12, 385:20, 386:3

**veracity**
88:3, 89:2, 226:13

**veras**
53:18

**versus**
196:16, 206:7

**very**
37:17, 177:1, 195:16, 207:10, 226:8, 240:6, 402:11

**vicente's**
20:24, 42:1, 70:12, 105:21, 132:21, 139:15, 148:3, 151:15, 188:19, 240:13, 247:5, 248:15, 251:3, 251:21, 296:21

**victim**
25:10, 63:3, 72:4, 86:24, 105:11, 131:1, 131:7, 131:19, 237:11, 320:6, 351:14, 366:3, 411:12, 412:5

**victim's**
24:17, 132:6

**victims**
64:5, 366:11, 407:15, 408:6, 408:10

**video**
7:1, 236:9, 417:2

**videographer**
5:10, 7:1, 7:10, 82:15, 82:18, 175:1, 175:4, 281:23, 282:1, 297:19, 297:21, 380:18, 380:21, 417:1

**vienna**
336:8

**view**
107:7, 222:23, 243:8, 307:11, 309:21, 326:9, 345:7, 354:17,

411:13, 414:20

**viewed**
107:15, 115:12, 177:9, 179:9, 181:11, 241:15, 242:8, 242:15, 304:11, 309:8, 309:13, 325:15, 325:22, 326:4, 326:11, 345:12

**viewing**
178:20, 179:4, 181:17, 181:22, 414:13

**villardita**
313:13, 314:13, 314:20, 316:5

**vincent**
98:6

**violated**
12:9, 12:17, 13:5, 13:12, 15:5, 276:17, 277:1

**violation**
267:20

**violations**
266:9, 266:15, 268:18, 269:3

**violence**
43:2, 157:9, 186:22, 186:23

**violent**
237:13

**virgilio**
314:21, 315:3, 315:10, 316:16

**virtue**
376:6

**visible**
45:2

**visiting**
54:22

**voice**
284:19

**voluntarily**
164:14, 303:2, 303:7, 329:5

Transcript of Ernest Halvorsen
Conducted on April 20, 2018

163

**vomit**
320:7
**vs**
1:6, 1:12, 7:5
**vulnerable**
37:17

### W

**wacker**
4:14
**wade**
311:9, 311:17,
311:23, 313:15,
313:19, 313:22,
314:3, 314:8,
314:16, 314:23,
315:12, 315:13,
315:18, 316:1,
316:7, 316:12
**wait**
159:18, 292:15
**waited**
86:12, 394:4
**waiting**
214:17, 236:14,
393:14
**waived**
419:23, 420:9
**walked**
43:23, 201:24,
202:1
**want**
10:6, 71:22,
82:5, 139:14,
139:20, 159:4,
195:11, 235:4,
236:8, 241:13,
246:15, 306:1,
330:22, 351:8,
372:10, 380:16,
404:7
**wanted**
27:13, 30:19,
34:2, 35:1,
35:16, 39:11,
55:11, 66:7,
73:8, 75:5,
75:13, 75:19,

76:3, 76:6,
81:16, 81:23,
83:14, 84:2,
84:10, 95:23,
99:10, 100:15,
101:15, 138:23,
139:5, 139:11,
148:10, 151:22,
153:22, 157:23,
158:23, 169:19,
172:9, 190:10,
211:12, 214:22,
216:17, 223:14,
233:18, 236:22,
239:7, 325:6,
327:17, 356:17,
386:13, 396:10,
402:7, 409:6
**wanting**
232:3
**wants**
404:8
**war**
312:5, 312:10,
408:3, 408:11
**warrant**
182:20
**warrants**
182:6, 183:4,
183:6
**washtenaw**
364:2, 368:23,
369:23
**wasn't**
29:20, 103:16,
104:21, 202:17,
208:4, 208:7,
216:7, 231:18,
237:21, 249:15,
250:19, 351:22,
355:12, 362:10,
380:9, 389:5
**watching**
412:6
**way**
16:6, 20:8,
30:3, 33:11,
62:5, 72:20,

79:12, 82:11,
93:14, 96:2,
105:20, 106:4,
142:16, 161:7,
176:21, 191:1,
277:14, 301:16,
330:1, 331:4,
332:1, 332:19,
336:23, 372:12,
403:2
**we'll**
56:1, 56:12,
56:18, 82:12,
105:7, 207:11,
320:8, 402:21,
416:23
**we're**
131:16, 235:10,
235:18, 373:2,
403:23, 404:3
**we've**
290:11
**weapon**
78:20, 79:19,
396:3
**wearing**
326:24, 327:1,
327:8, 357:9
**weeks**
340:17
**welcome**
214:5
**well**
11:2, 32:10,
45:8, 53:16,
55:24, 56:3,
93:13, 93:19,
101:4, 117:14,
131:16, 147:5,
157:8, 170:23,
195:12, 195:16,
198:1, 212:3,
212:12, 224:8,
228:2, 249:5,
253:22, 271:2,
273:9, 282:19,
306:12, 331:17,
338:13, 360:8,

372:18, 372:19,
392:13, 393:24,
396:24, 398:3,
402:21, 403:8,
403:17, 404:3
**wendt**
4:4, 8:9
**went**
37:16, 89:8,
101:24, 124:9,
125:2, 173:20,
174:1, 219:4,
219:12, 220:1,
220:22, 227:4,
227:6, 232:24,
237:14, 247:14,
340:22, 360:9,
393:2
**weren't**
53:1, 55:12,
66:20, 334:14,
337:6, 386:18
**west**
4:14, 110:16,
135:3, 226:21,
233:2, 355:2,
359:24, 363:17,
405:12
**what**
9:18, 25:10,
26:18, 27:21,
31:2, 31:13,
49:24, 50:9,
50:17, 55:18,
56:6, 56:10,
58:1, 71:22,
90:4, 102:16,
108:11, 112:3,
112:9, 117:2,
124:11, 128:17,
160:17, 185:21,
192:21, 196:1,
196:3, 200:14,
201:20, 213:18,
214:3, 214:9,
216:16, 217:1,
233:17, 233:18,
235:7, 235:13,

235:21, 235:22, 237:5, 240:14, 264:12, 270:20, 272:12, 272:23, 275:5, 275:12, 276:6, 300:3, 300:4, 306:3, 324:7, 338:24, 348:12, 350:15, 351:5, 352:21, 354:8, 354:18, 357:18, 357:22, 359:23, 372:9, 379:17, 396:9

**what's**
56:16, 56:21, 58:6, 184:6, 206:5, 235:6, 246:6, 246:7, 272:20, 299:19, 370:19

**whatever**
153:13, 360:24, 382:6, 418:7

**whatsoever**
31:8, 52:15, 60:4, 63:2, 111:5, 111:12, 187:15, 301:9, 302:16, 410:16

**when**
9:8, 9:11, 11:17, 18:22, 37:15, 41:23, 50:19, 71:12, 75:14, 77:6, 77:18, 80:24, 81:1, 83:8, 87:6, 88:11, 88:15, 95:21, 110:13, 112:24, 113:1, 116:9, 116:19, 117:1, 121:16, 121:23, 122:14, 129:9, 129:11, 130:2, 132:6, 135:17, 140:17, 155:7,

155:15, 155:21, 156:12, 156:21, 168:4, 168:11, 169:18, 180:8, 194:7, 209:16, 214:1, 215:16, 220:4, 242:8, 244:2, 250:6, 268:2, 274:4, 278:10, 292:8, 298:12, 300:9, 300:17, 300:24, 307:10, 313:8, 315:19, 319:6, 328:22, 330:14, 330:18, 333:11, 343:7, 346:7, 352:4, 353:19, 357:10, 357:16, 360:1, 364:12, 371:24, 379:4, 379:19, 386:6, 394:3, 398:18, 403:8, 405:14, 415:17

**whenever**
174:18, 351:9

**where**
28:7, 28:21, 32:14, 35:1, 38:23, 64:3, 65:20, 85:10, 95:10, 107:3, 114:15, 130:4, 145:6, 171:24, 192:9, 195:12, 237:4, 238:10, 238:14, 297:13, 326:23, 331:17, 332:9, 344:7, 354:2, 372:2

**whereas**
376:9

**whereby**
254:17, 255:4, 255:15, 255:24, 256:9, 256:18, 257:7, 257:18,

258:7, 258:18, 259:5

**whether**
107:22, 191:2, 215:19, 216:14, 276:15, 276:23, 278:12, 297:12, 352:17, 352:23, 355:6, 365:18

**which**
26:16, 30:9, 60:13, 83:10, 90:16, 92:10, 96:3, 102:24, 110:9, 110:14, 112:11, 112:16, 125:22, 126:4, 162:15, 167:8, 172:15, 187:24, 191:5, 196:5, 202:6, 204:20, 206:24, 230:16, 246:8, 246:17, 250:19, 251:14, 254:11, 262:11, 263:11, 304:1, 324:11, 327:7, 345:5, 358:14, 367:4, 369:16, 371:14, 376:5, 395:24, 400:5, 405:22, 408:3, 408:22, 414:21

**while**
37:10, 38:16, 46:16, 68:15, 71:18, 72:18, 80:11, 81:3, 82:22, 84:3, 89:15, 95:5, 97:2, 98:14, 99:1, 142:10, 143:4, 155:17, 155:23, 156:6, 156:22, 157:7, 158:13, 159:17, 210:10, 246:18, 249:6, 287:9,

290:21, 303:20, 333:10, 383:23, 394:5, 409:22

**white**
373:6, 373:13, 374:10, 374:20, 376:8

**who**
25:3, 25:4, 34:9, 34:18, 35:11, 50:11, 53:9, 55:11, 90:3, 91:22, 92:3, 101:24, 104:3, 104:13, 115:6, 115:13, 134:5, 134:19, 147:11, 147:12, 151:24, 160:17, 165:8, 178:18, 179:20, 205:12, 207:21, 208:8, 208:17, 211:11, 215:17, 223:6, 234:13, 239:16, 242:11, 243:14, 243:22, 279:12, 280:15, 284:10, 286:4, 286:14, 293:17, 293:23, 298:16, 300:21, 304:6, 307:19, 310:1, 313:9, 317:4, 324:14, 333:13, 336:14, 336:22, 340:8, 340:9, 340:21, 340:22, 341:9, 341:18, 341:23, 342:8, 343:9, 343:16, 344:1, 346:24, 347:1, 347:9, 347:17, 349:16, 351:14, 352:22, 355:7, 364:19, 366:10, 369:22, 375:19, 375:24, 376:24,

Transcript of Ernest Halvorsen
Conducted on April 20, 2018

165

377:17, 377:19, 378:15, 379:20, 385:10, 393:2, 402:24, 406:1, 407:18, 410:10, 411:19, 412:4, 412:11

**whole**
94:13, 109:11, 281:18, 419:14

**whom**
262:20, 295:20, 296:2

**whose**
59:5, 346:4, 387:8, 393:2

**why**
40:4, 48:14, 49:7, 55:21, 119:18, 171:2, 174:21, 234:24, 235:14, 235:16, 235:18, 235:23, 235:24, 236:3, 261:6, 268:9, 277:14, 281:21, 298:22, 348:5, 380:2, 403:14

**wife**
24:18, 86:6, 132:6, 221:24

**wild**
85:8

**wilda**
24:18, 25:2, 26:4, 26:11, 27:12, 28:4, 28:13, 29:8, 30:18, 62:7, 63:11, 84:19, 84:24, 105:12, 106:15, 107:2, 107:6, 107:14, 107:20, 109:16, 109:23, 110:15, 129:18, 129:22, 130:14, 175:10, 175:22, 176:8,

176:18, 177:9, 177:14, 177:19, 178:5, 178:24, 179:10, 179:14, 179:19, 179:24, 180:5, 180:13, 180:20, 181:2, 181:8, 181:15, 221:24, 224:22, 227:5, 227:6, 228:5, 228:23, 229:5, 241:15, 242:8, 243:8, 243:12

**wiley**
53:18, 53:24, 381:3, 381:14, 381:22, 382:18, 384:1, 384:7, 384:20, 385:23, 386:14, 388:13, 390:11, 391:7, 391:15, 391:22, 395:2, 395:16, 397:12, 399:5, 399:14, 399:24, 400:7, 400:20, 401:12

**will**
7:12, 7:17, 10:9, 37:20, 56:4, 113:6, 117:4, 183:23, 196:5, 196:14, 196:21, 206:7, 214:15, 236:7, 270:14, 271:7, 272:3, 274:4, 275:18, 283:24, 299:3, 306:15, 311:10, 317:1, 324:10, 330:2, 370:15, 402:8, 420:7

**william**
404:13, 410:17, 411:2, 411:21

**williams**
1:24, 2:12,

7:10, 419:4, 420:21

**willing**
40:3, 263:12

**window**
202:9

**wish**
270:12, 271:3

**withdrawal**
37:10, 37:16, 38:5, 38:10

**withheld**
291:8, 310:16, 329:10

**withhold**
329:13

**within**
254:9, 365:7, 403:3, 420:3, 420:11

**without**
136:9, 183:6, 214:3, 301:22, 319:22

**witnessed**
75:13, 75:22, 76:4, 77:10, 143:10, 162:17, 168:19, 173:13, 354:24, 364:19, 365:9

**witnessernest**
6:2

**witnesses**
34:19, 35:1, 38:16, 39:1, 45:1, 64:5, 88:2, 201:14, 202:23, 204:22, 205:11, 205:12, 257:23, 291:15, 297:7, 324:16, 325:15, 325:20, 325:22, 326:10, 327:9, 329:5, 329:14, 405:24, 407:15, 414:3

**woman**
24:18, 25:3,

165:23, 354:23, 366:4

**women**
366:10

**won**
357:18, 357:22

**word**
72:21, 73:5

**words**
40:20, 80:15

**work**
29:20, 37:20, 101:2, 131:9, 145:16, 148:20, 195:15, 201:24, 220:23, 349:17, 398:5

**worked**
114:16, 329:19

**world**
214:9

**would've**
124:10

**wouldn't**
45:1, 151:5, 196:9, 403:3

**wrapped**
365:11, 367:18

**write**
116:3, 162:23

**writer**
115:21

**writing**
97:6, 115:13, 398:5

**written**
396:18

**wrong**
124:10, 125:3, 363:22, 370:16, 372:13, 372:17

**wrongful**
15:17, 23:12, 204:12, 239:8, 244:19, 245:16, 245:24, 280:8, 377:12, 383:3, 389:19

**wrongfully**
190:12, 235:9,
337:23, 416:4
**wrongly**
305:18
**wrote**
56:8, 56:10,
121:2, 129:9,
170:10, 170:12,
252:9, 288:13,
288:18, 288:23,
346:22

**Y**

**y-b-a-r-r-a**
298:14
**ybarra**
298:13, 298:21,
299:20, 299:24,
300:10, 300:14,
301:5, 301:12,
303:1, 303:13,
304:1, 304:6,
304:11, 305:4
**yeah**
56:1, 82:14,
125:15, 131:21,
174:20, 174:24,
194:9, 253:20,
281:20, 337:10
**year**
245:24
**year-old**
348:20
**years**
9:17, 235:8,
249:17, 250:9,
250:10, 252:19,
253:15, 254:11,
275:6, 349:16,
353:19
**yelling**
124:13
**yes**
9:1, 10:3,
42:10, 112:7,
113:15, 125:16,
174:17, 180:22,

214:8, 234:21,
270:17, 299:1,
299:8, 305:17,
318:12, 318:14,
330:11, 337:23,
380:17
**yesenia**
364:18, 365:8,
365:17, 366:2,
367:14, 368:20,
369:17, 369:21,
371:7
**yet**
100:6, 173:11,
344:21, 402:8
**york**
3:7
**you'd**
350:13
**you'll**
197:15, 371:5
**you're**
71:21, 117:2,
174:12, 214:5,
227:21, 235:12,
279:3, 282:18,
284:23, 301:22,
346:18, 351:10
**you've**
58:19, 213:21,
214:18, 262:20,
402:10
**young**
364:17, 366:2,
366:4, 366:9,
366:10, 368:6,
405:16, 412:4
**yours**
34:17, 210:13
**yourself**
25:19, 32:11,
42:15, 45:10,
53:8, 54:10,
75:4, 76:23,
81:13, 93:2,
101:14, 102:23,
104:11, 115:12,
123:11, 126:13,

127:5, 127:16,
129:1, 141:10,
152:15, 161:24,
163:4, 166:24,
174:1, 184:9,
184:18, 190:1,
201:11, 207:22,
225:7, 261:8,
264:2, 268:4,
268:11, 269:1,
269:17, 270:2,
270:5, 272:14,
273:10, 273:15,
352:10, 366:18,
367:22, 384:14,
391:2, 396:8,
416:12
**youth**
319:23

**Z**

**zip**
235:13, 235:16,
235:19, 235:22

**$**

**$20,000**
334:2, 360:19,
360:23
**$200**
98:17
**$300**
98:17

**0**

**00**
86:12, 121:6
**000222**
56:19
**000226**
58:4
**004443**
420:23
**01**
6:16
**018247**
192:19, 192:22,
193:4, 193:13,

194:2, 194:15,
195:2
**04985**
206:8
**05**
175:2
**05100**
206:9
**07**
6:16
**08**
282:2
**084**
420:23

**1**

**1**
175:2, 175:5
**1,132**
251:23, 252:7
**1,476**
252:10
**10**
1:19, 7:9,
170:4, 373:7,
373:14
**100**
4:7
**1000**
3:6, 5:8
**101**
387:21
**11**
82:16, 82:19,
150:14, 152:9,
161:17, 174:5,
176:21, 177:10,
177:16, 177:22,
178:20, 179:4,
180:21, 180:22,
230:15, 233:6,
241:14, 303:24,
357:2, 392:23,
396:3
**11238**
3:7
**12**
392:23

Transcript of Ernest Halvorsen
Conducted on April 20, 2018                                    167

**1215**
364:2, 368:23, 369:23
**13**
207:16, 318:18, 318:23, 388:17, 388:20, 389:5, 389:24
**1320**
392:16
**1390**
398:20
**14**
1:19, 7:9, 32:18, 33:13, 35:10, 36:1, 37:8, 39:10, 164:22, 172:15, 251:20, 280:14, 324:15, 324:21, 325:11, 326:1, 326:11, 326:17, 350:17
**148**
112:5, 112:14
**15**
398:18, 399:5
**150**
3:20
**15871**
196:18
**16**
9:13, 348:20, 353:19
**164**
6:14
**17**
1:6, 1:12, 7:4, 7:6, 356:10
**18**
1:18, 7:8, 373:7, 373:14, 418:6, 419:7
**182444**
1:22
**1838**
198:5, 199:1, 199:8, 201:6,

201:22, 203:7, 203:14, 203:23, 237:8
**1850**
3:8
**19**
59:18, 175:5
**195**
6:16
**1972**
9:10
**1980**
330:23, 333:4, 334:7, 336:16, 353:12
**1984**
135:12, 226:22
**1985**
337:5, 339:21, 340:3, 340:24, 341:22, 342:9, 343:2, 343:17, 344:16, 350:17, 351:16, 355:1
**1988**
330:23
**1989**
311:9, 311:22, 312:5, 312:10, 312:12, 313:1, 341:14, 349:14
**199**
141:19
**1990**
353:12, 358:8, 381:4, 381:15, 381:23, 382:19, 383:10, 383:15, 383:22, 384:4, 384:10, 386:6, 386:21, 387:12, 387:23, 388:4, 391:21, 391:24, 392:24, 393:5, 395:21, 396:4, 398:18, 398:21, 399:6, 399:16, 399:23, 400:5,

400:11
**1991**
356:10, 357:2
**1992**
306:20, 307:17, 308:11, 309:2, 309:21, 318:19, 318:24, 319:7
**1994**
405:7, 405:14, 407:2, 412:22, 413:10, 414:23
**1995**
220:5, 282:10, 283:6, 284:6, 286:10, 287:24, 298:8, 298:14, 300:10, 300:19, 301:1, 302:7, 302:14, 302:22, 303:24, 304:7, 304:11
**1996**
251:4, 251:23, 254:6
**1997**
317:15
**1998**
364:7, 370:6, 371:9, 371:10, 375:13
**1st**
197:10, 202:13, 296:14, 399:23, 400:5, 405:7, 405:14, 407:1, 412:22, 413:10, 414:23

---
**2**
---
**2**
281:23
**20**
1:18, 7:8, 56:24, 254:11, 384:9, 386:21, 391:23, 406:19, 418:6, 419:7

**200**
98:17, 105:8
**2004**
246:10, 247:6
**2010**
9:13
**2013**
279:12
**2018**
1:18, 7:8, 418:6, 418:21, 419:7, 420:16
**206**
4:6, 6:18
**20692**
113:22
**207**
419:24
**20861**
114:3
**21**
291:23
**22**
82:16, 292:24, 293:7, 293:18, 373:7, 373:14, 387:12, 387:23, 388:4
**2200**
5:6
**23**
9:10, 235:8, 245:24, 251:4, 251:22, 254:6, 282:10, 293:1, 293:12, 293:24, 297:19, 297:22, 391:20, 395:21
**24**
27:5, 27:14, 27:22, 58:9, 59:3, 131:4, 141:22, 143:6, 143:13, 144:4, 145:14, 158:12, 283:5, 294:16, 294:23, 295:5, 295:10, 295:15,

295:21, 296:3,
354:1, 364:7,
381:3, 381:14,
381:22, 382:19,
392:24, 396:4,
396:16, 399:16,
400:11
**243**
2:8, 3:15
**246**
6:20
**25**
296:13, 371:9,
384:10, 386:6,
393:5
**26**
219:12, 246:10,
247:6, 341:13,
341:22, 343:2,
387:20
**2647**
363:17
**27**
340:23, 370:6,
371:9
**28**
188:23, 189:12,
189:24, 190:23,
191:20, 192:7,
375:13, 391:21
**282**
6:5
**2869**
1:12, 7:6
**2nd**
64:13, 65:2,
68:17, 74:3,
82:22, 84:24,
85:6, 95:21,
98:2, 100:23,
103:15, 105:8,
105:9, 107:1,
118:3, 118:9,
118:20, 119:2,
122:8, 128:2,
128:17, 130:15,
133:4, 141:3,
189:15, 191:5,

191:18, 192:9,
207:14, 210:23,
220:5, 220:12,
221:15, 298:14,
300:10

---
**3**
---
**3**
282:2, 297:19,
297:22
**30**
10:10, 121:6,
198:6, 199:1,
201:22, 202:1,
284:6, 286:9,
287:24, 392:23,
396:3, 417:2,
417:4, 420:3
**300**
253:3
**311**
2:5, 3:13, 7:6
**312**
2:8, 3:15, 4:9,
4:16, 4:24, 5:8
**321**
5:6
**330**
6:6
**3300**
3:22
**336**
196:17
**337**
6:22
**35**
161:17
**36**
82:19
**370**
6:24
**38**
9:17
**3900**
110:16, 135:3,
226:21, 227:16,
228:4
**3920**
405:12

**3939**
4:16
**3rd**
2:6, 3:13,
184:9, 192:5,
383:10, 383:15,
383:22, 384:4,
387:16, 398:20,
398:21

---
**4**
---
**4**
380:19, 380:22
**404**
403:22
**415**
418:7
**420**
1:23
**4218**
355:2
**422**
3:6
**4366**
4:24
**45**
380:19
**4560**
1:6, 7:4
**4588**
339:10
**46**
349:16
**494**
5:8
**4th**
130:4, 132:5,
133:10, 168:21,
180:9, 229:17,
230:7, 349:14

---
**5**
---
**5**
34:10, 35:12,
86:12, 198:6,
199:1, 201:22,
202:1, 373:7,
373:14, 417:2,

417:4
**5'7**
373:7, 373:14
**500**
4:22
**5100**
206:9
**53**
183:24, 184:1,
184:3, 184:7,
184:13, 380:22
**54**
183:23, 184:2,
185:8
**55**
183:23, 184:1
**550**
3:20
**5555**
233:2
**56**
6:10
**57**
281:23
**58**
6:12
**59**
184:7
**5900**
2:8, 3:15
**5th**
23:18, 24:3,
60:13, 61:10,
83:22, 86:18,
91:1, 121:4,
121:20, 136:2,
166:6, 198:6,
199:2, 199:8,
199:20, 201:6,
203:8, 203:15,
203:24, 223:17,
246:21

---
**6**
---
**60143**
3:21
**603**
4:24

Transcript of Ernest Halvorsen
Conducted on April 20, 2018

169

**6036**
339:4
**60601**
4:15
**60602**
4:23
**60607**
2:7, 3:14
**60654**
5:7
**60661**
4:8
**630**
3:22
**655**
4:9
**68**
164:19, 164:20,
165:4, 172:16
**6th**
118:15, 118:19,
123:21, 135:4,
226:20

**7**

**718**
3:8
**72**
164:19, 164:20,
172:16
**735**
3:22
**736499**
57:3, 57:11,
57:22
**7660**
4:9
**77**
4:14
**782**
4:16
**7th**
290:6, 290:17

**8**

**8**
121:6
**80**
207:11, 331:5,

331:13
**81**
161:14, 161:15,
162:6
**83**
216:23
**85**
161:15, 162:6
**874175**
58:12, 59:7
**875**
3:8
**8th**
138:10, 138:17,
140:18, 141:1,
141:8, 141:18,
141:21, 142:17,
147:7, 147:15,
149:19, 307:13,
308:11, 308:16,
309:2, 309:21,
339:21, 340:2,
342:9, 343:17,
344:16, 351:15,
355:1, 420:15

**9**

**9**
121:6, 391:21
**93**
6:16, 59:18,
196:18
**95**
241:13
**96**
112:16, 113:12,
113:13, 113:20,
117:8
**97**
120:23, 125:9,
125:14, 125:22,
125:24, 126:3,
126:11, 126:21,
128:16, 243:5
**98**
125:22, 127:23,
128:6, 128:16,
129:17

**99**
113:12, 117:8,
118:13
**9th**
147:23, 148:3,
149:3, 179:10,
179:16, 179:21,
180:2, 180:15,
181:3, 181:11,
181:17, 181:22,
243:1, 243:4,
300:19, 301:1,
302:7, 302:14

*DeLeon-Reyes v. Guevara, et al.*
Case No. 18 CV 01028

*Solache v. Guevara, et al.*
Case No. 18 CV 02312

# EXHIBIT 4



# Transcript of Ernest Halvorsen

**Date:** February 6, 2019
**Case:** Montanez & Serrano -v- Guevara, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
**www.planetdepos.com**

### Page 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

----------------------------x

JOSE MONTANEZ, :

      Plaintiff, :

  v. : Case No. 17 CV 4560

REYNALDO GUEVARA, et al., :

      Defendants. :

------------------------ :

ARMANDO SERRANO, :

      Plaintiff, :

  v. : Case No. 17 CV 2869

REYNALDO GUEVARA, et al., :

      Defendants. :

----------------------------x

Videotaped Deposition of ERNEST HALVORSEN

Chicago, Illinois

Wednesday, February 6, 2019

10:06 a.m.

Job No.: 225342

Pages: 1 - 370

Reported by: Joanne Ely, CSR, RPR

### Page 2

Videotaped deposition of ERNEST HALVORSEN, held at the location of:

LOEVY & LOEVY

311 North Aberdeen Street

3rd Floor

Chicago, Illinois 60607

(312) 243-5900

Pursuant to notice before Joanne Ely, a Certified Shorthand Reporter, Registered Professional Reporter, and a Notary Public in and for the State of Illinois.

### Page 3

A P P E A R A N C E S

ON BEHALF OF PLAINTIFF JOSE MONTANEZ:

    RUSSELL AINSWORTH, ESQUIRE

    LOEVY & LOEVY

    311 North Aberdeen Street

    3rd Floor

    Chicago, Illinois 60607

    312.243-5900

ON BEHALF OF PLAINTIFF ARMANDO SERRANO:

    JENNIFER BONJEAN, ESQUIRE

    ASHLEY COHEN, ESQUIRE

    BONJEAN LAW GROUP, PLLC

    1000 Dean Street

    Suite 345

    Brooklyn, New York 11238

    718.875-1850

ON BEHALF OF DEFENDANT REYNALDO GUEVARA:

    THOMAS MORE LEINENWEBER, ESQUIRE

    LEINENWEBER BARONI DAFFADA LLC

    120 North LaSalle Street

    Suite 2000

    Chicago, Illinois 60602

    312.663.3003

### Page 4

A P P E A R A N C E S  C O N T I N U E D

ON BEHALF OF DEFENDANT MATTHEW COGHLAN:

    PAULA S. QUIST, ESQUIRE

    JONES DAY

    77 West Wacker Drive

    Chicago, Illinois 60601

    312.782.3939

ON BEHALF OF DEFENDANTS ERNEST HALVORSEN AND EDWARD MINGEY:

    JOSH M. ENGQUIST, ESQUIRE

    DAVID A. BRUEGGEN, ESQUIRE

    THE SOTOS LAW FIRM, PC

    141 West Jackson Boulevard

    Suite 1240A

    Chicago, Illinois 60604

    312.735.3300

ON BEHALF OF DEFENDANT CITY OF CHICAGO:

    EILEEN E. ROSEN, ESQUIRE

    ROCK FUSCO & CONNELLY, LLC

    321 North Clark Street

    Suite 2200

    Chicago, Illinois 60654

    (312) 494-1000

## 5

A P P E A R A N C E S   C O N T I N U E D

ON BEHALF OF DEFENDANTS COOK COUNTY AND JOHN DILLON

JULIE NIKOLAEVSKAYA, ESQUIRE

OFFICE OF THE COOK COUNTY STATE'S ATTORNEY

500 Richard Daley Center

Chicago, Illinois 60602

(312) 603-3473

ALSO PRESENT:

ARMANDO SERRANO

JOSE MONTANEZ

RICK KOSBERG, Videographer

## 6

C O N T E N T S

EXAMINATION OF HALVORSEN                 PAGE

By Mr. Ainsworth                 8

By Ms. Rosen                 362

By Ms. Quist                 365

E X H I B I T S

(Attached to transcript.)

HALVORSEN DEPOSITION EXHIBITS          PAGE

Exhibit 1  Photograph                      121

Exhibit 2  Transcript of Trial Testimony  178

Exhibit 3  Bates Nos. RFC-Serr/Mont       185
           149-177

Exhibit 4  Sidley Austin Memorandum       190

Exhibit 5  Memorandum, 7/23/14            223

Exhibit 6  Bates Nos. RFC-Serr/Mont 1-148 225

Exhibit 7  Geraldo Iglesias Testimony,    290
           12/16/94

Exhibit 8  6/8/1993, Supplementary Report 316

Exhibit 9  Armando Serrano, Complaint For 362
           Preliminary Examination

Exhibit 10 Employee Training Record       362

## 7

P R O C E E D I N G S

THE VIDEOGRAPHER:  This is the video deposition of Ernest Halvorsen taken by Loevy & Loevy in the matter of Jose Montanez v. Reynaldo Guevara, et al., Case No. 17 CV 4560; and Armando Serrano versus Reynaldo Guevara, et al., Case No. 17 CV 2869 held at Loevy and Loevy, 311 North Aberdeen Street, Chicago, Illinois.

Today is February the 6th, 2019.  The time is 10:06.  The court reporter is Joanne Ely.  The videographer is Rick Kosberg.

Counsel will now introduce themselves.  Then the court reporter is free administer the oath.

MR. AINSWORTH:  This is Russell Ainsworth appearing on behalf of Plaintiff Jose Montanez.

MS. BONJEAN:  Jennifer Bonjean on behalf of Armando Serrano, also present.

MS. COHEN:  Ashley Cohen on behalf of Armando Serrano.

MR. LEINENWEBER:  Good morning.  Tom Leinenweber on behalf of Reynaldo Guevara.

MS. QUIST:  Paula Quist on behalf of Defendant Matt Coghlan.

MS. NIKOLAEVSKAYA:  Julie Nikolaevskaya on

## 8

behalf of John Dillon and Cook County.

MS. ROSEN:  Eileen Rosen on behalf of Defendant City of Chicago.

MR. ENGQUIST:  Josh Engquist on behalf of Defendants Halvorsen and Mingey.

MR. BRUEGGEN:  Dave Brueggen on behalf of Defendants Halvorsen and Mingey.

THE REPORTER:  Would you please raise your right hand.

(Witness duly sworn.)

ERNEST HALVORSEN,

having been duly sworn, testified as follows:

EXAMINATION BY COUNSEL FOR PLAINTIFF MONTANEZ

BY MR. AINSWORTH:

Q  Would you please state and spell your name for the record.

A  **Ernest Halvorsen.**

MR. ENGQUIST:  Can we just make sure that we have everyone else that's here on the record, that they're here.

MS. BONJEAN:  I said also present.

MR. ENGQUIST:  I'm sorry.  I didn't hear.

MS. ROSEN:  Can we take it down a notch. Sorry.

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

3 (9 to 12)

9

A H -- E-r-n-e-s-t H-a-l-v-o-r-s-e-n.

BY MR. AINSWORTH:

Q And your first name doesn't start with an H; correct?

A No, E.

Q Okay. Have you given a deposition before?

A Yes.

Q On how many occasions?

A Two.

Q And was one of those two in this case previously?

A Yes.

Q And when was the other time that you gave a deposition?

A I believe it was April of last year.

Q And in what case was that?

A Say again, please.

Q What was the case that you gave a deposition in in April of last year?

A The same case we're here today for.

Q And so when you say you've given two depositions, are you including today as one of those two?

A No.

10

Q So one of the other two was in April of last year in this case.

When was the other time that you had been deposed in the past?

A Early in 2000 sometime.

Q And in what case was that?

A Angel Rodriguez.

Q Do you know who it was who deposed you?

A No.

Q And do you know why it was that you were being deposed?

A I was being sued.

Q So you were a defendant in that lawsuit?

A Yes.

Q Because it's been quite some time since you gave that deposition, I just want to go over some of the ground rules; is that okay?

A Go ahead.

Q The first thing I'm going to ask you to do is to give your answers just as you've been doing thus far, that is out loud with a yes or no if the question calls for it. Okay?

A Yes.

Q The next thing I'll ask you to do is to wait

11

until I'm done asking my question before you begin your answer so that we're not speaking at the same time. Okay?

A Yes.

Q I'll try and do the same to you, and that is wait until you're done with your answer before I begin my next question. All right?

A Yes.

Q If you don't understand my question at any time or you don't hear my question at any time, would you please ask me to rephrase the question, re-ask the question, or in some way indicate to me that you did not either understand my question or hear my question. Okay?

A Yes.

Q The flip side of that is that if you answer my question, we'll assume that you've understood my question as I've posed it; fair?

A Yes.

Q If you need a break at any time, you can take a break. Just we -- you must answer any question that's pending before taking a break. Okay?

A Yes.

12

Q Do you have any medical issues or any medical condition or any medication that you're taking that would interfere with your ability to testify truthfully and accurately here today?

A No.

Q You were kind enough to alert me that you have some difficulty with your hearing; is that correct?

A Yes.

Q And so if at any time you can't -- you're having a problem hearing the questions that are being asked, you understood that -- you understand that you can simply ask me to re-ask the question or speak louder so that you can hear the question; right?

A Yes.

Q Do you have any difficulty with your memory?

A Not that I'm aware of.

Q All right. So nobody, no family member and no medical professional has mentioned to you that there is -- they perceive something wrong with your memory; is that right?

A No.

Q That's correct?

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

13

A No.
Q All right. I've got a double negative there.
It is correct that nobody has brought to your attention that there might be some problem with your memory; correct?
A That's correct.
Q You're retired; is that right?
A Yes.
Q Retired from the Chicago Police Department, I mean; correct?
A Yes.
Q You retired in 2010?
A Yes.
Q Have you had any employment since your retirement from the Chicago Police Department?
A Have I had any what?
Q Any employment.
A No.
Q Do you intend to seek employment?
A No.
Q Do you live in the State of Illinois?
A Yes.
Q Do you intend to move?

14

A No.
Q When was the last time you talked to Ray Guevara?
A Probably a year ago.
Q And in what context? Why was it that you were talking to Ray Guevara about a year ago?
A We were all sitting down in the cafeteria at 26th and California.
Q And why were you at the cafeteria at 26th and California?
A In response to a subpoena from Ms. Bonjean.
Q And for what case was that?
A I believe it was Mr. Maysonet.
Q And when you say we all were sitting down in the cafeteria, who was the "we" who was sitting together?
A Me, Guevara, Mingey, Dan Herbert, three other attorneys, I don't remember their names right now.
Q And was there -- did you see Ray Guevara at 26th and Cal on that day approximately a year ago when you were not seated and talking with your attorneys?
A No.

15

Q When you arrived at 26th and California that day, where did you go?
A The cafeteria.
Q And were you intending to meet people at the cafeteria?
A I was going to meet my attorney, Dan Herbert.
Q Did you arrive first, or did Guevara arrive first?
A I don't remember.
Q Did you go anywhere at 26th and Cal that day apart from the cafeteria?
A No.
Q So you left immediately from the cafeteria?
A I believe we left the cafeteria and went into the hallway outside of one of the courtrooms.
Q All right. Who is the "we" that went to the hallway outside of one of the courtrooms?
A Me and my attorney, Dan Herbert.
Q Did anyone else go to that hallway with you?
A Not with us but other people did go to that hallway.
Q Were there other detectives who went to that hallway?

16

A I believe I saw retired detectives there, yes.
Q Which retired detectives did you see there?
A Paul Nitsky and Montia.
Q Were Paul Nitsky or Montia in the cafeteria with you and your attorneys?
A They may have been, but I don't remember.
Q And while you were in that hallway outside the courtroom, did you have any discussions with anyone?
A No.
Q Why were you in the hallway outside the courtroom?
A The Judge ordered us to leave the courtroom.
Q Did you go in the courtroom?
A For a couple of minutes, then the Judge ordered us out.
Q And how long did you remain outside the courtroom?
A No more than 10 minutes.
Q Pause before you answer this question.
Did you have any -- what did you discuss while you were outside the courtroom?
MR. ENGQUIST: I'm going to object. If he's

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

17

talking about outside the -- conversations outside
conversations he had with his attorney, he can
answer the question. Otherwise, he shouldn't be
answering questions having to do with
attorney/client privilege.

Q Are you going to take your --

MR. AINSWORTH: Are you instructing the
witness not to answer?

MR. ENGQUIST: I'm instructing him not to
respond to anything having to do with conversations
with his attorney, Dan Herbert.

Q Are you going to take your attorney's advice
and not -- not testify about that conversation?

A With my attorney, that's correct.

Q Did you have any conversations with people
who were not your attorney while you were outside
the courtroom?

A Not that I remember.

Q Did you return to the courtroom after being
outside the courtroom for some period of time?

A No.

Q Why not?

A Dan Herbert told us to leave the building
and go home.

18

Q And did you walk out with anyone?

A My attorney.

Q Who else did you walk out with?

A Just my attorney.

Q Which attorney?

A Dan Herbert.

Q Did Ray Guevara walk with you out?

A No.

Q Why didn't -- did the other detectives leave
at the same time you did?

A Yes.

Q Was there a reason why you didn't walk out
with them?

A I remember we went down the stairs, and I
don't know where the other people went.

Q Did you walk down the stairs with them?

A Not with them. I walked down the stairs
with Dan Herbert.

Q Were the other detectives walking down the
stairs at the same time that you were?

A Not that I remember.

Q Where were you parked?

A Where was I parked?

Q Yeah.

19

A The parking garage across the street at 26th
Street.

Q Was Dan Herbert parked in that same garage?

A Yes.

Q Did you drive there with anyone?

A No.

Q Did you know that Ray Guevara was going to
be at court that day?

A No.

Q Do you know where Ray Guevara is living now?

A No.

Q Do you know that he's living out of state?

A No.

Q Do you know that he lives in Texas?

A No.

Q When did you start your employment with the
Chicago Police Department?

A As a police officer or as a police cadet?

Q Well, which did you do first, sir?

A I was a police cadet.

Q All right. When were you a police cadet?

A I think I began in 1969.

Q What is a police cadet?

A Someone who has graduated from high school,

20

who attends college, and works for the police
department in a civilian capacity.

Q Did you graduate high school?

A Yes.

Q Where did you graduate high school?

A Lane Tech.

Q When did you graduate high school?

A 1968.

Q Do you have any family members in the police
department?

A No.

Q Why did you want to become a police cadet?

A Because it allowed me to go to college.

Q Did they -- did the department pay you for
being a cadet?

A Yes, they did.

Q And was it a salary or was it tuition
credits or a combination?

A It was a salary.

Q What did you do for the department as a
police cadet?

A I had various jobs.

Q What were your various jobs?

A Timekeeper, tour guide, community relations

officer.  Those are the three I remember.

Q  Who were you a tour guide for?

A  Say that again, please.

Q  Who were you a tour guide for?  Who did you give tours to?

A  I gave tours mainly to school groups at police headquarters.

Q  For how long were you a civilian cadet?

A  A little less than four years.

Q  Did you attend college?

A  Yes.

Q  What college did you attend?

A  City College of Chicago.

Q  Did you receive a degree or certificate from the City College of Chicago?

A  No.

Q  How long did you attend the City College of Chicago?

A  A little less than four years.

Q  Did you attend any other post high school educational institution?

A  No.

Q  Did you ever receive either an associate's degree or a bachelor's degree?

A  No.

Q  Why did you stop attending City Colleges?

A  They eliminated the cadet program.

Q  So why did that cause you to not attend college anymore?

A  Because I had to go find another job that did not allow me to go to school.

Q  What job did you find?

A  I think after that I became a photographer for a few months.

Q  Did you have any training to become a photographer?

A  I worked in a camera store for a number of years.

Q  Was that while you were also a police cadet or --

A  No.

Q  -- when was that?

A  It was when I was in high school.

Q  Why did you stop being a photographer?

A  Because I became a police -- why did I stop becoming a photographer?

Q  Yeah.

A  I was hired by the police department as a

police officer.

Q  When was that?

A  23 October 1972.

Q  Did you attend the academy?

A  Yes.

Q  And what was your first assignment after the academy?

A  I was assigned to the patrol division, the 17th police district.

Q  Where was the 17th district headquarters at that time?

A  4461 North Pulaski.

Q  And for how long did you remain in patrol at the 17th district?

A  I was working a beat for approximately three years, and then I went on the district tact team.

Q  Staying within the 17th district?

A  Yes.

Q  How did you become a member of the tact team?

A  I was invited.

Q  Who invited you?

A  Lieutenant Harry Smith.

Q  Did you want to be a member of the tact team?

A  Yes.

Q  Why did you want to become a member of the tact team?

A  Because they were harder-working police officers in my opinion.

Q  The beat officers hard-working police officers?

A  Yes.

Q  Why -- what -- what made you want to become a tact officer, if both the tact officers and the beat officers were hard-working police officers?

A  The tact officers were harder-working police officers.

Q  All right.  So you thought the tact officers worked harder than the beat officers.

A  Yes.

Q  Why did you believe that the tact officers worked harder than the beat officers?

A  They made more arrests.

Q  And you wanted to make more arrests; is that right?

A  I wanted to do more police work.

Q  Why did you want to do more police work?

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

7 (25 to 28)

25

A That was the job I was hired to do.

Q Did you think that if you did more police work, you would have a better shot at advancement?

A No.

Q Did you want to get a promotion?

A Yes.

Q What did you think was a path to getting a promotion?

A Passing an exam.

Q All right. And did you sit for an exam to receive a promotion?

A I took an exam, yes.

Q What exam did you take?

A The sergeants promotional exam.

Q When did you take the sergeants promotional exam?

A That I don't remember.

Q Was there a list created based on the results of that exam that you took?

A Yes.

Q Were you on that list?

A I never saw it.

Q And I take it you were not promoted from that list?

26

A That's correct.

Q There is another path to be promoted to sergeant; isn't that right?

A In the Chicago Police Department?

Q Yes, sir.

A Not at that time there wasn't.

Q Not when you were at the 17th district?

A That's correct.

Q How long did you -- so did you want to make more arrests while you were on the -- while you were in the 17th district beat patrol?

A Could you repeat that question?

Q Yeah. Sorry.

When you were assigned to be a beat officer in the 17th district, did you want to make more arrests?

MR. ENGQUIST: Objection; form, vague.

A I wanted to do more meaningful police work.

Q And what was meaningful police work to you?

A To investigate and arrest dangerous individuals.

Q So one of the things you wanted to do was to make more arrests; right?

A Of dangerous individuals.

27

Q Yeah. And for how long did you serve on the tact team?

A Approximately, seven years.

Q Did you serve for seven years continuously with the tact team in the 17th district?

A What was your question again?

Q Did you serve continuously for about seven years in the 17th district on the tact team?

A Not continuously.

Q Can you explain why it wasn't continuously?

A I was taken off for a couple months and then put back on.

Q Why were you taken off for a couple months?

A I have no idea.

Q Who was it who reassigned you?

A Commander Richard Rouchford.

Q Did you seek an explanation for why you were being moved from the tact team or off the tact team?

A I never got one.

Q Did you seek an explanation?

A Yes.

Q Who did you ask?

A Commander Rouchford.

Q And what did Commander Rouchford say?

28

A His discretion.

Q When you left the tact team, did you go to -- back to the beat patrol?

A Yes.

Q And how did you get back on the tact team?

A He put me back on.

Q Who is he?

A Commander Rouchford.

Q Did you ask commander -- that commander why you were being placed back on the tact team?

A No.

Q Why did you leave the tact team after approximately seven years?

A I was transferred to the 24th police district.

Q Why were you transferred?

A It was a brand new police district, and they needed manpower to fill the station.

Q Did you volunteer to be a member of the 24th district?

A No.

Q And do you know why it was that you were selected as opposed to other officers to form the 24th district?

A No.

Q Where was the 24th district at the time?

A I believe it was 6401 North Clark Street. That address could be wrong, though.

Q Somewhere up in Roger's Park?

A It was on Clark Street north of Devon.

Q And for how long did you remain in the 24th district?

A A little less than three years.

Q What did you do -- or what was your work assignment at the -- in the 24th district?

A I was on the tact team.

Q Did you serve in patrol at all in the 24th district?

A Approximately a week I was in a beat car.

Q And what were your duties on the tact team in the 24th district?

A District law enforcement.

Q Did you respond to radio calls?

A Yes.

Q Were you asked to focus your attention on the gang activity in the 24th district?

A We did focus our attention on the gang activity in the 24th police district, but at that time there wasn't really a large gang problem.

Q What about in the 17th district? Were you asked to focus your attention on the gang activity in the 17th district when you were a member of the tact team?

A Same thing. We were asked to focus on gang activity, but there wasn't a lot of gang activity in the 17th district.

Q Why did you leave the 24th district?

A I was promoted to detective.

Q How did you go about becoming promoted to detective?

A I took a competitive examination and scored high.

Q Was there a list created based on the results of the exam that you took?

A Yes.

Q Were you on that list?

A Yes.

Q Were you promoted from that list?

A Yes.

Q How many times did you take that test to become a detective?

A Once.

Q Why did you want to become a detective?

A I thought that was the premiere spot of being a police officer.

Q Why did you think it was the premiere spot of being a police officer?

A I thought detectives were the cream of the crop of policemen.

Q Why did you think that -- why did you think that detectives were the cream of the crop of the policemen?

A That was my opinion.

Q What was your opinion based on?

A Watching detectives in action.

Q Did you work with detectives?

A Yes.

Q What was it about detectives that you admired?

A Their knowledge, their skill, their dedication.

Q Did you have knowledge and skill and dedication as a tact officer in the 24th district?

A To my level, yes.

Q What were the skills that you wanted to become better at while you were a tact officer in the 24th district?

A I imagine it would have been interviews, just basically following -- as a patrol officer, as a tact officer, you don't follow up on investigations. You do the initial investigation, and then you're out of the case.

As a detective you get to see the end of the case, and that's what I wanted to see. I wanted to see how the cases progressed, how they ended.

Q You wanted to see how to follow up on the leads; right?

A Part of it, yes.

Q How to try and solve the case over time; right?

A Correct.

Q Did you go to detective school?

A Yes.

Q When did you go to detective school?

A I believe it was in 1972, but I could be wrong.

Q You mean '82?

A '82 but I could be wrong.

Q How long was that detective school?

A If I remember correctly, it was three weeks.

33

Q  Were you trained in detective school on the importance of report writing?

A  Yes.

Q  Were you -- were you told the old saying that if it's not written down, it didn't happen?

A  Never heard that.

MS. ROSEN:  Object to the form.

Q  You never heard that phrase?

A  No.

THE REPORTER:  Sorry?

MS. ROSEN:  Object to the form.

Q  Were you trained in detective school to document the progress of your investigation?

A  Yes.

Q  Were you trained that you were supposed to document the facts of your investigation whether they were good for the prosecution or good for the defense?

A  Yes.

Q  Were you trained that you had an obligation to document the facts that might be good for the criminal defendant in the case?

A  Yes.

Q  Were you trained that sometimes you didn't

34

know what facts -- or the importance of certain facts until later in an investigation?

MS. ROSEN:  Object to the form.

MR. ENGQUIST:  Join.

A  I don't remember that specifically.

BY MR. AINSWORTH:

Q  Did you learn that in your experience as a detective, that sometimes a witness would tell you something and it didn't become really important until later in your investigation?

A  That's correct.

Q  And so you knew that because facts might become important later in your investigations, you knew that it was important to document the facts that you learned as you learned them; correct?

A  It would have to pertain to what facts are we talking about.

Q  Facts of the criminal investigation that you're working on.

A  Well, again, it would have to be what facts that would have to be documented.

Q  Let's ask that to you, sir.

What facts would you document in an investigation?

35

MS. ROSEN:  Object to the form.

MR. ENGQUIST:  Join.

A  Interviews, evidence, statements -- that's all I can recall right now.

BY MR. AINSWORTH:

Q  So let me start with an easy one.

If a witness told you that another person had confessed murder to him, is that the kind of thing that you would write down?

A  Yes.

Q  And why would you write that down?

A  I would cause that statement to be typed up in a report.  I would not necessarily write that down.

Q  Why wouldn't you write down the fact that a person had told you that another person had confessed murder to him?

A  As I have just stated, I typed many things that persons told me rather than taking longhand written notes.

Q  I see.

You mean you would type it in a supp report?

A  Correct.

Q  Okay.  So -- so in some fashion, either in

36

handwritten notes or in a supplemental police report, you would document the fact that a witness had told you that another person had confessed murder; correct?

A  Yes.

Q  And why would you document in a supplemental report that another -- that a witness had told you that another person had confessed murder to him?

A  It was a third-party admission that could be used for evidence.

Q  And evidence in an important case; right?

A  Evidence in a case --

MR. ENGQUIST:  Objection; calls for speculation.

Go ahead.

A  Evidence in that particular case that I would be involved in.

Q  And all cases are important; right?

A  All cases deserve to be investigated.

Q  But homicide cases are some of the most important cases that the Chicago Police Department handles.

Would you agree with that?

A  In my opinion, I'd have to say yes.

**37**

Q And so if a -- if a witness is telling you that another person had confessed murder to him, that's the kind of thing that should absolutely be written down, right, in a supplemental report?

A That is the type of statement that would have to be memorialized, yes.

Q In a supp report?

A Yes.

Q Were you trained in detective school on how to conduct interviews?

A Not that I remember.

Q Did you learn how to conduct interviews while you were a detective?

A Yes.

Q Did you learn that it was important to ask open-ended questions to witnesses to try and learn what they knew?

A I don't remember that.

Q Do you know what I mean by open-ended questions?

A No.

Q I mean a question that doesn't suggest the answer, something that allows the witness to explain to you what they know. As opposed to a closed-ended

**38**

question which is typically asking a witness such as what color was the -- was the color of the car red?

MS. ROSEN: Object to the form.

A Could you rephrase that question.

BY MR. AINSWORTH:

Q Sure.

A It's kind of confusing.

Q Yeah. Let me ask it this way. When you interviewed witnesses, you wanted to make sure that the information that you're obtaining from the witness was truly the witness's knowledge as opposed to something that you had suggested to the witness; is that right?

A Correct.

Q And so when you were interviewing a witness, you would be careful not to share nonpublic information with that witness when you're conducting the interview; is that right?

A Sometimes we'd have to give the person we're interviewing some basic information such as the location of where a crime occurred, the date and time the -- time the crime occurred. But no, we would not give a witness the details.

Q So you wouldn't, for example, reveal to the

**39**

witness the caliber of the gun that was used in a crime, but rather try and find out if the witness might know the caliber of the gun.

Is that the kind of thing that you would do?

A That's correct.

Q Because it was important for the integrity of your investigation to be able to determine whether witnesses were providing the facts as opposed to parroting information that you had provided to them; right?

A Yes.

Q And that's not something that you would do, that is to feed witnesses nonpublic information about the -- about the crime, and then attribute those facts to the witness; is that right?

A That's correct.

Q Were you trained to take notes in detective school?

A No.

Q Were you later trained to take notes?

A No.

Q Were you ever trained by the Chicago Police Department to take notes?

A When I was a cadet.

**40**

Q What were you trained while you were a cadet about how to -- about taking notes?

A I took an extension course called "Interviews and Interrogations."

Q Was that a course at the department or is it -- or did you have to go somewhere else for that training?

A It was an extension course. They sent me the material in the mail. I read books, answered question sheets, returned it to the training division.

Q Do you recall the name of the book?

A "Interviews and Interrogations."

Q By Reid and Inbau?

A I don't remember whose book it was.

Q And what were you trained in that extension course about note taking?

A I don't remember. This was from 45 years ago.

Q What were you trained in that extension course about conducting interviews?

A Again, this is so long ago, I don't remember.

Q Did you become a detective before GPRs were

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

used by the department?

A Yes.

Q When GPRs were introduced by the department, were you trained on how to use those GPRs?

A No.

Q They just gave you the GPRs?

A We were under order that you had to use them and what to do with them.

Q Would you take notes in your investigations?

A Sometimes, yes; sometimes, no.

Q What would determine whether you would take notes during your investigation?

A I would take notes of things that I couldn't remember such as a person's name, addresses, dates of birth, social security numbers, where they worked, what hours they worked.

I would generally not take notes on statements because I could remember a statement.

Q Why wouldn't you take notes on statements?

A Because I just said I could remember them.

Q How would you know that you would remember statements as well without the aid of your notes as you could with the aid of your notes?

A I just could.

Q Was there any other reason why you wouldn't take notes of statements that were being provided to you?

A No.

Q How is your handwriting?

MS. ROSEN: Objection to form.

MR. ENGQUIST: Go ahead.

A Average.

Q Legible?

MS. ROSEN: Object to form.

A To myself.

Q You didn't have a problem reading your writing?

A No.

Q Would you sometimes delay documenting statements because you didn't know if the statement was true or not?

MS. ROSEN: Object to the form.

A No.

Q And why not? Why wouldn't you --

A Why?

Q Yeah. Why would you not delay documenting a statement even though you didn't know if the statement was true or not?

MR. ENGQUIST: Objection.

MS. ROSEN: Object to the form.

MR. ENGQUIST: Join.

A If I believed the statement that was given to me was needed for a case, I would document it as soon as possible in a typed written report while it was fresh in my memory.

BY MR. AINSWORTH:

Q And would you -- you would document it so you didn't forget what the statement was; correct?

A Correct.

Q And then you would continue with your investigation to determine whether that documented statement was, in fact, true or whether portions of it were false; is that fair to say?

MS. ROSEN: Object to the form.

A That would be correct.

Q And is that what you understood you were supposed to do? If you received information, you would document it and then continue on with your -- let me just start over with that question so we've got it clean.

And would you document whatever statements you obtained in a written supp report and then continue in your investigation to determine whether the statement was true or false?

MR. ENGQUIST: Objection; calls for speculation. It's an incomplete hypothetical. Objection; form.

Go ahead. Go ahead.

A I did not use written supp reports.

Q I mean typed, sorry. Let me try that again.

Was it your understanding that what you were supposed to do was if you received a statement, and even if you weren't sure if the statement was true or false, you would document it in a typed supp report and then continue your investigation to determine whether that statement was, in fact, true or false?

MR. ENGQUIST: Objection; calls for speculation, incomplete hypothetical, and form.

Go ahead.

A That's correct.

Q Did you sometimes use polygraph tests?

A Yes.

Q As an investigative tool, I mean?

A Yes.

Q Why would you use a polygraph test?

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

A  To find out if some person was telling the truth or not.

Q  Did you find those tests to be helpful in your investigations?

A  Yes.

Q  If you had a suspect or a person of interest and you wanted them to sit for a polygraph exam, how would you go about doing that in 1993?

MR. ENGQUIST:  Objection; incomplete hypothetical, form.

Go ahead.

A  I would ask if they wanted to volunteer to take a polygraph examination.  If they did, I would call the polygraph section, arrange an appointment, and drive them down to the polygraph section.  They would meet with the polygraph examiner, and the test would be conducted.

Q  Well, would you sit in for any portion of the examination at the polygraph examiner's place?

A  No.  It was not permitted.

Q  Would you document the results of that polygraph examination?

A  Yes.

Q  How would you document the results of that polygraph examination?

A  In one of our supp reports.

Q  Why would you document the results of a polygraph examination in one of your supp reports?

A  To show the progress of the investigation.

Q  Would you also document the fact that you had requested a person to take a polygraph exam in your supp report?

A  Yes.

Q  And would you document the reason why you asked the person to sit for a polygraph exam?

A  I would inform the person of why I requested that they sit for a polygraph exam.  I don't think I would explain it in my report because the report would already indicate what investigation it was.

Q  What do you mean your report would already indicate what investigation it was?

A  Well, if I'm working on this case, for example, my reports would indicate what murder case I'm working on.  I wouldn't have to type in there I'm going to do a polygraph exam for this murder case; but I would tell the defendant that he was a suspect in this case, did he want to take a polygraph exam and try to show his innocence.

Q  Would you document in a supp -- in a typed supp report the reasons why you believed that person to be a suspect?

A  Yes.

Q  Why would you document the reasons why you believed a person to be a suspect?

A  To justify asking him to take a polygraph exam.

Q  Why was that important?

A  To show the flow of the investigation.

Q  Does it sometimes happen in your investigations that you would have multiple suspects for the same crime?

A  Yes.

Q  And did it sometimes happen that you would have multiple suspects who were not necessarily alleged to be working together, but, you know, different -- you know, two different people who were alleged to be the perpetrator -- you're looking at me quizzically, so let me stop that question, withdraw it, and try it in a different way.

A  Please.

Q  Sometimes you have investigations where you have multiple offenders; right?

A  Correct.

Q  But sometimes it's just one single offender; right?

A  Correct.

Q  But even cases where there's only alleged to be a single offender, you may have multiple suspects who might be that single offender; correct?

A  Correct.

Q  All right.  And so it's important -- even where you have a single offender but multiple suspects, it's important to document the reasons why you believe each of those suspects might be the perpetrator; correct?

A  Correct.

Q  And later on a criminal defendant who is accused of the crime, they would have access to the investigation that might point to somebody else as being the perpetrator; right?

A  Correct.

MS. ROSEN:  Object to the form.

Q  So long as you -- so long as you properly documented the information about why the other people were suspects; correct?

MS. ROSEN:  Object to the form.

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

13 (49 to 52)

49

MR. ENGQUIST: Join.

A Correct.

BY MR. AINSWORTH:

Q What was your first assignment after detective school?

A Area 5 detectives.

Q And for -- and did you have any choice in going to Area 5 as opposed to one of the other areas?

A I submitted a request to go there.

Q Why did you want to go to Area 5?

A It was close to my house.

Q Did you know any of the Area 5 detectives when you joined Area 5?

A Yes.

Q Who did you know?

A I knew Rich Schak.

Q Who else?

A I can only remember Schak.

Q Did Rich Schak speak Spanish at all?

A No.

Q How did you know Rich Schak?

A He was a police cadet.

Q At the same time that you were?

50

A Yes.

Q Did you work together?

A No.

Q How did you know he was a police cadet?

A One time I was the police -- I was the police timekeeper for the cadets.

Q And so you would see his name?

A I'd seen his name. I had met him.

Q And how did you meet him when you were a police cadet?

A That I don't recall.

Q Do you stay in touch with him?

A No.

Q How did you know he was at Area 5 -- strike that.

Did you know he was at Area 5 when you came to Area 5?

A When persons were taken into custody for crimes in the 17th district, say, robbery, detectives had to come out to process the crime. I would see Schak in the 17th district working on cases.

Q And did you -- did he work on some of your cases?

51

A Not that I remember.

Q While you were at the 17th district, did you work with gang crimes officers?

A I don't know if gang crimes even existed at the time I was in the 17th district, but I did not.

Q How about when you were on the 24th district, did you work with gang crimes officers?

A No.

Q For how long did you remain in Area 5 as a detective?

A 28 years.

Q Did you stay -- were you assigned to violent crimes when you first arrived at Area 5?

A Yes.

Q Did you stay for 28 years continuously on violent crimes?

A They changed the name of the unit, but the duties were the same.

Q How did the name change?

A They changed the name from violent crimes to homicide, gang, sex.

MS. ROSEN: Let the record just reflect that Mr. Montanez is now in the room.

MR. AINSWORTH: Thank you.

52

Q Were you assigned a partner while you were at Area 5?

A What year?

Q At all.

A When I first got to Area 5, I worked with an older detective by the name of Bill Rooney.

Q For how long did you work with Bill Rooney?

A Probably a year.

Q Why did you stop partnering with Bill Rooney?

A I believe he got promoted to sergeant.

Q Did you have a partner after you were with Bill Rooney?

A Yes.

Q Who was that?

A Detective Eddie Dickinson.

Q For how long were partnered with Dickinson?

A Eight, nine years.

Q Why did you stop being partnered with Eddie Dickinson?

A He wanted to work midnights to coach his son's little league team.

Q What watch were you working at the time?

A I was working the third watch.

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

Q And who was your partner after Eddie Dickinson?

A The next regular partner I had, which is the '90s, would have been Ray Guevara.

Q How did you come to be partnered with Ray Guevara?

A His partner had left him to go work days, and he didn't have a partner.

Q For how long were you and Ray Guevara partnered?

A Eight, nine years.

Q Why did you stop being partners?

A I developed a heart condition. My doctor told me to go find myself a less stressful job in the police department. I stopped working the street and took an inside desk job.

Q What was the inside desk job that you took?

A I answered the phones.

Q What was your assigned title?

A Desk officer.

Q How long -- and when did you become a desk officer?

A September of 1999.

Q Then for how long did you remain a desk officer in Area 5?

A Until I retired in 2010.

Q What were your duties as a desk officer?

A Answer the phone, take the requests for detectives to come out and be assigned to cases, do computer information for detectives, and do the daily -- we called them the attendance and assignment sheets.

Q What computer information would you gather for the detectives?

A As an example, if they called up and they wanted to know the registration of a car they were looking at, I went on the computer and tell them who the car was registered to.

Q Would you run it through LEADS?

A Yes.

Q Were there any other computer databases that you would use for that kind of task apart from LEADS?

A There were a number of different computer bases I had access to.

Q What were they?

A LEADS, NCIC, SOS. That's all I can remember right now.

Q Would you run searches to try and determine who potential perpetrators might be for detectives while you were a desk officer?

A I don't know how I would do that. What -- how I could determine who a potential offender is.

Q For example, if you wanted to know who the sex offenders were in a, you know, three-block radius of a, you know, sexual assault crime, is that the kind of thing that you would search for?

A No. That's too involved a search.

Q In 1993, how would you go about creating a supplemental police report?

A We had to use a two-part system. We had to type the first page on a manual typewriter, and we went to a word processor -- word processor and typed up the rest of the report.

Q So you would manually type the first page; is that right?

A Correct.

Q And then you'd type the remainder on a word processor?

A Correct.

Q When you typed the remainder on a word processor, were some of the fields already filled in?

A I don't remember.

Q Could you save the supp report as you went along, you know, if you were taken away from your typing?

A Yes.

Q And then you could pick back up where you left off?

A Yes.

Q And how would you -- what would you do once you completed the supplemental report to your satisfaction?

A Once the report was finished?

Q Yes.

A I'd print the whole report out and submit it to my sergeant.

Q So you would print the reports, and you'd take the typewritten first page, and you'd submit it to your sergeant; correct?

A Along with the computer-generated pages.

Q And would you staple them?

A I don't remember if we stapled them or used a paper clip.

Q Where would you submit them in order to have

your sergeant review them?

A There was a basket in the violent crimes office.

Q Can you describe that violent crimes office for us?

A Describe the office?

Q Yeah. Back in 1993.

A It's a little bit smaller than the room we're currently sitting in. There was a couple of desks, some file cabinets, and two or three computer terminals.

Q What would be housed in that violent crimes office?

A Say it again, please.

Q What would be housed in that violent crimes office?

A Files.

Q What would you call those files in the violent crimes office?

A Investigative files.

Q Okay. And what comprises an investigative file back in 1993?

A Manila folder, a 5-by-7 envelope that was stapled inside of it, and a clasp that was on the opposite page to hold reports.

Q What would go in the 5-by-7 envelope?

A Miscellaneous items such as photos, a dead person's driver's license, things of that nature.

Q And what would go in the clasp side of that manila folder?

A Xerox copies of information, GPRs, and typed reports.

Q Why would you put Xeroxed copies in the manila file?

MS. ROSEN: Object to the form. Mischaracterizes his testimony.

A Just to show the progress of the investigation.

Q Would you keep a Xerox copy of the reports for your own purposes?

A Never.

Q Why do you say "never"?

A Because I never did.

Q What would you do if you wanted to have access to the reports while you were out investigating?

A I would take the entire investigative file from the office with me.

Q And would you indicate to anyone or in any way that you had taken the file out of the office?

A Initially, when I was a detective, no.

Later on they instituted a system of green cards where you signed out the file and then signed the file back in.

Q And so you would have to sign the green card?

A I believe by the time they instituted those green cards, I had already stopped working the street. I was working at the desk.

Q Would those investigative files have an inventory sheet?

A Yes.

Q Did you -- back in 1993, would you fill out the inventory sheet?

A I would indicate what items I had put in the file, yes.

Q And would you be the person who put stuff in that investigative file?

A Some things, yes.

Q And what kind of things would you put in the file?

A My reports.

Q And then would you fill out from the inventory sheet which reports you were adding to the file?

A Yes.

Q Would anyone sit in the violent crimes office?

MS. ROSEN: Object to the form.

Q I mean -- I'll clarify.

Was anyone assigned to sit in the violent crimes office as their desk or workspace?

A Yes.

Q Who would -- in 1993, who would be there?

A It would be the on-duty violent crimes sergeant.

Q Anyone else?

A Nope. Not specifically assigned to sit in the office.

Q Were there other people who would sit in that office in 1993?

A Detectives could go in there and sit and do their work if they wanted to.

Q There were workspaces for them?

A There were desks, and there were computer terminals.

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

61

Q Was there a lieutenants office?

A Yes.

Q Where was the lieutenants office?

A That was a different office adjoining the violent crime office.

Q Was it next door, or did you have to go through the sergeants office to get to the lieutenants office?

A You had to go through the violent crime office to get to the lieutenants office.

Q Where was the on-duty -- well, the violent crimes office in relation to the interview rooms at Area 5 in 1993?

A Right behind some of them.

Q When you say "right behind," what do you mean?

A Within feet of the back wall of the interview room.

Q Is there an open area that -- that is adjacent to the violent crimes office?

A Say again, please.

Q Is there an open area that's adjacent to the violent crimes office?

A There is a main floor in Area 5 detectives.

62

There's a hallway that extends from the main floor into the violent crimes office. On either side of this hallway are interview rooms.

Q And in that hallway, are there spaces for the detectives to work?

A No.

Q Where would detectives -- where would -- where would detectives work on Area -- at Area 5?

A Most of the detectives worked on the main floor.

Q And when you say "the main floor," what do you mean?

A The largest open area in the office where detectives had desks and computer terminals where they could sit down and do their work.

Q And where was that area in relation to the violent crimes office?

A 10, 15 feet away.

Q Now, Area 5 is a secure police facility; right?

A A secure police facility?

Q Yeah.

A With locked doors and things of that nature?

Q Yeah.

63

A No.

Q All right. What floor was Area 5 -- Area 5 violent crimes on?

A Second floor.

Q I take it that a member of the public, such as myself, couldn't just walk into the middle of Area 5 violent crimes back in 1993; is that right?

A Unfortunately, they could.

Q And explain what you mean.

A There was no barring them from walking up the stairs and just walking into the office.

Q And so you would sometimes have a concern that there might civilians walking around Area 5; right?

MR. ENGQUIST: Object to the form.

Go ahead.

A There was -- in the first years I was a detective in the new Area 5, after the 911 attacks, they built a wall as you walked into Area 5 that anybody coming in couldn't walk into the detective area.

Q So before that wall was built -- let's just say in 1993, okay, in that time period.

It could pose problems for your

64

investigations if civilians were walking around freely within Area 5 violent crimes; is that correct?

A Yes.

Q For example, you might have civilian witnesses to a crime who might not want to be observed cooperating with the police; right?

A Yes.

Q You might also not want suspects to know who it was who was implicating them if you had suspects and civilian witnesses at the area at the same time; right?

A Yes.

Q And so sometimes -- so those interview rooms that you had at Area 5, they would have windows into them; right?

A Yes.

Q Windows on the door?

A Yes.

Q Those kind of like old-style narrow windows that would extend for a portion of the floor -- for a portion of the door, I should say.

A Yes.

Q You would sometimes cover up those windows

with paper; right?

A Yes.

Q And one of the purposes for doing so was to prevent suspects and witnesses from inadvertently seeing each other when you didn't want them to; right?

A Yes.

Q Was there any prohibition against putting paper on the windows?

A Could you repeat that, please.

Q Was there any prohibition against putting paper on the windows?

A No.

Q How did you meet Ray Guevara?

A When he was promoted to detective and he began working in Area 5.

Q Did you know him before he became detective?

A I had seen him up in the office working with other detectives on cases, but I didn't know him personally.

Q How did you learn that he was promoted meritoriously?

MS. ROSEN: Object to the form, foundation.

MR. ENGQUIST: Join.

A I was told by Ray.

BY MR. AINSWORTH:

Q Did you work with Ray Guevara before you became partners?

A Not that I remember.

Q When was it that you became partnered with him?

A Sometime in the early 1990s. I don't remember the exact year.

Q Do you know whether it was 1992 or 1991?

A Again, I don't remember the exact year.

Q How long before you began your investigation into the Rodrigo Vargas homicide, did you start working or being partnered with Ray Guevara?

A I don't remember.

Q Was it as short as a couple months, or was it longer than that?

A I don't remember.

Q When you would print your reports and submit them to be approved by a supervisor, would you sometimes get feedback from the supervisor and have to correct something in the report and resubmit it?

A That could happen, but I do not recall it happening to me.

Q You were pretty good at your reports; right?

MS. ROSEN: Object to the form.

MR. ENGQUIST: Go ahead.

A I thought I was.

Q And no sergeant was saying -- telling you that there's a problem with the -- with your reports or a repeated problem; right?

A Not that I recall.

Q Once you submitted your supplemental report, if you learned new information, would you then create a new supplemental report?

A Yes.

Q Why would you create a new supplemental report if you learned new information after submitting a report to be approved?

A Because you could not add on any information to that previous report. It was locked in the computer.

Q And how would it be locked in a computer?

A Well, when I retired, the only way that they could get at a report was the sergeant would have to unlock the case.

Q And so -- and just to be clear, I'm talking about the time frame of 1993.

Back in 1993, why would you create a new report for information you learned after you submitted your supp report?

A To show the flow of the investigation, to refresh my memory later on for trial.

Q And once you submitted a supp report in 1993, would the computer be locked so that you couldn't add on information to the report?

MS. ROSEN: Object to the form, foundation.

MR. ENGQUIST: Join.

A Not in 1993.

Q All right. Were you supposed to alter reports after they had been submitted to a supervisor for approval back in 1993?

MS. ROSEN: Object to the form.

A No.

Q Would you add on information to a report that you had submitted back in 1993 after a supervisor had approved it?

A No.

Q And why not?

A Because that report was finished.

Q And once it was finished, you weren't supposed to alter it or do anything to it; right?

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

A  That's correct.

Q  That would be altering a police report; right?

MS. ROSEN:  Object to the form.

A  That's correct.

Q  You know that you're not supposed to do that; right?

A  When it's finished, no.

Q  And the correct procedure, as I understand it, is that if you learned information after you completed a supplemental report would be to create a new supplemental report.

Would you agree with that?

A  Yes.

Q  Was there ever a reason to deviate from that practice?

MS. ROSEN:  Object to the form.

A  No.

Q  What does R/Det mean in a supplemental report?

A  I'm sorry.  Could you say that again, please?

Q  Yeah, sure.

Sometimes you use abbreviations in your reports; right?

A  Yes.

Q  What does R/Det mean?

A  R/Det means reporting detective.

Q  And what does R/Dets mean?

A  That's plural.  It would be more than one detective.

Q  So that would mean more than one detective was involved in whatever activity you were documenting?

A  Yes.

Q  When you interviewed witnesses, sometimes you would ask them to describe either a person or a suspect; right?

A  Yes.

Q  When you asked the witness to -- and let's take it in terms of a suspect.  Okay.

When you asked a witness to describe a suspect, what would you ask them to try and describe?

MR. ENGQUIST:  Objection; vague.

But go ahead.

A  How would I do it?

Q  Yeah.

A  Sex, age, height, weight, skin color, any distinguishing marks, clothing, facial hair, things of that nature.

Q  With as much detail as the witness is able to provide to you; right?

A  Yes.

Q  And if the witness is unable to describe the witness in any fashion, would you document that as well?

MS. ROSEN:  Object to the form.

A  I think you said if the witness is unable to describe the witness.

Q  I'm sorry.

If the witness was unable to describe the suspect in any way, would you document that fact?

A  Yes.

Q  When you first started in violent crimes in 1982 or thereabouts, what types of crimes would you investigate?

A  Mostly robbery.

Q  And why was it that you would be mostly involved in robbery cases?

A  Being a detective was a learning process, and you started out with robbery investigations.

Q  And for how long did you primarily work on robbery cases in violent crimes?

A  That first year I worked with Detective Rooney.

Q  And how about after you stopped working with Detective Rooney, what kind of cases did you work with -- work on?

A  I continued to work on all cases that came into violent crimes; but after that first year, I was allowed to start working on homicide cases.

Q  And so what would all cases comprise in violent crimes after you stopped working with Detective Rooney?

A  Well, we specifically investigated robberies, aggravated batteries, sex crimes, kidnappings, and I'm sure there are other crimes, and then homicides.

Q  Were you trained in how to conduct photo arrays?

A  I don't remember.

Q  In 1993, how would you go about conducting a photo array?

A  I knew the Supreme Court suggested that you would use five filler photos for every suspect.  So

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

---

73

if you had one suspect, you would need five filler photos, and that's what I did.

Q And when you referred to filler, you mean the people who are not suspects but whose photographs are included in the array alongside the suspect's photo; is that right?

A Yes.

Q And were you trained to try and make the photo array fair to the suspect?

A Yes.

MS. ROSEN: Object to form.

Q When you had one suspect in a photo array, would you try to make the fillers similar in appearance?

A Yes.

Q And when you had five fillers and one suspect in a photo array, would you try and make the fillers similar in appearance to the witness's description of the suspect, or would you try to make them similar in appearance to the suspect that you had?

A I would try to make them similar in appearance to the suspect at that time.

Q All right. And so when you're looking for

74

similarity in appearance, what kind of things would you look for?

A Age, glasses, teeth, facial hair, color of hair, things of that nature.

Q Ethnicity?

A Ethnicity, yes, sex.

Q Height and weight?

A Not in a filler photo, you can't see it.

Q I see. All right.

If you had two suspects and you wanted to conduct a photo array, would you create two separate arrays, one array with one suspect and five fillers and then a second array with the other suspect and five filler photos?

MR. ENGQUIST: Just to be clear, you're talking about back in '93; right?

MR. AINSWORTH: Yes.

A That would be the correct procedure.

Q Was that because if you had two suspects in one photo array, it'd be hard to have the fillers be fillers for both suspects? Do you know what I mean?

MS. ROSEN: Object to the form.

A If you had two suspects, you should do a photo array with 10 fillers.

75

BY MR. AINSWORTH:

Q And two separate photo arrays; right?

A No. You could do them all, but you'd need 10 filler photos.

Q Back in 1993.

A Yes.

Q And so you would -- you would include five fillers for each -- five fillers for each suspect to -- that would be similar in appearance in the ways you've described, right?

A I would, yes.

Q What if you had three suspects?

A Again, it would either be three separate photo arrays, or it would be one gigantic photo array, which we never did them that big. So I would have to say we did three separate photo arrays.

Q When you used a photo array back in 1993, what type of photographs would you use to conduct it?

A We used official Chicago Police Department photos. Some were black and white. Some were color.

Q Would you try and make sure the backgrounds of the photos were the same between the fillers and

76

the suspect?

A These were all Chicago Police Department photos. The backgrounds were all the same.

Q So when you say "Chicago Police Department photos," you mean mug shots?

A Yes.

Q Would you ever use Polaroids that were taken at the area as part of the photo arrays?

A I may have, but I don't remember.

Q Back in 1993, where would you get the filler photographs from?

A We had boxes of photos in Area 5 of people that had been taken into custody and that their photos had been sent for, and we had it on file in Area 5.

Q So there was a place in Area 5 where you had a box of filler photos, and you could just kind of root through it to find photos that would be similar in appearance to your suspect?

A Well, it was one location.

Q And when you displayed photographs to a witness during a photo array, how would you do it back in 1993?

MR. ENGQUIST: Objection. It's a

---

PLANET DEPOS
888.433.3767 | WWW.PLANETDEPOS.COM

hypothetical. It's an incomplete hypothetical and calls for speculation.

Go ahead.

A I would lay the photos out on a table such as this. I would tell the witness to look at all the photos and that if they identified anybody from the crime we were investigating, tell me about it.

BY MR. AINSWORTH:

Q And so you would display all the photos together; correct?

A Yes.

Q And I take it from your explanation that back in 1993 you wouldn't tell the witness something to the effect of even if you don't select somebody from the photo, we'll still keep investigating; is that right?

A Could you say that again, please.

MS. ROSEN: Object to the form.

Q Sure. I take it from your explanation of how you conducted photo arrays, that back in 1993 you would not tell a witness even if you don't select somebody from the photo array, we will still continue investigating?

MS. ROSEN: Object to the form.

A Back in 1993, when I laid the filler photos out, I would tell the person viewing the photos that I want you to look at some pictures. I've got no evidence at this time that these people are involved in this investigation. If you do see somebody that you recognize, please let me know.

I never remember telling them that if they didn't pick anybody, we'd keep investigating, no.

BY MR. AINSWORTH:

Q And I take it that it was not your habit to or it was not your practice to document the level of confidence that the witness displayed when making the identification at the time of the identification; is that right?

A Sometimes I did document their level of confidence.

Q And what would determine whether or not you did document their level of confidence?

A Some people would look at the photo array and say positively identified. Someone would say, It looks like the guy, but I need to view him personally in a lineup to be sure. I would document that.

Q Back in 1993, would you conduct physical lineups?

A Yes.

Q How would you conduct physical lineups back in 1993?

A In 1993, Area 5 had a specific area for viewing lineups. There was a holding room where persons to be viewed would either sit or stand.

There was a one-way window that looked into a separate room where the persons viewing the lineup could stand in front of this one-way window and look at the persons to be viewed.

Q And did you have a -- would you use fillers for physical lineups?

A Say again, please.

Q Would you use fillers for physical lineups?

A Yes.

Q And why would you use fillers for physical lineups?

A Keeping with Supreme Court decisions, you were suggested to use five fillers for every suspect in a physical lineup.

Q And what was the purpose for using fillers in the lineup?

A So that the person viewing the suspect didn't just get to look at one person.

Q That might be suggestive if you're just showing one person? Is him? Is that what you're getting at?

MR. ENGQUIST: Objection; form.

MS. ROSEN: Object to the form.

A Correct.

Q And so when you would select fillers for a lineup, would that be you and your partner who would go about selecting the fillers?

A Sometimes.

Q How else would it work?

A Sometimes we'd have other detectives go look for fillers for us.

Q And what would you look for in the fillers to try to make the -- was your purpose to make the lineup a fair lineup to the suspect?

A Yes.

Q And what would you look for in fillers to make the lineup a fair lineup for the suspect?

A Sex, race, age, height, weight, physical characteristics, we tried to do clothing.

Q So you wouldn't have one man with a bunch of women; right?

81

A No.

Q And you wouldn't have a lineup with A 5-foot-6 person, and all of the rest of the people 6 feet tall?

A We could if they were all seated.

Q Why would you have them seated?

A Because that would eliminate the height requirement. You couldn't tell a person's height if they were sitting down.

Q Why do you think people can't tell a person's height if they're sitting down?

A You just can't.

Q Were you trained that it was okay to do a lineup of a 5-foot-6 person and a bunch of 6-feet-tall people so long as they were all sitting down?

MS. ROSEN: Object to the form.

A This was something I learned in court from testifying in numerous cases, that it was permissible to do this.

Q Who told you in court that you would -- that it was permissible to have a 5-foot-6 person and a bunch of 6-feet-tall people so long as they are sitting down?

82

A On numerous motions to suppress lineup identifications.

Q And so how would you learn in the numerous motions to suppress lineup identifications? How did you learn this fact?

A We would win the motion.

Q And so if you had the lineup participants seated during the lineup, would you document the fact that you would have them seated?

A Yes.

Q And if you didn't document that they were seated, that meant they were standing; is that right?

A Say it again, please.

Q Sure. If you did not document that the lineup participants were seated, then that would mean that the lineup participants were standing; is that right?

A I think I documented all of my lineups specifically if they were standing or seated.

Q Why do you say "I think"?

A Say again.

Q Why do you say "I think"?

MS. ROSEN: Object to the form.

83

A I don't have in front of me every single lineup I ever conducted. I don't remember.

Q In any event, if you had a lineup where there was a 5-foot-6 guy and bunch of 6-feet-tall people and they were standing, that wouldn't be a fair lineup; right?

A I would never do a lineup like that.

Q Because that would be unfair.

A Yes.

Q Would you sometimes pull rap sheets on suspects?

A Yes.

Q How would you go about pulling a rap sheet on a suspect?

MR. ENGQUIST: Objection; vague, time frame.

Q Back in 1993.

A We would fill out a form that we would fax down to the identification section, and they would fax us back the arrest report, the rap sheets.

Q What form would you fill out?

A Request for identification records.

Q Getting back to the photo arrays, would you ever conduct a photo array with three suspects and five fillers?

84

A Would I?

Q Yes.

A No.

Q Why not?

A Because it violated the Supreme Court suggestions for how to properly do a photo array.

Q And if you had three suspects and only five fillers, you'd have either only two fillers for each suspect or one filler, for, you know, one of the suspects; right?

A Correct.

Q And that's not enough fillers to make it fair; right?

A In my opinion, no.

Q And that's based on your experience as a police officer?

A Yes.

Q Sometimes in your career you would get informants willing to provide you with information; right?

A Yes.

Q And when you're dealing with an informant, it's very important not to reveal the nonpublic facts about the investigation to that informant;

85

right?

A Correct.

Q It's important in all interviews, but it's critically important where the informant might be trying to get something from the police in exchange for their information; right?

A Correct.

Q You want to be able to corroborate the information that the suspect is giving you; correct?

MS. ROSEN: Object to the form.

MR. AINSWORTH: Yes. You're right. Let me withdraw that question and restate it.

Q You want to be able to corroborate the information that the informant is providing you; right?

A Yes.

Q And one way to corroborate is to see if the informant is able to provide you any of the nonpublic facts about the crime that only someone who committed the crime or talked to somebody who committed the crime might know; right?

A Yes.

Q And so when you're talking to an informant, you're paying attention to what facts they can

86

provide that you might be able to corroborate; right?

A Yes.

Q And when you're talking to an informant, you want to get as much detail as you can from that person; right?

A Yes.

Q And some people are very forthcoming in talking to the police about other criminal activity; right?

A Yes.

Q And when you have a cooperative witness, sometimes they can tell you a lot of information about a number of crimes; right?

A Yes.

Q And so one of your jobs, as a police detective, is if you have a cooperative witness is to try and find out whatever information that person might have about the crime that you're investigating; right?

A Say that one again, please.

Q Sure. When you have a cooperative informant, you want to get as much information about the crime that you're investigating from that

87

informant; right?

A Yes.

Q And if the informant is willing, you want to find out what other information about other crimes that informant might be willing to share; right?

A Yes.

Q And you need to be very careful not to make undisclosed promises to an informant; right?

A Yes.

Q You know that it would be wrong to promise something to an informant in exchange for their information but not reveal that fact to either the prosecution or the criminal defense; right?

A Could you rephrase that question.

Q Yeah. I can.

You know that it would be improper and wrong to promise something to an informant in exchange for their information without revealing the fact of the promise to the prosecution and to the criminal defendant; right?

A That's correct.

Q That's not something you would do; correct?

A No, I would not.

Q And when you're talking about an informant

88

who is facing significant time in the penitentiary, any kind of promise or benefit can be magnified for that person; right?

MR. ENGQUIST: Objection.

MS. ROSEN: Object to the form.

MS. NIKOLAEVSKAYA: Form.

MR. ENGQUIST: And it calls for speculation.

A I don't know.

Q Well, let me put it this way.

If the informant is not incarcerated, then offering that person the ability to make a phone call isn't that much of a benefit because that person could, you know, go home and use the phone themselves; right?

A Yes.

Q But for an incarcerated informant, offering that person the use of the phone could be a very real benefit to that person; right?

MS. ROSEN: Object to the form. Calls for speculation.

MR. ENGQUIST: Join.

A I don't know. I can't read a person's mind.

Q Well, you understand that incarcerated people don't have their freedom, right, because

they're incarcerated?

A  That's correct.

Q  So they don't have access to buy meals from a restaurant; right?

A  That's correct.

Q  They don't necessarily have the ability to make phone calls whenever they want; right?

MS. ROSEN:  Object to the form, foundation.

MR. ENGQUIST:  Join.

A  They have the ability to make phone calls.

Q  You knew in 1993 that phone calls they'd have to make would be collect calls; right?

A  I don't know how it worked.  I know there was a phone in lockup they could use.

Q  Would people in the Cook County Jail sometimes call you?

A  Yes.

Q  And how would you get calls from the Cook County Jail?  Would they come collect or direct or how would they work?

A  They came collect.

Q  So sometimes you would get collect calls, and they would say this is so-and-so.

Would they say who they wanted to reach?

A  Yes.

Q  Would you accept those calls?

A  Yes.

Q  And would you accept those calls whether or not the detective they were looking for was present?

A  I only accepted calls that pertained to me.

Q  So if there was a collect call that you happened to pick up -- well, strike that.

Did you have a direct dial back in 1993?

A  No.

Q  Was there a pool phone, pool for the floor?

A  Area 5 had a number of different phone numbers.

Q  And did you have a dedicated phone?

A  No.

Q  Did you share the phone with other detectives?

A  Did I share a phone with other detectives?

Q  Did you share a phone number with other detectives?

A  Area 5 had general phone numbers that we all used.

Q  And so were there -- how many general phone numbers did you have back in 1993?

A  There was a basic phone number that if that line was busy, it would skip to the next line; and if that line was busy, it would skip to the next line.  To the best of my knowledge, I think we had five incoming lines.

Q  And for the public, would the public -- if the public wanted to call violent crimes Area 5, was there just one number to call?

A  Yes.

Q  All right.  And so when somebody was calling violent crimes Area 5, they would call one number, and would it ring on all the desks of the detectives?

A  No.

Q  Whose desk would it ring at?

A  The sergeant's desk.

Q  And then the sergeant would -- would they transfer the call from the sergeant's desk to whoever is detective -- whichever detective was working that case?

A  We had a public address system.  Sometimes the sergeant would pick up the phone.  If he was busy, other detectives would pick up the phone, and then we'd announce on the public address system phone call for whoever, pick up line 8601.

Q  And was it -- would it only ring in the sergeant's office?

A  No.  It probably rang in more locations than that.  It rang in his office, and it rang up to special desk.

Q  What's the special desk?

A  That's where the desk officer sat.

Q  Where did the desk officer sit in 1993?

A  On the far northern end of the office.

Q  Where was that in relation to the violent crimes office?

A  Approximately 40 feet away.

Q  In which direction was the violent crimes office from the sergeants -- from the special -- what did you call it?  Special --

A  Special desk.

Q  From the special desk.

A  It was in the same office.  It was just an area where the special desk officer sat.

Q  Was the special desk north of the violent crimes office?

A  It was the same office.

Q  I'm just trying to get a sense of

geographically was the violent crimes office -- was the -- sorry.

You called it before the violent crimes office where the sergeant sat.

Did you have a different name for that?

A  Well, the sergeants office.

Q  All right.  Let's call it the sergeants office.  Okay.

Where was the special desk in relation to the sergeants office?

A  Approximately 40 feet north.

Q  Do you know what a Serafini report is?

A  Do I know what a what is?

Q  Serafini report.

A  No.

Q  How would you indicate to the next watch of detectives back in 1993 what investigative steps needed to be followed up on on a case?

A  We were done working at 11:30 at night.  The midnight watch would not start until 12:30.  We'd leave instructions for the oncoming midnight sergeant, and he'd pass them along.

Q  And so would you write out those instructions for the midnight sergeant to pass along?

A  No.

Q  How would you communicate to the midnight sergeant that there were investigative tasks that needed to be followed up on?

A  We'd tell them.

Q  Why would you tell them and not write them down?

A  There wasn't a need to.

Q  Why wasn't there a need to?

A  There wasn't.

Q  I'm asking why.

A  There wasn't a need to.

MS. ROSEN:  Object to the form.

Q  So when would the midnight sergeant arrive?

A  They arrived at 11:30.

Q  And so how many detectives were working third watch back in 1993?

A  It varied from night to night.

Q  What was the range?

A  Huh?

Q  What was the range?

A  I can't give you an accurate number.  I would say in total anywhere from 10 to 20 guys.

Q  And so 10 to 20 detectives would all crowd around the incoming midnight sergeant to tell them all the investigative steps that needed to be followed up on on their case --

MS. ROSEN:  Object to the form.

Q  -- is that right?

MR. ENGQUIST:  Join.

MS. NIKOLAEVSKAYA:  Join.

A  No.

Q  So how would it work?

MS. ROSEN:  Object to the form.

A  As I just said, if there was something we specifically needed the midnight crew to follow up on, we'd tell the sergeant go have these guys go do this specific task, and let us know how it turned out.

Q  What would you do if you needed the day shift to follow up on one of your investigations?

A  We'd let the sergeants know, and they would pass the information along.

Q  When you say "the sergeants," which sergeant would you tell?

A  Say that again.

Q  When you say "the sergeant," which sergeant would you tell?

A  I have no idea who was the sergeant in 1993.

Q  Well, you would just -- you would tell your third-watch sergeant or the first-watch?

A  The midnight sergeant.

Q  All right.  You'd tell the midnight sergeant.

A  Yes.

Q  And so you'd tell the midnight sergeant that you need these -- day watch to follow up on information pertaining to one of your investigations; is that right?

A  Sometimes.

Q  Why wouldn't you just leave a note for the day-shift sergeant?

A  We just didn't.  We just gave instructions orally.

Q  Were you instructed not to leave notes --

A  No.

Q  -- for the day-shift sergeant?

A  No.

Q  Did you have a problem with writing things down?

MS. ROSEN:  Object to the form.

97

A No.

Q Did you not want to taint your file with information that might be incorrect?

MS. ROSEN: Object to the form.

MR. ENGQUIST: Join.

MS. NIKOLAEVSKAYA: Join.

A I did not want to put incorrect information in my file. That is correct.

Q All right. And so if you received information about a criminal case, would you withhold that information from your file until you could verify that information?

MS. ROSEN: Object to the form.

MR. ENGQUIST: Join.

MS. NIKOLAEVSKAYA: Join.

A No.

Q You would include that information; right?

A Yes.

Q And you would include it in the -- in your file?

MS. ROSEN: Object to the form.

A Yes.

Q What's a nickname file?

A Gang members love to have nicknames for each

98

other, as the two gentlemen seated in this room have nicknames.

MS. BONJEAN: Objection to form.

A Many times we talk to people on the street, they don't know their real names, but they know their nicknames. So if we're interviewing persons on the street and they say, Well, we just had this shooting and Moon Dog from the IG shot him, well, then we'd try to find out who Moon Dog was.

And there was one sergeant in the 25th district Bob DeGraf that took it upon himself to go through every single arrest report and take the box where it said nickname and match it up with their real name.

So if we wanted to find out who Moon Dog was, we'd get a copy of Bob DeGraf's nickname folder, look it up, and many times we'd get the information we were looking for.

BY MR. AINSWORTH:

Q And so where was the nickname file?

A Bob DeGraf had it down in his office in the 25th district, but then he would occasionally give us a copy of it. We'd have it up in the office at Area 5.

99

Q Bob DeGraf, his office was on the first floor?

A Yes.

Q And so you would go downstairs and say, Bob, can I take a look at your nickname file?

A Sometimes.

Q And how was his nickname file organized?

A It was a binder with computer-printed sheets.

Q What was on the computer-printed sheets?

A The nicknames and the real names.

Q Was it like -- had he typed them up on to paper and then printed it out to be put in the binder or -- I don't know what you mean by computer-generated sheet.

A From what I saw is that he typed it into a computer, and then he printed out the sheets and put it in a binder.

Q Would each sheet have more than one nickname or just one nickname and real name per sheet?

A Yes. It was just -- well, there were more than one nicknames on the sheets.

Q And more than one real name on the sheet?

A Yes.

100

Q Were they organized by nickname or gang or in any fashion?

A It was organized by nickname.

Q Alphabetically?

A Yes.

Q So all the people named Speedy, regardless of gang, would be in one area of that nickname file?

A Yes.

Q Did you have access to gang books in -- at Area 5 in 1993?

A Say that again, please.

Q Did you have access to gang books in Area 5 in 1993?

A I don't remember Area 5 detectives having any gang books.

Q Did you have access to them?

A We didn't have any gang books in Area 5.

Q Do you know what gang books are?

A If you're referring to gang photo books, yes.

Q What is a gang photo book?

A Photos of known gang members.

Q Placed in binders or books?

A Chicago Police Department used to have

101

official photographic binders for pictures.

Q Separated by gang; is that right?

A Whoever maintained the photos. That was one way they were catalogued, but we did not have gang books at Area 5 detectives.

Q Did you use those gang books before?

A We did not have gang books at Area 5 detectives.

Q I'm not asking you if you had them at Area 5 detectives, sir. I'm asking if you used them before.

A I have used gang books at gang crimes north, yes.

Q Fine. So how would you go about using the gang books at gang crimes north?

A We would take whatever person we wanted to look through the books over to gang crimes north. They would have some kind of a log that this person was viewing whatever books on that date and time. And if they made identification, we would document it, and that was it.

Q How would you document an identification from a gang book?

A Supplemental report.

102

Q And how would you indicate the photograph -- or how would you memorialize the photograph that the person had identified from the gang book?

A We'd do a supp report. I would indicate they looked at a certain book, picked a certain picture of a certain person.

Q Would you remove the photograph that they identified from the book so there would be a record of what the person looked like that they identified?

MS. ROSEN: Object to the form.

A No. These books were locked. You could not take photos out of them.

Q And where was the log that would document who was viewing the photo books or the gang books?

A That was the on-duty officer that sat at the front desk in gang crimes north.

Q Well, would you have to indicate to that person which books you were going to show to the witness?

A That officer would go get the books we requested, and then we'd show those books that we brought to us.

Q Were you ever allowed to take those books out of area north?

103

A I did not.

Q I'm sorry. I said area north. I mean, gang crimes north at the time.

Did you ever remove the books from -- the gang photo books from gang crimes north?

A I did not.

Q Do you know if you were allowed back in 1993, allowed to take the photo of gang crimes -- gang photo books out of gang crimes north?

A I don't remember.

Q Why would you document any identifications made from those gang photo books?

A It was evidence.

Q Evidence of who the perpetrator might be?

A Correct.

Q Any reason not to document the identity of any person who is identified from the gang photo books?

A In 1993, we were not required to document negative identifications.

Q So if the person looked at the gang photo books and didn't identify anyone -- well, what do you mean that you weren't required to document a negative identification?

104

A Well, we did not have to document that they didn't make an identification. We would document the fact that they went to, let's just say, gang crimes north, for instance, and looked at Latin King photo books A, B, C, D, and E. No identifications were made. That's it.

Q So you would document to that extent.

A That no identifications were made, that's correct, in those specific books.

Q And why was it important to document if they did make an identification?

A So the detectives wouldn't have to repeat what we've already done.

Q And so you would have evidence of who the perpetrator was?

A Say that again, please.

MS. ROSEN: I think he got confused. You switched.

Q Sure. I'll try again.

And I'm -- in instances where the witness does make a positive identification, why is it important to document that identification?

A That's inculpatory evidence.

Q As to the person who is identified; right?

---

**105**

A  Correct.

MR. ENGQUIST:  We've been going for about two hours.  Want to give him a break to go charge his life and come back.

MR. AINSWORTH:  Now is a perfect time for that.

THE VIDEOGRAPHER:  Off the record at 11:59.

(A recess was taken from 11:59 a.m. to 12:19 p.m.)

THE VIDEOGRAPHER:  Back on the record, 12:19.

BY MR. AINSWORTH:

Q  Sir, you understand that you and you alone get to choose whether you assert the Fifth Amendment in response to questions that are posed to you at a deposition; right?

MS. ROSEN:  Object to the form.

MR. ENGQUIST:  I'm going to object to the form too.

Go ahead and answer.

A  Yes.

Q  You gave a deposition in this case previously; right?

A  Yes.

**106**

Q  And in response to every single question, apart from your name, you asserted your Fifth Amendment right to counsel; right?

A  Yes.

MS. ROSEN:  No.

Q  And so --

MS. ROSEN:  Your Fifth Amendment right to counsel?

Q  Fifth Amendment right not to incriminate yourself; right?

A  Yes.

Q  And you asserted your Fifth Amendment right not to incriminate yourself because you feared that giving truthful answers to the questions that were posed to you might subject you to criminal liability; right?

MR. ENGQUIST:  I'm going to object to the form.  Also I'm going to object to the extent that you're asking him to discuss things that were part of attorney/client privilege which is with his counsel.  I'm instructing him not to answer those parts.

But you can answer the question, if you can.

THE WITNESS:  Could you repeat your

**107**

question?

BY MR. AINSWORTH:

Q  Yes, sir.

The reason that you asserted your Fifth Amendment right against self-incrimination was because you feared truthful responses to the questions that were asked of you might subject you to criminal liability; right?

MR. ENGQUIST:  Same objection.

THE WITNESS:  Huh?

MR. ENGQUIST:  Same objection.  Without going into attorney/client privileged information, you can answer the question.

A  I was concerned that truthful responses would be turned against me, yes.

Q  And be used to prosecute you; right?

A  For truthful responses, yes.

Q  But if you gave truthful responses, those truthful responses could be used to prosecute you; correct?

A  Yes.

Q  Who did you consult with in determining whether or not to assert your Fifth Amendment right against self-incrimination?

**108**

A  Attorney Dan Herbert.

Q  Did you consult with anyone else?

A  No.  He was my -- he was my criminal attorney that gave me his opinion of what I should do.

Q  Did you consult with your civil attorneys?

A  Yes.

Q  Who did you consult with among your civil attorneys when deciding whether to assert your Fifth Amendment rights or not?

A  Mr. Sotos, Mr. Given at that time.

Q  Anyone else?

A  No.  Just those two at that time.  Oh, Mr. Brueggen.

Q  Mr. Who?

A  Dan.  Dave, I should say.

MR. BRUEGGEN:  Dave.

Q  Anyone else?

A  Not that I remember.

Q  And did you consult with anyone who is not an attorney about whether to assert your Fifth Amendment right against self-incrimination?

A  No.

Q  What did Dan Herbert tell you in regard to

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

---

109

whether or not to assert your Fifth Amendment right?

MR. ENGQUIST: I'm going to object. It's prohibited by attorney/client privilege, and I'm instructing him not to answer.

Q Are you going to follow your attorney's advice and not answer the question?

A That's correct.

Q Was your decision to assert your Fifth Amendment right against self-incrimination in part based on your attorney's advice?

MS. ROSEN: Same objection.

A Yes.

Q Then I want to know what that advice was; and so I'm going to ask you, sir, what was the advice that you were given by your counsel in regard to whether or not to assert your Fifth Amendment right to counsel?

MR. ENGQUIST: Once again I'm going to object.

Q Right to self -- right against self-incrimination.

MR. ENGQUIST: Once again I'm going to object. Conversations with his attorney are privileged, and I'm going to instruct him not to

---

110

answer the question.

BY MR. AINSWORTH:

Q Are you going to refuse to testify about the advice that was provided to you by your attorneys?

A That's correct.

MR. ENGQUIST: I think more accurately he's taking my advice, but go ahead.

Q Well, you have an independent right, you understand, to either assert a privilege or waive a privilege; right?

A What's your question, please?

Q You don't have to do what your attorneys tell you; right?

A That's correct.

Q Did you consult with any attorneys in advance of this deposition about whether to assert your Fifth Amendment right or not?

A Prior to this deposition, I had spoken with my civil attorneys.

Q Did you consult with Dan Herbert?

A No.

Q Why didn't you consult with Dan Herbert?

A I didn't.

Q Why didn't you, sir?

---

111

A I didn't need his advice.

Q Why didn't you need his advice?

A I had made up my mind to testify.

Q Why did you make up your mind to testify?

MR. ENGQUIST: I'm just going to object.

To the extent that the question would call for any kind of discussions you had with any of your attorneys, I'm going to instruct you not to answer, but otherwise, you can answer the question.

A Would you repeat your last question.

MR. AINSWORTH: Would you please read it back.

(Pending question read.)

A I saw the shameful way that Detective Guevara was being portrayed in the media as some kind of monster, which he is not. He did not have a chance to rebut any claims that were made against him.

I did not like the fact that I had to sit through Mrs. Bonjean's deposition where I had to sit there and not respond to her questions. I wanted to take the opportunity to accurately say what I had done that did not violate any laws, did not violate any department regulations. It was all -- all the

---

112

police work I had done was lawful and honorable, and I wanted the chance to say my -- my story.

Q Do you fear that truthful responses here will subject you to criminal liability?

A Yes.

Q Guevara did get to testify before Judge Orbish; right?

MR. ENGQUIST: Objection; calls for speculation, foundation.

A I don't know who Guevara testified in front of.

Q Did you read the reports of Judge Orbish saying that Ray Guevara had told bold-faced lies in his courtroom?

A I've never seen those.

Q Who paid for Dan Herbert to be your attorney?

A The Fraternal Order of Police.

Q So did you reach out to Ray to tell him that you, you know, thought it was shameful how he was being portrayed in the media and to lend your support to him?

A Could you say that again, please.

Q Sure. Did you reach out to Ray Guevara and

---

Case: 1:18-cv-01028 Document #: 873-2 Filed: 03/25/26 Page 248 of 556 PageID #:117932

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

29 (113 to 116)

113

tell him that it was shameful the way he was being portrayed in the media and show some support for him?

A  No.

Q  Why not?

A  I have not talked to him.

Q  Why haven't you talked to him?

A  I was instructed not to.

Q  When was the last time you talked to Ray Guevara outside the presence of your counsel?

A  Haven't.  Oh, the last time?

Q  Yeah.

A  Probably when I was still working, 19 -- when did I retire? -- 2016.

Q  You retired in 2016?

A  Yes.  No.  I didn't retire -- 2010, I'm sorry.

Q  Did you have a retirement party?

A  Just a few guys met after work in a bar for some drinks.

Q  Did Ray Guevara appear?

A  I don't believe so.

Q  Why don't you believe so?

A  I don't remember him being there.

114

Q  When did you first learn that Ray Guevara was taking the Fifth?

MS. ROSEN:  Objection; foundation.

MR. ENGQUIST:  I'm going to object to the extent --

MS. ROSEN:  Form.

MR. ENGQUIST:  To the extent that would require him to talk about conversations he had with his counsel, I'm going to instruct him not to answer, but other than that he can talk about -- you can answer the question.

A  The first time I learned was when I got sued in this case.

Q  So before you were sued in this case, you had no idea that Ray Guevara was pleading the fifth?

A  No.

Q  That's correct?

A  Yes.

Q  When you talked to the lawyers from Sidley Austin back in 2014, did they tell you that Ray was not testifying?

A  I don't remember.

Q  In the -- during the post-conviction phase of this case, so since Jose and Armando were

115

convicted, did you talk to the state's attorney's office about your investigation?

A  In this case?

Q  Yeah.

A  They never contacted me.

Q  Did you talk to any investigators in the state's attorney's office?

A  No.

Q  Did you ever talk to a Celeste Stack or a Kurt Smitko?

A  Who?

Q  Celeste Stack or Kurt Smitko?

A  No.

Q  Or Enrique Abraham?

A  No.

Q  Or Jim Papa?

A  Nope.

Q  Were you provided training from the Chicago Police Department in how to interact with confidential informants?

A  No.

Q  Were you given any training or guidelines on how to keep confidential informants confidential?

A  No.

116

Q  Were you given any training or guidelines from the department about how to document your contacts with confidential informants?

A  No.

Q  Did you work with confidential informants during your career?

A  A few.

Q  Was Francisco Vicente one of them?

A  Yes.

Q  In what kind of circumstances did you work with the other confidential informants?

A  Many years ago I remember I was involved in a murder-for-hire case that came out of Cook County Jail.

Q  And there was a -- was the confidential informant in that case incarcerated?

A  Yes.

Q  Were you provided with any training as to how you were supposed to -- well, strike that.

At Area 5, were you supposed to create a separate file for a confidential informant outside of the file for the case that you were working on?

A  There were --

MS. ROSEN:  Objection; form.

117

MR. ENGQUIST: Go ahead.

A There were no confidential informant files in Area 5 that I ever saw.

BY MR. AINSWORTH:

Q Well, part of a confidential informant is the confidential nature of hiding their identity; right?

A Yes.

Q And if you wrote down their name in the investigative file, that would destroy their confidentiality; right?

A If the name was there, yes.

Q So how would you document the name of the confidential informant?

A As I did in my report, I kept the identity of Francisco Vicente off my reports until I had the opportunity to ensure his safety in Cook County Jail.

Q So you just wouldn't write it down anywhere, write down the name of the informant anyplace and anywhere?

A Not of a confidential informant. I would not put their name in my report initially, no.

Q Well, then how would anyone know years later

118

who the informant was if it wasn't documented?

A They'd have to come ask me.

Q What if something happened to you?

A Say again.

Q What if something happened to you?

MS. ROSEN: Object to the form.

A I don't know.

MS. ROSEN: Calls for speculation.

A They'd have to ask Detective Guevara.

Q What did you review in preparation for this deposition?

A I read the investigative file for this case.

Q How long ago did you read it?

A Yesterday.

Q And before that, when was the last time you read it?

A I had been reading it off and on for weeks.

Q And would you read some portions of it more than once?

A Yes.

Q What else did you do to prepare for this deposition?

A Talked to my attorneys.

Q And which attorneys did you speak to?

119

A Mr. Josh Engquist, Mr. Dan Brueggen, Mr. Jeff Kivetz.

Q And when did you speak to them?

A Yesterday.

Q And did you speak to them before yesterday?

A Yes.

Q When did you speak to them before yesterday?

A We've had meetings over a period of weeks.

Q How long did you meet for yesterday?

A Probably three weeks ago.

Q I mean how long was your meeting yesterday?

A Well, from 10:00 in the morning until 5:00 in the afternoon.

Q And did you have a similarly long meeting at some point before yesterday?

A Not that long, no.

Q When was the last time you met with them before yesterday?

A As I mentioned, probably three weeks ago.

Q And how long was your meeting about three weeks ago?

A From 10:00 to 2:00.

Q And when else did you meet with your attorneys in preparation for this deposition?

120

A Again, I don't remember the exact dates, but we've had two or three meetings.

Q Was there a third meeting?

A Was there a third meeting?

Q Yes.

A Probably.

Q How long was that third meeting?

A Most of our meetings lasted from 10:00 to 2:00.

Q And so would it be fair to say you've met with your attorneys at least three times, the last one being a seven-hour meeting, and the first two being about four hours apiece?

A That would be roughly correct.

Q Did you review any other documents apart from the investigative file?

A I may have, but I don't remember.

Q Did you review any photographs?

A Not that I can recall.

Q Did you review any memos?

A Any what?

Q Memos?

A Not that I can recall.

Q Did you review any transcripts?

121

A  Just the ones that were in the investigative file.

Q  And what transcripts were in the investigative file?

A  I'm confusing the transcript with a handwritten statement.  I don't think there were any transcripts in the investigative file.

Q  Did you review any transcripts at all?

A  Not that I remember.

Q  You reviewed the handwrittens that were in the file; is that right?

A  Yes.

MR. AINSWORTH:  Let's mark this as Exhibit No. 1, please.

(Halvorsen Deposition Exhibit 1 marked for identification and attached to the transcript.)

MR. AINSWORTH:  Counsel, I just have the one color photo.  I'm going to give you each a black-and-white copy.

Q  Showing you what we've marked as Exhibit No. 1 to your deposition, can you identify the people in that photograph?

A  I see Ray Guevara.

Q  Can you describe who Ray Guevara is in that

122

photo?

A  He's the gentleman wearing a suit and the tan latex gloves.

Q  Pointing down towards the ground?

A  Yes.

Q  And who else do you recognize in that photograph?

A  That may be me behind Guevara, but I can't be sure.

Q  I guess that's why I'm asking.

How did you wear your hair back in 1993?

A  On my head.

Q  What style hair did you have?

A  Regular hair cut.  Nothing special.

Q  Did you have long hair?

A  No.

Q  Short hair?  Medium hair?

MS. ROSEN:  Object to the form.

A  I would probably consider it medium hair back in '93.

Q  All right.  Were you and Ray about the same height?

A  I think he was a little taller than me.

Q  How tall are you?

123

A  5-7.

Q  How much did you weigh back in 1993?

A  About 170.

Q  Do you recognize the third gentleman in the photograph standing by the pole?

A  No.

Q  Do you know what this photograph is -- depicts?

A  I think this is the kid that was shot out in front of Roosevelt High School.

Q  Salvador Ruvalcaba?

A  If that's the name of the guy.

Q  How did you first learn about that murder outside of Roosevelt High School?

A  I was assigned to the case when I walked in the door at Area 5 at 3:00 o'clock on the day of the murder.

Q  What was your typical shift start?

A  3:00 o'clock.

Q  And when you worked the 3:00 o'clock shift, what time would you arrive at work?

A  3:00 o'clock.

Q  What was the -- did you have a roll call?

A  No.

124

Q  Would you arrive in your -- dressed for work?

A  Yes.

Q  Would you carpool with anyone else to get to work in '93?

A  No.

Q  Where would you go when you first arrived for work in 1993?

A  Go up in the violent crimes office.

Q  And what would you typically do in 1993 when you arrived at work at the violent crimes office?

A  Check in with the sergeant and see what's going on.

Q  And on May 14th, 1993, what were you told -- and that was the day of the Salvador Ruvalcaba murder?

A  I don't remember the exact date; but if you're saying that's the date, then it would be correct.

Q  And what were you told on that date when you went in and checked with the sergeant?

A  Shortly after I arrived, me and Detective Guevara were assigned to a murder that had just occurred outside of Roosevelt High School.

125

Q  And were you -- when you were assigned a murder, what does that mean?

A  We were going to be the -- what we call the scene detectives, which would be the first detectives assigned to an investigation.

Q  And so what did you do after you learned that you were going to be the scene detectives for the murder outside of Roosevelt High School?

A  We went to Roosevelt High School.

Q  And what did you do when you got to Roosevelt High School?

A  Observed the body on the street.

Q  Then what did you do?

A  We learned from the officer of the 17th district that there were a number of eyewitnesses, the eyewitnesses had given them a very good description of the person who had shot Mr. Ruvalcaba, and that there was a search underway at that time to find the suspect.

Q  Do you recall what that description was?

A  No.

Q  But it was the 17th district officers who obtained that description?

A  Yes.

126

Q  What area of the city did you grow up in?

A  Two different areas.

Q  Which two?

A  Humboldt Park and Logan Square.

Q  Which part of Humboldt Park?

A  Kedzie and Evergreen.

Q  And which part of Logan Square?

A  Central Park and Wrightwood.

Q  Did you spend your teenage years in either one of those or both?

A  Teenager would have been Central Park and Wrightwood.

Q  When did you move to that area?  How old were you?

A  After I graduated grammar school, we left Humboldt Park and we moved to Logan Square.  So I would have been about 13 years old.

Q  What did you do at the scene of the Ruvalcaba murder after you learned that there was a description of the offender?

A  We did our initial work at the scene, and then me and Detective Guevara, we both went out looking for the suspect too.

Q  Do you recall the description of the

127

offender?

A  No.

Q  And what happened after you and Guevara went out looking for the suspect?

A  I heard on the radio that the tactical team from the 17th district had located the possible offender and they were taking him to the 17th district.

I then got on the radio and told them make sure you take them all to Area 5.  Then me and Guevara went back to Area 5.

Q  What do you mean "all"?

A  The suspect and the witnesses.

Q  Did you see the suspect at the scene of the murder?

A  No.

Q  Do you know if a show-up was conducted at the scene of the murder?

A  I have no knowledge of it.

Q  Do you know who any of the witnesses were to that murder?

A  I don't remember.

Q  Do you know what gangs were involved in that crime?

128

A  I don't remember.

Q  Do you remember there being a conflict between the Cobras and the PR Stones?

A  I don't remember.

Q  What happened after you went to Area 5 after directing the witnesses and the suspect to go there?

A  We conducted a series of lineups.

Q  And when you say "a series of lineups," was it more than one offender in the lineups?

A  One offender.

Q  One offender?

A  Yes.

Q  And a number of witnesses?

MS. ROSEN:  In the lineup?

MR. AINSWORTH:  Viewing the lineup.

MS. ROSEN:  Oh.

MR. AINSWORTH:  Number of witnesses.

A  There were if I -- I remember there were more than one lineup.

Q  When you have multiple witnesses and one lineup, do you have the witnesses view the lineup at the same time or separately?

A  Separately.

Q  Why do you have them view it separately?

129

A So they don't influence each other's identification.

Q When you were conducting a lineup back in 1993, would you typically be on one side of the lineup than the other?

A Could you say that again, please.

MS. ROSEN: Object to form.

Q Sure. When you conducted lineups back in 1993, you would have one detective on the side with the suspects and one detective on the side with the witnesses; right?

A Yes.

Q In 1993, would you more typically be on the side with the suspects or the side with the witnesses -- or the side with the witnesses?

A It depends --

MR. ENGQUIST: Objection.

Go ahead. Go ahead.

A It depends. Every case is different.

Q What would it depend on?

A Mainly language.

Q And what do you mean by language?

A I don't speak Spanish.

Q So what if the person, the witness was a

130

non-Spanish speaker?

A Then I could possibly be on either side of the glass.

Q If the witness was a Spanish speaker, which side would you be on?

A If the witness only spoke English, she would be on the side with Detective Guevara who spoke Spanish.

Q You mean, if the witness spoke Spanish, then they would be on the side with Detective Guevara; is that right?

A Correct.

Q Do you speak Spanish at all?

A No.

Q Do you understand Spanish when it's spoken?

A No.

Q What happened after you had a series of lineups?

A I don't really recall this investigation. I'd have to sit down and go through the entire investigative file to refresh my memory. If you'd like to give me the file, I'll read it here now and attempt to do so.

Q Well, I'm just asking what do you recall

131

happening next?

A Lineups and then after that I don't recall what we did then.

Q Have you reviewed any reports regarding that Ruvalcaba murder in preparation for today's deposition?

A No.

Q Was anyone charged in that crime?

A Yes.

Q Do you know who was charged in that crime?

A A guy named Robert Bouto.

Q Do you know what happened to his case?

A He was convicted.

Q Do you know what happened subsequently in his case?

A No.

Q Do you know his conviction was overturned?

A I don't know anything about that.

Q Do you recall anything that occurred in that investigation after there was a series of lineups?

A No.

Q Do you recall having any contact with Francisco Vicente in regard to that investigation?

A Now that you've just refreshed my memory,

132

yes.

Q What do you recall, sir?

A Specifically with Francisco Vicente?

Q Yes.

A He was a person that was taken into custody in the 25th district for a series of armed robberies. There was a Detective Rick Maher who processed him for those armed robberies.

At some point during Detective Maher's interviews with Francisco Vicente, he told Maher that he had been in the lockup having a conversation with a guy that was talking about shooting a kid in front of Roosevelt High School.

When I came to work at 3:00 o'clock in the afternoon, either Detective Maher or one of the sergeants told me about this information, and then I proceeded to have an interview with Francisco Vicente.

Q Were you alone or with your partner?

A I was with Detective Guevara.

Q All right. So you and Detective Guevara both questioned Francisco Vicente; right?

A Yes.

Q Where did you question him?

133

A  Up in Area 5 detectives.

Q  And was this during your normal shift of 3:00 o'clock on?

A  Yes.

Q  And where in Area 5 detectives did you question Francisco Vicente?

A  In one of the interview rooms.

Q  Which one?

A  I don't remember.

Q  How did Vicente appear when you talked to him?

A  Fine.

Q  Was he sweating at all?

A  No.

Q  Did he appear to be suffering the effects of withdrawal symptoms?

A  No.

Q  Was he cheerful?

A  Was he what?

Q  Cheerful.

MS. ROSEN:  Object to the form.

Q  Cheerful.

A  Cheerful or tearful?

Q  Cheerful, full of joy.

134

A  He seemed fine.

Q  And what did you say to Francisco Vicente, and what did he say to you?

A  I asked him to tell me what he had told Detective Maher.

Q  What did Vicente tell you?

A  He gave me a long statement about the conversation that he was having with someone in the lockup downstairs.

Q  What did he tell you?

A  I'd have to go back and look at the file to refresh my memory as to everything that Francisco Vicente told me 26 years ago.

Q  What do you remember him saying?

A  That he had been with a guy in the lockup that was talking about doing a shooting in front of Roosevelt High School.

Q  Well, what did he say about doing the shooting?  What do you mean?

A  Again, I'd have to look at his statement to refresh my memory from 26 years ago.

Q  Was Francisco Vicente forthcoming?

MS. ROSEN:  Object to the form.  Calls for speculation.

135

MR. ENGQUIST:  Join.

A  Yes.

BY MR. AINSWORTH:

Q  And did he -- did you have to ask a lot of questions to get him to give you information, or was he just, you know, running with it when you just asked him, you know, what happened?

A  No.  He just related everything that was -- he spoke about with this other person in the lockup.

Q  Which lockup?

A  The lockup at the 25th police district.

Q  And did you believe him when he was telling you this?

A  Yes.

Q  Had you met Vicente before?

A  No.

Q  What gang was Vicente with?

A  He told me he was an Imperial Gangster.

Q  And what gang was Bouto with?

A  I don't remember.

Q  Was Bouto an opposing gang member?

A  I don't remember.

Q  Were the Stones opposing or allied gang members with the IGs back in 1993?

136

A  I don't know.

Q  Did you know at the time?

A  I may have back then, but I don't now.  I don't know now.

Q  Well, back then you would pay attention to whether a person who was giving you information was giving you information about a fellow gang member or an opposing gang member; right?

MR. ENGQUIST:  Objection; calls for speculation, form.

Go ahead.

A  If I knew, yes.

Q  Well, you would make it your business to know whether they were providing information about a fellow gang member or an opposing gang member; right?

A  I did not have that much knowledge about who was a friendly gang as opposed to an opposing gang.

Q  That was more of Ray's territory; right?

A  Correct.

MS. ROSEN:  Objection to the form.

Q  So you would try and find out is what I'm saying.  You would try and find out whether somebody who was giving you information about gang activity

137

was informing about a fellow gang member or an opposing gang member; correct?

MR. ENGQUIST: Objection; form and asked and answered.

A Yes.

Q Because that would be relevant to that's person's bias; right?

A Yes.

Q And the credibility of what -- the information that they were giving you; right?

A Yes.

Q It was less likely, for example, that an opposing gang member would confess murder to -- or strike that.

It's less likely that a gang member would confess murder to an opposing gang member than to a fellow gang member; correct?

MS. ROSEN: Objection; form, calls for speculation.

MR. ENGQUIST: Join.

MS. NIKOLAEVSKAYA: Join.

A Could you say that question again. It was a little confusing.

138

BY MR. AINSWORTH:

Q Sure. A gang member who -- strike that.

It's less likely that a gang member would confess to an opposing gang member than to a member of their own gang; is that right?

A That's backwards.

MS. ROSEN: Object to the form.

Q It would be more likely that they would confess on an opposing gang than their own gang.

Why do you say that?

A Because I would suggest -- I would think they would want to protect members of their own gang.

Q So they're less likely to share their misdeeds with a member of the opposing gang; right?

A No. They're less likely to share their misdeeds with members of their own gang.

Q You think that somebody would say I committed murder more freely to an opposing gang member in the lockup than to a member of their own gang?

MS. ROSEN: Object to the form.

MR. ENGQUIST: I object to the form too, and I think we're talking past each other here but --

139

A If I was a gang member, I would be less likely to tell somebody from a rival gang any misdeeds that I did as opposed to telling members of my own gang of any misdeeds that I did.

BY MR. AINSWORTH:

Q Okay. Did you want to know from Francisco Vicente who else may have witnessed his conversation with Robert Bouto?

A If there was somebody else in the lockup, yes.

Q Did you want to know whether somebody else had witnessed the conversation?

A Yes.

Q Because that's one way to corroborate the information that Vicente is providing you; right?

A Correct.

Q Did you want to know what other information Vicente might have about other crimes?

A Not at that time.

Q Why wouldn't you want to know if Vicente had information about other crimes?

A I didn't think -- I didn't think to press him on anything else other than what he was telling me about the Ruvalcaba murder.

140

Q Remember earlier today you said that if you had an informant who is providing information about a crime, they were forthcoming, you would ask them about what other criminal activity they knew about. Remember that?

A Yeah.

Q So why wouldn't you ask Vicente about other crimes that he had knowledge of?

A He wasn't my informant.

MS. ROSEN: Objection to form.

Q Whose informant was he?

A Nobody's.

Q So he was informing on criminal activity by another person; right?

MS. ROSEN: Object to the form.

A When we spoke to Francisco Vicente, he was any other witness giving us information. We portrayed him as being a confidential informant so that when he went to Cook County Jail, he wouldn't get killed.

Q Why wouldn't you want to know if Vicente could provide information about other crimes in addition to the Ruvalcaba murder?

MS. ROSEN: Object to the form.

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

MS. NIKOLAEVSKAYA: Join.

MR. ENGQUIST: Join. Asked and answered also.

A He was not my informant. We did not question him about any other crimes.

BY MR. AINSWORTH:

Q I understand you're saying you didn't question him about other crimes. I'm asking you the why part.

Why didn't you --

A It didn't occur to me.

Q Let me just ask the whole question.

Why didn't you want to know from Francisco Vicente, who was forthcoming to you about the Ruvalcaba murder, if he knew about other criminal activity that he might be similarly willing to be forthcoming about?

MR. ENGQUIST: Objection; form. Objection; asked and answered.

A I just didn't.

Q I understand you didn't, sir.

Why didn't you?

A I didn't see the necessary -- I didn't think it was necessary.

Q I thought that you wanted to become a detective so that you could investigate crimes and arrest dangerous criminals; right?

A Yes.

MS. ROSEN: Object to the form.

MS. NIKOLAEVSKAYA: Join.

Q So why didn't you think it was helpful to see if this forthcoming witness would provide criminal -- information about other crimes that would help you to arrest dangerous people?

MR. ENGQUIST: Objection; form. Objection; asked and answered. He has already answered the question several times.

Go ahead. You can answer it again.

A I just didn't see a need.

Q You didn't see a need to find out information about other crimes that the witness might possess; right? That's what you're saying?

A I had no linkage with Francisco Vicente to any other crime other than what he was discussing with me regarding the Ruvalcaba murder.

Q So you're saying you didn't even ask him if he knew about any other -- any other crimes?

A As I've said like four times now, no, I did

not.

Q Did Ray Guevara ask Vicente whether he had information about other crimes?

A Not in my presence.

Q Did you talk to Ray Guevara about asking Vicente about other crimes?

MR. ENGQUIST: Objection; vague. Are you talking about that time?

Q Yeah. May 15 -- May 14, May 15 of 1993.

A I don't remember.

Q You knew John Dillon; right?

A Say that again, please.

Q You knew John Dillon; right?

MR. ENGQUIST: Objection; vague as to time frame.

MS. NIKOLAEVSKAYA: Join.

A I knew John Dillon when?

Q When did you first meet John Dillon?

A Many, many years ago.

Q In what context?

A He's an assistant state's attorney.

Q So how did you meet him?

A He was one of the prosecutors up in the state's attorney's office.

Q So how did you meet him?

A I don't remember specifically how I met him.

Q Was he the prosecutor on some cases that you had investigated?

A He might have been, but I don't remember.

Q How do you know Jose Montanez?

MS. ROSEN: Objection; form.

A From this case or other cases?

Q That's what I'm trying to find out, sir.

MS. ROSEN: Objection; form.

A I don't know him personally. He first came up in a murder investigation in 1990 in Area 5 where he was arrested and charged. I don't remember working on that case with him.

The next thing I knew about Jose Montanez was when -- the statement from Francisco Vicente.

Q How do you know that Jose Montanez was arrested and charged in a 1990 case?

A It's on his rap sheet.

Q And your name is on that rap sheet; right?

A I don't remember.

Q Did you arrest Jose Montanez ever?

A I don't remember.

Q Well, why did you say that -- or why is the

145

fact that Jose's rap sheet reveals he was arrested in 1990 -- what does that have to do with your response to whether you know Jose Montanez?

A At some point in 1990, he was brought up to Area 5 for a murder investigation, and I saw him.

Q And did you work that murder investigation?

A I don't believe so. I think I assisted Detective Paul Nitsky in making an arrest, and that was it.

Q How did it come up that you assisted Detective Paul Nitsky in making an arrest in that case?

MS. ROSEN: Object to form. What does that mean how did it come up?

A I don't remember.

Q Why were you assisting Detective Paul Nitsky?

A I'd have to look at that investigative file to refresh my memory. I don't remember.

Q Did you talk to Jose Montanez in 1990?

A Not that I remember.

Q After Vicente provided you information about Robert Bouto, what did you do with that information?

A We eventually called felony review, and the

146

assistant state's attorney came out and interviewed Robert -- Francisco Vicente and took a handwritten signed statement from him.

Q And did you try to corroborate Vicente's statement?

A Later that afternoon, yes, we did.

Q How did you go about trying to corroborate his information?

A Detective Guevara contacted Wilda -- Wilda, the victim's wife on the phone. They had a conversation, after which we went over to Wilda's house. I sat out in the car. Guevara went in the house and had an interview with Wilda. He showed her some photos.

Wilda identified two photos of some individuals that she had seen in a gas station at North Avenue and Central Park that had followed her home on the 4th of February, 1993.

MR. ENGQUIST: I think the question might have been vague. You got a different time-frame answer.

MR. AINSWORTH: I understand.

Q So after Vicente provided the information about Robert Bouto, what did you do?

147

A The next thing was we went and talked to Wilda.

Q And why did -- you sat in the car while Guevara went inside; right?

A Yes.

Q So you weren't present when Guevara showed Wilda the photographs; right?

A Correct.

Q So you have no idea what was said to Wilda by Ray Guevara; right?

A Correct.

Q Or what she said to him; right?

A Correct.

Q Or whether she actually identified anybody from that photo array; right?

MS. ROSEN: Objection to form.

A I'm going by what Ray Guevara told me.

Q And you helped create the photo array that was showed to Wilda Vargas; right?

A Not that I remember.

Q Who created that photo array that was showed to Wilda Vargas?

A Guevara.

Q So it was all Guevara's doing; right?

148

MS. ROSEN: Object to the form.

A Guevara showed her the photo array.

BY MR. AINSWORTH:

Q And he created the photo array; right?

A Yes.

Q Did you tell him, I don't know. That photo array doesn't really look to be a fair one?

A We didn't discuss the composition of the photo array.

Q My question is a little bit different.

Did you alert Guevara to the fact that you didn't think the photo array was a fair one?

A No.

Q Did you think the photo array was fair?

A Back in 1993, yes.

Q Why did you think it was fair?

A It looked fair to me.

Q So you viewed the photo array before it was shown to Wilda; right?

A Before or after, I don't remember. It was inventoried.

Q In any event, whenever it was that you saw the photo array, it didn't raise any issues in your mind about being unfair; correct?

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

149

A  No.

Q  That's correct?

A  That's correct.

Q  And I'm referring to the photo array that was shown to Wilda Vargas; right?

A  Yes.

Q  And so why didn't you go inside Wilda's house to observe her, you know, making an identification, if she could, from the photo array?

A  There might have been a parking problem out in front that I had to sit in the car.

Q  As a detective, you had M class plates; right?

A  Say again.

Q  You had M -- you had plates with a -- that indicated it was a municipal car?

A  I don't remember what we had in 1993.

Q  Do you know what I mean by M plates?

A  Yes.

Q  All right.  You drove a department-issued car back in 1993, right, when you were on duty?

A  An unmarked car, yes.

Q  All right.  An unmarked car with municipal plates?

150

A  I don't believe we had municipal plates on the car.  Those were on the marked cars.

Q  Wilda lived on a residential street; right?

A  Yes.

Q  Are you saying that you didn't go inside because you had to keep from getting a ticket?  That's what you're saying?

MS. ROSEN:  Object to the form.  Mischaracterizes his testimony.

MR. ENGQUIST:  Join.

A  What I'm saying is that I don't remember why I sat in the car.  I'm just giving you a plausible reason.  I don't really remember why I sat in the car.

Q  There's no police reason for you to be sitting in the car; right?

MS. ROSEN:  Object to the form.

MR. ENGQUIST:  Vague.

A  There had to be a reason.  I just don't remember.

Q  What I mean is there was -- it wasn't helpful for the investigation for you to be sitting out in the car; right?

MS. ROSEN:  Object to the form.  Calls for

151

speculation.

MS. NIKOLAEVSKAYA:  Join.

A  No.

BY MR. AINSWORTH:

Q  You didn't sit out in the car to give the investigation a tactical advantage to allow Guevara to go in alone; is that right?

MS. ROSEN:  Object to the form.

MS. NIKOLAEVSKAYA:  Join.

MR. ENGQUIST:  Join.

A  No.

Q  How did you -- did you come into contact with Vicente again after he provided information about Robert Bouto?

A  Yes.

Q  How did you come in contact with him again?

A  On the 31st, I can't remember what month it was.

Q  May?

A  I just remember it was on the 31st.  It might have been May.  He called me up at Area 5 on the pay phone from Cook County Jail, collect, that I accepted charges, to let me know that an attorney had showed up at Cook County Jail and tried to bribe

152

him not to testify against Robert Bouto.

Q  So did you answer that call when he was calling collect?

A  I don't know if I answered the phone or if the phone was given to me, and then I accepted the charges.

Q  What did you say to Francisco Vicente when he told you that an attorney had tried to bribe him?

A  I told him I was going to arrange for him to come over to the Cook County State's Attorney's Office as soon as possible so he could tell his story to someone in the gang prosecution office.

Q  Did you talk to anyone in the gang prosecution office about what Francisco Vicente told you?

A  Yes.

Q  Why did you contact somebody in the gang crimes -- or in the gang prosecution unit?

A  I believe they were prosecuting the case.

Q  How do you know that?

A  I don't recall at this time.

Q  Who did you contact within the gang prosecution unit?

A  John Dillon.

153

Q Why did you contact John Dillon as opposed to some other prosecutor?

A I believe he was a supervisor.

Q So you contacted the supervisor of the gang prosecution unit?

A Yes.

Q Why did you contact the supervisor of the gang prosecution unit?

A Because I wanted Francisco Vicente brought over to their office to let them know about this bribe attempt.

Q And so why the supervisor as opposed to any of the other assistants there?

A I thought it was an important matter to go right to the supervisor.

Q So at the time you didn't know that John Dillon was assigned to the case in any way?

A John Dillon?

Q Yeah.

A I think he was a supervisor. I don't think he was assigned to the case.

Q And what did the -- what did John Dillon say to you when you contacted him about Vicente?

A That he would arrange to bring him over as

154

soon as possible, and we'd talk to him.

Q All right. Did you set a time for that to happen?

A Huh?

Q Did you set a time for that to happen?

A No.

Q What was your understanding of how Vicente was going to get from Cook County Jail to the gang prosecution unit?

A Dillon would arrange it.

Q So you didn't think that you would be bringing Vicente up; is that right?

A That's correct.

Q So that was for Dillon to arrange and -- for Dillon to arrange for Vicente to get from the Cook County Jail to the gang crime -- gang prosecution unit; right?

A Correct.

Q Did you intend to be present for that conversation with John Dillon?

A Yes.

Q Why?

A I wanted to hear what was going on.

Q Why did you want to hear what was going on?

155

A Because I didn't like the fact that some attorney was trying to bribe a witness in my murder case.

Q Did you learn that Vicente was actually going to be at the gang prosecution unit?

A Yes.

Q How did you learn that?

A I don't remember who called me, but it was determined that Vicente will be brought over on the 2nd of June. The 2nd of June, I went down there, and he was there.

Q Did you go with anyone else to the gang prosecution unit?

A No.

Q Did you go at your scheduled work time, 3:00 o'clock?

A No.

Q Why not?

A Because he was -- Francisco Vicente was brought over earlier in the day. So I changed my work hours so that I could be there when he was there.

Q And how did you go about changing your work hours?

156

A Tell the sergeant what I had to do, and they change the work hours.

Q What were your work hours on that day, June 2nd?

A I don't remember.

Q Well, do you know what -- did you meet with Vicente in the morning? In the afternoon? At night?

A It was sometime afternoon.

Q And can you tell us what -- so when you went to the gang prosecution unit, was Vicente already there?

A Yes.

Q And where did you meet with Vicente?

A One of the offices up in gang prosecution on the 13th floor at 2600 South California.

Q And who was present for that meeting?

A Myself, John Dillon, and Francisco Vicente.

Q And so why didn't Ray Guevara come with you?

A He wasn't working.

Q You weren't working either; right?

A But I changed my hours.

Q Why didn't Ray Guevara change his hours?

MS. ROSEN: Objection; foundation.

MS. NIKOLAEVSKAYA: Join.

MS. ROSEN: Go ahead.

A I don't remember what Ray was doing back on the 2nd of June of 1993.

Q And so did Dillon do most of the questioning of Vicente in that meeting?

A Yes.

Q And you were there to take notes?

A No.

Q Did you take notes?

A No.

Q Why didn't you take notes?

A I didn't bring my notepad with me.

Q Did you ask for some paper?

A No.

Q You keep a notepad in your car; right?

A In my police car, yes.

Q All right. Did you drive there in your personal car?

A I don't believe so.

Q So why didn't you bring your notepad from your car to a meeting with a witness who has made a pretty serious allegation that he has been attempted to be bribed by an attorney?

A He had told me all the details on the phone when I first talked to him. I just didn't bring a notepad.

Q So when he told you all of the details on the phone, did you then document that in a supplementary report?

A Eventually.

Q Well, I mean, before June 2nd, did you make a supplementary report to document those details that he provided you on the phone?

A I can't remember the dates. I do know that everything that Francisco Vicente told me about the attempt to bribe with the attorney I documented on a supplementary report.

Q Did you take any notes when Vicente called you on the phone?

A That I don't remember.

Q Was there anything preventing you from taking notes when Vicente called you on the phone while you were at a desk in Area 5?

A I don't remember taking any notes.

Q You had no paper available; right?

A Yes.

Q All right. So then Vicente tells John

Dillon about the -- about the attempted bribery; right?

A Yes.

Q And then Dillon starts talking about the Vargas homicide; is that correct?

A No. I don't remember that conversation.

Q Well, how did Dillon get the conversation from the bribery to the Vargas -- to the Vargas homicide?

MR. ENGQUIST: Objection; form.

MS. NIKOLAEVSKAYA: Join.

A We never talked to him about the Vargas homicide, to my knowledge.

Q Well, tell us what conversation was had between John Dillon and Francisco Vicente in that room in the gang prosecution unit.

MS. ROSEN: Objection to form.

MS. NIKOLAEVSKAYA: Join.

A Dillon -- Dillon questioned Francisco Vicente about the bribery attempt in Cook County Jail. That's it. When Francisco Vicente started talking to me about the Vargas murder, Dillon wasn't in the room.

BY MR. AINSWORTH:

Q Well, where was Vicente when he started talking about the Vargas homicide?

A In one of the offices at gang prosecution.

Q And who was present?

A When he started talking about the Vargas homicide, it was just me and Francisco Vicente.

Q Well, where was John Dillon?

A He had left.

Q Why did he leave?

MS. NIKOLAEVSKAYA: Objection.

MS. ROSEN: Form.

MS. NIKOLAEVSKAYA: Form.

A He was a supervisor. He had other tasks and duties he had to attend to.

Q All right. And so tell us, you talk about the -- the bribery attempt, and Vicente doesn't say anything about the Vargas homicide; is that what you're saying?

A Not at that time.

Q And so how does it come up that Vicente starts talking about the Vargas homicide?

MS. ROSEN: Object to the form.

MR. ENGQUIST: Join.

161

MS. NIKOLAEVSKAYA: Join.

A We had information that some guy named Pistol Pete was a possible suspect in the Vargas murder. I had been told by Officer Lupe Pina that Francisco Vicente knew somebody named Pistol Pete.

When I was with Francisco Vicente, I asked him do you know somebody named Pistol Pete?

And he goes, Well, Little Pistol Pete or Big Pistol Pete?

I said, I don't know. I says, I'm investigating a Pistol Pete that did a shooting on Springfield last February.

He goes, Oh, that's Big Pistol Pete.

I said, Well, how do you know that?

He then gave me a lengthy statement about his knowledge of that case.

BY MR. AINSWORTH:

Q And did he -- did you document all the information that he provided you in a supplementary report?

A Yes.

Q And did you document how he described Pistol Pete in that supplementary report?

A I'd have to review that report to give you

162

an accurate accounting of what everything he said.

Q Is there any reason why you wouldn't document Vicente's description of Pistol Pete, Big Pistol Pete?

A There would not be any reason I would not document it, but again I would have to review that report to refresh my memory.

Q You said you'd received some information that there is a Pistol Pete involved in the homicide; is that right?

A Yes.

Q Where did that information come from?

A Ray Guevara.

Q What did Ray Guevara tell you?

A He had a street source that was telling him that three guys were involved in that murder over on Springfield.

Q So a street source said three guys were involved in the murder on Springfield?

A Yes.

Q Did Ray Guevara tell you anything else about the three guys who were involved in the murder on Springfield?

A I think he initially gave me their

163

nicknames.

Q What were the nicknames that he --

A Pistol Pete, Joker, and Mondo.

THE REPORTER: Pardon?

THE WITNESS: Pistol Pete, Joker, and Mondo.

Q Okay. So Ray Guevara told you Pistol Pete, Joker, and Mondo were involved in this crime; right?

A Ray told me that someone had given him information that these three guys were involved in that incident.

Q So when Ray Guevara told you that he had information that these three guys were involved in the murder, you then documented that information so it would be preserved in the file for you to then conduct your follow-up investigation.

A No, I did not.

Q Why didn't you document in the file when Ray Guevara told you that there's a street source saying that there were three guys -- Pistol Pete, Joker, and Mondo -- who were involved in this murder?

A It was an ongoing investigation. It was going to be documented eventually.

Q What do you mean "it was going to be documented eventually"?

164

A We were working the information to see if it was factual or not.

Q So you withheld the information from the file to see if it could be corroborated?

MS. ROSEN: Objection to form.

MR. ENGQUIST: Join.

MS. NIKOLAEVSKAYA: Join.

A No. We were proceeding with the investigation. Ray Guevara got some loose information that guys with three nicknames may have been involved in this incident.

I wanted to proceed and do a further investigation before I started typing supplemental reports.

Q So you looked in your nickname file to try and find out who Pistol Pete was; right?

A At one point I did, but there were just too many Pistol Petes.

Q And so you couldn't tell from the nickname file who Pistol Pete was; right?

A Not the one that Guevara was referring to.

Q Okay. So how long before June 2nd did Ray Guevara tell you that he heard from a source that three guys named Pistol Pete, Joker, and Mondo were

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

165

involved in this murder?

A  I think he told me that information sometime around the end of May.  That was before June 2nd.

Q  So at the end of May, he provided this information; right?

A  Huh?

Q  End of May he provided you this information; right?

A  I believe it was sometime around that.  Some time in that last week of May.  It was before June 2nd.

Q  So right before Francisco Vicente ends up in John Dillon's office, you learn about Pistol Pete and Joker and Mondo being involved in this murder via Ray Guevara; right?

MR. ENGQUIST:  Objection to form.

Go ahead.

A  I learned from Ray Guevara the information he had.

Q  Who did Ray Guevara get it from?

A  I don't know.

Q  Did you ever ask him?

A  Yes.

Q  What did he say?

166

A  Couldn't tell me.

Q  Well, what did he say?

A  Street source.

Q  He refused to tell you?

A  That I don't remember, but he didn't tell me.

Q  Did he do something other than refuse to tell you what the name of the person was?

MS. ROSEN:  Objection to form.  Asked and answered.

MS. NIKOLAEVSKAYA:  Join.

A  Did Ray Guevara do something else?

Q  Yeah.

A  I imagine that he tried to identify who the nicknames belonged to.

Q  Sorry.  I need to -- when you asked Ray Guevara who the source was, what did Ray say in response?

A  I don't remember the conversation specifically.

Q  Well, what did Ray say generally when you asked him who his source was for this information?

A  He never told me.

Q  So he just refused to tell you?

167

A  He never told me.  It's just as simple as that.

Q  Did you want to know?

A  Yes.

Q  Why did you want to know?

A  Reliability of the informant.

Q  You wanted to know if this was somebody who provided accurate information on other occasions; right?

A  Yes.

MS. ROSEN:  Object to the form.

Q  Did Ray Guevara tell you anything about the informant as to his or her reliability?

A  No.

Q  Did you ask him whether this was a witness who had provided credible information on other occasions?

A  No.

Q  Why didn't you ask Ray, you know, the foundational question?  Just, Hey, is this person legit or something to that effect?

A  I didn't ask him that question.

Q  Did you ask him something to that effect?

A  No.

168

Q  Why not?

A  I didn't.

Q  But you wanted to know whether the person was legit or not; right?

A  Ray said he got it from a street source, and that was it.

Q  All right.  But you wanted to know if the person was legit; correct?

A  Yes.

Q  But you didn't ask Ray if the person was legitimate or had provided credible information on other occasions; right?

A  He wouldn't tell me who the person was.

Q  Were there other occasions when Ray had obtained information from street sources but refused to tell you who it was who provided the information?

A  Not that I recall.

Q  So this was the only time that Ray refused to tell you who his source was for information as far as you can remember; right?

MS. ROSEN:  Object to the form.

A  As far as I can recall, this is the only time.  There may have been other times.  I don't recall them.

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

169

BY MR. AINSWORTH:

Q There were other occasions when Ray told you who his sources were; right?

A Yes.

Q Did it raise a red flag in your mind? You know, why isn't Ray sharing with me the name of the person who is providing this information?

A I thought it was someone that Ray was trying to protect.

Q Did you think that Ray didn't trust you?

A Could have been.

Q Did you think at the time that Ray didn't trust you?

A No. I don't know what I thought at the time.

Q Did you trust Ray?

A Yes. As a police officer, yes.

Q How about as a person?

A Yeah. I'd say yes.

Q Why do you hesitate?

A I have trusted him as a police officer and as a person.

Q You took a long pause there. What were you considering?

170

A Well --

MS. ROSEN: Object to the form.

A -- I would trust him as a police officer and a person.

BY MR. AINSWORTH:

Q What's some of the crazy ass stuff that you've heard about Ray doing off duty?

MR. ENGQUIST: Objection to form.

MS. ROSEN: I object to form.

MS. NIKOLAEVSKAYA: Join.

A When you mention "crazy ass stuff," such as what?

Q That's what I'm trying to find out from you, sir.

MS. ROSEN: Object to foundation as to crazy ass.

A The only crazy ass thing I know Ray ever did is he went into the 14th district police station one time, got into a verbal argument with the officers there over a parking ticket and he -- I think he took a suspension. That's the only crazy ass thing I can remember.

Q Did you ever tell anyone that Ray Guevara used to do crazy ass shit while off duty?

171

A Did I what?

Q Did you ever tell anyone that Ray Guevara did crazy ass stuff while off duty?

MS. ROSEN: Objection; form, foundation, once again --

A Not that I remember.

MS. ROSEN: -- to the phrase crazy ass.

MR. ENGQUIST: Join.

MS. NIKOLAEVSKAYA: Join.

Q All right. So you would have wanted to know who Vicente was referring to when he mentioned Pistol Pete and these other people; right?

A Yes.

Q Because you needed to know, like, which Pistol Pete he's talking about; right?

A Yes.

Q Because you already knew that there were too many Pistol Petes in the nickname file for you to be able to identify who it was based solely on the nickname Pistol Pete; right?

A Correct.

Q So you would have asked Vicente for a description of the Pistol Pete he was referring to; right?

172

A I don't specifically remember what I asked him.

Q But you would have wanted to obtain a description from Vicente that would allow you to narrow down which Pistol Pete we're talking about here; right?

A He just told me the Big Pistol Pete.

Q I understand what he told you, but I'm asking a different question. My question here is you wanted to know a description of the Pistol Pete that Vicente was referring to so you could narrow down who that Pistol Pete was; right?

A I don't remember.

Q Well, how about now? As an experienced homicide detective, if you knew that there were too many Pistol Petes in the nickname file to allow you to identify the person simply by the nickname, you would have wanted to know either the person's given name or a description of the person that would allow you to identify which of the Pistol Petes it was; right?

A I think what happened here is after I talked to Francisco Vicente, I called the office. I don't

**173**

remember who I talked to in the office, but someone was able to give me the names of Montanez, Pacheco, and Serrano.

I then went and got Chicago Police Department black-and-white photos. I can't remember if I went back to Area 5 and got them or if I went down to 11th and State and got them. But I got the black-and-white photos of the three individuals.

I took them back up to gang prosecution, showed them to Francisco Vicente, and he identified Pacheco, Serrano, and Montanez as being the three persons he was referring to in the statement he had given me.

Q Who did you call at the office?

A I just said I don't remember.

Q Was it a detective or a supervisor?

A I don't remember.

Q What was your purpose for calling the office?

A To have someone look up those three nicknames.

Q All right. So you asked somebody to look up the three nicknames, and the three nicknames were what?

**174**

A That Francisco Vicente had given me.

Q Which nicknames were they?

A Pistol Pete, Mondo, Joker.

Q All right. So you called somebody on the phone at Area 5?

A Yeah.

Q And you gave them the nickname Mondo; right?

A Yes.

Q And we're talking about the City of Chicago; right?

A Yes.

Q And all you said to them was I need to know who Mondo is; right? And the other nicknames; right?

MS. ROSEN: Object to the form.

A Someone at Area 5 was able to give those three nicknames I gave them on the phone and give me three possible real names to go with those nicknames.

Q One for each nickname; right?

A Yes.

Q So you said, for example, I need some -- the names for these people. One of them is named Mondo, and the person on the other end of the phone said,

**175**

Oh, you're looking for Mondo? That's Armando Serrano, or something to that effect.

Is that what you're saying, sir?

A I'm saying --

MS. ROSEN: Object to the form.

MR. ENGQUIST: Join.

MS. NIKOLAEVSKAYA: Join.

A I'm saying someone in the office was able to look up those three nicknames and give me possible names. I don't remember who it was.

Q Okay. So, sir, you testified at Armando Serrano and Jose Montanez's trial; right?

A Yes.

Q And at that trial, were you asked the following question, and did you give the following answer, sir?

MR. ENGQUIST: Can you tell us what you're reading off of.

MR. AINSWORTH: Sure. Page 83, Bates-numbered JR-L 05066.

MR. ENGQUIST: 05066?

MR. AINSWORTH: Yes.

MR. ENGQUIST: All right.

Q And I'll start lines 7 through 17.

**176**

"QUESTION: What else did he tell you?

"ANSWER: He then gave me a lengthy statement of what he knew about the murder of Rodrigo Vargas.

"QUESTION: After he did that, what did you do?

"ANSWER: He supplied me the three nicknames of Pistol Pete, Mondo and Jordan."

A Oh, Jordan. Okay.

Q "I checked my nickname files in my office, and I saw that Pistol Pete was, in fact, Jose Montanez, Mondo was Armando Serrano, and Jordan was Jorge Pacheco. I had dealt with all three of these persons in the past in investigations."

Were you asked those questions, and did you give those answers, sir?

A Yes.

Q So, sir, did you call some unknown person on the phone to check the nicknames, or did you check it yourself, sir?

A After I talked to the person -- let me correct something. I said Joker before. The nickname was Jordan.

After I talked to the person in Area 5 and

saw their pictures, once I got them, I remembered these guys.

Q Okay. But how did you connect Mondo to being Armando Serrano?

A From the nickname files.

Q What about the nickname files indicated that -- was there only one Mondo in the nickname files?

A As I said, when I called Area 5, whoever I spoke to gave me three names that could possibly be the persons associated with these nicknames.

Q So it was just the first person off the list of all the Mondos in the City of Chicago?

MS. ROSEN: Objection to form.

MS. NIKOLAEVSKAYA: Join.

MR. ENGQUIST: Join.

A This list was not a list in the City of Chicago. This is Bob DeGraf's nickname file.

Q Right. So of all the Mondos in the nickname file, he gave you -- just picked one at random, or how did that happen?

MS. ROSEN: Object to the form, foundation.

MR. ENGQUIST: Join.

MS. NIKOLAEVSKAYA: Join.

A I was given three names. I went and got their pictures to see if these were the right persons. Francisco Vicente identified them as being the persons he was referring to.

BY MR. AINSWORTH:

Q All right. Sir, so at that -- so when you testified at trial, you said that you checked your nickname files at the office, and you saw that Pistol Pete was, in fact, Jose Montanez, Mondo was Armando Serrano, and Jordan was Jorge Pacheco; right? Do you want to read your testimony?

A No. If you're saying that's what I said, that's probably true.

Q Well, let's avoid probably.

MR. AINSWORTH: Let's mark this as Exhibit No. 2. Everybody can take this.

(Halvorsen Deposition Exhibit 2 marked for identification and attached to the transcript.)

Q Flip to page 83 of Exhibit No. 2.

MS. ROSEN: The regular page or the Bates page?

MR. AINSWORTH: Regular page.

Q So back when you testified, you said, "I checked my nickname files at my office, and I saw

that Pistol Pete was, in fact, Jose Montanez, Mondo was Armando Serrano, and Jordan was Jorge Pacheco; right? That's what you testified to?

A Yes.

Q All right. Were you truthful in -- when you testified under oath at a murder trial?

A These weren't my nickname files. These were the Area's nickname files. I misspoke.

Q So you were using my nickname files. You meant Bob's nickname files; right?

A Yes.

Q Okay. But you said "I checked"; right?

A Did what?

Q You said that I checked my nickname files at my office, and I saw that Pistol Pete was, in fact, Jose Montanez, Mondo was Armando Serrano, and Jordan was Jorge Pacheco; right? That was your testimony; correct?

A Yeah.

Q That you were the one who checked; right?

A Yeah.

Q And you were the one that saw that those were the people identified for each of those people; right?

A As I explained today, I called my office. Someone in Area 5 checked these nicknames against Bob DeGraf's master nickname list of gang members. He gave me three possible names to match up the nicknames I was given.

Q And you knew that there were too many Pistol Petes in the nickname file to be able to identify any one Pistol Pete; right?

A Yes. Initially, yes.

Q Well, at any point in time?

A Initially, yes.

Q Well, when you talked to the person on the phone, did you say, Gee, how were you able to identify which Pistol Pete we're looking for from the nickname file? When I looked, there were too many for me to tell who it was.

MR. ENGQUIST: Objection; form.

MS. ROSEN: Object to the form.

MS. NIKOLAEVSKAYA: Join.

A I think at that time, I told them to look for Imperial Gangsters.

Q You told them to look for Imperial Gangsters.

A Yeah. Now that I'm thinking about it.

181

Q Okay. So you said, Look for Imperial Gangsters because Ray Guevara's informant on the street didn't know that these people were Imperial Gangsters; is that right?

A I don't know.

MR. ENGQUIST: Objection; form, argumentative.

MS. NIKOLAEVSKAYA: Join.

Q And you're saying that Jordan -- looking for the nickname Jordan led you to Jorge Pacheco. That's what you're saying?

MS. ROSEN: Object to the form.

A Okay. For about the fifth time now, I called my office. Someone I spoke to looked up these three nicknames, gave me three possible real names of members of the Imperial Gangsters who had these nicknames.

Q All right. So sir --

MR. ENGQUIST: Are we going on to another exhibit?

MR. AINSWORTH: Not yet.

MR. ENGQUIST: Okay. Because if now would be a good time for a break, now would be a good time for a break.

182

MR. AINSWORTH: Let me just finish this one point, and we can take a break.

BY MR. AINSWORTH:

Q So did you have to go and get the photos of Pistol Pete, Jordan, and Mondo?

MR. ENGQUIST: Objection; asked and answered.

A Yes.

Q All right. Sir, in your supplemental report dated June 2nd, 1993, in this case, did you write, "The reporting detectives were familiar with the Imperial Gangster street gang and had photos of Pistol Pete, Jordan, and Mondo"?

A Yes.

Q You didn't say we had to go and get photos of the three of them. You said we had photos because we are familiar with them; right?

MR. ENGQUIST: Objection.

MS. ROSEN: Object to the form.

MR. ENGQUIST: Join.

MS. NIKOLAEVSKAYA: Join.

A As I testified before, I don't remember where I got the photos from, either from the office

183

or from the graphic arts. Their photos were probably on their arrest cards at Area 5.

BY MR. AINSWORTH:

Q Well, when you learned that these three people were wanted for this murder, you wanted to get photos of them; right?

MS. ROSEN: Object to the form.

MR. ENGQUIST: Join.

MS. ROSEN: They were wanted by who? Object to the form.

A I wanted to show Francisco Vicente pictures of three individuals that might be the Pistol Pete, the Jordan, and the Mondo that he was referring to. I did not know when I showed him the pictures if these were the three guys he was talking about.

Q So you wanted to bring Vicente from gang prosecution to Area 5; right?

A No.

Q You wanted to show him the photos; right?

A Yes.

Q So you had to go get the photos; right?

A Yes.

Q So where did you -- so you didn't know where

184

to go to get the photos; right?

MS. ROSEN: Objection; form, foundation, and vague as to time.

A As I have now mentioned the fourth time, that I don't recall where I went and got the photos, either Area 5 or 11th and State.

Q But in 1993 you said you had the photos of these three; right?

MS. ROSEN: Object to the form.

MR. ENGQUIST: Join. Asked and answered.

A Yes. But I don't remember on that date where I went and got them.

Q You didn't say you had to go anywhere to get them; right?

MS. ROSEN: Objection; form, argumentative.

MS. NIKOLAEVSKAYA: Join.

MR. ENGQUIST: Join.

A I think I did.

Q It says, "The reporting detectives were familiar with the Imperial Gangster street gang and had photos of Pistol Pete, Jordan, and Mondo."

A Can I read my report?

Q Sure.

MR. AINSWORTH: Let's mark this as Exhibit

185

No. 3, please.

(Halvorsen Deposition Exhibit 3 marked for identification and attached to the transcript.)

MS. ROSEN: Do you want to direct us to the page that you're looking at?

MR. AINSWORTH: Sure. 173 is the Bates in the bottom right-hand corner.

BY MR. AINSWORTH:

Q Are you there, sir?

A Okay. I've read it.

It's not indicated in the -- it's not indicated in this report that I went and got the photos, but I did not have the photos with me. I had to go get them.

Q Okay. Even though your report says you had the photos; right?

MS. ROSEN: Objection; asked and answered.

A Not with me.

Q All right. If you look on the preceding page 172.

A Which page?

Q 172.

Second paragraph from the top, you say, "On June 2nd, 1993, the reporting detectives had a

186

meeting with a circumstantial witness."

Who was that circumstantial witness?

A That was a typo.

Q The circumstantial witness was a typo?

A No, the detectives. There's a typographical error.

Q I see. So the circumstantial witness is Vicente; right?

A Huh?

Q The circumstantial witness is Vicente; right?

A Yes.

Q And you're now saying that it was a typo that -- where you wrote, "The reporting detectives had a meeting with a circumstantial witness"?

A Yeah. I type up dozens of reports every week, and usually I'm with Detective Guevara. So I always used the phrase R/Dets. On the June 2nd interview, it was just me and John Dillon in the office.

Q On the next page, where it indicates the interview of Wilda Vargas, you just say Detective Guevara interviewed Wilda Vargas. You don't say R/Dets; right? You don't say plural detectives;

187

right?

A Which are you --

Q Sorry. On page 173. Right?

A I think in my trial testimony, I stated that after I completed the interview with Francisco Vicente, showed him the photos, I went back to Area 5 and told Guevara about the new developments.

He then contacted Wilda on the phone. He alone talked to Wilda because only he could talk to Wilda because they both spoke Spanish.

Q My point, sir, is simply just to establish that when it was just Ray Guevara talking to Wilda, you specified that it was just Ray Guevara talking to Wilda; right?

A Yes.

Q And you also -- you said -- you referred to detectives plural meeting with Vicente in your report; correct?

A As I have explained to you, that was a typographical error.

Q And then you made --

A Ray Guevara was not there.

Q And you made the same typographical error on page 173, sir; is that correct, where you said the

188

reporting detectives were familiar with the Imperial Gangster street gang and had photos of Pistol Pete, Jordan, and Mondo? Was that also a typographical error?

A No. I think that me and Guevara were familiar with these guys.

Q So how were you familiar with -- so you both had photos of Pistol Pete, Jordan, and Mondo; is that what you're saying, sir?

MS. ROSEN: Object to the form. Mischaracterizes the witness's testimony.

A Yeah. Is there a question?

Q Yes, there is.

A All right.

Q Are you saying that both you and Guevara had photos of Pistol Pete, Jordan, and Mondo?

A No.

MS. ROSEN: Object to the form. Mischaracterizes his prior testimony.

MR. ENGQUIST: Join.

Q Sir --

MR. ENGQUIST: Before you keep on going to different points, we need to take break.

MR. AINSWORTH: I know. I know.

MR. ENGQUIST: Well, you said you just had the one point, and you kept on going. So that's --

MR. AINSWORTH: I'm with you.

MR. ENGQUIST: Okay. So we're taking a break.

MR. AINSWORTH: Just one second.

MR. ENGQUIST: One second or --

MS. ROSEN: Well, wait. We're asking for a break. There's no question pending. We're asking for a break.

MR. AINSWORTH: All right. Let's take a break.

MS. ROSEN: Are you denying a break?

MR. ENGQUIST: Okay.

THE VIDEOGRAPHER: Off the record, 1:59.

(A recess was taken from 1:59 p.m. to 2:42 p.m.)

THE VIDEOGRAPHER: Back on the record, 2:42.

BY MR. AINSWORTH:

Q So if you get tired at any point during this deposition, would you let us know?

A Sure.

Q And I'm going to assume that you're okay unless you tell us. All right. So I'm checking in with you now just to make sure that if you are fatigued or feeling in any way encumbered, please do let us know.

A Yes. Thank you.

Q You met with lawyers from Sydney and Austin; right?

A Yes.

Q In 2013. I think I said 2014 earlier, but it was in 2013.

Does that sound right?

A Yes.

MR. AINSWORTH: Let's mark this as Exhibit No. 4, please.

(Halvorsen Deposition Exhibit 4 marked for identification and attached to the transcript.)

Q All right. Have you seen this document before, sir?

A I don't remember seeing this specific document, no.

Q All right. Let's turn to the second page of Exhibit 4. You told the -- so you had a meeting with lawyers from Sidley Austin who were investigating some cases on behalf of the City of Chicago.

Was that your understanding of the meeting?

A No. But -- I thought they were an outside law firm who had been hired to defend Detective Guevara, but it didn't turn out that way.

Q What do you mean "didn't turn out that way"?

A They were there to investigate -- they weren't there to defend Guevara. They were there investigating Guevara.

Q But you understood from your communications with them that they were defending Guevara; is that right?

A I thought they were hired by the corporation counsel to defend Guevara.

Q You told the lawyers from Sidley Austin that Detective Guevara's nephew had died in a gang-related incident; is that right?

MR. ENGQUIST: Objection. Before we go on, I have an objection. On page 1 of this document you put in front of him, it talks about how this was not a verbatim or substantially verbatim transcript or interview.

MR. AINSWORTH: Why the speaking objection?

MR. ENGQUIST: Well, I'm just --

MR. AINSWORTH: Stop.

MR. ENGQUIST: No. I'm putting on the record what it says it is. If you're going to be using it --

MR. AINSWORTH: Counsel --

MR. ENGQUIST: No. If you're going to be using this document to try to go through the --

MR. AINSWORTH: Stop. We'll let the witness step out of the room if you want to make a speaking objection. But I do not -- you're not allowed to characterize documents.

MR. ENGQUIST: The document characterizes itself.

MR. AINSWORTH: Then it doesn't need you to do anything.

MR. ENGQUIST: Well, it does if you're going to try to imply it doesn't. If it's something other than what it is.

MR. AINSWORTH: Josh, you can't do that in a deposition. You wouldn't do that at trial. You wouldn't stand up and say, Judge, the document says in front of the jury. This deposition is supposed to be conducted as if we were at trial. So you don't do that.

Transcript of Ernest Halvorsen

49 (193 to 196)

Conducted on February 6, 2019

193

And if there's something that needs to be clarified, you will have an opportunity to clarify at the end of the deposition.

MS. ROSEN. But it's a little bit different than it is at a trial because there's no Judge here to referee if, in fact, you're making misrepresentations that lead the witness astray.

MR. AINSWORTH: So --

MS. ROSEN: So if we need to send the witness out of the room to clarify things like that, we're happy to accommodate you.

MR. AINSWORTH: Great.

MS. ROSEN: Okay.

MR. AINSWORTH: All right.

THE WITNESS: Do you want me to leave?

MR. AINSWORTH: No.

MS. ROSEN: No. We're good.

BY MR. AINSWORTH:

Q Did you tell Sidley Austin -- the lawyers from Sidley Austin in that meeting in October of 2013 that Detective Guevara's nephew had died in a gang-related incident?

A I told them that his wife's nephew had been murdered.

194

Q How did you learn that?

A It was an Area 5 murder case.

Q How did you learn that, sir?

A I work in Area 5.

Q Did you investigate it?

A Initially, I did with Guevara until I learned that it was -- it was his wife's nephew. Then I said, No, we're not going to investigate this anymore, and I backed off.

Q Did Ray Guevara back off?

A I don't know.

Q Why did you back off?

A Because I thought it was an obvious conflict.

Q When was this that Detective Guevara's nephew died?

A I don't remember.

Q It was while you and Ray were partners?

A Yes, we were.

Q And here you -- do you know what his nephew's name was -- or his wife's nephew's name was?

A No.

Q Do you know whether the killer was brought

195

to justice?

MS. ROSEN: Object to the form.

A No.

BY MR. AINSWORTH:

Q Do you know who worked the case?

A No.

Q According to Sidley Austin, you told them that those of Mexican descent struggle to understand Detective Guevara's Spanish.

MR. ENGQUIST: Objection to form.

Q Is that something you told the lawyers at Sidley Austin?

A That's not what I said.

Q What did you say about Mexican -- people of Mexican descent being able to understand Detective Guevara's Spanish?

A We were discussing another case.

Q Solache and Reyes?

A Solache and Reyes.

And in my presence, Guevara was having an argument with another detective named Danny Trevino.

And I -- what are you guys arguing about?

And Trevino told me that the Mexican suspects we had in custody weren't understanding

196

Guevara's Humboldt Park Puerto Rican, and they got into a heated argument about who was the better interpreter, and that's what I told Sidley Austin.

Q Who got in a heated argument?

A Trevino and Guevara.

Q And Guevara was saying that he was a better interpreter?

A Yes.

Q And Trevino was saying that Solache and Reyes were saying they couldn't understand Guevara.

A Trevino was saying that they were having a hard time understanding Guevara, yes.

Q If you go down to the forth paragraph down, it states -- the memo states, "Despite their lengthy partnership, Detective Halvorsen reported and that he and Detective Guevara did not socialize together. He was aware, however, that Detective Guevara 'had a temper' and 'used to do crazy ass stuff' when off duty."

Do you see that, sir?

A I know for a fact he had a temper because we argued.

Q Okay. How did you know that Guevara had a temper?

A He yelled at me.

Q What did he yell at you about?

A Minor points in cases. We'd argue about different things.

Q So you told the lawyers at Sidley Austin that Guevara had a temper; right?

A Based on his interrelations with me.

Q All right. And did you tell the lawyers at Sidley Austin that Guevara used to do crazy ass stuff when off duty?

A Yes.

Q What did you tell them -- why did you tell them that Guevara used to do crazy ass stuff when off duty?

A Because I gave a specific example to them, and I gave a specific example here earlier today about him going into the 14th district and causing a commotion over a parking ticket.

Q So what did you tell Sidley Austin about Guevara doing crazy ass stuff when off duty?

MR. ENGQUIST: Objection; asked and answered.

A That specific incident at the 14th district. I don't remember anything else.

BY MR. AINSWORTH:

Q So why did you say that Guevara used to do crazy ass stuff when off duty? Simply because of that one incident? Is that what you're saying?

A That I can recall, yes. That was something to me that was crazy.

Q Were there other things that Guevara was doing while off duty that you can't recall now but gave you the impression that he would do crazy ass stuff?

A No.

Q And you told Sidley about -- the lawyers at Sidley Austin about the one instance of going into the 14th district; right?

A Yes.

Q Why did you characterize the one instant as Guevara used to do -- you know, doing crazy ass stuff when off duty?

MR. ENGQUIST: Objection; asked and answered, form.

Go ahead.

A My opinion.

Q Why did you have that opinion based on one incident?

A Because what he got involved with that day to me was crazy ass.

Q So he was somebody who you said would -- used to do crazy ass stuff because on one occasion he argued about a parking ticket.

A I used that as one example that I could remember. I couldn't remember anything else.

Q You see in that first footnote at the bottom of that second page, it says, "Detective Halvorsen explained that although it had 'always bothered' him that they sometimes memorialized in English statements taken from and approved by Spanish-only speakers, the office of the state's attorney had knowledge of and seemed 'comfortable' with the practice."

Do you see that, sir?

A Yes. I remember that distinctly.

Q And you told the lawyers at Sidley Austin that it always bothered you that Chicago police officers sometimes memorialized in English statements taken from and approved by Spanish-only speakers?

A I told Sidley Austin what bothered me in the Solache and Reyes case specifically is that we had two guys who couldn't speak English. They couldn't read and write English, but yet they were having state's attorneys come in there and taking handwritten statements from them interpreted by Chicago police officers in English.

And I walked in, and I says, How in the world are they supposed to read these statements? So why are we doing this? This was not my call. This was the State's Attorney's decision.

And they just answered me, Well, this is the way we always did it.

Then I finally got an answer from the state's attorney's office. They wanted it written in English so that when a handwritten statement went to the jury, they could read it.

I never liked their -- this wasn't our practice. This was the state's attorney's office practice.

Q I would like you to take a look at the last paragraph on page 3 here.

It says, "According to Detective Halvorsen, the investigation began to progress in earnest when Vicente was arrested for armed robbery on May 14, 1993. At that time, according to Detective

Halvorsen, Vicente informed Detective Bongiorno, Sergeant Mingey, and his arresting officers that" they -- "that he had been with the 'guys who killed Vargas,' i.e., Serrano, Montanez, and Pacheco shortly after the murder was committed.

"Detective Halvorsen and Detective Guevara met with Vicente in connection with the Vargas murder the following day. According to Detective Halvorsen, this sequence of events rendered Serrano and Montanez's argument that they were wrongfully convicted through Detective Guevara's fabrication of the evidence provided by Vicente 'the easiest claim in the world to destroy.'"

Q Do you see that, sir?

A I see the paragraph, yes.

Q And is that in sum and substance what you told Sidley Austin when you met with them on October 21st, 199 -- 2013?

A I don't remember specifically what I told them, but there's glaring errors in this. I probably provided the errors because when I went to Sidley Austin, as I mentioned before, I thought they were hired by the City to represent Guevara. They did not let me review any reports before I talked to them. I walked in there completely cold and ignorant as to what's going on. I had completely forgotten that we had used Vicente on multiple homicide investigations, and I am factually wrong here in a lot of the stuff I told them.

Q All right. So you're saying that you did tell Sidley Austin the substance that's attributed to you in this paragraph, but that you were mistaken when you said it; Is that what you're saying?

MR. ENGQUIST: Objection; mischaracterizing his testimony. Also I'm objecting because I think you're mischaracterizing the document itself.

A What was your question again?

Q You're saying that you did provide the information attributed to you in this -- the paragraph that I just read to you, the last paragraph on page 3, but you're saying it's erroneous; right?

A I don't remember what I told these guys back then, but I'm looking at this now and parts of this are wrong. I may have told them the wrong information, but I know now it's wrong. It wasn't Detective Bongiorno, it was Detective Maher who first interviewed Francisco Vicente.

Q Let's go on to the next page.

Do you see the top paragraph there.

It says, "We pointed out to Detective Halvorsen that we were not aware of any documentation confirming that Vicente had provided information in the Vargas matter prior to meeting with Detective Halvorsen and Detective Guevara on June 2nd, 1993.

"In response, Detective Halvorsen explained that the information obtained during the May 15, 1993, meeting with Vicente was not officially memorialized until the June 2nd, 1993, supplementary report was drafted because he wanted to verify several facts before putting it on paper and muddying up the case.

"Detective Halvorsen did insist, however, that if we were to locate the original investigative file, aka the RD or street file, we would find handwritten notes confirming this sequence.

"As Detective Halvorsen explained, they were reluctant to file an official report prior to verifying portions of Vicente's story because bullshit stays that way and forever taints the file. Detective Halvorsen emphasized that he initially suspected that Vicente was a big bullshit artist."

Q Do you see that, sir?

A Yes.

Q And did you provide that information to the lawyers at Sidley Austin?

A I don't remember this at all.

Q All right. Are you saying that you didn't tell them that you wanted to verify several facts from Vicente "before putting it on paper and muddying up the case"?

A I'm not saying that they're wrong. I'm just saying that I don't remember this.

Q All right. So you're not disputing that you said this. You just don't remember.

That's what you're saying?

A That's correct.

MS. ROSEN: Object to the form.

Q Going to the next paragraph, it says, "Specifically Detective Halvorsen wanted to verify information regarding damage Montanez's car sustained during the murder, both from ricocheting or pass-through bullets and from a collision during the getaway."

205

Do you see that, sir?

A  Yes.

Q  All right.  So did you tell the lawyers from Sidley Austin that you wanted to verify information regarding damage Montanez's car sustained during the murder, both from ricocheting or pass-through bullets and from a collision during the getaway?

A  I don't really remember what I told Sidley.

Q  Did you want to --

MR. ENGQUIST:  Are you done answering or not?

THE WITNESS:  Huh?

MR. ENGQUIST:  Were you done answering?

A  What was the question again?

Q  Let me ask it.

Did you want to verify information regarding damage to Montanez's car from ricocheting bullets or pass-through bullets?

A  Did I?  Yes.

Q  Why did you want to verify information about damage to Montanez's car both from ricocheting or pass-through bullets -- pass-through bullets?

A  That would give weight to the statement provided to me by Francisco Vicente.

206

Q  So you wanted to see if the ballistic evidence from Montanez's car would match Vicente's statement?

A  I wanted to see if there were bullet holes in the car.  I wanted to see if there was damage to the car where Francisco Vicente had told me.

Q  Do you think that the bullet holes in Montanez's car was caused as a result of the murder?

A  Francisco Vicente told me that the car had been shot by one of the defendants at the time that the murder took place.

Q  And you -- and that's what you believed, that the bullet holes in the car was a result of the murder; right?

A  You're using the word "holes."  I think Francisco Vicente only told me one bullet hole.

Q  Sorry.  Let me phrase then.

So your belief was that the bullet hole in Mr. Montanez's car was a result of the murder; right?

A  It took place during the murder, yes.

Q  And that's based on what Vicente told you; correct?

A  Yes.

207

Q  All right.  It says, "Detective Halvorsen also wanted to verify information regarding a store called Gold Busters, to which Vicente accompanied Montanez, Serrano, and Pacheco after the murder for purposes of fencing gold.

"Detective Halvorsen informed us that thereafter he confirmed that Montanez's car had sustained the described damage.  However, Detective Halvorsen and Detective Guevara went looking for but couldn't find a store called Gold Busters. Ultimately, they determined that Vicente's story about Gold Busters was bullshit."

Did you tell the lawyers from Sidley Austin the information that's attributed to you here?

A  Again, I don't remember what I told Sidley Austin.  As far as the investigation, we did try to find a store called Gold Busters.  We were unable to locate the store.

Q  And the damage to Montanez's car?

A  And we did confirm on Montanez's car that there was vehicle damage and a bullet hole as told to us by Francisco Vicente.

Q  And so you went looking for Gold Busters because that would help corroborate Vicente's

208

information to you; right?

A  Yes.

Q  And conversely, if Gold Busters didn't exist, that would cast some doubt on Vicente's statement; right?

A  I don't know if Gold Busters ever existed, but we could not find it.

Q  And you did that as part of your investigation to the Vargas homicide, to look for Gold Busters?

A  Yes.

Q  And so when you couldn't find any indication that Gold Busters actually existed -- well, strike that.

What did you do to try and find Gold Busters?

A  We went to the location where Francisco Vicente said it was located.  I think it was at the corner of Diversey and Harding in an apartment building on the first floor.  When we got there it was a vacant -- vacant storefront.  There was nothing there.  We talked to people in the building, and they couldn't give us any information about who had been there.

Q  And did you do this after Vicente had told you about it on June 2nd?

A  It was sometime after Vicente had given us the June 2nd statement.

Q  Sometime in the month of June of 1993?

A  Yes.

Q  Did you ask Vicente when you saw him again, Hey, Francisco, you know, we went to Gold Busters, and it wasn't where you said it was; you know, what's going on?

MR. ENGQUIST:  Objection to form.

Go ahead.

A  I don't remember asking him that.

Q  Why didn't you try and find out from Francisco Vicente why he had given you incorrect information about Gold Busters?

A  I didn't know it was incorrect.

Q  Well, it wasn't where he said it was; right?

A  Well, it might have been there, but it was gone.

Q  You went there just a few days after he told you about it; right?

A  No.  I just said at some time after the statement.  I didn't say it was a few days after he gave us the statement.

Q  Sorry.  I misspoke.  Let me ask it this way.

Did you ask Francisco, you know, did Gold Busters close or, you know, what happened here?

A  No, I did not.

Q  Were you curious as to why you were unable to corroborate his story about Gold Busters?

A  No.

Q  Why weren't you curious?

A  Francisco Vicente portrayed it as a fly-by-night outfit that was buying stolen merchandise off the street.  So the fact that they set up shop for a short time and disappeared did not seem strange to me.

Q  So then you documented in your supplementary report that you tried to confirm the existence of Gold Busters but were unable to because the location where Vicente said it was was a vacant lot.

A  It was a vacant storefront.  That's correct.

Q  Vacant storefront.

And you documented that in a typed supplementary report; is that right?

A  I'd have to see the report, but I believe so.

Q  Is there any reason why you wouldn't document that fact?

A  No.

Q  You wouldn't try and hide that or anything, would you?

A  No.

MS. ROSEN:  Object to the form.

Q  Because that would be wrong if you tried to hide the fact that you investigated Gold Busters but were unable to find any sign of its existence?

A  It would be wrong if we tried to conceal a material fact, but I think I did document that we went and looked for the place and couldn't find it.

Q  And I'm just saying, thus, it would be wrong if you had withheld the information about trying to corroborate Vicente's story about Gold Busters but were unable to do so; right?

A  It would be wrong if we tried to, but we didn't.

Q  But you didn't hide that information, you're saying?

A  We didn't hide that information.

Q  And it would be wrong if you did; right?

A  Yes.

MS. NIKOLAEVSKAYA:  Form.

THE REPORTER:  Pardon?

MS. NIKOLAEVSKAYA:  Withdrawn.

BY MR. AINSWORTH:

Q  Okay.  All right.  Let's go to the very last sentence actually on that same page, page 4.  Just the very last beginning of a paragraph at the bottom of the page where it says, "Detective Halvorsen also explained that," and then it goes on to the next page.  So it's the very end of that page, sir.

A  On page 4?

Q  Yeah.  If you don't -- can I point to it?  Would that help you?

A  No.  Just tell me.

Q  It's says, "Detective Halvorsen also explained that," and it's just a fragment of the last sentence at the bottom of the page and perhaps I can --

A  The bottom on my page, it says something about Vicente.

Q  Right.  Yeah.  That's a footnote, sir.  So if you just go up to above the -- where it starts there.

A  Okay.  And your question?

213

Q Just if you would just read along with me for right now. "Detective Halvorsen also explained that there was a significant risk that Vicente's name would leak if it were included in the police report because Joe Miedzianowski, John" Woodall "and other CPD personnel routinely photo --"

MS. ROSEN: The word is Woodard.

MR. ENGQUIST: Woodard.

Q Sorry. "And other CPD personnel routinely photocopied reports and gave them to shit heads."

A Okay.

Q "For this reason Detective Halvorsen and Detective Guevara did not trust other detectives to maintain source confidentiality."

Do you see that?

A That's not at the bottom of page 4. This is the top of page 5.

Q Right. Starting at the bottom of page 4.

A Oh, going to the top of page 5. And your question?

Q Did you tell that information to the lawyers at Sidley Austin?

A Again, I don't remember what I told those guys over at Sidley Austin.

214

Q But you don't dispute that you told them that.

A No.

Q And that it's true that you knew that Joe Miedzianowski and John Woodall --

MR. ENGQUIST: Not Woodall, Woodard. It's a different person.

MR. AINSWORTH: I'm saying Woodall.

MR. ENGQUIST: I know. But that's not what it says.

MR. AINSWORTH: I am aware of what it says.

MR. ENGQUIST: So you're -- well, then I'm objecting if it's characterizing what it says in the report.

MR. AINSWORTH: I'm not --

MR. ENGQUIST: Yes, you are. You're trying to trick the client -- trick my client. That's not what it says. You read it wrong, and now you're changing it again.

Q Sir, were you referring to John Woodall when you were talking to Sidley Austin?

A I don't remember what I was -- I don't remember what I said to Sidley Austin.

Q Right. So in terms of the shit heads who

215

would photocopy -- or the guys who would photocopy files and give them to shit heads, was John Woodall one of those people who you considered?

A Someone who photocopied reports?

Q Yeah.

A I never considered him. I considered Joe Miedzianowski.

Q All right. And the guy's name was John Woodall; right?

A Yes.

MS. ROSEN: Object to the form.

Q John Woodard is just a --

A A typo.

Q A typo. Okay.

So Joe Miedzianowski was somebody who you knew to photocopy reports and give them to shit heads; right?

A Yes.

Q How did you know that?

A I had a murder case. I had a good witness in this murder case. He identified the shooter, came forward and gave us statements, agreed to testify. We were going to take him down to the grand jury to have him locked in, and he

216

disappeared.

It took us days to find him again eventually, and then I said, What are you doing? I said, Why are you hiding?

He said, My father came to me with my statement and showed it to me. His statement that he had given us.

And his father, you know, got into him.

And my witness asked his father, Well, where the hell did you get this from?

And he said Joe Miedzianowski.

It's as simple as that. Then I went back. We told Commander Cline about this. He instituted a CR investigation. Where it went from there, I got no idea.

Q Well, did anyone from OPS or IAD ever question you about that incident?

A No.

Q How did you know a CR was obtained?

A Because Cline told me he did it.

Q And who was the victim in that case?

A I don't remember the name of the victim.

Q Who was the suspect?

A I just remember his nickname was Baby Bum.

217

Q Who was the witness?

A I don't remember that.

Q Did you talk to Joe Miedzianowski about this?

A Did I? No.

Q Why not?

A I went to Cline and told him about the allegation. I'm not going to confront Joe Miedzianowski about giving our paperwork to gang bangers.

Q Was this Phil Cline?

A Yes.

Q And what year was this?

A Probably someplace in the '90s.

Q Was Guevara your partner?

A He probably was because he always warned me to stay away from Joe Miedzianowski.

Q Did you and Ray talk about Miedzianowski?

A We really didn't have dealings with him. I never understood what the problem was, but more than twice Guevara told me don't have anything to do with Joe Miedzianowski.

Q Did he tell you why?

A No.

218

Q Did you ask him?

A I assumed it was something from their gang crime days together, but I don't know.

Q Did you ask him why?

A No.

Q Why --

A I asked him, but he never told me.

Q He just refused to say?

A Yeah.

Q Let's go back on this page 5 of Exhibit 4, the first full paragraph where it says, "Detective Halvorsen informed us that on June 2nd, 1993, as he was preparing the supplementary report in the Vargas matter, 'Ray came into the office and told' him, 'By the way,' at some point prior to June 2nd, 1993, Wilda informed him that she 'remembered something happened the night before the murder at a gas station.'

"Detective Halvorsen does not know precisely when Wilda shared this information with Detective Guevara but explained that she must have done so 'prior to June 2nd, 1993.' Detective Halvorsen recalls being surprised that Detective Guevara had not shared the information with him earlier and

219

recalls exclaiming at the time, 'You're just telling me about this now?'

"When we asked Detective Halvorsen whether Vicente instead might have introduced the gas station into the case, as the State had argued at trial, and during the meeting with us in this matter, Detective Halvorsen stated that Vicente 'didn't tell us about the gas station. He had no knowledge of that.'"

MR. ENGQUIST: I'm going to object as to completeness on what you're reading to him and misrepresentation of what it is.

Q All right. So, sir, did you tell the lawyers at Sidley Austin the information attributed to you in that paragraph?

A I don't recall my conversations with the lawyers at Sidley Austin.

Q But you don't dispute that you said the -- said the substance of what's attributed to you in that paragraph to the lawyers at Sidley Austin; right?

A I can't say they're lying if I don't remember it.

Q All right. And specifically -- well, did

220

Ray come into the office and tell you, By the way, at some point before June 2nd, 1993, Wilda informed him that she remembered something happened the night before the murder at the gas station?

A No.

Q Did he say anything like that to you?

A The first that I heard from Guevara about what Wilda said was after 3:00 o'clock in the afternoon on June 2nd, 1993, when Guevara called her on the phone and asked her about what Francisco Vicente had told me at the state's attorney's office earlier that day.

Q Do you know why the lawyers at Sidley Austin would attribute to you a statement that -- that Wilda had provided this information about the gas station to Ray prior to June 2nd?

MR. ENGQUIST: I'm going to object again.

MS. ROSEN: Object to the form, calls for speculation, foundation.

MR. ENGQUIST: I join, and I'm also going to object you're also misrepresenting the validity of the document by not showing the complete document to the witness.

A Again, I don't remember exactly what I told

---

these guys, what they told me. I can't dispute what they typed up if I don't remember.

BY MR. AINSWORTH:

Q Well, you say you don't recall exactly.

I'm just saying do you recall saying anything close to telling them that, in quotes, "Ray came into the office and told him, by the way," end quotes, at some point prior to June 2nd, 1993, Wilda informed Ray that she remembered something happened the night before the murder at a gas station?

MS. ROSEN: Object to the form.

MR. ENGQUIST: Join. Once again I'm objecting because you're misrepresenting the validity of the document, and you're not showing the completeness of the document.

Go ahead.

A Again, I don't remember the conversations I had with Sidley.

Q You don't remember any of it?

A No.

Q Do you think that this paragraph I just read to you on page 5 about Ray saying, By the way, Wilda had previously told him about the gas station encounter, do you think that was fabricated by the lawyers at Sidley Austin?

MR. ENGQUIST: I'm going to object to form. I'm also objecting that you're misrepresenting the validity of this document, and I object for the completeness of what you're showing him right now.

MS. QUIST: Join.

MS. BONJEAN: No. I don't join.

THE REPORTER: You joined? Thank you.

A What was your question again?

BY MR. AINSWORTH:

Q Do you believe that the lawyers at Sidley Austin fabricated the statements in this paragraph on page 5 talking about Ray coming to the office and telling you, by the way, Wilda had previously told him about a gas station encounter?

MR. ENGQUIST: Once again I'm objecting that you're misrepresenting the validity of this document, and also I'm objecting that you're not showing the complete document and misrepresenting what it means.

Go ahead.

A Again, I don't remember this conversation at all, and I'm not going to sit here and call them liars if I don't remember it.

---

BY MR. AINSWORTH:

Q You thought that Rankins was giving you false information; is that right?

A What was your question? You had your head turned away.

Q Sorry. You thought that Timothy Rankins was giving you false information; right?

A No.

Q All right. You thought he was nuts and not all the way there; right?

A I thought there was something wrong with him.

Q All right. Let's mark this as Exhibit No. 5 please.

(Halvorsen Deposition Exhibit 5 marked for identification and attached to the transcript.)

Q So this is a memo regarding an interview with Ed Mingey, but I wanted to turn your attention to -- it's page 4, although the page number is hard to read under the Bates number. It says -- 510 is the Bates number. That might be easier to see.

A What's the page?

Q Where it says 510.

MS. ROSEN: JR-L. Look at those numbers, the JR-L numbers.

A Okay.

Q All right. If you look at footnote 7 of this document, it says, "In two separate interviews with us, Detective Halvorsen stated that Rankins provided detectives with false evidence. He stated regarding Rankins, 'He was just making up stories' and 'didn't have any of the facts of the case.' Halvorsen continued 'He had no information. Everything he had was goofy.'"

Do you see that sir?

A Yes, I see it.

Q Did you provide that information to the lawyers at Sidley Austin?

MR. ENGQUIST: I'm going to object as to foundation. Also object that you're mischaracterizing this exhibit -- document that's labeled down here No. 5.

Go ahead.

A I don't remember the conversations I had with the attorneys at Sidley Austin.

Q Are you disputing that you told the lawyers at Sidley Austin that Rankins provided you with

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

---

225

false evidence and that Rankins was just making up stories, didn't have any of the facts of the case and that he had no information, everything he had was goofy?

MR. ENGQUIST: Same objection.

A Without being able to remember this conversation, I cannot dispute what they typed.

Q All right. All right. Let's mark this as Exhibit No. 6, please.

(Halvorsen Deposition Exhibit 6 marked for identification and attached to the transcript.)

MR. AINSWORTH: Okay. Are we missing one? Sorry.

Q All right. Would you turn to No. 4 in the bottom right-hand corner.

Do you see where it says "Investigative File Inventory"?

A Uh-huh.

Q Is that a yes?

A Yes, I have it.

Q All right. And is page 4 -- is this the investigative file inventory for the Vargas homicide?

---

226

A That's correct.

Q When you told Guevara that you had, you know, obtained this information from Vicente and you were able to link the crime to Jose Montanez and Armando Serrano and Jorge Pacheco, I take it that Guevara didn't say, Oh, I knew it. I knew it was those three or anything like that. Right?

A No.

Q That's correct?

A He didn't say that.

Q And he didn't say anything indicating that he had any knowledge of Montanez, Serrano, or Pacheco having anything to do with this crime before June 2nd of 1993; right?

A He told me prior to June 2nd that he was working with three nicknames for persons who may possibly be involved in the crime. That's it.

Q And before June 2nd, 1993 -- well, strike that.

And he never indicated that he had any hint that those three nicknames were Montanez, Serrano, or Pacheco before June 2nd, 1993, is that correct?

A Not that I remember.

MR. ENGQUIST: Object to the form.

---

227

Go ahead.

A Not that I remember.

BY MR. AINSWORTH:

Q All right. So does your handwriting appear on this page, page 4 of Exhibit 6?

A On the inventory?

Q Yeah.

A Yeah, it does.

Q Where is your handwriting?

A The whole page.

Q The whole page is yours.

A Uh-huh.

Q So on February 6th, you put Jack and Schak's 15 pages of GPRs and their progress supp and the canvas supp into the other file with the other stuff that you included?

A What happened here is that the original investigative file, I spilled coffee on. So I had to redo it.

Q I see. When did you spill coffee on the original?

A When I was working on the file.

Q All right. Was this -- at what point in the investigation did you spill coffee on the file?

---

228

A When it was completed. What date would that have been? It looks like 3 July.

Q So on July 3rd, you spilled coffee and just mucked it all up, and so then you just had to redo it?

A Yes.

Q So did you create a report to memorialize that you had spilled coffee on the inventory file and you had to recreate it?

A No.

MS. ROSEN: Object to the form.

A Because it was just a copy of what was already done.

Q Did you tell anyone that you had spilled coffee on the inventory file and needed to recreate it?

A No.

MS. ROSEN: I'm going to object to the form. You mean inventory -- investigative file inventory?

MR. AINSWORTH: I do mean the investigative file inventory.

MS. ROSEN: Okay. Because it gets confusing.

---

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

BY MR. AINSWORTH:

Q Did you tell anyone that you had spilled coffee on the investigative file inventory and needed to destroy it and then recreate it?

MS. ROSEN: Object to the form.

MR. ENGQUIST: Join.

A Not that I recall.

Q What did you do with the coffee spilled investigative file inventory?

A Threw it away.

Q All right. So did you alter anything when you created the new investigative file inventory?

A What was your question?

Q Did you alter anything from the original investigative file inventory when you created this new investigative file inventory?

A No. It was copied verbatim.

Q Were you careful when you created the investigative file inventory?

A Yes.

Q You understand that this is the document that tracks all of the documents that are contained within the investigative file; right?

A Yes.

Q And it's the way to make sure that important information isn't being removed from the file; right?

MS. ROSEN: Object to the form, foundation.

MR. ENGQUIST: Join.

A The investigative index tracks the reports that are put into the file.

Q You started working on the Vargas homicide on the day after it happened; right?

A On the 6th of February 1993.

Q What were you assigned to do on the 6th of February of 1993?

A Go work the homicide.

Q And what did you do to work the homicide?

A Me and Guevara went and talked to the murder victim's wife, Wilda Vargas.

Q Did you understand anything that she said?

A No.

Q Did you understand anything that Guevara said to her? Could you understand anything that Guevara said to her?

A No.

Q Do you know what she told Guevara?

A Only what Guevara related to me.

Q What did he relate to you?

A She was at home in bed sleeping, and some neighbor told her that her husband was out in the car and was injured or something.

Q Did you want to know what she was doing the day before the murder?

A Not at that time.

Q Did you want to know what her husband was doing the night before he was killed?

A Not at that time.

Q Hang on. So the shots were heard at 5:30 in the morning; right?

A I believe so.

Q At this point, you've got 11 years experience as a homicide detective; right?

A In '93?

Q Yeah.

A That would have been 11 years.

Q Yeah. And 20 years as a cop?

A If you say so.

Q I'm asking you, sir.

A Well, I have to get my calculator out and do the math.

Q All right. 21 years as a cop.

A All right.

Q Right?

A 21 years, yes.

Q All right. A guy is killed at 5:30 in the morning; right?

MS. ROSEN: Objection to the form.

A Yes.

MS. ROSEN: Asked and answered.

Q So you want to know what was that guy doing the night before; right?

MR. ENGQUIST: Objection.

MS. ROSEN: Object to the form. Object to your tone.

MR. ENGQUIST: Objection; it calls for speculation, incomplete hypothetical.

MS. QUIST: Join.

A I had no reason to be curious at that time what was he was doing the night before.

Q You wanted to know who committed the murder; right?

A Yes.

Q You wanted to know what leads there might be as to who committed the murder; right?

A Yes.

Q  And one of the leads might be, Gee, what was the decedent doing the night before he was killed at 5:30 in the morning; right?

MS. ROSEN:  Object to the form.

A  What was he doing at 5:30 in the morning? He was going to work.

Q  No.  What he was doing the night before he was killed at 5:30 in the morning; right?

MS. ROSEN:  Object to the form.

A  It didn't seem relevant at that time.

Q  Okay.  So it didn't seem relevant on February 6th to find out what the guy who was killed at 5:30 in the morning had been doing the night before; right?

MS. ROSEN:  Objection; asked and answered and now argumentative.

MR. ENGQUIST:  Join.

MS. QUIST:  Join.

A  It did not seem relevant at that time.

Q  Did it seem relevant on February 13th, a week later when you had no other document or leads in the case?

MS. ROSEN:  Object to the form.

MR. ENGQUIST:  Join.

A  I don't believe I worked on this case on February 13th.

BY MR. AINSWORTH:

Q  Well, sir, what did you do to try and find out who killed Rodrigo Vargas?

A  We interviewed his wife, Wilda Vargas, and that's it.  I didn't work on that case again until June the 2nd.

Q  So you asked her -- and according to Ray, he told you just that she woke up and her husband was dead, and that's all she had to offer; right?

A  I think the neighbor came and woke her up. She had actually very little to offer.  That's correct.  Her husband was going to work, and that's about it.

Q  So -- all right.  Well, we'll come back to that, sir.

In terms of this investigative file inventory, if you look at Item No. 7, it says CB and a bunch of numbers.

A  Uh-huh.

Q  What does that refer to?

A  It's the central booking number.

Q  Why did you write a central booking number

on the investigative file inventory?

A  Because a copy of that CB number was put into the file.

Q  When you say "a copy of that CB number," what are you referring to?

A  Somebody's arrest report.

Q  Okay.  And then after that, it says IR 863500.

What does that refer to?

A  Somebody's arrest history.

Q  You mean like a rap sheet?

A  We don't call them rap sheets.  They're called arrest histories.

Q  Okay.  Somebody's arrest history.

A  Rap sheet is from television.

Q  All right.  Sorry.

So Item No. 7 is a -- is an arrest report; right?

A  Yes.

Q  And that was entered into the file on June 2nd, 1993; correct?

A  Correct.

Q  And the arrest history -- oh, and then there's another arrest history and then another

arrest report and another arrest history on lines -- you know, comprising lines 7 through 11; is that right?

A  Yes.

Q  And all of those were entered into the file on June 2nd, 1993?

A  Yes.

Q  And those were all obtained on June 2nd, 1993?

A  I don't know when they were obtained.  I can only tell you when they were put in this file.

Q  All right.  Well, if I told you that the CB No. 9106-315 was Pacheco's CB number, that IR 863500 is Pacheco's IR number, and IR 736499, that's Montanez's IR number, and CB -- and the subject of the arrest is CB 9579443 was Armando Serrano, and Armando Serrano's IR number is 874175, for those three people, you didn't have their rap sheets before June 2nd; is that right?

A  No.  I believe Detective Guevara obtained all these reports sometime at the end of May.

Q  Detective Guevara obtained these reports at the end of May.

Why do you believe that Detective Guevara

obtained these reports at the end of May?

A  Because I've seen the inventory from identification where he requested them on the 24th of May.

Q  You saw the documents.

A  I saw the request for the documents, yes.

Q  Within the last month.

A  Right.  At the end of May, yeah.

Q  Sorry.  Within the last month in 2019, you saw those documents.

A  In the last month?

Q  Yes.

MS. ROSEN:  He's confused.

MR. ENGQUIST:  This last month.

THE WITNESS:  Oh.

MS. ROSEN:  When did you --

Q  In January or February of 2019.

A  No.  I saw that inventory when I was first brought down to Sotos office after I was sued.

Q  Yeah.  Okay.  So can you tell us when you first learned that Ray Guevara had requested those documents near the end of May of 1993?

A  I can only go by the identification section's log that he requested them on the 24th of May.

Q  All right.  And you learned that after you had been sued in this case.

A  Yes.

Q  In 2017; right?

A  Yes.

Q  Before 2017, you had no idea that Guevara had requested those documents in May of 1993; is that what you're saying?

A  I did not.

Q  Now, can you tell us do you know why Guevara requested those documents in May of 1993?

And when I say "those documents," I mean the arrest history for Pacheco, for Montanez, and Serrano, and the arrest reports for Serrano and Pacheco.

A  He did not tell me back then that he had requested these documents.

Today, I can speculate as to why he did, but that's just my speculation.

Q  Well, first tell us do you know why Ray Guevara requested those documents?

A  Back on the 24th of May, no.

Q  All right.  What is your speculation as to

why Ray Guevara requested those documents?

A  He had those three nicknames of Mondo, Pistol Pete, and Jordan, and he was trying to find out everything he could about them, specifically, if they were even alive.

Q  Why -- for example, why that particular Pistol Pete?

A  I don't know.

Q  You tried to find out who that Pistol Pete was.

A  And I couldn't.

Q  And you failed.  Yeah.

Did Ray have some secret special nickname file?

MR. ENGQUIST:  Objection to the form.

MS. ROSEN:  Object to the form.

MS. QUIST:  Join.

A  He had an informant that he was dealing with, that I don't know what information the informant gave him.

Q  Did you know Ray to have his own nickname file?

A  No, he did not.

Q  You knew him to consult the sergeant's --

the 25th district sergeant's nickname file if he needed to look up a nickname; right?

A  That was the primary nickname file we all used.

Q  Were there any other nickname files?

A  Were there any what?

Q  Were there any other nickname files apart from Sergeant --

A  In the Chicago Police Department, there might have been, but that's the one we used.

Q  Did you have any others that you could access?

A  No.

Q  All right.  So then in line 12 you have an evidence report that was added to the file on June 2nd, 1993; is that right?

A  Correct.

Q  And then you've got offender photos was added to the file on June 13th; right?

A  Correct.

Q  And you've got an inventory number.

What does that refer to?

A  I'd have to go through the file and look for it.

Transcript of Ernest Halvorsen

61 (241 to 244)

Conducted on February 6, 2019

241

Q All right. But it's a property inventory sheet? Is that what they were?

A I don't know. I'd have to go through the file and look at the inventory.

Q All right. And then line 15, you have the word "supp." --

A Uh-huh.

Q -- referring to a supp report?

A That refers to a supp report.

Q All right. And then you have line 16. There's -- line 16 and 17, two CB numbers.

A Uh-huh.

Q Is that a yes?

A Those are two CB numbers, yes.

Q Two arrest reports were added to the file on June 14th?

A Correct.

Q An IR number, a criminal history report was added on June 14th; right?

A What was added when?

Q An IR number of a criminal history report was added on June 14th, line 18?

A Yes.

Q And then you've got an evidence report that

242

was added on line -- on June 14th; right?

A Yes.

Q Statement from Rankins was added on June 14th; right?

A Yes.

Q Then you've got one lineup supp, line 21; right?

A Yes.

Q And one clearing supp that was line 22, also added on June 14th; right?

A Yes.

Q And then you've got two more inventory sheets added on line 23; right?

A Yes.

Q That was on July 3rd; correct?

A Yes.

Q And then a statement from Vicente was added on July 3rd.

A Yes.

Q And then one final supp was added on July 3rd; right?

A That's correct.

Q Then it says, "Copy sent to case report unit records processing; date, July 3rd, 1993."

243

Q And is that your signature?

A Yes.

Q Why did you sign that line?

A It's required.

Q Well, why was it required?

A By department order.

Q All right. What were you signifying when you signed that line?

A That this was an accurate accounting for the reports that were in the file.

Q What does it mean that copy sent to case report unit records processing?

A That's where all the police department's permanent records are maintained.

Q Did you send the report -- send a copy of the -- did you send a copy of just this one page to the case report unit?

A Yes.

Q When I say "this one page," meaning investigative file inventory?

A Yes.

Q Did you send a copy of the remainder of the file?

A No.

244

Q Why did you send a copy of the investigative file inventory to the case report unit at that time?

A I think this is the third time I've answered that. It's required by department order.

Q But why on June 3rd -- July 3rd?

A Because I was finished.

Q You were finished with the case?

A Yeah.

Q Let's turn back to Exhibit No. 3, please. All right. Would you turn to the page that says 155 on the bottom.

A Which stack of papers are we in?

Q Exhibit No. 3. It's the RD file.

A Where are you going to look at?

Q It's Exhibit 3, page 155.

A Okay.

Q All right. This is Schak and Jack's supp report; right?

A Yes.

Q Okay. If you turn to the page 157, where it says "Manner/Motive." Here it says, "The victim was shot several times as he sat in his vehicle preparing to go to his place of employment"; right?

A Yes.

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

245

Q  Do you see that?

And when you started working this case, you had access to Schak and Jack's scene supp; right?

A  Yes.  I read this.

Q  All right.  And you read this, meaning Schak and Jack's supplementary report, to understand the circumstances of the murder; right?

A  Yes.  Well, I read this -- read their initial investigation.

Q  Okay.  If you turn to page 8 of that same supp report.

MS. ROSEN:  158?

MR. AINSWORTH:  162, I'm sorry.  I switched to -- I thought it would help him more.

Q  So I'm on 162.  I think you're on 163.  I think you're on the wrong page, sir.  If you go back one.

A  Page 7?

Q  Page 8.

A  Okay.

Q  Okay.  See where it has a statement attributed to Anna Velez; and if you go down a couple lines, it talks about at approximately 5:30 a.m. she looked out of her window and observed

246

the victim's van running as usual.  She stated that the victim would start the van and sit for a few minutes warming it up before driving away.  A few moments later, she stated she heard several gunshots and again looked out.

Do you see that sir?

A  Yes.

Q  All right.  So you knew, based on your review of this report, that the victim would typically sit in his car, warming it up before he drove away in the morning; right?

A  Yes.

Q  And on a cold February morning in Chicago, that's not so unusual; right?

MS. ROSEN:  Objection to form.

A  What was your question?

Q  On a cold February morning in Chicago, that's not so unusual; right?

MS. ROSEN:  Object.

A  No, it wouldn't be.

Q  And you knew that Anna Velez said that on this morning, February 5th, 1993, she had observed the victim sitting in his car, warming it up as usual; right?

247

MS. QUIST:  Object to form.

A  That's what Detective Schak and Jack put in their report.

BY MR. AINSWORTH:

Q  All right.  And then if you go to page 164 or page 10 of the report -- actually, I'm going to direct your attention to the next page, page 11.  In the middle of the page there's a paragraph that begins with the words "During a check of robbery incidents."  So it's right in the middle of the page.

A  All right.  What's your question?

Q  Do you see the paragraph that says, "During a check of robbery incidents," the paragraph that begins with those words?  Underneath --

A  During a check of robbery incidents?

Q  Yes.

A  All right.  Go ahead.

Q  The last sentence of that paragraph says, "A copy of that report and the subsequent investigation has been included in this file."

Do you see that, sir?

A  I see it.

Q  Where is the copy of RD No. X018247,

248

aggravated battery and attempted armed robbery?  Where is that file?

A  If it's not listed in the inventory, it wasn't put in the file.

Q  Well, you were investigating this case; right?

MS. ROSEN:  Objection; asked and answered.

A  Not at this time.

Q  Well, you were investigating it on February 6th when this supp report was submitted; right?

A  Yes.

Q  And so wouldn't you want to know what follow-up investigation you could do based on Schak and Jack's suggestion that there may be a link between this murder and the aggravated battery that occurred as described in RD No. X018247?

MS. ROSEN:  Object to the form, foundation.

A  This doesn't give anything to follow up.

Q  See at the bottom of the page, page 11?

A  Uh-huh.

Q  It says, "Efforts will be made to interview this subject as soon as possible in an effort to determine if there's any possible connection between

Transcript of Ernest Halvorsen

63 (249 to 252)

Conducted on February 6, 2019

---

**249**

these incidents. The appropriate reports will be submitted for both investigative files."

Q Do you see that, sir?

A Yeah. This is not my report.

Q Right. I'm just saying that Schak and Jack gave some suggestions for what needed to be followed up on; right?

A Yeah. And they should have done it.

Q So it's their fault.

A It's their case.

MS. ROSEN: Object to the form of the question.

Q It's their case?

A Yes.

Q And Schak and Jack were the scene detectives; right?

A Yes.

Q And you were the follow-up detectives; right?

A For one day.

Q For one day.

A Yes.

Q And on that day you talked to one witness; right?

---

**250**

A Yes.

Q Who had already been questioned before; right?

A To my knowledge, yes.

Q Why did you talk to Wilda on February 6th?

A Seemed like a logical person to talk to.

Q Why did you want to talk to her?

A Again, she seemed like a logical person to talk to.

Q Sorry.

A She was the wife of the guy who had just been murdered. We were hoping she could provide us a direction to go and investigate. Ex-boyfriend, jealous lover, money dispute, gang affiliation, we didn't know.

Q What he had been doing recently?

A Uh-huh.

MR. ENGQUIST: Objection; asked and answered.

Q Right?

MR. ENGQUIST: Argumentative.

Q She might know what he had been doing recently; right?

MR. ENGQUIST: Same objection.

---

**251**

A We were hoping that Wilda would give us a direction to proceed in the investigation.

BY MR. AINSWORTH:

Q A direction that Jack and Schak had failed to uncover in their interview with her the day before?

A There was no direction to uncover the day before. This was a brand new homicide that all possibilities were available. It could have been a robbery attempt. It could have been a domestic. Wilda could have shot him. We didn't know.

Q So did you consider that Wilda might have been the perpetrator?

A Possibility at that time.

Q So did you investigate, for example, her whereabouts the day before?

A Not the day before, no.

Q Did you investigate her whereabouts at any time?

A Investigate her whereabouts when?

Q Sorry. Did you investigate, for example, her employment history?

A Did I? No.

Q Did you ask anyone else to?

---

**252**

A No.

Q Do you know why Wilda would say that detectives were going to her work to verify that she was actually at work the day before?

A No idea. It wasn't me and Ray.

Q Would you turn to page 8 of that same report? You've got to flip back a few pages.

A Which page again?

Q Page 8, 162 again.

See right above Anna Velez's paragraph, it says "Gang crimes records," and it refers to an auto theft under RD No. T-153841.

A Uh-huh.

Q And a copy of that report has been requested and will be included in the file pertaining to this incident?

A Uh-huh.

Q Whose responsibility was it to ensure that that file --

A Whoever wrote this report, Schak and Jack.

Q Whose responsibility was it to ensure that report was included in this file?

A Schak and Jack.

Q And it was their responsibility because they

---

253

were the scene --

**A It was their -- it was their investigative lead they were going to follow up on.**

Q So it wasn't your responsibility.

**A No.**

Q Were they the lead detectives on this case?

**A Uh-huh.**

Q Is that a yes?

**A Uh-huh. That's a yes. They were the scene detectives. They were the lead detectives.**

Q Schak and Jack were the lead detectives on this case.

**A Yes.**

Q Okay. Why did you have Anna Velez give a polygraph?

**A That one I don't remember, why she was polygraphed.**

Q Where would I look to find out why she was polygraphed?

**A Probably in the polygraph section.**

Q Well, where in the supplemental reports created by the detectives would I look?

**A I didn't polygraph her.**

Q You're not a polygraph operator.

254

**A I didn't take her to the polygraph. I didn't request she go take a polygraph. Who took her and why, I don't know.**

Q So your partner requested that she be given a polygraph.

You're aware of that; right?

**A No, I'm not aware of that.**

Q All right. So a detective supp report should have been created documenting why Anna Velez was taken for a polygraph; right?

**A Correct.**

Q Let's skip to Exhibit 6.

All right. I'll have to go back to Ms. Anna Velez and her polygraph test.

Do you know why she was suspected of committing this murder?

MR. ENGQUIST: Objection -- well, just the form, calls for speculation.

**A Why she was suspected of what?**

Q Of having some involvement in the Vargas homicide.

MS. QUIST: Object.

MS. ROSEN: Foundation.

**A I do not.**

255

**BY MR. AINSWORTH:**

Q Was there any other reason to polygraph her apart from her having some suspected involvement in the Rodrigo Vargas homicide?

**A Not to my knowledge.**

Q All right. Sir, so then why didn't you conduct any follow-up investigation after you talked to Wilda and she said, "I was sleeping and then somebody woke me up and told me my husband was dead."

MS. ROSEN: I'm sorry. Could you read that back.

(Pending question read.)

MR. ENGQUIST: I'm going to object to form.

Go ahead.

**A The question about Wilda is that after Guevara talked to her, she added no new information. We had no investigation direction to go in, and we were buried in other murder cases we were working on.**

Q So just so I get it right, your sergeant said investigate this murder.

**A For a day.**

Q For that day. You went and talked to Wilda.

256

She told you what she told you.

You didn't ask her any follow-up questions; right?

**A I never spoke to Wilda. She speaks Spanish.**

Q Okay. And then despite having access to Schak and Jack's report suggesting follow-up information on -- following up an investigation on the aggravated battery, you and your partner -- what did you do after you talked to Wilda?

**A Nothing as far as this case went, not until June 2nd.**

Q Did you go back to your sergeant and say, You know, we gave it our best shot, but we couldn't crack this one?

MR. ENGQUIST: Objection; argumentative, form.

MS. NIKOLAEVSKAYA: Join.

**A I don't remember what conversations we had with our sergeant in Area 5.**

Q Did you tell anyone that you were not going to investigate this murder anymore after June -- after February 6th?

MS. ROSEN: Object to the form.

MR. ENGQUIST: Join.

257

A  I don't remember.

BY MR. AINSWORTH:

Q  Your partner was keeping in contact with Wilda Vargas; right?

A  That I don't know about.

Q  Well, you testified at the same trial, right, with Montanez and Serrano?

A  What was your question?

Q  You testified at the trial of Mr. Montanez and Mr. Serrano; right?

A  Yes.

Q  Sorry.  My apologies.  This is actually Exhibit No. 4, the Sidley interview, if you turn to page 3.  Do you see that second paragraph on page 3?  The last sentence of that paragraph, "Detective Halvorsen noted that throughout the next several months, Detective Guevara 'kept in touch' with Wilda by phone," kept in touch being in quotes.

A  Again, I don't remember the conversations I had with Sidley.

Q  All right.

A  I can't dispute what they typed because I don't remember it.

Q  Do you dispute that you told the lawyers at

258

Sidley Austin that Detective Guevara kept in touch with Wilda by phone over the next several months?

A  I'm not disputing that.

Q  Why didn't you create a report regarding your interview of Wilda Vargas on February 6th?

A  On February 6th because no new information was learned.  It's pointless to turn a report in that says we learned nothing.

Q  So then let's go back to Exhibit No. 3.  Here we are, page 169.  We have a polygraph --

MR. ENGQUIST:  One second.  The staple you gave me didn't hold.  It kind of fell apart.  I'm sorry.  You have bad staples.

MR. AINSWORTH:  It's stress turning.

Q  All right.  Page 169, this is a -- appears to be a polygraph report; is that right?

A  Yes.

Q  Requested by Detective, it says, Geurrera of Area 5 violent crimes.

Is that supposed to be Guevara?

A  That's what it says.

Q  Did you have a Geurrera in Area 5 at the time?

A  Yeah.  Ricky Geurrera, Area 5 youth.

259

Q  Ricky Geurrera --

A  Uh-huh.

Q  -- Area 5 youth.

A  Uh-huh.

Q  What does youth mean?  What is Area 5 youth?

A  Where was it?

Q  What is it?

A  Youth division.

Q  Youth division.

They investigate crimes against children; right?

A  Mainly.

Q  And crimes committed by children?

A  Investigate crimes involving minors.

Q  Minors.

And the Vargas homicide was not a crime involving minors; right?

A  No.

Q  And this was for the murder of Rodrigo Vargas?  That's what the polygraph was in relation to; right?

A  It doesn't say that.

Q  Top left corner and it also has the RD number.

260

Do you see where it says victim's name?

A  I'm looking at the RD number.

Q  All right.

A  This would have been relating to the Rodrigo Vargas murder.

Q  Yeah.  All right.  And it was requested on March 11th, 1993, and that leads you to believe that that should be Detective Guevara rather than Geurrera.

A  I see this report, but I have no knowledge of this thing.

Q  All right.  Does the fact that it was requested in the Vargas homicide lead you to believe that it's actually a typo, and it was supposed to be Detective Guevara rather than Detective Geurrera who requested this?

A  I don't know.  I've got no idea why this was requested in October 3rd of 1993, way, way, way after this case was closed.

Q  Well, I take this as police writing where it says 11-3-93.

A  Okay.  You're saying it's March the 11th.

Q  Yes.

A  All right.  Again, I don't know anything

261

about this.

Q All right. What was the result of Anna Velez's polygraph?

A It doesn't say.

Q Why wasn't a copy of this report included in the set of documents that you submitted with the inventory file -- oh, strike that. You didn't send any documents.

Why wasn't this report listed on the inventory file or file inventory that you completed?

A I don't know. I don't know anything about this report. I have no idea why Anna Velez was taken to the polygraph.

Q All right. Let's then turn to page 171. You're listed as the first detective on this supp report.

Do you see that?

A Yes.

Q And Detective Guevara, he's listed as the second reporting detective; right?

A Yes.

Q That's your signature below your name on the first page?

A Say that again, please.

262

Q That's your signature there?

A Yes.

Q You signed it once you completed this report; right?

A Yes.

Q But before you turned it in; right?

A Correct.

Q And you signed it to affirm that it was truthful and accurate; right?

A I signed the report to say that I typed it.

Q You were not saying that it was truthful and accurate?

A I'm saying that I typed the report.

Q All right. Are your police reports truthful and accurate?

A Yes.

Q Is this report truthful and accurate, the supp report dated June 2nd, 1993?

MS. ROSEN: Object to the form.

A As far as I know, this report is truthful and accurate.

Q Okay. And you submitted this report on June 2nd, 1993, at 11:00 p.m.; is that right?

A On what day?

263

Q June 2nd.

A No, I don't believe so. That's the day I typed this first page.

Q Okay. So where it says date this report submitted --

A I know.

Q -- day -- let me just finish the question.

A Go ahead.

Q The date this report submitted: Day, June 2nd, 1993; time, 2300.

You're supposed to put the date that this is submitted; right?

A Yes.

Q Okay. And your -- and when you submitted this report dated June 2nd, 1993, you put it into the same basket where you're supposed to put reports; right?

A This report was not submitted on June 2nd, 1993.

Q I didn't -- I'm not there yet.

A Okay. Go ahead.

Q I'm just saying this report dated June 2nd, 1993.

A The first page is dated that.

264

Q This report, it's only dated by you in one place; right?

A No. It's dated on the back page too, June 6th.

Q Is that where it says the date of the report?

A No. But it's also dated on the back, June 6th.

Q So you consider that to be a date of the report.

A The front page is the day that I started typing. Yes, I know the box down here says the day it's submitted. That's wrong. I should have changed this box to June 6th.

Q Okay. In any event, this report which we'll call -- it's at least dated June 2nd, 1993; right?

A The front page is, yes.

Q Okay. Was submitted by you in the same box where you typically submit your reports; right?

A Yes.

Q When you're seeking approval for them; right?

A Yes.

Q And then it was approved by Sergeant Biebel

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

265

on June 3rd, 1993, at 11:45 a.m.; correct?

A That's what it shows, correct.

Q Do you have any doubt that Sergeant Biebel approved this report on June 3rd, 1993, at 11:45 p.m. -- a.m.?

A I think the date it was approved is wrong.

Q You think that both the date that it was submitted and the date that it was approved -- approved, both of those dates are wrong?

A You're mixing up things here. I have already told you that this was the first page that I started typing the report. I should have changed this date to the 6th. I didn't.

Q Right. You got that wrong.

A It's an error on my behalf.

Q Okay.

A There is a notation here this report was still in progress on June the 6th.

Q Okay. So you're saying that you erred in the date --

A Yes.

Q -- on the first page?

A Yes.

Q And your supervisor, Sergeant Biebel, also

266

erred as to the date that he approved the report; right?

A I'm not saying he intentionally erred. I'm saying that he had a stamp that he used. The wheel might have been turned to the wrong date.

Q And so it was one of those stamps that you set it at the beginning of the day to allow you to stamp --

A Yes.

Q -- everything that day?

A Yes.

Q All right. And do you know why he would have turned his wheel on that stamp back three days just for this particular report, which you also erred on the date on the first page?

MS. ROSEN: Object to the form.

MS. QUIST: Join.

A I'm not saying that he did. I'm saying that the wheel was turned back, and he may not have noticed.

Q Did you spill coffee on this report, sir?

A No.

MS. QUIST: Object to form.

Q All right. So when do you think you

267

submitted this report, sir?

A Sometime after June 6th.

Q Do you have any idea when?

A Probably June 6th or June 7th.

Q Why did you say that this report was added to the file on June 2nd? In the inventory file --

A Yeah, I know. I know. My error.

Q So --

A It should have said June 6th.

Q I'm sorry. I'm just trying to get this straight.

So you're saying that you not only got the date wrong on the report, but you also got the date wrong on the investigative file inventory, and your sergeant got the date wrong when he approved it.

Is that what you're saying, sir?

A Can I look at the investigative file inventory and make sure that we're comparing this report to that?

Q Sure.

A Can we do that?

Q Yeah. Exhibit 6.

So on June 2nd, you include a number of documents but only one supp report; right?

268

A None of this stuff is chronological. I would need to have the chronological file as to what was before this supp and what was after this supp so I can compare it to make sure I'm referring to this supp on June the 2nd and not on June the 14th.

Q All right. Well, you've got a -- on February 2nd, you've got a canvas supp and the progress supp. Those are the only other two supp reports submitted as of June 2nd.

The canvas supp, the progress supp, and then the supp that you introduced; right?

A Again, this is not chronological, and it's very confusing.

Q All right. So let's just --

A I will admit that I put the wrong date on the front of this report. I would admit that this report should have been logged in the file as of June 6th.

Why Bob Biebel had the wrong date on this I don't know. I can only assume that someone, I don't think it was him, probably was playing with his time stamp and changed the date, and he didn't notice.

Q But you agree that you logged the supp reports on June 2nd --

269

A  Apparently.

Q  -- in the investigative file inventory; correct?

A  Yes.

Q  And so you got the date wrong on the investigative file inventory on the first page of the supp report, and your sergeant also got the date wrong that he approved the report.

That's what you're saying?

A  Yes.

Q  All right.  Did you include the location -- sorry -- did you include in this report --

MR. ENGQUIST:  Which report are you speaking of?

MR. AINSWORTH:  The report that the first page is dated June 2nd, 1993.

Q  Did you include in that report the fact that you tried to verify that Gold Busters didn't exist, but you found it to be an empty storefront?

A  Which report are you referring to?

Q  The one that's dated on the first page, June 2nd, 1993.

A  I can't find it.  Can you find it for me.

Q  Yeah.  I'm sorry.  I'm on Exhibit 3, and

270

here's the first page of it just for your reference.

A  All right.

Q  You can turn to the second and third page, if you'd like.

A  Which page would you like me to turn to?

Q  Well, I will represent to you that there's nowhere in this report or in this file anything about you determining that Gold Busters was actually a vacant storefront.

And I'm asking you --

A  You would be correct.  There's nothing in this report.

Q  All right.  And there's nothing in this report about Vicente telling you that Jose Montanez's car was damaged by a bullet during the murder; correct?

A  Say your question again, please.

Q  Sure.  There's nothing in this report about Jose Montanez's car being damaged by a bullet as you claimed that Vicente had said to you.

A  No.  That was a different report.

Q  Okay.

A  Let me correct that.

Q  Yes.

271

A  Let me correct that.

Q  Yes, sir.

A  The same report --

Q  Yes.

A  -- that we talked about this one --

Q  Yes.

A  -- the front page says 2nd of June.

Q  Yes.

A  On page 3 --

Q  Yes.

A  -- Francisco Vicente clearly stated that two days later, Pistol Pete drove up.  He noticed new damage to the left-front fender.  Pistol Pete told him he smashed the car after he popped the victim.

Q  Okay.

A  Bullet hole.  Bullet hole.

You were correct.  There's nothing in here that -- about Francisco Vicente telling me that Pistol Pete -- the car had accidentally been shot during the murder.

Q  But you told Wilda Vargas that Montanez's car had sustained a bullet hole as part of the murder; correct?

MS. ROSEN:  Object to the form, foundation.

272

MR. ENGQUIST:  Mischaracterizes his previous testimony.

A  I never told Wilda Vargas anything.

BY MR. AINSWORTH:

Q  Sorry.  Your partner, Ray Guevara, told Wilda Vargas that Montanez's car had sustained a bullet hole as part of the murder; right?

A  That I'm unaware of.  I don't know what Ray told Wilda.

Q  You can't admit that's true or deny it's false; right?

A  What's that?

Q  You can't -- you can't say one way or the other whether Ray told Wilda that the bullet hole in Montanez's car came from the murder; right?

A  Correct.

MR. ENGQUIST:  I think we're going to take another break.  Just a few minutes.

MR. AINSWORTH:  Okay.

THE VIDEOGRAPHER:  Off the record, 4:20.

(A recess was taken from 4:20 p.m. to 4:31 p.m.)

THE VIDEOGRAPHER:  Back on the record, 4:31.

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

273

BY MR. AINSWORTH:

Q Okay. If you turn back to Exhibit No. 3, that's the RD file, and if you turn to page 174.

It says, "On June 2nd, 1993, Detective R. Guevara showed Wilda Vargas a photo array that consisted of CPD black-and-white identification photos. Wilda Vargas identified Jose Montanez, Pistol Pete, as the person who followed her husband into the gas station."

"She also identified Armando Serrano, Mondo, as the person she saw seated in the front passenger's seat of the tan" can -- tan "car that followed them. These photos were inventoried for evidence."

Do you see that, sir?

A Yes.

Q So the photo array consisted of three defendants; right?

A Yes.

Q Or three suspects.

A Three suspects at that time.

Q All right. Montanez, Serrano, and Pacheco; right?

A Yes.

274

Q And then five filler photos; right?

A Yes.

Q Do you know why Ray Guevara showed Wilda Vargas a photo array that contained three suspects and five fillers?

A No.

Q That was improper to do; right?

A Every case is different. You have to use what's available to you. It appears to be wrong. There should have been more filler photos.

Q And was there a shortage of filler photos on June 2nd, 1993?

A I do not know what filler photos Guevara had with him.

Q Well, I mean at the station, were there -- was there a shortage of filler photos on June 2nd, 1993?

A Not to my knowledge.

Q Did you ever have a situation where there weren't enough filler photos for a photo array?

A Yes.

Q All right. And tell us the circumstances when that happened.

A We didn't have them. We didn't have enough

275

pictures of a certain person we were trying to do a photo array with.

Q All right.

A If the guy is missing his eye, we'd need filler photos with the guys missing their eyes.

Q I see. There were situations where somebody has a very prominent distinguishing factor; right?

A Yes.

MS. ROSEN: Object to the form.

Q But how about people who did not have such a prominent distinguishing factor? Did you ever have not enough filler photos?

A Ordinarily, we would have filler photos in the office.

Q All right. Then it says that the reporting detectives -- well, according to this report, you then identified a car belonging to Jose Montanez; right?

A Yes.

Q And then it says detective --

A Let me correct that. We found a car that was registered to Jose Montanez.

Q Okay. And then in the last -- the next paragraph there, second from the end, it says,

276

"Detective R. Guevara drove Wilda Vargas around the neighborhood of the 3900 block of West Dickens."

Do you see that, sir?

A Yes.

Q And so was it only Ray Guevara who was driving Wilda around?

A Yes.

Q So you did not accompany him on that driving?

A No.

Q And so then -- and when did that take place?

A I imagine it was June 2nd. No, it couldn't have been June 2nd. I'm sorry. It had to be the same day we took the photographs of the car, which would have been June 6th.

Q And you took those photographs; right?

A Yes.

Q Okay. So you were not present when Wilda identified Jose Montanez's car; right?

A My report says no.

Q All right. And you don't know if Ray Guevara first drove her to a number of vehicles that looked nothing like the suspect vehicle from the gas station; right?

277

A That's correct.

Q You don't know where Ray Guevara took her; right?

A That's correct.

Q You don't know if Ray Guevara told Wilda Vargas that the bullet damage to Jose Montanez's car matched the ballistics evidence from the crime scene when she was asked to identify Jose Montanez's car; right?

A That's correct.

Q And if you did type stuff on here, on this report after June -- after submitting and having the report approved, that would have been totally wrong; right?

A Correct.

MS. ROSEN: Object to the form.

Q All right. Then I want to direct your attention to page 193.

This is a lineup report; correct?

A Correct.

Q You prepared this report?

A I did.

Q That's your signature under your name on the first page?

278

A That's correct.

Q Did you sign your partner's name on this?

A Yes.

Q Did you give him a chance to review it for accuracy before signing in his stead?

A No.

Q Why did you sign his name to your report?

A It's a common thing we did.

Q And this report was approved by Sergeant Mingey?

A Yes.

Q No way to forge that signature.

A That's Ed's signature.

MS. NIKOLAEVSKAYA: Objection to form.

Q So then going to the second page, you have a lineup, and you tried to make this a fair lineup to Armando Serrano; right?

A Yes.

Q Trying to find people who would appear similar to him; right?

A Yes.

Q And so when you were creating this lineup, you were looking for people who would appear similar to the 5-foot-6, 150 pound Armando Serrano; right?

279

A Yes.

Q And so you went out, and you found other Latino men; right?

A Yes.

Q And you found the tallest, skinniest Latino men you could to place next to Armando Serrano in the lineup; is that right?

A What was your question?

MS. ROSEN: Object to the form. Object to the argumentative.

MR. ENGQUIST: Join.

Q You went out and you found the tallest, skinniest Latino men that you could to place next to Armando Serrano in the lineup; right?

A Wrong.

Q All right. Well, let's just take a look here.

Did you have trouble finding shorter Latino men in the City of Chicago on June 11th, 1993?

A This report indicates that all the fellows in the lineup were prisoners.

Q Okay. So you went to the lockup and you found -- and you couldn't find any shorter Latinos in the lockup; is that what you're saying?

280

A We use what's available to us.

Q Did you --

A That's all we can do.

Q Did they just arrest a basketball team or something?

MS. QUIST: Objection.

MS. ROSEN: Object to the argumentative nature of the question.

MS. NIKOLAEVSKAYA: Join.

Q Why did you create a lineup that has people who are all either 5-11 or 6-1 or 6-foot tall next to the 5-foot-6 Armando Serrano?

A We used what filler are available to us. Can I see the lineup photo?

Q I don't have it in front of me, sir.

A I want to see if he's sitting down or not.

Q Well, sir, let's take a look at the --

A The persons are seated.

Q In the report, you would indicate if the participants in the lineup were seated, correct, if they were, in fact, seated?

A Well, that's why I want to look at the lineup photo.

Q I'm just asking you, sir, in your report you

281

would indicate if the participants were seated, if they were, in fact, seated; right?

A  I normally would, yes.

Q  All right.  And your report does not indicate that the participants were seated; right?

A  That's correct.

Q  All right.  And so -- and not only did you find really tall people, but proportionally they were really skinny people; right?

MS. ROSEN:  Object to the form of your question.

MS. NIKOLAEVSKAYA:  Join.

MR. ENGQUIST:  Join.

Q  You've got a guy who is 6-foot-1 and only 150 pounds.

MS. ROSEN:  Object to the form.

MS. QUIST:  Join.

MS. NIKOLAEVSKAYA:  Join.

A  What's your question, please?

Q  Well, just that you were -- you've got a guy who is 5-foot-6, 150 pounds, which would be about a medium build; right?

MS. ROSEN:  Object to the form.

A  I can save you some trouble here.

282

Wilda Vargas never saw Armando Serrano out of the car.  She had no idea how tall he is, how much he weighed.  She saw him sitting in the car.  So I don't see your questions about height.

BY MR. AINSWORTH:

Q  Well, would the -- as part of what you're trying to do in a lineup when you're creating the fillers is make sure that the suspect doesn't stand out in some significant way from the other people in the lineup.

A  That's correct.  That's why I'd like to see the lineup photo.

Q  Okay.  Let's turn to page 183 of Exhibit 3.

A  183?

Q  Yes.

All right.  So this is a report documenting the questioning of Armando Serrano and Jorge Pacheco on June 8th and June 9th of 1993.

Do you see that?

A  Yes.

Q  Why didn't you have Wilda come and view a lineup of Armando Serrano on June 8, 1993?

A  He wasn't under arrest.

Q  And so why -- why does that matter?

283

A  You're not supposed to put persons in lineups who aren't under arrest.

Q  Well, isn't it an investigative tool to try and find out who the perpetrator is?

A  No.  It's a charging tool.

Q  It's a charging tool.

A  Yeah.  To identify who an offender is and charge him.

Q  So you're saying that you can only do a lineup after somebody has already been arrested.

A  Arrested.  That's the proper procedure.

Q  All right.  So you can't ask somebody if they would voluntarily appear in a lineup.

A  We can ask, yes.

Q  All right.  So why didn't you ask Armando Serrano if he would -- you know, because he was cooperative and came down for a polygraph test; right?

A  Yes.

Q  He came down voluntarily; is that what you're saying?

A  Yes.

Q  And so why didn't you just say, Hey, Armando, we'd really like to clear this up.  Could

284

we just have you stand in a lineup.  We'll make it fair for you.

MS. ROSEN:  Object to the form of the question.

A  We didn't.

MR. ENGQUIST:  Join.

MS. NIKOLAEVSKAYA:  Join.

Q  Well, why didn't you, sir?

A  We weren't at that point in the investigation yet.

BY MR. AINSWORTH:

Q  Why weren't you at that point in the investigation?

A  To have them stand in a lineup?

Q  Yeah.

A  Because I wanted to talk to all three potential suspects before I took that step.

Q  Why?

A  I wanted to.

Q  Why?

A  Because that was my investigative steps.

Q  All right.  But why were those your investigative steps?

A  That's the way I did my job.

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

285

Q And what was the thinking behind it?

A That I was building a case.

Q And how was talking to everybody before you had a lineup --

A Well, I might have got some -- one of the three persons to come in and give me a statement.

Q And neither Armando Serrano or Jorge Pacheco claimed any responsibility for this crime whatsoever; right?

A That's correct.

Q They both denied it wholeheartedly?

A Correct.

Q And you submitted this report on June 14, 1993?

A It's not my report. It's Detective Guevara's report.

Q Oh, I see.

Does that mean he typed this report?

A No.

Q So you typed it?

A Guevara typed it.

Q Guevara typed it. Okay.

So Guevara typed it, and he submitted it on June 14th, 1993, at 8:30 p.m.; right?

286

MS. ROSEN: Objection; foundation.

A That's what the report indicates.

BY MR. AINSWORTH:

Q Do you have any reason to doubt that?

A What's that?

Q Do you have any reason to doubt that?

A No.

MS. ROSEN: Object to the foundation.

Q Sergeant Biebel approved it on June 15th at noon; correct?

MS. ROSEN: Object to the foundation.

MR. ENGQUIST: Join.

A That's what the report indicates.

Q Okay. So let's go back a few pages to 177.

This is a report typed by you; correct?

A Correct.

Q And this is submitted on June 14th, 1993, at 6:00 p.m.; is that right?

A Correct.

Q And approved by Sergeant Biebel on June 15th, 1993, at 12:45?

A That's what's indicated.

Q All right. And this demonstrates or documents your interview with Timothy Rankins; is

287

that right?

A That's correct.

Q All right. How did you come in contact with Timothy Rankins?

A I was at home. I was called at home by Sergeant Mingey. He told me he had a witness to the shooting of Rodrigo Vargas in the office, and he wanted me to come in and take a statement from him.

Q All right. And how did Sergeant Mingey come in contact with Timothy Rankins?

A I believe Rankins was in custody for some other crime.

Q And why did that lead Timothy -- why did that lead Mingey to be in contact with Timothy Rankins?

A I don't know.

Q Would reviewing your report help refresh your recollection?

A Yeah.

Q Take a look at the bottom of page 2 of your June 14, 1993, report relating to Timothy Rankins.

A Yes. My recollection has been -- has been --

Q Refreshed?

288

A Well, apparently, Ed Mingey knew this guy from another murder case.

Q And what was that murder case?

A Monica Roman.

Q You investigated the Monica Roman murder as well; right?

A I don't remember off the top of my head.

Q You don't remember a guy named Geraldo Iglesias who was prosecuted for that murder?

A No.

Q Did Vicente tell you that yet another person confessed to him in a murder that you were investigating?

A Did Vicente tell me what?

Q That yet another person confessed to him in a murder that you were investigating?

A I don't really remember.

Q How many murders did Vicente tell you people had confessed to him about?

A Sidley told me it was three, but I only remember two.

Q All right. Could it be because the third one never happened?

A The third murder never happened?

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

289

MS. ROSEN: Object to the form.

MS. NIKOLAEVSKAYA: Objection to form.

MR. AINSWORTH: Sorry. You're right. That's a poor question.

BY MR. AINSWORTH:

Q So Vicente testified that he told you -- well, strike that.

If Vicente told you that Geraldo Iglesias had murdered Monica Roman, you should have written that in a report; right?

MS. QUIST: Object to form.

A That's correct.

Q There's no reason not to document the fact that Vicente is telling you that Geraldo Iglesias has confessed to murdering Monica Roman?

A If he did, that would be correct.

Q Do you have any explanation for why in the Monica Roman homicide investigation there's no report documenting the fact that Vicente claims Geraldo Iglesias confessed the murder to him?

A Who did he tell this to?

MS. ROSEN: Object to the form, foundation.

MS. NIKOLAEVSKAYA: Join.

MR. ENGQUIST: Join.

290

BY MR. AINSWORTH:

Q Well, okay. So let's mark this -- well, let me just read this to you. This is Geraldo Iglesias's testimony on December 16, 1994.

MS. ROSEN: Do you have a copy of that for everyone?

MR. ENGQUIST: Yeah. So we can follow along.

MS. ROSEN: It's a completely different case.

MR. AINSWORTH: Well, it's this case.

MS. ROSEN: Well, no, it's not.

MR. AINSWORTH: It is. All right.

MS. ROSEN: So what number is this now?

MR. AINSWORTH: Oh, I didn't --

MS. ROSEN: 7?

THE REPORTER: 7.

MS. ROSEN: Is that right?

THE REPORTER: Yes.

(Halvorsen Deposition Exhibit 7 marked for identification and attached to the transcript.)

BY MR. AINSWORTH:

Q Page V-62, Iglesias is being examined by the

291

prosecutor in the case.

MS. NIKOLAEVSKAYA: 62 or 52?

MR. AINSWORTH: 62. It says -- and so line 2 on that page.

"QUESTION: And by the way, Chino, when you went on July 1st, to talk about the other case, you did tell the detectives about what he told you on the way over; is that correct?

"ANSWER: Yes, sir.

"QUESTION: And you brought that up to the detectives, didn't you?

"ANSWER: Yes.

"QUESTION: What did the detectives tell you when you brought that up to them?

"ANSWER: They told me let's take care of this in front of the grand jury, the case that we are speaking on now, forget about that.

"QUESTION: In other words, we will take one case at a time?

"ANSWER: Yes, sir."

Were you asked -- do you see that testimony, sir?

A No. Where is it at?

Q Oh, geez, V-62.

292

A Which one?

Q V-62. 62.

A Section 2?

Q Yeah.

MS. ROSEN: Is there a problem?

MS. BONJEAN: No. Do you have a problem?

MS. ROSEN: Well, you're huffing over there. So I'm just asking --

MR. BONJEAN: I exhaled. I exhaled. I really don't need you policing every little move I make. It's really -- (Overtalk.)

MS. ROSEN: I've been with you all day today.

MS. BONJEAN: You're really focusing a little too much. I exhaled. Okay. Relax.

MS. ROSEN: I have not said a word to you all day, and the record will reflect that.

MS. BONJEAN: Yes. The record will also reflect that I exhaled, and you have some arbitrary comment to make about my exhale.

BY MR. AINSWORTH:

Q All right. Are you on V-62, sir, line 2?

A Yeah. I'm reading this thing, and it doesn't show that Francisco Vicente told any

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

293

detective.  It says he told David Studenroth.

Q  He told the detectives who brought him to the grand jury.

Do you see that, sir?

MS. ROSEN:  Object to the form.

A  What line is that on?

Q  Line 2.  "And by the way, Chino, when you went on July 1st to the talk about the other case, you did tell the detectives about what he told you on the way over; is that correct?

"ANSWER:  Yes."

Do you see that, sir?

A  Yeah.  I see it but --

Q  Okay.

A  But it doesn't say that he -- you know, who he talked to.

Q  Right.  Okay.  So you -- if you turn to page 187 of Exhibit 3, and I guess, I should before we leave because we've got -- I don't know whether to flip back, which one to go to first, but on that page V-62.

MS. ROSEN:  This is back to the other exhibit.

MR. AINSWORTH:  Yeah.  I know.

294

BY MR. AINSWORTH:

Q  All right.  We'll stick on Exhibit 3.

So you see where it says, the third paragraph down, On July 1, 1993, the reporting detectives, that's you and your partner, Ray Guevara; right?

A  Uh-huh.

Q  Yes?

A  Yep.

Q  Yes?

A  I see it.

Q  Brought Francisco Vicente to the Cook County grand jury.

A  Correct.

Q  Do you see that, sir?

A  Right.

Q  Do you agree that you and Ray Guevara were the detectives who brought Francisco Vicente to the grand jury on July 1st, 1993?

A  That's correct.

Q  And in his testimony, Geraldo Iglesias is telling the prosecutor that he told the detectives --

MS. ROSEN:  Geraldo Iglesias is telling the

295

prosecutor?

A  Geraldo Iglesias.

MR. AINSWORTH:  Geraldo Iglesias is testifying.

A  Okay.

MS. ROSEN:  Okay.

BY MR. AINSWORTH:

Q  Yes.  Geraldo Iglesias is testifying that he told the detectives who brought --

MS. ROSEN:  That Iglesias told the detectives?

A  Geraldo is the defendant.

MR. AINSWORTH:  I'm so sorry, everyone.  I caused the utmost confusion.

Q  Vicente's testimony -- Vicente testified that he told the detectives who brought him to the grand jury on July 1st about Geraldo Iglesias confessing to him.

MS. ROSEN:  Well, are you now representing that this testimony on V-62 is Vicente's testimony, not Iglesias's testimony?

MR. AINSWORTH:  I'm sorry.

MS. ROSEN:  Okay.

MR. AINSWORTH:  In the Iglesias case.

296

MS. ROSEN:  Got it.

MR. AINSWORTH:  I got it wrong.

MS. ROSEN:  Okay.

BY MR. AINSWORTH:

Q  And so if you want to look at that again, by all means.

A  I don't remember him telling me about a third case.

Q  Okay.

MS. ROSEN:  Is there some -- oh, I see what you're saying.  Okay.

Q  And so you -- and you don't dispute that you brought Vicente to the grand jury on July 1st; right?

A  No.

Q  Okay.  And you don't dispute that you should have -- if Vicente told you about a confession he received from Iglesias, you should have documented that in a supp report; right?

A  I don't remember him giving me a confession ever.

Q  But you accept that you should have included Vicente's statement about Iglesias confession if, in fact, he told you about it on July 1st, 1993?

297

A  If he had told me that information, I would have documented it.

Q  All right.  So let's turn back to Mr. Rankins.

MS. ROSEN:  We're in Exhibit 3?

MR. AINSWORTH:  We're in Exhibit 3.

MS. ROSEN:  Okay.

A  Where are you at?

Q  Page 178.

A  On what exhibit?

Q  Exhibit 3.

A  2?

Q  3, 178.

So it just so happens that Vicente got a confession in another case that you and Guevara were investigating that's referenced in this file, the Monica Roman homicide.

That's just a coincidence?

MS. ROSEN:  Object to the form.

A  I have to read this Monica Roman file because it doesn't ring any bells with me at all.

Q  All right.  A girl who was shot in a car when she was driving by with some other Latin Kings, I believe, in a car, and somebody came up and shot

298

at the car and killed this young woman.

A  Again, I'd have to read the investigative file --

Q  All right.

A  -- to refresh my memory.

Q  How long was your interview with Timothy Rankins?

A  It's been 26 years since this interview. I'd say no more than an hour.

Q  All right.  And you started interviewing him at 2:00 p.m.; is that right?

A  That's what my report indicates.

Q  So did you come in early for that?

A  As I previously informed you, Sergeant Mingey called me at home and told me to come on in, he had this guy in the office that he wanted me to interview as a witness in the Rodrigo Vargas murder.

Q  All right.  So then he gave you some nicknames for the suspects.  He said that Jose Montanez was Moses or Barrel Belly?

A  Uh-huh.

Q  Is that a yes?

A  Correct.

Q  Did you look in the nickname file to see if

299

Jose Montanez was ever known by Moses or Barrel Belly?

A  No.

Q  Have you ever received any kind of corroboration that Montanez is known as Moses or Barrel Belly?

A  No.

Q  And Rankins referred to Armando Serrano as Joker.

Do you know of any other reference to Armando Serrano going by the nickname of Joker?

A  No.

Q  Did you look in the nickname file to see if you could find any reference to Armando Serrano being known as Joker?

A  No.

Q  And how about Jorge Pacheco being known as Stripes?  Do you know of any other instance where Jorge Pacheco was ever referenced as Stripes?

A  No.

Q  Did you look in your nickname file to see if Jorge Pacheco was also referred to as Stripes?

A  No.

Q  So Rankins tells you that he goes with

300

Shorty Folks to the scene of the crime; right?

A  I'd have to sit here and read this whole thing.

Q  Well, let me and -- let me direct you to the last four lines of page 179.  Here it says, "He, Shorty Folks, and Stripes got into a red van with white stripes on the bottom.  Stripes drove this van.  He did not know who owned the van, only that it was borrowed from another Imperial Gangster. They drove down to North Avenue to Springfield. They drove north on Springfield about two blocks.

"The tan Buick pulled over and parked a few car lengths away from a van that was parked on Springfield," and then Rankins relates that he witnessed the murder from that vantage point.

Do you see that, sir?

A  He gives a detailed description of the murder, and he says he sees Joker shoot and kill this guy.

Q  Right.  So -- and next to Timothy Rankins while this is going on is Shorty Folks; right?

A  Say that again, please.

Q  Next to Timothy Rankins while this is going on is Shorty Folks, right, according to your report?

301

A That's what Rankins told us.

Q So did you then, as an experienced homicide detective, ask Timothy Rankins the question who is Shorty Folks?

Spoiler alert, it's not reflected in the report that you did, if you're looking for that.

MR. ENGQUIST: Objection.

MS. ROSEN: Objection just to the form.

MR. ENGQUIST: Yeah. Give him time to read the report.

Q Certainly.

A It doesn't say so in this report, but I'm sure we asked Rankins who Shorty Folks was.

Q And did Rankins tell you he is the guy I was arrested with the day before?

A Where does it say that at?

Q Well, it doesn't in your report, but do you know?

A It doesn't?

Q It does not, not in your report.

A Well, then he didn't tell me then.

Q All right. Well, do you know that Shorty -- that Timothy Rankins was arrested with a person named Shorty Folks on June 10th, 1993?

302

A No, I do not.

Q What efforts did you take to try and find out who Shorty Folks was?

A I don't remember at this time.

Q Did you want to know who Shorty Folks was?

A Yes.

Q He was a witness to a murder; right?

A Yes.

Q He would be able to corroborate what Timothy Rankins was telling you; right?

A Yes.

Q So you wanted to find him; right?

A Yes.

Q Did you say, Mr. Rankins, would you mind telling us who Shorty Folks is or how we could talk to him?

A I don't remember that conversation.

Q All right. Did Timothy Rankins refuse to tell you who Shorty Folks was?

A I don't remember that conversation. Timothy Rankins was very cooperative.

Q If Timothy Rankins had refused to provide the information about this crime, such as who Shorty Folks was, that's something you would have

303

documented; right?

A What was your question again?

Q If Timothy Rankins had refused to tell you who Shorty Folks was, you would have documented that fact; right?

A Yes, probably.

Q Because that would be withholding pertinent information to a murder investigation; right?

A I don't remember the conversation with Timothy Rankins really. I don't remember any conversation about Shorty Folks.

Q That's --

A I documented everything he told me.

Q That's why you have to rely on your reports to aid your memory; right?

A Correct.

Q So that's why you know, as an experienced homicide detective, that it was important to include all pertinent information in your reports so it would assist your memory recall later; right?

A Correct.

Q Rankins also refers to his girlfriend Sabrina being at the park?

A Say that again, please.

304

Q Rankins refers to his girlfriend Sabrina being at the park, page 179. Let's go about -- in that last paragraph about -- the big one about Timothy Rankins, about a third from the bottom, "There was also a guy he knows as Shorty Folks. Rankins' girlfriend Sabrina was also at the park."

Do you see that?

A I see where it says Sabrina is at the park, yes.

Q All right. Did you want to know how to contact Sabrina?

A What park were they referring to? I don't know.

Q Well, did you want to be able to contact Sabrina? And just to fill you in, Sabrina was at the park when all --

A Which park?

Q Monticello Park when all three defendants or all three suspects were supposedly making a plan with Rankins to come back at -- sorry -- he arrived at Monticello Park with his girlfriend to meet up with all three suspects and Shorty Folks to go on this mission.

MS. ROSEN: Object to the form.

MR. ENGQUIST: Join.

A I have no idea where Monticello Park is at.

BY MR. AINSWORTH:

Q I don't see the relevance, sir, because I'm just trying to find out --

A Well, if she's not there at the murder, what relevance does she have?

Q Well, she's -- he's saying that when I met up with the three suspects, immediately before we went over to commit the murder, my girlfriend was there, and she would be able to see that I was with the three defendants, Montanez, Serrano and Pacheco, as well as Shorty Folks all meeting up to commit this crime.

A Which crime are they meeting up to commit?

Q The murder.

A No. I thought they were meeting up to go get guns or something.

Q And then they'd go to the murder -- scene of the murder.

A So they didn't meet up to commit a murder.

Q All right. Well, we can play semantics, but I'm just trying to find out did you or did you not --

A No, I didn't find Sabrina.

Q Did you want to --

A Yeah. I'm sure I did.

Q Let me just ask the questions.
Did you want to speak to Sabrina?

A Yes, I would have liked to talk to Sabrina.

Q Did you make any effort to find out who she was?

A I don't remember.

Q Did you ask Timothy Rankins who was your --

A I don't know.

Q -- girlfriend?
Did you ask Timothy Rankins for her last name?

A I don't remember.

Q Is there any reason why you wouldn't have asked Timothy Rankins for the last name of his girlfriend?

A No.

Q When you were typing this up, did it occur to you, Gee, I don't know who Sabrina's -- what Sabrina's last name is or have any way to contact her?

MR. ENGQUIST: Object to the form,
argumentative.

A What was your question?

Q When you were typing up this report as part of Exhibit 3, did it occur to you that I don't know who Sabrina's last name is -- or what Sabrina's latest name is or how to contact her?

MS. ROSEN: Object to the form, argumentative.

A I don't remember what I thought 26 years ago.

Q All right. So then on the next page, page 4, the very bottom, this is page 180 of Exhibit 3. The last paragraph says, The reporting detectives, so that's both you and Detective Guevara; right?

A That's correct.

Q Showed Timothy Rankins a photo array consisting of eight Polaroid color photos. Timothy Rankins identified the photo of Armando Serrano as the person known to him as Joker.
Do you see that?

A Yes.

Q And then the next page says, "Timothy Rankins identified the photo of Jorge Pacheco as the person known to him as Stripes. Lastly, Timothy Rankins identified the photo of Jose Montanez as the person known to him as Moses."
Do you see that?

A Yes.

Q And so you were creating a photo array to be fair to Jose Montanez and Armando Serrano; right?

A Yes.

Q And you showed Polaroid photos; right?

A Yes.

Q And those -- and Polaroid photos are not what TV calls mug shots and what the Chicago Police Department calls -- what do you call them?

A Arrest photos.

Q Arrest photos. All right.
They're not arrest photos; right?

A Correct.

Q So you didn't get the Polaroid photos from the identification section; right?

A No.

Q No. The only way that you could have Polaroid photos of the defendants or of the suspects is if they were at the area; right?

A Correct.

309

Q  And so when you learned from Francisco Vicente that the perpetrators were Pistol Pete, Mondo, and Jordan, you went back to the Area; right?

A  I don't remember if I went back to the area to get the pictures or identification to get the pictures.

Q  Well, take a look at Exhibit No. 6.  It's the thick one, page 114.

A  Okay.

Q  These are the photographs that you showed to Timothy Rankins; right?

A  My report says we showed him a photo array.

Q  Sorry.  These are the photos of the three suspects that you showed him along with five fillers; right?

A  I'd have to see the inventory photos.

Q  All right.

A  If we inventoried the photos, obviously, these can't be the photos.

Q  Then if you turn back to the same page that you're on on Exhibit 3, page 181.

A  Okay.

Q  You then state that Serrano was arrested at 3:00 p.m.?

310

A  Correct.

Q  You started talking to Rankins at 2:00 o'clock and by 3:00 o'clock, you had already arrested Armando Serrano?

A  Apparently.

Q  And then at 6:45 that evening, Timothy Rankins identified Armando Serrano in the lineup.
Do you see that?

A  That's what the report indicates.

Q  All right.  You don't indicate that Wilda Vargas viewed a lineup, right, in the supp report?

A  Not on the 11th of June at 1845 hours.

Q  But in the separate lineup supp, you do say that she viewed a lineup.

A  Say again, please.

Q  In the separate lineup supp that you created, you said that Wilda Vargas did view a lineup on June 11th at 1845 hours.

A  Not in this report.

Q  Right.  Not in this report.
Why didn't you include the fact that Wilda also viewed the lineup and identified Serrano?

A  I'd have to see the lineup reports.  Are they in this packet here?

311

Q  Yeah.  We looked at one of them already.  We looked at the Wilda Vargas one, and then I'll show you the other one.  It's on page 175.

A  I'm looking on 175.  That's the lineup that was viewed by --

Q  Rankins.

A  -- Timothy Rankins.

Q  Yep.

A  But I don't see a lineup that was viewed by Wilda.

Q  Well, we'll get to it in a second, but before you leave 175, you see that this report is submitted on June 11th, 1993, at 2300 hours?

A  Yes.

Q  And it's approved by Biebel --

A  Yes.

Q  -- on June 15 at 1208?

A  Yes.

Q  It's approved by Biebel at about the same time that he approves the other report at noon on June 15th and the other report that he reviewed at -- he approved at 12:45 on June 15th.

A  That appears to be correct.

Q  All right.  But then page 193 is --

312

A  Page which?

Q  Page 193 is the Wilda.

A  This is obviously my mistake.  I should have put that Wilda also viewed a lineup on that same date and at that same time.

Q  All right.  Sir, moving forward, we've got a -- then if you go to 185.

A  All right.

Q  This is a report dated July 3rd, 1993; right?

A  Correct.

Q  If you go to the second page -- and you typed this report; right?

MR. ENGQUIST:  I'm sorry.  Which Bates number are we on?

MR. AINSWORTH:  185 and now turning to 186.

Q  You see in the upper right-hand corner --

A  On which page?

Q  186.

A  Okay.

Q  -- you've got a date, July 3rd, 1993?

A  Uh-huh.

Q  Is that a yes?

A  Correct.

313

Q That's the date that you would submit the report; right?

A The date that's on the other pages of the report. As I previously explained to you, we typed up the first page first when we began it, and it may not necessarily match the dates on the other pages.

Q Because the dates on the other pages of the report reflect when you're writing those --

A When I'm actually typing it, yes.

Q When you're actually typing it.

So the fact on page 2 it says July 3rd, 1993, in the upper right-hand corner reflects that that page was typed on July 3rd; right?

A Yes.

Q And the same for page 187. In the upper right-hand corner where it says July 3rd, 1993, that reflects that it's typed on July 3rd, 1993.

A Yes.

Q All right. So then, sir, if you go back to page 172 of Exhibit 3. This is the famous June 2nd, 1993, report, and in the upper right-hand corner we have June 2nd of 1993 reflecting that that page was typed on June 2nd, 1993; correct?

MS. ROSEN: Object to the form.

314

A What's the question?

Q The June 2nd, 1993, in the upper right-hand corner of page 172 of Exhibit --

A All right.

Q -- 3 reflects that that page was typed on June 2nd; right?

A Yes.

Q And the same going on to the next page, page 173. In the upper right-hand corner, we have June 2nd, 1993.

That means that page was typed on June 2nd, 1993; right?

A Yes.

Q And then going on to the next page, page 174 of Exhibit 3, the date of June 2nd in the -- 1993 in the upper right-hand corner reflects that that page was typed on June 2nd, 1993; correct?

A No. As I've explained before, this report was not completed until June 6th.

Q So --

A So the final -- this typing took place between the period of June the 2nd and June the 6th. It all may not have been on the same day.

Q So are you saying that the date on the upper

315

right-hand corner of page 174 where it says June 2nd, 1993, that date is also wrong?

A I'm saying that this report was not finished until June the 6th. June the 2nd might have been the day I was typing this report, the majority of this report, but it was not finished until June the 6th.

Q That's not my question, sir.

My question is are you saying that where it says June 2nd, 1993, in the upper right-hand corner of page 174, that's also an error in the date?

MR. ENGQUIST: Objection; mischaracterizing his previous testimony, asked and answered.

You can answer it again.

A From June the 2nd to June the 6th, I was typing this report. Not all this was typed up on June the 2nd. The report was finished on June the 6th and submitted at that time.

Q What date should have been written in the upper right-hand corner of page 174 of Exhibit 3?

A The day I started typing this report, June 2nd.

Q So you're saying it should be June 2nd.

A Yeah.

316

Q Even though the report was not submitted --

A This box does not indicate the day the report is turned in.

Q Okay.

A I already indicated I made a mistake. I should have changed that first page to June the 6th.

Q All right. Sir, let me show you what we'll mark as Exhibit No. 8, please.

(Halvorsen Deposition Exhibit 8 marked for identification and attached to the transcript.)

Q All right. So this is your report; correct?

A This is my report, my first -- well, not my first. This is the interview with Francisco Vicente when he was attempted to be bribed.

Q All right. This documents your conversation with Vicente and John Dillon at the gang prosecution unit; right?

A Yes.

Q All right. And then one second, sir. Let's -- let me come back to this.

Going back to Exhibit 3, let's turn now to page 185. So this report documents that Rankins was brought to the Cook County grand jury.

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

317

Do you see that on the bottom of the second page?

A Which page are you on now?

Q 186.

A Okay. Go ahead.

Q The second-to-the-last paragraph says, Detectives brought Rankins to the grand jury; right?

A I must be on the wrong page here. You're talking about page 186?

Q Yeah.

A What's your question?

Q Just the second-to-the-last paragraph says Rankins was brought to the grand jury. You brought him to the grand jury.

A It doesn't say the grand jury. It says Cook County State's Attorney gang prosecution unit.

Q Sorry. If you go up one, I think one before it, where it's talking about Rankins, not Vicente. Next to Investigation, the reporting detectives brought Timothy Rankins to the Cook County grand jury.

A Rankins to the grand jury, not Vicente.

Q Yeah.

318

A Okay. All right. That's correct.

Q And then the next paragraph says, "On June 28, 1993, the detectives had Francisco Vicente brought from the Cook County Jail to the Cook County State's Attorney's gang prosecution unit. Why did you have Francisco Vicente brought from the Cook County Jail to the Cook County State's Attorney's gang prosecution unit?

A I think they wanted to take a handwritten statement from him.

Q So why did -- why were you involved in that process?

A Well, from what I can read here, we were seeking arrest warrants for Jorge Pacheco and Jose Montanez. The state's attorney wanted to take a handwritten statement from Francisco Vicente before she approved the murder warrants.

Q Okay. So why did you have to be present for Vicente talking to the prosecution?

A Why did I have to be what?

Q Present or involved in the state's attorney getting a statement from Vicente?

A I always witnessed statements. It's required. The state's attorney does not take

319

statements without a police officer or detective witnessing them?

Q Did you ask to be present?

A This was my investigation. I was requesting the murder warrants. She was responding to my request for murder warrants. Before she would issue them, she wanted to take a handwritten statement from Francisco Vicente where I was present when she took the statement.

Q I thought that Schak and Jack were the lead detectives?

A They were not at this point.

Q When did they stop being the lead detectives?

A When we had all the information that we were working with.

Q When was that?

A Probably after the 2nd of June.

Q So as of the 2nd of June, you and Guevara were the lead detectives on this case.

A I would say we took it over, yes.

Q Would you say you're the lead detectives?

A We don't use that term in the police department, "lead detectives." We took over the

320

investigation.

Q You called Jack and Schak the lead detectives. Why are you reluctant to --

A I called them the scene detectives.

Q I mean, that's why we have a court reporter.

A All right. Maybe I did.

Q All right. So --

A It's the scene detectives.

Q All right. So are you now saying that Jack and Schak were not the lead detectives?

A At this point in the investigation, no.

Q But they were on February 6th, 1993; right?

A Yes.

Q And you and Guevara were the lead detectives as of June 2nd, 1993; is that correct?

A If you want to use that phrase "lead detectives," yes.

Q I'm asking you, sir. I'm not the one testifying here.

A All right. We were -- we took over the investigation.

Q What does that mean to take over the investigation?

A Well, we were doing all the work.

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

321

Q Is there anybody else responsible -- well, strike that.

You signed the criminal complaints against each of Jose Montanez and Armando Serrano for murder; right?

A I'd have to see the complaints to verify that.

Q If you'd stay on the same page 187 of that report, is this a clearing supp?

A Yes, it was.

Q Why was it a clearing supp?

A One of the three offenders was in custody, and the case was cleared and open by arrest.

Q The other two suspects weren't arrested until after this point; is that right?

A The other two suspects were not arrested until after this report was submitted.

Q And so I'm wondering what was it about the June 3rd -- July 3rd supp report that caused you to send the inventory -- the investigative file inventory to that location where you sent it to?

A Because the case was cleared.

Q Even though only one person had been arrested?

322

A Correct.

Q So why didn't you send the inventory file or the investigative file inventory to the place where you were supposed on to June 14th when you arrested and charged Serrano?

A Obviously, I didn't.

Q I know that you didn't. I'm wondering why. What was it about July 3rd that caused you to send it in as opposed to an earlier date?

A Well, the case was cleared.

Q Why isn't there an inventory for documents that were added after July 3rd, 1993?

A I don't know.

Q Should there have been?

A There should have been.

Q Whose responsibility was that, to make sure that the documents that you added to this file after July 3rd were properly inventoried?

A Whatever the person --

MS. ROSEN: Object to form.

A Whatever person in the office puts the file -- puts the reports in the file.

Q And who was the person who put the reports in this file?

323

A I don't know.

Q Whose responsibility is it?

A I don't know.

Q Is it anybody's responsibility?

A Say again, please.

Q Is it anybody's responsibility?

A The job got done, so someone had to be doing it.

Q I'm going to ask you to turn back to Exhibit No. 6, this thick one.

A Which page?

Q Just for now Exhibit 6 and page 49.

A Okay.

Q All right. This is a complaint that you filed against Jose Montanez for murder; right?

A Yes.

Q That's your signature; correct?

A Yes.

Q Who clerked it?

A I can't make out that signature.

Q Is that Mingey?

A I can't make it out.

Q You also signed the complaint against Jorge Pacheco on page 51?

324

Sorry. 52 actually, that's the arrest warrant.

A Yes.

Q And that's your signatures on that page?

A Yes.

MR. AINSWORTH: Let's go off the record.

THE VIDEOGRAPHER: Off the record, 5:39.

(A recess was taken from 5:39 p.m. to 5:54 p.m.)

THE VIDEOGRAPHER: Back on the record, 5:54.

BY MR. AINSWORTH:

Q Sir, have you ever been disciplined by the department?

A No.

Q Have you ever witnessed another police officer commit misconduct?

A Yes.

Q On how many occasions?

A One I remember specifically.

Q Which one was that?

A It was a murder in the early 1990s involving Officer Johnny Rodriguez.

Q And what happened in that investi- -- or regarding that murder that you deemed to be officer

325

misconduct?

A He contacted the common law wife of one of the two people that were murdered and told her not to cooperate with the police, keep her mouth shut if she knew what was good for her.

Q Who did this?

A Johnny Rodriguez.

Q Sorry. I thought he was the victim.

A No. He was the police officer.

Q All right. And so he was investigating a murder?

A No. You asked me if I witnessed any misconduct.

Q Yes.

A And then you said who, and I said Johnny Rodriguez. I witnessed him commit misconduct.

Q Was he a detective?

A No. He was a patrolman.

Q Patrolman.

And it was in one of your murder investigations?

A Yes.

Q And he told a witness to not get involved in that murder?

326

A He told a common law wife of one of the murder victims she was not to cooperate with the police or something very bad was going to happen to her.

Q How did you know that he said this to her?

A She came and told me.

Q And so what did you do?

A I can't remember who the commander of Area 5 was at that time, but he got a CR number, and a confidential investigation was launched where internal affairs followed Johnny Rodriguez around.

Q And what was the result of that investigation?

A They caught him one night taking his car, setting it on fire, and filing an insurance claim. He was then prosecuted for insurance fraud and fired from the police department.

Q Was he fired for interfering in the investigation?

A No. He was fired for being a criminal.

Q I see. So --

A Your question was if I had ever witnessed any misconduct.

Q I understand.

327

A This was gross misconduct.

Q Yeah. But the Chicago Police Department didn't discipline or fire him for interfering in a murder investigation. They got him for insurance fraud.

A No. That was the trigger that got the investigation started.

Q Any other misconducts you've ever witnessed in your career?

A No, just that one.

Q Did you ever lend --

A And Joe Miedzianowski I told you about taking our reports and Xeroxing them and giving them to gang members.

Q Did you ever loan Ray Guevara money?

A No, never.

Q Why do you say "never"?

A I'd never get it back. The guy is broke.

Q And so did you know about his financial condition back in the '90s?

A I knew that he never had any money. He could never go out to dinner with us because he couldn't afford to buy dinner.

Q Would you guys talk about his money

328

troubles?

A No.

Q Was it something you avoided talking about?

A It wasn't -- I didn't really talk to Ray about his personal life. We weren't that buddy buddy. We worked together, but we weren't big buddies.

Q Do you know how many kids he had?

A A lot.

Q What's a lot?

A More than 10.

Q Did he talk to you about how much he appreciated overtime?

A No.

Q Did you try and get cases that would involve overtime?

A Did we what?

Q Did you try to get cases that would involve overtime?

A No.

MS. ROSEN: Object to form.

Q How was overtime doled out in Area 5 at that time, 1993?

MS. ROSEN: Objection; form.

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

329

A  If you had something to do and your supervisor deemed that you had to stay there and do it, overtime was approved.  If I had people in custody for murder that I had to do lineups and get statements and get state's attorneys in, overtime was approved.

BY MR. AINSWORTH:

Q  And so if you had a lot of cases going on, you would be more likely to be able to get overtime; is that right?

MR. ENGQUIST:  Objection; form, foundation.

A  People who did more police work tended to have more overtime, yes.

Q  Vicente, he told you that a large frame pistol -- let me get his exact words.

MR. ENGQUIST:  Which exhibit?

MR. AINSWORTH:  This is 3.

MR. ENGQUIST:  That's the -- oh, 3.  Okay.

Q  If you want to look at page 172 alongside me.  About a third of the way down that big ole paragraph, the sentence that reads, "The witness saw Pistol Pete take a large frame, 9-millimeter semiautomatic pistol from under the dashboard of the car and put the gun in one of the heating ducts in

330

the dashboard."

Do you see that?

MR. ENGQUIST:  You said a third of the way down?

MR. AINSWORTH:  To a quarter.  The sentence starts in the middle of the page, "The witness saw Pistol Pete take a large frame, 9-millimeter semiautomatic pistol --

A  It's in the bottom third of the paragraph.

MR. ENGQUIST:  Okay.

A  Yes, I see it.

BY MR. AINSWORTH:

Q  Okay.  And what's a large frame, 9-millimeter semiautomatic pistol?

A  A gun.

Q  Do you know guns?

A  Yes.

Q  What's the difference between a large frame and some other kind of 9-millimeter semiautomatic pistol?

A  The size of the gun.

Q  Is a large frame bigger than a -- than some other type of 9-millimeter gun?

A  A large frame would be bigger than a

331

medium-sized frame and a small frame.

Q  And does large frame refer to the grip?  What does it refer to?

A  Large frame usually pertain to a 4-inch barrel.

Q  Have you ever seen a heating duct on a dashboard that could fit a large frame, 9-millimeter pistol?

A  Not off the top of my head, no.

Q  Doesn't that seem odd to you that Francisco Vicente was telling you that he could fit a -- or that he saw Pistol Pete fit a large frame, 9-millimeter semiautomatic Pistol into the heating duct of his car?

A  Did that seem odd?

Q  Yeah.

A  No.

Q  Why didn't it seem odd to you?

A  I've seen cars with guns hidden in many different locations.

Q  But placed through the heating duct?

A  It's a possibility.  It didn't strike me as odd at all.

Q  So it completely did not strike you as odd

332

at all.

MS. ROSEN:  Objection; asked and answered.

MR. ENGQUIST:  Go ahead.

A  No.  Because I know that guns are hidden in cars.

BY MR. AINSWORTH:

Q  When you looked at Jose Montanez's car, did you look to see if the heating vents were large enough to fit a large frame, 9-millimeter gun?

A  No.

Q  How did you come to learn that Armando Serrano was at Area 5 on June 8th, 1993?

A  I'd have to see that report.

Q  All right.  Take a look at the report that appears at page 184 of Exhibit 3.

A  I see it.

Q  How did you learn that Armando Serrano was at Area 5?

A  I don't specifically remember, but I would assume that it was me and Guevara brought him in.

Q  Did he come voluntarily?

A  Yes.

Q  How do you know he came voluntarily?

A  Because he agreed to take a polygraph test.

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

84 (333 to 336)

**333**

Q Well, sometimes you have suspects under arrest who agree to take polygraph tests; right?
A Yes.
Q So -- and those people are not there voluntarily; correct?
A They are under arrest, yes.
Q So just because he agreed to take a polygraph test doesn't mean he's voluntarily at the police station; right?
A That's correct.
Q So how do you know that Armando Serrano came to the police station voluntarily?
A Because if he wasn't under arrest, he would have had to volunteer to come in. We don't just grab people off the street and bring them in.
Q Why don't you grab people off the street and bring them in?
A It's improper.
Q It violates their constitutional rights; right?
A I would say so.
MS. ROSEN: Object to the form.
MS. QUIST: Join.
Q How long was Armando Serrano at Area 5 on

**334**

June 8th, 1993, or June 9th, 1993?
A I'd have to look at the polygraph report.
Q Well, the polygraph test, according to your report, ended at 10:30 p.m.
A Then after 10:30 p.m., he was returned to Area 5, and he was allowed to leave.
Q Did you interrogate Armando Serrano?
A I can't remember. No. It was Guevara. This is his report. Guevara talked to him.
Q All right. How do you know it was only Guevara and not you?
A Because I don't remember talking to him.
Q So whatever happened between Armando Serrano and Ray Guevara you have no knowledge of; is that what you're saying?
A I don't remember, no.
Q So you can't tell us if Ray Guevara was -- used force against Armando Serrano; right?
A When he was up in the office, I didn't see Ray Guevara put a hand on him.
Q Well, were you present while Armando Serrano was being interrogated?
A I was in the office when Guevara was talking with him.

**335**

Q How do you know that?
A I had to be.
Q Why?
A Because me and Guevara took him down to the polygraph.
Q All right. Which interrogation room was Armando Serrano in?
A Say that again, please.
Q Which interrogation room was Armando Serrano in?
A I don't remember.
Q There are six at Area 5, right, six interrogation rooms?
A I don't remember.
Q Can you describe the interior of those interrogation rooms at Area 5 back in 1993?
A They were plain-walled rooms, approximately, I don't know, 10 feet wide, 20 feet deep with a metal bench and a handcuff ring on the wall.
Q So a hook on the wall --
A Yes.
Q -- where you could handcuff somebody?
A Yes.
Q The light switch, is it inside or outside

**336**

those rooms?
A That I don't remember.
Q The walls are concrete walls?
A Cinder block.
Q Cinder block walls.
What kind of -- fluorescent lighting?
A Yes.
Q Tile floor?
A Yes.
Q Anything on the walls?
A No.
Q No windows on the walls?
A There might have been some kind of sign on the walls.
Q What kind of sign?
A I think it was, like, prisoner's rights.
Q Like what kind of prisoner rights?
A I can't remember what was on the sign, but it was something about prisoners.
Q No windows in those walls; right?
A No. There was no windows in the walls.
Q The only window in the room was the narrow window in the door; correct?
A Yes.

337

Q  And that could be covered with paper; right?

MS. ROSEN:  Objection; asked and answered about seven hours ago.

A  Yes.

Q  When a person is in one of those interrogation rooms, the only way they can use the bathroom is by leave of the detectives who are working on that case; right?

A  No.  If the detectives that were assigned to the case had gone out to do something else, they could knock on the door, they could call out, and another detective would take them to the bathroom.

Q  So whoever is in the interrogation room needs a detective to assist them to be able to use the bathroom; right?

A  Yes.

Q  Same to get water; correct?

A  Yes.

Q  Same to get food; right?

A  No, not so much food as is bathroom and water.

Q  Well, how would a person who is in one of those interrogation rooms get fed?

A  The detectives that put them in the room

338

would be responsible for that.

Q  I see.  So they were reliant upon the detectives who were working that case to feed that person; right?

A  I'd say so, yes.

Q  And in order to feed that person in the interrogation room, the detectives would have to use their own money to go out and buy food for that person; right?

A  No.

Q  You'd get a sandwich from the lockup?

A  That's one way.

Q  Is there another way?

A  To go drive and buy food.

Q  And because, as we talked about seven hours ago, the Area 5 is a secure -- is supposed to be a secure facility, you don't want to let the people who are in the interrogation rooms just wander around the place freely; right?

A  The doors in the interrogation rooms had exterior locks that you could lock the door.

Q  And if you had somebody on Area 5, you would lock that door to ensure that they didn't walk into something that they weren't supposed to be walking

339

into; right?

A  Correct.

Q  Would you -- well, strike that.

Is there any reason why Armando Serrano would still be at Area 5 during the day on June 9th, 1993?

A  Nope, not to my knowledge.

Q  There's no telephones in the interrogation rooms; right?

A  No.

Q  So if somebody in the interrogation room needs to make a phone call, they're wholly reliant upon a detective allowing them to do so; correct?

A  Yes.

Q  Especially in 1993 when there were no ubiquitous cell phones being lugged around; right?

A  There were no cell phones in 1993.

Q  And just to be clear, sir, you have no record of when Armando Serrano was released from Area 5; right?

MR. ENGQUIST:  Objection; vague as to time frame.  Are we talking about this case?

MR. AINSWORTH:  Yeah.

Q  For his stay at Area 5 beginning on

340

June 8th.

A  Just my best guess that after the polygraph exam was finished, he was returned to Area 5, and he left.

Q  And that's your guess at this point; right?

A  Yes.

Q  And that's what should have happened; right? He should have been released after he took the polygraph test; right?

A  He was released and left the area.

Q  All right.  But it doesn't say when he left.

A  No.

Q  All right.  And it doesn't say when he was brought to the area; right?

A  No.  Just the date.

Q  And you have no record anywhere of when Armando Serrano was brought to Area 5; correct?

A  No.

Q  That's correct?

A  What was your question?

Q  That's correct?

A  Yes.

Q  If you'd flip to just a couple pages forward to 186.  We've looked at this report before.

341

You include all of the nick -- all of the nicknames for Jose Montanez and for Pacheco and Montanez?

A  Yes.

Q  Did you find it odd that Timothy Rankins didn't know Jose Montanez's nickname of Pistol Pete despite knowing Jose for seven years?

A  I don't specifically remember what Timothy Rankins said as far as remembering all the different nicknames these guys had.

Q  I'm asking a different question.

Do you find it odd that Timothy Rankins didn't know any of the three men's nicknames despite knowing them supposedly for seven years?

MS. QUIST:  Object to the form.

MS. NIKOLAEVSKAYA:  Join.

A  Timothy Rankins did know --

MS. ROSEN:  Object to the form.

A  -- all three of them by certain nicknames.

Q  Got it.

So -- but Timothy Rankins didn't know the nicknames that they're known by according to the nickname file and according to Francisco Vicente and according to their own admission, that is, Pistol

342

Pete, Jordan, or Mondo; right?

A  I don't know.

MS. ROSEN:  Object to the form.

MS. NIKOLAEVSKAYA:  Join.

A  I don't know if he knew them or not by those names.

BY MR. AINSWORTH:

Q  Or the street source that provided the nicknames for Pistol Pete, Mondo, and Jordan to Ray Guevara; right?

A  What was the question?

MS. ROSEN:  Objection to form.

MR. AINSWORTH:  That was a poor question.

Q  And the street source who provided the nicknames Pistol Pete, Mondo, and Jordan to Ray Guevara at some point before June 2nd, 1993, according to that person, didn't refer to any of those three men as Moses or Barrel Belly or Joker or stripes; right?

A  I never talked to that person.  I have no idea.

Q  Well, Ray Guevara never told you that that person said any of those other names; right?

A  Nope.

343

Q  So I guess, you know, my question to you is if you've got the nickname file, the street source, Francisco Vicente, and all three of Jose Montanez, Armando Serrano, and Jorge Pacheco admitting that their nicknames were Pistol Pete, Mondo, and Jordan respectively, did it strike you as odd that Rankins didn't know those nicknames at all?

MS. ROSEN:  Object to form.

MS. NIKOLAEVSKAYA:  Join.

A  I don't know.

Q  Did you ask him?

A  Hell, yes.

Q  Did you ask him if he knew that the three men had these other nicknames -- Pistol Pete, Mondo, and Jordan?

A  When he looked at the photos of these three individuals, I told him, I says, You're giving me all the wrong nicknames.  And I told him, I says, those aren't the names I know these guys by.  Then he corrected himself.

And that's when I said, You know what, I want you to prove to me something in addition to what you're saying as to what happened regarding this murder.

344

We then put him in a car.  I says, I want you to take me to the scene of this murder and point it out to me.  We drove to the corner of North Avenue and Springfield.  I said, Direct me where you want us to go.

He said, Go north on Springfield.  He stopped right in front of the Vargas house at 1838 North Springfield.  He said, The guy came out of that house.

I says, Where was the van parked?

He goes, Right there.

He knew exactly where the van was parked. He knew exactly where Rodrigo Vargas lived.

At that point in time, I became a believer in Timothy Rankins.  There is no way in the world he would know that unless he was there.

Q  Or if somebody provided the information to him; right?

A  Someone would have had to take him there and actually show him.

Q  Right.  Somebody with a car; right?

A  Somebody what?

Q  Somebody who could take him there in a car; right?

345

MS. QUIST: Object to form.

A He would have had to have been taken there the night of the murder to know where the van was parked.

BY MR. AINSWORTH:

Q Or somebody who knew where the van was parked could tell him; right?

A That's a possibility.

Q How did Timothy Rankins correct himself?

A Regarding the photos?

Q Regarding the nicknames.

A That's the photos, the nicknames. I told him, I says, You're giving me the wrong nicknames for these guys.

Then he corrected himself. Well, I also know this guy as Pistol Pete, this is Mondo, and this is Jordan.

I said, Did these guys have multiple names?

And he goes, Yeah.

That's why we put all their nicknames on the photos after that.

Q All right. So you said you're giving me all the nicknames, and did you tell him that actually Jose Montanez is known as Pistol Pete and Serrano is

346

known as Mondo --

A No, he told me.

Q He told you.

A Yeah.

Q So he told you that Jose Montanez is actually also known as Pistol Pete?

A After I told him I didn't know them by the names he was giving me. I says, Do you say you have any other nicknames, and he goes -- these other nicknames.

Q What nicknames?

A Regarding Jose Montanez?

Q Or any of them.

A Well, he also said that he knew Jose Montanez as Pistol Pete. I'd have to find his statement again and read it.

Q All right. Well, your report doesn't reflect that Timothy Rankins knew any of these suspects by names other than the ones he provided, which was Moses or Barrel Belly or Joker or Stripes; right?

A I'd have to read his report.

Q Well, it's at 178.

A No, he does not use the nicknames of --

347

initially, he does not use the nicknames of Pistol Pete, Mondo, and Jordan; but when we questioned him on this, he corrected himself. He said, Yeah, I also know them by other names, and then he come up with the other names.

Q Where did you document that --

A It's not documented.

Q All right. But that's a pertinent fact. If he's able to corroborate the nicknames of these people that he is identifying, that's an important fact; right?

A No, the fact is these guys had multiple --

MS. ROSEN: Object to the form.

A -- nicknames, and he knew them more by one than another.

Q How do you know that they had multiple nicknames?

A Well, to begin with he says that Moses pulled up. They called him Moses and Barrel Belly. So that's two nicknames right there.

Q That's just from Timothy Rankins.

A Yeah.

Q From no other source --

A No.

348

Q -- Right?

And you even thought it was weird because --

A Huh?

Q You even thought it was weird that he was -- that Rankins was referring to these guys by these names you had never heard before; right?

A Yes. I thought it was odd that I had not heard these names before.

Q And so you wanted to confront Timothy Rankins about that fact.

A Yes.

Q And so you wanted to know what he would say when you confronted him; right?

A What was the question again?

Q You wanted to know what he would say when you confronted him; right?

A I wanted to know that if he knew them by any other nicknames than these ones he was giving us because they were not the ones that we had been given by other people.

Q And you're saying that 26 years later, you remember from memory that Timothy Rankins said, Oh, I also know them by Pistol Pete, Mondo, and Jordan?

A Yes. Because I remember I didn't believe

him initially until he started telling things that fit, such as the nicknames, such as where the murder happened, such as where the van was parked.

Q So then why didn't you write down the fact that he was now providing you information that fit such as the suspects' nicknames that were known to other people?

A Because he knew them by different nicknames. He also heard -- be called by these other names, but he knew them personally by the names he gave me.

Q Why on the first page -- well, here.

Who is the -- when is the first time that you've ever told somebody that Timothy Rankins identified Jose Montanez, Armando Serrano, and Jorge Pacheco as Pistol Pete, Mondo, and Jordan?

A I don't remember.

Q Can you tell us any person that you have ever in your life told that Timothy Rankins identified the three men by those three nicknames?

A No.

Q Why doesn't it appear in his handwritten statement that he knew Jose Montanez, Armando Serrano, and Timothy Rankins [sic] by their nicknames Pistol Pete, Mondo, and Jordan as well as the other names he knew them by?

MS. NIKOLAEVSKAYA: Objection; form.

A He knew that they had multiple nicknames, but he referred to them by the names he knew them best as.

BY MR. AINSWORTH:

Q I know, but why didn't -- why didn't you talk with the assistant state's attorney about documenting the fact that not only did Timothy Rankins know them by these other nicknames that nobody else seemed to use, but he also knew them by their traditional nicknames that were used by other people and by themselves?

MS. ROSEN: Objection; form.

MS. NIKOLAEVSKAYA: Join.

MR. ENGQUIST: Join.

A It wasn't done.

Q Did you tell Assistant State's Attorney John King at the time that he memorialized Timothy Rankins' statement that Timothy Rankins knew Montanez, Serrano, and Pacheco by their nicknames Pistol Pete, Mondo, and Jordan?

A No.

Q Why didn't you tell John King that, Hey, you

know, I thought it was weird that he was using these other nicknames, but it turns out he also knows Montanez, Serrano, and Pacheco by their nicknames that they go by?

A He preferred to refer to them by the names that he knew them best as, but he had also heard them called these other nicknames by other people.

MR. ENGQUIST: Where are we on time?

MS. ROSEN: Seven minutes.

THE VIDEOGRAPHER: 6:54.

BY MR. AINSWORTH:

Q Did you ever use -- did you make any attempt to corroborate Rankins' statement with these nicknames -- Moses, Barrel Belly, Joker, or Stripes -- was ever used by any person to refer to those three men?

A No.

Q You documented in your report of which the first page is dated June 2nd, 1993, whatever description that Tim -- that Vicente provided to you of the three; right?

A What was the question again?

Q Actually, let me skip that one, and first I'll go to -- when you talked to -- when Guevara talked to Wilda Vargas and learned about the gas station incident, she described that there were three men in the car, right, at the gas station?

A She said one man walked in with her husband, and two guys were sitting in the car.

Q And --

A That's what Ray told me.

Q Yeah. And whatever description that Wilda had for those three men you included in your report; right?

A I'd have to see the report.

Q Is there any reason why you would not include the description that Wilda provided of those three men in your report?

A I don't know what she told Ray.

Q Take a look -- well, I'm just saying any description that he told you she had provided, you would include in your report; right?

A If Guevara would have shared that information with me, I would have put it in my report.

Q And if she provided no description for any of the three people at the gas station -- well, strike that.

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

353

The fact that there's no description of any of those three men at the gas station, that indicates that she didn't provide any descriptive information for those three men; right?

MS. NIKOLAEVSKAYA: Objection; form.

MS. ROSEN: Objection; form, foundation.

MR. ENGQUIST: Join.

A I'd have to look at the report.

Q Look at page 173 of Exhibit 3, please.

A She didn't need to provide a description of the person she saw. She immediately identified a photo array on June 2nd that was shown to her by Detective Guevara.

Q We talked earlier today that if you have a witness to a crime, you would want to know how they could describe that person; right?

A Yeah. But she wasn't a witness to a crime.

Q She was a witness to the perpetrators; right?

A She was a witness to an incident that happened at a gas station at Central Park and North Avenue that I had no idea that had any connection to this murder.

Q And you thought that those people were the

354

perpetrators of the murder; right?

A When did I think this?

MS. ROSEN: Objection; form.

BY MR. AINSWORTH:

Q After you talked -- after Vicente talked to you; right?

A Yeah. And that's the same day we showed Wilda the photos, and she identified it -- two of them.

Q So you wanted to know whatever identifying information Wilda might have for these three individuals; correct?

A No. Because the day we learned this information was the day she identified them.

Q Don't you want to know how she would describe them before you show her the photo array?

A No.

Q Don't you want to test her ability to identify the perpetrators to see if she is describing people who match the description of your suspects?

A No.

Q You didn't want to know that?

A She was -- it's a simple as this. She was

355

shown photos. Either she identifies people or she doesn't. I wasn't testing her mental abilities.

Q So you didn't want to know what her description was of the offenders; right?

A She didn't see the offenders. She saw guys in a gas station on the 4th that turned out to be the offenders, but she never witnessed her husband being murdered.

Q Right. So did you want -- so you didn't want her to describe the three men that she had seen in the car at the gas station; is that right?

MS. QUIST: Object to form.

A You're getting this all convoluted.

We didn't know about the guys in the car until June 2nd. Guevara did not go talk to her and demand a description before he showed her a photo array. He just showed her a photo array.

Q And I'm saying that on June 2nd, you didn't want her to -- Wilda Vargas to describe the three men she had seen at the gas station before she was shown a photo array; correct?

A I did not. I did not talk to Wilda.

Q And you didn't -- you weren't interested in what her description was of the men she had seen at

356

the gas station; right?

MS. QUIST: Object to form.

MR. ENGQUIST: Join.

A On June 2nd, no.

MS. ROSEN: You have one minute.

BY MR. AINSWORTH:

Q That's correct?

A Uh-huh.

Q That's correct?

A Yeah.

MS. ROSEN: Also you have one minute.

Q And whatever description Vicente provided you of the three people he knew as Pistol Pete, Mondo, and Pacheco is in your report; right?

A Probably not.

Q Why wouldn't you include whatever description Vicente had of those three people in your report?

A I didn't need Vicente to give me their description. We had plenty of information on Pistol Pete, Mondo, and Jordan in Area 5; and after he identified their three photos, I had their heights, weights, descriptions, where they lived, what they had been previously arrested for, what they have

357

been previously convicted of.  I didn't need Francisco to give me any information.

Q  But did you know which Pistol Pete it was?

A  After I showed Francisco Vicente the three photographs, he identified Pistol Pete, Mondo, and Jordan.  We had ample information about all these guys in Area 5.

Q  How did you get the photo for Pistol Pete?

A  As I said, I either went back to the office and got it, or I went down to 1121 South State Street and got it.

Q  But you knew --

A  I don't remember.

Q  You knew when you were asking Francisco Vicente that you had a problem identifying Pistol Pete.

So why wouldn't you want whatever description he could provide of Pistol Pete to you?

MR. ENGQUIST:  Objection; asked and answered, and literally over seven hours ago.  We're past seven.

THE WITNESS:  Asked and answered.

MR. ENGQUIST:  You can answer one more time.  Go ahead.

358

A  One more time.  After Francisco Vicente gave his information, I went and got pictures of what I believed to be the right three people he was referring to.  That's why I showed him pictures, to establish that I was looking at the right three people he was referring to.  He identified their pictures.  It's as simple as that.

MS. ROSEN:  You're at seven hours.

MR. ENGQUIST:  Yeah, you are.

BY MR. AINSWORTH:

Q  Did you look for any other --

MS. ROSEN:  Can you just acknowledge the fact of I just said?

MR. ENGQUIST:  -- acknowledge --

MR. AINSWORTH:  Okay.  Two minutes.

MS. ROSEN:  Okay.  One-and-a-half minutes.

MR. ENGQUIST:  I'll take one and a half.

BY MR. AINSWORTH:

Q  Did you look to see how many more Mondos there were in the nickname file?

MR. ENGQUIST:  Objection; asked and answered.

MS. BONJEAN:  No.

MS. QUIST:  Yes.

359

MR. AINSWORTH:  Oh, I can't tell.  It's been so long.

THE WITNESS:  I think you did ask if I looked up --

MS. ROSEN:  No.

THE WITNESS:  You maybe missed one of these guys.

MS. ROSEN:  I might have.  Yep.

THE WITNESS:  Yes, you did, I think a couple of times.

BY MR. AINSWORTH:

Q  And what did you say?

MS. BONJEAN:  What did you say?

A  I said we never looked.

Q  Did you look for Jordan?

A  We never looked for Mondo.  We never looked for Jordan, other than the guys that were identified.

Q  But when the street source said it was three guys named Pistol Pete, Mondo, and Jordan, why didn't you look in the nickname file to see if you could identify who Mondo and Jordan were?

A  You'd have to ask Detective Guevara that because I wasn't aware of that information at that

360

time.

Q  But I thought he -- so later on he told you that it was -- that he knew there was other nicknames too?

A  Sometime between the 24th of May and the 2nd of June Ray told me he had this other information.

Q  All right.  That's what I mean.  In that time frame, May 24th to June 2nd, why didn't you look in the nickname file to see if you could identify Mondo or Jordan?

A  I don't know if Guevara did or not.

Q  Well, why didn't you, sir?

A  He didn't pass that information on to me.

Q  I thought you just said he did pass that information on to you between --

A  Eventually, but I don't remember when.

Q  Between May 24th and June 2nd, in that time frame when he passed that information on to you, why didn't you look in the nickname file to see if you could identify Jordan and Mondo?

A  On June 2nd, as I previously told you, I called the office and had someone look up those names.

Q  I mean, between -- before June 2nd and after

361

May 24th, whenever Guevara told you that those are the nicknames you're looking for, why didn't you look for Mondo and Jordan?

A  I don't think Ray passed that information on to me until June 2nd.

MR. AINSWORTH:  I don't have any other questions.

MS. ROSEN:  I have some questions.  I need to print a document.  Can you do that?

MR. AINSWORTH:  What document do you need?

MS. ROSEN:  It was just produced Monday night, and it states RFC 1282 to 1296.

MR. AINSWORTH:  Hang on.

MS. ROSEN:  1282 to 1296.  It's a training record.

MR. AINSWORTH:  1296.

MS. ROSEN:  Yeah.

MR. ENGQUIST:  Let's go off the record.

MS. ROSEN:  Let's go off the record.

THE VIDEOGRAPHER:  Off the record at 6:37.

(A recess was taken from 6:37 p.m. to 6:45 p.m.)

THE VIDEOGRAPHER:  Back on the record, 6:45.

362

(Halvorsen Deposition Exhibit 9 marked for identification and attached to the transcript.)

BY MR. AINSWORTH:

Q  Showing you what we've marked as Exhibit No. 9, is that your signature, sir, where it says "Complainant's Signature"?

A  Yes.

Q  This is the complaint against Armando Serrano for murder; correct?

A  Yes.

MR. AINSWORTH:  Okay.  I have no further questions.

MS. ROSEN:  This will be 10.

(Halvorsen Deposition Exhibit 10 marked for identification and attached to the transcript.)

EXAMINATION BY COUNSEL FOR DEFENDANT CITY OF CHICAGO

BY MS. ROSEN:

Q  Okay.  Mr. Halvorsen, I introduced myself to you earlier today, but my name is Eileen Rosen, and I represent the City of Chicago.  I just have a couple questions.

A  Yes.

363

Q  We've put in front of you what we've marked as Exhibit No. 10, and I'll represent to you that that's your employee training record that's kept by the Chicago Police Department.

Have you ever seen that document before?

A  No.

Q  Okay.  I'm going to direct your attention to page 14 of the training record, which is also Bates stamped RFC Serrano Montanez 1295.

You've got the page?

A  You're on page 14 of 15?

Q  Correct.

A  Yes, I have it.

Q  Okay.  If you look at the bottom of the page there and you see the last entry, it says "010, Pre-service detective training program," and the date is 14 September 1981.

Do you see that there?

A  Yes.

Q  And does that generally correspond with your recollection of when you went to training once you were promoted to detective?

A  That's correct.

Q  Okay.  And then if you look up a couple

364

lines to the Item 104, four lines up from the bottom, do you see there some training that's labeled "In-service detective division reporting procedures," and the date of that is 5 July 1983?  Do you see that there?

A  Yes.

Q  And as you sit here today, do you have a specific recollection of what that training was?

A  No.

Q  Okay.  And as you look at the entries around that time period, the in-service 1st Amendment training, the investigative files training, any of those trainings that are listed there.

As you sit here today, do you have a specific recollection of any of that training that you received?

A  No.

Q  If I were to tell you that the inservice detective division reporting procedure training, this Item 104 was, in fact, the training that was provided by the Chicago Police Department after the institution of special orders that initiated the use of general progress reports, would you have any reason to doubt that you got that training?

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

---

365

A I'm sure I did.

Q Okay.

MS. ROSEN: I have no further questions.

EXAMINATION BY COUNSEL FOR DEFENDANT MATT COGHLAN

BY MS. QUIST:

Q I have just a few questions, Mr. Halvorsen. My name is Paula Quist. I represent Matthew Coghlan. I introduced myself to you earlier.

Do you know Matthew Coghlan?

A I have met him a couple of times.

Q And in what circumstances did you meet Mr. Coghlan?

A He was a state's attorney up in the gang prosecution unit.

Q Do you know Mr. Coghlan in any capacity other than his former role as state's attorney?

A No.

Q You were asked questions about a meeting you had with Francisco Vicente on June 2nd, 1993.

Do you remember those questions?

A Do I remember the questions?

Q The subject matter of the questions.

A Not all of them but --

Q Was Matthew Coghlan at any meeting that you

---

366

had with Francisco Vicente on June 2nd of 1993?

A No. It was Matt -- it was John Dillon.

Q Did you have any communication with Mr. Coghlan about the Vargas murder investigation on or before June 2nd of 1993?

A No.

Q Did you have any communication with Mr. Coghlan about Francisco Vicente on or before June 2nd of 1993?

A No.

Q Are you aware of whether Mr. Coghlan had any contact with Francisco Vicente on or before June 2nd of 1993?

A No.

Q To your knowledge, did Mr. Coghlan have anything to do with Mr. Vicente's June 2nd, 1993, interview at the Cook County State's Attorney's Office?

A No.

Q Do you have any reason to believe that Mr. Coghlan was involved in any way in requesting Mr. Vicente's presence at the Cook County State's Attorney's Office on June 2nd of 1993?

A No.

---

367

Q Did Mr. Vicente ever tell you that he had any contact with Matthew Coghlan on or before June 2nd of 1993?

A No.

Q Was Matthew Coghlan present for any meeting that you had with anyone regarding the Vargas murder before Mr. Montanez, Mr. Serrano, and Mr. Pacheco were indicted for the Vargas murder?

A Not to my knowledge.

Q Was Matthew Coghlan present for any conversations you had with anyone regarding the Vargas murder before Mr. Montanez, Mr. Serrano, and Mr. Pacheco were indicted for the Vargas murder?

A Not to my knowledge.

Q You had conversations with Timothy Rankins about the Vargas murder as well; is that right?

A Yes.

Q Was Mr. Coghlan present for any of those conversations?

A No.

Q When you put Mr. Rankins in a car to determine whether he was familiar with the scene of the murder, was Mr. Coghlan present for that ride?

A No.

---

368

MS. QUIST: I don't have any other questions. Thank you.

MR. ENGQUIST: Julie.

MS. NIKOLAEVSKAYA: None from me.

MR. ENGQUIST: We'll reserve.

THE VIDEOGRAPHER: This concludes the video deposition of Mr. Halvorsen at 6:53.

(Off the video record.)

THE REPORTER: Do you want to order the transcript?

MR. AINSWORTH: Yes.

THE REPORTER: Does anyone need a copy?

MS. QUIST: I'll order one, Etran.

MR. ENGQUIST: The City will take a copy.

(Off the record at 6:54 p.m.)

---

369

ACKNOWLEDGMENT OF DEPONENT

I, ERNEST HALVORSEN, do hereby acknowledge that I have read and examined the foregoing testimony, and the same is a true, correct, and complete transcription of the testimony given by me and any corrections appear on the attached errata sheet signed by me.

_____          _____
(DATE)                    (SIGNATURE)

370

CERTIFICATE OF COURT REPORTER - NOTARY PUBLIC

I, Joanne Ely, Certified Shorthand Reporter No. 84-4169, CSR, RPR, and a Notary Public in and for the County of Kane, State of Illinois, the officer before whom the foregoing deposition was taken, do hereby certify that the foregoing transcript is a true and correct record of the testimony given; that said testimony was taken by me stenographically and thereafter reduced to typewriting under my direction; that review was requested; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

IN WITNESS WHEREOF I have hereunto set my hand and affixed my notarial seal this 18th day of February, 2019.

My commission expires: May 16, 2020

*Joanne E. Ely*
_____
Notary Public in and for the
State of Illinois

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

94

| A | | | |
|---|---|---|---|
| **abbreviations** 69:24 **aberdeen** 2:5, 3:5, 7:8 **abilities** 355:2 **ability** 12:3, 88:11, 89:6, 89:10, 354:18 **able** 39:7, 71:4, 85:8, 85:13, 85:18, 86:1, 171:19, 173:2, 174:16, 175:8, 180:7, 180:13, 195:15, 225:6, 226:4, 302:9, 304:14, 305:11, 329:9, 337:14, 347:9 **above** 212:22, 252:10 **abraham** 115:14 **absolutely** 37:3 **academy** 23:4, 23:7 **accept** 90:2, 90:4, 296:22 **accepted** 90:6, 151:23, 152:5 **access** 48:16, 54:21, 58:21, 89:3, 100:9, 100:12, 100:16, 240:12, 245:3, 256:5 **accidentally** 271:19 **accommodate** 193:11 | **accompanied** 207:3 **accompany** 276:8 **according** 195:7, 200:21, 200:24, 201:8, 234:9, 275:16, 300:24, 334:3, 341:22, 341:23, 341:24, 342:17 **accounting** 162:1, 243:9 **accuracy** 278:5 **accurate** 94:23, 162:1, 167:8, 243:9, 262:9, 262:12, 262:15, 262:17, 262:21 **accurately** 12:4, 110:6, 111:22 **accused** 48:16 **acknowledge** 358:12, 358:14, 369:3 **acknowledgment** 369:1 **across** 19:1 **action** 31:13 **activity** 29:22, 29:24, 30:3, 30:7, 70:9, 86:9, 136:24, 140:4, 140:13, 141:16 **actually** 147:14, 155:4, 208:13, 212:6, 234:13, 247:6, 252:4, 257:12, 260:14, 270:8, 313:9, 313:10, | 324:1, 344:20, 345:23, 346:6, 351:23 **add** 67:16, 68:8, 68:17 **added** 240:15, 240:19, 241:15, 241:19, 241:20, 241:22, 242:1, 242:3, 242:10, 242:13, 242:17, 242:20, 255:17, 267:5, 322:12, 322:17 **adding** 60:2 **addition** 140:23, 343:22 **address** 29:4, 91:21, 91:24 **addresses** 41:14 **adjacent** 61:20, 61:22 **adjoining** 61:4 **administer** 7:13 **admired** 31:17 **admission** 36:9, 341:24 **admit** 268:15, 268:16, 272:10 **admitting** 343:4 **advance** 110:16 **advancement** 25:3 **advantage** 151:6 **advice** 17:12, 109:6, 109:10, 109:13, | 109:15, 110:4, 110:7, 111:1, 111:2 **affairs** 326:11 **affiliation** 250:14 **affirm** 262:8 **affixed** 370:17 **afford** 327:23 **after** 17:19, 22:9, 23:6, 28:12, 49:4, 52:12, 53:1, 63:18, 67:14, 68:2, 68:13, 68:18, 69:10, 72:5, 72:9, 72:12, 113:19, 124:22, 125:6, 126:15, 126:19, 127:3, 128:5, 130:17, 131:2, 131:20, 145:22, 146:11, 146:23, 148:20, 151:13, 172:23, 176:5, 176:21, 176:24, 187:5, 201:5, 207:4, 209:1, 209:3, 209:21, 209:23, 209:24, 220:8, 230:9, 235:7, 237:19, 238:2, 255:7, 255:16, 256:9, 256:21, 256:22, 260:19, 267:2, 268:3, 271:14, 277:12, 283:10, 319:18, 321:15, 321:17, 322:12, 322:17, 334:5, 340:2, 340:8, 345:21, |

346:7, 354:5,
356:21, 357:4,
358:1, 360:24,
364:21
**afternoon**
119:13, 132:15,
146:6, 156:7,
156:9, 220:9
**again**
9:17, 21:3,
27:6, 34:20,
40:22, 44:8,
57:14, 61:21,
66:11, 69:21,
75:13, 77:17,
79:14, 82:14,
82:22, 86:21,
95:23, 100:11,
104:16, 104:19,
109:18, 109:22,
112:23, 118:4,
120:1, 129:6,
134:20, 137:22,
142:14, 143:12,
149:14, 151:13,
151:16, 162:6,
171:5, 202:14,
205:14, 207:15,
209:7, 213:23,
214:19, 216:2,
220:17, 220:24,
221:12, 221:17,
222:9, 222:16,
222:22, 234:7,
246:5, 250:8,
252:8, 252:9,
257:19, 260:24,
261:24, 268:12,
270:17, 296:5,
298:2, 300:22,
303:2, 303:24,
310:15, 315:14,
323:5, 335:8,
346:16, 348:14,
351:22
**against**
65:8, 65:11,
107:5, 107:15,

107:24, 108:22,
109:9, 109:20,
111:17, 152:1,
180:2, 259:10,
321:3, 323:15,
323:23, 334:18,
362:9
**age**
71:1, 74:3,
80:21
**aggravated**
72:15, 248:1,
248:16, 256:8
**ago**
14:4, 14:6,
14:21, 40:19,
40:22, 116:12,
118:13, 119:10,
119:19, 119:21,
134:13, 134:21,
143:19, 307:10,
337:3, 338:16,
357:20
**agree**
36:23, 69:13,
268:23, 294:17,
333:2
**agreed**
215:22, 332:24,
333:7
**ahead**
10:18, 36:15,
42:7, 44:6,
44:18, 45:11,
63:16, 67:3,
70:22, 77:3,
105:20, 110:7,
117:1, 129:18,
136:11, 142:14,
157:2, 165:17,
198:21, 209:12,
221:16, 222:21,
224:20, 227:1,
247:18, 255:15,
263:8, 263:21,
317:5, 332:3,
357:24
**aid**
41:22, 41:23,

303:15
**aka**
203:19
**al**
1:8, 1:14, 7:5,
7:6
**alert**
12:6, 148:11,
301:5
**alive**
239:5
**allegation**
157:23, 217:8
**alleged**
47:17, 47:19,
48:5
**allied**
135:23
**allow**
22:7, 151:6,
172:4, 172:17,
172:20, 266:7
**allowed**
20:13, 72:10,
102:23, 103:7,
103:8, 192:10,
334:6
**allowing**
339:13
**allows**
37:23
**alone**
105:13, 132:19,
151:7, 187:9
**along**
56:4, 56:20,
93:22, 94:1,
95:20, 213:1,
290:8, 309:14
**alongside**
73:5, 329:19
**alphabetically**
100:4
**already**
46:15, 46:16,
55:24, 59:10,
104:13, 142:12,
156:11, 171:17,

228:13, 250:2,
265:11, 283:10,
310:3, 311:1,
316:5
**also**
5:9, 7:17,
8:21, 22:15,
46:6, 64:9,
106:18, 141:3,
187:16, 188:3,
202:12, 207:2,
212:8, 212:15,
213:2, 220:20,
220:21, 222:3,
222:18, 224:17,
242:9, 259:23,
264:7, 265:24,
266:14, 267:13,
269:7, 273:10,
292:18, 299:22,
303:22, 304:5,
304:6, 310:22,
312:4, 315:2,
315:11, 323:23,
345:15, 346:6,
346:14, 347:4,
348:23, 349:9,
350:11, 351:2,
351:6, 356:11,
363:8
**alter**
68:12, 68:24,
229:11, 229:14
**altering**
69:2
**although**
199:10, 223:20
**always**
186:18, 199:10,
199:19, 200:11,
217:16, 318:23
**amendment**
105:14, 106:3,
106:7, 106:9,
106:12, 107:5,
107:23, 108:10,
108:22, 109:1,
109:9, 109:16,

110:17, 364:11
**among**
108:8
**ample**
357:6
**angel**
10:7
**anna**
245:22, 246:21,
252:10, 253:14,
254:9, 254:13,
261:2, 261:12
**announce**
91:24
**another**
22:6, 26:2,
35:7, 35:16,
36:3, 36:7,
36:8, 37:2,
140:14, 181:19,
195:17, 195:21,
235:24, 236:1,
272:18, 288:2,
288:11, 288:15,
297:15, 300:9,
324:15, 337:12,
338:13, 347:15
**answer**
11:2, 11:6,
11:16, 11:21,
16:21, 17:3,
17:8, 37:23,
54:4, 105:20,
106:21, 106:23,
107:13, 109:4,
109:6, 110:1,
111:8, 111:9,
114:10, 114:11,
142:14, 146:21,
152:2, 175:16,
176:2, 176:7,
200:12, 291:9,
291:12, 291:15,
291:20, 293:11,
315:14, 357:23
**answered**
40:9, 53:18,
137:4, 141:2,

141:19, 142:12,
152:4, 166:10,
182:7, 184:10,
185:17, 197:22,
198:20, 200:10,
232:8, 233:15,
244:3, 248:7,
250:19, 315:13,
332:2, 337:2,
357:20, 357:22,
358:22
**answering**
17:4, 205:10,
205:13
**answers**
10:20, 106:14,
176:16
**anybody**
63:20, 77:6,
78:8, 147:14,
321:1
**anybody's**
323:4, 323:6
**anymore**
22:5, 194:9,
256:21
**anyone**
15:20, 16:10,
18:1, 19:5,
59:1, 60:5,
60:9, 60:15,
103:22, 108:2,
108:12, 108:18,
108:20, 117:24,
124:4, 131:8,
152:13, 155:12,
170:23, 171:2,
216:16, 228:14,
229:2, 251:24,
256:20, 367:6,
367:11, 368:12
**anyplace**
117:20
**anything**
17:10, 68:24,
131:18, 131:19,
139:23, 158:18,
160:18, 162:21,

167:12, 192:15,
197:24, 199:7,
211:4, 217:21,
220:6, 221:6,
226:7, 226:11,
226:13, 229:11,
229:14, 230:17,
230:19, 230:20,
248:19, 260:24,
261:11, 270:7,
272:3, 336:10,
366:16
**anywhere**
15:11, 94:24,
117:19, 117:21,
184:13, 340:16
**apart**
15:12, 54:18,
106:2, 120:15,
240:7, 255:3,
258:12
**apartment**
208:19
**apiece**
120:13
**apologies**
257:12
**apparently**
269:1, 288:1,
310:5
**appear**
113:21, 133:10,
133:15, 227:4,
278:19, 278:23,
283:13, 349:21,
369:7
**appearance**
73:14, 73:18,
73:20, 73:23,
74:1, 75:9,
76:19
**appearing**
7:15
**appears**
258:15, 274:9,
311:23, 332:15
**appointment**
45:14

**appreciated**
328:13
**appropriate**
249:1
**approval**
68:14, 264:21
**approved**
66:20, 67:15,
68:19, 199:12,
199:21, 264:24,
265:4, 265:6,
265:8, 265:9,
266:1, 267:15,
269:8, 277:13,
278:9, 286:9,
286:20, 311:15,
311:19, 311:22,
318:17, 329:3,
329:6
**approves**
311:20
**approximately**
14:21, 23:15,
27:3, 28:13,
29:15, 92:13,
93:11, 245:23,
335:17
**april**
9:15, 9:19,
10:1
**arbitrary**
292:19
**area's**
179:8
**areas**
49:9, 126:2
**aren't**
283:2, 343:19
**argue**
197:3
**argued**
196:22, 199:5,
219:5
**arguing**
195:22
**argument**
170:19, 195:21,
196:2, 196:4,

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

97

201:10
**argumentative**
181:7, 184:15,
233:16, 250:21,
256:15, 279:10,
280:7, 307:1,
307:8
**armando**
1:11, 3:9,
5:10, 6:22, 7:5,
7:17, 7:19,
114:24, 175:1,
175:11, 176:12,
177:4, 178:10,
179:2, 179:16,
226:5, 236:16,
236:17, 273:10,
278:17, 278:24,
279:6, 279:14,
280:12, 282:1,
282:17, 282:22,
283:15, 283:24,
285:7, 299:8,
299:11, 299:14,
307:19, 308:7,
310:4, 310:7,
321:4, 332:11,
332:17, 333:11,
333:24, 334:7,
334:13, 334:18,
334:21, 335:7,
335:9, 339:4,
339:19, 340:17,
343:4, 349:14,
349:22, 362:9
**armed**
132:6, 132:8,
200:23, 248:1
**around**
63:13, 64:1,
95:2, 165:3,
165:9, 276:1,
276:6, 326:11,
338:19, 339:16,
364:10
**arrange**
45:14, 152:9,
153:24, 154:10,

154:14, 154:15
**array**
72:22, 73:5,
73:9, 73:12,
73:17, 74:11,
74:12, 74:13,
74:20, 74:24,
75:15, 75:17,
76:22, 77:22,
78:19, 83:23,
84:6, 147:15,
147:18, 147:21,
148:2, 148:4,
148:7, 148:9,
148:12, 148:14,
148:18, 148:23,
149:4, 149:9,
273:5, 273:17,
274:4, 274:20,
275:2, 307:17,
308:6, 309:12,
353:12, 354:16,
355:17, 355:21
**arrays**
72:19, 74:12,
75:2, 75:14,
75:16, 76:8,
77:20, 83:22
**arrest**
26:20, 83:19,
98:12, 142:3,
142:10, 144:22,
145:8, 145:11,
183:2, 235:6,
235:10, 235:13,
235:14, 235:17,
235:23, 235:24,
236:1, 236:16,
238:14, 238:15,
241:15, 280:4,
282:23, 283:2,
308:14, 308:15,
308:16, 318:14,
321:13, 324:1,
333:2, 333:6,
333:13
**arrested**
144:13, 144:18,

145:1, 200:23,
283:10, 283:11,
301:15, 301:23,
309:23, 310:4,
321:14, 321:16,
321:24, 322:4,
356:24
**arresting**
201:2
**arrests**
24:20, 24:21,
26:10, 26:16,
26:23
**arrive**
15:8, 94:15,
123:21, 124:1
**arrived**
15:1, 51:13,
94:16, 124:7,
124:11, 124:22,
304:20
**artist**
204:2
**arts**
183:1
**ashley**
3:11, 7:18
**ask**
10:19, 10:24,
11:11, 12:13,
27:22, 28:9,
34:22, 37:15,
38:8, 45:12,
70:13, 70:19,
109:14, 118:2,
118:9, 135:4,
140:3, 140:7,
141:12, 142:22,
143:2, 157:14,
165:22, 167:15,
167:19, 167:22,
167:23, 168:10,
205:15, 209:7,
210:2, 210:3,
218:1, 218:4,
251:24, 256:2,
283:12, 283:14,
283:15, 301:3,

306:4, 306:10,
306:13, 319:3,
323:9, 343:11,
343:13, 359:3,
359:23
**asked**
12:12, 29:21,
30:3, 30:6,
46:11, 70:16,
70:18, 107:7,
134:4, 135:7,
137:3, 141:2,
141:19, 142:12,
161:6, 166:9,
166:16, 166:22,
171:22, 172:1,
173:22, 175:14,
176:15, 182:6,
184:10, 185:17,
197:21, 198:19,
216:9, 218:7,
219:3, 220:10,
232:8, 233:15,
234:9, 248:7,
250:18, 277:8,
291:21, 301:13,
306:17, 315:13,
325:12, 332:2,
337:2, 357:19,
357:22, 358:21,
365:18
**asking**
11:1, 38:1,
47:7, 94:12,
101:9, 101:10,
106:19, 122:10,
130:24, 141:8,
143:5, 172:9,
189:8, 189:9,
209:13, 231:21,
270:10, 280:24,
292:8, 320:18,
341:11, 357:14
**ass**
170:6, 170:11,
170:16, 170:17,
170:21, 170:24,
171:3, 171:7,

196:18, 197:9,
197:13, 197:20,
198:3, 198:9,
198:17, 199:2,
199:4
**assault**
55:8
**assert**
105:14, 107:23,
108:9, 108:21,
109:1, 109:8,
109:16, 110:9,
110:16
**asserted**
106:2, 106:12,
107:4
**assigned**
23:8, 26:14,
51:12, 52:1,
53:19, 54:5,
60:9, 60:16,
123:15, 124:23,
125:1, 125:5,
153:17, 153:21,
230:11, 337:9
**assignment**
23:6, 29:11,
49:4, 54:8
**assist**
303:20, 337:14
**assistant**
143:21, 146:1,
350:8, 350:18
**assistants**
153:13
**assisted**
145:7, 145:10
**assisting**
145:16
**associate's**
21:23
**associated**
177:11
**assume**
11:17, 189:23,
268:20, 332:20
**assumed**
218:2

**astray**
193:7
**attached**
6:8, 121:16,
178:18, 185:3,
190:15, 223:16,
225:11, 290:21,
316:10, 362:2,
362:16, 369:7
**attacks**
63:18
**attempt**
130:23, 153:11,
158:13, 159:20,
160:17, 251:10,
351:12
**attempted**
157:23, 159:1,
248:1, 316:15
**attend**
21:10, 21:12,
21:17, 21:20,
22:4, 23:4,
160:15
**attendance**
54:7
**attending**
22:2
**attends**
20:1
**attention**
13:5, 29:21,
29:23, 30:3,
85:24, 136:5,
223:19, 247:7,
277:18, 363:7
**attorney**
5:4, 15:6,
15:19, 17:2,
17:5, 17:11,
17:14, 17:16,
18:2, 18:4,
18:5, 106:20,
107:12, 108:1,
108:4, 108:21,
109:3, 109:23,
112:17, 143:21,
146:1, 151:23,

152:8, 155:2,
157:24, 158:13,
199:13, 317:16,
318:15, 318:21,
318:24, 350:8,
350:18, 365:13,
365:16
**attorney's**
17:12, 109:5,
109:10, 115:1,
115:7, 143:24,
152:10, 200:9,
200:13, 200:17,
220:11, 318:5,
318:8, 366:17,
366:23
**attorneys**
14:18, 14:23,
16:6, 108:6,
108:9, 110:4,
110:12, 110:15,
110:19, 111:8,
118:23, 118:24,
119:24, 120:11,
200:3, 224:22,
329:5
**attribute**
39:14, 220:14
**attributed**
202:8, 202:16,
207:14, 219:14,
219:19, 245:22
**austin**
6:16, 114:20,
190:5, 190:23,
191:15, 193:19,
193:20, 195:7,
195:12, 196:3,
197:5, 197:9,
197:19, 198:13,
199:18, 199:23,
201:17, 201:22,
202:8, 204:6,
205:4, 207:13,
207:16, 213:22,
213:24, 214:21,
214:23, 219:14,
219:17, 219:20,

220:13, 222:1,
222:12, 224:15,
224:22, 224:24,
258:1
**auto**
252:11
**available**
158:22, 251:9,
274:9, 280:1,
280:13
**avenue**
146:17, 300:10,
344:4, 353:22
**average**
42:8
**avoid**
178:14
**avoided**
328:3
**aware**
12:18, 196:17,
203:5, 214:11,
254:6, 254:7,
359:24, 366:11
**away**
56:4, 62:18,
92:13, 217:17,
223:5, 229:10,
246:3, 246:11,
300:13

**B**

**baby**
216:24
**bachelor's**
21:24
**back**
27:12, 28:3,
28:5, 28:6,
28:10, 56:7,
57:7, 57:22,
59:6, 59:15,
61:17, 63:7,
68:1, 68:14,
68:18, 74:16,
75:5, 75:17,
76:10, 76:23,
77:13, 77:20,

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

99

78:1, 78:24, 79:3, 83:16, 83:19, 83:22, 90:9, 90:24, 93:17, 94:18, 103:7, 105:4, 105:10, 111:12, 114:20, 122:11, 122:20, 123:2, 127:11, 129:3, 129:8, 134:11, 135:24, 136:3, 136:5, 148:15, 149:21, 157:3, 173:6, 173:9, 178:23, 187:6, 189:18, 194:10, 194:12, 202:20, 216:12, 218:10, 234:16, 238:17, 238:23, 244:9, 245:16, 252:7, 254:13, 255:12, 256:12, 258:9, 264:3, 264:7, 266:13, 266:19, 272:23, 273:2, 286:14, 293:20, 293:22, 297:3, 304:20, 309:3, 309:4, 309:20, 313:19, 316:21, 316:22, 323:9, 324:10, 327:18, 327:20, 335:16, 357:9, 361:23

**backed**
194:9

**backgrounds**
75:23, 76:3

**backwards**
138:6

**bad**
258:13, 326:3

**ballistic**
206:1

**ballistics**
277:7

**bangers**
217:10

**bar**
113:19

**baroni**
3:19

**barrel**
298:20, 299:1, 299:6, 331:5, 342:18, 346:20, 347:19, 351:14

**barring**
63:10

**based**
25:18, 30:15, 31:12, 84:15, 109:10, 171:19, 197:7, 198:23, 206:22, 246:8, 248:14

**bases**
54:21

**basic**
38:20, 91:1

**basically**
32:3

**basket**
57:2, 263:16

**basketball**
280:4

**bates**
6:14, 6:18, 178:20, 185:6, 223:21, 223:22, 312:14, 363:8

**bates-numbered**
175:20

**bathroom**
337:7, 337:12, 337:15, 337:20

**batteries**
72:15

**battery**
248:1, 248:16, 256:8

**beat**
23:15, 24:7, 24:12, 24:16, 24:19, 26:11, 26:14, 28:3, 29:15

**became**
22:9, 22:21, 65:17, 66:4, 66:6, 344:14

**because**
10:15, 20:13, 22:6, 22:21, 24:5, 34:12, 39:6, 41:18, 41:20, 42:16, 46:14, 58:19, 67:16, 68:22, 74:19, 81:7, 83:8, 84:5, 88:12, 88:24, 106:13, 107:6, 137:6, 138:11, 139:14, 150:6, 153:9, 155:1, 155:19, 171:14, 171:17, 181:2, 181:22, 182:17, 187:9, 187:10, 193:5, 194:13, 196:21, 197:15, 198:3, 199:1, 199:4, 201:21, 202:12, 203:14, 203:23, 207:24, 210:17, 211:8, 213:5, 216:20, 217:16, 221:13, 228:12, 228:22, 235:2, 237:2, 244:6, 252:24, 257:22, 258:6, 283:16, 284:16, 284:21, 288:22, 293:19, 297:21, 303:7, 305:4, 313:7, 321:22, 327:22, 332:4, 332:24, 333:7, 333:13, 334:12, 335:4, 338:15,

348:2, 348:19, 348:24, 349:8, 354:13, 359:24

**become**
20:12, 22:11, 23:19, 24:3, 24:10, 30:23, 31:1, 31:24, 34:9, 34:13, 40:24, 53:21, 142:1

**becoming**
22:22, 30:11

**bed**
231:2

**been**
8:12, 10:3, 10:15, 10:20, 16:7, 32:2, 53:4, 68:13, 76:13, 76:14, 105:2, 118:17, 126:11, 126:17, 132:11, 134:15, 144:5, 146:20, 149:10, 151:21, 157:23, 161:4, 164:11, 168:23, 169:11, 191:4, 193:23, 201:3, 206:10, 208:24, 209:19, 228:2, 231:18, 233:13, 238:3, 240:10, 247:21, 250:2, 250:12, 250:16, 250:22, 251:9, 251:10, 251:13, 252:14, 254:9, 260:4, 266:5, 268:17, 271:19, 274:10, 276:13, 276:15, 277:13, 283:10, 287:22, 287:23, 292:12, 298:8, 314:23, 315:4, 315:19, 321:23, 322:14,

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

100

322:15, 324:12,
336:13, 340:8,
345:2, 348:19,
356:24, 357:1,
359:1
**before**
2:12, 9:6,
11:1, 11:6,
11:22, 16:21,
40:24, 63:22,
65:17, 66:3,
66:12, 93:3,
101:6, 101:11,
112:6, 114:14,
118:15, 119:5,
119:7, 119:15,
119:18, 135:15,
148:18, 148:20,
158:8, 164:13,
164:22, 165:3,
165:10, 165:12,
176:22, 182:23,
188:22, 190:18,
191:18, 201:22,
202:1, 203:15,
204:10, 218:17,
220:2, 220:4,
221:10, 226:13,
226:18, 226:22,
231:6, 231:9,
232:10, 232:18,
233:2, 233:7,
233:14, 236:19,
238:7, 246:3,
246:10, 250:2,
251:6, 251:8,
251:16, 251:17,
252:4, 262:6,
268:3, 278:5,
284:17, 285:3,
293:18, 301:15,
305:9, 311:12,
314:18, 317:18,
318:16, 319:6,
340:24, 342:16,
348:6, 348:8,
354:16, 355:16,
355:20, 360:24,

363:5, 366:5,
366:8, 366:12,
367:2, 367:7,
367:12, 370:6
**began**
19:22, 65:16,
66:12, 200:22,
313:5
**begin**
11:1, 11:7,
347:18
**beginning**
212:7, 266:7,
339:24
**begins**
247:9, 247:15
**behalf**
3:2, 3:9, 3:17,
4:2, 4:8, 4:17,
5:2, 7:15, 7:16,
7:18, 7:21,
7:22, 8:1, 8:2,
8:4, 8:6,
190:24, 265:15
**behind**
61:14, 61:15,
122:8, 285:1
**being**
10:11, 10:12,
12:12, 17:19,
20:15, 22:20,
27:18, 28:10,
31:3, 31:5,
42:2, 48:18,
52:19, 53:12,
66:14, 71:23,
111:15, 112:21,
113:1, 113:24,
120:12, 120:13,
128:2, 140:18,
148:24, 165:14,
173:11, 177:4,
178:3, 195:15,
218:23, 225:6,
230:2, 257:18,
270:19, 290:24,
299:15, 299:17,
303:23, 304:2,

319:13, 326:20,
334:22, 339:16,
355:8
**belief**
206:18
**believe**
9:15, 14:13,
15:15, 16:1,
24:18, 29:3,
32:19, 48:12,
52:11, 59:9,
113:22, 113:23,
135:12, 145:7,
150:1, 152:19,
153:3, 157:20,
165:9, 210:23,
222:11, 231:13,
234:1, 236:20,
236:24, 260:7,
260:13, 263:2,
287:11, 297:24,
348:24, 366:20
**believed**
43:4, 47:2,
47:6, 206:12,
358:3
**believer**
344:14
**bells**
297:21
**belly**
298:20, 299:2,
299:6, 342:18,
346:20, 347:19,
351:14
**belonged**
166:15
**belonging**
275:17
**below**
261:22
**bench**
335:19
**benefit**
88:2, 88:12,
88:18
**best**
91:4, 256:13,

340:2, 350:5,
351:6
**better**
25:3, 31:24,
196:2, 196:6
**between**
75:24, 128:3,
159:15, 248:16,
248:24, 314:22,
330:18, 334:13,
360:5, 360:15,
360:17, 360:24
**bias**
137:7
**biebel**
264:24, 265:3,
265:24, 268:19,
286:9, 286:20,
311:15, 311:19
**big**
75:15, 161:8,
161:13, 162:3,
172:7, 204:2,
304:3, 328:6,
329:20
**bigger**
330:22, 330:24
**bill**
52:6, 52:7,
52:9, 52:13
**binder**
99:8, 99:14,
99:18
**binders**
100:23, 101:1
**birth**
41:15
**bit**
57:8, 148:10,
193:4
**black**
75:21
**black-and-white**
121:19, 173:5,
173:8, 273:6
**block**
276:2, 336:4,
336:5

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

101

**blocks**
300:11
**bob**
98:11, 98:16, 98:21, 99:1, 99:4, 177:18, 180:3, 268:19
**bob's**
179:10
**body**
125:12
**bold-faced**
112:13
**bongiorno**
201:1, 202:24
**bonjean**
3:10, 3:12, 7:16, 8:21, 14:11, 98:3, 222:7, 292:6, 292:9, 292:14, 292:18, 358:23, 359:13
**bonjean's**
111:20
**book**
40:12, 40:15, 100:21, 101:23, 102:3, 102:5, 102:8
**booking**
234:23, 234:24
**books**
40:9, 100:9, 100:12, 100:15, 100:17, 100:18, 100:19, 100:23, 101:5, 101:6, 101:7, 101:12, 101:15, 101:17, 101:19, 102:11, 102:14, 102:18, 102:20, 102:21, 102:23, 103:4, 103:5, 103:9, 103:12, 103:18, 103:22, 104:5, 104:9

**borrowed**
300:9
**both**
24:11, 74:21, 126:10, 126:22, 132:22, 187:10, 188:7, 188:15, 204:22, 205:6, 205:21, 249:2, 265:7, 265:9, 285:11, 307:14
**bothered**
199:10, 199:19, 199:23
**bottom**
185:7, 199:8, 212:7, 212:17, 212:19, 213:16, 213:18, 225:16, 244:11, 248:20, 287:20, 300:7, 304:4, 307:12, 317:1, 330:9, 363:14, 364:2
**boulevard**
4:13
**bouto**
131:11, 135:19, 135:21, 139:8, 145:23, 146:24, 151:14, 152:1
**box**
76:17, 98:12, 264:12, 264:14, 264:18, 316:2
**boxes**
76:12
**brand**
28:17, 251:8
**break**
11:20, 11:21, 11:22, 105:3, 181:23, 181:24, 182:2, 188:23, 189:5, 189:9, 189:10, 189:12, 189:13, 272:18
**bribe**
151:24, 152:8,

153:11, 155:2, 158:13
**bribed**
157:24, 316:15
**bribery**
159:1, 159:8, 159:20, 160:17
**bring**
153:24, 157:13, 157:21, 158:2, 183:17, 333:15, 333:17
**bringing**
154:12
**broke**
327:18
**brooklyn**
3:15
**brought**
13:4, 102:22, 145:4, 153:9, 155:9, 155:20, 194:24, 237:19, 291:10, 291:14, 293:2, 294:12, 294:18, 295:9, 295:16, 296:13, 316:24, 317:7, 317:13, 317:21, 318:4, 318:6, 332:20, 340:14, 340:17
**brueggen**
4:11, 8:6, 108:14, 108:17, 119:1
**buddies**
328:7
**buddy**
328:5, 328:6
**buick**
300:12
**build**
281:22
**building**
17:23, 208:20, 208:22, 285:2
**built**
63:19, 63:22

**bullet**
206:4, 206:7, 206:13, 206:16, 206:18, 207:21, 270:15, 270:19, 271:16, 271:22, 272:7, 272:14, 277:6
**bullets**
204:23, 205:7, 205:17, 205:18, 205:22
**bullshit**
203:24, 204:2, 207:12
**bum**
216:24
**bunch**
80:23, 81:14, 81:23, 83:4, 234:20
**buried**
255:19
**business**
136:13
**busters**
207:3, 207:10, 207:12, 207:17, 207:23, 208:3, 208:6, 208:10, 208:13, 208:16, 209:8, 209:16, 210:4, 210:7, 210:17, 211:9, 211:16, 269:18, 270:8
**busy**
91:2, 91:3, 91:23
**buy**
89:3, 327:23, 338:8, 338:14
**buying**
210:11

---
**C**
---

**cabinets**
57:10

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

102

**cadet**
19:18, 19:20, 19:21, 19:23, 20:12, 20:15, 20:21, 21:8, 22:3, 22:15, 39:24, 40:1, 49:23, 50:4, 50:10
**cadets**
50:6
**cafeteria**
14:7, 14:9, 14:15, 15:3, 15:5, 15:12, 15:14, 15:15, 16:5
**cal**
14:21, 15:11
**calculator**
231:22
**caliber**
39:1, 39:3
**california**
14:8, 14:10, 15:1, 156:16
**call**
45:14, 57:18, 88:12, 89:16, 90:7, 91:7, 91:8, 91:11, 91:18, 92:1, 92:16, 93:7, 111:6, 123:23, 125:3, 152:2, 173:14, 176:18, 200:8, 222:23, 235:12, 264:16, 308:13, 337:11, 339:12
**called**
40:3, 54:7, 54:11, 93:3, 145:24, 151:21, 155:8, 158:15, 158:19, 172:24, 174:4, 177:9, 180:1, 181:14,

207:3, 207:10, 207:17, 220:9, 235:13, 287:5, 298:15, 320:2, 320:4, 347:19, 349:9, 351:7, 360:22
**calling**
91:10, 152:3, 173:18
**calls**
10:22, 29:19, 36:13, 44:3, 44:16, 77:2, 88:7, 88:19, 89:7, 89:10, 89:11, 89:12, 89:18, 89:22, 90:2, 90:4, 90:6, 112:8, 118:8, 134:23, 136:9, 137:18, 150:24, 220:18, 232:14, 254:18, 308:12, 308:13
**came**
50:16, 72:8, 89:21, 116:13, 132:14, 144:11, 146:1, 215:22, 216:5, 218:14, 221:7, 234:12, 272:15, 283:17, 283:20, 297:24, 326:6, 332:23, 333:11, 344:8
**camera**
22:13
**can**
8:18, 8:23, 11:20, 12:13, 12:14, 17:2, 27:10, 35:4, 49:19, 54:23, 57:4, 85:24, 86:5, 86:13, 87:15, 88:2, 99:5, 106:23,

107:13, 111:9, 114:10, 114:11, 120:19, 120:23, 121:21, 121:24, 142:14, 156:10, 168:20, 168:22, 170:22, 175:17, 178:16, 182:2, 184:22, 198:5, 212:12, 212:18, 236:10, 237:20, 237:23, 238:11, 238:19, 267:17, 267:21, 268:4, 268:20, 269:23, 270:3, 273:12, 280:3, 280:14, 281:24, 283:9, 283:14, 290:7, 305:22, 315:14, 318:13, 335:15, 337:6, 349:17, 357:23, 358:12, 361:9
**can't**
12:10, 74:8, 81:10, 81:12, 88:22, 94:23, 122:8, 151:17, 158:11, 173:5, 192:19, 198:8, 219:22, 221:1, 257:22, 269:23, 272:10, 272:13, 283:12, 309:19, 323:20, 323:22, 326:8, 334:8, 334:17, 336:18, 359:1
**cannot**
225:7
**canvas**
227:15, 268:7, 268:10
**capacity**
20:2, 365:15
**car**
29:15, 38:2,

54:12, 54:14, 146:12, 147:3, 149:11, 149:16, 149:21, 149:22, 149:23, 150:2, 150:12, 150:14, 150:16, 150:23, 151:5, 157:16, 157:17, 157:19, 157:22, 204:21, 205:5, 205:17, 205:21, 206:2, 206:5, 206:6, 206:8, 206:9, 206:13, 206:19, 207:7, 207:19, 207:20, 231:4, 246:10, 246:23, 270:15, 270:19, 271:14, 271:19, 271:22, 272:6, 272:15, 273:12, 275:17, 275:21, 276:14, 276:19, 277:6, 277:8, 282:2, 282:3, 297:22, 297:24, 298:1, 300:13, 326:14, 329:24, 331:14, 332:7, 344:1, 344:21, 344:23, 352:3, 352:5, 355:11, 355:14, 367:21
**card**
59:8
**cards**
59:5, 59:10, 183:2
**care**
291:15
**career**
84:18, 116:6, 327:9
**careful**
38:16, 87:7, 229:18
**carpool**
124:4

**cars**
150:2, 331:19, 332:5
**cases**
32:9, 36:18, 36:19, 36:20, 36:21, 48:5, 50:22, 50:24, 54:5, 65:19, 71:22, 72:2, 72:6, 72:8, 72:10, 72:11, 81:19, 144:3, 144:8, 190:24, 197:3, 255:19, 328:15, 328:18, 329:8
**cast**
208:4
**catalogued**
101:4
**caught**
326:14
**cause**
22:4, 35:12
**caused**
206:8, 295:14, 321:19, 322:8
**causing**
197:17
**cb**
234:19, 235:2, 235:4, 236:12, 236:13, 236:15, 236:16, 241:11, 241:14
**celeste**
115:9, 115:12
**cell**
339:16, 339:17
**center**
5:5
**central**
126:8, 126:11, 146:17, 234:23, 234:24, 353:21
**certain**
34:1, 102:5,

102:6, 275:1, 341:19
**certainly**
301:11
**certificate**
21:14, 370:1
**certified**
2:13, 370:3
**certify**
370:7
**chance**
111:17, 112:2, 278:4
**change**
51:19, 156:2, 156:23
**changed**
51:17, 51:20, 155:20, 156:22, 264:14, 265:12, 268:22, 316:6
**changing**
155:23, 214:19
**characteristics**
80:22
**characterize**
192:11, 198:16
**characterizes**
192:12
**characterizing**
214:13
**charge**
105:3, 283:8
**charged**
131:8, 131:10, 144:13, 144:18, 322:5
**charges**
151:23, 152:6
**charging**
283:5, 283:6
**check**
124:12, 176:19, 247:9, 247:14, 247:16
**checked**
124:21, 176:10, 178:7, 178:24,

179:14, 179:20, 180:2
**checked"**
179:12
**checking**
189:24
**cheerful**
133:18, 133:20, 133:22, 133:23, 133:24
**chicago**
1:18, 2:7, 3:7, 3:22, 4:6, 4:15, 4:17, 4:22, 5:6, 7:8, 8:3, 13:10, 13:16, 19:17, 21:13, 21:15, 21:18, 26:4, 36:21, 39:22, 75:20, 76:2, 76:4, 100:24, 115:18, 173:4, 174:9, 177:13, 177:18, 191:1, 199:19, 200:5, 240:9, 246:13, 246:17, 279:19, 308:12, 327:2, 362:18, 362:22, 363:4, 364:21
**children**
259:10, 259:13
**chino**
291:5, 293:7
**choice**
49:7
**choose**
105:14
**chronological**
268:1, 268:2, 268:12
**cinder**
336:4, 336:5
**circumstances**
116:10, 245:7, 274:22, 365:11
**circumstantial**
186:1, 186:2,

186:4, 186:7, 186:10, 186:15
**city**
4:17, 8:3, 21:13, 21:15, 21:17, 22:2, 126:1, 174:9, 177:13, 177:17, 190:24, 201:23, 279:19, 362:18, 362:22, 368:14
**civil**
108:6, 108:8, 110:19
**civilian**
20:2, 21:8, 64:5, 64:11
**civilians**
63:13, 64:1
**claim**
201:12, 326:15
**claimed**
270:20, 285:8
**claims**
111:17, 289:19
**clarified**
193:2
**clarify**
60:8, 193:2, 193:10
**clark**
4:20, 29:3, 29:6
**clasp**
57:24, 58:5
**class**
149:12
**clean**
43:22
**clear**
67:23, 74:15, 283:24, 339:18
**cleared**
321:13, 321:22, 322:10
**clearing**
242:9, 321:9, 321:11

clearly
271:11
clerked
323:19
client
17:5, 106:20,
107:12, 109:3,
214:17
cline
216:13, 216:20,
217:7, 217:11
clip
56:23
close
49:12, 210:4,
221:6
closed
260:19
closed-ended
37:24
clothing
71:2, 80:22
coach
52:21
cobras
128:3
coffee
227:18, 227:20,
227:24, 228:3,
228:8, 228:15,
229:3, 229:8,
266:21
coghlan
4:2, 7:23,
365:4, 365:8,
365:9, 365:12,
365:15, 365:24,
366:4, 366:8,
366:11, 366:15,
366:21, 367:2,
367:5, 367:10,
367:18, 367:23
cohen
3:11, 7:18
coincidence
297:18
cold
202:2, 246:13,

246:17
collect
89:12, 89:19,
89:21, 89:22,
90:7, 151:22,
152:3
college
20:1, 20:13,
21:10, 21:12,
21:13, 21:15,
21:17, 22:5
colleges
22:2
collision
204:23, 205:7
color
38:2, 71:1,
74:3, 75:22,
121:18, 307:18
combination
20:18
come
50:20, 53:5,
54:5, 89:19,
105:4, 118:2,
145:10, 145:14,
151:12, 151:16,
152:10, 156:19,
160:21, 162:12,
200:3, 220:1,
234:16, 282:21,
285:6, 287:3,
287:8, 287:9,
298:13, 298:15,
304:20, 316:21,
332:11, 332:21,
333:14, 347:4
comfortable
199:14
coming
63:20, 222:13
commander
27:16, 27:23,
27:24, 28:8,
28:9, 216:13,
326:8
comment
292:20

commission
370:20
commit
305:10, 305:13,
305:15, 305:21,
324:16, 325:16
committed
85:20, 85:21,
138:19, 201:5,
232:19, 232:23,
259:13
committing
254:16
common
278:8, 325:2,
326:1
commotion
197:18
communicate
94:3
communication
366:3, 366:7
communications
191:10
community
20:24
compare
268:4
comparing
267:18
competitive
30:13
complainant's
362:7
complaint
6:22, 323:14,
323:23, 362:9
complaints
321:3, 321:6
complete
220:22, 222:19,
369:6
completed
56:11, 69:11,
187:5, 228:1,
261:10, 262:3,
314:19
completely
202:2, 202:3,

290:9, 331:24
completeness
219:11, 221:15,
222:5
composition
148:8
comprise
72:11
comprises
57:21
comprising
236:2
computer
54:6, 54:9,
54:13, 54:17,
54:20, 57:10,
60:23, 62:14,
67:18, 67:19,
68:7, 99:17
computer-generat-
ed
56:20, 99:15
computer-printed
99:8, 99:10
conceal
211:11
concern
63:12
concerned
107:14
concludes
368:6
concrete
336:3
condition
12:2, 53:13,
327:20
conduct
37:10, 37:12,
72:18, 74:11,
75:18, 78:24,
79:3, 83:23,
163:15, 255:7
conducted
45:17, 77:20,
83:2, 127:17,
128:7, 129:8,
192:23

Transcript of Ernest Halvorsen
Conducted on February 6, 2019                                    105

**conducting**
38:17, 40:21,
72:21, 129:3
**confess**
137:13, 137:16,
138:4, 138:9
**confessed**
35:8, 35:17,
36:3, 36:8,
37:2, 288:12,
288:15, 288:19,
289:15, 289:20
**confessing**
295:18
**confession**
296:17, 296:20,
296:23, 297:15
**confidence**
78:12, 78:16,
78:18
**confidential**
115:20, 115:23,
116:3, 116:5,
116:11, 116:15,
116:21, 117:2,
117:5, 117:6,
117:14, 117:22,
140:18, 326:10
**confidentiality**
117:11, 213:14
**confirm**
207:20, 210:16
**confirmed**
207:7
**confirming**
203:6, 203:20
**conflict**
128:2, 194:14
**confront**
217:8, 348:9
**confronted**
348:13, 348:16
**confused**
104:17, 237:13
**confusing**
38:7, 121:5,
137:23, 228:23,
268:13

**confusion**
295:14
**connect**
177:3
**connection**
201:7, 248:24,
353:22
**connelly**
4:19
**consider**
122:19, 251:12,
264:9
**considered**
215:3, 215:6
**considering**
169:24
**consisted**
273:6, 273:17
**consisting**
307:18
**constitutional**
333:19
**consult**
107:22, 108:2,
108:6, 108:8,
108:20, 110:15,
110:20, 110:22,
239:24
**contact**
131:22, 151:12,
151:16, 152:17,
152:22, 153:1,
153:7, 257:3,
287:3, 287:10,
287:14, 304:11,
304:14, 306:22,
307:6, 366:12,
367:2
**contacted**
115:5, 146:9,
153:4, 153:23,
187:8, 325:2
**contacts**
116:3
**contained**
229:22, 274:4
**context**
14:5, 143:20

**continue**
43:12, 43:20,
44:1, 44:13,
77:23
**continued**
72:8, 224:10
**continuously**
27:4, 27:7,
27:9, 27:10,
51:15
**conversation**
17:13, 132:11,
134:8, 139:7,
139:12, 146:11,
154:20, 159:6,
159:7, 159:14,
166:19, 222:22,
225:7, 302:17,
302:20, 303:9,
303:11, 316:16
**conversations**
17:1, 17:2,
17:10, 17:15,
109:23, 114:8,
219:16, 221:17,
224:21, 256:18,
257:19, 367:11,
367:15, 367:19
**conversely**
208:3
**convicted**
115:1, 131:13,
201:11, 357:1
**conviction**
131:17
**convoluted**
355:13
**cook**
5:2, 5:4, 8:1,
89:15, 89:18,
116:13, 117:17,
140:19, 151:22,
151:24, 152:10,
154:8, 154:15,
159:20, 294:12,
316:24, 317:15,
317:21, 318:4,
318:7, 366:17,

366:22
**cooperate**
325:4, 326:2
**cooperating**
64:7
**cooperative**
86:12, 86:17,
86:22, 283:17,
302:21
**cop**
231:19, 231:24
**copied**
229:17
**copies**
58:7, 58:9
**copy**
58:15, 98:16,
98:23, 121:19,
228:12, 235:2,
235:4, 242:23,
243:11, 243:15,
243:16, 243:22,
244:1, 247:20,
247:24, 252:14,
261:5, 290:5,
368:12, 368:14
**corner**
185:7, 208:19,
225:16, 259:23,
312:17, 313:12,
313:16, 313:21,
314:3, 314:9,
314:16, 315:1,
315:10, 315:20,
344:3
**corporation**
191:13
**corrected**
343:20, 345:15,
347:3
**corrections**
369:7
**correctly**
32:24
**correspond**
363:20
**corroborate**
85:8, 85:13,

85:17, 86:1,
139:14, 146:4,
146:7, 207:24,
210:7, 211:16,
302:9, 347:9,
351:13
**corroborated**
164:4
**corroboration**
299:5
**could**
26:12, 29:4,
32:19, 32:22,
36:9, 38:4,
41:18, 41:20,
41:23, 41:24,
55:5, 56:3,
56:7, 60:20,
62:15, 63:8,
63:24, 65:10,
66:23, 67:16,
67:21, 69:21,
75:3, 76:17,
77:17, 79:10,
81:5, 87:14,
88:13, 88:17,
89:14, 97:12,
102:11, 106:24,
107:19, 112:23,
129:6, 130:2,
137:22, 140:22,
142:2, 149:9,
152:11, 155:21,
164:4, 169:11,
172:12, 177:10,
187:9, 199:6,
200:15, 208:7,
230:20, 239:4,
240:11, 248:14,
250:12, 251:9,
251:10, 251:11,
255:11, 279:6,
279:13, 283:24,
288:22, 299:14,
302:15, 308:21,
327:22, 331:7,
331:11, 335:22,
337:1, 337:11,

338:21, 344:23,
345:7, 353:16,
357:18, 359:22,
360:9, 360:20
**couldn't**
41:13, 63:6,
63:20, 68:8,
81:8, 164:19,
166:1, 196:10,
199:7, 200:1,
207:10, 208:12,
208:23, 211:13,
239:11, 256:13,
276:12, 279:23,
327:23
**counsel**
7:12, 8:13,
106:3, 106:8,
106:21, 109:15,
109:17, 113:10,
114:9, 121:17,
191:14, 192:5,
362:18, 365:4,
370:12
**county**
5:2, 5:4, 8:1,
89:15, 89:19,
116:13, 117:17,
140:19, 151:22,
151:24, 152:10,
154:8, 154:16,
159:20, 294:12,
316:24, 317:16,
317:22, 318:4,
318:7, 366:17,
366:22, 370:5
**couple**
16:16, 27:11,
27:13, 57:9,
66:16, 245:23,
340:23, 359:9,
362:23, 363:24,
365:10
**course**
40:3, 40:5,
40:8, 40:17,
40:21
**court**
1:1, 7:10,

7:13, 19:8,
72:23, 79:19,
81:18, 81:21,
84:5, 320:5,
370:1
**courtroom**
16:9, 16:13,
16:14, 16:15,
16:19, 16:23,
17:17, 17:19,
17:20, 112:14
**courtrooms**
15:16, 15:18
**cover**
64:24
**covered**
337:1
**cpd**
213:6, 213:9,
273:6
**cr**
216:14, 216:19,
326:9
**crack**
256:14
**crazy**
170:6, 170:11,
170:15, 170:17,
170:21, 170:24,
171:3, 171:7,
196:18, 197:9,
197:13, 197:20,
198:3, 198:6,
198:9, 198:17,
199:2, 199:4
**cream**
31:6, 31:9
**create**
67:11, 67:13,
68:1, 69:11,
74:11, 116:20,
147:18, 228:7,
258:4, 280:10
**created**
25:18, 30:15,
147:21, 148:4,
229:12, 229:15,
229:18, 253:22,

254:9, 310:17
**creating**
55:11, 278:22,
282:7, 308:6
**credibility**
137:9
**credible**
167:16, 168:11
**credits**
20:18
**crew**
95:13
**crime**
38:21, 38:22,
39:2, 39:14,
47:13, 48:16,
50:20, 55:8,
61:5, 61:9,
64:6, 77:7,
85:19, 85:20,
85:21, 86:19,
86:24, 127:24,
131:8, 131:10,
140:3, 142:20,
154:16, 163:7,
218:3, 226:4,
226:13, 226:17,
259:16, 277:7,
285:8, 287:12,
300:1, 302:23,
305:14, 305:15,
353:15, 353:17
**crimes**
50:19, 51:3,
51:4, 51:7,
51:13, 51:16,
51:20, 57:2,
57:4, 57:12,
57:15, 57:19,
60:5, 60:10,
60:13, 61:12,
61:20, 61:23,
62:2, 62:17,
63:3, 63:7,
64:2, 71:17,
71:18, 72:2,
72:9, 72:12,
72:15, 72:16,

86:14, 87:4,
91:7, 91:11,
92:12, 92:14,
92:22, 93:1,
93:3, 101:12,
101:15, 101:17,
102:16, 103:3,
103:5, 103:8,
103:9, 104:4,
124:9, 124:11,
139:18, 139:21,
140:8, 140:22,
141:5, 141:8,
142:2, 142:9,
142:17, 142:23,
143:3, 143:6,
152:18, 252:11,
258:19, 259:10,
259:13, 259:14
**criminal**
33:22, 34:18,
48:15, 86:9,
87:13, 87:19,
97:10, 106:15,
107:8, 108:3,
112:4, 140:4,
140:13, 141:15,
142:9, 241:18,
241:21, 321:3,
326:20
**criminals**
142:3
**critically**
85:4
**crop**
31:7, 31:9
**crowd**
95:1
**csr**
1:24, 370:4
**curious**
210:6, 210:9,
232:17
**currently**
57:9
**custody**
50:18, 76:13,
132:5, 195:24,

287:11, 321:12,
329:4
**cut**
122:14
**cv**
1:7, 1:13, 7:5,
7:7

**D**

**daffada**
3:19
**daily**
54:7
**daley**
5:5
**damage**
204:21, 205:5,
205:17, 205:21,
206:5, 207:8,
207:19, 207:21,
271:13, 277:6
**damaged**
270:15, 270:19
**dan**
14:17, 15:6,
15:19, 17:11,
17:23, 18:6,
18:18, 19:3,
108:1, 108:16,
108:24, 110:20,
110:22, 112:16,
119:1
**dangerous**
26:20, 26:24,
142:3, 142:10
**danny**
195:21
**dashboard**
329:23, 330:1,
331:7
**databases**
54:17
**date**
38:21, 101:19,
124:17, 124:18,
124:20, 184:11,
228:1, 242:24,
263:4, 263:9,

263:11, 264:5,
264:9, 265:6,
265:7, 265:8,
265:13, 265:20,
266:1, 266:5,
266:15, 267:13,
267:15, 268:15,
268:19, 268:22,
269:5, 269:7,
312:5, 312:21,
313:1, 313:3,
314:15, 314:24,
315:2, 315:11,
315:19, 322:9,
340:15, 363:17,
364:4, 369:13
**dated**
182:10, 262:18,
263:15, 263:22,
263:24, 264:1,
264:3, 264:7,
264:16, 269:16,
269:21, 312:9,
351:19
**dates**
41:14, 120:1,
158:11, 265:9,
313:6, 313:7
**dave**
8:6, 108:16,
108:17
**david**
4:11, 293:1
**day**
4:4, 14:21,
15:2, 15:11,
19:8, 95:17,
96:10, 123:16,
124:15, 155:20,
156:3, 199:1,
201:8, 220:12,
230:9, 231:6,
249:20, 249:21,
249:23, 251:5,
251:7, 251:16,
251:17, 252:4,
255:23, 255:24,
262:24, 263:2,

263:7, 263:9,
264:11, 264:12,
266:7, 266:10,
276:14, 292:12,
292:17, 301:15,
314:23, 315:5,
315:21, 316:2,
339:5, 354:7,
354:13, 354:14,
370:17
**day-shift**
96:15, 96:20
**days**
53:7, 209:21,
209:24, 216:2,
218:3, 266:13,
271:12
**dead**
58:3, 234:11,
255:10
**dealing**
84:22, 239:18
**dealings**
217:19
**dealt**
176:13
**dean**
3:13
**decedent**
233:2
**december**
290:4
**deciding**
108:9
**decision**
109:8, 200:9
**decisions**
79:19
**dedicated**
90:14
**dedication**
31:19, 31:21
**deemed**
324:24, 329:2
**deep**
335:18
**defend**
191:4, 191:8,

191:14
**defendant**
3:17, 4:2,
4:17, 7:23, 8:3,
10:13, 33:22,
46:22, 48:15,
87:20, 295:12,
362:18, 365:4
**defendants**
1:9, 1:15, 4:8,
5:2, 8:5, 8:7,
206:10, 273:18,
304:18, 305:12,
308:22
**defending**
191:11
**defense**
33:18, 87:13
**degraf**
98:11, 98:21,
99:1
**degraf's**
98:16, 177:18,
180:3
**degree**
21:14, 21:24
**delay**
42:15, 42:22
**demand**
355:16
**demonstrates**
286:23
**denied**
285:11
**deny**
272:10
**denying**
189:13
**department**
13:10, 13:16,
19:17, 20:2,
20:10, 20:14,
20:20, 22:24,
26:4, 36:21,
39:23, 40:5,
41:1, 41:3,
53:15, 75:20,
76:2, 76:4,

100:24, 111:24,
115:19, 116:2,
173:5, 240:9,
243:6, 244:4,
308:13, 319:24,
324:13, 326:17,
327:2, 363:4,
364:21
**department's**
243:13
**department-issued**
149:20
**depend**
129:20
**depends**
129:16, 129:19
**depicts**
123:8
**deponent**
369:1
**deposed**
10:4, 10:8,
10:11
**deposition**
1:17, 2:1,
6:10, 7:3, 9:6,
9:14, 9:18,
10:16, 105:16,
105:22, 110:16,
110:18, 111:20,
118:11, 118:22,
119:24, 121:15,
121:21, 131:6,
178:17, 185:2,
189:21, 190:14,
192:20, 192:22,
193:3, 223:15,
225:10, 290:20,
316:9, 362:1,
362:15, 368:7,
370:6
**depositions**
9:22
**descent**
195:8, 195:15
**describe**
57:4, 57:6,
70:13, 70:18,

70:20, 71:7,
71:12, 71:14,
121:24, 335:15,
353:16, 354:16,
355:10, 355:19
**described**
75:10, 161:22,
207:8, 248:17,
352:2
**describing**
354:20
**description**
73:19, 125:17,
125:20, 125:23,
126:20, 126:24,
162:3, 171:23,
172:4, 172:11,
172:20, 300:17,
351:20, 352:8,
352:13, 352:17,
352:22, 353:1,
353:10, 354:20,
355:4, 355:16,
355:24, 356:12,
356:17, 356:20,
357:18
**descriptions**
356:23
**descriptive**
353:3
**deserve**
36:19
**desk**
53:16, 53:17,
53:20, 53:21,
53:24, 54:3,
55:3, 59:11,
60:10, 91:15,
91:16, 91:18,
92:6, 92:7,
92:8, 92:9,
92:17, 92:18,
92:20, 92:21,
93:9, 102:16,
158:20
**desks**
57:10, 60:23,
62:14, 91:12

**despite**
196:14, 256:5,
341:7, 341:13
**destroy**
117:10, 201:13,
229:4
**det**
69:19, 70:3,
70:4
**detail**
71:4, 86:5
**detailed**
300:17
**details**
38:23, 158:1,
158:4, 158:9
**detectives**
15:23, 16:1,
16:3, 18:9,
18:19, 31:6,
31:9, 31:13,
31:14, 31:16,
49:6, 49:13,
50:20, 54:5,
54:6, 54:10,
55:2, 60:20,
61:24, 62:5,
62:7, 62:8,
62:9, 62:14,
65:19, 80:13,
90:17, 90:18,
90:20, 91:13,
91:23, 93:17,
94:17, 95:1,
100:14, 101:5,
101:8, 101:10,
104:12, 125:4,
125:5, 125:7,
133:1, 133:5,
182:11, 184:19,
185:24, 186:5,
186:14, 186:24,
187:17, 188:1,
213:13, 224:7,
249:16, 249:18,
252:3, 253:6,
253:10, 253:11,
253:22, 275:16,

291:7, 291:11,
291:13, 293:2,
293:9, 294:5,
294:18, 294:23,
295:9, 295:11,
295:16, 307:14,
317:7, 317:21,
318:3, 319:11,
319:14, 319:20,
319:22, 319:24,
320:3, 320:4,
320:8, 320:10,
320:14, 320:17,
337:7, 337:9,
337:24, 338:3,
338:7
**determine**
39:7, 41:11,
43:13, 44:1,
44:14, 55:1,
55:5, 78:17,
248:24, 367:22
**determined**
155:9, 207:11
**determining**
107:22, 270:8
**dets**
70:5, 186:18,
186:24
**developed**
53:13
**developments**
187:7
**deviate**
69:15
**devon**
29:6
**dial**
90:9
**dickens**
276:2
**dickinson**
52:16, 52:17,
52:20, 53:2
**died**
191:16, 193:21,
194:16
**difference**
330:18

**different**
47:18, 47:21,
54:20, 61:4,
90:12, 93:5,
126:2, 129:19,
146:20, 148:10,
172:9, 188:23,
193:4, 197:4,
214:7, 270:21,
274:8, 290:9,
331:20, 341:9,
341:11, 349:8
**difficulty**
12:7, 12:17
**dillon**
5:2, 8:1,
143:11, 143:13,
143:17, 143:18,
152:24, 153:1,
153:17, 153:18,
153:22, 154:10,
154:14, 154:15,
154:20, 156:18,
157:5, 159:1,
159:4, 159:7,
159:15, 159:19,
159:22, 160:8,
186:19, 316:17,
366:2
**dillon's**
165:13
**dinner**
327:22, 327:23
**direct**
89:19, 90:9,
185:4, 247:7,
277:17, 300:4,
344:4, 363:7
**directing**
128:6
**direction**
92:14, 250:13,
251:2, 251:4,
251:7, 255:18,
370:11
**disappeared**
210:13, 216:1
**discipline**
327:3

**disciplined**
324:12
**discretion**
28:1
**discuss**
16:22, 106:19,
148:8
**discussing**
142:20, 195:17
**discussions**
16:9, 111:7
**display**
77:9
**displayed**
76:21, 78:12
**dispute**
214:1, 219:18,
221:1, 225:7,
250:14, 257:22,
257:24, 296:12,
296:16
**disputing**
204:14, 224:23,
258:3
**distinctly**
199:17
**distinguishing**
71:2, 275:7,
275:11
**district**
1:1, 1:2, 23:9,
23:10, 23:14,
23:16, 23:17,
26:7, 26:11,
26:15, 27:5,
27:8, 28:15,
28:17, 28:20,
28:24, 29:2,
29:8, 29:11,
29:14, 29:17,
29:18, 29:22,
29:24, 30:2,
30:4, 30:8,
30:9, 31:21,
32:1, 50:19,
50:21, 51:2,
51:5, 51:7,
98:11, 98:22,

125:15, 125:22,
127:6, 127:8,
132:6, 135:11,
170:18, 197:17,
197:23, 198:14,
240:1
**diversey**
208:19
**division**
1:3, 23:8,
40:11, 259:8,
259:9, 364:3,
364:19
**doctor**
53:13
**document**
33:13, 33:16,
33:21, 34:14,
34:23, 36:2,
36:6, 43:5,
43:9, 43:20,
43:23, 44:12,
45:21, 45:24,
46:3, 46:6,
46:10, 47:1,
47:5, 48:11,
71:8, 71:15,
78:11, 78:15,
78:18, 78:22,
82:8, 82:11,
82:15, 101:20,
101:22, 102:13,
103:11, 103:16,
103:19, 103:23,
104:1, 104:2,
104:7, 104:10,
104:22, 116:2,
117:13, 158:5,
158:9, 161:18,
161:22, 162:3,
162:6, 163:17,
190:17, 190:20,
191:19, 192:7,
192:12, 192:21,
202:13, 211:2,
211:12, 220:22,
221:14, 221:15,
222:4, 222:18,

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

110

222:19, 224:5,
224:18, 229:21,
233:21, 289:13,
347:6, 361:9,
361:10, 363:5
**documentation**
203:6
**documented**
34:21, 43:13,
48:22, 82:19,
118:1, 158:13,
163:13, 163:22,
163:24, 210:15,
210:21, 296:18,
297:2, 303:1,
303:4, 303:13,
347:7, 351:18
**documenting**
42:15, 42:22,
70:10, 254:9,
282:16, 289:19,
350:9
**documents**
120:15, 192:11,
229:22, 237:5,
237:6, 237:10,
237:22, 238:8,
238:12, 238:13,
238:18, 238:22,
239:1, 261:6,
261:8, 267:24,
286:24, 316:16,
316:23, 322:11,
322:17
**does**
47:11, 69:19,
70:3, 70:5,
104:21, 125:2,
145:2, 145:13,
160:21, 190:10,
192:16, 218:19,
227:4, 227:8,
234:22, 235:9,
240:22, 243:11,
259:5, 260:12,
281:4, 282:24,
285:18, 301:16,
301:20, 305:7,

316:2, 318:24,
320:22, 331:2,
331:3, 346:24,
347:1, 363:20,
368:12
**doesn't**
9:3, 37:22,
148:7, 160:17,
192:14, 192:17,
248:19, 259:22,
261:4, 282:8,
292:24, 293:15,
297:21, 301:12,
301:17, 301:19,
317:15, 331:10,
333:8, 340:11,
340:13, 346:17,
349:21, 355:2
**dog**
98:8, 98:9,
98:15
**doing**
10:20, 45:8,
65:3, 134:16,
134:18, 147:24,
157:3, 170:7,
197:20, 198:8,
198:17, 200:8,
216:3, 231:5,
231:9, 232:9,
232:18, 233:2,
233:5, 233:7,
233:13, 250:16,
250:22, 320:24,
323:7
**doled**
328:22
**domestic**
251:10
**done**
11:1, 11:6,
93:19, 104:13,
111:23, 112:1,
205:10, 205:13,
218:21, 228:13,
249:8, 323:7,
350:17
**door**
61:6, 64:18,

64:22, 123:16,
336:23, 337:11,
338:21, 338:23
**doors**
62:23, 338:20
**double**
13:2
**doubt**
208:4, 265:3,
286:4, 286:6,
364:24
**down**
8:23, 14:7,
14:14, 18:14,
18:16, 18:17,
18:19, 33:5,
35:9, 35:11,
35:14, 35:15,
37:4, 45:15,
62:15, 81:9,
81:11, 81:16,
81:24, 83:18,
94:8, 96:23,
98:21, 117:9,
117:19, 117:20,
122:4, 130:20,
155:10, 172:5,
172:12, 173:7,
196:13, 215:23,
224:19, 237:19,
245:22, 264:12,
280:16, 283:17,
283:20, 294:4,
300:10, 329:20,
330:4, 335:4,
349:4, 357:10
**downstairs**
99:4, 134:9
**dozens**
186:16
**drafted**
203:14
**dressed**
124:1
**drinks**
113:20
**drive**
4:5, 19:5,

45:15, 157:18,
338:14
**driver's**
58:4
**driving**
246:3, 276:6,
276:9, 297:23
**drove**
149:20, 246:11,
271:12, 276:1,
276:22, 300:7,
300:10, 300:11,
344:3
**duct**
331:6, 331:14,
331:21
**ducts**
329:24
**duly**
8:10, 8:12
**during**
41:12, 76:22,
82:8, 114:23,
116:6, 132:9,
133:2, 189:20,
203:11, 204:22,
204:23, 205:5,
205:7, 206:21,
219:6, 247:9,
247:13, 247:16,
270:15, 271:20,
339:5
**duties**
29:16, 51:18,
54:3, 160:15
**duty**
149:21, 170:7,
170:24, 171:3,
196:19, 197:10,
197:14, 197:20,
198:3, 198:8,
198:18

---
**E**
---
**e-r-n-e-s-t**
9:1
**each**
48:12, 65:5,

75:8, 84:8,
97:24, 99:19,
121:18, 129:1,
138:24, 174:20,
179:23, 321:4
**earlier**
140:1, 155:20,
190:8, 197:16,
218:24, 220:12,
322:9, 353:14,
362:21, 365:8
**early**
10:5, 66:8,
298:13, 324:21
**earnest**
200:22
**easier**
223:22
**easiest**
201:12
**eastern**
1:3
**easy**
35:6
**ed**
223:19, 288:1
**ed's**
278:13
**eddie**
52:16, 52:19,
53:1
**educational**
21:21
**edward**
4:9
**effect**
77:14, 167:21,
167:23, 175:2
**effects**
133:15
**effort**
248:23, 306:7
**efforts**
248:22, 302:2
**eight**
52:18, 53:11,
307:18
**eileen**
4:18, 8:2,

362:21
**either**
11:13, 21:23,
35:24, 62:2,
70:13, 75:13,
79:7, 84:8,
87:12, 110:9,
126:9, 130:2,
132:15, 156:21,
172:19, 182:24,
184:6, 280:11,
355:1, 357:9
**eliminate**
81:7
**eliminated**
22:3
**else**
8:19, 15:20,
18:3, 40:6,
48:17, 49:18,
60:15, 80:12,
108:2, 108:12,
108:18, 118:21,
119:23, 122:6,
124:4, 139:7,
139:9, 139:11,
139:23, 155:12,
162:21, 166:12,
176:1, 197:24,
199:7, 251:24,
321:1, 337:10,
350:11
**ely**
1:24, 2:12,
7:10, 370:3
**emphasized**
204:1
**employed**
370:13
**employee**
6:24, 363:3
**employment**
13:15, 13:18,
13:20, 19:16,
251:22
**employment"**
244:23
**empty**
269:19

**encounter**
221:24, 222:15
**encumbered**
190:2
**end**
32:7, 92:10,
165:3, 165:4,
165:7, 174:24,
193:3, 212:10,
221:7, 236:21,
236:23, 237:1,
237:8, 237:22,
275:24
**ended**
32:9, 334:4
**ends**
165:12
**enforcement**
29:18
**english**
130:6, 199:11,
199:20, 200:1,
200:2, 200:5,
200:14
**enough**
12:6, 84:12,
274:20, 274:24,
275:12, 332:9
**enrique**
115:14
**ensure**
117:17, 252:18,
252:21, 338:23
**entered**
235:20, 236:5
**entire**
58:23, 130:20
**entries**
364:10
**entry**
363:15
**envelope**
57:23, 58:2
**ernest**
1:17, 2:1, 4:8,
7:3, 8:11, 8:17,
369:3
**errata**
369:7

**erred**
265:19, 266:1,
266:3, 266:15
**erroneous**
202:19
**error**
186:6, 187:20,
187:23, 188:4,
265:15, 267:7,
315:11
**errors**
201:20, 201:21
**especially**
339:15
**esquire**
3:3, 3:10,
3:11, 3:18, 4:3,
4:10, 4:11,
4:18, 5:3
**establish**
187:11, 358:5
**et**
1:8, 1:14, 7:5,
7:6
**ethnicity**
74:5, 74:6
**etran**
368:13
**even**
42:23, 44:11,
48:5, 48:9,
51:4, 77:14,
77:21, 142:22,
185:15, 239:5,
316:1, 321:23,
348:2, 348:4
**evening**
310:6
**event**
83:3, 148:22,
264:15
**events**
201:9
**eventually**
145:24, 158:7,
163:22, 163:24,
216:3, 360:16
**ever**
21:23, 39:22,

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

112

| | | | |
|---|---|---|---|
| 69:15, 76:7, 83:2, 83:23, 102:23, 103:4, 115:9, 117:3, 144:22, 165:22, 170:17, 170:23, 171:2, 208:6, 216:16, 274:19, 275:11, 296:21, 299:1, 299:4, 299:19, 324:12, 324:15, 326:22, 327:8, 327:11, 327:15, 331:6, 349:13, 349:18, 351:12, 351:15, 363:5, 367:1 **evergreen** 126:6 **every** 72:24, 79:20, 83:1, 98:12, 106:1, 129:19, 186:16, 274:8, 292:10 **everybody** 178:16, 285:3 **everyone** 8:19, 290:6, 295:13 **everything** 134:12, 135:8, 158:12, 162:1, 224:11, 225:3, 239:4, 266:10, 303:13 **evidence** 35:3, 36:10, 36:11, 36:12, 36:16, 78:4, 103:13, 103:14, 104:14, 104:23, 201:12, 206:2, 224:7, 225:1, 240:15, 241:24, 273:14, 277:7 **ex-boyfriend** 250:13 | **exact** 66:9, 66:11, 120:1, 124:17, 329:15 **exactly** 220:24, 221:4, 344:12, 344:13 **exam** 25:9, 25:10, 25:12, 25:13, 25:14, 25:16, 25:19, 30:16, 45:7, 46:7, 46:11, 46:13, 46:21, 46:24, 47:8, 340:3 **examination** 6:2, 6:23, 8:13, 30:13, 45:13, 45:19, 45:22, 46:1, 46:4, 362:18, 365:4 **examined** 290:24, 369:4 **examiner** 45:16 **examiner's** 45:19 **example** 38:24, 46:19, 54:11, 55:6, 64:5, 137:12, 174:22, 197:15, 197:16, 199:6, 239:6, 251:15, 251:21 **exchange** 85:5, 87:11, 87:17 **exclaiming** 219:1 **exhale** 292:20 **exhaled** 292:9, 292:15, 292:19 **exhibit** 6:12, 6:13, | 6:14, 6:16, 6:17, 6:18, 6:19, 6:21, 6:22, 6:24, 121:13, 121:15, 121:20, 178:15, 178:17, 178:19, 181:20, 184:24, 185:2, 190:12, 190:14, 190:22, 218:10, 223:13, 223:15, 224:18, 225:9, 225:10, 227:5, 244:9, 244:13, 244:15, 254:12, 257:13, 258:9, 267:22, 269:24, 273:2, 282:13, 290:20, 293:18, 293:23, 294:2, 297:5, 297:6, 297:10, 297:11, 307:4, 307:13, 309:7, 309:21, 313:20, 314:3, 314:15, 315:20, 316:8, 316:9, 316:22, 323:9, 323:12, 329:16, 332:15, 353:9, 362:1, 362:5, 362:15, 363:2 **exhibits** 6:10 **exist** 208:4, 269:18 **existed** 51:4, 208:6, 208:13 **existence** 210:16, 211:10 **experience** 34:7, 84:15, 231:15 **experienced** 172:15, 301:2, 303:17 | **expires** 370:20 **explain** 27:10, 37:23, 46:14, 63:9 **explained** 180:1, 187:19, 199:10, 203:10, 203:21, 212:9, 212:16, 213:2, 218:21, 313:4, 314:18 **explanation** 27:17, 27:20, 77:12, 77:19, 289:17 **extend** 64:21 **extends** 62:1 **extension** 40:3, 40:8, 40:16, 40:20 **extent** 104:7, 106:18, 111:6, 114:5, 114:7 **exterior** 338:21 **eye** 275:4 **eyes** 275:5 **eyewitnesses** 125:15, 125:16 ----- F ----- **fabricated** 221:24, 222:12 **fabrication** 201:11 **facial** 71:2, 74:3 **facility** 62:19, 62:21, 338:17 **facing** 88:1 |

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

113

**fact**
35:15, 36:2,
43:14, 44:14,
46:6, 71:15,
82:5, 82:9,
87:12, 87:18,
104:3, 111:19,
145:1, 148:11,
155:1, 176:11,
178:9, 179:1,
179:15, 193:6,
196:21, 210:12,
211:2, 211:9,
211:12, 260:12,
269:17, 280:21,
281:2, 289:13,
289:19, 296:24,
303:5, 310:21,
313:11, 347:8,
347:11, 347:12,
348:10, 349:4,
350:9, 353:1,
358:13, 364:20
**factor**
275:7, 275:11
**facts**
33:16, 33:21,
34:1, 34:2,
34:12, 34:14,
34:16, 34:18,
34:20, 34:23,
39:8, 39:15,
84:24, 85:19,
85:24, 203:15,
204:9, 224:9,
225:2
**factual**
164:2
**factually**
202:5
**failed**
239:12, 251:4
**fair**
11:18, 43:15,
73:9, 80:17,
80:20, 83:6,
84:13, 120:10,
148:7, 148:12,

148:14, 148:16,
148:17, 278:16,
284:2, 308:7
**false**
43:15, 44:2,
44:12, 44:15,
223:3, 223:7,
224:7, 225:1,
272:11
**familiar**
182:11, 182:18,
184:20, 188:1,
188:6, 188:7,
367:22
**family**
12:19, 20:9
**famous**
313:20
**far**
10:21, 92:10,
168:20, 168:22,
207:16, 256:10,
262:20, 341:9
**fashion**
35:24, 71:8,
100:2
**father**
216:5, 216:8,
216:9
**fatigued**
190:2
**fault**
249:9
**fax**
83:17, 83:19
**fear**
112:3
**feared**
106:13, 107:6
**february**
1:19, 7:9,
146:18, 161:12,
227:13, 230:10,
230:12, 233:12,
233:20, 234:2,
237:17, 246:13,
246:17, 246:22,
248:10, 250:5,

256:22, 258:5,
258:6, 268:7,
320:12, 370:18
**fed**
337:23
**feed**
39:13, 338:3,
338:6
**feedback**
66:21
**feeling**
190:2
**feet**
61:17, 62:18,
81:4, 92:13,
93:11, 335:18
**fell**
258:12
**fellow**
136:7, 136:15,
137:1, 137:17
**fellows**
279:20
**felony**
145:24
**fencing**
207:5
**fender**
271:13
**few**
22:10, 113:19,
116:7, 209:21,
209:24, 246:2,
246:3, 252:7,
272:18, 286:14,
300:12, 365:6
**fields**
55:24
**fifth**
105:14, 106:2,
106:7, 106:9,
106:12, 107:4,
107:23, 108:9,
108:21, 109:1,
109:8, 109:16,
110:17, 114:2,
114:15, 181:13
**filed**
323:15

**files**
57:17, 57:18,
57:20, 59:12,
117:2, 176:10,
177:5, 177:6,
177:8, 178:8,
178:24, 179:7,
179:8, 179:9,
179:10, 179:14,
215:2, 240:5,
240:7, 249:2,
364:12
**filing**
326:15
**fill**
28:18, 59:15,
60:1, 83:17,
83:20, 304:15
**filled**
55:24
**filler**
72:24, 73:1,
73:3, 74:8,
74:14, 75:4,
76:10, 76:17,
78:1, 84:9,
274:1, 274:10,
274:11, 274:13,
274:16, 274:20,
275:5, 275:12,
275:13, 280:13
**fillers**
73:13, 73:16,
73:18, 74:12,
74:20, 74:21,
74:24, 75:8,
75:24, 79:12,
79:15, 79:17,
79:20, 79:22,
80:8, 80:10,
80:14, 80:15,
80:19, 83:24,
84:8, 84:12,
274:5, 282:8,
309:15
**final**
242:20, 314:21
**finally**
200:12

**financial**
327:19, 370:14
**find**
22:6, 22:8,
39:2, 45:1,
45:3, 53:14,
76:18, 86:18,
87:4, 98:9,
98:15, 125:19,
136:22, 136:23,
142:16, 144:9,
164:16, 170:13,
203:19, 207:10,
207:17, 208:7,
208:12, 208:15,
209:14, 211:10,
211:13, 216:2,
233:12, 234:4,
239:3, 239:9,
253:18, 269:23,
278:19, 279:23,
281:8, 283:4,
299:14, 302:2,
302:12, 305:5,
305:23, 306:1,
306:7, 341:5,
341:12, 346:15
**finding**
279:18
**fine**
101:14, 133:12,
134:1
**finish**
182:1, 263:7
**finished**
56:13, 68:22,
68:23, 69:8,
244:6, 244:7,
315:3, 315:6,
315:17, 340:3
**fire**
326:15, 327:3
**fired**
326:16, 326:18,
326:20
**firm**
4:12, 191:4
**first**
9:3, 10:19,

15:8, 15:9,
19:19, 23:6,
49:4, 51:13,
52:5, 55:14,
55:17, 56:18,
63:17, 71:17,
72:3, 72:9,
99:1, 114:1,
114:12, 120:12,
123:13, 124:7,
125:4, 143:18,
144:11, 158:2,
177:12, 199:8,
203:1, 208:20,
218:11, 220:7,
237:18, 237:21,
238:21, 261:15,
261:23, 263:3,
263:24, 265:11,
265:22, 266:15,
269:6, 269:15,
269:21, 270:1,
276:22, 277:24,
293:20, 313:5,
316:6, 316:13,
316:14, 349:11,
349:12, 351:19,
351:23
**first-watch**
96:4
**fit**
331:7, 331:11,
331:12, 332:9,
349:2, 349:5
**five**
72:24, 73:1,
73:16, 74:12,
74:14, 75:7,
75:8, 79:20,
83:24, 84:7,
91:5, 274:1,
274:5, 309:14
**flag**
169:5
**flip**
11:16, 178:19,
252:7, 293:20,
340:23

**floor**
2:6, 3:6,
61:24, 62:1,
62:10, 62:11,
63:2, 63:4,
64:21, 90:11,
99:2, 156:16,
208:20, 336:8
**flow**
47:10, 68:4
**fluorescent**
336:6
**fly-by-night**
210:11
**focus**
29:21, 29:23,
30:3, 30:6
**focusing**
292:14
**folder**
57:23, 58:6,
98:17
**folks**
300:1, 300:6,
300:21, 300:24,
301:4, 301:13,
301:24, 302:3,
302:5, 302:15,
302:19, 302:24,
303:4, 303:11,
304:5, 304:22,
305:13
**follow**
32:4, 32:10,
95:13, 95:18,
96:10, 109:5,
248:19, 253:3,
290:7
**follow-up**
163:15, 248:14,
249:18, 255:7,
256:2, 256:6
**followed**
93:18, 94:5,
95:4, 146:17,
249:6, 273:8,
273:13, 326:11
**following**
32:3, 175:15,

201:8, 256:7
**follows**
8:12
**food**
337:19, 337:20,
338:8, 338:14
**footnote**
199:8, 212:21,
224:4
**force**
334:18
**foregoing**
369:4, 370:6,
370:7
**forever**
203:24
**forge**
278:12
**forget**
43:10, 291:17
**forgotten**
202:3
**former**
365:16
**forth**
196:13
**forthcoming**
86:8, 134:22,
140:3, 141:14,
141:17, 142:8
**forward**
215:22, 312:6,
340:23
**found**
269:19, 275:21,
279:2, 279:5,
279:12, 279:23
**foundation**
65:23, 68:9,
89:8, 112:9,
114:3, 156:24,
170:15, 171:4,
177:22, 184:2,
220:19, 224:17,
230:4, 248:18,
254:23, 271:24,
286:1, 286:8,
286:11, 289:22,

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

115

329:11, 353:6
**foundational**
167:20
**four**
21:9, 21:19,
120:13, 142:24,
300:5, 364:1
**fourth**
184:4
**fragment**
212:16
**frame**
67:24, 83:15,
143:15, 329:14,
329:22, 330:7,
330:13, 330:18,
330:22, 330:24,
331:1, 331:2,
331:4, 331:7,
331:12, 332:9,
339:22, 360:8,
360:18
**francisco**
116:8, 117:16,
131:23, 132:3,
132:10, 132:17,
132:22, 133:6,
134:2, 134:12,
134:22, 139:6,
140:16, 141:13,
142:19, 144:16,
146:2, 152:7,
152:14, 153:9,
155:19, 156:18,
158:12, 159:15,
159:19, 159:21,
160:7, 161:5,
161:6, 165:12,
172:24, 173:10,
174:1, 178:3,
183:11, 187:5,
203:1, 205:24,
206:6, 206:9,
206:16, 207:22,
208:17, 209:8,
209:15, 210:3,
210:10, 220:10,
271:11, 271:18,

292:24, 294:12,
294:18, 309:1,
316:14, 318:3,
318:6, 318:16,
319:8, 331:10,
341:23, 343:3,
357:2, 357:4,
357:14, 358:1,
365:19, 366:1,
366:8, 366:12
**fraternal**
112:18
**fraud**
326:16, 327:5
**free**
7:13
**freedom**
88:24
**freely**
64:2, 138:19,
338:19
**fresh**
43:7
**friendly**
136:18
**front**
79:10, 83:1,
102:16, 112:10,
123:10, 132:13,
134:16, 149:11,
191:20, 192:22,
264:11, 264:17,
268:16, 271:7,
273:11, 280:15,
291:16, 344:7,
363:1
**full**
133:24, 218:11
**further**
164:12, 362:12,
365:3
**fusco**
4:19

---
G
---

**gang**
29:22, 29:23,
30:1, 30:3,

30:6, 30:7,
51:3, 51:4,
51:7, 51:21,
97:24, 100:1,
100:7, 100:9,
100:12, 100:15,
100:17, 100:18,
100:19, 100:21,
100:22, 101:2,
101:4, 101:6,
101:7, 101:12,
101:15, 101:17,
101:23, 102:3,
102:14, 102:16,
103:2, 103:5,
103:8, 103:9,
103:12, 103:17,
103:21, 104:3,
135:17, 135:19,
135:21, 135:23,
136:7, 136:8,
136:15, 136:18,
136:24, 137:1,
137:2, 137:13,
137:15, 137:16,
137:17, 138:2,
138:3, 138:4,
138:5, 138:9,
138:13, 138:15,
138:17, 138:19,
138:21, 139:1,
139:2, 139:4,
152:12, 152:13,
152:17, 152:18,
152:22, 153:4,
153:8, 154:8,
154:16, 155:5,
155:12, 156:11,
156:15, 159:16,
160:4, 173:9,
180:3, 182:12,
183:17, 184:20,
188:2, 217:9,
218:2, 250:14,
252:11, 316:17,
317:16, 318:5,
318:8, 327:14,
365:13

**gang-related**
191:17, 193:22
**gangs**
127:23
**gangster**
135:18, 182:12,
184:20, 188:2,
300:9
**gangsters**
180:21, 180:23,
181:2, 181:4,
181:16
**garage**
19:1, 19:3
**gas**
146:16, 218:17,
219:4, 219:8,
220:4, 220:15,
221:10, 221:23,
222:15, 273:9,
276:23, 352:1,
352:3, 352:23,
353:2, 353:21,
355:6, 355:11,
355:20, 356:1
**gather**
54:9
**gave**
9:13, 9:18,
10:16, 21:6,
41:6, 96:16,
105:22, 107:18,
108:4, 134:7,
161:15, 162:24,
174:7, 174:17,
176:2, 177:10,
177:20, 180:4,
181:15, 197:15,
197:16, 198:9,
210:1, 213:10,
215:22, 239:20,
249:6, 256:13,
258:12, 298:18,
349:10, 358:1
**gee**
180:13, 233:1,
306:21
**geez**
291:24

**general**
90:21, 90:23, 364:23
**generally**
41:17, 166:21, 363:20
**gentleman**
122:2, 123:4
**gentlemen**
98:1
**geographically**
93:1
**geraldo**
6:19, 288:8, 289:8, 289:14, 289:20, 290:3, 294:21, 294:24, 295:2, 295:3, 295:8, 295:12, 295:17
**get**
25:5, 28:5, 32:7, 61:7, 61:10, 66:21, 67:21, 76:10, 80:1, 84:18, 85:5, 86:5, 86:23, 89:18, 89:22, 92:24, 98:16, 98:17, 102:20, 105:14, 112:6, 124:4, 135:5, 140:20, 154:8, 154:15, 159:7, 165:20, 182:4, 182:15, 183:6, 183:22, 184:1, 184:13, 185:14, 189:20, 216:10, 231:22, 255:21, 267:10, 305:18, 308:18, 309:5, 311:11, 325:23, 327:18, 328:15, 328:18, 329:4, 329:5, 329:9, 329:15, 337:17, 337:19,

337:23, 338:11, 357:8
**getaway**
204:24, 205:7
**gets**
228:22
**getting**
25:7, 80:4, 83:22, 150:6, 318:22, 355:13
**geurrera**
258:18, 258:22, 258:24, 259:1, 260:9, 260:15
**gigantic**
75:14
**girl**
297:22
**girlfriend**
303:22, 304:1, 304:6, 304:21, 305:10, 306:12, 306:18
**give**
10:20, 21:5, 38:19, 38:23, 94:23, 98:22, 105:3, 121:18, 130:22, 135:5, 151:5, 161:24, 173:2, 174:16, 174:17, 175:9, 175:15, 176:16, 205:23, 208:23, 215:2, 215:16, 248:19, 251:1, 253:14, 278:4, 285:6, 301:9, 356:19, 357:2
**given**
9:6, 9:21, 43:4, 108:11, 109:15, 115:22, 116:1, 125:16, 152:5, 163:8, 172:19, 173:13, 174:1, 178:1, 180:5, 209:3,

209:15, 216:7, 254:4, 348:20, 369:6, 370:9
**gives**
300:17
**giving**
85:9, 106:14, 136:6, 136:7, 136:24, 137:10, 140:17, 150:12, 217:9, 223:2, 223:7, 296:20, 327:13, 343:17, 345:13, 345:22, 346:8, 348:18
**glaring**
201:20
**glass**
130:3
**glasses**
74:3
**gloves**
122:3
**goes**
161:8, 161:13, 212:9, 299:24, 344:11, 345:19, 346:9
**going**
10:19, 15:6, 16:24, 17:6, 17:12, 19:7, 46:21, 49:8, 102:18, 105:2, 105:18, 106:17, 106:18, 107:12, 109:2, 109:5, 109:14, 109:18, 109:22, 109:24, 110:3, 111:5, 111:8, 114:4, 114:9, 121:18, 124:13, 125:3, 125:7, 147:17, 152:9, 154:8, 154:23, 154:24, 155:5, 163:22, 163:23, 181:19,

188:22, 189:2, 189:23, 192:3, 192:6, 192:16, 194:8, 197:17, 198:13, 202:2, 204:19, 209:10, 213:19, 215:23, 217:8, 219:10, 220:17, 220:20, 222:2, 222:23, 224:16, 228:18, 233:6, 234:14, 244:14, 247:6, 252:3, 253:3, 255:14, 256:20, 272:17, 278:15, 299:11, 300:21, 300:23, 314:8, 314:14, 316:22, 323:9, 326:3, 329:8, 363:7
**gold**
207:3, 207:5, 207:10, 207:12, 207:17, 207:23, 208:3, 208:6, 208:10, 208:13, 208:15, 209:8, 209:16, 210:3, 210:7, 210:17, 211:9, 211:16, 269:18, 270:8
**gone**
209:20, 337:10
**good**
7:20, 33:17, 33:21, 67:1, 125:16, 181:23, 193:17, 215:20, 325:5
**goofy**
224:11, 225:4
**got**
13:2, 27:19, 43:22, 52:5, 52:11, 78:3, 104:17, 114:12, 125:10, 127:9,

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

117

146:20, 164:9,
168:5, 170:19,
173:4, 173:6,
173:7, 177:1,
178:1, 182:24,
184:5, 184:12,
185:12, 196:1,
196:4, 199:1,
200:12, 208:20,
216:8, 216:14,
231:14, 240:18,
240:21, 241:24,
242:6, 242:12,
252:7, 260:17,
265:14, 267:12,
267:13, 267:15,
268:6, 268:7,
269:5, 269:7,
281:14, 281:20,
285:5, 293:19,
296:1, 296:2,
297:14, 300:6,
312:6, 312:21,
323:7, 326:9,
327:4, 327:6,
341:20, 343:2,
357:10, 357:11,
358:2, 363:10,
364:24

**gprs**
40:24, 41:3,
41:4, 41:6,
58:7, 227:14

**grab**
333:15, 333:16

**graduate**
20:3, 20:5,
20:7

**graduated**
19:24, 126:15

**grammar**
126:15

**grand**
215:24, 291:16,
293:3, 294:13,
294:19, 295:17,
296:13, 316:24,
317:7, 317:13,

317:14, 317:15,
317:22, 317:23

**graphic**
183:1

**great**
193:12

**green**
59:4, 59:7,
59:10

**grip**
331:2

**gross**
327:1

**ground**
10:17, 122:4

**group**
3:12

**groups**
21:6

**grow**
126:1

**guess**
122:10, 293:18,
340:2, 340:5,
343:1

**guevara's**
147:24, 181:2,
191:16, 193:21,
194:15, 195:9,
195:16, 196:1,
201:11, 285:16

**guide**
20:24, 21:2,
21:4

**guidelines**
115:22, 116:1

**gun**
39:1, 39:3,
329:24, 330:15,
330:21, 330:23,
332:9

**guns**
305:18, 330:16,
331:19, 332:4

**gunshots**
246:4

**guy**
78:21, 83:4,

123:12, 131:11,
132:12, 134:15,
161:2, 232:4,
232:9, 233:12,
250:11, 275:4,
281:14, 281:20,
288:1, 288:8,
298:16, 300:19,
301:14, 304:5,
327:18, 344:8,
345:16

**guy's**
215:8

**guys**
94:24, 95:14,
113:19, 162:16,
162:18, 162:22,
163:9, 163:12,
163:19, 164:10,
164:24, 177:2,
183:15, 188:6,
195:22, 200:1,
201:3, 202:20,
213:24, 215:1,
221:1, 275:5,
327:24, 341:10,
343:19, 345:14,
345:18, 347:12,
348:5, 352:5,
355:5, 355:14,
357:7, 359:7,
359:17, 359:20

---
**H**
---

**h**
9:3

**h-a-l-v-o-r-s-e-n**
9:1

**habit**
78:10

**hair**
71:2, 74:3,
74:4, 122:11,
122:13, 122:14,
122:15, 122:17,
122:19

**half**
358:17

**hallway**
15:16, 15:18,
15:20, 15:22,
15:24, 16:8,
16:12, 62:1,
62:3, 62:4

**halvorsen**
1:17, 2:1, 4:8,
6:2, 6:10, 7:3,
8:5, 8:7, 8:11,
8:17, 121:15,
178:17, 185:2,
190:14, 196:15,
199:9, 200:21,
201:1, 201:6,
201:9, 203:5,
203:8, 203:10,
203:17, 203:21,
204:1, 204:20,
207:1, 207:6,
207:9, 212:8,
212:15, 213:2,
213:12, 218:12,
218:19, 218:22,
219:3, 219:7,
223:15, 224:6,
224:10, 225:10,
257:16, 290:20,
316:9, 362:1,
362:15, 362:20,
365:6, 368:7,
369:3

**hand**
8:9, 334:20,
370:17

**handcuff**
335:19, 335:22

**handles**
36:22

**handwriting**
42:5, 227:4,
227:9

**handwritten**
36:1, 121:6,
146:2, 200:4,
200:14, 203:20,
318:9, 318:16,
319:7, 349:21

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

118

**handwrittens**
121:10
**hang**
231:11, 361:13
**happen**
33:5, 47:11,
47:15, 66:23,
154:3, 154:5,
177:21, 326:3
**happened**
90:8, 118:3,
118:5, 127:3,
128:5, 130:17,
131:12, 131:14,
135:7, 172:23,
210:4, 218:17,
220:3, 221:9,
227:17, 230:9,
274:23, 288:23,
288:24, 324:23,
334:13, 340:7,
343:23, 349:3,
353:21
**happening**
66:24, 131:1
**happens**
297:14
**happy**
193:11
**hard**
74:20, 196:12,
223:20
**hard-working**
24:7, 24:12
**harder**
24:16, 24:19
**harder-working**
24:5, 24:13
**harding**
208:19
**harry**
23:23
**has**
12:20, 13:4,
19:24, 142:12,
157:22, 157:23,
245:21, 247:21,
252:14, 259:23,

275:7, 280:10,
283:10, 287:22,
289:15
**haven't**
113:7, 113:11
**having**
8:12, 12:11,
17:4, 17:10,
100:14, 131:22,
132:11, 134:8,
195:20, 196:11,
200:2, 226:13,
254:20, 255:3,
256:5, 277:12
**he'd**
93:22
**he's**
16:24, 19:12,
110:6, 122:2,
143:21, 171:15,
237:13, 261:19,
280:16, 305:8,
333:8, 347:9
**head**
122:12, 223:4,
288:7, 331:9
**headquarters**
21:7, 23:10
**heads**
213:10, 214:24,
215:2, 215:17
**hear**
8:22, 11:10,
11:14, 12:14,
154:23, 154:24
**heard**
33:6, 33:8,
127:5, 164:23,
170:7, 220:7,
231:11, 246:4,
348:6, 348:8,
349:9, 351:6
**hearing**
12:7, 12:11
**heart**
53:13
**heated**
196:2, 196:4

**heating**
329:24, 331:6,
331:13, 331:21,
332:8
**height**
71:1, 74:7,
80:21, 81:7,
81:8, 81:11,
122:22, 282:4
**heights**
356:22
**held**
2:1, 7:7
**hell**
216:10, 343:12
**help**
142:10, 207:24,
212:13, 245:14,
287:17
**helped**
147:18
**helpful**
45:3, 142:7,
150:22
**her**
111:21, 146:14,
146:17, 148:2,
149:8, 167:13,
220:9, 220:10,
230:20, 230:21,
231:3, 231:8,
234:9, 234:10,
234:12, 234:14,
245:24, 250:7,
251:5, 251:15,
251:18, 251:20,
251:22, 252:3,
253:23, 254:1,
254:3, 254:14,
255:2, 255:3,
255:17, 256:2,
273:8, 276:22,
277:2, 306:13,
306:23, 307:6,
325:3, 325:4,
325:5, 326:4,
326:5, 352:4,
353:12, 354:16,

354:18, 355:2,
355:3, 355:7,
355:10, 355:15,
355:16, 355:17,
355:19, 355:24
**herbert**
14:17, 15:7,
15:19, 17:11,
17:23, 18:6,
18:18, 19:3,
108:1, 108:24,
110:20, 110:22,
112:16
**here**
8:19, 8:20,
9:20, 12:4,
112:3, 130:22,
138:24, 172:6,
172:10, 172:23,
193:5, 194:20,
197:16, 200:20,
202:5, 207:14,
210:4, 222:23,
224:19, 227:17,
244:21, 258:10,
264:12, 265:10,
265:17, 271:17,
277:11, 279:17,
281:24, 300:2,
300:5, 310:24,
317:8, 318:13,
320:19, 349:11,
364:7, 364:14
**here's**
270:1
**hereby**
369:3, 370:7
**hereunto**
370:16
**hesitate**
169:20
**hey**
167:20, 209:8,
283:23, 350:24
**hidden**
331:19, 332:4
**hide**
211:4, 211:9,

Transcript of Ernest Halvorsen
Conducted on February 6, 2019                           119

211:20, 211:22
**hiding**
117:6, 216:4
**high**
19:24, 20:3,
20:5, 20:7,
21:20, 22:19,
30:14, 123:10,
123:14, 124:24,
125:8, 125:9,
125:11, 132:13,
134:17
**himself**
98:11, 343:20,
345:9, 345:15,
347:3
**hint**
226:20
**hired**
22:24, 25:1,
191:4, 191:13,
201:23
**his**
17:2, 17:11,
28:1, 46:24,
50:7, 50:8,
52:21, 53:7,
58:12, 92:5,
98:21, 99:1,
99:7, 105:4,
106:20, 108:4,
109:23, 111:1,
111:2, 112:14,
114:9, 117:17,
131:12, 131:15,
131:17, 134:20,
139:7, 144:19,
146:8, 150:9,
152:11, 156:23,
161:16, 166:22,
167:13, 168:19,
169:3, 188:19,
193:23, 194:7,
194:20, 194:21,
197:7, 201:2,
202:12, 210:7,
216:6, 216:8,
216:9, 216:24,

234:6, 239:21,
244:22, 244:23,
246:10, 246:23,
266:13, 268:21,
272:1, 275:4,
278:5, 278:7,
294:21, 303:22,
304:1, 304:21,
306:17, 315:13,
326:14, 327:19,
327:24, 328:5,
329:15, 331:14,
334:9, 339:24,
346:15, 346:22,
349:21, 358:2,
365:16
**histories**
235:13
**history**
235:10, 235:14,
235:23, 235:24,
236:1, 238:14,
241:18, 241:21,
251:22
**hold**
58:1, 258:12
**holding**
79:6
**hole**
206:16, 206:18,
207:21, 271:16,
271:22, 272:7,
272:14
**holes**
206:4, 206:7,
206:13, 206:15
**home**
17:24, 88:13,
146:18, 231:2,
287:5, 298:15
**homicide**
36:20, 51:21,
66:13, 72:10,
159:5, 159:9,
159:13, 160:3,
160:7, 160:18,
160:22, 162:10,
172:16, 202:4,

208:9, 225:24,
230:8, 230:13,
230:14, 231:15,
251:8, 254:21,
255:4, 259:16,
260:13, 289:18,
297:17, 301:2,
303:18
**homicides**
72:17
**honorable**
112:1
**hook**
335:20
**hoping**
250:12, 251:1
**hour**
298:9
**hours**
41:16, 105:3,
120:13, 155:21,
155:24, 156:2,
156:3, 156:22,
156:23, 310:12,
310:18, 311:13,
337:3, 338:15,
357:20, 358:8
**house**
49:12, 146:12,
146:13, 149:8,
344:7, 344:9
**housed**
57:12, 57:15
**however**
196:17, 203:17,
207:8
**huffing**
292:7
**huh**
94:21, 107:10,
154:4, 165:6,
186:9, 205:12,
348:3
**humboldt**
126:4, 126:5,
126:16, 196:1
**husband**
231:3, 231:8,

234:10, 234:14,
255:9, 273:8,
352:4, 355:7
**hypothetical**
44:4, 44:17,
45:10, 77:1,
232:15

**I**

**i'll**
10:24, 11:5,
60:8, 104:19,
130:22, 175:24,
254:13, 311:2,
351:24, 358:17,
363:2, 368:13
**i've**
11:18, 13:2,
78:3, 112:15,
142:24, 185:10,
237:2, 244:3,
260:17, 292:12,
314:18, 331:19
**iad**
216:16
**idea**
27:14, 96:2,
114:15, 147:9,
216:15, 238:7,
252:5, 260:17,
261:12, 267:3,
282:2, 305:2,
342:21, 353:22
**identification**
78:13, 78:14,
83:18, 83:21,
101:20, 101:22,
103:24, 104:2,
104:11, 104:21,
104:22, 121:16,
129:2, 149:9,
178:18, 185:3,
190:15, 223:16,
225:11, 237:3,
237:23, 273:6,
290:21, 308:19,
309:5, 316:10,
362:2, 362:16

Transcript of Ernest Halvorsen
Conducted on February 6, 2019                    120

| | | | |
|---|---|---|---|
| **identifications**<br>82:2, 82:4,<br>103:11, 103:20,<br>104:5, 104:8<br>**identified**<br>77:6, 78:20,<br>102:3, 102:8,<br>102:9, 103:17,<br>104:24, 146:15,<br>147:14, 173:10,<br>178:3, 179:23,<br>215:21, 273:7,<br>273:10, 275:17,<br>276:19, 307:19,<br>307:24, 308:2,<br>310:7, 310:22,<br>349:14, 349:19,<br>353:11, 354:8,<br>354:14, 356:22,<br>357:5, 358:6,<br>359:18<br>**identifies**<br>355:1<br>**identify**<br>103:22, 121:21,<br>166:14, 171:19,<br>172:18, 172:21,<br>180:7, 180:14,<br>277:8, 283:7,<br>354:19, 359:22,<br>360:10, 360:20<br>**identifying**<br>347:10, 354:10,<br>357:15<br>**identity**<br>103:16, 117:6,<br>117:15<br>**ig**<br>98:8<br>**iglesias**<br>6:19, 288:9,<br>289:8, 289:14,<br>289:20, 290:24,<br>294:21, 294:24,<br>295:2, 295:3,<br>295:8, 295:10,<br>295:17, 295:24,<br>296:18, 296:23 | **iglesias's**<br>290:4, 295:21<br>**ignorant**<br>202:2<br>**igs**<br>135:24<br>**illinois**<br>1:2, 1:18, 2:7,<br>2:15, 3:7, 3:22,<br>4:6, 4:15, 4:22,<br>5:6, 7:8, 13:22,<br>370:5, 370:24<br>**imagine**<br>32:2, 166:14,<br>276:12<br>**immediately**<br>15:14, 305:9,<br>353:11<br>**imperial**<br>135:18, 180:21,<br>180:22, 181:1,<br>181:3, 181:16,<br>182:12, 184:20,<br>188:1, 300:9<br>**implicating**<br>64:10<br>**imply**<br>192:17<br>**importance**<br>33:2, 34:1<br>**important**<br>34:9, 34:13,<br>34:14, 36:11,<br>36:18, 36:21,<br>37:15, 39:6,<br>47:9, 48:9,<br>48:11, 84:23,<br>85:3, 85:4,<br>104:10, 104:22,<br>153:14, 230:1,<br>303:18, 347:10<br>**impression**<br>198:9<br>**improper**<br>87:16, 274:7,<br>333:18<br>**in-service**<br>364:3, 364:11 | **inadvertently**<br>65:4<br>**inbau**<br>40:14<br>**incarcerated**<br>88:10, 88:16,<br>88:23, 89:1,<br>116:16<br>**incident**<br>163:10, 164:11,<br>191:17, 193:22,<br>197:23, 198:4,<br>198:24, 216:17,<br>252:16, 352:2,<br>353:20<br>**incidents**<br>247:10, 247:14,<br>247:16, 249:1<br>**include**<br>75:7, 97:17,<br>97:19, 267:23,<br>269:11, 269:12,<br>269:17, 303:18,<br>310:21, 341:1,<br>352:13, 352:18,<br>356:16<br>**included**<br>73:5, 213:4,<br>227:16, 247:21,<br>252:15, 252:22,<br>261:5, 296:22,<br>352:9<br>**including**<br>9:22<br>**incoming**<br>91:5, 95:2<br>**incomplete**<br>44:4, 44:17,<br>45:9, 77:1,<br>232:15<br>**incorrect**<br>97:3, 97:7,<br>209:15, 209:17<br>**incriminate**<br>106:9, 106:13<br>**inculpatory**<br>104:23<br>**independent**<br>110:8 | **index**<br>230:6<br>**indicate**<br>11:12, 46:15,<br>46:17, 46:19,<br>59:1, 59:17,<br>93:16, 102:1,<br>102:4, 102:17,<br>280:19, 281:1,<br>281:5, 310:10,<br>316:2<br>**indicated**<br>149:16, 177:6,<br>185:11, 185:12,<br>226:20, 286:22,<br>316:5<br>**indicates**<br>186:21, 279:20,<br>286:2, 286:13,<br>298:12, 310:9,<br>353:3<br>**indicating**<br>226:11<br>**indication**<br>208:12<br>**indicted**<br>367:8, 367:13<br>**individuals**<br>26:21, 26:24,<br>146:16, 173:8,<br>183:12, 343:17,<br>354:12<br>**influence**<br>129:1<br>**inform**<br>46:12<br>**informant**<br>84:22, 84:24,<br>85:4, 85:14,<br>85:18, 85:23,<br>86:4, 86:23,<br>87:1, 87:3,<br>87:5, 87:8,<br>87:11, 87:17,<br>87:24, 88:10,<br>88:16, 116:16,<br>116:21, 117:2,<br>117:5, 117:14, |

117:20, 117:22, 118:1, 140:2, 140:9, 140:11, 140:18, 141:4, 167:6, 167:13, 181:2, 239:18, 239:20

**informants**
84:19, 115:20, 115:23, 116:3, 116:5, 116:11

**informed**
201:1, 207:6, 218:12, 218:16, 220:2, 221:9, 298:14

**informing**
137:1, 140:13

**initial**
32:5, 126:21, 245:9

**initially**
59:3, 117:23, 162:24, 180:9, 180:11, 194:6, 204:1, 347:1, 349:1

**initiated**
364:22

**injured**
231:4

**innocence**
46:24

**inservice**
364:18

**inside**
53:16, 53:17, 57:24, 147:4, 149:7, 150:5, 335:24

**insist**
203:17

**instance**
104:4, 198:13, 299:18

**instances**
104:20

**instant**
198:16

**instead**
219:4

**instituted**
59:4, 59:9, 216:13

**institution**
21:21, 364:22

**instruct**
109:24, 111:8, 114:9

**instructed**
96:18, 113:8

**instructing**
17:7, 17:9, 106:21, 109:4

**instructions**
93:21, 93:24, 96:16

**insurance**
326:15, 326:16, 327:4

**integrity**
39:6

**intend**
13:20, 13:24, 154:19

**intending**
15:4

**intentionally**
266:3

**interact**
115:19

**interest**
45:6, 370:14

**interested**
355:23

**interfere**
12:3

**interfering**
326:18, 327:3

**interior**
335:15

**internal**
326:11

**interpreted**
200:4

**interpreter**
196:3, 196:7

**interrelations**
197:7

**interrogate**
334:7

**interrogated**
334:22

**interrogation**
335:6, 335:9, 335:13, 335:16, 337:6, 337:13, 337:23, 338:7, 338:18, 338:20, 339:8, 339:11

**interrogations**
40:4, 40:13

**interview**
38:18, 61:12, 61:18, 62:3, 64:14, 132:17, 133:7, 146:13, 186:19, 186:22, 187:5, 191:22, 223:18, 248:22, 251:5, 257:13, 258:5, 286:24, 298:6, 298:8, 298:17, 316:14, 366:17

**interviewed**
38:9, 70:12, 146:1, 186:23, 203:1, 234:6

**interviewing**
38:15, 38:20, 98:6, 298:10

**interviews**
32:2, 35:3, 37:10, 37:12, 40:4, 40:13, 40:21, 85:3, 132:10, 224:5

**into**
15:16, 50:18, 62:2, 63:6, 63:11, 63:19, 63:20, 64:15, 66:13, 72:9, 76:13, 79:8,

99:16, 107:12, 132:5, 151:12, 170:18, 170:19, 196:2, 197:17, 198:13, 216:8, 218:14, 219:5, 220:1, 221:7, 227:15, 230:7, 235:3, 235:20, 236:5, 263:15, 273:9, 300:6, 331:13, 338:23, 339:1

**introduce**
7:12

**introduced**
41:3, 219:4, 268:11, 362:20, 365:8

**inventoried**
148:21, 273:13, 309:18, 322:18

**inventory**
59:13, 59:16, 60:2, 225:18, 225:23, 227:6, 228:8, 228:15, 228:19, 228:21, 229:3, 229:9, 229:12, 229:15, 229:16, 229:19, 234:19, 235:1, 237:2, 237:18, 240:21, 241:1, 241:4, 242:12, 243:20, 244:2, 248:3, 261:7, 261:10, 267:6, 267:14, 267:18, 269:2, 269:6, 309:16, 321:20, 321:21, 322:2, 322:3, 322:11

**investi**
324:23

**investigate**
26:20, 71:19, 142:2, 191:7,

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

122

194:5, 194:8,
250:13, 251:15,
251:18, 251:20,
251:21, 255:22,
256:21, 259:10,
259:14
**investigated**
36:19, 72:14,
144:4, 211:9,
288:5
**investigating**
58:22, 77:7,
77:15, 77:23,
78:8, 86:20,
86:24, 161:11,
190:24, 191:9,
248:5, 248:9,
288:13, 288:16,
297:16, 325:10
**investigation**
32:5, 33:13,
33:16, 34:2,
34:10, 34:18,
34:24, 39:7,
41:12, 43:13,
44:1, 44:13,
46:5, 46:15,
46:17, 47:10,
48:17, 58:14,
66:12, 68:4,
78:5, 84:24,
115:2, 125:5,
130:19, 131:20,
131:23, 144:12,
145:5, 145:6,
150:22, 151:6,
163:15, 163:21,
164:9, 164:13,
200:22, 207:16,
208:9, 216:14,
227:24, 245:9,
247:20, 248:14,
251:2, 255:7,
255:18, 256:7,
284:10, 284:13,
289:18, 303:8,
317:20, 319:4,
320:1, 320:11,

320:21, 320:23,
326:10, 326:13,
326:19, 327:4,
327:7, 366:4
**investigations**
32:5, 34:13,
41:9, 45:4,
47:12, 47:23,
64:1, 71:24,
95:18, 96:12,
176:14, 202:4,
325:21
**investigative**
44:22, 57:20,
57:21, 58:23,
59:12, 59:20,
93:17, 94:4,
95:3, 117:10,
118:12, 120:16,
121:1, 121:4,
121:7, 130:21,
145:18, 203:18,
225:17, 225:23,
227:18, 228:19,
228:20, 229:3,
229:9, 229:12,
229:15, 229:16,
229:19, 229:23,
230:6, 234:18,
235:1, 243:20,
244:1, 249:2,
253:2, 267:14,
267:17, 269:2,
269:6, 283:3,
284:21, 284:23,
298:2, 321:20,
322:3, 364:12
**investigators**
115:6
**invited**
23:21, 23:22
**involve**
328:15, 328:18
**involved**
36:17, 55:10,
70:9, 71:22,
78:4, 116:12,
127:23, 162:9,

162:16, 162:19,
162:22, 163:7,
163:9, 163:12,
163:20, 164:11,
165:1, 165:14,
199:1, 226:17,
318:11, 318:21,
325:23, 366:21
**involvement**
254:20, 255:3
**involving**
259:14, 259:17,
324:21
**ir**
235:8, 236:13,
236:14, 236:15,
236:17, 241:18,
241:21
**isn't**
26:3, 88:12,
169:6, 230:2,
283:3, 322:11
**issue**
319:6
**issues**
12:1, 148:23
**it'd**
74:20
**it's**
10:15, 33:5,
38:7, 44:4,
48:2, 48:9,
48:11, 57:8,
69:8, 76:24,
77:1, 84:23,
85:3, 109:2,
130:15, 137:15,
138:3, 144:19,
167:1, 185:11,
192:17, 193:4,
202:18, 202:23,
212:10, 212:15,
212:16, 214:4,
214:6, 214:13,
216:12, 223:20,
230:1, 234:23,
241:1, 243:4,
244:4, 244:13,

244:15, 247:10,
248:3, 249:9,
249:10, 249:13,
258:7, 258:14,
260:14, 260:22,
264:1, 264:3,
264:7, 264:13,
264:16, 265:15,
268:12, 272:10,
278:8, 283:5,
283:6, 285:15,
290:9, 290:11,
290:12, 292:11,
298:8, 301:5,
309:7, 311:3,
311:15, 311:19,
313:17, 317:19,
318:23, 320:8,
330:9, 331:22,
333:18, 346:23,
347:7, 354:24,
358:7, 359:1,
361:14
**item**
234:19, 235:17,
364:1, 364:20
**items**
58:3, 59:17
**its**
211:10, 370:15
**itself**
192:13, 202:13

**J**

**jack**
227:13, 247:2,
249:5, 249:15,
251:4, 252:20,
252:23, 253:11,
319:10, 320:2,
320:9
**jack's**
244:17, 245:3,
245:6, 248:15,
256:6
**jackson**
4:13
**jail**
89:15, 89:19,

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

123

116:14, 117:18, 140:19, 151:22, 151:24, 154:8, 154:16, 159:21, 318:4, 318:7

**january**
237:17

**jealous**
250:14

**jeff**
119:2

**jennifer**
3:10, 7:16

**jim**
115:16

**joanne**
1:24, 2:12, 7:10, 370:3

**job**
1:22, 22:6, 22:8, 25:1, 53:14, 53:16, 53:17, 284:24, 323:7

**jobs**
20:22, 20:23, 86:16

**joe**
213:5, 214:4, 215:6, 215:15, 216:11, 217:3, 217:8, 217:17, 217:22, 327:12

**john**
5:2, 8:1, 143:11, 143:13, 143:17, 143:18, 152:24, 153:1, 153:16, 153:18, 153:22, 154:20, 156:18, 158:24, 159:15, 160:8, 165:13, 186:19, 213:5, 214:5, 214:20, 215:2, 215:8, 215:12, 316:17, 350:18, 350:24, 366:2

**johnny**
324:22, 325:7, 325:15, 326:11

**join**
34:4, 35:2, 43:3, 49:1, 65:24, 68:10, 88:21, 89:9, 95:7, 95:8, 97:5, 97:6, 97:14, 97:15, 135:1, 137:20, 137:21, 141:1, 141:2, 142:6, 143:16, 150:10, 151:2, 151:9, 151:10, 157:1, 159:11, 159:18, 160:24, 161:1, 164:6, 164:7, 166:11, 170:10, 171:8, 171:9, 175:6, 175:7, 177:15, 177:16, 177:23, 177:24, 180:19, 181:8, 182:21, 182:22, 183:8, 184:10, 184:16, 184:17, 188:20, 220:20, 221:12, 222:6, 222:7, 229:6, 230:5, 232:16, 233:17, 233:18, 233:24, 239:17, 256:17, 256:24, 266:17, 279:11, 280:9, 281:12, 281:13, 281:17, 281:18, 284:6, 284:7, 286:12, 289:23, 289:24, 305:1, 333:23, 341:16, 342:4, 343:9, 350:15, 350:16, 353:7, 356:3

**joined**
49:14, 222:8

**joker**
163:3, 163:5, 163:7, 163:19, 164:24, 165:14, 174:3, 176:22, 299:9, 299:11, 299:15, 300:18, 307:20, 342:18, 346:20, 351:14

**jones**
4:4

**jordan**
176:8, 176:9, 176:12, 176:23, 178:10, 179:2, 179:16, 181:9, 181:10, 182:5, 182:13, 183:13, 184:21, 188:3, 188:8, 188:16, 239:3, 309:3, 342:1, 342:9, 342:15, 343:5, 343:15, 345:17, 347:2, 348:23, 349:15, 349:24, 350:22, 356:21, 357:6, 359:15, 359:17, 359:20, 359:22, 360:10, 360:20, 361:3

**jorge**
176:13, 178:10, 179:2, 179:17, 181:10, 226:5, 282:17, 285:7, 299:17, 299:19, 299:22, 307:24, 318:14, 323:23, 343:4, 349:14

**jose**
1:5, 3:2, 5:11, 7:4, 7:15, 114:24, 144:6, 144:15, 144:17, 144:22, 145:3, 145:20, 175:12, 176:11, 178:9,

179:1, 179:16, 226:4, 270:14, 270:19, 273:7, 275:17, 275:22, 276:19, 277:6, 277:8, 298:19, 299:1, 308:2, 308:7, 318:14, 321:4, 323:15, 332:7, 341:2, 341:6, 341:7, 343:3, 345:24, 346:5, 346:12, 346:14, 349:14, 349:22

**jose's**
145:1

**josh**
4:10, 8:4, 119:1, 192:19

**joy**
133:24

**jr-l**
175:20, 224:1, 224:2

**judge**
16:14, 16:16, 112:6, 112:12, 192:21, 193:5

**julie**
5:3, 7:24, 368:3

**july**
228:2, 228:3, 242:15, 242:18, 242:21, 242:24, 244:5, 291:6, 293:8, 294:4, 294:19, 295:17, 296:13, 296:24, 312:9, 312:21, 313:11, 313:13, 313:16, 313:17, 321:19, 322:8, 322:12, 322:18, 364:4

**jury**
192:22, 200:15,

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

124

215:24, 291:16,
293:3, 294:13,
294:19, 295:17,
296:13, 316:24,
317:7, 317:13,
317:14, 317:15,
317:22, 317:23
**justice**
195:1
**justify**
47:7

**K**

**kane**
370:5
**kedzie**
126:6
**keep**
58:15, 77:15,
78:8, 115:23,
150:6, 157:16,
188:22, 325:4
**keeping**
79:19, 257:3
**kept**
117:15, 189:2,
257:17, 257:18,
258:1, 363:3
**kid**
123:9, 132:12
**kidnappings**
72:16
**kids**
328:8
**kill**
300:18
**killed**
140:20, 201:3,
231:9, 232:4,
233:2, 233:8,
233:12, 234:5,
298:1
**killer**
194:24
**kind**
12:6, 35:8,
37:3, 38:7,
39:4, 54:18,

55:9, 59:22,
64:20, 72:6,
74:1, 76:17,
88:2, 101:18,
111:7, 111:16,
116:10, 258:12,
299:4, 330:19,
336:6, 336:13,
336:15, 336:17
**king**
104:4, 350:19,
350:24
**kings**
297:23
**kivetz**
119:2
**knew**
34:12, 34:14,
37:17, 49:17,
72:23, 89:11,
136:12, 140:4,
141:15, 142:23,
143:11, 143:13,
143:17, 144:15,
161:5, 171:17,
172:16, 176:3,
180:6, 214:4,
215:16, 226:6,
239:24, 246:8,
246:21, 288:1,
325:5, 327:21,
342:5, 343:13,
344:12, 344:13,
345:6, 346:14,
346:18, 347:14,
348:17, 349:8,
349:10, 349:22,
350:1, 350:3,
350:4, 350:11,
350:20, 351:6,
356:13, 357:12,
357:14, 360:3
**knock**
337:11
**knowing**
341:7, 341:14
**knowledge**
31:18, 31:20,

38:12, 91:4,
127:19, 136:17,
140:8, 159:13,
161:16, 199:14,
219:9, 226:12,
250:4, 255:5,
260:10, 274:18,
334:14, 339:7,
366:15, 367:9,
367:14
**known**
100:22, 299:1,
299:5, 299:15,
299:17, 307:20,
308:1, 308:3,
341:22, 345:24,
346:1, 346:6,
349:6
**knows**
304:5, 351:2
**kosberg**
5:12, 7:11
**kurt**
115:10, 115:12

**L**

**labeled**
224:19, 364:3
**laid**
78:1
**lane**
20:6
**language**
129:21, 129:22
**large**
30:1, 329:14,
329:22, 330:7,
330:13, 330:18,
330:22, 330:24,
331:2, 331:4,
331:7, 331:12,
332:8, 332:9
**largest**
62:13
**lasalle**
3:20
**last**
9:15, 9:19,

10:1, 14:2,
111:10, 113:9,
113:11, 118:15,
119:17, 120:11,
161:12, 165:10,
200:19, 202:17,
212:5, 212:7,
212:17, 237:7,
237:9, 237:11,
237:14, 247:19,
257:15, 275:23,
300:5, 304:3,
306:13, 306:17,
306:22, 307:5,
307:13, 363:15
**lasted**
120:8
**lastly**
308:1
**later**
34:2, 34:10,
34:13, 39:20,
48:15, 59:4,
68:5, 117:24,
146:6, 233:21,
246:4, 271:12,
303:20, 348:21,
360:2
**latest**
307:6
**latex**
122:3
**latin**
104:4, 297:23
**latino**
279:3, 279:5,
279:13, 279:18
**latinos**
279:23
**launched**
326:10
**law**
3:12, 4:12,
29:18, 191:4,
325:2, 326:1
**lawful**
112:1
**laws**
111:23

Transcript of Ernest Halvorsen
Conducted on February 6, 2019     125

**lawsuit**
10:13
**lawyers**
114:19, 190:5,
190:23, 191:15,
193:19, 195:11,
197:5, 197:8,
198:12, 199:18,
204:6, 205:3,
207:13, 213:21,
219:14, 219:17,
219:20, 220:13,
222:1, 222:11,
224:15, 224:23,
257:24
**lay**
77:4
**lead**
193:7, 253:3,
253:6, 253:10,
253:11, 260:13,
287:13, 287:14,
319:10, 319:13,
319:20, 319:22,
319:24, 320:2,
320:10, 320:14,
320:16
**leads**
32:11, 54:15,
54:19, 54:23,
232:22, 233:1,
233:21, 260:7
**league**
52:22
**leak**
213:4
**learn**
34:7, 37:12,
37:15, 37:16,
65:21, 82:3,
82:5, 114:1,
123:13, 155:4,
155:7, 165:13,
194:1, 194:3,
332:11, 332:17
**learned**
34:15, 67:10,
67:14, 68:2,

69:10, 81:18,
114:12, 125:6,
125:14, 126:19,
165:18, 183:4,
194:7, 237:21,
238:2, 258:7,
258:8, 309:1,
352:1, 354:13
**learning**
71:23
**least**
120:11, 264:16
**leave**
16:14, 17:23,
18:9, 28:12,
30:9, 93:21,
96:14, 96:18,
160:10, 193:15,
293:19, 311:12,
334:6, 337:7
**led**
181:10
**left**
15:14, 15:15,
28:2, 53:7,
56:8, 126:15,
160:9, 259:23,
340:4, 340:10,
340:11
**left-front**
271:13
**legible**
42:9
**legit**
167:21, 168:4,
168:8
**legitimate**
168:11
**leinenweber**
3:18, 3:19,
7:20, 7:21
**lend**
112:21, 327:11
**lengths**
300:13
**lengthy**
161:15, 176:2,
196:14

**less**
21:9, 21:19,
29:9, 53:14,
137:12, 137:15,
138:3, 138:14,
138:16, 139:1
**let**
35:6, 38:8,
43:21, 44:8,
47:20, 51:22,
78:6, 85:11,
88:9, 95:15,
95:19, 141:12,
151:23, 153:10,
176:21, 182:1,
189:21, 190:3,
192:8, 201:24,
205:15, 206:17,
210:2, 263:7,
270:23, 271:1,
275:21, 290:2,
300:4, 306:4,
316:7, 316:21,
329:15, 338:17,
351:23
**let's**
34:22, 63:22,
70:16, 93:7,
104:3, 121:13,
178:14, 178:15,
184:24, 189:11,
190:12, 190:21,
203:2, 212:5,
218:10, 223:13,
225:8, 244:9,
254:12, 258:9,
261:14, 268:14,
279:16, 280:17,
282:13, 286:14,
290:2, 291:15,
297:3, 304:2,
316:21, 316:22,
324:6, 361:18,
361:19
**level**
31:22, 78:11,
78:15, 78:18
**liability**
106:16, 107:8,

112:4
**liars**
222:24
**license**
58:4
**lies**
112:13
**lieutenant**
23:23
**lieutenants**
61:1, 61:3,
61:8, 61:10
**life**
105:4, 328:5,
349:18
**light**
335:24
**lighting**
336:6
**like**
64:20, 78:21,
83:7, 99:12,
102:9, 111:19,
130:22, 142:24,
155:1, 171:14,
193:10, 200:19,
220:6, 226:7,
228:2, 235:11,
250:6, 250:8,
270:4, 270:5,
276:23, 282:11,
283:24, 336:16,
336:17
**liked**
200:16, 306:6
**likely**
137:12, 137:15,
138:3, 138:8,
138:14, 138:16,
139:2, 329:9
**line**
91:2, 91:3,
91:4, 92:1,
240:14, 241:5,
241:10, 241:11,
241:22, 242:1,
242:6, 242:9,
242:13, 243:3,

Transcript of Ernest Halvorsen
Conducted on February 6, 2019                    126

243:8, 291:4, 292:22, 293:6, 293:7

**lines**
91:5, 175:24, 236:1, 236:2, 245:23, 300:5, 364:1

**lineup**
78:22, 79:9, 79:21, 79:23, 80:9, 80:17, 80:20, 81:2, 81:14, 82:1, 82:4, 82:7, 82:8, 82:16, 82:17, 83:2, 83:3, 83:6, 83:7, 128:14, 128:15, 128:19, 128:21, 129:3, 129:5, 242:6, 277:19, 278:16, 278:22, 279:7, 279:14, 279:21, 280:10, 280:14, 280:20, 280:23, 282:7, 282:10, 282:12, 282:22, 283:10, 283:13, 284:1, 284:14, 285:4, 310:7, 310:11, 310:13, 310:14, 310:16, 310:18, 310:22, 310:23, 311:4, 311:9, 312:4

**lineups**
79:1, 79:3, 79:6, 79:13, 79:15, 79:18, 82:19, 128:7, 128:8, 128:9, 129:8, 130:18, 131:2, 131:20, 283:2, 329:4

**link**
226:4, 248:15

**linkage**
142:19

**list**
25:18, 25:21, 25:24, 30:15, 30:18, 30:20, 177:12, 177:17, 180:3

**listed**
248:3, 261:9, 261:15, 261:19, 364:13

**literally**
357:20

**little**
21:9, 21:19, 29:9, 52:22, 57:8, 122:23, 137:23, 148:10, 161:8, 193:4, 234:13, 292:10, 292:15

**live**
13:22

**lived**
150:3, 344:13, 356:23

**lives**
19:14

**living**
19:10, 19:12

**llc**
3:19, 4:19

**loan**
327:15

**locate**
203:18, 207:18

**located**
127:6, 208:18

**location**
2:2, 38:21, 76:20, 208:17, 210:17, 269:11, 321:21

**locations**
92:4, 331:20

**lock**
338:21, 338:23

**locked**
62:23, 67:17, 67:19, 68:7, 102:11, 215:24

**locks**
338:21

**lockup**
89:14, 132:11, 134:9, 134:15, 135:9, 135:10, 135:11, 138:20, 139:9, 279:22, 279:24, 338:11

**loevy**
2:4, 3:4, 7:3, 7:4, 7:7

**log**
101:18, 102:13, 237:24

**logan**
126:4, 126:7, 126:16

**logged**
268:17, 268:23

**logical**
250:6, 250:8

**long**
16:18, 21:8, 21:17, 23:13, 26:9, 27:1, 29:7, 32:23, 40:22, 48:21, 51:9, 52:7, 52:17, 53:9, 53:21, 53:24, 66:12, 72:1, 81:15, 81:23, 118:13, 119:9, 119:11, 119:14, 119:16, 119:20, 120:7, 122:15, 134:7, 164:22, 169:23, 298:6, 333:24, 359:2

**longer**
66:17

**longhand**
35:19

**look**
74:2, 77:5, 78:3, 78:19, 79:10, 80:1, 80:13, 80:15, 80:19, 98:17, 99:5, 101:17, 134:11, 134:20, 145:18, 148:7, 173:20, 173:22, 175:9, 180:20, 180:22, 181:1, 185:19, 200:19, 208:9, 224:1, 224:4, 234:19, 240:2, 240:23, 241:4, 244:14, 253:18, 253:22, 267:17, 279:16, 280:17, 280:22, 287:20, 296:5, 298:24, 299:13, 299:21, 309:7, 329:19, 332:8, 332:14, 334:2, 352:16, 353:8, 353:9, 358:11, 358:19, 359:15, 359:21, 360:9, 360:19, 360:22, 361:3, 363:14, 363:24, 364:10

**looked**
79:8, 102:5, 102:9, 103:21, 104:4, 148:17, 164:15, 180:15, 181:14, 211:13, 245:24, 246:5, 276:23, 311:1, 311:2, 332:7, 340:24, 343:16, 359:4, 359:14, 359:16

**looking**
47:19, 54:13, 73:24, 90:5, 98:18, 126:23,

127:4, 175:1,
180:14, 181:9,
185:5, 202:21,
207:9, 207:23,
260:2, 278:23,
301:6, 311:4,
358:5, 361:2
**looks**
78:21, 228:2
**loose**
164:9
**lot**
30:7, 86:13,
135:4, 202:5,
210:18, 328:9,
328:10, 329:8
**loud**
10:21
**louder**
12:14
**love**
97:24
**lover**
250:14
**lugged**
339:16
**lupe**
161:4
**lying**
219:22

## M

**made**
24:10, 24:20,
101:20, 103:12,
104:6, 104:8,
111:3, 111:17,
157:22, 187:21,
187:23, 248:22,
316:5
**magnified**
88:2
**maher**
132:7, 132:10,
132:15, 134:5,
202:24
**maher's**
132:9

**mail**
40:9
**main**
61:24, 62:1,
62:9, 62:11
**mainly**
21:6, 129:21,
259:12
**maintain**
213:14
**maintained**
101:3, 243:14
**majority**
315:5
**make**
8:18, 24:21,
26:9, 26:15,
26:23, 38:10,
73:8, 73:13,
73:17, 73:19,
73:22, 75:23,
80:16, 80:20,
84:12, 87:7,
88:11, 89:7,
89:10, 89:12,
104:2, 104:11,
104:21, 111:4,
127:9, 136:13,
158:8, 190:1,
192:9, 230:1,
267:18, 268:4,
278:16, 282:8,
284:1, 292:11,
292:20, 306:7,
322:16, 323:20,
323:22, 339:12,
351:12
**making**
78:12, 145:8,
145:11, 149:8,
193:6, 224:8,
225:1, 304:19
**man**
80:23, 352:4
**manila**
57:23, 58:6,
58:10
**manner**
244:21

**manpower**
28:18
**manual**
55:14
**manually**
55:17
**many**
9:8, 30:22,
35:18, 90:23,
94:17, 98:4,
98:17, 116:12,
143:19, 164:18,
171:18, 172:17,
180:6, 180:16,
288:18, 324:18,
328:8, 331:19,
358:19
**march**
260:7, 260:22
**mark**
121:13, 178:15,
184:24, 190:12,
223:13, 225:8,
290:2, 316:8
**marked**
121:15, 121:20,
150:2, 178:17,
185:2, 190:14,
223:15, 225:10,
290:20, 316:9,
362:1, 362:5,
362:15, 363:1
**marks**
71:2
**master**
180:3
**match**
98:13, 180:4,
206:2, 313:6,
354:20
**matched**
277:7
**material**
40:9, 211:12
**math**
231:23
**matt**
7:23, 365:4,

366:2
**matter**
7:4, 153:14,
203:7, 218:14,
219:7, 282:24,
365:22
**matthew**
4:2, 365:7,
365:9, 365:24,
367:2, 367:5,
367:10
**may**
16:7, 48:6,
76:9, 120:17,
122:8, 124:14,
136:3, 139:7,
143:9, 151:19,
151:21, 164:10,
165:3, 165:4,
165:7, 165:10,
168:23, 200:23,
202:22, 203:11,
226:16, 236:21,
236:23, 237:1,
237:4, 237:8,
237:22, 238:1,
238:8, 238:12,
238:23, 248:15,
266:19, 313:5,
314:23, 360:5,
360:8, 360:17,
361:1, 370:20
**maybe**
320:6, 359:6
**maysonet**
14:13
**meals**
89:3
**mean**
13:11, 32:21,
35:22, 37:19,
37:22, 44:8,
44:22, 46:16,
60:8, 61:16,
62:12, 63:9,
69:19, 70:3,
70:5, 70:8,
73:3, 74:21,

76:5, 82:17,
99:14, 103:2,
103:23, 119:11,
125:2, 127:12,
129:22, 130:9,
134:19, 145:14,
149:18, 150:21,
158:8, 163:23,
191:6, 228:19,
228:20, 235:11,
238:13, 243:11,
259:5, 274:15,
285:18, 320:5,
320:22, 333:8,
360:7, 360:24
**meaning**
243:19, 245:5
**meaningful**
26:18, 26:19
**means**
70:4, 222:20,
296:6, 314:11
**meant**
82:12, 179:10
**media**
111:15, 112:21,
113:2
**medical**
12:1, 12:2,
12:20
**medication**
12:2
**medium**
122:17, 122:19,
281:22
**medium-sized**
331:1
**meet**
15:4, 15:6,
45:16, 50:9,
65:14, 119:9,
119:23, 143:18,
143:22, 144:1,
156:6, 156:14,
304:21, 305:21,
365:11
**meeting**
119:11, 119:14,

119:20, 120:3,
120:4, 120:7,
120:12, 156:17,
157:6, 157:22,
186:1, 186:15,
187:17, 190:22,
191:2, 193:20,
203:7, 203:12,
219:6, 305:13,
305:15, 305:17,
365:18, 365:24,
367:5
**meetings**
119:8, 120:2,
120:8
**member**
12:19, 23:19,
23:24, 24:3,
28:19, 30:4,
63:5, 135:21,
136:7, 136:8,
136:15, 137:1,
137:2, 137:13,
137:15, 137:16,
137:17, 138:2,
138:3, 138:4,
138:15, 138:20,
139:1
**members**
20:9, 97:24,
100:22, 135:24,
138:12, 138:17,
139:3, 180:3,
181:16, 327:14
**memo**
196:14, 223:18
**memorandum**
6:16, 6:17
**memorialize**
102:2, 228:7
**memorialized**
37:6, 199:11,
199:20, 203:13,
350:19
**memory**
12:17, 12:22,
13:6, 43:7,
68:5, 130:21,

131:24, 134:12,
134:21, 145:19,
162:7, 298:5,
303:15, 303:20,
348:22
**memos**
120:20, 120:22
**men**
279:3, 279:6,
279:13, 279:19,
342:18, 343:14,
349:19, 351:16,
352:3, 352:9,
352:14, 353:2,
353:4, 355:10,
355:20, 355:24
**men's**
341:13
**mental**
355:2
**mention**
170:11
**mentioned**
12:20, 119:19,
171:11, 184:4,
201:22
**merchandise**
210:12
**meritoriously**
65:22
**met**
50:8, 113:19,
119:17, 120:10,
135:15, 144:2,
190:5, 201:7,
201:17, 305:8,
365:10
**metal**
335:19
**mexican**
195:8, 195:14,
195:15, 195:23
**middle**
63:6, 247:8,
247:10, 330:6
**midnight**
93:20, 93:21,
93:24, 94:3,

94:15, 95:2,
95:13, 96:5,
96:6, 96:9
**midnights**
52:21
**miedzianowski**
213:5, 214:5,
215:7, 215:15,
216:11, 217:3,
217:9, 217:17,
217:18, 217:22,
327:12
**might**
13:5, 33:21,
34:12, 39:3,
48:7, 48:12,
48:17, 55:2,
63:13, 64:5,
64:6, 64:9,
80:2, 85:4,
85:21, 86:1,
86:19, 87:5,
97:3, 103:14,
106:15, 107:7,
139:18, 141:16,
142:18, 144:5,
146:19, 149:10,
151:21, 183:12,
209:19, 219:4,
223:22, 232:22,
233:1, 240:10,
250:22, 251:12,
266:5, 285:5,
315:4, 336:13,
354:11, 359:8
**mind**
88:22, 111:3,
111:4, 148:24,
169:5, 302:14
**mingey**
4:9, 8:5, 8:7,
14:17, 201:2,
223:19, 278:10,
287:6, 287:9,
287:14, 288:1,
298:15, 323:21
**minor**
197:3

**minors**
259:14, 259:15, 259:17
**minute**
356:5, 356:11
**minutes**
16:16, 16:20, 246:3, 272:18, 351:9, 358:15, 358:16
**miscellaneous**
58:3
**mischaracterizes**
58:12, 150:9, 188:11, 188:19, 272:1
**mischaracterizing**
202:11, 202:13, 224:18, 315:12
**misconduct**
324:16, 325:1, 325:13, 325:16, 326:23, 327:1
**misconducts**
327:8
**misdeeds**
138:15, 138:17, 139:3, 139:4
**misrepresentation**
219:12
**misrepresentatio-**
**ns**
193:7
**misrepresenting**
220:21, 221:13, 222:3, 222:17, 222:19
**missed**
359:6
**missing**
225:13, 275:4, 275:5
**mission**
304:23
**misspoke**
179:8, 210:2
**mistake**
312:3, 316:5

**mistaken**
202:9
**mixing**
265:10
**moments**
246:4
**monday**
361:11
**mondo**
163:3, 163:5, 163:7, 163:20, 164:24, 165:14, 174:3, 174:7, 174:13, 174:23, 175:1, 176:8, 176:12, 177:3, 177:7, 178:9, 179:1, 179:16, 182:5, 182:13, 183:13, 184:21, 188:3, 188:8, 188:16, 239:2, 273:10, 309:3, 342:1, 342:9, 342:15, 343:5, 343:14, 345:16, 346:1, 347:2, 348:23, 349:15, 349:24, 350:22, 356:14, 356:21, 357:5, 359:16, 359:20, 359:22, 360:10, 360:20, 361:3
**mondos**
177:13, 177:19, 358:19
**money**
250:14, 327:15, 327:21, 327:24, 338:8
**monica**
288:4, 288:5, 289:9, 289:15, 289:18, 297:17, 297:20
**monster**
111:16

**mont**
6:14, 6:18
**montanez**
1:5, 3:2, 5:11, 7:4, 7:15, 8:13, 51:23, 144:6, 144:15, 144:17, 144:22, 145:3, 145:20, 173:2, 173:11, 176:12, 178:9, 179:1, 179:16, 201:4, 207:4, 226:4, 226:12, 226:21, 238:14, 257:7, 257:9, 273:7, 273:22, 275:17, 275:22, 298:20, 299:1, 299:5, 305:12, 308:2, 308:7, 318:15, 321:4, 323:15, 341:2, 341:3, 343:3, 345:24, 346:5, 346:12, 346:15, 349:14, 349:22, 350:21, 351:3, 363:9, 367:7, 367:12
**montanez's**
175:12, 201:10, 204:21, 205:5, 205:17, 205:21, 206:2, 206:8, 206:19, 207:7, 207:19, 207:20, 236:15, 270:15, 270:19, 271:21, 272:6, 272:15, 276:19, 277:6, 277:8, 332:7, 341:6
**month**
151:17, 209:5, 237:7, 237:9, 237:11, 237:14
**months**
22:10, 27:11,

27:13, 66:16, 257:17, 258:2
**montia**
16:4, 16:5
**monticello**
304:18, 304:21, 305:2
**moon**
98:8, 98:9, 98:15
**more**
3:18, 16:20, 24:20, 24:21, 24:23, 24:24, 25:2, 26:10, 26:15, 26:18, 26:23, 70:6, 70:8, 92:4, 99:19, 99:21, 99:23, 110:6, 118:18, 128:9, 128:19, 129:13, 136:19, 138:8, 138:19, 217:20, 242:12, 245:14, 274:10, 298:9, 328:11, 329:9, 329:12, 329:13, 347:14, 357:23, 358:1, 358:19
**morning**
7:20, 119:12, 156:7, 231:12, 232:5, 233:3, 233:5, 233:8, 233:13, 246:11, 246:13, 246:17, 246:22
**moses**
298:20, 299:1, 299:5, 308:3, 342:18, 346:20, 347:18, 347:19, 351:14
**most**
36:20, 62:9, 120:8, 157:5
**mostly**
71:20, 71:21

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

130

motion
82:6
motions
82:1, 82:4
motive
244:21
mouth
325:4
move
13:24, 126:13,
292:10
moved
27:18, 126:16
moving
312:6
mrs
111:20
much
71:4, 86:5,
86:23, 88:12,
123:2, 136:17,
282:3, 292:15,
328:12, 337:20
mucked
228:4
muddying
203:16, 204:11
mug
76:5, 308:12
multiple
47:12, 47:16,
47:24, 48:6,
48:10, 128:20,
202:4, 345:18,
347:12, 347:16,
350:3
municipal
149:16, 149:23,
150:1
murder-for-hire
116:13
murdered
193:24, 250:12,
289:9, 325:3,
355:8
murdering
289:15
murders
288:18

must
11:21, 218:21,
317:8
myself
42:11, 53:14,
63:6, 156:18,
362:20, 365:8

### N

name
8:15, 9:3,
40:12, 41:14,
50:7, 50:8,
51:17, 51:19,
51:20, 52:6,
93:5, 98:14,
99:20, 99:23,
106:2, 117:9,
117:12, 117:13,
117:20, 117:23,
123:12, 144:20,
166:8, 169:6,
172:20, 194:21,
213:4, 215:8,
216:22, 260:1,
261:22, 277:23,
278:2, 278:7,
306:14, 306:17,
306:22, 307:5,
307:6, 362:21,
365:7
named
100:6, 131:11,
161:2, 161:5,
161:7, 164:24,
174:23, 195:21,
288:8, 301:24,
359:20
names
14:18, 98:5,
99:11, 173:2,
174:18, 174:23,
175:10, 177:10,
178:1, 180:4,
181:16, 342:6,
342:23, 343:19,
345:18, 346:8,
346:19, 347:4,

347:5, 348:6,
348:8, 349:9,
349:10, 350:1,
350:4, 351:5,
360:23
narrow
64:20, 172:5,
172:12, 336:22
nature
58:4, 62:23,
71:3, 74:4,
117:6, 280:8
ncic
54:23
near
237:22
necessarily
35:13, 47:16,
89:6, 313:6
necessary
141:23, 141:24
need
11:20, 73:1,
75:3, 78:21,
87:7, 94:9,
94:10, 94:13,
96:10, 111:1,
111:2, 142:15,
142:16, 166:16,
174:12, 174:22,
188:23, 192:14,
193:9, 268:2,
275:4, 292:10,
353:10, 356:19,
357:1, 361:8,
361:10, 368:12
needed
28:18, 43:5,
93:18, 94:5,
95:3, 95:13,
95:17, 171:14,
228:15, 229:4,
240:2, 249:6
needs
193:1, 337:14,
339:12
negative
13:2, 103:20,

103:24
neighbor
231:3, 234:12
neighborhood
276:2
neither
285:7, 370:12
nephew
191:16, 193:21,
193:23, 194:7,
194:16
nephew's
194:21
never
25:22, 27:19,
33:6, 33:8,
58:17, 58:18,
58:19, 75:15,
78:7, 83:7,
112:15, 115:5,
159:12, 166:23,
167:1, 200:16,
215:6, 217:20,
218:7, 226:20,
256:4, 272:3,
282:1, 288:23,
288:24, 327:16,
327:17, 327:18,
327:21, 327:22,
342:20, 342:22,
348:6, 355:7,
359:14, 359:16
new
3:15, 28:17,
63:18, 67:10,
67:11, 67:13,
67:14, 68:1,
69:12, 187:7,
229:12, 229:16,
251:8, 255:17,
258:6, 271:12
next
10:24, 11:7,
53:3, 61:6,
91:2, 91:3,
93:16, 131:1,
144:15, 147:1,
186:21, 203:2,

Transcript of Ernest Halvorsen
Conducted on February 6, 2019                                    131

204:19, 212:9,
247:7, 257:16,
258:2, 275:23,
279:6, 279:13,
280:11, 300:20,
300:23, 307:11,
307:23, 314:8,
314:14, 317:20,
318:2
**nick**
341:1
**nickname**
97:23, 98:13,
98:16, 98:20,
99:5, 99:7,
99:19, 99:20,
100:1, 100:3,
100:7, 164:15,
164:19, 171:18,
171:20, 172:17,
172:18, 174:7,
174:20, 176:10,
176:23, 177:5,
177:6, 177:7,
177:18, 177:19,
178:8, 178:24,
179:7, 179:8,
179:9, 179:10,
179:14, 180:3,
180:7, 180:15,
181:10, 216:24,
239:13, 239:21,
240:1, 240:2,
240:3, 240:5,
240:7, 298:24,
299:11, 299:13,
299:21, 341:6,
341:23, 343:2,
358:20, 359:21,
360:9, 360:19
**nicknames**
97:24, 98:2,
98:6, 99:11,
99:22, 163:1,
163:2, 164:10,
166:15, 173:21,
173:23, 174:2,
174:13, 174:17,

174:19, 175:9,
176:7, 176:19,
177:11, 180:2,
180:5, 181:15,
181:17, 226:16,
226:21, 239:2,
298:19, 341:2,
341:10, 341:13,
341:19, 341:22,
342:9, 342:15,
343:5, 343:7,
343:14, 343:18,
345:11, 345:12,
345:13, 345:20,
345:23, 346:9,
346:10, 346:11,
346:24, 347:1,
347:9, 347:14,
347:17, 347:20,
348:18, 349:2,
349:6, 349:8,
349:19, 349:24,
350:3, 350:10,
350:12, 350:21,
351:2, 351:3,
351:7, 351:14,
360:4, 361:2
**night**
93:19, 94:19,
156:8, 218:17,
220:3, 221:10,
231:9, 232:10,
232:18, 233:2,
233:7, 233:13,
326:14, 345:3,
361:12
**nikolaevskaya**
5:3, 7:24,
88:6, 95:8,
97:6, 97:15,
137:21, 141:1,
142:6, 143:16,
151:2, 151:9,
157:1, 159:11,
159:18, 160:11,
160:13, 161:1,
164:7, 166:11,
170:10, 171:9,

175:7, 177:15,
177:24, 180:19,
181:8, 182:22,
184:16, 212:1,
212:3, 256:17,
278:14, 280:9,
281:12, 281:18,
284:7, 289:2,
289:23, 291:2,
341:16, 342:4,
343:9, 350:2,
350:15, 353:5,
368:4
**nine**
52:18, 53:11
**nitsky**
16:4, 16:5,
145:8, 145:11,
145:17
**nobody**
12:19, 13:4,
350:11
**nobody's**
140:12
**non-spanish**
130:1
**none**
268:1, 368:4
**nonpublic**
38:16, 39:13,
84:23, 85:19
**noon**
286:10, 311:20
**nope**
60:16, 115:17,
339:7, 342:24
**nor**
370:13
**normal**
133:2
**normally**
281:3
**north**
2:5, 3:5, 3:20,
4:20, 7:7,
23:12, 29:3,
29:6, 92:21,
93:11, 101:12,

101:15, 101:17,
102:16, 102:24,
103:2, 103:3,
103:5, 103:9,
104:4, 146:17,
300:10, 300:11,
344:3, 344:6,
344:8, 353:21
**northern**
1:2, 92:10
**nos**
6:14, 6:18
**notarial**
370:17
**notary**
2:14, 370:1,
370:4, 370:23
**notation**
265:17
**notch**
8:23
**note**
40:17, 96:14
**noted**
257:16
**notepad**
157:13, 157:16,
157:21, 158:3
**notes**
35:20, 36:1,
39:17, 39:20,
39:23, 40:2,
41:9, 41:12,
41:13, 41:17,
41:19, 41:22,
41:23, 42:2,
96:18, 157:8,
157:10, 157:12,
158:15, 158:19,
158:21, 203:20
**nothing**
122:14, 208:22,
256:10, 258:8,
270:11, 270:13,
270:18, 271:17,
276:23
**notice**
2:12, 268:22

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

132

**noticed**
266:20, 271:12
**now**
7:12, 14:19,
19:10, 35:4,
51:23, 54:24,
62:19, 105:5,
130:22, 131:24,
136:3, 136:4,
142:24, 172:15,
180:24, 181:13,
181:22, 181:23,
184:4, 186:13,
190:1, 198:8,
202:21, 202:23,
213:2, 214:18,
219:2, 222:5,
233:16, 238:11,
290:14, 291:17,
295:19, 312:16,
316:22, 317:3,
320:9, 323:12,
349:5
**nowhere**
270:7
**number**
22:13, 54:20,
86:14, 90:12,
90:19, 91:1,
91:8, 91:11,
94:23, 125:15,
128:13, 128:17,
223:20, 223:21,
223:22, 234:23,
234:24, 235:2,
235:4, 236:13,
236:14, 236:15,
236:17, 240:21,
241:18, 241:21,
259:24, 260:2,
267:23, 276:22,
290:14, 312:15,
326:9
**numbers**
41:15, 90:13,
90:21, 90:24,
224:1, 224:2,
234:20, 241:11,

241:14
**numerous**
81:19, 82:1,
82:3
**nuts**
223:9

---

O

---

**o'clock**
123:16, 123:19,
123:20, 123:22,
132:14, 133:3,
155:16, 220:8,
310:3
**oath**
7:13, 179:6
**objecting**
202:12, 214:13,
221:13, 222:3,
222:16, 222:18
**objection**
26:17, 36:13,
42:6, 43:1,
44:3, 44:5,
44:16, 45:9,
70:21, 76:24,
80:5, 83:15,
88:4, 98:3,
107:9, 107:11,
109:11, 112:8,
114:3, 116:24,
129:17, 136:9,
136:21, 137:3,
137:18, 140:10,
141:18, 142:11,
143:7, 143:14,
144:7, 144:10,
147:16, 156:24,
159:10, 159:17,
160:11, 164:5,
165:16, 166:9,
170:8, 171:4,
177:14, 180:17,
181:6, 182:6,
182:19, 184:2,
184:15, 185:17,
191:18, 191:19,
191:23, 192:10,

195:10, 197:21,
198:19, 202:11,
209:11, 225:5,
232:6, 232:11,
232:14, 233:15,
239:15, 246:15,
248:7, 250:18,
250:24, 254:17,
256:15, 278:14,
280:6, 286:1,
289:2, 301:7,
301:8, 315:12,
328:24, 329:11,
332:2, 337:2,
339:21, 342:12,
350:2, 350:14,
353:5, 353:6,
354:3, 357:19,
358:21
**obligation**
33:20
**observe**
149:8
**observed**
64:7, 125:12,
245:24, 246:22
**obtain**
172:3
**obtained**
43:24, 125:23,
168:15, 203:11,
216:19, 226:3,
236:8, 236:10,
236:20, 236:22,
237:1
**obtaining**
38:11
**obvious**
194:13
**obviously**
309:18, 312:3,
322:6
**occasion**
199:4
**occasionally**
98:22
**occasions**
9:8, 167:8,

167:17, 168:12,
168:14, 169:2,
324:18
**occur**
141:11, 306:20,
307:4
**occurred**
38:21, 38:22,
124:24, 131:19,
248:17
**october**
23:3, 193:20,
201:18, 260:18
**odd**
331:10, 331:15,
331:18, 331:23,
331:24, 341:5,
341:12, 343:6,
348:7
**off**
27:11, 27:13,
27:18, 56:8,
105:7, 117:16,
118:17, 170:7,
170:24, 171:3,
175:18, 177:12,
189:15, 194:9,
194:10, 194:12,
196:18, 197:10,
197:14, 197:20,
198:3, 198:8,
198:18, 210:12,
272:20, 288:7,
324:6, 324:7,
331:9, 333:15,
333:16, 361:18,
361:19, 361:20,
368:8, 368:15
**offender**
48:2, 48:6,
48:7, 48:10,
55:5, 126:20,
127:1, 127:7,
128:9, 128:10,
128:11, 240:18,
283:7
**offenders**
47:24, 55:7,

321:12, 355:4,
355:5, 355:7
**offer**
234:11, 234:13
**offering**
88:11, 88:16
**office**
5:4, 57:3,
57:4, 57:6,
57:13, 57:16,
57:19, 58:24,
59:2, 60:6,
60:10, 60:17,
60:19, 61:1,
61:3, 61:4,
61:5, 61:7,
61:8, 61:10,
61:12, 61:20,
61:23, 62:2,
62:13, 62:17,
63:11, 65:18,
92:3, 92:5,
92:10, 92:12,
92:15, 92:19,
92:22, 92:23,
93:1, 93:4,
93:6, 93:8,
93:10, 98:21,
98:23, 99:1,
115:2, 115:7,
124:9, 124:11,
143:24, 152:11,
152:12, 152:14,
153:10, 165:13,
172:24, 173:1,
173:14, 173:19,
175:8, 176:10,
178:8, 178:24,
179:15, 180:1,
181:14, 182:24,
186:20, 199:13,
200:13, 200:17,
218:14, 220:1,
220:11, 221:7,
222:13, 237:19,
275:14, 287:7,
298:16, 322:21,
334:19, 334:23,

357:9, 360:22,
366:18, 366:23
**officer**
19:18, 21:1,
23:1, 24:11,
26:14, 31:3,
31:5, 31:21,
31:24, 32:3,
32:4, 53:20,
53:22, 54:1,
54:3, 55:3,
84:16, 92:8,
92:9, 92:20,
102:15, 102:20,
125:14, 161:4,
169:17, 169:21,
170:3, 319:1,
324:16, 324:22,
324:24, 325:9,
370:6
**officers**
24:6, 24:7,
24:8, 24:11,
24:12, 24:13,
24:14, 24:15,
24:16, 24:18,
24:19, 28:23,
51:3, 51:7,
125:22, 170:19,
199:20, 200:5,
201:2
**offices**
156:15, 160:4
**official**
75:20, 101:1,
203:22
**officially**
203:12
**oh**
108:13, 113:11,
128:16, 161:13,
175:1, 176:9,
213:19, 226:6,
235:23, 237:15,
261:7, 285:17,
290:15, 291:24,
296:10, 329:18,
348:22, 359:1

**okay**
9:6, 10:17,
10:22, 11:3,
11:14, 11:23,
35:24, 57:21,
63:23, 70:17,
81:13, 93:8,
139:6, 163:6,
164:22, 175:11,
176:9, 177:3,
179:12, 181:1,
181:13, 181:22,
185:10, 185:15,
189:4, 189:14,
189:23, 193:13,
196:23, 212:5,
212:24, 213:11,
215:14, 224:3,
225:13, 228:22,
233:11, 235:7,
235:14, 237:20,
244:16, 244:20,
245:10, 245:20,
245:21, 253:14,
256:5, 260:22,
262:22, 263:4,
263:14, 263:21,
264:15, 264:18,
265:16, 265:19,
270:22, 271:15,
272:19, 273:2,
275:23, 276:18,
279:22, 282:13,
285:22, 286:14,
290:2, 292:15,
293:14, 293:17,
295:5, 295:6,
295:23, 296:3,
296:9, 296:11,
296:16, 297:7,
309:9, 309:22,
312:20, 316:4,
317:5, 318:1,
318:18, 323:13,
329:18, 330:10,
330:13, 358:15,
358:16, 362:12,
362:20, 363:7,

363:14, 363:24,
364:10, 365:2
**old**
33:4, 126:13,
126:17
**old-style**
64:20
**older**
52:6
**ole**
329:20
**on-duty**
60:13, 61:11,
102:15
**once**
30:24, 56:10,
56:13, 67:9,
68:6, 68:23,
109:18, 109:22,
118:19, 171:5,
177:1, 221:12,
222:16, 262:3,
363:21
**oncoming**
93:21
**one-and-a-half**
358:16
**one-way**
79:8, 79:10
**ones**
121:1, 346:19,
348:18, 348:19
**ongoing**
163:21
**only**
48:5, 49:19,
67:20, 84:7,
84:8, 85:19,
90:6, 92:2,
130:6, 168:18,
168:22, 170:17,
170:21, 177:7,
187:9, 206:16,
230:24, 236:11,
237:23, 264:1,
267:12, 267:24,
268:8, 268:20,
276:5, 281:7,

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

134

281:14, 283:9, 288:20, 300:8, 308:21, 321:23, 334:10, 336:22, 337:6, 350:9

**open**
61:19, 61:22, 62:13, 321:13

**open-ended**
37:16, 37:19

**operator**
253:24

**opinion**
24:6, 31:11, 31:12, 36:24, 84:14, 108:4, 198:22, 198:23

**opportunity**
111:22, 117:17, 193:2

**opposed**
28:23, 37:24, 38:12, 39:9, 49:8, 136:18, 139:3, 153:1, 153:12, 322:9

**opposing**
135:21, 135:23, 136:8, 136:15, 136:18, 137:2, 137:13, 137:16, 138:4, 138:9, 138:15, 138:19

**opposite**
58:1

**ops**
216:16

**orally**
96:17

**orbish**
112:7, 112:12

**order**
41:7, 56:24, 112:18, 243:6, 244:4, 338:6, 368:9, 368:13

**ordered**
16:14, 16:17

**orders**
364:22

**ordinarily**
275:13

**organized**
99:7, 100:1, 100:3

**original**
203:18, 227:17, 227:21, 229:14

**other's**
129:1

**others**
240:11

**otherwise**
17:3, 111:9, 370:15

**our**
29:23, 46:2, 120:8, 126:21, 200:16, 217:9, 256:13, 256:19, 327:13

**out**
10:21, 16:17, 18:1, 18:3, 18:7, 18:12, 19:12, 32:6, 39:2, 45:1, 50:20, 54:5, 56:15, 58:21, 59:2, 59:5, 59:15, 60:1, 71:24, 77:4, 78:2, 83:17, 83:20, 86:18, 87:4, 93:23, 95:16, 98:9, 98:15, 99:13, 99:17, 102:12, 102:24, 103:9, 112:19, 112:24, 116:13, 123:9, 126:22, 127:4, 136:22, 136:23, 142:16, 144:9, 146:1, 146:12, 149:10, 150:23,

151:5, 164:16, 170:13, 191:5, 191:6, 192:9, 193:10, 203:4, 209:14, 231:3, 231:22, 233:12, 234:5, 239:4, 239:9, 245:24, 246:5, 253:18, 279:2, 279:12, 282:1, 282:9, 283:4, 302:3, 305:5, 305:23, 306:7, 323:20, 323:22, 327:22, 328:22, 337:10, 337:11, 338:8, 344:3, 344:8, 351:2, 355:6

**outcome**
370:15

**outfit**
210:11

**outside**
15:16, 15:18, 16:8, 16:12, 16:18, 16:23, 17:1, 17:16, 17:20, 113:10, 116:21, 123:14, 124:24, 125:8, 191:3, 335:24

**over**
10:16, 32:13, 43:21, 101:17, 119:8, 146:11, 152:10, 153:10, 153:24, 155:9, 155:20, 162:16, 170:20, 197:18, 213:24, 258:2, 291:8, 292:7, 293:10, 300:12, 305:10, 319:21, 319:24, 320:20, 320:22, 357:20

**overtalk**
292:11

**overtime**
328:13, 328:16, 328:19, 328:22, 329:3, 329:5, 329:9, 329:13

**overturned**
131:17

**own**
58:16, 138:5, 138:9, 138:12, 138:17, 138:20, 139:4, 239:21, 338:8, 341:24

**owned**
300:8

**P**

**pacheco**
173:2, 173:11, 176:13, 178:10, 179:2, 179:17, 181:10, 201:4, 207:4, 226:5, 226:13, 226:22, 238:14, 238:16, 273:22, 282:17, 285:7, 299:17, 299:19, 299:22, 305:12, 307:24, 318:14, 323:24, 341:2, 343:4, 349:15, 350:21, 351:3, 356:14, 367:7, 367:13

**pacheco's**
236:13, 236:14

**packet**
310:24

**pages**
1:23, 56:20, 227:14, 252:7, 286:14, 313:3, 313:6, 313:7, 340:23

**paid**
112:16

**papa**
115:16

Transcript of Ernest Halvorsen
Conducted on February 6, 2019                135

**paper**
56:23, 65:1,
65:9, 65:12,
99:13, 157:14,
158:22, 203:15,
204:10, 337:1
**papers**
244:12
**paperwork**
217:9
**paragraph**
185:23, 196:13,
200:20, 201:15,
202:9, 202:17,
202:18, 203:3,
204:19, 212:7,
218:11, 219:15,
219:20, 221:21,
222:12, 247:8,
247:13, 247:14,
247:19, 252:10,
257:14, 257:15,
275:24, 294:4,
304:3, 307:13,
317:6, 317:12,
318:2, 329:21,
330:9
**pardon**
163:4, 212:2
**park**
29:5, 126:4,
126:5, 126:8,
126:11, 126:16,
146:17, 196:1,
303:23, 304:2,
304:6, 304:8,
304:12, 304:16,
304:17, 304:18,
304:21, 305:2,
353:21
**parked**
18:22, 18:23,
19:3, 300:12,
300:13, 344:10,
344:12, 345:4,
345:7, 349:3
**parking**
19:1, 149:10,

170:20, 197:18,
199:5
**parroting**
39:9
**part**
32:12, 76:8,
106:19, 109:9,
117:5, 126:5,
126:7, 141:9,
208:8, 271:22,
272:7, 282:6,
307:3
**participants**
82:7, 82:16,
82:17, 280:20,
281:1, 281:5
**particular**
36:16, 239:6,
266:14
**parties**
370:13
**partner**
52:1, 52:12,
53:1, 53:3,
53:7, 53:8,
80:9, 132:19,
217:15, 254:4,
256:8, 257:3,
272:5, 294:5
**partner's**
278:2
**partnered**
52:17, 52:19,
53:5, 53:10,
66:6, 66:14
**partnering**
52:9
**partners**
53:12, 66:4,
194:18
**partnership**
196:15
**parts**
106:22, 202:21
**party**
113:18
**pass**
93:22, 93:24,

95:20, 360:13,
360:14
**pass-through**
204:23, 205:6,
205:18, 205:22
**passed**
360:18, 361:4
**passenger's**
273:12
**passing**
25:9
**past**
10:4, 138:24,
176:14, 357:21
**path**
25:7, 26:2
**patrol**
23:8, 23:13,
26:11, 28:3,
29:13, 32:3
**patrolman**
325:18, 325:19
**paul**
16:4, 16:5,
145:8, 145:11,
145:16
**paula**
4:3, 7:22,
365:7
**pause**
16:21, 169:23
**pay**
20:14, 136:5,
151:22
**paying**
85:24
**pc**
4:12
**pending**
11:22, 111:13,
189:9, 255:13
**penitentiary**
88:1
**people**
15:4, 15:21,
17:15, 18:15,
47:18, 48:23,
60:18, 73:4,

76:12, 78:4,
78:19, 81:3,
81:10, 81:15,
81:23, 83:5,
86:8, 88:24,
89:15, 98:4,
100:6, 121:22,
142:10, 171:12,
174:23, 179:23,
181:3, 183:5,
195:14, 208:22,
215:3, 236:18,
275:10, 278:19,
278:23, 280:10,
281:8, 281:9,
282:9, 288:18,
325:3, 329:3,
329:12, 333:4,
333:15, 333:16,
338:17, 347:10,
348:20, 349:7,
350:13, 351:7,
352:23, 353:24,
354:20, 355:1,
356:13, 356:17,
358:3, 358:6
**per**
99:20
**perceive**
12:21
**perfect**
105:5
**perhaps**
212:17
**period**
17:20, 63:23,
119:8, 314:22,
364:11
**permanent**
243:14
**permissible**
81:20, 81:22
**permitted**
45:20
**perpetrator**
47:19, 48:13,
48:18, 103:14,
104:15, 251:13,

Transcript of Ernest Halvorsen
Conducted on February 6, 2019
136

283:4

**perpetrators**
55:2, 309:2,
353:18, 354:1,
354:19

**person**
35:7, 35:16,
36:3, 36:8,
37:2, 38:19,
45:1, 45:6,
46:7, 46:11,
46:12, 47:2,
47:6, 59:19,
70:13, 78:2,
79:24, 80:1,
80:3, 81:3,
81:14, 81:22,
86:6, 86:18,
88:3, 88:11,
88:13, 88:17,
88:18, 101:16,
101:18, 102:3,
102:6, 102:9,
102:18, 103:17,
103:21, 104:24,
125:17, 129:24,
132:5, 135:9,
136:6, 140:14,
166:8, 167:20,
168:3, 168:8,
168:10, 168:13,
169:7, 169:18,
169:22, 170:4,
172:18, 172:20,
174:24, 176:18,
176:21, 176:24,
177:12, 180:12,
214:7, 250:6,
250:8, 273:8,
273:11, 275:1,
288:11, 288:15,
301:23, 307:20,
308:1, 308:3,
321:23, 322:19,
322:21, 322:23,
337:5, 337:22,
338:4, 338:6,
338:9, 342:17,

342:20, 342:23,
349:17, 351:15,
353:11, 353:16

**person's**
41:14, 58:4,
81:8, 81:11,
88:22, 137:7,
172:19

**personal**
157:19, 328:5

**personally**
65:20, 78:22,
144:11, 349:10

**personnel**
213:6, 213:9

**persons**
35:19, 50:18,
79:7, 79:9,
79:11, 98:6,
173:12, 176:14,
177:11, 178:3,
178:4, 226:16,
280:18, 283:1,
285:6

**pertain**
34:16, 331:4

**pertained**
90:6

**pertaining**
96:11, 252:15

**pertinent**
303:7, 303:19,
347:8

**pete**
161:3, 161:5,
161:7, 161:8,
161:9, 161:11,
161:13, 161:23,
162:3, 162:4,
162:9, 163:3,
163:5, 163:6,
163:19, 164:16,
164:20, 164:24,
165:13, 171:12,
171:15, 171:20,
171:23, 172:5,
172:7, 172:11,
172:13, 174:3,

176:8, 176:11,
178:9, 179:1,
179:15, 180:8,
180:14, 182:5,
182:13, 183:12,
184:21, 188:2,
188:8, 188:16,
239:3, 239:7,
239:9, 271:12,
271:13, 271:19,
273:8, 309:2,
329:22, 330:7,
331:12, 341:6,
342:1, 342:9,
342:15, 343:5,
343:14, 345:16,
345:24, 346:6,
346:15, 347:2,
348:23, 349:15,
349:24, 350:22,
356:13, 356:21,
357:3, 357:5,
357:8, 357:16,
357:18, 359:20

**petes**
164:18, 171:18,
172:17, 172:21,
180:7

**phase**
114:23

**phil**
217:11

**phone**
54:4, 88:11,
88:13, 88:17,
89:7, 89:10,
89:11, 89:14,
90:11, 90:12,
90:14, 90:16,
90:18, 90:19,
90:21, 90:23,
91:1, 91:22,
91:23, 92:1,
146:10, 151:22,
152:4, 152:5,
158:1, 158:5,
158:10, 158:16,
158:19, 174:5,

174:17, 174:24,
176:19, 180:13,
187:8, 220:10,
257:18, 258:2,
339:12

**phones**
53:18, 339:16,
339:17

**photo**
72:18, 72:22,
73:6, 73:9,
73:12, 73:17,
74:8, 74:11,
74:20, 74:24,
75:2, 75:14,
75:16, 75:17,
76:8, 76:22,
77:15, 77:20,
77:22, 78:19,
83:22, 83:23,
84:6, 100:19,
100:21, 102:14,
103:5, 103:8,
103:9, 103:12,
103:17, 103:21,
104:5, 121:18,
122:1, 147:15,
147:18, 147:21,
148:2, 148:4,
148:6, 148:9,
148:12, 148:14,
148:18, 148:23,
149:4, 149:9,
213:6, 273:5,
273:17, 274:4,
274:20, 275:2,
280:14, 280:23,
282:12, 307:17,
307:19, 307:24,
308:2, 308:6,
309:12, 353:12,
354:16, 355:16,
355:17, 355:21,
357:8

**photocopied**
213:10, 215:4

**photocopy**
215:1, 215:16

**photograph**
6:12, 102:1,
102:2, 102:7,
121:22, 122:7,
123:5, 123:7
**photographer**
22:9, 22:12,
22:20, 22:22
**photographic**
101:1
**photographs**
73:5, 75:18,
76:11, 76:21,
120:18, 147:7,
276:14, 276:16,
309:10, 357:5
**photos**
58:3, 72:24,
73:2, 74:14,
75:4, 75:21,
75:24, 76:3,
76:5, 76:12,
76:14, 76:17,
76:18, 77:4,
77:6, 77:9,
78:1, 78:2,
100:22, 101:3,
102:12, 146:14,
146:15, 173:5,
173:8, 182:4,
182:12, 182:15,
182:17, 182:24,
183:1, 183:6,
183:20, 183:22,
184:1, 184:5,
184:7, 184:21,
185:13, 185:16,
187:6, 188:2,
188:8, 188:16,
240:18, 273:7,
273:13, 274:1,
274:10, 274:11,
274:13, 274:16,
274:20, 275:5,
275:12, 275:13,
307:18, 308:9,
308:11, 308:14,
308:15, 308:16,

308:18, 308:22,
309:13, 309:16,
309:18, 309:19,
343:16, 345:10,
345:12, 345:21,
354:8, 355:1,
356:22
**phrase**
33:8, 171:7,
186:18, 206:17,
320:16
**physical**
78:24, 79:3,
79:13, 79:15,
79:17, 79:21,
80:21
**pick**
56:7, 78:8,
90:8, 91:22,
91:23, 92:1
**picked**
102:5, 177:20
**picture**
102:6
**pictures**
78:3, 101:1,
177:1, 178:2,
183:11, 183:14,
275:1, 309:5,
309:6, 358:2,
358:4, 358:7
**pina**
161:4
**pistol**
161:3, 161:5,
161:7, 161:8,
161:9, 161:11,
161:13, 161:22,
162:3, 162:4,
162:9, 163:3,
163:5, 163:6,
163:19, 164:16,
164:18, 164:20,
164:24, 165:13,
171:12, 171:15,
171:18, 171:20,
171:23, 172:5,
172:7, 172:11,

172:13, 172:17,
172:21, 174:3,
176:8, 176:11,
178:9, 179:1,
179:15, 180:6,
180:8, 180:14,
182:5, 182:13,
183:12, 184:21,
188:2, 188:8,
188:16, 239:3,
239:7, 239:9,
271:12, 271:13,
271:19, 273:8,
309:2, 329:15,
329:22, 329:23,
330:7, 330:8,
330:14, 330:20,
331:8, 331:12,
331:13, 341:6,
341:24, 342:9,
342:15, 343:5,
343:14, 345:16,
345:24, 346:6,
346:15, 347:1,
348:23, 349:15,
349:24, 350:22,
356:13, 356:20,
357:3, 357:5,
357:8, 357:15,
357:18, 359:20
**place**
45:19, 76:16,
206:11, 206:21,
211:13, 244:23,
264:2, 276:11,
279:6, 279:13,
314:21, 322:3,
338:19
**placed**
28:10, 100:23,
331:21
**plain-walled**
335:17
**plaintiff**
1:6, 1:12, 3:2,
3:9, 7:15, 8:13
**plan**
304:19

**plates**
149:12, 149:15,
149:18, 149:24,
150:1
**plausible**
150:12
**play**
305:22
**playing**
268:21
**pleading**
114:15
**please**
8:8, 8:15,
9:17, 11:11,
21:3, 47:22,
57:14, 61:21,
65:10, 69:22,
77:17, 78:6,
79:14, 82:14,
86:21, 100:11,
104:16, 110:11,
111:11, 112:23,
121:14, 129:6,
143:12, 185:1,
190:2, 190:13,
223:14, 225:9,
244:9, 261:24,
270:17, 281:19,
300:22, 303:24,
310:15, 316:8,
323:5, 335:8,
353:9
**plenty**
356:20
**pllc**
3:12
**plural**
70:6, 186:24,
187:17
**point**
48:17, 119:15,
132:9, 145:4,
164:17, 180:10,
182:2, 187:11,
189:2, 189:20,
212:12, 218:15,
220:2, 221:8,

Transcript of Ernest Halvorsen
Conducted on February 6, 2019                                    138

227:23, 231:14,
284:9, 284:12,
300:15, 319:12,
320:11, 321:15,
340:5, 342:16,
344:2, 344:14
**pointed**
203:4
**pointing**
122:4
**pointless**
258:7
**points**
188:23, 197:3
**polaroid**
307:18, 308:9,
308:11, 308:18,
308:22
**polaroids**
76:7
**pole**
123:5
**police**
13:10, 13:16,
19:17, 19:18,
19:20, 19:21,
19:23, 20:1,
20:9, 20:12,
20:21, 21:7,
22:15, 22:21,
22:24, 23:1,
23:9, 24:5,
24:7, 24:12,
24:13, 24:23,
24:24, 25:2,
26:4, 26:18,
26:19, 28:14,
28:17, 29:24,
31:3, 31:5,
36:1, 36:21,
39:22, 49:23,
50:4, 50:5,
50:6, 50:10,
53:15, 55:12,
62:19, 62:21,
64:7, 69:2,
75:20, 76:2,
76:4, 84:16,

85:5, 86:9,
86:16, 100:24,
112:1, 112:18,
115:19, 135:11,
150:15, 157:17,
169:17, 169:21,
170:3, 170:18,
173:4, 199:19,
200:5, 213:4,
240:9, 243:13,
260:20, 262:14,
308:12, 319:1,
319:23, 324:15,
325:4, 325:9,
326:3, 326:17,
327:2, 329:12,
333:9, 333:12,
363:4, 364:21
**policemen**
31:7, 31:10
**policing**
292:10
**polygraph**
44:20, 44:24,
45:7, 45:13,
45:14, 45:15,
45:16, 45:19,
45:22, 46:1,
46:4, 46:7,
46:11, 46:13,
46:21, 46:24,
47:7, 253:15,
253:20, 253:23,
253:24, 254:1,
254:2, 254:5,
254:10, 254:14,
255:2, 258:10,
258:16, 259:20,
261:3, 261:13,
283:17, 332:24,
333:2, 333:8,
334:2, 334:3,
335:5, 340:2,
340:9
**polygraphed**
253:17, 253:19
**pool**
90:11

**poor**
289:4, 342:13
**popped**
271:14
**portion**
45:18, 64:21,
64:22
**portions**
43:14, 118:18,
203:23
**portrayed**
111:15, 112:21,
113:2, 140:18,
210:10
**pose**
63:24
**posed**
11:18, 105:15,
106:15
**positive**
104:21
**positively**
78:20
**possess**
142:18
**possibilities**
251:9
**possibility**
251:14, 331:22,
345:8
**possible**
43:6, 127:6,
152:11, 154:1,
161:3, 174:18,
175:9, 180:4,
181:15, 248:23,
248:24
**possibly**
130:2, 177:10,
226:17
**post**
21:20
**post-conviction**
114:23
**potential**
55:2, 55:5,
284:17
**pound**
278:24

**pounds**
281:15, 281:21
**pr**
128:3
**practice**
69:16, 78:11,
199:15, 200:17,
200:18
**pre-service**
363:16
**preceding**
185:19
**precisely**
218:19
**preferred**
351:5
**preliminary**
6:23
**premiere**
31:2, 31:4
**preparation**
118:10, 119:24,
131:5
**prepare**
118:21
**prepared**
277:21
**preparing**
218:13, 244:23
**presence**
113:10, 143:4,
195:20, 366:22
**present**
5:9, 7:17,
8:21, 90:5,
147:6, 154:19,
156:17, 160:5,
276:18, 318:18,
318:21, 319:3,
319:8, 334:21,
367:5, 367:10,
367:18, 367:23
**preserved**
163:14
**press**
139:22
**pretty**
67:1, 157:23

Transcript of Ernest Halvorsen
Conducted on February 6, 2019                                    139

**prevent**
65:4
**preventing**
158:18
**previous**
67:17, 272:1,
315:13
**previously**
9:11, 105:23,
221:23, 222:14,
298:14, 313:4,
356:24, 357:1,
360:21
**primarily**
72:1
**primary**
240:3
**print**
56:15, 56:17,
66:19, 361:9
**printed**
99:13, 99:17
**prior**
110:18, 188:19,
203:7, 203:22,
218:15, 218:22,
220:16, 221:8,
226:15
**prisoner**
336:17
**prisoner's**
336:16
**prisoners**
279:21, 336:19
**privilege**
17:5, 106:20,
109:3, 110:9,
110:10
**privileged**
107:12, 109:24
**probably**
14:4, 52:8,
92:4, 113:13,
119:10, 119:19,
120:6, 122:19,
178:13, 178:14,
183:2, 201:21,
217:14, 217:16,

253:20, 267:4,
268:21, 303:6,
319:18, 356:15
**problem**
12:11, 13:5,
30:1, 42:12,
67:6, 67:7,
96:22, 149:10,
217:20, 292:5,
292:6, 357:15
**problems**
63:24
**procedure**
69:9, 74:18,
283:11, 364:19
**procedures**
364:4
**proceed**
164:12, 251:2
**proceeded**
132:17
**proceeding**
164:8
**process**
50:20, 71:23,
318:12
**processed**
132:8
**processing**
242:24, 243:12
**processor**
55:15, 55:21,
55:24
**produced**
361:11
**professional**
2:13, 12:20
**program**
22:3, 363:16
**progress**
33:13, 46:5,
58:13, 200:22,
227:14, 265:18,
268:8, 268:10,
364:23
**progressed**
32:9
**prohibited**
109:3

**prohibition**
65:8, 65:11
**prominent**
275:7, 275:11
**promise**
87:10, 87:17,
87:19, 88:2
**promises**
87:8
**promoted**
25:23, 26:2,
30:10, 30:11,
30:20, 52:11,
65:15, 65:21,
363:22
**promotion**
25:5, 25:8,
25:11
**promotional**
25:14, 25:15
**proper**
283:11
**properly**
48:21, 84:6,
322:18
**property**
241:1
**proportionally**
281:8
**prosecute**
107:16, 107:19
**prosecuted**
288:9, 326:16
**prosecuting**
152:19
**prosecution**
33:17, 87:13,
87:19, 152:12,
152:14, 152:18,
152:23, 153:5,
153:8, 154:9,
154:16, 155:5,
155:13, 156:11,
156:15, 159:16,
160:4, 173:9,
183:17, 316:17,
317:16, 318:5,
318:8, 318:19,

365:14
**prosecutor**
144:3, 153:2,
291:1, 294:22,
295:1
**prosecutors**
143:23
**protect**
138:12, 169:9
**prove**
343:22
**provide**
71:5, 84:19,
85:18, 86:1,
140:22, 142:8,
202:15, 204:5,
224:14, 250:12,
302:22, 353:3,
353:10, 357:18
**provided**
39:10, 42:2,
110:4, 115:18,
116:18, 145:22,
146:23, 151:13,
158:10, 161:19,
165:4, 165:7,
167:8, 167:16,
168:11, 168:16,
201:12, 201:21,
203:6, 205:24,
220:15, 224:7,
224:24, 342:8,
342:14, 344:17,
346:19, 351:20,
352:13, 352:17,
352:22, 356:12,
364:21
**providing**
39:8, 85:14,
136:14, 139:15,
140:2, 169:7,
349:5
**public**
2:14, 63:5,
91:6, 91:7,
91:21, 91:24,
370:1, 370:4,
370:23

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

140

**puerto**
196:1
**pulaski**
23:12
**pull**
83:10
**pulled**
300:12, 347:19
**pulling**
83:13
**purpose**
79:22, 80:16,
173:18
**purposes**
58:16, 65:3,
207:5
**pursuant**
2:12
**put**
27:12, 28:6,
58:9, 59:17,
59:19, 59:22,
88:9, 97:7,
99:13, 99:17,
117:23, 191:20,
227:13, 230:7,
235:2, 236:11,
247:2, 248:4,
263:11, 263:15,
263:16, 268:15,
283:1, 312:4,
322:23, 329:24,
334:20, 337:24,
344:1, 345:20,
352:20, 363:1,
367:21
**puts**
322:21, 322:22
**putting**
65:8, 65:11,
192:2, 203:15,
204:10

**Q**

**quarter**
330:5
**question**
10:22, 11:1,

11:7, 11:9,
11:10, 11:11,
11:12, 11:13,
11:14, 11:17,
11:18, 11:22,
12:13, 12:14,
16:21, 17:3,
26:12, 27:6,
37:22, 38:1,
38:4, 40:10,
43:21, 47:20,
85:12, 87:14,
106:1, 106:23,
107:1, 107:13,
109:6, 110:1,
110:11, 111:6,
111:9, 111:10,
111:13, 114:11,
132:24, 133:6,
137:22, 141:5,
141:8, 141:12,
142:13, 146:19,
148:10, 167:20,
167:22, 172:9,
172:10, 175:15,
176:1, 176:5,
188:12, 189:9,
202:14, 205:14,
212:24, 213:20,
216:17, 222:9,
223:4, 229:13,
246:16, 247:12,
249:12, 255:13,
255:16, 257:8,
263:7, 270:17,
279:8, 280:8,
281:11, 281:19,
284:4, 289:4,
291:5, 291:10,
291:13, 291:18,
301:3, 303:2,
307:2, 314:1,
315:8, 315:9,
317:11, 326:22,
340:20, 341:11,
342:11, 342:13,
343:1, 348:14,
351:22

**questioned**
132:22, 159:19,
250:2, 347:2
**questioning**
157:5, 282:17
**questions**
12:11, 17:4,
37:16, 37:20,
105:15, 106:14,
107:7, 111:21,
135:5, 176:15,
256:2, 282:4,
306:4, 361:7,
361:8, 362:13,
362:23, 365:3,
365:6, 365:18,
365:20, 365:21,
365:22, 368:2
**quist**
4:3, 6:5, 7:22,
222:6, 232:16,
233:18, 239:17,
247:1, 254:22,
266:17, 266:23,
280:6, 281:17,
289:11, 333:23,
341:15, 345:1,
355:12, 356:2,
358:24, 365:5,
365:7, 368:1,
368:13
**quite**
10:15
**quizzically**
47:20
**quotes**
221:6, 221:8,
257:18

**R**

**race**
80:21
**radio**
29:19, 127:5,
127:9
**radius**
55:8
**raise**
8:8, 148:23,

169:5
**random**
177:20
**rang**
92:4, 92:5
**range**
94:20, 94:22
**rankins**
223:2, 223:6,
224:6, 224:8,
224:24, 225:1,
242:3, 286:24,
287:4, 287:10,
287:11, 287:15,
287:21, 297:4,
298:7, 299:8,
299:24, 300:14,
300:20, 300:23,
301:1, 301:3,
301:13, 301:14,
301:23, 302:10,
302:14, 302:18,
302:21, 302:22,
303:3, 303:10,
303:22, 304:1,
304:4, 304:6,
304:20, 306:10,
306:13, 306:17,
307:17, 307:19,
307:24, 308:2,
309:11, 310:2,
310:7, 311:6,
311:7, 316:23,
317:7, 317:13,
317:19, 317:21,
317:23, 341:5,
341:9, 341:12,
341:17, 341:21,
343:6, 344:15,
345:9, 346:18,
347:21, 348:5,
348:10, 348:22,
349:13, 349:18,
349:23, 350:10,
350:20, 351:13,
367:15, 367:21
**rap**
83:10, 83:13,

Transcript of Ernest Halvorsen
Conducted on February 6, 2019                    141

83:19, 144:19,
144:20, 145:1,
235:11, 235:12,
235:15, 236:18
**rather**
35:19, 39:2,
260:8, 260:15
**ray's**
136:19
**rd**
203:19, 244:13,
247:24, 248:17,
252:12, 259:23,
260:2, 273:3
**re-ask**
11:12, 12:13
**reach**
89:24, 112:19,
112:24
**read**
40:9, 88:22,
111:11, 111:13,
112:12, 118:12,
118:13, 118:16,
118:18, 130:22,
178:11, 184:22,
185:10, 200:2,
200:7, 200:15,
202:17, 213:1,
214:18, 221:21,
223:21, 245:4,
245:5, 245:8,
255:11, 255:13,
290:3, 297:20,
298:2, 300:2,
301:9, 318:13,
346:16, 346:22,
369:4
**reading**
42:12, 118:17,
175:18, 219:11,
292:23
**reads**
329:21
**real**
88:18, 98:5,
98:14, 99:11,
99:20, 99:23,

174:18, 181:15
**really**
30:1, 34:9,
130:19, 148:7,
150:13, 205:8,
217:19, 281:8,
281:9, 283:24,
288:17, 292:10,
292:11, 292:14,
303:10, 328:4
**reason**
18:12, 42:1,
46:10, 69:15,
103:16, 107:4,
150:13, 150:15,
150:19, 162:2,
162:5, 211:1,
213:12, 232:17,
255:2, 286:4,
286:6, 289:13,
306:16, 339:4,
352:12, 364:24,
366:20
**reasons**
47:2, 47:5,
48:11
**reassigned**
27:15
**rebut**
111:17
**recall**
35:4, 40:12,
50:11, 66:23,
67:8, 120:19,
120:23, 125:20,
126:24, 130:19,
130:24, 131:2,
131:19, 131:22,
132:2, 152:21,
168:17, 168:22,
168:24, 184:5,
198:5, 198:8,
219:16, 221:4,
221:5, 229:7,
303:20
**recalls**
218:23, 219:1
**receive**
21:14, 21:23,

25:11
**received**
43:19, 44:10,
97:9, 162:8,
296:18, 299:4,
364:16
**recently**
250:16, 250:23
**recess**
105:8, 189:16,
272:21, 324:8,
361:21
**recognize**
78:6, 122:6,
123:4
**recollection**
287:18, 287:22,
363:21, 364:8,
364:15
**record**
6:24, 8:16,
8:19, 51:22,
102:8, 105:7,
105:10, 189:15,
189:18, 192:3,
272:20, 272:23,
292:17, 292:18,
324:6, 324:7,
324:10, 339:19,
340:16, 361:15,
361:18, 361:19,
361:20, 361:23,
363:3, 363:8,
368:8, 368:15,
370:8
**records**
83:21, 242:24,
243:12, 243:14,
252:11
**recreate**
228:9, 228:15,
229:4
**red**
38:2, 169:5,
300:6
**redo**
227:19, 228:4
**reduced**
370:10

**refer**
234:22, 235:9,
240:22, 331:2,
331:3, 342:17,
351:5, 351:15
**referee**
193:6
**reference**
270:1, 299:10,
299:14
**referenced**
297:16, 299:19
**referred**
73:3, 187:16,
299:8, 299:22,
350:4
**referring**
100:19, 149:4,
164:21, 171:11,
171:23, 172:12,
173:12, 178:4,
183:13, 214:20,
235:5, 241:8,
268:4, 269:20,
304:12, 348:5,
358:4, 358:6
**refers**
241:9, 252:11,
303:22, 304:1
**reflect**
51:22, 292:17,
292:19, 313:8,
346:18
**reflected**
301:5
**reflecting**
313:22
**reflects**
313:12, 313:17,
314:5, 314:16
**refresh**
68:5, 130:21,
134:12, 134:21,
145:19, 162:7,
287:17, 298:5
**refreshed**
131:24, 287:24
**refuse**
110:3, 166:7,

302:18
**refused**
166:4, 166:24,
168:15, 168:18,
218:8, 302:22,
303:3
**regard**
108:24, 109:15,
131:23
**regarding**
131:4, 142:21,
204:21, 205:5,
205:16, 207:2,
223:18, 224:8,
258:4, 324:24,
343:23, 345:10,
345:11, 346:12,
367:6, 367:11
**regardless**
100:6
**registered**
2:13, 54:14,
275:22
**registration**
54:12
**regular**
53:3, 122:14,
178:20, 178:22
**regulations**
111:24
**reid**
40:14
**relate**
231:1
**related**
135:8, 230:24,
370:13
**relates**
300:14
**relating**
260:4, 287:21
**relation**
61:12, 62:16,
92:11, 93:9,
259:20
**relations**
20:24
**relax**
292:15

**released**
339:19, 340:8,
340:10
**relevance**
305:4, 305:7
**relevant**
137:6, 233:10,
233:11, 233:19,
233:20
**reliability**
167:6, 167:13
**reliant**
338:2, 339:12
**reluctant**
203:22, 320:3
**rely**
303:14
**remain**
16:18, 23:13,
29:7, 51:9,
53:24
**remainder**
55:20, 55:23,
243:22
**remembered**
177:1, 218:16,
220:3, 221:9
**remembering**
341:9
**remove**
102:7, 103:4
**removed**
230:2
**rendered**
201:9
**repeat**
26:12, 65:10,
104:12, 106:24,
111:10
**repeated**
67:7
**rephrase**
11:11, 38:4,
87:14
**reported**
1:24, 196:15
**reporter**
2:13, 2:14,

7:10, 7:13, 8:8,
33:10, 163:4,
212:2, 222:8,
290:17, 290:19,
320:5, 368:9,
368:12, 370:1,
370:3
**reporting**
70:4, 182:11,
184:19, 185:24,
186:14, 188:1,
261:20, 275:15,
294:4, 307:13,
317:20, 364:3,
364:19
**reports**
44:7, 46:2,
46:4, 46:19,
56:17, 58:1,
58:8, 58:15,
58:21, 59:24,
60:2, 66:19,
67:1, 67:6,
68:13, 70:1,
112:12, 117:16,
131:4, 164:14,
186:16, 201:24,
213:10, 215:4,
215:16, 230:6,
236:21, 236:22,
237:1, 238:15,
241:15, 243:10,
249:1, 253:21,
262:14, 263:17,
264:19, 268:9,
268:24, 303:14,
303:19, 310:23,
322:22, 322:23,
327:13, 364:23
**represent**
201:23, 270:6,
362:22, 363:2,
365:7
**representing**
295:19
**request**
49:10, 83:21,
237:6, 254:2,

319:6
**requested**
46:7, 46:12,
102:21, 237:3,
237:21, 237:24,
238:8, 238:12,
238:18, 238:22,
239:1, 252:14,
254:4, 258:18,
260:6, 260:13,
260:16, 260:18,
370:12
**requesting**
319:4, 366:21
**requests**
54:4
**require**
114:8
**required**
103:19, 103:23,
243:4, 243:5,
244:4, 318:24
**requirement**
81:8
**reserve**
368:5
**residential**
150:3
**respectively**
343:6
**respond**
17:10, 29:19,
111:21
**responding**
319:5
**response**
14:11, 105:15,
106:1, 145:3,
166:18, 203:10
**responses**
107:6, 107:14,
107:17, 107:18,
107:19, 112:3
**responsibility**
252:18, 252:21,
252:24, 253:4,
285:8, 322:16,
323:2, 323:4,

323:6
**responsible**
321:1, 338:1
**rest**
55:16, 81:3
**restate**
85:12
**restaurant**
89:4
**resubmit**
66:22
**result**
206:8, 206:13,
206:19, 261:2,
326:12
**results**
25:19, 30:16,
45:21, 45:24,
46:3
**retire**
113:14, 113:16
**retired**
13:8, 13:10,
13:13, 16:1,
16:3, 54:2,
67:20, 113:15
**retirement**
13:16, 113:18
**return**
17:19
**returned**
40:10, 334:5,
340:3
**reveal**
38:24, 84:23,
87:12
**revealing**
87:18
**reveals**
145:1
**review**
57:1, 118:10,
120:15, 120:18,
120:20, 120:24,
121:8, 145:24,
161:24, 162:6,
201:24, 246:9,
278:4, 370:11

**reviewed**
121:10, 131:4,
311:21
**reviewing**
287:17
**reyes**
195:18, 195:19,
196:10, 199:24
**reynaldo**
1:8, 1:14,
3:17, 7:4, 7:6,
7:21
**rfc**
361:12, 363:9
**rfc-serr**
6:14, 6:18
**rican**
196:1
**rich**
49:17, 49:20,
49:22
**richard**
5:5, 27:16
**rick**
5:12, 7:11,
132:7
**ricky**
258:24, 259:1
**ricocheting**
204:22, 205:6,
205:17, 205:21
**ride**
367:23
**right-hand**
185:7, 225:16,
312:17, 313:12,
313:16, 313:21,
314:2, 314:9,
314:16, 315:1,
315:10, 315:20
**rights**
108:10, 333:19,
336:16, 336:17
**ring**
91:12, 91:15,
92:2, 297:21,
335:19
**risk**
213:3

**rival**
139:2
**robberies**
72:15, 132:7,
132:8
**robbery**
50:19, 71:20,
71:22, 71:24,
72:2, 200:23,
247:9, 247:14,
247:16, 248:1,
251:10
**robert**
131:11, 139:8,
145:23, 146:2,
146:24, 151:14,
152:1
**rock**
4:19
**rodrigo**
66:13, 176:4,
234:5, 255:4,
259:19, 260:4,
287:7, 298:17,
344:13
**rodriguez**
10:7, 324:22,
325:7, 325:16,
326:11
**roger's**
29:5
**role**
365:16
**roll**
123:23
**roman**
288:4, 288:5,
289:9, 289:15,
289:18, 297:17,
297:20
**room**
51:23, 57:8,
61:18, 79:6,
79:9, 98:1,
159:16, 159:23,
192:9, 193:10,
335:6, 335:9,
336:22, 337:13,

337:24, 338:7,
339:11
**rooms**
61:12, 62:3,
64:14, 133:7,
335:13, 335:16,
335:17, 336:1,
337:6, 337:23,
338:18, 338:20,
339:9
**rooney**
52:6, 52:7,
52:10, 52:13,
72:4, 72:6,
72:13
**roosevelt**
123:10, 123:14,
124:24, 125:8,
125:9, 125:11,
132:13, 134:17
**root**
76:18
**rouchford**
27:16, 27:23,
27:24, 28:8
**roughly**
120:14
**routinely**
213:6, 213:9
**rpr**
1:24, 370:4
**rules**
10:17
**run**
54:15, 55:1
**running**
135:6, 246:1
**russell**
3:3, 7:14
**ruvalcaba**
123:11, 124:15,
125:18, 126:19,
131:5, 139:24,
140:23, 141:15,
142:21

**S**

**s**
53:4, 217:14,

327:20

**sabrina**
303:23, 304:1, 304:6, 304:8, 304:11, 304:15, 306:1, 306:5, 306:6

**sabrina's**
306:21, 306:22, 307:5

**safety**
117:17

**said**
8:21, 41:20, 71:11, 95:12, 98:13, 103:2, 140:1, 142:24, 147:9, 147:12, 161:10, 161:14, 162:1, 162:8, 162:18, 168:5, 173:15, 174:12, 174:22, 174:24, 176:22, 177:9, 178:7, 178:12, 178:23, 179:12, 179:14, 181:1, 182:17, 184:7, 187:16, 187:24, 189:1, 190:8, 194:8, 195:13, 199:3, 202:10, 204:15, 208:18, 209:9, 209:18, 209:23, 210:18, 214:23, 216:3, 216:4, 216:5, 216:11, 219:18, 219:19, 220:8, 230:17, 230:20, 230:21, 246:21, 255:8, 255:22, 267:9, 270:20, 292:16, 298:19, 310:17, 325:15, 326:5, 330:3, 341:9, 342:23, 343:21, 344:4,

344:6, 344:8, 345:18, 345:22, 346:14, 347:3, 348:22, 352:4, 357:9, 358:13, 359:14, 359:19, 360:14, 370:9

**salary**
20:17, 20:19

**salvador**
123:11, 124:15

**same**
9:20, 11:2, 11:5, 18:10, 18:20, 19:3, 30:6, 47:13, 49:24, 51:18, 64:11, 75:24, 76:3, 92:19, 92:23, 107:9, 107:11, 109:11, 122:21, 128:22, 187:23, 212:6, 225:5, 245:10, 250:24, 252:6, 257:6, 263:16, 264:18, 271:3, 276:14, 309:20, 311:19, 312:4, 312:5, 313:15, 314:8, 314:23, 321:8, 337:17, 337:19, 354:7, 369:5

**sandwich**
338:11

**sat**
92:8, 92:20, 93:4, 102:15, 146:12, 147:3, 150:12, 150:13, 244:22

**satisfaction**
56:12

**save**
56:3, 281:24

**saw**
16:1, 25:22,

99:16, 111:14, 117:3, 145:5, 148:22, 176:11, 177:1, 178:8, 178:24, 179:15, 179:22, 209:7, 237:5, 237:6, 237:10, 237:18, 273:11, 282:1, 282:3, 329:21, 330:6, 331:12, 353:11, 355:5

**saying**
33:4, 67:5, 112:13, 124:18, 134:14, 136:23, 141:7, 142:18, 142:22, 150:5, 150:7, 150:11, 160:19, 163:18, 175:3, 175:4, 175:8, 178:12, 181:9, 181:11, 186:13, 188:9, 188:15, 196:6, 196:9, 196:10, 196:11, 198:4, 202:7, 202:10, 202:15, 202:18, 204:8, 204:12, 204:13, 204:16, 211:14, 211:21, 214:8, 221:5, 221:22, 238:9, 249:5, 260:22, 262:11, 262:13, 263:22, 265:19, 266:3, 266:4, 266:18, 267:12, 267:16, 269:9, 279:24, 283:9, 283:21, 296:11, 305:8, 314:24, 315:3, 315:9, 315:23, 320:9, 334:15, 343:23, 348:21, 352:16, 355:18

**says**
161:10, 184:19, 185:15, 192:3, 192:21, 199:9, 200:6, 200:21, 203:4, 204:19, 207:1, 212:8, 212:15, 212:19, 214:10, 214:11, 214:13, 214:18, 218:11, 223:21, 223:24, 224:5, 225:17, 234:19, 235:7, 242:23, 244:11, 244:21, 247:13, 247:19, 248:22, 252:11, 258:8, 258:18, 258:21, 260:1, 260:21, 263:4, 264:5, 264:12, 271:7, 273:4, 275:15, 275:20, 275:24, 276:20, 291:3, 293:1, 294:3, 300:5, 300:18, 304:8, 307:13, 307:23, 309:12, 313:11, 313:16, 315:1, 315:10, 317:6, 317:12, 317:15, 318:2, 343:17, 343:18, 344:1, 344:10, 345:13, 346:8, 347:18, 362:6, 363:15

**scene**
125:4, 125:7, 126:18, 126:21, 127:14, 127:18, 245:3, 249:15, 253:1, 253:9, 277:7, 300:1, 305:19, 320:4, 320:8, 344:2, 367:22

**schak**
49:17, 49:19,

49:20, 49:22,
50:21, 244:17,
245:3, 245:5,
247:2, 248:14,
249:5, 249:15,
251:4, 252:20,
252:23, 253:11,
256:6, 319:10,
320:2, 320:10
**schak's**
227:13
**scheduled**
155:15
**school**
19:24, 20:3,
20:5, 20:7,
21:6, 21:20,
22:7, 22:19,
32:16, 32:18,
32:23, 33:1,
33:12, 37:9,
39:18, 49:5,
123:10, 123:14,
124:24, 125:8,
125:9, 125:11,
126:15, 132:13,
134:17
**scored**
30:13
**seal**
370:17
**search**
55:9, 55:10,
125:18
**searches**
55:1
**seat**
273:12
**seated**
14:22, 81:5,
81:6, 82:8,
82:9, 82:12,
82:16, 82:20,
98:1, 273:11,
280:18, 280:20,
280:21, 281:1,
281:2, 281:5
**second**
63:4, 74:13,

185:23, 189:6,
189:7, 190:21,
199:9, 257:14,
258:11, 261:20,
270:3, 275:24,
278:15, 311:11,
312:12, 316:20,
317:1
**second-to-the-la-
st**
317:6, 317:12
**secret**
239:13
**section**
45:14, 45:15,
83:18, 253:20,
292:3, 308:19
**section's**
237:24
**secure**
62:19, 62:21,
338:16, 338:17
**security**
41:15
**seeing**
65:5, 190:19
**seek**
13:20, 27:17,
27:20
**seeking**
264:21, 318:14
**seem**
210:14, 233:10,
233:11, 233:19,
233:20, 331:10,
331:15, 331:18
**seemed**
134:1, 199:14,
250:6, 250:8,
350:11
**seen**
50:8, 65:18,
112:15, 146:16,
190:17, 237:2,
331:6, 331:19,
355:10, 355:20,
355:24, 363:5
**sees**
300:18

**select**
77:14, 77:22,
80:8
**selected**
28:23
**selecting**
80:10
**self**
109:20
**self-incriminati-
on**
107:5, 107:24,
108:22, 109:9,
109:21
**semantics**
305:22
**semiautomatic**
329:23, 330:8,
330:14, 330:19,
331:13
**send**
193:9, 243:15,
243:16, 243:22,
244:1, 261:7,
321:20, 322:2,
322:8
**sense**
92:24
**sent**
40:8, 76:14,
242:23, 243:11,
321:21
**sentence**
212:6, 212:17,
247:19, 257:15,
329:21, 330:5
**separate**
74:11, 75:2,
75:13, 75:16,
79:9, 116:21,
224:5, 310:13,
310:16
**separated**
101:2
**separately**
128:22, 128:23,
128:24
**september**
53:23, 363:17

**sequence**
201:9, 203:20
**serafini**
93:12, 93:14
**sergeant**
26:3, 52:11,
56:16, 56:19,
57:1, 60:14,
67:5, 67:21,
91:17, 91:22,
93:4, 93:22,
93:24, 94:4,
94:15, 95:2,
95:14, 95:21,
95:24, 96:2,
96:4, 96:5,
96:7, 96:9,
96:15, 96:20,
98:10, 124:12,
124:21, 156:1,
201:2, 240:8,
255:21, 256:12,
256:19, 264:24,
265:3, 265:24,
267:15, 269:7,
278:9, 286:9,
286:20, 287:6,
287:9, 298:14
**sergeant's**
91:16, 91:18,
92:3, 239:24,
240:1
**sergeants**
25:14, 25:15,
61:7, 92:15,
93:6, 93:7,
93:10, 95:19,
95:21, 132:16
**series**
128:7, 128:8,
130:17, 131:20,
132:6
**serious**
157:23
**serrano**
1:11, 3:9,
5:10, 6:22, 7:6,
7:17, 7:19,

173:3, 173:11,
175:2, 175:12,
176:12, 177:4,
178:10, 179:2,
179:16, 201:4,
201:9, 207:4,
226:5, 226:12,
226:21, 236:16,
238:15, 257:7,
257:10, 273:10,
273:22, 278:17,
278:24, 279:6,
279:14, 280:12,
282:1, 282:17,
282:22, 283:16,
285:7, 299:8,
299:11, 299:14,
305:12, 307:19,
308:7, 309:23,
310:4, 310:7,
310:22, 321:4,
322:5, 332:12,
332:17, 333:11,
333:24, 334:7,
334:13, 334:18,
334:21, 335:7,
335:9, 339:4,
339:19, 340:17,
343:4, 345:24,
349:14, 349:23,
350:21, 351:3,
362:10, 363:9,
367:7, 367:12

**serrano's**
236:17

**serve**
27:1, 27:4,
27:7, 29:13

**set**
154:2, 154:5,
210:13, 261:6,
266:7, 370:16

**setting**
326:15

**seven**
27:3, 27:4,
27:7, 28:13,
337:3, 338:15,

341:7, 341:14,
351:9, 357:20,
357:21, 358:8

**seven-hour**
120:12

**several**
142:13, 203:15,
204:9, 244:22,
246:4, 257:16,
258:2

**sex**
51:21, 55:7,
71:1, 72:15,
74:6, 80:21

**sexual**
55:8

**shameful**
111:14, 112:20,
113:1

**share**
38:16, 87:5,
90:16, 90:18,
90:19, 138:14,
138:16

**shared**
218:20, 218:24,
352:19

**sharing**
169:6

**she**
130:6, 146:16,
147:12, 147:14,
149:9, 218:16,
218:21, 220:3,
221:9, 230:17,
230:23, 231:2,
231:5, 234:10,
234:11, 234:13,
245:24, 246:1,
246:4, 246:22,
250:8, 250:11,
250:12, 250:22,
252:3, 253:16,
253:18, 254:2,
254:4, 254:15,
254:19, 255:8,
255:17, 256:1,
256:4, 273:10,

273:11, 277:8,
282:2, 282:3,
297:23, 305:7,
305:11, 306:7,
310:14, 318:17,
319:5, 319:6,
319:7, 319:8,
325:5, 326:2,
326:6, 352:2,
352:4, 352:15,
352:17, 352:22,
353:3, 353:10,
353:11, 353:17,
353:18, 353:20,
354:8, 354:14,
354:15, 354:19,
354:24, 355:1,
355:5, 355:7,
355:10, 355:20,
355:24

**she's**
305:6, 305:8

**sheet**
59:13, 59:16,
60:2, 83:13,
99:15, 99:19,
99:20, 99:23,
144:19, 144:20,
145:1, 235:11,
235:15, 241:2,
369:8

**sheets**
40:10, 54:8,
83:10, 83:19,
99:9, 99:10,
99:17, 99:22,
235:12, 236:18,
242:13

**shift**
95:18, 123:18,
123:20, 133:2

**shit**
170:24, 213:10,
214:24, 215:2,
215:16

**shoot**
300:18

**shooter**
215:21

**shooting**
98:8, 132:12,
134:16, 134:19,
161:11, 287:7

**shop**
210:13

**short**
66:16, 122:17,
210:13

**shortage**
274:11, 274:16

**shorter**
279:18, 279:23

**shorthand**
2:13, 370:3

**shortly**
124:22, 201:5

**shorty**
300:1, 300:6,
300:21, 300:24,
301:4, 301:13,
301:22, 301:24,
302:3, 302:5,
302:15, 302:19,
302:23, 303:4,
303:11, 304:5,
304:22, 305:13

**shot**
25:3, 98:8,
123:9, 125:17,
206:10, 244:22,
251:11, 256:13,
271:19, 297:22,
297:24

**shots**
76:5, 231:11,
308:12

**should**
37:3, 64:22,
74:23, 108:4,
108:16, 249:8,
254:9, 260:8,
264:13, 265:12,
267:9, 268:17,
274:10, 289:9,
293:18, 296:16,
296:18, 296:22,
312:3, 315:19,

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

147

315:23, 316:6,
322:14, 322:15,
340:7, 340:8
**shouldn't**
17:3
**show**
46:5, 46:24,
47:10, 58:13,
68:4, 102:18,
102:21, 113:2,
183:11, 183:20,
292:24, 311:2,
316:7, 344:20,
354:16
**show-up**
127:17
**showed**
146:13, 147:6,
147:19, 147:21,
148:2, 151:24,
173:10, 183:14,
187:6, 216:6,
273:5, 274:3,
307:17, 308:9,
309:10, 309:12,
309:14, 354:7,
355:16, 355:17,
357:4, 358:4
**showing**
80:3, 121:20,
220:22, 221:14,
222:5, 222:19,
362:5
**shown**
148:19, 149:5,
353:12, 355:1,
355:21
**shows**
265:2
**shut**
325:4
**sic**
349:23
**side**
11:16, 58:5,
62:2, 129:4,
129:9, 129:10,
129:14, 129:15,

130:2, 130:5,
130:7, 130:10
**sidley**
6:16, 114:19,
190:23, 191:15,
193:19, 193:20,
195:7, 195:12,
196:3, 197:5,
197:9, 197:19,
198:12, 198:13,
199:18, 199:23,
201:17, 201:22,
202:8, 204:6,
205:4, 205:8,
207:13, 207:15,
213:22, 213:24,
214:21, 214:23,
219:14, 219:17,
219:20, 220:13,
221:18, 222:1,
222:11, 224:15,
224:22, 224:24,
257:13, 257:20,
258:1, 288:20
**sign**
59:7, 211:10,
243:3, 278:2,
278:7, 336:13,
336:15, 336:18
**signature**
243:1, 261:22,
262:1, 277:23,
278:12, 278:13,
323:17, 323:20,
362:6, 362:7,
369:13
**signature-sc3**
370:21
**signatures**
324:4
**signed**
59:5, 146:3,
243:8, 262:3,
262:8, 262:10,
321:3, 323:23,
369:8
**significant**
88:1, 213:3,

282:9
**signifying**
243:7
**signing**
278:5
**similar**
73:13, 73:18,
73:20, 73:22,
75:9, 76:18,
278:20, 278:23
**similarity**
74:1
**similarly**
119:14, 141:16
**simple**
167:1, 216:12,
354:24, 358:7
**simply**
12:13, 172:18,
187:11, 198:3
**since**
10:15, 13:15,
114:24, 298:8
**single**
48:2, 48:6,
48:7, 48:10,
83:1, 98:12,
106:1
**sir**
19:19, 26:5,
34:22, 101:10,
105:13, 107:3,
109:14, 110:24,
132:2, 141:21,
144:9, 170:14,
175:3, 175:11,
175:16, 176:16,
176:18, 176:20,
178:6, 181:18,
182:9, 185:9,
187:11, 187:24,
188:9, 188:21,
190:18, 194:3,
196:20, 199:16,
201:14, 204:3,
205:1, 212:10,
212:21, 214:20,
219:13, 224:12,

231:21, 234:4,
234:17, 245:16,
246:6, 247:22,
249:3, 255:6,
266:21, 267:1,
267:16, 271:2,
273:15, 276:3,
280:15, 280:17,
280:24, 284:8,
291:9, 291:20,
291:22, 292:22,
293:4, 293:12,
294:15, 300:16,
305:4, 312:6,
313:19, 315:8,
316:7, 316:20,
320:18, 324:12,
339:18, 360:12,
362:6
**sit**
25:10, 45:7,
45:18, 46:11,
46:13, 60:5,
60:9, 60:16,
60:18, 60:20,
62:15, 79:7,
92:9, 111:19,
111:20, 130:20,
149:11, 151:5,
222:23, 246:2,
246:10, 300:2,
364:7, 364:14
**sitting**
14:7, 14:14,
14:15, 57:9,
81:9, 81:11,
81:15, 81:24,
150:16, 150:22,
246:23, 280:16,
282:3, 352:5
**situation**
274:19
**situations**
275:6
**six**
335:12
**size**
330:21

Transcript of Ernest Halvorsen
Conducted on February 6, 2019                    148

**skill**
31:18, 31:20
**skills**
31:23
**skin**
71:1
**skinniest**
279:5, 279:13
**skinny**
281:9
**skip**
91:2, 91:3,
254:12, 351:23
**sleeping**
231:2, 255:8
**small**
331:1
**smaller**
57:8
**smashed**
271:14
**smith**
23:23
**smitko**
115:10, 115:12
**so-and-so**
89:23
**social**
41:15
**socialize**
196:16
**solache**
195:18, 195:19,
196:9, 199:24
**solely**
171:19
**solve**
32:13
**some**
10:15, 10:16,
11:12, 12:7,
13:5, 17:20,
35:24, 36:20,
38:20, 45:1,
50:23, 55:24,
57:10, 59:21,
61:14, 75:21,
78:3, 78:19,

86:8, 101:18,
111:15, 113:2,
113:20, 118:18,
119:15, 132:9,
144:3, 145:4,
146:14, 146:15,
153:2, 155:1,
157:14, 161:2,
162:8, 164:9,
165:9, 170:6,
174:22, 176:18,
190:24, 208:4,
209:23, 218:15,
220:2, 221:8,
231:2, 239:13,
249:6, 254:20,
255:3, 281:24,
282:9, 285:5,
287:11, 292:19,
296:10, 297:23,
298:18, 330:19,
330:22, 336:13,
342:16, 361:8,
364:2
**somebody**
48:17, 77:14,
77:22, 78:5,
85:20, 91:10,
136:23, 138:18,
139:2, 139:9,
139:11, 152:17,
161:5, 161:7,
167:7, 173:22,
174:4, 199:3,
215:15, 255:9,
275:6, 283:10,
283:12, 297:24,
335:22, 338:22,
339:11, 344:17,
344:21, 344:22,
344:23, 345:6,
349:13
**somebody's**
235:6, 235:10,
235:14
**someone**
19:24, 78:20,
85:19, 134:8,

152:12, 163:8,
169:8, 173:1,
173:20, 174:16,
175:8, 180:2,
181:14, 215:4,
268:20, 323:7,
344:19, 360:22
**someplace**
217:14
**something**
12:21, 34:9,
37:23, 38:12,
39:12, 66:22,
77:13, 81:18,
85:5, 87:11,
87:17, 87:22,
95:12, 118:3,
118:5, 166:7,
166:12, 167:21,
167:23, 175:2,
176:22, 192:17,
193:1, 195:11,
198:5, 212:19,
218:2, 218:16,
220:3, 221:9,
223:11, 231:4,
280:5, 302:24,
305:18, 326:3,
328:3, 329:1,
336:19, 337:10,
338:24, 343:22
**sometime**
10:5, 66:8,
156:9, 165:2,
165:9, 209:3,
209:5, 236:21,
267:2, 360:5
**sometimes**
33:24, 34:8,
38:19, 41:10,
42:15, 44:20,
47:11, 47:15,
47:23, 48:2,
63:12, 64:14,
64:24, 66:21,
69:24, 70:12,
78:15, 80:11,
80:13, 83:10,

84:18, 86:13,
89:16, 89:22,
91:21, 96:13,
99:6, 199:11,
199:20, 333:1
**somewhere**
29:5, 40:6
**son's**
52:22
**soon**
43:6, 152:11,
154:1, 248:23
**sorry**
8:22, 8:24,
26:13, 33:10,
44:8, 69:21,
71:13, 93:2,
103:2, 113:17,
166:16, 187:3,
206:17, 210:2,
213:9, 223:6,
225:14, 235:16,
237:9, 245:13,
250:10, 251:21,
255:11, 257:12,
258:13, 267:10,
269:12, 269:24,
272:5, 276:13,
289:3, 295:13,
295:22, 304:20,
309:13, 312:14,
317:17, 324:1,
325:8
**sos**
54:23
**sotos**
4:12, 108:11,
237:19
**sound**
190:10
**source**
162:15, 162:18,
163:18, 164:23,
166:3, 166:17,
166:22, 168:5,
168:19, 213:14,
342:8, 342:14,
343:2, 347:23,

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

149

359:19
**sources**
168:15, 169:3
**south**
156:16, 357:10
**spaces**
62:4
**spanish**
49:20, 129:23,
130:4, 130:8,
130:9, 130:13,
130:15, 187:10,
195:9, 195:16,
256:4
**spanish-only**
199:12, 199:21
**speak**
12:14, 49:20,
118:24, 119:3,
119:5, 119:7,
129:23, 130:13,
200:1, 306:5
**speaker**
130:1, 130:4
**speakers**
199:13, 199:22
**speaking**
11:2, 191:23,
192:9, 269:13,
291:17
**speaks**
256:4
**special**
92:6, 92:7,
92:15, 92:16,
92:17, 92:18,
92:20, 92:21,
93:9, 122:14,
239:13, 364:22
**specific**
79:5, 95:15,
104:9, 190:19,
197:15, 197:16,
197:23, 364:8,
364:15
**specifically**
34:5, 60:16,
72:14, 82:20,

95:13, 132:3,
144:2, 166:20,
172:1, 199:24,
201:19, 204:20,
219:24, 239:4,
324:19, 332:19,
341:8
**specified**
187:13
**speculate**
238:19
**speculation**
36:14, 44:4,
44:17, 77:2,
88:7, 88:20,
112:9, 118:8,
134:24, 136:10,
137:19, 151:1,
220:19, 232:15,
238:20, 238:24,
254:18
**speedy**
100:6
**spell**
8:15
**spend**
126:9
**spill**
227:20, 227:24,
266:21
**spilled**
227:18, 228:3,
228:8, 228:14,
229:2, 229:8
**spoiler**
301:5
**spoke**
130:6, 130:7,
130:9, 135:9,
140:16, 177:10,
181:14, 187:10,
256:4
**spoken**
110:18, 130:15
**spot**
31:2, 31:4
**springfield**
161:12, 162:17,

162:19, 162:23,
300:10, 300:11,
300:14, 344:4,
344:6, 344:8
**square**
126:4, 126:7,
126:16
**st**
151:17, 151:20,
201:18
**stack**
115:9, 115:12,
244:12
**stairs**
18:14, 18:16,
18:17, 18:20,
63:11
**stamp**
266:4, 266:8,
266:13, 268:22
**stamped**
363:9
**stamps**
266:6
**stand**
79:7, 79:10,
192:21, 282:8,
284:1, 284:14
**standing**
82:12, 82:17,
82:20, 83:5,
123:5
**staple**
56:21, 258:11
**stapled**
56:22, 57:24
**staples**
258:13
**start**
9:3, 19:16,
35:6, 43:21,
66:13, 72:10,
93:20, 123:18,
175:24, 246:2
**started**
71:17, 71:24,
159:21, 160:2,
160:6, 164:13,

230:8, 245:2,
264:11, 265:12,
298:10, 310:2,
315:21, 327:7,
349:1
**starting**
213:18
**starts**
159:4, 160:22,
212:22, 330:6
**state**
2:14, 8:15,
13:22, 19:12,
173:7, 184:6,
219:5, 309:23,
357:10, 370:5,
370:24
**state's**
5:4, 115:1,
115:7, 143:21,
143:24, 146:1,
152:10, 199:13,
200:3, 200:9,
200:13, 200:17,
220:11, 317:16,
318:5, 318:7,
318:15, 318:21,
318:24, 329:5,
350:8, 350:18,
365:13, 365:16,
366:17, 366:22
**stated**
35:18, 187:4,
219:7, 224:6,
224:7, 246:1,
246:4, 271:11
**statement**
35:12, 37:5,
41:18, 42:16,
42:23, 42:24,
43:4, 43:10,
43:14, 44:2,
44:10, 44:11,
44:14, 121:6,
134:7, 134:20,
144:16, 146:3,
146:5, 161:15,
173:12, 176:3,

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

150

200:14, 205:23, 206:3, 208:5, 209:4, 209:24, 210:1, 216:6, 220:14, 242:3, 242:17, 245:21, 285:6, 287:8, 296:23, 318:10, 318:16, 318:22, 319:7, 319:9, 346:16, 349:22, 350:20, 351:13

**statements**
35:3, 41:18, 41:19, 41:22, 42:2, 42:16, 43:23, 199:12, 199:21, 200:4, 200:7, 215:22, 222:12, 318:23, 319:1, 329:5

**states**
1:1, 196:14, 361:12

**station**
28:18, 146:16, 170:18, 218:18, 219:5, 219:8, 220:4, 220:16, 221:10, 221:23, 222:15, 273:9, 274:15, 276:24, 333:9, 333:12, 352:2, 352:3, 352:23, 353:2, 353:21, 355:6, 355:11, 355:20, 356:1

**stay**
50:12, 51:12, 51:15, 217:17, 321:8, 329:2, 339:24

**staying**
23:17

**stays**
203:24

**stead**
278:5

**stenographically**
370:10
**step**
192:9, 284:17
**steps**
93:17, 95:3, 284:21, 284:23
**stick**
294:2
**still**
77:15, 77:22, 113:13, 265:18, 339:5
**stolen**
210:11
**stones**
128:3, 135:23
**stop**
22:2, 22:20, 22:21, 47:20, 52:9, 52:19, 53:12, 192:1, 192:8, 319:13
**stopped**
53:15, 59:10, 72:5, 72:12, 344:7
**store**
22:13, 207:2, 207:10, 207:17, 207:18
**storefront**
208:21, 210:19, 210:20, 269:19, 270:9
**stories**
224:8, 225:2
**story**
112:2, 152:12, 203:23, 207:11, 210:7, 211:16
**straight**
267:11
**strange**
210:14
**street**
2:5, 3:5, 3:13, 3:20, 4:20, 7:8,

19:1, 19:2, 29:3, 29:6, 53:15, 59:11, 98:4, 98:7, 125:12, 150:3, 162:15, 162:18, 163:18, 166:3, 168:5, 168:15, 181:3, 182:12, 184:20, 188:2, 203:19, 210:12, 333:15, 333:16, 342:8, 342:14, 343:2, 357:11, 359:19
**stress**
258:14
**stressful**
53:14
**strike**
50:14, 90:8, 116:19, 137:14, 138:2, 208:13, 226:18, 261:7, 289:7, 321:2, 331:22, 331:24, 339:3, 343:6, 352:24
**stripes**
299:18, 299:19, 299:22, 300:6, 300:7, 308:1, 342:19, 346:20, 351:15
**struggle**
195:8
**studenroth**
293:1
**stuff**
59:19, 170:6, 170:11, 171:3, 196:18, 197:10, 197:13, 197:20, 198:3, 198:10, 198:18, 199:4, 202:5, 227:15, 268:1, 277:11
**style**
122:13

**subject**
106:15, 107:7, 112:4, 236:15, 248:23, 365:22
**submit**
56:15, 56:18, 56:24, 66:19, 264:19, 313:1
**submitted**
49:10, 67:9, 68:3, 68:6, 68:13, 68:18, 248:10, 249:2, 261:6, 262:22, 263:5, 263:9, 263:12, 263:14, 263:18, 264:13, 264:18, 265:8, 267:1, 268:9, 285:13, 285:23, 286:17, 311:13, 315:18, 316:1, 321:17
**submitting**
67:15, 277:12
**subpoena**
14:11
**subsequent**
247:20
**subsequently**
131:14
**substance**
201:16, 202:8, 219:19
**substantially**
191:21
**such**
38:1, 38:20, 41:14, 58:3, 63:5, 77:4, 170:11, 275:10, 302:23, 349:2, 349:3, 349:6
**sued**
10:12, 114:12, 114:14, 237:19, 238:3
**suffering**
133:15

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

151

**suggest**
37:22, 138:11
**suggested**
38:13, 72:23,
79:20
**suggesting**
256:6
**suggestion**
248:15
**suggestions**
84:6, 249:6
**suggestive**
80:2
**suit**
122:2
**suite**
3:14, 3:21,
4:14, 4:21
**sum**
201:16
**supervisor**
66:20, 66:21,
68:14, 68:19,
153:3, 153:4,
153:7, 153:12,
153:15, 153:20,
160:14, 173:16,
265:24, 329:2
**supp**
35:22, 37:7,
43:24, 44:7,
44:12, 46:2,
46:4, 46:8,
47:1, 47:2,
56:3, 68:3,
68:6, 102:4,
227:14, 227:15,
241:6, 241:8,
241:9, 242:6,
242:9, 242:20,
244:17, 245:3,
245:11, 248:10,
254:8, 261:15,
262:18, 267:24,
268:3, 268:5,
268:7, 268:8,
268:10, 268:11,
268:23, 269:7,

296:19, 310:11,
310:13, 310:16,
321:9, 321:11,
321:19
**supplemental**
36:1, 36:6,
37:4, 55:12,
56:11, 67:9,
67:11, 67:13,
69:11, 69:12,
69:19, 101:24,
164:13, 182:9,
253:21
**supplementary**
6:21, 158:6,
158:9, 158:14,
161:19, 161:23,
203:13, 210:15,
210:22, 218:13,
245:6
**supplied**
176:7
**support**
112:22, 113:2
**supposed**
33:15, 43:19,
44:10, 68:12,
68:24, 69:6,
116:19, 116:20,
192:22, 200:7,
258:20, 260:14,
263:11, 263:16,
283:1, 322:4,
338:16, 338:24
**supposedly**
304:19, 341:14
**suppress**
82:1, 82:4
**supreme**
72:23, 79:19,
84:5
**sure**
8:18, 38:6,
38:10, 44:11,
69:23, 72:16,
75:23, 77:19,
78:22, 82:15,
86:22, 104:19,

112:24, 122:9,
127:10, 129:8,
138:2, 175:19,
184:23, 185:6,
189:22, 190:1,
230:1, 267:18,
267:20, 268:4,
270:18, 282:8,
301:13, 306:3,
322:16, 365:1
**surprised**
218:23
**suspect**
45:6, 46:23,
47:3, 47:6,
70:14, 70:17,
70:19, 71:15,
72:24, 73:1,
73:9, 73:12,
73:17, 73:19,
73:20, 73:23,
74:12, 74:13,
75:8, 76:1,
76:19, 79:20,
79:24, 80:17,
80:20, 83:14,
84:9, 85:9,
125:19, 126:23,
127:4, 127:13,
127:14, 128:6,
161:3, 216:23,
276:23, 282:8
**suspect's**
73:6
**suspected**
204:2, 254:15,
254:19, 255:3
**suspects**
47:12, 47:16,
48:6, 48:11,
48:12, 48:23,
64:9, 64:10,
65:4, 73:4,
74:10, 74:19,
74:21, 74:23,
75:12, 83:11,
83:23, 84:7,
84:10, 129:10,

129:14, 195:24,
273:20, 273:21,
274:4, 284:17,
298:19, 304:19,
304:22, 305:9,
308:22, 309:14,
321:14, 321:16,
333:1, 346:19,
349:6, 354:21
**suspension**
170:21
**sustained**
204:22, 205:5,
207:8, 271:22,
272:6
**sweating**
133:13
**switch**
335:24
**switched**
104:18, 245:13
**sworn**
8:10, 8:12
**sydney**
190:5
**symptoms**
133:16
**system**
55:13, 59:4,
91:21, 91:24

**T**

**t**
252:12
**table**
77:4
**tact**
23:16, 23:19,
23:24, 24:4,
24:11, 24:13,
24:15, 24:18,
27:2, 27:5,
27:8, 27:18,
28:2, 28:5,
28:10, 28:12,
29:12, 29:16,
30:5, 31:21,
31:24, 32:4

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

152

**tactical**
127:5, 151:6
**taint**
97:2
**taints**
203:24
**take**
8:23, 11:21,
17:6, 17:12,
25:13, 25:15,
25:23, 30:22,
39:17, 39:20,
39:23, 41:9,
41:11, 41:13,
41:17, 41:19,
42:2, 45:13,
46:7, 46:23,
47:7, 54:4,
56:18, 58:23,
63:5, 70:17,
77:12, 77:19,
78:10, 98:12,
99:5, 101:16,
102:12, 102:23,
103:8, 111:22,
127:10, 157:8,
157:10, 157:12,
158:15, 178:16,
182:2, 188:23,
189:11, 200:19,
215:23, 226:5,
254:1, 254:2,
260:20, 272:17,
276:11, 279:16,
280:17, 287:8,
287:20, 291:15,
291:18, 302:2,
309:7, 318:9,
318:15, 318:24,
319:7, 320:22,
329:22, 330:7,
332:14, 332:24,
333:2, 333:7,
337:12, 344:2,
344:19, 344:23,
352:16, 358:17,
368:14
**taken**
7:3, 27:11,

27:13, 50:18,
56:4, 59:2,
76:7, 76:13,
105:8, 132:5,
189:16, 199:12,
199:21, 254:10,
261:13, 272:21,
324:8, 345:2,
361:21, 370:7,
370:9
**taking**
11:22, 12:3,
35:19, 40:2,
40:17, 110:7,
114:2, 127:7,
158:19, 158:21,
189:4, 200:3,
326:14, 327:13
**talk**
98:4, 114:8,
114:10, 115:1,
115:6, 115:9,
143:5, 145:20,
152:13, 154:1,
160:16, 187:9,
217:3, 217:18,
250:5, 250:6,
250:7, 250:9,
284:16, 291:6,
293:8, 302:15,
306:6, 327:24,
328:4, 328:12,
350:8, 355:15,
355:22
**talked**
14:2, 85:20,
113:6, 113:7,
113:9, 114:19,
118:23, 133:10,
147:1, 158:2,
159:12, 172:23,
173:1, 176:21,
176:24, 180:12,
187:9, 202:1,
208:22, 230:15,
249:23, 255:7,
255:17, 255:24,
256:9, 271:5,

293:16, 334:9,
338:15, 342:20,
351:24, 352:1,
353:14, 354:5
**talking**
14:6, 14:22,
17:1, 34:17,
67:23, 74:16,
85:23, 86:4,
86:9, 87:24,
132:12, 134:16,
138:24, 143:8,
159:4, 159:22,
160:3, 160:6,
160:22, 171:15,
172:5, 174:9,
183:15, 187:12,
187:13, 214:21,
222:13, 285:3,
310:2, 317:9,
317:19, 318:19,
328:3, 334:12,
334:23, 339:22
**talks**
191:20, 245:23
**tall**
81:4, 122:24,
280:11, 281:8,
282:2
**taller**
122:23
**tallest**
279:5, 279:12
**tan**
122:3, 273:12,
300:12
**task**
54:18, 95:15
**tasks**
94:4, 160:14
**team**
23:16, 23:20,
24:1, 24:4,
27:2, 27:5,
27:8, 27:18,
28:2, 28:5,
28:10, 28:12,
29:12, 29:16,

30:5, 52:22,
127:5, 280:4
**tearful**
133:23
**tech**
20:6
**teenage**
126:9
**teenager**
126:11
**teeth**
74:3
**telephones**
339:8
**television**
235:15
**tell**
34:8, 46:22,
54:13, 77:5,
77:7, 77:13,
77:21, 78:2,
81:8, 81:10,
86:13, 94:6,
94:7, 95:2,
95:14, 95:22,
96:1, 96:3,
96:6, 96:9,
108:24, 110:13,
112:19, 113:1,
114:20, 134:4,
134:6, 134:10,
139:2, 148:6,
152:11, 156:1,
156:10, 159:14,
160:16, 162:14,
162:21, 164:19,
164:23, 166:1,
166:4, 166:5,
166:8, 166:24,
167:12, 168:13,
168:16, 168:19,
170:23, 171:2,
175:17, 176:1,
180:16, 189:24,
193:19, 197:8,
197:12, 197:19,
202:8, 204:9,
205:3, 207:13,

212:14, 213:21,
217:23, 219:8,
219:13, 220:1,
228:14, 229:2,
236:11, 237:20,
238:11, 238:17,
238:21, 256:20,
274:22, 288:11,
288:14, 288:18,
289:21, 291:7,
291:13, 293:9,
301:14, 301:21,
302:19, 303:3,
334:17, 345:7,
345:23, 349:17,
350:18, 350:24,
359:1, 364:18,
367:1

**telling**
37:1, 45:1,
67:5, 78:7,
135:12, 139:3,
139:23, 162:15,
219:1, 221:6,
222:14, 270:14,
271:18, 289:14,
294:22, 294:24,
296:7, 302:10,
302:15, 331:11,
349:1

**tells**
158:24, 299:24

**temper**
196:18, 196:21,
196:24, 197:6

**tended**
329:12

**term**
319:23

**terminals**
57:11, 60:24,
62:14

**terms**
70:17, 214:24,
234:18

**territory**
136:19

**test**
30:22, 44:24,

45:16, 254:14,
283:17, 332:24,
333:8, 334:3,
340:9, 354:18

**testified**
8:12, 112:10,
175:11, 178:7,
178:23, 179:3,
179:6, 182:23,
257:6, 257:9,
289:6, 295:15

**testify**
12:4, 17:13,
110:3, 111:3,
111:4, 112:6,
152:1, 215:23

**testifying**
81:19, 114:21,
295:4, 295:8,
320:19

**testimony**
6:13, 6:19,
58:12, 150:9,
178:11, 179:17,
187:4, 188:11,
188:19, 202:12,
272:2, 290:4,
291:21, 294:21,
295:15, 295:20,
295:21, 315:13,
369:5, 369:6,
370:9

**testing**
355:2

**tests**
44:20, 45:3,
333:2

**texas**
19:14

**th**
14:8, 14:9,
14:21, 15:1,
15:11, 19:1,
23:9, 23:10,
23:14, 23:17,
26:7, 26:11,
26:15, 27:5,
27:8, 28:14,

28:19, 28:24,
29:2, 29:7,
29:11, 29:13,
29:17, 29:22,
29:24, 30:2,
30:4, 30:8,
30:9, 31:21,
32:1, 50:19,
50:21, 51:2,
51:5, 51:6,
98:10, 98:22,
124:14, 125:14,
125:22, 127:6,
127:7, 132:6,
135:11, 156:16,
170:18, 173:7,
184:6, 197:17,
197:23, 198:14,
233:20, 234:2,
237:3, 237:24,
238:23, 240:1,
240:19, 241:16,
241:19, 241:22,
242:1, 242:4,
242:10, 260:7,
260:22, 268:5,
279:19, 285:24,
286:9, 286:17,
286:21, 301:24,
310:12, 310:18,
311:13, 311:21,
311:22, 322:4,
360:5, 360:8,
360:17, 361:1,
370:17

**than**
16:20, 21:9,
21:19, 24:16,
24:19, 29:9,
35:19, 57:8,
66:17, 70:6,
70:8, 92:4,
99:19, 99:22,
99:23, 114:10,
118:19, 122:23,
128:9, 128:19,
129:5, 137:16,
138:4, 138:9,

138:20, 139:23,
142:20, 166:7,
192:18, 193:5,
217:20, 260:8,
260:15, 298:9,
328:11, 330:22,
330:24, 346:19,
347:15, 348:18,
359:17, 365:16

**thank**
51:24, 190:4,
222:8, 368:2

**theft**
252:12

**their**
14:18, 31:18,
60:10, 60:21,
62:15, 76:13,
78:15, 78:18,
85:6, 87:11,
87:18, 88:24,
95:4, 98:5,
98:6, 98:13,
117:6, 117:9,
117:10, 117:23,
138:5, 138:9,
138:12, 138:14,
138:16, 138:17,
138:20, 153:10,
162:24, 177:1,
178:2, 183:1,
183:2, 196:14,
200:16, 218:2,
227:14, 236:18,
245:8, 247:3,
249:9, 249:10,
249:13, 251:5,
252:24, 253:2,
275:5, 333:19,
338:8, 341:24,
343:5, 345:20,
349:23, 350:12,
350:21, 351:3,
356:19, 356:22,
358:6

**themselves**
7:12, 88:14,
350:13

**there's**
48:5, 62:1,
67:6, 150:15,
163:18, 186:5,
189:9, 193:1,
193:5, 201:20,
235:24, 241:11,
247:8, 248:24,
270:6, 270:11,
270:13, 270:18,
271:17, 289:13,
289:18, 339:8,
353:1
**thereabouts**
71:18
**thereafter**
207:7, 370:10
**these**
76:2, 78:4,
95:14, 96:10,
102:11, 163:9,
163:12, 171:12,
174:23, 176:13,
177:2, 177:11,
178:2, 179:7,
180:2, 181:3,
181:15, 181:17,
183:4, 183:15,
184:8, 188:6,
200:7, 202:20,
221:1, 236:21,
236:22, 237:1,
238:18, 249:1,
273:13, 309:10,
309:13, 309:19,
341:10, 343:14,
343:16, 343:19,
345:14, 345:18,
346:9, 346:18,
347:9, 347:12,
348:5, 348:8,
348:18, 349:9,
350:10, 351:1,
351:7, 351:13,
354:11, 357:6,
359:6
**they'd**
89:11, 118:2,

118:9, 305:19
**they're**
8:20, 81:11,
89:1, 138:14,
138:16, 204:12,
219:22, 235:12,
308:16, 339:12,
341:22
**thick**
309:8, 323:10
**thing**
10:19, 10:24,
30:6, 35:9,
37:3, 39:4,
55:9, 144:15,
147:1, 170:17,
170:21, 260:11,
278:8, 292:23,
300:3
**things**
26:22, 35:18,
41:13, 58:4,
59:21, 59:22,
62:23, 71:2,
74:1, 74:4,
96:22, 106:19,
193:10, 197:4,
198:7, 265:10,
349:1
**think**
19:22, 22:9,
25:2, 25:7,
31:4, 31:8,
46:13, 71:11,
81:10, 82:19,
82:21, 82:23,
91:4, 104:17,
110:6, 121:6,
122:23, 123:9,
138:11, 138:18,
138:24, 139:22,
141:23, 142:7,
145:7, 146:19,
148:12, 148:14,
148:16, 153:20,
154:11, 162:24,
165:2, 169:10,
169:12, 170:20,

172:23, 180:20,
184:18, 187:4,
188:5, 190:8,
202:12, 206:7,
206:15, 208:18,
211:12, 221:21,
221:24, 234:12,
244:3, 245:15,
245:16, 265:6,
265:7, 266:24,
268:21, 272:17,
317:18, 318:9,
336:16, 354:2,
359:3, 359:9,
361:4
**thinking**
180:24, 285:1
**third**
52:24, 94:18,
120:3, 120:4,
120:7, 123:4,
244:3, 270:3,
288:22, 288:24,
294:3, 296:8,
304:4, 329:20,
330:3, 330:9
**third-party**
36:9
**third-watch**
96:4
**thomas**
3:18
**those**
9:10, 9:22,
21:1, 39:15,
41:4, 45:3,
48:12, 57:18,
59:9, 59:12,
64:14, 64:20,
64:24, 90:2,
90:4, 93:23,
101:6, 102:21,
102:23, 103:12,
104:9, 106:21,
107:18, 108:13,
112:15, 126:10,
132:8, 150:2,
158:9, 173:20,

174:16, 174:18,
175:9, 176:15,
176:16, 179:22,
179:23, 195:8,
213:23, 215:3,
224:1, 226:7,
226:21, 236:5,
236:8, 236:17,
237:10, 237:21,
238:8, 238:12,
238:13, 238:22,
239:1, 239:2,
241:14, 247:15,
265:9, 266:6,
268:8, 276:16,
284:22, 308:11,
313:8, 333:4,
335:15, 336:1,
336:20, 337:5,
337:23, 342:5,
342:18, 342:23,
343:7, 343:19,
349:19, 351:16,
352:9, 352:13,
353:2, 353:4,
353:24, 356:17,
360:22, 361:1,
364:13, 365:20,
367:18
**though**
29:4, 42:23,
185:15, 316:1,
321:23
**thought**
24:15, 31:2,
31:6, 67:4,
112:20, 142:1,
153:14, 169:8,
169:14, 191:3,
191:13, 194:13,
201:22, 223:2,
223:6, 223:9,
223:11, 245:14,
305:17, 307:9,
319:10, 325:8,
348:2, 348:4,
348:7, 351:1,
353:24, 360:2,

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

155

360:14
**three**
14:17, 21:1,
23:15, 29:9,
32:24, 57:10,
75:12, 75:13,
75:16, 83:23,
84:7, 119:10,
119:19, 119:20,
120:2, 120:11,
162:16, 162:18,
162:22, 163:9,
163:12, 163:19,
164:10, 164:24,
173:8, 173:11,
173:20, 173:23,
174:17, 174:18,
175:9, 176:7,
176:13, 177:10,
178:1, 180:4,
181:15, 182:16,
183:4, 183:12,
183:15, 184:8,
226:7, 226:16,
226:21, 236:18,
239:2, 266:13,
273:17, 273:20,
273:21, 274:4,
284:16, 285:6,
288:20, 304:18,
304:19, 304:22,
305:9, 305:12,
309:13, 321:12,
341:13, 341:19,
342:18, 343:3,
343:13, 343:16,
349:19, 351:16,
351:21, 352:3,
352:9, 352:14,
352:23, 353:2,
353:4, 354:11,
355:10, 355:19,
356:13, 356:17,
356:22, 357:4,
358:3, 358:5,
359:19
**three-block**
55:7

**threw**
229:10
**through**
54:15, 61:7,
61:9, 76:18,
98:12, 101:17,
111:20, 130:20,
175:24, 192:7,
201:11, 236:2,
240:23, 241:3,
331:21
**throughout**
257:16
**thus**
10:21, 211:14
**ticket**
150:6, 170:20,
197:18, 199:5
**tile**
336:8
**tim**
351:20
**time-frame**
146:20
**timekeeper**
20:24, 50:6
**times**
30:22, 98:4,
98:17, 120:11,
142:13, 142:24,
168:23, 244:22,
359:10, 365:10
**timothy**
223:6, 286:24,
287:4, 287:10,
287:13, 287:14,
287:21, 298:6,
300:20, 300:23,
301:3, 301:23,
302:9, 302:18,
302:20, 302:22,
303:3, 303:10,
304:4, 306:10,
306:13, 306:17,
307:17, 307:18,
307:23, 308:1,
309:11, 310:6,
311:7, 317:21,

341:5, 341:8,
341:12, 341:17,
341:21, 344:15,
345:9, 346:18,
347:21, 348:9,
348:22, 349:13,
349:18, 349:23,
350:9, 350:19,
350:20, 367:15
**tired**
189:20
**title**
53:19
**today**
7:9, 9:20,
9:22, 12:4,
140:1, 180:1,
197:16, 238:19,
292:13, 353:14,
362:21, 364:7,
364:14
**today's**
131:5
**together**
14:16, 47:17,
50:2, 77:10,
196:16, 218:3,
328:6
**tom**
7:20
**tone**
232:13
**too**
55:10, 105:19,
126:23, 138:23,
164:17, 171:17,
172:16, 180:6,
180:15, 264:3,
292:15, 360:4
**took**
25:12, 25:19,
30:13, 30:16,
40:3, 53:16,
53:17, 98:11,
146:2, 169:23,
170:21, 173:9,
206:11, 206:21,
216:2, 254:2,

276:14, 276:16,
277:2, 284:17,
314:21, 319:9,
319:21, 319:24,
320:20, 335:4,
340:8
**tool**
44:22, 283:3,
283:5, 283:6
**top**
185:23, 203:3,
213:17, 213:19,
259:23, 288:7,
331:9
**total**
94:24
**totally**
277:13
**touch**
50:12, 257:17,
257:18, 258:1
**tour**
20:24, 21:2,
21:4
**tours**
21:5, 21:6
**towards**
122:4
**tracks**
229:22, 230:6
**traditional**
350:12
**trained**
33:1, 33:12,
33:15, 33:20,
33:24, 37:9,
39:17, 39:20,
39:22, 40:1,
40:16, 40:20,
41:4, 72:18,
73:8, 81:13
**training**
6:24, 22:11,
40:7, 40:10,
115:18, 115:22,
116:1, 116:18,
361:14, 363:3,
363:8, 363:16,

363:21, 364:2,
364:8, 364:12,
364:15, 364:19,
364:20, 364:24
**trainings**
364:13
**transcript**
6:8, 6:13,
121:5, 121:16,
178:18, 185:3,
190:16, 191:21,
223:17, 225:12,
290:22, 316:11,
362:3, 362:17,
368:10, 370:8
**transcription**
369:6
**transcripts**
120:24, 121:3,
121:7, 121:8
**transfer**
91:18
**transferred**
28:14, 28:16
**trevino**
195:21, 195:23,
196:5, 196:9,
196:11
**trial**
6:13, 68:5,
175:12, 175:14,
178:7, 179:6,
187:4, 192:20,
192:23, 193:5,
219:6, 257:6,
257:9
**trick**
214:17
**tried**
80:22, 151:24,
152:8, 166:14,
210:16, 211:8,
211:11, 211:18,
239:9, 269:18,
278:16
**trigger**
327:6
**trouble**
279:18, 281:24

**troubles**
328:1
**true**
42:17, 42:24,
43:14, 44:2,
44:11, 44:14,
178:13, 214:4,
272:10, 369:5,
370:8
**truly**
38:11
**trust**
169:10, 169:13,
169:16, 170:3,
213:13
**trusted**
169:21
**truth**
45:2
**truthful**
106:14, 107:6,
107:14, 107:17,
107:18, 107:19,
112:3, 179:5,
262:9, 262:11,
262:14, 262:17,
262:20
**truthfully**
12:4
**try**
11:5, 32:13,
37:16, 39:2,
44:8, 46:24,
47:21, 55:1,
70:19, 73:8,
73:13, 73:17,
73:19, 73:22,
75:23, 80:16,
86:18, 98:9,
104:19, 136:22,
136:23, 146:4,
164:15, 192:7,
192:17, 207:16,
208:15, 209:14,
211:4, 234:4,
283:3, 302:2,
328:15, 328:18
**trying**
85:5, 92:24,

144:9, 146:7,
155:2, 169:8,
170:13, 211:15,
214:16, 239:3,
267:10, 275:1,
278:19, 282:7,
305:5, 305:23
**tuition**
20:17
**turn**
190:21, 191:5,
191:6, 223:19,
225:15, 244:9,
244:10, 244:20,
245:10, 252:6,
257:13, 258:7,
261:14, 270:3,
270:5, 273:2,
273:3, 282:13,
293:17, 297:3,
309:20, 316:22,
323:9
**turned**
95:15, 107:15,
223:5, 262:6,
266:5, 266:13,
266:19, 316:3,
355:6
**turning**
258:14, 312:16
**turns**
351:2
**tv**
308:12
**twice**
217:21
**two**
9:9, 9:10,
9:21, 9:23,
10:1, 47:18,
57:10, 74:10,
74:11, 74:19,
74:23, 75:2,
84:8, 98:1,
105:3, 108:13,
120:2, 120:12,
126:2, 126:3,
146:15, 200:1,

224:5, 241:11,
241:14, 241:15,
242:12, 268:8,
271:11, 288:21,
300:11, 321:14,
321:16, 325:3,
347:20, 352:5,
354:8, 358:15
**two-part**
55:13
**type**
35:22, 37:5,
46:20, 55:14,
55:17, 55:20,
75:18, 186:16,
277:11, 330:23
**typed**
35:12, 35:18,
43:6, 44:8,
44:12, 47:1,
55:15, 55:23,
58:7, 99:12,
99:16, 210:21,
221:2, 225:7,
257:22, 262:10,
262:13, 263:3,
285:18, 285:20,
285:21, 285:22,
285:23, 286:15,
312:13, 313:4,
313:13, 313:17,
313:23, 314:5,
314:11, 314:17,
315:16
**types**
71:18
**typewriter**
55:14
**typewriting**
370:11
**typewritten**
56:18
**typical**
123:18
**typically**
38:1, 124:10,
129:4, 129:13,
246:10, 264:19

**typing**
56:5, 164:13, 264:12, 265:12, 306:20, 307:3, 313:9, 313:10, 314:21, 315:5, 315:16, 315:21

**typo**
186:3, 186:4, 186:13, 215:13, 215:14, 260:14

**typographical**
186:5, 187:20, 187:23, 188:3

**U**

**ubiquitous**
339:16

**uh-huh**
225:19, 227:12, 234:21, 241:7, 241:12, 248:21, 250:17, 252:13, 252:17, 253:7, 253:9, 259:2, 259:4, 294:7, 298:21, 312:22, 356:8

**ultimately**
207:11

**unable**
71:7, 71:11, 71:14, 207:17, 210:6, 210:17, 211:10, 211:17

**unaware**
272:8

**uncover**
251:5, 251:7

**under**
41:7, 179:6, 223:21, 252:12, 277:23, 282:23, 283:2, 329:23, 333:1, 333:6, 333:13, 370:11

**underneath**
247:15

**understand**
11:9, 11:13, 12:12, 69:9, 88:23, 105:13, 110:9, 130:15, 141:7, 141:21, 146:22, 172:8, 195:8, 195:15, 196:10, 229:21, 230:17, 230:19, 230:20, 245:6, 326:24

**understanding**
44:9, 154:7, 191:2, 195:24, 196:12

**understood**
11:17, 12:12, 43:18, 191:10, 217:20

**underway**
125:18

**undisclosed**
87:8

**unfair**
83:8, 148:24

**unfortunately**
63:8

**unit**
51:17, 152:18, 152:23, 153:5, 153:8, 154:9, 154:17, 155:5, 155:13, 156:11, 159:16, 242:23, 243:12, 243:17, 244:2, 316:18, 317:16, 318:5, 318:8, 365:14

**united**
1:1

**unknown**
176:18

**unless**
189:24, 344:16

**unlock**
67:22

**unmarked**
149:22, 149:23

**until**
11:1, 11:6, 34:2, 34:10, 54:2, 93:20, 97:11, 117:16, 119:12, 194:6, 203:13, 234:7, 256:10, 314:19, 315:4, 315:6, 321:15, 321:17, 349:1, 355:15, 361:5

**unusual**
246:14, 246:18

**upon**
98:11, 338:2, 339:13

**upper**
312:17, 313:12, 313:15, 313:21, 314:2, 314:9, 314:16, 314:24, 315:10, 315:20

**use**
41:4, 41:7, 44:7, 44:20, 44:24, 54:18, 55:13, 69:24, 72:24, 75:18, 76:7, 79:12, 79:15, 79:17, 79:20, 88:13, 88:17, 89:14, 101:6, 274:8, 280:1, 319:23, 320:16, 337:6, 337:14, 338:7, 346:24, 347:1, 350:11, 351:12, 364:22

**used**
36:10, 39:1, 41:1, 56:22, 75:17, 75:20, 90:22, 100:24, 101:10, 101:12, 107:16, 107:19, 170:24, 186:18, 196:18, 197:9, 197:13, 198:2, 198:17, 199:4, 199:6, 202:3, 240:4, 240:10, 266:4, 280:13, 334:18, 350:12, 351:15

**using**
79:22, 101:14, 179:9, 192:4, 192:7, 206:15, 351:1

**usual**
246:1, 246:24

**usually**
186:17, 331:4

**utmost**
295:14

**V**

**v**
290:24, 291:24, 292:2, 292:22, 293:21, 295:20

**vacant**
208:21, 210:18, 210:19, 210:20, 270:9

**vague**
26:17, 70:21, 83:15, 143:7, 143:14, 146:20, 150:18, 184:3, 339:21

**validity**
220:21, 221:14, 222:4, 222:17

**van**
246:1, 246:2, 300:6, 300:8, 300:13, 344:10, 344:12, 345:3, 345:6, 349:3

**vantage**
300:15

**vargas**
66:13, 147:19,

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

158

147:22, 149:5,
159:5, 159:8,
159:12, 159:22,
160:3, 160:6,
160:18, 160:22,
161:3, 176:4,
186:22, 186:23,
201:4, 201:7,
203:7, 208:9,
218:13, 225:23,
230:8, 230:16,
234:5, 234:6,
254:20, 255:4,
257:4, 258:5,
259:16, 259:20,
260:5, 260:13,
271:21, 272:3,
272:6, 273:5,
273:7, 274:4,
276:1, 277:6,
282:1, 287:7,
298:17, 310:11,
310:17, 311:2,
344:7, 344:13,
352:1, 355:19,
366:4, 367:6,
367:8, 367:12,
367:13, 367:16

**varied**
94:19

**various**
20:22, 20:23

**vehicle**
207:21, 244:22,
276:23

**vehicles**
276:22

**velez**
245:22, 246:21,
253:14, 254:9,
254:14, 261:12

**velez's**
252:10, 261:3

**vents**
332:8

**verbal**
170:19

**verbatim**
191:21, 229:17

**verify**
97:12, 203:14,
204:9, 204:20,
205:4, 205:16,
205:20, 207:2,
252:3, 269:18,
321:6

**verifying**
203:23

**versus**
7:6

**very**
84:23, 86:8,
87:7, 88:17,
125:16, 212:5,
212:7, 212:10,
234:13, 268:13,
275:7, 302:21,
307:12, 326:3

**via**
165:15

**vicente's**
146:4, 162:3,
203:23, 206:2,
207:11, 207:24,
208:4, 211:16,
213:3, 295:15,
295:20, 296:23,
366:16, 366:22

**victim**
216:21, 216:22,
244:21, 246:2,
246:9, 246:23,
271:14, 325:8

**victim's**
146:10, 230:16,
246:1, 260:1

**victims**
326:2

**video**
7:2, 368:6,
368:8

**videographer**
5:12, 7:2,
7:11, 105:7,
105:10, 189:15,
189:18, 272:20,
272:23, 324:7,

324:10, 351:10,
361:20, 361:23,
368:6

**videotaped**
1:17, 2:1

**view**
78:21, 128:21,
128:24, 282:21,
310:17

**viewed**
79:7, 79:11,
148:18, 310:11,
310:14, 310:22,
311:5, 311:9,
312:4

**viewing**
78:2, 79:6,
79:9, 79:24,
101:19, 102:14,
128:15

**violate**
111:23

**violated**
84:5

**violates**
333:19

**violent**
51:12, 51:16,
51:20, 57:2,
57:4, 57:12,
57:15, 57:19,
60:5, 60:9,
60:13, 61:5,
61:9, 61:11,
61:20, 61:23,
62:2, 62:17,
63:3, 63:7,
64:2, 71:17,
72:2, 72:9,
72:12, 91:7,
91:11, 92:11,
92:14, 92:21,
93:1, 93:3,
124:9, 124:11,
258:19

**voluntarily**
283:13, 283:20,
332:21, 332:23,

333:5, 333:8,
333:12

**volunteer**
28:19, 45:12,
333:14

---
**W**
---

**wacker**
4:5

**wait**
10:24, 11:6,
189:8

**waive**
110:9

**walk**
18:1, 18:3,
18:7, 18:12,
18:16, 63:6,
63:20, 338:23

**walked**
18:17, 63:19,
123:15, 200:6,
202:1, 352:4

**walking**
18:19, 63:10,
63:11, 63:13,
64:1, 338:24

**wall**
61:17, 63:19,
63:22, 335:19,
335:20

**walls**
336:3, 336:5,
336:10, 336:12,
336:14, 336:20,
336:21

**wander**
338:18

**want**
10:16, 20:12,
23:24, 24:3,
24:10, 24:24,
25:5, 26:9,
26:15, 31:1,
46:23, 49:11,
64:6, 64:9,
65:5, 78:3,
85:8, 85:13,

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

159

86:5, 86:23, 87:3, 89:7, 97:2, 97:7, 105:3, 109:13, 138:12, 139:6, 139:11, 139:17, 139:20, 140:21, 141:13, 154:24, 167:3, 167:5, 178:11, 185:4, 192:9, 193:15, 205:9, 205:16, 205:20, 231:5, 231:8, 232:9, 248:13, 250:7, 277:17, 280:16, 280:22, 296:5, 302:5, 304:10, 304:14, 306:2, 306:5, 320:16, 329:19, 338:17, 343:22, 344:1, 344:5, 353:15, 354:15, 354:18, 354:23, 355:3, 355:9, 355:10, 355:19, 357:17, 368:9

**wanted**
24:21, 24:23, 26:18, 26:22, 31:23, 32:8, 32:10, 38:9, 45:7, 45:12, 52:21, 54:12, 55:6, 58:20, 60:21, 74:10, 89:24, 91:7, 98:15, 101:16, 111:21, 112:2, 142:1, 153:9, 154:23, 164:12, 167:7, 168:3, 168:7, 171:10, 172:3, 172:10, 172:19, 183:5, 183:9, 183:11, 183:17, 183:20,

200:13, 203:14, 204:9, 204:20, 205:4, 206:1, 206:4, 206:5, 207:2, 223:19, 232:19, 232:22, 284:16, 284:19, 287:8, 298:16, 302:12, 318:9, 318:15, 319:7, 348:9, 348:12, 348:15, 348:17, 354:10

**warming**
246:3, 246:10, 246:23

**warned**
217:16

**warrant**
324:2

**warrants**
318:14, 318:17, 319:5, 319:6

**wasn't**
26:6, 27:10, 30:1, 30:7, 94:9, 94:10, 94:11, 94:13, 118:1, 140:9, 150:21, 156:20, 159:22, 200:16, 202:23, 209:9, 209:18, 248:4, 252:5, 253:4, 261:5, 261:9, 282:23, 328:4, 333:13, 350:17, 353:17, 355:2, 359:24

**watch**
52:23, 52:24, 93:16, 93:20, 94:18, 96:10

**watching**
31:13

**water**
337:17, 337:21

**way**
11:12, 38:8,

47:21, 59:2, 67:20, 71:15, 85:17, 88:9, 101:4, 111:14, 113:1, 139:14, 153:17, 190:2, 191:5, 191:6, 200:11, 203:24, 210:2, 218:15, 220:1, 221:7, 221:22, 222:14, 223:10, 230:1, 260:18, 272:13, 278:12, 282:9, 284:24, 291:5, 291:8, 293:7, 293:10, 306:22, 308:21, 329:20, 330:3, 337:6, 338:12, 338:13, 344:15, 366:21

**ways**
75:10

**we'd**
38:19, 78:8, 80:13, 91:24, 93:20, 94:6, 95:14, 95:19, 98:9, 98:16, 98:17, 98:23, 102:4, 102:21, 154:1, 197:3, 275:4, 283:24

**we'll**
11:17, 77:15, 192:8, 234:16, 264:15, 284:1, 294:2, 311:11, 316:7, 368:5

**we're**
9:20, 11:2, 38:19, 57:9, 98:6, 138:24, 172:5, 174:9, 180:14, 189:4, 189:8, 189:9, 193:11, 193:17, 194:8, 267:18,

272:17, 297:5, 297:6, 357:20

**we've**
43:21, 104:13, 105:2, 119:8, 120:2, 121:20, 293:19, 312:6, 340:24, 362:5, 363:1

**wear**
122:11

**wearing**
122:2

**wednesday**
1:19

**week**
29:15, 165:10, 186:17, 233:21

**weeks**
32:24, 118:17, 119:8, 119:10, 119:19, 119:21

**weigh**
123:2

**weighed**
282:3

**weight**
71:1, 74:7, 80:21, 205:23

**weights**
356:23

**weird**
348:2, 348:4, 351:1

**went**
15:15, 15:17, 15:23, 18:14, 18:15, 23:16, 54:13, 55:15, 56:3, 104:3, 124:21, 125:9, 126:22, 127:3, 127:11, 128:5, 140:19, 146:11, 146:12, 147:1, 147:4, 155:10, 156:10, 170:18, 173:4, 173:6,

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

160

178:1, 184:5,
184:12, 185:12,
187:6, 200:14,
201:21, 207:9,
207:23, 208:17,
209:8, 209:21,
211:13, 216:12,
216:14, 217:7,
230:15, 255:24,
256:10, 279:2,
279:12, 279:22,
291:6, 293:8,
305:10, 309:3,
309:4, 357:9,
357:10, 358:2,
363:21

**weren't**
44:11, 68:23,
103:23, 147:6,
156:21, 179:7,
191:8, 195:24,
210:9, 274:20,
284:9, 284:12,
321:14, 328:5,
328:6, 338:24,
355:23

**west**
4:5, 4:13,
276:2

**what's**
92:7, 97:23,
110:11, 124:12,
170:6, 202:2,
209:10, 219:19,
223:23, 247:12,
272:12, 274:9,
280:1, 281:19,
286:5, 286:22,
314:1, 317:11,
328:10, 330:13,
330:18

**whatever**
43:23, 70:9,
86:18, 101:16,
101:19, 322:19,
322:21, 334:13,
351:19, 352:8,
354:10, 356:12,

356:16, 357:17
**whatsoever**
285:9
**wheel**
266:4, 266:13,
266:19
**whenever**
89:7, 148:22,
361:1
**whereabouts**
251:16, 251:18,
251:20
**whereof**
370:16
**whether**
33:16, 39:8,
41:11, 43:13,
43:14, 44:1,
44:14, 66:10,
78:17, 90:4,
105:14, 107:23,
108:9, 108:21,
109:1, 109:16,
110:16, 136:6,
136:14, 136:23,
139:11, 143:2,
145:3, 147:14,
167:15, 168:3,
194:24, 219:3,
272:14, 293:19,
366:11, 367:22
**which**
16:3, 18:5,
19:19, 38:1,
53:3, 60:2,
75:15, 92:14,
95:21, 95:24,
102:18, 106:20,
111:16, 118:24,
125:4, 126:3,
126:5, 126:7,
130:4, 133:8,
135:10, 146:11,
171:14, 172:5,
172:21, 174:2,
180:14, 185:21,
187:2, 207:3,
244:12, 252:8,

264:15, 266:14,
269:13, 269:20,
270:5, 276:14,
281:21, 292:1,
293:20, 304:17,
305:15, 312:1,
312:14, 312:18,
317:3, 323:11,
324:20, 329:16,
335:6, 335:9,
346:20, 351:18,
357:3, 363:8
**whichever**
91:19
**while**
16:8, 16:23,
17:16, 22:15,
26:10, 31:24,
37:13, 40:1,
43:6, 51:2,
52:1, 55:3,
58:21, 147:3,
158:20, 170:24,
171:3, 194:18,
198:8, 300:21,
300:23, 334:21
**white**
75:21, 300:7
**whoever**
91:19, 92:1,
101:3, 177:9,
252:20, 337:13
**whole**
56:15, 141:12,
227:10, 227:11,
300:2
**wholeheartedly**
285:11
**wholly**
339:12
**whom**
370:6
**whose**
40:15, 73:4,
91:15, 140:11,
252:18, 252:21,
322:16, 323:2
**wide**
335:18

**wife**
146:10, 230:16,
234:6, 250:11,
325:2, 326:1
**wife's**
193:23, 194:7,
194:21
**wilda**
146:9, 146:13,
146:15, 147:2,
147:7, 147:9,
147:19, 147:22,
148:19, 149:5,
150:3, 186:22,
186:23, 187:8,
187:9, 187:10,
187:12, 187:14,
218:16, 218:20,
220:2, 220:8,
220:15, 221:8,
221:22, 222:14,
230:16, 234:6,
250:5, 251:1,
251:11, 251:12,
252:2, 255:8,
255:16, 255:24,
256:4, 256:9,
257:4, 257:17,
258:2, 258:5,
271:21, 272:3,
272:6, 272:9,
272:14, 273:5,
273:7, 274:3,
276:1, 276:6,
276:18, 277:5,
282:1, 282:21,
310:10, 310:17,
310:21, 311:2,
311:10, 312:2,
312:4, 352:1,
352:8, 352:13,
354:8, 354:11,
355:19, 355:22
**wilda's**
146:11, 149:7
**will**
7:12, 77:22,
112:4, 155:9,

193:2, 248:22, 249:1, 252:15, 268:15, 270:6, 291:18, 292:17, 292:18, 362:14, 368:14

**willing**
84:19, 87:3, 87:5, 141:16

**win**
82:6

**window**
79:8, 79:10, 245:24, 336:22, 336:23

**windows**
64:15, 64:18, 64:20, 64:24, 65:9, 65:12, 336:12, 336:20, 336:21

**withdraw**
47:21, 85:12

**withdrawal**
133:16

**withdrawn**
212:3

**withheld**
164:3, 211:15

**withhold**
97:11

**withholding**
303:7

**within**
23:17, 61:17, 64:2, 152:22, 229:23, 237:7, 237:9

**without**
41:22, 87:18, 107:11, 225:6, 319:1

**witness**
8:10, 17:8, 34:8, 35:7, 36:2, 36:7, 37:1, 37:23, 38:1, 38:11,

38:13, 38:15, 38:17, 38:23, 39:1, 39:2, 39:15, 70:16, 70:18, 71:4, 71:7, 71:8, 71:11, 71:12, 71:14, 76:22, 77:5, 77:13, 77:21, 78:12, 86:12, 86:17, 102:19, 104:20, 106:24, 107:10, 129:24, 130:4, 130:6, 130:9, 140:17, 142:8, 142:17, 155:2, 157:22, 163:5, 167:15, 186:1, 186:2, 186:4, 186:7, 186:10, 186:15, 192:8, 193:7, 193:10, 193:15, 205:12, 215:20, 216:9, 217:1, 220:23, 237:15, 249:23, 287:6, 298:17, 302:7, 325:23, 329:21, 330:6, 353:15, 353:17, 353:18, 353:20, 357:22, 359:3, 359:6, 359:9, 370:16

**witness's**
38:11, 73:18, 188:11

**witnessed**
139:7, 139:12, 300:15, 318:23, 324:15, 325:12, 325:16, 326:22, 327:8, 355:7

**witnesses**
37:16, 38:9, 39:8, 39:13, 64:6, 64:11,

65:4, 70:12, 127:13, 127:20, 128:6, 128:13, 128:17, 128:20, 128:21, 129:11, 129:15

**witnessing**
319:2

**woke**
234:10, 234:12, 255:9

**woman**
298:1

**women**
80:24

**wondering**
321:18, 322:7

**woodall**
213:5, 214:5, 214:6, 214:8, 214:20, 215:2, 215:9

**woodard**
213:7, 213:8, 214:6, 215:12

**word**
55:15, 55:20, 55:23, 206:15, 213:7, 241:6, 292:16

**words**
247:9, 247:15, 291:18, 329:15

**work**
24:23, 24:24, 25:3, 26:18, 26:19, 29:10, 31:14, 50:2, 50:23, 51:3, 51:7, 52:7, 52:21, 53:7, 60:21, 62:5, 62:8, 62:15, 66:3, 72:1, 72:6, 72:7, 72:8, 80:12, 89:20, 95:10, 112:1, 113:19,

116:5, 116:10, 123:21, 124:2, 124:5, 124:8, 124:11, 126:21, 132:14, 145:6, 155:15, 155:21, 155:23, 156:2, 156:3, 194:4, 230:13, 230:14, 233:6, 234:7, 234:14, 252:3, 252:4, 320:24, 329:12

**worked**
22:13, 24:16, 24:19, 41:16, 52:5, 62:9, 72:3, 89:13, 123:20, 195:5, 234:1, 328:6

**working**
23:15, 34:19, 46:18, 46:20, 47:17, 50:21, 52:23, 52:24, 53:15, 59:10, 59:11, 65:16, 65:18, 66:14, 72:5, 72:10, 72:12, 91:20, 93:19, 94:17, 113:13, 116:22, 144:14, 156:20, 156:21, 164:1, 226:16, 227:22, 230:8, 245:2, 255:19, 319:16, 337:8, 338:3

**works**
20:1

**workspace**
60:10

**workspaces**
60:22

**world**
200:7, 201:13, 344:15

**wouldn't**
35:15, 38:24,

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

162

41:19, 42:1,
42:20, 46:20,
77:13, 80:23,
81:2, 83:5,
96:14, 104:12,
117:19, 139:20,
140:7, 140:19,
140:21, 162:2,
168:13, 192:20,
192:21, 211:1,
211:4, 246:20,
248:13, 306:16,
356:16, 357:17
**wrightwood**
126:8, 126:12
**write**
35:9, 35:11,
35:13, 35:15,
93:23, 94:7,
117:19, 117:20,
182:10, 200:2,
234:24, 349:4
**writing**
33:2, 42:13,
96:22, 260:20,
313:8
**written**
33:5, 35:20,
37:4, 43:6,
43:24, 44:7,
200:13, 289:9,
315:19
**wrong**
12:21, 29:4,
32:20, 32:22,
87:10, 87:16,
202:5, 202:22,
202:23, 204:12,
211:8, 211:11,
211:14, 211:18,
211:23, 214:18,
223:11, 245:16,
264:13, 265:6,
265:9, 265:14,
266:5, 267:13,
267:14, 267:15,
268:15, 268:19,
269:5, 269:8,

274:9, 277:13,
279:15, 296:2,
315:2, 317:8,
343:18, 345:13
**wrongfully**
201:10
**wrote**
117:9, 186:14,
252:20

**X**

**xerox**
58:7, 58:15
**xeroxed**
58:9
**xeroxing**
327:13

**Y**

**yeah**
18:24, 22:23,
26:13, 27:1,
38:8, 42:22,
57:7, 62:22,
62:24, 69:23,
70:24, 87:15,
113:12, 115:4,
140:6, 143:9,
153:19, 166:13,
169:19, 174:6,
179:19, 179:21,
180:24, 186:16,
188:12, 212:12,
212:21, 215:5,
218:9, 227:7,
227:8, 231:17,
231:19, 237:8,
237:20, 239:12,
244:8, 249:4,
249:8, 258:24,
260:6, 267:7,
267:22, 269:24,
283:7, 284:15,
287:19, 290:7,
292:4, 292:23,
293:13, 293:24,
301:9, 306:3,
311:1, 315:24,

317:10, 317:24,
327:2, 331:16,
339:23, 345:19,
346:4, 347:3,
347:22, 352:8,
353:17, 354:7,
356:10, 358:9,
361:17
**year**
9:15, 9:19,
10:2, 14:4,
14:6, 14:21,
52:3, 52:8,
66:9, 66:11,
72:3, 72:9,
217:13
**years**
21:9, 21:19,
22:14, 23:16,
27:3, 27:4,
27:8, 28:13,
29:9, 40:18,
51:11, 51:15,
52:18, 53:11,
63:17, 116:12,
117:24, 126:9,
126:17, 134:13,
134:21, 143:19,
231:14, 231:18,
231:19, 231:24,
232:3, 298:8,
307:9, 341:7,
341:14, 348:21
**yell**
197:2
**yelled**
197:1
**yep**
294:9, 311:8,
359:8
**yesterday**
118:14, 119:4,
119:5, 119:7,
119:9, 119:11,
119:15, 119:18
**yet**
181:21, 200:2,
263:20, 284:10,

288:11, 288:15
**york**
3:15
**you'd**
55:20, 56:17,
56:18, 75:3,
84:8, 96:6,
96:9, 130:21,
162:8, 270:4,
321:8, 338:11,
340:23, 359:23
**you've**
9:21, 10:20,
11:17, 75:10,
120:10, 131:24,
170:7, 231:14,
240:18, 240:21,
241:24, 242:6,
242:12, 252:7,
268:6, 268:7,
281:14, 281:20,
312:21, 327:8,
343:2, 349:13,
363:10
**young**
298:1
**yours**
227:11
**yourself**
106:10, 106:13,
176:20
**youth**
258:24, 259:3,
259:5, 259:8,
259:9

**.**

**.3003**
3:23
**.3300**
4:16
**.3939**
4:7

**0**

**00**
119:12, 119:13,
119:22, 120:8,

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

163

120:9, 123:16, 123:19, 123:20, 123:22, 132:14, 133:3, 155:16, 220:8, 262:23, 286:18, 298:11, 309:24, 310:2, 310:3
**010**
363:15
**018247**
247:24, 248:17
**05066**
175:20, 175:21
**06**
1:20, 7:10

---

**1**

**1**
6:18, 189:15, 189:16
**10**
1:20, 6:24, 7:10, 16:20, 62:18, 74:24, 75:4, 94:24, 95:1, 119:12, 119:22, 120:8, 247:6, 301:24, 328:11, 334:4, 334:5, 335:18, 362:14, 362:15, 363:2
**1000**
3:13, 4:23
**104**
364:1, 364:20
**11**
93:19, 94:16, 105:7, 105:8, 173:7, 184:6, 231:14, 231:18, 236:2, 247:7, 248:20, 260:7, 260:21, 260:22, 262:23, 265:1, 265:5, 279:19, 280:11, 310:12,

310:18, 311:13
**1121**
357:10
**11238**
3:15
**114**
309:8
**12**
6:20, 93:20, 105:9, 105:11, 240:14, 286:21, 311:22
**120**
3:20
**1208**
311:17
**121**
6:12
**1240**
4:14
**1282**
361:12, 361:14
**1295**
363:9
**1296**
361:12, 361:14, 361:16
**13**
126:17, 156:16, 233:20, 234:2, 240:19
**14**
6:17, 124:14, 143:9, 170:18, 197:17, 197:23, 198:14, 200:23, 241:16, 241:19, 241:22, 242:1, 242:4, 242:10, 268:5, 285:13, 285:24, 286:17, 287:21, 322:4, 363:8, 363:11, 363:17
**141**
4:13
**148**
6:18

**149**
6:15
**15**
62:18, 143:9, 203:11, 227:14, 241:5, 286:9, 286:21, 311:17, 311:21, 311:22, 363:11
**150**
278:24, 281:15, 281:21
**153841**
252:12
**155**
244:11, 244:15
**157**
244:20
**158**
245:12
**16**
6:20, 241:10, 241:11, 290:4, 370:20
**162**
245:13, 245:15, 252:9
**163**
245:15
**164**
247:5
**169**
258:10, 258:15
**17**
1:7, 1:13, 7:5, 7:7, 23:9, 23:10, 23:14, 23:17, 26:7, 26:11, 26:15, 27:5, 27:8, 30:2, 30:4, 30:8, 50:19, 50:21, 51:2, 51:5, 125:14, 125:22, 127:6, 127:7, 175:24, 241:11
**170**
123:3

**171**
261:14
**172**
185:20, 185:22, 313:20, 314:3, 329:19
**173**
185:6, 187:3, 187:24, 314:9, 353:9
**174**
273:3, 314:14, 315:1, 315:11, 315:20
**175**
311:3, 311:4, 311:12
**177**
6:15, 286:14
**178**
6:13, 297:9, 297:13, 346:23
**179**
300:5, 304:2
**18**
241:22, 370:17
**180**
307:12
**181**
309:21
**183**
282:13, 282:14
**1838**
344:7
**184**
332:15
**1845**
310:12, 310:18
**185**
6:14, 312:7, 312:16, 316:23
**1850**
3:16
**186**
312:16, 312:19, 317:4, 317:9, 340:24
**187**
293:18, 313:15,

321:8
**19**
105:9, 105:11,
113:13
**190**
6:16
**193**
277:18, 311:24,
312:2
**1968**
20:8
**1969**
19:22
**1972**
23:3, 32:19
**1981**
363:17
**1982**
71:18
**1983**
364:4
**199**
201:18
**1990**
66:8, 144:12,
144:18, 145:2,
145:4, 145:20,
324:21
**1991**
66:10
**1992**
66:10
**1994**
290:4
**1999**
53:23
**1st**
291:6, 293:8,
294:19, 295:17,
296:13, 296:24,
364:11

---
**2**
---

**2**
119:22, 120:9,
189:17, 189:18,
298:11, 310:2
**20**
94:24, 95:1,

231:19, 272:20,
272:21, 335:18
**2000**
3:21, 10:5
**2010**
13:13, 54:2,
113:16
**2013**
190:8, 190:9,
193:21, 201:18
**2014**
114:20, 190:8
**2016**
113:14, 113:15
**2017**
238:5, 238:7
**2019**
1:19, 7:9,
237:9, 237:17,
370:18
**2020**
370:20
**21**
201:18, 231:24,
232:3, 242:6
**22**
242:9
**2200**
4:21
**223**
6:17
**225**
6:18
**225342**
1:22
**23**
6:17, 23:3,
242:13
**2300**
263:10, 311:13
**24**
28:14, 28:19,
28:24, 29:2,
29:7, 29:11,
29:13, 29:17,
29:22, 29:24,
30:9, 31:21,
32:1, 51:6,

237:3, 237:24,
238:23, 360:5,
360:8, 360:17,
361:1
**243**
2:8
**25**
98:10, 98:22,
132:6, 135:11,
240:1
**26**
14:8, 14:9,
14:21, 15:1,
15:11, 19:1,
134:13, 134:21,
298:8, 307:9,
348:21
**2600**
156:16
**28**
51:11, 51:15,
318:3
**2869**
1:13, 7:7
**290**
6:19
**2nd**
155:10, 156:4,
157:4, 158:8,
164:22, 165:3,
165:11, 182:10,
185:24, 186:18,
203:9, 203:13,
209:2, 209:4,
218:12, 218:15,
218:22, 220:2,
220:9, 220:16,
221:8, 226:14,
226:15, 226:18,
226:22, 234:8,
235:21, 236:6,
236:8, 236:19,
240:16, 256:11,
262:18, 262:23,
263:1, 263:10,
263:15, 263:18,
263:22, 264:16,
267:6, 267:23,

268:5, 268:7,
268:9, 268:24,
269:16, 269:22,
271:7, 273:4,
274:12, 274:16,
276:12, 276:13,
313:20, 313:22,
313:23, 314:2,
314:6, 314:10,
314:11, 314:15,
314:17, 314:22,
315:2, 315:4,
315:10, 315:15,
315:17, 315:22,
315:23, 319:18,
319:19, 320:15,
342:16, 351:19,
353:12, 355:15,
355:18, 356:4,
360:5, 360:8,
360:17, 360:21,
360:24, 361:5,
365:19, 366:1,
366:5, 366:9,
366:12, 366:16,
366:23, 367:3

---
**3**
---

**3**
123:16, 123:19,
123:20, 123:22,
132:14, 133:3,
155:16, 220:8,
260:21, 309:24,
310:3
**30**
93:19, 93:20,
94:16, 231:11,
232:4, 233:3,
233:5, 233:8,
233:13, 245:24,
285:24, 334:4,
334:5
**31**
151:17, 151:20,
272:22, 272:23
**311**
2:5, 3:5, 7:7

Transcript of Ernest Halvorsen
Conducted on February 6, 2019                    165

**312**
2:8, 4:23, 5:7
**312.243**
3:8
**312.663**
3:23
**312.735**
4:16
**312.782**
4:7
**315**
236:13
**316**
6:21
**321**
4:20
**345**
3:14
**3473**
5:7
**362**
6:4, 6:22, 6:24
**365**
6:5
**37**
361:20, 361:21
**370**
1:23
**39**
324:7, 324:8
**3900**
276:2
**3rd**
2:6, 3:6,
228:3, 242:15,
242:18, 242:21,
242:24, 244:5,
260:18, 265:1,
265:4, 312:9,
312:21, 313:11,
313:13, 313:16,
313:17, 321:19,
322:8, 322:12,
322:18

**4**

**4**
272:20, 272:21,

272:22, 272:23
**4-inch**
331:4
**40**
92:13, 93:11
**4169**
370:4
**42**
189:17, 189:18
**4461**
23:12
**45**
40:18, 265:1,
265:5, 286:21,
310:6, 311:22,
361:22, 361:23
**4560**
1:7, 7:5
**49**
323:12
**494**
4:23
**4th**
146:18, 355:6

**5**

**5**
63:13, 119:13,
183:18, 231:11,
232:4, 233:3,
233:5, 233:8,
233:13, 245:24,
280:11, 324:7,
324:8, 324:9,
324:10, 339:20,
340:17, 356:21
**5-7**
123:1
**5-by-7**
57:23, 58:2
**5-foot-6**
81:3, 81:14,
81:22, 83:4,
278:24, 280:12,
281:21
**500**
5:5
**51**
323:24

**510**
223:21, 223:24
**52**
291:2, 324:1
**53**
368:7
**54**
324:9, 324:10,
351:10, 368:15
**59**
105:7, 105:8,
189:15, 189:16
**5900**
2:8, 3:8
**5th**
246:22

**6**

**6**
286:18, 310:6,
351:10, 361:20,
361:21, 361:22,
361:23, 368:7,
368:15
**6-1**
280:11
**6-feet-tall**
81:15, 81:23,
83:4
**6-foot**
280:11
**6-foot-1**
281:14
**6/8/1993**
6:21
**603**
5:7
**60601**
4:6
**60602**
3:22, 5:6
**60604**
4:15
**60607**
2:7, 3:7
**60654**
4:22
**62**
290:24, 291:2,

291:3, 291:24,
292:2, 292:22,
293:21, 295:20
**6401**
29:3
**6th**
7:9, 227:13,
230:10, 230:11,
233:12, 248:10,
250:5, 256:22,
258:5, 258:6,
264:4, 264:8,
264:14, 265:13,
265:18, 267:2,
267:4, 267:9,
268:18, 276:15,
314:19, 314:22,
315:4, 315:7,
315:15, 315:18,
316:6, 320:12

**7**

**718.875**
3:16
**736499**
236:14
**77**
4:5
**7th**
267:4

**8**

**8**
285:24
**82**
32:21, 32:22
**83**
175:19, 178:19
**84**
370:4
**8601**
92:1
**863500**
235:8, 236:13
**874175**
236:17
**8th**
282:18, 332:12,

334:1, 340:1

**9**

**9-millimeter**
329:22, 330:7,
330:14, 330:19,
330:23, 331:7,
331:13, 332:9

**90**
53:4, 217:14,
327:20

**9106**
236:13

**911**
63:18

**92**
370:21

**93**
74:16, 122:20,
124:5, 231:16,
260:21

**94**
6:20

**9579443**
236:16

**9th**
282:18, 334:1,
339:5

*DeLeon-Reyes v. Guevara, et al.*
Case No. 18 CV 01028

*Solache v. Guevara, et al.*
Case No. 18 CV 02312

# EXHIBIT 5

1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ARTURO DeLEON-REYES,                )  Case No. 18 CV 1028
                                    )
                Plaintiff,          )
                                    )
        v.                          )
                                    )
REYNALDO GUEVARA, *et al.*,         )
                                    )
                Defendants.         )
_____     )
GABRIEL SOLACHE,                    )  Case No. 18 CV 2312
                                    )
                Plaintiff,          )
                                    )
        v.                          )
                                    )
CITY OF CHICAGO, *et al.*,          )  Chicago, Illinois
                                    )  July 24, 2025
                Defendants.         )  10:09 a.m.

TRANSCRIPT OF PROCEEDINGS - MOTIONS
BEFORE THE HONORABLE STEVEN C. SEEGER

APPEARANCES:

For Plaintiff          LOEVY & LOEVY
DeLeon-Reyes:          BY:  MR. STEVEN E. ART
                            MR. SEAN STARR
                            MR. ANAND SWAMINATHAN
                       311 N. Aberdeen Street, 3rd Floor
                       Chicago, Illinois 60607


For Plaintiff          PEOPLE'S LAW OFFICES
Solache:               BY:  MS. JANIS M. SUSLER
                       1180 N. Milwaukee Avenue
                       Chicago, Illinois 60642


                  *    *    *    *    *

PROCEEDINGS REPORTED BY STENOTYPE
TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION

2

APPEARANCES (Cont'd):

For Defendant          BORKAN & SCAHILL.
Guevara:               BY:  MR. TIMOTHY P. SCAHILL
                       Two First National Plaza
                       20 S. Clark Street, Suite 1700
                       Chicago, Illinois 60603


For Defendants         THE SOTOS LAW FIRM, P.C.
Halvorsen, Dickinson,  BY:  MR. JOSH M. ENGQUIST
Rutherford, and        141 W. Jackson Boulevard, Suite 1240A
Trevino:               Chicago, Illinois 60604


Court Reporter:        AMY M. KLEYNHANS, CSR, RPR, CRR
                       Official Court Reporter
                       219 S. Dearborn Street, Room 2318A
                       Chicago, Illinois 60604
                       Telephone:  (312) 818-6531
                       amy_kleynhans@ilnd.uscourts.gov

(Proceedings heard in open court:)

THE CLERK: 18 CV 1028, DeLeon-Reyes versus Guevara, *et al.*

And then 18 CV 2312, Solache versus City of Chicago, *et al.*

THE COURT: Good morning, everybody. Nice to see everyone. Good morning.

Let's get everyone's appearances on the record, if you would, please.

Start with counsel for the plaintiffs.

MR. ART: Good morning, Your Honor.

Steve Art for Plaintiff Reyes.

MR. SWAMINATHAN: Anand Swaminathan for plaintiff.

THE COURT: You've got to go into the microphone and speak nice and loud and nice and proud.

Go ahead.

MR. SWAMINATHAN: Anand Swaminathan for Plaintiff Reyes.

Good morning, Judge.

THE COURT: Good morning.

MR. STARR: Good morning, Judge.

Sean Starr for Plaintiff Reyes.

MS. SUSLER: Good morning, Judge.

Jan Susler for Plaintiff Gabriel Solache.

THE COURT: All right. Good morning to the plaintiff

team.

And defense counsel.

MR. ENGQUIST:  Josh Engquist, Your Honor, on behalf of Halvorsen, Dickinson, Rutherford, and Trevino.

MS. ROSEN:  Good morning, Your Honor.

Eileen Rosen on behalf of Defendant City of Chicago.

MR. SCAHILL:  And good morning, Your Honor.

Timothy Scahill on behalf of Defendant Guevara.

THE COURT:  All right.  Very good.

Good morning, folks.  Nice to see everyone.

Let me start by giving you both an apology and a "you're welcome" for what transpired on Tuesday.  I had called you in for a hearing, both on Tuesday and on Thursday.  And at about 9:00 in the morning, I issued an order saying, actually, I think we need to cancel today's hearing, which was set at 11:00 o'clock on Tuesday, and do it on Thursday.

Unbeknownst to me at the time, that was unexpectedly prescient because we had an emergency in the building.  We had a person with a knife in the lobby.  If you had come on over here or tried to come on over here, you either would have been trapped in the building with me, which is not good for anyone, or you would have been prevented from coming into the building.

So that was a lucky shot on my part.  But I do want to acknowledge if -- there may have been some inconvenience to you folks if you were planning to come in and found out a couple

hours before the hearing that we weren't actually going to have a hearing. So I want to apologize for that. I want to acknowledge that.

The reality is I needed a little more time, and I think it worked out in the wash anyway. Okay. So I just wanted to acknowledge that first.

As you folks are well aware, there are a number of pending motions. By my count, there are 14.

I am ready to rule. I am ready to rule.

Today I will be issuing a ruling on the motions for summary judgment filed by the individual defendants, so Mr. Guevara and the other officer defendants. There are two sets of defense motions for summary judgment, two in each case, for a total of four.

There are ten other motions that are pending, including a motion for summary judgment by the City, plus the plaintiffs' motion for partial summary judgment, plus a collection of expert-related motions. I have rulings ready for that as well.

But for purposes of today, I'm going to divide and concur. I'm going to give you my ruling on the motions for summary judgment filed by the individual defendants and only the individual defendants. I will save for later the ruling on the motion for summary judgment filed by the City, the motion for partial summary judgment filed by the plaintiffs, and the

expert motions.  I'll save that for later.  Okay?

Let me say this by way of a preview:  I have in my hands the ruling on the cross-motions for summary judgment by the individual defendants.  My ruling is 56 pages long, single-spaced.  One option is to apply more spit polish, get it ready to go, make it beautiful, make it sing, make it handsome for Westlaw, and get it out there in writing.  That's one option.

Another option is to read it to you.  I'm going to go through door No. 2.  I'm going to read it to you.  I'm going to read it to you.

Let me say this by way of an observation:  Everyone knows that judicial resources are finite.  You hear people talking about judicial resources.  Everyone knows that's a thing, but I don't think lawyers really believe it, truly.  I didn't.  As a lawyer, I didn't.  People think it's like the Pacific Ocean:  You can drink as much as you want.

Judicial resources are finite.  They're limited.  If I can save a couple of days and read it to you instead of making it beautiful, given the length, I'm going to do that.

I'm not suggesting that you folks in particular are insensitive to the limits on judicial resources.  Don't take it that way.  That's not what I'm saying.

I'm just saying that I once stood where you stand in this very courtroom, and I now sit where I sit.  And my

perception of judicial resources today is different than my perception of judicial resources when I was standing instead of sitting. It's a very real thing.

So I am going to read this to you.

Let me offer this other preface: This is going to take some time. This is going to take some time. Because I am merciful, I will allow you to sit. So you folks can take a seat.

MR. ART: Thank you, Judge.

MS. ROSEN: Thank you, Judge.

THE COURT: Let me say another couple things before I dive in.

Everyone is welcome to stay for the whole thing if you'd like. If any of you want to have your colleagues have the short straw and stick through the whole thing, that is okay. Okay?

I will not require each and every one of you to stay put. It's not quite a hostage situation. Okay? But I do require at least one lawyer for each party to be here because you need to listen to it. Okay?

Let me also acknowledge that getting an oral ruling is less satisfactory than getting a written ruling. It just is. It's harder to digest. I personally would prefer to give it to you in writing. I personally would prefer to give it to you in writing. Our interests are aligned, but there's only so much I

can do. Okay?

If you would like a written copy, you can get one; just order the transcript. It will be maybe a little more challenging to read, perhaps. It will maybe look a little less beautiful because it won't be on Westlaw. But everything that I would say in writing is going to be in writing in a transcript of my oral ruling. Okay?

If you want to order a transcript, just go to my Web page, get an estimate from the court reporter, pay the deposit, and put the order in. Okay?

Does anyone have any questions before we get going? Anyone?

MR. SCAHILL: No.

THE COURT: I do expect that we will take a break. We'll have a brief intermission in this little play that I'm about to give you, or I may need to take a break if my throat gives out.

I expect -- if I had to guess -- we'll see how I'm doing -- I expect this to take two to three hours. We'll see. Maybe you all can jot down before we start an estimate of how long this is going to go, and the winner will be acknowledged at the end of the hearing.

All right. Everyone has five seconds to think of their answer, how long this is going to go.

Okay? Everybody ready?

All right.  It's 10:17.  Here we go.

The parties filed cross-motions for summary judgment. I just summarized for you the pending motions.  Today, in open court, I will issue an oral ruling on the four summary judgment motions filed by the individual defendants.  They filed two motions for summary judgment in the two cases, for a total of four motions.

Specifically, I will rule on Defendant Guevara's motion for summary judgment, which is Docket No. 741 in *Reyes v. Guevara*, and Docket No. 570 in *Solache v. City of Chicago*.

I will also rule on the officer defendants' motion for summary judgment, which is Docket No. 742 in *Reyes v. Guevara*, and Docket No. 573 in *Solache v. City of Chicago*.

Before diving into the analysis, let me just give you the punch line of my ruling.

Here it goes.

The Court denies defendants' summary judgment motion on the following claims:

Number one, plaintiffs' coerced confession and fabricated confession claims.

Number two, the failure-to-intervene claim.

Number three, the state law malicious prosecution claim.

Number four, the Section 1983 deprivation-of-liberty claim.

Number five, the state law conspiracy claim.

And number six, the state law intentional infliction of emotional distress claim.

The Court grants the motions for summary judgment on the claim about the fabrication of Adriana Mejia's statement and on the Section 1983 conspiracy claim.

The Court grants the motions for summary judgment on nine of the 12 *Brady* theories, and denies the motions for summary judgment on the other three *Brady* theories.

That's the summary of the ruling.

Does anyone want me to repeat that?

MR. ART: No, Judge.

THE COURT: Okay. I'll start with some background.

The parties are well aware of the facts, and the record is voluminous, to put it mildly. I'll simply offer a high-level summary of the facts.

This case stems out of the wrongful conviction of Plaintiffs Gabriel Solache and Arturo DeLeon-Reyes for first-degree murder in June 2000.

Over 25 years ago, Adriana Mejia murdered Mariano and Jacinto Soto, a husband and wife, and kidnapped their two children, three-year-old Santiago and baby Maria.

Adriana Mejia pleaded guilty in February 2001 and remains in prison to this day. Solache and Reyes lived in the same apartment as Adriana Mejia. Investigators at the Chicago

Police Department quickly homed in on them as potential accomplices to Adriana Mejia's crime.

After an investigation, Solache and Reyes were each convicted of two counts of first-degree murder in June 2000. Their convictions were based largely on confessions that they made to investigators in CPD's Area 5 police district.

But Solache and Reyes maintained their innocence. They asserted that their supposed confessions were coerced and fabricated by members of the CPD.

Specifically, plaintiffs say that Detectives Reynaldo Guevara, Ernest Halvorsen, Edwin Dickinson, and Robert Rutherford, plus Youth Officer Daniel Trevino committed a host of constitutional violations that led to plaintiffs' confessions. They claim that the confessions led to their convictions.

After years of post-conviction proceedings, a judge ultimately suppressed the confessions. Without that key evidence, the Cook County State's Attorney decided to dismiss the indictment, and a state court vacated plaintiffs' convictions. In November 2002, Solache and Reyes each received certificates of innocence.

Plaintiffs now bring a series of constitutional and state law claims against the detectives who investigated their case and the City of Chicago.

They allege that defendants used coercive tactics to

procure their confessions in violation of the self-incrimination clause of the Fifth Amendment.

They allege that defendants fabricated their confessions in violation of the due process clause of the Fourteenth Amendment.

They allege the defendants fabricated a statement by Adriana Mejia, again, in violation of the due process clause.

They allege that defendants suppressed material exculpatory evidence in violation of *Brady v. Maryland* and *Giglio v. United States*.

They allege that defendants committed the state law tort of malicious prosecution and the related constitutional tort of deprivation of liberty.

They allege that the defendants committed state law intentional infliction of emotional distress.

They allege that defendants engaged in a state law conspiracy.

They allege that defendants also failed to intervene in other defendants' constitutional violations.

They allege that defendants conspired to commit constitutional violations.

Finally, defendants also bring a *Monell* claim against the City of Chicago.

The defendants include Reynaldo Guevara. The defendants also include a collection of other individual

defendants. And I'll simply call them the officer defendants. The defendants also include the City of Chicago.

At this stage, the Court has in front of it a series of motions for summary judgment by various defendants. Plaintiffs also filed a partial motion for summary judgment. The parties filed several motions about the experts, too.

Again, I'll put those motions to one side for now. Today, I will only address defendants' motions for summary judgment.

Those are the broad contours of the case. Obviously, specific facts will be critical in this summary judgment ruling.

But laying out a comprehensive factual background would take the Court all day, literally. The record is voluminous, to put it mildly. The record includes more than 14,000 pages of exhibits. The docket reveals multiple motions for summary judgment from various parties. The parties hotly debate the facts.

The Court will not attempt to give a full summary of the facts. The parties themselves know the background of the case. What the parties care about is whether there are factual disputes that preclude summary judgment on particular claims.

So the Court will address the facts and any factual disputes as they come up in the course of the Court's analysis.

I'll now turn to the legal standard.

The legal requirements for summary judgment are well established, and the Court will simply offer a brief overview of the legal standard here.

Basically, read Rule 56, read *Anderson*, and read *Celotex*.

Let me just read it to you.

A district court "shall grant" summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." That's from Rule 56.

A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." That's from *Anderson v. Liberty Lobby*.

The Court construes all facts in the light most favorable to the nonmoving party, giving the nonmoving party the benefit of all reasonable inferences.

Summary judgment is appropriate, if, on the evidence provided, no reasonable jury could return a verdict in favor of the nonmovant. And that's from *Celotex*.

That's the legal standard.

I'll now turn to the substance of the ruling.

My ruling has ten sections. By and large, each section is devoted to a different claim.

To make this oral ruling easier to understand, and to

make the transcript more digestible for you, I will tell you when I'm turning to a different section.

I'll start with Section I.

Before diving into the claims, the Court wants to make a brief note about the relationship between Defendant Guevara's motion for summary judgment and the officer defendants' motion for summary judgment.

Defendant Guevara filed for summary judgment separately from the officer defendants. But Guevara adopts large portions of the officer defendants' statement of facts and memorandum of law. That's from page 3 of Guevara's motion, Docket No. 741.

At the end of the day, Guevara asks the Court to grant summary judgment, quote, "to the extent this Court grants Co-Defendants' Motion for Summary Judgment," unquote. That's from page 3.

So, for the most part, the Court will analyze the claims together. The Court will address the arguments together, meaning the arguments from the defendants and from the plaintiffs.

But there are a few exceptions, such as when Guevara offers his own analysis on the claims of coerced and fabricated confessions.

Plaintiffs offer a number of other arguments against Guevara's motion, but the Court does not need to reach all of

the arguments.

I will now dive into the substance of the ruling. I will now turn to Section II.

I will turn to the first batch of claims. I'll start with the coerced and fabricated confession claims, which appear in Count I of Reyes's complaint and Counts I and II of Solache's complaint.

Reyes and Solache each allege that Guevara and the officer defendants used coerced and/or fabricated confessions in their prosecution of plaintiffs. The confession-based claims are the only claims on which Defendant Guevara offers his own analysis.

So the Court will separately analyze the claims against Guevara and the claims against the officer defendants.

But before diving in, I'll summarize the case law and confessions.

A coerced confession and a fabricated confession are not the same thing. But they're also not mutually exclusive. They can overlap, but they don't always overlap.

Quote, "The government violates the Self-Incrimination Clause by using coerced confessions at pre-trial hearings or trials in criminal cases," unquote. That's from *Jackson v. Curry*, 888 F.3d 259, at page 265, Seventh Circuit 2018.

It's well established that the government cannot beat a confession out of a defendant. *Brown v. Mississippi*, 297

U.S. 278, 1936.

The government also cannot overbear a defendant's will through certain forms of psychological pressure, like sleep deprivation or days of interrogation. *Spano v. New York*, 360 U.S. 315, 1989 -- excuse me -- 1959.

Oftentimes, the voluntariness of a confession is a question of fact.

Quote, "The voluntariness of a confession depends on the totality of the circumstances, including both the characteristics of the accused and the nature of the interrogation," unquote. *Hurt v. Wise*, 880 F.3d 831, 845, Seventh Circuit 2018.

Quote, "If those circumstances reveal that the interrogated person's will was overborne, admitting the resulting confession violates the Fifth Amendment," unquote. *Id.*

Not every coerced confession is false. Sometimes a coerced confession is true. It is possible to twist someone's arm until they tell the truth.

Coercion can lead to the truth. Even so, coercing a confession is a violation of the Fifth Amendment protection against self-incrimination.

But fabricated confessions are different. A fabricated confession, by its very nature, is false. A fabricated confession can come from anywhere except for the

incriminated person.

A different constitutional amendment governs fabricated confessions.

Using a fabricated confession against a defendant violates the due process clause of the Fourteenth Amendment. The Seventh Circuit has, quote, "consistently held that a police officer who manufactures false evidence against a criminal defendant violates due process if that evidence is later used to deprive the defendant of [his] liberty in some way," unquote. That's from *Avery v. City of Milwaukee*, 847 F.3d 433, at page 439, Seventh Circuit 2017.

Coercion and fabrication can overlap. A defendant can be coerced into admitting a made-up, false story. Violence or coercion can make someone admit something they know is untrue, simply to get the interrogation to stop. That is, coercion can sometimes produce unreliable statements. In that scenario, the confession was both coerced and fabricated.

But, again, coercion very well could produce a true statement.

So the upshot is that a coerced confession and a fabricated confession are different claims. A claim about a coerced confession falls under the Fifth Amendment, and a claim about a fabricated confession falls under the Fourteenth Amendment. But the same conduct can potentially support both claims.

With that background in mind, I will now turn to plaintiffs' claims. I'll start with the coerced confession claim, which is Part II.A of my ruling, and then I'll move to the fabricated confession claim, which is Part II.B of my ruling.

I'll start with Reyes's coerced confession claim against Defendant Guevara. This is Section II.A.1 of my ruling.

To start, it's not entirely clear which counts Defendant -- excuse me. Let me say that again.

To start, it's not entirely clear which counts Guevara is moving for summary judgment on. He incorporates by reference the officer defendants' arguments in their memorandum of law. That's from Guevara's motion, Docket No. 741 at page 3. But on some of the counts, the officer defendants don't explicitly offer argument that Guevara is entitled to summary judgment.

For example, maybe Guevara moved for summary judgment on the coerced confession claim, but the Court isn't really sure. He doesn't explicitly say so in his motion.

And as far as the Court can tell, the officer defendants don't offer an argument that Guevara is entitled to summary judgment on the coerced confession claim. That's from the officer defendants' motion, Docket No. 743, at page 10. And neither does Guevara in his own motion.

Nonetheless, it seems like Guevara is moving for summary judgment on all claims since he doesn't specify any particular claims. So the Court will assume that Guevara is moving for summary judgment on the coerced confession claim, too.

That said, the lack of any relevant argument that actually applies to Guevara means that the Court has nothing to work with. The Court, therefore, denies Defendant Guevara's motion for summary judgment on the coerced confession claims against Guevara.

The officer defendants don't argue for summary judgment on the coerced confession claim on Guevara's behalf. Again, look at page 10 of defendants' memo. The gist of the officer defendants' argument is that they weren't there when Guevara allegedly coerced confessions out of Reyes and Solache. That argument obviously doesn't apply to Guevara, so it can't be a basis for granting his motion.

Other than joining the officer defendants' memo, Guevara offers three pages of argument in support of the idea that a coerced confession is not the same as a fabricated confession.

As the Court just discussed a few minutes ago, that's true. A coerced confession is not the same as a fabricated confession. But it's beside the point. A coerced confession claim can stand on its own two feet.

In sum, Guevara argues for summary judgment only on the fabricated confession claim without discussing a coerced confession. Even in his reply, Guevara says that, quote, "the independent grounds for summary judgment . . . relate to the latter [fabrication] claim not the former coerced confession claim," unquote. That's page 8, at Footnote 2, of Docket No. 777.

So since Guevara has failed to argue for summary judgment on Reyes's coerced confession claim, the coerced confession claim survives.

The same logic applies to Solache's claim for a coerced confession against Defendant Guevara. Nowhere does Guevara argue for summary judgment on Solache's coerced confession claim. And the officer defendants don't make that argument on behalf of Guevara, either. Solache's coerced confession claim against Guevara survives as well.

And, in any case, plaintiffs have pointed to lots of admissible evidence of coercive activity by Guevara. The existence of that evidence is an independent basis for denying the motion for summary judgment. I will discuss some of that evidence later in my ruling.

I'll now turn to Section II.A.2, which is the coerced confession claims brought by Reyes and Solache against the officer defendants.

The officer defendants first argue that Reyes

conflates his coerced confession claims and his fabricated confession claims. That's at page 10 of their memo, Docket No. 743. But that argument goes nowhere. As discussed a minute ago, it is totally fine for Reyes to bring two separate claims stemming from the same overarching conduct, because a confession can be both coerced and fabricated.

The officer defendants also argue that Reyes never testified that any officer defendant used force against him, so Reyes can't show that the officer defendants were involved in his coerced confession. Similarly, the officer defendants argue that Solache has no evidence that the officer defendants were involved in his coerced confession, because supposedly only Guevara was involved in Solache's interrogations.

Ultimately, that's too narrow of a lens through which to view a coerced confession claim.

The officer defendants correctly note that Reyes must offer evidence of their, quote, "personal involvement," unquote, in the coerced confession claim for them to be liable. They cite *Colbert v. City of Chicago*, 851 F.3d 649, at page 657, Seventh Circuit 2017.

Quote, "Mere presence," unquote, of an officer is not enough for Section 1983 liability. *Trout v. Frega*, 926 F.Supp. 117, 121, Northern District of Illinois 1996.

But as defendants themselves point out, a constitutional violation that occurs with a defendant's

23

"knowledge or consent" is sufficient for Section 1983 liability.  See *Rasho v. Elyea*, 856 F.3d 469, 478, Seventh Circuit 2017.

Section 1983 liability may exist where a defendant, quote, "knew about the conduct and facilitated it, approved it, condoned it, or turned a blind eye for fear of what they might see," unquote.  *Matthews v. City of East St. Louis*, 675 F.3d 703, 708, Seventh Circuit 2012.

Another case supports that point.  It's *Rasho*, 856 F.3d, at page 478.

Against that standard, the officer defendants seem to say that they fall in the, quote, "mere presence," unquote, camp, or something like it.  They themselves did not personally use violence against Reyes, only Guevara did.  That's the argument on page 10 of Docket No. 473 [*sic*].  They argue that they were not present when Guevara got violent.  Similarly, they weren't present for all of the interrogation of Solache.

Nonetheless, there is some evidence that the officer defendants had knowledge of, or approved of, or consented to, or turned a blind eye or a deaf ear to Guevara's actions.  And Guevara's actions form the core of plaintiffs' coerced confession constitutional claims.

For example, Guevara and the officer defendants worked together on the investigation and kept each other up to date on the interrogations of plaintiffs.  Defendants admit that in

their response to Solache's statement of additional facts, which is Docket No. 781, at paragraph 23.

Paragraph 23 of plaintiffs' statement of additional facts also contains the following fact: "Area 5 was on a single floor, with a large open space in the middle, where all the detectives worked, which was right next to the interview rooms. If defendants were being physically abused in the interrogation rooms, other detectives and sergeants would have heard it."

Defendants only dispute that fact on the grounds that it's immaterial and argumentative. It's not immaterial, and it's not argumentative. Defendants offer no evidence to dispute that fact. The fact in paragraph 23 is supported by admissible evidence. That's enough to survive summary judgment.

Under these circumstances, it would be difficult for any of the officer defendants to not know what Guevara was up to right under their noses. They would have heard Guevara's screaming or his use of physical violence against both defendants.

Let me reread the last sentence in paragraph 23 of plaintiffs' statement of facts, which is from Docket No. 781.

Again, this fact is undisputed. Or, at the very least, there is admissible evidence to support it. That's a better way to put it. There is admissible evidence to support

it.

"If individuals were being physically abused in the interrogation rooms, other detectives and sergeants would have heard it."

So plaintiffs offered admissible evidence that other people would have heard physical abuse in the interrogation rooms. That evidence is sufficient to get to a jury about whether the individual defendants approved of or consented to or turned a blind eye or turned a deaf ear to the coercive interrogations.

To be sure, that's not the only possible inference. Maybe it's not the best inference. Maybe it's not the strongest inference. Maybe a jury won't buy it. Maybe a jury won't buy it. But that's not my question for today.

It is a reasonable inference. And at summary judgment, the nonmovant gets the benefit of reasonable inferences.

Defendants object to those facts as improperly argumentative. But for purposes of summary judgment, the Court is required to construe all facts in the light most favorable to plaintiffs as the nonmovants and give them the benefit of all reasonable inferences.

In the Court's view, the idea that the officer defendants would have known about Guevara's actions based on their proximity is an inference that a reasonable jury could

draw.

After all, Guevara was up to a lot.

Reyes offered admissible evidence about what happened to him in the interrogation room.

I'll summarize the record briefly as stated in paragraphs 42, 45, 54, 55, and 56 of defendants' response to Reyes's statement of additional facts, which is Docket No. 785.

Here's the summary of the evidence that Reyes offered:

At various points, Guevara slapped Reyes across the face, screamed at him and took his clothing away. That's from defendants' response to Reyes's statement of additional facts, Docket No. 785, at paragraphs 42 to 45. Guevara slapped Reyes harder each time Reyes denied his accusations. That's from paragraph 45.

Guevara also beat Solache, slapping him while he was handcuffed to a wall. That's from paragraph 54. In fact, Guevara slapped Solache so hard that Solache completely lost hearing in his left ear. That's from paragraph 56. He punched Solache in the stomach multiple times. That's from paragraph 56.

Guevara told Solache that he would get, quote, "fucked up," unquote, if he didn't tell the truth. That's from paragraph 54. Guevara told Solache that something bad would happen if Solache didn't tell the truth. That's from paragraph 55.

A jury could find that these actions would not go unnoticed in the close quarters of the Area 5 station. And if defendant noticed these actions and condoned it, then a jury could find that they had, quote, "personal involvement," unquote, in the coerced confession as required by *Colbert*, 851 F.3d at 657.

That inference may or may not be the most natural inference. It may not be the strongest inference. But it is a reasonable inference that a reasonable jury could make. We'll see what the jury does.

The officer defendants disagree. In their reply, they cite cases reaffirming the, quote, "personal involvement requirement," unquote. That's Docket No. 783, at pages 3 and 4.

But the cases they cite don't establish that the officer defendants' presence in the "close quarters" of Area 5 cannot, as a matter of law, constitute personal involvement.

For example, one case they cite is *de Lima Silva v. Department of Corrections*, 917 F.3d 546, at page 564, Seventh Circuit 2019. In that case, "plaintiff did not develop any arguments about [the defendants'] personal involvement . . ."

In contrast, Solache and Reyes have offered arguments that go beyond mere, quote, "speculation or conjecture," unquote, that the officer defendants were personally involved in Guevara's alleged violent and abusive conduct by seeing,

hearing, or condoning it. See *King v. Hendricks County Commission*, 954 F.3d 981, at page 984, Seventh Circuit 2020. That's a key case for that speculation or conjecture point.

Under the summary judgment standard, they should be able to present these arguments to a jury.

Other evidence confirms that there is a disputed question of material fact.

For example, after Reyes had been told that the police station -- excuse me -- for example, after Reyes had been held at the police station for more than a day without food or water, Guevara brought him to a conference room with Trevino, Dickinson, and Rutherford. That's from Reyes's statement of additional facts, Docket No. 785, at paragraph 43.

In that conference room, Guevara told Reyes, albeit in Spanish, that he was going to get the electric chair if he didn't confess to the murder. That's from Docket No. 785, at paragraph 43. That's the quintessential coercive statement. And Trevino was translating parts of that conversation into English for Dickinson and Rutherford.

So a reasonable jury could find that Dickinson and Rutherford were personally involved in the coercion of a confession from Reyes in the sense that they condoned and approved of Guevara's coercive language and tactics.

All of this is a long way of saying the following: There is evidence in the record that Guevara abused Reyes and

Solache physically. There is evidence in the record of violence, and there is evidence in the record that the violence took place in the close quarters of the Area 5 police station. There is evidence in the record that the officer defendants were nearby in close proximity.

Based on that physical proximity and based on the nature of the conduct, a reasonable jury could find that the defendants knew about the conduct or facilitated it or approved it or condoned it or turned a blind eye or a deaf ear to the conduct. That is not the only possible inference. Maybe a jury won't buy it. That's certainly a possible outcome. That's not my job. My job is simply to figure out what a reasonable jury would do. And given the nature of the violent conduct, given the close proximity, a jury could find that the officer defendants knew what was going on next door. So that's the ruling.

The officer defendants' motion for summary judgment on the coerced confession claims is -- are denied.

I will now turn to Section II.B. I'll address the fabricated confession claims brought by Reyes and Solache against Guevara and the officer defendants.

"The essence of a due process evidence-fabrication claim is that the accused was convicted and imprisoned based on knowingly falsified evidence, violating his right to a fair trial and thus depriving him of liberty without due process."

30

*Patrick v. City of Chicago*, 974 F.3d 824, 835, Seventh Circuit 2020.

That will be a key case today.

A plaintiff must also prove that an officer manufactured a statement that he, quote, "knew, with certainty, was false," unquote. *Coleman v. City of Peoria*, 925 F.3d 336, 344, Seventh Circuit 2019. Evidence that an officer, quote, "has reason to doubt," unquote, a statement is not enough.

It is undisputed that plaintiffs' confessions were used against them at trial, at least in some capacity. Paragraphs 84 and 85 of plaintiffs' response to defendants' statement of facts, at Docket No. 766, makes that clear.

So, to survive summary judgment, plaintiffs simply need to introduce at least some evidence that defendants knowingly falsified the confessions. That is, plaintiffs must point to evidence that defendants manufactured evidence that they knew was false.

With that background in mind, I'll first address plaintiffs' claims against Guevara, and then I'll address the claims against the officer defendants.

We just finished page 10.

Plaintiffs fabricated confession claim against Guevara is Section II.B.1.

While the Seventh Circuit has described the standard for a fabrication of evidence claim as a, quote, "high bar,"

unquote, plaintiffs have cleared that bar for purposes of Guevara's motion for summary judgment. Specifically, there is a dispute of material fact about whether Guevara knew that the plaintiffs' confessions were false.

As an initial matter, the question whether Guevara knew that plaintiffs' confessions were false is a question of mental state and of credibility. Those kinds of questions are poorly suited for resolution at the summary judgment stage. "State of mind is an inquiry that ordinarily cannot be concluded on summary judgment." *Conley v. Birch*, 796 F.3d 742, at page 747, 2015.

Here, Reyes and Solache both say that no one ever read their respective confessions to them. Guevara or Trevino, the two Spanish speakers, didn't read their confessions to them. Neither did any other officer.

Start with Solache's confession. Guevara interrogated him in Spanish. That's from defendants' response to Reyes's statement of additional facts, Docket No. 785, at paragraph 59. Guevara then translated into English realtime.

From there, an assistant state's attorney wrote down what Guevara said, and that statement became Solache's confession. All of that is in paragraph 59.

But no one ever shared the details of Solache's confession with Solache himself. Specifically, the assistant state's attorney, quote, "was writing in English, and Guevara

never read [Solache] anything. Solache just signed the pages and placed his initials where Guevara instructed," unquote. That's from paragraph 60.

Moreover, quote, "Guevara directed Solache to initial cross-outs in the confession statement that Solache could neither read nor understand and that were not read to him," unquote. That's from paragraph 60.

Defendants don't dispute any of those facts except on materiality grounds.

The most striking aspect of those facts is that no one ever read Solache's confession to Solache in Spanish, the language he could understand.

Let me say that again.

No one ever read Solache's confession to Solache in Spanish, the language he could understand.

Instead, Guevara put the confession in front of Solache in English, and instructed him to read it -- excuse me -- instructed him to sign it.

Solache spoke Spanish, not English. But he received a written version of his confession in English, not Spanish.

The officers had other options. They could have taken down Solache's confession verbatim, in Spanish, word for word, and later translated it into English.

As another option, they could have translated the confession into English in real time, and then given Solache a

33

copy of the confession in Spanish so that he knew what he was confessing to.

That didn't happen.

The bottom line is that Solache did not receive a copy of his confession in Spanish, the only language that he knew, before he approved it.

A reasonable jury could draw different inferences from the omission. One possibility is that no one read Solache his own confession, or told him what he was signing, because they knew that the English statement was false. A jury might think: How else can officers explain the failure to read Solache his supposed confession? After all, it's a deviation from the usual practice to have criminal defendants blindly sign a confession without knowing what it contains.

Maybe that's not the most obvious or natural inference, but it is a reasonable inference that a reasonable jury could draw. It's a reasonable inference. It's certainly plausible that an officer might purposefully fail to read a confession to a criminal defendant in his or her native language because he knows that something in the confession is false.

Again, that is not the only possibility, but it is a reasonable inference. It is within the realm of possibility. It is a reasonable inference that a jury could draw.

The fact that Guevara directed Solache to initial

34

certain crossed-out statements might bolster that inference. A jury could view those cross-outs as intended to make the confession seem more authentic.

Again, at summary judgment, the Court must draw all reasonable inferences in the nonmovant's favor. Here, after drawing those reasonable inferences, in favor of the nonmovants, there is a dispute of material fact that a jury needs to resolve. So the Court cannot grant summary judgment.

I will now turn to the claim by Reyes. Reyes tells a very similar story.

The primary difference is that Trevino, rather than Guevara, pushed the confession across the table. See Docket No. 785, at paragraph 52.

Specifically, quote, "Reyes didn't know what the statement actually said. The statement was never read to Reyes in Spanish, nor could Reyes read it in English," unquote. Also, quote, "Trevino directed Reyes to put his initials next to cross-outs in the confession statement. Trevino instructed Reyes to sign the statement, and he did," unquote. All of that is from paragraph 52.

In fact, defendants concede that this sequence of events raises a question of material fact about whether Trevino fabricated Reyes's confession. That's at page 9 of defendants' memo, which is Docket No. 743.

Given the marked similarities between Reyes's

fabricated confession claim against Trevino and Solache's fabricated confession claim against Guevara, it's hard to see why Solache's claim would fare any differently.

True, Guevara isn't the one who got Reyes to sign the confession. Even so, Reyes's claim against Guevara can still go forward for the same reasons that the Court will explain momentarily in its analysis of the officer defendants' liability. The upshot is that Guevara cannot escape liability merely because he was not in the room when Trevino pushed the allegedly fabricated confession across the table to Reyes.

I will next turn to Solache's fabricated confession claim brought against the officer defendants, which is Section II.B.2.

The officer defendants raise a single, one-paragraph argument here. They say that Solache testified that only Guevara was involved in his questioning. See defendants' memo at Docket No. 743.

A few minutes ago, I rejected that argument as insufficient when it came to the coerced confession claim.

An officer could be involved in fabricating a confession, even if he never interviewed a criminal defendant. The officer defendants are not in the clear simply because they did not enter the interview room with Solache.

Similarly, the fact that all of the officer defendants were working in the same close quarters of Area 5, coordinating

36

with each other, and working on the investigation together is enough for a reasonable jury to find that the officer defendants were involved in Solache's fabricated confession.

That's not the only possible inference. It may not be the strongest inference, or the most persuasive inference, but it's a reasonable inference that a reasonable jury could draw. They were working together on the same case, in the same area, at the same time. A reasonable jury could draw inferences from that reality.

For the same reasons, Reyes's claim against Guevara can go forward, too, even though Trevino was the one who had Reyes sign the allegedly fabricated confession.

I'll now turn to Reyes's fabricated confession claim against the officer defendants. The officer defendants offer a slightly more fulsome argument against Reyes's fabricated confession claim.

As discussed a few minutes ago, the officer defendants admit that there is a material factual dispute about whether Trevino fabricated Reyes's confession. See defendants' memo at page 9 of Docket No. 743.

So that claim is going to a jury.

Next, Dickinson and Rutherford invoke the rule that a defendant must, quote, "knowingly," unquote, fabricate evidence to be liable for a fabricated confession claim. Again, that rule comes from the *Patrick* case, 974 F.3d 835.

Dickinson and Rutherford argue that it was impossible for them to, quote, "knowingly," unquote, fabricate Reyes's confession because Reyes spoke only Spanish, and they spoke only English. That's at page 10 of the memo where they cite their statement of facts at page -- excuse me -- at paragraphs 4 to 5.

As a result, they say that they couldn't have even known what Reyes said and, therefore, couldn't knowingly fabricate his statement.

That argument does not get them very far. True, a defendant's knowledge that the confession was false is an element of a fabrication claim. But Dickinson and Rutherford's "lost in translation" defense would lead to absurd results.

Imagine an officer drafted a statement that said, quote, "I'm the Loch Ness Monster," unquote, and then the officer put that statement in front of a non-English-speaking suspect and convinced the suspect to sign the statement. By Dickinson's and Rutherford's logic, that statement wouldn't be a knowing fabrication because the language barrier prevents the officers from knowing that the suspect didn't actually say, "I'm a Lock Ness Monster," just in a different language. That can't be the case.

In this Court's view, knowledge of falsity must be measured based on the facts that an officer has at the time. If Dickinson and Rutherford had no facts, as they seem to

suggest, and yet they participated in drafting the confession, then they knew that the confession was false. That is, the confession would have been made up out of thin air, even if later somehow it turned out to be true.

Zero facts should equal zero confession. Zero facts can morph into a confession only through fabrication. So Dickinson and Rutherford could still participate in a fabricated confession if they drafted up a confession with no actual knowledge of what Reyes said.

Let me say that again.

Dickinson and Rutherford could still participate in a fabricated confession if they drafted up a confession with no actual knowledge of what Reyes said.

In short, the Court doesn't buy the "lost in translation" defense.

And Dickinson and Rutherford offer no other arguments in favor of summary judgment on Reyes's fabricated confession claim. So the claim survives against them as well.

The defendants are welcome to try the "lost in translation" defense before a jury. Maybe a jury will agree. Maybe a jury will agree. It might be a good argument. The question is not whether it's a good argument. It might be a good argument. The question is whether it's dispositive. The question is whether it's so strong that it takes away the ability of the plaintiffs to get to a jury.

39

So the "lost in translation" defense might be a good defense. It might be persuasive to a jury. That's not my question. The question is, is it so strong that that's the only outcome that a reasonable jury could reach? And I conclude that it's not. It's not enough to grant summary judgment in favor of the defendants.

Again, Dickinson and Rutherford offer no other arguments in favor of summary judgment on Reyes's fabricated confession claim, so the claim survives against them as well.

Similarly, the officer defendants argue that Halvorsen is not liable because he, quote, "had to rely on information conveyed to him by other officers when drafting the reports summarizing Reyes's confessions," unquote. That's page 11 of the memo, Docket No. 743.

That argument fails for similar reasons as Dickinson's and Rutherford's argument. Halvorsen may not have spoken directly to Reyes, but that doesn't mean he was incapable of fabricating a confession.

If the officer defendants told Halvorsen "X," and he told them to write "Y," or he himself wrote "Y," that's just as much of a knowing fabrication as if he heard "X" directly from Reyes.

Without any other arguments beside this insufficient one, the Court will look no further. The claim against Halvorsen survives summary judgment, too.

In sum, the Court denies summary judgment against all defendants on plaintiffs' fabricated confession claims.

At the end of the day, it's a jury question. We need a jury to sort it out.

I will now turn to Section III.

Guevara and the officer defendants moved for summary judgment on plaintiffs' claim that the alleged fabrication of witness statements violated defendant -- violated plaintiffs' due process rights. I will address Count II in Reyes's complaint and part of Count II in Solache's complaint.

The officer defendants discussed allegedly fabricated statements by various people in their original memo in support of summary judgment. That's page 16 of defendants' memo at Docket No. 743.

But plaintiffs clarified that they're only bringing due process claims about the alleged fabrication of their own confessions and about the alleged fabrication of Adriana Mejia's statement. That's page 7 of plaintiffs' response at Docket No. 772.

I've already discussed the claims about the alleged fabrication of plaintiffs' statements. I'll now turn to the statement given by Adriana Mejia.

As an aside, the claim in this case involve two people with the last name of Mejia. Again, the murders were committed by Adriana Mejia. But the case at hand involves Rosauro Mejia,

Adriana's husband, as well.

So to avoid confusion, I will refer to Adriana Mejia as simply "Adriana," just like you folks did.

In short, Adriana's statement inculpated Reyes and Solache in the murder of the Sotos. Adriana said that she, Solache, and Reyes, quote, "had all participated in the killing of Jacinto and Mariano Soto and abducting their children." That's paragraph 48, at Docket No. 766.

According to defendants, Adriana repeated the statement a second time and an assistant state's attorney took down her statement, which she signed and initialed. That's at paragraphs 49 and 50.

Plaintiffs dispute that any such statement ever occurred. They say that Adriana's confession and statement implicating Reyes and Solache was fabricated. They say the defendants, quote, "scripted Adriana's statement implicating plaintiffs in the crime, knowing the statement was false," unquote. That's from plaintiffs' response, Docket No. 772, at page 7.

And they say that the statement, therefore, violated their due process rights.

The parties vigorously disagree about whether the statement by Adriana was fabricated. Even if, for sake of argument, Adriana's statement was fabricated, it did not violate plaintiffs' due process rights because it was never

introduced at trial.

The only inculpatory evidence introduced against Reyes and Solache at their criminal trials were their own respective confessions.

Simply put, the State did not use Adriana's statement at the trial of Reyes and Solache. Preparing a fake statement by Adriana did not violate the due process of Reyes and Solache because the State never used it.

Basically, her statement wasn't part of the process, so there was no due process violation.

Let me briefly summarize the case law about evidence fabrication claims under the Fourth Amendment and the Fourteenth Amendment.

As I have previously written, quote, "evidence fabrication claims can sprout from the Fourth Amendment or the Fourteenth Amendment," unquote. That's my opinion in *Zambrano v. City of Joliet*, 2024 WL 532175, at page 9, Northern District of Illinois 2024, which was affirmed by the Seventh Circuit in 2025 WL 1733500.

Quote, "Different amendments apply to different stages of an interaction with law enforcement. If the police take you off the street based on phony evidence, that's a potential Fourth Amendment problem. If the State takes you to trial based on phony evidence, that's a potential Fourteenth Amendment problem," unquote. That was quoting my opinion in

*Zambrano*, 2024 WL 532175, at page 9.

The Seventh Circuit in *Patrick* elaborated on this point and described the, quote, "contours of constitutional claims based on allegations of evidence fabrication," unquote.

Let me read you a sentence or two.

Quote, "A claim for false arrest or pretrial detention based on fabricated evidence sounds in the Fourth Amendment right to be free from seizure without probable cause. If fabricated evidence is later used at trial to obtain a conviction, the accused may have suffered a violation of his due process right to a fair trial." I'm quoting the *Patrick* case, 974 F.3d 834. The Seventh Circuit in *Patrick* was citing the *Lewis* case. It's *Lewis v. City of Chicago*, 914 F.3d 472, at pages 476 to 479, Seventh Circuit 2019.

In short, quote, "The Fourth Amendment, not the due process clause, governs a claim for wrongful pretrial detention," unquote. *Young v. City of Chicago*, 987 F.3d 641, at page 645, Seventh Circuit 2021.

In contrast, when, quote, "fabricated evidence is later used at trial to obtain a conviction, the accused may have suffered a violation of his due process right to a fair trial," unquote. That's *Patrick*, 974 F.3d at 834 [*sic*].

Quote, "To bring a Fourteenth Amendment claim, a plaintiff has the burden to prove that 'the fabricated evidence was used against him, at his criminal trial,'" unquote.

*Zambrano*, 2024 WL 532175, at page 10.

Similarly, in *Avery v. City of Milwaukee*, the Seventh Circuit noted that, quote, "it was the admission of the false confession that made [the plaintiff's] trial unfair," unquote. *Avery*, 847 F.3d at 442.

Conversely, the Seventh Circuit in *Anderson v. The City of Rockford* held that the summary judgment on a due process claim was appropriate because the, quote, "plaintiffs cannot show that the prosecution used [the allegedly fabricated statement] to convict any of the plaintiffs," unquote. That's *Anderson*, 932 F.3d 494, 511, Seventh Circuit 2019.

In sum, fabricated evidence before trial can be a Fourth Amendment deprivation of liberty claim. But only fabricated evidence at trial can be a due process claim.

So plaintiffs need to show that Adriana's statement was admitted at trial or used against them at trial to secure a conviction. Impeachment counts.

Plaintiffs can't make that showing. Plaintiffs cannot point to a disputed question of material fact about it. After all, it's undisputed that Adriana's statement was never introduced at plaintiffs' criminal trial. That's from paragraph 86, at Docket No. 766, which is plaintiffs' response to defendants' statement of facts.

Plaintiffs raise a hearsay objection to the evidence that the officer defendants point to as supportive of that

fact. Again, take a look at paragraph 86. But the officer defendants cite the entire transcript from plaintiffs' criminal trial back in June of 2000.

The Court doesn't see how plaintiffs could raise a hearsay objection to the entire transcript of trial testimony. It is not hearsay. The question is simply what was said. The question is not whether something that was said was true. The trial testimony isn't offered for its truth. The trial testimony was offered to prove that something was not said.

The question is the presence or absence of the statement. The question is whether Adriana's statement was used at trial or was not used at trial. The question is not the truthfulness of Adriana's statement.

And, in any case, the Court is not concerned with what was actually said at trial, or the truth of what was said.

The Court here cares about what wasn't said. And the trial transcript confirms that Adriana's statement was not introduced at plaintiffs' criminal trial. So the hearsay rule doesn't bar the evidence for that purpose.

In any case, plaintiffs admit that it is, quote, "undisputed that the contours of Adriana's statements implicating Reyes and Solache were not presented to the jury at their trials," unquote. Again, take a look at paragraph 86 from Docket No. 766.

Next, plaintiffs try to argue that Adriana's statement

was used in other, more tangential ways. For example, its existence made defendant -- excuse me -- its existence made plaintiffs reluctant to cross-examine the testifying officers for fear of opening the door to its admission.

When I say "plaintiffs" there, I'm referring to Solache and Reyes.

Let me say it again with that in mind.

For example, they argue that the existence of Adriana's statement made Solache and Reyes reluctant to cross-examine the testifying officers for fear of opening the door to its admission. That's from page 12 of their response, Docket No. 772. And the officer defendants used it in the grand jury proceedings and suppression proceedings.

Maybe so. But plaintiffs cite no authority for their expansive interpretation of what it means to use something, quote, "at trial," unquote. The Seventh Circuit has been clear that it is, quote, "the admission," unquote, of the evidence, quote, "to obtain a conviction," unquote, that causes the injury. That's the *Avery* case, 847 F.3d at 442, and the *Patrick* case, 974 F.3d at 834. Both of those cases make that point.

What matters is the use of a fabricated statement at trial, not its potential use.

As an aside, we have now hit the one-hour mark.

Because Adriana's statement wasn't introduced at

trial, to convict Reyes and Solache, their due process claims fail, even if Adriana's statement was fabricated.

But plaintiffs soldier on and argue that any deprivation of liberty stemming from fabricated evidence is actionable as a due process violation. That's from page 9 of their response at Docket No. 772. That's incorrect, as the Court has just explained. The Seventh Circuit has not gone that far.

The cases the plaintiffs cite do not help them. All but one of the cases that they cite predates *Lewis v. City of Chicago*. In that case, the Seventh Circuit, quote, "clarified," unquote, its evidence fabrication jurisprudence, as I've just explained. I'm quoting there the *Patrick* case, 974 F.3d 834.

In other words, the Seventh Circuit in the *Patrick* case offered a gloss on what the Court did in the *Lewis* case, and the Seventh Circuit said that the *Lewis* case clarified its evidence fabrication jurisprudence. Did a little cleanup work.

They do cite one case that postdates *Lewis*. That's *Moran v. Calumet City*, 54 F.4th 483, Seventh Circuit 2022. That case dealt with evidence fabrication styled as a *Brady* claim. But a *Brady* claim is different than a due process claim about a fabricated statement. A *Brady* claim is a different animal. Plaintiffs don't couch their claim about Adriana's statement as a *Brady* claim, at page 7 of their response, so the

Court won't go there.

In short, the plaintiffs needed to show that the allegedly fabricated statement from Adriana was used against them at trial. They needed to show it was actually used at trial to get a due process violation. It wasn't used at trial. Adriana's statement wasn't used at the criminal trial of Reyes and Solache, so it could not have led to a due process violation. So the due process claims fail as a matter of law.

The Court grants Guevara's and officer defendants' motions for summary judgment on the due process claim about Adriana's statement.

One last point. At times, it appears that the parties might have confused due process fabrication of evidence claims with Fourth Amendment fabrication claims. They talked a lot about the pretrial deprivation of liberty. So I wanted to clarify one thing. The fabrication of evidence which leads to a pretrial deprivation of liberty can give rise to a constitutional violation, even if it isn't used at trial. But it's a Fourth Amendment claim, not a due process claim under the Fourteenth Amendment.

Specifically, the fabrication of Adriana's statement could be relevant evidence behind Reyes's Section 1983 deprivation of liberty claim, meaning Count III, as the Court will discuss a bit later.

But for now, the motion for summary judgment is hereby

granted as to the due process claims regarding the alleged fabrication of Adriana's statement.

I'll now turn to Section IV. This section is about the *Brady* claims.

I will consider plaintiffs' claim that defendants suppressed exculpatory evidence in violation of *Brady v. Maryland* and *Giglio v. United States*. This part will cover Count IV of Reyes's complaint and part three -- excuse me -- and part of Count II. Excuse me. Part two -- I'm sorry.

I'm going to say that whole sentence again because I misspoke.

This part will cover Count IV of Reyes's complaint and part of Count II of Solache's complaint. There will be a number of subparts here. Each *Brady* theory will get its own number, as I'll discuss in a moment.

I will start with a short overview of the law.

To establish a *Brady* claim, a plaintiff must show that, quote, "Number one, the evidence at issue is favorable to his defense; number two, the officer concealed the evidence intentionally or at least recklessly; and number three, the concealment prejudiced him," unquote. *Coleman v. Peoria*, 925 F.3d 336, at page 349, Seventh Circuit 2019.

A *Brady* claim can also be based on the suppression of impeachment evidence, rather than evidence that is directly exculpatory. *Giglio*, 405 U.S. 150, 154 to 155.

Plaintiffs have 12 theories under *Brady*. They have a dozen theories. That is, they have 12 theories about how defendants allegedly suppressed and withheld evidence. That's what plaintiffs say in their response to defendants' motion for summary judgment, which is Docket No. 772, on pages 14 through 17.

Plaintiffs say that as long as one of those claims is going forward, quote, "This Court need not parse due process theories at summary judgment, because it's clear a trial on plaintiffs' fair trial claims is necessary," unquote.

The argument seems to be "in for a penny, in for a pound." That is, plaintiffs basically argue that this Court doesn't need to get into the weeds about which *Brady* theories pass muster, as long as at least one *Brady* theory passes muster.

They say that on page 17. They cite *Goudy v. Cummings*, 922 F.3d 834, 843, Seventh Circuit 2019.

But the portion of *Goudy* that plaintiffs cite for that proposition doesn't support it. There, the Seventh Circuit explained that it must, quote, "look at the impact of withheld evidence in the aggregate, rather than seriatim. For this reason, we consider it appropriate that all defendants who can be shown to have 'suppressed' evidence in violation of *Brady* . . . should be liable for the aggregate impact on the outcome of the trial *Goudy* ultimately received," unquote.

That's the *Goudy* case, 922 F.3d at 843.

This Court does not read that language to mean that, as long as one *Brady* theory is going to trial, all of them can. The Seventh Circuit didn't say that say.  Instead, they stated that any defendant who participated in any *Brady* violation can be liable for all *Brady* violations, or something along those lines.

The Seventh Circuit didn't say that a district court has to let every *Brady* theory go to a jury, as long as one *Brady* theory goes to a jury.  The Seventh Circuit did not take away a district court's inherent ability to screenout *Brady* theories that lack legal or factual support."

I'm the gatekeeper, and I'm at my post.

That's a materiality question, not a question about whether a court needs to consider a theory.

Basically, if something isn't a *Brady* violation, I can call it like I can see it, and I can say that nobody can be held liable for it, and I can throw it out of the case.  I can call balls and strikes.

In conclusion, the Court can't just green-light one *Brady* theory and then say that every other theory under *Brady* can get to a trial.  If that's what plaintiffs were saying, I reject it.

So I'm going to consider each one of the plaintiffs' 12 *Brady* theories.

But before diving into each and every one of those 12 *Brady* theories, let me just offer a few background observations to set the stage.

As defendants point out, the two sides are like two ships passing in the night when it comes to the *Brady* claims. That's the phrase they used at Docket No. 783, at page 9.

Let me summarize the back-and-forth in the briefing.

Defendants moved for summary judgment on the *Brady* claim.

Plaintiffs responded. They identified their 12 theories. They argued the defendants failed to respond to 11 of the 12 theories in their motion for summary judgment. Take a look at page 14 of their response, Docket No. 772.

Plaintiffs seem to think that defendants waive the opportunity to argue against those 11 *Brady* theories.

Defendants then came back in their reply with the litigation equivalent of, quote, "I know you are, but what am I," unquote. They say that plaintiffs are the ones who waived some of their claims, specifically, six *Brady* theories. They say that plaintiffs never disclosed those six *Brady* theories during discovery. That's Docket No. 783, at pages 9 to 11.

Defendants say that they did address those -- excuse me. Defendants say that they did address the other six theories. Defendants point out they addressed five of the theories in a different part of their briefs when discussing

the fabrication claims, not the *Brady* claims.

Here's the good news: At least the parties agree that both sides addressed one of the 12 theories. That's a small victory.

Let me make one other brief observation. The parties use the phrase "two ships passing in the night." I've never understood that idiom. It seems like a good thing if two ships pass in the night. A collision of two ships in the middle of the night seems like a bad idea. I have really, frankly, never understood that idiom. People talk about two ships passing in the night like it's a terrible thing. It seems like that's the ideal scenario, as far as I'm concerned, but I get what you meant.

The idea is that you want people to engage each other in litigation. I get it.

So here's what I'll do: I will start by looking at the six *Brady* theories that the defendants say are waived. The defendants say that the plaintiffs waive those theories because they never addressed them during discovery. And if they are waived, there is no need to discuss them on the merits.

Let me offer a bit of background about waiver and discovery.

A party has an ongoing obligation during discovery to update its response to discovery requests, quote, "in a timely manner if the party learns that in some material respect the

disclosure or response is incomplete or incorrect," unquote. That's Rule 26(e)(1)(A).

Here, defendants think that plaintiffs failed to disclose several of their *Brady* theories in their interrogatory responses.

The Federal Rules of Civil Procedure require parties to answer discovery requests in full, unless there is an objection.  The default is full disclosure.  Full disclosure is a basic part of fairness.  Full disclosure allows a party to vet a theory during discovery.  Full disclosure allows a party to ask questions.  Full disclosure helps the party gather information and know what to ask about.  Full disclosure enables a lawyer to get his or her head around the case and get the mental wheels turning.  Full disclosure helps a lawyer think through an issue.  Full disclosure prevents gamesmanship. Full disclosure protects a party from getting sandbagged at trial by the other party.

Let me say this so nobody misunderstands what I'm saying:  Not every case involving nondisclosure is sandbagging. So don't anybody take anything that I say to be an accusation of sandbagging, because that's not where I'm going.

But sandbagging is a thing.  And I don't like it.

Rule 37 contemplates that a party may lose the ability to present evidence or information at trial that a party didn't disclose in response to a discovery request.  Rule 37 provides

that, quote, "if a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information . . . on a motion, at a hearing, or at trial, unless the failure was substantially justified or is harmless," unquote. That's Rule 37(c)(1).

The advisory committee has explained the purpose of the rule. The, quote, "automatic sanction provides a strong inducement for the disclosure of material that the disclosing party would expect to use as evidence, whether at a trial, at a hearing, or on a motion, such as one under Rule 56," unquote. That's in the notes to Rule 37.

Rule 37(c) is a full disclosure provision. Rule 37(c) is an antisandbagging provision. I like that rule.

Basically, if a party requests information during discovery, and if the responding party doesn't provide the information during discovery, then the responding party might lose the ability to present that information during trial.

Defendants think that, based on Rule 37, this Court should bar certain *Brady* theories that plaintiffs didn't disclose before summary judgment.

Again, plaintiffs offer 12 *Brady* theories. Defendants contend that six of the 12 *Brady* theories are waived.

I will address those six potentially waived theories first. I will use the numbering that plaintiffs use on pages 14 through 17 of their response, specifically, Docket

No. 772. Specifically, defendants argued that plaintiffs waived *Brady* theories No. 3, No. 4, No. 8, No. 9, and No. 10.

I will now address those six theories. I'm going to get into the weeds. I'm going to address each of the 12 theories one by one.

For now, I will set aside the other *Brady* theories, meaning theories No. 1, No. 2, No. 5, No. 6, No. 7, and No. 12. Again, I will start with the six theories that *Brady* say are waived. I will start with theories -- excuse me. I'm sorry.

I will start with theories No. 3, No. 4, No. 8, No. 9, No. 10, and No. 11, as numbered on pages 14 to 17.

Here it goes.

I will start with theory No. 3.

In plaintiffs' third *Brady* theory, they say that defendants suppressed that they never excluded Norma Salazar as a suspect and that no lineup procedure ever occurred.

Plaintiffs say this evidence would have implicated a different suspect, and would have called into question Adriana's allegedly fabricated statement. The nonoccurrence of a lineup could have been used to impeach Guevara, too.

The Court took a detailed look at plaintiffs' supplemental responses to defendants' interrogatory. Defendants asked plaintiffs to, quote, "state with particularity the exculpatory evidence the defendant withheld and/or suppressed," unquote. Take a look at Defendants'

Exhibits 98 and 99, at pages 194 and 208, of Docket No. 744-21. Those are the supplemental responses by plaintiffs to defendants' interrogatories.

Defendants asked a fair question. Defendants asked plaintiffs to state with particularity the exculpatory evidence that was withheld. That's a fair question. Defendants were entitled a straightforward answer. Basically, defendants asked a fair question, and they needed to get a fair answer. Plaintiffs had an obligation to give a straight answer to a straight question.

Plaintiffs can't expect to offer a *Brady* theory at trial that they did not disclose during discovery in response to that interrogatory.

Let me say that again.

Plaintiffs cannot expect to offer a *Brady* theory at trial that they did not disclose during discovery in response to that interrogatory. That's not fair. That's not how the federal rules work.

Parties must put their cards on the table during discovery or they will lose the ability to play the cards at trial. That's how our system of justice works.

Plaintiffs did respond to the interrogatory, but plaintiffs did not mention Norma Salazar. They did not mention a lineup or anything of the sort. Norma Salazar's name doesn't even appear in their responses to the interrogatories.

Plaintiffs do state that, quote, "Defendant withheld documents that reflect that Defendants had multiple theories of the case and alternative suspects," unquote. That's at pages 198 and 211 of Docket No. 744-21.

Read generously, perhaps too generously, that statement could potentially refer to the existence of Norma Salazar as an alternative suspect. But that's an overly generous reading.

The responding party has to give a straight answer, and the party that served the interrogatory should not have to guess what they're talking about. The response here is too generic. Plaintiffs' response is at such a high level of generality that it did not give defendants fair notice of the nature of the plaintiffs' theory. The interrogatory asked plaintiffs to disclose evidence with particularity. That's a quote, "with particularity." Referring to "documents" generally without any specificity, without any additional direction is not informative or responsive. It could have referred to anything. It just pointed to "documents."

I have no earthly idea what "document" means. The sentence could refer to just about any evidence that didn't corroborate defendants' case against the plaintiffs.

Frankly, the sentence basically just restated its obligation under *Brady*. It basically said that they didn't produce stuff, didn't produce documents. That's not a theory

of *Brady*. That's just a restatement of *Brady*. It says that they didn't produce things. It was not a response with particularity.

This Court doesn't see how defendants could have known what the theory was because plaintiffs didn't tell them what their theory was.

Here's the bottom line: Defendants served an interrogatory. Defendants asked a fair question. They asked plaintiffs to identify with particularity what evidence was not produced. That's a fair question. They need to get a fair answer. They received a response. Plaintiffs didn't point to anything involving Norma Salazar or any lineup procedure, so they didn't give notice that this was part of their *Brady* claim. So, therefore, it's out of the case.

Plaintiff waived the ability to bring *Brady* theory No. 3. Defendant's motion for summary judgment is granted as to theory No. 3 about Norma Salazar and the lineup.

I will now turn to the next *Brady* theory the plaintiffs alledgedly waived. That's theory No. 4.

Plaintiffs allege the defense suppressed the fact that they used physical force against Rosauro Mejia during an interrogation. Again, Rosauro Mejia was Adriana's husband.

Plaintiffs say that this evidence would corroborate plaintiffs' claims of abuse and coercion, and thus discredit their confessions. Plaintiffs also say it would have allowed

60

cross-examination of Guevara. That's in their response at Docket No. 772, at page 15.

Again, the Court examined the interrogatory responses. That's Exhibits 98 and 99.

I did not locate anything in plaintiffs' responses about defendants' use of physical force on Rosauro Mejia. It's not there.

Moreover, unlike Norma Salazar in theory No. 3, the interrogatory responses do mention Rosauro Mejia by name. But the responses only discuss fabricated statements by Rosauro Mejia, not coerced statements. That's pages 202 and 214 of Exhibits 98 and 99.

The affirmative mention of Rosauro, coupled with the absence of anything about the use of force against him, strengthens the conclusion that plaintiffs didn't disclose theory No. 4 to defendants, as required by Rules 26 and 37.

Basically, plaintiffs did mention Rosauro Mejia, but they didn't mention anything about using force against him. So it wasn't fully disclosed.

So for the same reasons as theory No. 3, plaintiffs waived theory No. 4, and the Court grants summary judgment to the defendants on that theory.

Plaintiff -- excuse me. Theory No. 4 fails for an additional reason.

It's undisputed that Rosauro Mejia testified at

61

plaintiffs' criminal trial that Guevara hit him. Take a look at Docket No. 766, at paragraph 83. So defendants didn't suppress that they allegedly used physical force against Mejia. It was out in the open. Rosauro Mejia testified that Guevara hit him. So it wasn't suppressed.

As the Seventh Circuit has noted, quote, "evidence cannot be used" -- excuse me. Let me say that again -- quote, "evidence cannot be said to have been suppressed in violation of *Brady* if it was already known to the defendant." That's from *Avery*, 847 F.3d at 443.

Also, quote, "The Seventh Circuit has held that evidence is not considered suppressed if the defendant has an opportunity to confront and use it at trial," unquote. That's from Judge Dow. Always cite Judge Dow whenever you can. *United States v. Zheng*, 2020 WL 868534, at page 10.

So plaintiffs' *Brady* theory No. 4 would fail even if it wasn't waived. Summary judgment is hereby granted as to theory No. 4.

I will now turn to theory No. 8.

By way of signposting, we're on page 24. I intend to take a break at the bottom of page 27 when we complete our discussion of theory 10.

If anybody needs to step out in the meantime, it won't rub me the wrong way. But I'm going to go about three pages, and then we'll take about a ten-minute break. Okay?

62

Thank you, folks.

Let's move on to theory No. 8.

Plaintiffs' eighth *Brady* theory is that, quote, "Trevino suppressed he had never seen Adriana demonstrate how she had stabbed the victims, despite submitting a police report a year after the crime documenting that Adriana supposedly had done so during the interrogation." That's at page 16, Docket No. 772.

Defendants again argue that plaintiffs never disclosed this theory before summary judgment.

But plaintiffs' response to defendants' interrogatory states that Trevino, quote, "and other officers wrote false and fabricated handwritten and typed reports meant to supplement the false and coerced statements that Defendants extracted from Plaintiff Reyes and others," unquote. Take a look at pages 197 and 210, of Docket No. 744-21, in Exhibits 98 and 99.

That response was not very specific, but the language was sufficient to put defendants on notice that plaintiffs were bringing *Brady* claims based on allegedly fabricated reports meant to paper over gaps in the case against Reyes and Solache.

Defendants could have moved to file -- excuse me. Defendants could have filed a motion to compel. Defendants could have pressed plaintiffs for more details.

Their response wasn't perfect. Their response wasn't detailed. But their response wasn't silent, either.

It didn't put the ball in play very far, but it did bunt the ball. It put it in play just a little.

So the Court is not convinced that the automatic sanction of Rule 37 applies to that theory.

But this *Brady* theory fails for another reason. Case law forecloses a *Brady* claim of this nature.

Recall that the *sine qua non* of a *Brady* or *Giglio* claim is the suppression, withholding, or concealment of evidence. As this Court has previously said, quote, "concealment or suppression of evidence is central to a *Brady* claim." *Bolden v. Pesavento*, 2024 WL 1243004, at page 23, Northern District of Illinois 2024. Take a look at *Anderson*, 932 F.3d at 504, Seventh Circuit 2019.

Plaintiffs say that Trevino fabricated the supplementary report that he wrote on November 18th, 1999, because he allegedly never saw Adriana demonstrate how she stabbed the victims. Take a look at paragraphs 84 to 85 of Docket No. 785.

If plaintiffs had evidence showing that Trevino's report was falsified, that would have been evidence to impeach Adriana's trial testimony. And they could have used it to impeach the credibility of the officer defendants more generally.

So this Court has two questions. First, what evidence shows that the Trevino report was a fabrication? Second, did

64

Trevino and the other defendants suppress that evidence?

The problem with plaintiffs' theory is that they point to no specific evidence that the defendants allegedly suppressed. They didn't point to an e-mail or a document the defendants suppressed. There's no e-mail, for example, that shows that the report was fabricated.

Instead, plaintiffs simply say that, quote, "Trevino suppressed he had never seen Adriana demonstrate how she had stabbed the victims," unquote. That's from page 16 of their response, Docket No. 772.

In other words, plaintiffs are simply saying that Trevino suppressed his own personal knowledge that he allegedly fabricated a report.

That's not a *Brady* claim.

Officers are required to refrain from suppressing evidence, but they are not required to create evidence of their misconduct. That is, officers are not required to create evidence which would thereby discredit or impeach the results of that misconduct. But that's what Trevino would have had to do in order to give plaintiffs the evidence that they argue was suppressed. Trevino would have had to write down a declaration, or something along those lines, some statement or e-mail or document or something along those lines, in which he admitted fabricating a report.

The Seventh Circuit considered similar circumstances

65

in *Saunders-El v. Rohde*, 778 F.3d 556, Seventh Circuit 2015. In *Saunders-El*, the Seventh Circuit similarly barred a *Brady* claim.

There, the plaintiffs argue that, quote, "police officers' failure to admit their misdeeds to the prosecution amounts to a withholding of exculpatory evidence," unquote.

Let me read that again.

The plaintiffs argued that, quote, "the police officers' failure to admit their misdeeds to the prosecution amounts to a withholding of exculpatory evidence," unquote. That's from page 561. Again, 778 F.3d at 561.

The Seventh Circuit first surveyed its previous rejections of such a theory. For example, the Seventh Circuit noted that it had previously, quote, "rejected a plaintiff's argument that *Brady* requires police to disclose truthful versions of statements made during interrogations," unquote, because, quote, "it implies that the state has a duty not merely to disclose but also to create truthful exculpatory evidence," quote. The Seventh Circuit was quoting its opinion in *Gauger v. Hendle*, 349 F.3d at 354, Seventh Circuit 2003.

As the Seventh Circuit pointed out, the Constitution does not require that police testify truthfully -- let me read that again, but tell you where the quotation starts.

Let me start at the top.

As the Seventh Circuit pointed out, quote, "The

Constitution does not require that the police testify truthfully; rather 'the constitutional rule is that the defendant is entitled to a trial that will enable the jurors to determine where the truth lies,'" unquote. They were quoting *Sornberger v. City of Knoxville*, 434 F.3d 1006, 1029, Seventh Circuit 2006.

And the Seventh Circuit previously, quote, "upheld the dismissal of a *Brady* claim premised on an argument that an officer is suppressing evidence of the truth by making a false statement to a prosecutor," unquote. I'm quoting page 561 of the *Saunders-El* decision once again. They were relying on that passage in *Harris v. Kuba*, 486 F.3d 1010, at page 1017, Seventh Circuit 2007.

Putting that all together, the Seventh Circuit rejected *Saunders-El's* claim because he sought, quote, "to charge the officers with a *Brady* violation for keeping quiet about their wrongdoing, not for failing to disclose any existing piece of evidence to the prosecution."

Let me read that quote again.

The Seventh Circuit rejected the claim because the plaintiff sought, quote, "to charge the officers with a *Brady* violation for keeping quiet about their wrongdoing, not for failing to disclose any existing piece of evidence to the prosecution," unquote.

And, quote, "case law makes clear that *Brady* doesn't

require the creation of exculpatory evidence," unquote, in that way. Again, I'm quoting *Saunders-El* at page 561.

Similarly, in *Avery v. City of Milwaukee*, 847 F.3d at 443, the Seventh Circuit explained that it was no -- *Brady* claim -- let me say that again.

In *Avery*, the Seventh Circuit explained that there was no *Brady* claim where a, quote, "criminal defendant was just complaining that the officer didn't admit to falsifying his report," unquote.

In this Court's view, *Saunders-El* controls this case. Plaintiffs ask this Court to green-light a *Brady* claim against defendants for keeping quiet about the wrongdoing and for not creating truthful exculpatory evidence in the form of admitting to fabricating a report. But that's not a *Brady* claim.

Simply put, plaintiffs cannot transform a fabrication claim into a *Brady* claim by saying the defendants suppressed exculpatory evidence by failing to affirmatively admit misconduct. Again, *Brady* is about the suppression and withholding of evidence. *Brady* is not about a failure to create evidence that would have helped the other side.

A failure to admit conduct -- excuse me. Let me say that again.

A failure to admit misconduct in and of itself is not a *Brady* violation.

In sum, plaintiffs' theory No. 8 fails because it

seeks relief that a *Brady*-type claim does not offer. The claim is foreclosed by *Saunders-El*. The Court grants summary judgment to defendants on theory No. 8.

The next theory is theory No. 9.

Plaintiffs' ninth theory is that Guevara suppressed a conversation that he had with Lourdes Rodriguez, a neighbor of the Sotos. The gist of that conversation is that Rodriguez saw the Sotos on the morning of March 28th. According to plaintiffs, that information, quote, "fatally contradicted plaintiffs' fabricated confession statements about when the crime was committed (the witness saw the victims alive after the time the confessions stated the crime occurred)," unquote. I'm quoting paragraph 16 of plaintiffs' response.

Plaintiffs have a waiver problem. Plaintiffs didn't disclose that *Brady* theory in their interrogatory responses. Look at Exhibits 98 and 99, Docket No. 744-21. The name "Rodriguez" doesn't even show up. As such, plaintiffs have waived this *Brady* theory.

Even if plaintiffs hadn't waived the theory, it would still fail.

Plaintiffs argue that Guevara, quote, "made up a story that he had reinterviewed Rodriguez, and that she had changed the date she saw the victims to March 26, and he suppressed that this reinterview never actually occurred," unquote. I'm quoting page 16 of the response.

69

Based on that assertion, Guevara didn't suppress the evidence at all. Instead, he fabricated new evidence. It's similar to theory No. 8. The evidence, quote/unquote, suppression consisted of Guevara's alleged failure to tell the truth. And that's not a *Brady* claim.

Lying is bad. Lying is wrong. But a failure to tell the truth and come clean about misconduct, standing alone, isn't a *Brady* violation.

And so this theory runs into the same problems that the Seventh Circuit identified in *Saunders-El*. Again, *Brady* does not require officers to, quote, "create truthful exculpatory evidence," unquote. That's *Saunders-El*, 778 F.3d 561.

*Brady* is about a failure to disclose exculpatory evidence. *Brady* is not about a failure to create exculpatory evidence.

In any event, the theory is waived. So the Court grants summary judgment on theory No. 9.

I'll do one last theory, and then we'll take our break. And it's mercifully short. Theory No. 10 is next.

Plaintiffs' tenth theory is that Guevara and Halvorsen suppressed that they had discovered evidence that a week before the Soto murders, Jacinto Soto had befriended a woman and that her keys had gone missing, which explained how Adriana got into the apartment to murder the Sotos, and which contradicted

plaintiffs' confessions." Once again -- unquote. Once again, I'm looking at page 16 of Docket No. 772.

Unlike the prior two theories, this is a true suppression theory in that plaintiffs allege the defendants withheld existing evidence. The theory is not that defendants failed to admit to misconduct and failed to admit fabricating evidence.

But once again, the plaintiffs run into a waiver problem. Plaintiffs did not bring up this theory anywhere in their responses to defendants' interrogatories. Take a look at Exhibits 98 and 99. So this theory is waived as well.

The Court hereby grants summary judgment to the defendants on theory No. 10.

Folks, I'm now at page 28 of 56. It is the halfway point. It is now 11:58. So we've gone on, you know, for the better part of an hour and a half or an hour and 40, whatever the math is.

We are going to take a break.

One option is that we take a ten-minute break and then plow forward, but I expect that we probably wouldn't be done until after 2:00 o'clock -- I don't know -- depending on how it goes.

I would propose that we take a lunch break, depending on the needs of my staff, who are doing a terrific job taking this down right now. I think we should take a lunch break.

Let's go off the record for one second.

(Off the record.)

THE COURT: We're back on the record.

I will confess to you all that I basically never eat lunch, so I'm a little reluctant to take lunch breaks, because I don't eat lunch anyway. It's just how I roll.

So I know not everybody has the same needs.

I would propose that we come back in, like, 15 minutes. Let you guys take a break, call your clients if you want, grab a snack downstairs, and we can come back at 12:15 and just roll forward.

Another option is we could go for an hour, but I think we should just, you know, take 15 minutes and come back.

Does that work for everybody?

I don't know if anybody has diabetes or anything where they need to eat food. If you do, speak up, and I'll be sensitive to that.

Okay? Is that good, everybody?

So why don't we come back at 12:15. It's 12:00 o'clock now. You can call your clients. You can talk things over. But we'll take a 15-minute break, and we'll get rolling.

We'll see you soon, folks. Thank you.

We are adjourned.

THE CLERK: All rise.

(Recess at 12:01 p.m., until 12:25 p.m.)

THE COURT:  All right.  Welcome back, everyone.

I'll say again, thank you, everyone, for indulging me with the oral ruling.  I wish I could give you a written ruling.  Everything in the world is finite, including little ole me.

We ended with theory No. 10.  I'll pick up where we left off.

I will now consider theory No. 11, meaning *Brady* theory No. 11.

Here it goes.

Plaintiffs' 11th theory is that Guevara engaged in misconduct in previous -- let me say that again.

Plaintiffs' 11th theory is that Guevara engaged in misconduct in previous investigations and that, quote, "Defendants didn't disclose [Guevara's] pattern of extreme misconduct . . . which could have been used to impeach Guevara," unquote.  That's on pages 16 and 17 of the response.

Basically, plaintiffs think that defendants suppressed *Brady* material because defendants didn't tell plaintiffs all about Guevara's earlier misconduct.  But defendants were not required to have affirmatively produced new exculpatory evidence.  As explained in *Saunders-El*, they did not have to create new evidence for the plaintiffs.  Nondisclosure is not the same as suppression, when the evidence exists simply as

thoughts in the defendant's heads.

So for the reasons explained above when analyzing theory No. 8, meaning the theory about Trevino's backdated report, *Brady* did not require Guevara to tell plaintiffs all about his past misdeeds.

Summary judgment is hereby granted on theory No. 11.

I have now covered the six theories that plaintiffs allegedly waived.

I will now turn to the other six *Brady* theories. I will address the *Brady* theories that the defendants say they knew about before filing for summary judgment.

First up is theory No. 1.

Plaintiffs' first *Brady* theory is that defendants suppressed the tactics they used to procure confessions from Reyes and Solache. They say the defendants: "Hid from Reyes that they had scripted Solache's confession and the abuse and other interrogation tactics they had used to obtain Solache's confession; and, conversely, they hid from Solache that they had scripted Reyes's confession and the abuse and other tactics they used to obtain Reyes's confession. Defendants actively covered them up with false reports, and they provided statements and testimony that prevented plaintiffs from discovering what had happened during the interrogations they were not present for," unquote. I'm quoting page 15 of the plaintiffs' response, Docket No. 772.

That theory runs into two problems.

The first problem is that a *Brady* claim must rest on something more than an officer's internal knowledge that he had created a false report. To bring a *Brady* claim, a plaintiff must point to some other evidence that the officer suppressed above and beyond the officer's own internal knowledge. Knowledge in your head isn't evidence. Putting that knowledge down on paper or revealing that knowledge in a statement or testimony is evidence.

*Brady* covers the suppression of evidence. *Brady* doesn't require the creation of evidence.

Here, plaintiffs don't point to any then-existing evidence suggesting that reports were fabricated. That is, plaintiffs don't identify any evidence, such as a memo or an e-mail, suggesting that the reports were fabricated. They only point to the officer defendants' internal knowledge that they allegedly fabricated reports.

Again, the Seventh Circuit doesn't recognize a, quote, "*Brady* claim premised on an argument 'that an officer is suppressing evidence of the truth by making a false statement to a prosecutor,'" unquote. That's *Saunders-El*, 778 F.3d at 561. So the creation of a false report in and of itself doesn't constitute a *Brady* claim.

In contrast, a *Brady* claim can arise from coercive tactics. Plaintiffs could base their *Brady* claim on a theory

the defendants suppressed evidence of the coercive tactics they used to procure witness statements or confessions.

In *Avery v. City of Milwaukee*, 847 F.3d 433, Seventh Circuit 2017, the Seventh Circuit discussed a, quote, "violation of the *Brady* duty to disclose facts about the coercive tactics used to obtain it," unquote.

The Seventh Circuit also explained why that duty to disclose coercive tactics is important. Quote, "Armed with the *Brady* disclosure, the accused can impeach the coerced testimony by pointing to the tactics the officer used to extract it, and the jury has a fair opportunity to find the truth," unquote. That's from Judge Sykes in the *Avery* case, 847 F.3d 439.

The point is that coercive tactics can give rise to a *Brady* claim.

The Seventh Circuit was even more explicit two years later in *Anderson v. City of Rockford*, 932 F.3d 494, at page 507, Seventh Circuit 2019.

In *Anderson*, the plaintiffs claimed that two witness statements implicating the plaintiffs in murder were procured by police coercion.

The *Anderson* court cited *Avery* for the idea that "the right to a fair trial is implicated if the State fails to disclose 'facts about the coercive tactics used to obtain' a witness's statement," unquote.

As a result, quote, "due process entitled the

plaintiffs to learn before their trial what went on with [one of the witnesses]," unquote.  Again, that's from *Anderson*, 932 F.3d at 507.

The Seventh Circuit got even clearer that a failure to disclose coercive tactics is a *Brady* violation.

The Seventh Circuit made that point later in the *Anderson* case.

Let me give you a long quote.

"Regardless of whether [the witness]'s statement (and the resulting testimony) was true or false, *Brady* imposed a disclosure obligation:  due process required the disclosure to the plaintiffs of the coercive tactics used to obtain [the witness]'s statement.  Armed with that information, the plaintiffs could have contended, in their cross-examinations of [the witness] and closing arguments, that [the witness]'s testimony implicating plaintiffs in the [] murder was false -- the fruit of police coercion . . .

"Because it is undisputed that the defendants failed to disclose the coercive tactics used to obtain [the witness]'s statement, the district court erred by granting summary judgment on this alleged *Brady* violation," unquote.  That's Anderson, 932 F.3d at 507 to 508.

Folks, I'll acknowledge that block quote was probably hard to digest when read to you in open court.  Just go ahead and read it.  It will make more sense.

At least you know what I'm reading and where you can find it.

The Seventh Circuit hasn't been completely clear about why officers need to bring forward evidence of coercive conduct that they committed in the process for procuring a witness's statement. That requirement feels like it is asking officers to create evidence, and *Brady* isn't about creating evidence.

So, perhaps, there's a bit of an aura of mystery around this. Perhaps the distinction is the coercive conduct is external to the officer, unlike an officer's internal thoughts or knowledge. Maybe the tactic is an act. Maybe the act of violence, for example, is an act as opposed to a thought, which is internal. Maybe that's the distinction.

Coercion involves an external manifestation of conduct, but knowledge only exists in an officer's head. There's no physicality to a thought.

Regardless, the Seventh Circuit has made clear that the suppression of evidence about coercive tactics can give rise to a *Brady* claim.

But that leads to a second problem with plaintiffs' theory. As the Court will explain, plaintiffs already possessed evidence about coercive tactics used by the defendants, or plaintiffs could have acquired that evidence with reasonable diligence. If the plaintiffs couldn't have gotten -- excuse me. If plaintiffs could have gotten the

information themselves, they don't have a *Brady* claim. That's what the Seventh Circuit said in *Goudy*, 922 F.3d at 832 [*sic*]. The Seventh Circuit said the same thing in *Carvajal v. Dominguez*, 542 F.3d 561, at page 567, Seventh Circuit 2008.

Plaintiffs each knew about the coercive tactics the defendants used on them. Reyes knew about the coercive tactics that the officers used on Reyes. Reyes didn't need the defendants to tell him what had happened to himself.

Solache knew about the coercive tactics that the officers used on Solache. Solache didn't need the defendants to tell him what had happened to himself.

Plaintiffs didn't need the defendants to tell them what had happened to the plaintiffs.

In fact, during their criminal proceedings, each plaintiff filed motions to suppress that detailed some of the coercive conduct that is the subject of this claim.

It was out in the open.

Plaintiffs also say that defendants hid evidence of coercive tactics used against Solache from Reyes. Plaintiffs say that defendants hid evidence of coercive tactics used by Reyes -- excuse me. Let me say that again.

I'll start at the top.

Plaintiffs say that defendants hid evidence of coercive tactics used against Solache from Reyes -- I'm going to say that one more time because I think if I move the phrase,

it's easier to understand.

Solache and Reyes say the defendants hid evidence of coercive tactics used against Solache and hid that from Reyes. Solache and Reyes also say the defendants hid evidence of coercive tactics that were used against Reyes and hid that evidence from Solache.

They say that such information is material because each plaintiff could have "used the evidence to corroborate their [respective] account of abuse." They say that on page 15 of their response.

Basically, Reyes and Solache say that defense suppressed evidence by failing to tell each plaintiff about what defendants did to the other plaintiff. So the notion is that the officers didn't tell Reyes what had happened to Solache, and they didn't tell Solache what happened to Reyes. That's the concept.

But with reasonable diligence, plaintiffs could have acquired that evidence. After all, Solache and Reyes undoubtedly knew each other. They lived together. They were prosecuted together. They could have talked to each other about the cases, and they both filed motions about what had happened to them. It was out in the open.

Solache could, with reasonable diligence, have acquired Reyes's account of coercion, and Reyes could, with reasonable diligence, have acquired knowledge about Solache's

account of coercion.  Solache and Reyes each knew each other. They knew that the other person was charged with murder.  They could have asked each other if defendants used coercive tactics on each other.

Moreover, they weren't testifying against each other. They weren't blaming each other.  They weren't pointing fingers at each other.  They weren't adverse codefendants.

Reyes knew that the officers had used coercive tactics to obtain a confession from him.  So Reyes could have asked Solache if the officers coerced a confession from him, too. Reyes could have said, "Look what happened to me.  Did that happen to you?  Is your confession phony, too?"

On the flip side, Solache could have done the same thing.  Solache knew that the officers had used coercive tactics against him to obtain a confession.  So Solache could have asked Reyes if the officers coerced a confession from him, too.  Solache could have asked Reyes if Reyes's confession was coerced.

As far as this Court can tell, Solache and Reyes didn't do that.  And that's a fatal flaw in their *Brady* argument.

After all, quote, "*Brady* does not oblige the government to provide defendants with evidence that they could obtain from other sources by exercising reasonable diligence," unquote.  That's from *United States v. Stokes*, 64 F.App'x 585,

594, Seventh Circuit 2003.

The Sixth Circuit has said the same thing. Quote, "For evidence to be withheld under *Brady*, the evidence must be in the exclusive control of the state," unquote. That's *Clark v. Abdallah*, 131 F.4th 432, at page 455, Sixth Circuit 2025.

Also, "there could be no *Brady* violation when the defense had access to the same evidence through other means," unquote. That's from *Marshall v. Buckley*, 644 F.Supp.2d 1075, 1081, Northern District of Illinois 2009.

Basically, the evidence that each plaintiff says was suppressed wasn't in the exclusive hands of the government. It wasn't in the exclusive hands of the defendants. It was in the hands of the other plaintiff.

Solache could have obtained information from Reyes. Reyes could have obtained information from Solache. The evidence was not in the exclusive control of the State. Each plaintiff could have obtained the information through reasonable diligence. That's why *Brady* theory No. 1 fails.

The bottom line is, Reyes could have found out from Solache what had happened to Solache. Solache could have found out from Reyes what had happened to Reyes with reasonable diligence. So the first *Brady* theory fails.

As far as this Court can tell, there is no other information under theory No. 1 that allegedly was suppressed. The Court does not understand plaintiffs to be arguing, for

example, a report exists out there saying the defendants used coercive tactics and that the defense suppressed it. It's not like there is a memo or an e-mail out there that describes the course of tactics that wasn't produced. That would be a different story.

This Court takes the argument as it gets it. And as framed, the theory cannot proceed.

Plaintiffs already had or could have obtained through reasonable diligence all the information they needed about the defendants' coercive tactics. They don't point to any specific evidence the defendants alone possessed and which the defendants suppressed.

For those reasons, the motion for summary judgment on theory No. 1 is granted.

I will now turn to *Brady* theory No. 2.

Plaintiffs' second theory is the defendants, quote, "suppressed that they had scripted Adriana's statement implicating Plaintiffs, and then had abused Adriana to force her to adopt the statement," unquote. That's page 15 of the response.

For the same reasons the Court has explained previously, the fabrication or scripting aspect of the claim is barred by *Saunders-El*. And just as before, plaintiffs could have acquired evidence of the coercive tactics the defendants allegedly used on Adriana.

Specifically, through reasonable diligence, they could have gotten testimony from Adriana about coercive tactics, which they could have used to impeach her account of the murder that implicated Reyes and Solache. So plaintiffs can't bring a *Brady* claim related to the coercive tactics.

Plaintiffs soldier on and say that theory No. 2, quote, "premised on the theory" -- I beg your pardon. Let me say it again.

Plaintiffs soldier on and say that theory No. 2 is, quote, "precisely the theory approved in *Avery v. City of Milwaukee*, which held that a suppression due process theory should go to trial where investigating officers 'failed to disclose material impeachment evidence regarding their interrogations of the three jailhouse informants,'" unquote. That's page 15.

But plaintiffs only get it half right. *Avery* did approve something like theory No. 2. Take a look at *Avery,* 847 F.3d at 443. But the Seventh Circuit also distinguished three previous cases in which, quote, "the criminal defendants were already aware of the impeaching facts -- namely, that the testimony in question was coerced," unquote.

So theory No. 2 is not precisely the theory in *Avery*, as plaintiffs contend. Instead, it's more like the other three cases, where the *Brady* claimants already knew, or could have known through reasonable diligence, about coercive tactics used

to procure inculpatory testimony. And in those case, the *Brady* claims could not proceed.

So too here. Theory No. 2 fails because Reyes and Solache could have acquired the impeachment evidence from Adriana through reasonable diligence.

So summary judgment is hereby granted as to theory No. 2.

Next up is theory No. 5.

Plaintiffs' fifth theory is that defendants suppressed evidence that they initially investigated the Soto family members as suspects. Take a look at page 15 of their brief.

Defendants argue that plaintiffs cannot point to any evidence to support this theory.

But plaintiffs do point to evidence. In fact, the first exhibit that plaintiffs cite for this theory is a deposition of Rosa Aranda, the niece of victims Jacinto and Mariano Soto, that took place in February of 2020.

During testimony, Aranda clearly stated that Guevara perceived her and other members of the Soto family as suspects and treated them as such.

I have a long set of Q&A that I could quote. In the interest of time, I'm not going to quote it. I'm just going to give you the cites.

Take a look at Exhibit FF, Docket No. 763-9, at pages 45 through 48. Specifically, look at the following

testimony:  Page 45:23, meaning page 45, line 23, through page 46, line 3.  Take a look at page 46, line 8 through page 46, line 25.  And take a look at page 47, line 15 through page 48, line 3.

If you read the testimony, you'll see that it supports the point.

The deposition testimony is more than enough to raise a question of fact about whether Guevara and the officer defendants considered the Sotos suspects in the investigation. So defendants' first argument fails.

To be fair, that testimony might be inadmissible hearsay if plaintiffs use it to prove the truth of the matter asserted, meaning that Rosa and Jose were suspects.  I'd have to think about that a little more.  Defendants don't raise a hearsay objection.  The parties don't brief the issue.  It might fall within the exception of hearsay.  I wondered about it.  That's all I'm saying, I wondered about whether it was a hearsay issue, but the parties don't address it, and maybe you don't address it because there is no hearsay problem.  So I'm just going to put that aside.  There may not be a hearsay problem.  I just wanted to flag it.  So don't anybody get too excited.  There may not be a hearsay problem.

Defendants' last argument is that the evidence wouldn't be material even if defendants were investigating alternative suspects.  They say that the evidence of other

suspects would not, quote, "tend to establish Plaintiffs' innocence or 'increase the probability that the trial judge would have reached a different verdict,'" unquote. I'm quoting the reply at page 15, Docket No. 783. There, they quoted *Serrano v. Guevara*, 2020 WL 3000284, at page 19, Docket No. -- excuse me -- Northern District of Illinois 2020.

Whether evidence of other suspects would tend to result in a different verdict is a factual question. The Court can't say with much certainty whether that evidence would make a difference. Maybe it would, maybe it wouldn't. It's a question best left for the jury.

After all, materiality is generally a mixed question of fact and law. In *Ruiz v. Cady*, the Seventh Circuit described materiality in a *Brady* claim as the kind of, quote, "mixed determination of law and fact that requires the application of legal principles to the historical facts," unquote. That's *Ruiz v. Cady*, 635 F.2d 584, 589, Seventh Circuit 1980.

A majority of other circuits have ruled similarly, including the First, Second, Third, Fourth, Fifth, Sixth, Seventh -- excuse me -- Fifth, Sixth, Eighth, and Tenth Circuits. I have a long string cite here. I'm going to spare you from reading it. Suffice it to say, a lot of circuits have come out the same way.

Mixed questions are for the jury. Quote, "The

application of legal standard to fact sort of question . . . commonly called a mixed question of law and fact, has typically been resolved by juries," unquote. I'm quoting the Supreme Court in *Hana Financial v. Hana Bank*, 574 U.S. 418, 423 to 424, 2015.

So because *Brady* materiality is a jury question, a jury must answer it. A reasonable jury could find that the existence of alternative suspects and the investigative steps not taken regarding those suspects would have allowed plaintiffs to impeach testifying defendants enough to create a, quote, "reasonable probability that the result of the proceeding would have been different," unquote. I'm quoting *Beaman v. Freesmeyer*, 776 F.3d 500, at page 506, Seventh Circuit 2015.

Because there are material questions of fact about the existence of alternative suspects and whether that information would be material, defendants' motion for summary judgment on plaintiffs' fifth theory is hereby denied.

The next theory is No. 6. Plaintiffs' sixth theory is that defendants "suppressed that they asked Alfredo Aranda, a neighbor of the victims, if he had heard sounds coming from the Sotos' apartment that might corroborate the content of Plaintiffs' false confessions, that Aranda said he had not heard such sounds, and that Guevara and Halvorsen nevertheless wrote a report claiming Aranda heard those sounds," unquote.

I'm quoting page 16 of Docket No. 772.

Plaintiff Reyes's statement of additional facts describes the content of the report in which Guevara and Halvorsen allegedly reported what Alfredo Aranda told them.

Let me quote from defendants' response of statement of material -- statement of additional facts, Docket No. 785 at page -- excuse me -- at paragraph 89.

Here it goes.

"Alfredo Aranda heard through a bathroom wall the sound of someone falling out of bed and hitting the floor and wall. He next heard the muffled screams of a woman, as if someone had a hand over her mouth. He told Guevara and Halvorsen that he couldn't understand what the woman was saying, but recognized the voice as being Jacinto Soto. He heard what sounded like someone being dragged on the floor. He then heard a male voice say, 'Don't scream. I'm not going to hurt you.' He next heard a loud disturbance taking place in the victim's apartment. He heard metal banging and the sound of glass breaking. He heard the victims' 3-year-old son yelling, "Papi, Papi." He told defendants that the disturbance lasted ten to 15 minutes." Again, I'm quoting from paragraph 89, Docket No. 785.

A report like that would be strong evidence that a man participated in the murder along with Adriana. After all, it says that he heard a male voice. But the allegedly false

report itself cannot support a *Brady* theory for the same reasons this Court has articulated a few times.

To the extent that defendants simply fabricated a report or did not tell the truth, that is not a *Brady* claim. It's a fabrication claim. Creating a false report in and of itself is not a *Brady* violation. It's a fabrication claim. Take a look at Sanders v. El -- excuse me -- *Saunders-El*, 778 F.3d at 561.

Theory No. 6 isn't just about the report, however. It's also about the suppression of what Alfredo Aranda originally told defendants.

Alfredo Aranda testified that -- let me say that again.

Alfredo Aranda testified at plaintiffs' criminal trials. And his trial testimony largely matched the allegedly fabricated report. Exhibit 15 at pages 680 to 698, Docket No. 744-5.

So if Alfredo Aranda originally said something different, that evidence would be a strong basis for impeaching his trial testimony. And if defendants covered up what Alfredo Aranda actually said, that's a quintessential *Brady* claim.

In other words, the alleged coverup of what Alfredo Aranda actually said the first time is different than the creation of a false report about what he said.

Defendants could, and allegedly did, create a false

report to attempt to legitimize the coverup about what Alfredo Aranda say. The creation of a false report would not give rise to a *Brady* claim for the reasons stated in *Saunders-El*, as I've already discussed.

But the suppression of what Alfredo Aranda actually said is not the same thing as the creation of a false report. And that is a classic suppression claim.

A failure to disclose what Alfredo Aranda said is not the same thing as creating a false report about what Alfredo said.

The core of this *Brady* theory is not the allegedly false report. The core of this *Brady* theory is the withholding of evidence about what Alfredo Aranda initially said. That's a factual question: Did Alfredo Aranda originally tell defendants something different from his trial testimony, which defendants then suppressed? And more precisely for our purposes, do plaintiffs point to admissible evidence that creates a material factual dispute about those questions?

They do. In 2019, Alfredo Aranda sat for a deposition. He recalled what he told the police during their investigation. His recollection in 2019 about what he told the police officers in 1998 was different than what he recalled when he testified at plaintiffs' criminal trial in 2000.

For example, in his deposition in 2019, Alfredo Aranda explained what he told the police.

"Q.   And what did you tell that detective you heard on March the 28th of 1998?

"A.   The only thing that I heard was something fell, something was dragged and that the kid -- I don't know whether there was a cry or not; that a man told him to shut up, that nothing was going to happen to him.  But I did not recognize that voice."

Take a look at Docket No. 763-15, at page 10, lines 11 to 18.

Even though those items were the, quote, "only thing," unquote, Alfredo Aranda had heard, he testified at trial in 2000 about other things he supposedly had heard.

For example, at the trial, Alfredo Aranda had this exchange with the prosecutor on direct examination:

"Q.   What kind of noise did you hear?

"A.   Some moaning, like a sick person."

I'm quoting from the transcript, Exhibit 15, Docket No. 744-15, at page 1313, lines 5 to 6.

In addition, Alfredo Aranda testified in his deposition in 2019 that the police wanted him to tell a particular story.

"Q.   When you talked to the police at the police station, did you tell him that you heard Jacinto Soto's voice?

"A.   I never heard her voice.

"Q. And did the detective try to get you to get you to say that you did hear her voice?

"A. He tried to say -- he tried to say that I said that, but I told him that I would never say something I had not heard.

"Q. And you didn't hear that, correct?

"A. No. No."

Again, that's the same exhibit. It's Exhibit XXXX, Docket No. 763-15, at page 12, lines 12 to 24.

A jury could find that there are discrepancies in his testimony. Discrepancies between Alfredo Aranda's trial testimony and what he later testified to at deposition, coupled with testimony suggesting that the police wanted Alfredo Aranda to tell a certain story, are enough to create a question of material fact about whether the defendants suppressed what Alfredo Aranda originally told them.

A reasonable jury could look at this evidence and find the defendants suppressed evidence that could have been used to impeach Alfredo Aranda's inculpatory trial testimony by pointing to inconsistent statements. And that's a *Brady* claim.

The discrepancies aren't huge, but they're enough to create a question of fact. A reasonable jury could look at the differences and find that plaintiffs' inability to impeach Alfredo Aranda's testimony with his original statements to the police made a difference to the outcome of the trial.

And, again, materiality is a mixed question of law and fact. It's a question for the jury.

So to the extent the defendants suppressed Alfred Aranda's original statement, meaning what he really said, not what's in the report, that may be a basis for liability on a *Brady*-type claim.

So the motion for summary judgment on theory No. 6 is hereby denied.

The next theory is theory No. 7. Defendants' seventh theory is that, quote, "Guevara suppressed that he got Guadalupe Mejia to give a false story about Reyes making incriminating statements over the phone, which he obtained only after detaining her for many hours and subjecting her to insults, mistreatment, and repeatedly accusing her of involvement in the crime." That's from page 16 of the plaintiffs' response.

To the extent this theory is about fabricated evidence, it fails for all the reasons the Court has explained on other theories. *Saunders-El* precludes *Brady* claims that are merely based on an officer's creation of a false report.

But similar to theories 1 and 2, this *Brady* theory also includes coercive tactics used to procure an inculpatory witness statement. That's plainly a *Brady* theory, as Judge Sykes laid out in *Avery v. City of Milwaukee*, as discussed above.

And, unlike theories No. 1 and 2, plaintiff put defendants on notice about a theory concerning a fabricated statement from Guadalupe Mejia in their responses to defendants' interrogatories. Take a look at Exhibits 98 and 99, Docket No. 744-21. So the theory isn't waived. Defendants don't argue that it's waived.

So far, so good on theory No. 7.

But then the Court reviewed the record that plaintiffs cite to support their factual assertions that Guadalupe was coerced into giving a false statement. Take a look at paragraph 76 through 79 of Docket No. 785.

The Court only saw two pieces of potential evidence that could even plausibly support the idea that any defendant coerced a statement out of Guadalupe.

First, Jorge Mejia, Guadalupe's husband, testified at a January 2020 deposition that someone threw food at Guadalupe while she was being interviewed.

Quote, "[Guadalupe] told me that when they were about to feed them, they threw the food on the ground -- on the floor, and she was screaming to get her out of there, that she had nothing to do with what was going on. But when I got there, she was sitting by an officer, and I didn't see anything," unquote. That's Plaintiffs' Exhibit NNNN, at page 38, lines 11 to 17, Docket No. 763-15.

That statement might be barred by the rule against

hearsay. It is likely that the present-sense-impression or excited-utterance exceptions don't apply. Although I'd have to think about that.

But even if it was admissible, the statement doesn't go far enough to raise a dispute of material fact that any defendant coerced Mejia into making a statement about the phone call.

The phrase "threw the food on the ground" is quite vague. Plaintiffs seem to take that to mean that Guevara threw food at Guadalupe, but that's not clear at all. That's a speculative reading of Jorge Mejia's statement. And speculation goes beyond a reasonable inference.

Moreover, the testimony in question used the phrase "they" -- or the word "they." It's unclear who "they" referred to. "They" could be a jailhouse worker completely unrelated to the investigation.

It's hard to believe that the defendant officers were the ones delivering trays of food in the Area 5 station while they were busy conducting a murder investigation. That, I suppose, is possible, but that's not in the record.

If "they" refers to someone else, it's hard to see how that could give rise to an inference that defendants coerced them.

I can't speculate on what the word "they" was referring to. That's not a reasonable inference. It's

speculative, and speculation can't defeat summary judgment.

I have to draw every reasonable inference in plaintiffs' favor as the nonmovants, but the idea that one cryptic sentence from Jorge Mejia establishes coercive tactics is simply a bridge too far. That conclusion would require speculation wrapped around speculation. It goes beyond reasonable inferences.

Next, plaintiffs argue that Guevara didn't deny that he used coercive tactics because he invoked the Fifth Amendment at deposition when asked if he used coercive tactics.

But the mere invocation of the Fifth Amendment is not enough to win at summary judgment.

Quote, "The nonmovant must point to some evidence in addition to the defendant's silence to avoid summary judgment." That's *Kluppelberg v. Burge*, 2017 WL 3142757, at page 4, Northern District of Illinois 2017.

Silence -- quote, "Silence, and adverse inferences drawn from it, cannot be the sole basis for finding liability," unquote. That's from *Ruiz-Cortez v. City of Chicago*, 2016 WL 6270768, at page 7, Northern District of Illinois 2016.

Quote, "A party's refusal to answer questions during discovery is not enough to create an issue of fact to avoid summary judgment." That's *Logan v. City of Chicago*, 891 F.Supp.2d 897, 901, Northern District of Illinois 2012.

So the invocation of the Fifth Amendment cannot get

plaintiffs across the finish line. And by the way, Guevara invoked the Fifth Amendment in response to every question in his deposition.

There isn't much other evidence in the record to support this point. Plaintiffs cite Exhibit 0 -- I'm sorry -- Exhibit 0000 for the idea that Guadalupe was coerced. See Reyes's statement of additional fact, Docket No. 763, at paragraph 76.

That exhibit doesn't appear in the list of filed exhibits. Take a look at Docket No. 763-15. The exhibit list says that Exhibit 0000 was produced electronically. I'm not aware of any electronically produced exhibits. I don't see that in the record. That's the record I'm relying on.

The long and short of it is that it wouldn't matter anyway, as far as I can tell. Plaintiffs had a burden to establish the absence of a genuine issue of material fact. I don't see it, so summary judgment is hereby granted on theory No. 7.

Let me pause here, folks.

If there is an exhibit in the record that is missing and you actually intended to file it and it just got missed someway, somehow, let me know, and I'll promise you that I'll revisit this. Okay? I'm just calling it as I see it. I don't see it, and I can't find it.

All right. So if there's something that I just

missed, I'd invite you to come back to me if you think it was submitted.

Fair enough, folks?

Okay. I'll now turn to the 12th and final *Brady* theory. That's *Brady* theory No. 12.

The Court reviewed plaintiffs' 12th theory. That's about the alleged suppression of Polaroid photos showing alternative suspects in defendants' investigation. The gist of theory No. 12 is that defendants were also investigating other suspects. That's on pages 17 and 18 of the response.

To that extent, the claim is duplicative of theory No. 3 -- excuse me. Theory -- I said "No. 3." Let me say that again.

To that extent, this claim is duplicative of theory No. 5. Theory No. 5 focused more broadly on defendants' suppression of investigation into other suspects. The Court sees no reason why theory No. 12 is anything more than a subset of theory No. 5.

The Polaroid photos themselves don't seem to have any exculpatory or impeachment value above and beyond what this Court already addressed in theory No. 5. It seems to fall within that.

So theory No. 5 survives summary judgment. Therefore, theory No. 12 survives summary judgment. It sounds like a subset of part 5 -- theory 5.

I have now completed my discussion of the 12 theories of *Brady* liability. I'm going to resist the temptation to summarize it for you off the cuff. Basically, read *Saunders-El*. Some of it survives; some of it doesn't. A lot of it was waived. That's the ruling.

I'm on page 40. We've got 16 pages to go.

I will now turn to Section V.

I will cover the failure-to-intervene claims. That claim is Count V in Reyes's complaint and Count III in Solache's complaint.

The basic idea of a failure-to-intervene claim is that, quote, "police officers who have a realistic opportunity to step forward and prevent a fellow officer from violating a plaintiff's right . . . but fails to do so may be held liable," unquote. *Harper v. Albert*, 400 F.3d 1052, 1064, Seventh Circuit 2005.

A failure-to-intervene claim naturally requires some predicate constitutional violation. "In order for there to be a failure to intervene, it logically follows that there must be an underlying constitutional violation," unquote. *Id.*

Defendants raise three arguments about the failure-to-intervene claim.

First, they argue that there has been no constitutional violation, so there necessarily cannot be a failure to intervene.

That argument obviously fails. The Court has denied summary judgment on multiple claims so far.

Second, defense argue that they never had an opportunity to intervene. Specifically, they say that Solache and Reyes cannot show that any officer had a chance to intervene in their allegedly coerced confessions. And they say that Reyes can't show that Halvorsen, Dickinson, or Rutherford had a chance to intervene in Reyes's allegedly fabricated confession. The idea is that they weren't present for the constitutional conduct. See their memo, Docket No. 473 -- excuse me -- Docket No. 743, at page 18.

But a reasonable jury could conclude that they were present.

The officer defendants may not have been in the same room for each plaintiff on each claim. But as discussed above, every officer was present in the cramped confines of the Area 5 station. A reasonable jury could conclude that the proximity gave them an opportunity to intervene.

Moreover, as discussed above, the Court has already denied summary judgment claims against all of the officer defendants on the coerced confession and fabricated confession claims. There is a question of material fact about whether the officer defendants are liable for his own conduct -- let me say that again.

There is a question of material fact about whether

each officer defendant is liable for his own personal involvement in the constitutional violation.

So, by the same token, there is a question of fact about whether each officer defendant failed to intervene. Failure to intervene is just one of the possible ways to be personally involved in a Section 1983 constitutional violation.

That said, plaintiffs will not be able to recover on both the underlying constitutional violations and on their failure-to-intervene claim. That's because, quote, "failure to intervene is not a claim for relief; rather, it's a theory of liability under Section 1983, specifically, a way to prove the liability of a state actor who is not a direct participant in the challenged wrongdoing." That's from *Johnson v. Guevara*, 2025 WL 903813, page 31, Footnote 12, Northern District of Illinois 2025, citing *Fields v. City of Chicago*, 2014 WL 477394, at page 10, Northern District of Illinois 2014.

For that reason, the Court's denial of summary judgment on the underlying constitutional violation as to each and every officer also precludes granting summary judgment on the failure-to-intervene claim.

Third and last, defendants argue that the, quote, "failure to intervene is not cognizable under Section 1983," unquote, because it, quote, "sounds like vicarious liability," unquote, and, quote, "Section 1983 supports only direct, and not vicarious liability," unquote. They quote from

Judge Easterbrook's concurrence in *Mwangangi v. Nielsen*, 48 F.4th 816, 834, Seventh Circuit 2022.

Other courts in this district have considered that argument and rejected it, including cases involving some of the same parties and same attorneys here.

Let me give you a couple cases.

*Johnson*, 2025 WL 903813, at page 31, Note 12. Also, *Fulton v. Bartik*, 2024 WL 1242637, at page 27, Footnote 32, Northern District of Illinois 2024.

Other courts have rejected the Judge Easterbrook concurrence for good reason. The Seventh Circuit has, quote, "long recognized," unquote, failure to intervene as a viable theory of a constitutional violation under Section 1983. That's from *Harper*, 400 F.3d 1064.

It has done so even after the *Nielsen* case where Judge Easterbrook offered his concurrence. For example, in *Stewardson v. Titus*, the Seventh Circuit considered a failure-to-intervene claim on the merits but ultimately affirmed summary judgment based on qualified immunity. That's from *Stewardson*, 126 F.4th 1264. Take a look at page 1279. Seventh Circuit 2025.

A concurrence by Judge Easterbrook is worth reading by definition. All of us should sit at attention and listen carefully.

That being said, a concurrence by Judge Easterbrook is

simply that. It's a concurrence. It's not a majority decision. It is not binding circuit precedent.

My job as a district court judge is to follow binding circuit precedent. I take my marching orders from the Seventh Circuit, not from any particular Seventh Circuit judge. Even if I personally think that that Seventh Circuit judge got it exactly right, I have to follow what the Seventh Circuit is saying.

The Seventh Circuit continues to recognize a failure-to-intervene claim. Simply put, quote, "Unless and until the Seventh Circuit alters course, failure to intervene remains a viable theory of liability under Section 1983," unquote. That's from *Fulton*, 2024 WL 1242637, at page 27, Footnote 32.

It's a long way of saying you've got a potential appellate issue here, but I'm not going to disagree with the Seventh Circuit, because that's not my job.

So, in sum, all of the defendants' arguments about the failure-to-intervene claim miss the mark. So the Court denies the motion for summary judgment as to the failure to intervene.

I'll now turn to Section 6. I'll now turn to the malicious prosecution claim. It appears as Count IX in Reyes's complaint and as Count V of Solache's complaint.

Malicious prosecution is a state law claim as framed here.

Under Illinois law, a malicious prosecution claim consists of five elements that a plaintiff must prove.

Quote, "(1) the commencement or continuance of an original criminal or civil judicial proceeding by the defendant; (2) the termination of the proceeding in favor of the plaintiff; (3) the absence of probable cause for such proceeding; (4) the presence of malice; and (5) damages resulting to the plaintiff." That's from *Beaman v. Freesmeyer*, 131 N.E.3d 488, at 495, Illinois 2019.

Here, the defendants largely contest the second and third elements. That is, they make arguments about whether there was a favorable termination, and they make arguments about probable cause.

I'll start by discussing the favorable termination requirement, which is Part V.A of my ruling.

At the very least, plaintiffs have raised a disputed question of material fact about whether the cases were favorably terminated.

In Illinois, a "criminal proceeding has been terminated in favor of the accused when a prosecutor formally abandons the proceeding via a *nolle prosequi*, unless the abandonment is for reasons not indicative of the innocence of the accused." That's from my opinion in *Zhang v. Schuster*, 2022 WL 615015, at page 22, Northern District of Illinois 2022. I got affirmed by the Seventh Circuit, 2023 WL 5928162, Seventh

Circuit 2023.

In other words, a *nolle prosequi* is presumably a favorable termination.

The charges against Reyes and Solache were dismissed according to a *nolle prosequi* after their confessions were suppressed. Take a look at paragraph 94 of Docket No. 766. That's usually a favorable termination.

Defendants argue that plaintiffs fall within the exception where the dismissal of criminal charges is, quote, "for reasons not indicative of the innocence of the accused." I'm quoting my *Zhang* opinion, 22 -- excuse me -- 2022 WL 615015, at page 22.

I don't need to hash out defendants' legal arguments on that point because plaintiff presented admissible evidence that the dismissal of the criminal charges did occur because of their innocence. Reyes and Solache have certificates of innocence from the state of Illinois. Look at paragraph 1 of Docket No. 785. The existence of the certificates of innocence creates a question of material fact.

The Seventh Circuit has described a certificate of innocence as particularly important evidence in a malicious prosecution case. Here, plaintiffs' certificates of innocence are, quote, "directly relevant to an element on which [Plaintiffs bear] the burden of proof: that the prosecution against [them] was terminated in a manner indicative of

innocence," unquote. That's from *Patrick*, 974 F.3d at 832 to 833.

The certificates of innocence appear to be admissible. Defendants argue that a certificate of innocence is hearsay and does not fall within any hearsay exception because it's offered for the truth of the matter asserted; that is, plaintiffs' innocence. I doubt that is correct.

As an initial matter, I don't think the record includes the actual certificates of innocence. I'm prepared to be wrong on that, folks, because the record is so voluminous. I think that the record only includes the petitions for the certificates, not the actual certificates themselves, but I know what certificates of innocence are, so I'm not going to dwell on it.

In any event, the Seventh Circuit in *Patrick* approved of a district court's decision to admit a certificate of innocence for the same reason that it would serve here. That is, the Seventh Circuit in *Patrick* gave its blessing to the use of a certificate of innocence as evidence on whether the dismissal of charges occurred, quote, "in a manner indicative of innocence," unquote. That's *Patrick*, 974 F.3d 832 to 833.

In other words, the Seventh Circuit in *Patrick* gave its blessing to the admissibility of a certificate of innocence.

As far as I can tell, a certificate of innocence is

offered to show that the state believes that a person has no criminal liability. It's not offered to show that the person didn't do it in the real world.

In other words, it goes to the state's position about whether a person is guilty or innocent. It doesn't go to whether a person is in fact innocent, meaning whether the person did or did not do the criminal act.

I will say this, folks: On the hearsay question, I'm going to keep my powder dry. If someone wants to raise this argument at trial, you can. As I currently see things, I doubt that it's hearsay, so I'm going to assume it's admissible.

I'm not giving you a definitive ruling on that because I want to think this through a little bit more, but that's my inclination. My inclination is it's not hearsay because it doesn't go to the truth of the matter asserted because it's simply sufficient that it was said. It goes to what the state's position is as to whether this person has any criminal liability.

It basically cleans the slate and restores the person to the *status quo* ante. All of us are innocent until proven guilty. The certificate of innocence restored this person to innocence until proven guilty.

I don't know that you need to prove that you're innocent until proven guilty, because that's the presumption that all of us enjoy. So it's simply a certificate that

restores the person to a legal status, as far as I can tell. It's like giving you your legal status. It's not really talking about what happened in the real world.

That's how I'm tempted to see things, folks. And I want to be candid with you, I need to think this through some more. I have admitted certificates of innocence before. I did that in the *Bolden* case. But when I was writing this ruling up, I paused on this, and I wanted to think about it.

So for purposes of my ruling today, I'm going to assume that it is not an admissible hearsay. I'm assuming that it's admissible, but I'm not giving you a set-in-stone ruling on this. I believe that ruling is correct, but if someone wants to revisit this later, I will listen to you. Okay? That's my ruling for today.

Defendants do cite a few cases. Those cases address other issues, like the admissibility of an acquittal.

I'm not going to belabor the point. I'm simply going to say they're an out-of-circuit case or they're nonbinding circuit court cases. The *Patrick* case controls.

As far as I understand things, I believe that the certificate of innocence is likely admissible. So the certificates of innocence are admissible evidence. They create a disputed question of material fact on whether the charges were dropped on reasons indicative of innocence.

Let me say that again.

The certificates of innocence appear to be admissible. They appear to go to the favorable termination element. They are sufficient to give rise to a question of fact about whether the charges were terminated in favor of Solache and Reyes for reasons indicative of their innocence.

So if it's admissible, it creates a genuine issue of material fact.

We need a jury. That's the point. We need a jury on this.

I'll now turn to the other requirement for a malicious prosecution claim. That's probable cause.

The existence of probable cause is an absolute barred liability for malicious prosecution. Take a look at *Wade v. Collier*, 783 F.3d at 1081, at page 1085, Seventh Circuit 4 -- excuse me -- Seventh Circuit 2015.

Defendants argue that, based on the facts that they had available to them at the time, they had probable cause to prosecute Reyes and Solache. So, in their view, a malicious prosecution claim necessarily fails.

Based on my review of the record, I disagree.

Quote, "Probable cause is defined as a state of facts that would lead a person of ordinary care and prudence to believe or to entertain an honest and sound suspicion that the accused committed the offense charged," unquote. That's *Williams v. Chicago*, 733 F.3d 749, 759, Seventh Circuit 2013.

Quote, "A district court must assess probable cause 'objectively' after considering 'the conclusions that the arresting officer reasonably might have drawn from the information known to him,'" unquote. That's from *Allen v. Taylor*, 2025 WL 885838, at page 5, Northern District of Illinois, 2025. Take a look at *Holmes v. Village of Hoffman Estates*, 511 F.3d 673, 679, Seventh Circuit 2007.

In addition, "probable cause 'necessarily' entails a 'fact-intensive inquiry.'" *Green ex rel. McCrory v. City of Chicago*, 2024 WL 1363543, at page 5, Northern District of Illinois 2024. Probable cause is based on the totality of circumstances. *United States v. Lewis*, 920 F.3d 483, 489, Seventh Circuit 2019.

The existence of probable cause is often a question that district courts cannot answer at the summary judgment stage.

Quote, "It is not always appropriate for the court to resolve the question of probable cause on summary judgment, as the probable cause determination 'typically falls within the province of the jury,'" unquote. *Saffold v. Village of Schaumburg*, 2009 WL 2601319, at page 7, Northern District of Illinois 2009.

Another court in this district has said that, quote, "the issue of probable cause is generally a question for the jury," unquote. *Payne v. Cook County*, 2017 WL 11886125, at

page 5, Northern District of Illinois 2017.

In sum, defendants, as the movants, face a high bar to show that there is not any dispute of material fact such that defendants have established the existence of probable cause as a matter of law.

In attempting to clear that bar, defendants point to at least ten pieces of evidence to support their determination of probable cause.

I will now go through the ten pieces of evidence.

Number one, defendants point out that Mariano and Jacinto Soto were savagely murdered and their children were taken from the scene between March 27th and April 1.

That evidence does not indicate anything about Reyes's and Solache's potential involvement. It simply states the offense.

Second, defendants point out that Reyes and Solache were living with Adriana and the two kidnapped children from March 28th until April 3rd.

Maybe so, but the mere fact that Reyes and Solache lived with Adriana does not give the officers probable cause to believe that they were involved in a murder. That factor also appears to be double-counted by the next factor, that Reyes and Solache had the opportunity to turn in Santiago only because they lived with Adriana.

Third, Reyes and Solache turned in the missing child,

Santiago, along with Rosauro.

Defendants seem to assume that Reyes and Solache brought Santiago to the police to deflect blame. Maybe that's a possible inference. But turning in a child is not enough to create probable cause that the person in question committed a murder. It's maybe a step. It's a fact. It's a data point. It's a stitch. But the stitch can't hold very much.

Fourth, defendants point out that Adriana was pretending that the two-month-old Maria was her own child. But, again, that has nothing to do with whether Reyes and Solache were involved in a murder.

Fifth, defendants point out that Adriana was approximately 5-foot tall and 164 pounds and that the two adult victims were bigger. Jacinto was 5-foot tall and 175 pounds, and Mariano was 5'3" and 161 pounds. And there was a sign of a struggle. The Sotos were collectively stabbed 50 times.

The idea appears to be that someone else must have been involved. Maybe so. Maybe a 5-foot woman that weighs 165 or 164 pounds wouldn't have enough muscle to murder two people with a knife. Maybe that's right. But that doesn't mean that Solache and Reyes were involved; it just means that maybe she didn't act alone. The question is whether there is probable cause to believe that Reyes and Solache were implicated in the murder.

Six, defendants point out that at least one man's

voice was heard by a neighbor at the time Jacinto and Mariano were murdered, saying something to the effect of "Don't scream. I'm going to hurt you." That tells you something, but it doesn't get you very far. A man's voice narrows the potential universe of suspects to approximately 50 percent of the adult population. That's not probable cause.

I had a male voice in 1999, in the year 2000. I don't think there was probable cause to think that I was involved.

It tells you something, but it doesn't get you very far.

Seventh, defendants point out the defendants collected shoes and pants from Adriana's apartment that tested positive for blood.

Again, it has nothing to do with Reyes's and Solache's involvement. The blood was Adriana's blood and the Sotos' blood. And nobody disputes that Adriana committed the offense.

So the existence of blood by Adriana and the Sotos doesn't tell you anything about whether Reyes and Solache were involved. It doesn't tell you much. It doesn't get you very far. It's certainly not dispositive. That's the key point. It's certainly not dispositive. The question is whether any of this is so compelling that there's no genuine issue of material fact.

Eighth, defendants point out that the police discovered a note in Reyes's pocket that mentioned Norma

114

Salazar. That's the same name that Adriana supplied to the police when falsely explaining her possession of Santiago.

But Reyes explained that Adriana had given him a note with the name Norma Salazar. Adriana told Reyes that she was babysitting 3-year-old Santiago for Salazar and pitched -- asked him to pitch in. Take a look at defendants' response to the Reyes's statement of facts, Docket No. 785, at paragraph 20.

There are other reasons that this note could have been in Reyes's pocket. They are potentially consistent with the Good Samaritan view of the evidence.

In sum, there is a disputed question of fact about how this piece of evidence contributes to probable cause, if at all.

Ninth, defendants point out that Guadalupe overheard a conversation between Adriana and Reyes in which he stated something to the effect of "You are the only one that knows. I hope you don't serve me up headfirst."

I'll say this: The veracity of the phone call is questionable given the coercive tactics that Guevara allegedly used against Guadalupe, even though the Court granted summary judgment on the *Brady* claim about that, meaning *Brady* theory No. 7. The Court granted summary judgment because there isn't a dispute of material fact about coercive tactics used on Guadalupe. There's still a question of fact about whether the

statement is true.

Tenth, and finally, defendants point out that Adriana admitted to detectives, at a minimum, that she, Solache, and Reyes were present inside the Sotos' home, witnessed the murders of Jacinto and Mariano. Solache stabbed Jacinto and Mariano, and she, Reyes, and Solache kidnapped Santiago and Maria.

Even though plaintiffs' fabrication claim over Adriana's statement fails because it wasn't introduced at trial, there might still be a factual question of whether the statement was made up. Fabricated evidence cannot support probable cause. Take a look at *Lawson v. Veruchi*, 637 F.3d 699, 704 to 705, Seventh Circuit 2011.

The answer might be different if there wasn't a question of fact about whether the statement is fabricated, but that's not the situation we have here.

The existence of Adriana's statement results in more factual questions. The questions are whether the officer defendants had probable cause to believe -- excuse me. The questions are whether the officer defendants had probable cause to bring charges against Reyes and Solache. Given those factual questions, Adriana's statement cannot support summary judgment for the defendants.

Let me try to summarize what I've just done in those ten points.

The question is whether there is a genuine issue of material fact about whether the officers had probable cause. There are a lot of disputed facts. I don't think these facts are either undisputed, or I think the undisputed facts are not compelling enough to say that no reasonable jury could doubt that there was probable cause.

Let me put that a different way.

The question for me is not whether there was probable cause. The question is, is there enough evidence in the record to support a finding by a reasonable jury that there was not probable cause.

I don't think the record dispositively demonstrates that the officers had probable cause. The evidence is either undisputed but uncompelling or the evidence is disputed.

The undisputed evidence doesn't get them very far. For example, pointing out that a murder took place and that Reyes and Solache turned in the missing child, pointing out that a voice was heard that was a male, pointing that Adriana was small. All of that may well be true, but none of that is enough, in my view, to show that there's probable cause, and certainly not enough to show that there's probable cause as a matter of law such that a reasonable jury couldn't reach the opposite conclusion.

As I look at this, there is a question of fact about whether there's probable cause. There's enough on both sides

of the ledger, so the jury has got to sort it out.

As I think about it, factors 1 through 4 -- excuse me -- factors 1 and factor -- let me say that one more time.

Factor 1 and Factors 4 through 7 don't relate to Reyes and Solache at all. For example, the first factor is the fact that the murder happened. Factor 4 is about Adriana pretending that the child is hers. Factor 5 is about the size of Adriana. Factor 6 is about a man's voice. Factor 7 is about blood. Those don't relate to Reyes and Solache.

Factor 2, about the fact that Reyes and Solache were living with Adriana, doesn't get the needle to move very far. It's not enough for probable cause. Certainly not dispositive. It's a data point. Maybe it's helpful. But it doesn't move the ball forward very much.

Factor 3 is about the fact that Solache and Reyes turned in the missing child. Maybe that shows a connection or maybe it shows that they were a Good Samaritan. It doesn't get them very far.

There are questions of fact about Factors 9 and 10, about Guadalupe and Adriana that have questions of fact.

That leaves Factor No. 8. That's the note with Norma Salazar's name. That fact alone wouldn't support probable cause about whether Reyes was involved in the murder. Adriana could have committed the murder by herself and asked Reyes to baby-sit. There's nothing about the note that would support

probable cause that Solache was involved.

In short, the existence of probable cause is highly disputed. The Court has to draw all reasonable inferences in favor of the plaintiffs as the nonmoving party. They get the benefit of the doubt.

I cannot say that the officer defendants had probable cause to charge the plaintiffs as a matter of law.

So defendants cannot avail themselves of the absolute bar of malicious prosecution provided by probable cause.

The long and short of it is simple. There is a question of fact about probable cause, and the record does not establish probable cause definitively. There is a question of fact, so it's going to go to a jury.

So summary judgment on the malicious prosecution claim is denied as to all defendants but Rutherford, who I am now going to address. So I'm going to address Rutherford separately.

Defendants threw out one additional argument. This is part VI.C of my analysis, Section VI.C.

Defendants argue that Rutherford cannot be liable for malicious prosecution because "Plaintiffs have no evidence that Rutherford played any role in their prosecutions." That's page 20 of the memo.

But defendants cite case law that cuts against them. They cite *Cusick v. Gualandri*. In that case, a court in this

district determined that "the significant role determination must include the persons who . . . knowingly provided misinformation to [the prosecutor], concealed exculpatory evidence, or otherwise engaged in wrongful or bad-faith conduct that was instrumental in the commencement or continuation of the criminal prosecution," unquote. That's from *Cusick*, 573 F.Supp.3d 1256, at page 1271, Northern District of Illinois 2021.

The Court previously denied Rutherford's motion for summary judgment as to the coerced and fabricated evidence claims, as well as some of the *Brady* claims. There are factual questions about whether he provided misinformation, suppressed exculpatory evidence, or committed other misconduct. So Rutherford falls squarely into the group of individuals who can be said to have played a significant role in a malicious prosecution as interpreted by the Illinois Supreme Court in *Beaman*.

In short, Rutherford is not entitled to summary judgment. Defendants' motion for summary judgment on the malicious prosecution claim is denied in full.

It's now 1:45 p.m. I'm on page 48. I've got eight or nine pages to go.

Does anyone need a break?

MR. SCAHILL: No, Judge.

THE COURT: Okay. If you need a break, just raise

your hand, and I'll take a break.

I'll now turn to Section VII.

Plaintiff Reyes, but not Plaintiff Solache, also brings a Section 1983 deprivation of liberty claim, which is basically a federal constitutional form of a malicious prosecution claim under the Fourth Amendment. The claim appears in Count III of Reyes's complaint.

Again, the claim is brought by Reyes only. Solache does not bring a deprivation of liberty claim.

As defendants note, a, quote, "Fourth Amendment claim for deprivation of liberty without probable cause mirrors the elements of malicious prosecution," unquote. I'm quoting defendants' memo, Docket No. 743, page 19. They were citing *Thompson v. Clark*, 596 U.S. 36, at page 42. The Supreme Court made that decision in 2022.

To be exact, a deprivation of liberty claim under Section 1983 has one additional element. As the name suggests, quote, "the plaintiff also has to prove that the malicious prosecution resulted in a seizure of the plaintiff." That's *Thompson* at page 43, Note 2. You can also take a look at my opinion in *Allen v. Taylor*, 2025 WL 885838, at page 4.

The parties do not discuss or dispute that Reyes suffered pretrial deprivations of his liberty as part of his prosecution. That's the last element of his claim. So the Court's denial of summary judgment on Reyes's malicious

prosecution claim also means that he made out a *prima facie* case of Section 1983 deprivation of liberty.

Defendants do raise one defense. They argue that they should receive qualified immunity on this constitutional claim. Specifically, they say that the notion of, quote, "arguable probable cause," unquote, requires a Court to grant qualified immunity.

As defendants point out, quote, "arguable probable cause exists when a reasonable police officer in the same circumstances and with the same knowledge and possessing the same knowledge as the officer in question could have reasonably believed that probable cause existed in light of well-established law." That's *Humphrey v. Staszak*, 148 F.3d 719, 725, Seventh Circuit 1998.

Essentially, arguable probable cause is how the second prong of qualified immunity, meaning a clearly established right, gets applied to a case where the alleged right violated is arrest or seizure on less than probable cause. The Seventh Circuit explained this in *Abbott v. Sangamon County*, 705 F.3d 706, at page 715, Seventh Circuit 2013.

Here's the quote.

Quote, "Though at first blush similar, the arguable probable cause inquiry is separate from the probable cause inquiry; whereas an arrest not supported by probable cause is a constitutional violation, an arrest not supported by arguable

probable cause is a violation of a 'clearly established' constitutional right."

Let me read that again.

Quote, "Though at first blush similar, the arguable probable cause inquiry is separate from the probable cause inquiry; whereas an arrest not supported by probable cause is a constitutional violation, an arrest not supported by arguable probable cause is a violation of a 'clearly established' constitutional right," unquote.

What's confusing about, quote, "arguable probable cause," unquote, is that there is, quote, "substantial, if not complete, overlap of the issue of immunity and the principal issue on the merits," unquote. That's *Maxwell v. City of Indianapolis*, 998 F.2d 431, at page 435, Seventh Circuit 1993.

The probable cause determination already includes a level of reasonable mistake in it. An officer doesn't have to get the facts perfectly right to have probable cause. Take a look at *Heien v. North Carolina*, 574 U.S. 54, at page 66, 2014.

But arguable probable cause also includes a bit of reasonable mistake of law in it. An officer doesn't have to get the law perfectly right to have arguable probable cause, because the officer is only required to know clearly established law. If their conduct was ultimately determined to be a constitutional violation, but the well-established law didn't make clear at the time that it was a violation, the

officer is still entitled to qualified immunity.

Here, defendants think that there was no clearly established law from which they could know that, based on the facts in front of them, there was not probable cause to arrest Reyes and Solache.

Quote, "Ordinarily, to show that the law was 'clearly established,' plaintiffs must point to a 'closely analogous case' finding the alleged violation was unlawful. But in some rare cases, where the constitutional violation is patently obvious, the plaintiffs may not be required to present the Court with any analogous cases," unquote. That's from *Reed v. Palmer,* 906 F.3d 540, 547, Seventh Circuit 2018.

So if the constitutional violation is patently obvious, there is no qualified immunity.

Here, the Court thinks that the patently obvious form of clearly established law applies.

Let's look at the relevant facts supporting probable cause that are not subject to a disputed question of fact.

First, Reyes and Solache lived with Adriana, and they brought 3-year-old Santiago into the police station with Rosauro.

Living with someone doesn't produce probable cause. That's not enough. Long before the events of this case, it was well known that "mere association with a person suspected of criminal activity is not enough to establish probable cause to

124

arrest the non-suspected individual," unquote.  That's *United States v. Mided*, 582 F.Supp. 1182, 1184, Northern District of Illinois 1984.  It was affirmed, 782 F.2d 1045, Seventh Circuit 1985.

Second, Adriana was small, so she might have had help in committing the murder, but that help could have been anyone.  The fact that Adriana needed help doesn't say that there was probable cause to think that Reyes and Solache provided the help.

Third, Reyes had a note in his pocket with Norma Salazar's name on it.  That's about it.  Everything else is subject to a genuine dispute of material fact.  Alfredo overhearing a man's voice is disputed.  Guadalupe eavesdropping on a telephone conversation is disputed.  Adriana's confession is disputed.  A lot of disputes.

The Court cannot incorporate those facts into arguable probable cause.  If there's a dispute about whether the facts are true, or if there is a dispute about whether the information is fabricated, that is enough to create a genuine issue of material fact.  Fabricated statements don't give probable cause, and that reality was clearly established a long time ago.  See *Olson v. Tyler*, 771 F.2d 277, 281, Seventh Circuit 1985.

When it boils down to it, defendants asked the Court to say that they're entitled to qualified immunity based almost

entirely on the note in Reyes's pocket. That piece of evidence is close to saying that there's probable cause based on mere association. And that's forbidden.

There is nothing to suggest that the note was nefarious. Officers simply assumed that it could only serve a nefarious purpose. They rejected Reyes's explanation for it, meaning the explanation that Adriana asked him to baby-sit for her on behalf of Norma Salazar.

In any event, it seems to fall within the patently obvious bucket that a mere piece of paper with a name on it can't provide probable cause for murder.

Let me say that again.

It seems patently obvious that simply having a piece of paper in your pocket with a name on it isn't enough to create probable cause to believe that someone committed a murder.

That's clearly established law that a reasonable officer could know even if there's not a closely analogous case.

It seems obvious that having someone's name in your pocket isn't probable cause to think that you murdered somebody. So the defendants aren't entitled to probable -- to qualified immunity on the deprivation of liberty claim.

One more thing to note is that -- before I leave this section, as I discussed earlier, plaintiffs' claim about

Adriana's allegedly fabricated statement as part of this Fourth Amendment deprivation of liberty claim, it can't be a due process claim because the fabricated statement wasn't used at trial, but it can be a Fourth Amendment claim because it arguably led to a pretrial deprivation of liberty.

So that's my ruling on Section VII.

I will now turn to Section VIII.

I'm on page 51 out of 56.

I will consider the state law tort of intentional infliction of emotional distress.

Under state law, intentional infliction of emotional distress consists of three elements:

"(1) the defendants' conduct was extreme and outrageous; (2) the defendants knew that there was a high probability that their conduct would cause severe emotional distress; and (3) the conduct in fact caused severe distress." *Swearnigen-El v. Cook County Sheriff's Department*, 602 F.3d 852, 864, Seventh Circuit 2010.

Defendants argue that their conduct was not extreme and outrageous because there were -- I'm sorry. Let me say that again.

Defendants argue that their conduct was not extreme and outrageous where, quote, "IIED claims are based on the same conduct that was allegedly unconstitutional," unquote. In their view, the constitutional claims fail, so, therefore, the

intentional infliction of emotional distress claims fail. That's really the only argument they have. But the constitutional claims pass muster, so I'm denying summary judgment on the claims about intentional infliction of emotional distress. So even if their reading of *Cooney* is right -- that's *Cooney*, 746 F.Supp.2d 973 -- it doesn't matter. The constitutional claims can proceed, so the intentional infliction of emotional distress claims can proceed as well.

So defendants' motion for summary judgment on the intentional infliction of emotional distress claims is denied.

I will now turn to Section IX.

Defendants move for summary judgment on the state law conspiracy claim. But the motion only invokes one short argument. Defendants argue that a, quote, "state law conspiracy claim is derivative of the state law malicious prosecution claims," unquote. That's at pages 22 to 20 -- excuse me -- 23 to 24 of their memo. Defendants believe that the malicious prosecution claim fails, so their conspiracy claim fails.

As discussed a few minutes ago, plaintiffs' malicious prosecution claim survives. The officer defendants don't make any other argument, so the motion for summary judgment is denied.

Similarly, Guevara, quote, "explicitly adopted the arguments that his codefendants made," unquote. I'm quoting

there page 2 of his reply, 777.

The long and short of it is the other claims survive, so the state law conspiracy claim survives, too. So the motion is denied.

I will now turn to Section X.

I'm pleased to report this is the last section.

I will turn to the Section 1983 conspiracy claim.

Only Reyes brings a Section 1983 conspiracy claim, and it appears as Count VI of his complaint.

Like the failure to intervene, conspiracy is another way of establishing liability under Section 1983. Quote, "Conspiracy is not an independent basis of liability in a Section 1983 action, but is instead a way of proving that a defendant is legally responsible for that violation," unquote. That's from *Wilson v. Estate of Burge*, 667 F.Supp.3d 785, 874 to 75, Northern District of Illinois 2023. The Court there was citing *Smith v. Gomez*, 550 F.3d 613 and 617, Seventh Circuit 2008.

To establish a Section 1983 conspiracy, a plaintiff must show, quote, "(1) an express or implied agreement among defendants to deprive plaintiff of his or her constitutional rights; and (2) actual deprivations of those rights in the form of overt acts in furtherance of the agreement," unquote. That's from Judge Dow in *Wheeler v. Piazza*, 364 F.Supp.3d 870, 880, Northern District of Illinois 2019.

As I said before, quoting Judge Dow is never a bad idea.

Defendants present one principal argument against Section 1983 conspiracy. They argue that they should receive qualified immunity.

Specifically, they invoke the so-called intra-corporate conspiracy doctrine. Despite its brevity, defendants' single-paragraph argument is potent. As the Court will explain, qualified immunity applies and bars plaintiffs' Section 1983 conspiracy claim.

As the Supreme Court has explained, the intra-corporate conspiracy doctrine stands for the principal that, quote, "an agreement between or among agents of the same legal entity, when the agents act in their official capacities, is not an unlawful conspiracy," unquote.

The idea is that, quote, "when two agents of the same legal entity make an agreement in the course of their official duties, [] as a practical matter and legal matter, their acts are attributed to their principal. And it then follows that there has not been an agreement between two or more separate people," unquote. I'm quoting *Ziglar v. Abbasi*, 582 U.S. 120, at page 153, 2017.

Defendants were all members of the Chicago Police Department, part of the city of Chicago. Because they were all members of the same legal entity, defendants think they

couldn't have engaged in a Section 1983 conspiracy as a matter of law.

At the very least, defendants think that plaintiffs cannot show that defendants' conduct constituted a Section 1983 conspiracy under clearly established law, as they must under *Ashcroft v. al-Kidd*, 563 U.S. 731, 735, cited in 2011.

The Seventh Circuit has not addressed whether the intra-corporate conspiracy doctrine applies to Section 1983 conspiracy claims. As far as I can tell, there's no decision from the Seventh Circuit on that.

But plaintiffs think that the intra-corporate conspiracy doctrine should not apply for three reasons.

First, plaintiffs point out that the Supreme Court and the Seventh Circuit have previously permitted Section 1983 conspiracy claims to go forward. They point to three cases, including the *Adickes* case, 398 U.S. 144, as well as the *Jones* case, 856 F.2d 985, and the *Bell* case, 746 F.2d 1205. The most recent of those cases was cited in 1988.

None of those three cases discuss the application of the intra-corporate conspiracy doctrine, so they don't really control the issue.

Moreover, only *Jones* even touches on immunity. So it's not clear that qualified immunity was even a defense that needed to be overcome.

In any event, the *Jones* decision was decided so long

ago that it didn't even use the term "qualified immunity." The doctrine of qualified immunity has changed a lot since 1988. I am loathed to rely on a 35-year-old case to establish the current boundaries of qualified immunity given that the law has gone through some transformations.

So the fact that the Supreme Court and the Seventh Circuit have permitted a Section 1983 conspiracy claim with one legal entity and allowed that to go forward does little for the plaintiffs.

All of those cases were decided before I graduated from high school.

Second, plaintiffs assert that courts have never applied the intra-corporate conspiracy doctrine to 1983 claims, and cases applying a doctrine in other contexts do not -- let me say that again.

Plaintiffs assert that courts have never applied the intra-corporate conspiracy doctrine to Section 1983 claims. Plaintiffs also assert that cases applying a doctrine in other contexts do not unsettle constitutional law. I'm giving but botching a quote from the plaintiffs' response on page 24, Docket No. 772.

As far as this Court can tell, the first part of that sentence isn't entirely accurate. Some courts have decided that the doctrine of quali- -- I'm sorry. Some courts have decided that the doctrine requires qualified immunity because

the right in question was not clearly established.

At least three circuit courts have granted qualified immunity based on the intra-corporate conspiracy doctrine and it barred a Section 1983 claim. Look at the *Rehberg* case in the Eleventh Circuit, 611 F.3d 824. That was affirmed, 566 U.S. 356. Take a look at the Eighth Circuit's decision in *Faulk*, 30 F.4th 739, decided in 2022. And take a look at the *Jackson* case, 925 F.3d 793, decided by the Sixth Circuit in 2019.

In addition, quote, "Once a defendant raises the defense of qualified immunity, 'it becomes the plaintiffs' burden to defeat it.'" That's the *Smith* case, 140 F.4th 359, Seventh Circuit 2025.

In that sense, applying a doctrine to a new context can unsettle constitutional law for purposes of an individual case, because it's the plaintiffs' burden to show that the law is settled. That is, it's on the plaintiffs to bring forward case law showing that defendants violated a clearly established right. But here, they don't point to any such case law.

Third, plaintiffs argue that applying the intra-corporate conspiracy doctrine to Section 1983 cases is inconsistent with the rest of Section 1983 and supporting case law.

Specifically, plaintiffs argue that, quote, "*Monell* holds that actions of municipal employees can never be imputed

to a municipal employer."  That's from page 22, Footnote 22 of plaintiffs' response, Docket No. 772.

Plaintiffs have that generally correct.  Quote, "There is no *respondeat superior* liability for municipalities under 42 U.S.C. Section 1983," unquote.  That's the *Ruiz-Cortez* case, 931 F.3d 592.

But the whole genesis of the intra-corporate conspiracy doctrine in corporate and antitrust contexts is that employees of the same legal entity cannot conspire because their actions are those of one single entity that is ultimately responsible for those actions.

A judge down the hall, Judge Chang, wrote about this in a case called *Haliw v. City of South Elgin*.

Judge Chang wrote:  "There is reason to doubt, however, that this corporate-based and antitrust-based doctrine should apply to civil-rights conspiracy claims under Section 1983.  The intracorporate conspiracy defense makes sense in the corporate and antitrust settings because whatever a business's employees do (within the scope of employment) is deemed to be the act of the business via vicarious liability. In sharp contrast, there is no *respondeat superior* theory of liability against municipalities for Section 1983 claims."

Judge Chang wrote that in 2020.  And the cite is 2020 WL 1304697, page 4, Northern District of Illinois 2020.

Notice the phraseology used by Judge Chang.  He said

134

there was reason to doubt. He gave a reason to doubt whether the intra-corporate conspiracy doctrine is a good fit for Section 1983 cases involving conspiracies.

Doubt is not enough to defeat qualified immunity. The whole idea of qualified immunity is that officers should receive immunity when there is an uncertainty about a particular doctrine's application. Doubt goes in favor of the officers. For that same reason, Judge Chang granted summary judgment in *Haliw*. Specifically, Judge Chang actually granted qualified immunity in *Haliw*, despite recognizing that the intra-corporate conspiracy doctrine was a poor fit for 1983.

So Judge Chang raised some doubts, but he still gave qualified immunity. The tie goes to the runner, and the doubt goes to the officer.

Similarly, in *Ziglar v. Abbasi*, the Supreme Court noted that multiple circuits had extended the intra-corporate conspiracy doctrine to bar the distinct but related concept of a Section 1985(3) conspiracy. While the Court reserved the merits question, the dispute among the circuits was enough for the Supreme Court to grant qualified immunity.

The Court wrote: "Yet the fact that the courts are divided as to whether or not a Section 1985(3) conspiracy can arise from official discussions between or among agents of the same entity demonstrates that the law on this point is not well settled. When courts are divided on an issue so central to the

cause of action alleged, a reasonable official lacks the notice required before imposing liability." That's *Abassi*, 582 U.S. at 154.

Judge Chang applied the same logic in the *Haliw* case when he barred a Section 1983 conspiracy claim on qualified immunity grounds. Again, the cite is 2020 WL 1304697, at page 4.

This Court will do the same thing. Applying the Supreme Court's approach in *Abassi* reaches -- leads me to reach the same conclusion.

Multiple circuits have granted qualified immunity on Section 1983 conspiracy claims based on the intra-corporate conspiracy doctrine.

This Court cannot say that the law is settled and clearly established such that police officers working for the same department should be on notice that they face liability for conspiracies under Section 1983.

Simply put, it is not clearly established that police officers have potential conspiracy liabilities under Section 1983. The law is in flux. And if the law is in flux, it's not clearly established. If it's not clearly established, there is qualified immunity. That's the long and short of it.

As Judge Chang said, quote, "in light of these extensions of the intracorporate conspiracy doctrine to Section 1983, and absent controlling authority to the contrary,

it cannot be said that the law is clearly established on this point," unquote.

Defendants are entitled to qualified immunity on Reyes's Count VI, so summary judgment is granted.

And at long last, I have reached the end of all ten sections.

I have one last thing to say.

The ruling resolves four of the pending motions for summary judgment. There are other pending motions, too.

I will rule separately on the other motions, including plaintiffs' motion for partial summary judgment, as well as the City of Chicago's motion for summary judgment on the *Monell* claim.

I will rule separately on the expert motions, too.

I will put out a minute order that summarizes what just happened.

Let me give you a brief conclusion.

In conclusion, the Court grants in part and denies in part the motions for summary judgment.

The Court grants summary judgment for the defendants on the claims about Adriana's fabricated witness statement.

The Court also grants summary judgment on Plaintiff Reyes's Section 1983 conspiracy claim.

The Court grants summary judgment on nine of the 12 *Brady* theories.

Specifically, the Court denies summary judgment on theories 5, 6, and 12. Those theories cover the investigation into alternative subjects, including Polaroid photos. The theories include Alfredo Aranda's statement about allegedly overhearing a murder. Summary judgment is granted as to the other *Brady* theories, meaning every theory except theories 5, 6, and 12.

Other than that, the motions for summary judgment are hereby denied.

All right, folks. Why don't you come on up.

All right. I've completed my oral ruling. I don't know at this point what is the most sore, whether it's my voice, my court reporter's fingers, or your ears. I'm going to go with my court reporter.

I want to thank Amy for her service today.

I will say this as like an overarching observation: There are so many people in this building, so many public servants that really, truly honestly go way, way, way above and beyond for litigants in ways that the litigants never see.

So I'm very appreciative for Amy. I'm very appreciative for Jessica. I'm appreciative of all the people in the clerk's office. There are people that work after hours all the time as need be just to get things done for people. And today was a lot to ask Amy to do, so I appreciate Amy doing that.

I want to, again, acknowledge what you all are thinking: You would rather have had a written ruling. I would rather have given you a written ruling instead of an oral ruling. I would've. But Congress has seen fit to create a lot of causes of action, and to have an amount-in-controversy requirement that is not particularly high, which means a lot of cases come to the building, which means we all have pretty big dockets, and there are only 20 of us, and you can only do what you can do. So if I can save a couple days, I'm going to save a couple days. Because I don't just look at you folks; I look to the docket as whole, the team as a whole, all litigants. I'm saving a couple days by giving you an oral ruling.

The reality is we're going to trial. You just want to know what the answer is. What are we going to trial on? Now you know. We're going to trial.

I don't know who won the estimate. We went from 10:17 until noon. That's about an hour and 40 minutes. We then went from 2:24 to 2- -- I'm sorry -- 12:24 to 2:13. That's an hour and 50 minutes. Doing a little math here, I think that's -- is that three and a half hours? Is that right?

Did anybody want to raise their hand and express pride at their guess? Anybody?

It went a little longer than I expected.

I appreciated your patience and your professionalism. I know it was a lot. I know it was a lot to sit through. I

get it.

Judge Shadur used to do this to me.  I would come in, and he would just say, "Sit down.  I'm going to read."  So I remember doing this.

I also want to acknowledge this:  I am a human being up here.  I am a flawed individual.  I make mistakes.  It is certainly possible that I botched some of the sentences.

My court reporter alerted me that there were times where, for example, I may have said the opposite of what I intended to say, or I just forgot a word, and I said "defendants" instead of "plaintiffs" or something.  That could have happened.

I would encourage you to read the transcript and try to figure out with context what I was trying to say instead of what I actually said.

I want to acknowledge that I could've gotten something wrong.

If there is any quote where you think it's just either so cryptic and uncertain or it just seems upside down and couldn't possibly be right, I want you to tell me if you think it's important, if it matters.

I am loathed to have it quoted back to me later if I just screwed it up.  Okay?  So if you think I messed something up, you can let me know, and I'll take it in the right spirit. Okay?

I had a criminal trial once where I was reading the jury instructions, and for whatever reason, I said that the burden of proof was on the defendant. That was a mistake, and I fixed it. But I was so horrified. I was so horrified. But I am a human being, and I'm flawed.

Okay. So if there's something that I said that you think just can't possibly be right or it's upside down, let me know, and I'll try to fix it. Okay?

I have other rulings to give you. I don't know what my schedule is. I'm going to need to work with my courtroom deputy to figure out what my availability is.

I expect I will probably do the same thing for the other rulings. I think the collective weight is about the same as what I have before -- before now, meaning today. So we're looking at another 50 pages or so, give or take.

Maybe I will decide to put one of out there in writing, but I think I will probably just do the same.

Here's what I would propose: Why don't I have my courtroom deputy throw out some dates and times when you can come back, and we'll see if it works. If it works, great. If it doesn't work, then maybe you can sort something out offline.

THE CLERK: How much time far out? In August?

THE COURT: We can do -- could we do next week?

THE CLERK: Oh.

THE COURT: How does next week look?

141

THE CLERK:  Does Monday, the 28th work?

MR. ART:  Yes for Reyes.

MS. SUSLER:  And yes for Solache.

MS. ROSEN:  I have a deposition that day, unfortunately.  Sorry.

THE CLERK:  That's fine.

Wednesday, the 30th?

MR. ART:  Yes again for the plaintiffs.

MR. SCAHILL:  One second.

Yeah, I have a dep, but our motion was ruled on.  I could probably get someone else from my office, if it works for everyone else here, if it's going to be best for the Court.

So I am taking a deposition on that day all day, though.  So . . .

THE COURT:  Okay.

MR. ENGQUIST:  Can you do it?  Because if not, I'll just get a body.

THE COURT:  Why don't we go off the record, folks, just for a second to give Amy a break.

(Off the record.)

THE COURT:  I will say this:  If you fly at O'Hare and you see the board of incoming and outgoing flights, that's what my docket looks like, that's my calendar in terms of hearings and things.

THE CLERK:  Does August 5th, then -- either the 4th,

the 5th, or the 8th?

THE COURT: Please speak up if it doesn't work. I try to have good customer service. So if it's problematic, we can figure something out.

MS. SUSLER: I'm out that week, but I could have my cocounsel come in.

THE COURT: Okay. Is that acceptable to you? Is that --

MS. SUSLER: Yes.

THE COURT: -- okay?

Does August 5th work, folks?

MR. SCAHILL: It's okay for me.

MR. ENGQUIST: I could get coverage, I'm sure.

MS. ROSEN: It's fine.

THE COURT: Okay. Why don't we put that down. If it becomes problematic, e-mail my courtroom deputy, and we'll try to work it out. Okay?

I do try to be easy to deal with on scheduling. When I was practicing, court hearings came down from Mt. Olympus with thunderbolts: This is when it's going to be. I try to have a little bit of a kinder, gentler approach and try to work with people because it's important to your clients. Okay? That's just how I roll.

All right. So let's put it down for August 5th. If you all realize after court that this is problematic, we'll

change it.  Okay?

Let's get the time again.

THE CLERK:  10:00 o'clock.

MR. ENGQUIST:  Okay.

THE COURT:  Does that work for everybody?

MS. ROSEN:  Yep.

THE COURT:  Here's what I would also propose:  I have denied defendants' motion for summary judgment.  So we need to talk about a trial.

I would like you to meet and confer beforehand, and start talking about it.

How long do you think you'll realistically need on the plaintiffs' side?

You know, you've got a burden here.  What do you think you're going to need to put your case on?

Do the best you can in terms of getting a real estimate.

You know, defendants don't have a burden to put a case on, but you certainly may want to, right?  So think about what you might want to do on their end once they close.  All right?

See if you can work together and kind of ballpark, back of the envelope, get me an estimate, and also let me know how soon you think you can be ready.

I will say this:  I think it would be a big challenge on my end to schedule something in 2025 unless something

miraculous happens. I assume that there is much rejoicing within your heads right now. I assume none of you were looking forward to a trial in 2025. Maybe the plaintiffs were. I don't know. But that's a heavy lift. I don't know.

I would say this: The longer the trial, the more difficult it is to schedule. So on the plaintiffs' side, if you're anxious to get to trial, bringing a bloated case to trial equals more delay than bringing a streamlined case to trial.

I will also say this: In criminal cases, I do not tend to sit on people for the length of their trials. Given that someone's liberty is at stake, I give people a lot of latitude. I give people less latitude in civil cases.

I have been known to get estimates from people and then say, "That's adorable. You get half that." So be as reasonable as you can.

It's hard for you folks because you don't want to get going in trial and things just take longer for reasons outside your control, and all of a sudden -- you've told the judge you need a week a half and -- you know, a week into trial, and most of your evidence isn't in yet, and then you feel stuck and the judge is grumpy. I get the whole dynamic, I do.

But I will say this: Having sat in this chair through lots and lots and lots of jury trials, juries get worn out. Juries get worn out, more than I think lawyers can reasonably

anticipate.

If I tell you to be short and brief and to cut it short, I'm doing you a huge favor. I really am.

All of us think that the more we speak, the more persuasive we are. I am probably more guilty of that than anyone. For crying out loud, I just read you a 56-page ruling.

Okay. Shorter works in a courtroom. I cannot tell you how many times I've seen an exam, like a cross-exam that has gone on for two hours, where I said, boy, a ten-minute cross would have been so much more effective. I'm just telling you. You made some great points in the first couple of minutes, and then you just made the jury fall asleep, and then it's lost. Get up there and make some -- land some punches and sit down.

But all of us, me included, think if we just keep going, we're going to be -- we're doing so great up here.

That's an observation that you can totally ignore if you want. It's up to you. I'm not really here to give you trial advice.

But I would say this: I think all of us, me included, overestimate the rhetorical value of length. All right? So just really think about it. Especially the plaintiffs here. You've got the burden, you know. Think about what's going to be effective for you.

And the same with the defense, what do you think is

going to be effective?

And this is the point in time where I often quote the Rolling Stones.  It's not what you want; it's what you need.  Okay.  Quoting the Rolling Stones isn't bad, either.

Think about what you really need, all right?

And I have no idea, do you folks have an estimate?  Have you thought about it?

You may not want to say it now.  That's fine.

MR. ART:  I mean, I would say, off the cuff, ten trial days total.

THE COURT:  Okay.

MR. ENGQUIST:  Wow.  We don't even know if the *Monell* claim is going forward, Your Honor.  I know that one --

THE COURT:  Yeah --

MR. ENGQUIST:  -- is substantial.

THE COURT:  -- I've got you.  Stay tuned.

MR. ENGQUIST:  And also, considering all the witnesses that almost every one of them needs translators, and during discovery, plaintiffs -- those depositions were doubled in length to cover the amount of translation that went on --

THE COURT:  Yeah.

MR. ENGQUIST:  -- I don't think ten days would make sense, even if it was just the underlying claim.

THE COURT:  Yeah.  Well --

MR. ENGQUIST:  But we can talk about it.

THE COURT: Yeah, yeah. And I know this is going to be a tricky case to get some estimate on. I get that.

I just want people to be aware of the phenomenon that the longer it goes, the harder it is to get a trial date, you know, because I give my criminal cases first priority for scheduling. Because if I've got somebody in lockup, they're going to get the courtroom before anybody else. All right?

So why don't we continue our discussion. And I understand that there are other motions pending, and until you know the full parameters of the case, it's hard to estimate the contours -- the length of the trial. You've got to know the size of the case before you can estimate its length. I get that. But just start thinking about it. That's all I'm saying, just start thinking about it. Okay?

Is there anything that anyone wants to raise while we're here?

MR. ART: Not from the plaintiffs.

THE COURT: Anything, anybody?

MR. SCAHILL: No.

MS. ROSEN: Not from defendants.

THE COURT: You all know how to order the transcript if you want it?

MS. ROSEN: Yep.

THE COURT: Thank you, everybody, for coming in today. I will look forward to seeing everyone on August 5th. I won't

require everyone to be here. You need at least just one person for each party, and that will suffice from my end. And I won't take it -- I won't take it as a slight if any of you decide to send someone over just to sit through. That's fine with me. Whatever you want to do.

Okay? Anything else, anyone?

MR. ART: Thank you, Judge.

MR. SWAMINATHAN: Thank you.

THE COURT: I will see you in a couple weeks. Thank you, folks. Take care.

THE CLERK: All rise.

(Concluded at 2:30 p.m.)

*   *   *   *   *

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

*/s/ Amy M. Kleynhans* _____        *8/4/2025* _
Amy M. Kleynhans, CSR, RPR, CRR        Date
Official Court Reporter

*DeLeon-Reyes v. Guevara, et al.*
Case No. 18 CV 01028

*Solache v. Guevara, et al.*
Case No. 18 CV 02312

# EXHIBIT 6

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| JACQUES RIVERA, | ) | |
| | ) | No. 12 CV 004428 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | The Honorable Joan B. Gottschall |
| | ) | |
| REYNALDO GUEVARA, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MOTION IN *LIMINE* NO. 3 TO BAR EVIDENCE AND TESTIMONY RELATED TO THE SIDLEY AUSTIN REVIEW

Defendant, CITY OF CHICAGO, (the "City"), by and through its undersigned attorneys, hereby moves this Honorable Court *in limine,* to bar evidence and testimony related to the Sidley Austin Review. In support thereof, Defendant City states as follows:

In 2012, the City of Chicago Department of Law retained Scott Lassar, a partner at Sidley Austin LLP to conduct an internal investigation into and to provide legal advice regarding a number of cases handled by former Chicago Police Department member Reynaldo Guevara (herein after referred to as the "Sidley Review"). According to Plaintiff's Proposed Exhibits, he seeks to introduce all 131,000 pages of documents that were produced in this case that were accumulated and created during the Sidley Review in this trial. (*See,* Pre-Trial Order at Ex. 139). These documents are comprised of pleadings from various criminal proceedings, including post-conviction proceedings, appellate records, and criminal proceeding transcripts; transcripts from various civil cases; police reports; Complaint Register Files; memorandums of interviews conducted by Sidley personnel during the Sidley Review; memorandums of conclusions reached regarding the review: and, other materials accumulated related to the various criminal cases under review.

Plaintiff should be barred from introducing any evidence or testimony regarding the Sidley Review, as the evidence is wholly irrelevant, and any probative value would be significantly outweighed by the danger of unfairly prejudicing both the Individual Defendants and the City, confusing the issues and misleading the jury and would cause an undue delay and waste the Court's time. *See,* Fed. R. Evid. 401, 403. First and foremost, the Sidley Review was undertaken 25 years *after* Plaintiff's arrest and criminal conviction. As such, any information obtained or opinions that Lassar or his staff may have developed as to Mr. Guevara's conduct could not possibly serve as notice to the City regarding his alleged behavior and are therefore irrelevant to Plaintiff's *Monell* claims. Fed. R. Evid. 401.

Furthermore, the materials at issue were either complied or prepared by attorneys with Sidley Austin LLP pursuant to its engagement for legal services with the City of Chicago after allegations of misconduct were made against Mr. Guevara. As the Supreme Court noted in *Upjohn v. United States,* "[t]he first step in the resolution of any legal problem is ascertaining the factual background and sifting through the facts with an eye to the legally relevant." 449 U.S. 383, 390-91 (1981) (holding that the attorney-client privilege exists to protect not only the giving of professional advice to those who can act on it but also the giving of information to the lawyer to enable him to give sound and informed advice), *see also, Sandra T.E. v. South Berwyn School District 100*, 600 F.3d 612, 619 (7th Cir. 2010). Such background gathering of information is all that can be interpreted from these documents, and the introduction of this evidence as an admission by the City is wholly improper and unsupported. Of the more than seventy cases that Lassar reviewed, Lassar determined that a small number merited further review by the Cook County State's Attorney" Office ("CCSAO"). Accordingly, City attorneys authorized Lassar to provide the CCSAO with copies of the materials he and other Sidley attorneys prepared and compiled

regarding those cases for further review. The introduction of this evidence would more likely than not mislead and confuse the jury and cause them to believe that the City in some way admitted that Mr. Guevara committed certain acts of misconduct. Fed. R. Evid. 403.

Finally, any and all materials from the Sidley Review constitute hearsay, or worse, double hearsay and triple hearsay, which does not fall under any recognized exception and should be barred under Fed. R. Evid. 801. First, pleadings and transcripts from other proceedings, civil or criminal, are indisputably inadmissible hearsay, as are the contents of Complaint Register Files. *See generally, Pacheco v. Will County Sheriff's Office,* No. 8 C 5403, 2010 WL 3155983, at *5 (N.D. Ill. Aug 9, 2010) ("[T]o the extent Plaintiff seeks to introduce the complaint to prove the truth of its allegations, the affidavit and statements within are hearsay). Further, as mere allegations, pleadings are not evidence. *Tibbs v. City of Chicago,* 469 F.3d 661, 663 n.2 (7th Cir. 2006). Second, during the course of the Sidley Review, members of Sidley Austin conducted various interviews with purported witnesses as well as complainants regarding their *allegations* against Mr. Guevara. Those interviews were then summarized into a memorandum wherein the drafter incorporated his or her conclusions on the veracity of the interview and other information. None of these interviews were conducted in the presence of a court reporter or under oath. The reports are simply the drafter's memory of what was said, and each would be introduced solely for the truth of the matter asserted – that Mr. Guevara committed some kind of misconduct. As such, the reports are all hearsay and should be barred. Finally, any memorandums created summarizing conclusions and opinions drawn from the review of any particular case are again hearsay and, therefore, inadmissible. Fed. R. Evid. 801, 805.

Finally, any attempt by Plaintiff to introduce the Sidley Review, through the testimony of their expert Michael Brasfield's opinions on CPD's disciplinary systems are similarly flawed. This

3

Court granted the City's summary judgment motion on this *Monell* claim, accordingly, all evidence in support of this claim, including Brasfield's opinions should be barred.

Accordingly, any and all evidence and testimony pertaining to the Sidley Austin LLP Review of Reynaldo Guevara should be barred pursuant to Rule 401, 403 and 801.

WHEREFORE, Defendant City of Chicago respectfully requests this Honorable Court grant its Motion in *Limine* No. 3and bar all evidence and testimony pertaining to the Sidley Austin LLP Review of Reynaldo Guevara, and for any other relief as this Court deems just and equitable.

Dated: May 14, 2018                                    Respectfully submitted,

                                                       CITY OF CHICAGO

                                                       By:      /s/ *Eileen E. Rosen*
                                                                One of its attorneys

Eileen E. Rosen
Catherine M. Barber
Theresa Berousek Carney
Rock Fusco & Connelly, LLC
321 N. Clark Street, Suite 2200
Chicago, Illinois 60654
312.494.1000
erosen@rfclaw.com

*DeLeon-Reyes v. Guevara, et al.*
Case No. 18 CV 01028

*Solache v. Guevara, et al.*
Case No. 18 CV 02312

# EXHIBIT 7

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

JACQUES RIVERA,               )
                                  )
          Plaintiff,          )
                                  )     Case No. 12-CV-04428
        v.                  )
                                  )     Judge Joan B. Gottschall
REYNALDO GUEVARA et al.,    )
                                  )
          Defendants.       )

### RULING ON CITY'S MOTION IN LIMINE NO. 3 TO BAR EVIDENCE AND TESTIMONY RELATED TO THE SIDLEY AUSTIN REVIEW

The motion is granted. Plaintiff says he wishes to use the reports prepared by Sidley Austin LLP ("Sidley") as part of a review of a number of cases handled by defendant Reynaldo Guevara to corroborate other Rule 404(b) evidence. The court has no precedent or other information that would support such a use. Is the plaintiff's contention that witness X told something to Sidley and told the same thing to plaintiff's counsel or investigator and therefore plaintiff should be able to bolster the 404(b) witness by proving that he said the same thing twice? The court has never experienced such "bolstering" of Rule 404(b) testimony and cannot believe it is appropriate.

Plaintiff argues, extremely superficially, that statements by Sidley are statements of a party opponent. Sidley was not, as far as the court is aware, the City's attorney. It was called in to conduct an independent investigation. Whether this makes Sidley the agent of the City in terms of its statements is not adequately argued. The case plaintiff cites, *United States v. Swan*, 486 F.3d 260 (7th Cir. 2007), is not analogous and besides, was based on plain error review.

However, in the event that the Sidley reports contain statements by the City or its agents bearing on the issues in this case, there may be an appropriate impeachment use of those

statements, if they are properly proven.  The court is not offering any opinion on what proof would be necessary or adequate for this purpose.  In any event, the plaintiff disavows any potential impeachment use of the Sidley reports.  The only use he proposes is the bolstering of his Rule 404(b) witnesses.

For the foregoing reasons, the City's Motion in Limine No. 3 to Bar Evidence and Testimony Related to the Sidley Austin Review, ECF No. 382, is granted.


Date:  May 30, 2018                                            /s/
                                                        Joan B. Gottschall
                                                        United States District Judge


This ruling does not decide the separate issue of whether plaintiff's expert[s] may refer to or rely on the Sidley reports.

*DeLeon-Reyes v. Guevara, et al.*
Case No. 18 CV 01028

*Solache v. Guevara, et al.*
Case No. 18 CV 02312

# EXHIBIT 8

| DEPARTMENT SPECIAL ORDER | DATE OF ISSUE | EFFECTIVE DATE | NO. |
|---|---|---|---|
| | 2 April 1984 | 3 April 1984 | 84--7 |

| SUBJECT | DISTRI-BUTION | AMENDS |
|---|---|---|
| FOREIGN NATIONALS AND ALIENS | B | |

| RELATED DIRECTIVES | RESCINDS |
|---|---|
| General Order: Information Report System<br>Department Special Order: Special Credentials | Department Special Order 78-40 |

**RESCINDED**
*by S.O. 99-05*
*on 30 April 1999*

## I. PURPOSE

This order:

A. continues Department policy relating to Diplomatic and Consular Officers.

B. defines foreign national, alien, illegal alien, Diplomatic Officer, Consular Officer, Honorary Consul, diplomatic immunity, immunities accorded to career Consular Officers, and Consular Posts.

C. disseminates provisions of Public Law 92-539, §101, 18 U.S.C. §112, §970, §1116, Act for the Protection of Foreign Officials and Official Guests of the United States and continues procedures for handling violations of the Act.

D. outlines Department procedures for:

1. responding to calls for service at Consular Posts.

2. handling incidents, violations, or minor offenses committed by a Consular Officer or members of the Consular Officer's family.

3. handling arrests of foreign nationals.

4. handling requests for asylum by foreign nationals.

5. assisting the United States Immigration and Naturalization Service in the control of alien crew members of foreign vessels.

6. processing persons suspected of transporting and/or harboring illegal aliens.

## II. DEPARTMENT POLICY RELATING TO DIPLOMATIC AND CONSULAR OFFICERS

Diplomatic and Consular Officers will be accorded their respective privileges, rights, and immunities as directed by international law and Federal statute. These officials will be treated with the courtesy and respect that befit their distinguished positions. It is a well-established principle of international law that, without prejudice to their privileges and immunities, it is the duty of all persons enjoying such privileges and immunities to respect local laws and regulations.

## III. DEFINITIONS

Foreign National - A foreign national is any person owing permanent allegiance to a foreign state. (Immigration and Nationality Act, 8 U.S.C. §1101-a-21).

Alien - An alien is a person not a citizen or a national of the United States who resides in the United States. (Immigration and Nationality Act, 8 U.S.C. §1101-a-3).

Illegal Alien - An illegal alien is any person not a citizen or national of the United States who is in the United States in violation of Immigration and Naturalization laws. This includes a person who entered the United States illegally without proper documents, or a person who was admitted to the United States as a visitor and has remained longer than the period admitted for, or who has accepted employment.

Diplomatic Officer - Ambassadors and Ministers are the highest ranking diplomatic representatives of a foreign government. Other diplomatic titles are Minister Counselor, Counselor, First Secretary, Second Secretary, Third Secretary and Attache. These officials are located either in Washington, D.C., or New York City.

Consular Officers - Consular officers are Consuls-General, Deputy Consuls-General, Consuls and Vice Consuls. They are also official representatives of foreign governments. Consular officers are required to be treated with due respect, and all appropriate steps are to be taken to prevent any attack on their person, freedom or dignity. They are entitled to limited immunities as described below.

RFC-Solache/Reyes 118448

Honorary Consul – An appointed individual who is not immune from arrest or detention; is not entitled to immunity from civil or criminal arrest except when performing official acts of consular functions.

Diplomatic Immunity – Diplomatic immunity, a principle of international law, is broadly defined as the freedom from local jurisdiction accorded duly accredited diplomatic agents and members of their immediate household. Diplomatic agents, and members of their families who are not nationals of the United States, have full immunity from arrest, detention, or prosecution for any criminal offense unless such immunity is expressly waived by the sending State. The above individuals also enjoy immunity from civil process except in certain actions involving private activities outside their official functions.

Immunities Accorded to Consular Officers – Consular Officers are not liable to arrest or detention pending trial except in the case of a grave crime (felony offense that would endanger the public safety) and pursuant to a decision by competent judicial authority. The immunity from criminal jurisdiction is limited to acts performed in the exercise of consular functions and is subject to court determination. Family members of Consular Officers do not enjoy the same privileges and immunities from civil and criminal jurisdiction as do Consular Officers. However, they will be accorded appropriate courtesy and respect.

Consular Post – A Consular Post is the premises of any Consulate General, Consulate, Vice-Consulate, or counsulate agency.

IV. PUBLIC LAW 92-539, §101, 18 U.S.C. § 112, §970, §1116, ACT FOR THE PROTECTION OF FOREIGN OFFICIALS AND OFFICIAL GUESTS OF THE UNITED STATES

    A. This Act provides for concurrent Federal jurisdiction in incidents of murder, conspiracy to murder, manslaughter, or kidnapping of a foreign official or official guest.

    B. The Act also prohibits anyone from:

       1. assaulting; striking; wounding; imprisoning; offering violence to; intimidating; coercing; threatening; or harassing a foreign official or official guest; and from obstructing a foreign official in the performance of his duties.

       2. within 100 feet of a Consular Post or the residence of a foreign official, parading; picketing; displaying any flag, banner, sign, placard, or device; uttering any word, phrases, sound or noise; or congregating with two or more persons with the intent to perform such acts; for the purpose of intimidating, coercing, threatening, or harassing any foreign official or obstructing a foreign official in the performance of his duties. (The Act states that these prohibitions shall not be construed to abridge the exercise of First Amendment rights.)

       3. injuring; damaging; destroying; or attempting to injure, damage, or destroy any real or personal property belonging to, utilized by, or occupied by a foreign official or official guest.

    C. Definitions for the purpose of this Act:

Foreign Official – Any person of foreign nationality who is duly notified to the United States as an officer or employee of a foreign government or international organization (i.e., the United States has been officially informed of his position) and who is in the United States on official business, and any member of his family whose presence in the United States is in connection with the presence of such officer or employee.

Official Guest – A citizen or national of a foreign country present in the United States as an official guest of the government of the United States pursuant to designation as such by the Secretary of State.

    D. Whenever a member of the Department handles a violation of this Act, in addition to taking the proper authorized police action, the member will notify the Office of the First Deputy Superintendent and that office will notify the Federal Bureau of Investigation.

V. PROCEDURES

    A. Calls for Service at Consular Posts

       1. When members respond to calls for service at Consular Posts, they will:

          a. not enter that part of the consular premises which is used for work purposes by the Consular Post except with the consent of the head of the Consular Post or his designee.

          b. presume consent of the consular head to enter the Consular Post in the case of fire or other emergency requiring prompt protective action.

       2. Consular archives and documents are inviolable at all times and wherever they may be located. The official correspondence of the Consular Post, which includes all correspondence relating to the Consular Post and its functions, is likewise inviolable.

RFC-Solache/Reyes 118449

3. District commanders in whose jurisdiction Consular Posts are located will take precautions to protect any consular premises against any intrusion or damage and to prevent any disturbance of the peace of the Consular Post or impairment of its dignity.

B. Methods of Handling Incidents, Violations, or Minor Offenses by a Consular Officer or Members of His Family

1. Moving Traffic Violations

When a Consular Officer is stopped for a moving traffic violation, the officer, upon being advised by the driver that he is a Consular Officer and ascertaining that he possesses the proper credentials, will either warn the driver of the danger of his actions or issue a traffic citation, depending on the nature of the violation. The issuance of a traffic citation does not constitute arrest or detention as cited in Item III (Immunities Accorded to Consular Officers) of this order. However, when a consular officer is taken into custody for the purposes of posting bond, this would constitute arrest or detention from which he would be immune. Additionally, consular officers are guests of the United States and should be treated with courtesy, dignity, and respect.

2. Driving While Under the Influence of Alcohol, Other Drugs, or a Combination Thereof

a. The primary consideration is that the Consular Officer is not a danger to himself or the public. Based upon the cicumstances, one of the following actions will be taken:

(1) The Consular Officer will be taken to a district or other police facility where he can recover sufficiently to enable him to drive safely, or from where he can be taken home.

(2) He will be taken to a telephone so that he can arrange for a relative or friend to transport him home.

(3) A taxi will be called for him.

b. The Consular Officer will not be handcuffed or subjected to any sobriety test.

3. Offenses Involving Family Members of a Consular Officer

Family members of a Consular Officer cannot claim immunity. A violation should be handled, whenever possible, through the seeking of a complaint. The individual should be released once positive identification is made and the relationship with the Consular Officer is verified. If the relative is a juvenile, the subject should be released to the parent Consular Officer.

4. Under prevailing international law and agreement, a foreign career consular officer is not liable to arrest or detention pending trial except in the case of a grave crime (felony offense that would endanger the public safety) and pursuant to a decision by competent judicial authority. His immunity from criminal jurisdiction is limited to acts performed in the exercise of consular functions and is subject to court determination.

5. In any situation in which a law enforcement official needs to verify the identification of an individual as a consular officer or employee, or wishes advice in a particular situation involving such individuals the Department of State may be contacted by telephone at 353-6163.

C. Arrests of Foreign Nationals

1. When an arrest or detention for any reason involves a foreign national, arresting officers and/or their supervising officer will:

a. determine immediately if the arrestee is, in fact, a foreign national.

b. notify the concerned Consular Post immediately if the arrest is made during the hours and on the days that the agency is open for business (see addendum to this order).

c. notify the Office of the First Deputy Superintendent if the concerned Consular Post is closed, or if the arrest is made after 1700 hours or on a Saturday, Sunday or holiday. The Office of the First Deputy Superintendent will telephone the office or home of the arrestee's consul.

d. inform the foreign national in custody without delay of the charge(s) and his rights.

e. allow Consular Officers the right to visit and confer with their foreign nationals who are in custody or detention and to arrange for their legal representation.

2. In cases where a member of a Consular Post or a member of his family or personal staff is arrested and detained, the watch commander of the holding unit will notify the Office of the First Deputy Superintendent. The Office of the First Deputy Superintendent will notify the Department of State, Office of Security at 353-6163, giving the name, country of the

RFC-Solache/Reyes 118450

member, charges against, and place of detention. Copies of all reports concerning the arrest (approved by the watch commander) will be forwarded promptly by the watch commander directly to the Office of the Superintendent of Police, and that office will notify the Office of the Mayor of the arrest.

3. In every case where a foreign national (not a member of a Consular Post) is arrested and detained, the watch commander of the unit of detention will notify the Office of the First Deputy Superintendent. The First Deputy Superintendent's Office will then notify the Immigration and Naturalization Service, Department of Justice at the telephone number listed in the current Chicago Police Deartment directory, giving the arrestee's full name, date and place of birth, and place and manner of entry into the United States. Copies of all reports concerning the arrest (approved by the watch commander) will be forwarded promptly by the watch commander directly to the Office of the Superintendent of Police.

4. When the death (natural or otherwise), or injury requiring hospitalization of a foreign national comes to the attention of a member of the Department, the officer assigned will notify his watch commander and the Office of the First Deputy Superintendent. The First Deputy Superintendent's Office will then notify the foreign national's Consular Post.

5. There are 64 Consular Posts in the Chicago area. If a foreign country does not maintain a Consular Post in Chicago, and if a foreign national from such a country is arrested, the arresting officer (or his immediate supervisor) will promptly notify the Office of the First Deputy Superintendent. The Office of the First Deputy Superintendent will contact the United States Department of State via 353-6163 where an arrest of a foreign national that has no consulate post in Chicago has been made.

6. The locations and telephone numbers of Consular Posts in the Chicago area are listed in an addendum to this order.

D. Requests for Asylum by Foreign Nationals

1. Upon receipt of a request for asylum from a foreign national, members will notify their watch commander.

2. The watch commander will ensure that a telephone call and an Information Report (CPD-11.461) are directed to the Office of the First Deputy Superintendent giving the following information:

    a. Name and nationality of the individual seeking asylum.

    b. Date and place of birth, and occupation.

    c. Description of any documents he shows.

    d. What foreign authorities, if any, are aware of his seeking asylum.

    e. Circumstances surrounding the request for asylum.

    f. The exact location of the person seeking asylum. If aboard a vessel or aircraft, estimated time of arrival at next intended port or airport.

    g. Reason for claiming asylum.

    h. Description of any criminal charges known or alleged to be pending against the person seeking asylum.

3. The Office of the First Deputy Superintendent will:

    a. immediately notify the Operations Officer at the United States Operations Center of the Department of State by telephone at 353-6163, and provide any of the foregoing information which is available.

    b. notify the Chicago office of the Immigration and Naturalization Service, Department of Justice at the telephone number listed in the current Chicago Police Department directory.

    c. ensure that arrangements are made to transfer the case to the Immigration and Naturalization Service as soon as possible.

4. Protective custody will be provided to the person requesting asylum until such time as he can be released to the custody of United States government officials. Force may be used against attempts at forcible repatriation (return of refugee to his homeland); where means of resistance are available. However, no greater force than is necessary to protect the individual should be used.

5. Any inquiries from interested foreign authorities will be directed to the Operations Officer at the United States Operations Center of the Department of State, Washington, D.C. by telephone at (202) 632-1512.

RFC-Solache/Reyes 118451

E. Alien Crew Members of Foreign Vessels

1. The United States Immigration and Natualization Service is responsible for the control of alien crewmen of foreign vessels that arrive in the United States.

2. Every alien crewman ashore is required to have in his possession one of the following documents:

a. Crewman's Landing Permit (Form I-95A)
This 3" x 5" printed white paper slip is considered to be an identification card. It contains the crewman's name, vital statistics, nationality, name of the ship on which he is a crewman, and the date of issuance.

b. Alien Crewman Landing Permit and Identification Card (Form I-184)
This I.D. card is printed on buff paper and is laminated in plastic. It contains the crewman's name, birthplace, birthdate, nationality, alien file number, photograph of the crewman, and the date of arrival in the United States.

NOTE:    The identification documents are valid only for 29 days from the date of arrival of the vessel in the United States.

F. Transporting and/or Harboring Illegal Aliens

1. Responsibilites for arresting and interrogating aliens or persons believed to be aliens as to their right to be in the United States:

The Attorney General of the United States has designated officers of the United States Immigration and Naturalization Service as having EXCLUSIVE responsibility for arresting and interrogating any alien or person believed to be an alien as to his right to be in the United States.

2. A pertinent extract of Section 274 of the Immigration and Nationality Act is quoted for information and guidance:

"Sec. 274. (a) Any person, including the owner, operator, pilot master, commanding officer, agent or consignee of any means of transportation who....

(1) brings into or lands in the United States, by any means of transportation or otherwise, or attempts, by himself or through another, to bring into or land in the United States, by any means of transportation or otherwise;

(2) knowing that he is in the United States in violation of law, and knowing or having reasonable grounds to believe that his last entry into the United States occurred less than three years prior thereto, transports, or moves, or attempts to transport or move, within the United States by means of transportation or otherwise, in furtherance of such violation of law;

(3) willfully or knowingly conceals, harbors, or shields from detection, or attempts to conceal, harbor, or shield from detection, in any place, including any building or any means of transportation; or

(4) willfully or knowingly encourages or induces, or attempts to encourage or induce either directly or indirectly, the entry into the United States of ...any alien, including an alien crewman, not duly admitted by an immigration officer or not lawfully entitled to enter or reside within the United States under the terms of this Act or any other law relating to the immigration or expulsion of aliens, shall be guilty of a felony, and upon conviction thereof shall be punished by a fine not exceeding $2,000 or by imprisonment for a term not exceeding five years, or both, for each alien in respect to whom any violation of this subsection occurs:  Provided, however, that for the purpose of this section employment (including the usual and normal practices incident to employment) shall not be deemed to constitute harboring."

3. If it is determined during the course of an investigation into violations of Illinois Revised Statutes and/or the Municipal Code of Chicago that the person being investigated has transported or harbored an illegal alien, or is himself an illegal alien, the following procedures will apply:

a. The processing of the arrestee(s) and the submission of reports will be in accordance with existing Department directives.

b. The watch commander of the detention facility will ensure that notification is made to the United States Immigration and Naturalization Service informing them of all charges placed against the arrestee, the court branch, court date, and time. If the arrestee is let to bail, immigration authorities will be contacted and informed at the telephone number listed in the current Chicago Police Department telephone directory.

RFC-Solache/Reyes 118452

    c.   Arresting officers will complete an Information Report and, whenever possible, will:

        (1)   include the names, descriptions, birthdates, home and employment addresses and telephone numbers of all persons involved.

        (2)   if a vehicle is involved, include the make and description of the vehicle, all license numbers, and complete information concerning the driver, including the drivers license number.

        (3)   include information on all charges placed against the arrestee, court branch, court date, and time. Also indicate the time and the name of the person at the Immigration and Naturalization Service who was notified.

Authenticated by:     *(signature)*

                           Fred Rice
                           Superintendent of Police

| Indicates new or revised items.

83-051  MRM

RFC-Solache/Reyes 118453

| | DATE OF ISSUE | EFFECTIVE DATE | NO. |
|---|---|---|---|
| **DEPARTMENT SPECIAL ORDER** | 20 February 1986 | 21 February 1986 | 84-7A |

| SUBJECT | DISTRI-BUTION | AMENDS |
|---|---|---|
| FOREIGN NATIONALS AND ALIENS | B | Department Special Order 84-7 |

| RELATED DIRECTIVES | RESCINDS |
|---|---|
| | |

I.  **PURPOSE**

This amendment informs Department members of procedures for recording changes in consular post locations or consular personnel, and of changes in United States Immigration and Naturalization Service (INS) notification procedures and telephone numbers.

II.  Item V-C-6 is amended as follows:

6.  The locations and telephone numbers of Consular Posts in the Chicago area are listed in an addendum to this order.

NOTE:  Correspondence concerning consular post location or personnel staff changes received by the Office of the Superintendent or any other Department unit will be promptly forwarded to the Office of the First Deputy Superintendent so that this information may be maintained in a master file and updated as necessary. Inquiries regarding a change in the name, address or location of a particular consular post will be directed to Operations Command via PAX 0-301. When updating Beat Information Sheets (CPD-21.927), district commanders are encouraged to consult with Operations Command regarding consular post locations within their district.

III.  Item V-F-3-b is amended as follows:

b.  Whenever the arrestee(s) is charged with a felony, felony narcotic offense or an offense where circumstances indicate organized criminal activity, the watch commander of the district of detention will ensure that the INS is notified of the charge(s) placed, court branch, court date, and time. The INS will be notified at the following telephone numbers:

(1)  during normal business hours (0900 to 1700 hours, Monday through Friday) - 886-0795.

(2)  other than normal business hours - 886-0596.

Authenticated by: *JJC*

Fred Rice
Superintendent of Police

85-107 MM

RFC-Solache/Reyes 118454

*DeLeon-Reyes v. Guevara, et al.*
Case No. 18 CV 01028

*Solache v. Guevara, et al.*
Case No. 18 CV 02312

# EXHIBIT 9

CHICAGO POLICE
**ARREST REPORT**
CPD-11,420 (REV. 6/92)

1. NAME (LAST - FIRST - MIDDLE)
SOLACHE, Gabriel NMI

3-3

| 2. SEX | 3. RACE | 4. AGE | 5. DATE OF BIRTH |
|---|---|---|---|
| M | Wh | 23 | 16 JUL 74 |

DAY MONTH YEAR

6. C.B. NO. 11024351

7. ALIAS OR NICKNAME
DNA

| 8. DIST./RES. | 9. HEIGHT | 10. WEIGHT | 11. HAIR | 12. HAIR STYLE | 13. EYES | 14. COMPLEXION |
|---|---|---|---|---|---|---|
| 008 | 5'6" | 145 | Blk | Med | Brn | Olive |

15. I.R. NO. 1232213

16. RESIDENCE ADDRESS
6234 S. Mozart   APT. NO./FLOOR 2nd

17. DISTING. MARKS, SCARS, DISABILITIES, ETC.   NV

18. SOCIAL SECURITY NO
Unknown

19. Y.D. NO.

16A. CITY - STATE
Chicago   ZIP CODE   HOME TELEPHONE none

20. STATE/PLACE OF BIRTH
Mexico

21. DRIVERS LICENSE NO   STATE
DNA

22. RD NO.
C0198126

23. OCCUPATION
Unemployed

24. BUSINESS NAME - ADDRESS
DNA

CITY - STATE ZIP CODE   BUSINESS TELEPHONE

25. ADDRESS OF ARREST
5555 W. Grand

26. NO. ARRESTED 4

27. LOCATION CODE FOR NATURE OF PREMISES 292

28. BEAT OF ARREST 2515

29. DATE OF ARREST
DAY 3 MONTH APR YEAR 98   TIME 1030

30. ARRESTEE TRANSPORTED TO UNIT A/5 5612 BY BEAT C8W   TIME

31. RESISTED ARREST YES ☐ NO ☒

32. WEAPON PISTOL-REVOLVER ☐  RIFLE ☐  SHOT-GUN ☐  KNIFE ☐  OTHER (SPECIFY) ☐  N/A

33. PROPERTY INVENTORY NO(S)
DNA

34. FOR NARCOTIC ARREST ☐ SUSPECT CANNABIS ☐ SUSPECT CONTROLLED SUBSTANCE N/A

APPRX WT   EST. STREET VALUE
NO. PILLS   CALL ORG CRIME
PAX 0-662   $

35. VEHICLE OF ARRESTEE   YEAR   MAKE
DNA   MODEL   BODY STYLE   COLOR   STATE LICENSE NO. OR V.I.N.   DISPOSITION OF VEHICLE

36. PERSON IN INVESTIGATIVE UNIT NOTIFIED
Sgt. MANOS #659   UNIT NOTIFIED 650   TIME 0600

37. DOES ARRESTEE HAVE DEPENDENT CHILDREN AT HOME ☐ YES ☐ NO   IF YES - NAME OF Y.D MEMBER NOTIFIED- TIME

38. NAME OF A.S.A FEL. REV.
T. O'MALLEY

CHARGES APPROVED ☐ YES ☐ NO

39. VICTIM-COMPLAINANT   NAME
Jacinta & Mariano SOTO (DEceased)

SEX   RACE   AGE   HOME ADDRESS   CITY - STATE   ZIP CODE   TELEPHONE NO

VICTIM INJURED ☐ YES ☐ NO   IF YES - DESCRIBE INJURIES   VICTIM HOSPITALIZED ☐ YES ☐ NO ☐ TREATED & RELEASED   HOSPITAL NAME

| 40. REFERENCES (CH. - PAR.) | 41 OFFENSES | 42. DISPOSITIONS | 40. REFERENCES (CH. - PAR.) | 41. OFFENSES | 42. DISPOSITIONS |
|---|---|---|---|---|---|
| 1 720ILCS5/9-1 | Murder 1st degree | | 5 720ILCS 5/9-1a2 | FIRST DEGREE MURDER | |
| 2 720ILCS5/ 10-2 | Agg/Kidnapping | | 6 720ILCS 5/10-2 | AGGRAVATED KIDNAPPING | |
| 3 720ILCS5/12-11 | Home Invasion | | 7 | | |
| 4 | | | 8 | | |

43. NARRATIVE   (The facts for probable cause to arrest AND to substantiate the charges include, but are not limited to, the following:)

The above arrestee, along with others, kidnapped Santiago (age 3) & Maria (age 2 months) SOTO after stabbing their parents, Jacinta & Mariano SOTO, to death. The murders occurred during a home invasion on Saturday, 28MAR98, at 2071 N. Leavitt.

Additional Investigating/Arresting Officers: Sgt. E. HANLON #1004, P.O. W. GOLAB #13897, & P.O. J. SOLIS #19696 of the 008th District. Det. N. JACK #863, K. McDONALD #20994, E. DICKINSON #20682, R. GUEVARA #20861 & E. HALVORSEN #20692 of A/5 Violent Crimes.

I do solemnly, sincerely, and truly declare and affirm that the facts stated herein are accurate to the best of my knowledge.

FIRST ARRESTING/APPEARING OFFICER'S SIGNATURE   STAR NO. 20703   UNIT 650

DEPUTY CLERK'S SIGNATURE

44. FIRST ARRESTING/APPEARING OFFICER - PRINT NAME
Det. J. MOHAN   BEAT NO. 5512   FURLO 8   D.O GRP 5   MISD.-ORD CRT KEY R

45. SECOND ARRESTING OFFICER - PRINT NAME - STAR NO
Det. W. KERNAN #20578   UNIT 650

46. VEHICLE ASSIGNED 1 ONE ☐ 2 TWO ☐ 3 ☐ P.O ☐ P.O ☐ OTHER

47. INITIAL APPROVAL OF PROBABLE CAUSE - SIG - STAR

48. RESULTS OF FINGERPR. CHECK WAIVED BY SIG - STAR   DATE   TIME

49. APPROVAL OF CHARGES - SIG - STAR   DATE 5Apr98   TIME 1945

WATCH COMMANDER (NOTIFIED)

50. ARRESTEE SEARCHED BY   STAR/EMPL NO 113244   UNIT

51. DATE RECEIVED LOCKUP 05Apr98   0840   PB

52. PERS PROPERTY RECEIPT NO

53. TELEPHONE NO CALLED 9255124   TIME 0700

54. BOOKING OFFICER   Bariento   STAR/EMPL NO 11660   UNIT

55. TIME FINGERPRINTED 0845

56. TIME PHOTOGRAPHED 0850   57. TIME FED

58. PLACED IN CELL NO 3-3

COURT INFORMATION

59. ARR OFF DESIRED COURT DATE 6APR98   BRANCH-CALL 66-2

60. COURT SGT. TO HANDLE ☐ YES ☐ NO

61. INITIAL COURT DATE 6Apr98   BRANCH-CALL 66

62. FINAL CRT DATE   BRANCH - CALL

63. BONDED- DATE   TIME TO   CT

64. BOND RECEIPT NO

65. COURT DOCKET NO

66. FINAL JUDGE'S NAME

RFC-Solache/Reyes 000669

## MOVING OF ARRESTEE OUT OF & INTO ARREST/DETENTION FACILITY

| | DATE | TIME | TURNED OVER TO/ RECEIVED FROM | STAR/ EMPL. NO | REASON | LOCKUP KEEPER/ OTHER DEPT. MEMBER | STAR/ EMPL. NO |
|---|---|---|---|---|---|---|---|
| OUT | | | | | | | |
| IN | | | | | | | |
| OUT | | | | | | | |
| IN | | | | | | | |

## RECORD OF INTERVIEWS IN LOCKUP

| DATE | TIME | INTERVIEWER | STAR NO. | REASON | LOCKUP KEEPER/ OTHER DEPT. MEMBER | STAR/ EMPL. NO |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |

## RECORD OF VISITORS TO ARRESTEE

| DATE | TIME IN | TIME OUT | VISITOR'S NAME - ADDRESS - TELEPHONE | RELATIONSHIP | W. C.'S APPROVAL (SIGNATURE) |
|---|---|---|---|---|---|
| | | | | | |

| RECEIVING SCREENING RECORD FOR ARRESTEE TO BE HELD IN LOCKUP | REFER TO GUIDELINES FOR DISPOSITION OF ARRESTEE, CPD-11.523 NOTE: ALL "YES" ANSWERS REQUIRE ACTION | DATE 05 APRIL 98 | TIME 0840 |
|---|---|---|---|
| ARRESTEE'S NAME SOLACHE, GABRIEl | C.B. NO. 11024 351 | LOCKUP KEEPER'S NAME (PRINT) BASURTO | STAR NO. 11668 |

| LOCKUP KEEPER'S VISUAL CHECK | YES | NO | | LOCKUP KEEPER'S-ARRESTEE QUESTIONNAIRE | YES | NO | REFUSED |
|---|---|---|---|---|---|---|---|
| 1. DOES ARRESTEE HAVE OBVIOUS PAIN OR INJURY? | ☐ | ☒ | 8 | ARE YOU PRESENTLY TAKING ANY MEDICATION? (For what.............) | ☐ | ☒ | ☐ |
| 2. IS THERE OBVIOUS SIGN OF INFECTION? | ☐ | ☒ | 9 | (IF FEMALE) ARE YOU PREGNANT? | ☐ | ☒ | ☐ |
| 3. APPEARS TO BE UNDER THE INFLUENCE OF ALCOHOL/DRUGS | ☐ | ☒ | 10 | IS THIS THE FIRST TIME YOU HAVE EVER BEEN ARRESTED? | ☐ | ☒ | ☐ |
| 4. ARE THERE VISIBLE SIGNS OF ALCOHOL AND/OR DRUG WITHDRAWAL? | ☐ | ☒ | 11 | HAVE YOU EVER TRIED TO KILL YOURSELF OR DONE SERIOUS HARM TO YOURSELF? | ☐ | ☒ | ☐ |
| 5. DOES ARRESTEE APPEAR TO BE DESPONDENT? | ☐ | ☒ | 12 A. | DO YOU HAVE ANY SERIOUS MEDICAL OR MENTAL PROBLEMS? (IF YES, specify problem under REMARKS) | ☐ | ☒ | ☐ |
| 6. DOES ARRESTEE APPEAR TO BE IRRATIONAL? | ☐ | ☒ | | | | | |
| 7. IS ARRESTEE CARRYING MEDICATION? | ☐ | ☒ | 12.B. | ARE YOU RECEIVING ANY TREATMENT? (If YES, specify under REMARKS) | ☐ | ☒ | ☐ |

PERSON TO BE NOTIFIED IN CASE OF EMERGENCY - NAME     ADDRESS     TELEPHONE     RELATIONSHIP

REMARKS

....................................................................................................................

....................................................................................................................

### SPECIAL DISPOSITION
### COMPLETE ONLY FOR ARRESTEES REFERRED OUT OR TO BE MONITORED

| REFERRED TO (Specify) | PLACED IN ONE-PERSON CELL NO. (for communicable disease cases) | PLACED IN TWO OR MORE PERSON CELL NO. UNDER SPECIAL/CLOSE OBSERVATION (potential suicides) |
|---|---|---|
| **NOTE: LOCKUP KEEPER MUST SIGN IN ALL INSTANCES** | LOCKUP KEEPER'S SIGNATURE | |

## RELEASE OF ARRESTEE FROM CUSTODY

FOR THE FOLLOWING REASON(S), I HAVE DETERMINED THERE IS NOT SUFFICIENT CAUSE TO FURTHER DETAIN/CHARGE THE ARRESTEE:

....................................................................................................................

....................................................................................................................

....................................................................................................................

| SIGNATURE - ARR. OFF /DETECTIVE | STAR NO UNIT | APPROVED - W/C - DETENTION FAC. - STAR NO | DATE-TIME RELEASED FROM CUSTODY |
|---|---|---|---|
| | | | |

RFC-Solache/Reyes 000670

*DeLeon-Reyes v. Guevara, et al.*
Case No. 18 CV 01028

*Solache v. Guevara, et al.*
Case No. 18 CV 02312

# EXHIBIT 10

**CHICAGO POLICE**
**ARREST REPORT**
CPD-11.420 (REV. 6/92)

6. C.B. NO. 11024352
15. I.R. NO. 1732215
19. Y.D. NO.

1. NAME (LAST - FIRST - MIDDLE): LEON, Arturo NMI

2. SEX: M  3. RACE: Wh  4. AGE: 25  5. DATE OF BIRTH: 26 AUG 72

7. ALIAS OR NICKNAME: DELEON-REYES, ARTURO

8. DIST./RES.: 008  9. HEIGHT: 5'6"  10. WEIGHT: 145  11. HAIR: Blk  12. HAIR STYLE: Med  13. EYES: Brn  14. COMPLEXION: Olive

16. RESIDENCE ADDRESS: 6234 S. Mozart  APT. NO./FLOOR
17. DISTING MARKS, SCARS, DISABILITIES, ETC.: N.V.
18. SOCIAL SECURITY NO: Unknown

16A. CITY - STATE: Chicago  ZIP CODE  HOME TELEPHONE: none
20. STATE/PLACE OF BIRTH: Mexico
21. DRIVERS LICENSE NO: UNK  STATE

22. RD NO: C-198126
23. OCCUPATION: Unemployed
24. BUSINESS NAME - ADDRESS: DNA
CITY - STATE  ZIP CODE  BUSINESS TELEPHONE

25. ADDRESS OF ARREST: 5555 W. Grand
26. NO. ARRESTED: 4
27. LOCATION CODE FOR NATURE OF PREMISE:
28. BEAT OF ARREST: 2515
29. DATE OF ARREST: DAY 3 MONTH APR YEAR 98  TIME: 1030
30. ARRESTEE TRANSPORTED TO UNIT / BY BEAT / TIME

31. RESISTED ARREST: NO
32. WEAPON: PISTOL-REVOLVER X; RIFLE SHOT GUN; OTHER (SPECIFY); KNIFE — DNA
33. PROPERTY INVENTORY NO(S): DNA
34. FOR NARCOTIC ARREST: SUSPECT CANNABIS / SUSPECT CONTROLLED SUBSTANCE
APPRX WT / EST STREET VALUE: NO. PILLS / CALL ORG. CRIME / PAX 0-662  $

35. VEHICLE OF ARRESTEE: YEAR; MAKE: DNA; MODEL; BODY STYLE; COLOR; STATE LICENSE NO. OR V.I.N.; DISPOSITION OF VEHICLE

36. PERSON IN INVESTIGATIVE UNIT NOTIFIED: Sgt. MANOS #659  UNIT NOTIFIED: A/5VC  TIME: 0600
37. DOES ARRESTEE HAVE DEPENDENT CHILDREN AT HOME: YES / NO  IF YES - NAME OF Y D MEMBER NOTIFIED - TIME
38. NAME OF A.S.A. FEL. REV.: T. O'Malley  CITY - STATE  ZIP CODE  CHARGES APPROVED: YES / NO  5 Aug 98 0815

39. VICTIM-COMPLAINANT: NAME: Jacinta & Mariano SOTO (Deceased)  SEX; RACE; AGE; HOME ADDRESS; CITY - STATE; ZIP CODE; TELEPHONE NO

VICTIM INJURED: YES / NO  IF YES - DESCRIBE INJURIES
VICTIM HOSPITALIZED: YES / NO / TREATED & RELEASED  HOSPITAL NAME

| 40. REFERENCES (CH. - PAR.) | 41. OFFENSES | 42. DISPOSITIONS | 40. REFERENCES (CH. - PAR.) | 41. OFFENSES | 42. DISPOSITIONS |
|---|---|---|---|---|---|
| 1 720ILCS5/9-1 | Murder 1st degree | | 720 ILCS 5/9-1a2 | FIRST DEGREE MURDER | |
| 2 720ILCS5/ 10-2 | Agg. Kidnapping | | 720 ILCS 10-2 | AGGRAVATED KIDNAPPING | |
| 3 720ILCS5/12-11 | Home Invasion | | 7 | | |
| 4 | | | 8 | | |

43. NARRATIVE (The facts for probable cause to arrest AND to substantiate the charges include, but are not limited to, the following:)

The above arrestee, along with others, kidnapped Santiago (age 3) & Maria (age 2 months) SOTO after stabbing their parents, Jacinta & Mariano SOTO, to death. The murders occurred during a home invasion on Saturday, 28MAR98, at 2071 N. Leavitt.

Additional Investigating/Arresting Officers: Sgt. E. HANLON #1004, P.O. W. GOLAB #13897, & P.O. J. SOLIS #19696 of the 008th District. Det. N. JACK #20863, K. McDONALD #20994, E. DICKINSON #20682, R. GUEVARA #20861, & E. HALVORSEN #20692 of A/5 Violent Crimes.

I do solemnly, sincerely, and truly declare and affirm that the facts stated herein are accurate to the best of my knowledge

FIRST ARRESTING/APPEARING OFFICER'S SIGNATURE  STAR NO. 20703  UNIT 650
DEPUTY CLERK'S SIGNATURE  STAR EMP. NO. 20721

44. FIRST ARRESTING/APPEARING OFFICER - PRINT NAME: Det. J. M. MOHAN  BEAT NO. 5512  FURLO 8  D O GRP 5  MISD./ORD CRT KEY R
45. SECOND ARRESTING OFFICER - PRINT NAME - STAR NO: Det. W. KERNAN #20578  UNIT 650
46. VEHICLE ASSIGNED: 1 ONE / 2 TWO / 3 / P.O. / P.O. / OTHER

47. INITIAL APPROVAL OF PROBABLE CAUSE SIG. STAR 418
48. RESULTS OF FINGERPR. CHECK WAIVED BY SIG. STAR  DATE  TIME
49. APPROVAL OF CHARGES SIG. - STAR  DATE  TIME
WATCH COMMANDER NOTATION

50. ARRESTEE SEARCHED BY: BASURTO  STAR/EMPL. NO. 11660  UNIT 2
51. DATE RECEIVED - LOCKUP: 05 APR 98  TIME: 0830
52. PERS. PROPERTY RECEIPT NO: P/B
53. TELEPHONE NO. CALLED: 4372449  TIME

54. BOOKING OFFICER: CASEY  STAR/EMPL. NO. 113244  UNIT 5
55. TIME FINGERPRINTED: 0845
56. TIME PHOTOGRAPHED: 0840
57. TIME FED
58. PLACED IN CELL NO: 3-2

COURT INFORMATION

59. ARR OFF DESIRED COURT DATE: 6 APR 98  BRANCH-CALL: 66-2
60. COURT SGT. TO HANDLE: YES / NO
61. INITIAL COURT DATE: 6 AUG 98 66-2  BRANCH-CALL
62. FINAL CRT DATE  BRANCH-CALL

63. BONDED DATE  TIME: TC
64. BOND RECEIPT NO
65. COURT DOCKET NO
66. FINAL JUDGE'S NAME

RFC-Solache/Reyes 000663

## MOVING OF ARRESTEE OUT OF & INTO ARREST/DETENTION FACILITY

| | DATE | TIME | TURNED OVER TO/ RECEIVED FROM | STAR/ EMPL. NO | REASON | LOCKUP KEEPER/ OTHER DEPT. MEMBER | STAR/ EMPL. N |
|---|---|---|---|---|---|---|---|
| OUT | | | | | | | |
| IN | | | | | | | |
| OUT | | | | | | | |
| IN | | | | | | | |

## RECORD OF INTERVIEWS IN LOCKUP

| DATE | TIME | INTERVIEWER | STAR NO. | REASON | LOCKUP KEEPER/ OTHER DEPT. MEMBER | STAR/ EMPL. N |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |

## RECORD OF VISITORS TO ARRESTEE

| DATE | TIME IN | TIME OUT | VISITOR'S NAME - ADDRESS - TELEPHONE | RELATIONSHIP | W. C.'S APPROVAL (SIGNATURE) |
|---|---|---|---|---|---|
| | | | | | |

| RECEIVING SCREENING RECORD FOR ARRESTEE TO BE HELD IN LOCKUP | REFER TO GUIDELINES FOR DISPOSITION OF ARRESTEE, CPD-11.523. NOTE: ALL "YES" ANSWERS REQUIRE ACTION | DATE 05 April 98 | TIME 0830 |
|---|---|---|---|

| ARRESTEE'S NAME LEON ARTURO | C.B. NO. 11024352 | LOCKUP KEEPER'S NAME (PRINT) BASURTO | STAR NO. 11660 |
|---|---|---|---|

**LOCKUP KEEPER'S VISUAL CHECK**

| | | YES | NO |
|---|---|---|---|
| 1. | DOES ARRESTEE HAVE OBVIOUS PAIN OR INJURY? | ☐ | ☒ |
| 2 | IS THERE OBVIOUS SIGN OF INFECTION? | ☐ | ☒ |
| 3 | APPEARS TO BE UNDER THE INFLUENCE OF ALCOHOL/DRUGS | ☐ | ☒ |
| 4. | ARE THERE VISIBLE SIGNS OF ALCOHOL AND/OR DRUG WITHDRAWAL? | ☐ | ☒ |
| 5. | DOES ARRESTEE APPEAR TO BE DESPONDENT? | ☐ | ☒ |
| 6 | DOES ARRESTEE APPEAR TO BE IRRATIONAL? | ☐ | ☒ |
| 7 | IS ARRESTEE CARRYING MEDICATION? | ☐ | ☒ |

**LOCKUP KEEPER'S-ARRESTEE QUESTIONNAIRE**

| | | YES | NO | REFUSED |
|---|---|---|---|---|
| 8 | ARE YOU PRESENTLY TAKING ANY MEDICATION? (For what ...............) | ☐ | ☒ | ☐ |
| 9 | (IF FEMALE) ARE YOU PREGNANT? | ☐ | ☒ | ☐ |
| 10 | IS THIS THE FIRST TIME YOU HAVE EVER BEEN ARRESTED? | ☐ | ☒ | ☐ |
| 11 | HAVE YOU EVER TRIED TO KILL YOURSELF OR DONE SERIOUS HARM TO YOURSELF? | ☐ | ☒ | ☐ |
| 12.A. | DO YOU HAVE ANY SERIOUS MEDICAL OR MENTAL PROBLEMS? (IF YES, specify problem under REMARKS) | ☐ | ☒ | ☐ |
| 12.B. | ARE YOU RECEIVING ANY TREATMENT? (If YES, specify under REMARKS) | ☐ | ☒ | ☐ |

PERSON TO BE NOTIFIED IN CASE OF EMERGENCY - NAME          ADDRESS          TELEPHONE          RELATIONSHIP

REMARKS

........................................................................................

........................................................................................

## SPECIAL DISPOSITION
### COMPLETE ONLY FOR ARRESTEES REFERRED OUT OR TO BE MONITORED

| REFERRED TO (Specify) | PLACED IN ONE-PERSON CELL NO. (for communicable disease cases) | PLACED IN TWO OR MORE PERSON CELL NO. UNDER SPECIAL/CLOSE OBSERVATION (potential suicides) |
|---|---|---|
| **NOTE: LOCKUP KEEPER MUST SIGN IN ALL INSTANCES** | LOCKUP KEEPER'S SIGNATURE | |

## RELEASE OF ARRESTEE FROM CUSTODY

FOR THE FOLLOWING REASON(S), I HAVE DETERMINED THERE IS NOT SUFFICIENT CAUSE TO FURTHER DETAIN/CHARGE THE ARRESTEE:

........................................................................................

........................................................................................

........................................................................................

........................................................................................

| SIGNATURE - ARR. OFF./DETECTIVE | STAR NO. UNIT | APPROVED - W/C - DETENTION FAC. - STAR NO | DATE-TIME RELEASED FROM CUSTODY |
|---|---|---|---|

RFC-Solache/Reyes  000664