*DeLeon-Reyes v. Guevara, et al.*
Case No. 18 CV 01028

*Solache v. Guevara, et al.*
Case No. 18 CV 02312

# EXHIBIT 11

1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ARTURO DeLEON-REYES, | ) | Case No. 18 CV 1028 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| REYNALDO GUEVARA, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |
| GABRIEL SOLACHE, | ) | Case No. 18 CV 2312 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CITY OF CHICAGO, *et al.*, | ) | Chicago, Illinois |
| | ) | August 7, 2025 |
| Defendants. | ) | 1:40 p.m. |

TRANSCRIPT OF PROCEEDINGS - MOTIONS
BEFORE THE HONORABLE STEVEN C. SEEGER

APPEARANCES:

| | |
|---|---|
| For Plaintiff DeLeon-Reyes: | LOEVY & LOEVY BY:  MR. ANAND SWAMINATHAN MR. SEAN STARR 311 N. Aberdeen Street, 3rd Floor Chicago, Illinois 60607 |
| For Plaintiff Solache: | PEOPLE'S LAW OFFICES BY:  MS. NORA P. SNYDER 1180 N. Milwaukee Avenue Chicago, Illinois 60642 |

*    *    *    *    *

PROCEEDINGS REPORTED BY STENOTYPE
TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION

APPEARANCES (Cont'd):

For Defendant            BORKAN & SCAHILL
Guevara:                 BY:  MR. TIMOTHY P. SCAHILL
                         Two First National Plaza
                         20 S. Clark Street, Suite 1700
                         Chicago, Illinois 60603


For Defendants           THE SOTOS LAW FIRM, P.C.
Halvorsen, Dickinson,    BY:  MS. CAROLINE P. GOLDEN
Rutherford, and          141 W. Jackson Boulevard, Suite 1240A
Trevino:                 Chicago, Illinois 60604


Court Reporter:          AMY M. KLEYNHANS, CSR, RPR, CRR
                         Official Court Reporter
                         219 S. Dearborn Street, Room 2318A
                         Chicago, Illinois 60604
                         Telephone:  (312) 818-6531
                         amy_kleynhans@ilnd.uscourts.gov

3

(Proceedings heard in open court:)

THE CLERK: 18 CV 1028, DeLeon-Reyes versus Guevara, *et al.*, and 18 CV 2312, Solache v. City of Chicago.

THE COURT: All right. Good afternoon, everyone.

Why don't you come up in terms of introduction. It will be helpful to me to get to know everyone.

My overriding observation is you seemed to have switched sides. You think that I'm not paying attention, but I am paying attention.

Let's start with counsel for the plaintiffs.

MR. SWAMINATHAN: Good afternoon, Judge. Good afternoon.

Anand Swaminathan and Sean Starr from Loevy & Loevy.

MR. STARR: Good afternoon.

THE COURT: Sean Starr, you said?

MR. STARR: Yes, Your Honor.

THE COURT: Good afternoon.

MS. SNYDER: Good afternoon, Judge.

Nora Snyder for Plaintiff Solache.

THE COURT: All right. Good afternoon to the plaintiffs' team.

And defense team.

MS. ROSEN: Good afternoon, Your Honor.

Eileen Rosen on behalf of Defendant City of Chicago.

MS. GOLDEN: Caroline Golden, like the color, for the

individual officer defendants.

THE COURT: Okay.

MR. SCAHILL: Good afternoon, Your Honor.

Timothy Scahill on behalf of Defendant Guevara.

THE COURT: All right. Good afternoon, everyone.

Thank you, everybody, for being here. I appreciate you folks making the effort.

It's like the good ole days. There's actually a hearing in federal court. It doesn't happen as often as it used to.

I'll tell you this: I think it's a detriment to the bar that there aren't as many civil hearings. I mean, back in the good ole days, you'd come in for a motion and the place would be packed. And it was a great opportunity for young lawyers. And it's a great opportunity for the lawyers to get to know the judge. And I think the culture has changed here. I think we have not fully recovered from the pandemic on that score.

But it's good to have you folks in here.

So I will say this: There are obviously a slew of motions that were filed. I issued a long oral ruling a couple of weeks ago on the defendants' motion for summary judgment.

I don't know if you folks have ordered the transcript. You obviously can order the transcript if you haven't.

I don't remember exactly how long it took me to read

it.  I think it was about three and a half hours, I think, give or take.

On a personal note, when I went to bed that night, my throat still hurt.  I mean, there is a physicality to this job that I'll simply say.  And that's certainly true of my court reporter, too.

So we made some progress with an oral ruling.  I'm going to give you an oral ruling today on two of the other motions.  So not the rest of them, just two of them, partly because I want to look over a couple more things on what's left, but partly just from a digestibility standpoint and, frankly, a presentation standpoint, I just can't read everything that I've got.  So we're just going to keep chipping away.  Okay?

Was everyone here last time?  I don't think -- were all of you here?  I don't think -- a couple of you --

MS. SNYDER:  I was not, but I did get a recap, Judge.

THE COURT:  Okay.  Good.

All right.  So I'll just repeat what I said last time. I know that you would prefer to get a written ruling.  If I were in your shoes, I would want a written ruling.

I personally would rather give you a written ruling. I like writing.  I like putting things out there.  I think it's helpful for accountability.  It's helpful to make a record.  I just like it better.

But there are limits.  Limited judicial resources is a thing.

I think sometimes the bar -- not you fine people -- but sometimes the bar talks about limited judicial resources, and they know it's a thing, but they don't really think it's a thing, really.  I think there is more of a vibe that judicial resources are like the Pacific Ocean:  You can drink as much as you want, and it's going to be there for you.  You can take whatever because it's just there.

It takes a lot to get a 59-page, single-spaced document to be beautiful enough to go on Westlaw.  It takes a lot.  So that's why last time I read the 59-page, single-spaced ruling, because if I can save a couple of days, I'm going to do it.  Because everyone on my docket is on the same team.  Everybody wants a ruling, and I just have to make do sometimes.

So it's a long way of saying I'm going to give you an oral ruling today on two of the *Daubert* motions.  Okay?

So why don't you folks have a seat.

Any questions before we get going?

Okay.

MS. ROSEN:  Thanks, Judge.

THE COURT:  As the saying goes, sit back, relax, and enjoy the ride.

Before I start reading, I'm going to just give you a quick overview.  I'm going to rule on two of the City's *Daubert*

motions. The ruling is for Thomas Tiderington and Anthony Finnell. So those two motions.

I'm going to save the Leo ruling for later. Okay? And don't read anything into that.

Okay. Here it goes.

The City of Chicago filed three motions to exclude plaintiffs' experts.

The City moved to bar Dr. Richard Leo. That's Docket No. 747. The City also moved to bar Thomas Tiderington. That's Docket No. 759. Finally, the City moved to bar Anthony Finnell. That's Docket No. 6 -- excuse me -- 760.

I'm referring to the docket numbers in the case filed by DeLeon-Reyes, which is case No. 18 CV 1028.

I'm going to rule today on two of the three *Daubert* motions.

I'm going to rule on the motions about Thomas Tiderington -- am I saying that right, folks? Tiderington?

MR. STARR: Tiderington, yep.

THE COURT: Tiderington, okay. Tiderington.

-- and Anthony Finnell. I'm going to save the motion about Dr. Richard Leo for a later hearing.

For the following reasons, the City's motion to bar plaintiffs' experts are largely denied.

I'm going to address the two motions one at a time, starting with the motion about Tiderington.

I'll start with an overview of his qualifications briefly.

Tiderington has worked in law enforcement for over 40 years. Since 2001, Tiderington has served as chief of police in Plymouth Township, Michigan. He is also a long-time police training instructor, and he has given many lectures on police practices, criminal investigations, and more. That's all from his CV, which is on the docket at Docket No. 759-10.

The City does not challenge Tiderington's qualifications. Instead, the City challenges his opinions.

Tiderington has two expert opinions that he would offer to the jury. The motion at hand challenges only his second opinion. That opinion is relevant to the *Monell* claim against the City.

Tiderington's second opinion is that the CPD's policies and practices for documentation and disclosure of evidence in homicide investigations were inadequate and resulted in routine failures to document and disclose information uncovered during investigations. That's from page 33 of his report, which is Docket No. 759-2.

The City argues that there are three reasons to exclude Tiderington's testimony.

First, the City argues that Tiderington's opinion has no foundation.

Second, the City argues that he did not rely on any

methodology when forming his opinion.

And third, the City argues that the opinion will not be helpful to the jury. That's from the City's motion, Docket No. 759.

So the arguments fall into three buckets. The first bucket is the lack of foundation. The second bucket is methodology. The third bucket is helpfulness to the jury.

I will analyze those arguments one at a time, but I will start with one overarching observation.

The City frames its arguments as challenges to foundation, methodology, and helpfulness, but that's not really what they are.

And in reality, the City is challenging the weight that a fact finder should give to the opinion. And that's a matter for the jury. It isn't a question about admissibility.

Again, as the Supreme Court said in *Daubert*, "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible testimony" [*sic*]. That's from *Daubert*, 509 U.S. at 596.

Let me say this before I dive in. You all know the standard for *Daubert* and *Kumho Tire*. I'm not going to take the time to summarize it for you. The standard isn't in dispute. If anybody wants to come back and hear me talk about the standard, I can, but everybody knows the standard.

Take a look at 702, *Daubert* and *Kumho Tire*. Come back to me if you have any questions.

With that observation in mind, I'll turn to the specific arguments.

I'll start with the first bucket. I will start with the objection about foundation.

The gist of the City's argument is that Tiderington doesn't know enough about the facts he says he relied on, so Tiderington has no basis for his opinion.

So the City highlights several examples of supposed gaps in Tiderington's testimony. As the City sees things, those gaps indicate that Tiderington doesn't know what he's talking about.

The Court disagrees. When it comes down to it, the City is really challenging the persuasiveness of Tiderington's opinion, not its foundation.

Let me make this overarching observation before I dive in.

The City makes a lot of arguments. Some of the arguments might land with a jury. I'm not saying these are bad arguments. Candidly, I think the City has got some pretty useful lines of cross-examination.

I am not saying these are bad arguments. I'm saying these aren't arguments for admissibility. They aren't a reason to keep the expert out of the courtroom and keep him from

taking the witness stand. I think the City is going to have some punches, and some of them may land, but those aren't enough for a knockout before the person even enters the ring.

I just came up with that metaphor on the fly. It actually kind of worked.

So here it goes.

I'm going to first address the first bucket, which is the lack of foundation.

The City has five arguments about the lack of foundation. I'm going to address each of the five arguments separately.

Here it goes.

The first foundation argument is a challenge to Tiderington's analysis of the *Palmer* and *Jones* cases. *Palmer* and *Jones* were cases from the 1980s about the police's use of so-called street files, which are off-the-books investigative notes. The parties are well aware of these cases. You can find the *Palmer* case at 755 F.2d 560, Seventh Circuit 1985. And the *Jones* case is at 787 F.2d 200, Seventh Circuit 1986.

Tiderington's analysis of those cases goes from pages 36 to 39 of his report. He believes that the cases revealed a trend of failing to disclose relevant investigative materials. And he thinks that the CPD policies that the City put in place after *Palmer* and *Jones* didn't fix the problem.

The City argues that Tiderington doesn't know nearly

enough about the *Palmer* and *Jones* cases to opine on them. That's from page 5 of the City's motion, which is Docket No. 759.

The City thinks Tiderington's deposition shows an "utter lack of ability to answer the simplest of questions" on the cases. And that the only "only conclusion to be drawn" is that his opinions come from "summaries of the cases prepared by someone else." The City also says that Tiderington "didn't even have a basic understanding of the Court from which he purported to be citing from." I'm quoting there page 6 of the City's motion.

It's true that an expert cannot uncritically rely on summaries prepared by someone else. Judge St. Eve made that point in *Obrycka v. City of Chicago*, 792 F.Supp.2d 1013, at pages 1025 to 1026, Northern District of Illinois 2011.

But according to the list of materials that Tiderington reviewed, Tiderington looked at the *Palmer* and *Jones* cases. The list is on the docket at Docket No. 769-20.

So if the City thinks that Tiderington's thoughts on the cases are thin, that's best saved for cross-examination. But there is a foundation for Tiderington's review -- excuse me -- for Tiderington's views on those cases.

Basically, he said that he reviewed documents from those cases.

For example, at his deposition, Tiderington explained

that he read *Palmer*, but "not in specific detail." That's at Docket No. 759-3, at page 448, lines 3 to 5.

That testimony could be meat on the bone for cross-examination. The City could question Tiderington on his knowledge of the cases and call his credibility into question.

I will say this as an observation: Sometimes expert reports are bloated. Sometimes expert reports do too much. Sometimes that's a great benefit to the opposing party because it creates a target-rich environment, because most experts don't know their reports as well as they think they do, and it leads to vulnerability.

So when you have an expert report that's 50 pages or 60 pages or 70 pages or 80 pages, the expert better know it or the expert is going to get exposed.

But the exposure comes at the cross-examination time, not at the admissibility time. That's the key point.

The Court also disagrees with the City's implication that Tiderington has no foundation because he isn't familiar with the court system.

At Tiderington's deposition, defense counsel read the citation for the *Palmer* case to Tiderington. Take a look at Docket No. 759-3, at page 449.

The attorney asked Tiderington what F.2d means and what C-i-r means. Tiderington said he didn't know what "F.2d" means, and he said that "Cir.," C-i-r, probably meant

"circuit." And when the attorney asked Tiderington what the Seventh Circuit is, all Tiderington had to say was that it was part of the judicial system in Chicago. I'm looking at page 449 of his deposition.

In the Court's view, knowledge about how the Federal Reporter system works isn't particularly probative. Knowledge about how the judiciary works doesn't reveal a crippling vulnerability in his testimony.

In other words, he can testify about police practices even if he doesn't have a command about how judicial decisions are reported. Those are different things.

If defense counsel wants to expose him as a know-nothing who doesn't know anything about the judicial system, they could do that at cross-examination.

The second foundation argument is a challenge to Tiderington's opinions about the *Fields*, *Rivera*, and *Kluppelberg* cases. That argument is on pages 7 and 8 of the City's motion, Docket No. 759. For purposes of today's decisions, it's enough to say that those three cases are relevant in the same way as *Palmer* and *Jones*.

The City says that Tiderington testified that all of his knowledge about *Fields*, *Rivera*, and *Kluppelberg* came from reviewing the report of another expert, Michael Brasfield. So, in the City's view, Tiderington was merely parroting another expert.

In my view, the City is not fairly characterizing the deposition testimony.

Basically, defense counsel asked Tiderington what he knew about Brasfield's work on those cases.

Defense counsel asked Tiderington: "So the information that you know about the work that Mr. Brasfield did on the *Fields* case, the *Rivera* case, and the *Kluppelberg* case comes solely from the reports that he prepared in the cases, right" -- excuse me -- "in those cases, correct?"

Tiderington responded: "That's correct. It certainly was not from him in any way, shape, or form."

That's from Docket No. 759-3, at page 384.

In other words, Tiderington was not saying that all of the information he had on those cases came from Brasfield's report. That's not what he said. Tiderington was saying that all the information that he had about the work that Brasfield did on those cases came from Brasfield's report. He was talking about his knowledge of Brasfield's work. He was not talking about his knowledge of the cases. Those are different things.

The testimony was about Tiderington's knowledge about Brasfield's work on those three cases. The testimony was not about Tiderington's knowledge about those three cases more generally.

Regardless, Tiderington's report indicates that he

reviewed *Fields*, *Rivera*, and *Kluppelberg*.

Tiderington's list of materials contains depositions from all three cases, motions and briefs filed in all three cases, investigative files and retention files from all three cases and more. Again, the list of materials is at Docket No. 769-20.

If the City doesn't like what Tiderington had to say about those cases, the City can take it up on cross-examination.

The third foundation argument is a challenge to Tiderington's knowledge more generally. The City says that Tiderington's deposition shows that he "lacked a basic understanding of the opinions contained in his own report." That's from the City's motion at page 8.

That argument goes to Tiderington's credibility, not to the admissibility of his testimony.

The City points to an example from Tiderington's deposition testimony, implying that Tiderington doesn't know what he's talking about.

Defense counsel asked Tiderington about the basis for his opinion that the CPD had a practice of failing to document information from investigations. Specifically, counsel asked him to identify examples in his report of cases where detectives failed to document. That's from the deposition transcript at page 426, lines 18 to 22, Docket No. 759-3.

In response, Tiderington pointed to cases on page 50 of his report. That testimony appears later on page 426 and 427 of the testimony.

The City argues that those cases were examples where the inventory sheets, which contained investigatory files, were missing or incomplete. That's from page 8 of the City's motion, Docket No. 759. The implication is that Tiderington's response shows that he doesn't know his own report.

Again, that's fodder for cross-examination.

If an expert does not know his own report, he can get badly exposed in front of a jury. But the right venue is the jury.

If some inventory sheets were missing, that could plausibly contribute to an opinion about potential failure to document information. So there is an apparent foundation for the opinion. I don't think that the problem here is foundation. The problem is credibility. Overall, the argument goes to his credibility, his believability, his command over the docket, his command over the materials, his command over the case files. Save it for cross-examination.

Defense counsel may be able to bat him around if he doesn't know his stuff, but the fun can happen in front of the jury.

The fourth foundation challenge is about the statistical analysis in Tiderington's report. That's from

page 9 of the City's motion.

The City argues that Tiderington is not a statistician. The City also argues that he did not verify the underlying data and that he did not know the coders for the spreadsheets that contained the data.

The City takes issue with, for example, Tiderington's opinion that "only 334 of the 344 investigative files contained handwritten notes. Of those, 154 of the 334 files, or approximately 46 percent, contained handwritten notes not on" the general progress reports. I'm quoting here from page 49 of the report, which is Docket No. 759-2.

In reality, Tiderington does not need to be a statistician to punch a few three-digit numbers into a calculator. It does not require special expertise as a statistician. It is not a statistical analysis to see which files contained handwritten notes and which files didn't contain handwritten notes. It is not something that requires statistical analysis to compare those numbers to the total number of files.

If the City disagrees with Tiderington's view of the evidence, the City can ask him in front of the jury.

The Court also disagrees with the notion that Tiderington did not verify the underlying data. I'm not saying it's wrong on the merits; I'm saying it's not a reason to keep him out.

Tiderington testified that he looked at all 344 investigative files, albeit "some in greater detail than others."  I'm quoting page 400 of his transcript, Docket No. 759-3.  That testimony alone is enough for the Court to conclude that Tiderington did not blindly go along with the data on the spreadsheet.  Tiderington said that he spot-checked several of the files more deeply than others, but that he looked at all of them.  We'll see if that is believable in front of the jury.

The fifth and final foundation argument is a challenge to the amount of time that Tiderington spent on the case.  The City argues that he didn't bill enough time to complete the analysis in his report.  That's page 11 from the City's motion.

The City points to the loads of documents and depositions that Tiderington allegedly reviewed and then notes that he billed only 78 hours.

Again, this isn't a challenge to the foundation of Tiderington's opinion.  It's about the weight that a jury should give to the opinion.  If a jury thinks that an expert didn't spend enough time formulating his opinion, then the opinion loses credibility.

That said, I do want to make one observation.  It is hard for me to see how Tiderington could have done this analysis in only 78 hours.

When I read that number, I thought to myself:  That's

less than the amount of time that a district court judge works in a week.  That was my reaction.

A standard workweek is 40 hours.  So 78 hours is not a lot of time, especially when Tiderington supposedly evaluated hundreds, many hundreds of case files.

Tiderington's report is 66 pages long.  It includes over a hundred footnotes.  It's chockfull of citations.

I don't know how long it took to write that report.  I know it took a lot of time.  It makes me wonder who did the writing.  It makes me wonder who did the analysis.  It's hard for me to see how this expert could have reviewed 344 case files.

If someone said that they built the Giza pyramids in 78 hours, I would have a few questions, even if you had helpers.  It's hard to see how this expert examined hundreds and hundreds of case files and came up with a 66-page report in only 78 magical hours.

True, experts are allowed to rely on assistants.  They can do that.  The federal rules contemplate that.  Oftentimes, colleagues and subordinates will review the documents and even write a first draft of the report to keep costs down.  That is acceptable.

Overall, the fact that Tiderington spent only 78 hours on the case is not a reason to exclude him at the admissibility stage.  It's not a *Daubert* argument.  But it is a

vulnerability, and it could expose him at trial.

He might get hung out to dry on cross-examination. Defense counsel might have some fun with him on the witness stand. But it's not a reason to keep him from taking the stand altogether.

I've said it before. I'll say it again. Take it up on cross.

That's the first bucket.

I'll now turn to the second bucket, meaning the second category of arguments against Tiderington's testimony. The second challenge has to do with his methodology.

Basically, the City challenges two of Tiderington's opinions, arguing that they aren't based on any methodology.

Or at least, that's how the City frames the challenges.

The City challenges Tiderington's methodology on two topics.

The first challenge to his methodology is about his opinion about the alleged failures of the government to produce all of its investigative files to the defense when the criminal cases were active.

The second challenge to his methodology is about whether the CPD followed its practices -- excuse me -- followed its policies.

I will start with the challenge about the

investigative files.

Tiderington opined that important investigative materials were regularly withheld from the defendants. That's from pages 52 to 55 of the report.

To get to that conclusion, Tiderington looked at the investigative files currently possessed by the government and compared them to the investigative files currently possessed by the defense. Tiderington found that some of the documents in the government's investigative files were regularly missing from the criminal defense's investigative files.

In other words, the government's current collection of its investigatory files from those old cases is bigger and more inclusive and contains more documents than the defense's current collection of the investigatory files from the old cases.

The government has more documents than the defense. The implication is that the defense never had the documents.

The implication is that the prosecutors and/or the police -- I assume it's the police here because the Cook County State's Attorney's Office didn't produce any files.

Is that right?

MS. ROSEN: They did produce files.

THE COURT: All -- how many of the files did they produce?

MS. ROSEN: The majority of the files that the Cook

County Public Defender's Office --

THE COURT: All right. Fair enough.

MS. ROSEN: -- produced.

THE COURT: So the implication is that the prosecutors and the police had important files that did not get into the criminal -- excuse me. Let me say that again.

The implication is that the government, meaning the prosecution team, had important files that did not get into the hands of the defense team for the defendants.

Basically, the assumption is that if the defense doesn't have the files now, then the defense must not have had the files decades ago, when the criminal cases were ongoing.

The City makes three arguments about Tiderington's methodology when it comes to the investigatory files.

First, the City makes the argument that Tiderington's methodology was unsound because it was based on faulty or incomplete data which led to erroneous results.

The City points out that there might be another explanation for why the current collections of documents are different. As the City points out, the fact that the government's files now are different than the defense's files now does not mean that the government's files decades ago were different than the defense team's files decades ago.

A difference now does not mean there was a difference earlier.

24

There are all sorts of reasons why the defense documents today could be different than the documents that the defense had decades ago. Documents could have been lost or misplaced or destroyed in the intervening years.

Not everyone keeps all documents forever. The Department of Justice doesn't keep all documents forever. Prosecutors don't keep all judges -- excuse me. Prosecutors don't keep all documents forever. The police doesn't keep all documents forever. Defense lawyers don't keep all documents forever. And I can tell you for sure the judiciary doesn't keep all documents forever, except on CM/ECF.

As the City points out, the record includes evidence that the defense did not maintain all of the documents in the intervening years. The City argues that the Public Defender's Office acknowledged that the defense files were not carefully maintained in the last 30 years.

So the idea is that the methodology is unreliable because the data set is flawed.

The City puts a lot of weight on the possibility that the defense simply lost or destroyed or otherwise misplaced the files in the last 30 years. The City argues that Tiderington knew about that problem. That argument appears on pages 14 and 15 of the City's motion, which is Docket No. 759.

The City has a point on the merits, maybe a strong point.

Tiderington's analysis assumes that the defense collection today is the same as the defense collection from decades ago. And he assumes that the absence of documents means that the government never turned them over way back when.

There could be all sorts of reasons why the defense collection today doesn't match the defense collection years ago.

Let me give you an analogy. It's the best I could do.

Let's imagine that a parent, a mom or a dad, packs school lunches for their two kids, and each kid is supposed to get five cookies in their sack of lunch. But when lunchtime comes, one kid has five cookies, and another kid has three cookies.

One possible explanation is that the second kid got shorted. Maybe mom or dad hadn't had their coffee yet and neglected to give the second kid the full allotment of five cookies. Maybe mom or dad messed up. So maybe the second kid walked out the door with only three cookies and not five cookies.

That's possible. That's a possible explanation, but it's not the only possible explanation.

Maybe both kids walked out the door with five cookies. Maybe the second kid got hungry before lunch and munched on two of the five cookies. Maybe the kid dropped a few cookies. Maybe his or her sibling swiped a couple. Who knows.

The point is simply that there could be all sorts of reasons why a collection at any one moment in time does not match a collection earlier in time. It could mean that the collections were different from the get-go. But it doesn't have to mean that. It could mean that something happened in the meantime.

That's basically what the City is arguing here. The City argues that the expert assumes that the government failed to turn over documents when the criminal cases were ongoing. The expert assumes that the explanation for the disparity is that the government never produced the documents on day one and the defense team never had them.

That is, the expert assumes that if the defense doesn't have the documents now, then the defense didn't have the documents decades ago when the criminal cases were ongoing.

That assumption might not be right. Maybe the defense had all of the documents on day one but lost them or misplaced them or destroyed them in 30 years.

Even so, that assumption is worth exploring at trial in front of the trier of fact. The assumption by the expert is not necessarily true, but the assumption is within the field of play. The assumption is not so outlandish that the expert can't be allowed to entertain it on the witness stand.

As the Seventh Circuit has said, "Assuming a rational connection between the data and the opinion" -- excuse me. Let

me say that again.

"Assuming a rational connection between the data and the opinion, an expert's reliance on faulty data is a matter to be explored on cross-examination; it does not go to admissibility." That's from *Manpower v. Insurance Company of Pennsylvania*, 732 F.3d at 796, page 809, Seventh Circuit 2013.

Overall, this is a fertile line of cross-examination. Maybe the defense has fewer documents now, but that does not mean that the defense had fewer documents decades ago. Even so, that is not a reason to keep the opinion from entering the courtroom. It does not challenge the methodology.

So I conclude that it's fair game.

Again, the defense team has some holes to poke. The defense team might convince the jury that this analysis is deeply flawed, but it is not so flawed that it can't pass through the gate of *Daubert*.

I'll now turn to the second argument that the City makes about Tiderington's methodology when it comes to the investigative files. The City complains that there were so many redactions in the criminal defendants' files that a comparison would be useless.

And, again, the City notes that Tiderington recognized that the reactions could affect his analysis. That argument is on page 15 of the City's motion.

But, again, that's a problem with the underlying data,

not the methodology.  If the reports were so heavily redacted that a comparison would be impossible, then the City can explore that topic on cross-examination.

The City can poke holes in the analysis when the witness is on the stand.

The City also makes a third argument about Tiderington's methodology for assessing the investigative files.

The City notes that Tiderington did not review any of the files kept by the State Attorney's Office.  The City argues that the CPD discloses files to the State Attorney's Office, which, in turn, discloses files to the criminal defense attorneys.

So without a comparison with the files kept by the State's Attorney's Office, Tiderington -- Tiderington's conclusion falls apart.  That's what the City is arguing on page 15 and 16 of the City's motion.

That was the reason for my question earlier.  I had forgotten that part of it, but this is what I was getting at. So I was a little bit off, but I understand the point.

Again, that's not a problem with Tiderington's methodology.

As the Seventh Circuit has stated, whether an expert selected the best data to use is a question for the jury, not the judge.  That's from *Manpower*, 732 F.3d at 809.

Again, this might be a really potent argument. If he didn't look at the files kept by the State's Attorney's Office, you might have some fun with him on cross-examination, but that goes to whether the data set was adequate. Rule 702 does require the person to rely on sufficiently reliable data, must have a foundation for it.

The defense team has an argument why the data set was incomplete, but my conclusion is it was not so incomplete that I have to close the door to it for *Daubert* purposes. You can save it for cross. And you might convince the jury.

I'll now turn to the second category, meaning the second challenge to Tiderington's methodology.

This is the second methodology-related argument about Tiderington.

The second category is a challenge to Tiderington's methodology when he opined that CPD's policies were not being followed. That's on page 49 of the report, Docket No. 759-2.

That conclusion was based on Tiderington's review of the 344 investigative files, which the Court discussed a few minutes ago. Basically, Tiderington reviewed the files alongside the CPD's policies for handling criminal investigations and evaluated whether the investigative files indicated compliance with the CPD's policies.

The City trivializes Tiderington's methodology as merely "using a spreadsheet." The City argues that he didn't

prepare the spreadsheet or do the calculations. I'm quoting here page 17 of the City's motion.

It looks like a recharacterization of the City's prior argument about Tiderington's statistical analysis, and I reject it for the same reason. Tiderington reviewed the investigative files, albeit with varying degrees of depth.

The City also argues that the coding in the spreadsheet is inconsistent and unverified. They make that argument at pages 18 to 19 of the City's motion.

In support, the City notes an instance in the spreadsheet that has an obvious error. The City argues that the error indicates that the spreadsheet is unreliable.

But, again, the Seventh Circuit has said that an expert's reliance on faulty data is an issue for cross-examination; it's not a matter of admissibility.

If you've spotted a problem in their spread- -- in the spreadsheet, great job. You're going to have some fun. You can bat him around, but it's not a reason for me to exclude his testimony.

If Tiderington relied on a faulty spreadsheet, then there's a problem with the underlying data, but it's not a problem with his methodology.

The methodological flaw is not so deep that he needs to not give the opinion at all.

So that's my ruling on the methodology challenges.

I will now turn to the third and final bucket. The issue is whether Tiderington's opinions would be helpful to the jury.

The City argues that the Court should exclude Tiderington's opinions because they won't help the jury decide the *Monell* claims.

Remember, *Monell* has three requirements. You folks know this better than everybody.

First, there was a deprivation of a constitutional right.

Second, the City had a widespread practice.

Third, an action taken pursuant to that practice caused the deprivation of a constitutional right.

I'm just paraphrasing the standard. That's the gist of it. It's from *Dean v. Wexford Health Services*, 18 F.4th 214, page 235, Seventh Circuit 2021.

Simply speaking, plaintiffs intend to argue that the City had a widespread practice of failing to disclose investigative information and that this practice caused plaintiffs' injuries.

The City argues that Tiderington's opinions don't help with the causation element. According to the City, Tiderington didn't identify any particular documents that were created and then withheld from the plaintiffs. That argument goes from pages 20 to 24 of the City's motion.

32

So basically, the City argues that Tiderington's opinions won't help the jury because Tiderington's opinions are only relevant to one of the three requirements, meaning the widespread practice element.

In my view, the City's argument is misplaced. The City is not making an argument about helpfulness to the jury; it's making an argument about the sufficiency of the evidence.

The existence of a widespread practice is one element that plaintiffs would need to prove to succeed on their *Monell* claim. Tiderington's testimony is helpful to the jury on that element.

Tiderington's testimony does not need to prove every element of a claim to be helpful to a jury.

His testimony is a piece of the evidentiary puzzle. It's a brick in the wall.

As the saying goes, a brick is not a wall, and a brick doesn't have to be a wall.

A brick is a building block. Plaintiffs can use Tiderington's testimony to built part of its case. It doesn't have to build its entire case with Tiderington's testimony.

Tiderington's testimony goes to one of the elements of a *Monell* claim. So it's admissible even if it doesn't advance the ball on the other elements of the *Monell* claim.

So that's my ruling on the *Daubert*-related arguments about Tiderington.

33

I want to say one thing about Rule 403. The City included a one-paragraph argument that Tiderington's opinions are inadmissible under Rule 403 because of the potential to confuse the jury. That argument comes in the very last page of the City's motion. We're going to save that argument for later.

I'm resolving today the *Daubert* motion to exclude. The City can raise its argument at the motion *in limine* stage if it wants. There wasn't enough there for me to rule on it. It was just a one-paragraph argument given the page limits. So I'm not going to reach the Rule 403 argument. You can save it for later. I'm just addressing the *Daubert* motions now. That's it. So any argument about Rule 403 is best reserved for a later time. So I'm not going to reach the Rule 403 issue today.

That's my analysis of the motion to bar Tiderington's testimony. The motion is hereby denied.

I will now turn to the motion to exclude testimony of a second expert, Anthony Finnell.

Plaintiffs want Finnell to testify about the law enforcement practices of the CPD.

Finnell has worn many hats in his long career. He's been a police officer, a police unit supervisor, a homicide investigator, and more. He has worked with police review boards, local agencies, and state governments.

34

Nowadays, Finnell is a consultant for issues involving civilian oversight of law enforcement. That's all from his CV, which is on the docket at Docket No. 768-1.

If allowed to testify, Finnell would opine that the CPD had a widespread practice of condoning improper law enforcement practices. He would further opine that the CPD's failure to discipline the officer defendants created a sense of impunity, which facilitated abuses. That's from Finnell's report, which is at Docket No. 768-3.

The City has four arguments for why the Court should bar Finnell's expert testimony. They are similar to the City's challenges to Tiderington with a little bit of extra flavor here and there.

The first argument is about Finnell's qualifications.

The second argument is about the foundation for Finnell's opinions.

The third argument is about Finnell's methodology.

The fourth argument is about whether Finnell's testimony would be helpful to the jury.

The Court is going to address the arguments one at a time.

I'll start with the argument about Finnell's qualifications.

The City's first challenge is that Finnell isn't qualified to render the opinions listed in his report. The

argument goes from pages 5 to 10 of the City's motion, Docket No. 760.

The City makes three arguments about his qualifications.

First, the City argues that Finnell is not qualified to be an expert because he lacks the necessary training and experience.

Second, the City argues that Finnell isn't an expert on statistics and, therefore, can't give opinions based on statistical analysis.

Third, the City argues that Finnell isn't an expert on qualitative analysis, so he can't give opinions based on a qualitative analysis.

I'll start with the first argument, which is about Finnell's experience generally. The City's first argument does not get very far.

Finnell holds a B.S. in organizational management from Oakland City University in Indianapolis. He earned an MBA, with an emphasis on security management, from the Keller Graduate School of Management. And he studied at the Indianapolis Police Department's Leadership Academy.

So from an educational background standpoint, he has at least some training in law enforcement.

More importantly, during his employment, Finnell has years of experience in law enforcement. Finnell held a number

of roles at the Indianapolis Police Department, where he worked for over 20 years. He was a field officer, a homicide and robbery investigator, a sergeant, a unit supervisor, and more.

Finnell also worked with two police review boards in Oakland, California, and worked with Seattle's Office of the Inspector General to investigate allegations of police misconduct.

He's a member of the National Organization of Black Law Enforcement Executives, and he's the vice president of the National Association for Civilian Oversight of Law Enforcement, to name just a few organizations.

For the last five years, Finnell has been the owner of his own consulting firm, specializing in matters of civilian oversight in law enforcement. That's from his CV, which is on the docket at Docket No. 768-1.

The City argues that Finnell was terminated after the Police Commission voted to remove him. The City says that Finnell was under investigation during his time at the Seattle OIG, Office of Inspector General, for failing to adequately review allegations of police misconduct, and that he resigned three days after the Seattle OIG received the results of the investigation.

As an aside, it sounds like the City is going to have some fun on cross-examination.

Plaintiffs take issue with the City's characterization

of Finnell's employment history.

But even apart from Finnell's supposed terminations and resignations, Finnell is still qualified as an expert within the requirements of the Federal Rules of Evidence.

Rule 702 requires that an expert be "qualified as an expert by knowledge, skill, experience or training." See Rule 702.

The rule "takes a liberal approach to expert witness qualifications." That's from Volume 29 of Wright & Miller, Federal Practice and Procedure, Section 6264.1.

There is some case law for when a wannabe expert is on the border between qualified and unqualified. Here, Finnell has enough experience to qualify as an expert on the issues at hand.

Again, Finnell spent over two decades in law enforcement. He worked on police enforcement review boards, and he is a member of multiple professional organizations dedicated to police oversight.

Based on that record, Finnell is qualified as an expert on issues of law enforcement practices.

If the City wants to bring up how Finnell's employment ended, that's an argument for cross-examination. It's not about his qualifications.

The City's second argument fares no better. The City thinks that Finnell can't use statistical analysis because he

38

is not a statistician.

Finnell relied on the statistical analysis of Miroslava Meza. That's from page 9 of Finnell's expert report, which is Docket No. 768-3.

Meza is a mathematician, data analyst, and industrial engineer. She taught college courses on statistics and has led the Seattle OIG's policy and statistics team. Meza currently works as a senior auditor for Seattle's Office of the City Auditor, where she leads citywide audits and provides technical advice to the city council and the mayor's office. That's from her CV, which is at Docket No. 768-13.

The City complains that Finnell relied heavily on Meza's statistics, but that he didn't crunch the numbers himself. The City argues that Finnell has no idea how Meza created the tables and graphs in the report and that he can't validate any of the table -- excuse me -- he can't validate any of the data in those tables and graphs.

That may be true, but those aren't reasons to exclude Finnell's testimony. For starters, the Seventh Circuit has said that it's permissible, even "common," under the Federal Rules of Evidence, "in technical fields for an expert to base an opinion in part on what a different expert believes on the basis of expert knowledge not possessed by the first expert." That's from *Dura Automotive*, 285 F.3d 609, page 613, Seventh Circuit 2002.

As Judge Kness has said, "There is nothing objectionable about an expert relying on the work of a colleague." That's from *Washington v. Boudreau*, 2022 WL 4599708, page 11, Northern District of Illinois 2022.

If the City has an issue with how Meza crunched the numbers, the Seventh Circuit has said what the City's options are: "The opposing party can depose them in order to make sure the [assistants] performed their tasks competently; and the expert witness can be asked at his deposition whether he supervised them carefully and whether his relying on their assistance was standard practice in his field." That's from *Dura Automotive*, 285 F.3d at 613.

Here, the City has done just that. Meza was not some sort of secret, behind-the-curtain statistics expert. Quite the opposite, the City deposed Meza three times across three cases. She was deposed in this case and in the *Iglesias* case and in the *Sierra* case. Those deposition transcripts are on the docket, Docket No. 768-7, 768-6, and 768-8.

The City also asked Finnell about Meza's statistical work during Finnell's deposition.

It's true that Finnell admitted that he is not a statistician and that Meza did the heavy lifting of putting the charts and tables together. And he admits that a few times. For example, take a look at page 768 -- excuse me -- at page 468, Docket No. 768, line 15.

40

Even so, Finnell was involved in the process.  For example, he looked through every complaint that was on the complaint register spreadsheet, meaning that he looked at all 349 complaints.  That's on page 131 of the Finnell deposition, which is at Docket 768-2.

He testified that he checked "several" of the complaints on the final product spreadsheet to make sure they were accurately recorded.  That's on page 347 of Finnell's deposition, Docket No. 768-15.

I will also note that Finnell's deposition for this case happened over two days, so there are two docket entries.  That's Docket No. 768-2 and 768-15.

Plus, Finnell testified that it is an accepted practice within this field to rely on statistical calculations provided by statisticians.  That's from Finnell's deposition in the *Rodriguez* case, at page 263 through 264, Docket No. 768-14.

In short, it's permissible for an expert who is not a statistician to rely on the calculations of a statistician.  That's especially true when the statistician herself was deposed.

So Finnell can rely on the statistical work performed by Meza, but he can't portray Meza's work as his own.  He can't simply repeat what Meza said and then stop.  He has to bring some additional value to the table.

So it can be a building block, but it can't be the

41

whole enchilada.

The City's third argument is that Finnell has no background in qualitative analysis and relied entirely on the qualitative analysis of Dr. Timothy Knight. So in the City's view, any of Finnell's opinions that are based on qualitative analysis -- that's "quantitative analysis" -- should be barred.

According to Finnell's report, Dr. Knight has a Ph.D. in human services and specializes in social and community services. He's done a wide range of work, including policy review and development for local governments, supervising investigations and more. That's from pages 4 through 5 of Finnell's report, Docket No. 768-3.

On page 9 of the report, Finnell says that he "relied on Dr. Knight for the historical context and relevant documents" [*sic*] to support his opinion about the City's widespread practice of condoning improper law enforcement policies. That opinion is on page 11.

Finnell testified that Dr. Knight helped Finnell review documents and gather historical data, but Finnell confirmed that he formulated his own opinions and that Dr. Knight "didn't provide any input into the opinions." I'm quoting from page 145, Docket No. 768-2. That's Finnell's deposition testimony.

As far as this Court can tell, Dr. Knight is nothing more than a permissible assistant for Finnell, the expert

witness.  Dr. Knight helped lay the groundwork.  Finnell is not testifying as a mouthpiece for Dr. Knight.  That's how I read things.

As Finnell said, Finnell's opinions belong to Finnell alone.

So in the Court's view, Finnell is qualified to give expert opinions, and he can rely on the work by Meza and Knight.

I'll now turn to the second argument about Finnell.

The City's second argument is that Finnell has no foundation for his opinions.

So I'm turning now to the second of four bullets.  Or maybe second of four buckets, either one, whichever works for you.

The City gives a few reasons in support of its argument about foundation, but the City's arguments are misplaced.  Some of them are repackaged versions of the City's arguments about Meza and Dr. Knight.  They go to the weight of the testimony and not admissibility.

The City first complains that Finnell did not conduct any statistical analysis in the report and that he renders his statistical analysis -- I'm sorry.  Let me say that again.

The City first complains that Finnell "did not conduct any of the statistical analysis in the report."  As the City sees things, "this renders his statistical analysis unreliable

43

and justifies excluding his opinions that rely on this information."  I'm quoting from the motion at pages 14 to 15, Docket No. 760.

That is a repeat of one of the City's arguments about Finnell's qualifications, which I've already addressed.

The City similarly complains that Finnell has no foundation to talk about the historical context of the CPD because he relied on Dr. Knight.

Again, that's the same sort of argument that I just addressed.  So for the same reasons, it's denied.

Next, the City argues that Finnell relied on inherently biased materials in formulating his opinion on the historical context of the CPD.  For example, the City complains that Finnell "relies heavily on a law review article written by G. Flint Taylor," the founding partner of the People's Law Office, which is counsel in this case for Plaintiff Solache.

That's not an admissibility problem; that's a weight of the evidence problem.  It goes to the person's bias.  It goes to the person's credibility.  If the City wants to make Finnell look like a biased expert in front of the jury by relying on something prepared by plaintiffs' counsel, the City is free to go to town.

Finally, the City argues that Finnell has no foundation for his "sustained rate" analysis.

The "sustained rate" analysis refers to how frequently

civilian complaints against CPD officers were sustained. Basically, Finnell compared Chicago's sustained rate with national rates and with the rates of other large cities.

The City argues that Finnell used the wrong time period for the comparison and that Finnell should have compared the City -- Chicago's sustained rate to large law enforcement agencies rather than to local ones.

But the City's argument, in reality, isn't about foundation; it's about the data itself and the conclusion that Finnell drew from it.

As I've noted earlier, the Seventh Circuit has talked about relying on unreliable data. They said, "Assuming a rational connection between the data and the opinion, an expert's reliance on faulty data is a matter to be explored on cross-examination; it does not go to admissibility." That's from *Manpower*, 732 F.3d at 809.

As the Seventh Circuit said in the same case, "whether [an expert] has selected the best data set to use" is "a question for the jury, not the judge."

My use of the word "quotes" and "brackets" may have interfered with the point. I'll simply say this: The Seventh Circuit in *Manpower* said that questions about the reliability of the data go to the believability of the witness, the reliability of the testimony. It doesn't go to admissibility.

I will say this: I have often thought that that quote

from the Seventh Circuit is a bit of an overstatement, candidly. Rule 702(b) says that the testimony must be based on sufficient facts or data. It's one of the four requirements.

"The testimony is based on sufficient facts or data."

So speaking on behalf of little ole me, and me alone, to say that you can't make a *Daubert* challenge based on faulty data seems like an overstatement. It's one of the requirements in the rule.

But I don't think the Seventh Circuit maybe meant that literally. I think what the Seventh Circuit was probably trying to say is just because you can poke holes in the data doesn't mean the opinion is inadmissible. It doesn't have to be perfect. It can be flawed and still be admissible. There has to be room for cross-examination. So just because you've got a really good argument why it's unreliable doesn't mean that it's not going to see the light of day at trial.

I do have to decide whether it's sufficiently reliable within the meaning of Rule 702. And that's my limited holding.

The data in front of Finnell was sufficiently reliable within the meaning of 702 to be allowed to be presented at trial. It doesn't mean it's perfect. It doesn't mean it's not flawed. It can be flawed or incomplete and still admissible. That's my ruling.

Here's the punch line: Any arguments about that are best left for cross-examination.

I will now turn to the third bucket of arguments about Finnell. I will challenge -- I will talk about the challenge to Finnell's methodology.

Again, the City has a few arguments in support of its challenge. But once again, they go to the weight of the testimony, not its admissibility.

One of the City's arguments is that there's no reliable evidence to support the sustained rate analysis. But once again, the City is simply repeating its other arguments. The City's arguments are really a challenge to Meza's role in Finnell's report. Once again, the City argues that Meza did all the statistics and, therefore, Finnell has no idea what's going on. The City's argument is that Finnell didn't understand Meza's methodology, so the opinions have to go.

Again, that argument is about the reliability of the evidence, not about his methodology. It has to do with whether Finnell really understands Meza's statistics. It doesn't go to methodology.

And the City also repeats its argument about Finnell's reliance on Dr. Knight. I'm going to reach the same ruling.

Apart from those arguments, the City argues that Finnell's report contains errors, and those errors indicate that Finnell doesn't understand the methodology or the concepts that he would opine on.

For example, the City asserts that Finnell conflates

complaint files with individual investigations and allegations. In the City's view, that means that Finnell didn't review 9.6 percent of the complaints, but he reviewed only 0.9 percent of the complaints.

That's on page 19 of the City's motion, Docket No. 760.

Plaintiffs disagree. They point out that in Finnell's rebuttal report, Finnell notes that the CPD's reports often don't distinguish among complaints, investigations, and allegations. That's Figure 1 on page 10 of the rebuttal report. It's in the docket at Docket No. 768-4.

So, in the City's view, the math is wrong, meaning the City's math is wrong.

Truth be told, this back-and-forth between the parties isn't about Finnell's methodology. If Finnell used incorrect or incomplete data, that's a problem for him, but it's not a problem with his methodology. So once again, I reject the City's argument.

The last challenge, meaning the fourth bucket, is the challenge to Finnell's testimony about helpfulness to the jury.

The City argues that Finnell's testimony would not be relevant or helpful to the jury. Take a look at pages 24 to 25 of the City's motion, Docket No. 760.

As the City sees things, Finnell's testimony isn't connected to the people involved in this case. It's because

Finnell doesn't plan to testify about how CPD's policies caused plaintiffs, in particular, to suffer constitutional injuries, and Finnell didn't testify that any particular complaint that he reviewed should have been sustained.

This is basically the same sort of challenge that the City made to Tiderington's testimony. And the Court rejects it for the same reasons.

Again, a brick is not a wall, and a brick doesn't have to be a wall.

For plaintiffs to win on their *Monell* claim against the City, plaintiffs need to prove the existence of a widespread practice that caused their injuries. Finnell's testimony is directly related to the existence of a widespread practice. Finnell's testimony does not need to prove each and every one of the elements of *Monell* to be admissible. It speaks to a relevant element. It's admissible. It otherwise satisfied the rules -- the requirements of Rule 702.

The City also makes an argument about Rule 403. I'm going to bracket that, and I'm going to put that aside for the moment.

Before I turn to that issue, I want to make one other topic -- I want to address one other topic.

Finnell didn't simply opine about the pattern and practices of the Chicago Police Department. He also opined about a culture of impunity.

49

He mentioned the word "impunity" more than a dozen times in his report.

Let me read Finnell's second opinion, which appears on page 69 of his report, as stated in Docket No. 768-3.

He wrote: "The Chicago Police Department's and the Defendant City of Chicago's failure to discipline and supervise Defendants created a sense of impunity and facilitated, encouraged, and allowed abuses."

Let me give you two more examples.

Actually, before I do that, let me read that opinion again.

Finnell's second opinion was as follows: "The Chicago Police Department's and the Defendant City of Chicago's failure to discipline and supervise Defendants created a sense of impunity and facilitated or encouraged and allowed abuses."

Again, that's page 69 of his report, Docket No. 768-3.

Let me give you two more examples where he talked about the culture of impunity.

Here's a quote from page 16 of the report.

"It has been my experience that when an organization fails to establish and sustain effective systems of accountability and consciously turns a blind eye to misconduct, it sends a message throughout the organization that those who engage in misconduct may do so without immunity" [*sic*].

Here's another example from page 65.

50

"The aforementioned data and cumulative evidence are indicative of a broken and ineffective disciplinary process that invites officers to conceal misconduct and fosters a culture of silence and complacency that allows wrongdoers to act without fear of punishment and impunity."

I do not see how this expert could testify so directly about a culture of impunity or a code of silence. I don't see any expert analysis. I do not see any methodology. He does not appear to reach that opinion through any methodology that could be tested. He just says so.

I don't see how that opinion passes the rigors of *Daubert*, because I don't see any methodology that led to the opinion.

Rule 702(c) says that the opinion must be "the product of reliable principles and methods."

I don't see any principles and methods here.

There is no way to measure culture.

The Supreme Court has talked about the fact that an expert's analysis must be able to be tested. I don't see how this can be tested.

It, frankly, doesn't seem helpful to the jury, either. The jury can figure it out.

Frankly, it seemed like raw advocacy. He seems like a commentator on this point, not an expert. I don't see any expertise; I see gloss.

So here's my reaction: Save it for closing argument.

Maybe an expert could testify about the number of complaints filed against officers in a police department. An expert hypothetically could compare the volume of complaints in one city to the volume of complaints in another city.

Similarly, an expert could, hypothetically, evaluate how often complaints are sustained. You can crunch the numbers and reach a conclusion, that seems fine, if the conclusion is fair game, meaning the topic is fair game.

That type of analysis is one thing, but opining about a culture is another. It feels like a leap. It feels like a gloss. It feels like raw argument.

So here's the point on this: I'm going to keep my powder dry on this issue. I want to hear more from the parties about Finnell's second opinion before trial. I want to hear more from the parties about whether an expert can talk about whether there is or is not a culture of impunity, whether there is or is not a code of silence.

The presumption is going to be that Finnell can't testify about a culture of impunity, including a code of silence, unless and until he receives clearance from me. It's out unless and until I say it can come in.

So I want to make sure everybody understands what I'm saying.

I have my doubts about this. I have my doubts about

this.  But I'm not issuing a ruling because I want to hear more.  And, frankly, folks, I want to think about it some more.  I want to think about it some more.

So for now, he can't take the leap and talk about the culture, the feelings, the beliefs, because I don't think that can be tested.  I don't think that's something that is able to be determined through any particular methods.

I am skeptical of experts who roll up in the witness stand and say, "I have a lot of experience, and here's what I think about the world."  That's not what experts are supposed to be doing.

So I have my doubts on Finnell on this point.  But let me say this again:  I'm keeping my powder dry.  Don't anybody get too excited.  Don't anybody get too disappointed.

Let me also say this as an overarching observation to all of the experts, including the two rulings that I've just done and the ruling for Leo that will come down the pike.  All pretrial rulings are preliminary by definition.  They're preliminary.  I am here calling balls and strikes.  I have tried my best to call balls and strikes to the arguments presented to me.

I have gone through the reports.  I have gone through the briefs.  The materials are quite voluminous.  Frankly, folks, it's a lot.  I'm a human being, and it's a lot.

When I went through the reports, especially Finnell's

report, I had some questions. I had some questions. There were times when I paused. There were times where I independently wondered whether this is admissible.

Our system relies on the adversary process, but the Supreme Court has also appointed me as a gatekeeper to protect the jury.

So my gears always independently turn whenever I read an expert report.

It might be too strong to say that I have some concerns about some of the proffered opinions. I will simply say I have some questions in my own head about some of the opinions.

Let me tell you what I've done today and what I have not done today.

I have given you a preliminary ruling on two of the experts. I have not said that anything and everything in the report is fair game. We might do some trimming. The trimming might come with a little hand trimmer. The trimming might come from a chain saw or some other gas-powered device.

I want to think about the experts some more. Expert testimony can sway a jury. I have often seen expert reports that are more advocacy than I want.

I'm not saying that's true in this particular case, so don't anybody feel that way. I'm just saying in general, I often see that in my cases.

54

So I feel duty-bound to be on the lookout for advocacy disguised as expert testimony. I'm always on the lookout for experts who get over their skis. I'm always on the lookout for expert testimony that really goes to something that the jury can figure out.

So I'll simply say this: I've called balls and strikes on the arguments presented to me. I think a lot of the arguments had to do with problems with the reports that really go to believability, credibility, those sorts of things. I think you can do it at cross.

I don't think by and large they go to admissibility. But that is not to say that I have no concerns about admissibility generally. I'm independently thinking about these things. And I may want to revisit the admissibility of expert testimony.

I don't plan to change my mind on anything I've just said, unless somebody gives me a good reason to, but I can tell you this: Before any of these experts take the witness stand, I am going to be personally comfortable that everything they intend to say is fair game, because I have a few questions. I have a few questions.

So the long and the short of it is this: The motion for exclusion of Tiderington is denied. The motion to exclude Finnell is denied. That's Dockets No. 759 and 760. But I am not green-lighting their testimony lock, stock, and barrel.

55

I don't know if those two metaphors play well together, but you know what I mean.

I'm not saying it's all coming in, because I have a few questions.

But by and large, the motions are denied, except as I have otherwise indicated.

One last housekeeping matter. There was a Rule 403 argument about Finnell. We're going to save that for later, too. I'm just going to reach *Daubert* now.

Okay. So that is my ruling, folks.

Thank you, everybody, for listening.

Does anyone have any questions? Anything, anyone?

Okay. So we've got two more motions down.

I will talk to my courtroom deputy about when I can have you back on the other motions. I've got a very vibrant criminal calendar right now, and criminal cases always take first dibs with me.

I'm hoping that we can come back at some point in the next two weeks, maybe next week, even, depending on my calendar, to do another ruling.

I've got rulings that I'm ready to give, but I've got to just fit you in. Okay?

Does that sound good, everyone?

MS. ROSEN: Yes.

THE COURT: So we'll make progress.

56

MR. STARR:  (Nodding head up and down.)

MS. SNYDER:  (Nodding head up and down.)

THE COURT:  I know that we talked last time about thinking about a trial date, and I know that the defense team in particular said it's hard to figure out the need for the length of trial without knowing the scope of the trial.  And that is fair, but it's fair up to a point.  You know, it's -- this isn't going to be a short trial, whatever it is.  So I think we should start talking about that.  I think it would be nice to get a placeholder on the docket.

Have you all talked about that?

MS. ROSEN:  No.  Amongst us, not yet.

THE COURT:  Okay.  Does anybody think this trial can be done in less than two weeks?

MS. ROSEN:  No.

THE COURT:  Obviously not, I wouldn't think.

What do you think?

MR. STARR:  I think our goal is to present the case in two weeks.  I think our goal is to present the case in two weeks from plaintiffs' side.  I think we acknowledge -- I think one of their counsel last -- last time we were here noted that there are some witnesses who would have to be presented through interpreter, which is a fair point.  It does add some time.

Our view is that it's going to be for a limited number of witnesses.  And so we think that might add two to three days

57

of trial time, but that's still what we think is -- is the goal.

THE COURT: Okay. I would like you to start thinking about this and talk about this. I think we should pin something down the next time we're here, see if we can get something on the calendar so you folks can start planning accordingly.

MR. STARR: We'll confer.

THE COURT: You know, I -- I know it's not going to be in 2025. And that reality disappoints no one, I'm sure. But we're probably looking at, what, next summer, something like that. So I think we should get something on the docket. Maybe late spring. We'll see where we are.

Nothing bad ever happens by setting a trial date. So I'd like to do that. And this case is a long time coming. This case was filed in 2018. It's one of the very -- these two cases are one of the very few cases that I still have on the docket from day one.

When I raised my hand on September 16th, 2019, I got blessed with 342 cases. I think I have fewer than five from that original allotment. And this is two of them. I don't have very many.

So you folks have been working really hard for a really long time on this case. I'm sure the plaintiffs are anxious to get to trial. I need to give you a trial date. I

58

understand that.

It's just been -- it's been a ton of work for you folks. You guys have done a ton of work and done such a terrific job with everything.

I appreciate everybody's work on these motions. You know, I can just tell how much work you put into this. I've been there and I've done that. I know how much work it is. So I appreciate everybody's thoughtfulness.

And I'll say this in particular: On the defense team, I thought you made a lot of good points, as I've talked about, on the vulnerabilities of these witnesses. I just think it's going to be saved for cross, but you've got some good arguments. You know, you've got some good arguments.

You've also kind of previewed for the plaintiffs what some of the arguments might be. Maybe you've got some more things up your sleeve or maybe they know anyway.

Whenever I had an expert who said too much and knew too little, I loved it. That's when the fun begins.

So, you know, we'll pop some popcorn when the day comes.

So why don't we do that, folks. We'll come back in the next week or two. We will see how much progress we make.

I've got to give you the ruling on Leo, and then I've got a couple other motions. I think we've got, like, seven or eight left.

59

But we are making progress. And we'll get you a trial date, and we'll go from there.

Anything else from anybody?

MR. STARR: Nothing from plaintiffs.

THE COURT: Anything from the defense team?

I appreciate you guys coming in.

We're adjourned. Thank you, folks.

THE CLERK: All rise.

(Concluded at 3:06 p.m.)

\* \* \* \* \*

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

/s/ *Amy M. Kleynhans* _____        *8/21/2025* __
Amy M. Kleynhans, CSR, RPR, CRR        Date
Official Court Reporter

*DeLeon-Reyes v. Guevara, et al.*
Case No. 18 CV 01028

*Solache v. Guevara, et al.*
Case No. 18 CV 02312

# EXHIBIT 12

```
               IN THE UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF ILLINOIS
                        EASTERN DIVISION

JOHN MARTINEZ,                          )
                                        )
            Plaintiff,                  )
                                        )
        -vs-                            )NO. 23 CV 1741
                                        )
RENALDO GUEVARA, et al.,                )
                                        )
            Defendants.                 )
_____

JOSE TINAJERO,                          )
                                        )
            Plaintiff,                  )
                                        )
        -vs-                            )NO. 24 CV 1598
                                        )
RENALDO GUEVARA, et al.,                )
                                        )
            Defendants.                 )
_____

THOMAS KELLY,                           )
                                        )
            Plaintiff,                  )
                                        )
        -vs-                            )NO. 24 CV 05354
                                        )
RENALDO GUEVARA, et al.,                )
                                        )
            Defendants.                 )
_____
```

The videotaped deposition of THOMAS TIDERINGTON, a witness herein called for examination pursuant to notice and the Federal Rules of Civil Procedure as they pertain to the taking of depositions before Aana M. Giftos, CSR, on Wednesday, March 18th, 2026, via audio-videoconference commencing at the hour of 10:00 a.m.

THOMAS TIDERINGTON, 03/18/2026                    Page 2..5

Page 2

ALL APPEARANCES BY ZOOM:
SEAN STARR, ESQUIRE
Loevy & Loevy
311 North Aberdeen Street, Third Floor
Chicago, Illinois  60607
Telephone: (312)243-5900
Email: sean@loevy.com
on behalf of Plaintiffs John Martinez and Thomas Kelly, Witness Thomas Tiderington;

JOEL A. FLAXMAN, ESQUIRE
Kenneth N. Flaxman, PC
200 South Michigan Avenue, Suite 201
Chicago, Illinois  60604
Telephone: (312)427-3200
Email: jaf@kenlaw.com
on behalf of Jose Tinajero;

ANDREA CHECKAI, ESQUIRE
Borkan & Scahill, Ltd.
20 South Clark Street, Suite 1700
Chicago, Illinois  60603
Telephone: (312)580-1030
Email: ACheckai@borkanscahill.com
on behalf of Defendant Reynaldo Guevara;

JEFFREY C. GROSSICH, ESQUIRE
The Sotos Law Firm, PC
141 West Jackson Boulevard, Suite 1240A
Chicago, Illinois  60604
Telephone: (630)735-3300
Email: jgrossich@jsotoslaw.com
on behalf of defendant officers except Guevara;

CHRISTOPHER SLOSS, ESQUIRE
O'Connor & Battle, LLC
111 West Jackson Boulevard, Suite 1700
Chicago, Illinois  60604
Telephone: (312)786-4611
Email: csloss@mokblaw.com
on behalf of Defendant Jake Rubenstein;

Page 3

ALL APPEARANCES BY ZOOM:
THERESA CARNEY, ESQUIRE
Rock Fusco & Connelly
333 West Wacker Drive, 19th Floor
Chicago, Illinois  60606
Telephone: (312)494-1000
Email: tcarney@rfclaw.com
on behalf of the City of Chicago;
ALSO PRESENT:
Mr. Nick Trotta, Certified Legal Videographer.

I N D E X

WITNESS
THOMAS TIDERINGTON

Direct Examination by Mr. Grossich..........   5
Cross-Examination by Ms. Carney.............  180

EXHIBITS
Deposition Exhibit Number 1.................   22
Expert Report of Thomas J. Tiderington

Deposition Exhibit Number 2.................   22
Supplemental Report of Expert Thomas J. Tiderington
Deposition Exhibit Number 3.................   40
Invoice

Deposition Exhibit Number 4.................   88
Transcript of Melloney Parker
Deposition Exhibit Number 5.................  130
Affidavit of Eladio Valdez

Deposition Exhibit Number 6.................  179
Response to Defendants' Subpoena

Page 4

THE VIDEOGRAPHER:  Good morning.  This is the beginning of media unit 1.  We are now on the video record at 10:02 a.m., central standard time.

This is the videotaped discovery deposition of Thomas Tiderington being taken on March 18th, 2026.  This deposition is being taken on behalf of the Defendant in the matter of John Martinez v. Reynaldo Guevara, et al.

The case number 12 CV 1741 filed in the United States District Court for the Northern District of Illinois, Eastern Division.

My name is Nick Trotta, certified legal videographer representing Urlaub Bowen & Associates with offices at 20 North Clark Street, Suite 600, Chicago, Illinois.  The court reporter today is Aana Giftos also of Urlaub Bowen & Associates.

Counsel, please identify yourselves for the video record and the parties which you represent starting with the questioning attorney.

MR. GROSSICH:  I'm Jeff Grossich and I represent the officer defendants besides Guevara.

MS. CHECKAI:  Good morning.  Andrea Checkai on behalf of the Defendant Reynaldo Guevara.

MS. CARNEY:  Theresa Carney on behalf of the City of Chicago.

Page 5

MR. STARR:  Sean Starr.  I represent the Plaintiffs Martinez and Kelly, and along with Mr. Flaxman, I also represent the witness.

MR. FLAXMAN:  And Joel Flaxman for Jose Tinajero.

MR. SLOSS:  And Christopher Sloss for Defendant Rubinstein.

THE VIDEOGRAPHER:  Will the court reporter please swear in the witness.

(Witness sworn.)

MR. GROSSICH:  And actually, Nick, the case number you read, what was that case number?  You said this case number and you said a number.

THE VIDEOGRAPHER:  23 CV 1741.

MR. GROSSICH:  Okay.  I might have heard it wrong.  Thank you for that.

THOMAS TIDERINGTON, having been called on behalf of certain defendants, being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION
BY MR. GROSSICH:

Q   Mr. Tiderington, can you please state and spell your name for the record.

A   Sure.  Thomas J. Tiderington,

THOMAS TIDERINGTON, 03/18/2026                        Page 6..9

Page 6

T-I-D-E-R-I-N-G-T-O-N.

Q Let the record reflect that this is the deposition of Thomas Tiderington being taken pursuant to notice, the Federal Rules of Civil Procedure and the local rules for the Northern District of Illinois.

Mr. Tiderington, do you understand that we're here today because you've been disclosed as an expert by Plaintiffs John Martinez, Thomas Kelly and Jose Tinajero in these cases?

A Correct, yes.

Q Okay. Even though these are technically three separate cases, if I say this case during this deposition, will you understand that I'm referring to all three of those cases?

A I will, yes.

Q All right. And what do you understand your role to be as an expert in this case?

A My role is to examine the material that was provided to me and to offer opinions concerning police practices.

Q Can you do that?

A I did do that, yes.

Q All right. Approximately, how many depositions have you testified in before?

Page 7

A Throughout my career and again just a point of clarification, I testified in many depositions as a police officer for more than 44 years. If you're asking how many depositions in civil matters, just so I have a point of clarification.

Q Yes, I am.

A In civil matters, I have -- I provided a list. I don't know the exact number, but probably 25 -- 20 or 25. I think I provided a list. I can pull it up and give you an exact number.

Q Understood. And you said that you've also testified in civil depositions as a police officer?

A No, no. What I -- probably at some point in my career, but what I was trying to explain is that throughout my career as a police officer especially in Florida was a deposition state, meaning just about every arrest that took place was a deposition associated with it. So probably had hundreds if not thousands of depos in criminal matters.

As an expert witness, I guess probably around 20 or 25, whatever is listed on my materials that were provided to you.

Q Understood. Have you ever testified in a civil deposition as a defendant when you were a police officer?

A I don't think so.

Page 8

Q Okay. So it's fair to say you're familiar with the basic ground rules of a deposition?

A Yes.

Q All right. So I won't spend too much time on them. Just a reminder that if you don't understand a question, please let me know and I will rephrase it. Okay.

A Yes.

Q We can take a break at any time.

A I'd just like to -- like about every hour for five minutes if that's all right with everyone.

Q Yeah. I'm pretty much the same. So that sounds good to me.

If you answer a question, I'm going to assume you understood it, is that fair?

A That's fair.

Q All right. What did you do to prepare for your deposition today?

A Reviewed the material that had previously been provided to me and a couple phone conversations with the Plaintiffs' attorneys.

Q Was there any material -- so I understand that you have a list of materials reviewed, correct?

A Correct.

Q And I believe that's attachment B to your

Page 9

November 26, 2025, disclosure, is that correct?

A Yes.

Q And did you review those materials in performing your analysis in this case?

A Yes.

Q Did you review those materials prior to drafting your expert report in this case?

A Did I -- I'm sorry. Did I review them prior to drafting my report? Yes.

Q Correct. All right. Did you review any of those materials again specifically for the purpose of preparing for this deposition?

A Yes, I did.

Q Which materials did you review specifically in preparing for this deposition?

A Well, if you'd like to pull the material list up, --

Q Sure.

A -- we can go through that.

Q Before we go any further, do you have any documents in front of you?

A I have a partially printed out copy of my report. When I say partially printed out, I had trouble with my printer this morning. So I don't think I have every page,

THOMAS TIDERINGTON, 03/18/2026                    Page 10..13

Page 10

but on one of the breaks, I'm going to try to print it out. It's easier for me to look at a hard copy than perhaps online viewing. So I am going to try to print out a full copy of my report if that's okay.

Q   Yeah. I actually am the same. I prefer a hard copy of everything I saw. So I understand.

Okay. So I'll show you my screen. Just give me one moment. All right. Can you see my screen right now?

A   Yes.

Q   All right. And is this the first page of your November 26th, 2025, expert disclosure in this case?

A   It is. If you can make it a little bit larger just so I --

Q   Is that better?

A   I have two monitors. So if I move -- I'm not looking, I've moved it over to the larger one which makes it easier for me to review and read.

Q   All right. And this is a 900-page document, correct?

A   Correct.

Q   908 pages, right?

A   Yes.

Q   Okay. I'm going to go to page 79 in this document. This is attachment B, correct?

Page 11

A   Correct.

Q   Is this a list of the materials, excuse me, you have reviewed as part of your work in this case?

A   Yes.

Q   Okay. I'm going to scroll down. And here's where the list begins, correct?

A   Yes.

Q   Okay. So now that you're viewing this in answer to my earlier question, which materials did you specifically review in preparation for your deposition today?

A   Well, I kind of went through all of the material. I mean I think I probably clicked on most of the material that was provided to me via a Drop Box link or some type of a link, and I think I probably reviewed most of the materials listed.

Q   All right. So I'm scrolling down here and it looks like there are 157 separate items listed here?

A   Correct.

Q   Okay. Is it your testimony that you reviewed a majority of these specifically in preparation for your deposition today?

A   No. And, again, thank you for that question. Probably up to -- probably up to 47 I think is the majority of what I looked at, but I -- you know, I did look at some

Page 12

of the other materials, you know, number 58 witness perception training key, some of those things listed there.

Q   All right. Go ahead.

A   As a point of clarification also, you probably know I had another deposition last week. I've had several depositions in the last month or so on other cases related to the same topics, subject matter.

So I would have perhaps reviewed some of this information in preparation of other depositions and not necessarily specifically for this deposition, but, obviously, there would be some collective knowledge of reviewing this material that would be relevant to this as well.

Q   All right. So items 1 through 47 on this list, it looks like those are items that are specifically related to the Daniel Garcia murder investigation, is that correct, and these civil cases, is that correct?

A   Yes.

Q   Okay. Then it looks like further down you have -- you have file -- you have something called file comparisons. Do you see that?

A   I do.

Q   Okay. It looks like these are files that are not related specifically to this case but to other investigations by the Chicago Police Department or by the

Page 13

Cook County State's Attorney, is that fair to say?

A   That's correct. Thank you.

Q   Okay. And then under that, you have additional materials. And, again, these look like they are, you know, general materials related to police practices that are not specific to this case, is that fair to say?

A   Correct.

Q   Okay. So is it your testimony that some of these materials that do not relate specifically to this case that you may have reviewed those in your preparation for other depositions that you've given recently?

A   That's correct, yes.

Q   And when you reviewed 1 through 47 on this list in preparation for this deposition, did you, like, go over these materials line by line or do you more skim them?

A   I guess the answer is both. I skim them, and if there's something very specific or relevant to what I, you know, like, the investigative file, something like that, I would probably spend more time on it.

Some of the depositions I would have reviewed them in more -- in depth than just skipping -- skimming through them.

Q   You mentioned that you had a number of phone calls with Plaintiffs attorneys in this case in preparation for

Urlaub Bowen & Associates, Inc.   312-781-9586

THOMAS TIDERINGTON, 03/18/2026                    Page 14..17

Page 14

your deposition, is that correct?

A   I think I've only had two.

Q   All right.  When was the first of those phone calls?

A   Well, other than scheduling, it would have been within -- in the last couple of days.  Maybe yesterday and this morning.

Q   All right.  So the call that you had yesterday, who was on that call?

A   Sean, Attorney Sean Starr.

Q   Was anyone from Mr. Flaxman's office on that call?

A   I don't think so, no.

Q   Anyone else on the call besides you and Mr. Starr?

A   No.

Q   How long did that call last?

A   Probably an hour.

Q   Was that call over, like, a video conference software or was that a telephone call?

A   It was just a telephone call.

Q   All right.  And the phone call that you had this morning, who was that with?

A   It was with Sean Starr and Joel was on for part of the call.

Q   All right.  How long did that call last for this

Page 15

morning?

A   Maybe 20 minutes.

Q   And -- all right.  Other than those two phone calls, have you had any discussions with anyone else to prepare for your deposition today?

A   No.

Q   What is your area of expertise?

A   Police practices.

Q   And what does that mean exactly?

A   Well, I was a law enforcement officer for more than 44 years.  I developed expertise on -- specifically on criminal investigations, but throughout my career, I probably touched every base of police work in terms of patrol officer throughout -- up through the ranks.

Involved in training, involved with the accreditation process of getting two different police departments accredited.  So I guess it -- my expertise along those lines is related to my experience of over 44 years.

Q   And do you have any other areas of expertise besides police practices?

A   Well, they're all related somehow to police practices.  I have -- I've been retained on several cases involving human trafficking, premises liability cases.

Again, it's still related to police work, but

Page 16

it's different than this type of case.

Q   Just so I understand better, are you an expert in human trafficking?

A   I have been qualified as an expert in human trafficking, yes.

Q   Are you an expert in premises liability?

A   I have testified about premises liability as it relates to human trafficking, yes.

Q   Do you hold yourself out as an expert in any areas besides police practices?

A   I don't think so.

Q   And have any courts previously found you to be qualified as an expert in the area of police practices?

A   Yes.

Q   Do you know how many times that has happened?

A   Again, throughout my -- again, two different buckets there if you will.  As a law enforcement officer testifying as a police officer on criminal matters or are you speaking of just civil matters where I'm a police expert or police practices expert in civil matters?

Q   I'm talking about when you have been -- okay.  So I understand that as a police officer -- so you had a long career as a police officer, correct?

A   Yes.

Page 17

Q   And as a police officer, you testified in court about investigations that you were a part of, is that correct?

A   Correct.

Q   Is it fair to say you were a fact -- a fact witness in those cases?

A   A fact witness but I've also -- on many occasions, was offered as an expert on various things in criminal matters.

Q   All right.  Let's start by doing it this way.  How many times have you been qualified as an expert in police practices in civil cases?

A   I don't know the exact number.  I testified in maybe a half a dozen trials.  So I'm assuming I was qualified as an expert during those -- those trials.

If you're speaking of when I was being deposed as an expert witness, I don't think that's what you're asking.  I think there's a distinction between being qualified by a court versus me testifying as an expert during depositions.

Q   Let me ask it this way.  How many times have you testified in federal court as an expert in police practices?

A   Again, I'm not trying to be difficult.  I'm trying to be precise.  In civil matters, probably five or six times.

Page 18

Q   Okay.  And you've provided a list -- in the disclosure that you made on November 26, 2025, did you provide a list of cases in which you testified?

A   Yes.

Q   All right.  And where is that in the disclosure that you made?

A   What do you mean where is it in the disclosure?

Q   Which attachment is it?

A   Oh, I'm not sure.  I'll have to pull that up or do you not have it or --

Q   While I look for that, I'll ask you a different question.

MR. STARR:  He testified earlier that he only printed a portion of his report.

MR. GROSSICH:  Sure, understood.

BY MR. GROSSICH:

Q   Let me ask you this question.  Have -- in the cases, the civil cases in federal court in which you've been retained as an expert, testifying expert, has anyone ever filed a motion to have your testimony excluded?

A   I think so, yes.

Q   Okay.  And do you know if those -- any of those motions have ever been granted?

A   I've never been told by an attorney that I've been

Page 19

barred to testify.  I know there's been -- if I'm using the correct legal term, there's been some limiting instructions as to what I can testify to, but I don't think I've ever been told -- with the exception of one case out in California.  It was a trademark violation case, and the judge apparently made a ruling that although I was an expert in the areas that I was going to testify, the areas that I was going testify was not relevant to the question at hand.  The case settled.  So I was never barred from testifying.  I guess so -- I just -- you know, to be clear on that, I think there was some opinion that the judge was not going to let me testify about my -- that area of expertise because he deemed it not relevant to the matters at hand is what I understand.

Q   Are you aware of any ruling by any court that said that you were not qualified to be an expert in the area of police practices?

A   No.

Q   Who hired you in this case?

A   The law firm Loevy & Loevy.

Q   What did Loevy & Loevy ask you to do in this case?

MR. STARR:  Objection to the extent it seeks to intrude upon attorney-client conversations.

Q   I'll ask it a different way.

Page 20

What were you asked to do in this case?

MR. STARR:  Same objection.  I mean I'm going to let him answer that generally without revealing any attorney-client communications.

Q   All right.

A   Well, I was -- actually in this case, I don't remember specifically the conversation, but generally speaking, on cases involving Loevy & Loevy, I provided the case file, the complaint, and I'm asked to review the matter.

I don't believe I'm ever given specific direction as to what I should be looking at.  May have happened early on in maybe the first or second case that I worked, but in the most recent cases, I just provided the information and I kind of understand what's expected of me in terms of providing my opinions and in terms of reviewing the matter.

Q   Okay.  You drafted a report in this case, is that correct?

A   I did, yes.

Q   I'm going to share my screen with you again.  All right.  Can you see my screen okay?

A   Yes.

Q   I'm going to scroll up here.  So we're looking at

Page 21

the first page of your expert report in this case?

A   That's correct.  And I'm sorry.  Can you make that -- Jeff, can you make it larger just so it's --

Q   Yeah.  Can you see that okay?

A   I can.  Thank you.

Q   All right.  So I know that you -- well, strike that.

You have tendered two separate reports in this case, is that correct?

A   That's correct.

Q   You tendered one report that was dated November 26, 2025, is that correct?

A   Yes.

Q   Then you also tendered a rebuttal report, right?

A   Correct.

Q   And let me just check.  I believe that report is dated February 27th, 2026, is that correct?

A   That sounds correct.

Q   All right.  So just for ease of reference during this deposition, is it okay if I refer to the November 26, 2025, report as your affirmative report?

A   Yes.

Q   And I'll refer to the February 2026 report as your rebuttal report?

THOMAS TIDERINGTON, 03/18/2026                              Page 22..25

Page 22

A   That's fine, yes.

Q   Okay.  So this affirmative report that you tendered on November 26, 2025, it looks like it's, let me see here, 71 pages long, is that correct?

A   Correct.

Q   Okay.  We'll make this Exhibit 1 to the deposition.  It will be the entire -- the entire November 26, 2025, disclosure.  Okay.

A   Yes.  I'm sorry.

Q   Sure.  And I'm just going to pull up another document here.  Give me a moment.  Sir, can you see what's on the screen now?

A   Yes.

Q   All right.  And is this your February 27, 2026, rebuttal report?

A   It is.  Yes, it is.

Q   Let's make this Exhibit 2 to this deposition.  And it looks like this document is seven pages long, is that correct?

A   That's correct.

Q   Are all of the opinions that you'll be offering in this case contained within these two reports?

A   They are, yes.

Q   Will you be offering any opinions that are not

Page 23

contained within these two reports?

A   I don't think I will.  I guess it depends on what I'm asked, but I don't have -- I don't know what else I would offer at this point.

Q   If there comes a point in time when you offer additional opinions, will you supplement one or both of your reports?

A   I would certainly do that if I'm asked to do that, yes.

Q   And will you produce that supplement to all the parties in this case?

A   I would if I'm requested to, of course.

Q   What opinions are you offering in this case?

A   Do you want to go sequentially through the report or how would you like to do this?

Q   We'll go through the report in a bit, but I'm just asking you generally if you can tell me what opinions you're offering in this case?

A   I'm offering opinions about whether or not the investigative practices that occurred were consistent with widely accepted police practices during this time period.

Q   And are you offering an opinion as to whether the investigative practices here were or were not consistent with widely accepted police practices during this time

Page 24

period?

A   I am, yes.

Q   And what is your opinion in that regard?

A   Certainly, as I detailed throughout my report, there were certainly deviations from acceptable police practices.

Q   So you're offering the opinion that in this investigation there were deviations from widely accepted police practices during this time period?

A   I am, yes.

Q   Are you offering any other opinions in this case besides that?

A   Well, all the opinions explained in my report.  I think that would be a wide net that would capture all of my opinions, I'm assuming.

Q   Are you offering any opinions as to the ultimate issues in this case?

MR. STARR:  Objection to form, foundation, vague.

Go ahead.

A   As a point of -- the ultimate issue of what?

Q   Well, for example, are you offering any opinion as to whether John Martinez's confession was coerced?

A   I have no way of knowing whether it was or not.  I'm offering an opinion on -- on the practices that -- the

Page 25

documentation of the interviews, the interrogations, the -- offering opinions about how he was held.  I'm offering opinions about the documentation of those alleged confessions.

I can't offer an opinion on whether or not he was coerced other than to consider his testimony and his allegations.

Q   All right.  So am I correct in saying that whether or not John Martinez's confession was coerced you're not offering an opinion about that?

MR. STARR:  Objection.  Form, asked and answered.

A   I'm offering an opinion that if -- if it was -- if the jury credits the allegations if he's -- if, in fact, it was coerced, then I would -- or I did offer or I would offer an opinion that it would be a violation of acceptable police practices and training.

Q   Do you understand that whether or not John Martinez's confession was coerced is the province of the trier of fact in this case?

A   Yes.

MR. STARR:  Hold on.  Objection.  Form, asked and answered.

Go ahead.

A   Yes.  I understand that and I think I make it very

Urlaub Bowen & Associates, Inc.  312-781-9586

THOMAS TIDERINGTON, 03/18/2026                    Page 26..29

Page 26

clear in my report. So if my answer wasn't clear, I appreciate you giving me the opportunity to clarify that.

Q   When I say trier of fact, do you understand that I'm referring to the judge or the jury?

A   Yes.

Q   Do you have any opinion about whether Jose Tinajero's confession was coerced?

A   It would be the same answer as what I just gave on -- as I just gave.

Q   Do you have any opinion as to whether Thomas Kelly's confession was coerced?

A   Again, my answer would be the same.

Q   And that answer was no, correct?

A   Well, I am not in a position to -- as you said, this is -- if the jury credits the allegations and their testimony that this occurred, then it would be a violation, but I don't know if they did or not. I can only base that on their statements and their testimony. I don't have an opinion on whether or not it actually happened.

Q   Do you have any opinion about whether any evidence was fabricated in this case?

MR. STARR: Objection. Form, foundation.

A   I think I detailed and articulate that in my -- in my report, yes.

Page 27

Q   Okay. What is your opinion in that regard?

A   Well, I guess we'd have to -- if you don't mind, we can go through the report. I can talk about it more specifically.

Q   Well, I respect that and we will go through your report, but I'm just asking generally right now are you offering an opinion in this case about whether any evidence was fabricated?

A   Yes.

Q   And what is that opinion?

A   That there were deviations from acceptable police practices in terms of documenting information provided to -- provided by witnesses, information concerning whether or not the police reports were properly prepared.

I have an opinion about whether or not it's proper to forge, if you will, the signature of another officer's name on reports. Whether attesting to the accuracy of a report, it's improper to forge somebody or fabricate somebody's signature. So I detail a lot of this in my report.

Q   Okay. So -- and correct me if I'm wrong in summarizing what you just said, but you said that you detail in the report that there was a deviation from police practices regarding documentation, signing reports, and memorializing certain things, is that correct?

Page 28

A   Correct.

Q   All right. And what you just said does that in your mind equate to fabrication of evidence?

A   It could, yes.

Q   Okay. Do you know if that equates to fabrication of evidence in the legal -- in the -- do you have an understanding of that term?

MR. STARR: Objection to form, foundation, calls for a legal conclusion.

A   Again, I'm certainly not an attorney. So I can only speak to whether or not it's appropriate in terms of police practices, not whether or not it's a criminal violation.

Q   Can you remind me again how long you were a police officer for?

A   Over 44 years.

Q   And during that time period, did you ever sign another officer's name on a police report?

A   No.

Q   Did you ever know of any other officer doing that?

MR. STARR: Objection. Form, foundation, call for speculation.

A   No. As a point of clarification, I've printed other officer's names. There is a proper way to sign

Page 29

somebody else's name to a report, but that's not what was occurring in my evaluation of what has happened here in many of the cases that I reviewed. There's a proper way to do it and there's an improper way of doing it.

Q   What is the proper way to sign another officer's name to a report?

A   Well, if I'm going to -- if I'm going to sign the police chief's name to a report based on my review of, you know, whatever the matter was, I would sit, sign my name, and then I would print out for Chief Joe Denesi, dated such and such.

Q   Do you have any opinion --

A   I mean it's -- and I'm sure we'll get into it later, but it's totally improper just to attempt to forge a signature of another officer and it seems to be a common practice. I'm sure they -- I'm hoping the Chicago Police Department's changed the practice, but it seems to be that it was a common practice during this era to do so.

Q   Are you offering any opinion as to whether any evidence was suppressed in this case?

MR. STARR: Objection. Form, foundation and to the extent it calls for a legal conclusion.

Go ahead.

A   I don't know if there was.

THOMAS TIDERINGTON, 03/18/2026                    Page 30..33

Page 30

Q   Are you offering any opinion about whether any witness or witnesses were pressured in this case?

MR. STARR:  Objection, form.

A   My report speaks to that issue, yes, whether --

Q   What does your report -- sorry, go ahead.

A   I'm sorry.  Go ahead.  I think you were going to ask the question that I was going to answer before you asked the question.

Q   What opinions are you offering about witnesses being pressured?

A   Certainly, there's information, and I detail it throughout my report, about allegations of witnesses claiming that they were coerced and pressured into identifying and giving statements about what occurred.

Q   So you're saying that in your report you note certain things that you reviewed that you believe indicate that witnesses were pressured, is that right?

A   Based on their testimony, yes.

Q   Okay.  And as to whether or not that pressure actually happened, are you offering any opinion as to that?

MR. STARR:  Objection, form.

A   No.  I explain in detail the circumstances and the documentation by the officers, but I don't -- again, I believe that's an -- ultimately a question for the judge or

Page 31

the jury on whether or not it actually occurred.

Q   Are you offering any opinion as to the guilt or innocence of Martinez, Tinajero or Kelly?

MR. STARR:  Objection to form and to the extent it calls for a legal conclusion.

Go ahead.

A   No.

Q   Are you offering any opinion one way or the other as to whether Martinez, Tinajero and Kelly committed the beating of Daniel Garcia?

MR. STARR:  Form.

A   No.

Q   I'm going to show you again what's been marked as Exhibit 1 to this deposition.  For the record, it's your November 26, 2025, disclosure.  Do you see what I'm showing you now?

A   Yes.

Q   All right.  And this is that attachment B which is the list of materials reviewed, correct?

A   Yes.

Q   Are all the materials that you reviewed for this case listed here in attachment B?

A   All the materials that were provided prior to me writing my report, I listed here.  I believe there was

Page 32

additional -- some additional material provided since I wrote my report that would not be listed here.

Q   What materials have you reviewed since November 26, 2025, that are not listed here?

A   Without looking at my records, I believe there was -- well, the rebuttal -- the Defendants' expert, I believe I was provided his report after I wrote this.  Recently, I was provided Dr. Dysart's report.  I think that's all.  There might have been something else, but I would have to go back and look at my records.  But I think those are the -- well, those are two I recall as we stand here today.

Q   All right.  So in addition to the materials listed here, you reviewed a report by Mr. Stefan Bjes, right?

A   Yes.

Q   You also reviewed a report by Dysart, right?

A   Correct.

Q   Besides that and the materials listed here, are there any other materials you reviewed for your work on this case?

MR. STARR:  Objection, asked and answered.

A   I think that's all.  There may have been some depositions provided to me.  I would have to go back and look, but I think that's all -- that's all I can recall at

Page 33

this point.

Q   Will you supplement attachment B your materials reviewed to reflect all the materials you reviewed in this case so far?

A   I can do that, yes.

Q   All right.  Were you asked to make any assumptions in this case?

A   No.

Q   And I know that this is in your report and we'll go over it in more detail later, but can you generally explain the methodology that you used in formulating your opinions in this case?

A   Sure.  Do you want me to do it without looking at my report though?

Q   Do you need to look at your report to --

A   Well, I mean, again, I'll -- you know, if we're just having a conversation, of course, I can give you the 10,000-foot perspective, but I would -- I would say though that my report is more definitive and more detailed.  But, you know, if you'd like to have a discussion without all of the details, I'm happy to do that as well.

Q   Why don't you give me the 10,000-foot explanation and then as we go through the report, we can talk about it in more detail.  Okay.

THOMAS TIDERINGTON, 03/18/2026                    Page 34..37

Page 34

A   That's fine.  Typically, I'll take the case material that's provided to me by either the plaintiff or defendant's attorneys.  I'll review the matter.  Quite frankly when I'm reviewing the materials, I kind of use the mindset that if I'm the police chief in this police department and I'm reviewing the conduct of my officers -- this is essentially the same thing that I've done throughout my career as a supervisor, command officer, as a police chief, I've reviewed investigative reports, case files, allegations of misconduct.

So I kind of put myself in the perspective of a police chief that's actually reviewing the information and the activities and investigative efforts of my own police officers.

And, you know, if this was my department -- this is the mindset I kind of use.  If this is my department, what are the questions I would be asking.  What is the assessment that I would be making in terms of this occurred within my own department, and then I render an opinion based on my knowledge and experience combined with perhaps additional reference material guiding -- guidance from what I call widely accepted practices and perhaps nationally known practices and training.

Q   You're being paid for your work on this case,

Page 35

right?

A   I am, yes.

Q   Who's paying you?

A   Well, for the depo today, I hope you are.  I've been retained by Loevy & Loevy and I submit my invoices to them.

Q   And do they pay those invoices?

A   They do.

Q   Let's take a look at your report again, the affirmative report.  Can you see my screen, sir?

A   Yes.

Q   All right.  And this says attachment C fee schedule summary.  Do you see that?

A   I do.

Q   And for the record, this is page 84 of the disclosure, correct?

A   Yes.

Q   All right.  On the following page 85, it lists your fee schedule for 2025, is that correct?

A   That's correct.

Q   Is this an accurate fee schedule for you for 2025?

A   For 2025 it is, yes.

Q   All right.  So in 2025, you charged $375 per hour for case review and expert report, is that right?

Page 36

A   That's correct.

Q   Does that mean that you charged $375 per hour per your review of the materials listed on attachment B?

A   Yes.

Q   Did you charge $375 per hour for drafting this affirmative report?

A   Yes.

Q   Did you also charge $375 per hour for drafting the rebuttal report?

A   Yes.

Q   And you also charged $375 per hour for reviewing materials that you reviewed to prepare your rebuttal report?

A   Yes.

Q   In 2025, you charged $2,400 per day for four hours of deposition testimony, is that right?

A   Per half day, yes.

Q   Okay, half day.  So if you -- if you testified in a deposition for a full day, would it be double that amount?

A   Yes.

Q   And it says in 2025 -- go ahead, sorry.

A   Or more if it extends beyond eight hours.

Q   Fair enough.  Do you have an hourly rate for deposition testimony?

A   Yes.  I think it's -- I'd have to look at the

Page 37

retainer, but I think it's $600 an hour or something along those lines.

Q   And in 2025, you charged 4,500 per day for trial testimony, is that right?

A   That's correct.

Q   Has your fee schedule changed at all in 2026?

A   Slightly, yes.

Q   How so?

A   The hourly rate is 425 per hour and that extrapolates across the deposition testimony and trial testimony with the same incremental increase I guess would be how I would explain it.

Q   How did you -- how did you come -- strike that.

How did you come up with that hourly rate for 2026?

A   Well, same way I came up with my fee schedule to begin with.  I understand that I've looked at documents that indicate that this is probably the average of what a police practices expert with similar experience and training and knowledge would have would charge.  I don't think it's at the high end.  I think it's somewhere -- at least my understanding it's somewhere in the middle of what experts typically would charge.

Q   Do you -- have you compared your rates

THOMAS TIDERINGTON, 03/18/2026                    Page 38..41

Page 38

specifically to rates that other police practices experts charge?

A   Yes.

Q   Okay.  Can you name any of the experts that you compared your rate to?

A   There's a -- I think it's called SEEK, S-E-E-K, and I think they publish that analysis and I do recall looking at that some time ago.

Q   How many hours have you spent -- strike that.

How many hours have you worked on this case to date?

A   I don't have the invoice in front of me.  I'm sure we can easily look at that on a break.  I can tell you.

Q   Okay.  So without looking at your invoices, you can't say how much -- or strike that.  You can't say -- strike that.

Without looking at your invoices, you can't say how many hours you've worked on this case to date?

A   I'm sorry.  I didn't look at -- in preparation, I didn't look at the invoice, but I'm sure it's somewhere between 45 and 55 hours would be my estimate.  Not counting -- not counting the prep time.

Q   Not counting the prep time for this deposition?

A   Correct.

Page 39

Q   How much time did you spend preparing for this deposition specifically?

A   I would say somewhere between 10 and 12 hours.

Q   So I understand you don't have the documentation in front of you, but is it your estimate that for your initial review of materials in preparation of your affirmative report you spent approximately 45 to 55 hours working on this case?

A   Probably spent more hours than that, but that was I think what I billed, yes.

Q   And you spent approximately 10 to 12 hours preparing specifically for this deposition?

A   Again, probably more than that, but that is what I billed.

Q   How much time did you spend reviewing materials -- strike that.

How much time did you spend preparing your rebuttal report?

A   Again, I don't have that invoice in front of me.  I'd have to look.  I don't recall.

Q   Can you provide an estimate?

A   I can provide the exact number, but I just would have to pull it up and tell you.

Q   Do you know how much you've been compensated for

Page 40

your work on this case to date?

A   I don't know the exact number.

Q   Do you know how much you have billed or invoiced for this case to date?

A   I don't.  I do have those records, but I don't know without looking at something obviously.

Q   I'm going to show you a document that we'll mark as Exhibit 3 to this deposition.  Can you see that, sir?

A   If you can make that a little bit larger.  Yes.

Q   Better?

A   Yeah.

Q   And for the record, this document is Bates stamped Tiderington 2598 to 2602.  Now, the first page of this document, what is this?

A   It's an invoice.

Q   Is this an invoice that you created?

A   Yes.

Q   And did you submit this invoice to the Loevy & Loevy Law Firm?

A   I would have, yes.

Q   And the date of this invoice is December 14th, 2025, correct?

A   Correct.

Q   And it looks like the amount you billed was

Page 41

$18,693.75, is that correct?

A   Correct.

Q   Have you been paid for this invoice yet?

A   I believe I have.

Q   Have you been paid the entire amount of this invoice yet?

A   I believe so.  I hope so.

Q   Did this -- so this invoice is dated -- strike that.

So this invoice is dated December 14th, 2025.  That's after you made your November 26, 2025, disclosure, correct?

A   It would be, yes.

Q   So does this invoice cover all the work that you did up to December 14th, 2025?

A   It would, yes.

Q   Does it cover the initial review of materials for the purposes of drafting your affirmative report?

A   Yes.

Q   Does it also cover the time that you spent actually drafting your affirmative report?

A   Yes.

Q   Do you know if it covers anything else that you did in this case?

THOMAS TIDERINGTON, 03/18/2026                                    Page 42..45

Page 42

A   No.

MR. STARR:  Objection, form.

Q   Did you have any conversations with Plaintiffs' attorneys prior to this date about this case?

A   Oh, yes.

Q   Did you bill for those?

A   That -- that would be included in -- in this invoice, yes.

Q   And what rate do you bill for conversations with attorneys?

A   I usually don't bill for conversations with the attorneys.  As I said, the time I bill for is certainly not all the time that I spent on the case, but I usually don't track or bill for conversations that I have.

Q   Are you able to parse out the time you spent doing specific tasks, and by that I mean, are you able to tell us how much time you spent reviewing materials versus how much time you spent drafting your affirmative report?

A   No.  I couldn't -- I couldn't tell you that.

Q   Do you keep track of that information for your own purposes?

A   I do not.

Q   So when you -- well, how do you keep track of your billing for the cases that you work on?

Page 43

A   I have a phone app and essentially it works kind of like a stopwatch, and I keep track of it that way.

Q   What's the name of that app?

A   I think it's just called Time App.  It's not the -- I know there's a more sophisticated one where you pay for the subscription, but mine's the -- mine's the free one, the basic one.

Q   And does that app just keep track of, like, time?  Like, is it just a timer or does it actually include information like the name of the case and things of that nature?

A   No, it's pretty basic.

Q   Do you write any -- write any of this down by hand?

A   I don't.

Q   So I took this number $18,693.75 and I divided it by your hourly rate of $375 and it came out to a little less than 50 hours spent working on the case up to December 14, 2025.  Does that sound correct to you?

A   I believe that's what the figure would calculate out as, yes.

Q   Okay.  And you can't say in all that 50 hours what amount of time you spent reviewing materials and what amount of time you spent drafting your affirmative report, is that

Page 44

correct?

A   That is correct.

Q   All right.  And you listed 157 separate items on your materials review list, right?

A   Yes.

Q   And some of those materials are quite lengthy, is that fair?

A   It is.

Q   Let's take a look at that again really quick.  Can you see my screen, sir?

A   Yes.

Q   All right.  So I believe you testified earlier that items 1 through 47 were items that are specific to the Garcia murder investigation and the civil case, is that correct?

A   Correct.

Q   All right.  And it looks like items 22 through 37 on this list of materials reviewed in attachment B to your disclosure are deposition transcripts, is that right?

A   Correct.

Q   Some of these deposition transcripts are hundreds of pages long, is that correct?

A   They are, yes.

Q   How closely did you read those deposition

Page 45

transcripts?

MR. STARR:  Objection to form and foundation, argumentative.

Go ahead.

A   I guess it would depend on which depo you're speaking of.

Q   Okay.  Did you read some depositions more closely than others?

A   I would have as a general practice, yes.

Q   Which depositions did you read more closely?

A   Well, I don't know if I can tell you that detail on this case.  Generally speaking, I mean if there's a deposition from the medical examiner and if it was 2,000 pages long, I probably could read that in 20 minutes because I'm not going to spend a lot of time on information that perhaps is not relevant to my opinions.

Comparing that to perhaps the Plaintiffs' depositions or -- well, Guevara's deposition, I was able to read that pretty quickly.  There wasn't a lot of substance in his deposition.  I believe he invoked the Fifth on just about every question.  So I don't know.  I think that was several hundred pages, but I think that was a pretty quick read.

So, again, it depends.  I -- I don't think I could tell you exactly how much time I spent on each of the

THOMAS TIDERINGTON, 03/18/2026                    Page 46..49

Page 46

depositions.

Q   Do you know the total number of pages of materials that you were provided in this case?

A   I would have no way of knowing that.

Q   Okay.  The materials listed here 1 through 47 on attachment B, do you know the total number of pages that those materials consist of?

A   I do not.

Q   Okay.  But it would be in the thousands, right?

MR. STARR:  Objection.  Form, foundation, speculation.

Go ahead.

A   I mean do you know -- I mean I know you're not here to answer my questions, but do you know the number?  I mean I -- if you know the number, I won't dispute it, but I -- would you say -- would I say it was in the thousands.  Probably, yes.

Q   All right.  And your affirmative report that's part of this it's 71 pages long, right?

A   Yes.

Q   Did you draft your affirmative report in this case from scratch?

A   I would have, yes.

Q   All right.

Page 47

A   Well, I guess I would have to understand what you mean by scratch.

Q   All right.  So what I mean by that is prior to being retained as a testifying expert in this case what was essentially -- what is now your affirmative report was it a blank page with no writing on it?

MR. STARR:  Objection to form.

A   Yes.  It started out as a blank page, of course.

Q   Okay.  So do you know when you were retained in this case?

A   I don't.

Q   All right.  So after being retained in this case, you know, did you start your 71-page affirmative expert report from the beginning without there being any words that were already there?

MR. STARR:  Objection to form and asked and answered.

A   If I understand your question, yes, the report started out as a blank page.  You know, probably started -- if you're looking at the first page, I probably started it with a header or a footnote header and probably typed in that information.

I may have cut and pasted United States District Court from someplace and then certainly there's

Page 48

different sections of my report that are very similar to other reports that I've rendered not only in this case but other cases.

So some of that material would be inserted into this blank page or this blank page, but it would again ultimately culminate in what we have here today.

MR. STARR:  Jeff, can we take that break, that one-hour break we discussed?

MR. GROSSICH:  How long is the break going to be?

MR. STARR:  I need 10 minutes to, like, make sure that they get in the house okay.

MR. GROSSICH:  Yeah, okay.  That's perfectly fine.  10 minutes.

MR. STARR:  Thanks.

THE VIDEOGRAPHER:  Going off the record at 11:01 a.m. central standard time.

(Whereupon a recess was taken.)

THE VIDEOGRAPHER:  This is the beginning of media unit 2.  We're going back on the record at 11:13 a.m. central standard time.

BY MR. GROSSICH:

Q   Mr. Tiderington, before the break, we were discussing your affirmative report in this case, right?

A   Correct.

Page 49

Q   And please correct me if I'm wrong, but it's your testimony that you drafted your affirmative report in this case from scratch when you -- after you were retained, is that correct?

A   Correct.

Q   Did you use any kind of template based on prior expert reports that you have written?

A   I guess I don't know if there would be a template, but, yes, certainly I would -- as I said, the format that I use is pretty consistent in most of my reports.

Actually, I think this report is somewhat different than how I do all or how I've done other reports.  But there's a typical format that I follow especially in terms of introduction and methodology.  That's pretty much the same in every case that I review.

Q   How was your report in this case different from other reports that you've written?

MR. STARR:  Objection to form, foundation.

Go ahead.

A   Again, just some of the formatting I think is somewhat different.  I mean each report I do is individual and all of them don't end up looking exactly alike.  So as we go through it, I'm sure there's differences in the format if you're comparing my reports that you would have seen.

THOMAS TIDERINGTON, 03/18/2026                    Page 50..53

Page 50

Q   Are there any portions of your affirmative report in this case that were cut and pasted from other expert reports that you've written?

A   There would have been, sure.

Q   Okay.  Do you know which sections have been -- of your affirmative report were cut and pasted from other reports?

A   I don't know.  I'm assuming maybe the introduction, methodology.  I don't know -- when you say cut and pasted, I don't know if they're verbatim.  Perhaps I cut the introduction section and may have added to it or changed it slightly.  I don't know if it would be exactly the same in every report.  Perhaps it is, but I don't think it would be.

Q   Do you know which other reports you cut and pasted from to create this affirmative report?

MR. STARR:  Objection.  Form, foundation.

A   Well, I'm not sure that's what I said.  I said there'd be sections of this report that would be similar if not identical to other reports that I've written, but I don't -- without looking at all of my other reports -- even in my premises liability cases the -- the format is very similar, and my knowledge and experience, you know, that's something that would not be different in any report that I

Page 51

do.

Q   Do you know how many pages in your affirmative report are unique to this case?

A   I would say all of them.

Q   But you just testified that some of the sections of your affirmative report in this case are similar or identical to sections of other reports you've written, is that correct?

MR. STARR:  Asked and answered.

A   They could be.

I'm sorry.  Sean, I should give you an opportunity.

I would have to compare them.  I would say that they're similar certainly in terms of formatting that I use, yes.  There's no question about it.

Q   Do you know how many pages in your affirmative report you wrote fresh just for this case?

MR. STARR:  Objection, asked and answered.

A   I'd like to think that all of them were fresh.  I started out with as you pointed out a blank piece of paper, whether I type it or -- or copied the word introduction and pasted the word introduction, I still -- versus typing the word introduction, I would still think that that's a unique report.

Page 52

Q   Did anyone help you in writing your affirmative report in this case?

A   No.

MR. STARR:  Objection to form.

Q   Did you draft this affirmative report by yourself?

A   Yes.

Q   So is it your testimony -- well, strike that.

Is it your testimony that you reviewed 157 separate items including at least 22 deposition transcripts and drafted a 71-page report all in approximately 50 hours worth of time?

MR. STARR:  Objection to form, foundation, asked and answered.

A   I don't think that's what I testified to.

Q   Can you clarify, please?

A   I think you were asking me about my billable hours and I think I mentioned and testified that my billable hours doesn't necessarily represent all of the time and effort that I spent on this case.

I would estimate probably maybe double the hours that I spent that are not reflected in my billable hours, and then there's another --

Q   Go ahead.

A   And then, of course, some of this information is

Page 53

what I consider to be cumulative knowledge of these cases that I reviewed and other cases.  So I already have a knowledge of that.

So I don't think I'm suggesting that I went through every single one of these items and reviewed it from a fresh perspective that I -- like I never reviewed it before.  That -- you know, that's not exactly what happened.

Q   All right.  So a few things there.  So is it your testimony -- again, please correct me if I'm wrong because I don't want to mischaracterize what you're saying, but is it your testimony that up until December 14th, 2025, you believe that you worked 100 -- approximately 100 hours on this case?

MR. STARR:  Objection to form, mischaracterizes his testimony.

Go ahead.

A   I probably did.  Again, I don't track all of my hours in every waking moment that I spend thinking about a case.  I don't -- and maybe some attorneys do that.  Perhaps that's why the fees of the City of Chicago are so high, but I don't bill for all of the hours that I spend on these cases because it's -- when I'm working on a case until I'm done with it, I don't think I ever stop thinking about it.

When I was a police officer, I had the same

Urlaub Bowen & Associates, Inc.   312-781-9586

THOMAS TIDERINGTON, 03/18/2026                    Page 54..57

Page 54

method and methodology that I somewhat become obsessed with the case and don't stop thinking about it, but I certainly cannot bill for every moment that I'm thinking about the case and how I'm going to write it and what I'm going to say. If I click on a depo and I want to read a portion of it, that's -- that's not what I do.

Q   Why don't you bill for all the time you spend working on a case?

A   Well, I think if I bill for every moment that I spent thinking and working on the case and every conversation that I had, probably wouldn't get retained on too many more cases. I probably -- yeah. So the bill would be pretty high if I did that.

Q   All right. You heard your attorney's objection earlier that I was mischaracterizing your testimony. Do you remember that?

A   No. He says that often. So I don't know.

Q   All right. Well, that's absolutely what I do not want to do. So I want to make sure that your testimony is accurate. So --

A   I'll certainly help -- I'll help you with that.

Q   I appreciate that. So, again, I don't want to mischaracterize, but I believe you testified earlier that your December 14, 2025, bill reflected approximately

Page 55

50 hours of work billed on this case, is that correct?

A   That's correct.

Q   And I also believe you testified just a few moments ago that you believe that, in fact, the actual amount of time you spent working on this case was probably double that. Is that a fair statement as well?

A   It could be. I don't have a definite -- I'm sorry, Sean.

MR. STARR: Sorry, yeah. I'm just trying to get a form, asked and answered.

Go ahead.

A   I don't have an exact number. Again, I know I've spent many, many more hours working on this case than what's reflected in the billing.

Q   All right. And you also just testified that some of these materials you have reviewed are considered for other cases, right?

A   Correct.

Q   All right. But -- and I can pull it up again, but, you know, the materials 1 through 47 on attachment B to your November 26, 2025, disclosure we've already agreed that those were materials that were unique to the Daniel Garcia investigation in this civil case, correct?

A   Yes. Those would be unique. I would -- I thought

Page 56

you were asking me materials as a whole. When you asked the question, you said there was a total of 157 I think is what your question to me was.

Q   That was my question then. I'm asking you a different question now. Okay, sir.

A   Okay.

Q   And my question now is, am I correct in saying that those 47 materials that are unique to this case that you reviewed those fresh for the first time for your work in this case, is that correct?

A   That's correct, yes.

Q   Have you submitted any other invoices besides the one we just looked at that was dated December 14th, 2025?

A   There may have been an invoice for the work I did on the rebuttal. I don't know if I -- if I submitted that or not. I'd have to go back and look.

Q   Can you please make sure that any future invoices that you submit or invoices that you've already submitted are produced to all counsel?

MR. STARR: I think that's counsel's responsibility. So if he has submitted invoices and we haven't produced them, we will produce them. I don't know that he has either, but I can check.

MR. GROSSICH: Appreciate that.

Page 57

BY MR. GROSSICH:

Q   I'm going to go back to the document that we have designated as Exhibit 3 to this deposition. Give me a moment while I pull that up.

All right. Mr. Tiderington, can you see what I have on the screen right now?

A   Actually, I minimized something. Now, I can't see -- I can hear you, but I can't see you. So let me see what I -- how I can get you back. I apologize. Like I say, I had a bunch of -- I'm trying to find you where I can pull it back up.

Q   Are we back yet?

A   I'm sorry?

Q   Have you found the window yet?

A   I have not.

Q   Do you mind if we take a brief break while Mr. Tiderington finds the correct window on his computer?

A   That's fine. It should only take me a second but I appreciate that. Thank you.

MR. GROSSICH: One moment then.

THE VIDEOGRAPHER: Going off the record at 11:25 a.m. central standard time.

(Whereupon a recess was taken.)

THE VIDEOGRAPHER: This is the continuation of

THOMAS TIDERINGTON, 03/18/2026                                    Page 58..61

Page 58

media unit 2. We're going back on the record at 11:25 a.m. central standard time.

BY MR. GROSSICH:

Q   Mr. Tiderington, can you see what's on the screen right now?

A   I can, yes.

Q   This is Exhibit 3 to this deposition. We've already talked about the first page of this Exhibit which is an invoice you submitted on December 14th, 2025, right?

A   Correct.

Q   All right. I'm going to scroll down to the second page of this Exhibit. Can you tell me what this is?

A   Material provided from my review.

Q   All right. And for the record, I'm looking at Bates stamped document Tiderington 2599 and it goes all the way to 2602, is that correct, sir?

A   It appears to, yes.

Q   All right. Now, there are it looks like 130 items listed on this, is that correct?

MR. STARR:  Asked and answered.

Go ahead.

Q   This is a different document than the other one we looked at.

A   Yes.

Page 59

Q   So what is this document -- well, strike that.

How does this document differ from the attachment B materials reviewed that was included in your November 26, 2025, disclosure?

A   Well, that would have been materials that were provided to me by Plaintiffs' counsel. The other 131 through 157 would have been reference materials that I may have here in my library or material that wasn't necessarily provided to me but reference material that I used for these types of police reports.

Q   What was your reason for creating this document that we're looking at right now?

A   It's the same document I have listed. It's a list of materials that I reviewed.

Q   What was your reason for attaching it to this invoice?

A   That's my typical practice.

Q   So is it fair to say that by attaching this document to your invoice you're indicating that the time you had spent that you were billing for was for review of these materials?

A   Well, certainly part of that would have been, certainly.

Q   Is the list of materials reviewed that is

Page 60

attachment B to your affirmative report, is that a more complete list than the one we're looking at now?

MR. STARR:  Objection, form.

A   I don't think I understand your question. I mean it's -- it's a different list. Is it more complete. No. In terms of materials provided, that's a complete list.

If you're asking were there additional materials that I used as reference material in my report, then I would say the category general reference and background materials should be listed which it is in my original report.

Q   I think I understand the distinction now. You're saying that these documents listed on Exhibit 3 are materials that were provided to you for your work on this case, is that correct?

A   Correct.

Q   And that attachment B to your disclosure in November 26 of 2025, that list includes other materials that you yourself have and that were not provided to you, is that right?

A   That's correct, yes.

Q   All right. Are there any materials that you reviewed in formulating your opinions in this case that are not listed on attachment B?

A   I thought -- I think we discussed that already,

Page 61

but I think there was some additional materials that were provided since I wrote my report, if you recall that testimony earlier.

Q   Understood. But at the time that you made your November 26, 2025, disclosure, there were no other materials that you reviewed, is that correct?

A   Not that I can recall.

Q   Okay. Do you do anything else for a living besides being an expert witness?

A   For a living. You mean work-wise or --

Q   Right.

A   I golf. I fish. I hunt, but for other employment, I would say I'm a case consultant. I do police training. I haven't done necessarily any police training in the last couple of years, but at the moment beyond being retired, this is -- I'm a case consultant and expert witness.

Q   Do you have any other sources of income currently besides being an expert witness?

A   Yes.

Q   In the calendar year of 2025, do you know what percentage of your income came from being an expert witness?

A   No.

Q   Do you know how much money you made in 2025 from

Page 62

being an expert witness?

A    I don't know the exact figure. I don't have that off the top of my head. I'm sure I have those -- my tax records, but I don't recall what it is.

Q    Are you able to provide an estimate?

A    I'd rather give you an exact number than an estimate. Plus, there's other factors that would weigh into it. Are you talking about the net proceeds? Are you talking about the gross that I've received? Are you talking about my taxable income?

You're asking me to compare that as -- compare that to my other income? I guess I'm trying to better understand the question.

Q    That was my -- that was one of my earlier questions, but right now I'm just asking for a dollar amount of money that you received, let's say amount that you received in total for being an expert witness in 2025.

A    I don't have that exact number.

Q    Do you have documentation that would reflect that?

A    I'm sure I do.

Q    Okay. But sitting here today, you can't provide an estimate?

A    I can probably provide an estimate. I would say somewhere between 250 and maybe 275,000. And, again, that's

Page 63

a guess. I don't know for certain.

Q    I know you've testified to this before and I don't want to belabor it too much, but can you just generally explain your education, training and experience in the field of police practices?

A    We can go through my CV. If you're asking me to summarize, law enforcement officer for 44 years. Retired with -- as a chief of police for over 20 years.

Q    Do you have any degrees?

A    I have a bachelor's degree, criminal justice.

Q    Let's take a look again at your November 26, 2025, disclosure Exhibit 1. Can you see my screen, sir?

A    I can, yes.

Q    All right. Looking at page 86 of this disclosure and it says attachment D, CV, right?

A    Yes.

Q    That's your curriculum vitae?

A    It is.

Q    And is this CV accurate as of today's date?

A    I believe it is, yes.

Q    Is there anything -- go ahead.

A    I may have -- I may have updated it since this was submitted but nothing significant. There might have been, like, a format change, but nothing significant in terms of

Page 64

changes.

Q    All right. If you've updated that CV since this one, can you please provide that?

A    Sure.

Q    All right. I'm going to look at page 91 here of this disclosure. All right. And you see here where it says chief of police Plymouth Township Police Department, 2001 to 2022?

A    I do see that.

Q    What was the population of Plymouth -- strike that.

What was the population of Plymouth Township when you worked there?

A    Somewhere between -- well, obviously, it may fluctuate from over 20 years, but somewhere between I think 28,000 and 32,000 or 31,000.

Q    Approximately, how many sworn police officers were in the Plymouth Township Police Department when you were the chief of police?

A    Anywhere from 30 to 35 officers, I think.

Q    When you were the chief of police in Plymouth Township, was there any gang activity in Plymouth Township at that time?

A    There was gang activity, yes. Primarily gang

Page 65

activity that committed crimes there would be I guess a way to describe it. I don't know that we had a significant gang problem. I know we had criminal activity that was perhaps gang related.

Q    Did the Plymouth Township Police Department have any specific, like, gang crimes investigators when you were the chief of police?

A    No. We had one of our officers that was assigned to a gang task force. Not sure exactly what years -- years it would have been, but it was a county wide task force that was investigating criminal activities, gang related criminal activities.

Q    Do you know which gangs were active in Plymouth Township when you were the chief of police?

A    No.

Q    Do you know how many gang related crimes the Plymouth Township Police Department investigated while you were the chief of police?

A    Quite a few. I don't -- I can't give you an exact number.

Q    Do you know -- like, what does quite a few mean? Are we talking tens, hundreds, thousands?

A    No. I don't think thousands. Probably -- and I guess -- you know, I guess I would need additional

THOMAS TIDERINGTON, 03/18/2026                    Page 66..69

Page 66

clarification in terms of what you consider to be gang activity.

As an example, I know we had -- our officers identified that there was a gang of auto theft criminals that were operating in the City of Detroit would come into -- into the suburbs and steal cars. I'm counting that as gang activity.

If you're asking me, you know, are the cribs -- are the Latin Kings, I don't -- that's not -- that's not the answer to the question that you're asking. I'm taking it -- understanding it in a different way.

Q Do you know if the Latin Kings were active in Plymouth Township when you were the chief of police?

A Not to my knowledge.

Q Did you have any gang related murders occur in Plymouth Township when you were the chief of police?

A Not that I know of.

Q Did you investigate any gang related -- strike that.

Did you investigate any murders as chief of police in Plymouth Township?

A I did, yes.

Q Do you know how many?

A I think while I was the chief, I think there was

Page 67

either two or three homicides.

Q So during your time as chief of police in Plymouth Township, there were approximately two to three homicides during that time period?

A That's my -- best of my recollection, yes.

Q How many times have you been hired as an expert witness by Loevy & Loevy?

A I don't have the exact number. Maybe 15 times, maybe more.

Q Have you ever been hired as an expert witness by Mr. Flaxman's firm?

A No.

Q In the cases where you have been retained as a testifying expert, approximately what percentage of those cases were civil?

A The vast majority were civil -- civil cases.

Q Do you know --

A I think there's only been a couple -- I'm sorry, not to interrupt, but anticipating your question, I think there's only been a couple criminal cases that I've been retained on.

Q Do you know what percentage of those civil cases you've been retained by the plaintiff?

A I don't.

Page 68

Q Have you ever been retained by defendants in a civil case?

A Yes.

Q Do you know how many times that's happened?

A Several.

Q Have you ever rendered an expert opinion on behalf of law enforcement in a civil case?

A Yes.

Q How many times has that happened?

A Don't have the exact number but several times.

Q Do you know what the most recent time was?

A Within the last year, of course.

Q Do you know the name of that case?

A I don't.

Q Do you know where that case was pending?

A I think it's pending in Arizona. Actually, there's two or three cases pending in Arizona, the southwest border states.

Q Do you know the name of the law firm that retained you in that case?

A The Department of Justice.

Q You testified earlier about citing police reports. Do you remember that?

A I do.

Page 69

Q All right. And correct me if I'm wrong, please, but I believe you testified that in your review of the materials in this case you saw police officers signing police reports on behalf of other officers, is that correct?

A It is correct.

Q And I believe it was your prior testimony in this deposition that you believe that to be improper, is that correct?

A I do believe it's improper, yes.

Q Okay. And are you basing that on any kind of written rule or guideline put out by any kind of police body? I guess that's the question.

A I'm trying to understand the question. So have I been able -- can I point to a reference document that says that officers should not forge the name of another officer's name on a report? Is that what you're asking me?

Q What I'm asking you is are you -- can you point to somewhere what's written down that a police officer cannot sign the name of a fellow officer on a police report?

A Beyond being obviously wrong when you sign another person's name to an official police document, I think from the police academy days that I went to the Detroit police academy in 1978, I think that was taught and learned.

I talked about earlier that there's -- and I

Page 70

can probably find this documentation. The proper way to sign somebody's name to a report as I described to you earlier is that the person that signed the report signs his name and then he writes the word for and then he prints the name of the person that he's signing the report for.

Q   Is that written down anywhere?

A   It -- actually, it is.  I just saw it recently.

Q   Where?

A   I'd -- I'd have to -- I'd have to pull it up and -- not sure exactly where, what reference document I have it in, but I -- actually, I just recently looked at it.

Q   Do you know what case that was for?

A   It was -- I had a depo last -- or had a depo last week, and upon that depo, I pulled up some of my reference material and I looked at that section.

Q   Let's take a look at your affirmative report.

A   And also just to add to that, even in this case I don't recall exactly what depo, but there was an officer that testified that -- that it would be improper for him to sign somebody else's name to a -- to a report.

I'd have to -- again, I'm not sure exactly whose depo it was, but I believe it was on this case.  It may have been on the other case as well.

Q   All right.  So you're saying you saw the

Page 71

deposition testimony of someone either in this case or another case that said it was improper for a police officer to sign another police officer's name to a report?

A   Yes.

Q   Do you know the name of that person?

A   I don't.

Q   All right.  I'm going to show you Exhibit 1.  This is your November 26, 2025, disclosure.  Okay.

A   Yes.

Q   In the first 71 pages of this are your affirmative report, right?

A   Correct.

Q   And this is -- this is page 1.  So you have an introductory section here, is that right?

A   Yes.

Q   All right.  And it says, I've been retained by attorneys representing John Martinez, Jose Tinajero, and Thomas Kelly to provide my professional opinions concerning the investigation, arrest and prosecution that arose from the October 12th, 1998, beating death of Daniel Garcia in Chicago, Illinois.  Did I read that correctly?

A   Correct.

Q   Is that the reason why you were retained in this case?

Page 72

A   Yes.

Q   All right.  Then it says below that, I was asked to assess two primary issues.  Do you see that?

A   I do.

Q   All right.  And issue number 1 is whether there were deviations from generally accepted police practices in the investigation into the October 12th, 1998, assault and subsequent death of Daniel Garcia, conducted by Chicago Police Detectives Reynaldo Guevara, and other CPD officers, right?

A   Correct.

Q   And issue number 2 is whether the Chicago Police Department's policies and practices at the time relating to homicide investigations, including eyewitness identification procedures, lineup documentation, recordkeeping, and the creation, preservation and disclosure of investigative materials, were adequate and consistent with the accepted police practices nationally, is that right?

A   Correct.

Q   Were you asked to do anything else in this case?

A   No.

Q   And I guess just to anticipate something, you were subsequently asked to review and analyze the expert report of Stefan Bjes, right?

Page 73

A   I was, yes.

Q   And you did issue a rebuttal report, right?

A   Correct.

Q   Okay.  So aside from that, anything else you were asked to do in this case?

A   Not that I can recall, no.

Q   Okay.  And then below that you say, I have reached conclusions on both issues, right?

A   Yes.

Q   And it says -- sorry for that.  All right.  And then below on the following page -- before we get to that, you say -- on the -- on the bottom of page 1 you say, In reaching my conclusions, I also considered that when Detective Guevara was later questioned under oath about his conduct, he repeatedly invoked his Fifth Amendment rights and refused to deny that he coerced witnesses and fabricated evidence in this case, a pattern of misconduct consistent with my findings and that of other police practices experts in numerous other cases linked to him.  Do you see that?

A   I do see that, yes.

Q   How did Detective Guevara taking the Fifth in this case, how did that affect your analysis and opinions here?

A   Well, I can only assess the testimony of what witnesses say.  Obviously, as a police practices expert, I

THOMAS TIDERINGTON, 03/18/2026                    Page 74..77

Page 74

have to consider evidence, and part of the evidence that I consider is the testimony of those that are involved in the case.

If there's allegations made, I would expect -- that if they were not true, I would expect that an officer would testify that he did not commit misconduct or he did not coerce or he did not physically assault or he did not do any of these things.

So I considered it. It wasn't part in parcel to all of my opinions, but it certainly impacted and influenced perhaps some of my opinions.

Q    How did it influence your opinions?

A    Well, it influenced it because I was not able to understand whether or not Guevara actually did this or didn't do it. I had nothing to assess whether or not the allegations were true based on whether or not -- and a lot of the allegations are made with -- the only person that would have been able to refute the allegations would have been Guevara because at times he was the only one in the lockup facility with the suspects or Plaintiffs at the time.

Q    Were you asked to make a determination as to whether Detective Guevara engaged in the misconduct that he's alleged to have engaged in?

A    No.

Page 75

MR. STARR: Objection. Form, asked and answered.

Q    And you understand that that is the province of the trier of fact, right?

A    It would be, yes.

Q    Because Guevara invoked the Fifth Amendment, are you making any assumption as to whether or not he engaged in the misconduct that's alleged?

A    I'm not making a determination. I think I -- in my report, I -- I've been a law enforcement officer for 44 years and I've never come across a situation where an officer, a sworn officer has invoked his right on cases such as these or any case whatsoever actually.

Q    All right. So the fact that Guevara invoked his Fifth Amendment here makes you believe that he did engage in the misconduct that he's accused of?

MR. STARR: Objection. Asked and answered, mischaracterizes his testimony.

Go ahead.

A    I -- I don't know if he did or not. All I point out is the fact that he never responded which is again unusual for -- from my perspective for a police officer to not explain what that officer did in a criminal investigation.

Q    And then you say here that this is a pattern of

Page 76

misconduct consistent with my findings and that of other police practices experts in numerous other cases linked to him. Do you see that?

A    I do.

Q    All right. So when you say a pattern of misconduct consistent with your findings, does that mean that you're making a finding that he engaged in misconduct?

A    No. I'm suggesting that there's allegations that are consistent in a pattern of misconduct where there's allegations across many cases, and experts -- other experts other than myself have also concluded that if the allegations that are made against Guevara are accurate and truthful, then, of course, that would be a pattern of misconduct.

Q    And do you have any personal knowledge of any of the facts or allegations in those cases in which other experts rendered opinions but not you?

A    I'm sorry. I don't know if I understand that question.

Q    Sure. You say that a pattern of misconduct consistent with my findings and that of other police practices experts in numerous other cases linked to him. Do you see that?

A    Yes.

Page 77

Q    So the findings of other police practices experts in numerous other cases, do you have any personal knowledge about those numerous other cases?

A    No personal knowledge, no.

Q    Okay. So are you just, like, accepting what those other experts said at face value?

MR. STARR: Objection, form.

A    I would have reviewed the report, accepted at face value perhaps.

Q    Go ahead.

A    I didn't do any independent investigation on my own.

Q    So the fact that other experts in other cases rendered opinions about Detective Guevara does that lead you to conclude that he committed the misconduct that's alleged here?

MR. STARR: Objection, form.

A    Well, again, which misconduct are you speaking of? But I guess the answer to your question would be no. That would have no impact on my ultimate opinions in this case other than to note that the allegations are similar in other cases made by other individuals that had no connections to this case.

Q    All right. Well, the misconduct I'm referring to

Page 78

is you say here pattern of misconduct, right?

A   Correct.

Q   So when you wrote the words pattern of misconduct, what were you referring to?

A   Well, as detailed throughout my report.  I can -- again, if we can dig into the report or I can give you the 10,000-foot view again.

Q   Why don't you give me your view without looking at the rest of the report, please.

A   In many of the cases including this one, there's very limited documentation about what Guevara actually did in terms of his investigative efforts.  Clearly -- clearly, there's policy violations in terms of documentation because quite frankly there's little or no documentation by Guevara.

I think in this case I think he wrote one report, maybe two reports, and I think it totaled, I don't know, maybe three sentences.  There's no other GPRs.  There's no other notes.  There's no other explanation as to what his actions were as an investigator.  Certainly that's -- that's improper.  The methods that he used to create photo arrays, improper.

Again, as we go through my report, I can detail additional specifics, but certainly those -- those are the highlights of the misconduct.

Page 79

Q   All right.  Below that you say, To summarize my opinions, this is a case in which the Plaintiffs were criminally charged and wrongfully convicted based almost entirely on two deeply flawed forms of evidence.  Do you see that?

A   I do see that.

Q   All right.  So you say here that the Plaintiffs were wrongfully convicted, right?

A   That's my understanding is that they were exonerated.  They were initially convicted and then they were exonerated.

Q   So are you offering the opinion in this case that the convictions of the Plaintiffs was a wrongful conviction -- wrongful convictions?

MR. STARR:  Objection, asked and answered.

A   I don't know if that's a legal term or not.  When a conviction is overturned, I guess I interpret that to be a wrongful conviction.  Whether -- whether it's the right terminology or not I guess from a police practices, that's how I described it.

Q   Okay.  So is it fair to say that because the Plaintiffs' criminal convictions were overturned you're concluding that they were wrongfully convicted?

MR. STARR:  Objection.  Asked and answered, form.

Page 80

A   Well, there had to be a reason why their convictions were overturned.  I don't know that I spent a lot of time deciphering exactly why their convictions were overturned.  I assume it was perhaps because of inadequacy in the investigation.

Q   Do you know the reasons why their convictions were vacated?

A   I don't.

Q   Do you know the process by which that happened?

A   I don't know that in any detail, no.

Q   Have you reviewed any documents from those state court proceedings that led to those convictions being overturned?

A   I believe I did, yes.

Q   Which documents were those?

A   I would have to look at the list.  I don't remember specifically, but I -- I don't know exactly which ones.  Certificate of Innocence perhaps, documents -- again, I typically don't spend a lot -- a great deal of time or effort in looking at that because it really has nothing -- it's really not relevant to my opinions in terms of the police investigation and whether or not there were deviations from acceptable police practices.

Q   But you already testified that you're not offering

Page 81

any opinions as to the Plaintiffs' guilt or innocence, is that right?

MR. STARR:  Asked and answered.

A   That's correct.

Q   All right.  So you say here, To summarize my opinions, this is a case in which the Plaintiffs were criminally charged and wrongfully convicted based almost entirely on two deeply flawed forms of evidence.  Then you list two things, right?

A   Yes.

Q   Okay.  The first is an identification -- an eyewitness identification obtained under coercive and unreliable circumstances, right?

A   That's correct.

Q   The second is purported confessions obtained after prolonged coercive interrogation, is that right?

A   Yes.

Q   All right.  Any other flawed forms of evidence that you saw in your review of the materials in this case?

A   As detailed in the rest of my report I'm sure we're going to go through.

Q   Okay.  Can you identify those?

A   You know, I could, but I'd rather be specific and not leave anything out.  So I'd rather go through the report

THOMAS TIDERINGTON, 03/18/2026                        Page 82..85

Page 82

in detail with you versus trying to remember what I wrote in a very lengthy report.

MR. GROSSICH: All right. Let's take a brief break. Okay.

THE WITNESS: Perfect.

THE VIDEOGRAPHER: All right. Going off the record at 11:59 a.m. central standard time.

(Whereupon a recess was taken.)

THE VIDEOGRAPHER: This is the beginning of media unit 3. We're going back on the record at 12:08 p.m. central standard time.

THE WITNESS: I'm sorry. Jeff, before we start, can we plan around, like -- I guess it would be 2:00 o'clock my time for maybe half hour, 40 -- half hour lunch break?

MR. GROSSICH: Sure. Just remind me, okay.

THE WITNESS: I mean I'm assuming -- okay, that's fine.

BY MR. GROSSICH:

Q   Okay. Earlier in this deposition, I believe you testified that one police officer signing another police officer's name on a police report was forgery. Do you remember that?

A   Yes.

Q   Do you still consider it forgery if an officer has

Page 83

permission to sign another officer's name from that officer?

A   Well, are you asking from a criminal standpoint or from a legal standpoint? I don't know if I can answer that. If somebody -- I'm just trying to think of a scenario where one officer can say go ahead and forge my name. I'm using the word forge or sign my name to a document. It's a legal document.

I just can't think -- I just can't rationalize how this would be proper. Even if an officer says go ahead and sign my name, it's still improper. The signature means that the officer reviewed the report and is attesting to the accuracy of a government document. To sign a report with another officer's signature, it's improper.

Q   Well, you use the term forgery. So when you use that, what did you mean by it?

A   Well, again, depending on the motive. I think if an officer signs another officer's name knowing that the information contained in the report is not accurate, that it is factually incorrect, if it's a lie, and he signs the other officer's name, I think it perhaps -- again, I'm not a lawyer, but perhaps there could be some legal consequences of doing so depending on the motive.

Q   What if the information in the report is accurate? Would you still consider that a forgery using your term?

Page 84

A   Well, I would still consider the fact -- if I signed your name to a birthday card, it's -- you know, I forged your name on a birthday card. But, you know, was there any criminal intent. Probably not, but I would certainly still -- there's no question in my mind it's still improper.

You can't sign somebody else's signature to an official document because you're representing that that person signed the report and is swearing to the accuracy of the report.

So to sign somebody else's name to it is -- I can't -- I can't rationalize how it could be proper, and in all these cases, I've never seen an opposing expert that said it was proper.

Q   Well, I've signed my wife's name to thank you cards and Christmas cards many, many times. Does that mean that I forged her signature by doing that?

MR. STARR: Objection to form and foundation, relevance.

Go ahead.

Q   By the way, it's an example he gave, Sean. So but --

A   I know. Maybe it was a poor example of mine. And I didn't use Christmas card. I used birthday card, but it's

Page 85

a similar example.

But we're not talking about a birthday card or a Christmas card here. What we're talking about is an official police document involving a homicide investigation. I know I gave that example, but when you look back at what we're talking about, we're not talking about something, you know, such as one spouse signing the name of another spouse. That comparison is not even close.

Q   All right. You understand that forgery has a specific legal definition, right?

A   I don't know if I understand it. You know, I think I have a working understanding of it, but the elements of the crime I don't necessarily know.

Q   Okay. When you say forgery, are you using that term according to its legal definition?

A   No.

Q   Are you just using that term colloquially?

A   I'm using that term to mean that one person signed the name of another person's, used that signature as part of a requirement of submitting an official government report.

Q   Even if that police officer had permission to sign another officer's name?

MR. STARR: Form.

A   Yes.

Page 86

Q   All right.

A   And quite frankly, I've never seen -- if that officer -- this is -- in that situation -- well, first of all, we're getting way off on a tangent because I don't know how that would be possible.

But if there would have been some reason for an officer to give somebody permission, I would have expected that that officer would have done a supplemental report saying I reviewed this report. I find it to be factual and I gave officer -- Detective Halverson permission to sign my name to that report. Still improper. It makes no sense whatsoever to sign one person's name.

If you look at it, how can we even rationalize that it is justified in doing so. That's an official police document, a government document. The fact that somebody signs it with their own signature as a requirement of submitting this report indicates that they're attesting to the accuracy of the report and that second signature in my -- from my perspective holds that same implied value and importance.

Q   Let's go back to your report.

A   Thank you.

Q   I'll put it back on the screen. Can you see that, sir?

A   Yes.

Page 87

Q   All right. So you list here two items of what you call deeply flawed forms of evidence, right?

A   Correct.

Q   All right. And the first one is, and I'm going to read it, it says, An eyewitness identification obtained under coercive and unreliable circumstances. The sole eyewitness, Melloney Parker, viewed the incident from her third-floor window at night, across the street, and later admitted that she could not clearly see the offenders.

She stated that Detective Guevara pressured her into identifying Mr. Martinez by threatening to arrest her on an outstanding warrant and by falsely claiming police had found incriminating physical evidence, bloody boots, connecting one or more of the Plaintiffs to the crime. Evidence that never existed. Did I read that correctly?

A   Yes, you did.

Q   Okay. This first sentence here where you say that Parker later admitted that she could not clearly see the offenders, where is that from?

A   That's my understanding of her testimony.

Q   Okay. Do you know which -- like, where she testified to that or when?

A   Well, that's a good point. There's several different versions of her testimony. I -- I don't recall

Page 88

specifically when she said that.

Q   Okay. So can you point to anywhere in the record where she said that she could not see the offenders clearly?

A   I would have to go look back through the materials that were provided, and if -- I mean, again, without looking at the investigative report, there was no indication that she provided a description of the suspects early on in the investigation.

I would have expected that if she had a clear view that she would have been able to describe specifically in detail what they -- what they look like. I don't recall seeing that. I'd have to go back and look at the investigative reports or through my report a little bit further to provide those details.

Q   Let's take a look at a document that we'll mark as Exhibit 4 to this deposition. Can you see this document, sir?

A   Yes.

Q   I'll represent to you that this is a transcript of the deposition testimony of Melloney Parker in this case. Okay.

A   Yes.

Q   All right. I'm going to go to a specific page of this document. All right. So I'm looking now at page 192

Page 89

starting at line 13 -- I'm sorry, starting at line 10 of this page.

I'm just going to read it to you. So please bear with me. Question: All right. And was that -- and when you gave this statement, did you tell the truth?

Answer: Yes, I did.

Question: All right. Then it says, Melloney Parker lives on the third floor and her living room window faces directly out onto Whipple and gets a clear view of the mouth of the alley that makes a T with Whipple and the parking lot that is at the mouth of the alley. Is that true?

Answer: Yes.

Do you see that?

A   I do.

Q   All right. So Ms. -- Ms. Parker testified at her deposition that she had a clear view of the mouth of the alley from her apartment window, is that correct?

A   I can see what you read. I -- I think there was other testimony as well, but that's what it says right there. That's correct.

Q   Can you point me to any specific testimony that contradicts what I've just read?

A   I would have to go back. As you know, there's what. 277 pages of it. I would turn to my report, also,

THOMAS TIDERINGTON, 03/18/2026                    Page 90..93

Page 90

and probably provide some additional details as far as that goes.

Q   Go ahead.

A   Page -- page 19 of my report based on my review of the materials.

Q   Let's take a look at page 19 of your report. Okay.

A   Sure.

(Whereupon, Inaara Tajuddin entered deposition suite.)

Q   All right.  Sir, I'm showing you page 19 of your affirmative report.  Can you see that?

A   I do.

Q   Can you point me to the spot that you say contradicts the testimony of Ms. Parker that I just read?

A   It's my understanding she lived on the third floor of a multi-unit apartment building located across from the alley.  She had limited and partially obstructed view of the alley below as her line of sight was partially blocked by a large tree and low lighting conditions.

Parker reported that she was awakened at 1:55 by noises.  She observed several men around another man. Heard one yell, where's my money, and then saw what appeared to be group assault in progress.

She watched for a brief period she estimated to

Page 91

be a few seconds before the group dispersed.

Q   When you write, from her window she had a limited and partially obstructed view of the alley below as her line of sight was partially blocked by a large tree and low lighting conditions, where are you getting that from?

A   I don't know exactly what material I referenced when I wrote this report, but I do -- I did note that Dr. Dysart's report that I reviewed just recently confirmed that as well.

Q   Okay.  And Dr. Dysart is not an eyewitness to this case, is that correct?

A   No.

MR. STARR:  Objection --

COURT REPORTER:  I'm sorry.

MR. STARR:  Objection to form.  Go ahead.

THE WITNESS:  My apologies to the court reporter. I will pause.

My understanding is that she did a comprehensive review of the materials and concluded that which is consistent with what my opinions are based on the material that I reviewed as well.

BY MR. GROSSICH:

Q   All right.  Two things.  First of all, respectfully, I'm not asking you to vouch for Dr. Dysart's

Page 92

review of the materials and opinions.  I'm asking you for what you -- about what you wrote in your report, is that fair?

A   That's correct.

Q   So are you saying that you're -- you're offering the opinion that Ms. Parker could not clearly see what was going on in the alley across the street from her apartment?

MR. STARR:  Objection, form.

A   That's my understanding.

Q   Is that your expert opinion?

MR. STARR:  Objection.  Form, foundation.

A   No.  That's information that I gleaned from the investigative files and the materials that were provided to me.

Q   Where in the materials that were provided to you does it say that Ms. Parker had a limited and partially obstructed view of the alley?

MR. STARR:  Objection.  Form, asked and answered.

A   I would have -- again, I'd have to go back and look at the material and all of -- all of the statements that she made to investigators and all of her testimony.

Q   Can you point to any piece of testimony by Ms. Parker that said she had a limited and partially obstructed view of the alley?

Page 93

MR. STARR:  Objection.  Form, asked and answered.

A   I, again, would have to go back and look at that which I certainly can do.

Q   All right.  And can you point to any piece of testimony from Ms. Parker where she says that her line of sight was partially blocked by a large tree?

MR. STARR:  Objection.  Form, asked and answered.

A   Again, I'd have to go back and look at the material.  As you pointed out earlier, there's thousands and thousands of pages of documents.  I'd have to go back and look.

Q   All right.  But sitting here right now in your deposition in this case that you -- well, strike that.

So you -- sitting here right now in this deposition that you prepared for in this case, you can't tell me where you got that information, is that correct?

MR. STARR:  Objection, asked and answered.

A   I can't tell you specifically where it is in the documentation.  I know that it's within the materials provided to me.  I don't know exactly where it is.

Q   And I believe you testified earlier that you spent approximately 10 to 12 hours preparing for this deposition, right?

A   Billable hours.  Probably more hours than that.

THOMAS TIDERINGTON, 03/18/2026                    Page 94..97

Page 94

Q   How many hours would you estimate you spent in total?

A   Well, I think this depo was scheduled earlier, maybe a month earlier, and I think I spent some time at that point prepping for the depo that was canceled.  So somewhere between, I don't know, 12 and 15 hours I would guess.

Q   And during that 12 to 15 hours, did you review the testimony of Ms. Parker?

A   Which testimony?

Q   Any of it?

A   Yes.

Q   Which -- which testimony did you review?

A   Her deposition.  I'd have to go back to the list. If you pull that list back up, I could tell you what else I reviewed.

Q   No.  I'd rather just have you tell me from memory what you reviewed.

A   Well, I'd rather look at the documents and tell you exactly versus what I remember.

Q   Can you tell me from memory --

A   I don't know -- I don't know if that's appropriate or if this is just going to be a memory test to see what I can remember or if we can look at the document and see if that is helpful to refresh my memory.

Page 95

Q   Well, can you tell me from memory what testimony of Ms. Parker you reviewed specifically to prepare for this deposition?

MR. STARR:  Asked and answered, form.

A   Not accurately.  If you want me to be accurate -- and I'm assuming you do unless you tell me differently.  If you want me just to answer questions based on guesses, is that what you would like me to do today or would you like me to be factual and accurate in my responses?

Q   I'd like you to answer my questions to the best of your knowledge and memory.

A   So -- so just my memory then?

Q   That's the question I'm asking you right now, sir.

A   Well, my memory -- I would have to refresh my memory in order to answer the question.

Q   All right.  You wrote in this report that Melloney Parker was the sole witness to this crime, is that right?

A   Well, again, there's a lot of investigative mysteries in the criminal file.  It depends on what point in time.  There were other individuals that came forward and claimed to be witnesses at various times.  That information that was provided not initially to the police but perhaps afterwards.

Q   And you said that, you know, you -- you became

Page 96

obsessed with this case, right?

A   To some degree, perhaps.

Q   All right.  What is to some degree of obsession mean?

A   Well, I don't know that I was foregoing all other life -- involvement in life activities, but I spent a good deal of time trying to understand the case.

And, quite frankly, you bring up a really good point.  Normally, in an appropriate investigative -- investigation, a person, an officer, a chief of police could look through the investigative file and pretty easily go through all the facts sequentially from the beginning to the end and try -- and be able to figure out exactly what happened, how individuals were eliminated or charged, what statements were provided, what evidence the officers had.  And it's typically a pretty easy read, and it's something that you can do pretty -- pretty easily and perhaps pretty efficiently.

In this case, like many of the Chicago PD cases that I looked at, there are no straight lines.  Everything I read there's an investigative mystery to it, and it does take a lot of time and effort to try to rationalize, you know, why didn't Guevara do a police report.  Why didn't this person -- if he interviewed somebody, why didn't he do a supplemental report.  Why weren't everybody -- why wasn't everybody that

Page 97

was involved in the case charged.

So, again, yeah, these are things I'm still thinking about that can't be answered and that's precisely what the problem is here.  And the questions you're asking are precisely the deficiencies that I've noted.

Q   So -- but you did testify earlier today that you became obsessed with this case.  You're thinking about it frequently and that you believe that you spent approximately 100 hours working on this case, right?

A   That would be a guess, yes.

Q   Okay.  But that was your testimony, right?

A   Correct.

MR. STARR:  Asked and answered.

Q   And --

A   My testimony is not any different now than when you asked me that 10 minutes ago.

Q   And you would agree with me that Melloney Parker she's a pretty important witness in this case, right?

A   She's a witness in the case, yes.

Q   All right.  Well, she testified at trial, right?

A   That's my understanding.

Q   And she identified the Plaintiffs as the offenders in this crime, right?

A   That's my understanding.

THOMAS TIDERINGTON, 03/18/2026                    Page 98..101

Page 98

Q   And she testified that she witnessed this crime, right?

A   At trial I believe that was her testimony, yes.

Q   So in the 100 hours you spent working on this case when you were obsessed with it, pretty important to be familiar with her testimony, right?

MR. STARR:  Objection.  Form, foundation, argumentative.

A   Well, when you're asking me what she said in a deposition, I think it's more important to point to the deposition versus what I remember.  I mean it doesn't really matter what I remember when we can open up a page or I can flip through the testimony and then give you an accurate answer.

I mean, you know, I don't understand the value of trying to figure out what -- what I'm guessing at or what my memory is when we have documents that can definitively demonstrate the question and answer the question.

Q   I agree.  I agree.

A   But I'm happy to do that if you want to -- if you want me just to guess and -- but I would defer back to my report.  I would defer back to -- even if I say this wasn't said in a deposition, if it said in a deposition I would certainly defer to what is actually written there versus,

Page 99

you know, what, you know, memory I might have.

Q   Well, I hope that after spending 100 hours working on this case you wouldn't have to guess about where this line came from in Ms. Parker's testimony.

MR. STARR:  Objection.  Form, foundation, argumentative.

Q   But I agree with you that we should look to her deposition testimony, and rather than waste our time to look at it again, you remember that the testimony I just showed you she testified that she had a clear view of the alley, did she not?

A   I'm not disputing anything --

MR. STARR:  Objection.  Form, asked and answered.

A   I'm not disputing anything that is transcribed in her deposition.  I'm not -- I won't dispute that.

Q   All right.  Let's go back to earlier in your report.  All right.

A   I'm sorry.  But to go back to that, you know, and if you do look at my page 19 because you were asking me specifically and I did footnote, Parker was uncertain about her identification and stated, quote, I believe they took part in it, yes.  I believe they took part in it indicating a lack of confidence which was my opinion and I referenced the trial testimony as a footnote.

Page 100

Q   Which footnote are you referring to?

A   Number 9, trial testimony.

Q   Okay.  But that doesn't have anything to do with her testimony that she had a clear view of the alley, correct?

MR. STARR:  Objection to form.

A   Well, her overall identification of the suspects I guess is I thought what the question was, but perhaps I was wrong and I guess we can move on.

Q   Going back to page 2, this item number 1 here you say, she, meaning Parker, stated that Guevara -- Detective Guevara pressured her into identifying Mr. Martinez by threatening to arrest her on an outstanding warrant and by falsely claiming police had found incriminating physical evidence, bloody boots, connecting one or more of the Plaintiffs to the crime.  Evidence that never existed, right?

A   I'm sorry.  What page are you --

Q   I'm on page 2 of your affirmative report.

A   Yes.

Q   Okay.  In this first part of that sentence where you say that Parker stated that Guevara pressured her into identifying Mr. Martinez by threatening to arrest her on an outstanding warrant, where were you getting that from?

Page 101

A   That was within the materials that were provided to me.

Q   Can you point to which material?

A   No.  I can't without going back.  Maybe it's on -- in more detail further on in my report.

Q   All right.  Well, we can get to that later.  I'm just asking you if right now you can tell me where you got that from?

A   Again, when I'm doing -- the page 2 is a summary of a 60- or 70-page report.  There's more details behind that.  I don't recall without going forward and looking at my report exactly those specific details.

Q   All right.  Let's take a look again at Ms. Parker's deposition testimony that's Exhibit 4.  Just give me a moment.

A   Do you mind if I pull up her testimony also or do you want me to just look at -- I'm sorry.

Q   Yes, please.

A   It's just easier -- sometimes it's easier.  I mean you can put it up.  As you're doing it, I'll try to pull it up as well.

Q   All right.  I'm pulling it up now.  Give me a moment.  All right.  I'm looking at page 140 of Ms. Parker's deposition testimony.  Feel free to look at it on your

THOMAS TIDERINGTON, 03/18/2026                    Page 102..105

Page 102

screen or you can look at it on my screen.

A   I'll have to look at it -- yeah.  I'm not able to pull it up.  So I'll have to look at it on yours.

Q   All right.  So I'm starting here -- and this is page 140, line 12, question -- so paragraph 9, this says, quote, Ms. Parker told me that she went to the police station because Detective Guevara told her she had to because of a warrant, is that correct?

There's an objection and then the witness says, no, that's not correct.

Question:  Okay.  It said that Detective Guevara also -- also told her that if she provided the information he wanted he would, quote, take care of the warrant.  Question:  Is that correct?

Answer:  No.  He didn't say that.

All right.  So do you -- do you see what I just referred to in her testimony?

A   I do.

Q   Okay.  And that contradicts what you have written here in your report, right?

A   Well, I think her statements contradicted.  There was various statements that she made that contradicted what actually happened as well which identifies the problem of using an individual perhaps such as this as the whole basis

Page 103

for relying on charging individuals with a homicide.  This is the danger of using uncorroborated information.

Q   So you acknowledge that she's saying here that she -- that Guevara did not threaten her with a warrant, correct?

A   In the depo --

MR. STARR:  Just objection, asked and answered.

Go ahead, Tom.

A   Yes.  In the dep, I -- that's what it states, yes.

Q   And are you aware of anywhere else in the record that Ms. Parker contradicts that and says that she was threatened with a warrant by Detective Guevara?

MR. STARR:  Objection, asked and answered.

A   I believe there is other evidence that -- that demonstrates that her testimony is conflicted somewhat.

Q   Can you point me to that?

A   I would have to go back and look at her other testimony, but I'm pretty sure I could.

Q   All right.  Then you say here -- I'm going back to your expert report.  You say on page 2 that Parker stated that Detective Guevara pressured her into identifying Mr. Martinez by threatening to arrest her on an outstanding warrant and by falsely claiming police had found incriminating evidence, bloody boots, connecting one or more

Page 104

of the Plaintiffs to the crime, evidence that never existed, right?

A   Yes.

Q   All right.  In this part where you say that he falsely claimed police had found incriminating evidence, physical evidence, bloody boots, where is that coming from?

A   That's my understanding that -- that she overheard Guevara talking to I don't recall exactly because you're only on page 2 of my report, but she overheard Guevara mention to another witness that there were bloody boots of the suspects found and that she overheard that testimony or overheard those statements he was making --

Q   Let's take -- go ahead.

A   -- which indicated to her that the -- you know, that if the police had this information and this evidence they must have the right people.

Q   I'm going to show you page 141, line 16 of Ms. Parker's deposition testimony.  Question:  Ms. Parker stated that Detective Guevara told her that they knew they had the right people because they had searched their apartment and found bloody boots that she had used to stop the victim, is that correct?

Answer:  No.  He did not tell me that.

Did I read that correctly?

Page 105

A   I believe you read it correctly, yes.

Q   Okay.  So Ms. Parker testified at her deposition that Guevara did not claim that the police had found bloody boots, right?

A   I'd have to look at it further, but as I explained, I think she's accurate in saying she -- that Guevara didn't tell her.  That she overheard Guevara telling somebody else, is what my understanding of what occurred.

Q   Okay.

A   And I think that is in her deposition.

Q   Okay.  Let's take a look again at your expert report.

A   Did you want me to find that section where she says that in her depo or no?

Q   We'll get to that later.  We'll get to that later.  I got another question right now.

Let's take a look again at your report.  So number 2 here, the second item of what you say is deeply flawed forms of evidence is purported confessions obtained after prolonged coercive interrogation.  Do you see that?

A   I do see that.

Q   And it says, Mr. Martinez was allegedly held for nearly two days in an interrogation room with little rest or food and was threatened by Detective Guevara until he signed

Page 106

a false statement.

Thomas Kelly provided an affidavit describing similar treatment before sighing a false statement. Jose Tinajero has also stated that he gave a false confession as a result of Detective Guevara's coercion.

Did I read that correctly?

A  Yes.

Q  First question, are you an expert in false confessions?

A  I don't think I'm an expert in false confessions. I think I'm an expert on police practices and how confessions and documentation of confessions should be handled by police, but I'm not an expert necessarily -- I don't -- based on your question, I don't know that I'm an expert in the area that I guess how I am interpreting your question.

Q  Okay. Have you ever testified in court as a false confession expert?

A  No.

Q  Okay. Do you have any specialized education or training in the psychological factors behind false confessions?

A  I probably have gone through training related to that, not necessarily academic training but perhaps law

Page 107

enforcement training that discusses or discussed or detailed the motives behind false confessions, but certainly not at the degree that perhaps other experts such as Dr. Dysart would have.

Q  All right. You say here Mr. Martinez signed a false statement, correct?

A  That's my understanding, yes.

Q  Okay. And are you offering any opinion as to whether this statement was false or not?

A  Well, only to the extent that the jury would credit the allegations and their testimony that that's what happened. I don't know if it did or not, and, again, that would be not a question that I could answer and there's nothing that I saw that could refute the statements that were attributable to him by what occurred between him and Guevara.

So other than that, no, I'm not offering an opinion about whether or not it is accurate or not.

Q  Next you say Thomas Kelly provided an affidavit describing similar treatment before signing a false statement. Do you see that?

A  I do.

Q  Okay. And are you offering an opinion as to whether Kelly signed a false statement?

Page 108

A  Same answer.

Q  All right. But you do not -- in the sentence that I just read, you do not qualify it by saying that, you know, the statement was allegedly false or it's up to the jury to decide it was false. You don't say anything like that there, right?

A  I say it elsewhere in my report as you probably know.

Q  But here you just flat out say he signed a false statement, right?

A  Well, again, this is a two-paragraph summary of a 40-, 50-, 60-page report and detail further. So I do explain it in detail.

Q  Okay. But here you just say he signed a false statement, right?

A  That's what it says, yes. And I guess -- you know, I appreciate the opportunity to clarify that for you, and what I mean by that is if the jury credits their allegations.

Q  Well, you testified earlier about documentation and how important it is to document things correctly, right?

A  Correct.

Q  And you understand that, you know, when you're writing something like this that's an official document that

Page 109

it will be used in court it's important to choose your words carefully and write things accurately, right?

MR. STARR: Objection. Form, argumentative.

A  Are you trying to compare this report to the police officer's report that had the forged signature on it or are you -- I mean is that where we're going -- you want to compare these -- my report to theirs? I wrote this report. I signed this report. I detail it more specifically elsewhere in my report. I stand by exactly what it says and I think it's proper.

Q  Okay. Well, you know, I mean I am. This is a document that's being used in a case that's in federal court, right?

MR. STARR: Objection.

A  I don't know if you're planning on using it. I don't know -- I don't know how you're going to use it.

Q  Well, this is your expert report in a federal civil rights case, right?

A  That's correct. I don't know if it gets presented to a jury or if you ask me questions about it, but, yes, I understand it's part of the federal civil matter. And it is accurate. But go ahead.

Q  Okay. Well, I'm just pointing out here that you say that Thomas Kelly provided an affidavit describing

THOMAS TIDERINGTON, 03/18/2026                    Page 110..113

Page 110

similar treatment before signing a false statement, and you don't qualify that by saying it was allegedly false or he claims it was false or that's up to the jury to decide. You just say it's false, right?

MR. STARR: Objection. Form, asked and answered, argumentative.

A   As I said, we can continue to go through my report where it's explained in more detail, and if there is some confusion, I do appreciate the fact that you gave me an opportunity to clarify that.

If the attorneys think it's important for me to supplement because of perhaps a confusion that you have with that statement, I would certainly consider supplementing the report, not to change things, but to make them a little more clearer for everyone that may read those.

Q   All right. Next you say, Jose Tinajero was also stated that he gave a false confession as a result of Detective Guevara's coercion, right?

A   That's my understanding.

Q   Are you offering any opinion as to whether or not Tinajero's statement was actually false or not?

A   No.

Q   Next you say in short, the case against Martinez, Kelly and Tinajero appears to have rested entirely on an

Page 111

unreliable eyewitness identification and coerced confessions both the direct result of improper and unethical investigative practices. Did I read that correctly?

A   Yes.

Q   So are you concluding then that these confessions that Martinez, Kelly and Tinajero gave were coerced?

A   Well, I don't know if you intentionally didn't read the last sentence or if you want me to read that to you.

Q   Go ahead.

A   These actions if credited by the jury represent departures from accepted law enforcement standards governing homicide investigations.

So, again, I made it clear that it's contingent upon whether or not the jury believes the allegations or not.

Q   But you yourself are not offering any opinion as to whether or not these confessions were coerced, is that correct?

MR. STARR: Objection. Form, asked and answered multiple times.

A   Correct.

Q   Going to the following page, you have this section here where you talk about video recording of interviews and interrogations. Do you see that?

Page 112

A   Can you make that a little bit larger just so I can orientate myself to -- yes.

Q   Okay. And remind me, which police department were you working for in 1999?

A   I was working -- I was working for the Fort Lauderdale Police Department, but I was on loan to the United States Drug Enforcement Administration as a group supervisor in charge of the task force.

Q   In --

A   It was a multi -- it was a multi-agency task force consisting of 10 -- I think 10 or 12 different jurisdictions, agencies.

Q   Do you know if in 1999 the Fort Lauderdale Police Department video recorded interviews and interrogations?

A   We did, yes.

Q   Do you know when that started?

A   I know I recorded interrogations and other information probably in the early '80s.

Q   Going back to your report here bottom of the third page, this section that says sole eyewitness, Melloney Parker, do you see that?

A   I do.

Q   The last sentence on that page says, Parker has since stated that she was threatened with arrest on an

Page 113

outstanding warrant if she did not cooperate and was told by Guevara that he would take care of it if she identified Martinez. Do you see that?

A   I do.

Q   In the deposition testimony that we just looked at, she said that never happened, right?

MR. STARR: Objection, asked and answered.

A   Are these the same questions you already asked me?

Q   I'm asking you about this section of your report.

MR. STARR: Same objection, asked and answered.

A   I would -- you'd have to pull that deposition up again. I think -- if that's -- if it's the same question that you asked me when you had the deposition pulled up, I think I've already answered that. If it's a different question, I think I need to read the depo again to be able to answer it accurately.

Q   Okay. Let's take a look. All right. I'm taking a look now at page 142, line 1 of Parker's deposition testimony.

A   I'm sorry. Can you make that --

Q   Sure.

A   It's real small on my screen.

Q   Sure. Can you see that okay now?

A   One more click. There you go. Thank you.

THOMAS TIDERINGTON, 03/18/2026                    Page 114..117

Page 114

Q   It says, Question: Next paragraph, Ms. Parker explained to me that she believed that if she did not identify anyone -- anyone in the lineup, the detective would have her arrested on the warrant he said he had.  Is that correct?

The witness, No.  He never said that.

Did I read that correctly?

A   You did, but I -- as a point of clarification, what is -- who's reading -- I mean, quote, Ms. Parker explained to me.  What document is that coming from?  Ms. Parker explained to me that she believed that she or if she did not identify anyone detective would have her arrested.

So which document are you -- is being referenced in this deposition?

Q   Can you identify the document that's being referenced?

A   I could if I had access to the full depo.  I'd have to go back and look at the attachments and do it the correct and comprehensive way.

You're asking me -- you're putting little sentences of testimony out, but you're not putting it in context of what's being asked.  I don't think you're doing it intentionally trying to trick me because you don't -- you seem

Page 115

like a nice guy.  I don't think you're trying to trick me, but the end result is we're not getting the full and accurate picture of what was actually testified to.

Q   Can you point me to the spot in the materials you reviewed where Ms. Parker said that she was threatened with an arrest with an outstanding warrant if she did not cooperate?

MR. STARR:  Objection to the form of the question, asked and answered.

A   You know, I recall the quote that is in that deposition.  I recall seeing that somewhere and that's where I would probably start and go back and find where that interview or -- is quoting.  That's clearly -- there's information that that's what occurred.

Q   Do you identify that document?

MR. STARR:  Identify it in citation form or are you asking him to identify it generally?  I'm sorry.  I'm confused.

Q   Can you tell me what document he's referring to?

A   If you can pull that back up.  I mean I think you could.  I think you have -- I'm sorry.  I'll have to pull that depo up because if you go back a couple pages I think it will probably explain where that information came from and what document is being referenced there.

Page 116

So if you pull that back, we can go back -- a few pages back in the questioning and I think it could explain all of that.

MR. GROSSICH:  Okay.  Let's take a five-minute break.  Okay.

THE WITNESS:  Lunch around -- I thought we would break for lunch or --

MR. GROSSICH:  If you want to take a lunch, that's fine.  How long would you like, sir?

THE WITNESS:  30 minutes.  Sean, is that all right with you or how long do you need?

MR. STARR:  20 or 30 is fine.

MR. GROSSICH:  That's fine with me.

THE VIDEOGRAPHER:  Going off the record at 12:54 p.m. central standard time.

(Whereupon a recess was taken.)

THE VIDEOGRAPHER:  This is the beginning of media unit 4.  We're going on back on the record at 1:32 p.m. central standard time.

BY MR. GROSSICH:

Q   Mr. Tiderington, in your job as an expert witness, are you supposed to make determinations about witness credibility?

A   No.

Page 117

Q   So am I correct in saying that you're not supposed to judge the credibility of witnesses in this case, is that correct?

A   Correct.

Q   And it's your understanding that that again -- well, strike that.

It's your understanding that that is the province of the trier of fact, right?

A   Correct.

Q   Did you make any credibility determinations when formulating your opinions in this case?

A   No, not that I know of.

Q   Okay.  Let's take a look again at Exhibit 1 which is your affirmative report.  I'm on page 4.  So you can either look on the screen or you can look on a copy you have there.  Whatever you prefer.

A   Okay.

Q   Okay.  And before we broke for lunch, we were talking about this section on page 4 underneath the subheading the official police reports prepared by the detectives contained misleading and incomplete information, right?

A   Correct.

Q   Okay.  There's three bullet points there, right?

THOMAS TIDERINGTON, 03/18/2026                    Page 118..121

Page 118

A    Yes.

Q    The third bullet point you say, In addition, all three plaintiffs were coerced into giving false confessions, right?

A    That's their -- that's what they claim occurred, yes.

Q    Okay. But that's not how you say it here, right?

MR. STARR: Objection. Form, the document speaks for itself.

MR. GROSSICH: And by the way, I don't know if it's Judge Cole or Judge Shadur, but I think he said he's never heard a document speak. So --

BY MR. GROSSICH:

Q    Anyway, Mr. Tiderington, it says here, All three plaintiffs were coerced into giving false confessions, right?

A    That's what it says. And as you know, I explained it and I showed you in other parts of my report where I'm referencing if the jury credits their testimony. And that would apply to this section as well.

Again, based on the apparent confusion, I would be happy to supplement that to clarify that, but I think it's very clear in my report what I meant and I thought anybody that read it would understand when they read the other

Page 119

sections where I talk about if the jury credits these allegations, and I say it throughout the report.

Q    But this is the second time in this report that we've seen that you make that statement without qualifying it, right?

A    Well, --

MR. STARR: Objection as to form.

A    -- if you're counting how many times do I say if you credit -- if the jury credits that, I probably say that more times than not I think if you go back and if you're keeping score.

Q    Were you operating under that assumption when you drafted this report, and by that I mean, were you assuming that these confessions were coerced?

A    No. I was assuming that you were -- not you, but an attorney would try to confuse the issue in any way possible and misconstrue exactly what I was trying to say, and that's what is occurring. So I expected that that's what was going to happen, and I guess I'm thankful that I have the opportunity to clarify that.

Q    All right. Well, respectfully, sir, I'm not trying to confuse anything. I'm literally just reading the words that are on your report.

A    Right. But --

Page 120

Q    And you don't dispute the words that I read are written in your report, do you?

A    No. But just like in the depo that you cited a little while ago about the tree and that there's no information about the tree, you didn't read the entire depo. And if you did, there was a lot of discussion about a tree being in front of her window.

You just pointed to certain words and -- I mean, you know, this is your depo and I have been through many of these and I understand that that's what -- you know, appears to be what you want to do. And instead of taking my report and trying to understand my opinions, if we're going to look at each sentence and try to convince somebody that -- something that's not true, then I guess that's what we're doing.

Q    Can you point me to the spot in Ms. Martinez's dep testimony where she said she does not have a clear view of the alley?

MR. STARR: Objection to form.

A    We can go through her depo again. I can pull it up, but there was -- I don't think you're going to dispute that there was a lot of questions about whether or not there was trees in front of her -- in front of her window. She talked about the tree being there but it didn't have leaves

Page 121

on it.

So I'm looking out my window. It doesn't have leaves on it, but it obstructs my view of the house across the street.

Q    But she never said that though? She never said that the tree obstructed her view, right, in her dep or anywhere?

MR. STARR: Asked and answered.

A    Again, based on your question, I haven't had -- the few minutes I had to go back and look at the depo, I didn't go all the way through. So I can't really answer that.

Q    I thought you did a comprehensive review of the materials in this case prior to your dep?

MR. STARR: Objection. Asked and answered, argumentative.

A    I did.

Q    Okay. So just because a lawyer in Ms. Parker's deposition asks questions about a tree does not mean that Ms. Parker herself affirmatively stated that a tree blocked her view, right?

MR. STARR: Objection to form, foundation.

A    No. She said there was a tree in front of her building and in front of her window. Yes, she did say that.

THOMAS TIDERINGTON, 03/18/2026      Page 122..125

Page 122

Q   Did she say it blocked her view of the alley?

MR. STARR: Objection. Asked and answered repeatedly, argumentative.

A   Her depo is 277 pages long. I didn't -- in the short lunch break that I had, I didn't have a chance to go through all of those details.

Q   All right. Let's move on. Looking here again on page 4, same paragraph, bullet point three under that subheading it says, Furthermore, Detective Guevara and at least one other Defendant used physical abuse against Mr. Martinez. Did I read that correctly, sir?

A   That's what I understand based on the allegations, yes.

Q   Okay. Again, you do not qualify this sentence by saying that that's alleged or it's up to the jury to decide? You just say that he was, in fact, physically abused, right?

A   It's -- as you know, it's elsewhere in my report, but you are correct in that particular sentence it does not say that. That's correct.

Q   Were you operating under the assumption that Mr. Martinez was physically abused when you drafted this report and formulated your opinions?

MR. STARR: Objection to form, asked and answered.

A   I was under the opinion that that's what he

Page 123

claimed happened, yes.

Q   Okay. But are you making a determination as to whether or not Mr. Martinez's claims of physical abuse are true or not true?

MR. STARR: Same objections.

A   No.

Q   Okay. Now, let's take a look at the following page. This is page 5. If you go to the bottom of this page it says, Casiano's credibility was also highly questionable. Do you see that?

A   I don't. What page are you on?

Q   Bottom of page 5, last paragraph.

A   I do see that.

Q   Okay. What was your purpose of including that sentence in your report?

MR. STARR: Form.

A   Well, a law enforcement officer if they're going to -- and I've dealt with individuals that have been addicted to heroin and crack cocaine and cocaine and other drugs, and I know from my own experience that their testimony is often not credible and that their view of what happened might not be totally accurate based on their admitted drug use or perhaps their drug addiction.

So any reasonably trained officer would

Page 124

understand that if you're going to rely on the statements of an individual that admittedly is perhaps addicted to crack cocaine that the -- any information provided should be taken with caution.

Q   Are you making a judgment as to Ms. Casiano's credibility?

MR. STARR: Objection. Form, asked and answered.

A   I think her testimony was, is that she was a drug user and she was addicted. So I made an observation that a reasonably trained officer would understand that.

Am I making an assessment of her credibility, no. If the jury credits her testimony, then they credit her testimony.

Q   Okay. But you wrote here, and I'm quoting you again, that her credibility was highly questionable, right?

MR. STARR: Objection, asked and answered.

A   You're right, yes.

Q   Is that not a judgment of her credibility?

A   I think I qualified that for you.

Q   But it's not qualified in the report itself, right?

A   It is. Yes, it is.

Q   Okay. Can you point that out for me?

MR. STARR: Objection to form, argumentative,

Page 125

asked and answered.

Go ahead.

A   She admitted that she was a daily drug user. I think that speaks for itself.

Q   Okay. So the fact that she admitted she was a daily drug user that means that her credibility is highly questionable?

MR. STARR: Objection. Form, foundation, asked and answered.

A   Credibility if the police are going to rely on that as the basis for charging somebody with homicide, of course you would want to factor that into any investigative document that you're using and -- and corroborate the information further if it's coming from an individual that's perhaps addicted to crack cocaine.

Q   So are you saying that drug users are inherently not credible?

MR. STARR: Objection. Form, foundation.

A   That's my experience in dealing with individuals that were -- are or were addicted to crack cocaine, yes.

Q   But you do understand that it's up to the judge and jury -- judge or jury in this case to determine whether or not Ms. Casiano was credible, right?

A   That's what I just said. I just testified to

Page 126

that, correct.

Q   All right.  Let's go to the following page, page 6.  I'm looking at this paragraph that starts the investigative shortcomings.  Do you see that?

A   Yes.

Q   You say, The investigative shortcomings in the Martinez, Tinajero, and Kelly investigation were not isolated or unique; rather, they reflect the same pattern of misconduct long associated with Detective Reynaldo Guevara's homicide investigations during this period.  Do you see that?

A   I do.

Q   Okay.  What was your purpose of including this sentence in your report?

MR. STARR:  Objection to form.

A   What was my purpose?  I'm trying to explain how I reached my conclusions and my opinions.

Q   Okay.  So we already touched on this, but you say here that there was the same pattern of misconduct on the part of Detective Guevara.  Do you say that?

A   I do.

Q   What are you referring to there?

A   I think I already testified to that, but I guess you want me to explain it again and I will, that misconduct

Page 127

can range from not seeing any evidence that he abided to by the Chicago Police Department's policies in terms of submitting GPR, taking notes on GPRs.  I don't think I've ever seen Guevara ever write a GPR in any of those investigations.

I've never seen documentation or in this case there's very limited documentation as to what Guevara actually did.  I think he wrote one short police report; although, he interviewed multiple witnesses, obtained multiple -- allegedly obtained multiple confessions, interviewed individuals for a long period of time, there's no documentation whatsoever about what he said.  There's no definitive documentation about how or what he said in advising individuals of the Miranda warning rights.  And the list goes on.

Those are what I recall off the top of my head without going throughout the report.

Q   When you were formulating your opinions in this case, were you operating under the assumption that Detective Guevara had, in fact, committed misconduct in prior investigations?

A   I don't think I was operating under that assumption.  I guess I knew it.  I knew from reviewing other cases that -- that Guevara didn't write GPRs.  Guevara didn't write reports.  Guevara's name was signed, and quite

Page 128

frankly, Guevara signed -- the few reports that Guevara did report or that he did write there's evidence that he signed Halverson's name to at least one of those reports.

So I look at each case individually.  Certainly, I have some cumulative knowledge of what occurred in other cases.

Q   So are you saying that you know for a fact that Detective Guevara engaged in misconduct in other investigations?

MR. STARR:  Objection to form, asked and answered.

A   At least based on what I reviewed in terms of the misconduct that I noted, yes, and detailed in each one of those reports.

Q   Okay.  And when you reviewed the materials in this case and were formulating your opinions in this case, were you assuming that since Guevara had committed misconduct in other cases that he must have done so here?

MR. STARR:  Objection, foundation.

A   No.

Q   All right.  I'm going to go on to page 12.  So you have this section that says Investigative actions and personnel involvement summary.  Do you see that?

A   Yes.

Q   Okay.  And then you have this number 1 and it says

Page 129

Detective Reynaldo Guevara, lead detective, area 5 violent crimes.  Do you see that?

A   I do.

Q   And under there, there's a number of bullet points?

A   Yes.

Q   And then you have -- the third bullet point last clause says, Parker later denied the photo identification and expressed uncertainty about the lineup results.  Do you see that?

A   I do.

Q   Where were you getting that information from?

A   I'd have to go back and I can easily do that either in her deposition or other testimony or I'm sorry and also I believe she also provided an affidavit to either State's Attorney investigator or to some type of private investigator.  I believe she also provided a statement.

Q   Let's take a look --

A   I'm sorry, an affidavit.

Q   Let's take a look.  Do you know if that's an affidavit that she herself, you know, attested to?

A   You mean maybe somebody signed her name to it?

Q   No.  I'm saying, like -- well, you know what an affidavit is, right?

THOMAS TIDERINGTON, 03/18/2026                    Page 130..133

Page 130

A   Yes.

Q   Like an affidavit -- an affidavit is, like -- is a statement under oath that someone gives and signs. Is that your general understanding of what it is?

A   Generally, yes.

Q   Okay. And the affidavit you're referring to, is that a statement that Ms. Parker gave under oath and signed?

A   I don't know. I mean I understand it's an affidavit. I don't -- was it signed under oath? I don't know if I can make that legal determination.

(Whereupon, Mr. Flaxman left the deposition suite.)

Q   Let's take a look -- this will be Exhibit 5 to the dep. Can you see this document, sir?

A   Yes, I can.

Q   All right. And this says affidavit of Eladio Valdez, right?

A   Yes.

Q   Okay. And I will represent to you this was Exhibit 2 to Ms. Parker's deposition. Okay.

A   Yes.

Q   Is this something that you reviewed for your work in this case?

A   It was provided, yes.

Q   All right. And it says here, I, Eladio Valdez,

Page 131

under oath and penalty of perjury, subscribe and swear as follows, right?

A   Correct.

Q   This is not an affidavit of Ms. Parker, correct?

A   Oh, it's an -- correct, yes.

Q   Okay. So this is not the sworn testimony of Ms. Parker, correct?

A   Correct.

Q   This is the -- this is the sworn testimony of someone else named Eladio Valdez, right?

A   Based on what my understanding, based on what she told him, yes.

Q   Okay. So it's secondhand of what Ms. Parker supposedly said, right?

A   That's fair I guess, yes.

Q   And it will be hearsay, correct?

A   I don't make -- I guess I don't make that determination, but I guess I heard that on -- I guess it would be hearsay. I'm not -- not a lawyer but apparently it would be.

MR. STARR:  Belated objection to form and calls for a legal conclusion. Sorry.

Q   Let's take a look at Ms. Parker's deposition testimony again.

Page 132

All right. So I'm looking at page 46 starting at line 23. Okay.

A   Sure.

Q   All right. It says -- bear with me while I read some of this. Line 23, Question: All right. I want to do another exhibit. Okay. This is Exhibit 2. It's Martinez 5. Do you recall speaking to an investigator named Eladio Valdez from the exoneration project in 2016?

Answer: No.

Question: All right. Well, I'm going to see if this refreshes your memory. This exhibit, it starts at 5. it goes to 6.

Answer: Uh-huh.

Question: And looking at paragraph 9, Ms. Parker told me that she went to the police station because Detective Guevara told her she had to because of a warrant.

Answer: He's lying.

Question: Do you see where it says that?

Answer: I don't even know who this person is and that's not correct, ma'am.

Question: Okay. And next it says, she related that Detective Guevara also told her that if she provided information he wanted he would take care of a warrant.

Answer: That's not --

Page 133

Question: Do you recall saying that?

Answer: No. I didn't say that.

Question: Do you recall saying -- do you recall what you did say to the investigator?

Answer: I don't even know who this is. Where is he at.

Question: Do you recall speaking to an investigator at all in 2016?

Answer: No, I do not.

Okay. Did I accurately read that testimony?

A   I believe you did.

Q   So Ms. Parker testified under oath that she never spoke with Mr. Valdez, correct?

A   Apparently, yes.

Q   And she testified that Mr. Valdez what he wrote in his affidavit was a lie, correct?

A   Apparently, yes.

Q   And are you aware of any other evidence in this case that you reviewed that says that Parker denied the photo identification and expressed uncertainty about the lineup results?

MR. STARR:  Objection. Asked and answered repeatedly, argumentative.

Go ahead.

Page 134

A   Well, wait a minute.  I'm still thinking back on the Valdez.  If you look at her deposition and you can pull that up, there was a discussion about her having a warrant and she wasn't sure what was going to happen if she went to the police station.  She thought they might take care of the warrant for her.

So the affidavit according to other testimony in her deposition it's consistent with what she testified to.

Q   But are you aware of any evidence in this case other than the Valdez affidavit that says that Parker denied the photo identification and expressed uncertainty about the lineup results?

MR. STARR:  Same objections.

A   I would have to go back through and I'd have to turn to that section in my report that detailed that, but as I stand here right now, no.

Q   Okay.  Let's go back to your report.  I'm looking at page 12 and I'm looking under 2 Ernest Troche, Investigator.  Do you see that?

A   Yes.

Q   All right.  And I'm not familiar with any defendant in this case named Ernest Troche.  I believe there's an Ernest Halverson and a Randy Troche.  Do you know who you're referring to here?

Page 135

A   Oh, it must be -- it must be Randy.

Q   And do you see the line where it says, did not document any investigative -- or I'm sorry.  Did not document any independent investigative steps, leads, or follow-up on other possible suspects.  Do you see that?

A   I do.

Q   What other possible suspects are you referring to?

A   Whether it's information -- there's information that there was four or five other people that -- four or five people that actually did the beating.  I saw no effort to identify the additional people that were there.

Q   Do you know the names of any alternative suspects in this case?

A   No.  That's what I would have liked to have seen in the investigative file, but to your point, no, there wasn't.  I didn't really see any questioning in the alleged confessions either about who else was there which again is another important point.

Q   Going to the following page 13, top of the page, second bullet point you say, their involvement -- and I'll just represent to you you're talking about ASAs.  You say, The ASA's involvement lent formal appearance to confessions later determined to be coerced.  Do you see that?

A   Yes.

Page 136

Q   What are you talking about here?

A   Well, as I'm sure you know, there's -- these individuals were held what?  40 to 45 hours in holding cells or interview rooms.  They were interviewed, interrogated multiple times by multiple detectives.

We don't know what was said in any type of specific detail.  We don't know exactly whether or not they were properly advised of their Miranda rights.

At some point which is a pattern and practice involving cases that I've looked at involving Guevara, is that there's multiple interrogations that are not documented which is by the way a violation of the -- even Chicago's policies not to have documented what a witness or what a suspect told an officer.

And then after 40 hours, an Assistant State's Attorney is called and said got a guy wants to confess.  Come on over.  And -- but there's a big gap between what happened before.  Were there promises made.  Was there exculpatory information about not being involved in this.

It's my experience having interviewed many, many suspects that there's a beginning, a middle and an end, but in this case and like most of these cases, there's never a discussion about what occurred before the Assistant State's Attorney got there.

Page 137

Q   All right.  Who determined that the confessions were coerced?

A   We're -- we're going to continue to talk about this?  I don't know how many times I said this throughout my report and you're skipping over all the areas where I -- where I actually say if the jury credits their allegations, and this is the same situation there.

MR. STARR:  Belated objection to form, asked and answered.

Q   I'm asking him about separate -- different sentences in the report, so on a different page.

But, anyway, now the section about Melloney Parker, number of bullet points under there.  You say, She later participated in the photo array lineup under pressure from Detective Guevara, right?

A   That's my understanding.

Q   But in her deposition testimony, she said that did not happen, correct?

MR. STARR:  Objection, asked and answered.

A   I don't know if I would agree with that.  I mean I -- I found some inconsistent -- inconsistencies with what you are asking me to agree with, and I would have to go back and look at all of her testimony -- excuse me, all of her testimony before I ultimately agree with you on that.

THOMAS TIDERINGTON, 03/18/2026 Page 138..141

Page 138

Q   Let's take a look at her deposition testimony. Okay.

A   I would say -- I would say her deposition speaks for itself. I can't put -- I can't put words in her mouth and neither can you. So whatever it says in the deposition is what she said.

Q   Okay. Page 145, line 25 of her deposition. Question: Is it true that the police pressured you into making a positive identification?

Answer: No. I didn't feel pressured at all. When they -- when they came to my house or when I went to the police station, I didn't feel pressured at all.

Do you see that?

A   I do.

Q   So now do you acknowledge that she testified to that at her deposition?

A   Whatever's in her deposition is what she said. I don't know if there's other areas where they discussed it. It's a 277-page deposition. Whatever's contained in there is what she testified to.

I don't independently recall -- independently. I don't recall as we sit here if there was other testimony that -- where she explains it somewhat differently.

Q   Okay. So on page -- well, feel free to find that

Page 139

and point out during a break or whatever if you want to bring it to my attention. But you say here that she participated in a photo array and lineup under pressure from Detective Guevara. Where are you getting that information?

A   I'm sorry?

Q   Where are you getting that information that she participated in a photo array and lineup under pressure from Detective Guevara?

MR. STARR: Form, asked and answered.

A   That's my understanding.

Q   From what?

A   Based on the material that was provided to me.

Q   What material specifically?

MR. STARR: Form, asked and answered.

A   Again, I'd have to go back and look at it, and, you know, like I said, I was able to quickly do that on the lunch break where there was some discrepancy, not on my part, confusion about whether or not there were trees partially blocking her view. And I'm sure I could do that given the opportunity. I mean when I say do that, I could demonstrate where I got that information from.

Q   All right. Let's take a look at your report again. You say, Later -- Parker later stated that Detective Guevara promised to take care of her warrant if she provided

Page 140

the information he wanted. Do you see that?

A   I do.

Q   Where are you getting that information from?

MR. STARR: Objection. Form, asked and answered.

A   Well, there's testimony in her deposition about that.

Q   Let's take a look. I'm looking at page 146, line 12 of Parker's deposition. Question: It's out of order. The detectives told her they would take care of the warrant if she positively identified these men, is that correct?

The witness: They never told me that.

Do you see that?

A   Yes.

Q   Okay. So she testified at her deposition that she was never told by detectives that they would take care of her warrant if she came to the police station, correct?

MR. STARR: Objection. Form, asked and answered.

A   I'm sorry. What --

Q   They said -- she said the detectives never told her they'd take care of the warrant if she positively identified the men, right?

A   Well, there was more discussion elsewhere in her deposition about that as well.

Q   All right.

Page 141

A   The point that you're asking me to read, I agree with you, but there's other discussions in her deposition as well that you could pull up and that we could analyze her testimony if you'd like.

Q   Can you point out the spot in her deposition where she said that the detectives told her they would take care of the warrant if she identified anybody?

A   It might take some time.

Q   Let's take a -- let's take a look back at her testimony. Okay. I'm looking now page 140, line 20, Question: Okay. It says that Detective Guevara also told her that if she provided the information he wanted he would, quote, take care of the warrant, is that correct?

Answer: No, he didn't say that.

Do you see what I'm reading?

A   Yes.

Q   So it's the second time now where she said that didn't happen in her dep, right?

A   Her dep -- we can go through this. Her deposition speaks for itself. I'm not disputing anything that she says in her deposition, but -- I'm sorry, but to fully answer your question, if you can pull up the affidavit from Valdez I think there was some discussion about that as well.

Q   We already established that Ms. Parker said that

Urlaub Bowen & Associates, Inc.   312-781-9586

Page 142

that affidavit is a lie, right?

MR. STARR: Objection. Form, foundation.

A   Well, like all the evidence and all the witness statements in this case, I can't assess the credibilities. So if you're asking me to assume that he was lying under oath, I don't know if he was ever charged with perjury, but it's something, of course, an expert would have to factor into -- ultimately into opinions.

Q   Let's take a look again at your report. I'm going to scroll down to page 15 here. I'm looking at page 15, second paragraph that starts with the statements. You say, The statements attributed to Jose Tinajero, John Martinez, and Thomas Kelly were central to the prosection's case; however, each was obtained allegedly under coercive circumstances and contained details inconsistent with the physical evidence and eyewitness accounts.

A review of the investigative file, court transcripts, and post-conviction filings demonstrates that these statements were neither voluntary nor reliable and were the direct result of improper interrogation tactics employed by Detective Reynaldo Guevara and Ernest Troche. Do you see that?

A   I do.

Q   All right. First of all, again, you say Ernest

Page 143

Troche. Do you know who you're referring to there?

A   Yeah, I'm sorry. Randy probably is who I'm referring to because I don't think Halverson was in the room for any of these interviews.

Q   Okay. So you state again in an unqualified way that the statements given by the plaintiff -- Plaintiffs were neither voluntary nor reliable, right?

MR. STARR: Objection. Form, misrepresents the document.

Go ahead.

A   Can we take, like, a two-minute quick break? I have somebody knocking on my door here.

Q   We can do that, but can you answer the question first?

A   I'm sorry. What was the question?

Q   You say in an unqualified way that the statements were neither voluntary nor reliable, right?

MR. STARR: Same objections.

A   Yes.

MR. GROSSICH: You can go take a break. Thank you.

THE WITNESS: I'll be five minutes or two minutes. I just got to -- the guy won't stop knocking.

MR. GROSSICH: Let's take two. That's fine.

Page 144

THE VIDEOGRAPHER: Going off the record at 2:10 p.m. central standard time.

(Whereupon a recess was taken.)

THE VIDEOGRAPHER: This is the beginning of media unit 5. We're going back on the record at 2:12 p.m. central standard time.

BY MR. GROSSICH:

Q   Mr. Tiderington, when you drafted this report, is there a reason why you did not include citations -- why you did not include citations to the materials in the record -- in the report?

MR. STARR: Objection to the form of the question.

A   I think I do at some point through it.

Q   Okay. Well, you know, for example, we've talked a number of times about Melloney Parker's identifications and whether her view was obstructed and things of that nature.

But you didn't cite in your report, like, where you're getting that information, right?

A   I think I cited. I think I said based on her testimony and evidence. Did I cite specific lines? No, probably not.

Q   Well, we're sitting here today and I've asked you extensively about it and you've been unable to identify exactly where in her testimony you're getting this

Page 145

information.

And, you know, do you agree that it would be helpful now if you had included those citations in your report?

MR. STARR: Objection to form, asked and answered.

A   No. I think my report is adequate for the purpose. I think I can provide information and I think I answered all of your questions about where the information came from.

When I spoke about an affidavit, you concluded that I should not have put any emphasis or value into that. So I think you're disputing -- when I do show you where the information comes from, I think you're disputing whether or not it's relevant. So I guess I'm -- doesn't matter what I do, I'm in a no win situation.

Q   All right. Let's go back to your report. So before we took that break, we were looking at the second paragraph on page 15 of your affirmative report.

In the second sentence in this paragraph says, A review of the investigative file, court transcripts, and post-conviction filings demonstrates that these statements were neither voluntarily nor reliable and were the direct result of improper interrogation tactics employed by Detectives Reynaldo Guevara and Ernest Troche, right?

THOMAS TIDERINGTON, 03/18/2026

Page 146..149

Page 146

A   That's what it says.

Q   Okay.  So are you concluding here then that improper interrogation tactics were, in fact, employed by those detectives?

A   Well, there's allegations of misconduct, but there's also undisputed areas in which misconduct occurred.  There is no documentation.  The officers are required to document their actions.  There's no documentations of that.

There's improper police tactics that are used.  When you conduct a photo array and a live lineup with multiple suspects in that, that's improper.  Perhaps it's suggestive.  That -- that would be improper.  So there's many things like that.

Q   Okay.  But, respectfully, I'm asking you if you have made the determination that improper interrogation tactics were, in fact, employed by Detectives Reynaldo Guevara and Troche?

MR. STARR:  Objection to form, asked and answered.

A   Well, as -- hopefully as you recall, I said obtained allegedly under coercive circumstances.  So this would -- this would fall under that same category as I have to consider -- equally consider the information provided by the Plaintiffs about their allegations of misconduct and mistreatment.  And if it did occur, then I don't think

Page 147

there's any question that it was improper.

Q   Okay.  Next paragraph, first sentence you say, It is also significant that all three defendants, Tinajero, Martinez, and Kelly, were known members or associates of the Latin Kings, a hierarchical street gang active in the Humboldt Park area at the time of the homicide, right?

A   Correct.

Q   All right.  So that's not in dispute, right?

A   I don't think it's in dispute.  It could be.  I haven't seen any evidence that said it was but --

Q   Well, you reviewed the deposition transcripts of Tinajero, Martinez, and Kelly, right?

A   I have.

Q   And all three of them admitted that at the time of this incident they were members of the Latin Kings, right?

A   Correct.

Q   So that's -- they don't dispute that, right?

A   That's my understanding.

Q   Okay.  And they also, all three of those individuals, testified that this area of 1900 North Whipple was Latin King territory, right?

A   I believe you're correct.  My only hesitation when you say all three admittedly I don't know if that was the case, but I'm not disputing that.

Page 148

Q   Okay.  And they all testified that that was actually a Latin King hangout spot, right?

A   It's hard to say if all three of them.  I would have to go back and look at it.  Like I say, I'm not disputing it, but as you know, there's I think you said thousands of pages of documents.  I don't -- I can't recall every word that they said in every deposition.

Q   All right.  Let's take a look at the following page.  Page 16 underneath the John Martinez's statement, do you see that?

A   I do.

Q   You say, John Martinez was arrested later on February 7th, 1999, and interrogated over the course of nearly two days.  Like Tinajero, Martinez initially denied involvement.  He later signed a written statement on February 8th, 1999, after prolonged interrogation and exposure to Guevara's pressure tactics.  Do you see that?

A   I do see that.

Q   Okay.  So, again, are you concluding here that Guevara, in fact, used pressure tactics against John Martinez?

MR. STARR:  Objection.  Form, foundation, asked and answered.

A   That's what the evidence demonstrated, yes.

Page 149

Q   Okay.  So you're concluding then that Guevara did, in fact, use pressure tactics against Martinez?

MR. STARR:  Same objections.

A   I'm concluding that there's evidence and this is statements made by the Plaintiffs that this occurred.  Ultimately, it has -- somebody else has to ultimately decide whether or not that actually occurred besides me.

I have to consider the statements of these individuals as evidence and that's what the evidence demonstrates.

If Guevara had denied this, I would likewise be pointing out that this is a point of dispute because Detective Guevara has testified that this did not occur.  I don't have the ability to do that at this point.

Q   Okay.

A   Unless you can represent to me that you talked with Guevara and he said he didn't do any of this stuff.

Q   Let's move on.  I'm looking at page 17 of your report.  You say -- I'm looking at this paragraph.  It starts as previously stated.  Do you see that?

A   Yes.

Q   All right.  I'm going to skip down in this paragraph.  I'm going to start at the sentence that says in summary.  Do you see that?

THOMAS TIDERINGTON, 03/18/2026                    Page 150..153

Page 150

A   Yes.

Q   You say, In summary, the statements of Tinajero Martinez, and Kelly were inherently unreliable due to their gang affiliations, the coercive interrogation methods used, and the absence of corroboration.  Do you see that?

A   I do.

Q   All right.  So are you concluding then that the statements they gave were inherently unreliable?

MR. STARR:  Objection to form, foundation, asked and answered.

A   I would consider that to be in the same category as somebody that's addicted to crack cocaine, in terms of being associated with gangs, you know, the motive for being truthful or untruthful has to be considered by law enforcement.

Q   But, ultimately, whether or not those statements were true or not, that's for the trier of fact to decide, correct?

A   Oh, yes, yes.  I said it throughout my report.

Q   It's not for -- well, strike that.
    You say that they were inherently unreliable due to their gang affiliations and the coercive interrogation methods used, right?

A   That's correct.  That's what it says.

Page 151

Q   So once again in this report, you know, you're saying the coercive interrogation methods were used and you're not qualifying that in any way, right?

MR. STARR:  Objection.  Form, foundation, asked and answered.

A   Well, I did qualify it throughout the report.

Q   But not -- you're not -- in this sentence I just read, there's no qualification, right?

MR. STARR:  Same objection.

A   I agree.  I didn't say it in every sentence.

Q   Okay.  Then you say, In reviewing the investigative materials, it is notable that there are no contemporaneous notes, documentation, or detailed police reports describing what was said by Detectives Reynaldo Guevara and Ernest Troche during the multiple interrogations that produced the three codefendant statements, right?

A   Correct.

Q   And, again, you say Ernest Troche.  Who are you referring to there?

A   Any time I refer to Troche, obviously it was a typo.  I meant to say Randy.  So throughout the report, I would replace that with Randy.

Q   Okay.  Are you aware of any constitutional requirement that police officers take contemporaneous notes?

Page 152

A   No.

Q   I'm going to go down to page 25 of your report.  You have this section here -- can you see -- are you on page 25?

A   I can see that, yes.

Q   Okay.  In this section here entitled, Guevara and Miedzianowski's relationship and the broader pattern of corrupt investigative practices and the suppression of criminal conduct by police.  Do you see that?

A   I do.

Q   What does Joseph Miedzianowski have to do with this case?

A   Well, there's evidence that he and Guevara were part of a criminal enterprise.  So --

Q   Have you seen any documents reflecting that Miedzianowski had any involvement in the Garcia murder investigation?

A   Well, there's evidence that he pulled a criminal history of one of the defendants -- one of the plaintiffs.

Q   Okay.  Any other evidence --

A   And I don't think there was any -- you know, usually when you pull a criminal history of somebody, there's some type of supplemental report that's associated with a specific case or specific case number.  I haven't

Page 153

seen any evidence that -- that there was any type of a supplemental report explaining why he did that.

Q   Okay.  Have you seen anything -- any other indication of any involvement by him in this case?

A   One of the codefendants in this case Woodall was -- I believe that's his name, was also part of the case.

Q   Okay.  And Mr. Woodall -- and Detective Woodall he was involved in the initial investigation of the beating back in October 1998, right?

A   That's my understanding, yes.

Q   In the materials you reviewed, did you see any indication Mr. Woodall had any involvement in this case after October of 1998?

A   I don't think so.  I mean the documentation is certainly lacking, but I have not seen any documentation that he had any additional involvement and I believe that was his deposition testimony as well.

Q   But you also -- in addition to this November 26, 2025, report, you also drafted a rebuttal report on February 27th, 2026, right?

A   I did, yes.

Q   And that was to rebut the opinions provided by Mr. Stefan Bjes?

A   Yes.

Urlaub Bowen & Associates, Inc.   312-781-9586

THOMAS TIDERINGTON, 03/18/2026                    Page 154..157

Page 154

Q   Do you note why Mr. Bjes was retained by the Defendants in this case?

A   Do I know why?  No.

Q   Yeah.  Do you know what opinions he's offered in this case?

A   I read his report.

Q   Okay.  And can you tell me what opinions he offered?

A   Well, can you pull up his report?  We can go over it together.  I don't know if I --

Q   We can do that.  We can do that, but I'm just asking you if you can tell me what opinions he offered in this case.

A   Again, my memory is that he is a gang expert, not necessarily a gang expert in terms of Chicago PD gang activity during this time period.  I believe he was nine years old when this murder occurred.

So he wasn't a gang expert or working in law enforcement during this time period, and he wrote a report about gang hierarchy.  I don't think he tied it into anything related to police practices or investigative practices.  I could be wrong, but that's my memory of what he did.

Q   Do you understand that Mr. Bjes opined that the beating of Daniel Garcia was a gang related crime?

Page 155

A   I believe that's -- was part of his opinion, yes.

Q   Do you disagree with that opinion?

A   I don't know if I disagree with it.  I mean there's certainly a number of questions that -- that would have to be considered.  You know, was this a drug ripoff.  Was this retribution for somebody stealing drugs.  Was it -- there's no evidence that there was rival gangs.  There's no evidence that the victim necessarily was in a rival gang.

I think his opinions were that it was gang related and --

Q   Go ahead.

A   Without going through his report -- I think he had, like, a 28-page report without going through all of it, but that's -- that's my memory of it.

Q   Do you have an opinion one way or the other as to whether the beating of Daniel Garcia was a gang related crime?

A   I don't know if it was or not.  Certainly, there's evidence that suggests that it may have been, yes.

Q   So if Mr. Bjes opines that it was a gang related crime, do you dispute that?

A   I'd have to go through -- go ahead.

MR. STARR:  Objection, foundation.

Go ahead.

Page 156

A   I'd have to go through his report and you're just representing to me that that's sum and substance of what his opinions are.  I think it was a lot more detailed than that.

Q   Well, let me say this.  So you -- you testified that, you know, independent of whatever Mr. Bjes did you yourself performed an independent review of the materials you were provided in this case, right?

A   Correct.

Q   Okay.  And you estimated that you spent over 100 hours doing that, right?

A   Probably, yes.

Q   And you became obsessed with this case, right?

MR. STARR:  Objection, asked and answered.

A   Somewhat.

Q   So even if Mr. Bjes had never rendered any opinions in this case, if I'd ask you based on your independent review of the materials that were provided to you was this a gang related crime, what would you say?

MR. STARR:  Objection, asked and answered.

A   I would say that the investigative file did not -- and I would have expected it to be sufficient to the point where it would have been able to explain that.

There's some -- some of the police reports if you care to pull those up that indicates that this was not

Page 157

gang related.  So I think you've identified part of the problem.

You've got Mr. Bjes who was nine years old when this occurred and no disrespect to him.  I think he is perhaps a gang expert although he never worked in Chicago and his information is based on his historical review of what occurred, I mean as far as his knowledge of what occurred in the '90s.  But I don't think there's enough information contained in the police investigative file to make that determination.

And I would -- I would defer to the investigators to make that determination versus Mr. Bjes.

Q   Okay.  Do you understand that Mr. Bjes also opined that gang related witness intimidation played a role in the investigation and prosecutions related to the Garcia beating?

A   Again, we can pull up his report.  I'm not disputing that that's what he did.  I don't recall specifically his support for that opinion if that was what his opinion was.

Q   Do you have any opinion as to whether gang related witness intimidation played a role in the investigation and prosecution related to the Garcia beating?

MR. STARR:  Objection.  Form, asked and answered.

THOMAS TIDERINGTON, 03/18/2026                    Page 158..161

Page 158

A   Well, again, it's kind of an investigative mystery when you -- you can't have it both ways.  If you say there was gang intimidation, it's my experience people are very reluctant to testify against gang members, especially those that live on the street corner or live nearby.

And oftentimes officers have to do a great deal of convincing and witness protection and understanding or making the witness understand how they are going to be protected if they testify.

So you can't really have it both ways.  You can't say that this was gang intimidation when there's no explanation as to why witnesses would come forward and provide information about gang members living in their area.  So it is confusing.

Q   Do you recall Mrs. -- strike that.

Do you recall Ms. Parker's testimony in her deposition that she was afraid of retaliation by gang members?

A   I think she talked about that, yes.

Q   Okay.  And do you recall in Ruby Garcia's deposition, the sister of the victim, that she testified that when she went to the location of the beating afterwards that she felt intimidated by a group of men who were on the scene who she believed to be gang members?

A   I think there was testimony about that, yes.

Page 159

Q   Okay.  In that testimony by Ms. Garcia, that was undisputed, right?

A   About whether or not she did that?

Q   About whether -- Ms. Garcia's testimony that when she went to the alley near Armitage and Whipple that there were men there who were throwing gang signs at her and that she felt scared.

Are you aware of any evidence in the record that you reviewed that disputes that?

MR. STARR:  Objection.  Form, compound.

A   No.  But you bring up another good point.  I haven't seen any evidence that there was any investigative effort to identify these individuals that Ruby claimed was throwing up gang signs.

I think that would have been a relevant starting point for the investigation to have her identify individuals that were perhaps standing at the location where the murder occurred.

So that was one of the -- now that you bring it up, it was one of the questions I had is why didn't they conduct a further investigation and have her attempt to identify some of these individuals that were perhaps at the scene of the crime.

Q   Do you recall in Ms. Garcia's deposition that she

Page 160

identified the Plaintiffs as the individuals who were in the alley that night throwing gang signs?

MR. STARR:  Objection.  Form, foundation, misstates facts in the record.

A   I don't recall that.

Q   Okay.  Are you an expert in street gangs?

A   I guess it depends on what type of questions I'm going to be asked in terms of my testimony.  I can certainly -- as a law enforcement officer and in the areas that I worked in South Florida, certainly I have a great deal of experience working various types of criminal gangs.

So I guess I would be, I guess.  Would I be an expert on the Latin Kings.  Probably not.

Q   Have you ever qualified as an expert in street gangs?

A   Not in a civil matter and I'm thinking back on whether or not in any of my criminal testimony.  Certainly, I would say, yes, I have testified about various drug organizations which are criminal gangs and the hierarchy and how they operate.  So, yes, I've been qualified in that area.

Q   Have you ever testified in court as an expert in street gangs?

MR. STARR:  Objection to form.

Page 161

A   I believe I have in criminal matters but not in a civil matter.

Q   Okay.  How many times have you testified as an expert in street gangs in criminal matters?

A   I wouldn't be able to give you a number.  I don't know.  Sometimes I've testified as a fact witness -- fact witness.  I believe there were times where I've testified as an expert on drug organizations and criminal gangs as it related to drug activity.

Q   When was the last time that you testified in a criminal case as an expert about street gangs?

A   That would have been during the time period that I was with the DEA or with the Fort Lauderdale Police Department.

Q   How long ago would that have been?

A   That would have been prior to 2001.

Q   What opinions did you offer in your rebuttal report to Mr. Bjes?

A   Can we pull that up?

Q   Well, do you know what they are without looking at the document?

A   I really don't.  It would be more helpful if I pulled it up and probably be more expedient and more efficient.

THOMAS TIDERINGTON, 03/18/2026                    Page 162..165

Page 162

Q   Were you asked to make any assumptions when you were formulating your opinions in the rebuttal report?

A   No.

Q   What materials did you rely on in formulating your opinions in the rebuttal report?

A   What opinions did I rely on?

Q   What materials did you rely on in formulating your opinions in the rebuttal report?

A   Well, all of the materials that was -- all of the material that was provided to me in addition to I think Mr. Bjes' report as well.

MS. CARNEY:  Sorry.  Jeff, I don't mean to interrupt.

Mr. Tiderington, you seen to have just been clicking around and opening something on your computer.  Can you tell us what you opened or closed or tell us what you're looking at?

I understand you want to look at your report, but Mr. Grossich is asking you questions without that and I don't think it's appropriate to have opened it up if that's what you did.

MR. STARR:  Are you asking him if he did that?

MS. CARNEY:  I am.

THE WITNESS:  I did not do that.  I opened up my

Page 163

original report that we've been talking about.

MS. CARNEY:  Okay.  The next time you open something up on the screen that wasn't there before, can you please let the record reflect -- tell us what you're opening up so that we are aware of what you're looking at on your screen.  I think Jeff asked you that at the beginning of the dep as well.

THE WITNESS:  I don't think he asked me that, but I'd be happy to do that.

MS. CARNEY:  Okay.  Well, if he didn't, then I'm asking you now to please let us know if there's something on your screen that you're looking at.  It is not appropriate to be opening documents and looking at things without letting us know what you have on your screen.

MR. STARR:  I think it was established earlier that he had the report on the screen, but if it wasn't, it is now.

MS. CARNEY:  I understand he said earlier he had his original report.  He had just stopped and was clicking things open while Jeff was asking him about his second report, and Jeff had indicated he didn't want to show him that report yet.  And I wanted to make sure it's clear that that report is not up on his screen.

MR. STARR:  I think it's clear.

Page 164

MS. CARNEY:  Thanks.

THE WITNESS:  And I can explain.  When I clicked, I was clicking on -- I wanted to find my original report.  So I was trying to bring that back up is what I was attempting to do.

BY MR. GROSSICH:

Q   All right.  We'll take a look at your rebuttal report anyway.

A   I'm afraid to pull it up.

Q   Well, I'm pulling it up now.  So --

A   Is it all right if I pull it up, too, or, no?

Q   Go ahead.  Just let us know you're doing it.  All right.  Can you see my screen okay?

A   Yes.

Q   All right.  And this is what we have already marked as Exhibit 2.  This is your rebuttal report, right, first page?

A   Correct, yes.  Just a point, I have it pulled up just so I can see it larger and I can scroll through it.  So, yes, I can see it and I have it pulled up side by side.

Q   All right.  I'm going to your summary of rebuttal opinions.  Do you see that?

A   I do.

Q   And you say, 1, Mr. Bjes' report does not analyze

Page 165

police investigative conduct; rather, it offers a generalized overview of gang culture and applies it in a speculative manner to support the original prosecution narrative.  Do you see that?

A   I do, yes.

Q   Okay.  Do you know if Mr. Bjes was asked to opine on police practices in this case?

A   I don't know.

Q   Okay.  Do you know when he was performing his analysis he was doing that for the purposes of opining on police practices?

MR. STARR:  Objection, foundation.

A   I don't know what he was asked to do.

Q   All right.  Next you say, His report does not meaningfully evaluate whether CPD detectives conducted a thorough, unbiased homicide investigation consistent with accepted police practices.  Do you see that?

A   Yes.

Q   And on the third you have, His conclusions rely on -- rely heavily on assumptions about gang dynamics rather than documented investigative evidence.  Do you see that?

A   I do.

Q   Other than these three items, are you offering any other rebuttal opinions to Mr. Bjes' reported opinions?

THOMAS TIDERINGTON, 03/18/2026                    Page 166..169

Page 166

A   Well, number 4.

Q   Where is number 4?  I only see 3.

A   He does not address critical investigation.  He does not address critical investigative deficiencies including those bulleted points as well.

Q   Okay.  Any other rebuttal opinions you're offering in this report?

A   Other than what's stated in the report, no.

Q   Okay.  You say that -- number 2 here that his report does not meaningfully evaluate whether CPD detectives conducted a thorough, unbiased homicide investigation consistent with accepted police practices.

How does that affect any of the opinions that Mr. Bjes offers?

A   It doesn't.  I guess we're in agreement on that issue.

Q   Okay.  So whether or not he evaluated that has no bearing on his conclusion that this was a gang related crime, right?

MR. STARR:  Objection, foundation.

A   I guess I agree with that.  I don't know if I fully understand the question, but I guess -- I guess I agree with you.

Q   All right.  And how does his failure to

Page 167

meaningfully evaluate in bullet point 2 here, how does that impact his opinion that a gang related witness intimidation was a factor into the investigation and prosecution related to the Garcia beating?

MR. STARR:  Objection to form.

A   I don't think he explains.  I'd have to go through his report again.  I don't think he explains -- and I think he does at some point, but he doesn't thoroughly explain and correlate it to this case in terms of the risk that people -- that if the Plaintiffs were going to testify against other gang members, he doesn't I don't think in detail explain how unusual it is for that to occur amongst the gang culture.

And he doesn't really acknowledge or explain that -- or account for the fact that in the documented police reports there's little discussion about -- there was some word that was used, assuage in her, you know, the safety -- I can't even pronounce the word, trying to convince one of the witnesses of her safety.  They had to convince her.

But he doesn't explain the fact that there's no documentation which perhaps could be exculpatory about the fact that this was never documented in a police report.

Now, the fact that he is not a police practices expert and -- nor is he a supervisor, I guess I could relate

Page 168

it to his inexperience in terms of identifying deficiencies.  But he never really explains that a police officer if he's interrogating somebody that's -- there's a beginning, a middle and an end.  And in this case, none of that beginning or the middle is ever documented.

The only thing that's documented is the end result and that is the conversation with the ASA.

Q   Okay.  So are you aware that Mr. Bjes was deposed in this case two days ago?

A   That's my understanding, yes.

Q   Have you reviewed a transcript of that deposition?

A   I don't think I did.

Q   Are you aware of what Mr. Bjes testified to in that deposition?

MR. STARR:  I'm going to object to the extent that it intrudes upon attorney-client conversations because obviously Mr. Tiderington wasn't present in the deposition.  So I'm going to instruct him to the extent that -- I don't know how he possibly could have any other information about that deposition unless he talked to you, Jeff, or someone else that was present.

So any conversations he had with me, I'm going to instruct him not to answer.

(Whereupon, Mr. Flaxman entered deposition suite.)

Page 169

Q   Are you going to follow your attorney's advice, sir?

A   Do you think I should?

Q   That's a question I got to ask for the record.  Are you going to follow your attorney's advice and refuse to answer my question?

A   Yes.  I think that's appropriate.  I'm not an attorney, and if that's -- that is what's appropriate, certainly I would follow that advice.

MR. STARR:  And, Jeff, just so it's clear, I'm not going -- clearly not going to instruct him if you want to represent things that you think came out of that deposition and ask about them, I'm not going to instruct him not to answer about the deposition per se.

It's just the matter of asking if he knows what testimony came -- was elicited or given or generated in that deposition, and if he knows about it any other way than his conversations with his attorneys, he can answer that but it doesn't sound like he does.

Q   Mr. Tiderington, I'll represent to you that Mr. Bjes testified during his deposition that he was retained to determine what role, if any, gang culture and gang activity played in the murder of Daniel Garcia and the effect it had on the witnesses to that murder.  Okay.

THOMAS TIDERINGTON, 03/18/2026                    Page 170..173

Page 170

A   Okay.

Q   And, in fact, that's in his report.  So -- and you reviewed his report before you drafted your rebuttal report, right?

A   That's correct.

Q   So you read that in his report, right?

A   I believe I did, yes.

Q   Okay.  So Mr. Bjes did not say that he was retained to offer any opinions about police conduct, correct?

A   I don't think he said that, correct.

Q   Okay.  And he did not say that he was retained to evaluate whether CPD detectives conducted a thorough, unbiased homicide investigation consistent with accepted police practices, correct?

A   That's correct.

Q   Okay.  Going back to your rebuttal report, let me pull it up here, you say in bullet point three here or item three, His conclusions rely heavily on assumptions about gang dynamics rather than documented investigative evidence.  Do you see that?

A   I'm sorry.  If you could make it just a little bit bigger so I can read it.

Q   Sure.

Page 171

A   Yes.

Q   What assumptions are you referring to there?

A   Well, again, the assumptions -- he's assuming that in 1998 based on his historical training and knowledge that he gained through training classes that this gang dynamic occurred in this investigation.

I'm not sure exactly what gang dynamics.  I know in his report I think he talked about the hierarchy and what happens if you snitch or if you testify against other gang members.  So I'd have to go through his report again to be clear as to what he -- exactly what he said, but I agree that he did not opine on police practices.

Q   Okay.  Let's go down to page 2.  Under scope of expertise and limitations, do you see that?

A   Yes.

Q   You say, Mr. Bjes' background reflects substantial experience as a gang investigator with the Addison Police Department, including interviewing gang members and testifying as a gang expert in criminal cases.  That experience is acknowledged, and nothing in my report is intended to diminish his service, his dedication to law enforcement, or his commitment to public safety.  Do you see that?

A   I do.

Page 172

Q   Are you in any way questioning Mr. Bjes' qualifications as a street gangs expert?

A   Well, it's not my job to qualify him as an expert.  I would say that his experience indicates that he probably has more experience than the average police officer in terms of gang investigations.  He cited a number of training classes that he attended.

So I don't think there's any question that he is perhaps a gang expert.  I don't know that he is a gang expert as to what occurred when he was 11 years old and maybe he was 9 years old.  I don't know how old he was.  But I don't think he has any firsthand experience of what occurred as it relates to the Chicago Police Department or this specific area.

I don't know that he would be qualified as an expert to opine more so than the Chicago police detectives that were investigating the crime.  I think they would be more qualified to make that determination than Mr. Bjes could.

Q   Based on your review of the materials in this case, doesn't -- don't those materials indicate that the Chicago police did conclude that this was a gang related crime?

A   Not to the extent that Mr. Bjes opined on.

Q   What do you mean by that?

Page 173

A   Well, his -- and, again, we have to pull up his report, but he -- I think in his report he talks about, you know, the hierarchy and he talks about protecting the turf and vetting out punishment and all of these things.

But if this was as relevant as Mr. Bjes is indicating in his report, then I would have expected to see that.  Certainly, the Chicago Police Department had gang experts that were more so better suited to bring that evidence and information forward than Mr. Bjes 20 years later.

So I did not see any supplemental reports from any gang expert from the Chicago PD that really supports what Mr. Bjes is saying.  And if -- and I would look at -- if it was that relevant to the investigation, that there would have been some type of supplemental report.

As I pointed out, there's at least one report that says it was not gang related.

Q   Which report was that?

A   We can pull it up and I can -- it's a box that's checked on one of the supplemental reports.

Q   In the materials that you reviewed, you saw that Melloney Parker testified that she heard the perpetrators yell, we're Latin Kings, mother fucker, right?

A   I believe that's what she says, yes.

Q   Okay.  And do you dispute that Ms. Parker heard

THOMAS TIDERINGTON, 03/18/2026      Page 174..177

Page 174

that?

MR. STARR: Objection, foundation.

A I'm not disputing that.

Q Okay. Are you aware of any evidence in the record that you reviewed that contradicts that?

A No.

Q So going back up here to what you call item number 4 here, he does not address critical investigative deficiencies.

A Yes.

Q What do those have to do with the opinions that Mr. Bjes is offering in this case?

MR. STARR: Objection to form.

A Well, I guess maybe I didn't understand his purpose in being an expert on this case. I thought if he was -- and I think part of his report was in rebuttal to my -- to my report I think is what -- I'd have to pull up his report to be clear.

But I noted that he didn't refute any of the investigative stuff that I talked about, and I guess I was expecting an expert to come in and opine on whether or not the investigation was done properly. Kind of was confused as to really what his purpose is or was to be frank.

Q Isn't that what Richard Rudolph is going to

Page 175

testify to in this case?

MR. STARR: Objection. Foundation, calls for speculation.

A I don't know.

Q Well, you're -- you're aware that the Defendants in this case have disclosed a police practices expert, right?

MR. STARR: Objection to the extent it seeks to invade any attorney-client conversations. I'll instruct my client not to testify. If he knows independent of that, go for it.

A I don't know what he's going to testify to. I don't even know if he's going to testify.

Q Are you familiar with the -- Mr. Bjes at all? Have you met him?

A No.

Q Do you know of him?

A I don't think so, unless he was in one of my training classes, but I don't think I know him though.

Q Are you familiar at all with his career as a police officer?

A Other than what is documented in his CV, no.

Q Are you familiar at all with his work as an expert witness?

Page 176

A No.

Q Do you plan to review Mr. Bjes' deposition in this case?

A If I'm asked to, I certainly would.

Q Okay. Do you plan to issue any additional supplemental opinions in response to Mr. Bjes' deposition testimony?

MR. STARR: Objection. Foundation, speculation.

A I would have to look at his deposition and determine if there was any need to offer a rebuttal or supplemental report.

Q All right. Let's take a look further here in this rebuttal report. All right. You have this section called failure to distinguish between gang context and proof of guilt. Do you see that?

A I do.

Q And you say, Mr. Bjes' central opinion is that gang culture played a significant role in the murder of Daniel Garcia and that the crime was gang related, right?

A That's correct.

Q So that's your understanding of Mr. Bjes' central opinion being offered in this case?

A Based on his report. I haven't read his deposition.

Page 177

Q Okay. And you say, Nonetheless, Bjes' report raises certain gang related issues that are contradictory in nature, but fails to provide a comprehensive analysis and opinion to address those contradictions. Do you see that?

A Yes.

Q What -- what contradictions are you referring to?

A Well, again, on the one hand where you have hardened -- hard core gang members allegedly committing a murder and then they decide to testify against each other with little, if any, documented investigative interrogation techniques, promises oftentimes in my experience in dealing with gang members, they're very reluctant to testify against individuals. They're reluctant to even, you know, cooperate in any way with the police.

Here it seems just the opposite. It seems that because there's no documentation of what actually occurred, it seems that they were brought in. After a few hours, it was decided -- well, in this case it was many hours, but there's no documentation as to what occurred during the interrogations.

No explanation whatsoever about denials, and then all of a sudden all three gang members are testifying against each other. Really doesn't make sense to me, and Mr. Bjes doesn't clarify how this would be possible.

THOMAS TIDERINGTON, 03/18/2026                    Page 178..181

Page 178

Q   All right.  So you already -- you already testified that you do not dispute that this crime occurred in a Latin King controlled area, right?

MR. STARR:  Objection, foundation.

A   I think there's evidence that suggests it is.  I can't -- I don't know that.  Mr. Bjes doesn't know that and neither do I.  Neither one of us were there.

Q   And you also recognize that Ms. Parker testified that she heard someone yell, we're Latin Kings, mother fucker, during the beating, right?

A   I don't recall that.  If you're reading that from her deposition, I'm certainly not going to dispute it, but I don't remember that specifically.  I mean something to that effect, yes, I don't disagree with that.

Q   Okay.  And Ruby Garcia testified that when she went to the scene of the crime that there were guys there who were throwing gangs signs at her, right?

A   That's correct, yes.

MR. GROSSICH:  Okay.  Why don't we take a five-minute break.

THE WITNESS:  Okay.

THE VIDEOGRAPHER:  Going off the record at 3:01 p.m. central standard time.

(Whereupon a recess was taken.)

Page 179

THE VIDEOGRAPHER:  This is the beginning of media unit 6.  We're going back on the record at 3:09 p.m. central standard time.

BY MR. GROSSICH:

Q   Okay.  Mr. Tiderington, I'm going to show you another document, and this will be Exhibit 6 to this deposition.  Can you see my screen?

A   Yes, but I can't read it.

Q   Do you want me --

A   Yes.  If you can just make it a little bit -- okay.

Q   All right.  And you see it says Thomas J. Tiderington's Response To Defendants' Subpoena?

A   Yes.

Q   Okay.  And I guess I can scroll through it slowly, but is this your response to Defendants' subpoena in this case?

A   It appears to be, yes.

Q   Okay.  And did you prepare your response to Defendants' subpoena?

A   I did not.

Q   Okay.  Do you know who did?

A   I don't really.

Q   Okay.  Are there any changes that you want to make

Page 180

to the subpoena response?

A   Such as?

Q   Well, we can take a look at it I guess.  Let me see.  Did you have a chance to review the subpoena response before it was tendered to Defendants?

A   I did.  It was quite some time ago, but yes.

Q   Okay.  Since that -- since that time, do you know of any changes that you -- well, strike that.

MR. GROSSICH:  Let's see here.  All right.  I don't have any other questions for you at this time, sir, but I believe that some of the other defense lawyers in this case might have some.

THE WITNESS:  Okay.  Thank you, Jeff.  I appreciate it.

MR. GROSSICH:  Yup.

MS. CARNEY:  Hi, Mr. Tiderington.

Oh, Andrea, do you want to go first?  Do you have any?

MS. CHECKAI:  No.  Go ahead, Theresa.  Thanks.

CROSS-EXAMINATION

BY MS. CARNEY:

Q   All right.  Hi, Mr. Tiderington, I have some questions about the back half of your report here.  But first let me ask you this, do you have any firsthand

Page 181

experience in investigating gang murders in Chicago's Humboldt Park neighborhood?

A   No.

Q   Okay.  And do you have any firsthand experience working with the Chicago Police Department in 1998?

A   I think the answer is yes, but I'm not sure it was '98.  It might have been '96 or '97.

Q   Were you a Chicago police detective in 1998?

A   No.  I thought you asked if I was -- if I have any experience working with them.

Q   No, I understand.  I asked a separate question.

A   Okay.

Q   Okay.  So I think the answer is, no, you were not a Chicago Police Department detective in 1998, is that correct?

A   I never was.

Q   Okay, great.  Your report starting at page -- I just want to confirm with you here.  Starting at page 33, you have a header, CPD's Policies and Practices Concerning The Documentation and Disclosures In Homicide Investigations.  Do you see that?

A   I do.

Q   Okay.  So from page 33 to about 66, is it fair to say that those are your opinions regarding the disclosure of

THOMAS TIDERINGTON, 03/18/2026                    Page 182..185

Page 182

documentation in homicide investigations that you have opined about in several other cases at this point, right?

A   That's correct.

Q   Okay. And, substantively, pages 33 to 66 are the same as the opinions that you've given in previous cases, is that correct?

A   Correct.

Q   Okay. So then moving to page 67, you have a header that says, The failure to turn over crucial documents in the Daniel Garcia homicide investigation was a direct result of the failed policies and practices discussed above, correct?

A   I'm sorry. Can you print that out? I told you my printer had a problem. So I wasn't able to print those pages out.

Q   Okay. I can't share the screen right now, but I will represent to you that on page 67 of your report it's where you have the header, The failure to turn over crucial documents in the Daniel Garcia homicide investigation was a direct result of the failed policies and practices discussed above. That's your header. Okay.

A   Correct.

Q   Okay. And then from there you have one, two, four pages -- four pages that seem to address the investigation

Page 183

into the Daniel Garcia homicide investigation.

That is a new portion of this report, is that correct?

A   Yes.

Q   And within this portion of the report, you have several bullet points of documents that you claim are missing from the investigative file -- I'm sorry. That you claim are missing from the State's Attorney's file.

Do you remember adding that opinion into this case.

A   I do, yes.

Q   Okay. Do you understand -- do you have an understanding of what happens to evidence that is used in a criminal trial after it is -- after it is -- sorry, let me start that question over.

Do you have an understanding of what happens to evidence used in a criminal trial after the trial concludes?

A   No.

Q   Okay. If I represent to you -- I will represent to you that for the most part evidence that is used in a criminal trial in Cook County -- in the Cook County State's Attorney -- wow, I'm having a hard time talking today. Let me start over.

I will represent to you that in the Circuit

Page 184

Court of Cook County after evidence is used in a criminal trial it is impounded with the clerk of the court. Do you understand what that means?

A   Probably.

MR. STARR: Form.

Q   Okay. That means that the Circuit Court of Cook County maintains that original evidence within the clerk of the circuit court. Do you understand that?

A   Okay. After explaining it, it makes sense, yes.

Q   Okay. Were you ever provided the photographs of the evidence that was used in the criminal court -- in the criminal case that was impounded by the clerk of the circuit court?

A   I don't think I was.

Q   Okay. And if I were to represent to you that multiple pieces of evidence that you claim were missing from the State's Attorney's file were, in fact, impounded by the Circuit Court of Cook County as evidence used at the trial, that would undermine your opinion that those documents were not produced to the State's Attorney's Office and then produced to the criminal defense attorney?

MR. STARR: Objection to form, foundation, calls for speculation.

A   I guess that would be an explanation as to why

Page 185

they weren't in the file.

Q   Not only an explanation about why they weren't in the file, but it would show that the evidence was used at the criminal trial and the defense attorneys had access to it, right?

MR. STARR: Objection. Form, foundation.

A   I can't really speak -- again, I'm a police practices expert. I can't speak to what an attorney may have had access to or what happened in the court afterwards. That's kind of beyond my scope of expertise, but it seems logical the way you're explaining it to me.

Q   And in your review of the files that underlie your opinions regarding the policies and practices of documenting homicide investigations, were you -- did you ever review documents known as discovery receipts from the State's Attorney's Office?

A   I don't recall doing that. If they were in the materials provided, I would have looked at them, but I don't have any independent recollection of what they say.

Q   Okay. And if I were to represent to you that the State's Attorney's file in this case had a discovery receipt that indicated that documents that you claimed were withheld from the State's Attorney's file were actually received by the State's Attorney and documented as such, would that

THOMAS TIDERINGTON, 03/18/2026                              Page 186..189

Page 186

undermine your opinion that the State's Attorney's Office and subsequently the criminal defense attorneys did not get documents from the Chicago Police Department?

MR. STARR: Objection to form, foundation, calls for speculation.

A   I guess I would have to look at that, yes.

Q   But according to your report, you reviewed the State's Attorney's file in this case, right?

A   I did, yes.

Q   Did you review that State's Attorney's file thoroughly?

A   I believe it was, like 2,000 pages if I remember, over 2,000 pages. I did review it. Is it possible there's things that I missed in there. Perhaps.

Perhaps there's things I didn't understand because I don't necessarily understand the workings of the court. I essentially was looking at what was in the investigative file and comparing that to what was in the State's Attorney's file.

Q   But if you don't understand the workings of the court, how can you make -- how can you form opinions on the documents that you claimed CPD withheld from the State's Attorney's Office and subsequently from the criminal defense attorneys?

Page 187

MR. STARR: Objection. Form, foundation, incomplete hypothetical.

MS. CARNEY: It's not an incomplete hypothetical. He just said it.

MR. STARR: Okay. Say whatever you want. It's your deposition. I made my objection.

THE WITNESS: Well, I think if you look at my report, I think I described the analysis I did. I didn't consider all of the other court related things that you're asking me to consider at this point. I did a comparison of what was in the investigative file and what was missing from the State's Attorney's file.

Now, again, if there's logical explanations that you're offering as an attorney, I guess it makes sense, but that wasn't the analysis that I did.

MS. CARNEY: Okay. I don't have any other questions. Thank you.

THE WITNESS: Thank you, Theresa.

MS. CHECKAI: I have no questions either. Thank you.

THE WITNESS: Thank you.

MR. GROSSICH: I have nothing further.

THE WITNESS: Thank you to all, the court reporter and video.

Page 188

MR. STARR: And nothing from Plaintiff. We'll reserve.

THE VIDEOGRAPHER: All right. I'll take us off. This concludes today's video deposition of Thomas Tiderington. We're going off the record at 3:21 p.m. central standard time.

COURT REPORTER: Any orders today?

MR. GROSSICH: I'll order it, please. Standard delivery, PDF.

MR. STARR: We'll take a copy.

MS. CARNEY: Nothing from me. Thank you.

MS. CHECKAI: Nothing from me, Aana. Thank you.

3:21 p.m.

(Further deponent saith not.)

Page 189

STATEMENT OF CHANGE OR CORRECTION

Page   Line

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____
THOMAS TIDERINGTON

THOMAS TIDERINGTON, 03/18/2026            Page 190..192

Page 190

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JOHN MARTINEZ,          )
                      )
      Plaintiff,     )
                      )
   -vs-              )NO. 23 CV 1741
                      )
RENALDO GUEVARA, et al.,    )
                      )
     Defendants.     )

I hereby certify that I have read the foregoing transcript of my deposition given on Wednesday, March 18th, 2026, at the time and place aforesaid, consisting of pages 4 through 188 inclusive, and I do again subscribe and make oath that the same is a true, correct and complete transcript of my deposition so given as aforesaid. Please check one:

_____ I have submitted errata sheet(s).

_____ No corrections were noted.

     _____
        THOMAS TIDERINGTON

Subscribed and sworn to
before me this \_\_\_\_\_ day of
_____, 20\_\_.

     _____
       Notary Public

     My commission expires _____.

Page 191

STATE OF ILLINOIS :
           : SS
COUNTY OF PEORIA  :

     I, Aana M. Giftos, CSR, do hereby certify that heretofore, to-wit, on Wednesday, March 18th, 2026, appeared before me via audio-videoconference:

     THOMAS TIDERINGTON, a witness herein.

     I further certify that the said witness was by me first duly sworn to testify to the truth, the whole truth and nothing but the truth in the cause aforesaid; that the testimony then given by said witness was reported stenographically by me in the presence of said witness and afterwards reduced to typewriting, and the foregoing is a true and correct transcript of the testimony so given by said witness as aforesaid.

     I further certify that the signature of the witness was not waived.

     I further certify that I am not counsel for nor in any way related to any of the parties to this suit, nor am I in any way interested in the outcome

Page 192

thereof.

     In testimony whereof, I hereunto set my hand on this day, Friday, March 20th, 2026.

     _____

     Aana M. Giftos, Certified Shorthand Reporter
      (State of Illinois License #084-003571)

Index: $18,693.75-3:21

THOMAS TIDERINGTON, 03/18/2026

### Exhibits

**1 Tiderington 031826-1** 3:15 22:6 31:14 63:12 71:7 117:13

**2 Tiderington 031826-2** 3:16 22:17 130:19 132:6 164:16

**3 Tiderington 031826-3** 3:18 40:8 57:3 58:7 60:12

**4 Tiderington 031826-4** 3:19 88:16 101:14

**5 Tiderington 031826-5** 3:21 130:12

**6 Tiderington 031826-6** 3:22 179:6

### $

**$18,693.75** 41:1 43:16

**$2,400** 36:14

**$375** 35:23 36:2,5,8,11 43:17

**$600** 37:1

### 1

**1** 4:2 12:13 13:13 22:6 31:14 44:13 46:5 55:20 63:12 71:7,13 72:5 73:12 100:10 113:18 117:13 128:24 164:24

**10** 39:3,11 48:10,13 89:1 93:22 97:16 112:11

**10,000-foot** 33:18,22 78:7

**100** 53:12 97:9 98:4 99:2 156:10

**10:02** 4:3

**11** 172:10

**11:01** 48:16

**11:13** 48:19

**11:25** 57:22 58:1

**11:59** 82:7

**12** 4:8 39:3,11 93:22 94:6,7 102:5 112:11 128:20 134:18 140:8

**12:08** 82:10

**12:54** 116:15

**12th** 71:20 72:7

**13** 89:1 135:19

**130** 58:18

**131** 59:6

**14** 43:18 54:24

**140** 101:23 102:5 141:10

**141** 104:17

**142** 113:18

**145** 138:7

**146** 140:7

**14th** 40:21 41:10,15 53:11 56:13 58:9

**15** 67:8 94:6,7 142:10 145:18

**157** 11:17 44:3 52:8 56:2 59:7

**16** 104:17 148:9

**17** 149:18

**1741** 4:8 5:13

**18th** 4:5

**19** 90:4,6,10 99:19

**1900** 147:20

**192** 88:24

**1978** 69:23

**1998** 71:20 72:7 153:9,13 171:4 181:5,8,14

**1999** 112:4,13 148:13,16

**1:32** 116:18

**1:55** 90:21

### 2

**2** 22:17 48:19 58:1 72:12 100:10,19 101:9 103:20 104:9 105:18 130:19 132:6 134:18 164:16 166:9 167:1 171:13

**2,000** 45:13 186:12,13

**20** 4:13 7:8,20 15:2 45:14 63:8 64:15 116:12 141:10 173:9

**2001** 64:7 161:16

**2016** 132:8 133:8

**2022** 64:8

**2025** 9:1 10:11 18:2 21:12,21 22:3, 8 31:15 32:4 35:19,21,22,23 36:14, 20 37:3 40:22 41:10,11,15 43:19

53:11 54:24 55:21 56:13 58:9 59:4 60:17 61:5,21,24 62:17 63:11 71:8 153:19

**2026** 4:5 21:17,23 22:14 37:6,15 153:20

**22** 44:17 52:9

**23** 5:13 132:2,5

**25** 7:8,20 138:7 152:2,4

**250** 62:24

**2598** 40:13

**2599** 58:15

**26** 9:1 18:2 21:12,20 22:3,8 31:15 32:4 41:11 55:21 59:4 60:17 61:5 63:11 71:8 153:18

**2602** 40:13 58:16

**26th** 10:11

**27** 22:14

**275,000** 62:24

**277** 89:24 122:4

**277-page** 138:19

**27th** 21:17 153:20

**28,000** 64:16

**28-page** 155:13

**2:00** 82:13

**2:10** 144:2

**2:12** 144:5

### 3

**3** 40:8 57:3 58:7 60:12 82:10 166:2

**30** 64:20 116:10,12

**31,000** 64:16

**32,000** 64:16

**33** 181:18,23 182:4

**35** 64:20

**37** 44:17

**3:01** 178:23

**3:09** 179:2

**3:21** 188:5,14

THOMAS TIDERINGTON, 03/18/2026

**4**

**4** 88:16 101:14 116:18 117:14,19 122:8 166:1,2 174:8

**4,500** 37:3

**40** 82:14 136:3,15

**40-** 108:12

**425** 37:9

**44** 7:3 15:11,18 28:16 63:7 75:10

**45** 38:21 39:7 136:3

**46** 132:1

**47** 11:23 12:13 13:13 44:13 46:5 55:20 56:8

**5**

**5** 123:8,12 129:1 130:12 132:7,11 144:5

**50** 43:18,22 52:10 55:1

**50-** 108:12

**55** 38:21 39:7

**58** 12:1

**6**

**6** 126:3 132:12 179:2,6

**60-** 101:10

**60-page** 108:12

**600** 4:13

**66** 181:23 182:4

**67** 182:8,17

**7**

**70-page** 101:10

**71** 22:4 46:19 71:10

**71-page** 47:13 52:10

**79** 10:23

**7th** 148:13

**8**

**80s** 112:18

**84** 35:15

**85** 35:18

**86** 63:14

**8th** 148:16

**9**

**9** 100:2 102:5 132:14 172:11

**900-page** 10:18

**908** 10:21

**90s** 157:8

**91** 64:5

**96** 181:7

**97** 181:7

**98** 181:7

**A**

**a.m.** 4:3 48:16,19 57:22 58:1 82:7

**Aana** 4:14 188:12

**abided** 127:1

**ability** 149:14

**absence** 150:5

**absolutely** 54:18

**abuse** 122:10 123:3

**abused** 122:16,21

**academic** 106:24

**academy** 69:22,23

**acceptable** 24:5 25:15 27:11 80:23

**accepted** 23:21,24 24:8 34:22 72:6,17 77:8 111:12 165:17 166:12 170:14

**accepting** 77:5

**access** 114:18 185:4,9

**account** 167:15

**accounts** 142:16

**accreditation** 15:16

**accredited** 15:17

**accuracy** 27:17 83:12 84:9 86:17

**accurate** 35:21 54:20 63:19 76:12

83:18,23 95:5,9 98:13 105:6 107:18 109:22 115:2 123:22

**accurately** 95:5 109:2 113:16 133:10

**accused** 75:15

**acknowledge** 103:3 138:15 167:14

**acknowledged** 171:20

**actions** 78:19 111:11 128:21 146:8

**active** 65:13 66:12 147:5

**activities** 34:13 65:11,12 96:6

**activity** 64:22,24 65:1,3 66:2,7 154:16 161:9 169:23

**actual** 55:4

**add** 70:17

**added** 50:11

**addicted** 123:19 124:2,9 125:15, 20 150:12

**addiction** 123:23

**adding** 183:9

**Addison** 171:17

**addition** 32:13 118:2 153:18 162:10

**additional** 13:3 23:6 32:1 34:21 60:7 61:1 65:24 78:23 90:1 135:11 153:16 176:5

**address** 166:3,4 174:8 177:4 182:24

**adequate** 72:17 145:6

**Administration** 112:7

**admitted** 87:9,18 123:23 125:3,5 147:14

**admittedly** 124:2 147:23

**advice** 169:1,5,9

**advised** 136:8

**advising** 127:13

**affect** 73:22 166:13

**affidavit** 106:2 107:19 109:24 129:15,19,21,24 130:2,6,9,15 131:4 133:16 134:7,10 141:22 142:1 145:10

**affiliations** 150:4,22

THOMAS TIDERINGTON, 03/18/2026

**affirmative** 21:21 22:2 35:10 36:6 39:7 41:18,21 42:18 43:24 46:18, 21 47:5,13 48:23 49:2 50:1,6,16 51:2,6,16 52:1,5 60:1 70:16 71:10 90:11 100:19 117:14 145:18

**affirmatively** 121:20

**afraid** 158:17 164:9

**agencies** 112:12

**agree** 97:17 98:19 99:7 137:20,22, 24 141:1 145:2 151:10 166:21,23 171:11

**agreed** 55:21

**agreement** 166:15

**ahead** 12:3 24:19 25:23 29:23 30:5,6 31:6 36:20 45:4 46:12 49:19 52:23 53:16 55:11 58:21 63:21 75:18 77:10 83:5,9 84:20 90:3 91:15 103:8 104:13 109:22 111:10 125:2 133:24 143:10 155:11,22,24 164:12 180:19

**alike** 49:22

**allegations** 25:7,13 26:15 30:12 34:10 74:4,16,17,18 76:8,10,12,16 77:21 107:11 108:19 111:15 119:2 122:12 137:6 146:5,23

**alleged** 25:3 74:23 75:7 77:15 122:15 135:16

**allegedly** 105:22 108:4 110:2 127:9 142:14 146:20 177:8

**alley** 89:10,11,17 90:17,18 91:3 92:7,17,24 99:10 100:4 120:18 122:1 159:5 160:2

**alternative** 135:12

**Amendment** 73:15 75:5,14

**amount** 36:18 40:24 41:5 43:23 55:5 62:15,16

**analysis** 9:4 38:7 73:22 165:10 177:3 187:8,15

**analyze** 72:23 141:3 164:24

**Andrea** 4:21 180:17

**anticipate** 72:22

**anticipating** 67:19

**apartment** 89:17 90:16 92:7 104:21

**apologies** 91:16

**apologize** 57:9

**app** 43:1,3,4,8

**apparent** 118:21

**apparently** 19:6 131:19 133:14,17

**appearance** 135:22

**appeared** 90:22

**appears** 58:17 110:24 120:11 179:18

**applies** 165:2

**apply** 118:20

**approximately** 6:23 39:7,11 52:10 53:12 54:24 64:17 67:3,14 93:22 97:8

**area** 15:7 16:13 19:12,16 106:15 129:1 147:6,20 158:13 160:21 172:14 178:3

**areas** 15:19 16:9 19:7 137:5 138:18 146:6 160:9

**argumentative** 45:3 98:8 99:6 109:3 110:6 121:16 122:3 124:24 133:23

**Arizona** 68:16,17

**Armitage** 159:5

**arose** 71:19

**array** 137:14 139:3,7 146:10

**arrays** 78:20

**arrest** 7:16 71:19 87:11 100:13,23 103:22 112:24 115:6

**arrested** 114:4,13 148:12

**articulate** 26:23

**ASA** 168:7

**ASA's** 135:22

**ASAS** 135:21

**asks** 121:19

**assault** 72:7 74:7 90:23

**assess** 72:3 73:23 74:15 142:4

**assessment** 34:18 124:11

**assigned** 65:8

**Assistant** 136:15,23

**associates** 4:12,15 147:4

**assuage** 167:17

**assume** 8:13 80:4 142:5

**assuming** 17:14 24:15 50:8 82:16 95:6 119:13,15 128:16 171:3

**assumption** 75:6 119:12 122:20 127:18,22

**assumptions** 33:6 162:1 165:20 170:19 171:2,3

**attaching** 59:15,18

**attachment** 8:24 10:24 18:8 31:18,22 33:2 35:12 36:3 44:18 46:6 55:20 59:3 60:1,16,23 63:15

**attachments** 114:19

**attempt** 29:14 159:21

**attempting** 164:5

**attended** 172:7

**attention** 139:2

**attested** 129:21

**attesting** 27:17 83:11 86:17

**attorney** 4:18 13:1 14:10 18:24 28:10 119:16 129:16 136:16,24 169:8 183:22 184:21 185:8,24 187:14

**attorney's** 54:14 169:1,5 183:8 184:17,20 185:16,21,23 186:1,8, 10,19,23 187:12

**attorney-client** 19:23 20:4 168:16 175:9

**attorneys** 8:20 13:24 34:3 42:4, 10,12 53:19 71:17 110:11 169:18 185:4 186:2,24

**attributable** 107:15

**attributed** 142:12

**auto** 66:4

**average** 37:18 172:5

**awakened** 90:20

**aware** 19:15 103:10 133:18 134:9 151:23 159:8 163:5 168:8,13 174:4 175:5

---

**B**

---

**bachelor's** 63:10

**back** 32:10,23 48:19 56:16 57:2,9, 11,12 58:1 82:10 85:5 86:20,22 88:4,12 89:23 92:19 93:2,8,10

THOMAS TIDERINGTON, 03/18/2026

94:13,14 98:21,22 99:16,18 100:10 101:4 103:17,19 112:19 114:19 115:12,20,22 116:1,2,18 119:10 121:10 129:13 134:1,14,17 137:22 139:15 141:9 144:5 145:16 148:4 153:9 160:16 164:4 170:17 174:7 179:2 180:23

**background** 60:9 171:16

**barred** 19:1,9

**base** 15:13 26:17

**based** 29:8 30:18 34:19 49:6 74:16 79:3 81:7 90:4 91:20 95:7 106:14 118:21 121:9 122:12 123:22 128:11 131:11 139:12 144:19 156:16 157:6 171:4 172:19 176:23

**basic** 8:2 43:7,12

**basing** 69:10

**basis** 102:24 125:11

**Bates** 40:12 58:15

**bear** 89:4 132:4

**bearing** 166:18

**beating** 31:10 71:20 135:10 153:8 154:24 155:16 157:16,23 158:21 167:4 178:10

**begin** 37:17

**beginning** 4:2 47:14 48:18 82:9 96:12 116:17 136:21 144:4 163:6 168:3,4 179:1

**begins** 11:6

**behalf** 4:6,22,23 5:17 68:6 69:4

**belabor** 63:3

**Belated** 131:21 137:8

**believed** 114:2,11 158:23

**believes** 111:15

**big** 136:17

**bigger** 170:23

**bill** 42:6,9,11,12,14 53:21 54:3,7,9, 12,24

**billable** 52:16,17,21 93:24

**billed** 39:10,14 40:3,24 55:1

**billing** 42:24 55:14 59:20

**birthday** 84:2,3,24 85:2

**bit** 10:12 23:16 40:9 88:13 112:1 170:22 179:10

**Bjes** 32:14 72:24 153:23 154:1,23 155:20 156:5,15 157:3,12,13 161:18 165:6 166:14 168:8,13 169:21 170:8 172:18,23 173:5,9,12 174:12 175:14 177:24 178:6

**Bjes'** 162:11 164:24 165:24 171:16 172:1 176:2,6,17,21 177:1

**blank** 47:6,8,19 48:5 51:20

**blocked** 90:18 91:4 93:6 121:20 122:1

**blocking** 139:19

**bloody** 87:13 100:15 103:24 104:6,10,21 105:3

**body** 69:12

**boots** 87:13 100:15 103:24 104:6, 10,21 105:4

**border** 68:18

**bottom** 73:12 112:19 123:8,12

**Bowen** 4:12,15

**box** 11:13 173:18

**break** 8:8 38:13 48:7,8,9,22 57:16 82:4,14 116:5,7 122:5 139:1,17 143:11,20 145:17 178:20

**breaks** 10:1

**bring** 96:8 139:2 159:11,19 164:4 173:8

**broader** 152:7

**broke** 117:18

**brought** 177:17

**buckets** 16:17

**building** 90:16 121:24

**bullet** 117:24 118:2 122:8 129:4,7 135:20 137:13 167:1 170:18 183:6

**bulleted** 166:5

**bunch** 57:10

---

**C**

**calculate** 43:20

**calendar** 61:21

**California** 19:5

**call** 14:8,9,11,13,15,17,18,19,20, 23,24 28:21 34:22 87:2 174:7

**called** 5:17 12:19 38:6 43:4 136:16 176:13

**calls** 13:23 14:4 15:4 28:8 29:22 31:5 131:21 175:2 184:22 186:4

**canceled** 94:5

**capture** 24:14

**card** 84:2,3,24 85:2,3

**cards** 84:16

**care** 102:13 113:2 132:23 134:5 139:24 140:9,15,20 141:6,13 156:24

**career** 7:1,14,15 15:12 16:23 34:8 175:20

**carefully** 109:2

**Carney** 4:23 162:12,23 163:2,10, 18 164:1 180:16,21 187:3,16 188:11

**cars** 66:6

**case** 4:8 5:10,11 6:12,17 9:4,7 10:11 11:3 12:23 13:6,9,24 16:1 19:4,5,9,19,21 20:1,6,9,13,18 21:1, 9 22:22 23:11,13,18 24:11,17 25:19 26:21 27:7 29:20 30:2 31:22 32:20 33:4,7,12 34:1,9,24 35:24 38:10,18 39:8 40:1,4 41:24 42:4,13 43:10,18 44:14 45:12 46:3,21 47:4, 10,12 48:2,23 49:3,15,16 50:2 51:3,6,17 52:2,19 53:13,19,22 54:2,3,8,10 55:1,5,13,23 56:8,10 60:14,22 61:13,16 68:2,7,13,15,20 69:3 70:12,17,22,23 71:1,2,24 72:20 73:5,17,22 74:3 75:12 77:20, 23 78:15 79:2,12 81:6,19 88:20 91:11 93:13,15 96:1,7,18 97:1,7,9, 18,19 98:4 99:3 109:12,18 110:23 117:2,11 121:14 125:22 127:6,18 128:4,15 130:22 133:19 134:9,22 135:13 136:22 142:4,13 147:24 152:12,24 153:4,5,6,12 154:2,5,13 156:7,12,16 161:11 165:7 167:9 168:4,9 172:20 174:12,15 175:1,6 176:3,22 177:18 179:17 180:12 183:10 184:12 185:21 186:8

**cases** 6:9,12,14 12:6,16 15:22,23 17:6,12 18:3,18 20:8,14 29:3 42:24 48:3 50:22 53:1,2,22 54:12 55:17 67:13,15,16,20,22 68:17 73:19 75:11 76:2,10,16,22 77:2,3,13,22 78:10 84:13 96:18 127:23 128:6,17 136:10,22 171:19 182:2,5

**Casiano** 125:23

THOMAS TIDERINGTON, 03/18/2026

**Casiano's** 123:9 124:5

**category** 60:9 146:21 150:11

**caution** 124:4

**cells** 136:3

**central** 4:3 48:16,20 57:22 58:2 82:7,11 116:15,19 142:13 144:2,5 176:17,21 178:23 179:2 188:6

**Certificate** 80:18

**certified** 4:11

**chance** 122:5 180:4

**change** 63:24 110:14

**changed** 29:17 37:6 50:11

**charge** 36:5,8 37:20,23 38:2 112:8

**charged** 35:23 36:2,11,14 37:3 79:3 81:7 96:14 97:1 142:6

**charging** 103:1 125:11

**check** 21:16 56:23

**Checkai** 4:21 180:19 187:19 188:12

**checked** 173:19

**Chicago** 4:13,24 12:24 29:16 53:20 71:21 72:8,12 96:18 127:2 154:15 157:5 172:13,16,21 173:7, 11 181:5,8,14 186:3

**Chicago's** 136:12 181:1

**chief** 29:10 34:5,9,12 63:8 64:7,19, 21 65:7,14,18 66:13,16,20,24 67:2 96:10

**chief's** 29:8

**choose** 109:1

**Christmas** 84:16,24 85:3

**Christopher** 5:5

**circuit** 183:24 184:6,8,12,18

**circumstances** 30:22 81:13 87:6 142:15 146:20

**citation** 115:16

**citations** 144:9,10 145:3

**cite** 144:17,20

**cited** 120:3 144:19 172:6

**citing** 68:22

**City** 4:23 53:20 66:5

**civil** 6:4 7:4,7,12,22 12:16 16:19,20 17:12,23 18:18 44:14 55:23 67:15, 16,22 68:2,7 109:18,21 160:16 161:2

**claim** 105:3 118:5 183:6,8 184:16

**claimed** 95:21 104:5 123:1 159:13 185:22 186:22

**claiming** 30:13 87:12 100:14 103:23

**claims** 110:3 123:3

**clarification** 7:2,5 12:4 28:23 66:1 114:8

**clarify** 26:2 52:15 108:17 110:10 118:22 119:20 177:24

**Clark** 4:13

**classes** 171:5 172:7 175:19

**clause** 129:8

**clear** 19:10 26:1 88:9 89:9,16 99:10 100:4 111:14 118:23 120:17 163:22,24 169:10 171:11 174:18

**clearer** 110:15

**clerk** 184:2,7,12

**click** 54:5 113:24

**clicked** 11:12 164:2

**clicking** 162:15 163:19 164:3

**client** 175:10

**close** 85:8

**closed** 162:16

**closely** 44:24 45:7,10

**cocaine** 123:19 124:3 125:15,20 150:12

**codefendant** 151:16

**codefendants** 153:5

**coerce** 74:7

**coerced** 24:22 25:6,9,14,18 26:7, 11 30:13 73:16 111:1,6,17 118:3, 15 119:14 135:23 137:2

**coercion** 106:5 110:18

**coercive** 81:12,16 87:6 105:20 142:14 146:20 150:4,22 151:2

**Cole** 118:11

**collective** 12:11

**colloquially** 85:17

**combined** 34:20

**command** 34:8

**commit** 74:6

**commitment** 171:22

**committed** 31:9 65:1 77:15 127:19 128:16

**committing** 177:8

**common** 29:15,18

**communications** 20:4

**compare** 51:13 62:11 109:4,7

**compared** 37:24 38:5

**comparing** 45:17 49:24 186:18

**comparison** 85:8 187:10

**comparisons** 12:19

**compensated** 39:24

**complaint** 20:9

**complete** 60:2,5,6

**compound** 159:10

**comprehensive** 91:19 114:20 121:13 177:3

**computer** 57:17 162:15

**conclude** 77:15 172:21

**concluded** 76:11 91:19 145:10

**concludes** 183:17 188:4

**concluding** 79:23 111:5 146:2 148:19 149:1,4 150:7

**conclusion** 28:9 29:22 31:5 131:22 166:18

**conclusions** 73:8,13 126:17 165:19 170:19

**conditions** 90:19 91:5

**conduct** 34:6 73:15 146:10 152:9 159:21 165:1 170:9

**conducted** 72:8 165:15 166:11 170:13

**conference** 14:17

**confess** 136:16

**confession** 24:22 25:9,18 26:7,11 106:4,18 110:17

**confessions** 25:4 81:15 105:19

THOMAS TIDERINGTON, 03/18/2026

106:9,10,12,22 107:2 111:1,5,17 118:3,15 119:14 127:10 135:17,22 137:1

**confidence** 99:23

**confirm** 181:18

**confirmed** 91:8

**conflicted** 103:15

**confuse** 119:16,22

**confused** 115:18 174:22

**confusing** 158:14

**confusion** 110:9,12 118:21 139:18

**connecting** 87:14 100:15 103:24

**connections** 77:22

**consequences** 83:21

**considered** 55:16 73:13 74:9 150:14 155:5

**consist** 46:7

**consistent** 23:20,23 49:10 72:17 73:17 76:1,6,9,21 91:20 134:8 165:16 166:12 170:14

**consisting** 112:11

**constitutional** 151:23

**consultant** 61:13,16

**contained** 22:22 23:1 83:18 117:21 138:19 142:15 157:9

**contemporaneous** 151:13,24

**context** 114:23 176:14

**contingent** 111:14

**continuation** 57:24

**continue** 110:7 137:3

**contradicted** 102:21,22

**contradictions** 177:4,6

**contradictory** 177:2

**contradicts** 89:22 90:14 102:19 103:11 174:5

**controlled** 178:3

**conversation** 20:7 33:17 54:11 168:7

**conversations** 8:19 19:23 42:3,9, 11,14 168:16,22 169:18 175:9

**convicted** 79:3,8,10,23 81:7

**conviction** 79:14,17,18

**convictions** 79:13,14,22 80:2,3,6, 12

**convince** 120:13 167:18,19

**convincing** 158:7

**Cook** 13:1 183:21 184:1,6,18

**cooperate** 113:1 115:7 177:13

**copied** 51:21

**copy** 9:22 10:2,4,6 117:15 188:10

**core** 177:8

**corner** 158:5

**correct** 6:10 8:22,23 9:1,10 10:19, 20,24 11:1,6,18 12:15,16 13:2,7,12 14:1 16:23 17:3,4 19:2 20:19 21:2, 9,10,12,15,17,18 22:4,5,19,20 25:8 26:13 27:20,24 28:1 31:19 32:17 35:16,19,20 36:1 37:5 38:24 40:22, 23 41:1,2,12 43:19 44:1,2,15,16, 20,22 48:24 49:1,4,5 51:8 53:9 55:1,2,18,23 56:7,10,11 57:17 58:10,16,19 60:14,15,20 61:6 69:1, 4,5,8 71:12,22 72:11,19 73:3 78:2 81:4,14 87:3 89:17,20 91:11 92:4 93:16 97:12 100:5 102:8,10,14 103:5 104:22 107:6 108:22 109:19 111:18,21 114:5,20 117:1,3,4,9,23 122:18,19 126:1 131:3,4,5,7,8,16 132:20 133:13,16 137:18 140:10, 16 141:13 147:7,16,22 150:18,24 151:17 156:8 164:18 170:5,10,11, 15,16 176:20 178:18 181:15 182:3, 6,7,12,22 183:3

**correctly** 71:21 87:15 104:24 105:1 106:6 108:21 111:3 114:7 122:11

**correlate** 167:9

**corroborate** 125:13

**corroboration** 150:5

**corrupt** 152:8

**counsel** 4:16 56:19 59:6

**counsel's** 56:20

**counting** 38:22,23 66:6 119:8

**county** 13:1 65:10 183:21 184:1,7, 18

**couple** 8:19 14:6 61:15 67:18,20 115:22

**court** 4:9,14 5:7 17:1,19,21 18:18 19:15 47:24 80:12 91:14,16 106:17 109:1,13 142:17 145:20 160:22 184:1,2,6,8,11,13,18 185:9 186:17, 21 187:9,23 188:7

**courts** 16:12

**cover** 41:14,17,20

**covers** 41:23

**CPD** 72:9 165:15 166:10 170:13 186:22

**CPD's** 181:19

**crack** 123:19 124:2 125:15,20 150:12

**create** 50:16 78:20

**created** 40:16

**creating** 59:11

**creation** 72:16

**credibilities** 142:4

**credibility** 116:23 117:2,10 123:9 124:6,11,15,18 125:6,10

**credible** 123:21 125:17,23

**credit** 107:11 119:9 124:12

**credited** 111:11

**credits** 25:13 26:15 108:18 118:19 119:1,9 124:12 137:6

**cribs** 66:8

**crime** 85:13 87:14 95:17 97:23 98:1 100:16 104:1 154:24 155:17, 21 156:18 159:23 166:19 172:17, 22 176:19 178:2,16

**crimes** 65:1,6,16 129:2

**criminal** 7:18 15:12 16:18 17:8 28:12 63:10 65:3,11 67:20 75:22 79:22 83:2 84:4 95:19 152:9,14,18, 22 160:11,17,19 161:1,4,8,11 171:19 183:14,17,21 184:1,11,12, 21 185:4 186:2,23

**criminally** 79:3 81:7

**criminals** 66:4

**critical** 166:3,4 174:8

**CROSS-EXAMINATION** 180:20

**crucial** 182:9,18

**culminate** 48:6

THOMAS TIDERINGTON, 03/18/2026

**culture** 165:2 167:13 169:22 176:18

**cumulative** 53:1 128:5

**curriculum** 63:17

**cut** 47:23 50:2,6,9,10,15

**CV** 4:8 5:13 63:6,15,19 64:2 175:22

---

**D**

---

**daily** 125:3,6

**danger** 103:2

**Daniel** 12:15 31:10 55:22 71:20 72:8 154:24 155:16 169:23 176:19 182:10,19 183:1

**date** 38:11,18 40:1,4,21 42:4 63:19

**dated** 21:11,17 29:10 41:8,10 56:13

**day** 36:14,16,17,18 37:3

**days** 14:6 69:22 105:23 148:14 168:9

**DEA** 161:13

**deal** 80:19 96:7 158:6 160:11

**dealing** 125:19 177:11

**dealt** 123:18

**death** 71:20 72:8

**December** 40:21 41:10,15 43:18 53:11 54:24 56:13 58:9

**decide** 108:5 110:3 122:15 149:6 150:17 177:9

**decided** 177:18

**deciphering** 80:3

**dedication** 171:21

**deemed** 19:13

**deeply** 79:4 81:8 87:2 105:18

**defendant** 4:6,22 5:5 7:23 122:10 134:22

**defendant's** 34:3

**defendants** 4:20 5:17 68:1 147:3 152:19 154:2 175:5 180:5

**Defendants'** 32:6 179:13,16,20

**defense** 180:11 184:21 185:4 186:2,23

**defer** 98:21,22,24 157:11

**deficiencies** 97:5 166:4 168:1 174:9

**definite** 55:7

**definition** 85:10,15

**definitive** 33:19 127:12

**definitively** 98:17

**degree** 63:10 96:2,3 107:3

**degrees** 63:9

**delivery** 188:9

**demonstrate** 98:18 139:21

**demonstrated** 148:24

**demonstrates** 103:15 142:18 145:21 149:10

**Denesi** 29:10

**denials** 177:21

**denied** 129:8 133:19 134:10 148:14 149:11

**deny** 73:16

**dep** 103:9 120:16 121:6,14 130:13 141:18,19 163:7

**department** 12:24 34:6,15,16,19 64:7,18 65:5,17 68:21 112:3,6,14 161:14 171:18 172:13 173:7 181:5, 14 186:3

**Department's** 29:17 72:13 127:2

**departments** 15:17

**departures** 111:12

**depend** 45:5

**depending** 83:16,22

**depends** 23:2 45:23 95:19 160:7

**depo** 35:4 45:5 54:5 70:13,14,18, 22 94:3,5 103:6 105:14 113:15 114:18 115:22 120:3,5,9,20 121:10 122:4

**deponent** 188:16

**depos** 7:18

**deposed** 17:16 168:8

**deposition** 4:4,6 6:2,12 7:16,17, 23 8:2,17 9:12,15 11:10,21 12:5,10 13:14 14:1 15:5 21:20 22:7,17 31:14 36:15,18,23 37:10 38:23 39:2,12 40:8 44:19,21,24 45:13,18,

20 52:9 57:3 58:7 69:7 71:1 82:19 88:16,20 89:16 90:9 93:13,15,22 94:13 95:3 98:10,11,23 99:8,15 101:14,24 104:18 105:2,10 113:5, 11,13,18 114:15 115:11 121:19 129:14 130:11,19 131:23 134:2,8 137:17 138:1,3,5,7,16,17,19 140:5, 8,14,23 141:2,5,19,21 147:11 148:7 153:17 158:17,20 159:24 168:11,14,17,20,24 169:12,14,17, 21 176:2,6,9,24 178:12 179:7 187:6 188:4

**depositions** 6:23 7:2,4,12 12:6,9 13:11,20 17:19 32:23 45:7,10,18 46:1

**depth** 13:21

**describe** 65:2 88:10

**describing** 106:2 107:20 109:24 151:14

**description** 88:7

**designated** 57:3

**detail** 27:19,21 30:11,22 33:10,24 45:11 78:22 80:10 82:1 88:11 101:5 108:12,13 109:8 110:8 136:7 167:12

**detailed** 24:4 26:23 33:19 78:5 81:20 107:1 128:12 134:15 151:13 156:3

**details** 33:21 88:14 90:1 101:10,12 122:6 142:15

**detective** 73:14,21 74:22 77:14 86:10 87:10 100:11 102:7,11 103:12,21 104:19 105:24 106:5 110:18 114:3,12 122:9 126:9,20 127:18 128:8 129:1 132:16,22 137:15 139:4,8,23 141:11 142:21 149:12 153:7 181:8,14

**detectives** 72:9 117:21 136:5 140:9,15,19 141:6 145:24 146:4,16 151:14 165:15 166:10 170:13 172:16

**determination** 74:21 75:8 123:2 130:10 131:18 146:15 157:10,12 172:18

**determinations** 116:22 117:10

**determine** 125:22 169:22 176:10

**determined** 135:23 137:1

**Detroit** 66:5 69:22

THOMAS TIDERINGTON, 03/18/2026

**developed** 15:11

**deviation** 27:22

**deviations** 24:5,8 27:11 72:6 80:23

**differ** 59:2

**differences** 49:23

**differently** 95:6 138:23

**difficult** 17:22

**dig** 78:6

**diminish** 171:21

**direct** 5:20 111:2 142:20 145:22 182:10,20

**direction** 20:12

**directly** 89:9

**disagree** 155:2,3 178:14

**disclosed** 6:7 175:6

**disclosure** 9:1 10:11 18:2,5,7 22:8 31:15 35:16 41:11 44:19 55:21 59:4 60:16 61:5 63:12,14 64:6 71:8 72:16 181:24

**Disclosures** 181:20

**discovery** 4:4 185:15,21

**discrepancy** 139:17

**discussed** 48:8 60:24 107:1 138:18 182:11,20

**discusses** 107:1

**discussing** 48:23

**discussion** 33:20 120:6 134:3 136:23 140:22 141:23 167:16

**discussions** 15:4 141:2

**dispersed** 91:1

**dispute** 46:15 99:15 120:1,21 147:8,9,17 149:12 155:21 173:24 178:2,12

**disputes** 159:9

**disputing** 99:12,14 141:20 145:12,13 147:24 148:5 157:18 174:3

**disrespect** 157:4

**distinction** 17:18 60:11

**distinguish** 176:14

**District** 4:9 6:5 47:24

**divided** 43:16

**Division** 4:10

**document** 10:18,24 22:11,18 40:7,12,14 57:2 58:15,22 59:1,2, 11,13,19 69:14,21 70:10 83:6,7,12 84:8 85:4 86:15 88:15,16,24 94:23 108:21,24 109:12 114:10,14,16 115:15,19,24 118:8,12 125:13 130:13 135:3,4 143:9 146:8 161:21 179:6

**documentation** 25:1,3 27:23 30:23 39:4 62:19 70:1 72:15 78:11, 13,14 93:19 106:12 108:20 127:6, 7,11,12 146:7 151:13 153:14,15 167:21 177:16,19 181:20 182:1

**documentations** 146:8

**documented** 136:11,13 165:21 167:15,22 168:5,6 170:20 175:22 177:10 185:24

**documenting** 27:12 185:13

**documents** 9:21 37:17 60:12 80:11,15,18 93:10 94:18 98:17 148:6 152:15 163:13 182:9,19 183:6 184:19 185:15,22 186:3,22

**dollar** 62:15

**door** 143:12

**double** 36:18 52:20 55:6

**dozen** 17:14

**draft** 46:21 52:5

**drafted** 20:18 49:2 52:10 119:13 122:21 144:8 153:19 170:3

**drafting** 9:6,9 36:5,8 41:18,21 42:18 43:24

**Drop** 11:13

**drug** 112:7 123:23 124:8 125:3,6, 16 155:5 160:18 161:8,9

**drugs** 123:20 155:6

**due** 150:3,22

**duly** 5:18

**dynamic** 171:5

**dynamics** 165:20 170:20 171:7

**Dysart** 32:16 91:10 107:3

**Dysart's** 32:8 91:8,24

**E**

**earlier** 11:9 18:13 44:12 54:15,23 61:3 62:14 68:22 69:24 70:2 82:19 93:9,21 94:3,4 97:6 99:16 108:20 163:15,18

**early** 20:13 88:7 112:18

**ease** 21:19

**easier** 10:2,17 101:19

**easily** 38:13 96:11,17 129:13

**Eastern** 4:10

**easy** 96:16

**education** 63:4 106:20

**effect** 169:24 178:14

**efficient** 161:24

**efficiently** 96:17

**effort** 52:18 80:20 96:21 135:10 159:13

**efforts** 34:13 78:12

**Eladio** 130:15,24 131:10 132:8

**elements** 85:12

**elicited** 169:16

**eliminated** 96:14

**else's** 29:1 70:20 84:7,11

**emphasis** 145:11

**employed** 142:20 145:23 146:3,16

**employment** 61:13

**end** 37:21 49:22 96:13 115:2 136:21 168:4,6

**enforcement** 15:10 16:17 63:7 68:7 75:9 107:1 111:12 112:7 123:17 150:15 154:19 160:9 171:22

**engage** 75:14

**engaged** 74:22,23 75:6 76:7 128:8

**entered** 90:9 168:24

**enterprise** 152:14

**entire** 22:7 41:5 120:5

**entitled** 152:6

**equally** 146:22

Index: equate-file

THOMAS TIDERINGTON, 03/18/2026

**equate** 28:3

**equates** 28:5

**era** 29:18

**Ernest** 134:18,22,23 142:21,24 145:24 151:15,18

**essentially** 34:7 43:1 47:5 186:17

**established** 141:24 163:15

**estimate** 38:21 39:5,21 52:20 62:5,7,22,23 94:1

**estimated** 90:24 156:9

**et al** 4:7

**evaluate** 165:15 166:10 167:1 170:13

**evaluated** 166:17

**evaluation** 29:2

**evidence** 26:20 27:7 28:3,6 29:20 73:17 74:1 79:4 81:8,18 87:2,13,15 96:15 100:15,16 103:14,24 104:1, 5,6,15 105:19 127:1 128:2 133:18 134:9 142:3,16 144:20 147:10 148:24 149:4,9 152:13,18,20 153:1 155:7,8,19 159:8,12 165:21 170:20 173:8 174:4 178:5 183:13,17,20 184:1,7,11,16,18 185:3

**exact** 7:8,10 17:13 39:22 40:2 55:12 62:2,6,18 65:19 67:8 68:10

**EXAMINATION** 5:20

**examine** 6:18

**examined** 5:18

**examiner** 45:13

**exception** 19:4

**excluded** 18:20

**exculpatory** 136:18 167:21

**excuse** 11:2 137:23

**exhibit** 22:6,17 31:14 40:8 57:3 58:7,8,12 60:12 63:12 71:7 88:16 101:14 117:13 130:12,19 132:6,11 164:16 179:6

**existed** 87:15 100:16 104:1

**exonerated** 79:10,11

**exoneration** 132:8

**expect** 74:4,5

**expected** 20:15 86:7 88:9 119:18 156:21 173:6

**expecting** 174:21

**expedient** 161:23

**experience** 15:18 34:20 37:19 50:23 63:4 123:20 125:19 136:20 158:3 160:11 171:17,20 172:4,5,12 177:11 181:1,4,10

**expert** 6:7,17 7:19 9:7 10:11 16:2, 4,6,9,13,19,20 17:8,11,15,17,19,21 18:19 19:6,16 21:1 32:6 35:24 37:19 47:4,13 49:7 50:2 61:9,16, 19,22 62:1,17 67:6,10,14 68:6 72:23 73:24 84:13 92:10 103:20 105:11 106:8,10,11,13,15,18 109:17 116:21 142:7 154:14,15,18 157:5 160:6,13,14,22 161:4,8,11 167:24 171:19 172:2,3,9,10,16 173:11 174:15,21 175:6,23 185:8

**expertise** 15:7,11,17,19 19:12 171:14 185:10

**experts** 37:22 38:1,4 73:18 76:2, 10,17,22 77:1,6,13 107:3 173:8

**explain** 7:14 30:22 33:11 37:12 63:4 75:22 108:13 115:23 116:2 126:16,24 156:22 164:2 167:8,12, 14,20

**explained** 24:13 105:6 110:8 114:2,10,11 118:17

**explaining** 153:2 184:9 185:11

**explains** 138:23 167:6,7 168:2

**explanation** 33:22 78:18 158:12 177:21 184:24 185:2

**explanations** 187:13

**exposure** 148:17

**expressed** 129:9 133:20 134:11

**extends** 36:21

**extensively** 144:23

**extent** 19:22 29:22 31:4 107:10 168:15,18 172:23 175:8

**extrapolates** 37:10

**eyewitness** 72:14 81:12 87:5,7 91:10 111:1 112:20 142:16

---

**F**

---

**fabricate** 27:18

**fabricated** 26:21 27:8 73:16

**fabrication** 28:3,5

**face** 77:6,8

**faces** 89:9

**facility** 74:20

**fact** 17:5,7 25:13,19 26:3 55:4 75:3,13,20 77:13 84:1 86:15 110:9 117:8 122:16 125:5 127:19 128:7 146:3,16 148:20 149:2 150:17 161:6 167:15,20,22,23 170:2 184:17

**factor** 125:12 142:7 167:3

**factors** 62:7 106:21

**facts** 76:16 96:12 160:4

**factual** 86:9 95:9

**factually** 83:19

**failed** 182:11,20

**fails** 177:3

**failure** 166:24 176:14 182:9,18

**fair** 8:1,14,15 13:1,6 17:5 36:22 44:7 55:6 59:18 79:21 92:3 131:15 181:23

**fall** 146:21

**false** 106:1,3,4,8,10,17,21 107:2,6, 9,20,24 108:4,5,9,14 110:1,2,3,4, 17,21 118:3,15

**falsely** 87:12 100:14 103:23 104:5

**familiar** 8:1 98:6 134:21 175:14, 20,23

**February** 21:17,23 22:14 148:13, 16 153:20

**federal** 6:4 17:21 18:18 109:12,17, 21

**fee** 35:12,19,21 37:6,16

**feel** 101:24 138:10,12,24

**fees** 53:20

**fellow** 69:19

**felt** 158:22 159:7

**field** 63:4

**figure** 43:20 62:2 96:13 98:16

**file** 12:19 13:18 20:9 95:19 96:11 135:15 142:17 145:20 156:20 157:9 183:7,8 184:17 185:1,3,21, 23 186:8,10,18,19 187:11,12

THOMAS TIDERINGTON, 03/18/2026

**filed** 4:8 18:20

**files** 12:22 34:9 92:13 185:12

**filings** 142:18 145:21

**find** 57:10 70:1 86:9 105:13 115:12 138:24 164:3

**finding** 76:7

**findings** 73:18 76:1,6,21 77:1

**finds** 57:17

**fine** 22:1 34:1 48:12 57:18 82:17 116:9,12,13 143:24

**firm** 19:20 40:19 67:11 68:19

**firsthand** 172:12 180:24 181:4

**fish** 61:12

**five-minute** 116:4 178:20

**flat** 108:9

**flawed** 79:4 81:8,18 87:2 105:19

**Flaxman** 5:2,4 130:11 168:24

**Flaxman's** 14:11 67:11

**flip** 98:13

**floor** 89:8 90:15

**Florida** 7:15 160:10

**fluctuate** 64:15

**follow** 49:13 169:1,5,9

**follow-up** 135:5

**food** 105:24

**footnote** 47:21 99:20,24 100:1

**force** 65:9,10 112:8,10

**foregoing** 96:5

**forge** 27:16,18 29:14 69:15 83:5,6

**forged** 84:3,17 109:5

**forgery** 82:21,24 83:14,24 85:9,14

**form** 24:18 25:11,21 26:22 28:8,21 29:21 30:3,21 31:4,11 42:2 45:2 46:10 47:7,16 49:18 50:17 52:4,12 53:14 55:10 60:3 75:1 77:7,17 79:24 84:18 85:23 91:15 92:8,11, 18 93:1,7 95:4 98:7 99:5,13 100:6 109:3 110:5 111:19 115:8,16 118:8 119:7 120:19 121:22 122:23 123:16 124:7,24 125:8,18 126:15 128:10 131:21 137:8 139:9,14 140:4,17 142:2 143:8 144:12 145:5 146:18 148:22 150:9 151:4 157:24

159:10 160:3,24 167:5 174:13 184:5,22 185:6 186:4,21 187:1

**formal** 135:22

**format** 49:9,13,23 50:22 63:24

**formatting** 49:20 51:14

**forms** 79:4 81:8,18 87:2 105:19

**formulated** 122:22

**formulating** 33:11 60:22 117:11 127:17 128:15 162:2,4,7

**Fort** 112:5,13 161:13

**forward** 95:20 101:11 158:12 173:9

**found** 16:12 57:14 87:13 100:14 103:23 104:5,11,21 105:3 137:21

**foundation** 24:18 26:22 28:8,21 29:21 45:2 46:10 49:18 50:17 52:12 84:18 92:11 98:7 99:5 121:22 125:8,18 128:18 142:2 148:22 150:9 151:4 155:23 160:3 165:12 166:20 174:2 175:2 176:8 178:4 184:22 185:6 186:4 187:1

**frank** 174:23

**frankly** 34:4 78:14 86:2 96:8 128:1

**free** 43:6 101:24 138:24

**frequently** 97:8

**fresh** 51:17,19 53:6 56:9

**front** 9:21 38:12 39:5,19 120:7,23 121:23,24

**fucker** 173:22 178:10

**full** 10:3 36:18 114:18 115:2

**fully** 141:21 166:22

**future** 56:17

---

**G**

**gained** 171:5

**gang** 64:22,24 65:2,4,6,9,11,16 66:1,4,6,15,18 147:5 150:4,22 154:14,15,18,20,24 155:8,9,16,20 156:18 157:1,5,14,21 158:3,4,11, 13,17,23 159:6,14 160:2 165:2,20 166:18 167:2,11,13 169:22,23 170:20 171:5,7,10,17,18,19 172:6, 9,21 173:7,11,16 176:14,18,19 177:2,8,12,22 181:1

**gangs** 65:13 150:13 155:7 160:6, 11,15,19,23 161:4,8,11 172:2 178:17

**gap** 136:17

**Garcia** 12:15 31:10 44:14 55:23 71:20 72:8 152:16 154:24 155:16 157:15,23 159:1 167:4 169:23 176:19 178:15 182:10,19 183:1

**Garcia's** 158:19 159:4,24

**gave** 26:8,9 84:21 85:5 86:9 89:5 106:4 110:9,17 111:6 130:7 150:8

**general** 13:5 45:9 60:9 130:4

**generalized** 165:2

**generally** 20:3,7 23:17 27:6 33:10 45:12 63:3 72:6 115:17 130:5

**generated** 169:16

**Giftos** 4:14

**give** 7:9 10:7 22:11 33:17,22 51:11 57:3 62:6 65:19 78:6,8 86:7 98:13 101:15,22 161:5

**giving** 26:2 30:14 118:3,15

**gleaned** 92:12

**golf** 61:12

**good** 4:1,21 8:12 87:23 96:6,8 159:11

**governing** 111:12

**government** 83:12 85:20 86:15

**GPR** 127:3,4

**GPRS** 78:17 127:3,23

**granted** 18:23

**great** 80:19 158:6 160:10 181:17

**gross** 62:9

**Grossich** 4:19 5:10,14,21 18:15, 16 48:9,12,21 56:24 57:1,20 58:3 82:3,15,18 91:22 116:4,8,13,20 118:10,13 143:20,24 144:7 162:19 164:6 178:19 179:4 180:9,15 187:22 188:8

**ground** 8:2

**group** 90:23 91:1 112:7 158:22

**guess** 7:19 13:16 15:17 19:10 23:2 27:2 37:11 45:5 47:1 49:8 62:12 63:1 65:1,24 69:12 72:22 77:19 79:17,19 82:13 94:6 97:10 98:21 99:3 100:8,9 106:15 108:16 119:19

THOMAS TIDERINGTON, 03/18/2026

120:14 126:23 127:22 131:15,17, 18 145:14 160:7,12 166:15,21,22 167:24 174:14,20 179:15 180:3 184:24 186:6 187:14

**guesses** 95:7

**guessing** 98:16

**Guevara** 4:7,20,22 72:9 73:14,21 74:14,19,22 75:5,13 76:12 77:14 78:11,14 87:10 96:22 100:11,12,22 102:7,12 103:4,12,21 104:8,9,19 105:3,7,24 107:16 113:2 122:9 126:20 127:4,7,19,23 128:1,8,16 129:1 132:16,22 136:10 137:15 139:4,8,24 141:11 142:21 145:24 146:17 148:20 149:1,11,13,17 151:15 152:6,13

**Guevara's** 45:18 106:5 110:18 126:9 127:24 148:17

**guidance** 34:21

**guideline** 69:11

**guiding** 34:21

**guilt** 31:2 81:1 176:15

**guy** 115:1 136:16 143:23

**guys** 178:16

---

**H**

**half** 17:14 36:16,17 82:14 180:23

**Halverson** 86:10 134:23 143:3

**Halverson's** 128:3

**hand** 19:8,13 43:14 177:7

**handled** 106:13

**hangout** 148:2

**happen** 119:19 134:4 137:18 141:18

**happened** 16:15 20:13 26:19 29:2 30:20 53:7 68:4,9 80:9 96:14 102:23 107:12 113:6 123:1,22 136:17 185:9

**happy** 33:21 98:20 118:22 163:9

**hard** 10:2,5 148:3 177:8 183:22

**hardened** 177:8

**head** 62:3 127:15

**header** 47:21 181:19 182:9,18,21

**hear** 57:8

**heard** 5:14 54:14 90:22 118:12 131:18 173:21,24 178:9

**hearsay** 131:16,19

**heavily** 165:20 170:19

**held** 25:2 105:22 136:3

**helpful** 94:24 145:3 161:22

**heroin** 123:19

**hesitation** 147:22

**hierarchical** 147:5

**hierarchy** 154:20 160:19 171:8 173:3

**high** 37:21 53:20 54:13

**highlights** 78:24

**highly** 123:9 124:15 125:6

**hired** 19:19 67:6,10

**historical** 157:6 171:4

**history** 152:19,22

**hold** 16:9 25:21

**holding** 136:3

**holds** 86:19

**homicide** 72:14 85:4 103:1 111:13 125:11 126:10 147:6 165:16 166:11 170:14 181:20 182:1,10,19 183:1 185:14

**homicides** 67:1,3

**hope** 35:4 41:7 99:2

**hoping** 29:16

**hour** 8:9 14:16 35:23 36:2,5,8,11 37:1,9 82:14

**hourly** 36:22 37:9,14 43:17

**hours** 36:14,21 38:9,10,18,21 39:3,7,9,11 43:18,22 52:10,16,17, 21,22 53:12,18,21 55:1,13 93:22, 24 94:1,6,7 97:9 98:4 99:2 136:3, 15 156:10 177:17,18

**house** 48:11 121:3 138:11

**human** 15:23 16:3,4,8

**Humboldt** 147:6 181:2

**hundred** 45:22

**hundreds** 7:18 44:21 65:22

**hunt** 61:12

**hypothetical** 187:2,3

---

**I**

**identical** 50:20 51:7

**identification** 72:14 81:11,12 87:5 99:21 100:7 111:1 129:8 133:20 134:11 138:9

**identifications** 144:15

**identified** 66:4 97:22 113:2 140:10,21 141:7 157:1 160:1

**identifies** 102:23

**identify** 4:16 81:22 114:3,12,16 115:15,16,17 135:11 144:23 159:13,16,22

**identifying** 30:14 87:11 100:12,23 103:21 168:1

**Illinois** 4:9,14 6:5 71:21

**impact** 77:20 167:2

**impacted** 74:10

**implied** 86:19

**importance** 86:19

**important** 97:18 98:5,10 108:21 109:1 110:11 135:18

**impounded** 184:2,12,17

**improper** 27:18 29:4,14 69:7,9 70:19 71:2 78:20,21 83:10,13 84:6 86:11 111:2 142:20 145:23 146:3, 9,11,12,15 147:1

**Inaara** 90:9

**inadequacy** 80:4

**incident** 87:7 147:15

**include** 43:9 144:9,10

**included** 42:7 59:3 145:3

**includes** 60:17

**including** 52:9 72:14 78:10 123:14 126:13 166:5 171:18

**income** 61:18,22 62:10,12

**incomplete** 117:21 187:2,3

**inconsistencies** 137:21

**inconsistent** 137:21 142:15

**incorrect** 83:19

THOMAS TIDERINGTON, 03/18/2026

**increase** 37:11

**incremental** 37:11

**incriminating** 87:13 100:14 103:24 104:5

**independent** 77:11 135:4 156:5,6, 17 175:10 185:19

**independently** 138:21

**indicating** 59:19 99:22 173:6

**indication** 88:6 153:4,12

**individual** 49:21 102:24 124:2 125:14

**individually** 128:4

**individuals** 77:22 95:20 96:14 103:1 123:18 125:19 127:10,13 136:3 147:20 149:9 159:13,17,22 160:1 177:13

**inexperience** 168:1

**influence** 74:12

**influenced** 74:11,13

**information** 12:9 20:15 27:12,13 30:11 34:12 42:20 43:10 45:15 47:22 52:24 83:18,23 92:12 93:16 95:21 102:13 103:2 104:15 112:18 115:14,23 117:21 120:5 124:3 125:14 129:12 132:23 135:8 136:19 139:4,6,21 140:1,3 141:12 144:18 145:1,7,8,13 146:22 157:6, 8 158:13 168:19 173:9

**inherently** 125:16 150:3,8,21

**initial** 39:6 41:17 153:8

**initially** 79:10 95:22 148:14

**innocence** 31:3 80:18 81:1

**inserted** 48:4

**instruct** 168:18,23 169:11,13 175:9

**instructions** 19:2

**intended** 171:21

**intent** 84:4

**intentionally** 111:7 114:24

**interpret** 79:17

**interpreting** 106:15

**interrogated** 136:4 148:13

**interrogating** 168:3

**interrogation** 81:16 105:20,23 142:20 145:23 146:3,15 148:16 150:4,22 151:2 177:10

**interrogations** 25:1 111:24 112:14,17 136:11 151:15 177:20

**interrupt** 67:19 162:13

**interview** 115:13 136:4

**interviewed** 96:23 127:9,10 136:4,20

**interviewing** 171:18

**interviews** 25:1 111:23 112:14 143:4

**intimidated** 158:22

**intimidation** 157:14,22 158:3,11 167:2

**introduction** 49:14 50:9,11 51:21, 22,23

**introductory** 71:14

**intrude** 19:23

**intrudes** 168:16

**invade** 175:9

**investigate** 66:18,20

**investigated** 65:17

**investigating** 65:11 172:17 181:1

**investigation** 12:15 24:8 44:14 55:23 71:19 72:7 75:23 77:11 80:5, 22 85:4 88:8 96:10 126:7 152:17 153:8 157:15,22 159:16,21 165:16 166:3,11 167:3 170:14 171:6 173:13 174:22 182:10,19,24 183:1

**investigations** 12:24 15:12 17:2 72:14 111:13 126:10 127:5,20 128:9 172:6 181:21 182:1 185:14

**investigative** 13:18 23:20,23 34:9,13 72:16 78:12 88:6,13 92:13 95:18 96:9,11,20 111:3 125:12 126:4,6 128:21 135:3,4,15 142:17 145:20 151:12 152:8 154:21 156:20 157:9 158:1 159:12 165:1, 21 166:4 170:20 174:8,20 177:10 183:7 186:18 187:11

**investigator** 78:19 129:16,17 132:7 133:4,8 134:19 171:17

**investigators** 65:6 92:21 157:12

**invoice** 38:12,20 39:19 40:15,16, 18,21 41:3,6,8,10,14 42:8 56:14

58:9 59:16,19

**invoiced** 40:3

**invoices** 35:5,7 38:14,17 56:12, 17,18,21

**invoked** 45:20 73:15 75:5,11,13

**involved** 15:15 74:2 97:1 136:19 153:8

**involvement** 96:6 128:22 135:20, 22 148:15 152:16 153:4,12,16

**involving** 15:23 20:8 85:4 136:10

**isolated** 126:8

**issue** 24:20 30:4 72:5,12 73:2 119:16 166:16 176:5

**issues** 24:17 72:3 73:8 177:2

**item** 100:10 105:18 170:18 174:7

**items** 11:17 12:13,14 44:3,13,17 52:9 53:5 58:18 87:1 165:23

---

**J**

---

**Jeff** 4:19 21:3 48:7 82:12 162:12 163:6,20,21 168:20 169:10 180:13

**job** 116:21 172:3

**Joe** 29:10

**Joel** 5:4 14:22

**John** 4:7 6:8 24:22 25:9,17 71:17 142:12 148:9,12,20

**Jose** 5:4 6:8 26:6 71:17 106:3 110:16 142:12

**Joseph** 152:11

**judge** 19:6,11 26:4 30:24 117:2 118:11 125:21,22

**judgment** 124:5,18

**jurisdictions** 112:12

**jury** 25:13 26:4,15 31:1 107:10 108:4,18 109:20 110:3 111:11,15 118:19 119:1,9 122:15 124:12 125:22 137:6

**justice** 63:10 68:21

**justified** 86:14

---

**K**

---

**keeping** 119:11

Urlaub Bowen & Associates, Inc.    312-781-9586

THOMAS TIDERINGTON, 03/18/2026

**Kelly** 5:2 6:8 31:3,9 71:18 106:2 107:19,24 109:24 110:24 111:6 126:7 142:13 147:4,12 150:3

**Kelly's** 26:11

**key** 12:2

**kind** 11:11 20:15 34:4,11,16 43:1 49:6 69:10,11 158:1 174:22 185:10

**King** 147:21 148:2 178:3

**Kings** 66:9,12 147:5,15 160:13 173:22 178:9

**knew** 104:19 127:22

**knocking** 143:12,23

**knowing** 24:23 46:4 83:17

**knowledge** 12:11 34:20 37:20 50:23 53:1,3 66:14 76:15 77:2,4 95:11 128:5 157:7 171:4

---

**L**

**lack** 99:23

**lacking** 153:15

**large** 90:19 91:4 93:6

**larger** 10:12,16 21:3 40:9 112:1 164:19

**Latin** 66:9,12 147:5,15,21 148:2 160:13 173:22 178:3,9

**Lauderdale** 112:6,13 161:13

**law** 15:10 16:17 19:20 40:19 63:7 68:7,19 75:9 106:24 111:12 123:17 150:14 154:18 160:9 171:21

**lawyer** 83:21 121:18 131:19

**lawyers** 180:11

**lead** 77:14 129:1

**leads** 135:4

**learned** 69:23

**leave** 81:24

**leaves** 120:24 121:3

**led** 80:12

**left** 130:11

**legal** 4:11 19:2 28:6,9 29:22 31:5 79:16 83:3,6,21 85:10,15 130:10 131:22

**lengthy** 44:6 82:2

**lent** 135:22

**letting** 163:14

**liability** 15:23 16:6,7 50:22

**library** 59:8

**lie** 83:19 133:16 142:1

**life** 96:6

**lighting** 90:19 91:5

**likewise** 149:11

**limitations** 171:14

**limited** 78:11 90:17 91:2 92:16,23 127:7

**limiting** 19:2

**lines** 15:18 37:2 96:19 144:20

**lineup** 72:15 114:3 129:9 133:21 134:12 137:14 139:3,7 146:10

**link** 11:13,14

**linked** 73:19 76:2,22

**list** 7:7,9 8:22 9:16 11:2,6 12:13 13:13 18:1,3 31:19 44:4,18 59:13, 24 60:2,5,6,17 80:16 81:9 87:1 94:13,14 127:14

**listed** 7:20 11:15,17 12:2 31:22,24 32:2,4,13,18 36:3 44:3 46:5 58:19 59:13 60:10,12,23

**lists** 35:18

**literally** 119:22

**live** 146:10 158:5

**lived** 90:15

**lives** 89:8

**living** 61:8,10 89:8 158:13

**loan** 112:6

**local** 6:4

**located** 90:16

**location** 158:21 159:17

**lockup** 74:20

**Loevy** 19:20,21 20:8 35:5 40:18,19 67:7

**logical** 185:11 187:13

**long** 14:15,24 16:22 22:4,18 28:14 44:22 45:14 46:19 48:9 116:9,11 122:4 126:9 127:11 161:15

**looked** 11:24 37:17 56:13 58:23 70:11,15 96:19 113:5 136:10 185:18

**lot** 27:19 45:15,19 74:16 80:3,19 89:11 95:18 96:21 120:6,22 156:3

**low** 90:19 91:4

**lunch** 82:14 116:6,7,8 117:18 122:5 139:17

**lying** 132:17 142:5

---

**M**

**made** 18:2,6 19:6 41:11 61:4,24 74:4,17 76:12 77:22 92:21 102:22 111:14 124:9 136:18 146:15 149:5 187:6

**maintains** 184:7

**majority** 11:20,23 67:16

**make** 10:12 21:2,3 22:6,17 25:24 33:6 40:9 48:10 54:19 56:17 74:21 110:14 112:1 113:20 116:22 117:10 119:4 130:10 131:17 157:9, 12 162:1 163:22 170:22 172:18 177:23 179:10,24 186:21

**makes** 10:16 75:14 86:11 89:10 184:9 187:14

**making** 34:18 75:6,8 76:7 104:12 123:2 124:5,11 138:9 158:8

**man** 90:21

**manner** 165:3

**March** 4:5

**mark** 40:7 88:15

**marked** 31:13 164:16

**Martinez** 4:7 5:2 6:8 31:3,9 71:17 87:11 100:12,23 103:22 105:22 107:5 110:23 111:6 113:3 122:11, 21 126:7 132:7 142:12 147:4,12 148:12,14,21 149:2 150:3

**Martinez's** 24:22 25:9,18 120:16 123:3 148:9

**material** 6:18 8:18,21 9:16 11:11, 12 12:12 32:1 34:2,21 48:4 58:13 59:8,9 60:8 70:15 91:6,20 92:20 93:9 101:3 139:12,13 162:10

**materials** 7:20 8:22 9:3,6,11,14 11:2,9,15 12:1 13:4,5,9,15 31:19, 21,23 32:3,13,18,19 33:2,3 34:4 36:3,12 39:6,15 41:17 42:17 43:23

THOMAS TIDERINGTON, 03/18/2026

44:4,6,18 46:2,5,7 55:16,20,22 56:1,8 59:3,5,7,14,21,24 60:6,8,10, 13,17,21 61:1,5 69:3 72:17 81:19 88:4 90:5 91:19 92:1,13,15 93:19 101:1 115:4 121:14 128:14 144:10 151:12 153:11 156:6,17 162:4,7,9 172:19,20 173:20 185:18

**matter** 4:7 12:7 20:10,17 29:9 34:3 98:12 109:21 145:14 160:16 161:2 169:15

**matters** 7:4,7,18 16:18,19,20 17:9, 23 19:13 161:1,4

**meaning** 7:16 100:11

**meaningfully** 165:15 166:10 167:1

**means** 83:10 125:6 184:3,6

**meant** 118:23 151:21

**media** 4:2 48:18 58:1 82:9 116:17 144:4 179:1

**medical** 45:13

**Melloney** 87:7 88:20 89:7 95:16 97:17 112:20 137:12 144:15 173:21

**members** 147:4,15 158:4,13,17,23 167:11 171:10,18 177:8,12,22

**memorializing** 27:24

**memory** 94:16,20,22,24 95:1,11, 12,14,15 98:17 99:1 132:11 154:14,22 155:14

**men** 90:21 140:10,21 158:22 159:6

**mention** 104:10

**mentioned** 13:23 52:17

**met** 175:15

**method** 54:1

**methodology** 33:11 49:14 50:9 54:1

**methods** 78:20 150:4,23 151:2

**middle** 37:22 136:21 168:3,5

**Miedzianowski** 152:11,16

**Miedzianowski's** 152:7

**mind** 27:2 28:3 57:16 84:5 101:16

**mindset** 34:5,16

**mine** 84:23

**mine's** 43:6

**minimized** 57:7

**minute** 134:1

**minutes** 8:10 15:2 45:14 48:10,13 97:16 116:10 121:10 143:22

**Miranda** 127:13 136:8

**mischaracterize** 53:10 54:23

**mischaracterizes** 53:14 75:17

**mischaracterizing** 54:15

**misconduct** 34:10 73:17 74:6,22 75:7,15 76:1,6,7,9,14,20 77:15,18, 24 78:1,3,24 126:9,19,24 127:19 128:8,12,16 146:5,6,23

**misconstrue** 119:17

**misleading** 117:21

**misrepresents** 143:8

**missed** 186:14

**missing** 183:7,8 184:16 187:11

**misstates** 160:4

**mistreatment** 146:24

**moment** 10:8 22:11 53:18 54:3,9 57:4,20 61:15 101:15,23

**moments** 55:4

**money** 61:24 62:16 90:22

**monitors** 10:15

**month** 12:6 94:4

**morning** 4:1,21 9:24 14:7,21 15:1

**mother** 173:22 178:9

**motion** 18:20

**motions** 18:23

**motive** 83:16,22 150:13

**motives** 107:2

**mouth** 89:10,11,16 138:4

**move** 10:15 100:9 122:7 149:18

**moved** 10:16

**moving** 182:8

**multi** 112:10

**multi-agency** 112:10

**multi-unit** 90:16

**multiple** 111:20 127:9,10 136:5,11 146:10 151:15 184:16

**murder** 12:15 44:14 152:16 154:17 159:18 169:23,24 176:18 177:9

**murders** 66:15,20 181:1

**mysteries** 95:19

**mystery** 96:20 158:1

---

**N**

**named** 131:10 132:7 134:22

**names** 28:24 135:12

**narrative** 165:4

**nationally** 34:22 72:18

**nature** 43:11 144:16 177:3

**nearby** 158:5

**necessarily** 12:10 52:18 59:8 61:14 85:13 106:13,24 154:15 155:8 186:16

**neighborhood** 181:2

**net** 24:14 62:8

**nice** 115:1

**Nick** 4:11 5:10

**night** 87:8 160:2

**noises** 90:21

**Nonetheless** 177:1

**North** 4:13 147:20

**Northern** 4:9 6:5

**notable** 151:12

**note** 30:15 77:21 91:7 154:1

**noted** 97:5 128:12 174:19

**notes** 78:18 127:3 151:13,24

**notice** 6:3

**November** 9:1 10:11 18:2 21:12, 20 22:3,8 31:15 32:4 41:11 55:21 59:4 60:17 61:5 63:11 71:8 153:18

**number** 4:8 5:10,11,12 7:8,10 12:1 13:23 17:13 39:22 40:2 43:16 46:2, 6,14,15 55:12 62:6,18 65:20 67:8 68:10 72:5,12 100:2,10 105:18 128:24 129:4 137:13 144:15 152:24 155:4 161:5 166:1,2,9 172:6 174:7

**numerous** 73:19 76:2,22 77:2,3

THOMAS TIDERINGTON, 03/18/2026

---

**O**

**oath** 73:14 130:3,7,9 131:1 133:12 142:6

**object** 168:15

**objection** 19:22 20:2 24:18 25:11, 21 26:22 28:8,21 29:21 30:3,21 31:4 32:21 42:2 45:2 46:10 47:7,16 49:18 50:17 51:18 52:4,12 53:14 54:14 60:3 75:1,16 77:7,17 79:15, 24 84:18 91:13,15 92:8,11,18 93:1, 7,17 98:7 99:5,13 100:6 102:9 103:7,13 109:3,14 110:5 111:19 113:7,10 115:8 118:8 119:7 120:19 121:15,22 122:2,23 124:7,16,24 125:8,18 126:15 128:10,18 131:21 133:22 137:8,19 140:4,17 142:2 143:8 144:12 145:5 146:18 148:22 150:9 151:4,9 155:23 156:13,19 157:24 159:10 160:3,24 165:12 166:20 167:5 174:2,13 175:2,8 176:8 178:4 184:22 185:6 186:4 187:1,6

**objections** 123:5 134:13 143:18 149:3

**observation** 124:9

**observed** 90:21

**obsessed** 54:1 96:1 97:7 98:5 156:12

**obsession** 96:3

**obstructed** 90:17 91:3 92:17,24 121:6 144:16

**obstructs** 121:3

**obtained** 81:12,15 87:5 105:19 127:9,10 142:14 146:20

**occasions** 17:7

**occur** 66:15 146:24 149:13 167:12

**occurred** 23:20 26:16 30:14 31:1 34:18 105:8 107:15 115:14 118:5 128:5 136:23 146:6 149:5,7 154:17 157:4,7 159:18 171:6 172:10,12 177:16,19 178:2

**occurring** 29:2 119:18

**October** 71:20 72:7 153:9,13

**offenders** 87:9,19 88:3 97:22

**offer** 6:19 23:4,5 25:5,14 161:17 170:9 176:10

**offered** 17:8 154:4,8,12 176:22

**offering** 22:21,24 23:13,18,19,22 24:7,11,16,21,24 25:2,10,12 27:7 29:19 30:1,9,20 31:2,8 79:12 80:24 92:5 107:8,17,23 110:20 111:16 165:23 166:6 174:12 187:14

**offers** 165:1 166:14

**office** 14:11 184:20 185:16 186:1, 23

**officer** 4:20 7:3,12,15,23 15:10,14 16:17,18,22,23 17:1 28:15,20 29:15 34:8 53:24 63:7 69:18,19 70:18 71:2 74:5 75:9,11,21,22 82:20,24 83:1,5,9,11,17 85:21 86:3,7,8,10 96:10 123:17,24 124:10 136:14 160:9 168:2 172:5 175:21

**officer's** 27:17 28:18,24 29:5 69:15 71:3 82:21 83:1,13,17,20 85:22 109:5

**officers** 30:23 34:6,14 64:17,20 65:8 66:3 69:3,4,15 72:9 96:15 146:7 151:24 158:6

**offices** 4:13

**official** 69:21 84:8 85:4,20 86:14 108:24 117:20

**oftentimes** 158:6 177:11

**one-hour** 48:8

**online** 10:3

**open** 98:12 163:2,20

**opened** 162:16,20,24

**opening** 162:15 163:4,13

**operate** 160:20

**operating** 66:5 119:12 122:20 127:18,21

**opine** 165:6 171:12 172:16 174:21

**opined** 154:23 157:13 172:23 182:2

**opines** 155:20

**opining** 165:10

**opinion** 19:11 23:22 24:3,7,21,24 25:5,10,12,15 26:6,10,19,20 27:1, 7,10,15 29:12,19 30:1,20 31:2,8 34:19 68:6 79:12 92:6,10 99:23 107:8,18,23 110:20 111:16 122:24 155:1,2,15 157:19,20,21 167:2 176:17,22 177:4 183:9 184:19

186:1

**opinions** 6:19 20:16 22:21,24 23:6,13,17,19 24:11,13,15,16 25:2, 3 30:9 33:12 45:16 60:22 71:18 73:22 74:10,11,12 76:17 77:14,20 79:2 80:21 81:1,6 91:20 92:1 117:11 120:12 122:22 126:17 127:17 128:15 142:8 153:22 154:4, 7,12 155:9 156:3,16 161:17 162:2, 5,6,8 164:22 165:24 166:6,13 170:9 174:11 176:6 181:24 182:5 185:13 186:21

**opportunity** 26:2 51:12 108:17 110:10 119:20 139:20

**opposing** 84:13

**opposite** 177:15

**order** 95:15 140:8 188:8

**orders** 188:7

**organizations** 160:19 161:8

**orientate** 112:2

**original** 60:10 163:1,19 164:3 165:3 184:7

**outstanding** 87:12 100:13,24 103:22 113:1 115:6

**overheard** 104:7,9,11,12 105:7

**overturned** 79:17,22 80:2,4,13

**overview** 165:2

---

**P**

**p.m.** 82:10 116:15,18 144:2,5 178:23 179:2 188:5,14

**pages** 10:21 22:4,18 44:22 45:14, 22 46:2,6,19 51:2,16 71:10 89:24 93:10 115:22 116:2 122:4 148:6 182:4,15,24 186:12,13

**paid** 34:24 41:3,5

**paper** 51:20

**paragraph** 102:5 114:1 122:8 123:12 126:3 132:14 142:11 145:18,19 147:2 149:19,23

**parcel** 74:9

**Park** 147:6 181:2

**Parker** 87:7,18 88:20 89:8,15 90:14,20 92:6,16,23 93:5 94:8 95:2,17 97:17 99:20 100:11,22 102:6 103:11,20 104:18 105:2

THOMAS TIDERINGTON, 03/18/2026

112:21,23 114:1,9,11 115:5 121:20 129:8 130:7 131:4,7,13 132:15 133:12,19 134:10 137:13 139:23 141:24 173:21,24 178:8

**Parker's** 99:4 101:14,23 104:18 113:18 121:18 130:19 131:23 140:8 144:15 158:16

**parking** 89:10

**parse** 42:15

**part** 11:3 14:22 17:2 46:19 59:22 74:1,9 85:19 99:22 100:21 104:4 109:21 126:20 139:18 152:14 153:6 155:1 157:1 174:16 183:20

**partially** 9:22,23 90:17,18 91:3,4 92:16,23 93:6 139:19

**participated** 137:14 139:3,7

**parties** 4:17 23:11

**parts** 118:18

**pasted** 47:23 50:2,6,10,15 51:22

**patrol** 15:14

**pattern** 73:17 75:24 76:5,9,13,20 78:1,3 126:8,19 136:9 152:7

**pause** 91:17

**pay** 35:7 43:5

**paying** 35:3

**PD** 96:18 154:15 173:11

**PDF** 188:9

**penalty** 131:1

**pending** 68:15,16,17

**people** 104:16,20 135:9,10,11 158:3 167:10

**percentage** 61:22 67:14,22

**perception** 12:2

**Perfect** 82:5

**perfectly** 48:12

**performed** 156:6

**performing** 9:3 165:9

**period** 23:21 24:1,9 28:17 67:4 90:24 126:10 127:11 154:16,19 161:12

**perjury** 131:1 142:6

**permission** 83:1 85:21 86:7,10

**perpetrators** 173:21

**person** 70:3,5 71:5 74:17 84:8 85:18 96:10,22 132:19

**person's** 69:21 85:19 86:12

**personal** 76:15 77:2,4

**personnel** 128:22

**perspective** 33:18 34:11 53:6 75:21 86:19

**phone** 8:19 13:23 14:3,20 15:3 43:1

**photo** 78:20 129:8 133:20 134:11 137:14 139:3,7 146:10

**photographs** 184:10

**physical** 87:13 100:14 104:6 122:10 123:3 142:16

**physically** 74:7 122:16,21

**picture** 115:3

**piece** 51:20 92:22 93:4

**pieces** 184:16

**place** 7:17

**plaintiff** 34:2 67:23 143:6 188:1

**plaintiffs** 5:2 6:8 13:24 74:20 79:2, 7,13 81:6 87:14 97:22 100:16 104:1 118:3,15 143:6 146:23 149:5 152:19 160:1 167:10

**Plaintiffs'** 8:20 42:3 45:17 59:6 79:22 81:1

**plan** 82:13 176:2,5

**planning** 109:15

**played** 157:14,22 169:23 176:18

**Plymouth** 64:7,10,12,18,21,22 65:5,13,17 66:13,16,21 67:2

**point** 7:1,4,13 12:4 23:4,5 24:20 28:23 33:1 69:14,17 75:19 87:23 88:2 89:21 90:13 92:22 93:4 94:5 95:19 96:9 98:10 101:3 103:16 114:8 115:4 118:2 120:16 122:8 124:23 129:7 135:15,18,20 136:9 139:1 141:1,5 144:13 149:12,14 156:21 159:11,16 164:18 167:1,8 170:18 182:2 187:10

**pointed** 51:20 93:9 120:8 173:15

**pointing** 109:23 149:12

**points** 117:24 129:5 137:13 166:5 183:6

**police** 6:19 7:2,12,15,23 12:24 13:5 15:8,13,16,20,21,24 16:10,13, 18,19,20,22,23 17:1,11,21 19:17 23:21,24 24:5,9 25:15 27:11,14,22 28:12,14,18 29:8,16 34:5,8,12,13 37:18 38:1 53:24 59:10 61:13,14 63:5,8 64:7,17,18,19,21 65:5,7,14, 17,18 66:13,16,21 67:2 68:22 69:3, 4,11,18,19,21,22 71:2,3 72:6,9,12, 18 73:18,24 75:21 76:2,21 77:1 79:19 80:22,23 82:20,21 85:4,21 86:14 87:12 95:22 96:10,22 100:14 102:6 103:23 104:5,15 105:3 106:11,13 109:5 112:3,6,13 117:20 125:10 127:2,8 132:15 134:5 138:8,12 140:16 146:9 151:13,24 152:9 154:21 156:23 157:9 161:13 165:1,7,11,17 166:12 167:15,22,23 168:2 170:9,15 171:12,17 172:5, 13,16,21 173:7 175:6,21 177:14 181:5,8,14 185:7 186:3

**policies** 72:13 127:2 136:12 181:19 182:11,20 185:13

**policy** 78:13

**poor** 84:23

**population** 64:10,12

**portion** 18:14 54:5 183:2,5

**portions** 50:1

**position** 26:14

**positive** 138:9

**positively** 140:10,20

**possibly** 168:19

**post-conviction** 142:18 145:21

**practice** 29:16,17,18 45:9 59:17 136:9

**practices** 6:20 13:5 15:8,20,22 16:10,13,20 17:12,21 19:17 23:20, 21,23,24 24:6,9,24 25:16 27:12,23 28:12 34:22,23 37:19 38:1 63:5 72:6,13,18 73:18,24 76:2,22 77:1 79:19 80:23 106:11 111:3 152:8 154:21 165:7,11,17 166:12 167:23 170:15 171:12 175:6 181:19 182:11,20 185:8,13

**precise** 17:23

**precisely** 97:3,5

**prefer** 10:5 117:16

**premises** 15:23 16:6,7 50:22

THOMAS TIDERINGTON, 03/18/2026

**prep** 38:22,23

**preparation** 11:10,20 12:9 13:10, 14,24 38:19 39:6

**prepare** 8:16 15:5 36:12 95:2 179:19

**prepared** 27:14 93:15 117:20

**preparing** 9:11,15 39:1,12,17 93:22

**prepping** 94:5

**present** 168:17,21

**presented** 109:19

**preservation** 72:16

**pressure** 30:19 137:14 139:3,7 148:17,20 149:2

**pressured** 30:2,10,13,17 87:10 100:12,22 103:21 138:8,10,12

**pretty** 8:11 43:12 45:19,22 49:10, 14 54:13 96:11,16,17 97:18 98:5 103:18

**previous** 182:5

**previously** 8:18 16:12 149:20

**Primarily** 64:24

**primary** 72:3

**print** 10:1,3 29:10 182:13,14

**printed** 9:22,23 18:14 28:23

**printer** 9:24 182:14

**prints** 70:4

**prior** 9:6,8 31:23 42:4 47:3 49:6 69:6 121:14 127:19 161:16

**private** 129:16

**problem** 65:3 97:4 102:23 157:2 182:14

**Procedure** 6:4

**procedures** 72:15

**proceedings** 80:12

**proceeds** 62:8

**process** 15:16 80:9

**produce** 23:10 56:22

**produced** 56:19,22 151:16 184:20,21

**professional** 71:18

**progress** 90:23

**project** 132:8

**prolonged** 81:16 105:20 148:16

**promised** 139:24

**promises** 136:18 177:11

**pronounce** 167:18

**proof** 176:14

**proper** 27:16 28:24 29:3,5 70:1 83:9 84:12,14 109:10

**properly** 27:14 136:8 174:22

**prosection's** 142:13

**prosecution** 71:19 157:23 165:3 167:3

**prosecutions** 157:15

**protected** 158:9

**protecting** 173:3

**protection** 158:7

**provide** 18:3 39:21,22 62:5,21,23 64:3 71:18 88:14 90:1 145:7 158:12 177:3

**provided** 6:19 7:7,9,21 8:19 11:13 18:1 20:8,14 27:12,13 31:23 32:1, 7,8,23 34:2 46:3 58:13 59:6,9 60:6, 13,18 61:2 88:5,7 92:13,15 93:20 95:22 96:15 101:1 102:12 106:2 107:19 109:24 124:3 129:15,17 130:23 132:22 139:12,24 141:12 146:22 153:22 156:7,17 162:10 184:10 185:18

**providing** 20:16

**province** 25:18 75:2 117:8

**psychological** 106:21

**public** 171:22

**publish** 38:7

**pull** 7:9 9:16 18:9 22:10 39:23 55:19 57:4,10 70:9 94:14 101:16, 20 102:3 113:11 115:20,21 116:1 120:20 134:2 141:3,22 152:22 154:9 156:24 157:17 161:19 164:9, 11 170:18 173:1,18 174:17

**pulled** 70:14 113:13 152:18 161:23 164:18,20

**pulling** 101:22 164:10

**punishment** 173:4

**purported** 81:15 105:19

**purpose** 9:11 123:14 126:13,16 145:7 174:15,23

**purposes** 41:18 42:21 165:10

**pursuant** 6:3

**put** 34:11 69:11 86:22 101:20 138:4 145:11

**putting** 114:21,22

---

### Q

**qualification** 151:8

**qualifications** 172:2

**qualified** 16:4,13 17:11,15,18 19:16 124:19,20 160:14,20 172:15, 18

**qualify** 108:3 110:2 122:14 151:6 172:3

**qualifying** 119:4 151:3

**question** 8:6,13 11:9,22 18:12,17 19:8 30:7,8,24 45:21 47:18 51:15 56:2,3,4,5,7 60:4 62:13 66:10 67:19 69:12,13 76:19 77:19 84:5 89:4,7 95:13,15 98:18 100:8 102:5, 11,14 104:18 105:16 106:8,14,16 107:13 113:12,15 114:1 115:8 121:9 132:5,10,14,18,21 133:1,3,7 138:8 140:8 141:11,22 143:13,15 144:12 147:1 166:22 169:4,6 172:8 181:11 183:15

**questionable** 123:9 124:15 125:7

**questioned** 73:14

**questioning** 4:18 116:2 135:16 172:1

**questions** 34:17 46:14 62:15 95:7, 10 97:4 109:20 113:8 120:22 121:19 145:8 155:4 159:20 160:7 162:19 180:10,23 187:17,19

**quick** 44:9 45:22 143:11

**quickly** 45:19 139:16

**quote** 99:21 102:6,13 114:9 115:10 141:13

**quoting** 115:13 124:14

---

### R

**raises** 177:2

THOMAS TIDERINGTON, 03/18/2026

**Randy** 134:23 135:1 143:2 151:21, 22

**range** 127:1

**ranks** 15:14

**rate** 36:22 37:9,14 38:5 42:9 43:17

**rates** 37:24 38:1

**rationalize** 83:8 84:12 86:13 96:21

**reached** 73:7 126:17

**reaching** 73:13

**read** 5:11 10:17 44:24 45:7,10,14, 19,22 54:5 71:21 87:5,15 89:3,18, 22 90:14 96:16,20 104:24 105:1 106:6 108:3 110:15 111:3,8 113:15 114:7 118:24 120:1,5 122:11 132:4 133:10 141:1 151:8 154:6 170:6,23 176:23 179:8

**reading** 114:9 119:22 141:15 178:11

**real** 113:22

**reason** 59:11,15 71:23 80:1 86:6 144:9

**reasons** 80:6

**rebut** 153:22

**rebuttal** 21:14,24 22:15 32:6 36:9, 12 39:18 56:15 73:2 153:19 161:17 162:2,5,8 164:7,16,21 165:24 166:6 170:3,17 174:16 176:10,13

**recall** 32:11,24 38:7 39:20 61:2,7 62:4 70:18 73:6 87:24 88:11 101:11 104:8 115:10,11 127:15 132:7 133:1,3,4,7 138:21,22 146:19 148:6 157:18 158:15,16,19 159:24 160:5 178:11 185:17

**receipt** 185:21

**receipts** 185:15

**received** 62:9,16,17 185:23

**recent** 20:14 68:11

**recently** 13:11 32:8 70:7,11 91:8

**recess** 48:17 57:23 82:8 116:16 144:3 178:24

**recognize** 178:8

**recollection** 67:5 185:19

**record** 4:2,17 5:23 6:2 31:14 35:15 40:12 48:15,19 57:21 58:1,14 82:7, 10 88:2 103:10 116:14,18 144:1,5,

10 159:8 160:4 163:4 169:4 174:4 178:22 179:2 188:5

**recorded** 112:14,17

**recording** 111:23

**recordkeeping** 72:15

**records** 32:5,10 40:5 62:4

**refer** 21:20,23 151:20

**reference** 21:19 34:21 59:7,9 60:8,9 69:14 70:10,14

**referenced** 91:6 99:23 114:15,17 115:24

**referencing** 118:19

**referred** 102:17

**referring** 6:13 26:4 77:24 78:4 100:1 115:19 126:22 130:6 134:24 135:7 143:1,3 151:19 171:2 177:6

**reflect** 6:2 33:3 62:19 126:8 163:4

**reflected** 52:21 54:24 55:14

**reflecting** 152:15

**reflects** 171:16

**refresh** 94:24 95:14

**refreshes** 132:11

**refuse** 169:5

**refused** 73:16

**refute** 74:18 107:14 174:19

**regard** 24:3 27:1

**relate** 13:9 167:24

**related** 12:6,14,23 13:5 15:18,21, 24 65:4,11,16 66:15,18 106:23 132:21 154:21,24 155:10,16,20 156:18 157:1,14,15,21,23 161:9 166:18 167:2,3 172:21 173:16 176:19 177:2 187:9

**relates** 16:8 172:13

**relating** 72:13

**relationship** 152:7

**relevance** 84:19

**relevant** 12:12 13:17 19:8,13 45:16 80:21 145:14 159:15 173:5, 13

**reliable** 142:19 143:7,17 145:22

**reluctant** 158:4 177:12,13

**rely** 124:1 125:10 162:4,6,7 165:19,20 170:19

**relying** 103:1

**remember** 20:7 54:16 68:23 80:17 82:1,22 94:19,23 98:11,12 99:9 178:13 183:9 186:12

**remind** 28:14 82:15 112:3

**reminder** 8:5

**render** 34:19

**rendered** 48:2 68:6 76:17 77:14 156:15

**repeatedly** 73:15 122:3 133:23

**rephrase** 8:6

**replace** 151:22

**report** 9:7,9,22 10:4 18:14 20:18 21:1,11,14,16,21,23,24 22:2,15 23:14,16 24:4,13 26:1,24 27:3,6, 18,19,22 28:18 29:1,6,8 30:4,5,12, 15 31:24 32:2,7,8,14,16 33:9,14, 15,19,23 35:9,10,24 36:6,9,12 39:7,18 41:18,21 42:18 43:24 46:18,21 47:5,14,18 48:1,23 49:2, 11,16,21 50:1,6,13,16,19,24 51:3, 6,17,24 52:2,5,10 60:1,8,10 61:2 69:16,19 70:2,3,5,16,20 71:3,11 72:23 73:2 75:9 77:8 78:5,6,9,16, 22 81:20,24 82:2,21 83:11,12,18, 23 84:9,10 85:20 86:8,9,11,17,18, 20 88:6,13 89:24 90:4,6,11 91:7,8 92:2 95:16 96:22,24 98:22 99:17 100:19 101:5,10,12 102:20 103:20 104:9 105:12,17 108:7,12 109:4,5, 7,8,9,17 110:7,14 112:19 113:9 117:14 118:18,23 119:2,3,13,23 120:2,12 122:17,22 123:15 124:20 126:14 127:8,16 128:2 134:15,17 137:5,11 139:22 142:9 144:8,11,17 145:4,6,16,18 149:19 150:19 151:1,6,21 152:2,23 153:2,19 154:6,9,19 155:12,13 156:1 157:17 161:18 162:2,5,8,11,18 163:1,16, 19,21,22,23 164:3,8,16,24 165:14 166:7,8,10 167:7,22 170:2,3,6,17 171:8,10,20 173:2,6,14,15,17 174:16,17,18 176:11,13,23 177:1 180:23 181:17 182:17 183:2,5 186:7 187:8

**reported** 90:20 165:24

**reporter** 4:14 5:7 91:14,16 187:23 188:7

**reports** 21:8 22:22 23:1,7 27:14,

THOMAS TIDERINGTON, 03/18/2026

17,23 34:9 48:2 49:7,10,12,17,24 50:3,7,15,20,21 51:7 59:10 68:22 69:4 78:16 88:13 117:20 127:24 128:1,3,13 151:14 156:23 167:16 173:10,19

**represent** 4:17,19 5:1,3 52:18 88:19 111:11 130:18 135:21 149:16 169:12,20 182:17 183:19, 24 184:15 185:20

**representing** 4:12 71:17 84:8 156:2

**requested** 23:12

**required** 146:7

**requirement** 85:20 86:16 151:24

**reserve** 188:2

**respect** 27:5

**respectfully** 91:24 119:21 146:14

**responded** 75:20

**response** 176:6 179:13,16,19 180:1,4

**responses** 95:9

**responsibility** 56:21

**rest** 78:9 81:20 105:23

**rested** 110:24

**result** 106:5 110:17 111:2 115:2 142:20 145:23 168:7 182:11,20

**results** 129:9 133:21 134:12

**retained** 15:22 18:19 35:5 47:4,9, 12 49:3 54:11 67:13,21,23 68:1,19 71:16,23 154:1 169:22 170:9,12

**retainer** 37:1

**retaliation** 158:17

**retired** 61:16 63:7

**retribution** 155:6

**revealing** 20:3

**review** 9:3,6,8,10,14 10:17 11:10 20:9 29:8 34:3 35:24 36:3 39:6 41:17 44:4 49:15 58:13 59:20 69:2 72:23 81:19 90:4 91:19 92:1 94:7, 12 121:13 142:17 145:20 156:6,17 157:6 172:19 176:2 180:4 185:12, 14 186:10,13

**reviewed** 8:18,22 11:3,14,19 12:8 13:10,13,20 29:3 30:16 31:19,21 32:3,14,16,19 33:3 34:9 36:12

44:18 52:8 53:2,5,6 55:16 56:9 59:3,14,24 60:22 61:6 77:8 80:11 83:11 86:9 91:8,21 94:15,17 95:2 115:5 128:11,14 130:21 133:19 147:11 153:11 159:9 168:11 170:3 173:20 174:5 186:7

**reviewing** 12:11 20:16 34:4,6,12 36:11 39:15 42:17 43:23 127:22 151:11

**Reynaldo** 4:7,22 72:9 126:9 129:1 142:21 145:24 146:16 151:14

**Richard** 174:24

**rights** 73:15 109:18 127:14 136:8

**ripoff** 155:5

**risk** 167:9

**rival** 155:7,8

**role** 6:16,18 157:14,22 169:22 176:18

**room** 89:8 105:23 143:3

**rooms** 136:4

**Rubinstein** 5:6

**Ruby** 158:19 159:13 178:15

**Rudolph** 174:24

**rule** 69:11

**rules** 6:4 8:2

**ruling** 19:6,15

— S —

**S-E-E-K** 38:6

**safety** 167:17,19 171:22

**saith** 188:16

**scared** 159:7

**scenario** 83:4

**scene** 158:23 159:23 178:16

**schedule** 35:13,19,21 37:6,16

**scheduled** 94:3

**scheduling** 14:5

**scope** 171:13 185:10

**score** 119:11

**scratch** 46:22 47:2 49:3

**screen** 10:7,8 20:21,22 22:12

35:10 44:10 57:6 58:4 63:12 86:22 102:1 113:22 117:15 163:3,6,12, 14,16,23 164:13 179:7 182:16

**scroll** 11:5 20:24 58:11 142:10 164:19 179:15

**scrolling** 11:16

**Sean** 5:1 14:10,22 51:11 55:8 84:21 116:10

**searched** 104:20

**secondhand** 131:13

**seconds** 91:1

**section** 50:11 70:15 71:14 105:13 111:22 112:20 113:9 117:19 118:20 128:21 134:15 137:12 152:3,6 176:13

**sections** 48:1 50:5,19 51:5,7 119:1

**SEEK** 38:6

**seeks** 19:22 175:8

**sense** 86:11 177:23 184:9 187:14

**sentence** 87:17 100:21 108:2 111:8 112:23 120:13 122:14,18 123:15 126:14 145:19 147:2 149:23 151:7,10

**sentences** 78:17 114:22 137:11

**separate** 6:12 11:17 21:8 44:3 52:9 137:10 181:11

**sequentially** 23:14 96:12

**service** 171:21

**settled** 19:9

**Shadur** 118:11

**share** 20:21 182:16

**short** 110:23 122:5 127:8

**shortcomings** 126:4,6

**show** 10:7 31:13 40:7 71:7 104:17 145:12 163:21 179:5 185:3

**showed** 99:9 118:18

**showing** 31:15 90:10

**side** 164:20

**sighing** 106:3

**sight** 90:18 91:4 93:6

**sign** 28:17,24 29:5,7,9 69:19,20 70:1,20 71:3 83:1,6,10,12 84:7,11

THOMAS TIDERINGTON, 03/18/2026

85:21 86:10,12

**signature** 27:16,19 29:15 83:10, 13 84:7,17 85:19 86:16,18 109:5

**signed** 70:3 84:2,9,15 85:18 105:24 107:5,24 108:9,14 109:8 127:24 128:1,2 129:22 130:7,9 148:15

**significant** 63:23,24 65:2 147:3 176:18

**signing** 27:23 69:3 70:5 82:20 85:7 107:20 110:1

**signs** 70:3 83:17,19 86:15 130:3 159:6,14 160:2 178:17

**similar** 37:19 48:1 50:19,23 51:6, 14 77:21 85:1 106:3 107:20 110:1

**single** 53:5

**sir** 22:11 35:10 40:8 44:10 56:5 58:16 63:12 86:23 88:17 90:10 95:13 116:9 119:21 122:11 130:13 169:2 180:10

**sister** 158:20

**sit** 29:9 138:22

**sitting** 62:21 93:12,14 144:22

**situation** 75:10 86:3 137:7 145:15

**skim** 13:15,16

**skimming** 13:21

**skip** 149:22

**skipping** 13:21 137:5

**slightly** 37:7 50:12

**Sloss** 5:5

**slowly** 179:15

**small** 113:22

**snitch** 171:9

**software** 14:18

**sole** 87:6 95:17 112:20

**somebody's** 27:19 70:2

**someplace** 47:24

**sophisticated** 43:5

**sound** 43:19 169:19

**sounds** 8:11 21:18

**sources** 61:18

**South** 160:10

**southwest** 68:17

**speak** 28:11 118:12 185:7,8

**speaking** 16:19 17:16 20:8 45:6, 12 77:18 132:7 133:7

**speaks** 30:4 118:8 125:4 138:3 141:20

**specialized** 106:20

**specific** 13:6,17 20:11 42:16 44:13 65:6 81:23 85:10 88:23 89:21 101:12 136:7 144:20 152:24 172:13

**specifically** 9:11,14 11:9,20 12:10,14,23 13:9 15:11 20:7 27:4 38:1 39:2,12 80:17 88:1,10 93:18 95:2 99:20 109:9 139:13 157:19 178:13

**specifics** 78:23

**speculation** 28:22 46:11 175:3 176:8 184:23 186:5

**speculative** 165:3

**spell** 5:22

**spend** 8:4 13:19 39:1,15,17 45:15 53:18,21 54:7 80:19

**spending** 99:2

**spent** 38:9 39:7,9,11 41:20 42:13, 15,17,18 43:18,23,24 45:24 52:19, 21 54:10 55:5,13 59:20 80:2 93:21 94:1,4 96:6 97:8 98:4 156:9

**spoke** 133:13 145:10

**spot** 90:13 115:4 120:16 141:5 148:2

**spouse** 85:7

**stamped** 40:12 58:15

**stand** 32:11 109:9 134:16

**standard** 4:3 48:16,20 57:22 58:2 82:7,11 116:15,19 144:2,6 178:23 179:3 188:6,8

**standards** 111:12

**standing** 159:17

**standpoint** 83:2,3

**Starr** 5:1 14:10,13,22 18:13 19:22 20:2 24:18 25:11,21 26:22 28:8,21 29:21 30:3,21 31:4,11 32:21 42:2 45:2 46:10 47:7,16 48:7,10,14 49:18 50:17 51:9,18 52:4,12 53:14 55:9 56:20 58:20 60:3 75:1,16

77:7,17 79:15,24 81:3 84:18 85:23 91:13,15 92:8,11,18 93:1,7,17 95:4 97:13 98:7 99:5,13 100:6 103:7,13 109:3,14 110:5 111:19 113:7,10 115:8,16 116:12 118:8 119:7 120:19 121:8,15,22 122:2,23 123:5,16 124:7,16,24 125:8,18 126:15 128:10,18 131:21 133:22 134:13 137:8,19 139:9,14 140:4,17 142:2 143:8,18 144:12 145:5 146:18 148:22 149:3 150:9 151:4,9 155:23 156:13,19 157:24 159:10 160:3,24 162:22 163:15,24 165:12 166:20 167:5 168:15 169:10 174:2, 13 175:2,8 176:8 178:4 184:5,22 185:6 186:4 187:1,5 188:1,10

**start** 17:10 47:13 82:12 115:12 149:23 183:15,23

**started** 47:8,19,20 51:20 112:16

**starting** 4:17 89:1 102:4 132:1 159:16 181:17,18

**starts** 126:3 132:11 142:11 149:20

**state** 5:22 7:16 80:11 143:5

**State's** 13:1 129:16 136:15,23 183:8,21 184:17,20 185:15,21,23, 24 186:1,8,10,19,22 187:12

**stated** 87:10 99:21 100:11,22 103:20 104:19 106:4 110:17 112:24 121:20 139:23 149:20 166:8

**statement** 55:6 89:5 106:1,3 107:6,9,21,24 108:4,10,15 110:1, 13,21 119:4 129:17 130:3,7 148:9, 15

**statements** 26:18 30:14 92:20 96:15 102:21,22 104:12 107:14 124:1 142:4,11,12,19 143:6,16 145:21 149:5,8 150:2,8,16 151:16

**states** 4:9 47:23 68:18 103:9 112:7

**station** 102:7 132:15 134:5 138:12 140:16

**steal** 66:6

**stealing** 155:6

**Stefan** 32:14 72:24 153:23

**steps** 135:4

**stop** 53:23 54:2 104:21 143:23

**stopped** 163:19

**stopwatch** 43:2

THOMAS TIDERINGTON, 03/18/2026

**straight** 96:19

**street** 4:13 87:8 92:7 121:4 147:5 158:5 160:6,14,23 161:4,11 172:2

**strike** 21:6 37:13 38:9,15,16 39:16 41:8 52:7 59:1 64:10 66:18 93:13 117:6 150:20 158:15 180:8

**stuff** 149:17 174:20

**subheading** 117:20 122:9

**subject** 12:7

**submit** 35:5 40:18 56:18

**submitted** 56:12,15,18,21 58:9 63:23

**submitting** 85:20 86:16 127:3

**subpoena** 179:13,16,20 180:1,4

**subscribe** 131:1

**subscription** 43:6

**subsequent** 72:8

**subsequently** 72:23 186:2,23

**substance** 45:19 156:2

**substantial** 171:16

**substantively** 182:4

**suburbs** 66:6

**sudden** 177:22

**sufficient** 156:21

**suggesting** 53:4 76:8

**suggestive** 146:11

**suggests** 155:19 178:5

**suite** 4:13 90:9 130:11 168:24

**suited** 173:8

**sum** 156:2

**summarize** 63:7 79:1 81:5

**summarizing** 27:21

**summary** 35:13 101:9 108:11 128:22 149:24 150:2 164:21

**supervisor** 34:8 112:8 167:24

**supplement** 23:6,10 33:2 110:12 118:22

**supplemental** 86:8 96:23 152:23 153:2 173:10,14,19 176:6,11

**supplementing** 110:13

**support** 157:19 165:3

**supports** 173:11

**supposed** 116:22 117:1

**supposedly** 131:14

**suppressed** 29:20

**suppression** 152:8

**suspect** 136:13

**suspects** 74:20 88:7 100:7 104:11 135:5,7,12 136:21 146:11

**swear** 5:8 131:1

**swearing** 84:9

**sworn** 5:9,18 64:17 75:11 131:6,9

---

**T**

**T-I-D-E-R-I-N-G-T-O-N** 6:1

**tactics** 142:20 145:23 146:3,9,16 148:17,20 149:2

**Tajuddin** 90:9

**taking** 66:10 73:21 113:17 120:11 127:3

**talk** 27:3 33:23 111:23 119:1 137:3

**talked** 58:8 69:24 120:24 144:14 149:16 158:18 168:20 171:8 174:20

**talking** 16:21 62:8,9 65:22 85:2,3,6 104:8 117:19 135:21 136:1 163:1 183:22

**talks** 173:2,3

**tangent** 86:4

**task** 65:9,10 112:8,10

**tasks** 42:16

**taught** 69:23

**tax** 62:3

**taxable** 62:10

**technically** 6:11

**techniques** 177:11

**telephone** 14:18,19

**telling** 105:7

**template** 49:6,8

**tendered** 21:8,11,14 22:3 180:5

**tens** 65:22

**term** 19:2 28:7 79:16 83:14,24 85:15,17,18

**terminology** 79:19

**terms** 15:13 20:16 27:12 28:11 34:18 49:13 51:14 60:6 63:24 66:1 78:12,13 80:21 127:2 128:11 150:12 154:15 160:8 167:9 168:1 172:5

**territory** 147:21

**test** 94:22

**testified** 5:18 6:24 7:2,12,22 16:7 17:1,13,21 18:3,13 36:17 44:12 51:5 52:14,17 54:23 55:3,15 63:2 68:22 69:2 70:19 80:24 82:20 87:22 89:15 93:21 97:20 98:1 99:10 105:2 106:17 108:20 115:3 125:24 126:23 133:12,15 134:8 138:15,20 140:14 147:20 148:1 149:13 156:4 158:20 160:18,22 161:3,6,7,10 168:13 169:21 173:21 178:2,8,15

**testify** 19:1,3,7,8,12 74:6 97:6 158:4,9 167:10 171:9 175:1,10,12, 13 177:9,12

**testifying** 16:18 17:19 18:19 19:9 47:4 67:14 171:19 177:22

**testimony** 11:19 13:8 18:20 25:6 26:16,18 30:18 36:15,23 37:4,10, 11 49:2 52:7,8 53:9,11,15 54:15,19 61:3 69:6 71:1 73:23 74:2 75:17 87:20,24 88:20 89:19,21 90:14 92:21,22 93:5 94:8,9,12 95:1 97:11,15 98:3,6,13 99:4,8,9,24 100:2,4 101:14,16,24 102:17 103:15,18 104:11,18 107:11 113:5, 19 114:22 118:19 120:17 123:21 124:8,12,13 129:14 131:6,9,24 133:10 134:7 137:17,23,24 138:1, 22 140:5 141:4,10 144:20,24 153:17 158:16,24 159:1,4 160:8,17 169:16 176:7

**thankful** 119:19

**theft** 66:4

**there'd** 50:19

**Theresa** 4:23 180:19 187:18

**thing** 34:7 168:6

**things** 12:2 17:8 27:24 30:16 43:10 53:8 74:8 81:9 91:23 97:2 108:21 109:2 110:14 144:16

THOMAS TIDERINGTON, 03/18/2026

146:12 163:13,20 169:12 173:4 186:14,15 187:9

**thinking** 53:18,23 54:2,3,10 97:3,7 134:1 160:16

**third-floor** 87:8

**Thomas** 4:5 5:16,24 6:3,8 26:10 71:18 106:2 107:19 109:24 142:13 179:12 188:4

**thought** 55:24 60:24 100:8 116:6 118:23 121:13 134:5 174:15 181:9

**thousands** 7:18 46:9,16 65:22,23 93:9,10 148:6

**threaten** 103:4

**threatened** 103:12 105:24 112:24 115:5

**threatening** 87:11 100:13,23 103:22

**throwing** 159:6,14 160:2 178:17

**Tiderington** 4:5 5:16,22,24 6:3,6 40:13 48:22 57:5,17 58:4,15 116:21 118:14 144:8 162:14 168:17 169:20 179:5 180:16,22 188:5

**Tiderington's** 179:13

**tied** 154:20

**time** 4:3 8:4,8 13:19 23:5,21,24 24:9 28:17 38:8,22,23 39:1,15,17 41:20 42:12,13,15,17,18 43:4,8,23, 24 45:15,24 48:16,20 52:11,18 54:7 55:5 56:9 57:22 58:2 59:19 61:4 64:23 67:2,4 68:11 72:13 74:20 80:3,19 82:7,11,14 94:4 95:20 96:7,21 99:8 116:15,19 119:3 127:11 141:8,17 144:2,6 147:6,14 151:20 154:16,19 161:10, 12 163:2 178:23 179:3 180:6,7,10 183:22 188:6

**timer** 43:9

**times** 16:15 17:11,20,24 67:6,8 68:4,9,10 74:19 84:16 95:21 111:20 119:8,10 136:5 137:4 144:15 161:3,7

**Tinajero** 5:4 6:8 31:3,9 71:17 106:4 110:16,24 111:6 126:7 142:12 147:3,12 148:14 150:2

**Tinajero's** 26:7 110:21

**today** 4:14 6:7 8:17 11:10,21 15:5 32:12 35:4 48:6 62:21 95:8 97:6

144:22 183:22 188:7

**today's** 63:19 188:4

**told** 18:24 19:4 102:6,7,12 104:19 113:1 131:12 132:15,16,22 136:13 140:9,11,15,19 141:6,11 182:13

**Tom** 103:8

**top** 62:3 127:15 135:19

**topics** 12:7

**total** 46:2,6 56:2 62:17 94:2

**totaled** 78:16

**totally** 29:14 123:22

**touched** 15:13 126:18

**Township** 64:7,12,18,22 65:5,14, 17 66:13,16,21 67:3

**track** 42:14,20,23 43:2,8 53:17

**trademark** 19:5

**trafficking** 15:23 16:3,5,8

**trained** 123:24 124:10

**training** 12:2 15:15 25:16 34:23 37:19 61:14 63:4 106:21,23,24 107:1 171:4,5 172:6 175:19

**transcribed** 99:14

**transcript** 88:19 168:11

**transcripts** 44:19,21 45:1 52:9 142:18 145:20 147:11

**treatment** 106:3 107:20 110:1

**tree** 90:19 91:4 93:6 120:4,5,6,24 121:6,19,20,23

**trees** 120:23 139:18

**trial** 37:3,10 97:20 98:3 99:24 100:2 183:14,17,21 184:2,18 185:4

**trials** 17:14,15

**trick** 114:24 115:1

**trier** 25:19 26:3 75:3 117:8 150:17

**Troche** 134:18,22,23 142:21 143:1 145:24 146:17 151:15,18,20

**Trotta** 4:11

**trouble** 9:23

**true** 74:5,16 89:11 120:14 123:4 138:8 150:17

**truth** 89:5

**truthful** 76:13 150:14

**turf** 173:3

**turn** 89:24 134:15 182:9,18

**two-minute** 143:11

**two-paragraph** 108:11

**type** 11:13 16:1 51:21 129:16 136:6 152:23 153:1 160:7 173:14

**typed** 47:21

**types** 59:10 160:11

**typical** 49:13 59:17

**typically** 34:1 37:23 80:19 96:16

**typing** 51:22

**typo** 151:21

---

## U

**Uh-huh** 132:13

**ultimate** 24:16,20 77:20

**ultimately** 30:24 48:6 137:24 142:8 149:6 150:16

**unable** 144:23

**unbiased** 165:16 166:11 170:14

**uncertain** 99:20

**uncertainty** 129:9 133:20 134:11

**uncorroborated** 103:2

**underlie** 185:12

**undermine** 184:19 186:1

**underneath** 117:19 148:9

**understand** 6:6,13,16 8:5,21 10:6 16:2,22 19:14 20:15 25:17,24 26:3 37:17 39:4 47:1,18 60:4,11 62:13 69:13 74:14 75:2 76:18 85:9,11 96:7 98:15 108:23 109:21 118:24 120:10,12 122:12 124:1,10 125:21 130:8 154:23 157:13 158:8 162:18 163:18 166:22 174:14 181:11 183:12 184:3,8 186:15,16,20

**understanding** 28:7 37:22 66:11 79:9 85:12 87:20 90:15 91:18 92:9 97:21,24 104:7 105:8 107:7 110:19 117:5,7 130:4 131:11 137:16 139:10 147:18 153:10 158:7 168:10 176:21 183:13,16

**understood** 7:11,22 8:14 18:15 61:4

THOMAS TIDERINGTON, 03/18/2026

**undisputed** 146:6 159:2

**unethical** 111:2

**unique** 51:3,23 55:22,24 56:8 126:8

**unit** 4:2 48:19 58:1 82:10 116:18 144:5 179:2

**United** 4:8 47:23 112:7

**unqualified** 143:5,16

**unreliable** 81:13 87:6 111:1 150:3, 8,21

**untruthful** 150:14

**unusual** 75:21 167:12

**updated** 63:22 64:2

**Urlaub** 4:12,15

**user** 124:9 125:3,6

**users** 125:16

---

### V

**vacated** 80:7

**vague** 24:18

**Valdez** 130:16,24 131:10 132:8 133:13,15 134:2,10 141:22

**vast** 67:16

**verbatim** 50:10

**versions** 87:24

**versus** 17:19 42:17 51:22 82:1 94:19 98:11,24 157:12

**vetting** 173:4

**victim** 104:22 155:8 158:20

**video** 4:2,17 14:17 111:23 112:14 187:24 188:4

**view** 78:7,8 88:10 89:9,16 90:17 91:3 92:17,24 99:10 100:4 120:17 121:3,6,21 122:1 123:21 139:19 144:16

**viewed** 87:7

**viewing** 10:3 11:8

**violation** 19:5 25:15 26:16 28:13 136:12

**violations** 78:13

**violent** 129:1

**vitae** 63:17

**voluntarily** 145:22

**voluntary** 142:19 143:7,17

**vouch** 91:24

---

### W

**wait** 134:1

**waking** 53:18

**wanted** 102:13 132:23 140:1 141:12 163:22 164:3

**warning** 127:13

**warrant** 87:12 100:13,24 102:8,14 103:4,12,23 113:1 114:4 115:6 132:16,23 134:3,6 139:24 140:9, 16,20 141:7,13

**waste** 99:8

**watched** 90:24

**ways** 158:2,10

**week** 12:5 70:14

**weigh** 62:7

**Whatever's** 138:17,19

**whatsoever** 75:12 86:11 127:11 177:21

**Whipple** 89:9,10 147:20 159:5

**wide** 24:14 65:10

**widely** 23:21,24 24:8 34:22

**wife's** 84:15

**win** 145:15

**window** 57:14,17 87:8 89:8,17 91:2 120:7,23 121:2,24

**withheld** 185:22 186:22

**witnessed** 98:1

**witnesses** 27:13 30:2,9,12,17 73:16,24 95:21 117:2 127:9 158:12 167:19 169:24

**Woodall** 153:5,7,12

**word** 51:21,22,23 70:4 83:6 148:7 167:16,18

**words** 47:14 78:3 109:1 119:23 120:1,8 138:4

**work** 11:3 15:13,24 32:19 34:24 40:1 41:14 42:24 55:1 56:9,14

60:13 130:21 175:23

**work-wise** 61:10

**worked** 20:14 38:10,18 53:12 64:13 157:5 160:10

**working** 39:8 43:18 53:22 54:8,10 55:5,13 85:12 97:9 98:4 99:2 112:4,5 154:18 160:11 181:5,10

**workings** 186:16,20

**works** 43:1

**worth** 52:11

**wow** 183:22

**write** 43:13 54:4 91:2 109:2 127:4, 23,24 128:2

**writes** 70:4

**writing** 31:24 47:6 52:1 108:24

**written** 49:7,17 50:3,20 51:7 69:11,18 70:6 98:24 102:19 120:2 148:15

**wrong** 5:14 27:20 49:1 53:9 69:1, 20 100:9 154:22

**wrongful** 79:13,14,18

**wrongfully** 79:3,8,23 81:7

**wrote** 32:2,7 51:17 61:2 78:3,15 82:1 91:7 92:2 95:16 109:7 124:14 127:8 133:15 154:19

---

### Y

**year** 61:21 68:12

**years** 7:3 15:11,18 28:16 61:15 63:7,8 64:15 65:9 75:10 154:17 157:3 172:10,11 173:9

**yell** 90:22 173:22 178:9

**yesterday** 14:6,8

**Yup** 180:15

*DeLeon-Reyes v. Guevara, et al.*
Case No. 18 CV 01028

*Solache v. Guevara, et al.*
Case No. 18 CV 02312

# EXHIBIT 13

**07 C 1130**          **Judge Guzman**

**Thompson v. City of Chicago, et al**

*Filed Jury Instructions —GIVEN.*

FILED
NOV 09 2009
RONALD A. GUZMAN, JUDGE
UNITED STATES DISTRICT COURT

If you find for Plaintiff Terrance Thompson and against one or more of the Defendants Suchocki, Burzinski or McDermott, you may, but are not required to, assess punitive damages against each such Defendant. The purposes of punitive damages is to punish a Defendant for his conduct and to serve as an example or warning to him and others not to engage in similar conduct in the future.

The Plaintiff must prove by a preponderance of the evidence that punitive damages should be assessed against a Defendant. You may assess punitive damages only if you find that a Defendant's conduct was malicious or in reckless disregard of the Plaintiff's rights. Conduct is malicious if it is accompanied by ill will or spite, or is done for the purpose of injuring the Plaintiff. Conduct is in reckless disregard of the Plaintiff's rights if, under the circumstances, it reflects complete indifference to the Plaintiff's safety or rights.

If you find that punitive damages are appropriate against one or more of the Defendants, then you must use sound reason in setting the amount of those damages against each such Defendant. Punitive damages, if any, should be in an amount sufficient to fulfill the purposes that I have described to you, but should not reflect bias, prejudice, or sympathy toward any party. In determining the amount of any punitive damages, you should consider the following factors:

- the reprehensibility of the Defendant's conduct;

- the impact of the Defendant's conduct on the Plaintiff;

- the relationship between the Plaintiff and the Defendant;

- the likelihood that the Defendant would repeat the conduct if an award of punitive damages is not made;

- the relationship of any award of punitive damages to the amount of actual harm the Plaintiff suffered.

To succeed on his claim for malicious prosecution as to any Defendant, Plaintiff Terrance Thompson must prove each of the following things by a preponderance of the evidence:

1. That the Defendant caused a criminal proceeding to be commenced or continued against the Plaintiff for aggravated unlawful use of a weapon;

2. The criminal proceeding terminated in a manner indicative of the Plaintiff's innocence;

3. There was no probable cause to commence or continue the criminal proceeding against the Plaintiff for aggravated unlawful use of a weapon;

4. The Defendant acted with malice; and

5. The Plaintiff suffered damages as a proximate result of the Defendant's conduct.

If you find that the Plaintiff has proved each of these as to any Defendant, then you should find for Plaintiff and against that Defendant, and go on to consider the question of damages as to that Defendant.

If you find that the Plaintiff has not proved any one of these things as to any Defendant, then you should find for that Defendant, and you will not consider the question of damages as to that Defendant.

The parties have stipulated that the criminal proceeding against the Plaintiff Terrance Thompson terminated on December 5, 2006 when the state court granted Plaintiff's petition pursuant to section 5/2-1401 of the Illinois Code of Procedure.

The purpose of a section 5/2-1401 petition is to raise facts that were not known to the petitioner or the court at the time of trial, that could have caused the court to render a different decision.

Let me explain what "probable cause" means. A Defendant had probable cause to commence or continue the criminal proceeding against the Plaintiff for aggravated unlawful use of a weapon if a prudent person would have believed that the Plaintiff had committed that crime.

A person commits aggravated unlawful use of a weapon if he knowingly:

1.     carries or conceals on or about his person any pistol, revolver or other firearm when he is not on his own land; or

2.     carries or possesses on or about his person any pistol, revolver or other firearm when he is on any public street, alley, or other public lands within the corporate limits of a city; and

3.     the firearm was uncased, loaded and immediately accessible.

In determining whether any Defendant had probable cause to commence or continue the criminal proceeding against the Plaintiff, you should consider what the Defendant knew, and what reasonably trustworthy information he had received, at the time of his actions.

Probable cause requires more than just a suspicion. But it does not need to be based on evidence that would be sufficient to support a conviction, or even a showing that the Defendant's belief was probably right.

Illinois law defines malice as the intent, without justification or excuse, to commit a wrongful act.

When I use the expression "proximate cause," I mean a cause which, in the natural and ordinary course of events, produced the Plaintiff's injuries. It need not be the only cause, nor the last or nearest cause. It is sufficient if it occurs with some other cause acting at the same time, which in combination with it, causes the injury.

To succeed on any one of his claims against any one of the Defendants Burzinski, Suchocki or McDermott, Plaintiff Terrance Thompson must prove by a preponderance of the evidence that the Defendant was personally involved in the conduct about which Plaintiff complains. You may not hold any of the Defendants Burzinski, Suchocki or McDermott liable on any claim for what anyone else did or did not do.

If you find that the Plaintiff Terrance Thompson has proved any of his claims against one or more of the Defendants Burzinski, Suchocki or McDermott, then you must determine what amount of damages, if any, the Plaintiff is entitled to recover. The Plaintiff must prove his damages by a preponderance of the evidence.

If you find that the Plaintiff has failed to prove any of his claims against any of the Defendants, then you will not consider the question of damages.

Members of the jury, you have seen and heard all the evidence and arguments of the attorneys. Now I will instruct you on the law.

You have two duties as a jury. Your first duty is to decide the facts from the evidence in the case. This is your job, and yours alone.

Your second duty is to apply the law that I give you to the facts. You must follow these instructions, even if you disagree with them. Each of the instructions is important, and you must follow all of them.

Perform these duties fairly and impartially. Do not allow sympathy, prejudice, fear, or public opinion to influence you. You should not be influenced by any person's race, color, religion, national ancestry, or sex.

Nothing I say now, and nothing I said or did during the trial, is meant to indicate any opinion on my part about what the facts are or about what your verdict should be.

You should consider and decide this case as an action between persons of equal standing in the community, and holding the same or similar stations in life. Each party is entitled to the same fair consideration. All parties stand equal before the law and are to be dealt with as equals in a court of justice.

The evidence consists of the testimony of the witnesses, the exhibits admitted in evidence, and stipulations. A stipulation is an agreement between both sides that certain facts are true.

Certain things are not to be considered as evidence. I will list them for you:

First, if I told you to disregard any testimony or exhibits or struck any testimony or exhibits from the record, such testimony or exhibits are not evidence and must not be considered.

Second, anything that you may have seen or heard outside the courtroom is not evidence and must be entirely disregarded. This includes any press, radio, Internet or television reports you may have seen or heard. Such reports are not evidence and your verdict must not be influenced in any way by such publicity.

Third, questions and objections or comments by the lawyers are not evidence. Lawyers have a duty to object when they believe a question is improper. You should not be influenced by any objection, and you should not infer from my rulings that I have any view as to how you should decide the case.

Fourth, the lawyers' opening statements and closing arguments to you are not evidence. Their purpose is to discuss the issues and the evidence. If the evidence as you remember it differs from what the lawyers said, your memory is what counts.

Any notes you have taken during this trial are only aids to your memory. The notes are not evidence. If you have not taken notes, you should rely on your independent recollection of the evidence and not be unduly influenced by the notes of other jurors. Notes are not entitled to any greater weight than the recollections or impressions of each juror about the testimony.

Case 1:07-cv-02813-... Document #: 733 Filed: 03/25/09 Page 144 of 287 PageID #:3275388

In determining whether any fact has been proved, you should consider all of the evidence bearing on the question regardless of who introduced it.

Case 1:07-cv-02813 Document 873-38 Filed 03/25/09 Page 149 of 287 PageID #:3276389

You should use common sense in weighing the evidence and consider the evidence in light of your own observations in life.

In our lives, we often look at one fact and conclude from it that another fact exists. In law we call this "inference." A jury is allowed to make reasonable inferences. Any inference you make must be reasonable and must be based on the evidence in the case.

You may have heard the phrases "direct evidence" and "circumstantial evidence." Direct evidence is proof that does not require an inference, such as the testimony of someone who claims to have personal knowledge of a fact. Circumstantial evidence is proof of a fact, or a series of facts, that tends to show that some other fact is true.

As an example, <u>direct evidence</u> that it is raining is testimony from a witness who says, "I was outside a minute ago and I saw it raining." <u>Circumstantial evidence</u> that it is raining is the observation of someone entering a room carrying a wet umbrella.

The law makes no distinction between the weight to be given to either direct or circumstantial evidence. You should decide how much weight to give to any evidence. In reaching your verdict, you should consider all the evidence in the case, including the circumstantial evidence.

You must decide whether the testimony of each of the witnesses is truthful and accurate, in part, in whole, or not at all. You also must decide what weight, if any, you give to the testimony of each witness.

In evaluating the testimony of any witness, including any party to the case, you may consider, among other things:

- the ability and opportunity the witness had to see, hear, or know the things that the witness testified about;

- the witness's memory;

- any interest, bias, or prejudice the witness may have;

- the witness's intelligence;

- the manner of the witness while testifying;

- and the reasonableness of the witness's testimony in light of all the evidence in the case.

You may consider the statements given by any party or witness who testified under oath before trial as evidence of the truth of what he or she said in the earlier statements, as well as in deciding what weight to give his or her testimony.

With respect to other witnesses, the law is different. If you decide that, before the trial, one of these witnesses made a statement not under oath or acted in a manner that is inconsistent with his testimony here in court, you may consider the earlier statement or conduct only in deciding whether his testimony here in court was true and what weight to give to his testimony here in court.

In considering a prior inconsistent statement or conduct, you should consider whether it was simply an innocent error or an intentional falsehood and whether it concerns an important fact or an unimportant detail.

You have heard evidence that Plaintiff Terrance Thompson has been convicted of a crime. You may consider this evidence only in deciding whether Plaintiff Terrance Thompson's testimony is truthful in whole, in part, or not at all. You may not consider this evidence for any other purpose.

It is proper for a lawyer to meet with any witness in preparation for trial.

You may find the testimony of one witness or a few witnesses more persuasive than the testimony of a larger number.  You need not accept the testimony of the larger number of witnesses.

The law does not require any party to call as a witness every person who might have knowledge of the facts related to this trial. Similarly, the law does not require any party to present as exhibits all papers and materials mentioned during this trial.

When I say a particular party must prove something by "a preponderance of the evidence," or when I use the expression "if you find," or "if you decide," this is what I mean: When you have considered all the evidence in the case, you must be persuaded that it is more probably true than not true.

If you decide for all of the Defendants on all of the claims, then you should not consider the question of damages.

You must give separate consideration to each claim and each party in this case.

The parties have stipulated that, prior to trial, each of the Defendants Burzinski, Suchocki and McDermott and non-party witnesses Brett Rice, James Eldridge and John Blake were asked questions under oath. The parties have also stipulated that each of the Defendants Burzinski, Suchocki and McDermott and non-party witnesses Brett Rice, James Eldridge and John Blake asserted his Fifth Amendment privilege not to testify in response to those questions.

You may, but are not required to, infer from each of the Defendants Burzinski, Suchocki and McDermott and non-party witnesses Brett Rice, James Eldridge and John Blake's assertion of his Fifth Amendment privilege that his testimony in response to those questions would have been adverse to him.

Plaintiff Terrance Thompson brings the following claims.

First, the Plaintiff claims that the Defendants Burzinski, Suchocki and/or McDermott violated his right to due process under the Fourteenth Amendment of the United States Constitution by denying him a fair criminal trial.

Second, the Plaintiff claims that the Defendants Burzinski, Suchocki and/or McDermott further violated his right to due process under the Fourteenth Amendment of the United States Constitution by failing to intervene to prevent the above constitutional violation.

Third, the Plaintiff claims that Defendants Burzinski, Suchocki and/or McDermott conspired to violate his right to due process under the Fourteenth Amendment of the United States Constitution.

Fourth, the Plaintiff claims that Defendants Burzinski, Suchocki and/or McDermott maliciously prosecuted him.

Defendants Burzinski, Suchocki and McDermott deny all of these claims.

To succeed on his Fourteenth Amendment due process claim based on the denial of a fair criminal trial against any Defendant, Plaintiff Terrance Thompson must prove each of the following by a preponderance of the evidence:

1.      The Defendant deliberately withheld evidence that the officers who testified at Plaintiff's criminal trial engaged in a pattern of misconduct.

2.      The evidence withheld was exculpatory or had impeachment value.

3.      The evidence withheld was material to an issue at trial.

4.      The Plaintiff was damaged as a proximate result of the Defendant's action.

A Defendant deliberately withheld evidence if he failed to disclose it in time for the Plaintiff to make use of it during his criminal trial and the proceedings after the trial in which the Plaintiff sought to have his conviction vacated and the charges against him dismissed and the evidence was not otherwise available to the Plaintiff through the exercise of reasonable diligence. For this claim, you may not consider evidence about the gun itself as evidence that was withheld from the Plaintiff in his criminal proceedings. Evidence about the gun may be considered only with regard to Plaintiff's malicious prosecution claim.

Evidence is exculpatory if it would have been favorable to the Plaintiff in his criminal trial. Evidence has impeachment value if it would have called into question the truthfulness of a witness.

Withheld evidence is material if there is a reasonable probability that, had the evidence been disclosed, the result of the trial would have been different.

If you find that the Plaintiff has proved each of these things as to any Defendant, then you should find for the Plaintiff and against that Defendant, and go on to consider the question of damages as to that Defendant.

If you find that the Plaintiff has not proved any one of these things as to any Defendant, then you should find for that Defendant, and you will not consider the question of damages as to that Defendant.

To succeed on his Fourteenth Amendment due process failure to intervene claim as to any Defendant, Plaintiff Terrance Thompson must prove each of the following things by a preponderance of the evidence:

1. One or more of the Defendants Burzinski, Suchocki or McDermott violated Plaintiff's constitutional rights by denying him a fair criminal trial.

2. The Defendant you are considering knew that one or more of the other Defendants violated the Plaintiff's constitutional rights by denying him a fair criminal trial.

3. The Defendant you are considering had a realistic opportunity to do something to prevent that harm from occurring.

4. The Defendant you are considering failed to take reasonable steps to prevent that harm from occurring.

5. The failure to act of the Defendant you are considering caused the Plaintiff to suffer harm.

If you find that the Plaintiff has proved each of these things as to any Defendant, then you should find for the Plaintiff and against that Defendant, and go on to consider the question of damages as to that Defendant.

If you find that the Plaintiff has not proved any one of these things as to any Defendant, then you should find for that Defendant, and you will not consider the question of damages as to that Defendant.

To succeed on his conspiracy claim as to any Defendant, Plaintiff Terrance Thompson must prove each of the following things by a preponderance of the evidence:

1. That the Defendant formed an express or implied agreement with at least one other Defendant.

2. The purpose of the agreement was to deprive, either directly or indirectly, the Plaintiff of his right to due process.

3. That one or more of the conspirators either did an act in furtherance of the object of the conspiracy or caused someone else to do so.

4. That the Plaintiff suffered some injury as a result of the conspiracy.

If you find that the Plaintiff has proved each of these things as to any Defendant, then you should find for Plaintiff and against that Defendant, and go on to consider the question of damages as to that Defendant.

If you find that the Plaintiff has not proved any one of these things as to any Defendant, then you should find for that Defendant, and you will not consider the question of damages as to that Defendant.



If you find in favor of Plaintiff Terrance Thompson, then you must determine the amount of money that will fairly compensate him for any injury that you find he sustained and is reasonably certain to sustain in the future as a direct result of any Defendant's violation of his Fourteenth Amendment due process rights by denying him a fair criminal trial or failing to intervene to prevent another Defendant from denying him a fair criminal trial, conspiracy, and/or malicious prosecution. These are called "compensatory damages."

The Plaintiff must prove his damages by a preponderance of the evidence. Your award must be based on evidence and not speculation or guesswork. This does not mean, however, that compensatory damages are restricted to the actual loss of money; they include both the physical and mental aspects of injury, even if they are not easy to measure.

You should consider the following types of compensatory damages, and no others:

The physical and  mental/emotional pain and suffering that the Plaintiff has experienced and is reasonably certain to experience in the future. No evidence of the dollar value of physical or mental/emotional pain and suffering has been or needs to be introduced. There is no exact standard for setting the damages to be awarded on account of pain and suffering. You are to determine an amount that will fairly compensate the Plaintiff for the injury he has sustained.

If you find in favor of the Plaintiff but find that he has failed to prove compensatory damages, you must return a verdict for Plaintiff in the amount of one dollar ($1.00).

Case 1:07-cv-02813-RDB Document 87-3 Filed 03/25/09 Page 166 of 287 PageID #3293406

Upon retiring to the jury room, you must select a presiding juror. The presiding juror will preside over your deliberations and will be your representative here in court.

A verdict form has been prepared for you.

[Verdict form read.]

Take the verdict form to the jury room, and when you have reached unanimous agreement on the verdict, your presiding juror will fill in and date the appropriate form, and all of you will sign it.

I do not anticipate that you will need to communicate with me. If you do need to communicate with me, the only proper way is in writing. The writing must be signed by the presiding juror, or, if he or she is unwilling to do so, by some other juror. The writing should be given to the marshal, who will give it to me. I will respond either in writing or by having you return to the courtroom so that I can respond orally.

If you do communicate with me, you should not indicate in your note what your numerical division is, if any.

The verdict must represent the considered judgment of each juror. Your verdict, whether for or against the parties, must be unanimous.

You should make every reasonable effort to reach a verdict. In doing so, you should consult with one another, express your own views, and listen to the opinions of your fellow jurors. Discuss your differences with an open mind. Do not hesitate to reexamine your own views and change your opinion if you come to believe it is wrong. But you should not surrender your honest beliefs about the weight or effect of evidence solely because of the opinions of other jurors or for the purpose of returning a unanimous verdict.

All of you should give fair and equal consideration to all the evidence and deliberate with the goal of reaching an agreement that is consistent with the individual judgment of each juror. You are impartial judges of the facts.

*DeLeon-Reyes v. Guevara, et al.*
Case No. 18 CV 01028

*Solache v. Guevara, et al.*
Case No. 18 CV 02312

# EXHIBIT 14

STATE OF ILLINOIS )
                  )  SS:
COUNTY OF C O O K  )


      IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
           COUNTY DEPARTMENT - CRIMINAL DIVISION

   THE PEOPLE OF THE STATE       )
   OF ILLINOIS,                   )
                                  )
                    Plaintiff,    )
                                  ) No. 98 CR 12440 (02)
            vs.                   ) No. 98 CR 12440 (03)
                                  )
   ARTURO REYES and GABRIEL       )
   SOLACHE,                       )
                                  )
                    Defendants.   )

   REPORT OF PROCEEDINGS had before the HONORABLE

JAMES M. OBBISH, Judge of said Court, on the 29th

day of June, A.D., 2016.

APPEARANCES:

     HON. ANITA M. ALVAREZ,
     State's Attorney of Cook County, by:
     MS. CELESTE STACK,
     MR. JAMES PAPA,
     MR. KURT SMITKO, Assistant State's Attorneys,
          On behalf of the People;

     MR. ANDREW VAIL,
     MR. DAVID SAUNDERS,
     MR. MICHAEL WERNER,
          On behalf of Defendant Reyes;

     MS. KAREN DANIEL,
          On behalf of Defendant Solache.


KRISTEN M. PARRILLI, CSR, RPR
Official Court Reporter
Criminal Division
CSR: #084-004723

— 1 —

**JGS 920**

THE COURT: Solache and Reyes.

(A brief pause.)

THE COURT: All right. This is the case of People versus Solache and Reyes. Mr. Reyes is the 02 defendant. He is present. Mr. Solache is the 03 defendant on that case. He is also present.

Parties please identify.

MR. VAIL: Good morning, your Honor. Andrew Vail, David Saunders, and Michael Werner on behalf of Mr. Reyes.

MS. DANIEL: Karen Daniel on behalf of Gabriel Solache.

MS. STACK: Celeste Stack on behalf of the People, with James Papa and Kurt Smitko.

THE COURT: All right. The record should reflect as well that both Mr. Solache and Mr. Reyes are being assisted by an official court interpreter.

Your name for the record, please.

THE INTERPRETER: Yes, your Honor. Maria Zavala.

THE COURT: Thank you, Ms. Zavala.

All right. This matter comes before the Court today for the Court to rule on post conviction petitions filed on behalf of both Mr. Solache and Mr. Reyes.

2

JGS 921

The Appellate Court, several years ago, reversed a decision of the Circuit Court and ordered that these hearings take place and sent -- directed the Circuit Court to send it to a courtroom where it could be held, and so it ended up being in front of this Court.

It sent it to this Court with direction from the Appellate Court, some very strong and significant language. Included in that language was the sentence, If even a fraction of the allegations included in this evidence had been presented prior to trial, it appears likely that Detective Guevara's credibility would have been damaged and defendants' confessions would have been suppressed. That is a very strong directive from an Appellate Court to a lower Court.

Subsequent to the Appellate Court opinion on their case, the Appellate Court further ruled on another case, People versus Whirl, regarding how Courts should treat witnesses that take -- refuse to testify on the grounds that their answers might incriminate them. That happened in this case when Detective Guevara was called as a witness.

Four people really know what exactly was said when Reyes and Solache provided their statements to

3

JGS 922

Assistant State's Attorneys back in 1998. The four people would be the two petitioners, Reyes and Solache, Detective Guevara, and another police officer who acted as an interpreter.

Neither of the State's Attorneys who were present when the statements were provided could speak the Spanish language or understand the Spanish language. The statements were recorded, to the extent that they were written out in the English language. They were presented to the petitioners in the English language, a language which neither petitioner spoke or could read.

The petitioners have made multiple claims about how any statements were obtained and they also made multiple claims about what they said. When Detective Guevara was called and asked about those -- his interaction with Petitioner Solache, I believe he refused to answer any questions. So nobody really knows what Guevara said to Solache or Solache said to Guevara but those two people. So we are relying heavily on what Detective Guevara said.

A similar situation took place with Reyes and the Chicago police officer that acted as an interpreter there. Again, the Assistant State's Attorney who wrote

4

JGS 923

Case: 1:18-cv-02083 Document #: 763-1 Filed: 03/22/23 Page 174 of 287 PageID #:15880414

out the words wrote out the words that were provided by the police officer in the English language and had no idea, because they did not speak English -- or Spanish, rather, what either that officer was saying to Reyes or what Reyes was saying back to the officer.

Sadly, there was a Spanish-speaking -- or I shouldn't say sadly. Unfortunately, there was an Assistant State's Attorney who took a third statement of a third defendant. That State's Attorney could speak the Spanish language. Mr. Navarro was fluent in Spanish. He was fluent, obviously, in English. He could speak both languages but he was not called upon to be yet another witness to the statements that were being written down in English for Mr. Reyes and Mr. Solache to openly sign.

I think that weighs very heavily on the impact of Detective Guevara's assertion of his 5th Amendment privilege when he testifies in this courtroom. It weighed heavily on the Court as People versus Whirl directed the Courts to do.

Other information, certainly, was available to various people. But this Court cannot consider evidence that a jury would be forbidden in considering when determining guilt or innocence or in determining

the voluntariness of confessions here.

What was at issue in this here is only whether or not these confessions were voluntary, not whether they were true or accurate. But the only issue is voluntariness.

After an extensive hearing and enormous undertakings by all of the parties here and, sadly, some not here, but an enormous effort has been put in to gathering evidence, producing evidence, cooperating with each other. And I extend that to all the parties. This was not an easy task from the petitioners' point of view. This was not an easy task from the State's Attorney's Office for them to undertake. Both sides -- both sides were admirable, in this Court's opinion, as to how they conducted themselves in their advocacy. The State's hands were somewhat tied when the star witness in this case refused to answer any questions. The result might very well have been different.

But in any event, this Court is granting relief to both petitioners in the form of granting their motion for new hearing on the motion to suppress. A written order will be entered today. I'll tender a copy to counsel for both Reyes and Solache at this time.

-6-

JGS 925

MR. VAIL:  Thank you, your Honor.

THE COURT:  I will tender a copy to the State as well.

MS. STACK:  Thank you, Judge.

THE COURT:  If you would like a second copy, I can give you a second one as well.

At this stage, the written order explains the new motion to suppress hearing will be granted.  But at this time, the petitioners' request that their convictions be vacated will be denied.  But the -- Obviously the -- Well, whatever.  What happens at the hearing will be, obviously, if -- when it's held, will be very determinative as to what is the next issue in the case.

So I'll give it -- I don't know if you want a check date or ...

MR. SMITKO:  Yes, Judge.  Can we have July 21st for appellate check date?

THE COURT:  Does that work, folks?

The writs will not be extended.  Thank you, officers.

MS. DANIEL:  July 21st is -- works for me.

THE COURT:  July 21st.  Thank you.

MR. VAIL:  Thank you, your Honor.

---
7

JGS 926

MS. STACK:  Thank you, Judge.

(Whereupon the above-entitled cause was continued until 7/21/16.)

8

JGS 927

STATE OF ILLINOIS )
                  )  SS:
COUNTY OF C O O K )


        IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
            COUNTY DEPARTMENT - CRIMINAL DIVISION


        I, Kristen M. Parrilli, an Official Court

Reporter for the Circuit Court of Cook County,

Illinois, Judicial Circuit of Illinois, do hereby

certify that I reported in shorthand the proceedings

had on the hearing in the above-entitled cause; that

I thereafter caused the foregoing to be transcribed

into computer-aided transcription, which I hereby

certify to be a true and accurate transcript of the

proceedings had before the HONORABLE JAMES MICHAEL

OBBISH, Judge of said court.

                    _____
                    KRISTEN M. PARRILLI, CSR, RPR
                    CSR No. 084-004723
                    Official Court Reporter
                    Circuit Court of Cook County
                    County Department
                    Criminal Division


Dated this 23rd day
of July, A.D., 2018.

**JGS 928**

*DeLeon-Reyes v. Guevara, et al.*
Case No. 18 CV 01028

*Solache v. Guevara, et al.*
Case No. 18 CV 02312

# EXHIBIT 15

STATE OF ILLINOIS          )
                           )  SS:
COUNTY OF C O O K          )

     IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
          COUNTY DEPARTMENT - CRIMINAL DIVISION

THE PEOPLE OF THE STATE    )
OF ILLINOIS,               )
          Plaintiff,       )
                           )  No.  98 CR 12440-03
  vs.                      )
                           )
GABRIEL D. SOLACHE,        )
          Defendant.       )

     REPORT OF PROCEEDINGS of a Motion State Nolle

Pros, had at the hearing in the above-entitled cause

before the Honorable James M. Obbish, Judge of said

court, on the 21st day of December, 2017.

APPEARANCES:

  HONORABLE KIMBERLY M. FOXX,
          State's Attorney of Cook County, by:
  Mr. Eric Sussman,
  Mr. James Papa,
  Mr. Alan Spellberg,
          Assistant State's Attorneys,
          appeared on behalf of the People;

  Ms. Karen Daniel,
  Mr. Jeff Urdangen,
          appeared on behalf of the Defendant.

ALSO PRESENT:
  Mr. Andrew Vail;
  Mr. David Saunders.


Lisa A. Ciarrachi, CSR, RPR
Official Court Reporter
2650 S. California Ave., Rm. 4C02
Chicago, Illinois 60608
License No. 084-00453
                    1

**JGS 1189**

THE CLERK: Arturo Reyes and Gabriel Solache.

MR. SUSSMAN: Morning, your Honor.

THE COURT: Good morning.

MR. SUSSMAN: Eric Sussman, James Papa and Alan Spellberg for the State.

MS. DANIEL: Karen Daniel and Jeff Urdangen, U-r-d-a-n-g-e-n, for Gabriel Solache.

MR. VAIL: On behalf of Mr. Reyes, Andrew Vail, V-a-i-l, and David Saunders, S-a-u-n-d-e-r-s.

THE COURT: All right, good morning.

MR. VAIL: Good morning, your Honor.

THE COURT: This case was motion to advance and reset will be granted.

MR. SUSSMAN: Your Honor, as you know, following a lengthy hearing on the admissibility of the Defendants' confessions, this Court concluded that Detective Guevara violated his duty to provide honest testimony and lied repeatedly under oath.

You further opined that Detective Guevara had now eliminated the possibility of being considered a credible witness in any proceeding, and the State's Attorney's Office does not dispute this Court's conclusions and will not appeal the suppression of the Defendants' confessions.

2

**JGS 1190**

That having been said, there is not a doubt in my mind or the mind of any prosecutor who has worked on this case that Mr. Solache and Mr. Reyes are guilty of these heinous crimes, but because Detective Guevara was the lead investigator in this crime, and because he has repeatedly refused to testify truthfully, the State's Attorney's Office has no choice but to dismiss the case against Defendants Solache and Reyes, and we would ask the Court to nolle those charges.

And I would just add that this is, as your Honor opined earlier, it is a tragic day for justice in Cook County, and the State's Attorney's Office offers its condolences to the victims of this crime and their families.

THE COURT: All right. Thank you.

MS. DANIEL: Judge --

MR. URDANGEN: We have no objection to the motion to nolle pros, Judge.

THE COURT: All right. Motion State nolle --

MR. VAIL: We have no objection, your Honor, although we do disagree with Mr. Sussman's statement that he believes there's no doubt that my client is guilty. We believe strongly the State lacks any

3

JGS 1191

evidence to make that proof or showing.

MS. DANIEL: And, Judge, I'd just like to state for the record as well, my client has maintained his innocence since day one. I believe that; our defense team believes that; Jane Raley (phonetic) believed that until she passed away; and that's why we've remained on his case for 16 years. We believe him to be innocent.

THE COURT: Well, the reality is that no one may ever completely ever know the truth about what occurred when those two people were slaughtered.

I understand the State's position since it would seem highly unlikely that the third Defendant was able to accomplish the brutality that occurred during the course of this case, and overpower an adult male and an adult woman and inflict the kind of damages that occurred here.

So, Ms. Mejia -- I believe her name was -- probably did not act alone. The question would be who the other -- who else was likely to have assisted her.

So, it would be -- so I think there's a sadness because justice hasn't been totally carried out; because everyone responsible, probably, certainly has not been held responsible. And it may have been,

4

JGS 1192

as you argue, that the other individuals involved were not your clients.

But we have all been left with a void because of the choices made by -- the selfish choices of Detective Guevara placing himself above the citizens of -- that he was sworn to serve and protect.

I don't know. There's just not much I can say. I can't say anything that would bring back those people. None of us can do that, so.

Be that as it may. State has now dismissed all charges. Motion State nolle pros all charges as to Mr. Reyes and Mr. Solache.

I'm not sure how the Clerk -- who notifies Illinois Department of Corrections?

MR. PAPA: Judge, if you wouldn't mind signing the orders that we have prepared, they're --

THE COURT: Want to take a look at those?

MR. PAPA: -- state that.

MS. DANIEL: Judge, could we just pass to review these orders? My experience in these of matters is that if the orderer is not properly worded, there can be difficulties with the Department of Corrections and them knowing what to do and --

MR. PAPA: Judge, I've spoken to General

5

JGS 1193

Counsel, Chief Counsel of the Department of Corrections. I've dealt with her in the past with these exact same orders, obviously, on not these cases -- this case, but on different cases.

It has, in the past, always worked without any hitch. She is expecting to have this in her hands sometime later this morning.

MS. DANIEL: Judge, I haven't had a chance to look at the order. I'd really appreciate a chance to just look at it.

THE COURT: I'll enter the orders. If you feel the need, after you examine them, that something else needs to be addressed, discuss it with Mr. Papa, and then we can -- both sides can bring it back to my attention, so.

But, if it's satisfactory, then we won't have to. So, how many copies to you need signed?

MR. PAPA: Judge, if you could sign all of the ones that I've prepared just so that I can tender them to everybody, and make sure that the Department of Corrections has enough.

THE COURT: All right.

(Which were all the proceedings had in the above-entitled cause.)

6

JGS 1194

STATE OF ILLINOIS    )
                     )
COUNTY OF C O O K    )


              IN THE CIRCUIT COURT OF COOK COUNTY
              COUNTY DEPARTMENT - CRIMINAL DIVISION


        I, Lisa A. Ciarrachi, an Official Court Reporter for the Circuit Court of Cook County, County Department-Criminal Division, do hereby certify that I reported in shorthand the proceedings, had at the above-entitled cause; that I thereafter caused the foregoing to be transcribed into typewriting, which I hereby certify to be a true and accurate transcript of the proceedings, had before the Honorable James M. Obbish, Judge of said court.

                    _____
                    Official Court Reporter

Dated this 27th day of July, 2018.

                          7

**JGS 1195**

*DeLeon-Reyes v. Guevara, et al.*
Case No. 18 CV 01028

*Solache v. Guevara, et al.*
Case No. 18 CV 02312

# EXHIBIT 16

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ARTURO DELEON-REYES,               )
            Plaintiff,             )
                                   )
            -vs-                    )Case Number 18 CV 01028
                                   )
REYNALDO GUEVARA, et al.,          )
            Defendants.            )
*****************************
GABRIEL SOLACHE,                   )
            Plaintiff,             )
                                   )
            -vs-                    )Case Number 18 CV 02312
                                   )
REYNALDO GUEVARA, et al.,          )
            Defendants.            )

VIDEOTAPED

AUDIO-VIDEOCONFERENCE DEPOSITION

CHRISTA BOWDEN

a witness herein, called for examination pursuant to Notice

and the Federal Rules of Civil Procedure as they pertain to

the taking of depositions before Lea Ruth Cohen, CSR, and a

Notary Public in and for the County of Peoria, State of

Illinois, on Monday, May 1, 2023, commencing at the hour of

11:02 a.m., via Zoom platform.

CHRISTA BOWDEN, 05/01/2023 Page 2..5

Page 2

ALL APPEARANCES VIA ZOOM:

STEVE ART, ESQUIRE
a n d
VALERIE BARAJAS, ESQUIRE
Loevy & Loevy
311 North Aberdeen Street, Third Floor
Chicago, Illinois 60607
(312)243-5900
steve@loevy.com
valerie@loevy.com
on behalf of Plaintiff Arturo Deleon-Reyes;

JAN SUSLER, ESQUIRE
People's Law Office
1180 North Milwaukee Avenue, Third Floor
Chicago, Illinois 60622
(773)235-0070
jsusler@peopleslawoffice.com
on behalf of Plaintiff Gabriel Solache;

MEGAN MCGRATH, ESQUIRE
Leinenweber Baroni & Daffada, LLC
120 North LaSalle Street, Suite 2000
Chicago, Illinois 60603
(866)786-3705
mkm@ilesq.com
on behalf of Defendant Reynaldo Guevara;

ALLISON ROMELFANGER, ESQUIRE
The Sotos Law Firm, P.C.
141 West Jackson Boulevard, Suite 1240A
Chicago, Illinois 60604
(630)735-3300
ARomelfanger@jsotoslaw.com
on behalf of individual police officer Defendants;

EILEEN E. ROSEN, ESQUIRE
a n d
ERICA FATIMA, ESQUIRE
Rock Fusco & Connelly, LLC
321 North Clark Street, Suite 2200
Chicago, Illinois 60654
(312)494-1000
erosen@rfclaw.com
on behalf of Defendant City of Chicago;

Page 3

APPEARANCES VIA ZOOM (cont.):

LYLE HENRETTY, ESQUIRE
Cook County State's Attorney's Office
50 West Washington Street, Suite 500
Chicago, Illinois 60602
(312)603-3369
henretty@cookcountyil.gov;

JOHN C. COYNE, ESQ.
John C. Coyne Law Offices
53 West Jackson Blvd., Suite 1750
Chicago, IL 60604
(312)929-4308
jcc@johnccoynelaw.com
on behalf of deponent Christa Bowden;

ALSO PRESENT VIA ZOOM:
NICK TROTTA, Certified Legal Videographer
Urlaub Bowen & Associates
20 North Clark Street, Suite 600
Chicago, Illinois 60602
(312)781-9586
ntrotta@urlaubbowen.com.

Page 4

I N D E X

Called on behalf of Defendant City of Chicago:

CHRISTA BOWDEN

Direct Examination by Ms. Romelfanger 7 - 56

| Exhibit | Page | Description |
| --- | --- | --- |
| Bowden 1 | . . . 28 | JGS2827-2833 |
| Bowden 2 | . . . 32 | REYES15025-15029 |
| Bowden 3 | . . . 38 | REYES11971-11972 |
| Bowden 4 | . . . 43 | REYES15055-15059 |

Page 5

THE VIDEOGRAPHER: Good morning. This is the beginning of Media Unit 1. We are now on the video record at 11:02 a.m.

This is the videotaped videoconference discovery deposition of Christa Bowden being taken on May 1st, 2023.

This deposition is being taken on the behalf of the Defendant in the matter of Arturo Deleon-Reyes versus Reynaldo Guevara, et al. The case numbers are 18 CV 01028 and 18 CV 02312, filed in the United States District Court for the Northern District of Illinois.

My name is Nick Trotta, legal videographer, representing Urlaub Bowen & Associates, with offices at 20 North Clark Street, Suite 600, Chicago, Illinois. The court reporter today is Lea Cohen also of Urlaub Bowen & Associates.

Counsel, please identify yourselves for the video record and the parties which you represent.

MS. ROMELFANGER: Good morning --

MR. ART: Sorry, Allison. Go ahead.

MS. ROMELFANGER: No, Steve, you can go first since you represent the Plaintiff.

MR. ART: Steve Art for the Plaintiff Reyes.

MS. SUSLER: Jan Susler for Gabriel Solache,

Page 6

and you mentioned case number but not his name. So, just to make the record clear, this is a deposition in both the Reyes and Solache cases.

MS. ROMELFANGER: Allison Romelfanger on behalf of the individual Chicago police Defendants other than Ray Guevara.

MR. COYNE: On behalf of the witness, John Coyne, C-O-Y-N-E.

MR. HENRETTY: On behalf of the Cook County State's Attorney's office, Lyle Henretty.

MS. MCGRATH: Megan McGrath on behalf of Defendant Guevara.

MS. ROSEN: Eileen Rosen on behalf of Defendant City of Chicago.

THE VIDEOGRAPHER: Will the court reporter please swear in the witness?

(Witness sworn.)

MS. ROMELFANGER: Let the record reflect that this is the deposition of Assistant Cook County State's Attorney Christa Bowden taken pursuant to subpoena, the Federal Rules of Civil Procedure, the local rules of the Northern District of Illinois and the consolidated cases of Reyes v Guevara, et al., 18 CV 1028, and Solache v Guevara, et al., 18 CV 2312, pending in the United States

Page 7

District Court for the Northern District of Illinois.

CHRISTA BOWDEN, having been called on behalf of certain Defendants, being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION
BY MS. ROMELFANGER:

Q. Good morning, Miss Bowden. How are you?
A. Good. Thank you.
Q. Good. Can you please state and spell your name for the record?
A. Christa Bowden, C-H-R-I-S-T-A, B as in boy, O-W-D as in David, E-N.
Q. Miss Bowden, have you ever given a deposition before?
A. No.
Q. So since you've never given a deposition before, I'll just go over a couple ground rules with you which I'm sure you might be familiar with anyways since you're an attorney. But, obviously, we're proceeding over Zoom so there might be pauses or, you know, people might freeze. So please let me know if that happens, okay?
A. Okay.
Q. All of your answers need to be out loud.

Page 8

Obviously, the court reporter is taking down everything you and I say so she can't take the head nods or uh-huhs or huh-uhs. So just make sure all your answers are voiced out loud. Is that fair?
A. Okay. Yes.
Q. This isn't a marathon. If you need to take a break at any time, please let me know and we can take a break. The only thing that I would ask is if there is a question pending you answer my question before we take a break. Is that fair?
A. Okay.
Q. If at any point in time you don't understand a question that I'm asking you, please let me know so that I can rephrase that question for you. Okay?
A. Okay.
Q. And if you answer a question that I ask of you, I'm going to assume that you understood my question. Is that fair?
A. Okay.
Q. All right, Miss Bowden, you understand that you are under oath today, correct?
A. Yes.
Q. Is there any reason you would not be able to give truthful testimony here today?

Page 9

A. No.
Q. Did you do anything to prepare for today's deposition?
A. Yes.
Q. And you met with your -- did you meet with your attorney, Mr. Coyne?
A. Yes.
Q. How many times?
A. I met with him one time and I spoke to him on the phone a couple of times.
Q. How long --
A. Let me -- I met with him on Zoom one time and I spoke to him on the phone a couple times.
Q. Without telling me what you discussed with Mr. Coyne, how long was the Zoom meeting that you had with Mr. Coyne?
A. About two hours.
Q. And, again, without telling me what you discussed with Mr. Coyne, how long were those phone conversations that you had with Mr. Coyne?
A. I don't think any was longer than 10, 15 minutes.
Q. When you met with Mr. Coyne over Zoom, did you review any documents in preparation for your deposition today?

Page 10

A. No.

Q. Other than Mr. Coyne, have you spoken to anyone else about your deposition here today?

A. I was first notified that I had been subpoenaed for a deposition by Mr. Henretty.

Q. Other than that brief conversation with Mr. Henretty, anybody else that you spoke to about your deposition here today?

A. Other than to tell them that I was subpoenaed, no.

Q. Who were the individuals that you told you were subpoenaed for this case?

A. My immediate supervisor Linda Walls, and my partner Maureen Renno.

Q. Maureen, and what was Maureen's last name? I'm sorry.

A. Renno, R-E-N-N-O.

Q. Did either Linda Walls or Maureen Renno work on the certificate of innocence proceedings for Mr. Reyes or Mr. Solache?

A. No.

Q. When you met with Mr. Coyne over Zoom was anyone else present besides yourself and Mr. Coyne?

A. No. His assistant or paralegal set the Zoom up

Page 11

so her name was on the screen. I don't know whether or not she was there.

Q. Okay. I'm just going to go through a little bit of your background, Miss Bowden.

You are obviously a licensed attorney, correct?

A. Yes.

Q. And are you licensed in the State of Illinois?

A. Yes.

Q. Are you licensed anywhere else?

A. No.

Q. You are in good standing with Illinois, correct?

A. Yes.

Q. Are you currently employed with the Cook County State's Attorney's office?

A. Yes.

Q. How long have you been with the Cook County State's Attorney's office?

A. Since September of 1994.

Q. What is your current title with the Cook County State's Attorney's office?

A. Assistant State's Attorney.

Q. What division are you currently assigned to?

A. The criminal bureau, the special litigation unit.

Q. How long have you been with that division?

Page 12

A. Since January -- the criminal bureau or the whole time?

Q. Yes. Okay. What about the special litigation unit?

A. I was in the criminal bureau except for four years when I was in juvenile court from '95 to '99. And what was your question?

Q. How long have you been with the special litigation unit?

A. Since January of 2021.

Q. What does the special litigation unit do?

A. I don't know all of the things that they do. I know what I do which is step up on petitions for certificates of innocence.

Q. So is it fair to say since January 2021 you have been handling certificate of innocence proceedings on behalf of the Cook County State's Attorney?

A. Yes.

Q. Can you just generally explain for me what your general duties as an Assistant State's Attorney in that unit are?

A. Well, if a petition for a certificate of innocence is filed it gets assigned to either myself or my partner. There is two of us that handle them. We review

Page 13

the petitions. We look at any documentation we might need, order files, look at transcripts, look at the case, determine what the issues are, and in some cases we make a decision on behalf of the State's Attorney's office and in other cases we lay out our analysis and send it up the chain of command.

Q. Back in 2022, when you say send it up the chain of command, do you know what the chain of command would have been in 2022?

A. My main supervisor, and then she would make a determination as to who to send it from there if necessary.

Q. Who was your immediate supervisor in November of 2022?

A. Carol Rogala.

Q. I'm so sorry, Miss Bowden. I heard Carol and then what was the last name?

A. Rogala, R-O-G-A-L-A.

Q. If you were to send out an analysis about a certain case, you would send it to -- in November of 2022 you would have sent it to Carol Rogala and then she would have determined who to send it to from there?

A. Yes.

Q. Can you briefly explain, Miss Bowden, what the process is for an individual to obtain a certificate of

Page 14

innocence?

MR. ART: Objection, foundation. Go ahead.

A. I'm not quite sure what you mean.

Q. How -- strike that, actually.

Does an individual have to file a petition for a certificate of innocence to even be granted one?

A. Yes.

Q. There is actually a statute that governs certificates of innocence, is that correct, Miss Bowden?

MR. ART: Object to form and foundation.

Q. Are you familiar with that statute?

A. Yes.

Q. Is it your understanding that in a certificate of innocence proceedings only the Cook County State's Attorney or the Attorney General can legally intervene in those proceedings?

MR. ART: Objection to form and foundation. And, Allison, is it okay if the Plaintiffs have a standing objection to form and foundation on all questions about the procedures for obtaining a COI and the statutory basis for those certificates of innocence?

MS. ROMELFANGER: Sure.

MR. HENRETTY: We'll join, then, that way we won't have to interrupt you, Allison.

Page 15

THE WITNESS: I don't know.

BY MS. ROMELFANGER:

Q. Do you know what the burden of proof is in a certificate of innocence proceedings?

A. Yes.

Q. What is the burden of proof?

A. The petitioner has to prove their innocence by a preponderance of the evidence.

Q. To your personal knowledge does the Cook County State's Attorneys have any policies in place with regards to when the Cook County State's Attorney would intervene in a certificate of innocence proceeding at the time that you were there between 2021 and 2022?

A. Not to my knowledge.

Q. Miss Bowden, would you agree as a general principle that the Cook County State's Attorney may choose to vacate a conviction for reasons other than actual innocence of a defendant?

MR. HENRETTY: No foundation.

A. I'm not sure, are you talking about certificates of innocence or --

Q. Yes. That's my mistake. So there -- strike that.

The Cook County State's Attorney may choose to

Page 16

vacate a conviction of a certain defendant, correct?

MR. ART: Objection to form, foundation.

A. Yes. Yes.

Q. And that is different than the certificate of innocence proceedings, correct?

MR. ART: Same objection.

A. Actually, I want to go back to the first part of the question. The State's Attorney does not have the ability to vacate conviction.

Q. The Cook County State's Attorney has a conviction integrity unit; is that correct?

A. Yes.

Q. And do you have any knowledge of what the conviction integrity unit does?

A. No. I know that they exist, yes, but I don't know what they do.

Q. Let me phrase this another way, Miss Bowden. If a defendant's conviction is vacated the Cook County State's Attorney can decide whether or not to retry that person; is that correct?

A. Yes.

Q. And would you agree as a general principle that the Cook County State's Attorney may choose to retry or not retry that person for reasons other than actual innocence

Page 17

of that person?

MR. COYNE: Objection, form.

A. The State's Attorney can exercise prosecutorial discretion, yes.

Q. Okay. And then the same kind of question with regards to certificate of innocence proceedings. As a general principle, can the Cook County State's Attorney choose to not intervene or to intervene on reasons other than actual innocence of the person moving for a certificate of innocence?

MR. COYNE: Same objection.

A. Yes.

Q. In other words, would you agree with me, again, just generally, that there could be no relation whatsoever to the Cook County's decision to not intervene and the actual innocence of a person?

MR. HENRETTY: Objection, foundation.

A. The Cook County State's Attorney's office exercises its prosecutorial discretion in the decision-making process.

Q. Okay. And, Miss Bowden, I know you already testified who your immediate supervisor was in November of 2022. In addition to that, was there a supervisor that oversaw all certificate of innocence proceedings at the

CHRISTA BOWDEN, 05/01/2023                                   Page 18..21

Page 18

time of November 2022?

A. Well, Carol Rogala was the supervisor of the special litigation unit that handles all of the certificate of innocence petitions.

Q. Okay. Going back, Miss Bowden, prior to your time in the special litigation unit, what unit were you in with the Cook County State's Attorney prior to that?

A. In the year -- the whole year of 2020, I was in felony review.

Q. Where were you at prior to felony review?

A. Felony trial division.

Q. So I am very bad at math, but in your almost 20 years with the Cook County State's Attorney, or maybe over 20 years with the Cook County State's Attorney, how many bench trials would you say you've done?

A. I couldn't say. Countless.

Q. Over 100; is that fair?

A. Yes. Yes.

Q. Are you able to say how many jury trials you've done?

A. It's -- I think it's 84, right around -- between 80 and 85.

Q. Do you know how many murder trials that you have done?

Page 19

A. I believe 54.

Q. Does the burden in the criminal trial differ from the burden in the certificate of innocence proceedings?

A. Yes.

Q. What is the burden in the criminal trial?

A. State has to prove the defendant guilty beyond a reasonable doubt.

Q. Would you agree with the general principle that not being able to meet that burden of beyond a reasonable doubt does not equate to actual innocence of a particular defendant?

A. Yes.

Q. All right, Miss Bowden, do you understand the nature of the lawsuits filed by Mr. Solache and Mr. Reyes in this case?

A. Generally.

MR. COYNE: Objection.

MR. ART: Objection, form, foundation.

Q. Was your answer "generally"?

A. Yes.

Q. What is your general understanding of the lawsuits that have been filed by Mr. Reyes and Mr. Solache?

MR. ART: Same objection.

MR. COYNE: You can answer that question, if

Page 20

you may do so -- you may do so without disclosing any material that you learned from counsel in your preparation for this deposition. If you can answer that question without revealing that information, then go ahead.

BY MS. ROMELFANGER:

Q. Are you able to answer that, Miss Bowden, without anything that Mr. Coyne has told you?

A. Yes. I believe that the lawsuits have to do with wrongful conviction.

Q. Have you read any news articles on the lawsuits brought by Mr. Solache or Mr. Reyes?

A. I don't know.

Q. Do you know if you've read any news articles whatsoever on Mr. Solache or Mr. Reyes in connection with their alleged wrongful convictions?

A. I don't know.

Q. Other than what Mr. Coyne might have told you, were you ever aware that the Cook County State's Attorney was also a defendant in the lawsuits brought by Mr. Reyes and Mr. Solache?

MS. SUSLER: Objection, misstates the evidence and the facts.

A. Yes.

Q. How were you made aware that the Cook County

Page 21

State's Attorney was a defendant? Again, I don't want to know anything Mr. Coyne has told you.

A. In reviewing the petition for the certificate of innocence, I was aware and it's my understanding that they were initially involved and then they were -- those lawsuits were settled or somehow resolved prior to my becoming involved with this petition for a certificate of innocence.

Q. Okay. So you had an understanding that the Cook County State's Attorney was no longer a defendant in the lawsuit -- the civil lawsuits at the time you took over the certificate of innocence proceedings; is that correct?

A. That was my understanding.

Q. Do you have an independent recollection of your involvement in the certificate of innocence proceedings involving Gabriel Solache and Arturo Deleon-Reyes?

A. Yes.

Q. Very briefly, what if anything do you recall with regards to your involvement in the certificate of innocence proceedings?

A. Um --

MR. HENRETTY: Just object to the extent -- I assume you're just asking practical things that she did as opposed to any, you know, mental impressions or thoughts

Case: 1:18-cv-01028 Document #: 873-3 Filed: 03/25/26 Page 194 of 287 PageID #:118434

CHRISTA BOWDEN, 05/01/2023

Page 22..25

Page 22

or discussions. I have no objection to practical, but I do object to deliberative process privilege if you want to get into the reasons things were done.

MS. ROMELFANGER: I'm just looking for in general the practical things that she did.

MR. HENRETTY: That's fine.

THE WITNESS: I took over the case while it was ongoing, the petition for certificate of innocence. I responded to a motion for summary judgment, and I withdrew the State's position as an intervener in the case in court.

BY MS. ROMELFANGER:

Q. Miss Bowden, is it your understanding that those certificates of innocence related to overturned convictions of Mr. Reyes and Solache arising out of the murders of Jacinita and Mariano Soto, as well as the kidnapping of their two children Santiago and Maria Soto?

MR. COYNE: Objection, form. I didn't catch that.

A. Yeah, I don't understand the question.

Q. Sure. Did you understand that the certificate of innocence that Mr. Solache and Mr. Reyes were seeking arose out of convictions that were overturned based on the murders of Jacinita and Mariano Soto, as well as the kidnapping of their two children Santiago and Maria Soto?

Page 23

MR. ART: Objection to form.

A. I don't think that the convictions were overturned. They were vacated. But, yes, that fact -- those facts are the basis for the charges for which they are seeking the petition for a certificate of innocence.

Q. Okay. And those facts -- strike that.

And was it your understanding, Miss Bowden, that Mr. Solache and Mr. Reyes were co-defendants along with a Miss Adriana Mejia?

A. Yes.

Q. Thank you for correcting me before, Miss Bowden. Your understanding is that at some point the convictions were vacated, correct?

A. Yes.

Q. Did you have an understanding as to whether or not the Cook County State's Attorney decided to retry or not retry Mr. Solache and Mr. Reyes on those vacated convictions?

A. I'm not sure what you mean do I have an understanding.

Q. Sure. Do you have any knowledge of whether the Cook County State's Attorney decided to retry or not retry Mr. Solache and Mr. Reyes with regards to the vacated convictions?

Page 24

MR. ART: Objection, form, foundation.

A. A decision was made not to retry.

Q. Other than anything you might have discussed with Mr. Coyne, do you have an understanding as to why the Cook County State's Attorney decided not to retry them?

A. No.

MR. COYNE: Objection, let me -- going forward, Christa, you can answer those questions as long as you can do so without revealing your mental impressions, conclusions, opinions, legal theories of you or another attorney that you worked with as far as your involvement in this, but you've already answered the question so go ahead.

A. Okay. Thanks, John.

Q. I'm sorry, what was the answer?

A. No.

Q. Miss Bowden, do you know former ASA Eric Sussman?

A. Yes, I -- yes.

Q. Did you ever review any statements Mr. Sussman gave on the Solache/Reyes matters?

A. I don't recall.

Q. All right, Miss Bowden. I believe you testified that you joined this particular unit in 2021; is that correct?

A. Yes.

Page 25

Q. So you are not the original Assistant State's Attorney assigned to the certificate of innocence proceedings for Mr. Reyes and Mr. Solache; is that correct?

A. Yes.

Q. Do you know who the original State's Attorney was that was handling the case at the time that these petitions were filed in 2018?

A. No.

Q. Did you review any of the prior transcripts from any of the prior proceedings in the certificate of innocence proceedings once you became involved?

A. Of the petition for certificate of innocence proceedings?

Q. Yes, ma'am.

A. I don't think so.

Q. At what point did you take over the certificate of innocence proceedings?

A. I'm not sure. I'm not sure when exactly I took over.

Q. Would it have been sometime in 2021 when you joined the unit?

A. Yes.

Q. And when you did take over the certificate of innocence proceedings for Mr. Solache and Mr. Reyes, would

Urlaub Bowen & Associates, Inc.   312-781-9586

CHRISTA BOWDEN, 05/01/2023                                    Page 26..29

Page 26

you have had to go over the file that the Cook County State's Attorney had on that certificate of innocence proceedings to get yourself up to speed on the case?

A. I did review documents that were provided to me.

Q. At the time that you took the case over in 2021, were you aware what the Cook County State's Attorney's position was as to whether or not the Cook County State's Attorney was objecting to Mr. Reyes and Mr. Solache's certificate of innocence?

A. Yes.

Q. Was it your understanding that from the time the petitions were filed in 2018 until you took over in 2021 that the Cook County State's Attorney was continuing to object to the certificates of innocence for Mr. Reyes and Mr. Solache?

A. It was my understanding that the State's Attorneys had filed an objection.

Q. I'm sorry, I'm going to completely mispronounce her name so bear with me, but do you know an Assistant State's Attorney Julie Nikolaevskaya?

A. I do.

Q. Okay. Do you know whether or not she was handling these proceedings prior to yourself?

A. She did do some work on it before I got the case,

Page 27

yes.

Q. And when you say the Cook County State's Attorney filed an objection to the Solache/Reyes certificate of innocence, were you referring to the motions to dismiss that was filed by Miss Julie?

A. Yes.

Q. Were you aware at the time that the Cook County State's Attorney filed those motions to dismiss -- actually, strike that.

Are the motions to dismiss for both Mr. Reyes and Mr. Solache's certificates of innocence something you would have reviewed in getting caught up on the file?

A. Yes.

Q. Do you recall if in those motions that the Cook County State's Attorney's position was that Mr. Reyes and Mr. Solache could not meet their burden of proof in those proceedings?

A. That's what the motions to dismiss alleged.

Q. And at that time, based on those motions, is it your understanding that the Cook County State's Attorney's office knew that Mr. Solache and Mr. Reyes were claiming misconduct on behalf of Defendant Guevara at that time?

A. I don't know what that person knew.

Q. Did you have any knowledge while you were

Page 28

handling the certificate of innocence proceedings that Mr. Solache and Mr. Reyes were alleging misconduct against Mr. Guevara?

A. Yes.

Q. All right. I'm going to pull up one of the transcripts really quick. Just give me a second, Miss Bowden.

MS. ROMELFANGER: Did you guys get the exhibits that Amy sent over this morning?

MR. COYNE: On behalf of the witness, we received that link and forwarded it. I did not have a chance to open it or download it.

MS. ROMELFANGER: Okay.

(Remote screen sharing.)

BY MS. ROMELFANGER:

Q. Miss Bowden, are you able to see that?

A. Yes.

Q. I'm going to scroll through it very slowly. So let me know when you have been able to read each page, okay?

A. Okay.

Q. I'm sorry, for the record, I'm going to mark this as Bowden Exhibit 1. It was produced as JGS2827 through JGS2833.

Page 29

Miss Bowden, are you able to read that?

A. Yes.

Q. Let me know when you want me to scroll down.

A. Okay. Okay.

Q. Based on your review, Miss Bowden, does this appear to be the transcripts from the April 29th, 2019, hearing in the Solache/Reyes certificate of innocence proceedings?

A. I don't know if it's the certificate of innocence proceedings but it says it's from that date.

Q. Okay. Based on your review of that transcript, did you see that -- I'm sorry, strike that.

Based on your review of that transcript, did you see at some point that the attorneys for Mr. Solache and Mr. Reyes were talking about a DNA expert?

A. They did -- they did. In this transcript, that's what it says.

Q. In your handling of the certificate of innocence for Mr. Solache and Mr. Reyes -- strike that.

In your handling of the certificate of innocence proceedings for the Cook County State's Attorney's office, were you aware of any DNA expert disclosed by Mr. Solache or Mr. Reyes?

A. I don't remember.

Urlaub Bowen & Associates, Inc.    312-781-9586

Page 30

Q. Did Mr. Solache or Mr. Reyes ever tender any DNA expert opinions to you in the certificate of innocence proceedings?

A. I don't recall.

Q. If they had, would they have been in your file for the certificate of innocence proceedings?

MR. COYNE: Objection, foundation, speculation.

A. I don't know whether I got them -- yeah, I don't know.

Q. Based on your review of this transcript, do you understand at this time that the Cook County State's Attorney's office was still opposing the certificate of innocence filed by Mr. Reyes and Mr. Solache?

MR. COYNE: Objection, foundation.

A. It appears that the State's Attorney in this transcript is not agreeing to the granting of certificates of innocence.

Q. Okay. And, in review of this transcript, do you understand Miss Julie's position to be that Detective Guevara's testimony in the civil case was not relevant to the certificate of innocence proceedings?

A. According to the transcript, that's what she said.

Page 31

Q. Miss Bowden, I believe you already testified to this, but your understanding was during these proceedings there was also a collateral civil case filed in relation to Mr. Reyes and Mr. Solache's convictions; is that correct?

A. Yes.

Q. Is it your understanding that at some point the Cook County State's Attorney's office and the counsel for Mr. Solache and Mr. Reyes were exchanging depositions that were occurring in the civil case; is that correct?

A. Yes.

Q. And is it your understanding that oftentimes continuances were obtained in the certificate of innocence proceedings based on what was happening in the civil lawsuit; is that correct?

A. I don't know.

Q. Do you recall whether or not you were ever present for a status in which the case was continued for depositions to proceed in the civil case?

A. I know that I asked for them to be produced, but I don't know whether or not that was the reason a continuance was given.

Q. When you say you asked for them to be produced, is that the transcripts of depositions that had proceeded in the civil case?

Page 32

A. Yes.

Q. Were you ever provided transcripts of depositions that occurred in the civil case?

A. Yes.

Q. Do you recall which depositions you were provided?

A. No.

Q. I'm going to share my screen one more time with you, Miss Bowden.

(Remote screen sharing.)

Q. Are you able to see that?

A. Yes.

Q. I'll go ahead and mark this as Bowden Exhibit 2. This was produced by Reyes, it's REYES15025 to REYES15029.

Miss Bowden, I would do the same thing. I would ask that you read through them and let me know when you're finished reading through them. I'll scroll slowly.

A. Okay. Okay. All right. All right. Okay.

Q. All right. Did you recognize those emails, Miss Bowden?

A. Yes.

Q. And this is an email exchange between you and attorneys from Loevy and Loevy about certain deposition transcripts that you were requesting in the certificate of

Page 33

innocence proceedings, correct?

A. Yes.

Q. And based on those emails, it appears that in your -- strike that.

Based on those emails it appears that you were in possession of Mr. Reyes' deposition testimony; is that correct?

A. Yes.

Q. And you were also in possession of Miss Adriana Mejia's deposition transcript; is that correct?

A. Yes.

Q. Then you also subsequently asked for copies of Alfredo Jose and Rosa Areanda's deposition transcripts; is that correct?

A. Yes.

Q. As well as Art Hill; is that correct?

A. Yes.

Q. As well as George Jose and Rosario Mejia; is that correct?

A. Yes.

Q. As well as Salvador Olivares; is that correct?

A. Yes.

Q. As well as Kevin Sheehan; is that correct?

A. Yes.

CHRISTA BOWDEN, 05/01/2023          Page 34..37

Page 34

Q. As well as Daniel Trevino; is that correct?

A. Yes.

Q. And then you also asked for Assistant State's Attorney's Karen Wehrle and Eric Sussman; is that correct?

A. Yes.

Q. And, based on Miss Brady's response from the Loevys, it appears that they provided all those deposition transcripts other than they did not provide ASA Eric Sussman's deposition; is that correct?

A. Yes.

Q. So you had all of that testimony in your possession with regards to the certificate of innocence proceedings, correct?

A. I did.

Q. And, in March of 2022, was it still your understanding that the Cook County State's Attorney was opposing the certificate of innocence for Mr. Solache and Mr. Reyes?

A. Yes.

Q. And, in addition to all those transcripts, did you also have access to all of the materials the Cook County State's Attorney had in relation to the criminal -- the underlying criminal trials?

A. I was able to get the file. The file that I

Page 35

requested I was given. I don't know whether that was everything.

Q. Okay. Were you also able to obtain testimony from the criminal trial -- strike that.

Were you also able to obtain the criminal testimony from the underlying criminal proceedings against Mr. Solache and Mr. Reyes?

A. Yes.

Q. And at some point Mr. Reyes filed a motion for summary judgment in his certificate of innocence proceedings; is that correct?

A. Yes.

Q. Do you recall when he filed that motion for summary judgment?

A. No.

Q. If I represent to you that that motion was filed in January of 2022, would you have any reason to dispute that?

A. No.

Q. Okay. Did you file a response to Mr. Reyes' summary judgment motion?

A. I did.

Q. And in your response to the summary judgment motion were you still opposing the certificate of innocence

Page 36

for Mr. Reyes?

A. Yes.

Q. And in your response to the summary judgment motion you were also opposing Reyes' summary judgment; is that correct?

A. Yes.

Q. And, although Mr. Solache did not file summary judgment, were you still opposing Mr. -- was the Cook County State's Attorney still opposing Mr. Solache's certificate of innocence at that time as well?

A. Yes.

Q. Did you review all of the deposition transcripts that were given to you by the Loevys in the certificate of innocence proceedings?

A. I don't remember.

Q. Okay. Do you recall whether or not Adriana Mejia was still implicating Mr. Solache and Mr. Reyes in the murders of Mr. and Mrs. Soto?

A. Can you repeat that?

Q. Sure. Do you remember whether or not in her deposition transcripts Miss Adriana Mejia was still implicating Mr. Solache and Mr. Reyes in the Sotos' murders?

A. Yes.

Page 37

Q. In your review of the file, did you in fact have an affidavit from Miss Julie with regards to a conversation she had with Miss Adriana Mejia?

A. Yes.

Q. And do you recall -- strike that.

Did you review that affidavit?

A. I did.

Q. And in that affidavit did Miss Julie confirm that Miss Mejia was still implicating Mr. Reyes and Mr. Solache in the Sotos murders?

MR. COYNE: Objection, form.

A. I don't recall the content.

MR. COYNE: I'm sorry, I didn't hear that answer.

A. I don't recall the content.

Q. Need one moment, Miss Bowden, I'm going to share my screen with you again. Sorry, Bowden. I keep mispronouncing. My apologies.

Miss Bowden, do you recall whether or not you attached Miss Julie's affidavit to your motion for summary judgment as an exhibit -- or, sorry, your response to the motion for summary judgment as an exhibit?

A. I don't remember.

(Remote screen sharing.)

CHRISTA BOWDEN, 05/01/2023                                    Page 38..41

Page 38

Q.  Are you able to see my screen, Miss Bowden?

A.  Yes.

Q.  Are you able to see this first page here?

A.  Yes.

Q.  And it reads, People's Response to Petitioner's Motion for Summary Judgment?

A.  Yes.

Q.  I'm going to scroll to this last page here, and I see your E signature on page eight of your motion; is that correct?

A.  Yes.

Q.  Give me one second.  I'm going to find the affidavit for you, just give me one second.

MR. COYNE:  Allison, could you just give me Bates-stamped page one, the first one?

MS. ROMELFANGER:  Yes, I will definitely do that.  It's REYES11971, and then do you want the end, John?

MR. COYNE:  That's all right.  That's cool, thank you.

MS. ROMELFANGER:  It's going to take me one moment, Miss Bowden.  I apologize.

You know what, can we take a two-minute break so that I can pull this up for her really quick?

MR. COYNE:  Sure.  We've been going for an

Page 39

hour, can we make it five?

MS. ROMELFANGER:  Yeah, that's totally fine.

THE VIDEOGRAPHER:  All right.  We are going off the video record at 11:59 a.m.

(Whereupon a recess was taken.)

THE VIDEOGRAPHER:  This is the beginning of Media Unit 2.  We are back on the video record at 12:07 p.m.

MS. ROMELFANGER:  To clarify, for the record, Miss Bowden, we looked at REYES11972 which is the People's Response to Petitioner's Motion for Summary Judgment which we will mark as exhibit Bowden Exhibit 3.

DIRECT EXAMINATION (cont.)
BY MS. ROMELFANGER:

Q.  Just so you can see, this is still your Response to Petitioner's Motion for Summary Judgment, correct, Miss Bowden?

A.  Can't see it.

Q.  Oh, I stopped sharing my screen with you.  That's my fault.

(Remote screen sharing.)

Q.  Are you able to see that, Miss Bowden?

A.  Yes.

Q.  This is still your Response to Petitioner's

Page 40

Motion for Summary Judgment, correct?

A.  Yes.

Q.  The Petitioner, for clarification, is Mr. Reyes, correct?

A.  Yes.

Q.  You can review -- for the record, this is page 12635 of the exhibit.  Can you just briefly review that for me, Miss Bowden?  Let me know when you're finished.

A.  Okay.

Q.  Does this refresh your recollection whether or not you attached Miss Julie's declaration as an exhibit to your Response to Reyes' Motion for Summary Judgment?

A.  No.

Q.  Do you recall reviewing this declaration in your handling of the certificate of innocence proceedings for Mr. Reyes?

A.  Yes.

Q.  And, based on your review of this declaration, is it your understanding that Miss Mejia was still implicating Arturo and Gabriel in the murders of the Sotos, Mr. and Mrs. Soto?

MR. ART:  Objection, form.

A.  According to the document, it says that Mejia told Miss Julie that they were present at the time of the

Page 41

murder.

Q.  I know earlier we talked about a long list of deposition transcripts that you asked and received for from the Loevys.  In addition to those transcripts, do you also have -- actually, strike that.

(Remote screen sharing.)

Q.  I'm going to ask you to review very quickly page 12453 to 124 -- 12455 of the exhibits to your Motion for Summary Judgment.  I'll scroll through really quickly.

A.  Could you increase the font size on there?

Q.  Yeah, absolutely.  That help at all?

A.  Yes, thank you.  Okay.

Q.  And, based on your very brief review of these couple of pages, did you also have in your possession the transcript of ASA Heather Brualdi at the time that you were handling the certificate of innocence proceedings?

A.  I don't see anything on here that tells me that I hadn't.

Q.  If it was an exhibit to your motion -- your Response to Reyes' Motion for Summary Judgment, would it have been something you had in the file for the certificate of innocence proceedings?

A.  Yes.

Q.  I guess the same question for Guadalupe Mejia.

CHRISTA BOWDEN, 05/01/2023                                    Page 42..45

Page 42

If you had attached Mr. Guadalupe Mejia's deposition transcript in your Response to Mr. Reyes' Motion for Summary Judgment, would that have been something that you had at the time for the certificate of innocence proceedings?

A. Yes.

Q. If you attached to your Response to the Motion for Summary Judgment filed by Mr. Reyes the statements of Mr. Reyes, of Guadalupe Mejia, of Adriana Mejia, of Mr. Solache and Rosario Mejia, were those things that you would have had in your possession at the time that you filed your Response to Reyes' Motion for Summary Judgment?

A. I'm not sure which of those statements that you're referring to, but if I attached something to my motion then -- or, my response, then I actually had it in my possession.

Q. Okay. Were those things you would have reviewed in your handling of the certificate of innocence proceedings?

A. Yes.

Q. And after you filed your response to the summary judgment motion filed by Mr. Reyes, Mr. Reyes then filed his reply; is that correct?

A. I don't remember. Excuse me. I don't remember.

Page 43

I don't recall if he filed a response or not.

Q. Do you recall whether or not the Court was going to have a hearing on Mr. Reyes' summary judgment motion?

A. Yes.

Q. And, based on your recollection, was the hearing for that summary judgment motion pushed back a couple of times?

A. Yes.

Q. Prior to November 11th, 2022, was the Cook County State's Attorney continuing to object to Mr. Solache and Mr. Reyes' certificate of innocence?

A. I don't know what date -- what's the significance of that date.

Q. Okay. Let me pull it up for you.

(Remote screen sharing.)

Q. Okay. Are you able to see this, Miss Bowden?

A. Yes.

Q. Okay. For the record, this will be Bowden Exhibit 4, and it is Bates-stamped for the record REYES15055 to REYES15059, and I'll just ask you to do the same thing, Miss Bowden, just very quickly review it, and I'll scroll down, let me know when you're finished.

A. Okay. Okay. Okay. Okay. Okay.

Q. Okay. You were finished reviewing that exhibit,

Page 44

Miss Bowden?

A. Yes.

Q. These appear to be emails between yourself, counsel for Mr. Solache and Mr. Reyes, as well as the Court, with regards to the certificate of innocence proceedings?

A. Yes.

Q. And, based on your emails, it appears that on November 11th, 2022, you emailed the Court and counsel for Mr. Reyes and Mr. Solache and let them know that the State was going to be asking leave to withdraw as intervenors in the certificate of innocence proceedings, correct?

A. Yes.

Q. So is it your understanding that up until November 11th, 2022, the Cook County State's Attorney was still opposing the certificate of innocence proceedings for Mr. Solache and Mr. Reyes?

A. I don't know what the State's Attorney was doing, but I was up until that day stepping up to oppose it.

Q. Okay. Thank you for clarifying. So up until November 11th, 2022, you were opposing the certificate of innocence proceedings for Mr. Solache and Mr. Reyes, correct?

Page 45

A. Yes.

Q. And to your knowledge from the time that the Cook County State's Attorney first opposed Mr. Solache and Mr. Reyes' certificate of innocence in 2018 up until your email of November 11th, 2022, did the Cook County State's Attorney's office position ever change as to its position on the certificate of innocence proceedings?

A. I'm not really -- are you asking did it ever change before it changed? Was that the question?

Q. So, basically, is it your understanding in handling these proceedings that from 2018 when these were filed up until November 11th, 2022, the Cook County State's Attorney's office was continually opposing the certificate of innocence; is that correct?

MR. COYNE: Show an objection to the extent it predates her involvement. Foundation. Go ahead.

A. I received no instructions otherwise until November 11th --

Q. Okay.

A. -- 2022.

Q. And your email here states on Exhibit 4 that you were informed that you would be requesting the state to be granted leave to withdraw. Who informed you of this decision?

CHRISTA BOWDEN, 05/01/2023 Page 46..49

Page 46

A. Carol Rogala.

Q. Did Carol tell you whether it was her decision or if it was someone else's decision?

A. I received an email.

Q. Without telling me why, in a yes-or-no response, did she tell you why the state would be granted leave to withdraw, wanted -- strike that.

Without telling me why, yes or no, were you given a reason as to why the Cook County wanted to withdraw as intervenors in Mr. Solache and Mr. Reyes' certificate of innocence proceedings?

A. Did she explain to me why the decision was made?

Q. Correct.

A. No.

Q. Okay. Did she tell you who made the decision?

A. No.

Q. To this day, without telling me any conversations with your counsel, do you know who made the decision to withdraw the State as intervenors in the certificate of innocence -- strike that.

To this day, do you know who made the decision to have the Cook County State's Attorney withdraw as intervenors in the Reyes and Solache certificate of innocence proceedings?

Page 47

A. No.

Q. Okay. Sitting here today, were you ever given a reason as to why the Cook County State's Attorney withdrew as intervenors in the certificate of innocence proceedings for Mr. Reyes and Mr. Solache?

A. No.

Q. Without telling me the substance of the conversations, were you ever asked by anyone to give a recommendation about how to proceed on the certificate of innocence proceedings with Mr. Reyes and Mr. Solache?

A. Yes.

Q. Who asked you?

A. Carol Rogala.

Q. When did she ask you?

A. I don't know. It -- during the proceedings, while I was on the case. She was my immediate supervisor.

Q. Was it close in time to November 11th, 2022, if you recall?

MR. COYNE: Objection, form.

A. I -- I don't know.

Q. From when you first got on the case in -- actually, strike that.

From November 10th, 2022, to November 11th, 2022, were any new facts brought to your attention that --

Page 48

strike that.

Between November 10th, 2022 and November 11th, 2022, were any new facts about the Sotos' murders brought to your attention?

A. No.

MR. HENRETTY: I'm going to object on deliberative process and instruct the witness not to answer.

MS. ROMELFANGER: I'm only asking about facts. I'm not asking about anybody's impressions of those facts.

MR. HENRETTY: No, I understand, but I think in the Brown case that was covered and the Court ordered that that was not in that case appropriate. So we'll stick by it and go to the judge if we need to.

MS. ROMELFANGER: Okay.

BY MS. ROMELFANGER:

Q. Miss Bowden, at any point in time did you ever engaged in negotiations over the certificate of innocence proceedings with any of the attorneys for Mr. Solache or Mr. Reyes?

A. No.

Q. Were you ever present -- strike that.

Did you ever meet in person with any of the

Page 49

attorneys for Mr. Solache or Mr. Reyes with regards to the certificate of innocence proceedings minus any in-court appearances you might have had with them?

A. No.

Q. Okay. I think I know the answer to this question, but other than your attorneys have you spoken with anyone at the Cook County State's Attorney's office about the Cook County State's Attorney withdrawing as intervenors in the Solache and Reyes certificate of innocence proceedings after November 11th, 2022?

A. Other than the fact that it occurred, no.

Q. Okay.

MS. ROMELFANGER: I might be wrapped up, Miss Bowden. If you can just give me five minutes. John, is that okay?

MR. COYNE: That's fine, Allison. Thanks.

THE VIDEOGRAPHER: We want to go off the record for this?

MS. ROMELFANGER: Yes, please.

MS. ROSEN: Can you give us 10 minutes?

THE VIDEOGRAPHER: Sure. We're going off the video record at 12:27 p.m.

(Whereupon a recess was taken.)

THE VIDEOGRAPHER: This is the beginning of

Urlaub Bowen & Associates, Inc. 312-781-9586

CHRISTA BOWDEN, 05/01/2023                                    Page 50..53

Page 50

Media Unit 3. We are back on the video record at 12:35 p.m.

DIRECT EXAMINATION (cont.)

BY MS. ROMELFANGER:

Q. I'm going to share my screen with you one more time, Miss Bowden.

(Remote screen sharing.)

MS. ROMELFANGER: Did I mark this as an exhibit already, the emails?

THE REPORTER: I show emails as being Exhibit 2.

MS. ROMELFANGER: Okay, so maybe not. I had an earlier set of emails. So for the record --

MS. ROSEN: I think these ones are Exhibit 4. The ones ending in November 11th are Exhibit 4.

(Remote screen sharing.)

BY MS. ROMELFANGER:

Q. Does that pop up on your screen, Miss Bowden?

A. Yes.

Q. So we were just discussing these emails, correct?

A. Yes.

Q. And based on your email in front of you here from November 11th, 2022, is it your recollection that the

Page 51

Solache -- strike that, the Reyes matter was set for hearing with regards to his Motion for Summary Judgment the following Monday which would have been November 14th, 2022?

A. Yes.

Q. And were you prepared to argue against the Motion for Summary Judgment up until you received that email telling you essentially to stand down?

A. Yes.

Q. And I know earlier -- actually, I'll stop sharing this.

Miss Bowden, I know you testified that you do not personally know who made the decision to have the Cook County State's Attorney withdraw as intervenors in the Solache/Reyes certificate of innocence proceedings, but do you have any understanding as to who made that decision?

MR. COYNE: Objection, foundation.

A. I couldn't tell you. I don't know who was involved.

Q. I just have a couple clarifying questions for you, Miss Bowden. Earlier you testified that at one point you were asked about your opinion as to what the Cook County State's Attorney's position should be on the certificate of innocence proceedings for Mr. Solache and

Page 52

Mr. Reyes; is that correct?

A. Yes.

Q. And I believe you testified that you don't recall when specifically you were asked for that opinion; is that correct?

A. Right. There are discussions with my supervisor regarding the case. That's my job.

Q. Do you recall if those discussions were prior to your filing of the Cook County State's Attorney's response to Reyes' Motion for Summary Judgment?

A. I can't pinpoint the dates that I had these discussions.

Q. And I know I'm going to get an objection on this so, Miss Bowden, you might want to pause before you give me your answer, but do you know -- recall what your recommendation was with regards to the certificate of innocence for Mr. Solache and Mr. Reyes?

MR. COYNE: Objection. Don't answer the question, Christa, based on attorney work product, and Lyle can address --

MR. HENRETTY: Also instruct not to answer based on deliberative process.

A. I'm declining to answer the question.

Q. Understood. Do you recall -- strike that.

Page 53

Would you have any reason to disagree with me that the Cook County State's Attorney filed its Response to Reyes' Motion for Summary judgment on March 17th, I believe it was, 2022?

A. No.

Q. Between March 17th, 2022 to November 11th, 2022, when you were instructed to essentially stand down on the Solache/Reyes certificate of innocence proceedings, were any new facts brought to your attention?

MR. HENRETTY: I'm going to object and instruct the witness not to answer based on deliberative process.

Q. Going back to your general experience, I'm not talking about Mr. Solache and Mr. Reyes anymore, Miss Bowden. Since your time in this unit since 2021, how many certificate of innocence proceedings have you handled if you can estimate?

A. I don't know.

Q. Is it over 50?

A. I don't know. Maybe. I don't know.

Q. Are you able to tell me out of all the certificate of innocence proceedings you have handled how many of those the Cook County State's Attorney has opposed?

A. No, I cannot tell you.

Page 54

Q. I would assume the true -- the same is true then that you would not be able to tell me how many you have not opposed; is that correct?

A. Correct.

Q. Have you ever been involved in a certificate of innocence proceedings other than this one where the Cook County State's Attorney has opposed the certificate of innocence for years and then withdrew as intervenors a couple years later?

MR. COYNE: Objection, form.

A. No.

MS. ROMELFANGER: John, could I just have five more minutes for a break?

MR. COYNE: Sure.

THE VIDEOGRAPHER: We're going off the video record at 12:41 p.m.

(Whereupon a recess was taken.)

THE VIDEOGRAPHER: This is the continuation of Media Unit 3. We are back on the video record at 12:46 p.m.

MS. ROMELFANGER: Miss Bowden, I have nothing further for you. I really appreciate you coming down -- or, I appreciate your time today. I guess you didn't have to come down to my office today, but I

Page 55

appreciate your time today.

MR. COYNE: Anyone else?

MS. ROSEN: I don't have any questions at this time.

MR. COYNE: Anyone else?

MS. MCGRATH: Nothing at this time, thank you.

MR. ART: Nothing for Plaintiffs.

THE VIDEOGRAPHER: Okay.

MR. COYNE: Miss Susler? Has she weighed in? She's Plaintiffs too.

MS. SUSLER: I have nothing here.

MR. COYNE: Christa, you have the right to review your transcript prior to its completion. That's a right you can reserve or you can waive that right to review the transcript. How do you choose?

THE WITNESS: I'm going to look at it.

MR. COYNE: Signature reserved.

MS. ROMELFANGER: Thank you, Christa.

THE VIDEOGRAPHER: This concludes the video deposition today of Christa Bowden. We are off the video record at 12:47 p.m. Thank you.

(Video concluded.)

MS. ROMELFANGER: Eileen, do you want to

Page 56

order?

MS. ROSEN: I don't.

MS. ROMELFANGER: We'll order.

THE VIDEOGRAPHER: Anybody for video right now?

MS. ROMELFANGER: No video right now. Thank you.

(Further deponent saith not.)

Page 57

STATEMENT OF CHANGE OR CORRECTION

Deleon-Reyes/Solache vs. Guevara, et al.

Case Numbers 18 CV 1028; 18 CV 2312

Page   Line     Correction

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

CHRISTA BOWDEN (5/1/2023)

Page 58

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ARTURO DELEON-REYES,            )
                Plaintiff,      )
                                )
            -vs-                 )Case Number 18 CV 01028
                                )
REYNALDO GUEVARA, et al.,       )
            Defendants.         )
*****************************
GABRIEL SOLACHE,                )
                Plaintiff,      )
                                )
            -vs-                 )Case Number 18 CV 02312
                                )
REYNALDO GUEVARA, et al.,       )
            Defendants.         )

        I hereby certify that I have read the foregoing transcript of my deposition given on Monday, May 1, 2023, at the time and place aforesaid, consisting of pages 1 through 56, inclusive, and I do again subscribe and make oath that the same is a true, correct and complete transcript of my deposition so given as aforesaid.
        Please check one:
                _____  I have submitted errata sheet(s).
                _____  No corrections were noted.
                _____
                        CHRISTA BOWDEN

Subscribed and sworn to
before me this _____ day of
_____, 20__.
        _____
            Notary Public

        My commission expires _____.

Page 59

STATE OF ILLINOIS :

                : SS

COUNTY OF PEORIA  :

        I, Lea Ruth Cohen, CSR, and Notary Public in and for the County of Peoria, State of Illinois, do hereby certify that heretofore, to-wit, on Monday, May 1, 2023 appeared before me via remote audiovisual means:

        CHRISTA BOWDEN, a material witness herein.

        I further certify that the said witness was by me first duly sworn to testify to the truth, the whole truth and nothing but the truth in the cause aforesaid; that the testimony then given by said witness was reported stenographically by me via remote audiovisual means and afterwards reduced to typewriting, and the foregoing is a true and correct transcript of the testimony so given by said witness as aforesaid.

Page 60

        I further certify that the signature of the witness was not waived.

        I further certify that I am not counsel for nor in any way related to any of the parties to this suit, nor am I in any way interested in the outcome thereof.

        In testimony whereof, I hereunto set my hand and affix my notarial seal on this day, Saturday, May 6, 2023.


        _____
                Notary Public


        Lea Ruth Cohen, Certified Shorthand Reporter
        (State of Illinois License #084-002868)
        My commission expires 4/12/2026

CHRISTA BOWDEN, 05/01/2023

**Exhibits**

**1 Bowden 050123-1** 28:23

**2 Bowden 050123-2** 32:13 50:11

**3 Bowden 050123-3** 39:12

**4 Bowden 050123-4** 43:19 45:21 50:15,16

**0**

**01028** 5:9

**02312** 5:10

**1**

**1** 5:2 28:23

**10** 9:21 49:20

**100** 18:17

**1028** 6:23

**10th** 47:23 48:2

**11:02** 5:3

**11:59** 39:4

**11th** 43:9 44:9,16,22 45:5,12,18 47:17,23 48:3 49:10 50:15,24 53:6

**124** 41:8

**12453** 41:8

**12455** 41:8

**12635** 40:7

**12:07** 39:8

**12:27** 49:22

**12:35** 50:2

**12:41** 54:16

**12:46** 54:20

**12:47** 55:22

**14th** 51:3

**15** 9:21

**17th** 53:3,6

**18** 5:9,10 6:23,24

**1994** 11:18

**1st** 5:5

**2**

**2** 32:13 39:7 50:11

**20** 5:13 18:12,14

**2018** 25:7 26:12 45:4,11

**2019** 29:6

**2020** 18:8

**2021** 12:10,15 15:13 24:22 25:20 26:5,12 53:15

**2022** 13:7,9,13,19 15:13 17:23 18:1 34:15 35:17 43:9 44:9,16,22 45:5,12,20 47:17,23,24 48:2,3 49:10 50:24 51:4 53:4,6,7

**2023** 5:6

**2312** 6:24

**29th** 29:6

**3**

**3** 39:12 50:1 54:19

**4**

**4** 43:19 45:21 50:15,16

**5**

**50** 53:19

**54** 19:1

**6**

**600** 5:14

**8**

**80** 18:22

**84** 18:21

**85** 18:22

**9**

**95** 12:6

**99** 12:6

**A**

**a.m.** 5:3 39:4

**ability** 16:9

**absolutely** 41:11

**access** 34:21

**actual** 15:17 16:24 17:9,16 19:10

**addition** 17:23 34:20 41:4

**address** 52:20

**Adriana** 23:9 33:9 36:16,21 37:3 42:9

**affidavit** 37:2,6,8,20 38:13

**agree** 15:15 16:22 17:13 19:8

**agreeing** 30:17

**ahead** 5:20 14:2 20:4 24:12 32:13 45:16

**Alfredo** 33:13

**alleged** 20:15 27:18

**alleging** 28:2

**Allison** 5:20 6:4 14:18,24 38:14 49:16

**Amy** 28:9

**analysis** 13:5,18

**answers** 7:24 8:3

**anybody's** 48:10

**anymore** 53:14

**apologies** 37:18

**apologize** 38:21

**appearances** 49:3

**appears** 30:16 33:3,5 34:7 44:8

**April** 29:6

**Areanda's** 33:13

**argue** 51:6

**arising** 22:14

**arose** 22:21

**Art** 5:20,23 14:2,10,17 16:2,6 19:18,23 23:1 24:1 33:16 40:22 55:8

**articles** 20:10,13

CHRISTA BOWDEN, 05/01/2023

**Arturo** 5:8 21:16 40:20

**ASA** 24:16 34:8 41:15

**assigned** 11:22 12:23 25:2

**assistant** 6:19 10:24 11:21 12:20 25:1 26:19 34:3

**Associates** 5:13,16

**assume** 8:17 21:23 54:1

**attached** 37:20 40:11 42:1,7,14

**attention** 47:24 48:4 53:9

**attorney** 6:20 7:20 9:6 11:5,21 12:17,20 14:14,15 15:11,16,24 16:8,10,19,23 17:3,7 18:7,13,14 20:18 21:1,10 23:16,22 24:5,11 25:2,5 26:2,8,13,20 27:2,8 30:16 34:16,22 36:9 43:10 44:16,19 45:3 46:22 47:3 49:8 51:14 52:19 53:2, 23 54:7

**Attorney's** 6:10 11:14,17,20 13:4 17:18 26:6 27:15,20 29:21 30:13 31:7 34:4 45:6,13 49:7 51:23 52:9

**attorneys** 15:10 26:17 29:14 32:23 48:20 49:1,6

**aware** 20:18,24 21:4 26:6 27:7 29:22

**B**

**back** 13:7 16:7 18:5 39:7 43:6 50:1 53:13 54:19

**background** 11:4

**bad** 18:12

**based** 22:22 27:19 29:5,11,13 30:11 31:13 33:3,5 34:6 40:18 41:13 43:5 44:8 50:23 52:19,22 53:11

**basically** 45:10

**basis** 14:20 23:4

**Bates-stamped** 38:15 43:19

**bear** 26:19

**beginning** 5:2 39:6 49:24

**behalf** 5:7 6:5,7,9,11,13 7:3 12:17 13:4 27:22 28:10

**bench** 18:15

**bit** 11:3

**Bowden** 5:5 6:20 7:2,8,12,14 8:20

11:4 13:15,23 14:9 15:15 16:17 17:21 18:5 19:13 20:6 22:12 23:7, 11 24:16,21 28:7,16,23 29:1,5 31:1 32:9,13,15,20 37:16,17,19 38:1,21 39:10,12,17,22 40:8 43:16,18,21 44:1 48:18 49:14 50:6,19 51:12,21 52:14 53:15 54:21 55:21

**Bowen** 5:13,15

**boy** 7:12

**Brady's** 34:6

**break** 8:7,8,10 38:22 54:13

**briefly** 13:23 21:18 40:7

**brought** 20:11,19 47:24 48:4 53:9

**Brown** 48:13

**Brualdi** 41:15

**burden** 15:3,6 19:2,3,5,9 27:16

**bureau** 11:23 12:1,5

**C**

**C-H-R-I-S-T-A** 7:12

**C-O-Y-N-E** 6:8

**called** 7:3

**Carol** 13:14,15,20 18:2 46:1,2 47:13

**case** 5:9 6:1 10:12 13:2,19 19:15 22:7,10 25:6 26:3,5,24 30:21 31:3, 9,17,18,24 32:3 47:16,21 48:13,14 52:7

**cases** 6:3,23 13:3,5

**catch** 22:17

**caught** 27:12

**certificate** 10:19 12:16,22 13:24 14:6,13 15:4,12 16:4 17:6,10,24 18:3 19:3 21:3,7,12,15,19 22:8,20 23:5 25:2,10,12,16,23 26:2,9 27:3 28:1 29:7,9,18,20 30:2,6,13,22 31:12 32:24 34:12,17 35:10,24 36:10,13 40:15 41:16,21 42:4,18 43:11 44:5,12,17,22 45:4,7,14 46:10,19,23 47:4,9 48:19 49:2,9 51:15,24 52:16 53:8,16,22 54:5,7

**certificates** 12:14 14:9,21 15:20 22:13 26:14 27:11 30:17

**chain** 13:6,7,8

**chance** 28:12

**change** 45:6,9

**changed** 45:9

**charges** 23:4

**Chicago** 5:14 6:5,14

**children** 22:16,24

**choose** 15:16,24 16:23 17:8 55:16

**Christa** 5:5 6:20 7:2,12 24:8 52:19 55:13,19,21

**City** 6:14

**civil** 6:21 21:11 30:21 31:3,9,13,18, 24 32:3

**claiming** 27:21

**clarification** 40:3

**clarify** 39:9

**clarifying** 44:21 51:20

**Clark** 5:14

**clear** 6:2

**close** 47:17

**co-defendants** 23:8

**Cohen** 5:15

**COI** 14:20

**collateral** 31:3

**command** 13:6,8

**completely** 26:18

**completion** 55:14

**concluded** 55:23

**concludes** 55:20

**conclusions** 24:10

**confirm** 37:8

**connection** 20:14

**consolidated** 6:22

**cont** 39:13 50:3

**content** 37:12,15

**continually** 45:13

**continuance** 31:21

**continuances** 31:12

**continuation** 54:18

**continued** 31:17

CHRISTA BOWDEN, 05/01/2023

**continuing** 26:13 43:10

**conversation** 10:6 37:2

**conversations** 9:19 46:17 47:8

**conviction** 15:17 16:1,9,10,14,18 20:9

**convictions** 20:15 22:13,22 23:2, 12,18,24 31:4

**Cook** 6:9,19 11:13,16,19 12:17 14:14 15:9,11,16,24 16:10,18,23 17:7,15,18 18:7,13,14 20:18,24 21:9 23:16,22 24:4 26:1,6,7,13 27:2,7,14,20 29:21 30:12 31:7 34:16,21 36:8 43:9 44:16 45:2,5,12 46:9,22 47:3 49:7,8 51:13,22 52:9 53:2,23 54:6

**cool** 38:18

**copies** 33:12

**correct** 8:21 11:5,11 14:9 16:1,5, 11,20 21:12 23:13 24:23 25:3 31:4, 9,14 33:1,7,10,14,16,19,21,23 34:1,4,9,13 35:11 36:5 38:10 39:16 40:1,4 42:23 44:13,24 45:14 46:13 50:21 52:1,5 54:3,4

**correcting** 23:11

**counsel** 5:17 20:2 31:7 44:4,9 46:18

**Countless** 18:16

**County** 6:9,19 11:13,16,19 12:17 14:14 15:9,11,16,24 16:10,18,23 17:7,18 18:7,13,14 20:18,24 21:10 23:16,22 24:5 26:1,6,7,13 27:2,7, 15,20 29:21 30:12 31:7 34:16,22 36:9 43:9 44:16 45:3,5,12 46:9,22 47:3 49:7,8 51:14,23 52:9 53:2,23 54:7

**County's** 17:15

**couple** 7:18 9:10,13 41:14 43:6 51:20 54:9

**court** 5:10,15 6:15 7:1 8:1 12:6 22:10 43:2 44:5,9 48:13

**covered** 48:13

**Coyne** 6:7,8 9:6,15,16,19,20,22 10:2,22,23 17:2,11 19:17,24 20:7, 17 21:2 22:17 24:4,7 28:10 30:7,15 37:11,13 38:14,18,24 45:15 47:19 49:16 51:17 52:18 54:10,14 55:2,5, 10,13,18

**criminal** 11:23 12:1,5 19:2,5

34:22,23 35:4,5,6

**current** 11:19

**CV** 5:9,10 6:23,24

---

**D**

**Daniel** 34:1

**date** 29:10 43:12,13

**dates** 52:11

**David** 7:13

**day** 44:20 46:17,21

**decide** 16:19

**decided** 23:16,22 24:5

**decision** 13:4 17:15 24:2 45:24 46:2,3,12,15,18,21 51:13,16

**decision-making** 17:20

**declaration** 40:11,14,18

**declining** 52:23

**defendant** 5:8 6:12,14 15:18 16:1 19:6,11 20:19 21:1,10 27:22

**defendant's** 16:18

**Defendants** 6:5 7:3

**Deleon-reyes** 5:8 21:16

**deliberative** 22:2 48:7 52:22 53:11

**deponent** 56:8

**deposition** 5:5,7 6:2,19 7:14,17 9:3,23 10:3,5,8 20:3 32:23 33:6,10, 13 34:7,9 36:12,21 41:3 42:1 55:21

**depositions** 31:8,18,23 32:2,5

**Detective** 30:20

**determination** 13:11

**determine** 13:3

**determined** 13:21

**differ** 19:2

**DIRECT** 7:6 39:13 50:3

**disagree** 53:1

**disclosed** 29:22

**disclosing** 20:1

**discovery** 5:4

**discretion** 17:4,19

**discussed** 9:14,18 24:3

**discussing** 50:21

**discussions** 22:1 52:6,8,12

**dismiss** 27:4,8,10,18

**dispute** 35:17

**District** 5:10,11 6:22 7:1

**division** 11:22,24 18:11

**DNA** 29:15,22 30:1

**document** 40:23

**documentation** 13:1

**documents** 9:23 26:4

**doubt** 19:7,10

**download** 28:12

**duly** 7:4

**duties** 12:20

---

**E**

**E-N** 7:13

**earlier** 41:2 50:13 51:10,21

**Eileen** 6:13 55:24

**else's** 46:3

**email** 32:22 45:5,21 46:4 50:23 51:7

**emailed** 44:9

**emails** 32:19 33:3,5 44:3,8 50:9, 10,13,21

**employed** 11:13

**end** 38:17

**ending** 50:15

**engaged** 48:19

**equate** 19:10

**Eric** 24:16 34:4,8

**essentially** 51:8 53:7

**estimate** 53:17

**et al** 5:9 6:23,24

**evidence** 15:8 20:22

**EXAMINATION** 7:6 39:13 50:3

CHRISTA BOWDEN, 05/01/2023

**examined** 7:4

**exchange** 32:22

**exchanging** 31:8

**Excuse** 42:24

**exercise** 17:3

**exercises** 17:19

**exhibit** 28:23 32:13 37:21,22 39:12 40:7,11 41:19 43:19,24 45:21 50:9,11,15,16

**exhibits** 28:9 41:8

**exist** 16:15

**experience** 53:13

**expert** 29:15,22 30:2

**explain** 12:19 13:23 46:12

**extent** 21:22 45:15

**F**

**fact** 23:3 37:1 49:11

**facts** 20:22 23:4,6 47:24 48:3,10, 11 53:9

**fair** 8:4,10,18 12:15 18:17

**familiar** 7:19 14:11

**fault** 39:20

**Federal** 6:21

**felony** 18:9,10,11

**file** 14:5 26:1 27:12 30:5 34:24 35:20 36:7 37:1 41:21

**filed** 5:10 12:23 19:14,22 25:7 26:12,17 27:3,5,8 30:14 31:3 35:9, 13,16 42:8,12,21,22 43:1 45:12 53:2

**files** 13:2

**filing** 52:9

**find** 38:12

**fine** 22:6 39:2 49:16

**finished** 32:17 40:8 43:22,24

**font** 41:10

**form** 14:10,17,19 16:2 17:2 19:18 22:17 23:1 24:1 37:11 40:22 47:19 54:10

**forward** 24:8

**forwarded** 28:11

**foundation** 14:2,10,17,19 15:19 16:2 17:17 19:18 24:1 30:7,15 45:16 51:17

**freeze** 7:21

**front** 50:23

**G**

**Gabriel** 5:24 21:16 40:20

**gave** 24:19

**general** 12:20 14:15 15:15 16:22 17:7 19:8,21 22:5 53:13

**generally** 12:19 17:14 19:16,19

**George** 33:18

**give** 8:23 28:6 38:12,13,14 47:8 49:14,20 52:14

**good** 5:1,19 7:8,9,10 11:11

**governs** 14:8

**granted** 14:6 45:23 46:6

**granting** 30:17

**ground** 7:18

**Guadalupe** 41:24 42:1,9

**guess** 41:24 54:23

**Guevara** 5:9 6:6,12,23,24 27:22 28:3

**Guevara's** 30:21

**guilty** 19:6

**guys** 28:8

**H**

**handle** 12:24

**handled** 53:16,22

**handles** 18:3

**handling** 12:16 25:6 26:23 28:1 29:18,20 40:15 41:16 42:18 45:11

**happening** 31:13

**head** 8:2

**hear** 37:13

**heard** 13:15

**hearing** 29:7 43:3,5 51:2

**Heather** 41:15

**Henretty** 6:9,10 10:5,7 14:23 15:19 17:17 21:22 22:6 48:6,12 52:21 53:10

**Hill** 33:16

**hour** 39:1

**hours** 9:17

**huh-uhs** 8:3

**I**

**identify** 5:17

**Illinois** 5:11,14 6:22 7:1 11:7,11

**implicating** 36:17,22 37:9 40:19

**impressions** 21:24 24:9 48:10

**in-court** 49:2

**increase** 41:10

**independent** 21:14

**individual** 6:5 13:24 14:5

**individuals** 10:11

**information** 20:4

**informed** 45:22,23

**initially** 21:5

**innocence** 10:19 12:14,16,23 14:1,6,9,14,21 15:4,7,12,18,21 16:5,24 17:6,9,10,16,24 18:4 19:3, 10 21:4,8,12,15,19 22:8,13,21 23:5 25:2,11,12,17,24 26:2,9,14 27:4,11 28:1 29:7,9,18,20 30:2,6,14,18,22 31:12 33:1 34:12,17 35:10,24 36:10,14 40:15 41:16,22 42:4,18 43:11 44:5,12,17,23 45:4,7,14 46:11,20,24 47:4,10 48:19 49:2,10 51:15,24 52:17 53:8,16,22 54:6,8

**instruct** 48:7 52:21 53:11

**instructed** 53:7

**instructions** 45:17

**integrity** 16:11,14

**interrupt** 14:24

**intervene** 14:15 15:11 17:8,15

**intervener** 22:10

**intervenors** 44:12 46:10,19,23 47:4 49:9 51:14 54:8

CHRISTA BOWDEN, 05/01/2023

**involved** 21:5,7 25:11 51:19 54:5

**involvement** 21:15,19 24:11 45:16

**involving** 21:16

**issues** 13:3

_____

**J**
_____

**Jacinita** 22:15,23

**Jan** 5:24

**January** 12:1,10,15 35:17

**JGS2827** 28:23

**JGS2833** 28:24

**job** 52:7

**John** 6:7 24:13 38:17 49:14 54:12

**join** 14:23

**joined** 24:22 25:21

**Jose** 33:13,18

**judge** 48:15

**judgment** 22:9 35:10,14,21,23 36:3,4,8 37:21,22 38:6 39:12,16 40:1,12 41:9,20 42:3,8,12,22 43:3, 6 51:2,7 52:10 53:3

**Julie** 26:20 27:5 37:2,8 40:24

**Julie's** 30:20 37:20 40:11

**jury** 18:19

**juvenile** 12:6

_____

**K**
_____

**Karen** 34:4

**Kevin** 33:23

**kidnapping** 22:15,24

**kind** 17:5

**knew** 27:21,23

**knowledge** 15:9,14 16:13 23:21 27:24 45:2

_____

**L**
_____

**lawsuit** 21:11 31:14

**lawsuits** 19:14,22 20:8,10,19 21:6, 11

**lay** 13:5

**Lea** 5:15

**learned** 20:2

**leave** 44:11 45:23 46:6

**legal** 5:12 24:10

**legally** 14:15

**licensed** 11:5,7,9

**Linda** 10:13,18

**link** 28:11

**list** 41:2

**litigation** 11:23 12:3,9,11 18:3,6

**local** 6:21

**Loevy** 32:23

**Loevys** 34:7 36:13 41:4

**long** 9:11,15,19 11:16,24 12:8 24:8 41:2

**longer** 9:21 21:10

**looked** 39:10

**loud** 7:24 8:4

**Lyle** 6:10 52:19

_____

**M**
_____

**made** 20:24 24:2 46:12,15,18,21 51:13,16

**main** 13:10

**make** 6:2 8:3 13:3,10 39:1

**marathon** 8:6

**March** 34:15 53:3,6

**Maria** 22:16,24

**Mariano** 22:15,23

**mark** 28:22 32:13 39:12 50:8

**material** 20:2

**materials** 34:21

**math** 18:12

**matter** 5:8 51:1

**matters** 24:19

**Maureen** 10:14,15,18

**Maureen's** 10:15

**Mcgrath** 6:11 55:6

**Media** 5:2 39:7 50:1 54:19

**meet** 9:5 19:9 27:16 48:24

**meeting** 9:15

**Megan** 6:11

**Mejia** 23:9 33:18 36:16,21 37:3,9 40:19,23 41:24 42:9,10

**Mejia's** 33:10 42:1

**mental** 21:24 24:9

**mentioned** 6:1

**met** 9:5,9,12,22 10:22

**minus** 49:2

**minutes** 9:21 49:14,20 54:13

**misconduct** 27:22 28:2

**mispronounce** 26:18

**mispronouncing** 37:18

**misstates** 20:21

**mistake** 15:22

**moment** 37:16 38:21

**Monday** 51:3

**morning** 5:1,19 7:8 28:9

**motion** 22:9 35:9,13,16,21,24 36:4 37:20,22 38:6,9 39:11,16 40:1,12 41:8,19,20 42:2,7,12,15,22 43:3,6 51:2,6 52:10 53:3

**motions** 27:4,8,10,14,18,19

**moving** 17:9

**murder** 18:23 41:1

**murders** 22:14,23 36:18,23 37:10 40:20 48:4

_____

**N**
_____

**nature** 19:14

**negotiations** 48:19

**news** 20:10,13

**Nick** 5:12

**Nikolaevskaya** 26:20

**nods** 8:2

**North** 5:14

CHRISTA BOWDEN, 05/01/2023

**Northern** 5:11 6:22 7:1

**notified** 10:4

**November** 13:12,19 17:22 18:1 43:9 44:9,16,22 45:5,12,18 47:17, 23 48:2,3 49:10 50:15,24 51:3 53:6

**number** 6:1

**numbers** 5:9

---

**O**

**O-W-D** 7:12

**oath** 8:21

**object** 14:10 21:22 22:2 26:14 43:10 48:6 53:10

**objecting** 26:8

**objection** 14:2,17,19 16:2,6 17:2, 11,17 19:17,18,23 20:21 22:1,17 23:1 24:1,7 26:17 27:3 30:7,15 37:11 40:22 45:15 47:19 51:17 52:13,18 54:10

**obtain** 13:24 35:3,5

**obtained** 31:12

**obtaining** 14:20

**occurred** 32:3 49:11

**occurring** 31:9

**office** 6:10 11:14,17,20 13:4 17:18 27:21 29:21 30:13 31:7 45:6,13 49:7 54:24

**offices** 5:13

**oftentimes** 31:11

**Olivares** 33:21

**ongoing** 22:8

**open** 28:12

**opinion** 51:22 52:4

**opinions** 24:10 30:2

**oppose** 44:20

**opposed** 21:24 45:3 53:23 54:3,7

**opposing** 30:13 34:17 35:24 36:4, 8,9 44:17,22 45:13

**order** 13:2 56:1,3

**ordered** 48:13

**original** 25:1,5

**oversaw** 17:24

**overturned** 22:13,22 23:3

---

**P**

**p.m.** 39:8 49:22 50:2 54:16,20 55:22

**pages** 41:14

**paralegal** 10:24

**part** 16:7

**parties** 5:18

**partner** 10:14 12:24

**pause** 52:14

**pauses** 7:21

**pending** 6:24 8:9

**people** 7:21

**People's** 38:5 39:11

**person** 16:19,24 17:1,9,16 27:23 48:24

**personal** 15:9

**personally** 51:13

**petition** 12:22 14:5 21:3,7 22:8 23:5 25:12

**petitioner** 15:7 40:3

**Petitioner's** 38:5 39:11,16,24

**petitions** 12:13 13:1 18:4 25:6 26:12

**phone** 9:10,13,19

**phrase** 16:17

**pinpoint** 52:11

**place** 15:10

**Plaintiff** 5:22,23

**Plaintiffs** 14:18 55:8,11

**point** 8:12 23:12 25:16 29:14 31:6 35:9 48:18 51:21

**police** 6:5

**policies** 15:10

**pop** 50:19

**position** 22:10 26:7 27:15 30:20 45:6 51:23

**possession** 33:6,9 34:12 41:14

42:11,16

**practical** 21:23 22:1,5

**predates** 45:16

**preparation** 9:23 20:2

**prepare** 9:2

**prepared** 51:6

**preponderance** 15:8

**present** 10:23 31:17 40:24 48:23

**principle** 15:16 16:22 17:7 19:8

**prior** 18:5,7,10 21:6 25:9,10 26:23 43:9 52:8 55:14

**privilege** 22:2

**Procedure** 6:21

**procedures** 14:20

**proceed** 31:18 47:9

**proceeded** 31:23

**proceeding** 7:20 15:12

**proceedings** 10:19 12:16 14:14, 16 15:4 16:5 17:6,24 19:3 21:12, 15,20 25:3,10,11,13,17,24 26:3,23 27:17 28:1 29:8,10,21 30:3,6,22 31:2,13 33:1 34:13 35:6,11 36:14 40:15 41:16,22 42:5,19 44:6,12,17, 23 45:7,11 46:11,24 47:4,10,15 48:20 49:2,10 51:15,24 53:8,16,22 54:6

**process** 13:24 17:20 22:2 48:7 52:22 53:12

**produced** 28:23 31:19,22 32:14

**product** 52:19

**proof** 15:3,6 27:16

**prosecutorial** 17:3,19

**prove** 15:7 19:6

**provide** 34:8

**provided** 26:4 32:2,6 34:7

**pull** 28:5 38:23 43:14

**pursuant** 6:20

**pushed** 43:6

---

**Q**

**question** 8:9,13,14,16,17 12:7 16:8 17:5 19:24 20:3 22:19 24:12

CHRISTA BOWDEN, 05/01/2023

41:24 45:9 49:6 52:19,23

**questions** 14:19 24:8 51:20 55:3

**quick** 28:6 38:23

**quickly** 41:7,9 43:21

---

**R**

**R-E-N-N-O** 10:17

**R-O-G-A-L-A** 13:17

**Ray** 6:6

**read** 20:10,13 28:19 29:1 32:16

**reading** 32:17

**reads** 38:5

**reason** 8:23 31:20 35:17 46:9 47:3 53:1

**reasonable** 19:7,9

**reasons** 15:17 16:24 17:8 22:3

**recall** 21:18 24:20 27:14 30:4 31:16 32:5 35:13 36:16 37:5,12,15, 19 40:14 43:1,2 47:18 52:3,8,15,24

**received** 28:11 41:3 45:17 46:4 51:7

**recess** 39:5 49:23 54:17

**recognize** 32:19

**recollection** 21:14 40:10 43:5 50:24

**recommendation** 47:9 52:16

**record** 5:3,18 6:2,18 7:11 28:22 39:4,7,10 40:6 43:18,19 49:18,22 50:1,13 54:16,19 55:22

**referring** 27:4 42:14

**reflect** 6:18

**refresh** 40:10

**related** 22:13

**relation** 17:14 31:3 34:22

**relevant** 30:21

**remember** 29:24 36:15,20 37:23 42:24

**remote** 28:14 32:10 37:24 39:21 41:6 43:15 50:7,17

**Renno** 10:14,17,18

**repeat** 36:19

**rephrase** 8:14

**reply** 42:23

**reporter** 5:15 6:15 8:1 50:10

**represent** 5:18,22 35:16

**representing** 5:13

**requested** 35:1

**requesting** 32:24 45:22

**reserve** 55:15

**reserved** 55:18

**resolved** 21:6

**responded** 22:9

**response** 34:6 35:20,23 36:3 37:21 38:5 39:11,15,24 40:12 41:20 42:2,7,12,15,21 43:1 46:5 52:9 53:2

**retry** 16:19,23,24 23:16,17,22 24:2,5

**revealing** 20:4 24:9

**review** 9:23 12:24 18:9,10 24:18 25:9 26:4 29:5,11,13 30:11,19 36:12 37:1,6 40:6,7,18 41:7,13 43:21 55:14,15

**reviewed** 27:12 42:17

**reviewing** 21:3 40:14 43:24

**Reyes** 5:23 6:3,23 10:19 19:14,22 20:11,14,19 22:14,21 23:8,17,23 25:3,24 26:8,14 27:10,15,21 28:2 29:15,19,23 30:1,14 31:4,8 32:14 34:18 35:7,9 36:1,17,22 37:9 40:3, 16 42:8,9,22 44:4,10,18,23 46:23 47:5,10 48:21 49:1,9 51:1 52:1,17 53:14

**Reyes'** 33:6 35:20 36:4 40:12 41:20 42:2,12 43:3,11 45:4 46:10 52:10 53:3

**REYES11971** 38:17

**REYES11972** 39:10

**REYES15025** 32:14

**REYES15029** 32:14

**REYES15055** 43:20

**REYES15059** 43:20

**Reynaldo** 5:9

**Rogala** 13:14,17,20 18:2 46:1 47:13

**Romelfanger** 5:19,21 6:4,18 7:7 14:22 15:2 20:5 22:4,11 28:8,13,15 38:16,20 39:2,9,14 48:9,16,17 49:13,19 50:4,8,12,18 54:12,21 55:19,24 56:3,6

**Rosa** 33:13

**Rosario** 33:18 42:10

**Rosen** 6:13 49:20 50:14 55:3 56:2

**rules** 6:21 7:18

---

**S**

**saith** 56:8

**Salvador** 33:21

**Santiago** 22:16,24

**screen** 11:1 28:14 32:8,10 37:17, 24 38:1 39:19,21 41:6 43:15 50:5, 7,17,19

**scroll** 28:18 29:3 32:17 38:8 41:9 43:22

**seeking** 22:21 23:5

**send** 13:5,7,11,18,19,21

**September** 11:18

**set** 10:24 50:13 51:1

**settled** 21:6

**share** 32:8 37:16 50:5

**sharing** 28:14 32:10 37:24 39:19, 21 41:6 43:15 50:7,17 51:10

**Sheehan** 33:23

**show** 45:15 50:10

**signature** 38:9 55:18

**significance** 43:12

**Sitting** 47:2

**size** 41:10

**slowly** 28:18 32:17

**Solache** 5:24 6:3,23 10:20 19:14, 22 20:11,14,20 21:16 22:14,21 23:8,17,23 25:3,24 26:15 27:16,21 28:2 29:14,19,22 30:1,14 31:8 34:17 35:7 36:7,17,22 37:9 42:10 43:10 44:4,10,18,23 45:3 46:10,23 47:5,10 48:20 49:1,9 51:1,24 52:17 53:14

**Solache's** 26:8 27:11 31:4 36:9

**Solache/reyes** 24:19 27:3 29:7 51:15 53:8

**Soto** 22:15,16,23,24 36:18 40:21

**Sotos** 37:10 40:20

**Sotos'** 36:22 48:3

**special** 11:23 12:3,8,11 18:3,6

**specifically** 52:4

**speculation** 30:8

**speed** 26:3

**spell** 7:10

**spoke** 9:9,13 10:7

**spoken** 10:2 49:6

**stand** 51:8 53:7

**standing** 11:11 14:18

**state** 7:10 11:7 19:6 44:11 45:22 46:6,19

**State's** 6:10,20 11:14,17,20,21 12:17,20 13:4 14:14 15:10,11,16, 24 16:8,10,18,23 17:3,7,18 18:7, 13,14 20:18 21:1,10 22:10 23:16, 22 24:5 25:1,5 26:2,6,7,13,16,20 27:2,8,15,20 29:21 30:12,16 31:7 34:3,16,22 36:9 43:10 44:16,19 45:3,5,13 46:22 47:3 49:7,8 51:14, 23 52:9 53:2,23 54:7

**statements** 24:18 42:8,13

**states** 5:10 6:24 45:21

**status** 31:17

**statute** 14:8,11

**statutory** 14:20

**step** 12:13

**stepping** 44:20

**Steve** 5:21,23

**stick** 48:14

**stop** 51:10

**stopped** 39:19

**Street** 5:14

**strike** 14:4 15:22 23:6 27:9 29:12, 19 33:4 35:4 37:5 41:5 46:7,20 47:22 48:1,23 51:1 52:24

**subpoena** 6:20

**subpoenaed** 10:4,9,12

**subsequently** 33:12

**substance** 47:7

**Suite** 5:14

**summary** 22:9 35:10,14,21,23 36:3,4,7 37:20,22 38:6 39:11,16 40:1,12 41:9,20 42:3,8,12,21 43:3, 6 51:2,7 52:10 53:3

**supervisor** 10:13 13:10,12 17:22, 23 18:2 47:16 52:6

**Susler** 5:24 20:21 55:10,12

**Sussman** 24:16,18 34:4

**Sussman's** 34:9

**swear** 6:16

**sworn** 6:17 7:4

---

**T**

---

**taking** 8:1

**talked** 41:2

**talking** 15:20 29:15 53:14

**telling** 9:14,18 46:5,8,17 47:7 51:8

**tells** 41:17

**tender** 30:1

**testified** 7:4 17:22 24:21 31:1 51:12,21 52:3

**testimony** 8:24 30:21 33:6 34:11 35:3,6

**theories** 24:10

**thing** 8:8 32:15 43:21

**things** 12:12 21:23 22:3,5 42:10, 17

**thoughts** 21:24

**time** 8:7,12 9:9,12 12:2 15:12 18:1, 6 21:11 25:6 26:5,11 27:7,19,22 30:12 32:8 36:10 40:24 41:15 42:4, 11 45:2 47:17 48:18 50:6 53:15 54:23 55:1,4,6

**times** 9:8,10,13 43:7

**title** 11:19

**today** 5:15 8:21,24 9:24 10:3,8 47:2 54:23,24 55:1,21

**today's** 9:2

**told** 10:11 20:7,17 21:2 40:24

**totally** 39:2

**transcript** 29:11,13,16 30:11,17, 19,23 33:10 41:15 42:2 55:14,16

**transcripts** 13:2 25:9 28:6 29:6 31:23 32:2,24 33:13 34:8,20 36:12, 21 41:3,4

**Trevino** 34:1

**trial** 18:11 19:2,5 35:4

**trials** 18:15,19,23 34:23

**Trotta** 5:12

**true** 54:1

**truthful** 8:24

**two-minute** 38:22

---

**U**

---

**uh-huhs** 8:2

**underlying** 34:23 35:6

**understand** 8:12,20 19:13 22:19, 20 30:12,20 48:12

**understanding** 14:13 19:21 21:4, 9,13 22:12 23:7,12,15,20 24:4 26:11,16 27:20 31:2,6,11 34:16 40:19 44:15 45:10 51:16

**understood** 8:17 52:24

**unit** 5:2 11:23 12:4,9,11,21 16:11, 14 18:3,6 24:22 25:21 39:7 50:1 53:15 54:19

**United** 5:10 6:24

**Urlaub** 5:13,15

---

**V**

---

**vacate** 15:17 16:1,9

**vacated** 16:18 23:3,13,17,23

**versus** 5:8

**video** 5:2,17 39:4,7 49:22 50:1 54:15,19 55:20,21,23 56:4,6

**videoconference** 5:4

**voiced** 8:3

---

**W**

---

**waive** 55:15

CHRISTA BOWDEN, 05/01/2023

**Walls** 10:13,18

**wanted** 46:7,9

**Wehrle** 34:4

**weighed** 55:10

**whatsoever** 17:14 20:14

**withdraw** 44:11 45:23 46:7,9,19, 22 51:14

**withdrawing** 49:8

**withdrew** 22:9 47:3 54:8

**words** 17:13

**work** 10:18 26:24 52:19

**worked** 24:11

**wrapped** 49:13

**wrongful** 20:9,15

### Y

**year** 18:8

**years** 12:6 18:13,14 54:8,9

**yes-or-no** 46:5

### Z

**Zoom** 7:20 9:12,15,22 10:22,24

*DeLeon-Reyes v. Guevara, et al.*
Case No. 18 CV 01028

*Solache v. Guevara, et al.*
Case No. 18 CV 02312

# EXHIBIT 17

Case 1:18-cv-01028 Document #: 331 Filed: 03/03/26 Page 1 of 287 PageID #:5984454

STATE OF ILLINOIS      )
                       ) SS:
COUNTY OF COOK         )

          IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
               COUNTY DEPARTMENT-CRIMINAL DIVISION

  THE PEOPLE OF THE       )
  STATE OF ILLINOIS,      )
                          )
                          )
  Plaintiff,              )
                          )   No. 98CR12440-02
          vs.             )   No. 98CR12440-03
                          )
  ARTURO REYES and        )
  GABRIEL SOLACHE,        )
                          )
                          )
  Defendants.             )


REPORT OF PROCEEDINGS had before the Honorable

SOPHIA ATCHERSON, one of the Judges of said Criminal

Division, heard on the 14th of November, 2022.

   APPEARANCES:

          HON. KIMBERLY M. FOXX,
          State's Attorney of Cook County, by
          MS. CHRISTA BOWDEN,
             Assistant State's Attorney,
              Appeared on behalf of the People;

          PEOPLE'S LAW OFFICE, by
          MS. JAN SUSLER,
             Private Attorney,
              Appeared on behalf of Gabriel Solache.

1

JGS 2760

APPEARANCES: (CONTINUED)

      LOEVY& LOEVY ATTORNEYS AT LAW, BY,
      MS. RACHEL BRADY,
      MR. ANAND SWAMINATHAN,
        Private Attorneys,
         Appeared on behalf of Arturo Reyes.

                  * * * * *

Auhdikiam Carney,
Official Court Reporter
Criminal Division #084-004658

2

JGS 2761

MS. SUSLER:  Jan Susler on behalf of Gabriel Solache.

MS. BRADY:  Rachel Brady on behalf of Arturo Deleon Reyes.

MR. SWAMINATHAN:  Anand Swaminathan on behalf of Deleon Reyes.

MS. BOWDEN:  Assistant State's Attorney Christa Bowden for the people.

THE COURT:  The Petitioners both have certificates of innocence petitions before the Court and it was set today on Mr. Reyes' motion for summary judgment, but it is my understanding there may have been some additional developments?

MS. BOWDEN:  Yes, Judge.  The state's attorney has determined that at this time we're seeking to withdraw as intervenors in this matter and to allow the Petitions to proceed without the state's participation.

THE COURT:  There's no objection to that?

MS. BRADY:  No.

THE COURT:  State is granted leave to withdraw as intervenors to the Petitions pending before the Court.  Therefore I'm considering the Petitions and the documentation that has been presented to the

3

JGS 2762

Court without any further input from the state. I have had an opportunity to review both Petitions and the multiple exhibits that have been attached in support of each Petition. I do find that each Petitioner has established by a preponderance of the evidence their innocence to the charges that were previously pending before the Court.

I am granting a certificate of innocence as to each petitioner today. I have copies of orders. I don't know if you've prepared any orders. I do find that they meet every one of the factors that they would need to under the statute so I am entering those orders today. Their appearances were waived today as agreement of the parties as they are not physically present. Thank you.

(WHICH WERE ALL THE PROCEEDINGS HAD)

* * * * *

4

**JGS 2763**

STATE OF ILLINOIS   )
                    ) SS:
COUNTY OF C O O K   )

   IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
       COUNTY DEPARTMENT-CRIMINAL DIVISION


          I, Auhdikiam Carney, an Official Court

Reporter in the Circuit Court of Cook County, County

Department, Criminal Division, do hereby certify that

I reported in shorthand the proceedings had at the

hearing of the aforementioned cause; that I

thereafter caused the foregoing to be transcribed,

which I hereby certify to be a true and accurate

transcript taken to the best of my ability of the

proceedings had before the Honorable Sophia

Atcherson, Judge of said Court.


_____*Auhdikiam Carney*_____
       Official Court Reporter




Dated this 17th day

of November, 2022.

CSR# 084-004658


5

JGS 2764

*DeLeon-Reyes v. Guevara, et al.*
Case No. 18 CV 01028

*Solache v. Guevara, et al.*
Case No. 18 CV 02312

# EXHIBIT 18

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ARTURO DeLEON-REYES,                )
                                    )
                    Plaintiff,      )
                                    )
-vs-                                )  Case No. 18 CV 1028
                                    )
REYNALDO GUEVARA, *et al.*,         )
                                    )
                    Defendants.     )  Chicago, Illinois
_____)  June 28, 2023
GABRIEL SOLACHE,                    )  11:27 a.m.
                                    )
                    Plaintiff,      )
                                    )
-vs-                                )  Case No. 18 CV 2312
                                    )
CITY OF CHICAGO, *et al.*,          )
                                    )
                    Defendants.     )

TRANSCRIPT OF PROCEEDINGS - Status
BEFORE THE HONORABLE STEVEN C. SEEGER

APPEARANCES:

For Plaintiff          LOEVY & LOEVY
DeLeon-Reyes:          BY:  MR. STEVEN E. ART
                       311 North Aberdeen Street
                       3rd Floor
                       Chicago, IL  60607


For Plaintiff          PEOPLE'S LAW OFFICES
Solache:               BY:  MS. JANIS M. SUSLER
                            MS. NORA SNYDER
                       1180 North Milwaukee Avenue
                       Chicago, IL  60642

Court Reporter:        AMY M. SPEE, CSR, RPR, CRR
                       Federal Official Court Reporter
                       United States District Court
                       219 South Dearborn Street, Room 2318A
                       Chicago, IL  60604
                       Telephone:  (312) 818-6531
                       amyofficialtranscripts@gmail.com

2

APPEARANCES (CONT'D):

For Defendant City          ROCK FUSCO & CONNELLY LLC
of Chicago:                 BY:  MS. EILEEN E. ROSEN
                            321 North Clark Street
                            Suite 2200
                            Chicago, IL  60654

For various                 THE SOTOS LAW FIRM, P.C.
individual officer          BY:  MR. JOSH M. ENGQUIST
defendants:                      MS. ALLISON ROMELFANGER
                            141 West Jackson Boulevard
                            Suite 1240 A
                            Chicago, IL  60604

For Defendant               LEINENWEBER BARONI & DAFFADA LLC
Guevara:                    BY:  MR. THOMAS M. LEINENWEBER
                                 MS. MEGAN McGRATH
                            120 North LaSalle Street
                            Suite 2000
                            Chicago, IL  60602

For Defendant Cook
County Attorney's           BY:  MR. LYLE K. HENRETTY
Office:                     50 West Washington Street
                            20th Floor
                            Chicago, IL  60602

(Proceedings heard in open court:)

THE CLERK: 18 CV 1028, DeLeon-Reyes versus Guevara, *et al.*, and 18 CV 2312, Solache versus City of Chicago, *et al.*

THE COURT: Good morning, everyone.

Welcome. Welcome. Come on up.

All right. Let's go ahead and get everyone's appearances on the record, if you would, please.

Let's start with counsel for Plaintiff DeLeon-Reyes.

MR. ART: Good morning, Your Honor.

Steve Art for Mr. Reyes.

THE COURT: All right. Good morning.

As long as everybody speaks in the microphone, my court reporter will be happy.

So Mr. Art, is that right?

MR. ART: Yes, Your Honor.

THE COURT: All right. Good morning.

MR. ART: Good morning.

MS. SUSLER: Good morning, Judge.

Jan Susler on behalf of the plaintiff, Gabriel Solache.

THE COURT: Okay. Good morning.

MS. SNYDER: Good morning, Your Honor.

Nora Snyder, also for Plaintiff Solache.

THE COURT: Okay. Good morning.

MR. HENRETTY: Good morning, Your Honor.

Lyle Henretty on behalf of the Cook County State's Attorney's Office.

THE COURT: Okay. Good. All right. Good morning. Henretty?

MR. HENRETTY: Henretty, H-e-n-r-e-t-t-y.

THE COURT: All right. Good morning. And --

MS. ROSEN: Good morning, Your Honor.

THE COURT: -- anybody else from the plaintiffs' team? I assume not.

MR. ART: That's it, Your Honor.

THE COURT: I figured out from microphone placement who is who.

Go ahead, defense team.

MS. ROSEN: Good morning, Your Honor.

Eileen Rosen on behalf of the City of Chicago in both cases.

THE COURT: Okay. Good. Good morning.

MR. ENGQUIST: Good morning, Your Honor.

Josh Engquist and Allison Romelfanger --

THE COURT: A little slower, and I'll be happy.

Go ahead.

MR. ENGQUIST: Sure.

Josh Engquist and Allison Romelfanger --

THE COURT: Okay.

MR. ENGQUIST: -- on behalf of Defendants -- let me see if I can get them all right here -- Mingey, Biebel, Dickinson, Harvey, Yanow, Rutherford, Dickinson, Karalow, and Rogers and Stankus and Trevino.

THE COURT: Good morning.

MR. LEINENWEBER: Good morning, Judge.

Tom Leinenweber and Megan McGrath on behalf of Defendant Reynaldo Guevara in both cases.

THE COURT: Good morning to you.

I fed your father a bagel this morning. He's well fed. Good morning to you.

MR. LEINENWEBER: I have lunch with him today.

THE COURT: All right. There you go. Well, I can put for the record he is well fed this morning.

So good morning, folks. You know, it's been a while. I was thinking of you folks this morning.

Let me actually -- let me back up.

I'm sorry that I'm late. I adjusted the hearing, and then you folks showed up for 11:00 o'clock and you were sitting on those hard benches wondering what on earth is happening behind that door. I know, because I used to sit on those hard benches wondering what on earth is happening.

I remember before I was a district court judge sitting in those hard benches here in the Dirksen Federal Building and saying, "Why can't the judge be on time? Why

can't the judge -- the judge is the one who set the hearing. I didn't set the hearing. The judge set the hearing. Why can't the judge be on time for his own hearing?"

So I am sensitive to that perspective. If any of you felt sensitive to the hard benches back there, I get it, and I'm sorry.

I will tell you, a lot of things happen behind the scenes. I have a sentencing this afternoon. I'll just simply say, there is a lot going on.

So I acknowledge that it was a later hearing than you expected when you woke up this morning, and then when you arrived in my courtroom, you had to sit and wait on a hard bench. So I apologize for that. I do actually respect your time. So thank you for indulging me.

I also wanted to say, it's been a while since I've seen you folks, needless to say. This case was reassigned to me when I took the bench. It came over from Judge Wood back in 2019. There was a song called *It's Been a While* by the band Staind back in the '90s. There's a line in there: "It's been a while since I first saw you." That's what I thought when I prepared for the hearing today. I do actually remember when you folks rolled back into my courtroom in 2019. I've been monitoring you folks from afar, seeing a lot of activity on the docket. We're up to almost 700 docket entries.

You've been taken care of by Judge Harjani in the

meantime. I know that you folks have worked incredibly hard. I acknowledge that. I've seen the entries. I have not read each and every submission in detail, but I have been reading things, trying to keep up to speed.

So I know how hard and how long you folks have worked on the case. So I appreciate everything you folks have done to get the case in the shape that it's in.

My understanding of the case posture is this: We closed fact discovery back in June of 2021, obviously. In March of this year, I authorized a limited reopening of discovery for the limited purpose of getting discovery on the certificate of innocence. The plaintiffs here obtained the certificate of innocence I think in November of 2022. So it was after the close of discovery. So nobody had a chance to take discovery on that. So I thought it was fair game to get to ask some questions.

I expressly said in my ruling that I was not making a ruling on any privilege issues. I acknowledge that there could be all sorts of thorny privilege issues out there that had not emerged, but I let you do a couple of months of discovery on that.

I also issued a couple of orders in addition to my initial order on March 7th, 2023, Docket No. 633. I issued an order on May 12th, 2023, Docket No. 665, and -- as well as another order on May 5th, 2023, Docket No. 652.

In there I posed a number of questions to you folks, in particular to the Cook County State's Attorney's Office to try to figure out what the story was. My understanding was that the Cook County State's Attorney's Office opposed the certificate of innocence for quite a while and then rather unexpectedly dropped the opposition toward the end of last year, I think the night before the hearing, give or take, before the state court judge.

I put in my order that it looked abrupt and unexplained. I think there was a little pushback on that from the Cook County State's Attorney's Office in your filing. I don't want to get into wordsmithing, but it looked abrupt and it looked unexplained to me. I don't think anybody, at least as far as I can tell, knows what the reason was. It's a mystery. It's a sphinx-like reaction from the Cook County State's Attorney's Office that they opposed it, and then they announced that they weren't opposing it, as I understand the lay of the land. So I authorized some limited discovery to try to get to the bottom of it.

You folks have done some discovery. I saw that one of the prosecutors was deposed. You've had quite an extensive document production. I'm surprised, by the way, about the number of e-mails in question that were scooped up. I don't know if there were really 20,000 e-mails in question. I assumed, frankly, that there would be a lot of false hits on

that. I just can't imagine that the Cook County State's Attorney's Office is sending tens of thousands of external e-mails.

I mean, what I had in mind, if anything, was any external e-mails between the Cook County State's Attorney's Office and anybody else about the certificate of innocence, if any. When I issued my order, I frankly didn't think there would be a whole lot to be produced. I didn't know, but I don't think the Cook County State's Attorney's Office is probably doing a lot of e-mailing on that topic, but if there was any, I'd let you do it.

So I did see those filings, and I authorized a limited extension of discovery because I thought that you needed more time to get to the bottom of things. There is one issue that is pending. That's why you're here today. I wanted to talk about it. It's been a while since we were nose to nose. I thought we should get nose to nose and talk about the future direction of the case.

But I understand that there is an issue about whether Ms. Lanier, First Assistant Lanier should be deposed to get her thoughts on what had transpired.

I've got a few preliminary thoughts. I want to give you folks a chance to say whatever you want to say. I don't know if there's anything any of you want to say at the outset in terms of setting the table for our discussion today.

I say all of this as kind of a warmup, bring everybody up to speed, set the table. Let's talk about why we're here today.

So any sort of -- without arguing the motion yet, folks, is there anything anybody wants to say? Any sort of background?

I'm assuming -- let me start with this: I assume that all discovery is done on the certificate of innocence except the Lanier hunk, if any, right? She has not been deposed, obviously, because it's been a -- is there any other lingering issue or are you otherwise done?

I'll hear from the plaintiffs' team first.

MR. ART: The only lingering issue --

THE COURT: As long as you go into the microphone, we'll both be happy.

MR. ART: Sorry, Your Honor.

THE COURT: Go ahead.

MR. ART: The only lingering issue --

THE COURT: You're Mr. Art?

MR. ART: Yes.

THE COURT: All right. So everybody -- say your name -- I'm one for one in remembering names. Don't hold me to that. But if you could, everybody, say your name. It just makes it a whole lot easier for my court reporter. We'll get to know you, but we don't know you as well yet as we'll know

you down the road.

So go ahead, please.

MR. ART:  Very good, Your Honor.

So Steve Art for Plaintiff Reyes.

The only lingering issue other than the deposition issue that the defendants have is, we have a request to the City to search for communications with the State's Attorney's Office regarding the COIs.  And we are having a discussion about what custodians to search, but I don't think that that is going to be a dispute that requires the -- or there is going to be a dispute about that.  It's a limited number of custodians and I think a limited search.

THE COURT:  Okay.  So these would be communications between the City and the State's Attorney's Office?

MR. ART:  Yes, Your Honor.

THE COURT:  Okay.  And when do you expect that to be done?

MR. ART:  I mean, I hope to have -- go ahead, Ms. Rosen.

MS. ROSEN:  So --

THE COURT:  As long as you say your name, we'll both be happy.  Into --

MS. ROSEN:  Yes.

THE COURT:  -- the microphone.

MS. ROSEN:  Eileen Rosen on behalf of the City of

Chicago.

So, Your Honor, the plaintiffs issued a request for the City's communications with the State's Attorney's Office with respect specifically to the COIs of Mr. Solache and Mr. Reyes. We did a preliminary search and indicated that, to our knowledge, there was no such communication. But if they wanted specific custodians, both on the City side and the State's Attorney's Office side, searched specifically with search terms, we'd be happy to do that.

We offered up a couple names that we thought would be the relevant names, both on the City side and the State's Attorney's Office side, and then plaintiffs' counsel indicated they were going to give us additional custodians. This was I think two status reports ago.

And so we're just waiting for plaintiff to provide any additional custodian names to do that search. And assuming that it's just a couple more names, then we're happy to run the search.

THE COURT: And did I understand you to say you don't expect there to be any documents to produce, but you're happy to kick the tires on it?

MS. ROSEN: Correct.

THE COURT: All right. Fair enough.

All right. Anything else by way of bringing everybody up to speed? Anything?

MS. ROSEN: There is -- sorry, Judge. Eileen Rosen again.

There is just one issue with the response, the subpoena response from the Cook County State's Attorney's Office with respect to e-mails that were produced. There were some e-mails that were -- part of the e-mails were redacted. We had a Rule 37 conference with Mr. Henretty yesterday or the day before, and Mr. Henretty confirmed that the redactions were not based on privilege, they were based on relevance.

And it's the State's Attorney's Office's position that because the topics addressed in that e-mail string, part of which were responsive to the subpoena, part of which were not, if I'm understanding them correctly, were not relevant, and so, therefore, they redacted it.

We had 37.1 conference, asked for the topics and the custodians so we could further assess whether or not this was something we wanted to pursue. The State's Attorney's Office took a position that they don't need to provide that information to us. We're considering whether or not to leave that alone or whether or not we're going to need court assistance on that.

THE COURT: Okay. Let's drill down on that, just -- a very small drill bit.

MR. HENRETTY: I can give some context, Your Honor.

This is Lyle Henretty for the State's Attorney's

Office.

The document -- the one e-mail chain that we're talking about here was at least in part, the part that we produced, about a meeting between the state's attorney herself and a few other people and some representatives -- or a lawyer, a couple of lawyers, some of which I believe are involved in this case, although I'm not a hundred percent sure about that, but generally involved in the Guevara cases.

THE COURT: This is the June 12th -- or June 14th, 2022, meeting with Kim Foxx and Lanier?

MR. HENRETTY: Yeah.

THE COURT: Yeah, I've got it.

MR. HENRETTY: Yeah, that's correct.

And --

THE COURT: I'm with you.

MR. HENRETTY: -- attached to that, the e-mail that we produced was the presentation. And you've looked at the plaintiffs' -- excuse me -- yeah, the plaintiffs' filing yesterday to sort of understand what that was about.

I turned it over out of an abundance of caution. I wasn't certain that it was responsive. It didn't talk about Solache or Reyes in any detail. It mentioned them, though. And because it mentioned them and because it mentioned COIs, although not together, I turned it over. Plus, I knew that the defendants had known about it because they asked me about

that document --

THE COURT: Yeah.

MR. HENRETTY: -- before I started searching.

So I turned it over just so there wasn't going to be a fight about it and then redacted the remainder of the e-mail chain. They involve other cases. It does not involve COIs. Specifically, my -- for one case that wasn't this one, mostly it was about other pending criminal actions and whether -- you know, how those were going to be addressed that involved Guevara.

THE COURT: Okay. What was redacted by way of concept? You say it's not relevant, but, like, what's the topic?

MR. HENRETTY: That was -- the topics were about the -- just basically the setup for the meeting and specifically about the -- some other cases involving Guevara.

THE COURT: What does that mean? Does that mean logistics? When you say setup of the meeting, what does that mean?

MR. HENRETTY: There was --

THE COURT: Come by and you'll have lunch and --

MR. HENRETTY: It was a five-page e-mail. It was a bunch of different things. But it was effectively, here are a bunch of cases by a bunch of lawyers that are currently pending in criminal court that we want to talk about, and that

was -- there was some description of what those cases were. On our part, it was mostly practical stuff.

THE COURT: Okay. So we're not going to do a deep dive into this little side issue today.

When you're done, talk it over. I'd like you to give a -- make a proffer to defense counsel about what's in there --

MR. HENRETTY: That's fine.

THE COURT: -- without producing it yet. You can figure out if it satisfies you. You can also figure out if you care. You know, if you care and you must, you may file a motion.

I've often thought, by the way, for discovery motions, I should make litigants post a bond, each side. If you lose, that's okay, you surrender the bond, you know.

I've often thought, too, for pretrial orders, say, you can object as much as you want. That's the good news, you can object as much as you want. You really can. It's fine. As soon as I rule against you three times, all other objections are waived. So go ahead. Just make sure they're good. Because people go crazy on objections, frankly. I haven't done that, but it's something I've often toyed with.

So talk it over, see if it matters. If it matters and you really need me to tee it up -- you really need to tee it up for me, I'll issue a decision, okay? But see if it

matters.

MS. ROSEN: Thank you.

THE COURT: Okay. So the -- it's a long way of saying the Lanier issue is the issue, right? That's why -- that's the last lingering thing.

So I've read the submissions on it. I have some preliminary thoughts.

Do you folks want to say anything at the outset? I'm happy to have you folks argue it. Do you want to give me your best pitch?

I mean, you -- is it Henrietta?

MR. HENRETTY: Henretty.

THE COURT: Henretty. Henretty, okay.

MR. HENRETTY: Henretty.

THE COURT: Henretty.

So, Mr. Henretty, it's your motion. Why don't you just -- I mean, I've read everything, but go ahead and give me your best take on --

MR. HENRETTY: Sure, Your Honor.

And when I -- we didn't get an opportunity obviously to reply because -- I shouldn't say that. I didn't file a reply based on what I read and maybe through the lines in what was filed earlier this week that you didn't want us to file a reply, but I would have been -- I'm happy to do it.

THE COURT: As a general matter, attorneys always

want to say more and judges always want lawyers to say less.

MR. HENRETTY: Understood.

So I would really just like to hit a few points that are raised and give some clarification, I think, to what's going on here.

We did disclose Ms. Lanier as the final decision-maker. I think it's --

THE COURT: That can't be privileged, by the way. And I have not researched this, and I issued a minute order on this. But the identity of a decision-maker can't possibly be privileged, right? I mean, I'm not --

MR. HENRETTY: Our office --

THE COURT: I thought the line about the buck stops here actually was kind of on point. Like, if you say so-and-so makes a decision, you have not waived privilege.

I mean, identifying the speaker isn't privileged, right? So identifying the decision-maker, I just don't see how that's privileged.

But go ahead.

MR. HENRETTY: Yeah, and I just -- you know, we've -- obviously we're way past that. My office has --

THE COURT: I understand, but, you know --

MR. HENRETTY: -- always taken the position just that it's -- the office makes the decision, not the individual who makes the decision. But I understand, Your Honor.

THE COURT: I mean, technically Kim Foxx makes every decision, right? I mean, technically, I suppose.

MR. HENRETTY: There is an argument --

THE COURT: It's all delegated authority.

MR. HENRETTY: There is an argument to that.

THE COURT: Yeah. Go ahead.

MR. HENRETTY: So -- but in this case --

THE COURT: The secret is out. Ms. Lanier made the decision.

MR. HENRETTY: Ms. Lanier made the decision.

I -- again -- and the reason we filed this was, I don't know what question they could ask Ms. Lanier that isn't either privileged or something we can give them through some other means; meaning, you know, when they talk about the -- what documents were reviewed, I think -- and then this is -- I don't know how deep we want to get into this. But the issue that -- in the Brown case in front of Judge Pallmeyer, I disagree wholeheartedly with counsel. It was decided in that case and ordered in that case that the parties were not allowed to ask who reviewed what in your office. They were allowed to ask very generally what documents were reviewed in coming to this decision.

And we, I believe, have already started providing that through Christa Bowden's deposition. And I would agree to provide a list of that or however the best way for that to

come across.  But who reviewed what we do believe is privileged.

And obviously --

THE COURT:  All right.  Can I stop you there?  You say, "I believe we've already starting producing that through Christa Bowden's deposition."  So drill down on that.  What exactly have you started producing and have you -- have you made a proffer about what was reviewed generally?

MR. HENRETTY:  No, but Christa Bowden talked about what she reviewed.  And that's the other -- that was sort of leading to my next point, which is, you know, Ms. Lanier is very close to the top of this pile.  So without going into specifics on this case, it stands to reason, and it's the typical practice I think in most places with a lot of people in a sort of pyramid of employment, the people that are lower do a lot of work, they pass it up to the next person who does their own work but often doesn't review every single document that was reviewed by the people underneath them.

THE COURT:  Mm-hmm.

MR. HENRETTY:  So --

THE COURT:  Not in this little operation I have here, by the way.  But go ahead.

MR. HENRETTY:  That's -- that's fair, Your Honor.

But, you know, to the extent that we're talking about, you know, who was making recommendations, who was

making -- who was reviewing what as it went up the chain, that's a very different thing than what Ms. Lanier may or may not have looked at in this particular case.

And so I think to say anything beyond, you know, she is the final decision-maker, I don't think they can ask too much beyond that that would be -- that would be privileged.

And for the first time in their response they did say that they believe that even if it is privileged, that they -- that the privilege outweighs the -- or -- excuse me -- that the privilege is outweighed by their need for this information in this case. And that is, again -- and something I've -- you know, I would respond, I would have said that other cases have already -- other judges in this courthouse have said no to that, including the Brown case.

Those are, I would say, the main ones. I don't want to sort of nitpick through this, but I have -- any questions Your Honor has, I'd be happy to talk about or answer.

THE COURT: Did Ms. Lanier communicate with anyone outside of the Cook County State's Attorney's Office about the certificate of innocence in this case?

MR. HENRETTY: No.

THE COURT: Did anyone make a presentation to her, for example? Anybody outside her organization?

MR. HENRETTY: No.

THE COURT: Okay. And she's not made any public

statements about it --

MR. HENRETTY: No.

THE COURT: -- right?

Okay. And I understand from the plaintiff team, you, I assume, are going to want to present evidence of the certificate of innocence at trial. And you said in your filing that you would not seek to present evidence to the jury that the Cook County State's Attorney's Office formally opposed the certificate of innocence and then retracted its opposition, right?

MR. ART: Steve Art for Plaintiff Reyes.

And I can speak for both plaintiffs. That's correct, Your Honor.

THE COURT: Okay. Okay. So the fact that the Cook County State's Attorney's Office formally opposed it but then no longer opposed it won't be tendered by the plaintiff. So I think that affects the relevance of the information. If it's not going to come out that they did a bait-and-switch, why does it matter -- not a bait-and-switch. Maybe flip-flop. I don't mean that in a pejorative sense.

But like, if the fact that they flip-flopped isn't going to come out, why does it matter the reasons for the flip-flop, is a thought that I had.

MR. HENRETTY: I would agree.

THE COURT: I see heads nodding on the right and

heads staying still on the left.

So why don't I hear from the defense team. Go ahead.

MS. ROSEN: Sure, Judge.

So it's our expectation that what's going to happen at trial is going to be very similar to what's happened at trials in this building in other cases. And in fact, recently, just a couple weeks ago, there was another reverse conviction case where the plaintiff in that case had a COI, and Mr. Reyes's counsel argued in rebuttal to the defense closing argument specifically: "Ms. Ekl," who was the defense attorney, "has eloquently and carefully explained to you all the evidence that in 1996 got Adam Gray convicted. That evidence has been vacated. The Cook County State's Attorney's Office decided that the conviction, based on everything she just talked about for the last hour and a half, could not stand because it would be contrary to the interests of justice because science has intervened and we now know the confession is false."

So we fully expect a similar argument to be made to the jury in this case if we get to a jury, that the confessions in this case are false in part because the State's Attorney's Office took the position that they were innocent.

In this particular case, we have sworn testimony from the former first assistant corporation counsel, Eric Sussman, who was -- Sussman.

MR. ENGQUIST: State's attorney.

MS. ROSEN: Oh, sorry, state's attorney. I apologize. First Assistant State's Attorney Eric Sussman, who was involved in the post-conviction proceedings in the case. So after the case came back from the appellate court, there was a new hearing on the motions to suppress. Mr. Sussman was involved.

During that hearing, the judge suppressed the confessions, and then it was up to the State's Attorney's Office whether or not to proceed to trial.

And after some deliberation, they made the decision that they could not, without the confessions, proceed to trial, and so then the convictions were vacated. At that point in time, the petitions for certificate of innocence were filed and they were litigated for years and years and years, as the Court knows.

Mr. Sussman in a deposition in this case testified that the decision not to proceed to trial after the confessions were suppressed had nothing at all to do with innocence and that there wasn't anybody in the Cook County State's Attorney's Office that made that decision based on innocence and that had to do with whether or not they could prove the case beyond a reasonable doubt, which is what their obligation is as prosecutors, and that that was the decision at that time.

Now, fast-forward that, and then the COI is litigated and litigated and litigated. Obviously the pandemic impacted the speed with which things got accomplished. But in large part, evidence that was developed in the civil case here was utilized in the post-conviction proceeding. And the depositions that were taken here were provided to the State's Attorney's Office. The lawyers that are involved and represent Mr. Solache and Mr. Reyes here represented them in COI petitions.

And at one -- at some point in time late last year, I believe -- or early last year, if I have my timeline correct, Mr. Reyes filed a motion for summary judgment on his -- on the petition.

That's the -- the -- the procedural posture of the case that was pending before the judge up until the moment in time that the State's Attorney's Office did this about-face in November of 2022.

Ms. Bowden testified that she was on vacation the week before. She was preparing to make her argument in front of the Court on the Monday or the Tuesday that it was set for hearing, and that she got an e-mail with no explanation whatsoever that she was to go into court and let everybody know that the State's Attorney's Office was withdrawing its opposition.

And she told us at her deposition she never

communicated or made recommendations up the chain of command to do anything and that she was proceeding under her previous marching orders.

So obviously something occurred. And in order for the defendants to rebut what we expect to be the argument that is made over and over and over in this building, that the evidence that was developed at the time of the case can no longer be trusted because the Cook County State's Attorney's Office is now saying they were innocent, has to -- if there's evidence to utilize to rebut that, we have to have that evidence available to us. And right now, it appears that the only person with that information is the current first assistant, Ms. Lanier.

THE COURT: Okay. I appreciate that.

So I want to hear from the plaintiff team again. I'd like -- and I read your submissions on this, but I want to make sure we're all on the same page.

What exactly do the plaintiffs hope to say to the jury about the Cook County State's Attorney's Office with respect to the certificates of innocence?

MR. ART: We expect to present no evidence or argument at all about the Cook County State's Attorney's position on the COI proceedings whatsoever. So that's correct what Ms. Rosen just said.

And I'm sorry, Your Honor. This is Steve Art for

Plaintiff Reyes, but speaking for both plaintiffs.

That's correct in the Gray case that was just tried before Judge Chang. The state's attorney's position was brought in as evidence on the COI and it was argued. What we're saying here is, we don't intend to present that evidence chiefly because we don't know.

THE COURT: Isn't that better for you? That seems like a win for you. I mean, they're not going to say anything about what position the State's -- the Cook County State's Attorney's Office took. In other words, they're not going to say that the Cook County State's Attorney's Office put their thumb on the scale and thinks that these people are innocent. It just won't come in.

MR. ART: And for the record, that's correct, Your Honor.

THE COURT: Okay.

MS. ROSEN: Well -- but the COI is coming in, right? So they're going to waive --

THE COURT: Well, can we talk about that?

Is it? Can I just tell you -- and this may be a little judicial thunderbolt -- I'm not sure. So everybody should start thinking about that. I let it in in Bolden. You all probably know that. It's not a secret. It's out there. I wrote on it. You all have had lots and lots of these cases. I didn't have a lot of these 1983 cases at the SEC or at

Kirkland & Ellis, so I'm still getting up to speed on this. I'm still learning the case law. A lot of judges have allowed them. I'm not sure, candidly. I have some 403 concerns about whether they will get undo weight in front of a jury.

I mean, it looked to me like the judge entertained an awfully short hearing here. It was like three or four pages where it looked like people rolled in and said, "I want a certificate of innocence." No opposition, granted. That's what it looked like here. And if that's what happened, I have questions in my mind about whether hearing about a certificate of innocence would get an inflated sense of importance in front of the jury.

I mean, it looks to me like there was no evidence-gathering by the state court judge or any investigatory body. There was no testimony taken. There was no evidentiary hearing. There was a short hearing that was not opposed and it was granted.

I could be missing something. I don't know what I don't know. But that's what it looks like to me.

And I will say, as a general matter, and I genuinely mean this, I'm keeping an open mind. So don't anybody get concerned or excited. Okay? Don't anybody get concerned or excited. But I thought I should tell you that nobody should bank on any ruling on this one way or the other, because I have some uncomfort -- discomfort on whether it's going to

come in. Maybe it ought to come in. It looks like most judges -- most, it looks like, let it in because it is relevant to whether the case was disposed of in a manner that is indicative of innocence. That's what I did in Bolden. That's what I said in the Bolden case. I wrote on this. I'm sure you've seen it. I had a nice little string cite on this. I remember citing Judge St. Eve and company, so I thought I was in good company with Judge St. Eve and company. But I have had some moments of quiet reflection since then about whether that's the right thing to do. Maybe it is the right thing to do.

But I will tell you, nobody should take it as a given that it's coming in. Okay? So people should be prepared to entertain discussion on that. Because I don't know.

I mean, I think, okay, you've got 12 bodies in the chairs over there. They're going to decide, you know, was this case resolved in a manner that's indicative of innocence. They hear that there's a certificate of innocence issued by a state court judge, that's going to be impactful for your average person. That's going to mean a lot.

Is that actually all that it purports to be from a probative value sense? I mean, if somebody rolled into court and said, look, I want a certificate of innocence, and it wasn't opposed and the -- I don't want to say the judge rolled over, because that sounds bad. What if the judge said, "Okay,

it's not opposed.  There is a basis for it.  I'll grant it"?
I just wonder how much weight a decision like that should be
entitled to.

It's entitled to something.  I respect state judges.
You know, it's certainly not a nothing.  I have questions in
my mind, though, about whether it would have an inflated,
oversized importance in the minds of the jurors.  I'm not
saying it's not important.  I'm saying, I have questions about
whether it would be overstated by the jury.

I don't know if any of this is a surprise to people,
but I wanted to front it because, you know, when you think
about trial, people shouldn't bank on it coming in or not
coming in.  I don't know.  You know, these are hard questions
for me.  Maybe it's easy for you all.  Maybe you see it clear
as day.  I'm not a hundred percent sure, and I've wrestled
with it, you know.

So you've baked in a premise there in your statement.
You kind of launched me into a discussion here about whether
it's going to come in.  It may come in, okay?  I don't know.
It may not.

But the premise of your question was that I was going
to let it in.  So go ahead from there.

MS. ROSEN:  Okay.  So assuming that the COI comes in,
we believe that it does have that kind of weight that you were
just talking about to a jury and that we have to have an

explanation for it.

And if the explanation is that the State's Attorney's Office made this decision based on X, then that -- whatever that reason is --

THE COURT: That premise doesn't seem correct to me. And I'm sorry to interrupt you. But I understood plaintiffs' counsel to say they -- they aren't going to present that. So I assume the evidence would be, they sought a certificate of innocence and it was granted by the judge. And you're not going to -- the state court judge. And you're not going to tell the jury anything about whether it was opposed one way or the other?

MR. ART: Correct.

THE COURT: Okay.

MR. ART: Your Honor, this is Steve Art for Plaintiff Reyes but speaking for both plaintiffs.

That's correct. The thing that could be introduced as the evidence before the state court judge when the state court judge made that decision and the state court judge's reasoning potentially --

THE COURT: Hm-hmm.

MR. ART: -- we don't know why the Cook County State's Attorney --

THE COURT: Hm-hmm.

MR. ART: -- did what it did --

32

THE COURT:  Hm-hmm.

MR. ART:  -- and so we have no evidence to present.

THE COURT:  Yeah.

MR. ART:  So we don't intend to present it, we don't intend to argue it, and we also don't know.

THE COURT:  Okay.  If the jury hears that there was a litigated certificate of innocence presented to a state court, is the jury going to infer that it was opposed?  I just wonder about that.  Because usually things in court are opposed.  That's the presumption.  It's an adversary system by definition.

If they don't hear -- if you don't hear anything about it, whether it was opposed or not, most people probably think things in court are opposed.

MR. ART:  I --

THE COURT:  And so the jury might think, boy, it was opposed and the Court still did it, so, therefore, that's important.  Or if the Court -- if the jury hears it was not opposed, then they're going to think, okay, well, that really is -- has merit.

I mean, it seems like if they hear that a certificate of innocence was issued by a judge, they're either going to think it's really important because it was opposed and the judge decided after going through some process that this was the right outcome, or they went in front of a state court

judge and it wasn't imposed, and the fact that it wasn't imposed really tells you something, there really wasn't -- these guys really must have been innocent.

You know, I'm thinking out loud here, obviously. But go ahead.

MR. ART: I think from our perspective, we don't know the reason.

THE COURT: Yep.

MR. ART: We don't intend to present that reason as --

THE COURT: Right.

MR. ART: -- evidence, we don't intend to argue it, and we don't oppose any of the relief the defendants are seeking in terms of doing discovery about the certificate of innocence --

THE COURT: Yeah, yeah.

MR. ART: -- because we understand the points that they are making --

THE COURT: Yeah.

MR. ART: -- about needing to do that discovery --

THE COURT: Yep.

MR. ART: -- given that we do intend to try to offer this as evidence. And we will address the admissibility of the COI and all of the --

THE COURT: Yeah.

MR. ART: -- points Your Honor just raised at the appropriate point in pretrial, but we understand their need for --

THE COURT: Yeah, let me drill down on that a little bit.

What material was presented to the state court judge when she made the decision?

MR. ART: So --

THE COURT: If you know.

MR. ART: -- I can't tell you off the top of my head exactly what the state court judge had, but sometimes these rulings are on the papers, right? So it's the petition with exhibits, right?

THE COURT: Right.

MR. ART: And the judge makes a decision.

THE COURT: Right.

MR. ART: Sometimes there's a full summary judgment record. And I don't want to misrepresent what was in that summary judgment record because I don't know standing here right now.

But there was fully briefed summary judgment motions. It could have just been on the issue -- we had just had a case before the Illinois Supreme Court in the Palmer case about changing positions --

THE COURT: Mm-hmm.

MR. ART: -- in COI proceedings. And so it might have just been a legal brief at summary judgment on that issue.

And then in some cases, they're full-on hearings, right, with evidence --

THE COURT: Right.

MR. ART: -- presented by witnesses, which there weren't here.

So I don't think that it was just, you know, here's a petition, no opposition, here's your COI. I think there was more of a robust evidentiary record, because the State requires one.

THE COURT: But not an evidentiary hearing?

MR. ART: Correct, Your Honor.

THE COURT: Okay. So there is a written record of some kind --

MR. ART: Correct.

THE COURT: -- and to be determined. I mean, we could figure out what it was.

Do you know off the top of your head?

MS. ROSEN: So it's my understanding, based on just reviewing the pleadings and the transcripts, that Plaintiff -- Plaintiff Reyes filed a motion for summary judgment and attached certain depositions and certain things --

THE COURT: Okay.

MS. ROSEN: -- from the civil case.

THE COURT: Okay.

MS. ROSEN: And that the State filed a response also attaching certain depositions and certain things, mostly from the civil case.

THE COURT: Okay.

MS. ROSEN: And then there may have been a reply. I don't recall. It was set for hearing on the summary judgment for Reyes only because Reyes is the only one that filed summary judgment. And then it's my understanding that there was supposed to be an evidentiary hearing. So this was November 2022, and I thought it was maybe February 2023 for the remain- -- for whatever was left after the Court ruled on summary judgment.

So if Reyes did not win summary judgment at that point, then on the remainder of whatever issues were left for his hearing and then Mr. Solache's hearing because he did not file a summary judgment at all.

So the Court had whatever pleadings had been filed, I suppose. I don't know what else the Court would have had. And certainly the Court had not heard any testimony at that point in time because no hearing had been scheduled.

THE COURT: Okay. Well, not to repeat myself, but I am wondering what, if anything, the jury could hear about whether the application for a certificate of innocence was

opposed. Because it seems like if you don't say anything, the jury is going to think that it was opposed. But if you tell them it wasn't opposed, that gets tricky, too, for the reasons we've just talked about.

Here's an issue I'm struggling with: I don't know what information the defense team could elicit from this deposition that would be nonprivileged and relevant, those two things. That's what I'm struggling with.

Like, what -- what do you expect she could say that would not spill the beans in terms of the basis for the decision and divulge privilege and that would help you -- you know, we're all thinking about how this is going to go at trial, right? So we've got witnesses at trial. We have got closing arguments at trial. How is it actually going to advance the ball at trial? What could she say that you would actually use?

MS. ROSEN: Well, for -- it's the defendants' position, which I think we lay out in our papers, that the information that she reviewed in making her decision is not privileged.

THE COURT: Well, I saw that, but let's say it's -- let's say she testified -- you get her, and she says, "I reviewed nothing," or she says, you know, "I reviewed every last piece of evidence. You know, we withdrew it -- we withdrew our opposition because I read all of the depositions.

I talked to the scientists who did the lab tests. I, you know, talked to the parties themselves. I did a thorough, exhaustive" -- you know, I don't know how that helps you either way. Or somewhere in between. You know, how -- the -- you may or may not be right that it's not privileged what she reviewed. I have questions about that.

But put that aside, I don't know how it advances the ball for you. Ms. Lanier, when she made the decision the office would not oppose the certificate of innocence, looked at X, Y, and Z. How does that help you?

MS. ROSEN: So, for example, Judge, if she were -- if we were permitted to get her deposition and we were permitted to ask questions around the meeting or meetings that were had between Ms. Lanier or Ms. Foxx and plaintiffs' counsel in this case about -- which the topic of Mr. Solache and Mr. Reyes's case is part of the PowerPoint presentation. I mean, Solache's and Reyes' names appear.

Now, we appreciate, based on plaintiffs' filing, that plaintiffs have said that they didn't specifically talk about Solache and Reyes in the meeting in June.

But the purpose of the meeting, right, was to persuade the State's Attorney's Office to change course with respect to how they were handling the Guevara cases generally, and Solache and Reyes were part of that discussion.

And so to the extent -- whatever plaintiffs' pitch

was -- plaintiffs' counsel pitch was --

THE COURT: Well, they were part of the discussion in concept or in particularity?

MS. ROSEN: According to the PowerPoint.

THE COURT: Okay.

MS. ROSEN: I mean, you know, we could depose, I suppose, plaintiffs' counsel, but that would probably --

THE COURT: That's not happening.

MS. ROSEN: Yeah, that's probably going to take us, you know, into a whole different area, but -- so --

THE COURT: That's where things go completely off the rails. You know that litigation has jumped a shark when people have --

MS. ROSEN: Yeah.

THE COURT: -- started talking about -- and I have actually seen that in a former life, where people try to depose opposing counsel. I never like it, but --

MS. ROSEN: We so far have not jumped that shark, but, you know, you never know.

Anyway, base- -- and this is simply based on the pleading, right? Like, so we have -- the only thing we knew about the meeting --

THE COURT: The losing party always wants to depose the opposing lawyer. It's a sign you're losing the case.

Anyway, go ahead.

MS. ROSEN: So with respect to the meeting, to the extent that the pitch was Guevara generally and that Solache and Reyes were part of that discussion and the only thing pending at that point in time was the COI and the State's Attorney's Office had at that point settled out of the case so that its liability was fixed and set in stone with respect to that, did Ms. Lanier know that the case -- the civil case had settled? And did that factor into her decision?

You know, maybe we don't get to ask did that factor into her decision if you say that the basis for her decision is protected, but certainly did she know it.

THE COURT: Can I -- is the jury going to hear that that settlement exists?

MR. ART: No, Your Honor.

THE COURT: I mean, I'm thinking about how this is going to play out in trial. I mean, we can be curious about all kinds of things, but what I care about is what those 12 people are going to hear. And whether she knew about a settlement won't advance the ball at trial unless the jury knows that there was a settlement, and then there are a couple other things. But they're not going to know about the settlement, are they?

All right. So I can't -- right?

MR. ART: Steve Art for Plaintiff Reyes speaking for both plaintiffs.

No.

THE COURT: Right. So --

MR. ART: Settlements never come in.

THE COURT: So --

MS. ROSEN: Okay. So you -- I mean, if you take that piece of --

THE COURT: You're winning little mini victories here.

MS. ROSEN: I --

THE COURT: You're racking them up. You know, I'll give them to you.

Go ahead.

MS. ROSEN: So -- but the point of the matter is, Judge, you know, we have this fact pattern and this timeline here where the State's Attorney's Office had consistently taken the position that Mr. Solache -- that the prosecution of Mr. Solache and Mr. Reyes did not end based on any decision by that office that they were innocent. And then suddenly they're given this COI that obviously impacts dramatically this case if it's to come into evidence at trial and it changes the dynamic.

So from the defendants' perspective, we need to understand what she looked at. I mean, we believe based on our papers that the basis, the -- not the deliberations, right, not the communications leading up to the final

decision. But at some point in time, Ms. Lanier made a decision. And the basis for that decision, we think, is not protected. She is -- if she is the final decision-maker for that office, deliberative process only protects the deliberations. And once the decision is made, the basis for decision is fair game.

THE COURT: What if she were to say, "Well, look, before I made the decision, I got a memo from my staff, and the staff summarized, you know, the testimony of the people, you know, the people involved," would that fact come out at trial and would that advance the ball?

When the Cook County State's Attorney's Office made the decision through Ms. Lanier, she received a memo that summarized the applicable evidence. Would that come in? Does that help? I don't know --

MS. ROSEN: Well, come in or help --

THE COURT: I mean --

MS. ROSEN: -- you know, I'm not sure if that's correct. But if she says, "I made the decision simply because this was a Guevara case, and our office has made the decision that we are no longer fighting Guevara cases," then that's not based on innocence, right? That's just based on a decision made by the Cook County State's Attorney's Office --

THE COURT: You could be able to figure -- you could figure that out independently, couldn't you?

I mean, how many Guevara cases are there?

And I'm just -- couldn't you hypothetically -- and this was a question that I frankly had for the Cook County State's Attorney's Office.

I mean, are they opposing certificates of innocence in these Guevara cases?

MR. HENRETTY:  I don't know the answer to that generally.  I know about --

THE COURT:  Would you rather answer that question or have Ms. Lanier raise her right hand?  You have to pick.

MR. HENRETTY:  No, no.  I'm certainly going to find out --

THE COURT:  That's a --

MR. HENRETTY:  -- the answer to that --

THE COURT:  -- rhetorical question.

MR. HENRETTY:  -- question.  I mean, I could generally find out the answer to that question.

THE COURT:  Yeah.

MR. HENRETTY:  I suspect -- my understanding is they are.

THE COURT:  They are what?

MR. HENRETTY:  We are -- not all of them, but, you know, on a case-by-case basis, they decide to oppose some and not others, is my understanding.

But if I may, Your Honor, we did offer an affidavit

from Ms. Lanier -- or from our office, I think from Ms. Lanier, saying that this decision was not -- no decision was made on innocence in deciding to withdraw the objection, and that was insufficient, which it sounds to me like that's what they're asking --

THE COURT: Say that one more time.

MR. HENRETTY: Sure.

And I'll read it from -- because it was not me who made the proffer. It was somebody else.

They said: "To declare that the withdrawal of the CCSAO's opposition to the COIs did not reflect a final determination that Solache or Reyes were innocent."

And I think all -- the -- I believe everybody agreed to that except for the defendants.

THE COURT: Why doesn't that help you? That seems pretty helpful to you.

MS. ROSEN: Well, Judge, it was -- well, initially -- and I have to go back and look at the proffer because I think originally when the proffer was offered, then plaintiffs' counsel said that if that's the case, then they need to get behind the decision.

So they -- plaintiff was not going to agree to that. And I, quite frankly, have lost the thread on that original proffer --

MR. HENRETTY: And if I misspoke, I apologize.

MS. ROSEN: -- and what is plaintiffs' changed course on that.

MR. ART: Your Honor, I can speak --

THE COURT: Yeah.

MR. ART: -- for -- this is Steve Art for Plaintiff Reyes speaking for both plaintiffs.

There was the idea floated in Rule 37 conversations about a proffer that would be put in place in lieu of a deposition, and I believe Ms. Scheller from the Cook County State's Attorney's Office proposed language similar to what Mr. Henretty has just read in court. And the parties discussed that it could be problematic to have a -- have a proffer or statement from the State's Attorney's Office that favored one party over the other.

So I think what I said during that Rule 37 call is, if it said it's not based on a determination about innocence, we'd certainly need language along the lines of "or guilt." And we'd probably need to know what the basis was so that we don't just have a piece of evidence that says it's not X.

THE COURT: Well, we're talking here not about the meaning of the certificate of innocence but about why the Cook County State's Attorney's Office did what it did.

MR. ART: Right, Your Honor.

THE COURT: So --

MR. ART: I apologize.

THE COURT: Do you want to read the language again that you --

MR. HENRETTY: And if I -- I may have stepped earlier.

Ms. Scheller was the one on the phone, and she is prepping for a Seventh Circuit argument tomorrow, which is why she is not here with me --

THE COURT: Okay.

MR. HENRETTY: -- today.

It was something along the lines of -- my understanding was that it was that the CCSAO had declared that a withdrawal of its opposition to the COIs did not reflect a final determination that Solache or Reyes were innocent or if it was innocent or guilty. I don't -- I thought it was just -- that's what I had thought the proffer was. And maybe -- I didn't mean to suggest that the plaintiffs had agreed to that. I apologize.

THE COURT: Yeah. Well, they wouldn't have withdrawn their opposition because they thought he was guilty, right? I mean, I don't understand the assertion of guilt there in the language. You don't withdraw an opposition to a certificate of innocence because you think somebody was guilty.

MR. ART: I think our more general point, Your Honor --

THE COURT: Yeah.

MR. ART: -- this is Steve Art --

THE COURT: Yeah.

MR. ART: -- speaking for plaintiffs -- is, if there is going to be a statement from the first assistant that says, our reasons for changing our positions -- position in this proceeding were not, whatever the statement is going to say, X, then the statement should say what the reasons were.

I suspect that -- and this is speculation because we do not know. I suspect there is an institutional change in position in Guevara cases because of the pattern of misconduct, right? The defense side doesn't want that evidence in at trial, right? And I don't even know if it could come in.

But the idea that the COI would come in and the defendants would have a statement tailored to their evidence in the case from the first assistant saying it wasn't about innocence and then there's nothing to respond to, no evidence about what the reason was, what the basis for the decision was seems to tip the scales the other way and make it unfair for the plaintiffs. So that's our position on the stipulation that was proposed by the state's attorney.

THE COURT: Okay. Okay. I interrupted. You were saying?

MR. HENRETTY: I think that was the majority of it, Your Honor.

I did want to point out -- and I lost it earlier -- the closing argument in the case from a few weeks ago that was read earlier didn't talk about COIs. That was about the decision not to retry, which has been deposed in this case. I don't think the word "COI" was anywhere in there.

They were talking about the CCSAO decided not to retry these people.

THE COURT: Mm-hmm.

MR. HENRETTY: And that is -- that's already been -- you know, we had Mr. Sussman testify about that already.

THE COURT: So -- you go ahead.

MS. ROSEN: Yeah, no, I think that's a different case that you're talking about.

MR. HENRETTY: That you just read.

MS. ROSEN: From Gray, no.

MR. HENRETTY: That was about COI.

THE COURT: Let's go into the microphone.

MS. ROSEN: Yeah, sure. Sorry.

I'm pretty sure that this argument had to do with the COI.

MR. HENRETTY: What you just read didn't. That's why --

MS. ROSEN: Okay. Well, I -- it was the argument that was made in support of the COI.

THE COURT: Okay. So let's go back to the Cook

49

County State's Attorney's Office position with respect to Guevara cases generally.

I mean, how many cases are there and what positions are they taking in terms of the certificates of innocence?

MR. ART: Steve Art for the plaintiffs, Your Honor.

In the submission that we had submitted a couple -- yesterday, probably --

THE COURT: Yep.

MR. ART: -- on the last page, I believe, I did my best to outline the cases since August 2022. In August 2022, there were seven exonerations -- I believe August 8th or 9th, 2022 -- of folks who had pending post-conviction petitions in Illinois state court who alleged that their wrongful convictions were caused by Reynaldo Guevara.

Following that, I think there have been ten more post-conviction proceedings resulting in convictions being vacated. It's something in that area of 15 to 20.

THE COURT: And I'm wondering, in how many of those cases was the -- did the Cook County State's Attorney's Office withdraw their opposition or never oppose it?

MR. ART: In all --

THE COURT: We're talking about whether it's impactful that they withdrew their opposition here.

MR. ART: In all --

THE COURT: Maybe there is a decision that they're

50

just not going to oppose it in Guevara cases.

MR. ART: I'm sorry, Your Honor.

THE COURT: Yeah, go ahead. I keep interrupting you.

MR. ART: No, no. My understanding is, in all of them, they have made a decision -- in -- sorry. Let me start that again.

In each of the cases, they have made a decision either to withdraw an opposition that was in place or not to oppose. I do not think that they have said in those cases "we are doing this in all cases as a blanket matter."

THE COURT: Okay.

MR. ART: In some of the cases where they have done that, the state court judges have said, I'm still holding an evidentiary hearing to determine in an evidentiary hearing if the due process standard for a vacatur of a conviction has been met.

So those are the post-conviction cases.

On the same page, we talk about the certificates of innocence issued since August 2022. And I think that it is seven --

THE COURT: Okay.

MR. ART: -- have been issued, all without opposition or with withdrawal of opposition.

In each of those certificate of innocence proceedings, the decision has been presented to us as a

decision in the individual case --

THE COURT: Okay.

MR. ART: -- as happening on a case-by-case basis.

THE COURT: How hard is that to figure out? There's got to be a warm body over there that's --

MR. HENRETTY: I think I can figure it out. Mr. Art deals with these specific cases more than I do. I'm just here for this. But --

THE COURT: Yeah.

MR. HENRETTY: -- I can -- I believe that is something that I can get an answer to as far as numbers goes.

If it's something that was a policy decision and change, I do worry we might be right back in the same position.

THE COURT: Yeah, I'm not looking for whether there is a policy. I would -- I'm just curious --

MR. HENRETTY: Yeah.

THE COURT: -- and it may impact my decision generally, I don't know, but --

MR. HENRETTY: Yeah, I can certainly --

THE COURT: -- I'm curious to know how many Guevara cases there are where someone is seeking a certificate of innocence. And of those cases, how many of those cases resulted in the Cook County State's Attorney's Office withdrawing their opposition or not withdrawing -- or not

52

opposing it?

I assume they oppose it until their people are out of the case, and then they probably don't care. I don't know. Maybe not.

MR. ART: In a lot of these cases, there's --

THE COURT: I don't mean that in a pejorative sense.

MR. ART: No, no, no.

THE COURT: I just mean, like, you know, there's no skin in the game, so maybe they don't fight it as hard.

Go ahead.

MR. ART: I don't -- from my perspective don't understand it to be related to civil litigation at all. A lot of these are happening before civil litigation has gotten going.

THE COURT: Okay.

MR. ART: And then a lot of them there are no Cook County State's Attorney defendants in the civil case.

THE COURT: Okay.

MR. HENRETTY: Yeah, and I would push back on that, too, Judge. They actually split those into two different parts of the office for that very reason. So there wouldn't be an ethical consideration of the civil lawyers are worried about what happens with the COI and they're trying to -- so those are totally separate decisions and they do not discuss them.

THE COURT: Okay. Can we go back to the draft affidavit that you had sketched out and paraphrased.

So the concept is, the Cook County State's Attorney's Office was willing to offer a declaration along the lines that they withdrew their opposition here for reasons that didn't have anything to do with the guilt or innocence of the individuals?

MR. HENRETTY: I think the language that Ms. Scheller apparently initially said was "reflect a final determination" --

THE COURT: On the --

MR. HENRETTY: -- on the Solache --

THE COURT: -- innocence or guilt.

MR. HENRETTY: Yeah.

THE COURT: I think -- I mean, I have questions about that, but it's the opposite of innocent.

So, I mean, wouldn't that go a long way towards satisfying people?

Is anybody objecting to that declaration?

So, in other words --

MR. HENRETTY: I mean, I would have to --

THE COURT: We're just talking here.

MR. HENRETTY: Yeah, I --

THE COURT: We're -- we're just -- it's just us talking.

MR. HENRETTY: I think that was what was originally presented by someone with a higher title --

THE COURT: This would be --

MR. HENRETTY: -- than me, so that sounds okay.

THE COURT: -- signed by who?

MR. HENRETTY: That -- I don't know if they had discussed it or not whether it would be somebody -- whether it would be Ms. Lanier or whether it would be somebody who had the authority --

THE COURT: Yeah.

MR. HENRETTY: -- to say that for the office.

THE COURT: So the concept would be some sort of confirmation by way of a declaration that the Cook County State's Attorney's Office did not withdraw its opposition in these two cases for reasons that had to do with the innocence or guilt of these particular people. That's the concept?

MR. HENRETTY: Mm-hmm. Yes, Your Honor.

THE COURT: Okay. Does anybody feel uncomfortable with that concept?

MR. ART: Yes, Your Honor, the plaintiffs do.

This is Steve Art for --

THE COURT: Yeah.

MR. ART: -- Plaintiff Reyes speaking for both plaintiffs.

Having the jury in this civil trial presented with

the facts Solache and Reyes got certificates of innocence, and then, you know -- I'm not sure that we concede that it's relevant at all what the state's attorney's position leading up to the issuance of that certificate by a state court is.

But suppose it comes in and the defendants get to present evidence that says it didn't have to do with this person's innocence, with the affidavit as currently proposed, what we don't have is the reason that they did drop their opposition, and we think that needs to be in there.

If there is going to be an affidavit that says it wasn't for this reason, the affidavit should say it was for -- and explain the reason.

THE COURT: But we're talking about why the Cook County State's Attorney's Office removed their opposition.

Does it matter what the reason was if the reason was something other than guilt or innocence?

Just -- you know, it's either something about guilt or innocence or it's some other reason. And if it's in the "some other reason" bucket, it doesn't really matter what the other reason was, it seems to me. It just wasn't involving guilt or innocence.

MR. ART: I can't answer that question without knowing what the reason is.

THE COURT: Yeah.

MR. ART: The reason could be, I looked at all of the

evidence, and, gosh, you know, it was clear to me that there is no way we were going to win this hearing. Right? I didn't make a determin- --

THE COURT: But that's guilt or innocence.

MR. ART: I mean --

THE COURT: Yeah, I mean, I'm talking about, on the one hand, they removed their opposition because it had something to do with their assessment of guilt or innocence, and then there's a bucket of everything else, every other reason, you know, resources, it's a pain in the neck, who knows what, they don't like something, who knows what.

But does it matter what the reason was for withdrawing their opposition if their reason is something other than guilt or innocence?

MR. ART: Potentially, no. Potentially it's not relevant. Potentially none of the reasoning is relevant. But I don't think I can make arguments about whether or not we need to know the reason without having some idea of what the reason is, right?

I could imagine a situa- -- if the defendants are presenting a story to the jury, you know, the Cook County State's Attorney decided these guys -- you know, didn't make any decision about these guys being innocent, then we have absolutely nothing to say.

THE COURT: All right. I'm going to ask you a loaded

57

question.

MR. ART:  Yeah.

THE COURT:  Imagine two universes.  One universe is, the jury hears about the certificate of innocence, the jury hears that the Cook County State's Attorney's Office initially opposed it, the jury hears that the Cook County State's Attorney later withdrew its opposition, and the jury hears that the reason for withdrawing it had nothing to do with the guilt or innocence of the people.

That's universe one.

Universe two is, the jury hears nothing.

Which universe would you like to reside in?

MR. ART:  Universe one, Your Honor, for both plaintiffs.

I guess what our position on the discovery issue about what evidence is going to be gathered here at this stage of the case --

THE COURT:  Yeah.

MR. ART:  -- before we make arguments about relevance and what's coming in and how it's coming in and how it shall be limited is, we shouldn't be deprived of that information at this stage without having the opportunity to know what the basis is and make arguments or not based on that information.

In other words, it doesn't make a lot of sense to us to gather a reason something didn't happen from a

decision-maker without also gathering as evidence the reason that it did.

THE COURT: Okay. Anything else, anybody?

All right. So the sentencing that I alluded to before is looming. So I'm going to go ahead and give you some thoughts and give you a ruling.

I'm going to go ahead and quash the subpoena. I'm going to grant the motion to quash.

Let me give you some thoughts in no particular order.

We're talking about here about getting discovery from the Cook County State's Attorney's Office. That's a serious thing. They have a job to do. They've got a really important job to do. Discovery is distracting and disruptive and burdensome for anybody, let alone a public agency.

So anytime you're in the territory of getting discovery from a public agency, it's -- it's serious business, let alone a prosecutor's office. I mean, there is a real public interest in having them devoted to their mission. That's not to say there aren't other interests at play. There obviously are. But you start from the standpoint that they've got a pretty important job to do, and distracting them and burdening them is something you don't do lightly. I think everybody would probably agree with that. Sometimes it's important enough, you do it.

I thought here it was important enough to allow you

to do some discovery on it. That's why I authorized it, I green-lighted it to do some discovery. It seems like there was a deposition, obviously. There was some document production.

I appreciate you folks working cooperatively on that.

But the question is simply how much. I do think, in general, federal courts need to tread lightly when invading the province of state prosecutors. So it's not something I do lightly.

This particular would-be deponent is the first assistant. I understand it's the number two person in the Cook County State's Attorney's Office. Sometimes high-ranking people are deposed, but, again, you don't do it lightly.

I have some concern that once a high-ranking person is deposed in one case, it could be a bursting of the damn and everybody is going to want their piece of this person in every other case.

You know, Governor Pritzker cannot be deposed left, right, up, and down. He wouldn't have time to do anything else. But he is named in lots and lots of lawsuits, right? So you've just got to be careful. It's susceptible to abuse. I'm not suggesting that any of you abused anything in this case, so please don't take it that way. But just for other lawyers, it's susceptible to potential abuse and distraction, even for people who are good-intentioned, as I know all of you

are.  It's just going to be burdensome on people who have significant other duties.

I am concerned also about what the deposition would accomplish here.  I'm not convinced that it would elicit nonprivileged information that is relevant and likely admissible.

I think it would be costly and burdensome and distracting to depose this person, and I'm not sure what the payout would be.  I don't envision a lot of scenarios in which I would allow it to come into evidence.

I think all of us are at a disadvantage because we don't know what we don't know.  It's hard to say, you know. But when I think about the scenarios about what she could say, maybe she'd say, "I looked at nothing.  I just did it on a whim."  Or she could say, "I got a memo from my staff, and they summarized the evidence.  And I learned about this, that, and the other" or "I looked at the underlying documents" or "I talked to the victim" or "I just talked to my staff, and we made a policy decision.  In these Guevara cases, once our people are out, we've got to cut bait.  We've got other stuff going on.  We've just got to let them go.  We're not going to oppose it because we don't have the resources.  We're stretched too thin."

I mean, the Cook County State's Attorney's Office has a lot of irons in the fire.  Maybe they decide if they have a

couple of their irons in the fire, they still have their hands full of what is in the fire.

I may not have said that right. You get the metaphor. There are a lot of irons in the fire.

I'm not necessarily convinced that what Ms. Lanier knew and whether she reviewed X, Y, and Z would be relevant. Maybe it would be, but I have my concerns about that. It seems pretty far afield from the issues that I envision happening at trial.

You know, I -- the ultimate issue is whether the state court case was resolved in a way that's indicative of innocence and whether Ms. Lanier reviewed X, Y, or Z before she made her decision to not oppose the certificate of innocence before the state court judge made the decision on the certificate of innocence. It just seems pretty far afield.

So it seems like -- it's not exactly a bird in the hand and two in the bush concept, but you'd be banking a lot of burden disruption cost and expense and distraction for her. You'd incur that cost, and I'm not sure the payout long term would outweigh that. So I'm going to quash it.

I do think, though, you folks should talk about that declaration that I'm potentially amenable to. That's not a ruling. I hesitate to say that because maybe people will get excited and we'll be back here in a couple weeks. And maybe

we will anyway. I don't know. It's at least worth talking about separately. I'm not sure if any of this is going to come in. You ought to talk about my universes, my two universes. I'm not saying that there are -- these are the only two universes. Maybe this is a multiverse where we've got a lot of potential universes. But that's two universes that I have in my head.

One is, the certificate of innocence comes in, it comes in that the Cook County State's Attorney's Office opposed it, it comes in that they dropped it, it comes in that they dropped their opposition for reasons unrelated to the merits, the innocence or guilt of these people. That's one universe.

The other universe is, the jury hears nothing. Maybe there are other options out there. I'm sure there are. You folks can brainstorm. I think people ought to think about that.

You know, I hear what Mr. Art is saying that if the Cook County State's Attorney says that it wasn't about guilt or innocence, he'd want to know what the reason was. I get that from a curiosity perspective. But it seems to me if it's some other reason unrelated to guilt or innocence, it really doesn't matter what the reason was unless you don't believe that the reason really was different from innocence or guilt. In other words, you think it was a phony reason.

I don't know that I would allow discovery to see if the Cook County State's Attorney's Office is offering a phony reason behind its decision, certainly not a decision like -- excuse me -- certainly not a deposition like this one.

You know, all of this goes against the backdrop that the Cook County State's Attorney's Office has never offered any explanation for why it's changed course.

Is that right?

MR. HENRETTY: Correct, Your Honor.

THE COURT: All right. So it's a mystery to all of us, and I think it's going to remain entombed, at least as far as I'm concerned.

So the motion to quash is denied. I'm sorry. The motion to quash is granted. The request to depose her is denied. You know what I mean. Like I said, sometimes I say things backwards, so that was an example.

I do think this discussion was helpful. If there is a discussion about the declaration and you folks butt heads and you think it's really important to come back, you can. Would I compel them to do a declaration or rethink this deposition? Maybe. I hesitate to say this because I don't want to precipitate more discovery fights. But people just ought to talk about how this is going to play out.

You got a sense of me and my thinking. You know, think about how this might play out for you at trial. You

know, you might like what I do and you might be disappointed. You've just got to think about the scenarios, okay? It's the best I can do with what I've got. That's the ruling.

All right. So with that ruling, you folks are -- I'm going from memory here. You're doing expert discovery, right? That's not done? Remind me, is it done?

MR. ART: It's done.

THE COURT: So are people filing for summary judgment?

MR. ENGQUIST: Yes, Your Honor.

THE COURT: We don't have a schedule, right? We don't have a schedule.

MS. ROSEN: And, Judge, we also are going to do *Daubert* motions.

THE COURT: Okay.

MS. ROSEN: I don't know how the Court -- some judges do --

THE COURT: Yep.

MS. ROSEN: -- it differently.

THE COURT: So does anyone -- and you don't have to tell me definitively now if you're still thinking about this, but does anybody expect that a *Daubert* motion would be a necessary step for summary judgment?

In other words, would a summary judgment motion by you depend on whether I grant or deny a *Daubert* motion?

65

MS. ROSEN: With respect to the *Monell* claims, the *Monell* claims are almost entirely dependent on experts. So if we are successful in limiting or barring the experts in support of the *Monell* theories, then that would impact the *Monell*, at least the *Monell* part --

THE COURT: Okay.

MS. ROSEN: -- of the summary judgment.

THE COURT: So here's what I would say: If you are filing for summary judgment and you need a *Daubert* ruling in your favor for that, then you should file them both, obviously.

If there is a *Daubert*-related motion that is not relevant for summary judgment but is relevant for trial, you can file that later. Okay?

What I would like to do, folks, is, have you folks talk together cooperatively. See if you can iron out a schedule. File a joint motion for a proposed schedule.

Does anybody have a back-of-the-envelope sketched-out plan about when you'd like to file for summary judgment?

MR. ENGQUIST: No. No, Your Honor. We certainly have other summary judgment schedules all lined up right now in several case, so I'm -- I don't have it even clear in my head.

THE COURT: Yeah, okay.

MS. ROSEN: Yeah, I would have to check the other

schedules because all of these cases seem to be following sort of very close --

THE COURT: Yeah.

MS. ROSEN: -- to one another.

THE COURT: It's a live fire exercise, I know, and you've got a lot of planes to land.

MS. ROSEN: Yeah.

THE COURT: How about on the plaintiffs' team, are you going to file for summary judgment?

MR. ART: No, Your Honor.

THE COURT: Okay. Why don't you just talk cooperatively. Just -- you know, the cases were filed in 2018. One of my professional goals is to have every case that ends with a teen off my docket one way or the other soon. So the sooner you can file it, the better, without sitting on you. You know, I don't want it to be end of the year, obviously. I mean, I think in the next couple of months, I would think, would be sufficient for you. But I don't know. I don't know the record. I don't know how close you are to being done.

Why don't you do that, file a joint motion. I'll grant it. We'll enter it, and we'll go from there. Is that okay? We'll get you off to the races.

Anything else, anybody?

MR. ART: No from plaintiffs, Your Honor. Thank you.

THE COURT: All right. So I started later than I expected. I kept you here longer than I expected, and I've undoubtedly made Judge Leinenweber hungry. He's wondering what happened to his lunch companion. So you can tell him that you were in front of a long-winded judge, and he will get it. I'll just put it that way. Okay?

MR. LEINENWEBER: Justice takes time.

THE COURT: Justice -- the wheels of justice grind slow, as you've just seen. All right. So I apologize to him for making you late.

Thank you, folks, for coming in. I'm looking forward to your submissions. I always enjoy cases with high-caliber lawyers. So I appreciate everybody, all the work they've done. I'm going to enjoy working on this case. So I'm looking forward to it long term.

Anything else, anybody?

All right. Thanks, everybody.

THE CLERK: All rise.

(Which were all the proceedings heard.)

                              *   *   *   *   *   *

                              CERTIFICATE

     I certify that the foregoing is a correct transcript from

the record of proceedings in the above-entitled matter.


/s/ *Amy Spee*                          *7/1/2023*
_____             _____
Amy Spee, CSR, RPR, CRR                 Date
Official Court Reporter