*DeLeon-Reyes v. Guevara, et al.*
Case No. 18 CV 01028

*Solache v. Guevara, et al.*
Case No. 18 CV 02312

# EXHIBIT 19

Case: 1:16-cv-07024 Document #: 363 Filed: 03/23/25 Page 2 of 150 PageID #:2343

**1**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JERMAINE WALKER,          )
                         )
         Plaintiff,   )
                         )
  vs.               )  No. 16 C 7024
                         )
MICHAEL WHITE, ERIC REYES, )
SEBASTIAN FLATLEY,      )
and CITY OF CHICAGO,    )  Chicago, Illinois
                         )  March 2, 2023
         Defendants.  )  1:30 o'clock p.m.

TRANSCRIPT OF PROCEEDINGS -
Final Pretrial Conference
BEFORE THE HONORABLE MANISH S. SHAH

APPEARANCES:

For the Plaintiff:      THE FAKHOURI FIRM, L.L.C.
                      BY:  MR. ROBERT S. FAKHOURI
                      77 West Wacker Drive, Suite 4500
                      Chicago, Illinois  60601
                      (312) 471-8873

For the Officer       HALE & MONICO, L.L.C.
Defendants:           BY:  MR. BRIAN J. STEFANICH
                           MS. BARRETT E. BOUDREAUX
                           MS. JENNIFER BITOY
                      53 West Jackson Boulevard, Suite 334
                      Chicago, Illinois  60604
                      (312) 870-6908

For Defendant City:    REITER BURNS, L.L.P.
                      BY:  MR. PAUL A. MICHALIK
                      311 South Wacker Drive, Suite 5200
                      Chicago, Illinois  60606
                      (312) 982-0090

COLLEEN M. CONWAY, CSR, RMR, CRR
Official Court Reporter
219 South Dearborn Street, Room 1918
Chicago, Illinois  60604
(312) 435-5594  *colleen_conway@ilnd.uscourts.gov*

Case: 1:16-cv-04762 Document #: 369-15 Filed: 03/28/25 Page 3 of 57 PageID #:23480

(Proceedings heard in open court:)

THE COURT REPORTER:  16 C 7024, Jermaine Walker versus Michael White, et al; final pretrial conference.

THE COURT:  Good afternoon, everyone.  Why don't we start with appearances for the record.

MR. FAKHOURI:  Good afternoon, Your Honor.  Robert Fakhouri on behalf of the plaintiff, Jermaine Walker.

THE COURT:  And Mr. Walker is not attending the conference?

MR. FAKHOURI:  He's available by phone, Judge.

MR. STEFANICH:  Good afternoon.  Brian Stefanich for Defendants Reyes, Flatley, and White.

MS. BOUDREAUX:  Good afternoon, Judge.  Barrett Boudreaux for the same defendants.

MS. BITOY:  Good afternoon, Your Honor.  Jennifer Bitoy on behalf of the same defendants.

MR. MICHALIK:  And Paul Michalik for the City of Chicago.

THE COURT:  Good afternoon.  So a fair amount of material to get through this afternoon.

My agenda is to cover jury selection.  I can give you rulings on all of the motions *in limine*.

I don't think we're going to be in a position to finalize the jury instructions.  I had some questions and thoughts about the jury instructions, and I think we need to

Colleen M. Conway, Official Court Reporter

discuss a little bit the claims and the landscape, the legal landscape. So I don't think we're going to finalize those this afternoon. I hope we can have a useful discussion that will get us pretty close to -- at least get me pretty close to how I think I am going to want to handle those.

What I typically do in this scenario is that I work towards putting together a set of instructions that I will then propose to the parties, and we'll use that as a working set for a jury instruction conference, likely during trial one evening where we have -- we find the time to do that.

With respect to exhibits, similarly I am not going to resolve objections over the contested exhibits this afternoon.

My rulings on the motions *in limine* will affect some of those disputes. And then what I think will make the most sense would be having a bit of a procedure where any exhibit anyone wants to use during the trial needs to be identified and disclosed to the other side at least a day before it's going to be used. And then if there's an objection to that, you can raise that with me either the morning of or the evening before, and I can resolve those objections as we go forward in a way that eliminates a lot of fights in front of the jury.

That has worked for me in the past. And I don't think there are actually a huge number of disputes on this one. So it may be that after the rulings on the motions *in limine*, things will be pretty smooth as far as exhibits. But I am just

Case 1:16-cv-04762 Document #863-4 Filed 03/03/25 Page 5 of 110 PageID #:23482

**4**

telling you right now, I am not in a position to give you rulings on the exhibits.

So before we dive in, the motion to supplement the pretrial order to include a defense request for setoff is granted. Whether the defense will be entitled to a setoff is a different question, but I'll allow the defense to make its desire of record. And it's not surprising or prejudicial to the plaintiff that the defense is noting that potential issue now. So that motion is granted.

The motion to start the trial on Tuesday is granted in part. Here's what I would like to do, if it's okay with all of you, is my plan is to bring the venire down to the courthouse on Monday, have them fill out written questionnaires, and then have them come back on Tuesday, and we'll do -- we'll get started with them in person on Tuesday with jury selection.

But if someone is available on both sides Monday afternoon, I can make the written questionnaires -- the completed questionnaires available to you and we can start looking at them then. We might be able to resolve some obvious "for cause" challenges based on the written questionnaire right then and there. I will discuss with you the kinds of follow-up questions I would ask of those jurors based on the written questionnaires. And that way, when the jurors do come in on Tuesday morning, we'll have had some bit of a head start on the

jury selection process.

One of the problems is I cannot bring a venire into the courthouse on Tuesday because of a conflicting venire that is coming into the building.  So in order for us to get started on Tuesday, I need to bring the venire in on Monday.  But I think, and I hope, that this method would be okay with plaintiff.

MR. FAKHOURI:  That works perfectly fine, Judge.

THE COURT:  Okay.  So -- and, Mr. Fakhouri, will it be you who's here on Monday?

MR. FAKHOURI:  I will be here on Monday, Judge.

THE COURT:  Okay.  Great.  We'll work out the timing of all of that later.

So -- okay.  So let's talk about jury selection, then.  I have prepared a written questionnaire that I would like to use, and we can hand that out.

(Document tendered to counsel.)

THE COURT:  So first, let me talk about the estimate of trial length.  The latest I think I saw in the pretrial order was that the parties thought five days would be enough.

I am tentatively -- or at least I am proposing that I tell the jury seven, just in case.

(Counsel nod.)

THE COURT:  Anyone have an issue with that?

MR. FAKHOURI:  I do not, Judge.  I think that's fair.

MR. STEFANICH:  No issue, Judge.

THE COURT:  Always better if we can come under-budget than we go over-budget.  So I will tell them seven, starting on Tuesday, March 7th.

The way this works is so the venire, the prospective jurors will get this cover letter and a two-page questionnaire and then a list of witnesses or names that may be mentioned during the trial.

In the cover letter, I give them a statement of the case.  And so that's the second paragraph of the cover letter.  I have considered what the parties had submitted in the pretrial order, and I made some adjustments.  The point of this is to give the prospective jurors some sense of what the case is about and possibly some key bits of information so that the prospective jurors, if there is a "for cause" problem, they will know enough to alert me.

So my proposal is to tell them that:  "This is a civil lawsuit.  Plaintiff Jermaine Walker alleges that in 2006, the defendants, Chicago Police Officers Michael White, Eric Reyes, and Sebastian Flatley, fabricated evidence against him to support criminal drug charges.  Mr. Walker was convicted after a trial and sentenced to a term of incarceration.  In 2016, the prosecution moved to vacate Mr. Walker's conviction and he was released from custody.  In this lawsuit, Mr. Walker alleges that the defendants violated his civil rights by

fabricating evidence, causing his unlawful detention, and maliciously prosecuting him. The defendants deny all of plaintiff's allegations. The jury will decide if Mr. Walker has proven his claims and whether to award him an amount of money as compensation."

So I am trying to give them a sense of timing of who's involved; that drugs might be coming up in the trial; the nature of the civil rights claims at issue; and that damages is a concept that might come up as well.

So let me now ask, having spent enough time to give you a chance to actually read it, whether you have any comments or edits, starting with plaintiff.

MR. FAKHOURI: Your Honor, my only comment would be that, you know, in addition -- and I know this has been discussed before the Court on a prior occasion. But with respect to the fact that the City of Chicago will indemnify these officers, I do believe it would be important that the jury would be informed that the City of Chicago is a defendant in this matter, and that should be included because they are a defendant.

THE COURT: I thought there was an unopposed in *limine* --

MR. MICHALIK: There was, Your Honor. It was unopposed. And that's one of the agreed motions *in limine*.

THE COURT: Yes. There was an unopposed motion *in*

8

*limine* to effectively treat the City of Chicago as not a party in this case, so that the jury need not be informed that the City is in.

So here's -- and I'll just tell you, I would have granted that motion, even if it had not been unopposed, unless there is going to be some issue as to punitive damages and the individual officers' financial wherewithal to pay punitive damages. And if we're getting into the officers' inability to pay punitive damages, then that may very well lead me to say: Well, the jury ought to then know that the City is indemnifying on compensatory damages.

Usually how that plays out is that the officers aren't making a financial poverty issue as to punitives, and so indemnification becomes not an issue.

And my view is that indemnification generally is not a fact, a relevant fact for the jury in assessing the amount of damages caused by the conduct. So --

MR. FAKHOURI: That would be my only criticism, Judge. So that's fine.

THE COURT: Very good.

Any edits or revisions from the defendants?

MR. STEFANICH: Yes, Judge, one small suggested edit. Where you describe the claims, so the sentence that starts, "In this lawsuit," I think we would propose, "In this lawsuit, Mr. Walker alleges that the defendants violated his civil rights by

Case 1:19-cv-04780 Document #85944 Filed 03/03/23 Page 10 of 110 PageID #6254387

fabricating drug evidence" as opposed to just "fabricating evidence."

THE COURT:  So I purposefully didn't do that because I am not exactly sure what we are going to be talking about --

MR. STEFANICH:  Okay.

THE COURT:  -- in terms of the fabrication of evidence.  And, again, this is just the cover letter before anything has started.  So I appreciate that point, but I will leave it as is.

Any other suggestions?

MR. STEFANICH:  No, Judge.

THE COURT:  Then I, in the cover letter, let the prospective jurors know what our estimate of trial length is, and then I ask them to fill out the questionnaire.  And then I give them a warning not to do any research or talk about the case, because we'll be letting them go and then they'll be coming back.  So I try to enforce that.

Then on the questionnaire, you will see that I ask the basic biographical questions that I am sure you're all familiar with, including education, occupation, spouse's occupation, other adults in the household, hobbies, interests, sources of information, organizations, prior jury service, involvement in lawsuits or criminal cases, connections to government agencies.  Then with respect to this case, specifically Chicago Police Department, Cook County State's

Case 1:18-cv-04762-DDD Document #: 384 Filed: 02/28/25 Page 11 of 110 PageID #:28438

10

Attorney's Office, legal training.  And then some catchall questions about the ability to be fair to both sides.

I will -- what happens is when jurors answer these questions, if there is an answer -- so, for example, "Have you ever served on a jury," and they just answer "Yes," my plan is to just ask follow-up questions, "Well, what kind of jury was it?  Don't tell me the verdict, but did you reach a verdict?"  And if they express any views that require follow-ups, I'll do that in person.

I did consider the voir dire questions that both sides had proposed, and to the extent I am not asking them, that's because I am satisfied that the questions I am covering are enough and adequate to identify any "for cause" problems, as well as giving you enough information such that you could exercise peremptories.

My main concern is finding any "for cause" problems in the jury.  I am less concerned about giving you fodder for peremptories.  But I'll give you enough to exercise your peremptories.

So we will get the written questionnaires.  We'll have an opportunity to look at those before the jurors come back, if everyone's available.

You are not allowed -- if you get early access to the questionnaires, you are not allowed to do any research on any of the jurors.  I like to preserve as much the ability or the

premise that we're all doing it at the same time, all in the courtroom, and nobody has access to hours and hours of free time to research jurors.  So we're not -- I am forbidding you from conducting any research on the jurors.

We'll review the written questionnaires, and once we see them, I'll talk to you about what follow-ups I think are appropriate for any one juror based on their answers.  And I'll solicit from you any follow-ups you think should be asked based on the answers in a questionnaire.  And if someone has written something that suggests a "for cause" challenge right then and there, we can address it based on the questionnaires themselves.

I am ordering 32 jurors to come in.  I will seat eight jurors for the trial.  That gives us a fair number of extra jurors.  We need to have 14 jurors after "for cause" challenges for each side to exercise three peremptories and then have eight left over.  So I think 32 is probably going to be more than enough, my hope is.  And you will know who's at the front of the line and who's at the back of the line.

So once all the jurors are here, I will do all of the questioning.  I will individually ask each juror to stand and, using a microphone, I'll review with them the answers in their written questionnaire.  I'll ask them follow-up questions.

We'll do that for the first 14.  After we have gone over the questionnaires with the first 14, I will ask the group

a few follow-up questions, asking for a show of hands if they have any issues. And those questions are usually just to impress upon them the need to make a decision based on the evidence in the courtroom, not based on outside sources; find out whether anyone has any sort of philosophical or religious or moral reason why they can't sit as a juror, and those kinds of questions. And if I get a show of hands, I'll ask follow-ups of those individual jurors.

After we do all of that for the first 14 jurors, we'll go to sidebar and I'll ask the lawyers: Based on those first 14, are there follow-up questions you'd like me to ask of anyone of those first 14? And if I think that's a good question to ask, I'll ask the follow-ups.

Once we're done with all follow-ups as to the first 14, I'll then ask you at sidebar: Do you have any "for cause" challenges to that group of 14? And I'll resolve any "for cause" challenges. If there are no "for cause" challenges, we will then have questioned enough jurors for you to exercise your peremptories and we'll go to peremptory challenges.

If there have been successful "for cause" challenges or agreed disqualifications for hardship and the like, I'll continue, repeat the process with the next batch of jurors. I might not do another 14, depending on how many jurors I think we need.

I won't tell anyone that they have been excused.

I'll just keep going through the process.

And, again, I'll ask -- I'll review the questionnaires with each individual juror.  I'll ask follow-up questions.  I'll ask some additional questions, asking for a show of hands.  I'll ask follow-ups from there.  We'll go to sidebar and I'll ask you if you have any follow-ups of the next batch.  We'll repeat.  We'll do "for cause" challenges and so on until we all know that we have 14 jurors on our list after "for cause" challenges.

Sidebar.  Have you conducted trials in our building now post-pandemic?  And are you familiar with our sidebar mechanisms?

(Counsel nod.)

THE COURT:  Some of you are; some of you aren't.

We don't move anywhere for sidebars.  We put on headsets that are at counsel table.  We turn on a white noise machine so no one can hear; but if you speak into the microphone and are listening on the headsets, you can hear what's being said.  And so we just do the sidebars that way, and that's what I mean by sidebar.

Usually, I can have a civil jury before lunch, and hopefully we'll be able to do that this time around as well.

Depending on how early it is that we've resolved all the "for cause" challenges, I may give you a 15-minute break or a 20-minute break to do your peremptories.  Or if we're really

at the lunch hour, we'll break for lunch and I'll bring everyone back, and we'll resolve the peremptories.

Each side will have three peremptory challenges. Defense will share the three, and the plaintiff has three. There are no alternates in a civil trial. The first eight jurors on the list that survive that process will be the jury.

I've done all of that talking to give you some time to look at the questionnaire and let me know if you have any issues with the questionnaire. I'll start with plaintiff.

MR. FAKHOURI: No objection to anything on the questionnaire, Judge.

THE COURT: Can we take a moment to look at the list of names?

MR. MICHALIK: Judge, if I may? Is there an extra copy that I could look at?

THE COURT: Do we have an extra copy?

(Law clerk nods, tenders document to counsel.)

THE COURT: Where there were entities associated with individuals, I put the entity next to that individual.

I understand that some of these individuals are not current employees of some of these entities, but I think that's how they're going to be identified in the case. I don't feel strongly about it, but I would like to at least confirm that I've got the right names, I've got the right spelling, I've got the right entities.

There was one individual, I think it was Officer Nicpan, I wasn't sure in the materials if I even had a first name. But we gleaned that his first name might be Dennis, and so we put "Dennis" in there.

On behalf of plaintiff, are there any names that you think are missing from this list?

MR. FAKHOURI: No, Judge.

THE COURT: And so, defense, any comments or concerns about the questionnaire? And then any issues with the list of names?

MR. STEFANICH: No objection on the questionnaire, Judge. And there is no names on the list that you forgot, so --

THE COURT: And do I have the spelling right, as far as everyone knows?

MR. FAKHOURI: You know, I just wanted to check Gamele Folston, Judge. I thought it was with an E at the end, but I just want to double-check here.

(Pause.)

MR. FAKHOURI: That's correct, Judge.

THE COURT: Any spelling or typo issues from the defense?

MR. STEFANICH: No, Judge.

THE COURT: Okay. So we've then finalized the questionnaire.

Any questions about jury selection?  Plaintiff?

MR. FAKHOURI:  Nothing from plaintiff, Your Honor.

MR. STEFANICH:  No, Judge.

THE COURT:  So let's turn to motions *in limine*.

