3:17-cv-03268 Document #: 890-31 Filed: 04/04/26 Page 1 of 72 PageID #:119813
E-FILED
Thursday, 08 May, 2025 02:17:15 PM
Clerk, U.S. District Court, ILCD

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## URBANA DIVISION

|  |  |  |
|---|---|---|
| **CHARLES PALMER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **Case No. 17-CV-3268** |
| | ) | |
| **CITY OF DECATUR, et al,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## ORDER

Plaintiff, Charles Palmer, filed a Second Amended Complaint (#43) on December 6, 2018, against Defendants alleging violations of his rights under the U.S. Constitution pursuant to 42 U.S.C. § 1983 and various Illinois state law claims due to his conviction for the murder of William Helmbacher, a conviction that was later overturned.

Defendants filed a Motion for Summary Judgment (#153) on April 16, 2021. On September 20, 2021, this court entered an Order (#210) granting in part and denying in part Defendants' Motion for Summary Judgment. Remaining for trial in this case are Plaintiff's claims for federal due process violations based on fabrication of evidence relating to the planting of blood (Count I), unlawful detention (Count II), failure to intervene (Count III), federal conspiracy (Count IV), Illinois state malicious prosecution (Count V), Illinois state intentional infliction of emotional distress ("IIED") (Count VI), Illinois state civil conspiracy (Count VIII), Illinois state respondeat superior (Count IX), and indemnification (Count X).

The remaining Defendants are Roger Morville, Roger Ryan, and Amy Waks, as special administrator of the Estate of Tim Carlton (Counts I, II, III, IV, V, VI, and VIII), and the City of Decatur (Counts IX and X).

The final pretrial conference in this matter was held on May 5, 2025, and jury trial is scheduled to begin on June 3, 2025. Defendants City of Decatur, Morville, and Ryan have filed Motions in Limine (#292) as has Defendant Waks (#293). Plaintiff has filed Responses (#298, #297, respectively) to both. Plaintiff filed his own Motions in Limine (#291), to which Defendants filed Responses (#295, #296).

*Motions in Limine in General*

"Trial courts issue rulings on motions in limine to guide the parties on what evidence it will admit later in trial." *Perry v. City of Chicago*, 733 F.3d 248, 252 (7th Cir. 2013). Later, as the trial progresses, the trial court remains free to alter earlier rulings. *Perry*, 733 F.3d at 252; see also *United States v. Hanjuan Jin*, 833 F.Supp.2d 957, 961 (N.D. Ill. 2011), citing *United States v. Connelly*, 874 F.2d 412, 416 (7th Cir. 1989) ("Because motions in limine are filed before a court has seen or heard the evidence at trial, rulings in limine are preliminary decisions that may be subject to alteration or reconsideration based upon the court's exposure to the evidence at trial."). The district court has discretion in making these rulings. *United States v. Wade*, 962 F.3d 1004, 1011 (7th Cir. 2020).

"Denial of a motion in limine does not necessarily mean that all evidence contemplated by the motion will be admitted at trial. Denial merely means that without the context of trial, the court is unable to determine whether the evidence in question should be excluded." *United States v. Haig*, 365 F.Supp.3d 1101, 1106 (D. Nev. 2019). The purpose of a motion in limine is to prevent the jury from hearing evidence that is clearly inadmissible on all possible grounds, and, therefore, "in some instances it is best to defer rulings until trial, where decisions can be better informed by the context, foundation, and relevance of the contested evidence within the framework of the trial as a whole." *Casares v. Bernal*, 790 F.Supp.2d 769, 775 (N.D. Ill. 2011).

*Defendants Ryan, Morville, and City of Decatur's Motions in Limine (#292)*

1.      Hearsay from Police Reports

Defendants first move to bar any inadmissible hearsay contained within police reports from being presented to the jury. Specifically, Defendants seek to bar police report hearsay from "untrustworthy sources." Plaintiff responds that it is too early for the court to make a blanket determination on the admission of hearsay statements in police reports, particularly as Defendants have not specifically identified the statements in question about which they have concerns. The court agrees with Plaintiff and RESERVES ruling on this issue. To the extent this Motion concerns statements of Jane Redenberg in police reports, the court addresses it below in Plaintiff's Motions in Limine.

3

2.      Facts About Douglas Lee as an Alternate Suspect

Defendants next seek to bar any evidence, argument, or even mention at trial of Douglas Lee as an alternate suspect in Helmbacher's murder.  Defendants argue that evidence and argument concerning Lee should be excluded because: (1) it is based entirely on speculation; (2) it is irrelevant; and (3) it is more prejudicial than probative. Defendants also argue the court should exclude "any evidence regarding Lee's propensity for violence[,]" as it would be improper propensity evidence.

Plaintiff responds that his theory of Lee as an alternate suspect is highly relevant Specifically, Plaintiff argues that: (1) evidence of an alternate perpetrator is evidence of innocence, which goes to damages; (2) evidence of an alternate perpetrator undermines probable cause; (3) evidence that Defendants abandoned investigating an alternate suspect shows malice; (4) evidence that Defendants abandoned investigating an alternate suspect is probative of fabrication; (5) evidence of Lee's guilt is admissible to prove Plaintiff's claims of conspiracy and IIED; and (6) any prejudice Defendants would suffer is outweighed by the probative value of the evidence.

**Speculation**

The court first addresses Defendants' argument that "the assertion that Lee had anything to do with Helmbacher's murder is pure speculation."  The court will not bar the evidence on this ground, as the Decatur Police Department ("DPD") did have what it believed to be evidence, in the early stages of the investigation into Helmbacher's death, suggesting that Lee could be a suspect, albeit such evidence was entirely

circumstantial and somewhat, but not entirely, speculative.  See *Palmer v. City of Decatur*, 2021 WL 7707939, at *8-13 (C.D. Ill. Sept. 20, 2021).  Therefore, Plaintiff's theory in this regard is not "pure speculation."

**Relevance**

Defendants next argue that whether Lee had anything to do with Helmbacher's murder is irrelevant to the issue to be decided by the jury in this case, which is whether Defendants planted Helmbacher's blood in Plaintiff's shoe.

Plaintiff responds that the evidence is relevant to damages and probable cause, as well as his malicious prosecution, fabrication, conspiracy, and IIED claims.

First, Plaintiff is correct that evidence of innocence can be relevant to damages. Evidence that someone else is responsible for the crime is certainly evidence that Plaintiff is not the one responsible.  See *Parish v. City of Elkhart, Indiana*, 702 F.3d 997, 1002 (7th Cir. 2012).  Such evidence of innocence can be critical to the issue of damages. See *Parish*, 702 F.3d at 1003.  Thus, evidence of Lee as an alternate suspect is relevant as to the extent of the harm suffered by Plaintiff in that it is evidence supporting his innocence.  See *Goudy v. Cummings*, 2019 WL 5291040, at *1 (S.D. Ind. Oct. 18, 2019).

Next, Plaintiff argues that the alternate suspect evidence is relevant for purposes of *liability*, not just damages, on his malicious prosecution, IIED, conspiracy, and fabrication claims.  While, in a general sense, evidence that the police failed to pursue a viable alternate suspect may be relevant to such claims, to be admissible, evidence "must be relevant to the facts the party intends to prove under the legal theory that has

been chosen to support the party's claim." *Allard v. Indiana Bell Telephone Co., Inc.*, 1 F.Supp.2d 898, 906 (S.D. Ind. 1998), affirmed in part and reversed in part on other grounds by *Adams v. Ameritech Services, Inc.*, 231 F.3d 414 (7th Cir. 2000), citing Charles Alan Wright & Kenneth W. Graham, Jr., Federal Practice And Procedure: Evidence § 5162. Evidence is relevant when it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. "To be relevant, evidence need not conclusively decide the ultimate issue in a case, nor make the proposition appear more probable, but it must in some degree advance the inquiry." *Thompson v. City of Chicago*, 472 F.3d 444, 453 (7th Cir. 2006).

The court finds that the alternate suspect evidence is relevant to Plaintiff's conspiracy, fabrication, IIED, and malicious prosecution claims, if only barely. The court's Order on summary judgment made clear that the remaining basis for those claims was Defendant officers' planting of Helmbacher's blood in Plaintiff's shoe (*Palmer*, 2021 WL 7707939, at *34-35 (fabrication), *42 (conspiracy), *46 (malicious prosecution, at least with respect to the probable cause element), and *47 (IIED)).

The central question to be answered with respect to those claims is whether Defendant officers worked together to plant blood in Plaintiff's shoe to frame him for Helmbacher's murder. Whether Defendants failed to pursue Lee as an alternate suspect in favor of framing Plaintiff could be relevant in the sense that, for example, if they let the actual murderer go unprosecuted, they had a motive to fabricate evidence and pin

6

the murder on someone else, i.e., Plaintiff.  As will be discussed below, and as was

recounted in the summary judgment Order, evidence of Lee's involvement was, for the

most part, somewhat weak and circumstantial.  Still, to be relevant, the evidence does

not have to conclusively decide the issue, which the alternate suspect evidence certainly

does not, but only "advance the inquiry" in some degree, which this evidence does.  See

*Thompson*, 472 F.3d at 453.

### Probative Value Versus Unfair Prejudice

In order to be admissible, however, the evidence must still pass muster under

Rule 403.  Under Rule 403, the district court is allowed to exclude evidence whose

probative value is substantially outweighed by the danger of unfair prejudice. Fed. R.

Evid. 403.  "Evidence is unfairly prejudicial 'only if it will induce the jury to decide the

case on an improper basis, commonly an emotional one, rather than on the evidence

presented.'"  *Davies v. Benbenek*, 836 F.3d 887, 890 (7th Cir. 2016), quoting *United States v.*

*Bogan*, 267 F.3d 614, 623 (7th Cir. 2001) (internal marks omitted).  The Seventh Circuit

gives "special deference" to the district court's admission of evidence under Rule 403.

*Davies*, 836 F.3d at 890.  "The amount of prejudice that is acceptable varies according to

the amount of probative value the evidence possesses."  *Lange v. City of Oconto*, 28 F.4th

825, 844 (7th Cir. 2022).

The court will first address the admissibility of the evidence as it pertains to liability for Plaintiff's remaining claims. Before doing so, the court must specify exactly what evidence concerning Lee Plaintiff wishes to admit, and the relative probative value of the individual pieces of evidence.

Defendants expect Plaintiff will offer the following evidence of Lee's guilt: (1) Lee had disputes with Helmbacher about Helmbacher's rent collection practices and his pay; (2) Lee did not fully cooperate with the investigation into Helmbacher's murder; (3) Lee had an opportunity to commit the murder; (4) Lee had motive to commit the murder; (5) Lee's friend, Jane Redenberg, reported to police that Lee made bizarre statements to her about the murder; (6) Lee's own blood was found on a towel in his car; (7) Lee changed clothes the night of the murder; (8) DNA results do not exclude Lee; (9) Lee had a violent personality; and (10) the police prematurely discontinued investigating Lee.

For the reasons discussed in the court's summary judgment Order, the court finds that the probative value of the blood on the towel and the gas station surveillance video regarding whether Lee changed clothes on the night of the murder to be minimal to nil. See *Palmer*, 2021 WL 7707939, at *38-41.

The rest of the evidence, as discussed in the summary judgment Order, *Palmer*, 2201 WL 7707939, at *8-13, paints a compelling picture of a possible alternate suspect in Helmbacher's murder, at least in the early days of the investigation before law enforcement became aware of Plaintiff's possible involvement. However, the alternate

8

suspect theory is not the actual basis for Plaintiff's remaining claims, which are almost entirely premised on the theory that Defendant officers framed Plaintiff by planting Helmbacher's blood in his shoes. The alternate suspect evidence may go to the background of the investigation, and provide support for a theory that Defendants had motive to frame Plaintiff because their deficient investigation into Lee went nowhere, but it is only tangentially related to the actual claims still at issue. As demonstrated in the court's summary judgment Order, the Lee evidence was really only discussed in the context of Plaintiff's *Brady*[1] claims that Defendants suppressed exculpatory evidence, which the court dismissed. Therefore, as it relates to the specific claims left in this case, the Lee evidence is only minimally probative.

Where Plaintiff's attempt to admit this evidence becomes a concern for the court, at least as it relates to liability, is its possible prejudicial impact under Rule 403. As stated above, evidence is unfairly prejudicial only if it will induce the jury to decide the case on an improper or irrational basis, such as by appealing to the jury's emotions, rather than on the evidence presented. *Davies*, 836 F.3d at 890; *Parish*, 702 F.3d at 1001.

