

# Transcript of Arturo DeLeon-Reyes, Volume 1

**Date:** February 25, 2020
**Case:** DeLeon-Reyes & Solache -v- Guevara, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

Transcript of Arturo DeLeon-Reyes, Volume 1
Conducted on February 25, 2020

1 (1 to 4)

**Page 1**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

------------------------------x

ARTURO DeLEON-REYES,         :

    Plaintiff,   :

v.               : Case No. 1:18-cv-01028

REYNALDO GUEVARA, et al.,    :

    Defendants.  :

------------------------------x

GABRIEL SOLACHE,          :

    Plaintiff,   :

v.               : Case No. 1:18-cv-2312

REYNALDO GUEVARA, et al.,    :

    Defendants.  :

------------------------------x

Videoconference Deposition of ARTURO DeLEON-REYES

VOLUME 1

San Jose del Cabo, Mexico

Tuesday, February 25, 2020

09:05 a.m. Central Standard Time

Job No.: 288456

Pages: 1 - 166

Reported by: Tiffany M. Pietrzyk, CSR RPR CRR

**Page 2**

Videoconference deposition of ARTURO DeLEON-REYES, held at the location of:

WITNESS LOCATION:

    HYATT PLACE LOS CABOS

    Paseo Malecon San Jose 128, Zone Hotelera

    San Jose del Cabo 23406 BCS, Mexico

COURT REPORTER LOCATION:

    ROCK FUSCO & CONNELLY, LLC

    321 North Clark Street, Suite 2200

    Chicago, Illinois 60654

Pursuant to notice before Tiffany M. Pietrzyk, a Certified Shorthand Reporter, Registered Professional Reporter, Certified Realtime Reporter, and a Notary Public in and for the State of Illinois.

**Page 3**

A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFF DeLEON-REYES:

    ANAND SWAMINATHAN, ESQUIRE, Present in Mexico

    SEAN STARR, ESQUIRE, Present in Mexico

    STEVEN ART, ESQUIRE, By Telephone

    JOHN HAZINSKI, ESQUIRE, By Telephone

    Loevy & Loevy

    311 North Aberdeen Street

    3rd Floor

    Chicago, Illinois 60607

    312.243.5900

ON BEHALF OF THE PLAINTIFF SOLACHE:

    JAN SUSLER, ESQUIRE, Present in Mexico

    JOHN L. STAINTHORP, ESQUIRE, Present in Chicago

    PEOPLE'S LAW OFFICE

    1180 North Milwaukee Avenue

    3rd Floor

    Chicago, Illinois 60642

    773.235.0070

**Page 4**

A P P E A R A N C E S   C O N T I N U E D

ON BEHALF OF THE DEFENDANT GUEVARA:

    THOMAS MORE LEINENWEBER, ESQUIRE, By Telephone

    JAMES V. DAFFADA, ESQUIRE, By Telephone

    Leinenweber, Baroni & Daffada, LLC

    120 North LaSalle Street

    Suite 2000

    Chicago, Illinois 60602

    866.786.3705

ON BEHALF OF DEFENDANTS DICKINSON, RUTHERFORD, STANKUS, NAUJOKAS, HARVEY, TREVINO, MINGEY, BIEBEL:

    CAROLINE P. GOLDEN, ESQUIRE, Present in Chicago

    JOSH ENGQUIST, ESQUIRE, Present in Mexico

    THE SOTOS LAW FIRM, PC

    141 West Jackson

    Suite 1240A

    Chicago, Illinois 60604

    630.735.3314

Transcript of Arturo DeLeon-Reyes, Volume 1
Conducted on February 25, 2020

2 (5 to 8)

APPEARANCES CONTINUED

ON BEHALF OF DEFENDANTS WEHRLE, BRUALDI, VARGA, O'MALLEY and COOK COUNTY:

EDWARD M. BRENER, ESQUIRE, Present in Mexico
RYAN GILLESPIE, ESQUIRE, Present in Mexico
COOK COUNTY STATE'S ATTORNEY'S OFFICE
500 Richard J. Daley Center
Chicago, Illinois 60602
312.603.5971

ON BEHALF OF DEFENDANT NAVARRO:

DANIEL J. BURNS, ESQUIRE, By Telephone
REITER BURNS LLP
311 South Wacker Drive
Suite 5200
Chicago, Illinois 60606
312.982.0090

APPEARANCES CONTINUED

ON BEHALF OF DEFENDANT CITY OF CHICAGO:

EILEEN E. ROSEN, ESQUIRE, Present in Mexico
THERESA B. CARNEY, ESQUIRE, Present in Chicago
ROCK FUSCO & CONNELLY, LLC
321 North Clark Street
Suite 2200
Chicago, Illinois 60654
312.494.1000

ALSO PRESENT:

(Present in Mexico)
Valerie Barajas, Paralegal
Isco Carillo, Videographer
Adriana Trevino, Interpreter 1
Jose Luis Fonseca, Interpreter 2

(Present in Chicago)
Kara Hutson, Paralegal

CONTENTS

EXAMINATION OF ARTURO DeLEON-REYES          PAGE
  Direct Examination By Ms. Rosen          13

EXHIBITS

(Attached to transcript.)

DeLEON-REYES DEPOSITION EXHIBITS          PAGE
Exhibit 1          Drawing          117
Exhibit 2          Calendar/Scheduler          131
          Photographs
Exhibit 3          Photograph of Papers          149
Exhibit 4          Day Planner          153
          Photographs

PROCEEDINGS

THE VIDEOGRAPHER: Here begins Media Number 1 in the video deposition of Arturo DeLeon-Reyes in the matter of Arturo DeLeon-Reyes vs. Reynaldo Guevara, et al., Gabriel Solache vs. The City of Chicago in the United States District Court For the Northern District of Illinois, Eastern Division, Case No. 1:18-CV-1028 and 1:18-CIV-2312.

Today's date is February 25th, 2020. The time on the video monitor local time is 9:05 a.m.

The videographer today is Isco Carillo on behalf of Planet Depos. This videotaped deposition is being taking place at Hyatt Place Los Cabos, San Jose del Cabo 128.

Will counsel please voice-identify themselves and state who they represent, please.

MS. ROSEN: Eileen Rosen -- Eileen Rosen on behalf of Defendant City of Chicago.

MR. SWAMINATHAN: Can you please translate all of this so he understands what's happening?

MR. ENGQUIST: Josh Engquist, E-n-g-q-u-i-s-t, on behalf of all the individual defendant officers except Reynaldo Guevara.

MR. BURNS: Daniel Burns on behalf of

Transcript of Arturo DeLeon-Reyes, Volume 1
Conducted on February 25, 2020

3 (9 to 12)

Defendant Navarro.

MR. GILLESPIE: Brian Gillespie, on behalf of the Cook County defendants with the exception of Defendant Navarro.

MR. BRENER: Edward Brener, also on behalf of Cook County defendants with the exception of Defendant Navarro.

MR. SWAMINATHAN: Anand Swaminathan.

MS. SUSLER: Jan Susler on behalf of Plaintiff Gabriel Solache.

MR. DAFFADA: James Daffada for Ray Guevara, and Tom Leinenweber as well.

MR. SWAMINATHAN: Say it again, please.

MR. DAFFADA: James Daffada, D-a-f-f-a-d-a, and Tom Leinenweber for Defendant Guevara.

MR. STARR: Sean Starr, S-e-a-n, S-t-a-r-r, on behalf of Plaintiff Reyes.

MS. BARAJAS: Valerie Barajas, on behalf of Plaintiff Arturo DeLeon-Reyes.

MR. SWAMINATHAN: Anand Swaminathan for Arturo DeLeon-Reyes.

MS. ROSEN: Did everybody that's on the phone -- yeah.

MR. STAINTHORP: Okay. So in Chicago, John Stainthorp. I'm at the video feed at Rock Fusco.

MS. GOLDEN: Caroline Golden from Sotos Law, for the individual defendants, in Chicago.

MS. CARNEY: Theresa Carney, also in Chicago, on behalf of Defendant City of Chicago.

INTERPRETER 1: Could you repeat the last name?

MS. CARNEY: Carney, C-a-r-n-e-y.

MS. ROSEN: It's Theresa actually.

INTERPRETER 1: Oh, Theresa.

MS. ROSEN: And then are Steve and John on the phone?

MR. SWAMINATHAN: Steve, are you on the line?

MR. ART: Yeah, Steve Art and John Hazinski for the plaintiff.

THE VIDEOGRAPHER: The court reporter is Tiffany Pietrzyk on behalf of Planet Depos.

Will the reporter swear in the interpreter and the witness.

THE REPORTER: Will counsel please state any stipulations regarding the oath?

MS. ROSEN: If not, then I'll have to find the language in the e-mail.

MR. SWAMINATHAN: We can always do it at the end of the day if somebody can --

MS. ROSEN: Oh, here we go.

Thanks, Kara.

MS. HUTSON: Yep.

MS. ROSEN: We understand that the notary laws do not permit the court reporter to administer an oath if they are not in the presence of the witness. As such, -- do you want me to go slow? Sorry. Sorry.

INTERPRETER 1: Could you repeat?

MS. ROSEN: Yeah.

We understand that the notary laws do not permit the court reporter to administer an oath if they are not in the presence of the witness. As such, counsel agrees that the reporter will not administer the oath.

Instead, the witness will verbally acknowledge the following: Do you solemnly swear or affirm under penalties of perjury that the testimony you will give in this matter will be the truth, the whole truth, and nothing but the truth?

Agreed by all parties?

MR. SWAMINATHAN: Agreed by Plaintiff Reyes.

MS. ROSEN: And then we have to do the same -- well, I don't think she can -- for the same reasons she can't swear in the witness, I don't think she can swear you guys in, so I think I have to do the same thing.

Okay. So let me read it again. Because of the notary laws, we have to swear in the interpreters in the same way as we did the witness.

Do you solemnly swear or affirm under penalties of perjury that the testimony you will translate in this matter will be accurate and to the best of your ability?

INTERPRETER 1: Yes, I do.

INTERPRETER 2: Yes, I do.

MS. ROSEN: And do all parties agree with that?

MR. SWAMINATHAN: Agreed for Plaintiff Reyes.

MS. ROSEN: All right. With that, we can get started.

MS. CARNEY: Eileen, it's Theresa. Can we just ask that everybody mute their lines unless they're gonna be objecting, because every time a sound comes from the telephone connections, the

13

video feed changes.

MS. ROSEN: Okay.

(Testimony taken through a Spanish interpreter.)

(ADRIANA TREVINO and JOSE LUIS FONSECA, after having acknowledged to translate the Spanish language into the English language and the English language into the Spanish language to the best of their abilities, interpreted the following:)

WHEREUPON:

ARTURO DeLEON-REYES, after having acknowledged to tell the truth, the whole truth, and nothing but the truth, through the Interpreters, testified as follows:

DIRECT EXAMINATION

BY MS. ROSEN:

Q. Mr. Reyes, could you please state your name for the record?

A. Arturo DeLeon-Reyes.

Q. Should I call you Mr. Reyes, Mr. DeLeon-Reyes?

A. Whichever way you'd like.

Q. I'll just call you, just to keep it short, Mr. Reyes; okay?

14

A. That's fine.

Q. Okay. My name is Eileen Rosen, and I represent the City of Chicago. And I'm going to ask you many questions about the things that happened to you in 1997 and 1998.

If you don't understand my question, please let me know, and I will rephrase it so that you understand it. Okay?

A. That's fine.

Q. If you don't tell me that you don't understand my question, I will assume that you do understand it. Is that fair?

A. Yes.

Q. When I'm done asking questions, others might have questions for you too. Okay?

A. Yes.

Q. If you need a break at any time, let us know. Okay? The only thing that I would ask is that if I've asked you a question, is that you need to answer the question before we take a break. Okay?

A. Of course.

Q. Okay. What is your date of birth?

A. August 26, '74.

15

Q. And where were you born?

A. Mexico.

Q. Where in Mexico?

A. Guadalajara, Jalisco.

Q. Where do you live now?

A. In Guadalajara, Jalisco.

Q. Who do you live with now?

A. Alone.

Q. Do you have any children?

A. Yes.

Q. How many?

A. Three.

Q. How old are your children?

A. 23, 21, and one just turned 18.

Q. Your 23-year-old, is that a boy or a girl?

A. It's a girl.

Q. And your 21-year-old?

A. It's a boy.

Q. And your 18-year-old?

A. Another boy.

Q. What is your daughter's name?

A. Maria Elena.

Q. And your 21-year-old son?

A. Carlos Arturo.

16

Q. And your 18-year-old son?

A. Alejandro.

Q. Do all of your children have the same mother?

A. Two do. No. Yes, correct.

Q. Which two share the same mother?

A. I made a mistake with that.

Q. Okay.

A. It is the same mother.

Q. So all three children have the same mother?

A. Yes.

Q. And what is their -- your children's mother's name?

A. Araceli.

Q. Araceli?

A. That's correct.

Q. And were you and Araceli married at some point in time?

A. In the past we were.

Q. When did you and Araceli get married?

A. I do not remember the year.

Q. Were you married before you had your daughter Maria?

A. Yes.

Transcript of Arturo DeLeon-Reyes, Volume 1
Conducted on February 25, 2020

Page 17

Q. How long before Maria was born were you and Araceli married?

A. I don't remember exactly when.

Q. Approximately?

A. I do not remember.

Q. Did you get married in a church?

A. Only.

Q. Only in a church?

A. Yes.

Q. And have you and Araceli gotten divorced?

A. One time we did.

Q. When did you get divorced?

A. It was really not a divorce. It was a separation.

Q. So are you still legally married to Araceli?

A. Only to the church, yes.

Q. Is there a way to legally separate or divorce through the church?

MR. SWAMINATHAN: Objection to form and foundation.

Go ahead.

A. I don't know.

Q. If you wanted to get married again, could you?

Page 18

A. I don't know. I have no clue to that.

Q. Has Araceli remarried?

A. She has a new partner, yes.

Q. Are they married?

A. That I don't know.

Q. Do you speak with Araceli?

A. Yes.

Q. Where does she live?

A. In a house with her mom.

Q. In what town?

A. It is Guadalajara, Jalisco.

Q. I'm sorry. Go ahead.

A. The town is called Santa Ana -- (Inaudible.)

Q. Can you say the name of the town again?

A. Santa Ana de -- the municipality is Sapulpa.

Q. And Santa Ana is the town, is that what you said?

A. Yes.

Q. And do you also live in that town?

A. Yes.

Q. How big is that town?

MR. SWAMINATHAN: Objection to form.

Go ahead.

A. Not very big.

Page 19

Q. How many people do you think live there?

A. I don't know.

Q. A thousand?

A. I imagine so. I don't know.

Q. And do you live in a house or an apartment?

A. I live in my parents' house. The home belong to them.

Q. Where does your daughter Maria live?

A. She lives with her husband and son.

Q. And where do Maria and her family live?

A. They live in Guadalajara.

Q. Do they live in the same town you live in?

A. No.

Q. How far away?

A. I don't know. I haven't checked how far.

Q. Do you visit her?

A. No.

Q. When did you move back to Mexico?

A. When I got out of immigration.

Q. When you got out of immigration in the United States?

A. That is correct.

Q. What year was that?

A. I believe it was 2018. I don't remember. I

Page 20

don't remember. I'm not sure.

