

**Planet Depos**
We Make It *Happen*™

# Transcript of Arturo DeLeon-Reyes, Volume 2

**Date:** February 27, 2020
**Case:** DeLeon-Reyes & Solache -v- Guevara, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

----------------------------x

ARTURO DELEON-REYES,             :

               Plaintiff,     :

  v.                             :  Case No. 18-CV-01028

REYNALDO GUEVARA, et al.,     :

             Defendants.    :

_____ :

GABRIEL SOLACHE,                 :

              Plaintiff,     :

  v.                             :  Case No. 18-CV-02312

REYNALDO GUEVARA, et al.,     :

             Defendants.    :

----------------------------x

Videoconference Deposition of ARTURO DELEON-REYES

VOLUME II

Thursday, February 27, 2020

10:02 a.m. Central Standard Time

Job No.:  288457

Pages:  167 - 396

Reported by:  Paula M. Quetsch, CSR, RPR

Transcript of Arturo DeLeon-Reyes, Volume 2
Conducted on February 27, 2020          168

Videoconference deposition of ARTURO DELEON-REYES,
held at the location of:


    WITNESS LOCATION:

        HYATT PLACE LOS CABOS

        Paseo Malecon San José 128, Zona Hotelera

        San José del Cabo 23406 BCS, Mexico


    COURT REPORTER LOCATION:

        ROCK FUSCO & CONNELLY, LLC

        312 North Clark

        Suite 2200

        Chicago, Illinois   60654



    Pursuant to notice before Paula M. Quetsch, a
Certified Shorthand Reporter, Registered Professional
Reporter, and a Notary Public in and for the State
of Illinois.

Transcript of Arturo DeLeon-Reyes, Volume 2
Conducted on February 27, 2020                    169

A P P E A R A N C E S

ON BEHALF OF PLAINTIFF DELEON-REYES:

     ANAND SWAMINATHAN, ESQUIRE, Present in Mexico

     SEAN STARR, ESQUIRE, Present in Mexico

     STEVEN ART, ESQUIRE, By Telephone

     JOHN HAZINSKI, ESQUIRE, By Telephone

     LOEVY & LOEVY

     311 North Aberdeen Street

     3rd Floor

     Chicago, Illinois 60607

     (312) 243-5900


ON BEHALF OF PLAINTIFF SOLACHE:

     JAN SUSLER, ESQUIRE, Present in Mexico

     JOHN STAINTHORP, ESQUIRE, Present in Chicago

     PEOPLE'S LAW OFFICE

     1180 North Milwaukee Avenue

     Chicago, Illinois 60642

     (773) 235-0070

ON BEHALF OF DEFENDANT CITY OF CHICAGO:

    EILEEN E. ROSEN, ESQUIRE, Present in Mexico

    CATHERINE BARBER, ESQUIRE, Present in Chicago

    ROCK FUSCO & CONNELLY, LLC

    321 North Clark Street

    Suite 2200

    Chicago, Illinois 60654

    (312) 494-1000

ON BEHALF OF DEFENDANT GUEVARA:

    THOMAS M. LEINENWEBER, ESQUIRE,

    Present in Chicago

    LEINENWEBER BARONI & DAFFADA, LLC

    120 North LaSalle Street

    Suite 2000

    Chicago, Illinois  60602

    (312) 663-3003

ON BEHALF OF COOK COUNTY DEFENDANTS:

    EDWARD M. BRENER, ESQUIRE, Present in Mexico

    RYAN GILLESPIE, ESQUIRE, Present in Mexico

    COOK COUNTY STATE'S ATTORNEY'S OFFICE

    50 West Washington Street

    Room 500

    Chicago, Illinois  60602

    (312) 603-3369

ON BEHALF OF DEFENDANT NAVARRO:

    DANIEL M. NOLAND, ESQUIRE

    REITER BURNS LLP

    311 South Wacker Drive

    Suite 5200

    Chicago, Illinois  60606

    (312) 878-1291


ON BEHALF OF THE INDIVIDUAL DEFENDANTS:

    JOSH ENGQUIST, ESQUIRE, Present in Mexico

    THE SOTOS LAW FIRM, PC

    141 West Jackson

    Suite 1240A

    Chicago, Illinois  60604

    (630) 735-3300


ALSO PRESENT:

    ISCO CARILLO, Videographer

    KARA HUTSON

Transcript of Arturo DeLeon-Reyes, Volume 2
Conducted on February 27, 2020

172

09:37:27

C O N T E N T S

EXAMINATION OF ARTURO DELEON-REYES          PAGE

    By Ms. Rosen                            176


            E X H I B I T S

          (Attached to transcript.)


REYES DEPOSITION EXHIBITS                    PAGE

 Exhibit 5  Photographs                      200

 Exhibit 6  Photographs                      215

 Exhibit 7  Statement                        216

 Exhibit 8  Consent to Search                315

 Exhibit 9  Photographs                      350

 Exhibit 10 Photographs                      353

 Exhibit 11 Photographs                      355

 Exhibit 12 Photographs                      359

 Exhibit 13 Photographs                      360

 Exhibit 14 Photograph                       364

 Exhibit 15 Answers to Defendant Guevara's   365

            First Set of Interrogatories

 Exhibit 16 Plaintiff's Responses to         371

            Defendant Rutherford's

            Interrogatories

Transcript of Arturo DeLeon-Reyes, Volume 2
Conducted on February 27, 2020                    173

P R O C E E D I N G S                        09:37:27

THE VIDEOGRAPHER:  Here begins Media No. 1 in        09:37:27

the deposition of Arturo DeLeon-Reyes in the        10:02:30

matter of Arturo DeLeon-Reyes v. Reynaldo Guevara,        10:02:31

et al., and Gabriel Solache v. The City of Chicago        10:02:36

in the United States District Court for the        10:02:46

Northern District of Illinois, Case Nos. 18-CV-01028        10:02:48

and 18-CV-02312.        10:03:00

Today's date is February 27th, 2020.  The        10:03:07

time on the video monitor is 9:02 a.m.  The        10:03:11

videographer today is Isco Carillo.  This deposition        10:03:18

is taking place at Hyatt Place Los Cabos, Paseo        10:03:23

Malecon San José 128, Zona Hotelera, San José del        10:03:23

Cabo, Mexico.        10:03:33

Will counsel please voice identify        10:03:34

themselves and state whom they represent.        10:03:36

MS. ROSEN:  Eileen Rosen on behalf of the        10:03:39

Defendant City of Chicago.        10:03:43

(Reporter clarification.)        10:03:43

MR. ENGQUIST:  Josh Engquist on behalf of        10:03:45

all the individual officers with the exception of        10:03:45

Ray Guevara.        10:03:45

MR. BURNS:  Daniel Burns on behalf of        10:04:13

Defendant Navarro.        10:04:15

MR. GILLESPIE: Ryan Gillespie for the Cook County defendants with the exception of Navarro.

MR. BRENER: Edward Brener also for the Cook County defendants with the exception of Navarro.

MS. SUSLER: Jan Susler for Plaintiff Gabriel Solache.

MR. STARR: Sean Starr for Plaintiff Reyes.

MS. BARAJAS: Valerie Barajas for Plaintiff Reyes.

MR. SWAMINATHAN: Anand Swaminathan for Plaintiff Reyes.

MS. ROSEN: And then I don't think there's anybody live yet in Chicago; is that correct?

MS. HUTSON: That is correct.

MS. ROSEN: And then I think there's people on the phone. If there's people on the phone, can you identify yourself.

MR. ART: Steve Art and John Hazinski for the plaintiff.

THE VIDEOGRAPHER: The court reporter today is Tiffany --

MS. ROSEN: No, I think it's a different

court reporter.  Is there a different court reporter today?  10:06:01

THE COURT REPORTER:  Yes.  It's Paula Quetsch with Planet Depos, Q-u-e-t-s-c-h.  10:05:23

THE VIDEOGRAPHER:  Court reporter, please swear in the witness -- will the reporter please swear in the witness.  Thank you.  10:05:23 10:05:26

MS. ROSEN:  So the court reporter can't swear in the witness, but the same -- the same stipulation from the first day of the deposition is agreed to by all the parties with respect to the witnesses; is that correct?  10:05:35 10:05:35 10:05:36 10:05:39 10:05:41

MR. SWAMINATHAN:  Agreed.  10:05:44

MR. NOLAND:  Yes.  10:05:45

MR. ENGQUIST:  Agreed.  10:05:45

MS. ROSEN:  And the same stipulation that was read at the beginning of Day 1 applies to both translators; agreed?  10:05:46 10:05:48 10:05:52

MR. SWAMINATHAN:  Agreed.  10:05:56

MR. ENGQUIST:  Agreed.  10:05:57

MS. ROSEN:  Okay.  With that I think we can proceed.  10:05:58 10:06:01

ARTURO DELEON-REYES,  10:06:01

having been previously sworn, testified as follows:  10:06:01

EXAMINATION BY COUNSEL FOR DEFENDANT

CITY OF CHICAGO

BY MS. ROSEN:

Q  Good morning, Mr. Reyes.  How are you today?

A  I'm fine.  Good morning.

Q  Have you done anything additional to prepare for Day 2 of your deposition since we last met on Tuesday?

MR. SWAMINATHAN:  Objection to form.

Go ahead.

A  Yes.

Q  What have you done since we last met on Tuesday to additionally prepare for your deposition?

A  I've seen the PC, the one I did when I was in Menard, the ones that my attorneys did, the lawsuit, and other papers, as well.

Q  When you -- is there anything else -- any other documents that you looked at other than the ones you've just told me about?

A  To my recollection, yes.

Q  What else did you look at?

A  I looked at other papers.  I don't remember. I don't remember which petition, which documents I looked at but I -- I don't remember.  I looked at

Transcript of Arturo DeLeon-Reyes, Volume 2
Conducted on February 27, 2020

177

other papers but I don't remember.

Q   The papers that you looked at, were they in Spanish or in English?

A   The ones I looked at, the majority were in Spanish, and some of them were in English.

Q   You talked about looking at the PC that you did when you were in Menard.  Is that the one that has the exhibits that you drew of the house and other things?

A   Of course, yes.

Q   And was that document in Spanish or in English?

A   It was in English.

Q   Were you able to read it?

A   In English, no.

Q   Did somebody translate it for you?

MR. SWAMINATHAN:  Objection.

MS. ROSEN:  Just a yes or no.

MR. SWAMINATHAN:  Yeah, go ahead.  I will let him answer that question yes or no.

A   Yes.

Q   Who translated it for you?

MR. SWAMINATHAN:  Objection; calls for privileged information.  I instruct you not to

10:08:51
10:08:53
10:08:59
10:09:01
10:09:16
10:09:32
10:09:35
10:09:40
10:09:45
10:09:46
10:10:05
10:10:08
10:10:08
10:10:24
10:10:26
10:10:33
10:10:37
10:10:41
10:10:43
10:10:47
10:10:51
10:10:52
10:11:05
10:11:08

Transcript of Arturo DeLeon-Reyes, Volume 2
Conducted on February 27, 2020                    178

answer.

Q   Did you meet with anybody since we last met on Tuesday to prepare for your deposition?

A   Yes.

Q   Who did you meet with?

A   My attorneys.

Q   The same attorneys that are here with you today?

A   Yes.

Q   And you've met with nobody else to prepare for your deposition other than your attorneys; right?

A   That's correct.

Q   How much time did you spend -- did you spend any time -- let me start over.

Did you spend any time Tuesday evening after your deposition either meeting with your lawyers or reading documents?

A   Yes.

Q   How much time did you spend?

A   The time I don't remember but it was a while.

Q   And the time that you spent Tuesday night, was that with your lawyers?

MR. SWAMINATHAN:  Objection; asked and answered.

Transcript of Arturo DeLeon-Reyes, Volume 2
Conducted on February 27, 2020                        179

        MS. ROSEN:  You can answer.                        10:13:14

    A  Yes.                                                10:13:16

    Q  And then yesterday did you meet with your           10:13:17

lawyers?                                                   10:13:21

    A  Yes.                                                10:13:21

    Q  How much time did you spend with your               10:13:25

lawyers yesterday?                                         10:13:27

        MR. SWAMINATHAN:  Objection to form.               10:13:34

        Go ahead.                                          10:13:36

    A  All day.                                            10:13:39

    Q  And did you spend all day with your lawyers         10:13:43

preparing for your deposition?                             10:13:46

    A  Only in the morning.                                10:13:55

    Q  Now, you mentioned that you also reviewed           10:13:57

the PC that your lawyers prepared?                         10:14:08

    A  That's correct.                                     10:14:14

    Q  Was that in English or in Spanish?                  10:14:20

    A  That was in English.                                10:14:22

    Q  Did somebody translate it for you?                  10:14:29

        MR. SWAMINATHAN:  You can answer that              10:14:34

question yes or no.                                        10:14:36

    A  Yes.                                                10:14:40

    Q  And then you said you reviewed the lawsuit;         10:14:41

is that right?                                             10:14:48

A  That's right.　　　　　　　　　　　　　　10:14:49

Q  And was that document in English or in Spanish?　　　　　　　　　　　　　　　　　10:14:57 / 10:14:59

A  In English.　　　　　　　　　　　　　　10:14:59

Q  And did somebody translate that for you?　10:15:04

MR. SWAMINATHAN:  I'll allow you to answer that question a yes or no, please.　　　　10:15:10 / 10:15:13

A  Yes.　　　　　　　　　　　　　　　　　10:15:17

Q  Okay.  I want to go back to where we left off on Tuesday taking a look again at Exhibit 4 which I have in front of you, and I have it open to the page where we left off.　　　　　10:15:27 / 10:15:30 / 10:15:38 / 10:15:41

So we already talked about Bernardo, but I want to direct your attention to the page next to the page that has Bernardo's name.  Can you read the first line for me?　　　10:15:54 / 10:16:00 / 10:16:03 / 10:16:20

A  Yes.　　　　　　　　　　　　　　　　　10:16:22

Q  What does that say?　　　　　　　　　　10:16:26

A  It says, "Carmen, Araceli Carmen."　　　10:16:28

Q  And who is Carmen?　　　　　　　　　　　10:16:47

A  Carmen is an aunt who lives in Chicago, my wife's aunt.　　　　　　　　　　　　10:16:50 / 10:17:00

Q  And did you spend any time living with your wife's Aunt Carmen when you were in Chicago?　10:17:03 / 10:17:06

Transcript of Arturo DeLeon-Reyes, Volume 2
Conducted on February 27, 2020

181

A I believe they're the people when I just arrived from Mexico, but I'm not 100 percent sure.

