

## Transcript of Arturo DeLeon-Reyes, Volume 3

**Date:** February 28, 2020
**Case:** DeLeon-Reyes & Solache -v- Guevara, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

ARTURO DeLEON-REYES,              :

              Plaintiff,    :

  v.                              :

REYNALDO GUEVARA, et al.          :

             Defendants.     :

------------------------   :  Case No. 1:18-cv-01028

GABRIEL SOLACHE,                  :

              Plaintiff,    :

  v.                              :

REYNALDO GUEVARA, et al,          :  Case No. 1:18-cv-2312

             Defendants.     :

Videotaped deposition of

ARTURO DeLEON-REYES, Volume 3

(First Portion)

Chicago, Illinois

Friday, February 28, 2020

10:04 a.m.

Job No.:  288458

Pages:  1 - 38

Reported by:  Theresa A. Vorkapic, CSR, RMR, CRR, RPR

Transcript of Arturo DeLeon-Reyes, Volume 3
Conducted on February 28, 2020                    2

Continued videotaped deposition of Arturo DeLeon-Reyes, via teleconference, (San Jose del Cabo, Mexico) held at the location of:


ROCK FUSCO & CONNELLY, LLC

321 North Clark Street

Suite 2200

Chicago, Illinois 60654

312-494-1000

(Court reporter location)


Pursuant to notice before Theresa A. Vorkapic, a Certified Shorthand Reporter, Registered Merit Reporter, Certified Realtime Reporter, Registered Professional Reporter and a Notary Public in and for the State of Illinois.

                    A P P E A R A N C E S

 ON BEHALF OF THE PLAINTIFF DeLEON-REYES:

        SEAN STARR, ESQUIRE

        ANAND SWAMINATHAN, ESQUIRE

        STEVEN ART, ESQUIRE

        LOEVY & LOEVY

        311 North Aberdeen Street

        3rd Floor

        Chicago, Illinois 60607

        312-243-5900

 ON BEHALF OF PLAINTIFF SOLACHE:

        JAN SUSLER, ESQUIRE

        JOHN STAINTHORP, ESQUIRE

        PEOPLE'S LAW OFFICE

        1180 North Milwaukee Avenue

        3rd Floor

        Chicago, Illinois 60642

 ON BEHALF OF DEFENDANT GUEVARA:

        THOMAS MORE LEINENWEBER, ESQUIRE

        LEINENWEBER BARONI & DAFFADA, LLC

        120 North LaSalle Street

        Suite 2000

        Chicago, Illinois 60602

        866-786-3705

Transcript of Arturo DeLeon-Reyes, Volume 3
Conducted on February 28, 2020                    4

A P P E A R A N C E S (Continued)

ON BEHALF OF DEFENDANTS DICKINSON,

RUTHERFORD, STANKUS, NAUJOKAS, HARVEY,

TREVINO, MINGEY, BIEBEL:

JOSH ENGQUIST, ESQUIRE

THE SOTOS LAW FIRM, PC

141 West Jackson

Suite 1240A

Chicago, Illinois 60604

630-735-3314

ON BEHALF OF DEFENDANTS WEHRLE, BRUALDI,

VARGA, O'MALLEY and COOK COUNTY:

EDWARD M. BRENER, ESQUIRE

RYAN GILLESPIE, ESQUIRE

COOK COUNTY STATE'S ATTORNEY'S OFFICE

500 Richard J. Daley Center

Chicago, Illinois 60602

312-603-5971

A P P E A R A N C E S (Continued)


   ON BEHALF OF DEFENDANT NAVARRO:

        EDWARD BURNS, ESQUIRE

        REITER BURNS, LLP

        311 South Wacker Drive

        Suite 5200

        Chicago, Illinois 60606

        312-982-0090

   ON BEHALF OF DEFENDANT CITY OF CHICAGO:

        EILEEN E. ROSEN, ESQUIRE

        CATHERINE M. BARBER, ESQUIRE

        ROCK FUSCO & CONNELLY, LLC

        321 North Clark Street

        Suite 2200

        Chicago, Illinois 60654

        312-494-1000


ALSO PRESENT:


   Isco Carillo, Videographer

   Adriana Trevino, Spanish Interpreter

   Valerie Barajas, Paralegal

Transcript of Arturo DeLeon-Reyes, Volume 3
Conducted on February 28, 2020                    6

C O N T E N T S

EXAMINATION OF ARTURO DeLEON REYES          PAGE

    Examination (Resumed) By Mr. Brener      9


E X H I B I T S

(None marked.)

