FILED
4/7/2022 9:01 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
98CR1244002
Martin, LeRoy K, Jr.
17418521

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, CRIMINAL DIVISION**

| | |
|---|---|
| **ARTURO De LEON-REYES,** ) | |
| ) | |
| *Petitioner,* ) | |
| v. ) | **No. 98 CR 12440-02** |
| ) | |
| **STATE OF ILLINOIS** ) | |
| ) | |
| *Respondent.* ) | |

**PETITIONER'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT ON PETITION FOR CERTIFICATE OF INNOCENCE PURSUANT TO 735 ILCS 5/2-702**

Petitioner, Arturo De Leon-Reyes, through counsel, hereby replies in support of his Motion for Summary Judgment, as follows:

**INTRODUCTION**

In his opening brief, Mr. Reyes established that he is entitled to a certificate of innocence as a matter of law. Mr. Reyes presented ample evidence of innocence, including DNA showing he was not at the crime scene, his repeated and consistent testimony to his innocence, evidence that disgraced Detective Reynaldo Guevara coerced false inculpatory statements out of Mr. Reyes and his co-defendant, and a host of other testimony establishing innocence. The State's evidence in Response, on the other hand, even when construed in the State's favor, cannot overcome this evidence of innocence. In other words, there is no version of these facts in which Mr. Reyes does not meet his burden.

Keeping in mind the goal of the COI statute is to make it easier for petitioners to seek certificates of innocence and not impose additional burdens, and that this Court must interpret the statute in the petitioner's favor, 735 ILCS 5/2-701 *et seq.* & 735 ILCS 5/2-702 (including

1

REYES 014793

FILED DATE: 4/7/2022 9:01 PM   98CR1244002

COI statute in "Action For Declaratory Judgment"); *Illinois Gamefowl Breeders Ass'n v. Block*, 75 Ill. 2d 443, 452 (1979 ("The declaratory judgment remedy should be liberally applied and not restricted by unduly technical interpretations.")), this Court must grant Mr. Reyes a certificate of innocence ("COI").

## ARGUMENT

The State makes several critical concessions in its Response:

- Mr. Reyes has satisfied his burden under 735 ILCS 5/2-702(g)(1), (g)(2)(A), and (g)(4). The only element in dispute is whether Mr. Reyes has shown innocence by a preponderance of the evidence, as a matter of law. *Id.* at 5/2-702(g)(3).

- Mr. Reyes and Mr. Solache's statements, obtained based on physical and psychological abuse by Detective Guevara, are not admissible in these proceedings and cannot be considered.

- Ms. Mejia's original statement is also not admissible, for the same reasons.

- Detective Guevara has a pattern of engaging in gross misconduct during homicide investigations, including coercing false confessions from innocent people.

- Mr. Reyes's DNA was not found anywhere at the crime scene, but the crime scene contains DNA from Adriana Mejia and an unknown accomplice.

- Mr. Reyes has repeatedly and at every opportunity testified to his innocence.

- Mr. Reyes was not convicted as a principal.

- There is no evidence that Mr. Reyes committed murder or kidnapping as a principal.

The only remaining disputes are:

- Whether evidence that Guevara has a history of misconduct that includes coercing false confessions from innocent people is admissible;

- Whether inclusion of the word "they" in the indictment means Mr. Reyes was charged as an accomplice despite a lack of any statutory "accountability" language; and

- Whether the following evidence, when construed in the State's favor, could ever rebut the testimonial and DNA evidence showing Mr. Reyes's innocence, given that at most it establishes mere presence at the crime scene:

   o Mr. Reyes had a note in his pocket and a calendar entry listing the name of the woman whom Adriana Mejia told everyone she was babysitting for;

   o Adriana Mejia testified that she was told by Solache in Mr. Reyes's presence that Mr. Reyes was going to "help"; and that Mr. Reyes waited in the car while Mejia and Solache killed Mr. Soto, and then entered the home.

2

REYES 014794

I.    **MR. REYES WAS CHARGED AS A PRINCIPAL, AND THE STATE DOES NOT ARGUE THAT MR. REYES HAS NOT SHOWN INNOCENCE OF PRINCIPAL CRIMES.**

*People v. Palmer* holds that a COI petitioner must prove innocence of the specific factual theory of the offense charged in the indictment. 2021 IL 125621, ¶72 ("we hold that subsection (g)(3) requires a petitioner to prove by a preponderance of the evidence his or her innocence of the offense *as it was charged in the indictment or information* that resulted in the wrongful criminal conviction") (emphasis added). *Palmer* also holds that if the State acknowledges there is no evidence that the petitioner is not innocent of those crimes, then the petitioner is entitled to a certificate of innocence as a matter of law. *Id.* ¶73 ("The State does not contest petitioner's substantive argument that the new forensic DNA evidence demonstrates that petitioner did not repeatedly strike the victim on the head, as petitioner was originally charged and convicted. Thus, the State implicitly concedes that…petitioner has satisfied" subsection (g)(3)).

The Court's holding in *Palmer* is binding on the facts here. The language in Mr. Reyes's indictment clearly charges him only with principal crimes. And critically, the State does *not* argue that Mr. Reyes has failed to show innocence of principal crimes of which he was charged and convicted. In other words, the State cites no evidence that Mr. Reyes murdered the Soto parents or kidnapped the children. Therefore, this Court must grant Mr. Reyes a certificate of innocence as a matter of law, based on *Palmer*.

The State's only argument is that Mr. Reyes was also charged under an accountability theory, and that he has not shown innocence of accountability. This argument is flawed for several reasons. First, the indictment does not include any language suggesting an accountability charge, and thus *Palmer* bars the State from challenging Mr. Reyes's certificate of innocence by arguing there is evidence to support an accountability theory. Second, even if the indictment did

3

REYES 014795

FILED DATE: 4/7/2022 9:01 PM   98CR1244002

state an accountability theory—which it did not—the State has presented no evidence of Mr. Reyes's guilt under an accountability theory, and thus failed to create a material dispute of fact on that theory, as well. Accordingly, Mr. Reyes is still entitled to a COI as a matter of law.

### a.   Mr. Reyes Was Charged as a Principal

Looking at the specific language in the indictment, as *Palmer* directs, 2021 IL 125621, ¶ 72, Mr. Reyes was charged only as a principal. For instance, to prove first-degree murder, the State must have shown that the defendant killed an individual without lawful justification, and "in performing the acts which cause the death":

(1) he either intends to kill or do great bodily harm to that individual or another, or knows that such acts will cause death to that individual or another; or

(2) he knows that such acts create a strong probability of death or great bodily harm to that individual or another; or

(3) he is attempting or committing a forcible felony other than second degree murder.

720 ILCS 5/9-1(a); *see* Ill. Pattern Jury Inst. 7.01.

To have proven home invasion in 1998, the State must have shown that the Defendant, as relevant here:

(1) A person who is not a peace officer acting in the line of duty commits home invasion when without authority he or she knowingly enters the dwelling place of another when he or she knows or has reason to know that one or more persons is present or he or she knowingly enters the dwelling place of another and remains in such dwelling place until he or she knows or has reason to know that one or more persons is present; and

(2) While armed with a dangerous weapon uses force or threatens the imminent use of force upon any person or persons within such dwelling place whether or not injury occurs....

720 ILCS 5/12-11(A)(1).

4

REYES 014796

FILED DATE: 4/7/2022 9:01 PM  98CR1244002

To have proven kidnaping in 1998, the State must have shown, as relevant here, that the Defendant knowingly:

(1) and secretly confine[d] another against his or her will;

(2) by force or threat of imminent force carries another from one place to another with intent secretly to confine that other person against his or her will; or

(3) by deceit or enticement induces another to go from one place to another with intent secretly to confine that other person against his or her will; and

(4) takes as his or her victim a child under the age of 13 years, or a person with a severe or profound intellectual disability.

720 ILCS 5/10-1, 5/10-2(a)(2).

This is the exact language of principal liability that appears in each count of the indictment. Ex. 2 (Counts 1, 3, 17, 23, 25).[1]

An accountability indictment, on the other hand, would have required completely different language. At the time of Mr. Reyes's criminal trial, a person would be legally accountable for the conduct of another if:

(a) having a mental state described by the statute defining the offense, he causes another to perform the conduct, and the other person in fact or by reason of legal incapacity lacks such a mental state;

(b) the statute defining the offense makes him so accountable; or

(c) either before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid such other person in the planning or commission of the offense.

---

[1] Count 1: "intentionally or knowingly stabbed and killed Jacinta Soto with a knife"
Count 3: "intentionally or knowingly stabbed and killed Mariano Soto with a knife"
Count 17: "knowingly entered the dwelling place of Mariano Soto…while armed with a dangerous weapon, to wit: a knife, used force upon Mariano Soto"
Count 19: "knowingly entered the dwelling place of Jacinta Soto…and intentionally injured Jacinto Soto…to wit: stabbed Jacinto Soto with a knife"
Count 25: "knowingly and secretly confined Maria Soto…against her will"

REYES 014797

FILED DATE: 4/7/2022 9:01 PM   98CR1244002

720 ILCS 5/5-2 (1991); Ill. Pattern Jury Inst. 5.03; *People v. Ceasar*, 231 Ill. App. 3d 54, 56 (1992) (to prove guilt by accountability, prosecution must establish "that the defendant elicited, aided, abetted, agreed, or attempted to aid another person in planning or commission of offense").

The indictment does not so much as hint that Mr. Reyes caused someone else to commit the crime, or solicited, aided, or abetted a commission of the crime. The State argues, incorrectly, that Mr. Reyes was charged as an accomplice because he was charged in the same indictment with two co-defendants, and the indictment uses the word "they." Absent any language suggesting accountability, though, this does not mean he was charged with accountability; it means the three defendants were each charged as principals.

Indeed, the word "they" in the indictment does not provide Mr. Reyes with any notice that he needed to prepare a defense to an accountability charge. As the Illinois Supreme Court explained in *People v. Smith*, an indictment must include not only a statement of the offense and its elements, but also "allegations of the essential facts to enable the accused to prepare a defense which, if successful, would bar further prosecution for the same offense." 99 Ill.2d 467, 470-71 (1984); *see also People v. Lutz*, 73 Ill. 2d 204, 211-13 (1978) (charging instrument insufficient when it did not allege facts specifying any alternative methods of committing the offense); *People v. Trumbley*, 252 Ill. 29, 31 (1911) ("It is a fundamental rule of criminal pleading that an indictment must allege all of the facts necessary to constitute the crime with which the defendant is charged, and an indictment which does not set forth such facts with sufficient certainty will not support a conviction."); 725 ILCS 5/111-3 (requiring a charge to allege "the nature and elements of the offense as definitely as can be done").

6

REYES 014798

FILED DATE: 4/7/2022 9:01 PM   98CR1244002

To the State's argument that the jury was instructed on accountability and the State's closing arguments referred to accountability: it does not matter. *Palmer* clearly instructs the Court to look at the specific language in the indictment, not the jury instructions or closing arguments. *Palmer*, 2021 IL 125621 at ¶72. And even if this Court were to consider the theories at trial, the State's closing argument supports Mr. Reyes's argument that he was charged and convicted as a principal.

To be clear, the State's theory at trial was that Mr. Reyes planned the killing with Mejia and Mr. Solache, entered the Soto home and immediately stabbed Mrs. Soto, entered the bedroom, and grabbed both of the children. And to put a finer point on it, the State's theory was specifically that:

- Mr. Reyes spoke to Adriana Mejia and agreed to help her steal a baby for $600.
- Mr. Reyes pre-planned the crime with Solache and Adriana Mejia.
- Mr. Reyes rushed into the Soto home, pulled a knife, and immediately stabbed Mrs. Soto.
- Mr. Reyes went into the bedroom and grabbed the baby and the boy and carried them out to their getaway car.

*E.g.,* State's Ex. 3, at 9611. In other words, the State unequivocally charged and convicted Mr. Reyes for acting as a principal in the murder and kidnapping.

What the State is doing now is attempting to infuse the indictment, and the trial, with an accountability theory that simply was not there. But comparing the theory in the indictment and the trial with the only theory available on the currently admissible evidence is revealing. Because the State concedes that the inculpatory statements of Mr. Reyes, Mr. Solache and Adriana Mejia are inadmissible—Judge Obbish granted a motion to suppress them given the evidence that Detective Guevara obtained them through the use of physical abuse—the only evidence available to it now is the current testimony of Adriana Mejia. That testimony does not support an accountability theory. Her testimony is as follows:

7

REYES 014799

- She and Mr. Reyes barely knew each other, and she'd had almost no interaction with him. Ex. 20 at 74-75.
- She had no conversations with Mr. Reyes about a murder or a kidnapping, at any point, ever. Ex. 17 (Mejia Feb. 4, 2021, Dep.) at 20, 96; Ex. 20 (Mejia Feb. 5, 2021 Dep.) at 148-49.
- She was surprised Mr. Reyes was even in the car when she was picked up by Solache to get the baby. Ex. 17 at 27.
- She and Mr. Solache went to the Soto home and entered, while Reyes came later, after Mr. Soto had been killed. Ex. 17 at 112; Ex. 20 at 8-9, 151-52, 156-57, 219.
- She took the baby girl from the apartment. Ex. 17 at 33, 99-100.
- She does not remember who took the boy from the apartment. Ex. 17 at 33.
- Mr. Reyes tried to stop Mr. Solache from stabbing Mrs. Soto. Ex. 20 at 219-20.

This is the only arguably admissible evidence to which the State cites.[2] To suggest that this evidence supports Mr. Reyes's guilt—as a principal or on an accountability theory—is fanciful. But more relevant to the issue at hand, it is a theory of guilt that constitutes a complete rewriting of the indictment (and the theory at trial). *Palmer* clearly prohibits such an approach.

### b. The State Acknowledges There is No Evidence that Mr. Reyes Committed any Crime as Principal

To its credit, the State does not argue that there is any admissible evidence that Mr. Reyes is guilty of committing any crime as a principal, nor could it for the reasons discussed above. Given that Mr. Reyes was charged only as a principal, *Palmer* establishes that Mr. Reyes is entitled to a certificate of innocence as a matter of law.

## II. MR. REYES PRESENTS AMPLE EVIDENCE OF INNOCENCE THAT IS UNREBUTTED AND THUS SUFFICIENT AS A MATTER OF LAW

Even if this Court concludes that Mr. Reyes was charged as an accomplice, Mr. Reyes has firmly established that he is innocent as a matter of law.

---

[2] The State's only other evidence is the note in Mr. Reyes's pocket referencing a Norma Salazar. As discussed below, that reference is not inculpatory in the slightest.

8

REYES 014800

FILED DATE: 4/7/2022 9:01 PM   98CR1244002

### a. Testimony Supporting Innocence

The State agrees that Mr. Reyes has testified at every available opportunity that he is innocent. He testified about his own innocence in his suppression hearing in March 2000, his criminal trial in June 2000, and his evidentiary hearing in 2013. Evidence that a defendant has maintained his innocence since his arrest, by itself, is sufficient to state a claim of actual innocence. *People v. Lofton*, 2011 IL App (1st) 100118, ¶¶ 36-37. These statements of innocence are corroborated by testimony from Mr. Reyes's co-worker, Salvador Olivares, establishing that it would have been almost impossible for Mr. Reyes to have committed these crimes. Ex. 14 (Trial Tr.) at 1903, 2033-34, 2121, 2125-26; 2419-25; *see also* Ex. 10 (Timesheets) (showing Mr. Reyes's long workdays the day of the crime and the day before, without any unusual behavior whatsoever). This Court must consider this evidence of innocence. *See People v. Caine*, Case No. 86 CR 6091 (Order, March 27, 2012); *see also People v. Fields*, 2011 IL App (1st) 100169, ¶ 19 (2011).

### b. DNA Shows Mr. Reyes Is Innocent and Corroborates His Testimony

The State acknowledges that Mr. Reyes has been excluded as a contributor to all DNA from the crime scene but argues that it does not support Mr. Reyes's claim of innocence. As an initial matter, of course the fact that Mr. Reyes's DNA was not found on any one of numerous items of evidence in a violent, DNA-rich crime scene is evidence of innocence. DNA evidence is the most powerful, objective evidence of innocence possible. *People v. Rozo*, 2012 IL App (2d) 100308, ¶ 19 (DNA evidence found under victim's fingers could "significantly advance defendant's claim of actual innocence"). The State argues the fact that Mr. Reyes's DNA was not at the crime scene is not definitive proof of his innocence. But that does not negate the fact that it is additional evidence of innocence worthy of some weight. All the more so, given that the State

REYES 014801

FILED DATE: 4/7/2022 9:01 PM   98CR1244002

admits that the DNA of Adriana Mejia was found at the crime scene, the one person who everyone agrees committed the crime. The State's argument does not rebut Mr. Reyes's evidence of innocence, nor does it constitute affirmative evidence of guilt that would warrant denying Petitioner's motion for summary judgment.

Next, among the items tested was a green towel containing blood stains found in the perpetrator's getaway car. That towel contained the DNA of Adriana Mejia, as well as an additional unknown person (excluding Reyes, Solache, and the victims). Ex. 21 (Reyes_Jenner 9572; Ex. 13 (Report of Dr. Reich) at 4. The State acknowledges such evidence, yet claims it is not evidence of innocence. That argument borders on frivolous. Evidence that a defendant's DNA was not found at a crime scene and/or evidence that someone else's DNA was found at a crime scene has been the basis of 246 murder exonerations nationwide since 1987, including 42 in Illinois alone. *See* National Registry of Exonerations, Browse by Cases, Sort by: State (Illinois)/Crime/DNA[3]. DNA evidence has also been the basis of dozens of certificates of innocence. *See* Petitioner's Motion, at 11-12. Evidence of an alternative perpetrator is also powerful evidence of innocence. *People v. Robinson*, 2020 IL 123849, ¶80 (evidence of another likely perpetrator "is of such a conclusive character as to probably change the outcome at a retrial.").

Put simply, the DNA evidence in this case is powerfully corroborative of Mr. Reyes's own testimony about his innocence.

---

[3] http://www.law.umich.edu/special/exoneration/Pages/detaillist.aspx (last accessed April 6, 2022).

REYES 014802

FILED DATE: 4/7/2022 9:01 PM   98CR1244002

#### c.  Guevara Coerces False Confessions from Multiple People

In addition, Mr. Reyes has presented evidence that the false confessions Guevara coerced in this case are consistent with his pattern of coercing false confessions from other innocent people in other cases. The State does not dispute this evidence, but asserts, without argument, that evidence is not admissible. This undeveloped argument is waived. *Sakellariadis v. Campbell*, 391 Ill. App. 3d 795, 804 (2009) ("failure to assert a well-reasoned argument supported by legal authority [in appellate brief] is a violation of Supreme Court Rule 341(h)(7)..., resulting in waiver.")

In any event, case law clearly establishes that this evidence is admissible. Courts routinely consider pattern and practice evidence in addressing claims of innocence. "Illinois courts have consistently held that a 'pervasive pattern of criminal conduct by police officers'" is not only relevant but "enough," on its own, to permit a court to reach a finding of actual innocence. *People v. Tyler,* 2015 IL App (1st) 123470, ¶189 (quoting *People v. Mitchell,* 2012 IL App (1st) 100907, ¶63, and citing *People v. Patterson,* 192 Ill.2d 93, 139-45 (2000); *People v. King,* 192 Ill.2d 189, 193-99 (2000); *People v. Cannon,* 293 Ill.App.3d 634, 640 (1997)). The First District Appellate Court held in *Tyler* that "evidence of systemic police misconduct is sufficient to support defendant's claim of actual innocence." *Id*. ¶200. Albeit in the context of a petition for post-conviction relief, based on allegations of police misconduct alone the *Tyler* court remanded for an evidentiary hearing on petitioner's actual innocence claim. *Tyler* at ¶¶200-02; *see also People v. Almodovar,* 2013 IL App (1st) 101476, ¶¶77-79 (concluding the court need not rule on the issue but stating that "a strong argument could be made" that evidence of Guevara's "history of improperly influencing witnesses" would satisfy the actual innocence standard in light of the questionable inculpatory evidence and the import of Guevara's

REYES 014803

FILED DATE: 4/7/2022 9:01 PM  98CR1244002

credibility). This holding is not surprising: Of course evidence of an officer's pattern of committing a particular kind of misconduct in a number of cases is relevant to whether he committed the same misconduct in the case at bar. Courts have repeatedly affirmed this axiomatic principle, including in cases involving Guevara specifically. *See People v. Montanez,* 2016 IL App (1st) 133726, ¶34 ("As we stated in another case concerning Guevara's misconduct, 'In our view, any allegation that Guevara coerced a person to provide evidence is relevant to whether defendants in the case at bar were similarly coerced.'" (quoting *People v. Reyes,* 369 Ill. App. 3d 1, 21 (2006)). In *Almodovar* at ¶68, the First Appellate District explained why that is so obviously the case:

> [I]n the instant case, we find that defendant's allegations that Detective Guevara influenced witnesses to provide identifications are relevant to whether witnesses in the case at bar were similarly influenced, since such allegations, if true, would damage Detective Guevara's credibility. As was the case in *Reyes,* the credibility of Detective Guevara is directly at issue with regard to the crucial question of how he procured the evidence that led to defendant's conviction. New evidence that attacks his credibility on that crucial question would be highly material.

The First Appellate District again affirmed the principle—in another Guevara case—that evidence of an officer's pattern of misconduct is relevant to whether that officer committed similar misconduct in the case at bar. *Martinez,* 2021 IL App (1st) 190490. The appellate court first had strong language about Guevara's pattern, noting that the State "does not dispute that Detective Guevara has a history of misconduct," that the First Appellate District "has recognized Guevara's well-documented history of influencing and manipulating witnesses," and calling Guevara "a malignant blight on the Chicago Police Department and the judicial system." *Martinez* at ¶64. The Court cataloged Guevara's common forms of misconduct and summarized the pattern evidence by saying Guevara's "toolbox of coercion was well-stocked with a wide variety of tools." *Id.* ¶80. The Court ultimately held that "evidence of Guevara's misdeeds in

12

REYES 014804

other cases would clearly be admissible in this case to show a pattern and practice of misconduct." *Id.* (emphasis added). Indeed, undersigned counsel has presented pattern evidence regarding Guevara's misconduct at multiple COI hearings in the last few months (*e.g.*, COI hearings of Mr. Thomas Sierra and Mr. Geraldo Iglesias, before Judge Reddick). And the only reason Mr. Reyes is in this situation to begin with is because Guevara fabricated his involvement out of whole cloth. Evidence that Mr. Reyes's conviction is based on evidence that was concocted through physical abuse, and thus inadmissible, is further evidence of Mr. Reyes's innocence.

To summarize, Mr. Reyes has presented ample evidence of innocence, including his own testimony, alibi evidence, and DNA, combined with a swath of evidence that it was Guevara's practice to coerce false confessions out of innocent people. This is more than sufficient. The COI statute cautions:

> It is the intent of the General Assembly that the court, in exercising its discretion as permitted by law regarding the weight and admissibility of evidence submitted pursuant to this Section, shall, in the interest of justice, give due consideration to difficulties of proof caused by the passage of time, the death or unavailability of witnesses, the destruction of evidence or other factors not caused by such persons or those acting on their behalf.

735 ILCS 5/2-702(a). Against this mandate, what other evidence could Mr. Reyes present 24 years after the fact to show innocence?

III. **EVEN IF THE COURT READS ACCOUNTABILITY INTO THE INDICTMENT, THERE IS STILL NO EVIDENCE THAT MR. REYES IS NOT INNOCENT**

Even if this Court chooses to evaluate the evidence of accountability crimes, despite that accountability language does not appear in the indictment, the State has failed to point to any evidence to rebut the evidence of innocence. Mr. Reyes is still entitled to a certificate of innocence as a matter of law.

13

REYES 014805

### a. The State Must Present Evidence to Establish Its Defense

If this Court chooses to evaluate the evidence of innocence of an accountability charge versus the evidence of non-innocence, it must first consider whether Mr. Reyes, as the movant, has established a *prima facie* case of innocence. He has done that. Next, the Court must consider whether the State has presented evidence to establish a *prima facie* case of non-innocence. *People v. Williams*, 2017 IL App (1st) 152021, at ¶ 30 (citing *527 S. Clinton, LLC v. Westloop Equities, LLC*, 403 Ill. App. 3d 42, 52 (2010)[4]. Where the nonmovant presents no evidence on each essential element of its defense (non-innocence), the Court must find for the petitioner. *Stenger v. Swartwout*, 62 Ill. 257, 257 (1871) ("Where as to any essential element of a cause of action or defense there is no evidence at all…this court will interfere and set it aside.").

The State spends a portion of its brief explaining the difference between an affirmative showing of innocence and a lack of guilt. To be clear, Mr. Reyes does not argue that the State has the initial burden to show guilt. Mr. Reyes understands that his burden is to prove innocence by a preponderance of the evidence. The State fails to recognize, however, that once Mr. Reyes presents evidence of innocence—which he has—the burden then shifts to the state to disprove Mr. Reyes's evidence of innocence by 51%. There is a fine line between non-guilt and innocence.[5] And the defense to evidence of innocence is evidence of guilt. Therefore, in order to

---

[4] The State asserts that it does not need to present evidence of each element of the crimes it asserts Mr. Reyes is not innocent of, and attempts to distinguish *People v. Williams*, 2017 IL App (1st) 152020. The State says that *Williams* involves a motion for a directed finding rather than a motion for summary judgment, and that it involves a post-conviction matter. Though *Williams* involves a different procedural posture, at its core it discusses parties' burdens and a court's task of balancing evidence. Here it does not matter that there has not been a hearing, because at this stage, the Court must draw all reasonable inferences in the State's favor. *Beaman v. Freesmeyer*, 2021 IL 125617, ¶ 106, reh'g denied (Sept. 27, 2021). The principle remains: when a Court is balancing evidence, it first looks at whether the movant has provided evidence to establish a *prima facie* case. After so finding, it then looks to see whether the nonmovant has satisfied the elements of its defense. *Stenger v. Swartwout*, 62 Ill. 257, 257 (1871).

[5] In fact, it is up for debate whether the Constitution allows an innocence statute to require a petitioner to prove innocence in the first place. *See People v. Fields*, 2017 IL App (1st) 140988-U, ¶ 93

14

REYES 014806

successfully rebut Mr. Reyes's evidence of innocence, the State must present at least some evidence that Mr. Reyes is guilty. As a matter of law, it has not, and cannot do that.

### b. The State's Evidence Cannot, as a Matter of Law, Satisfy the Elements of a Defense

Even construing all inferences in the State's favor, there is no version of events in which Mr. Reyes *does not* meet his burden of showing innocence. This is because the State has no evidence of its own. Indeed, even when construing the evidence in the State's favor, as the Court must at this stage, the State cannot meet its burden of presenting evidence on each essential element of its defense.

As a threshold matter, the State refers to 17 exhibits, most of which are duplicates of Mr. Reyes's exhibits, or hearsay. And of those 17 exhibits and the rest of the record, the state points to no actual evidence that undermines Mr. Reyes's claims of innocence. To the extent that the State expects this Court to wade through all those materials itself looking for evidence, "[j]udges are not like pigs, hunting for truffles buried in briefs." *United States v. Dunkel,* 927 F.2d 955, 956 (7th Cir.1991). The State has waived any argument about the substance of these materials beyond what it identifies in its brief. *Sakellariadis*, 391 Ill. App. 3d at 804.

As for the evidence the State has proffered, the relevant inquiry now is whether the evidence of non-innocence, even if taken in the State's favor, establishes non-innocence of *any crime at all*. As a matter of law, it does not. Out of the entire record in this case, the State identifies only four pieces of evidence that it says outweighs the powerful DNA and evidence of coerced confession: (1) Mr. Reyes's living arrangements; (2) a note in Mr. Reyes's pocket and a

---

(Pucinski, J., dissenting). The U.S. Supreme Court observed in *Nelson v. Colorado*, a state may not presume that a person who has been acquitted or exonerated is not entitled to statutory relief provided to innocent people by the state. 137 S. Ct. 1249, 1256 ("Colorado may not presume a person, adjudged guilty of no crime, nonetheless guilty *enough* for monetary exactions.").

15

REYES 014807

FILED DATE: 4/7/2022 9:01 PM    98CR1244002

name on a calendar; and Ms. Mejia's testimony that (3) she was told by Solache in Mr. Reyes's presence that Mr. Reyes was present to help get the baby, and (4) that Mr. Reyes waited in the car until getting the "signal" to enter the Soto home.

The State does not explain what it means by "living arrangements and relationships with his co-defendants" or "the sum of the testimony from the various witnesses at trial." To the extent it asserts that the fact that he rented a room from Mr. and Mrs. Mejia is evidence of guilt of murder and kidnapping on an accountability theory, that is preposterous. Indeed, if that is the case, then the 5-6 others who lived in that home who were Adriana's family members are equally guilty of accountability.

Likewise, the note in Mr. Reyes's pocket and a calendar entry listing Norma Salazar's name is not inculpatory in any way. According to the trial testimony of Adriana Mejia's husband, Rosauro Mejia, Adriana told him that she had given birth to the baby girl and was babysitting the older boy for a woman named Norma Salazar, who was in the hospital having another baby of her own. Ex. 14 (Trial Tr., Testimony of Rosauro Meija) at 1928. Mr. Reyes similarly testified that Adriana told him she was babysitting the boy for Norma Salazar and gave him Salazar's phone number when she asked him to look after the older boy for a time. Ex. 5 (Reyes Trial Testimony) at 2037-38, 2066. And, as it turns out, "Norma Salazar's" involvement is apparently made up; no Norma Salazar was ever charged or convicted. So, Adriana made up a lie and told it to both her husband Rosauro and Mr. Reyes. If it was inculpatory in any way, then Rosauro is implicated as well; but no one in this proceeding to date—certainly not the State—has asserted that he is not innocent. Moreover, the fact that a made-up person's name and phone number was in Mr. Reyes's possession—a name that no one says came from Mr. Reyes (and the State has not and cannot present any evidence to suggest otherwise)—is plainly exculpatory:

REYES 014808

why would Mr. Reyes write down the name and phone number of someone he knew did not exist or had nothing to do with the crime? Put simply, the State has simply stated a fact—Mr. Reyes had a note—without citation to any other evidence that would make it evidence of guilt. This evidence neither rebuts Mr. Reyes's evidence of innocence, nor provides any support for his guilt.

That leaves just two statements from Adriana Mejia on which the State relies: that Solache told her that Reyes was in the car to help get the baby, and that Reyes waited in the car until "getting the signal to enter the Soto home." For one, the State cites nothing to support its characterizations of Mejia's testimony, and instead sends this Court on a truffle hunt. More critically, however, the State does not accurately characterize Mejia's testimony. Mejia did not testify that Mr. Solache told her that Mr. Reyes was present to "help get the baby." Her testimony is much more nebulous. She testified that Mr. Solache told her that Reyes "wasn't going to say anything and that he was going to help us," Ex. 17 at 27, and that Solache told her that he had told Reyes "what was going on" with her and that Reyes "knew." Ex. 20 at 149. She also did not testify that Mr. Reyes waited in the car until "getting a signal." She testified that he waited in the car alone and did not enter the home until after Mr. Soto had been killed, and then tried to stop the killing of Mrs. Soto. Ex. 17 at 112; Ex. 20 at 8-9, 151-52, 156-57, 219-20. She never says anything about a "signal."