I am going to jump around on motions *in limine*.  I have tried to -- at least I just organize my thoughts in a certain way, and so -- but please keep track and make sure I haven't forgotten something.

Let me start with the unopposed motions *in limine*.

Plaintiff's motion *in limine* No. 2 was -- there was no opposition to 2, so that was granted.  That was about other lawsuits.

Plaintiff's motion *in limine* 13, to exclude commendations, is granted without objection; based on defendants' motion *in limine* No. 13, to which there was no objection, so that's granted, about prior acts of the defendant officers.

Defendants' 12 about plaintiff's counsel's conviction.  That there was no objection to, so that's granted.

Defendants' 14 about the COPA investigation.  There was no objection to that, so that's granted.

And defendants' 18 about the sentence, the 22-year sentence, there was no objection to that, and so that's granted.

I think that covers all of the unopposed -- now

unopposed motions *in limine*.  Have I missed any?

MR. STEFANICH:  I don't believe you missed any, Judge.

THE COURT:  Mr. Fakhouri, have I missed any?

MR. FAKHOURI:  No, Judge.

THE COURT:  Okay.  So those are the unopposed ones.

So that leads me, then, to plaintiff's No. 1 and defendants' 17 about plaintiff's prior arrests and convictions.

In light of the agreement or a lack of opposition to defendants' 18 about the sentence, do I understand correctly that the sentence is not going to be offered by either side?

MR. FAKHOURI:  That's right, Judge.  The sentence.

THE COURT:  Okay.  So on plaintiff's motion *in limine* No. 1 and defendants' motion *in limine* No. 17, those are granted in part, denied in part.

As to the armed robbery conviction, I am excluding the armed robbery conviction.

Plaintiff's opinion about the wrongfulness of his conviction, in my view, isn't actually relevant.  And so his opinion about whether it was wrongful that he was convicted in the case at issue here or wrongful that he was convicted in the armed robbery case is not relevant.

And while it might be relevant to his concept of damages and his feeling of having been subjected to a wrongful conviction, my view is that the fact of an armed robbery

conviction is unfairly prejudicial.  It raises a specter of a propensity inference that I don't think could be adequately cured by a limiting instruction.

And to the extent that Mr. Walker pled guilty to a crime he says he didn't commit, there may be an impeachment of him for making a false statement under oath.  If he, under oath, admitted to a crime that he says he didn't do, there may be impeachment for saying something under oath that isn't true, but that need not elicit the nature of the crime or the sentence that he received for that.  And I am not so sure the defendants are going to even try that kind of impeachment.

Mr. Walker's prior experience in prison, which might be elicited if I allowed the armed robbery conviction to come in, may be relevant to damages in the sense of evaluating the harm he suffered from his experiences in prison for the sentence at issue, but that point could be made without, again, getting into the conduct that led him into prison on an earlier occasion.

So the fact of a prior armed robbery conviction is -- I am excluding that under Rule 403.

The forgery conviction will be allowed.  It goes to honesty.

Mr. Walker's credibility is a central issue in this case, so the value of impeachment is high.  And it's not substantially outweighed by unfair prejudice.  It's not a

particularly, in my view, prejudicial or inflammatory crime that would inflame the passions of the jury. And here, I do think a limiting instruction that the conviction can only be used to evaluate his credibility will eliminate the risk of any improper consideration by the jury.

The retail theft conviction will not be allowed. I am not given any more information other than it was retail theft over $150, and I am not persuaded that that is significant enough of value to make this a crime of dishonesty.

And even if there is some sufficient way to think that that was a kind of dishonest crime, when balanced against the prejudicial effect of a felony conviction that is that old, I nevertheless conclude that under Rule 403, it should be kept out.

So the retail theft I will not allow. I have some questions about the Tennessee marijuana conduct and convictions.

The information I have, or at least from the briefs, it's these are misdemeanor possession cases. They're not distribution cases. So to the extent the defense is saying they impeach Mr. Walker's statement that he's never been involved in a drug deal before, I am not so sure they do if they're just possession cases, unless you're saying: By saying he was never involved in a drug deal, he's saying he never purchased drugs, and these misdemeanor convictions somehow bear

on that.

So I guess I am asking, what --

MR. FAKHOURI: They were --

THE COURT: Is there anything more to know about these Tennessee misdemeanors?

MR. FAKHOURI: Judge, they are just possession charges. They are not a distribution charge.

THE COURT: And the timing of them with respect to the defense argument that at least the 2005 one might be relevant to rebut a claim by Mr. Walker that his life was on the straight-and-narrow at the time of these events, do you have a response on that?

MR. FAKHOURI: Yeah. Frankly, all of Mr. Walker's convictions, Judge, are well over ten years, ten years, including the distribution of the marijuana.

And, again, being in possession of marijuana does not rebut the claim that he was delivering with -- you know, had the intent to deliver within a thousand feet of a school, which is the subject of this case.

THE COURT: Well, what about the argument that -- with respect to his damages? That he was going to be otherwise living a full and productive life that would have generated X amount of income, or the prospects of a life that could be evaluated by X amount of dollars? And the defense, I think, wants to make the point: Well, it doesn't look like he was on

that track because he had this misdemeanor conviction in 2005, right close in time to the events here.

MR. FAKHOURI:  Your Honor, the misdemeanor -- the misdemeanor conviction, Judge, has no bearing on, you know, his abilities, when the plaintiff has admitted in his discovery deposition that he was smoking a blunt at the time of his arrest.

So the, you know, probative value of getting into a misdemeanor conviction is slim, if at all, but the prejudicial effect to the jury of this individual having a conviction in the year before with possession of marijuana is highly prejudicial to the plaintiff.

THE COURT:  Have I misunderstood the defense point as to what you want to do with these misdemeanor convictions?  Or can you tell me more about why you want to do what you want to do?

MS. BOUDREAUX:  Sure, Judge.

First, looking at this, the document by which we gathered the information from, I am not so sure that they are only possession charges.  It says "CS," which I believe means "controlled substance," and then it says "Poss" and then, slash, "Exchange."  So I was not necessarily under the assumption that these were just possession charges.

I think they're relevant for two reasons; the main one being what Your Honor just said, that his whole argument is

going to be that he is on the straight-and-narrow; he's this college student at Fisk University; he has no reason to engage in this type of behavior. And I think that this impeaches him, that he's not on the straight -- and not only is he using drugs, he's getting caught using drugs by the police. I think that's relevant to his credibility.

And I also think -- you know, I know this is slightly jumping ahead. But even without the 22-year sentence, ten years seems like a significant amount of time for this crime, and I think that the defense needs to be able to say in, at least, a generalized fashion that his prior criminal history was taken into account by the judge that sentenced him.

THE COURT: All right. That is jumping ahead, but --

MS. BOUDREAUX: Yeah.

THE COURT: So on the misdemeanor convictions, I am keeping them out under Rule 403 based on a concern that the facts of conviction are more prejudicial than probative, particularly because they are for what apparently are misdemeanors, so minor offenses, which ordinarily don't bear on credibility for convictions. And I am not convinced that just by the statutory language that might be in the charging document that we know enough to say it is impeaching of any testimony he may offer that he's never been involved in a drug deal.

I will be open to reconsidering, in part, based on

how Mr. Walker testifies. And if there is something he says that the defense can put a finer point on why it does make sense to confront him with the fact that he, at a minimum, possessed marijuana in 2005, I'll hear you out on that.

But I think the point about the trajectory of his life likely can be made without reference to misdemeanor convictions and his interaction with the criminal legal system in that way, particularly if there will, as I have -- I mean, the forgery conviction is only allowed for credibility. It can't be used to make that same argument. But there may very well be other ways to point out that the prediction of his own future may not be all that accurate based on other facts in the case, which then makes this effort less probative on that front.

And I continue to have concerns about the use of misdemeanor convictions that could be unfairly prejudicial to the plaintiff.

So I am going to keep the Tennessee misdemeanors out, but if something happens during plaintiff's direct testimony, and you want a sidebar on that, I'll hear you out on it.

MS. BOUDREAUX: Okay.

THE COURT: Then there are a group of motions *in limine* that I am putting in the bucket of the events that happened during the arrest.

So plaintiff's motion *in limine* No. 3 about his own

marijuana use, the motion is denied.

That evidence of his marijuana use limited to the day of the arrest corroborates his access to marijuana. It's also relevant to his perception of events at the time. It's not unfairly prejudicial. Might not even be a crime under Illinois law now. So I don't think it's unfairly prejudicial.

And the same is true for Russell Walker's use of marijuana on the day of the arrest.

So plaintiff's motion *in limine* No. 8 is also denied.

The claims on trial are not false arrest or even excessive force during the arrest, but the events that occurred are all relevant to assessing the credibility of the different witnesses who are going to be talking about what happened, especially those witnesses who are going to testify on the question of whether evidence was fabricated or not, and the question of whether there was probable cause to support certain charges.

So, as a result, my view is that what happened in that alley and surrounding events is relevant to the claims, and particularly to the credibility of the various witnesses at issue, which leads me to conclude that Mr. Brown 's observations are relevant, as is his mental health history, to the extent it bears on his ability to perceive and relate the events.

So plaintiff's motion *in limine* No. 4, defendants'

Case 1:19-cv-00762 Document #863 Filed 03/28/25 Page 26 of 57 PageID #23493

motion *in limine* 6, and plaintiff's 5 are all denied.

Plaintiff's 7 about the marijuana in the car is also denied for the same reason. It's about the events that were going on at the time. It may tend to show the presence of marijuana in other locations, which is a relevant fact in this case. So plaintiff's 7 is denied.

Plaintiff made a point about whether his guilt for offenses is being attempted to be proven; and if so, then that should be proven beyond a reasonable doubt.

I don't agree with that. Mr. Walker's commission of other offenses need not be shown beyond a reasonable doubt in this civil trial. They're being offered on the ordinary civil questions of liability and damages. Whether the evidence proves by a preponderance of the evidence that defendants planted or fabricated the drugs can be evaluated by a preponderance of the evidence on whether Mr. Walker actually possessed the drugs, for example.

The BB gun, plaintiff's motion 6. As I understand it, the BB gun is not alleged to have been fabricated, but its recovery is, in my view, relevant to the circumstances of the arrest, which, in turn, will help the jury understand what happened and whether the defendants' testimony about what happened is credible.

So I am denying plaintiff's motion No. 6 about the BB gun. But it does -- it did lead me to start thinking about a

question about the Fourth Amendment claim in the case, and maybe about malicious prosecution as well.

Is the plaintiff's legal theory on the Fourth Amendment claim, that the Fourth Amendment claim started upon arrest, upon criminal complaint?  Or is your theory that the Fourth Amendment claim starts after the indictment with the drug charges?

MR. FAKHOURI:  No, Judge.  Our position would be that it started at the time of the stop at the -- in the alleyway.

THE COURT:  Then that further, I think, supports the relevance of the BB gun and its recovery during the arrest.

And this is one of the reasons why I am not exactly sure what the jury instructions are going to look like, because I think we're going to have a conversation about probable cause and probable cause for what at what period of time as a result of what legal process, and what's the causation connection between the defendants' conduct and the different moments when legal process is occurring, causing the plaintiff's detention.

I think that's going to be a conversation for another day.  But at least with respect to plaintiff's motion *in limine* No. 6 about the BB gun, the current theory of the case supports the relevance and the admission of the BB gun.

The next set of motions I am categorizing is the "camera in the alley" motions.

Defendants' No. 7, to bar the Google image, is denied

subject to a foundation being laid for an image having some relevance to 2006 and the condition of the scene back then.

But that can come from different sources. It could come from Mr. Walker himself who could look at a picture and say, "That does fairly and accurately depict the scene of the alley as I remember it in 2006." It perhaps could come from somebody who says they, using Google, did it on a certain time at a certain date, and there's a foundation to think that this is what the image looked like around 2006 or around a particular time.

But I am not just going to admit the Google image. I will need to hear some foundation for it. But subject to that foundation, it could be admitted.

The presence of cameras in the alley is, in my view, only really minimally relevant to the claims on trial. The only argument from the plaintiff, again, as I understand it, is that the evidence of the cameras' presence undermines the officers' credibility when they say there were no cameras or they didn't notice any cameras.

As I said earlier, with respect to Mr. Walker, credibility is important in this case, so I do conclude that either side impeaching their adversary's credibility is important, it's relevant.

But under Rule 403, I am concerned that the cameras become a bit of a mini trial or a sideshow and not a good use

of time. It may be a fairly-simply-done exercise of establishing through proper witnesses that there were cameras, such that when the officers say there weren't, the jury has something to say: Well, that's not true. The officers are wrong or mistaken or lying about that.

So I will allow evidence of the cameras in the alley to be introduced, but I will just caution plaintiff from belaboring that point because it's -- this is no longer the case against Mr. Finnelly, and that theory of the wrongfulness of the conviction here is not what this jury is going to decide.

So with respect to defendants' motion 20, which was to bar the evidence entirely, that's denied. But I'll keep an eye on how it's coming in and whether it's a good use of time.

With respect to defendants' motion 11 as to Ms. Johnson's testimony that officers were asking about cameras, that is granted in part.

Ms. Johnson, as I understand it, doesn't identify which officer was asking the question, so her testimony doesn't directly contradict the testifying officers about their perception of events. Testifying that, at some point in the past, out of court, she told someone that there were cameras offered to prove the truth that there were cameras there would be hearsay. Even though it's her own statement, that's hearsay. It's an out-of-court statement by Ms. Johnson, so

that's not admissible.

The fact that officers were asking questions about cameras, again, that's not hearsay. Those are questions. But, as I just said, we don't know who the -- what that officer -- who that officer was, so I find that not probative of the officers at issue, their credibility.

She could testify, however, that there were, in fact, cameras in the alley in 2006. She was a percipient witness at the time. She has knowledge. She could testify that there were cameras there. But she can't testify about what she told unknown officers. And absent some stronger tie that the officers asking her the question were, in fact, Reyes and Flatley, the fact that officers ask questions is too weakly probative of their credibility to be relevant and a good use of everybody's time. And so in that sense, it's a 403 issue I am having with testimony about officers asking questions about cameras.

I see, Mr. Fakhouri, you want to be heard on this, so go ahead.

MR. FAKHOURI: I do, Judge.

With respect to the timing, which Ms. Johnson states that officers came and asked about the cameras, it was during the 2006 period. Why are officers going into that alleyway to ask about the existence of the cameras but for them being the officers involved in this litigation?

It is circumstantial proof that the officers involved in this case were aware that cameras existed, and that is something that the plaintiff should have the right to show.

Now, I understand Defendant Reyes and Flatley were not specifically identified, but, Judge, we're dealing with three officers in a circumstance, in a situation where since the arrest that my client underwent on February 21st, 2006, stated that there was a camera.

You know, the -- while I understand that this litigation is not with respect to the camera, and the fabrication is as it relates to drug evidence, but that calls into question these officers' credibility, if they were, in fact, ones that went out there and asked the employee of Joann Johnson what the -- you know, the existence of this camera and, you know, potentially if this camera was capable of recording at that time.

THE COURT: The problem being if it were those officers, and I am not satisfied that there's enough there to make that tie. There were other officers involved in the arrest and in the investigation. It could have been them. There's no showing that what they learned was communicated back to Reyes and Flatley.

So I am just not satisfied that there's enough there to warrant the inquiry. So that's my ruling on defendants' motion *in limine* 11.

The next set of motions *in limine* that I'll talk about are the statements to defense attorneys by Russell Walker. So this is plaintiff's 9, plaintiff's 10, and plaintiff's 11.

Those -- all three are denied. Those motions are denied based on defendants' explanation that they're only offering evidence of Russell Walker's prior inconsistent statements to the attorneys as impeachment of Russell Walker.

And if Russell Walker is confronted with the inconsistent statement and denies making the inconsistent statement, proving it up by extrinsic evidence would be allowed under Rule 613. But it's not allowed substantively and only for impeachment of Russell Walker. So the defense would not be able to argue that those statements were true; just that Russell Walker is not telling the truth today based on that inconsistency.

So you have to be careful about how you argue it. But these are just prior inconsistent statements of Russell Walker. And as long as the defense tracks the proper method of impeachment with a prior inconsistent statement, this evidence could be admitted.

Next is the recorded telephone call between Russell Walker and Plaintiff Walker, which is plaintiff's motion *in limine* 12 and defendants' motion *in limine* 5.

Russell Walker's statements are hearsay. Adopting

Russell Walker's admission that, "I have done my time," is -- I guess my view is Mr. Russell Walker's statement, "I have done my time," and Plaintiff Walker's failure to say anything in response contradicting that is not an admission by Jermaine Walker that Jermaine Walker did anything.

This is a different kind of statement than the ones at issue in the *Ward* and *Woods* cases cited by the defense, where the statements were more directly incriminating of the silent party to the conversation.

Here, it's quite a stretch, I think, to read, "I did my time, and I threw everything out the window," as -- from Russell Walker as meaning that Plaintiff Walker was complicit in the events. To the extent that is an inference, my view is that's so weakly probative of that point that the risk of confusion and blurring the lines between Russell Walker and Plaintiff Walker's conduct would substantially outweigh the probative value. And so I exclude it under both hearsay and Rule 403.

As part of my Rule 403 concerns, my concern is admitting part of a recording here would likely invite other parts of the recording to come in for completeness or added context, and that would spin this relatively minor point, in my view, into a collateral and tangential issue that's not a good use of time.