The court believes that there is a significant danger that the narrative of Lee's guilt, despite the relatively circumstantial and speculative nature of the evidence supporting it, may be more compelling to jury than the actual basis for Plaintiff's claims, which is the conspiracy to plant blood in shoes to frame Plaintiff for the murder. Plaintiff, in his Motion, concedes that a deficient investigation is not an independent

---

[1]*Brady v. Maryland*, 373 U.S. 83 (1963).

basis for a constitutional claim. While it can be relevant and admissible to inform other constitutional claims, there is a very real and significant danger here that, despite the relative lack of competent evidence supporting the narrative, the alternate suspect theory becomes *the* basis for Plaintiff's claims in the minds of the jury. This greatly increases the risk that the jury will decide the claims due to the alternate suspect theory, and *not* on evidence that Defendants planted blood in Plaintiff's shoe.

The alternate suspect evidence, given its limited probative value to the actual claims at issue, as discussed above, has the potential to confuse or mislead the jury, especially because introduction of such evidence would consist of multiple mini-trials on Defendants' failure to investigate Lee and the strength of the evidence against Lee. See *Hill v. City of Chicago*, 2011 WL 3840336, at *11 (N.D. Ill. Aug. 30, 2011). Indeed, the alternate suspect evidence would most likely distract the jury from the central issue in this lawsuit, namely, whether Defendant officers fabricated evidence against Plaintiff by planting Helmbacher's blood in Plaintiff's shoe. See *Hill*, 2011 WL 3840336, at *11. Therefore, the court will, at this point, GRANT Defendants' Motion to bar the alternate suspect evidence as it relates to liability on Plaintiff's claims.

Admissibility related to damages is a much closer call. The Seventh Circuit has written that evidence of innocence in connection with alternate suspects is "critical to the damages issue." *Parish*, 702 F.3d at 1003. A plaintiff's guilt or innocence is "a significant issue for the jury in determining the appropriate damage award," and is not dependent on admissibility limitations pertinent to issues of liability. See *Parish*, 702

F.3d at 1001. The court finds that the alternate suspect theory is more relevant and probative to damages than it is to liability. Moreover, any danger of unfair prejudice is lessened as evidence of Plaintiff's innocence in this respect is more relevant and proper for the jury to consider in making its ultimate damages determination. Therefore, Defendants' Motion is DENIED with respect to admission of the alternate suspect evidence as to damages.

However, due to the highly unfair prejudicial nature of this evidence in the liability context, it may be advisable to bifurcate the trial with respect to liability and damages. "Under Federal Rule of Civil Procedure 42(b), a district judge may separate claims or issues for trial if the separation would prevent prejudice to a party or promote judicial economy." *Chlopek v. Federal Insurance Co.*, 499 F.3d 692, 700 (7th Cir. 2007). As of yet neither party has moved to bifurcate the trial. The court directs the parties to file position statements with respect to possible bifurcation of the trial into liability and damages phases by May 14, 2025.

All of that being said, this ruling is preliminary and subject to change. Defendants will apparently, as part of their defense at trial, argue that Plaintiff is actually guilty of Helmbacher's murder. Thus, evidence indicative of innocence would be relevant and probative to Plaintiff's case. See *Sanford v. Russell*, 531 F.Supp.3d 1221, 1224 (E.D. Mich. 2021). If Defendants elect to focus their defense on evidence and argument of Plaintiff's guilt, instead of focusing on the lack of evidence for fabrication,

11

the more relevant and probative evidence of Plaintiff's innocence, and therefore the alternate suspect theory, may become. See *Parish*, 702 F.3d at 1002-03.

3.       Claims of *Brady* Violations

Defendants next move to bar Plaintiff from referring to any evidence as being "suppressed," because to do so would revive his *Brady* claims that the court dismissed at summary judgment due to the lack of evidence supporting suppression or materiality. Defendants argue that any evidence of suppression is irrelevant to the remaining claims and unduly prejudicial.

Plaintiff responds that Defendants' argument on this point is unclear, and exactly what pieces of evidence Defendants request the court to bar are similarly unclear. Plaintiff further argues that, although he will not contend at trial that Defendants can be held liable for their suppression of exculpatory evidence due to the court's *Brady* ruling, "the fact that Defendants suppressed those items of evidence is also relevant to other elements of other claims in this case."

Defendants do not appear to be arguing that certain evidence should be barred. To the extent they are, those arguments are dealt with in other Motions in Limine in this Order. Rather, Defendants appear to be arguing that Plaintiff should be barred from characterizing any evidence, whether that evidence is admissible or not, as "suppressed." The court agrees with Plaintiff that sweeping with such a broad brush would be inadvisable.

For example, a crucial part of Plaintiff's fabrication claim is that Carlton omitted from two separate testimonies the fact that no blood had been found on Plaintiff's shoes the first time they were sent to the Illinois State Police ("ISP") lab. Such testimony could be characterized as "suppression" of evidence. The court finds that, so long as the evidence at issue is admissible, and there is evidence that could suggest suppression on the part of Defendants, Plaintiff can make such argument to the extent it is relevant to the remaining claims in this case. Therefore, Defendants' Motion is DENIED on this ground. If Defendants believe that Plaintiff is referencing inadmissible evidence or is coming too close to reviving the dismissed *Brady* claims, they may renew their objection.

4.     Evidence of Post-Conviction Litigation

Defendants next move to bar any evidence derived from Plaintiff's post-conviction litigation. Specifically, Defendants seek to bar Plaintiff's Certificate of Innocence ("COI"), evidence regarding hairs supposedly found in Helmbacher's hands that were never tested for DNA during the criminal investigation, the fact that the DPD reopened the murder investigation after Plaintiff's release from prison, and that Plaintiff was "exonerated" by post-conviction DNA analysis and results. Defendants argue that allowing this evidence would "hijack" the trial from the sole remaining issue: whether Defendants planted Helmbacher's blood in Plaintiff's shoe.

Plaintiff responds that this evidence is relevant to his innocence, which is a central component to the damages claim in this case. Plaintiff also argues that evidence that he was exonerated due to being excluded as a contributor to DNA on the murder weapon is relevant to liability for the remaining claims, as "facts and forensic evidence showing that Plaintiff was not the perpetrator make it more likely that the victim's blood ended up on his shoes via blood plant – i.e., if DNA shows that someone else committed the crime, there is no good crime-scene related explanation for how the blood ended up on Plaintiff's shoes, and the prospect that it was planted becomes more likely."

While the planting of blood is the central component to Plaintiff's remaining claims, it is not the *only* component, as evidence not directly related to blood planting, but making it more or less likely that the blood was planted, is relevant. See Fed. R. Evid. 401. Moreover, as stated above, evidence of innocence is relevant to the extent Defendants raise Plaintiff's guilt in the underlying case as a defense in this case.

The court will address the admissibility of the COI in the section on Plaintiff's Motions in Limine below. As to the post-conviction DNA evidence, Plaintiff's "exoneration," and the reopening of the Helmbacher murder investigation, such evidence is relevant and probative to both damages and liability, to the extent it does not conflict with other evidentiary rulings made by the court, such as the alternate suspect theory. Setting aside the alternate suspect theory, the probative value of the other evidence cited is not substantially outweighed by any unfair prejudice. The

14

reopening of the investigation is highly relevant to counter Defendants' defense that Plaintiff is guilty. It is true that addressing the post-conviction DNA evidence may create a "mini-trial," but this mini-trial does not have near the risk of confusing the jury that the alternate suspect evidence does. It will help explain to the jury the background to why Plaintiff was released from prison and his conviction for Helmbacher's murder overturned. Moreover, Defendants, for example, may counter whatever weight Plaintiff attempts to put on the post-conviction DNA evidence with testimony from Lucy Davis. Defendants will not be unduly prejudiced by this evidence. Defendants' Motion is DENIED as it relates to the COI, post-conviction DNA evidence, and the reopening of the murder investigation.

   5.   Claims of a "Deficient" Murder Investigation

Defendants next move to bar Plaintiff from introducing evidence of Defendants' incomplete investigation because this evidence is irrelevant to Plaintiff's claims. Defendants specifically seek to bar evidence that the DPD failed to request certain evidence testing by the ISP lab; that certain activities left open on a "LEADS" sheet for follow-up were not completed; that Lee should have been considered a suspect longer; and "so on."

The court will not address whatever Defendants mean by "so on," and evidence related to Lee is discussed above in Defendants' Motion No. 2.

The remaining evidence cited by Defendants are basically pieces of evidence that Defendants did not "follow up" on before Plaintiff was arrested.  It is true, as Defendants argue, that when considering a *Brady* claim, "there is no obligation to disclose latent evidence that is discoverable only through further testing." *Camm v. Faith*, 937 F.3d 1096, 1109 (7th Cir. 2019).  However, an argument that an investigation was so "shoddy that a simple test on a highly important piece of physical evidence" was "overlooked" could, in turn, "set up an argument that [defendants] were hiding crucial evidence because they thought it might undermine their case against" a plaintiff. See *Camm*, 937 F.3d at 1109-10.  Thus, the court finds this evidence relevant to Plaintiff's damages claim and to liability for the remaining substantive claims.

Defendants also argue that this evidence should be barred because "police officers have no duty to investigate extenuating circumstances or search for exculpatory evidence once probable cause has been established via the accusation of a credible witness." *Burritt v. Ditlefsen*, 807 F.3d 239, 250-51 (7th Cir. 2015) (cleaned up).  While this is true, this is only the case once probable cause has already been established.  The relevant evidence here predates the establishment of probable cause, which this court found to have been formed once Plaintiff's shoe came back with Helmbacher's blood being in it.  See *Palmer*, 2021 WL 7707939, at *41.

Defendants make no real argument as to prejudice.  While, again, there is potential for prejudice, the evidence is probative and, unlike the alternate suspect evidence, does not run the risk of misleading or confusing the jury in such a way as to implicate Rule 403.  Defendants' Motion is DENIED with respect to the identified evidence.

6.　　　Characterization of Carlton's Testimony

Defendants next move to bar Plaintiff from "mischaracterizing" Carlton's testimony from the February 18, 1999, preliminary hearing.  Defendants believe that Plaintiff will argue Carlton lied at that hearing, and request the court bar Plaintiff "from misstating or mischaracterizing Carlton's preliminary hearing testimony."  Defendants argue that, since Carlton is dead, the statements are hearsay, and, moreover, that to allow the "mischaracterization" "would be an injustice" because the bare transcript is "ambiguous" and "[t]here is no tape to judge inflection or tonal emphasis, and Carlton is not here to explain what he meant."

At the preliminary hearing on February 18, 1999, Carlton discussed only two categories of evidence: the blood found on Plaintiff's shoe and Ray Taylor's story about Plaintiff's supposed confession.  No other evidence was discussed.  Carlton also testified that the shoes were sent to the crime lab and blood was found, and that they were sent back to the lab and the blood was matched to Helmbacher.  Based on those two pieces of evidence, the court concluded that there was probable cause to believe Plaintiff committed the offense.

17

Carlton later testified at a suppression hearing that the shoes were sent to the lab and came back about five months later with the results that Helmbacher's blood was on them. Carlton did not testify at the preliminary hearing or suppression hearings that the shoes were examined once, tested negative for blood, and returned to DPD.

At summary judgment this court agreed with Plaintiff that Carlton's "testimony in this regard [was] troubling[,]" and "[t]aken in the light most favorable to Plaintiff, a trier of fact could conclude that Carlton was misstating the evidence and being deceptive about what happened involving the shoes and covering up the fact that no human blood was found the first time." *Palmer*, 2021 WL 7707939, at *33. Thus, this evidence is highly relevant to Plaintiff's fabrication claim, and any prejudice Defendants would suffer from its admission is outweighed by its highly probative nature.

The court further agrees with Plaintiff that Carlton's statements at the preliminary hearing are not hearsay, as they could be admissible as an opposing party's statement (Rule 801(d)(2)) or the prior testimony exception to hearsay in Rule 804(b)(1).