Q. Are you taking any medication?

A. No.

Q. Do you suffer from any physical conditions that affect your memory?

A. That I'm aware of, no.

Q. Have you seen your daughter Maria since you moved back to Mexico?

A. Yes, many times.

Q. Does she come to visit you?

A. Sometimes she has come to visit me. Sometimes see her when I see her with her mom.

Q. With her mom?

A. Hers, yes.

Q. Have you met her husband?

A. Yes.

Q. And her son?

A. Yes.

Q. How would you describe your relationship with your daughter Maria?

A. Very good.

Q. Does your daughter Maria work?

A. At this moment I don't know.

Q. Do you know if she ever worked?

Transcript of Arturo DeLeon-Reyes, Volume 1
Conducted on February 25, 2020

21

A. Yes.

Q. What did she do when she worked?

A. I don't remember what she did at her work.

Q. Did she graduate from high school?

A. I believe so. I'm not quite sure.

Q. Did she go to college at all, university?

A. That I know of, no.

Q. Your son Carlos, where does he live?

A. He lives with his mom.

Q. And when was Carlos born?

A. May 2, 1998.

Q. How often do you see Carlos?

A. I see Carlos very often because he's sick.

Q. What's wrong with Carlos?

A. He was run over by a locomotive -- motorcycle.

Q. I'm sorry to hear that. When did that happen?

A. It's going on two years.

Q. Were you already back in Mexico when the accident happened?

A. Yes.

Q. Do you help care for him?

A. The most I can I do.

22

Q. So what type of things do you have to do for him because of his accident?

A. To help him apply his medicine, his diapers. When he's in the hospital, I try to take care of him. Especially I'm the one to take care of him at night.

Q. Does he need round-the-clock care?

A. Yes.

Q. Will he ever get better?

A. He has been improving but very, very slowly.

Q. Can he walk?

A. He cannot walk.

Q. Did he suffer a head injury?

A. He had head injury, his chest, his face. His ankle broke. One of his hands, half of it broke in this area. One of his feet are broke too, this part of the bone (Indicating.)

MS. ROSEN: He's pointing to his calf.

Q. Can he talk and communicate?

A. No.

Q. Does Araceli work?

A. No. She takes care of Carlos.

Q. How close do you live to Araceli?

A. Nearby, just a couple of blocks away.

23

Q. Do you work?

A. Yes, I have two jobs.

Q. And what do you do?

A. Construction.

Q. Two different construction jobs?

A. Yes.

Q. What are the names of the companies that you work for?

A. Where I work at, they're not companies. I work with architects.

Q. And what do you do?

A. Whatever is needed for a house.

Q. To build a house?

A. That's correct.

Q. Do you actually physically do the labor to help build the house?

A. Yes.

Q. And what are the names of the two companies that you work for?

A. I do not remember.

Q. Either one?

A. No.

MR. SWAMINATHAN: When you're going to change topics, can we take a break?

24

MS. ROSEN: Sure.

BY MS. ROSEN:

Q. Where -- are they both full-time jobs?

A. Yes.

Q. And what are your hours for each of the two jobs?

A. One is during the day, and the other one is at night.

Q. The company that you work for during the day, who is your boss?

A. It's a female architect.

Q. What is her name?

A. I don't remember. I just call her architect.

Q. How long have you worked for the female architect?

A. I believe -- I'm not quite sure -- two years or something like that.

Q. And do you work in the same town that you live, or do you work in other towns?

A. It is close to there, nearby.

Q. How do you get to work?

A. Sometimes I walk. Sometimes I go by bike, bicycle.

25

Q. And the job that you have at night, what is the name of your boss?

A. I don't remember.

Q. And where is that job located, in your town or somewhere else?

A. That one is close to the other job that I have.

Q. Are both jobs located in the same town?

A. Yes.

Q. What is the name of the town?

A. Bugambilias.

Q. Can you spell it?

A. No.

MS. ROSEN: The interpreter says it is B-u-g-a-m-b-i-l-i-a-s.

Q. What hours do you work for the job that you work during the day?

A. I start at 9. I get out at 6.

Q. And the job that you work at night?

A. I start when I finish the other job, and it finishes when I go back to the -- that shift ends when I'm going -- I'm on my way to the other job.

Q. When do you sleep?

A. At times.

26

Q. How many days a week do you work?

A. The first one from Monday through Saturday.

Q. And the night job?

A. From Monday through Sunday.

Q. So when do you have an opportunity to sleep if you're going from job to job around the clock?

MR. SWAMINATHAN: Objection; argumentative. Go ahead.

A. The second job is just to watch or to take care of another job.

Q. I don't understand what you mean. Can you explain?

A. Yes, of course. The second job is just to watch at night. I have a chance to sleep.

Q. So you sleep while you're at the second job?

A. Yes.

Q. So are you acting like security for a job site?

A. Something like that.

Q. And when you're not sleeping at the night job, what about your responsibilities?

A. Just to check no one goes into the work area.

Q. And what is the work area?

27

A. It's a construction in progress.

Q. Is it for a house or apartment building?

MR. SWAMINATHAN: Objection to form.

A. It's going to a restaurant.

Q. And how long have you worked at this night job?

A. That hasn't been long since it started.

Q. How long?

A. I don't remember exactly, but it hasn't been long.

Q. Has it been a month?

A. It could be a month. It could be longer.

Q. Could it be six months?

A. Not that long.

Q. Could it be three months?

A. I think around that.

Q. And where do you sleep when you have an opportunity to sleep at the night job?

A. I have a place.

Q. What kind of place?

A. They call it a bodega warehouse.

Q. And it's on the job site?

A. Yes, correct.

Q. Are you the only one on the job site

28

overnight?

A. There's another person as well.

Q. So there's two of you?

A. There's only one, but when I'm not staying, he stays.

Q. So while you're working, is there anybody else working?

A. Yes, the ones doing the construction of the house.

Q. Are they doing construction overnight while you're there?

A. Not at night but they do stay late.

Q. So when you first get there, say, around 6 in the evening, there's still people working?

A. Yes.

Q. How many workers are usually there when you get there?

A. I don't remember exactly how many.

Q. Is it more than ten?

A. No.

Q. More than five?

A. Sometimes it's more than five. Sometimes it's fewer.

Q. And how late do the workers stay while

Transcript of Arturo DeLeon-Reyes, Volume 1
Conducted on February 25, 2020

29

you're there?

A. Sometimes for a while.

Q. Until like 9 o'clock at night or 10 o'clock at night?

MR. SWAMINATHAN: Objection to form.

A. I don't remember. I don't believe they would be staying that late.

Q. How much do you make working the day job?

A. 2,800.

Q. 2,800 what?

A. Pesos.

Q. Per week, per month, per day?

A. Per week.

Q. And do you get paid with a check or cash?

A. In cash.

Q. And your night job, how much do you make for your night job?

A. They pay 1,500 pesos.

Q. Per week?

A. Yes.

Q. Is that also in cash?

A. Yes.

MS. ROSEN: We can take a break.

THE VIDEOGRAPHER: We are going off the

30

record the time is 9:45 a.m.

(A short break was had.)

THE VIDEOGRAPHER: We are back on the record. The time is 9:56 a.m.

BY MS. ROSEN:

Q. Okay. Your son Alejandro, when was he born?

A. I guess in July. I'm not sure.

Q. July of what year?

A. I don't remember.

Q. But he was born after Carlos?

A. Yes.

Q. And you came to the United States in December of 1997; right?

A. That is right.

Q. And you were arrested in April of 1998; correct?

A. Yes.

Q. So how is it that you were able to conceive another child?

A. He's not my direct son, my blood son. But I know him, and I decided so call him son since he was an infant. I accepted him as my own son, my blood son, and I love him as much as I love my other son and my other daughter -- my daughter.

31

Q. So Araceli became pregnant with Alejandro after you were convicted; correct?

A. That's right.

Q. And during the time that you were in prison, did you interact with Alejandro?

MR. SWAMINATHAN: Objection to form.

A. All the time, just like I did with my other children, my other kids.

Q. Who is Alejandro's biological father?

A. I don't know.

Q. Is it the same person that Araceli is partnered with now?

A. No.

Q. When you were in prison, how did you communicate with your children?

A. All the time. It was by letter. Sometimes Mexican consulate would call me to allow me to communicate by telephone with my family.

Q. How would that work?

A. I would ask them sometimes if I wanted to talk to my family, that I wanted to say hi, that I wanted to see how they were doing, I wanted to hear their voices.

Q. So would you make contact with the Mexican

32

consulate?

A. Yes.

Q. And how would you do that?

A. I would call collect.

Q. And then they would arrange the calls with your family?

A. Sometimes it was like that, and sometimes it was a private call.

Q. What do you mean by a private call?

A. The time of day I could call. Or sometimes they would call me, but they would tell me when they were going to call me.

Q. The consulate would tell you when your family was going to call you?

A. No. The consulate would tell me when I was going to receive a call from them, and then on another line, I had a call with them. I could receive a call on another line.

Q. And how often would you have these calls with your family?

A. It was only sometimes.

Q. Would it happen once a year?

MR. SWAMINATHAN: Objection to form.

A. Sometimes it was once a year. Sometimes it

33

was during the same year several times.

Q. Did anybody from your family ever come to visit you while you were in prison?

A. No.

Q. Okay. I want to talk a little bit about your background growing up in Mexico. Okay?

A. Yes.

Q. Do you have brothers and sisters?

A. Yes.

Q. How many?

A. I have seven siblings -- seven brothers and three sisters. I'm going to rectify. There are seven of us. Seven siblings.

Q. Seven boys?

A. Including myself, seven boys.

Q. And three sisters?

A. Yes.

Q. So a total, including you, of ten?

A. That's correct.

Q. You understand a little bit of English; right?

A. Very little, almost nothing.

Q. Almost nothing.

When you were in prison in the United

34

States, how did you communicate, in English or Spanish?

A. Only in Spanish.

Q. And were there enough Spanish speakers in the prison that they were able to understand you?

A. Yes.

Q. Were there prison guards that spoke Spanish? Were there prison guards that spoke Spanish?

A. Not all of them, but some of them did.

Q. And were there other inmates that spoke Spanish?

A. Yes.

Q. Okay. Going back to your family here in Mexico, do all ten of you share the same mother?

A. Yes.

Q. Do all of you share the same father?

A. No.

Q. Do you share the same father with any of your brothers or sisters?

A. With one sister.

Q. Is your sister older or younger than you, the one that you share the same father?

A. She's older than me.

Q. And are the other siblings all younger than

35

you?

A. Yes.

Q. And what is your mother's name?

A. Maria de Jesus, J-e-s-u-s.

Q. And what was your biological father's name?

A. I don't remember.

Q. Did you ever live with your father?

A. I didn't get to meet him.

Q. Why not?

A. I don't know. I never met him.

Q. Did your father die when you were young?

A. I don't know.

Q. How much older is your sister than you?

A. Some years.

Q. Two years, three years?

A. Exactly, no, I haven't paid attention to that.

Q. So you don't know if she's one year older than you or ten years older than you?

A. The only one thing I recall is that she's a few years older than me.

Q. What is her name?

A. Her name is also Maria de Jesus.

Q. Are you in regular contact with her?

36

A. Yes.

Q. Where does she live with?

A. In Zacatecas, Mexico.

Q. How far is that from your town?

A. Some hours away.

Q. How old is the next sibling younger -- let me try that again.

How much younger is your next sibling from you?

A. Some years. I don't remember how many years.

Q. Do the rest of your siblings, the ones that are younger than you, share the same father?

A. Yes.

Q. Do you know the name of their father?

A. Yes.

Q. What is it?

A. That's Juan Manuel. I respect him -- respect of him as much as I respect my father. He was like a father to me. He always saw me like his son. He always loved me.

Q. Your mother is deceased; is that correct?

A. That's correct.

Q. When did she pass away?

Transcript of Arturo DeLeon-Reyes, Volume 1
Conducted on February 25, 2020

37

A. I don't remember.

Q. Was it while you were in prison?

A. It was before.

Q. And Juan Manuel, is he still alive or no?

A. No.

Q. And when did he pass away?

A. When I was in prison. That's when I lost him.

Q. Did your mother marry Juan Manuel?

A. Yes.

Q. How old were you when you first recall Juan Manuel being a father figure to you?

A. Since I was very little.

Q. And you grew up in the same town that you live in now; right?

A. That's correct.

Q. And in the same house?

A. Yes.

Q. How is it that you ended up living in the house once you came back to Mexico?

A. Because my marriage was destroyed.

Q. And is the house that you live in owned by your family?

A. Yes, it was my parents' house.

38

Q. And then when they died, who was the property given to?

A. It hasn't been given to anybody.

Q. It's still in your parents' name?

A. Yes, and all my siblings are fighting for that house.

Q. Was anybody living in the house before you moved into it when you came back to Mexico after your parents both died?

A. When I came back to Mexico, one of my brothers was living there with his son and one sister with her daughter.

Q. And so did you move in with them?

A. Yes.

Q. And they now have moved out?

A. They're still living there.

Q. Oh, I thought you told me before that you live alone.

MR. SWAMINATHAN: Objection to form, foundation.

Q. Did I misunderstand you?

MR. SWAMINATHAN: Same objection.

A. I meant to say that I live alone in a room.

Q. I see.

39

What is the name of the brother that lives in the house with you?

A. His name is Fortino, F-o-r-t-i-n-o.

Q. And how many children does he have?

A. He has two.

Q. And both of them live in the same house?

A. Yes.

Q. And his wife lives there too?

A. Yes.

Q. And the sister that lives in the house, what is her name?

A. Her name is Gaby, G-a-b, as in boy, y.

Q. And you say she has a daughter?

A. Yes.

Q. And the daughter lives there too?

A. Yes.

Q. Does she have other children?

A. She's pregnant now.

Q. And does her husband live there too?

A. No.

Q. Is she married?

A. Not to my knowledge.

Q. Is the father of her children living in the house?

40

A. No.

Q. Do you know where the father of her children is living?

A. No.

Q. Do you know who that person is?

A. I've only seen him.

Q. How many times have you seen him?

A. Several times.

Q. Do you know his name?

A. No.

Q. How old is Gaby's daughter?

A. I don't remember, but she was little.

Q. She lives there now, right, in the house with you?

A. Yes.

Q. Is she less than ten years old?

A. Yes.

Q. And how many bedrooms does that house have?

A. Now it has three.

Q. And you have one room for yourself?

A. Yes.

Q. Do you have to pay any rent for living in the house?

A. No.

Transcript of Arturo DeLeon-Reyes, Volume 1
Conducted on February 25, 2020

Q. Do you have to pay for electricity or water?

A. I don't pay for that myself. I contribute for whatever is needed in the house.

Q. Like what kinds of things?

A. The maintenance of the house.

Q. So, like, if the roof needs to be fixed or something like that?

A. Yes.

Q. How about food? Do you contribute for food?

A. I buy my own food.

Q. Do you all share the same kitchen?

A. Yes.

Q. Do you give any money to Araceli or --

A. For whatever my son Carlos needs, yes.

Q. But for Carlos only; right?

A. Yes.

Q. Now, you said that your siblings are all fighting over the house that you live in? What are they fighting about?

A. I don't remember saying that answer.

INTERPRETER 2: If I may, not physically fighting, arguing.