Q And did they live in Chicago?

A Yes.

Q And maybe I'm misremembering, but is Manuel's wife also named Carmen?

MR. SWAMINATHAN: Objection to form.

A Yes.

Q So -- but this Carmen is not Manuel's wife?

A No.

Q And then can you read the phone number for us below that?

A After the name, the number that's there?

Q Yes.

A That's 5499 -- no, excuse me -- that's 4529.

Q 5429; right?

A That's correct.

Q And is that a street address?

A I don't remember.

Q Okay. And the numbers beneath that, could you read those to us, please?

A Yes. 773, 7 -- I guess it's a 3. I cannot see very well -- 74569.

10:17:24
10:17:29
10:17:36
10:17:40
10:17:41
10:17:46
10:17:53
10:17:56
10:17:58
10:18:05
10:18:11
10:18:14
10:18:17
10:18:32
10:18:33
10:18:47
10:18:50
10:18:54
10:18:57
10:19:10
10:19:12
10:19:15
10:19:18
10:19:48

Transcript of Arturo DeLeon-Reyes, Volume 2
Conducted on February 27, 2020

182

Q   And do you remember Carmen's last name?

A   Her last name, no.

Q   Okay.  And so far the first couple of pages that we've gone through, all of these entries of the various names, that's in your handwriting; right?

A   It looks like my hand -- it seems to be my handwriting.  It looks like my handwriting, and it is my appointment book, my agenda, so it could be, yes.

Q   Okay.  Now, let's go to the next page that has writing on it.  So one more.  This one, it looks like Francisco, which is Reyes 8037.

Can you read the name that's listed on that -- the photograph of that?

A   It says Francisco.

Q   And then can you read below that?

A   Yes.  It says, "Friend of Chicago of construction."

Q   And then can you read the words beneath that?

A   I can't see them well.  They're a bit blurred.

Q   Okay.  So you can't make it out?

A   No.

Q   Okay.  Do you know who Francisco is that's

being referred in this entry?

MR. SWAMINATHAN:  Objection to form.

Go ahead.

A  I don't remember but it could be a person with whom I went to look for a job.  I could have kept his number.

Q  Can you read the phone number for us?

A  (773) 927-5440.

Q  And there's a letter after Francisco's name.  Can you make that out?

THE INTERPRETER:  Could you please repeat the question?

Q  Sure.  It looks like there's a letter right next to Francisco's name.  Can you make that out?

MR. SWAMINATHAN:  Objection; form, foundation.

A  Yes.  I can see it but I cannot tell what letter it is.

Q  Okay.  Now, why don't you go to the very next page.  Flip it over.  There you go.  The page where it looks like Juan is written in the first entry there.  Do you see it?  And that's Bates-stamped Reyes 8038.  Can you read the first line of that entry?

10:23:23
10:23:31
10:23:33
10:23:36
10:23:45
10:23:58
10:23:59
10:24:01
10:24:31
10:24:34
10:24:40
10:24:41
10:24:43
10:24:45
10:24:54
10:24:56
10:24:59
10:25:10
10:25:12
10:25:18
10:25:26
10:25:30
10:25:43
10:25:54

A First, there's a name that says Juan. And after that it says "of the same job."

Q And as you sit here today, do you know what that's referencing, what job or who Juan is?

A Possibly he could have been a coworker in the first office where I worked, or he could have been a coworker in the second job.

Q But you don't remember?

A No.

Q And then can you read the writing below?

A It says, "Friend of truck," and after that there's a "B-e-t." And after that something is circled and it says "Raitera."

Q Can you make out what any of that means?

A Of course, yes. Raitera refers to a person who is in the same job, who rides -- drives someone. People who work in the same job.

Q And then below that, is that a phone number?

A I couldn't tell you if -- whether or not it's a telephone number, but it looks like a telephone number.

Q Can you read the numbers for us?

A Yes. 471-50-30.

Q Okay. Now, if we go to the entry on the

10:25:55
10:26:15
10:26:22
10:26:25
10:26:47
10:26:58
10:27:07
10:27:11
10:27:14
10:27:16
10:27:21
10:27:52
10:28:12
10:28:15
10:28:20
10:28:40
10:28:46
10:28:53
10:29:07
10:29:10
10:29:14
10:29:15
10:29:17
10:29:35

Transcript of Arturo DeLeon-Reyes, Volume 2
Conducted on February 27, 2020

185

page next to the one we were just looking at, can you read that to us?

A  It says "Manuel."

Q  And then below that?

A  It says Mozat [sic], Illinois.  I guess it says "Mozat."  I guess it says Illinois.

Q  Okay.  And then there's the number 6228; right?

A  That's correct.

Q  And do you recall that Manuel Mejia lived on Mozart at 6228 South Mozart?

A  Yes.

Q  And then below that, can you read what you have written there?

A  First, it says "Carmen's wife."

Q  And then?

A  And after that there's an "L."  And after that it says, "Areceli's sister."

Q  And the phone number below that, is that (773) 434-2444 or 49?

MR. SWAMINATHAN:  Objection to form.

A  Yes.

Q  Can you make out the last two numbers?

A  I believe it's a 4 and a 9.

Transcript of Arturo DeLeon-Reyes, Volume 2
Conducted on February 27, 2020

186

Q Okay. Now we can turn to the very -- the back side of that page, so it's the very next page, Reyes 8039. It's got "Olga." Can you read what you have written there for us?

A Yes. "Olga Sombrono Olivares."

Q And who is that?

A She's my wife's sister.

Q And what does it say beneath her name?

A It says, "Calle Arroyo" --

THE INTERPRETER: A-r-r-o-y-o.

A -- "Mexico."

Q And is that where Olga lives or lived?

A Yes.

Q And then what does it say beneath that?

A "Sister-in-law."

Q And then the numbers below that, can you read those for us?

A Yes. 0115952.

THE INTERPRETER: Interpreter is going to say it again 0115936, and there's another number which is separated, 847074.

Q And what is the significance of those numbers? Is that a phone number?

A The first ones, they're an area, telephone

10:32:54
10:33:01
10:33:08
10:33:35
10:33:37
10:34:01
10:34:02
10:34:05
10:34:08
10:34:08
10:34:23
10:34:28
10:34:33
10:34:34
10:34:36
10:34:47
10:34:49
10:34:56
10:35:27
10:35:29
10:35:38
10:35:42
10:35:43
10:35:46

Transcript of Arturo DeLeon-Reyes, Volume 2
Conducted on February 27, 2020

187

area.  The second one is a telephone.

Q  Okay.  Why don't you go to the very next page, which is Reyes 8040, "Servando."  Can you read what you have written there for us, please?

A  It says "Servando Garsia."

THE INTERPRETER:  Servando, S-e-r-v-a-n-d-o; Garsia, G-a-r-s-i-a.

Q  And can you read what's below that?

A  It says "Friend from work."

Q  And do you remember Servando?

A  But it's -- but it's -- I don't remember but it's someone I met at one of the jobs that I had.

(Mr. Stainthorp joined the proceedings in Chicago.)

Q  And then can you read the phone number for us, please?

A  773 523820.

Q  52 -- 5230820; right?

A  That's correct.

Q  And then there's a word written next to the numbers.  Can you make that out?

A  I guess it says "cell phone number."

Q  Cellular?  I think that's what the word is, cellular.

A   I believe so.  I'm not sure.                    10:39:20

Q   And is this planner, or calender, or phone      10:39:22
book, whatever you want to call it, is this something   10:39:27
that you carried with you always?                  10:39:30

A   I didn't have it with me all the time, but     10:39:43
it's something that I had.                          10:39:50

Q   Would you take it to work with you?            10:39:53

A   I don't remember.                             10:39:55

    (Mr. Leinenweber joined the proceedings in     10:39:55
Chicago.)                                           10:40:11

Q   Okay.  If we can go -- there's -- the next     10:40:11
page is blank.  There's no handwriting on it.  If   10:40:17
you can just go to the following page with          10:40:21
writing, it's Reyes 8042.                           10:40:23

    Can you read to us what you have written       10:40:37
there?                                              10:40:39

A   Yes.  It says "Norma Salvador" or something    10:40:44
like that.  And after that it says "patient."       10:41:07

Q   And then below that?                           10:41:12

A   It says "Su," and there's an I, a J, and       10:41:30
an O, and after that it says "Leonardo."            10:41:44

Q   Do you know what that means, those             10:41:50
three words there?                                  10:41:52

A   Yes.                                           10:41:58

Transcript of Arturo DeLeon-Reyes, Volume 2
Conducted on February 27, 2020

189

Q   What does it mean?

A   It means son.

Q   So son Leonardo?

A   Yes.

Q   And then below that what does it say?

A   Hospital.

Q   And do you know what -- who Norma Salvador or Salvadar is?

A   The person, no.

Q   Why do you have that person's name written in your telephone book or day planner?

A   When I took care of the boy that Adriana asked me to take care of, she said her mother's name was Norma Salazar, and that's why I wrote it down.

Q   So Adriana had given you a piece of paper with the name on it; right?  That's what you said?

MR. SWAMINATHAN:  Objection to form. There's no foundation for that.

A   Yes.  But I could have also written it down in my address book, my planner.

Q   Why would you do that?

MR. SWAMINATHAN:  Objection; form and foundation.

10:41:59
10:42:00
10:42:05
10:42:12
10:42:13
10:42:16
10:42:25
10:42:39
10:42:50
10:42:55
10:42:57
10:43:02
10:43:24
10:43:35
10:43:44
10:43:45
10:43:50
10:43:58
10:44:01
10:44:06
10:44:17
10:44:22
10:44:27
10:44:29

A  Because I am used to -- whenever I have a piece of paper I keep it in my wallet.  I also write it down in my planner.

Q  But you didn't put the phone number down; right?

A  Here, no.

Q  And we also -- yesterday we -- or Tuesday we looked at the front of your planner -- right? -- and the name Norma Salazar and the phone number was taped, right, to the front of your planner? Remember that?

A  Yes, I remember that.

Q  And that was in your handwriting, also; right?

A  It looks a lot like my handwriting.  It could be my handwriting but I'm not sure.

Q  So you have the name Norma Salazar written down twice in your day planner; right?

MR. SWAMINATHAN:  Objection to foundation.

Go ahead.

A  My recollection, yes.

Q  And then you also had two pieces of paper with the name Norma Salazar written down on it in your pocket when you went to the police station;

10:44:41
10:44:45
10:44:48
10:44:50
10:44:52
10:44:53
10:45:03
10:45:06
10:45:12
10:45:23
10:45:25
10:45:38
10:45:41
10:45:44
10:45:44
10:45:57
10:46:00
10:46:09
10:46:17
10:46:19
10:46:21
10:46:26
10:46:30
10:46:36

Transcript of Arturo DeLeon-Reyes, Volume 2
Conducted on February 27, 2020

191

right?

A  That's correct.

Q  And did you have your day planner with you when you went to the police station?

A  I don't remember.

Q  But you do recall that it was taken from you and used as evidence, your day planner in the criminal case; right?

A  That's correct.

Q  All right.  Let's -- let me ask you this. Since we met on Tuesday, in the preparations that you were doing for today did you look at your day planner?

A  Yes.

Q  Before your deposition on Tuesday began, had you looked at your day planner in preparation for your deposition?

A  No.  To my recollection, no.

Q  Okay.  Let's go to the next page that has writing on it.  So that's Reyes 8044.  It looks like this.  Yeah, that's it.

Can you read for us what that says?

A  The first top letters in bold it says "Work."

Q  And can you read the telephone numbers

Transcript of Arturo DeLeon-Reyes, Volume 2
Conducted on February 27, 2020                    192

for us?

    A  Yes.  773-927-9200.          10:49:32

    Q  And do you know -- do you recall which
that phone number goes -- which of the jobs that
you had when you were here -- when you were in the
United States?

    A  This could be one of the jobs that I had
in the first job.

    Q  And then can you read the number below?

    A  Yes.  78 -- no -- 708 225 0350.

    Q  And then can you just read the names that
are written below there?

    A  These ones?

    Q  The names.

    A  The name, I cannot pronounce it, but I can
read -- I can say the letters.

    Q  Okay.

    A  G-e-r-r-y.

    Q  Do you recall who that person was?

    A  I don't remember who it was, but it could
have been a coworker, a female or male coworker.

    Q  Okay.  And then can you read the name
below that for us and what you have written next
to the name?

A   The first name I believe -- I'm not sure -- it says "Sara."  And after that it says "Supervisor."

Q   Do you remember having a supervisor named Sara?

A   I believe so but I don't remember.

Q   And then can you read the -- the name below that?

A   It says "Daniella."

Q   Do you remember Daniella?

A   I don't remember her but she could have been a coworker.

Q   And then can you just read for us what you have written below that?

A   The first name -- the first letters I cannot tell whether or not it is a name.  I cannot tell whether or not it is a name, but it looks like a name.  It says "Victor de la Tardes."

Q   So you think that's somebody's name?

A   Yes, of work.

Q   And then below that?

A   It says "Boss where I am."

Q   Okay.  If you can go to the next pages that have something written on it.  So it's Reyes 8046.  So there's this handwriting on here that's in red.

10:53:02
10:53:25
10:53:30
10:53:34
10:53:37
10:53:44
10:53:47
10:53:48
10:54:07
10:54:19
10:54:22
10:54:23
10:54:26
10:54:27
10:54:55
10:55:04
10:55:14
10:55:22
10:55:28
10:55:33
10:55:59
10:56:06
10:56:12
10:56:33

Do you see that?

A   Yes, I see that.

Q   Okay.  And then if you turn the page over, you'll see that, I think it's the same page but now that note is removed so we can see the whole page.  Do you see that?

A   Yes.

Q   Okay.  So that looks like it's the same page to you, right, both -- both of those?