Transcript of Arturo DeLeon-Reyes, Volume 3
Conducted on February 28, 2020                    7

P R O C E E D I N G S

THE VIDEOGRAPHER:  Okay.  Here begins
Video No. 1 in the video deposition of Arturo
DeLeon-Reyes in the matter of Arturo DeLeon-Reyes
versus Reynaldo Guevara, et al., Gabriel Solache
versus City of Chicago, in the United States
District Court for the Northern District of
Illinois, Eastern Division, Case No. 118-civ-1028
and 118-civ-2312.

Today's date is February 28, 2020.  The
time on the video monitor is 9:03 a.m.  The
videographer today is Isco Carillo on behalf of
Planet Depos.  This deposition is being taken
place at Hyatt Place Los Cabos, Paseo Malecon San
Jose 128, Zona Hotelera, San José del Cabo.

Will counsel please voice identify
themselves and state whom they represent.

MR. BRENER:  Edward Brener, B-r-e-n-e-r.
I represent the Cook County defendants with the
exception of David Navarro.

MR. GILLESPIE:  Ryan Gillespie,
G-i-l-l-e-s-p-i-e, also for the Cook County
defendants with the exception of David Navarro.

MR. BURNS:  Daniel Burns on behalf of

10:03:24
10:03:25
10:03:28
10:03:37
10:03:38
10:03:44
10:03:47
10:03:56
10:04:02
10:04:05
10:04:20
10:04:21
10:04:23
10:04:29
10:04:29
10:04:33
10:04:36
10:04:39
10:04:41
10:04:48

Transcript of Arturo DeLeon-Reyes, Volume 3
Conducted on February 28, 2020                    8

David Navarro.                                          10:04:51

MS. ROSEN:  Eileen Rosen on behalf of                  10:04:51
Defendant City of Chicago.                             10:04:53

MR. ENGQUIST:  Josh Engquist on behalf of              10:04:54
all the individual defendants officers with the        10:04:57
exception of Ray Guevara.                              10:04:58

MS. SUSLER:  Jan Susler on behalf of                   10:04:59
Plaintiff Gabriel Solache.                             10:05:08

MR. STARR: Sean Starr on behalf of                     
Plaintiff Arturo Reyes.                                

MS. BARAJAS:  Valerie Barajas on behalf of             
Plaintiff Reyes.                                       

MR. SWAMINATHAN:  Anand Swaminathan for                10:05:14
Plaintiff Reyes.                                       

MR. BRENER:  Before we start I should put              10:05:14
on the record that --                                  10:05:15

UNKNOWN SPEAKER:  People on the phone?                 

MR. ART: Steve Art for the plaintiff.                  10:05:22

MS. BARBER:  And Catherine Barber for                  10:05:23
Defendant City.                                        10:05:26

THE VIDEOGRAPHER:  The court reporter                  10:05:34
today is Theresa Vorkapic on behalf of Planet          10:05:35
Depos.                                                 10:05:39

Will the reporter please swear in the                  10:05:39

Transcript of Arturo DeLeon-Reyes, Volume 3
Conducted on February 28, 2020                    9

interpreter and the witness.

    MR. BRENER:  We can agree to stipulate to that like we did for the last two days.

    MR. SWAMINATHAN:  Agreed for Plaintiff Reyes.

    MR. BRENER: We can agree to agree to stipulate to the interpreters as well.

    MR. SWAMINATHAN:  Agreed for Plaintiff Reyes.

    ARTURO DeLEON-REYES, called as a witness herein, having been previously duly sworn and having testified through a Spanish interpreter, was examined and testified further as follows:

    EXAMINATION (Resumed)

BY MR. BRENER:

   Q  Very good.  Good morning, Mr. Reyes.  My name is Edward Brener.  I represent some of the prosecutors that you sued in this case.

    You understand that you've sued a prosecutor by the name of Tom O'Malley, yes?

   A  That's correct.

   Q  In your own words, can you describe why you chose to sue Mr. O'Malley?

10:05:42
10:05:46
10:05:48
10:05:53
10:05:53
10:05:56
10:05:56
10:05:57
10:06:02
10:06:02
10:06:03
10:06:03
10:06:06
10:06:09
10:06:23
10:06:32
10:06:35
10:06:39

Transcript of Arturo DeLeon-Reyes, Volume 3
Conducted on February 28, 2020

10

A  Mr. O'Malley was with Mr. Trevino when this treatment was carried out.

Q  Is that the entire reason?

MR. SWAMINATHAN:  Objection to form and calls for privileged information.

I'll allow him to answer the question. That might be as far as I let him go.

Go ahead.  Let me just say, Arturo, if you can answer that question without relying on communications with your counsel, you can answer the question.  If you cannot, I instruct you not to answer the question.  You can answer the question pursuant to my instruction.