That evidence, even for the sake of argument accepting it as true and construing it in the light most favorable to the State is insufficient as a matter of law to support a finding of guilt on accountability murder or kidnapping. It is long established that mere presence at a crime scene and knowledge that a crime is being committed is insufficient to establish accountability. *People v. Ceasar*, 231 Ill.App.3d 54, 56 (1992) ("mere presence at scene of crime, even with knowledge

17

REYES 014809

FILED DATE: 4/7/2022 9:01 PM   98CR1244002

that crime is being committed, is not enough to prove participation"); *see also People v. Reid*, 136 Ill.2d 27, 61 (1990) ("Mere presence of a defendant at the scene of the crime does not render him or her accountable for the offense."); *see also Brumley v. DeTella*, 83 F.3d 856, 863 (7th Cir. 1996) (In Illinois, "proof of accountability requires more than consent to the commission of a crime; more than knowledge of the commission of a crime; and more than presence at the scene of a crime, even when coupled with flight from the scene").

So, even accepting these two statements from Ms. Mejia, they do not as a matter of law rebut Mr. Reyes's evidence of innocence, nor do they constitute evidence of guilt of accountability even as a matter of law. Notably absent from the State's evidence, of course, is any assertion that Mr. Reyes participated in the planning or commission of the crime. That is because in the same deposition testimony the State relies on, Adriana Mejia stated that she had not had any planning conversations with Reyes, that she had no idea he would be there, that he did not enter the home with Adriana and Solache, that he did not kill Mr. or Mrs. Soto, that he did not grab the baby, and that she does not know who grabbed the boy. The only affirmative act she describes him committing is to try to stop Solache from stabbing Mrs. Soto upon arriving and seeing what was happening. Ex. 20 (Mejia Feb. 5, 2021 Dep.) at 219-220.[6] The State's only evidence, the testimony of Adriana, cannot possibly support guilt on an accountability theory, or any other. While the State attempts to dispute some of Mr. Reyes's facts, there is no dispute on a *material* issue, because all of the State's evidence combined cannot as a matter of law rebut Mr. Reyes's evidence of innocence.

---

[6] To be clear, Mr. Reyes disputes all of this vehemently; he has always maintained that he had absolutely no knowledge or involvement in the crime whatsoever. The factual presentation Petitioner presents is exclusively at summary judgment, construing the facts in the State's favor.

18

REYES 014810

FILED DATE: 4/7/2022 9:01 PM    98CR1244002

Mr. Reyes understands that the State believes he is guilty of this crime, regardless of what decades of new evidence have revealed about the corruption of this police investigation (and so many other Guevara investigations). That is a pity. But the only legitimate thing that ever connected him to the crime was his and his co-defendants' coerced statements. Stripping those away, and *truly* removing them from consideration as this Court must do, there is no possible way that a note in his pocket and the fact that he lived with Ms. Mejia and several others, rebuts Mr. Reyes's evidence of innocence, or constitutes affirmative evidence of guilt. Indeed, that meager evidence is insufficient *as a matter of law* to support guilt of murder or kidnapping on an accountability theory.

Even assuming the State could change course now and pursue an accountability theory, contrary to Palmer, it has failed to present evidence to support such a theory. Mr. Reyes is entitled to a COI as a matter of law.

## IV.    MR. REYES'S MOTION IS TIMELY

The State makes one additional argument, but it requires little attention at this point. The State asserts that this motion for summary judgment was not timely because the State did not have some depositions from Mr. Reyes's civil proceedings. The bulk of these depositions are neither relevant nor admissible (such as depositions of various prosecutors over the years, which contain multiple layers of hearsay). Indeed, the COI statute does not contemplate that the State can rely on any and all testimony ever generated in connection with a case. Subsection (c) says that the Court can consider materials attached to the petition, and subsection (f) makes clear that the State can rely on "prior sworn testimony or evidence admitted in the criminal proceedings related to the convictions." COI proceedings are not retrials and they are not evaluations of every shred of evidence under the sun. They are designed to be quick adjudications based on materials

19

REYES 014811

FILED DATE: 4/7/2022 9:01 PM   98CR1244002

the *Petitioner* has presented. *See* 95th Ill. Gen. Assem., House Proceedings, May 18, 2007, at 5-6 (statements of Representative Flowers (explaining that the language in the statute allowing judicial notice of prior proceedings, 735 ILCS 5/2-702(f), was placed in the statute to address concerns "that the process of petitioning for a COI would force the court to try…the original case over again")). In any event, Mr. Reyes has now provided all outstanding depositions to the State, and so the State's argument is moot.[7]

## CONCLUSION

Mr. Reyes was charged with principal crimes, and the State agrees there is no evidence that he committed any crime as a principal. This entitles him to a certificate of innocence as a matter of law under the binding holding of *Palmer*. Even assuming *arguendo* that the State had charged Mr. Reyes under an accountability theory, the State cannot rebut Mr. Reyes's evidence of innocence or to present affirmative evidence sufficient to meet the elements of its defense. For these reasons, the other reasons discussed herein, and the reasons raised in Mr. Reyes's petition for a certificate of innocence and motion for summary judgment, Mr. Reyes respectfully requests that this Court grant his motion for summary judgment and issue a certificate of innocence.

---

[7] Petitioner inadvertently did not attach the transcript from the second half of Ms. Mejia's February 2021 deposition. He provided a copy to the State on April 7, 2022 and has no objection if the State wishes to file a sur-reply to address this testimony.

REYES 014812

FILED DATE: 4/7/2022 9:01 PM   98CR1244002

Respectfully Submitted,

/s/ *Rachel Brady*
Rachel Brady
*Attorney for Arturo De Leon-Reyes*


Jon Loevy
Anand Swaminathan
Steve Art
Rachel Brady
Sean Starr
Loevy & Loevy
311 N. Aberdeen St., 3rd floor
Chicago, IL 60607
(312) 243-5900
brady@loevy.com

*Counsel for Petitioner Arturo De Leon-Reyes*

21

REYES 014813

FILED DATE: 4/7/2022 9:01 PM   98CR1244002

## CERTIFICATE OF SERVICE

I, Rachel Brady, an attorney, hereby certify that on this 7th day of April 2022, I caused a

copy of the foregoing to be served by electronic mail and USPS mail to:

Assistant State's Attorney
c/o Christa Bowden
Cook County State's Attorney's Office
2650 S. California Avenue
Chicago, IL 60608

Dated: April 7, 2022

Respectfully Submitted,

*/s/ Rachel Brady*
Rachel Brady
*Attorney for Arturo De Leon-Reyes*

Loevy & Loevy
311 N. Aberdeen St., 3rd floor
Chicago, IL 60607
(312) 243-5900
brady@loevy.com

REYES 014814

FILED DATE: 4/7/2022 9:01 PM    98CR1244002

# EXHIBIT 20

REYES 014815

# ILLINOIS STATE POLICE
Division of Forensic Services
Forensic Science Center at Chicago
1941 West Roosevelt
Chicago, Illinois 60608-1229
(312) 433-8000 (Voice) * 1-(800) 255-3323 (TDD)

George H. Ryan
*Governor*

December 16, 1999

Sam W. Nolen
*Director*

Detective Halvorsen
CHICAGO POLICE DEPARTMENT UNIT 650
DETECTIVE DIVISION, AREA 5
5555 WEST GRAND
CHICAGO, IL 60639

Laboratory Case #C98-015970
RD #C0198126

OFFENSE  Murder
SUSPECTS  Adriana Mejia/Gabriel Solache/Arturo DeLeon
VICTIMS  Jacinta Soto/Mariano Soto

The following evidence was received by the Forensic Science Center at Chicago on April 6, 1998:
**Inventory# 1972804**

| EXHIBIT | DESCRIPTION |
|---------|-------------|
| 1A | Blood Standard:  Jacinta Soto |

The following evidence was received by the Forensic Science Center at Chicago on April 6, 1998:
**Inventory# 1972807**

| EXHIBIT | DESCRIPTION |
|---------|-------------|
| 3A | Blood Standard:  Mariano Soto |

The following evidence was received by the Forensic Science Center at Chicago on April 7, 1998:
**Inventory# 1974077**

| EXHIBIT | DESCRIPTION |
|---------|-------------|
| 18A | Blood stain from green towel found in 1984 Toyota Corolla |
| 18B | Blood stain from green towel found in 1984 Toyota Corolla |
| 18C | Blood stain from green towel found in 1984 Toyota Corolla |
| 18D | Blood stain from green towel found in 1984 Toyota Corolla |
| 18E | Blood stain from green towel found in 1984 Toyota Corolla |
| 18F | Blood stain from green towel found in 1984 Toyota Corolla |
| 18G | Blood stain from green towel found in 1984 Toyota Corolla |

FILED DATE: 4/7/2022 9:01 PM  98CR1244002

Reyes_Jenner 009572

REYES 014816

CHICAGO POLICE DEPARTMENT UNIT 650
Laboratory Case #C98-015970                    -2-                    December 16, 1999

FILED DATE: 4/7/2022 9:01 PM   98CR1244002

The following evidence was received by the Forensic Science Center at Chicago on April 7, 1998:
**Inventory# 1982726**

| EXHIBIT | DESCRIPTION |
|---------|-------------|
| 19A | Blood stain from Adriana Mejia's shoes |
| 19B | Blood stain from Adriana Mejia's shoes |
| 19C | Blood stain from Adriana Mejia's shoes |
| 19D | Blood stain from Adriana Mejia's shoes |
| 19E | Blood stain from Adriana Mejia's shoes |
| 19F | Blood stain from Adriana Mejia's shoes |
| 19G | Blood stain from Adriana Mejia's shoes |

The following evidence was received by the Forensic Science Center at Chicago on April 9, 1998:
**Inventory# 1982723**

| EXHIBIT | DESCRIPTION |
|---------|-------------|
| 23B1 | Blood stain from towel |
| 23B2 | Blood stain from towel |

The following evidence was received by the Forensic Science Center at Chicago on April 9, 1998:
**Inventory# 1982731**

| EXHIBIT | DESCRIPTION |
|---------|-------------|
| 27A | Blood stain from Adriana Mejia's trousers |
| 27B | Blood stain from Adriana Mejia's trousers |
| 27C | Blood stain from Adriana Mejia's trousers |
| 27D | Blood stain from Adriana Mejia's trousers |

The following evidence was received by the Forensic Science Center at Chicago on September 2, 1999:
**Inventory# 2190428**

| EXHIBIT | DESCRIPTION |
|---------|-------------|
| 29A1 | Blood Standard:  Arturo DeLeon |
| 30A1 | Blood Standard:  Adriana Mejia |
| 31A1 | Blood Standard:  Gabriel Solache |

**RESULTS**
DNA from Exhibits 1A, 3A, 18A, 18B, 18F, 18G, 19B, 19C, 19D, 19E, 19G, 23B1, 23B2, 27A, 27B, 27C, 27D, 29A1, 30A1 and 31A1 was amplified using the Polymerase Chain Reaction (PCR) and profiled at the following loci: D3S1358, vWA, FGA, D8S1179, D21S11, D18S51, D5S818, D13S317, D7S820, D16S539, TH01, TPOX, CSF1PO and Amelogenin.

Due to an insufficient amount of human DNA for PCR analysis, Exhibit 19F was not profiled.

Reyes_Jenner 009573

REYES 014817

CHICAGO POLICE DEPARTMENT UNIT 650
Laboratory Case #C98-015970                     -3-                     December 16, 1999

**RESULTS** (continued)
Exhibits 18C, 18D, 18E and 19A were not examined.

A DNA profile was identified in Exhibits 18A and 18G which matches the DNA profile of Adriana Mejia and does not match the DNA profile of Jacinto Soto, Mariano Soto, Gabriel Solache or Arturo DeLeon. This profile would be expected to occur in approximately 1 in 390 quadrillion Black, 1 in 2.1 quadrillion White or 1 in 1.7 quadrillion Hispanic unrelated individuals.

A mixture of DNA profiles was identified in Exhibit 18B. A DNA profile was identified in Exhibit 18B which matches the DNA profile of Adriana Mejia and does not match the DNA profile of Jacinto Soto, Mariano Soto, Gabriel Solache or Arturo DeLeon. This profile would be expected to occur in approximately 1 in 390 quadrillion Black, 1 in 2.1 quadrillion White or 1 in 1.7 quadrillion Hispanic unrelated individuals.

An additional DNA profile was identified in Exhibit 18B at the FGA, D8S1179, D21S11, D18S51, D5S818, TH01, TPOX, CSF1PO and Amelogenin loci which does not match the DNA profile of Jacinto Soto, Mariano Soto, Arturo DeLeon, Adriana Mejia or Gabriel Solache.

A mixture of DNA profiles was identified in Exhibit 18F. A DNA profile was identified in Exhibit 18F which matches the DNA profile of Adriana Mejia and does not match the DNA profile of Jacinto Soto, Mariano Soto, Gabriel Solache or Arturo DeLeon. This profile would be expected to occur in approximately 1 in 390 quadrillion Black, 1 in 2.1 quadrillion White or 1 in 1.7 quadrillion Hispanic unrelated individuals.

Low levels of an additional (male) DNA profile were detected in Exhibit 18F at the CSF1PO and Amelogenin loci that are not suitable for comparison to known standards.

A DNA profile was identified in Exhibits 19E, 19G, 23B1, 23B2, 27A, 27B, 27C and 27D which matches the DNA profile of Mariano Soto and does not match the DNA profile of Jacinto Soto, Adriana Mejia, Gabriel Solache or Arturo DeLeon. This profile would be expected to occur in approximately 1 in 170 quadrillion Black, 1 in 35 quadrillion White or 1 in 300 trillion Hispanic unrelated individuals.

A mixture of DNA profiles was identified in Exhibits 19B, 19C and 19D. A DNA profile was identified in Exhibits 19B, 19C and 19D which matches the DNA profile of Mariano Soto and does not match the DNA profile of Jacinto Soto, Adriana Mejia, Gabriel Solache or Arturo DeLeon. This profile would be expected to occur in approximately 1 in 170 quadrillion Black, 1 in 35 quadrillion White or 1 in 300 trillion Hispanic unrelated individuals.

Low levels of an additional DNA type were detected in Exhibits 19B, 19C and 19D at the D16S539 locus that are not suitable for comparison to known standards.

**CONCLUSIONS**
No comparisons were made from Exhibit 19F due to the insufficient amount of DNA obtained.

Reyes_Jenner 009574

REYES 014818

FILED DATE: 4/7/2022 9:01 PM   98CR1244002

CHICAGO POLICE DEPARTMENT UNIT 650
Laboratory Case #C98-015970                                   -4-                                   December 16, 1999

FILED DATE: 4/7/2022 9:01 PM   98CR1244002

**CONCLUSIONS** (continued)
The blood identified in Exhibits 18A, 18F and 18G is consistent with having originated from Adriana Mejia and could not have originated from Jacinto Soto, Mariano Soto, Gabriel Solache or Arturo DeLeon.

The mixture of DNA profiles identified in Exhibits 18B is consistent with having originated from Adriana Mejia and an unidentified individual. Jacinto Soto, Marino Soto, Gabriel Solache or Arturo DeLeon could not have contributed to this mixture of DNA profiles.

The blood identified in Exhibits 19B, 19C, 19D, 19E, 19G, 23B1, 23B2, 27A, 27B, 27C and 27D is consistent with having originated from Mariano Soto and could not have originated from Jacinto Soto, Adriana Mejia, Gabriel Solache or Arturo DeLeon .

**REQUESTS**
Upon submission of additional standards, further analysis can be conducted to resolve the source of the open profile identified in Exhibit 18B.

No examination of Exhibits 18C, 18D, 18E and 19A was performed at this time. If, at a later date, it is determined that the value of this evidence can significantly aid the case, please advise.

For results of previous biological examinations, please refer to my laboratory report and to the laboratory report by Forensic Scientist Elizabeth Boedeker from the Forensic Science Center at Chicago.

If you have any questions regarding this report, please feel free to contact me.

**EVIDENCE DISPOSITION**
DNA evidence will be maintained in the laboratory evidence vault until such time as the case has been adjudicated or the evidence is required by the agency.

Respectfully submitted,


Barbara J. Wilson
Forensic Scientist

cc: Chief, Detective Division - Crime Analysis, Unit 601
    ASA Mercedes Luque-Rosales-Rm 11 B28-Cook County State's Attorney's Office, 2600 S. California

Reyes_Jenner 009575

REYES 014819

FILED DATE: 4/7/2022 9:01 PM   98CR1244002

# EXHIBIT 21

REYES 014820

FILED DATE: 4/7/2022 9:01 PM   98CR1244002

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION


ARTURO DELEON-REYES,                    )
                                        )
                Plaintiff,              )
                                        )
vs.                                     ) Case No. 18-CV-01028
                                        )
REYNALDO GUEVARA, et al.,               )
                                        )
                Defendants.             )
_____ )
GABRIEL SOLACHE,                        )
                                        )
                Plaintiff,              )
                                        )
vs.                                     ) Case No. 18-CV-02312
                                        )
REYNALDO GUEVARA, et al.,               )
                                        )
                Defendants.             )


        VOLUME IV OF THE VIDEOTAPED RECORD OF

PROCEEDINGS FOR THE DEPOSITION of ADRIANA MEJIA, a

witness, called by Defendant City of Chicago for

examination in the above-entitled cause, pursuant to

the Federal Rules of Civil Procedure, taken before me,

Brenda L. Zeitler, CSR, License No. 084-004062, by

Zoom Video Conference on the 5th day of February,

2021, commencing at 9:04 a.m.


REYES 014821

FILED DATE: 4/7/2022 9:01 PM   98CR1244002

ADRIANA MEJIA, 02/05/2021                                   Page 2..5

**Page 2**

APPEARANCES:

 LOVEY & LOEVY
 BY:  ANAND SWAMINATHAN, ESQ.
 and RACHEL BRADY, ESQ
 and SEAN STARR, ESQ
 311 North Aberdeen, 3rd Floor
 Chicago, Illinois  60607
 (312) 243-5900
 anand@loevy.com
 brady@loevy.com
 sean@loevy.com
  On Behalf of Plaintiff Arturo Reyes.
PEOPLE'S LAW OFFICE
 BY:  JAN SUSLER, ESQ.
 1180 North Milwaukee Avenue
 Chicago, Illinois  60642
 (773) 235-0070
 jsusler@gmail.com
  On Behalf of Plaintiff Gabriel Solache.
COOK COUNTY STATE'S ATTORNEY'S OFFICE
 BY:  EDWARD BRENER, ESQ.
 and DAVID ADELMAN, ESQ.
 50 West Washington Street, Room 500
 Chicago, Illinois  60602
 (312) 603-3369
 edward.brener@cookcountyil.gov
 david.adelman@cookcountyil.gov
  On Behalf of Cook County Defendants.
ROCK FUSCO & CONNELLY, LLC
 BY:  EILEEN E. ROSEN, ESQ.
 and THERES B. CARNEY, ESQ.
 312 North Clark, Suite 2200
 Chicago, Illinois  60654
 (312) 494-1000
 erosen@rfclaw.com
 tcarney@rfclaw.com
  On Behalf of Defendant City of Chicago.

**Page 3**

APPEARANCES (Continued):

 LEINENWEBER, BARONI & DAFFADA, LLC
 BY:  MEGAN McGRATH, ESQ.
 120 North LaSalle Street, Suite 2000
 Chicago, Illinois  60602
 (312) 663-3003
 mkm@ilesq.com
  On Behalf of Defendant Guevara.
REITER BURNS LLP
 BY:  DANIEL M. NOLAND, ESQ.
 311 South Wacker, Suite 5200
 Chicago, Illinois  60606
 (312) 982-0900
 dnoland@reiterburns.com
  On Behalf of Defendant Navarro.
THE SOTOS LAW FIRM, P.C.
 BY:  JOSH M. ENGQUIST, ESQ.
 and CAROLINE JAMIESON GOLDEN, ESQ.
 and SAMANTHA PALLINI, ESQ.
 141 West Jackson Boulevard, Suite 1240A
 Chicago, Illinois  60604
 (630) 735-3300
 jengquist@jsotoslaw.com
 cgolden@jsotoslaw.com
 spallini@jsotoslaw.com
  On Behalf of Individual Defendants.
BEDI & SINGER, LLP
 BY:  DENA M. SINGER, ESQ.
 53 West Jackson, Suite 1505
 Chicago, Illinois  60604
 (312) 525-2017
 dsinger@bedisinger.com
  On Behalf of the Deponent.
ALSO PRESENT:
 JOSEPH BONURA, Interpreter (9:00 to 1:00)
 ELSA MADRIGAL, Interpreter (1:00 to end of day)
 BRETT SCHATZLE, Videographer
 VALERIE BARAJAS, Paralegal for Loevy & Loevy

**Page 4**

    I N D E X
WITNESS:
 ADRIANA MEJIA
  Exam by Mr. Swaminathan (Continued)   6
  Examination by Mr. Engquist ....... 214
  Further Examination by Ms. Rosen .. 227

EXHIBITS:

 PLAINTIFF'S EXHIBIT NO. 1 ................  68
  Area 5 Supplementary Report,
  Cleared Closed Report
  (RFC Solache Reyes 233-253
 PLAINTIFF'S EXHIBIT NO. 2 ................ 105
  Photographs of Car
  (RFC Solache Reyes 44)
 PLAINTIFF'S EXHIBIT NO. 3 ................ 113
  Google Map

 PLAINTIFF'S EXHIBIT NO. 4 ................ 119
  Prescriptions for Rosauro Mejia
  from Sinai Medical Group
  (Bluhm 25519 and 25520)
 PLAINTIFF'S EXHIBIT NO. 5................. 167
  "Notes," Two Sheets of Paper with
  Handwriting on Them
  (Reyes 264)

 PLAINTIFF'S EXHIBIT NO. 6 ................ 172
  04/15/98 Supplementary Report by
  McDonald and Collins
  (RC Solache Reyes 194 - 196)
 PLAINTIFF'S EXHIBIT NO. 7 ................ 174
  11/18/99 Area 5 Supplementary Report,
  Progress Investigation 3, Cleared
  Closed Report by Investigator Trevino
  (No Bates)
 PLAINTIFF'S EXHIBIT NO. 8 ................ 185
  Phone Log
  (RFD Solache Reyes 160 - 162)

**Page 5**

EXHIBITS (Continued):
 PLAINTIFF'S EXHIBIT NO. 9 ................ 202
  06/01/99 Letter from Adriana Mejia
  to Gabriel Solache
  (RFC Solache Reyes 4812 - 4816.)

 PLAINTIFF'S DEPOSITION EXHIBITS 10 ....... 204
  07/12/99 Letter from Adriana Mejia
  to Gabriel Solache
  (RFC Solache Reyes 4827 - 4836)
 DEFENDANT'S EXHIBIT NO. 5 ................ 198
  06/11/98 Letter to "Lupe"
  (RFC Solache Reyes 3949 - 3952)
 DEFENDANT'S EXHIBIT NO. 7 ................  65
  Chicago Police Department CB Report
  (RFC Solache Reyes 207)
 DEFENDANT'S EXHIBIT NO. 9 ................ 189
  04/98 Cermak Health Record Form
  (HIPAA 4 and HIPAA 5)
 DEFENDANT'S EXHIBIT NO. 19 .............. 134
  Declaration of Jose Mejia
  (Reyes 8726 - 8729
 DEFENDANT'S EXHIBIT NO. 36 .............. 191
  Transcription of an Audio Recording
  of a Call that Took Place on October
  23, 2019

REYES 014822

FILED DATE: 4/7/2022 9:01 PM   98CR1244002

ADRIANA MEJIA, 02/05/2021                                    Page 6..9

**Page 6**

THE VIDEOGRAPHER: This is the beginning of media unit 1, and we are now on the video record at 9:04 a.m. This is the continuing videotaped video conferenced deposition of Adriana Mejia taken on February 5, 2021. You may proceed.

MR. SWAMINATHAN: Good morning, Ms. Mejia.

THE WITNESS: Good morning.

MR. SWAMINATHAN: Did you get a chance to get some rest last night?

THE WITNESS: A little bit.

MR. SWAMINATHAN: You understand this is your continued deposition in this case, correct, a continuation from yesterday?

THE WITNESS: Si.

THE INTERPRETER: The translator wants to ask: Do I start interpreting now? Because I haven't been sworn in.

MR. SWAMINATHAN: Please. Let's start over. Can you please -- let's get the interpreter sworn in.

(Interpreter sworn.)

(Witness sworn.)

ADRIANA MEJIA, after having been first duly sworn to tell the truth, was examined and testified upon her oath through the

**Page 7**

interpreter as follows:

EXAMINATION (continued)

BY MR. SWAMINATHAN:

Q. Ms. Mejia, you understand this is a continuation of your deposition from yesterday, correct?

A. Yes.

Q. And just like yesterday, you remain under oath, correct?

A. Yes.

Q. Anything that would prevent you from being able to understand my questions and give truthful answers today?

A. No.

Q. You said yesterday that you were having headaches. Are you having headaches today?

A. Just a little bit. I took pills.

Q. So you feel like you're fine to be able to go forward with the questioning; is that right?

A. I'm going to try to answer everything truthfully and to be strong and do it well.

Q. Okay. If at any point you feel like your headaches or anything else is hurting your ability to understand my questions and answer them, please tell

**Page 8**

us, and we'll stop. Okay?

A. Okay.

Q. So as long as you continue to answer questions, we will assume you are feeling fine to be able to do so. Okay?

A. Okay.

Q. I'll indicate again to you this morning we can take a break any time you need to take a break, okay?

A. Very well.

Q. If at any point you are feeling tired or you need to get some food for your blood sugar, let us know and we'll take a break. Okay?

A. Very well. Thank you.

Q. I want to ask you about one thing you said yesterday. Yesterday, when you were describing what happened when you were first going into the Soto home, you said that Gabriel and then you went first and Arturo came later. That's the phrase you used. What did you mean by that?

A. When we got to the house first, Gabriel got out, and then I got out.

Q. Then did Arturo come later? Is that what you're saying?

**Page 9**

THE INTERPRETER: Translator wants to ask: Are you referring to did he arrive later?

MR. SWAMINATHAN: Let me reask it.

Q. When you and Gabriel first went to the house, Arturo came after that; is that right?

MS. ROSEN: Objection, form.

A. A few minutes afterwards. It didn't take long.

Q. Was he waiting in the car?

A. Yes. A few minutes, not a lot.

Q. Did anybody call him to come in, or did he come in on his own?

A. I no longer remember.

Q. When Arturo first came in, what had happened in the apartment at the point that he came in?

A. When he came in, I believe that Gabriel already had stabbed him. When he came in, he asked what were we doing, because he had come in a little bit later.

Q. So when he came in, Mr. Soto had already been stabbed; is that right?

A. Yes.

Q. Okay. I want to ask you about your background and go back to when you lived in Mexico. I

Urlaub Bowen & Associates, Inc.   312-781-9586

REYES 014823

ADRIANA MEJIA, 02/05/2021                                    Page 10..13

FILED DATE: 4/7/2022 9:01 PM   98CR1244002

Page 10

know you were asked a few questions about that. I want to ask you a couple of things.

A. Very well.

Q. What was the name of the town you grew up in?

THE INTERPRETER: Translator is not able to make it out. Turundeo.

MR. SWAMINATHAN: Turundeo, yeah?

A. Turundeo.

Q. Did you grow up with both your parents?

A. Yes.

Q. Did they work?

A. My dad is a -- works on the land, and my mother always worked at home.

Q. Have your parents ever come to the United States to visit you?

A. Yes. They came when I did my time in 2000 and last year in December.

Q. So they visited you, you said, in 2000?

A. Yes, when I was sentenced. I think it was around 2000.

Q. Where would they see you when they came in 2000?

A. The first time they saw me, they saw me in

Page 11

Cook County.

Q. Where did they see you after that?

A. They were there a couple months extra, and they came to see me in Dwight.

Q. Anywhere else during the 2000 visit?

A. Not until this year, this past year, in December.

Q. How many times did they visit with you when they came in 2000, between Cook County Jail and Dwight Correctional Center?

A. The truth is, I don't remember.

Q. Did they stay with your brother Carlos?

A. Yes. Also for a time with my friend Lorena.

Q. How did you know Lorena?

A. Lorena is from Michoacan, but I know her because she is a friend of one of my aunts.

Q. Do you stay in touch with her?

A. Yes.

Q. Do you still talk to her on the phone?

A. No. Unfortunately, I don't have a telephone number, just the address.

Q. When was last time you were able to communicate with her on the phone?

A. Since she went to Texas.

Page 12

Q. And approximately when was that?

A. The truth is I don't remember what year it was.

Q. And then you said your parents came again in December of 2020. Why did they come then?

A. Because they came to see how I was.

Q. Did they come to the US for any other reason in December of 2020?

A. No. They just came to see me and my brother. That's it.

Q. When did Carlos pass away?

A. I'm not sure. But when they had told me that he had passed away, it was around the 18th of May. And when they told me he had already passed away, it had been already 23 days since he had passed away.

Q. Were you able to go to his funeral?

A. No.

Q. I'm sorry to hear about that.

A. (Nodding head up and down.)

Q. That was May of 2020 when he passed away?

A. Yes.

Q. Do you have any other brothers who are in the US?

Page 13

A. No.

Q. When your parents came in December, I assume they came and visited you at the prison?

A. Yes.

Q. How many times did they visit you?

A. They only had two weeks of permission. It was a short time. I think it was four or five times.

Q. You said they only had two weeks for what? For the mission?

A. In other words, when they gave them their visa to come, their permission to come, they didn't get it for a long period. It was for a short period of time to be here.

Q. When they came in December of 2020, did you talk to them at all about this case?

A. Very little. People brought them, some friends. Some friends had brought them. No, very little.

Q. The friends who brought them, were they people that you knew?

A. Yes. I know a girl or a young lady who came, and then the woman who visits me was from the church, and another friend with her brother-in-law.

Q. So the people who came to visit with your

REYES 014824

ADRIANA MEJIA, 02/05/2021            Page 14..17

Page 14

parents, what were their names?

A. Beatrice Lopez, Aurora Ortiz, Ramon Calvario, Yarina Sanchez, my brother Carlos. Then some other people brought them, but they left my parents alone with me.

Q. The person named -- is it Raido Sanchez?

A. Ramon Calvario.

Q. And then you said Raida Sanchez? What was the next person's name?

A. Yarina Sanchez.

Q. Is that Y-a-d-i-r-a?

THE INTERPRETER: Translator says spell that again, sir. I'm sorry.

Translator says I got Y-a-r-i-d-a-n. That's what I'm hearing.

A. Yes, Yarina.

Q. And you said Carlos brought your parents for some of those visits; is that right.

And would Carlos visit you regularly --

THE INTERPRETER: Translator didn't get an answer.

MR. SWAMINATHAN: Go ahead. You can answer.