So plaintiff's motion *in limine* 12 is granted and

defendants' motion *in limine* 5 is denied.

Again, Russell Walker could be impeached by a prior inconsistent statement if he denies committing the offense; but on a prior occasion has admitted to committing the offense, he might be confronted with an inconsistent statement. As a result, again, only for his credibility, not for the truth of the matter asserted. But that could be -- that would be a separate issue.

Defendants' motion *in limine* No. 8 as to Ms. Stack's employment at Hale & Monico, that's denied.

Her employment could be relevant to bias. Bias is always a relevant consideration. So that's denied.

There's a separate issue about favorable termination, and the defense offered to stipulate to that. We'll talk about that in a moment.

Defendants' motion *in limine* No. 9, to bar testimony about Mr. Walker's witnessing of a prison killing, is denied. My view is it's not unfairly prejudicial to these defendants, and it is relevant to damages.

The jury will easily understand, I think, that these defendants were not present or involved in that activity. And I don't -- I just don't agree that there's a risk of unfair propensity or 404(b) inferences drawn against the officers. And it does go to Mr. Walker's experience while incarcerated, which is a relevant consideration for damages.

So defendants' 9 is denied.

Defendants' 10 with respect to Krista Walker, that's granted in part, without objection, as to her opinion about Mr. Walker being a victim of sexual assault.

And as to Mr. Walker telling Ms. Walker that the drugs were planted, that motion is also granted. That's hearsay. It's not a present-sense impression in June or later for Mr. Walker to be narrating what he says happened to him. So that would be hearsay.

Ms. Walker could testify by describing his demeanor at the time without getting into the content of his statements.

So, again, his emotional state is a relevant consideration, especially as it bears on damages, but without eliciting the content of the statements, she can talk about how she talked to him in June of 2006, and he was very upset, very worked-up about what he was experiencing, those kinds of things. But a statement about what he says happened offered for the truth would be hearsay.

So defendants' 10 is granted.

Defendants' --

MR. FAKHOURI: Your Honor, may I be heard on defense No. 10?

THE COURT: Sure.

MR. FAKHOURI: Just for clarification purposes?

THE COURT: Go ahead.

MR. FAKHOURI: If there is an explanation by Krista Walker as it relates to her conduct following that conversation, any effect on the listener is not going to be prevented from the plaintiffs getting into that subject matter.

THE COURT: He wouldn't necessarily need to elicit the content of the statement either. "I had a conversation with Mr. Walker, and then I did X," doesn't elicit the content of the conversation with Mr. Walker.

MR. FAKHOURI: Well, with -- I understand, Judge. But the fact that she took steps to investigate the scene -- it was -- you know, we're not offering it for the truth, but it would be the effect on the listener; that she went out there, she took photographs, she did certain things and got involved with certain individuals in order to, you know, assist her brother while he was incarcerated.

And I think that's an important point, although we're not offering it for its truth.

THE COURT: I am not sure why that's relevant.

Why is Ms. Walker taking steps relevant to whether these defendants fabricated evidence or lacked probable cause for his detention?

MR. FAKHOURI: Well, as it relates to the fabrication of evidence, of the drugs, Judge. She went out to see, you know, the scene of the alleyway. She took certain steps to, you know, make sure any allegations that were brought against

her brother were, in fact, true.

THE COURT: She could also do that without saying, "I did that at the prompting of my brother."

Again, there's ways -- if that is relevant, there's ways to elicit that testimony without eliciting the content of a communication for the truth from Mr. Walker. So my ruling remains the same.

Defendants' 15 about the "code of silence" is granted.

As briefed, it was fairly perfunctory. So I can see how things play out at trial and I might revisit this. But, ultimately, I am not seeing a connection between a code of silence -- which itself, I don't think, has a settled, agreed-upon definition as to what that even means. But I am not seeing a connection between a code of silence and these officers' fabrication of evidence.

That doesn't mean that loyalty among officers isn't a potential source of bias that bears on officer credibility, but that can be inquired of without invoking the term "code of silence."

So, as currently briefed, I am not seeing really any relevance to the "code of silence," and I will not permit argument that it's because of a code of silence that these officers fabricated evidence. So defendants' 15 is granted.

Defendants' 16 as to racial motivation. Again,

similarly, it's a little perfunctory as briefed.  It seems -- I am not seeing evidence of racial motivation being offered by the plaintiff.

If racial motivation were the subject of some evidence, which perhaps could be relevant to a claim for punitive damages, then there may be appropriate argument to be had.  But, as I am seeing it, I am not seeing an evidentiary foundation to make an argument that there was racial motivation to the conduct.  So defendants' 16 is granted.

That then leaves the almost final set, which is the certificate of innocence and the issues around the certificate of innocence.

Starting with defendants' motion *in limine* No. 1 as to Judge Haberkorn's comments.

The judge's comments seem to be about the camera and the camera issue, which isn't, as we've talked about already, all that relevant to the claimed fabrication of evidence against these defendants.

As I've already said, the presence of the cameras is relevant to the credibility of the officers, Reyes and Flatley, but the judge's comments offered for the -- if offered for the truth that some unidentified people did not tell the truth, and if offered for the truth of the judge's statements that this was outrageous, that would be hearsay.  And the judge's sickening feeling about this case is, in my view, irrelevant

for this jury.

Evidence that the case was terminated in a manner indicative of innocence is relevant to the claims, at a minimum, to the state-law claim of malicious prosecution, and that would be a non-hearsay use. But with the defendants' concession that the case was so terminated, the probative value of Judge Haberkorn's comments drops to near zero. Not all the way to zero, because a stipulation doesn't necessarily mean additional evidence can't add to the preponderance of the evidence on a question, but it's near zero if there is a concession on that element.

And meanwhile, there is then a strong weight substantially outweighing the probative value of unfair prejudice from the broad-strokes judicial comments that are not clearly directed at these defendants and outweighs the value of any of those comments on the manner-indicative-of-innocence issue.

Plaintiff also refers to the relevance of innocence to his damages.

I agree that guilt or innocence is relevant to damages, but I don't agree that Judge Haberkorn's statements can be admitted to demonstrate actual innocence without them being admitted for the truth of the matters asserted. So the prohibition on hearsay precludes their use to prove innocence for purposes of damages.

So defendants' No. 1 is granted.

Defendants' No. 3 with respect to the judicial statements of Judge Martin on the certificate of innocence I resolve similarly.

I agree with the defense that Judge Martin's comments are inadmissible as hearsay.  And under Rule 403, in light of the defense stipulation that the proceedings had been favorably terminated, the probative value is near zero, but then substantially outweighed by unfair prejudice.

A limiting instruction about the certificate of innocence procedures can be effective in some cases, but in this one, I nevertheless worry that the judge's actual comments take on an added force that a jury would have too difficult a time parsing, even with a limiting instruction.

And, again, as to damages, the judge's statement that he is finding Mr. Walker innocent by a preponderance would be offered for the truth of factual innocence, and my view is that that would be prohibited hearsay.

So defendants' 3 is granted.  Again, all subject to the defendants stipulating to:  The proceedings had been terminated favorably in a manner indicative of innocence.

The certificate of innocence itself, defendants' 2, carries with it less prejudice than the judge's comments and less risk of inadmissible hearsay.  It has, as we've already discussed, the probative non-hearsay value of demonstrating on

the manner in which the proceedings had been terminated.  True, it occurred after the conviction was vacated, but I think it still can shed some light on the manner of termination.

The balance, again, though, I conclude, is that the probative value on that issue is very low to -- near zero in light of the defense stipulation.

In *Kluppelberg v. Burge*, the court there did say that judicial findings in a certificate of innocence could be non-hearsay public records.  And the court there cited the Seventh Circuit's opinion in *Greycas*, G-r-e-y-c-a-s, 826 F.2d 1560, 1567 (7th Circuit 1987).

But I don't read *Greycas* as opening the door the same way that the court in *Kluppelberg* thought.  There is no *res judicata* or preclusive effect of a certificate of innocence.  And it was the preclusive effect of civil judgments that led the Seventh Circuit to muse that evidentiary use could be allowed in a bench trial.

That's not our situation here.  And my view is it would be hearsay to offer the certificate of innocence as evidence of actual innocence and the truth of innocence.

So defendants' 2 is granted.  I am excluding the certificate of innocence, again, based on the defense stipulation that the proceedings had been terminated in a manner indicative of innocence.

And defendants' 4 as to Russell Walker's certificate

of innocence is granted.

Russell Walker's certificate of innocence is really of no probative value to the manner of termination of plaintiff's case, and my same analysis of hearsay and unfair prejudice applies to that as well.

That then leaves defendants' motion *in limine* 19, to dismiss the failure-to-intervene claim. That's denied.

The defense had made the argument. It's procedurally unusual to raise the argument in a motion *in limine*. The argument is more likely one that should be raised at summary judgment, which time has passed.

It could be raised, I suspect, as a motion for a directed verdict, and there's still time to do that. So the issue, in my view, can be preserved for appeal that way.

For present purposes, the motion *in limine* to dismiss the failure-to-intervene claim is denied.

As I read the state of the law, failure to intervene is a recognized method of proving liability under Section 1983, at least as far back as *Byrd v. Brishke*, *B-y-r-d v. Brishke*, B-r-i-s-h-k-e, 466 F.2d, 6 at page 10 (7th Circuit decision of 1972), which relied on the Supreme Court's decision of *Monroe v. Pape*, 365 U.S. 167, 187.

That traces back to where I think, as I understand it, failure to intervene as a theory of liability has come to be accepted. There may be some tension with more recent

Supreme Court precedent. And I have to follow the Supreme Court precedent as well as the Seventh Circuit precedent. My view is that I can resolve that tension by understanding failure to intervene as not mere vicarious liability, but it is a method of proving conduct that rises to the level of personal involvement.

I might be alone in this view -- I am not sure -- but I see failure to intervene as very similar to conspiracy in Section 1983 cases where all the defendants are state actors. It's just really an evidentiary and accepted theory of proving someone's liability for the substantive violation.

I see and understand the argument that absent an affirmative constitutional duty to intervene, then there should be no personal involvement under Section 1983. At least as where the case law is today that I am bound to follow, I take failure to intervene as a gloss on how tort liability works, which, in turn, informs Section 1983. And there, the reasonable opportunity to do something while acting under color of law to stop a constitutional violation would be the kind of evidence of complicity and participation in the underlying violation.

So that's why I view failure to intervene similarly to conspiracy in cases involving all state actors. It's just a method of demonstrating responsibility for the substantive violation.

Other authorities will likely have the last word on that, but that's my take on the issue for now.  So defendants' motion 19 is denied.

Have I forgotten any motions *in limine*?

MR. STEFANICH:  Judge, I think in the Russell -- defendants' motion about Russell Walker's COI, there were arguments about his lawsuit and his settlement with the defendants in this case, as well as Defendant Finnelly's settlement in this lawsuit.

THE COURT:  Right.  Thank you for reminding me about that one.

Let me ask the plaintiff, are we getting into Mr. Walker's lawsuit or settlement?  Mr. Russell Walker's lawsuit or plaintiff's settlement with Finnelly?

MR. FAKHOURI:  We don't intend to, Judge.

THE COURT:  With that, I guess I am not sure what I would be excluding.

MR. STEFANICH:  Sure, Judge.  Understood.

THE COURT:  Are there any other issues in motions *in limine* that I've --

MR. FAKHOURI:  Judge, I just want to make sure, as it relates to 9, 10, and -- 9 and 10, plaintiff's 9 and 10, they can only be used as it relates to inconsistent statements made by Russell Walker.  Am I correct?

THE COURT:  Correct.

MR. FAKHOURI:  Okay.  So they can only be used against Mr. Russell Walker?

THE COURT:  They can be used to impeach Mr. Russell Walker's credibility.

MR. FAKHOURI:  Thank you, Your Honor.

THE COURT:  Okay.  So --

MS. BOUDREAUX:  Judge, could I just -- one more point of clarification about that?

So are we saying that the phone call can only be played during Russell Walker's examination and not during Jermaine Walker's examination?

MR. FAKHOURI:  The phone call's out.

THE COURT:  I have excluded the phone call entirely.

I alluded to the idea that he might be impeached with an inconsistent statement, but the way to do that would be to first confront him with:  "Isn't it true in a conversation with your brother that had been recorded, you admitted that you did your time for the crime you committed?"  And if he denies it, then I would let you prove that up by extrinsic evidence of the recorded statement.

But I am not -- again, I don't know if he's going to deny that --

MS. BOUDREAUX:  Right.

THE COURT:  -- or will need to prove it up.  And then I may be worried about whether it's really worth the time to do

that.

MS. BOUDREAUX: Yes. I guess I am just wondering if there's any ability to play it for Jermaine's statements in the phone -- I think what you said was you did not consider his statements to be an admission and, therefore, it's excluded.

So you're saying that in order to be played, it would have to be an admission, not just a statement of a party opponent?

THE COURT: Correct.

MS. BOUDREAUX: Okay.

THE COURT: Because, as briefed, the only parts of the call that the defense was saying you wanted to use were for the purpose of suggesting that Jermaine Walker was adopting Russell Walker's statement, "I did my time for the crime I committed, and I threw everything out the window." That was how it was briefed.

I did not see anywhere in the motion *in limine* the defendant saying: Here's just a statement of Jermaine Walker that he made in this recording that we want to offer as a statement of a party opponent. And having read the transcript, I am not surprised that there isn't a statement that you want to offer from Mr. Jermaine Walker in the recording.

So, as briefed, it was really just about, is there an adopted admission? My conclusion is no, there isn't. And that's my ruling on it.

MS. BOUDREAUX: Okay. Thanks for the clarification.

MR. FAKHOURI: Your Honor, may I also have a clarification on the certificate of innocence?

Now, with respect to defendants' stipulation, how are we going to be handling that? Because it's been made clear, especially in Your Honor's order as it relates to the motion for summary judgment, that our use of that is in order to prove that element.

Now, are we going to be reading the stipulation to the members of the jury that the defendants are admitting that the underlying charge was terminated in a manner consistent with his innocence?

THE COURT: Well, if -- so what happens often is that there are stipulations that elements have been met and the jury doesn't need to consider the element at all. So then the jury doesn't even need to be told that there is an element of the claim that the plaintiff has to prove. And so it's only these two elements that the plaintiff has to prove, or only these three elements.

So, for example, the most common one is under color of law. It is an element of the 1983 cause of action that the plaintiff prove that the defendant officers were acting under color of law. But it's almost routine for there to be an agreement in a stipulation that the officers were, in fact, acting under color of law, so the jury is never even instructed

that there is this element under color of law, and it's on the elements instruction, and they need to be told about it.

So that was how I was thinking of this approach; that, effectively, the defendants, just as I think they have said they stipulate to under color of law, they also stipulate to that other element, which means I find that that element has been established. The jury need not find it in order to find liability in this case. The jury need only find the other elements that are contested in order for there to be a judgment against the defendants.

MR. FAKHOURI: Thank you for the clarification, Judge.

THE COURT: The other things on my agenda are to talk a little bit about jury instructions and about the schedule.

Does anyone need a break?

MR. FAKHOURI: No, Judge.

MR. STEFANICH: No, Judge.

THE COURT: Okay. So before opening statements, I have a set of stock jury instructions that I read to the jurors, and we can hand out a set of those.

(Document tendered to counsel.)

THE COURT: I don't think you will see anything surprising in these, so I'll let you look at that on your own time. And if you do want to change something or suggest a change, we could do that on Tuesday or Monday.

Ordinarily, at this point in the preliminary instructions, I do give the jurors the elements of the various claims that they'll be considering.  I am not proposing to do that in this case because I still don't know what the elements will be as I want to instruct the jury.

So what I am planning on doing is just, again, basically repeating what was in the cover letter, which is the claims are fabricated evidence, unlawful detention, malicious prosecution.  And if the jury finds for the plaintiff, they'll have to decide damages.  But you will see that in what we've handed out.

Let's talk about the schedule.  So Monday, the jurors will come in and fill out the questionnaires.  They should be done by the morning, and we'll let them go home.  And so we usually have the -- we have copies made and ready for you to inspect usually by late morning, early afternoon.

If there is a time that you think you'd all be available and want to come down to look at the questionnaires, we can set that time now.

MR. FAKHOURI:  Yeah.  Judge, my schedule's already cleared for the next two weeks, so --

MR. STEFANICH:  Same, Judge.

THE COURT:  Okay.  So why don't we plan to convene in the courtroom to review the completed questionnaires at 1:00 p.m.

We will send you an e-mail or let you know if they're available earlier, and you can come down and start looking at them even earlier.  You won't be allowed to take them out of the courtroom.  You'll have to leave them in the courtroom.

Then on Tuesday, be here at 9:15.  I will want to bring in the venire at 9:30 to start the questioning and then I hope we'll have the jury by lunchtime.  So plan on opening statements and your first witness or witnesses on Tuesday.

(Counsel nod.)

THE COURT:  Do you have a sense now how long your opening statements are?

MR. FAKHOURI:  I think ours is about 30 minutes, Judge.

MS. BOUDREAUX:  30 to 40.

THE COURT:  So I think we'll have time to get started with witnesses.  At least that's my hope.  Unless jury selection takes a lot longer than I'm currently thinking.