The court also disagrees with Defendants that the admission of the statements and the characterization or inference Plaintiff will argue to the jury amounts to an "injustice." The purpose of motions in limine is to resolve trial-related evidentiary issues. *Ajala v. Swiekatowski*, 2015 WL 5009802, at *3 (W.D. Wis. Aug. 19, 2015). The court has resolved the evidentiary issue on this point. Defendants appear to want the court to bar Plaintiff from suggesting to the jury what he believes that evidence shows, an argument that will likely arise during closings. But "[a]ttorneys have more leeway

18

in closing arguments to suggest inferences based on the evidence, highlight weaknesses in the opponent's case, and emphasize the strengths in their own case." *Soltys v. Costello*, 520 F.3d 737, 745 (7th Cir. 2008). "In closing argument, Plaintiff's counsel may suggest inferences regarding the evidence and characterize the evidence in a way that supports Plaintiff's case." *Elrod v. Yerke*, 890 F.Supp.2d 995, 1005 (N.D. Ill. 2012). Plaintiff can characterize the evidence and suggest reasonable inferences arising from that evidence in a way that supports his case, and Defendants are free to do the same and rebut Plaintiff's argument. Defendants' Motion is DENIED on this ground.

<u>7.</u>　　<u>Plaintiff's Acquittal on the Burglary Charge</u>

Defendants next move to bar evidence of Plaintiff's acquittal by the jury on the burglary charge in the underlying criminal case. Defendants argue that this has no relevance to whether Plaintiff was denied due process for the murder charges against him, and no probative value. Therefore, Defendants request evidence or argument related to the burglary acquittal be barred pursuant to Rules 402 and 403.

Plaintiff responds that Defendants' argument on this point is perfunctory, and thus the court should find it waived. In the event the court does not find it waived, Plaintiff argues the acquittal is essential to proving that the allegedly fabricated evidence, the blood in his shoe, was material. Plaintiff argues that his acquittal on the burglary charge shows the jury did not believe Taylor's testimony about Plaintiff, and therefore his conviction for murder must have been based on the blood evidence and not Taylor's testimony.

Plaintiff further argues that his acquittal is necessary evidence to rebut Defendants' arguments regarding his guilt that rely on Taylor's statements and testimony.

"Evidence of acquittal in a criminal action is generally irrelevant and inadmissible in a civil case involving the same incident 'since it constitutes a negative sort of conclusion lodged in a finding of failure of the prosecution to sustain the burden of proof beyond a reasonable doubt.'" *Estate of Moreland v. Dieter*, 395 F.3d 747, 755 (7th Cir. 2005), quoting *Borunda v. Richmond*, 885 F.2d 1384, 1387 (9th Cir. 1989).

Here, Plaintiff has demonstrated the relevance of the outcome of his criminal burglary case to the instant civil case. However, the probative value of the acquittal is undercut by the starkly different standards applied in criminal and civil matters, with criminal cases requiring a much higher "beyond a reasonable doubt" standard than the preponderance of the evidence "more likely than not standard" required in civil cases. See *Dixon v. Baldwin*, 2024 WL 5003069, at *4 (S.D. Ill. Dec. 6, 2024).

The fact that the jury declined to convict Plaintiff on the burglary charge does not necessarily mean that they completely disbelieved Taylor, leading to the inference that the *only* reason Plaintiff was convicted of the murder charge was due to the allegedly fabricated evidence. It *may* mean that, but it is also entirely speculative. The jury may have believed Taylor's testimony, but not to the extent required by the burden of proof. Thus, the reduced probative value is outweighed by the significant prejudice the evidence of Plaintiff's acquittal poses to Defendants, and considering that evidence

of acquittal in a criminal action is generally inadmissible in a civil case involving the same incident, the court finds that Defendants' Motion should be GRANTED in this respect.  See *Adams v. Szczerbinski*, 329 Fed. Appx. 19, 23 (7th Cir. 2009).

    8.      <u>Burglary Charges Against Taylor Dropped by State's Attorney</u>

Defendants next seek to bar evidence that the Macon County State's Attorney's Office dropped Taylor's burglary charges following his testimony at Plaintiff's murder trial.  Defendants argue that the decision to drop charges was made by prosecutors, not by any of the individual Defendants, who are police officers and had no part in dismissing the charges.  Thus, the dismissal of the burglary charge is irrelevant to this case.  Plaintiff responds that the dismissal of Taylor's burglary charge is relevant to showing Taylor's possible bias, self-interest, and motive to lie.

Evidence showing a witness' bias or motive to lie is relevant and generally permissible material for cross-examination.  *Harris v. City of Chicago*, 2017 WL 2462197, at *2 (N.D. Ill. June 7, 2017), citing *United States v. Jamison*, 635 F.3d 962, 965 (7th Cir. 2011); *United States v. Abel*, 469 U.S. 45, 52 (1984) ("Bias may be induced by a witness' like, dislike, or fear of a party, or by the witness' self-interest.  Proof of bias is almost always relevant because the jury, as finder of fact and weigher of credibility, has historically been entitled to assess all evidence which might bear on the accuracy and truth of a witness' testimony.").

The court does not know the manner in which Taylor's testimony at the murder trial will be used in this trial, or if Taylor himself will testify in this trial and what testimony Taylor will provide. To the extent the defense case relies in any way on Taylor's testimony at the criminal trial, the dropping of charges in the underlying case is relevant to issues of Taylor's bias and credibility, and is therefore admissible. To be sure, Defendants will be prejudiced by such evidence, but that prejudice is not unfair, regardless of whether Defendants *themselves* made the promise or decision to drop the charges. The fact remains that the charges were dropped after Taylor provided testimony implicating Plaintiff in Helmbacher's murder. It would not be unreasonable to draw an inference that his charges were dropped in exchange for his testimony. Therefore, Defendants' Motion is DENIED at this time.

9.    Jury Deliberations in Plaintiff's Criminal Trial

Defendants next seek to bar details from Plaintiff's underlying criminal trial, including, but not limited to: (1) questions the jury asked of the court; (2) how long the jury was out; and (3) any potential for a hung jury. Defendants argue that such evidence is irrelevant to the remaining issue in this case of whether they planted blood in Plaintiff's shoe, and would be unduly prejudicial under Rule 403. Plaintiff does not oppose this Motion, and therefore it is GRANTED.

10.  Argument or Evidence that Defendants Failed to Submit DNA to CODIS

Defendants next move to bar Plaintiff from making any reference or offering any evidence of the request and refusal to submit to the Combined DNA Index System ("CODIS") certain DNA data obtained from the hammer handle previously believed to be the murder weapon.

Defendants made a similar request that the court addressed in the earlier *Daubert*[2] Motions concerning Plaintiff's expert Thomas Fedor.  There, Defendants sought to bar Fedor's opinion that "the DNA results obtained from the hammer handle may be suitable for submissions to [CODIS, and by] submitting the DNA profile to CODIS the source of the major contributor to the hammer handle DNA might be identified."  Defendants argued that such testimony was irrelevant, because the remaining issue in this case was whether the victim's blood was planted on or within Plaintiff's shoe, and because the court already ruled in an earlier Order (#150) that Defendants could not be compelled to submit DNA profiles to CODIS as there was no legal basis to force such submission.

Plaintiff responded that this evidence was relevant, and that his claim was not strictly limited to fabrication of evidence.  Plaintiff further argued that the court's earlier ruling on the CODIS issue had no impact on Fedor's opinion, as it was relevant and "the fact that the court did not order the testing has nothing to do with the reality that Defendants could have submitted it themselves, but actively resisted."

---

[2]*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

23

The court reserved the issue of relevance.  Next, the court found Defendants' argument on the prior Motion to Compel unpersuasive because Defendants cited no authority for the proposition that, because the court found that Defendants could not be compelled to submit the DNA evidence to CODIS for a search as such a search could only be generated by or on behalf of a criminal justice agency for law enforcement purposes, Plaintiff should be barred from introducing evidence at trial that Defendants never performed or requested such a search.  The court then stated that "[t]here is nothing in the court's ruling on the Motion to Compel that would bar Plaintiff from introducing the fact that the DNA evidence was not submitted by Defendants to CODIS *during the criminal case.*"  (Emphasis added).

Defendants now seek clarification on the court's prior Order, arguing that there was no opportunity for them to send the DNA to CODIS in the underlying criminal case, and that the court should bar any mention of their refusal to send the DNA to CODIS in *the instant civil litigation*.  Defendants again argue that it is not relevant to Plaintiff's fabrication of evidence claim.

Plaintiff responds that Defendants' refusal to send the DNA to CODIS is relevant because it is evidence of Plaintiff's innocence, and Defendants are expected to argue that Plaintiff is not innocent of Helmbacher's murder, or at least that there is insufficient evidence of innocence.  Plaintiff also argues that the evidence is admissible against Defendants as relevant to his conspiracy claim.  Plaintiff argues that "Defendants' disinterest in the testing to the point of opposing it is also probative of Defendants'

24

continuing conspiracy to limit the discovery of evidence that would show that

Defendants violated Plaintiff's constitutional rights during their investigation and

throughout Plaintiff's trial, continuing even now when Plaintiff is fighting to vindicate

those same rights."

The court disagrees with Plaintiff that Defendants' opposition to CODIS testing

during this litigation is evidence of the conspiracy to frame him, which concerns

Defendant officers' actions during the original underlying criminal case, not any action

in this litigation.

However, if Defendants intend to argue either that Plaintiff is guilty of

Helmbacher's murder, or that he has not demonstrated sufficient factual innocence, this

evidence is relevant to the extent it supports Plaintiff's claims of innocence. See *Sanford*,

531 F.Supp.3d at 1224 ("It is well settled that evidence of innocence is relevant to both

liability and damages in any wrongful prosecution case where the factual premise of

actual innocence remains in dispute. *Ayers v. City of Cleveland*, 773 F.3d 161, 169 (6th

Cir. 2014). Conversely, the absence of a live dispute on that aspect of the case may

nullify the relevance, and the defendants' position would be well taken if they were

willing to concede the plaintiff's factual innocence. However, not only are the

defendants not willing to stipulate to the plaintiff's innocence of the underlying crime,

they doggedly have insisted throughout this litigation that the plaintiff actually

committed or aided the commission of the Runyon Street murders."); see also *Parish*,

25

702 F.3d at 1003 (reversing for new trial where court excluded evidence of innocence and minimal damages indicated that jury believed the plaintiff had been guilty).

The court now clarifies its prior Order to state that there is nothing in the court's ruling on the Motion to Compel that would bar Plaintiff from introducing the fact that the DNA evidence was not submitted by Defendants to CODIS *during the instant civil case*. Indeed, Defendants have cited no case law or statutory law in support of their request, outside of a general references to Rules 402 and 403.

While the admission of this evidence, like most relevant evidence is, by its nature, prejudicial, it is only *unfair* prejudice that requires exclusion. See *Parish*, 702 F.3d at 1001. "Evidence is unfairly prejudicial if it would cause the jury to decide the case on an improper or irrational basis, such as by appealing to the jury's emotions." *Parish*, 702 F.3d at 1001. This evidence does not fall into that category. The arguments Defendants advance about Plaintiff's CODIS request being an "obvious ploy" to allow Plaintiff to "disingenuously" argue that the DNA results "showed a multitude of suspects" is best made to the jury to demonstrate *why* Defendants objected to the request. Defendants' Motion is DENIED in this respect.

11.    Deficiencies of the Decatur Police Department's Policies

Defendants next seek to bar any contention faulting the DPD's policies because the court has granted summary judgment on Plaintiff's *Monell*[3] claim, and alleged deficiencies in DPD policies and procedures have no relevance to any remaining claim.

---

[3]*Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978).

Plaintiff responds by conceding that, in light of this court's summary judgment ruling, admission of DPD policy deficiencies is not relevant to any remaining federal claims, but argues that evidence of Defendants' *deviations* from DPD policies "can be used to prove Defendants' intent to violate Plaintiff's rights, and elements related to Plaintiff's malicious prosecution and [IIED] claims."

"Testimony regarding the standards of conduct that the law enforcement community has developed for use by its members is irrelevant in determining whether a police officer's conduct is 'objectively reasonable' under the Fourth and Fourteenth Amendments." *Legg v. Agee*, 2009 WL 56876, at *5 (C.D. Ill. Jan. 6, 2009), citing *Thompson*, 472 F.3d at 454. Accordingly, any testimony regarding police department guidelines, police best practices, internal standards for police conduct, and the like, are inadmissible. See *Legg*, 2009 WL 56876, at *5; see also *United States v. Brown*, 871 F.3d 532, 536-37 (7th Cir. 2017); *Cole v. Perry*, 2019 WL 4165304, at *1-10 (S.D. Ind. Apr. 30, 2019). Thus, Defendants' Motion is GRANTED as it concerns any constitutional violations.