MS. ROSEN: Sure, arguing about the house. Arguing about who is going to own the house.

INTERPRETER 2: Let me just confirm the witness.

(Interpreter clarification.)

If I may, I apologize. I thought the witness said the word arguing, but he said they were looking after the house rather than arguing or fighting for the house.

MS. ROSEN: Got it. Thank you.

BY MS. ROSEN:

Q. So your siblings are all making sure that the house is maintained properly?

A. That's right.

Q. So even the ones that don't live there might contribute to making sure that the house is kept nice?

A. That's correct.

Q. So that it will remain a family home?

A. Yes.

Q. How far did you get in your education?

A. I only completed the 12th grade, junior high school.

Q. Can you explain to me how the education system works?

A. Okay. Middle school. Middle school, 12th grade. 9th grade. 9th grade. Sorry. Middle school.

Q. In Mexico, the school system, can you explain just how that works, because I think it's a little different than it is in the United States?

A. Yes, of course. In elementary school is six years. Middle school is only three years.

Q. And then after middle school, what's next?

A. Preparatory high school.

Q. And how many years is that?

A. That I don't know because I never reached that point.

Q. How old were you approximately when you finished the 9th grade?

A. I don't remember.

Q. Would you have been about 13 or 14 years old?

A. I don't remember.

Q. How old do children in Mexico -- how old are they when they start the first grade?

A. I don't remember.

Q. Well, are they, like, five or six years old? Approximately.

A. I don't remember.

Q. What did you do when you finished the ninth grade?

A. I work with my father in construction.

Q. Did your father have a construction company, or did you just work with him where he worked?

A. I would work with him where he was working.

Q. Did you work full-time?

A. I don't remember.

Q. How long did you work with your father in construction?

MR. SWAMINATHAN: Objection to form.

A. The time I don't recall, but I remember that it was a long time.

Q. Did you work with your father in construction until you moved to the United States?

A. No. I work with my father in construction for a time, and then I didn't work with him anymore. I went to another job.

Q. What was the other job that you went to?

A. Construction too.

Q. And why did you switch jobs?

A. Because I learned how to work with my father. I learned to work like my father did.

Q. And so you switched jobs because there was a

45

better job?

MR. SWAMINATHAN: Objection to form.

Go ahead.

A. No, because there was more work.

Q. So you would make more money?

A. Yes.

Q. And how much money were you making when you were working with your father?

A. I don't remember.

Q. How about the job that you went to, the other construction job you went to after you stopped working with your father, how much money did you make working that job?

A. I don't remember.

Q. How long did you work at that second construction job?

A. I don't remember the time.

Q. Did you work at that construction job until you came to the United States -- went to the United States?

A. Yes.

Q. When you got married to Araceli, where did you and she live?

A. In my parents' house.

46

Q. Who else lived in your parents' house when you and Araceli got married?

A. My other sister lived there. My sister who was in the middle. One of my brothers, but I don't remember exactly who at the time.

Q. And had your mother passed away before you married Araceli?

A. Yes.

Q. And your father, did he still live in the house when you married Araceli?

A. She was living in another house that my parents owned as well.

Q. Where is that house?

A. It's in Guadalajara, Jalisco, near the place where the other house is.

Q. Does your family still own that property as well?

A. Yes.

Q. And who lives in that house today?

A. In that house some of my siblings live there.

Q. With their families?

A. Yes.

Q. While you were married to Araceli, did she

47

ever work?

A. Sometimes.

Q. And what type of work did she do?

A. She would clean houses.

Q. How did you meet Araceli?

A. I don't remember.

Q. Is she from the same town that you are?

A. No, but I met her in the same town.

Q. You met her in your town?

A. Yes.

Q. And what town is she from?

A. She's from Michoacan, next -- beside Guadalajara -- beside Guadalajara, that's correct.

Q. And do you know what she was doing in your town when you met her?

A. She moved there along with her family to live there.

(Interpreter clarification.)

INTERPRETER 2: Just wanted to clarify whether she moved along with her family or whether she moved to that town to join her family, but he does not remember.

MR. SWAMINATHAN: Okay. So the record should reflect that the interpreter had asked the

48

witness for clarification, and then the interpreter explained the interpreter's question for clarification and Arturo's explanation.

INTERPRETER 2: Yes. I just wanted to clarify to get it correctly whether the witness meant to state he joined his family who was already living in town or whether the whole family moved together to live in that town, and the witness doesn't remember.

MR. SWAMINATHAN: Thank you. Hopefully, the court reporter is able to make clear for the record when the interpreter is asking for a clarification from the witness. Thank you.

MS. SUSLER: Can the interpreter put on the record when the witness is asking for clarification?

MS. ROSEN: I thought he did.

INTERPRETER 2: Refrain from doing that?

MS. ROSEN: No, you should do that.

MS. SUSLER: Can the interpreter say on the record when you are asking the witness for clarification?

INTERPRETER 2: Right. Yeah, I will.

MR. SWAMINATHAN: Please.

(Discussion had off the record.)

49

MS. SUSLER: The interpreter from the United States is explaining how we do it in the United States. The interpreter will, so it is clear for the court reporter, who is saying what.

MR. SWAMINATHAN: Thank you.

MS. ROSEN: Okay.

BY MS. ROSEN:

Q. At some point you decided to move to the United States; is that correct?

A. Yes.

Q. And why did you decide to move to the United States?

A. To move ahead to help my family.

Q. Did you believe there were better opportunities for you in the United States?

A. Yes.

Q. When you decided to move to the United States, did you have a plan of where you wanted to live?

A. I don't remember.

Q. How did you get to the United States?

A. My wife's relatives help me.

Q. Which relatives?

A. Brother-in-law who was related to the woman

50

who was my wife.

Q. What is the name of the brother-in-law?

A. Manuel.

Q. Manuel Mejia?

A. Yes.

Q. And Manuel was married to Araceli's sister; correct?

A. That's correct.

Q. And at the time that you were planning to move to the United States, Manuel was already here in the United States; correct?

A. Yes.

Q. And he lived in Chicago; right?

A. Yes.

Q. So was it your plan to move to Chicago?

A. Yes.

Q. And was there a job for you in Chicago that you were aware of?

A. There was no job for me there, but my wife's relatives helped me to find a job.

Q. Which relatives helped you to find a job?

A. I don't remember their names.

Q. Was it other members of the Mejia family?

A. No.

51

Q. When you first came to the United States, I think I read somewhere that you first went to California; is that right?

MR. SWAMINATHAN: Objection to form. Are you asking if you read that -- can you --

MS. ROSEN: I'll repeat the question. Sure.

BY MS. ROSEN:

Q. I believe I read somewhere that when you first came to the United States, you went to California.

Is that correct that you first went to California?

A. I don't remember.

Q. How, physically, did you come to -- go to the United States from Mexico? By boat, by plane, by train?

MR. SWAMINATHAN: Go ahead. You finish.

Objection to form.

A. I don't remember.

Q. You went to the United States by yourself; correct?

A. That's correct.

Q. Were you planning to bring Araceli and your daughter to the United States at some point?

52

A. No.

Q. What was your plan?

A. My plan was to work, send money to my children for them to study to have the opportunity that I did not have and for them to have what was needed for them to eat.

Q. So your plan was to work in the United States and send money to your family for how long?

A. But I don't know.

Q. Well, when you first went to the United States, did you expect to be there for years?

A. At that time I didn't think about that. The one thing that I know that I can tell you is that I went there only to work.

Q. Did you believe that you could make more money in the United States?

A. Yes.

Q. And when you went to the United States, you went there illegally; correct?

MR. SWAMINATHAN: Objection to form.

Go ahead.

A. Yes.

Q. And why did you choose to go to the United States without going through the proper channels so

53

that you could become documented in the United States?

A. Because I only went -- I only came to work.

Q. I don't -- I don't -- I'm not sure I understand. You were only coming -- going to the United States to work so you didn't think you needed to become properly documented?

MR. SWAMINATHAN: Objection to form.

A. I didn't think about that.

MS. ROSEN: Why don't we take a break. The videographer needs to switch out.

THE VIDEOGRAPHER: This is the end of Media Number 1 in the video deposition of Arturo DeLeon-Reyes. We are going off the record at 10:48.

(A short break was had.)

THE VIDEOGRAPHER: Here begins Media Number 2 in the video deposition of Arturo DeLeon-Reyes. We are back on the record at 11:00 a.m.

MS. ROSEN: Is everybody in Chicago ready?

BY MS. ROSEN:

Q. Before you decided to go to the United States to work, did you ever have a plan to become a US citizen?

54

A. No.

Q. Did you ever have a plan before you went to the United States to get yourself properly documented so that you could work in the United States legally?

MR. SWAMINATHAN: Objection to form.

A. I didn't think of that.

Q. And you said you never had a plan to have your wife and your children come to live with you; correct?

A. No.

Q. And you never had a plan that you would, say, work in the United States for five years and then go home to your family?

MR. SWAMINATHAN: Objection to form.

A. About the time, no.

Q. Did you expect at some point to return to Mexico?

A. Yes.

Q. You just didn't have a time frame in mind?

A. No.

Q. Did you have a goal to make a certain amount of money and then you could go back to Mexico?

A. I wasn't thinking of that. I just thought

55

about working and supporting my family -- to support my family.

Q. Up until the time that you left Mexico to go to the United States to work, you were working in Mexico; correct?

A. That is correct.

Q. You just thought you could make more money in the United States than what you were making in Mexico?

A. Yes.

Q. And was it your plan once you came -- let me rephrase.

Was it your plan when you went to the United States to file tax returns in the United States?

A. Could you please repeat that question for me?

Q. Sure. Your plan was to come to the United States to work; correct?

A. Yes.

Q. And to make money?

A. Yes.

Q. Were you planning to file tax returns in the United States to pay taxes on the money that you earned?

56

A. I didn't know anything about that.

Q. You didn't know that in the United States, people are expected to pay taxes on the money that they earn?

A. I didn't know that.

Q. In Mexico, do people pay taxes on the money that they earn?

A. I can only explain to you what happens to me in Mexico. I am paid weekly in cash.

Q. And so at the end of the year, are you required to do paperwork to pay taxes on the money that you earn under the rules here?

A. The whole time that I have worked, I am unaware of that.

Q. So you've never heard that anybody in Mexico is required to pay taxes on the money that they make?

MR. SWAMINATHAN: Objection to form.

A. I have not looked into that.

Q. Do you have a cell phone today? Do you use a cell phone?

A. Yes.

Q. Do you have an e-mail address?

A. I believe so. I'm not sure.

Transcript of Arturo DeLeon-Reyes, Volume 1
Conducted on February 25, 2020

57

Q. Do you know how to use the Internet?
A. Internet, no.
Q. Do you own a computer?
A. Yes.
Q. And what do you use your computer for?
A. Just in case if one day I learn.
Q. Where did you get the computer?
A. One of my brothers sold it to me.
Q. But you don't know how to use it?
A. No, I keep it away.
Q. What kind of cell phone do you have?
A. The type I do not know that exactly. What I can tell you is that it is a telephone.
Q. Do you know how to text?
A. Yes.
Q. Do you use your phone at all to go on the Internet?
A. No, not Internet.
Q. What do you do for -- in your free time?
A. In my free time I go see my family.
Q. Do you go to church?
A. The truth is once in a while.
Q. Do you do any activities or --
A. Football in the summer -- football soccer.

58

Well, yeah. Okay. Sometimes I do. I like to play football soccer, the one that you play when you kick the ball. Sometimes I like to ride a bicycle.
Q. Do you own a car?
A. No, I do not have a car.
Q. Do you have access to a car if you want to use one?
A. I do not know how to drive. I know very little.
Q. You never learned how to drive a car?
A. When I was younger, I got to drive a car, automatic transmission.
Q. How about a motorcycle? Have you ever ridden a motorcycle?
A. Yes.
Q. Did you ever own a motorcycle?
A. Yes.
Q. When was that?
A. It hasn't been long since I bought it.
Q. You have a motorcycle now?
A. That is correct.
Q. When you said earlier that you ride your bicycle to work, did you mean a motorcycle, or do you mean, like, a bicycle that you pedal?

59

A. No, the bicycle.
Q. Where did you get the motorcycle from?
A. I bought it from one of my brothers.
Q. And how much did you pay for it?
A. I don't remember. I'm still not quite sure.
Q. But you bought it not that long ago, you said; right?
A. Yes.
Q. Within the last year?
A. No, no. I have been making payments on it. Just recently I finished making payments on it.
Q. Did you start making payments when you came back to Mexico?
A. Not immediately after I came back but later.
Q. And you've been back in Mexico for approximately two years; right?
A. More or less.
Q. And how much were the payments that you were making?
A. The payments I was making, they were not -- because my brother told me to pay it as I could because he knows my son needs things.
Q. Did you ride to Mexico -- did you ride a motorcycle before you moved from Mexico to the

60

United States?
A. I don't remember.
Q. Did you ever get into a motorcycle accident?
A. I believe so.
Q. When was that?
A. That was before I go into the United States.
Q. How long before you moved to the United States?
A. I don't remember the time.
Q. And did you suffer any injuries as a result of your motorcycle accident?
A. Yes.
Q. What types of injuries?
A. I don't know if I twisted my shoulder or my neck. All I knew is that I had pain.
Q. You had pain where?
A. The exact -- the exact area I don't remember, but what I do remember is that I did have pain right here in the upper area.
Q. In your neck area?
A. I believe so.
Q. Did you go to a doctor?
A. Yes.
Q. And did the doctor give you any treatment?

61

A. Yes.
Q. What was the treatment?
A. I don't remember the type of medicine.
Q. He gave you medicine?
A. Yes.
Q. Was it pain medicine?
A. I believe so.
Q. And this was a doctor here in Mexico; correct?
A. Yes.
Q. By the time you went to the United States, was your injury healed?
A. No.
Q. Were you still in pain when you went to the United States?
A. Yes.
Q. Did you see a doctor in the United States for the pain?
A. I don't remember if I went to see a doctor.
Q. Did you continue to take pain medicine while you were in the United States?
A. Yes.
Q. What type of pain medicine?
A. I don't remember the type of medicine.