A   Yes, it seems to be the same page.

Q   Okay.  And can you just read for us what's written there?

A   It says, "Araceli Zambrano Olivares."  At the end there is an "O" only but it means Olivares.

Q   And is that your former wife?

A   That's her name and her last names.

Q   And then what's written below that?

A   It says -- it says "Vicente Guerrero No. 137."

Q   And what is that a reference to?

A   That is the name of the street where she lives.

Q   And is that where she lived when you moved to the United States?

A   That's where she ended up living.

Q   After you left?

A   Yes.

Q   When you left Mexico and moved to the United States, did you and Araceli live somewhere else?

A   Yes.

Q   Did she move after you left?

A   Yes.  She moved to this address because that's where her mom lives.

Q   But she didn't move there until you had already left Mexico; right?

A   That is correct.

Q   You didn't help her move?

A   I do not remember that.

Q   And why did she move to live with her mother?

A   Because she was pregnant.  She had a little daughter, and she would be taken care of there better.

Q   And then can you read the rest of the address there?

A   Yes.  It says, "Santa Ana Tepetitlan, Zapopan, Jalisco, Mexico, CP45230."

Q   And is that just the rest of her address?

10:58:56
10:59:00
10:59:00
10:59:05
10:59:08
10:59:21
10:59:21
10:59:23
10:59:30
10:59:37
10:59:40
10:59:43
10:59:46
10:59:49
10:59:51
11:00:01
11:00:05
11:00:14
11:00:21
11:00:29
11:00:33
11:00:33
11:00:59
11:01:10

A   That is correct.

Q   Okay.  And then below that is her name written again?

A   Yes.

Q   And then what does it say beneath her name?

A   It says "Calle," street.  I cannot make out the first name but the rest I can.  It says "Juan de San Ramon, No. 69."

Q   And what is that?

A   This is an address where one of my -- one of the sisters of my wife lived.

Q   And did your wife ever live with that sister?

A   Not that I remember but they do visit each other.

Q   And then can you read the rest of that for us?

A   Yes.  It says, Colonia San Francisco Zapopon, Guadalajara Julisco, Mexico," and the zip code, "4540."

Q   And is that all written in your handwriting?

A   It seems like my handwriting.  It could be my handwriting but I am not sure.

Q   Okay.  If we can go, then, to the very next page, which is Reyes 8049.  Did you draw that

11:01:15
11:01:16
11:01:21
11:01:23
11:01:26
11:01:29
11:01:55
11:02:02
11:02:14
11:02:27
11:02:30
11:02:37
11:02:46
11:02:58
11:02:58
11:03:01
11:03:03
11:03:19
11:03:26
11:03:30
11:03:32
11:03:50
11:03:56
11:04:00

picture?

A  Yes.

Q  And what is it a picture of?  What does it mean?

A  It means to me, it's the hands of Jesus Christ.

Q  And why did you draw that in your daily planner?

A  I sometimes have to have it that if I see a sign like a lover for a church or a place where they help people, any type of people, I like to draw it.

Q  And what do the words say?

A  The ones that are around the hands or the ones underneath?

Q  Let's start with the ones around the hands.

A  It says -- the one -- the letters that are in between the hands, I cannot make them out, but the others, one says "Drugs."  The other one says "prostitu" -- something follows.

Q  And why did you write those two words there?

A  It must be just a name, but I could have run out of room when I started writing it.

Q  And then read for us what it says

11:04:22
11:04:23
11:04:27
11:04:30
11:04:30
11:04:40
11:04:40
11:04:43
11:04:53
11:05:05
11:05:12
11:05:18
11:05:22
11:05:25
11:05:32
11:05:34
11:05:39
11:05:52
11:05:58
11:06:17
11:06:23
11:06:25
11:06:33
11:06:36

below the --

    A  It says, "For more information."                    11:06:41

    Q  And then it has some phone numbers; right?                    11:06:50

    A  Yes.                    11:06:54

    Q  And then the words below that, what does that say?

    A  First, it says "Pastor."  And the name, I cannot pronounce it, but I can spell it.

    Q  Okay.

    A  L-a-r-r-y and then it says Avina, something like that.

    Q  And then it has an address; right?

    A  That is correct.

    Q  Was that 2505 West 63rd Street?

    A  I imagine so.

    Q  And did you see a sign or something and then write that down?

    A  I do have that habit that I do that.  If you're asking if I saw that picture and I drew it, my answer is yes.

    Q  And would you have drawn it when you saw it, or would you have seen the picture and then gone home and drawn it?

        MR. SWAMINATHAN:  Objection; foundation

for that.

A  I do not remember this drawing, but when I see a picture that I like where they help people out, right at that -- the place, the spot, I take some time to look at it.

Q  And why are you interested in places where they help people?

A  Because since I was very young I was in a group that's called Civil Protection.  I belonged to this group for a long time.  That group supports the police, the firemen, the Green Cross, Red Cross, and people in need, people that need help.  That's why when I see places like that, not only do I like making the drawing, I go there and I hang out with people even if I don't know them.  I have liked that my whole life.

Q  So do you think that you went to -- to this place that you had written down and hung out?

A  If I -- if I do it -- wrote down the address, yes, it is quite possible.  But I do not remember.

MS. ROSEN:  Let's mark this.  Let's make this Exhibit 5.  For the court reporter in Chicago, it's Tab 23.  You can make that Exhibit 5.

(Reyes Deposition Exhibit 5 marked for identification and attached to the transcript.)

THE COURT REPORTER:  Okay.  Thank you.

Q   Mr. Reyes, if you could just quickly leaf through that so you can be familiar with the documents that are there.  Okay?

A   Yes.

Q   All right.  I'm going to first ask you to take a look at the second page, which is Reyes 7990 -- no -- is that right?  Yeah, it is -- oh, no, I think it's 7999.  Now, I'm going to represent to you that that's a Chicago Police Department inventory slip and that that inventory slip was maintained with the evidence which is what's been photographed in this exhibit.

And if you'll look at the -- that page, the top of the page it says "one brown wallet," and it says "one black calendar."  And the document indicates that this property was inventoried and taken from you, Arturo DeLeon-Reyes, at 55 -- I can't read it -- West Grand, which is the police station that you -- where you were on April 3rd and 4th and 5th.  Okay?

Does that help refresh your recollection

at all that, in fact, the day planner, you had it with you when you went to the police station on April 3rd?

A No.

Q Okay. Let's go to the next page, which is Reyes 8000. Do you recognize what that's a photograph of?

A This one?

Q Yes.

A Yes.

Q What is it?

A This seems to be -- I'm not sure. Looks like a wallet that used to be mine. But I'm not sure.

Q If you flip to the next page, does that help you at all to determine whether or not it was your wallet? And even the next page. I think on the next page you can make out that -- I think the word Araceli is written there.

A Yes, it does say Araceli.

Q Did you or your wallet have -- did you write Araceli's name on your wallet?

A Yes.

Q And do you know what the numbers are that are written on your wallet?

A  I don't remember.                                    11:18:20

Q  If you go one more page, so it's 8003.  It          11:18:28
looks like this one.  You can see it's a close-up,     11:18:43
and I think it says Araceli.  Right?                   11:18:46

A  It does say Araceli.                                 11:18:50

Q  Okay.  And then if you go to the next               11:18:53
page, it looks like it's a photograph of a wallet      11:19:01
opened.  Does that help you to confirm that this       11:19:04
was your wallet?                                        11:19:09

A  To confirm that it is indeed my wallet,             11:19:20
no, but it does look a lot like a wallet that I had.   11:19:25

Q  Okay.  Do you see the photograph that's in          11:19:28
the wallet?                                             11:19:31

A  The one of the Virgin or the little one             11:19:32
that's next to it?                                      11:19:42

Q  The actual photograph of a person.                  11:19:43

A  The only thing I can make out is that it's          11:19:47
a little picture.                                       11:19:55

Q  But you can't tell whose picture it is?             11:19:56

A  I cannot make it out.                               11:20:04

Q  Okay.  Let's flip to the next page,                 11:20:07
Reyes 8005.  Do you recognize the photograph           11:20:12
there, the one on top?                                  11:20:22

A  I don't recognize it but it does look like          11:20:25

someone that I know.                                        11:20:40

Q   Like who?                                              11:20:40

A   My little sister.                                      11:20:42

Q   And we're talking about the photo that's              11:20:48
on top, right, the one where you can see the               11:20:51
whole face?                                                11:20:55

A   That is correct.                                       11:20:57

Q   Okay.  Let's go to the next page,                     11:20:59
Reyes 8006.  There are multiple photographs on             11:21:03
that page.  Do you recognize any of the people in          11:21:16
the photograph -- photographs?                             11:21:18

A   Yes, all of them.                                      11:21:20

Q   Okay.  Why don't we stop -- start at the --           11:21:28
the photograph of the little girl with the bows or         11:21:31
something in her hair.  Who is that?                        11:21:39

A   This is the most valuable thing that I                 11:21:45
have in my life.  It's my daughter.                         11:21:56

Q   And that was a photograph when she was a               11:21:58
little girl; right?                                         11:22:00

A   Yeah.  That's the way she looked when --              11:22:02
before I left and moved to the United States.              11:22:15

Q   Got it.  And then the picture directly                11:22:17
next to her, who is that?                                   11:22:20

A   I don't make -- cannot make it out very               11:22:22

well, but it looks like one of my photos.

Q    And the one next to that, can you make that one out?

A    Yes, also it looks like another one of my photos.

Q    Okay.  And then the photograph of the woman below your daughter, who is that?

A    She is my wife, the mother of my daughter.

Q    Araceli?

A    That's correct.  Her name was Araceli.

Q    And then the woman in the photograph next to Araceli?

A    That's my mother when she was younger.

Q    And then the photograph next to your mother -- the photograph of your mother?

A    That's my little sister.

Q    Okay.  And if you flip to the next page -- I apologize -- these are bigger pictures.  I didn't realize we had them.  But why don't you take a quick look and just confirm what we've already said since you didn't see the pictures bigger.

MR. SWAMINATHAN:  What page range?

MS. ROSEN:  So we are now at 8007.

A   Could you -- could you repeat the question?          11:24:21

Q   Yeah, sure.  So this is the same pictures            11:24:24
we looked at before, but the photographs are better      11:24:26
photographs.  So I just want you to make sure that        11:24:30
because now you can see it better that the answers         11:24:34
that you gave me before, that there's no changes.          11:24:36

A   It is correct.                                        11:24:52

Q   Okay.  Now, let's skip the next page and             11:24:53
go to Reyes 8009.  Can you read the writing on the        11:24:56
back -- it looks like the back of the photographs          11:25:23
we were just looking at.                                   11:25:26

A   It says, "Daddy, put me on a key chain               11:25:28
ring."  And then it says, "Daddy, I love you."            11:25:53
And then it says, "a lot," mucho.                          11:26:06

Q   Do you know who wrote that?                          11:26:10

A   Yes.                                                  11:26:11

Q   Who?                                                  11:26:14

A   My daughter's mother, Araceli.                       11:26:14

Q   Okay.  And then on the photograph below it          11:26:23
there's some writing.  Can you read that for us?          11:26:25

A   Yes.  "Here you have your ugly wife."               11:26:28

Q   And who wrote that?                                  11:26:40

A   She did.                                              11:26:44

Q   All right.  If we could skip three pages            11:26:50

to 8012 -- actually -- I'm sorry -- let's do 8013.    11:26:55
It's a bigger one.  Do you recognize the documents,    11:27:15
the cards that are in this photograph as documents    11:27:25
that you had kept in your wallet?    11:27:29

A  Yes.    11:27:39

Q  Okay.  And the -- the yellow card on the    11:27:40
top that says "phone card," what is that?    11:27:49

A  I would buy cards to call my family.  This    11:27:56
could be one of them but I'm not sure.    11:28:08

Q  And how would you use those cards?    11:28:12

A  When I would buy the cards, on the back it    11:28:16
has a number.  First, I would use that number of    11:28:22
the area code, and then I would -- and then the    11:28:29
number, and then that's how I would send stuff to    11:28:33
my family.    11:28:40

Q  And then next to that is a Social Security    11:28:40
card with a Social Security number and your name.    11:28:42
Do you see that?    11:28:45

A  Yes.    11:28:45

Q  How did you get a Social Security card?    11:28:53

A  When I first arrived, I mean to the United    11:28:56
States, I started looking for a job.  But every    11:29:10
job that I would go to, they would ask me if I    11:29:15
have --    11:29:25

THE INTERPRETER: Interpreter will clarify because it could also be insurance.

Yes, I will be referring to Social Security.

A -- if I had a Social Security number. And I knew I didn't. Sometimes I don't remember well. I believe that one of the jobs -- place that I went to look for a job, outside there was this -- a man, and he was selling that and I bought it so I could work. And then I went to look for a job, and I was given a job.

Q And did you have to pay for the Social Security card?

A Yes.

Q And how much did it cost to buy a Social Security card?

A The truth is that I do not remember how much it cost.

Q But you knew that this wasn't a legitimate Social Security number, right, because you were undocumented and in the United States illegally; right?

MR. SWAMINATHAN: Objection to form.

A At that time I didn't know anything about

Social Security or how it works here, nothing like that.  The only thing I knew, that if I bought that, it was going to help me find a job.

Q  So you didn't know that buying a Social Security card was illegal in the United States?

A  I did not know.

Q  Okay.  And then there's a card under it that's pink and blue.  Do you see that?

A  Yes, I do see it.

Q  And what is that card?

A  I don't remember.

Q  Okay.  And then below that there's a blue card that says "Banamex."  What is that?

A  It's a card that I got.

Q  What kind of card?  What do you do with it?

A  In Mexico, here in Mexico I got a card so I could save, save up for my daughter.  And I would carry it with me so when I would work, so I could put some money in it, so later she would have some -- something when she went to school.  The reason that I would carry it, so I could see the name every time I would put some money in it.

Q  So it was a way to save money for your daughter?