BY THE WITNESS:

A  He's the one who wrote the papers that I signed at the end of all the circumstances.

BY MR. BRENER:

Q  When was the first time you encountered Mr. O'Malley?

A  The first time was when I was first persecuted strongly by the Defendant Guevara.

Q  Where was O'Malley at the time?

A  Which moment are you referring to?

(Simultaneous speakers)

10:06:42
10:07:10
10:07:13
10:07:21
10:07:24
10:07:25
10:07:27
10:07:29
10:07:46
10:07:48
10:07:50
10:07:59
10:08:08
10:08:21
10:08:29
10:08:30
10:08:34
10:08:35
10:08:37
10:08:42
10:08:59
10:09:02
10:09:05
10:09:18

MR. SWAMINATHAN:  Maybe we can have the interpreter clarify.

MR. BRENER:  Yeah, I'm sorry.  I missed that.

MR. SWAMINATHAN:  The answer to the last question I think indicated that it was after he had interacted with Guevara.  So maybe you can ask that first question again or we can have it read back.

MR. BRENER:  I'll ask the question again. I'll ask it a different way.

BY MR. BRENER:

Q  Did you first meet O'Malley after Guevara abused you?

A  That's correct.

Q  Was your first encounter with O'Malley when he and Trevino sat down with you to record your statement?

A  Yes.

Q  Do you know when O'Malley arrived at the police station?

MR. SWAMINATHAN:  Objection to form.

BY THE WITNESS:

A  No.

10:09:18
10:09:20
10:09:21
10:09:22
10:09:23
10:09:25
10:09:27
10:09:32
10:09:35
10:09:35
10:09:37
10:09:39
10:09:40
10:09:44
10:09:45
10:09:55
10:09:57
10:10:01
10:10:11
10:10:11
10:10:15
10:10:17
10:10:19
10:10:21

BY MR. BRENER:

Q   Do you know how O'Malley arrived to the police station?

A   No.

Q   Do you know where O'Malley was before he sat down with you and Trevino to regard your statement?

A   No.

Q   Do you know if O'Malley spoke to anyone at the police station before he sat down with you and Trevino to record your statement?

A   No.

Q   Do you know if O'Malley saw any documents not in your presence -- strike that question.

Do you know if O'Malley saw any documents before he sat down with you and Trevino to record your statement?

A   No.

Q   Was Detective Guevara in the room with you and Trevino at the time that O'Malley wrote your statement?

A   No, not that I remember.

Q   And yesterday you testified that you did not understand O'Malley because he only spoke

Transcript of Arturo DeLeon-Reyes, Volume 3
Conducted on February 28, 2020          13

English; that was right, correct?                    10:11:47

A  That's correct.                                   10:11:54

Q  So if O'Malley had told you in that room          10:11:57
with Trevino that he was writing out your            10:11:59
confession to the Soto murders and that he said      10:12:03
that to you in English, you would not have           10:12:06
understood, correct?                                 10:12:08

A  That's correct.                                   10:12:20

Q  If he told you he was writing out a               10:12:21
confession to your involvement in the kidnapping     10:12:23
of the Soto children, you also would not have        10:12:26
understood that, correct?                            10:12:28

A  That's correct.                                   10:12:37

Q  If he had asked you if you wanted to write        10:12:40
your statement out on paper and then review and      10:12:43
sign it, you wouldn't have understood that           10:12:45
question, would you?                                 10:12:47

A  That's correct.                                   10:12:59

Q  If he had asked you to describe your              10:13:04
involvement in the Soto murders and the kidnapping   10:13:06
of the Soto children, you would not have             10:13:09
understood that question?                            10:13:10

MR. SWAMINATHAN:  Objection to form.                 10:13:18

BY THE WITNESS:                                      10:13:20

Transcript of Arturo DeLeon-Reyes, Volume 3
Conducted on February 28, 2020                14

A    That's correct.                                                10:13:20

BY MR. BRENER:                                                     10:13:23

Q    If he had told you you had the right to                       10:13:23
remain silent, you would not have understood that,                 10:13:25
correct?                                                           10:13:28

A    Correct.                                                       10:13:33

Q    And if he told you that you had the right                     10:13:34
to speak with counsel, you would not have                          10:13:36
understood that, either, correct?                                  10:13:37

A    Correct.                                                       10:13:45

Q    And if he had warned you that anything he                     10:13:47
told you in that room could be used against you at                 10:13:49
your criminal trial, you wouldn't have understood                  10:13:52
that, either, correct?                                             10:13:54

A    Correct.                                                       10:13:55

Q    You wouldn't have understood any of those                     10:14:08
things unless Trevino accurately translated them                   10:14:10
into Spanish, correct?                                             10:14:14

A    Correct.                                                       10:14:22

Q    You testified yesterday that the first                        10:14:24
time you ever read the statement that you signed                   10:14:26
was when your attorney Mr. Verdune had it                          10:14:29
translated.                                                        10:14:32

    Do you remember giving that testimony?                         10:14:33

Transcript of Arturo DeLeon-Reyes, Volume 3
Conducted on February 28, 2020                    15

MR. SWAMINATHAN:  Sorry.  I need the translation there.