Let's start again because you said you didn't get an answer to the last question, right?

Page 15

THE INTERPRETER: Translator repeated it again, and I still didn't get an answer. I don't know why.

A. When my brother came, he couldn't drive because he didn't have a license. So when my brother came, he came with Beatrice Lopez, with her husband, but her husband could not come in to see me.

Q. So Carlos came with your parents, right?

A. Yes.

Q. And would he also come regularly before he brought your parents?

A. No.

Q. When was the last time he visited you before he came with your parents?

A. I don't remember if it was, like, nine or ten years. I was not in communication with him.

Q. Is there a reason why he wasn't visiting you or communicating with you?

MS. ROSEN: Objection -- sorry. Go ahead.

(Question translated.)

MS. ROSEN: Objection: Form, foundation.

A. He had a personal problem among brothers.

THE INTERPRETER: Translator is not sure if she said he did or I did. That part didn't come out.

Page 16

I don't know if she said "tuve" or "tuvo" because I couldn't hear that. I don't know if she said I had a problem or he had a problem with brothers.

MR. SWAMINATHAN: Can you get clarification?

A. My brother and I had had an argument.

Q. What was the argument about?

A. About some money.

Q. Was it your money or his money that was the subject of the argument?

A. Some family members had sent that to me, and he had never put it in.

Q. And when did that fight happen?

A. Like around 10 years or 11 years, something like that. I'm not sure. I don't remember exactly.

Q. Did he tell you why he wasn't going to put the money in your account?

A. No. I was in communication with him. He wasn't accepting my calls, and I was not calling him anymore.

Q. Before that, had you and Carlos been close?

A. Unfortunately, no. My brother and I had always argued a lot from when we were kids.

Q. And when you were in the US, you were living together at the Mozart house, correct?

Page 17

A. Yes.

Q. So were you close at that time?

A. Very little, because he worked, and he would go with his friends to bars or dancing.

Q. Would he drink?

A. Yes.

Q. Would he drink a lot?

A. I think that's something that caused his death. I'm not very sure.

Q. Was he drinking a lot even back in 1998, when he was living with you?

A. Yes. He would drink with Gabriel Solache, with Leobardo, with my ex-husband, with my other brothers-in-law and a lot of friends.

Q. Did you have any other family members living in the US with you other than Carlos?

A. No. I have family from my father's side, but I don't have communication with them.

Q. Carlos, you said, would go to the bars and go out dancing. Would he ever get in trouble with the police?

A. The truth is, I don't know.

Q. Do you know if he ever got arrested?

A. The truth is, I don't remember if he told

Urlaub Bowen & Associates, Inc. 312-781-9586

FILED DATE: 4/7/2022 9:01 PM 98CR1244002

REYES 014825

ADRIANA MEJIA, 02/05/2021                                    Page 18..21

Page 18

me.

Q.   Do you know if he ever went to jail for any period of time?

A.   As far as I know, no.  I don't know.

Q.   Did he use any drugs?

A.   My brother?

Q.   Yeah, Carlos.

A.   The truth is, I don't know.

Q.   Would he get in fights?

A.   No.

Q.   You said that Carlos was working a lot back then.  Where did he work?

A.   He worked in a type of a restaurant.

Q.   Do you remember the name of it?

A.   It was called Piadaria Jalisco.  But after that, they closed it.

Q.   When did they close it?

A.   I don't remember what happened with the owner.  Something my brother commented to me, I think he told me that the owner had gone to prison.  I'm not sure though.

Q.   But her brother told her that it was closed.  Was that after she'd been arrested?

THE INTERPRETER:  The translator asks you to

Page 19

repeat that, sir.  It didn't come in clear.

Q.   Yes.  When her brother told her that the restaurant had been closed, was that sometime after she'd already been arrested?

MS. ROSEN:  Objection, form.  Her?  She?

THE INTERPRETER:  The translator asks that you ask the question directly to her.  If I say, "When her brother," she's not going to know who I'm referring to.  She's going to think I'm speaking about another woman.  You have to speak to her.  I am your voice.

MR. SWAMINATHAN:  Okay.  Sorry.

MS. ROSEN:  Yeah.  Objection, form.

MR. SWAMINATHAN:  Yeah.  Let me ask it again.

Q.   When Carlos informed you that Jalisco had been closed, was that after you'd been arrested?

A.   Yes.  When he told me they had closed the bar, I was already in jail.  I was already an inmate.

Q.   What was Carlos's job at the Jalisco Piadaria?

A.   I think he would make or prepare the tacos.

Q.   So he was basically a cook?

A.   Something similar to that.  He would attend

Page 20

to the tables and to the clients, to the customers.

Q.   So what was his usual shift?  What hours did he work?

A.   I don't think he had a shift.  I think he went from the morning until very late, but I don't remember exactly the schedule.

Q.   What time would he usually get home?

A.   Different times.

Q.   What were the earlier times he would usually get home?

A.   Like 7:00 or 8:00 at night.  I don't know.

Q.   Then if he stayed out late, when would he come home?

MS. ROSEN:  Objection, form,

MR. SWAMINATHAN:  Go ahead.

A.   Can you please repeat the question?

MR. SWAMINATHAN:  Yeah.  And Mr. Interpreter, yesterday you had not been interpreting the objections in the morning.  Then we continued that practice in the afternoon with the other interpreter.  It did reduce the confusion for the witness.  I would suggest you continue that practice today.  Then if there's a point we need to, we can do that.

Page 21

THE INTERPRETER:  Just to make sure, the translator is asking:  You don't want me to translate the objections, correct?

MR. SWAMINATHAN:  That's right.  That would be consistent with yesterday's practice.

THE INTERPRETER:  Yes, sir, whatever makes it easier for you.  Sorry about that.

MR. SWAMINATHAN:  No problem.  No problem.

BY MR. SWAMINATHAN:

Q.   If he stayed up late, when would he usually come home?

MS. ROSEN:  Objection:  form, foundation.

A.   I don't know.  Sometimes I would be asleep.  He'd get there different times.

Q.   Was it your understanding that his work ended before midnight, but sometimes he would stay out after that?

A.   Yes.  Since he had a girlfriend, I would imagine he would go see his girlfriend.  He had his friends.

Q.   Would his shifts at work -- strike that.  His work hours, did they end before midnight?

MS. ROSEN:  Objection:  form, foundation.

Urlaub Bowen & Associates, Inc.  312-781-9586

REYES 014826

ADRIANA MEJIA, 02/05/2021 — Page 22..25

Page 22

A.  Sometimes he would stay there if the boss would leave early.  He would stay and close up.  He would stay and clean up.

Q.  If he stayed to close up, how late would he have to stay?

A.  I don't know because I didn't pay too much attention to what time he would come.

Q.  Was it a restaurant or bar?

A.  It was a family restaurant.

Q.  Would it close before midnight then?

A.  Yeah.  I think he closed, like, around 9:00.  Depending if there was a lot of people or not a lot of people, they would close.

Q.  Did Carlos have any other jobs other than the job at the Jalisco Piadaria?

A.  Before, yes.  I think he would mow the grass.

Q.  In March and April of 1998, when you were arrested, was his only job the restaurant job?

THE INTERPRETER:  Translator asks the job in the bar, correct?

MR. SWAMINATHAN:  The restaurant job.

A.  Yes.

Q.  I wanted to go back to the money that you

Page 23

had an argument with Carlos over.  How much money was sent for you?

A.  They sent me -- I don't remember if it was 200 or $300.

Q.  And who sent it?

A.  My cousin who is in Washington, Elizabeth Torres.

Q.  Why did she send it to you?

A.  Well, she said she was going to help me so that I would have something, to help me in the prison.

Q.  Was she someone you stayed in touch with, even after you were in prison?

A.  Now?  With her?

Q.  Yeah.  Do you stay in touch with her now?

A.  No.  Unfortunately, after all those years, after all that, once, she visited me in prison and then, after that, no.

Q.  Do you have anyone who still visits you?

A.  No, just the woman Aurora.

Q.  Anyone else?

A.  No.  I don't have any visits.

Q.  How do you know Aurora?

A.  I know her, like, two or three years through a friend who is a woman from the church that they go

Page 24

visit people who are in jail, in prison.

Q.  You said that you told your parents just a little bit about this case when they visited you.

MR. ENGQUIST:  Objection to form.

Q.  What little did you tell them?

A.  Very little, because they came with people.  I just told them to stay strong, to be strong.  Very little.

Q.  I know that was very little, but what was that little bit that you told them?

A.  About my sentence.  In Mexico, it's called perpetual -- the lowest chains a lot are different.  I told them to continue having faith and continue praying a lot.

Q.  Continue having faith that you would hopefully be released one day?

A.  Yeah.  I have faith that some day I'll be able to leave.

Q.  Did you tell them that you were expecting that one day that would happen for you?

A.  Why not?  Why can't I have another opportunity?

Q.  So that's, yes, you did tell them that you were expecting that, one day, that would happen to

Page 25

you?

A.  Yes.  I still feel that, and it could be soon, perhaps.  You never know.  No one knows.

Q.  And did you tell them that, before that, you had to do these depositions in this case?

A.  Now?

Q.  When you visited with them, at that point, you knew that there were these depositions in this case, right?

MS. ROSEN:  Objection, form, foundation.

MR. SWAMINATHAN:  Go ahead.

A.  No.

Q.  You said that this visit was in December of 2020, right?

A.  Yes.

Q.  So you had already been deposed, right?

A.  Yes.

Q.  So did you tell them that you had to answer these -- you'd been answering these questions in this case?

MS. ROSEN:  Objection:  Form, foundation.

A.  The truth is I don't remember.

Q.  Have you ever told your parents before they visited you that you were hoping to be able to get

Urlaub Bowen & Associates, Inc.  312-781-9586

FILED DATE: 4/7/2022 9:01 PM  98CR1244002

REYES 014827

ADRIANA MEJIA, 02/05/2021                     Page 26..29

Page 26

out?

A. I've always said that to them. I always have hope.

Q. Have you ever told them that you expected to be released soon?

A. I always thought that maybe I can get out soon. Why not?

Q. You've always said that you were going to get out soon?

A. I've always said that I have a lot of faith, a lot of hopes that --

MS. ROSEN: Is everything okay?

THE WITNESS: The guard is asking me if I'm okay.

MR. SWAMINATHAN: I think she was in the middle of her answer. Can you ask her the question again or read back my question?

THE WITNESS: Could you please repeat the question to me?

MR. SWAMINATHAN: Yeah, let's have the court reporter read it back.

(Requested record read.)

THE INTERPRETER: Translator wants to say that's all there was. I gave up until what I heard

Page 27

because she turned at that time to look at someone. And then someone asked her, "Is everything okay?" and she didn't give anymore.

MR. SWAMINATHAN: I'll just ask another question.

Q. Ms. Mejia, when your parents came to visit you in 2020, did you tell them that you expected that you would be released soon?

A. I always said it.

Q. You've always said that you expected to be released soon?

A. I still say it. There could be a miracle. You people have your laws, and I respect them.

Q. I just want to be clear. When you spoke to them in December when they visited you, you told them that you expected you would be released soon; is that right?

A. I hope to get out of here soon. I'm not going to stay here the rest of my life.

Q. That's what I want to -- did you tell them that you hoped to or that you expected to?

A. I hope. I hope.

Q. You didn't tell them that you expected that it was about to happen?

Page 28

A. Always like -- how can I say this -- I can't explain this question.

Q. You had mentioned yesterday that you had -- strike that.

Yesterday, you were asked if your parents had any interactions with Gabriel Solache. Do you remember that?

A. One time, I asked my mother -- I asked my mother if they have seen him. And she said they've only seen him once when he had recently went to Mexico and was in the town, but they didn't speak to him.

Q. So there was only one time that your mother saw Gabriel Solache, correct?

A. Yes.

Q. And he didn't say anything to her, right?

A. I don't think my family has -- are in communication with him.

Q. And your mom told you about this one time that she saw him in town, right?

A. Yes.

Q. Other than saying she saw him, did she say anything else about seeing him?

A. No. My mom is not going to say anything to me.

Page 29

Q. What do you mean she's not going to say anything to you?

A. My mom is, like -- my mother is not going to say absolutely anything about him.

Q. Your mother told you that she saw him?

A. Yes, just a little bit, just in passing.

Q. And she told you that they didn't have any kind of conversation, correct?

A. No.

Q. And that's it. That's all that happened?

MS. ROSEN: I have a belated form and foundation objection. Sorry.

A. That's all she told me, and she's not going to say any -- absolutely nothing to me about him.

Q. She did not tell you that he threatened her at all, right?

A. No.

Q. She not tell you that he scared her or anything like that, right?

A. The truth is I don't know.

Q. Well, she didn't tell you that she was in fear of him or that he said something to make her feel fearful, right?

A. No.

Urlaub Bowen & Associates, Inc.   312-781-9586

REYES 014828

FILED DATE: 4/7/2022 9:01 PM 98CR1244002

ADRIANA MEJIA, 02/05/2021      Page 30..33

Page 30

Q. She just told you she saw him?

A. Yes.

Q. Are you still close with your parents?

A. Yes.

Q. How often do you talk to them on the phone?

A. Whenever I have minutes on my telephone, I call them.

Q. And how often is that?

A. I call them like four or three times per week.

Q. Do you talk to both your mom and dad?

A. Yes.

Q. Have you ever told them the truth about what happened?

A. No.

Q. Have you ever told them anything about it?

A. Very little.

Q. Have you told them a false story about what happened?

THE INTERPRETER: Translator says can you repeat that, please? You cut out.

Q. Have you told them a false story about what happened?

MS. ROSEN: Objection, form.

Page 31

A. I'm not going to answer that question.

Q. How old were you when you left Mexico?

A. I think 19.

Q. Had you been living at home until the time that you left?

Strike that. Let me ask a better question.

Were you living with your parents until the time that you left Mexico at 19?

A. No. When I got married, I went to my husband's town.

Q. And how old were you when you and Rosauro got married?

A. I was 16, and he was 18.

Q. When you went to live with him in his town, who lived with you in the house you lived in with Rosauro?

THE INTERPRETER: The translator couldn't make out what she said twice. It was echoing. Could I ask her to say it one more time slower?

A. When I went with him, I went to the house of one of his brothers. The house was loaned to us by his brother.

Q. So who lived at that house other than you and Rosauro?

Page 32

A. No one.

Q. And who is the brother who lent you all the house?

A. Encarnacion Mejia.

Q. Was that the only house you lived in while in Mexico with Rosauro before you came to the US?

A. Sometimes I would come to my mother-in-law's house, and I'd stay there with her.

Q. Who lived in that house?

A. My father-in-law, my sister-in-law Rosa, and two smaller brothers, younger brothers, of my husband, but they don't go to the Mexico capitol to work. They would only be there from time to time.

Q. What were their names?

A. Endovias Mejia, Leobardo Mejia.

Q. Any other Mejias who lived in the mother-in-law's house?

A. No.

Q. How did you meet Rosauro? How did you two end up getting married?

MS. ROSEN: Objection: form, compound.

A. It's a very long story. I'm not going to answer that.

Q. Did your families put you together, or did

Page 33

you guys meet and fall in love?

A. No. We met.

Q. And were you in love when you got married?

A. Yes.

Q. And when you were living in Mexico with Rosauro, were the two of you happy?

A. Yes.

Q. And then how was it decided that you would come to the United States?

A. When he came first.

Q. Why did he decide to come to the US?

MS. ROSEN: Objection: form, foundation.

A. Him?

Q. Yes?

A. Because, in Mexico, there's not a lot of opportunities for work.

Q. And so he -- go ahead.

A. He didn't have a stable job; so there was no way to get ahead.

Q. So did you both agree that you would move to the United States?

A. No. He wanted to come.

Q. So he made the decision on his own?

A. Yes.

Urlaub Bowen & Associates, Inc.    312-781-9586

REYES 014829

FILED DATE: 4/7/2022 9:01 PM 98CR1244002

ADRIANA MEJIA, 02/05/2021                                    Page 34..37

Page 34

Q. But did he tell you in advance, before he left?

A. Yeah. We would talk about it a lot.

Q. And were you happy to go to the United States?

A. Me?

Q. Yes.

MS. SINGER: Object to the form of the question. She does have a Fifth Amendment right regarding this.

MR. SWAMINATHAN: I'm sorry, Dena. Do you want her to assert the Fifth on this? Is that what you said?

MS. SINGER: I do, yeah, on this line of questioning.

MR. SWAMINATHAN: Do you want to talk to her, take a quick break and talk to her?

MS. SINGER: I can talk to her and take a breakout room, or you guys can move on from this.

MR. SWAMINATHAN: Why don't you go into a breakout room. I'm not going to spend much more time on this, but I want to be able to assert what you need to assert. So why don't you go quickly to a breakout room.

Page 35

MS. SINGER: She's going to have to get a sheriff.

THE INTERPRETER: The translator says you don't want to give the answer then, correct.

MS. SINGER: I'm asking to hold off on the answer. I'm asking to talk to her.

THE VIDEOGRAPHER: All right. Let's go off the record. We're going off the video record at 10:09 at the end of media unit 1.

(Recess in proceedings from 10:09 to 10:14 a.m.)

THE VIDEOGRAPHER: We are back on the video record at 10:14 at the beginning of media unit 2.

MR. SWAMINATHAN: Madam court reporter, could you read back the last question, and then we'll have it interpreted to allow Ms. Mejia to answer?

(Pending question read.)

A. I'm not going to answer.

Q. Are you asserting your Fifth Amendment right?

A. Yes. In this question, yes.

Q. When I asked you earlier today if you ever told your parents a false story about what happened to the Soto family, you said you were not going to answer

Page 36

that question, right?

A. Yes.

Q. Are you asserting your Fifth Amendment right for that question?

MS. ROSEN: Objection: form, foundation.

A. Yes.

Q. Did you have concerns about coming to the United States?

MS. ROSEN: Objection, form.

A. I'm not going to answer.

Q. Are you asserting your Fifth Amendment right?

A. Yes.

Q. Did you have concerns about staying in Mexico?

MS. ROSEN: Objection, form.

A. I'm not going to answer.

Q. Are you asserting your Fifth Amendment right against self-incrimination?

THE INTERPRETER: The translator is not sure if she answered. Her volume is very low. I think I heard "uh-huh," but I can't tell you for sure.

A. Yes.

Q. Did Rosauro have concerns about staying in

Page 37

Mexico?

MS. ROSEN: Objection: form, foundation.

A. I don't know.

Q. Did Rosauro ever indicate to you that he had any concerns about staying in Mexico?

MS. ROSEN: Objection, form.

A. I don't know.

Q. Did you or anyone in your family have any issues with the police in Mexico at the time that you were planning to leave?

MS. ROSEN: Objection: form, foundation.

A. Pardon me? Could you please repeat the question?

Q. Did anybody in your family have any issues with the police at the time that you were making a decision to leave?

MS. ROSEN: Objection: form, foundation.

A. No.

Q. Did anyone in Rosauro's family have any problems with the police when you were making the decision to leave Mexico?

MS. ROSEN: Objection: form, foundation.

A. I don't know very much about my husband's family, if they had problems or not.

Urlaub Bowen & Associates, Inc.   312-781-9586

REYES 014830

FILED DATE: 4/7/2022 9:01 PM   98CR1244002

ADRIANA MEJIA, 02/05/2021                                    Page 38..41

Page 38

Q.  When the decision was made to go to the United States, did anybody else go with Rosauro?

A.  I don't remember.  I don't know.

Q.  When you went to the United States, did you go with anyone else?

A.  Yes.

Q.  Who else did you go with?

A.  This is private.  This is his family.

Q.  Okay.  These are important questions, and we need you to answer them.

Who else came with you to the United States?

MS. ROSEN:  I'm going to object to form, foundation, and harassing and to your representations about what are and what are not important questions. From the Defendant's perspective, these are irrelevant questions.

MR. SWAMINATHAN:  Go ahead.

A.  I'm not going to give the names -- I'm not going to say the people who came with me.

Q.  Were any of them members of Rosauro Mejia's family, the Mejia family?

MS. ROSEN:  Objection:  form, harassing.

A.  I don't know.  I'm not going to answer.

Q.  Are you asserting your Fifth Amendment

Page 39

right?

A.  Yes.

Q.  Before you left to come to the United States, had you committed any crimes in Mexico?

A.  Never.

Q.  Before Rosauro came to the United States, did he commit any crimes in Mexico?

A.  No.

Q.  Before you came to the United States, did you know of any other members of his family committing any crimes in Mexico?

A.  My family has never done anything bad, as far as I know.

Q.  Before Carlos went to the United States, had he committed any crimes in Mexico?

A.  No.

Q.  When you went to the United States, had Carlos already gone to the United States?

A.  No.  He came when I came, afterwards.

Q.  Did he come at the same time as you or after you?

A.  No, after.

Q.  When I asked you if you had concerns about coming to the US and you didn't answer my question,

Page 40

did you or your family have any issues with gangs in Mexico before you came to the United States?

A.  In my town, there is no gangs.  There was no islands.  There were no criminal problems.  No.  No.

Q.  What about in Rosauro's town?  Were there any gang issues there?

A.  That town is very small, but I don't know anything about that.  So no.  As far as I know, no.

Q.  Did Rosauro or any of his family members have any problems with gang members in Mexico?

MR. ENGQUIST:  Objection, foundation.

A.  No.

Q.  Are any members of your family in a gang?

A.  As far as I know, no.

Q.  Has Carlos ever been in a gang?

MR. ENGQUIST:  Objection, asked and answered.

A.  Never.

Q.  If Rosauro said that Carlos was involved with gangs, is he lying?

MS. ROSEN:  Objection:  Form, foundation, misstates Rosauro's testimony.

A.  I don't know.

Q.  Is it possible that Carlos was involved with

Page 41

gangs in the United States?

MS. ROSEN:  Objection:  form, foundation.

A.  I don't know.

Q.  When you were coming to the United States, had Rosauro already settled in Chicago?

A.  Would you repeat the question, please?

Q.  When you were coming to the United States, Rosauro was already in the United States, right?

A.  Could you please repeat the question again?

Q.  When you came to the United States, Carlos was already in the US, right?

MS. ROSEN:  Objection, form.

MR. SWAMINATHAN:  Let me reask that.  I asked the wrong name.

Q.  When you came to the United States, Rosauro was already in the United States, right?

THE INTERPRETER:  The translator is confused.

Q.  I'll ask it again.  When you came to the United States, Rosauro had already come, correct?

A.  Yes.

Q.  Where in the United States was he?

MS. ROSEN:  Objection:  form, foundation. At what time?

REYES 014831

ADRIANA MEJIA, 02/05/2021            Page 42..45

FILED DATE: 4/7/2022 9:01 PM  98CR1244002

Page 42

MR. SWAMINATHAN: When she's coming to the United States.

A. Confusing me a little bit. Can you please repeat the question?

Q. When you came to the United States, where was Rosauro?

A. I don't know.

Q. When you came to the United States, did you know you were going to be going to Chicago?

A. Yes.

Q. Did you or Rosauro have family in Chicago?

MS. ROSEN: Objection, form.

MR. SWAMINATHAN: Go ahead.

A. Why do you have to ask about my ex's family?

Q. Because many of those family members are in the US and are witnesses in this case, identified by both parties.

I'll ask my question again. Did you or Rosauro have any family members who were in Chicago?

A. Yes. He did. I did not.

Q. So when you came to the US, did you expect that you would be going to Chicago to join his family?

A. With my family or his family?

THE INTERPRETER: La familia de Rosauro.

Page 43

A. Yes.

Q. Which family members of his were already in the United States when you came?

MS. ROSEN: Objection, foundation.

A. Family, his brothers.

Q. Which ones were already here?

A. Adolpho Mejia, Horacio Mejia, Manuel Mejia, Clemente Mejia, with their children and families.

Q. Anyone else?

A. Leobardo Mejia and Clemente Mejia, I think, but he stayed a short time and then went back to Mexico.

Q. Anyone else?

A. Well, just them, that I recollect, as family.

Q. What did Adolpho Mejia do for work?

MS. ROSEN: Objection, foundation.

A. That's his life. I'm not going to explain it.

Q. Do you know what Adolpho did for work in the United States?

A. I never asked him. He was a man a lot older.

Q. Do you know what Horacio Mejia did for work

Page 44

in the US?

A. I don't remember what he did.

Q. Do you know what Manuel Mejia did for work?

MS. ROSEN: I'm going to object to relevance on what the Mejia family members' work was.

A. I don't remember the jobs. It's been years. I don't remember. It's their life.

Q. How long had Rosauro been in the US before you joined him?

THE INTERPRETER: Translator asks that you repeat that. You echoed.

Q. How long had Rosauro been in the US before you joined him?

A. I don't remember if it was months or a year. Something like that.

Q. When you came to the US, I think you said you first spent some time in Los Angeles, right?

A. Yes.

Q. Who did you live with when you were in Los Angeles?

A. With people from my town, acquaintances.

Q. Any members of the Mejia family?

A. No.

Q. And then was your next stop Chicago?

Page 45

A. Yes.

Q. And when you came to Chicago, Rosauro was not living at Mozart, right?

A. Yes.

Q. What address was he living at?

A. 51st and Western.

Q. Is that where you joined him and lived with him?

A. Yes.

Q. Was that an apartment that he rented?

A. Yes.

Q. And who lived with you and Rosauro at 51st and Western?

A. On the first floor, my brother-in-law Adolpho lived there. It was his. He rented us a small apartment with my brother-in law Encarnacion and, for a time, with the brother Clemente and two people from my husband's town. I don't remember their names.

Q. Then what was the next house you lived in after 51st and Western?

MR. ENGQUIST: I'm just going to object to asked and answered. We went through these addresses yesterday at length.

Urlaub Bowen & Associates, Inc.  312-781-9586

REYES 014832

ADRIANA MEJIA, 02/05/2021                              Page 46..49

FILED DATE: 4/7/2022 9:01 PM  98CR1244002

Page 46

MR. SWAMINATHAN:  You're doing asked and answered based on your questioning of the witness?

MR. ENGQUIST:  No.  That was your questioning of the witness, Anand.

MR. SWAMINATHAN:  No.  Okay, go ahead, Adriana.

A.  62nd and Mozart, something like that.

Q.  Okay.  So you moved from 51st and Western to the Mozart house, right?

A.  Yes.

Q.  And you've already gone through everybody who lived at the Mozart house.  Was there anybody who lived there a period of time and left before the time of your arrest?

THE INTERPRETER:  Translator ask you to repeat that again, please.

MR. SWAMINATHAN:  Yeah.  Let me just ask a different question.

Q.  Was there anybody who lived at the Mozart street address with you and then moved out?

A.  Yes, a brother of my husband's.

Q.  Who is that?

A.  Encarnacion Mejia, his family.

Q.  Anyone else who lived with you at that house

Page 47

and then moved out?

A.  Two friends, a guy from my town and a guy from my husband's town, acquaintances.

Q.  Where did Encarnacion go when he left the house?

A.  He went to Texas.

Q.  The Mozart house, was that an apartment you were renting?

A.  Yes.

Q.  Did you know who owned the house?

A.  Yes.

Q.  Who owned it?

A.  Horacio Mejia.

Q.  Did Horacio own other buildings as well?

MS. ROSEN:  Objection, foundation.

A.  I don't know about his life.

Q.  Do you know if he owned other buildings?

A.  That's his private life.  I don't know if it was his house or if he was renting it.

Q.  If you don't know the answer, then you can just tell me you don't know.  If you do know, I need you tell me the answer or tell me you're refusing to answer.  But --

A.  I don't know about his life, whether it was

Page 48

his house or if he was renting it.  How am I going to know about his life?

Q.  If I ask you a question and the answer is you don't know, tell me you don't know.  Okay?

MS. ROSEN:  Objection:  form, harassing.  She just said she didn't know.

MR. SWAMINATHAN:  She asked me why would she know.  The answers are not supposed to be rhetorical questions.  Let me ask the question one last time.

Q.  Did Horacio own any other buildings that you know of?

A.  I don't know.

Q.  The family members of Rosauro who you lived with in Chicago, did you get to know them?

A.  What's that?

Q.  Did you get to know his family members?

MS. ROSEN:  Objection, form.

A.  I don't understand that question.

Q.  Did you consider them to be part of your family?

A.  Well, not that close, no.

Q.  Were there any members of Rosauro's family who you became close with?

A.  I always spoke a lot with his brother

Page 49

Edwiges, with Leobardo I spoke a lot with, his sister Rosa, his mother-in-law, but she already died, passed away.  Well, I spoke with all of them, but a relationship --

Q.  Okay.  Were there any members of his family that you did not get along with?

A.  No.  I spoke with all of them.

Q.  Among the people at the house at Mozart, who did you spend the most time with?

A.  Guadalupe Mejia and Jorge Mejia and Edwiges Mejia and Jessica Mejia.

Q.  Edwiges, was that Rosauro's brother?

A.  Yes.

Q.  And who was Jessica?

A.  The wife of Edwiges.

Q.  And where did they live?

A.  They lived for a time with me, and then they went to where I lived before.

Q.  Did you say you grew close with Guadalupe and Jorge Mejia?

A.  Since we lived in the same apartment, I would watch their little girl sometimes.

Q.  If you needed someone to talk to, who would you go to?

REYES 014833

FILED DATE: 4/7/2022 9:01 PM   98CR1244002

ADRIANA MEJIA, 02/05/2021                                    Page 50..53

Page 50

A.  Sometimes on the weekend I would go with Estoria Mejia. I was also a little closer with her.

THE INTERPRETER:  The translator could not hear what she said. It was going in and out. Can I ask her to repeat her last line?

MR. SWAMINATHAN:  Yeah.

A.  I spoke a lot with her, but she was already a woman much older than me.

Q.  Who else other than her would you turn to?

A.  Sometimes I would go with Carmen Mejia, with Rosalinda Mejia, and Marisa Mejia, but she was in Texas. I spoke very little with her.

Q.  And was Guadalupe also someone you would also turn to for support?

THE INTERPRETER:  Translator asks you to repeat that, sir. You came in garbled.

Q.  Was Guadalupe Mejia someone you also turned to for support?

A.  Yes. Almost every day, she spoke with me.

Q.  Did she work, or was she at home?

A.  She made bread to sell, and sometimes she took care of children.

Q.  Did she do all of that from home?

A.  Yes.

Page 51

Q.  Would you see her every day?

A.  The majority of the time, yes.

Q.  What about Carlos? Would you ever turn to Carlos for support?

A.  No.

Q.  Jose Mejia, was he in the United States?

A.  Yes.

Q.  Who did he live with?

A.  With his wife and his dad.

Q.  Who was his dad?

THE INTERPRETER:  The translator wants to say the way she said it, it could have been his dad or her dad.

MR. SWAMINATHAN:  Can you clarify?

A.  It was his dad.

Q.  Who was his dad?

A.  Adolpho Mejia.

Q.  Did you -- were you friend with Jose Mejia?

A.  Not very good friends. When I would go to the house, we would talk. I would watch the kids.

Q.  How often would you see Jose Mejia?

A.  Every time my husband would take me to his brother's house.

Q.  How often was that?

Page 52

A.  Sometimes every week. Sometimes every 15 days.

Q.  And then, on the weekends, who would you spend time with on the weekends?

A.  With my charity at the time, with my husband; but sometimes he would leave, and I would be by myself. I didn't have friends.