Do try to have your witnesses close by and get a sense for how long it takes for someone who's sitting in an attorney/witness room to walk down the hallway.  And do what you can to get a feel for when one witness is about to wrap up so you can get the next one lined up.

I don't take a break in the mornings until it's time to break for lunch.  We take an hour for lunch.  And that's usually 12:15 or so, 12:15, 12:30.  Do an hour for lunch.  In

the afternoons, I will break for about 15 minutes, around 3:15 or so. And then we'll end the day at 4:30. And every day we'll end at 4:30.

That should give us plenty of time, outside the presence of the jury, to handle any issues that come up, so -- because then I'll tell the jurors, after Tuesday, to be here at 9:45, and I'd like to start with them by 10:00 o'clock.

So if you're here by 9:45, you can tell me if you've got any issues before we bring in the jury at 10:00. If there are issues, we can talk about those over the lunch hour. And then at 4:30, we can talk about whatever issues that are coming up the next day.

Do use the courtroom technology for publishing exhibits.

On Tuesday, be extra careful in the hallways. Because when you're coming up on the public side of the courtroom, the venire is also going to be coming up at the same time. So extra caution about anything you're saying, anything you're doing. There might be a prospective juror right around.

After jury selection, we can be more successful at keeping everybody apart, but the way we're doing this, especially that Tuesday morning, there could be a real risk that you're going to be on an elevator or in a hallway or in one of the restrooms with a prospective juror. So please use extra caution Tuesday morning. So --

MR. STEFANICH:  Judge, one of the issues we're having is trying to get a sense of where plaintiffs are going to be, I guess, on Tuesday and Wednesday to line up some of our witnesses.  So I don't know if you have a rule or a practice that you do where plaintiff tells the Court and the parties, you know, what the lineup's going to be.  But we would appreciate that.

THE COURT:  I do.  I do expect that everybody -- this is related to my comment earlier about telling each other what exhibits you're using at least a day in advance.  So that the day before someone is going to use an exhibit, there's an opportunity for me to weigh in on any exhibit issues.

Similarly, the lineup of witnesses should be disclosed on a rolling basis.

Do you know now who your first witness is?

MR. FAKHOURI:  The plaintiff, Judge.

THE COURT:  And do you know now who your second witness is?

MR. FAKHOURI:  No, Judge.

THE COURT:  Okay.  Well, as we get closer, you should have a sense of who your second witness is.

MR. FAKHOURI:  Yes.

THE COURT:  I think that would likely get us through day one.

And then -- so on Monday when we convene for the

questionnaires, I'll ask you, are there any exhibit issues for Tuesday?  Who are your witnesses for Tuesday?  Do you know now who your witnesses are going to be for Wednesday?  And we'll start that process.

MR. STEFANICH:  Thanks, Judge.

MR. MICHALIK:  Judge, one other question on witnesses.

I presume that, for example, that the plaintiff's going to call some of the defendant officers in his case-in-chief.  Then the defense would just put in the rest of the case at that point.

THE COURT:  Yes.  Thank you for that reminder.

No scope objections to the first round of questions and then there can be scope objections.  But let's extract everything we're going to extract out of a witness the first time the witness is on the stand.

I need to take a break for a moment.  So let's reconvene in about five minutes.

MR. FAKHOURI:  Yes, Judge.

MS. BOUDREAUX:  Thank you, Judge.

(Recess.)

THE COURT:  I have to interrupt what we're doing for another matter, so let's just run through a couple of things.

Let's -- we'll talk more about jury instructions Monday when we convene for the questionnaires.

Primarily, what I think I need to talk to you most about is the Fourth Amendment claim. My tentative view or current view is that there is a difference between unlawful detention and malicious prosecution, even under Section 1983. I think those are two different things; and that this is an unlawful detention claim, but probable cause is still required, because it's a Fourth Amendment claim, and the Fourth Amendment is primarily concerned with seizures without probable cause.

I want to think through the chronology and the timeline as to when the constitutional violations occurred and then ended, and whether that matters with respect to damages.

So, for example, if the Fourth Amendment drops out upon conviction and sentence, do the damages from a Fourth Amendment violation stop at that point? And should the jury be advised of that?

We talked a little bit at the very beginning about when does the Fourth Amendment claim -- when did it start? Did it start at the arrest? Did it start with the indictment? And I ask those questions because then probable cause for what offenses to support the seizure becomes a relevant thing to discuss. And maybe the jury needs to know what the different offenses are and what the elements of them may be.

So those are some of the thoughts I had about the Fourth Amendment claim. But we'll need to talk about that further.

Masks during the trial will be not required. It's now a voluntary proposition. I'll tell the jurors that they are welcome to and free to wear a mask, but they're not required to. And so the same goes for you and your witnesses.

Any exhibits, you need to make sure that you have them formatted in an electronic format that can be used with our court system with the jurors, when they deliberate, and you'll be giving the exhibits on a flash drive to the courtroom deputy at the end of the trial. So be sure to pay attention to that.

(Court conferring with staff.)

THE COURT: Speaking of exhibits, if there are exhibits that you have no objection to and you're in agreement on, then I'll just admit them outside the presence of the jury and you don't need to lay foundation. You'd just say, "Showing you what's previously been admitted as Exhibit X," and then go ahead and show and publish.

So that's the other thing that we can do during breaks, is, are there any exhibits you want to admit right now? And we can do that.

I think I have likely given you enough direction to be able to get started on Monday and Tuesday. Are there any pressing issues that you'd like to raise with me? On behalf of plaintiff?

MR. FAKHOURI: Not at this time, Your Honor.

Case 1:16-cv-04762 Document #: 834 Filed: 03/28/25 Page 56 of 57 PageID #:23863

55

MS. BOUDREAUX:  No, Judge.

MR. STEFANICH:  No.

THE COURT:  Okay.  Thank you.  I'll see you on Monday at 1:00 o'clock.

MS. BOUDREAUX:  Thank you.

MR. MICHALIK:  Thank you.

MR. FAKHOURI:  Thank you, Judge.

(Proceedings concluded.)

Case: 1:19-cv-00762 Document #: 634 Filed: 03/28/25 Page 57 of 157 PageID #:23684

C E R T I F I C A T E


I, Colleen M. Conway, do hereby certify that the foregoing is a complete, true, and accurate transcript of the Final Pretrial Conference proceedings had in the above-entitled case before the HONORABLE MANISH S. SHAH, one of the Judges of said Court, at Chicago, Illinois, on March 2, 2023.


*/s/ Colleen M. Conway, CSR, RMR, CRR*          *03/03/23*
Official Court Reporter                          Date
United States District Court
Northern District of Illinois
Eastern Division


Colleen M. Conway, Official Court Reporter

*DeLeon-Reyes v. Guevara, et al.*
Case No. 18 CV 01028

*Solache v. Guevara, et al.*
Case No. 18 CV 02312

# EXHIBIT 20

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

EDDIE L. BOLDEN,            )

                )

         Plaintiff,       )      Case No. 17-cv-417

                )

     v.            )      Hon. Steven C. Seeger

                )

CITY OF CHICAGO, *et al.*,      )

                )

        Defendant.     )

_____)

## ORDER

The Court makes the following rulings on the twenty-seven motions *in limine* filed by

Plaintiff Eddie Bolden, Defendant the City of Chicago, and the Defendant Officers.

Trial courts have broad discretion in ruling on evidentiary issues before and during trial.

*See Bridgeview Health Care Ctr., Ltd. v. Clark*, 816 F.3d 935, 939 (7th Cir. 2016); *Whitfield v.*

*Int'l Truck & Engine Corp.*, 755 F.3d 438, 447 (7th Cir. 2014).  "Although the Federal Rules of

Evidence do not explicitly authorize *in limine* rulings, the practice has developed pursuant to the

district court's inherent authority to manage the course of trials." *Luce v. United States*, 469 U.S.

38, 41 n.4 (1984); *see also Dietz v. Bouldin*, 136 S. Ct. 1885, 1891 (2016) ("The Federal Rules of

Civil Procedure set out many of the specific powers of a federal district court," but "they are not

all encompassing," for example, they make no provision "for the power of a judge to hear a

motion *in limine*.").

"Trial courts issue rulings on motions in limine to guide the parties on what evidence it

will admit later in trial," and "[a]s a trial progresses, the presiding judge remains free to alter

earlier rulings." *Perry v. City of Chicago*, 733 F.3d 248, 252 (7th Cir. 2013).  Regardless of the

Court's initial ruling on a motion *in limine*, the Court may adjust its ruling during the course of

trial.  *See Farfaras v. Citizens Bank & Trust of Chicago*, 433 F.3d 558, 565 (7th Cir. 2006).  It is well-established that a motion *in limine* "is an important tool available to the trial judge to ensure the expeditious and evenhanded management of the trial proceedings" and that it "permits the trial judge to eliminate from further consideration evidentiary submissions that clearly ought not be presented to the jury because they clearly would be inadmissible for any purpose."  *Jonasson v. Lutheran Child & Family Servs.*, 115 F.3d 436, 440 (7th Cir. 1997).

So, from the get-go, this Court underscores that the following rulings are preliminary. This Court might learn more as the case unfolds, and that additional information may change this Court's assessment of the admissibility of the evidence.  But in the meantime, this Court makes the following rulings so that the parties can plan ahead and prepare for trial accordingly.

To help the reader, the Court provides the following summary of the cast of characters. Plaintiff Eddie Bolden was convicted in 1996 of murdering two people on January 29, 1994.  His conviction was vacated in 2016, and he later received a Certificate of Innocence.  Derrick Frazier and Irving Ledell Clayton were the two murder victims.  Clifford Frazier (Derrick's brother) was injured during the shooting, and at the criminal trial, the State heavily relied on his testimony identifying Bolden as the shooter.

Anthony ("Ant") Williams (deceased) was a childhood friend of Bolden.  He was a governor of the Gangster Disciples, and allegedly orchestrated the killings.  Edna Williams and James Williams are his parents.  They owned J&J fish, a nearby restaurant where Bolden allegedly was during the killings.

Roderick Stewart is the person who, according to Bolden, actually committed the murders.  Cynthia Steward was the fiancée of Ledell Clayton (*i.e.,* one of the two victims).

**Bolden's Motion *in Limine* #1 – Prior Criminal History**

Plaintiff's motion *in limine* no. 1 to bar references to prior criminal history (Dckt. No. [277]) is hereby granted. Plaintiff seeks to exclude any references to his 1985 conviction for involuntary manslaughter for killing Lafere Boyd (when Bolden was 15 years old), which led to his incarceration until 1992.

That crime has little, if any, probative value to the issues at hand. A conviction for involuntary manslaughter does not have much bearing on whether Defendants used a suggestive lineup, or engaged in malicious prosecution, and so on.

Defendants argue that the prior conviction would explain "why Anthony Williams would have trusted Plaintiff to murder Frazier and Clayton." (Dckt. No. [278]). But the connection seems tenuous, and presumably there are other ways to establish the relationship between Anthony Williams and Bolden without getting into Bolden's prior criminal history. (As an aside, the Court assumes that Bolden did not kill *Boyd* at the behest of Anthony Williams. If that assumption is incorrect, counsel can raise it at the pretrial conference.)

Next, Defendants argue that the prior conviction is relevant to Bolden's attempt to intimidate a witness. That attempt involved giving a false story to Cynthia Steward about the reasons for the Boyd killing, to show a lack of motive for the Clayton and Frazier murders. But the connection seems tenuous, at best, and far afield from the issues at hand. Again, presumably Defendants could offer testimony about attempts to intimidate a witness without getting into Bolden's recharacterization of the reasons for the Boyd killing. That is, his criminal history doesn't seem to be a critical part of the story about Bolden's attempt to intimidate a witness.

3

In all likelihood, the evidence does not seem relevant to damages, either, unless Plaintiff opens the door (*e.g.*, by alleging that he is now a convicted felon because of the conduct of the Defendants).

Defendants offer a few other justifications, too, but they are a stretch, and even then, they do not move the needle very far. Except in an inflammatory direction.

Defendants do not come forward with evidence that they took Bolden's criminal history into account when making the probable cause determination. If that point proves to be incorrect, the Court might revisit its ruling.

It is difficult to see what evidence of a prior killing would contribute to the trial, except unfair prejudice. Any probative value would be substantially outweighed by the risk of unfair prejudice and confusion. *See* Fed. R. Evid. 403. It is only natural to think that the jury might give outsized importance to evidence of an earlier killing when evaluating evidence of a later killing. *See United States v. Jones*, 455 F.3d 800, 811 (7th Cir. 2006) (Easterbrook, J., concurring) ("Telling juries not to infer from the defendant's criminal record that someone who violated the law once is likely to do so again is like telling jurors to ignore the pink rhinoceros that just sauntered into the courtroom.").

**Bolden's Motion *in Limine* #2 – Gang Affiliations and Drug Selling**

Plaintiff's motion *in limine* no. 2 to bar references to Plaintiff's gang affiliation and drug activity (Dckt. No. [295]) is hereby denied (for now). Plaintiff seeks to exclude evidence that he was, as a teenager, affiliated with the Gangster Disciples, and sold drugs provided by Anthony Williams. But no party can elicit any such evidence, or make any such statements to the jury, without checking with the Court first. The Court wants to hear more from the parties.

4

In his third amended complaint, Plaintiff seems to fault the officers for failing to investigate the notion that the killing of Frazier and Clayton was a "gang-related hit." *See* Third Am. Cplt., at ¶ 60 (Dckt. No. [236]) ("Defendant Officers . . . failed to investigate whether the shootings were the result of gang retaliation, despite the fact that Defendant Officers had information suggesting that Derrick Frazier and Ledell Clayton had a gang-related hit on them at the time of the shootings . . . .").

As Judge Shah noted, "[i]f the Gangster Disciples had a hit out on the murder victims, then Bolden's gang involvement would have become relevant, since he was a member of the Gangster Disciples." *See* 8/9/19 Order, at 43 (Dckt. No. [276]).

So, the Court wants to hear more from the parties about whether any party will argue that the killings had something to do with the Gangster Disciples. If so, the fact that Plaintiff himself had something to do with the Gangster Disciples might be fair game.

The Court also wants to learn more about what the Defendants knew at the time. Did the officers know anything about Bolden's gang affiliation, and if so, what did they know, and when? Did they investigate his gang affiliation, and if so, what did they learn? If the killings had something to do with the Gangster Disciples, and if Defendants knew at the time that Bolden was affiliated with that gang, then his gang affiliation might be relevant.

Mentioning Plaintiff's history with the gang does not seem especially inflammatory in a case that seems destined to involve references to gang activity.

Also, the Court wants to hear if Defendants have evidence that Plaintiff continued to be a member of or associated with the Gangster Disciples after he left incarceration in 1992, meaning 14 months before the murders in question. An older affiliation (from 1985, when the Boyd killing took place) would be less probative.

In addition, Plaintiff seeks to exclude evidence that, on occasion, Anthony "Ant" Williams (the governor of the Gangster Disciples) provided him small amounts of narcotics to sell. That evidence is potentially relevant. It depends on whether the Defendants' theory is that Plaintiff had something to do with the drug transaction in question that led to the murders (involving large amounts of cocaine). Evidence that Plaintiff had a drug-dealing relationship with Ant is potentially relevant to whether Plaintiff had something to do with a drug-dealing operation with Ant that went *bad* (and led to two murders).

True, the transaction in question involved much larger quantities, but that distinction about the weight of the drugs goes to the weight of the evidence. So, the Court wants to hear more from the parties before issuing a definitive ruling.

**Bolden's Motion *in Limine* #3 – Court Rulings**

Plaintiff's motion *in limine* no. 3. to bar references to state appellate court decisions and the trial court's witness credibility determinations (Dckt. No. [296]) is hereby granted in part and denied in part. Plaintiff seeks to exclude evidence of (1) the state appellate court decisions affirming his conviction on direct appeal; and (2) the state trial court's views regarding the credibility of witnesses Octavia Jackson and Vondell Goins.

The appellate history is fair game (at least in broad strokes, meaning a high-level summary). Plaintiff wants to present evidence that he prevailed in his post-conviction petition, so Plaintiff wants to tell *part* of the story of his post-conviction challenges to the verdict. If Plaintiff wants to tell the jury that he prevailed on his post-conviction petition, then Defendants can tell the jury that he did not prevail on direct appeal.

Telling part of the story does not tell the full story. Otherwise, the jury might have the misimpression that it was obvious from day one that the criminal trial was unfair to Bolden and riddled with errors.

That said, there is little need to get into the weeds of the rulings on direct appeal. Informing the jury what happened, for the sake of completeness, should suffice.

Defendants take it one step further. They want to exclude everything, including the post-conviction petition and the Certificate of Innocence. But as this Court will explain in its ruling on a related motion, the Certificate of Innocence is relevant to the malicious prosecution claim. If Defendants want to inform the jury that Plaintiff did not prevail on direct appeal, and thus round-out the appellate story that Plaintiff wants to tell, Defendants can do so.

This Court agrees that the jury should not hear judicial commentary on the credibility of witnesses. So the parties must not present evidence about what other judges had to say about whether they found witnesses to be credible.

On that note, the Court is interested to know if Plaintiff's counsel intends to offer evidence that the Court of Appeals referred to the State's case as "extremely thin." If so, Plaintiff must explain why, and how that position squares with a motion to exclude evidence that cuts in the other direction. Judicial comments on the strengths or weaknesses of evidence presumably should be in or out, across the board, no matter which direction they go.