"While inadmissible to the Fourth Amendment reasonableness inquir[y], evidence of rule, policy, and training violations may be admissible as circumstantial evidence of intent." *Hernandez for Estate of Cruz v. City of Peoria*, 2023 WL 5015418, at *2 (C.D. Ill. Aug. 4, 2023), citing *United States v. Proano*, 912 F.3d 431, 438-39 (7th Cir. 2019) (in criminal prosecution under 18 U.S.C. § 242 for violation of an individual's Fourth Amendment rights, "evidence of departmental policies can be relevant to show intent

27

..."); *Hobgood v. Illinois Gaming Board*, 731 F.3d 635, 645 (7th Cir. 2013) (in First Amendment retaliation claim, "[s]ignificant, unexplained or systemic deviations from established policies and practices can no doubt be relative [sic] and probative circumstantial evidence of intent.").

Evidence of deviation from established DPD policies and procedures may be relevant to the extent Plaintiff needs to prove willful and wanton behavior with respect to Illinois state law claims or punitive damages. Thus, the court will DENY, at this time, Defendants' Motion to the extent it also seeks to bar Plaintiff from arguing that Defendants deviated from those policies and procedures. See *Hernandez*, 2023 WL 5015418, at *2. Plaintiff states that he will not argue the policies and procedures themselves were deficient or the cause of any constitutional deprivation.

12.     Indemnification By City of Decatur

Defendants next move to bar any evidence or argument that the City of Decatur will indemnify the individual Defendants and/or Carlton's Estate. Specifically, "Defendants seek to preclude Plaintiff from presenting any evidence, eliciting any testimony, or making any argument that damages will be paid by the City, that the City will indemnify the individual Defendants and/or Carlton's Estate for any damages awarded against them, and/or that the City is paying for the defense." Defendants argue that such evidence is irrelevant and overly prejudicial.

Plaintiff does not object, so long as Defendants do not open the door by presenting evidence or argument of their own poverty or lack of financial resources to pay a judgment. Defendants' Motion is GRANTED. However, if Defendants open the door as described in the preceding sentence, Plaintiff may present evidence of indemnification. See *Christmas v. City of Chicago*, 691 F.Supp.2d 811, 819 (N.D. Ill. 2010).

*Defendant Waks' Motion in Limine (#293)*

1.      Bar Plaintiff from Testifying as to Any Statement or Act by Carlton

Defendant Waks, as special administrator of Carlton's Estate, moves the court to bar Plaintiff "from testifying to any statement or act by Tim Carlton occurring in the presence of [Plaintiff]." Defendant cites Illinois' Dead Man's Act (735 Ill. Comp. Stat. 5/8-201) in support of her argument.

Plaintiff responds that the Illinois Dead Man's Act does not apply in this case. Plaintiff is correct. Federal Rule of Evidence 601 states, "Every person is competent to be a witness unless these rules provide otherwise. But in a civil case, state law governs the witness's competency regarding a claim or defense for which state law supplies the rule of decision." However, the Dead Man's Act does not apply in cases where the testimony sought to be excluded relates to overlapping state and federal claims. *Arrington v. City of Chicago*, 2022 WL 3357272, at *2 (N.D. Ill. Aug. 15, 2022); *Horton v. City of Chicago*, 2018 WL 4699790, at *4 n.5 (N.D. Ill. Sept. 30, 2018); *Estate of Chlopek v. Jarmusz*, 877 F.Supp. 1189, 1193 (N.D. Ill. 1995).

The court concludes that the federal and state claims in this case are overlapping because they primarily involve a single claim concerning fabrication of evidence. Defendant's Motion is DENIED.

### 2. Punitive Damages Against the Estate

Defendant next moves to bar any evidence or argument "stating or tending to suggest that the Estate of Tim Carlton should be punished or that punitive damages should be awarded against the Estate." Defendant argues that: (1) the Second Amended Complaint does not purport to seek punitive damages against the Estate; and (2) punitive damages cannot be awarded against the deceased or the deceased's Estate. Plaintiff responds that he does not intend to argue that a jury should impose punitive damages as to Carlton's Estate or on Defendant Waks as special administrator. Therefore, Defendant's Motion is GRANTED.

### 3. Character, Reputation, or Habit Evidence Concerning Carlton

Defendant next moves to bar "all testimony or opinion that opines or tends to suggest an alleged character, reputation, or habit of Tim Carlton for 'cutting corners,' lack of detail, or sloppiness in his investigations and reports." Defendant argues such character evidence is barred by Federal Rules of Evidence 404(a)(1) and (b)(1) and, even if relevant, "would be unfairly prejudicial to this Defendant designed to stoke prejudice against a decedent unavailable to rebut the prejudicial matter."

Plaintiff responds that the court should reserve this Motion, as Defendant has not yet specified what exact evidence regarding Carlton's character she wishes to bar. The court agrees. The court may deny a motion in limine when it lacks the necessary specificity with respect to the evidence to be excluded, although later, at trial, the court may alter its limine ruling based on developments at trial or on its sound judicial discretion. *Rosenberg v. Cottrell, Inc.*, 2007 WL 2028789, at *1 (S.D. Ill. July 12, 2007). A court considering a motion in limine may also reserve judgment until trial, so that the motion is placed "in an appropriate factual context." *Rosenberg*, 2007 WL 2028789, at *1.

The court will RESERVE ruling on Defendant's Motion until trial, where Defendant may renew her objection to specific, discrete pieces of evidence regarding Carlton's character that she believes are inadmissible under Rule 404 or so unfairly prejudicial so as to outweigh any probative value under Rule 403.

*Plaintiff's Motions in Limine (#291)*

### 1.     Admission of Plaintiff's Certificate of Innocence

Plaintiff first moves to admit his COI into evidence at trial. Plaintiff argues that the COI is admissible because (1) case law in the Seventh Circuit "unanimously supports the admissibility of a COI"; (2) it shows liability for his Illinois malicious prosecution claim; (3) it shows liability for his federal due process and state IIED claims; and (4) it is relevant to damages.

31

Defendants object to the admission of Plaintiff's COI, arguing it should be barred under Federal Rules of Evidence 402 and 403 because whether Plaintiff was actually innocent or truly exonerated has no relevance to the issue at the heart of Plaintiff's due process and IIED claims: whether Defendants violated Plaintiff's rights by planting the victim's blood in Plaintiff's shoe. Defendants also argue that the issue of blood planting is not relevant to the COI, as that claim was never presented in Plaintiff's petition for a COI in state court. Rather, the COI was granted based on results of postconviction DNA analysis, which Defendants argue should never have been reached given the data underlying the analysis. Defendants request, should the court allow the COI to be admitted, that they not be precluded from presenting evidence from their DNA forensics expert Lucy Davis to challenge the basis for the COI.

In *People v. Palmer*, 182 N.E.3d 672 (Ill. 2021), the Illinois Supreme Court directed that Plaintiff be issued a COI because Plaintiff had proven, by a preponderance of the evidence, that he was innocent of the offense as charged in the indictment, specifically first degree murder wherein Plaintiff, without lawful justification and with the intent to kill or do great bodily harm to the victim, repeatedly struck the victim on the head, thereby causing his death. *Palmer*, 182 N.E.3d at 685. The COI was issued based on DNA analysis of blood collected under Helmbacher's fingernails and from bags placed around Helmbacher's hands, which excluded Plaintiff as the principal offender in Helmbacher's murder, directly contradicting the State's original theory of Plaintiff's guilt. *Palmer*, 182 N.E.3d at 686.

32

First, the court agrees with Defendants that the COI is not directly relevant to Plaintiff's due process and IIED claims, which hinge on Plaintiff's theory that Helmbacher's blood was planted by law enforcement in Plaintiff's shoe to frame him for Helmbacher's murder.  Although such a theory was apparently raised in Plaintiff's amended petition for a COI, *Palmer*, 182 N.E.3d at 679, it was not the basis on which the Illinois Supreme Court directed the COI be issued.  *Palmer*, 182 N.E.3d at 683-86.

The COI may, however, be relevant to damages, because a jury may award damages based in part on whether Plaintiff is actually innocent, and Defendants have made it clear that they plan to contest liability and minimize damages by presenting evidence that Plaintiff committed the crime. See *Kluppelberg v. Burge*, 84 F.Supp.3d 741, 746 (N.D. Ill. 2015), citing *Parish*, 702 F.3d at 1003.

Moreover, regarding Plaintiff's malicious prosecution claim, the Seventh Circuit has held that COIs are "directly relevant" in malicious prosecution claims "to an element on which" Plaintiff bears the burden of proof: "that the prosecution against him was terminated in a manner indicative of innocence." *Patrick v. City of Chicago*, 974 F.3d 824, 833 (7th Cir. 2020).  "The indicative-of-innocence element is an element of the malicious prosecution claim." *Gray v. City of Chicago*, 2023 WL 7092992, at *11 (N.D. Ill. May 8, 2023).

The Seventh Circuit recognized, however, that "a certificate of innocence carries a risk of unfair prejudice if misunderstood[,]" and that "the admissibility calculus should be weighed with care." *Patrick*, 974 F.3d at 833. In *Patrick*, the Seventh Circuit noted the substantial limits of the COI's probative value in that case, because the petition only summarized the evidence, no affidavits or other evidence were adduced, no hearing was held, and the State took no position on the plaintiff's petition. *Patrick*, 974 F.3d at 833. Thus, the COI did "not really reflect a factual finding arising from the crucible of the adversarial process, which our legal system regards as the best means of discovering the truth[,]" and the "defendants were understandably concerned that jurors may be tempted to give conclusive weight to the certificate of innocence merely because it reflects a formal judicial finding." *Patrick*, 974 F.3d at 833.

Here, in contrast, the amended petition in support of Plaintiff's COI went into great detail on the evidence at trial and new evidence, and contained fully developed arguments which were vigorously contested at the trial, appellate, and supreme court levels by the State, thus obviating the concerns present in *Patrick*. *Palmer*, 182 N.E.3d at 679-80.

The Seventh Circuit also noted that there was "a possibility that introducing a certificate of innocence as evidence in a civil-rights suit may risk confusing the issues[,]" because the "jury in a case like this need not decide the plaintiff's innocence but instead is asked to determine whether one or more of the defendants violated his federal constitutional or state-law rights in the manner alleged." *Patrick*, 974 F.3d at 833. "The

34

focus of a certificate-of-innocence petition is different; the state-court judge considers the materials attached to the petition in relation to the evidence presented against the petitioner at his criminal trial." *Patrick*, 974 F.3d at 833.

However, the Seventh Circuit wrote that "[w]ell-crafted jury instructions can guard against the risk of unfair prejudice or confusion of the issues[,]" and cited by way of example to the jury instruction issued by then-district court Judge St. Eve in *Harris v. City of Chicago*, 2018 WL 2173992, at *4-6 (N.D. Ill. May 11, 2018).

Here, the court could issue an instruction that states, for example:

The State court decided different issues than those before you when issuing the Certificate of Innocence. The State court was not asked to nor did it decide the issue of whether Plaintiff's constitutional rights were violated or whether the Defendants engaged in any misconduct under state or federal law. The State court was not asked to nor did it decide the issue of whether Defendants fabricated evidence against Plaintiff by planting William Helmbacher's blood in Plaintiff's shoe. These are issues for you alone to decide. You have listened to and heard all the evidence in this case and are to decide this case based on the evidence you heard in this case and this case alone.

See *Harris*, 2018 WL 2183992, at *5.

Or:

(1) the state court's decision to issue a Certificate of Innocence is not binding on the jury in this case, (2) the Certificate of Innocence court considered different evidence than what has been presented to this jury, and (3) the Certificate of Innocence court did not consider whether Defendants fabricated evidence against Plaintiff by planting William Helmbacher's blood in Plaintiff's shoe.

See *Brown v. City of Chicago*, 2023 WL 2640317, at *2 (N.D. Ill. Mar. 22, 2023).

Morever, Defendants will be allowed to present testimony from Davis to challenge the basis for the COI, consistent with the rulings in the court's Order (#288) on Plaintiff's request to exclude Davis' testimony.

Therefore, Plaintiff's Motion is GRANTED in this respect, as detailed above.