62

Q. Was it a prescription?
A. Yes.
Q. How did you get the prescription?
A. I would say the -- the prescription that the doctor gave to me.
Q. The one in Mexico?
A. Yes.
Q. And you were just able to keep refilling that prescription?
A. That is correct.
Q. How often would you take the pain medicine?
MR. SWAMINATHAN: Objection to form, foundation.
A. I don't remember exactly when I would take the medicine.
Q. But you knew that you were taking it in the United States?
A. Yes.
Q. Before you were arrested?
A. Yes.
Q. Were you taking it up until the time you were arrested?
A. I believe so. I'm not quite sure.
Q. Were you driving the motorcycle when the

63

motorcycle accident happened?
A. Yes, I believe so. I'm not sure.
Q. Whose motorcycle was it?
A. I don't remember.
Q. Do you still have pain today?
A. No.
Q. Did you, once you were arrested and you went into the Cook County Jail, did you get more pain medicine?
A. I don't remember.
Q. The type of medicine -- was it the type of medicine you could take and still work during the day without any problems?
A. I would work, but I did have a little bit of trouble.
Q. What kind?
A. Pain.
Q. But you were able to work through the pain?
A. Yes.
Q. And did the pain medicine affect the way you thought or the way you behaved?
A. No.
Q. When you were growing up, did your house have a television?

64

A. Yes.
Q. And did you and your family watch television from time to time?
A. Yes.
Q. What type of shows would you watch on television?
A. I don't remember the shows, but what I do remember is that we would watch TV.
Q. Would you go to movies?
A. Yes. We got to go, yes.
Q. And what type of movies would you and your family go to?
A. I do not remember the type of movies.
Q. Would you from time to time see American movies?
A. I wouldn't be able to tell if they were American or not. What I do remember is that they were movies.
Q. What did you know about the United States before you went there?
A. The truth, nothing.
Q. So why did you think it was a good idea to go there to work?
A. Because many people had gone there to work,

**65**

and they had told me that work is paid better there.

Q. The people that told you that work is paid better there, did they tell you anything about life in the United States?

A. I don't remember that part.

Q. How did Araceli feel about the fact that you were going to move to the United States to work?

A. I don't remember her having an opinion about that.

Q. Did you ask for her opinion?

A. I believe so.

Q. If she would have told you not to go, would you have stayed and not gone?

A. Probably, yes.

Q. How would you describe your relationship with Araceli before you moved to the United States?

A. It was very nice.

Q. Now, when you left, she was pregnant; right?

A. Yes.

Q. And how many months pregnant was she when you left?

A. I don't remember the month, but I remember she was supposed to be due.

Q. Were you worried at all about leaving her

**66**

before she had the baby?

A. Of course I was.

Q. And how did you choose to leave when you did in terms of the timing?

A. To work.

Q. Is there a reason you didn't wait until she had the baby before you left?

A. No.

Q. Did she have anyone in Mexico to help her once she had the baby?

A. Yes, my family and her family.

Q. At the time that you left for the United States, did her family live near where you and Araceli lived?

A. Yes, just a few blocks away.

Q. And who of her family members lived nearby?

A. Nearby her mom lived there, her sisters.

Q. How many sisters does Araceli have?

A. I don't remember how many she has.

Q. The sister that she has that's married to Manuel Mejia, had you ever met her before you moved to the United States?

A. Not in person. I just knew her by picture.

Q. Do you know when that sister moved to the

**67**

United States?

A. No.

Q. Do you have plans or desires to return to the United States?

A. Not for now, especially now that my son is sick.

Q. You mentioned earlier something about moving back to Mexico once you got out of immigration earlier today.

Do you remember that?

A. That is correct.

Q. When you were released from prison in Illinois, were you taken into custody by immigration?

A. That is correct.

Q. Did you go -- did they take you into custody immediately upon your release from prison?

A. Yes.

Q. And where did they take you?

MR. SWAMINATHAN: Objection to foundation.

A. I do not remember the place. What I can tell you is that I was arrested by immigration.

Q. And how long did you stay in custody, in the custody of immigration?

**68**

A. I do not remember the time.

Q. Did you get deported?

MR. SWAMINATHAN: Objection to form.

A. I ask for a free -- voluntary departure.

Q. And that was granted to you?

A. I believe so.

Q. And why did you want a voluntary departure?

A. Because I wanted to see my family, my children, and all my loved ones.

Q. And because of your immigration status right now, you are not permitted to return to the United States; correct?

A. I have not looked into that or reviewed that.

Q. Do you have anybody working for you to try and clear up the immigration problems that you have in the United States?

A. No, I don't remember. Due to my son's accident, I have not paid attention to that. I have not paid attention.

Q. You have a lawsuit; right?

A. Yes.

Q. And at some point you know that we're probably going to have to go to trial on your

Transcript of Arturo DeLeon-Reyes, Volume 1
Conducted on February 25, 2020

**69**

lawsuit, right, to decide the outcome?

MR. SWAMINATHAN: Objection. It calls for attorney-client privilege.

(Reporter clarification.)

MR. SWAMINATHAN: And I don't believe he can answer the question without revealing that information. So I instruct him not to answer the question.

BY MS. ROSEN:

Q. What do you want out of this lawsuit?

A. Justice.

Q. And how do you define justice?

A. That everything is reviewed.

Q. When you say that everything is reviewed, what do you mean?

A. I mean to say that I was incarcerated unfairly for something I did not do.

Q. Well, you know that the only thing that you can get out of this lawsuit that you filed is money; right?

MR. SWAMINATHAN: Objection to the extent it calls for privileged information.

Arturo, if you can answer that question without talking about privileged communications with

**70**

your lawyers, you can answer it. If you cannot, then you should not answer it.

A. I'm going to follow my attorney's advice.

Q. Do you understand that there's going to be a trial?

MR. SWAMINATHAN: Objection to the extent it called for privileged information.

If you can answer that question without revealing any attorney-client communications, you can answer it. But if you cannot, then you should not answer the question.

A. I'm going to follow my attorney's advice.

Q. Do you know what a civil lawsuit is in the United States?

MR. SWAMINATHAN: I'm going to make the same objection. What we could do is take a break. I could -- I would talk to my client to try to understand to what extent I'm comfortable with that he can answer some of your questions without relying on privileged information. I think that might be a way to streamline it.

MS. ROSEN: Okay. Why don't we do that.

THE VIDEOGRAPHER: We are going off the record at 11:34 a.m.

**71**

(A short break was had.)

THE VIDEOGRAPHER: We are back on the record. The time is 11:49 a.m.

BY MS. ROSEN:

Q. Mr. Reyes, I was asking you some questions about the lawsuit you had filed and your understanding about the lawsuit, and we took a break so that you could confer with your attorney so that you could maybe answer some of my questions. So I believe that's happened.

And based on the conversation, do you believe you can answer some of the questions I was asking you? Or are you going to stand on attorney-client -- or maybe you want to explain to me?

MR. SWAMINATHAN: I would maybe ask -- I believe there are maybe some things he can answer if you want to ask -- so I believe there are some -- you can translate this as we go. We can go back on the record. Are we on?

INTERPRETER 1: May I interpret what she said?

MR. SWAMINATHAN: Yes, please.

I believe there are some subjects he may be

**72**

able to able to provide some answers. You can either ask him the questions again, and I can let you know where I'm making an objection to privileged and instructing him not to answer or not. I think that's probably the way to do it.

MS. ROSEN: Okay. So I'll ask the questions, and we'll just see where we go.

BY MS. ROSEN:

Q. Do you understand that there will likely be a trial to resolve this lawsuit that you have filed?

A. Yes.

Q. And do you understand that that trial will take place in Chicago in the United States?

A. Yes.

Q. Do you plan to try to come to the United States to attend that trial?

A. Yes, if I have permission to go, yes.

Q. And what are you doing to get permission to go to the trial?

MR. SWAMINATHAN: Arturo, you can answer the question to the extent you can answer that question without relying on attorney-client communication. If you can't answer that question without relying on attorney-client communication, you should not answer

73

the question.

A. I'm going to follow my attorney's advice.

Q. Do you have immigration lawyers?

A. I don't know.

Q. Has anybody filed any paperwork on your behalf in the United States to -- in the United States to clear up your immigration problem?

MR. SWAMINATHAN: Arturo, you should answer the question to the extent you can answer it without relying on attorney-client communication. And if you cannot answer it without relying on attorney-client communication, you should not answer the question.

A. I'm going to follow my attorney's advice.

Q. Are your lawyers that are here representing you for your civil lawsuit representing you on immigration matters?

MR. SWAMINATHAN: Objection. That called for privileged information.

Arturo, you can answer if you can answer without relying on attorney-client communication. If you cannot, you should not answer the question.

MS. ROSEN: I don't believe the question -- the pure question of whether -- who is representing

74

him or whether he is being represented by a particular lawyer that would require a yes-or-no response requires for privileged communication.

MR. SWAMINATHAN: I actually think it's a question to ask of the scope of our representation, and I think -- so actually, in hindsight, he should not answer the question. It does call for privileged information.

BY MS. ROSEN:

Q. Are you going to follow your attorney's advice and not answer my question?

A. Yes.

Q. Have you signed any paperwork related to your immigration matters?

A. I don't remember.

Q. Have you seen any paperwork that's been filed on your behalf in relation to anything to do with your immigration matters?

A. Not that I remember.

Q. If you are permitted to come back to the United States for your civil trial, do you intend to then try and remain in the United States?

A. No, especially now because my son is sick.

Q. We talked a little earlier about the type of

75

TV shows and movies that you watched when you were a kid growing up.

Do you recall seeing any TV shows or movies relating to life in America?

A. I don't remember that. What I do remember is that they were movies.

Q. Now, when you made your decision to go to work in the United States, did you have a place that you planned to live?

A. No.

Q. Did you have a city that you planned to go to?

A. Yes.

Q. What city?

A. Chicago.

Q. And I think you told me earlier you don't recall how you got from Mexico to Chicago; is that correct?

MR. SWAMINATHAN: Objection; asked and answered.

A. Yes.

Q. And do you recall how much money you had with you when you left Mexico to come to the United States?

76

A. I don't remember.

Q. And so when you arrived in the United States, how did you decide where to live?

A. I didn't make that decision right away.

Q. So where did you live?

A. With relatives of my former wife.

Q. Which relatives?

A. The only thing I remember, what I can tell you is that they were relatives.

Q. You don't know what relation they were to your wife?

A. I don't remember.

Q. Where did they live?

A. In Chicago.

Q. Where in Chicago?

A. I don't remember the area where they lived.

Q. This is before you moved into the house on Mozart; right?

A. That's correct.

Q. Was it near the house on Mozart?

A. I don't remember the distance between the house and the other.

Q. And how were the arrangements made that you would go live with the relatives of your former wife

Transcript of Arturo DeLeon-Reyes, Volume 1
Conducted on February 25, 2020

in Chicago?

A. I believe they offered their home to me.

Q. While you were still in Mexico?

A. I don't remember that part.

Q. When you came to the United States, did you have a cell phone?

A. No.

Q. When you left Mexico, were you intending to go to a certain home or residence to stay?

A. Yes.

Q. And was that these relatives of your wife that you can't remember who they are?

A. Yes.

Q. And how is it that you -- how long did you stay with the relatives of your former wife?

A. Short time.

Q. Why did you leave their home and go elsewhere?

A. Because they found me a place where I could rent.

Q. Who found you a place?

A. Manuel Mejia did.

Q. Were you in contact with Manuel Mejia when you came -- when you first went to the United States?

A. Yes.

Q. And where did -- where was the place that Manuel Mejia found you to live?

A. One house away from his.

Q. And is that the house that you lived there in with Adriana Mejia, Rosauro Mejia, and Gabriel Solache?

A. Yes.

Q. Did you ever live in a home with Horatio Mejia?

A. To live, no.

Q. To stay?

A. No.

Q. You never stayed in that house?

A. I would just go home for a while.

Q. What do you mean, for a while?

A. That house, Manuel lived in that house with his wife, his kid, and I would go visit them.

Q. But you never had a room or anything there?

A. No.

Q. And when you moved into the house with Adriana and Rosauro, were you working then?

A. Yes.

Q. Where were you working?

A. I started working at an office, a temp work agency.

Q. What did you do at that office?

A. That -- if they send different workers to different work types.

Q. What type of work were you doing?

A. I don't remember the types of jobs, but I do remember that I was working.

Q. And then did you eventually get other employment?

A. Yes.

Q. Where?

A. It was another small -- another work office.

Q. And what did you do in that small work office?

A. That small work office sent me to a job.

Q. What job?

A. It was a meat packing plant, a meat packing place -- company.

Q. Is that the place you were working at the time of your arrest?

A. That is correct.

Q. How long did you work at that meat packing place?

A. I do not remember the time.

Q. In order to work at either the temporary work agency that you first worked at or the second place that you worked at or the meat packing place, did you have to give the companies a Social Security number?

A. I don't remember.

Q. Do you know what a Social Security number is?

A. Yes.

Q. What is it?

A. I think it's some, like, security number.

Q. When you were paid, were you paid in cash or check from these places in the United States?

A. Check.

Q. And did you notice when you received your check that taxes were being taken out of your check?

A. At that time I did not know.

Q. Did you ever pay taxes in the United States?

A. I imagine I did. I'm not sure.

Q. Have you ever paid taxes in Mexico?

MR. SWAMINATHAN: Objection; asked and answered.

Transcript of Arturo DeLeon-Reyes, Volume 1
Conducted on February 25, 2020

81

Q. You have to answer.

MR. SWAMINATHAN: Yeah.

A. I'm sorry, I'm sorry. In Mexico?

Q. Yeah. Have you ever paid taxes in Mexico?

A. Not in Mexico, no.

Q. When you went to the first place that you worked at in the United States, how did you get to work?

A. The first job, I would get there with the people that were already working there.

Q. What people?

A. I don't remember. They were relatives of my former wife. I don't remember.

Q. And then the second place you worked where they would send you to different job sites, how did you get to that job?

A. The second job, someone helped me get to the second job.

Q. Who helped you?

A. I don't remember who, but it was somebody.

Q. And how did you get back and forth to work?

A. Cousin of my former wife, I used to work there. He's the one who would take me to work and who would bring me from work.

82

Q. And is this to the meat packing plant?

A. That is correct.

Q. So I think I might be a little confused. Did you work at only two different places when you were in the United States?

A. That is correct.

Q. So the first place was the temporary agency, and that's the one where you went to different work sites?

A. That is right.

Q. So in that first job when you would -- would you show up to the agency and then they would say today you're going to go work over here?

A. Could you repeat that question?

Q. Sure. The first place that you worked, the temporary agency, you said they would send you to different work sites; right?

A. That is correct.

Q. And so one day you might be working at one place, and on another day you'd be working at another place; right?

A. That is correct.

Q. But did you always every morning go to the same office and then get sent to the different job

83

sites from that office?

A. Yes.

Q. So how would you get to the office?

A. I don't remember if someone who was already working there would take me. I do not remember.

Q. And then once you got to the office and they said you need to go to this work site, how would you go from the office to the work site?