A   Yes.                                                   11:33:52

Q   Now, if we'd go to Reyes 8016.  So it's              11:33:52
this one.  This is the back side, the other side          11:34:25
of all of the cards we were just looking at.  And         11:34:37
so the card that we talked about that you couldn't        11:34:43
remember what it was that was pink and blue, the          11:34:46
front of it is the card that's pink with your             11:34:54
picture on it that says "resident alien."  Do you         11:34:59
see that?                                                 11:35:04

A   Yes, I do see it.                                     11:35:11

Q   Does that help refresh your recollection            11:35:14
as to what that card is and what you used it for?         11:35:17

A   Yes, a little.                                        11:35:20

Q   And what is that card and what did you use          11:35:23
it for?                                                   11:35:28

A   When I bought the card, the Social Security         11:35:28
card, I was also given this one.                          11:35:38

Q   And it provided you with identification            11:35:43
indicating that you were a resident alien of the          11:35:47
United States; right?                                     11:35:50

A   I didn't know any of that.  The only thing         11:35:52
I knew is that would help me find a job.                  11:36:08

Q   So you didn't appreciate that this card was        11:36:13
falsely identifying you as being properly documented      11:36:18

to be a resident alien in the United States?

A   Could you repeat the question?

Q   Sure.   So you didn't appreciate that this card was falsely identifying you as being a properly documented resident alien of the United States?

MR. SWAMINATHAN:   Objection to form.

A   I didn't know.

Q   You did or didn't?

A   I did not know.

Q   When you came to the United States, did you realize that there was a mechanism to come to the -- to go to the United States legally?

A   I imagine so.

Q   And when you left Mexico to go to the United States, you didn't just get on a plane, right, to go?

A   I do not remember how I came.

Q   Well, you do know that you wouldn't have been allowed into the country if you had just flown on an airplane; right?

A   Yes.

Q   And you didn't have the Social Security card or the resident alien card when you left Mexico; right?   You told us you got it at a job site.

MR. SWAMINATHAN:  Objection; mischaracterizes the testimony.

A   That's correct.

Q   Did you have a passport?

A   No.

Q   Do you have a passport today?

A   No.

MS. ROSEN:  I think we have to take a break for the tape.

THE VIDEOGRAPHER:  This is the end of Media No. 1 in the deposition of Arturo DeLeon-Reyes. We are off the record at 10:38 a.m.

MS. ROSEN:  We're going to take like a 5- or 10-minute break so people can use the bathroom.

(Recess taken, 11:38 a.m. to 11:50 a.m.)

THE VIDEOGRAPHER:  Here begins Media No. 2 in the deposition of Arturo DeLeon-Reyes.  We are back on the record at 11:50 a.m.

BY MS. ROSEN:

Q   Okay.  I'm going to ask you now to flip a couple more pages to Reyes 8022, which is this one.  And can you tell us who that is a picture of?

A   Yes.  She's my wife, the mother of my children.

Q   Okay.  And then flip two more pages.  Is that your wife and your daughter?

A   Yes.

Q   And if you go to 8027, can you tell me what's written there?

A   This, right?

Q   Yes.

MR. SWAMINATHAN:  I'd just note for the record the documents --

THE COURT REPORTER:  You'll have to repeat that.  I can't hear you.

MR. SWAMINATHAN:  I'm going to note for the record an objection because it does appear the document he's being questioned about has words that are cut off and incomplete, but the witness can go ahead and answer to the extent he can.

A   I cannot read it, what it says here because it's only parts of what has been -- what's written on this picture.  What I can read is -- I can read what's in this area, in this part.

Q   Okay.

A   It says "la," and then it says "Arturo," and then there's two letters, "g" and "o."  And then it says "cinco meses," five months, and then

11:51:52
11:52:09
11:52:10
11:52:28
11:52:48
11:52:49
11:52:54
11:53:17
11:53:31
11:53:31
11:53:31
11:53:32
11:53:33
11:53:35
11:53:41
11:53:43
11:53:56
11:54:06
11:54:10
11:54:19
11:54:22
11:54:23
11:54:38
11:54:46

another "i" and then -- and it says "your baby."

And I don't know if it says "Ramos."  I don't.

THE INTERPRETER:  The interpreter repeated the phonetic word because there's not like an interpretation of that word that would make sense.

A  (Continuing.)  And then it says "and l-e." It says "Ranamos."  But I do remember this word.

Q  What is it?

A  And it means "Extranamos, we miss you." And then there's m-u-c.  It means mucho, much. And then it says "Arturo," and then that's an n-e, another m, another o.  I do know what that means.

Q  What?

A  It means, "Arturo, no nos olvides, do not forget us."

Q  And do you recognize the handwriting?

A  Yes.

Q  Whose handwriting?

A  This is the handwriting of the mother of my children, Araceli.

To finish, the last part on the bottom, it says "olvides, n-u-n."  But if I read those two paragraphs, it says, "Arturo, never forget us."

Q  Okay.  So do you believe that the

photograph with this writing on the back of it, based on what you're reading here, was sent to you after you went to the United States?

A  All the pictures, no.  But I think I was sent one -- well, more than one picture.

Q  After you had moved to the United States?

A  Yes.

Q  Okay.  If we could now just go to Reyes 8030, which is this one.  Do you recall having that slip of paper in your wallet?

A  I don't remember it but it is possible.

Q  And do you have any recollection at all about why you might have this slip of paper with this information in your wallet?

A  In order to respond to that question, I need to look at it more, at this photograph.

Q  Okay.

A  Ready.

Q  Okay.

A  When I was in the United States, I had the illusion of sending something to my daughter, a toy or something she could wear.  Because by mail, from what I knew, I was only able to send letters.

Q  So you were investigating another way to

11:58:11
11:58:15
11:58:18
11:58:34
11:58:50
11:58:52
11:58:53
11:58:57
11:59:08
11:59:22
11:59:29
11:59:34
11:59:37
11:59:44
11:59:46
12:00:01
12:00:06
12:00:22
12:00:24
12:00:33
12:00:38
12:00:42
12:00:53
12:01:02

send something to your daughter?

A  Yes.

Q  Do you recall if you ever followed through and did mail something to your daughter or send it?

A  I don't remember.

MS. ROSEN:  Okay.  We're going to mark another exhibit.  So for the people in Chicago, it's Item No. 24, and we're going to make that Exhibit 6.

THE COURT REPORTER:  It's marked.

MS. ROSEN:  Thank you.

(Reyes Deposition Exhibit 6 marked for identification and attached to the transcript.)

Q  Mr. Reyes, this is a series of photographs of -- of a ring.  Do you recognize the ring?

A  Recognize it?  No.

Q  Do you know whose ring it is?

A  It looks a lot like one I used to have, but I don't know if it is this one.

Q  And when did you have that ring?

MR. SWAMINATHAN:  Objection to form.

A  I had -- I had one when I was -- when I was here in the United States.

Q  And is it a ring that you had before you

moved to the United States?

A  I don't remember but I did have one -- I mean, I do remember wearing a ring.

Q  But as you sit here today, you're not sure if that's the ring that you had?

THE INTERPRETER:  I'm sorry.  Could you repeat for the interpreter?

Q  Sure.  As you sit here today, you can't recall if the ring that's shown in the photograph is a picture of the ring that you had?

A  No.

MS. ROSEN:  All right.  We're going to go Tab No. 1, and we're going to make that Exhibit 7.

THE COURT REPORTER:  It's marked.

MS. ROSEN:  Thank you.

(Reyes Deposition Exhibit 7 marked for identification and attached to the transcript.)

Q  Mr. Reyes, take a quick look at what we've marked as Exhibit 7 so you can familiarize yourself with this document before I ask you some questions.

Have you had a chance to look through the document?

A  Yes.

Q And do you recognize what that document is? 12:06:05

A Yes. 12:06:08

Q What is it? 12:06:11

A This paper, this piece of paper -- papers is what I signed at the police station. 12:06:20 12:06:24

Q And this document is written primarily in English; right? 12:06:35 12:06:37

A Yes. 12:06:41

Q Has anyone ever translated the document for you? 12:06:46 12:06:52

A Yes. 12:06:53

Q Who has translated the document for you? 12:07:00

A This has been translated to me by the attorney that I had in trial, for the trial. 12:07:06 12:07:19

Q Do you remember his name? 12:07:26

A No. 12:07:27

Q Is it Mr. Verdun, Thomas Verdun? 12:07:38

A I believe so but I am not sure it is him. I believe so. 12:07:58 12:08:02

Q And did he communicate with you in Spanish or in English? 12:08:04 12:08:07

A He communicated through an interpreter. 12:08:07

Q And did he -- when this statement that you signed at the police statement -- let me start 12:08:17 12:08:22

over.  When this statement that you signed at the    12:08:25

police station was translated to you by your    12:08:27

attorney, did he translate it orally, or did he    12:08:30

write it out for in Spanish or have somebody write    12:08:34

it out for you in Spanish?    12:08:37

    A   Well, from what I remember, in writing.    12:08:48

    Q   And did you keep a copy of the translated    12:08:57

Spanish version of your handwritten statement?    12:09:06

    A   Yes.    12:09:15

    Q   And do you know where that copy is today?    12:09:16

    A   That copy, I don't.    12:09:18

    Q   Another copy?    12:09:27

    MR. SWAMINATHAN:  Objection to form.    12:09:29

    A   With time and through appeals I got to    12:09:32

have another copy.    12:09:46

    Q   That was written in Spanish?    12:09:46

    A   Yes, the same.    12:09:49

    Q   And do you have a copy -- do you still    12:09:51

have that Spanish version of your handwritten    12:09:55

statement?    12:09:58

    A   Yes.    12:09:58

    Q   Where do you have it?    12:10:10

    A   I don't know if I have it or I don't know    12:10:12

if I gave it back to my attorneys.    12:10:26

Q   Which attorneys?                                    12:10:29

A   The ones that are here present.                    12:10:30

Q   So you either have a copy at your home             12:10:38
somewhere, or you gave it to your attorneys?           12:10:40

A   That is correct.                                   12:10:47

Q   And when you read the Spanish version, the         12:10:50
translated version of your handwritten statement,      12:11:07
did it indicate the things that you told the police    12:11:12
and the State's Attorney when you were there?          12:11:22

        MR. SWAMINATHAN:  Objection to form.            12:11:37

A   I didn't say those words.  It was Trevino           12:11:39
who said the words.                                    12:11:50

Q   And explain to me what you mean when you           12:11:53
say you didn't say the words, "It was Trevino who      12:11:58
said the words."                                       12:12:02

A   Of course.  Trevino gave me examples of            12:12:03
what to say.  Sometimes I would repeat the same        12:12:18
thing, something similar, but all those ideas, I       12:12:24
got them from him.                                     12:12:35

Q   So this statement was written by an                12:12:37
Assistant State's Attorney; right?                     12:12:51

        MR. SWAMINATHAN:  Objection to form and        12:13:01
foundation.                                            12:13:02

        Go ahead.                                      12:13:03

A   That's correct.

Q   And in the room with you were the Assistant State's Attorney and Trevino; correct?

MR. SWAMINATHAN:  Objection to form.

A   In the area where I was sitting at the table, yes.  But I'm not sure if there were more officers in the room.  I do not remember.

Q   Okay.  And do you know the name of the Assistant State's Attorney that was writing out the statement?

A   I think his name is O'Malley.

Q   Okay.  So at some point in time after you went to the police station, you were with Assistant State's Attorney O'Malley and Detective Trevino or Officer Trevino, and Assistant State's Attorney O'Malley wrote this document, Exhibit 7; right?

A   Correct.

Q   And State's Attorney O'Malley could not speak Spanish; correct?

A   Correct.

Q   But Officer Trevino could speak Spanish; correct?

A   Correct.

Q   So when you were with an Assistant State's Attorney asking you questions in English like I'm asking you questions in English?

MR. SWAMINATHAN:  Objection to form.

A   The one thing I remember is that Trevino would tell -- give me examples of what to say.  I didn't understand what O'Malley was telling the -- the attorney's assistant was telling Trevino because I don't know English.

Q   I understand that you don't know English. What I'm asking you is, was Assistant State's Attorney O'Malley speaking with you in English like I'm speaking with you in English?

MR. SWAMINATHAN:  Objection to form; asked and answered.

A   He was speaking English.  I don't know whether or not he was asking me questions.  The one thing I remember is that he was speaking English.

Q   Was he looking at you?

A   There were moments, according to what I remember, when yes.

Q   And was he looking at you and saying words, and then Officer Trevino was repeating the

words or repeating some words, whether they were the right words or not, sort of like what's happening here?

MR. SWAMINATHAN: Objection to form and foundation. The use of the term "repeating" when he said he didn't understand English is a concern.

Go ahead.

A  That's correct.

Q  Okay. But as you were sitting there, you didn't know whether or not Trevino was translating the actual words that O'Malley was saying; correct?

A  That's correct.

Q  And when you Assistant State's Attorney O'Malley was speaking with you, was he asking questions and then Trevino was translating something?

MR. SWAMINATHAN: Objection to form; asked and answered.

THE WITNESS: Should I answer?

MR. SWAMINATHAN: Yes.

MS. ROSEN: Yes.

A  Yes.

Q  And then were you responding to whatever Trevino was saying, and then Trevino spoke English

to O'Malley?                                          12:19:38

    MR. SWAMINATHAN:  Objection to form.    12:19:48

  A  Yes.                                     12:19:50

  Q  But you don't know if what Trevino was   12:19:51
saying to O'Malley was accurately reporting what     12:19:55
you said to Trevino; correct?                        12:20:01

  A  That's correct.                          12:20:14

  Q  And you said that Trevino asked you to   12:20:16
repeat certain things.  Do I have that right?        12:20:20

    MR. SWAMINATHAN:  Objection to form;    12:20:31
mischaracterizes testimony.                          12:20:33

    Go ahead.                             12:20:34

  A  That's correct.                          12:20:35

  Q  And as you sit here today, can you tell us  12:20:42
what Trevino told you to repeat?                     12:20:49

  A  I don't remember exactly what I repeated,  12:20:52
but he would tell me some things, and I would        12:21:22
repeat something that was similar or something       12:21:26
that was rather similar to what I had repeated.      12:21:30

  Q  Can you remember any of the things that  12:21:34
you repeated?                                        12:21:37

  A  I don't remember.                        12:21:38

  Q  So I'm going to ask you to take a look at  12:21:47
the statement, and you can see at the top -- well,   12:21:50

actually, towards the middle there's some language
in Spanish.  Do you see that there?