THE INTERPRETER:  Can you please repeat the question?

MR. BRENER:  Of course.  Of course I can.

BY MR. BRENER:

Q   Yesterday you told us that the first time you read your statement was when your attorney Tom Verdune had it translated into Spanish.

Do you remember giving that testimony?

A   That's correct.

Q   If O'Malley had read that statement to you in the room with Trevino, you would not have understood him reading that statement because it was in English, correct?

A   Yes, that's correct.

Q   You would have relied on Trevino to translate that statement to you into Spanish, right?

A   Yes.

Q   You don't know what O'Malley said to you in that room, do you?

A   No.

Q   Yesterday you testified to the manner in

Transcript of Arturo DeLeon-Reyes, Volume 3
Conducted on February 28, 2020

16

which Guevara abused you, and you said he slapped you on your face; you said he threatened to give you the electric chair.

Do you remember giving that testimony?

A  Yes, I recall that.

Q  Did any of that abuse take place in front of O'Malley?

A  No.

Q  Did O'Malley ever hit you?

A  No, never.

Q  Did O'Malley ever scream at you or raise his voice to you?

A  No.

Q  Did you ever try to tell O'Malley that you had been abused by police?

A  No.  Even if I had tried, he would not have understood me.

Q  After you gave your statement, Officer Trevino arrested you and then you were taken out of the room.

Do you remember giving that testimony?

A  Yes.

Q  After you were taken out of that room, did you see O'Malley again at the police station?

Transcript of Arturo DeLeon-Reyes, Volume 3
Conducted on February 28, 2020      17

A   No, no, and I don't think I saw him again.     10:18:17

Q   At all?     10:18:25

A   That I remember, no.     10:18:26

Q   Do you know what O'Malley did after Trevino arrested you?     10:18:33 10:18:36

MR. SWAMINATHAN:  Objection to form and foundation.     10:18:42 10:18:44

BY THE WITNESS:     10:18:51

A   I don't know.     10:18:52

BY MR. BRENER:     10:18:52

Q   You don't know who he talked to?     10:18:53

A   No.     10:18:55

Q   Do you know if he talked to anyone at all?     10:18:55

A   No.  The only thing I can say is that I was moved out of that room.     10:18:58 10:19:13

Q   By -- who moved you out of that room, by the way?     10:19:15 10:19:17

A   Trevino.     10:19:17

Q   By himself?     10:19:23

A   Yes.     10:19:27

Q   Is it fair to say you don't know anything O'Malley did at the police station that didn't take place in that room?     10:19:29 10:19:33 10:19:35

A   Can you repeat the question?     10:19:39

Q   Sure.  Is it fair to say you do not know what O'Malley did at the police station except what happened in the room where he wrote your statement?

A   That's correct.

Q   Do you know the name Karen Wehrle?

A   At this moment I don't remember.  I don't remember that name you just asked me about.

Q   So then you don't know if Wehrle is a man or a woman; is that correct?

A   That's correct.

Q   And you don't know if Wehrle was involved in your case at all, correct?

A   Yes.

Q   I'll represent to you that you have sued Karen Wehrle in this lawsuit.

Can you tell me why?  I'll clarify that question.  I'm not asking for anything that you've learned in conversations with your attorneys, but can you tell me why you've sued Karen Wehrle without relying on communications with your lawyers?

MR. SWAMINATHAN:  So Arturo, if you can answer that question based on -- I'm sorry, go

10:19:46
10:19:48
10:19:50
10:19:54
10:19:54
10:20:09
10:20:13
10:20:29
10:20:33
10:20:36
10:20:41
10:20:43
10:20:45
10:20:49
10:20:55
10:20:57
10:20:59
10:21:05
10:21:07
10:21:13
10:21:16
10:21:19
10:21:19
10:21:21

Transcript of Arturo DeLeon-Reyes, Volume 3
Conducted on February 28, 2020                    19

ahead.