Q.  Anyone else you spent time with on the weekend when Rosauro was not there?

A.  Sometimes Lupe would invite us over to the house to eat. I would go down Lupe's apartment, and we would chat a little bit, or she would come up to my apartment.

Q.  Anyone else you would spend time with on the weekends?

A.  His brother-in-laws or when there were birthday parties or parties.

Q.  One of the people living at the house we talked about yesterday was Martin Vaca, right?

A.  Yes.

Q.  Was he one of the people who you mentioned earlier who you knew from your town or Rosauro's town?

A.  No. That man, he was from a town near my house, but he got married to a girl from my town.

Page 53

That's why I know him.

Q.  What did Martin Vaca do for work?

A.  I don't remember.

Q.  And do you know a Ramiro Vaca?

A.  I don't remember.

Q.  Did Martin Vaca go by any other name?

A.  The truth is I don't know.

Q.  Did Rosauro have any nicknames?

A.  What was that?

Q.  Did Rosauro have any nicknames?

A.  Yes.

Q.  What was his nickname?

A.  His brothers called him Chapa Pi (phonetic).

Q.  What did you call him?

A.  Chapa.

Q.  Did he have any other nicknames?

A.  The truth is I don't remember.

Q.  Did you make any friends while you were living at Mozart Street, any friends from the United States?

A.  No, I hardly had any friends. It was just with Miss Lorena who I speak with most.

Q.  Lorena, was she your friend even when you were living at Mozart?

Urlaub Bowen & Associates, Inc.   312-781-9586

REYES 014834

ADRIANA MEJIA, 02/05/2021                                    Page 54..57

FILED DATE: 4/7/2022 9:01 PM   98CR1244002

Page 54

A. Yeah, because she lived three houses from where I lived.

Q. Did you know a person named Robert Kubon, K-u-b-o-n?

A. I don't remember.

Q. Does that name sound familiar to you at all?

A. At this moment, no, I don't know who it is.

Q. Do you know a person named Diana Gama?

A. Yes. I had spoke very little with her.

Q. Who was she?

A. It was woman who I met in a -- I think it was a -- I don't remember how I knew her, but I wasn't around her much.

Q. Was she someone -- so she was somebody that you know, or was she somebody that knew other people --

THE INTERPRETER: Translator asks: Can you repeat that, sir?

MR. SWAMINATHAN: Let me ask a better question. Sorry.

Q. Did other people at the house also know Diana Gama?

MS. ROSEN: Objection: form, foundation.

A. I don't think so.

Page 55

Q. So she was just somebody that you had gotten to know?

A. No. I hardly ever made friends here.

Q. And where did you meet her?

A. The truth is I don't remember. The truth is no.

Q. As far as you know, other than yourself, did anybody else in the house talk to Diana Gama or know Diana Gama?

MS. ROSEN: Objection: form, foundation.

A. No.

Q. What about Miguel Gama? Do you know -- is the name Miguel Gama familiar to you?

A. I don't remember exactly who they are.

Q. But Miguel Gama is also a name that's familiar to you?

A. At this moment, I'm remembering, but I'm not remembering well, totally.

Q. Was Miguel Gama always someone that you knew but not other people in the house knew. Strike that. Let me ask a better question.

Was Miguel Gama also someone that only you knew?

MS. ROSEN: Objection: form, foundation,

Page 56

mischaracterizes her testimony.

A. No. I don't remember who they are. I don't know.

Q. Are you familiar with the name Romualdo Moreno, R-o-m-u-a-l-d-o?

A. At this moment, I don't remember who they are.

Q. Is that name familiar to you?

A. The truth is I don't know what to tell you because I don't remember who they are.

Q. So let me ask a different question. Have you ever -- strike that.

Have you ever heard the name Romualdo Moreno?

MS. ROSEN: Objection: form, foundation.

A. The truth is, at the moment, I don't remember who it is.

Q. At some point, did you know a Romualdo Moreno, and you just can't remember who that is now?

MS. ROSEN: Objection: form, foundation.

A. I don't know. I don't remember if I know him or who it is. I don't know.

Q. Did you ever have any friends with the name Moreno?

Page 57

MS. ROSEN: Objection: form, foundation.

A. No. I don't remember who it is. It's the truth.

Q. Did you know anyone who has the nickname Moreno?

A. No, I don't remember.

Q. Did Rosauro or anybody else who lived at the house spend time with anybody with the first name or last name Moreno?

MS. ROSEN: Objection: form, foundation.

A. No. I don't know who they are.

Q. Back in March of 1998, a person named Romualdo Moreno had been calling the Mozart house. Would that be surprising to you?

MS. ROSEN: Objection: form, foundation.

A. No, I don't remember. I'm not going to answer because I don't remember.

Q. Yesterday we talked a little bit about the name Norma Salazar. Did you ever meet a woman named Norma Salazar?

A. No. I didn't know her, but someone had told me that her name was Norma Salazar.

Q. I'm just asking: Did you ever meet a person named Norma Salazar?

Urlaub Bowen & Associates, Inc.   312-781-9586

REYES 014835

ADRIANA MEJIA, 02/05/2021                                    Page 58..61

FILED DATE: 4/7/2022 9:01 PM   98CR1244002

Page 58

A. No.

Q. Did you ever meet someone who you were told was Norma Salazar?

A. No.

Q. And you indicated yesterday that Gabriel had told you the name, Norma Salazar; is that right?

A. Yes.

MR. SWAMINATHAN: Did you get the answer?

THE INTERPRETER: The translator hasn't heard anything.

MR. SWAMINATHAN: She answered, but I think you missed it. Go ahead, Ms. Mejia.

THE REPORTER: The court reporter got a yes.

MR. SWAMINATHAN: The court reporter got a yes; so we can keep going.

Q. So have you ever told anyone else the name Norma Salazar?

MS. ROSEN: Objection, form.

A. Yeah. I think to my husband, I said that the little one that I was watching was Norma Salazar.

Q. Did you tell anybody else about Norma Salazar?

MS. ROSEN: Objection: form, foundation.

A. I don't remember.

Page 59

Q. Weren't you telling everybody at that time when you came home with the little boy that that was Norma Salazar's boy?

A. I don't remember that.

Q. When you were saying the name "Norma Salazar" to others, you knew that that was a lie, right?

A. Yes.

Q. Did you ever mention Norma Salazar to the police?

A. Yes.

Q. When you told police about -- you told the police that Normal Salazar -- strike that.

You told the police that the little boy belonged to Norma Salazar; is that right?

A. Yes.

Q. When you told them that, it was a lie, right?

A. Yes.

Q. At the police station, were you ever shown any photos of anybody the police believed to be Norma Salazar?

A. They showed me a lot of women in a line.

Q. This is women who were in person, live, when

Page 60

they showed you?

A. They were behind a glass. They were people arrested for things. I don't know.

Q. Before that, were you ever shown any photographs?

A. I think so.

Q. Were you asked, when you looked at photos, to pick out a person who was Norma Salazar?

MS. ROSEN: Objection, form.

A. The truth is I no longer remember.

Q. Tell us what you remember about being shown photos.

A. The truth is I no longer remember a lot.

Q. Did you look at any of the photos and select a photo of any one of the people?

A. I don't remember.

Q. After that at some point, did you see a lineup?

MR. ENGQUIST: Objection: form, mischaracterizes previous testimony.

MS. ROSEN: Foundation after that.

MR. SWAMINATHAN: Let me reask it.

Are you okay, Ms. Mejia?

THE WITNESS: I need to go to the lady's

Page 61

room. Can I?

MR. SWAMINATHAN: Let's take a break.

THE VIDEOGRAPHER: We are off the video record at 11:15 at the end of media unit 2.

(Recess in proceedings

from 11:15 to 11:45 a.m.)

THE VIDEOGRAPHER: We are back on the video record at 11:45 at the beginning of media unit 3.

MR. SWAMINATHAN: Ms. Mejia, are you able to go forward right now?

THE WITNESS: Yes.

MR. SWAMINATHAN: You indicated earlier that you were feeling a little dizzy. Are you fine now?

THE WITNESS: Yes. I ate something sweet. I'm okay.

MR. SWAMINATHAN: If you need to stop once again, just tell us, and we can stop. Okay?

THE WITNESS: Very well. Yes.

BY MR. SWAMINATHAN:

Q. I asked you earlier about the name Moreno. There's one question I forgot to ask you.

A. The truth is I don't know who they are.

Q. Sitting here today, do you know anyone who goes by the name Moreno?

Urlaub Bowen & Associates, Inc.   312-781-9586

REYES 014836

ADRIANA MEJIA, 02/05/2021                                          Page 62..65

FILED DATE: 4/7/2022 9:01 PM   98CR1244002

Page 62

A.  No.  I don't know.

Q.  Okay.  I was asking you about Norma Salazar. You described viewing a lineup at the police station, right?

A.  Yes.

Q.  How many people were in the lineup that you viewed?

A.  10 or 12.

Q.  Did you identify any of them?

A.  No.

Q.  Did any of them look familiar to you?

A.  No.

Q.  Where were you when you viewed the lineup?

A.  Detective Guevara took me to a small room. Yes, a small room, but I don't remember if it was the first floor or the basement.

Q.  And where were the people that you were viewing in the lineup?

A.  They were in a room that had a -- I could see them, but they could not see me.

Q.  And the person with you was Detective Guevara, did you say?

A.  Yes.

Q.  Were there any other police officers with

Page 63

you?

THE INTERPRETER:  Translator asks can you repeat that, sir?

Q.  Were there any other police officers with you?

A.  I don't know if it was a man or a woman that had --

THE INTERPRETER:  Translator couldn't make out what she said about the handcuffs.  Can I ask her?

MR. SWAMINATHAN:  Please.

A.  They had my hands handcuffed behind me, but I don't remember if it was a man or a woman that was taking me.

Q.  When you went in and actually viewed the 10 to 12 people in the lineup, was anybody there other than Detective Guevara?

MS. ROSEN:  Objection, form.

A.  At the entrance door, there was -- there was a guard at the door, and at the other exit, another guard and, at the door to get to the people on the lineup, another guard.

Q.  You viewed photos on that same day, right?

MR. ENGQUIST:  Asked and answered. Mischaracterizing her previous testimony.

Page 64

MR. SWAMINATHAN:  Go ahead.

A.  I think so.

Q.  How many photos were you shown?

A.  A lot of different people.

Q.  Can you describe what kind of photographs they were?

A.  They were like done in lapiz.  They were pencil.  It was as if someone had made a picture, but it was faces of people.

Q.  Are you describing a drawing?

A.  They were photos that they already had. They had a lot of them.

Q.  Were they Polaroids?

A.  Pardon me?

Q.  Do you know what Polaroid photos are?

THE INTERPRETER:  Translator would like to say:  Can I change the word "Polaroid" to something else to make her understand?

MR. SWAMINATHAN:  Yes.

A.  No.  It was like as if someone had done them.

Q.  Were you shown the photos before or after you saw the lineup?

A.  I don't remember.

Page 65

Q.  When you say you were shown a lot of photos, was it more or less than ten?

A.  There were a lot of them.  It was more like -- more than 20.

Q.  And where were you when you were shown those photos?

A.  With Detective Guevara in a room that had a --

THE INTERPRETER:  Translator wants to say she's coming in and out.  I see her mouth moving.  I don't hear anything.  Then I'll hear it way later. That's why I'm having trouble putting together her last two sentences.

MR. SWAMINATHAN:  Try again.  Can you ask her to answer it again and try to translate?

A.  Detective Guevara took me to a room where they had a lot of cabinets filled with papers.  There was a lot of other things I no longer remember.  But it was one of their offices.  It was an office of one of them.

Q.  Was there anybody there other than you and Detective Guevara?

A.  I think so, but they were doing other things.  The truth is I don't remember a lot, but I

REYES 014837

FILED DATE: 4/7/2022 9:01 PM   98CR1244002

ADRIANA MEJIA, 02/05/2021                               Page 66..69

Page 66

believe so.

Q.   I'm showing you a document that was marked as Exhibit 7 to your prior deposition.  It's Bates stamped RFC Solache Reyes 207.

Ms. Mejia, is this person familiar to you?

MS. ROSEN:  Object to the form.

A.  I don't remember.

Q.   Have you ever seen this picture before?

MS. ROSEN:  Objection, form.  She saw it at the last deposition.

A.  I don't remember.

Q.   Were you shown a photograph of this woman when you were at the police station in April of '98?

A.  I don't remember.  There were a lot of photographs.  The truth is I don't remember.

Q.   Were the photographs that you saw -- were they pages like this?

A.  No.  They were like when people do photos with a pencil, doing the face with a pencil.

Q.   What do you mean it was like people doing it with a pencil?  Does that mean it was a photo or a drawing?

A.  Like when they do someone's -- like a face or a profile with a pencil.

Page 67

Q.   Did it look like something taken with a camera?

A.  No.  They were photographs on a piece of white or blank paper --

THE INTERPRETER:  Translator is not sure which because it means both.

A.  -- but done with a pencil.

Q.   So what you saw were pictures that looked like they were made with a pencil and not a camera; is that right?

A.  It's different.  I don't remember this photograph.

Q.   I'm asking you a different question.  What you were shown -- strike that.

If I understand you correctly, what you were shown were pictures created using a pencil and not a camera; is that right?

A.  Yes, they were.  They were from pencil.

Q.   All right.  When you were shown those pictures created by a pencil, did you pick any of them out?

A.  I don't think so.

Q.   Did any of them look familiar?

A.  No.

Page 68

Q.   Were you ever shown a single photograph taken by a camera of a woman?

A.  I don't remember.

Q.   When you were shown -- when Guevara showed you the pictures, what did he tell you he wanted you to do?

MS. ROSEN:  Objection, form.

A.  The truth is I don't remember.

Q.   Did he tell you why he wanted you to do a lineup?

A.  No, I don't remember why.

Q.   When you were viewing the photos, was it your understanding that you were supposed to be identifying Norma Salazar?

MS. ROSEN:  Objection, form.

A.  It's been a lot of years, and I no longer remember.

Q.   When you were shown a lineup, was it your understanding that you were to try to identify someone from the lineup who was Norma Salazar?

MS. ROSEN:  Objection, form.

A.  Yes, but I don't remember -- I don't remember a lot.

Q.   I'm showing you a document that we'll mark

Page 69

as Plaintiff's Exhibit 1 to this deposition.  This is RFC Solache Reyes 233 through 253.  And it's Area 5 Supplementary Report, Cleared Closed Report.

The report states that a "Detective K. McDonald searched the ICAM database and located a woman named Norma Salazar."  The report then states "A photo of this Norma Salazar was shown to Adriana Mejia, who identified her as being the woman who gave her the children."

Is that statement true or false?

MS. ROSEN:  Objection: form, foundation.

A.  False.

Q.   What part of it is false?

MS. ROSEN:  Objection, form.

A.  I don't remember having said that.

Q.   You don't remember having said what?

A.  What you read to me at first.

Q.   Which part did you not say?

MS. ROSEN:  Objection, form.

Q.   Let me try another way.

Ms. Mejia, where it says that you identified the photo of Norma Salazar as being the woman who gave you children, is that false?

MS. ROSEN:  Objection, form.

Urlaub Bowen & Associates, Inc.  312-781-9586

REYES 014838

ADRIANA MEJIA, 02/05/2021      Page 70..73

FILED DATE: 4/7/2022 9:01 PM   98CR1244002

Page 70

MR. SWAMINATHAN: Go ahead.

A. False. I didn't say that.

Q. Did you identify anyone from a photo as being the woman who gave you a child?

A. No.

Q. So is what is written here by the police a lie?

MS. ROSEN: Objection, form.

A. I didn't say that.

Q. So the police wrote something that you didn't say; is that right?

MS. ROSEN: Objection, form.

A. How am I going to answer that if I didn't say that?

Q. That's what I want to understand. The information written here, what you're saying is this did not happen. So what the police wrote is not true, right?

MS. ROSEN: Objection, form.

A. How was I going to know what they were putting down if I didn't know what they were speaking? I didn't speak English.

Q. Understood. All right. We talked yesterday about the phone calls. Strike that.

Page 71

We talked yesterday about the phone that was at the Mejia house, right?

THE INTERPRETER: The translator didn't hear anything.

A. Can you repeat the question, please?

Q. Yeah. Who would you call from the phone at the Mejia house? Who would you make calls to?

A. My parents in Mexico, Estoria Mejia, sometimes Marisa Mejia in Texas, Estoria Mejia. Mostly using it to speak -- to call my parents in Mexico.

Q. Who were the people who would regularly call you at the house?

A. The lady whose children I watched. Sometimes Jose Mejia would call me. Estoria Mejia. Javier Mejia to see if I would take care of the kids. Rosalinda Mejia sometimes. I don't remember who else called me.

Q. What was the name of the person whose kids you babysat?

A. Just Graviella Sanchez, Jose or his wife to watch his children, and Javier Mejia. I would watch his little boy.

Q. Was Rosauro close with Javier Mejia?

Page 72

A. No.

Q. Was Rosauro close with Jose Mejia?

A. No.

Q. Would Javier Mejia call the house to talk to Rosauro?

A. Almost never.

Q. Would Jose Mejia call the house to talk to Rosauro?

A. He does sometimes, when he has to fix his car.

Q. Fix whose car?

A. Either Jose's or my husband's. Sometimes to clean them or put in stereos.

Q. Jose would do that, and he would be calling Rosauro for help?

A. Sometimes, yes.

Q. Would Jose ever call to borrow Rosauro's car?

A. Jose?

Q. Yeah, Jose.

A. No. I don't think ever.

Q. What about Javier Mejia? Would he -- strike that?

Would Rosauro Mejia lend his car to other

Page 73

people?

A. Yes.

Q. Who would he lend his car to?

A. His brothers.

Q. Anyone else?

A. Sometimes. Or a lot of times, he would lend it to Gabriel Solache. I'm not sure, but to Martin Vaca also. I don't remember to who else.

Q. Okay. Was the first time you met Arturo Reyes when he moved into the Mozart house?

A. Yes.

Q. You never met him before he moved in, right?

A. Yes.

Q. He had his own room, right?

A. No.

Q. Did he share a room?

A. No. He shared the living room with my brother, with Gabriel. And he also shared it with a guy named Daniel, but he went to Los Angeles.

Q. Arturo had some family that lived nearby, right?

A. No. He just had his sister-in-law, Carmen.

Q. And he would spend time over at Carmen's house, right?

Urlaub Bowen & Associates, Inc.   312-781-9586

REYES 014839

ADRIANA MEJIA, 02/05/2021                 Page 74..77

FILED DATE: 4/7/2022 9:01 PM  98CR1244002

Page 74

THE INTERPRETER: Translator asks are you saying "he" or "she" would?

Q. Arturo would spend time at Carmen's house, right?

A. I wouldn't know what to tell you.

Q. Did Arturo work?

A. I think so.

Q. He worked a lot, right?

A. I think so. Although sometimes he didn't work because his job -- I think he was laid off. I don't remember.

Q. And when we wasn't at work, he would regularly spend time away from the house with others, right?

MS. ROSEN: Objection: form, foundation.

Q. He didn't spend much time at the house on Mozart, right?

MS. ROSEN: Objection, form.

A. I don't remember.

Q. Is it fair to say that you barely knew Arturo Reyes?

MS. ROSEN: Objection, form.

A. Very little. Very little. I lived with him very little or interacted with him very little.

Page 75

Q. And other than just saying hello to each other, did you ever have any other conversation?

A. Yes, when we would eat together.

Q. What would you talk about with him?

A. Food. And he would talk about his family in Mexico. But very little.

Q. Fair to say he was not someone that you would confide in?

A. Correct.

Q. He wasn't someone you looked to for support, right?

A. Correct.

Q. And he wasn't someone you would share your personal secrets with, right?

A. Yes.

Q. Who were the people you would share your personal secrets with? Who were you close enough to?

A. With no one. Until the present day, no.

Q. Did she say present day?

THE INTERPRETER: The interpreter understood "hasta la fecha" meaning until the present day. But then there was a word or two behind that. And another noise came in, and I couldn't actually make out if it was her or someone else.

Page 76

Q. Back in March of 1998, who would you share your personal secrets with?

A. With no one.

Q. After your arrest, did you ever talk to Arturo Reyes?

A. No. But I remember he sent me a letter. I think it was when I was still in Dwight, in prison.

Q. Let me come back to the letter. You and Arturo Reyes never spoke after you'd been at the police station and arrested, right?

MR. NOLAND: Object to form.

A. When we were arrested, when we were going to court together, yes, we would speak.

Q. What would Arturo say to you when you were going to court?

A. Very basic, like how I was.

Q. Anything else?

A. I remember, one time, I asked him about his family. Very basic.

Q. Other than when you saw him on the way to court, did you have any other conversations with Arturo Reyes?

A. No.

Q. And you said he sent you one letter?

Page 77

A. No. He sent me a letter.

Q. And what did he say in the letter?

A. It was written by a person, but I don't know who the person was. But yes, it said it was Arturo Reyes.

Q. So the letter was from him or someone else?

A. No. It was from him because it was from when I found out that he was in -- I don't remember the name of the place where he was incarcerated, but he told me where he was.

Q. What did the letter say?

A. He spoke about how he was. Through this, I don't remember much.

Q. Other than telling you how he was doing, did the letter say anything else?

A. Truth is I don't remember.

Q. Did you have any other communications with Arturo Reyes after you were charged with the crime other than the one letter he sent you and the communications on the way to court?

A. No.

Q. Arturo Reyes has never threatened you, correct?

A. No.

Urlaub Bowen & Associates, Inc.  312-781-9586

REYES 014840

ADRIANA MEJIA, 02/05/2021      Page 78..81

Page 78

Q. Is that correct?

A. Yes.

Q. He's never promised you anything, correct?

A. No. But on an occasion when we were in jail, everything was going to be okay, that I should be strong. What else did he tell me? Trying to think. He told me that I should pray a lot, that I should have a lot of faith, I think. And I don't remember what else he told me.

Q. Arturo Reyes was a religious person, right?

A. Well, the truth is I don't know.

Q. So he never promised you anything in any communications you had with him, right?

A. I don't remember.

Q. After you were arrested, did you have any communications with Gabriel Solache?

A. Yes.

Q. When did you have -- let me ask you any conversations you had. Did you ever have conversations or speak to Gabriel Solache after you were charged with this crime?

A. I don't remember. I don't think so.

Q. So the only communication you had with Gabriel since you were charged with this crime were

Page 79

letters; is that right?

A. Except when we went to court.

Q. Okay. So the only communications that you had with Gabriel since this happened were letters and when you saw him before court, correct?

A. Yes.

Q. What did he tell you when you would talk to him before court?

A. What didn't he tell me?

Q. What did you tell him?

A. For example, when we were close to the -- what are they called?

THE INTERPRETER: Translator can't make out the word she's using. I think she's saying something in English, but I can't make it out.

MR. SWAMINATHAN: Bullpen.

THE INTERPRETER: Oh, the bullpen?

A. He would tell me to show him, like, my chest, that he was going to show me his intimate, his private parts. He would tell me a lot of gross things.

Q. Anything else that he would say to you or tell you when you were in the bullpen?

A. That I was going to have everything on me

Page 80

and he was not going to keep taking the blame.

Q. Did he tell you that he didn't want to take the blame for what happened?

A. Yes, he said it.

Q. And what would you say to him? Did you ever -- strike that.

Did you ever tell him that you were sorry for what happened?

A. I always said that everything we had done was -- it's difficult for me to say it.

Q. Did you ever tell him that you were sorry for what had happened to him?

MR. NOLAND: Objection, form.

A. Yes. One time, on one occasion, I told him I was sorry for everything that was happening when he lost his dad.

Q. When was that?

A. Because he was in jail and he couldn't be with his dad.

Q. Other than that, was there any other time you told him you were sorry for what had happened to him?

A. I always felt bad. Yes, I think so.

Q. Did you ever tell him it was your fault?

Page 81

A. No.

Q. Did you ever, in letters, write to him and tell him that it was your fault?

A. I don't remember.

Q. Well, is that something you would have ever written?

MS. ROSEN: Objection: form, foundation.

A. The truth is I no longer remember.

Q. So it is possible that you wrote to him and told him that it was your fault what had happened?

MS. ROSEN: Objection, form.

A. I don't remember if I wrote. It's been a lot of years. Truth is I don't remember. He also wrote me telling me a lot of things; but unfortunately, when I came here, I lost those letters.

Q. When you were -- strike that.

Anything else that you can remember Gabriel Solache saying to you or doing when you would see him going to court?

A. When we were going to court, yes, he would say a lot of things to me.

Q. But you told me some things that he told you. You told me that there were things he would say that were of a sexual nature, right?

Urlaub Bowen & Associates, Inc. 312-781-9586

REYES 014841

ADRIANA MEJIA, 02/05/2021                                    Page 82..85

Page 82

THE WITNESS: Give me a minute, please?

MS. SINGER: Are you okay?

THE WITNESS: He was asking me if I needed a break.

MR. SWAMINATHAN: You okay to go on?

THE WITNESS: Yes.

MR. SWAMINATHAN: We plan to stop in, like, 15 minutes, and maybe you can get some more food. Okay?

THE WITNESS: Okay. Thank you.

BY MR. SWAMINATHAN:

Q. You told us that in the bullpen, when you saw Gabriel, he said some things to you of a sexual nature, right?

A. Yes.

Q. And he told you some things about -- and he told you that you were the one who was going to be responsible, right?

A. Yes, he said that to me.

Q. Did he say anything else? Did he say anything else -- anything else you remember that he told you in the bullpen other than those two things?

A. Yes. He said to me -- I remember well the words that he said to me when he told me that, if I

Page 83

would have paid attention, if I would have preferred him as a boyfriend when I was a girlfriend of my husband, my husband's girlfriend -- he said it had been my fault, and he asked me why hadn't I chosen him as a boyfriend? All the things would have been different if I had.

But I didn't love him. And then he told me I had to pay for a lot of things. (Unintelligible.) He probably hadn't said all of that.

MR. SWAMINATHAN: I didn't understand the last part.

A. When my husband and him fought, it always ended up, like, a little bit -- he's always been a little bit gross, like a bully.

Q. Anything else? So he had some conversations with you about your past and about wanting to have a romantic relationship with you; is that right?

A. Yes.

Q. Anything else that you remember him talking to you about in the bullpens?

A. I don't remember a lot of things.

Q. Other than what -- so we've talked about some comments of a sexual nature, your past, and that you were the one to take the blame. Those are all the

Page 84

topics you can remember talking about in the bullpen, correct?

MS. ROSEN: Object to the form. Sorry, go ahead.

(Question was translated.)

MS. ROSEN: Object to the form.

A. Correct.

Q. Now, let me ask you about -- have you kept copies of any letters that Gabriel Solache sent you?

A. Unfortunately, no. When they moved me here, I lost a lot of things.

Q. And you sent letters to Gabriel Solache too, correct?

A. Yes.

Q. What would you tell Gabriel Solache in the letters you wrote him?

A. Truth is I no longer remember.

Q. Did you and Rosauro ever get divorced?

A. As far as I know. I didn't sign the papers. The person who signed the papers was my mom.

Q. So you are divorced from Rosauro?

A. I think so.

Q. When did that happen?

A. The truth is I don't know. I ended up

Page 85

finding out about things a lot later.

Q. Do you know if he has remarried?

A. Yes, he's married. He has children, but I don't know a lot.

Q. When did you last speak to him?

A. A week after I was imprisoned.

Q. Were you in Cook County Jail?

A. Yes.

Q. And he came to visit you?

A. No. He couldn't come in because he didn't have papers.

Q. So you didn't get a chance to speak to him then?

A. No.

Q. So has he ever come to visit you from the time that you were charged for this crime?

A. No.

Q. Do you still love Rosauro?

A. I don't think so.

Q. When you were living together in the United States, were you still in love with Rosauro?

A. Yes.

Q. Was there a point when -- strike that. At what point did you stop feeling in love with Rosauro?

Urlaub Bowen & Associates, Inc.   312-781-9586

FILED DATE: 4/7/2022 9:01 PM   98CR1244002

REYES 014842

FILED DATE: 4/7/2022 9:01 PM   98CR1244002

ADRIANA MEJIA, 02/05/2021                                    Page 86..89

Page 86

A.  I don't know how to explain it.  The truth is I don't know.

Q.  What was your relationship like with Rosauro when you were living together in the United States?

A.  It was not a very -- not a lot of trust because he drank a lot.  He went out a lot because he would always listen to his brother, Horacio.  I think that -- I don't know.

Q.  What would Horacio want him to do that made you unhappy?

A.  It would bother me because he would take him on Friday until very late, and they would drink a lot.

Q.  What other things would Rosauro do with Horacio that bothered you?

A.  He would say to my husband that he was a wuss.  Why would he allow himself to be dominated by his wife?

Q.  What else?

A.  If they were going to go to any place, they would have to all go together.  Horacio would say, "I want to go to this place.  I want to go all together." And they would all go together.

Q.  When you say "they," who would that be? Horacio and Rosauro?

Page 87

A.  All of his brothers.

Q.  It sounds like he and his brothers would often go out drinking, right?

A.  Yes.

Q.  Where else would they go?

A.  I think to bars.

Q.  Anywhere else?

A.  The truth is I wouldn't know where else they would go.

Q.  Would Rosauro ever take you with him to the bars?

A.  No.  I never went to a bar.

Q.  Did you have any concerns that Rosauro was seeing other women?

MS. ROSEN:  Objection: form, relevance.

A.  I don't know.

Q.  You said that you and Rosauro would argue; is that right?

A.  Yeah.  We argued a lot.

Q.  And one of the things you argued about was him listening to Horacio all the time, right?

A.  Yes.

Q.  What else would you argue about?

MS. ROSEN:  Objection. I'm sorry. I'm

Page 88

going to object to all of this detailed questioning about the relationship between Adriana and Rosauro as being not relevant, but I don't want to keep interrupting.

MR. SWAMINATHAN:  You can have a standing objection.

MS. ROSEN:  I have a standing objection. Thank you.

MR. SWAMINATHAN:  Go ahead.

THE WITNESS:  I've forgotten the question.

Q.  Other than Horacio, what are the other things that you and Rosauro argued about?

A.  Because I didn't ask my brother to pay the rent or the food.  When I sent money to my parents. When a lot was spent on the telephone.

Q.  Anything else?

A.  It bothered me because he insulted me a lot.

Q.  How did he insult you?

A.  Because he would make me feel ashamed when we would be walking in the stores.  He would call me a "bandeja."

THE INTERPRETER:  The translator wants to say that's an insult in Mexican.