**Bolden's Motion *in Limine* #4 – Testimony by James Oliver**

Plaintiff's motion *in limine* no. 4 to preclude certain testimony of James Oliver (Dckt. No. [297]) is hereby denied. During his deposition, Defendant Oliver testified that he might have received an informant tip in 1994 that "Lanier" (*i.e.*, Lynier, Bolden's middle name and nickname) was responsible for the shootings.

7

Plaintiff points out that the criminal record is devoid of any such evidence, despite requests by defense counsel during the criminal trial. That sounds like a fruitful basis for cross examination, but is not a basis for keeping it out at trial. (If anything, the fact that information about an informant was not disclosed to Bolden in the criminal case might help Bolden's case here.)

Maybe the testimony was "unsupported and vague" (*id.* at 3), but that's not much of a reason for banning it altogether.

Also, a tip is not hearsay because it is offered to demonstrate the effect on the listener (and not for its truth). The point is that an officer heard a tip, not that the tip was *true*.

Plaintiff argues that Oliver is not "sure" that he received the tip (*id.* at 3), but witnesses do not have to be "sure" about a fact to offer testimony about it. Again, that's fodder for cross.

**Bolden's Motion *in Limine* #5 – Testimony by Cynthia Steward**

Plaintiff's motion *in limine* no. 5 to exclude Cynthia Steward's testimony (Dckt. No. [307]) is hereby granted in part and denied in part. Plaintiff seeks to bar testimony from Cynthia Steward (the fiancée of Ledell Clayton, one of the victims) about whether she "believes" Bolden was involved in the murders. Plaintiff also seeks to exclude Steward's testimony about Bolden's participation in drug dealing, and testimony about hearing the victim's use Bolden's name.

People have all sorts of beliefs, but most of them probably aren't admissible. Here, Steward was not a witness to the crime, and based on her deposition testimony, she has no personal knowledge about whether Bolden participated in the murder. So she cannot express her beliefs on that question at trial.

At this time, the Court declines to categorically exclude testimony by Steward about whether Bolden was involved in drug deals with the victims. It is not clear if Steward could lay

8

a foundation.  The Court will take up that issue at a later time, after hearing more from the parties.

Finally, it would not be hearsay for Steward to testify that she heard one of the victims use Bolden's name, because it would be enough that it was said.  Plaintiff points out that Steward offered no such testimony in the criminal trial (*id.* at 4), but that's a point for cross examination.

**Bolden's Motion *in Limine* #6 – Statements by Anthony Williams**

Plaintiff's motion *in limine* no. 6 to exclude testimony about a statement that Anthony Williams made to Bolden (Dckt. No. [299]) is hereby granted in part and denied in part.  Plaintiff seeks to exclude evidence of a statement that Williams made to Bolden on January 28, 1994, the day before the murders of Derrick Frazier and Ledell Clayton.  Williams offered Bolden $20,000 to lure two other men outside a party so that they could be killed.  Bolden testified at his deposition about that offer by Williams.

Plaintiff objects to that testimony as hearsay.  It isn't hearsay.  An offer to engage in criminal activity is not offered for its truth.  It's enough that it was said.

An offer to participate in a double murder – on the day before a different double murder – is not irrelevant, either.  If Defendants' theory of the case is that Williams and Bolden had a role in the murders of Derrick Frazier and Ledell Clayton, then an invitation by Williams to Bolden to participate in *another* double murder the day before is relevant.  An invitation by Williams to Bolden to help with a double murder on Day 1 is probative of whether Williams invited Bolden to help with a double murder on Day 2.  One would-be double murder is not so "very *different*" than another double murder, the very next day.  *Id.* at 2 (emphasis in original).

But it all depends on what the officers knew at the time.  The statement would seem to be relevant only if Defendants *knew* at the time about the invitation by Williams.  This case is

9

ultimately about the conduct of the Defendants, so if the Defendants did not know about the offer by Williams at the time, it is difficult to see how it could have a bearing on the conduct of the Defendants.

That said, depending on the testimony by Bolden at trial, it is conceivable that he could open the door. For example, statements that he did not know Williams well, or that their relationship was entirely on the up-and-up, or (maybe) that he had no motive to engage in this killings, might be inconsistent with an invitation by Williams to help with a killing. So, depending on Bolden's testimony at trial, it is possible that this point could come out during impeachment. The Court will take up that issue at a later time, as appropriate. When Bolden is on the witness stand, Plaintiff's counsel should be mindful of opening the door.

### Bolden's Motion *in Limine* #7 – Counsel's Involvement

Plaintiff's motion *in limine* no. 7 to exclude references to the involvement of Plaintiff's counsel in prosecuting the Gangster Disciples (Dckt. No. [300]) is hereby granted.

Trial should be about the evidence, not the advocates. The fact that Plaintiff's counsel prosecuted the Gangster Disciples is not relevant to the facts at hand, and would be unfairly prejudicial under Rule 403.

But the prohibition is a two-way street. Plaintiff's counsel cannot attempt to laud his laurels before the jury by pointing to his prosecutorial background, either.

Any prior connection between Plaintiff's counsel and defendant Oliver (who worked on the same federal Gangster Disciples investigation) is out of bounds, too. It's irrelevant, confusing, and distracting. They did not work together on the incident in question. It would be improper to use that shared experience on other cases as a backdoor way to infer an opinion by

10

Plaintiff's counsel about the credibility of defendant Oliver. Attorneys aren't supposed to offer their personal opinions.

**Bolden's Motion *in Limine* #8 – Plaintiff's Criminal Trial Strategy**

Plaintiff's motion *in limine* no. 8 to exclude references to his criminal trial strategy (Dckt. No. [301]) is hereby granted. Plaintiff seeks to exclude any reference to the fact that he did not testify at his criminal trial.

This issue involves an interesting nexus between criminal and civil trials. *See Patrick v. City of Chicago*, 314 F. Supp. 3d 970, 975 (N.D. Ill. 2017) ("[T]he defendants are ordered to refrain from discussing Plaintiff's Fifth Amendment silence at his criminal trial, unless the door is once again opened by Plaintiff's counsel either through elicited testimony or argument.") (excluding testimony in a civil case under section 1983 that the plaintiff did not testify in a prior criminal trial).

The right against self-incrimination under the Fifth Amendment – including the ban on an adverse inference from silence – applies in criminal cases, but not in civil cases. In civil cases, the fact that a party asserted the Fifth Amendment can give rise to an adverse inference. *See Baxter v. Palmigiano*, 425 U.S. 308 (1976); *see also LaSalle Bank Lake View v. Seguban*, 54 F.3d 387, 390 (7th Cir. 1995) ("The rule that adverse inferences may be drawn from Fifth Amendment silence in civil proceedings has been widely recognized by the circuit courts of appeals, including our own."); *United States ex rel. Bilokumsky v. Tod*, 263 U.S. 149, 153–54 (1923) (Brandeis, J.) ("Silence is often evidence of the most persuasive character."). So the question is whether a defendant in a civil action under section 1983 can point to the plaintiff's decision not to testify in a prior criminal trial.

11

Here, the Court is not necessarily convinced that pointing to silence in a prior criminal trial is categorically out of bounds in a later civil trial. Silence does have probative value. The Constitution protects the right against self-incrimination in criminal cases, but the freedom from an adverse inference does not apply in civil cases. (That is, a witness can *assert* the Fifth Amendment in a civil case, but that assertion can be used against that witness, too.). A civil case cannot lead to criminal jeopardy (putting aside perjury, etc.), so the Fifth Amendment's concern about incrimination does not come into play, strictly speaking.

Even so, the Court concludes that it would confuse and distract the jury to allow them to hear about Bolden's silence during his criminal trial. Bolden did not have an obligation to offer any evidence at trial, and a lot of considerations come into play when deciding whether to take the witness stand. There is risk that this jury may place undue emphasis on Bolden's decision not to testify, and view it as a tacit admission of guilt.

In a civil case, pointing to silence in an earlier criminal trial may not be unconstitutional, but that doesn't mean that it's a good idea, either. Silence may have probative value, but it may not have as much probative value as a jury thinks it has. Allowing a civil jury to hear about silence during a criminal trial would impose a cost on asserting a constitutional right, too.

Here, based on the unique facts at hand, the Court concludes that allowing the jury to hear about Bolden's silence during his criminal trial would do more harm than good. *See* Fed. R. Evid. 403. Bolden's silence might have some probative value. But on this record, any probative value would be substantially outweighed by the risk of unfair prejudice and confusion.

Defendants argue that "[h]aving used the Fifth Amendment as a shield at the criminal trial, Plaintiff may not now use it as a sword." (Dckt. No. [345], at 1). But it is not at all clear

12

how, if at all Plaintiff is attempting to use his prior lack of testimony as a sword. In fact, Plaintiff seemingly wants to bury the sword altogether, and never bring it up.

Unless Bolden opens the door, it is closed.

**Bolden's Motion *in Limine* #9 – Testimony by Linda Walls**

Plaintiff's motion *in limine* no. 9 to exclude testimony by Linda Walls (Dckt. No. [302]) is hereby granted in part and denied in part. Walls was the Assistant State's Attorney who worked on Bolden's post-conviction proceeding. During her deposition, Walls commented on the strength of the evidence against Bolden, and disagreed with the notion that the evidence against Bolden was thin.

Walls is not an expert witness, and the jury does not need to hear a lay witness opine about the strength of the evidence.

That said, it is conceivable that Walls could offer other facts that tell part of the story. Bolden apparently intends to offer testimony about the post-conviction proceedings, so if Plaintiff is going to cover that topic, Defendants can too (at least at a high level).

Also, one of the issues in the case is whether the criminal case was dismissed in a manner indicative of innocence. Maybe Defendants plan to argue that the dismissal was not indicative of innocence, despite the issuance of a Certificate of Innocence. If so, the Court will reserve judgment on whether Walls could offer testimony on that point. If Plaintiff wants to present evidence about the meaning of the Certificate of Innocence, then presumably Defendants can too.

Walls potentially could explain the State's decision-making, to the extent that it comes into play. But it is not clear to the Court if she has first-hand knowledge on that topic. (As an aside, this Court will not allow Walls to testify about matters that defense counsel prohibited her

13

from testifying about at deposition under the deliberative process privilege. If it was out of bounds then, it's out of bounds now.)

Generally speaking, Walls can't opine on the evidence writ large and offer personal opinions about Bolden's guilt. But perhaps she could contribute to other parts of the story.

It is conceivable that Plaintiff could open the door, too. If Plaintiff intends to argue that the State dropped the case because it was weak, presumably Defendants could respond with evidence about why the State dropped the case.

**Bolden's Motion *in Limine* #10 – Photographs of the Decedents**

Plaintiff's motion *in limine* no. 10 to exclude photographs of the decedents (Dckt. No. [303]) is hereby granted. The photographs show the blood-covered and hole-ridden bodies of the two murder victims. The jury doesn't need that mental picture. It would confuse and distract them, and they may have a hard time un-seeing it. The jury will hear that the underlying incident involves two murders. They'll understand that two people were shot. Showing them the pictures will not contribute anything constructive to the trial.

**Bolden's Motion *in Limine* #11 – The Screenplay**

Plaintiff's motion *in limine* no. 11 to exclude reference to Bolden's screenplay (Dckt. No. [304]) is hereby denied. Bolden apparently wrote a screenplay while incarcerated, entitled "Chasing Justice."

Bolden claims that it is a fictionalized account of the Frazier/Clayton homicides. Some details come from the events in question, and some parts are "complete fiction." Plaintiff argues that the screenplay has no probative value because of its "fictional nature."

14

But the screenplay is a statement – albeit perhaps a *fictional* statement – of a party opponent. If the screenplay is fiction, Bolden can say so in open court, and leave it to the jury. Defendants are entitled to argue that it is truth, and Plaintiff is entitled to argue that it is fiction.

**Bolden's Motion *in Limine* #12 – Disciplinary Decision Against Charles Ingles**

Plaintiff's motion *in limine* no. 12 to exclude references to the disciplinary decision against Charles Ingles (Dckt. No. [305]) is hereby granted. Charles Ingles represented Bolden when he appeared for the lineup in 1994. In 1990, four years earlier, Ingles comingled personal and client funds, and the ARDC later found that it amounted to a conversion because the amount of the account fell below the amount owed to the client. *In re Charles D. Ingles* (Dckt. No. [305-1], at 2 of 5).

That incident is not particularly probative. It took place in 1990, three decades ago. An episode of conversion that took place one year after the fall of the Berlin Wall is not very telling about the attorney's propensity for truth telling now. *See, e.g.*, *United States v. Stoecker*, 215 F.3d 788, 790 (7th Cir. 2000) (evidence of a fifteen-year-old complaint "was unrelated and far too remote to be probative"); *United States v. Mandell*, 2014 WL 464226, at *3 (N.D. Ill. 2014) ("Here, the probative value of Defendant admitting that he took bribes over 30 years ago is diluted by its remoteness in time" when considered pursuant to Rule 608(b)); *Marlow v. Winston & Strawn*, 1994 WL 424124, at *5 (N.D. Ill. 1994) (holding that a suspension that occurred 12 years before the events of the case was "too remote in time to be probative of [the witness's] capacity for truthfulness").

**Bolden's Motion *in Limine* #13 – Treating Police Officers and Prosecutors as Adverse**

Plaintiff's motion *in limine* no. 13 to treat police officers, City representatives, and prosecutors as adverse (Dckt. No. [306]) is hereby granted in part and denied in part. The City is

a party, so current employees are affiliated with a party and thus are adverse. The City's corporate representatives are affiliated with the City, too.

But former employees are not affiliated with the City, so they are not linked to a party in a way that would give rise to a presumption of adversity. So there is no reason to call them adversely. That said, if there are witness-specific reasons why a former employee should be called adversely, the Court will hear it.

The prosecutors worked for the State, not the City, so they are not affiliated with a party. But it's fair to infer adversity nonetheless. The prosecutors were adverse to Bolden, in a very real sense, when they were prosecuting him.

In sum, Plaintiff can call current police officers, the City's 30(b)(6) representatives, and the prosecutors as adverse witnesses, but cannot do so for former employees (absent additional facts coming to light).

**The City's Motion *in Limine* No. 1 – Identifying the City as a Defendant**

The City of Chicago's motion *in limine* no. 1 (Dckt. No. [425]) is hereby granted. The City seeks to remove its name from any case caption, verdict form, and jury instructions given to the jury. The City also seeks to bar any reference to the City as a named defendant at the trial.

On July 19, 2018, Judge Shah (this Court's predecessor, before reassignment) issued a bifurcation order. *See* 7/19/18 Order (Dckt. No. [213]) ("[T]he Monell claim is bifurcated from the claims against the individual defendants and stayed."). So trial will not involve any substantive claims against the City. The *respondeat superior* and indemnification claims simply involve the City's duty to pay for the acts and omissions of its agents, but the City has stipulated to pay for any compensatory damages.

16

It could taint the jury's decision-making to tell them that the City is the payor.  Telling the jury that the City is a defendant would announce the existence of a deep pocket, and might cause the jury to reach deeper.  The jury should decide liability and damages issues without hearing that the City is on the hook for any damages.

Including a reference to the City as a defendant – without advancing any substantive claims against the City – could confuse the jury, too.  What's the point of including the City's name on the caption and verdict form, if the jury isn't deciding any claims *against* the City?  Why tell them information that they don't need to know, especially when it could impact their decision-making?

This Court acknowledges that thoughtful judges in this district have drawn the line differently, and allowed the City's name to appear on the case caption and jury verdict form.  *See, e.g., Jones v. City of Chicago*, 2017 WL 413613, at *6 (N.D. Ill. 2017) (St. Eve, J.); *Bruce v. City of Chicago*, 2011 WL 3471074, at *3–4 (N.D. Ill. 2011) (Dow, J.).  But this Court does not see the point of including the City's name if there are no pending claims against the City (and there aren't), and if there is a potential downside in doing so (there is).

Plaintiff Bolden argues that the City is "attempt[ing] to avoid responsibility for its employees' actions," but the City's motion says the opposite.  The City has stipulated to footing the bill, if any, so the jury should not know who's paying when deciding what to do.

For purposes of the trial, the parties must remove the City from the case caption, verdict form, and jury instructions, and must not refer to the City as a defendant.

**Defendant Officers' Motion *in Limine* No. 1 – The Composite Sketch**

Defendant Officers' motion *in limine* no. 1 to exclude evidence of the composite sketch (Dckt. No. [308]) is hereby denied.  The officers seek to exclude Plaintiff's trial exhibit 19,

17

which is a sketch created by law enforcement dated January 29, 1994. It was based on a description given by Clifford Frazier, the key witness against Bolden at the criminal trial.

Plaintiff points out that the sketch "looks nothing like Plaintiff" (Dckt. No. [332], at 1), and thus should have prompted the officers to believe that Bolden was not the culprit. The sketch is fair game, assuming that Plaintiff can lay a sufficient evidentiary foundation for the notion that one or more of the officers saw it (or likely saw it).

The sketch is not hearsay. A picture may be worth a thousand words, but a picture isn't a "statement." *See* Fed. R. Evid. 801(a).