2.      Bar Introduction of Plaintiff's Prior Bad Acts

Plaintiff next moves to bar introduction of any prior arrests or convictions in his past. Plaintiff argues that any prior arrests that did not result in convictions are inadmissible, as is any "speculation or evidence relating to entirely uncharged or unsubstantiated crimes[.]" Plaintiff argues such evidence would also be overly prejudicial under Rule 403. Plaintiff further seeks to bar the admission of his past criminal convictions because they are over 20 years old, and none of the limited exceptions allowing their admission apply.

Defendants object to Plaintiff's request, arguing Plaintiff's prior arrests and convictions are relevant under Federal Rule of Evidence 404(b) to show Defendants' state of mind, their investigatory process, and to the extent they establish probable cause. Defendants also argue that Plaintiff's prior arrests and convictions are relevant to Plaintiff's damages claims, to the extent he claims that he was traumatized by this event. Finally, Defendants argue they may pursue testimonial evidence regarding prior convictions and arrests for impeachment purposes under Federal Rule of Evidence 609 should Plaintiff testify and open the door.

**Prior Arrests or Uncharged Conduct**

"It's well established that '[i]n general, a witness's arrest record will not be admissible.'" *Nelson v. City of Chicago*, 810 F.3d 1061, 1067 (7th Cir. 2016), quoting *Thompson v. City of Chicago*, 722 F.3d 963, 977 (7th Cir. 2013). Defendants advance two bases for admitting Plaintiff's prior arrests or uncharged conduct: to show Defendant officers' state of mind during their investigation of Plaintiff for murder and for damages purposes.

The court first addresses Defendants' argument that Plaintiff's prior arrests are admissible to show Defendants' state of mind during their investigatory process that informed their probable cause determination. Here, Defendants cite to just one instance of a prior arrest that they believe is admissible on this ground, a prior arrest for burglary.

Rule 404(b)(1) bars the use of prior bad acts, such as prior arrests, to show propensity, i.e., "to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." However, Rule 404(b)(2) "specifically allows evidence of other bad acts to prove state of mind." *United States v. House*, 2015 WL 1058093, at *2 (N.D. Ill. Mar. 6, 2015).

37

Plaintiff's prior arrest for burglary may indeed be relevant under Rule 404(b)(2) to show the officers' state of mind at the time they were investigating Plaintiff for the burglary of Helmbacher's apartment and Helmbacher's murder, to the extent it informed the officers' belief that they had probable cause to arrest Plaintiff for the murder. See *Hurt v. Vantlin*, 2019 WL 6828153, at *14 (S.D. Ind. Dec. 13, 2019).

Thought it may be relevant, there is a substantial risk of unfair prejudice to Plaintiff should his prior burglary arrest be admitted. Neither party has provided the court with any information about this prior arrest, such as when it occurred in relation to the Helmbacher murder investigation, and how much information about the arrest Defendants seek to admit. Is this arrest related to the charge on which Plaintiff was acquitted at trial? Therefore, the court cannot make a definitive ruling at this time, and must RESERVE ruling on this issue.

Defendants next argue that Plaintiff's prior arrests and uncharged conduct/encounters with police should be admitted in relation to Plaintiff's damages claims because "Plaintiff may open the door to questioning about previous police encounters because he claims to have been emotionally traumatized by this event."

Defendants continue that the "fact that Plaintiff has been arrested on other occasions is highly relevant in determining the damages he has suffered[,]" as "[e]vidence of Plaintiff's other arrests and convictions[4] are admissible to rebut his claim for emotional damages."

The Seventh Circuit, however, foreclosed this line of reasoning in *Nelson*. In that case, the trial court allowed in evidence of the plaintiff's prior arrests in a trial on the plaintiff's § 1983 claims of unlawful search and seizure. On appeal, the defendants argued that evidence of prior arrests was relevant to the issue of damages, arguing that the plaintiff's history of arrests either mitigated his fear during the traffic stop (because being arrested was old hat for him) or augmented it (because his numerous encounters with the police suggest that some of his emotional injury might have been preexisting).

Before addressing the argument on the merits, the Seventh Circuit noted, in a footnote, that "[i]It is unclear whether the damages 'mitigation' theory offered by the defendants is viable given the rule that '[t]he tortfeasor takes his victim as he finds him. That is the "eggshell skull" rule, which like most principles of the common law of torts is applicable to a constitutional tort case brought under 42 U.S.C. § 1983.'" *Nelson*, 810 F.3d at 1068 n.2, quoting *Richman v. Sheahan*, 512 F.3d 876, 884 (7th Cir. 2008) (internal citations omitted).

---

[4]The court, in this subsection, is only concerned with the admission of prior arrests or uncharged conduct to rebut Plaintiff's damages claims.

Turning to the argument, the Seventh Circuit noted that it had "cast doubt on this type of argument before" in "another false-arrest case," where "the defense introduced evidence of the plaintiff's subsequent arrest for the sole purpose of distinguishing between the damages attributable to the alleged false arrest at issue in the litigation and those that might be attributable to the later arrest." *Nelson*, 810 F.3d at 1068, citing *Barber v. City of Chicago*, 725 F.3d 702, 708 (7th Cir. 2013).

In *Barber*, the court "warned against admitting a civil-rights plaintiff's arrest history on this theory of relevance" because doing so "'would seemingly permit any civil-rights plaintiff's criminal history to come in on the issue of emotional-distress damages, no matter how tenuous a connection the evidence has to the issue of damages or how central a role emotional distress plays during the plaintiff's case.'" *Nelson*, 810 F.3d at 1068-69, quoting *Barber*, 725 F.3d at 715. Admitting on this theory of relevance "would be contrary to [the Seventh Circuit's] prior statements instructing courts to proceed carefully when deciding to admit evidence of a § 1983 plaintiff's criminal past." *Barber*, 725 F.3d at 715.

The *Barber* court held that the relevance of the plaintiff's "subsequent arrest was 'tenuous at best,' because his claim for emotional-distress damages was closely tied to the arrest at issue in the litigation rather than 'any fear of police generally[.]'" *Nelson*, 810 F.3d at 1069, quoting *Barber*, 725 F.3d at 712, 713.

The *Nelson* court addressed the defendants' attempt to distinguish *Barber* by arguing that the evidence of the plaintiff's subsequent arrest in that case was necessarily less probative of his emotional distress at the time of his false arrest than the evidence of Nelson's prior arrests would be, writing that "in either scenario, the real question is whether the probative value of the plaintiff's arrests is substantial enough to outweigh the risk of undue prejudice inherent in this type of evidence." *Nelson*, 810 F.3d at 1069 n.3.

The court found that the plaintiff's arrest history had "minuscule probative value" on the question of his damages, as the arrests were distant in time, and the plaintiff carefully limited his claimed emotional injury to the fear he felt during the 30 minutes of the traffic stop itself. *Nelson*, 810 F.3d at 1069. "Although he said he remained angry about the incident despite the passage of time, he never claimed that the experience left him fearful of the police more generally." *Nelson*, 810 F.3d at 1069.

The court then found that "the risk of prejudice from this testimony was enormous[,]" as it was "doubtful that the jury drew the distinction between an arrest and a legal finding of wrongdoing; where there's smoke, there's fire." *Nelson*, 810 F.3d at 1069. The court went on to write that "[e]ven assuming the jury accounted for this distinction, evidence of prior arrests—here numerous prior arrests—generally impugns character[,]" and "in a false-arrest case, the prejudice is even greater because it invites the jury to draw a propensity inference, forbidden by Rule 404(b), that the plaintiff is a serial law breaker and general troublemaker and the police must have had probable

41

cause to arrest him." *Nelson*, 810 F.3d at 1069. "Even considering the special deference we give to the trial judge's evidentiary rulings, the evidence of Nelson's prior arrests should not have been admitted in light of the narrow scope of his claimed damages and the inherent risk of unfair prejudice." *Nelson*, 810 F.3d at 1069.

The court also found that the admission of the evidence was not harmless error. The court noted that "the damage caused by admitting evidence of this sort in a false-arrest case is two-fold: First, it encourages the jury to draw an improper propensity inference that the plaintiff's other arrest made it more likely that he was committing some crime on the day of the arrest in question; and, second, it 'provide[s] powerful ammunition to support a jury argument that [the plaintiff] is a despicable human being who should not be permitted to recover from the angelic police officers being wrongly sued.'" *Nelson*, 810 F.3d at 1069-70, quoting *Barber*, 725 F.3d at 717. The court concluded that the risk of a propensity inference was great because the "jury heard that Nelson had been arrested numerous times, making him appear particularly unsympathetic[,]" and the "trial turned entirely on his credibility, so the harm caused by improperly admitting this damaging evidence would naturally be substantial." *Nelson*, 810 F.3d at 1070. The district court in *Nelson* also did not issue a limiting instruction that the jury must limit its use of the other-arrest evidence to the question of damages[,]" but even if it had, the court in *Barber* held that the issuance of such a limiting instruction "did not cure the error." *Nelson*, 810 F.3d at 1070, citing *Barber*, 725 F.3d at 716-17.

42

Applying *Nelson* to the instant case, while there may be more probative value than was present in *Nelson*, as the police interactions are likely closer in time and it is not certain how "limited" Plaintiff's claimed emotional injuries from his arrest and conviction for Helmbacher's murder will be compared to those in *Nelson*, the risk of prejudice from this testimony is "enormous" and, even with a limiting instruction, it is doubtful that a jury could draw the distinction between an arrest and a legal finding of wrongdoing. See *Nelson*, 810 F.3d at 1069. Therefore, Plaintiff's Motion is GRANTED as to the relevance of prior arrests/police contacts with respect to Plaintiff's damages claims.

Defendants also reference admitting Plaintiff's prior arrests for impeachment purposes under Federal Rule of Evidence 609, but Rule 609 concerns only convictions, not arrests. Rule 608 concerns "specific incidents of conduct" to examine a witnesses' "character for truthfulness or untruthfulness," but Defendants make no argument under Rule 608. Therefore, Plaintiff's Motion is GRANTED as to the use of his prior arrests for impeachment purposes.

**Convictions**

Plaintiff argues that none of his criminal convictions are admissible in this case, as they all occurred more than 20 years ago, prior to his conviction for Helmbacher's murder. Plaintiff further argues that these convictions are irrelevant to the issues before the jury and, even if they "had minimal probative value, it would be eliminated due to the significant age of these past convictions."

Defendants argue Plaintiff's prior convictions should be admissible for the same reason as his prior burglary arrest, to show Defendant officers' state of mind during their investigation and as to how the officers formed probable cause to arrest Plaintiff for the murder. Defendants also repeat their arguments that the convictions could be admissible for damages purposes and for impeachment purposes under Rule 609.

The court RESERVES ruling on the admissibility of the convictions to show state of mind. The court has no information as to which prior convictions Defendants seek to introduce, what those convictions were for, and when they occurred.

Evidence of prior convictions may be relevant if a plaintiff is claiming emotional distress due to his treatment by law enforcement and the legal system. See *Ramirez v. Kranski*, 2021 WL 2458095, at *4 (W.D. Wis. June 16, 2021). Further, Federal Rule of Evidence 609(b)(1) allows for the use of convictions that are over 10 years old *only* if "its probative value, supported by specific facts and circumstances, substantially outweighs its prejudicial effect" and "the proponent gives an adverse party reasonable written notice of the intent to use it so that the party has a fair opportunity to contest its use." Again, the court has no specific information as to which convictions Defendants intend to use for Rule 609 and emotional damages purposes, so this issue must be RESERVED.

3.      Admission of Statements by Jane Redenberg[5]

Plaintiff next moves to admit the statements of deceased witness Jane Redenberg. Plaintiff argues that the statements are relevant regarding Defendants' failure to pursue alternate suspect Lee and that they will not be admitted for the truth of the matter asserted and thus are not hearsay.

Defendants respond that any statements Redenberg made, including written statements to police, are hearsay.  Further, Redenberg is deceased, and there is no opportunity to cross-examine her on the veracity of her statements.  Defendants also repeated their arguments from their Motion in Limine No. 2 that Lee's status as an alternate suspect is irrelevant to this case.

Based on the court's ruling in Defendants' Motion No. 2, Plaintiff's Motion with respect to Redenberg is DENIED at this time as to introduction related to liability on the claims.

The court has allowed the Lee alternate suspect evidence for damages purposes.