A. Because there is a group of people that they send at one time -- at the same time.

Q. And then at the end of the workday, you drove back to the office?

A. Yes.

Q. And then from there you got a ride home by somebody, or you just don't remember?

A. Yes.

Q. And what did you do with the money that you earned when you were working in the United States?

A. I saved it, and I would send it to Mexico.

Q. How would you send it to Mexico?

A. I think it was e-mail, I believe. I don't remember.

Q. And would you send a certain amount every paycheck?

84

A. Yes.

Q. Do you recall how much you were able to send to Mexico to your family?

A. No, I do not remember.

Q. Do you remember how much money you were making when you were working?

A. I do not remember.

Q. Did you have to pay rent?

A. Yes.

Q. Do you recall how much rent you paid?

A. No.

Q. Who else -- do you remember the address of the house that you ended up living in where you were renting a room?

(Interpreter clarification.)

A. No.

Q. Do you remember it was on Mozart?

A. I believe so, but I'm not sure.

Q. Who lived in that house?

A. Rosauro, Adriana.

INTERPRETER 1: The interpreter needs to make a correction.

(Interpreter clarification.)

A. Rosauro, Adriana, Gabriel Solache, and a

person named Carlos.

Q. Anybody else live in the house?

A. Not that I remember.

Q. And the people that you just identified, Rosauro, Adriana, Gabriel, Carlos, and you, you all shared the same floor of the house; right?

A. Yes.

Q. Did anybody live in the basement of the house?

A. Yes.

Q. Who?

A. I think it was Guadalupe with his wife -- with his family or her family.

(Interpreter clarification.)

A. Guadalupe, female, with her family.

Q. And do you know Guadalupe's husband's name?

A. I think his name is Jorge.

Q. And do you know the relationship between Guadalupe, Jorge, and anybody in the house on the floor where you lived?

A. Yes.

Q. What relationship are you aware of?

A. I -- what I knew is that Jorge is Rosauro's brother.

Q. And did you know of any relationship between Jorge and Rosauro and Manuel?

A. Yes.

Q. And what was that relationship?

A. Jorge and Rosauro are brothers, Manuel's brothers.

Q. And I don't remember if I asked you this before, but before you moved to the United States, had you ever met Manuel?

A. In person I never met him. I think the only way I knew him by was a photo.

Q. You first met him in person when you moved to the United States?

A. Yes.

Q. Did you know that he had brothers that lived here in the United States also before you moved here?

A. I didn't know anything about that.

Q. Did you know before you moved to the United States that you were going to be living in a house with Manuel's brothers?

A. No.

Q. You only found that out once you got here -- got to the United States?

A. Yes.

Q. So the first time you met Rosauro was when you moved into his home?

A. That is correct.

Q. And the same with his wife Adriana?

A. Yes.

Q. And what about Gabriel Solache, did you know him before you moved into the house?

A. No.

Q. Did you know anything about Gabriel Solache's relationship to Adriana or Rosauro?

A. No. The only thing I knew is that he also lived there.

Q. And then Carlos, the other person that lived in the house, did you know anything about his relationship to Adriana?

A. At first I didn't know.

Q. Did you eventually learn?

A. I learned that he is Adriana's brother.

Q. And you learned that once you moved into the house?

A. Yes.

Q. Did you ever learn any relationship Gabriel Solache had with Adriana or Rosauro after you moved into the house?

A. No.

Q. Do you know where Adriana was from in Mexico?

A. No.

Q. To this day do you know?

A. No.

Q. How about Gabriel Solache, do you know where he came from in Mexico?

A. I don't know. I don't know.

Q. Do you know how Manuel and his wife met?

A. No.

Q. Do you know how long Manuel and his wife had been married before you moved to the United States?

A. No.

Q. Where did you -- where was your room in the house that you rented in the home on Mozart?

A. My room was in the front.

Q. And was it a regular bedroom with a door?

A. I imagine so.

Q. You don't remember?

A. I only remember that it was a room. It had a door and windows.

Q. So you do remember it had a door and windows

like a typical bedroom?

A. Yes.

Q. And did you have the room all to yourself?

A. Yes.

Q. While you were here working in the United States, what did you do for fun?

A. When I had time, I would go with Manuel and his family or I would write letters to my family.

Q. Did you ever speak to your wife on the telephone?

A. Yes, several times.

Q. And did you ever socialize with Rosauro?

A. No.

Q. Why not?

A. Most of the time I would be working. The rest of the time I would go with Manuel and his family or sometimes I would write letters for my -- to my family.

Q. Why were you socializing with Manuel and his family rather than Rosauro?

A. Because Manuel and Carmen, their relatives are closest to my family, the one that used to be my wife.

Q. Is Carmen your former wife's sister?

A. That is correct.

Q. So you felt they were family because of the relationship between Manuel's wife and your wife?

A. Yes.

Q. Did Manuel and his family ever come over to the house where you lived to visit Jorge or Rosauro, to your knowledge?

A. I believe so, but I'm not sure.

Q. Did you ever attend any family gatherings with any of the members of the Mejia family?

A. Not that I remember.

Q. What were your work hours when you worked at the temporary agency, the first place that you worked?

A. I don't remember the schedule.

Q. How about when you worked at the meat packing place, what hours were you working?

A. I don't remember.

Q. You don't remember at all?

A. The only thing I remember is I would leave in the morning and I would come back late.

Q. How many hours did you work on a daily basis?

A. I think around ten, maybe more. Perhaps

less. But the hours that I worked exactly I don't remember.

Q. Do you remember approximately what time you would leave for work when you were working at the meat packing plant in the morning?

A. I don't recall to be at work, but I guess that an estimate is around 9, after 9.

Q. What have you done in the last week to prepare for today's deposition?

A. Can you repeat the question, please?

Q. Sure. You knew, obviously, that you were going to be giving a deposition; right?

A. That's right.

Q. And so I want to know what, if anything, you did in the last week to get ready for this deposition.

A. During the last week I was working.

Q. How about this week?

A. This week I saw my attorneys.

Q. How many times did you see your attorneys?

A. On Sunday and Monday.

Q. How much time did you spend with your attorneys?

A. I don't remember.

Q. Where did you meet with your attorneys on Sunday?

A. Could you repeat the question?

Q. Sure. Where on Sunday did you meet with your attorneys? What location?

A. In the same hotel where I'm staying.

Q. And do you know what time you first met with your attorneys on Sunday?

A. It was already in the afternoon, but I don't recall the time.

Q. Do you think you met with them for more than an hour?

A. I don't remember. I was not keeping track of the time that I was with them.

Q. When you -- they first met with you, you said it was in the afternoon, so the sun was out; right?

A. I guess so. I don't remember.

Q. By the time they left, was it dark out?

A. Yes.

Q. Did you have dinner with them?

A. Yes.

Q. And who exactly did you meet with?

A. With the attorneys who are present now at

Transcript of Arturo DeLeon-Reyes, Volume 1
Conducted on February 25, 2020

93

this moment.

Q. Okay. So we have Mr. Swaminathan; correct?

A. That's correct.

Q. And we have Mr. Starr; correct?

A. Correct.

Q. And we have Ms. Barajas; correct?

A. Yes, only three of them.

Q. So Ms. Susler at the end, you did not meet with her; correct?

A. Not that I remember.

Q. And when you met with your attorneys on Sunday, did you look at documents?

A. Yes.

Q. What documents did you look at?

A. I don't remember which documents I looked at. I remember that I looked at something.

Q. Was it a big stack of documents or a little stack of documents?

A. Small stack.

Q. Was it police reports?

A. I don't remember. What I know is that they were legal papers.

Q. You know that during the course of the police investigation, a statement was written down

94

that was supposed to be the things that you said to the police; right?

A. Yes.

Q. Then everybody refers to that document as the handwritten statement; right?

MR. SWAMINATHAN: Objection; form and foundation.

A. Could you repeat that question?

Q. Sure. During the course of the -- your criminal trial, do you remember that your lawyer and in the criminal case and the prosecutor would call that document the handwritten statement; right?

MR. SWAMINATHAN: Objection; form, foundation.

A. Yes.

Q. Did you look at that document when you were preparing with your lawyers on Sunday?

A. I don't remember.

Q. Do you remember that when you were in the police station that at some point Detective Guevara put a piece of paper in front of you in Spanish and asked you to sign it? Do you recall that?

A. I don't remember whether it was a document in Spanish or English, but I remember that it was a

95

document.

Q. Did you look at that document when you were preparing with your attorneys on Sunday?

A. I don't remember.

Q. Do you recall that after you were convicted, when you were in prison, with the help of somebody in the prison library, you prepared a legal document?

A. Yes.

Q. And do you remember that attached to that document, there were sketches of the layout of the home on Mozart where you lived?

A. I -- I guess so.

Q. Did you look at that document when you were preparing with your lawyers on Sunday?

A. I don't remember.

Q. The documents that you looked at on Sunday with your lawyers, were they in Spanish or English?

A. In Spanish.

Q. All of the documents that you looked at on Sunday were in Spanish?

A. The ones I looked at, yes.

Q. Did you look at your testimony from your criminal trial when you testified in court?

96

A. I don't remember. What I was recall is I saw different papers.

Q. And all of the papers were in Spanish?

A. Yes.

Q. Did you look at any photographs?

A. I think so. I'm not sure.

Q. What photographs did you look at?

A. I think it was a car. I'm not sure.

Q. Whose car?

A. I guess it was Rosauro's.

Q. You guess? You're not sure?

MR. SWAMINATHAN: We have a concern that there's a difference between "I think so" and "I guess so." I want to make sure that the translation is capturing what we believe is the proper translation as "I think so." But I'll let you confirm if you don't mind.

MS. ROSEN: So do we think the proper translation is I think so?

INTERPRETER 1: Correct, or I believe so.

MS. ROSEN: Okay.

BY MS. ROSEN:

Q. Are you not sure that the photographs that you looked at was the photograph of Rosauro's car?

Transcript of Arturo DeLeon-Reyes, Volume 1
Conducted on February 25, 2020

MR. SWAMINATHAN: Objection to form.

Go ahead.

A. I believe so. I'm not sure.

Q. Did you look at any photograph of yourself?

A. I believe so.

Q. You're not sure?

A. No.

Q. Did you look at any photographs of Adriana?

A. No.

Q. Did you look at any photograph of Gabriel Solache?

A. No.

Q. Did you look at any photograph of the little boy that was in the home that you lived at on Mozart just before you were arrested?

A. No.

Q. Now, you said you also met with your lawyers on Monday; right?

A. Yes.

Q. How long did you meet with them on Monday?

A. The time I don't recall. I wasn't keeping track of time. I wasn't checking my phone. I wasn't keeping track of time.

Q. When did you first start meeting with your lawyers? What time of day was it when you first started meeting with your lawyers on Monday?

A. In the morning.

Q. And did you meet with them continuously throughout the day, or did you take breaks?

A. We took breaks.

Q. Were they short breaks?

A. I don't recall the time during which we took the break.

Q. Did you meet with them all day?

A. I believe it was almost all day. I don't know if it was all day.

Q. Did you have lunch with them?

A. Yes.

Q. Did you have dinner with them?

A. Yes.

Q. Did you spend time meeting with them and getting ready for your deposition after dinner?

A. I believe a short time.

Q. Did you look at any documents yesterday?

A. Yesterday, yes.

Q. The same documents or different documents?

MR. SWAMINATHAN: Objection to form.

MS. ROSEN: I'll rephrase it.

BY MS. ROSEN:

Q. The same documents you looked at on Sunday or different documents?

A. I believe they were the same documents.

Q. And what did those documents say?

A. The ones in Spanish, I believe they were the documents that were used during the period of time where I was arguing -- I was filing my complaint, my case.

Q. Which case?

A. My criminal case.

Q. So you were looking at the document that you prepared?

MR. SWAMINATHAN: Objection; foundation, mischaracterizes testimony.

Go ahead.

A. My attorneys gave me those papers.

Q. Your -- the attorneys that you met with gave you those papers?

A. Yes.

Q. And I guess I'm trying to understand what the papers were that you were looking at.

So were they documents that were filed in your criminal case?

MR. SWAMINATHAN: Objection to form.

A. Yes.

Q. And what did those documents say?

A. A record of what I was fighting for in court.

Q. And you said the documents were in Spanish; right?

A. That's correct.

Q. And were you able to read the documents?

A. Yes.

Q. And you read them on Sunday; right?

A. I read one part on Sunday and another part on Monday.

Q. And what did it say, the document?

A. It's part of what happened, my trial, appeals, but I don't remember what paper I saw and what paper described each thing.

Q. So you can't tell me any of the words that you read on the page?

A. No. What I can tell you is that I saw some papers about what happened during the trial of my case.

Q. So do you mean you saw testimony, people testifying?

101

A. Yes, I believe so.

Q. Did you read your testimony?

A. I believe so.

Q. How many times did you testify during the criminal proceedings that were brought against you, do you remember?

A. In which part?

Q. During the criminal case back in 1998-2000.

A. Yes.

Q. How many times did you testify?

A. What I'm sure about is that it was once. I don't remember how many times it was.

Q. And then you testified again more recently, right, in 2013 or 2014?

A. Yes.

Q. Did you look at that testimony too yesterday or Sunday?

A. I believe so.

Q. Did you look at Gabriel Solache's testimony?

A. No.

Q. Did you look at Adriana Mejia's testimony?

A. No.

Q. Did you look at Rosauro Mejia's testimony?

A. No.

102

MS. ROSEN: I think we need to stop for the videographer, and I think this is a good time to take the lunch break.

THE VIDEOGRAPHER: We are off the record at 12:54 p.m.

(A lunch break was had.)

THE VIDEOGRAPHER: Here begins Media Number 3 in the deposition of Arturo DeLeon-Reyes. We are back on the record at 2:03 p.m.

BY MS. ROSEN:

Q. Are you all set, Mr. Reyes?

A. Yes.

Q. Are you paying any lawyers to help you with your immigration status?

A. No.

Q. Other than the lawyers that are working for you at Loevy and Loevy, do you have any other lawyers working for you in any other capacity?

A. The truth is that I don't know.

Q. So you're saying you might have other lawyers that you don't know about?

A. When I went through immigration, I had an attorney.

Q. What was that attorney's name?

103

A. The name I don't remember, but I remember that I had an attorney.

Q. When was the last time you spoke to that attorney?

A. I believe it was last year.

Q. Was the attorney -- is the attorney a male or a female?

A. Female.

Q. Is that attorney from Mexico or the United States?

MR. SWAMINATHAN: Objection to foundation.

A. From United States.

Q. And when you spoke to that female attorney last year, how did you speak to her, over the phone, in person?

A. I believe she send me some papers that I had to complete.

Q. What kind of papers?

A. The papers I don't recall, but she told me that I had to complete those papers.

Q. So she sent you papers?

A. She didn't send papers. I believe she sent me an e-mail.

Q. Where did she send the e-mail?

104

A. I'm not sure if it was to the e-mail I have or if it was to another one.

Q. What is your e-mail address?

A. I don't know it by heart because I don't use it.

Q. Where do you receive e-mails when you people send you e-mails?

A. They're not e-mails. They come from the web page.

Q. From the what?

(Interpreter clarification.)

A. I guess that is the one where one can send messages to relatives. I would have to take a look at that page to tell you.