A  Yes, I can see that.

Q  And as you sit here today, are you able --
I don't want you to read it out loud, but are you
able to read the Spanish words that are in there?

A  Yes, I can read them.

Q  Okay.  And back on April 5th, 1998, when
you were speaking with Assistant State's Attorney
O'Malley and Officer Trevino, did you read the
Spanish that's written there?

A  No.

Q  Why not?

A  No document for me to read was shown to me.

Q  Nobody showed you this document?

MR. SWAMINATHAN:  Objection to form.

A  The only moment when I saw the document and I
touched it was when they asked me to sign it.

Q  And when they asked you to sign it, you
signed it; right?  Those are your initials, aren't
they, next to the words that are by paragraph 1 and
the words that are by paragraph 2, your initials
are there, and your name is -- that's your
signature; right?

MR. SWAMINATHAN: Objection to form.

A That's correct.

Q Okay. So when did -- who asked you to initial the form there?

A Detective Trevino.

Q And when he put the form in front of you and asked you to initial next to paragraph 1, you didn't read it?

A No. When he asked me to write my initials, he rushed me.

Q What do you mean he "rushed" you?

A He would tell me, "Write your initials here," and I would write them, and he would tell me, "Write your initials here," and I would write them. But -- but his hand was on top of the paper. I didn't have the opportunity for somebody to tell me, "Read this."

The first time I saw this document, that's when the attorney that represented me during the trial, Thomas gave me a copy of this document. It was a great surprise for me to see this part in Spanish, in Spanish. Because when I was at the police station, when they asked me to write my initials on it, they didn't give me the

opportunity to say, "Read this." Even if it had          12:26:15

been written in Spanish, at that moment I didn't          12:26:29

pay attention to that because Detective Trevino           12:26:32

asked me to do that and he rushed me. He was             12:26:43

tired; he was sleepy.                                     12:26:47

    THE INTERPRETER: The interpreter clarifies,     12:27:03

plaintiff said, "I was tired. I was sleepy."             12:27:06

Q   Did you have more -- were you done with              12:27:16

your answer?                                             12:27:18

    MR. SWAMINATHAN: I'm sorry; can we have           12:27:25

the court reporter read back the question and            12:27:27

answer because it did seem like he wanted to have        12:27:30

the opportunity if he had more to say.                   12:27:35

    MS. ROSEN: Sure. He said he has more to          12:27:35

say.                                                     12:27:37

    MR. SWAMINATHAN: Oh, he did. Okay.               12:27:37

    MS. ROSEN: I said, "Did you finish your          12:27:38

answer" and he said no.                                  12:27:39

    THE WITNESS: May I continue?                     12:27:46

    MR. SWAMINATHAN: Yes.                            12:27:52

A   (Continuing.) That's perhaps the reason why          12:27:52

I didn't see this when I wrote my initials on it.        12:27:54

Q   Because you were tired and you were hungry --        12:27:58

I don't remember what other words you said you           12:28:03

were, but that's why you think you didn't see the
words?

A   That's why.  Also, because I didn't have
the opportunity.  Detective Trevino didn't give me
the opportunity for him to tell me, "Read this."

Q   Are you saying you didn't even realize
that there were words written in Spanish on the
page as you were initialing and signing the
document?

MR. SWAMINATHAN:  Objection; asked and
answered.

A   The truth, at that moment, no.

Q   Okay.  So I want to walk through this a
little carefully.  At the top of the page you see
there's a squiggly line.  And then next to it are
your initials; right?

A   That's correct.

Q   And then if we work our way down at the
paragraph that is in Spanish that starts with the
number 1, your initials appear above the word
"explicado."  Do you see that?

A   That's correct.

Q   And you yourself wrote your initials
there; correct?

A   That's correct.

Q   And you wrote the initials that we talked about by the squiggly line above; correct?

A   That's correct.

Q   And then at the end of the Spanish line that begins with the number 1, you have initialed that line again; correct?

A   It seems like yes, but my initials are not complete here.

Q   Okay.  And then if we move down the document to the Spanish line that begins with the number 2, again, those are your initials, right, at the end of that over the blank space?

A   These seem to be my initials here but I'm not sure.  Perhaps, yes.

Q   And then your full signature then appears after the X, right, on the line below the paragraph in Spanish that begins with the number 2?

A   That's correct.

Q   Okay.  And then at the bottom of the page your signature appears again; correct?

A   That's correct.

Q   And you're saying at no time when you initialed your name on four different occasions

12:30:08
12:30:09
12:30:13
12:30:24
12:30:26
12:30:29
12:30:34
12:30:36
12:31:07
12:31:09
12:31:12
12:31:16
12:31:20
12:31:48
12:31:58
12:32:00
12:32:04
12:32:08
12:32:13
12:32:26
12:32:34
12:32:36
12:32:45
12:32:49

Transcript of Arturo DeLeon-Reyes, Volume 2
Conducted on February 27, 2020                           229

and signed your name twice did you notice that              12:32:54

there were Spanish words written on the page;               12:32:56

correct?                                                    12:33:00

    MR. SWAMINATHAN:  Objection to form.      12:33:14

    Go ahead.                                   12:33:16

    A  That's correct.                           12:33:18

    Q  And when you were putting your initials   12:33:18

into the places that we talked about, Officer               12:33:22

Trevino was also putting his initials; correct?            12:33:26

    A  That's correct.                           12:33:29

    Q  And Assistant State's Attorney O'Malley   12:33:37

was also putting his initials in the same place             12:33:40

that you had put your initials and Officer Trevino          12:33:44

had put his initials; correct?                              12:33:48

    A  Could you repeat the question?             12:33:50

    Q  Sure.  And Assistant State's Attorney     12:34:04

O'Malley was putting his initials in all of the             12:34:08

same places that you had put your initials and              12:34:10

Officer Trevino had put his initials?                       12:34:14

    A  I believe so but I don't remember.        12:34:17

    Q  And then at the bottom of the page where   12:34:42

your signature -- your full signature is, both              12:34:44

Officer Trevino and Assistant State's Attorney              12:34:48

O'Malley also signed their names; correct?                  12:34:52

Transcript of Arturo DeLeon-Reyes, Volume 2
Conducted on February 27, 2020

230

A  That's correct. — 12:34:54

Q  And that was -- all those signatures were happening with you in the room; right? — 12:35:08 / 12:35:11

A  That's correct. — 12:35:13

Q  Okay.  Now, we're going to go through the statement, and I'm going to try and figure out, since you don't -- can't remember, if you can tell us as we go through the statement which things you repeated.  Okay? — 12:35:21 / 12:35:25 / 12:35:28 / 12:35:32 / 12:35:35

MR. SWAMINATHAN:  That's just a statement; right? — 12:35:53 / 12:35:57

MS. ROSEN:  Yeah, I just said okay. — 12:35:57

Q  When you first met Assistant State's Attorney O'Malley, did he introduce himself to you? — 12:35:59 / 12:36:02

A  I believe so. — 12:36:15

Q  And did he explain to you that he was an Assistant State's Attorney, and a prosecutor, and a lawyer but not your lawyer? — 12:36:16 / 12:36:19 / 12:36:24

A  I believe so but I don't remember. — 12:36:35

Q  Did you think Assistant State's Attorney O'Malley was there to help you? — 12:36:38 / 12:36:42

A  I don't remember what I thought. — 12:36:44

Q  You knew what a lawyer was; right? — 12:36:58

A  I knew very little what a lawyer was. — 12:37:00

Q   Did you know what a prosecutor was?                    12:37:12

A   I didn't know what a prosecutor was.  I               12:37:15
didn't know what a prosecutor was because I              12:37:47
haven't been to a police station.  I haven't seen         12:37:53
any State Attorneys; I haven't seen any lawyers.          12:37:57
I haven't seen that because I haven't been to a           12:37:59
police station neither in the Mexico nor in the           12:38:02
United States because I have never had any                12:38:04
problems like that.                                        12:38:06

Q   Didn't you tell us earlier that you worked           12:38:07
with the civil protection since you were very             12:38:09
young, and so you worked with police officers?            12:38:12
Isn't that what you told us earlier?                       12:38:14

A   Yes.                                                  12:38:16

Q   So you were --                                        12:38:23

MR. SWAMINATHAN:  I'm sorry; he had more.             12:38:25

MS. ROSEN:  Oh, sorry.                                12:38:27

A   Yes, in the street I have experience with            12:38:38
officers and with other people, but going to court        12:38:50
I didn't know -- I didn't know who was who or how         12:38:53
the system worked.  I have no idea.                        12:38:56

Q   So before you were in the police station            12:38:59
on April 5th, you didn't know anything at all             12:39:03
about prosecutors who would go after criminals and        12:39:09

try and get them convicted for crimes?  You knew
nothing about that?

    A  The only thing -- I knew very little based
on what I had watched on TV or what I had heard.

    Q  And what types of things had you watched
on TV about prosecutors, and criminals, and court?

    A  When one watches a soap opera, a show,
sometimes something like that is shown.

    Q  So you had a general knowledge that if a
person gets arrested and charged with a crime that
they would have to go to court, and there would be
a prosecutor and they -- to represent the State,
and then there would be a lawyer to represent the
person accused; right?

    MR. SWAMINATHAN:  Objection to form and
foundation since it's not clear whether this is
about Mexico or the United States.

    MS. ROSEN:  You can answer.

    A  Of course, yes, in Mexico.

    Q  And is it your understanding that things
are very different in the Mexico than they are in
the United States when it comes to prosecuting
criminals?

    MR. SWAMINATHAN:  Objection to foundation.

12:39:17
12:39:20
12:39:21
12:39:58
12:40:02
12:40:04
12:40:19
12:40:31
12:40:33
12:40:38
12:40:42
12:40:44
12:40:52
12:40:56
12:41:16
12:41:17
12:41:22
12:41:38
12:41:38
12:41:40
12:41:43
12:41:45
12:41:49
12:41:55

A   I don't believe so.  I couldn't tell you.

I don't know.

Q   When Assistant State's Attorney O'Malley

came in to speak with you, by that point you knew

that you were being accused of killing Mr. and

Mrs. Soto and -- or helping to kill Mr. and

Mrs. Soto and to kidnap both of their children;

right?

        MR. SWAMINATHAN:  Object to the form.

A   That's correct.

Q   And, in fact, I think before you spoke to

Assistant State's Attorney O'Malley and Officer

Trevino, you claim that Detective Guevara told you

could get the electric chair; right?

A   That's correct.

Q   So you knew you were in serious trouble;

right?

        MR. SWAMINATHAN:  Objection to form.

A   I didn't know I was in serious trouble.

What I knew is that they -- they were accusing me

wrongfully.

Q   They were accusing you of a very, very

serious crime; right?

A   That's correct.

Q   And you knew that?                                    12:44:36

A   Yes.                                                  12:44:39

Q   And when you were in the room with                    12:44:42
Assistant State's Attorney O'Malley and Officer           12:44:50
Trevino, Assistant State's Attorney O'Malley gave         12:44:57
you and advised you of your constitutional rights         12:45:01
under the United States justice system; right?            12:45:06

        MR. SWAMINATHAN:   Objection to form.             12:45:28

A   No.                                                   12:45:30

Q   So you're saying you were not provided                12:45:31
your constitutional rights by Assistant State's           12:45:34
Attorney O'Malley?                                        12:45:38

A   No.                                                   12:45:38

Q   Okay.  I'm going to go through some of the            12:45:51
words that are written here to see if, in fact,           12:45:55
you said these things when you were speaking to           12:45:58
Assistant State's Attorney O'Malley and Officer           12:46:03
Trevino.                                                  12:46:07

        If we -- and you can't read any English,          12:46:07
right, today?                                             12:46:12

A   No.                                                   12:46:14

Q   Okay.  So on this document it says,                   12:46:25
"Arturo states that he speaks Spanish and only            12:46:28
understands very little English."                         12:46:31

MR. SWAMINATHAN: Are you going to be starting at the beginning of the document?

MS. ROSEN: No, I'm midway through right now. So it's the same page but it doesn't do me any good to direct him; he doesn't speak English.

MR. SWAMINATHAN: So can you just tell me?

MS. ROSEN: Sure. I'm about the middle of the page. It says, "Arturo says that he speaks Spanish and only understands very little English."

MR. SWAMINATHAN: I see it now.

MS. ROSEN: And if I jump, I'll --

MR. SWAMINATHAN: You'll tell me where you're going?

MS. ROSEN: Yes.

MR. SWAMINATHAN: I don't know if you asked a question; I'm sorry.

MS. ROSEN: So let me go back to the question.

Q   The document states, "Arturo states that he speaks Spanish and only understands very little English."

Did you say that to Assistant State's Attorney O'Malley and Officer Trevino?

MR. SWAMINATHAN: I have an objection to

form and foundation, and I believe questions of

this sort are asked and answered and improper

based on his prior testimony.

        Go ahead.

        MS. ROSEN:  Asked and answered what?

        MR. SWAMINATHAN:  And improper based on

his prior testimony.

        MS. ROSEN:  Okay.

    A  No.

    Q  Was that one of the things that Trevino

said to you and that Trevino asked you to repeat?

        MR. SWAMINATHAN:  I have the same objection.

    A  These are Trevino's words.

    Q  Is it true that when you were in the room

on April 5th, 1998, that you spoke Spanish only

and understood very little English?

    A  That's false.  I only spoke Spanish.

    Q  So on April 5th, 1998, you spoke no

English whatsoever?

    A  No.

    Q  The next line states, "Arturo states that

he agreed to have Investigator Trevino interpret

from English to Spanish and Spanish to English for

the purpose of this statement."  Did you allow

Officer Trevino to translate your statement to

Assistant State's Attorney O'Malley?

A   No.   Those are Trevino's words.

Q   And when you say, "Those are Trevino's

words," what do you mean?

A   I want to say that he gave me ideas.   I

don't know if I repeated that.   I don't know if I

said uh-huh.

Q   Did Trevino ask you if you would be

willing to allow him to translate your words to

Assistant State's Attorney O'Malley?