BY THE WITNESS:                                    10:21:30

    A   Would you repeat the question?            10:21:30

BY MR. BRENER:                                     10:21:33

    Q   In your own words, without revealing       10:21:33
communications you've had with your attorneys, can 10:21:35
you explain to me why you've sued Karen Wehrle?    10:21:37

        MR. SWAMINATHAN:  And Arturo, if you can   10:21:48
answer the question without relying on             10:21:50
communications with counsel, but based on          10:21:52
documents you have reviewed or a trial or          10:21:55
otherwise, then you can answer the question.        10:22:00

BY THE WITNESS:                                    10:22:29

    A   To be able to answer your question, I       10:22:32
would need to remember exactly about that person.  10:22:33

BY MR. BRENER:                                     10:22:40

    Q   Remember what exactly about that person?   10:22:41

    A   The name.  The more information about that  10:22:46
person.                                            10:22:53

    Q   Let me give you some more information.      10:22:53

        I'll represent to you that Karen Wehrle    10:22:55
took the handwritten statement of Guadalupe Mejia. 10:22:57

        Does that refresh your recollection as to  10:23:18
why you've sued her?                               10:23:19

MR. SWAMINATHAN: I would ask if you're making a representation to him that you represent for clarity that it is a prosecutor you're referring to, but it's your question.

MR. BRENER: Sure. I think it was implied, but I can make that explicit.

BY MR. BRENER:

Q Karen Wehrle is a prosecutor who took the handwritten statement of Guadalupe Mejia.

Does that refresh your recollection as to why you've sued her?

MR. SWAMINATHAN: Arturo, you can answer the question if you're able to do so without relying on attorney's communications, but based on documents or testimony.

BY THE WITNESS:

A If I answer that question, I would reveal conversations that I had with my attorneys. I'm going to follow my attorney's advice.

BY MR. BRENER:

Q Do you know whether Guadalupe spoke English at the time of your arrest?

A I don't know.

Q Do you know whether Guadalupe was ever at

the police station?

A  To my knowledge, based on what I learned from the records, yes.

Q  Do you know when she was at the police station?

MR. SWAMINATHAN:  Objection to form.

BY THE WITNESS:

A  No.

BY MR. BRENER:

Q  Did you ever see her at the police station?

A  I don't remember whether or not I got to see her.

Q  Did you ever talk to her at the police station?

A  No.

Q  With the exception of Karen Wehrle, do you know who was present for Guadalupe's statement?

A  No.

Q  Do you know the contents of Guadalupe's statement?

A  The contents I don't remember.  I remember seeing her and something throughout the process.

Q  Are you finished?

Transcript of Arturo DeLeon-Reyes, Volume 3
Conducted on February 28, 2020                    22

A   Yes.                                          10:27:26

Q   Do you know whether Karen Wehrle used a       10:27:27
Spanish language interpreter to question          10:27:31
Guadalupe?                                         10:27:34

A   I don't know because I wasn't there.          10:27:47

Q   So then you don't know what was said in       10:27:55
the room when Karen spoke to Guadalupe, correct?  10:27:58

A   That's correct.                               10:28:02

Q   I will represent to you that Karen is not     10:28:07
a Spanish speaker and did use an interpreter when  10:28:10
she spoke to Guadalupe.                            10:28:12

So you don't know what Karen said to              10:28:22
Guadalupe, correct?                                10:28:26

MR. SWAMINATHAN:  I don't know whether            10:28:31
that representation is true or not.  I'm not       10:28:33
saying it isn't true.                              10:28:36

From my perspective, that should be              10:28:38
treated as a hypothetical, if you assume she did   10:28:41
not speak English and operated through an          10:28:44
interpreter for purposes of Arturo and for the     10:28:47
question or if you want to phrase it "I would like  10:28:50
you to assume."                                    10:28:55

MR. BRENER:  I think the question was            10:28:56
clear.  She did use an interpreter.                10:28:57

MR. SWAMINATHAN:  That's true.  Whether she spoke any Spanish at all, I don't know, but I accept you're making that representation because you know that to be true, but I want to get on the record that isn't any commitment from plaintiff that is, in fact, true and from our perspective any such question should be operated as a hypothetical, but go ahead.

MR. BRENER:  Look, I'll do it this way.

BY MR. BRENER:

Q  Mr. Reyes, forget the representation.

Assuming that Karen Wehrle -- is there a problem?

MR. SWAMINATHAN:  It's fine.  It's fine.

BY MR. BRENER:

Q  Mr. Reyes, assuming that Karen used an interpreter to speak with Guadalupe Mejia, you would not have understood her questions to Guadalupe; is that an accurate statement?

MR. SWAMINATHAN:  Objection to foundation.  Go ahead.