Q.  What other insults would he use?

Page 89

A.  I no longer remember a lot.

Q.  Was he ever abusive toward you?

A.  Not as far as I can remember.  Just twice he hit me in the face.

Q.  This is while you were living in the Mozart?

A.  No.  Once in Mexico and once when we lived on 51st.

Q.  Did you call the police?

A.  No.

Q.  Had he been drinking when -- the first time he hit you, had he been drinking?

A.  No.

Q.  And had you had a fight that caused that?

A.  Yeah.  We argued about something, but I don't remember why.

Q.  The second time when he struck you, had he been drinking?

A.  I think so.

Q.  Do you know what -- what were you arguing about when he hit you?

A.  I believe it was because he was going to go with his brother Horacio.

Q.  And you didn't want him to go?

A.  Yes.

Urlaub Bowen & Associates, Inc.  312-781-9586

REYES 014843

ADRIANA MEJIA, 02/05/2021                                        Page 90..93

Page 90

Q. In March of 1998, you and Rosauro were still living together in the Mozart house, right?

A. Yes.

Q. And you shared a bedroom, right?

A. Yes.

Q. And he would sleep at that house, right?

THE INTERPRETER: The translator asks can you repeat that? He or she?

MR. SWAMINATHAN: He.

Q. Rosauro would sleep at that house at Mozart?

A. Yes.

Q. And would you sleep in the same bed?

A. Yes.

Q. I'm sorry to ask a very personal question, but were you guys still -- were you still sexually active?

A. I don't have to answer. I want to stay quiet. That's private.

Q. I fully appreciate why you don't want to answer it. I know it's a very personal question, but it is very much relevant to this case. We're allowed to ask you. After I ask you this question, I won't spend time on it.

Were you and Rosauro Mejia still sexually

Page 91

active at that time?

A. Yes.

Q. And that was up to the time that you had been arrested?

A. Yes.

Q. Were you still trying to have children up to the time that you were arrested?

A. Yes.

MS. ROSEN: Objection, form.

MR. SWAMINATHAN: Did you get the answer?

THE INTERPRETER: Yes.

Q. When you and Rosauro were sexually active in the months before your arrest, were you hoping to get pregnant?

A. Yes.

Q. Was he also hoping to get pregnant?

MS. ROSEN: Objection: form, foundation. At what point in time?

MR. SWAMINATHAN: Go ahead.

A. He didn't pay a lot of attention to my things.

Q. You wanted to have children, correct, at that time in 1998?

A. Yes.

Page 92

Q. Did he want to have kids?

A. Yes.

Q. How long had the two of you been trying to have kids?

A. Me, always. But that's why we had the arguments we had sometimes.

Q. Some of the arguments were about trying to have kids?

A. Yes.

Q. What were you arguing about?

A. (No response.)

Q. I'm sorry, Ms. Mejia.

A. I don't want to answer.

Q. Let me just ask this. You indicated that you had both wanted to have kids. So what were you arguing about?

A. It was because he blamed me and that I wasn't worth anything as a woman.

Q. Because you weren't able to have a child?

A. Yes.

Q. And how long was it that you had been trying with Rosauro and had not been able to have a child?

A. The truth is I don't remember, but for a long time.

Page 93

Q. And you indicated that you were trying all the way until you were arrested, correct?

A. Yes.

Q. How many years before that had you been trying?

A. The truth is I don't remember.

Q. Was it multiple years?

A. Like three, four years.

Q. And for how long had you been getting testing to see if you had any medical issues that prevented you from having kids?

A. Every month.

Q. Starting when?

A. The truth is I no longer remember that.

Q. Was it for multiple years that you were getting testing?

A. Yes.

Q. Was Rosauro also going in for testing to see if he could have kids?

MS. ROSEN: Objection, form. Go ahead.

A. Only on one occasion.

Q. What did he do on that occasion?

A. He went into a room with a nurse. I think that the nurse gave him a small glass and then said

Urlaub Bowen & Associates, Inc.   312-781-9586

FILED DATE: 4/7/2022 9:01 PM   98CR1244002

REYES 014844

FILED DATE: 4/7/2022 9:01 PM 98CR1244002

ADRIANA MEJIA, 02/05/2021      Page 94..97

Page 94

that he had to put his sperm in there.

Q. So when was it that he went in and did this, gave sperm?

A. I no longer remember the dates or the years.

Q. How close in time was it to when you were arrested?

A. It would be like three years before.

Q. And then after that, you continued to get testing; is that right?

A. Yes.

Q. Was he cooperative in helping you try to get testing?

A. Yes. But he never went to the consults with me.

Q. I thought he -- didn't he sometimes drop you off and then come into the waiting area?

A. Yes. Sometimes he'll wait for me there, or sometimes he'll wait for me in his car.

Q. Was it ever requested that he do additional testing?

A. I don't remember.

MR. SWAMINATHAN: I said we would take a pause actually a little bit before this; so why don't we take a break now?

Page 95

THE INTERPRETER: Translator would like to say I was told that someone would be there by 1:00 to replace me.

MS. MADRIGAL: Yes. I logged on at 1:00.

THE VIDEOGRAPHER: We're off the video record at 1:05 at the end of media unit 3.

(Recess in proceedings from 1:05 to 1:31 p.m.)

THE VIDEOGRAPHER: We're back on the video record at 1:31 at the beginning of media unit 4.

MR. SWAMINATHAN: Adriana, I want to move to other topics.

BY MR. SWAMINATHAN:

Q. In March of 1998, Rosauro was working, correct?

A. Yes.

MR. SWAMINATHAN: The interpreter is on mute.

MS. MADRIGAL: I am so sorry. Also, I do need to be sworn in.

(Interpreter sworn.)

A. Yes.

Q. Where was he working?

A. A cardboard factory near Franklin Park.

Page 96

Q. How much was he making per week or per month?

A. Honestly, I don't remember anymore.

Q. Were you working at that time?

A. No. I've never worked.

Q. How much were you paying in rent for the apartment?

A. Honestly, I don't recall because everybody paid the rent. So honestly, I don't recall how much we paid.

Q. Would Rosauro send money back to Mexico to his family?

A. No, because his mother lived here for some time.

Q. In the US in March of 1998?

A. For some time because she returned to Mexico in '98.

Q. Did she return to Mexico before or after you were arrested?

A. Before.

Q. Were you sending money back to your family in Mexico?

A. Sometimes.

Q. How often would you send money back?

Page 97

A. Not often.

Q. When you say "not often," do you mean once a month, once a year? Give us a sense.

A. I would send her for holidays, for mother's day, Christmas, because my ex-husband was putting money together for a house for us in Mexico.

Q. Were you and Rosauro hoping to move back to Mexico?

A. Yes.

Q. When you were sending money back to Mexico, how much would you send each time?

A. My ex-husband would send money to his brother Clemente because he was building the house. I believe it was $1,000 every two months, I believe.

Q. Were you and Rosauro -- other than the -- after the money that you were sending back regularly and the rent and everything else, were you and Rosauro able to save money while were living in the US?

MS. ROSEN: Objection, form.

MR. SWAMINATHAN: Go ahead.

A. Not really.

Q. Did you have a bank account?

A. No.

Q. Did you keep all of your money in cash?

Urlaub Bowen & Associates, Inc. 312-781-9586

REYES 014845

ADRIANA MEJIA, 02/05/2021                                    Page 98..101

Page 98

A.  Yes.

Q.  And how would you describe the overall financial situation for you and Rosauro in 1998?

A.  Not very good.

Q.  Would you say you did not have enough money at that time?

MS. ROSEN:  Objection, form.

MR. SWAMINATHAN:  Strike that.  I'll withdraw it.

Q.  Between you and Rosauro, was one of you in charge of the money?

MS. ROSEN:  Objection, form.

MR. SWAMINATHAN:  Go ahead.

A.  For the most part, he kept the money.

Q.  And if you needed money to buy things, how would you get the money?

A.  I would have to ask him for it.

Q.  So when you needed money to buy things, basically you would ask him for the money, and he would give it to you; is that right?

A.  Yes.

Q.  Would he ever give you extra money just to have around for yourself?

A.  Sometimes when he had some left over.

Page 99

Q.  How much would he give you when he was giving you extra money?

A.  Maybe about 50 or $100.

Q.  In March of 1998, did you have your own money that you were collecting outside, or were you depending on Rosauro?

A.  By that time, I was babysitting for a boy.

Q.  How much money were you making doing that?

A.  I believe $30 or $50.  I really don't recall.

Q.  How often would you get that money?

A.  Every week.

Q.  And other than that, did you have any other money you were making separate from Rosauro?

A.  When my brother Carlos would have me put money away that was his, I would save it for him.

Q.  So Carlos was having you hold on to some of his money?

A.  Yes, so that I could send money back to my mother from his money.

Q.  So when you were making money from the babysitting, was that money that you would keep or that you would give to Rosauro for the two of you to use for the family?

Page 100

A.  No.  I would leave it for me.

Q.  So would you use that money to buy things that you needed?

A.  Sometimes I would buy things that I needed or things for the house.

Q.  And when you said your overall financial situation was not good, does that mean you didn't have a lot of extra money lying around?

MS. ROSEN:  Objection, form.

MR. SWAMINATHAN:  Go ahead.

A.  Perhaps you can say that I didn't have a lot of money, but maybe $10.  I would save those.

Q.  So you would sometimes have for yourself, you know, $10, $20, things like that; is that right?

A.  For the most part, I almost always had a little bit of money.

Q.  And then if you needed more than that, you would have to ask Rosauro; is that right?

A.  Yes.

Q.  And if you needed hundreds of dollars, you would have to ask Rosauro; is that right?

A.  Yes.

Q.  And if you took hundreds of dollars -- well, strike that.

Page 101

Did Rosauro have hundreds of dollars lying around the house?

A.  No, because he had things with his sister-in-law Rosalinda that would put money away.  They had like a little savings plan going.

Q.  So you didn't have access to that?

A.  Yes.

Q.  How would you access that?  You would have to ask him or Linda?

A.  No.  It's because it was like a savings with numbers that everybody would put in.  When it was your number, then you would get the entire amount.

Q.  How much would that be?

A.  Sometimes it was 1,200, sometimes $1,000

THE INTERPRETER:  Counsel, can we go off the record for a second?

MR. SWAMINATHAN:  Yes.

THE VIDEOGRAPHER:  Off the record at 1:44.

(Pause in proceedings.)

THE VIDEOGRAPHER:  We're back on the video record at 1:46 p.m.

BY MR. SWAMINATHAN:

Q.  Did you ever get the money from the tanda?

A.  Yes.  For the most part, I would receive it.

Urlaub Bowen & Associates, Inc.   312-781-9586

REYES 014846

FILED DATE: 4/7/2022 9:01 PM   98CR1244002

ADRIANA MEJIA, 02/05/2021                        Page 102..105

FILED DATE: 4/7/2022 9:01 PM 98CR1244002

Page 102

Q. When did you get the money from the tanda.

A. When it was his turn, it was his number, I would pick it up. I would take the money.

Q. When you say "his turn," do you mean Rosauro?

A. Yes.

Q. When was the last time that Rosauro had won the money in the tanda?

A. Sometime close to in March, around the time of my case.

Q. When you got that money from the tanda, did you and Rosauro use it for any family reasons or any family purpose?

A. No, because I picked up the money, and I kept the money that time.

Q. What did you do with that money?

A. I saved it for some time; and then he would ask me, and I would tell him that his money was there.

Q. So you never used that money. You gave it to Rosauro?

THE INTERPRETER: Sorry?

Q. So you said you were holding on to that money; is that right?

A. Yes, but I was also in a tanda. And from

Page 103

what little I was getting, I put my own money together.

Q. You were in a different tanda?

A. It was the same one; but he had a number, and I had a number.

Q. Okay. But the money that Rosauro got from the tanda, you kept that money for the family, right? You're not saying you spent it?

A. Yes.

Q. So that money from the tanda never got spent, right?

A. No.

Q. You didn't spend it on something for yourself, right?

A. Not that I recall.

Q. If you did, would Rosauro have noticed?

A. Yes.

Q. Would he have been upset?

A. Yes.

Q. If you had taken, you know, hundreds of dollars from that money that Rosauro and you had saved, would he have noticed?

A. Of course.

Q. If you took hundreds of dollars that Carlos

Page 104

had given you to send to Mexico, would he have noticed?

A. Yes.

Q. I'm going to ask you about cars. Back in 1998, did you drive?

A. No. Until present day, I don't know how to drive.

Q. And you said that Rosauro had a car, right?

A. Yes.

Q. Did he have more than one car?

A. He would buy and sell. So he had different cars.

Q. In March of 1998, near the time you got arrested, did he have more than one car?

A. Just one.

Q. And can you describe that car?

A. I don't know about cars.

Q. What color was it?

A. Honestly, I don't recall the color anymore.

MR. SWAMINATHAN: Let me show you a document. This is RFC Solache Reyes 44. And I apologize. I did not mark this as an exhibit. It didn't get included, but it's a document everyone is familiar with. My apologies.

Page 105

MS. ROSEN: You mean you haven't exchanged it as an exhibit?

MR. SWAMINATHAN: Yeah. We'll send a copy of this exhibit over to the court reporter and everybody so we have it. I'll identify it for the record.

MS. ROSEN: Can we mark it as whatever number? I think you started with your own numbering.

MR. SWAMINATHAN: Yeah. So this is Plaintiff's Exhibit 2. It is RFC Solache Reyes 44.

BY MR. SWAMINATHAN:

Q. Ms. Mejia, do you see that this is -- these are two pictures of a car?

A. Uh-huh.

Q. Was this Rosauro's car in March of 1998?

A. Honestly, I don't recall anymore.

Q. Was this the car that was used to go to the Soto home?

A. Honestly, I don't remember anymore.

Q. The car that you used to go to the Soto home, was it the same car that you got picked up in the next day by Rosauro and Guadalupe?

MS. ROSEN: Objection, form.

A. I'm not very sure. I think Gabriel Solache

Urlaub Bowen & Associates, Inc. 312-781-9586

REYES 014847

FILED DATE: 4/7/2022 9:01 PM   98CR1244002

ADRIANA MEJIA, 02/05/2021                                    Page 106..109

Page 106

had a car, but I don't remember his car either.

Q. Is it your testimony that you don't know what car you were in when you went to the Soto home?

MS. ROSEN: Objection: form, mischaracterizes her testimony.

A. It's been so many years. I don't recall.

Q. When you went to the Soto home, were you in the car that's on Plaintiff's Exhibit 2? Were you in a different car that Gabriel Solache owned, or were you in some other car?

MS. ROSEN: Objection: form, asked and answer. She said she doesn't recall.

MR. SWAMINATHAN: Go ahead.

A. Honestly, I don't recall.

Q. Does this car look familiar to you at all?

MS. ROSEN: Objection, form.

A. Perhaps, but I don't remember anymore.

Q. Did Jose Mejia have his own car?

A. Yes.

Q. Did Horacio Mejia have his own car?

A. Yes. He had a van.

Q. Did Adolpho Mejia have his own car?

A. Yes. He had a very old car, the big ones.

Q. Did Jorge Mejia have his own car?

Page 107

A. Yes. They had a van.

Q. Did Leobardo Mejia have his own car?

A. I don't recall if he had a car or if he didn't have a car on those dates.

Q. Did Carlos Martinez have his own car?

A. When my brother was with me, he didn't know how to drive yet.

Q. As of March of 1998, Carlos Martinez did not know how to drive; is that right?

A. Yes, he didn't know how to drive.

Q. All right. We talked yesterday about the fact that, at some point, you pretended that you were pregnant, right?

A. Yes.

Q. Was there a point in time before that when you actually were pregnant?

A. No.

Q. Was there a point in time before that when you believed you were pregnant?

A. Yes.

Q. Why was it that you believed you were pregnant?

A. Because I didn't have a period.

Q. Did you tell people that you were pregnant?

Page 108

A. Yes.

Q. Did you take a pregnancy test?

A. No.

Q. Did you see a doctor?

A. No.

Q. How long was it that you believed you were pregnant?

A. About two months.

Q. And then, at some point, did you realize you were not pregnant?

A. Yes.

Q. How did you find out?

A. Because I got my period.

Q. And then did you tell anybody the fact that you were not pregnant?

A. No.

Q. And so did you then lie to your family about being pregnant?

A. Yes.

Q. Did you lie to your husband Rosauro Mejia about being pregnant?

A. Yes.

Q. Did you lie to everybody else in the house about being pregnant?

Page 109

A. Yes.

Q. Did you lie to Carlos Martinez?

A. Yes.

Q. Did you lie to your other family members?

A. Yes.

Q. Did you lie to your parents?

A. Yes.

Q. And did you lie to your friends?

A. What friends?

Q. What did you do to make it appear that you were pregnant?

A. Well, no one would pay attention to me.

Q. So you didn't do anything to make it appear that you were pregnant?

A. Yes. I would wear loose clothing, but no one would pay much attention to me.

Q. Other than wearing loose clothing, would you do anything else to make it appear that you were pregnant?

A. No.

Q. Did you ever put anything under your shirt to make it appear that you had a belly?

A. No.

Q. Did you tell people when you were due?

Urlaub Bowen & Associates, Inc.   312-781-9586

REYES 014848

FILED DATE: 4/7/2022 9:01 PM   98CR1244002

ADRIANA MEJIA, 02/05/2021                                    Page 110..113

Page 110

A.  Yes.

Q.  Did you lie to them about when you were due?

A.  Yes.

Q.  Did you pretend to go to doctor's appointments for your pregnancy?

A.  Yes.

Q.  And would you actually go to a doctor's office, or would you just say that you had gone to a doctor's office?

A.  Sometimes I would say that I would go, and sometimes I would just go.

Q.  When you would just go, what would you do?

A.  I would go and wait in the waiting area at the hospital, or I would walk in the streets.

Q.  So sometimes you would go to the hospital and just walk around there?

A.  Yes.

Q.  And sometimes would you just go to clinics and walk around there?

A.  Yes.  Sometimes I would go on the streets that I was familiar walking around.

Q.  Okay.  So sometimes you would walk the streets.  Sometimes you would go to the hospital, and then you would go to the clinic.  Do I have that

Page 111

right?

A.  Yes.  I would go on the streets that I was familiar with.  I really didn't know how to get around Chicago; so for the most part, I would go around 26th Street.

Q.  When you would go to the hospital, which hospital would you go to?

A.  The one on 26th Street.  What is it called?

Q.  Mount Sinai?

A.  Yes.  Because I knew how to return to the University of Chicago.  I believe just there and then a small clinic that was there by the university.

Q.  When you would go to the hospital and to the clinic, would you just sit inside and sit in the waiting area?

A.  Sometimes I would go inside.  Sometimes I would go out to eat something.

Q.  Sometimes would Rosauro take you and drop you off at the hospital or the clinic?  I'm talking about when you were going to these pretend appointments.

A.  Yes.  Sometimes he would go in and wait in the waiting area, and I would go into the bathroom or wherever I could; or sometimes he would go outside and

Page 112

wait for me in the car.

Q.  Sometimes when he would come in with you, you would go into the bathroom to make it appear like you had actually seen a doctor; is that right?

A.  Yes.

Q.  In addition to these trips to the doctor's office where you weren't actually there for an appointment, you also had actual fertility appointments that you would go to as well, right?

A.  Yes.

Q.  And Rosauro would take you to those fertility appointments sometimes, right?

A.  Yes.

Q.  You said that one of the clinics -- do you remember where the clinic was that you were going to that was near the University of Illinois Chicago Hospital?

A.  No.  I don't remember the street anymore.

Q.  It was just near the hospital?  Is that as much as you can remember?

A.  Yes.  I don't recall.

Q.  Would you also go to that location for actual fertility appointments in addition to the pretend appointments?

Page 113

A.  Yes.

Q.  Would that be 20 South Wood Street?  Does that sound familiar?

A.  Honestly, I can't -- I don't remember the streets.

MR. SWAMINATHAN:  I'm going to show you a map.  This is just a Google map that identifies the University of Illinois Hospital at 820 South Wood Street.  We'll make this into an exhibit.  We'll mark it as Plaintiff's Exhibit 3.

MS. ROSEN:  So this is another exhibit that you haven't provided in advance that we need to give to the court reporter?  Is that what you're saying?

MR. SWAMINATHAN:  No.  I'll give this to the court reporter.  I just pulled this up on Google maps just a little bit ago.

BY MR. SWAMINATHAN:

Q.  So Ms. Mejia, this is -- in the lower right-hand area, it shows where the University of Illinois Hospital is.  Do you see that?  Are you able to see that, Ms. Mejia?  Go ahead.

A.  Yes.

Q.  And that's the hospital that you said that you were being picked up and dropped off from when you

REYES 014849

ADRIANA MEJIA, 02/05/2021        Page 114..117

Page 114

went to the Soto home, right?

A. It's very changed now. I really don't recall.

Q. Okay. When you went to the hospital -- strike that.

When you were referring to the University of Chicago Hospital during the course of your deposition, that's one of the hospitals that you would also go to for your pretend appointments, right?

A. Yes.

Q. And then up here in the center of this picture is 820 South Wood Street, which is one of the University of Illinois Chicago clinics. Does that look approximately like where you would go sometimes to the clinic?

MS. ROSEN: Objection: form, foundation.

A. Honestly, I no longer remember the address. I don't recall the numbers.

Q. The clinic that you would go to, you said that it was near the University of Illinois Chicago Hospital. Was it within one to two blocks, like this map shows?

A. Honestly, I don't remember.

Q. The clinic that you went to, was it on,

Page 115

like, a campus with other medical buildings?

MS. ROSEN: Objection: form, foundation.

A. There were a lot of buildings, and I really don't recall how the streets were.

Q. Let me ask you, when you were going for the pretend appointments to the clinic and to the hospital, would anybody drop you off or take you other than Rosauro?

A. Yes. My brother-in-law Edwiges and, on some occasions, Gabriel Solache.

Q. Anyone else?

A. No. I don't recall.

Q. Were you ever told why you were not able to get pregnant?

A. No.

Q. Did the doctors ever identify any problems that you had in your body that prevented you from being able to have kids?

A. I believe, when I was at Mount Sinai, the doctor said that I didn't ovulate too much.

Q. Did they give a particular reason why you weren't ovulating as much as you should?

A. No. I don't recall them saying anything.

Q. Did they ever tell you there were any

Page 116

problems in your reproductive organs?

A. I don't recall.

Q. Up to the point that you were arrested, had you ever had any serious medical issues during your life?

A. Yes. On two occasions in Mexico, I was sick with my kidneys. And once here in Chicago, I was also sick, and it was from my kidneys.

Q. Did this relate to your diabetes?

A. No. My diabetes was just about -- I'm sorry. My diabetes came about just about 15 years ago.

Q. So what were the issues you were having with your kidneys where you would go to the hospital?

A. Just, like, kidney stones.

Q. Okay. How long were you hospitalized?

A. In Mexico, my parents took me to regular doctors. Here, in Chicago, my husband didn't have money to take me to the doctor; so I had to take, like, natural, like pills.

Q. When did that happen that you had this issue in the United States?

A. About three years after I had arrived from Mexico.

Page 117

Q. So what year would that have been?

A. Around '96.

Q. Have you ever been diagnosed with schizophrenia?

A. No.

Q. Have you ever been diagnosed with bipolarism?

A. No.

Q. Have you ever been diagnosed with a manic condition or manic episodes?

A. No.

Q. Have you ever been diagnosed with depression?

A. No.

Q. And you indicated yesterday that you've never tried to commit suicide, right?

A. Yes.

Q. Have you ever had hallucinations?

A. No.

Q. Have you ever had amnesia?

A. Can you explain to me what amnesia is?

Q. Have you ever had a condition where you just -- you lost memory of large periods of time?

A. Oh, no.

Urlaub Bowen & Associates, Inc. 312-781-9586

FILED DATE: 4/7/2022 9:01 PM 98CR1244002

REYES 014850

FILED DATE: 4/7/2022 9:01 PM   98CR1244002

ADRIANA MEJIA, 02/05/2021                                    Page 118..121

Page 118

Q.  Or have you ever had a period where you lost memory of who you were?

A.  No.

Q.  Have you ever lost your consciousness, like been knocked out?

A.  Yes, only when I lost my brother Carlos.

Q.  What happened then?

A.  When I got the news, I went to my room, and I felt my body was numb.  And I just couldn't anymore.

Q.  Did you lose consciousness?

A.  It felt like my body wasn't responding, but my body was tired.

Q.  Have you ever had a stroke?

A.  No.

Q.  Up until the point that you were arrested for the murders, had Rosauro had any serious medical issues?

A.  No.

Q.  Did he have any mental health issues, or was he taking any medications for any mental issues?

A.  No.

Q.  You said that he had had some testing to see -- for fertility.  What were the results of that testing?

Page 119

MS. ROSEN:  Objection to form.  Go ahead.

A.  Honestly, I don't remember anymore what they said.

Q.  I am showing you a document that we'll mark as Plaintiff's Exhibit 4.  It is Bluhm 25519 and 25520.  This was previously marked as Deposition Exhibit 8 to Ms. Mejia's previous deposition.

This document indicates that -- this relates to an appointment at Mount Sinai.  Is that a place where you were going to for facility appointments?

MS. ROSEN:  Objection, form.  Sorry.  Go ahead and translate it.

(Question translated.)

MS. ROSEN:  Objection:  form, foundation.

MR. SWAMINATHAN:  Go ahead.  You can answer.

A.  Yes.

Q.  It indicates that Rosauro Mejia is supposed to go for a sperm analysis; is that right?

MS. ROSEN:  Objection:  form, foundation.

A.  Yes.

Q.  And the date of this is March 18, 1998, correct?

MS. ROSEN:  Objection:  form, foundation.

A.  Yes.

Page 120

Q.  And it indicates that he had an appointment on the eighth floor on March 20, 1998, correct?

MS. ROSEN:  Objection:  form, foundation.

A.  Yes.

Q.  So was it March 1998 when Rosauro went for his sperm test?

MS. ROSEN:  Objection:  form, foundation, mischaracterizes the record, misleading.

A.  I honestly don't recall the year.

Q.  So you're not sure?

MS. ROSEN:  Objection:  form, foundation.

Q.  Is that right?  You're not sure whether he had his sperm appointment in March of 1998?

MS. ROSEN:  Objection:  form, foundation, misleading.

A.  No.  I don't recall.  I don't think it was in '98.  It would have been '96 or around '97.

Q.  So you think that he did not -- is it your statement that he did not go for a sperm analysis in March of 1998?

A.  He did go one time, but I don't recall the date.

Q.  Okay.  I want to ask you about your plan for getting a baby, okay?

Page 121

When did you first speak with somebody about your plan to get a baby?

MR. ENGQUIST:  Objection to the form.

MR. SWAMINATHAN:  Go ahead.

A.  When Gabriel found me crying, he's the first person I told.

Q.  And when was that?  What month?

A.  Around -- I'm not sure if it was -- around January or February of '98.

Q.  Okay.  So it was more than a month before you actually went to the Soto home, correct?

A.  Honestly, I don't remember anymore.

Q.  Where in the house were you when he found you crying?

A.  One time, he found me in the living room, and he asked me what was happening.  And I didn't want to tell him.  Then in the kitchen.

Q.  Is that a different day?

A.  Yes.

Q.  And then when was it -- so is it a second time that you were crying and he asked you what was wrong?

A.  No.  I don't recall if it was two or three times.  No, because when he would come home from work

Urlaub Bowen & Associates, Inc.   312-781-9586

REYES 014851

ADRIANA MEJIA, 02/05/2021                                Page 122..125

Page 122

at night is when -- yes, I believe so.

Q. So how many times -- were there multiple times where Gabriel found you crying and he asked you what was wrong?

A. Yes, many times. Sometimes he would also see me sad during the day.

Q. And so a number of times when he saw you crying, you didn't tell him that you were faking a pregnancy, correct?

A. Yes.

Q. And then when was the first time that you actually told him?

A. When it was getting close to the time that I was supposedly going to have the baby, and I couldn't find a solution. And I had plans to go back to Mexico, but I couldn't.

Q. So at the time that you actually told him that you were faking, how close was that to when you went to the Soto home?

A. Honestly, I don't recall if it was a month or some weeks.

Q. Okay. And where were you in the house when you revealed to him that you were faking?

A. I really don't recall if it was in the

Page 123

kitchen or in the living room, but it was one of those two places.

Q. And what time of day was it?

A. It wasn't in the daytime. It was at night.

Q. Was anyone else home?

A. My brother was sleeping. My husband hadn't gotten home yet.

Q. And so you just revealed to him your secret; is that right?

A. Yes.

Q. Did he tell you something to get you to reveal your secret?

A. Well, he would always ask me, "Why is it that I'm always seeing you crying? Why is it I find you sad? Are you having problems? Are you having problems with your husband?"

And I would say, "No, everything is fine."

But he would say, "I would see you sad all the time." But one of those times, I didn't have any more, and I told him.

Q. Okay. And what did you say to him?

A. I told him the truth, that I wasn't pregnant, that I had faked a pregnancy, that I was having problems, that I was afraid about what my

Page 124

husband could tell me.

Q. And what was his response?

A. I don't remember the adequate words that he said to me, but he said that he would help me.

Q. Did he tell you that he would help you get a baby in that conversation?

A. I don't know if it was that day or the following day, the conversation where he told me that he knew a friend that didn't want her baby.

Q. So that day or the next day, he told you that he had a friend who didn't want their baby; is that right?

A. He told me he knew a lady that didn't want her baby.

Q. Did he tell you that person's name?

A. No. I think it was one of his friends or one of his girlfriends.

Q. And did he tell you how much it would cost?

A. Yes. He told me to put $600 together.

Q. And did he tell you why this person was getting rid of their child?

A. I don't really recall what he told me about that lady.

Q. Did he tell you if it was going to be a boy

Page 125

or girl?

A. No. I believe he said it was a girl.

Q. Did he tell you if the baby had been born yet?

A. I don't recall.

Q. Did he tell you when he was going to get the baby for you?

A. Yes. It was a little bit before I was about to have my child.

Q. You told him that you were faking a pregnancy, and that same day or the next day he told you all of this information about this person who actually had a baby for you, right?

A. Yes. But he didn't tell me everything the same day. He told me within days.

Q. That's what I'm asking you. There was an initial conversation where you told him that you were faking your pregnancy, right?

A. Yes, one conversation where he was asking what was happening. And he told me not to worry, that everything was going to be fine.

Q. And in that same conversation or a conversation on the next day, he told you he could get you a baby, right?

Urlaub Bowen & Associates, Inc.  312-781-9586

REYES 014852

ADRIANA MEJIA, 02/05/2021                                    Page 126..129

FILED DATE: 4/7/2022 9:01 PM   98CR1244002

Page 126

A.  Yes.

Q.  And in that conversation where he told you he could get you a baby, what else did he tell you?

A.  That's when he told me not to worry, that he knew a lady that didn't want her baby.

Q.  And did he tell you that it would cost $600?

A.  Yes.

Q.  And did he tell you that it was going to be a baby girl?

A.  Yes.  I believe he told me it was a girl.

Q.  And in that conversation, did he tell you when he would have the baby available for you?

A.  I don't really recall, but I believe he said in some days.

Q.  So he indicated, when you had that conversation with him, that within a few days he'd be able to get you the baby; is that right?