**Defendant Officers' Motion *in Limine* No. 2 – Indemnification**

Defendant Officers' motion *in limine* no. 2 to bar evidence of indemnification and exclude any reference to the City as a defendant (Dckt. No. [309]) is hereby granted.

In light of Judge Shah's bifurcation order (Dckt. No. [213]), the trial will not involve the *Monell* claim, so there are no substantive claims against the City. The City is responsible to pay any compensatory damages awarded against the officers. The jury does not need to know about the deep(er) pocket.

There is no need to inform the jury that the City is a defendant. There aren't substantive claims against the City, so it could breed confusion to tell the jury that the City is a defendant.

Worse yet, informing the jury that the City will bankroll any judgment may impact the jury's decision-making in negative ways. The jury might award more damages if they know that the payor has a greater ability to pay. The jury should decide whether Defendants are liable, and if so, how much Plaintiff is entitled to receive in damages, without knowing who (if anyone) will pay the bill. *See Lawson v. Trowbridge*, 153 F.3d 368, 379 (7th Cir. 1998) ("In the general case courts exclude evidence of indemnification out of a fear that it will encourage a jury to inflate its

18

damages award because it knows the government – not the individual defendants – is footing the bill."); *see also Kemezy v. Peters*, 79 F.3d 33, 37 (7th Cir. 1996) ("When the defendant is to be fully indemnified, such evidence, far from being required, is inadmissible").

Including the City on the case caption, jury instructions, and verdict form would create confusion. It would create a risk of a wink-wink, nudge-nudge inference that the City is going to pay any damages.

That said, if the officers open the door by pointing to their financial condition, Bolden may point out that they will have not have to pay a judgment. That is, if Defendants argue an inability to pay (or an inability to pay *much*), Plaintiff can present evidence that they aren't going to have to pay anyway.

This Court will entertain limiting instructions, as appropriate.

**Defendant Officers' Motion *in Limine* No. 3 – Roderick Stewart**

Defendant Officers' motion *in limine* no. 3 to bar evidence of Roderick Stewart's prior convictions, out-of-court statements, and other alleged acts (Dckt. No. [310]) is hereby granted in part and denied in part. Defendant Officers seek to exclude any reference to (1) Stewart's prior convictions that are more than ten years old; (2) Stewart's out-of-court statements to Bolden's brother that Stewart committed the murders; and (3) Stewart's prior alleged threats and assaults on Bolden's family members. Defendant Officers do not move to exclude any reference to the conviction for violating an order of protection, theft, negligent driving, and criminal trespass to a vehicles, which took place in 2004 and led to a 15-year sentence and incarceration that ended less than 10 years ago. *See* Fed. R. Evid. 609(a)(1)(A).

19

Defendants plan to call Stewart as a witness, purportedly to say that he did not commit the murders in question. Plaintiff plans to use the prior convictions, statements, and acts to impeach Stewart.

Stewart's convictions, at least those that are more than ten years old, have little (if any) probative value to the issues at hand. They are stale convictions for criminal trespass, possession of cannabis and controlled substances, unlawful use of a weapon, aggravated battery, and domestic battery. They do not have much bearing on whether Stewart committed a murder, or is testifying truthfully at trial.

Plaintiff argues the old convictions are probative, not in and of themselves, but because Stewart denied his past criminal acts, challenging Stewart's credibility. Plaintiff argues that Stewart's denials of his criminal history remove the old convictions from the province of Rule 609(b)(1) (which provides that evidence is admissible only if its probative value substantially outweighs its prejudicial effect), and move them into the territory of Rule 609(a)(1)(A) (which provides that the evidence must be admitted unless its prejudicial effect substantially outweighs its probative value). *See* Fed. R. Evid. 609(b)(1); Fed. R. Evid. 609(a)(1)(A); Fed. R. Evid. 403.

Plaintiff's argument that Stewart lied about his convictions is misplaced. Plaintiff argues that since Stewart pled guilty to the crimes, his later denials of committing the crimes are contradictions and lies.

But Stewart never testified he didn't plead guilty or wasn't convicted of the crimes. Instead, during his testimony, he disputed the *circumstances* of the crimes. For example, he pled guilty to possessing cocaine. At deposition, he admitted the conviction, but testified that the cocaine didn't belong to him. As a second example, he was guilty of unlawful possession of a

20

firearm.  At deposition, he admitted the conviction, but testified that the gun didn't belong to him and that he was falsely accused.

Those disputes are not lies about whether he was convicted of prior crimes.  He didn't deny the existence of the convictions themselves.

If Plaintiff's theory was right, it would come back to bite him.  Bolden pled guilty to involuntary manslaughter in 1985.  But at his deposition, he testified that he acted in self-defense.  If that inconsistency opens the door, should this Court allow the jury to hear that Bolden killed someone?

Since Stewart never lied about the stale convictions, the convictions remain governed by Rule 609(b)(1).  Plaintiff failed to explain how the probative value of the convictions substantially outweighs the prejudicial effect.

And since it's not clear that Stewart actually lied, it's difficult to see what the convictions would contribute to the trial, other than unfair prejudice.  Any probative value is not enough to outweigh the prejudicial effect.  *See* Fed. R. Evid. 609(b)(1).

Stewart's prior inconsistent statements are fair game if he takes the stand, too.  If Defendants call Stewart to the stand, and elicit testimony that he *didn't* commit the murders, then Plaintiff can impeach him with prior inconsistent statements that he *did* commit the murders.  What he said before is germane to what he says now.

Finally, Defendants seek to exclude references to Stewart allegedly threatening and assaulting Plaintiff's family members.  They argue that this is merely propensity evidence that Stewart is a violent person.  The alleged threats and assaults are largely not probative.  However, if Stewart opens the door by suggesting that he is a non-violent person, Plaintiff can impeach Stewart with the alleged acts.

21

**Defendant Officers' Motion *in Limine* No. 4 – Certain Evidence and Argument Based on the Court's Summary Judgment Ruling**

Defendant Officers' motion *in limine* no. 4 to exclude evidence based on the summary judgment ruling (Dckt. No. [311]) is hereby denied. In his summary judgment decision, Judge Shah made a ruling on the sufficiency of the evidence for only one claim: due process. *See* 8/9/19 Mem. Opin. and Order (Dckt. No. [276]). Judge Shah did not reach the sufficiency of that evidence for any other claim. The fact that the evidence in question was not sufficient for a due process claim does not mean that it is *inadmissible* to prove the remaining claims.

And the evidence does not unfairly prejudice the Defendants, either. Some of the evidence may prove inadmissible eventually, but the Court will take that up down the road. For now, the failure of the due process claims alone cannot serve as grounds to preclude this evidence wholesale.

**Defendant Officers' Motion *in Limine* No. 5 – Charles Ingles**

Defendant Officers' motion *in limine* no. 5 to bar Charles Ingles from testifying to his experience in other cases (Dckt. No. [312]) is hereby granted in part and denied in part. Ingles represented Bolden during the lineup in 1994. He was not allowed to be in the viewing room during the lineup. Defendants want to exclude any testimony that Ingles was allowed to be in the viewing room during other lineups in *other* cases.

The experience of Ingles is admissible in part. Plaintiff could offer the testimony of Ingles to establish that the treatment of Bolden departed from the standard practices and procedures of the Chicago Police Department at that time. Plaintiff can elicit testimony that Bolden was treated unfairly – that is, he wasn't allowed to have his attorney in the viewing room, unlike other people in other cases. So, as evidence that he was treated unfavorably compared to everyone else, it can come in.

22

But Plaintiff cannot elicit testimony, or argue to the jury, that Ingles had a *right* to be in the witness room.  Bolden cannot give the impression that the denial of access to his lawyer, in and of itself, violated his rights.  Bolden had no right to counsel in the viewing room because he was not arrested at that point.  *See Kirby v. Illinois*, 406 U.S. 682 (1972).

Plaintiff must carefully walk this line.  Plaintiff can elicit testimony about the standard practices at the time, as part of a broader pattern of mistreatment, but cannot suggest that the failure to give access to his lawyer violated his rights *per se*.

The officers later filed an unsolicited supplement (Dckt. No. [432]), seeking to bar any and all evidence that Ingles was not allowed in the witness room.  That is, the officers originally moved to exclude evidence about his past experience in other cases.  But now, the officers seek to bar all evidence about the participation by Ingles in the case at hand, meaning the lineup in question.

One of the issues at trial will be whether the lineup was unduly suggestive.  Ingles was there for the lineup, so he can testify about what he saw, and what he didn't see.  The role of counsel also has a bearing on why Bolden agreed to participate in the lineup in the first place.

**Defendant Officers' Motion *in Limine* No. 6 – The Arrests of Edna Williams, James Williams, and David McCray**

Defendant Officers' motion *in limine* no. 6 to bar all references to the arrests of Edna Williams, James Williams, and David McCray (Dckt. No. [313]) is hereby denied.

Edna and James Williams owned J&J Fish, where Bolden allegedly was during the murders.  David McCray (an employee) arrived after the shootings.  The police arrested them after they found a gun and ammunition.  They took them in for questioning, and eventually brought charges against McCray.  They took Edna Williams's goddaughter, Tanesha Gatson, in

for questioning, too (but never arrested her). In contrast, the police did not arrest Clifford Frazier, who possessed the same gun. Frazier later identified Plaintiff as the murderer.

The fact that Defendants arrested three people (and questioned a fourth) about Frazier's gun – but never arrested Frazier – could help tell the story of the Defendants' practices and intent. But, to be relevant, Plaintiff will need evidence that the Defendant Officers were involved in (1) the arrests of the Williamses and McCray and (2) the non-arrest of Frazier.

And testimony from the Williamses, McCray, and Gatson about the arrests could provide helpful background evidence, too. The evidence about McCray's arrest and Edna Williams' and Gatson's interviews with police might provide insight on how the police conducted the investigation.

**Defendant Officers' Motion *in Limine* No. 7 – Omissions in the Investigation**

Defendant Officers' motion *in limine* no. 7 to bar certain evidence related to the police investigation (Dckt. No. [314]) is hereby granted in part and denied in part. Defendants seek to exclude evidence of investigative leads not pursued, evidence not collected or examined, witnesses not interviewed, and other failures to obtain, preserve, or analyze evidence.

Plaintiff can offer evidence about lapses in the investigation, meaning departures from reasonable police practices, to the extent that it sheds light on Defendants' intent. Plaintiff can also introduce evidence that the officers deliberately ignored investigative leads, for the purposes of both intent and probable cause. Plaintiff cannot, however, offer failures to investigate as evidence of the lack of probable cause.

Defendants' deviations from reasonable police practices are relevant to show Defendants' intent. Plaintiff's malicious prosecution claim, intentional infliction of emotional distress claim, and the assessment of punitive damages all involve an intent element of proof. Plaintiff is not

24

simply offering a list of facts that the Defendant Officers did not know.  Instead, the evidence consists of facts that the officers should have known or were readily discoverable.  Potential deviations from reasonable police practices, or failures to follow up with key witnesses, are relevant to whether the Defendants acted intentionally or with malice.  *See, e.g.*, *Grayson v. City of Aurora*, 157 F. Supp. 3d 725, 746–47 (N.D. Ill. 2016).  That said, Plaintiff cannot suggest to the jury that the failure to investigate, in and of itself, gives rise to liability.

On the other hand, the situation is different for probable cause.  The probable cause inquiry involves what the police knew at the time they detained Bolden, not what they could have known if they had dug a little deeper.  "Probable cause exists if, at the time of the arrest, the facts and circumstances *within the defendant's knowledge* are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed an offense."  *Lawson v. Veruchi*, 637 F.3d 699, 703 (7th Cir. 2011) (cleaned up) (emphasis added); *see Reynolds v. Jamison*, 488 F.3d 756, 765 (7th Cir. 2007) ("The reasonableness of the seizure turns on what the officer knew, not whether he knew the truth or whether he should have known more.").  Allowing unexplored facts into the probable cause question could confuse the jury on the applicable standard.

If necessary, a jury instruction could clarify that evidence about lapses in the investigation is germane to *intent*, but is not germane to probable cause.

**Defendant Officers' Motion *in Limine* No. 8 – The Certificate of Innocence**

Defendant Officers' motion *in limine* no. 8 to bar references to the Certificate of Innocence (Dckt. No. [319]) is hereby denied, with a caveat.

Plaintiff can offer the Certificate of Innocence to address whether the dismissal was indicative of innocence.  That is, the issuance of a Certificate of Innocence is at least some

evidence that the dismissal was indicative of innocence. Under the statute, one of the requirements for the issuance of a certificate of innocence is a finding, by a preponderance of the evidence, that the "petitioner is innocent of the offense charged." *See* 735 ILCS 5/2-702(g); *see also Harris v. City of Chicago*, 2018 WL 2183992, at *3 (N.D. Ill. 2018) ("Plaintiff's certificate is relevant and admissible to demonstrate that Plaintiff's underlying criminal proceedings were terminated in her favor in relation to her malicious prosecution claim . . . .") (St. Eve, J.). As a practical matter, it seems difficult to tell the story of the case without it.

But Defendants can offer evidence about the basis for the Certificate of Innocence. That is, Defendants can offer evidence that the Circuit Court of Cook County found that his trial counsel was ineffective (and not because witnesses recanted, or because evidence was fabricated, and so on).

So, Plaintiff can offer the Certificate of Innocence to support the notion that the dismissal was indicative of innocence, and Defendants can present evidence that it was not indicative of innocence at all. The jury will sort it out.

In *Kluppelberg v. Burge*, 84 F. Supp. 3d 741 (N.D. Ill. 2015), Judge Lefkow ruled that a certificate of innocence fell within the public record exception to the hearsay rule. *See* Fed. R. Evid. 803(8).

Also, if Plaintiff opens the door by arguing that the State did not oppose the petition for a certificate of innocence, then Defendants can respond by offering evidence about *why* the State did not oppose it.

**Defendant Officers' Motion *in Limine* No. 9 – Police Department Internal Rules and Regulations**

Defendant Officers' motion *in limine* no. 9 to bar evidence about the internal rules and regulations of the Chicago Police Department (Dckt. No. [316]) is hereby granted in part and

26

denied in part. Plaintiff can offer evidence of the Chicago Police Department's ("CPD") policies to the extent that they shed light on Defendants' intent. But the policies cannot be used for any probable cause analysis.

It is true that "the violation of police regulations or even a state law is completely immaterial as to the question of whether a violation of the federal constitution has been established." *Thompson v. City of Chicago*, 472 F.3d 444, 455 (7th Cir. 2006). Plaintiff is *not* equating the Defendants' violations of CPD regulations with constitutional violations. Instead, Plaintiff wants to introduce the policies for the purpose of proving intent, which is an element of Plaintiff's state law claims of malicious prosecution, intentional infliction of emotional distress, and the calculation of punitive damages.

Indeed, the Seventh Circuit clarified that "there is no per se rule against the admission of police policies or training" because "*Thompson* did not address whether evidence of police policy or training can be relevant to intent." *United States v. Proano*, 912 F.3d 431, 439 (7th Cir. 2019). Police policies and regulations can be relevant to state law claims, including willful actions and damages calculations. *See, e.g.*, *Brooks v. City of Chicago*, 2015 WL 3545386, at *5 (N.D. Ill. 2015) (noting that "[p]olice department policies, procedures, and general orders" are "not barred for all purposes and may be admissible if relevant to other issues, including state law claims and claims for punitive damages"); *Scott v. City of Chicago*, 2010 WL 3034188, at *1 (N.D. Ill. 2010). The relevance of police regulations to a showing of an officer's intent is simple: if an officer has been trained according to certain policies, but he deviated from those policies, "the fact that he broke from his training could make it more likely that he acted willfully." *See Proano*, 912 F.3d at 439.

27

However, the risk of misleading the jury is stronger in the probable cause analysis. "Probable cause exists where the police officer is aware of facts and circumstances sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense." *Coleman v. City of Peoria*, 925 F.3d 336, 350 (7th Cir. 2019) (cleaned up). The Defendant Officers' violation of CPD's lineup policy could unduly distort the probable cause analysis and confuse the jury as to the applicable standard of "reasonableness." The jury must determine whether there was probable cause for Bolden's arrest, not whether the police followed their training in arresting him. A jury instruction can clarify the proper application of CPD policies to intent, as opposed to probable cause.

**Defendant Officers' Motion *in Limine* No. 10 – Expert Testimony of William Gaut**

Defendant Officers' motion *in limine* no. 10 to exclude certain testimony from William Gaut (Dckt. No. [317]) is hereby granted in part and denied in part.

Gaut is Plaintiff's expert. Plaintiff intends to offer him to opine that Plaintiff could have seen through the one-way window during the lineup. *See* Gaut Report, at 14 (Dckt. No. [317-1]) ("[I]t is my opinion that Mr. Bolden would have been able to see the silhouettes of individuals in the witness room under the conditions he described."). Gaut opined that the inspection by the investigator "provides corroboration for Mr. Bolden's version of the events." *Id.* at 15. Plaintiff also intends to offer Gaut to testify that Defendants violated their *Brady* obligations. *Id.* at 17.

Gaut has no particular expertise at measuring light or figuring out what is visible. Plaintiff points to his "education, training, experience, and review of the record," but he has no particular expertise in interior lighting. (Dckt. No. [337], at 2 of 18).