With regard to Redenberg's statements in Carlton's police report and her handwritten note, Plaintiff advances three arguments that the statements do not constitute inadmissible hearsay: (1) the statements are admissible to show Defendants' notice of, and knowledge about, an alternate suspect; (2) police report and handwritten

---

[5]Plaintiff refers to Redenberg as "Jane Vredenburgh."  Defendants note that the police reports refer to her as "Jane Redenberg," which is how the court referred to her in its Order on summary judgment.  For continuity and consistency purposes, the court will continue to refer to her as "Redenberg."

statements are not hearsay; and (3) the statements are not being offered for the truth of the matter asserted, but to show Defendant officers' state of mind.

First, with respect to notice and knowledge, "[e]vidence that is 'used only to show notice' is not hearsay." *Harden v. Marion County Sheriff's Department*, 799 F.3d 857, 861 (7th Cir. 2015), quoting *Marseilles Hydro Power, LLC v. Marseilles Land & Water Co.*, 518 F.3d 459, 468 (7th Cir. 2008). The statements would not constitute hearsay if offered to prove that Defendants were aware of (and ignored) Lee and not to prove that Lee was the murderer. See *Harden*, 799 F.3d at 861. However, the evidence shows that Defendants were aware of Lee and pointedly did *not* ignore him. Lee was investigated as a possible suspect in the early days of the murder investigation. There is no question that Defendants were aware of Lee, and there is no question that he was not "ignored" as a suspect. These facts are established by myriad other evidence in relation to Lee. Thus, the probative value of the statements would be low in this respect, and substantially outweighed by unfair prejudice, as described above in Defendants' Motion No. 2.

Next, trial courts have the discretion to exclude police reports if circumstances demonstrate a lack of trustworthiness. See *Daniel v. Cook County*, 833 F.3d 728, 740 (7th Cir. 2016). Moreover, the Seventh Circuit has held that "third-party statements contained in a police report do not become admissible for their truth by virtue of their presence in a public record and instead must have an independent basis for admissibility." *Jordan v. Binns*, 712 F.3d 1123, 1133 (7th Cir. 2013). Redenberg's

statements in the police report are not admissible on this ground as non-hearsay, and it is not at all clear to the court why the handwritten statement Redenberg faxed into the DPD would qualify as a "police report."

Thus, to be admissible, Redenberg's statements must have an independent basis for admissibility. Plaintiff argues that the statements are not hearsay because he will not offer them for the truth of the matter asserted – that Lee was the murderer – but rather to show Defendants' state of mind. See *Minett v. Overwachter*, 433 F.Supp.3d 1084, 1088 (W.D. Wis. 2020) ("The witness statements summarized in the police report have been offered to show what information had been provided to defendant and the effect that this information had on him."); *Torry*, 932 F.3d at 585 (statements introduced to show effect on listener, rather than truth of matter asserted, are not hearsay); *Woods v. City of Chicago*, 234 F.3d 979, 986-87 (7th Cir. 2000) (statement in police report not hearsay if offered "to show the effect that the statements had on the officers" who heard it).

Redenberg's statements in Carlton's police report would not qualify as hearsay if Plaintiff offered them not to prove whether or not Lee killed Helmbacher, but rather to show how a reasonable officer might react to that information in pursuing a murder investigation. See *Minett*, 433 F.Supp.3d at 1088. Thus, the statements would be admissible for this purpose as non-hearsay.[6]

---

[6]The statements in Redenberg's note, faxed to the police department, were not contained within a police report, and thus would not appear to constitute "third party statements in a police report." However, the fax was apparently received and could be

The statements must still be admissible under Rule 403. The court will RESERVE ruling at this time on the prejudicial nature of Redenberg's statements. There is a danger of unfair prejudice in the admission of these statements. Redenberg told Carlton about statements made to her by both Lee and Helmbacher. The statements are being offered to show their effect on Defendant officers, particularly Carlton, but Carlton is deceased and cannot explain what effect those statements had on his state of mind or why he did not pursue Lee as a suspect. Redenberg herself is also deceased. Further, as discussed above, to the extent Plaintiff offers the statements to demonstrate that Defendant officers were aware of an alternate suspect but failed to pursue him, there is ample other evidence to that effect that does not implicate the same concerns as Redenberg's statements.

Still, the statements themselves are probative of Defendant officers' state of mind with respect to the investigation, and are relevant to damages concerning Plaintiff's innocence. The court does not know exactly how much and what evidence will be presented on Plaintiff's damages claims that concern the alternate suspect theory, and how Redenberg's statements will fit into that presentation. It may be advisable that, if the statements are allowed, Plaintiff work with Defendants to summarize them in a way to lessen their prejudicial impact.

---

considered to show the state of mind of Defendant officers who viewed the note and its contents.

As it stands now, the court will RESERVE ruling until trial, where its decision "can be better informed by the context, foundation, and relevance of the contested evidence within the framework of the trial as a whole." See *Casares*, 790 F.Supp.2d at 775.

### 4.     Bar Polygraph Testing and Results

Plaintiff next moves to bar all evidence relating to polygraph testing of witnesses in this case as inadmissible and irrelevant. Plaintiff further argues that polygraph evidence would confuse and mislead the jury into believing it does not need to evaluate the evidence.

Defendants respond that Plaintiff fails to fully develop his argument, as he does not discuss which specific polygraph tests and results he seeks to have excluded. In any event, Defendants state the only polygraph evidence they would introduce would be that of Ray Taylor, which is clearly relevant to the issue of probable cause and represented a turning point in the Helmbacher murder investigation. Defendants further argue there is no danger of confusing the jury, as the polygraph results do not override other evidence, but rather are simply a piece of evidence in the larger picture.

The court finds instructive the decision of the district court in *Bahena v. Kennedy*, 2021 WL 8153974 (N.D. Ill. Oct. 25, 2021). In that case, the plaintiff, Bahena, filed a § 1983 action alleging unlawful pretrial detention and state law malicious prosecution claims. The claims arose from an investigation of a shooting that was conducted by Chicago Police Sergeant Michael Kennedy, and Detectives Hipolito Velazquez, Juan

Morales, and John Hillman.  The defendants claimed to have probable cause to arrest and charge the plaintiff for the shooting based on Arturo De La Cruz's identification of the plaintiff as the shooter.  The trial court denied summary judgment, finding that "there is a genuine dispute about whether De La Cruz volunteered his identification of Bahena or whether the officers drew it out of him without regard to its truth."  *Bahena*, 2021 WL 8153974, at *1.

The plaintiff filed a motion in limine to bar any evidence or argument that he was given a polygraph examination and the purported results of such an examination, arguing that the polygraph exam was not relevant under Federal Rules of Evidence 401 and 402, and, because, under Illinois law, it may not be used for probable cause determinations; no expert had been disclosed who could provide necessary testimony to explain the science behind the exam and its results; it constituted inadmissible hearsay; and, even if relevant, should be excluded as unfairly prejudicial under Rule 403.

The defendants argued for the polygraph exam's admission on the basis that it was central to the investigation and contributed to the facts known to the defendants as the investigation into the shooting continued.  They noted that the plaintiff voluntarily agreed to take a polygraph exam after his initial arrest for the shooting and while in police custody.  The investigation continued so that they could administer a polygraph exam, attempt to interview a shooting victim (who later succumbed to his injuries), and to obtain lab results from a sweater taken from the plaintiff's car.  The defendants also

"point[ed] out that, as a matter of federal law, polygraph exam results can be one of many factors in determining whether, objectively, probable cause exists." *Bahena*, 2021 WL 8153974, at *5, citing *Cervantes v. Jones*, 188 F.3d 805, 813 n.9 (7th Cir. 1999), overruled on other grounds in *Newsome v. McCabe*, 256 F.3d 747, 751 (7th Cir. 2001).

The district court in *Bahena* reserved ruling. "If defendants propose only to offer the evidence that Bahena agreed to take the examination and officers followed up to do so, the evidence is relevant at least for context but, since officers had other reasons to continue the investigation, omission would not leave a hole in the evidence that might confuse the jury." *Bahena*, 2021 WL 8153974 at *5. "On the other hand, if defendants offer Bahena's response to a question as a factor in their decision to charge Bahena, then it is relevant to the existence of probable cause and therefore admissible[,]" and because the defendants' position was not clear on that point, the ruling was reserved. *Bahena*, 2021 WL 8153974, at *5.

"If defendants argue to the jury that the result of the polygraph exam was a factor supporting probable cause, the court will allow the evidence." *Bahena*, 2021 WL 8153974, at *5. The plaintiff could, however, "also introduce evidence about the result to support his position that the exam results show that he was truthful and reasonable officers would not have relied on it to support probable cause." The court concluded that "[s]ince Illinois law does not allow polygraph examinations to be used in probable-cause determinations, see *Cervantes*, 188 F.3d at 813 n.9 ('Illinois courts have created a rule that the police, grand juries, and courts may not rely on polygraph

51

evidence in determining whether probable cause exists'); *Kuri* [*v. City of Chicago*], 2017 WL 4882338, at *8 [(N.D. Ill. Oct. 30, 2017)], admission of this evidence will entail separate jury instructions for state and federal law." *Bahena*, 2021 WL 8153974, at *5.

The *Bahena* court's approach is sensible. The fact that Taylor took a polygraph examination and that its results caused police to continue the investigation while relying on Taylor's information helps explain to the jury why Defendants' investigation took the course it did, eventually resulting in Plaintiff's arrest. While it "is true that due to the suspected unreliability of polygraphs, Illinois courts have created a rule that the police, grand juries, and courts may not rely on polygraph evidence in determining whether probable cause exists [...] as a matter of federal law, polygraph results are one of many factors which may be used in determining whether, from an objective viewpoint, probable cause for an arrest existed under the Fourth Amendment." *Cervantes*, 188 F.3d 813 n.9, citing *Booker v. Ward*, 94 F.3d 1052, 1058 (7th Cir. 1996) (relying on polygraph results as one factor in finding that Illinois police officers had probable cause for an arrest as a matter of law); see also *Halsey v. Pfeiffer*, 750 F.3d 273, 301 (3d Cir. 2014) (citing *Cervantes*).

Moreover, as noted by Defendants, Taylor's polygraph was but a small piece of Defendants' investigation. To be sure, the polygraph explains why, at a certain juncture, Defendants continued to rely on Taylor and pursued the investigation that ultimately resulted in Plaintiff's arrest, but, in terms of actual evidence, Taylor's polygraph was not essential to establishing probable cause that Plaintiff murdered

Helmbacher.  See *Cervantes*, 188 F.3d 813 n.9  ("Furthermore, as we mentioned above, the polygraph evidence was not essential to establishing probable cause.").  The polygraph evidence primarily functions to show what was in the Defendant officers' minds as they pursued the investigation of Plaintiff.  As such, the court finds there is little chance that polygraph evidence related to Taylor would run afoul of Rule 403's concern that the evidence not confuse or mislead the jury.

To that end, however, the court would admonish Defendants to limit the reference and discussion of Taylor's polygraph exam and results to the purpose of explaining the Defendant officers' state of mind in demonstrating why the investigation into Plaintiff developed in the manner that it did.  Plaintiff's Motion is DENIED on this ground.

  5.  Bar Defendants from Introducing Undisclosed Expert Opinions

Plaintiff next moves to bar Defendants from introducing certain undisclosed expert opinions pursuant to Federal Rule of Civil Procedure 26(a)(2)(C).  Plaintiff identifies eight disclosed expert witnesses whose testimony he seeks to curtail: Jennifer Lu; Dana Pitchford; Mark Mills; Jack Ahola; Scott Reuter; Tammy Wagoner; Mark Cheviron; and Travis Hindman.

Pursuant to Rule 26(a)(2)(C), a disclosure for an expert witness that is not required to provide a written report "must state (i) the subject matter on which the witness is expected to present evidence under Federal Rule of Evidence 702, 703, or 705; and (ii) a summary of the facts and opinions to which the witness is expected to testify."

"When considering sanctions for the failure to disclose an expert witness, the Court turns to Federal Rule of Civil Procedure 37(c)(1)[,]" and "if the failure to disclose is substantially justified or harmless, sanctions are not required." *Liss v. TMS International, LLC*, 2022 WL 2192863, at *5 (S.D. Ill. June 17, 2022). "In analyzing whether such noncompliance is harmless, the Court considers '(1) the prejudice or surprise to the party against whom the evidence is offered; (2) the ability of the party to cure the prejudice; (3) the likelihood of disruption to the trial; and (4) the bad faith or willfulness involved in not disclosing the evidence at an earlier date.'" *Macaluso v. City of Chicago*, 2018 WL 11206476, at *3 (N.D. Ill. July 28, 2018), quoting *David v. Caterpillar, Inc.*, 324 F.3d 851, 857 (7th Cir. 2003).