Q. Where would you access that page, on what device?

A. On my telephone.

Q. So if you look at your telephone, you can see a web page?

A. Yes.

Q. Via the Internet?

A. I don't know if it's via Internet, but we -- they can send me messages, they can send me notes, but I don't think it has to do with the Internet.

105

Q. So the immigration -- the female immigration lawyer that you were last in contact with last year, you believe sent you papers via either your e-mail or a web page; is that correct?

A. Yes.

Q. And did you respond to your immigration lawyer via the web page or an e-mail?

A. No, I didn't reply because then my son's accident took place.

Q. So you've never sent the paperwork -- you've never filled out the paperwork that your immigration lawyer asked for?

A. Not yet.

Q. Do you have your phone with you today?

A. Yes.

Q. At a break, can you look at your phone and see if you can find the contact from your lawyer so we can figure out what her name is?

MR. SWAMINATHAN: We'll take a look at it at the break and we can figure it out.

A. Of course, yes.

Q. Now, we talked a little bit before we broke for lunch about the photographs that you looked at either yesterday or the day before.

106

Did you look at any photographs of police officers?

A. No.

Q. How did you get from your home town to del Cabo?

A. By plane.

Q. And when did you get to Cabo?

A. Sunday afternoon.

Q. And you're staying at a hotel here; right?

A. That's right.

Q. And when are you scheduled to go back home?

A. I believe it's Saturday.

Q. And how much did your airplane ticket from your hometown to Cabo cost?

MR. SWAMINATHAN: Objection to the relevance of the question.

You can answer it if you know.

A. I just picked up the ticket. I didn't take a look at the price.

Q. You didn't pay for it?

A. Correct, I didn't.

Q. Do you know who did?

A. Yes, my attorneys.

Q. And your hotel, are your attorneys paying

107

for your hotel room as well?

A. Yes.

Q. Are they also paying for your meals?

A. Yes.

Q. Now, going back to when you were living on the house on Mozart, did you ever spend any time with Rosauro Mejia?

A. No.

Q. Never had a meal with him?

A. Meal, I don't recall.

Q. And anytime having a drink with him?

A. That I recall, no.

Q. Was there a TV in the house?

A. Yes, there was one in the living room.

Q. Did you ever spend any time in the living room?

A. Yes.

Q. Did you ever spend time in the living room when other members of the house were in the living room?

A. I believe so.

Q. Did you ever spend any time with Rosauro in the living room?

A. I believe so.

108

Q. Would you ever have conversations with him when you were spending time with him in the living room?

A. I don't remember.

Q. How about with Gabriel Solache, do you recall ever spending any time at all with Mr. Solache?

A. Time, time, we say no. I would look at him when he was at home or I would see him when I was home.

Q. Did you have any conversations with him?

A. Yes.

Q. What did you talk about?

A. I don't remember.

Q. Were you friendly with Gabriel Solache?

MR. SWAMINATHAN: Objection to form.

A. Friendly in that he was living in the same house, we could say yes. But being my friend, no.

Q. How about Rosauro, were you friendly with Rosauro?

MR. SWAMINATHAN: Objection to form.

A. I would look at him as living in the same house that I was living, but a friend, no.

Q. Let's talk a little bit about Adriana Mejia.

109

Did you ever spend any time with Adriana while you were living in the house on Mozart?

A. Spend time talking with her, no. I would look at her in the house. When I arrived she was with Rosauro, but saying that she was my friend or I spoke with her privately, no.

Q. Are you saying you never had a conversation one-on-one with Adriana?

A. At this moment I don't remember.

Q. And Carlos Martinez, Adriana's brother that also lived in the house, did you have any conversations with him while you lived in the house?

A. Yes.

Q. Did you ever spend any time with him?

A. I don't remember.

Q. Was he about your age?

A. No, he's much younger than me.

Q. When you lived in the house on Mozart, how old were you?

A. 20-something. I don't remember exactly how old I was.

Q. You lived there in early part of 1998; right?

A. Yes.

110

Q. And you were born, you said, in 1974?

A. That's correct.

MR. SWAMINATHAN: Did you get the day wrong?

INTERPRETER 2: Interpreter clarifies or rectifies. Witness confirmed that he was born in 1974.

BY MS. ROSEN:

Q. That would have been made you 23 in the early part of 1998; right?

A. I believe so.

Q. You said Carlos was much younger than you?

A. Yes.

Q. Was he a teenager?

A. I don't know how young he was or what the difference in terms of years was, but I can tell you is that he looked much younger than me.

Q. What about Rosauro? Were you much closer in age to Rosauro?

A. That could be possible, but I don't know.

Q. What about Gabriel? Were you about the same age as Gabriel Solache?

A. I don't know. I don't remember asking him how old he was.

Q. Well, did you feel like you were around the

111

same age?

A. I believe that more or less, yes.

Q. Did you and Gabriel ever work at the same temp agency?

A. I guess he used to work or worked in the first work agency.

Q. At the same time you did?

A. I don't remember if it was at the same time, but I remember that I saw him there.

Q. You saw him at the temp agency while you were at the temp agency?

A. I believe so, but I am not very sure about that.

Q. And did you -- when you and he -- when you saw -- let me withdraw that.

When you saw Gabriel at the temp agency, did you ride with him to work?

A. I don't remember. What I know is that he had a different job.

Q. He had a different job?

A. The agency didn't send us at the same time to the same job. He was on a different job.

Q. After you got convicted of the murder -- of the murders of the Soto family, you went to prison;

112

correct?

(Interpreter clarification.)

Q. To prison?

A. Yes.

Q. Do you recall the names of the different prisons that you were in for the time that you were serving?

A. Yes.

Q. Where was the first prison that you were assigned to?

A. The first prison I just passed there as part of the process, but I was there for a matter of weeks or days.

Q. Or days?

A. Or days.

Q. Was that Stateville?

A. It was in a place by that name, but I guess it was called -- I don't remember exactly the name, but it's not the name you just mentioned. There was other prison there -- near there or in the same area.

Q. Okay. And after you were at that first prison for days or weeks, where is the next prison that you were assigned to?

113

A. They send me to Menard.

Q. And did you stay at Menard for the whole time that you were in prison until you got released?

A. That I remember, yes.

Q. When you went to the first prison that you were at for a very short period of time, did you see Gabriel Solache at that prison?

A. I don't remember.

Q. And was Solache ever at Menard while you were at Menard?

A. To my knowledge, no.

Q. Before you got convicted, you were being detained at the Cook County Jail; correct?

A. That's correct.

Q. And do you recall what division were you assigned to?

A. Yes.

Q. What division?

A. The majority of the time, I was in Division 10.

Q. And while you were in Cook County Jail awaiting trial, did you ever see Mr. Solache?

A. Yes, when they transferred me to another division.

114

Q. Which division?

A. 11.

Q. Was Mr. Solache also assigned to Division 11 when you got there?

A. Could you repeat that question?

Q. Sure. You said you saw Mr. Solache once you got moved to Division 11.

Was Mr. Solache also assigned to Division 11 at that time?

A. Yes.

Q. And for how long were you and Mr. Solache both assigned to Division 11?

A. At the time I don't remember.

Q. When you and Mr. Solache were both in Division 11, did you ever discuss your circumstances?

A. I remember I got to talk to him, but I don't remember what I talked to him about.

Q. Did you talk about the case?

A. I don't remember.

Q. Did you ask Mr. Solache if he was involved in the murders and kidnapping?

A. I don't remember.

Q. Did Mr. Solache ask you if you were involved

115

in the murders and kidnapping?

A. I don't remember if he asked me that.

Q. Do you have an opinion on whether or not Mr. Solache was involved in the murder of Mr. and Mrs. Soto and the kidnapping of their two children?

A. No.

Q. No opinion whatsoever?

MR. SWAMINATHAN: Objection; asked and answered.

Q. You can answer.

A. No.

Q. How about Adriana Mejia's involvement in the murder of Mr. and Mrs. Soto and the kidnapping of their two children? Do you have an opinion on whether or not Adriana was involved in the murders and kidnapping?

A. No.

Q. Are you aware that Adriana is -- well, let me back up.

Do you know what DNA is?

A. Based on what I have learned, a little bit, yes.

Q. And are you aware that Adriana's DNA was found at the Soto home where they were murdered?

116

A. Based on what I heard about the records, yes.

Q. And are you also aware that Mr. Soto's DNA was found on Adriana's clothing or shoe?

A. Based on what I learned from the record, yes.

Q. And you obviously know that the little boy that Adriana brought home to the house on Mozart was Santiago Soto; correct?

MR. SWAMINATHAN: Objection to form.

A. Based on what I could learn here during my trial and the appeals, yes.

Q. And you also know that the little baby, the little female baby that Adriana claimed to have given birth to, was actually the baby of Mr. and Mrs. Soto; right?

A. Yes.

Q. So if Adriana was not involved in the murder of Mr. and Mrs. Soto and the kidnapping of their two children, do you have any idea how Adriana came into possession of the two children?

MR. SWAMINATHAN: Objection to form, foundation, and mischaracterizes the testimony.

A. No.

117

MS. ROSEN: I'm going to ask the court reporter to retrieve Item Number 40 and mark that as Exhibit No. 1. And then I'm also going to mark it as Exhibit No. 1 here so that we have it.

(DeLeon-Reyes Exhibit 1 was marked for identification and is attached to the transcript.)

MR. SWAMINATHAN: Do you have a copy for me?

MS. ROSEN: Yeah.

MR. SWAMINATHAN: Josh wants one.

MS. ROSEN: No, he's got it.

MR. SWAMINATHAN: Thank you.

BY MS. ROSEN:

Q. Mr. Reyes, I'm going to ask you to take a look at what we've marked as Exhibit No. 1 for your deposition.

Do you recognize Exhibit No. 1?

A. Yes.

Q. What is it?

A. It's a drawing.

Q. Who made the drawing, do you know?

A. I know who did it.

Q. Who?

A. Myself.

118

Q. And when did you make this drawing?

A. When, I don't remember.

Q. Was it while you were in prison?

A. Yes.

Q. And what is shown in the drawing?

A. A living room is shown there.

Q. What living room?

A. This is the living room that was in the house where I was renting.

Q. Okay. And then it says on here Exhibit E.

Do you see that?

A. Yes.

Q. Did you write that?

A. Yes.

Q. And then there's a circle with an A, the letter A. Do you see that? Just below exhibit E there's a circle?

A. Yes.

Q. What does the A stand for?

A. It means my name.

Q. And does that tell us where you were standing or sitting at a certain point in time?

MR. SWAMINATHAN: Objection to form.

A. No, I was standing.

119

Q. You were standing.

And at what point in time were you standing there? Is this telling us where people were at a certain point in time?

MR. SWAMINATHAN: Objection to form.

A. Would you repeat the question?

Q. Sure. This drawing shows where you were standing and where others were in the room at the house on Mozart; right?

A. Yes.

Q. Is this telling us where people were standing at a certain point in time?

A. Yes.

Q. At what point in time?

A. The point was -- this was before going to the police station.

Q. When you heard the arguing?

A. That's correct.

Q. And then along the side of the document, I think it says April. It's cut off.

Do you see that there?

A. Yes, I believe so.

Q. And do you think it says April 3, 1998?

A. I believe so, but I'm not sure about that.

120

Q. And the argument that took place before you went to the police station with the little boy happened in the early morning hours on April 3rd; right?

A. Yes.

Q. And is that your handwriting, the April 3, 1998?

A. I could not recognize that because it's only half what is written.

Q. Okay. And you don't remember if you wrote that or not as you sit here today?

A. Yes.

Q. And then next to the date, it looks like maybe there's a time? Does it say 1:30 to 2 maybe? Can you tell?

MR. SWAMINATHAN: Objection to form, foundation.

Go ahead.

A. Yes, I can see it, but I cannot notice exactly the time that is marked here.

Q. Okay. If we look at the drawing, there's an orange rectangle. It says TV.

Do you see that?

A. Yes.

121

Q. Did you write TV?

A. Yes.

Q. And is that where the TV was in the living room?

A. According to my recollection at the time, yes.

Q. And then in front of the TV by the -- by what looks like a couch of some sort, there's a circle, and it says Gabriel.

Do you see that?

A. Yes.

Q. And is that telling us that that's where Gabriel was standing or sitting at the time?

A. Yes.

Q. Do you remember was he standing or sitting?

A. I don't remember.

Q. And then there's another circle, and it says Rosauro.

Is that where Rosauro was standing or sitting?

A. Yes.

Q. Do you recall whether he was standing or sitting?

A. That part I don't remember.

122

Q. Then there's also towards the top of the page a circle with Guadalupe.

Do you see that one?

A. Yes.

Q. Is that where Guadalupe was standing or sitting?

A. Yes.

Q. And then right next to Guadalupe there's some lines. Is that a staircase? That's supposed to be a staircase?

A. According to my recollection at the time, yes.

Q. And then there's something on one side of the staircase, not the thing that looks like a chair, but on the other side. What is that?

A. I guess that's where they washed the dishes.

Q. So that is the kitchen area?

A. To my recollection, yes.

Q. And then there's a circle with the name Adriana in it.

Do you see that?

A. Yes.

Q. Is that where Adriana was standing or

123

sitting at the time?

A. Yes.

Q. And then there's a circle on the couch that says Carlos Martinez.

Do you see that?

A. Yes.

Q. Now, does that mean that's where Carlos was either standing or sitting at the time?

A. Yes.

Q. Now, the way you have that one drawn, you have the circle half on the couch.

Does that mean he was sitting?

A. Could you refer which circle you're referring to? Are you referring to the small circle or the one in the middle of the couch?

Q. The one in the middle that has the name Carlos Martinez written inside of it.

A. Yes.

Q. So you think he was sitting; right?

A. Yes.

Q. And then the little circle on the couch, can you tell what's written inside of the little circle?

A. Of course, yes. It says boy.

Q. And was that where the little boy was

124

sitting?

A. Yes.

Q. And that's the little boy that Adriana brought home with her and said she was asked to baby-sit because the mother was in the hospital or something; right?

MR. SWAMINATHAN: Objection to form and foundation for that question.

A. I don't know when she brought him, but I can tell you that that's the boy that I took care of.

Q. The boy that you took care of when?

A. I don't remember the correct date.

Q. Did you take care of the boy for one day?

A. I don't remember it being one day. What I remember, that it was part of the day.

Q. What do you remember about the day that you watched the boy?

A. I remember little. I remember going to take care of him in the morning, but I don't remember if I took care of him until noon or afternoon. I do not remember.

Q. Why were you taking care of the boy?

A. Because Adriana asked me if I could take care of him.

125

Q. But you don't remember if you watched him for only the morning or the whole day?

MR. SWAMINATHAN: Objection; asked and answered.

Q. You can answer.

A. No, I do not remember.

Q. Do you remember why Adriana needed you to take care of the boy?

A. I do not remember. What I do remember is that she was insisting. And after all -- and eventually I ended up taking care of him.