A   No, I don't remember.   I don't remember.

Q   The next line states, "Arturo states that

he's 23 years old and his birthday is 8/23/74."

Did you say that to Officer Trevino and Assistant

State's Attorney O'Malley?

MR. SWAMINATHAN:   Objection to form and

foundation and that the question is improper

because it's -- based on the prior testimony.

THE INTERPRETER:   Based on?

MR. SWAMINATHAN:   Based on the prior

testimony.

A   Trevino at some point asked me for my

name, for my date of birth, and I answered that.

Q   And you were 23 years old; right?  `12:52:35`

A   That's correct.  `12:52:38`

Q   And your birthday is August 23rd, 1974?  `12:52:43`

A   The month, no.  The year, yes.  `12:52:47`

Q   What's the date of your birth?  `12:53:03`

A   The month is the same.  That's August 26th `12:53:05`
and I believe that you asked me about the 23rd.  `12:53:20`

Q   And what is your -- what's the date?  `12:53:23`

A   It's August 26th of '74.  `12:53:25`

Q   Okay.  And then the statement says, `12:53:34`
"Arturo states that he lives at 6234 South Mozart `12:53:37`
in Chicago."  Did you say that to Officer Trevino `12:53:44`
and ASA O'Malley?  `12:53:46`

MR. SWAMINATHAN:  Objection to form, `12:54:04`
foundation, and I believe it's improper in light `12:54:05`
of the prior testimony.  `12:54:11`

Go ahead.  `12:54:24`

A   Yes.  `12:54:25`

Q   And the next line reads, "Arturo states that `12:54:26`
he lives there with Adriana Mejia, Rosauro Mejia, `12:54:32`
Gabriel Solache, and Carlos Martinez."  Did you `12:54:37`
say that to Officer Trevino and ASA O'Malley?  `12:54:44`

A   Yes.  `12:55:01`

MS. ROSEN:  We can go to the next page, `12:55:08`

for those following along.

Q  The statement says, "Arturo states that Adriana Mejia is the person shown in the photograph labeled People's Exhibit 1."  Did State's Attorney O'Malley or Officer Trevino show you a picture of Adriana?

MR. SWAMINATHAN:  Objection to form.

A  If the question is about whether or not they showed me a photograph where Adriana was, the answer is yes.

Q  And you identified the photo as being Adriana Mejia; right?

MR. SWAMINATHAN:  Objection to form.

A  That's correct.

Q  And were you also shown a picture of Gabriel Solache?

A  Yes.

Q  And did you identify the person in the photograph as somebody you knew to be Gabriel Solache?

A  Yes.

Q  The statement says, "Arturo states that he" -- sorry, let me try that again.  "Arturo states that he finished secondary school in Mexico

Transcript of Arturo DeLeon-Reyes, Volume 2
Conducted on February 27, 2020                    240

and finished the 9th grade."                                    12:56:53

Did you tell that to Officer Trevino and                        12:56:56
Assistant State's Attorney O'Malley?                            12:56:58

THE INTERPRETER:  Could you please repeat.                      12:57:11
To the 9th grade?                                               12:57:14

Q   Finished the 9th grade.  Did you tell that --               12:57:16

MR. SWAMINATHAN:  Objection to form and                         12:57:30
foundation and as improper in light of his prior               12:57:31
testimony.                                                      12:57:34

A   Yes.                                                        12:57:45

Q   And that's information that you provided                    12:57:46
to Officer Trevino in Spanish; right?                           12:57:53

A   That's correct.                                             12:57:55

Q   The statement then says, "Arturo states                     12:58:01
that he has lived at 6234 South Mozart since                    12:58:09
December of 1997."                                              12:58:14

Did you say that to Officer Trevino and                         12:58:16
ASA O'Malley?                                                   12:58:21

MR. SWAMINATHAN:  Objection to form and                         12:58:38
foundation and improper in light of his prior                  12:58:39
testimony.                                                      12:58:42

A   That's correct.                                             12:58:51

Q   And when you were providing this background                 12:58:53
information about where you live, your school and              12:58:57

education in Mexico, how old you were, was ASA O'Malley asking you questions about your background, and then Officer Trevino translating, and you responding?

MR. SWAMINATHAN:  Objection; form and asked and answered.

A  I don't know if O'Malley was asking those questions.  What I can tell you is that Trevino asked me those questions.

Q  Did Trevino ask you those questions after O'Malley spoke words in English?

MR. SWAMINATHAN:  Objection; asked and answered.

A  Yes.

Q  Okay.  And these questions that you were being asked from -- these questions that you were being asked by Officer Trevino about your background, was that happening at the beginning of the conversation that you had with Trevino and ASA O'Malley?

A  Yes.

Q  The next line of the statement says, "Arturo states that in February of 1998 he found out that Adriana was not pregnant."

Transcript of Arturo DeLeon-Reyes, Volume 2
Conducted on February 27, 2020                242

Was that something that Officer Trevino asked you to say?

A    Yes.

Q    And describe for me how Officer Trevino said that to you.

A    I don't remember how he told me.  What I remember is that I repeated that.

Q    So Officer O'Malley -- I mean, Assistant State's Attorney O'Malley said something in English; right?

A    (In Spanish)  Sí.

Q    And then Officer Trevino said to you, "Say that in February of 1998 you found out that Adriana was not pregnant"; right?

A    Correct.

Q    And so then you repeated back to Officer Trevino, "In February of 1998 I found out that Adriana was not pregnant"; correct?

MR. SWAMINATHAN:  Objection; form, foundation, and improper in light of his prior testimony.

A    That's correct.

Q    Okay.  And then Trevino translated whatever he translated; right?

A   That's correct.

Q   Okay.  And then the next line of the statement says, "Arturo states Adriana had said she was pregnant in February, but she did not look as pregnant as she said she was."

Is that information that Trevino asked you to repeat?

A   Yes.

Q   So, again, Assistant State's Attorney O'Malley asked a question in English that you didn't understand; right?

A   Correct.

Q   And then Officer Trevino said to you, "Arturo, say Adriana has said she was pregnant in February, but she didn't look as pregnant as she said she was"; right?

A   Correct.

Q   And then you repeated back to Officer Trevino, "Adriana has said she was pregnant in February, but she didn't look as pregnant as she said she was," or words to that effect; right?

MR. SWAMINATHAN:  Objection; form, foundation, asked and answered, and improper in light of his prior testimony.

A   That's correct.

Q   And then Trevino said something --

MR. SWAMINATHAN:  After you have your next question and answer, let's take a break.

MS. ROSEN:  Sure.

Q   And then after --

MS. ROSEN:  Well, I want to finish this portion.

MR. SWAMINATHAN:  Okay.  After this question and answer I need to take a break.

MS. ROSEN:  I'm sorry; could the court reporter just read back my last question?

(The Reporter read the question as follows:  And then you repeated back to Officer Trevino, "Adriana has said she was pregnant in February, but she didn't look as pregnant as she said she was," or words to that effect; right?)

Q   And then Officer Trevino said something to ASA O'Malley that you didn't understand; correct?

A   That's correct.

MR. SWAMINATHAN:  Okay.  Thank you.

///

///

///

THE VIDEOGRAPHER:  This marks the end of Media No. 2 in the deposition of Arturo DeLeon-Reyes. We are off the record at 12:07.

(A recess was taken from 1:08 p.m. to 1:27 p.m.)

THE VIDEOGRAPHER:  Here begins Media No. 3 in the deposition of Arturo DeLeon-Reyes.  We are back on the record at 12:27 p.m.

BY MS. ROSEN:

Q  Okay.  Mr. Reyes, going back to Exhibit 1 --

MR. SWAMINATHAN:  Exhibit 1 or Exhibit 7?

MS. ROSEN:  Oh, I'm sorry, Exhibit 7.  I misspoke.

Q  The statement reads, "Arturo states before February he heard others in the house state Adriana was pregnant."

Was that something that Officer Trevino asked you to repeat?

THE INTERPRETER:  The interpreter would like to know --

MS. ROSEN:  Sorry.  So we're right at the bottom of the second paragraph.

Q  "Arturo states before February he heard others in the house state Adriana was pregnant."

13:07:36
13:07:41
13:07:44
13:07:44
13:27:46
13:27:46
13:27:50
13:27:57
13:28:05
13:28:05
13:28:10
13:28:14
13:28:19
13:28:30
13:28:34
13:28:38
13:28:40
13:28:43
13:28:51
13:28:55
13:28:57
13:28:59
13:29:02
13:29:06

Is that something that Officer Trevino asked you to repeat?

A   I don't know.

Q   Why don't you know?

A   Because I don't remember what I repeated, if I said something close to that or that.

Q   Well, was it that or something close to that?

A   I don't know.

Q   Because you don't remember?

A   That's correct.

Q   Had you heard in the house that Adriana was pregnant?

A   No.

Q   So before you took the little boy to the police station with Rosauro and Gabriel Solache, you didn't know Adriana was pregnant?

MR. SWAMINATHAN:   Objection; asked and answered on Tuesday.

Go ahead.

A   I don't remember if he said to me that she was pregnant, but from what I could see, it looked like -- I mean, she looked like a pregnant woman.

Q   Okay.  The statement says, "Arturo states that on February 27th, Adriana said, 'I need you

to help me get a baby.'"

Was that something that Officer Trevino asked you to repeat?

A   I don't know.

Q   Why not?

A   I don't remember if he asked me to repeat that or if he himself said it.

Q   He himself said it to who?

A   O'Malley.

Q   Well, if he said it to O'Malley, he wouldn't have understood; right?

A   That's correct.

Q   But you don't remember if that was one of the things that Trevino asked you to repeat?

A   I don't remember.

Q   Do you remember anything that Officer Trevino asked you to repeat?

A   No.

Q   How come you were remembering before we took the break and now you don't remember?

MR. SWAMINATHAN:   Objection; argumentative.

Go ahead.

A   Trevino asked me where I lived, my date of birth, things like that.  I answered to that.

Then I did not know what to say.  That's when he started giving me examples.

Q  But as you sit here today, you're saying you don't remember any examples that Trevino asked you to repeat?

A  I don't remember any of the examples that you're asking me.

Q  You remembered some examples when you testified at your postconviction proceedings, didn't you?

A  It is possible.

Q  And the postconviction proceeding was in February of 2013; right?

A  I believe so.

Q  When is the last time you read your postconviction proceeding testimony?

THE INTERPRETER:  The interpreter needs to clarify.

A  Yes.  In this past days.

Q  And do you remember reading in the postconviction proceeding the testimony you gave about some of the examples that Officer Trevino gave you that you repeated?

A  I don't remember.

Q   The statement says, "Arturo states Adriana offered him $600 and gave him $200 on that day."

Was that something that Officer Trevino asked you to repeat?

A   I don't remember if that is.

Q   So you don't remember whether that was one of the things that Officer Trevino asked you to repeat?

A   That's correct.

Q   How long did you spend speaking with Officer Trevino and State's Attorney O'Malley?

A   The time I don't know.  What I know is that it was a while.

Q   And your attorneys for the postconviction proceeding were David Sanders and Andrew Val; right?

A   Yes.

Q   Do you remember your lawyer, Mr. Sanders asking you at the postconviction proceeding, "Did Adriana Mejia offer you $600 to steal a baby?

"Answer:  No.

"Question:  Did you tell that to the police?

"Answer:  Yes."

Do you recall giving that testimony in

February of 2013 regarding whether or not you told the police that Adriana offered you $600 to steal a baby?

MR. SWAMINATHAN: Objection to form.

A I don't -- I don't remember. The only thing I remember is what I saw what happened on those records.

Q What do you mean what you saw?

A What I saw in those papers.

Q The statement says, "Arturo states Adriana stated she wanted him to help her take the baby from a lady's house."

Is that something that Officer Trevino asked you to repeat?

A I don't know.

Q The statement reads, "Arturo states he remembers that date because Adriana gave him $200 that day."

Is that something that you said to Officer Trevino -- I mean, is that something that Officer Trevino asked you to repeat?

A I don't know.

Q "Arturo states that this happened in the living room of the house at 6234 South Mozart."

Is that something that Officer Trevino asked you to repeat?

A   I don't know.

Q   "Arturo states that he understood this to mean he was supposed to help Adriana steal a baby from a lady."

Is this something that Officer Trevino, according to you, asked you to repeat?

A   I don't know.

Q   The statement says, "Arturo states he knew that Adriana wasn't really pregnant."

Is that something that you claim Officer Trevino asked you to repeat?

A   I don't know.

Q   The statement says, "Arturo states that three days later Adriana gave him the rest of the $600."

Is that something that you claim Officer Trevino asked you to repeat?

A   I don't know.

Q   The statement reads, "Arturo states before Adriana gave him the $400, she said, quote, 'Are you really going to help me with this,' end quote, and Arturo said yes, so Adriana gave him the $400."

Transcript of Arturo DeLeon-Reyes, Volume 2
Conducted on February 27, 2020                    252

Is this something you claim Officer Trevino asked you to repeat?

A  I don't know.

Q  The statement reads, "Arturo states he said to Adriana, quote, 'Why are you giving me so much money for such a simple task,' end quote, and Adriana said it was so that Arturo wouldn't say anything to her husband."

Is this something you claim Officer Trevino asked you to repeat?

A  I don't know.

Q  On the second page of your statement you have initialled it in various places; right?

A  That is correct.

Q  And why did you put your initials in the places that you put your initials?

A  Detective Trevino asked me to also put them there, rushing me.

Q  When you say "rushing me," what do you mean?

A  He would say to me, "Place them here, place them here, place them there."

Q  Did you -- go ahead.

A  But it seemed like he was in a rush.

Q  Did you ask him to slow down?

A   I don't remember if I said that to him or not.

Q   Did you ask him what you were signing?

A   I don't remember if I asked him that.  I don't remember that but what I do remember is he said to me that in order for him to help me, I had to sign those papers, and I signed them, and I put my initials where he told me to do so.

Q   Did you ask him how he was going to help you?

A   I don't remember.  But what I understood, by saying that to me, he was going to investigate everything.  The truth was going to come out, and I was going to go home, go back to my family.

Q   But you didn't ask him how he was going to do that; right?

A   I don't remember.