BY THE WITNESS:

A  I don't know because I wasn't there when that person was asking Guadalupe something.

BY MR. BRENER:                                          10:30:22

Q   Did you hear any communications that Karen         10:30:22
Wehrle had with anyone at the police station?          10:30:25

A   No.                                                10:30:35

Q   Did you hear anyone speak to Karen Wehrle         10:30:36
at the police station?                                 10:30:40

A   No.                                                10:30:42

Q   Apart from Guadalupe, do you know if Karen        10:30:46
spoke to anyone at the police station?                 10:30:51

A   No.                                                10:30:53

Q   Did she did speak to anyone at the police         10:30:59
station, do you know what they discussed?              10:31:02

MR. SWAMINATHAN:  Objection.  Foundation.          10:31:05

BY THE WITNESS:                                         10:31:09

A   I don't know whether or not she spoke with        10:31:11
somebody.                                              10:31:12

BY MR. BRENER:                                          10:31:13

Q   Do you know whether Karen Wehrle reviewed         10:31:13
anything at the police station?                        10:31:15

A   I don't know whether or not she reviewed          10:31:17
something.  I don't know.                              10:31:27

Q   Do you recall ever meeting Karen Wehrle?          10:31:35

A   No.                                                10:31:43

Q   Mr. Reyes, I am going to ask you about            10:31:49

another prosecutor you sued in this case named Andrew Varga.

Do you recognize that name?

A  I don't remember him well, but it's possible that I saw him throughout this process.

Q  When you say possible, what do you mean?

A  I mean that I don't remember well that name.

Q  Are you finished?

A  Yes.

Q  Can you describe Mr. Varga?

A  I could describe if you tell me a little bit more about him if possible.

Q  And I will do that.  Let me just ask you a few more questions first.

Do you recall ever meeting Andrew Varga?

A  That I remember, no.

Q  In your own words, can you explain why you've sued Andrew Varga?

MR. SWAMINATHAN:  If you can answer that question without relying on your communications with counsel but based on documents or testimony, you can go ahead.

BY THE WITNESS:

Transcript of Arturo DeLeon-Reyes, Volume 3
Conducted on February 28, 2020                    26

A   If I answer the question, if I answer the question, I would be revealing information with my attorneys.  If you could ask me the question in a different way.

BY MR. BRENER:

Q   Sure.  I can do that.

What do you allege that Andrew Varga did wrong?

MR. SWAMINATHAN:  Same instruction, Arturo, about only answering the question if you can do so without relying on your communications with attorneys, and instead can answer it based on documents, that would be fine.

BY THE WITNESS:

A   If I answer your question, I would be revealing information, conversations that I had with my attorney.

BY MR. BRENER:

Q   Do you know whether Rosaro Mejia gave a statement to police?

A   Could you repeat the question?

Q   Do you know whether Rosaro gave a statement to police?

A   Based on what I've seen on the records, in

the process of my case, yes.                              10:36:28

    Q  Do you know whether Rosaro gave a                  10:36:29
handwritten statement to a prosecutor?                    10:36:33

    A  I don't know.                                    10:36:43

    Q  Do you know whether Rosaro spoke English          10:36:50
in 1998?                                                  10:36:53

    A  I don't know whether or not she spoke at          10:37:04
that moment English.                                      10:37:11

    Q  So yesterday you told us that at a certain        10:37:14
point you and Gabrielle Solache and Rosario Mejia         10:37:17
were separated.                                           10:37:27

    Do you recall that testimony?                         10:37:29

A  Yes, I remember.                                      10:37:38

    Q  After being separated from Gabrielle and          10:37:38
Rosario, did you see Rosario again at the police          10:37:42
station?                                                  10:37:46

    A  No.                                               10:37:51

    Q  Did you witness anyone hitting Rosario?           10:37:52

    A  No, I wasn't there.                               10:37:56

    Q  Did you witness anyone threatening                10:38:04
Rosario?                                                  10:38:12

    A  No.                                               10:38:12

    Q  Did you witness anyone yelling at him?             10:38:14

    A  No.                                               10:38:19

Transcript of Arturo DeLeon-Reyes, Volume 3
Conducted on February 28, 2020                    28

Q  So I'm going to represent to you that Rosario did give a handwritten statement to a prosecutor; specifically, he gave it to the prosecutor Andrew Varga.

Do you know who was present when Rosario gave his handwritten statement?

A  No.

Q  Do you know whether Rosario speaks Spanish?

A  I don't know.

Q  Were you present for Rosaro's statement to the prosecutor?

A  No.

Q  So is it fair to say you don't know what was said in that room?

A  That's correct.  I don't know.