A.  Yes.

Q.  And then how long did it take you to get $600?

A.  Didn't I explain to you that it was in a tanda?

Q.  Yeah.  So you got the money from the tanda; is that right?

Page 127

A.  Yes.

Q.  So your testimony is the place where you got $600 was from a tanda with the Mejia family; is that right?

A.  Yes.

Q.  Did Rosauro ever find out about it?

A.  That I had another number?

Q.  Did Rosauro ever find out that you had received money from the tanda and that you had used it for some other purpose?

MS. ROSEN:  Objection, foundation.

A.  You confused me a little bit.  Could you explain it to me a little slower?

Q.  You're saying that you won money from the tanda separate from the money that Rosauro won; is that right?

A.  Yes.

Q.  From the same tanda?

A.  You're not understanding me.

Q.  Go ahead.  Explain.

A.  He had one number, and I had a separate number.

Q.  But both were in the same tanda, right?

A.  Yes.

Page 128

Q.  And so you're saying that you got money from the tanda that he didn't know about.  Is that what you're saying?

A.  Yes.  He didn't know I had the tanda until I got that money.

Q.  And when you got that money, you're saying he had no idea that you got that money; is that right?

A.  Yes.  Because when my ex-sister-in-law Rosalinda Mejia gave me the money is when he found out I had that tanda.

Q.  And when was that that he found out about that?

A.  I believe around February.

Q.  So in February, you got the money from the tanda, and he knew about that money, right?

A.  Yes.

Q.  What did he have you do with that money?

A.  I had it saved for myself.

Q.  Did he let you keep that money for yourself?

A.  Yes, because he was putting together the other money from his tanda.  He had me save both the money.

Q.  So he was fine with you keeping the money from the other tanda?

Page 129

A.  No.  Because his plans were to send it to Mexico to finish building the house.

Q.  And did he ever find out that you didn't send the money for the house?

A.  Yes.

Q.  And is it your testimony that you and him both got money from the tanda in February and March?

A.  (Nodding head up and down.)

MR. SWAMINATHAN:  Go ahead.

A.  Yes.

Q.  And how long after you had this conversation, this first conversation with Gabriel in which he said he could get you money, how long after that did you get money to give him?

THE INTERPRETER:  I'm sorry, Counsel.  Can you repeat that?

MR. SWAMINATHAN:  Yeah.  I'll ask a better question.

Q.  How long was it from when you had this conversation with Gabriel about getting the baby that you came up with the $600?

A.  It didn't take long because I had the money; so I gave it to him after.

Q.  You had the money just -- you had the cash

Urlaub Bowen & Associates, Inc.   312-781-9586

REYES 014853

ADRIANA MEJIA, 02/05/2021                                    Page 130..133

FILED DATE: 4/7/2022 9:01 PM   98CR1244002

Page 130

in your house?

A. Yes.

Q. Where in the house were you keeping it?

A. I have a small jewelry box where you keep your -- what do you call it -- your jewelry.

Q. Did Rosauro know where you were saving that money?

A. Sometimes when he would search.

Q. And how much of the money was -- after you gave the money to Gabriel, how much money was left from the tanda?

A. $400.

Q. So you got $1,000 from the tanda in February?

A. Yes.

Q. When was the last time before that that you got money from the tanda?

A. I don't recall, but I think it was around -- I don't remember anymore.

Q. Was it in 1998? Was it in 1997?

A. 1998, but I don't --

UNIDENTIFIED SPEAKER: -- something, but I can't tell what.

MR. SWAMINATHAN: Somebody is not on mute?

Page 131

Sorry. Was she in the middle of the answer?

THE REPORTER: Yeah. Could you repeat the answer for me? This is the reporter.

A. 1998, but I don't recall the date.

Q. So you'd won the tanda before in 1998?

A. No, in '98.

Q. Yeah. So you got the money from the tanda in February of 1998; and before that, you had gotten money from the tanda also in 1998?

A. Yes. We would make a lot of tandas, and we would get a lot of numbers.

Q. So you were getting money from multiple tandas in 1998; is that right?

A. Yes. With my ex-husband's and mine and then -- I mean, a lot of his siblings would make tandas, and then I did too.

Q. And then you had to be lucky enough to have your number selected, right?

A. No. I could pick my number.

Q. Okay. You said you had the money lying around. So when Rosauro told you you would need to come up with $600, did you give him the money right then?

A. Rosauro?

Page 132

Q. Sorry if I said the wrong name. Let me ask it again.

When Gabriel said you would need to come up with $600, you already had the $600, right?

A. Yes.

Q. Did you give it to him at the same time?

A. Yes.

Q. And at that point, did he tell you the name of the person?

A. Honestly, I don't remember if it was that day or -- I really don't remember.

Q. When is the first time you learned the name of the person who was going to be giving you a baby?

A. I just recall that it was Norma Salazar, but I don't remember the date.

Q. Did he ever tell you that the person who was supposed to sell you a baby, that that had fallen through?

A. No.

Q. Your expectation was that you would have the baby in a few days, right?

A. Yes.

Q. And that didn't happen, right?

A. Yes.

Page 133

Q. So when that didn't happen after a few days, what did you do?

A. I was worried. I was frustrated. I was affected.

Q. Did you talk to Gabriel?

A. Yes. I believe about two days later.

Q. What did he say?

A. He told me not to worry, that he was going to keep helping me.

Q. What else did he tell you?

A. Not much, because we couldn't really talk much because there was a lot of people that lived with us. But he would just say not to worry, that he was going to help me, that he promised that he would help.

Q. And at least a few weeks went by, right?

A. I think so.

Q. At that point, were you past the due date that you'd been telling people in the family?

A. Yes.

Q. Were people asking you questions?

A. Yes. They would ask what was happening, if I had my calculations correct. Then I would tell them that everything was fine.

Q. Did anybody tell you that they didn't

Urlaub Bowen & Associates, Inc.   312-781-9586

REYES 014854

FILED DATE: 4/7/2022 9:01 PM   98CR1244002

ADRIANA MEJIA, 02/05/2021          Page 134..137

Page 134

believe you that you were pregnant?

A. No, because they would never pay attention to me.

Q. Did they tell you that they were suspicious?

A. No.

Q. Did anyone act like they were suspicious?

A. Not that I recall.

Q. I'm going to show you a document, Defendant's Exhibit 19, since I cannot find our version. This is Defendant's Exhibit 19, Reyes 8726 through 8729. This is a declaration of Jose Mejia. Ms. Mejia, have you ever seen this document before?

A. No.

Q. This document indicates that, back in 1998, his cell phone number was (773) 434-8643. Do you remember what Jose Mejia's cell phone number was?

MS. ROSEN: Objection, form.

A. No. Until now, I didn't remember.

Q. His affidavit states -- strike that. His declaration states, "Before her arrest, I had to become close with my aunt Adriana"; is that true?

MS. ROSEN: Objection, form.

A. Only on one occasion. He went to pick me up when he asked if I could please watch his kids.

Page 135

Q. Well, had you become close with Jose Mejia?

MS. ROSEN: Objection: form, asked and answered.

A. I had gotten close to him, but not as far as trusting him.

Q. He says: "My aunt Adriana used to babysit my two children a few times a week. She stopped babysitting shortly before her arrest." Is that statement true?

MS. ROSEN: Objection, form. Oh, sorry.

(Question translated.)

MS. ROSEN: Objection, form.

A. Two times a week? No, I just babysat on two occasions.

Q. He write, "Adriana wanted to have children." Is that true?

MS. ROSEN: Objection, form.

A. I don't know.

Q. He says he knew that you were not actually -- strike that.

His declaration says, "I knew that she was not actually pregnant." Did Jose Mejia ever say anything to you about knowing that you were not pregnant?

Page 136

MS. ROSEN: Objection -- sorry. Go ahead.

(Question translated.)

MS. ROSEN: Objection, form. This is improper what you're doing. It is improper to put somebody else's declaration in front of a witness and ask -- and say, "This is what the witness said. Is that true? Is that not true?"

(Technical issues with connection.)

MR. SWAMINATHAN: Defendants asked leading questions of a witness they can't lead through their entire portion. So objection to form is noted for the same reason I made the same objection for trial exam purposes.

MS. ROSEN: You did not object -- first of all, we didn't ask leading questions. Second of all, you made no such objection. Go ahead and hit yourself in the head. It's okay. I'm making an objection. I'm giving you a warning. Your use of this exhibit in this way is improper; and if this ends up being her trial testimony, we're moving to strike it.

I am giving you an opportunity -- stop trying to interrupt me. I am giving you an opportunity to try and cure the defect. If you don't want to take that opportunity, then you act at your

Page 137

own peril.

MR. SWAMINATHAN: I'm going to note for the record that Defendants, through their exam, asked numerous, numerous leading questions of the witness to which I made objections to form without making a speaking objection.

Defendants, through the course of their exam, put documents and prior testimony and statements in front of Ms. Mejia and then asked her questions. And I made objections to form, but I did not make speaking objections.

So I'm a little disappointed that Counsel is now suggesting to me that there's something improper about me asking these questions.

(Technical issues with connection.)

THE REPORTER: Anand, I've lost you. This is the court reporter. I got ". . . Counsel is now suggesting to me that there's something improper about me asking these questions," but you've been freezing.

MR. SWAMINATHAN: Well, we'll keep going.

BY MR. SWAMINATHAN:

Q. In Jose Mejia's statement, his declaration: "Once, I overheard my uncles, Jorge Mejia and Horacio Mejia, discussing Adriana's pregnancy with Rosauro."

Urlaub Bowen & Associates, Inc.   312-781-9586

REYES 014855

FILED DATE: 4/7/2022 9:01 PM   98CR1244002

ADRIANA MEJIA, 02/05/2021                                    Page 138..141

Page 138

Do you see that?

A. Uh-huh.

Q. "They were speaking in Spanish and assumed that I didn't understand them. But I did understand what they were saying. My uncles knew Adriana was not pregnant or were highly suspicious that she was not pregnant. I heard them telling Rosauro this."

Did any members of the Mejia family indicate to you that they were suspicious that you were not pregnant?

MS. ROSEN: Objection, form.

A. No.

Q. Did Rosauro ever say anything to you about being suspicious that you were not pregnant?

MS. ROSEN: Objection, form.

A. No.

Q. Were you concerned that Rosauro was going to figure out that you weren't pregnant?

A. Yes.

Q. What steps did you take to keep him from finding out that you were pregnant -- that you were not pregnant?

A. Towards the last months, I did -- we did have sexual relations, but I didn't let him see my

Page 139

body.

Q. Anything else you did?

A. No.

Q. Okay. Jose Mejia says: "I also saw Adriana changing in her bedroom in her apartment. She was pretending to be pregnant by placing a small pillow under her clothing and strapping it around her waist. I saw the pillow on the bed while she was changing."

Is that true?

A. That's a lie because he never came into the apartment that I lived in.

Q. So Jose Mejia, when he said that he saw you placing a pillow under your clothing, he's lying?

THE WITNESS: The officer is calling me for the count.

MR. SWAMINATHAN: Okay.

THE VIDEOGRAPHER: We're going off the video record at 2:59 at the end of media unit 4.

(Recess in proceedings from 2:59 to 3:08 p.m.)

THE VIDEOGRAPHER: We're back on the video record at 3:08 at the beginning of media unit 5.

MR. SWAMINATHAN: Can we have the last question read back? I don't believe we got an answer.

Page 140

A. He would never enter my home. He would stay from the door to the outside. And on the two occasions where he picked me up, he picked me up in front. And when he -- he also picked me up on Mozart, the street that runs -- where there's a lot of stores. But he never saw me. He's lying there because he never saw me.

Q. Is your testimony that, when Jose says he saw you with a pillow under your shirt, that he's lying?

A. Yes, he's lying, because he never saw me.

Q. I want to ask you about March 27, 1998, the day that you went to the hospital, okay?

What time that day did you go to the hospital?

A. In the morning.

Q. What time?

A. I don't recall if it was 8:00 or 9:00 in the morning.

Q. And Rosauro drove you, right?

A. Yes.

Q. How long did Rosauro stay with you at the hospital?

A. Not much -- very little time.

Page 141

Q. Where did you and Rosauro wait inside the hospital?

A. I believe in the waiting room.

Q. When you wait in the waiting room, where is that?

A. Where the people that are visiting the patients wait.

Q. Is that when you first enter, or do you have to go in further to the hospital?

A. It's when you enter. There's a waiting room there.

Q. Did you ever go into any other areas of the hospital that day?

A. I think so.

Q. Where else did you go in the hospital?

A. I believe I was walking around on different floors.

Q. Was that with Rosauro or after he'd left?

A. After he left.

Q. When Rosauro was there, you went into the waiting area. Then did you go check in at some counter?

A. I don't know how I told him to go back. I don't know if I registered or if I stayed inside.

Urlaub Bowen & Associates, Inc.   312-781-9586

REYES 014856

FILED DATE: 4/7/2022 9:01 PM 98CR1244002

ADRIANA MEJIA, 02/05/2021                                    Page 142..145

Page 142

Q.  Did you have any actual appointment that day for yourself, or were you pretending?

A.  I was just pretending.

Q.  And so you had to make it appear that you were actually checking in with someone, right?

A.  Yes.

Q.  Did you do that?

A.  I think so.  I talked to one of the nurses in the reception.

Q.  What did you say?

A.  I don't remember specifically what I asked, but I wanted my husband to see that I was there.

Q.  After he left, what are some things you did at the hospital while you were there?

A.  Once I was there, I called once to see if Gabriel would answer the call, if he was home.

Q.  Did he answer?

A.  No, because Guadalupe is the one that would answer.

Q.  What time of day was that that you made the call, hoping to get Gabriel?

A.  I don't recall.  It was about 12:00 or 1:00 p.m.

Q.  And did you have a conversation with

Page 143

Guadalupe at that time?

A.  I believe I hung up on her.

Q.  And that call was made from a pay phone at the hospital, right?

A.  I believe I took it on the phone that was on the street.

Q.  Where on the street?  Next to the hospital or in front of the hospital?

A.  I believe it was in front of the hospital.

Q.  And then we talked about some other phone calls that you made that evening, right?

A.  Yes.

Q.  And those were also made from pay phones in the hospital and just outside the hospital, right?

A.  Yes.

Q.  And we talked about a phone call that you made in the morning after you had the Soto children, right?

A.  Yes.

Q.  And that was also made from a pay phone at the hospital, right?

A.  Yes.

Q.  Other than those phone calls, what else did you do at the hospital that day after Rosauro left?

Page 144

A.  I stayed there in the waiting area for a long time, and then I was walking for a while.

Q.  Other than sitting there and walking around and making those phone calls, did you do anything else.

A.  I don't recall what else I did.

Q.  And then the next thing that happened was that Gabriel picked you up around 12:30 to 1:00 a.m., right?

A.  Yes.

Q.  And so you were basically at the hospital from around 9:00 a.m. that morning until 12:30 to 1:00 a.m., right?

A.  Yes.

Q.  And did you leave the hospital for any period of time?

A.  Yes.  I went out to walk through the streets that I was familiar with.

Q.  So you left the hospital for a little while?

A.  Yes.  Yes.

Q.  Did you go talk to anyone or see anyone that you knew?

A.  No, I didn't know anybody.  Everybody spoke English.

Page 145

Q.  All right.  And then finally around -- you get picked up by Gabriel -- strike that.

When you got picked up, where were you picked up from at the hospital?  Was it outside the entrance?

A.  Yes.  Not exactly in front, but almost in the front.

Q.  And had you been waiting outside?

A.  Yes, a little while.

Q.  Were picked up at the same place Rosauro dropped you off?

A.  Close.

Q.  And how did you know to come outside at that time?

A.  Because -- I don't recall if I saw Gabriel outside or he honked with the car he had.

Q.  So you were just sitting waiting, and eventually you just happened to see him parked outside or honking; is that right?

Strike that.  Strike that.

How did you know what time to be looking for Gabriel?

A.  Because he told me that, around the time he would get off work, he would pick me up around that

Urlaub Bowen & Associates, Inc.  312-781-9586

REYES 014857

FILED DATE: 4/7/2022 9:01 PM   98CR1244002

ADRIANA MEJIA, 02/05/2021                                Page 146..149

Page 146

time to go pick up the baby.

Q.   So you understood that he would be off work by -- in time to pick you up around 12:30; is that right?

A.   Yes.

Q.   When he picked you up, did you recognize the car that he was in?

A.   I don't really recall the color or the model of the cars.

Q.   And when he picked you up, your testimony is you didn't know who you were going to go see, right?

A.   Yes.

Q.   And your testimony is, when you got in the car, you thought you were just going to go buy the baby, right?

A.   Yes.

Q.   Your testimony is that, at that point, you had already given Gabriel the money weeks earlier, right?

MS. ROSEN:  Objection, asked and answered.

MR. SWAMINATHAN:  Go ahead.

A.   I think so.

Q.   So why were you there at all?

MS. ROSEN:  Objection, form.  Go ahead.

Page 147

A.   Because he told me he was going to give me the baby outside of the hospital.

Q.   So you thought that he already had the baby and was going to give it to you?

A.   Yes.  Because he said he was going to go pick it up with his friend.

Q.   So instead of him having the baby there for you, he told you to get in the car?

A.   Yes.  But when he told me to get into the car, Arturo Reyes was already in there as well.

Q.   And at that point, you thought that you were already supposed to have the baby?

A.   Yes.

Q.   So based on your version of events, you agree it doesn't make sense why you would need to go to the Soto home.  You had already handed over the money, right?

MS. ROSEN:  Objection to form.

MR. BRENER:  Objection to form.  Argumentative.

MR. SWAMINATHAN:  Go ahead.

MR. ENGQUIST:  Vague.

A.   Yes.

Q.   Why did you go along?  At that point --

Page 148

strike that.

If you were just buying a baby and you had already given him the money, why did you go along with Gabriel at that point?

A.   I don't recall specifically what he told me, but he told me to get into the car.

Q.   What else did he tell you?

A.   I asked him where the baby was, and he said he would give it to me.

Q.   Anything else?

A.   No.

Q.   So you got in the car?

A.   Yes.

Q.   And then you drove off with them?

A.   Yes.

Q.   And then you got to the Soto home, right?

A.   Yes.

Q.   Did you know where you were?

A.   No.

Q.   It was the middle of the night, correct?

A.   Yes.

Q.   Did you park right in front of the house, or did you park a little bit away from the house?

A.   Honestly, I don't recall, but it wasn't very

Page 149

far.  I don't remember if it was in the front or a little bit to the side.

Q.   Other than Gabriel telling you to get in the car and that he was going to get you the baby, did you have any other conversation in that car on the way to the Soto home?

A.   Yes.  I asked him what was Arturo Reyes doing there.

Q.   What was his answer?

A.   He told me that he already knew because he had told him what was going on with me.

Q.   Did Arturo say anything in the car?

A.   Very little.

Q.   And then did the three of you discuss anything about what was going to happen when you went to the house?

A.   No.

Q.   Your testimony is that Gabriel went in, and you and Arturo waited in the car, right?

A.   Gabriel got out first, and then I got out after.

Q.   Did you go down to the house with him at the same time, or did he go down to the door to the house first?

Urlaub Bowen & Associates, Inc.   312-781-9586

REYES 014858

FILED DATE: 4/7/2022 9:01 PM   98CR1244002

ADRIANA MEJIA, 02/05/2021                          Page 150..153

Page 150

A. No. He was already opening the door with a hanger.

Q. When he went to the house, did he have anything with him?

A. Honestly, I don't know.

Q. Did you see anything in his hands when he got out of the car?

A. No, because he had a jacket on and a hat on his head, and he had gloves. So I didn't know if he had anything.

Q. And at the point that he goes down to the door, you're sitting in the car, right?

A. Not long because I got out behind him.

Q. That's what I'm trying to understand. He was picking the lock, right?

A. Yes. It was a normal door.

Q. What do you mean by that?

A. It just had a key.

Q. How many locks?

A. I think one.

Q. And you were there with him, standing next to him, when he was trying to open the lock, right?

A. Yes.

Q. And did you say anything to him while he was

Page 151

doing that?

A. Yes. I asked him what he was doing. He said not to worry, that everything was going to be fine.

Q. Did he say anything else?

A. No, not that I recall.

Q. And he was using a coat hanger to pick the lock; is that right?

A. Yes.

Q. How long did that take?

A. Not long.

Q. Give me an approximation. How many minutes?

MS. ROSEN: Objection, form.

A. Honestly, I wouldn't be able to say.

Q. Is it your testimony that there was only one lock that he had to open?

MS. ROSEN: Objection, form.

A. Yes. I think it was -- yes, I think it was only one lock.

Q. Did it take him more or less than ten minutes to pick the lock?

A. Honestly, I don't recall how long it took.

Q. So it could have been as much as ten minutes?

Page 152

MS. ROSEN: Objection, form.

A. Honestly, I wasn't counting the time.

Q. And while he was doing that, Arturo was in the car, correct?

A. Yes, for a little bit. Then he came in once we were inside.

Q. Had you ever seen Gabriel break through locks using a hanger before?

A. Not here, but in Mexico, I did.

Q. In Mexico, he used to break through locks with a hanger?

A. Yes.

Q. And when did you see him do that?

A. When we would go to school, then he would open the classroom doors.

Q. Any other times when you saw him breaking -- picking locks with a hanger?

A. No. I believe only once at school.

Q. And when he was finally able to open that door, what happened?

A. He made a little bit of noise, and that's when the man woke up.

Q. So he was able to pick the lock without causing anyone to wake up?

Page 153

A. I don't recall how the man woke up.

Q. The man woke up after you had already come into the house; is that right?

A. I think he heard the noises when the door was being opened.

Q. What did the man say?

A. I don't really recall the words, but I remember he said what were we doing there.

Q. What did you guys do in reaction?

A. I really don't recall much.

Q. What did Gabriel do when the man got up?

A. Why do I have to say it again?

Q. Well, I want to understand what happened inside that apartment, which we haven't talked about. I mean, we've talked about the fact that these people were stabbed, but I want to understand what happened in that house.

A. But I had already told you yesterday.

Q. Well, where was the man when he was stabbed?

MS. ROSEN: Objection, asked and answer.

Q. Where in the house?

A. I don't want to answer that anymore.

Q. Are you pleading the Fifth?

MS. ROSEN: Objection, asked and answered.

REYES 014859

FILED DATE: 4/7/2022 9:01 PM  98CR1244002

ADRIANA MEJIA, 02/05/2021                    Page 154..157

Page 154

A.  Yes.  I already said it yesterday.  I don't want to repeat that.

Q.  Did Gabriel stab -- strike that.

When Mariano Soto was stabbed, was he stabbed in his front or his back?

A.  Everywhere.  First in front.

Q.  And then in back?

A.  I think so.

Q.  And what was the knife that was used to do that?

MS. ROSEN:  Objection, form.  What was the knife?

Q.  Yeah.  Where was the knife from that was used to stab --

A.  I don't know if he took it from somewhere close, from a little table where the lady had her knives, or where he took it from.

Q.  I assume, at that point, Gabriel no longer had the coat hanger, right?

A.  I don't think so.

Q.  He dropped the coat hanger before he was dealing with Mariano, right?

MS. ROSEN:  Objection:  form, foundation.

A.  I think he threw it to one side.

Page 155

Q.  And then, when Mariano Soto was stabbed, that happened very quickly after you got into the house, right?

You can answer.

A.  Yes.

Q.  And then Jacinta Soto, did she wake up at that point?

MS. ROSEN:  Objection, asked and answered.

MR. SWAMINATHAN:  Go ahead.

A.  Yes, because she heard the screams.

Q.  So had Mariano been screaming when this happened?

A.  Yes.  He screamed some times.

Q.  Tell me what you remember him screaming?

A.  I recall him asking who we were or what we were doing there.

Q.  Anything else you remember him saying?

A.  No.

Q.  And after Mariano had been stabbed and Jacinta was up, was Jacinta stabbed immediately after that?

MS. ROSEN:  Objection, asked and answered.

A.  Yes.

Q.  Were both of them stabbed and killed very

Page 156

fast once you guys got into the house?

A.  Yes.

Q.  Were they both stabbed within less than a minute of being in the house?

A.  I don't recall the time.

Q.  Does that sound right?  I mean, it happened very fast; so it would have been less than one minute for them to be both stabbed.  Does that sound right?

MR. BRENER:  Objection, form and foundation.

MR. ENQUIST:  Sorry.  He said form and foundation.  I was going to say argumentative as well.

A.  I don't recall the time.  I don't know.  I didn't count the time.

Q.  Did Jacinta say anything?

A.  Honestly, I don't remember.

Q.  Did the kids say anything?

A.  No.  It was dark.  They really didn't recognize us.

Q.  And you grabbed the baby, right?

A.  Yes.

Q.  And who grabbed the boy?

A.  Honestly, I don't recall if it was Gabriel or Arturo.

Q.  Were both Mariano and Jacinta already killed

Page 157

by the time Arturo got into the apartment?

A.  No.  Just the gentleman was already stabbed, but not the lady.

Q.  So you were able to see that Arturo -- your testimony is you could see that, after Mariano was killed, then Arturo came in before Jacinta was killed?  Is that what you're saying?

MS. ROSEN:  Objection:  form, asked and answered.

A.  I told you yesterday that by the time that the man was already stabbed, Arturo was already with us.

Q.  Other than grabbing the two kids, did you guys grab anything else in the house?

MS. ROSEN:  Objection, asked and answered.

A.  I don't recall.

Q.  Did you grab any clothes or anything else for the children?

A.  No.  Just a blanket.

Q.  After both children had been killed, did you spend any time in the house, or did you just get out of there?  Strike that.

After the parents had been killed and you grabbed the children, did you do anything else in the

Urlaub Bowen & Associates, Inc.   312-781-9586

REYES 014860

FILED DATE: 4/7/2022 9:01 PM  98CR1244002

ADRIANA MEJIA, 02/05/2021                                          Page 158..161

Page 158

house?

A. No. We got out quickly.

Q. But you basically got in. They were both killed. You grabbed the kids, and you got out. Is that it?

MS. ROSEN: Objection, form.

MR. SWAMINATHAN: Go ahead.

A. Yes. From what I recall now, that was the quickest.

Q. Did you guys do anything to the bodies of Jacinta or Mariano?

MS. ROSEN: Objection, form.

A. I don't think so.

Q. Was there a lot of blood?

A. I don't recall.

Q. Did you have blood on you?

A. Perhaps.

Q. And you don't remember if your clothes had blood on them?

A. Perhaps my shoes and my pants.

Q. And what about Gabriel? Did he have a lot of blood on him?

A. Yes. He had a lot of blood on his gloves and his jacket.

Page 159

Q. And what about Arturo? Did he have lots of blood on him?

A. Perhaps just on his shoes.

Q. The overall apartment had a lot of blood in it, right?

A. I think so.

Q. The kids' blankets, did they also have a lot of blood on them?

MS. ROSEN: Objection, form.

A. Honestly, I don't recall.

Q. Did the children have blood on them, the children themselves?

A. I don't think so.

Q. So after you had the kids and you guys left, did you do anything else when you left the apartment?

A. Yes. We went to the car, and we were talking for a little bit. And then they took me to the hospital.

Q. And so when you left, you didn't have the keys to the apartment, did you?

A. No.

Q. You didn't lock the door?

A. Honestly, I'm not sure.

Q. Well, you couldn't lock the door, could you?

Page 160

A. I'm not sure.

Q. Well, did you have a key to the apartment?

A. I don't know. Perhaps, yes. I don't know.

Q. "Perhaps, yes," you did have a key to the apartment?

A. The persons, yes, not me.

Q. In fact, you did have a key to the apartment, didn't you, to the Soto home?

A. Of theirs? No, I didn't have a key of theirs.

Q. Were you aware that Jacinta Soto's family said that she had made a friend in the weeks before she was killed?

MS. ROSEN: Objection, form.

A. No.

Q. Are you aware that her family said that her key had been taken from her?

MS. ROSEN: Objection: form, foundation.

A. No.

Q. Didn't you take the key from Jacinta Soto?

A. How was I going to take her key if I didn't know her?

Q. Did you meet her? You met her at one of the clinics, right?

Page 161

A. No.

Q. When you got back in the car, where did each of you sit in the car?

A. Arturo and Gabriel sat in the front, and I sat in the back with the children.

Q. And they took you straight to the hospital and dropped you off, right?

A. Yes.

Q. And you went and -- strike that.

We discussed yesterday that you would have gotten back to hospital around 2:00 or 3:00 in the morning, right?

A. Yes.

Q. And what time did you get picked up the next morning?

A. Early in the morning.

Q. Around 8:00 or 9:00 in the morning?

A. Something like that.

Q. So you were at the hospital for four to six hours, right?

A. Yes.

Q. And where did you go in the hospital during that period?

A. I was waiting in the waiting area.

Urlaub Bowen & Associates, Inc.  312-781-9586

REYES 014861

FILED DATE: 4/7/2022 9:01 PM   98CR1244002

Page 162

Q.  But you were sitting inside the hospital with the two children for hours?

A.  Yes.

Q.  And you had blood on your clothes?

A.  Honestly, I didn't look, but perhaps.

Q.  And you had blood on your shoes?

A.  Perhaps.

Q.  Did anyone come over to ask you any questions?

A.  No.

Q.  Did any security guard come and talk to you?

A.  I don't recall.

Q.  Were you just sitting in the waiting area the whole time, or did you walk around inside the hospital?

A.  I don't know if I walked for a little bit.

Q.  Your testimony is you spent hours in a hospital with blood on your shoes and on your clothes without anybody asking any questions?

MR. BRENER:  Objection, misstates the witness's testimony.

MS. ROSEN:  Form.

MR. SWAMINATHAN:  Go ahead.

A.  I don't recall.

Page 163

Q.  You got picked up the next day by Rosauro and Guadalupe along with her kids, right?

THE INTERPRETER:  I'm sorry?

Q.  You got picked up the next day by Rosauro and Guadalupe, right?

MS. ROSEN:  Objection, asked and answered.

A.  Yes.

Q.  Did they ask you any questions about -- strike that.  They asked you some questions about the boy, right?

A.  Yes.

Q.  At that time, did you tell them the name Norma Salazar?

A.  I believe I said it was a friend's.

Q.  Did they ask you anything about -- did they indicate to you that they were surprised about how big the baby was?

A.  Just Guadalupe said that she was very big.

Q.  Did she say anything other than that?

A.  I don't recall what else she said.

Q.  Did Lupe make a comment to you that the baby couldn't possibly be yours because she was too beautiful?

A.  No.

Page 164

Q.  Did you say to Guadalupe in the car, "Don't you ever say that again because I will kill you"?

A.  No.

Q.  Is Lupe lying if she says you said that?

MS. ROSEN:  Objection, form.

A.  She didn't say that.

Q.  When you were in the hospital with the kids, what were they doing?

A.  The baby girl was asleep, and the little boy was asleep.

Q.  Did you feed them at all?

A.  No, not at that moment.

Q.  When you got home, did anybody ask you any questions about how big the baby was?

A.  No.  I think just Guadalupe.

Q.  Guadalupe was suspicious about the baby; is that right?

A.  Perhaps.

Q.  Anyone else?

A.  No.

Q.  Did anybody say anything to you about having blood on your clothes?

A.  I don't recall.

Q.  When you came home, what was the reaction

Page 165

from other family members?