He relied on an inspection by his investigator in 2018, but that data point is too wobbly to support an opinion about what was visible in 1994. That opinion rests on the unstated and

28

unsupported assumption that light conditions in 2018 were the same as the light conditions in 1994.

Visibility in 2018 doesn't shed much light on visibility in 1994 without a showing that the light conditions remained the same. How much light was in the room in 1994? Did the light fixtures change in the past 25+ years? Maybe new bulbs?

In any event, testimony that Plaintiff could have seen the participants is a backdoor way to buttress Plaintiff's credibility. An expert can't offer testimony about whether a witness is believable. *See Sanders v. City of Chicago Heights*, 2016 WL 1730608, at *7 (N.D. Ill. 2016) (St. Eve, J.) ("Dr. Gaut cannot tell the jury whether to believe what a witness says . . . ."). The jury doesn't need to hear it. Plaintiff can testify about what he saw, without an expert testifying about what he could see.

Expert testimony about compliance with *Brady* obligations is inadmissible, too. Judge Shah granted summary judgment to the Defendants on the *Brady*-based due process claim. *See* 8/9/19 Mem. Opin. and Order (Dckt. No. [276]).

Plaintiff states that "Gaut will not testify to the legal conclusion that Defendants violated *Brady*." (Dckt. No. [337], at 2 of 18). But that opinion seems to be exactly what Gaut said on page 17 of his report. *See* Gaut Report, at 17 (Dckt. No. [317-1]) ("Officers' obligations under *Brady* were well known by 1994 . . . . The evidence demonstrates that defendants *violated these duties* and substantially departed from generally accepted law enforcement standards by withholding, failing to preserve, and/or destroying material evidence in the case.") (emphasis added).

Gaut can testify about whether Defendants complied with generally applicable standards for law enforcement. *See Sanders v. City of Chicago Heights*, 2016 WL 1730608, at *7 (N.D.

29

Ill. 2016) (St. Eve, J.) ("Dr. Gaut, however, may testify to the relevant professional standards and identify departures from these standards, including that the City's customs or practices led to violations of generally accepted police standards and procedures."); *see also Hopkins v. City of Huntsville, Ala.*, 2014 WL 5488403, at *5 (N.D. Ala. 2014) ("The expert opinion of Dr. Gaut on the issue of whether defendants' actions and policies were consistent with reasonable, typical police practices and procedures is admissible, however, and will be considered by this court.").

But he cannot testify about the legal conclusion of whether Defendants violated *Brady*. That ship has sailed. And an expert cannot offer legal conclusions. *See Good Shepherd Manor Found., Inc. v. City of Momence*, 323 F.3d 557, 564 (7th Cir. 2003).

**Defendant Officers' Motion *in Limine* No. 11 – Testimony of Dale Tipton**

Defendants later withdrew motion *in limine* no. 11. (Dckt. No. [459]).

**Defendant Officers' Motion *in Limine* No. 12 – Character Evidence re Defendant Oliver**

Defendant Officers' motion *in limine* no. 12 to exclude character evidence relating to Defendant Oliver (Dckt. No. [430]) is hereby granted. Defendants seek to bar evidence that the Internal Affairs Division conducted an investigation into whether Oliver accepted a job as an investigator with the Illinois Secretary of State's Office shortly before his retirement from the Chicago Police Department.

Apparently, there were nine days of overlap. So he received double pay for about two weeks.

The investigation took place in 1999. That's last *century*. Before everyone learned whether all of the computers worldwide would crash during Y2K. It's far too old to be probative of his truthfulness now.

The probative value is slight, and is not worth the diversion of time and attention.  This type of evidence is too far afield from what the case should be about.

**Defendant Officers' Motion *in Limine* No. 13 – Expert Testimony of Geoffrey Loftus**

The Court reserves judgment on Defendant Officers' motion *in limine* no. 13 to exclude testimony from Geoffrey Loftus (Dckt. No. [434]).

**Conclusion**

For the foregoing reasons, the Court grants some of the motions *in limine*, and denies others.  The Court underscores once again that the rulings are preliminary, and that the admissibility of the evidence may change as more facts come to light at trial.

Date:   September 22, 2021

Steven C. Seeger
United States District Judge

31

*DeLeon-Reyes v. Guevara, et al.*
Case No. 18 CV 01028

*Solache v. Guevara, et al.*
Case No. 18 CV 02312

# EXHIBIT 21

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| EDDIE L. BOLDEN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 17 C 00417 |
| v. | ) | |
| | ) | Honorable Steven Seeger |
| | ) | |
| CITY OF CHICAGO, JAMES OLIVER, | ) | |
| ANGELO PESAVENTO, and EDWARD SIWEK | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANT OFFICERS' MOTION *IN LIMINE* NO. 8 TO BAR REFERENCE TO PLAINTIFF'S CERTIFICATE OF INNOCENCE

Defendants James Oliver, Angelo Pesavento, Edward Siwek, the Estate of George Karl, and the Estate of Michael Kill (collectively "Defendant Officers") by their attorneys, hereby move this Court, *in limine*, for an order barring evidence relating to the grant of Plaintiff's petition for a certificate of innocence. In support of their motion, Defendant Officers state:

Plaintiff seeks admission of the order granting him a certificate of innocence pursuant to 735 ILCS 5/2-702 to sidestep his burden of proof, and usurp the fact-finding function of the jury, with respect to his malicious prosecution claim. Specifically, having failed to allege or adduce any evidence that the circumstances surrounding the dismissal *nolle prosequi* of the criminal proceedings against him "compel an inference that there existed a lack of reasonable grounds to pursue the criminal prosecution," (*Swick v. Liautaud,* 169 Ill.2d 504, 513-514 (1996)),[12] plaintiff

---

[1] To prevail on a malicious prosecution claim, plaintiff must prove that: (1) the defendants commenced or continued the criminal proceeding against him; (2) did so with malice; (3) without probable cause; (4) that the proceeding terminated in his favor in a manner indicative of innocence; and (5) that he suffered damages. *Swick,* 169 Ill.2d 504, 512-513 (1996); *Logan v. Caterpillar, Inc.*, 246 F.3d 912, 921-22 (7th Cir. 2001).

[2] Plaintiff merely alleges that his conviction was vacated, his charges were dismissed and his petition for a certificate of innocence was granted. (Dkt. #236, ¶¶85-87.)

wants to substitute the evidence required to sustain his claim with an inadmissible, irrelevant hearsay finding of another court.

As the record stands now, the evidence indisputably establishes that Plaintiff's conviction was not vacated because a confession or witness testimony was coerced or fabricated. Nor was it vacated because a witness recanted or exculpatory evidence was suppressed. Indeed, Plaintiff's conviction was affirmed on direct appeal by the Illinois Appellate Court for the First District and the Illinois Supreme Court. And neither court found any wrongdoing on the part of Defendant Officers.

Plaintiff's conviction was ultimately vacated because the Circuit Court of Cook County found that Plaintiff's criminal counsel was ineffective for failing to make sufficient efforts to track down and interview an alibi witness (Plaintiff claimed that his counsel failed to track down and present three alibi witnesses, Octavia Jackson, Vondell Goins and Todd Henderson; however, the court found Jackson and Goins' testimony to be blatantly not credible).[3] Linda Walls, plaintiff's prosecutor in his post-conviction proceedings, testified in this case that she did not believe plaintiff had been wrongfully convicted and argued vehemently during his post-conviction proceedings that his purported alibi witnesses were not credible and that Clifford Frazier was an honest man who made the right identification and whose self-evident credibility stood in stark contrast to Plaintiff's purported alibi witnesses. In short, the State had every intention of retrying plaintiff and had commenced proceedings to retry plaintiff, successfully seeking bail in the amount of $1 million in February 2016 and, in March 2016, reserving a jury for June 17 through June 24, 2016 for trial. In

---

[3] Henderson's testimony also suffers from some serious credibility issues. For example, Henderson has testified in this case that that he was able to identify Plaintiff after eighteen years having seen him only once in his life for five to ten minutes while at the same time testifying that he only got a partial sideview of the individual he claims was Plaintiff on the night of the shooting.

2

fact, Walls testified at her deposition that the only reason she *nolled* the charges against plaintiff was because she was ordered to do so.

Shortly after the decision had been made to retry plaintiff, his counsel sent a letter to the Criminal Prosecutions Chief, Fabio Valentini, declaring Plaintiff's innocence, assuring him that the time Plaintiff spent in prison after his conviction was "the responsibility" of "another prosecutor's office" but informing him that the time Plaintiff was spending in prison after his conviction was vacated was "the responsibility" of Anita Alvarez's office. Plaintiff's counsel also informed Valentini that he would "pursue zealously [Plaintiff's] innocence" and that it was his "duty" to "question publicly, as loudly as [he could], why [the State's Attorney's] office would cling to a wrongful conviction." (See Letter dated February 22, 2016 attached to this motion as Exhibit 1.) A few weeks later, Walls was directed to *nolle pros* Plaintiff's case.

Even after entry of *nolle prosequi*, "[t]he burden of proof of a favorable termination [] remains with the plaintiff. *Swick*, 169 Ill. 2d at 513. Indeed:

> Only when a plaintiff establishes that the *nolle prosequi* was entered for reasons consistent with his innocence does the plaintiff meet his burden of proof. The circumstances surrounding the abandonment of the criminal proceedings must compel an inference that there existed a lack of reasonable grounds to pursue the criminal prosecution.

*Id.* at 513-14. The *Swick* court further instructed that merely alleging a lack of evidence showing guilt and offering a *nolle prosequi* order that does not explain why it was entered without testimony stating the reasons behind its entry is insufficient to meet this burden of proof. *Id.* at 514. Walls has testified that she *nolled* Plaintiff's case because Valentini and Alvarez ordered her to do so. Neither Valentini or Alvarez were deposed in this case nor are they identified as witnesses for trial. Thus, Plaintiff cannot rely on the *nolle prosequi* order to meet the burden of proof necessary to sustain his malicious prosecution claim. Nor can he rely on the order granting his petition for a

certificate that was entered *after* the decision to *nolle* was made and that is irrelevant and otherwise inadmissible here.

**Plaintiff's Petition For A Certificate Of Innocence**

The "substantive" portion of Plaintiff's five-page "petition" consists of two pages of (i) allegations giving a brief description of Plaintiff's version of events on the night of the shootings and (ii) conclusory statements mischaracterizing the testimony and evidence at trial. (See Plaintiff's Petition For A Certificate Of Innocence attached to this motion as Exhibit 2, 1-5.) There is not a single affidavit or transcript or document whatsoever (from a record consisting of tens of thousands of pages of documents and transcripts) cited or attached to support the allegations or the characterizations. Instead, Plaintiff attached the appellate court opinion remanding his post-conviction petition for a third-stage hearing on the issue of whether his counsel's efforts to locate Jackson, Goins and Henderson were sufficient, the circuit court opinion vacating his conviction and the single-page *nolle prosequi* order containing the words "MS Nolle." (*Id.* at Exhibits A-C.) The State took no position on Plaintiff's petition. The court did not hold any hearings on the petition or require Plaintiff to submit any evidence and summarily granted Plaintiff a certificate of innocence based solely on his five-page petition. (See Report of Proceedings dated September 1, 2016 attached as Exhibit 3 to this motion.)

The Seventh Circuit has yet to address the issue of whether a judgment granting a petition for a certificate of innocence is admissible in a section 1983 action as evidence of whether a dismissal *nolle prosequi* is "indicative of innocence" as required to sustain a claim for malicious prosecution. Our circuit has, however, addressed whether a prior judgment is admissible as evidence of some necessary fact in a subsequent case. Consistent with other circuits, it has held that such a judgment is not admissible as evidence of a necessary fact in subsequent litigation

because the judgment is hearsay in nature, not relevant to the claims in the subsequent suit and either usurps the jury's role in assessing credibility or would be unfairly prejudicial. *Schultz v. Thomas*, 832 F.2d 108, 110–11 (7th Cir. 1987) (barring a state court opinion from being admitted into evidence at a civil trial because it was irrelevant and the "opinion so unavoidably overlapped the jury's role in assessing the credibility of the key witness as to unfairly prejudice the defendants by denying them the right to have a jury decide the facts which formed the claims against them."); *cf. Greycas, Inc. v. Proud*, 826 F.2d 1560, 1567 (7th Cir. 1987) ("civil judgments are said not to be usable in subsequent proceedings as evidence of the facts underlying the judgment; for as to those facts, the judgment is hearsay."); *Nipper v. Snipes*, 7 F.3d 415, 417 (4th Cir. 1993) (prior judgment "is hearsay evidence, under Fed. R. Evid. 801(c), which is not admissible unless it falls within one of the exceptions mentioned in the Federal Rules of Evidence" and the court finding that no exceptions were applicable); *United States v. Sine*, 493 F.3d 1021, 1036 (9th Cir. 2007) ("A court judgment is hearsay to the extent that it is offered to prove the truth of the matters asserted in the judgment." (internal quotation marks omitted)).

Although research continues, defendants have found but one published opinion from our district courts addressing this specific issue, *Kluppelberg v. Burge*, 84 F. Supp. 3d 741, 747 (N.D. Ill. 2015). In *Kluppleberg*, the court found that an order granting a certificate of innocence ("COI") was relevant to the issue of innocence and then considered (but reserved ruling on) whether innocence was relevant to the element of materiality in a *Brady* claim in that a jury may focus on the plaintiff's guilt or innocence rather than on whether the defendants withheld material evidence. *Id.* at 745. The court also considered whether, and found that, innocence was relevant to the plaintiff's damages. *Id.* at 746.

The court then addressed the defendants' arguments that the finding of innocence (*i.e.*, the COI), even if relevant, was hearsay and did not fall within the public records exception to the hearsay rule. *Id.* at 746-47. The court agreed that judicial findings of fact generally do not fall within the exception and acknowledged that *Greycas* recognized as much. *Id.* at 746. Nonetheless, the court read *Greycas* as questioning the soundness of this rule and pointed out that it upheld the trial court's admission of a state court judgment determining the priority of liens as "some evidence of the degree to which [the defendant's] misconduct injured [the plaintiff]" which was analogous to the plaintiff's argument that his injury included the need to apply for and obtain the COI. *Id.* (quoting *Greycas*, 826 F. Ed at 1567). The court determined that *Greycas* thus "opened the door to an expansion of admissibility of judicial findings" and allowed the COI into evidence under Rule 803(8) as evidence of the extent of the plaintiff's damages. *Id.* at747.

But the *Kluppleberg* court two key point keys in *Greycas* which led to an overbroad reading of the case. First, *Greycas* pointed out that:

> A practical reason for denying [prior judgments] evidentiary effect is, however, the difficulty of weighing a judgment, considered as evidence, against whatever contrary evidence a party to the current suit might want to present. *The difficulty must be especially great for a jury, which is apt to give exaggerated weight to a judgment.*

826 F. Ed at 1567 (emphasis added). The court then reasoned that where there is no jury, as in its case, "we are not sure the rule should apply." *Id.* Thus, all *Greycas* actually questioned was whether the rule for denying the evidentiary effect of prior judgments is necessary in a bench trial. The second key point in *Greycas* was that the state court judgment at issue was an adjudication of property rights under state law. *Id.* As such, the judgment was admissible *not* as a public record exception under Rule 803 but as a record of a document that affects property rights under Rule

6

803(14). *Id.*[4] Thus, contrary to *Kluppleberg*'s conclusion, *Greycas* did not change or expand the rules in connection with jury trials.

The other problem with *Kluppleberg* is that it conflates evidence of innocence (or guilt) with an opinion of a judge in another court assessing a different record (or in this case, with no record) without even the benefit of an adversarial process. And while the court was quick to express concern that a jury might ignore a constitutional violation if it believed a plaintiff to be guilty of the underlying crime, it wholly failed to consider that a finding of innocence by a judge in another proceeding could cause a jury to conclude that a plaintiff is in fact innocent without weighing the balance of the evidence itself and therefore entitled to damages regardless of whether a defendant breached any state or federal law or the jury could conclude (again with appropriately weighing all of the evidence) that the defendant must have violated some law or the plaintiff would not have been convicted.

A better reasoned case is *Fields v. City of Chicago,* which confirmed its ruling denying the defendants' request to admit the denial of a petition for a certificate of innocence at trial as evidence of the plaintiff's guilt, expressing "serious doubt" as to whether "it would be appropriate to introduce another fact-finder's rulings on issues the jury in this case was called upon to determine for the very purpose of influencing the jury's determination of those same issues." 2017 U.S. Dist. LEXIS 146077, at *36-38 (N.D. Ill. Sep. 11, 2017) (Kennelly, J.) (Dkt. #1227, 26-27.) As the court remarked, it was proper to exclude the results of the COI proceedings at to both liability and damages and the defendants' claim that evidence regarding the CO proceedings was necessary to rebut the plaintiff's claim that he was innocent of the underlying crime was meritless.

---

[4] *See also Nipper v. Snipes*, 7 F.3d 415, 417 ("We also note that when the drafters of the Federal Rules of Evidence wanted to allow the admission of judgments or their underlying facts, they did so expressly. See Fed. R. Evid. 803(22) (previous conviction); Fed. R. Evid. 803(23) (personal history, etc., boundaries). Therefore, we can find no basis on which to imply that Rule 803(8)(C) applies to judicial findings of fact.")