### Jennifer Lu[7]

Plaintiff first seeks to limit the testimony of ISP analyst Lu. Specifically, Plaintiff argues Lu should be barred from opining about: (1) whether Plaintiff's Fila shoes had been washed; (2) how Helmbacher's blood got on Plaintiff's shoe; (3) whether the nail scrapings or hair found in Helmbacher's hand are probative; (4) the DNA analysis performed by Cellmark; and (5) who killed Helmbacher. The basis for excluding Lu's testimony on these points is that she "did not offer any opinion on these subjects during the work she performed on this case in 1998."

---

[7]Lu has also been referred to as "Jennifer Aper" in this litigation. For the sake of consistency, the court will refer to her last name as "Lu."

54

Defendants respond that: (1) testimony about whether the shoes were washed correspond directly to Lu's statement in her forensic report that the shoes "appear[ed] worn and dirty"; (2) how Helmbacher's blood got on the shoe and the probative value of the scrapings found in Helmbacher's hand were in response to specific questions asked by Plaintiff and well within Lu's purview and experience; and (3) Lu's comments regarding Cellmark and who killed Helmbacher were in response to extensive questioning from Plaintiff, and "tie together with Lu's analysis and her personal involvement in discussions with prosecutors during the post-conviction proceedings."

Plaintiff's argument is not that Defendants failed to disclose the above testimony in their Rule 26(a)(2)(C) disclosures, but rather that the above cited testimony from Lu has nothing to do with her involvement in the underlying case in 1998. A witness can provide an expert opinion without submitting a written report if the expert's opinion was formed during the course of their involvement in the underlying event, and not in preparation for present federal litigation. See *E.E.O.C. v. AutoZone, Inc.*, 707 F.3d 824, 833 (7th Cir. 2013). "Even so, questions asked at depositions may expand the scope of the expert's testimony." *Guarantee Trust Life Insurance Co. v. American Medical and Life Insurance Co.*, 291 F.R.D. 234, 237 (N.D. Ill. 2013), citing *In re Sulfuric Acid Antitrust Litigation*, 235 F.R.D. 646, 659 (N.D. Ill. 2006) (stating that questions asked at a deposition that go beyond the reports "may well have a bearing on the permissible

scope of testimony at trial"). Still, the answers to the questions at deposition that "go beyond the reports" must be based on information gleaned from and opinions formed during the underlying event, and not made in anticipation of the federal litigation to be admissible at trial. See *Guarantee Trust Life*, 291 F.R.D. at 237-38.

Lu was a laboratory analyst for the ISP, who, in 1998, analyzed Plaintiff's Fila shoes twice at the request of Defendants. Plaintiff's Motion is GRANTED as to Lu's statements about the shoes being washed, as her forensic report from the time stated the shoes appeared "worn and dirty," and she testified that she did not think or consider whether they had been washed at any point before this federal litigation. Likewise Plaintiff's Motion is GRANTED as to Lu's opinion as to how the blood got on the shoes, as she specifically testified that while she was dissecting the shoes in 1998 she did not think about how the blood got there, and that she did not start making such conclusions until 2017 or 2018, after this case was initiated, when she first heard the theory that the blood had been planted.

Similarly, Plaintiff's Motion is GRANTED as to Lu's testimony concerning the probative value of the fingernail scrapings and Cellmark, as Lu testified that, after 2005, she did not think about the case until 2016 when she was contacted by a detective from the Decatur Police Department just before Plaintiff's release from prison, with questions about how reliable the ISP "testing" had been because "he knew that this [presumably, the instant federal litigation] was coming." Thus, it appears to the court that Lu's opinions on these points were formed specifically for this litigation, and must be barred.

The court RESERVES ruling on Lu's testimony as to who killed Helmbacher, as Plaintiff's Motion is vague on this point, and the cited transcript portions do not make the issue any clearer.

**Dana Pitchford**

Dana Pitchford was also an ISP laboratory forensic analyst in 1998 during the Helmbacher murder investigation. Plaintiff seeks to bar the following opinions from Pitchford: (1) the appearance of the shoe; (2) the first round of testing performed by Lu; (3) whether the Fila shoes had been wiped or cleaned; (4) how Helmbacher's blood got on the shoe; (5) whether the nail scrapings or hair found in Helmbacher's hand are probative; (6) the DNA analysis performed by Cellmark; and (6) who killed Helmbacher.

Defendants respond that, like Lu, the topics on which Pitchford testified are "part and parcel of her work." Like Lu, Pitchford is a fact witness who performed DNA analysis in the underlying case, and "determining what evidence is probative is one of the first steps performed by the analysts in analyzing forensic evidence." Also like Lu, Defendants argue, Pitchford had conversations with prosecutors when she saw Plaintiff was released from prison based on DNA analysis because she had performed DNA analysis that identified Helmbacher's blood in Plaintiff's shoe. Relatedly, Pitchford questioned the Cellmark results because DNA from under the fingernails is not

probative in this case, and her explanation of why she thinks so "is part and parcel to why she had additional conversations with prosecutors about the results given her analysis."

The court cannot tell from the cited deposition testimony whether or not Pitchford formed her opinions on the contested evidence before or after this litigation was initiated, or at least in anticipation of this litigation. Nothing in the cited portions of the testimony, besides her opinion on whether Plaintiff's blood was planted in the shoe, clearly implies opinion formation in connection with the instant litigation. The subject matter of the cited testimony certainly would be in her purview as a forensic DNA analyst for the ISP who worked on this case (apart from the "probative value" testimony discussed below). Therefore, ruling on Plaintiff's Motion is RESERVED on this point. Should Defendants seek to introduce the contested testimony at trial, it must be established that Pitchford formed her opinions in connection with her work in the underlying case, and not in anticipation of the instant litigation.

**Jack Ahola and Scott Reuter**

Plaintiff seeks to bar prosecutors Jack Ahola and Scott Reuter from "opining about any of the DNA, DNA testing, and DNA results in this case" because they "did not form any beliefs about the fingernail or hair DNA" during their work on Plaintiff's prosecution, and were not at the Macon County State's Attorney's Office when the postconviction DNA testing occurred.

58

Defendants argue that Plaintiff's requests to bar Ahola and Reuter from *any* testimony regarding their opinions on the DNA testing and results are overly broad and "are based on inaccurate and misleading citations that [they] had no knowledge of any of those three topics in any capacity." Defendants do concede that Ahola and Reuter were not involved in any postconviction DNA, DNA testing, and DNA results, and will not provide testimony on those subjects.

Plaintiff's Motion is GRANTED as to any testimony from Ahola or Reuter on postconviction DNA, DNA testing, and DNA results. Plaintiff's Motion is DENIED as to Ahola and Rueter testifying about DNA, DNA testing, and DNA results that were available for and a part of the underlying investigation and trial of Plaintiff during the time that they worked for the Macon County State's Attorney's Office and of which they have first-hand knowledge.

### Tammy Wagoner

Plaintiff next moves to bar prosecutor Tammy Wagoner "from opining about any of the DNA, DNA testing, and DNA results in this case," noting that she was not at the Macon County State's Attorney's Office in 2017 and was not involved in the decision not to dismiss charges against Plaintiff. The court would note that Plaintiff's Motion makes no argument as to why Wagoner should be barred from testifying about DNA, DNA testing, and DNA results from the original prosecution of Plaintiff. Moreover, Wagoner testified that she wrote and filed the motion to dismiss in Plaintiff's state court postconviction proceedings, arguing that Plaintiff had not met the statutory criterion for

59

DNA testing.  Wagoner can testify as to knowledge she gained or opinions she formed regarding DNA during her work on Plaintiff's postconviction proceedings.  Plaintiff's Motion is DENIED in its entirety as it relates to Wagoner.

**Mark Cheviron**

Plaintiff seeks to bar Taylor's polygraph examiner, Mark Cheviron, "from offering opinions about polygraph examination results" and testimony about the conduct of the examination.  Plaintiff also argues that if Cheviron is permitted to offer opinions about the polygraph examination, he should be limited to what is memorialized in his report, and should be allowed to offer new opinions.

Defendants respond that, as hybrid fact-expert witness who participated in the underlying case, "Cheviron should be allowed to testify to what he did, why he did it, and the bases and reasons for what he did[,]" as well as the "factual underpinnings of his work and opinions."

The court RESERVES ruling on Plaintiff's Motion concerning Cheviron.  In its ruling on Plaintiff's Motion No. 4, regarding the polygraph, the court counseled Defendants to keep any discussion or reference to Taylor's polygraph to a minimum, and that it should only be used to show Defendants' state of mind during the investigation of Helmbacher's murder, and to explain why the investigation developed in the manner that it did.  The court, at this point, does not see the necessity for calling Cheviron to testify, except maybe to lay the foundation for the above-described polygraph evidence.  Perhaps Plaintiff will wish to challenge the polygraph evidence

and the reasons for Defendants' reliance on it, in which case the court will revisit this ruling and the necessity for Cheviron to testify in depth.  Perhaps the parties will enter into a stipulation about the polygraph that will obviate the need for any testimony at all.  The court cannot say at this time.

**Travis Hindman**

Plaintiff seeks to bar forensic pathologist Dr. Travis Hindman from opining about several topics, including: (1) the time of death; (2) the victim's condition at the time his body was discovered; (3) blood spatter; (4) how long the victim's struggle with his attacker lasted; (5) the order in which the victim received his hammer blows; (6) whether/when the victim ate anything before he was killed; and (7) anything else beyond the explicit contents of Hindman's autopsy report.  Plaintiff argues that Hindman did not opine on any of these subjects during his work on the underlying case.

First, Defendants argue that while Hindman did not opine as to Helmbacher's *actual* time of death, the autopsy report does contain an *official* time of death, to which Hindman should not be barred from testifying.  The court agrees.  Hindman can testify as to Helmbacher's official time of death and why he included that time in the report.  However, Plaintiff's Motion is GRANTED as to actual time of death.

Second, Defendants agree that Hindman did not opine about the condition of Helmbacher's body at the time it was discovered by witnesses.  Plaintiff's Motion is thus GRANTED in that respect.  Defendants then argue that this should not bar

Hindman from testifying to the condition of Helmbacher's body when he started his autopsy, which was described in the report. The court agrees, Hindman may testify in that respect.

Next, Defendants argue that Plaintiff has not identified with specificity what evidence concerning blood spatter Hindman should be barred from testifying about, as his report does not contain the term "blood spatter," and Defendants do not anticipate that Hindman will testify or provide opinions concerning blood spatter analysis. Thus, Plaintiff's Motion is GRANTED in that respect.

However, Defendants argue that Hindman should be permitted to testify about the blood pattern and notations he made within his report and any logical corollaries related to that. Defendants are correct, and Hindman may testify to those matters contained within his report. Hindman may also testify to anything that is a logical corollary of his disclosed opinion, i.e. his report. See *Magnuson v. Trulite Glass & Aluminum Solutions*, 2024 WL 1216338, at *12 (N.D. Ill. Mar. 21, 2024) ("The Court denied these two motions in limine as to Dr. Bauer, finding that as to No. 52, the testimony about osteophytes was a logical corollary to Dr. Bauer's disclosed opinions, and as to No. 54, Dr. Bauer's disclosed opinion was not barred based on Dr. Nader Dahdaleh's records that 'complaints of numbness and tingling would not preclude him from working as a supervising contractor.'").

Plaintiff's Motion is DENIED as to barring Hindman from testifying "whether or when the victim ate anything before he was killed." The report itself at page 9 discusses stomach contents, stating "[t]here is no food identified" and the "stomach contents are discarded." As the condition and contents of Helmbacher's stomach were discussed in the report, testimony about whether Helmbacher ate anything before his murder would be a logical corollary related to the report. See *Magnuson*, 2024 WL 1216338, at *12.

Defendants concede that Hindman did not opine on how long the struggle lasted before Helmbacher was killed, and the order in which he received the hammer blows, so Plaintiff's Motion is GRANTED in that respect.

Finally, the court RESERVES ruling on Hindman "testifying to anything else beyond the explicit contents of his autopsy report." The court does not know what specific evidence "outside the report" Hindman would be testifying to. As noted by Defendants, Hindman testified at the criminal trial in the original case, testimony that has long been available to Plaintiff and would not be a surprise. Any opinion expressed by Hindman in the underlying case would be admissible, as it would not be an opinion formed for the instant litigation.