Q. When you say she was insisting, what do you mean?

A. The little that I remember is the first time she asked me if I could take care of him, I believe I said to her I couldn't do it because I had to work. But she started just continuous telling me more times, and I ended up taking care of him.

Q. Was there anybody else at home in the house when Adriana asked you to take care of the little boy?

A. I don't remember.

Q. When Adriana asked you to take care of the little boy, did she have the little baby with her?

126

A. Not that I remember.

Q. Did you know that Adriana was claiming to be pregnant?

MR. SWAMINATHAN: Objection to form. At that point?

MS. ROSEN: Let me rephrase.

BY MS. ROSEN:

Q. Before the little boy came to the house on Mozart and before Adriana had a little baby with her, did you know that Adriana was claiming to be pregnant?

A. I don't remember.

Q. Do you remember, before Adriana brought the little boy home and before she had the little baby with her, anybody in the house making any kind of preparations for a new baby?

A. I do not remember that part. What I do remember is that she did look like a pregnant woman.

Q. When you lived in the house on Mozart, did you ever have opportunity to socialize or interact with Guadalupe Mejia?

A. No.

Q. Do you recall ever having a meal with her?

A. No.

127

Q. Did Guadalupe spend any time on the first floor with the people that lived there, Rosauro and Adriana and the others?

(Interpreter clarification.)

Q. Rosauro, Adriana, and the others that lived there.

A. I believe so.

Q. And Guadalupe's husband Jorge, did you ever spend any time with him?

A. Spend time with him, no. I did get to see him.

Q. Did he often or periodically come up to the first floor and interact with the family members that lived on the first floor?

A. Not that I remember.

Q. Do you remember if Guadalupe and Jorge had children?

A. Yes.

Q. Do you recall how many?

A. No.

Q. Did anyone -- did anybody else live -- let me withdraw that.

So the floor that you lived on, was that the first floor of the house?

128

A. Yes.

Q. So Guadalupe and Jorge and their children lived in the basement?

A. Yes.

Q. Did anybody else live with them in the basement?

A. I think somebody else, but I'm not sure.

Q. Do you know somebody by the name of Martin Bacca?

A. I don't remember.

Q. Was there also a second floor or an attic to that house?

A. Yes.

Q. At the time that you lived there, did anybody live in the second-floor attic?

A. Not that I remember.

Q. Other than Manuel Mejia and his wife, did you know any other people in the Chicago area other than the people that you lived with?

A. Yes.

Q. Who?

A. There were the -- they were relatives of my former wife. Yeah, those were the people in which house I lived when I first came -- went to the

United States.

Q. And you said you don't remember their names; right?

A. I do not remember the names, but what I do remember is that they're relatives of my former wife.

Q. Anybody else other than those people, Manuel Mejia and his wife and the people that you lived with on Mozart?

A. Yes.

Q. Who?

A. There was another relative, relative of my wife.

Q. Do you remember that person's name?

A. I believe his name is Salvador.

Q. He is the person that gave you a ride to the meat packing plant job back and forth to work?

A. Yes, that's him.

Q. Any other people that you knew in the Chicago area other than the ones that we've talked about so far?

A. Not that I know. The person that I saw and I greeted, it's one brother, another brother of Manuel. He lived on the first floor of the house.

Q. Which house?

A. Where Manuel lived.

Q. Do you remember that brother's name?

A. I believe -- I'm not sure. I believe his name was Horacio.

Q. Anybody else that you knew in the Chicago area other than all of the people we've talked about so far?

A. No, not that I remember.

Q. And while you were here working and sending money back to your family, did you have any plans to return to Mexico to visit your family and then come back to the United States to work?

A. But then I was planning just to work for a while in the United States and then go back to be with my family.

Q. Did you have any plan to bring your family over to visit you? Not to live, but just to visit so you could see them while you were here working?

A. No.

MS. ROSEN: I'm going to ask the court reporter to pull Item Number 21 and mark it as Exhibit No. 2.

(DeLeon-Reyes Exhibit 2 was marked for identification and is attached to the transcript.)

BY MS. ROSEN:

Q. Mr. Reyes, if you could just leaf through that just so you can take a look at what it all is?

A. Yeah.

Q. And notice that there's copies on both sides.

Mr. Reyes, have you had a chance to look through the exhibit and familiarize yourself with it?

A. Yes.

Q. And do you recognize what's depicted in those photographs?

A. Yes.

Q. What is this?

A. It seems to be a calendar, scheduler, I mean, that I had, but I don't know if it is.

Q. In March of 1998, did you have a schedule or calendar like this?

A. Yes.

Q. And do you recall that at the time of your arrest, the police took possession of the calendar?

A. Yes.

Q. And it was actually evidence at your criminal trial.

Do you remember that?

A. Yes.

Q. And I can tell you that in this lawsuit, everybody, the lawyers went and looked at all of the evidence, and these are photographs that were taken when we inspected all of that evidence.

A. Okay.

Q. And I have some questions about some of the things that are in the pictures, and you can help us a little bit to understand what's here.

If you flip to the third page, to the back of it, it has a number -- I don't know if you can see it -- it's very small. It says -- each page says Reyes 0080, and then the page I want you to look at it is 8058. It's very hard to see because it's very small.

A. I can show you the piece of page.

Q. Sure. Yeah, that's the one.

So do you recognize that document?

A. Yes.

Q. What is it?

133

A. This is something from the work office. They would give it to me.

Q. And it says on it -- can you read any of that?

A. I cannot read it because it is in English.

Q. So it says Kelly Services timecard. Is Kelly Services the -- one of the agencies that you worked for?

A. Yes. That was the second job.

Q. And you work at the meat packing plant through Kelly Services; right?

A. That is correct.

Q. Okay. And then the next page, is that just the other side of the same document?

A. I wouldn't be able to say yes or no. I do not remember.

Q. Okay. And then the -- do you see the blue part? Is that where you would fill in your hours?

A. You're talking about this one?

Q. Yeah.

A. Could you repeat the question?

Q. Sure. Where there's blue writing and then there's a chart and there's some squares, is that where you would fill in your hours for work?

134

A. I do not remember that.

Q. Okay. If you go to the next page, flip the page over, and you see that one --

A. Which one? This one?

Q. Let me -- yes, that one. It's Reyes 8060. There's the part of the page that has the blue on it and then there's another part that looks like it's an envelope.

Do you see that there?

A. Those look like an envelope, but I'm not sure if it is or not.

Q. Do you remember if you had to -- when you were working for Kelly Services, you would fill out your time and you would mail it in, or would you just turn it in at the end of the day or week?

A. I don't remember that part.

Q. Okay. And now as you go to the next page, one more, the first page with what looks like business cards. It's Reyes 8063.

Do you recognize those business cards as being something that you kept in your calendar or planner?

A. I do not remember.

Q. The one card, would be at the top of the

135

page if you're looking at it in the proper direction, says Saturn Construction.

Does that mean anything to you, that name?

A. No.

Q. Then there's some handwriting on the card. Is that your handwriting?

A. I believe so, but I'm not sure.

Q. And do you know what it says below the phone number?

A. I believe it says painted or something like that and friend.

Q. Amigo means friend; right?

(Interpreter clarification.)

Q. The word that is written is "amigo"; right?

A. Yes.

Q. And the word "amigo" is Spanish; right?

A. It is correct.

Q. And then below that can you tell what that word is?

A. I think it says truck.

Q. Truck?

A. Truck is camioneta. I think it says camioneta.

(Interpreter clarification.)

136

INTERPRETER 1: Camioneta could be a van, could be a truck.

BY MS. ROSEN:

Q. And then there's more letters after camioneta?

A. Yes.

Q. What letters are those?

A. The only thing I can recognize I can see it's B and E and maybe a T, but it's not a C.

Q. And do you know what that means?

A. No.

Q. And then the first word, what did you say you thought that said?

A. The only thing I can say it looks like painting.

Q. Painting?

A. Painting.

MR. SWAMINATHAN: So I think just to be clear, I think you're just asking for this portion what the word looks like it says, which is a Spanish word.

MS. ROSEN: Correct.

MR. SWAMINATHAN: So I think for that, there's not -- you're not asking for a translation

137

to the English of what the word is. And I don't know that -- he's not qualified to do that. Or if you can ask him a different question that did that, but for now I think the question is just what do you think that word is in Spanish that's written there and there's no translation.

MS. ROSEN: He's the one that said painting.

MR. SWAMINATHAN: In English?

MS. ROSEN: No, that's what he said when he read it.

MR. SWAMINATHAN: He never said an English word.

MS. ROSEN: I'm not suggesting he was saying an English word at all.

INTERPRETER 1: Just for clarification, the interpreter is repeating what the interpreter is hearing. The interpreter is not --

MS. ROSEN: The document.

INTERPRETER 1: Correct.

BY MS. ROSEN:

Q. Let's be clear about that first word. What do you think that first word says?

A. I don't know.

Q. Can you read the letters to us?

138

A. I cannot read them, but I can describe them.

Q. Sure.

A. Okay it's a P, an A, an I, a T, and an E.

Q. And is that -- does that signify -- significant to you in any way, those letters or that word?

A. No.

Q. And if you look at the card below it on the same page, is that your handwriting on that card?

A. No, this is not my handwriting.

Q. Do you know whose handwriting it is?

A. No.

Q. And then the card at the bottom, that's in Spanish; right?

A. Yes.

Q. And what is that card, for what place?

A. It says agencia, translation of agency.

Q. Do you recall why you had that card in your planner?

A. I don't remember.

Q. Now, you can go to the next page. So it's Reyes 8065. The first card at the top says brick stone.

Do you see that there's handwriting on that

139

card?

A. Yes.

Q. Is that your handwriting?

A. I don't remember.

Q. Then there's a phone number along the side. It says 773?

A. Okay.

Q. 762-73 -- it's either 0 or maybe 96?

MR. SWAMINATHAN: Objection to form to the extent that counsel is characterizing what those letters state.

Go ahead.

Q. Do you see those numbers there? I'm just trying to direct your attention to the numbers.

A. Yes, I'm looking at them.

Q. Do you know whose phone number is that?

A. No.

Q. And there's some letters written beneath the phone number.

Do you know what that says?

A. No.

Q. And you're not sure if that's your handwriting or not; right?

A. That's correct.

140

Q. And then along the bottom of that card looks like in green pen.

Can you make out what that word is?

A. Yes.

Q. What is it?

A. It says construction.

Q. Is that your handwriting?

A. I don't remember.

Q. And then the other side, there's some more numbers. It looks like maybe 773-927-5440. I'm simply directing your attention to those numbers. I'm not asking you if that's the accurate number.

Do you see those there?

A. Yes.

Q. Do you know whose phone number that is?

A. No.

Q. Can you read the word that's written beneath the numbers?

A. No.

Q. And then the card that's in the middle, can you make out any of the words that are written on that card?

A. I could, but I don't remember.

Q. Can you read any of the words?

A. Yes.

Q. Which words can you read?

A. The one that says Araceli.

Q. And Araceli was your wife; correct?

A. Yes.

Q. And then any other words that you can read?

A. Just the other word that says Araceli again.

Q. Any other words on that middle card that you can read?

A. No.

Q. And then now the last card, the one at the bottom, can you make out any of the words that are written on that card?

A. No.

Q. Okay.

MS. ROSEN: Why don't we just break here. The videographer needs to take a break.

THE VIDEOGRAPHER: We are going off the record at 3:30 p.m.

(A short break was had.)

THE VIDEOGRAPHER: Here begins Media Number 4 in the deposition of Arturo DeLeon-Reyes. We are back on the record at 3:44 p.m.

BY MS. ROSEN:

Q. Mr. Reyes, I'm going to still try and March our way through Exhibit No. 2. So now if you will flip to the page that's marked Reyes 8067, which is the one that has the calendar with the circles around it.

MR. SWAMINATHAN: What page?

MS. ROSEN: 8067.

BY MS. ROSEN:

Q. Do you see the circles that are on that calendar?

A. Yes.

Q. Do you know why there's circles on the calendar?

A. No.

Q. Do you remember if you were the one who made the circles?

A. I don't remember.

Q. And if you just look to the very next page, it's more calendar and it looks like the month of January and the month of February have lines drawn through them.

Do you see that?

A. Yes.

Q. Did you draw those lines?

A. I don't remember.

Q. And then March, do you see the lines -- there's vertical lines through each week.

Do you see that?

A. Yes, I can see that.

Q. And do you recall whether or not you were the one that made those marks or drew those lines in month of March?

A. I don't remember.

Q. And do you see that the week that ends in Saturday the 28th, that week has a blue line written through it, but the following line has no line written through it?

Do you see that?

A. Yes, I can see that.

Q. And does that have any significance to you?

A. No.

Q. If you go to the very next page, which is 8068, there's numbers written.

Do you see that?

(Interpreter clarification.)

MS. ROSEN: Oh, I'm sorry. Thank you. 8069.

BY MS. ROSEN:

Q. Is that your handwriting?

A. I don't remember.

Q. Do you recall writing down either the time or numbers or anything like that?

A. I think so. I believe so, but I'm not sure.

Q. If you had to guess, what do you think the significance of this page is?

A. I could not guess because I don't remember.

Q. Look at the very next page. Reyes 8070. There's also more numbers written.

Is that your handwriting?

A. No, I cannot remember.

Q. Did anyone else have access to your planner or calendar back in January, February, and March of 1998?

A. No.

Q. Do you have any idea what the numbers on Reyes 8070 mean?

A. I don't remember.

Q. I'm going to ask you to go to the beginning of the exhibit. And look at page 2 of the exhibit Bates stamped 8054.

Do you see there's a slip of paper in there

145

with a name on it?

A. Yes, I see that.

Q. Can you read the name?

A. I guess it says -- I believe it says Norma Salazar.

Q. And is there a phone number written there?

A. Yes.

Q. Can you read the phone number for us?

A. Yes. It's 773-7 -- I believe it's a 35-9262.

Q. And is that written in your handwriting?

A. I don't remember.

Q. And then if you flip to the next page, the backside of the following page, Reyes 8056 -- one more, there you go -- yeah, that one. It's the one at the top. If you look and see there on the back of that note, there's a piece of tape.

Do you see that?

A. Yes, I can see that.

Q. And so the slip of paper with the name Norma Salazar and the phone number is taped to your planner.

Do you see that?

MR. SWAMINATHAN: Objection; form.

146

A. It looks like it's posted there.

(Interpreter clarification.)

A. It looks like it's pasted there.

Q. Looks like it's pasted there.

Do you recall why that slip of paper with the name Norma Salazar and that phone number would be pasted to the front of your daily planner?

A. No.

Q. Do you know who Norma Salazar is?

A. No.

Q. Have you ever heard the name -- have you ever heard the name Norma Salazar before today?

A. Yes.

Q. When have you heard the name Norma Salazar?

A. I don't remember exactly when.

Q. What do you remember about the name Norma Salazar?

A. What I remember is that it was mentioned several times when -- during the process of the trial and during appeals.

Q. Who mentioned it?

A. The Court, the Court. I saw it on papers on the records. That's what I recall for now.

Q. Do you recall anybody talking to you about

147

an individual by the name of Norma Salazar?