MR. SWAMINATHAN:  Before you ask the next question -- (speaking Spanish.)

Would you make sure he's fine.

Q   I'm moving to page 3 of the statement.  At the top of the page the statement reads, "Arturo states that he didn't talk to Adriana about this again until Thursday, March 26th."

Is that something that Officer Trevino

asked you to repeat?

A   I don't know.

Q   The statement reads, "Arturo states that on that day Adriana asked him if he was still going to help her and he said yes."

Did -- is that something Officer Trevino asked you to repeat?

A   I don't know.

Q   The statement says, "Adriana states" -- I'm sorry -- let me start over.

The statement reads, "Arturo states Adriana said, "Well, be ready tomorrow."

Is that something Officer Trevino asked you to repeat?

A   I don't know.

Q   The statement reads, "Arturo states Adriana told them they would meet Friday after midnight."

Is that something Officer Trevino asked you to repeat?

A   I don't know.

Q   "Arturo states" --

MR. SWAMINATHAN:  At the end of this paragraph I'm going to take a quick break just to see that he's doing fine.  I'll indicate for the

record he indicated to me on a break that he was      13:49:21

drowsy.  I would like to talk to him after this       13:49:27

session, see where he's at.                           13:49:30

    MS. ROSEN:  So after what?  Where do you    13:49:30

want me to break?                                     13:49:30

    MR. SWAMINATHAN:  You can finish this      13:49:31

paragraph.                                            13:49:32

Q  Arturo states that before -- the statement         13:49:35

reads, "Arturo states that before Thursday,           13:49:37

March 26th, he had seen Adriana talking to Gabriel    13:49:40

on the side, and he knew Gabriel would be             13:49:46

involved, too."                                       13:49:48

    Is that something Officer Trevino asked     13:49:49

you to repeat?                                        13:49:51

A  I don't know.                                      13:49:52

    MR. SWAMINATHAN:  Okay.  I mean -- off the  13:50:16

record.                                               13:50:23

    THE VIDEOGRAPHER:  We are going off the     13:50:23

record.  The time is 12:49 p.m.                       13:50:25

    (A recess was taken from 1:49 p.m. to      13:50:25

1:53 p.m.)                                            13:53:03

    MS. ROSEN:  Let's go back on the record     13:53:03

for a second without the witness.                     13:53:08

    THE VIDEOGRAPHER:  We are back on the       13:53:15

record.  The time is --

MR. SWAMINATHAN:  You don't need to go on right now.  It's fine.  We're just making a record.

MS. ROSEN:  We're just making a record, you're good.

And then do you want to just say whatever you want to say?

MR. SWAMINATHAN:  Yeah.  We have asked to take a lunch break.  Our client has indicated that he is feeling hungry and he's feeling extremely tired.  So we're going to go get some lunch, get him some coffee and hopefully he'll be fine.

MS. ROSEN:  How much are you proposing to take for lunch?

MR. SWAMINATHAN:  I think 45 minutes.

MS. ROSEN:  45 minutes, okay.  And I just want to state on behalf of the defendant that I am becoming increasingly concerned that we're not going to have enough days left to get our 22 hours in based on how much progress we've made as of 1:00 on Day 2.

We're obviously going to do our best, but I just want to say that and put that out there now.  I know the plaintiffs have offered to stay

as late as it takes today -- plaintiff's counsel       13:54:20
has offered to stay as late as it takes today, but       13:54:23
we do have a court reporter in Chicago, a single       13:54:26
court reporter, and at some point she's not going       13:54:29
to be able to stay and keep court reporting.  So       13:54:31
we're just going to have make the best of it.       13:54:35

    With that we'll take a 45-minute lunch break.       13:54:48

    THE VIDEOGRAPHER:  We are going off the       13:54:48
record 12:53 p.m.       13:54:52

    (A recess was taken from 1:53 p.m. to       13:54:52
2:54 p.m.)       14:55:18

    THE VIDEOGRAPHER:  Here begins Media No. 4 in       14:55:18
the deposition of Arturo DeLeon-Reyes.  We're back       14:55:22
on the record at 1:54 p.m.       14:55:28

    MS. ROSEN:  At the lunch break I asked the       14:55:36
court reporter to tally up all the time so that       14:55:38
we'd know precisely how much time we have in, and       14:55:42
as of right now we have 9 hours and 4 minutes on       14:55:46
the record.  And defendants again reiterate the       14:55:50
concern that they're not going to have an       14:55:52
opportunity to complete the 22 hours that the       14:55:54
Court has ordered that we're entitled.  I mean,       14:55:58
the fact that plaintiffs asked for 45 minutes for       14:56:03
lunch and took over an hour, again, is part of the       14:56:06

problem.  So we'll do what we can to get this done.

MR. SWAMINATHAN:  We've indicated we are prepared to go as late as needed today, but let's see how we're going.

BY MS. ROSEN:

Q  Mr. Reyes, when you testified earlier today that Officer Trevino gave you examples and you repeated them but that you can't remember any of the examples that he gave you, were the examples that he gave you related to your participation in the murder -- murders and kidnapping?

A  Yes.  And I would also like to explain why I don't remember.

Q  Okay.  Well, we'll get to that.  But first, I want to understand what it is that you were given examples of to repeat.

So the examples that Mr. Trevino, Officer Trevino gave you were examples that had you participating in the murder of Mr. and Mrs. Soto; correct?

A  Yes.

Q  And the examples that he gave you were examples that had you participating in the kidnapping of Santiago Soto; correct?

A   Yes.

Q   And the examples that he gave you were examples that had you participating in the kidnapping of Maria Soto; correct?

A   Yes.

Q   And you knew that when you were agreeing to repeat these examples that State's Attorney O'Malley was writing those things down; right?

MR. SWAMINATHAN:  Objection to foundation based on the prior testimony.

A   I was not in agreement.  I didn't agree to repeat them.

Q   So you didn't repeat the words that Officer Trevino asked you to repeat?

A   Sometimes I would repeat them.  Sometimes I would repeat something similar.  Sometimes I would go uh-huh.  Sometimes I would say nothing.

Q   But you knew that when you were repeating the words or when you were saying uh-huh that State's Attorney O'Malley was writing down what you were saying; right?

MR. SWAMINATHAN:  Objection; asked and answered, improper in light of his prior testimony.

Go ahead.

Transcript of Arturo DeLeon-Reyes, Volume 2
Conducted on February 27, 2020                    260

A   I saw that he was writing something.

Q   What did you think he was writing?

A   Well, I think it was what Trevino was telling him to write.

Q   And what Trevino was asking you to repeat?

A   Yes, sometimes I would repeat it.  Sometimes I would say something similar.

Q   Right.  So if Officer Trevino said, "Oh, and Arturo, you stabbed Mariano Soto 50 times" and you repeated that, what did you think State's Attorney O'Malley was writing down?

THE INTERPRETER:  I'm sorry; could you repeat the last part?

MS. ROSEN:  Can you read back my question, Ms. Court Reporter, please.

(Pending question read.)

MR. SWAMINATHAN:  Objection to form; mischaracterizes prior testimony, asked and answered.

Go ahead.

A   At that time I don't remember if I thought anything.  The only thing that I do remember, that I saw him writing something.

Q   And you -- you told us earlier that Officer Trevino told you that he was going to help

15:00:54
15:00:56
15:00:58
15:01:10
15:01:11
15:01:17
15:01:23
15:01:25
15:01:28
15:01:35
15:01:39
15:01:39
15:01:39
15:01:39
15:01:39
15:02:39
15:02:39
15:02:41
15:02:47
15:02:48
15:02:55
15:03:02
15:03:06
15:03:10

Transcript of Arturo DeLeon-Reyes, Volume 2
Conducted on February 27, 2020                        261

you; right?                                           15:03:15

    A   Yes.                                           15:03:16

    Q   And you explained that what you expected       15:03:23
was that he was going to do more investigation,        15:03:26
and that's how he was going to help you?               15:03:29

        MR. SWAMINATHAN:  Objection to form;           15:03:37
mischaracterizes his prior testimony.                  15:03:39

    A   Yes.                                           15:03:40

    Q   So how did you think Officer Trevino was        15:03:44
going to help you when he was asking you to say         15:03:50
things that made you participating in the murders       15:03:54
and kidnappings?                                        15:03:58

    A   That he was going to investigate things,        15:04:00
and the truth was going to come out.  Because           15:04:21
everything I was repeating, all the examples I was      15:04:29
giving, all of that is false.  Everything here in       15:04:34
this piece of paper, that came -- that came from        15:04:41
words from Trevino.                                     15:04:46

    Q   That you, some of them, repeated; right?        15:04:49

        MR. SWAMINATHAN:  Objection; asked and          15:04:56
answered.                                               15:04:57

        Go ahead.                                       15:04:57

    Q   So you were admitting to doing things that      15:05:03
today you're saying you didn't do; right?              15:05:08

MR. SWAMINATHAN:  Objection to form.      15:05:10

A  I'm not admitting.  I'm just saying that I   15:05:16
don't know.      15:05:20

Q  No, you were admitting to Trevino -- when   15:05:20
he was asking you to repeat these things, you were   15:05:25
admitting to Trevino?      15:05:28

MR. SWAMINATHAN:  Objection to form.      15:05:36

A  No.  I was repeating what Trevino was asking   15:05:38
me to repeat.  I would repeat the same thing.   15:05:49
Sometimes I would say something similar.  Sometimes   15:05:53
I would say nothing.  Sometimes I would just say   15:05:57
uh-huh.      15:06:00

Q  I understand.  You've said that now like   15:06:01
five times that those were the different things   15:06:05
that you said.  I have a different question, though.   15:06:08

The question I have is, when you were --   15:06:13
when you were repeating what you were repeating,   15:06:16
you were repeating to doing things that had you   15:06:19
being a participant in the murder.  Why did you   15:06:23
do that?      15:06:26

A  So they wouldn't put me back in the room   15:06:26
where I was, so Guevara would not continue   15:06:46
mistreating me, slapping me.  That Detective   15:06:57
Guevara was growing angrier.  He was getting more   15:07:02

angry. He would raise his voice. He would hit me harder every time I would say the word no.

That's the reason. I felt that I had no other alternative, that I had no -- that I had no other option.

Q So you agreed to repeat the things that Trevino asked you to repeat because you were afraid of Guevara? That's what you're saying today?

MR. SWAMINATHAN: Objection to form and mischaracterizes his testimony.

Go ahead.

A Yes.

Q At your criminal trial, right, you didn't -- you didn't say that you repeated things that Trevino said to you; right?

A I don't remember.

Q Going to back to your statement, Exhibit 7, we're at page 3. Then going to the paragraph -- second paragraph that begins, "Arturo states that on Thursday," the statement reads, "Arturo states that on Thursday, March 26, Adriana told him she had found a friend that had a very pretty baby."

Was this one of the examples that Trevino asked you to repeat?

A  I don't know but I would like to explain it.     15:09:16

MR. SWAMINATHAN:  Go ahead.     15:09:24

MS. ROSEN:  I have a question and he is     15:09:25
supposed to answer the question.  You're not going     15:09:27
to ask him questions.     15:09:30

MR. SWAMINATHAN:  What I don't understand     15:09:31
is what -- okay.  That's fair.  Are you done with     15:09:33
your answer?     15:09:36

MS. ROSEN:  Can we read back his --     15:09:40
Ms. Court Reporter, read back what he said.     15:09:43

(The reporter read the answer as follows:     15:09:43
"I don't know but I would like to explain it.")     15:09:53

MR. SWAMINATHAN:  He has the right to     15:09:53
explain it.  He's asking you does he have a right     15:09:54
to explain it.  I think the answer is he does have     15:09:57
a right to finish his answer.     15:09:59

MS. ROSEN:  That's not a finish to the     15:10:00
answer.  He said he wanted to explain it, and I     15:10:01
said I would get back to it.  And I will get back     15:10:02
to his explanation when I want to get back to his     15:10:03
explanation.     15:10:06

MR. SWAMINATHAN:  Then let me ask him this.     15:10:06

Are you -- have you completed your answer,     15:10:09
or is there more you wanted to say in answer to     15:10:10

that question?

MS. ROSEN:  That is totally improper.

MR. SWAMINATHAN:  No, it's not.

THE WITNESS:  I have not -- I'm not done with the answer.

MR. SWAMINATHAN:  Okay.  Please go ahead.

MS. ROSEN:  Okay.  I am going to ask you -- I am going to ask you not to ask questions during my questioning.  If you want to rehabilitate him, you have the opportunity to do that.  His desire to explain, which is a nonexplanation to my question, which is, "Did you or did you not say this thing" -- I know he wants to explain it, and we'll get to it when I'm ready to get to it.

MR. SWAMINATHAN:  No.  He -- when he said that, he was asking for permission to continue his answer, and I wanted to make clear it was fair.  It's a little ambiguous, so I asked him, "Was there more you wanted to say?  Had you completed your answer?"  And he said no, he had not completed his answer.  And it is clear you said at the very beginning of this deposition he does have a right to complete his answer, and he said that's what he wants to do.  He's going to do it.

15:10:13
15:10:14
15:10:15
15:10:19
15:10:21
15:10:21
15:10:26
15:10:27
15:10:29
15:10:34
15:10:38
15:10:40
15:10:42
15:10:47
15:10:50
15:10:52
15:10:54
15:10:57
15:11:01
15:11:02
15:11:04
15:11:05
15:11:06
15:11:09

MS. ROSEN: It's not a complete answer to the question of yes or no. And I'm going to ask you to stop interjecting and trying to fix things in this deposition. It's my deposition. I get to ask the questions when I want to ask the question.

MR. SWAMINATHAN: Okay. Understood. He has indicated that he's not completed his answer.

You have a right to complete your answer. Go ahead.

THE WITNESS: I would like to explain why, that part.

MR. SWAMINATHAN: Go ahead.

A (Continuing.) Sometimes I would repeat the exact same thing. Sometimes I would repeat something similar. Sometimes I was saying nothing. Sometimes I would just go uh-huh. But those words are Trevino's.

Q Are you finished with your answer?

A Yes.