Q  You didn't hear Vargas question -- strike that question.

You didn't hear what Vargas said to Rosario, correct?

A  That's correct.

Q  You also didn't hear what Rosario said back to Varga, correct?

A  That's correct.

Transcript of Arturo DeLeon-Reyes, Volume 3
Conducted on February 28, 2020                    29

Q   Assume for the next question that Varga was asking questions and speaking to Rosario in English.

Would you have understood what he was saying to Rosario?

MR. SWAMINATHAN:  Objection to foundation because he's confused.  He was not there.  Go ahead.

BY THE WITNESS:

A   I wasn't there.

BY MR. BRENER:

Q   If you had heard a conversation in English between Varga and Rosario, would you have understood that?

MR. SWAMINATHAN:  Objection to foundation. Go ahead.

BY THE WITNESS:

A   No.

BY MR. BRENER:

Q   Do you know when Varga arrived to the police station?

A   No.  And I have no idea.

Q   Do you know what Varga did at the police station other than talk to Rosario?

A    No.                                              10:41:02

Q    Do you know if he talked to anyone?             10:41:09

A    No, I don't know.                               10:41:13

Q    Do you know if he ever reviewed any             10:41:15
records?                                             10:41:17

A    No.                                             10:41:19

Q    I'm also going to ask you about a               10:41:32
prosecutor by the name of Heather Brualdi.          10:41:36

     Do you know who Heather Brualdi is?             10:41:38

A    No.                                             10:41:42

Q    Safe to say, then, that you can't describe      10:41:53
her?                                                10:41:56

A    No.                                             10:42:02

Q    Do you recall ever meeting a prosecutor         10:42:02
named Brualdi?                                       10:42:05

A    What moment are you referring to?  What         10:42:13
time are you referring to?                           10:42:19

Q    That's a good point.                           10:42:21

     At the police station at Grand and             10:42:24
Central, do you remember meeting a prosecutor       10:42:26
named Brualdi?                                       10:42:29

A    No.                                             10:42:35

Q    In your own words, can you explain to me        10:42:38
why you've sued Heather Brualdi?                      10:42:40

MR. SWAMINATHAN: If you can answer without relying on attorney-client communications but based on documents, testimony or other things, you can answer the question.

BY THE WITNESS:

A If I were to answer your question, I'd be revealing information, conversations that I had with my attorneys.

BY MR. BRENER:

Q Do you have any understanding of Brualdi's role in your prosecution for the Soto murders and kidnappings outside of communications with your counsel?

A No.

Q After you were separated from Gabriel and Rosario, did you see Gabrielle again at the police station?

A When I was being processed, when my photo was taken.

Q That was after you gave your statement to O'Malley, correct?

A I guess I saw him, but I don't remember well.

MR. SWAMINATHAN: I want to just clarify

Transcript of Arturo DeLeon-Reyes, Volume 3
Conducted on February 28, 2020                                    32

again --

 THE INTERPRETER:  I believe interpreter states that Plaintiff Mr. Reyes said "I believe" --

BY MR. BRENER:

 Q  When you saw Gabriel, that was after you had signed the statement that O'Malley wrote; is that correct?

 A  That's correct.

 Q  Did you see how Gabriel got into that cell?

 A  No.

 Q  Did you ever witness anyone hitting Gabriel?

 A  No.  I wasn't there.

 Q  Did you ever witness anyone threatening Gabriel?

 A  No.

 Q  So I will represent to you that Prosecutor Brualdi prepared Gabriel's handwritten statement.

 Were you present when Gabriel's handwritten statement was written?

 (Inaudible voice).

BY MR. BRENER:

Q   You can answer the question.

A   Before I answer the question, could you please repeat it?

Q   Sure.  Were you present when Gabriel's handwritten statement was written?

MR. SWAMINATHAN:  I would note the same objection from counsel, for the record.

BY THE WITNESS:

A   I was not.

BY MR. BRENER:

Q   So you don't know what was said in that room, correct?

A   That's correct.

Q   And apart from Prosecutor Brualdi, you don't know who was present with Gabriel when that document was written, correct?

A   I don't know because I wasn't there in that room.

Q   Assume for the purposes of the next question that Brualdi spoke only English and not Spanish.

Had you been present, would you have understood what Brualdi was saying in English?

MR. SWAMINATHAN:  Objection.  Foundation.

BY THE WITNESS:

    A No.

BY MR. BRENER:

    Q Do you recall ever meeting Heather Brualdi?

    A No.

    Q Do you know when she got to the police station?

    A No.

    Q Do you know how she got to the police station?

    A No.