A.  Not much, because then they came to see me later.

Q.  The boy, where did he stay at the house?  Strike that.

Where did the boy sleep at your house?

A.  In a little room.

Q.  Whose room is that?

A.  It was not a room.  It was a little porch where there was a bed.  I don't recall if that's where Gabriel would sleep.

Q.  Did you keep the boy in a closet?

A.  No.

Q.  If Guadalupe says that you kept the boy in a closet, is she lying?

MS. ROSEN:  Objection:  form, misstates the testimony, foundation.

THE REPORTER:  I lost the connection for about a minute, and then it came back up.  The last question I had is:  "If Guadalupe says you kept the boy in a closet, is she lying?"  And then there was an objection from Ms. Rosen, and I did not get an answer. I apologize.  The screen went blank.

MR. SWAMINATHAN:  What was the question

REYES 014862

FILED DATE: 4/7/2022 9:01 PM   98CR1244002

ADRIANA MEJIA, 02/05/2021                              Page 166..169

Page 166

right before that?

(Requested record discussed.)

MR. SWAMINATHAN: Okay, go ahead.

MR. INTERPRETER: I don't remember.

MR. SWAMINATHAN: Let's reask the question.

A. Yes. I never had him in a closet.

Q. After you came home with the baby and the boy, you had conversations with Arturo about the boy, right?

A. Yes.

Q. He was concerned about the boy, right?

A. Yes.

Q. And he took care of the boy, right?

A. Yes.

Q. And he would buy clothes for the boy and take care of him, right?

A. Yes. He would buy clothes for the baby. He would buy diapers, because the baby was still in diapers. He would buy him clothing.

Q. Did you have -- other than buying things for the baby, did you have any other conversations with Arturo after you came home from the hospital?

A. Honestly, I don't remember anymore.

Q. Did Arturo ever call you from anywhere else?

Page 167

While you were -- when you came back with the kids?

A. Can you repeat the word, the question?

Q. Yeah. Did Arturo ever make any calls to the house to talk to you?

A. Rarely, because Guadalupe would answer the phone.

Q. Arturo has never called the house to talk to you, has he?

A. No.

Q. Is that correct?

A. Yes.

Q. Showing you a document that was previously marked Plaintiff's Exhibit -- Adriana, it's a deposition exhibit from Adriana Mejia's previous deposition. We can mark it as Plaintiff's Exhibit 4 (sic) (Reporter's Note: This is Plaintiff's 5.) for this deposition, Reyes 264.

Ms. Mejia, do you recognize any of the handwriting on this note?

A. I think it's my writing.

Q. Where?

A. At the bottom.

Q. Where it says "Hospital"?

A. It seems like it.

Page 168

Q. You agree with me this is your handwriting?

A. I believe so.

Q. Is there any other handwriting on these notes that is yours?

A. I'm not too sure if the one on top.

Q. At some point, Arturo Reyes was asking for information about who the person was whose boy this was, right?

MS. ROSEN: Objection: form, foundation.

A. I don't recall, and I'm not going to answer.

Q. Are you asserting the Fifth?

A. Yes.

MS. ROSEN: Objection. She said, "I don't recall." Then you invite her to take the Fifth, and she's been ordered not to take the Fifth.

MR. SWAMINATHAN: I'm asking her -- she has now done this several times in the dep. I want to understand.

Q. Are you refusing to answer the question?

A. Yes.

Q. Arturo -- this note was found in Arturo Reyes's pocket. So you had written down the name Norma Salazar for him, correct?

MS. ROSEN: Objection, form.

Page 169

A. I'm not going to answer because I don't remember.

Q. Arturo Reyes -- strike that.

Arturo Reyes was asking you for information about whose boy it was, right?

MS. ROSEN: Objection: form, foundation.

A. I'm not going to answer. I don't remember.

Q. Do you not remember, or you're not going to answer the question? Which one is it?

MR. BRENAN: Objection, asked and answered, and now it's argumentative.

A. I'm not going to answer the answer.

Q. And so you're asserting your Fifth Amendment right?

MS. ROSEN: Objection to you -- go ahead. Translate it.

(Question translated.)

MS. ROSEN: I'm objecting to you inviting her to take the Fifth when she has said, "I don't recall." I'm objecting to you doing that. It's improper.

MR. SWAMINATHAN: Go ahead, Ms. Mejia.

A. I told you I'm not going to answer that answer.

Urlaub Bowen & Associates, Inc.   312-781-9586

REYES 014863

FILED DATE: 4/7/2022 9:01 PM  98CR1244002

ADRIANA MEJIA, 02/05/2021                                    Page 170..173

Page 170

Q.  Okay.  So I need to add to the process.  Are you not answering because you're asserting your Fifth Amendment right?

A.  Yes.

MR. SWAMINATHAN:  And to be clear, I asked the witness if the reason she was not answering was because she couldn't remember or because she didn't want to answer.  And she said -- she gave me the reason, which is why I asked about the question.

Ms. ROSEN:  Well, but the original answers were:  "I don't recall; so I'm not going to answer."  And for you then to invite her to violate a court order -- because she's already been ordered.  So now you are inviting her to violate a court order because I guess you prefer that.  I don't know.

MS. SINGER:  Hey, you guys, can I please have a moment with her?

MS. ROSEN:  Yes.

MR. SWAMINATHAN:  Sure.

MS. SINGER:  Thanks.

THE VIDEOGRAPHER:  We're off the record at 4:03.

(Recess in proceedings from 4:03 to 4:21 p.m.)

Page 171

THE VIDEOGRAPHER:  We are now back on the video record at 4:21 p.m.

BY MR. SWAMINATHAN:

Q.  Looking again at this note, Ms. Mejia, you wrote this information down for Arturo because he was asking questions about where the boy's parents were, right?

A.  I don't remember.

Q.  All right.  We talked yesterday about the night that the boy was taken to the police by Arturo and Gabriel and Rosauro, right?

A.  Yes.

Q.  You indicated that, at some point that night, Guadalupe saw the two children on the news, right?

A.  Yes.

Q.  And Guadalupe said something to you about seeing the two children on the news, right?

A.  Yes.

Q.  At that time, was Rosauro, Arturo, and Gabriel still at work, or were they home?

A.  At work.

Q.  You said, when you were taken to the police station, Guadalupe was also taken to the police

Page 172

station with you, right?

A.  Yes.

Q.  Were you both taken together in the same car?

A.  Yes.

Q.  And were you in the car with Detective Guevara?

A.  Yes.

Q.  What did he say to you in the car?

MS. ROSEN:  Objection, asked and answered.

A.  I don't recall.

Q.  When you were at the police station, you talked about the fact that you were interviewed a number of times by Detective Guevara, right?

MS. ROSEN:  Objection, asked and answered.

Q.  Correct?

A.  Yes.

Q.  Showing you a document we'll mark as Plaintiff's Exhibit 6.  It says, "RC Solache Reyes 194 through 196, and it's a supplementary report by McDonald and Collins dated April 15, 1998.

Ms. Mejia, this report indicates that Detective Guevara conducted an interview of you at the police station.  Do you see that?

Page 173

MS. ROSEN:  Objection:  form, foundation.

Ms. Mejia, can you read English?

A.  Very little but -- very little.

Q.  Okay.  So let me ask the question, and we'll have the translator translate it for you, okay?

A.  That's fine.

MR. SWAMINATHAN:  This is for the translator to just see where we're reading.  Okay?

THE INTERPRETER:  Okay.

Q.  It states that "Mejia stated that she had been released from the hospital on 28 March '98.  As she was waiting to leave the hospital, she was approached by a female Hispanic who identified herself as Norma Salazar and asked her if she would look after her little boy while she entered the hospital to have a baby.  Mejia said that she agreed; and after they exchanged phone numbers, she took the child home with her."

What is described here, is that true or false?

A.  False.

MS. ROSEN:  Objection.  Belated form objection.

Q.  Did you tell Detective Guevara or other

Urlaub Bowen & Associates, Inc.   312-781-9586

REYES 014864

ADRIANA MEJIA, 02/05/2021      Page 174..177

Page 174

police officers that that's what happened?

A. No. It's false.

Q. So what the police wrote is a lie; is that right?

MS. ROSEN: Objection, form.

Q. Is that right?

A. I am not going to answer.

Q. Ms. Mejia, are you asserting your Fifth Amendment right with regard to that question?

MS. SINGER: Can you reask the question? I'm sorry. I was having some internet issue, and I lost you.

Q. Is what the police wrote in that report a lie?

MS. ROSEN: Objection, form.

A. I don't recall.

Q. When you were at the police station, were you ever asked to act out how the crime occurred?

A. I told you yesterday that Detective Guevara wrote a lot of things that I hadn't said.

Q. Showing you a document marked Plaintiff's Exhibit 7. It is -- this copy does not have a Bates stamp on it. I'll identify it for the record. It is Area 5 Supplementary Report, Progress Investigation 3,

Page 175

Cleared Closed Report. And at the bottom, it's dated November 18, 1999, by Investigator Daniel Trevino.

Ms. Mejia, I'm going to read this again, and I'll ask the interpreter to read it for Ms. Mejia.

This police report states: "When asked to be specific, Ms. Mejia, by using a pen as a prop, acted out the scenario by showing the reporting investigator" -- that's Trevino -- "how she used the knife to stab the victim."

Did that happen, Ms. Mejia?

A. No.

Q. Did you use a pen and act out for the police how you stabbed the victim?

A. How was I going to use a pen if I was handcuffed?

Q. Is what the police wrote here a lie?

MS. ROSEN: Objection, form.

A. Yes.

Q. It says, "Mrs. Mejia also stated that, when the victim fell on the floor on all fours, she straddled her and began to stab her back."

Your testimony is that that did not happen; is that right?

A. I'm told today I didn't -- I'm finding out

Page 176

about this. I didn't know they had written this.

Q. And did you ever tell them?

A. No.

Q. So what the police wrote in this report is a lie, correct?

MS. ROSEN: Objection, form.

A. I'm not going to answer because I didn't say that.

Q. Okay. The next sentence says, "When asked to demonstrate, Mrs. Mejia got on all fours and started to act out as the victim while she was being stabbed."

Ms. Mejia, did that happen?

A. No. I already told you in that little while how things had happened.

Q. Did you ever demonstrate by getting on all fours and acting as a victim for the police?

A. No.

Q. What the police wrote here is a lie; is that right?

MS. ROSEN: Objection, form.

A. That's false, because I'm telling you how things were happening.

Q. During your interrogations -- at some point

Page 177

during the interrogations, were you taken to see Gabriel Solache?

A. I don't recall.

Q. Do you remember any point when you were at the police station that you saw Gabriel Solache?

A. I believe I did see him, but we couldn't have communication.

Q. When you saw Gabriel -- strike that.

Did you ever see Gabriel Solache get hit by Detective Guevara?

A. Yes. On one occasion when he passed in front of me, he was mistreating him.

Q. Who was mistreating Solache?

A. Detective Guevara.

Q. When you say he was mistreating him, what did he do?

A. He couldn't do much because he was handcuffed, from what I remember.

Q. Sorry. What did Detective Guevara do to Solache? Did he hit him?

A. I don't really recall if he hit him in his face or physically. I really don't recall anymore.

Q. Did Detective Guevara hit Gabriel Solache?

A. I think so. I believe so.

FILED DATE: 4/7/2022 9:01 PM 98CR1244002

REYES 014865

FILED DATE: 4/7/2022 9:01 PM   98CR1244002

ADRIANA MEJIA, 02/05/2021                                    Page 178..181

Page 178

Q.  You previously testified that Guevara hit Gabriel Solache in front of you.  Is that testimony true or false?

MS. ROSEN:  Object to the form.

A.  I honestly don't remember.

Q.  Okay.  Did you testify at the trials of Arturo Reyes and Gabriel Solache?

MS. ROSEN:  Object to the form.  She didn't testify at the trials.

MR. SWAMINATHAN:  I said, "did you"?

THE INTERPRETER:  I'm sorry, Counsel?

MR. SWAMINATHAN:  She can go ahead and answer.

THE INTERPRETER:  I didn't hear the question Counsel.  I'm sorry.

Q.  Did you testify at the trials of Arturo Reyes and Gabriel Solache?

MS. ROSEN:  Object to the form, foundation.

A.  No.

Q.  Were you asked to testify at their trials?

A.  I don't recall.

Q.  Did any prosecutor talk to you before their trials?

MS. ROSEN:  You broke up for me.  Could I

Page 179

get the question back?

MR. SWAMINATHAN:  Can we have it read back?  Please?

(Requested record read.)

MS. ROSEN:  Before whose --

MR. SWAMINATHAN:  Reyes and Solache.  Go ahead.

A.  Honestly, I don't recall.  I don't think so.

Q.  Were you ever told that, if you testified against Reyes and Solache, you could get a lighter sentence?

A.  I don't recall.

MR. SWAMINATHAN:  Ms. Mejia, are you able to keep going now, or are you just really tired?

THE WITNESS:  Well, I'm a little tired, but I really want to finish this.

MR. SWAMINATHAN:  Okay.  Are you still able to answer the questions based on your memory, or are you too tired to be able to remember and answer questions?

THE WITNESS:  I'm not too tired.  It's just it's been many years, and I don't remember the investigations and the questions.  It's been many years.

Page 180

BY MR. SWAMINATHAN:

Q.  In recent years, have any lawyers for the police or prosecutors come to see you?

A.  Just two people when I was moved to this prison and then when they were released, but I don't remember the name of the people.

Q.  The two people who came, tell me what you remember about that.

A.  When they were released, they just came to tell me that they were free.

Q.  Were there individuals -- was there anyone from the prosecutor's office who came to talk to you about this case?

MS. ROSEN:  Objection, form.

A.  I'm not really good at remembering people.  I just recall that it was a male and a female.

Q.  The male and female who came, did they come to the prison you're currently at?

A.  Yes.

Q.  Did they tell you who they represent?

A.  I don't recall anymore.

Q.  Did you say that they told you that Reyes and Solache had been released?

A.  Yes.

Page 181

Q.  And did they ask you some questions about this case?

A.  I don't remember much.

Q.  How long did they visit you?

A.  Very little time.

Q.  Did you walk through any of the facts of the case with them or the crime with them?

A.  I don't remember a lot of specific things.

Q.  Did they ask you to tell them what you remembered about what happened?

A.  At this moment, the only thing I recall is them asking how I was feeling, knowing that they were free and I was still in prison.  But that's what I remember at the moment.

Q.  And what was your response to that?

A.  I think I told them that I felt badly.

Q.  What was their response?

A.  Not much.  They just looked at each other.

Q.  Did they tell you that you were going to be deposed in this case?

MS. ROSEN:  Objection:  form, foundation.

A.  I don't recall.

Q.  Was there a time when you were taken to Chicago to the courthouse unexpectedly?

Urlaub Bowen & Associates, Inc.   312-781-9586

REYES 014866

ADRIANA MEJIA, 02/05/2021 Page 182..185

FILED DATE: 4/7/2022 9:01 PM 98CR1244002

Page 182

MS. ROSEN: Objection, form.

A. I think so, on one occasion before they returned to court.

Q. You met with an attorney then, right?

A. They wanted to speak to me, but I told them I was not speaking to anyone because I didn't have an attorney to help me.

Q. How long did they meet with you?

A. Very little because they became upset.

Q. And did they try to ask you some more questions about what happened?

A. Yes. They told me that if I knew that my friends were going back to court on the case, and I said that I wasn't going to speak about anything because I didn't have an attorney to help me.

Q. They said that they were your friends?

MS. ROSEN: Objection, misstates her testimony. That's not what she just said.

MR. BRENER: Join.

MR. SWAMINATHAN: I thought she just said friends. Well, the record will say what it says. I'll ask a different question.

Q. So after you indicated that you didn't want to talk to them, they were upset?

Page 183

A. Yes. They told me that they took me because they wanted me to talk, but I didn't want to talk to them because I said I wouldn't say anything until I had someone representing me.

Q. And did they ask you some more questions anyway?

A. I don't really remember specifics because I wasn't there long. They returned me right away.

MR. SWAMINATHAN: Let's take a quick break for a few minutes. I'll try and get my last set of questions set up. I'll try to speed this up.

THE VIDEOGRAPHER: We're off the video record at 4:46 at the end of media unit 5.

(Recess in proceedings from 4:46 to 5:02 p.m.)

THE VIDEOGRAPHER: We are back on the video record at 5:02 at the beginning of media unit 6.

BY MR. SWAMINATHAN:

Q. Ms. Mejia, who is Ruben Artiaga?

A. I don't know any Ruben Artiaga. I know Ruben Luna.

Q. Who is Ruben Luna?

A. Someone I knew from my town.

Q. Is he somebody that you communicated with

Page 184

back in March of 1998?

A. I think just on two occasions.

Q. What did you communicate with Ruben Luna about?

A. Just very little. Just about how we were out here and how they were out there. Not much.

Q. Did Ruben Luna live in Chicago?

A. No.

Q. Did Ruben Luna live in Mexico?

A. Honestly, I wouldn't know what to say. It's been years.

Q. Who is Claudia Hernandez?

A. I don't know.

Q. Are you familiar with the name Claudia Hernandez?

MS. ROSEN: Objection, form.

A. No.

Q. Ms. Mejia, did you know anybody who had a cell phone back in 1997 and 1998?

A. Just Javier Mejia when he would leave it for me when I would watch his baby.

Q. Was that Javier Mejia or Jose Mejia?

A. Javier Mejia.

Q. You would watch Javier's kids, and you also

Page 185

watched Jose's kids?

A. For some time, I watched -- for about three months, I watched Javier's baby.

Q. All right, Ms. Mejia. I want to show you a document we'll mark as Plaintiff's Exhibit 7 (sic). (Reporter's Note: This is Plaintiff's 8.) This is RFD Solache Reyes 160 through 162. This is a log of phone calls that were obtained by the police related to calls to the Mejia home at Mozart, phone calls made to the 925-5124 number.

What I want to show you is calls made on March 27. This shows calls made on March 27, 1998, to the Mejia home. Do you see that?

MS. ROSEN: Objection: form, foundation.

Q. And it includes calls made on the morning of March 28, 1998.

MS. ROSEN: Objection: form, foundation.

Q. You previously stated that you called from the hospital to the home on the morning of March 28 after you had the Soto children, correct?

A. Yes.

Q. This log indicates that there were no calls made to the home between 12:30 a.m. and 10:50 a.m. Do you see that?

Urlaub Bowen & Associates, Inc. 312-781-9586

REYES 014867

FILED DATE: 4/7/2022 9:01 PM   98CR1244002

ADRIANA MEJIA, 02/05/2021                          Page 186..189

Page 186

MS. ROSEN: Objection: form, foundation.

Q. Ms. Mejia, you didn't call the Mejia home on the morning of March 28, did you?

A. Yes, I did call. I don't know why they didn't come on there.

Q. You didn't make any calls from the hospital, did you?

A. Yes, I made many calls from the hospital.

Q. This phone number here, 434-8643, is the phone of Jose Mejia.

MS. ROSEN: Objection: form, foundation.

Q. Did you make the calls to the Mejia home from Jose Mejia's phone?

MS. ROSEN: Objection: form, foundation.

A. I don't recall.

Q. So you might have made the calls from Jose Mejia's phone but not from a pay phone; is that right?

MS. ROSEN: Objection: form, foundation.

A. I don't recall.

Q. So is it fair to say that the calls that you made to the house after you had the Soto children may not have actually been from a pay phone, but it might have actually been from a cell phone. Is that your testimony?

Page 187

MS. ROSEN: Objection: form, foundation, misstates her testimony.

A. I'm not going to answer.

Q. Are you not going to answer based on your Fifth Amendment rights?

A. Yes.

MS. ROSEN: Objection. Oh, my God.

MR. SWAMINATHAN: The witness is telling me she's not going to answer the question. What am I supposed to do?

MS. ROSEN: You're not supposed to invite her to violate a court order.

MR. SWAMINATHAN: Well, I've asked her to answer the question. Ms. Mejia, I'll ask it another time.

Q. Ms. Mejia, did you call home, not from a hospital, but from Jose Mejia's phone?

A. How am I going to use Jose Mejia's phone if I hadn't seen him in days?

Q. Do you have any explanation for why the only phone calls that were made to the Mejia home on the morning of March 28 were from Jose Mejia?

MS. ROSEN: Objection: form, foundation.

A. I don't recall.

Page 188

Q. Do you have any explanation for why this phone record does not indicate that there was any call made to the Mejia home on the morning of March 28, as you claim -- strike that.

You claim you made a call to the home from a pay phone at the hospital on the morning of March 28. Do you have any explanation for why that call is not included in this call log?

MS. ROSEN: Objection: form, foundation.

A. I'm not going to answer.

Q. Why not?

A. Because I'm not going to answer.

Q. Are you asserting your Fifth Amendment right?

MS. SINGER: Give me a second.

MR. SWAMINATHAN: Okay.

MS. SINGER: Can you take the exhibit down?

THE VIDEOGRAPHER: We're off the record at 5:13.

(Recess in proceedings from 5:13 to 5:19 p.m.)

THE VIDEOGRAPHER: We're back on the video record at 5:19.

MR. SWAMINATHAN: Counsel asked me to reask

Page 189

the question, which I'm happy to do.

Q. Ms. Mejia, you've testified in this deposition that you called the Mejia home from a pay phone at the hospital on the morning of March 28. Do you have any explanation for why there are no calls to the Mejia home on the phone log marked as Plaintiff's Exhibit 7 (sic) (Reporter's Note: Actually Plaintiff's Exhibit 8) on the morning of March 28?

MS. ROSEN: Objection: form, foundation.

A. I don't remember.

Q. Showing you a document that is marked as Defendant's Exhibit 9, Bates-stamped -- let's see if it's got a Bates stamp on it. Looks like HIPAA 4 and HIPAA 5.

Ms. Mejia, this is a Cermak health record form. This document is from April of 1998. That's the month that you were arrested and taken into custody, correct?

A. I don't recall.

Q. You were asked Question Number 6 on the Cermak. "Has detainee ever attempted suicide?"

Answer, "Yes."

"If yes, when?"

"February 23."

Urlaub Bowen & Associates, Inc.   312-781-9586

ADRIANA MEJIA, 02/05/2021

Page 190..193

Page 190

Q. Ms. Mejia, you testified at this deposition that you never attempted suicide, correct?

A. I've never tried to commit suicide.

Q. Is what is written here false?

A. I don't recall.

Q. It says here that you cut your wrist "because I couldn't have children."

Have you ever tried to cut your wrist?

A. No.

Q. Is what's written on this document false?

A. Yes. I've never tried to take my own life.

Q. Is your testimony that the person from Cermak who wrote this down wrote down a lie?

MR. BRENER: Objection to form and foundation.

A. I don't recall.

Q. Which is the truth, what is written here or what you're telling us today?

A. I'm telling you that I've never tried to take my own life.

Q. Do you know where the people from Cermak got that information?

A. I don't recall.

Q. Whatever it is, whatever they wrote down,

Page 191

according to you, is false, correct?

A. Yes.

Q. All right. I want to play an audio clip. I'd like you to listen to this audio clip. I'll share my screen.

Ms. Mejia, what I'm showing you is a document marked Defendant's Exhibit 36 produced to us by Defendants' counsel the day before this deposition. And it is a transcription of an audio recording dated October 23 -- a call that took place on October 23, 2019. Ms. Mejia, that's one day after you were previously deposed in this case.

Do you recall that?

UNIDENTIFIED SPEAKER: Ready for the clips?

Q. Ms. Mejia, you recall that, right? This is one day after you were previously deposed, right?

Go ahead, Ms. Mejia.

UNIDENTIFIED SPEAKER: I thought you were going to play an audio clip.

Q. I'm asking: Ms. Mejia, you understand this is -- October 23, 2019, is one day after your previous deposition. You agree, right?

THE INTERPRETER: I'm sorry, Counsel. One day previous?

Page 192

Q. One day after the prior deposition you gave in this case, right?

A. I don't recall that.

MR. SWAMINATHAN: Okay. Let's play the audio clip.

Shawn, it should be playing. Shawn, is it working?

SHAWN: I'm playing it. Hang on a second. Let me start it again. Maybe it will be better.

(Audio clip playing.)

MR. SWAMINATHAN: We can't hear it, Shawn. We'll just use the transcript. I'll ask the interpreter to just read this for us -- read this for the witness.

THE INTERPRETER: Do you want me to interpret it as I'm reading, obviously?

MR. SWAMINATHAN: Yeah. Just interpret it for her, yeah.

(Interpreter reading the document for Ms. Mejia in Spanish.)

MR. SWAMINATHAN: Let me stop you there for one second.

BY MR. SWAMINATHAN:

Page 193

Q. Adriana, who is Maleno?

A. My brother.

Q. And where is Maleno?

A. Mexico.

MR. SWAMINATHAN: And then I want -- we can start here. Starting here.

THE INTERPRETER: Okay.

(Interpreter continuing to read the document for Ms. Mejia in Spanish.)

MR. SWAMINATHAN: Sorry. Let's pause there.

BY MR. SWAMINATHAN:

Q. Ms. Mejia, you're talking about the deposition that you had just given, right?

A. Yes.

MR. SWAMINATHAN: And then let's please read the next section. Can you read it? You need it a little bigger?

THE INTERPRETER: Yes. Starting where, Counsel? I'm sorry.

MR. SWAMINATHAN: Starting with "Adriana: But the attorney."

(Interpreter continuing to read the document for Ms. Mejia in

Urlaub Bowen & Associates, Inc.   312-781-9586

FILED DATE: 4/7/2022 9:01 PM   98CR1244002

REYES 014869

ADRIANA MEJIA, 02/05/2021 Page 194..197

FILED DATE: 4/7/2022 9:01 PM 98CR1244002

Page 194

Spanish.)

MR. SWAMINATHAN: You can stop there.

BY MR. SWAMINATHAN:

Q. Ms. Mejia, you were describing to your brother what happened at the deposition, correct?

A. Yes.

Q. What you told him is completely made up, right?

A. Because I didn't want to worry them anymore because they're tired. My parents have been tired for a long time.

Q. What you told them didn't happen, right?

A. Yes.

Q. You said in here -- you told your brother that your attorney got up and she threw the papers at their face, right?

A. Yes.

Q. But that didn't happen, right?

A. Yes.

Q. You just made that up, right?

A. Yes, because I don't want to worry them anymore.

Q. You said -- you told your brother that you got a two-month -- in two months, you were going to be

Page 195

out, right?

A. Because I'm going to get out of here. Even if you don't believe it, I'm going to get out of here one day.

Q. But what you told him was a lie. You don't have any reason to believe you're going to be out in two months, do you?

A. Perhaps. Who are you to say that I'm not going to get out?

Q. Has anybody suggested to you that you do have a chance of maybe getting out if you do the right thing?

MS. ROSEN: Object to the form.

A. I'm not going to answer.

Q. You say -- in this call with your brother, you say, "The judge was going to give the sentence, the final one. The opponents got up and, well, they gave me a continuance. But it was fine."

That's made up, right?

THE INTERPRETER: I'm sorry, Counsel. Where are you? Oh.

A. I'm not going to answer.

Q. That's not true, right? That's made up, right?

Page 196

MS. ROSEN: Object to the form, argumentative.

A. I'm not going to answer.

Q. Later in the same clip, you --

MR. SWAMINATHAN: Let's read for Ms. Mejia what she said later in this clip. Let me read it. Then you can translate.

Later in this clip, you said, "Tell my mommy that everything is very good and explain to her . . . oh, my attorney says not to talk if there are people that communicate with you because they are against us. And also, tell Carlos that my attorney said they are going to look for him to ask questions since he is here, that he is to say nothing, nothing, absolutely nothing.

A. I'm not going to answer.

Q. Ms. Mejia, you did not want your brother answering any questions about this case; is that right?

A. I'm not going to answer.

Q. And you told your brother Maleno to make sure that Carlos did not answer any questions about your case, right?

A. Yes.

Page 197

Q. And why was it so important to you to make sure that Carlos didn't talk about what happened?

A. Because he didn't know anything, and they were always interrogating him.

Q. Ms. Mejia, you wanted to -- it was important to you to make sure that Carlos didn't talk about this case, right?

MS. ROSEN: Objection: asked and answered, harassing.

A. I'm not going to answer you.

Q. Were you afraid of what he might say?

A. No, because he didn't know anything.

Q. So why couldn't he answer the questions and tell people he didn't know anything?

A. Because they were always bothering him.

Q. Who said they were bothering him?

A. I don't know, but I think that a lot of people were bothering him.

Q. If Carlos knew nothing, there would have been no problem for Carlos to answer questions and explain he knew nothing, correct?

A. Objection: form, argumentative.

MR. BRENER: Join the objection.

Q. What does Carlos know that you don't want

Urlaub Bowen & Associates, Inc. 312-781-9586

REYES 014870

ADRIANA MEJIA, 02/05/2021                           Page 198..201

Page 198

him to talk about?

A.  He doesn't know anything.

Q.  Ms. Mejia, you wrote letters from prison to Guadalupe Mejia, right?

A.  I don't recall.

Q.  But you testified about a letter you wrote to Guadalupe on October 22 at your prior deposition, right?

Strike that.  At your October 22 deposition, you answered questions about a letter you wrote to Guadalupe on June 11, 1998.  You remember that?

A.  At this time, I don't recall.

Q.  Ms. Mejia, I'm going to show you a letter.  This is Exhibit 5 to your prior deposition, RFC Solache Reyes 3949 to 3952.

And I'll ask the court reporter to read the excerpt that starts at number 1.  Here.

THE INTERPRETER:  The court interpreter?  You want me to read?

MR. SWAMINATHAN:  Court interpreter, I'm sorry.

THE INTERPRETER:  I'm trying to understand the handwriting, Counsel.

"I feel very badly' --

Page 199

MR. SWAMINATHAN:  You can read it in Spanish.

MR. BRENER:  We're going to need it in English for the record, too.

THE INTERPRETER:  So you want me to read it to her in Spanish and then translate it?

MR. SWAMINATHAN:  Yes.

THE INTERPRETER:  Got you.  I can't understand "perdi a Chapa."

MR. SWAMINATHAN:  Let me let Ms. Mejia read it.  And then we can have you interpret it in English.

THE INTERPRETER:  Actually, there's just one word.  I think Chapa is the name of someone?

MR. SWAMINATHAN:  That's Rosauro's nickname.

THE INTERPRETER:  Okay.  Thank you.

"I feel badly because I know that I lost Chapa because of my fault, and that will be my punishment."

BY MR. SWAMINATHAN:

Q.  In this letter to Lupe, you wrote about feeling sad about losing your husband, Chapa, right?

A.  Yes.

Q.  And you acknowledged that it was your fault, right?

Page 200

A.  My fault in that -- how can I explain it?

Q.  You didn't say it was anyone else's fault.  You said it was your fault, right?

MS. ROSEN:  You just interrupted her.  She was not finished.  She didn't finish her answer.

Q.  Did you have more you wanted to say, Ms. Mejia?

A.  I don't know how to explain it to you right now.

Q.  You said it was your fault, not anybody else's fault, right?

MS. ROSEN:  Objection, form.