Indeed, the court admonished, the defendants had plenty of opportunity to submit actual evidence to demonstrate the plaintiff's alleged guilt and the opinion of another court was simply not relevant.[5] Thus, *Fields*, unlike *Kluppleberg*, is consistent with *Greycas* and *Schultz* both of which are binding precedent that cannot be disregarded and require the Court to bar the admission of any evidence referring or relating to Plaintiff's certificate of innocence proceedings.

Wherefore, for all of the foregoing reasons, Defendant Officers respectfully request that the Court issue an order barring any testimony or documentary evidence relating or referring to the grant of Plaintiff's Petition for A Certificate of Innocence.

> Respectfully submitted,
>
> DEFENDANT OFFICERS
>
> BY:  /s/ Andrew M. Hale

Andrew M. Hale (ahale@ahlaelaw.com)
William E. Bazarek (wbazarek@ahalelaw.com)
Brian J. Stefanich (bstefanich@ahalelaw.com)
Hale & Monico LLC
53 West Jackson Blvd., Suite 330
(312) 870-6926

---

[5] *See Schultz*, 832 F.2d 108, 111 ("Judge Flynn's findings and opinion regarding Schultz's arrest and subsequent prosecution are irrelevant to an adjudication of his civil rights claim. Judge Flynn was not a witness to the events in question and therefore could not properly comment on what transpired on November 14, 1984. *See* Fed. R. Evid. 602 ("A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that he has personal knowledge of the matter....") * * * The appellee maintains that Judge Flynn was, in fact, a witness to the defendants' false testimony given during the disorderly conduct trial and therefore could properly testify upon such matters. Again, however, Judge Flynn was not testifying about the existence of some objective fact as to which he had personal knowledge; but rather, gave his opinion based upon his own assessment of the witnesses' credibility. Such opinion testimony, unless rendered by an expert upon matters of "scientific, technical, or other specialized knowledge," *see* Fed. R. Evid. 702 & 703, is inadmissible. *See* Fed. R. Evid. 602.")

8

**CERTIFICATE OF SERVICE**

I, Brian J. Stefanich, an attorney hereby certify that I filed the attached document on October 9, 2019, with the Court's CM/ECF system, which sent electronic copies of the same to all counsel of record.

/s/ *Brian J. Stefanich*

*DeLeon-Reyes v. Guevara, et al.*
Case No. 18 CV 01028

*Solache v. Guevara, et al.*
Case No. 18 CV 02312

# EXHIBIT 22

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

EDDIE L. BOLDEN,                              )
                                             )
                 Plaintiff,                   )
                                             )      No. 17 C 00417
          v.                                  )
                                             )      Honorable Steven Seeger
                                             )
CITY OF CHICAGO, JAMES OLIVER,                )
ANGELO PESAVENTO, and EDWARD SIWEK            )
                                             )
                 Defendants.                  )

**DEFENDANT OFFICERS' REPLY IN SUPPORT OF THEIR MOTION *IN***
***LIMINE* NO. 8 TO BAR REFERENCE TO PLAINTIFF'S CERTIFICATE OF**
<u>**INNOCENCE**</u>

Defendants James Oliver, Angelo Pesavento, the Estate of George Karl, the Estate of

Michael Kill, and Edward Siwek, (collectively "Defendant Officers") by their attorneys, hereby

reply in support of their motion *in limine* number 8, for an order barring evidence relating to the

grant of Plaintiff's certificate of innocence ("COI") as follows.

**INTRODUCTION**

Plaintiff is well aware of circuit precedent that requires the Court to bar any reference to

the order granting the COI ("COI Order") and relies on it extensively to argue that the appellate

court opinions affirming his conviction should be barred from evidence. (See Plaintiff's Motion *In*

*Limine* No. 3, Dkt. #296; see also Defendants' Response at Dkt. #346.) Nevertheless, Plaintiff

brushes aside this precedent here and instead relies on a few unpublished district court opinions

which do not address that precedent or the arguments Defendants raise in their motion.

**ARGUMENT**

The COI Order is not relevant to any of Plaintiff's claims or damages because it is not

*evidence* of Plaintiff's innocence. It is another court's *opinion* on whether the limited evidence

presented to it likely established Plaintiff's innocence. For this reason, our circuit has deemed such orders (orders of other courts) inadmissible hearsay and improper opinion testimony. Our circuit has also found them to be highly prejudicial as well as misleading and confusing to a jury even if they have some relevance.

Because this law has been extensively briefed in Dkt. ##296, 346 and 315, Defendants will not repeat the analysis of that law in this reply and will limit their discussion to two points not addressed in those motions and the response.

1. **The State's Decision Not to Oppose Plaintiff's Petition for A COI Is Not Evidence of Plaintiff's Innocence.**

The only evidence that sheds light on the State's decision not to oppose Plaintiff's petition for a COI is the testimony of Linda Walls, Plaintiff's post-conviction prosecutor, and the letter sent by Plaintiff's counsel to Fabio Valentini, the then State's Attorney's Criminal Prosecutions Chief. (See Dkt. #325 at 2-3.) Walls testified that she did not believe Plaintiff was wrongfully convicted; that she did not find Plaintiff's newly discovered alibi witnesses credible; that she found Clifford Frazier to be highly credible; and that the State had every intention (and had commenced proceedings) to retry Plaintiff after his conviction was vacated. (*Id.*; see also Defendants' Response to Plaintiff's Motion *In Limine* No. 9, Dkt. #341.) After Mr. Valentini received Plaintiff's counsel's letter in which he suggested the press was interested in Plaintiff's criminal case if a retrial occurred, Ms. Walls was abruptly ordered to *nolle* Plaintiff's charges with no explanation. (Dkt. #315, 2-3; Dkt. #34, 3-4.) Illinois law requires an examination of the circumstances surrounding a *nolle* dismissal and does not accept bare *nolle* orders as evidence indicative of innocence. (Dkt. #341 at 3 and 5.) Walls' testimony and the letter to Valentini is the only evidence of the "circumstances surrounding" the termination of Plaintiff's criminal proceedings from which to draw any inference regarding the State's decision not to retry Plaintiff. There is absolutely no evidence, however, to,

2

as plaintiff contends, support an inference that because the State did not oppose his petition for a COI, it did not believe it had adequate grounds to contest Plaintiff's innocence.

Ironically, while Plaintiff argues that Walls' testimony is nothing more than her opinion on Plaintiff's guilt and therefore should be barred (see Plaintiff's Motion *In Limine* No. 9, Dkt. #302),[1] Plaintiff fails to explain how her opinion is any different than the state court judge's opinion embodied in the COI Order. There is no difference—at least not in the nature of these opinions. There is, however, a difference in the degree of danger of prejudice and confusion. Plaintiff argues that Walls' opinion as to Plaintiff's guilt is inadmissible not only because it is an opinion but also because Plaintiff's jury will almost certainly give her opinion undue weight given that she was Plaintiff's post-conviction prosecutor and her opinion therefore "carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence."[2] (Dkt. #302 at 3-4.) This argument applies with even greater force when an actual judge's opinion on whether Plaintiff is guilty is presented to a jury. (See Dkt. #296 at 3-4, #346 at 5-8.)[3]

Plaintiff offers no principled reason why the authority he cites in Dkt. ##296 and 302 does not apply equally (if not more so) to the COI Order. And there is none. Plaintiff seeks to conflate evidence of innocence with another judge's opinion on whether the limited and self-serving evidence presented to him established that Plaintiff was likely more innocent than not. If Plaintiff thinks he has adduced evidence that demonstrates his innocence (that is "compels an inference that

---

[1] As detailed in Defendants' Response to Plaintiff's Motion *In Limine* No. 9 (Dkt. #341), Defendants are not seeking to admit Ms. Walls' opinion with respect to Plaintiff's guilt; they are seeking to admit her testimony regarding the circumstances of the State's dismissal of Plaintiff's charges.

[2] Plaintiff is quoting *United States v. Young*, 470 U.S. 1, 18-19 (1985).

[3] Defendants note that Walls, unlike the state court judge, actually heard testimony from witnesses and had access to all of the evidence presented by Plaintiff and the State.

there existed a lack of reasonable ground to pursue the criminal prosecution"),[4] he should present that evidence to the jury and allow *it* to weigh the credibility of the witnesses and reach its *own* conclusions as circuit precedent requires.

### 2. The *Dicta* in *Greycas Inc. v. Proud* Does Not Change Its Holding.

Plaintiff contends that *Greycas* held that a state court judgment is admissible under the catch-all exception to the hearsay rule. (Dkt. #339, 12.) The Seventh Circuit's statement, "A [hearsay] statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness" is admissible, subject to conditions that in fact are satisfied here," however, was plainly *dicta*. 826 F.2d 1560, 1567 (7th Cir. 1987). And the court's subsequent interpretation of Fed. R. Evid. 807 makes clear that *Greycas*' casual reference to Rule 807 with no analysis was in fact *dicta*. *See United States v. Dent*, 984 F. 2d 1453, 1465-66 (7th Cir. 1993) (Easterbrook, J. and Bauer, C.J., concurring) ("[the residual exception] reads more naturally if we understand the introductory clause to mean that evidence of a kind specifically addressed ('covered') by one of the four other subsections must satisfy the conditions laid down for its admission").

Finally, the prior order to which the *Greycas* court was referring was an order fixing property rights which was "equivalent to title" under state law. 826 F.2d at 1567. Obviously, a prior order quieting title which allows the successful party to assert and exercise ownership of the property at issue under state law would have to have the necessary indicia of reliability, otherwise any action to quiet title would be rendered meaningless (and thus the exception under Rule 803(14) regarding title to property which made the court's reference to Rule 807 not only unnecessary but in fact redundant).

---

[4] See *Swick v. Liautaud,* 169 Ill.2d 504, 513-514 (1996).

## CONCLUSION

For all of the foregoing reasons, as well as the reasons set forth in Dkt. ##296, 302, 346 and 315, Defendant Officers respectfully request that the Court issue an order barring any testimony or documentary evidence relating or referring to the grant of Plaintiff's Petition for A Certificate of Innocence.

Respectfully submitted,

/s/ Brian J. Stefanich
One of the Attorneys for the Defendant
Officers

Andrew M. Hale (andy@halemonico.com)
Barrett Boudreaux (bboudreaux@halemonico.com)
Brian J. Stefanich (bstefanich@halemonico.com)
William E. Bazarek (web@halemonico.com)
Hale & Monico, LLC
53 W. Jackson Blvd., Suite 330
Chicago, IL 60604
Ph.  (312) 341-9646
Fax (312) 341-9656

## CERTIFICATE OF SERVICE

I, Brian Stefanich, an attorney, hereby certify that I filed the attached document on November 22, 2019, with the Court's CM/ECF system, which sent electronic copies of the same to all counsel of record.


/s/ Brian J. Stefanich

*DeLeon-Reyes v. Guevara, et al.*
Case No. 18 CV 01028

*Solache v. Guevara, et al.*
Case No. 18 CV 02312

# EXHIBIT 23

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

IELIOT JACKSON,
        Plaintiff

    v.

CITY OF CHICAGO and CLARK
EICHMAN,
        Defendants.

No. 20-cv-05886

Judge Jeremy C. Daniel

## ORDER

The Court denies the defendant's motion to admit the plaintiff's recent conduct [194] for the reasons stated on the record at the final pretrial conference on January 6, 2026. The Court grants the defendant's motion to reconsider concerning the certificate of innocence [198] for the reasons stated on the record and in this signature order. The Court denies the plaintiff's motion to reconsider concerning the June 4, 2009, June 11, 2009, and June 17, 2009, transactions [219] for the reasons stated on the record and in this signature order. The Court denies, without prejudice, the defendant's motion concerning jury instructions and verdict form [223]. As the Court explained at the final pretrial conference, the Court will continue to hear arguments concerning jury instructions up to the final instructions conference, which will occur near the end of the trial.

## STATEMENT

Certificate of Innocence. The Court previously determined that the plaintiff's certificate of innocence did not have any tendency to make the fact of the plaintiff's guilt with respect to the alleged June 13, 2009, drug transaction more or less likely than it would be without the evidence. (R. 192 at 2.) The Court explained that "[w]hat someone else thought of the evidence presented on those issues has no bearing on what actually occurred on June 13, 2009." (*Id.*) The Court still finds that to be true.

It is important to remember that a certificate of innocence has no preclusive effect. *See Patrick v. City of Chicago*, 974 F.3d 824, 833 (7th Cir. 2020) (noting that the certificate of innocence statute states, "[t]he decision to grant or deny a certificate of innocence shall be binding only with respect to claims filed in the Court of Claims and shall not have a res judicata effect on any other proceedings."). While it may have evidentiary value in some cases, that evidentiary value stems from the legal effect of the certificate of innocence. For example, a certificate of innocence is relevant where

a plaintiff must prove that a criminal prosecution had been terminated favorably in a manner indicative of innocence. *Id.* at 832. Under those circumstances, the certificate of innocence bears directly on an element of a claim. That is not true in this case.

Even when a certificate of innocence bears directly on a claim, however, concerns remain. For instance, a jury may misunderstand the purpose of the certificate of innocence, which is to "remove legal obstacles that prevent a wrongly convicted person from receiving relief in the Illinois Court of Claims." *Id.* at 833. There is also a risk that a certificate of innocence "does not really reflect a factual finding arising from the crucible of the adversarial process." *Id.* Similarly, there are concerns as to whether the evidence presented to the court that issued the certificate of innocence and that presented to a jury in a subsequent case is the same. Finally, there is a considerable risk that "jurors may be tempted to give conclusive weight to the certificate of innocence merely because it reflects a formal judicial finding." *Id.* at 833. There is no reason to take such risks here because the plaintiff's claims do not require proof that he obtained a certificate of innocence.

The Court also previously concluded that the certificate of evidence was relevant to damages. (R. 192 at 2.) Since that ruling, the parties have revisited that issue with the Court. The Court has repeatedly asked the plaintiff to put forth a viable damages theory concerning the certificate of innocence. The plaintiff has not done so.

The defendant has asked the Court to reconsider its ruling, and insists that the Court misapplied *Parish v. City of Elkhart, Ind.*, 702 F.3d 997, 1003 (7th Cir. 2012). Having revisited *Parish*, the Court agrees. In *Parish*, the plaintiff in a wrongful conviction case received an "astoundingly low" damages award. *Parish*, 702 F.3d at 999. The plaintiff challenged that damages award, which the defendants and the district court attributed to the jury's supposed belief that the plaintiff was guilty of the underlying crime. *Id.* The Seventh Circuit reversed because the district court did not allow the plaintiff to present evidence of innocence, which could have counteracted any belief by the jury that the plaintiff was guilty of the underlying crime. *Id.*

*Parish* did not involve a certificate of innocence. *Id.* at 1002 (noting that the plaintiff did not have the opportunity to obtain an exoneration). Rather, it concerned evidence of innocence. Here, the Court will allow the plaintiff to introduce evidence of innocence, which is consistent with what *Parish* requires. After hearing that evidence, the jury will have to determine what happened on June 13, 2009.

Further, in *Parish*, the Seventh Circuit mentioned an argument raised by the defendants that Parish's lack of an exoneration could have supported a low damages award. *Id.* The Seventh Circuit did not address the merits of that argument. *Id.* Rather, it noted that the failure to obtain an exoneration was not Parish's fault because the government, by dismissing the criminal case, precluded Parish from

2

doing so. *Id.* In light of that argument, the Court previously wrote that "the fact of exoneration and a certificate of innocence *may* underscore the harm suffered by the plaintiff." (R. 192 at 2 (emphasis added).) As mentioned above, the Court invited the plaintiff to explain how. The plaintiff has not done so. The Court has continued to consider the matter, yet has been unable to see how it would. A person wrongfully imprisoned who has not obtained a certificate of innocence has suffered no less harm than a person wrongfully imprisoned who has a certificate of innocence.

<u>Other transactions</u>. The Court rejects the plaintiff's claim that a sentencing transcript from 2011—a transcript of a hearing that the plaintiff participated in—constitutes new evidence warranting reconsideration. That alone is reason to deny the plaintiff's motion to reconsider. Further, the sentencing court acknowledged that the other transactions were offered in aggravation. (R. 208 at 4 ("Subsequent to that, due to the fact of the State's desire to proceed and use it in aggravation, they are allowed to do that.").) The sentencing court received testimony concerning those other transactions. (R. 208 at 11-19.) The sentencing court referenced those other transactions prior to imposing sentencing. (*See* R. 208 at 60 ("The Court has heard the testimony today from Officer Fleming, who indicated in regards to prior narcotic transactions that took place between himself, Mr. Jackson, he identified, and Mr. Luster on three other alleged dates. June 4th, June 11th and June 17th.").) And the sentencing court concluded that the plaintiff participated in those other transactions, stating "Were you acting as a big brother or concerned for your family on June 4th, 11th, 17th or 13th when you felt compelled to be out there selling drugs?" (R. 208 at 63.) All of this is at odds with the plaintiff's argument that the sentencing "judge never specifically said, 'I am considering the aggravation of these other alleged drug deals'" in imposing sentence. (R. 227 at 17.) The sentencing judge acknowledged the government's use of those transactions in aggravation, received evidence concerning the other transactions, concluded that the defendant was selling drugs on those dates, and considered those transactions when imposing a sentence.

Date: January 8, 2026

_____
JEREMY C. DANIEL
United States District Judge

3