And again, as it relates to opinions from the report or testified to in the criminal trial, Hindman can testify to any logical corollary related to his disclosed opinions and the factual underpinnings of those opinions. See *Magnuson*, 2024 WL 1216338, at *12.

**Legal Conclusions and Opinions Beyond Their Areas of Expertise**

Plaintiff also makes a general argument that the above identified non-retained experts may not offer legal conclusions and opinions beyond their areas of expertise.

Experts cannot testify about matters on which they are not experts. *Washington v. Boudreau*, 2022 WL 4599708, at *12 (N.D. Ill. Sept. 30, 2022). Further, there is a "general prohibition against experts testifying 'as to legal conclusions that will determine the outcome of the case.'" *Ploss v. Kraft Foods Group, Inc.*, 637 F.Supp.3d 561, 573 (N.D. Ill. 2022), quoting *Good Shepherd Manor Found., Inc. v. City of Momence,* 323 F.3d 557, 564 (7th Cir. 2003).

Plaintiff specifically identifies Pitchford and Wagoner opining on the probative value of the DNA found underneath Helmbacher's fingernails and in the hair found in his hand, whether Helmbacher got the attacker's DNA under his nails and in his hand, the manner in which the murder was committed, and Plaintiff's innocence.

The court agrees that Pitchford cannot testify about the "probative value" of evidence or Plaintiff's innocence, as such testimony would be beyond her expertise. To the extent she has personal knowledge of whether Helmbacher got the attacker's DNA under his nails and in his hand and how the murder was committed, based on her work in the underlying case, Pitchford may testify to that subject matter. Plaintiff's Motion is GRANTED in part and DENIED in part with respect to Pitchford on this ground.

64

Wagoner is an attorney and was involved in Plaintiff's original prosecution, thus she may testify about the probative value of evidence, to the extent she formed opinions on that evidence due to her involvement with the underlying case and not the instant federal litigation. See *Ezell v. City of Chicago*, 2023 WL 5287919, at *28 (N.D. Ill. Aug. 16, 2023) ("While the Court has the ultimate legal say in this matter, that does not prevent Mr. Sexton [a former prosecutor] from offering an expert opinion on matters related to criminal prosecutions, the evaluation of evidence, and other issues relevant to this case."). Likewise, Wagoner can testify as to what any report on the DNA underneath Helmbacher's fingernails stated, and how that influenced her prosecutorial decisions, but she cannot testify as to any opinion on whether the attacker's DNA was present, as she did not do any testing herself and is not an expert in DNA forensic analysis.

Wagoner may also testify as to the manner in which Helmbacher's murder was committed based on the evidence in the underlying case, as such a "prosecutor's-eye opinion will assist the jury" in evaluating how her assessment impacted her decision-making throughout the prosecution, but she may not testify as to whether she believes Plaintiff was "innocent," as such an opinion is unhelpful and impermissibly tells the jury what decision to reach. See *Ezell*, 2023 WL 5287919, at *32.

Plaintiff also requests the court bar Hindman from testifying as to a possible motive for the murder, as Hindman's notes say that an examination at the scene indicated the possibility of robbery as a motive for the murder.  The court agrees that speculating about a motive would be beyond the scope of Hindman's expertise as a pathologist.  Plaintiff's Motion is GRANTED on this ground.

The court will endeavor to do its best to ensure that experts do not offer impermissible legal conclusions or unduly tread on the jury's realm as the ultimate decider, and Plaintiff may make appropriate objections to their testimony at trial.  See *Ezell*, 2023 WL 5287919, at *28.

6.      Bar Reference to Illegal Drug or Alcohol Abuse

Plaintiff next moves to bar reference to illegal drug or alcohol use on his part, as such evidence is irrelevant to the case and overly prejudicial.

Defendants respond that they wish to only introduce evidence that Plaintiff admitted to being intoxicated on cocaine and alcohol up to the morning of the day of the burglary of Helmbacher's apartment, and that he was ill and feeling the effects of that intoxication continuing on to the day of the murder.  Specifically, Defendants note that, in his deposition, Plaintiff testified that for two days straight prior to the burglary of Helmbacher's apartment that occurred the day before murder, he (Plaintiff) used cocaine and drank straight gin, while eating very little, with two female friends.

Plaintiff contends he arrived at Taylor's apartment – above where the murder took place – the day of the burglary, and was ill at the time. He testified the illness lasted throughout the following two days while the burglary and murder occurred.

Defendants argue that such evidence is highly relevant under Rule 401, going to Plaintiff's ability to remember and understand the activities taking place on those important days. Defendants argue that this evidence will help the jury evaluate Plaintiff's credibility as to his memory and observations of that critical time period.

"Evidence of intoxication may be relevant to a witness' ability to recall events that occurred during the period of intoxication." *Wilson v. Keske*, 2012 WL 266186, at *1 (N.D. Ill. Jan. 27, 2012), citing *Kunz v. DeFelice*, 538 F.3d 667, 676-77 (7th Cir. 2008). "However, because of the risk of undue prejudice, before admitting such evidence the court must first assure itself that the issue of memory is legitimately at issue." *Wilson*, 2012 WL 266186, at *1.

Evidence of Plaintiff's use of alcohol and illegal drugs on dates other than the dates in question is irrelevant. See *Valdez v. Lowry*, 2021 WL 5769533, at *2 (N.D. Ill. Dec. 5, 2021), citing *Casares*, 790 F.Supp.2d at 784 (whether plaintiff and witnesses "used illegal drugs or abused alcohol on days other than the date in question carries almost no probative value and would tend to lead the jury to conclude that they are bad characters"). Thus, for any dates other than those surrounding Helmbacher's murder, the Motion is GRANTED.

However, evidence of Plaintiff's intoxication on the days surrounding Helmbacher's murder is highly relevant to Plaintiff's memories and perceptions of the events of those days, and to assist the jury in evaluating Plaintiff's credibility. See *Casares*, 790 F.Supp.2d at 785-86 ("Where there is reason to believe that alcohol or marijuana had seriously impaired a witness's memory of the events to which he is testifying or prevented him from understanding the events at the time they occurred, evidence of his drug or alcohol use is admissible."); *Common v. City of Chicago*, 661 F.3d 940, 940 (7th Cir. 2011) (credibility of the witness can always be attacked by showing that his capacity to observe, remember, or narrate is impaired).

It is true that Plaintiff's testimony as to his intoxication at the time could paint Plaintiff "in a bad light," but that prejudicial impact is substantially outweighed by its probative value. See *Casares*, 790 F.Supp.2d at 786. Plaintiff's testimony concerning his actions on those dates, and Defendants' competing narrative and theory of the case, place Plaintiff's memory of events squarely and "legitimately at issue." See *Wilson*, 2012 WL 266186, at *1. Plaintiff's Motion is DENIED in this respect.

7.     Bar Prison Disciplinary Infractions

Plaintiff next moves to bar evidence or any reference to prison rule infractions at trial. This Motion is unopposed, and therefore is GRANTED.

8.    Bar Non-Expert, Non-Party Witnesses from Courtroom

Plaintiff next moves to exclude non-expert, non-party witnesses from the

courtroom.  Defendants do not oppose the Motion, and join Plaintiff in further

requesting that they be allowed to have expert witnesses present in the courtroom for

some instances in the event such witnesses need to hear facts, testimony, or data

presented during trial upon which they will render opinions, or to rebut testimony.

This Motion is GRANTED.

9.    Bar Any Reference to Individual Defendants' Inability to Pay Judgment
      for Compensatory Damages

Plaintiff next moves to bar any reference to the individual Defendants' financial

inability to pay a judgment for compensatory damages.  Defendants do not oppose, so

this Motion is GRANTED.[8]

10.   Bar Reference to Defendants' Commendations, Awards, Complimentary
      History, or Job Evaluations

Plaintiff next moves to bar any Defendants from introducing evidence of their

"good character" by reference to prior work-related commendations, awards,

complimentary history, or job evaluations.  Defendants oppose this Motion only with

respect to Defendant Carlton, who is deceased, arguing that because Plaintiff will

---

[8]Defendant Amy Waks, as administrator of Carlton's Estate, does not oppose the
Motion but preserves her contention "that no judgment may be entered against her in
the capacity as a Special Representative until any issue regarding whether the Special
Representative appointed under 735 Ill. Comp. Stat. 5/2-1008 enjoys indemnification
under 745 Ill. Comp. Stat. 10/9-102 as an 'employee' defined in 745 Ill. Comp. Stat.
10/1-202."

accuse Carlton of planting blood in his shoe to frame him for Helmbacher's murder, Defendants should be able to present evidence of Carlton's character for truthfulness pursuant to Federal Rule of Evidence 608(a).

Such evidence is usually barred as improper character evidence pursuant to Rule 404(a). See, e.g., *Estate of Sillah by Carter v. Loredo*, 2024 WL 5074531, at *2 (W.D. Wis. Dec. 11, 2024); *Pryor v. Corrigan*, 2023 WL 1100436, at *21 (N.D. Ill. Jan. 30, 2023). "However, once a witness's credibility has been attacked, 'the non-attacking party is permitted to admit evidence to "rehabilitate" the witness.'" *Burns v. Village of Crestwood*, 2017 WL 11889309, at *2 (N.D. Ill. Jan. 12, 2017), quoting *United States v. Lindemann*, 85 F.3d 1232, 1242 (7th Cir. 1996).

To the extent that Carlton's credibility is attacked and defense counsel believes that any particular evidence of awards, commendations, or honorable mentions is relevant to rehabilitate Carlton, defense counsel must discuss such evidence with the court and outside the presence of the jury before seeking to introduce it. See *Burns*, 2017 WL 11889309, at *2. Therefore, the court RESERVES ruling on this Motion.

11. Bar Any Reference to Jurors' Pecuniary Interests

Plaintiff next moves to bar any reference to jurors' pecuniary interests, which Defendants do not oppose. This Motion is GRANTED.

70

12.    Bar Reference to Other and Former Defendants

Plaintiff next moves to bar any reference to other Decatur police officers who should be Defendants or former Defendants and claims that are no longer in the case. Defendants to do not oppose this Motion, so it is GRANTED.

13.    Bar Reference to Street Gangs

Plaintiff next moves to bar Defendants from making any reference relating to street gangs before the jury and barring them from introducing any evidence relating to street gangs.  Defendants do not oppose this Motion, so it is GRANTED.

14.    Bar "Tag Team" Cross-Examination

Plaintiff moves the court to direct Defendants to designate one primary attorney per witness per cross-examination, with counsel for the other Defendants to "follow-up only with topic areas not previously covered bearing on their clients' defenses." Plaintiff argues there are two sets of attorneys, one set representing Carlton's Estate, and another set representing all other Defendants.  Plaintiff argues that the two sets of attorneys interests "are aligned in most respects," and it would be unfair and unnecessarily prolong the trial to permit counsel for one Defendant to duplicate cross-examination areas already covered by counsel for the other.

Defendants respond that each party has the right to cross-examine witnesses to defend him/her/itself as against Plaintiff's liability and damages claims.  "Defendants expect that, for instance, once Plaintiff's direct examination is complete, only one

attorney on behalf of these Defendants will conduct a cross-examination on behalf of these Defendants, and one attorney on behalf of the Estate of Tim Carlton will conduct a cross-examination on behalf of the Estate."

Plaintiff's Motion is GRANTED.  Defendants should designate one primary attorney to conduct cross-examination, and the other defense attorney will be permitted to follow up on discrete issues that specifically concern that party.  See *Warfield v. City of Chicago*, 2009 WL 10739476, at *3 (N.D. Ill. Mar. 9, 2009).

15. Duplicative Testimony

The parties are directed to continue conferring regarding the issue of duplicative testimony.

IT IS THEREFORE ORDERED:

(1) The parties' Motions in Limine (#291, #292, and #293) are all GRANTED in part and DENIED in part.  Some issues are RESERVED.

(2) The parties position statements with respect to bifurcation are due by May 14, 2025.

(3) The clerk is directed to MOOT Plaintiff's Motion to File Reply (#313).  The Motion is moot due to the rulings in the court's Order.

(4) This case remains set for a jury trial on June 3, 2025, at 9:00 am.

ENTERED this 8th day of May, 2025.

s/ COLIN S. BRUCE
U.S. DISTRICT  JUDGE