A. When I was testifying at the trial, I believe they asked me there.

Q. They asked you what?

A. That if I knew who Norma Salazar was.

Q. And what did you say?

A. No.

Q. No, you didn't know her?

A. No.

Q. Do you know why you have the name Norma Salazar and the phone number pasted to your calendar?

A. I believe that when I looked after the boy, Adriana gave me, I believe it was a piece of paper, and I believe that name was there.

Q. So when -- the day that Adriana asked you to look after the boy, she gave you a piece of paper with the name and the phone number on it?

A. That's correct.

Q. And you took that piece of paper and you taped it to your planner?

A. I don't remember.

Q. Did Adriana just give you one piece of paper with the name Norma Salazar and the phone number on

148

it?

A. I don't remember.

Q. Did Adriana give you a piece of paper with the name Norma Salazar and a phone number on it only during the time that you were watching the little boy?

MR. SWAMINATHAN: Objection.

Sorry. Can the court reporter read back the question?

(Record read as requested.)

MR. SWAMINATHAN: Thank you.

BY THE WITNESS:

A. That's correct.

Q. Did she explain to you why she was giving you the piece of paper with the phone number?

A. I don't remember if she explained that part. What I remember is that she gave me a slip of paper.

Q. One slip of paper?

A. I don't remember if it was one or two.

MS. ROSEN: In Chicago, Ms. Court Reporter, if you could take Item Number 20 and mark it Exhibit No. 3.

Transcript of Arturo DeLeon-Reyes, Volume 1
Conducted on February 25, 2020

149

(DeLeon-Reyes Exhibit 3 was marked for identification and is attached to the transcript.)

BY MS. ROSEN:

Q. I'm going to ask you to take a look at what we've marked as Exhibit No. 3. It is also a two-sided document and it's the same document -- or photograph -- I guess it's a photograph -- of what appears to be two documents, the backside of that page is bigger so it might be easier for you. The print is bigger.

Do you recognize the two pieces of paper that are shown in the photograph that we've marked as Exhibit No. 3?

A. Yes.

Q. And what do you recognize those to be?

A. I believe, but I'm not so sure, that the one with red, I guess that's a piece of paper that Adriana gave me.

Q. The one with the red writing?

A. Yes.

Q. And the top of the page, the first word written in red says hospital; is that correct?

A. That's correct.

150

Q. And then below that, it says Norma Salazar?

A. Yes.

Q. And then below that it's 773-977-3031?

A. That is correct.

Q. And all of that red handwriting is Adriana's handwriting?

A. I believe so, but I don't know.

Q. But you're saying that Adriana handed you this piece of paper with that writing on it; is that correct?

A. That's correct.

Q. And then below that there's some writing in blue. It says Leonardo?

A. Yes.

Q. Did the piece of paper have that name on it when Adriana gave it to you?

A. I don't believe so. I don't remember.

Q. Is the word "Leonardo" written in your handwriting?

A. That's possible, but I don't remember.

Q. And then there's some numbers written below that, 925-5124.

Do you see that?

A. That's correct.

151

Q. Whose phone number is that?

A. I don't know.

Q. And then below that, there's some more writing. There's some numbers, 869-9525, do you see that?

A. That's correct.

Q. What are those numbers? Is that a phone number or something else?

A. I don't know because I don't remember.

Q. There's a word written next to it.

Can you read that?

A. I believe it says Leobardo.

Q. And below that there's another word that begins with the letter N.

Can you read that?

A. I believe that it says -- I'm not sure -- I believe it says "Noemi" or something like that.

Q. And is that a real word or a name?

A. It could be. I'm not sure.

Q. And there's also another slip of paper at the top of the photograph that also has Norma Salazar's name on it.

Do you see that there?

A. Yes.

152

Q. Where did that slip of paper come from?

A. I don't remember.

Q. And that note says Norma Salazar and Adriana Martinez; right?

A. That's correct.

Q. Who is Adriana Martinez?

A. To my knowledge based on the record, I believe she's Carlos Martinez's sister.

Q. So Adriana Mejia and Adriana Martinez are the same person?

A. I believe so. I'm not sure.

Q. And then below that, does it say 3:00 p.m.?

A. Yes.

Q. Do you know what that signifies?

A. No.

Q. And there's a word written beneath that.

What is that word?

A. I don't know what that word means.

Q. The writing on the slip of paper at the top of the photograph, is that in your handwriting?

A. I'm not sure whether or not that's my handwriting.

Q. As you sit here today, do you know why you would have the name Norma Salazar with various phone

153

numbers written down on three different pieces of paper?

A. No.

Q. Do you know these two slips of paper that are in Exhibit No. 3, do you know where those were found by the police?

A. Yes.

Q. Where?

A. In my wallet. I don't remember whether they found it in my wallet or they found it in the pockets of my pants. I don't remember.

Q. Okay.

MS. ROSEN: If we could have the exhibits in Item Number 22 marked as Exhibit No. 4, please.

(DeLeon-Reyes Exhibit 4 was marked for identification and is attached to the transcript.)

MS. ROSEN: I'm going to give this to you guys because there's a lot of writing. If you could hand this to the witness.

MS. CARNEY: Did you say Item 22 or 24?

MS. ROSEN: 22 to be marked as Exhibit No. 4.

MS. CARNEY: Got it. Thank you.

154

MS. ROSEN: Yep.

BY MS. ROSEN:

Q. Have you had a chance to flip through the photographs that we've marked as Exhibit No. 4, Mr. Reyes?

A. Yes.

Q. And do you recognize the documents that are photographed in Exhibit No. 4?

A. I believe so. I'm not so sure.

Q. If you flip to the second-to-the-last page, which is Bates stamped Reyes 8051, it looks like this. It's at the very end. You got it? Mr. Reyes, do you have it? All right.

You have to say out loud -- answer my question.

Do you have the exhibit?

A. Yes.

Q. Thank you. And it says day planner; right?

A. Correct.

Q. And then at the top is written the name Araceli; right?

A. Correct.

Q. And does that help you figure out these documents come from your day planner?

155

A. That's correct.

Q. Okay. Now, if we can go to the first page of the exhibit, can you read the first line?

A. What I can distinguish is Araceli's print.

Q. What is the first word?

A. I can't distinguish that well.

Q. Is the first letter an S?

A. Yes.

Q. Is the second letter an E?

A. Yes.

Q. Is the third letter an X?

A. I'm not sure whether or not it's an X.

Q. Is the fourth letter a Y?

A. Here it looks like a B.

Q. Like a B?

A. A B.

Q. And the next word is amigo, which is friend; right?

A. That's correct.

Q. And then below that, what does that second line say?

A. It says Privada Zaragosa, Santa Ana.

Q. What is Privada Zaragosa? Is that a name?

A. Privada Zaragosa, that's the name of a

156

street.

Q. And is Santa Ana a place in Mexico, a town or something?

A. It's a town.

Q. And then it says Mexico, right, below that?

A. That's correct.

Q. And there's some numbers.

Is that a phone number?

A. The one on the right-hand side, yes, that seems to be a telephone number. The one on the left-hand side, that doesn't seem to be telephone.

Q. And is the name of Araceli's friend written there anywhere?

A. No.

Q. Okay. Then if you look at the bottom of the document, there's some more writing.

Can you read the first line?

A. It says Adriana Martinez, lady where I live.

Q. And then below that, what does it say?

A. I believe it says -- there's a letter S and it says Mozart or something like that.

Q. And then what comes after Mozart?

A. There's 6234.

Q. And that was the street address at the house

157

on Mozart where you were living; right?

A. I believe so.

Q. And then the word after that, what does that say?

A. It says coat.

Q. Coat?

A. It says here coat.

Q. Do you know why it says coat there?

(Interpreter clarification.)

INTERPRETER 2:  If I could spell it out, c-o-d-e.

Q. Code.  Do you know why it says code there?

A. No.

Q. Can you read the next line?

A. It says telephone of her brother-in-law's wife.  D, the same house.

Q. And then it has the phone number written below it; right?

A. That's correct.

Q. And when you lived on that house on Mozart, the only phone in the house was in the basement in Guadalupe and Jorge's portion; correct?

A. No.

Q. No?  There was other phones?

158

A. I don't remember whether or not there was a telephone in the basement.

Q. Was there a telephone on the first floor where you lived?

A. That I remember, no.

Q. So you're not sure if there was any phone in the house?

A. I'm not sure.

Q. When you called your wife and family in Mexico, what phone did you use?

A. I always used Manuel's.  Or if my family called me, they would call Manuel always.

Q. But what you have written here is the phone number of Adriana's sister-in-law in the same house; right?

A. It looks like that.

Q. Okay.  Can you tell me the next -- the lines below that?  Can you read the first line?

A. It says Alfonso Andrete.  I cannot tell -- distinguish what the following word says.  After that it says Y, and I guess I believe it says Luis's attorney.

Q. Who is Alfonso Andrete?

A. He is boss at work that I had.  He was also

159

one of my brothers or some of my brothers' boss.

Q. In Mexico?

A. Yes.

Q. The boss at the construction place that you worked just before you moved to the United States?

A. Yes, that's correct.

MR. SWAMINATHAN:  Can we take a quick break?

MS. ROSEN:  Sure.  Yeah, let's take a break.

THE VIDEOGRAPHER:  We are going off the record.  The time is 4:31 p.m.

(A short break was had.)

THE VIDEOGRAPHER:  We are going back on the video record at 4:39 p.m.

MR. SWAMINATHAN:  So we had a few words, an error in translation.  One was the word concuna.  And the other was the word licenciado.  Concuna, I'll let the translator explain, but my understanding is it was translated as brother-in-law's wife, but it actually has another potential meaning.

INTERPRETER 2:  Correct.  Concuna, c-o-n-c-u-n-a, may mean brother-in-law's wife or may also mean either sister -- yeah -- sister -- sister of a brother-in-law, brother-in-law's sister.  So

160

it's two meanings.  Again, brother-in-law's wife or brother-in-law's sister.  Either of those meanings.

MR. SWAMINATHAN:  And the other one was licenciado, which we thought it was translated as attorney and we had thought the translation is teacher.  And I think you have an explanation for your view of what the proper translation is.

INTERPRETER 2:  In this context, licenciado refers to a lawyer or an attorney.  The vast majority of people in this context will refer to a licenciado meaning attorney or lawyer, although licenciado refers to anybody holding a university degree.  So maybe somebody who majored in economics or any other field.  Although 90 percent plus of people in this context refer to licenciado as attorney.

THE REPORTER:  Can you spell that last one?

MR. SWAMINATHAN:  It's written here as l-i-s-i-n-s-i-a-d-o.  At least that's what it looks like.  I'll let the interpreter explain the proper spelling.

INTERPRETER 2:  Correct.  Could I spell it out again?  L-i-c-e-n-c-i-a-d-o.

THE REPORTER:  Thank you.

161

BY MS. ROSEN:

Q. Back at Exhibit No. 4 on the first page, the second line, can you tell me what that says at the bottom there, Alfonso or Alfondo?

A. Are you referring to this one?

Q. Yeah, it's the third line from the bottom.

A. This say Alfonso Andrete patron.

INTERPRETER 1: Which boss.

Q. Yeah. The line below that?

A. It says Luis, my brother.

Q. You have a brother named Luis?

A. Yes.

Q. And did your brother Luis also work for Alfonso?

A. Yes.

Q. And then the next line?

A. This say Guadalajara, Jalisco, Mexico.

Q. And is that where your boss worked, the town?

A. Could you repeat the question for me?

Q. Sure. What is the significance of the town?

A. Guadalajara is the place where this boss lived.

Q. And then the numbers beneath that, is that

162

the boss' phone number?

A. I imagine so, but I'm not -- I'm not sure.

Q. And then there's some -- a couple words below the numbers.

Can you make that out?

A. It says clave, code viper.

INTERPRETER 1: Interpreter might make a correction. Might be beeper. Beeper or viper.

A. Beeper are those little devices that people used to have.

Q. So the phone number is to -- for your boss' beeper so that you can send him a message?

A. Yes.

Q. If you turn the page over -- I'm sorry. I didn't realize this when we started. This seems to be the same page.

(A short break was had.)

(Record read as requested.)

BY MS. ROSEN:

Q. If you look at the backside of that first page, it is a larger, zoomed-in photograph.

MR. SWAMINATHAN: Which page are we on now, the Bates stamp?

MS. ROSEN: We are on Bates stamp Reyes

163

8033.

BY MS. ROSEN:

Q. And so I'd ask you to take a look at the larger print. That first word at the top of the page based on the larger print, can you tell whether it says s-e-x-y or not?

A. I can clearly see two letters, which are the S and the E.

Q. You can't make out the other two?

A. The one after the E, no. The one right after that one looks like a V.

Q. Do you know the name of Araceli's friend that you're referencing in that entry?

A. No.

Q. Okay. If we go to the next page, which is Reyes 8035, there's an entry that begins with what looks like Bernardo.

Do you see that?

A. Yes.

Q. Can you read that line for me?

A. It says Bernardo amigo, friend. And there's CA and then something blurry. And then there's a 47. Period. Something like that. W-E, I believe it's an S, T, E and an R.

164

Q. Do you know what that word is?

A. I believe so.

Q. What is that word?

A. That word is the same -- we can say like an address, something like that for the first office where I worked.

Q. And was Bernardo somebody you worked with?

A. I believe so.

Q. At that first place that you worked when you came to the United States?

A. Yes.

Q. And then the line below it, what does it say?

A. I cannot make out the word, the smaller one.

Q. Okay. What about the bigger one?

A. The bigger ones, yeah.

Q. What do the bigger ones say?

A. It means home phone, telephone.

Q. Whose home phone?

A. I imagine it's from the person that I met at work.

Q. Bernardo?

A. It is possible.

Q. And then can you read the numbers?

165

A. Yes.

Q. Please tell us.

A. 773-869-9525.

Q. And then is there some more words after that?

A. Yes. This has words.

Q. And then below that?

A. It says home.

Q. And then can you read the numbers?

A. The first numbers are 773. There's something here scratched out. And there's here again numbers.

Q. Can you read us the numbers?

A. Yes. 773-247-55, I believe it's a 5 and a 7.

Q. Okay.

MS. ROSEN: I think we need to break at this point in the day for the court reporter, the end for today.

THE VIDEOGRAPHER: This marks the end of today's deposition of Arturo DeLeon-Reyes. We are going off the record at 4:58 p.m.

(Off the record at 4:58 p.m.)

166

CERTIFICATE OF SHORTHAND REPORTER-NOTARY PUBLIC

I, Tiffany M. Pietrzyk, CSR RPR CRR, the officer before whom the foregoing deposition was taken, do hereby certify that the foregoing transcript is a true and correct record of the testimony given; that said testimony was taken by me stenographically and thereafter reduced to typewriting under my direction; that reading and signing was not discussed; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 6th day of March, 2020.

My commission expires: February 28th, 2024

_____
Tiffany M. Pietrzyk