Q The statement continues, "Arturo states that after Adriana told him that she had a friend with a very pretty baby, she then told -- asked Arturo if he was still going to help her, and Arturo told her yes."

Was that something that Officer Trevino asked you to repeat?

A  I don't remember because sometimes like he would say something --

THE INTERPRETER:  Interpreter will clarify who said what.

A  (Continuing.)  I don't remember because sometimes I would say something similar.  Sometimes I would say the same, I would repeat the same thing, or I would simply go uh-huh.

Q  Are you finished with your answer?

A  Yes.

Q  The statement continues, "Arturo states he understood that to mean he was going to help Adriana steal a baby."

Is that something that Trevino asked you to repeat?

A  I don't know.  Sometimes I would repeat the same thing.  Sometimes I would repeat something similar.  Sometimes I would say uh-huh, and sometimes I would say nothing.

Q  Arturo states -- the statement continues, "Arturo states that very early in the morning on Saturday, March 28th, around 1:30 a.m. Gabriel

picked him up behind the house on Mozart."

Is that something that Officer Trevino asked you to repeat?

A  I don't know because sometimes I would repeat the same thing; sometimes something similar; sometimes only uh-huh, and sometimes I would say nothing.

Q  The statement goes on to state, "Arturo states that Adriana had told him to be ready around that time.  Arturo states he knew Gabriel was involved."

Is that something that Officer Trevino asked you to repeat?

A  I don't know because sometimes I would repeat the same thing.  Sometimes I would repeat something similar.  Sometimes I would just say uh-huh, and sometimes I would say nothing.

Q  The statement goes on to say, "Arturo states Gabriel pulled up, whistled, and so Arturo got in the car with him."

Is that something that Officer Trevino asked you to repeat?

A  I don't know because sometimes I would repeat the same thing.  Sometimes I would repeat

15:14:49
15:14:53
15:14:54
15:15:12
15:15:14
15:15:22
15:15:25
15:15:27
15:15:34
15:15:37
15:15:42
15:15:42
15:15:44
15:16:00
15:16:12
15:16:15
15:16:17
15:16:20
15:16:35
15:16:40
15:16:42
15:16:46
15:16:47
15:17:10

something similar.  Sometimes I would just say
uh-huh, and sometimes I would say nothing.

Q  On page 3 of this document did you initial
in various places on the document?

A  Yes.

Q  And did you sign the bottom of the document?

A  Yes.

Q  And if we go to the next page, did you
make initials on the next page?

A  Yes.

Q  And did you sign the bottom of the page?

A  Yes.

Q  And then on the following page, which I
believe is page 5 of your statement, do your
initials appear throughout the document?

A  May I just take a moment just to make sure
that I'm on the same page?

Q  Yeah.  It's 298 at the bottom.  So do your
initials appear on that page?

A  Yes.

Q  Is that your signature at the bottom?

A  Yes.

Q  And then on the next page, 299, do your
initials appear on that page?

A   Yes.

Q   And your signature at the bottom?

A   Yes.

Q   And then on the next page, 300, is your signature at the bottom of that document?

A   Yes.

Q   And if I were to go through each and every page of this document and ask you line by line if Officer Trevino asked you to repeat that thing, would your answer be you don't know because sometimes you repeated the same thing, sometimes you repeated similar things, sometimes you said uh-huh, and sometimes you said nothing?

A   That is correct.

Q   Okay.  We're done with the statement for right now.

You did understand when Officer Trevino was talking to you and when he was asking you to repeat the things he was asking you to repeat that he was asking you to repeat that you stabbed people; correct?

MR. SWAMINATHAN:  Objection; asked and answered.

A   I don't know.  Sometimes I would repeat

the same thing; sometimes something similar;     15:21:38

sometimes I would just uh-huh; sometimes I would     15:21:43

say nothing.     15:21:46

    Q   So as you sit here today, you don't remember     15:21:49

at all the topic of the discussion you were having     15:21:51

with Officer Trevino?     15:21:57

    MR. SWAMINATHAN:   Objection -- go ahead.     15:22:06

    A   I don't remember because it has been a     15:22:10

long time.     15:22:13

    Q   Is it possible you were talking about a     15:22:15

football game?     15:22:20

    A   It is possible but I do not remember.     15:22:21

    Q   Is it possible you were talking about how     15:22:31

you got to the United States?     15:22:38

    A   I don't know.   I don't remember.     15:22:44

    Q   All right.   Why don't we talk a little bit     15:22:49

about when you first noticed the little boy in the     15:23:10

house on Mozart.     15:23:15

    When did you first notice that there was a     15:23:17

little boy in the house?     15:23:20

    A   It was a Sunday morning.   I don't know if     15:23:23

I was on my way to the bathroom or to the kitchen,     15:23:51

but when I went through the living room, there was     15:23:58

a little one.   He was sleeping on the floor.   He     15:24:02

Transcript of Arturo DeLeon-Reyes, Volume 2
Conducted on February 27, 2020                    272

did not have a pillow; he did not have a blanket. It sounds ugly what I'm going to say, but he was sleeping like a puppy.

I felt bad about it, that I was sleeping in a bed, and the rest of people that were sleeping comfortably when that little one was sleeping on the floor. I don't believe that is fair.

That is the first time that I met him, the first time I saw him.

Q So this was a Sunday morning, you said?

A Yes.

Q And up until that point in time, did you see a baby in the house?

A I saw him? No.

Q Did you hear a baby in the house?

A I believe so. I don't remember.

Q When do you first remember hearing the baby in the house?

A After Sunday. I don't remember the date.

Q So on Saturday you don't remember Adriana with an infant, a baby in the house?

THE INTERPRETER: Oh, sorry.

A Could you repeat the question because of this interruption.

Q   Sure.  Do you recall seeing Adriana with a baby, an infant on Saturday?

A   Not Adriana.  The one I saw was Guadalupe.

Q   And when did you see Guadalupe with a baby?

A   It was Saturday morning when she was coming to the house.  She had a bundle but it was covered with a baby blanket.

Q   Where did you see Guadalupe with a bundle?

A   When she came into the house where I was renting.  She came with Adriana and Rosauro.

Q   Did you see a little boy with them?

A   No.  I only saw the three of them and what Guadalupe had in her arms.

Q   Did you say you saw them as they were coming into the house?  Or did you see them outside on the porch?

MR. SWAMINATHAN:  Objection to form.

A   I saw them outside and later they came into the house.

Q   How long did you see them outside?

A   I think for a short time.

Q   Where were you when you saw Guadalupe, and Adriana, and Rosauro outside?

A   I was in my room that is in front, in the

15:26:33
15:26:37
15:26:48
15:26:54
15:27:03
15:27:08
15:27:18
15:27:21
15:27:30
15:27:33
15:27:47
15:27:51
15:28:02
15:28:05
15:28:07
15:28:09
15:28:12
15:28:13
15:28:23
15:28:28
15:28:32
15:28:39
15:28:44
15:28:50

front part of the house.  I heard noises on the     15:29:00

street, and I looked out, and that's when I saw     15:29:04

them.  That's when I saw them on the street.     15:29:10

Q  Were they in a car or were they just walking?     15:29:15

A  When I looked out the window, they were     15:29:18

getting out of a car.     15:29:27

Q  Did you recognize the car?     15:29:32

A  Yes.     15:29:34

Q  Whose car did you recognize it to be?     15:29:43

A  From what I knew, it was Rosauro's.     15:29:53

Q  When you looked and you saw the car, were     15:30:00

the people still in the car?     15:30:03

A  When I first looked out, yes.  But then     15:30:13

they were getting out of the car.     15:30:17

Q  Did you see who was driving the car?     15:30:19

A  Yes.     15:30:27

Q  Who?     15:30:28

A  Rosauro.     15:30:28

Q  Did you see where Adriana had been sitting     15:30:32

in the car?     15:30:34

A  Yes.     15:30:34

Q  Where?     15:30:35

A  It was in the -- next to Rosauro in the     15:30:41

front of the car.     15:30:51

Q  Adriana was?          15:30:52

A  Yes.          15:30:53

Q  And did you see where Guadalupe was sitting?          15:30:54

A  Yes.          15:30:59

Q  Where?          15:31:00

A  In the back part.          15:31:02

Q  And you said that you didn't see the little boy?          15:31:08 15:31:12

A  No.          15:31:13

Q  Did you know that Guadalupe had children?          15:31:15

A  Yes.          15:31:21

Q  And did you see any of Guadalupe's children in the car?          15:31:22 15:31:26

A  No.          15:31:27

Q  Did you know how many -- do you know how many children Guadalupe had at that time?          15:31:31 15:31:35

A  I think she had two but I'm not sure.          15:31:37

Q  And then did you watch as they all got out of the car and started coming into the house?          15:31:50 15:31:57

A  Yes.          15:31:59

Q  And where is the door, the entry door from the outside in relation to your room?          15:32:02 15:32:08

A  If the house is facing towards -- I mean facing to the front.  The door is to -- this way.          15:32:14 15:32:21

Transcript of Arturo DeLeon-Reyes, Volume 2
Conducted on February 27, 2020                          276

Q   When you say "this way," do you mean to 15:32:27
your right if you're facing the front of the house? 15:32:31

A   That's correct. 15:32:35

Q   At some point do you lose sight of them as 15:32:38
they're coming around the house to come inside? 15:32:44

A   Yes.  But someone knocked on the door.  I 15:32:47
opened it and they came inside. 15:33:02

Q   So they knocked on the door? 15:33:07

A   Yes. 15:33:09

Q   Do you know who knocked on the door? 15:33:10

A   No. 15:33:13

Q   And so when you opened the door, what did 15:33:17
you see? 15:33:23

A   The three of them came inside the house. 15:33:23
I do not remember who came in first. 15:33:31

Q   Did you speak with them at all? 15:33:34

A   No. 15:33:36

Q   You didn't even say hello? 15:33:38

A   I don't remember.  What I do remember is 15:33:44
that they didn't say anything to me.  They were 15:33:51
quiet. 15:33:54

Q   Did they say hello? 15:33:56

A   Not that I remember. 15:33:57

Q   Then what happened? 15:34:02

A   They came into the house.  After they came in, I went back to my room.

Q   Do you know where they went?

A   No.  The only thing I remember is that they came into the house, and I went back to my room.

Q   Do you recall seeing Guadalupe again that day with the -- the bundle?

A   Not that I remember.

Q   How about Adriana?  Do you remember seeing her again that day?

A   No.

Q   And Rosauro, do you recall seeing him again that day?

A   Yes.

Q   Where did you see Rosauro?

A   After a while, I went to my job.  When I was getting out of the house, Rosauro was outside. He was washing the gray car.  He had the car mats outside.  And Rosauro was speaking -- was talking with his brother Jorge.

Q   What time did you leave for work that day?

A   The truth is I do not remember the time, but I do remember that it was in the morning.

Q   Did you have a regular time that you would

15:34:04
15:34:12
15:34:21
15:34:23
15:34:36
15:34:41
15:34:44
15:34:48
15:34:55
15:34:59
15:35:00
15:35:03
15:35:08
15:35:10
15:35:10
15:35:17
15:35:25
15:35:32
15:35:46
15:35:51
15:35:57
15:36:02
15:36:14
15:36:16

Transcript of Arturo DeLeon-Reyes, Volume 2
Conducted on February 27, 2020                    278

leave for work in March of 1998?

A   I had my routine to more or less go to work.  The time I don't remember.

Q   Did you speak with Rosauro at all when you saw him outside washing this car?

A   I didn't speak.

Q   Did you speak with Jorge?

A   No.

Q   Did you typically get picked up from work -- did you typically get picked up for work in front of your house?

A   Typically, yes.

Q   And then when you returned home from work that day, do you recall seeing or speaking with Rosauro?

A   No.

Q   When you returned from work that night -- this is Saturday night -- do you recall speaking or seeing Adriana -- speaking with or seeing Adriana?

A   No.

Q   How about Guadalupe?  Do you recall seeing or speaking with Guadalupe when you returned from work on Saturday?

A   No.

Q   Did you know that -- or learn that the
bundle that Guadalupe had was a baby?

A   I believe so because it was wrapped up
with a baby blanket.

Q   Did you ever see the baby's face?

A   No.

Q   Did you ever see the little boy that day?

A   Are you talking about Saturday?

Q   Yes.

A   No.

Q   Okay.  So the first time that you saw the
little boy was Sunday morning when you saw him
sleeping on the floor?

A   Yes.

Q   And so when you saw the little boy sleeping
on the floor, what, if anything, did you do?

A   I don't remember.

Q   And you said you saw the little boy in the
living room?

A   Yes.

Q   Was there anybody else there in that room?

A   Yes.  Carlos was there.  Adriana's brother
was sleeping on one of the sofas.

Q   Do you recall what time it was that you

15:38:31
15:38:37
15:38:40
15:39:01
15:39:04
15:39:06
15:39:09
15:39:15
15:39:23
15:39:23
15:39:25
15:39:28
15:39:31
15:39:32
15:39:40
15:39:44
15:39:48
15:39:55
15:40:02
15:40:03
15:40:05
15:40:12
15:40:26
15:40:34

saw the little boy sleeping on the floor?    15:40:35

A  I don't remember the time, but the one thing I remember is it was early.    15:40:38 / 15:40:53

Q  When you say "early," what do you mean?    15:40:56

A  I want to say -- I mean to say that the sol was just coming up.    15:41:05 / 15:41:09

Q  The sun?    15:41:10

THE INTERPRETER:  The sun?    15:41:18

MS. ROSEN:  You said sol.    15:41:18

THE INTERPRETER:  Did I?    15:41:19

MS. ROSEN:  Yes.    15:41:19

THE INTERPRETER:  The sun; sorry.    15:41:20

Q  Did you go to work that day?    15:41:38

A  I don't remember.    15:41:46

Q  Do you recall anything else happening that day, Sunday?    15:41:48 / 15:41:53

A  No.    15:41:54

Q  What about the next day, Monday?  Do you recall anything happening on Monday?    15:42:05 / 15:42:08

A  Yes.    15:42:09

Q  What do you recall happening?    15:42:16

A  I recall that I woke up like every day to get ready to go to work.  Suddenly Adriana came out of her room.    15:42:17 / 15:42:34 / 15:43:03