    Q Do you know anything she did apart from writing Gabriel's statement while she was at the police station?

    MR. SWAMINATHAN: Objection to foundation.

BY THE WITNESS:

    A No, I don't know.

BY MR. BRENER:

    Q Do you know whether she talked to anyone except for Gabriel at the police station?

    A I don't know.

    Q Have you ever talked to Gabriel about the claims that you've raised against the prosecutors

10:48:39
10:48:40
10:48:41
10:48:41
10:48:43
10:48:44
10:48:51
10:48:53
10:48:56
10:48:57
10:48:59
10:49:04
10:49:04
10:49:09
10:49:12
10:49:26
10:49:29
10:49:30
10:49:33
10:49:33
10:49:35
10:49:43
10:49:48
10:49:52

in this case?                                    10:49:55

    A  No.                                        10:50:02

    Q  Are you aware that Gabriel has filed his    10:50:06

own lawsuit?                                     10:50:09

    A  Based on the little I've seen, if I carry   10:50:11

on answering that question, if I did, I would    10:50:55

reveal conversations that I had with my attorneys.   10:50:59

    Q  I'll ask you a question maybe you can       10:51:01

answer.                                          10:51:04

    Have you ever seen a complaint filed by      10:51:04

Gabriel Solache alleging that he was wrongfully   10:51:09

convicted of the Soto murders and kidnappings of   10:51:12

the Soto children?                               10:51:18

    A  No.                                        10:51:18

    Q  Have you seen any document in Spanish       10:51:33

describing Gabriel alleging that he was wrongfully   10:51:39

-- strike that question.                         10:51:44

    Have you discussed Gabriel's lawsuit with    10:51:45

anyone but your lawyers?                          10:51:48

    A  No.                                        10:51:51

    Q  Are you aware that he alleges he also       10:52:03

signed a false handwritten statement?            10:52:05

    MR. SWAMINATHAN:  Arturo, you can answer     10:52:15

the question, but, Arturo, if you cannot answer   10:52:16

that question without relying on attorney

communications, you shouldn't answer it.  If you

can answer it based on documents, trial or

otherwise, you can answer the question.

BY THE WITNESS:

    A   If I were to answer that question, I would

be revealing information, conversation that I had

with my attorneys.

BY MR. BRENER:

    Q   Mr. Reyes, do you have any source of

knowledge regarding either Gabriel's complaint or

his allegations apart from conversations with your

lawyers?

    A   No.

       (Inaudible speaker).

       MR. SWAMINATHAN:  For those on the phone,

counsel for Solache indicated that her objections

are not being heard so we're getting another mic

for her.

       MR. BRENER:  Madam court reporter, did you

miss the objection.

THE COURT REPORTER:  I couldn't hear

anything.

       MR. SWAMINATHAN:  I'll note for the record

Transcript of Arturo DeLeon-Reyes, Volume 3
Conducted on February 28, 2020                    37

that counsel for Solache indicated objection to          10:54:45

characterization of -- witness the documents which       10:54:49

were referred to as Mr. Solache's handwritten            10:54:57

statement and each time document the document was        10:55:00

handwritten statement in the question, counsel for       10:55:04

Solache indicated an objection to that                   10:55:07

characterization.                                        10:55:10

    MR. BRENER:  That's accurate to my            10:55:14

recollection, and I believe there were two               10:55:16

questions in which counsel made that objection.          10:55:18

    MS. SUSLER:  Yes.  Thank you.                 10:55:21

    THE INTERPRETER:  Mr. Reyes is asking if      10:55:26

he can take a break.                                     10:55:28

    MS. BARBER:  There is some interference        10:55:41

with the microphones or something.  You might want       10:55:44

to stop that.                                            10:55:49

    (A recess was had.)                           10:55:49

CERTIFICATE OF COURT REPORTER - NOTARY PUBLIC

        I, Theresa A. Vorkapic, Certified
Shorthand Reporter No. 084-2589, CSR, RMR, CRR,
RPR, and a Notary Public in and for the County of
Kane, State of Illinois, the officer before whom
the foregoing deposition was taken, do hereby
certify that the foregoing transcript is a true
and correct record of the testimony given; that
said testimony was taken by me and thereafter
reduced to typewriting under my direction; that
reading and signing was not requested; and that I
am neither counsel for, related to, nor employed
by any of the parties to this case and have no
interest, financial or otherwise, in its outcome.

        IN WITNESS WHEREOF, I have hereunto set my
hand and affixed my notarial seal this 31st day of
March, 2020.
My commission expires November 6, 2023.

_____

THERESA A. VORKAPIC

NOTARY PUBLIC IN AND FOR ILLINOIS