A.  And in order to better explain it and admit it was my fault and my personal -- with my husband, not other people.

Q.  Take a look at the section here that we've highlighted on page 3 of this letter.  You've had a chance to read that, Ms. Mejia?

Ms. Mejia, you told Guadalupe that you were planning to get out of jail in "no more than a few days," correct?

A.  I don't recall.

Q.  What made you think that you might be getting out of jail in just a few days after June 11

Page 201

of 1998?

A.  I don't recall.

Q.  Did you make that up, or did you believe that?

A.  I still continue believing that I'm going to get out.

Q.  Did you actually believe you were going to get out in a few days, or were you making that up?

MS. ROSEN:  Objection, form.

A.  I thought I was going to get out in three days.

Q.  And you had a plan to get out, right?

A.  No, not a plan.

Q.  Let's look at this excerpt that we've marked as number 3.  Go ahead and read that, Ms. Mejia?

A.  You're going to read it.  I'm not.

Q.  You wrote to Lupe.  "Soon I'm going to leave," right?

A.  I don't recall.

Q.  Let's take a look at the excerpt we've marked as number 4.  You wrote to Lupe, "For now, I'll be here for a very short time.  Then I'll follow my path together with my parents.  They are waiting for me."  You wrote that to Lupe, right?

Urlaub Bowen & Associates, Inc.  312-781-9586

REYES 014871

ADRIANA MEJIA, 02/05/2021                                    Page 202..205

FILED DATE: 4/7/2022 9:01 PM   98CR1244002

Page 202

A. I don't recall.

Q. Well, that's what you wrote to Lupe, right, in this letter?

A. I don't recall. It's many years.

Q. Well, do you dispute that what's written on -- that what I said, that's what you said in this letter? That's what I'm asking you.

A. I repeat that it's been many years. I don't remember.

Q. You didn't end up getting out a few days after you wrote that letter, did you?

A. I don't know.

Q. You said you didn't have a plan then. But in June of 1999, you came up with a plan, right?

A. I never made a plan.

Q. Take a look at the document marked Plaintiff's Exhibit 8 (sic) (Reporter's Note: This is Plaintiff's Exhibit 9). This is RFC Solache Reyes 4812 through 4816. This is a letter that you wrote on June 1, 1999, to Gabriel Solache. You were writing letters to Gabriel solache. We talked about that, right?

MS. ROSEN: Objection, form.

Q. You wrote him letters, right?

Page 203

A. Yes.

Q. And in those letters, you came up with a plan to get Gabriel to take responsibility for the crime so that you could go back to Mexico, right?

A. When he wrote, he had already decided, and he wrote a lot of things to me too. I've lost the letters, but otherwise I would prove that he had said a lot of things to me as well.

Q. You wrote to him and asked him to lie so that you could be released to go see your parents, right?

MS. ROSEN: Objection, form. Go ahead.

A. I don't recall.

Q. All right. Let's take a look. Looking at Plaintiff's Exhibit 8 (sic), if we look at the first excerpt, you wrote to Gabriel. Excerpt 1: "Write to me as soon as possible so that Montez (phonetic) can send you money and take you clothes."

You tried to get Gabriel Solache to do what you wanted by sending him money and clothes, right?

MS. ROSEN: Objection: form, argumentative.

A. I don't recall.

Q. Let's take a look at excerpt 3. "You said there is something about all of this, and I can't tell

Page 204

you." What did you mean by that?

A. That we couldn't speak by letter about the crime, about what had happened.

Q. You wrote to him telling him that there were things about this that you could not tell him. You were hiding something from him, right?

A. No.

Q. You were hiding from him what actually happened at the Soto residence, right?

A. I'm not going to answer. I don't remember.

Q. Let's take a look at another letter you wrote marked as Plaintiff's Exhibit 9 (sic) (Reporter's Note: This is Plaintiff's Exhibit 10). It's RFC Solache Reyes 4827 - 4836. This is a letter you wrote on July 12, 1999.

Looking at page 6 of this letter, you wrote, "You will soon be in Mexico, and I will have to come back to this place because this is what I deserve. Think about it and tell me if you'll help me for only about six months, just to make my mother happy."

You wrote that to Gabriel Solache in July of 1999, right?

A. I don't recall.

Q. You wanted to go back to Mexico to say

Page 205

goodbye to your parents, right?

A. I don't recall that.

Q. And you said you would take full responsibility for the crimes you committed, allowing Gabriel to be released, right?

MR. BRENER: Objection, argumentative.

MS. ROSEN: Objection: form, foundation.

MR. SWAMINATHAN: Go ahead.

A. I don't recall.

Q. Looking at excerpt number 2, you wrote, "All I ask are six months of happiness. After that, nothing will matter. I will make you a letter and sign it that you personally can submit. I know that they would go for it for me, but I would come back because then you could soon go free."

A. I don't recall.

Q. You were admitting there that Gabriel Solache should go free; but first, you wanted him to help you go home for a period to see your parents, right?

MS. ROSEN: Objection: form, foundation, mischaracterizes the letter.

A. I don't recall.

Q. You believe that Gabriel Solache did deserve

Urlaub Bowen & Associates, Inc.  312-781-9586

REYES 014872

FILED DATE: 4/7/2022 9:01 PM    98CR1244002

ADRIANA MEJIA, 02/05/2021                           Page 206..209

Page 206

to be free, right?

A. Why would he have to be freed if he was also an accomplice in the crime.

Q. You wrote to him that, if he would just lie, you could go home for six months. Then you would say whatever you needed for him to be able to go home, right? That's what you wrote.

MS. ROSEN: Objection: form, foundation. That's not what you read to her; and if it's somewhere in the letter, then you should let her read it.

MR. SWAMINATHAN: Go ahead.

A. I'm not going to answer.

Q. All right. Let's take a look at excerpt number 3. You said, "I will help you and defend you of everything. I want you to help at least a little. I want to see my mother, ask her to forgive me, and then speak of everything. I wanted to go see her and then say everything so that they can leave you in liberty."

THE INTERPRETER: I'm trying to follow, Counsel, I'm sorry.

MR. SWAMINATHAN: Sorry. I can start over and go through it slower.

THE INTERPRETER: Okay.

Page 207

Q. "I will help you and defend you of everything. I want you to help me at least a little. I want to see my mother, ask her to forgive me, and then speak of everything. I wanted to go see her and then say everything so that they can leave you in liberty."

You wrote, "I have to pay for what I did. And I want my parents to hug me for the last time. I ask this for my mother and for me. I know I don't deserve anything from you. But I know that you have a heart that's double or the same as God's."

You wrote that to Gabriel Solache, right?

MS. ROSEN: Objection, form and foundation. I don't know what you're reading from. I don't know if that's an accurate translation. So form, foundation.

MR. SWAMINATHAN: Go ahead, Ms. Mejia?

A. I don't recall.

Q. You wrote in that letter that Gabriel deserved his liberty, right?

A. Everybody deserves an opportunity. Why just him?

Q. Were you apologizing to him in this letter?

A. I don't recall if I was apologizing to him

Page 208

or not. I don't remember.

Q. Let's take a look at one last section. Take a look at excerpt number 5. You wrote, "I hope some day you can forgive me all that you have suffered and that you have gone through because of my fault. Forgive me. It's easy to say. And you must think, after all that's been done to me, you ask me for that."

You told him it was all your fault that he was in prison, right?

MS. ROSEN: Object: form, foundation.

MR. SWAMINATHAN: Go ahead.

A. I don't recall.

Q. Ms. Mejia, do you dispute that you wrote that in the letter to him, that he should go free?

A. I don't recall if I wrote that, no.

Q. You agree this is your handwriting, right?

A. (No response.)

Q. Ms. Mejia, you previously testified about these letters. Go ahead.

MS. ROSEN: Objection, you're mischaracterizing what she testified to about this letter, this particular letter.

MR. SWAMINATHAN: We have to take a break

Page 209

here. She had to step away. Oh, she's back.

Q. Ms. Mejia, this is your handwriting. This is a letter you wrote to Gabriel Solache, right?

A. I don't recall.

Q. You don't remember writing this letter?

A. I don't recall.

Q. And you agree that this is your handwriting, right, under oath? It appears to be your handwriting?

A. It looks like it, but --

Q. But you don't remember saying this?

MS. ROSEN: Objection: form, foundation. Mischaracterizes what she just said.

MR. SWAMINATHAN: Go ahead, Ms. Mejia.

A. I don't recall.

Q. Ms. Mejia, you wrote to Gabriel Solache and told him multiple times that it was your fault, right?

A. I felt guilty about the deaths, but not -- I don't know how to explain it.

Q. You also told him in multiple letters that he deserved to be free, right?

A. We all deserve to be free. We have to pay for our mistakes, but --

Q. All right. Ms. Mejia, if the crime actually happened the way you've described here in your

Urlaub Bowen & Associates, Inc.  312-781-9586

REYES 014873

FILED DATE: 4/7/2022 9:01 PM 98CR1244002

ADRIANA MEJIA, 02/05/2021                    Page 210..213

Page 210

deposition yesterday and today, you never would have written to Gabriel Solache saying that he deserved to be free, would you?

MR. BRENER: Objection to form, argumentative.

A. I'm not going to answer.

Q. If -- strike that.

And you just mentioned feeling guilty. Do you feel guilty that your statements resulted in Gabriel Solache being locked up for many years?

MR. BRENER: Objection: form, foundation, mischaracterizes the record.

A. Can you repeat the question?

Q. Yeah. You said -- earlier, you used the word "guilty." You feel guilty about what happened to Gabriel Solache.

A. I feel guilty for -- I don't know how to explain it.

Q. Ms. Mejia, do you feel guilty to what happened to Arturo Reyes?

A. I'm not going to answer.

Q. Ms. Mejia, you realize that the story that you told us here today and yesterday, it's simply impossible, right?

Page 211

MS. ROSEN: Objection: form, argumentative.

MR. BRENER: Foundation.

MR. SWAMINATHAN: Go ahead.

A. I'm not going to answer.

Q. Based on the story you just told, your blood should not have been found anywhere in the Soto home, right?

MS. ROSEN: Objection: form, foundation.

MR. SWAMINATHAN: Go ahead.

A. I'm not going to answer.

Q. But it was. Your blood was found in the Soto home, right?

A. I'm not going to answer.

Q. And based on the story you just told, you had almost no role whatsoever, correct?

A. What do you mean, "role"?

Q. Based on the story you just told, you didn't really have any role in killing the Soto family, right? You didn't even know what was going to happen, right?

A. I'm not going to answer.

Q. And yet your blood was found on the knives in the house, right?

A. I don't know. I'm not going to answer.

Page 212

Q. The story you just told would require Gabriel to have skipped work that day, right?

MS. ROSEN: Objection: form, foundation.

A. I'm not going to answer.

Q. When you say the crime was happening, Gabriel Solache was at work, right?

MS. ROSEN: Objection: form, foundation.

A. I'm not going to answer.

Q. All right. The last few questions. Ms. Mejia, are you lying about what happened because you're angry at Gabriel Solache?

A. I'm not going to answer.

Q. Are you angry that he wouldn't help you go back to Mexico to see your parents?

A. I'm not going to answer anymore.

Q. Ms. Mejia, are you lying about what happened because you want to get released -- strike that.

Ms. Mejia, are you lying because you hope to one day get released from prison, and you're hoping your testimony will help you?

A. I can tell you that I respect your laws. I don't know. I know it's your job, but I can say that I believe in the law of God.

Q. Ms. Mejia, are you lying to protect others?

Page 213

A. No.

Q. Are you lying to protect whoever made the calls to the house on the night of March 27, the morning of March 28?

A. I'm not going to answer.

Q. Ms. Mejia, --

MS. ROSEN: You're out of time.

MR. SWAMINATHAN: I have two last questions.

Q. Ms. Mejia, you were previously asked questions about whether Arturo Reyes had anything to do with this crime. And in a previous deposition, you asserted your Fifth Amendment right against self-incrimination, correct?

A. I don't recall.

Q. Ms. Mejia, in a previous deposition, you were asked whether you lied when you implicated Gabriel Solache in this murder and kidnapping of the Sotos, and you asserted your Fifth Amendment right, correct?

A. Honestly, I don't remember anymore.

MR. SWAMINATHAN: I have no further questions.

MR. ENGQUIST: We have a few, or I have a few.

Urlaub Bowen & Associates, Inc.  312-781-9586

REYES 014874

ADRIANA MEJIA, 02/05/2021                          Page 214..217

FILED DATE: 4/7/2022 9:01 PM   98CR1244002

Page 214

MS. ROSEN: I assume Ms. Susler has no questions?

MS. SUSLER: That's correct.

MS. ROSEN: Thank you.

MR. ENGQUIST: Do you want me to go straight into it, or what?

MS. ROSEN: Ms. Mejia, would you like us to take a quick break before we ask some follow-up questions, or are you good to go?

THE WITNESS: How much longer is this going to take, a lot?

MR. ENGQUIST: Not too long for me. Not for me. But if you need to take a break to use the restroom before we start or something like that, just let me know.

THE WITNESS: Okay. If we could take a break in about 20 minutes.

MR. ENGQUIST: Okay. Sure.

EXAMINATION
BY MR. ENGQUIST:

Q. Ms. Mejia, I just want to -- I'm going to jump around a little bit, okay?

Earlier in your testimony -- I'm not sure if it was today or yesterday -- you talked about

Page 215

basically growing up with Mr. Solache; is that correct?

A. Yes.

Q. And I know, earlier today, you also talked about seeing him pick a lock at the school when you were in Mexico, correct?

A. Yes, because he was terrible.

Q. When you say "he was terrible," did you ever see him break any laws when he was in Mexico?

A. Not laws, but in Mexico, where we lived, there's no authority. I don't know if I can say it or if I have to reserve that to myself.

Q. Why would you have to reserve that to yourself about Mr. Solache's activities when he was growing up in Mexico?

A. Well, because when we were younger, when we were young, he was a little bit violent with his peers. He was kind of abusive.

Q. When you say "violent to his peers," can you describe what he would do to his peers that would be violent?

A. Violent in the fact that he would make fun. He would, like, make fun of people.

Q. Would he ever physically hurt anybody?

Page 216

A. I remember, when he used to hang out with my older brother, he was, like, very possessive, very abusive.

Q. When you say "abusive," was he physically abusive?

MS. ROSEN: Objection, been asked and answered.

MR. ENGQUIST: Go ahead.

A. Yes, very abusive because he would bully people from his generational line.

Q. I know you said you saw him use a hanger to get into the door the night of the murders, but you also saw him use it one time in Mexico. Do you ever see him any other time break in through a locked door other than those two times?

A. I remember, when we were in elementary school, there was a little room where they sold food. It was easy to take the windows off. He would go in with his little friends to get a lot of candy out. He had a lot of reports from his teachers.

Q. Other than reports from his teachers, did he ever get in trouble with the law, as far as you know, down in Mexico.

A. Yes. On one occasion, he tried to abuse a

Page 217

lady.

Q. And where was this?

A. In my town.

Q. Do you remember when this was, what year?

A. I don't recall the exact date, but that's why he fled my town.

Q. When you say "fled your town," was that before -- right before he went to the United States, or did he move somewhere else before coming to the United States?

A. I believe that happened -- when it happened, it was about April 25 when he tried to force her. And he left to the capitol with his mother.

Q. And do you know who that girl was or who that woman was?

A. Yes. Her name is Penelope. I don't recall her last name, but she's from my town.

Q. Do you know whatever happened with that -- or did anything ever happen with those allegations of abuse?

MR. SWAMINATHAN: Form. Go ahead.

A. All I know was that the lady's husband was looking for him.

Q. Do you know what the abuse was, what

Urlaub Bowen & Associates, Inc.   312-781-9586

REYES 014875

ADRIANA MEJIA, 02/05/2021                                    Page 218..221

Page 218

actually happened, allegedly happened?

A. No. Very little, no.

Q. Now, at some point while Mr. Solache was living in the United States, he received some type of head injury. Do you know anything about that?

A. Yes, for fighting.

Q. Who was he fighting with?

A. With Daniel.

Q. And do you remember when this fight took place?

A. No. I don't remember anymore.

Q. It was before the events which you were arrested for, correct?

A. Yes.

Q. Do you remember what his injury was?

A. Can you repeat the question?

Q. Sure. Do you remember what his injury was?

A. I think they put a brick in his head.

Q. Oh, he was struck on the head with a brick on the head? Is that correct?

A. I think Daniel stabbed him in the head with it.

Q. Do you know if Mr. Solache went to the hospital for that?

Page 219

A. I believe my brother-in-law Leobardo and my brother Carlos went to take him to Cook County.

Q. And was he hospitalized for a period of time with that.

A. Yes.

Q. Do you remember him having any kind of lasting injuries from that being struck in the head with a brick?

A. I don't know. But later, he would say that he couldn't see out of one eye. But I don't remember which eye.

Q. Did he ever complain to you about his hearing at that time?

A. At that time, I couldn't have a lot of communication with him. It was my brother Carlos and my brother-in-law Leobardo.

Q. Okay. I want to go back to the night of the crime and just do a couple of questions on that, if you don't mind.

You've already testified that Mr. Reyes came in after the husband was stabbed but before the wife was stabbed, correct?

A. Yes.

Q. Did Mr. Reyes tell Mr. Solache to stop when

Page 220

the wife was attacked?

A. I don't recall.

Q. Did he try to physically stop him at all?

A. I think so.

Q. You think so, okay. Do you know how he tried to physically stop him?

A. I think he wanted to grab him, but I'm not -- I think he did want to push him.

Q. Did he actually push him?

A. Yes, I think he did, a little bit.

Q. Is this when Mr. -- is this right before Mr. Solache was stabbing the woman in the back?

THE INTERPRETER: I'm so sorry, Counsel. What was that?

Q. Was this when you described Mr. Solache stabbing the woman in the back?

A. Yes.

Q. At this time, the woman was on the ground on all fours?

A. What do you mean "on all fours"?

Q. Down on her hands and knees.

A. Honestly, I don't recall.

Q. What else did Mr. Reyes do to try to stop Mr. Solache from stabbing the woman?

Page 221

A. I don't really remember a lot now.

Q. When the stabbing was going on, did either you or Mr. Reyes leave the apartment to try to get help?

A. No.

Q. You were testifying earlier how you thought that Mr. Solache would have had blood on his clothing. Remember that?

MR. SWAMINATHAN: Objection to form.

MS. ROSEN: Objection, mischaracterizes her testimony.

MR. ENQUIST: Go ahead.

A. Yes.

Q. Do you know what Mr. Solache did with that bloody clothing?

A. Yes.

Q. What?

A. He washed it in the bathroom and put it in a bag and went to throw it out.

Q. How do you know that?

A. Because I was watching him when he was washing them.

Q. Earlier, you testified that you did answer questions from police officers and also an Assistant

Urlaub Bowen & Associates, Inc.   312-781-9586

FILED DATE: 4/7/2022 9:01 PM   98CR1244002

REYES 014876

ADRIANA MEJIA, 02/05/2021                                          Page 222..225

Page 222

State's Attorney. Do you recall those questions?

A. Yes.

Q. When you answered the police officers and the State's Attorney, did you try to be truthful?

A. Yes.

Q. Did you ever change your story over time?

A. No.

Q. Did you tell the police or the state's attorney that you, Mr. Solache, Mr. Reyes were present when the Soto family were -- when Mr. and Mrs. Soto were killed?

A. Can you please repeat the question?

Q. Sure. I'll re-ask something.

Did you tell the police or the State's Attorney that you were present when Mr. and Mrs. Soto were killed?

A. I don't recall.

Q. Did you tell the police or the State's Attorney that Mr. Solache was present when the Sotos were killed?

A. I don't recall that.

Q. Well, if you had told them that, that would have been true, correct?

A. I don't recall that question.

Page 223

Q. You talked earlier about talking directly to the State's Attorney, and he was asking you questions. Do you recall that?

A. Yes.

Q. And you tried to be honest with him?

A. Yes.

Q. If he would have asked you if Mr. Solache was involved in the murders, would you have told him yes?

MR. SWAMINATHAN: Objection to form.

MS. SUSLER: Join.

Q. Can I get the answer, please?

A. Yes.

Q. If he would have asked you if Mr. Reyes was present during the murders, would you have told him yes?

MR. SWAMINATHAN: Objection to form.

A. Yes.

Q. That's because it was true, correct?

MR. SWAMINATHAN: Objection to form.

A. Yes.

Q. And if you would have been asked who was involved in the kidnapping of the children, you would have told him that you, Mr. Reyes, and Mr. Solache

Page 224

were all involved; is that correct?

MR. SWAMINATHAN: Object to form.

MS. SUSLER: Join that.

A. Yes.

Q. That's because it's true, correct?

MR. SWAMINATHAN: Objection to form.

MS. SUSLER: Same.

A. Yes.

MR. ENGQUIST: I need about five minutes. I just want to look at something to make sure I'm going to be done. So if we could take a quick break for five minutes. This might be a good time to use the restroom, Ms. Mejia.

THE WITNESS: Okay.

THE VIDEOGRAPHER: We're off the record at 6:30 p.m.

(Recess in proceedings from 6:30 to 6:39 p.m.)

THE VIDEOGRAPHER: We're back on the video record at 6:39.

MR. ENQUIST: Before we get back on the record, I think you had one correction to make, Ms. Translator.

THE INTERPRETER: That is correct. When

Page 225

Ms. Mejia stated that he would bully people from his generation, I interpreted that literally. Because in Spanish, "generacion" actually means class, like if you're class of '99, class of 2000. That's the example. And I interpreted it as generation instead of saying from his class.

MR. ENGQUIST: I appreciate that. Thank you.

BY MR. ENGQUIST:

Q. Ms. Mejia, you were asked a lot of questions today about Jose Mejia.

Was Jose Mejia involved in the kidnapping of the Soto children?

A. No.

Q. Was Jose involved in the murders of Mr. and Mrs. Soto?

A. No.

Q. Did Jose Mejia know anything about the crime before it was committed?

A. No.

Q. You were also asked a lot of questions about your former husband, Rosauro?

A. Yes.

Q. Was Rosauro involved in the kidnapping of

Urlaub Bowen & Associates, Inc.   312-781-9586

REYES 014877

ADRIANA MEJIA, 02/05/2021                                           Page 226..229

Page 226

the Soto children?

A. No.

Q. Was Rosauro involved in the murders of Mr. and Mrs. Soto?

A. No.

Q. Was he aware of the crime before it was committed?

A. No.

Q. You were asked a lot of questions about your ex-husband's brothers. He had quite a few of them.

A. Yes.

Q. Were any of your former husband's brothers involved in the murders of Mr. and Mrs. Soto?

A. No.

Q. Were any of them involved in the kidnapping of the Soto children?

A. No.

Q. Did any of them know about the crime before it was committed?

A. No.

Q. You were also asked questions about your downstairs neighbors, including Guadalupe?

A. Yes.

Q. Was Guadalupe involved in the kidnapping of

Page 227

the Soto children?

A. No.

Q. Was Guadalupe involved in the murders of Mr. and Mrs. Soto?

A. No.

Q. Was she aware of the crimes before they were committed -- the plan for the crime before it was committed?

A. No.

MR. ENGQUIST: I don't think I have anything else.

Does anybody else on the defense counsel crew here have anything?

MS. ROSEN: I actually do have just a couple of questions.

FURTHER EXAMINATION

BY MS. ROSEN:

Q. Ms. Mejia, you were asked a lot of questions about your brother Carlos in the last two days, correct?

A. Yes.

Q. Was your brother Carlos involved in the murders of Mr. and Mrs. Soto?

A. No.

Page 228

Q. Was your brother involved in the kidnapping of the Soto children?

A. No.

Q. Did your brother Carlos know about the plan to kidnap the children and murder their parents before the crimes happened?

A. No.

MS. ROSEN: I don't have any more questions.

MR. NOLAND: I do not have any questions.

MR. BRENER: I also do not have any questions.

MR. SWAMINATHAN: Nothing else for us.

MR. ENGQUIST: The only other thing is whether or not you want to waive or reserve your signature. I do not know, Dena if you want to make a call on that or not. It's up to you.

MS. SINGER: No. It's fine. I don't have a position on it. I mean, I can reserve it. But I don't have a position on it.

MR. ENGQUIST: Okay. Do you want to ask her if she wants to waive or reserve or explain it to her? Do you want me to explain it to her?

MS. SINGER: Go ahead. You can do it. It's fine. It's easier if you can do it with the

Page 229

interpreter though so she understands.

MR. ENGQUIST: Ms. Mejia, the only issue left is whether or not you want to waive or reserve your signature. That means, when this deposition is typed up, you get to choose whether or not you have a chance to read it over for accuracy before it's finalized or whether or not you want to waive it and trust that the court reporter typed up everything accurately.

THE WITNESS: That's fine.

MR. ENGQUIST: Which one? Waive or reserve?

THE WITNESS: I don't know. Whatever my attorneys advises me.

MR. ENGQUIST: Back to you, Dena.

MS. SINGER: I would need a second to talk to her, guys. It's really her decision. So I've got to go into a breakout room real quick. I'm sorry.

MR. SWAMINATHAN: We can log off, right? You don't need any of us -- oh, no no. We need to get that, right.

MS. SINGER: You do, because you need to know the answer.

MR. SWAMINATHAN: Sorry. Go ahead.

MS. SINGER: Adriana, we're almost done.

Urlaub Bowen & Associates, Inc. 312-781-9586

FILED DATE: 4/7/2022 9:01 PM 98CR1244002

REYES 014878

ADRIANA MEJIA, 02/05/2021            Page 230..233

FILED DATE: 4/7/2022 9:01 PM  98CR1244002

Page 230

Can you grab the guard?

THE VIDEOGRAPHER: We're off the record at the 6:46.

(Recess in proceedings from 6:46 to 6:50 p.m.)

MR. ENGQUIST: Before it's asked, I will just say, yeah, I'll order. Etran.

MS. SINGER: She's on her way back in. She would like to read it, but the concern is that it's in English. So I don't know how to satisfy the issue of the whole transcript being in English.

MR. ENGQUIST: I don't either. Because I think it would be a tad overkill to have 2 days, 17 hours or whatever, worth of translations done.

MS. SINGER: Right.

MR. ENQUIST: I'm honestly not sure even how that works. Any thoughts from the peanut gallery here?

THE INTERPRETER: You can always hire me.

MR. STARR: Could we send her the video, and she could watch the video, and then send the transcript?

MS. SINGER: That's a good -- but will the

Page 231

facility have a way for her to do that?

MR. ENGQUIST: I honestly don't know. I'm going to order the video too, by the way.

MS. SCHATZLE: Just food for thought on the video side, I can send the video through email to whoever at the jail, and then they can pull it up on a computer and let her watch it. So it will be an electronic copy of the video.

MR. ENGQUIST: But I don't control what they're going to allow her access to or period of time or anything like that.

You know, we can work on getting her a copy, I guess, at some point. But I don't know what else to say about that. Eileen, do you have a thought on it?

MS. ROSEN? Me? Yes, me. What would it cost, Elsa to have you read it to her?

THE INTERPRETER: You would just contact the agency, and I'm sure they would work with you.

MS. ROSEN: I mean, if Plaintiffs are willing to split costs on something like that, I suppose it's something we can talk about.

THE INTERPRETER: I mean, I don't get involved with the pricing. But I work with them, and they would work with you.

Page 232

MR. SWAMINATHAN: My concern is it's going to be extremely time consuming and expensive. What I would propose we do is try get her the video and see if there's a way that she can get set up to be able to review that. If we need to be able to set up a notice for her to be able to get a room to be able to review the video, that's also fine, or whatever we can do to facilitate that.

MR. ENGQUIST: I have no problem trying to work out sharing with her the video. But if it's a reserving signature thing, then it's the reading of the transcript, not the video. Her watching a video doesn't alleviate that concern.

So if it's reserved, that's a different issue. And honestly, I don't know how to deal with that in this case. If it's going to be "waived, but I'd like to get a copy of it," then we can probably work that out.

MR. SWAMINATHAN: Maybe we need ask her that.

MS. SINGER: I'm sorry, what did you say?

MR. SWAMINATHAN: If we get her a copy of the video, is that what she would like? Or is she additionally indicating that she's not waiving, and

Page 233

she wants to be able to do a comparison to the actual transcript before she -- rather than waive signature?

In other words, if what she wants is --

MS. SINGER: No, I understand. I'm with you. It's 17 hours, but I got you. Is she there? Sorry. I can only see -- not everybody.

Elsa, I guess, can you ask her: Adriana, do you want to see the video, and is the video sufficient for to you determine if everything is accurate?

THE WITNESS: Because of the Corona virus, they're not going to let me see it. Everything is canceled right now.

MS. SINGER: Right. A lot of the facilities won't give them access to computers and stuff because of the virus.

Well, I think we should --

MR. SWAMINATHAN: If it's a matter of time, it could be that -- I don't know how long it usually takes to go back and forth; but if it's going to be 60, 90 days, we could be in a different place with regard to her ability to have access to a computer.

MS. SINGER: Well, then you guys are waiting 60 or 90 days until --

MR. SWAMINATHAN: I don't care about waiting

Urlaub Bowen & Associates, Inc.  312-781-9586

REYES 014879

FILED DATE: 4/7/2022 9:01 PM   98CR1244002

ADRIANA MEJIA, 02/05/2021                                    Page 234..235

Page 234

60 to 90 days to have her sign off on the errata sheet, which is basically what we're talking about.

MR. ENGQUIST:  The thing is, if it gets written, then you just have 30 days to determine.

MS. ROSEN:  I know, you can extend that by agreement.  we could agree to give her more time.

MS. SINGER:  Adriana, are you comfortable waiving it?  Are you comfortable saying that you think the transcript, as written, was taken accurately, or would you prefer to read it?

THE WITNESS:  Whatever decision my attorney makes is fine.

MS. SINGER:  All right.  We can waive it.

THE VIDEOGRAPHER:  Just to note, the video was not recording.  Do you want that also on the video or just on the written transcript?

MR. ENGQUIST:  The fact that it's waived?

THE VIDEOGRAPHER:  Yeah.

MR. ENGQUIST:  Just on the written transcript.  That's fine.

THE VIDEOGRAPHER:  I was just letting you guys know.

(Deposition concluded at 6:57 p.m.; by agreement, signature waived.)

Page 235

CERTIFICATE OF REPORTER

I, BRENDA L. ZEITLER, a Certified Shorthand Reporter within and for the State of Illinois, do hereby certify that the witness, ADRIANA MEJIA, whose testimony appears in the foregoing deposition was duly sworn by me through a Spanish interpreter; that the testimony of said witness was taken through Spanish interpreter on February 5, 2021, by me to the best of my ability and thereafter reduced to typewriting under my direction; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition was taken, and further that I am not a relative or employee of any attorney or counsel employed by the parties thereto, nor financially or otherwise interested in the outcome of the action.

_____

Brenda L. Zeitler, CSR
Illinois License No. 084-004062

Urlaub Bowen & Associates, Inc.   312-781-9586

REYES 014880