| | |
|---|---|
| **From:** | Valerie Barajas |
| **To:** | attorney_general@ilag.gov; CHRISTA BOWDEN (States Attorney) |
| **Cc:** | Rachel Brady; Anand Swaminathan; Sean Starr; Steve Art |
| **Subject:** | De Leon-Reyes v. People of the State of Illinois, 98CR12440-02 |
| **Date:** | Thursday, January 20, 2022 4:19:39 PM |
| **Attachments:** | NOF.pdf |
| | Mtn for SJ Petition for COI.pdf |

---

### External Message Disclaimer

This message originated from an external source. Please use proper judgment and caution when opening attachments, clicking links, or responding to this email.

Counsel:

Attached, please find a courtesy copy of Petitioner's Motion for Summary Judgment for Certificate of Innocence Pursuant to 735 ILCS 5/2-702 as well as the Notice of Filing. Once we receive the file stamped copy from the Clerk of the Court we will provide those to you as well.

Additionally, please use the link below to download the exhibits accompanying the brief.

If you have any trouble accessing the documents, please let us know.

https://spaces.hightail.com/receive/GQEYvoZpCj

Sincerely,

--
**Valerie Barajas**
Paralegal
Loevy & Loevy
311 N. Aberdeen, 3rd Fl
Chicago, IL 60607
(312) 243-5900
valerie@loevy.com

CCSAO COI SUBPOENAS 000001

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, CRIMINAL DIVISION**

|  |  |  |
|---|---|---|
| ARTURO De LEON-REYES, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | No. 98 CR 12440-02 |
| v. | ) | |
| | ) | |
| STATE OF ILLINOIS | ) | |
| | ) | |
| Respondent. | ) | |

**NOTICE OF FILING**

TO:    Attorney General
State of Illinois
100 W. Randolph Street
Chicago, IL 60601

Assistant State's Attorney
Cook County State's Attorney's Office
2650 S. California Avenue
Chicago, IL 60608

Please take notice that on January 20, 2022, I caused to be filed with the Clerk of the Circuit Court of Cook County, 2650 S. California Avenue, Chicago, IL 60608, the original of the attached MOTION FOR SUMMARY JUDGMENT ON PETITION FOR CERTIFICATE OF INNOCENCE, a copy of which is hereby served upon you.

Dated: January 20, 2022

Respectfully Submitted,

Rachel Brady
*Attorney for Arturo De Leon-Reyes*

Loevy & Loevy
311 N. Aberdeen St., 3rd floor
Chicago, IL 60607
(312) 243-5900
brady@loevy.com

CCSAO COI SUBPOENAS 000002

## CERTIFICATE OF SERVICE

I, Rachel Brady, an attorney, hereby certify that on this 20th day of January 2022, I caused a copy of the foregoing MOTION FOR SUMMARY JUDGMENT ON PETITION FOR CERTIFICATE OF INNOCENCE to be served by electronic mail and USPS mail to:

Attorney General
State of Illinois
100 W. Randolph Street
Chicago, IL 60601

Assistant State's Attorney
Cook County State's Attorney's Office
2650 S. California Avenue
Chicago, IL 60608

Dated: January 20, 2022

Respectfully Submitted,

Rachel Brady
*Attorney for Arturo De Leon-Reyes*

Loevy & Loevy
311 N. Aberdeen St., 3rd floor
Chicago, IL 60607
(312) 243-5900
brady@loevy.com

CCSAO COI SUBPOENAS 000003

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, CRIMINAL DIVISION**

| | | |
|---|---|---|
| **ARTURO De LEON-REYES,** | ) | |
| | ) | |
| *Petitioner,* | ) | |
| v. | ) | **No. 98 CR 12440-02** |
| | ) | |
| **STATE OF ILLINOIS** | ) | |
| | ) | |
| *Respondent.* | ) | |

**MOTION FOR SUMMARY JUDGMENT ON PETITION FOR CERTIFICATE OF INNOCENCE PURSUANT TO 735 ILCS 5/2-702**

Jon Loevy
Anand Swaminathan
Steven Art
Sean Starr
Rachel Brady
Loevy & Loevy
311 N. Aberdeen St., 3rd floor
Chicago, IL 60607
(312) 243-5900
anand@loevy.com

*Counsel for Petitioner Arturo Reyes*

CCSAO COI SUBPOENAS 000004

**TABLE OF CONTENTS**

INTRODUCTION AND BACKGROUND…………………………………………………1

I.  UNDISPUTED FACTS  ......................................................................................3

II.  LEGAL STANDARD ..........................................................................................9

III.  MR. REYES HAS PRESENTED EVIDENCE OF INNOCENCE ...........................10

IV.  THERE IS NO EVIDENCE OF MR. REYES'S GUILT............................................12

    A.  **This Court Can Consider Only Sworn Testimony or Evidence that Was Admitted in Underlying Criminal Proceedings in Evaluating the State's Opposition, and Cannot Consider Suppressed Statements**..............................13

        1.  Law of the Case and Equitable Principles Preclude this Court from Considering the False, Coerced Statements...............................................13

        2.  This Court Cannot Consider Hearsay about Ms. Mejia.............................14

    B.  **The Only Other Evidence the State Can Possibly Try to Rely on Does Not Make a *Prima Facie* Case of Guilt of the Offenses Charged in the Indictment**........................................................................................ 15

        1.  Any evidence discussing Mr. Reyes's alleged presence at the crime scene does not establish that he is not innocent of the factual theory of the offenses detailed in the indictment.  ..........................................16

        2.  To the extent this Court does consider tortured and involuntary statements, it should afford them no weight. ..............................................18

    C.  **A Preponderance of the Evidence Establishes that Mr. Reyes is Innocent** ....20

V.  MR. REYES SATISFIES THE OTHER STATUTORY REQUIREMENTS TO RECEIVE A CERTIFICATE OF INNOCENCE. ......................................................21

CONCLUSION ...................................................................................................22

CCSAO COI SUBPOENAS 000005

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, CRIMINAL DIVISION**

| | | |
|---|---|---|
| **ARTURO De LEON-REYES,** | ) | |
| | ) | |
| *Petitioner,* | ) | |
| v. | ) | **No. 98 CR 12440-02** |
| | ) | |
| **STATE OF ILLINOIS** | ) | |
| | ) | |
| *Respondent.* | ) | |

**MOTION FOR SUMMARY JUDGMENT ON PETITION FOR**
**CERTIFICATE OF INNOCENCE PURSUANT TO 735 ILCS 5/2-702**

Petitioner, ARTURO DeLEON- REYES, by his attorneys LOEVY & LOEVY, respectfully petitions this Court to enter an order granting him a certificate of innocence pursuant to 735 ILCS 5/2-702. In support of this request, Petitioner states as follows:

**INTRODUCTION AND BACKGROUND**

Arturo De Leon-Reyes spent nearly 18 years in prison for a crime he did not commit. On December 21, 2017, Mr. Reyes's conviction was vacated and he was released from prison. The State's case against Mr. Reyes at his criminal trial in 2000 was based exclusively on his false, fabricated, and involuntary inculpatory statement, which the court suppressed during post-conviction proceedings. Without the confession, the State had no evidence against Mr. Reyes, and declined to retry him. Indeed, there was never a shred of physical or other evidence implicating Mr. Reyes in the crime, and DNA evidence, as well as sworn testimony, shows that he is innocent. Mr. Reyes now seeks a certificate from this Court acknowledging his innocence.

This case stems from the tragic stabbing murder of Mariano and Jacinta Soto, and the kidnapping of their infant daughter and three-year old son. As the narrative unfolded,

CCSAO COI SUBPOENAS 000006

investigators learned that a woman named Adriana Mejia and her husband had been unable to conceive children, and that in the early morning hours of March 28, 1998, she stabbed the Sotos to death and kidnapped their young son and infant girl. She then claimed that she had given birth to the infant and was babysitting the boy. A few days after the murders, Mr. Reyes heard Mejia arguing with her husband and another roommate about the older child, and, fearing for the boy's safety, offered to bring him to the police station. Mr. Reyes, a roommate named Gabriel Solache, and Mejia's husband brought the boy to the police station, where they were immediately detained. They remained in custody for days, enduring physical and psychological abuse at the hands of disgraced Chicago Detective Reynaldo Guevara.

Despite his complete lack of knowledge about the crimes and wholesale innocence, Mr. Reyes succumbed to the pressure and agreed to sign a false statement, written in a language he did not understand, implicating himself in the murders and kidnapping. Guevara tortured Mr. Solache and Ms. Mejia until they agreed to implicate themselves in the murders and kidnappings, as well. Mr. Reyes and Mr. Solache were tried and convicted based only on those false inculpatory statements, and Ms. Mejia pleaded guilty.

Mr. Reyes and Mr. Solache tried for years to convince courts that their statements were false and coerced, and eventually succeeded after uncovering scores of evidence that Guevara had similarly tortured false confessions out of other suspects. Guevara pleaded his Fifth amendment right against self-incrimination in response to questions in post-conviction proceedings about his misconduct, and the trial court vacated Mr. Reyes and Mr. Solache's convictions, explaining that Guevara had told "bald faced lies" about this case and had "eliminated any possibility of [] being considered a credible witness in any proceeding." The State dismissed the charges against Mr. Solache and Mr. Reyes, and after nearly two decades of

2

CCSAO COI SUBPOENAS 000007

wrongful incarceration, they were finally free. Mr. Reyes petitioned this Court for a certificate of innocence, and now moves this Court to grant his petition because the undisputed facts establish that he is innocent as a matter of law.

## I. UNDISPUTED FACTS[1]

1. Mr. Reyes was convicted of two counts of first-degree principal murder by stabbing Mariano Soto and Jacinta Soto with a knife; one count of home invasion for entering the dwelling place of Mariano Soto…knowing "that one or more persons were present therein and while armed with a dangerous weapon, to wit: a knife" and "used force upon Mariano Soto"; and two counts of aggravated kidnapping for knowingly and secretly confining Santiago Soto and Maria Soto. *See* Ex. 1 (Amended Mittimus); Ex. 2 (Counts 1, 3, 17, 23, 25). Those convictions have been vacated. Ex. 3 (Order Vacating Convictions).

2. Mr. Solache was convicted of the same crimes, and his convictions were also vacated. Ex. 3 (Order Vacating Convictions).

3. Mr. Reyes and Mr. Solache made contemporaneous outcries in 1998 that their false inculpatory statements were the product of physical and psychological coercion by Detective Guevara, and that statements themselves are false.

4. In his pretrial and trial testimony, and every opportunity since, Mr. Reyes has testified that he is entirely innocent of the crimes. For instance, he has consistently testified that he never left the house on the night the Sotos were killed; did not offer to help Ms. Mejia steal a baby; did not know she was pretending to be pregnant; never told Ms. Mejia that he found a baby for her; was not involved in kidnapping any children; and was not involved in any deaths. Ex. 4 (Reyes 2000 Supp. Hrg. Testimony) at 643, 655-656, 660, 746-48; Ex. 5 (Reyes Trial

---

[1] If this Court concludes that disputed issues of fact preclude summary judgment, Mr. Reyes intends to proceed with a hearing.

CCSAO COI SUBPOENAS 000008

Testimony) at 2134-36, 2044, 2051, 2055, 2069-71; Ex. 6 (E. Hearing) at 14-18, 20-21, 23, 25-27.[2] In other words, Mr. Reyes has always disavowed all knowledge of and participation in the kidnappings and murders. He has also always maintained that he agreed to sign an inculpatory statement only because Detective Guevara beat him; and further, that he did not provide the facts about the crime that were included in the confession. Ex. 14 (ROP) at 643, 655-656, 660, 746-48, 2134-36, 2044, 2051, 2055, 2069-71[3]; Ex. 6 (E. Hearing) at 14-18, 20-21, 23, 25-27.

5.      Indeed, Mr. Reyes has consistently maintained that he did not understand the substance of his "confession," and that he agreed to sign the false inculpatory statement only after extreme sleep deprivation and 40 hours of physical and psychological abuse by Guevara. In addition, the statement he signed was handwritten in English, a language he could not read or understand. The details of Mr. Reyes's abuse and coercion are listed in his Petition at ¶¶ 33-46.

6.      Mr. Solache has also consistently testified about similar abuse and coercion during the suppression hearing. Ex. 7 (Solache Record Excerpts) at 716, 722-23, 746, 852, 909, 2051-52, 2055, 2066; Ex. 8 (S. Hearing) at 46-52, 54.[4] The details of the abuse and coercion Mr. Solache endured are detailed in Mr. Reyes's Petition at ¶ 48.

7.      The only evidence introduced at Mr. Reyes's trial implicating him in the crime is the handwritten statement he signed, and Detective Guevara's testimony. *See* Ex. 14 (ROP) at 1273-2277.

---

[2] A transcript of the relevant evidentiary hearing testimony is included on a disk as Exhibit 4, and referred to herein as "E. Hearing." The page numbers in the E. Hearing are at the bottom of each page with the prefix E. Hearing COMBINED.

[3] The complete trial record is included on a disk as Exhibit 14, and referred to herein as "ROP." The page numbers in the ROP are in the bottom footer and do not have a prefix.

[4] A transcript of the relevant suppression hearing testimony is included on a disk as Exhibit 8, and referred to herein as "S. Hearing." The page numbers in the S. Hearing are at the top of each page with the prefix S. Hearing COMBINED.

CCSAO COI SUBPOENAS 000009

8.      Mr. Reyes and Mr. Solache's false inculpatory statements have been suppressed in the underlying criminal proceedings. Ex. 6 (E. Hearing) at 302.

9.      For years after they were convicted, Mr. Reyes and Mr. Solache petitioned courts for relief. On June 13, 2008, Mr. Reyes and Mr. Solache filed amended petitions for post-conviction relief, presenting evidence that Guevara had used similar abusive and coercive tactics in many other instances. The post-conviction court determined that a third-stage evidentiary hearing was warranted on their claims that newly discovered evidence indicated that Detective Guevara engaged in abuse and coercion in other instances, indicating that the confessions of Mr. Reyes and Mr. Solache were involuntary and procured through abuse and coercion. Ex. 9 (Order on Post-Conviction Petition).

10.      In post-conviction proceedings, the trial court wrote in an order granting Reyes and Solache's motions for new suppression hearings: "After reviewing the evidence in third stage evidentiary proceedings, it is abundantly clear that, the uncontradicted accounts of these specific interactions entailing abuse, coercion and improper influence in addition to the negative inference drawn from Det. Guevara's assertion of his 5th amendment privilege against self-incrimination lend credence to petitioners' allegations of abuse and coercion." Ex. 9 (Order on Post-Conviction Petition) at 35.

11.      In the evidentiary hearing, in response to questions about whether he physically abused Mr. Reyes during his interrogation, Detective Guevara invoked his Fifth Amendment right not to incriminate himself. *See* Ex. 8 (S. Hearing) at 227-228. After being granted immunity, Guevara then denied abusing Mr. Reyes and Mr. Solache. Evaluating that testimony, Cook County Judge James Obbish said that Guevara had told "bald face lies" and further stated

CCSAO COI SUBPOENAS 000010

that Guevara had "eliminated any possibility of [] being considered a credible witness in any proceeding." Ex. 8 (S. Hearing) at 300-301.

12.    On December 13, 2017, Judge Obbish granted Mr. Reyes's motion to suppress his confession. Ex. 6 (E. Hearing) at 302.

13.    On December 21, 2017, without the false and coerced confession, Mr. Reyes's judgment of conviction was vacated, the State dismissed all charges, and Mr. Reyes was released from prison.

14.    Judge Obbish ordered the same relief for Mr. Solache. *See* Ex. 3 (Order Vacating Conviction).

15.    Illinois Appellate Courts have on numerous occasions acknowledged that Guevara engaged in a pattern of investigative misconduct similar to that long-alleged by Mr. Reyes and Mr. Solache. *See, e.g., People v. John Martinez*, 2021 IL App (1st) 190490 at ¶ 80 ("Detective Guevara is a malignant blight on the Chicago Police Department and the judicial system"); *People v. Serrano*, 2016 IL App (1st) 133493, generally & at ¶¶35-36; *People v. Montanez*, 2016 IL App (1st) 133726, generally & at ¶¶36-37; *People v. Almodovar*, 2013 IL App (1st) 101476; *People v. Ricardo Rodriguez*, 2021 IL App (1st) 200173, at ¶51; *People v. Ariel Gomez*, 2021 IL App (1st) 192020, at ¶58.

16.    The State does not dispute that Guevara has a history of committing misconduct in homicide investigations. *Martinez*, 2021 IL App (1st) 190490 at ¶ 64 ("The State does not dispute that Detective Guevara has a history of misconduct. Nor could it…."); Ex. 11 (Order in *People v. Demetrius Johnson*, 91 CR 19833(01)); Ex. 12 (Transcript from *People v. Munoz*, 85 CR 12403(01)) at 93, 103.

6

17. Evidence from the crime scene, car, and clothing, that does not belong to the victims, matches Ms. Mejia and an unidentified person. No DNA or physical evidence has ever tied Mr. Reyes or Mr. Solache to the crime. Their DNA was not present on any of the items tested, and their fingerprints were not found at the scene. Mr. Reyes's shoes were confiscated during his interrogation, but no blood was found on them. Ex. 14 (ROP) at 1377-83, 1553-64, 1570, 2054; Ex. 13 (Report of Dr. Karl Reich) at 4-8.

18. Ms. Mejia has asserted that the inculpatory statement she signed, which falsely implicates Mr. Reyes and Mr. Solache as her accomplices, was the result of physical and psychological abuse and coercion by Detective Guevara. *See, e.g.*, Ex. 14 (ROP) at 643, 655-656, 660, 746-48, 958, 1917, 2134-36, 2044, 2051-52, 2055, 2066, 2069-71, 2084; Ex. 6 (E. Hearing) at 14-18, 20-21, 23, 25-27.

19. Substantial physical evidence linked Ms. Mejia to the crime. Among other things, her DNA was found on the knife recovered from behind the couch in the Soto apartment and on the green towel that was recovered from the car that the prosecution believed was used in the crime. Further, Mariano Soto's blood was found on Ms. Mejia's shoes and pants. Ex. 14 (ROP) at 1544-49, 1564-65.

20. After Mr. Reyes's conviction, DNA testing was performed on the physical evidence recovered from the crime scene; the testing excluded Mr. Reyes and instead revealed the presence of the DNA profile of an unidentified person. Ex. 13 (Report of Dr. Karl Reich).

21. Mr. Reyes has been excluded as a contributor to the DNA at the crime scene. Ex. 13 (Report of Dr. Karl Reich).

22. The only evidence admitted at trial regarding Mr. Reyes's involvement in the crimes was the confessions themselves—which were suppressed based on physical abuse—and

CCSAO COI SUBPOENAS 000012

Guevara's testimony about those confessions—which Judge Obbish found to be thoroughly not credible. Ex. 14 (Entire Trial Tx.); Ex. 15 (Mejia June 2019 Dep.); Ex. 8 (S. Hearing) at 296-302.

23.     The only other sworn testimony or evidence that exists about the crimes comes from Ms. Mejia. Ms. Mejia has testified four times in connection with these cases: the March 2000 suppression hearing, and three civil depositions related to Mr. Solache and Mr. Reyes's civil cases. Ex. 14 (ROP) at 951- 88, 2582-2633; Ex. 15 (Mejia June 2019 Dep.); Ex. 16 (Mejia Oct. 2019 Dep.); Ex. 17 (Mejia Feb. 2021 Dep.).

24.     Ms. Mejia has never testified that Mr. Reyes participated in planning a murder or kidnapping; had any beforehand knowledge that a murder and kidnapping would occur; had a weapon, participated in the homicide, or took any affirmative step to take either Soto child.[5] Ex. 14 (ROP) at 951-88, 2582-2633; Ex. 15 (Mejia June 2019 Dep.); Ex. 16 (Mejia Oct. 2019 Dep.); Ex. 17 (Mejia Feb. 2021 Dep.).

25.     Ms. Mejia testified at her deposition that Mr. Reyes did not participate in the murder of Mr. or Mrs. Soto, did not participate in planning the murders or kidnapping, and did not know that she was faking her pregnancy. Ex. 17 (Mejia Feb. 2021 Dep.) at 11, 21, 22, 24, 56, 96.

26.     Ms. Mejia also testified that Mr. Reyes was unexpectedly in the car when she was picked up to go to the Sotos' home, but he arrived at the apartment after Mr. Solache and Ms.

---

[5] The State says in its response to Reyes's COI petition that Mejia testified as a witness for codefendant Solache that Mr. Reyes participated in the murders. This is patently false. The transcript the State cites to support its statement says nothing of the sort. She has never given a shred of sworn or admissible testimony suggesting that Mr. Reyes committed the murders.

CCSAO COI SUBPOENAS 000013

Mejia, did not know about the murders until they had occurred, and did not have a knife. Ex. 17 (Mejia Feb. 2021 Dep.) at 27, 56, 96, 112, 176.

27.     Ultimately, Ms. Mejia testified that Mr. Reyes is innocent of the murders. Ex. 17 (Mejia Feb. 2021 Dep.) at 98.

## II.     LEGAL STANDARD

To receive a certificate of innocence, Mr. Reyes must show by a preponderance of the evidence that he is innocent of the specific factual theory of the crimes of conviction enumerated in the indictment. 735 ILCS 5/2-702(g)(3); *People v. Palmer*, 2021 IL 125621, ¶¶ 64, 72, 78. He must also show by a preponderance of the evidence that he was convicted of one or more felonies, was sentenced to a term of imprisonment, and has served all or any part of the sentence, 735 ILCS 5/2-702(g)(1); the judgment of conviction was reversed or vacated and the charges were subsequently dismissed, *id*. § 5/2-702(g)(2)(A); and he did not by his own conduct voluntarily cause or bring about his conviction, *id*. § 5/2-702(g)(4).

The State may rely on evidence introduced during the underlying criminal proceedings and sworn testimony in its response. 735 ILCS 5/2-720(f); *Palmer*, 2021 IL 125621 at ¶67. Only once the State has presented evidence to establish the essential elements of the crimes of conviction may this Court begin weighing the evidence. *People v. Williams*, 2017 IL App (1st) 152021, ¶ 30 (Ill. 2017), reh'g denied (July 24, 2017), appeal denied, 93 N.E.3d 1068 (citing *Zannini v. Reliance Ins. Co. of Ill., Inc.*, 147 Ill. 2d 437, 448-49 (1992); *527 S. Clinton, LLC v. Westloop Equities, LLC*, 403 Ill. App. 3d 42, 52 (2010).) If the State does not present evidence to establish the *prima facie* elements of the crimes of conviction, this Court must grant Mr. Reyes a certificate of innocence as a matter of law. *Cf. Tucker v. New York, C. & St. L.R. Co.*, 12 Ill. 2d 532, 534 (1957).

CCSAO COI SUBPOENAS 000014

Applied here, Mr. Reyes must show innocence of stabbing Mariano and Jacinta Soto with a knife; entering Mariano Soto's home with a knife and using force upon Mr. Soto; and knowingly and secretly confining the Soto children. *See* Ex. 1 (Amended Mittimus); Ex. 2 (Counts 1, 3, 17, 23, 25). Mr. Reyes has presented evidence to establish his innocence, and the State can identify no admitted evidence or sworn testimony to the contrary. Thus, the undisputed facts in this case establish that Mr. Reyes is innocent of the factual offenses of which he was charged and convicted. This is what allows this Court to decide this petition as a matter of law rather than on the facts. Mr. Reyes is therefore entitled to a certificate of innocence as a matter of law.

### III.     MR. REYES HAS PRESENTED EVIDENCE OF INNOCENCE

The substantial evidence of Mr. Reyes's innocence falls into two general categories: testimony and forensic evidence. As for the testimony: from the moment he was detained at the police station, Mr. Reyes has professed his innocence. He testified about his own innocence in his suppression hearing in March 2000, his criminal trial in June 2000, and his evidentiary hearing in 2013.[6] Thus, these repeated assertions are evidence of innocence, and this Court must consider them. *See People v. Caine*, Case No. 86 CR 6091 (Order, March 27, 2012); *see also People v. Fields*, 2011 IL App (1st) 100169, ¶ 19 (2011).

---

[6] These statements of innocence are corroborated by testimony from Mr. Reyes's coworker, Salvador Alivas, establishing that it would have been almost impossible for Mr. Reyes to have committed a violent double murder and double child abduction. Mr. Alivas drove Mr. Reyes home from work on the night of the murder. He testified that he left work in South Holland, Indiana (an approximate 40-minute drive from Mr. Reyes's apartment) with Mr. Reyes around 12:15 or 12:30 a.m. on the night of the killings, stopped at some stores, and then dropped Mr. Reyes off at his apartment; he also testified that when he picked up Mr. Reyes at 10:00 a.m. the next day, he was acting normally and did not appear tired. Ex. 14 (ROP) at 1903, 2033-34, 2121, 2125-26; 2419-25; *see also* Ex. 10 (Timesheets) (showing Mr. Reyes's long workdays the day of the crime and the day before).

10

Mr. Reyes also testified that when he learned the three-year old Soto boy was in danger, he accompanied Rosauro Mejia to bring the boy to the police station to ask for help. Ex. 6 (E. Hearing) at 52-53; Ex. 14 (ROP) at 2039-40, 2069-71. This, too, is evidence of innocence.

The other relevant testimony, as discussed above, comes from Detective Guevara, who pleaded the Fifth when asked whether he physically abused, coerced and framed Mr. Reyes.

Second, all available forensic evidence excludes him as a possible contributor to the DNA left all over the crime scene, and there has never been a shred of physical evidence connecting Mr. Reyes to the crime. Investigators conducted extensive forensic collection at the crime scene. *See generally* Ex. 13 (Report of Dr. Karl Reich). It is a tenet of forensic DNA science that "every contact leaves a trace." *Id.* at 8 (internal citation and quotation marks omitted). In a case where the victims were stabbed to death, the fact that the DNA points to Ms. Mejia and an unidentified perpetrator, yet none of the DNA left at the crime scene matches Mr. Reyes is powerful evidence of innocence. At a bare minimum, evidence of another likely perpetrator "is of such a conclusive character as to probably change the outcome at a retrial." *People v. Robinson*, 2020 IL 123849, ¶ 80. Illinois courts routinely grant certificates of innocence based on such undisputed DNA evidence. *See, e.g., People v. Patterson*, Case No. 02 CR 13473-01; *People v. Richardson*, Case No. 95 CR 09676 (Order, September 14, 2012); *People v. Saunders*, Case No. 95 CR 09676 (Order, September 14, 2012); *People v. Swift*, Case No. 95 CR 09676 (Order, September 14, 2012); *People v. Thames*, Case No. 95 CR 09676 (Order, September 14, 2012); *People v. Barr*, Case No. 95 CR 23475 (Order, April 17, 2012; *People v. Coleman*, Case No. 94 CR 1443301 (Agreed Order, March 8, 2018); *People v. Fulton*, Case No. 94 CR 1334402 (Agreed Order, March 9, 2018); *People v. Harden*, Case No. 92 CR 2247 (Order April 17, 2012); *People v. Rivera*, Case No. 92 CR 2751 (Order, May 15, 2013);

11

*People v. Carini*, Case No. 91 CF 2233 (Order, December 20, 2017); *People v. Gillard*, Case No. 81 CR 3979 (Agreed Order, August 27, 2009); *People v Andersen*, Case No. 80 C 1405 (Order, December 18, 2015).

The COI statute instructs that Courts should, "in the interest of justice, give due consideration to the difficulties of proof caused by the passage of time, the death or unavailability of witnesses, the destructions of evidence or other factors not caused by [the petitioner] or those acting on their behalf." 735 ILCS 5/2-702(a). Through that lens, it is difficult to imagine what other evidence beyond sworn testimony and DNA Mr. Reyes could possibly present at this point to show his innocence. [7] He has established his innocence.

## IV.    THERE IS NO EVIDENCE OF MR. REYES'S GUILT

Now that Mr. Reyes has presented evidence of innocence, this Court must evaluate whether the State has presented evidence as a matter of law to establish the *prima facie* elements of the crimes of conviction: in this case first-degree murder as a principal, home invasion as a principal, and aggravated kidnapping as a principal. *Palmer*, 2021 IL 125621, ¶¶ 64, 72, 78 (petitioner must prove innocence of crime of conviction as specifically enumerated in indictment); *Williams*, 2017 IL App (1st) 152021, at ¶ 30 (court balancing evidence of innocence must "(1) determine as a matter of law whether the nonmovant has presented a *prima facie* case (some evidence on every element essential to the cause of action); and only after concluding that a *prima facie* case has been established, (2) consider and weigh the totality of the evidence presented, including evidence favorable to the movant"); *see* Ex. 1 (Amended Mittimus ); Ex. 2 (Counts 1, 3, 17, 23, 25). If a factfinder concludes there is not evidence on even one essential element of those crimes, it must find in favor of the side that did present evidence. *Tucker*, 12 Ill.

---

[7] Given that Mr. Reyes and Mr. Solache were falsely implicated in the crimes together, the evidence of Mr. Solache's innocence is also evidence of Mr. Reyes's innocence.

12

CCSAO COI SUBPOENAS 000017

2d at 534 (a party's evidence is legally insufficient "if, when all the evidence is considered … there is a total failure to prove one or more essential elements of the case"). In other words, if the State cannot present at least some evidence of each essential element of the crimes of Mr. Reyes's conviction, this Court must award Mr. Reyes a certificate of innocence as a matter of law.

That is exactly what must happen here. The State can point to no evidence that Mr. Reyes committed any crime whatsoever, let alone as a principal. The only evidence admitted at Mr. Reyes's underlying criminal trial to secure his conviction was the handwritten statement that he could not read, and Guevara's testimony about it; but as discussed below, that evidence may no longer be considered based on Judge Obbish's ruling. The State also points to unsworn hearsay that was never admitted in the underlying criminal proceedings—and this Court cannot consider it, either. 735 ILCS 5/2-702(f); *Palmer*, 2021 IL 125621 at ¶ 67; *see also People v. Hood*, 2021 IL App (1st) 162964, ¶ 30-32. Without that inadmissible hearsay, the only remaining evidence the State can conceivably point to does not establish the *prima facie* elements of any of the crimes of conviction. In other words, the State cannot meet the minimum threshold of showing Mr. Reyes is not innocent of the crimes of conviction such that this Court may begin weighing the evidence. Therefore, Mr. Reyes is entitled to a certificate of innocence as a matter of law.

      **A.**    **This Court Can Consider Only Sworn Testimony or Evidence that Was Admitted in Underlying Criminal Proceedings in Evaluating the State's Opposition, and Cannot Consider Suppressed Statements**

As an initial matter, the COI statute clearly spells out the evidence this Court can consider in evaluating the State's opposition: new testimony adduced during COI hearings; prior sworn testimony; and evidence admitted in the underlying criminal proceedings. 735 ILCS 5/2-

13

702(f). As applied here, this Court may consider only sworn statements and previously admitted evidence. This Court may not consider suppressed false statements or hearsay. 735 ILCS 5/2-702(f); *Palmer*, 2021 IL 125621 at ¶ 67; *Hood*, 2021 IL App (1st) 162964, ¶ 30-32 (court can consider admissible evidence or sworn testimony); *see also* Ill. R. Evid. 802.

> 1.    Law of the Case and Equitable Principles Preclude this Court from Considering the False, Coerced Statements.

The State does not appear to argue in its response to Mr. Reyes's petition that this Court should consider Mr. Reyes's or Mr. Solache's false, coerced, inculpatory statements. Nor should it. Those statements have been suppressed, and the law of the case doctrine precludes any consideration of those statements now. *People v. Patterson*, 154 Ill. 2d 414, 468–69 (1992); *People v. Tenner*, 206 Ill.2d 381, 395 (2002); Ex. 18 (Order Granting COI in *People v. Wilson,* No. 82 C 1211-02 & 88 CR 7771-01, ¶¶8-9 (Cook Cty. Dec. 18, 2020) (law of the case precludes consideration of suppressed inculpatory statements in COI proceedings)). The statute's plain language, along with equitable principles of estoppel preclude consideration of suppressed statements, as well. *See infra*, § IV(A)(2). To allow consideration of statements that a court has already concluded were the product of abuse and coercion would run afoul of the purpose of the law and implement additional procedural hurdles.

> 2.    This Court Cannot Consider Hearsay about Ms. Mejia.

In its response to Mr. Reyes's petition for a certificate of innocence, the State attaches two inadmissible documents: Ms. Mejia's handwritten statement, which is hearsay; and a write-up of an unsworn statement Mejia gave to an investigator from Jenner and Block, which is double hearsay. Neither of those statements was admitted in the underlying criminal proceedings, and they are not sworn. The State has chosen not to rely on Ms. Mejia's statements at any point during the two decades it has been litigating this case. It cannot do so now. *See Palmer*, 2021 IL

14

125621, ¶¶ 67, 74-77; *see also* 735 ILCS 5/2-702(f); *Hood*, 2021 IL App (1st) 162964, ¶ 30-32; Ill. R. Evid. 802.

The plain language of the statute, its legislative history, its placement in the code, and principles of estoppel preclude the State from relying on hearsay in these proceedings. 735 ILCS 5/2-702(f); *Palmer*, 2021 IL 125621 at ¶ 67; *see also People v. Hood*, 2021 IL App (1st) 162964, ¶ 30-32; Ill. R. Evid. 802. A court's "primary objective in construing a statute is to ascertain and give effect to the intent of the legislature, bearing in mind that the best evidence of such intent is the statutory language, given its plain and ordinary meaning." *People v. Johnson*, 2013 IL 114639, ¶ 9. Here legislators drafted a statute that gave judges the tools to make quick determinations on COI petitions based on evidence in the criminal case, and new evidence of innocence. *See* 95th Ill. Gen. Assem., House Proceedings, May 18, 2007, at 5-6 (statements of Representative Flowers (explaining that the language in the statute allowing judicial notice of prior proceedings, 735 ILCS 5/2-702(f), was placed in the statute to address concerns "that the process of petitioning for a COI would force the court to try…the original case over again")). That is, the COI statute allows Courts to take notice of evidence that already exists, and hearsay is not evidence. Ill. R. Evid. 802. Any interpretation of this statute that would require a petitioner to rebut unsworn testimony that is not admitted and inadmissible, and which lacks any indicia of reliability, would be highly prejudicial.

Indeed, if the State has not attempted to present the unsworn hearsay statement before, it is not allowed to do so now. *See Palmer*, 2021 IL 125621, ¶ 74-77 (the State may not take a position, benefit from that position, and then take a contrary position in a later proceeding). Thus, the only permissible construction of subsection (f) is one that limits the evidence this Court

CCSAO COI SUBPOENAS 000020

can consider to evidence presented to this Court, sworn testimony, and evidence admitted in the underlying proceedings.

Because the only evidence implicating Mr. Reyes in the murder—the handwritten statement he signed under duress, Guevara's testimony about that statement, and Ms. Mejia's unsworn hearsay statements—are all inadmissible and otherwise precluded from consideration in this proceeding, Mr. Reyes's petition should be granted as a matter of law.

**B.     The Only Other Evidence the State Can Possibly Try to Rely on Does Not Make a *Prima Facie* Case of Guilt of the Offenses Charged in the Indictment**

The State's response identified no sworn testimony or admitted evidence to counter the substantial evidence of innocence of factual offenses charged in the indictment. *See Palmer*, 2021 IL 125621 at ¶¶ 64, 72, 78. On that basis alone, the COI petition should be granted.

The only admissible evidence the State could conceivably rely on is the recent deposition testimony of Ms. Mejia, but that testimony does not satisfy each element of the *prima facie* case of the offenses charged in the indictment: first-degree murder as a principal for stabbing the Sotos, home invasion as a principal, and aggravated kidnapping as a principal. *Williams*, 2017 IL App (1st) 152021, ¶ 30 (Ill. 2017). To the contrary, that testimony, if anything, confirms Mr. Reyes's innocence. The only other admissible evidence or sworn statements before the Court are Mr. Reyes and Mr. Solache's repeated, sworn assertions of innocence.

1.     Any evidence discussing Mr. Reyes's alleged presence at the crime scene does not establish that he is not innocent of the factual theory of the offenses detailed in the indictment.

Neither in the State's response to the Petition, nor otherwise, has it presented evidence that Mr. Reyes is not innocent of the factual offenses charged in the indictment. As discussed *supra*, Ms. Mejia has given testimony recently about Mr. Reyes's whereabouts during the murders. Contrary to the indictment and the State's theory of the case at trial, Ms. Mejia testified

16

CCSAO COI SUBPOENAS 000021

that Mr. Reyes never stabbed Mr. or Mrs. Soto, and never had a weapon. Ex. 17 (Mejia Feb. 2021 Dep.) at 11, 56. She testified that she had never spoken with Mr. Reyes before; and that Mr. Reyes did not participate in the murders, did not know about the murders until after the fact, and did not arrive at the Soto home until after the fact. Ex. 17 (Mejia Feb. 2021 Dep.) at 11, 22, 96, 98, 112. The extent of her testimony is that Mr. Reyes was "just present," and that he was not involved in planning or participating in the crime. *Id.* at 11, 22, 24, 56, 96, 98.[8]

This comes nowhere close to satisfying the elements of the charges in the indictment. It is blackletter law that mere presence cannot satisfy the elements of any crime. *People v. Ceasar*, 231 Ill. App. 3d 54, at 56 (1992) ("mere presence at scene of crime, even with knowledge that crime is being committed, is not enough to prove participation"); *People v. Reid*, 136 Ill. 2d 27, 61 (1990) ("Mere presence of a defendant at the scene of the crime does not render him or her accountable for the offense."); *People v. Clark*, 30 Ill. 2d 67, 72 (1963) ("mere presence or negative acquiescence is not sufficient to constitute a person a principal to a crime."); *People v. Bell*, 96 Ill. App. 3d 857, 868, 421 N.E.2d 1351, 1360 (1981) (applying *Clark,* 30 Ill. 2d at 72, to kidnapping); *People v. Daniels*, 391 Ill. App. 3d 750, 794 (2009) (evidence that defendant was present inside the apartment or car where kidnapping occurred, without more, would not be evidence of principal liability). In other words, to satisfy the elements of any of the crimes of conviction would require more than testimony about mere presence. And conspicuously absent from Ms. Mejia's testimony is any claim that Reyes had any knowledge that a murder or kidnapping would be occurring, that he participated in any way, or that he had any requisite mental state. To the contrary, she acknowledges that he "arrived later," was not involved in any

---

[8] Mr. Reyes of course denies that he was present, as he has consistently testified, but that is not relevant for purposes of this motion.

17

planning, and "was innocent" of the crime. Ex. 17 (Mejia Feb. 2021 Dep.) at 11, 22, 24, 27, 96, 98, 112, 176. On this basis, the State cannot meet its burden to oppose the certificate.

Supposing this Court considers Ms. Mejia's testimony as anything other than showing Mr. Reyes's innocence, the testimony would at most, support a theory of accountability for the murder and kidnapping on which Reyes was charged. But Mr. Reyes was not charged or convicted on an accountability theory, and the State may not introduce a new theory of guilt at the COI stage. The plain language of the COI statute and principles of judicial estoppel preclude it from doing so. As the Illinois Supreme Court held unequivocally in *People v. Palmer*, the State may not oppose a certificate of innocence by arguing that a petitioner who was charged as a principal should be denied a certificate of innocence because he may have been an accomplice. 2021 IL 125621, ¶¶ 62-80.

Thus, because there is no evidence that Mr. Reyes participated in the crimes charged in the indictment, the uncontroverted evidence of innocence establishes that Mr. Reyes is entitled to a certificate of innocence as a matter of law.

> 2. To the extent this Court does consider tortured and involuntary statements, it should afford them no weight.

To the extent this Court does consider the tortured and involuntary statements from Reyes, Solache, and Mejia, it should afford them no weight. Where, as here, a petitioner's evidence is unrebutted, uncontradicted, and not inherently improbable, a court must take it as established. Ex. 19 (Order Granting COI in *Caine v. State*, 86 CR 6091(02) (March 27, 2012) (citing, amongst other cases, *Bucktown Partners v. Johnson*, 119 Ill. App. 3d 346 (1st Dist. 1983) (noting that)).

Mr. Reyes, Mr. Solache, and Ms. Mejia have consistently testified that Guevara psychologically and physically abused them until they agreed to sign false statements that they

18

had not read or did not understand. In contrast, during the post-conviction evidentiary hearing, in response to questions about whether he physically abused Mr. Reyes during his interrogation, Guevara invoked his Fifth Amendment right not to incriminate himself. Ex. 8 (S. Hearing) at 227-28. The Illinois Supreme Court explains that the Fifth Amendment allows "adverse inferences against parties in civil actions when they refuse to testify in response to probative evidence offered against them." *People v. $1,124,905 U.S. Currency & One 1988 Chevrolet Astro Van*, 177 Ill.2d 314, 332 (1997), *quoting Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976). In cases involving allegations of "improper law enforcement," "the decision of government actors to invoke their fifth amendment privilege against self-incrimination is judicially deafening." *People v. Wilson*, 2019 IL App (1st) 181486, ¶ 66.

As Judge Obbish noted in his June 29, 2016 decision granting a new motion to suppress hearing, "all accounts [of abuse and coercion] including and especially those put forth by petitioners, stood unrefuted by Det. Guevara" and therefore "it is abundantly clear that, the uncontradicted accounts of these specific interactions entailing abuse, coercion and improper influence in addition to the negative inference drawn from Det. Guevara's assertions of his 5th Amendment privilege against self-incrimination lend credence to [Mr. Reyes and Mr. Solache's] allegations of abuse and coercion." Ex. 9 (Order on Post-Conviction Petition) at 35. Judge Obbish remarked that Guevara had told "bald face lies" and that he had "eliminated any possibility of [] being considered a credible witness in any proceeding." Ex. 8 (S. Hearing) at 294, 300, 301.

This is consistent with dozens of other cases involving Guevara's rampant misconduct, including torturing innocent people into providing false confessions, *see* Pet. for COI, ¶¶ 55-61nn, 74 and attached exhibits; those in which Illinois Appellate Courts have condemned

19

Guevara's conduct, *see e.g., People v. John Martinez*, 2021 IL App (1st) 190490 at ¶¶64, 80

("The State does not dispute that Detective Guevara has a history of misconduct. Nor could

it….Detective Guevara is a malignant blight on the Chicago Police Department and the judicial

system); *People v. Serrano*, 2016 IL App (1st) 133493, generally & at ¶¶35-36; *People v.*

*Montanez*, 2016 IL App (1st) 133726, generally & at ¶¶36-37; *People v. Almodovar*, 2013 IL

App (1st) 101476; *People v. Ricardo Rodriguez*, 2021 IL App (1st) 200173, at ¶51; *People v.*

*Ariel Gomez*, 2021 IL App (1st) 192020, at ¶58, including some which the State itself does not

dispute, *see Martinez*, 2021 IL App (1st) 190490 at¶¶64; Ex. 11 (Order in *People v. Demetrius*

*Johnson*, 91 CR 19833(01)); Ex. 12 (Transcript from *People v. Munoz*, 85 CR 12403(01)) at 93,

103. It is also consistent with other exonerations in Illinois, *see also* National Registry of

Exonerations, Browse by Cases, Sort by State (Illinois)[9] (listing 373 Illinois exonerations,

including 105 where the wrongfully convicted individual falsely confessed (as of January 16,

2022)).

And while Ms. Mejia's allegations of abuse and misconduct were not challenged during

the post-conviction proceedings, the same undisputed facts and analysis regarding Guevara's

abuse and misconduct that caused Judge Obbish to suppress Mr. Solache and Mr. Reyes's

statements apply to Ms. Mejia's statement, as well. Thus, the evidence that the inculpatory

statements were coerced is unrebutted and not inherently improbable. This Court cannot afford

these statements any value. Ex. 19 (Order Granting COI in *Caine v. State*, 86 CR 6091(02)

(March 27, 2012)).

---

[9] http://www.law.umich.edu/special/exoneration/Pages/detaillist.aspx?SortField=FC&View={faf6
eddb-5a68-4f8f-8a52-2c61f5bf9ea7}&FilterField1=ST&FilterValue1=IL&SortDir=Desc (last accessed
January 16, 2022).

CCSAO COI SUBPOENAS 000025

### C.    A Preponderance of the Evidence Establishes that Mr. Reyes is Innocent

As discussed, Mr. Reyes has presented ample, unrebutted evidence of his innocence. He has presented powerful exonerating DNA evidence, evidence of an alternative perpetrator, and his own sworn testimony. *See supra*, § III. Mr. Reyes has discharged his initial burden to demonstrate innocence. In contrast, the State cannot meet the threshold of presenting admissible evidence on each prima facie element of any of the crimes of conviction. Thus, as a matter of law, Mr. Reyes satisfies subsection (g)(3) of the COI statute. 735 ILCS 5/2-702(g)(3); *Tucker*, 12 Ill. 2d at 534; *Stenger v. Swartwout*, 62 Ill. 257, 257 (1871) ("Where as to any essential element of a cause of action or defense there is no evidence at all…this court will interfere and set it aside.").

But even if this Court does consider the suppressed false confessions, or the hearsay or double hearsay statements about Ms. Mejia, there is ample evidence that these statements were coerced and false. A preponderance of the evidence analysis is a balancing test. It "requires the trier of fact to weigh the evidence presented by the parties and to find for the party who, overall, has the stronger evidence." *City of Chicago v. Ill. Workers' Comp. Com'n*, 373 Ill. App. 3d 1080, 1091 (1st. Dist. 2007). On the one side of the scale: Mr. Reyes's ample evidence of innocence, and significant evidence that Guevara engaged in a pattern and practice of coercing false confessions from innocent people, *see supra*, § IV(B)(2). On the other side of the scale: nothing other than unreliable, unsworn, inadmissible out-of-court statements that courts have determined were the product of abuse and coercion at the hands of Guevara. There can be no dispute that Mr. Reyes has shown by a preponderance of the evidence that he is innocent of the crimes charged in the indictment. 735 ILCS 5/2-702(g)(3); *Palmer*, 2021 IL 125621, at ¶¶ 64, 72, 78.

21

CCSAO COI SUBPOENAS 000026

## V.     MR. REYES SATISFIES THE OTHER STATUTORY REQUIREMENTS TO RECEIVE A CERTIFICATE OF INNOCENCE.

Mr. Reyes also satisfies the remaining statutory requirements to receive a certificate of innocence. It is undisputed that he was convicted of one or more felonies, was sentenced to a term of imprisonment, and has served all or any part of the sentence, 735 ILCS 5/2-702(g)(1). It is also undisputed that the judgment of conviction was reversed or vacated and the charges were subsequently dismissed. *Id*. § 5/2-702(g)(2)(A).

As for the final element, Judge Obbish has already concluded that Mr. Reyes was convicted based on an involuntary, coerced and fabricated confession. Mr. Reyes has vigorously maintained his innocence, pleaded not guilty, was convicted after a contested trial, and pursued other forms of relief in the years since being convicted. *See* 735 ILCS 5/2-702(g)(4). A petitioner who is beaten into falsely confessing to a crime has not voluntarily brought about his conviction. *See* Ex. 18 (Order Granting COI in *People v. Wilson,* No. 82 C 1211-02 & 88 CR 7771-01, ¶¶8-9 (Cook Cty. Dec. 18, 2020).)

### Conclusion

In conclusion, Mr. Reyes respectfully requests that this Court grant his petition for a certificate of innocence.

Respectfully Submitted,

_____
Rachel Brady
*Attorney for Arturo De Leon-Reyes*

Jon Loevy
Anand Swaminathan
Steve Art

22

CCSAO COI SUBPOENAS 000027

Rachel Brady
Sean Starr
Loevy & Loevy
311 N. Aberdeen St., 3rd floor
Chicago, IL 60607
(312) 243-5900
brady@loevy.com

*Counsel for Petitioner Arturo De Leon-Reyes*

23

CCSAO COI SUBPOENAS 000028

## <u>CERTIFICATE OF SERVICE</u>

I, Rachel Brady, an attorney, hereby certify that on this 20th day of January 2022, I

caused a copy of the foregoing MOTION FOR SUMMARY JUDGMENT ON PETITION FOR

CERTIFICATE OF INNOCENCE to be served by electronic mail and USPS mail to:

Attorney General
State of Illinois
100 W. Randolph Street
Chicago, IL 60601

Assistant State's Attorney
Cook County State's Attorney's Office
2650 S. California Avenue
Chicago, IL 60608

Dated: January 20, 2022

Respectfully Submitted,

_____

Rachel Brady
*Attorney for Arturo De Leon-Reyes*

Loevy & Loevy
311 N. Aberdeen St., 3rd floor
Chicago, IL 60607
(312) 243-5900
brady@loevy.com

CCSAO COI SUBPOENAS 000029

| | |
|---|---|
| **From:** | Valerie Barajas |
| **To:** | attorney_general@ilag.gov; CHRISTA BOWDEN (States Attorney) |
| **Cc:** | Rachel Brady; Anand Swaminathan; Sean Starr; Steve Art |
| **Subject:** | Re: De Leon-Reyes v. People of the State of Illinois, 98CR12440-02 |
| **Date:** | Wednesday, February 23, 2022 3:40:32 PM |
| **Attachments:** | Reyes COI Notice of Supp Authority Notice of Filing-FINAL -Stamped.pdf<br>COMBINED-File Stamped.pdf |

## External Message Disclaimer

This message originated from an external source. Please use proper judgment and caution when opening attachments, clicking links, or responding to this email.

Counsel:

Attached, please find a file stamped copy of Petitioner's Notice of Supplemental Authority in Support of his Motion for Summary Judgment on Petition for Summary Judgment as well as the Notice of Filing.

Sincerely,

Valerie Barajas

On Thu, Jan 20, 2022 at 4:18 PM Valerie Barajas <valerie@loevy.com> wrote:
Counsel:

Attached, please find a courtesy copy of Petitioner's Motion for Summary Judgment for Certificate of Innocence Pursuant to 735 ILCS 5/2-702 as well as the Notice of Filing. Once we receive the file stamped copy from the Clerk of the Court we will provide those to you as well.

Additionally, please use the link below to download the exhibits accompanying the brief.

If you have any trouble accessing the documents, please let us know.

https://spaces.hightail.com/receive/GQEYvoZpCj

Sincerely,

--
**Valerie Barajas**
Paralegal
Loevy & Loevy
311 N. Aberdeen, 3rd Fl
Chicago, IL 60607
(312) 243-5900
valerie@loevy.com

--

CCSAO COI SUBPOENAS 000030

**Valerie Barajas**
Paralegal
Loevy & Loevy
311 N. Aberdeen, 3rd Fl
Chicago, IL 60607
(312) 243-5900
valerie@loevy.com

CCSAO COI SUBPOENAS 000031

FILED
2/23/2022 10:57 AM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
98CR1244002
Martin, LeRoy K, Jr.
16814777

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS COUNTY DEPARTMENT, CRIMINAL DIVISION**

| | | |
|---|---|---|
| **ARTURO De LEON-REYES,** | ) | |
| | ) | |
| *Petitioner,* | ) | |
| v. | ) | **No. 98 CR 12440-02** |
| | ) | |
| **STATE OF ILLINOIS** | ) | |
| | ) | |
| *Respondent.* | ) | |

**NOTICE OF FILING**

TO:   Assistant State's Attorney Christa Bowden
      Cook County State's Attorney's Office
      2650 S. California Avenue
      Chicago, IL 60608

Please take notice that on February 23, 2022, I caused to be e-filed with the Clerk of the Circuit Court of Cook County, via Odyssey eFileIL, the attached NOTICE OF SUPPLEMENTAL AUTHOITY, a copy of which is hereby served upon you.

Dated: February 23, 2022

                                        Respectfully Submitted,

                                        /s/ Rachel Brady
                                        Rachel Brady
                                        *Attorney for Arturo De Leon-Reyes*

                                        Loevy & Loevy
                                        311 N. Aberdeen St., 3rd floor
                                        Chicago, IL 60607
                                        (312) 243-5900
                                        brady@loevy.com

CCSAO COI SUBPOENAS 000032

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CRIMINAL DIVISION**

FILED
2/23/2022 10:55 AM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
98CR1244002
Martin, LeRoy K, Jr.
16814435

|  |  |  |
|---|---|---|
| **ARTURO De LEON-REYES,** | ) | |
| | ) | |
| *Petitioner,* | ) | |
| v. | ) | **No. 98 CR 12440-02** |
| | ) | |
| **STATE OF ILLINOIS** | ) | |
| | ) | |
| *Respondent.* | ) | |

**PETITIONER'S NOTICE OF SUPPLEMENTAL AUTHORITY
IN SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT
ON PETITION FOR CERTIFICATE OF INNOCENCE**

Petitioner, ARTURO DeLEON- REYES, by his attorneys, LOEVY & LOEVY, hereby submits this Notice of Supplemental Authority in support of his motion for summary judgment on his petition for a certificate of innocence, stating as follows:

In his motion for summary judgment, Mr. Reyes cites the Illinois Supreme Court case *People v. Palmer,* 2021 IL 125621, for the following proposition: because Mr. Reyes was charged only as a principal participant in the crimes of conviction, and given the wholesale absence of any evidence implicating him as a direct participant in any crime, Mr. Reyes cannot be denied a certificate of innocence on the ground that he may have been merely present at, or an accomplice to, those crimes.

On February 22, 2022, the Second District Court of Appeals vacated and remanded an order denying a certificate of innocence based on the same application of *Palmer. People v. Liebich*, 2022 IL App (2d) 200718-U. In *Liebich*, the trial court denied Mr. Liebich a certificate of innocence, despite conclusive evidence he had not committed the crime, on the ground that he had not shown innocence of being an accomplice to the crime. The *Liebich* court reversed on

CCSAO COI SUBPOENAS 000033

FILED DATE: 2/23/2022 10:55 AM   98CR1244002

appeal, explaining that *Palmer* prohibited the trial court from denying a certificate of innocence on the ground that the petitioner, who was charged only as a principal, had not shown innocence of being an accomplice. The Second Circuit's decision in *Liebich* is attached as Exhibit A.

This Court must apply *Palmer* the same way. Mr. Reyes was charged only as a principal. The State has provided no evidence that he participated in any crime as a principal. The only evidence the State can provide on the matter is that Mr. Reyes may have been present at the crimes (which Petitioner Reyes has vehemently and consistently denied). As a matter of law, this evidence cannot support denying Mr. Reyes a certificate of innocence. According to *Palmer* and *Liebich,* this Court must grant a certificate of innocence.

Respectfully Submitted,

*/s/ Rachel Brady*
Rachel Brady
*Attorney for Arturo De Leon-Reyes*

Jon Loevy
Anand Swaminathan
Steve Art
Rachel Brady
Sean Starr
Loevy & Loevy
311 N. Aberdeen St., 3rd floor
Chicago, IL 60607
(312) 243-5900
brady@loevy.com

*Counsel for Petitioner Arturo De Leon-Reyes*

2

CCSAO COI SUBPOENAS 000034

FILED DATE: 2/23/2022 10:55 AM    98CR1244002

# EXHIBIT A

CCSAO COI SUBPOENAS 000035

FILED DATE: 2/23/2022 10:55 AM    98CR1244002

2022 IL App (2d) 200718-U
No. 2-20-0718
Order filed February 22, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Du Page County. |
| Respondent-Appellee, | ) ) | |
| v. | ) ) | No. 02-CF-654 |
| RANDY LIEBICH, | ) ) | Honorable John Kinsella, |
| Petitioner-Appellant. | ) | Judge, Presiding. |

JUSTICE HUDSON delivered the judgment of the court.
Justice Schostok concurred in the judgment.
Justice McLaren concurred in part and dissented in part.

### ORDER

¶ 1    *Held*:   As the trial court's decision was based on a case that was reversed by the supreme court, the trial court's judgment would be vacated and cause remanded to allow trial court to reconsider in light of newly announced law.

¶ 2    At issue in this appeal is whether petitioner, Randy Liebich, was entitled to a certificate of innocence. Because the trial court based is decision denying petitioner's request on case law that was subsequently reversed by our supreme court, we vacate its judgment and remand for further proceedings.

CCSAO COI SUBPOENAS 000036

2022 IL App (2d) 200718-U

¶ 3                                     I. BACKGROUND

¶ 4      As an initial matter, two appeals related to this case have previously been before this court.
The first was petitioner's direct appeal from his conviction (see *People v. Liebich*, No. 2-04-1238
(Dec. 12, 2007) (unpublished order under Illinois Supreme Court Rule 23 (eff. July 1, 1994))
(*Liebich I*)), and the second followed the denial of petitioner's postconviction petition (see *People
v. Liebich*, 2016 IL App (2d) 130894-U, ¶ 4 (*Liebich II*)).  The evidence presented at petitioner's
trial and postconviction hearing is set forth in great detail in these two earlier appeals; thus, we
will reference that evidence here only as is necessary to address the issues raised in this appeal.

¶ 5      Petitioner was convicted of first-degree murder (720 ILCS 5/9-1 (West 2002)) relating to
the death of Steven Quinn, who was two years old at the time.  Petitioner appealed, and we
affirmed.  See *Liebich*, No. 2-04-1238 (Dec. 12, 2007).  Subsequently, petitioner filed a
postconviction petition alleging, *inter alia*, that newly discovered evidence showed his innocence
and that he received ineffective assistance of counsel during his trial.  See *Liebich*, 2016 IL App
(2d) 130894-U, ¶ 4.  The majority of the petitioner's claims were dismissed during second-stage
postconviction proceedings (except for one claim—that petitioner's attorneys failed to advise him
he had a right to testify, which was denied at the third stage).  *Id.*  This court reversed the "trial
court's dismissal of [petitioner's] allegations that he received ineffective assistance of counsel with
respect to the medical issues, which includes evidence from both fact and expert witnesses" and
otherwise affirmed.  *Id.* ¶ 108.  This claim was remanded for stage-three proceedings.  *Id.*  On
remand, the trial court granted relief and vacated petitioner's conviction and sentence.  The State
declined to retry petitioner.

¶ 6      Petitioner then filed the petition for a certificate of innocence, which is at issue in this
appeal.  In it, he alleged that he was "falsely convicted of causing the death of his fiancée's young

-2-

CCSAO COI SUBPOENAS 000037

2022 IL App (2d) 200718-U

son, Steven Quinn." The sole issue in this appeal is whether petitioner proved by a preponderance of the evidence that he did not commit the offense in question here.

¶ 7     The trial court concluded that petitioner failed to carry this burden. It first stated that it had reviewed all of the evidence, including the evidence presented in petitioner's trial. Regarding the testimony of the medical providers that treated Steven, it found, "[Q]uestions that have been raised certainly draw into serious question the medically [*sic*] correctness of some of those opinions and observations and certainly in terms of timing of injuries and the nature of the injuries." However, it also found that there was "a great deal of evidence that would corroborate that this child was the victim of physical abuse and traumatic injury." The only two people that could have perpetrated the abuse were petitioner or his fiancée, Kenyatta Brown. It added that based on the evidence, it could not make a finding as to who, of the two possible perpetrators, committed the abuse. It did find, however, that petitioner "was either present for or was a participant in those acts." Relying on *People v. Palmer*, 2019 IL App (4th) 190148 (*Palmer I*) (*rev'd People v. Palmer*, 2021 IL 125621(*Palmer II*)), the trial court stated that there was a "serious issue of accountability for what happened to the child." The trial court interpreted (correctly) *Palmer I* as holding that if there is a preponderance of the evidence that a crime had been committed and that a person was accountable for the crime, that person could not be said to be actually innocent of the crime simply because the evidence indicates that the person is not the principal. It then concluded that since petitioner had not disproven the possibility that he was accountable for the offense as an accomplice, he was not entitled to a certificate of innocence. This appeal followed.

¶ 8                                    II. ANALYSIS

¶ 9     Petitioner contends that the trial court erred in denying his request for a certificate of innocence. To succeed on such a petition, a petitioner must show by a preponderance of the

-3-

CCSAO COI SUBPOENAS 000038

2022 IL App (2d) 200718-U

evidence that:

"(1) the petitioner was convicted of one or more felonies by the State of Illinois and subsequently sentenced to a term of imprisonment, and has served all or any part of the sentence;

(2)(A) the judgment of conviction was reversed or vacated, and the indictment or information dismissed or, if a new trial was ordered, either the petitioner was found not guilty at the new trial or the petitioner was not retried and the indictment or information dismissed; or (B) the statute, or application thereof, on which the indictment or information was based violated the Constitution of the United States or the State of Illinois;

(3) the petitioner is innocent of the offenses charged in the indictment or information or his or her acts or omissions charged in the indictment or information did not constitute a felony or misdemeanor against the State; and

(4) the petitioner did not by his or her own conduct voluntarily cause or bring about his or her conviction." 735 ILCS 5/2-702(g) (West 2020).

The parties agree that only the third element is at issue here. Whether to grant a certificate of innocence is a matter committed to the discretion of the trial court, so we will reverse only if no reasonable person could agree with the trial court. *People v. Hood*, 2021 IL App (1st) 162964, ¶ 23. The failure to correctly apply the law is an abuse of discretion. *Cable America, Inc. v. Pace Electronics, Inc.* 396 Ill. App. 3d 15, 24 (2009). Moreover, questions of law are reviewed using the *de novo* standard. *Id.* As always, findings of historical fact are reviewed using the manifest-weight standard. *People v. Jones*, 215 Ill. 2d 261, 268 (2005). In accordance with this standard, we will reverse only if an opposite conclusion to the trial court's is clearly apparent. *In re M.M.*, 303 Ill. App. 3d 559, 565 (1999).

-4-

CCSAO COI SUBPOENAS 000039

2022 IL App (2d) 200718-U

¶ 10    As a preliminary matter, we note that the case upon which the trial court based its decision, *Palmer I*, 2019 IL App (4th) 190148, has been reversed (at the time the trial court ruled on petitioner's request, *Palmer I* was still good law, and the trial court appropriately followed it). In *Palmer I*, the Fourth District of this appellate court held that to be entitled to a certificate of innocence, a "petitioner must prove, by a preponderance of the evidence, that he or she was neither a principal nor an accomplice in the commission of the charged offenses." *Id.* ¶ 150. The supreme court disagreed, holding that a petitioner is required to "establish his or her innocence of the offense on the factual basis *charged* in the indictment or information." (Emphasis in original.) *Palmer II*, 2021 IL 125621, ¶ 64. The court explained that a petitioner could not be "expected to have access to the evidence necessary to disprove a theory of guilt that was never charged or presented during the original criminal proceedings." *Id.* ¶ 67. Thus, the trial court's conclusion that petitioner is not entitled to a certificate of innocence because he did not prove he was not an accomplice to the charged offense no longer is tenable in light of *Palmer II*. Petitioner only needed to show by a preponderance of the evidence that he did not commit the offense charged in the indictments.

¶ 11    The State attempts to distinguish *Palmer II* by pointing to the fact that it involved potential accomplice liability for an unknown purported co-offender while in this case, all the relevant parties—petitioner and Kenyatta Brown—are known. The supreme court's chief concern was that "the record [was] devoid of any meaningful evidence or argument to assist a reviewing court in deciding whether first degree murder as an accomplice has been disproven by petitioner in this case." *Id.* ¶ 67. According to the State, there is ample evidence of record concerning the events occurring in the days leading up to the day Steven was taken to the hospital. We disagree. The question of accomplice liability was never litigated. As noted, the supreme court flatly held that a

-5-

CCSAO COI SUBPOENAS 000040

2022 IL App (2d) 200718-U

petitioner could not be expected to disprove a theory of guilt that had never been "charged or presented" at trial. *Id*. It would be mere speculation to assume that no other relevant evidence would have been presented had the State charged petitioner on an accountability theory. We find the State's attempt to distinguish *Palmer II* unpersuasive.

¶ 12    As noted, the trial court found that petitioner failed to prove he was not an accomplice to the charged offenses. Hence, the trial court's resolution of this matter is based on a case that has been overturned (though it had not been at the time the trial court ruled). Generally, a decision based on an erroneous statement of the law is an abuse of discretion. *Cable America, Inc.*, 396 Ill. App. 3d at 24. Here, the trial court's decision rests on law that is no longer sound. Accordingly, it is an abuse of discretion—albeit through no fault of the trial court—and is therefore error. See *In re Marriage of Ackerley*, 333 Ill. App. 3d 382, 392 (2002) (holding that we review the result at which the trial court arrived rather than its reasoning).

¶ 13    At oral argument, the State asserted that the trial court reliance on *Palmer I* was harmless because the trial court also found that petitioner failed to carry his burden of proving his innocence irrespective of the accountability theory. We disagree. The chief evidence of petitioner's guilt was the testimony of the physicians' who treated the victim, which was given during petitioner's original trial. Initially, we note that there would have been no need for the trial court to advance its accountability theory had it found that petitioner failed to prove that he was innocent of the offenses charged in the indictment. Moreover, the trial court observations about the inculpatory testimony of the treating physicians indicates that it found this testimony to be of dubious value:

> "And the questions that have been raised certainly draw into serious question the medically [*sic*] correctness of some of those opinions and observations and certainly in terms of timing of injuries and the nature of the injuries."

-6-

CCSAO COI SUBPOENAS 000041

2022 IL App (2d) 200718-U

Similarly, in discussing its accountability theory, the trial court stated that it did not "think it could make * * * a finding" as to who the principal was (*i.e.*, it could not find that petitioner was the principal). In short, we see nothing in the trial court's ruling to support the State's contention that the trial court found petitioner had failed to carry his burden of proof as it pertained to the crimes that were actually charged in the indictments. That is, we cannot say that the trial court's reliance on *Palmer I* was harmless.

¶ 14    Nevertheless, the trial court also did not *explicitly* find that petitioner carried his burden with respect to proving his innocence. Hence, we deem it prudent to allow the trial court to directly address this issue and set forth a new ruling consistent with current law. Accordingly, we vacate its judgment and remand to allow it to do so.

¶ 15    Vacated and remanded, with directions.

¶ 16    JUSTICE McLAREN, concurring in part and dissenting in part:

¶ 17    I concur with the majority that the trial court's judgment was unknowing prejudicial error. I dissent because I believe we should reverse and enter an order per Supreme Court Rule 366(a)(5) (eff. Feb. 1, 1994) certifying petitioner's innocence. See Rule 366(a)(5) ("the reviewing court may, in its discretion, and on such terms as it deems just *** enter any judgment and make any order that ought to have been given or made, and make any other and further orders and grant any relief, including a remandment, a partial reversal, the order of a partial new trial, the entry of a remittitur, or the enforcement of a judgment, that the case may require").

¶ 18    The majority holds that a remand is appropriate because the law changed subsequent to the entry of judgment, explaining its reason for remand as follows: "Nevertheless, the trial court also did not *explicitly* find that petitioner carried his burden with respect to proving his innocence. Hence, we deem it prudent to allow the trial court to directly address this issue and set forth a new

-7-

CCSAO COI SUBPOENAS 000042

2022 IL App (2d) 200718-U

ruling consistent with current law. Accordingly, we vacate its judgment and remand to allow it to do so." *Supra* ¶ 14. By issuing a remand, however, the majority sidesteps important aspects of the case, namely, whether a reasonable and logical interpretation of the court's findings indicate that a remand is unnecessary. If petitioner failed to prove a *prima facie* case, namely, that he did not cause the injury that resulted in death, the court would have had no need to address accountability, as explained in the next paragraph.

¶ 19    Curiously, the majority acknowledges the trial court's implicit finding that petitioner proved he did not cause the injury resulting in death in that he showed the charges against him were unsustainable. *Supra* ¶ 13. I submit that the trial court said enough to conclude that it would have granted the petition if it applied the tenets of *Palmer II*. In order to understand how clear, despite not being explicit, the trial court's ruling was, one need only comprehend the nonsense of requiring an explicit statement. In the law there is a distinction between being the perpetrator and directly responsible and those individuals who are accountable because they aided and abetted the perpetrator. Like similar legal relationships of master and servant, or principal and agent, the perpetrator and aider and abettor relationship involves more than one person, each in a singular capacity. Put another way, the perpetrator *cannot* be guilty of aiding and abetting himself or herself. The trial court could neither legally nor logically find that petitioner was both the perpetrator and the aider and abettor. It follows that the two concepts of guilt are mutually exclusive and one cannot be guilty through accountability while simultaneously being guilty as the perpetrator. The trial court, by finding petitioner accountable effectively determined he was not the perpetrator of the crimes charged.

¶ 20    There is nothing to be gained by having the trial court not only explain that the defendant was innocent because he proved he was not the cause of the injury and also either recant its

-8-

CCSAO COI SUBPOENAS 000043

2022 IL App (2d) 200718-U

determination that petitioner is accountable or rationalize its ruling that mutually exclusive legal conclusions can exist simultaneously. I submit such clarity and specificity is immaterial under *Palmer II*.

¶ 21    The record reflects that petitioner has met his burden of proof under the manifest weight of the evidence standard, and, as a matter of law, no reasonable person would deny him relief under the holding of *Palmer II*. I submit that, though unacknowledged, the trial court did in fact find that petitioner sustained his burden as to the crime charged but then went beyond the holding in *Palmer II* and considered another crime, accountability, that petitioner was not charged with and did not have to address, let alone disprove. The fact that the court went beyond the purview of *Palmer II* does not affect the logic that it determined that petitioner was not the perpetrator.

¶ 22    To require a remand for the court to *explicitly* state the only rational conclusion to be drawn has some intuitive appeal. Nevertheless, it is a *fait accompli* and a total waste of time and effort. Accordingly, I dissent from the majority's decision to remand the case and would, instead, enter an order pursuant to Rule 366(a)(5) granting petitioner relief and putting the matter to rest.

-9-

CCSAO COI SUBPOENAS 000044

FILED DATE: 2/23/2022 10:55 AM 98CR1244002

## CERTIFICATE OF SERVICE

I, Rachel Brady, an attorney, hereby certify that on February 23, 2022, I caused a copy of

the foregoing NOTICE OF SUPPLEMENTAL AUTHOITY to be served by electronic mail and

USPS mail to:

Assistant State's Attorney Christa Bowden
Cook County State's Attorney's Office
2650 S. California Avenue
Chicago, IL 60608

Dated: February 23, 2022

Respectfully Submitted,

/s/ Rachel Brady
Rachel Brady
*Attorney for Arturo De Leon-Reyes*

Loevy & Loevy
311 N. Aberdeen St., 3rd floor
Chicago, IL 60607
(312) 243-5900
brady@loevy.com

CCSAO COI SUBPOENAS 000045

From: CHRISTA BOWDEN (States Attorney)
To: Anand Swaminathan
Subject: Reyes Motion 3-2-2022
Date: Tuesday, March 1, 2022 10:17:05 AM
Attachments: MET summary judgement.pdf

I have attached the Motion for tomorrow. I will also efile it on Odyessy.

Christa Bowden
Assistant State's Attorney
2650 South California Avenue
Special Litigation, 12C42
Chicago, Illinois 60608
(773)674-7537
christa.bowden@cookcountyil.gov

The information contained in this electronic message may be confidential and may be subject to the attorney-client privilege and/or the attorney work product doctrine. It is intended only for the use of the individual or entity to whom it is addressed. If you are not the intended recipient, you are hereby notified that any use, dissemination or copying of this communication is strictly prohibited. If you have received this electronic message in error, please delete the original message from your e-mail system. Thank you.

CCSAO COI SUBPOENAS 000046

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**

PEOPLE OF THE STATE OF ILLINOIS,    )
            Plaintiff,        )
            vs.               )    No. 98CR12440-02
                         )    Honorable Sophia Atcherson
ARTURO DeLEON REYES,       )    Judge Presiding
          Defendant.       )

<u>NOTICE OF UNOPPOSED MOTION</u>

TO:   Jon Loevy
       Anand Swaminathan
       Steven Art
       Sean Starr Rachel Brady
       Loevy & Loevy
       311 N. Aberdeen St., 3rd floor
       Chicago, IL 60607
       (312) 243-5900
       anand@loevy.com

PLEASE TAKE NOTICE that on March 2, 2021, at 9:30 a.m., or as soon as they can be heard, the undersigned will appear before the Honorable Sophia Atcherson, in Room 205, at the Criminal Courts Building, 2651 N. California Ave., Chicago, IL, via zoom, and present the Unopposed Motion for an Extension of Time to File Objection to Motion for Summary Judgement on Petition for Certificate of Innocence, a copy of which is attached hereto and is hereby served upon you.

                              Respectfully submitted,

                              Kimberly M. Foxx
                              Cook County State's Attorney

        By:   /s/ *Christa Bowden*
                   Assistant State's Attorney
                   christa.bowden@cookcountyil.gov

## CERTIFICATE OF SERVICE

The undersigned, an attorney, certifies that on March 1, 2022, she caused a copy of the foregoing Notice of Motion and Motion to be served by email on:

Anand Swaminathan
anand@loevy.com

/s/ *Christa Bowden*
Assistant State's Attorney
christa.bowden@cookcountyil.gov

CCSAO COI SUBPOENAS 000048

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**

PEOPLE OF THE STATE OF ILLINOIS, )
        Plaintiff, )
        vs. )      No. 98CR12440-02
        )      Honorable Sophia Atcherson
ARTURO DeLEON REYES, )      Judge Presiding
        Defendant. )

**UNOPPOSED MOTION FOR AN EXTENSION OF TIME TO FILE OBJECTION TO MOTION FOR SUMMARY JUDGEMENT ON PETITION FOR CERTIFICATE OF INNOCENCE**

The People of the State of Illinois, by their Attorney, KIMBERLY M. FOXX, State's Attorney of Cook County, Illinois, through Christa Bowden, Assistant State's Attorney, ask this Honorable Court for an extension of time, to and including March 17, 2022, for the filing of their Objection to Petitioner's Motion for Summary Judgement on his Petition for a Certificate of Innocence. The People state the following in support of their Motion.

1. On December 3, 2021, The Honorable Judge Thaddeus Wilson set a "briefing" schedule for Petitioner's Motion for Summary Judgement.

2. The People were directed to file their Objection to Petitioner's Motion (filed on January 20, 2022) on March 4, 2022. Petitioner's response if any was to be filed March 17, 2022, and arguments heard April 4, 2022.

3. The People need additional time to research the issues in this matter, and to prepare and file their Objection.

4. Accordingly, The People request an extension to March 17, 2022, to file their Objection to Petitioner's Motion for Summary Judgment and an appropriate adjustment to the remainder of the "briefing" schedule.

5. Counsel for the parties conferred by email and counsel for Mr. DeLeon Reyes does not oppose The People's request for an extension of time.

THEREFORE, the People of the State of Illinois respectfully request an extension of time to file their Objection to the Motion for Summary Judgement.

CCSAO COI SUBPOENAS 000049

Respectfully submitted,

Kimberly M. Foxx
Cook County State's Attorney

By:    /s/ *Christa Bowden*
Assistant State's Attorney
christa.bowden@cookcountyil.gov

CCSAO COI SUBPOENAS 000050

| | |
|---|---|
| **From:** | CHRISTA BOWDEN (States Attorney) |
| **To:** | Sophia Atcherson (Judiciary) |
| **Cc:** | Anand Swaminathan; Jan Susler |
| **Subject:** | Arturo Reyes/Gabriel Solache COI |
| **Date:** | Wednesday, March 2, 2022 10:14:05 AM |

Good morning Judge, the next scheduled date for the arguments on the Reyes Motion for Summary Judgement is 4-14-22.

Christa Bowden
Assistant State's Attorney
2650 South California Avenue
Special Litigation, 12C42
Chicago, Illinois 60608
(773)674-7537
christa.bowden@cookcountyil.gov

The information contained in this electronic message may be confidential and may be subject to the attorney-client privilege and/or the attorney work product doctrine. It is intended only for the use of the individual or entity to whom it is addressed. If you are not the intended recipient, you are hereby notified that any use, dissemination or copying of this communication is strictly prohibited. If you have received this electronic message in error, please delete the original message from your e-mail system. Thank you.

CCSAO COI SUBPOENAS 000051

| From: | CHRISTA BOWDEN (States Attorney) |
|---|---|
| To: | Sophia Atcherson (Judiciary) |
| Cc: | Anand Swaminathan |
| Subject: | People"s Response to Motion for Summary Judgement |
| Date: | Thursday, March 17, 2022 7:23:03 PM |
| Attachments: | People"s Response MSJ.pdf |

Please be advised that I have efiled the attached Response to Petitoner's Motion for Summary Judgement on today's date. The next scheduled court date is 4/14. I will have the exhibits put on a disc for the court file and will share a digital file in a separate email.

Have a good evening,

Christa Bowden
Assistant State's Attorney
2650 South California Avenue
Special Litigation, 12C42
Chicago, Illinois 60608
(773)674-7537
christa.bowden@cookcountyil.gov

The information contained in this electronic message may be confidential and may be subject to the attorney-client privilege and/or the attorney work product doctrine. It is intended only for the use of the individual or entity to whom it is addressed. If you are not the intended recipient, you are hereby notified that any use, dissemination or copying of this communication is strictly prohibited. If you have received this electronic message in error, please delete the original message from your e-mail system. Thank you.

CCSAO COI SUBPOENAS 000052

**IN THE CIRCUIT COURT OF COOK COUNTY**
**COUNTY DEPARTMENT-CRIMINAL DIVISION**

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| | ) | |
| Respondent | ) | CASE NO. 98CR12440-02 |
| | ) | HONORABLE |
| VS | ) | Sophia Atcherson |
| | ) | Judge Presiding |
| Arturo Deleon-Reyes, | ) | |
| Petitioner | | |

TO:    Anand Swaminathan
        Loevy & Loevy
        311 N Aberdeen St, 3rdFl
        Chicago, IL 60607
        anand@loevy.com

## NOTICE OF FILING

PLEASE TAKE NOTICE that on March 17, 2022, I filed the attached People's Response to Petitioner's Motion for Summary Judgment by efiling a copy with the Clerk of the Circuit Court. The matter is set before the Honorable Sophia Atcherson on April 14, 2022, at 9:30 a.m. in courtroom 205.

/S/ *Christa Bowden*
Assistant State's Attorney
2650 S. California, Room 12C42
Chicago, Illinois 60608
(773) 674-7537
christa.bowden@cookcountyil.gov

## PROOF OF SERVICE BY MAIL

I hereby certify that I have served a copy of this notice to the above addressee by Odyssey/efile and email.

/S/ *Christa Bowden*
Assistant State's Attorney

CCSAO COI SUBPOENAS 000053

**IN THE CIRCUIT COURT OF COOK COUNTY**
**COUNTY DEPARTMENT-CRIMINAL DIVISION**

| | | |
|---|---|---|
| **PEOPLE OF THE STATE OF ILLINOIS,** | ) | |
| **Respondent** | ) | |
| | ) | **CASE NO. 98CR12440-02** |
| **VS** | ) | **HONORABLE** |
| | ) | **Sophia Atcherson** |
| **Arturo Deleon-Reyes,** | ) | **Judge Presiding** |
| **Petitioner** | ) | |

**PEOPLE'S RESPONSE TO PETITIONER'S**
**MOTION FOR SUMMARY JUDGMENT**

NOW comes Kimberly M. Foxx, State's Attorney of Cook County, Illinois, through her assistant Christa Bowden, and respectfully ask this Honorable Court to deny petitioner's motion for summary judgment. In further support, the People state as follows:

The matter is before the Court on Arturo Deleon- Reyes'(Reyes) Petition for Certificate of Innocence (COI). Petitioner seeks summary judgment on his COI. Petitioner argues that there is no genuine issue of material fact because "[t]he State cannot meet the threshold of presenting admissible evidence on each prima facie element of any of the crimes of conviction." Motion, Section IV. C. This is not the legal standard of summary judgment.

Petitioner's motion for summary judgment falls short along many avenues. 1) Petitioner's motion for summary judgment is untimely. 2) Petitioner conflates the State's burden here with that in a criminal trial. 3) There are significant disputes between the parties concerning fact, admissibility of evidence, and inferences to be drawn from evidence. 4) Petitioner's case is not analogous to *People v. Palmer,* 2021 IL 125621.

1) Petitioner's motion for summary judgment is untimely. On December 3, 2021, Judge Thaddeus Wilson ordered petitioner to provide the State with "copies deposition transcripts when

CCSAO COI SUBPOENAS 000054

available." (Ex. 1 Court Sheet). To date the State has not received any depositions from petitioner other than those provided as part of petitioner's pleadings. The State has expressed to counsel for petitioner and the Court that the currently assigned assistant state's attorney anticipated filing additional pleadings to supplement those filed by her predecessor.

2) Petitioner conflates the State's burden here with that in a criminal trial. The State has no burden in a Certificate of Innocence. Petitioner's conviction has been vacated and the charges dismissed. Petitioner bears the burden of proving to the Court that he has met the conditions set forth in 735 ILCS 5/2-702(g)(1)-(g)(4).[1] This is the standard whether or not the State intervenes. *People v. Hood,* 220 IL App (1st) 162964,

> (1) [he] was convicted of one or more felonies by the State of Illinois and subsequently sentenced to a term of imprisonment, and has served all or any part of the sentence;
>
> (2) (A) the judgment of conviction was reversed or vacated, and the indictment or information dismissed or, if a new trial was ordered, either the petitioner was found not guilty at the new trial or the petitioner was not retried and the indictment or information dismissed; or (B) the statute, or application thereof, on which the indictment or information was based violated the Constitution of the United States or the State of Illinois;
>
> **(3)** [he] is innocent of the offenses charged in the indictment or information or his or her acts or omissions charged in the indictment or information did not constitute a felony or misdemeanor against the State; and
>
> **(4)** the petitioner did not by his or her own conduct voluntarily cause or bring about his or her conviction.

735 ILCS 5/2-702(g) (West 2021).

Petitioner contends that on a motion for summary judgment on a petition for a COI, once petitioner has presented a prima facie case on each of the four elements of the COI statute the burden becomes the State's to "establish the *prima facie* elements of the crimes of conviction…"

---

[1] The State concedes and does not dispute that petitioner has met his burden regarding sections (g)(1), (2) and (4), but vigorously contests the assertion that he has met his burden with regard to section (g)(3).

CCSAO COI SUBPOENAS 000055

2

(Motion, section II). This is an improper interpretation of both the law governing summary judgment as well as the law governing COIs. The State has no obligation to prove any elements of the crimes for which petitioner was originally convicted. It is petitioner that must show by a preponderance of the evidence that he can meet his burden to prove the four elements set forth in 2-702. The issue is not one of guilt but rather innocence, if the State could provide evidence on the elements of the crimes for which petitioner was convicted, he would be guilty.

Petitioner cites to *People v. Williams,* 2017 IL App (1st) 152021, to support his position. The issues decided in *Williams* arose from the State's motion for directed finding pursuant to 735 ILCS 5/2-1110, after defendant presented his case in a third stage post-conviction hearing. *Id* at ₱27-31. *Williams* was a post-conviction matter, which has its own statutory evidentiary rules and is not a COI. Petitioner, in the instant case, has requested this court grant a motion for summary judgment on a COI prior to any hearing on the merits, presumably pursuant to 735 ILCS 5/1005 summary judgments, although a statutory citation is not made in petitioner's motion.

The standard for summary judgment in civil actions is set forth by the Illinois Supreme Court in *Beamen v. Freesmeyer,* 2021 IL 12567. "Summary judgment is proper when the "pleadings, depositions, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *735 ILCS 5/2-1005©* (West 2016). Summary judgment is a drastic means of disposing of litigation and should be allowed only when the right of the moving party is clear and free from doubt. Where a reasonable person could draw divergent inferences from the undisputed material facts or where there is a dispute as to a material fact, summary judgment should be denied and the issue decided by the trier of fact. In ruling on a motion for summary judgment, we must construe the pleadings, depositions, admissions and affidavits strictly against the movant and

CCSAO COI SUBPOENAS 000056

3

liberally in favor of the nonmoving party." *Beamen v. Freesmeyer,* 2021 IL 12567, ⁋71 (internal citations omitted).

The intent of the statute is clear from its language. The statute does not contemplate that a COI should be granted because, for example, a criminal defendant's constitutional rights were violated. Rather, the plain language makes clear that a COI should issue only when a petitioner can meet his burden of proving that he is "innocent of all offenses charged in the indictment or information." *See* 735 ILCS 5/2-702 (g)(3). To that end, this Court has consistently held that the term "innocent" is to be given its common understanding. As such, the fact that a petitioner was acquitted will not suffice. As this Court has long held, "the plain language of Section 2-702 shows the legislature's intent to distinguish between a finding of not guilty at retrial and actual innocence of the charged offense." *People v. Fields*, 2011 IL App (1st) 100169, ¶ 19.

3) There are significant disputes between the parties, concerning facts, admissibility of evidence, and inferences to be drawn from evidence and facts. Petitioner cites 27 "undisputed facts." (Motion, section I). The State disputes many of these enumerated "undisputed facts," a large number of which contain commentary and argument; and responds to each as follows:

> 1. Disputed. The State asserts petitioner was charged on a theory of legal responsibility with the offenses in the indictment for which was convicted. The charging documents for counts 1,3,17,23 and 25 list the three offenders, Adriana Mejia, petitioner and Gabriel Solache by name and alias and charge that "**They**, without lawful justification intentionally or knowingly" committed the offenses of first degree murder of Jacinta Soto and Mariano Soto and the home invasion of the Soto family home and the aggravated kidnappings of Santiago Soto and Maria Soto. (pet. Ex. 2). The jury instructions given at trial included the language of legal responsibility and legal responsibility was argued by the trial lawyers to the jury. (Ex. 2, jury instruction transcript, Ex. 3 transcript closing arguments). It is agreed that petitioner's convictions were vacated.

> 2. Agreed

3. Agreed

4. Agreed, petitioner has denied participation in the crimes, and alleged coercion by former detective Guevara caused him to sign an inculpatory statement in all of his testimony.

5. Agreed, petitioner has denied participation in the crimes, and alleged coercion by Mr. Guevara caused him to sign an inculpatory statement, in all of his testimony.

6. Agreed, Gabriel Solache has made similar allegations of coercion by Mr. Guevara and testified to the same.

7. Disputed. During the trial, evidence was received regarding multiple notes and notations in petitioner's pockets and personal calendar, which contained the name of the fictional parent of the kidnapped children, as well as general evidence regarding petitioner's living arrangements and relationships with his co-defendants. The sum of the testimony from the various witnesses at trial support his lack of innocence of the crimes for which he was convicted.

8. Petitioner's statements were suppressed. Their falsity is not conceded.

9. Agreed

10. Agreed

11. Agreed

12. Agreed

13. Petitioner's judgment of conviction was vacated; the State did dismiss all charges and petitioner was released from prison. The falsity of the confession is not conceded.

14. Agreed

15. The admissibility of this item is disputed.

16. The admissibility of this item is disputed.

CCSAO COI SUBPOENAS 000058

17. Agreed, however, petitioner's emphasis on the lack of his DNA on evidence recovered from the crime scene is misleading. Jacinta Soto's DNA was also not found on any of the evidence recovered from the crime scene, despite her stabbing death. This would favor the argument that the presence of a suspect's DNA would be indicative of guilt, but the reverse is not necessarily true.

18. Ms. Mejia has asserted that she was physically abused by Mr. Guevara. It is disputed that her statements implicating petitioner and Solache were false.

19. Agreed

20. Evidence was presented at trial that there was unidentified DNA in some of the evidence recovered during the investigation.

21. Petitioner has been excluded as a contributor to the DNA **recovered** at the crime scene. Petitioner's emphasis on the lack of his DNA on evidence recovered from the crime scene is misleading. Jacinta Soto's DNA was also not found on any of the evidence recovered from the crime scene despite her stabbing death. The presence of a suspect's DNA would be indicative of guilt, but the reverse is not necessarily true.

22. Dispute, see 7.

23. Dispute, many witnesses have been deposed in this case (some of whom are unknown to the State at this time and until petitioner complies with Judge Wilson's order to provide the depositions to the State). Known deponents include petitioner and Adriana Mejia, Guadalupe Mejia, ASA Healther Brualdi and former ASA Thomas O'Malley.

24/25/26/27. Dispute. The State disputes the inferential value of the limited selection of blurbs from hundred of pages of deposition testimony. Throughout her various depositions Adriana Mejia describe the actions of petitioner during the course of the crimes. For example, that she was told by Solache in petitioner's presence that petitioner was present to help get the baby. Mejia describes petitioner's actions waiting with her in the car until getting the signal to enter the Soto home. (Ex. 4 Mejia dep. 2-4-21).

The State submits additional documentation (Ex. 1-17) in addition to that already in in the record and anticipates the presentation of depositions that have been taken in the associated federal civil matter that have not yet been made available or have yet to be completed. The State asserts that a full consideration of the record in conjunction with additionally submitted exhibits

CCSAO COI SUBPOENAS 000059

6

sufficiently rebuts petitioner's assertion of innocence. For a COI to be granted petitioner must prove his innocence not merely that he is not guilty. *People v.* Fields, 2011 IL App (1st) 100169 at par. 19.

4) Petitioner's case is not analogous to *People v. Palmer,* 2021 IL 125621. Petitioner asserts that he was not convicted on an "accountability theory," and pursuant to *Palmer,* the State is constrained from arguing "accountability" in the COI. This is a false premise. Petitioner was in fact convicted on a theory of his accountability for the crimes of his co-defendants. The indictment, the jury instructions as evidenced by the decisions made at the instruction conference and the closing arguments at trial all reference the concept of legal responsibility or "accountability." (pet. Ex. 2, States Ex. 2, 3).

The State's assertion that petitioner cannot meet the burden of proving his innocence by a preponderance of the evidence, specifically as to section 735 ILCS 5/2-702(g)(4) is supported when the cumulative testimony of the witnesses at trial and the more recent depositions including that of petitioner when viewed as a whole and not in individual blurbs. Petitioner has not shown that there are no disputes as to material facts, that there are no disputes as to the admissibility of tendered exhibits, that a reasonable person could not draw divergent inferences from the evidence received.

WHEREFORE, the People respectfully request that the motion for summary judgment be denied.

Respectfully submitted,

KIMBERLY M. FOXX

CCSAO COI SUBPOENAS 000060

7

State's Attorney of Cook County

BY:

/s/ Christa Bowden
Assistant State's Attorney
2650 S. California, Room 12 C 42
Chicago, IL  60608
(773) 674-7537
christa.bowden@cookcountyil.gov

CCSAO COI SUBPOENAS 000061

**From:** CHRISTA BOWDEN (States Attorney)
**To:** Sophia Atcherson (Judiciary); anand@loevy.com
**Subject:** CHRISTA BOWDEN (States Attorney) shared the folder "exhibits" with you.
**Date:** Thursday, March 17, 2022 7:28:06 PM
**Attachments:** AttachedImage
AttachedImage
AttachedImage
AttachedImage

# CHRISTA BOWDEN (States Attorney)
## shared a folder with you

Please find attached a link to the digital file containing the exhibits for the People's Response to Motion for Summary Judgment, in the matter of Arturo Reyes 98CR12440-02. If you have any difficulty accessing the file, please contact me.

ASA Christa Bowden

📁 exhibits

This link only works for the direct recipients of this message.

**Open**

■■ Microsoft

Privacy Statement

CCSAO COI SUBPOENAS 000062

| | |
|---|---|
| **From:** | CHRISTA BOWDEN (States Attorney) |
| **To:** | Rachel Brady |
| **Subject:** | Re: Notification of Service for Case: 98CR1244002, People of the State of Illinois vs. ARTURO D REYES for filing Response to Defendant"s Motion, Envelope Number: 17137360 |
| **Date:** | Tuesday, March 22, 2022 2:13:27 PM |

Great, thanks for confirming!

Christa Bowden
Assistant State's Attorney
2650 South California Avenue
Special Litigation, 12C42
Chicago, Illinois 60608
(773)674-7537
christa.bowden@cookcountyil.gov

The information contained in this electronic message may be confidential and may be subject to the attorney-client privilege and/or the attorney work product doctrine. It is intended only for the use of the individual or entity to whom it is addressed. If you are not the intended recipient, you are hereby notified that any use, dissemination or copying of this communication is strictly prohibited. If you have received this electronic message in error, please delete the original message from your e-mail system. Thank you.

**From:** Rachel Brady <brady@loevy.com>

**Sent:** Tuesday, March 22, 2022 2:12 PM

**To:** CHRISTA BOWDEN (States Attorney) <christa.bowden@cookcountyil.gov>

**Subject:** Re: Notification of Service for Case: 98CR1244002, People of the State of Illinois vs. ARTURO D REYES for filing Response to Defendant's Motion, Envelope Number: 17137360

**External Message Disclaimer**
This message originated from an external source. Please use proper judgment and caution when opening attachments, clicking links, or responding to this email.

Yes, got it. Thank you!

On Tue, Mar 22, 2022 at 2:10 PM CHRISTA BOWDEN (States Attorney) <christa.bowden@cookcountyil.gov> wrote:

I have sent a link, please let me know if you have received it and are able to access the documents.

Christa Bowden
Assistant State's Attorney
2650 South California Avenue
Special Litigation, 12C42
Chicago, Illinois 60608
(773)674-7537
christa.bowden@cookcountyil.gov

The information contained in this electronic message may be confidential and may be subject to the attorney-client privilege and/or the attorney work product doctrine. It is intended only for the use of the individual or entity to whom it is addressed. If you are not the intended recipient, you are hereby notified that any use, dissemination or copying of this communication is strictly prohibited. If you have received this electronic message in error, please delete the original message from your e-mail system. Thank you.

CCSAO COI SUBPOENAS 000063

**From:** Rachel Brady <brady@loevy.com>
**Sent:** Tuesday, March 22, 2022 2:03 PM
**To:** CHRISTA BOWDEN (States Attorney) <christa.bowden@cookcountyil.gov>
**Cc:** Anand Swaminathan <anand@loevy.com>; Valerie Barajas <valerie@loevy.com>
**Subject:** Re: Notification of Service for Case: 98CR1244002, People of the State of Illinois vs. ARTURO D REYES for filing Response to Defendant's Motion, Envelope Number: 17137360

**External Message Disclaimer**
This message originated from an external source. Please use proper judgment and caution when opening attachments, clicking links, or responding to this email.

Christa,

This response refers to 17 exhibits, but I do not see them attached to this filing. Can you please send them to us?

Thanks,
Rachel

On Fri, Mar 18, 2022 at 9:53 AM <no-reply@efilingmail.tylertech.cloud> wrote:

# Notification of Service

Case Number: 98CR1244002
Case Style: People of the State of Illinois vs.
ARTURO D REYES
Envelope Number: 17137360

This is a notification of service for the filing listed. Please click the link below to retrieve the submitted document.

| Filing Details | |
|---|---|
| **Case Number** | 98CR1244002 |
| **Case Style** | People of the State of Illinois vs. ARTURO D REYES |
| **Date/Time Submitted** | 3/17/2022 7:16 PM CST |
| **Activity Requested** | Response to Defendant's Motion |
| **Filing Description** | People's Response to Motion for Summary Judgment |
| **Filed By** | Christa Bowden |
| **Service Contacts** | ARTURO D REYES: <br><br> Rachel Brady (brady@loevy.com) |
| **Hearing Date** | No hearing scheduled |
| **Court Room Number** | No hearing scheduled |
| **Court Address** | No hearing scheduled |

CCSAO COI SUBPOENAS 000064

| Document Details | |
|---|---|
| **Served Document** | Download Document |
| This link is active for 45 days. | |

If the link above is not accessible, copy this URL into your browser's address bar to view the document:
https://illinois.tylerhost.net/ViewServiceDocuments.aspx?ADMIN=0&SID=650745a1-f589-4f91-9414-968b7cf12194


--
Rachel Brady
Loevy & Loevy
311 N. Aberdeen St., 3rd Floor
Chicago, IL 60607
312.243.5900
brady@loevy.com
she/her


--
Rachel Brady
Loevy & Loevy
311 N. Aberdeen St., 3rd Floor
Chicago, IL 60607
312.243.5900
brady@loevy.com
she/her

CCSAO COI SUBPOENAS 000065

| | |
|---|---|
| **From:** | CHRISTA BOWDEN (States Attorney) |
| **To:** | Rachel Brady |
| **Cc:** | Anand Swaminathan; Valerie Barajas |
| **Subject:** | Re: Notification of Service for Case: 98CR1244002, People of the State of Illinois vs. ARTURO D REYES for filing Response to Defendant's Motion, Envelope Number: 17137360 |
| **Date:** | Tuesday, March 22, 2022 2:06:24 PM |

I sent a link to Anand when I filed. I can send one to you as well .

Christa Bowden
Assistant State's Attorney
2650 South California Avenue
Special Litigation, 12C42
Chicago, Illinois 60608
(773)674-7537
christa.bowden@cookcountyil.gov

The information contained in this electronic message may be confidential and may be subject to the attorney-client privilege and/or the attorney work product doctrine. It is intended only for the use of the individual or entity to whom it is addressed. If you are not the intended recipient, you are hereby notified that any use, dissemination or copying of this communication is strictly prohibited. If you have received this electronic message in error, please delete the original message from your e-mail system. Thank you.

**From:** Rachel Brady <brady@loevy.com>
**Sent:** Tuesday, March 22, 2022 2:03 PM
**To:** CHRISTA BOWDEN (States Attorney) <christa.bowden@cookcountyil.gov>
**Cc:** Anand Swaminathan <anand@loevy.com>; Valerie Barajas <valerie@loevy.com>
**Subject:** Re: Notification of Service for Case: 98CR1244002, People of the State of Illinois vs. ARTURO D REYES for filing Response to Defendant's Motion, Envelope Number: 17137360

<div style="background-color: #FFE600; padding: 10px;">

**External Message Disclaimer**
This message originated from an external source. Please use proper judgment and caution when opening attachments, clicking links, or responding to this email.

</div>

Christa,

This response refers to 17 exhibits, but I do not see them attached to this filing. Can you please send them to us?

Thanks,
Rachel

On Fri, Mar 18, 2022 at 9:53 AM <no-reply@efilingmail.tylertech.cloud> wrote:

# Notification of Service

■

Case Number: 98CR1244002
Case Style: People of the State of Illinois vs.
ARTURO D REYES
Envelope Number: 17137360

This is a notification of service for the filing listed. Please click the link below to retrieve the

CCSAO COI SUBPOENAS 000066

submitted document.

| Filing Details | |
|---|---|
| **Case Number** | 98CR1244002 |
| **Case Style** | People of the State of Illinois vs. ARTURO D REYES |
| **Date/Time Submitted** | 3/17/2022 7:16 PM CST |
| **Activity Requested** | Response to Defendant's Motion |
| **Filing Description** | People's Response to Motion for Summary Judgment |
| **Filed By** | Christa Bowden |
| **Service Contacts** | ARTURO D REYES:<br><br>Rachel Brady (brady@loevy.com) |
| **Hearing Date** | No hearing scheduled |
| **Court Room Number** | No hearing scheduled |
| **Court Address** | No hearing scheduled |

| Document Details | |
|---|---|
| **Served Document** | Download Document |
| This link is active for 45 days. | |

If the link above is not accessible, copy this URL into your browser's address bar to view the document:

https://illinois.tylerhost.net/ViewServiceDocuments.aspx?ADMIN=0&SID=650745a1-f589-4f91-9414-968b7cf12194

--
Rachel Brady
Loevy & Loevy
311 N. Aberdeen St., 3rd Floor
Chicago, IL 60607
312.243.5900
brady@loevy.com
she/her

CCSAO COI SUBPOENAS 000067

| From: | Rachel Brady |
| To: | CHRISTA BOWDEN (States Attorney) |
| Cc: | Anand Swaminathan; Valerie Barajas |
| Subject: | Re: Reyes COI: No. 98CR1244002 |
| Date: | Thursday, March 24, 2022 5:52:10 PM |
| Attachments: | Navarro, David 072320 Condensed without Word Index.pdf |
| | Solache, Gabriel 120621 Condensed.pdf |
| | 02 Solache, Gabriel 120821 Condensed.pdf |
| | Solache, Gabriel 120921 Condensed.pdf |

---

**External Message Disclaimer**

This message originated from an external source. Please use proper judgment and caution when opening attachments, clicking links, or responding to this email.

Christa,

There are a lot of depositions in the Solache/Reyes civil cases, almost none of which have any bearing on these COI proceedings. For that reason, we did not understand the Court in these proceedings to be ordering parallel discovery with the civil case. Nevertheless, so we can put this issue aside and proceed with summary judgment, here are the remaining transcripts we have, excluding Reyes and Adriana Mejia (which you already have), and those witnesses who relate to our policy and practice claims:

- Aranda, Alfredo (Soto neighbor)
- Aranda, Jose (Jacinta Soto's nephew-in-law, Interrogated by Guevara)
- Aranda, Rosa (Jacinta Soto's niece, interrogated by Guevara)
- Bank, Naomi (Solache trial PD)
- Brualdi, Heather (prosecutor)
- Cerda, Jose (CPD officer)
- Dickinson, Edwin (CPD officer)
- Dorsch, William (former CPD officer who witnessed Guevara committing misconduct in other cases/pattern and practice witness)
- Guevara, Reynaldo (takes the Fifth on all questions)
- Harvey, Mark (evidence technician)
- Hill, Art (prosecutor)
- Mejia, Guadalupe (Adriana Mejia's sister in law)
- Mejia, Jorge (Rosauro Mejia's brother)
- Mejia, Jose (Rosauro Mejia's cousin)
- Mejia, Rosauro (Adriana Mejia's husband)
- Olivares, Salvador (Arturo Reyes's coworker)
- O'Malley, Tom (prosecutor)
- Rouse, Viola (Solache PD)
- Rutherford, Robert (CPD)
- Sheehan, Kevin (prosecutor)
- Soto, Jorge (Mariano Soto's brother, ID's the body)
- Trevino, Daniel (CPD youth officer, translated Reyes's statement)
- Valentin, David (CPD, called to crime scene)
- Varga, Andrew (CPD)
- Velazquez, David (pattern and practice witness)
- Verdun, Tom (prior Reyes attorney)

CCSAO COI SUBPOENAS 000068

- Wehrle, Karen (prosecutor)

I'm attaching Navarro and Solache. Please let us know which depositions you want and we will send them right away.

Thanks,
Rachel

On Thu, Mar 24, 2022 at 9:29 AM CHRISTA BOWDEN (States Attorney) <christa.bowden@cookcountyil.gov> wrote:

Mr. Swaminathan was present on the zoom on 12/3. A discussion was had about the depositions that were ocurring around that time (Solache, Eric Sussman, Judge Navarro(?)), I indicated that I did not have the deps from the civil case. Mr. Swaminathan assured the court that I would receive everything as it became available. The problem is that I do not know what depositions have been taken. If you would provide a list of depositions taken in the combined civil case of both Solache and Reyes, I can then make a determination as to what I do not have.

Best regards,

Christa Bowden
Assistant State's Attorney
2650 South California Avenue
Special Litigation, 12C42
Chicago, Illinois 60608
(773)674-7537
christa.bowden@cookcountyil.gov

The information contained in this electronic message may be confidential and may be subject to the attorney-client privilege and/or the attorney work product doctrine. It is intended only for the use of the individual or entity to whom it is addressed. If you are not the intended recipient, you are hereby notified that any use, dissemination or copying of this communication is strictly prohibited. If you have received this electronic message in error, please delete the original message from your e-mail system. Thank you.

**From:** Rachel Brady <brady@loevy.com>
**Sent:** Thursday, March 24, 2022 8:00 AM
**To:** CHRISTA BOWDEN (States Attorney) <christa.bowden@cookcountyil.gov>
**Cc:** Anand Swaminathan <anand@loevy.com>; Valerie Barajas <valerie@loevy.com>
**Subject:** Reyes COI: No. 98CR1244002

**External Message Disclaimer**

This message originated from an external source. Please use proper judgment and caution when opening attachments, clicking links, or responding to this email.

Christa,

The State's response to Mr. Reyes's summary judgment motion in the COI case says that the Court ordered us on December 3, 2021 to provide deposition transcripts as they become

CCSAO COI SUBPOENAS 000069

available. There have been only two depositions taken in the Reyes civil case since December 3, 2021. Both of those were depositions of corporate designees for the City of Chicago relating to Chicago Police Department policies and practices. They are not substantively related to the Reyes case, and do not bear on Mr. Reyes's petition for a certificate of innocence.

If there are any depositions you believe are outstanding, please let me know and we will provide them immediately. Otherwise, we will represent to the Court in our reply that this issue has been resolved.

Thanks,
Rachel


--
Rachel Brady
Loevy & Loevy
311 N. Aberdeen St., 3rd Floor
Chicago, IL 60607
312.243.5900
brady@loevy.com
she/her


--
Rachel Brady
Loevy & Loevy
311 N. Aberdeen St., 3rd Floor
Chicago, IL 60607
312.243.5900
brady@loevy.com
she/her

CCSAO COI SUBPOENAS 000070



**Planet Depos**
We Make It Happen™

# Transcript of David Navarro

**Date:** July 23, 2020
**Case:** DeLeon-Reyes & Solache -v- Guevara, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
www.planetdepos.com

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

CCSAO COI SUBPOENAS 000071

Transcript of David Navarro
Conducted on July 23, 2020

1 (1 to 4)

NT NT D STAT S D STR CT CO RT
ORT NORT RN D STR CT O NO S
AST RN D V S ON

ART RO De ON R S )
)
P a nt ff ) 1 18 cv 01028
)
vs ) on Steven Seeger
) D str ct Judge on
R NA DO G VARA et a ) Sun R Jar an
) Mag strate Judge
Defendants )
GABR SO AC ) 1 18 cv 2312
)
P a nt ff ) on Steven Seeger
) D str ct Judge on
vs ) Sun R ar an
) Mag strate Judge
CT O C CAGO et a )
)
Defendants )

The v rtua depos t on of DAV D NAVARRO ca ed by P a nt ff Arturo Reyes for exam nat on pursuant to the edera Ru es of C v Procedure of the n ted States D str ct Courts perta n ng to the tak ng of depos t ons taken before Stephan e A Battag a CSR and Notary Pub c n and for the County of DuPage and State of no s on Ju y 23 2020 10 02 a m

---

3

(Cont'd )
R T R BURNS, P
BY MR T RR NC M BURNS
MR DAN M NO AND
311 South Wacker Drive, Suite 5200
Chicago, inois 60606
(312) 878-1291

appeared on beha o De endant
David Navarro
ROCK, FUSCO & CONN Y, C
BY MS N ROS N
321 North C ark Street
Chicago, inois 60654
(312) 494-1000
appeared on beha o De endant
City o Chicago

N NW B R, BARON & DAFFADA, C
BY MR THOMAS N NW B R
120 North aSa e Street, Suite 2000
Chicago, inois 60602
(312) 663-3003

appeared on beha o De endant
Reyna do Guevara
A SO PR S NT
Ms Va erie Barajas, Para ega
oevy & oevy

Ms Stephanie A Battag ia, CSR, RMR, CRR

---

2

PR S NT (A part es appeared v a Zoom )
O V & O V
B MR JO N AZ NSK
MR S AN STARR
311 North Aberdeen Street 3rd oor
Ch cago no s 60607
(312) 2 3 900

appeared on beha f of P a nt ff
Arturo Reyes
P OP 'S A W O C
B MS JAN S S R
1180 North M waukee Avenue
(773) 23 0070

appeared on beha f of P a nt ff
Gabr e So ache
COOK CO NT STAT 'S ATTORN 'SO C
C V ACT ONS B R A
B MR DWARD M BR N R
MR R AN G SP
00 R chard J Da ey Center
(312) 603 3369

appeared on beha f of the Defendant
Prosecutors Kar n Wehr e eather
Brua d Andrew Varga Thomas
O'Ma ey
T SOTOS AW RM
B MS CARO N GO DN
1 1 West Jackson Bou evard
Su te 12 0A
Ch cago no s 6060
(312) 73 3300

appeared on beha f of the Defendant
Po ce Off cers dw n D ckinson R
Rutherford Stankus J Nau okas Mark
arvey Dan e Trev no dward M ngey
B ebe

---

4

I N D E X
WITNESS PAGE
Dav d Nava o

EXAMINATION BY
M Haz nsk 6
M B ene 295
Ms Sus e 297
M No and 300

E X H I B I T S
Nava o Exh b s
Exh b 1 A ea 5 supp e en a y Repo 204
RFC-So ache/Reyes
000426 - 000446
Exh b 2 Po yg aph Case Rev ew 238
RFC-So ache/Reyes
008662 - 007665
Exh b 3 S a e en of Ad ana Mej a 242
RFC--So ache/Reyes
000281 - 000293
Exh b 4 Mo on o Supp ess 249
Reyes_Jenne
007277 - 007443
Exh b 5 Hea ng 10-8-2014 268
Reyes 011262 - 011362

Exh b 6 Me o andu 274
RFC-So ache/Reyes Lassa
0044137 - 0044142

CCSAO COI SUBPOENAS 000072

Transcript of David Navarro
Conducted on July 23, 2020

2 (5 to 8)

MS. REPORTER: If I can have counsel state their name for the record and that they agree to my swearing in the witness virtually, please.

Can you state your name for the record?

MR. HAZINSKI: Yes.

John Hazinski for the Plaintiff, Arturo Reyes.

MS. REPORTER: Mr. Noland?

MR. NOLAND: Yes, agreed, on behalf of the witness, David Navarro, and Terry Burns.

MS. REPORTER: Mr. Brener, can you state your name?

MR. BRENER: Good morning. My name is Edward Brener, B-r-e-n-e-r. I represent the following defendants: Tom O'Malley, Heather Brualdi, Andrew Varga, Karin Wehrle, and also Cook County.

MS. REPORTER: Eileen Rosen?

MS. ROSEN: Yes, I agree.

MS. REPORTER: Carrie Golden?

MS. GOLDEN: Caroline Golden for the individual officer defendants.

MS. REPORTER: Jan Susler?

MS. SUSLER: Jan Susler on behalf of Gabriel Solache, and so stipulated.

MS. REPORTER: Mr. Gillespie?

MR. GILLESPIE: Brian Gillespie also on behalf of defendants O'Malley, Brualdi, Wehrle, Varga, Cook County, and I agree.

MS. REPORTER: Mr. Leinenweber?

MR. LEINENWEBER: Good morning, Tom Leinenweber on behalf of Reynaldo Guevara and I also agree.

DAVID NAVARRO, called as a witness herein, having been first duly sworn was examined and testified virtually as follows:

EXAMINATION
BY MR. HAZINSKI:

Q Good morning.

Will you please state and spell your name for the record?

**A My name is David R. Navarro. Navarro is spelled N-a-v-a-r-r-o.**

Q Have you been deposed before, sir?

**A I have.**

Q On about how many times?

**A Twice.**

Q And which cases were you deposed in?

**A I don't recall the names.**

Q Do you recall generally what the cases were about?

**A They were related to my employment as an Assistant State's Attorney.**

Q Were you a defendant in either of those cases?

**A No, I was not.**

Q Sir, I understand you are sophisticated and probably don't need these reminders, but I will just talk through briefly the ground rules for the deposition which you and other people see. Okay?

**A Yes.**

Q First, is as the court reporter mentioned earlier, it is very important we do our best to try to speak one at a time so that we can have a clean record, okay?

**A Okay.**

Q If you give me an answer to the question I will assume that you understood the question, the questions are clear, otherwise please ask me to rephrase, is that okay?

**A Yes.**

Q If you don't know the answer to the question that I ask I ask that you please don't speculate or guess, okay?

**A Okay.**

Q And, importantly, in the context of a Zoom deposition if there are any technical issues of any kind that prevent you from hearing or understanding any part of any question that any of the attorneys asks you please ask me to repeat the question to ensure that you have heard it in full and completely understand it, okay?

**A I will do so.**

Q Thank you.

MS. ROSEN: Mr. Hazinski, before you begin I just want to confirm as your office has agreed in this and other cases I assume you are Zoom recording this deposition. As you know the defendants have an objection to the use of a Zoom recording, but for purposes of the deposition we have agreed to go forward and you have agreed to produce a copy of the Zoom recording at the conclusion of the deposition to defendants and have agreed not to disseminate it in any way until

CCSAO COI SUBPOENAS 000073

we reach agreement about its use or get court assistance.

MR. HAZINSKI: That's correct, we will provide a copy to you and otherwise will not disseminate, that's right.

MS. ROSEN: Thank you.

BY MR. HAZINSKI:

Q Mr. Navarro, do you have any documents in front of you right now?

A I do, to my side.

Q What documents do you have in front of you?

A They were provided to me just a little while ago before we started.

It looks like some transcripts, two separate hearing transcripts, a copy of the statement of Adriana Mejia, detective's supplemental report, another police report titled Polygraph Case Review, and a document titled/captioned Sidley Work Product - Memorandum.

Q Besides the screen you are using to participate in this deposition do you have any other screens in front of you like another laptop or phone or tablet?

A I am sorry, are you asking me -- I didn't understand the question.

Q I will repeat it.

Besides the screen you are using to communicate in this deposition do you have any other screens in front of you like a laptop or phone or tablet?

A Just the laptop that we are conducting this hearing on.

Q One other feature in a remote deposition like this one, it is not always possible to tell when people are looking at the same information, which is why I have asked you those last two questions. I would ask that if you ever take a look at another document other than the one that we are discussing together I would ask that you let me know you are looking at that document. Is that okay?

A Yes.

Q Thank you.

Sir, do you have any medical issues or are you on any medications that might affect your ability to give truthful testimony today?

A No.

Q Do you suffer from any memory problems or issues affecting your memory?

A No.

Q Please feel free to take breaks at any point during the deposition. I would just ask that you not take a break while there is a question pending before you have given an answer, is that okay?

A Understood.

Q Have you ever given sworn testimony in connection with the 1998 Soto murder investigation or the resulting criminal case?

A Yes.

Q How many times?

A Twice.

Q Was the first of those times at a hearing on a motion to suppress at a hearing in 1999?

A I believe, yes.

Q Was the second time at a post conviction hearing for Arturo Reyes and Gabriel Solache in October, 2014?

A If I can just look at the day, if that's the date you are telling me, that was the next time that I testified, October 8, yes.

Q You didn't testify at any other post-conviction hearings in connection with this case, did you?

A No.

Q Are you aware that there were additional post-conviction hearings in this case that took place in the year 2017?

MR. NOLAND: John, I am going to object to that question and just to -- because there could be more like it, the "are you aware" question could sometimes implicate conversations with attorneys and we object, we allow him to answer of course, but subject to the objection we are not waiving to exclude the attorney-client privilege we presume you are not we are not asking about.

MR. HAZINSKI: That's exactly correct. Thank you for the clarification, Dan.

MR. NOLAND: Thanks.

BY MR. HAZINSKI:

Q I will say going forward my questions I will never be seeking to ask you to divulge communications subject to the attorney-client privilege.

Subject to that caveat are you aware that

CCSAO COI SUBPOENAS 000074

**3**

there were additional post-conviction hearings for Reyes and Solache in 2017?

A  I don't know that I was aware of that.

Q  Were you asked to testify at those proceedings?

A  I don't recall being asked to testify at those hearings.

Q  Were you aware that Assistant State's Attorneys Heather Brualdi and Tom O'Malley did testify at those proceedings?

A  No, I was not aware of that.

Q  Do you know why you weren't called to testify in 2017?

MR. NOLAND:  Objection, foundation.

MS. REPORTER:  When you object if you could state who's speaking, I am only getting partial people up on the screen.

MR. NOLAND:  Dan Noland, objection, foundation.

But you may answer the question over the objection.

MS. ROSEN:  Eileen Rosen, form, form, foundation.

THE WITNESS:  Answer the question, do I

**4**

know why I was -- the question was do I know why I wasn't called to testify or why I didn't testify?

BY MR. HAZINSKI:

Q  Why you weren't called to testify is the question.

A  I don't know why I wasn't called to testify.

Q  What did you do to prepare for your deposition?

A  What did I do to prepare for this deposition?

Q  Yes, sir.

A  I met with my attorneys.

Q  How many times?

A  Well, prior to this date I met with my attorneys -- for this deposition I met with my attorneys earlier this week.

This deposition in a more broader sense was set on several prior dates, I met with them on prior -- prior to those depositions when they had been set.

Q  In terms of your preparation for this deposition that is being conducted today you met with your attorneys once earlier this week for the

**5**

purpose of preparing for this deposition, is that right?

A  That's correct.

Q  And on previous occasions when you met with your attorneys to prepare for a scheduled deposition that ultimately did not proceed did you meet with your attorneys once to prepare for each of those instances?

A  Sometimes once, sometimes twice.

Q  How many times in total have you met with your attorneys in preparation to give a deposition in this case?

A  Like I said, each time there was a deposition set, like last month there was a deposition set, so I met with them days or the week prior, I don't recall if it was the week prior to it, and then on prior dates I met with them either once or twice.

Q  When you met with your attorneys earlier this week did you review any documents?

A  Yes.

Q  What documents do you recall reviewing with your attorneys?

A  I recall reviewing the statement of

**6**

Adriana Mejia that she gave at the police station. I recall reviewing the statement of Rosauro Mejia, the statement of Guadeloupe Mejia, and my testimony at the suppression hearing that you referred to earlier from 1999 and my testimony of the suppression hearing that you referred to from 2014.

Q  Did you review any police reports?

A  I am sorry?

Q  Did you review any police reports?

A  No, I did not.

Q  Besides the and written statements of Andrea Mejia, Rosauro Mejia, and Guadeloupe Mejia, did you review any other handwritten statements?

A  I don't recall reviewing any other handwritten statements.

Q  Did you review any photographs?

A  There was photographs that were part of the statement of Adriana Mejia.  Those photographs I reviewed.

Q  Can you explain what you mean when you say part of the statement of Adriana Mejia?

A  The photographs that were attached to the statement exhibit, there were copies of

CCSAO COI SUBPOENAS 000075

**7**

photographs.

Q What was depicted in those photographs?

A I am sorry?

Q What was depicted in those photographs?

A There was a photograph of -- it is not -- as I look at it now as I am looking at your statement that you provided today or I was provided with today those photographs aren't on that, but there was a photograph of Adriana Mejia, a copy of a Polaroid photo of Adriana Mejia. I think there were photos of Solache, a photo of Reyes, a photo of the victims in the case.

Q Did you review any policies in preparation for this deposition?

A Did you ask me did I review any policies?

Q Yes, sir.

A No.

MR. NOLAND: John, I am going to say I don't know if the witness is having any problems hearing you.

Once in a while you slightly are breaking up so I think that accounts for a couple of times he has asked you just to make sure you understand what you are saying, just FYI, we are getting I

**8**

think the substance of what you are saying, but there is just once in a while a slight breakup in your statements.

THE WITNESS: Right, that's what happens, it garbles out a little.

MR. HAZINSKI: Thank you. I appreciate being advised of that.

MR. NOLAND: That's better.

MR. HAZINSKI: -- and you asking me to clarify when it happens, and I would ask you to continue to do that, although it may be repetitious.

BY MR. HAZINSKI:

Q You said you reviewed your own testimony from a hearing in 1999 as well as a hearing in 2014, is that right?

A That's correct.

Q Did you review anybody else's testimony from those hearings?

A I did not.

Q Did you review the testimony of anybody else from any part of the criminal case?

A No.

**9**

Q Did you review any deposition testimony?

A No.

Q Other than the handwritten statements of Adriana Mejia, Rosauro Mejia, Guadeloupe Mejia, your own testimony at suppression hearings of 1999 and 2014, and photos accompanying the statement of Adriana Mejia, can you think of any other documents that you reviewed in preparation for this deposition?

A I don't recall reviewing any other documents.

Q And all those documents I just mentioned you reviewed in the last week in preparation for today's deposition, is that right?

A Yes.

Q When you prepared for previously scheduled depositions in this case did you review those same documents or different ones?

A Reviewed -- I reviewed those same documents. I don't know that we reviewed them all on each occasion, but, yes, I reviewed those same documents.

Q Did you review any documents in addition to the ones that we have just discussed?

**20**

A I think at least initially when I initially met with my attorneys we would have reviewed the interrogatories, answers to interrogatories.

Q When you met with your attorneys who was present at that meeting earlier this week?

A My attorneys and myself, Dan Noland and Terry Burns and myself.

Q How long was that meeting approximately?

A Several hours.

Q Have you met with any attorneys who represent the City of Chicago in this case?

A Not in connection with this case, no.

Q Have you met with attorneys for any of the other defendants in this case in connection with this case?

A You broke up just a little bit, but did you asked me did I meet with attorneys from any of the parties, that is what you asked me, right?

Q I will ask it again.

Did you meet with attorneys for any of the other defendants in the case in relation to this case?

A No.

CCSAO COI SUBPOENAS 000076

Transcript of David Navarro
Conducted on July 23, 2020

Q  Besides your attorneys did you speak with any other person about your deposition?

A  When are you asking -- when -- at what point?

Q  Let's say in the last week have you spoken with any other person besides your attorneys about your deposition?

A  My wife.

Q  Did you speak -- well, we will go over that.

Did the process of meeting with your attorneys to prepare for this deposition earlier this week or any of the prior times you met with the attorneys to prepare for the deposition bring back any independent memories of the Soto homicide investigation?

A  You know, I had -- are you asking did I remember the Soto murder investigation?  Yes.

Q  Did the act of speaking about the case and reviewing the documents you mentioned bring back additional memories?

A  I don't know about additional memories, but I was able to -- I was able to then focus more on a time or date that I wouldn't have remembered specifically after 22 years.

Q  Mr. Navarro, where do you currently work?

A  I work -- I am a Cook County judge at the Cook County Criminal Courthouse.

Q  When did you become a Cook County judge?

A  In May of 2017.

Q  Have you run in any judicial elections?

A  Yes.

Q  When was that?

A  It was a primary in March of 2018 and then the general election in November of 2018.

Q  Did you have an opponent in the 2018 primary election?

A  I did.

Q  And who was that?

A  That was Carolyn Golden; she is one of the attorneys in this deposition.

Q  Before you became a judge what was your previous job?

A  Immediately prior to becoming a judge I was an Assistant Attorney General with the Illinois Attorney General's Office.

Q  What year did you become an Assistant Attorney General?

A  2009.

Q  What were your responsibilities as an Assistant Attorney General?

A  I was Chief of the Public Integrity Bureau when I left the Illinois Attorney General's Office.

Q  What does the Public Integrity Bureau do?

A  In general prosecute cases as the Attorney General statewide, cases involving fraud or misconduct by states/government employees.

Q  Did your work at the Public Integrity Bureau ever involve prosecuting Chicago police officers?

A  No.

Q  What position did you hold before you became an Assistant Attorney General?

A  Before I was an Assistant State's Attorney with the Cook County State's Attorney's Office.

Q  What years did you work as an Assistant State's Attorney?

A  I worked two different times as an Assistant State's Attorney, 1994 through 2001, I left the office for a year, then came back and worked in the office from 2002 to 2009.

Q  Did you hold a different position between 2001 and 2002?

A  When I left the office?

Q  Yes, sir.

A  Yes.

Q  Where did you work?

A  I worked as an attorney with the Law Offices of David Wiener.

Q  What type of law did you practice there?

A  Primarily criminal defense.

Q  Between 2002 and 2009 what was your assignment within the Cook County State's Attorney's Office?

A  Between 2002 and 2009 I held several assignments in that time.

Q  Can you please describe each of them?

A  Initially I was an Assistant STATE'S Attorney in the Public Integrity Bureau.  I think it was called -- at different times it may have been called the Public Corruption Financial Crimes Unit or the Governmental and Financial Crimes Unit.  I was in that unit.

And then I was made the supervisor of the Professional Standards Unit.

CCSAO COI SUBPOENAS 000077

Transcript of David Navarro
Conducted on July 23, 2020

And then before I left the office I was assigned to the Felony Trial Division.

Q What did you do as supervisor of the Professional Standards Unit?

A The Professional Standards Unit handled cases/allegations of misconduct by police officers.

Q Were you responsible for investigating those allegations?

MR. NOLAND: Object to the form of the question investigation, assumes facts not in evidence.

You may answer.

THE WITNESS: We prosecuted those cases. They were investigated by different agencies.

BY MR. HAZINSKI:

Q Which agencies investigated those cases?

A A number of different agencies. There was the Chicago Police Department Internal Affairs Division. And within the Internal Affairs Division there was different divisions within that department or that division. The Sheriffs had a division. There were a number of different agencies that we worked with.

Q Between 1994 and 2001 what positions did you hold -- actually, strike that.

Between 1994 and 2001 what assignments did you have at the State's Attorney's Office?

A I had a number of different assignments. I was assigned to the criminal -- I started in the criminal appeals division -- you want me to go through each of them?

Q Yes, please.

A I started in the criminal appeals division. Then I was assistant to the chief judge. Then I was in first municipal, I was an assistant in the first municipal division. I was an assistant in Felony Review. I was assigned to the preliminary hearings division. And then the felony trial division. And I had various assignments within the felony trial division.

Q What years did you work in Felony Review?

A I don't remember the exact years, it would have been in 1998, but I don't remember the exact period.

Q Did you remain in Felony Review up until the point you left the office in 2001?

A No.

Q What is your best guess about when you stopped working in Felony Review?

MR. NOLAND: Object to the form of the question.

You may answer.

THE WITNESS: My best guess -- well, I was married in December of 1998 and I know I wasn't in Felony Review in December of 1998, so it was before December of 1998 when I was out of Felony Review.

BY MR. HAZINSKI:

Q So all in all you spent less than a year total in Felony Review, is that right?

A Yes.

MS. ROSEN: Objection, objection, form.

MR. HAZINSKI: I am sorry, I couldn't hear the answer.

THE WITNESS: I answered yes. And there was --

BY MR. HAZINSKI:

Q I am sorry, sir, were you continuing to answer?

A No. No, I just -- there was an objection, I didn't know if you wanted to address that. Old habits.

Q Sure.

Unfortunately I do not get to rule on these objections; would if I could.

MR. NOLAND: I will take that responsibility, John.

MR. HAZINSKI: Let's defer judgment for the moment.

MR. NOLAND: I was joking of course.

BY MR. HAZINSKI:

Q The attorneys will object. You should go ahead and answer the question if you are able to unless your attorney specifically instructs you not to answer and you choose to follow their advice, okay?

A Understood.

Q Other than the jobs we have talked about already have you held any other jobs in your life?

A Well, yes.

Q Any other jobs after law school?

A Yes.

Q What jobs are those?

A Well, immediately after law school I worked at a law firm for while I was studying for

CCSAO COI SUBPOENAS 000078

Transcript of David Navarro
Conducted on July 23, 2020

the bar exam and until I started with the State's Attorney's Office, the Law Offices of Melvin Kaplan.

Q Did you attend college?

A I did.

Q Where?

A The University of Chicago.

Q And what did you study?

A Majored in English language and literature.

Q Are you a native speaker of the Spanish language?

MR. NOLAND: Object to the form.

You may answer.

THE WITNESS: I grew up speaking Spanish, yes.

BY MR. HAZINSKI:

Q Was Spanish spoken in your household when you were a child?

A Yes.

Q Do you speak Spanish fluently today?

A Yes.

Q Did you speak Spanish fluently in 1998?

A Yes.

Q Are you able to write in Spanish today?

A Today, yes.

Q Were you able to write in Spanish in 1998?

A Yes.

Q Beyond speaking Spanish growing up have you received any formal education in the Spanish language?

A I did.

Q Can you please describe what formal education in Spanish you have received.

A I took -- going back to junior high school I had Spanish classes at junior high school. I then had Spanish in high school, three years of Spanish in high school. I also took Spanish classes at the University of Chicago.

Q And in your experience is it true that some Spanish words or phrases cannot be adequately translated into English without some distortion or loss of the original meaning?

MR. NOLAND: Object to form.

MS. ROSEN: Object. That was Eileen Rosen by the way.

MS. GOLDEN: And Golden.

MR. NOLAND: Dan Noland, join.

You may answer.

THE WITNESS: If you can point me to a specific example, but I can't immediately identify a specific example of a phrase that does not translate.

BY MR. HAZINSKI:

Q Okay.

Are you aware of any allegations that have been filed against you with the Illinois Attorney Registration & Disciplinary Commission?

A Yes.

Q Please describe those allegations.

A I don't remember the nature of the allegation, I just know -- I recall receiving at some point during my employment as an attorney letters -- two letters specifically at different times from the ARDC saying that a complaint had been filed and then on each occasion the letter just said the matter had been resolved and closed.

MR. NOLAND: John, I am going to identify that question and answer as confidential under the protective order.

BY MR. HAZINSKI:

Q Do you still have those letters or any other documents or correspondence relating to those allegations?

A I don't.

Q Approximately when did you receive those two letters you mentioned?

A I don't recall.

Q Was it within the last ten years to the best of your memory?

A It could have been. I don't recall.

Q Do you recall what job you had at the time you received either of the letters?

A They were related to my employment as an Assistant State's Attorney, if I recall.

Q Do you recall whether they were related to any particular assignment of yours within the State's Attorney's Office?

A No, I don't.

Q Did anybody ever speak with you or attempt to speak with you about allegations that had been filed with the Illinois Attorney Registration & Disciplinary Commission besides the letters that you mentioned?

MR. BRENER: This is Edward Brener, I object.

CCSAO COI SUBPOENAS 000079

33

MR. NOLAND: Dan Noland.

John, actually, we are going to identify -- since you referenced to ARDC again we are going to identify this whole colloquy as confidential.

You may answer the question.

THE WITNESS: You are asking me did anyone from the ARDC ask to speak to me about any of the complaints that were filed against me, that's your question?

BY MR. HAZINSKI:

Q Yes, sir.

A I didn't understand your response.

Q I said, yes, you understood my question correctly.

A Okay.

Then my answer is, no, no one from the ARDC asked to speak to me regarding any complaint that was filed against me.

Q Thank you.

MS. ROSEN: Before you ask your next question I just noticed on the screen that it indicated that Valerie Barajas had just left the Zoom meeting. I don't believe Ms. Barajas put her appearance on the record.

34

Was she on the record sitting in on the dep up until this time?

MR. HAZINSKI: I believe Valerie may have joined momentarily, Valerie being a paralegal from my office, but I don't believe she was on at the beginning of the call and I am not certain when she joined precisely.

MS. ROSEN: So going forward if anybody new joins the call I think that they should -- their appearance should be reflected on the record because if anybody joined in a room where a deposition was going forward the person would have to reflect their appearance on the record.

MR. STARR: This is Sean Starr. I joined after everyone identified themselves as well, Sean Starr for Plaintiff Arturo Reyes.

MS. ROSEN: Sean, when did you join?

MR. STARR: I joined like two minutes after the dep started.

MS. ROSEN: Is there anybody else on the record that has not reflected their appearance on the record?

(No response.)

MS. ROSEN: Okay, so going forward if that

35

can be a ground rule for these depositions, that when somebody joins late --

MR. STARR: I apologize, I was going to wait for a break in the deposition.

MS. ROSEN: -- or leaves.

MR. HAZINSKI: I think that's perfectly fair.

Eileen, I would suggest since you are -- since you raised the issue, I wonder, if you could notify people as they join or call our attention to any one who joins, obviously anybody who is participating currently will receive this message, but future participants will not have received that message, does that make sense?

MS. ROSEN: The problem --

MS. GOLDEN: Valerie is back.

MS. ROSEN: The problem is I didn't see Valerie join and I didn't see Sean join, I simply saw Valerie leave.

MS. GOLDEN: Valerie is back.

MS. ROSEN: And I didn't see Valerie come back. I think -- if people can be responsible for telling people in their own office that this is the rule then I think that -- because like I don't

36

know why it flashed that I even noticed it on my screen and I am looking at you, we are having this conversation, I didn't see her join, but Carrie did.

MS. GOLDEN: There is --

MS. ROSEN: It is not that big of a deal, but let's just do it.

MR. STARR: This is Sean Starr again.

I will make sure that everybody in our firm who may join this deposition will identify themselves when they do.

MS. ROSEN: Thank you.

MR. HAZINSKI: Let's continue.

BY MR. HAZINSKI:

Q Mr. Navarro, are you aware of any allegations filed against you with the Judicial Inquiry Board?

A I am not.

Q Have you ever been a defendant in a lawsuit?

A Other than this case?

Q Yes, sir.

A I am not aware of it.

Q I want to focus on your time working as an

Assistant State's Attorney in Felony Review. That was in the year 1998, is that right?

A In the year 1998? It may have begun in 1997 but it was -- I was an Assistant in 1998, yes.

Q During the period you worked in Felony Review were you generally familiar with policies of the Cook County State's Attorney's Office as they related to the assignment of Felony Review?

MR. BRENER: Objection to form and foundation. This is Edward Brener.

MR. NOLAND: I think now is a good time, and I know in the past in these depositions that when one party objects one defendant objects then the other parties are deemed to have adopted that so we don't have to continue to object, especially in the Zoom format, is everybody good with that?

MR. BRENER: That sounds good, Dan.

MS. ROSEN: Sounds good.

MS. GOLDEN: Yes.

MR. HAZINSKI: I appreciate that, thank you. It will run a little more smoothly.

BY MR. HAZINSKI:

Q I will ask my question differently because it was poorly phrased.

When you worked as an Assistant State's Attorney in Felony Review were you generally familiar with policies and practices of the Cook County State's Attorney's Office relating to the job responsibilities of Assistant States Attorneys in Felony Review?

MR. BRENER: Objection to form and foundation.

THE WITNESS: I don't know that I knew any specific -- that I can recall any specific policies or practices of an Assistant in Felony Review.

BY MR. HAZINSKI:

Q So, for example, were you aware of any policies of the State's Attorney's Office that dictated how Assistant States Attorneys should take statements from witnesses or suspects?

MR. BRENER: Objection to form.

THE WITNESS: When I was -- I was familiar with a general form that we -- that I followed in documenting statements of witnesses or defendants.

BY MR. HAZINSKI:

Q Can you explain what you mean by a general form that you followed?

A Well, there was a -- literally a form, a photocopied form that an assistant had with them when they worked Felony Review.

Q Beyond that general form were you aware of any other policies relevant to taking statements from witnesses or suspects?

MR. BRENER: Objection to form and foundation.

THE WITNESS: The policy -- you keep referring to a policy. I don't know that there was a -- that I could say that I knew a policy, but just the manner in which a statement was taken, we would introduce ourselves as Assistant States Attorneys and advise any individuals in custody of their rights.

BY MR. HAZINSKI:

Q Did you receive training on taking statements from witnesses or suspects?

A You know, if we did -- we may have. I don't recall the specific training.

Q Did you receive training on that same subject in the form of on-the-job training?

A I would -- I believe I did work with other Assistants when I was a new Assistant on Felony Review if that's your question, yes.

Q In the process of working with other Assistants when you were new on Felony Review did you learn the usual practices for how to take statements from witnesses or suspects?

MR. BRENER: Objection to form and foundation.

THE WITNESS: You referred to usual practices, I don't know that there was a usual practice. Again, the introduction, advisement of rights, and then how to just making sure that you had that form with you when you were documenting a statement.

BY MR. HAZINSKI:

Q So aside from a standard introduction, advising the interviewee of rights and using the standard form, was there anything else about the process of taking statements from witnesses or suspects that constituted a standard practice?

MR. NOLAND: Object to the form.

You may answer.

THE WITNESS: So when if we were going to take a statement from a defendant in custody it

CCSAO COI SUBPOENAS 000081

was important to determine that that statement was voluntary and so we would -- I would speak to that individual in custody and make sure that I had an opportunity to speak to that individual alone, say, just myself and the defendant.

BY MR. HAZINSKI:

Q That's what you would do?

A Yes.

Q Is it your understanding that that was a standard practice?

MR. BRENER: Objection to form, foundation.

THE WITNESS: I believe that to be the -- I believe that was the practice of the Assistant States Attorneys on Felony Review.

BY MR. HAZINSKI:

Q Did you receive any training in connection with your work on Felony Review about what to do with impeaching or exculpatory material favorable to criminal defendants?

A I don't know that I understand that question.

Q Were you aware of any policies or practices in the State's Attorney's Office that dictated what Assistant States Attorneys in Felony Review should do with impeaching or exculpatory material that was favorable to criminal defendants?

MR. BRENER: Form.

THE WITNESS: Well -- I am --

MR. NOLAND: I am just going to also object, it mischaracterizes prior testimony about policies, so that would be foundation, but you may answer.

THE WITNESS: I don't know that I can say that we received specific training about impeaching or about what the other part of that question was, but impeaching material.

We would interview witnesses if the witness -- interview witnesses or defendants. If those individuals were willing to give a statement, we documented that statement.

BY MR. HAZINSKI:

Q Was it your practice -- well, scratch that.

When you worked as an ASA in Felony Review were you familiar with any policies or practices of the Chicago Police Department related to

witness interviews or interrogations?

MR. BRENER: Form and foundation.

THE WITNESS: I don't know that I can speak to -- that I said I knew the policies and practices of the Chicago Police Department in 1998.

BY MR. HAZINSKI:

Q You also can't say that you knew about any policies regarding the use of force during interviews or interrogations, is that right?

MR. BRENER: Same objections.

MR. NOLAND: Objection, argumentative, foundation.

You may answer.

THE WITNESS: If you are asking did I know that the police -- the police had a policy -- are you asking if the police had a policy against using force against individuals in custody, is that your question?

BY MR. HAZINSKI:

Q Yes.

A I don't know.

I don't know that I could have said this is the exact policy or policy number.

But did I know that they were not to do that? Yes, I knew that.

Again, that's why I would ask the individuals in custody how they -- if the statement was voluntary and I would ask them alone.

Q Were you aware of any CPD policies that required officers to document pertinent investigative information?

MS. ROSEN: Objection, form, foundation. This is Eileen Rosen.

THE WITNESS: I don't -- again, you are asking me to describe what Chicago's policies or procedures were regarding how they documented their investigation. I don't know that I could -- that I could speak to that or I could have spoken to that in 1998.

BY MR. HAZINSKI:

Q Is it -- based on that answer is it fair to say that in 1998 you didn't have a specific understanding of what as a matter of policy CPD officers were required to document in the course of an investigation?

MS. ROSEN: Objection to form.

CCSAO COI SUBPOENAS 000082

THE WITNESS: I don't know that I can speak to in 1998 what Chicago's policy was about documenting an investigation, if that's your question, right, I don't know that I was familiar with their policies, correct.

BY MR. HAZINSKI:

Q I want to talk now a little more about the involvement of Assistant States Attorneys with ongoing investigations.

At what stage of an investigation did Felony Review ASAs generally become involved?

MR. BRENER: Objection to form, foundation.

MR. NOLAND: Objection, form, foundation, specifically assumes facts not in evidence with respect to investigation.

You may answer over the objection.

THE WITNESS: Assistant States Attorneys were contacted or, rather, the Felony Review unit would be contacted by the Chicago Police Department in regards when -- usually, usually when the police were seeking charges against an individual.

BY MR. HAZINSKI:

Q Is it fair to say then that Felony Review would be contacted by CPD for the end of an investigation?

MR. BRENER: Objection to form, foundation, incomplete hypothetical, and calls for speculation.

THE WITNESS: To the extent that you are saying usually, usually towards the end of an investigation that's when Felony Review would be contacted, yes.

BY MR. HAZINSKI:

Q And you said it was usually the case that Felony Review would be contacted when police officers were seeking charges, is that right?

A Yes, sir.

Q What other circumstances would Felony Review be contacted?

MR. NOLAND: Objection, foundation, form.

You may answer.

MR. BRENER: Object.

THE WITNESS: I don't recall all the instances in which an Assistant from Review might be contacted, but just an example would be a witness on a case could -- the police could have a witness on a case and be asking review, Felony Review, to come and speak to that witness on a case.

BY MR. HAZINSKI:

Q And in that example, I take it, you mean the CPD is not seeking charges against that witness?

A Right.

Q Did CPD in your experience usually contact Felony Review after they had spoken with the witness or suspect from whom they wanted the ASA to take a statement?

MS. ROSEN: Objection, form, foundation.

THE WITNESS: In my experience Chicago would be calling Felony Review after they had spoken to individuals in custody or witnesses, yes; sometimes maybe not all of the witnesses or all of the defendants on a particular crime.

BY MR. HAZINSKI:

Q Can you recall any times as an Assistant State's Attorney that you interviewed or took a statement from a witness or suspect who had not already spoken to the police as part of that investigation?

A I don't recall an example of that.

Q If you know, who was responsible in a given case for requesting the involvement of Felony Review?

MR. BRENER: Form, foundation.

MS. ROSEN: Objection to form, foundation.

THE WITNESS: The investigating officers for a case would contact Felony Review.

BY MR. HAZINSKI:

Q In a homicide case would it be the lead detectives on the case who would contact Felony Review?

MS. ROSEN: Objection, form, foundation.

THE WITNESS: I don't know if every instance it was the lead detective, what you are calling lead detectives, but in a homicide case I recall it would be a detective that would contact, a detective or detective.

BY MR. HAZINSKI:

Q Do you know if supervisors, such as sergeants or lieutenants, ever requested --

A I didn't understand -- your question broke up, I didn't -- I heard you say do I know if --

Q I will repeat the question, thank you.

CCSAO COI SUBPOENAS 000083

**49**

Do you know if supervisors or lieutenants ever requested the involvement of Felony Review?

A Possibly, but I don't know.

Q Did Assistant States Attorneys ever request the involvement of additional personnel from Felony Review?

A Again, the start of your question broke up, but I think I heard you say did Assistant States Attorneys ask for additional help, is that your question?

Q Yes.

MR. BRENER: I will just object to the foundation.

MR. NOLAND: Objection form, incomplete hypothetical.

You may answer.

THE WITNESS: It is possible. I don't recall that, it could happen.

BY MR. HAZINSKI:

Q Do you recall at any time that you were working in Felony Review and had already been assigned to a particular investigation and you requested additional personnel from Felony Review

**50**

to assist you?

MR. BRENER: Objection to form.

MR. NOLAND: John, objection, assumes facts not in evidence with respect to him being assigned to an investigation.

You may answer.

THE WITNESS: That may have happened. I don't recall a specific example of I asking for additional Assistant State's Attorneys to help me on a case. That may have happened. I can't recall specifically an example of that.

BY MR. HAZINSKI:

Q With respect to Mr. Noland's objection is it incorrect to say that Felony Review ASAs were assigned to cases?

MR. NOLAND: Object to the extent it mischaracterized my objection, but go ahead.

THE WITNESS: Well, we would be assigned to a case, yes.

BY MR. HAZINSKI:

Q Is it inaccurate to say that Assistant States Attorneys would be assigned to investigations?

**51**

A Yes, that would be inaccurate to say.

Q Can you please explain why that is inaccurate?

A Because --

MS. ROSEN: Object to the form.

THE WITNESS: Because the Assistant States Attorneys were not -- our job was not to investigate a case, but, rather, to review a case for charges.

BY MR. HAZINSKI:

Q Was it true that sometimes when you were assigned to a case the investigation in that case was still ongoing?

MR. BRENER: Object to foundation.

THE WITNESS: The question is very broad. There were instances where the police may have brought us an individual in custody for charges but there may be other individuals believed to have been involved with it so there was still an investigation going on, that was the police investigation. That's an example where an Assistant on Review would be there to review a case as to an individual, the case could still be under investigation.

**52**

BY MR. HAZINSKI:

Q I think I understand, but I would like to clarify that answer if I could.

So are you saying that an Assistant State's Attorney might be assigned to a case to perform the responsibilities of a Felony Review Assistant State's Attorney with respect to one part of that case while another discrete part of the case might still be the subject of an ongoing investigation that was within the purview of the police?

MR. BRENER: Objection to form, foundation, incomplete hypothetical.

THE WITNESS: I don't know that I specifically understand your question, but an Assistant could review -- would review the case for the case that is in front of them and the individual that is in custody, that is who you -- that is who I would review.

BY MR. HAZINSKI:

Q As clarifying questions go my last one was quite poor.

In your experience -- would Felony Review ASAs ever be assigned to a case for the purpose of

CCSAO COI SUBPOENAS 000084

Transcript of David Navarro

Conducted on July 23, 2020

---

**53**

taking a statement from an individual who is still the subject of an ongoing police investigation at the time Felony Review was contacted?

MR. BRENER: Objection to form and foundation.

THE WITNESS: Did we ever take a statement from an individual -- did I ever take a statement from an individual in custody? Yes.

BY MR. HAZINSKI:

Q I believe you said that Felony Review ASAs were not there to investigate reviews, is that right?

A That's correct.

Q Your interviews with suspects and witnesses took place after the investigation with respect to the interviewee was complete, is that right?

MR. BRENER: Objection to form.

THE WITNESS: I didn't -- I neither understood for heard your question.

BY MR. HAZINSKI:

Q I will try to ask it more clearly in the hope without technical interruptions.

By the time you became involved in a case

---

**54**

to take a statement from a particular person was the police's -- police officer's investigation with respect to that person complete at that point?

MR. BRENER: Objection to form, foundation, assumes facts not in evidence.

MR. NOLAND: And also incomplete hypothetical.

You can answer.

THE WITNESS: It is possible. I can't speak to every instance in which I took a statement from an individual, but normally if we were interviewing a defendant in custody it was because the police were presenting that individual for charges.

BY MR. HAZINSKI:

Q At the time you interviewed that person the interviewee was not a defendant, right?

MR. BRENER: Objection to form, foundation, incomplete hypothetical.

THE WITNESS: He would be a suspect -- if that is how he was being presented he would be a suspect in an investigation.

---

**55**

BY MR. HAZINSKI:

Q Earlier you said that Felony Review would be contacted by the Chicago Police Department, right?

A If that was the investigating agency, yes.

Q Who received requests from CPD officers asking for the involvement with the Felony Review?

A Normally it was -- there was a dispatcher or central dispatcher on Felony Review.

Q Did the dispatcher receive those questions by phone or in person?

A The questions?

Q I am sorry --

A I don't know --

Q Let me rephrase that.

Did the dispatcher receive those requests by phone or in person?

A I don't know every time how they received them. I would think normally they would receive them by phone.

Q Do you know what the dispatcher did upon receiving requests?

A I don't know the specific (inaudible) the dispatcher followed, but at some point an

---

**56**

Assistant who was on Review would get contacted.

Q Who was responsible for contacting the Assistants on Review?

A Normally it was the dispatcher.

Q So when you in your experience when you were assigned to cases it was through the dispatcher?

MR. BRENER: Objection, misstates prior testimony.

THE WITNESS: I don't know specifically if the dispatcher -- I don't know that the work of -- how the dispatcher determined who to call, but it was the dispatcher that would contact the Review Assistant, in this instance me.

BY MR. HAZINSKI:

Q To clarify your last answer, is it correct to say you don't know how it was determined which Assistant States Attorneys would be assigned to particular cases?

A You trailed off at the end.

Q I will repeat it.

If I understand your last answer you are saying you don't know how it was determined which ASAs would be assigned to particular cases, is

---

CCSAO COI SUBPOENAS 000085

Transcript of David Navarro
Conducted on July 23, 2020

15 (57 to 60)

that right?

A So just -- if there were -- I don't know how many assist apartments on Felony Review, let's say X number of Assistants, at any point there were only a group of those Assistants that were working during a time period. How the dispatcher determined which of those assistants that were working, not all the world of Review Assistants, I don't know or if I knew I don't recall the process by which the dispatcher would do that.

Q Do you know if the dispatcher ever received requests for the involvement of particular Assistant States Attorneys identified by name?

A I don't know.

Q Do you know if your involvement was ever specifically requested?

MR. NOLAND: Object to the extent it calls for speculation, but you can answer.

THE WITNESS: I don't know that my involvement -- are you saying ever or in this case?

BY MR. HAZINSKI:

Q Ever in your time at Felony Review.

A No, I don't know.

Q What about in this case, do you know if your involvement was specifically requested?

A I don't know that my specific involvement was requested.

What I recall was that there was a request for a Spanish-speaking Assistant.

Q Is it your understanding that you were assigned to this case involving the Soto murders because of your particular language skills?

A Yes, that is my understanding.

Q Do you recall being assigned to any other cases because of your language skills?

A I don't.

Q During the time at Felony Review did the State's Attorney's Office make interpreters available to assist Felony Review Assistant States Attorneys?

A No.

Q Did the Chicago Police Department make such interpreters available?

MR. NOLAND: I object to the form.

You may answer.

THE WITNESS: If your question is were

official interpreters or someone titled interpreter provided by the police, no.

BY MR. HAZINSKI:

Q Did officers requesting the involvement of Felony Review to your knowledge request a particular number of personnel from Felony Review?

MR. NOLAND: Object to the extent it calls for speculation.

You may answer.

THE WITNESS: I don't know. Did they ask for a particular number of assistants, that is your question, did they ask for a particular number of assistants on a case?

BY MR. HAZINSKI:

Q Yes.

A They may have, but that would depend -- that would depend on the case.

Q If you know -- actually, scratch that.

In your experience how many Felony Review Assistants would typically be assigned to a particular case?

MR. BRENER: Objection to form.

MR. NOLAND: Objection, incomplete hypothetical.

You can answer.

THE WITNESS: There is no way to say how many are assigned to a particular case, each case was different.

In many instances one Assistant would review a case, but that's not -- I can't say that that is how every case went.

BY MR. HAZINSKI:

Q Do you recall any case where five Felony Review Assistants were assigned to a given case?

A Other than -- are you saying other than this case?

Q Yes.

A Possibly. I can't point to a specific example, but I also don't -- I would have to think about any other cases where there were three individuals in custody.

Q Do you recall other instances in which you were assigned to a case alongside another Felony Review Assistant?

A Yes.

Q In such cases would you coordinate with the other Felony Review Assistant or Assistants during your work on the case?

CCSAO COI SUBPOENAS 000086

61

MR. NOLAND: Object to the form, incomplete hypothetical.

You may answer.

THE WITNESS: I don't necessarily understand what you mean by coordinate.

BY MR. HAZINSKI:

Q Would you discuss with the other Felony Review Assistant what -- the substance of what witnesses or suspects are told them?

A Yes, I would -- yes.

Q Would you discuss whether witnesses or suspects were credible?

MR. NOLAND: Object to the form.

You may answer.

THE WITNESS: Likely.

BY MR. HAZINSKI:

Q Would you discuss whether the information that all of the Assistants were receiving from suspects and witnesses was consistent?

MR. NOLAND: Form, foundation, incomplete hypothetical.

You may answer.

THE WITNESS: Yes, possibly.

62

BY MR. HAZINSKI:

Q Would you discuss with the other Assistants your opinions about the quality of the police investigation?

MR. NOLAND: Objection, form, foundation.

You can answer.

THE WITNESS: Possibly. I don't recall those conversations, but possibly. I don't recall a conversation like that.

BY MR. HAZINSKI:

Q Did you ever learn that in the course of your involvement in a case as a Felony Review Assistant that two suspects gave statements incriminating themselves but those statements were factually inconsistent with one another?

MR. NOLAND: Objection, form, foundation, incomplete hypothetical, but you may answer.

THE WITNESS: Was I ever in an instance where one defendant was saying something inconsistent that another defendant was saying, that's your question?

BY MR. HAZINSKI:

Q Yes.

A Yes.

63

Q Do you recall what cases that occurred in?

A I don't.

Q If that happened and a different Felony Review Assistant took each of those statements, that is to say one defendant gave a statement to one Assistant and the other defendant gave a statement to another, would the Assistants confer about those factual inconsistencies?

MR. BRENER: Objection to form, foundation, incomplete hypothetical.

THE WITNESS: It is possible that we would -- it is possible that I could have interviewed different individuals in custody and those individuals gave inconsistent statements to me.

It is also possible that individuals in custody give inconsistent statements to different Assistants. In those instances was it possible that I discussed those inconsistent statements with the other Assistant if that Assistant was there? It's possible that I discussed that with them.

BY MR. HAZINSKI:

Q When you say it's possible, do you mean to say that in any given case that occurred you are

64

not sure one way or the other whether you would have taken that step?

MR. BRENER: Objection to form.

THE WITNESS: To the extent that it -- what occurred in 1998 you are asking me what I did in a case in 1998 that -- I don't -- yes, it's possible that I did that.

BY MR. HAZINSKI:

Q At this point I am just asking you more generally about your practices across all of the cases you worked in Felony Review.

So generally speaking in that sense do you know one way or the other whether you would have conferred with other Assistants about inconsistencies in statements that you had taken?

MR. BRENER: Asked and answered.

MR. NOLAND: Object to foundation.

You can answer.

THE WITNESS: Like I said before, if another Assistant was there would I have spoke to them, likely I would have spoken to that Assistant regarding inconsistencies or consistencies.

An inconsistency could be one guy, one person puts himself there and the other person --

CCSAO COI SUBPOENAS 000087

Transcript of David Navarro

17 (65 to 68)

Conducted on July 23, 2020

the other individual says that person was -- did some other act other than just admitting their presence, but while those statements were -- could be considered inconsistent, they were also consistent otherwise.

BY MR. HAZINSKI:

Q Did Felony Review ASAs -- excuse me -- keep files that contained documents from cases they worked on?

MR. BRENER: Objection to foundation.

THE WITNESS: Keep a personal file of cases I worked on?

BY MR. HAZINSKI:

Q Did you keep any files that contained documents from cases you worked on?

**A I did not keep any files of cases that I worked on, no.**

Q Are you aware of any other Felony Review ASAs who kept files that contained documents from cases they worked on?

MS. ROSEN: I am going to object to the form, vague as to what you are referring about when you are talking about files.

THE WITNESS: I am not aware of any other assistants that kept files other than the file that was created -- I just want to make sure that I -- because you are talking about files.

There was a Felony Review file that was created for a case, but that file went with the case, not with the Assistant. I didn't keep any and I am not aware of any Assistant that kept any personal file.

BY MR. HAZINSKI:

Q What kind of documents went into Felony Review files?

MR. BRENER: Objection to form, assumes facts not in evidence.

THE WITNESS: Any statements, if statements were taken of witnesses or individuals or defendants, any reports that were able, that's what would be in the Felony Review folder.

BY MR. HAZINSKI:

Q What types of reports would typically be included in a Felony Review file?

MR. NOLAND: Objection, mischaracterizes.

You may answer.

THE WITNESS: There is no -- typically whatever reports were available, it depended on

when the case -- when the case was being reviewed.

BY MR. HAZINSKI:

Q So would that include, for example, a lineup report that existed when the case was being reviewed?

MS. ROSEN: Object to the form.

THE WITNESS: Possibly, but those are reports that were normally generated after, afterward, so I -- I don't know that that was a normal or usual if you want to say thing that was included. It could have been, but I don't -- I can't say.

BY MR. HAZINSKI:

Q Were general progress reports that had been created at the time of review generally included in the Felony Review file?

MR. NOLAND: Objection, form, foundation, and I think you are misusing the word file versus folder.

Over that objection you can answer.

THE WITNESS: Right.

So the -- I guess what I am talking about is a folder. The folder goes on to -- back to -- after the case is done being reviewed goes back to Felony Review office and ultimately follows the case on forward. The GPRs, general progress reports, CPR's, I don't recall those being part of the file folder.

BY MR. HAZINSKI:

Q Who was responsible for putting documents into Felony Review folders?

**A One of the Assistant -- an Assistant State's Attorney.**

Q Did you ever have occasion to put documents into a Felony Review folder?

**A Yes.**

Q Did you have to make decisions in placing documents in that folder which documents to include and which documents to exclude?

MR. BRENER: Objection to form and foundation.

MR. NOLAND: And argumentive, incomplete hypothetical.

You can answer.

THE WITNESS: I don't recall excluding anything. I would include whatever was available at that time.

BY MR. HAZINSKI:

CCSAO COI SUBPOENAS 000088

**69**

Q Have you ever taken notes during your conversations with police officers?

**A You are asking have I ever taken notes when I was on Felony Review, no.**

Q I will rephrase that question a little more precisely.

In the course of your responsibilities as an Assistant State's Attorney for Felony Review did you ever take notes during a conversation with a police officer in the course of reviewing a case?

**A No.**

MR. NOLAND: John, I actually need a break to go to the restroom, if we can take a break now.

MR. HAZINSKI: Sounds great.

MR. NOLAND: Five minutes.

MS. REPORTER: Going off at 11:33.

(Recess taken.)

MS. REPORTER: Back on at 11:42.

BY MR. HAZINSKI:

Q Resuming the video recording.

Mr. Navarro, a few more questions about Felony Review folders.

What were those folders used for?

**70**

MR. BRENER: Objection to foundation.

THE WITNESS: The folder was -- it really was what followed the case on to if the case was approved or -- it followed the case on to the next stage, which would be a preliminary hearing.

So you can have handwritten statements, contact information for any of the witnesses, and then the reports which really at that point really you are talking about a CB and an RD -- arrest reports and case report.

BY MR. HAZINSKI:

Q When you would review a case did you have a physical folder with you that was the Felony Review folder?

**A Yes.**

Q And while you were reviewing a case at, for example, a police station you would put documents into that folder, correct?

MR. NOLAND: Objection, vague, form.

You may answer.

THE WITNESS: If there were documents available, like a handwritten statement, yes. It depended -- each case is different.

BY MR. HAZINSKI:

**7**

Q As a matter of your usual practice did the original handwritten statement go in the Felony Review folder or in a different folder? And when I say original, I mean to distinguish between the version that was physically written on versus any photocopies of it.

**A You know, I don't remember how -- the specific way we kept the original handwritten separate from copies.**

Q If police officers prepared reports in an investigation after Felony Review left and completed that aspect of their review were those later-created police reports make their way into the Felony Review folder?

MR. BRENER: Objection to foundation.

THE WITNESS: If a report that was completed after -- I am not aware of an instance where a report -- rather, a case that I worked on where a report made it into a folder, I don't know how that would have happened in a case I worked on.

BY MR. HAZINSKI:

Q Where were Felony Review folders kept?

MR. BRENER: Objection to form, timeframe.

**72**

THE WITNESS: Are you talking about a blank folder or are you talking about completed folders?

BY MR. HAZINSKI:

Q After you had put documents into a folder in the course of reviewing a case, what did you do with that folder?

**A The folder when I was done with the case, which is to say having reviewed it and approved it, it would go back to the State's Attorney's Office.**

Q Were the folders kept at the State's Attorney's Office from that point forward or were they moved to other locations after that?

MR. BRENER: Foundation.

THE WITNESS: I don't know exactly the route that the folders followed, but the folders would go on -- should have gone on to the different preliminary hearing courtrooms where that case was then going to go pending.

BY MR. HAZINSKI:

Q Would the Assistant State's Attorney prosecuting a case have that folder with them at preliminary hearings in the criminal case?

CCSAO COI SUBPOENAS 000089

A Normally, yes.

Q Would they have it with them at the criminal trial?

A Normally, yes.

Q And to the best of your knowledge what did the Assistants States Attorneys prosecuting the case use the Felony Review file for?

MR. NOLAND: Objection, foundation, form. You may answer.

THE WITNESS: Well, the folder in instances had contact information for witnesses, it could be used for that, to contact witnesses.

BY MR. HAZINSKI:

Q Can you think of anything else the Felony Review folder might have been used for?

A Well, if --

MR. BRENER: Just a clarifying question, John, are you asking about trial ASAs?

MR. HAZINSKI: With respect to Assistant States Attorneys prosecuting a criminal case, yes.

THE WITNESS: So either by the Assistant State's Attorney in preliminary hearings or in the trial division there would be instances where if a defendant only gave an oral statement, not a handwritten statement, that oral statement could have been documented on that Felony Review folder.

BY MR. HAZINSKI:

Q Could you explain what you mean by that?

A An Assistant on Felony Review could interview an individual in custody, that individual might not have agreed to give a handwritten statement or a court reported statement, in which case then the Assistant would document that statement on the Felony Review folder.

Q Do you ever have occasion to document an interview in which a suspect or witness declines to give a handwritten or court reported statement?

A Did I ever do that while I was on Felony Review, is that your question?

Q Yes.

A Yes, that's your question?

Q Yes.

A Yes, there were instances where that occurred.

Q What information about that interview would you document?

A I don't -- I can't speak to each of the individual times that I did that, but if you are asking what did I -- what do I recall doing, I would recall doing an advisement of rights and then a summary of the statement that the individual gave.

Q In the summary was it your practice to include all of the information that the witness had given you or only a subset of that information?

MR. BRENER: Objection to form, vague.

THE WITNESS: I would have been as complete as possible.

BY MR. HAZINSKI:

Q When would you put that on a sheet of paper?

A I didn't hear your question, it was garbles.

Q Did you write that question on a sheet of paper?

A Would I write out the question -- would I write out the statement?

Q Yes, I am sorry. Let me say it again, now my question was truly garbled that time.

Would you write out your summary on a sheet of paper?

A I would write it out on the folder.

Q On the physical folder?

A Yes.

Q Was it like a manila file folder?

A Yes.

Well, I mean -- yes, it was manila, manila-colored Felony Review file folder, yes.

Q And did you write a description or a summary of an interview with a witness in some cases on one of the inside flaps of the folder for lack of a better term?

A It would not be a verbatim transcript of the statement, but, yes, I would write down the statement of the individual on that folder, yes.

Q Is there any particular reason that those summaries were recorded directly on a physical folder and not as with handwritten statements on a separate sheet of paper that goes into the folder?

A If there was I wasn't part of that decision process.

Q Was this process of writing directly on the folder standard across the Assistants?

A Standard across the system, that is your

CCSAO COI SUBPOENAS 000090

Transcript of David Navarro
Conducted on July 23, 2020

question?

Q Standard across all of the Felony Review ASAs.

MR. BRENER: Objection to foundation.

THE WITNESS: It was -- there was a line on -- there was space on the folder to do that.

BY MR. HAZINSKI:

Q Was any other information about the case as far as you recall reported on the folder itself?

A There was another box or area on the folder to write a summary of the incident, and as I previously said you had also include the witness information, in this instance you put the deceased also.

Q Did Felony Review folders typically include an inventory of any kind documenting what was contained in the folder?

A No.

Q When you were preparing to testify in criminal cases for which you had previously conducted a review did you consult the Felony Review folder as part of that preparation?

A Possibly. I don't know that I would have in every instance, possible.

Q Do you recall why in particular instances you might have consulted the Felony Review folder?

MR. NOLAND: Objection, form, foundation, overly broad.

You may answer.

THE WITNESS: The folder, let's say, you are asking for why I would in an instance there could be an instance where there was only an oral statement that I had versus a handwritten statement, in that instance I would rely more on the handwritten statement than the folder.

BY MR. HAZINSKI:

Q I am sorry, I didn't understand the last part of your answer. Could you explain what you mean?

A If I was a Review Assistant testifying at a hearing and an individual that I had interviewed had only given an oral statement then I would be -- I would want to review the folder because the folder would have the oral statement. If I had documented a handwritten I would want it to review the handwritten statement.

Q If there was an oral statement that was written on the folder, as was your usual practice, you would in the course of preparing to testify review the actual folder because that information about that statement was not recorded anywhere else, is that right?

A Well, I am not saying it wasn't reported anywhere else, I didn't say that. It is just that's a place where it was recorded.

Q Where else --

A It could have been recorded somewhere else.

Q Do you know of any other places where it would have been recorded?

A Well, a place where it could have been reported is in the detective's supplemental report.

Q Would a detective's supplemental report ordinarily contain your summary verbatim as you have written it?

MR. BRENER: Objection to form and foundation.

MR. NOLAND: Objection, mischaracterizes.

You can answer.

THE WITNESS: It would have a summary of the detective or whoever wrote that report.

BY MR. HAZINSKI:

Q I want to talk to you now about some specific responsibilities of Felony Review Assistants, and we have touched on some of these responsibilities already in our conversation, but first could you just generally tell me what were the responsibilities of an Assistant State's Attorney in Felony Review.

A The general responsibilities of an Assistant on Felony Review in 1998 as I recall were to respond to -- get a call from the dispatcher, respond to that call, and then review the case as assigned.

Q And your responsibility for reviewing a case as assigned entailed some other -- some specific sub-tasks, right?

A Well, there were instances where you could review a case over the phone for charges/for approval of charges, other instances where you went to a police station to review the case for approval of charges. So this was 1998.

Q Okay.

So when you reviewed a case over the

CCSAO COI SUBPOENAS 000091

phone, as you mentioned, you were not speaking to any witnesses or taking any statements as part of that review, right?

A **It is possible that you were speaking to witnesses. Normally those cases where non-victim cases or like a retail theft.**

Q Do you recall any instances where you reviewed a case over the phone to determine whether it was appropriate to bring charges in a case that did have a victim such as a homicide?

A **No.**

**Well, you are asking me did I review a homicide case over the phone, no.**

Q Did you review any other types of cases that had victims, for example, other violent crimes besides homicide, over the phone?

A **I don't recall any of that.**

Q Was one of your responsibilities as a Felony Review ASA to discuss the investigation with the officers who had investigated the case?

MR. NOLAND: Object to the form of the question, but you may answer.

THE WITNESS: Well, you are asking once we were -- having been assigned to a case would I talk to the investigating police officers? Yes.

BY MR. HAZINSKI:

Q Would you always talk to the investigating officers?

A **I would have a tough time thinking of an instance where I didn't speak to the investigating police officers. You may be able to point to an example, but I don't recall.**

Q Would you typically speak with every officer who had participated in an investigation in a case you were reviewing?

MR. BRENER: Objection to form, foundation.

THE WITNESS: It would be impossible to speak to every officer that participated in an investigation, it really would.

Depending on the case, officers -- cases took a -- a crime may have occurred a week prior or days prior, just there could have been multiple officers involved, so, no, I didn't speak to every officer who had participated in an investigation.

BY MR. HAZINSKI:

Q How did you decide which officers you did

speak?

MR. BRENER: Incomplete hypothetical.

MR. NOLAND: Object to form.

You may answer.

THE WITNESS: Again, I spoke to the officers normally in -- there is no real normal case, but there might be a case where you are speaking to multiple officers, there might be a case where you are speaking to a couple officers. It is just every case was different, I didn't -- you spoke to the officers as part of the review of the case.

BY MR. HAZINSKI:

Q Sometimes after you were assigned to a case you went to a police station to conduct a review, right?

A **Are you talking about -- yes, you would go to the police station, yes.**

Q Right.

And at the station generally speaking would one or more investigating officers from that case be there?

A **Generally speaking, yes.**

Q Would you speak to all such investigating officers who were at the station in every case?

MR. NOLAND: Objection, asked and answered.

You may answer.

THE WITNESS: Again, you are asking -- I guess when you say investigating officers there is a number of officers that investigate a case. I would speak to the officers who were calling the case in at that time, that's who I talked to.

BY MR. HAZINSKI:

Q Would you ever speak to the supervisors of -- actually, let me rephrase that question.

Can you think of any occasions where you spoke with the supervisors of the officers who called the police?

MS. GOLDEN: Object to foundation.

THE WITNESS: I don't recall specific examples of that, but it is possible that I did.

BY MR. HAZINSKI:

Q When you spoke with the officers who were called in a case what information did you try to obtain from those officers?

MR. BRENER: Objection, incomplete hypothetical.

CCSAO COI SUBPOENAS 000092

MR. NOLAND: Objection, form.

Go ahead.

THE WITNESS: The information -- I would -- the officers that were officers or detectives that they called the case in in general would provide a summary of what their case was if they were looking to review charges on in general.

BY MR. HAZINSKI:

Q Okay.

And to clarify, because you raised the point in your answer, you distinguished officers and detectives, and when I use the word officers I am using it in a more general sense, meaning anyone who was a sworn officer of the CPD in this context. I mean to include detectives among them as well as their supervisors. Does that make sense?

A It does.

I just -- I would distinguish that because there were times when officers might call a case in and other instances where detectives would call a case in.

Q When you spoke with officers or detectives who had called in Felony Review did you try to ascertain the identity of the suspects?

A I would -- would I try and determine if there was an individual or how many individuals were in custody? Yes.

Q And would you try to learn their names, for example?

A Yes.

Q Would you attempt to determine what evidence had been gathered in the case up to that point?

A To the extent that the detectives were able to tell me, yes.

Q Can you explain what you mean by that?

A Well, just whatever they were able to tell me at the time, yes.

Q Did you have any experiences where the detectives who called you in were unable to tell you what evidence had been gathered in the case?

MR. NOLAND: Objection, form, foundation. I think it is just so broad and nonspecific that it is an incomplete hypothetical. I object to for those -- over those objections you may answer.

THE WITNESS: I don't recall the specific nature of conversations I had with police officers or detectives from 22 years past, 22 years ago, the detectives, whatever conversations I had with them they would give me a summary of the case, that's what I recall.

BY MR. HAZINSKI:

Q Was it your practice when you spoke with officers or detectives who had contacted Felony Review to ask questions of those officers or detectives in the course of your conversation?

MR. NOLAND: Objection, form, incomplete hypothetical.

You may answer.

THE WITNESS: A question like what is the case or what do you have? Okay, yes.

BY MR. HAZINSKI:

Q Do you recall asking any more questions that were more specific than that relating to the investigation?

MR. BRENER: Objection, form.

THE WITNESS: I don't recall the specific questions I would have asked at that time.

BY MR. HAZINSKI:

Q I guess all I am really trying to figure out is in these conversations you have with the detectives who contacted Felony Review did you see a summary of the information from the detectives and then go forward or did you ask questions of the detectives to supplement or expand on the summary that they offered you?

MR. BRENER: Form, incomplete hypothetical.

MR. NOLAND: And asked and answered.

You may answer.

THE WITNESS: I don't recall -- what you are asking me is what did I talk to the detectives about on cases when I was on Felony Review? What is likely what I said is what is going on, what do we have, what are you presenting me with?

Whether I asked a question additional to that, I don't recall.

BY MR. HAZINSKI:

Q In those conversations were you trying to develop an understanding of the case?

A Yes, that's what I was trying to do, develop an understanding of the case, exactly.

Q Was it important to you in that conversation you developed a relatively complete understanding of the case in the investigation?

CCSAO COI SUBPOENAS 000093

Transcript of David Navarro
Conducted on July 23, 2020

MR. BRENER: Form.

MR. NOLAND: Go ahead.

THE WITNESS: You know what, I wasn't going to include my review of the case based on a conversation -- an initial conversation with the detectives. It was important to me just to get an understanding of the case and then go from there.

BY MR. HAZINSKI:

Q After that initial conversation were there instances in which you were reviewing a case and you had subsequent follow-up conversations with those same detectives or officers?

A Yes, possibly.

Are you saying that I would have only spoken to the detectives once and that's at the start of the review of the case?

Q Is that what happened?

A No. Well -- I don't -- I can't say that that's -- that that never happened, but it's likely I would have spoken to the detectives more than just the initial -- more than just at the initial introduction or summary of the case.

Q Why is that?

A Because I didn't -- I am there to review the case, they may have had -- they may have had witnesses to provide to me or individuals that I didn't know about upon the initial presentation of that initial summary. It is their case and their investigation.

Q You testified earlier that as part of your responsibilities on Felony Review after being assigned a case you would review available police reports, correct?

A If there were any reports available, yes.

Q And when you say available, what do you mean specifically?

A What I mean is it depends on -- on each case it depends on when the case is being reviewed. If a case occurred, the crime occurred years prior, which could have happened, then there might be more reports that would have been generated than if the crime occurred the day before. And so I would review whatever reports were available at the time.

Q When you say available, the reports that existed at the point that you were conducting your review?

MR. NOLAND: I am just going to object,

form, foundation, incomplete hypothetical.

You may answer.

THE WITNESS: I wouldn't know what reports were -- all the reports that existed because that's Chicago's -- the Chicago's reports, not my reports. I would review -- again, I would review the reports that were available to me at the time.

BY MR. HAZINSKI:

Q In 1998 you would review physical, that is paper copies, of reports, right?

A Yes.

Q I mean as opposed to digital or electronic reports, right?

A Right.

Q Would you retrieve those physical pieces of paper yourself or did someone give them to you?

A You mean did I go into a file cabinet, is that what you are asking me?

Q Yes.

A Yes, that's what you are asking me, did I go into a file cabinet at a police station to get reports, no, I didn't go.

I would get or I would review what was provided to me by the officers or detective.

Q And did officers provide you with the entire investigative file for that case?

MR. BRENER: Objection to form, foundation, incomplete hypothetical.

THE WITNESS: I don't know.

Again, as the Assistant State's Attorney -- as an Assistant State's Attorney I wouldn't know what the complete investigative file is you are referring to.

A file -- again, if a case had occurred recently oftentimes all you had was what I refer to as an RD is also referred to as a case report, you might have the CB which is sometimes also referred to as the arrest report, that might be all you have, a CB and an RD.

I am not going to say that that's a complete investigative file because a file would have more than that, but many of those reports would have been generated subsequently.

BY MR. HAZINSKI:

Q I don't mean to belabor this point, and this is kind of a simplistic question, but when officers or detectives provided you with case documents that needed your review did they provide

CCSAO COI SUBPOENAS 000094

you with a folder containing documents or pieces of loose -- loose pieces of paper that were not attached together in a folder?

MS. GOLDEN: Object to form.

MS. ROSEN: Objection, form.

THE WITNESS: I don't know that I can say that there was one way that those reports were provided. I don't know that there was one way, but you are asking me was I provided with like some type of binders of reports? I don't recall ever being given such a thing. I was given reports to review. I don't remember the exact format that they were given other than they were in paper.

BY MR. HAZINSKI:

Q Would you review every document that was provided to you to review?

A Well, yes, I think I would have -- again, I don't know that I can speak to everything that I did from 1998, but I believe I would have reviewed any documents that were given to me to look at.

Q Can you think of any reason as you sit here today that in 1998 you would have not reviewed a document that the police provided you?

A I can't.

Q Do you recall any instance in which you requested that the police provide you with additional documents in addition to the ones they originally provided to you?

A You trailed off there, all I heard is do I recall an instance where.

Q I will repeat the question, thank you.

Do you recall an instance where you requested that the police provide you with additional documents beyond the ones that the police had already provided to you?

A I don't recall an instance where I was asking for -- asking for reports that they had not given me, I don't recall. It's possible that I did that, but I don't recall that.

Q Do you recall any instance you asked to see an officer or detective's handwritten notes?

A I don't recall an instance where I would have done that.

Q One more question on this topic to close it up.

Do you recall any case where you were performing a review where you learned that there

were additional documents that the police did not provide to you that you believe could have been provided to you to your role as Felony Review Assistant?

A I don't know that I understand your question.

Are you asking me while I was on Felony Review reviewing a case did I learn that the police had additional reports that hadn't been provided to me?

Q The question is slightly more specific than that.

Do you recall while you were in Felony Review as an Assistant State's Attorney reviewing a case and at any time learning that the police were in possession of additional documents such as police reports that had not been provided to you that you believed they should have provided to you?

A I can't think of an example such as that.

Q Okay.

Was one of your responsibilities as a Felony Review ASA to interview witnesses?

A Yes. If witnesses were available, yes.

Q Did you interview witnesses most frequently at police stations?

MR. BRENER: Objection to form.

THE WITNESS: Mostly.

BY MR. HAZINSKI:

Q Did you ever conduct interviews in the field?

A I may have, yes.

Q Can you think of any examples of witness interviews you conducted in the field?

A You know what, I can't think of a specific example.

I think there was instances maybe where a witness was elderly or couldn't get down to the police station for whatever reason and then we were asked to then go to that person's place. There could be a witness that was in the hospital and so we would go. This is each time with the investigating detective or officer we would go with them to speak to that individual.

Those are -- I can't think of a specific examples of when I did that, but those would be instances.

Q Did you ever conduct witness interviews

CCSAO COI SUBPOENAS 000095

97

which the entirety of the interview took place outside the presence of police officers or detectives?

A No.

Q So to put that another way --

A I don't recall that, but it's possible I don't recall that.

Q You can't recall any instance in which -- let me phrase the question differently.

As far as you can remember every time you conducted a witness interview in the course of your responsibilities as a Felony Review ASA a police officer or detective was there for at least part of that interview, right?

MR. NOLAND: Objection, mischaracterizes, foundation, calls for speculation, and it has been asked and answered.

You can answer again.

THE WITNESS: So to the extent that I can remember was an officer or detective present for part of -- at least part of an interview? Yes.

BY MR. HAZINSKI:

Q Did Felony Review Assistants ever interview witnesses before those witnesses had

98

ever been interviewed by a CPD officer or detective?

MR. BRENER: Objection to form and foundation.

MR. NOLAND: I think it has been asked and answered.

You can answer.

THE WITNESS: I don't know how I would have known that an individual was a witness other than if the detective or officer was presenting him to me as such.

BY MR. HAZINSKI:

Q To do that --

A I don't know how I would have known that person was there, you know what I mean, I am at the police station and it's their investigation.

Q Right.

To put the question another way that perhaps might be clearer, the witnesses you were responsible for interviewing had already spoken to a CPD officer or detective in some capacity by the time you spoke to them?

A Likely.

Q As you sit here today can you think of any

99

contrary examples?

A I don't -- I can't, but it -- it doesn't mean it didn't happen, I just can't think of an example.

Q So the CPD officers and detectives had already spoken with these witnesses, the officers or detectives knew at least to some extent what information the witnesses had, is that right?

MR. BRENER: Foundation.

MR. NOLAND: Form, go ahead.

THE WITNESS: I can't speak to everything that another individual knew, but to the extent that they would have spoken to a witness or an individual prior to me speaking to them, yes, they knew that prior to me speaking to them.

BY MR. HAZINSKI:

Q Because you were only talking to them because the CPD thought it would be fruitful for you to do so, right?

MR. NOLAND: Objection, form, foundation.

THE WITNESS: I was -- I spoke to the individuals that Chicago or -- whatever agency it was -- we keep on referring to Chicago, but we reviewed cases other than Chicago. I spoke to the

00

individuals that that -- that the detectives or officers provided.

BY MR. HAZINSKI:

Q And before you spoke to the witness did you speak with any officers or detectives about what that witness had previously conveyed in the course of earlier interviews?

A You are saying did the officer or detective say here is this witness and he is saying this, is that what you are saying?

Q More or less.

A Possibly. I don't know that that was -- I could have, but I don't know that that was how every witness was presented to me.

Q Do you recall instances where you for lack of a better term went into -- blind into a witness interview without knowing what information that witness might have?

A Possibly, but I don't recall each interview I conducted -- you are talking in an abstract do I recall every interview that I conducted from 1998, 1997 to 1998? I don't recall.

Q Do you know whether officers and

CCSAO COI SUBPOENAS 000096

detectives of the Chicago Police Department in the course of interviewing witnesses before you had an opportunity to speak with those witnesses made notes of or otherwise documented those earlier interviews?

MR. NOLAND: Objection, form, foundation. You may answer.

THE WITNESS: I don't know how Chicago or the -- how agencies documented their interviews in each instance.

BY MR. HAZINSKI:

Q Is it fair to say if you were interviewing a witness who had not previously given a handwritten or court reported statement and who was not discussed a police report that was provided to you, you would not review any documents about that witness' previous statements before you interviewed them?

MR. BRENER: Form, incomplete hypothetical.

THE WITNESS: So in the situation that you have described there is nothing for me to review prior to talking to that individual and you are asking me did I review anything prior to talking to them, so, no.

In the situation that you are describing there wouldn't have been anything for me to review prior to talking to that individual.

BY MR. HAZINSKI:

Q Okay.

In addition to interviewing witnesses you also interviewed suspects or defendants, right?

A I interviewed suspects or -- yes.

Q Did you conduct those interviews most often at a police station?

A Yes.

Q Do you recall conducting any suspect or defendant interviews in the field?

A I don't recall unless you want to call in the field the interviews may have taken place in a Department of Corrections, either the Cook County Department of Corrections or the Illinois Department of Corrections. If you want to call it the field that could be the field, a field with walls around it.

Q Did you ever interview suspects as distinguished from witnesses outside the presence of police officers?

A Yes.

Q Did you ever conduct an entire interview with a suspect or a defendant entirely outside the presence of officers or detectives that you can recall?

A No, I don't recall an instance where that occurred.

Q What was the purpose of interviewing suspects outside the presence of law enforcement?

A One of the purposes would have been to determine the voluntary nature of any conversation that I was having with that individual to ask them how they had been treated, to ask them if they had been allowed to use the bathroom, if they had been given anything to eat, any threats or promises had been made to them at any point, and to have that conversation outside of the presence of any police officers.

Q Why was it important to ask those particular questions outside the presence of officers?

A So that there would be -- the individual would not be intimidated by the presence of that -- a police officer while those questions are being given or being discussed.

Q Did you ever -- well, strike that.

Do you recall any circumstance in which you asked a suspect point blank whether they had experienced physical violence from the police?

A You are asking me did I ever ask -- use the words "have you experienced physical violence during your time in custody," did I use those exact words? I don't recall using those exact words and it is unlikely that I used those exact words.

Q Did you use words with a substantially similar meaning in an effort to directly determine whether a suspect had experienced physical violence from the police?

A Words with a similar meaning, yes.

Q Would you ask questions designed to determine whether the suspect had experienced physical violence of every suspect you interviewed or only some suspects you interviewed?

A Of every suspect I interviewed.

MR. HAZINSKI: I think now is an appropriate time to take a break because (inaudible).

CCSAO COI SUBPOENAS 000097

Transcript of David Navarro

Conducted on July 23, 2020

Should we take a break for lunch and plan to reconvene in 45 minutes, is that agreeable?

THE WITNESS: Fine with me.

MR. NOLAND: We can do it quicker if those okay, maybe 30 minutes.

MS. REPORTER: Going off at 12:34 and we will start again at 1:00 o'clock.

(Lunch recess taken.)

A F T E R N O O N  S E S S I O N

MS. REPORTER: This is the reporter, we are going back on at 1:10 p.m.

BY MR. HAZINSKI:

Q I have resumed recording.

Mr. Navarro, we left off we were discussing your time as (inaudible) interview of suspects during your time as a ASA, as part of the interviewing of suspects did you ever have to convince a suspect to be more forthcoming with information?

MS. ROSEN: You are totally breaking up.

THE WITNESS: I was going to say your question got muddled there.

During my time on Felony Review --

BY MR. HAZINSKI:

Q During your time on Felony Review did you ever have to convince a suspect you were interviewing to be more forthcoming with information?

A I don't recall having to do that, no.

Q Do you recall ever -- sorry --

A Do I recall, I am sorry?

Q Do you recall ever having to convince a suspect to be more forthcoming with information was the question.

A No.

Q Did you ever yell at a suspect in an effort to get them to provide you with more information?

A No.

Q You prepared handwritten statements in the suspect interviews on some occasions, correct?

A I prepared handwritten statements, yes.

Q Did you ever prepare a handwritten statement before you interviewed a suspect?

A I don't understand what you are asking me.

Did I write out a handwritten statement of an individual before I interviewed them, is that what you are asking me?

Q Yes.

A No.

Q Did you ever ask an interviewee, like a suspect, to sign a statement without informing them of what the statement said?

A No.

Q When you prepared handwritten statements of a suspect's words or witness' words, was that a verbatim transcript of what the interviewee had said to you?

A What you said got garbled there, but I think what I heard you say is was -- is the handwritten statement a verbatim transcript of what the person told me, that was your question?

Q That's the question, yes.

A No, it was not a verbatim. It was not a verbatim summary of what the individual was telling me.

Q Is it fair to describe the handwritten statement as a paraphrase of the interviewee's statements?

MS. GOLDEN: Object to form.

THE WITNESS: I would describe it as a summary, and not word for word, and in fact that's what I wrote, a summary, not word for word.

BY MR. HAZINSKI:

Q If a suspect provided you with information in the course of preparing this statement that you believed was totally irrelevant to the case or the investigation would you omit that information from the handwritten statement?

MR. BRENER: Objection, form and incomplete hypothetical.

THE WITNESS: I don't know what you are characterizing as totally irrelevant.

My role on Felony Review was if I documented a statement was to document what the individual was willing to say and that's what I did. That relevant/irrelevant, I am not sure about that distinction.

BY MR. HAZINSKI:

Q And earlier you testified that on some occasions you interviewed a witness without taking handwritten statement or a court reported statement?

A Yes.

Q Why did that happen?

MR. NOLAND: Objection, form, foundation, vague.

You may answer.

THE WITNESS: There could be a variety of reasons why that would have happened.

BY MR. HAZINSKI:

Q Was one reason that the witness refused to give such a statement?

A That is -- that could have been one of the reasons, yes.

Q Can you think of any other reasons?

A The statements, oral statement may be straight out denial of any involvement in the crime, and in that instance there would be -- wouldn't really make sense to take a handwritten statement of that denial.

In other instances the individual while denying may give such an alibi or a defense that that might have been included. But each case is so different I don't know that I could give you every reason why.

Q Okay.

If you interview a suspect and for any reason did not ultimately take a statement from them you said you would document a summary of that interview in the Felony Review folder, correct?

MR. NOLAND: Objection, form, foundation, mischaracterizes, incomplete hypothetical.

You can answer.

THE WITNESS: If I interviewed a suspect in custody and that person didn't -- ultimately didn't give a handwritten or court reported statement whatever oral statement was given a summary of that would have been documented on the Felony Review folder.

BY MR. HAZINSKI:

Q What if you interviewed a person who was a witness but not a suspect or a defendant in custody who did not ultimately give you a statement, in that case would you document a summary of your interview with that person anywhere?

A Would I document -- are you asking would I document that on the Felony Review folder, no.

Q Besides documenting that summary information from the Felony Review folder would you personally document that information in any other place?

A I don't recall an instance where I would have done that in any other place.

Q Do you recall any instance you made a photocopy or any other visual reproduction of summary that you wrote on a Felony Review folder?

MR. NOLAND: Objection, form.

Go ahead.

THE WITNESS: Are you asking were there a instance of where I made a photocopy of the Felony Review jacket or the Felony Review folder, is that what you are asking me? I don't know at what point was I using that photocopy.

BY MR. HAZINSKI:

Q Before we get to that could you answer the initial question, do you remember ever making such a photocopy?

A Do I ever remember making a photocopy of the Felony Review folder, yes, I made photocopies of Felony Review folders, yes.

Q Would you make such photocopies at the police station?

MR. NOLAND: Objection, form, foundation, incomplete hypothetical.

THE WITNESS: Possibly.

BY MR. HAZINSKI:

Q Do you recall any instance where you provided a photocopy of the Felony Review folder to police officers or detectives who were investigating the case you were reviewing?

A No, I don't recall. I don't recall doing that.

I thought you were asking would I make

CCSAO COI SUBPOENAS 000099

**copies of Felony Review folders, yes, you do that as part of discovery.**

Q So that information, those photocopies, would be prepared for disclosures in subsequent criminal proceedings, right?

MR. BRENER: Object to the form.

THE WITNESS: Yes.

BY MR. HAZINSKI: Yes.

Q And other than making those photocopies and providing them to the defense counsel for purposes of criminal trial discovery or criminal pretrial discovery did you make photocopies of Felony Review folders for any other purpose?

**A If I did I don't recall.**

Q Did you ever interview witnesses or suspects for a period of time before you began to take a handwritten or court reported statement from them?

MR. BRENER: Objection to form.

THE WITNESS: Yes.

BY MR. HAZINSKI:

Q What was the purpose of that?

MR. NOLAND: Object to the form.

You can answer.

THE WITNESS: Well, I would have to talk to the person first to know what they were saying before seeing if this was a case where a handwritten statement -- to see, one, if the person was willing to give a handwritten statement or if this is an instance where in a homicide case where they are willing to give a court reported statement.

BY MR. HAZINSKI:

Q Would you say that you typically spoke with witnesses for a period of time before you began preparing a statement?

**A Did I typically speak to -- speak to witnesses or defendants?**

Q Well, I will make the question specifically first about witnesses.

Did you typically speak to witnesses for a period of time before preparing a statement with them?

**A Typically if we are saying typically, yes.**

Q The same answer for suspects and/or defendants?

**A Yes.**

Q Did you take notes as part of that initial conversation before the statement was reported?

**A No.**

Q Do you recall any instance in which you did that?

**A No.**

Q As part of your responsibilities to interview suspects of witnesses were you responsible for making a determination about whether a witness or a suspect was telling the truth?

MR. NOLAND: Objection, form, foundation, incomplete hypothetical.

You can answer.

THE WITNESS: Was it my responsibility to determine if someone was being truthful? I don't know that I can characterize that was my responsibility to determine if someone was being truthful. We -- your job as an attorney, any attorney, is to assess a witness's credibility.

BY MR. HAZINSKI:

Q I want to clarify an earlier answer.

In the course of talking to a witness before you began preparing a statement you did not take notes of that portion of the conversation, right?

**A In the course of interviewing a witness did I take notes, no.**

Q Why not?

**A Because that was not what I did.**

Q Do you know whether other Felony Review ASAs did take notes under those circumstances?

**A I don't know. I don't know what other Assistants did. I know what I did.**

Q As a lawyer part of your job was to assess the credibility of people you were talking to, correct?

**A Yes.**

Q If you believe a witness or suspect was not being truthful would you still take a statement from them?

**A Depends on the -- it depended on that particular situation.**

Q Can you explain what you mean by that?

**A Well, there could be a situation where an individual implicates himself by being present but says another individual was the actual shooter and then the other individual in custody says they**

CCSAO COI SUBPOENAS 000100

**Page 7**

were present but the other person -- they point the finger at each other would be the kind of way of saying it another way, one of those individuals is not -- one or both is not being truthful. So does that mean that you don't document that statement?

I don't know that that -- in that instance I might have documented both of those statements even though in my assessment one or both is not being credible.

Q Can you describe an instance in which you declined to take a -- actually, strike that question.

Can you think of a set of circumstances where you would decline to take a statement from a witness or a suspect specifically because you believed they were not being truthful?

A There might be a situation -- there could be a number of reasons, one, that just says as we are sitting here talking if an individual denies involvement in the crime, does not give any other -- just a denial and without any other additional information such as to say an alibi or a defense such as self-defense or defense of others where in

**Page 8**

the absence of that there would be nothing to document other than the denial.

Q Okay.

Can you think of any other examples in a case where you refused to take a statement from a witness or suspect specifically because you believed they were not being truthful?

MR. NOLAND: Object to the form.

You may answer.

THE WITNESS: You are saying refused. It is not -- you are characterizing it as refused, it is just -- I don't know that I characterize it as refuse, I just wouldn't document the statement, like I said, I think I gave you the examples previously.

BY MR. HAZINSKI:

Q Okay.

If you believed that a witness or suspect was not being truthful in the information they were providing to you would you document that anywhere?

A I don't know that I would -- I don't know that I would be documenting that anywhere because the detectives or investigating officers are the

**Page 9**

ones conducting the investigation and so that would have been documented in their reports.

Q Did you --

A I can't think of an example.

Q I apologize for interrupting.

Would you convey that information that you believed a person was not being truthful to the investigating detectives or officers?

MR. NOLAND: Objection, form, foundation, incomplete hypothetical.

You may answer.

THE WITNESS: Well, the convey information, again, in any normal instance I am interviewing those witnesses or individuals with the police present, so there is nothing to convey.

BY MR. HAZINSKI:

Q I am asking if you conveyed to the lead officer -- I shouldn't say lead, I am sorry, let me strike that question.

I am asking if you conveyed your belief about a person's truthfulness or credibility to the officer or detective at any point.

A Could I have in the cases I worked on Felony Review during the time -- during that time,

**Page 20**

I could have. I can't recall specific conversations where I said I don't believe this person is being truthful. I don't recall those specific examples, but could have that occurred, yes.

Q But you don't know one way or the other whether you ever in fact did that?

A I don't recall. As I sit here today I don't recall those specific conversations.

Q If you interviewed a witness or suspect that you believed was falsely implicating someone else in a crime would you document anywhere that you believed their attempts to implicate somebody else were untrue?

MR. BRENER: Objection, form, incomplete hypothetical.

THE WITNESS: Again, if I wasn't documenting their statement in a handwritten are you asking me -- or in a court reported statement was there a separate place where I was documenting that statement other than if it were a suspect in custody where I documented an oral statement those are the places it would have been documented.

BY MR. HAZINSKI:

CCSAO COI SUBPOENAS 000101

Q So are you saying that if you documented a statement by a suspect in custody with implicating someone in a crime and you believed that that part of their statement was untrue that you would have documented that in the statement?

MR. NOLAND: Objection to form, incomplete hypothetical.

THE WITNESS: I don't know.

BY MR. HAZINSKI:

Q Confusing --

A I am not sure if I understand the question, if what I -- in a handwritten statement would I include -- I guess I am not sure what you are asking me.

Would I include information that was untrue or would I include information only information that was true, is that what you are asking me?

Q I will rephrase the question and hopefully make it clearer.

When you believe that a witness or suspect is falsely implicating someone else in a crime would you document that information that you believed that this witness was making a false implication in the statement itself?

A I am not documenting my -- so you are asking me if I am documenting my thoughts, my beliefs in the statement? That's not what I was -- that is not what I would do at any point.

Q Would you document that information in a separate report of any kind?

MR. NOLAND: Objection, form, foundation, incomplete hypothetical.

You can answer.

THE WITNESS: So you are asking me would I document somewhere this guy is a liar, is that what you are asking me, did I write that somewhere?

BY MR. HAZINSKI:

Q Specifically the person is lying about -- I believe this person is lying about someone else's involvement, would you document that somewhere?

A No, no.

Q Would you convey that particular belief of yours to investigating officers or detective?

A I think you asked me that before and, again, I don't know if I had that conversation with investigating officers while I was on Review, I may have, but I don't recall a specific example of where I would have said this individual is lying. I don't recall specific examples of that. I may have. I just can't tell you right no.

Q Was there an average or are you able to estimate an average amount of time it took to reduce a witness or suspect's statement in handwriting in the form of a handwritten statement?

MR. NOLAND: Objection, form, foundation.

You may answer.

THE WITNESS: No, I couldn't give you an average.

BY MR. HAZINSKI:

Q What factors?

A Each case was different. The -- what factors?

Q I will ask it, I didn't get all the way through it.

What factors would affect the length of time it took to prepare a handwritten statement?

A The nature of the crime, whether you are talking about a -- maybe you could have been interviewing someone on a string of armed robberies or a sexual assault case and there is more -- some cases had more detail. Some individuals had more to say, and if they were speaking to me I was documenting what they had to say. Some individuals had less to say and so correspondingly the statement was shorter.

In this specific case that we are talking about here today if we are talking -- you have an individual who speaks Spanish, that is going to take longer because you are now interpreting.

Q Other than in this case did you ever take handwritten statements of witnesses or suspects who were monolingual Spanish speakers or spoke only limited English?

A Other than this case did I take a statement from someone who only spoke Spanish, that's your question?

Q Yes.

A I don't -- I can't think of another example, but I know I interviewed other individuals who spoke Spanish. I can't remember if there were other statements I took from individuals that spoke Spanish.

CCSAO COI SUBPOENAS 000102

**25**

Q You can't recall whether there was another instance in which you prepared a handwritten statement in English based on an interview of a witness or suspect who was speaking to you in Spanish, correct?

A Correct. Correct.

Q If a witness is speaking to you in Spanish why would you write their statement in English?

MR. NOLAND: Objection, form of the question.

You may answer.

THE WITNESS: In this instance -- we are going to speak to just this instance because I can't recall another instance, in this instance this is a court exhibit and as a court exhibit the trier of fact either by a judge or jury would speak English.

BY MR. HAZINSKI:

Q Miranda rights in this case were written and read in Spanish, weren't they?

A The Miranda rights on the handwritten statement in this case were written in Spanish, that is your question?

Q Yes.

**26**

A Yes.

Q And there is -- those also comprise part of an exhibit that was later used in court, correct?

A Correct.

Q You wrote them in Spanish because it was important that the suspect be able to understand the content of what was written, correct?

MR. NOLAND: Objection to form.

THE WITNESS: At least part. At least part of that, yes. The rest of that I translated or interpreted to Ms. Mejia.

BY MR. HAZINSKI:

Q Generally speaking are you aware of an investigative tactic involving law enforcement officers inserting deliberately incorrect information into a handwritten statement so the witness can correct those errors to make the statement appear more credible?

MS. GOLDEN: Object to foundation.

THE WITNESS: I am not aware of that as you described, no.

BY MR. HAZINSKI:

Q How was it decided whether a statement

**27**

would be taken in handwritten form or reported in some other way?

A Combination of factors, but by -- essentially based on what the individual, the suspect, was willing or agreed to do.

Q In your experience did suspects generally prefer the process of -- strike that.

In your experience did suspects generally opt for preparing handwritten statements or having their statements be reported in some other way?

MR. NOLAND: Object to the form, foundation.

You can answer.

THE WITNESS: I don't know that I can give you a general -- there is no way to characterize how individuals -- everyone is so different. Took handwritten statements, took court reported statements, some statements were just oral. There was a mix of all those.

BY MR. HAZINSKI:

Q You don't know whether among the people that you interviewed in your times at Felony Review ASA interviewees generally preferred handwritten statements to court reported

**28**

statements or vice versa?

A Well, your -- you are kind of combining a couple situations here by asking that question, and specifically when I was on Felony Review the court reported statements were only taken on homicides and in some sexual assault cases. So you can't necessarily say like as you generalize across all those cases and all the instances that I took statements in armed robberies, there could have been instances in armed robberies where a court reported might have been taken.

But because the court reporters were not a lot of court reporters you -- they were really used in very kind of focused instances or limited instances.

Q The court reporters were used in limited instances because of personnel limitations, right?

A Well, I imagine, yes. I wasn't chief of staff, but that was my understanding.

Q And they were used, you testified, primarily homicide cases and perhaps some sexual assault cases as well?

A As I recall, yes.

Q Why those cases?

CCSAO COI SUBPOENAS 000103

**29**

A Because those were the most egregious cases.

Q Why was it important in egregious cases to have court reporters available?

MR. NOLAND: Objection.

THE WITNESS: I don't know what the --

Like I said, I didn't make the staffing decisions, I just know that's when they were used.

BY MR. HAZINSKI:

Q You don't have any understanding of why there was a preference given to the use of court reporters in homicide cases and sexual --

MR. NOLAND: Objection, asked and answered.

MR. BRENER: Again, form as to the word preference.

MR. HAZINSKI: Please hold your objections until I ask a complete question, if you could, otherwise it will be very difficult for myself, but primarily for the court reporter to get an accurate record, so, please.

MR. NOLAND: John, if there was any interruption it surely was because you were breaking up as we pointed out.

**30**

We have been very patient, but you have broken up on actually many occasions and the witness has been extremely patient and so, certainly I apologize if I spoke over you on that single instance, but that would have been the reason if that's what happened.

And, you know, just to help out, I notice that I think it is when you lean back, you know, just -- you know, just let's keep on moving forward since we will all do our best to speak loudly and clearly.

MR. BRENER: Likewise, John, it was inadvertent, I apologize.

MR. HAZINSKI: Thank you.

BY MR. HAZINSKI:

Q In 1998 did Area 5 have audiovisual technology that would have allowed taking video or audio-recorded statements?

MR. BRENER: Objection to form and foundation.

THE WITNESS: I don't know if they did, but I don't believe them to have had that technology then. I don't know if they did.

BY MR. HAZINSKI:

**3**

Q In your time as Felony Review ASA did you ever take a video or audio-recorded statement at Area 5?

A No, I did not.

MS. GOLDEN: I am sorry, I didn't hear the question.

MR. HAZINSKI: The question was in your time as -- I will paraphrase.

BY MR. HAZINSKI:

Q In your time as a Felony Review ASA did you ever take an audio or visual -- video or audio-recorded statement at Area 5 and the witness answered?

A No.

MS. GOLDEN: I didn't hear take, sorry.

BY MR. HAZINSKI:

Q Court reporters were available to take statements in some of the cases in which you worked as a Felony Review ASA, right?

A Yes.

Q Were they only available at particular times of day?

MR. NOLAND: Objection to foundation.

THE WITNESS: I don't believe that to be

**32**

the case.

BY MR. HAZINSKI:

Q So if you were interviewing someone after work hours in a homicide case and believed for whatever reason that it was appropriate to take a court reported statement, is there any reason you wouldn't have been able to get a court reporter there just because it was after work hours?

A What you are saying, work hours, the reality of Felony Review, I am not saying anything you don't know, Felony Review is 24/7, so there wasn't really work hours in Felony Review. You were always -- there was always someone working.

Q And the work hours of course I mean 9:00 to 5:00. I guess my question is court reporters were not bound by 9:00 to 5:00 Monday to Friday schedule in terms of their involvement in Felony Review cases, right?

MS. ROSEN: Object to form, foundation.

MS. GOLDEN: Same.

THE WITNESS: The Assistant -- the court reporters as I understood it who were assigned to work to -- work on Felony Review, I guess,

CCSAO COI SUBPOENAS 000104

**33**

understood that they could be called out at odd hours, including after 9:00 to 5:00 as you have defined it.

BY MR. HAZINSKI:

Q There are handwritten statements on one hand and court reported statements on the other hand. Was one method of taking statements faster than the other?

A I don't know that you could --

MS. GOLDEN: Object to form.

THE WITNESS: I don't know that you could say one method is faster than the other inasmuch as if you were -- if a court reporter was called you have to wait for the court reporter to get to the police station, so that time factors into the time that it took to get the statement.

BY MR. HAZINSKI:

Q As comparing those two methods of taking statements was one method more reliable than the other?

MR. BRENER: Object to form.

MR. NOLAND: Object to form, foundation. You may answer.

THE WITNESS: I don't know that I can

**34**

characterize one method as more reliable than another.

BY MR. HAZINSKI:

Q When you took handwritten statements those statements did not expressly create a record of questions asked, did they?

A No, they don't.

Q And a court reported method of taking a statement records the exact words of the interview as opposed to a summary of their words, right?

A Yes.

Q Preparing handwritten statements were interviewees ever permitted to handwrite their own statement?

A No.

Q Why not?

A I have only seen that happen on television. I never saw that. That didn't happen when I was on Felony Review.

Q Do you have any understanding of why that didn't happen while you were on Felony Review?

A There would be a variety of reasons. I don't know the specific reasons.

In some instances the penmanship of an

**35**

individual who is writing is bad. Other instances you are talking to some pretty violent people and I wasn't always interested in putting a sharp object in their hands for hours at a time.

It is just a variety of reasons why that individual -- why we wrote it.

Again, it is a court exhibit and so we are documenting that court exhibit.

Q If I give you an example of a -- an eyewitness, for example, that you are interviewing and taking a statement from in the course of your duties on Felony Review who you understand to be entirely non-violent and to have outstanding penmanship can you think of any reason that that person would not have been permitted to hand write their own statement?

MR. BRENER: Objection, form.

MS. ROSEN: Objection to form, foundation, and relevance.

THE WITNESS: Again, given all the provisos you have given it is still a court exhibit and the attorney prepares that exhibit, in this instance the Assistant State's Attorney.

In each instance though the individual has

**36**

a chance to go over it and make any changes or corrections that they wish to, so it is their statement, they are adopting that statement while we are writing it.

BY MR. HAZINSKI:

Q Earlier you testified that one of your responsibilities on Felony Review was to ensure that the statements of witnesses and suspects were not the result of coercion, is that right?

A Yes.

MR. BRENER: Objection, misstates prior testimony.

BY MR. HAZINSKI:

Q Please tell me everything you did as a matter of ordinary practice to determine whether witnesses or suspects had been mistreated or coerced.

MR. NOLAND: Objection, overly broad, but you may answer.

THE WITNESS: One of -- I think we discussed this previously when you asked me, but at some point when I would speak to an individual I would ask them outside of the presence of the police, I would ask them how they had been

CCSAO COI SUBPOENAS 000105

37

treated, if they had been allowed to have something to eat or drink, they be allowed to use the bathroom, if anyone had threatened them or was forcing them to say anything, just in general how are they, and make a determination if that statement was being given freely and absent coercion.

BY MR. HAZINSKI:

Q Can you recall any occasion in which a witness or suspect told you that they had not given a statement freely?

A No, I cannot -- I never had a witness tell me that.

Q During your time on Felony Review did you ever hear of that happening?

MR. NOLAND: Object to the form.

You may answer.

THE WITNESS: I don't recall hearing about that happening when I was on Felony Review.

BY MR. HAZINSKI:

Q When you were asking people whether they had been mistreated by police among the other questions you asked them an effective way of determining whether their statements had been

38

given freely?

A It was a -- it was one of the ways.

Another thing, you would have an opportunity to make an observation of the person you are talking to, their physical condition while you are talking to them.

Q What types of observations would you make as a part of that investigation?

A Well, just as you are looking at me, I am looking at them to see are they -- do they have any marks on them, are they -- were they -- what was their condition, what was their emotional state, how were they when I was talking to them.

Q If you noticed that a person had marks or a condition, what would you do?

A As I previously said, I never encountered that situation.

Q Do you know what you would have done if such a situation had come to pass?

A I don't recall what the specific -- what I would have specifically done. Likely I would have spoken to my supervisor.

Q Would you have -- we will move on.

A number of your responsibilities on

39

Felony Review was making a recommendation about whether charges should be brought against particular people, right?

A Approving charges or not, yes.

Q What does it mean to approve charges?

A To approve the charges that were being presented -- for the individual or individuals that were being presented to us.

Q Who had input into the decision about whether to approve charges?

MR. BRENER: Objection, form, incomplete hypothetical.

THE WITNESS: It depends on the case, but it is the Felony Review assistant primarily who is out there.

BY MR. HAZINSKI:

Q Besides the Felony Review assistant conducting the review, who else might have input into the decision about whether to approve charges?

A As I recall in certain instances you may -- we may have contacted supervisors on certain cases. I don't recall the exact -- which cases those were, but on certain cases it was my

40

recollection that we called supervisors on certain cases.

Q Did detectives or officers have any input into decisions to approve charges?

A No. They are the ones who are presenting the case.

Q If multiple Felony Review assistants were working on a particular case did only one of those assistants make the charging decision?

MR. NOLAND: Objection, form, foundation, incomplete hypothetical.

You may answer the question over the objections, vague.

THE WITNESS: So you are -- the way you are asking that, there could have been multiple assistants working on a case, maybe in an instance those witnesses were interviewing witnesses, the other assistant you are describing were interviewing witnesses, and the other assistant or assistants were interviewing the suspect, so it is -- there is not a -- there could be instances where individual assistants are interviewing individual defendants and so then those are all different situations.

CCSAO COI SUBPOENAS 000106

**Page 4**

BY MR. HAZINSKI:

Q Does making a decision about whether to approve charges require you to be familiar with the entire criminal investigation?

MR. BRENER: Objection, form and foundation.

THE WITNESS: You -- to review charges and approve charges or -- as to an individual defendant you would try and have as much information as possible.

BY MR. HAZINSKI:

Q Other than what did that information gathering that we discussed available involve, reviewing police reports, right?

**A Yes.**

Q To who did Felony Review ASAs make or convey to approve charges?

MR. NOLAND: Objection to form.

THE WITNESS: You trailed off at the end, John, can you repeat that one?

BY MR. HAZINSKI:

Q I will repeat it. In fact, I will ask it differently because it was poorly phrased.

**Page 42**

Did you convey your charging decisions whether to approve or not approve charges to anyone at the State's Attorney's Office?

**A Well, you -- I would have conveyed it to the -- one, on any case you convey it to the dispatcher to let them know what happened, but as I said on certain cases you would speak to your supervisor. I don't recall the specific cases, but I remember there were certain cases that you spoke to a supervisor about.**

Q After a Felony Review ASA made a decision to approve charges, was that decision subject to further review by anyone else at the State's Attorney's Office?

MR. BRENER: Objection to foundation.

THE WITNESS: Well, again, like I said, there were instances where we spoke to a supervisor. I don't know if that's further review, but if I approved charges ultimately that's because charges were approved.

BY MR. HAZINSKI:

Q Are you aware of any instances where either you or another Felony Review ASA approved charges but the suspect was not ultimately

**Page 43**

charged?

**A I am not aware of an example to that.**

Q Are you aware of any instances where you or any other felony ASA did not approve charges and a suspect was charged anyway?

**A I am not aware of a specific example of that, of a case where I did not approve charges but charges -- I can't think of an example of that.**

Q Did you apply a particular legal standard to determine whether to approve charges?

MR. BRENER: Objection to form, foundation.

THE WITNESS: The legal standard would have been the probable cause to believe that this case, that the individual before us, had committed the offense and should be held over to trial on the matter.

BY MR. HAZINSKI:

Q At the time you were working in Felony Review did you have any further more specific definition of what is meant by probable cause in this context?

MR. NOLAND: Object to the form.

**Page 44**

You may answer.

THE WITNESS: I don't. I don't know that I did more than what I have just said.

BY MR. HAZINSKI:

Q Do you recall any instances where you did not approve charges in a case where investigating detectives and/or officers believed that a suspect should be charged?

**A You kind of -- you garbled at the end, were there instances where I did not approve charges but a case was being presented to me for charges, that's the question?**

Q I will ask it again and hopefully avoid confusion.

Was there a case where you did not approve charges even though the investigating detectives and officers believed that the person/the suspect should have been charged?

**A Yes. That would have been a rejected case.**

Q Do you recall how many times that happened?

**A I don't.**

Q Was it more than once?

CCSAO COI SUBPOENAS 000107

**Page 45**

A Yes.

Q Was it more than five times as far as you remember?

A During the time that I was on Felony Review more than five times, likely, yes.

Q Is it likely that it was more than ten times?

A I don't -- more than that I can't say. I know that it happened. The numbers I couldn't tell you, more than five, that seems fair to say, more than that I couldn't tell you.

Q Did you ever -- do you recall ever not recommending charges to someone who had confessed to the crime?

A I don't. I don't recall an instance where someone had confessed to committing a crime and I didn't charge them. I don't recall that. It could have happened, I am just saying I don't recall that.

Q Do you recall any cases in which you did not approve charges against a suspect who had been identified by a suspect who had confessed?

A Where I did not approve charges for someone who did not confess but someone else was

**Page 46**

implicating them?

Q Yes.

A I think that's possible I did that, yes. I can't recall specific examples, but that -- yes.

Q In a case like that can you explain to me why a person who had been implicated by someone else would not be charged?

MR. BRENER: Objection, form, incomplete hypothetical.

THE WITNESS: Wait, you are saying -- you asked me if I would have approved charges for someone who was denying their involvement but was implicated by another person, that was your initial question, now you are asking me why I would not have charged that person?

BY MR. HAZINSKI:

Q I mean to be asking you about the same situation, you declined the approved charges for a person who has been implicated by somebody else but the suspect in question has not confessed.

MR. BRENER: Objection to form, incomplete hypothetical.

THE WITNESS: Okay, I am making sure I

**Page 47**

understand this. You are asking me did I reject charges on somebody -- did I ever reject charges on somebody where the defendant was denying involvement but he was being implicated by someone else, that's your question?

BY MR. HAZINSKI:

Q Yes.

A So, okay, there could have been a variety of reasons that maybe there wasn't physical evidence to tie the person, maybe there wasn't any other witnesses other than the other person, maybe there isn't -- maybe that guy who was denying had an alibi that stood up? I don't know, there is a number of reasons why that wouldn't have -- why the rejection would have been the case, but that's -- I don't know about that one, there is a lot of reasons. I don't know that I could single them out for you.

Q This is maybe redundant with the previous question, but, just to confirm, did you ever reject charges against someone because you believed their statements were the result of mistreatment or coercion by the police?

A I never had an instance where someone

**Page 48**

complained to me that they had been mistreated or coerced by the police, so correspondingly I never had an instance where I rejected charges for those reasons.

Q Was another one of your responsibilities as a Felony Review ASA to testify in criminal proceedings?

MR. NOLAND: Object to the form.

You may answer.

THE WITNESS: That is your responsibility, but that's your responsibility as an individual to testify if you are subpoenaed or asked to testify, so, yes, that was a responsibility.

BY MR. HAZINSKI:

Q Did that include giving grand jury testimony?

A If needed.

I don't recall an instance where I gave grand jury testimony as a Review Assistant.

Q Did you testify in pretrial motion hearings in connection with cases you had reviewed?

A Did I testify in any motions in limine in any cases that I reviewed, yes.

CCSAO COI SUBPOENAS 000108

49

Q What about criminal trials?

A Did I testify at trial, yes.

Q What about sentencing?

A You know, I don't know -- I don't recall if I ever testified at sentencing, I might have.

Q When you testified in criminal proceedings, whether grand jury, pretrial motion hearings, or the criminal trial itself in general what would you do to prepare to testify?

MR. NOLAND: Objection, overly broad.

You may answer.

THE WITNESS: What I would do to prepare is meet with the assistant that was presenting me for that hearing.

BY MR. HAZINSKI:

Q Did you review any documents?

A Depending on the case I would review what was -- it depended on the case.

Q In cases you reviewed the documents what kind of documents did you review?

A Again, if it depends on the case, but I could have reviewed if there was a handwritten statement that I took, likely I would have reviewed the handwritten statement. If it was

51

MR. BRENER: Objection.

THE WITNESS: It was an assignment. I don't know if desirable or not desirable, really everything is relative, right, if you are a misdemeanor assistant you want to be on Felony Review. If you are on Felony Review you want to be in the trial division. It was an assignment.

BY MR. HAZINSKI:

Q Are you saying there were worse jobs and better jobs?

A It was a job, it was an assignment that when you are on Felony Review, yes, worse jobs, other jobs, okay.

Q Other than this case were you ever on Felony Review on any other Area 5 violent crimes cases that you can recall?

A That I recall, likely, yes.

Q Do you recall what those cases were specifically?

A I don't.

Q Can you give me an estimate of how many times you reviewed an Area 5 violent crimes case for Felony Review?

A I can't.

50

just an oral statement I would have reviewed the oral statement, the review folder, and any oral statement documented in the effective supplemental report. Those are the examples of something I think I would have reviewed.

Q Besides meeting with the ASA presenting your testimony, did you generally discuss your testimony with anyone else before you testified?

A I can't think of who else I would have discussed it with.

Q Did you ever discuss it with any detectives or other officers who investigated the case?

A No.

Q Beyond meeting with the assistant presenting your testimony would you otherwise have any role in assisting the ASAs who were prosecuting the case?

A No.

Q Was Felony Review considered a desirable assignment in the Cook County State's Attorney's Office when you were there?

MR. NOLAND: Objection to form, foundation.

52

You know, I have worked at that Grand and Central station in different capacities, as a preliminary hearings assistant, on Felony Review, as a judge, as a misdemeanor assistant, so I have been to that building so many times it all kind of bleeds together, honestly. I don't know, was I there previously, was I there as a review assistant, yes. How many times, I couldn't tell you.

Q Were you familiar with the officers who worked at Area 5 violent crimes during your tenure on Felony Review?

MR. NOLAND: Objection, form.

You can answer.

MS. GOLDEN: Foundation.

THE WITNESS: Did I know? Did I know some of those or was I familiar with those officers? I believe so.

BY MR. HAZINSKI:

Q Were you familiar with any Area 5 detectives in 1998?

A Like I said, yes. Which ones I couldn't tell you.

Q Are you familiar with the layout of Area 5

CCSAO COI SUBPOENAS 000109

**53**

as it existed in 1998?

A Roughly -- I could say roughly, yes.

Q Are you familiar with the layout as it existed today?

A No, no, I am not.

Q In 1998 detectives worked out of the second floor of Area 5, right?

A That's what I recall, yes.

Q Could you describe the second floor of Area 5 in general?

A The second floor of Area 5, there were stairs in kind of the front of the building from the first floor up to the second floor. There was kind of a glass wall before you went into the main detective area. There were a row of chairs there. Then the main if you want to call it the main detective area was where a bunch of desks/rows of desks were and there were offices and interview rooms and conference rooms around the perimeter of that.

Q Was that basic layout of Area 5 more or less the same the entire -- the entire span of time that you have been familiar with the layout of Area 5?

**54**

MR. BRENER: Objection to form.

THE WITNESS: I can only say what I recall. They may have remodeled it at some point. That's what I remember it looking like.

BY MR. HAZINSKI:

Q To the best of your knowledge did it ever have a significantly different layout than what you just described?

A Right, no, I don't know --

MS. ROSEN: Objection, foundation.

THE WITNESS: I don't remember it. I don't recall it having a different layout other than what I described to you.

BY MR. HAZINSKI:

Q Thank you.

Did you ever have to wait around on the second floor of Area 5 in the course of your work?

MR. NOLAND: Object to the form.

You may answer.

THE WITNESS: There were -- to wait around, yes.

BY MR. HAZINSKI:

Q Where would you wait around at Area 5?

A I don't know. I don't remember

**55**

specifically where I would be other than at one of the desks -- an empty desk somewhere in the division.

Q Did you ever have occasion to be at an empty desk of the second floor of Area 5 while there was an interview or an interrogation going on in one of the interview rooms?

A Again, your question got a little muddled, but was I ever present waiting while an interview or interrogation was going on?

Q Yes.

A Likely, yes.

Q Do you recall whether the doors to the interview rooms were closed when your interviews or interrogations were taking place inside them?

A At every instance I don't recall. Likely the doors were closed, but I don't recall specifically each instance.

Q Do you remember if the interview room doors had windows?

A I don't remember. They must have, but I don't remember.

Q Why do you say they must have?

A Well, I am just picturing that you would

**56**

want to look inside to see who is there, but I really don't remember.

Q Do you remember ever noticing that a window in a door to one of the interview rooms was covered over with paper?

A No, I don't remember that.

Q Do you remember ever being in Area 5 and being able to hear anything that was being said or here any sounds at all from inside the interview room?

A No, I don't recall that.

Q Based on your experience with Area 5 do you know if, for example, standing outside the door of an interview room you would be able to tell whether or not there was an interview going on in there?

A I don't remember that. I don't remember that. There wouldn't have been -- no, I don't.

Q Do you know Rey Guevara?

A Do I know who Rey Guevara is? Yes, I know who Detective Guevara is.

Q Do you remember working with him while he was a detective with the Chicago Police Department?

CCSAO COI SUBPOENAS 000110

A I recall working with him on this specific case.

Q Do you recall working with him on any other cases?

A I may have, but I don't recall any other cases that I worked with him.

Q Did you ever see him in a social context?

A I don't know that I ever did.

Q Do you have any idea who Rey Guevara spent time with socially?

A No, I do not.

Q In terms of your experience working with him when he was a detective did you develop an opinion about his work performance?

A I don't know that I had an opinion plus or minus. He was a detective that I worked with on this case.

Q You didn't develop any opinion about the quality of the homicide investigations that he conducted?

MR. NOLAND: Object to the form.

You may answer.

THE WITNESS: Like I said, I don't recall working any other homicide investigations with him, but I didn't have -- if you are asking me what was my opinion as to this case I didn't have -- I approved charges on this case, that would have been my opinion as to his work on this case.

BY MR. HAZINSKI:

Q Did Rey Guevara have a reputation within the Cook County State's Attorney's Office?

A Not that I was aware of.

Q Were there any officers on the force that developed a reputation in the Cook County State's Attorney's Office?

MR. BRENER: Objection to foundation.

THE WITNESS: Not that I was aware of.

BY MR. HAZINSKI:

Q Did you ever see Rey --

A Again --

Q Sorry, go ahead.

A Well, nothing -- you are asking me whether any officers that had a reputation, again, focusing on 1997/1998, no, I wasn't aware of individual officers with a reputation.

Q Did you ever see Rey Guevara engage in misconduct?

A No, I did not.

Q In 1997 or 1998 did you ever hear that he had been involved in misconduct?

A No, I did not.

Q Subsequently did you ever hear that he was involved in misconduct?

MR. NOLAND: Object to the form.

You may answer.

THE WITNESS: Well, right, I was named in a lawsuit with him, so, yes.

BY MR. HAZINSKI:

Q Before you were named as a defendant -- as his co-defendant did you hear that he was involved in misconduct at any point?

MR. NOLAND: Object to the form.

You may --

THE WITNESS: At some point likely, but I don't recall when.

BY MR. HAZINSKI:

Q Have you ever had any communications with anyone within the Chicago Police Department or the Cook County State's Attorney's Office about Guevara's alleged misconduct?

A Other than this case?

Q Correct.

A No.

Q Were you ever asked to review any of the investigation for work performed -- excuse me. Were you ever asked to review any of the investigations for work performed on cases that you worked with Rey Guevara?

A No, I was never asked to.

Q Do you remember Ernest Halvorsen?

A Did -- I lost your question there, did you -- do I know --

Q Do you know --

A Ernest Halvorsen?

Q Yes.

A I knew Detective Halvorsen, yes.

Q Besides this case did you ever work with him?

A Again, I think I did, but I don't recall a specific case.

Q Did you ever observe Halvorsen engage in misconduct?

A No, I did not.

Q Did you ever hear that he was involved in misconduct outside of this case?

A Outside of this case, no.

CCSAO COI SUBPOENAS 000111

**61**

MS. GOLDEN: I have an objection to the form of the question.

BY MR. HAZINSKI:

Q Do you have any concerns about Ernest Halvorsen's professional integrity?

A Did I have any concerns in 1997/1998 when I was on Review? No, I did not.

Q Do you have any concerns about Halvorsen's integrity at any point after 1997 or 1998?

A I didn't form an opinion as to Ernest Halvorsen's -- Detective Halvorsen's integrity. My experience with him was on this case that I can recall and as I said I approved charges on him, so, that was my opinion at least as to this case.

Q Do you know Edwin Dickinson?

A The name is not familiar to me.

Q Do you know Robert Rutherford?

A That name is not familiar to me.

Q Do you know Mark Harvey?

A That name is not familiar to me.

Q Do you know John Naujokas?

A The name is not familiar to me.

Q Do you know John Karalow?

A Repeat the last name.

**62**

Q Karalow, K-a-r-a-l-o-w.

A The name is not familiar to me.

Q Do you know Daniel Trevino?

A Well, I know a -- I know a Daniel Trevino. If you are asking me on the Trevino that is part of this case, I don't know him.

Q Do you know a Daniel Trevino who is not a defendant in this lawsuit?

A Yes.

Q Do you know Edward Mingey?

A I don't, I don't know that name.

Q Do you know Robert Biebel?

A No, I don't know that name.

Q Do you know F.J. Cappitelli?

A No, I don't know that name.

Q Do you know Tom O'Malley?

A I know who Tom O'Malley is, yes, the Assistant -- former Assistant State's Attorney, yes.

Q Did you work with him as an Assistant State's Attorney?

A Yes, we did.

Q Do you recall how many times you worked together on a case?

**63**

A Well, so I am -- I started in the office, I don't know if we started around the same time, but I worked with Tom in Misdemeanor First Municipal Division in different assignments and then I don't know if we worked together in the trial division.

Q Did you ever see Tom O'Malley socially?

A I may have.

Q Were you aware of anyone that Tom O'Malley worked with at the State's Attorney's Office that he didn't get along with?

MR. NOLAND: Object to the form. You may answer.

THE WITNESS: No, I am not aware.

BY MR. HAZINSKI:

Q Do you recall having conflicts with anyone at the State's Attorney's Office?

A I don't, I don't recall that. I don't -- no.

Q Do you have an opinion about Tom O'Malley's work performance as a Felony Review Assistant State's Attorney?

A My only recollection of Tom as a Felony Review Assistant was on this case, and my opinion

**64**

was he did his -- his work was good.

Q Do you have an opinion about Tom O'Malley's work as an Assistant State's Attorney more generally?

A I never had any reason to question Tom's performance or any -- never knew of any complaints about Tom.

Q Did Tom O'Malley have any particular reputation within the State's Attorney's Office?

MR. BRENER: Objection, foundation.

THE WITNESS: I don't remember any reputation that Tom had.

BY MR. HAZINSKI:

Q Did you ever see Tom O'Malley engage in misconduct?

A No, I never did.

Q Did you ever hear that he was involved in misconduct?

A No, I never did, other than this case.

Q Do you know Heather Brualdi?

A I do.

Q Did you work with her at the State's Attorney's Office?

A I did.

CCSAO COI SUBPOENAS 000112

Transcript of David Navarro
Conducted on July 23, 2020

Q Do you recall how many times you worked with her on a case while you were in Felony Review?

A I believe this would have been the only case that we worked together on Felony Review.

Q Did you see Heather Brualdi socially?

A I don't know if I ever saw Heather socially.

Q Were you friends with her at work?

A We worked together. I think we didn't work together until after Review.

Q Were you aware of anyone at the Cook County State's Attorney's Office that Heather did not get along with?

A No, I was not aware of that.

Q Did you have any opinion about Ms. Brualdi's work performance as a Felony Review Assistant State's Attorney?

A Again, this is the only case that I recall working with Heather together on Felony Review. I had no reason -- I don't recall any issues or complaints that I have had regarding her performance on this case.

Q Did Ms. Brualdi have a reputation in the Cook County State's Attorney's Office?

MR. NOLAND: Objection to foundation.

THE WITNESS: I don't know. I don't know any reputation of Heather Brualdi.

BY MR. HAZINSKI:

Q Did you ever see Ms. Brualdi engage in misconduct?

A Never.

Q Did you ever hear she was involved in misconduct?

A Never.

MR. NOLAND: Object to form.

BY MR. HAZINSKI:

Q Do you know Karin Wehrle?

A I do.

Q For the record, Wehrle is spelled W-e-h-r-l-e.

Did you work with Ms. Wehrle?

A I did.

Q At the State's Attorney's Office?

A Yes.

Q Were you on Felony Review at the same time as Ms. Wehrle?

A Yes.

Q Other than this case do you remember any times you were assigned to the same case as they are in Felony Review?

A No, I don't.

Q Did you see Ms. Wehrle socially?

A I have seen her, I saw her socially after Review, yes.

Q In 1997 to 1998 were you aware of anyone she worked with that she didn't get along with?

A No, I was not aware of anyone she didn't get along with.

Q Did you have at that time -- at that time did you have an opinion about her work performance as a Felony Review Assistant State's Attorney?

A Karin and I didn't work together on Felony Review so I didn't have an opinion about her on Felony Review, but I never heard anything that would make me question her performance as a review assistant.

Q Fair to say you have never seen her engage in misconduct or heard that she was involved in misconduct?

A I have never seen Karin Wehrle engage in misconduct, I have never heard of any allegation of her engaging in misconduct.

Q Do you know Andrew Varga?

A I do know Andrew Varga.

Q Did you work with him at the State's Attorney's Office?

A I did.

Q Was he on Felony Review at the same time as you were?

A He was.

Q Besides this case do you remember any cases you both were assigned while you were on Felony Review?

A You are asking me do I remember working a case with him on Felony Review, no, I don't, other than this case.

And the truth is as to -- I don't even remember seeing Tom at the area.

MR. NOLAND: Andrew?

THE WITNESS: Rather Andrew Varga at the Area.

BY MR. HAZINSKI:

Q At the time in 1998 did you see Andrew Varga socially?

A I don't know if I saw him socially outside

CCSAO COI SUBPOENAS 000113

**69**

of the office.

Q Were you aware of anyone he worked with at the State's Attorney's Office that he didn't get along with?

A No, I am not aware of anyone.

Q Do you have an opinion about his work performance as a Felony Review Assistant State's Attorney?

A Again, I did not work with Andrew Varga on review. We were on different teams so I don't have a performance -- opinion as to his performance other than the statement that I subsequently seen.

Q Do you know if Andrew Varga had a reputation of any kind in the Cook County State's Attorney's Office?

MR. NOLAND: Objection, foundation.

THE WITNESS: No, I am not aware of any reputation.

BY MR. HAZINSKI:

Q Did you ever see Andrew Varga engage in misconduct or hear in he was involved in misconduct?

A No, I did not.

**70**

Q That ends that line of questioning.

I would like to speak to you now more specifically about the Soto murder investigation.

Do you have an independent recollection of the Soto murder investigation in late March and April of 1998?

MR. NOLAND: And I am just going to object. You keep on using the word investigation, we talked about it earlier, I just -- you know, your foundation and then kind of mischaracterizes what his previous testimony was, I just -- maybe use a different word so we don't have to object every time.

BY MR. HAZINSKI:

Q To clarify, I am not asking Mr. Navarro whether you recall -- involved in an investigation, I am not asking -- I am just generally speaking were you aware -- rather, generally speaking do you have an independent recollection of that homicide investigation or the resulting criminal case.

MR. NOLAND: I was just trying to help, so I am going to object, form of the question.

You can answer.

**7**

THE WITNESS: I recall that case, yes.

BY MR. HAZINSKI:

Q Do you recall when you learned about the murders of Mariana and Jacinta Soto?

A It would have been in the afternoon of -- the afternoon that I went out to the area, April 4.

Q I want to ask you about your independent recollection of this case. When I say independent recollection what I am asking for specifically are recollections that you have independent of any review of documents or conversations that you had after the fact. In other words, things that are memories that do not depend on being refreshed by documents or other conversations. Does that make sense?

A Yes.

Q I realize that in some cases it may be difficult to distinguish those things, but to the extent possible the following questions I would like you to answer just based on your independent recollections, okay?

A I will to the best that I am able to.

Q Thank you.

**72**

Can you please tell me everything you remember about the Soto homicide investigation in general?

MS. ROSEN: Object to the form.

MR. NOLAND: Object to the form of the question.

You can answer.

THE WITNESS: You want me to tell you everything that I remember starting from when I got a call to go out to the area?

BY MR. HAZINSKI:

Q Sure.

A I remember to the best I can I remember that I was coming to the end of my what I will call shift or day on Felony Review and that at some point toward the end of my day or shift I got a call or page, we wore pagers back then, and that I called the dispatcher on the page and that I was -- based on that I went to based on the page and based on talking to review I was to go out to Area 5 on a double homicide and that there was a Spanish speaker, I don't remember if it was Spanish speaker or Spanish speakers and I was to go out there to interview, conduct an interview.

CCSAO COI SUBPOENAS 000114

Q Do you recall what happened when you arrived at Area 5?

A As I roughly remember, got there that evening, sometime after 5:00. I spoke to Detective or Detectives Halvorsen and/or Guevara.

Q Do you recall reviewing any documents after arriving at Area 5?

A I don't know if I -- what documents I would have reviewed at that time. Did I review some documents, yes, I don't recall which documents I reviewed.

Q You said that you reviewed documents because you have an independent memory of reviewing documents or because that was your usual practice?

A I am -- I don't know that I have any memory of what documents I reviewed, just that if there were documents to review I would have reviewed them. I don't have any memory of what documents I reviewed.

Q Do you recall leaving the Area 5 for any period of time on the evening of April 4?

A I do. Again, I was coming at the end of my shift, I think called it a shift like I am a shift worker, but I was coming to the end of my shift and I hadn't eaten all day since morning. The normal assignment on review is I am 6:00 at morning to 6:00 at night or 6:00 at night to 6:00 in the morning, and I was coming to the end of the 6:00 in the morning to 6:00 at night and I hadn't eaten since the morning so I left to get something to eat.

Q When you were initially called or I should say when you were initially informed that you would be going to Area 5 as part of this case did you learn which detectives had -- I should say which detectives or officers had made the request for Felony Review?

A I don't know that I recall specifically, but likely it was Detective Guevara and Halvorsen.

Q What makes you think it was likely Guevara or Halvorsen?

A Because those were the detectives that were working the case.

Q Were there also other detectives working the case?

A Possibly.

Q Do you recall if you spoke with any other detectives or officers besides Guevara or Halvorsen?

A I don't remember speaking to any other detective or officers.

Q Do you recall speaking to any witnesses in the investigation who were not defendants or suspects?

A Yes.

Q Who did you speak with?

A Rosauro Mejia.

Q I have more questions about that, but before I get to those, do you recall speaking to any defendants or suspects in the investigation?

A Yes.

Q With whom did you speak?

A Adriana Mejia.

Q Do you recall speaking to any other Felony Review Assistant States Attorneys about the case at Area 5?

A Yes.

Q Which ones?

A Tom O'Malley and Heather Brualdi.

Q Do you recall -- do you independently recall whether any detectives or officers had interviewed any of the suspects before you arrived at Area 5?

MS. GOLDEN: Object to form.

THE WITNESS: I don't independently recall.

Yes, I believe they had spoken to individuals in custody prior to my getting there, yes.

BY MR. HAZINSKI:

Q Returning to your interview of Rosauro Mejia, do you recall when this interview took place?

A Sometime in the evening of April 4.

Q Do you remember who else was there?

A I don't. I know I wasn't by myself, but I don't recall who was with me.

Q Do you recall if that interview was conducted in English?

A I don't believe Rosauro Mejia spoke English, but if he did he spoke limited English.

Q You assume that your conversation with him was in Spanish, but you don't recall certainly one way or the other?

MR. NOLAND: Objection, mischaracterizes.

CCSAO COI SUBPOENAS 000115

You may answer.

THE WITNESS: I don't recall.

BY MR. HAZINSKI:

Q Do you recall where you spoke with Rosauro Mejia?

A I don't remember the specific location. I think it was in a conference room somewhere in the area.

Q Do you recall who asked you to speak with Rosauro Mejia?

A No.

Q Do you recall what information you knew about Rosauro Mejia in advance of your interview with him?

A I don't. I don't recall. It was likely I had information about what -- who he was outside of being the spouse of the -- one of the individuals in custody, but I don't remember what I knew specifically prior to talking to him.

Q When you interviewed Rosauro Mejia was he a suspect in the killings?

A I don't recall that he was a suspect.

Q When you say that you don't recall if he was a suspect, do you mean you affirmatively remember he was not a suspect?

A Well, again, what I remember is I talked to him in a conference room in the area, he wasn't handcuffed, he wasn't -- I don't remember him being a suspect.

Q Is it possible that Tom O'Malley was with you during that interview?

MR. BRENER: Objection, calls for speculation.

THE WITNESS: Is it possible, yes, it's possible.

BY MR. HAZINSKI:

Q Do you recall what questions you asked Rosauro Mejia?

A I don't. And -- I don't remember our specific conversation.

Q Do you remember any information that he provided to you?

A Very generally I recall him describing that his wife -- he believed his wife was pregnant, at that point I believe she was ten months pregnant, and that in connection with that he had taken her to the hospital to deliver the child when she had told him she was going into labor.

At different points -- more than that I don't remember other than later he picked her up from the hospital with the baby that she claimed she had given birth to and another child.

Q Do you specifically recall Rosauro providing those pieces of information to you or is your recollection drawn from documents that you subsequently reviewed?

A I believe I am recalling that from our conversation.

Q Do you recall whether you believed that Rosauro was telling you the truth?

A I did believe he was telling me the truth.

Q Why?

A He impressed me as a very, let's say, simple man who believed where it might be unlikely -- he believed that his wife had been pregnant for ten months and believed that his wife had come home with this child that he believed was his daughter.

Q What do you mean by simple?

A Just won't -- he didn't strike me as a mastermind criminal.

Q Do you believe that Rosauro Mejia had any cognitive deficits?

A No.

Q Do you recall anything else about his demeanor or appearance during your interview?

A No, I don't.

Q Do you know how long Rosauro had been at Area 5 before you started talking to him?

A I don't know how long he had been there. I don't recall, no.

Q So you said earlier because he impressed you as being a very simple man you believed him when he said that he did not realize that his wife was not in fact ten months pregnant, is that right?

MR. NOLAND: Objection, form, foundation, and asked and answered.

THE WITNESS: Yes.

BY MR. HAZINSKI:

Q You also -- you testified that you got the impression that he was not a mastermind criminal, is that right?

A Yes.

Q In your opinion that you believe that a

CCSAO COI SUBPOENAS 000116

**81**

person who was simple and not a mastermind criminal would be likely to fail to notice that their wife was not in fact ten months pregnant despite claiming to be so?

MR. BRENER: Objection, form, foundation, argumentative.

THE WITNESS: I am not sure what you are asking, but he didn't notice -- my impression of him was that he was -- he believed that his wife was pregnant and had given birth to the child, I believed him when he told me that.

BY MR. HAZINSKI:

Q Do you believe that he would have any motive to lie about that?

A Again, I believed -- I believed him when I spoke.

Q When interviewing witnesses and determining their credibility did you as a Felony Review ASA generally consider whether the witness had a motive to lie?

MR. NOLAND: Objection, form, foundation, incomplete hypothetical.

You may answer.

THE WITNESS: That the witness' motive or

**82**

-- sure, I could -- that could be a factor to consider.

BY MR. HAZINSKI:

Q Did you consider that factor in connection with the information that Rosauro Mejia provided to you?

A I don't know what I was -- honestly, you are asking me what I remember and what factors I was considering during my interview of him. I don't know. What I remember about that interview 22 years later is that I believed him.

Q Do you recall interviewing Adriana Mejia?

A I do.

Q Do you recall whether you spoke with anyone, including detectives or other Felony Review ASAs, or other witnesses specifically in preparation to interview Adriana?

A Yes.

Q With whom did you speak?

A I don't know whether I spoke to Detective Guevara or Detective Halvorsen, but I would -- I spoke to one or both of them prior to speaking to Adriana Mejia.

Q Do you recall what time you began --

**83**

MR. NOLAND: John, I am so sorry, I think I am the only one here, we have been going for a little while now and you are moving on to Adriana, I am going to request a break to use the restroom.

MR. HAZINSKI: Absolutely, fine, let's take a break.

MR. NOLAND: If we can take five minutes.

MS. REPORTER: We are going off at 2:55.

(Recess taken.)

MS. REPORTER: We are going back on at 3:51.

MS. ROSEN: It has come to my attention that in another case today that was being Zoom videotaped at Loevy & Loevy that the Zoom video apparently inadvertently videotaped the plaintiff's breakout rooms during the deposition and it is unclear whether or not it also videotaped the defendant's breakout rooms.

This is a deposition in M4 with Tara, Tara informed the parties that that had happened, she stopped listening, but now she cannot share the video with defendants because she has heard the plaintiffs breakout rooms, and I believe her plan is to send it to a court reporter, but I am very

**84**

concerned that obviously we are not saying that she did that on purpose, but clearly people are not familiar with the technology and so I hope that you take extra care to the extent that that's the appropriate suggestion at this point and then we are going to have to re-visit globally this idea of using the Loevy Zoom account for these video depositions, but I just wanted to put that on the record since I just found out about it.

MR. HAZINSKI: Thanks for bringing it to my attention. I wasn't aware of that happening. I am happy to discuss that more with you off the record when we are done and of course fortunately here we don't have any breakout rooms, I don't anticipate a problem like that but we will be sensitive to it and I suggest take every precaution to ensure that any issue like that isn't developing.

MS. ROSEN: I appreciate it, thank you.

MS. GOLDEN: John, are you recording breaks?

MR. HAZINSKI: No. I have been pausing the recording during breaks, it is currently only when we are on the record.

CCSAO COI SUBPOENAS 000117

Transcript of David Navarro

Conducted on July 23, 2020

BY MR. HAZINSKI:

Q Mr. Navarro, picking up, do you recall what time you first began interviewing Adriana?

A I think the first time I went in to talk to her was around 11:00 p.m.

Q Do you recall -- so you were originally there around 5:00 p.m. or shortly thereafter, right?

A Yes.

Q And between 5:00 and 11:00 you interviewed Rosauro Mejia for a period of time, right?

A Yes.

Q Do you remember what else you did between 5:00 and 11:00 p.m. on April 4?

A Also I went to get something to eat shortly after getting to the area, I think that was about -- I was gone for about an hour, and then I previously said I talked to Rosauro Mejia, I think that whole conversation took about an hour.

Q Do you know how long it took you to go out and get something to eat?

A I think, like I said, I think that was about an hour.

Q So that was about an hour, the conversation with Rosauro was about an hour.

Do you know what you did in the additional four hours before you began talking to Adriana?

MR. NOLAND: Object to the form.

You may answer.

THE WITNESS: I was there at the area.

At some point later after I got back from getting something to eat at some point I talked to Tom and Heather and then I was there.

BY MR. HAZINSKI:

Q When you were spending time at the area do you remember where you were physically in the building?

A I don't remember specifically where I was.

Q Do you remember what time you talked to Tom and Heather?

A I think I would have talked to them more than once, but I don't recall the specific time that I talked to them.

Q Do you remember whether you talked to them before or after your Rosauro interview or both?

A Possibly before and after, I don't recall.

Q Do you recall where your interview with Adriana took place?

A It was in an office off to the side of the detective division, I want to call it a watch commander's office or lieutenant's office.

Q Who else was present in that room during that interview?

A During the interview of Adriana Mejia Detective Halvorsen was present with me.

Q At any one time was -- over the course of the entire time that you were interviewing Adriana was anybody besides you Adriana or Detective Halvorsen in that room?

A No.

Q Where was Adriana sitting in that room?

A She was sitting in a chair beside or behind a desk that was in that conference -- not the conference room, in that office.

Q Was she handcuffed?

A She was not.

Q Were there things on that desk?

A You know, there was a -- the things you remember, there was a little Matchbox car that was on the desk, that is what I remember.

Q Do you recall anything about Adriana's demeanor during your conversation with her?

A Yes, I do.

Q What do you recall?

A I remember that she was calm and -- she was calm, that's what I would describe her as.

Q Do you remember any other aspects of her demeanor besides her being calm?

A Not really.

Q Do you recall anything about her physical appearance?

A Generally, yes.

Q Can you describe how she physically appeared?

A As I generally recall her appearing now as I sit here, she was a female Hispanic, dark hair, medium dark complected.

Q Do you recall if she was tall or short?

A You know, I think most of the time she was sitting, she was seated, but it my general recollection is that she was short, but I don't remember. I am not the tallest guy.

Q Did she have any visible injuries?

A She did not.

Q Do you recall whether she seemed alert or

CCSAO COI SUBPOENAS 000118

89

tired?

A  I recall her being alert and I don't recall her being tired.

Q  Did you get the sense that she had any mental health problems?

A  No, I did not.

Q  Did you have any concerns about her mental health at all?

A  You know, I asked her if she was -- if she was under any -- I think I asked her if she was under the care of a psychiatrist or if she was taking any medicine, but I didn't have any specific concern about it.

It just struck me that as she was describing these horrific, horrific crimes she was doing so very calmly and it was -- you shouldn't ever be surprised, I suppose, but it was somewhat -- it was disturbing to me to hear, it struck me that someone describing that would be more upset than she was and she wasn't.

Q  Do you recall how you began your initial conversation with her?

A  I began by introducing myself to her.

Q  What did you say to her after you

90

introduced yourself?

A  I explained to her that I was an attorney, an Assistant State's Attorney, not her attorney.

Q  Did you explain that to her in English or in Spanish?

A  Spanish.

Q  What did you say to her after that?

A  I then advised her of what is referred to as her Miranda warnings.

Q  Was that in Spanish as well?

A  Yes, it was.

Q  Did you provide those warnings to her orally only or did you also provide them to her in writing?

A  During the time that I initially talked to her I provided those -- provided them I just said them to her.

Q  Did do you recall what you said to her after you provided her Miranda warnings?

A  Well, I just made sure that she understood both who I was and what her rights were.  And after that I asked her if she wanted to tell me anything about the murders of the couple and of the baby, anything about the baby.

9

Q  And what did she say in response to that?

A  Then she proceeded -- we proceeded to have a conversation about it.

Q  What did she tell you in the course of that conversation?

A  Generally I don't recall what she specifically said to me at that time, but she generally described her involvement in the murders of the Sotos, how she had faked her pregnancy.

Q  How long did that initial conversation last?

A  I don't recall how long it lasted.  It was an hour or two, I don't recall.

Q  Was Detective Halvorsen present during that inquiry or the whole conversation?

A  You trailed off there and I heard you say was Detective Halvorsen present.

Q  Let me restate it.

Was Detective Halvorsen present during that entire initial conversation that lasted one to two hours?

A  No, he wasn't present for the entire conversation.

Q  How many times did he leave the room?

92

A  I think at least once, maybe twice.

Q  Do you know why he left?

A  I think one time I remember him he went to get a soda for me and I think for Adriana, a Coke.

Q  Did you speak with Adriana while Detective Halvorsen was out of the room?

A  I did.

Q  What did you talk about while Detective Halvorsen was out of the room?

A  I asked her -- I asked her despite the fact that Halvorsen, my knowledge, didn't speak Spanish, so he didn't know really what we were talking about, I asked him while -- while Halvorsen was not there I asked her how she had been treated, how she was doing, I asked her if she had been threatened in any way while she had been there at the area, how she had been treated while she was there, and if she had been allowed to use the bathroom if she needed to or if she needed anything to eat, wanted anything to eat.

She answered that she had not been mistreated, she had not been -- she had been treated fine, she only wanted a soda at that time and that she had been allowed to use the bathroom

CCSAO COI SUBPOENAS 000119

93

when she needed to.

Q Did you at any point find out from Adriana how long she had been at Area 5 at that point?

A I don't remember asking her about that or talking to her about that. While I may have, I don't remember asking her about that.

Q During this initial conversation do you recall any of the specific questions that you asked her about the Soto murders or kidnappings?

A I don't recall. No, I don't recall specific questions that I asked her.

Q While Detective Halvorsen was in the room what was he doing?

A Sitting there.

Q Was he watching your conversation?

A Yes.

Q Was any part of that conversation in English?

A There might have been some part of it that I was -- that I could have said to Halvorsen just to include him in our conversation, but the conversation was primarily in Spanish between myself and Adriana Mejia.

Q What kinds of things would you say to

94

Detective Halvorsen to include him in the conversation?

A I don't recall.

Q After that initial conversation with Adriana, do you recall what you did?

A After that conversation I left the watch commander's office/lieutenant's office and went back out into the main room, main detective division area.

Q What did you do in the main detective division area?

A I don't remember specifically, but I believe I would have spoken to Tom and Heather, but I don't have a specific recollection.

Q Besides from potentially speaking to Tom and Heather, do you know anything else that you might have done at that point?

A No, I don't remember anything else that I would have done.

Q You began speaking with Adriana again after 2:00 in the morning, correct?

A I spoke to her shortly after 2:00 a.m., yes.

Q At that point you began preparing a

95

handwritten statement, right?

A Correct.

MS. GOLDEN: Form.

BY MR. HAZINSKI:

Q Did you give Adriana the option of getting a court reported statement?

A I did not.

Q Why not?

A Because there was not -- there was no method by which to take a court reported statement in Spanish.

Q Would it have been possible for a Spanish speaker to interpret her statements into English for the court reporter?

A You are asking could -- then I would have -- I would have been the person translating to the court reporter the conversation, is that what you are asking?

Q Suppose that you were the one translating, yes.

A Could that have been possible, yes, I suppose that could have been possible.

Q Did you consider --

A There was no opportunity -- there was no

96

opportunity to have an independent court interpreter because we weren't in court.

Q Did you consider trying to find another Spanish speaker at Area 5 to serve as the interpreter or court reporter?

MR. BRENER: Object to the form.

THE WITNESS: Are you asking then I would have had a -- I would have been asking the questions and then there would have been another individual serving as the interpreter?

BY MR. HAZINSKI:

Q That's right.

A To Mejia?

Q Did you --

A Does that answer your question?

Q Let me clarify in case it's unclear.

Did you consider having another person such as a detective or police officer who spoke Spanish serving as an interpreter who could interpret Adriana's statements in Spanish to English so they could be taken down by a court reporter?

MR. BRENER: Objection to foundation.

THE WITNESS: No.

CCSAO COI SUBPOENAS 000120

Transcript of David Navarro
Conducted on July 23, 2020

**97**

BY MR. HAZINSKI:

Q Why didn't you consider that?

A I didn't. You know, it sounds strange to say, we weren't tripping over Spanish speakers here at the area. I was there because I spoke Spanish. I had already worked a shift and now I was there working essentially a second stay, so there wasn't like we were like full up on Spanish speakers.

Q Do you believe it would have been improper for you to both ask questions of Adriana and translate her answers for a court reporter?

MR. NOLAND: Objection, form, foundation.

THE WITNESS: It wasn't -- I don't know that I would have considered it improper or proper, it just wasn't considered.

BY MR. HAZINSKI:

Q How long in total did it take to prepare a handwritten statement with Adriana?

A Several hours.

Q Do you recall how many hours exactly?

A I think we finished around -- somewhere around 6:00 in the morning.

**98**

Q Do you recall taking a particular long time to prepare that statement?

A Do I recall taking a particularly long time, is that your question?

Q Yes.

A It took -- it took as long as it took. I was speaking to her, she was -- I was -- we were speaking, having a conversation, I was writing that down in English and then interpreting that back to her in Spanish, reviewing it with her, signing it, it took as long as it took for that.
      I am looking right now just so you know what I am doing I am looking at the statement, the 13-page statement then, that's how long it took.

Q Thank you.
      After you completed writing out the statement did you review it with Adriana?

MS. GOLDEN: Object to form.

THE WITNESS: Yes, I --

MR. NOLAND: And object to the extent it mischaracterized the prior testimony.

THE WITNESS: I reviewed it with her as we went through it as I wrote it.

BY MR. HAZINSKI:

**99**

Q Would it be fair to say that the process of preparing the statement involved you asking her questions in Spanish, listening to her answers in Spanish, writing down her answer in some form in English, and then relaying what you had written back to her in Spanish?

A Yes.

Q And that was easier than calling the court reporter?

MR. NOLAND: Objection, argumentative.

THE WITNESS: It is what we did.

BY MR. HAZINSKI:

Q There are a number of corrections in the statement, right?

A There are.

Q Who is responsible for making the corrections?

MR. NOLAND: Object to the form.

THE WITNESS: In some instances I was responsible, in some instances Adriana Mejia was responsible.

BY MR. HAZINSKI:

Q Was Ernest Halvorsen responsible for any of the corrections?

**200**

A I don't think -- I don't recall him doing anything.

Q While you were having the back and forth with Adriana in preparing the statement are you sitting across from one another at a desk?

A Ultimately we were sitting kind of at the desk, I was at the corner, we were both at the corners so I am -- right now you can't see me, I am motioning to the corner of the table, but I was sitting kind of at the edge of the one corner and she was sitting -- seated then at the other corner of the desk.

Q Was the piece of the paper with the statement on it positioned in a way that both of you could look at it and review the text without one person having to read it upside down?

A Right.
      Well, as best I remember that's how I remember doing it, that's why we were on a corner, so that she can see as I was writing and then she can read back or she can see me as I was reading it back to her.

Q And did you indicate to her what portions of the statement you were reading as you went

CCSAO COI SUBPOENAS 000121

through?

A I believe I did. I believe I did because then she would make corrections if we changed something.

Q I want to -- actually, let me confirm, you said you finished up preparing that statement at around 6:00 in the morning, correct?

A I believe so.

Q Were there any other Felony Review ASAs still at Area 5 at that time?

A ASA Brualdi and ASA O'Malley, as I recall.

Q Do you recall speaking with them after you finished preparing the handwritten statement?

A Yes.

Q Do you recall what you talked about?

A I don't.

Q At that time were you aware that they had also taken handwritten statements from suspects?

A I believe I would have been aware of that, yes, but I don't honestly as I sit here do I recall the specific nature of that conversation, but I believe that that's what we would have talked about, yes.

Q Do you recall interacting with Andrew Varga at any time at Area 5 in connection with this case?

A I don't.

Q Do you recall interacting with Karin Wehrle at Area 5 at any time in connection with this case?

A I don't.

Q After you -- so this whole period of time between 11:00 p.m. and 6:00 a.m. with the exception of the few times that Ernest Halvorsen/Detective Halvorsen left the room he was otherwise there sitting in on your conversation, correct?

A Correct.

Q He was unable to participate in the conversation because he was not a Spanish speaker, right?

A Correct.

Q Did you and Detective Halvorsen ever leave the room so the two of you could discuss what she was saying to you?

A I don't recall doing that.

Q I don't mean the question to sound pejorative but I don't know how else to put it,

what was the point of Detective Halvorsen being there?

MS. ROSEN: Object to the form.

THE WITNESS: Because the detective is present during the taking of the statement and Detective Halvorsen was one of the detectives working on the case.

BY MR. HAZINSKI:

Q When detectives were present during the taking of the statement, was it commonplace that the detective who would be present during the ASAs interview would be the same person who previously interviewed that suspect or a different detective?

MR. BRENER: Objection to form and foundation.

THE WITNESS: I don't -- I don't know that there was any one way how things were done. A detective was present. In this instance it was Detective Halvorsen. You had three people in custody and so there is only -- there were two detectives, so that's what was happening.

BY MR. HAZINSKI:

Q I would like to direct your attention to a document that I believe you said you have in front of you, which contains the bait ranges RSC426 through RSC446. Do you have that document, sir, the supplementary report?

A I do have it in front of me now.

Q I would like to mark this as Exhibit 1, please.

(Document identified as Exhibit 1 for identification.)

BY MR. HAZINSKI:

Q Mr. Navarro?

A Do I -- I didn't hear the question.

Q Do you recognize this document?

MR. NOLAND: Objection, vague.

THE WITNESS: I recognize this to be a supplemental report, yes.

BY MR. HAZINSKI:

Q Do you recognize this document filled out as it is with the information that it contains?

A Have I seen this document prior to today, is that your question?

Q Yes.

A I don't remember if I ever have reviewed this prior to today.

Q Does this appear to you to be an Area 5

CCSAO COI SUBPOENAS 000122

205

cleared closed report?

A Well, it on its face that's what it is -- says, Area 5 Supplementary Report, and it says in the middle of the page this is an Area 5 Field Investigation 3-Clear Closed Report, and so I would say on its face it is what it says it is.

Q Fair enough.

Did you review this document in preparation for your deposition at any time?

A This is the first time that I am looking at this document.

Q Okay.

I would like you please to turn to Page 6 of the document which bears the Bates stamp RSC431.

A Okay.

MS. ROSEN: Are you not marking this as an exhibit?

MR. HAZINSKI: I marked it as Exhibit 1.

MS. ROSEN: I missed that, sorry.

MR. HAZINSKI: No problem.

BY MR. HAZINSKI:

Q You see the top of the page where it says Notifications?

206

A I see that, yes.

Q Do you see the names of five ASAs including yourself are listed there?

A Yes, I do.

Q Do you know what notifications means?

A I don't know what Chicago characterizes as notifications.

Q Do you recall seeing this report or being sent this report before or after it was prepared in 1998?

A I -- you are asking me that Chicago sent this report to me?

Q I am asking do you recall that happening.

MS. ROSEN: Objection, form.

THE WITNESS: No, I don't recall that. No, I don't recall that happening.

BY MR. HAZINSKI:

Q If you performed Felony Review on a case would you as a matter of course be notified about subsequent developments in that case?

MR. NOLAND: Object to the form.

You may answer.

THE WITNESS: I can't think of an example where I -- as I understand your question, as I

207

approved charges on a case and then there is some subsequent development, you are asking me would I have been contacted?

BY MR. HAZINSKI:

Q Correct.

A I can't think of an example where that would have occurred.

Q Can you please turn to Page 8 within the document which bears the stamp RSC433.

A Okay.

Q I would like to direct your attention to the second full paragraph on this page that begins "on 3 April 98 at 1500 hours," do you see that?

A Yes.

Q Can you please read that paragraph and let me know when you are done?

A Do you want me to read it out loud?

Q No, please read to yourself.

A Okay.

Q This paragraph describes an investigative steps in this case related to a woman named Norma Salazar, right?

A Yes.

Q In 1998 were you informed at any time that

208

the police brought a woman named Norma Salazar into Area 5?

A If I was I don't recall being informed of that.

Q And so you also -- you don't remember whether you were informed that Adriana failed to pick Norma Salazar out of the lineup, right?

A Correct.

Q I would like you to turn to the next page, please, RFC434. The third paragraph on this page begins "On 3 April 98 at 2100 hours," do you see that?

A I do see that paragraph.

Q Can you please read this paragraph to yourself and let me know when you are done.

MS. GOLDEN: Can I have the paragraph again?

MR. HAZINSKI: It is the third paragraph on the page beginning "3 April 98 at 2100 hours."

MS. GOLDEN: I must be on the wrong Page 4, 34?

MR. HAZINSKI: Uh-huh.

THE WITNESS: Okay.

BY MR. HAZINSKI:

CCSAO COI SUBPOENAS 000123

Q At any time in 1998 were you informed by any detectives or officers assigned by the case about the investigative steps that are detailed in this paragraph?

MS. REPORTER: This is the reporter, can you repeat that question?

MR. HAZINSKI: Yes, of course.

BY MR. HAZINSKI:

Q At any time in 1998 were you informed by officers assigned to the case about the investigative steps described in this paragraph?

A The investigative steps described in this paragraph are polygraph exam, and I don't remember knowing about -- if I knew about a polygraph exam or not.

Q Fair to say that you don't remember one way or the other whether in 1998 you knew that Adriana had submitted to a polygraph test, right?

A That's correct.

Q Lower down in this page, the fifth paragraph, begins "On 3 April 98 at 2230 hours," do you see that?

A I do.

Q Could you please also read that paragraph and let me know when you are done?

A Yes.

Q This portion of the report details that Adriana revealed to detective Guevara that she had previously lied to him, correct?

A That she had previously lied -- and then I didn't hear the end of it.

Q This portion of this report details that Adriana stated the evening of April 3 that she had previously given a false story to Detective Guevara, right?

A It says that "she had previously lied about how she got the baby and would now provide a different story," yes.

Q When you interviewed Adriana on April 4th at that time did you know that she had given false stories to the police already?

MS. ROSEN: Object to the form, foundation.

THE WITNESS: I don't recall, again, the conversations that I had with Detectives Guevara/Halvorsen and whether they in describing the work they had done at that point whether that included her prior denials. I don't know that. I

may have, but I don't recall.

BY MR. HAZINSKI:

Q If you had been told that she had previously lied to the police about what happened would that have affected your opinion about whether she was being truthful during your interview with her?

A You are saying individuals in custody are being untruthful and then are then being truthful, that would have not been an unusual situation.

Q Would you turn to Page 15 of the document which is RFC440, please?

A Okay.

Q About two-thirds of the way -- about two-thirds of the way down the page the first full paragraph begins "The R/Detectives contacted Felony Review," do you see that?

A Yes.

Q Can you read that paragraph, please, and tell me when you are done?

A Yes.

Q This portion of the report says you arrived at Area 5 at 5:00 p.m. on April 4, 1998, correct?

A Yes.

Q Is that accurate?

A I think that's what it -- yes, I think that is what I said previously.

Q It also says that you were joined later that evening by Tom O'Malley and Heather Brualdi, right?

A That's what that says, yes.

Q Do you recall what time they arrived at Area 5?

A I don't.

Q Do you recall who requested their presence at Area 5?

MR. BRENER: Objection to foundation.

THE WITNESS: No, I don't recall.

BY MR. HAZINSKI:

Q Do you recall whether you personally requested additional Felony Review personnel to come to Area 5 on that evening?

A I don't know that -- I don't know that I did or didn't or if the detectives did, I don't know. I do know there are three people in custody.

Q Did Tom O'Malley and Heather Brualdi speak

CCSAO COI SUBPOENAS 000124

Spanish in 1998?

A  I don't believe they did.

Q  Besides yourself do you know if there were other Felony Review Assistant States Attorneys in April of 1998 who spoke Spanish?

A  I don't know that there were any others that were -- I don't know.

It is really actually a pretty sad statement, and I don't believe that's the current statement of the -- current situation of the State's Attorney's Office, but the truth is back then I think it was me -- I don't know if there was maybe one other.  I know I did and that's why I was there.

Q  Did Andrew Vargas (phonetic) also speak Spanish?

A  I don't think he did.  I think Andrew was actually like Romanian, Varga is not Spanish.  It's not Vargas, it's Varga.

Q  As far as you know Karin Wehrle didn't speak Spanish?

A  I don't believe she spoke Spanish.

The truth is there just wasn't Spanish-speaking assistants, that's really.

Q  This report also says that you, Tom O'Malley, and Heather Brualdi reviewed the available police reports and the handwritten statements of Guadalupe Mejia.

A  Guadalupe Mejia, that is what it says, yes.

Q  Was that accurate?

A  I don't have any -- I don't recall specifically what we reviewed at that point, but I don't have any reason to believe that that's inaccurate.

Q  Do you recall any particular pieces of information that you learned from reviewing the available reports at that time?

A  No, I don't.

Q  Do you recall reviewing phone records at that time?

A  No, I don't recall reviewing phone records at that time, no.

Q  Do you recall reviewing crime scene photographs at that time?

A  I don't recall reviewing any crime scene photos.

Q  I would like you to turn to the next page, please, which is RFC441.

A  Yes.

Q  The second paragraph on this page begins "On 4 April 98 at 1900 hours," do you see that?

A  I do.

Q  Can you please read this paragraph and let me know when you are done?

A  I have read it.

Q  It says that you and Tom O'Malley interviewed Rosauro Mejia, right?

A  That is what that paragraph says, yes.

Q  You may have said this before, but you don't have any independent memory of Tom O'Malley being present during your interview of Rosauro Mejia, right?

A  I don't.  I remember I was present and it says in an office at the Area 5, and that's what I remember, an office or a conference room.  Someone else was with me, it could have been Tom, I just don't remember who was with me.

Q  Given that Rosauro Mejia was a Spanish speaker would Tom O'Malley have been able to participate in that interview in any way?

A  Not really.

Q  Did you think of --

A  Other than me, other than me translating to him what Rosauro is saying.

Q  Can you think of any reason that he would participate or I should say be present at that interview if you were able to participate in it?

MR. BRENER:  Objection, calls for speculation.

THE WITNESS:  So that I wasn't interviewing an individual by myself, another person was present.

Again, the unfortunate truth is that we were not -- we did not have a lot of Spanish speakers that night.  We went with who was there.

BY MR. HAZINSKI:

Q  There were no officers or detectives present according to this report, right?

A  That's what the report says.

Q  That's unusual, right?

MR. NOLAND:  Object to the form.

You may answer.

THE WITNESS:  It is --

MS. ROSEN:  Objection to foundation.

THE WITNESS:  I don't know what -- I don't

CCSAO COI SUBPOENAS 000125

know that it is unusual or usual, it is just what we did in that instance.

BY MR. HAZINSKI:

Q  Besides possibly this instance can you think of any other time you conducted a witness interview entirely without the presence of a detective or police officer as a Felony Review ASA?

A  I don't.

I don't know that I can describe an instance, but I also can't describe an instance where there were three Spanish-speaking individuals in custody on a double homicide, that I know, there was only this case, so it was a unique situation.

Q  When you spoke with Rosauro -- apologies if you testified to this already -- did you know that his wife was a suspect in custody at the time you began talking to him?

A  I likely did but I don't know.  I don't know specifically what I knew at that point about Adriana Mejia, it is likely I knew that but I can't say for certain.

Q  In addition to the other information that you previously provided me about what Rosauro told you during this conversation, does reading this description of that interview and talk about it bring back any memory of anything else he told you?

A  Does reading the paragraph that I conducted an interview with Rosauro Mejia in an office with Area 5 detectives present in this interview were ASA D. Navarro and ASA T. O'Malley, that does not prompt any other memories independent from what I previously described.

Q  Does it prompt a Proustian moment of insight for you?

A  Proustian moment, no, it doesn't prompt a Proustian moment.

MS. ROSEN:  I am objecting to the form.

MR. HAZINSKI:  Note that the witness testified to having studied English language at the University of Chicago and therefore is a man of words.

BY MR. HAZINSKI:

Q  And after this conversation you wrote a summary of the interview in the Felony Review folder, right?

MR. NOLAND:  Objection, form, foundation, assumes facts not in evidence.

You may answer.

THE WITNESS:  You are asking me did I write a summary of my interview with Rosauro Mejia?

BY MR. HAZINSKI:

Q  Yes.

A  No, I did not.

Q  Why not?

MR. NOLAND:  Objection, argumentative.

You may answer.

THE WITNESS:  Because I didn't write -- I didn't write summaries of witness' statements in the Felony Review folder.

BY MR. HAZINSKI:

Q  Though if you were interviewing a person who was just a witness in a case and not a suspect and you did not ultimately take a statement from that person then that information would not be reported anywhere, is that right?

MR. NOLAND:  Objection, mischaracterizes the record for that objection.

MR. HAZINSKI:  I would like to withdraw the question and rephrase it.

BY MR. HAZINSKI:

Q  Earlier when you told me about writing summaries of oral statements by witnesses and Felony Review folder, it applies only to statements by suspects or defendants, right?

A  Correct.

Q  But for a witness interview like this one you would not have written a summary in the Felony Review folder, right?

A  I did not in this instance and I would not have -- I don't recall an instance where I would have.

Q  Do you recall discussing Rosauro's statement with anybody else after?

Let me rephrase that question, it was an unclear question, I shouldn't have used the word statement.

Do you recall discussing your interview with Rosauro Mejia at any time after?

A  I may have.  I don't recall who I discussed that with.  At this point now as I sit here today I don't recall that.

Q  In general would you have -- would it have

CCSAO COI SUBPOENAS 000126

221

been your practice to describe the substance of that interview to a detective or officer investigating the case?

MR. NOLAND: Object to the form.

You can answer.

MS. ROSEN: I am so confused.

THE WITNESS: In general it is possible that I would have discussed it with them, but I don't know. I don't know what I -- what I discussed with the detective or detectives about what Rosauro Mejia said to me.

BY MR. HAZINSKI:

Q I would like you to please look at the next paragraph below the one we were just discussing, the one that begins on April 4, 1998 at 2000 hours, I suppose. Do you see that?

A Yes.

Q Could you please read that paragraph and let me know when you are done?

A Yes.

Q This paragraph describes Detective Guevara's second interview with Adriana Mejia, correct?

A That's what it says.

222

Q Taking place at 8:00 p.m. on April 4 of 1998, at which time you were already at Area 5, right?

A Yes.

Q During this conversation the detectives reported here that she again changed her story, right?

A That's what this says basically.

Q And then you didn't begin interviewing Adriana until after this second interview had already concluded, right?

A Well, as I previously said, when I met with her there it was approximately 11:00 o'clock, yes, it was after this.

Q Do you recall knowing that Guevara was interviewing Adriana at 8:00 p.m. on that evening?

A I don't. I don't know that I knew what Detective Guevara or other detectives were specifically doing at 8:00 p.m.

Q Do you know one way or the other the certainty whether Detective Guevara used physical violence against Adriana during the course of the interrogation described in this paragraph?

MR. NOLAND: Object to form.

223

You may answer.

THE WITNESS: I know that Adriana Mejia never told me that that occurred and that I never witnessed anything occurring, that's what I know.

BY MR. HAZINSKI:

Q On that basis are you certain that Detective Guevara did not use physical violence against her in the course of this interview?

MR. NOLAND: Again, object to the form, argumentative.

You may answer.

THE WITNESS: I know what I saw. I know what I saw, which is I didn't see that occur. I know that Adriana Mejia upon my talking to her never told me that, that's what I know.

BY MR. HAZINSKI:

Q Fair to say you don't have any evidence that that is what happened that you know of, right?

MS. ROSEN: Object to the form.

MS. GOLDEN: Now you are arguing with him.

THE WITNESS: I don't have any -- I don't know what you mean by I don't have any evidence. I don't have any evidence because I was never told

224

that and I never witnessed that.

BY MR. HAZINSKI:

Q And so I don't mean to belabor the point and I just want to make sure I get a direct answer to the question, which is based on what you know, are you certain that Adriana Mejia was not subject today physical violence by Detective Guevara during the course of the interview described in this paragraph?

MS. GOLDEN: Objection, form.

MR. BRENER: And foundation.

MR. NOLAND: Objection, asked and answered, form, move to strike that a preliminary statement of -- I will allow you to answer one more time, answer the question.

THE WITNESS: I am certain that I never observed any -- I never observed Guevara strike Adriana Mejia.

I am certain that Adriana Mejia never told me that she had been struck or threatened in any way when she -- when I talked to her, that is what I am certain of.

BY MR. HAZINSKI:

Q I would like you to look to Page 19 in

CCSAO COI SUBPOENAS 000127

225

this document, which is RFC444, please.

A Yes.

Q Do you see the second to last paragraph on this page that begins "On 4 April 98 at 2315 hours"?

A I do.

Q Can you please read that paragraph and tell me when you are done?

A Okay.

Q This paragraph describes your interview with Adriana, correct?

A Yes.

Q Is there anything about this description that you believe is inaccurate?

A I don't. As I read it here I don't see anything here that strikes me as inaccurate.

Q The last sentence of this paragraph says, "Adriana Mejia repeated her previously given statement." Do you see that?

A I do.

Q As far as you know were there any differences between the statement that she made to Guevara previously and the statement that she gave to you?

226

MS. ROSEN: Objection, form, foundation.

MR. NOLAND: Join.

You can answer over the objections.

THE WITNESS: I don't know.

As I sit here today was there any difference between what she said to Guevara and what she said to me, I don't know.

That -- I don't know that there was any differences, there could have been differences, specific differences, but I don't know what those specific differences were.

BY MR. HAZINSKI:

Q Look at the next page, please, Page 20, bearing the Bates stamp RFC445.

A Yes.

Q Look at the last paragraph on that page begins ASA Varga arrived at Area 5 Detectives?

A Yes.

Q Please read that paragraph and let me know when you are done.

A Okay.

Q It says that ASA Varga arrived at Area 5 at 4:00 a.m. on April 5, right?

A That's what that says, yes.

227

Q Were you still at Area 5 at that point?

A Yes, I was.

Q Do you know what shift Mr. Varga was working on this date?

A I don't know.

Q Does the fact that he arrived at Area 5 at 4:00 a.m. give you any clues about what shift he was working?

MR. NOLAND: Objection, calls for speculation.

THE WITNESS: No, it doesn't. He either got pulled in at the end of his shift or called in early, I don't know which one it was.

BY MR. HAZINSKI:

Q Do you have any particular reason that ASA Varga was sent to Area 5 to be involved in this case?

A Well, from reading this supplemental report he was sent there to document the handwritten statement of Rosauro Mejia.

Q Do you know why Rosauro Mejia gave a statement to ASA Varga at 4:00 a.m. but did not give a statement to you when you interviewed him the evening prior?

228

MR. NOLAND: Object to the form.

You can answer.

THE WITNESS: You are asking why Varga took a statement at 4:00 and why I didn't take a statement earlier?

BY MR. HAZINSKI:

Q Yes.

A That's the question?

Q Yes.

A I don't recall why that was the case.

I know I talked to Rosauro, but I don't know why it was I didn't take a handwritten at that time.

Q At 4:00 a.m. on April 5 the three suspects in the case had already begun giving their statements to the other Felony Review Assistant Attorneys at Area 5, right?

A At 4:00 a.m. I was in the process of speaking to Adriana Mejia.

Q Do you know whether ASA Brualdi had already begun taking a statement from Gabriel Solache at 4:00 a.m.?

A I believe so.

Q Do you know whether ASA O'Malley had

Case: 1:18-cv-01028 Document #: 892-2 Filed: 04/04/26 Page 129 of 855 PageID #:120755

**229**

already begun taking a statement from Arturo Reyes by 4:00 a.m.?

A I believe so.

Q Do you know whether Rosauro Mejia had additional information at 4:00 a.m. on April 5 that was relevant to the Soto homicide investigation he did not possess when you interviewed him the evening prior?

MS. ROSEN: Objection, form, foundation.

THE WITNESS: I don't know that. I don't know that to be the case.

BY MR. HAZINSKI:

Q Did you speak to ASA Varga at any time on April 4 or April 5?

A I don't recall speaking to ASA Varga in the evening or early morning hours.

Q Do you believe that -- well, let's move on.

The next page and the final page is 21 bearing the stamp RFC46. On that page if you can please look at the third paragraph "A.S.A. Tom O'Malley." Do you see that?

A Yes.

Q Can you please read that paragraph and let

**230**

me know when you are done?

A Yes.

Q This paragraph says that Tom O'Malley approved charges against Adriana, Arturo, and Gabriel, is that correct?

A That's what that paragraph says.

Q Is that accurate?

A Well, I don't know that Tom -- I don't know how to characterize that. Tom didn't speak to Mejia and I didn't speak to DeLeon or Solache, so I think -- was Tom the one that ultimately told the detectives, possibly, but that's what they wrote.

Q In this case three different ASAs took statements from three different suspects, right?

A In this case, yes.

Q Was each of those ASAs separately responsible for approving charges with respect to the suspect from whom they took a statement?

MS. GOLDEN: Form.

MR. BRENER: Sorry to interrupt, go ahead.

THE WITNESS: In this instance that's how I would characterize it.

BY MR. HAZINSKI:

**231**

Q Was it fair so say that you made a charging decision with respect to Adriana and Mr. O'Malley and Ms. Brualdi made charging decisions with respect to the other two suspects?

MR. BRENER: Objection to form.

THE WITNESS: Yes, that's how I would characterize it generally.

BY MR. HAZINSKI:

Q Do you recall what time you approved charges against Adriana Mejia?

A I don't. Sometime after completing the handwritten statement.

Q Do you recall whether it was before you left area 5:00 that morning?

A I didn't hear your question, all I heard was do I recall.

Q Do you recall whether you approved charges against Adriana before you left area 5:00 that morning?

A Yes, I do believe -- yes.

Q Before any of the ASAs approved charges did you, Ms. Brualdi, and Mr. O'Malley discuss the statements that you had taken?

A We likely did. I don't recall. It is

**232**

likely that we, did but I don't recall the specific nature of that conversation.

Q Do you recall noticing any inconsistencies between the statements that had been taken?

A It is possible.

Q If you had noticed an inconsistency would you have taken that into account in deciding whether to approve charges?

MR. NOLAND: Objection, incomplete hypothetical, foundation, form.

You can answer.

THE WITNESS: In this instance whatever the inconsistencies were if there were consistencies, whatever those inconsistencies were were still such that Adriana Mejia had implicated herself in the murders of the Sotos and accordingly so had Solache and Reyes, so the fact that whether or not there were inconsistencies in those statements they still had implicated themselves in different ways.

BY MR. HAZINSKI:

Q As you sit here today do you independently recall what evidence supported the decision to approve charges against Arturo Reyes?

CCSAO COI SUBPOENAS 000129

Transcript of David Navarro

59 (233 to 236)

Conducted on July 23, 2020

233

A  No, I do not.

Q  Are you aware of any physical evidence implicating Arturo Reyes?

A  As I sit here today, I don't, no, I am not aware of that.

Q  And you recall that Reyes was -- his statement was taken by Tom O'Malley who was a non-Spanish speaker, right?

MS. REPORTER:  He is waiving his hand here?

MR. HAZINSKI:  It is possible there is a technical problem, why don't we take a quick break and sort it out.

MR. BRENER:  There is a question pending, right, John?

MR. HAZINSKI:  I am not sure if he heard the question.

MS. REPORTER:  I have a question on the record.

MS. GOLDEN:  We are missing a lawyer, we have to wait, we are missing the deponent's lawyer.  We can go off the record, but we can't ask the witness anything.

MR. BRENER:  Did someone hang up the

234

phone?

MS. REPORTER:  There is the phone back, we lost his phone.

MR. NOLAND:  That is exactly what happened.

It was a question dealing with -- I think the last question I heard was whether or not he was aware of any physical evidence implicating Mr. Reyes in the crime.

BY MR. HAZINSKI:

Q  I don't know -- the next -- do you --

A  Do you want me to answer the question?

Q  I believe we already got your answer on the record.

Do you recall in Reyes -- his statement was taken by Tom O'Malley who was a non-Spanish speaker?

A  Do I recall that the statement of Arturo Reyes was taken by Tom O'Malley?

Q  Yes.

A  In conjunction with another Spanish speaking officer, yes.

Q  Did the fact that -- actually, strike that.

235

As you sit here today do you know what evidence supported charging Gabriel Solache with murder?

A  Well, I mean, I know what Adriana Mejia told me about Solache and Reyes, certainly that was evidence implicating Solache and Reyes.

Q  Besides Adriana's statement are you aware of anything else that supported approving charges against Solache?

A  As I sit here today I don't know what other -- whether there was other physical evidence or not.

Q  If you had known that -- if you had learned that Reyes and Solache was physically abused during their interrogations would that have factored into the decision to approve charges?

MR. NOLAND:  Objection, assumes facts not in evidence that this witness approved charges for Reyes or Solache.  I think it is form, foundation.

You can answer.

THE WITNESS:  Right, as I said -- or I may have said previously, if I didn't, what I recall is approving charges as to Adriana Mejia because that is who I spoke to.  I never spoke -- I never

236

saw Solache or Reyes so I didn't -- I never had any knowledge or would have never had any knowledge other than my conversations with ASA Brualdi or ASA O'Malley.

BY MR. HAZINSKI:

Q  On this last page of this report, the final paragraph -- I am sorry, the second to last paragraph, it begins "ASA Tom O'Malley having reviewed all the facts," and the last sentence of that paragraph says, "No charges were placed against Rosauro Mejia and he is released from custody."  Do you see that?

A  I do.

Q  Are you aware that Rosauro owned the car that was used in the commission of these murders?

MR. BRENER:  Object to the form.

MS. ROSEN:  Object to form.

MS. GOLDEN:  And foundation.

MR. NOLAND:  You may answer over the objections.

THE WITNESS:  If I am aware of that.  I don't know that I am -- I think I am aware of that as I sit here now, but I don't know that I was aware of that in 1998.

CCSAO COI SUBPOENAS 000130

237

BY MR. HAZINSKI:

Q Do you recall broaching the subject of the car used to commit the crime with Rosauro when you interviewed him?

A I don't recall if we discussed the car.

Q Does -- would the fact that Rosauro owned or possessed the car used in the commission of the crime constitute some evidence of his involvement in the crime?

MR. BRENER: Objection to form.

MS. ROSEN: Form, foundation.

THE WITNESS: It constitutes -- I don't know that it constitutes evidence against him.

It is corroborative of the fact that the defendants who were charged used a vehicle available to them to commit the crime, that's what it would have been -- that is what is corroborative to me.

BY MR. HAZINSKI:

Q Do you know if any DNA samples were taken from Rosauro Mejia?

A I don't know that.

Q In 1998 was it commonplace to collect DNA samples from suspects in murder investigations?

238

MS. GOLDEN: Foundation.

MR. BRENER: Objection.

THE WITNESS: I don't recall whether that was -- your term is commonplace, I don't recall if that was something that was done in 1998. Certainly DNA evidence existed in 1998. I just don't know if that was something that was done in this case.

BY MR. HAZINSKI:

Q At any time in 1998 did you learn that Rosauro had been treated as a suspect in the Soto murders?

A You are asking me while I was at the area did I -- was I aware that he was a suspect, is that the question?

Q Did you ever learn that he had been treated as a suspect by the police?

MS. ROSEN: Objection to form.

THE WITNESS: I don't know that I -- if I knew or learned that he had been considered a suspect or not considered a suspect.

(Document identified as Exhibit 2 for identification.)

BY MR. HAZINSKI:

239

Q I would like you to set this report to the side and ask you to look at another document, and this one is a document that says polygraph case review at the top and it begins at RFC7662.

A Okay, I have it in front of me.

Q For the record this goes from RFC7662 to 7665, and I would like to mark it as Exhibit 2.

Mr. Navarro, have you seen this particular document before?

A I have never seen this document. I don't recall ever seeing this document before today.

Q Does this appear to you to be a report of a polygraph examination of Adriana Mejia?

A It is what it would appear to be, yes.

Q On the first page of this document do you see near the bottom that it says Results: Deception indicated?

A I see that, yes.

Q It might be -- I can't tell.

MR. NOLAND: We didn't hear that, John.

MR. HAZINSKI: Sorry, I was saying it may -- I can't entirely read what it says, it may say deception indicated or deception detected.

BY MR. HAZINSKI:

240

Q Do you -- you did not as far as you remember see this document before speaking to Adriana, correct?

A Correct.

Q I would like you to turn to the second page of the document bearing the stamp RFC7663, please.

A Yes.

Q Do you see No. 10 near the bottom of the page that says "Are you lying about the" -- and the words are crossed out, it says "Norma's existence," do you see that?

A I see that.

Q Does it appear to you from this report that she gave an untruthful answer to that question?

MS. ROSEN: Objection, foundation.

THE WITNESS: I am looking at this now, there is a minus sign after there and there is also a checkmark beside it. I guess that would seem to indicate she is not being truthful about that, but I don't know, I don't know what those marks mean.

BY MR. HAZINSKI:

CCSAO COI SUBPOENAS 000131

24

Q Supposing that that does in fact mean that she gave an un truthful answer to that question it also appears that she gave an untruthful answer to the question "Did you lie to the police today?"

A Okay.

Q Would reviewing any of these polygraph results before you interviewed Adriana have affected your opinion about whether she was guilty?

A Would the polygraph -- would my knowledge of the polygraph have affected my opinion about Adriana Mejia, that's the question?

Q Yes.

A It could or could not have, it depended -- it would have depended on the questions and it would have been a factor to consider along with my interview of her.

Q Would seeing polygraph results indicating that she had failed a polygraph examination regarding her involvement in this these crimes have affected your opinion about whether her statements to you were credible?

MR. NOLAND: Objection, form, foundation, incomplete hypothetical.

242

You can answer.

THE WITNESS: I don't know -- the polygraph is just a factor, it is not the factor. Ultimately I spoke to her and she told me her involvement in it. That was the factor that I was considering.

BY MR. HAZINSKI:

Q I would like you to put that document aside and pull up the documents --

MS. REPORTER: Can you repeat that?

MR. HAZINSKI: Of course.

(Document identified as Exhibit 3 for identification.)

BY MR. HAZINSKI:

Q The statement of Adriana Mejia bears the Bates stamp RFC281 through RFC293. Do you have that in front of you, sir?

A I do now.

Q Do you recognize this document?

A I do.

Q You reviewed this in preparation for your deposition, correct?

A Yes.

243

Q Did you write this statement?

A I did.

Q On the first page of this document it says taken April 5, 1998 at 2:10 a.m. Correct?

A Correct.

Q Does 2:10 a.m. reflect the time you began taking the statement or the time you concluded taking the statement?

A That is the time I started taking the handwritten statement.

Q So at this point when you began taking the statement you had already been speaking with Adriana for about three hours, is that right?

MR. NOLAND: Objection, mischaracterizes the record.

You may testify -- you may answer.

THE WITNESS: I think my prior testimony was that I had spoken to her beginning sometime after 11:00 p.m. for an hour or -- maybe two hours, but I wasn't speaking to her for the full-time between 11:00 and 2:00.

BY MR. HAZINSKI:

Q How many times did you go through Adriana's story with her before you began

244

preparing this statement at 2:10 a.m.?

MS. ROSEN: Object to the form.

MR. NOLAND: Objection.

Go ahead.

THE WITNESS: I don't know when you are saying go through the story how you characterize that, I -- she told me her involvement or role in the crime, that was in our conversation at 11:00 o'clock. And then I went back in to talk to her to take the handwritten shortly after 2:00 o'clock.

BY MR. HAZINSKI:

Q Would it be fair to say before you began taking this statement at 2:10 a.m. Adriana had only relayed the information contained in this statement to you once before?

A I don't know that I could say that, you know, is a -- we had a conversation at 11:00 o'clock, part of that was me producing myself to her and part of that was her telling me what happened as part of -- as part of the murders of the Sotos. Did she tell me parts of those things more than once, possibly. I couldn't tell you specifically if it was just one thing or did

CCSAO COI SUBPOENAS 000132

245

she repeat herself at different times.  I don't remember that.

Q  Do you recall whether any of the information that Adriana gave you in the course of preparing this statement differed in any way from the information she had given you during your previous conversation?

A  I believe that the conversation -- this statement was consistent with our earlier conversation.

Q  And at the time of that -- you spoke with her around 11:00 the night before she had already relayed substantially the same story to the detectives, correct?

A  Apparently.

Q  The first line of -- the first line of the -- sorry.

The first paragraph of this statement, the fourth line, there is a sentence beginning "After stating that she understood each of her rights as explained and after signing her name, Adriana Mejia agreed to the following statement, which is a summary and not word for word."  Do you see that?

246

A  I do.

Q  When you say "a summary and not word for word," what does that mean?

A  It means that I was not writing out every single word that she was saying to me, but rather writing it out in a summary fashion.  If there were direct quotes of what she was saying to me I would put that -- I would have put that in a quote.

Q  Can you turn to the second page of the document bearing stamp RFC282, please?

A  Yes.

Q  Do you see the first line of this page a sentence begins, "Adriana states that she agreed to have Assistant State's Attorney David Navarro interpret from Spanish to English and English to Spanish for the purpose of this statement," do you see that?

A  I do.

Q  Did you give Adriana a choice about whether the statement would be written in English or Spanish?

A  I don't believe I gave her that option.

Q  If she had asked you to write the

247

statement in Spanish would you have complied with that request?

A  I don't know.

Q  Why might you have refused to write it in Spanish?

A  It wasn't refuse, I don't know that -- I didn't say that I would have refused to have done that, I just -- I don't know.  I know that I wrote it in English.

And, again, that goes back to when we earlier discussed that this was a court exhibit and so in order for the trier of fact to be able to read it it would be in English.

Q  Because it was written in English she could not review it directly without your assistance, correct?

A  Correct.

Q  You reviewed this document in preparation for this deposition as you testified earlier.  In the course of reviewing it did it bring back or refresh any memories of Adriana saying particular things to you during the course of this interview?

A  Yes, I can't say specifically what those specific things are, but, yes, it refreshes my

248

memory of the interview I conducted with her.

Q  Do you have a memory, an independent memory of anything she said to you, that is not described in this statement?

A  No.

Q  The statement contains a number of corrections, as we discussed previously, and it appears that each of those corrections or words are crossed out includes an initial, is that correct?

A  That's correct.

Q  Whose initials are those?

A  They would be my initials, Adriana Mejia's initials, and Detective Halvorsen's initials.

Q  Did you, Adriana, and Detective Halvorsen initial these changes at the same time or at different times?

A  Well, when you say the same time, we didn't each hold the pen at the same time, but as we were making the corrections they were done, they were done at that time.

Q  Was Detective Halvorsen sitting near enough to this document to be able to write on it at that point?

Transcript of David Navarro

Conducted on July 23, 2020

249

A He would move closer to be able to write on it.

Q When you reviewed this document in preparation for this deposition did you notice any statement in here that you know to be untrue?

A No.

Q I would like you to set this aside.

(Document identified as Exhibit 4 for identification.)

BY MR. HAZINSKI:

Q I would ask you to look at an exhibit -- I should say a document bearing the Bate stamp Reyes Jenner 7277. Do you have that one?

A Yes.

Q I would like to please mark this document as Exhibit 4.

MS. REPORTER: Are you skipping 3, was there a three?

MR. HAZINSKI: I may have failed to mark the last document we looked at. That statement of Adriana Mejia I would like to mark as Exhibit 3. Thank you for that.

MR. GILLESPIE: Can we get the Bates of the present exhibit again?

250

MR. HAZINSKI: This exhibit which I would like to enter as Exhibit 4 is the Bates range Reyes Jenner 7277 through 7444.

BY MR. HAZINSKI:

Q This appears --

A I have it in front of me.

Q This appears to be a transcript of the motion to suppress evidence in the criminal case dated September 1, 1999, correct?

A Yes, that's what it appears to be.

Q And you reviewed part of this document in preparation for your deposition today, right?

A I never -- I don't -- I don't believe I reviewed anything from this, unless somewhere here there is my testimony is what I reviewed.

Q I am going to ask you to look at further back in the document, Reyes Jenner 7400.

A Yes.

Q Do you recall reviewing this portion of this document in preparation for your deposition?

A Beginning with 120 -- or rather 7400, 7400, yes, that's what I recall.

Q And this is the transcript of your own testimony at this hearing, correct?

25

A Yes.

Q When you reviewed this testimony in preparation for this deposition did you see anything in your testimony that was untrue?

A I did not.

Q Did you notice any of your testimony you now believe is inaccurate or misleading?

A No, I do not.

Q Did you review this document -- I should say did you review this -- a transcript of this testimony in preparation for the 2014 testimony at the post-conviction hearing?

A I believe I did, yes.

Q When you gave this testimony in 1999 it was about a year and a half after the Soto murders, right?

A Yes.

Q At that point did you have independent memory of working on that case?

A Yes.

Q Is it fair to say that your memory of your work on that case was better when you gave this testimony in 1999 than it is today?

A I think I was -- I think that's fair to

252

say, yes.

Q Is it fair to assume then in September of 1999 you probably remembered details about this case that you can no longer remember today?

A In general I think that's fair to say.

Q According to this transcript ASA Mercedes Luque-Rosales, L-u-q-u-e - R-o-s-a-l-e-s, conducted or presented your testimony.

Did you meet with Ms. Luque-Rosales to prepare?

A I believe I did.

Q Do you have an independent memory of meeting with her?

A I don't remember the specific meeting, but I likely would have met with her prior to testifying, yes.

Q Do you recall meeting with ASA Art Hill in preparation for giving this testimony?

A I may have. I don't remember whether I met with Hill or Rosales or just -- Luque-Rosales.

Q Do you recall if you met with anybody else besides ASA Hill or ASA Luque-Rosales?

A I don't know -- no, I don't recall meeting with anyone else.

CCSAO COI SUBPOENAS 000134

**For the preparation of this testimony, the 1999 testimony?**

Q Yes.

**A No.**

Q Do you recall whether you reviewed any documents in preparation for giving this testimony in 1999?

**A I don't recall what I would have reviewed other than certainly the handwritten statements, that I feel certain -- fairly confident that I would have reviewed that. Other than what else I reviewed, I don't know or don't recall.**

Q Other than handwritten statements were there other categories of documents you would commonly review before testifying in court about a statement that you had taken in a criminal case?

**A You are talking about commonly reviewed, I don't know that there is -- you can say what was common to review, I don't know what you mean by commonly reviewed.**

Q If we are ranking the documents we are most likely to review when giving testimony about a statement you have taken, number one with the bullet is the statement. What is an example of the document that you might have reviewed in addition to that?

MR. NOLAND: Objection, calls for speculation.

You may answer.

THE WITNESS: I may have reviewed the Felony Review folder, depending on whether I completed that folder or not, or just -- I may have reviewed the folder. I may have reviewed supplemental reports, I don't know if I did or not. But those would be the things to review or could be reviewed.

BY MR. HAZINSKI:

Q I would like you to look at Reyes Jenner 7402, please, internal page numbers 122, please at lines 8 through 13. Can you read those lines, please to yourself?

**A Yes.**

Q You testified that you spoke to Detective Guevara and Detective Halvorsen upon arriving at Area 5, right?

**A Yes.**

Q In 1999 when you gave that testimony was that based on your independent memory of having a conversation with those two detectives at Area 5?

MR. NOLAND: Objection, foundation.

You may answer.

THE WITNESS: You are asking me what -- I don't know what I -- what my memory was in 1999, likely it was based on my independent memory, but I can't tell you exactly what was the basis for that testimony as I sit here in 2020.

BY MR. HAZINSKI:

Q As you sit here today you don't have an independent recollection of a particular conversation with Detectives Guevara or Halvorsen upon arriving at Area 5, is that --

**A That I met with them. I don't know that I would -- that is -- that I don't remember that, but that the specific nature of that conversation, no, I don't remember the specific nature of that conversation.**

Q I would like you to turn to Page Number 7408, which is internal Page Number 128, please.

**A Yes.**

Q In particular could you please look at lines 5 through 10, read those lines and let me know when you are done.

**A Yes.**

Q You testified here that your initial conversation with Adriana that began around 11:00 p.m., lasted an hour or an hour and a half, correct?

**A I testified at this hearing, yes, hour to an hour and a half, yes.**

Q As far as you know was that testimony accurate?

**A Yes.**

Q Once again, I will ask, as you sit here today do you know whether when you gave -- when you made that statement on the stand in 1999 whether that was based on your independent recollection or based on a review of documents?

**A As I sit here today I don't -- I can't tell you exactly how it was I came to -- I had that knowledge, likely it was, my independent recollection.**

Q If you could turn to page bearing the Stamp 7415, please, which is internal Page 135, and let me know when you are there.

**A I am there.**

CCSAO COI SUBPOENAS 000135

257

Q Would you read lines 3 through 6, please?

A Yes.

Q In this portion of the transcript you testified that it took you four or four-and-a-half hours to write out Adriana's statement, is that right?

A Yes.

Q Is that testimony accurate?

A Yes, I believe that to be accurate.

Q Does four or four-and-a-half hours strike you as an unusually long time to spend preparing a handwritten statement?

MR. NOLAND: Objection to form.

THE WITNESS: We -- you asked me this about this before, but it doesn't strike me as a particularly long time when I consider that I was talking to her in Spanish, getting her answer in Spanish, reducing that answer to English, and then translating that back to her in Spanish, that is how long it took to do a 13-page statement.

BY MR. HAZINSKI:

Q I would like you to look now please on that same page at lines 10 through 19, please, and let me know when you finish reading them.

258

A Yes.

Q In this portion of your testimony you stated that you read the statement to Adriana in Spanish after the statement was written out, correct?

A After you wrote out the statement did I go out -- yes.

Q Was that testimony truthful?

A Yes.

Q I would like you to turn to the page bearing Stamp 7423 which is internal Page 143, please.

A Yes.

Q I would like you to please read lines 17 through 23 on this page.

A Yes.

Q You testified that you were not informed that Adriana had been at Area 5 since 10:30 a.m. on April 3.

A That was my testimony.

Q Is that testimony truthful?

A I don't have any reason to challenge that testimony.

Q As you sit here today do you have any

259

independent recollection of learning in 1998 that Adriana had been at Area 5 for that period of time?

A As I sit here now in 2020 do I have different information or do I have different knowledge? I don't.

Q As a general principle do you believe that the amount of time a suspect spends in custody before they give a confession to a crime can affect their reliability of that confession?

MR. NOLAND: Objection, form, foundation, calls for speculation, incomplete hypothetical, argumentative.

You can answer.

THE WITNESS: The length of time that an individual is in custody is a -- could be a factor to consider, but it is not individually the only factor to consider.

BY MR. HAZINSKI:

Q If you had been told that Adriana had been at Area 5 for more than 18 hours at the time you began speaking to her, would that have affected your opinion about the reliability of the information she was providing?

260

MR. BRENER: Calls for speculation.

THE WITNESS: I don't know that that -- independent of anything else that that would have caused me to question the reliability of her statement.

BY MR. HAZINSKI:

Q Would that have been a factor you would have taken into account in determining the reliability of the information she was providing you?

A Well, separate from everything else I had a chance to talk to her and ask her how she had been treated, if she had been able to eat anything or if she had been -- how she had been treated. She told me she had been treated fine, and so whatever period of time that she had been in custody at the point that I was talking to her she had no complaints to me about the time that she had been in custody or her treatment and so I didn't -- that wasn't a factor.

Q Would you please turn to page stamped 7425, please, that's internal Page 145.

A Yes.

Q Could you please read lines 3 through 6 on

CCSAO COI SUBPOENAS 000136

this page?

A Yes.

Q In this portion of your testimony you stated that you did not -- you were not told the contents of the various statements that had been elicited from Adriana before you arrived at Area 5, correct?

A Yes.

Q Was that testimony truthful?

A I believe it to be truthful, yes.

Q Further down on the same page -- well, actually flip over that. In your ordinary -- the ordinary course of conducting Felony Review do you typically seek out information about what a -- what a suspect had previously told the investigating agency or officers?

MR. BRENER: Objection to form, foundation, incomplete hypothetical.

THE WITNESS: You know, whatever the objection was, I just didn't understand -- hear the question literally, I didn't hear that question in its entirety, I would ask you to repeat it.

BY MR. HAZINSKI:

Q Of course, I will rephrase the question to make it a little clearer.

Ordinarily when you went to a police station to interview a suspect as part of the Felony Review did you make an attempt to learn what that suspect had previously told the police investigating the crime?

A We are still on, I don't know -- I don't know that I can say what you are saying like in every case what I did in every case, I don't know that I can speak to in every case what I did, but it is possible, I don't know what -- whether a detective would always tell me or was able to tell me the prior statements.

Q On the same page on lines 11 through 13 there is a question from the attorney that says, You did not speak to Mrs. Mejia until approximately 11:15 on the 4th for the first time? Had you been speaking to other defendants prior to that?" Do you see that?

A I do.

Q And then at the very bottom of that page on 124 following objection the answer, "I remember I got something to eat around 5:00 p.m.,"

continuing on to the following page, which is 7426, it begins p.m., "because I had been working that morning to get some dinner and then return from that, I spoke to -- there was a witness that I spoke to, and reviewed some reports, and at that point just waited to begin the interview." Do you see that?

A I do.

Q Who is the witness that you were referring to in this testimony?

A I believe I was referring to Rosauro Mejia.

Q What were the reports you were referring to in this testimony?

A I don't know what report I was referring to. I don't recall what reports I was referring to.

Q Could you please turn to the page with the Stamp 7431, it is number 151.

A Yes.

Q Could you please read lines 14 through 24 on that page?

A Yes.

Q Here you testified that you could have written out Adriana's statement in Spanish, correct?

A Correct. Yes, correct.

Q Thank you.
Was that testimony truthful?

A Yes. I had the ability to write the statement in Spanish.

Q Writing the statement in Spanish would have been easier for Adriana to review?

A Possibly.

Q If written in Spanish would Adriana have been able to tell whether you were accurately reporting her statements?

MS. ROSEN: Objection, form.

MR. NOLAND: Foundation, but go ahead.

THE WITNESS: Possibly.

BY MR. HAZINSKI:

Q On the page bearing the Stamp 7432, could you please read lines 1 through 8?

A Yes.

Q You testified that there was not an option of a court reported statement because it would have worked through an interpreter, is that your testimony?

CCSAO COI SUBPOENAS 000137

**265**

A Yes.

Q In giving that testimony what did you mean when you said it would have worked through an interpreter?

A It would have worked as you were asking me earlier where I would have been interpreting the answers and questions to a court reporter since there wasn't a Spanish-speaking court reporter.

Q What would have been wrong with you interpreting to a court reporter?

MR. NOLAND: We have already covered this. It is kind -- John, it is kind of late in the day, it is 5:00 o'clock, we started at 10:00, I don't know exactly how long we have been on the record, but a fairly long time since we took a break. I will let him answer the question, but I think we should be moving this along to conclusion.

MR. HAZINSKI: Could the court reporter let us know how much time we have used at this point?

MS. REPORTER: Can we go off the record for a second and I will add it up?

MR. HAZINSKI: Please.

(Brief recess taken.)

**266**

MS. REPORTER: Back on the record at 5:01.

MS. ROSEN: This is Eileen Rosen, can you just give me the time?

MR. HAZINSKI: I calculate that we are now a few minutes north of six hours, so, Dan, you will get your wish and we will be done within the next hour.

MR. NOLAND: Just because you have the time, John, doesn't mean you have to use it. Go ahead, let's move forward.

MS. REPORTER: We are on the record.

BY MR. HAZINSKI:

Q On lines 9 through 11 of the same page, 7432, you also testified you were not aware of a Spanish-speaking court reporter, correct?

A That's correct.

Q Was that testimony truthful?

A Yes, that is truthful testimony.

Q The next line, Line 12, would you please read from Line 12 through Line 19 on the following page?

A From 12 up to 19 of the following page?

Q Yes, please.

A Okay.

**267**

Q This testimony describes the timing of your conversations with Adriana, correct?

A Yes.

Q And is this testimony truthful?

A I believe it to be, yes.

Q Your initial conversation with Adriana lasted from about 11:15 p.m. through 12:15 or 12:45 a.m., is that right?

A Correct.

Q And you began recording or taking her handwritten statement at 2:10 a.m. according to this testimony, right?

A Correct.

Q And here you testified that during that break in between 12:15 or 12:45 and 2:10 a.m. you left to get some paper and "I came back to write the statement in her presence," correct?

A Yes.

Q Do you recall doing anything else in that period of time besides getting paper?

A I don't recall specifically.

I believe I would have most likely have spoken to the other assistants, O'Malley and Brualdi.

**268**

Q Does reviewing this transcript today in the course of this deposition refresh your memory in any way about any aspect of the Solache or Reyes cases?

A To the Solache or Reyes cases, no.

(Document identified as Exhibit 5 for identification.)

BY MR. HAZINSKI:

Q I would like you to turn to the -- a document bearing the Bates Stamp 11262, and I would like to please -- this document has the range Reyes Jenner 11262 through 11362. And I would like to mark this as Deposition Exhibit 5.

A Okay.

Q This appears to be a transcript of testimony of a post-conviction hearing in 2014, correct?

A Correct.

Q Did you review this document or any part of this document in preparation for this deposition?

A I reviewed the pages regarding my testimony which would have begun at Page 6 continuing through it looks like page -- 19, I

Transcript of David Navarro
Conducted on July 23, 2020

269

think I went through 6 through 18.

Q So that Page 6 is internal page number Reyes Jenner 11267 where --

A Okay.

Q Kurt Smitko of the Cook County State's Attorney's Office presents your testimony, correct?

A Correct.

Q Did you meet with Mr. Smitko, S-m-i-t-k-o, to prepare to testify?

A I believe I did, yes.

Q Do you recall how many times you met with Mr. Smitko?

A I think I met with him -- I don't recall, but I don't think I met with him more than once.

Q Were you represented by an attorney during the purposes of testifying for these post-conviction proceedings?

A No, I was not.

Q In preparation for giving this testimony did you meet with anyone else from the Cook County State's Attorney's Office?

A I think when I met with Mr. Smitko I think Mr. Papa was also present.

270

Q Was that Jim Papa?

A Yes.

Q Do you recall whether swellest Stack was present?

A I don't recall her being present.

Q Besides meeting with Mr. Smitko and Mr. Papa did you do anything else to prepare to give this testimony in 2014?

A I believe I reviewed my -- well, I don't recall, but I believe I reviewed my handwritten statements again.

Q Do you recall before testifying in this discussing your anticipated testimony with anybody besides Mr. Smitko or Mr. Papa?

A You broke up, but do I recall discussing my testimony with anyone else other than Smitko and Papa, that's your question?

Q Yes.

A My answer is no.

Q At any point during your preparation to testify at this hearing do you recall anyone from the State's Attorney's Office expressing an opinion about the guilt or innocence of Arturo Reyes?

271

A I don't recall.

Q Do you recall anyone from the State's Attorney's Office expressing an opinion about the guilt or innocence of Gabriel Solache?

A I don't recall that.

Q At any point in your preparing to testify in 2014 do you recall anyone from the State's Attorney's Office expressing an opinion about whether any of the police officers involved in the Soto homicide investigation had engaged in misconduct?

A Whether any of the police officers involved had engaged in misconduct, is that your question?

Q Yes.

A I apologize if I am repeating, your voice cuts out a little in the middle of the question, so I don't mean to belabor questions, it is just that I want to make sure I am understanding them, that's why I am repeating them to you.

I don't recall them saying any allegations of misconduct or whether saying that -- no, I don't recall that.

Q Thank you. And I appreciate you

272

clarifying because it allows us to ensure that this is a complete and accurate record of our discussion.

When you reviewed this testimony in preparation for this deposition did you notice any testimony that was untrue?

A No, I did not.

Q Did you notice any points in your testimony where you omitted information from an answer that you believe was relevant and responsive to a question?

A I don't -- I don't recall seeing any instances of that.

Q Could you please turn to Page 11273 which is the internal Page 12 in this document, please?

A Yes.

Q Can you look at lines 2 through 4 on this page?

A Yes.

Q Here you testify that you never spoke with -- that you never spoke with Solache or Reyes, correct?

A That's correct.

Q Is that testimony truthful?

CCSAO COI SUBPOENAS 000139

273

A  That testimony is truthful, to date I have never spoken to Solache or Reyes.

Q  When you were giving this testimony in 2014 about events that happened in 1998 were you testifying based on an independent memory of what happened in 1998 or testifying based on documents you had reviewed?

A  You are asking me do I recall now, what was in my mind approximately six years ago, I believe I was testifying as to my independent memory, and also for that memory -- where I didn't have independent memory I was testifying to the -- based on the reports or -- whether -- based on the transcript and based on the statement that I had taken previously.

Q  I would like you to please turn to --

MR. HAZINSKI: Actually -- can we take a quick -- can we do a five-minute break and then I will have a few more questions and then we will be all done.

MS. REPORTER: It is 5:13, we are going off.

(Recess taken.)

MR. HAZINSKI: I resumed the video

274

recording.

(Document identified as Exhibit 6 for identification.)

BY MR. HAZINSKI:

Q  Mr. Navarro, I would like you to now look at the document Bates stamp RFC-Solache/Reyes Lasar, L-a-s-a-r, 44137.  This document says Memorandum.  Do you have that?

A  I do.

Q  I would like to mark that exhibit, the Bates range of this exhibit begins at RFC-Solache/Reyes Lasar 44137 and it goes through number 44142.

Mr. Navarro, have you seen this document before?

A  I have not.

Q  Do you know what it is?

A  Well, I am looking at it now as we speak and it says Interview with Adriana Mejia, so that's dated October 9, 2014.

Q  Did you ever learn that the City of Chicago retained attorneys from the law firm of Sidley Austin to investigate allegations of misconduct against Reynaldo Guevara?

275

A  No.

Q  I would like you to please read this full document, take as long as you need to do so, and let me know when you are done.

A  Do you want me to read this whole thing?

Q  Yes, please.

A  Okay.

Q  Mr. Navarro, have you had time to review this entire document?

A  I read through it.  I can't say that I studied it, but I certainly did read it, yes.

Q  I would like you to turn to Page 44138, which is Page 2.

A  Yes.

MS. ROSEN: I am sorry, 4413 --

MR. HAZINSKI: 8, which is, again (inaudible) --

MS. ROSEN: You are breaking up.

MS. REPORTER: Counsel, you are very muffled.

BY MR. HAZINSKI:

Q  Please turn to Page 2.

A  Okay.

Q  Did you ever hear that Adriana had been

276

handcuffed in a small room and had been unable to sleep for two nights before you spoke to her?

A  No.

Q  According to this memorandum that is what she stated during this interview, correct?

A  That is what she stated to these attorneys on the October 9, 2014 interview, yes.

Q  If you had learned in 1998 that Adriana had been handcuffed in a small room and been unable to sleep for two nights before you spoke with her, would that have affected your opinion about the reliability of the statements she was making?

MS. ROSEN: Objection, form, foundation.

MR. NOLAND: Form.

THE WITNESS: She did not make any complaints when I asked her about her treatment or she certainly never told me that she had been handcuffed or unable to sleep the entire time, so that wasn't -- that wasn't my understanding of what her condition was at that time.  But would it be -- if that was what she told me, I would have to consider that at that time, but that wasn't what she told me.

CCSAO COI SUBPOENAS 000140

Transcript of David Navarro
Conducted on July 23, 2020

70 (277 to 280)

277

BY MR. HAZINSKI:

Q If she had told you that would it have affected your decision or influenced in any way your decision to approve charges against her?

MS. ROSEN: Objection, form, foundation, calls for speculation.

THE WITNESS: I would have considered it in conjunction with whether there was any other evidence to charge her.

BY MR. HAZINSKI:

Q Is it fair to say that you also did not learn or were not told that Adriana had been hit in the face and in the back by Detective Guevara?

**A She never told me that, correct.**

Q No one ever told you that, correct?

**A No one ever told me, correct.**

Q If you had learned that that happened would it have changed your opinion about the reliability of the statements she made to you?

MS. ROSEN: Objection, form, foundation.

THE WITNESS: It would have been a -- it could have been a factor to consider, but she never told me that.

BY MR. HAZINSKI:

278

Q Would it also have been a factor to consider if she had told you, would it have been a factor to consider in connection with the decision to approve charges against her?

**A The decision to charge would be separate from that. The decision is charge is based on evidence, whatever evidence there was at the time including whether there was other witnesses or other individuals implicating her, so that would just be part of what would be -- would have to have been considered.**

**I didn't consider that because it wasn't -- I didn't have that knowledge and I was never told that.**

Q But if you did have that knowledge and you were told that is your testimony that that would have or would not have been part of your analysis in making the decision about whether to approve charges?

**A If that had been -- if she had told me that then I would have then in the circumstance I would have had to factor that in together with other evidence to make a determination.**

Q Is it fair to say you never learned or

279

were told by anyone that Detective Guevara had threatened to harm Adriana's family.

MS. ROSEN: Objection, form, foundation.

THE WITNESS: I was never told by Adriana Mejia or anyone that Adriana Mejia's family had been threatened.

BY MR. HAZINSKI:

Q If you had learned that or been told that would that have been a factor relevant to your opinion about whether she -- her statements to you were reliable?

**A If I had been told that then that would be a factor to consider together with all the other evidence that I would have had at the time.**

Q Would it similarly have been a factor to consider, among others, affecting the decision to approve or not approve the charges?

**A I think that's what I just answered, but, okay, yes, it would be a factor to consider.**

Q To be fair, Mr. Navarro, I am talking about the reliability of her statements and the second question was about (inaudible) --

MS. REPORTER: Counsel, you are muffled again, I didn't hear the beginning of that.

280

MR. HAZINSKI: It is fine, we will move on.

BY MR. HAZINSKI:

Q You were not present during any of Detective Guevara's interviews or interrogations of Adriana Mejia, were you?

MS. ROSEN: I can't hear the question.

MR. HAZINSKI: I will repeat it more loudly.

BY MR. HAZINSKI:

Q You were not present during Detective Guevara's interviews or interrogations of Adriana Mejia, were you?

**A I was not.**

Q So you did not personally see or hear anything he did or said to her, correct?

MR. NOLAND: Objection, asked and answered.

THE WITNESS: Correct, I was not present.

BY MR. HAZINSKI:

Q In light of that do you have any basis for -- well, let's move on.

I would like you to look at the next page of this document bearing the Stamp 44139. The

CCSAO COI SUBPOENAS 000141

focus of this page describes statements Adriana made about her interactions with?

A Portions of that, yes.

Q Yes.

And according to this memorandum she stated at one point that you prepared this statement that was attributed to her without her assistance or input, correct?

A Correct, that is what she is saying in this statement here.

Q Was that true?

A No, it is not.

Q Did you tell Adriana that if she signed the statement she could go home?

A No, I never said that.

Q Are you aware of anybody else, including other Assistant States Attorneys, detectives, or police officers, telling Adriana that if she signed the statement she could go home?

A No, I do not -- I am not aware of anyone saying that to her.

Q Did you fail to read the handwritten statement to Adriana in Spanish?

A I read the statement to her in Spanish, translated from English into Spanish to her.

Q Did you yell at Adriana any point?

A I never yelled at her.

Q Did you --

A And I don't know what she means by where to put her fingerprints, I don't know what that means.

Q Did you torment Adriana in any way?

A I did not torment her.

Q Did Adriana ask for her statement to be written in Spanish?

A No, she did not.

Q Did you insist on preparing the statement in English?

A I didn't insist, I just I wrote the statement in English and explained to her that I would translate the statement back to her in Spanish.

Q Did you advise Adriana of her Miranda rights for the first time only after the statement was finalized?

A I advised her of her Miranda rights in Spanish when I first met with her after 11:00 p.m. and then again when I met with her to begin

documenting the handwritten statement at -- shortly after 2:00 a.m. She read through that Spanish language version of the rights and signed those, that's her signature on that form.

Q It was your testimony that by and large everything that Adriana Mejia is reported to have said about you in this memorandum is false?

MS. GOLDEN: Form, foundation.

THE WITNESS: Well, no. I mean, I don't know that I can say everything about this is false. She says that we spent roughly three hours together and that she told him what she knew, he wrote down, and then told her where to sign. That part seems to be roughly an accurate summary of what happened, that she said I did not make her any promises but I said I was an attorney for the State and not her attorney, that's consistent with what -- with what occurred.

BY MR. HAZINSKI:

Q As you sit here today do you know of any reason that Adriana Mejia would have to make false claims about how you went about preparing her handwritten statement?

MR. BRENER: Objection to form, foundation, calls for speculation.

THE WITNESS: You are asking me why Adriana is saying this now?

I don't -- I don't know why she is saying what she is saying now other than she may not want to spend the rest of her life in custody.

BY MR. HAZINSKI:

Q Were you aware that Adriana continues to admit her own involvement in the Soto murders?

A I don't know what I specifically that I am aware of what she has admitted to or not admitted to after my involvement, no, I don't know that I could say that.

Q Based on your review of this document was Adriana lying when she made these claims about you engaging in various forms of misconduct?

MS. ROSEN: Object to the form.

THE WITNESS: I would say that any statement that says I committed misconduct is not a true misstatement because I did not commit any misconduct in my interview of Adriana Mejia.

BY MR. HAZINSKI:

Q Does learning she made false claims about you in the course of this interview cause you to

CCSAO COI SUBPOENAS 000142

Transcript of David Navarro

Conducted on July 23, 2020

285

doubt in any way the truth of what she told you in 1998?

A She is making -- based on the fact that she is making false claims but still admitting her role in this crime, does that cause me to question her role in this crime? No.

Q My question is not actually the one that you posed, but does learning that Adriana made false claims about you as documented in this interview cause you to doubt the truth of any aspect of what she told you in 1998?

A The fact that she is saying -- making allegations against me in 2014, does that make me question what she said to me in 1998? No.

Q Does it cause you to think that Adriana may have made false claims regarding Arturo Reyes and Gabriel Solache?

MR. NOLAND: Objection, asked and answered.

You can answer.

THE WITNESS: That doesn't change my -- what she said to me and what I believe she said to me in 1998, no.

BY MR. HAZINSKI:

286

Q Do you have an opinion about whether Adriana Mejia is generally a truthful person?

MS. ROSEN: Object to the form.

MR. NOLAND: Objection, form, foundation.

You may answer.

THE WITNESS: I can't speak to whether Adriana Mejia as she sits here today is generally a truthful person. I took a statement from her in April of 1998 while we spent several hours together, that was the extent of my involvement with Adriana Mejia.

BY MR. HAZINSKI:

Q Could you please turn to the following page of this document bearing Stamp 44140?

In reviewing this page did you observe that Adriana reportedly disputed a number of details from her handwritten statement prepared in 1998?

A I see that, yes.

Q Does seeing that she disputes those details in any way affect your opinion about the voracity of the statement taken in 1998?

MS. ROSEN: Object to form.

MS. GOLDEN: Form and foundation.

287

BY MR. HAZINSKI:

Q You can answer.

A The fact that in 2014 -- 2014 she was saying something different than she is saying that she said to me in 1998 doesn't change what I believe she said to me and what I believe she was saying to me in 1998, especially when I look at this largely she still implicates herself, Reyes, and Solache, while individual details may change, no, it doesn't change my opinion.

Q The next questions I have for you, Mr. Navarro, all concern punitive damages.

MR. HAZINSKI: Dan, I -- my understanding is that thus far in the case we have been agreeing to defer questioning about punitive damages with certain -- to a certain set of circumstances.

Do you -- is that what you would like to do in this case?

MR. NOLAND: Yes.

MS. GOLDEN: I just want to speak up because I don't think we have had that agreement for a number of depositions that have already gone forward, not in this case, but be that as it may it doesn't apply to this deposition.

288

MR. HAZINSKI: Well, Dan, rather than engaging in punitive damages questioning now would you agree to forego that questioning for this deposition and, say, two weeks after summary judgment or six weeks before trial engage in written discovery if Mr. Navarro is still in the case?

MR. NOLAND: At specific times, definitely after summary judgment and some reasonable time before trial, that we can work it out with you guys to deal with punitive damage discovery, so, yes.

MR. HAZINSKI: We will agree to defer until that point.

I have just a few more questions for you, Mr. Navarro, before we wrap up.

BY MR. HAZINSKI:

Q As far as you know is it possible that one or more detectives at Area 5 mistreated Adriana before you first interviewed her?

MR. NOLAND: Objection, asked and answered, in a different way. I mean, it is retreading old ground we have covered at least a couple of times and form and foundation.

CCSAO COI SUBPOENAS 000143

Transcript of David Navarro

Conducted on July 23, 2020

289

Over that objection you may answer.

THE WITNESS: I have no knowledge -- I have no knowledge as I sit here from when I was interviewing Adriana Mejia in 1998 I have no knowledge of any misconduct or mistreatment of either before or during I interviewed her.

BY MR. HAZINSKI:

Q And, just to be clear, because I don't believe I have gotten an answer to this question in the form that I have asked it precisely, do you have knowledge that allows you to say with 100% certainty that Adriana was not mistreated before you interviewed her?

MS. ROSEN: Objection, form.

MS. GOLDEN: Asked and answered.

MR. NOLAND: Same objections.

You may answer again.

THE WITNESS: I don't have any -- I was never given any information when I met with Adriana Mejia either by her or by observation that she had been mistreated in any way, that is based on my observations and what she told me.

BY MR. HAZINSKI:

Q I get the sense, Mr. Navarro, that you are

290

answering a different question than the one I am posing to you, but that's fine.

Did any part of our discussion today about this case or this investigation refresh your recollection of this case and bring back memories that you didn't have before you sat down in that chair this morning?

**A No.**

Q At any point during your involvement in the Soto murder case did you learn that Gabriel Solache or Arturo Reyes had experienced any form of mistreatment by the police?

**A I never spoke to Solache or Reyes during any point in that investigation that the police conducted so, no, I never learned that.**

Q Well, my question wasn't specifically about whether you spoke to them, it was is -- is your answer that you broadly never learned about any allegations of mistreatment against Gabriel Solache or Arturo Reyes in 1998.

MS. ROSEN: Object to the form.

THE WITNESS: That is my answer.

BY MR. HAZINSKI:

Q Beyond what we have discussed thus far

29

today in this deposition, do you have any information suggesting that either Solache or Reyes was involved in the Soto homicides?

MS. ROSEN: Object to the form.

MR. BRENER: And foundation.

MR. NOLAND: Objection. Join.

You may -- I think you mischaracterized, but you may answer.

THE WITNESS: Well, I know what Adriana Mejia told me, if that is what you are asking me, and she implicated Solache and Reyes in the murders along with herself.

BY MR. HAZINSKI:

Q Beyond Adriana's statement do you have any other information suggesting that either Solache or Reyes was involved in the Soto homicides?

MR. NOLAND: Objection to form.

MS. ROSEN: Objection to form.

THE WITNESS: I don't. If I have information in my possession, no, I don't have information in my possession, but the statements has details that I -- that implicate the two of those individuals.

BY MR. HAZINSKI:

292

Q Do you have in your possession any information suggesting that either Solache or Reyes is innocent of the Soto homicides?

**A I have no information regarding their innocence.**

Q Are you aware that multiple witnesses in this case have testified that Detective Guevara asked them to lie during the course of the investigation in this case?

MS. ROSEN: Objection, form, foundation.

MS. GOLDEN: And I couldn't hear the question.

BY MR. HAZINSKI:

Q Are you aware that multiple witnesses in this case have testified that Detective Guevara asked them to lie during the course of his investigation of this case?

MS. ROSEN: Objection, form.

THE WITNESS: I am not aware.

MS. ROSEN: Foundation.

THE WITNESS: I am not aware of that.

BY MR. HAZINSKI:

Q Does learning that witnesses have so testified affect your opinion about the accuracy

CCSAO COI SUBPOENAS 000144

293

of the results of this investigation in any way?

MS. ROSEN: Object to the form.

MS. GOLDEN: Object to the form.

THE WITNESS: It doesn't change what I learned that night when I interviewed Adriana Mejia.

BY MR. HAZINSKI:

Q Are you aware that the Cook County State's Attorney's Office moved to dismiss all charges against both Reyes and Solache following post-conviction proceedings in front of Judge Obbish?

A I have learned that, yes.

Q Does learning that in any way affect your opinion about whether Reyes or Solache is guilty of the Soto murders?

A I believed the statement that Adriana Mejia gave me and the statement I documented since I believe that I believe that Reyes and Solache were -- played a role in the murder of the Sotos.

Q Are you aware that no physical evidence has been discovered tying either Reyes or Solache to the Soto murders?

MS. ROSEN: Object to the form.

294

MS. GOLDEN: Foundation.

THE WITNESS: I don't know that I can say I am aware of that, no.

BY MR. HAZINSKI:

Q Is it your opinion that Reyes and Solache are guilty of the Soto murders?

MR. NOLAND: Objection, asked and answered.

You can answer again.

THE WITNESS: I believe that they are responsible for the -- that they played a role in the murders of the Sotos, yes.

BY MR. HAZINSKI:

Q Do you have any additional information about Solache, Reyes, or the Soto homicide investigation that was not already discussed during this deposition?

MR. NOLAND: Objection, form, foundation, overly broad, asked and answered, mischaracterizes the record.

You may answer.

THE WITNESS: I don't have any -- I don't have any other evidence other than what we have talked about or -- no, I don't have any other

295

evidence.

MR. HAZINSKI: Okay, that's all the questions that I have for you, Mr. Navarro.

MS. ROSEN: I don't have any questions.

MR. LEINENWEBER: I don't have any questions.

MR. BRENER: I have some questions.

EXAMINATION

MR. BRENER:

Q Mr. Navarro, my name is Edward Brener. I represent the other ASAs who were sued by Mr. Reyes in this case.

Thinking back to your time in Felony Review, do you recall whether supervisors were ever required to make the decision whether to approve or reject charges?

A I don't recall specifically whether a supervisor was required to approve or reject charges. I think that there was -- that you had to contact a supervisor at some point and -- but the specific -- the specific cases that you had to, I don't remember what those were, I don't remember the specific cases that you had to.

Q By specific cases do you mean what types

296

of cases would require the involvement of the supervisor in the murder charges?

A Right, either to approve or reject charges.

Q I am sorry, were you finished?

A I apologize, I interrupted you.

Q I want to make sure you finished.

A I don't -- it would have been -- when I say the cases, I mean the types of charges, whether those were murders or aggravated criminal sexual assaults, those type of charges.

Q Do you know whether the murder of the Sotos and the kidnappings of their children was such a case that required the approval of charges by a supervisor?

A I don't know that it required the approval of a supervisor.

At the time it would have been a capital case in 1998 because it was the murder of two individuals so is it possible that we contacted a supervisor as part of that, yes, it is possible.

MR. BRENER: I have no further questions, thank you for your time.

MS. SUSLER: I have a question. Did

CCSAO COI SUBPOENAS 000145

anybody else want to go?

EXAMINATION

BY MS. SUSLER:

Q  I just want to be clear, if I understand your testimony correctly Detective Guevara never disclosed to you that he had any physical contact with Adriana Mejia, is that right?

MS. ROSEN:  Object to the form, foundation.

THE WITNESS:  That's correct.

BY MS. SUSLER:

Q  And in your several conversations with him and Halvorsen did either one of them, Guevara or Halvorsen, ever disclose to you they had any kind of physical contact with Gabriel Solache?

MS. ROSEN:  Object to form, foundation.

MS. GOLDEN:  Object to foundation.

THE WITNESS:  No, neither detective ever said anything like that to me.

BY MS. SUSLER:

Q  In your multiple conversations --

A  Can we stop -- Jan, I just I can't see the person who is -- is there a way I can -- I don't know why it is I can't see, can I change the view that I have?

MR. NOLAND:  I think so on the top right.

THE WITNESS:  I just don't want to affect the recording.

I see it, I see gallery view I can do that without affecting the -- I see it.

BY MS. SUSLER:

Q  In the multiple conversations that you had with Detectives Guevara and Halvorsen did either one of them ever disclose to you that they had any kind of physical contact with Arturo Reyes?

A  No, they did not.

MS. ROSEN:  Objection, form, foundation.

MS. GOLDEN:  And compound.

MS. SUSLER:  Did the court reporter get the answer?

THE WITNESS:  No, they did not.

BY MS. SUSLER:

Q  Now, if you had known that Detective Guevara and/or Halvorsen had had physical contact in the way of beating or hitting or slapping any of the three, any of the three suspects, Solache, Reyes, or Adriana Mejia, is that something that you certainly would have discussed with the other ASAs who were present if he had hit her, right?

MS. GOLDEN:  Objection to form, foundation.

MR. NOLAND:  Object to form.  Objection, form, foundation.

I think it pretty much has been asked and answered, but you can answer though, you can answer over the objections.

THE WITNESS:  If I had knowledge of that would I have likely discussed that with any of the other assistants that were present.

BY MS. SUSLER:

Q  That's my question.

A  I probably would have.

MS. SUSLER:  Thank you, I don't have any other questions.

MS. GOLDEN:  I have no questions.

MS. SUSLER:  Actually, I do have another one.  As a follow-up to that.

BY MS. SUSLER:

Q  From your knowledge of your practice in the Felony Review if any of the other ASAs, Heather or Tom or for that matter -- help me with the other ones, any of the ASAs that were present, if they -- if they had information that Guevara or Halvorsen had had physical contact in a way of touching or slapping or punching or pulling hair, any of that, that is something that they likely would have brought to you, isn't that fair to say?

MS. ROSEN:  Objection, form, foundation.

THE WITNESS:  While I can't speak to the other assistants or those other individuals, yes, likely they would have shared that information with me.

BY MS. SUSLER:

Q  And in your conversation with any of the other ASAs that were present at Area 5 on April 4 and 5 that none of them said anything to you about any kind of force used by Guevara or Halvorsen on any of the suspects, correct?

A  That's correct.

MS. SUSLER:  Thank you.

MR. NOLAND:  It sounds like that is it.

This is Dan Noland.  I just have a couple questions.

EXAMINATION

BY MR. NOLAND:

CCSAO COI SUBPOENAS 000146

301

Q I am going to ask you to turn to Exhibit 3, the statement of Adriana Mejia that she gave you.

At some point prior to Adriana Mejia giving you this 13-page handwritten confession did you translate the Miranda warnings that are on Page 1 from English to Spanish in order to utilize it as a form so that she then would be able to read the Miranda rights herself?

A Yes, I did.

Q And did you make also your knowledge with that form that you created with the Miranda rights into the Spanish language were those also provided to Mr. O'Malley and Ms. Brualdi for their use?

A I believe they were.

MR. NOLAND: That's all I have with that document.

I just have one more.

BY MR. NOLAND:

Q There was some questions about that you were a -- were a little confusing to me about that were asked about if you didn't believe a complaining witness that was telling you something, so do you remember just generally

302

questions like that earlier in the deposition whether something like that would be recorded?

A Yes, I do recall that.

Q In your role as Felony Review in reviewing a case, if a complaining witness who was making allegations that another person had committed a crime and if you did not believe that complaining witness, if you believed that they were untruthful, would you have rejected charges?

A Likely I would have rejected charges, right.

Q Presuming that it wasn't some other evidence that would corroborate the allegation, but if it was -- if you are relying upon the complaining witness and you think the complaining witness is lying to you you are going to reject charges, right?

A Right.

MR. NOLAND: That's all I have, thank you.

MS. REPORTER: Anybody else?

(No response.)

MR. NOLAND: We will reserve signature.

MS. REPORTER: Is there a standing order on this?

303

MR. HAZINSKI: We are not going to order at this time.

Once the audiovisual recording is complete I will send it to all counsel in this case.

(WHICH WERE ALL OF THE PROCEEDINGS HAD OR TAKEN PLACE IN THE ABOVE-ENTITLED MATTER.)

304

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ARTURO DeLEON REYES,    )
                        )
        Plaintiff       ) 1:18-cv-01028
                        )
vs                      ) Hon. Steven Seeger
                        ) District Judge Hon.
REYNALDO GUEVARA, et al  ) Susan R. Jaran
                        ) Magistrate Judge
        Defendants      )
GABRIEL SOLACHE         ) 1:18-cv-2312
                        )
        Plaintiff       ) Hon. Steven Seeger
                        ) District Judge Hon.
vs                      ) Susan R. Jaran
                        ) Magistrate Judge
CITY OF CHICAGO, et al   )
                        )
        Defendants      )

DAVID NAVARRO being first duly sworn on oath say that I am the deponent in the aforesaid deposition taken on July 23, 2020, that I have read the foregoing transcript of my deposition consisting of pages No. 1 through No. 292 inclusive and affix my signature to same

                    DAVID NAVARRO

Subscribed and sworn to before me this day of 2020

Notary Public

305

STATE OF ILLINOIS)
) SS.
COUNTY OF DUPAGE )
    I, STEPHANIE A. BATTAGLIA, CSR and Notary Public in and for the County of DuPage and State of Illinois, do hereby certify that on July 23, 2020, at 10:02 a.m., Central Standard Time, the deponent DAVID NAVARRO virtually appeared before me.
    I further certify that the said DAVID NAVARRO was by me first duly sworn to testify and that the foregoing is a true record of the testimony given virtually by the witness.
    I further certify that the deposition was terminated at 6:08 p.m., Central Standard Time.
    I further certify that I am not counsel for nor related to any of the parties herein, nor am I interested in the outcome hereof.
    In witness whereof, I have hereunto set my hand and seal of office this 24th of August, 2020.

                    Notary Public
CSR No. 084-003337 - Expiration Date: May 31, 2021.

CCSAO COI SUBPOENAS 000148



**Planet Depos**
We Make It Happen™

# Transcript of Gabriel Solache

**Date:** December 6, 2021
**Case:** Solache -v- City of Chicago, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
www.planetdepos.com

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

CCSAO COI SUBPOENAS 000149

IN THE UNITED STATES DISTRICT COURT

OR THE NORTHERN DISTRICT O ILLINOIS

EASTERN DIVISION

GABRIEL SOLACHE,                )
                               )
                Plaintiff,     )
                               )
        vs.                    ) No.  : 8Civ.23 2
                               )
CITY O  CHICAGO, et al.,       )
                               )
                Defendants. )
_____) Volume I


                Volume I

        Videotaped Deposition of

            GABRIEL SOLACHE

        (Via Videoconference)




DATE:      December 6, 202

TIME:     9:53 A.M.

PLACE:    Los Cabos San Lucas, Mexico






REPORTED BY:   Ruben Garcia

            Certified Shorthand Reporter

A P P E A R A N C E S

ON BEHAL  O  THE PLAINTI  :

    PEOPLE S LAW O  ICE
    BY: JAN SUSLER, ESQ.
     80 North Milwaukee Avenue
    Chicago, Illinois 60642
    773.235.0070


ON BEHAL  O  THE DE ENDANT CITY O  CHICAGO:

    ROCK,  USCO & CONNELLY, LLC
    BY: EILEEN ROSEN, ESQ.
        JESSICA ZEHNER, ESQ.
    32  North Clark Street
    Suite 2200
    Chicago, Illinois 60654
    3 2.494. 00

ON BEHAL  O  DE ENDANT REYNALDO GUEVARA:

    LEINENWEBER, BARONI & DA  ADA
    THOMAS LEINENWEBER, ESQ.
     20 North LaSalle Street
    Suite 2000
    Chicago, Illinois 60602
    866.786.3705


ON BEHAL  O  INDIVIDUAL OTHER DE ENDANTS:

    THE SOTOS LAW  IRM
    BY: JOSH ENGQUIST, ESQ.
        CAROLINE GOLDEN, ESQ.
     4  West Jackson Boulevard
    Suite  240A
    Chicago Illinois 60604
    630.735.3300

APPEARANCES (Cont d)


  OR BEHAL  O  DE ENDANT DAVID NAVARRO:
    REITER BURNS, ESQ.
    BY: DANIEL BURNS, ESQ.
    3   South Wacker Drive
    Suite 5200
    Chicago, Illinois 60606
    3 2.982.0090


  OR BEHAL  O  ARTURO REYES:

    LOEVY & LOEVY
    BY: SEAN STARR, ESQ.
    3   North Aberdeen Street
    3rd  loor
    Chicago, Illinois 60607
    3 2.243.5900


ON BEHAL  O  THOMAS O MALLEY, HEATHER BRUALDI, ANDREW
VARGA, KARIN WEHRLE:
    (Remotely)

    HINSHAW & CULBERSON
    BY: MICHAEL STEPHENSON, ESQ.
     5 North  ranklin Street
    Suite 2500
    Chicago, Illinois 60606
    3 2.704.3000




ALSO PRESENT:

    Itcoatl Carrillo, Videographer

    Interpreters:  Jose  onseca, Adriana Trevino

INDEX


Witness:  Gabriel Solache                      Page

        Examination by Ms. Rosen .............    7

Exhibits Referenced:                            Page

Exhibit    Description

    Typed letter to Adriana from Mr. Solache      30

    2   Handwritten document                      26

    3   Photocopy of an envelope                  28

    4   Handwritten letters                       2

    0   Visitor Log                               50

    Telephone list                               54

37    acebook pages                              33

5   Plaintiff Gabriel Solache s Answers to       64

    defendant Daniel Trevino s first set of

    interrogatories to plaintiff

52  Plaintiff s verification of answers to        70

    defendant s interrogatories

Transcript of Gabriel Solache
Conducted on December 6, 2021

LOS CABOS SAN LUCAS, MEXICO, MONDAY, DECEMBER 6, 202

THE VIDEOGRAPHER: Here begins Media Number in the video deposition of Gabriel Solache, in the matter of Solache versus City of Chicago, et al., in the United States District Court for the Northern District of Illinois, Eastern Division, case number : 8 Civ. 23 2.

Today s date is December 6, 202 . The time on the video monitor is 9:56 a.m. The videographer today is Itzcoatl Carrillo on behalf of Planet Depos. This video deposition is being taken place at J.W. Marriott, Los Cabos.

Will counsel please voice identify themselves and state whom they represent.

MS. SUSLER: My name is Jan Susler, S u s l e r. I m the attorney for Gabriel Solache.

MS. ROSEN: Eileen Rosen, R o s e n, on behalf of one of the defendants, the City of Chicago.

MR. ENGQUIST: Yes, Josh Engquist, E n g q u i s t, on behalf of the individual officer defendants with the exception of Reynaldo Guevara.

MR. LEINENWEBER: Tom Leinenweber, L e i n e n w e b e r, on behalf of Defendant Reynaldo

Guevara.

THE VIDEOGRAPHER: The court reporter today is Ruben Garcia on behalf of Planet Depos. Will the reporter please swear in the interpreter and the witness.

MS. ROSEN: I think there are other people in Chicago.

MR. STARR: Sean Starr on behalf of plaintiff Arturo Reyes.

MS. ROSEN: That was Sean Starr, S t a r r.

MR. STPHENSON: Michael Stephenson. It s S t e p h e n s o n, for defendants Karin Wehrle, Heather Brualdi, Andrew Varga and Thomas O Malley.

MR. BURNS: Daniel Burns on behalf of defendant David Navarro.

ADRIANA TREVINO AND JOSE ONSECA, were sworn to translate from the English Language to the Spanish Language and from the Spanish Language to the English Language

GABRIEL SOLACHE, having been first duly sworn by the reporter, was examined and testified as follows:

THE WITNESS: Yes.

(Interpretation by Adriana Trevino:)

EXAMINATION

BY MS. ROSEN:

Q Good morning, Mr. Solache.

A Good morning.

Q I will be asking you most of the questions I m sure I ll be the only one asking questions today regarding the events that happened back in 998. Okay?

A Yeah, that s fine.

Q If at any point in time you need to take a break, let us know.

A Yes.

Q The only thing I would ask is that if I ask a question, you answer the question before we take a break. Okay?

A Of course.

Q If you don t understand my question, please let me know.

A That's fine.

Q If you don't let me know that you don't understand my question, I will assume that you understood it. Okay?

A That's fine.

Q Mr. Solache, when were you born?

A July 16, 1971.

Q Are you taking any medications today that would affect your ability to testify truthfully?

A No.

Q Where do you currently live?

A In Pachuca.

Q How long have you lived in Pachuca?

A Three years and two months. Sorry, no. Three years and some months.

Q Do you live in the same place -- sorry, let me start over. Have you lived in the same place in Pachuca for the three years or so that you've lived there?

A Yes.

Q Is that a house or an apartment?

A It's an apartment.

Q Do you live with anybody else in the apartment in Pachuca?

CCSAO COI SUBPOENAS 000151

Transcript of Gabriel Solache
Conducted on December 6, 2021

3 (9 to 12)

**9**

A    No.

Q    In the three years or so that you've lived in the apartment in Pachuca, have you ever lived with anyone else?

A    Yes.

Q    Who?

A    With my wife.

Q    Are you currently married?

A    Yes, I am married.

Q    When did you get married?

A    February of this year.

Q    But your wife doesn't live with you?

A    No.

Q    Did she move out?

A    Yes.

Q    When did she move out?

A    She left around the beginning of September.

Q    What's your wife's name?

A    Sophia Trejo Zanos.  Sophia Trejo Zanos.

Q    Can you spell her last name?

A    Z-a-n-o-s.

Q    When did you first meet Sophia?

**0**

A    I don't remember.  It's been a while.

Q    When did move back to Mexico from the United States?

A    May 17, 2018.

Q    Did you know Sophia before you moved back to Mexico in May of 2018?

A    No.

Q    Approximately how long after you moved back to Mexico did you meet Sophia?

THE INTERPRETER:  Before?

BY MS. ROSEN:

Q    Let me try that again.  Approximately how long after you moved back to Mexico in May of 2018 did you meet Sophia.

A    I don't remember.

Q    Where did you meet Sophia?

A    In Pachuca.

Q    How did you meet Sophia?

A    At a mall.

Q    Did she work at the mall?

A    No.

Q    Did you work at the mall?

A    No.

Q    So did you just run into each other at

**1**

the mall?

A    That's where I met her.

Q    What were you doing at the mall when you met her?

A    I don't remember, but I was at the mall.

Q    How long after you met Sophia did you get married?

A    Some time went by.  I don't remember exactly.

Q    Do you still communicate with Sophia?

A    We are in contact.

Q    Are you planning to get a divorce?

A    No, I have not considered that.

Q    Why aren't you living together?

A    Because the relationship doesn't work.

Q    Is Sophia currently employed?

A    I haven't asked her.

Q    While the two of you were married and living together, was Sophia employed?

A    No.

Q    Where does Sophia live now?

A    I don't know exactly, but I know she lives in Catepec (phonetic).

**2**

Q    Did you say "Catepec"?

A    Yes, in Catepec.

Q    How far is Catepec from Pachuca?

A    About an hour approximately.

Q    When is the last time you saw Sophia?

A    I don't remember.

THE INTERPRETER:  The interpreter needs to make a correction of "Catepec."  It's Ecatepec, E-c-a-t-e-p-e-c.

MS. ROSEN:  Thank you.

BY MS. ROSEN:

Q    How old is Sophia?

A    27.

Q    Are you currently employed?

A    I work at a store.

Q    What kind of store?

A    Miscellaneous.

Q    Do you sell things at the store?

A    Yes, just miscellaneous.

Q    When you say "miscellaneous," do you mean food?  Souvenirs?  Clothing?

A    Only food and drinks, like chips, Sabritas, water.

Q    What's the name of the store?

CCSAO COI SUBPOENAS 000152

A   La Isla.
Q   Can you spell that?
A   I-s-l-a.
Q   Are you a salesclerk?
A   Yes.
Q   How long have you worked at Isla?
A   I don't remember exactly.
Q   How about approximately?
A   A little bit over a year.
Q   Before working at Isla, did you have other employment here in Mexico?
A   No.
Q   So from the time you move back to Mexico in May of 2018 until about a year ago, you were not working at all?
A   No.
Q   How did you support yourself?
A   With my family, with family.
Q   Who in your family helped to support you?
A   My daughter.
Q   Anybody else?
A   My mom too.
Q   Anybody else?

A   No.
Q   Do you pay rent in the apartment that you have in Pachuca?
A   No.
Q   How are you able to live there without paying rent?
A   The apartment is mine.
Q   You own it?
A   Yes.
Q   When did you buy it?
A   I don't remember.
Q   Did you buy it after 2018?
A   It was in 2018, but I do not remember exactly when it was.
Q   How much did the apartment cost?
A   I don't remember.
Q   Approximately.
A   I don't remember.
Q   Where did you get the money to buy the apartment?
MS. SUSLER:  Objection.  The source of his finances is not subject to discovery, and I'm just going to make an objection and instruct him not to answer if the answer is related to getting money from

a source other than his family.
MR. STARR:  And just for the record, Plaintiff Reyes, unless otherwise noted, is going to join in any objections that are made by counsel for Mr. Solache.
MS. ROSEN:  Okay.  I'm not understanding your objection, so I'm just going to ask a couple questions about it.  I think you said the source of his income other than from family is not discoverable?
MS. SUSLER:  Yeah, well, maybe "income" isn't the right word.  Where he got money is not discoverable.
MS. ROSEN:  And why not?
MS. SUSLER:  I'll give you a case.  It's Rhew, R-h-e-w, versus Norfolk, N-o-r-f-o-l-k, Southern Railway Company, 2013 Westlaw, 5308803.
MS. ROSEN:  We're probably going to have to circle back at some point later in the week, but we can move on for now.
MS. GOLDEN:  Could I get the cite again?
MS. SUSLER:  2013 Westlaw 5308803.
MS. GOLDEN:  2013 Westlaw 5308803?
MS. SUSLER:  Yeah, and there are other cases as well, if we end up litigating, and I'm happy to

provide you with other cases, but that's the essence of it.
MS. ROSEN:  Just for the record, I believe that was Carrie Golden on behalf of Officer Defendants.
Right, Carrie?
MS. GOLDEN:  Yes.
MS. ROSEN:  The officer defendants, other than Mr. Guevara, just to be clear.
BY MS. ROSEN:
Q   Did your family help you to buy your apartment?
A   No.
Q   What are the monthly expenses of your apartment?
A   Water and maintenance.
Q   And how much do you spend on water and maintenance on a monthly basis?
A   About 100 pesos for water and 300 for maintenance.
Q   Since you have moved back to Mexico, approximately how much money has your daughter given you to help support you?
A   I don't remember.

CCSAO COI SUBPOENAS 000153

**7**

Q   Approximately how much money has your mother given you since you've moved back to Mexico in May of 2018?

A   I don't remember how much money she has given me.

Q   How old is your daughter?

A   She turned 27.

Q   Other than Sophia, have you been married to anyone else?

A   No.

Q   What is your daughter's name?

A   Alejandra.

Q   Who is Alejandra's mother?

A   Her name is Flor Italia.

Q   And you were never married to Flor Italia, right?

A   No.

Q   When did you first start a relationship with Flor Italia?

A   I don't remember.

Q   What's your daughter's date of birth?

A   17th of September of '85 -- no, '95. I'm sorry.

Q   How long had you been in a relationship

**8**

with your daughter's mother before she was born, approximately?

A   I don't remember.

Q   Did you and your daughter's mother Flor Italia live together?

A   Yes.

Q   Do you recall approximately how long you lived together?

A   No.

Q   When did you leave Mexico to come to the United States?

A   It was in '96, but I do not remember the exact date.

Q   Do you remember whether or not it was in the winter or spring or summer or fall?

A   I don't remember.

Q   Do you recall how old your daughter was when you moved to the United States?

MS. SUSLER:  I'm just going to object to the use of the word "moved to the United States," form.

BY MS. ROSEN:

Q   You can answer.

A   How old was my daughter when I left? Months.

**9**

Q   Did you move to the United States?

A   Yes.

Q   How did you get to the United States?

A   By bus.

THE INTERPRETER:  The interpreter needs to clarify.  "Camion" could be "truck."

THE WITNESS:  Yes, passenger, a bus, yes.

BY MS. ROSEN:

Q   Who did you travel to the United States with, if anyone?

A   With Carlos Martinez.

Q   Who is Carlos Martinez?

A   He is Adriana's brother.

MS. ROSEN:  He's Adriana's --

THE INTERPRETER:  Adriana's brother.

THE WITNESS:  May I take a break?

MS. ROSEN:  Of course.

THE VIDEOGRAPHER:  Going off the record.

(Recess)

(Interpretation by Jose Fonseca:)

THE VIDEOGRAPHER:  We are back on the record.  The time is 10:32 a.m.

MS. SUSLER:  Could I just say, we're going to need somebody to be keeping track of how much time

**20**

we're on the record.  Thank you.

THE REPORTER:  Who was that speaking?

MS. SUSLER:  Jan Susler.

BY MS. ROSEN:

Q   We are back on the record, and Mr. Solache has removed his mask because the interpreters were having a little difficulty hearing him, and everybody here has agreed that we're all comfortable with that so that way we can hopefully run this a little more smoothly on our end and the interpreters aren't asking Mr. Solache to repeat his answers.

MS. SUSLER:  Eileen, I think before you start questioning, Mr. Solache wanted to say something.

MS. ROSEN:  Okay.

THE WITNESS:  Before you continue with your questions, I'd like to make a correction about Sophia.

MS. ROSEN:  Okay.

THE WITNESS:  Sophia is currently with me. She's here with me in Los Cabos.  I was nervous when you asked me, but I wanted to make that correction.

BY MS. ROSEN:

Q   Anything else you want to say about

CCSAO COI SUBPOENAS 000154

**Page 21**

Sophia?

A   No, that's all.

Q   And why were you nervous to say Sophia was with you?

A   Yes, I got a bit nervous.

Q   Okay. Because you didn't want to tell us that she was here with you or because you -- why were you nervous?

A   No, I wasn't nervous because she was with me. I was just nervous because of the case.

Q   I see. And how is it that you decided to have Sophia come with you to Los Cabos?

A   Well, we decided together. I wanted to have her support. She's a support for me. So we spoke about it and the two of us decided, so she's here with me.

Q   And when did you arrive in Los Cabos?

A   Friday afternoon.

Q   And did she travel with you?

A   Yes.

Q   How long are you staying?

A   We are traveling back on Sunday morning.

Q   And you'll travel back together?

**Page 22**

A   Yes.

Q   And then when you go back to Pachuca, will then she go back to her house or apartment?

A   No.

Q   Will she resume living with you in Pachuca?

A   No, she's not going to live with me.

Q   Where is she going to live?

A   Where she's living, in Ecatepec.

Q   Are the two of you planning to do anything to help your marriage so that you can resume living together?

A   No, we haven't talked about that.

Q   What, if anything, have you done to prepare for the deposition?

A   Conversations with my attorney.

Q   And I don't want to know what you and your attorney talked about, but can you tell me how many conversations you've had with your attorney getting ready for your deposition?

MS. SUSLER: I'm just going to object to form, and I think that's vague.

THE WITNESS: Some times.

**Page 23**

BY MS. ROSEN:

Q   Did you meet with your attorney in person in the last week to prepare for your deposition?

A   Yes.

Q   On how many occasions did you meet with your attorney in person in the last week?

A   Some times. I didn't count them, but there were some times.

MS. SUSLER: Interpreter, I just want to say "algunas veces" could be "a few times."

THE INTERPRETER: "A few times." The interpreter is going to make a correction. "Aglunas veces," translates as "a few times."

"I didn't count them, but a few times."

MS. SUSLER: Thank you.

BY MS. ROSEN:

Q   In the last week, the times that you met with your attorney has it been only in Los Cabos?

A   That's correct.

Q   Did you meet with your attorney on Friday when you arrived in Los Cabos?

A   Yes.

Q   And for how long did you meet with your

**Page 24**

attorney on Friday when you arrived in Los Cabos?

A   I don't remember how long it was.

Q   Was it more or less than an hour?

A   I don't remember.

Q   Was Sophia with you when you met with your attorney?

A   No.

Q   Did you meet with your attorney on Saturday?

A   Yes.

Q   How long did you meet with your attorney on Saturday?

A   I didn't count the hours. I don't know how many hours.

Q   Did you meet with your attorney only one time on Saturday?

A   No, it was two or three times. I don't remember exactly.

Q   Was Sophia with you at all when you met with your attorney on Saturday?

A   No.

Q   Did you meet with your attorney on Sunday?

A   Yes.

CCSAO COI SUBPOENAS 000155

25

Q   How long did you meet with your attorney on Sunday?

A   I don't remember.

Q   Did you meet with your attorney on Sunday on one occasion or more than one occasion?

A   More than one occasion.

Q   Do you remember how many times?

A   No.

Q   And this was yesterday, right?  Sunday was yesterday?

A   Yes.

Q   Was Sophia with you at all for any of the meetings you had with your attorney on Sunday?

A   No.

Q   Did you review any documents as you were getting ready for your deposition?

A   Yes.

Q   What documents did you review?

A   I don't remember which documents.

Q   Do you remember any of the documents that you reviewed?

A   No.

Q   Do you remember how many documents you reviewed?

26

A   No.

Q   Did you review your prior testimony about this case?

A   Possibly.  I don't remember whether we checked the previous testimony, but there were several papers we checked.

Q   The papers that you reviewed, were they in English or Spanish?

A   In English.

Q   Do you read English?

A   Yes, I read it.

Q   Do you speak English?

A   Not perfectly, but I do.

Q   And do you understand it?

A   Yes.

Q   Do you have any other children other than your daughter?

A   No.

Q   I believe I read somewhere that you had a son that died either at childbirth or shortly before; is that right?

A   After his birth.  And yes, he was my daughter's brother.

Q   I'm sorry to hear about the death of

27

your son.  Did he die right after he was born or did he live for some period of time?

A   After some time.  As a matter of fact, I was not in Mexico.  I was in the United States.

Q   How old was he when he passed away?

A   Months.

Q   What was your son's name?

A   He didn't have a name.  I didn't learn anything about a name.  He didn't have a name.

Q   Who was your son's mother?

A   Flor Italia.

Q   Do you know when your son was born?  The date?

A   No.

Q   Did you know Flor Italia was pregnant when you left for the United States?

A   No, she didn't say anything.

Q   When did you find out that she was pregnant?

A   When I was in the United States.

Q   Do you recall where you were living when she told you that she was pregnant?

A   No.

Q   Why did you decide to leave Mexico and

28

go to the United States?

A   My dream was to have a house in Mexico, but in Mexico there are not many jobs where we can make enough money to build a house, so my plan was to go to the United States for some time to build a house and to come to Mexico.

Q   So your plan was to go to the United States for some period of time to make money and then to return to Mexico to build a house?

A   That's correct.

Q   Did you discuss this plan with Flor Italia?

A   I don't remember discussing that.

Q   And was she in agreement that you should leave her and your daughter behind and go to the United States to make money?

MS. SUSLER: Objection.  Form and foundation.  You can answer.

THE WITNESS: I didn't ask her.

BY MS. ROSEN:

Q   Did you tell her that you were going to move to the United States?

A   I don't remember telling her.

Q   Were you living with Flor Italia at the

CCSAO COI SUBPOENAS 000156

29

time that you left to go to the United States?

A   Yes.

Q   How long did it take you to get from where you lived in Mexico to the border in the United States where you crossed?

A   Public transportation, the bus.

Q   And how long did it take you?

A   I don't remember.

Q   And you traveled, you said, with Carlos?

A   Yes.

Q   And did you travel with anybody else that you knew?

A   No.

Q   When did you and Carlos decide to travel to the United States together?

A   I don't remember.

Q   Where did you live in Mexico before you left to go to the United States?

MS. SUSLER:  Objection.  Form.  Do you mean at the time he left?

MS. ROSEN:  Sorry, yeah.

BY MS. ROSEN:

Q   When you left to move to the United

30

States, where were you living?

A   In Michoacan.

Q   And were you living in a house or an apartment in Michoacan?

A   I was living in my grandmother's house.

Q   And other than Flor Italia and your daughter, was there anybody else living in your grandmother's house at that time?

A   No, only my grandmother, one of my brothers, and myself.

THE INTERPRETER:  The interpreter is going to clarify.

(Interpreter speaks with witness in Spanish)

THE INTERPRETER:  "One of my siblings."  I'm doing the translation as "one of my siblings."

BY MS. ROSEN:

Q   Which sibling?

A   His name is Rogelio.

Q   Can you spell that?

A   R-o-g-e-l-i-o.

Q   Can you say it again?  "Rogelio"?

How many siblings do you have?

A   There are 11 of us.

Q   And can you tell me the names of your

31

siblings?

A   Yes, the oldest one, Lorenza; Mauricio; Lilia; myself; Angelica; Antonio; Margarita; Rogelio; Irene.

THE INTERPRETER:  I-r-e-n-e.

THE WITNESS:  Pedro and Eduardo.

BY MS. ROSEN:

Q   How did you know Carlos?

A   He was my grandmother's neighbor.

Q   How long had you known Carlos before you and he decided to leave to go to the United States?

A   Since we were children.  All my life.

Q   Is Carlos the same age as you?

A   No, he's younger.

Q   How much younger than you was Carlos?

A   Six, seven years perhaps.

Q   When is the last time you had any communication or contact with Carlos?

A   I don't remember.

Q   Have you had any communication with Carlos or contact with Carlos after your arrest in 1998?

A   Once he went to visit me at the Cook

32

County, and that was the last time that I saw him.

Q   At the jail while you were awaiting trial?

A   Yes.

Q   And do you recall approximately when Carlos came to visit you?  Was it close in time to your arrest or had some period of time passed?

A   Exactly the date, I don't remember, but he went to visit me once.

Q   And you said earlier, when I asked you if you and Carlos were the same age, that he was younger than you.  Have you heard that Carlos has passed away?

A   I learned, I realized, my sister-in-law has contacts in the ranch, because we used to live in the ranch, and she's the one who told me that he had passed away.

Q   Which sister-in-law?

A   She's married to one of my brothers. She's living in Ecatepec.

Q   Which brother is she married to?

A   Roger.  Rogelio.

Q   Do you still have any family that lives in the ranch?

Transcript of Gabriel Solache
Conducted on December 6, 2021

9 (33 to 36)

---

**33**

A    I have one brother.
Q    Which brother still lives in the ranch?
A    Mauricio.
Q    Is your grandmother still alive?
A    No.
Q    Is your grandmother's house still owned by somebody in your family?
A    No.
Q    And do you know who your sister-in-law heard from about Carlos passing away? Who told her?
A    No, I don't. She didn't tell me.
Q    Did she tell you how Carlos passed away?
A    No.
Q    When you went to the United States in 1996, where did you cross the border?
A    I don't remember. It was near Tijuana.
Q    And did you have papers to get across the border?
A    No.
Q    Do you recall how it is you crossed the border exactly?
MS. SUSLER: Objection. Form.

---

**34**

BY MS. ROSEN:
Q    You can answer.
A    Walking.
Q    Was it just you and Carlos that walked across the border?
A    No.
Q    How many people did you walk across the border with?
A    A few. I didn't count them.
Q    Did you know any of the other people that crossed the border with you?
A    Yes, one of them.
Q    Who?
A    His name is Ramiro.
Q    Is he related to you?
A    No.
Q    How did you know Ramiro?
A    We used to live in the same ranch.
Q    When you first crossed the border into the United States, where did you end up living?
A    Santa Paula, California.
Q    How did you choose Santa Paula to live?
A    I didn't decide that. We arrived there. Another person was living there and he

---

**35**

received us to work there.
Q    How did you decide to go to the city of Santa Paula?
MS. SUSLER: Objection. Asked and answered.
BY MS. ROSEN:
Q    You can answer.
A    I already answered.
Q    How far was Santa Paula from the border?
A    I have no idea.
Q    How did you get from the border to Santa Paula?
A    By car.
Q    Whose car?
A    I don't know which car. I don't know the brand of the car.
Q    Who owned the car?
A    I don't know him.
Q    Why did you get into that particular car?
A    We all got into that car.
Q    When you say "We all got into that car," who all got into that car?
A    All the ones who were part of the

---

**36**

group.
Q    Did you pay somebody to help you cross the border?
A    Yes.
(Adriana Trevino begins interpreting)
BY MS. ROSEN:
Q    Who did you pay?
A    An uncle paid for me, and then I paid my uncle back later.
Q    How much did it cost to cross the border?
A    I don't remember.
Q    So included in the fee that was paid to cross the border was the transportation to get you to Santa Paula; is that correct?
A    No, just to Los Angeles.
Q    And then from Los Angeles you made the decision to go to Santa Paula?
MS. SUSLER: Objection. Misstates his prior testimony.
BY MS. ROSEN:
Q    You can answer.
A    No, my uncle took me, the one who lent me the money.

---

CCSAO COI SUBPOENAS 000158

Transcript of Gabriel Solache
Conducted on December 6, 2021

10 (37 to 40)

---

**37**

Q   Took you to Santa Paula?
A   Yes.
Q   So that uncle lived in the United States?
A   Yes.
Q   What is that uncle's name?
A   Salvador.
Q   What's his last name?
A   Sanchez.
Q   And is he related to your mother or to your father?
A   With my dad.
Q   Was it your dad's brother?
A   Cousin.
Q   And at the time that you crossed the border into the United States, where did your uncle Salvador live?
A   In Los Angeles.
Q   And did your uncle arrange for you to have a place to live in Santa Paula?
A   No.
Q   Who went to Santa Paula other than you?
A   Ramiro.
Q   What is Ramiro's last name?

---

**38**

A   Hinojosa Maya.
Q   How do you spell "Maya"?
A   M-a-y-a.
Q   Where did Carlos go?
A   He stayed in Los Angeles.
Q   When you went to Santa Paula with Ramiro, where did you end up living?
A   With an uncle of Ramiro's that lived there in Santa Paula.
Q   How long did you live in Santa Paula with Ramiro in his uncle's home?
A   I don't remember exactly. Seven or eight months.
Q   Did you find a job?
A   Yes.
Q   What kind of job did you find?
A   In the fields.
Q   Before you moved to the United States when you were in Mexico, did you work?
A   Yes.
Q   And tell me the job that you had immediately before you left for the United States.
A   I worked at a rotisserie.
Q   What did you do at the rotisserie?

---

**39**

A   I would roast chickens.
Q   What was the name of the rotisserie that you worked at?
A   I don't remember.
Q   How long did you work there?
A   I don't remember.
Q   And this was while you were living at your grandmother's house, right?
A   No.
Q   Where were you living at the time when you were working at the rotisserie?
A   In Ecatepec.
Q   Your grandmother's house is in the ranch, right?
A   Correct.
Q   When did you move from -- strike that. How long were you living in your grandmother's house at the ranch before you left to go to the United States?
A   Well, I lived a few years with my grandmother. Then Ecatepec. Then I went back to the ranch for several weeks before going to the United States. I just don't want to confuse you.
Q   So your grandmother also lived in

---

**40**

Ecatepec?
MS. SUSLER: Objection. Misstates his testimony.
THE WITNESS: No, my grandmother lived in Michoacan.
BY MS. ROSEN:
Q   And that's the ranch, right?
A   Yes.
Q   And how long were you living in your grandmother's house on the ranch before you left to go to the United States?
A   A few weeks. I don't remember exactly how many.
Q   Was your daughter living with you when you were at your grandmother's house?
A   No, she stayed with her mom.
Q   And where was her mother living?
A   Right now?
Q   Either I misunderstood you earlier, so let me backtrack a little bit. When you were living in your grandmother's house on the ranch right before you left for the United States, who else was living there?
A   My brother.

---

CCSAO COI SUBPOENAS 000159

Q   So Flor Italia and your daughter were not living with you at that point in time?
A   No, they stayed.  They were living in Ecatepec.
Q   Did you live with Flor Italia and your daughter in Ecatepec at any point in time?
A   Yes.
Q   For how long?
A   I don't remember.
Q   When you were living in Ecatepec with your daughter and Flor Italia, was anybody else living with you?
A   No, I only lived with them.
Q   And why did you move from Ecatepec to your grandmother's house on the ranch?
A   I went there for a few weeks to work.
Q   To work on the ranch?
A   Yes.
Q   And then from there you left to go to the United States?
A   Yes.
Q   I think I might have asked you this, but I'm a little confused, maybe I misunderstood you, so I'm just going to ask again.  When you moved from

the ranch -- when you left Mexico from the ranch to go to the United States, did you tell Flor Italia you were going to the United States?
MS. SUSLER: Objection.  Asked and answered.
BY MS. ROSEN:
Q   What was your answer?
A   No.
Q   So as far as she knew, you were still on the ranch working?
MS. SUSLER: Objection. Foundation.
BY MS. ROSEN:
Q   You can answer.
A   No, because when I arrived to the United States, I told her that I was there.
Q   So when you got to the United States, you let her know that you had gone to the United States?
A   That's right.
Q   Had you told her that you were going to the ranch to work?
A   I don't remember.
Q   What type of work were you doing on the ranch before you left for the United States?
A   I don't remember.

Q   Had you told Flor Italia that you were going to the ranch to work?
A   I don't remember having told her.
Q   When you went to the ranch to work, was Carlos living on the ranch?
A   Yes.
Q   Did you make the decision to go to the United States with Carlos in those few weeks that you had moved to the ranch?
A   Yes.
Q   So the rotisserie that you worked at, was that while you were living in Ecatepec with Flor Italia and your daughter?
A   That's right.
Q   And I think you told me you don't remember how long you worked at the rotisserie, right?
A   No.
MS. SUSLER:  That's not going to come out right.
MS. ROSEN:  Let me ask it clean.
BY MS. ROSEN:
Q   You don't recall how long you worked at the rotisserie; is that correct?
A   That's correct.

Q   Before working at the rotisserie, where did you work?
A   I don't remember.
Q   Do you remember any of the other jobs you held before the job at the rotisserie?
A   I worked on the ranch, in the fields.
Q   How long did you live in Ecatepec?
A   I don't remember exactly how long, but it was a while.
Q   Where did you meet Flor Italia?
A   In Ecatepec.
Q   So after you had moved to Ecatepec?
A   When I was living in Ecatepec.
Q   And other than the rotisserie, you don't remember any other jobs you had while you were in Ecatepec?
A   Well, I only had that job in Ecatepec.
Q   Any other jobs that you can remember other than the rotisserie and working in the fields on the ranch?
MS. SUSLER: Objection. Form.  Are you talking about ever in his life?
MS. ROSEN:  In that time period before he moved to the United States.

CCSAO COI SUBPOENAS 000160

Transcript of Gabriel Solache
Conducted on December 6, 2021

12 (45 to 48)

THE WITNESS: No.

BY MS. ROSEN:

Q   Where did you grow up?

A   In Michoacan.

Q   Did you grow up in your grandmother's house?

A   Well, I lived with my great-great grandmother, and also my grandmother, and also a family that lived there nextdoor.

Q   Did you live with your parents for some period of time while you lived on the ranch?

A   Until my mom separated from my dad, I lived with them.

Q   And that was on the ranch?

A   Yes.

Q   Do you recall when, what year your mom split from your mother?

A   No, I don't remember.

Q   When your mother and your father separated, did either your mother or your father move from the ranch?

A   My mom left for Mexico City.

Q   Did you go with her?

A   No.

Q   Did any of your siblings go with her?

A   Not at that time.

Q   So she went by herself at that point?

A   Yes.

Q   And did the children remain on the ranch with your father?

A   No, with my grandma.

Q   Do all of your brothers and sisters share the same mother and father?

A   The last two are from a different father.

Q   So there's nine of you from your mother and father?

A   Yes.

Q   So when your mother and father split, all nine of you went to live with your grandmother?

A   No, I stayed with my great-great grandmother.

Q   Did any of your other siblings stay with your great-great grandmother?

A   Not that I remember.

Q   Did your father stay on the ranch?

A   Yes.

Q   And are your parents both still alive?

A   My mom is.  My dad passed away.

Q   When did your dad pass away?

A   I think it was around 2012, 2013.  I was still in jail.

MS. SUSLER: For the interpreter, "La carcel," it could be "prison."  It could be "jail."

THE INTERPRETER: But the interpreter needs to translate what he says.  He would have to clarify.  So "carcel" is "jail."

MS. SUSLER: Okay.  It's also "prison."

THE INTERPRETER: No, prison is "prision."  It's a different word.

MS. SUSLER: Okay.

MS. ROSEN: I think we all know where he was in 2012 and 2013, but okay.

BY MS. ROSEN:

Q   When your parents split, how would you describe your relationship at that time with your mother?

A   Good.

Q   Do you know why she decided to move to Mexico City?

A   No, I don't know.

Q   How often did you see your mother between the time that your mother and your father split and the time that you decided to move to the United States?

A   I don't remember exactly.  It could have been every three months, every four months, but I don't remember exactly, but I would see her.

Q   And how far is it from the ranch to Mexico City, approximately?

A   Four hours.

Q   By car?

A   Yes.

Q   Did you ever live in Mexico City?

A   Yes.

Q   And when did you live in Mexico City?

A   I don't remember the date, but it was a few months.

Q   Did you live with your mother?

A   Yes.

Q   Do you remember how old you were approximately?

A   Maybe 15 or 14 years old.

Q   Do you remember how old you were approximately when your parents split?

A   No.

CCSAO COI SUBPOENAS 000161

**49**

Q How old were you when you moved to the United States?

A 24.

Q Did you discuss with your mother your decision to move to the United States?

A No.

Q Did you discuss with your father your decision to move to the United States?

A No.

Q How about any of your siblings, did you have any discussion with any of your siblings about your decision to move to the United States?

A No.

Q How far did you get in your education while you were in Mexico?

A I finished secondary school.

THE INTERPRETER: Clarification from the interpreter. That would be like middle school or junior high.

THE WITNESS: I started the first year of secondary school, but I only did five months.

BY MS. ROSEN:

Q And why did you only do five months?

A Well, when you're in secondary school,

**50**

you need money for books, shoes and uniform, and I didn't have that.

Q So you couldn't afford it?

A No.

Q So then what did you do when you stopped going to school?

A Work.

Q After the seven or eight months that you lived in Santa Paula, where did you move to?

A Chicago.

Q And why did you decide to move to Chicago?

A Well, because in Santa Paula there was only like seasonal work, like nine months of the year, and then there was nothing else.

Q And how did you choose Chicago?

A Carlos was over there in Chicago.

Q Do you know when Carlos moved to Chicago?

A I don't know the exact date when he left, but he went to Chicago to his sister's.

Q And I take it you stayed in touch with Carlos once you came to the United States?

A Yes.

**51**

Q And before Carlos moved to Chicago, did you know that his sister Adriana was living in Chicago?

A Yes.

Q Were you in contact with Adriana up until the time that you moved to Chicago?

A No.

MS. ROSEN: The videographer needs to take a break, and this is probably a good place to take a break.

THE VIDEOGRAPHER: This marks the end of Media Number 1 in the deposition of Gabriel Solache. We are off the record at 11:32 a.m.

(Recess)

(Jose Fonseca begins interpretation)

THE VIDEOGRAPHER: Here begins Media Number 2 in the deposition of Gabriel Solache. We are back on the record at 11:47 a.m.

MS. ROSEN: Okay. Just so everyone kind of knows what we talked about at the break, the media unit goes for 90 minutes, so we're going to try to go straight through for 90 minutes, and then take a lunch break at that point. So for here, that would put us in Cabo at about 1:15 or so. So that's the plan.

**52**

BY MS. ROSEN:

Q Did you have any other family members in the United States when you -- let me strike that.

Were any of your siblings in the United States when you first arrived in the United States?

A No.

Q Did any of your siblings move to the United States between the time you arrived in the United States and the time you were arrested?

A No.

Q At any point in time have any of your siblings moved to the United States?

A Yes.

Q Who?

A Mauricio and Rogelio.

Q When did Mauricio move to the United States?

A I don't know the date, but I was already in jail.

Q Were you in Cook County Jail?

A I don't remember.

Q Do you know where in the United States Mauricio moved when he came to the United States?

A Not exactly, but I know he was in

CCSAO COI SUBPOENAS 000162

California.

Q   Are you in contact with Mauricio today?

A   Yes.

Q   Where does Mauricio live?

A   In Michoacan.

Q   How long was Mauricio in the United States?

A   I don't know.

Q   Do you have any approximation for how many years -- strike that.

Do you have any approximation for how much time Mauricio lived in the United States?

A   No, I don't know.

Q   Was Mauricio already back in Mexico when you returned to Mexico in 2018?

A   Yes.

Q   And then you said -- who was the second brother that moved to the United States?

A   Rogelio.

Q   And when did Rogelio move to the United States?

A   I don't know.

Q   Are you still in contact with Rogelio?

A   Yes.

Q   And where does he live today?

A   He lives in Ecatepec.  He lives in Ecatepec.

Q   And do you know how long Rogelio lived in the United States?

A   No, I don't know.

Q   Do you know why Mauricio moved to the United States?

A   No.

Q   Do you know why Rogelio moved to the United States?

A   No, I don't know that either.

Q   Did both Mauricio and Rogelio move to the United States after you were arrested in 1998?

A   Yes.

Q   Did Mauricio move to the United States because you were arrested?

A   I don't know.

Q   How about Rogelio, did he move to the United States because you were arrested?

A   I don't know that either.

Q   Did either Mauricio or Rogelio contact you after you were arrested?

A   No.

Q   Did either Mauricio or Rogelio visit you either at Cook County Jail or after you were incarcerated?

A   No.

Q   Did either Mauricio or Rogelio write to you while you were either in Cook County Jail or incarcerated?

A   No.

Q   Did either Mauricio or Rogelio attend any of the court proceedings that were associated with your arrest?

A   No.

Q   Before you decided to leave Mexico and move to the United States, how was your relationship with your brother Mauricio?

A   Good.

Q   And before you decided to leave Mexico and move to the United States, how was your relationship with Rogelio?

A   It was good.

Q   So you decided to move to Chicago because of better work, right?

A   Correct.

Q   And was it your intention to move in with Carlos and Adriana when you moved to Chicago?

A   It wasn't my intention to move in with them, but they were the only people I knew in Chicago.

Q   But you went to Chicago because Carlos told you that you could find work there?

A   Correct.

Q   And when you moved to Chicago, where did you move to?

A   With Adriana and Rosauro Mejia.

Q   Do you remember the address of the house that you moved into?

A   62 Mozart.

Q   Other than Adriana and Rosauro, do you remember who else lived in the house on Mozart?

A   Yes, the house was divided into three levels.  In the house, there was a couple, there were a couple there, and I don't remember what their names were, but they were part of the Mejias.  And in the basement there were Guadalupe and Jorge Mejia and their two daughters.

Q   And Jorge Mejia and Rosauro Mejia were brothers, right?

A   Correct.

Q   And on the first floor, the main level

CCSAO COI SUBPOENAS 000163

57

of the house, who lived on that floor?

A   Can you be more specific of the level?

Q   Was the first level subdivided into different apartments or was it one house, one kitchen and bedrooms and things like that?

A   The house was divided into three levels. There was a basement, there was the house itself, and there was the attic.

THE INTERPRETER: The interpreter is going to clarify.

(Interpreter speaks to witness in Spanish)

THE INTERPRETER: Yes, the attic.

BY MS. ROSEN:

Q   So Guadalupe and Jorge and their two daughters were in the basement, right?

A   Correct.

Q   Did you ever live in the basement?

A   Yes.

Q   When you first got to Chicago, did you live in the basement?

A   No.

Q   When you first got to Chicago, where in the house did you live?

A   In the attic, in the upper part.

58

Q   Did you live with anybody else in the attic?

A   Yes, Rosauro, Adriana and Carlos.

Q   And then on the main floor of the house, when you first moved there and you were living in the attic, who lived on the main floor of the house?

A   A couple lived there. I don't remember their names, but I already answered the question. They were part of the Mejias.

Q   Did any other people live with the Mejia couple, who you don't remember their names, on the main level of the house while you and Rosauro and Adriana and Carlos were living in the attic?

A   Yes, there was a brother of Mr. Mejia's wife, but I don't remember their names.

Q   Anybody else that you recall living in any part of the house when you first moved there?

A   Not that I remember.

Q   And then eventually did you and Rosauro and Adriana and Carlos move to the first floor of the house?

A   Yes.

Q   Do you recall when that happened?

59

A   No, I don't remember, but I was living with Guadalupe in the basement, and we moved to the house.

Q   You moved to the basement with Guadalupe. Is that what you said?

A   When I was living with Adriana in the attic, I don't remember when, but at some point I moved to the basement with Guadalupe, Jorge and their daughters.

Q   And did anybody else live in the basement at the time that you were living in the basement with Guadalupe and Jorge and their children?

A   At that moment, no, there was nobody. But then at some point later a guy by the name of Martin moved there, and there was also another guy whose name was Leobardo Mejia.

Q   And Leobardo Mejia was another Mejia brother, correct?

A   Correct.

Q   And the guy named Martin, do you recall his last name?

A   No, I don't remember.

Q   Does Martin Vaca sound familiar?

A   Something like that.

60

Q   Before he moved in, did you know him?

A   I knew him before he moved there. I knew him from the ranch. I knew him, but I knew his name was Martin. I didn't know his last name.

Q   He was also somebody that was from the ranch?

A   Not exactly from the ranch. He lived near the ranch, but he came from another ranch.

Q   So he was somebody that you met on the ranch where you lived?

A   I never spoke with him when I was in the ranch.

Q   Did you know his name when you were on the ranch?

A   I knew his name was Martin. I didn't know his last name.

Q   So when he moved into the house, he was familiar to you?

A   Yes.

MS. SUSLER: Let me just say for the interpretation, the interpretation in Spanish was not "Was he familiar to you." It was more, "He was known to you."

THE INTERPRETER: Correct, which is what I

CCSAO COI SUBPOENAS 000164

**6**

said, "ubicar," meaning not a relative. He's a "Familar," meaning relative, so I wanted to clarify by using another word, "ubicar" meaning --

MS. SUSLER: You were able to place him.

THE INTERPRETER: Rather than a family member, a relative.

BY MS. ROSEN:

Q You recognized him, right?

A Yes.

Q Was Martin living in the house up until the time of your arrest?

A He was not living in the house, but he was living in the basement, but yes.

Q When is the last time you talked to Martin?

A I don't remember. We didn't have any conversations. We would only say hi. We didn't have conversations.

Q Do you know where he is now?

A No, I don't know.

Q Before moving to Chicago, you knew Adriana, right?

A Yes.

Q And how did you know Adriana?

**62**

A She was my grandmother's neighbor.

Q And do you know how old you were when you first met Adriana?

A No, I don't remember my age, but since we were little, we were children, I knew her just as I knew her brother.

Q She was younger than you, too, right?

A Yes.

Q And when the two of you were in the ranch together, were you friendly with one another?

A Friendship? We just talked.

Q Did you know Rosauro, her husband, before you moved into the house on Mozart in Chicago?

A Yes.

Q And how did you know Rosauro?

A He lived in another ranch which was near the ranch I was living in.

Q Do you know the name of the ranch that Rosauro lived in?

A Yes, Jasmine.

Q And Rosauro was younger than you also, correct?

A Correct.

Q How well did you know Rosauro before

**63**

you moved to the United States?

A I don't know exactly how long, but I had known him for some time.

Q Were you and Rosauro friends in Mexico?

A No.

Q Did you know that Rosauro and Adriana had gotten married?

MS. SUSLER: Objection. Form. When? When did he know.

BY MS. ROSEN:

Q You can answer.

A Yes.

Q And when did you first find out that Rosauro and Adriana had married?

A I was still living in the ranch, but I don't remember what year exactly they got married.

Q Before you moved to the United States, had you heard that Rosauro had moved to the United States?

A Yes.

Q And before you moved to the United States had you heard that Adriana had moved to the United States?

A Yes.

**64**

Q Did you know Guadalupe Mejia before you moved into the house on Mozart in Chicago?

A Yes.

Q How did you know Guadalupe?

A We're from the same ranch.

Q And have you known her since you were a child too?

A Yes.

Q Did you know she moved to the United States before you moved to the United States?

A Correct.

Q Did you know Jorge Mejia before you moved into the house on Mozart in Chicago?

A Yes.

Q How did you know Jorge?

A He also was living in Jasmine, in the ranch.

Q Did you know, before you moved into the house on Mozart in Chicago, that Rosauro and Jorge were brothers?

A Yes.

Q And did you know that Jorge and Guadalupe were married?

A Yes.

CCSAO COI SUBPOENAS 000165

65

Q   When did you first learn that Guadalupe and Jorge were married?
A   In the ranch.
Q   And Leobardo Mejia, did you know him before you moved into the house on Mozart in Chicago?
A   That's correct.
Q   How did you know him, Leobardo?
A   He and I worked together at a rotisserie in a town called Amecameca in the state of Mexico.
THE INTERPRETER:  Ameca, A-m-e-c-a, meca, m-e-c-a.
MS. ROSEN:  Amecameca?
THE INTERPRETER:  Amecameca.
BY MS. ROSEN:
Q   At a rotisserie?
A   Yes.
Q   When did you and Leobardo work together in a rotisserie?
A   I don't remember what year that was in, but we were working there a few months.
Q   Was this before or after you moved to Ecatepec?
A   Before.

66

Q   Do you remember the name of the rotisserie?
A   No.
Q   Was that the first time you had met Leobardo or had you known him before that?
A   I already knew him.
Q   And did you know him -- how did you know him?
A   He was living near my ranch.
Q   In Jasmin, right?
A   Yes.
Q   And you knew he was brothers with Jorge and Rosauro?
A   That's correct.
Q   At some point you moved from the basement to the main floor of the house, correct?
A   Correct.
Q   Do you remember when that was?
A   No, I don't remember.
Q   When you moved to the main floor of the house, who else was living in the main floor of the house?
A   Rosauro, Adriana and his brother.  And there was somebody else living there whose name is

67

Daniel or Fernando.  That person has two names, Daniel or Fernando.  The same person.
Q   Rosauro, Adriana, and did you say Adriana's brother?
A   That's correct.
Q   So Rosauro, Adriana, Carlos, and then Daniel, who also goes by Fernando; is that correct?
A   Correct.
Q   Did you know Daniel before you were living with him on the main floor of the house on Mozart?
A   Yes, he's the son of one of my uncles.
Q   Which uncle is he the son of?
A   An uncle whose name is Medardo.
THE INTERPRETER:  M-e-d-a-r-d-o.
BY MS. ROSEN:
Q   And is Medardo, your uncle Medardo, related to your mother or to your father?
A   To my mother.
Q   And what is the relationship between your mother and your uncle?
A   I don't know.
Q   Do you know if they're cousins?
A   I only know they're cousins.  I don't

68

know their relationship.
Q   Got it.  What's your mother's name?
A   Antonia Romero Plaza.
Q   And what is your father's name?
A   Gabriel Solache Chavez.
Q   How old is Daniel -- is Daniel older than you or younger than you or the same age as you?
A   He's younger.
Q   Do you know how much younger?
A   No, I don't know that.
Q   And how long did Daniel live in the house with you and the others?
A   I don't remember that.
Q   Did he move out at some point before you were arrested?
A   He left the house.
Q   Do you know why he left the house?
A   I don't know that.
Q   Did you and Daniel get along?
A   We would talk.
Q   Did you and Daniel ever get into a fight?
A   Yes.
Q   And what was that fight about?

CCSAO COI SUBPOENAS 000166

**69**

A   He was drunk and he was breaking bottles in front of the house where we were living, so I told him to stop breaking those bottles because Guadalupe's daughters lived there and they could get cut.  So he threw a brick here (indicating).

Q   When you say "here," you're pointing to the left side of your forehead, correct?

A   Correct.

Q   And you were seriously injured as a result of that brick, right?

A   Correct.

Q   And you were in the hospital for some period of time as a result of that incident, right?

MS. SUSLER:  Excuse me.  I think you said "you were in the house," and the question was "Were you in the hospital."

THE INTERPRETER:  Sorry.  About that.

(Interpreter retranslates question)

THE WITNESS:  That's correct.

BY MS. ROSEN:

Q   When you got out of the hospital, was Daniel still in the house?

A   No, when that happened, he was not in the house anymore.

**70**

Q   But at the time of the fight, he was living in the house, right?

(Witness Speaking to interpreter in Spanish)

THE INTERPRETER:  He's telling me that I didn't understand; but he said that he was no longer living in the house.

MS. SUSLER:  Wait a minute.

(Interpreter and witness speaking in Spanish)

MS. ROSEN:  There's obviously some confusion here, so we're going to try to get it straightened out, but let's try to get the translations going.  So maybe I can ask some questions and try to get this straightened out.

MS. SUSLER:  Please.

BY MS. ROSEN:

Q   At the time that Daniel threw the brick at you, was he living in the house on Mozart?

A   No.

Q   So he had moved out before that incident?

A   That's correct.

Q   So he had come back to the house and started throwing the bottles in front of the house?

A   He would go to the house sometimes to

**7**

drink, so he was there that day.

Q   So he had been invited over to the house and was drinking?

MS. SUSLER:  Objection to the form of the question.  Assumes facts not in evidence.

BY MS. ROSEN:

Q   You can answer.

THE WITNESS:  I don't remember whether or not he was invited.  He would simply arrive there.

BY MS. ROSEN:

Q   But it wasn't that unusual for him to come back to the house?

A   Yes, he would come to the house.

Q   And he would come to the house and drink with other people that lived in the house, right?

A   Yes, sometimes all of us would drink there.

Q   So the people that lived in the house were friendly with one another, right?

A   He would get along well with them.

Q   And the day of the incident where he was breaking the bottles, were you also there drinking with him?

**72**

A   Yes, I had some beers.

Q   Who else was at the house drinking before the incident with the bottle?

A   I don't remember exactly who was there, but there were some people.

Q   People that lived in the house?

A   People who lived in the house and people who did not live in the house.

Q   So other friends?

A   We could say that.

Q   Was it a party, a special occasion, or was it just a get-together?

A   A get-together.

Q   And do you know what happened that caused Daniel to start breaking bottles in front of the house?

A   No, I don't know.

Q   When Daniel started breaking bottles in front of the house, what did you do?

A   I believe I already answered that question.

Q   So you just went up to him and told him to stop breaking the bottles?

A   That's correct.

CCSAO COI SUBPOENAS 000167

Transcript of Gabriel Solache
Conducted on December 6, 2021

73

Q   Did anybody else also tell him to stop breaking the bottles?
A   I don't know if somebody else saw him breaking the bottles, but I saw him.
Q   And when you approached him and told him to stop breaking the bottles, was there anybody else around?
A   I don't remember.
Q   When you told Daniel to stop breaking the bottles, what did he say?
A   I don't remember what he said.
Q   What did he do?
A   He grabbed a brick and he threw it at me.
Q   Did you see where he grabbed the brick from?
A   No.
Q   When he hit you with the brick, did you lose consciousness?
A   No.
Q   Did your forehead immediately start bleeding?
A   Yes.
Q   What happened next?

74

A   They took me to the hospital.
Q   Who took you to the hospital?
A   Leobardo and another guy whose name I don't remember now.
     (Interpretation by Adriana Trevino)
BY MS. ROSEN:
Q   And that other guy whose name you don't remember is not someone that lived in the house, right?
A   No, he did not live in the house.
Q   And when Leobardo took you to the hospital, how did he take you there?  By car?
A   By car.
Q   What hospital did you go to?
A   Cook County.
Q   When you got hit with the brick, did you get dizzy or disoriented?
A   No.
Q   When you got to the hospital, what did they do for you?
A   "They" who?
Q   The doctors and the nurses.
A   They treated me.
Q   And what kind of treatment did you get?

75

A   First I received some stitches, and days later an operation to file or fix the bone that had caved in in my forehead.
Q   How many days were you in the hospital before you had the operation?
A   I don't remember.
Q   And do you know what type of operation they did exactly?
A   In the head.
Q   Do you still have scars from the surgery?
A   Yes.
Q   And where is the scar?
A   Here (indicating), from one ear to the other ear.
Q   And it goes across the top of your head, correct?
A   Correct.
Q   And was it your understanding that they had to do that surgery to fix the broken bone or bones in your forehead from the brick, right?
A   Yes, that's what I was told.
Q   And do you know how long or remember how long you were in the hospital in total?

76

A   No.
Q   When you went to the hospital for treatment, did you tell the doctors and nurses that you were hit in the head with a brick?
A   No.
Q   Why not?
A   Because I didn't want to get Daniel into trouble.
Q   What did you tell the hospital happened to you?
A   I don't remember exactly what I told them.
Q   After you were released from the hospital, did you have to have any follow-up care?
A   Yes.
Q   What type of follow-up care did they give you?
A   Well, I went, but I didn't go into treatment because I -- I just left.  There were a lot of people.
Q   Where did you go?
A   Home.
Q   When you went for the follow-up care -- you said you went for the follow-up care but there was

CCSAO COI SUBPOENAS 000168

**77**

a lot of people and you didn't go in.  You said "I went for the follow-up care."  Where did you go?

A   Cook County Hospital, the same hospital.

Q   And why didn't you go in?

A   I don't know.  There were a lot of people, and I just left.  Went back.

Q   What was it about the fact that there was a lot of people there that stopped you from going in to get your follow-up treatment?

MS. SUSLER:  Objection.  Form.

BY MS. ROSEN:

Q   You can answer.

A   Well, there were a lot of people there.  I did wait there, but I speak no English, and there were a lot of people, and I left and I went home.

Q   How long did you wait before you went home?

A   I don't remember.

Q   What type of follow-up treatment were you supposed to get that you didn't go in and went home instead?

A   Well, I wasn't told.

Q   Up until the time that you were -- let

**78**

me strike that.  Do you recall when it was that you were hit in the head with a brick by Daniel?

A   No, I don't remember the date, but I do remember that it was during the summer because it was hot.

Q   In the last few days that you've been getting ready for your deposition, have you seen medical records from that incident?

A   No, not that I remember.

Q   Do you remember when it was -- I might have already asked you this and I apologize if I did, but when it was that you moved to Chicago?  What year?

A   '96.

Q   The medical records that I've seen about the incident where Daniel threw the brick at you indicate that you were in the hospital in July of 1997.  Does that seem about right to you?

A   It is possible.

Q   Between the time that you moved to Chicago and the time that you suffered the head injury as a result of Daniel throwing the brick at you, were you working?

A   Yes.

Q   Where were you working?

**79**

A   I worked in a suburb near Chicago called Franklin Park.  I do not remember the name of the factory.

Q   What kind of work did you do?

A   In the factory they would make cardboard boxes.

Q   And how did you get that job?

A   I don't know if it was either Jorge or Leobardo that got it for me.

Q   And how would you get to the factory in Franklin Park?

A   By car.

Q   Did you own a car?

A   Back then, no.

Q   Whose car then did you use to get to your job in Franklin Park?

A   I would not drive.  I would get a ride.

Q   And who did you get a ride with?

A   Jorge Mejia.

Q   Did Jorge also work in that factory?

A   Yes.

Q   How long did you have that job in the factory in Franklin Park?

A   I don't remember, but it was until that

**80**

day when Daniel threw the brick at me, that's the last day I had that job.

Q   And then after the incident with the brick, between that time and the time that you were arrested, did you have any other jobs?

A   No.  Could you repeat the question please?

Q   Sure.  Between the time that you were hit in the head with the brick and the time that you were arrested, did you have any other jobs?

A   Yes.

Q   What job did you have?

A   I worked for an office.  The name was Pago Al Dia.

THE INTERPRETER:  The interpreter will spell, Pago, P-a-g-o, Al, A-l, Dia, D-i-a.

THE WITNESS:  They would send me to several places -- well, actually, it was only two places, but they sent me to two places to work.

BY MS. ROSEN:

Q   What were the two places they sent you to work?

A   One was on Island (phonetic) Avenue, I don't remember the exact address.  The other one was

CCSAO COI SUBPOENAS 000169

---

**81**

on 7th, before getting to Cicero Avenue. I don't know the exact address.

MS. SUSLER: Just a correction for the interpreter. I think what he said was "Ashland."

THE INTERPRETER: Oh, "Ashland," I'm sorry. I heard "Island." Yeah, thank you for the correction. Ashland.

BY MS. ROSEN:

Q So one place was on Ashland and the other was on 47th Street before you get to the town of Cicero -- or the street?

A The street. The Avenue.

Q And what type of work did you do at the place on Ashland?

A It was like a chicken packing place.

Q And how did you get from the house on Mozart to the chicken packing place on Ashland?

A I had a car.

Q When did you get a car?

A I don't remember when it was, but I bought a car.

Q What kind of car did you buy?

A It was a Volkswagen.

Q Where did you buy the car?

---

**82**

A I bought it from a brother of Rosauro Mejia.

Q Do you remember which brother?

A Yes, Horacio Mejia.

Q So you would use that car to get back and forth to work at the chicken packing place on Ashland, right?

A Yes.

Q And the place that you worked on 47th Street, what type of work did you do there?

A Yes, we would work with metal sheets, stainless steel. They would do several things there.

Q And how did you get from the house on Mozart to the metal sheet place on 47th Street?

A By car.

Q Whose car?

A Well, afterwards the car that I bought from Horacio broke down and I was not able to fix it. But then later I bought -- Leobardo sold me another car, it was an old one, but that's the one that I used.

Q Who sold you the other car?

A Leobardo Mejia.

Q And what kind of car was that?

---

**83**

A It was a Toyota.

Q So you would drive yourself back and forth to work in the Toyota when you were working at the metal sheets place?

A That's right.

Q Did you do that up until the time of your arrest?

A Well, no. Before I was arrested, my car was stolen from the factory's parking lot.

Q The factory on 47th Street?

A Correct.

Q How long before your arrest was your car stolen from the factory's parking lot?

A I don't remember.

Q Was it a couple days or a couple weeks? A couple months?

A I don't remember.

Q Did you report your car stolen to the police?

A No.

Q Why not?

A Well, no, I didn't have a license, and I'm undocumented, I was undocumented, and the car was old, so I did not.

---

**84**

Q Did you tell anybody your car was stolen?

A Yes, the supervisor at the factory.

Q What was the supervisor's name?

A The supervisor, I don't remember the name. There were several supervisors there. I told the first one that I ran into, I think he was Hispanic, but I don't remember his name.

Q What did that supervisor tell you when you told him your car was stolen in the parking lot?

A I don't remember.

Q After your car was stolen, how did you get back and forth to work?

A Sometimes I would use public transportation and sometimes Rosauro would let me use his car.

Q Any other ways that you would get back and forth to work after your car was stolen?

A Well, I usually would take public transportation if I could not borrow a car. Also, I could get a ride back from work from this coworker who lived just three blocks away from where I lived.

Q And what was that coworker's name?

A Jose Blanco.

CCSAO COI SUBPOENAS 000170

Transcript of Gabriel Solache

Conducted on December 6, 2021

85

Q    And he lived three blocks away?

A    Approximately, yes.

Q    During the time that you were in the United States, how much money did you save?

A    I don't remember.

Q    When you were arrested, did you have any money saved?

A    No.

Q    At the time of your arrest, you had been in the United States for approximately two years; is that right?

A    Yes.

Q    And it had been your plan to save money and go back to Mexico to build a house, right?

A    Correct.

Q    But after two years, you had not been able yet to save any money to accomplish that goal; is that correct?

A    It is correct.

Q    While you were in the United States, before you were arrested, did you have contact with your daughter?

A    I lost touch with her. I was in touch with her when I was in California, and after that I

86

lost touch.

Q    And why did you lose touch with your daughter after you moved to Chicago?

A    Well, I don't remember, but back then my daughter was a baby.

Q    Were you in touch with her mother?

A    Only when I was in California.

Q    Why did you stop communicating with your daughter's mother when you moved to Chicago?

MS. SUSLER: Objection. Form.

BY MS. ROSEN:

Q    You can answer. You can answer the question.

A    I really don't remember.

Q    Did you ever send money home to Mexico to support your daughter?

A    When I was in California, yes, I was sending, but not when I moved to Chicago.

Q    When you first came to the United States and had the plan of saving money to go back and build a house in Mexico, was it your intention to have your daughter live with you?

A    Well, yeah, that was the idea.

Q    And how about Flor Italia, was it your

87

intention to have Flor Italia live with you and your daughter as well?

A    She too, yeah.

Q    But at the point in time when you lost touch with them, had something changed in your relationship between you and Flor Italia?

A    I don't remember.

Q    Was she mad at you for coming to the United States, Flor Italia?

MS. SUSLER: Objection. Foundation.

BY MS. ROSEN:

Q    You can answer.

A    Well, she never said anything to me.

Q    Would you speak with her on the telephone after you moved to the United States?

A    When I was in California I talked to her a few times.

Q    But never once you moved to Chicago?

A    No.

Q    How did you find out she was pregnant?

A    I don't remember. I think she told me, but I don't remember.

Q    How did you find out that your son had passed away?

88

A    Someone in the family told me, but I don't remember who.

Q    Did you talk to Flor Italia after you found out that your son had passed away?

A    I don't remember having talked to her.

Q    Did you find out that your son passed away while you were still in California?

A    No, I believe I was already in Chicago. I really don't remember.

Q    Do you recall who -- when you say somebody in the family told you that your son had passed away, somebody in your family?

A    Yes.

Q    And do you remember who that was?

A    No, I don't remember.

Q    Was Flor Italia close with any of your brothers or sisters?

A    No, I don't know.

Q    When is the last time you had any communication or contact with Flor Italia?

A    It was this year, but I do not remember the month.

Q    Have you seen Flor Italia since you moved back to Mexico?

CCSAO COI SUBPOENAS 000171

89

A    Yes.

Q    How often have you seen her?

A    Not very often.  I have seen her three times.

Q    And how would you describe your relationship with her now?

A    Well, I've seen her three times.  It's not that we have a relationship.  It's not a relation that I talk to her every day of the week.

Q    Are you friendly to one another?

A    I have only seen her three times.

Q    In the three times that you have seen her, have you spoken with her?

A    Yes.

Q    And is the conversation friendly?

A    A conversation between two adult people.

Q    Have you and she ever discussed the fact that your son passed away?

A    No, she has never said anything to me.

Q    Do you know why your son passed away?

A    I don't know.
Can we take a break?

MS. ROSEN:  Sure.  And we might as well

90

then -- it's close to the lunch break.

THE VIDEOGRAPHER:  We are going off the record.  The time is 1:05 p.m.

(Discussion off the record)

THE VIDEOGRAPHER:  We're back on the record at 1:06 p.m.  This marks the end of Media Number 2 of the deposition of Gabriel Solache.  We are off the record at 10:06 p.m.

(lunch recess)

(Jose Fonseca Interpreting:)

THE VIDEOGRAPHER:  Her begins Media Number 3 in the video deposition of Gabriel Solache.  We are back on the record at 2:18 p.m.

BY MS. ROSEN:

Q    Mr. Solache, where we left off before we broke for lunch, we were talking about your daughter and your daughter's mother, and I just want to ask a few more follow-up questions about that.
With respect to your daughter, how often do you see her now that you're back in Mexico?

A    It has been around two months since I saw her because she was positive when she had a COVID test, but I would see her often.

Q    Where does she live?

9

MS. SUSLER:  The question was not who does she live with.  It was where does she live.

THE WITNESS:  She lives in the State of Hidalgo, in a town called Almoloya De Juarez.

BY MS. ROSEN:

Q    "Almoloya"?  Is that what you said?  And how far is Almoloya from where you currently live?

A    One hour, 45 minutes approximately.

Q    By car, right?

A    Yes.

Q    So before she tested positive a couple months ago, how often do you think you would see her?  Was it once a month?  Once a week?  More than that?  Less than that?

A    Two or three times per month.

Q    Would you go visit her, would she come visit you or both?

A    I would go more times to visit her compared to the number of times she would come to visit me.

Q    And is she married?  Does she have kids?

A    She's married.  She has a daughter.

Q    Do you know her husband?

92

A    Yes.

Q    When did she get married?

A    I don't know.  She got married when I was still in prison.

Q    And how old is her daughter?

A    She turned four on the 17th of July.

Q    Does your daughter work?

A    Yes.

Q    What does she do?

A    Well, she majored in nursing.  She's a nurse, but she's working at a drug store, at a pharmacy.

Q    Did she go to college?

A    I believe so.  She holds a degree as a nurse.

Q    While you were in prison, did you communicate with your daughter?

A    No.

Q    Not at all?

A    No.

Q    So is the first communication you had with your daughter when you came back to Mexico?

A    No, that was when I left the prison.

MS. SUSLER:  Wait a minute.  When you "lived

CCSAO COI SUBPOENAS 000172

93

in" or when you "left"?

MS. ROSEN: "Left," I think he said.

MS. SUSLER: Okay. Sorry.

BY MS. ROSEN:

Q    So when you first left prison, where did you go?

A    A hotel.

Q    Where was that hotel?

A    I don't remember exactly, but it was in -- I don't remember the street, but it was near the Mexican Consulate in Chicago.

MS. SUSLER: This is a little bit of a tardy objection, but you asked the question "When you first left prison." Are you talking about all the detention, including ICE, or are talking about the Illinois Department of Corrections? So I guess my question is one of form and vague.

MS. ROSEN: Okay, I said "left prison," but I can clarify.

MS. SUSLER: I'd appreciate it. Thank you.

BY MS. ROSEN:

Q    At some point in time you were released from the Illinois Department of Corrections; is that correct?

94

A    Yes.

Q    Do you remember the date that you were released from the custody of the Illinois Department of Corrections?

A    December 23rd, 2017.

Q    And when you were released from the custody of the Illinois Department of Corrections, where did you go?

A    Immigration took me into custody.

Q    And they took you into custody immediately upon your release from the Illinois Department of Corrections, correct?

A    Correct.

Q    And when Immigration took you into custody, where did they take you?

A    To the jail of Kankakee County.

MS. ROSEN: Kankakee County.

BY MS. ROSEN:

Q    And when you were taken to the Kankakee County Jail, how long were you there?

A    42 days.

Q    And do you know why Immigration took you into custody?

A    No.

95

Q    During the 42 days that you were in Kankakee County in the jail, did you ever learn why Immigration took you into custody?

A    No.

Q    How is it that you were released from the Kankakee County Jail?

A    A bail was paid.

Q    Who paid the bail?

A    Northwestern University.

Q    Do you know how much the bail was?

A    I don't remember.

Q    And once the bail was paid, where did you go?

A    I went to the Mexican Consulate, and from there they took me to a hotel.

Q    Who paid for the hotel?

A    The Consulate.

Q    And this is the hotel that you talked about earlier near the Consulate that you don't remember the name of, right?

A    Correct.

Q    How long did you stay in the hotel?

A    I don't remember. A few days.

Q    And then after that, where did you go?

96

A    To a hotel near the Northwestern University.

Q    And was this in downtown Chicago too?

A    Yes.

Q    Do you remember the name of that hotel?

A    No.

Q    How long were you in that hotel?

A    A little more than two months. A little longer than two month.

Q    And who paid for that hotel?

A    Karen Daniels.

Q    Was she your attorney?

A    Correct.

Q    And after you spent the two months in the hotel near Northwestern University that Ms. Daniels paid for you, where did you go?

A    Mexico.

Q    Did you leave the United States voluntarily?

A    Yes.

Q    Did you have an understanding of what would happen to you if you did not leave the United States voluntarily?

A    Yes.

CCSAO COI SUBPOENAS 000173

**97**

Q   What was that understanding?
A   I came from the United States as a result of the advice that my immigration attorney provided.
Q   Who was your Immigration attorney?
A   Her name is Monie.  I don't know her last name.
Q   "Monie"?  Is that M-o -- you know -- M-o-n-i-e or Y?
A   I never saw her name written on a document, but just people called her "Monie."
Q   Did somebody find this Immigration attorney for you?
A   I'm not sure, but I believe it was the Mexican Consulate.
Q   If you did not leave the United States voluntarily, was it your understanding that the United States would deport you?
A   Yes, I believe so.
Q   Do you have any desire to go back to the United States?
MS. SUSLER: Objection. Form. Vague. Are you talking about living?  Visiting?  Testifying?
MS. ROSEN: I'm talking about going back.

**98**

BY MS. ROSEN:
Q   Do you have any desire to go back to the United States?
A   No.  I have many friends there, but I haven't thought about going back there.
Q   Who are some of the friends that you still have back in the United States?
A   Do you need the names?
Q   Sure.
A   Esther Hernandez and her husband; Esther's brother.  I don't remember his name.  I guess his name is Rene.
MS. ROSEN: Is what?
THE INTERPRETER: Rene.
MS. ROSEN: Rene.
THE WITNESS: And other people whose names I don't remember.
BY MS. ROSEN:
Q   How do you know Esther Hernandez and her husband?
A   Well, she's a member of a group called Innocent People Asking for Justice, and when I left the jail, she helped me a lot.
Q   How did she help you?

**99**

A   She would take me to church.  And if I needed something, she would take me to get food.
Q   And this is while you were staying in the hotels?
A   Correct.
Q   Anything else that she did to help you out during that timeframe?
A   I don't remember anything else for now.
Q   Do you keep in touch with her now?
A   Sometimes we exchange messages.
Q   How do you exchange messages?
A   On Messenger.
Q   On Facebook?
A   (No audible answer).
Q   You have to say out loud.
A   On Messenger.
Q   You're talking about using the Messenger function on Facebook?
A   That's correct.
Q   And do you also speak to her on the telephone?
A   No.
Q   Are there any other people in the United States that you communicate with via messenger

**00**

on Facebook?
A   I have a friend in New York whose name is Sharon Makowsky.  Sometimes we also exchange messages.
Q   Your friend Sharon Makowsky, how did you meet her?
A   She was working on my case when I was --
(Interpreter speaking to witness in Spanish)
THE WITNESS:  She was working on my case when she was a student at Northwestern.
MS. SUSLER:  And just for the record, the confusion in the response was not Mr. Solache's.  It was the interpreter's.
MS. ROSEN:  I think we got that.
MS. SUSLER:  It's not going to come out in the transcript that way, so I just wanted the transcript to be clear.
MS. ROSEN:  Okay.  Well, I don't think it got translated, but fine.  I don't think that anybody is assuming that Mr. Solache was confused about that, but that's fine.
BY MS. ROSEN:
Q   Do you recall when Ms. Makowsky started

CCSAO COI SUBPOENAS 000174

working on your case while she was a student at Northwestern?

A   I don't remember exactly what year, but she worked on my case.

Q   There were a lot of students that worked on your case, right?

A   Correct.

Q   Did you become friends with any of the other students other than Sharon Makowsky?

A   No.

Q   And do you know why it is that you developed this friendship with Sharon Makowsky, of all the students that worked on your case?

A   I don't know.  We became friends, and to this date we're still friends.

Q   Since you were released from the Kankakee Jail, have you seen Sharon Makowsky?

A   Yes, a few times.

Q   And when was the first time that you saw Ms. Makowsky after your release from the Kankakee jail?

A   In Chicago, at the Northwestern University.

Q   So you met with her actually at the university, right?

A   Correct.

Q   When is the next time you recall seeing Ms. Makowsky in person?

A   I don't remember exactly, but she went to visit me in my apartment in Pachuca.

Q   With respect to your apartment in Pachuca, did you move into that apartment the day you move back to Mexico?

A   No.

Q   How much time -- how many days were you in Mexico before you moved into the apartment in Pachuca?

A   I don't remember the exact day, but it was at the end of June, in early July.  That was in 2018.

Q   Where were you staying between the time that you returned to Mexico and the time that you moved into the apartment in Pachuca?

A   I would stay in my daughter-in-law's house.

MS. SUSLER:  I don't think that's --

THE INTERPRETER:  "I would stay in my" -- sorry.  "I would stay in my daughter's mother and father-in-law's house."

BY MS. ROSEN:

Q   So your daughter's husband's parents?

A   Yes.

Q   And where do they live, or where did they live at the time?

A   It's a neighborhood near Apan, Hidalgo. I don't remember exactly.

Q   And how did you decide to buy an apartment in Pachuca?

A   I didn't decide.  The opportunity simply came up and there was an opportunity to buy the apartment in Pachuca.

Q   When you say "the opportunity came up," what do you mean?

A   That the apartment had a low price.

Q   Were you looking for something to buy?

A   Yes.

Q   Did you have a budget?

A   No.

Q   Have you seen Ms. Makowsky since she visited you in the apartment on Pachuca -- in Pachuca. Sorry.

A   No.

Q   How many bedrooms is the apartment in Pachuca?

A   Two.

Q   When is the last time you spoke with Ms. Makowsky?

A   A month, a month and -- a little longer than a month.

Q   How often do you communicate with her?

A   Not very often.

Q   Let's talk a little bit about your relationship with Adriana Mejia, okay?  When you moved into the house in Chicago, how would you describe your relationship with Adriana at that point in time?

A   Could you be more specific?

Q   Sure.  When you moved into the house on Mozart in Chicago, you knew Adriana, right?

A   Correct.

Q   And I think you told us earlier today that you had not been in communication with Adriana while you were in California.  Do I have that right?

A   Correct.

Q   So when you moved into the house, would you describe Adriana at that point in time as a friend?  As an acquaintance?  Something else?

CCSAO COI SUBPOENAS 000175

Transcript of Gabriel Solache
Conducted on December 6, 2021

A    Only a friendship of acquaintances.

Q    And during the time that you spent living in the house, up until the time of your arrest, did your relationship with Adriana change?

A    There was no relationship.

Q    When I use the word "relationship," I mean, how you interacted with her, how you viewed her. I don't necessarily mean some kind of dating or sexual relationship.  Okay?

A    Okay.

Q    So for the year or so that you lived in the house, did Adriana become more than just a friendship of acquaintances?

A    No.

Q    How often would you see Adriana?

A    Well, when I was living in her house, I would see her every day.

Q    Would you talk to her every day?

A    Greeting, yes.

Q    Would you have meals with her?

A    Well, I would prepare my own food.

Q    Were there ever occasions where you would have a meal with Adriana?

A    Well, on some occasions all of us would eat there, but it wasn't only Adriana and myself.

Q    So it would be with others?

A    Rosauro, Carlos.

Q    Did you consider Carlos a friend of yours?

A    Yes.

Q    Did you consider Rosauro a friend of yours?

A    No.

Q    Did you consider Leobardo a friend of yours?

A    Yes.

Q    Did you consider Jorge a friend of yours?

A    No.

Q    At some point in time while you were living in the house on Mozart, did you learn that Adriana was saying that she was pregnant?

A    Well, she didn't tell me, but everybody believed that she was pregnant.

Q    So she herself did not tell you that she was pregnant?

A    No.

Q    But through others in the house you learned that she was saying she was pregnant?

A    Not only through others.  I didn't get to ask her, but we could see that she was pregnant.

Q    When you say you could see that she was pregnant, what do you mean?

A    You would see her belly big.

Q    At some point in time Arturo Reyes moved into the house; is that correct?

A    Correct.

Q    Do you recall when Mr. Reyes move into the house?

A    No.

Q    Did you know Mr. Reyes before he moved into the house?

A    I had seen him a few times.  But know him?  No.

Q    Where had you seen him a few times?

A    He lived with one of the Mejias who lived a few houses away.

Q    Do you remember the name of the Mejias that lived a few houses way?

A    Well, the owner was Horacio Mejia, but he didn't live with Horacio.  He was living downstairs with somebody else.  I don't remember that person.

Q    And how was it that you saw Mr. Reyes -- strike that.

Where did you see Mr. Reyes when he was living in Horacio's house?

MR. STARR:  Objection to form.

BY MS. ROSEN:

Q    You can go ahead.  He said "Objection, form," but now you can answer.

A    Outside Horacio's house.

Q    Were there occasions where you and others would spend time outside of Horacio's house?

A    Yes.

Q    And during these times, were you socializing?

A    We were talking.

Q    Maybe sharing a drink?

A    We would drink a few beers with the gentleman.

Q    And so it was in those circumstances that you had seen Mr. Reyes before he moved into the house that you lived in; is that correct?

A    Correct.

Q    Had you know Mr. Reyes before you moved to the United States?

CCSAO COI SUBPOENAS 000176

Transcript of Gabriel Solache
Conducted on December 6, 2021

A No.

Q When you first saw Mr. Reyes at Horacio's house, did you communicate with him? Talk to him?

A No.

Q Did you know whether or not Mr. Reyes was married?

A At that point I didn't.

Q Did you come to learn that Mr. Reyes was married?

A Yes, it was mentioned in the house, but I don't remember who made that comment.

Q Do you know who he was married to?

A She (sic) was married to a man who lived in the basement in the house, in Horacio's house.

MS. ROSEN: Can you repeat what you just said?

THE INTERPRETER: "She was married to a man who lived in the basement in Horacio's house."

MS. ROSEN: "He"?

(Interpreter speaks with witness in Spanish)

THE WITNESS: He was married to the sister of the man who lived in the basement.

(Interpreter speaking with witness in Spanish)

MS. SUSLER: Maybe you should ask the question again.

THE WITNESS: I don't remember the name.

BY MS. ROSEN:

Q So you came to learn that Mr. Reyes was married, correct?

A Correct.

Q And did you learn who Mr. Reyes' wife was?

A No, I didn't know her.

Q And did you know whether or not Mr. Reyes' wife was related to any of the individuals that lived in Horacio's house?

A Yes.

Q And what did you learn about that?

A No, I only knew that she was married to Horacio's brother's --

(Interpreter speaking to witness in Spanish)

THE WITNESS: All I knew is that he was married to Horacio's wife's brother.

THE INTERPRETER: "He was married to Horacio's wife's sister. He was married to Horacio's wife's sister."

BY MS. ROSEN:

Q Is that right, Horacio's wife's sister?

A No.

Q Let me try it a different way. It was Horacio's brother that lived in the basement, right?

A Correct.

Q Do you remember that brother's name?

A I don't remember. I would have told you.

Q Okay. So that brother, his wife and Mr. Reyes' wife were sisters; is that correct?

(Interpreter translates question)

MS. SUSLER: I don't think you got that right.

THE INTERPRETER: Can you say that again, please?

MS. ROSEN: Sure.

(Witness speaking in Spanish)

MS. ROSEN: You want to take a break? Sure, we can take a break.

THE VIDEOGRAPHER: We're going off the record at 3:05 p.m.

(Recess)

THE VIDEOGRAPHER: Back on the record at 3:15 p.m.

(Interpretation by Adriana Trevino:)

BY MS. ROSEN:

Q With respect to Mr. Reyes, when he moved into the house on Mozart, he moved into the same -- the first floor where you and Rosauro and Adriana and Carlos were living; is that correct?

A Correct.

Q And where did Mr. Reyes sleep in the house?

A Well, when he was in the house, he was not in any -- he was not in the living room or any other room in the house. There was no door to the space where he was staying, but they did place some curtains there where he was staying.

Q Did he have a bed?

A I don't remember. I believe so.

Q And in what room of the house were you living in?

A Well, I had the smallest room in the house, but I did have to go through Carlos' room to get to mine.

Q You had the smallest room in the house to yourself, but you had to walk through Carlos' room

CCSAO COI SUBPOENAS 000177

Transcript of Gabriel Solache
Conducted on December 6, 2021

29 (113 to 116)

---

to get to your room?

A Correct.

Q And was that the only way to get into your room, was through Carlos' room?

A Well, I mean you could go through a window, but I didn't choose to go through the window.

Q There was no other doorway into that room?

A No.

Q And then Carlos, did he have his room to himself?

A Yes.

Q And then I assume Rosauro and Adriana shared a different bedroom, right?

A Yes.

Q Were there any other bedrooms that were unoccupied during that time?

A No, because there were only two bedrooms -- I mean three, with the small one that I was occupying, but yes.

Q And how many bathrooms were in that house?

A One.

Q And do you remember how long Mr. Reyes was staying in the same house with you and the others before you and Mr. Reyes got arrested?

A No.

Q Once Mr. Reyes moved into the house, did you get to know him any better?

A Well, no, because he --

THE INTERPRETER: Interpreter is going to clarify who worked during the day.

(Interpreter speaking with witness in Spanish)

THE WITNESS: No, because he worked during the day, I worked at night, so we hardly saw each other.

BY MS. ROSEN:

Q But it was your understanding that Mr. Reyes worked daytime hours; is that right?

A Correct.

Q And you worked the -- well, what hours did you work during that timeframe?

A I don't remember exactly if I started working at 4:00, 4:30 p.m., and I would finish, I would get out at 12:30 a.m. or 1:00 a.m.

Q Now once you learned that Adriana was claiming that she was pregnant, did you ever take her to doctor appointments?

A Yes.

Q How often do you think you took her to doctor appointments?

A Only one time.

Q Do you remember when that was?

A No.

Q Do you remember why it was that you took Adriana to the doctor?

A Well, because in that afternoon there was nobody around. Rosauro was going to work and I was starting my work later, so I took her there, dropped her off and went to work.

Q Where did you drop her off?

A I dropped her off on California Street and Mount Sinai.

Q So you dropped her off on California at Mount Sinai Hospital?

A Yes.

Q Do you know how she was going to get home?

A I have no idea.

Q Do you know what shift Rosauro worked?

MS. SUSLER: Objection. Form. When?

MS. ROSEN: Sure, I'll clarify it.

BY MS. ROSEN:

Q Do you know what shift Rosauro worked during the timeframe after Mr. Reyes moved into the house?

A He worked in the afternoons, the second shift.

Q So similar to your hours, right?

A Well, he would start a little earlier than me. And also, to go from the house to work, it would take him over an hour, so he would have to leave earlier.

Q Do you know where his work was, what town or ...

A Well, we used to work in the same factory, but he was working the second shift.

Q The factory in Franklin Park?

A Correct.

Q Why didn't you go back to work in that factory after you had recovered from your head injury?

A No, I don't know. I don't remember.

Q During the time that Adriana was telling everyone that she was pregnant, did you believe that she was pregnant?

A Well, in reality, that was not

Transcript of Gabriel Solache
Conducted on December 6, 2021

important to me. She had nothing to do with me.

Q   Did you ever doubt that she was pregnant?

A   Well, I'm going to repeat again, it was none of my business, and I was only paying rent. If she was pregnant or not, that was none of my business.

Q   So you just ignored it?

A   Well, I'm going to repeat it again. I didn't have to ignore anything. It was just none of my business.

Q   You at some point found out that Adriana was lying, right?

A   When I was in jail.

Q   Were you surprised?

A   A lot.

Q   After you were arrested, did you communicate with Adriana at all?

A   Yes.

Q   And how did you communicate with Adriana after you were arrested?

A   She started sending me letters.

Q   And did you write back to her?

A   Yes.

Q   And what kind of letters was she sending you?

A   I don't remember exactly.

Q   Generally, do you remember what kind of letters she was sending you?

A   No.

Q   And what did you write back to her?

A   It's been a long time. I don't remember exactly what I wrote.

Q   How about generally?

A   I don't remember.

Q   How were you able to write letters to Adriana while you were in Cook County Jail?

A   Well, I would write them.

Q   Would you send them to her directly in the jail?

A   I would place them in the mail.

Q   And you knew she was in Cook County Jail too, right?

A   Yes.

Q   So you were able to address the letter to her in Cook County Jail and send it to her directly?

A   I would place in the mail.

Q   Did you address -- you made an envelope, right?

A   An envelope.

Q   And would you address it to her at the Cook County Jail?

A   Correct.

Q   And would put your return address in the Cook County Jail as well?

A   I don't remember.

Q   Why were you writing letters to Adriana?

A   I wanted to see if she could give me information on who had committed the crimes, but she would never say anything to me, and she would not listen to me, so I stopped writing to her.

Q   What type of information were you hoping she would give you about who had committed the crimes?

A   Who had helped to commit them.

Q   Did you believe that Adriana committed the crime?

A   It's not that I believed that she committed them. It was just based on proof.

Q   Based on what proof?

A   The blood that was found on her shoes and pants.

Q   And you know that Adriana at some point told police that you and Mr. Reyes helped her commit the crimes, right?

MS. SUSLER: Objection, form and foundation.

BY MS. ROSEN:

Q   You can answer.

A   Yes.

Q   Do you have any idea why she would say that if it wasn't true?

A   No, I have no idea why she said that.

Q   Did Adriana ever tell you that she had feelings for you?

A   Yes, she said that in a letter.

Q   And was that the first time that you became aware that Adriana had feelings for you, when she said it in the letter?

A   Yes.

Q   So before you received that letter, you had no idea that Adriana had feelings for you?

A   No.

MS. SUSLER: I'm just going to interpose an objection because I think you're assuming facts that are not in evidence.

CCSAO COI SUBPOENAS 000179

Transcript of Gabriel Solache
Conducted on December 6, 2021

31 (121 to 124)

**2**

BY MS. ROSEN:

Q   Did you ever -- did Adriana ever tell you, either orally or in a letter, that she loved you?

A   I don't really think that she said it to me. But written in a letter, I don't remember.

MS. SUSLER: Let's go ahead and take a look at Exhibit Number 4, and I'm going to ask you to hand Mr. Solache a copy of Exhibit Number 4.

(Exhibit Number 4 was referenced for identification)

MS. SUSLER: I have two --

MS. ROSEN: I think you handed them both. So can you give one back.

BY MS. ROSEN:

Q   Mr. Solache, we've put in front of you what we've previously marked as Exhibit Number 4, and these are some letters that were produced to us, and so I'm just going to ask you if you could take a look at them. You can just flip through them, and then just let us know once you've gone through the whole packet.

A   Yes, yes, I do remember these letters.

Q   Okay. Great. So do you remember receiving these letters while you were at Cook County

**22**

Jail?

A   Yes.

MS. SUSLER: I just -- I need to object because you have interspersed within the letters some typed translations.

MS. ROSEN: Yeah, I'll fix that.

MS. SUSLER: Okay.

BY MS. ROSEN:

Q   And I'm going ask you to take a look at -- if you flip to the third page of the packet, you'll see at the bottom it says "4816," the bottom of that page that you're on right there.

You went to far.

A   This one?

Q   Mr. Solache, if you go to the beginning, so just go to the top page, the first page. At the bottom you see Number 4812? You have to flip it back.

A   Yes.

Q   So that's how the number of the pages are. So if you go to 4816, you see that's typed and in English. Do you see that?

A   Yes.

Q   When you received the letter, you did

**23**

not get English, right? You got letters in Spanish; is that correct?

A   Correct.

Q   Have you ever seen this page, 4816, before today?

A   Yes.

Q   Do you recall when you saw this page before today?

A   I don't know if it was yesterday or the day before.

Q   Got it. Do you remember any of the attorneys that were working for you from Northwestern showing you this letter?

MS. SUSLER: You mean the typed version?

MS. ROSEN: The typed version, yeah.

THE WITNESS: No.

BY MS. ROSEN:

Q   Just to be clear, the letters that Adriana sent you were all in Spanish, right?

A   Correct.

Q   Now if you can go back to page 4814?

A   4814?

Q   Correct. Okay. So at the top it's hard to see because the copies are bad, but you see it

**24**

says 6/1/99 at the very top right corner?

A   Uh-huh.

Q   Does that -- in June of 1999, you were still in Cook County Jail; is that correct?

A   Yes.

Q   And if you look six lines down on that page, there's a reference to "Linda." Do you see it?

A   Yes.

Q   Do you know who Adriana is referencing there when she's talking about "Linda"?

A   Yes.

MS. SUSLER: Objection. Foundation.

BY MS. ROSEN:

Q   Who do you believe Adriana is referencing when she's talking about "Linda"?

A   Linda was Horacio Mejia's daughter.

Q   And did you have any kind of a relationship with Linda?

A   No.

Q   How old was Linda during this timeframe?

A   Around 15, 16. But the truth is, I don't know.

Q   Okay. If you go down, so if you count

CCSAO COI SUBPOENAS 000180

Transcript of Gabriel Solache
Conducted on December 6, 2021

down 18 lines, and all the way to the right there's a reference to "Montes," M-o-n-t-e-s, is how it's spelled.

A   Yes.

Q   Do you know who that is referring to?

A   Yes.

Q   And who is that referring to?

A   That's her brother, Carlos Martinez.

Q   If you go from the line where it says "Montes," if you go down five lines, it says "Grillo," G-r-i-l-l-o.

Do you know what that's referencing?

A   That's how they would call me at the ranch.

Q   So it's your nickname?

A   Yes.

Q   Did everybody call you that at the ranch?

A   Yes, most people would call me that.

Q   And were you called that from a very young age?

A   Yes.

Q   The letters that you received from Adriana while you were in Cook County Jail, who did you give them to?

A   To my attorney.

Q   The attorney that was representing you during the criminal case, right?

A   Correct.

Q   Do you remember her name?

A   Viola.

Q   Viola Rouse, right?

A   Viola Rose (phonetic).

Q   Did she ever show you the English typed versions of these letters while she was representing you during the criminal case?

A   No.

MS. SUSLER:  We can put that exhibit to the side for now.  We're going to take a look at Exhibit Number 2.

(Exhibit Number 2 was
referenced for identification)

THE INTERPRETER:  He needs to change the tape.

MS. ROSEN:  Does anybody need a break or can we just let him change and keep going?

THE VIDEOGRAPHER:  This marks the end of Media Number 3 in the deposition of Gabriel Solache.

We are off the record at 3:45 p.m.

(Recess)

(Jose Fonseca begins translation:)

THE VIDEOGRAPHER:  Here begins Media Number 4 in the deposition of Gabriel Solache.  We are back on the record at 3:57 p.m.

BY MS. ROSEN:

Q   If we could take a look at Exhibit Number 2.

BY MS. ROSEN:

Q   Mr. Solache, do you recognize Exhibit Number 2?

A   Yes.

Q   And what is that?

A   This is like a prayer.

Q   Is that something that you wrote?

A   No, I copied it from a book.

Q   Is that your signature at the bottom?

A   That's my name, yes.

Q   And is this your handwriting?

A   Yes.

Q   Do you remember when you copied that prayer from a book?

A   No.

Q   Do you know why?

A   No, I don't know either.  I don't know that either.

Q   Do you remember who you sent it to?

A   No, I don't remember who I sent it to, but yes, I sent it.

Q   Is this something that you wrote when you were in Cook County jail?

A   Yes.

MS. ROSEN:  Let's take a look at exhibit Number 3.

(Exhibit Number 3 was
referenced for identification)

BY MS. ROSEN:

Q   Mr. Solache, this is what looks like it is a photocopy of an envelope, and it has your name on it.

Do you see that?

A   Yes.

Q   And the address is Pontiac, Illinois. Do you see that there?

A   Yes.

Q   And were you at some point in time housed in the Pontiac facility of the Illinois

CCSAO COI SUBPOENAS 000181

**Page 29**

Department of Corrections?

A   Yes.

Q   And is the handwriting on the envelope your handwriting?

A   Yes.

Q   And this letter is addressed to someone named Jaqueline Johnson.

Do you see that there?

A   Correct.

Q   Do you know who that is?

A   Yes.

Q   Who is that?

A   It was a student who worked in my house (sic).

Q   In your case? "On my case"?

(Interpreter speak with witness in Spanish)

THE INTERPRETER: "In my case. On my case."

BY MS. ROSEN:

Q   And was she one of the Northwestern students?

A   Correct.

Q   Do you have any recollection of what it is that you mailed to her?

A   No.

**Page 30**

MS. ROSEN: While we're doing letters, let's take a look at Exhibit Number 1.

MS. SUSLER: Which number?

MS. ROSEN: Number 1.

(Exhibit Number 1 was referenced for identification)

BY MS. ROSEN:

Q   Mr. Solache, are you able to read this letter that's written in English?

A   Could you repeat the question?

Q   Sure.  I'll let you finish reading. Are you reading it?

A   Yes.

Q   Are you able to read it?  It's all in English.

A   Yes, I can read it.

Q   And this appears to be a letter you wrote to Adriana; is that right?

MS. SUSLER: Objection.  Assumes facts not in evidence.

BY MS. ROSEN:

Q   You can answer.

A   No, I didn't write it.

Q   Did somebody write it on your behalf,

**Page 3**

do you know?

A   No.  I look at the date and it says that it's 2004.  At that time I didn't speak English. I spoke very little.  So it shows that this letter is very well written.  I don't know who wrote this letter.  I have no idea.

Q   So in 2004 you did not speak very good English; is that correct?

A   No.

MS. SUSLER: That's not going to come out right.

THE WITNESS: No, I still don't speak very well, but at that time, no.

BY MS. SUSLER:

Q   And have you ever seen this exhibit before?  Has anybody shown it to you before today?

A   Yes.

Q   And when was the last time you saw it?

A   I don't remember if it was yesterday or the day before yesterday.

Q   And before either yesterday or the day before yesterday, had you ever seen this before?

A   No.

Q   Do you remember ever -- wait.  Let me

**Page 32**

strike that.

In 2004, who was representing you?

A   Northwestern.

Q   And wait before you answer my question because Ms. Susler may have an objection.  Do you recall any conversations with your attorneys at Northwestern about sending Adriana an affidavit to sign?

MS. SUSLER: Yeah, you're right.  Good guess.  I do object based on attorney/client privilege.  As you know, Northwestern, when they produced the documents, produced a privilege log.  I'm not sure why this didn't get there.  But yeah, attorney/client privilege between him and his -- communications with his lawyers at Northwestern.  So I'm instructing my client not to answer the question.

MS. ROSEN: And just to speak to the point about the privilege log, I don't know why this would -- this, some draft, something to Adriana, doesn't strike me as privilege in any way, different from the question I asked your client about conversations about the letter.  So for whatever that's worth.

CCSAO COI SUBPOENAS 000182

BY MS. ROSEN:

Q After you got convicted of the murders -- of Mr. and Mrs. Soto and the kidnapping of their children, did you ever try to make contact with Adriana?

MS. SUSLER: No, "con Adriana."

MS. ROSEN: "Adriana."

(Interpreter retranslates question to witness)

THE WITNESS: No.

MS. ROSEN: Let's take a look at Exhibit Number 37.

(Exhibit Number 37 was marked for identification)

BY MS. ROSEN:

Q Do you recognize what Exhibit Number 37 is?

A Yes.

Q And what do you recognize it to be?

A That's what is put on the cover of Facebook. Those are my friends.

Q And then you'll see on the first page of this, which is at the bottom you'll see it says "JGS2743" in red, that first page, it notes "Esther Hernandez." Is that the person that you were referring to earlier as your friend who works on the Innocence Project or committee, or whatever you call it?

A Yes, that's correct.

Q And then there's a person named Juan Rivera. Who is that?

A He's a person who was also released from jail. I could not say he's a friend of mine because I spoke to him three or four times on Facebook.

Q So your only contact with him is on Facebook?

A No, I don't have contact. I'm not in touch with him now.

Q When is the last time you had any contact with Juan Rivera?

A When I was still living in Chicago.

Q Had you ever met him in person?

A Yes.

Q Where did you meet him?

A In the offices of Northwestern, at the University.

Q And was this after you were released from the Kankakee Jail?

A Correct.

Q Was it only one time that you met him in person?

A No, it was only three or four times, and I don't remember exactly, to be sure. I don't know how many times I met him in person.

Q And then if we go to the next page, at the top of the page there's the name "Jose Juan Maysonet Junior." Do you see that there?

A Yes.

Q Who is Mr. Maysonet?

A I met him when I was in jail, both were at the Correctional in Pontiac. That's where I met him.

Q And are you in contact with Mr. Maysonet currently?

A No.

Q When you met Mr. Maysonet while you were in Pontiac, did you discuss why you were both in prison?

A Not that I remember.

Q Do you know why Mr. Maysonet was in prison?

A No.

Q Do you remember discussing with him anything about his arrest or his prosecution?

A No.

Q Do you know where Mr. Maysonet is today?

A I don't know.

Q And then also on the same page, to the right of Mr. Maysonet's name is "Nelson Gonzalez." Who is Mr. Gonzalez?

A Nelson Gonzalez, I met him at the Committee where Esther Hernandez, she's a member of.

Q Did you meet him in person?

A Yes.

Q When did you meet him?

A I don't remember the exact date, but it was after I left the Immigration jail.

Q And where did you meet him?

A I already told you.

Q I'm sorry. I've forgotten. Can you tell me again?

A I met him at the committee that Ms. Hernandez is a member of.

Q Where is that committee located?

A I don't know the name of the street. I

CCSAO COI SUBPOENAS 000183

just know it's near Humboldt Park.

Q And how did you -- strike that. Was there some kind of a meeting or something that you were told about?

A Yes, they meet sometimes to talk about cases, and I got to meet Mr. Nelson Gonzalez. When I was there they spoke about my case.

Q Did you speak about your case?

A No.

Q Who spoke about your case?

A There were other people talking about other cases, about someone, a person who I don't know.

Q Did you only go to one of these committee meetings?

A That's correct.

Q And this happened during the couple-month period of time that you were released from the Kankakee Jail and before you left to return to Mexico; is that correct?

A Correct.

Q And then on the same page there's the name "Charlie Hernandez." Who is that? On the same page, who is that?

A Charlie Hernandez is Ms. Esther's husband, Esther Hernandez's husband.

Q And next to Charlie Hernandez's name is "Carmen Montanez." Who is Carmen Montanez?

A I don't know her. I don't know who she is.

Q If we go to the next page, there's the name Eruby Abrego, E-r-u-b-y. Who is Mr. Abrego?

A I don't know him. I know he's in jail, but I never got to meet him.

Q On the same page is Jose Montanez. Who is Jose Montanez?

A I met Jose Montanez, Mr. Martinez, when there was a meeting.

MS. SUSLER: I think we're talking about "Montanez."

THE INTERPRETER: What was the name?

MS. ROSEN: Jose Montanez.

THE INTERPRETER: I'm sorry. I'm going to translate into English.

THE WITNESS: I met Mr. Jose Montanez when there was a meeting, we had a meeting. There was a meeting, and it was one of the committees, and there was another woman whose name I don't remember. It's a committee that was organized by people whose name I

don't remember. I don't remember. But I now remember it's Cristine Bunch and also Juan Rivera.

BY MS. ROSEN:

Q So is that a different committee than the one you were talking about with Esther Hernandez?

A That's correct.

Q Did you go to one of those committee meetings too?

A I only attended -- for each committee, I attended once. I was there once.

Q If we go to page 2747, there's the name "Roberto Almodovar." Do you know who Mr. Almodovar is?

A Yes.

Q Who is Mr. Almodovar?

A I met Roberto Almodovar, he was released, but I don't know exactly what it was, but I him three or four times. We traveled together to committees, and that's when I met him.

Q When did you travel to Memphis?

A I don't remember exactly, but that was when I was released from the Immigration jail, Immigration prison.

Q So during that couple-month period of time after you were leased from the Kankakee Jail and before you returned to Mexico, you traveled to Memphis with Mr. Almodovar; is that right?

A Could you repeat the question, please?

Q Sure. You went to Memphis with Mr. Almodovar; is that right?

A Correct.

Q And it was in that couple-month period of time after release from Kankakee Jail and before you returned to Mexico, right?

A Correct.

Q And why did you go to Memphis?

A They took me, Karen Daniels, she took me to a place where there was a meeting where all of the exonerated prisoners were there, and that's when she took me to Memphis, and that's when I also met with the inmates, and I was also with a group of people where there were African-Americans.

(Interpreter speaks with witness in Spanish)

THE WITNESS: I said we were there, we went to that place to advocate for the rights of African-Americans.

BY MS. ROSEN:

Q And I take it that Ms. Daniels paid for

CCSAO COI SUBPOENAS 000184

your trip to Memphis?

A    The truth is, I don't know who paid for the trip. I don't know if it was her. I don't know who paid for that.

Q    You didn't pay for it?

A    No.

Q    Do you remember the names of any of the other individuals that you met when you were at this meeting in Memphis?

A    There were some witnesses such as Jose Montanez, and there were also other people who had been released from jail. I don't remember their names. There were other attorneys in addition to Karen Daniels, attorneys from Northwestern, and there was also Jay Rivera there. I don't remember all the names.

MS. SUSLER: You're going to have to excuse me, but I don't recall him saying anything about a "witness."

THE INTERPRETER: I didn't say "witness."

MS. SUSLER: I misheard you.

MS. ROSEN: No, the translator didn't say "witness."

MS. SUSLER: Okay. I misheard. Sorry.

THE INTERPRETER: I said "Karen Daniels."

MS. SUSLER: It's okay.

MS. ROSEN: Karen Daniels?

THE INTERPRETER: Karen Daniels.

BY MS. ROSEN:

Q    If we go to Page 2749, there's the name "William Dorsch." Who is Mr. Dorsch? 2749.

A    Mr. Dorsch, I don't know him in person, but he was one of the people who testified in my case.

Q    Do you remember what he testified about?

A    I don't remember what he testified about.

Q    Do you communicate with Mr. Dorsch?

A    We've exchanged a few words, but only once.

Q    Do you know what you exchanged words about?

A    No, I don't remember.

Q    After you were convicted -- we're done with that exhibit, Mr. Solache, so I won't be asking you any more questions about that exhibit.

After you were convicted, do you remember where you were first sent in the Illinois

Department of Corrections?

A    Yes.

Q    Where?

A    Stateville Correctional. I was there for a period of time, I don't remember exactly, but it was a very shore period of time, and from there I was sent to the Pontiac Correctional.

Q    And did you stay at Pontiac the whole time that you were in the Illinois Department of Corrections or did you get moved again?

A    I stayed there until the governor, Governor Ryan, granted forgiveness for the death penalty.

Q    And then after that, where did you go?

A    Stateville.

Q    Where?

A    Stateville.

Q    And did you stay at Stateville for the rest of your time?

A    No, I stayed there -- I don't remember exactly -- for a short period of time, and then I went back to Pontiac.

Q    And did you spend the rest of your time in Pontiac?

A    Yes.

Q    At any point in time while you were in the Cook County Jail, did any of your siblings visit you?

A    No.

Q    At any point in time while you were in Cook County Jail, did either of your parents visit you?

A    No.

Q    At any point in time while you were in the custody of the Illinois Department of Corrections, either at Stateville or at Pontiac, did any of your siblings ever come to visit you?

A    My mom visited me when I was in Stateville.

Q    And that was one time, right?

A    Correct.

Q    And other than that, nobody else, none of your other siblings or your father visited you, right?

A    Correct.

Q    Did any of your friends visit you at any point in time while you were at Cook County Jail?

A    Leobardo and Ricardo were the only ones

CCSAO COI SUBPOENAS 000185

who visited me.

Q  Leobardo and Carlos, right?

A  Leobardo and Carlos.

Q  And Carlos we talked about earlier today. He came the one time, right?

A  Yes, Carlos, Adriana's brother.

Q  Right. And he only visited you one time. We talked about that earlier today, right?

A  Correct.

Q  And Leobardo, how many times did he visit you?

A  I only remember that he visited me once.

Q  And do you recall anything about the conversation you had with Leobardo during that visit?

A  No.

Q  Did you ever, while you were at Cook County Jail, talk to any of your siblings on the telephone?

A  Yes.

Q  How often would you call your siblings when you were in Cook County Jail?

A  I don't remember how many times, but it wasn't many times.

Q  And did you, while you were at Cook County Jail, call your mother?

A  No, I don't remember.

Q  How about your father, while you were at Cook County Jail, did you ever call your father?

A  No.

Q  Did your family know what happened to you, that you had been arrested for committing two murders and kidnapping two children?

MS. SUSLER: Objection. Foundation.

BY MS. ROSEN:

Q  You can answer if you know.

A  Yes.

Q  Did you tell them?

A  I don't remember.

Q  Did you talk to any of your friends on the phone while you were at Cook County Jail?

A  No.

Q  Did you write letters to your family while you were at Cook County Jail?

A  Yes.

Q  Did they write letters to you?

A  Yes.

Q  Did you keep any of the letters?

A  No.

Q  Did you ever have any conversation with Flor Italia while you were in Cook County Jail?

A  She sent me a few letters. I don't remember how many, but they were not many letters.

Q  Did she know why you were in jail?

MS. SUSLER: Objection. Foundation.

BY MS. ROSEN:

Q  You can answer.

A  (In Spanish:) Si.

BY MS. ROSEN:

Q  While you were in the Illinois Department of Corrections, did you communicate with your siblings by either -- let me strike that.

While you were at the Illinois Department of Corrections, did you commute with your siblings by telephone?

A  Yes.

(Interpretation by Adriana Trevino:)

BY MS. ROSEN:

Q  And did you write your siblings letters?

A  Not to my brothers, but one or two sisters I think I wrote to them.

Q  And did any of your siblings write to you?

A  Sisters, yes, but not brothers.

Q  Did you save any of the letters?

A  No.

Q  When you were in the Illinois Department of Corrections, did you telephone call your mother?

A  Yes.

Q  And did you write your mother letters?

A  Yes.

Q  Did your mother write you letters?

A  Yes.

Q  Did you save any of the letters that your mother wrote you?

A  No.

Q  How about your father, did you call your father?

A  No.

Q  Did you write your father any letters?

A  No.

Q  Did your father write you any letters?

A  No.

Q  Before you left Mexico to go to the

CCSAO COI SUBPOENAS 000186

**49**

United States, how was your relationship with your father?

A    Well, we did not have a relationship.

Q    And why is that?

A    Well, I don't know. We didn't have a relationship.

Q    When did your relationship with your father end?

A    I don't remember, but I believe it was when my parents separated -- I don't know if they got divorced or they split up.

Q    So after the time that your parents separated, your relationship with your father ended?

A    Yes.

Q    From the time that your parents split up until the time you left for the United States, did you ever speak with your father?

A    No.

Q    Do you know why your mother and your father split up?

A    No.

Q    Were you angry with your father?

A    No.

Q    Was your father angry with you?

**50**

A    I don't know. I never learned that.

Q    Did your father maintain a relationship with any of his children after he and your mother split up?

A    Not that I know.

Q    Do you know where your father lived after your mother and your father split up?

A    Yes.

Q    Where?

A    With his mom.

Q    In what town was that?

A    In the same ranch.

Q    Did you have a relationship with your paternal grandmother?

A    No.

Q    Did you have a relationship with that grandmother before your mother and your father split up?

A    No.

MS. ROSEN: Let's take a look at Exhibit Number 10.

(Exhibit Number 10 was marked for identification)

**51**

BY MS. ROSEN:

Q    Mr. Solache, these are some visitor lists and logs that we got from the Illinois Department of Corrections, and there's just a bunch of names on there. I'm not going to ask you about all of them, but just a few of them.

A    Okay.

Q    On the first page of the exhibit, which is the number at the bottom of it, is 7393, is the name Alba Mendiola. Do you see that there?

A    Yes.

Q    And it says under "relationship," "reporter."

Do you see that?

A    Yes.

Q    And do you know what kind of reporter? With what media outlet this person was a reporter?

A    Yes.

Q    What?

A    Telemundo.

Q    This visitor list that we're looking at, is the handwriting on here, any of that handwriting your handwriting?

A    Yes, all of it.

**52**

Q    And did this reporter from Telemundo visit you?

A    That's correct.

Q    How many times?

A    Only one time that I remember.

Q    And do you know why the reporter wanted to speak with you?

A    Yes, about my case.

Q    Do you know how that reporter knew about your case?

MS. SUSLER: Objection. Form. Foundation.

THE WITNESS: Well, what she told me, that she had been following my case for many years.

BY MS. ROSEN:

Q    Okay. If we go to page 7419, on the left-hand side. Do you see where the numbers are?

A    No.

Q    7419. And this is a visitor list that's dated, it looks like, January 2nd, 2005, maybe, at the bottom there.

A    Yes.

Q    There's a name on there, "Juliana Garcia," and it says "friend."

Who is Ms. Garcia?

CCSAO COI SUBPOENAS 000187

53

A    I don't remember. I don't remember her.

Q    If we go to the very last page of the exhibit, this looks like another visiting list. This one is dated May 22nd, 2004. Do you see the name "Ruth Pena"?

A    Yes.

Q    And it says "friend."

A    Uh-huh.

Q    "Yes"?

A    Yes.

Q    Who is Ruth Pena?

A    Well, I would talk with this girl, I don't remember her name, she told me to put her on the list, but she never came to visit me.

Q    How did she tell you -- how did she communicate to you to put her name on the list?

A    We wrote each other some letters.

Q    Did you know Ms. Pena before you were arrested?

A    No.

Q    So did she just write you a letter out of the blue?

MS. SUSLER: Objection. Foundation.

54

THE WITNESS: No, Ms. Pena did not write me any letters. It was a friend of hers, but I don't remember her name, but Ms. Pena never visited me.

BY MS. ROSEN:

Q    So a friend of Ms. Pena's communicated with you about Ms. Pena?

A    In fact this girl was a member of the committee but I do not remember the name of the committee.

Q    And did you ever communicate with Ms. Pena either in writing or by phone?

A    No, not that I remember.

Q    Let's look at Exhibit Number 11?

A    I don't have an 11. Well, wait a minute. Is that the phone list?

MS. ROSEN: Yes.

MS. SUSLER: There's just not a tab for that.

MS. ROSEN: Sorry about that.

MS. SUSLER: It's okay. Oh, I see where the tab is. It came out.

(Exhibit Number 11 was referenced for identification)

55

BY MS. ROSEN:

Q    Take a look at Exhibit Number 11. These are some phone lists that we got from the Illinois Department of Corrections, and I'm going to again ask you about some of these names.

Is this your -- just looking at this page, is that your handwriting?

A    Yes.

Q    If we go to Page 7417, it's along that left-hand side. I think you're too far. It's this second page in, 7417. It says "Solache 7417." It's on the other side.

A    7417. Okay. Yes.

Q    And then there's the name "Susan Birkelo" and it says "friend."

A    Yes.

Q    Who is Susan Birkelo?

A    I met her in Cook County. She used to work for my attorney, the one who was representing me, Viola Rose (phonetic).

Q    And then she -- did you continue -- sorry, let me start over. Did you continue to communicate with Ms. Birkelo after she came to see you in Cook County Jail?

56

THE INTERPRETER: Could you repeat the last part of the question?

MS. ROSEN: Let me start over.

BY MS. ROSEN:

Q    Did you continue to communicate with Ms. Birkelo after she visited you at Cook County Jail?

A    Yes. I don't know what role she played in my case, but she was working for my attorney, Viola Rose, yes.

Q    Now if we go to page 7430, and this time it's on the right at the top. It's just the next page after the Birkelo one. The name is "Mexican Consulate." Do you see that?

THE INTERPRETER: I'm sorry. What name?

BY MS. ROSEN:

Q    "Mexican Consulate." There's a name Eddie Torres and it says "Investigator." Do you see that?

A    Yes.

Q    Who is Mr. Torres?

A    I never met him.

Q    Did you ever talk to him?

A    Well, I think I did talk to him a few times. I don't remember how many times I did, but I

CCSAO COI SUBPOENAS 000188

did talk to him.

Q   And why is he on your phone list?

A   I don't know who gave me his number. One of the attorneys. Well, I really don't remember who he is exactly, but he might have been working on the case.

Q   And then the next name is "Gerardo Cardenas."

A   Gerardo Cardenas.

Q   It says "Reporter." Do you see that?

A   Yes.

Q   And do you recall who that person is/was?

A   I didn't meet him and I never talked with him.

Q   Do you know why his name is on your phone list?

A   No, I don't remember why it is there.

Q   When you were at Cook County -- no, strike that.

When you were at the Illinois Department of Corrections, were you ever in protective custody?

A   Yes.

Q   And why were you put in protective custody?

A   I had a problem with a gang, and the name is Reyes Latinos.

Q   Latin Kings. And what kind of problem did you have with the Latin Kings?

A   My cellmate was one of them, and he stole my shoes, and obviously I was not going to be fighting with them because they're united. So I asked to be put under protection.

Q   And which prison facility were you in when your cellmate stole your shoes?

A   In Stateville.

Q   Do you remember the name of the cellmate who stole your shoes?

A   No.

Q   So after the roommate, who was a Latin King, stole your shoes, you asked to be put in protective custody?

A   Yes.

Q   For how long did you stay in protective custody?

A   Yes, after that happened, I asked to be accepted in the Protective Program. And then when I

asked for that, I was taken to Pontiac, and that's when I had Protective Custody. And I stayed there for some years, and then they brought me back to Stateville. But then I placed another request to be put back, and years later they took me back to Pontiac.

THE INTERPRETER: Interpreter is clarifying.

(Interpreter speaks with witness in Spanish)

THE WITNESS: Let me explain.

(Ms. Susler speaks to witness in Spanish)

MS. ROSEN: Can you translate what Ms. Susler just said, or Ms. Susler, can you translate what you said?

MS. SUSLER: I suggested to him that he answer in short spurts so that she could translate, and then he tells some more, because it's too long and nobody is going to remember what he said.

THE WITNESS: You're right.

I did ask for protection when I was in Stateville when my shoes were stolen. Then I was given, granted the protection, I was taken to Pontiac where they have the Protection Program. Years later they sent me back to Stateville. And then I asked again for protection, and then I was sent back to Pontiac.

Q   Okay. Got it. And I think what you told me earlier was you were in Stateville for a short period of time. Then you went to Pontiac until governor Ryan commuted the death penalty against you. Then you went back to Stateville, and then you went back to Pontiac. Do I have that right?

A   No, I was on the death penalty when I was in Pontiac. And when the governor, when he commuted the death sentence, then I was sent to Stateville. That's when I stayed there for a very short time.

Q   Let me just clarify. You were in Stateville first, right?

A   No. Let's just start again because I think we got confused.

When I was sentenced in Cook County, I was first taken to Stateville, where they took our fingerprints and they took pictures and all that. I was there a very short period of time, but I don't remember how long. Very short time. From there I was sent to Pontiac for death penalty.

MS. SUSLER: What is called "death row." That's what he's saying.

CCSAO COI SUBPOENAS 000189

**6**

THE INTERPRETER: Okay, "death row." Makes sense.

THE WITNESS: When Governor Ryan commuted the death penalty, that's when I was sent to Stateville.

BY MS. ROSEN:

Q Brought back to Stateville.

A Yes.

Q And then you were there in Stateville that time for a short period of time, and then you went back to Pontiac?

A Correct.

Q Were you put in protective custody the first time you were at Stateville or the second time you were at Stateville?

A Both times.

Q Got it. And then when you were at Pontiac, you were in protective custody at Pontiac, right?

MS. SUSLER: Objection, form, because there's more than one time at Pontiac, so we should clarify.

BY MS. ROSEN:

Q The first time you were at Pontiac,

**62**

were you in protective custody?

A No, the first time I was on death row.

Q The whole time you were there the first time, you were on death row, right?

A I was on death row for like two -- a little bit over two years. And that's when governor Ryan commuted the death penalty.

Q And then did you immediately go to Stateville?

A Not immediately but days later.

Q Okay. And then when you went to Stateville the second time, were you put in protective custody?

A Not in Stateville.

Q In Pontiac?

A Yes.

Q And so the problem that you had with the Latin Kings was in Pontiac?

A Stateville.

Q I think I got it.

THE WITNESS: Can we take a break?

MS. ROSEN: Sure.

THE VIDEOGRAPHER: This marks the end of the Media Number 4 in the deposition of Gabriel Solache.

**63**

We are off the record at 5:13 p.m.

(Recess)

(Translation by Jose Fonseca:)

THE VIDEOGRAPHER: Here begins Media Number 5 in the deposition of Gabriel Solache. We are back on the record at 5:23 p.m.

MS. ROSEN: And for the people back in Chicago, we've talked here amongst ourselves, and we're going to push forward and try to get at least another hour in so that the days are more evenly divided. We have something close to five and-a-half hours on the record today. We got a late start today, but we don't want to leave 10 hours for a day either on Wednesday or Thursday, so we're just going to plug forward a little longer.

Mr. Solache, I'm going to ask you to take a look at what we've marked as Exhibit Number 51.

MS. SUSLER: I'm sorry. Did we finish with the transfers? Is everything clear? Because I'm not sure it is.

MS. ROSEN: Oh, I thought I had it clear, but if you think it's unclear.

MS. SUSLER: Well, maybe you could just ask him if he was able to express and have translated

**64**

correctly about the transfers, because I felt like it kind of got left up in the air.

BY MS. ROSEN:

Q Okay. Mr. Solache, with respect to your transfers from the various prisons, as I understand it you went from Stateville to Pontiac, back to Stateville, back to Pontiac, correct?

A That's correct.

MS. SUSLER: Thank you very much.

BY MS. ROSEN:

Q Now let's take a look at Exhibit Number 51.

MS. SUSLER: 1-5?

MS. ROSEN: 5-1.

(Exhibit Number 51 was referenced for identification)

BY MS. ROSEN:

Q Do you recognize what we've marked as Exhibit Number 51?

A Yes.

Q And on the last page of Exhibit Number 51 there is your name and a signature. Is that your signature?

A Yes.

CCSAO COI SUBPOENAS 000190

**65**

Q   And did you sign it after having reviewed the pages that are in front of the page with your signature?

A   Yes.

Q   And did you review the information that was contained in the document before you signed it?

A   Yes.

Q   And your signature is dated November 26, 2018; is that correct?

A   Yes.

Q   Does that mean that you reviewed the document and signed it on November 26th, 2018?

A   Correct.

Q   If you go to Page 3, in answer to Question Number 3, the last sentence says "Plaintiff states that he's never been married and that he has one child living in Mexico, Alejandra Solache Agarrido, born September 17, 1995."

A   That's correct.

Q   And the name "Agarrido," where does that come from?

A   That's her mother's last name.

Q   Now if we go to Page 5, in answer to Question Number 6 that is asking you about any claims

**66**

you're making for lost wages or lost income, and it asks for your various employers, at the bottom of the page it states "Plaintiff states that he worked in agriculture."

Do you see that there?

A   I did not understand.  (In English:) Can you repeat the question please?

Q   Yeah, sure.  Absolutely.  In answer to the Question Number 6 which asks you about lost wages, the answer states at the bottom of the page "plaintiff states that he worked in agriculture."

Do you see that there?

A   Yes.

Q   And the reference to "agriculture," is that a reference to our discussion earlier where you talk about working in the field, both in Mexico and California?

A   Correct.

Q   It also references "sales," that you worked in sales.  What is that referring to?

A   Sales?  What kind of sales?

Q   I don't know.  So the answer says "Plaintiff states that he worked in agriculture, sales, the food industry and manufacturing prior to

**67**

his wrongful arrest and conviction."

So I want to know what sales job you're referencing.

A   I don't remember having worked in sales.

Q   Okay.  And then with respect to the reference to the food indust -- sorry, the reference to the "food industry," what is that a reference to?

A   Perhaps when I worked at the rotisserie.

Q   Rotisserie.  And it also says "manufacturing."  Is that a reference to the jobs you had in Chicago?

A   Yes.

Q   If we go to the next page of this exhibit, Page 6, at the top of the page it also says in response to the same question -- so it's Page 6, at the top of the page it says "He was not able to choose a profession or rise within it and missed out on the opportunity to develop his professional skills."

Do you see that there?

A   Correct.

Q   Now at the time of your arrest, you were 26 years old.  Do I have that right?

**68**

A   Correct.

Q   And you were working for a temporary agency, doing various factory work that we talked about earlier today, right?

A   Yes.

Q   Did you have plans at that point in time, before your arrest, to change course and enter some kind of profession?

A   No.

Q   Then it also says, on the same page, "Defendant's conduct also deprived him of the opportunity to pursue further education."

Do you see that?

A   Correct.

Q   And up until that point in time, meaning the time just before your arrest, when you were 26 years old, you had only completed -- I think you said earlier -- five months of high school; is that right?

THE INTERPRETER:  The interpreter is going to --

MS. SUSLER:  You need to translate what he's asking you.

THE INTERPRETER:  Just to confirm, there's a

distinction between high school, "preparatoria" and "secundaria," which is junior high school. Should I --

MS. SUSLER: Whenever he asks a question, you translate it.

THE INTERPRETER: So the correction, the interpreter is going to say that again, that he completed up to five months of junior high school.

BY MS. ROSEN:

Q Of junior high school. So what grade did you get to?

A I completed grade school, and I did five months of junior high school.

Q How many grades are there in grade school?

A (In English:) Could you repeat the question, please.

Q Sure. How many grades are there in grade school?

A Six.

Q And then from grade six, you go to the secondary school, and that's grades seven, eight -- is it also nine?

A Yes.

Q So you did five months of grade seven; is that right?

A Correct.

Q And you had no more education after that up until the time that you were arrested; is that correct?

A Correct.

Q And before you were arrested, did you have plans to go back to school?

A Not at that moment.

MS. ROSEN: Let's go to Exhibit Number 52.

(Exhibit Number 52 was referenced for identification)

BY MS. ROSEN:

Q Mr. Solache, have you seen Exhibit Number 52 before?

A Yes.

Q And if we go to the last page of the document, is that your signature?

A Yes.

Q And that document is dated November 26, 2018, right?

A Correct.

Q So that means that you reviewed the

document and signed it on November 6 -- sorry, November 26, 2018, correct?

A Correct.

Q If we look at page -- well, it says Page 3 at the bottom of the page. It's misnumbered, but it says Page 3. Do you see that? It has Question Number 6. You can see the question number 6 on it.

A Yeah.

Q So above that is an answer that I want to ask you questions about, and the question is Question Number 5 on the page before it. And the question asks you to specify in detail where you were, who you were with and what you were doing between March 27th, 1998 and April 3rd, 1998.

And in answer to that question, you say on Page 3, it's the second paragraph -- go ahead and translate that part -- and it says "Plaintiff further states that the last week of March 1998 he worked at Ready Metal from 4:30 p.m. to about 2:00 a.m."

Do you see that there?

A Correct.

Q And then it says "On March 27th a coworker gave him a ride home after they hung around talking about work, arriving home around 4:00 a.m."

Do you see that there?

A Correct.

Q The coworker that gave you a ride home from work, what was his name?

A Jose Blanco.

Q And that's the individual that lives about three blocks from where you lived on Mozart, right?

A Yes.

Q Then it says "He woke up the following day sometime before noon. He went to cash his check and returned home."

Do you see that there?

A Correct.

Q And then it says "He stayed home for a couple hours and went out with friends."

Do you see that there?

A Yes.

Q Which friends did you go out with on March 27th?

A I don't remember the names, but they worked where I worked at the factory.

Q Would you often go out with friends from the factory?

CCSAO COI SUBPOENAS 000192

**73**

A    No.

Q    Was this the first time you went out with friends from the factory?

A    Yes.

Q    And where did you go?

A    I don't remember.  It seems that we went to -- the truth is that I don't remember.

Q    How many friends from the factory did you go out with on March 27th?

A    It was only one.

Q    One friend from the factory?

A    Yes.

Q    Did you go out with other friends in addition to the friend from the factory or was it just the two of you?

A    No, it was only that day.

Q    How many friends did you go out with that day?

A    It was only a friend and myself.

Q    Where did you go?

MS. SUSLER:  Asked and answered.

BY MS. ROSEN:

Q    You can answer again.  Sorry.

A    I don't remember where we went.

**74**

Q    How did you get there?

A    He was driving a car.

Q    Your friend picked you up?

A    Yes.

Q    And this was the first time you ever went out with this person; is that right?

A    Correct.

THE VIDEOGRAPHER:  It's picking it up.

(Background noise)

MS. ROSEN:  It's picking it up?

THE VIDEOGRAPHER:  It still can work.

MS. ROSEN:  Jan, it's your call.

(Discussion is off the record).

THE VIDEOGRAPHER:  This marks the end of today's deposition of Gabriel Solache.  We are going off the record at 5:50 p.m.

(Deposition concluded)

**75**

CERTIFICATE OF READER INTERPRETER

I, _____,

whose address is _____,

a person who speaks the language of the witness, namely Spanish, do hereby certify that on the _____ day of _____ 20___ I did translate the foregoing deposition from the English language into the Spanish language, reading the same to the witness in his native tongue, to the best of my ability; that all the corrections and changes requested by the witness were made and initialed by the witness; that upon completion of said reading, the witness did confirm to me that he had understood the reading

_____
Reader interpreter

**76**

DEPOSITION SIGNATURE PAGE

DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that I have read the entire transcript of my deposition taken in the above captioned matter or the same has been read to me, and the same is true and accurate, except for changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath

Executed on this_____day of_____, 202 ,

at_____,

_____

(city)              (state)

_____
GABRIEL SOLACHE

**DEPOSITION ERRATA SHEET**

Page No _____ Line No _____ Change to:

_____

_____

Reason for change:

_____

_____

Page No _____ Line No _____ Change to:

_____

_____

Reason for change:

_____

_____

Page No _____ Line No _____ Change to:

_____

_____

Reason for change:

_____

Page No _____ Line No _____ Change to:

_____

_____

Reason for change:

_____

_____

Page No _____ Line No _____ Change to:

_____

_____

Reason for change:

_____

Page No _____ Line No _____ Change to:

_____

_____

Reason for change:

_____

_____

SIGNATURE_____ DATE_____

GABRIEL SOLACHE

I, RUBEN GARCIA, CSR, do hereby certify that I am a duly qualified Certified Shorthand Reporter, in and for the State of California, holder of Certificate Number 11305, which is in full force and effect.

That the foregoing reporter videoconference proceedings were taken before me at the time herein set forth; that any witness in the foregoing proceedings, prior to testifying, were placed under oath; that every attempt was made to ensure a verbatim record of the remote proceedings which inherently have technical interference and audio interruptions and issues. Such transcript was created by me using machine shorthand which was thereafter transcribed under my direction.

I further certify that I am not a relative or employee or attorney or counsel of any of the parties nor am I financially interested in the outcome of this action.

IN WITNESS WHEREOF, I have subscribed my name this 16th day of December, 2021.

*Ruben Garcia*

RUBEN GARCIA, CSR NO. 11305

CCSAO COI SUBPOENAS 000194

**A**

a-l
80: 6
a-m-e-c-a
65:
aberdeen
3: 4
ability
8:9, 75: 0
able
4:5, 6 :4,
82: 8, 85: 7,
8: , 8:20,
30:8, 30: 4,
63:24, 67: 8
about
2:4, 3:8,
3: 4, 5:8,
6: 9, 20: 8,
20:24, 2 : 5,
22: 3, 22: 8,
26:3, 26:24,
27:9, 33: 0,
44:22, 49: 0,
49: , 5 :20,
5 :24, 54: 9,
68:24, 69: 7,
77:8, 78: 5,
78: 7, 86:24,
90: 6, 90: 8,
93: 4, 93: 5,
95: 9, 97:23,
97:24, 98:5,
99: 7, 00:2 ,
04: 0, 0: 6,
8:9, 9: 6,
24: 0, 24: 5,
32:7, 32: 8,
32:2 , 32:22,
36:2, 37:4,
37:5, 37:7,
37:8, 37: 0,
37: , 37: 2,
38: 4, 39:5,
4 : 8, 42: ,
42: 3, 42: 8,
42:22, 45:4,

45:8, 45: 4,
46:4, 48: 7,
5 :5, 52:8,
52: 0, 54:6,
54: 9, 55:5,
64: , 65:24,
66:9, 66: 6,
68:4, 7 : 0,
7 : 9, 7 :24,
72:7
above
7 :9
above-captioned
76:9
abrego
38:7
absolutely
66:8
accepted
58:24
accomplish
85: 7
accurate
76: 0
acquaintance
04:24
acquaintances
05: , 05: 3
across
33: 8, 34:5,
34:7, 75: 6
action
79: 7
actually
80: 8, 0 :24
addition
4 : 3, 73: 4
address
56: 0, 80:24,
8 :2, 8:20,
8:24, 9:3,
9:6, 28:20,
75:4
addressed
29:6
adriana
3:35, 4: 0,
6: 7, 7:6, 36:5,

5 :2, 5 :5,
56: , 56:9,
56: 3, 58:3,
58: 4, 58:2 ,
59:6, 6 :22,
6 :24, 62:3,
63:6, 63: 4,
63:22, 66:23,
67:3, 67:6,
74:5, 04: ,
04: 3, 04: 6,
04: 9, 04:23,
05:4, 05: 2,
05: 5, 05:23,
06: , 06: 8,
2:2, 2:7,
3: 3, 4:22,
5:8, 6:2 ,
7: 2, 7: 7,
7:20, 8: 2,
9: 0, 9: 9,
20:2, 20: 2,
20: 6, 20:20,
2 :2, 23: 9,
24:9, 24: 4,
25:24, 30: 8,
32:7, 32: 9,
33:5, 33:6,
33:7, 47: 9
adriana's
9: 3, 9: 4,
9: 5, 67:4,
45:6
adult
89: 6
advice
97:3
advocate
40:2
affect
8:9
affidavit
32:7
afford
50:3
african-americans
40: 8, 40:22
after
0:8, 0: 3,

:7, 4: 2,
26:22, 27: ,
27:3, 3 :22,
44: 2, 50:8,
54: 4, 54:23,
55:2, 65:22,
76: 3, 80:3,
84: 2, 84: 8,
85: 6, 85:24,
86:3, 87: 5,
88:3, 95:24,
96: 4, 0 :20,
6:3, 6: 9,
7: 6, 7:20,
33:2, 34:23,
36: 6, 40: ,
40:9, 42:20,
42:23, 43: 4,
49: 2, 50:3,
50:7, 55:23,
56:6, 56: 2,
58: 7, 58:23,
65: , 70:4,
7 :23
afternoon
2 : 8, 5:9
afternoons
6:5
afterwards
82: 7
again
0: 2, 5:20,
30:2 , 4 :24,
0:3, : 5,
7:4, 7:8,
36:20, 43: 0,
55:5, 59:24,
60: 5, 69:7,
73:23
against
60:5
agarrido
65: 8, 65:20
age
3 : 4, 32: ,
62:4, 68:7,
25:2
agency
68:3

CCSAO COI SUBPOENAS 000195

| | | | |
|---|---|---|---|
| aglunas | 40:6 | 59: 7, 60:8, | 53: , 55: 0, |
| 23: 3 | almoloya | 6 :3, 62: 0, | 58: , 58: 8, |
| ago | 9 :4, 9 :6, | 62: 6, 7 :20, | 6 : 6, 76: 4, |
| 3: 4, 9 : 2 | 9 :7 | 74:3, 82: 9, | 80:5, 80: 0, |
| agreed | along | 89: 0, 38:23, | 84: 7, 85:7, |
| 20:8 | 68: 9, 7 :2 , | 53:4, 59:4, | 85: 7, 88: 6, |
| agreement | 55:9 | 63: 0 | 88: 9, 97:20, |
| 28: 4 | already | answer | 98:2, 99:23, |
| agriculture | 35:7, 52: 9, | 7:20, 4:24, | 0 :8, 0: 3, |
| 66:4, 66: , | 53: 4, 58:9, | 8:22, 28: 8, | 2: 2, 3: 6, |
| 66: 4, 66:23 | 66:6, 72:20, | 34:2, 35:6, | 4:5, 20:9, |
| ahead | 78: , 88:8, | 36:22, 42:6, | 23: , 24: 7, |
| 08:7, 2 :6, | 36: 8 | 42: 2, 63: , | 29:22, 32:6, |
| 7 : 6 | also | 7 :7, 77: 3, | 32:20, 34: 5, |
| air | 3:33, 39:24, | 86: 2, 87: 2, | 4 :7, 42:22, |
| 64:2 | 45:8, 47: 0, | 99: 4, 08:8, | 44:2, 44:3, |
| al | 59: 5, 60:5, | 20:7, 30:22, | 44:6, 44: 0, |
| : , 5:6, | 62:2 , 64: 6, | 32:4, 32: 6, | 44: 2, 44:22, |
| 80: 4, 80: 6 | 67:7, 7 :23, | 46: 2, 47:9, | 44:23, 45: 8, |
| alba | 73: , 79:20, | 59: 5, 65: 4, | 46: 6, 46:24, |
| 5 : 0 | 84:20, 99:20, | 65:23, 66:8, | 47:2, 48: , |
| alejandra | 00:3, 6:9, | 66: 0, 66:22, | 48:4, 48: 4, |
| 7: 2, 65: 7 | 34:7, 36:7, | 7 :9, 7 : 5, | 48:20, 48:22, |
| alejandra's | 39:2, 40: 6, | 73:23 | 50:3, 5 :22, |
| 7: 3 | 40: 7, 4 : , | answered | 54:2, 65:24, |
| algunas | 4 : 5, 66: 9, | 35:4, 35:7, | 76: , 79:7, |
| 23: | 67: , 67: 6, | 42:4, 58:9, | 79: 5 |
| alive | 68: 0, 68: , | 72:20, 73:2 | anybody |
| 33:4, 46:24 | 69:23 | answers | 8:23, 3:22, |
| all | ameca | 4: 7, 4:20, | 3:24, 29: 2, |
| 3: 5, 20:8, | 65: | 20: 2 | 30:7, 4 : , |
| 2 :2, 24: 9, | amecameca | antonia | 58: , 58: 7, |
| 25: 2, 3 : 3, | 65:9, 65: 3, | 68:3 | 59: 0, 73: , |
| 35:2 , 35:22, | 65: 4 | antonio | 73:6, 84: , |
| 35:23, 35:24, | amongst | 3 :3 | 00:20, 26:2 , |
| 46:8, 46: 6, | 63:8 | any | 3 : 6 |
| 47: 4, 7 : 7, | and-a-half | 7: 6, 8:8, | anymore |
| 92: 9, 93: 4, | 63: | 5:4, 25: 2, | 69:24 |
| 0 : 2, 05:24, | andrew | 25: 5, 25:20, | anyone |
| 0:20, 7: 7, | 3:20, 6: 3 | 26: 6, 3 : 8, | 9:4, 7:9, |
| 23: 9, 25: , | angeles | 3 :2 , 32:23, | 9: 0 |
| 30: 4, 40: 4, | 36: 6, 36: 7, | 34: 0, 4 :6, | anything |
| 4 : 5, 5 :5, | 37: 8, 38:5 | 44:4, 44: 5, | 20:24, 22: , |
| 5 :24, 60: 9, | angelica | 44: 8, 46: , | 22: 4, 27:9, |
| 75: 0 | 3 :3 | 46: 9, 49: 0, | 27: 7, 87: 3, |
| almodovar | angry | 49: , 52:2, | 89:20, 99:6, |
| 39: 2, 39: 5, | 49:22, 49:24 | 52:4, 52:7, | 99:8, 7:9, |
| 39: 6, 40:3, | another | 52: , 53:9, | 9: 3, 36:2, |
| | 34:24, 59: 5, | | |

CCSAO COI SUBPOENAS 000196

Transcript of Gabriel Solache
Conducted on December 6, 2021

48

4 : 8,   45: 4
apan
03:7
apartment
8:2 , 8:22,
8:24, 9:3,   4:2,
 4:7,   4: 5,
 4:20,   6: 2,
 6: 5,   22:3,
30:4,   02:6,
 02:7,   02:8,
 02: 2,   02: 9,
 03: 0,   03: 3,
 03: 6,   03:22,
 04:
apartments
57:4
apologize
78:
appearances
3:
appears
 30: 7
appointments
 4:24,   5:3
appreciate
93:20
approached
73:5
approximately
 0:8,   0: 2,
 2:4,   3:8,
 4: 7,   6:22,
 7: ,   8:2,
 8:7,   32:5,
48:8, 48:20,
48:23, 85:2,
85: 0, 9 :8
approximation
53:9, 53:
april
 7 : 4
aren't
 : 5, 20:
around
9: 7, 47:3,
73:7, 90:2 ,
 5: 0,   24:22,

7 :23,   7 :24
arrange
37: 9
arrest
3 :22, 32:7,
55: ,  6 : ,
83:7, 83: 2,
85:9,   05:3,
 36:2,   67: ,
 67:23,   68:7,
 68: 6
arrested
52:9, 54: 4,
54: 7, 54:20,
54:23, 68: 5,
80:5, 80: 0,
83:8, 85:6,
85:2 ,   4:2,
 7: 6,   7:20,
46:8,   53:20,
70:5,   70:8
arrive
2 : 7, 7 :9
arrived
23:22, 24: ,
34:23, 42: 3,
52:5, 52:8
arriving
 7 :24
arturo
3: ,  6:9,
 07:7
ashland
8 :4, 8 :5,
8 :7, 8 :9,
8 : 4, 8 : 7,
82:7
asked
 : 8, 20:22,
32: 0,   35:4,
4 :22, 42:4,
78: ,   93: 3,
32:2 ,   58:9,
58: 8,   58:23,
59: ,   59:23,
73:2
asking
7: , 7: 2,

20: ,   98:22,
 42:2 ,   65:24,
 68:23
asks
 66:2,   66:9,
 69:4,   7 : 2
associated
55: 0
assume
8:3,   3: 3
assumes
7 :5,   30: 9
assuming
 00:2 ,   20:23
at_
 76: 8
attempt
79:9
attend
55:9
attended
 39:9,   39: 0
attic
57:8, 57: 2,
57:24, 58:2,
58:6, 58: 4,
59:7
attorney
5: 7, 22: 6,
22: 8, 22: 9,
23:2, 23:7,
23: 9, 23:2 ,
24: , 24:6,
24:8, 24: 2,
24: 5, 24:20,
24:22, 25:2,
25:4, 25: 3,
96: 2, 97:3,
97:5, 97: 3,
 26:2,   26:3,
 32: 0,   32: 4,
 55: 9,   56:8,
 79: 5
attorneys
23: 2,   32:6,
4 : 3,   4 : 4,
57:4
audible
99: 4

audio
 79:
avenue
2:6, 80:23,
8 : , 8 : 2
awaiting
32:2
aware
 20: 6
away
27:5, 32: 3,
32: 7, 33: 0,
33: 3, 47: ,
47:2, 84:22,
85: , 87:24,
88:4, 88:7,
88: 2, 89: 9,
89:2 ,   07: 9

---

**B**

baby
86:5
back
7: 4,   0:2,
 0:6,   0:9,
 0: 3,   3: 3,
 5: 8,   6:2 ,
 7:2,   9:2 ,
20:5, 2 :22,
2 :24, 22:2,
22:3, 36:9,
39:2 , 5 : 7,
53: 4, 70:22,
7 : 2, 77:7,
79: 4, 82:5,
83:2, 84: 3,
84: 7, 84:2 ,
85: 4, 86:4,
86:20, 88:24,
90:5, 90: 3,
90:20, 92:22,
97:20, 97:24,
98:2, 98:5,
98:7,   02:9,
 :24,   6: 8,
 7:22,   8:6,
2 : 3,   22: 8,
23:2 ,   27:6,

CCSAO COI SUBPOENAS 000197

43:22, 59:3,
59:5, 59:23,
59:24, 60:6,
60:7, 6 :7,
6 : , 63:5,
63:7, 64:7,
70:9
**background**
74:9
**backtrack**
40:20
**bad**
23:24
**bail**
95:7, 95:8,
95: 0, 95: 2
**baroni**
2:22
**based**
9:22, 9:23,
32: 0
**basement**
56: 9, 57:7,
57: 5, 57: 7,
57:20, 59:2,
59:4, 59:8,
59: , 59: 2,
6 : 3, 66: 6,
09: 5, 09:20,
09:24, :5
**basis**
6: 8
**bathrooms**
3:2
**became**
0 : 4, 20: 6
**because**
: 6, 20:6,
2 :6, 2 :7,
2 :9, 2 : 0,
32: 5, 42: 3,
50: 3, 54: 7,
54:20, 55:22,
56:4, 69:3,
76:7, 76: 9,
78:4, 90:22,
3: 8, 4:6,
4: 0, 5:9,

20:23, 22:4,
23:24, 32:5,
34:9, 58:9,
59: 6, 60: 5,
6 :20, 63: 9,
64:
**become**
0 :8, 05: 2
**bed**
2: 6
**bedroom**
3: 4
**bedrooms**
57:5, 04: ,
3: 6, 3: 9
**been**
7:2, 0: ,
7:8, 7:24,
23: 9, 48:5,
7 :2, 78:6,
85: 0, 85: 3,
85: 6, 90:2 ,
04: 9, 8:7,
4 : 2, 46:8,
52: 3, 57:5,
65: 6, 76:9
**beers**
72: , 08: 7
**before**
7:20, 0:5,
0: 0, 3: 0,
8: , 20: 3,
20: 7, 26:2 ,
29: 8, 3 : 0,
38: 8, 38:22,
39: 8, 39:22,
40: 0, 40:22,
42:23, 44: ,
44:5, 44:23,
5 : , 55: 3,
55: 7, 60: ,
60:2, 6 :2 ,
62: 3, 62:24,
63: 7, 63:2 ,
64: , 64: 0,
64: 2, 64: 8,
65:5, 65:22,
65:24, 66:5,

67:9, 68: 4,
70: 9, 72:3,
75:5, 77: 7,
8 : , 8 : 0,
83:8, 83: 2,
85:2 , 90: 5,
9 : , 02: 2,
07: 3, 08:20,
08:23, 4:2,
20: 9, 23:5,
23:8, 23: 0,
3 : 6, 3 :20,
3 :2 , 3 :22,
32:4, 37: 8,
40:2, 40:9,
48:24, 50: 7,
53: 9, 65:6,
68:7, 68: 6,
70:8, 70: 6,
7 : , 72: ,
79:6
**beginning**
9: 7, 22: 6
**begins**
5:3, 36:5,
5 : 5, 5 : 6,
90: , 27:3,
27:4, 63:4
**behalf**
2:3, 2: ,
2:2 , 2:30, 3:3,
3: , 3:20,
5: , 5: 9,
5:2 , 5:24, 6:3,
6:8, 6: 4, 6:4,
30:24
**behind**
28: 5
**being**
5: 2
**believe**
6:3, 26: 9,
72:20, 88:8,
92: 4, 97: 4,
97: 9, 2: 7,
6:23, 9: 9,
24: 4, 49:9
**believed**
06:20, 9:2

**belly**
07:6
**best**
75: 0
**better**
55:22, 4:5
**between**
48: , 52:8,
67:20, 78: 9,
80:4, 80:8,
87:6, 89: 6,
02: 7, 32: 4,
69: , 7 : 3
**big**
07:6
**birkelo**
55: 5, 55: 7,
55:23, 56:6,
56: 2
**birth**
7:2 , 26:22
**bit**
3:9, 2 :5,
40:20, 93: 2,
04: 0, 62:6
**blanco**
84:24, 72:5
**bleeding**
73:22
**blocks**
84:22, 85: ,
72:7
**blood**
9:24
**blue**
53:23
**bone**
75:2, 75:20
**bones**
75:20
**book**
27: 7, 27:23
**books**
50:
**border**
29:4, 33: 6,
33: 9, 33:22,
34:5, 34:8,

CCSAO COI SUBPOENAS 000198

34:   ,   34: 9,
35:9,  35:   ,
36:3,  36:   ,
36: 4,  37: 6
**born**
8:6,   8: ,
27: ,  27: 2,
65: 8
**borrow**
84:20
**both**
46:24,  54: 3,
9 : 7,   2 : 2,
35: 2,   35: 9,
6 : 6,   66: 6
**bottle**
72:3
**bottles**
69:2,  69:3,
70:23,  7 :23,
72: 5,  72: 8,
72:23,  73:2,
73:4,  73:6,
73: 0
**bottom**
22:   ,   22: 7,
27: 8,   33:22,
5 :9,   52:20,
66:2,   66: 0,
7 :5
**bought**
8 :2 ,  82: ,
82: 7,  82: 9
**boulevard**
2:35
**boxes**
79:6
**brand**
35: 6
**break**
7: 7,  7:2 ,
9: 6,  5 :9,
5 : 0,  5 :20,
5 :23,  89:23,
90: ,   : 9,
:20,  26:2 ,
62:2
**breaking**
69: ,  69:3,

7 :23,  72: 5,
72: 8,  72:23,
73:2,  73:4,
73:6,  73:9
**brick**
69:5,  69: 0,
70: 6,  73: 3,
73: 5,  73: 8,
74: 6,  75:2 ,
76:4,  78:2,
78: 5,  78:2 ,
80: ,  80:4,  80:9
**broke**
82: 8,  90: 6
**broken**
75:20
**brother**
9: 3,   9: 5,
26:23,  32:2 ,
33: ,  33:2,
37: 3,  40:24,
53: 8,  55: 5,
58: 5,  59: 8,
62:6,  66:23,
67:4,  82: ,
82:3,  98:   ,
0:2 ,   :5,
: 0,  25:8,
45:6
**brother's**
0: 8,   :7
**brothers**
30: 0,  32: 9,
46:8,  56:22,
64:20,  66: 2,
88: 7,  47:23,
48:3
**brought**
59:3,  6 :7
**brualdi**
3:20,  6: 3
**budget**
03: 9
**build**
28:4,  28:5,
28:9,  85: 4,
86:2
**bunch**
39:2,  5 :4

**burns**
3:4,  3:5,  6: 4
**bus**
9:4,   9:7,
29:6
**business**
7:5,   7:6,
7: 0
**buy**
4: 0,   4: 2,
4: 9,   6: ,
8 :22,  8 :24,
03:9,   03: 2,
03: 7

---
**C**

**cabo**
5 :24
**cabos**
:24,  5: ,
5: 3,  20:2 ,
2 : 2,  2 : 7,
23: 9,  23:22,
24:
**california**
34:2 ,  53: ,
85:24,  86:7,
86: 7,  87: 6,
88:7,   04:20,
5: 4,   5: 6,
66: 7,   79:3
**call**
25: 3,   25: 7,
25: 9,   34:2,
45:2 ,   46:2,
46:5,   48:7,
48: 7,   74: 2
**called**
65:9,  79:2,
9 :4,  97: ,
98:2 ,  25:20,
60:23
**came**
32:6,  50:23,
52:23,  60:8,
86: 9,  92:22,
97:2,   03: 2,
03: 4,   0:6,

45:5,   53: 5,
54:2 ,   55:23
**camion**
9:6
**car**
35: 3,  35: 4,
35: 5,  35: 6,
35: 7,  35:20,
35:2 ,  35:23,
48: 0,  74: 2,
74: 3,  79: 2,
79: 3,  79: 5,
8 : 8,  8 : 9,
8 :2 ,  8 :22,
8 :24,  82:5,
82: 5,  82: 6,
82: 7,  82:20,
82:22,  82:24,
83:9,  83: 3,
83: 8,  83:23,
84: ,  84: 0,
84: 2,  84: 6,
84: 8,  84:20,
9 :9,   74:2
**carcel**
47:6,  47:9
**cardboard**
79:6
**cardenas**
57:8,   57:9
**care**
76: 4,  76: 6,
76:23,  76:24,
77:2
**carlos**
9: ,   9: 2,
29: 0,  29: 5,
3 :8,  3 : 0,
3 : 4,  3 : 6,
3 : 9,  3 :22,
32:6,  32: ,
32: 2,  33: 0,
33: 2,  34:4,
38:4,  43:5,
43:8,  50: 7,
50: 8,  50:23,
5 : ,  56: ,
56:4,  58:3,

CCSAO COI SUBPOENAS 000199

58: 4, 58:2 ,
67:6, 06:3,
06:4, 2:7,
2:2 , 2:24,
3:4, 3: 0,
25:8, 45:2,
45:3, 45:4,
45:6
**carmen**
38:3
**caroline**
2:34
**carrie**
6:4, 6:6
**carrillo**
3:34, 5:
**case**
5:7, 5: 4,
2 : 0, 26:3,
00:7, 00: 0,
0 : , 0 :4,
0 :6, 0 : 3,
26:4, 26: 2,
29: 5, 29: 7,
37:7, 37:8,
37: 0, 42:9,
52:8, 52: 0,
52: 3, 56:8,
57:6
**cases**
5:23, 6: ,
37:6, 37: 2
**cash**
72:
**catepec**
:24, 2: ,
2:2, 2:3, 2:8
**caused**
72: 5
**caved**
75:3
**cellmate**
58:7, 58: 2,
58: 5
**certificate**
75: , 79:3
**certified**
:29, 79:2

**certify**
75:6, 79: ,
79: 4
**change**
05:4, 26: 9,
26:22, 68:7,
77: , 77: 7,
77:23, 78:5,
78: , 78: 7
**changed**
87:5
**changes**
75: , 76: ,
76: 3
**charlie**
37:22, 37:24,
38:2
**chavez**
68:5
**check**
72:
**checked**
26:5, 26:6
**chicago**
: , 2:7,
2: , 2: 8,
2:26, 2:37, 3:8,
3: 6, 3:28, 5:5,
5: 9, 6:7,
50: 0, 50: 2,
50: 6, 50: 7,
50: 9, 50:2 ,
5 : , 5 :3,
5 :6, 55:2 ,
56: , 56:3,
56:4, 56:7,
57: 9, 57:22,
6 :2 , 62: 3,
64:2, 64: 3,
64: 9, 65:5,
78: 2, 78:20,
79: , 86:3,
86:9, 86: 8,
87: 8, 88:8,
93: , 96:3,
0 :22, 04: 2,
04: 6, 34: 7,
63:8, 67: 3

**chicken**
8 : 5, 8 : 7,
82:6
**chickens**
39:
**child**
64:7, 65: 7
**childbirth**
26:20
**children**
26: 6, 3 : 3,
46:5, 59: 2,
62:5, 33:4,
46:9, 50:3
**chips**
2:22
**choose**
34:22, 50: 6,
3:6, 67: 8
**church**
99:
**cicero**
8 : , 8 :
**circle**
5: 8
**circumstances**
08: 9
**cite**
5:20
**city**
: , 2: ,
5:5, 5: 9, 35:2,
45:22, 47:22,
48:8, 48: 2,
48: 4, 76:20
**civ**
5:8
**claiming**
4:23
**claims**
65:24
**clarification**
49: 7
**clarify**
9:6, 30: 2,
47:8, 57: 0,
6 :2, 93: 9,
4:8, 5:24,

60: 3, 6 :22
**clarifying**
59:7
**clark**
2: 6
**clean**
43:20
**clear**
6:9, 00: 8,
23: 8, 63: 9,
63:2
**client**
32: 0, 32: 4,
32: 6, 32:2
**close**
32:6, 88: 6,
90: , 63:
**clothing**
2:2
**college**
92: 3
**come**
8: 0, 2 : 2,
28:6, 43: 8,
70:22, 7 : 2,
7 : 3, 7 : 4,
9 : 6, 9 : 9,
00: 6, 09:9,
3 : 0, 44: 3,
65:2
**comfortable**
20:9
**coming**
87:8
**comment**
09: 2
**commit**
9: 8, 20:3
**committed**
9: 2, 9: 6,
9: 9, 9:22
**committee**
34:2, 36: ,
36:2 , 36:23,
37: 4, 38:24,
39:4, 39:7,
39:9, 54:8,
54:9

CCSAO COI SUBPOENAS 000200

committees
38:22, 39: 9
committing
46:8
communicate
: , 92: 7,
99:24, 04:8,
09:3, 7: 7,
7: 9, 42: 4,
47: 3, 53: 7,
54: 0, 55:23,
56:5
communicated
54:5
communicating
86:8
communication
3 : 9, 3 :2 ,
88:20, 92:2 ,
04: 9
communications
32: 5
commute
47: 6
commuted
60:5, 60: 0,
6 :3, 62:7
company
5: 6
compared
9 : 9
completed
68: 7, 69:8,
69: 2
completion
75: 2
con
33:6
concluded
74: 7
conduct
68:
confirm
68:24, 75: 3
confuse
39:23
confused
4 :23, 00:2 ,

60: 6
confusion
70:9, 00: 3
connelly
2: 3
consciousness
73: 9
consider
06:4, 06:7,
06: 0, 06: 3
considered
: 4
consulate
93: , 95: 4,
95: 7, 95: 9,
97: 5, 56: 3,
56: 6
cont'd
3:
contact
: 2, 3 : 9,
3 :22, 5 :5,
53:2, 53:23,
54:22, 85:2 ,
88:20, 33:4,
34: , 34: 3,
34: 6, 35: 5
contacts
32: 5
contained
65:6
continue
20: 7, 55:2 ,
55:22, 56:5
conversation
89: 5, 89: 6,
45: 5, 47:2
conversations
22: 6, 22: 9,
6 : 7, 6 : 8,
32:6, 32:22
convicted
33:2, 42:20,
42:23
conviction
67:
cook
3 :24, 52:20,

55:2, 55:6,
74: 5, 77:3,
8: 2, 8: 7,
8:2 , 9:4,
9:7, 2 :24,
24:4, 25:24,
28:8, 44:3,
44:7, 44:23,
45: 7, 45:22,
46: , 46:5,
46: 7, 46:20,
47:3, 55: 8,
55:24, 56:6,
57: 9, 60: 7
copied
27: 7, 27:22
copies
23:24
copy
2 :8
corner
24:
correction
2:8, 20: 8,
20:22, 23: 3,
8 :3, 8 :6,
69:6
correctional
35: 3, 43:4,
43:7
corrections
93: 6, 93:23,
94:4, 94:7,
94: 2, 29: ,
43: , 43: 0,
44: , 47: 3,
47: 6, 48:7,
5 :4, 55:4,
57:22, 75: 0,
76:
correctly
64:
cost
4: 5, 36: 0
could
5:20, 9:6,
9:23, 23: ,
47:6, 48:4,

56:5, 69:4,
72: 0, 80:6,
84:20, 84:2 ,
04: 4, 07:3,
07:4, 3:5,
9: , 2 : 8,
27:8, 30: 0,
34:8, 40:4,
56: , 59: 5,
63:23, 69: 6
couldn't
50:3
counsel
5: 4, 5:4,
79: 5
count
23:8, 23: 5,
24: 3, 34:9,
24:24
county
32: , 52:20,
55:2, 55:6,
74: 5, 77:3,
94: 6, 94: 7,
94:20, 95:2,
95:6, 8: 2,
8: 7, 8:2 ,
9:4, 9:7,
2 :24, 24:4,
25:24, 28:8,
44:3, 44:7,
44:23, 45: 8,
45:22, 46:2,
46:5, 46: 7,
46:20, 47:3,
55: 8, 55:24,
56:6, 57: 9,
60: 7
couple
5:7, 56: 6,
56: 7, 58:8,
58: 2, 83: 5,
83: 6, 9 : ,
72: 6
couple-month
37: 7, 39:24,
40:8
course
7:22, 9: 7,

CCSAO COI SUBPOENAS 000201

Transcript of Gabriel Solache
Conducted on December 6, 2021

53

68:7
court
: , 5:6, 6:2,
55: 0
cousin
37: 4
cousins
67:23, 67:24
cover
33: 9
covid
90:22
coworker
84:2 , 7 :23,
72:3
coworker's
84:23
created
79: 2
crime
9:20
crimes
9: 2, 9: 7,
20:4
criminal
26:4, 26: 2
cristine
39:2
cross
33: 6, 36:2,
36: 0, 36: 4
crossed
29:5, 33:2 ,
34: , 34: 9,
37: 5
csr
79: , 79:22
culberson
3:24
currently
8: , 9:8,
: 7, 2: 4,
20:20, 9 :7,
35: 6
curtains
2: 5
custody
94:3, 94:7,

94:9, 94: 0,
94: 5, 94:23,
95:3, 44: ,
57:23, 58:2,
58: 9, 58:22,
59:2, 6 : 3,
6 : 8, 62: ,
62: 3
cut
69:5

**D**

d-i-a
80: 6
dad
37: 2, 45: 2,
47: , 47:2
dad's
37: 3
daffada
2:22
daniel
3:5, 4: 8,
6: 4, 67: ,
67:7, 67:9,
68:6, 68: ,
68: 9, 68:2 ,
69:22, 70: 6,
72: 5, 72: 8,
73:9, 76:7,
78:2, 78: 5,
78:2 , 80:
daniels
96: , 96: 6,
40: 3, 40:24,
4 : 4, 42: ,
42:3, 42:4
date
:22, 5:9,
7:2 , 8: 3,
27: 3, 32:8,
48: 5, 50:20,
52: 8, 78:3,
94:2, 0 : 5,
3 :2, 36: 5
dated
52: 9, 53:5,
65:8, 70:2

dating
05:8
daughter
3:2 , 6:22,
7:6, 8: 7,
8:23, 26: 7,
28: 5, 30:7,
40: 4, 4 : ,
4 :6, 4 : ,
43: 3, 85:22,
86:3, 86:5,
86: 6, 86:22,
87:2, 90: 7,
90: 9, 9 :23,
92:5, 92:7,
92: 7, 92:22,
24: 6
daughter's
7: , 7:2 ,
8: , 8:4,
26:23, 86:9,
90: 7, 02:24,
03:3
daughter-in-law's
02:20
daughters
56:20, 57: 5,
59:9, 69:4
david
3:3, 6: 5
day
7 : , 7 :22,
80: , 80:2,
89:9, 02:8,
02: 4, 05: 7,
05: 8, 4:8,
4: , 23: 0,
3 :20, 3 :2 ,
63: 3, 72: ,
73: 6, 73: 8,
75:6, 79: 9
days
75:2, 75:4,
78:6, 83: 5,
94:2 , 95: ,
95:23, 02: ,
62: 0, 63: 0
daytime
4: 5

de
9 :4
death
26:24, 43: 2,
60:5, 60:8,
60: 0, 60:22,
60:23, 6 : ,
6 :4, 62:2,
62:4, 62:5,
62:7
december
:22, 5: , 5:9,
94:5, 79: 9
decide
27:24, 29: 5,
34:23, 35:2,
50: , 03:9,
03:
decided
2 : , 2 : 3,
2 : 5, 3 : ,
47:2 , 48:2,
55: 3, 55: 7,
55:2
decision
36: 8, 43:7,
49:5, 49:8,
49: 2
declaration
76:4
declare
76:7
defendant
2: , 2:2 ,
3:3, 4: 8, 5:24,
6: 5
defendant's
4:2 , 68:
defendants
: 3, 2:30,
5: 9, 5:22,
6: 2, 6:5, 6:8
degree
92: 4
department
93: 6, 93:23,
94:3, 94:7,
94: 2, 29: ,

CCSAO COI SUBPOENAS 000202

Transcript of Gabriel Solache
Conducted on December 6, 2021

54

43: ,    43:9,
44:  ,    47: 3,
47: 6,    48:7,
5 :4,    55:4,
57:22
**deport**
97: 8
**depos**
5: 2,  6:3
**deposition**
: 7,  5:4,
5: 2,  22: 5,
22:20,  23:4,
25: 6,  5 : 2,
5 : 7,  78:7,
90:7,  90: 2,
26:24,    27:5,
62:24,    63:5,
74: 5,    74: 7,
75:7,    76:8,
76: 2,    77:
**deprived**
68:
**describe**
47: 8,  89:5,
04: 2,    04:23
**description**
4:9
**desire**
97:20,  98:2
**detail**
7 : 2
**detention**
93: 5
**develop**
67:20
**developed**
0 : 2
**dia**
80: 4,  80: 6
**die**
27:
**died**
26:20
**different**
46: 0,  47: 2,
57:4,    :4,
3: 4,    32:20,

39:4
**difficulty**
20:7
**direction**
79: 3
**directly**
8: 4,    8:22
**discoverable**
5:9,  5: 2
**discovery**
4:22
**discuss**
28:  ,  49:4,
49:7,    35: 9
**discussed**
89: 8
**discussing**
28: 3,    36:
**discussion**
49:  ,  90:4,
66: 5,    74: 3
**disoriented**
74: 7
**distinction**
69:
**district**
:  ,  :2,  5:6,
5:7
**divided**
56: 5,  57:6,
63:
**division**
:3,  5:7
**divorce**
: 3
**divorced**
49:
**dizzy**
74: 7
**doctor**
4:24,    5:3,
5:8
**doctors**
74:22,  76:3
**document**
4:  ,  97:  ,
65:6,    65: 2,
70: 9,    70:2 ,

7 :
**documents**
25: 5,  25: 8,
25: 9,  25:20,
25:23,    32: 2
**doing**
:3,  30: 5,
42:22,    30: ,
68:3,    7 : 3
**done**
22: 4,    42:20
**door**
2: 3
**doorway**
3:7
**dorsch**
42:7,    42:8,
42: 4
**doubt**
7:2
**down**
82: 8,    24:6,
24:24,    25: ,
25: 0
**downstairs**
07:23
**downtown**
96:3
**draft**
32: 9
**dream**
28:2
**drink**
7 : ,  7 : 5,
7 : 7,    08: 6,
08: 7
**drinking**
7 :3,  7 :23,
72:2
**drinks**
2:22
**drive**
3:6,  79: 7,
83:2
**driving**
74:2
**drop**
5: 3

**dropped**
5: 2,    5: 4,
5: 6
**drug**
92:
**drunk**
69:
**duly**
7:2,    79:2
**during**
78:4,  85:3,
95: ,  99:7,
05:2,    08: 3,
3: 7,    4:8,
4: 0,    4: 8,
6:3,    6:2 ,
24:20,    26:4,
26: 2,    37: 6,
39:24,    45: 5
_____
E
**e-c-a-t-e-p-e-c**
2:9
**e-n-g-q-u-i-s-t**
5:2
**e-r-u-b-y**
38:7
**each**
0:24,    4:  ,
39:9,    53: 8
**ear**
75: 4,  75: 5
**earlier**
32: 0,  40: 9,
95: 9,    04: 8,
6:8,    6:  ,
34: ,    45:4,
45:8,    60:3,
66: 5,    68:4,
68: 8
**early**
02: 5
**eastern**
:3,  5:7
**eat**
06:
**ecatepec**
2:8,  22:9,

CCSAO COI SUBPOENAS 000203

32:20, 39: 2,
39:2 , 40: ,
4 :4, 4 :6,
4 : 0, 4 : 4,
43: 2, 44:7,
44: , 44: 2,
44: 3, 44: 6,
44: 7, 54:2,
54:3, 65:23
**eddie**
56: 7
**eduardo**
3 :6
**education**
49: 4, 68: 2,
70:4
**effect**
79:4
**eight**
38: 3, 50:8,
69:22
**eileen**
2: 4, 5: 8,
20: 3
**either**
26:20, 40: 9,
45:20, 54: 2,
54:2 , 54:22,
55: , 55:2,
55:5, 55:6,
55:9, 79:8,
2 :3, 28:2,
28:3, 3 :2 ,
44:7, 44: 2,
47: 4, 54: ,
63: 3
**else**
8:23, 9:4,
3:22, 3:24,
7:9, 20:24,
29: 2, 30:7,
40:23, 4 : ,
50: 5, 56: 4,
58: , 58: 7,
59: 0, 66:2 ,
66:24, 72:2,
73: , 73:3,
73:7, 99:6,

99:8, 04:24,
07:24, 44: 8
**employed**
: 7, :20,
2: 4
**employee**
79: 5
**employers**
66:2
**employment**
3:
**end**
5:24, 20: 0,
34:20, 38:7,
5 : , 90:6,
02: 5, 26:23,
49:8, 62:23,
74: 4
**ended**
49: 3
**english**
6: 8, 6:20,
26:8, 26:9,
26: 0, 26: 2,
77: 5, 22:22,
23: , 26: 0,
30:9, 30: 5,
3 :3, 3 :8,
38: 9, 75:8
**english:**
66:6, 69: 6
**engquist**
2:33, 5:20
**enough**
28:4
**ensure**
79:9
**enter**
68:7
**entire**
76:8
**envelope**
4: 2, 9: ,
9:2, 28: 6,
29:3
**errata**
76: 2, 77:
**eruby**
38:7

**esq**
2:5, 2: 4,
2: 5, 2:23,
2:33, 2:34, 3:4,
3:5, 3: 3, 3:25
**essence**
6:
**esther**
98: 0, 98: 9,
33:23, 36: ,
38: , 39:5
**esther's**
98: , 37:24
**et**
: , 5:6
**evenly**
63: 0
**events**
7: 3
**eventually**
58:20
**ever**
9:3, 44:22,
48: 2, 57: 7,
68:2 , 86: 5,
89: 8, 95:2,
05:22, 4:23,
7:2, 20: 2,
2 :2, 23:4,
26: 0, 3 : 5,
3 :22, 3 :24,
33:4, 34: 8,
44: 3, 45: 7,
46:5, 47:2,
49: 7, 54: 0,
56:22, 57:22,
74:5
**every**
48:5, 89:9,
05: 7, 05: 8,
79:8
**everybody**
20:8, 06: 9,
25: 7
**everyone**
5 : 9, 6:22
**everything**
63: 9

**evidence**
7 :5, 20:24,
30:20
**exact**
8: 3, 50:20,
80:24, 8 :2,
02: 4, 36: 5
**exactly**
: 0, :23,
3:7, 4: 4,
24: 8, 32:8,
33:22, 38: 2,
40: 2, 44:8,
48:4, 48:6,
52:24, 60:7,
63:2, 63: 6,
72:4, 75:8,
76: , 93:9,
0 :3, 02:5,
03:8, 4: 9,
8:2, 8:8,
35:5, 39: 7,
39:2 , 43:5,
43:2 , 57:5
**examination**
4:4, 7:7
**examined**
7:3
**except**
76: 0
**exception**
5:22
**exchange**
99: 0, 99: ,
00:3
**exchanged**
42: 5, 42: 7
**excuse**
69: 4, 4 : 7
**executed**
76: 7
**exhibit**
4:9, 2 :7,
2 :8, 2 :9,
2 : 6, 26: 4,
26: 5, 26: 7,
27:8, 27: ,
28: 0, 28: 2,

CCSAO COI SUBPOENAS 000204

Transcript of Gabriel Solache
Conducted on December 6, 2021

56

30:2, 30:5,
3 : 5, 33: 0,
33: 2, 33: 5,
42:2 , 42:22,
50:20, 50:22,
5 :8, 53:4,
54: 3, 54:22,
55:2, 63: 7,
64: , 64: 5,
64: 9, 64:2 ,
67: 6, 70: ,
70: 2, 70: 5
**exhibits**
4:8
**exonerated**
40: 5
**expenses**
6: 4
**explain**
59:9
**express**
63:24

---
**F**
---

**facebook**
4: 6, 99: 3,
99: 8, 00: ,
33:20, 34: 0,
34: 2
**facility**
28:24, 58:
**fact**
27:3, 77:8,
89: 9, 54:7
**factory**
79:3, 79:5,
79: 0, 79:20,
79:23, 83: 0,
84:3, 6: 5,
6: 6, 6: 9,
68:3, 72:22,
72:24, 73:3,
73:8, 73: ,
73: 4
**factory's**
83:9, 83: 3
**facts**
7 :5, 20:23,

30: 9
**fall**
8: 5
**familar**
6 :2
**familiar**
59:23, 60: 8,
60:22
**family**
3: 8, 3: 9,
5: , 5:9,
6: , 32:23,
33:7, 45:9,
52:2, 6 :5,
88: , 88: ,
88: 2, 46:7,
46: 9
**far**
2:3, 35:8,
42:8, 48:7,
49: 4, 9 :7,
22: 3, 55: 0
**father**
37: , 45: 9,
45:20, 46:6,
46:9, 46: ,
46: 3, 46: 5,
46:22, 48: ,
49:7, 67: 8,
44: 9, 46:4,
46:5, 48: 7,
48: 8, 48:20,
48:22, 49:2,
49:8, 49: 3,
49: 7, 49:20,
49:22, 49:24,
50:2, 50:6,
50:7, 50: 7
**father's**
68:4
**father-in-law's**
03:
**february**
9:
**fee**
36: 3
**feelings**
20: 3, 20: 6,

20:20
**felt**
64:
**fernando**
67: , 67:2,
67:7
**few**
23: , 23: 2,
23: 4, 23: 5,
34:9, 39:20,
40: 2, 4 : 6,
43:8, 48: 6,
65:2 , 78:6,
87: 7, 90: 8,
95:23, 0 : 8,
07: 5, 07: 7,
07: 9, 07:2 ,
08: 7, 42: 5,
47:4, 5 :6,
56:23
**field**
66: 6
**fields**
38: 7, 44:6,
44: 9
**fight**
68:22, 68:24,
70:
**fighting**
58:9
**file**
75:2
**finances**
4:22
**financially**
79: 6
**find**
27: 8, 38: 4,
38: 6, 56:5,
63: 3, 87:20,
87:23, 88:6,
97: 2
**fine**
7: 5, 8: , 8:5,
00:20, 00:22
**fingerprints**
60: 9
**finish**
4:20, 30: ,

63: 8
**finished**
49: 6
**firm**
2:32
**first**
4: 8, 7:2,
9:24, 7: 8,
34: 9, 49:20,
52:5, 56:24,
57:3, 57: 9,
57:22, 58:5,
58: 8, 58:2 ,
62:3, 63: 3,
65: , 66:4,
75: , 84:7,
86: 9, 92:2 ,
93:5, 93: 3,
0 : 9, 09:2,
2:6, 20: 5,
22: 6, 33:2 ,
33:23, 42:24,
5 :8, 60: 4,
60: 8, 6 : 4,
6 :24, 62:2,
62:3, 73:2,
74:5
**five**
49:2 , 49:23,
25: 0, 63: ,
68: 8, 69:8,
69: 3, 70:
**fix**
75:2, 75:20,
82: 8, 22:6
**flip**
2 : 9, 22: 0,
22: 7
**floor**
3: 5, 56:24,
57: , 58:4,
58:6, 58:2 ,
66: 6, 66:20,
66:2 , 67: 0,
2:6
**flor**
7: 4, 7: 5,
7: 9, 8:4,

CCSAO COI SUBPOENAS 000205

Transcript of Gabriel Solache
Conducted on December 6, 2021

57

27: , 27: 5,
28: , 28:24,
30:6, 4 : ,
4 :5, 4 : ,
42:2, 43: ,
43: 2, 44: 0,
86:24, 87: ,
87:6, 87:9,
88:3, 88: 6,
88:20, 88:23,
47:3
**follow-up**
76: 4, 76: 6,
76:23, 76:24,
77:2, 77: 0,
77:20, 90: 8
**following**
52: 3, 72: 0
**follows**
7:3
**fonseca**
3:35, 6: 7,
5 : 5, 90: 0,
27:3
**fonseca:**
9:20, 63:3
**food**
2:2 , 2:22,
99:2, 05:2 ,
66:24, 67:7,
67:8
**force**
79:4
**foregoing**
75:7, 79:5,
79:7
**forehead**
69:7, 73:2 ,
75:3, 75:2
**forgiveness**
43: 2
**forgotten**
36: 9
**form**
8:20, 22:22,
28: 7, 29:20,
33:23, 44:2 ,
63:8, 7 :4,

77: , 86: 0,
93: 7, 97:22,
08:5, 08:8,
5:23, 20:5,
52: , 6 :20
**forth**
82:6, 83:3,
84: 3, 84: 8,
79:7
**forward**
63:9, 63: 5
**found**
88:4, 7: ,
9:24
**foundation**
28: 8, 42: 0,
87: 0, 20:5,
24: 2, 46: 0,
47:7, 52: ,
53:24
**four**
48:5, 48:9,
92:6, 34:9,
35:4, 39: 8
**franklin**
3:26, 79:2,
79: , 79: 6,
79:23, 6: 6
**friday**
2 : 8, 23:22,
24:
**friend**
00:2, 00:5,
04:24, 06:4,
06:7, 06: 0,
06: 3, 34: ,
34:8, 52:23,
53:8, 54:2,
54:5, 55: 5,
73: , 73: 4,
73: 9, 74:3
**friendly**
62: 0, 7 :20,
89: 0, 89: 5
**friends**
63:4, 72:9,
98:4, 98:6,
0 :8, 0 : 4,

0 : 5, 33:20,
44:22, 46: 6,
72: 6, 72: 9,
72:23, 73:3,
73:8, 73: 3,
73: 7
**friendship**
62: , 0 : 2,
05: , 05: 3
**front**
69:2, 70:23,
72: 5, 72: 9,
2 : 5, 65:2
**full**
79:4
**function**
99: 8
**further**
68: 2, 7 : 7,
79: 4
**fusco**
2: 3

**G**

**g-r-i-l-l-o**
25:
**gabriel**
:5, : 8, 4:3,
4: 7, 5:4, 5: 7,
7: , 5 : 2,
5 : 7, 68:5,
90:7, 90: 2,
26:24, 27:5,
62:24, 63:5,
74: 5, 76:23,
78:24
**gang**
58:3
**garcia**
:28, 6:3,
52:23, 52:24,
79: , 79:22
**gave**
57:3, 7 :23,
72:3
**generally**
8:3, 8:9
**gentleman**
08: 8

**gerardo**
57:7, 57:9
**get-together**
72: 2, 72: 3
**getting**
4:24, 22:20,
25: 6, 78:7,
8 :
**girl**
53: 3, 54:7
**give**
5: 4, 76: 7,
9: , 9: 6,
2 : 3, 26:
**given**
6:22, 7:2,
7:5, 59:2
**go**
22:2, 22:3,
28: , 28:5,
28:7, 28: 5,
29: , 29: 9,
3 : , 35:2,
36: 8, 38:4,
39: 8, 40: 0,
4 : 9, 42: ,
43:7, 45:23,
46: , 5 :2 ,
70:24, 74: 4,
76: 8, 76:2 ,
77: , 77:2,
77:5, 77:2 ,
85: 4, 86:20,
9 : 6, 9 : 8,
92: 3, 93:6,
94:8, 95: 3,
95:24, 96: 6,
97:20, 98:2,
08:7, 2:2 ,
3:5, 3:6,
6:9, 6: 8,
2 :6, 22: 5,
22: 6, 22:2 ,
23:2 , 24:24,
25:9, 25: 0,
35:7, 37: 3,
38:6, 39:7,
39: , 40: 2,

PLANET DEPOS
888.433.3767 | WWW.PLANETDEPOS.COM

CCSAO COI SUBPOENAS 000206

42:6,   43: 4,
48:24,   52: 5,
53:3,   55:9,
56: 0,   62:8,
65: 4,   65:23,
67: 5,   69:2 ,
70:9,   70:   ,
70: 8,   7 : 6,
72: 9,   72:23,
73:5,   73:9,
73: 3,   73: 7,
73:20
**goal**
85: 7
**goes**
5 :2 ,  67:7,
75: 6
**going**
4:23,   5:3,
5:7,   5: 7,
8: 9,   9: 8,
9:23,   22:7,
22:8,   22:2 ,
23: 3,   28:2 ,
30:   ,  39:22,
4 :24,   42:3,
42: 9,   43:2,
43: 8,   50:6,
5 :2 ,   57:9,
70: 0,   70:   ,
77:9,   90:2,
97:24,   98:5,
00: 6,     :2 ,
4:7,   5: 0,
5: 9,   7:4,
7:8,   20:22,
2 :7,   2 : 8,
22:9,   26: 5,
26:22,   3 : 0,
38: 8,   4 : 7,
5 :5,   55:4,
58:8,   59: 7,
63:9,   63: 4,
63: 6,   68:20,
69:7,   74: 5
**golden**
2:34,   5:20,
5:22,   6:4,

**6:7**
**gone**
42: 6,   2 :20
**gonzalez**
36:8,   36:9,
36: 0,   37:6
**good**
7:9, 7: 0,
47:20, 5 :9,
55: 6, 55:20,
3 :7,   32:9
**gotten**
63:7
**governor**
43:   ,  43: 2,
60:5,   60:9,
6 :3,   62:6
**grabbed**
73: 3, 73: 5
**grade**
69: 0,   69: 2,
69: 4,   69: 9,
69:2 ,   70:
**grades**
69: 4,   69: 8,
69:22
**grandma**
46:7
**grandmother**
30:9, 33:4,
39:2 , 39:24,
40:4, 45:8,
46: 6, 46: 8,
46:20,   50: 4,
50: 7
**grandmother's**
30:5, 30:8,
3 :9, 33:6,
39:8, 39: 3,
39: 7, 40: 0,
40: 5, 40:22,
4 : 5, 45:5,
62:
**granted**
43: 2,   59:2
**great**
2 :23
**great-great**
45:7, 46: 7,

46:20
**greeting**
05: 9
**grillo**
25: 0
**group**
36: , 98:2 ,
40: 7
**grow**
45:3, 45:5
**guadalupe**
56: 9, 57: 4,
59:2, 59:5,
59:8, 59: 2,
64: , 64:4,
64:23, 65:
**guadalupe's**
69:4
**guess**
93: 6, 98:   ,
32: 0
**guevara**
2:2 , 5:22,
6: ,   6:9
**guy**
59: 4, 59: 5,
59:20, 74:3,
74:7

---

**H**

---

**hand**
2 :7
**handed**
2 : 2
**handwriting**
27:20,   29:3,
29:4,   5 :22,
5 :23,   55:7
**handwritten**
4: , 4: 3
**happen**
96:22
**happened**
7: 3, 58:24,
69:23, 72: 4,
73:24, 76:9,
37: 6,   46:7,
58:23

**happy**
5:24
**hard**
23:24
**hardly**
4:
**head**
75:9, 75: 7,
76:4, 78:2,
78:20, 80:9,
6: 9
**hear**
26:24
**heard**
32: 2, 33: 0,
63: 8, 63:22,
8 :6
**hearing**
20:7
**heather**
3:20, 6: 3
**held**
44:5
**help**
6:   ,   6:23,
22:   ,   36:2,
98:24,   99:6
**helped**
3: 9, 98:23,
9: 8,   20:3
**here**
5:3,   3:   ,
20:8, 20:2 ,
2 :7, 2 : 6,
5 : 6, 5 :23,
69:5, 69:6,
70: 0, 75: 4,
27:4,   5 :22,
63:4,   63:8
**hereby**
75:6,   79:
**herein**
79:6
**hereof**
76: 2
**hernandez**
98: 0, 98: 9,
33:24,   36:   ,

CCSAO COI SUBPOENAS 000207

Transcript of Gabriel Solache
Conducted on December 6, 2021

59

36:22, 37:22, 37:24, 39:5
**hernandez's**
38: , 38:2
**herself**
46:3, 06:2
**hi**
6 : 7
**hidalgo**
9 :4, 03:7
**high**
49: 9, 68: 8, 69: , 69:2, 69:8, 69: 0, 69: 3
**himself**
3:
**hinojosa**
38:
**hinshaw**
3:24
**hispanic**
84:8
**hit**
73: 8, 74: 6, 76:4, 78:2, 80:9
**holder**
79:3
**holds**
92: 4
**home**
38: , 76:22, 77: 6, 77: 8, 77:22, 86: 5, 5:20, 7 :23, 7 :24, 72:3, 72: 2, 72: 5
**hopefully**
20:9
**hoping**
9: 6
**horacio**
82:4, 82: 8, 07:22, 07:23, 24: 6
**horacio's**
08:4, 08:9, 08: , 09:3,

09: 5, 09:20, 0: 4, 0: 8, 0:2 , 0:23, :2, :5
**hospital**
69: 2, 69: 6, 69:2 , 74: , 74:2, 74: 2, 74: 4, 74: 9, 75:4, 75:24, 76:2, 76:9, 76: 4, 77:3, 77:4, 78: 6, 5: 7
**hot**
78:5
**hotel**
93:7, 93:8, 95: 5, 95: 6, 95: 8, 95:22, 96: , 96:5, 96:7, 96: 0, 96: 5
**hotels**
99:4
**hour**
2:4, 24:3, 9 :8, 6: 0, 63: 0
**hours**
24: 3, 24: 4, 48:9, 4: 5, 4: 7, 6:7, 63: 2, 63: 3, 72: 6
**housed**
28:24
**houses**
07: 9, 07:2
**humboldt**
37:
**hung**
7 :23
**husband**
62: 2, 9 :24, 98: 0, 98:20, 38:
**husband's**
03:3

**I**

**i-r-e-n-e**
3 :5
**i-s-l-a**
3:3
**ice**
93: 5
**idea**
35: 0, 86:23, 5:2 , 20:9, 20: , 20:20, 3 :6
**identification**
2 : 0, 26: 8, 28: 3, 30:6, 33: 3, 50:23, 54:23, 64: 6, 70: 3
**identify**
5: 4
**ignore**
7:9
**ignored**
7:7
**illinois**
:2, 2:7, 2: 8, 2:26, 2:37, 3:8, 3: 6, 3:28, 5:7, 93: 6, 93:23, 94:3, 94:7, 94: , 28:20, 28:24, 42:24, 43:9, 44: , 47: 2, 47: 5, 48:6, 5 :3, 55:4, 57:2
**immediately**
38:22, 73:2 , 94: , 62:8, 62: 0
**immigration**
94:9, 94: 4, 94:22, 95:3, 97:3, 97:5, 97: 2, 36: 6, 39:22, 39:23
**important**
7:

**incarcerated**
55:3, 55:7
**incident**
69: 3, 70:20, 7 :22, 72:3, 78:8, 78: 5, 80:3
**included**
36: 3
**including**
93: 5
**income**
5:9, 5: 0, 66:
**index**
4:
**indicate**
78: 6
**indicated**
76:
**indicating**
69:5, 75: 4
**individual**
2:30, 5:2 , 72:6
**individuals**
0: 3, 4 :8
**indust**
67:7
**industry**
66:24, 67:8
**information**
9: 2, 9: 5, 65:5
**inherently**
79: 0
**initialed**
75: 2
**injured**
69:9
**injury**
78:20, 6: 9
**inmates**
40: 7
**innocence**
34:2
**innocent**
98:22

CCSAO COI SUBPOENAS 000208

Transcript of Gabriel Solache
Conducted on December 6, 2021

60

instead
77:22
instruct
4:23
instructing
32: 6
intention
55:24, 56:2,
86:2 , 87:
interacted
05:7
interested
79: 6
interference
79:
interpose
20:22
interpretation
7:6, 9:20,
5 : 5, 60:2 ,
74:5, 2:2,
47: 9
interpreter
6:4, 0: 0,
2:7, 9:5,
9: 5, 23: 0,
23: 2, 23: 3,
30: , 30: 3,
30: 4, 3 :5,
47:5, 47:7,
47: , 49: 7,
49: 8, 57:9,
57: , 57: 2,
60:24, 6 :5,
65: , 65: 4,
67: 5, 69: 7,
69: 8, 70:3,
70:4, 70:8,
80: 5, 8 :4,
8 :5, 98: 4,
00:9, 02:23,
09: 9, 09:22,
0: , 0: 9,
0:22, : 2,
: 5, 4:7,
4:9, 26: 9,
29: 6, 29: 7,
33:8, 38: 6,

38: 8, 40: 9,
4 :20, 42: ,
42:4, 56: ,
56: 4, 59:7,
59:8, 6 : ,
68:20, 68:24,
69:6, 69:7
interpreter's
00: 4
interpreters
3:35, 20:7,
20:
interpreting
36:5
interpreting:
90: 0
interrogatories
4: 9, 4:2
interruptions
79:
interspersed
22:4
investigator
56: 7
invited
7 :2, 7 :9
irene
3 :4
isla
3: , 3:6,
3: 0
island
80:23, 8 :6
issues
79:
italia
7: 4, 7: 6,
7: 9, 8:5,
27: , 27: 5,
28: 2, 28:24,
30:6, 4 : ,
4 :5, 4 : ,
42:2, 43: ,
43: 3, 44: 0,
86:24, 87: ,
87:6, 87:9,
88:3, 88: 6,
88:20, 88:23,

47:3
itcoatl
3:34
itself
57:8
itzcoatl
5:

**J**

jackson
2:35
jail
32:2, 47:4,
47:6, 47:9,
52: 9, 52:20,
55:2, 55:6,
94: 6, 94:20,
95:2, 95:6,
98:23, 0 : 7,
0 :2 , 7: 3,
8: 2, 8: 5,
8: 8, 8:2 ,
9:4, 9:7,
22: , 24:4,
25:24, 28:8,
34:8, 34:24,
35: 2, 36: 6,
37: 8, 38:8,
39:22, 40: ,
40:9, 4 : 2,
44:3, 44:7,
44:23, 45: 8,
45:22, 46:2,
46:5, 46: 7,
46:20, 47:3,
47:6, 55:24,
56:6
jan
2:5, 5: 6,
20:3, 74: 2
january
52: 9
jaqueline
29:7
jasmin
66: 0
jasmine
62:20, 64: 6

jay
4 : 5
jessica
2: 5
jgs
33:23
job
38: 4, 38: 6,
38:2 , 44:5,
44: 7, 79:7,
79: 6, 79:22,
80:2, 80: 2,
67:2
jobs
28:3, 44:4,
44: 5, 44: 8,
80:5, 80: 0,
67: 2
johnson
29:7
join
5:4
jorge
56: 9, 56:2 ,
57: 4, 59:8,
59: 2, 64: 2,
64: 5, 64: 9,
64:22, 65:2,
66: 2, 79:8,
79: 9, 79:20,
06: 3
jose
3:35, 6: 7,
9:20, 5 : 5,
84:24, 90: 0,
27:3, 35:8,
38: 0, 38: ,
38: 2, 38: 7,
38:20, 4 : 0,
63:3, 72:5
josh
2:33, 5:20
juan
34:5, 34: 6,
35:8, 39:2
juarez
9 :4
juliana
52:22

CCSAO COI SUBPOENAS 000209

july
8:7, 78: 6,
92:6, 02: 5
june
02: 5, 24:3
junior
49: 9, 35:9,
69:2, 69:8,
69: 0, 69: 3
justice
98:22

**K**

kankakee
94: 6, 94: 7,
94: 9, 95:2,
95:6, 0 : 7,
0 :20, 34:24,
37: 8, 40: ,
40:9
karen
96: , 40: 3,
4 : 4, 42: ,
42:3, 42:4
karin
3:2 , 6: 2
keep
99:9, 26:22,
46:24
keeping
9:24
kidnapping
33:3, 46:9
kids
9 :22
kind
2: 6, 38: 6,
5 : 9, 74:24,
79:4, 8 :22,
82:24, 05:8,
7:24, 8:3,
24: 7, 37:3,
5 : 6, 58:5,
64:2, 66:2 ,
68:8
king
58: 8
kings
58:5, 58:6,

62: 8
kitchen
57:4
knew
29: 3, 42:8,
56:3, 60:2,
60:3, 60: 5,
6 :2 , 62:5,
62:6, 66:6,
66: 2, 04: 6,
0: 7, 0:20,
8: 7, 52:9
known
3 : 0, 60:22,
63:3, 64:6, 66:5
knows
5 :20

**L**

l-e-i-n-e-n-w-e--
b-e-r
5:24
la
3: , 47:5
language
6: 8, 6: 9,
6:20, 75:5,
75:8
lasalle
2:24
last
9:22, 2:5,
23:3, 23:7,
23: 8, 3 : 8,
32: , 37:8,
37:24, 46: 0,
59:2 , 60:4,
60: 6, 6 : 4,
78:6, 80: ,
88: 9, 97:7,
04:4, 3 : 8,
34: 5, 53:3,
56: , 64:2 ,
65: 5, 65:22,
70: 8, 7 : 8
late
63: 2
later
5: 8, 36:9,

59: 4, 75:2,
82: 9, 5: ,
59:5, 59:22,
62: 0
latin
58:5, 58:6,
58: 7, 62: 8
latinos
58:4
law
2:4, 2:32
lawyers
32: 5
learn
27:8, 65: ,
95:2, 06: 7,
09:9, 0:6,
0:9, 0: 6
learned
32: 4, 07: ,
4:22, 50:
leased
40:
least
63:9
leave
8: 0, 27:24,
28: 5, 3 : ,
55: 3, 55: 7,
96: 8, 96:22,
97: 6, 6: 0,
63: 3
left
9: 7, 8:23,
27: 6, 29: ,
29: 9, 29:2 ,
29:24, 38:22,
39: 8, 40: 0,
40:22, 4 : 9,
42: , 42:23,
45:22, 50:2 ,
68: 6, 68: 7,
69:7, 76: 9,
77:7, 77: 6,
90: 5, 92:23,
93: , 93:2,
93:5, 93: 4,
93: 8, 98:22,

36: 6, 37: 8,
48:24, 49: 6,
64:2
left-hand
52: 6, 55: 0
leinenweber
2:22, 2:23,
5:23
lent
36:23
leobardo
59: 6, 59: 7,
65:4, 65:7,
65: 8, 66:5,
74:3, 74: ,
79:9, 82: 9,
82:23, 06: 0,
44:24, 45:2,
45:3, 45: 0,
45: 5
less
24:3, 9 : 4
let's
70: , 04: 0,
2 :6, 28: 0,
30: , 33: 0,
50:20, 54: 3,
60: 5, 64: ,
70:
letter
4: 0, 8:20,
20: 4, 20: 7,
20: 9, 2 :3,
2 :5, 22:24,
23: 3, 29:6,
30:9, 30: 7,
3 :4, 3 :6,
32:22, 53:22
letters
4: 3, 7:2 ,
7:24, 8:4,
8: , 9:9,
2 : 7, 2 :22,
2 :24, 22:4,
23: , 23: 8,
25:23, 26: ,
30: , 46: 9,
46:22, 46:24,

CCSAO COI SUBPOENAS 000210

47:4, 47:5,
47:22, 48:4,
48: 0, 48: 2,
48: 4, 48:20,
48:22, 53: 8,
54:2
**level**
56:24, 57:2,
57:3, 58: 3
**levels**
56: 6, 57:7
**license**
83:22
**life**
3 : 3, 44:22
**lilia**
3 :3
**linda**
24:7, 24: 0,
24: 5, 24: 6,
24: 8, 24:20
**line**
25:9
**lines**
24:6, 25: ,
25: 0
**list**
4: 5, 5 :2 ,
52: 8, 53:4,
53: 5, 53: 7,
54: 5, 57:2,
57: 7
**listen**
9: 4
**lists**
5 :3, 55:3
**litigating**
5:24
**little**
3:9, 20:7,
20: 0, 40:20,
4 :23, 62:5,
93: 2, 96:8,
96:9, 04:6,
04: 0, 6:8,
3 :4, 62:6,
63: 5
**live**
8: , 8: 6,

8:23, 9: 2,
:22, 4:5,
8:5, 22:7,
22:8, 27:2,
29: 8, 32: 5,
34: 8, 34:22,
37: 7, 37:20,
38: 0, 4 :5,
44:7, 45: 0,
46: 6, 48: 2,
48: 4, 48: 7,
53:4, 54: ,
57: 7, 57:20,
57:23, 58: ,
58: , 59: 0,
68: , 72:8,
74: 0, 86:22,
87: , 90:24,
9 :2, 9 :7,
03:5, 03:6,
07:23
**lived**
8: 3, 8: 7,
8: 8, 9:3, 8:8,
29:4, 37:3,
38:8, 39:20,
39:24, 40:4,
4 : 3, 45:7,
45:9, 45: ,
45: 3, 50:9,
53: 2, 54:4,
56: 4, 57: ,
58:6, 58:8,
60:7, 60: 0,
62: 6, 62: 9,
69:4, 7 : 5,
7 : 9, 72:6,
72:7, 74:8,
84:22, 85: ,
92:24, 05: ,
07: 8, 07: 9,
07:2 , 08:2 ,
09: 5, 09:20,
09:24, 0: 4,
:5, 50:6,
72:7
**lives**
:24, 32:23,

33:2, 54:2,
9 :3, 72:6
**living**
: 5, :20,
22:5, 22:9,
22: 2, 27:2 ,
28:24, 30: ,
30:3, 30:5,
30:7, 32:20,
34:20, 34:24,
38:7, 39:7,
39: 0, 39: 7,
40:9, 40: 4,
40: 7, 40:2 ,
40:23, 4 :2,
4 :3, 4 : 0,
4 : , 43:5,
43: 2, 44: 3,
5 :2, 58:5,
58: 4, 58: 7,
59: , 59:6,
59: , 6 : 0,
6 : 2, 6 : 3,
62: 7, 63: 5,
64: 6, 66:9,
66:2 , 66:24,
67: 0, 69:2,
70:2, 70:6,
70: 7, 97:23,
05:3, 05: 6,
06: 7, 07:23,
08:4, 2:7,
2: 2, 2: 9,
34: 7, 65: 7
**llc**
2: 3
**located**
36:23
**loevy**
3: 2
**log**
4: 4, 32: 2,
32: 8
**logs**
5 :3
**long**
8: 3, 0:8,
0: 3, :7,

3:6, 7:24,
8:7, 2 :2 ,
23:24, 24:2,
24: , 25: ,
29:3, 29:7,
3 : 0, 38: 0,
39:5, 39: 7,
40:9, 4 :8,
43: 6, 43:22,
44:7, 44:8,
53:6, 54:4,
63:2, 68: ,
75:23, 75:24,
77: 7, 79:22,
83: 2, 94:20,
95:22, 96:7,
3:24, 8:7,
58:2 , 59: 6,
60:2
**longer**
70:5, 96:9,
04:6, 63: 5
**look**
2 :6, 2 : 8,
22:9, 24:6,
26: 5, 27:8,
28: 0, 30:2,
3 :2, 33: 0,
50:20, 54: 3,
55:2, 63: 7,
64: , 7 :4
**looking**
03: 7, 5 :2 ,
55:6
**looks**
28: 5, 52: 9,
53:4
**lorenza**
3 :2
**los**
:24, 5: ,
5: 3, 20:2 ,
2 : 2, 2 : 7,
23: 9, 23:22,
24: , 36: 6,
36: 7, 37: 8,
38:5
**lose**
73: 9, 86:2

CCSAO COI SUBPOENAS 000211

Transcript of Gabriel Solache
Conducted on December 6, 2021
63

lost
85:23, 86: ,
87:4, 66: ,
66:9
lot
76: 9, 77: ,
77:6, 77:9,
77: 4, 77: 6,
83:9, 83: 3,
84: 0, 98:23,
0 :5, 7: 5
loud
99: 5
loved
2 :3
low
03: 6
lucas
:24, 5:
lunch
5 :22, 90: ,
90:9, 90: 6
lying
7: 2

**M**

m-a-y-a
38:3
m-e-c-a
65: 2
m-e-d-a-r-d-o
67: 5
m-o
97:8
m-o-n-i-e
97:9
m-o-n-t-e-s
25:2
machine
79: 2
mad
87:8
made
5:4, 36: 7,
09: 2, 8:24,
75: , 79:9
mail
8: 6, 8:23

mailed
29:23
main
56:24, 58:4,
58:6, 58: 3,
66: 6, 66:20,
66:2 , 67: 0
maintain
50:2
maintenance
6: 6, 6: 8,
6:20
majored
92: 0
make
2:8, 4:23,
20: 8, 20:22,
23: 3, 28:4,
28:8, 28: 6,
43:7, 79:5,
33:4
makes
6 :
making
66:
makowsky
00:3, 00:5,
00:24, 0 :9,
0 : 2, 0 : 7,
0 :20, 02:4,
03:2 , 04:5
mall
0: 9, 0:20,
0:22, : ,
:3, :6
man
09: 4, 09: 9,
09:24
manufacturing
66:24, 67: 2
many
22: 9, 23:6,
24: 4, 25:7,
25:23, 28:3,
30:22, 34:7,
40: 3, 53: 0,
75:4, 98:4,
02: , 04: ,

3:2 , 35:6,
45: 0, 45:23,
45:24, 47:5,
52:4, 52: 3,
56:24, 69: 4,
69: 8, 73:8,
73: 7
march
7 : 4, 7 : 8,
7 :22, 72:20,
73:9
margarita
3 :3
marked
2 : 6, 33: 3,
50:23, 63: 7,
64: 8
marks
5 : , 90:6,
26:23, 62:23,
74: 4
marriage
22:
married
9:8, 9:9, 9: 0,
:8, : 9,
7:9, 7: 5,
32: 9, 32:2 ,
63:7, 63: 4,
63: 6, 64:23,
65:2, 9 :2 ,
9 :23, 92:2,
92:3, 09:7,
09: 0, 09: 3,
09: 4, 09: 9,
09:23, 0:7,
0: 7, 0:2 ,
0:22, 0:23,
65: 6
marriott
5: 3
martin
59: 5, 59:20,
59:23, 60:4,
60: 5, 6 : 0,
6 : 5
martinez
9: , 9: 2,

25:8, 38: 2
mask
20:6
matter
5:5, 27:3,
76:9
mauricio
3 :2, 33:3,
52: 5, 52: 6,
52:23, 53:2,
53:4, 53:6,
53: 2, 53: 4,
54:7, 54: 3,
54: 6, 54:22,
55: , 55:5,
55:9, 55: 5
maya
38: , 38:2
maybe
5: 0, 4 :23,
48:2 , 70: 2,
08: 6, 0:2,
52: 9, 63:23
maysonet
35:9, 35: ,
35: 6, 35: 8,
35:22, 36:4
maysonet's
36:8
meal
05:23
meals
05:20
mean
2:2 , 29:20,
03: 5, 05:7,
05:8, 07:5,
3:5, 3: 9,
23: 4, 65:
meaning
6 : , 6 :2,
6 :3, 68: 6
means
70:24
meca
65:
medardo
67: 4, 67: 7

CCSAO COI SUBPOENAS 000212

media
5:3, 5 : 2,
5 : 6, 5 :20,
90:6, 90: ,
26:24, 27:4,
5 : 7, 62:24,
63:4
medical
78:8, 78: 4
medications
8:8
meet
9:24, 0:9,
0: 4, 0: 6,
0: 8, 23:2,
23:6, 23:2 ,
23:24, 24:8,
24: , 24: 5,
24:22, 25: ,
25:4, 44: 0,
00:6, 34:20,
36: 2, 36: 4,
36: 7, 37:5,
37:6, 38:9,
57: 4
meeting
37:3, 38: 3,
38:2 , 38:22,
40: 4, 4 :9
meetings
25: 3, 37: 4,
39:8
mejia
56:9, 56: 9,
56:2 , 58: 2,
59: 6, 59: 7,
64: , 64: 2,
65:4, 79: 9,
82:2, 82:4,
82:23, 04: ,
07:22
mejia's
58: 5, 24: 6
mejias
56: 8, 58: 0,
07: 8, 07:20
member
6 :6, 98:2 ,

36: , 36:22,
54:7
members
52:2
memphis
39:20, 40:2,
40:5, 40: 2,
40: 6, 4 : ,
4 :9
mendiola
5 : 0
mentioned
09:
messages
99: 0, 99: ,
00:4
messenger
99: 2, 99: 6,
99: 8, 99:24
met
:2, :4,
:7, 23: 9,
24:5, 24: 9,
60:9, 62:3,
66:4, 0 :24,
34: 8, 35:2,
35:6, 35: 2,
35: 3, 35: 8,
36: 0, 36:2 ,
38: 2, 38:20,
39: 6, 39: 9,
40: 6, 4 :8,
55: 8, 56:2
metal
82: , 82: 4,
83:4, 7 : 9
mexican
93: , 95: 4,
97: 5, 56: 2,
56: 6
mexico
:24, 5: ,
0:2, 0:6,
0:9, 0: 3,
3: , 3: 4,
6:2 , 7:2,
8: 0, 27:4,
27:24, 28:2,

28:3, 28:6,
28:9, 29:4,
29: 8, 38: 9,
42: , 45:22,
47:22, 48:8,
48: 2, 48: 4,
49: 5, 53: 4,
53: 5, 55: 3,
55: 7, 63:4,
65: 0, 85: 4,
86: 5, 86:2 ,
88:24, 90:20,
92:22, 96: 7,
02:9, 02: 2,
02: 8, 37: 9,
40:2, 40: 0,
48:24, 65: 7,
66: 6
michael
3:25, 6:
michoacan
30:2, 30:4,
40:5, 45:4, 53:5
middle
49: 8
might
4 :22, 78: 0,
89:24, 57:5
milwaukee
2:6
mine
4:7, 2:22,
34:8
minute
70:7, 92:24,
54: 5
minutes
5 :2 , 5 :22,
9 :8
miscellaneous
2: 7, 2: 9,
2:20
misheard
4 :2 , 4 :24
misnumbered
7 :5
missed
67: 9

misstates
36: 9, 40:2
misunderstood
40: 9, 4 :23
mom
3:23, 40: 6,
45: 2, 45: 6,
45:22, 47: ,
44: 4, 50: 0
moment
59: 3, 70: 0
monday
5:
money
4: 9, 4:24,
5: , 6:22,
7: , 7:4,
28:4, 28:8,
28: 6, 36:24,
50: , 85:4,
85:7, 85: 3,
85: 7, 86: 5,
86:20
monie
97:6, 97:8,
97:
monitor
5: 0
montanez
38:3, 38: 0,
38: , 38: 2,
38: 5, 38: 7,
38:20, 4 :
montes
25:2, 25: 0
month
88:22, 9 : 3,
9 : 5, 96:9,
04:6, 04:7
monthly
6: 4, 6: 8
months
8: 4, 8: 5,
8:24, 27:6,
38: 3, 48:5,
48: 6, 49:2 ,
49:23, 50:8,
50: 4, 65:2 ,

PLANET DEPOS
888.433.3767 | WWW.PLANETDEPOS.COM

CCSAO COI SUBPOENAS 000213

83: 6, 90:2 ,
9 : 2, 96:8,
96: 4, 68: 8,
69:8, 69: 3,
70:

**more**
20: 0, 24:3,
25:5, 25:6,
57:2, 60:22,
90: 8, 9 : 3,
9 : 8, 96:8,
04: 4, 05: 2,
42:22, 59: 6,
6 :2 , 63: 0,
70:4

**morning**
7:9, 7: 0,
2 :23

**most**
7: , 25: 9

**mother**
7:2, 7: 3,
8: , 8:4,
27: 0, 37: 0,
40: 7, 45: 7,
45: 9, 45:20,
46:9, 46: 2,
46: 5, 47: 9,
47:24, 48: ,
48: 7, 49:4,
67: 8, 67: 9,
67:2 , 86:6,
86:9, 90: 7,
02:24, 46:2,
48:8, 48: 0,
48: 2, 48: 5,
49: 9, 50:3,
50:7, 50: 7

**mother's**
68:2, 65:22

**mount**
5: 5, 5: 7

**move**
9: 4, 9: 6,
0:2, 3: 3,
5: 9, 9: ,
28:22, 29:24,
39: 6, 4 : 4,

45:20, 47:2 ,
48:2, 49:5,
49:8, 49: 2,
50:9, 50: ,
52:7, 52: 6,
53:20, 54: 3,
54: 6, 54: 9,
55: 4, 55: 8,
55:2 , 55:24,
56:2, 56:8,
58:2 , 68: 4,
02:8, 02:9,
07: 0

**moved**
0:5, 0:8,
0: 3, 6:2 ,
7:2, 8: 8,
8:20, 38: 8,
4 :24, 43:9,
44: 2, 44:24,
49: , 50: 8,
5 : , 5 :6,
52: 2, 52:23,
53: 8, 54:7,
54: 0, 56: ,
56:7, 56: ,
58:5, 58: 8,
59:2, 59:4,
59:8, 59: 5,
60: , 60:2,
60: 7, 62: 3,
63: , 63: 7,
63: 8, 63:2 ,
63:22, 64:2,
64:9, 64: 0,
64: 3, 64: 8,
65:5, 65:22,
66: 5, 66:20,
70: 9, 78: 2,
78: 9, 86:3,
86:9, 86: 8,
87: 5, 87: 8,
88:24, 02: 2,
02: 9, 04: ,
04: 5, 04:22,
07:8, 07: 3,
08:20, 08:23,
2:5, 4:4,

6:3, 43: 0
**moving**
6 :2

**mozart**
56: 2, 56: 4,
62: 3, 64:2,
64: 3, 64: 9,
65:5, 67: ,
70: 7, 8 : 7,
82: 4, 04: 6,
06: 7, 2:5,
72:7

**much**
4: 5, 6: 7,
6:22, 7: ,
7:4, 9:24,
3 : 6, 36: 0,
53: 2, 68:9,
85:4, 95: 0,
02: , 64:9

**murders**
33:3, 46:9

**myself**
30: 0, 3 :3,
06: , 73: 9

**N**

**n-o-r-f-o-l-k**
5: 5

**name**
5: 6, 9: 9,
9:22, 2:24,
7: , 7: 4,
27:7, 27:8,
27:9, 30: 8,
34: 4, 37:6,
37:8, 37:24,
39:2, 59: 4,
59: 6, 59:2 ,
60:4, 60: 3,
60: 5, 60: 6,
62: 8, 66: ,
66:24, 67: 4,
68:2, 68:4,
74:3, 74:7,
79:2, 80: 3,
84:4, 84:6,
84:8, 84:23,

95:20, 96:5,
97:6, 97:7,
97: 0, 98: ,
98: 2, 00:2,
07:20, 0:4,
:7, 26:6,
27: 9, 28: 6,
35:8, 36:8,
36:24, 37:22,
38:2, 38:7,
38: 6, 38:23,
38:24, 39: ,
42:6, 5 : 0,
52:22, 53:5,
53: 4, 53: 7,
54:3, 54:8,
55: 4, 56: 2,
56: 4, 56: 6,
57:7, 57: 6,
58:4, 58: 4,
64:22, 65:20,
65:22, 72:4,
79: 8

**named**
59:20, 29:7,
34:5

**namely**
75:5

**names**
30:24, 56: 7,
58:9, 58: 2,
58: 6, 67: ,
98:8, 98: 6,
4 :7, 4 : 3,
4 : 6, 5 :5,
55:5, 72:2

**native**
75:9

**navarro**
3:3, 6: 5

**nd**
53:5

**near**
33: 7, 60:8,
62: 7, 66:9,
79: , 93: 0,
95: 9, 96: ,
96: 5, 03:7,

CCSAO COI SUBPOENAS 000214

Transcript of Gabriel Solache
Conducted on December 6, 2021

66

**37:**
**necessarily**
05:8
**need**
7: 6,   9:24,
50: ,   98:8,
22:3,   26:2 ,
68:22
**needed**
99:2
**needs**
2:7,   9:5,
47:7,   5 :8,
26: 9
**neighbor**
3 :9,   62:
**neighborhood**
03:7
**nelson**
36:8,   36: 0,
37:6
**nervous**
20:2 ,   2 :3,
2 :5,   2 :8,
2 :9,   2 : 0
**never**
7: 5,   60:   ,
87: 3,   87: 8,
89:20,   97: 0,
9: 3,   38:9,
50: ,   53: 5,
54:3,   56:2 ,
57: 4,   65: 6
**new**
00:2
**next**
73:24,   02:3,
35:7,   38:2,
38:6,   56:   ,
57:7,   67: 5
**nextdoor**
45:9
**nickname**
25: 5
**night**
4:
**nine**
46: 2,   46: 6,

**50: 4,   69:23**
**nobody**
59: 3,   5: 0,
44: 8,   59: 7
**noise**
74:9
**none**
7:5,   7:6,
7:9,   44: 8
**noon**
72:
**norfolk**
5: 5
**north**
2:6,   2: 6,
2:24,   3: 4,   3:26
**northern**
:2,   5:7
**northwestern**
95:9,   96: ,
96: 5,   00:   ,
0 :2,   0 :22,
23: 2,   29: 9,
32:3,   32:7,
32:   ,   32: 5,
34:2 ,   4 : 4
**noted**
5:3
**notes**
33:23
**nothing**
50: 5,   7:
**november**
65:9,   65: 2,
70:2 ,   7 : ,
7 :2
**number**
5:4,   5:8,
5 : 2,   5 : 6,
90:6,   90:   ,
9 : 9,   2 :7,
2 :8,   2 :9,
2 : 6,   22: 7,
22:20,   26: 6,
26: 7,   26:24,
27:5,   27:9,
27: 2,   28:   ,
28: 2,   30:2,

**30:3,   30:4,**
30:5,   33:   ,
33: 2,   33: 5,
50:2 ,   50:22,
5 :9,   54: 3,
54:22,   55:2,
57:3,   62:24,
63:4,   63: 7,
64: 2,   64: 5,
64: 9,   64:22,
65: 5,   65:24,
66:9,   70:   ,
70: 2,   70: 6,
7 :7,   7 :   ,
79:4
**numbers**
52: 6
**nurse**
92:   ,   92: 5
**nurses**
74:22,   76:3
**nursing**
92: 0

---
**O**
---

**o'malley**
3:20,   6: 3
**oath**
76: 4,   79:8
**object**
8: 9,   22:2 ,
22:3,   32: 0
**objection**
4:2 ,   4:23,
5:7,   28: 7,
29:20,   33:23,
35:4,   36: 9,
40:2,   42:4,
42: 0,   44:2 ,
63:8,   7 :4,
77:   ,   86: 0,
87: 0,   93: 3,
97:22,   08:5,
08:7,   5:23,
20:5,   20:23,
24: 2,   30: 9,
32:5,   46: 0,
47:7,   52:   ,

**53:24,   6 :20**
**objections**
5:4
**obviously**
70:9,   58:8
**occasion**
25:5,   25:6,
72:
**occasions**
23:6,   05:22,
05:24,   08: 0
**occupying**
3:20
**of_____**
76: 7
**offer**
76: 3
**office**
2:4,   80: 3
**officer**
5:2 ,   6:4,
6:8
**offices**
34:2
**often**
47:24,   89:2,
89:3,   90:20,
90:23,   9 : 2,
04:8,   04:9,
05: 5,   5:2,
45:2 ,   72:23
**oh**
8 :5,   54:20,
63:2
**okay**
7: 4,   7:2 ,
8:4,   5:6,
20: 6,   20: 9,
2 :6,   47: 0,
47: 3,   47: 5,
5 : 9,   93:3,
93: 8,   00: 9,
04:   ,   05:9,
05: 0,   : 0,
2 :23,   22:7,
23:23,   24:24,
4 :24,   42:2,
5 :7,   52: 5,

CCSAO COI SUBPOENAS 000215

**54:20, 55: 3,** 60:2, 6 : , 62: , 64:4, 67:6
**old** 2: 2, 7:6, 8: 7, 8:23, 27:5, 48: 9, 48:2 , 48:22, 49: , 62:2, 68:6, 82:20, 83:24, 92:5, 24:20, 67:24, 68: 7
**older** 68:6
**oldest** 3 :2
**once** 3 :24, 32:9, 50:23, 87: 8, 9 : 3, 95: 2, 4:4, 4:22, 2 :20, 39: 0, 42: 6, 45: 3
**one** 5: 9, 7: 2, 24: 6, 25:5, 25:6, 30:9, 30: 4, 30: 5, 3 :2, 32: 6, 32: 9, 33: , 34: 2, 36:23, 57:4, 62: 0, 67: 2, 7 :20, 75: 4, 80:23, 80:24, 8 :9, 82:20, 84:7, 89: 0, 9 :8, 93: 7, 07: 8, 3: 9, 3:23, 5:4, 2 : 3, 22: 4, 29: 9, 35:2, 37: 3, 38:22, 39:5, 39:7, 42:9, 44: 6, 45:5, 45:7, 47:23,

**52:5, 53:5,** 55: 9, 56: 2, 57:4, 58:7, 6 :2 , 65: 7, 73: 0, 73:
**ones** 35:24, 44:24
**only** 7: 2, 7: 9, 2:22, 23: 9, 24: 5, 30:9, 4 : 3, 44: 7, 49:2 , 49:23, 50: 4, 56:3, 6 : 7, 67:24, 80: 8, 86:7, 89: , 05: , 06: , 07:2, 0: 7, 3:3, 3: 8, 5:4, 7:5, 34: , 35:2, 35:4, 37: 3, 39:9, 42: 5, 44:24, 45:7, 45: 2, 52:5, 68: 7, 73: 0, 73: 6, 73: 9
**operation** 75:2, 75:5, 75:7
**opportunity** 03: , 03: 2, 03: 4, 67:20, 68: 2
**orally** 2 :3
**organized** 38:24
**other** 2:30, 6:6, 0:24, 3: , 5: , 5:9, 5:23, 6: , 6:8, 7:8, 26: 6, 30:6, 34: 0, 37:22, 44:4, 44: 4,

**44: 5, 44: 8,** 44: 9, 46: 9, 52:2, 56: 3, 58: , 7 : 5, 72:9, 74:7, 75: 5, 80:5, 80: 0, 80:24, 8 : 0, 82:22, 84: 7, 98: 6, 99:23, 0 :9, 2: 3, 3:7, 3: 6, 4: 2, 37: , 37: 2, 4 :8, 4 : , 4 : 3, 44: 8, 44: 9, 53: 8, 55: 2, 73: 3
**others** 68: 2, 06:2, 06:24, 07:2, 08: , 4:
**otherwise** 5:3
**ourselves** 63:8
**out** 9: 4, 9: 6, 27: 8, 43: 8, 63: 3, 68: 4, 69:2 , 70: , 70: 3, 70: 9, 87:20, 87:23, 88:4, 88:6, 99:7, 99: 5, 00: 6, 4:2 , 7: , 3 : 0, 53:22, 54:2 , 67: 9, 72: 6, 72: 9, 72:23, 73:2, 73:9, 73: 3, 73: 7, 74:6
**outcome** 79: 6
**outlet** 5 : 7
**outside** 08:9, 08:

**over** 8: 7, 3:9, 50: 7, 7 :2, 6: 0, 55:22, 56:3, 62:6
**own** 4:8, 79: 3, 05:2
**owned** 33:6, 35: 7
**owner** 07:22

——— **P** ———

**p-a-g-o** 80: 6
**pachuca** 8: 2, 8: 3, 8: 8, 8:24, 9:3, 0: 7, 2:3, 4:3, 22:2, 22:6, 02:6, 02:8, 02: 3, 02: 9, 03: 0, 03: 3, 03:22, 04:2
**packet** 2 :2 , 22: 0
**packing** 8 : 5, 8 : 7, 82:6
**page** 4:3, 4:8, 22: 0, 22: 2, 22: 6, 23:4, 23:7, 23:2 , 24:7, 33:2 , 33:23, 35:7, 35:8, 36:7, 37:2 , 37:23, 38:6, 38: 0, 39: , 42:6, 5 :8, 52: 5, 53:3, 55:7, 55:9, 55: , 56: 0, 56: 2, 64:2 , 65:2, 65: 4, 65:23,

CCSAO COI SUBPOENAS 000216

Transcript of Gabriel Solache
Conducted on December 6, 2021

68

66:3, 66: 0, 67: 5, 67: 6, 67: 7, 67: 8, 68: 0, 70: 8, 7 :4, 7 :5, 7 :6, 7 : , 7 : 6, 77:8, 77: 4, 77:20, 78:2, 78:8, 78: 4

**pages**
4: 6, 22:20, 65:2

**pago**
80: 4, 80: 6

**paid**
36:8, 36: 3, 95:7, 95:8, 95: 2, 95: 6, 96: 0, 96: 6, 40:24, 4 :2, 4 :4

**pants**
20:

**papers**
26:6, 26:7, 33: 8

**paragraph**
7 : 6

**parents**
45: 0, 46:24, 47: 7, 48:23, 03:3, 44:7, 49: 0, 49: 2, 49: 5

**park**
79:2, 79: , 79: 6, 79:23, 6: 6, 37:

**parking**
83:9, 83: 3, 84: 0

**part**
35:24, 56: 8, 57:24, 58: 0, 58: 8, 56:2, 7 : 7

**particular**
35: 9

**parties**
79: 5

**party**
72:

**pass**
47:2

**passed**
27:5, 32:7, 32: 3, 32: 7, 33: 2, 47: , 87:24, 88:4, 88:6, 88: 2, 89: 9, 89:2

**passenger**
9:7

**passing**
33: 0

**paternal**
50: 4

**paula**
34:2 , 34:22, 35:3, 35:8, 35: 2, 36: 5, 36: 8, 37: , 37:20, 37:22, 38:6, 38:9, 38: 0, 50:9, 50: 3

**pay**
4:2, 36:2, 36:7, 4 :5

**paying**
4:6, 7:5

**pedro**
3 :6

**pena**
53:6, 53: 2, 53: 9, 54: , 54:3, 54:6, 54:

**pena's**
54:5

**penalty**
43: 3, 60:5, 60:8, 60:22, 6 :4, 62:7, 76:4, 76:7

**people**
6:6, 34:7,

34: 0, 56:3, 58: , 7 : 5, 7 : 9, 72:5, 72:6, 72:7, 72:8, 76:20, 77: , 77:7, 77:9, 77: 4, 77: 6, 89: 7, 97: , 98: 6, 98:22, 99:23, 25: 9, 37: , 38:24, 40: 8, 4 : , 42:9, 63:7

**people's**
2:4

**perfectly**
26: 3

**perhaps**
3 : 7, 67:9

**period**
27:2, 28:8, 32:7, 44:23, 45: , 69: 3, 37: 7, 39:24, 40:8, 43:5, 43:6, 43:2 , 60:4, 60:20, 6 : 0

**perjury**
76:4, 76:7

**person**
23:3, 23:7, 34:24, 67: , 67:2, 02:4, 07:24, 33:24, 34:5, 34:7, 34: 8, 35:3, 35:6, 36: 2, 37: 2, 42:8, 5 : 7, 57: 2, 74:6, 75:5

**pesos**
6: 9

**pharmacy**
92: 2

**phone**
46: 7, 54: ,

54: 5, 55:3, 57:2, 57: 7

**phonetic**
:24, 80:23, 26:9, 55:20

**photocopy**
4: 2, 28: 6

**picked**
74:3

**picking**
74:8, 74: 0

**pictures**
60: 9

**place**
:24, 5: 3, 8: 6, 8: 7, 37:20, 5 :9, 6 :4, 8 :9, 8 : 4, 8 : 5, 8 : 7, 82:6, 82:9, 82: 4, 83:4, 2: 4, 8: 6, 8:23, 40: 4, 40:2

**placed**
59:4, 79:8

**places**
80: 8, 80: 9, 80:2

**plaintiff**
:7, 2:3, 4: 7, 4: 9, 6:9, 5:3, 65: 5, 66:3, 66: 0, 66:23, 7 : 7

**plaintiff's**
4:20

**plan**
28:4, 28:7, 28: , 5 :24, 85: 3, 86:20

**planet**
5: 2, 6:3

**planning**
: 3, 22: 0

**plans**
68:6, 70:9

**played**
56:7

CCSAO COI SUBPOENAS 000217

plaza
68:3
please
5: 4, 6:4,
7:24, 70: 4,
80:7, : 6,
40:4, 66:7,
69: 7
plug
63: 4
point
7: 6, 5: 8,
4 :2, 4 :6,
46:3, 5 :23,
52: , 59:7,
59: 4, 66: 5,
68: 4, 87:4,
93:22, 04: 3,
04:23, 06: 6,
07:7, 09:8,
7: , 20:2,
28:23, 32: 7,
44:2, 44:6,
44: 0, 44:23,
68:6, 68: 5
pointing
69:6
police
83: 9, 20:3
pontiac
28:20, 28:24,
35: 3, 35: 9,
43:7, 43:8,
43:22, 43:24,
44: 2, 59: ,
59:6, 59:2 ,
60: , 60:4,
60:7, 60:9,
60:22, 6 : ,
6 : 8, 6 :2 ,
6 :24, 62: 5,
62: 8, 64:6,
64:7
positive
90:22, 9 :
possible
78: 8
possibly
26:4

prayer
27: 5, 27:23
pregnant
27: 5, 27: 9,
27:22, 87:20,
06: 8, 06:20,
06:22, 07: ,
07:3, 07:5,
4:23, 6:22,
6:23, 7:3,
7:6
preparatoria
69:
prepare
22: 5, 23:3,
05:2
present
3:33
previous
26:5
previously
2 : 6
price
03: 6
prior
26:2, 36: 9,
66:24, 79:8
prision
47:
prison
47:6, 47: 0,
47: , 92:4,
92: 6, 92:23,
93:5, 93: 4,
93: 8, 35:20,
35:23, 39:23,
58:
prisoners
40: 5
prisons
64:5
privilege
32: , 32: 2,
32: 4, 32: 8,
32:20
probably
5: 7, 5 :9
problem
58:3, 58:5,

62: 7
proceedings
55: 0, 79:6,
79:7, 79: 0
produced
2 : 7, 32: 2
profession
67: 9, 68:8
professional
67:20
program
58:24, 59:22
project
34:2
proof
9:22, 9:23
prosecution
36:2
protection
58: 0, 59: 9,
59:2 , 59:22,
59:24
protective
57:22, 58: ,
58: 9, 58:2 ,
58:24, 59:2,
6 : 3, 6 : 8,
62: , 62: 2
provide
6:
provided
97:4
public
29:6, 84: 4,
84: 9
pursue
68: 2
push
63:9
put
5 :23, 9:6,
2 : 5, 26: 4,
33: 9, 53: 4,
53: 7, 58: ,
58: 0, 58: 8,
59:5, 6 : 3,
62: 2

**Q**

qualified
79:2

question
7:20, 7:23,
8:3, 58:9,
69: 5, 69: 8,
7 :5, 72:2 ,
80:6, 86: 3,
9 : , 93: 3,
93: 7, 0:3,
: 2, 30: 0,
32:4, 32: 6,
32:2 , 33:8,
40:4, 56:2,
65: 5, 65:24,
66:7, 66:9,
67: 7, 69:4,
69: 7, 7 :6,
7 :7, 7 : 0,
7 : , 7 : 2,
7 : 5
questioning
20: 4
questions
7: 2, 7: 3,
5:8, 20: 8,
70: 2, 90: 8,
42:22, 7 : 0

**R**

r-h-e-w
5: 5
r-o-g-e-l-i-o
30:20
r-o-s-e-n
5: 8
railway
5: 6
ramiro
34: 4, 34: 7,
37:23, 38:7,
38:
ramiro's
37:24, 38:8
ran
84:7
ranch
32: 5, 32: 6,
32:24, 33:2,
34: 8, 39: 4,

CCSAO COI SUBPOENAS 000218

Transcript of Gabriel Solache
Conducted on December 6, 2021

70

| | | | |
|---|---|---|---|
| 39: 8, 39:22, | 77:23, 78:5, | **reference** | 40:9 |
| 40:7, 40: 0, | 78: , 78: 7 | 24:7, 25:2, | **released** |
| 40:22, 4 : 5, | **recall** | 66: 4, 66: 5, | 76: 3, 93:22, |
| 4 : 7, 42: , | 8:7, 8: 7, | 67:7, 67:8, | 94:3, 94:6, |
| 42:9, 42:20, | 27:2 , 32:5, | 67: 2 | 95:5, 0 : 6, |
| 42:23, 43:2, | 33:2 , 43:22, | **referenced** | 34:7, 34:23, |
| 43:4, 43:5, | 45: 6, 58: 7, | 4:8, 2 : 0, | 37: 7, 39: 7, |
| 43:9, 44:6, | 58:24, 59:20, | 26: 8, 28: 3, | 39:22, 4 : 2 |
| 44:20, 45: , | 78: , 88: 0, | 30:6, 54:23, | **remain** |
| 45: 4, 45:2 , | 00:24, 02:3, | 64: 6, 70: 3 | 46:5 |
| 46:6, 46:22, | 07: 0, 23:7, | **references** | **remote** |
| 48:7, 60:3, | 32:6, 4 : 8, | 66: 9 | 79: 0 |
| 60:6, 60:7, | 45: 4, 57: 2 | **referencing** | **remotely** |
| 60:8, 60: 0, | **received** | 24:9, 24: 5, | 3:22 |
| 60: 2, 60: 4, | 35: , 75: , | 25: 2, 67:3 | **removed** |
| 62: 0, 62: 6, | 20: 9, 22:24, | **referring** | 20:6 |
| 62: 7, 62: 8, | 25:23 | 25:5, 25:7, | **rene** |
| 63: 5, 64:5, | **receiving** | 34: , 66:20 | 98: 2, 98: 4, |
| 64: 7, 65:3, | 2 :24 | **regarding** | 98: 5 |
| 66:9, 25: 4, | **recess** | 7: 3 | **rent** |
| 25: 8, 50: 2 | 9: 9, 5 : 4, | **reiter** | 4:2, 4:6, |
| **rather** | 90:9, :23, | 3:4 | 7:5 |
| 6 :5 | 27:2, 63:2 | **related** | **repeat** |
| **rd** | **recognize** | 4:24, 34: 5, | 20: , 80:6, |
| 94:5 | 27: , 33: 5, | 37: 0, 67: 8, | 09: 7, 7:4, |
| **read** | 33: 8, 64: 8 | 0: 3 | 7:8, 30: 0, |
| 26: 0, 26: , | **recognized** | **relation** | 40:4, 56: , |
| 26: 9, 30:8, | 6 :8 | 89:8 | 66:7, 69: 6 |
| 30: 4, 30: 6, | **recollection** | **relationship** | **report** |
| 76:8, 76:9 | 29:22 | : 6, 7: 8, | 83: 8 |
| **reader-interpret-** | **record** | 7:24, 47: 8, | **reported** |
| **er** | 5:2, 6:3, | 55: 4, 55: 9, | :28 |
| 75: , 75:2 | 9: 8, 9:22, | 67:20, 68: , | **reporter** |
| **reading** | 20: , 20:5, | 87:6, 89:6, | :29, 6:2, 6:4, |
| 30: , 30: 2, | 5 : 3, 5 : 8, | 89:8, 04: , | 7:2, 20:2, |
| 75:9, 75: 3, | 90:3, 90:4, | 04: 3, 05:4, | 5 : 3, 5 : 6, |
| 75: 4 | 90:5, 90:8, | 05:5, 05:6, | 5 : 7, 52: , |
| **ready** | 90: 3, 00: 2, | 05:9, 24: 8, | 52:6, 52:9, |
| 22:20, 25: 6, | :22, :24, | 49: , 49:3, | 57: 0, 79:2, |
| 78:7, 7 : 9 | 27: , 27:6, | 49:6, 49:7, | 79:5 |
| **reality** | 63: , 63:6, | 49: 3, 50:2, | **represent** |
| 6:24 | 63: 2, 74: 3, | 50: 3, 50: 6, | 5: 5 |
| **realized** | 74: 6, 79:9 | 5 : 2 | **representing** |
| 32: 4 | **records** | **relative** | 26:3, 26: , |
| **really** | 78:8, 78: 4 | 6 : , 6 :2, | 32:2, 55: 9 |
| 86: 4, 88:9, | **recovered** | 6 :6, 79: 4 | **request** |
| 2 :4, 57:4 | 6: 9 | **release** | 59:4 |
| **reason** | **red** | 94: , 0 :20, | **requested** |
| 77: , 77: 7, | 33:23 | | 75: |

PLANET DEPOS
888.433.3767 | WWW.PLANETDEPOS.COM

CCSAO COI SUBPOENAS 000219

respect
90: 9,   02:7,
  2:4,   64:4,
67:6
response
00: 3,   67: 7
rest
43: 9,   43:23
result
69: 0, 69: 3,
78:2 ,  97:3
resume
22:5, 22:
retranslates
69: 8,   33:8
return
28:9,   9:6,
  37: 8
returned
53: 5,   02: 8,
40:2,   40: 0,
  72: 2
review
25: 5, 25: 8,
26:2,   65:5
reviewed
25:2 , 25:24,
26:7,   65:2,
  65:   ,  70:24
reyes
3:   , 6:9,
5:3,   07:7,
07: 0,   07: 3,
08:2,   08:3,
08:20,   08:23,
09:2,   09:6,
09:9,   0:6,
  0:9,   0: 3,
    :   ,   2:4,
2:9,   3:24,
4:2,   4:4,
  4: 5,   6:3,
20:3,   58:4
reynaldo
2:2 , 5:22,
5:24
rhew
  5: 5

ricardo
  44:24
ride
79: 7, 79: 8,
84:2 ,  7 :23,
72:3
right
  5:   ,  6:6,
  7: 6, 25:9,
26:2 , 27:   ,
39:8, 39: 4,
40:7, 40: 8,
40:22, 42: 8,
43: 4, 43: 6,
43: 9, 55:22,
56:22, 57: 5,
6 :8, 6 :22,
62:7, 66: 0,
69: 0, 69: 3,
70:2, 7 : 6,
7 :20, 74:9,
75:2 , 78: 7,
82:7, 83:5,
85:   ,  85: 4,
9 :9, 95:20,
  0 :6,   02:   ,
04: 6,   04:20,
    :2,       :5,
    : 4,   3: 4,
4: 5,   6:7,
7: 2,   8: 8,
9:   ,   20:4,
22: 2,   23:   ,
23: 9,   24:   ,
25:   ,   26:4,
26:8,   30: 8,
3 :   ,   32:9,
36:8,   40:3,
40:6,   40: 0,
44: 6,   44:20,
45:2,   45:5,
45:7,   45:8,
56:   ,   59: 8,
60:7,   60: 4,
6 : 9,   62:4,
67:24,   68:4,
68: 9,   70:2,
70:22,   72:8,

74:6
rights
40:2
rise
67: 9
rivera
34:6,   34: 6,
39:2,   4 : 5
roast
39:
roberto
39: 2,   39: 6
rock
2: 3
rogelio
30: 8, 30:2 ,
3 :3, 32:22,
52: 5, 53: 9,
53:20, 53:23,
54:4, 54: 0,
54: 3, 54: 9,
54:22, 55:   ,
55:5, 55:9,
55: 9
roger
32:22
role
56:7
romero
68:3
room
  2: 2,   2: 3,
  2: 8,   2:20,
  2:2 ,   2:23,
  2:24,   3:   ,
  3:4,   3:8,
  3: 0
roommate
58: 7
rosauro
56:9, 56: 3,
56:2 , 58:3,
58: 3, 58:20,
62: 2, 62: 5,
62: 9, 62:2 ,
62:24, 63:4,
63:6, 63: 4,
63: 8, 64: 9,

66: 3, 66:23,
67:3, 67:6,
82: , 84: 5,
  06:3,   06:7,
  2:6,   3: 3,
  5: 0,   5:22,
  6:2
rose
26:9,   55:20,
  56:9
rotisserie
38:23, 38:24,
39:2, 39:   ,
43:   , 43: 6,
43:23, 44:   ,
44:5, 44: 4,
44: 9, 65:9,
65: 6, 65: 9,
66:2,   67: 0,
  67:
rouse
  26:8
row
60:23,   6 :   ,
62:2,   62:4,
62:5
ruben
  :28, 6:3,
79:   ,   79:22
run
0:24, 20:9
ruth
53:6,   53: 2
ryan
43: 2,   60:5,
6 :3,   62:7

**S**

s-t-a-r-r
6: 0
s-t-e-p-h-e-n-s--
o-n
6: 2
s-u-s-l-e-r
5: 7
sabritas
2:23
said
5:8, 29:9,

32: 0, 53: 7,
59:5, 6 : ,
69: 4, 70:5,
73: , 76:24,
77: , 8 :4,
87: 3, 89:20,
9 :6, 93:2,
93: 8, 08:7,
09: 8, 20: ,
20: 4, 20: 7,
2 :4, 40:20,
42: , 59: 2,
59: 3, 59: 7,
68: 8, 75: 2

**sales**
66: 9, 66:20,
66:2 , 66:24,
67:2, 67:5

**salesclerk**
3:4

**salvador**
37:7, 37: 7

**same**
8: 6, 8: 7,
3 : 4, 32: ,
34: 8, 46:9,
64:5, 67:2,
68:7, 77:3,
2:6, 4: ,
6: 4, 36:7,
37:2 , 37:22,
38: 0, 50: 2,
67: 7, 68: 0,
75:9, 76:9,
76: 0

**san**
:24, 5:

**sanchez**
37:9

**santa**
34:2 , 34:22,
35:3, 35:8,
35: 2, 36: 5,
36: 8, 37: ,
37:20, 37:22,
38:6, 38:9,
38: 0, 50:9,
50: 3

**saturday**
24:9, 24: 2,
24: 6, 24:20

**save**
85:4, 85: 3,
85: 7, 48:4,
48: 4

**saved**
85:7

**saving**
86:20

**saw**
2:5, 32: ,
73:3, 73:4,
90:22, 97: 0,
0 :20, 08: ,
09:2, 4: ,
23:7, 3 : 8

**say**
2: , 2:20,
9:23, 20: 4,
20:24, 2 :3,
23: 0, 27: 7,
30:2 , 35:22,
60:20, 6 : 7,
67:3, 69:6,
72: 0, 73: 0,
88: 0, 99: 5,
03: 4, 07:4,
: 5, 9: 3,
20:9, 34:8,
4 :20, 4 :22,
69:7, 7 : 5

**saying**
06: 8, 07: ,
4 : 8, 60:24

**says**
47:8, 22: ,
24: , 25:9,
25: 0, 3 :2,
33:22, 5 : 2,
52:23, 53:8,
55: , 55: 5,
56: 7, 57: 0,
65: 5, 66:22,
67: , 67: 6,
67: 8, 68: 0,
7 :4, 7 :6,

7 : 7, 7 :22,
72: 0, 72: 5

**scar**
75: 3

**scars**
75: 0

**school**
49: 6, 49: 8,
49:2 , 49:24,
50:6, 68: 8,
69: , 69:2,
69:8, 69: 0,
69: 2, 69: 3,
69: 5, 69: 9,
69:22, 70:9

**sean**
3: 3, 6:8, 6: 0

**seasonal**
50: 4

**second**
53: 7, 6:5,
6: 5, 55: ,
6 : 4, 62: 2,
7 : 6

**secondary**
49: 6, 49:2 ,
49:24, 69:22

**secundaria**
69:2

**see**
2 : , 47:24,
48:6, 73: 5,
90:20, 90:23,
9 : 2, 05: 5,
05: 7, 07:3,
07:4, 07:6,
08:3, 9: ,
22: , 22: 7,
22:2 , 22:22,
23:24, 24:7,
28: 8, 28:2 ,
29:8, 33:2 ,
33:22, 35:9,
5 : 0, 5 : 4,
52: 6, 53:5,
54:20, 55:23,
56: 3, 56: 7,
57: 0, 66:5,

66: 2, 67:2 ,
68: 3, 7 :6,
7 :7, 7 :20,
72: , 72: 3,
72: 7

**seeing**
02:3

**seem**
78: 7

**seems**
73:6

**seen**
78:7, 78: 4,
88:23, 89:2,
89:3, 89:7,
89: , 89: 2,
0 : 7, 03:2 ,
07: 5, 07: 7,
08:20, 23:4,
3 : 5, 3 :22,
70: 5

**sell**
2: 8

**send**
80: 7, 86: 5,
8: 4, 8:2

**sending**
86: 8, 7:2 ,
8: , 8:4,
32:7

**sense**
6 :2

**sent**
80: 9, 80:2 ,
23: 9, 28:4,
28:5, 28:6,
42:24, 43:7,
47:4, 59:23,
59:24, 60: 0,
60:22, 6 :4

**sentence**
60: 0, 65: 5

**sentenced**
60: 7

**separated**
45: 2, 45:20,
49: 0, 49: 3

**september**
9: 8, 7:22,

CCSAO COI SUBPOENAS 000221

Transcript of Gabriel Solache
Conducted on December 6, 2021

73

65: 8
**seriously**
69:9
**set**
4: 8,   79:6
**seven**
3 : 7, 38: 2,
50:8,   69:22,
70:
**several**
26:5, 39:22,
80: 7, 82: 2,
84:6
**sexual**
05:8
**share**
46:9
**shared**
3: 4
**sharing**
08: 6
**sharon**
00:3,   00:5,
0 :9,   0 : 2,
0 : 7
**sheet**
82: 4,   76: 2,
77:
**sheets**
82:  , 83:4
**shift**
5:22,   6:2,
6:6,   6: 5
**shoes**
50: ,   9:24,
58:8,   58: 2,
58: 5,   58: 8,
59:20
**shore**
43:6
**short**
43:2 ,   59: 5,
60:3,   60: 2,
60:20,   60:2 ,
6 : 0
**shorthand**
:29,   79:2,
79: 2

**shortly**
26:20
**should**
28: 5,   0:2,
6 :2 ,   69:2
**show**
26: 0
**showing**
23: 3
**shown**
3 : 6
**shows**
3 :4
**si**
47: 0
**sibling**
30: 7
**siblings**
30: 4, 30: 5,
30:22, 3 : ,
46: , 46: 9,
49: 0, 49:   ,
52:4, 52:7,
52: 2,   44:3,
44: 3,   44: 9,
45: 8,   45:2 ,
47: 4,   47: 7,
47:2 ,   48:
**sic**
09: 4,   29: 4
**side**
69:7,   26: 5,
52: 6,   55: 0,
55: 2
**sign**
32:8,   65:
**signature**
27: 8,   64:22,
64:23,   65:3,
65:8,   70: 9
**signature-kcnbo**
79:20
**signature__date__-**
____
78:23
**signed**
65:6,   65: 2,
7 :

**similar**
6:7
**simply**
7 :9,   03: 2
**sinai**
5: 5,   5: 7
**since**
6:2 ,   7:2,
3 : 3, 62:4,
64:6, 88:23,
90:2 ,   0 : 6,
03:2
**sister**
5 :2,   09:23,
0:23,   0:24,
:2
**sister's**
50:2
**sister-in-law**
32: 4, 32: 8,
33:9
**sisters**
46:8, 88: 7,
: ,   47:24,
48:3
**six**
3 : 7,   24:6,
69:20,   69:2
**skills**
67:20
**sleep**
2:9
**small**
3: 9
**smallest**
2:20,   2:23
**smoothly**
20: 0
**socializing**
08: 4
**solache**
:5,   : 8, 4:3,
4: 0, 5:4, 5:5,
5: 7, 7: , 7:9,
8:6, 5:5, 20:6,
20: , 20: 4,
5 : 2, 5 : 7,
68:5, 90:7,

90: 2, 90: 5,
00:2 ,   2 :8,
2 : 5,   22: 5,
26:24,   27:5,
27: ,   28: 5,
30:8,   42:2 ,
5 :2,   55: ,
62:24,   63:5,
63: 6,   64:4,
65: 7,   70: 5,
74: 5,   76:23,
78:24
**solache's**
4: 7,   00: 3
**sold**
82: 9, 82:22
**some**
8: 5,   :9,
5: 8, 22:23,
23:8, 23:9,
27:2, 27:3,
28:5, 28:8,
32:7, 45: 0,
59:7, 59: 4,
63:3, 66: 5,
68: 4, 69: 2,
70:9, 70: 2,
72: , 72:5,
75: , 93:22,
98:6, 05:8,
05:24, 06: 6,
07:7, 2: 4,
7: , 20:2,
2 : 7, 22:4,
28:23, 32: 9,
37:3, 4 : 0,
5 :2, 53: 8,
55:3, 55:5,
59:3, 59: 6,
68:8
**somebody**
9:24, 33:7,
36:2, 60:5,
60:9, 66:24,
73:3, 88: ,
88: 2, 97: 2,
07:24, 30:24
**someone**
74:8, 88: ,

CCSAO COI SUBPOENAS 000222

Transcript of Gabriel Solache
Conducted on December 6, 2021

74

29:6, 37: 2
**something**
20: 5, 59:24,
87:5, 99:2,
03: 7, 04:24,
27: 6, 28:7,
32: 9, 37:3,
63:
**sometime**
72:
**sometimes**
70:24, 7 : 7,
84: 4, 84: 5,
99: 0, 00:3,
37:5
**somewhere**
26: 9
**son**
26:20, 27: ,
27: 2, 67: 2,
67: 3, 87:23,
88:4, 88:6,
88: , 89: 9,
89:2
**son's**
27:7, 27: 0
**sophia**
9:20, 9:24,
0:5, 0:9,
0: 4, 0: 6,
0: 8, :7,
: , : 7,
:20, :22,
2:5, 2: 2,
7:8, 20: 8,
20:20, 2 : ,
2 :3, 2 : 2,
24:5, 24: 9,
25: 2
**sorry**
8: 4, 8: 6,
7:23, 26:24,
29:22, 69: 7,
8 :5, 93:3,
02:24, 03:23,
36: 9, 38: 8,
4 :24, 54: 9,
55:22, 56: 4,

63: 8, 67:7,
7 : , 73:23
**soto**
33:3
**sotos**
2:32
**sound**
59:23
**source**
4:2 , 5: ,
5:8
**south**
3:6
**southern**
5: 5
**souvenirs**
2:2
**space**
2: 4
**spanish**
6: 9, 26:8,
30: 3, 57: ,
60:2 , 70:3,
70:8, 00:9,
09:22, 0: ,
0: 9, : 8,
4:9, 23: ,
23: 9, 29: 6,
40: 9, 59:8,
59: 0, 75:6,
75:8
**spanish:**
47: 0
**speak**
26: 2, 77: 5,
87: 4, 99:20,
29: 6, 3 :3,
3 :7, 3 : 2,
32: 7, 37:8,
49: 7, 52:7
**speaking**
20:2, 70:3,
70:8, 00:9,
0: , 0: 9,
: 8, 4:9
**speaks**
30: 3, 57: ,
09:22, 40: 9,

59:8, 59: 0,
75:5
**special**
72:
**specific**
57:2, 04: 4
**specify**
7 : 2
**spell**
9:22, 3:2,
30: 9, 38:2,
80: 6
**spelled**
25:3
**spend**
6: 7, 08: ,
43:23
**spent**
96: 4, 05:2
**split**
45: 7, 46: 5,
47: 7, 48:2,
48:23, 49: ,
49: 5, 49:20,
50:4, 50:7,
50: 7
**spoke**
2 : 5, 60: ,
04:4, 3 :4,
34:9, 37:7,
37: 0
**spoken**
89: 3
**spring**
8: 5
**spurts**
59: 5
**stainless**
82: 2
**starr**
3: 3, 6:8,
6: 0, 5:2,
08:5
**start**
8: 7, 7: 8,
20: 4, 72: 5,
73:2 , 6:8,
55:22, 56:3,

60: 5, 63: 2
**started**
49:20, 70:23,
72: 8, 00:24,
4: 9, 7:2
**starting**
5:
**state**
5: 5, 65:9,
9 :3, 76:20,
79:3
**states**
: , 5:6, 0:3,
8: , 8: 8,
8:20, 9: ,
9:3, 9:9,
27:4, 27: 6,
27:20, 28: ,
28:5, 28:8,
28: 6, 28:22,
29: , 29:5,
29: 6, 29: 9,
30: , 3 : 2,
33: 5, 34:20,
37:4, 37: 6,
38: 8, 38:22,
39: 9, 39:23,
40: , 40:23,
4 :20, 42:2,
42:3, 42: 4,
42: 5, 42: 7,
42:23, 43:8,
44:24, 48:3,
49:2, 49:5,
49:8, 49: 2,
50:23, 52:3,
52:5, 52:8,
52:9, 52: 2,
52: 7, 52:22,
52:23, 53:7,
53: 2, 53: 8,
53:2 , 54:5,
54:8, 54: ,
54: 4, 54: 6,
54:20, 55: 4,
55: 8, 63: ,
63: 7, 63: 9,
63:22, 63:23,

CCSAO COI SUBPOENAS 000223

Transcript of Gabriel Solache
Conducted on December 6, 2021

75

64: 0, 85:4,
85: 0, 85:20,
86:20, 87:9,
87: 5, 96: 8,
96:23, 97:2,
97: 6, 97: 8,
97:2 , 98:3,
98:7, 99:24,
08:24, 49: ,
49: 6, 65: 6,
66:3, 66: 0,
66: , 66:23,
7 : 8
**stateville**
43:4, 43: 5,
43: 7, 43: 8,
44: 2, 44: 5,
58: 3, 59:4,
59:20, 59:23,
60:3, 60:6,
60: , 60: 4,
60: 8, 6 :5,
6 :7, 6 :9,
6 : 4, 6 : 5,
62:9, 62: 2,
62: 4, 62: 9,
64:6, 64:7
**stay**
46: 9, 46:22,
95:22, 02:20,
02:23, 02:24,
43:8, 43: 8,
58:2
**stayed**
38:5, 40: 6,
4 :3, 46: 7,
50:22, 43: ,
43:20, 59:2,
60: , 72: 5
**staying**
2 :2 , 99:3,
02: 7, 2: 4,
2: 5, 4:
**steel**
82: 2
**stephenson**
3:25, 6:
**still**
: , 32:23,

33:2, 33:4,
33:6, 42:8,
46:24, 47:4,
53:23, 63: 5,
69:22, 75: 0,
88:7, 92:4,
98:7, 0 : 5,
24:4, 3 : 2,
34: 7, 74: ,
76: 3
**stitches**
75:
**stole**
58:8, 58: 2,
58: 5, 58: 8
**stolen**
83:9, 83: 3,
83: 8, 84:2,
84: 0, 84: 2,
84: 8, 59:20
**stop**
69:3, 72:23,
73: , 73:6,
73:9, 86:8
**stopped**
50:6, 77:9,
9: 4
**store**
2: 5, 2: 6,
2: 8, 2:24,
92:
**stphenson**
6:
**straight**
5 :22
**straightened**
70: 0, 70: 3
**street**
2: 6, 2:24,
3: 4, 3:26,
8 : 0, 8 : ,
8 : 2, 82: 0,
82: 4, 83: 0,
93: 0, 5: 4,
36:24
**strike**
39: 6, 52:3,
53: 0, 78: ,

08:2, 32: ,
32:20, 37:2,
47: 4, 57:20
**student**
00: , 0 : ,
29: 3
**students**
0 :5, 0 :9,
0 : 3, 29:20
**subdivided**
57:3
**subject**
4:22
**subscribed**
79: 8
**suburb**
79:
**suffered**
78:20
**suggested**
59: 4
**suite**
2: 7, 2:25,
2:36, 3:7, 3:27
**summer**
8: 5, 78:4
**sunday**
2 :22, 24:23,
25:2, 25:5,
25:9, 25: 3
**supervisor**
84:3, 84:5,
84:9
**supervisor's**
84:4
**supervisors**
84:6
**support**
3: 7, 3: 9,
6:23, 2 : 4,
86: 6
**supposed**
77:2
**sure**
7: 2, 80:8,
89:24, 97: 4,
98:9, 04: 5,
: 7, : 9,

5:24, 30: ,
32: 3, 35:5,
40:5, 62:22,
63:20, 66:8,
69: 8
**surgery**
75: , 75:20
**surprised**
7: 4
**susan**
55: 4, 55: 7
**susler**
2:5, 5: 6,
4:2 , 5: 0,
5: 4, 5:2 ,
5:23, 8: 9,
9:23, 20:3,
20: 3, 22:2 ,
23: 0, 23: 6,
28: 7, 29:20,
33:23, 35:4,
36: 9, 40:2,
42:4, 42: 0,
43: 8, 44:2 ,
47:5, 47: 0,
47: 3, 60:20,
6 :4, 63:8,
69: 4, 70:7,
70: 4, 7 :4,
77: , 8 :3,
86: 0, 87: 0,
9 : , 92:24,
93:3, 93: 2,
93:20, 97:22,
00: 2, 00: 6,
02:22, 0:2,
: 3, 5:23,
20:5, 20:22,
2 :6, 2 : ,
22:3, 22:7,
23: 4, 24: 2,
26: 4, 30:3,
30: 9, 3 : 0,
3 : 4, 32:5,
32:9, 33:6,
38: 4, 4 : 7,
4 :2 , 4 :24,
42:2, 46: 0,

CCSAO COI SUBPOENAS 000224

47:7, 52: ,
53:24, 54: 7,
54:20, 59: 0,
59: 2, 59: 4,
60:23, 6 :20,
63: 8, 63:23,
64:9, 64: 3,
68:22, 69:4,
73:2

**swear**
6:4

**sworn**
6: 8, 7:2

---

### T

**tab**
54: 7, 54:2

**take**
7: 7, 7:20,
9: 6, 29:3,
29:7, 50:22,
5 :8, 5 :9,
5 :22, 74: 2,
84: 9, 89:23,
94: 5, 99: ,
99:2, : 9,
:20, 4:23,
6: 0, 2 :6,
2 : 8, 22:9,
26: 5, 27:8,
28: 0, 30:2,
33: 0, 40:24,
50:20, 55:2,
62:2 , 63: 7,
64:

**taken**
5: 2, 94: 9,
59: , 59:2 ,
60: 8, 76:8,
79:6

**taking**
8:8

**talk**
68:20, 88:3,
89:9, 04: 0,
05: 8, 09:3,
37:5, 45: 8,
46: 6, 53: 3,

56:22, 56:23,
57: , 66: 6

**talked**
22: 3, 22: 8,
5 :20, 6 : 4,
62: , 87: 6,
88:5, 95: 8,
45:4, 45:8,
57: 4, 63:8,
68:3

**talking**
44:22, 90: 6,
93: 4, 93: 5,
97:23, 97:24,
99: 7, 08: 5,
24: 0, 24: 5,
37: , 38: 4,
39:5, 7 :24

**tape**
26:20

**tardy**
93: 2

**technical**
79: 0

**telemundo**
5 :20, 52:

**telephone**
4: 5, 87: 5,
99:2 , 45: 9,
47: 7, 48:7

**tell**
2 :6, 22: 8,
28:2 , 30:24,
33: , 33: 2,
38:2 , 42:2,
73: , 76:3,
76:9, 84: ,
84:9, 06: 9,
06:2 , 20: 2,
2 :2, 36:20,
46: 4, 53: 6

**telling**
28:23, 70:4,
6:22

**tells**
59: 6

**temporary**
68:2

**test**
90:23

**tested**
9 :

**testified**
7:3, 42:9,
42: 0, 42: 2

**testify**
8:9

**testifying**
97:23, 79:8

**testimony**
26:2, 26:5,
36:20, 40:3

**th**
7:22, 8 : 0,
82:9, 82: 4,
83: 0, 92:6,
65: 2, 7 : 4,
7 :22, 72:20,
73:9, 79: 9

**thank**
2: 0, 20: ,
23: 6, 8 :6,
93:20, 64:9

**themselves**
5: 5

**thereafter**
79: 3

**thing**
7: 9

**things**
2: 8, 57:5,
82: 2

**think**
6:6, 5:8,
20: 3, 22:22,
4 :22, 43: 5,
47:3, 47: 4,
69: 4, 8 :4,
84:7, 87:2 ,
9 : 2, 93:2,
00: 5, 00: 9,
00:20, 02:22,
04: 8, : 3,
5:2, 20:23,
2 :4, 2 : 2,
38: 4, 47:24,

**test**
55: 0, 56:23,
60:2, 60: 6,
62:20, 63:22,
68: 7

**third**
22: 0

**thisday**
76: 7

**thomas**
2:23, 3:20,
6: 3

**thought**
98:5, 63:2

**three**
8: 4, 8: 5,
8: 8, 9:2,
24: 7, 48:5,
56: 5, 57:6,
84:22, 85: ,
89:3, 89:7,
89: , 89: 2,
9 : 5, 3: 9,
34:9, 35:4,
39: 8, 72:7

**threw**
69:5, 70: 6,
73: 3, 78: 5,
80:

**through**
5 :22, 06:24,
07:2, 2:2 ,
2:24, 3:4,
3:5, 3:6,
2 : 9, 2 :20

**throwing**
70:23, 78:2

**thursday**
63: 4

**tijuana**
33: 7

**timeframe**
99:7, 4: 8,
6:3, 24:2

**times**
22:23, 23:8,
23:9, 23: ,
23: 2, 23: 4,
23: 5, 23: 8,

CCSAO COI SUBPOENAS 000225

| | | | |
|---|---|---|---|
| 24: 7, 25:7, | **took** | **translates** | **truth** |
| 87: 7, 89:4, | 36:23, 37: , | 23: 4, : 2 | 24:22, 4 :2, |
| 89:7, 89: , | 74: , 74:2, | **translation** | 73:7 |
| 89: 2, 9 : 5, | 74: , 94:9, | 30: 5, 63:3 | **truthfully** |
| 9 : 8, 9 : 9, | 94: 0, 94: 4, | **translation:** | 8:9 |
| 0 : 8, 07: 5, | 94:22, 95:3, | 27:3 | **try** |
| 07: 7, 08: 3, | 95: 5, 5:2, | **translations** | 0: 2, 5 :2 , |
| 34:9, 35:4, | 5:8, 5: , | 70: , 22:5 | 70: 0, 70: , |
| 35:6, 39: 8, | 40: 3, 40: 6, | **translator** | 70: 2, :4, |
| 45: 0, 45:23, | 59:5, 60: 8, | 4 :22 | 33:4, 63:9 |
| 45:24, 52:4, | 60: 9 | **transportation** | **turned** |
| 56:24, 6 : 6 | **top** | 29:6, 36: 4, | 7:7, 92:6 |
| **today** | 75: 6, 22: 6, | 84: 5, 84:20 | **two** |
| 5: , 6:2, | 23:23, 24: , | **travel** | 8: 4, : 9, |
| 7: 3, 8:8, 53:2, | 35:8, 56: , | 9:9, 2 : 9, | 2 : 5, 22: 0, |
| 54: , 04: 8, | 67: 6, 67: 8 | 2 :24, 29: 2, | 24: 7, 46: 0, |
| 23:5, 23:8, | **torres** | 29: 6, 39:20 | 56:20, 57: 4, |
| 3 : 6, 36:5, | 56: 7, 56:20 | **traveled** | 62:9, 67: , |
| 45:5, 45:8, | **total** | 29:9, 39: 8, | 80: 8, 80: 9, |
| 63: 2, 68:4 | 75:24 | 40:2 | 80:2 , 85: 0, |
| **today's** | **touch** | **traveling** | 85: 6, 89: 6, |
| 5:9, 74: 5 | 50:22, 85:23, | 2 :22 | 90:2 , 9 : 5, |
| **together** | 86: , 86:2, | **treated** | 96:8, 96:9, |
| : 5, :20, | 86:6, 87:5, | 74:23 | 96: 4, 04:3, |
| 8:5, 8:8, | 99:9, 34: 4 | **treatment** | 3: 8, 2 : , |
| 2 : 3, 2 :24, | **town** | 74:24, 76:3, | 46:8, 46:9, |
| 22: 2, 29: 6, | 65:9, 8 : 0, | 76: 9, 77: 0, | 47:23, 62:5, |
| 62: 0, 65:8, | 9 :4, 6: 3, | 77:20 | 62:6, 73: 5 |
| 65: 8, 39: 8 | 50: | **trejo** | **type** |
| **told** | **toyota** | 9:20 | 42:22, 75:7, |
| 27:22, 32: 6, | 83: , 83:3 | **trevino** | 76: 6, 77:20, |
| 33: 0, 42: 4, | **track** | 3:35, 6: 7, | 8 : 3, 82: 0, |
| 42: 9, 43: , | 9:24 | 36:5, 74:5 | 9: 5 |
| 43:3, 43: 5, | **transcribed** | **trevino's** | **typed** |
| 56:5, 69:3, | 79: 3 | 4: 8 | 4: 0, 22:5, |
| 72:22, 73:5, | **transcript** | **trevino:** | 22:2 , 23: 4, |
| 73:9, 75:22, | 00: 7, 00: 8, | 7:6, 2:2, | 23: 5, 26: 0 |
| 76: , 77:23, | 76:8, 79: 2 | 47: 9 | **U** |
| 84:6, 84: 0, | **transfers** | **trial** | **ubicar** |
| 87:2 , 88: , | 63: 9, 64: , | 32:3 | 6 : , 6 :3 |
| 88: , 04: 8, | 64:5 | **trip** | **uh-huh** |
| :8, 20:3, | **translate** | 4 : , 4 :3 | 24:2, 53:9 |
| 36: 8, 37:4, | 6: 8, 47:8, | **trouble** | **uncle** |
| 52: 2, 53: 4, | 38: 9, 59: , | 76:8 | 36:8, 36:9, |
| 60:3 | 59: 2, 59: 5, | **truck** | 36:23, 37:3, |
| **tom** | 68:22, 69:5, | 9:6 | 37: 6, 37: 9, |
| 5:23 | 7 : 7, 75:7 | **true** | 38:8, 67: 3, |
| **tongue** | **translated** | 20: 0, 76: 0 | |
| 75:9 | 00:20, 63:24 | | |

CCSAO COI SUBPOENAS 000226

Transcript of Gabriel Solache
Conducted on December 6, 2021

78

| | | | |
|---|---|---|---|
| 67: 4, 67: 7, | 42:3, 42: 4, | **upper** | 90:5, 90: , |
| 67:2 | 42: 5, 42: 6, | 57:24 | :2 , :24, |
| **uncle's** | 42:23, 43:8, | **use** | 26:23, 27:4, |
| 37:6, 38: | 44:24, 48:3, | 8:20, 79: 5, | 62:23, 63:4, |
| **unclear** | 49:2, 49:5, | 82:5, 84: 4, | 74:8, 74: , |
| 63:22 | 49:8, 49: 2, | 84: 5, 05:6 | 74: 4 |
| **uncles** | 50:23, 52:3, | **using** | **videotaped** |
| 67: 2 | 52:4, 52:5, | 6 :3, 99: 7, | : 7 |
| **under** | 52:8, 52:9, | 79: 2 | **viewed** |
| 5 : 2, 58: 0, | 52: 2, 52: 6, | **usually** | 05:7 |
| 76:4, 76:7, | 52:22, 52:23, | 84: 9 | **viola** |
| 76: 4, 79:8, | 53:6, 53: 2, | | 26:7, 26:8, |
| 79: 3 | 53: 8, 53:20, | **V** | 26:9, 55:20, |
| **understand** | 54:5, 54:8, | **vaca** | 56:8 |
| 7:23, 8:3, | 54: , 54: 4, | 59:23 | **visit** |
| 26: 4, 70:5, | 54: 6, 54:20, | **vague** | 3 :24, 32:6, |
| 64:6, 66:6 | 55: 4, 55: 8, | 22:22, 93: 7, | 32:9, 55: , |
| **understanding** | 63: , 63: 7, | 97:22 | 9 : 6, 9 : 7, |
| 5:6, 75: 9, | 63: 8, 63:2 , | **varga** | 9 : 8, 9 :20, |
| 96:2 , 97: , | 63:23, 64:9, | 3:2 , 6: 3 | 02:6, 44:3, |
| 97: 7, 4: 4, | 64: 0, 85:4, | **various** | 44:7, 44: 3, |
| 76: 3 | 85: 0, 85:20, | 64:5, 66:2, | 44:22, 45: , |
| **understood** | 86: 9, 87:9, | 68:3 | 45: 5, 52:2, |
| 8:4, 75: 4 | 87: 5, 96: 8, | **veces** | 53: 5 |
| **undocumented** | 96:22, 97:2, | 23: , 23: 4 | **visited** |
| 83:23 | 97: 6, 97: 7, | **verbatim** | 03:22, 44: 4, |
| **uniform** | 97:2 , 98:3, | 79:9 | 44: 9, 45: , |
| 50: | 98:7, 99:24, | **verification** | 45:7, 45: 2, |
| **unit** | 08:24, 49: , | 4:20 | 54:3, 56:6 |
| 5 :2 | 49: 6, 58:9 | **version** | **visiting** |
| **united** | **university** | 23: 4, 23: 5 | 97:23, 53:4 |
| : , 5:6, 0:3, | 95:9, 96:2, | **versions** | **visitor** |
| 8: , 8: 8, | 96: 5, 0 :23, | 26: | 4: 4, 5 :2, |
| 8:20, 9: , | 02: , 34:22 | **versus** | 5 :2 , 52: 8 |
| 9:3, 9:9, | **unless** | 5:5, 5: 5 | **voice** |
| 27:4, 27: 6, | 5:3 | **via** | 5: 4 |
| 27:20, 28: , | **unoccupied** | : 9, 99:24 | **volkswagen** |
| 28:5, 28:7, | 3: 7 | **video** | 8 :23 |
| 28: 6, 28:22, | **until** | 5:4, 5: 0, | **volume** |
| 29: , 29:4, | 3: 4, 45: 2, | 5: 2, 90: 2 | : 4, : 6 |
| 29: 6, 29: 9, | 5 :6, 6 : 0, | **videoconference** | **voluntarily** |
| 29:24, 3 : , | 77:24, 79:24, | : 9, 79:5 | 96: 9, 96:23, |
| 33: 5, 34:20, | 83:6, 05:3, | **videographer** | 97: 7 |
| 37:3, 37: 6, | 43: , 49: 6, | 3:34, 5:3, | **vs** |
| 38: 8, 38:22, | 60:4, 68: 5, | 5: , 6:2, | :9 |
| 39: 8, 39:22, | 70:5 | 9: 8, 9:2 , | |
| 40: , 40:23, | **unusual** | 5 :8, 5 : , | **W** |
| 4 :20, 42:2, | 7 : | 5 : 6, 90:2, | **wacker** |
| | | | 3:6 |

CCSAO COI SUBPOENAS 000227

wages
66: , 66:9
wait
70:7, 77: 5,
77: 7, 92:24,
3 :24, 32:4,
54: 4
walk
34:7, 2:24
walked
34:4
walking
34:3
want
20:24, 2 :6,
22: 7, 23: 0,
39:23, 76:7,
90: 7, : 9,
63: 3, 67:2,
7 :9
wanted
20: 4, 20:22,
2 : 3, 6 :2,
00: 7, 9: ,
52:6
water
2:23, 6: 6,
6: 7, 6: 9
way
20:9, 00: 7,
07:2 , :4,
3:3, 25: ,
32:20
ways
84: 7
we're
5: 7, 9:23,
20: , 20:8,
5 :2 , 64:5,
70: 0, 90:5,
0 : 5, :2 ,
26: 5, 30: ,
38: 4, 42:20,
5 :2 , 63:9,
63: 4
we've
2 : 5, 2 : 6,
42: 5, 63:8,

63: 7, 64: 8
wednesday
63: 4
week
5: 8, 23:3,
23:7, 23: 8,
89:9, 9 : 3,
7 : 8
weeks
39:22, 40: 2,
4 : 6, 43:8,
83: 5
wehrle
3:2 , 6: 2
went
:9, 3 :24,
32:9, 33: 5,
37:22, 38:6,
39:2 , 4 : 6,
43:4, 46:3,
46: 6, 50:2 ,
56:4, 72:22,
76:2, 76: 8,
76:23, 76:24,
77:2, 77:7,
77: 6, 77: 7,
77:2 , 95: 4,
02:5, 5: 2,
22: 3, 40:5,
40:20, 43:2 ,
60:4, 60:6,
6 : , 62: ,
64:6, 72: ,
72: 6, 73:2,
73:7, 73:24,
74:6
west
2:35
westlaw
5: 6, 5:2 ,
5:22
whatever
32:22, 34:2
whenever
69:4
whereof
79: 8
whether
8: 4, 26:4,

7 :8, 09:6,
0: 2
whole
2 :20, 43:8,
62:3
wife
9:7, 9: 2,
58: 6, 0:9,
0: 3, : 0,
:
wife's
9: 9, 0:2 ,
0:23, 0:24,
:2
william
42:7
window
3:6
winter
8: 5
within
22:4, 67: 9
without
4:5
witness
4:3, 6:5, 7:4,
9:7, 9: 6,
20: 7, 20:20,
22:23, 28: 9,
30: 3, 3 :6,
40:4, 45: ,
49:20, 57: ,
69: 9, 70:3,
70:8, 7 :8,
80: 7, 9 :3,
98: 6, 00:9,
00: 0, 09:22,
09:23, 0: ,
0:4, 0: 9,
0:20, : 8,
4:9, 4: 0,
23: 6, 29: 6,
3 : 2, 33:8,
33:9, 38:20,
40: 9, 40:20,
4 : 9, 4 :20,
4 :23, 52: 2,
54: , 59:8,

59:9, 59: 0,
59: 8, 6 :3,
62:2 , 75:5,
75:9, 75: ,
75: 2, 75: 3,
79:7, 79: 8
witnesses
4 : 0
woke
72: 0
woman
38:23
word
5: , 8:20,
47: 2, 6 :3,
05:6
words
42: 5, 42: 7
work
0:20, 0:22,
: 6, 2: 5,
35: , 38: 9,
39:5, 4 : 6,
4 : 7, 42:20,
42:22, 43:2,
43:4, 44:2,
50:7, 50: 4,
55:22, 56:5,
65: 8, 79:4,
79:20, 80: 9,
80:22, 8 : 3,
82:6, 82: 0,
82: , 83:3,
84: 3, 84: 8,
84:2 , 92:7,
4: 8, 5: 0,
5: , 5: 2,
6:9, 6: 2,
6: 4, 6: 8,
55: 9, 68:3,
7 :24, 72:4,
74:
worked
3:6, 38:23,
39:3, 43: ,
43: 6, 43:22,
44:6, 65:8,
79: , 80: 3,

CCSAO COI SUBPOENAS 000228

Transcript of Gabriel Solache
Conducted on December 6, 2021

80

82:9, 0 :4,
0 :6, 0 : 3,
4:8, 4: 0,
4: , 4: 5,
4: 7, 5:22,
6:2, 6:5,
29: 3, 66:3,
66: , 66:20,
66:23, 67:4,
67:9, 7 : 8,
72:22
**working**
3: 0, 3: 5,
39: , 42:9,
44: , 44: 9,
65:2 , 78:22,
78:24, 83:3,
92: , 00:7,
00: 0, 0 : ,
4:20, 6: 5,
23: 2, 56:8,
57:5, 66: 6,
68:2
**works**
34:
**worth**
32:23
**write**
55:5, 7:22,
8:6, 8: ,
8: 3, 30:23,
30:24, 46: 9,
46:22, 47:2 ,
48: , 48: 0,
48: 2, 48:20,
48:22, 53:22,
54:
**writing**
9:9, 9: 4,
54:
**written**
97: 0, 2 :5,
30:9, 3 :5
**wrongful**
67:
**wrote**
8:8, 27: 6,
28:7, 30: 8,

3 :5, 47:24,
48: 5, 53: 8

---
**Y**
---

**yeah**
7: 5, 5: 0,
5:23, 29:22,
8 :6, 86:23,
87:3, 22:6,
23: 5, 32:9,
32: 3, 66:8,
7 :8
**year**
9: , 3:9,
3: 4, 45: 6,
49:20, 50: 4,
63: 6, 65:20,
78: 2, 88:2 ,
0 :3, 05:
**years**
8: 4, 8: 5,
8: 8, 9:2,
3 : 7, 39:20,
48:2 , 53: 0,
85: 0, 85: 6,
52: 3, 59:3,
59:5, 59:22,
62:6, 67:24,
68: 7
**yesterday**
25:9, 25: 0,
23:9, 3 : 9,
3 :20, 3 :2 ,
3 :22
**york**
00:2
**young**
25:2
**younger**
3 : 5, 3 : 6,
32: 2, 62:7,
62:2 , 68:7,
68:8, 68:9
**yourself**
3: 7, 83:2,
2:24

---
**Z**
---

**z-a-n-o-s**
9:23

**zanos**
9:20, 9:2
**zehner**
2: 5

---
**.**
---

**.0070**
2:8
**.0090**
3:9
**.1001**
2: 9
**.2312**
:9
**.3000**
3:29
**.3300**
2:38
**.3705**
2:27
**.5900**
3: 7

---
**0**
---

**00**
4:20, 4:2 ,
7 : 9, 7 :24
**05**
90:3, :22
**06**
90:6, 90:8

---
**1**
---

**1**
5:8, 5 :24,
90:3, 90:6,
4:2
**1-5**
64: 3
**10**
4: 4, 9:22,
90:8, 50:2 ,
50:22, 63: 3
**100**
6: 9
**11**
4: 5, 30:23,
5 : 3, 5 : 8,

54: 3, 54: 4,
54:22, 55:2
**11305**
79:4, 79:22
**1180**
2:6
**12**
4:2
**120**
2:24
**121**
4: 3
**1240**
2:36
**126**
4:
**128**
4: 2
**13**
63:
**130**
4: 0
**133**
4: 6
**14**
48:2
**141**
2:35
**15**
48:2 , 5 :24,
2: , 24:22
**150**
4: 4
**151**
3:26
**154**
4: 5
**16**
8:7, 24:22,
79: 9
**164**
4: 7
**17**
0:4, 7:22,
92:6, 65: 8
**170**
4:20
**18**
:9, 5:8,

CCSAO COI SUBPOENAS 000229

Transcript of Gabriel Solache
Conducted on December 6, 2021

81

90: 3, 25:
**1971**
8:7
**1995**
65: 8
**1996**
33: 6
**1997**
78: 7
**1998**
7: 4, 3 :23,
54: 4, 7 : 4,
7 : 8
**1999**
24:3
**1:civ**
:9

---
**2**
---

**2**
90: 3, 7 : 9
**20**
75:7
**2000**
2:25
**2004**
3 :3, 3 :7,
32:2, 53:5
**2005**
52: 9
**2012**
47:3, 47: 5
**2013**
5: 6, 5:2 ,
5:22, 47:3,
47: 5
**2017**
94:5
**2018**
0:4, 0:6,
0: 3, 3: 4,
4: 2, 4: 3,
7:3, 53: 5,
02: 6, 65:9,
65: 2, 70:22,
7 :2
**2021**
:22, 5: , 5:9,

76: 7, 79: 9
**22**
53:5
**2200**
2: 7
**23**
94:5, 63:6
**2312**
5:8
**24**
49:3
**2500**
3:27
**26**
65:9, 65: 2,
67:24, 68: 7,
70:2 , 7 :2
**27**
2: 3, 7:7,
7 : 4, 7 :22,
72:20, 73:9
**2743**
33:23
**2747**
39:
**2749**
42:6, 42:7
**2nd**
52: 9

---
**3**
---

**3**
:22, 2: ,
27: , 27:6
**30**
4:20, 4:2 ,
7 : 9
**300**
6: 9
**311**
3:6, 3: 4
**312.243**
3: 7
**312.494**
2: 9
**312.704**
3:29
**312.982**
3:9

**32**
9:22, 5 : 3
**321**
2: 6
**37**
4: 6, 33: ,
33: 2, 33: 5
**3rd**
3: 5, 7 : 4

---
**4**
---

**4**
4:20, 7 : 9,
7 :24
**42**
94:2 , 95:
**45**
9 :8, 27:
**47**
5 : 8, 8 : 0,
82:9, 82: 4,
83: 0
**4812**
22: 7
**4814**
23:2 , 23:22
**4816**
22: , 22:2 ,
23:4

---
**5**
---

**5**
63: , 63:6,
74: 6
**5-1**
64: 4
**50**
74: 6
**51**
4: 7, 63: 7,
64: 2, 64: 5,
64: 9, 64:22
**52**
4:20, 70: ,
70: 2, 70: 6
**5200**
3:7
**53**
:23

**5308803**
5: 6, 5:2 ,
5:22
**56**
5: 0
**57**
27:6

---
**6**
---

**6/1/99**
24:
**60602**
2:26
**60604**
2:37
**60606**
3:8, 3:28
**60607**
3: 6
**60642**
2:7
**60654**
2: 8
**62**
56: 2
**630.735**
2:38

---
**7**
---

**7393**
5 :9
**7417**
55:9, 55: ,
55: 3
**7419**
52: 5, 52: 8
**7430**
56: 0
**773.235**
2:8
**7th**
8 :

---
**8**
---

**85**
7:22
**866.786**
2:27

PLANET DEPOS
888.433.3767 | WWW.PLANETDEPOS.COM

| 9 |
|---|
| 9 |
| :23, 5: 0 |
| 90 |
| 5 :2 , 5 :22 |
| 95 |
| 7:22 |
| 96 |
| 8: 2, 78: 3 |

CCSAO COI SUBPOENAS 000231



# Transcript of Gabriel Solache, Volume 2

**Date:** December 6, 2021
**Case:** Solache -v- City of Chicago, et al.

**Planet Depos**
**Phone:** 666.844.4373
**Email:** transcripts@planetdepos.com
www.planetdepos.com

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

CCSAO COI SUBPOENAS 000232

180

IN THE UNITED STATES DISTRICT COURT

OR THE NORTHERN DISTRICT O ILLINOIS

EASTERN DIVISION

GABRIEL SOLACHE,                )
                                )
                 Plaintiff,  )
                                )
        vs.                  ) No.  : 8 Civ. 23 2
                                )
CITY O CHICAGO, et al.,      )
                                )
                 Defendants. )
————————————————————————————)

VOLUME II

VIDEOTAPED DEPOSITION O

GABRIEL SOLACHE

(Via Videoconference)

DATE:     Wednesday, December 8, 202

TIME:     9:07 A.M.

PLACE:    Los Cabos San Lucas, Mexico

REPORTED BY:   Ruben Garcia
               Certified Shorthand Reporter

---

181

A P P E A R A N C E S

ON BEHAL O THE PLAINTI :
   (In Person)

   PEOPLE S LAW O ICE
   BY: JAN SUSLER, ESQ.
      80 North Milwaukee Avenue
   Chicago, Illinois 60642
   773.235.0070
   jsusler@peopleslawoffice.com

ON BEHAL O THE DE ENDANT CITY O CHICAGO:
   (In Person)

   ROCK, USCO & CONNELLY, LLC
   BY: EILEEN ROSEN, ESQ.
      JESSICA ZEHNER, ESQ.
   32 North Clark Street
   Suite 2200
   Chicago, Illinois 60654
   3 2.494. 00
   erosen@rfclaw.com

ON BEHAL O THE DE ENDANT REYNALDO GUEVARA:
   (Remotely)

   LEINENWEBER, BARONI & DA ADA
   BY: THOMAS LEINENWEBER, ESQ.
      MEGAN McGRATH, ESQ.
    20 North LaSalle Street
   Suite 2000
   Chicago, Illinois 60602
   866.786.3705
   thomas@ilesq.com

---

182

APPEARANCES (Cont d)

ON BEHAL O INDIVIDUAL OTHER DE ENDANTS:
   (In person)

   THE SOTOS LAW  IRM
   BY: JOSH ENGQUIST, ESQ.
      CAROLINE GOLDEN, ESQ.
    4 West Jackson Boulevard
   Suite  240A
   Chicago Illinois 60604
   630.735.3300

ON BEHAL O DE ENDANT DAVID NAVARRO:
   (Remotely)

   REITER BURNS, LLP
   BY: DANIEL BURNS, ESQ.
    3  South Wacker Drive
   Suite 5200
   Chicago, Illinois 60606
   3 2.982.0090
   dburns@reiterburns.com

OR BEHAL O ARTURO REYES:
   (Remotely)

   LOEVY & LOEVY
   BY: ANAND SWAMINATHAN, ESQ.
      SEAN STARR, ESQ.
      VALERIE BARRAJAS
    3  North Aberdeen Street
   3rd  loor
   Chicago, Illinois 60607
   3 2.243.5900

---

183

APPEARANCES (Cont d:)

ON BEHAL O THOMAS O MALLEY, HEATHER BRUALDI, ANDREW VARGA, KARIN WEHRLE:
   (Remotely)

   HINSHAW & CULBERSON
   BY: MICHAEL STEPHENSON, ESQ.
    5  North  ranklin Street
   Suite 2500
   Chicago, Illinois 60606
   3 2.704.3000
   mstephenson@hinshawlaw.com

ALSO PRESENT:

   Itzcoatl Carrillo, Videographer

   Jose  onseca and Adriana Trevino, Interpreters

NOTE:  The original deposition transcript will be

delivered to:  ROCK,  USCO & CONNELLY, LLC

Transcript of Gabriel Solache, Volume 2
Conducted on December 8, 2021

8 (1t3 4) 1t95

184

INDEX

WITNESS: Gabriel Solache                                    PAGE

        EXAMINATION BY Ms. Rosen ............... 88

EXHIBITS RE ERENCED:                                        PAGE

Exhibit    Description

| Exhibit 29 | Employee Detail Earnings and employment records | 396 |
| Exhibit 45 | Pro se Petition for Post Conviction Relief in a Capital Case with a Motion for Appointment of Counsel | 363 |
| Exhibit 54 | Plaintiff Gabriel Solache s verification of answers to Defendant s interrogatories | 89 |
| Exhibit 56 | Plaintiff Gabriel Solache s Supplemental Answers to Defendant Rutherford s  irst Set of Interrogatories | 222 |
| Exhibit 65 | Interview with Gabriel Solache, November  7, 2000 | 348 |
| Exhibit 77 | Photograph of Norma Salazar | 394 |
| Exhibit 88 | Photographs | 379 |
| Exhibit 89 | Photographs | 380 |
| Exhibit 90 | Photographs | 38 |
| Exhibit 9 | Photographs | 389 |

185

INDEX   (Continued)

EXHIBITS (Continued)

Exhibit    Description                                      Page

| Exhibit 92 | Photographs | 39 |
| Exhibit 93 | Photographs of pages showing telephone numbers and addresses | 392 |
| Exhibit 94 | Photographs of day planner and its contents | 393 |

186

LOS CABOS SAN LUCAS, MEXICO, WEDNESDAY, DECEMBER 8, 202

        THE VIDEOGRAPHER:  Here begins Media Number  in the video deposition of Gabriel Solache in the matter of Gabriel Solache versus City of Chicago in the United States District Court for the Northern District of Illinois, Eastern Division, Case Number  : 8 Civ. 23 2.

                Today s date is December 8, 202 . The time on the video monitor is 9:08 a.m.  The videographer today is Itzcoatl Carrillo on behalf of Planet Depos.  This video deposition is being taken place at Westin Los Cabos.

                Will counsel please voice identify themselves and state whom they represent, please.

        MS. SUSLER:  Jan Susler.  I m the attorney for Gabriel Solache, the plaintiff.

        MR. STARR:  Sean Starr, attorney for plaintiff Arturo Reyes.

        MS. ROSEN:  Eileen Rosen on behalf of defendant City of Chicago.

        MR. ENGQUIST:  Josh Engquist on behalf of

87

all the individual defendant officers with the exception of Reynaldo Guevara.

        MR. LEINENWEBER:  Tom Leinenweber on behalf of defendant Reynaldo Guevara.

        MR. STEPHENSON:  Michael Stephenson on behalf of Defendants O'Malley, Varga, Brualdi and Wehrle.

        MR. BURNS:  Dan Burns on behalf of defendant David Navarro.

        MS. ROSEN:  I think that's everyone.

        THE REPORTER:  Will counsel please stipulate that in lieu of formally swearing in the witness, the reporter will instead ask the witness to acknowledge their testimony will be true under the penalties of perjury, that counsel will not object to the admissibility of the transcript based on proceeding in this way, and that the witness has verified that he is in fact Gabriel Solache.

        MS. SUSLER:  Jan Susler, so stipulated.

        MR. STARR:  Plaintiff Reyes stipulates.

        MS. ROSEN:  Eileen Rosen, so stipulated.

        MR. ENGQUIST:  Josh Engquist, so stipulated.

        MR. LEINENWEBER:  Tom Leinenweber, so

CCSAO COI SUBPOENAS 000234

**88**

stipulated.

MR. STEPHENSON: Michael Stephenson, so stipulated.

MR. BURNS: Dan Burns, so stipulated.

THE REPORTER: Mr. Solache, do you hereby acknowledge that your testimony will be true under the penalties of perjury?

THE WITNESS: Yes.

MS. SUSLER: Is it possible for you all to get a little closer to Mr. Solache?

Thank you so much.

(Adriana Trevino is interpreting.)

EXAMINATION
BY MS. ROSEN:

Q    Good morning, Mr. Solache.

A    Good morning.

Q    We're going to try to pick up where we left off on Monday, the same rules apply as applied on Monday. If you need to take a break, let us know.

A    Of course.

Q    I'm going to ask you to take a look at Exhibit Number 54. Mr. Solache, if you could

**89**

quickly thumb through the document so that you're familiar with what it is, and then I have a few questions.

A    Yes.

(Deposition Exhibit 54 was marked for identification.)

BY MS. ROSEN:

Q    Mr. Solache, have you seen this document before?

A    Yes.

Q    And on the last page of the document appears the verification page, which appears to me has your signature; is that correct?

A    Yes.

Q    And the signature page is dated November 26, 2018. Do you see that?

A    Yes.

Q    Is it fair to assume that you reviewed and signed the document on November 26, 2018?

A    Yes.

Q    And did you write that date in? Is that your handwriting?

A    Yes.

**90**

Q    I have a couple questions on some of your answers. As you take a look at page 3, there isn't a number at the bottom of the page, but the page before it says page 2.

A    I found it.

Q    And on page 3 is your answer to the question that asks you to detail the nature of the injuries that you claim to have sustained as a result of defendant's conduct.

THE INTERPRETER: I'm sorry. Conduct?

MS. ROSEN: The defendant's conduct.

BY MS. ROSEN:

Q    And if you look at the bottom of page 3, you state that you were deprived of the opportunity to pursue your passions and interests. Can you tell us what passions and interests you had in the two years before your arrest?

A    Well, I had the dream to come to the United States, and obviously I did do that, I went there. I also had the dream to build a house in Mexico, but I was unable to do that due to what happened in 1998, the arrest.

Q    When you went to the United States with the dream of making enough money to build a

**9**

house in Mexico, did you have a plan for how long it would take for you to save enough money?

A    Yes, around a period of five to six years.

Q    And how much money did you want to save so that you could return to Mexico and build your house?

A    The most I could.

Q    So was your plan to save a certain amount of money or was your plan to return home after five or six years, regardless of how much money you had saved?

A    Well, I cannot say anything about that because I was only able to stay two years in the U.S., and anything beyond that I wouldn't be able to tell.

Q    And in that two-year period of time you had not saved any money to build your house, right?

A    That is correct.

Q    Where in Mexico did you intend to build the house?

A    On the ranch, Michoacan.

Q    And did you have any idea of how much

CCSAO COI SUBPOENAS 000235

money it would cost to build the type of house you were dreaming of?

A   No.

Q   Any other dreams or passions or interests that were interrupted by your arrest, prosecution and conviction?

A   No.  That's all I can think of now.

Q   You also say in response to this question that your arrest and prosecution and conviction prevented you from engaging in meaningful labor and development of a career.  What career had you planned on pursuing had you not been arrested?

A   No, I don't know.

Q   You also say that you are trying to reestablish relationships with your mother, who you only saw one time while you were in prison.  What have you been doing in the last few years to reestablish your relationship with your mother?

A   I have a good relationship with my mother.

Q   Did you have a good relationship with your mother throughout the time of your incarceration?

A   Yes.

Q   You also say that you have been trying to reestablish relationships with your siblings.

A   I don't remember having said that.

Q   Can you describe your relationships with your siblings?

A   Well, we get along well.  I mean, they all have their jobs, but I get along well with all of them.

Q   You also say that during the time that you were incarcerated, you experienced anxiety and panic attacks.  Can you tell us about that?

A   Yeah; in fact, up to now I still suffer from panic attacks.

Q   When you say you suffer from panic attacks, can you tell us what happens?

A   Well, yes, sometimes I feel like a pain in my chest, like I'm about to have an attack.

Q   Any other symptom?

A   No.

Q   And then what happens when you feel this pain in your chest?

A   When I was in Chicago, I went to see a therapist at Northwestern, and she gave me,

like -- I don't remember the word -- for breathing.

Q   So when you were in Chicago, so that's the couple months that you were there after you were released from the Kankakee Jail and before you came back to Mexico, correct?

THE INTERPRETER:  He can't hear me.  I've got to get closer.

MS. ROSEN:  Okay.

THE INTERPRETER:  Can you repeat the question?

BY MS. ROSEN:

Q   So when you're saying when you were in Chicago, that was from the period of time that you were released from the Kankakee Jail and before you came back to Mexico, right?

A   Yes.

Q   And you went to see a therapist at Northwestern?

A   Yes.

Q   How many times did you see that therapist?

A   I don't remember how many times I went, but I went a few times.

Q   So you went more than one time?

A   Yes.

Q   Do you know the name of the -- sorry.  Do you know the name of the therapist?

A   I'm not quite sure, but I think her name is Becky Birch, something like that.

Q   Becky Bertz (phonetic)?

A   Yes, Birch.  I'm not sure.

Q   Do you know what kind of doctor this Becky person is?

MS. SUSLER:  Objection.  Form.  Assumes facts not in evidences.

THE WITNESS:  Well, the truth is I don't know, but the one who sent me there was my attorney, Karen Dennis.

BY MS. ROSEN:

Q   So Karen Daniels is the person that set up your visits with Becky, right?

A   Correct.

Q   Do you know if Becky was a doctor?

A   No.

Q   And other than giving you some kind of breathing exercises, did she do anything else for you?

A   Not that I can remember right now.

CCSAO COI SUBPOENAS 000236

Transcript of Gabriel Solache, Volume 2
Conducted on December 8, 2021

7 (160 4) 1665

Q When did your panic -- what you're describing as panic attacks -- start?

A I don't remember, but I was still in prison.

Q Do you remember if it started in the first ten years you were in prison?

A I don't remember.

Q And did you get any treatment while you were in prison?

A I went to see a psychologist. I don't remember how many times I went.

Q And what, if anything, did the psychologist do to help you with what you believe to be are -- were -- panic attacks?

A She didn't do much.

Q During the time that you were in -- during the time that you were in prison, how often did you have these panic attacks?

A I don't remember.

Q And once you get the feeling in your chest, how long does it last?

A Well, I have not paid attention, but when it starts, I start doing the breathing exercises and then it goes away, but I don't know how long it lasts.

Q And you said you still have these panic attacks?

A Yes.

Q When is the last time you had this feeling that you are having a panic attack?

A Friday.

Q You're talking about last Friday, right?

A Yes.

Q And when was the last time you had the panic attack before last Friday?

A I don't remember.

Q Was it within the last month?

A I don't remember.

Q How many times have you had these feelings that you described as a panic attack since you moved back to Mexico?

A I don't remember how many times.

Q Have you seen any doctors to help you with what you're calling a panic attack?

A No.

MS. ROSEN: We're going to go off the record for one second because there's somebody

knocking on the door. We're having the air adjusted. Give us a minute.

THE VIDEOGRAPHER: We are going off the record. The time is 9:33 a.m.

(Recess.)

THE VIDEOGRAPHER: We are back on the record. The time is 9:38 a.m.

BY MS. ROSEN:

Q Mr. Solache, is there anything that you have noticed that causes these panic attacks that you're describing?

A Well, obviously I'm not a doctor. I don't know what causes panic attacks.

Q But you're not noticing anything in your activities that seem to cause the panic attack?

A I believe it's the same question, but as I said before, I'm not a doctor; I don't know what causes panic attacks.

Q Have any doctors that you have -- doctors or counselors or anybody that you have seen -- prescribed any medication for you to help address what you're calling a panic attack?

A No.

Q And do you remember, as you sit here today, when you had your very first, what you're calling panic attack?

A Yes.

Q Can you tell us when that was?

A I don't remember the exact year, but I was in prison, and I was taking --

THE INTERPRETER: The interpreter will clarify "bano."

THE WITNESS: When I was taking a shower.

BY MS. ROSEN:

Q Did anything happen in the shower that you connect to your panic attacks?

A Well, I don't remember exactly what happened, but yes, it was a panic attack.

Q Did you have any altercation or argument or confrontation with anybody either in the shower, before going to the shower, on the day that you had your first panic attack?

A No.

Q Has any doctor or healthcare provider told you that what you're experiencing is a panic attack?

A No.

Q You also state, in your answers to

CCSAO COI SUBPOENAS 000237

Transcript of Gabriel Solache, Volume 2
Conducted on December 8, 2021

0 (8oo 4) 8o25

the question about your injuries, that you have migraine headaches.

A    That is correct.

Q    When did you first start having migraine headaches?

A    I don't remember.

Q    Has any doctor or health -- sorry. Let me start over.

Has any doctor or healthcare provider told you that the headaches that you are experiencing are migraine headaches?

A    No.

Q    How do you know that they're migraine headaches?

A    Well, I just know that migraine headaches because I hear that when it's hard pain, head pain, that people say that those are migraine headaches.

Q    How often do you get these headaches?

A    I don't remember.

Q    When is the last time you had one of these headaches?

A    I don't remember the exact dates. Some days back.  I don't remember the exact date.

Q    Has it been within the last month?

A    It was some days back, but I do not remember the date.

Q    "Some days"?  Is that what you said?

A    Yes.

Q    How often have you had these headaches since you moved back to Mexico?

A    I do not remember how often.

Q    Did you get these headaches while you were in prison?

A    Yes.

Q    How often would you get the headaches while you were in prison?

A    I do not remember.

Q    Did you get these headaches while you were in Cook County Jail?

A    Yes.

Q    How often would you get these headaches while you were in Cook County Jail?

A    I do not remember.

Q    Did you get these headaches before you were arrested?

A    Yes.

Q    Did these headaches start after your

head injury in 1997?

A    Well, I don't remember.  Possibly. But I did not get like headaches that were that severe after the accident.

Q    Have you gone to any doctor or healthcare provider for treatment for these headaches?

A    Not that I remember.

Q    Has any doctor or healthcare provider given you any medication to help with these headaches?

A    Not that I remember.

Q    You also state in your answer to Question Number 3 about your injuries that you suffer chronic gastrointestinal -- sorry -- chronic gastrointestinal symptoms.  Can you tell us about that?

A    Yes.  When I was in the Pontiac Prison, I had pain in my leg, and they gave me medication, and that's what caused the gastritis.

Q    Do you know why you had pain in your leg?

A    Well, I went to the doctor, but I was never told.

Q    Which leg did you have pain in?

A    The right one.

Q    You broke your leg, didn't you, while you were in Cook County Jail?

A    No.

Q    Did you break your leg playing basketball?

A    No.  It was my foot.  But it wasn't broken.  It was just --

THE INTERPRETER:  The interpreter needs to clarify "Estrello."

THE WITNESS:  It just cracked.  Like cracking.  It's just cracked.

BY MS. ROSEN:

Q    Were you wearing a cast?

A    Yes.

Q    And was that the right leg or the left -- you said it was your foot?

A    (In Spanish:) Si.

Q    Was it your right foot or your left foot?

A    Yes, I already answered that, but I will answer it again.  It was the right foot.

Q    And the pain that you had while you

CCSAO COI SUBPOENAS 000238

204

were in Pontiac was different than whatever injury you suffered in your right foot, right?

A   Correct.

Q   What medication did they give you in Pontiac for the pain in your leg?

A   Well, I don't remember exactly, but ibuprofen.  That's all they give, ibuprofen.

Q   And that ibuprofen gave you the gastritis, right?

A   Yes.

Q   When you stopped taking it, did the symptoms go away?

A   No.

Q   Do you still suffer from the gastritis?

A   Yes.

Q   Do you take any medication for it?

A   Yes, when the stomach gas is high, yes, I do.

Q   What type of medication?

A   I don't remember what the pills are called.

Q   Do you see -- have you seen a doctor or healthcare provider for medications for your

205

gastritis?

A   Yes.

Q   Do you see a doctor currently here in Mexico?

A   Yes, 20 days ago I went to see a doctor, and he diagnosed diabetes.

Q   What's the name of the doctor that you saw 20 days ago?

A   I don't know.

Q   Was that the first time you ever saw that doctor?

A   Yes.

Q   And where is that doctor located? What city or town?

A   Pachuca.

Q   Did the doctor prescribe you medication for your diabetes?

A   Yes.

Q   What type of medication?

A   I don't remember the name of the medication.

Q   Is it something you have to take every day?

A   Yes, they're different pills.  One I

206

take every eight hours and another one, morning and afternoon or evening.

Q   And do you have to test your blood sugar every day?

A   No.

Q   Did the doctor that you saw 20 days ago give you any medication for your gastritis?

A   Yes.

Q   Before getting the medication from the doctor 20 days ago, had you seen a doctor before that or a healthcare provider about your gastritis?

MS. SUSLER: Objection.  Form.  Are you talking about since his return to Mexico or ever?

MS. ROSEN:  Yeah, since his return to Mexico.

THE WITNESS:  Yes.

BY MS. ROSEN:

Q   And what's the name of the doctor that you saw?

A   I don't know his name.  He works for the Mexican government.

Q   How often did you see this doctor about the gastritis?

A   I only saw him once.

207

Q   Do you recall approximately when?

A   When I just came from the United States.

Q   Any other doctors that you've seen since being in Mexico for your gastritis?

A   No.

Q   You also state in answer to the question about your injuries that you experienced high cholesterol.

A   They detected high cholesterol when I was in Pontiac, but I don't remember exactly when.

Q   So at some point in time while you were at Pontiac, one of the doctors or healthcare providers told you that your cholesterol was high; is that right?

A   I don't remember if it was in Pontiac, but yes, I was told.

Q   While you were in prison?

A   Yes.

Q   And were you given any medication for that?

A   No, I don't remember.

Q   You also say that you experienced high blood pressure during your imprisonment.  How

CCSAO COI SUBPOENAS 000239

208

do you know you had high blood pressure?

A   I don't remember saying that.  But if I said that, it must be on some paper.

Q   Do you recall ever being told that you have high blood pressure?

A   Yes, when I went to see the doctor for the diabetes, he told me I had high blood pressure.

Q   So this was 20 days ago?

A   Approximately.

Q   Did he give you any medication?

A   Well, he gave me several pills.  I don't know if some of them are for the high blood pressure, but I imagine they are.

Q   You also state that you experienced joint pain while you were in prison?

A   Yes.

Q   Can you tell us about that?

A   Well, my knees, my elbows and my feet hurt.

Q   Do you still experience that pain today in your knees, elbows and feet?

A   When it's cold only.

Q   Have you seen any doctor or

209

healthcare provider about your joint pain?

A   No.

MS. SUSLER:  Just objection, form.  Are you talking about ever in his life or since his return to Mexico?

MS. ROSEN:  I guess I'm going to start with in Mexico.

THE WITNESS:  No.

BY MS. ROSEN:

Q   Have you seen any doctor or healthcare provider -- even before you came to Mexico -- about the knee, elbow and -- about the joint pain in your knees, elbows and feet?

A   No.

Q   You also state that while you were in prison, you had to maintain a high sense of vigilance constantly because you could not trust the people around you.

Can you tell us about that?

A   It's the prison.  You have to be vigilant.

Q   Did you experience any conflict with any individuals at any point in time while you were in prison?

2 0

A   No.

Q   You also state that now that you are out of prison, it's very difficult for you to trust people.  Can you tell us about that?

A   Yeah, well, I mean, with just of what you see in prison, and then when I got out of prison -- how do I say this.  Yeah, well, I mean, nobody helped me to get integrated into society.  I got out, and you were just alone.

Q   When you say nobody helped you to "integrate into society," do you mean once you were released from prison?

A   Also when I was in prison.

Q   So when you were in prison, nobody helped you to integrate into the prison society.  Is that what you mean?

A   I am referring to the outside society.  Inside a prison, there's no society.

Q   Okay.  So I'm just having a little trouble understanding what you're saying.  So maybe you can help me out.

You currently have difficulty trusting people; is that right?

A   That's correct.

2

Q   And you believe that's a result of your prison experience, right?

A   Correct.

Q   And you believe that that's caused, in part, by the fact that nobody helped to integrate you into society?

A   Correct.

Q   And when you say "integrate you into society," you mean once you got out of prison, right?

A   Yes.

Q   What type of help do you think would have been beneficial to you?

A   Maybe there was a program for people that get out of prison.

Q   Have you looked into whether or not there are any kinds of programs that help people who get out of prison?

A   No.

Q   Did you ask Karen Daniels about any kind of program that could help you -- hold on a second.  Let me rephrase it.

First I'm going to tell you you should pause before you answer my question, because

CCSAO COI SUBPOENAS 000240

I see that Ms. Susler might have something to say about my question. So let me pose it again.

MS. SUSLER: Let him translate what you just said.

(Jose Fonseca is interpreting.)

THE INTERPRETER: I just want to clarify just one part of the question.

MS. SUSLER: Then she asked, "Did you ask your lawyer Karen Daniels?"

And I'm going to make an objection and say that we are entering the field of attorney/client privilege, and I'm going to instruct my client not to answer any questions about communication between him and his lawyer.

BY MS. ROSEN:

Q When you met with the healthcare provider at Northwestern -- whose name you believe was Becky -- did you ask her about whether or not there were any such programs?

MS. SUSLER: Excuse me. Just one minute. Did you say the word "abogada" in your translation, because that was not the question.

THE INTERPRETER: "Con una persona profesional de la salud."

MS. SUSLER: Okay. Sorry. I didn't hear that.

THE WITNESS: I didn't ask her about a program that related to anybody who left prison, but I didn't ask about health or a program, about a program that would help people who leave prison.

BY MS. ROSEN:

Q You also state in your answer that new places cause you stress and anxiety. Can you tell us a little bit about that?

A I didn't understand the question.

Q Sure. In your answer to the question about your injuries, you state that being in new places cause stress and anxiety.

Can you tell us about that?

A I don't remember.

Q Do you own a car?

A Now?

Q Yeah.

A Yes.

Q And so the way you get around generally is in your own car; is that right?

A Correct.

Q When did you buy the car?

A I don't remember exactly, but it was some time ago.

Q When you first came back to Mexico or some period of time after that?

A No, it was after, but I don't remember exactly when I bought it.

Q What type of car do you have?

A A Toyota -- a Honda.

Q What year is the Honda?

A '18.

Q You also state in your answer regarding your injuries that you had difficulty finding employment. Can you tell us about that?

A I don't remember having said that, but if that's on the paper, I don't remember having said that.

Q Did you have difficulty finding employment once you came back to Mexico?

A Yes.

Q Can you tell us about that?

A Everything changed when I came back to Mexico. Before, you could get a job with grade school, but now they're asking for high school, and I don't have high school.

Q Do you have any plans to go back to school?

A Not now.

Q Why not?

A If I go to school, I'm going to have to stop working. And I need to work. I need to have the money.

Q You also state in your answer about your injuries that it's difficult for you to let down your guard, including with women.

THE INTERPRETER: "That it's difficult for you to"?

MS. ROSEN: "Let down your guard, including with women."

THE INTERPRETER: The interpreter is going to clarify. Would you please be so kind as to rephrase "let down your guard"?

MS. ROSEN: Well, it's his words in the answer, so the precise quote is, "It is difficult to let down his guard, which is constantly up, including with women."

BY MS. ROSEN:

Q Can you tell us about that?

A I don't remember that.

CCSAO COI SUBPOENAS 000241

26

Q   Do you have difficulty forming relationships with women?

A   Yes.

Q   Can you tell us about that?

A   I don't know exactly what happens, but I have difficulties.

Q   And what type of difficulties?

A   Well, I believe that it was because I was for a long time without a relationship with women.  I believe that that's the reason.

Q   Can you provide us any more details about the difficulties you have forming relationships with women?

A   I believe that's all I can tell you.

Q   You also state that you have difficulty sleeping.  Can you tell us about that?

A   Yes, I also have difficulties to sleep.  I don't know why.

Q   And when you say you have difficulty sleeping, can you describe exactly what the difficulty is?

A   Yes.  Well, I wake up early in the morning, and then I want to go back to sleep and I can't.

27

Q   How early do you wake up?

A   3:00, 2:00 a.m.

Q   And then you have difficulty falling back to sleep?

A   Yes.

Q   Have you spoken to any doctor or healthcare provider about that?

A   No.

Q   Does it happen to you every night?

A   Not every night.  Sometimes.

Q   Now, I know that you were, for some period of time, getting some treatment with Dr. Valadez, I believe his name is?

A   Yes.

Q   And we'll talk about that a little bit later, but other than the treatment with Dr. Valadez, have you had any treatment with any other mental health provider since returning to Mexico?

A   No.

MS. SUSLER:  Are you done with this exhibit?

MS. ROSEN:  I am.

28

BY MS. ROSEN:

Q   How many jobs have you applied for since you have returned to Mexico?

A   None.

Q   None?

THE INTERPRETER:  "None," uh-huh.

BY MS. ROSEN:

Q   How did you get the job that you currently have?

A   The store is mine.

Q   You own the store?

A   Yes.

Q   When did you buy the store?

A   More than two years.

Q   Where did you get the money to buy the store?

MS. SUSLER:  Objection.  Same objection I made yesterday and the same case.  I'm instructing my client not to answer.

MS. ROSEN:  Is it based on collateral source?

MS. SUSLER:  It's based on what I said yesterday; same objection.  And I'm instructing him not to answer.

29

BY MS. ROSEN:

Q   How much did the store cost?

A   About -- I don't remember the exact price, but it didn't cost much.

Q   How much revenue does your store generate on a yearly basis?

THE INTERPRETER:  "How much"?

BY MS. ROSEN:

Q   How much revenue does your store generate on a yearly basis?

A   Not much, really, but it gives me enough to eat, and for me that's enough.

Q   Do you have any employees?

A   No.

Q   Is the store closed now because you're here?

A   No, I have neighbors who take care of it.

Q   So you're paying them to take care of it?

A   Yes, only for the days that I'm here, yes.

Q   Do you own the store free and clear or is there a loan, where you're paying money to a

CCSAO COI SUBPOENAS 000242

220

bank or a loan company?

A    No, I am the owner, but I have to pay rent, electricity and water.

Q    With respect to your apartment, do you own that free and clear, or do you have a loan with a bank or a mortgage company or something like that?

A    No, I'm the owner.

Q    Do you pay yourself a salary from your business?

A    No, I just take money to eat.

Q    Do you have to file income taxes?

A    No.

Q    Why not?

A    Because the place where I have the store, trade is not regularized.

Q    I don't know exactly what that means, so maybe you can help me.  What do you mean "trade is not regularized"?

A    Yes, in many places in Mexico, that's different from the United States.  There are many places where businesses don't pay electricity, water.  But I pay electricity and water.  And that zone could be referred to as an area that is a

22

municipality, which is not regularized by the municipality.

MS. SUSLER:  Let me just ask the interpreter, is another way to say "regularized," "governed"?

THE INTERPRETER:  "Regulated" if the question was "regulado."  But the witness said "regularizado," which is regularized.  "Regulado" would mean regulated.

MS. SUSLER:  Okay.

THE INTERPRETER:  If I'm allowed to change "reguladisador" for "regulated."

MS. ROSEN:  Well, is that not the word he used?

THE INTERPRETER:  He did not use --

MS. ROSEN:  Well, we're going to translate the word he used.

MS. SUSLER:  That's fine.

MS. ROSEN:  All right.  Well, we have to change the tape; so why don't we take a break, and we can maybe take a five-minute break so people can use the restroom or something like that.

THE VIDEOGRAPHER:  This marks the end of Media Number 1 in the deposition of Gabriel Solache.

222

We are going off the record.  The time is 10:24 a.m.

(Recess.)

THE VIDEOGRAPHER:  Here begins Media Number 2 in the deposition of Gabriel Solache.  We are back on the record at 10:36 a.m.

MS. ROSEN:  I'm going to ask you, Mr. Solache, to take a look at Exhibit 58.

(Deposition Exhibit 56 was marked for identification.)

(Adriana Trevino is interpreting.)

BY MS. ROSEN:

Q    Mr. Solache, if you could take a quick look at that and let me know once you've looked at it and we can ask some questions about it.

A    Yes.

Q    Do you recognize that document?

A    Yes.

Q    And the last page of the document has your signature and it's dated October 8, 2021.

Do you see that?

A    (In Spanish:) Si.

Q    So just like with the others, is it fair to say that you reviewed the document and signed it on October 8, 2021?

223

A    Yes.

Q    And this request asks you to identify --

MS. SUSLER:  Excuse me.  I'm sorry.  I just had an objection.  I think in Mexico the dates are written with the --

MS. ROSEN:  You are correct.

MS. SUSLER:  -- day first and the month second.

BY MS. ROSEN:

Q    Mr. Solache, could you take a look at the date and can you tell us what date you signed and review the document.

A    10/8/21.

Q    And what is the month that is being referenced there?

A    I imagine it's October.  October 8 of 2021.

MS. SUSLER:  If we look at the complete document, it may be more instructive, to direct him to --

MS. ROSEN:  Okay.  I'm going to ask my questions and he's going to answer them.

CCSAO COI SUBPOENAS 000243

Transcript of Gabriel Solache, Volume 2
Conducted on December 8, 2021

18 (883 4) 8895

BY MS. ROSEN:

Q All right. Is that handwriting yours that has the date written on the page next to your signature?

A Yes.

Q I'm going to ask you some questions about your responses to this question, which is asking you about mental health treatment, okay?

A Yes.

Q And in this document you indicate that you began treatment with Dr. Valadez in or around November of 2018; is that correct?

MS. SUSLER: You're on the second page, Counsel?

MS. ROSEN: I am.

MS. SUSLER: Mr. Solache, will you look at the document, please?

THE INTERPRETER: "2018"?

MS. ROSEN: 2018, yes.

(Interpreter translated the question to the witness.)

TECHNICIAN: Pardon the interruption. This is Alex, the tech.

Ma'am, was that Exhibit Number 58, ma'am, 5-8?

MS. ROSEN: Correct. Yes.

TECHNICIAN: It appears that my copy of 58 is not what you're looking at.

MS. ROSEN: It should be Plaintiff Gabriel Solache's Second Supplemental Answers to Defendant Rutherford's First Set of Interrogatories; is that right?

TECHNICIAN: It says "Supplemental Answers" but it doesn't say "Second." And it's dated March 11, 2020.

MS. ROSEN: Okay. Hold on one second. So that one, the March 11th one is 57 in my packet.

TECHNICIAN: I see. One moment. In the set that I received it's Number 5- -- excuse me. My apologies, ma'am. It doesn't match up with my set, I'm afraid.

MS. ROSEN: So what do you have as 58?

TECHNICIAN: I'll share it to the screen.

MS. ROSEN: We're not on the Zoom.

TECHNICIAN: Understood. It is Plaintiff Gabriel Solache's Supplemental Answers to Defendant Rutherford's First Set of Interrogatories.

MS. ROSEN: I can't figure out exactly what the issue is from here right at this moment.

We all have the correct exhibit.

Those playing along at home in Chicago, I will identify the document, and if you're interested in pulling it up, then you can pull it up. It's part of discovery in the case. And then at the lunch break, maybe we can talk about the exhibits.

Unfortunately, my paralegal this morning is in the emergency room with her son, so I can't have her help us figure this out right this second.

TECHNICIAN: Understood. Best wishes to your paralegal, of course.

MR. BURNS: This is Dan Burns. It might be 56 on our list.

TECHNICIAN: Thank you, sir. That does appear to be it. Thank you very much, sir.

MS. ROSEN: Thanks, Dan.

BY MS. ROSEN:

Q Okay. So back to the exhibit. If you could -- let me go back to the question.

In answer to the question asking you about your mental health treatment, generally you indicate that in or around November 2018 you began seeing Dr. Fernando Valadez; is that correct?

A Yes.

Q And then in the second supplemental answer to that question, you indicate that you stopped seeing Dr. Valadez in approximately March of 2020 at the beginning of the pandemic; is that correct?

A I don't remember exactly when I stopped seeing him, but it is possible.

Q And since you've stopped seeing him in or around March of 2020, you have not started seeing him again; is that correct?

A It is correct.

Q Why did you stop seeing Dr. Valadez?

A Well, the reason I stopped seeing him, he is in Mexico City, and I have to travel to the city to see him. Well, there's so many people. I mean, the subway in Mexico City is different from the subway in Chicago, which is kind of empty. The subways in Mexico are quite full, and I feel anxious when I'm around so many people.

Q Is the only way for you to get to Mexico City to see Dr. Valadez via the subway?

A No.

CCSAO COI SUBPOENAS 000244

Transcript of Gabriel Solache, Volume 2
Conducted on December 8, 2021

12 (88t 4) 8215

**228**

Q   Could you drive your car to see Dr. Valadez?

A   Well, I could drive, but the traffic in Mexico is bad.  I think it's worse to drive than to take the subway.

Q   How long was it taking you to get from your home to Dr. Valadez's office when you were seeing him?

A   Approximately two hours or more.  It would depend on traffic.

Q   Each way?

A   Yeah, the same.

Q   Did you ask Dr. Valadez for a referral for another doctor closer to your home?

A   Yes.

Q   Did he provide you one?

A   No; for that type of doctor, like Dr. Valadez, you don't find them in Pachuca.

Q   So is the only reason that you stopped seeing Dr. Valadez because of the difficulty that you had in getting to him?

MS. SUSLER:  Well, objection; that misstates his testimony.

THE WITNESS:  No.

**229**

BY MS. ROSEN:

Q   Why else did you stop seeing Dr. Valadez?

A   Well, I stopped going to see him because Mexico City stresses me out, and I don't like to go to Mexico City.

Q   Has Mexico City always stressed you out?

A   I don't like living in Mexico City.

Q   Did you ever live in Mexico City?

A   Yes.

Q   When you were a teenager, right?

A   Yes.

Q   Did you like it then?

A   No.

Q   And why didn't you like it when you were a teenager?

A   Well, I don't like Mexico City.  I never liked Mexico City.  I don't know why.  It's too many people and a fast life in Mexico City.

Q   Okay.  And then you also state in your response about mental health treatment that you sought marital couple's counseling.

MS. SUSLER:  You're still on page 2?

**230**

MS. ROSEN:  I am.

BY MS. ROSEN:

Q   Do you recall going to see marital couple's counseling in 2020?

A   Yes.

Q   How often -- and you have the name of the counselor as somebody named Margarita -- I don't know how to say the last name, Palapa?

A   Palapa.

Q   And it says you went for three sessions?

A   That is correct.

Q   And since the time that you supplemented your responses, you have not gone back to see Ms. Palapa; is that correct?

A   That's correct.

Q   And do you connect the marital counseling treatment that you required to your arrest and incarceration?

MS. SUSLER:  Objection to the characterization -- to form, the characterization of seeing Ms. Palapa as "treatment."

THE WITNESS:  No; I believe that the treatment, the sessions, they were related to my

**23**

marriage and not to my health or my mental state.

BY MS. ROSEN:

Q   So you do not see a connection between your health or your mental state to the troubles that you have in your marriage?

MS. SUSLER:  Objection.  Misstates his testimony.

THE INTERPRETER:  I'm sorry.  Can you repeat the question for the interpreter?

MS. SUSLER:  I'll try to wait to interpose my objection.  I apologize.

MS. ROSEN:  Can the court reporter read back the question, please.

(Record read as follows:
"So you do not see a connection between your health or your mental state to the troubles that you have in your marriage?")

THE WITNESS:  I don't believe that there is a connection.  I mean, many marriages go through the same problems and not related to mental problems.  We wanted some guidance to help us find a solution for our marriage.

CCSAO COI SUBPOENAS 000245

232

BY MS. ROSEN:

Q    So do you believe that the trouble that you are having, or had, in your marriage are related to your arrest and subsequent incarceration?

A    Well, as I said before, it is possible.  All marriages go through problems; but it's possible, but I'm not quite sure.

Q    We're done with that exhibit.  Okay, we're going to change gears a little bit, Mr. Solache, and I'm going to ask you some questions about what happened back in 1998 regarding your arrest.

Do you recall what was going on in your life at the time that Adriana was -- well, let me back up.  Let me start it this way.

Do you recall Adriana saying that she was going to be delivering the baby and needed to go to the hospital?

A    Well, I don't have knowledge of that. I didn't have that type of relationship with Adriana, that she would say "I'm going to deliver the baby.  I need a ride to the hospital."  I was not a boyfriend.  I was not the husband.

Q    Do you recall talk in the house

233

of Adriana --

THE INTERPRETER:  Of?

MS. ROSEN:  "Talk in the house."

THE INTERPRETER:  Oh "talk."  I'm sorry.

MS. ROSEN:  No worries.

BY MS. ROSEN:

Q    Do you recall talk in the house about Adriana saying it was time to deliver the baby?

A    I heard something, but nobody said anything directly to me.

Q    And what do you recall hearing about that topic?

A    I don't remember much about it.  I do remember going to the hospital.  That's what I heard.

Q    And in that time when Adriana was saying she was going to deliver the baby soon, you were still very close with her brother Carlos, right?

A    We were friends.

Q    Do you remember any conversations with Carlos about Adriana having to go to the hospital to deliver the baby soon?

A    Okay.  No, that was none of my

234

business, I mean, if she was going to the hospital or not.  I just paid my rent for the house, and that was my deal.

Q    Do you know where Carlos worked during that time period?

A    Yes.

Q    Where did he work?

A    Well, I don't know the exact address. I just know that he worked on 47th.

Q    Do you know what type of business he worked at?

A    Well, I mean, I think it was a birria store.

THE INTERPRETER:  The interpreter will find a translation in English.

THE WITNESS:  I think it is the same thing, a birria store.

MS. ROSEN:  Birria?

THE INTERPRETER:  B-i-r-r-i-a.

BY MS. ROSEN:

Q    And what do they sell in that store?

A    Birria.

Q    "Beer," right?  You're talking about beer?

235

A    No.

Q    What is birria?

A    It's goat meat.

Q    So is it some type of restaurant or food supply store?

A    A restaurant.

Q    Do they also sell alcohol there, like you can get a beer and wine?  Tequila?

A    Not that I remember.

Q    Did you ever go to the place where Carlos worked?

A    Yeah, sometimes I went there to eat.

Q    Do you remember the name of it?

A    No.

Q    Do you know what hours Carlos worked during that timeframe?

A    No, I do not remember.

Q    Now, the morning that Adriana came home from the hospital with the baby, do you recall that morning?

A    Yes.

Q    And what do you remember about the morning when Adriana came home from the hospital?

A    Well, I was sleeping.  I was woken up

CCSAO COI SUBPOENAS 000246

by the crying of a baby. I got up, and there were many people there. A lot of the Mejias were in the house.

Q Do you recall what day of the week that was?

A Saturday.

Q Did you typically work on Saturday?

A No.

Q Do you recall whether or not you worked the day before, Friday?

A Yes.

Q And do you recall what hours you worked the day before, Friday?

A Well, I don't remember the exact hours I worked. I know it was 10 or 11, but I do remember it was more than 8.

Q You're talking about an eight-hour or ten-hour shift, right?

A Well, no, the shift is regularly eight hours; but we worked extra hours that day.

Q And remind me what your normal shift was; what hours you worked, from what time to what time?

A I don't remember the time that I started. It was either 4:00 or 4:30. But it was between 4:00 and 4:30.

Q So normally you would work til about midnight, right?

A Yeah, until 12:30, 12:00. Yeah, but I remember it was eight hours.

Q But you recall on this Friday you worked longer than eight hours, right?

A Yes.

Q And why do you remember that?

A Because I remember there was not anyone to take me home. But I remember there was a guy waiting for me outside in the parking area.

Q What guy?

A His name was Jose Blanco.

Q And did you know Mr. Blanco?

A He worked there.

Q And had you arranged for him to give you a ride home?

A Well, yeah. In fact, there was another guy there; he was related to Jose Blanco. I think they were cousins. He was waiting there.

Q So both Mr. Blanco and the person that you believe was his cousin was waiting there?

A Can you repeat the question?

Q Sure. So do you believe that Mr. Blanco, as well as the person who you believe was his cousin, was waiting there to give you a ride home?

A Well, his cousin was also working, but there were other people with Jose Blanco in the parking area.

Q Was his cousin -- do you know the name of his cousin?

A Let me see if I remember. No.

Q And Mr. Blanco is the one that lived approximately three blocks from you on Mozart, right?

MS. SUSLER: Objection. Asked and answered.

BY MS. ROSEN:

Q And the cousin, do you know where the cousin lived?

A I believe he lived on 47th, but I don't remember exactly.

Q And Mr. Blanco and his cousin and some other people were in the parking lot when you left work?

A Well, yes, they were there, but he was the one who gave me a ride home.

Q Was his cousin in the car with you on the ride home?

A No, a brother of his was waiting for him.

Q A brother of the cousin?

A Yes.

Q So in the parking lot, when you came out of work, Mr. Blanco was there, and he was going to give you a ride home, right?

A Correct.

MS. SUSLER: Objection. Asked and answered.

BY MS. ROSEN:

Q And his cousin was there. Did you see his cousin?

A Yes.

Q Did you speak to his cousin?

A Yeah, we were all talking there because they were in a van drinking. In fact, they offered me to have a beer with them and we were talking about the summer that's starting and that there was going to be extra hours for us to work,

CCSAO COI SUBPOENAS 000247

Transcript of Gabriel Solache, Volume 2
Conducted on December 8, 2021

10 (83o 4) 8325

---

**240**

and that that was going to be good.

(Jose Fonseca is interpreting.)

BY MS. ROSEN:

Q How many people were in the van drinking?

A No, I don't remember how many.

Q More than five?

A I don't remember exactly how many.

Q Were the people that were in the van drinking, all people that worked in the same factory that you worked?

A Yes.

Q Did you know the people that were drinking in the van?

A Some of them. Some of them I didn't.

Q Did you recognize all the people that were drinking in the van?

A I already answered the question.

Q Well, can you tell me whether or not you recognized all of the people who were drinking in the van.

A I already answered the question. I already told you that I knew some of them and some of them I didn't. You're asking me the same

**24**

question another way.

Q When I say "recognized them," what I mean is, even if you didn't know them by name, did you recognize them as people that worked in the factory, by face?

A That's more specific. Yes, I didn't know them, but I would identify them by sight.

Q Do you know whose van it was they were drinking in?

A It was a brother of a guy who was working with me.

Q Do you remember the name of the guy that was working with you?

A You already asked me that question. I told you that I didn't know the name.

Q You don't remember the name today, but did you know it back then when you were working with him?

A Yes. But since it has been many years since then, I didn't have much contact with them, I don't remember.

Q And the brother whose van it was, did you know his name back in 1998?

A No.

**242**

Q How long did you spend in the parking lot talking with the people that were drinking in the van?

A No, I don't remember. I don't remember. I was waiting for them to stop drinking for them to give me a ride home, but I don't remember how long.

Q Did you have anything to drink while you were waiting for the ride home?

A I only had a beer.

Q And eventually Mr. Blanco gave you a ride home; is that correct?

A Correct.

Q Do you remember what time you got home?

A I don't remember the exact time, but it was in the morning. It was 4:00 or around that time.

Q And then I think you told us on Monday that you had a conversation with Carlos when you got home. You don't remember what it was. Am I remembering that correctly?

MS. SUSLER: I apologize. I have a late question about the translation. In Spanish, did he

**243**

say "cuatro, cuatro y algo"?

THE INTERPRETER: He did.

MS. SUSLER: So that would mean 4:00 and --

THE INTERPRETER: Interpreter is going to translate that part again. The witness said "4:00 or after 4:00."

MS. ROSEN: Thank you.

BY MS. ROSEN:

Q So I think on Monday you told us when you got home you had a conversation with Carlos that you don't recall; is that right? Am I remembering it right?

A Yes, that's correct.

Q Was Carlos awake when you got home?

A He was awake. I was surprised to see him awake. He was awake.

Q Was anybody else in the house awake when you got home?

A No, I only saw him.

Q And why were you surprised that Carlos was awake?

A Because I would get there five days a week, and I would never see him awake.

CCSAO COI SUBPOENAS 000248

Q   Did you ask him why he was awake?

A   No.

Q   Were you suspicious of the fact that he was awake?

A   At that moment, no.

Q   Eventually were you suspicious that Carlos was awake?

A   When I was in jail, yes.

Q   Tell me about that.

A   I was thinking about exactly at that time why he was awake, if he wasn't awake at that time.  So I thought a lot about that and I came to the conclusion of why he was awake at that time.

MS. SUSLER:  Didn't he say something about the day of the murders?

THE INTERPRETER:  "The day of the murders."

MS. SUSLER:  You know, I don't know how to fix this, but this is very sensitive area, and we have to get the translation right.  So I'm going to ask you to listen really carefully and translate every word that Mr. Solache says.  Thank you so much.

THE WITNESS:  (In English:) Could we take a break, please?

MS. ROSEN:  Of course.

THE VIDEOGRAPHER:  We're going off the record.  The time is 11:18 a.m.

(Recess.)

(Adriana Trevino is interpreting.)

THE VIDEOGRAPHER:  We are going back on the record at 11:27 a.m.

BY MS. ROSEN:

Q   Mr. Solache --

MS. SUSLER:  I'm sorry, Eileen.  Can we just put on the record that I asked you to repeat the question?

MS. ROSEN:  Sure.

MS. SUSLER:  All right.  Let's just do that.

MS. ROSEN:  At the break, Ms. Susler asked that I reask the question so that Mr. Solache could reanswer the question because of the issue that she flagged in the translation.  I don't think that that's a good use of our time.  We have a video recording of Mr. Solache's answer to the extent that it needs to be corrected, it can be corrected on the back end.  I'm not going to reask the question and have him reanswer the question.  And we're going to move forward, and we will do our very best to make sure that the translations are accurate.  And as we've done throughout the course of this entire case, when issues are noted about translation, it's been raised and they've been addressed, I believe mostly to plaintiff's counsels' collective satisfaction.

So anyhow, we're going to move forward.

BY MS. ROSEN:

Q   Mr. Solache, now you said that at some point while you were in jail you became suspicious of the fact that Carlos was awake when you came home the Friday evening before Adriana came home from the hospital with a baby, right?

A   That is correct.

Q   Did you ever confront Carlos with your suspicions?

A   No.

Q   Were your suspicions that Carlos was somehow involved in the murders and kidnapping?

THE INTERPRETER:  I'm sorry.  Could you repeat the question for the interpreter?

BY MS. ROSEN:

Q   Involved in the murders and kidnapping.

A   Yes.

Q   And what did you base those suspicions on?

A   Well, because the day when I came home from work, he was awake the day of the murders, and every time I would come back, he would be asleep, and he was awake.

Q   Any other reason other than the fact that he was awake that night?

A   No, not that I remember right now.

Q   Did you tell your attorney, Viola Rouse, that you suspected that Carlos was involved in the murders and kidnapping?

A   Not that I remember.

Q   Why not?

A   Because I don't remember.

Q   Do you remember filing any post-conviction petitions complaining about the work Viola did for you?

A   I do remember sending a letter to the Mexican Consulate only, but not complaining that she

CCSAO COI SUBPOENAS 000249

Transcript of Gabriel Solache, Volume 2
Conducted on December 8, 2021

1t (83t 4) 8715

248

had done bad work.

Q   What kind of letter do you remember sending to the Mexican Consulate?

A   I don't remember much, but something like she was not doing a good job on the case.

Q   Do you remember when you sent that letter?

A   No.

Q   Was it while the case was going on or after you had been convicted?

A   When the case was in process.

Q   And why did you feel that she wasn't doing a good enough job?

A   Because I gave an address to her of where I worked, and then she said she could not find it.

Q   You gave her the address of where you worked in the weeks leading up to your arrest.  Is that what you mean?

A   Yes.

Q   And she said she couldn't find the company that you worked for.  Is that what you're saying?

A   Well, the company I was working for

249

did not pay me directly.  I worked for an office that was sending me there.

Q   So what couldn't she find, the place you worked or the company that was sending you there?

A   The company that sent me.

Q   Do you remember her ever being able to find that company that sent you?

A   I don't remember if she said anything to me about that.

Q   Do you recall during the course of your trial whether or not there was any evidence put in about work records that she had obtained from the company?

A   No, I don't remember.

Q   Have you ever, before testifying today, told anyone that you were suspicious of Carlos?

MS. SUSLER:  Asked and answered.  Are you talking about other than an attorney?  Otherwise there's an attorney/client privilege and I'll instruct him not to answer.

Oh, I'm sorry.  No, she said "before testifying."

250

MS. ROSEN:  Here today.

MS. SUSLER:  Yeah.

MS. ROSEN:  So I'll rephrase it to make that clear.

BY MS. ROSEN:

Q   Other than to any attorneys -- well, see, that's not going to work because you've waived privilege on Viola Rouse, right?

MS. SUSLER:  On Viola Rouse, yes.

BY MS. ROSEN:

Q   Have you told anyone, other than any of your attorneys, excluding Viola, that you were suspicious of Carlos?

A   No.

Q   Then the day that Adriana came home from the hospital with the baby, did you notice that there was another small child there also?

A   No, I don't think I remember that day.

Q   Did you notice the other child in the days after that first day she had brought the baby home from the hospital?

A   That day I did not notice anything.

Q   How about in the days after, did you

25

notice the little boy?

A   Well, I did see him, but because she takes care of children, watches children, I didn't think anything about that.

Q   Adriana used to baby-sit other kids.  Is that what you're saying?

A   Yes.

Q   And how often would she baby-sit other children?

A   I think every day.  I would see kids every day in the house.

Q   And it was Adriana that was watching the kids, not Guadalupe?

A   Well, no, my understanding is that it was Adriana the one watching the children.  I don't know why Lupe was watching them too.

Q   So you didn't -- you just assumed that the little boy was just another kid that Adriana was watching?

A   Well, that's what I thought.  I mean, if it was this other kid or not -- I mean, I was only paying rent there.  Either she was watching the kid or not, that was none of my business.  That's all I had to do, just pay my rent.

CCSAO COI SUBPOENAS 000250

Transcript of Gabriel Solache, Volume 2
Conducted on December 8, 2021

252

Q    How much rent did you pay?

A    I don't remember.  I think it was about like a hundred dollars, something like that.

Q    A hundred dollars a month?

A    Yes.

Q    And who would you pay the rent to?

A    I don't remember if I was giving it to her or Rosauro, but I did have to pay rent.

Q    And do you remember ever seeing Mr. Reyes with the little boy?

A    No.

Q    On the night that you and Rosauro and Mr. Reyes took the little boy to the police station, what do you remember doing that day before taking the little boy to the police station?

A    I worked that day.

Q    Do you recall what hours you worked that day?

A    Eight hours.

Q    Do you recall how you got to work?

A    To work?

Q    Yeah.

A    I don't remember.  I think it was public transportation.

253

Q    Do you remember how you got home from work?

A    I think I got a ride.  I don't remember exactly.

Q    Do you recall what time you got home from work?

A    No, I don't remember.

Q    When you got home from work, was there anybody awake?

A    At that time there was nobody.  But then Adriana came out of her bedroom and Rosauro did too.

Q    Do you know where Carlos was?

A    No, I didn't see him.  At that moment I did not see him.

Q    How about Mr. Reyes, did you see Mr. Reyes when you came home from work?

A    At that moment, no, I didn't see him either.

Q    So how long were you home before Adriana and Rosauro came out of their bedroom?

A    I don't remember, but I was fixing something in the kitchen when they came out.

Q    Fixing something in the kitchen to

254

eat?

A    Yes.

Q    And what do you recall happening when Adriana and Rosauro came out of the bedroom?

THE INTERPRETER:  The interpreter will clarify "discusion," which could be an argument or just like a discussion.

(Interpreter speaks with witness in Spanish.)

THE WITNESS:  Well, they just were having an oral discussion.

THE INTERPRETER:  The interpreter was clarifying if it was like an argument or just discussion.  He said "oral discussion."

THE WITNESS:  And?

BY MS. ROSEN:

Q    And?

A    And then they went to the living room.

Q    Do you know what they were talking about?

A    Not at that moment.

Q    Were they using a normal tone of voice?

A    No, I don't remember.

255

Q    Did you eventually learn what they were talking about?

A    Yes.

Q    And what were they talking about?

A    The discussion they were having is that Rosauro wanted to drop off the kid at the police station and Adriana didn't want that.

Q    Where was Carlos when this conversation was happening about Rosauro wanting to drop off the kid at the police station?

A    Well, I don't remember exactly where he was, but when this happened -- he did make it to the living room.  He was in the living room.

Q    How about Mr. Reyes, when this discussion about dropping the kid off at the police station was happening, where was Mr. Reyes?

A    Well, I didn't see him either.  I mean, suddenly he was -- I mean, I didn't see him when he appeared at the scene, I mean, but he was eventually there.

Q    In the living room?

A    Yes.

Q    And then did you go into the living room too?

CCSAO COI SUBPOENAS 000251

Transcript of Gabriel Solache, Volume 2
Conducted on December 8, 2021

8o (870 4) 8765

**256**

A   Well, yeah, after finishing eating, like having dinner, yeah, I went to the living room.

Q   And other than hearing that Rosauro said he wanted to drop the kid off to the police station and Adriana saying that she didn't want to, what else did you hear Rosauro and Adriana talking about?

A   Yes.

Q   What did you hear them talking about?

A   I heard -- I'm not exactly sure if it was Rosauro who said that or Adriana -- that they said that Guadalupe was saying that the parents to the kid had been murdered.

Q   Was Guadalupe upstairs during this discussion about taking the little boy to the police station?

A   No, I didn't see them.

THE INTERPRETER:  The interpreter is clarifying if Guadalupe is a woman.

(Interpreter speaks to witness in Spanish.)

THE INTERPRETER:  The interpreter was clarifying Guadalupe was a female.  He said Guadalupe is a female.  It's for the interpretation.

**257**

BY MS. ROSEN:

Q   Any other conversation that you heard between Rosauro and Adriana about taking the little boy to the police station?

A   No.  The discussion between Rosauro and Adriana, no.  It was just like the discussion, it was none of my business.  I just didn't pay much attention to that.  I just had to pay my rent.  I mean, it was their problem.  They had the kid.  It was not my problem.

Q   Did Rosauro and Adriana ever raise voices -- raise their voices at each other when they were having this discussion?

A   No, I did not pay attention to them.

Q   Did you participate in the conversation at all?

A   No.

Q   Did you hear Mr. Reyes participate in the conversation at all?

A   I don't remember.

Q   Did you hear Carlos participate in the conversation at all.

A   No, I do not remember either.

Q   Do you remember why -- do you

**258**

remember Adriana saying why she didn't want to take the little boy to the police station?

A   No.

Q   Did you hear Adriana say something like, "Let's just put him in the alley"?

THE INTERPRETER:  "Let's just" what?

MS. ROSEN:  "Let's just put him in the alley."

THE WITNESS:  No, I don't remember.

BY MS. ROSEN:

Q   Do you remember Carlos crying when Adriana and Rosauro were discussing what to do with the little boy?

A   I don't remember.

Q   Do you recall Mr. Reyes saying, "If you have a problem, then we should go to the police"?

MR. STARR:  Objection.  Asked and answered.

BY MS. ROSEN:

Q   You can answer.

A   I don't remember having heard anything.

Q   Do you recall any other conversation

**259**

between Adriana and Rosauro about what to do with the boy?

A   No.

Q   Did they eventually make a decision about what to do with the boy?

A   Well, Rosauro asked me if I would go with him to the police station.  In fact, I drove him to the police station.  Yeah, I drove.

Q   So Rosauro asked you to go with him to the police station?

A   That is correct.

Q   And you drove whose car to the police station?

A   Rosauro's.

Q   Did anybody else go to the police station with you and Rosauro?

A   Arturo and the kid.

Q   Do you know why Arturo went with to the police station?

MR. STARR:  Objection.  Foundation.

BY MS. ROSEN:

Q   You can answer.

A   Well, I don't know.  You already had him here.  I have no idea why he did that.

CCSAO COI SUBPOENAS 000252

Q   Did you hear anybody ask Mr. Reyes to go with to the police station?

A   No.

Q   Did you ask Mr. Reyes to go with to the police station?

A   No.

Q   And what police station did you go to?

A   Well, I don't remember the name of the station, but I think it was on 63rd and St. Louis.

Q   How did you choose to go to that police station?

A   Well, it was the one closest to the house.

Q   Had you ever been to that police station before for anything?

A   No.

Q   How did you know where that police station was?

A   Well, I lived in that area.  It was close to where I lived.  I think that everyone who lived in that area knew about that police station.

Q   And when you got to the police station -- during the car ride, did you have any conversation with anybody in the car?

A   Not that I remember.

Q   When this conversation was happening in the living room at the house, where was the little boy?

A   I remember Adriana had him.

Q   And was the little boy saying anything?

A   I didn't hear him say anything.

Q   Did you ever hear that little boy speak?

A   No.

Q   Not one time in the house did you ever hear that little boy speak?

A   No.

Q   Did you ask the little boy anything about what happened to his parents?

A   No.  Why would I be doing that?

Q   Did you hear anybody ask the little boy about what happened to his parents?

A   Well, no.  The only thing I did was to pay my rent.  If there were 100 kids or 200 kids there, that was not my problem.

Q   Did you participate in any conversation in the car?

MS. SUSLER: Objection.  Asked and answered.

BY MS. ROSEN:

Q   You can answer.

A   I already answered that question.

Q   How long did it take you to get from the house to the police station?

A   Well, I don't remember.  It's pretty close.  I don't know, three, four, five minutes.  Really close.

Q   Was there any conversation about which police station to go to?

A   No.

Q   Did you hear Rosauro say anything while you were in the car driving to the police station?

MS. SUSLER: Objection.  Asked and answered.

BY MS. ROSEN:

Q   You can answer.

A   No.

Q   Did you hear Mr. Reyes say anything in the car on the way to the police station?

MR. STARR: Objection.  Asked and answered.

BY MS. ROSEN:

Q   You can answer.

A   No, I didn't hear.

Q   Did you hear Mr. Reyes say something along the lines of "I have a friend who's a police officer.  Let's just take him to my friend"?

MR. STARR: Objection.  Form.  Foundation.  Asked and answered.

BY MS. ROSEN:

Q   You can answer.

A   No, not that I remember.

Q   When you got to the police station, what happened?

A   I remember we arrived and Rosauro asked for an officer who spoke Spanish.

Q   Did you talk to any police officers when you first got to the police station?

A   No.

Q   And did a police officer who spoke Spanish eventually come and talk to you?

A   No.

CCSAO COI SUBPOENAS 000253

Transcript of Gabriel Solache, Volume 2
Conducted on December 8, 2021

88 (803 4) 8095

264

Q    Did a police officer that spoke Spanish ever come and talk to Rosauro?

A    Yes.

Q    So while you were at that first police station, did you talk to anybody?

A    No.

Q    So you didn't talk to any police officers at that first police station, right?

A    That is correct.

Q    Did you have any conversation with Rosauro while you were at that first police station?

A    No.

Q    Did you have any conversation with Mr. Reyes while you were in that first police station?

A    No, not either.

Q    And where did you wait for the Spanish-speaking police officer to come?

A    Well, I'm not very familiar with the police station, so I don't remember exactly, but we were in the there, the police station.

Q    When you went into the police station, were you waiting in some kind of a lobby area?

265

A    Well, I don't know if the police station has a lobby, but we were inside the police station.

Q    Were there chairs?

A    I don't remember.

Q    Were you in a big open space or were you in an enclosed room?

A    I don't remember.

Q    Where was the little boy while you were waiting for the Spanish-speaking police officer?

A    I don't remember where he was.

Q    Did you ever know the little boy's name?

A    Well, in the house they called him -- well, when I was in prison I learned his name, but they called him by another name in the house.

Q    Do you remember the name -- when you say "in the house," do you mean the house on Mozart?

A    Correct.

Q    Do you remember the name they called him in the house on Mozart?

A    No, I don't remember, but it was not the name that he has.

266

Q    Do you remember who was referring to him by this other name?

A    Adriana.

Q    So in the couple days that the little boy was in the house, between the time he first came to the house on Saturday and the time that you took him to the police station, you did hear Adriana refer to him by name?

A    She did call him by a name, but I do not remember the name it was.

Q    Do you know how long you waited at the police station for the Spanish-speaking police officer?

A    No, I do not remember.

Q    Were you and Rosauro and Mr. Reyes waiting together?

A    Yes.

Q    Why did you go to the police station with Rosauro?

A    I already answered that question to you.  But if you want me to, I will answer it again.

Q    Please.

A    He asked me to.

Q    And simply because he asked, you said

267

yes, right?

A    Well, I mean, it's the right thing to do, and it had to do with a child.  And the child was the same age of my daughter.  So any person would have done the same thing in my place.

Q    And why were you driving?

A    Well, everyone got into the car, and then Rosauro got on the passenger's side.  And, actually, the keys were already in the ignition.  The car was running.

Q    Where was the -- the car was running?

A    Yeah, it was outside Rosauro's house.

Q    Where was it parked -- where was it parked outside Rosauro's house?

A    In front of the house.

Q    On the street?

A    Yes.

Q    Approximately what time was it?

A    No, I don't remember.

Q    Was it the middle of the night?

A    It was in the middle of the night, but I do not remember the exact time.

Q    So it was dark out, right?

A    Yes.

CCSAO COI SUBPOENAS 000254

268

Q   And the car was running when you came out to the car?

A   Yeah.  When we got out of the house, the car was already running.  I don't know who started the car, but when we got out, it was already running.

Q   Did you see anybody leave the house at any point in time after Adriana and Rosauro came out of the bedroom and before you went out to the car and found it running?

A   No, the truth is I do not remember.

Q   When the Spanish-speaking police officer came to talk to Rosauro, were you present for the conversation?

A   Yes, I was there.  It's not that I was not close to them.  I was not close enough to hear what they were saying.

Q   How far away were you from Rosauro and the police officer when they were speaking to each other?

A   Well, it was not too far, but far enough not to hear what they were saying.  Plus, I did not pay attention to what they were saying.

Q   Why didn't you pay attention to what

269

they were saying?

A   It was none of my business.

Q   Did that Spanish-speaking police officer ever speak to you?

A   I already answered that question, but if you want me to, I'll answer it again.  I have no problem answering it again.

Q   Go ahead.

A   No, I did not talk to anyone at the police station.

Q   Not a word, right?

A   No.

Q   What happened after Rosauro finished his conversation with the Spanish-speaking police officer?

A   Well, I don't remember.  Later some officers arrived, I believe they were detectives because they were wearing street clothes.  I believe they were wearing suits.  I'm not sure, but I believe they were wearing suits.

Q   And then what happened after those police officers arrived?

MS. SUSLER:  I mean, I'm just not sure if he finished his answer.

270

MS. ROSEN:  Oh, I'm sorry.

MS. SUSLER:  He broke it up for the interpretation.

THE WITNESS:  Then they came and they told us that we had to go to a different police station.

BY MS. ROSEN:

Q   Those other detectives, did they speak to you directly?

A   No.

Q   So how is it that you learned that they wanted you to go to this other police station?

A   Because they said so.  I even believe it was the officer who spoke Spanish.  They said we had to go to a different police station.

Q   So the detectives that said you had to go to a different police station did not speak Spanish?

A   I didn't hear them speak Spanish.

Q   How did you become aware that you were being asked to go to this other police station?

MS. SUSLER:  Objection.  Form.  Misstates his testimony in terms of "you were being asked."

BY MS. ROSEN:

Q   You can answer.

27

A   I was not asked directly.  I was not told "Mr. Solache, you need to go to this other police station."  We were just told that we need to go to the other police station.

Q   Who told you you needed to go to the other police station?

A   They said it in Spanish.  I imagine it was the officer who spoke Spanish, I imagine.

Q   Did you ask why?

A   No.

Q   Why not?

A   I didn't think of it.

Q   Were you objecting to go to the other police station?

A   No.  Why not?  I owed nothing.

Q   You what?

THE INTERPRETER:  I'm sorry.  That was the wrong translation.

(Interpreter speaks with witness in Spanish.)

THE WITNESS:  No, because I had nothing to do with it.

BY MS. ROSEN:

Q   So you were willing to go to the other police station?

CCSAO COI SUBPOENAS 000255

272

A   Yes.

Q   How much time passed between the time you were told you needed to go to the other police station and when you left for the other police station?

A   Could you repeat the question again? You're saying how long did it take us to go from one police station to the other police station?

Q   No.  At some point you were told you need to go to the other police station, and then you left the first police station.  How much time did you stay at that first police station after you were told you needed to go to the other one after?

A   Okay.  I do not remember.

Q   Where was the little boy when you were told you needed to go to the other police station?

A   I don't know.  At a certain time, I mean, at some point I stopped seeing him.  I don't know where he was.

Q   Did you ever see where that little boy went?

A   No.

Q   Did you see any family member with

273

the detectives that came and said that you needed to go to the other -- let me strike that.

Did you see any family members of the little boy with the detectives that came to tell you you need to go to the other police station?

MS. SUSLER:  Objection, form and foundation.

BY MS. ROSEN:

Q   You can answer.

A   Yes.

Q   When did you see those family members?

A   When we were over there at the station, before we went to the other police station.

Q   How many individuals did you see?

A   Well, I only remember one person.

Q   And did you know that that person was somehow related to the little boy?

A   Yes, that's what he said.  I mean, he claimed to be the uncle of the kid, the kid's uncle.

MS. SUSLER:  Didn't he also say "They didn't say anything to me"?

THE INTERPRETER:  I didn't hear that.

(Interpreter speaks to witness in Spanish.)

274

THE WITNESS:  He didn't say that to me directly, but I heard that he said he was the kid's uncle.

BY MS. ROSEN:

Q   You overheard him say that when he came to the police station?

A   Correct.

Q   And was that person speaking Spanish?

A   Yes.

Q   And did you see him interact with the little boy at all?

A   No, I don't remember.

MS. ROSEN:  We need to change the media, and it's a natural break.

THE VIDEOGRAPHER:  This marks the end of Media Number 2 in the deposition of Gabriel Solache. We are off the record at 12:16 p.m.

(Recess.)

(Jose Fonseca is interpreting.)

THE VIDEOGRAPHER:  Here begins Media Number 3 in the deposition of Gabriel Solache.  We are back on the record at 12:27 p.m.

BY MS. ROSEN:

Q   Mr. Solache, how did you get from the

275

first police station to the second police station?

A   In a police car.

Q   Who was in the police car with you?

A   Rosauro, Arturo and myself.

Q   How many police officers were in the police car?

A   Two.

Q   Were both police officers sitting in the front seat?

A   Yes.

Q   And you and Rosauro and Arturo were in the back seat?

A   That's correct.

Q   Did you and Arturo and Rosauro speak at all while you were in the back seat of this police car?

A   Not that I remember.

Q   Did the police officers that were in the front seat say anything to any of you?

A   No.

Q   How long did it take to go from the first police station to the second police station?

A   I'm not sure, but around between 35 and -- 25 and 35 minutes.

CCSAO COI SUBPOENAS 000256

Transcript of Gabriel Solache, Volume 2
Conducted on December 8, 2021

87 (890 4) 8965

276

Q   Where was the second police station?
A   At that moment I didn't know where it was.
Q   Do you know now?
A   Yes.
Q   Where?
A   The Grant and Central.
MS. SUSLER:  Grand and Central.
MS. ROSEN:  Grand.
THE INTERPRETER:  Grand and Central.
BY MS. ROSEN:
Q   When you were in the police car going from the first police station to the second police station at Grand and Central, was it still dark out?
A   No, it was daytime.
Q   Could you tell -- did you know what time it was?
MS. SUSLER: Objection, form.  What time it was when?
MS. ROSEN:  When they were driving from the first police station to the second police station.
THE WITNESS:  No, I don't know exactly what time it was, but it was in the morning.

277

BY MS. ROSEN:
Q   When you got to the second police station at Grand and Central, where did you go?
A   Inside the police station.
Q   Did you go into -- did you go in -- strike that.
When you went into the police station, did you remain on the first floor or on the second floor?
A   I don't know how many floors the police station has, but I was in the police station.
Q   So you don't remember what floor you were on when you were at the police station and being questioned by the police?
A   No.
Q   How much time had passed from the time you left your home on Mozart until the time you got to Grand and Central?
A   No, I don't remember.
Q   Was it more than an hour?
A   I don't remember.
Q   Was it more than two hours?
A   I don't remember.
Q   Was it more than three hours?

278

A   I don't remember.  I didn't have a watch.
Q   From the time you left your house and the time you got to Grand and Central, am I correct that you did not say a word to anyone?
A   When you say "anybody," who do you mean?  Who are you referring to?
Q   A single person.
A   Are you talking about police officers, Arturo or Rosauro?
Q   I'm talking about anybody.  Did you say anything to anybody from the time you left the house until the time you got to Grand and Central?
A   Not that I remember.
Q   And do you recall anybody speaking to you directly from the time you left your house until the time you got to Grand and Central?
A   No.
Q   When you got to Grand and Central, were you and Rosauro and Arturo together?  In a room?
A   The three of us were put in a room.
Q   Can you describe the room?
A   It was very small.  I don't know the

279

exact measurements, but it was a very small room.
Q   Were there chairs for you to sit?
A   No, I don't remember that.
Q   So were you guys just standing in the room?
A   I don't remember.  I believe so.
Q   And how did you know to go into this room?
THE INTERPRETER:  "How did you know"?
BY MS. ROSEN:
Q   How did you know to go into the room?
A   I didn't know.  I was put there.
Q   Did somebody speak to you and tell you to go into the room?
A   I don't remember whether or not they spoke to me directly, but the three of us were put there.
Q   Did you have any -- who put you there?
A   I believe it was an officer.
Q   Was it one of the officers that was in the car with you?
A   I don't remember.
Q   The two officers that were in the car

CCSAO COI SUBPOENAS 000257

**280**

with you, did you ever see them again after you got to Grand and Central?

A   No.

Q   How long did you stay in the room with Rosauro and Arturo?

A   I don't remember exactly how long I was with them, but it wasn't a long time.

Q   It was not a long time? I'm just verifying. Correct?

A   Yes.

Q   And what happened after some period of time while the three of you were in that room?

A   I don't know what happened with them, but I was changed, I was put in another room alone.

Q   At any point in time while you were in the room with Rosauro and Arturo, did the three of you speak?

A   Yes.

Q   And what did you say to one another?

A   I didn't say anything. Rosauro said that we should have left the little boy in an alley.

Q   And when Rosauro said, "We should have left the little boy in an alley," did you say anything back to him?

**282**

A   Yes.

Q   In what way?

A   Once when he took Adriana to the hospital, he came back and he told me he had seen a boy in the ultrasound, and days before he made a comment about giving the boy away to a neighbor who lived in front of the house.

Q   You said Rosauro had made a comment about seeing a boy in an ultrasound when he took Adriana to the hospital. Is that what you said?

A   That's correct.

Q   When you say "He saw a boy in the ultrasound," do you mean he saw the ultrasound of Adriana's stomach and saw a boy inside, or do you mean he saw a boy in the office at the ultrasound?

A   He said it was a boy baby that Adriana was expecting, that he had seen him in the ultrasound.

Q   So it was your impression that Adriana was having a boy based on what Rosauro told you?

A   At that point I didn't think about anything. He just said that comment, and perhaps he was happy he made that comment. I didn't know

**28**

A   No, I don't remember.

Q   How about Mr. Reyes, did he say anything back to Rosauro when he said "We should have left the little boy in an alley"?

A   No, I don't remember that either.

Q   What was your reaction to Rosauro saying "We should have left the little boy in an alley"?

A   At that moment I didn't have a reaction.

Q   Did you think it was strange for him to say that?

A   At that moment I didn't think anything.

Q   Did you later think something?

A   Yes.

Q   And when later did you think something?

A   Well, I don't remember exactly when, but it was strange that he had made that comment.

Q   What was strange about that comment?

A   Leaving the little boy in the alley.

Q   Did it make you suspicious of Rosauro?

**283**

anything about that.

Q   When did he make the comment?

A   Days before Adriana went to the hospital to give birth to the baby supposedly.

Q   When did you first realize that the baby that Adriana brought home from the hospital was a little girl and not a little boy?

THE WITNESS: When they --

(Interpreter speaks to witness in Spanish.)

THE INTERPRETER: I'm asking him --

MS. SUSLER: Gabriel, do you need her to ask the question again?

MS. ROSEN: Can the court reporter please read back my question.

MS. SUSLER: And just so the record is clear, it was a long response in Spanish and the interpreter tried to ask him to repeat his answer, at which point I said, "Would you please ask the question again."

MS. ROSEN: Can you read the question back.

(Record read as follows:

"When did you first realize that the baby that Adriana brought

CCSAO COI SUBPOENAS 000258

Transcript of Gabriel Solache, Volume 2
Conducted on December 8, 2021

89 (8t3 4) 8t95

home from the hospital was a little girl and not a little boy?")

THE WITNESS: The same day. It was a Saturday. And as I told you, what I said earlier, that was none of my business, whether it was a boy or a girl, because that was not my problem.

BY MS. ROSEN:

Q  That Saturday when Adriana brought the baby home from the hospital, did you know that the baby was a girl?

A  Yes.

Q  Based on what Rosauro had told you days earlier, were you surprised that it was a girl?

A  Not at that moment. No, not at that moment.

Q  At any point were you surprised by the fact that Adriana brought home a girl based on what Rosauro had told you?

A  Yes, when I was in prison.

Q  You also said that Rosauro said something about giving the boy away to a neighbor. When did Rosauro tell you that?

A  He didn't tell me that directly. He just made a comment, but I don't remember what day he said that.

Q  Who did he make the comment to?

A  I don't remember how many people were there.

Q  Did anybody respond to Rosauro's comment about giving the boy to a neighbor that lived in front of the house or across the street?

A  No.

Q  Do you know what neighbor he was referring to?

A  Yes.

Q  What neighbor?

A  I don't remember his name, but he lived in front of the house I was living in.

Q  Did he live right across the street?

A  Yes.

Q  And was it family that lived across the street?

A  Could you be more specific? Was it Rosauro's family or whose family?

Q  No. So you said it was a male neighbor that lived across the street that you were referring to, right?

A  Correct.

Q  That person that you're referencing, the male, did he have a family that lived with him in the house?

A  Yes, he had a family.

Q  Did he have children that lived in the house with him?

A  I believe he had one. I'm not sure.

Q  And back in 1998, did you know this man's name?

A  No. I don't remember his name.

Q  Would you see him, though, from time to time in the neighborhood?

A  Yes, I would see him in the neighborhood, but I never asked him for his name. He was an older person. He was 40-plus. He was older than 40 years old.

Q  Did you ever tell Viola Rouse about the comment that Rosauro made about giving the little boy to the neighbor that lived across the street?

A  I don't remember, but that's possible.

Q  Other than Viola Rouse and any of your other lawyers, have you told anyone else about the comment that Rosauro made about giving the little boy to the neighbor that lived across the street?

MS. SUSLER: I just want to -- I'll wait until he translates.

(Interpreter translates question.)

MS. SUSLER: And my instruction is that I just want to make sure you understand you're not to say anything about what you told any lawyer. You can talk about what you told anybody else. That's what she's asking, but not what you told a lawyer.

THE WITNESS: Not that I remember.

BY MS. ROSEN:

Q  When you were put into a room by yourself, can you describe that room?

A  Yes.

Q  Can you describe it for us, please.

A  It had a metal bench, and there was a plastic chair there, and there was a loop attached to the wall.

MS. SUSLER: Could we also call that a "ring"?

THE WITNESS: A ring attached to the wall.

CCSAO COI SUBPOENAS 000259

288

There was a ring attached to the wall.

BY MS. ROSEN:

Q   And was the ring a metal ring?

A   Yes.

Q   Who put you into that room by yourself?

THE INTERPRETER: Pardon?

BY MS. ROSEN:

Q   Who put you into the room by yourself?

A   I believe it was an officer, but I didn't get to see his name. I didn't know his name.

Q   Was it a police officer you had already seen before or was it a brand-new police officer?

A   I don't remember.

Q   Did that police officer say anything to you?

A   I believe so, but I don't remember exactly what he said to me.

Q   Did he speak to you in Spanish or English?

A   I don't remember.

Q   And it was a male police officer,

289

right?

A   Correct.

Q   At any point in time that you were at any police station, did you deal with any female police officer?

A   No.

Q   Did the police officer that put you in that room come in with you or just close the door?

A   He just put me in the room.

Q   Did you ever see Mr. Reyes again after you were put into that room?

MS. SUSLER: Objection. Form. Are you talking about at Area 5?

MS. ROSEN: That's a good point. Let me rephrase the question.

BY MS. ROSEN:

Q   Did you ever see Mr. Reyes again after you were put in that room, while you were at the police station?

A   Yes.

Q   When did you see him again?

A   I don't remember exactly when that happened, but I saw him again.

290

Q   Where did you see him?

A   There at the police station.

Q   Where were you when you saw Mr. Reyes?

A   I don't know exactly the areas at the police station, but I was in the police station. I was still in the police station.

Q   At some point in time that day you spoke with a prosecutor, right, a female prosecutor?

MS. SUSLER: Objection. Form. Did you say "that day"?

MS. ROSEN: Sorry. Let me say it again. I'm going to withdraw the question.

BY MS. ROSEN:

Q   At some point while you were in the police station you spoke with a female prosecutor; is that correct?

A   No.

Q   At some point while you were in the police station you were in a room with a female prosecutor; is that correct?

A   Correct.

Q   Did you see Mr. Reyes before or after you were in the room with the female prosecutor?

29

A   After.

Q   Did you speak with Mr. Reyes when you saw him?

A   I don't remember.

Q   What was Mr. Reyes doing when you saw him?

A   We were standing in front of a desk.

Q   What kind of a desk?

A   I don't know what kind it would be.

Q   Was there a police officer there?

A   Yes.

Q   Was the police officer asking you questions?

A   I don't remember.

Q   Was it shortly before you were put into the lock-up?

THE INTERPRETER: "Into"?

MS. ROSEN: "Into the lock-up."

THE WITNESS: Yes.

BY MS. ROSEN:

Q   Did Mr. Reyes say anything to you at that point?

A   Not that I remember.

Q   After you were put into the room by

CCSAO COI SUBPOENAS 000260

Transcript of Gabriel Solache, Volume 2
Conducted on December 8, 2021

yourself, did you see Rosauro again?

A No.

Q Did you ever see Guadalupe Mejia in the police station?

A No.

Q Did you ever see Jorge Mejia in the police station?

A No.

Q I know at one point you saw Adriana, right?

A Yes.

Q Did you see any other people you knew at the police station after you were put in that room, other than Mr. Reyes and Adriana?

A No.

Q How long were you in that room by yourself?

A I don't remember.

Q Did eventually somebody come into the room?

A Yes.

Q Do you recall who?

A I believe they were officers, but I don't know their names.

Q How many officers?

A There were two of them.

Q Did they say anything to you?

A No.

Q Did they do anything?

A Yes, they were talking to each other, then they took my shoes.

Q They didn't say anything to you before they took your shoes?

A No.

Q Can you describe for me how that happened?

A I don't remember, but they took them.

Q Were you sitting when they took your shoes?

A I don't remember whether I was standing or sitting, but they took my shoes.

Q So it's possible they just took your shoes right off your feet while you were standing?

A I don't remember, but they took my shoes.

Q Did you say anything to them?

A No.

Q Can you describe those two police

officers in any way?

A No.

Q After those police officers took your shoes, what happened?

A I stayed in the room.

Q How long did you stay in the room?

A I don't remember.

Q Did somebody else eventually come to the room?

A Yes.

Q Who?

A Another officer came and he took me out of the room.

Q Do you know the name of that police officer?

A No.

Q Did that police officer speak to you?

A Yes.

Q What did that police officer say to you?

A He told me that I was accused of some murders.

Q Was this police officer speaking to you in Spanish?

A Yes.

Q Was this police officer Detective Guevara?

A No.

Q In 1998 when you were in the police officer, did you speak any English at all?

MS. SUSLER: You mean in the station?

MS. ROSEN: Yeah.

BY MS. ROSEN:

Q In 1998 when you were in the police station, did you speak any English at all?

A Yes, a few words. Not many, but a few words. Not enough to have a conversation.

Q And did you read any English when you were in the police station in April of 1998?

A Nothing.

Q When did you learn to read English?

A Like in 2006.

Q How did you learn to read English?

A I had a job in the prisoners' kitchen. And for some reason I didn't want to work there anymore, so I asked for a change to the officers' office -- and I asked for a change to be transferred to the officers' kitchen. No, I didn't

CCSAO COI SUBPOENAS 000261

296

get the change. And then I stopped working there. And I was sent to a place that we refer to in Spanish as "El oyo."

THE INTERPRETER: I will translate, "the hole." The translation of "El oyo" into English is "the hole."

BY MS. ROSEN:

Q And how long did you stay in the hole?

A 30 days.

Q And this is because you didn't want to work in the prisoners' kitchen anymore, right?

A Correct.

Q And then how does this relate to you learning how to read English?

A My two neighbors who were next to me in the cell next to mine, they were African-American. And they didn't speak any Spanish. So at that point I spoke a little bit of English. And they offered books to me for me to read them, and evidently they offered books in English. And so I started reading, and I realized that I understood -- I didn't understand a hundred percent, but I understood 60 percent. And from that

297

moment, during all the time that I was a prisoner, they would send me books in English. That's how I learned to read in English.

Q Back to the police station. So this police officer told you that you were accused of some murders, right?

A Correct.

Q Did he tell you what murders?

A No.

Q Did he tell you how many murders?

A No. But he told me the day on which the murders took place, and I said that it was impossible because that day I was working.

Q What day did he tell you the murders happened on?

A I don't remember the exact date on which the two murders took place, but at that point I told him that I was working.

Q Did you tell him where you were working?

A Yes.

Q Did you give him the name of the company?

A Yes.

298

Q Did you give him the address of the company?

A No.

Q Did you provide him any other information about where you worked, other than the name of the company?

A Not that I remember now.

Q And when you told the police officer it was impossible because you were working, what did the officer say?

A Evidently he said I was lying, and he said that I have to tell the truth. Otherwise I'd be fucked up.

MS. SUSLER: I think he also said "He didn't believe me."

(Interpreter speaks with witness in Spanish.)

THE INTERPRETER: The interpreter is going to translate again.

THE WITNESS: Evidently he didn't believe me. He said it was a lie, that I had to tell the truth, and that I had to talk. Otherwise I'd be fucked up.

BY MS. ROSEN:

Q Did he say why he didn't believe you?

299

A No.

Q Can you tell me approximately how long you had been at Grand and Central when that police officer told you he didn't believe you?

A No, I don't remember how long I had been there.

Q And this was the first police officer that talked to you at all about the murders, right?

A Correct.

Q How long did this conversation with this police officer last?

MS. SUSLER: Objection to the form and your characterization of it as a "conversation."

You can answer.

THE WITNESS: I don't remember how long I talked with this police officer because I didn't have a watch, but it wasn't a long time.

BY MS. ROSEN:

Q And where did this conversation take place?

MS. SUSLER: Same objection.

BY MS. ROSEN:

Q You can answer.

A He took me out of the small room and

CCSAO COI SUBPOENAS 000262

I went to an area, a bigger area, where there were desks and computers. If I'm not mistaken, there was a board.

MS. SUSLER: A blackboard?

THE WITNESS: I don't remember the color, but it was a board.

BY MS. ROSEN:

Q Like a board that you can write on?

A The ones we use at school.

Q Was there writing on the board?

A Not that I remember.

Q And how long did you stay in that bigger area with the desks and the board?

A No, I don't remember, but it wasn't a long time.

Q Then what happened -- let me strike that.

Did that police officer say anything more to you other than what you've already described?

A For now, that's all I remember that he told me.

Q Did you say anything more to this police officer other than what you have already described?

A Not that I remember now.

Q And when the two of you had stopped speaking with one another, what happened?

A I was returned to the small room and I was cuffed.

Q The same small room you had been in before?

A Yes.

Q And how were you cuffed?

A Could you be more specific?

Q Sure. Were your hands -- when you say "cuffed," you mean handcuffed, right?

A No. He put one cuff around here and the other one attached to the ring.

Q So when you say "cuffed," you do mean handcuffed, right, with handcuffs?

A From the right hand to the ring.

Q The ring that was on the wall by the bench, right?

A Correct.

Q Did the police officer say anything to you before he put the handcuffs on you?

A No, not that I remember.

Q Did you ask him why he was handcuffing you?

A No.

Q And then after the handcuffs -- after you were handcuffed to the ring on the wall, what happened?

MS. SUSLER: You need a break?

BY MS. ROSEN:

Q Can you answer the question? Are you able to answer the question?

A Yes. Mr. Rivera walked in.

MS. SUSLER: "Guevara"?

THE INTERPRETER: "Mr. Guevara walked in."

MS. ROSEN: We can take a break.

THE VIDEOGRAPHER: This marks the end of Media Number 3 in the deposition of Gabriel Solache. We are off the record at 1:17 p.m.

(Lunch recess.)

(Jose Fonseca is interpreting.)

THE VIDEOGRAPHER: Here begins Media Number 4 in the deposition of Gabriel Solache. We are back on the record at 2:28 p.m.

BY MS. ROSEN:

Q Mr. Solache, the police officer that first took you out of the room and told you that he didn't believe you, was he a white officer or a Hispanic officer?

A Hispanic.

Q Can you describe him at all?

A No.

Q Did you ever see him again after that time when he took you out of the small room and told you he didn't believe you?

A No.

Q Did he ever testify in court against you?

A Possibly, but I don't know his name.

Q Then after he returned you to the small room, the next police officer you talked to was Detective Guevara; is that right?

A I didn't understand the question. Could you please repeat it?

Q Sure. The police officer that told you he didn't believe you, then he put you back in the room, right?

A Correct.

Q And then the next police officer that you talked to was Detective Guevara, right?

CCSAO COI SUBPOENAS 000263

Transcript of Gabriel Solache, Volume 2
Conducted on December 8, 2021

28 (2o3 4) 2o95

---

**304**

A    Yes.

Q    And how long were you in that small room before Detective Guevara came into the room?

A    Not a long time.

Q    And tell me what happened when Detective Guevara came into the room?

A    He walked in beating me, and he told me why I had done it.  So I told him what I had done.

MS. SUSLER:  No, that is not what he said.

THE INTERPRETER:  The interpreter is going to clarify.

(Interpreter speaks with witness in Spanish.)

THE WITNESS:  Then I asked him what I had done.

MS. SUSLER:  I think it should be translated "What did I do?"

THE INTERPRETER:  I told him, "What did I do?"

MS. ROSEN:  She just said "What have I done" too.

(Indecipherable from Adriana Trevino.)

MS. SUSLER:  You're not on the mic, so I don't know that that's on the record.

**305**

THE REPORTER:  Correct.  This is the court reporter.  I didn't hear Adriana.

MS. ROSEN:  She said "What have I done" as a question, is what Adriana said.  I'll clarify it so that we're all clear.

BY MS. ROSEN:

Q    So he walked into the room beating you.  Is that what you said?

A    Yes.

Q    So where were you when he walked into the room?

A    In the room, in the small room?

Q    Yes.  Where exactly in the room where you when he walked into the room beating you?

A    I was cuffed to the ring.

Q    So did he say anything to you before he started beating you?

A    No.  While he was beating me, he told me why had I done that.

Q    So he never talked to you at all before he started hitting you; is that correct?

A    That's correct.

Q    And it was as he was beating you that he asked you, "What have you done" or "Why have you

**306**

done what you did," right?

A    Yes.  But I told him that I already spoken with the officer, whose name I don't remember, and that I had already explained to him where I was when the deaths took place.

Q    And is this conversation that you're having with Detective Guevara where he's accusing you and you're saying "I've already talked to somebody else," happening at the same time that he's beating you?

MS. SUSLER:  Objection.  Form to your characterization as to a "conversation."

BY MS. ROSEN:

Q    You can answer.

A    I don't remember if that happened while he was hitting me or there was a moment when he stopped beating me and that's when I told him.

Q    Is this the first time you saw Detective Guevara?

A    Yes.

Q    And up until the point that Detective Guevara walked into the room, you had -- I'm breaking up my question.

Up until the point where Detective

**307**

Guevara walked into the room, you had seen two police officers who took your shoes and the one police officer who took you out of the room and told you he didn't believe you, right?

A    Correct.

Q    Tell me what Detective Guevara did to you that you're calling he started beating you?  Exactly what did he do?

A    He started slapping me.

Q    Where did he slap you?

A    On the left-hand side of my face.

Q    Did he slap you with an open hand or a closed fist?

A    Open hand.

Q    And how many times did he strike the left side of your face?

A    I didn't count them.

Q    Can you estimate?

A    No.

Q    Was it more than one time?

A    Yes.

Q    Did he hit you hard?

A    Yes.

Q    Where on the left side of your face

CCSAO COI SUBPOENAS 000264

308

did he make contact?

A   All over the face, from the ear all the way down (indicating).

Q   Did he hit you anywhere else other than the left side of your face?

MS. SUSLER:  Objection.  Are you talking about this same moment in time or --

MS. ROSEN:  Yes, this same moment in time.

THE WITNESS:  At that moment, no.

BY MS. ROSEN:

Q   How long was he hitting you on the left side of your face for?

A   If seemed like forever.

Q   Did it hurt?

A   Yes.

Q   And at the time that he hit you on the left side of your face, were you sitting on the bench?

A   I don't remember.

Q   Was your right hand handcuffed to the ring on the wall?

A   Yes.

Q   Did he cause any swelling to your face?

309

A   I don't know.

Q   There were a lot of photographs taken of you while you were at the police station, correct?

A   Correct.

Q   And there were photographs taken of you when you went -- when you first went to Cook County Jail, correct?

A   Correct.

Q   When is the last time you looked at any of those photographs that were taken of you?

A   I don't remember.

Q   Have you looked at them at all in the last week as you were getting ready for this deposition?

A   I don't remember.

Q   Did you look at them -- do you recall looking at them during the course of your criminal case?

A   No, I don't remember.

Q   Do you remember how many times you testified in your criminal case before you were convicted?

A   It seems like two times.

3 0

Q   The first time that you testified, do you remember being shown photographs that were taken of you while you were at the police station and when you first went to Cook County Jail?

A   I don't remember.

Q   The second time that you testified in your criminal case, do you recall seeing photographs that were taken of you while you were at the police station and when you first went to Cook County Jail?

A   I don't remember.

Q   Do you recall any photographs taken of you after you first went into Cook County Jail?

A   No, I don't remember.

Q   Do you recall seeing any photographs of you that were taken during that timeframe that showed any injuries on your face?

A   No, I don't remember.

Q   Did you bleed at all as a result of the slaps to your face by Detective Guevara?

A   No.

Q   How long did Detective Guevara stay in the room with you?

A   I don't know.

Q   Other than asking you why you had

3

done it and you asking "What have I done," was there any other words exchanged between you and Detective Guevara at that time?

MS. SUSLER:  Objection.  You mean other than what he's already testified to today?

MS. ROSEN:  Sure.  I think I recapped it, but sure.

MS. SUSLER:  I don't think you did.

MS. ROSEN:  Okay.

BY MS. ROSEN:

Q   Other than what you've already testified to, were there any other words exchanged between you and Detective Guevara at this time?

A   No, not that I remember.

Q   And then did he leave the room?

A   He left the room and he returned with Adriana.

Q   How much time passed between the time he left the room and he returned with Adriana?

A   Not a long time.

Q   And when he left the room, how were you feeling?

A   With pain.

Q   Describe the pain.

CCSAO COI SUBPOENAS 000265

32

A    I had pain.

Q    Where?

A    On my face.

Q    Anywhere else?

A    No.

Q    Were you dizzy at all?

A    Not that I remember.

Q    Anything else you were feeling other than pain on your face?

A    No.

Q    When Detective Guevara came back into the room with Adriana, what happened?

A    He slapped me again.

Q    Did he say anything before he slapped you again?

A    Yes.

Q    What did he say?

A    He told me if I was going to continue denying in front of the lady.

Q    Did you respond to his question?

A    I told him I hadn't done anything.

Q    And then he slapped you?

A    No.  He only slapped me once there.

Q    When did he slap you?

33

A    When he brought Adriana back.

Q    So before he said anything to you, he slapped you?

A    Yes.

Q    So he walked into the room with Adriana and just slapped you without saying anything?

A    No, he said something.  He said if I was going to continue denying in front of the lady, and he slapped me again.

Q    So he slapped you before you could answer his question?

A    Well, I don't know, but he slapped me.

Q    Do you remember if he slapped you before you answered his question?

A    No, I don't remember.

Q    And after you told him -- where did he slap you?

THE INTERPRETER:  "Where did"?

MS. ROSEN:  Withdraw that.  Let me start over.

BY MS. ROSEN:

Q    Where did he slap you?

34

MS. SUSLER:  You mean on his body?

MS. ROSEN:  Yeah.  Sorry.

THE WITNESS:  No, he slapped me on the face, on the same side he was hitting me, on the left side, left-hand side of my face.

BY MS. ROSEN:

Q    And that was one slap at that point, right?

A    Yes.

Q    And after you told him that you hadn't done anything, did he say anything else?

A    No.

Q    Did Adriana say anything?

A    Yes.

Q    What did Adriana say?

A    That I had helped Adriana, and that I had been the one who had stabbed the man.

Q    When did Adriana say that you had helped her and you were the one that stabbed the man?

A    At that moment.

Q    And did you say anything after Adriana said that?

A    Yes.

35

Q    What did you say?

A    I told her no, that that was not true.

Q    Did she say anything else?

A    No.

Q    Did Detective Guevara say anything?

A    No.

Q    Did you say anything more?

A    No.

Q    What happened next?

A    She left with Adriana and she took her back.  I don't know where she brought her from.

Q    Up until that point, did you know that Adriana was in the police station?

A    Yes.

Q    How did you know that?

A    Well, I didn't know she was there until Detective Guevara took her there.

Q    So let me clarify my question.  Before Adriana walked into the room, did you know she was in the police station?

A    No.

Q    After Detective Guevara and Adriana left the room, how much time did you spend in the

CCSAO COI SUBPOENAS 000266

room before somebody else came in or something else happened?

A   It wasn't very long.  Detective Guevara came back and he started beating me on the stomach.

Q   After Adriana left the room, how were you feeling, before Detective Guevara came back?

A   With pain.

Q   And where was your pain?

A   On the face, on the left-hand side.

Q   Did you feel any other pain other than on the left side of your face?

A   No.

Q   Were you dizzy at all?

A   I don't remember.

Q   Then when Detective Guevara came back into the room, what happened?

A   He started hitting me on the stomach.

Q   With his fist?

A   Yes.

Q   How many times did he hit you in the stomach with his fist?

A   I don't know.  I didn't count them.

Q   Was it many times?

A   Few times.  I didn't count them.

Q   Did he say anything to you before he started hitting you in the stomach?

A   No.

Q   Did he say anything to you as he was hitting you in the stomach?

A   No.

Q   Did you say anything to him?

A   Yes.

Q   What did you say to him?

A   That, yes, that I had done it.

Q   When exactly did you say "Yes, I had done it"?

A   When he was hitting me in the stomach.

Q   So as he was hitting you in the stomach?

A   Yes.

Q   And why did you say it?

A   Because he was harming me.

Q   "Harming"?  Is that the word?

A   Yes.

Q   And after you said that you had done it, what happened?

A   He stopped hitting me.

Q   And after he stopped hitting you, did he say anything to you?

A   No, he left the room.

Q   And other than saying "Yes, I had done it," did you say anything more to him?

A   No, I don't remember saying anything at this moment.

Q   And then how long were you in the room before something else happened?

A   No, I don't remember how long.

(Adriana Trevino is interpreting.)

BY MS. ROSEN:

Q   What's the next thing that you remember happening?

A   Then Detective Guevara came back and left from there.  Left there.

Q   With you?

A   No, he took me out of the room.

Q   Okay.  So he came back and then he took you out of the room?

A   Yes, yes.

Q   Was there any conversation between you and Detective Guevara at that point?

MS. SUSLER:  Objection to the form of the question and use of the word "conversation."

BY MS. ROSEN:

Q   You can answer.

A   No, I don't remember if we had a conversation.

Q   Did he say anything to you at that point?

A   I don't remember him saying anything to me.  I just remember he took me to a big room.

Q   Did you say anything to him at that point?

A   Not that I remember.

Q   And the big room he took you to, had you been to that room before?

A   No.

Q   So this was a completely different room than you had been in up until that point, right?

A   Well, I was in a similar room before the first time the first officer that took me out.

Q   But you don't think it was the same room?

A   Well, no, it looked different.

CCSAO COI SUBPOENAS 000267

**320**

Q   Can you describe that room?

A   It had some desks.  I think they were together.  It also had computers.  And it also seemed to me that there was a writing board, but I'm not sure.

Q   Were there other people in that room?

A   Yes.

Q   How many other people were in the room?

A   There was a lady.

Q   Was she the prosecutor?

A   Yes.

Q   Do you remember what her name was?

A   Not at that moment.

Q   Does the name Heather Brualdi sound familiar?

A   Yeah, I later learned that it was Ms. Heather Rowley.

MS. ROSEN:  "Brualdi."

THE INTERPRETER:  "Brualdi."

BY MS. ROSEN:

Q   And you saw her testify, right, in the criminal case at various points?

A   Yes.

**322**

A   I don't remember.

Q   So you don't remember her greeting you in any way directly at all?

A   No, I don't remember.

Q   What happened -- was she already in the room when you walked into the room?

A   I'm not sure if she was already there or if she came later, but she was in the room.

Q   And what happened while the three of you were in this room?

A   Well, she started talking to Detective Guevara.

Q   Did you understand anything she was saying?

A   No.

Q   Did Detective Guevara speak back to her?

A   Yes.

Q   Did you understand anything Detective Guevara was saying to her?

A   No.

Q   Then what happened?

A   Well, they started asking me -- well, Detective Guevara started asking.

**32**

Q   And it's the same woman we're talking about, right?

A   Yes.

Q   When the first officer took you out into the similar room earlier, were there other people in that room?

A   I don't remember.

Q   So when you're in the room with Detective Guevara and the Prosecutor Brualdi, were there any other people in the room other than the three of you?

A   No.

Q   Did Ms. Brualdi introduce herself to you?

A   No.

Q   Did she say anything to you?

A   No.

Q   She did not directly address you at all?

A   No.

Q   Did she shake your hand?

A   I don't remember her doing that.

Q   Did she wave hello or anything to you?

**323**

Q   What did Detective Guevara start asking you?

A   I don't remember exactly, but they were things related to the case.

Q   Do you remember anything specifically about what he asked you related to the case?

A   No.

Q   Did he ask you anything other than things related to the case?

A   I don't remember.

Q   Did you answer his questions?

A   Yes.

Q   And were you able to answer the questions he was asking you?

MS. SUSLER:  Objection.  Form.

BY MS. ROSEN:

Q   You can answer.

A   Well, I don't remember if I answered all the questions that he asked me, but I did answer questions he asked me.

Q   When you were answering Detective Guevara's questions, were you answering them truthfully?

A   Yes.

Q   So if he was asking you questions about the case, and you weren't involved in the case, then you responded to his questions by telling him "no," correct?

A   I don't remember what he asked me about the case.  Obviously he asked me a lot of questions.  Well, specifically one question that he asked me -- well, I mean, he asked me a lot of questions.

Q   Do you remember any specific questions he asked you?

A   No.

Q   Did you know why the prosecutor was there?

A   At that time, no.

Q   Did you ask Detective Guevara why the prosecutor was there?

A   No.

Q   Did you know at the time you walked into the room that Ms. Brualdi was a prosecutor?

A   No.

Q   Did you have any understanding why Ms. Brualdi was even in the room?

A   No, I wasn't told anything.  Neither of them said anything to me.

MS. SUSLER:  I'm going to need to take a break.  I'm sorry.

MS. ROSEN:  You need to take a break?

MS. SUSLER:  Yeah.  I don't need very long, but I need to take a quick break.

MS. ROSEN:  Sure.

THE VIDEOGRAPHER:  We are going off the record.  The time is 3:08 p.m.

(Recess.)

THE VIDEOGRAPHER:  We are back on the record.  The time is 3:15 p.m.

BY MS. ROSEN:

Q   How long were you in the room with Detective Guevara and Ms. Brualdi?

A   I don't remember.

Q   What was Ms. Brualdi doing as Detective Guevara was asking you questions about the case?

A   She was writing.

Q   Do you know what she was writing?

A   No.

Q   Do you know what she was writing on? Was it a pad of paper?

A   I don't know.  She was writing.

Q   Did you ever see what she was writing?

A   No.

Q   Was she speaking at all?

A   Yes.

Q   Who was she speaking to?

A   To Guevara.

Q   And do you have any idea what she was saying to Guevara?

A   No.

Q   After Detective Guevara was asking you things about the case, what happened?

A   Could you be more specific?

Q   Sure.  At some point in time Detective Guevara stopped asking you questions about the case, right?

A   He asked questions or he stopped asking them?

Q   Right.  At some point, right, he was asking you questions about the case, you were answering, and then at some point he stopped asking you questions, right?

A   Correct.

Q   Then what happened?

A   When he stopped asking the questions?

Q   Yeah, when he was done.

A   He brought me back to the room.

Q   That same small room that you had been in before?

A   Yes.

Q   At any time before Detective Guevara took you back to the small room, were you shown any documents?

A   Not that I remember.

Q   How long were you in the small room?

A   Could you be more specific?  I don't know when you refer to when you say "How long in the small room."

Q   When Detective Guevara took you back into the small room, how long did you stay there before something else happened?

A   I don't remember.

Q   What happened next?

A   I was taken out of there and I was taken downstairs to the basement.

Q   And when you were taken to the basement, is that when you saw Mr. Reyes?

CCSAO COI SUBPOENAS 000269

Transcript of Gabriel Solache, Volume 2
Conducted on December 8, 2021

2t (28t 4) 2215

328

A    Yes.

Q    Before you were taken to the basement, did you have any more interaction with Detective Guevara other than what we've already talked about?

MS. SUSLER: Objection. Form.

BY MS. ROSEN:

Q    You can answer.

A    I don't know what you are referring to. Are you asking if I had another confrontation with him?

Q    No. I said "interaction," any kind of interaction.

A    Well, no, we talked. I mean, he was talking there when the prosecutor was there. That's the whole interaction that we had.

Q    So after that, he put you in the room. Did you ever see him again at the police station?

A    No.

Q    Who took you down to the basement?

A    I don't remember.

Q    Did any other detectives talk to you again about the case before they took you to the

329

basement other than what we've already talked about?

THE INTERPRETER: I'm sorry. This is the interpreter talking. Could you repeat the question for the interpreter?

MS. ROSEN: Sure.

BY MS. ROSEN:

Q    Did any other detectives talk to you about the case before you were taken to the basement, other than what we've already talked about here today?

A    No, I don't remember.

Q    And when you were taken into the basement, tell me what happened.

A    Well, there was an officer there. He asked us some type of questions, and then he locked us in a cell. Questions that I do not remember.

Q    And when you were put in the cell, was there anybody else in the cell with you?

A    No.

Q    Did you see Mr. Reyes get put in the cell?

A    Yes.

Q    How far away from you was Mr. Reyes?

A    He was next to me.

330

Q    So were the two of you able to talk to one another?

A    Yes.

Q    Did you talk to Mr. Reyes while you were in the cell?

A    I don't remember.

Q    Did Mr. Reyes talk to you while you were in the cell?

A    No, I don't remember.

MR. STARR: Objection. Asked and answered.

THE INTERPRETER: What?

MS. ROSEN: He said "Objection. Asked and answered." It doesn't matter. He already answered the question.

MR. STARR: It's a belated objection for the record. Maybe I misheard you, Eileen, saying "It doesn't matter." I was trying to get the objection in. The translator --

MS. ROSEN: I was responding to the translator who looked at me as if something were to be done. It's noted for the record. I wasn't trying to belittle your objection. It's noted.

MR. STARR: Fair enough. I can't see your

33

face. I'm not sure what's going on in the room.

MS. ROSEN: No, I got it. No worries.

BY MS. ROSEN:

Q    Were you surprised to see Mr. Reyes down in the basement?

MR. STARR: Objection. Foundation.

THE WITNESS: Well, yes, a little.

BY MS. ROSEN:

Q    And why were you surprised?

A    Because I didn't think he was there.

Q    You didn't think he was where?

A    Over there at the station.

Q    Did you ask him why he was in the cell?

MS. SUSLER: Objection. Asked and answered.

BY MS. ROSEN:

Q    What was your answer?

A    No.

Q    Did you see anybody else down in the basement that you recognized?

A    No.

Q    How long did you stay in the basement in the cell?

Transcript of Gabriel Solache, Volume 2
Conducted on December 8, 2021

26 (228 4) 2275

332

A No, I don't know.

Q What happened next?

A I was later taken to Cook County.

Q Was Mr. Reyes taken to Cook County at the same time you were taken to Cook County?

A Yes.

MR. STARR: Objection, foundation.

BY MS. ROSEN:

Q Were you guys transported in some kind of van or bus or something?

A I don't remember what it was, if it was a van, a truck, a bus, but we were taken to Cook County.

Q Were there any other people taken to Cook County at the same time as you and Mr. Reyes were taken to Cook County?

A Yes.

Q Did you know any of those people?

A No.

Q Were you and Mr. Reyes sitting close to one another when you were taken to Cook County?

A I don't remember.

Q Did you have any conversations with Mr. Reyes while you were being taken to Cook County?

333

A No, not that I remember.

Q Did you know you were being taken to Cook County when you were put in whatever the vehicle was that took you there?

A No.

Q Tell me what happened when you got to Cook County Jail.

A We were taken out of the vehicle and we were put in a room.

Q Can you describe the room?

A Well, it was not very big, but an officer pushed me against the wall.

Q An officer at Cook County?

A Yeah, it was a male officer, not a female officer.

Q Were there other individuals in the room other than yourself?

A Yes.

Q How many other individuals?

A I don't know. I did not count them.

Q Was Mr. Reyes in the room?

A Yes.

Q And do you know why the officer pushed you -- you say he pushed you into the wall?

334

MS. SUSLER: Objection. Foundation.

BY MS. ROSEN:

Q Do you know why the officer pushed you into the wall?

A No, I don't know.

Q Did the officer say anything to you before he pushed you into the wall?

A Yes.

Q What did he say?

A I don't remember exactly what he said, but he did say something.

Q Do you remember generally what he said?

A No.

Q You have no recollection at all about what he said?

A No.

Q How long were you in this room?

A I don't remember.

Q After you were in this room for some period of time, what happened?

A Well, I was taken out of the -- I don't know if I was taken to court, to the courtroom or to the room where they take the fingerprints and

335

that.

Q And after you were taken to the room where you were getting your fingerprints, do you remember what happened after that?

A Well, I don't remember where I was taken first, but then I was taken to Division 11.

Q Did you have any cellmates when you were at Division 11?

A Yes.

Q Do you remember the names of any of your cellmates?

A It was an American, a U.S. person, but it was an African-American.

Q Was it just the two of you in that cell?

A Yes.

Q Do you remember his name?

A No.

Q And were you able to communicate with your cellmate at all while you were there?

A No.

Q Did you have any problems with your cellmate at all?

A No.

CCSAO COI SUBPOENAS 000271

Transcript of Gabriel Solache, Volume 2
Conducted on December 8, 2021

3o (220 4) 2265

336

Q Did you see Mr. Reyes at all while you were at Cook County Jail?

A When we would go to court.

Q Other than when you would go to court, did you ever see him while you were at the jail?

A Yes, after a while he was moved to Division 11 and I would see him there.

Q Did you and Mr. Reyes, once he was moved to Division 11, have conversations about why the both of you were there?

A No.

Q Did you ever have conversations with Mr. Reyes about what happened to you at the police station?

A Not that I remember.

Q Did you have any conversations with Mr. Reyes about what Mr. Reyes was claiming happened to him in the police station?

A No.

Q When you first went to Cook County Jail, did you know what you were being charged with?

A Yes.

Q And what was your understanding of

337

what you were being charged with?

A Two deaths.

Q Who told you that you were being charged with the two deaths?

A The female attorney.

Q That's Viola, right, Viola Rouse?

A Yes.

Q Do you recall how quickly you were assigned Ms. Rouse as your attorney?

A No.

MS. SUSLER: Objection. Foundation.

BY MS. ROSEN:

Q You didn't hire Ms. Rouse; is that correct?

A No.

Q She was assigned to you; is that correct?

A Correct.

Q And do you remember the first time you met her?

A Well, I mean, I did meet her. I don't remember the exact date.

Q But do you remember -- even if you don't remember the date, do you remember the first

338

meeting with her?

A Yes.

Q Was she able to communicate with you in Spanish?

A No, I think she did not speak Spanish.

Q So when the two of you would meet, did she have somebody with her to interpret?

A Yes.

Q And did you tell Ms. Rouse what happened to you in the police station?

A Yes.

Q Do you remember that at some point in time Ms. Rouse filed a motion to suppress your statement?

A No, I don't remember. She didn't make any comment to me about that.

Q The first time that you testified in connection with your criminal case, do you remember what the purpose of that proceeding was?

A I remember I testified, but I didn't even know what it was for.

Q You didn't understand why you were testifying?

339

A No.

Q Ms. Rouse didn't tell you?

A Maybe she told me, but I don't remember.

(Jose Fonseca is interpreting.)

BY MS. ROSEN:

Q Now, you are claiming that as a result of Detective Guevara slapping you, that you can't hear out of your left ear; is that correct?

A Correct.

Q When did you first notice that you could not hear out of your left ear?

A When I arrived at the Cook County Jail. But when he slapped me, I had a buzz in my ear that I still have to this day.

Q Did you say a buzz in your ear?

A Yes.

Q And you still have that buzzing to today. Is that what you're saying?

A Yes.

Q When did you first notice that buzzing?

A When Detective Guevara was hitting me.

CCSAO COI SUBPOENAS 000272

**340**

Q    So in the police station?

A    Yes.

Q    And did you immediately realize that you could not hear out of your left ear?

MS. SUSLER: Objection. Asked and answered.

THE WITNESS: At that moment, no.

BY MS. ROSEN:

Q    When did you first realize you could not hear out of your left ear?

MS. SUSLER: Objection. Asked and answered.

THE WITNESS: I don't know exactly when that happened, but it was when I was at the Cook County Jail.

BY MS. ROSEN:

Q    And how is it that you first realized that you couldn't hear out of your left ear?

A    It seems to me, I'm not sure, but I believe I was using the telephone.

Q    And who were you talking to?

A    With Guadalupe Mejia.

Q    Did you call Guadalupe Mejia?

A    Yes.

**342**

Q    On this occasion when you called Guadalupe from Cook County Jail, were you calling to speak with her?

A    Yes.

Q    But as you sit here today, you don't recall why you were calling?

A    No.

Q    Did you tell anybody after your telephone call with Guadalupe when you first noticed that you couldn't hear out of your left ear, that you couldn't hear out of your left ear?

A    I don't remember, but I asked for help to see a doctor because I didn't know how to see the doctor, so I placed a request to see the doctor.

Q    Other than placing a request to see the doctor at some point, did you tell anybody else about the fact that you could not hear out of your left ear?

A    Not that I remember.

Q    Did you ever tell your lawyer that you couldn't hear out of your left ear?

A    Yes.

Q    Do you remember when you first told

**34**

Q    What was the purpose of your phone call to Guadalupe Mejia?

A    I don't remember.

Q    Do you remember when you made this phone call?

A    I don't remember exactly the day, but it was when I had recently arrived at Cook County.

Q    Did you tell Guadalupe that you couldn't hear out of your left ear?

A    I don't remember.

Q    Did you have any conversations with Guadalupe after that phone call?

A    I believe I only called him a couple of times.

Q    Called her, right? Guadalupe, her?

A    Yes, called her.

Q    Did you frequently have conversations with Guadalupe before you were arrested?

A    Could you repeat the question?

Q    Sure. Before you were arrested, did you and Guadalupe have conversations frequently?

A    Yes, but not long conversations. A greeting. "How are you doing? How's the family over there?" And that's all we would say.

**343**

her that?

A    No, I don't remember.

Q    Do you remember your criminal trial, the actual trial in your case?

A    Yes.

Q    And you testified at the trial, right?

A    Yes. Correct.

Q    And the jury found you guilty, right?

A    Correct.

Q    Do you remember who testified at the trial other than yourself?

THE INTERPRETER: "Who testified at trial"?

MS. ROSEN: Other than himself.

THE WITNESS: I don't remember the names of the people, but there were a few. There were several people who testified.

BY MS. ROSEN:

Q    Were there people that you asked Ms. Rouse to call as witnesses on your behalf?

A    I don't remember if I requested that or if she called them.

Q    Was there anybody that you wanted her

CCSAO COI SUBPOENAS 000273

**344**

to call to testify that she didn't?

A   Yes.

Q   Who?

A   Jose Blanco.

Q   Anybody else?

A   No.

Q   Did you and Ms. Rouse discuss Mr. Blanco?

THE INTERPRETER: "Did you and Ms. Rouse discuss"?

MS. ROSEN: Mr. Blanco.

THE WITNESS: Is that the question?

BY MS. ROSEN:

Q   Yeah, did you discuss Mr. Blanco?

A   No, not that I remember.

Q   Do you remember her telling you that she was not going to call Mr. Blanco as a witness on your behalf?

A   No, I don't remember.

Q   After the -- and you went to trial at the same time as Mr. Reyes; is that correct?

A   That's correct.

Q   When the two of --

A   May I take a break?

**345**

MS. ROSEN: Sure.

THE VIDEOGRAPHER: This marks the end of Media Number 4 in the deposition of Gabriel Solache. We are off the record at 3:48 p.m.

(Recess.)

THE VIDEOGRAPHER: Here begins Media Number 5 in the deposition of Gabriel Solache. We are back on the record at 4:05 p.m.

MS. ROSEN: Can I ask the court reporter to read back the last question and answer.

(Record read as follows:

"Question: And you went to trial at the same time as Mr. Reyes; is that correct?

"Answer: That's correct.")

BY MS. ROSEN:

Q   And Mr. Reyes was also convicted; is that correct?

A   Correct.

Q   And you and Mr. Reyes were subject to the death penalty; is that correct?

THE INTERPRETER: Pardon?

BY MS. ROSEN:

Q   You and Mr. Reyes were both subject

**346**

to the death penalty; is that correct?

MR. STARR: Objection. Foundation.

THE INTERPRETER: What?

MS. ROSEN: "Objection. Foundation."

THE WITNESS: No.

BY MS. ROSEN:

Q   But you received the death penalty; is that correct?

A   Yes.

Q   And Mr. Reyes did not receive the date penalty; is that correct?

A   Correct.

Q   But Mr. Reyes could have gotten the death penalty, right?

MS. SUSLER: Objection. Foundation. And also calls for a legal conclusion.

MR. STARR: Join.

BY MS. ROSEN:

Q   You can answer.

A   Well, no, I don't know.

Q   Because of the nature of the crimes, there was another hearing after you were convicted to determine whether or not you should get the death penalty; is that correct?

**347**

MS. SUSLER: Objection. Foundation and calls for a legal conclusion.

BY MS. ROSEN:

Q   You can answer.

A   I don't remember, but it seems to me like yes.

Q   Do you remember having any conversations with your attorney about having your family come to the United States to testify on your behalf in the penalty phase of your case?

A   Yes.

Q   And none of your family members came to the United States to testify; is that correct?

MS. SUSLER: Objection. Form.

BY MS. ROSEN:

Q   You can answer.

A   Yes, they didn't come because I didn't want them to come. I didn't want them to go to the United States.

Q   And why didn't you want your family to come?

A   Well, I didn't want them to go.

Q   Was there a reason?

A   No, none. I simply didn't want them

CCSAO COI SUBPOENAS 000274

Transcript of Gabriel Solache, Volume 2
Conducted on December 8, 2021

32 (23t 4) 2715

348

to go.

Q    Were you told that if your family members came to testify for you that you might avoid getting the death penalty as a sentence?

A    Well, the truth is I didn't want them to come testify because I was going to stay there, and they were going to go back to Mexico.

MS. ROSEN: Let's take a look at Exhibit Number 65.

MS. SUSLER: I'm sorry.  I didn't hear you.

MS. ROSEN: Let's take a look at Exhibit Number 65.

(Deposition Exhibit 65 was marked for identification.)

BY MS. ROSEN:

Q    I'm going ask you to take a look at what we've marked as Exhibit 65.  It indicates it's an interview with you, Gabriel Solache, on November 17th, 2000.

Have you ever seen that document before?

A    No.

Q    Do you remember being interviewed

349

after you were convicted by Susan Birkelo, who was somebody that worked for Ms. Rouse?

THE INTERPRETER: "Rose"?

MS. ROSEN: "Rouse."  Viola Rouse.

THE INTERPRETER: Oh, Rouse.

I'm sorry.  The interpreter will ask for a repetition of the question.

MS. ROSEN: Sure.  No problem.

BY MS. ROSEN:

Q    Do you recall being interviewed by Susan Birkelo after you were convicted?

A    Yes.

Q    And did she come to Division 11 at Cook County Jail to interview you?

A    Yes, it seems to me like yes.

Q    And did she just ask you a bunch of questions about your background in that interview?

A    Yeah, I don't remember what type of questions she asked, but she did ask me questions.

Q    So let's take a look at the information that's written on this document.  It indicates that you were born July 17th, 1971.

Is that accurate information?

A    Did you say 17?

350

Q    July 17, 1971, is what the document says.

A    No, I was born July 16.

Q    Okay.  But 1971 is correct?

A    It is correct.

Q    And then it says you were born in Turundeo, Michoacan, Mexico; is that right?

A    No, Turundeo.

Q    Okay.  I just missaid it.  Do you want to look at the document and see if it's spelled correctly on the document?  At the top.  The first line.

A    It is correct.

Q    And then it indicates that your parents are Gabriel Solache Chavez.  Is that your father's name?

A    Yes.

Q    And then it has listed as your mother Antonia Romero Plaza; is that correct?

THE INTERPRETER: Can you repeat the name for the interpreter?

MS. ROSEN: Sure.

BY MS. ROSEN:

Q    The document indicates that your

35

mother's name is Antonia Romero Plaza.

A    Not "Ramiro."  Romero.

Q    That's just my mispronunciation.

MS. SUSLER: Gabriel, when she's asking you about a document, I want you to look at the document.

BY MS. ROSEN:

Q    The document also indicates that you're the fourth child of 11 children.

Is that accurate?

A    Yes.

Q    And that nine of the children are from your parents and then the two youngest are from your mother and her second husband; is that correct?

A    Yes.

Q    The document also indicates that your parents were divorced when you were ten years old.

Is that accurate?

A    Well, I don't remember how old I was, but they did get separated.

Q    So as you sit here today, you don't remember whether or not they divorced when you were ten?

A    No, I don't remember.

CCSAO COI SUBPOENAS 000275

Q  And the document indicates that your brothers stayed with their maternal grandmother and the girls went with their mother to Mexico City.

THE INTERPRETER:  Could you repeat for the interpreter the last part of the question?

MS. ROSEN:  Sure.

BY MS. ROSEN:

Q  The document indicates that your brothers stayed with their maternal grandmother and that the girls went with their mother to Mexico City.

A  Well, the girls also stayed there. They didn't go with my mom right away to Mexico City.  That was later.

Q  The document also indicates that you, Gabriel, stayed with your great grandparents until your great grandmother died, and then you moved to your grandmother's house when you were about 12 years old.  Is that accurate?

A  Yes.

Q  This document indicates that at some point in time your father became ill and you had not heard from him for many years; is that correct?

A  Well, I mean, he did get sick, but not that I didn't hear from him for several years. I knew he was sick.

Q  But it is true though that you and your father lost contact; is that correct?

MS. SUSLER:  Objection.  Asked and answered.

BY MS. ROSEN:

Q  You can answer.

A  Well, it's not that we lost touch.  I mean, he was simply sick.  And then him being sick, we could not have a relationship.

Q  Did he recover from his illness?

A  No, I did not know, was aware of it, because I went to the United States.

Q  Did he become ill before you left for the United States?

A  Yes.

Q  And after you came to the United States, did you ever hear whether or not he recovered?

A  No.

Q  The document also states that "Gabriel's father occasionally hit his mother.  He remembers one time that he tried to help to protect her from his father's blows."

Is that accurate?

A  Yes.

Q  The document also states that "Gabriel describes himself as always working and being on his own and having to take care of himself."

A  I do not understand.

Q  The document states that you described yourself as always working and being on your own and having to take care of yourself.

A  Correct.

Q  The document also states that your daughter, Rosa Isela, was born September 17th, 1995, and that you wanted to name her Alejandra but Flor named her Rosa Isela.

Is that accurate?

A  I don't know.  I don't know that.  I don't know where that came from, Rosa Isela.  My daughter has always been named Alejandra.

Q  So you don't recall telling Ms. Birkelo that your daughter's name was Rosa Isela?

A  Not that I remember.

Q  The document also says that "Flor Italia doesn't believe he's in jail.  According to Gabriel's mother she thinks he's with another woman."  Did you tell that to Ms. Birkelo?

A  Yes, that's what my mother told me, and I said that to her.

(Audio feedback in proceedings.)

MS. ROSEN:  Hold on.

THE INTERPRETER:  The interpreter, Adriana, was trying to get the document as an aid on Zoom, but it interfered.

MS. ROSEN:  No problem.

BY MS. ROSEN:

Q  This document also indicates that in 1997 you were hit with a brick block and that you spent 18 days in the hospital.

Is that accurate?

MS. SUSLER:  Objection.  Form.  Are you asking if the fact is accurate or if he told Ms. Birkelo that?

MS. ROSEN:  The fact.

BY MS. ROSEN:

Q  Is the information accurate?

A  It is correct.

CCSAO COI SUBPOENAS 000276

356

Q    And the document also indicates that you had to have therapy to learn to walk again and that you still have headaches from the injury.

Is that information accurate?

A    Correct.

Q    The document also indicates that Mr. Solache's head hurts when he runs and he has vision problems.

Is that accurate information?

THE INTERPRETER: I'm sorry.  You have to repeat for the interpreter.

MS. ROSEN:  Sure.

BY MS. ROSEN:

Q    The document indicates that Mr. Solache's head hurts when he runs and he has vision problems.

Is that accurate information?

A    Headaches, yes.  But vision problems, no.

Q    Did you ever have vision problems after you were hit in the head with the brick in 1997?

A    Not that I remember.

Q    The document also indicates that

357

you've been visited in jail by your friend Leobardo.

Is that accurate information?

A    He visited me once.

Q    And the document also indicates that you were visited by some church people that you met through your cellmate.

Is that accurate information?

A    Yes, they were Mormons.  They visited me sometimes, a few times.

Q    The document also identifies as potential witnesses for you as your mother, your sister Lilia and her husband, your sister Angelica and her husband, and your sister Irene.

Did you discuss those individuals as possible witnesses with Ms. Birkelo?

A    No, I don't remember, but it's possible that I did that.

Q    And the document also identifies as potential witnesses some neighbors from -- how do you say your town?  Turundeo.  Am I saying that right?

A    Yes.

Q    And the neighbors are Zenaida and Salvador Rubio -- I'm going to make a mess of

358

this -- Palomares?

A    Uh-huh, yes.

Q    Do you remember discussing those individuals with Ms. Birkelo?

A    Yes.

Q    The document also identifies as a potential witness on your behalf your supervisor from your last job named Jerry?

A    Yes.

Q    Do you remember discussing Jerry as a potential witness with Ms. Birkelo?

A    No, I don't remember.

Q    The document also indicates that you identified Guadalupe Mejia as a potential witness with Ms. Birkelo.

Do you remember doing that?

A    No, I don't remember.

Q    The document also indicates that when you weren't working, you would help Guadalupe make bread and that you took her daughter to school.

Is that accurate information?

A    Yeah, I think I helped her like two times.

Q    The document also identifies Jose

359

Luis Martinez, Adriana's brother, as somebody that was a potential witness for you.  Do you remember discussing Mr. Martinez with Ms. Birkelo?

A    No, I don't remember.

Q    Is Jose Luis Martinez also Carlos Martinez?  The same person?

A    No.  They're brothers.

Q    Was Jose Luis Martinez in the United States?

A    No.

Q    The document also indicates that you mentioned that you once helped him by pulling him out of a lake.

Is that accurate information?

A    Yes.

Q    And when did you help pull Jose out of the lake?

A    The lake?

Q    The lake.

A    I don't know anything about a lake. It was like a swimming pool.

Q    Okay.  The document indicates lake, but it was a swimming pool that he was in and you helped pull him out of it?

CCSAO COI SUBPOENAS 000277

Transcript of Gabriel Solache, Volume 2
Conducted on December 8, 2021

30 (20o 4) 2025

360

A    Yeah, it is a swimming pool.

Q    And was that here in Mexico?

A    Yes.

Q    And when did that happen?

A    I don't remember.  We were teenagers.

Q    Was Jose younger or older than Carlos?

A    Older.

Q    Is he younger or older than Adriana?

A    Older.

Q    Is he younger or older than you?

A    Younger.

Q    When is the last time you talked to Jose?

A    I don't remember, probably before leaving for the United States.

Q    Finally the document indicates that another potential witness is Leobardo Mejia.  Do you recall discussing Leobardo with Ms. Birkelo?

A    No, I don't remember, but I might have done it.

Q    When is the last time you spoke with Leobardo?

A    When he came to visit me at Cook

36

County.  I don't remember the date.

Q    But since that time, you have not had any contact with him?

A    No.

Q    Do you know whether or not Adriana still has family members that live at the ranch?

A    Well, I don't know, but she probably does.  I mean they have family there their whole life.

Q    Did you know Adriana's mother?

A    Yes.

Q    Did she live on the ranch?

A    She's a neighbor, was a neighbor to my grandmother.

Q    Do you know if she's still alive?

A    No, I don't know.

Q    Does anybody in your family have any contact with anybody in Adriana's family?

MS. SUSLER: Objection.  Foundation.

BY MS. ROSEN:

Q    To your knowledge.

A    My brother lives on the ranch, but I don't know if he has contact with them or he calls them.  I mean, I haven't asked him.

362

Q    When you were at Cook County Jail, did you ever call Jose Blanco?

A    No.

Q    Why not?

A    Because I did not have his number.

Q    How did you arrange rides to and from work with Mr. Blanco?

A    Well, he was working at the same job where I was.

Q    So you would communicate with him at work?

A    Well, not that we were communicating. I mean, I worked in one area.  He worked in another area, but we would talk.

Q    And so you would arrange the rides while you were at work?

A    When I would see him, yes.

Q    Did you know exactly where he lived?

A    Well, not exactly.  I never went to his house.  He just told me that he lived three blocks from where I lived.

Q    And so the only way that you, though, had contact with him was through work, right?

A    Correct.

363

Q    Do you know somebody named Alexa Van Brunt (phonetic)?

A    No.

MS. ROSEN:  All right.  Let's take a look at Exhibit Number 45.

(Deposition Exhibit 45 was marked for identification.)

BY MS. ROSEN:

Q    Mr. Solache, take a quick look at that document and once you've had a chance to look at it, let me know and I can ask you a few questions.

Mr. Solache, have you had a chance to look at the document?

A    Not all of it, but I did see it.

Q    Do you recognize this document?

A    Yes.

Q    And if you look at the third page of the document, where it says "Respectfully submitted, Gabriel Solache."  No, go one page back, I think.

MS. SUSLER:  This one?

MS. ROSEN:  Yeah, that page right there, yeah.

CCSAO COI SUBPOENAS 000278

BY MS. ROSEN:

Q  Is that your signature or your handwriting?

A  That's my handwriting.

Q  Did you prepare this document yourself?

A  No.

Q  How did this document get prepared?

MS. SUSLER: Objection. Foundation.

BY MS. ROSEN:

Q  You can answer.

MS. SUSLER: And also, we're treading on attorney/client with the appellate counsel, so I'm going to instruct him not to answer.

THE INTERPRETER: I didn't hear you.

MS. SUSLER: We're treading near attorney/client privilege with his appellate counsel, and so if he can answer without talking about communication between him and his appellate counsel or any other lawyer other than Viola, then he can answer.

MS. ROSEN: All right. Well, I guess I'm confused. It says "Pro-se Petition," which I interpret to mean that it was pro-se, not with the assistance of counsel.

MS. SUSLER: You're entitled to your confusion, but that's my objection.

THE INTERPRETER: I'm sorry. It's too long.

MS. SUSLER: I said, "You're entitled to your confusion, but that's my objection."

And I repeated it because the interpreter asked me to.

MS. ROSEN: And now I've lost the question, so let me start over.

MS. SUSLER: You asked how did it get prepared.

BY MS. ROSEN:

Q  Do you know who prepared this document?

(Interpreter speaking with witness in Spanish.)

THE INTERPRETER: The interpreter will ask for a repetition.

(Interpreter speaking with witness in Spanish.)

THE WITNESS: The attorney had an office in Springfield, and I believe it was Alec Andrew.

BY MS. ROSEN:

Q  Did you review the document before you signed it?

A  Well, at that time I did not read English so I did not review it.

Q  So why did you sign it?

MS. SUSLER: Objection. If it's an attorney/client communication, then I'm instructing you not to answer. If it's for some other reason, you can answer.

BY MS. ROSEN:

Q  If you can answer the question, please answer.

A  Well, I received it, it arrived in the mail, and I was told to sign it, and that's what I did.

Q  Okay. Have you reviewed this document since you signed it?

THE INTERPRETER: "After you signed it"?

MS. ROSEN: "Since."

THE WITNESS: Excuse me. I didn't hear the question.

BY MS. ROSEN:

Q  Did you review this document -- let me start over.

Did you review this document at any point in time prior to today, since you signed it?

A  No.

Q  I'm going to ask you to look at the next page after that one that I directed you to. So flip the page. It says "Affidavit of Petitioner Gabriel Solache."

Do you see that?

A  Yes.

Q  And it says "Gabriel Solache states the following on oath:

"1, that I am the petitioner in this cause.

"2, that I am indigent and cannot afford to retain counsel.

"3, that I asked my attorney to call Carlos Martinez, Jose Blanco and my supervisors from work so they could testify and support my alibi.

"4, that I know my co-defendant, Arturo Reyes, received a sentence of life imprisonment in this case."

And then it says "Further affiant sayeth not."

THE INTERPRETER: One second for the interpreter. It is a legal term, a little hard to

CCSAO COI SUBPOENAS 000279

Transcript of Gabriel Solache, Volume 2
Conducted on December 8, 2021

3t (20t 4) 2915

368

interpret in Spanish. This is the interpreter speaking, giving that statement.

MS. SUSLER: You could say "El que esta firmando abajo jura."

MS. ROSEN: What does that mean?

MS. SUSLER: I'm saying, another way to say it very simply is to say "The person who is signing below," instead of saying "the affiant." That's the word that's the stumbling block.

THE INTERPRETER: Well, it's the whole phrase.

MS. SUSLER: And it means "Que no dice nada mas," "Sayeth not."

(Interpreter speaks to witness in Spanish.)

THE WITNESS: Okay.

BY MS. ROSEN:

Q And then it has your signature at the bottom of the document, correct?

A Correct.

Q Did you review and understand the words that were written on the page that's called "Affidavit" before signing it?

A No.

Q Did you ask your attorney, Viola

369

Rouse, to call Carlos Martinez as a witness to support your alibi?

MS. SUSLER: Objection. Asked and answered.

BY MS. ROSEN:

Q You can answer.

A I don't remember having asked, but if it's on the list, I probably did.

Q Do you remember asking Viola Rouse to call Jose Blanco as a witness to support your alibi?

MS. SUSLER: Objection. Asked and answered.

BY MS. ROSEN:

Q You can answer.

A Yes.

(Jose Fonseca is interpreting.)

BY MS. ROSEN:

Q And did you ask Viola Rouse to call your supervisors from work to testify and support your alibi?

A Yes.

Q Did you believe that if Carlos was called to testify, he would have testified that you were at home at the time of the murders?

370

MS. SUSLER: Objection. Foundation.

BY MS. ROSEN:

Q You can answer.

A Well, I don't know. I cannot think on his behalf.

Q Can you turn to the second page of the document, paragraph 1 at the top of the second page. Do you see where it says "Counsel failed to call as a witness Carlos Martinez"?

Do you see that?

A (In Spanish:) Si.

Q And then do you see the sentence that says, "He would have testified that Petitioner was at home at the time the offense occurred, contradicting his co-defendants' claims that he committed the murder with them."

Do you see that?

A Yes.

Q So do you believe that if Carlos had been called to testify, he would have testified that you were at home?

MS. SUSLER: Same objection.

BY MS. ROSEN:

Q You can answer.

37

A Well, I don't know. I couldn't say the way in which he would have testified.

Q As you sit here today, do you believe that Carlos was involved in the murders?

A It's possible.

Q Tell me all the reasons why you believe it's possible that Carlos was involved in the murders.

MS. SUSLER: Go ahead, and then I'll object.

(Interpreter translates question.)

MS. SUSLER: Objection. This has been asked and answered. If you want to ask him other than what he's already testified to today, you can do that.

BY MS. ROSEN:

Q Other than anything you've already testified to.

You can answer.

A Well, the reason why I believe that he was involved in the murder is that the day of the murder he was awake, and he was never awake. That's the reason I have.

Q Nothing else, though?

CCSAO COI SUBPOENAS 000280

A   Yes.

Q   Do you believe that Rosauro Mejia was involved in the murders?

A   Yes.

Q   And why do you believe Rosauro was involved in the murders?

MS. SUSLER: Same objection. You mean other than what he's already testified to today?

MS. ROSEN: Sure.

BY MS. ROSEN:

Q   You can answer.

A   Yes, I believe he was involved in the murder as a result of the comments that he made.

Q   The comments that we talked about earlier today about the little boy?

MS. SUSLER: Objection. It's not a complete summary of what he testified to about the reasons of Rosauro's involvement.

BY MS. ROSEN:

Q   You can answer.

A   Not only about the little boy, but also about the ultrasound that he saw when he took Adriana to the ultrasound, to the doctor.

Q   Do you believe that Arturo Reyes was involved in the murders and kidnapping?

MR. STARR: Objection. Form. Foundation. Objection to the form and foundation of that question.

BY MS. ROSEN:

Q   You can answer.

A   No, I don't believe so. I don't believe that.

Q   Why don't you believe that Mr. Reyes was involved?

MR. STARR: Same objections. Form. Foundation.

THE WITNESS: Because at the crime scene there was no evidence found about Mr. Reyes being involved in the crime, and neither was evidence found about me, myself, being involved in the crime.

BY MS. ROSEN:

Q   Any other reason other than the fact that there was no evidence of Mr. Reyes found at the crime scene?

MR. STARR: Same objection.

BY MS. ROSEN:

Q   You can answer.

A   At the crime scene there were samples of DNA test that showed that neither Mr. Reyes nor myself, none of us was involved with the crime. That's the reason why I believe that.

Q   No other reason?

A   No.

Q   Have you ever had a conversation in all these 20-something years with Mr. Reyes about the fact that both of you were accused of this crime?

MS. SUSLER: Objection. Asked and answered.

MS. ROSEN: I don't believe I've asked that.

MR. STARR: Objection. Form. Foundation. Asked and answered.

THE WITNESS: No, I haven't had a conversation with Mr. Reyes about this evidence. I only had a conversation with my attorneys about these evidence.

BY MS. ROSEN:

Q   Have you ever had a conversation with Mr. Reyes about your experiences in the police station?

MS. SUSLER: Objection. Asked and answered.

MR. STARR: Objection to form.

BY MS. ROSEN:

Q   You can answer.

A   No.

Q   When is the last time you spoke with Mr. Reyes?

A   I don't remember.

Q   Have you spoken with him at all since you moved back to Mexico?

A   No.

Q   Are you in contact with him at all?

A   No.

Q   Do you know where he lives?

A   No.

Q   Are you aware that he's moved back to Mexico also?

A   Yes.

Q   How did you know that?

MS. SUSLER: Objection.

MS. ROSEN: Let me rephrase the question. Sorry.

BY MS. ROSEN:

Q   Can you tell me -- well, let me ask

CCSAO COI SUBPOENAS 000281

376

it a different way.

When did you first learn that Mr. Reyes moved back to Mexico?

MS. SUSLER: Objection. We're getting very close to the attorney/client privilege. If you can answer that question without revealing communication between an attorney and you, you can answer the question. Otherwise I'm instructing you not to answer the question.

BY MS. ROSEN:

Q  Can you answer that question without revealing communications with your lawyer?

A  I'm not sure about where I got that information from, but I believe that information appeared in the news.

Q  In the news?

A  Yes.

Q  When you were taken to the facility in Kankakee, was Mr. Reyes there too?

MS. SUSLER: Objection. Foundation.

BY MS. ROSEN:

Q  You can answer.

A  No, I didn't see him.

Q  Okay. Let's talk a little bit about

377

your experiences in the facility at the Kankakee jail. For the period of time that you were there, where were you housed?

A  I don't remember exactly where I was, but I was inside the Kankakee jail.

Q  Were you in some kind of a cell?

A  Yes.

Q  Did you have any cellmates?

A  Yes.

Q  How many cellmates did you have?

A  Only one.

Q  For the entire time that you were there?

A  No.

Q  Did you have multiple cellmates over the course of time?

A  No. After that I was transferred to another area, another place, and there I had four -- three cellmates.

Q  With respect to the first cellmate that you had, did you have any issues or problems with that cellmate?

A  No.

Q  When you were moved to the other cell

378

where you had more cellmates, did you have any problems with any of those cellmates?

A  No.

Q  How would you describe the way you were treated when you were in the Kankakee jail?

A  Horrible.

Q  And can you tell me about that?

A  Yes. The condition of the bathrooms was very dirty. The bathrooms were horrible.

THE INTERPRETER: Just to clarify, the interpreter is going to clarify. The witness is referring to the showers.

(Interpreter speaks with witness in Spanish.)

THE WITNESS: The conditions of the showers were horrible. They were dirty. And the food, the portion they would give you was a baby's portion. And I didn't have privacy to use the toilet.

BY MS. ROSEN:

Q  Anything else?

A  The recreational area was also one room and it was closed, so that area, the recreational area was horrible.

Q  Anything else?

379

A  That's all that I remember for now.

Q  Would you say that the conditions at the Kankakee jail were worse than the conditions in Pontiac?

MS. SUSLER: Objection. Form.

BY MS. ROSEN:

Q  You can answer.

A  Yes, somehow, yes.

Q  And would you say that the conditions in the Kankakee jail were worse than the conditions in Stateville?

MS. SUSLER: Same objection.

BY MS. ROSEN:

Q  You can answer.

A  Yes.

MS. ROSEN: Let's take a look at Exhibit 88.

(Deposition Exhibit 88 was marked for identification.)

BY MS. ROSEN:

Q  Mr. Solache, we've handed you what's been marked as Exhibit 88, and it's a series of photographs. I'm going to ask you to take a look at them and then let me know if you recognize either of

CCSAO COI SUBPOENAS 000282

**380**

the children in the photographs.

A   Yes, I recognize them.  The boy, yes, I do.

Q   And who do you recognize the boy to be?

A   This boy is the boy that Adriana had in her house.

Q   And then if you look at the last photograph -- one more.  The back side of that.  Do you recognize that baby?

A   No.

MS. ROSEN:  Let's take a look at Exhibit 89.  These are some more photographs.

(Deposition Exhibit 89 was marked for identification.)

BY MS. ROSEN:

Q   Why don't you take a look at them and let me know.  I've got a couple of questions.

A   Okay.

Q   Do you recognize the car that is depicted in these photographs?

A   Well, it's very similar to the car that Rosauro Mejia had.  I'm not sure whether or not it's the same car, but it looks very similar to that

**38**

car.

Q   And the car -- similar to the car that you drove to the police station with Rosauro, Mr. Reyes and the little boy, right?

A   Correct.

MS. ROSEN:  Let's look at Exhibit Number 90.

(Deposition Exhibit 90 was marked for identification.)

BY MS. ROSEN:

Q   I'm going to ask you to take a look at the photographs that are contained in Exhibit 90.  Looking at the first page of the exhibit, there are photographs of five individuals, right?

A   Correct.

Q   The person, the female at the top left, who is that?

A   Adriana Mejia.

Q   And is that the way she looked the night that you were taken to the police station?

A   Yes.

Q   And then the gentleman depicted in the photograph next to the photograph of Adriana, do you recognize who is depicted in that photograph?

**382**

A   Yes.

Q   Who is that?

A   Rosauro Mejia.

Q   And does that depict how Rosauro looked the night that you and he and Mr. Reyes drove to the police station?

A   Yes.

Q   And then the bottom left, do you know who is depicted in that photograph?

A   Yes.

Q   Who is that?

A   Arturo Reyes.

Q   And does that photograph show how Mr. Reyes looked the night that you and he and Rosauro drove the little boy to the police station?

A   Yes.

Q   And then the middle photograph, who's that?

A   It's myself.

Q   And does that show how you looked the night that you drove to the police station?

A   Correct.

Q   And then the photograph of the female to the right of your photograph, do you recognize

**383**

who is depicted in that photograph?

A   Yes.

Q   Who is that?

A   Guadalupe Mejia.

Q   And is that what Guadalupe looked like in and around the time that you were arrested?

MS. SUSLER:  Objection.  Calls for a legal conclusion and foundation.

BY MS. ROSEN:

Q   You can answer.

A   The day we went to the police station, I don't know whether or not she was wearing the same clothes or if her hair was like that, but it's the same person.  It's Guadalupe Mejia.

Q   And that's what she looked like around that same time period, right?  She looks the right age; is that correct?

A   Correct.

Q   The photograph of you, do you know when that photograph was taken?

A   No, I don't know.

Q   Does it appear to you to have been taken at the police station?

A   That's possible.

CCSAO COI SUBPOENAS 000283

384

Q   Have you ever seen that particular photograph before today?

A   Yes.

Q   Do you see any injuries on your face in that particular photograph?

THE INTERPRETER:  What did you say?

MS. ROSEN:  "Injuries on your face in that particular photograph."

THE WITNESS:  No.

BY MS. ROSEN:

Q   Let's go to the next page of photographs.  That's Adriana, Mr. Reyes, yourself and Rosauro, right?

A   Correct.

Q   And those photographs show all of you wearing the same clothing that you were wearing in the photographs we just looked at; is that correct?

A   Correct.

Q   The photograph of you, does that look to you to have been taken in the police station?

A   Yes.

Q   And in that photograph do you see any injuries on your face?

A   No.

385

Q   And now let's go to --

MS. SUSLER:  Excuse me.  I'm just going to make a tardy objection to all of the questions about whether the photos reflect an injury on his face and just say the photographs speak for themselves.

MS. ROSEN:  Okay.

BY MS. ROSEN:

Q   If you could flip to the next page, please, and that's another photo of Mr. Reyes, correct?

A   Yes.

Q   And do you see all the signatures at the bottom of the page?

A   Yes.

Q   Do you recall seeing this particular photograph at any point in time prior to today, the one with all the signatures on it?

A   No, I don't remember.

Q   Okay.  Let's go to the next photograph.  And do you see the two photographs on the next page are a photocopy of what appears to be an envelope, right?

A   Yes.

Q   And that's you in the two

386

photographs, right?

A   Correct.

Q   And behind you in these two photographs appears to be a blackboard; is that correct?

MS. SUSLER:  Objection.  The photo speaks for itself.

BY MS. ROSEN:

Q   Do you see the blackboard?  Can you tell us whether -- which room you're in at the police station when you're looking at that photograph?

A   I don't remember whether it was the first or the second one.  They were similar.

Q   Okay.  And then in your hand, in your left hand in the photographs that has the letter "F" at the bottom, is that a pen in your hand?  Can you tell?

MS. SUSLER:  Objection.  The photo speaks for itself.

BY MS. ROSEN:

Q   Can you tell?

A   Yes, it's a pen.

Q   And then in your right hand, there

387

appears to be something.  Is that also a pen?

MS. SUSLER:  Objection.  The photo speaks for itself.

THE WITNESS:  Yes, that seems to be a pen.

BY MS. ROSEN:

Q   Do you remember having your photograph taken holding a pen in either one or both hands?

A   No, I don't remember.

Q   Okay.  I'm sorry.  Can we go to the last page of that exhibit.

Do you see your signature on the back side of both of those photographs?

A   Yes.

Q   And do you also see the signature of Ms. Brualdi?

MS. SUSLER:  Objection.  Foundation.

BY MS. ROSEN:

Q   You can answer.

A   Those are the photographs that Detective Guevara got me to sign.

Q   Did Ms. Brualdi -- when did Detective Guevara get you to sign those photographs?

A   When I was in the big room.

CCSAO COI SUBPOENAS 000284

Q   And did you see Detective Guevara also sign the photographs?

A   Yes, I believe so.

Q   And did you see Ms. Brualdi also sign the photographs?

A   No, I didn't see her sign any photographs.

Q   And her signature is in the middle, correct, between yours and Detective Guevara?

MS. SUSLER: Objection. The photo speaks for itself.

THE WITNESS: Can we take a break?

MS. ROSEN: Sure.

THE VIDEOGRAPHER: This marks the end of Media Number 5 in the video deposition of Gabriel Solache. We are off the record at 5:24 p.m.

(Recess.)

THE VIDEOGRAPHER: Here begins Media Number 6 in the deposition of Gabriel Solache. We are back on the record at 5:40 p.m.

(Adriana Trevino is interpreting.)

BY MS. ROSEN:

Q   Mr. Solache, if we could ask you to take a look at Exhibit 91.

(Deposition Exhibit 91 was marked for identification.)

BY MS. ROSEN:

Q   These are some more photographs.

A   Uh-huh.

Q   Let me know when you've had a chance to look through them.

A   Okay.

Q   Okay. Looking at the first page, the photograph, the male at the top left-hand corner, do you recognize who's depicted in that photograph?

A   Yes.

Q   And who is that?

A   Jorge Mejia.

Q   And does that picture show what, generally speaking, Jorge Mejia looked like in April of 1998?

A   Yes.

Q   And then to his right, who is in that photograph?

A   Guadalupe Mejia.

Q   And then the photograph of the gentleman below Jorge Mejia, do you recognize that person?

A   No.

Q   And then if we go to the next page of photographs. Do you recognize any of the individuals depicted in those four photographs?

A   No.

Q   Have you ever seen any of those photographs before?

A   No. This is the first time I see them.

Q   Now, going to the next page of photographs. Do you recognize any of the individuals in those three photos?

A   Yes. The one on top, I think it looks like Guadalupe Mejia.

Q   Do you recognize any of the other individuals?

A   No.

Q   Let's go to the next page of photographs. Do you recognize any of the individuals in those three photographs?

A   Yes.

Q   And who do you recognize?

A   Here is Mr. Reyes.

Q   And which photograph has Mr. Reyes?

A   The one on the bottom.

MR. STARR: Eileen, could you just say the Bates, because I think on the screen photo they're not lining up with what you're talking about.

MS. ROSEN: The Bates that we're on right now is RFC-Solache/Reyes 82.

MR. STARR: Thank you.

MS. ROSEN: Sorry about that.

Let's take a look at Exhibit 92.

(Deposition Exhibit 92 was marked for identification.)

BY MS. ROSEN:

Q   Have you had a chance to look through all the photographs?

A   Yes.

Q   Do you recognize anything that's depicted in those photographs?

MR. STARR: I'm going to object to form and foundation of that question.

THE WITNESS: Like what?

BY MS. ROSEN:

Q   Is anything in there familiar to you? Do you know what they're pictures of?

MR. STARR: Same objection.

CCSAO COI SUBPOENAS 000285

THE WITNESS: It looks like a wallet, but I don't recognize it. The only thing I recognize here is the photo of Mr. Reyes.

BY MS. ROSEN:

Q Did you ever see Mr. Reyes carrying this wallet?

A No.

MS. ROSEN: Let's take a look at Exhibit Number 93.

(Deposition Exhibit 93 was marked for identification.)

THE WITNESS: Okay.

BY MS. ROSEN:

Q Do you recognize any of the pages that are photographed in that exhibit?

A No. I only see that they're addresses and telephone numbers, but I don't recognize any of them.

MR. STARR: I just want a belated objection -- I didn't want to interrupt Mr. Solache -- to the form and foundation of the question and also just the relevance of showing him personal belongings that used to belong to Mr. Reyes.

MS. ROSEN: If we can show Mr. Solache Exhibit 94.

(Deposition Exhibit 94 was marked for identification.)

THE WITNESS: Okay. I already saw them.

BY MS. ROSEN:

Q Do you recognize any of the pages that are depicted in those photographs?

MR. STARR: Again, objection to the form and foundation of the question and to the relevancy of this line of questioning showing Mr. Solache Mr. Reyes' personal belongings from 20 years ago.

BY MS. ROSEN:

Q You can answer.

A It looks like it's --

THE INTERPRETER: The interpreter will clarify.

(Interpreter speaks with witness in Spanish.)

THE WITNESS: An agenda, calendar, agenda. But I do not recognize it. I don't recognize anything.

BY MS. ROSEN:

Q Can you take a look at the second page of the exhibit?

A Oh, this.

Q So the second page and third page both show a note, photograph of a note that says Norma Salazar. Does that name mean anything to you?

A Yes.

Q And what meaning does the name "Norma Salazar" have for you?

A I heard the name. It came up, I don't remember, I think it was during the trial. And there's also a photo of her. But I never had the pleasure of meeting this Ms. or Mrs. Salazar.

Q Do you recall as you sit here today in what way it came up during the trial?

A I don't remember. It came up during the trial. I don't even know if it was during the trial. But I remember hearing her name.

MS. ROSEN: If we could show Mr. Solache Exhibit Number 77.

(Deposition Exhibit 77 was marked for identification.)

BY MS. ROSEN:

Q Mr. Solache, we've put in front of you Exhibit Number 77, which is a photograph of an individual named Norma Salazar. Is this the photograph that you were referencing that you had seen previously?

A Yes.

Q And when do you recall seeing this photograph?

A I don't remember the exact date, but it was around these dates.

THE INTERPRETER: The interpreter needs to clarify.

(Interpreter speaks with witness in Spanish.)

THE WITNESS: Yeah, it was recently.

BY MS. ROSEN:

Q Recently?

A Uh-huh.

Q So within the last week or so?

A Yes, these past days. I don't remember the exact day, but yes.

Q While you were getting ready for your deposition?

A Yes.

MS. ROSEN: Let's take a look at Exhibit Number 29.

(Deposition Exhibit 29 was marked for

CCSAO COI SUBPOENAS 000286

identification.)

BY MS. ROSEN:

Q    Take a look at the second page of Exhibit 29.

A    Okay.

Q    Do you recognize this form?

A    Yes, I know it.

Q    And did you fill out this form?

A    I think part of it.  Just where my name is.

Q    And is this something that you filled out in order to work at the Staffing Network, which was the temporary agency you were doing work for?

A    Yeah.  But at that time I didn't know the name was Staffing Network.  We knew it more as "Oficina," office, or Payday.  That's how we knew it.

Q    The signature at the bottom of the form, is that your signature?

A    Yes.

Q    And then did you fill out the date there at the bottom?

A    One does look like my writing.  The other one does not.

Q    Which one looks like your writing?

A    The one on the left.  The one on the right doesn't look like my writing for the date.

MS. SUSLER:  Just for the record, do you want to clarify or do you want me to?

BY MS. ROSEN:

Q    When you say "the one on the left," you mean the one that has the page number at the bottom NPSL0040449?

A    Correct.

Q    And the one on the right is the one that ends with "450," right?

A    Yes.

Q    And then tell me again, because I've forgotten.  Which one looks like your handwriting and which one doesn't?

A    Yes, the one, 449, that's the one I recognize, like my numbers, like that has the date.

Q    Got it.  At the top of the one "449," where it says, next to your name and address, there's a place that says "Social Security number."

Do you see that, 342, I think it says 74-3425?

A    Yes.

Q    Are those numbers your handwriting?

A    Yeah, it looks like it, yes.

Q    And then the next page, 450, is some of that handwriting your handwriting where it says your name and your address?

THE INTERPRETER:  Did you say "your name and your address"?

MS. ROSEN:  Yes.

THE WITNESS:  Yes.

BY MS. ROSEN:

Q    Do you remember filling out this type of form in connection with your job with the temporary office place?

A    Well, no, I really don't remember.  But if it's here with my name, I probably did fill it out.

Q    Okay.  If you turn to the next page.

A    Yes.

Q    There's a photocopy there of a Social Security card with your name on it.

How did you obtain that Social Security card?

A    I obtained it in the area called La Villita.  I don't know if you are familiar with it.

Q    No.  Where is that?

A    It is really close to Cook County.  It's kind of around the corner.

Q    And did you have to pay for it?

A    Yes.

Q    Because you were undocumented, right, so you had to get a fake Social Security number; is that right?

A    Yeah, it is correct.  But all undocumented people get that paper.  If you don't get it, you cannot work.

Q    Because you need to have a Social Security number to work, right?

A    Correct.

Q    And then the card next to it says "Resident Alien Card"; do you see that there?

A    Yes.

Q    And did you also have to pay to get that because you were undocumented?

A    That is correct.

Q    Did you get it at the same place?

A    Yes.

Q    And how much does it cost -- did it

CCSAO COI SUBPOENAS 000287

**400**

cost you to get the fake Social Security card and Resident Alien card?

A   No, I don't remember how much I paid.

Q   Do you remember -- did you have one of those cards when you worked in the fields in California?

A   No.

Q   You only needed it to work when you came to Chicago; is that right?

A   Correct.

MS. ROSEN:  This is probably a natural breaking place, if this is where you want to break.

THE WITNESS:  I feel that it would be right to close the day now because I feel very tired.

MS. ROSEN:  Yeah, that's fine.

THE VIDEOGRAPHER:  This marks the end of today's deposition of Gabriel Solache.  We are going off the record at 6:12 p.m.

(Deposition concluded at 6:12 p.m.)

**402**

DEPOSITION SIGNATURE PAGE

Case Caption: Gabriel Solache v City of Chicago, et al

DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that I have read the entire transcript of my deposition taken in the above captioned matter or the same has been read to me, and the same is true and accurate, except for changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath

Executed on this_____day of_____, 202 ,
at_____,
_____
(city)            (state)

_____
GABRIEL SOLACHE

**40**

CERTIFICATE OF READER INTERPRETER

I, _____,
whose address is_____
_____,
a person who speaks the language of the witness;
namely,_____, do hereby certify that on
the _____ day of _____,
20_____, I did translate the foregoing deposition
from the _____language into the
_____ language, reading same to the
witness in his/her native tongue, to the best of my
ability;
That all corrections and changes requested by
the witness were made and initialed by the witness;
That upon completion of such reading, the
witness did confirm to me that he/she had understood
the reading

_____
Interpreter Reader

**403**

DEPOSITION ERRATA SHEET

Page No _____Line No _____Change to:
_____
_____
Reason for change:
_____
_____
Page No _____Line No _____Change to:
_____
_____
Reason for change:
_____
_____
Page No _____Line No _____Change to:
_____
_____
Reason for change:
_____
_____

CCSAO COI SUBPOENAS 000288

404

Page No _____ Line No _____ Change to:

_____

_____

Reason for change:

_____

_____

Page No _____ Line No _____ Change to:

_____

_____

Reason for change:

_____

_____

Page No _____ Line No _____ Change to:

_____

_____

Reason for change:

_____

_____

SIGNATURE_____ DATE_____

GABRIEL SOLACHE

405

CALIFORNIA CERTIFIED SHORTHAND REPORTER

I, RUBEN GARCIA, a Certified Shorthand Reporter of the State of California, do hereby certify: That the foregoing reporter videoconference proceedings were taken before me at the time herein set forth; that any witness in the foregoing proceedings, prior to testifying, were placed under oath; that every attempt was made to ensure a verbatim record of the remote proceedings which inherently have technical interference and audio interruptions and issues. Such transcript was created by me using machine shorthand which was thereafter transcribed under my direction. I further certify that I am neither financially interested in the action nor a relative or employee of any attorney nor of any of the parties. Reading and signing was requested. IN WITNESS WHEREOF, I have this date subscribed my name. My certificate to the original may be attached to certified copies electronically.

Dated this 20th day of December, 2021.

RUBEN GARCIA, CSR NO. 11305

CCSAO COI SUBPOENAS 000289

Transcript of Gabriel Solache, Volume 2
Conducted on December 8, 2021

58

**A**

abajo
80: 6
aberdeen
5:3 86
ability
645 56
able
595 56, 595 50,
369 7, 843 54,
838 58, 884 5,
882 59, 88: 8
abogada
353 35
above-captioned
643 54
accident
343 6
according
822 3
accurate
360 8, 869 38,
825 54, 825 5:,
823 59, 826 3,
826 57, 822 57,
822 59, 822 38,
820 6, 820 9,
820 57, 827 3,
827 7, 82: 35,
829 56, 643 55
accused
396 35, 397 2,
876 :
accusing
840 7
acknowledge
5:7 56, 5:: 0
across
3:2 :, 3:2 50,
3:2 5:, 3:2 38,
3:0 34, 3:7 8
action
642 52
activities
59: 52
actual
868 6

actually
307 9
address
59: 33, 386 :,
36: 56, 36: 57,
39: 5, 835 5:,
897 34, 89: 2,
89: 7, 645 2
addressed
360 0
addresses
5:2 7, 893 57
adjusted
59: 3
admissibility
5:7 50
adriana
5:8 5:, 5:: 53,
333 54, 383 56,
383 50, 383 35,
388 5, 388 :,
388 50, 388 33,
382 5:, 382 38,
362 0, 360 52,
324 52, 325 2,
325 53, 325 52,
325 59, 328 55,
328 35, 326 6,
322 7, 320 2,
320 0, 320 55,
327 8, 327 0,
327 55, 32: 5,
32: 6, 32: 53,
329 5, 305 7,
300 8, 300 7,
30: :, 3:3 8,
3:3 54, 3:3 57,
3:3 34, 3:8 8,
3:8 0, 3:8 36,
3:6 9, 3:6 5:,
393 9, 393 56,
846 33, 842 3,
842 6, 855 57,
855 59, 853 53,
858 5, 858 0,
856 58, 856 52,
856 50, 856 5:,
856 38, 852 55,

852 56, 852 34,
852 38, 850 0,
85: 53, 822 54,
804 9, 805 2,
873 38, 8:4 0,
8:5 5:, 8:5 38,
8:6 53, 8:: 35
adriana's
3:3 56, 829 5,
805 54, 805 5:
affiant
807 35, 80: :
affidavit
807 2, 80: 33
afford
807 56
afraid
332 50
african-american
390 5:, 882 58
after
595 55, 596 8,
345 36, 343 6,
356 6, 356 2,
368 7, 36: 54,
324 35, 324 36,
320 5, 30: :,
309 58, 309 35,
373 53, 373 58,
3:4 5, 3:4 55,
3:9 53, 3:9 59,
394 38, 395 5,
395 36, 393 58,
396 8, 843 6,
848 7, 848 56,
854 53, 858 5:,
856 54, 856 33,
852 38, 850 0,
857 38, 85: 3,
830 53, 83: 57,
886 34, 882 3,
882 6, 880 7,
865 53, 863 :,
866 34, 860 33,
869 5, 869 55,
828 5:, 820 35,
800 57, 807 6,
877 57

afternoon
340 3
again
348 38, 353 3,
337 53, 368 0,
300 35, 309 0,
309 7, 373 0,
3:4 5, 3:8 53,
3:8 59, 3:9 55,
3:9 5:, 3:9 33,
3:9 36, 394 53,
393 5, 39: 5:,
848 7, 853 58,
853 52, 858 54,
83: 5:, 83: 36,
820 3, 898 9,
897 56
against
848 55, 888 53
age
307 6, 8:8 57
agency
890 58
agenda
898 59
ago
342 2, 342 :,
340 7, 340 54,
34: 9, 356 3,
898 53
ahead
309 :, 875 9
aid
822 54
air
59: 5
al
5:4 54, 643 8
alcohol
382 7
alec
802 33
alejandra
826 52, 826 34
alex
336 33
alexa
808 5

CCSAO COI SUBPOENAS 000290

Transcript of Gabriel Solache, Volume 2
Conducted on December 8, 2021

59

algo
368 5
alibi
807 57, 809 3,
809 54, 809 34
alien
899 57, 644 3
alive
805 52
all
5:7 5, 5:: 9,
593 7, 598 :,
598 9, 346 7,
350 56, 335 59,
336 3, 330 5,
383 0, 389 34,
364 54, 364 50,
364 34, 362 52,
325 36, 327 50,
327 59, 327 33,
376 55, 372 52,
392 0, 392 55,
397 5, 399 :,
844 35, 848 2,
842 2, 842 34,
84: 3, 849 58,
854 5:, 853 0,
850 56, 835 59,
833 8, 838 59,
830 2, 886 52,
882 34, 882 38,
880 5, 865 36,
808 6, 808 52,
806 33, 875 0,
876 7, 872 9,
872 53, 879 5,
8:6 52, 8:2 8,
8:2 53, 8:2 57,
895 56, 899 54,
645 52
alley
32: 2, 32: :,
3:4 35, 3:4 38,
3:5 6, 3:5 :,
3:5 33
allowed
335 55
alone
354 9, 3:4 56

along
598 7, 598 :,
330 3, 308 :
already
348 33, 364 5:,
364 33, 364 38,
365 56, 329 38,
303 7, 300 34,
307 9, 30: 6,
30: 2, 309 2,
3:: 56, 844 59,
844 36, 840 3,
840 6, 840 :,
855 2, 855 55,
833 2, 833 7,
83: 6, 839 5,
839 9, 884 56,
875 56, 875 57,
873 :, 898 2
also
5:8 50, 594 34,
593 :, 593 56,
598 5, 598 54,
599 36, 343 58,
347 7, 347 38,
34: 52, 349 52,
354 3, 354 58,
358 :, 356 55,
352 :, 350 52,
350 57, 339 35,
382 7, 38: 0,
324 57, 378 35,
3:6 35, 3:7 33,
39: 56, 834 8,
862 57, 860 50,
825 :, 825 50,
823 53, 823 52,
828 33, 826 6,
826 58, 822 5,
822 56, 820 5,
820 0, 820 36,
827 6, 827 54,
827 5:, 82: 0,
82: 58, 82: 5:,
82: 36, 829 2,
829 55, 806 53,
873 33, 872 57,
87: 35, 8:7 5,

8:7 52, 8:: 3,
8:: 6, 893 33,
896 54, 899 59
altercation
599 52
always
339 7, 826 2,
826 54, 826 34
american
882 53
amount
595 54
anand
5:3 85
andrew
5:8 8, 802 33
angelica
827 53
another
340 5, 335 6,
33: 56, 387 35,
365 5, 324 57,
325 5:, 302 57,
3:4 56, 3:4 59,
396 53, 845 6,
83: 54, 884 3,
883 35, 860 33,
822 8, 804 5:,
803 58, 80: 0,
877 5:, 8:2 9
answer
594 0, 343 58,
348 38, 347 7,
355 36, 353 58,
358 :, 358 53,
356 55, 352 :,
352 59, 35: 59,
35: 36, 338 38,
330 33, 337 6,
362 33, 369 33,
32: 35, 329 33,
303 0, 303 33,
308 2, 308 58,
300 35, 309 0,
309 36, 374 36,
378 9, 3:8 57,
399 56, 399 38,
843 9, 843 54,

840 56, 858 53,
859 6, 838 55,
838 58, 838 57,
838 59, 83: :,
885 5:, 862 54,
862 52, 860 59,
867 6, 867 50,
828 :, 806 55,
806 56, 806 5:,
806 35, 800 7,
800 :, 800 54,
800 55, 809 0,
809 56, 874 8,
874 36, 875 59,
873 55, 873 34,
878 0, 878 38,
872 6, 870 0,
870 :, 870 9,
870 55, 870 33,
879 7, 879 56,
8:8 54, 8:7 59,
898 56
answered
348 33, 38: 50,
389 56, 364 5:,
364 33, 369 59,
32: 59, 303 6,
303 7, 303 34,
308 8, 308 55,
300 34, 309 2,
858 50, 838 5:,
884 55, 884 56,
885 50, 864 0,
864 53, 828 0,
809 6, 809 53,
875 58, 876 55,
876 52, 872 5
answering
309 7, 838 35,
838 33, 830 33
answers
5:6 5:, 5:6 35,
594 3, 599 36,
332 2, 332 9,
332 35
antonia
824 59, 825 5
anxiety
598 55, 358 9,

CCSAO COI SUBPOENAS 000291

358 56
**anxious**
337 34
**anybody**
59: 34, 599 50,
358 6, 368 5:,
328 9, 329 52,
304 5, 305 3,
305 34, 306 2,
30: 7, 37: 0,
37: 55, 37: 53,
37: 52, 3:2 0,
3:7 55, 839 5:,
885 34, 863 :,
863 57, 868 36,
866 2, 805 57,
805 5:
**anyhow**
360 9
**anymore**
392 33, 390 53
**anyone**
387 53, 369 57,
324 55, 309 9,
37: 2, 3:7 5
**anything**
595 58, 595 52,
592 33, 590 53,
59: 9, 59: 56,
599 55, 388 54,
363 :, 369 9,
324 38, 325 6,
32: 38, 304 57,
305 9, 305 54,
305 57, 303 50,
303 36, 378 33,
372 59, 37: 53,
3:4 34, 3:4 36,
3:5 8, 3:5 56,
3:3 38, 3:8 5,
3:7 54, 3:: 57,
395 35, 398 8,
398 2, 398 :,
398 33, 844 5:,
844 38, 845 33,
842 50, 853 :,
853 56, 853 35,
858 3, 858 7,

856 55, 856 58,
856 33, 852 6,
852 0, 852 :,
857 3, 857 2,
857 :, 85: 8,
85: 0, 85: 7,
859 7, 859 9,
859 55, 835 50,
835 38, 833 58,
833 59, 838 2,
838 :, 836 36,
832 5, 886 0,
829 34, 875 57,
87: 34, 87: 36,
895 50, 895 33,
898 35, 896 6
**anywhere**
84: 6, 853 6
**apartment**
334 6
**apologies**
332 52
**apologize**
385 55, 363 38
**appear**
330 57, 8:8 33
**appearances**
5:3 5, 5:8 5
**appeared**
322 59, 870 52
**appears**
5:9 53, 332 3,
8:2 35, 8:0 6,
8:7 5
**appellate**
806 58, 806 57,
806 59
**applied**
5:: 34, 35: 3
**apply**
5:: 59
**appointment**
5:6 50
**approximately**
347 5, 34: 54,
337 2, 33: 9,
38: 58, 307 5:,
399 3

**april**
392 52, 8:9 50
**area**
334 36, 387 58,
38: :, 366 59,
304 35, 304 38,
306 36, 3:9 56,
844 5, 844 58,
803 58, 803 56,
877 5:, 87: 35,
87: 33, 87: 38,
89: 38
**areas**
394 2
**argument**
599 50, 326 0,
326 53
**around**
595 8, 349 5:,
358 35, 336 53,
330 36, 337 55,
337 35, 363 57,
372 38, 845 56,
8:8 0, 8:8 50,
892 7, 899 6
**arrange**
803 0, 803 52
**arranged**
387 5:
**arrest**
594 57, 594 33,
593 2, 593 9,
384 59, 383 6,
383 53, 36: 5:
**arrested**
593 53, 345 33,
865 5:, 865 34,
8:8 0
**arrived**
308 57, 309 57,
309 33, 889 58,
865 7, 800 53
**arturo**
5:3 37, 5:0 35,
329 57, 329 5:,
372 6, 372 55,
372 56, 37: 54,
37: 34, 3:4 2,

3:4 50, 807 59,
873 36, 8:3 53
**asked**
353 :, 38: 52,
389 58, 365 56,
362 53, 362 57,
369 59, 32: 5:,
329 0, 329 9,
303 8, 303 59,
308 3, 308 55,
308 5:, 300 38,
300 36, 374 34,
374 33, 375 5,
3:0 52, 392 33,
392 38, 846 56,
842 36, 838 0,
838 59, 838 34,
836 2, 836 0,
836 :, 836 55,
830 5:, 839 52,
884 54, 884 58,
885 52, 864 2,
864 55, 863 53,
868 34, 869 59,
828 2, 805 36,
802 9, 802 53,
807 52, 809 8,
809 7, 809 55,
875 58, 876 54,
876 53, 876 52,
876 36
**asking**
356 38, 336 :,
330 33, 364 36,
3:8 54, 3:7 53,
395 53, 854 36,
855 5, 833 38,
833 36, 838 3,
838 56, 836 5,
832 5:, 830 53,
830 50, 830 59,
830 35, 830 33,
837 3, 83: 54,
825 6, 822 59,
809 9
**asks**
594 7, 338 3
**asleep**
367 54

CCSAO COI SUBPOENAS 000292

| | | | |
|---|---|---|---|
| **assigned** | 876 5: | 356 5:, 356 35, | 839 58, 885 2, |
| 887 9, 887 50 | **audio** | 352 5, 350 38, | 885 35, 885 38 |
| **assistance** | 822 7, 642 55 | 357 6, 333 2, | **basis** |
| 802 5 | **avenue** | 330 34, 330 35, | 359 0, 359 54 |
| **assume** | 5:5 7 | 384 56, 385 58, | **basketball** |
| 5:9 5: | **avoid** | 383 55, 383 52, | 348 7 |
| **assumed** | 86: 8 | 365 57, 365 38, | **bates** |
| 325 57 | **awake** | 362 7, 362 36, | 895 8, 895 2 |
| **assumes** | 368 52, 368 50, | 367 9, 376 33, | **bathrooms** |
| 592 54 | 368 57, 368 5:, | 372 53, 372 52, | 87: :, 87: 9 |
| **at_** | 368 33, 368 36, | 3:4 36, 3:5 8, | **beating** |
| 643 59 | 366 5, 366 6, | 3:3 6, 3:8 56, | 846 7, 842 7, |
| **attached** | 366 7, 366 55, | 3:8 35, 3:0 9, | 842 56, 842 57, |
| 3:7 34, 3:7 36, | 366 58, 360 56, | 397 6, 843 33, | 842 5:, 842 38, |
| 3:: 5, 845 52, | 367 :, 367 54, | 848 34, 853 55, | 840 54, 840 57, |
| 642 34 | 367 53, 328 9, | 858 5, 852 53, | 847 7, 850 6 |
| **attack** | 875 33 | 850 6, 850 7, | **became** |
| 598 5:, 597 0, | **aware** | 850 50, 85: 50, | 360 58, 823 33 |
| 597 53, 597 57, | 374 59, 828 58, | 85: 34, 833 50, | **because** |
| 597 35, 59: 52, | 872 50 | 832 55, 837 6, | 595 56, 597 36, |
| 59: 33, 599 3, | **away** | 837 9, 837 50, | 344 50, 349 57, |
| 599 56, 599 5:, | 590 36, 346 53, | 862 :, 862 54, | 355 36, 353 33, |
| 599 33 | 30: 5:, 3:3 0, | 86: 7, 808 34, | 350 :, 359 52, |
| **attacks** | 3:6 33, 839 38, | 872 54, 872 50, | 334 52, 33: 34, |
| 598 53, 598 56, | 823 58 | 870 8, 8:4 9, | 339 2, 387 55, |
| 598 50, 590 3, | | 8:7 53, 8:: 34 | 389 35, 368 38, |
| 590 56, 590 5:, | **B** | **background** | 362 59, 367 7, |
| 597 8, 59: 54, | **b-i-r-r-i-a** | 869 57 | 367 59, 36: 56, |
| 59: 58, 59: 5:, | 386 59 | **bad** | 324 7, 325 3, |
| 599 53 | **baby** | 33: 6, 36: 5 | 300 36, 309 5:, |
| **attempt** | 383 57, 383 33, | **bank** | 374 53, 375 34, |
| 642 9 | 388 :, 388 57, | 334 5, 334 0 | 3:6 7, 390 55, |
| **attention** | 388 38, 382 59, | **bano** | 397 58, 39: 9, |
| 590 33, 327 :, | 380 5, 360 50, | 599 : | 399 50, 857 34, |
| 327 56, 30: 38, | 324 50, 324 35, | **baroni** | 885 54, 863 58, |
| 30: 36 | 3:3 50, 3:8 6, | 5:5 3: | 860 35, 867 57, |
| **attorney** | 3:8 0, 3:8 36, | **barrajas** | 86: 0, 828 56, |
| 5:0 5:, 5:0 34, | 3:6 54, 3:6 55, | 5:3 88 | 803 2, 802 :, |
| 592 58, 353 53, | 8:4 54 | **base** | 878 58, 895 8, |
| 367 56, 369 34, | **baby's** | 367 2 | 897 56, 899 7, |
| 369 35, 887 2, | 87: 50 | **based** | 899 58, 899 34, |
| 887 9, 867 :, | **baby-sit** | 5:7 50, 35: 34, | 644 56 |
| 806 58, 806 57, | 325 2, 325 : | 35: 33, 3:3 34, | **becky** |
| 802 35, 800 0, | **back** | 3:6 58, 3:6 5: | 592 2, 592 0, |
| 807 52, 80: 36, | 596 2, 596 52, | **basement** | 592 9, 592 57, |
| 870 2, 870 7, | 597 5:, 59: 0, | 837 33, 837 36, | 592 59, 353 5: |
| 642 50 | 344 36, 345 3, | 83: 8, 83: 35, | **become** |
| **attorneys** | 345 7, 356 8, | 839 5, 839 9, | 374 59, 828 52 |
| 324 0, 324 53, | | | |

**bedroom**
328 55, 328 35,
326 6, 30: 9
**been**
593 53, 593 57,
598 5, 345 5,
355 58, 365 59,
360 0, 36: 54,
320 58, 304 50,
399 8, 399 0,
845 7, 856 57,
859 52, 859 5:,
837 0, 826 34,
827 5, 874 34,
875 53, 879 33,
8:8 33, 8:6 34,
643 54
**beer**
386 38, 386 36,
382 :, 389 33,
363 54
**before**
5:9 9, 594 6,
594 57, 596 6,
596 56, 597 53,
59: 57, 599 57,
345 35, 340 9,
340 54, 349 55,
355 36, 356 33,
383 2, 380 54,
380 58, 360 52,
369 50, 369 38,
323 56, 328 34,
304 57, 30: 9,
378 56, 3:3 2,
3:8 8, 3:: 56,
394 38, 395 52,
398 9, 845 :,
845 38, 846 8,
842 50, 842 35,
849 33, 853 56,
858 3, 858 55,
858 50, 852 34,
850 5, 850 7,
857 3, 85: 54,
859 52, 859 34,
837 0, 837 :,
837 5:, 83: 3,

83: 36, 839 :,
886 7, 865 5:,
865 34, 86: 33,
828 52, 804 52,
802 36, 80: 33,
8:6 3, 894 7,
642 0
**began**
336 55, 330 36
**beginning**
337 0
**begins**
5:0 2, 333 8,
376 34, 843 34,
862 0, 8:: 5:
**behalf**
5:5 8, 5:5 58,
5:5 30, 5:3 6,
5:3 52, 5:3 37,
5:8 8, 5:0 58,
5:0 33, 5:0 36,
5:7 6, 5:7 0,
5:7 :, 868 35,
866 5:, 867 54,
82: 7, 874 2
**behind**
8:0 8
**being**
5:0 56, 347 2,
34: 6, 358 58,
338 52, 369 7,
374 34, 374 33,
377 56, 854 3,
883 36, 888 3,
880 33, 887 5,
887 8, 86: 36,
869 54, 828 54,
826 0, 826 54,
878 56, 878 50
**belated**
884 50, 893 59
**believe**
590 58, 59: 50,
355 5, 355 6,
353 57, 350 :,
350 54, 350 56,
357 58, 384 38,
385 59, 383 3,

387 36, 38: 3,
38: 8, 38: 34,
360 0, 309 57,
309 5:, 309 34,
374 53, 379 0,
379 34, 3:0 :,
3:: 55, 3:: 59,
393 38, 39: 52,
39: 59, 39: 36,
399 6, 848 3,
848 9, 848 34,
847 6, 864 34,
865 58, 822 3,
802 33, 809 33,
874 59, 875 8,
875 7, 875 34,
873 3, 873 2,
873 53, 873 36,
878 7, 878 :,
878 9, 876 8,
876 53, 870 56,
8:: 8
**belittle**
884 38
**belong**
893 38
**belongings**
893 38, 898 53
**below**
80: :, 8:9 38
**bench**
3:7 59, 845 34,
84: 5:
**beneficial**
355 58
**bertz**
592 0
**best**
330 53, 360 3,
645 58
**between**
353 56, 385 6,
385 50, 387 3,
327 8, 327 2,
329 5, 300 2,
373 3, 372 38,
855 3, 855 58,
855 5:, 85: 38,

806 59, 870 7,
8:: 9
**beyond**
595 52
**big**
302 0, 859 54,
859 56, 888 55,
8:7 36
**bigger**
844 5, 844 58
**birch**
592 2, 592 7
**birkelo**
869 5, 869 55,
826 33, 822 6,
822 34, 827 52,
82: 6, 82: 55,
82: 52, 829 8,
804 59
**birria**
386 53, 386 57,
386 5:, 386 33,
382 3
**birth**
3:8 6
**bit**
358 54, 357 50,
383 9, 390 59,
870 36
**blackboard**
844 6, 8:0 6,
8:0 9
**blanco**
387 52, 387 50,
387 35, 387 38,
38: 8, 38: 7,
38: 53, 38: 33,
389 54, 363 55,
866 6, 866 :,
866 55, 866 56,
866 57, 803 3,
803 7, 807 50,
809 54
**bleed**
854 5:
**block**
822 52, 80: 9
**blocks**
38: 58, 803 35

CCSAO COI SUBPOENAS 000294

**blood**
340 8, 347 36, 34: 5, 34: 2, 34: 7, 34: 58
**blows**
826 5
**board**
844 8, 844 0, 844 :, 844 54, 844 58, 834 6
**body**
856 5
**books**
390 34, 390 35, 397 3
**born**
869 33, 824 8, 824 0, 826 56
**both**
387 38, 372 :, 880 55, 862 36, 876 :, 8:7 7, 8:7 58, 896 8
**bottom**
594 8, 594 58, 80: 5:, 8:3 :, 8:2 58, 8:0 57, 895 5, 890 5:, 890 33, 897 9
**bought**
356 0
**boulevard**
5:3 9
**boy**
325 5, 325 5:, 323 54, 323 58, 323 52, 320 52, 327 6, 32: 3, 32: 58, 329 3, 329 2, 305 0, 305 :, 305 55, 305 52, 305 57, 305 35, 302 9, 300 2, 373 52, 373 33, 378 6, 378 5:, 376 55, 3:4 35, 3:4 38, 3:5 6, 3:5 7,

3:5 33, 3:3 2, 3:3 0, 3:3 9, 3:3 53, 3:3 56, 3:3 52, 3:3 50, 3:3 34, 3:8 7, 3:6 8, 3:6 0, 3:6 33, 3:2 7, 3:0 34, 3:7 8, 873 52, 873 35, 8:4 3, 8:4 6, 8:4 0, 8:5 6, 8:3 52
**boy's**
302 58
**boyfriend**
383 38
**brand-new**
3:: 56
**bread**
82: 34
**break**
5:: 34, 348 0, 335 34, 335 35, 330 0, 362 5, 362 57, 376 56, 843 7, 843 56, 832 8, 832 6, 832 0, 866 36, 8:: 53, 644 53
**breaking**
840 38, 644 53
**breathing**
596 5, 592 33, 590 38
**brick**
822 52, 820 35
**broke**
348 8, 374 3
**broken**
348 9
**brother**
388 5:, 389 2, 389 7, 365 54, 365 33, 829 5, 805 33
**brothers**
823 3, 823 9, 829 7

**brought**
324 35, 3:8 0, 3:8 36, 3:6 9, 3:6 5:, 858 5, 852 53, 837 6
**brualdi**
5:8 8, 5:7 0, 834 52, 834 59, 834 34, 835 9, 835 58, 836 34, 836 38, 832 52, 832 57, 8:7 50, 8:7 33, 8:: 6
**brunt**
808 3
**build**
594 34, 594 36, 595 0, 595 5:, 595 33, 593 5
**bunch**
869 50
**burns**
5:3 5:, 5:3 59, 5:7 :, 5:: 6, 330 56
**bus**
883 54, 883 53
**business**
334 54, 386 5, 386 54, 325 38, 327 7, 309 3, 3:6 0
**businesses**
334 33
**buy**
358 36, 35: 58, 35: 52
**buzz**
889 56, 889 50
**buzzing**
889 5:, 889 33

---
**C**
---

**cabos**
5:4 38, 5:0 5, 5:0 52
**calendar**
898 59

**california**
644 0, 642 5, 642 6
**call**
300 9, 3:7 33, 864 38, 865 3, 865 2, 865 53, 863 9, 868 35, 866 5, 866 57, 803 3, 807 52, 809 5, 809 54, 809 5:, 874 9
**called**
346 33, 302 52, 302 57, 302 35, 865 58, 865 52, 865 50, 863 5, 868 38, 80: 35, 809 38, 874 34, 89: 38
**calling**
597 35, 59: 33, 599 3, 847 7, 863 3, 863 0
**calls**
860 50, 867 3, 805 38, 8:8 7
**came**
596 2, 596 52, 347 3, 349 55, 356 8, 356 5:, 356 35, 382 5:, 382 38, 389 9, 366 53, 360 52, 367 7, 324 52, 328 55, 328 57, 328 35, 328 38, 326 6, 300 2, 30: 5, 30: :, 30: 58, 374 6, 378 5, 378 6, 376 0, 3:3 6, 396 53, 846 8, 846 0, 853 55, 850 5, 850 6, 850 7, 850 50, 85: 50, 85: 34, 833 :, 867 53,

CCSAO COI SUBPOENAS 000295

86: 8, 828 5:,
826 59, 804 36,
896 :, 896 58,
896 56, 644 9
**can't**
596 0, 350 36,
332 38, 330 54,
884 36, 889 9
**cannot**
595 58, 807 58,
874 6, 899 53
**capital**
5:6 52
**caption**
643 8
**car**
358 57, 358 33,
358 36, 356 7,
33: 5, 389 8,
329 53, 305 5,
305 3, 303 3,
303 57, 308 5,
307 7, 307 54,
307 55, 30: 5,
30: 3, 30: 6,
30: 2, 30: 54,
372 3, 372 8,
372 0, 372 50,
370 53, 379 33,
379 36, 8:4 34,
8:4 33, 8:4 36,
8:5 5, 8:5 3
**card**
89: 34, 89: 33,
899 50, 644 5,
644 3
**card"**
899 57
**cards**
644 2
**care**
359 57, 359 59,
325 8, 826 0,
826 55
**career**
593 55
**carefully**
366 35

**carlos**
388 5:, 388 33,
386 6, 382 55,
382 52, 363 34,
368 55, 368 52,
368 33, 366 7,
360 56, 360 5:,
360 35, 367 52,
369 5:, 324 58,
328 58, 322 :,
327 35, 32: 55,
829 2, 804 7,
807 50, 809 5,
809 33, 874 9,
874 59, 875 6,
875 7
**caroline**
5:3 :
**carrillo**
5:8 57, 5:0 58
**carrying**
893 2
**case**
5:6 52, 5:0 54,
35: 5:, 330 2,
360 2, 36: 2,
36: 9, 36: 55,
849 59, 849 33,
854 7, 834 38,
838 6, 838 0,
838 9, 836 3,
836 8, 836 0,
832 59, 830 58,
830 57, 830 35,
83: 36, 839 :,
88: 59, 868 6,
867 54, 807 34,
643 8
**cast**
348 52
**cause**
59: 52, 358 9,
358 56, 84: 38,
807 53
**caused**
343 34, 355 6
**causes**
59: 54, 59: 58,

59: 5:
**cell**
390 57, 839 50,
839 57, 839 5:,
839 35, 884 2,
884 :, 885 56,
885 36, 882 52,
877 0, 877 36
**cellmate**
882 34, 882 38,
827 0, 877 34,
877 33
**cellmates**
882 7, 882 55,
877 :, 877 54,
877 52, 877 59,
87: 5, 87: 3
**central**
370 7, 370 :,
370 54, 370 56,
377 8, 377 5:,
37: 6, 37: 58,
37: 57, 37: 59,
3:4 3, 399 8
**certain**
595 9, 373 5:
**certificate**
645 5, 642 59
**certified**
5:4 30, 642 5,
642 8, 642 34
**certify**
645 :, 642 6,
642 56
**chair**
3:7 34
**chairs**
302 6, 379 3
**chance**
808 54, 808 58,
8:9 0, 895 58
**change**
335 55, 335 34,
383 9, 376 58,
392 33, 392 38,
390 5, 648 54,
648 50, 648 33,
646 6, 646 54,

646 50
**changed**
356 35, 3:4 56
**changes**
645 52, 643 53,
643 56
**characterization**
384 35, 399 58,
840 53
**charged**
880 33, 887 5,
887 6
**chavez**
824 52
**chest**
598 5:, 598 33,
590 35
**chicago**
5:4 54, 5:5 :,
5:5 58, 5:5 35,
5:5 88, 5:3 55,
5:3 33, 5:3 80,
5:8 54, 5:0 :,
5:0 38, 598 38,
596 3, 596 58,
330 8, 337 59,
644 9, 643 8
**child**
324 57, 324 34,
307 8, 825 9
**children**
325 8, 325 9,
325 52, 3:0 0,
825 9, 825 53,
8:4 5
**cholesterol**
347 9, 347 54,
347 56
**choose**
304 53
**chronic**
343 52
**church**
827 2
**city**
5:4 54, 5:5 58,
5:0 7, 5:0 38,
342 56, 337 50,

CCSAO COI SUBPOENAS 000296

Transcript of Gabriel Solache, Volume 2
Conducted on December 8, 2021

65

337 57, 337 5:,
337 38, 339 2,
339 0, 339 7,
339 9, 339 54,
339 5:, 339 59,
339 34, 823 8,
823 55, 823 56,
643 8, 643 35
**civ**
5:4 :, 5:0 54
**claim**
594 :
**claimed**
378 34
**claiming**
880 5:, 889 7
**claims**
874 52
**clarify**
599 :, 348 55,
353 0, 352 50,
326 0, 846 53,
842 6, 852 59,
87: 54, 87: 55,
898 57, 892 9,
897 2
**clarifying**
326 53, 320 59,
320 33
**clark**
5:5 59
**clear**
359 38, 334 2,
324 6, 3:8 50,
842 2
**client**
353 53, 353 58,
35: 59, 369 35,
806 58, 806 57,
800 0, 870 2
**close**
388 5:, 304 33,
303 55, 303 53,
30: 50, 3:9 :,
883 34, 870 2,
899 8, 644 56
**closed**
359 52, 847 58,

87: 33
**closer**
5:: 54, 596 7,
33: 56
**closest**
304 56
**clothes**
309 5:, 8:8 58
**clothing**
8:6 50
**co-defendant**
807 5:
**co-defendants**
874 52
**cold**
34: 38
**collateral**
35: 34
**collective**
360 7
**color**
844 2
**com**
5:5 54, 5:5 38,
5:5 82, 5:3 36,
5:8 53
**come**
594 5:, 367 9,
308 38, 306 3,
306 5:, 3:9 :,
393 59, 396 :,
867 9, 867 57,
867 5:, 867 35,
86: 0, 869 58
**comment**
3:5 34, 3:5 35,
3:3 0, 3:3 :,
3:3 38, 3:3 36,
3:8 3, 3:2 5,
3:2 8, 3:2 7,
3:0 59, 3:7 3,
88: 57
**comments**
873 58, 873 56
**committed**
874 50
**communicate**
882 59, 88: 8,

803 54
**communicating**
803 53
**communication**
353 56, 806 59,
800 0, 870 7
**communications**
870 53
**company**
334 5, 334 0,
36: 33, 36: 36,
369 6, 369 0,
369 :, 369 56,
397 38, 39: 3,
39: 0
**complaining**
367 35, 367 36
**complete**
338 59, 873 57
**completely**
859 57
**completion**
645 57
**computers**
844 3, 834 8
**con**
353 38
**concluded**
644 34
**conclusion**
366 58, 860 50,
867 3, 8:8 :
**condition**
87: :
**conditions**
87: 56, 879 3,
879 8, 879 9,
879 54
**conduct**
594 9, 594 54,
594 55
**confirm**
645 5:
**conflict**
349 33
**confront**
360 5:
**confrontation**
599 50, 83: 54

**confused**
806 38
**confusion**
802 8, 802 7
**connect**
599 53, 384 57
**connection**
385 8, 385 50,
385 34, 88: 59,
89: 53
**connelly**
5:5 50, 5:8 38
**constantly**
349 57, 352 34
**consulate**
367 36, 36: 8
**cont'd**
5:3 5
**cont'd:**
5:8 5
**contact**
365 34, 84: 5,
828 6, 805 8,
805 5:, 805 38,
803 38, 872 53
**contained**
8:5 53
**contents**
5:2 54
**continue**
853 5:, 858 9
**continued**
5:2 5, 5:2 8
**contradicting**
874 52
**conversation**
363 34, 368 55,
322 9, 327 3,
327 50, 327 59,
327 33, 32: 36,
305 3, 305 6,
303 3, 303 58,
306 54, 306 58,
30: 56, 309 56,
392 58, 399 54,
399 58, 399 59,
840 0, 840 53,
85: 38, 859 3,

CCSAO COI SUBPOENAS 000297

859 0, 876 0,
876 57, 876 5:,
876 35
**conversations**
388 35, 883 38,
880 54, 880 58,
880 57, 865 55,
865 57, 865 35,
865 33, 867 :
**convicted**
36: 54, 849 38,
862 57, 860 33,
869 5, 869 55
**conviction**
593 0, 593 54
**cook**
345 50, 345 59,
348 6, 849 7,
854 6, 854 9,
854 53, 883 8,
883 6, 883 2,
883 53, 883 52,
883 50, 883 35,
883 36, 888 8,
888 7, 888 58,
880 3, 880 35,
889 58, 864 56,
865 7, 863 3,
869 56, 804 36,
803 5, 899 8
**copies**
642 34
**copy**
332 3
**corner**
8:9 54, 899 6
**corrected**
362 38
**corrections**
645 52, 643 53
**correctly**
363 33, 824 55
**cost**
593 5, 359 3,
359 6, 899 36,
644 5
**could**
5:: 36, 595 0,

595 :, 349 57,
355 35, 356 33,
334 36, 333 53,
338 55, 330 35,
33: 5, 33: 8,
366 36, 362 5:,
360 38, 36: 52,
326 0, 373 0,
370 50, 3:2 34,
3:7 33, 845 55,
848 5:, 858 55,
830 56, 837 58,
839 8, 889 53,
864 6, 864 9,
865 59, 863 5:,
860 58, 823 6,
828 55, 807 57,
80: 8, 8:2 :,
8:: 38, 895 3,
896 57
**couldn't**
36: 35, 369 8,
864 5:, 865 9,
863 54, 863 55,
863 33, 875 5
**counsel**
5:6 50, 5:0 50,
5:7 55, 5:7 52,
336 56, 806 58,
806 5:, 806 34,
802 5, 807 56,
874 :
**counseling**
339 38, 384 6,
384 5:
**counselor**
384 7
**counselors**
59: 34
**counsels**
360 7
**count**
847 57, 850 38,
857 5, 888 34
**county**
345 50, 345 59,
348 6, 849 :,
854 6, 854 9,

854 53, 883 8,
883 6, 883 2,
883 58, 883 52,
883 50, 883 35,
883 36, 888 8,
888 7, 888 58,
880 3, 880 35,
889 58, 864 52,
865 7, 863 3,
869 56, 805 5,
803 5, 899 8
**couple**
594 5, 596 8,
300 6, 865 58,
8:4 5:
**couple's**
339 38, 384 6
**course**
5:: 33, 330 58,
362 3, 360 6,
369 55, 849 5:,
877 50
**court**
5:4 5, 5:0 :,
385 53, 3:8 58,
848 55, 842 5,
886 38, 880 8,
880 2, 862 9
**courtroom**
886 38
**cousin**
387 36, 38: 6,
38: 0, 38: 9,
38: 54, 38: 5:,
38: 59, 38: 33,
389 8, 389 7,
389 50, 389 57,
389 59
**cousins**
387 33
**cracked**
348 53, 348 58
**cracking**
348 58
**created**
642 53
**crime**
878 58, 878 52,

878 50, 878 34,
878 36, 876 3,
876 9
**crimes**
860 35
**criminal**
849 5:, 849 33,
854 7, 834 38,
88: 59, 868 8
**crying**
380 5, 32: 55
**csr**
642 32
**cuatro**
368 5
**cuff**
845 56
**cuffed**
845 0, 845 54,
845 58, 845 50,
842 52
**culberson**
5:8 0
**currently**
342 8, 354 33,
35: 9

**D**

**daffada**
5:5 3:
**dan**
5:7 :, 5:: 6,
330 56, 330 5:
**daniel**
5:3 59
**daniels**
592 50, 355 34,
353 9
**dark**
307 38, 370 56
**date**
5:4 35, 5:0 55,
5:9 33, 344 36,
345 8, 338 53,
336 8, 397 50,
887 33, 887 36,
860 55, 805 5,
892 0, 890 35,

CCSAO COI SUBPOENAS 000298

Transcript of Gabriel Solache, Volume 2
Conducted on December 8, 2021

67

897 8, 897 5:,
642 5:
**dated**
5:9 52, 333 59,
332 54, 642 33
**dates**
344 38, 338 2,
892 7
**daughter**
307 6, 826 56,
826 34, 82: 34
**daughter's**
826 33
**david**
5:3 52, 5:7 9
**day**
5:2 9, 599 57,
342 38, 340 6,
338 :, 380 6,
380 54, 380 58,
380 34, 366 52,
366 50, 367 7,
367 :, 324 52,
324 59, 324 35,
324 38, 325 54,
325 55, 323 56,
323 50, 323 5:,
3:6 6, 3:2 5,
394 :, 394 55,
397 55, 397 58,
397 56, 889 52,
865 0, 875 35,
8:8 55, 892 57,
644 56, 645 9,
642 33
**days**
344 36, 345 3,
345 6, 342 2,
342 :, 340 0,
340 54, 34: 9,
359 35, 368 38,
324 35, 324 36,
300 6, 3:3 2,
3:8 8, 3:6 56,
390 54, 822 50,
892 50
**daytime**
370 52

**dburns@reiterbur-ns**
5:3 36
**de**
353 36
**deal**
386 8, 3:9 6
**death**
862 35, 860 5,
860 7, 860 56,
860 38, 86: 6
**deaths**
840 2, 887 3,
887 6
**december**
5:4 35, 5:0 5,
5:0 55, 642 33
**decision**
329 6
**declaration**
643 2
**declare**
643 :
**defendant**
5:5 58, 5:5 30,
5:3 52, 5:6 33,
5:0 38, 5:7 5,
5:7 6, 5:7 9,
332 2, 332 35
**defendant's**
5:6 59, 594 9,
594 55
**defendants**
5:4 53, 5:3 6,
5:7 0
**deliver**
383 35, 388 :,
388 57, 388 38
**delivered**
5:8 38
**delivering**
383 57
**dennis**
592 56
**denying**
853 59, 858 9
**depend**
33: 54

**depict**
8:3 6
**depicted**
8:4 35, 8:5 33,
8:5 36, 8:3 9,
8:8 5, 8:9 55,
894 6, 895 57,
898 :
**depos**
5:0 56
**deposition**
5:4 50, 5:8 33,
5:0 0, 5:0 56,
5:9 2, 335 36,
333 6, 333 :,
376 50, 376 35,
843 50, 843 35,
849 52, 862 8,
862 7, 86: 56,
808 0, 879 5:,
8:4 56, 8:5 :,
8:: 52, 8:: 59,
8:9 5, 895 54,
893 54, 898 8,
896 59, 892 59,
892 36, 644 5:,
644 34, 645 54,
643 9, 643 58,
648 5
**deprived**
594 56
**describe**
598 2, 350 34,
37: 38, 3:7 50,
3:7 5:, 398 55,
398 36, 848 2,
855 36, 834 5,
888 54, 87: 6
**described**
597 57, 844 34,
845 5, 826 54
**describes**
826 2
**describing**
590 3, 59: 55
**description**
5:6 9, 5:2 6
**desk**
395 7, 395 :

**desks**
844 3, 844 58,
834 3
**detail**
5:6 54, 594 7
**details**
350 55
**detected**
347 54
**detective**
392 3, 848 50,
848 36, 846 8,
846 0, 840 7,
840 59, 840 35,
840 36, 847 0,
854 59, 854 35,
855 3, 855 58,
853 55, 852 0,
852 5:, 852 38,
850 8, 850 7,
850 50, 85: 50,
85: 36, 835 9,
833 53, 833 50,
833 59, 833 36,
838 5, 838 35,
836 50, 832 52,
832 5:, 830 53,
830 50, 837 :,
837 50, 83: 6,
889 :, 889 38,
8:7 35, 8:7 33,
8:: 5, 8:: 9
**detectives**
309 57, 374 7,
374 52, 378 5,
378 6, 83: 38,
839 7
**determine**
860 38
**development**
593 55
**diabetes**
342 0, 342 57,
34: 7
**diagnosed**
342 0
**dice**
80: 53

CCSAO COI SUBPOENAS 000299

**died**
823 57
**different**
346 5, 342 36,
334 35, 337 5:,
374 2, 374 56,
374 50, 859 57,
859 36, 870 5
**difficult**
354 8, 352 9,
352 55, 352 59
**difficulties**
350 0, 350 7,
350 53, 350 57
**difficulty**
354 33, 356 53,
356 57, 350 5,
350 50, 350 59,
350 35, 357 8,
33: 34
**dinner**
320 3
**direct**
338 34
**directed**
807 6
**direction**
642 58
**directly**
388 54, 369 5,
374 :, 375 5,
376 3, 37: 50,
379 50, 3:6 36,
835 5:, 833 8
**dirty**
87: 9, 87: 52
**discovery**
330 2
**discusion**
326 0
**discuss**
866 7, 866 54,
866 56, 827 56
**discussing**
32: 53, 82: 8,
82: 54, 829 8,
804 59
**discussion**
326 7, 326 54,

326 58, 322 2,
322 52, 320 52,
327 2, 327 0,
327 58
**district**
5:4 5, 5:4 3,
5:0 :, 5:0 9
**division**
5:4 8, 5:0 9,
882 0, 882 :,
880 :, 880 54,
869 58
**divorced**
825 57, 825 33
**dizzy**
853 0, 850 56
**dna**
876 5
**doctor**
592 :, 592 59,
59: 53, 59: 57,
599 34, 344 7,
344 9, 343 2,
343 9, 343 38,
346 38, 342 8,
342 0, 342 7,
342 55, 342 58,
342 50, 340 0,
340 54, 340 5:,
340 33, 34: 0,
34: 36, 349 54,
357 0, 33: 56,
33: 57, 863 58,
863 56, 863 52,
863 57, 873 38
**doctors**
597 34, 59: 59,
59: 34, 347 6,
347 58
**document**
5:9 5, 5:9 9,
5:9 55, 5:9 59,
333 50, 333 5:,
333 38, 338 58,
338 34, 336 54,
336 57, 330 8,
86: 35, 869 35,
824 5, 824 54,

824 55, 824 36,
825 2, 825 0,
825 :, 825 50,
823 5, 823 :,
823 52, 823 35,
828 33, 826 6,
826 9, 826 58,
822 5, 822 54,
822 56, 820 5,
820 0, 820 56,
820 36, 827 6,
827 54, 827 5:,
82: 0, 82: 58,
82: 5:, 82: 36,
829 55, 829 33,
804 57, 808 54,
808 56, 808 50,
808 59, 806 2,
806 :, 802 50,
802 36, 800 50,
800 33, 800 36,
80: 5:, 874 7
**documents**
837 54
**doing**
593 57, 590 38,
36: 2, 36: 58,
323 56, 305 59,
395 2, 835 33,
832 57, 865 38,
82: 50, 890 58
**dollars**
323 8, 323 6
**done**
357 35, 383 :,
360 6, 36: 5,
307 2, 846 :,
846 9, 846 52,
846 35, 842 8,
842 59, 842 36,
840 5, 855 5,
853 35, 856 55,
857 55, 857 58,
857 38, 85: 0,
837 8, 884 33,
804 35
**door**
59: 5, 3:9 9

**down**
352 54, 352 58,
352 57, 352 34,
84: 8, 83: 35,
885 2, 885 34
**downstairs**
837 33
**dr**
357 58, 357 57,
336 55, 337 5,
337 2, 337 56,
337 38, 33: 3,
33: 7, 33: 58,
33: 5:, 33: 34,
339 8
**dream**
594 5:, 594 34,
594 36
**dreaming**
593 3
**dreams**
593 6
**drink**
363 :
**drinking**
389 35, 364 2,
364 54, 364 56,
364 57, 364 34,
365 9, 363 3,
363 2
**drive**
5:3 34, 33: 5,
33: 8, 33: 6
**driving**
303 57, 307 0,
370 34
**drop**
322 0, 322 54,
320 6
**dropping**
322 52
**drove**
329 7, 329 :,
329 53, 8:5 8,
8:3 2, 8:3 52,
8:3 35
**due**
594 35

CCSAO COI SUBPOENAS 000300

Transcript of Gabriel Solache, Volume 2
Conducted on December 8, 2021

69

| | | | |
|---|---|---|---|
| during | 325 33, 328 59, | ends | estrello |
| 598 54, 590 50, | 322 57, 327 38, | 897 53 | 348 55 |
| 590 57, 347 36, | 306 50, 3:5 2, | engaging | et |
| 386 2, 382 50, | 879 36, 8:7 7 | 593 54 | 5:4 54, 643 8 |
| 369 55, 320 56, | el | english | even |
| 305 5, 397 5, | 390 8, 390 2, | 386 52, 3:: 33, | 349 55, 365 8, |
| 849 5:, 854 52, | 80: 8 | 392 0, 392 55, | 374 53, 836 38, |
| 896 9, 896 58, | elbow | 392 56, 392 57, | 887 38, 88: 33, |
| 896 56, 896 52 | 349 53 | 392 59, 390 2, | 896 52 |
| **E** | elbows | 390 52, 390 34, | evening |
| each | 34: 59, 34: 33, | 390 33, 397 3, | 340 3, 360 52 |
| 33: 55, 327 53, | 349 58 | 397 8, 800 8 | eventually |
| 30: 34, 398 0 | electricity | english: | 363 55, 366 0, |
| ear | 334 8, 334 33, | 366 36 | 322 5, 322 34, |
| 84: 3, 889 9, | 334 38 | engquist | 329 6, 308 38, |
| 889 53, 889 52, | electronically | 5:3 7, 5:0 36, | 393 59, 396 : |
| 889 50, 864 6, | 642 34 | 5:7 33 | ever |
| 864 54, 864 5:, | else | enough | 342 54, 340 58, |
| 865 9, 863 54, | 592 33, 339 3, | 594 36, 595 3, | 34: 6, 349 6, |
| 863 55, 863 59, | 368 5:, 320 0, | 359 53, 36: 58, | 339 54, 382 54, |
| 863 33 | 329 52, 3:7 5, | 30: 50, 30: 33, | 360 5:, 369 7, |
| earlier | 3:7 55, 396 :, | 392 58, 884 36 | 369 50, 323 9, |
| 3:6 2, 3:6 56, | 840 9, 84: 6, | ensure | 327 55, 304 50, |
| 835 2, 873 52 | 853 6, 853 :, | 642 9 | 305 55, 305 52, |
| early | 856 55, 852 6, | entering | 306 3, 302 58, |
| 350 33, 357 5 | 850 5, 85: 54, | 353 55 | 309 6, 373 35, |
| earnings | 837 5:, 839 5:, | entire | 3:4 5, 3:0 5:, |
| 5:6 54 | 885 34, 863 57, | 360 6, 877 53, | 3:9 55, 3:9 5:, |
| eastern | 866 2, 875 36, | 643 9 | 393 8, 393 0, |
| 5:4 8, 5:0 9 | 87: 34, 87: 36 | entitled | 848 7, 848 55, |
| eat | emergency | 802 3, 802 0 | 830 3, 83: 5:, |
| 359 53, 334 55, | 330 9 | envelope | 880 2, 880 58, |
| 382 53, 326 5 | employee | 8:2 33 | 863 35, 86: 35, |
| eating | 5:6 54, 642 50 | erosen@rfclaw | 828 59, 820 34, |
| 320 5 | employees | 5:5 38 | 803 3, 876 0, |
| eight | 359 58 | errata | 876 35, 8:6 5, |
| 340 5, 380 34, | employment | 643 58, 648 5 | 894 0, 893 2 |
| 387 0, 387 :, | 5:6 55, 356 58, | esq | every |
| 323 59 | 356 5: | 5:5 0, 5:5 57, | 342 38, 340 5, |
| eight-hour | empty | 5:5 5:, 5:5 39, | 340 6, 357 9, |
| 380 57 | 337 59 | 5:5 84, 5:3 7, | 357 54, 366 33, |
| eileen | enclosed | 5:3 :, 5:3 59, | 367 9, 325 54, |
| 5:5 57, 5:0 33, | 302 7 | 5:3 85, 5:3 83, | 325 55, 642 : |
| 5:7 35, 362 55, | end | 5:8 7 | everyone |
| 884 57, 895 3 | 335 38, 362 36, | esta | 5:7 54, 304 33, |
| either | 376 52, 843 52, | 80: 8 | 307 7 |
| 599 50, 387 5, | 862 3, 8:: 56, | estimate | everything |
| | 644 57 | 847 5: | 356 35 |

CCSAO COI SUBPOENAS 000301

evidence
369 53, 878 56,
878 52, 878 59,
876 57, 876 59
evidences
592 55
evidently
390 35, 39: 55,
39: 59
exact
599 2, 344 38,
344 36, 359 8,
386 :, 380 56,
363 50, 307 33,
379 5, 397 50,
887 33, 892 0,
892 57
exactly
599 58, 346 0,
347 55, 356 5,
356 0, 350 2,
350 34, 334 57,
332 38, 337 :,
38: 35, 364 :,
366 54, 328 6,
322 55, 320 54,
306 34, 370 38,
3:4 0, 3:5 59,
3:: 34, 3:9 38,
394 2, 842 58,
847 :, 857 53,
838 8, 886 54,
864 58, 865 0,
803 5:, 803 59,
877 6
examination
5:6 6, 5:: 56
except
643 55
exception
5:7 3
exchanged
855 3, 855 53
excluding
324 53
excuse
353 34, 338 6,
332 56, 800 59,

8:2 3
executed
643 5:
exercises
592 33, 590 36
exhibit
5:6 9, 5:6 54,
5:6 58, 5:6 57,
5:6 34, 5:6 32,
5:6 37, 5:6 3:,
5:6 39, 5:6 84,
5:6 85, 5:2 6,
5:2 2, 5:2 0,
5:2 9, 5:: 36,
5:9 2, 357 33,
333 7, 333 :,
336 38, 330 5,
330 34, 383 :,
86: :, 86: 53,
86: 56, 86: 5:,
808 2, 808 0,
879 57, 879 5:,
879 33, 8:4 58,
8:4 56, 8:5 0,
8:5 :, 8:5 53,
8:5 58, 8:7 55,
8:: 36, 8:9 5,
895 9, 895 54,
893 :, 893 54,
893 52, 898 3,
898 8, 898 36,
896 5:, 896 59,
896 38, 892 35,
892 36, 890 6
exhibits
5:6 :, 5:2 8,
330 7
expecting
3:3 57
experience
34: 35, 349 33,
355 3
experienced
598 55, 347 :,
347 38, 34: 52
experiences
876 33, 877 5
experiencing
599 35, 344 55

explained
840 6
extent
362 33
extra
380 34, 389 36

**F**

f
8:0 50
face
365 2, 847 55,
847 50, 847 36,
84: 3, 84: 2,
84: 53, 84: 57,
84: 36, 854 50,
854 59, 853 8,
853 9, 856 6,
856 2, 850 54,
850 53, 885 5,
8:6 6, 8:6 7,
8:6 38, 8:2 6
facility
870 5:, 877 5
fact
5:7 5:, 598 58,
355 2, 387 34,
389 35, 366 8,
360 56, 367 55,
329 7, 3:6 5:,
863 5:, 822 59,
822 35, 878 5:,
876 :
factory
364 54, 365 2
facts
592 55
failed
874 :
fair
5:9 5:, 333 38,
884 36
fake
899 :, 644 5
falling
357 8
familiar
5:9 3, 306 59,

834 50, 895 33,
89: 36
family
373 36, 378 8,
378 55, 3:2 5:,
3:2 35, 3:0 8,
3:0 2, 865 38,
867 9, 867 53,
867 34, 86: 3,
805 0, 805 :,
805 57, 805 5:
far
30: 5:, 30: 35,
839 38
fast
339 34
father
823 33, 828 6,
828 38
father's
824 50, 826 5
feedback
822 7
feel
598 57, 598 35,
337 34, 36: 53,
850 55, 644 58,
644 56
feeling
590 34, 597 0,
855 33, 853 :,
850 7
feelings
597 57
feet
34: 59, 34: 33,
349 58, 398 59
female
320 33, 320 38,
3:9 6, 394 9,
394 50, 394 34,
394 36, 888 52,
887 2, 8:5 50,
8:3 38
fernando
337 5
few
5:9 3, 593 57,

CCSAO COI SUBPOENAS 000302

Transcript of Gabriel Solache, Volume 2
Conducted on December 8, 2021

71

596 38, 392 53,
392 58, 857 5,
868 57, 827 9,
808 55
**field**
353 55
**fields**
644 2
**figure**
332 38, 330 54
**file**
334 53
**filed**
88: 56
**filing**
367 34
**fill**
890 :, 890 35,
89: 52
**filled**
890 55
**filling**
89: 55
**finally**
804 57
**financially**
642 52
**find**
33: 5:, 385 33,
386 52, 36: 52,
36: 35, 369 8,
369 :
**finding**
356 58, 356 57
**fine**
335 5:, 644 50
**fingerprints**
886 36, 882 8
**finished**
309 58, 309 36
**finishing**
320 5
**firm**
5:3 0
**firmando**
80: 6
**first**
5:6 33, 590 0,

599 5, 599 5:,
344 6, 342 54,
355 38, 356 8,
338 :, 332 0,
332 33, 324 35,
308 34, 306 6,
306 :, 306 55,
306 56, 300 2,
373 55, 373 53,
372 5, 372 33,
370 58, 370 35,
377 :, 3:8 2,
3:8 38, 399 7,
848 5, 840 5:,
849 7, 854 5,
854 6, 854 9,
854 53, 859 35,
835 6, 882 0,
880 35, 887 59,
887 36, 88: 5:,
889 55, 889 35,
864 9, 864 57,
863 9, 863 36,
824 55, 870 3,
877 34, 8:5 58,
8:0 56, 8:9 9,
894 :
**fist**
847 58, 850 59,
850 33
**five**
595 8, 595 55,
364 7, 368 38,
303 55, 8:5 56
**five-minute**
335 35
**fix**
366 59
**fixing**
328 33, 328 36
**flagged**
362 34
**flip**
807 2, 8:2 :
**floor**
5:3 82, 377 :,
377 9, 377 53
**floors**
377 54

**flor**
826 52, 822 5
**following**
807 54
**follows**
385 56, 3:8 33,
862 55
**fonseca**
5:8 5:, 353 2,
364 3, 376 59,
843 59, 889 2,
809 50
**food**
382 2, 87: 50
**foot**
348 :, 348 5:,
348 34, 348 35,
348 38, 346 3
**foregoing**
645 54, 642 2,
642 7
**forever**
84: 58
**forgotten**
897 52
**form**
592 54, 340 53,
349 8, 384 35,
308 54, 374 35,
378 0, 370 5:,
3:9 58, 394 54,
399 53, 840 55,
859 5, 838 52,
83: 0, 867 56,
822 5:, 878 3,
878 8, 878 55,
876 56, 872 3,
879 2, 895 5:,
893 35, 898 9,
890 0, 890 :,
890 59, 89: 53
**formally**
5:7 53
**forming**
350 5, 350 53
**forth**
642 7
**forward**
360 3, 360 54

**found**
594 2, 30: 54,
868 9, 878 56,
878 50, 878 59
**foundation**
329 34, 308 54,
378 7, 885 0,
883 7, 886 5,
887 55, 860 3,
860 6, 860 52,
867 5, 805 59,
806 9, 874 5,
878 3, 878 8,
878 53, 876 56,
870 34, 8:8 :,
8:7 57, 895 59,
893 35, 898 54
**four**
303 55, 877 5:,
894 6
**fourth**
825 9
**franklin**
5:8 :
**free**
359 38, 334 2
**frequently**
865 57, 865 35
**friday**
597 7, 597 :,
597 53, 380 54,
380 58, 387 7,
360 52
**friend**
308 :, 308 9,
827 5
**friends**
388 34
**front**
307 52, 372 9,
372 59, 3:3 7,
3:2 :, 3:2 52,
395 7, 853 59,
858 9, 896 33
**fucked**
39: 58, 39: 33
**full**
337 34

CCSAO COI SUBPOENAS 000303

| | | | |
|---|---|---|---|
| **further** | 886 53, 8:9 50 | 374 56, 374 50, | 86: 7, 86: 57, |
| 807 35, 642 56 | **generate** | 374 34, 375 3, | 827 36, 806 56, |
| **fusco** | 359 0, 359 54 | 375 6, 375 2, | 807 8, 87: 55, |
| 5:5 50, 5:8 38 | **gentleman** | 375 58, 375 38, | 879 38, 8:5 55, |
| **G** | 8:5 33, 8:9 38 | 373 8, 373 7, | 8:2 3, 894 54, |
| **gabriel** | **getting** | 373 54, 373 58, | 895 5:, 644 5: |
| 5:4 6, 5:4 57, | 340 9, 357 53, | 373 50, 378 3, | **golden** |
| 5:6 8, 5:6 57, | 33: 35, 849 56, | 378 2, 372 35, | 5:3 : |
| 5:6 34, 5:6 32, | 882 8, 86: 6, | 377 8, 377 2, | **gone** |
| 5:0 0, 5:0 7, | 870 6, 892 5: | 379 7, 379 55, | 343 2, 384 56 |
| 5:0 59, 5:7 5:, | **girl** | 379 56, 880 8, | **good** |
| 335 36, 333 6, | 3:8 7, 3:6 3, | 880 6, 867 5:, | 5:: 50, 5:: 57, |
| 332 6, 332 35, | 3:6 7, 3:6 55, | 867 33, 86: 5, | 593 59, 593 35, |
| 376 50, 376 35, | 3:6 56, 3:6 5: | 86: 7, 823 58, | 364 5, 362 35, |
| 3:8 55, 843 50, | **girls** | 808 34, 875 9, | 36: 2, 36: 58, |
| 843 35, 862 8, | 823 8, 823 54, | 8:6 55, 8:2 5, | 3:9 52 |
| 862 7, 86: 59, | 823 53 | 8:2 59, 8:7 54, | **gotten** |
| 824 52, 825 6, | **give** | 894 3, 894 5: | 860 58 |
| 823 50, 826 2, | 59: 3, 346 6, | **goat** | **governed** |
| 808 34, 807 0, | 346 7, 340 7, | 382 8 | 335 2 |
| 807 9, 8:: 52, | 34: 55, 387 5:, | **goes** | **government** |
| 8:: 59, 644 5:, | 38: 6, 389 55, | 590 36 | 340 35 |
| 643 8, 643 36, | 363 0, 3:8 6, | **going** | **grade** |
| 646 38 | 397 33, 39: 5, | 5:: 5:, 5:: 38, | 356 33 |
| **gabriel's** | 87: 50 | 597 38, 59: 8, | **grand** |
| 828 38, 822 8 | **given** | 599 57, 349 0, | 370 :, 370 9, |
| **garcia** | 343 54, 347 34 | 355 38, 353 54, | 370 54, 370 56, |
| 5:4 32, 642 8, | **gives** | 353 53, 352 2, | 377 8, 377 5:, |
| 642 32 | 359 55 | 352 52, 335 50, | 37: 6, 37: 58, |
| **gas** | **giving** | 333 5, 333 0, | 37: 57, 37: 59, |
| 346 5: | 592 35, 323 7, | 338 33, 338 38, | 3:4 3, 399 8 |
| **gastritis** | 3:3 0, 3:6 33, | 336 0, 339 6, | **grandmother** |
| 343 34, 346 9, | 3:2 7, 3:0 59, | 384 8, 383 9, | 823 3, 823 9, |
| 346 52, 342 5, | 3:7 3, 80: 3 | 383 54, 383 58, | 823 57, 805 56 |
| 340 7, 340 55, | **go** | 383 57, 383 35, | **grandmother's** |
| 340 38, 347 2 | 597 38, 346 53, | 388 56, 388 57, | 823 5: |
| **gastrointestinal** | 352 5, 352 2, | 386 5, 389 54, | **grandparents** |
| 343 52, 343 50 | 350 38, 330 35, | 389 36, 364 5, | 823 50 |
| **gave** | 339 0, 385 34, | 368 2, 366 34, | **grant** |
| 598 36, 343 59, | 383 0, 383 57, | 362 8, 362 7, | 370 7 |
| 346 :, 34: 53, | 388 33, 382 54, | 362 36, 360 5, | **great** |
| 389 3, 363 55, | 322 38, 32: 50, | 360 9, 36: 9, | 823 50, 823 57 |
| 36: 56, 36: 57 | 329 0, 329 9, | 324 7, 370 53, | **greeting** |
| **gears** | 329 52, 304 3, | 394 58, 39: 57, | 833 3, 865 38 |
| 383 9 | 304 6, 304 7, | 846 55, 853 5:, | **guadalupe** |
| **generally** | 304 53, 303 56, | 858 9, 832 3, | 325 58, 320 53, |
| 358 33, 330 38, | 300 5:, 309 :, | 832 :, 885 5, | 320 56, 320 59, |
| | 374 2, 374 55, | 866 57, 86: 0, | 320 33, 320 38, |

CCSAO COI SUBPOENAS 000304

Transcript of Gabriel Solache, Volume 2
Conducted on December 8, 2021

73

393 8, 864 33,
864 38, 865 3,
865 :, 865 53,
865 52, 865 5:,
865 35, 863 3,
863 9, 82: 56,
82: 59, 8:8 6,
8:8 2, 8:8 56,
8:9 35, 894 56

**guard**
352 54, 352 58,
352 57, 352 34

**guess**
349 0, 806 33

**guevara**
5:5 30, 5:7 3,
5:7 6, 392 8,
843 53, 843 58,
848 50, 848 36,
846 8, 846 0,
840 7, 840 59,
840 33, 847 5,
847 0, 854 59,
854 35, 855 8,
855 58, 853 55,
852 0, 852 5:,
852 38, 850 6,
850 7, 850 50,
85: 50, 85: 36,
835 9, 833 53,
833 50, 833 34,
833 36, 838 5,
836 50, 832 52,
832 5:, 830 :,
830 54, 830 53,
830 50, 837 :,
837 50, 83: 6,
889 :, 889 38,
8:7 35, 8:7 38,
8:: 5, 8:: 9

**guevara's**
838 33

**guidance**
385 33

**guilty**
868 9

**guy**
387 58, 387 56,

387 35, 365 54,
365 53

**guys**
379 6, 883 9

**H**

**hair**
8:8 58

**hand**
845 5:, 847 53,
847 56, 84: 34,
835 35, 8:0 52,
8:0 50, 8:0 57,
8:0 36

**handcuffed**
845 58, 845 57,
843 2, 84: 34

**handcuffing**
843 3

**handcuffs**
845 57, 845 38,
843 6

**handed**
879 35

**hands**
845 53, 8:7 :

**handwriting**
5:9 38, 336 3,
806 8, 806 6,
897 52, 89: 5,
89: 6

**happen**
599 55, 357 9,
804 6

**happened**
594 33, 599 56,
383 55, 322 53,
305 5:, 305 35,
308 50, 309 58,
309 35, 3:4 55,
3:4 58, 3:9 36,
398 53, 396 6,
397 52, 844 50,
845 6, 843 0,
846 2, 840 52,
853 53, 852 54,
850 3, 850 57,
857 36, 85: 54,

833 2, 833 9,
833 33, 830 58,
837 5, 837 5:,
837 34, 839 58,
883 3, 888 0,
886 35, 882 6,
880 56, 880 5:,
88: 55, 864 56

**happening**
326 8, 322 9,
322 50, 305 6,
840 9, 85: 52

**happens**
598 50, 598 35,
350 2

**happy**
3:3 36

**hard**
344 50, 847 33,
807 36

**harming**
857 34, 857 35

**head**
344 57, 343 5,
820 7, 820 52,
820 35

**headaches**
344 3, 344 2,
344 54, 344 55,
344 56, 344 50,
344 5:, 344 59,
344 33, 345 7,
345 9, 345 53,
345 52, 345 59,
345 35, 345 36,
343 8, 343 7,
343 55, 820 8,
820 5:

**health**
344 7, 358 2,
357 5:, 336 :,
330 38, 339 33,
385 5, 385 6,
385 50

**healthcare**
599 34, 344 9,
343 0, 343 9,
346 36, 340 55,

347 58, 349 5,
349 55, 353 50,
357 7

**hear**
596 0, 344 50,
358 5, 320 0,
320 9, 327 5:,
327 35, 32: 6,
304 5, 305 54,
305 55, 305 52,
305 34, 303 50,
303 36, 308 0,
308 7, 300 7,
30: 57, 30: 33,
374 5:, 378 38,
842 3, 889 9,
889 53, 864 6,
864 54, 864 5:,
865 9, 863 54,
863 55, 863 5:,
863 33, 86: 54,
828 5, 828 59,
806 52, 800 59

**heard**
388 9, 388 52,
320 54, 327 3,
32: 33, 376 3,
823 38, 896 :

**hearing**
388 55, 320 8,
860 33, 896 50

**heather**
5:8 8, 834 52,
834 5:

**hello**
835 38

**help**
590 58, 597 34,
59: 35, 343 54,
354 35, 355 53,
355 57, 355 35,
358 0, 334 5:,
330 54, 385 33,
863 58, 828 36,
82: 59, 829 50

**helped**
354 :, 354 54,
354 52, 355 2,

CCSAO COI SUBPOENAS 000305

856 50, 856 59,
82: 33, 829 53,
829 36

**here**
5:0 2, 59: 36,
342 8, 359 50,
359 35, 333 8,
332 36, 324 5,
329 36, 376 34,
845 56, 843 34,
839 54, 863 2,
862 0, 825 35,
804 3, 875 8,
8:: 5:, 894 38,
893 8, 896 53,
89: 52

**hereby**
5:: 2, 645 :,
642 6

**herein**
642 0

**hereof**
643 58

**herself**
835 58

**high**
346 5:, 347 9,
347 54, 347 56,
347 36, 34: 5,
34: 2, 34: 7,
34: 58, 349 50,
356 38, 356 36

**himself**
868 52, 826 2,
826 7

**hinshaw**
5:8 0

**hire**
887 58

**hispanic**
848 8, 848 6

**hit**
847 33, 84: 6,
84: 50, 850 35,
828 38, 822 52,
820 35

**hitting**
842 35, 840 50,

84: 55, 856 6,
850 5:, 857 8,
857 0, 857 56,
857 50, 85: 5,
85: 3, 889 38

**hold**
355 35, 332 55,
822 :

**holding**
8:7 7

**hole**
390 2, 390 0,
390 9

**home**
595 54, 330 3,
33: 7, 33: 56,
382 59, 382 38,
387 53, 387 59,
38: 2, 389 3,
389 6, 389 55,
363 0, 363 9,
363 53, 363 52,
363 35, 368 55,
368 52, 368 59,
360 52, 360 50,
367 :, 324 52,
324 33, 328 5,
328 2, 328 :,
328 57, 328 34,
377 57, 3:8 0,
3:6 5, 3:6 54,
3:6 5:, 809 36,
874 56, 874 35

**honda**
356 :, 356 9

**horrible**
87: 0, 87: 9,
87: 52, 87: 38

**hospital**
383 5:, 383 33,
388 56, 388 38,
386 5, 382 59,
382 38, 360 50,
324 50, 324 33,
3:3 6, 3:3 54,
3:8 6, 3:8 0,
3:6 5, 3:6 54,
822 50

**hour**
377 34

**hours**
340 5, 33: 9,
382 52, 380 53,
380 52, 380 34,
380 33, 387 0,
387 :, 389 36,
323 57, 323 59,
377 33, 377 36

**house**
594 34, 595 5,
595 7, 595 5:,
595 33, 593 5,
383 36, 388 8,
388 7, 386 3,
380 8, 368 5:,
325 55, 304 52,
305 2, 305 56,
303 9, 302 52,
302 57, 302 59,
302 33, 300 2,
300 0, 307 53,
307 56, 307 52,
30: 8, 30: 7,
37: 8, 37: 58,
37: 50, 3:3 7,
3:2 :, 3:2 52,
3:0 6, 3:0 7,
823 5:, 803 34,
8:4 7

**housed**
877 8

**how's**
865 38

**hundred**
323 8, 323 6,
390 38

**hurt**
34: 34, 84: 56

**hurts**
820 7, 820 52

**husband**
383 38, 825 56,
827 53, 827 58

**I**

**ibuprofen**
346 7, 346 :

**idea**
595 36, 329 36,
830 9

**identification**
5:9 0, 333 9,
86: 52, 808 7,
879 59, 8:4 52,
8:5 9, 8:9 3,
895 55, 893 55,
898 6, 896 34,
890 5

**identified**
82: 56

**identifies**
827 54, 827 5:,
82: 0, 82: 36

**identify**
5:0 50, 338 8,
330 8, 365 7

**ignition**
307 9

**ii**
5:4 52

**ill**
823 33, 828 52

**illinois**
5:4 3, 5:5 :,
5:5 35, 5:5 88,
5:3 55, 5:3 33,
5:3 80, 5:8 54,
5:0 9

**illness**
828 53

**imagine**
34: 56, 338 57,
375 7, 375 :

**immediately**
864 8

**impossible**
397 58, 39: 9

**impression**
3:3 59

**imprisonment**
347 36, 807 34

**incarcerated**
598 55

**incarceration**
593 38, 384 59,

CCSAO COI SUBPOENAS 000306

383 6
**including**
352 54, 352 56, 352 35
**income**
334 53
**indecipherable**
846 33
**index**
5:6 5, 5:2 5
**indicate**
336 54, 330 36, 337 6
**indicated**
643 53
**indicates**
86: 5:, 869 33, 824 56, 824 36, 825 :, 825 50, 823 5, 823 :, 823 52, 823 35, 822 56, 820 5, 820 0, 820 56, 820 36, 827 6, 82: 58, 82: 5:, 829 55, 829 33, 804 57
**indicating**
84: 8
**indigent**
807 58
**individual**
5:3 6, 5:7 5, 896 36
**individuals**
349 38, 378 52, 888 50, 888 59, 827 56, 82: 6, 8:5 56, 894 6, 894 53, 894 50, 894 34
**information**
39: 2, 869 35, 869 38, 822 38, 820 6, 820 9, 820 57, 827 3, 827 7, 82: 35, 829 56, 870 56

**inherently**
642 54
**initialed**
645 50
**injuries**
594 :, 344 5, 343 56, 347 :, 358 58, 356 53, 352 9, 854 50, 8:6 6, 8:6 7, 8:6 38
**injury**
343 5, 346 5, 820 8, 8:2 6
**inside**
354 5:, 302 3, 377 6, 3:3 56, 877 2
**instead**
5:7 58, 80: :
**instruct**
353 53, 369 33, 806 56
**instructing**
35: 5:, 35: 38, 800 0, 870 :
**instruction**
3:7 :
**instructive**
338 34
**integrate**
354 55, 354 52, 355 2, 355 :
**integrated**
354 :
**intend**
595 35
**interact**
376 54
**interaction**
83: 8, 83: 53, 83: 58, 83: 50
**interested**
330 6, 642 52
**interests**
594 52, 594 50, 593 2
**interfered**
822 55

**interference**
642 55
**interpose**
385 54
**interpret**
88: :, 806 36, 80: 5
**interpretation**
320 38, 374 8
**interpreter**
594 54, 596 0, 596 9, 599 7, 348 54, 353 0, 353 38, 352 55, 352 52, 35: 0, 359 7, 335 6, 335 0, 335 55, 335 52, 336 5:, 336 34, 385 :, 385 9, 388 3, 388 6, 386 56, 386 59, 368 3, 368 2, 366 50, 360 38, 360 36, 326 2, 326 :, 326 55, 320 5:, 320 34, 320 35, 32: 0, 375 57, 375 59, 378 38, 378 36, 370 54, 379 9, 3:8 9, 3:8 54, 3:8 57, 3:7 7, 3:: 7, 395 57, 390 6, 39: 50, 39: 57, 843 58, 846 55, 846 58, 846 5:, 858 34, 834 34, 839 3, 839 8, 839 6, 884 53, 868 58, 866 9, 862 33, 860 8, 869 8, 869 2, 869 0, 824 34, 824 35, 823 6, 823 2, 822 9, 820 54, 820 55, 806 52, 802 6,

802 9, 802 57, 802 5:, 802 34, 800 57, 807 38, 807 36, 80: 5, 80: 54, 80: 56, 875 55, 87: 54, 87: 55, 87: 58, 8:6 0, 898 50, 898 5:, 892 :, 892 54, 89: 0
**interpreter-reader**
645 38
**interpreters**
5:8 5:
**interpreting**
5:: 53, 353 2, 333 54, 364 3, 362 0, 376 59, 843 59, 85: 53, 889 2, 809 50, 8:: 35
**interrogatories**
5:6 59, 5:6 38, 332 0, 332 33
**interrupt**
893 34
**interrupted**
593 2
**interruption**
336 35
**interruptions**
642 55
**interview**
5:6 32, 86: 59, 869 56, 869 57
**interviewed**
86: 36, 869 54
**introduce**
835 58
**involved**
360 33, 367 3, 367 52, 836 3, 875 6, 875 7, 875 35, 873 8, 873 0, 873 53, 878 5, 878 54, 878 52, 878 50,

CCSAO COI SUBPOENAS 000307

876 3
involvement
873 5:
irene
827 58
is__
645 2
isela
826 56, 826 50,
826 59, 826 38
issue
332 36, 362 59
issues
360 2, 877 35,
642 55
italia
822 3
itself
8:0 7, 8:0 34,
8:7 8, 8:: 55
itzcoatl
5:8 57, 5:0 58

**J**

jackson
5:3 9
jail
596 6, 596 56,
345 50, 345 59,
348 6, 366 :,
360 58, 849 :,
854 6, 854 9,
854 53, 888 7,
880 3, 880 0,
880 33, 889 56,
864 52, 863 3,
869 56, 822 3,
827 5, 803 5,
877 3, 877 2,
87: 2, 879 8,
879 54
jan
5:5 0, 5:0 5:,
5:7 59
jerry
82: :, 82: 54
jessica
5:5 5:

job
356 33, 35: :,
36: 2, 36: 58,
392 34, 82: :,
803 :, 89: 53
jobs
598 :, 35: 3
join
860 57
joint
34: 50, 349 5,
349 58
jorge
393 0, 8:9 56,
8:9 50, 8:9 38
jose
5:8 5:, 353 2,
387 52, 387 35,
38: 7, 364 3,
376 59, 843 59,
889 2, 866 6,
82: 36, 829 2,
829 :, 829 50,
804 0, 804 56,
803 3, 807 50,
809 54, 809 50
josh
5:3 7, 5:0 36,
5:7 33
jsusler@peoplesl-
awoffice
5:5 54
july
869 33, 824 5,
824 8
jura
80: 6
jury
868 9

**K**

kankakee
596 6, 596 56,
870 59, 877 5,
877 2, 87: 2,
879 8, 879 54
karen
592 56, 592 50,

355 34, 353 9
karin
5:8 6
keys
307 9
kid
325 5:, 325 35,
325 38, 322 0,
322 54, 322 52,
320 6, 320 58,
327 9, 329 57,
378 34
kid's
378 34, 376 3
kidnapping
360 33, 367 8,
367 50, 878 5
kids
325 2, 325 54,
325 58, 305 38
kind
592 :, 592 35,
355 35, 352 50,
337 59, 36: 3,
306 38, 395 :,
395 9, 83: 53,
883 54, 877 0,
899 6
kinds
355 57
kitchen
328 38, 328 36,
392 35, 392 36,
390 53
knee
349 53
knees
34: 59, 34: 33,
349 58
knew
364 38, 304 38,
393 53, 828 3,
890 52, 890 50
knocking
59: 5
knowledge
383 59, 805 35

**L**

la
353 36, 89: 36

labor
593 55
lady
853 59, 858 9,
834 54
lake
829 58, 829 57,
829 5:, 829 59,
829 34, 829 33
language
645 7, 645 53
lasalle
5:5 85
last
5:9 55, 593 57,
590 35, 597 2,
597 :, 597 55,
597 53, 597 56,
344 35, 345 5,
333 5:, 384 :,
399 55, 849 54,
849 56, 862 54,
823 2, 82: :,
804 58, 804 33,
872 0, 8:4 :,
8:7 55, 892 52
lasts
597 5
late
363 38
later
357 50, 309 50,
3:5 52, 3:5 57,
834 57, 833 :,
883 8, 823 56
law
5:5 2, 5:3 0
lawyer
353 9, 353 56,
3:7 54, 3:7 53,
863 35, 806 34,
870 53
lawyers
3:7 5
leading
36: 5:
learn
322 5, 392 57,

CCSAO COI SUBPOENAS 000308

Transcript of Gabriel Solache, Volume 2
Conducted on December 8, 2021

77

| | | | |
|---|---|---|---|
| 392 59, 820 3, 870 3 | 5:7 8, 5:7 36 | 320 52, 327 8, | **lock-up** |
| **learned** | **leobardo** | 32: 3, 32: 58, | 395 50, 395 5: |
| 302 50, 374 54, | 827 5, 804 5:, | 305 0, 305 :, | **locked** |
| 397 8, 834 57 | 804 59, 804 38 | 305 55, 305 52, | 839 52 |
| **learning** | **let's** | 305 57, 305 34, | **loevy** |
| 390 52 | 362 52, 32: 2, | 302 9, 302 58, | 5:3 84 |
| **leave** | 32: 0, 32: 7, | 300 6, 373 52, | **long** |
| 358 0, 30: 7, | 308 9, 86: :, | 373 35, 378 6, | 595 5, 590 35, |
| 855 52 | 86: 53, 869 34, | 378 5:, 376 55, | 597 5, 350 9, |
| **leaving** | 808 6, 870 36, | 3:4 35, 3:4 38, | 33: 0, 363 5, |
| 3:5 33, 804 50 | 879 50, 8:4 53, | 3:5 6, 3:5 7, | 363 7, 328 34, |
| **left** | 8:5 0, 8:6 55, | 3:5 33, 3:8 7, | 303 :, 300 55, |
| 5:: 59, 348 5:, | 8:2 5, 8:2 59, | 3:6 3, 3:0 34, | 373 7, 372 35, |
| 348 34, 358 6, | 894 5:, 895 9, | 3:7 8, 390 59, | 3:4 6, 3:4 0, |
| 38: 36, 373 6, | 893 :, 892 35 | 885 7, 807 36, | 3:4 7, 3:4 :, |
| 373 55, 377 57, | **letter** | 873 52, 873 35, | 3:8 50, 393 50, |
| 37: 8, 37: 53, | 367 38, 36: 3, | 870 36, 8:5 6, | 396 0, 390 :, |
| 37: 50, 3:4 35, | 36: 7, 8:0 50 | 8:3 52 | 399 8, 399 2, |
| 3:4 38, 3:5 6, | **lie** | **live** | 399 54, 399 52, |
| 3:5 7, 847 50, | 39: 34 | 339 54, 3:2 50, | 399 57, 844 53, |
| 847 36, 84: 2, | **lieu** | 805 0, 805 53 | 844 52, 846 3, |
| 84: 53, 84: 57, | 5:7 53 | **lived** | 846 6, 84: 55, |
| 855 50, 855 59, | **life** | 38: 53, 38: 59, | 854 35, 855 34, |
| 855 35, 856 2, | 349 6, 339 34, | 38: 34, 304 35, | 850 8, 85: 9, |
| 852 55, 852 36, | 383 56, 805 9, | 304 33, 304 38, | 85: 55, 832 0, |
| 850 0, 850 53, | 807 59 | 3:3 7, 3:2 :, | 832 56, 837 53, |
| 85: 6, 85: 57, | **liked** | 3:2 52, 3:2 5:, | 837 56, 837 57, |
| 889 9, 889 53, | 339 59 | 3:2 38, 3:0 8, | 885 38, 886 5:, |
| 864 6, 864 54, | **lilia** | 3:0 0, 3:0 34, | 865 33, 802 2 |
| 864 5:, 865 9, | 827 53 | 3:7 8, 803 5:, | **longer** |
| 863 54, 863 55, | **line** | 803 34, 803 35 | 387 : |
| 863 59, 863 33, | 824 53, 898 55 | **lives** | **look** |
| 828 52, 8:5 57, | **lines** | 805 33, 872 56 | 5:: 38, 594 3, |
| 8:3 :, 8:0 50, | 308 : | **living** | 594 58, 333 7, |
| 897 3, 897 7 | **lining** | 339 9, 326 57, | 333 58, 338 55, |
| **left-hand** | 895 6 | 322 58, 322 35, | 338 59, 336 50, |
| 847 55, 856 2, | **list** | 322 38, 320 3, | 849 57, 86: :, |
| 850 54, 8:9 54 | 330 52, 809 : | 305 2, 3:2 52 | 86: 53, 86: 57, |
| **leg** | **listed** | **llc** | 869 34, 824 54, |
| 343 59, 343 33, | 824 5: | 5:5 50, 5:8 38 | 825 2, 808 6, |
| 348 5, 348 8, | **listen** | **llp** | 808 9, 808 54, |
| 348 0, 348 57, | 366 35 | 5:3 5: | 808 56, 808 5:, |
| 346 2 | **little** | **loan** | 807 8, 879 50, |
| **legal** | 5:: 54, 354 59, | 359 36, 334 5, | 879 38, 8:4 :, |
| 860 50, 867 3, | 358 54, 357 52, | 334 2 | 8:4 53, 8:4 57, |
| 807 36, 8:8 7 | 383 9, 325 5, | **lobby** | 8:5 0, 8:5 55, |
| **leinenweber** | 325 5:, 323 54, | 306 38, 302 3 | 8:6 59, 8:: 36, |
| 5:5 3:, 5:5 39, | 323 58, 323 52, | **located** | 8:9 7, 895 9, |
| | | 342 58 | |

CCSAO COI SUBPOENAS 000309

Transcript of Gabriel Solache, Volume 2
Conducted on December 8, 2021

78

```
895 58, 893 :,
898 38, 892 35,
890 8, 890 38,
897 8
looked
355 50, 333 56,
849 54, 849 58,
859 36, 884 35,
8:5 59, 8:3 2,
8:3 56, 8:3 34,
8:8 2, 8:8 52,
8:6 57, 8:9 50
looking
332 8, 849 5:,
8:5 58, 8:0 55,
8:9 9
looks
8:4 36, 8:8 50,
894 56, 893 5,
898 52, 897 5,
897 52, 89: 3
loop
3:7 34
los
5:4 38, 5:0 5,
5:0 52
lost
828 6, 828 9,
802 54
lot
380 3, 38: 38,
389 9, 363 3,
366 53, 849 3,
836 0, 836 :
louis
304 55
lucas
5:4 38, 5:0 5
luis
829 5, 829 2,
829 :
lunch
330 0, 843 5:
lupe
325 50
lying
39: 55
```

**M**

```
ma'am
336 38, 336 36,
```

```
332 52
machine
642 53
made
35: 5:, 3:5 34,
3:3 2, 3:3 :,
3:3 36, 3:2 5,
3:0 59, 3:7 3,
865 6, 873 58,
645 50, 642 9
mail
800 58
maintain
349 50
make
353 54, 360 3,
324 8, 322 53,
329 6, 3:5 38,
3:8 3, 3:2 8,
3:7 9, 84: 5,
88: 57, 827 36,
82: 59, 8:2 8
making
594 36
male
3:2 33, 3:0 8,
3:: 36, 888 56,
8:9 54
man
856 57, 856 34
man's
3:0 54
many
596 34, 596 33,
590 55, 597 50,
597 59, 35: 3,
334 34, 334 35,
337 57, 337 35,
339 34, 385 34,
380 3, 364 6,
364 0, 364 :,
365 59, 378 52,
372 2, 377 54,
3:2 6, 398 5,
392 53, 397 54,
847 52, 849 35,
850 35, 850 36,
834 :, 888 59,
```

```
823 38, 877 54
march
332 54, 332 53,
337 2, 337 55
margarita
384 7
marital
339 38, 384 8,
384 57
marked
5:9 2, 333 :,
86: 56, 86: 5:,
808 0, 879 5:,
879 33, 8:4 56,
8:5 :, 8:9 5,
895 54, 893 54,
898 8, 896 59,
892 36
marks
335 38, 376 52,
843 52, 862 3,
8:: 56, 644 57
marriage
385 5, 385 2,
385 5:, 385 38,
383 8
marriages
385 34, 383 0
martinez
829 5, 829 8,
829 2, 829 0,
829 :, 807 50,
809 5, 874 9
mas
80: 58
match
332 52
maternal
823 3, 823 9
matter
5:0 7, 884 56,
884 5:, 643 54
maybe
354 34, 355 56,
334 5:, 335 35,
330 0, 884 57,
889 8
mcgrath
5:5 84
```

```
mean
598 7, 354 2,
354 7, 354 55,
354 50, 355 9,
334 5:, 335 9,
337 5:, 385 34,
386 5, 386 53,
365 8, 368 8,
36: 59, 325 34,
325 35, 322 5:,
322 59, 327 9,
302 59, 307 3,
309 38, 373 59,
378 59, 37: 7,
3:3 58, 3:3 52,
392 7, 845 58,
845 50, 855 6,
856 5, 836 :,
83: 56, 887 35,
823 36, 828 54,
805 :, 805 36,
803 58, 806 36,
80: 2, 873 7,
896 6, 897 :
meaning
896 0
meaningful
593 54
means
334 57, 80: 53
measurements
379 5
meat
382 8
media
5:0 2, 335 36,
333 8, 376 58,
376 50, 376 34,
843 50, 843 34,
862 8, 862 0,
8:: 52, 8:: 5:
medication
59: 35, 343 54,
343 34, 346 6,
346 57, 346 34,
342 57, 342 59,
342 35, 340 7,
340 9, 347 34,
```

CCSAO COI SUBPOENAS 000310

| | | | |
|---|---|---|---|
| 34: 55 | 596 2, 596 52, | mispronunciation | 845 55, 847 34, |
| medications | 597 5:, 345 7, | 825 8 | 852 :, 85: 0, |
| 346 36 | 342 6, 340 58, | missaid | 830 56, 837 58, |
| meet | 340 52, 347 2, | 824 9 | 83: 8, 87: 5, |
| 887 35, 88: 7 | 349 2, 349 7, | misstates | 8:4 9, 8:4 58, |
| meeting | 349 53, 356 8, | 33: 38, 385 0, | 8:9 6, 890 52 |
| 88: 5, 896 55 | 356 5:, 356 33, | 374 35 | mormons |
| megan | 357 59, 35: 8, | mistaken | 827 : |
| 5:5 84 | 334 34, 338 2, | 844 3 | morning |
| mejia | 337 50, 337 5:, | mom | 5:: 50, 5:: 57, |
| 393 8, 393 0, | 337 34, 337 38, | 823 58 | 340 5, 350 38, |
| 864 33, 864 38, | 33: 6, 339 2, | moment | 330 9, 382 5:, |
| 865 3, 82: 56, | 339 0, 339 7, | 332 58, 332 36, | 382 34, 382 38, |
| 804 5:, 873 3, | 339 9, 339 54, | 366 2, 328 56, | 363 57, 370 36 |
| 8:4 38, 8:5 5:, | 339 5:, 339 59, | 328 5:, 326 35, | mortgage |
| 8:3 8, 8:8 6, | 339 34, 86: 7, | 370 3, 3:5 9, | 334 0 |
| 8:8 56, 8:9 56, | 824 7, 823 8, | 3:5 58, 3:6 52, | most |
| 8:9 50, 8:9 35, | 823 54, 823 58, | 3:6 50, 397 5, | 595 : |
| 8:9 38, 894 56 | 804 3, 872 54, | 840 50, 84: 7, | mostly |
| mejias | 872 57, 870 8 | 84: :, 84: 9, | 360 7 |
| 380 3 | mic | 856 35, 85: :, | mother |
| member | 846 38 | 834 56, 864 7 | 593 52, 593 5:, |
| 373 36 | michael | monday | 593 34, 593 33, |
| members | 5:8 7, 5:7 2, | 5:: 59, 5:: 34, | 824 5:, 825 56, |
| 378 8, 378 53, | 5:: 3 | 363 34, 368 54 | 823 8, 823 54, |
| 867 53, 86: 8, | michoacan | money | 828 38, 822 8, |
| 805 0 | 595 38, 824 7 | 594 36, 595 3, | 822 2, 827 55, |
| mental | middle | 595 2, 595 54, | 805 54 |
| 357 5:, 336 :, | 307 34, 307 35, | 595 53, 595 5:, | mother's |
| 330 38, 339 33, | 8:3 57, 8:: : | 593 5, 352 7, | 825 5 |
| 385 5, 385 6, | midnight | 35: 52, 359 36, | motion |
| 385 57, 385 35 | 387 6 | 334 55 | 5:6 52, 88: 56 |
| mentioned | might | monitor | move |
| 829 53 | 353 5, 330 56, | 5:0 53 | 360 3, 360 9 |
| mess | 86: 8, 804 34 | month | moved |
| 827 36 | migraine | 597 56, 345 5, | 597 5:, 345 7, |
| met | 344 3, 344 2, | 338 :, 338 52, | 880 7, 880 54, |
| 353 50, 887 34, | 344 55, 344 58, | 323 6 | 823 57, 872 54, |
| 827 2 | 344 52, 344 57 | months | 872 50, 870 8, |
| metal | milwaukee | 596 8 | 877 36 |
| 3:7 59, 3:: 8 | 5:5 7 | more | mozart |
| mexican | mine | 596 36, 350 55, | 38: 58, 302 59, |
| 340 35, 367 36, | 35: 54, 390 57 | 35: 56, 338 34, | 302 33, 377 57 |
| 36: 8 | minute | 33: 9, 380 50, | mstephenson@hins- |
| mexico | 59: 3, 353 34 | 364 7, 365 0, | hawlaw |
| 5:4 38, 5:0 5, | minutes | 377 34, 377 33, | 5:8 53 |
| 594 35, 595 5, | 303 55, 372 36 | 377 36, 3:2 34, | much |
| 595 0, 595 35, | misheard | 844 59, 844 38, | 5:: 55, 595 2, |
| | 884 57 | | |

CCSAO COI SUBPOENAS 000311

595 55, 595 36, 590 52, 359 3, 359 6, 359 2, 359 7, 359 9, 359 55, 330 57, 388 58, 365 34, 366 38, 36: 6, 323 5, 327 7, 373 3, 373 55, 377 50, 855 5:, 852 36, 899 36, 644 8

**multiple**
877 52

**municipality**
335 5, 335 3

**murder**
874 50, 875 35, 875 33, 873 58

**murdered**
320 58

**murders**
366 52, 366 57, 360 33, 367 3, 367 :, 367 50, 396 33, 397 0, 397 :, 397 54, 397 53, 397 56, 397 57, 399 :, 809 36, 875 6, 875 :, 873 8, 873 0, 878 5

**must**
34: 8

**myself**
372 6, 878 50, 876 3, 8:3 59

---

**N**

**nada**
80: 58

**name**
592 3, 592 8, 592 2, 342 7, 342 34, 340 5:, 340 34, 353 57, 357 58, 384 0, 384 :, 382 58,

387 52, 38: 54, 365 8, 365 53, 365 52, 365 50, 365 38, 304 9, 302 56, 302 50, 302 57, 302 5:, 302 35, 302 36, 300 3, 300 :, 300 9, 300 54, 3:2 56, 3:0 54, 3:0 55, 3:0 52, 3:: 53, 396 56, 397 33, 39: 0, 848 58, 840 8, 834 58, 834 52, 882 57, 824 50, 824 34, 825 5, 826 52, 826 33, 896 6, 896 0, 896 :, 896 50, 890 54, 890 52, 897 34, 89: 2, 89: 0, 89: 52, 89: 34, 642 59

**named**
384 7, 826 50, 826 34, 82: :, 808 5, 896 36

**namely**
645 :

**names**
393 36, 882 54, 868 50

**native**
645 58

**natural**
376 56, 644 55

**nature**
594 7, 860 35

**navarro**
5:3 52, 5:7 9

**near**
806 50

**need**
5:: 34, 352 0, 383 33, 375 3, 375 8, 373 54, 378 2, 376 58,

3:8 55, 843 7, 832 3, 832 6, 832 2, 832 0, 899 58

**needed**
383 57, 375 2, 373 8, 373 58, 373 50, 378 5, 644 :

**needs**
348 54, 362 38, 892 :

**neighbor**
3:3 0, 3:6 33, 3:2 7, 3:2 54, 3:2 58, 3:2 38, 3:0 34, 3:7 8, 805 58

**neighborhood**
3:0 58, 3:0 52

**neighbors**
359 57, 390 50, 827 59, 827 38

**neither**
836 36, 878 52, 876 5, 642 56

**network**
890 53, 890 52

**never**
343 36, 339 59, 368 36, 3:0 52, 842 34, 803 59, 875 33, 896 54

**new**
358 9, 358 58

**news**
870 52, 870 50

**next**
336 8, 390 50, 390 57, 848 52, 848 38, 852 54, 85: 56, 837 34, 839 36, 883 3, 807 6, 8:5 38, 8:6 55, 8:2 :, 8:2 59, 8:2 35, 894 3, 894 54, 894 5:, 897 34,

89: 8, 89: 57, 899 50

**night**
357 9, 357 54, 367 53, 323 53, 307 34, 307 35, 8:5 34, 8:3 2, 8:3 56, 8:3 35

**nine**
825 53

**nobody**
354 :, 354 54, 354 56, 355 2, 388 9, 328 54

**none**
35: 6, 35: 2, 35: 0, 388 36, 325 38, 327 7, 309 3, 3:6 0, 867 53, 867 36, 876 3

**norma**
5:6 37, 896 6, 896 0, 896 36

**normal**
380 35, 326 33

**normally**
387 8

**north**
5:5 7, 5:5 59, 5:5 85, 5:3 86, 5:8 :

**northern**
5:4 3, 5:0 9

**northwestern**
598 36, 596 5:, 353 57

**note**
5:8 33, 896 8

**noted**
360 2, 884 33, 884 38

**nothing**
375 52, 375 34, 392 50, 875 36

**notice**
324 50, 324 34, 324 38, 325 5,

CCSAO COI SUBPOENAS 000312

**noticed**
889 55, 889 35
59: 54, 863 9
**noticing**
59: 56
**november**
5:6 30, 5:9 50,
5:9 59, 336 53,
330 36, 86: 34
**npsl**
897 9
**number**
5:0 0, 5:0 54,
5:: 36, 594 8,
343 56, 335 36,
333 6, 336 38,
332 56, 376 50,
376 35, 843 50,
843 35, 862 8,
862 7, 86: 9,
86: 58, 803 2,
808 2, 8:5 0,
8:: 52, 8:: 59,
893 9, 896 5:,
896 38, 892 33,
897 :, 897 35,
899 :, 899 56
**numbers**
5:2 7, 893 57,
897 5:, 89: 5

**O**

**o'malley**
5:8 8, 5:7 0
**oath**
807 54, 643 52,
642 :
**object**
5:7 50, 875 54,
895 5:
**objecting**
375 58
**objection**
592 54, 340 53,
349 8, 353 54,
35: 57, 35: 38,
338 2, 33: 33,
384 34, 385 0,

385 55, 38: 52,
389 58, 32: 5:,
329 34, 303 8,
303 59, 308 3,
308 54, 374 35,
378 0, 370 5:,
3:9 58, 394 54,
399 53, 399 35,
840 55, 84: 0,
855 6, 859 5,
838 52, 83: 0,
884 54, 884 58,
884 50, 884 59,
884 38, 885 0,
885 52, 883 7,
886 5, 887 55,
864 2, 864 55,
860 3, 860 6,
860 52, 867 5,
867 56, 828 2,
822 5:, 805 59,
806 9, 802 8,
802 7, 800 2,
809 8, 809 55,
874 5, 874 33,
875 53, 873 7,
873 50, 878 3,
878 8, 878 35,
876 54, 876 56,
876 36, 872 3,
872 34, 870 6,
870 34, 879 2,
879 53, 8:8 7,
8:2 8, 8:0 0,
8:0 59, 8:7 3,
8:7 57, 8:: 54,
895 36, 893 34,
898 9
**objections**
878 55
**obtain**
89: 35
**obtained**
369 58, 89: 38
**obviously**
594 59, 59: 53,
836 0
**occasion**
863 5

**occasionally**
828 38
**occurred**
874 56
**october**
333 59, 333 36,
338 57
**of____**
643 5:
**offense**
874 56
**offer**
643 56
**offered**
389 33, 390 34,
390 35
**office**
5:5 2, 33: 7,
369 5, 3:3 52,
392 38, 802 35,
890 50, 89: 58
**officer**
308 9, 308 5:,
308 33, 306 5,
306 5:, 302 55,
300 58, 30: 58,
30: 59, 309 6,
309 52, 374 58,
375 :, 379 34,
3:: 55, 3:: 58,
3:: 52, 3:: 57,
3:: 36, 3:9 2,
3:9 7, 395 54,
395 53, 396 53,
396 52, 396 57,
396 59, 396 38,
392 3, 392 0,
397 2, 39: :,
39: 54, 399 6,
399 7, 399 55,
399 50, 844 5:,
844 36, 845 33,
843 36, 848 3,
848 8, 848 52,
848 59, 848 38,
840 8, 847 8,
859 35, 835 6,
839 56, 888 53,

888 58, 888 56,
888 52, 888 38,
886 8, 886 0
**officers**
5:7 5, 308 59,
306 :, 309 57,
309 33, 372 2,
372 :, 372 5:,
37: 54, 379 35,
379 36, 393 38,
398 5, 396 5,
396 8, 392 38,
392 36, 847 3
**oficina**
890 50
**often**
590 57, 344 59,
345 0, 345 :,
345 53, 345 5:,
340 33, 384 0,
325 :
**oh**
388 6, 369 38,
374 5, 869 2,
896 5
**okay**
596 :, 354 59,
358 5, 335 54,
338 33, 336 :,
332 55, 330 34,
339 35, 383 :,
388 36, 373 56,
855 9, 85: 34,
824 6, 824 9,
829 33, 800 52,
80: 52, 870 36,
8:4 59, 8:2 0,
8:2 59, 8:0 52,
8:7 54, 8:9 :,
8:9 9, 893 53,
898 2, 890 2,
89: 57
**old**
3:0 57, 825 57,
825 59, 823 59
**older**
3:0 50, 3:0 57,
804 0, 804 :,

CCSAO COI SUBPOENAS 000313

Transcript of Gabriel Solache, Volume 2
Conducted on December 8, 2021

82

804 9, 804 54, 804 55

**once**
590 34, 340 36, 354 55, 355 9, 356 5:, 333 58, 3:3 8, 853 38, 880 9, 827 8, 829 53, 808 54

**one**
593 50, 596 36, 592 58, 597 36, 344 35, 348 3, 342 36, 340 5, 347 58, 353 7, 353 34, 332 55, 332 53, 332 58, 33: 50, 38: 53, 389 3, 325 52, 304 56, 305 56, 373 7, 373 58, 378 50, 379 35, 3:4 59, 3:0 :, 393 9, 845 6, 845 56, 845 52, 847 3, 847 34, 856 7, 856 57, 856 59, 836 7, 884 3, 883 35, 828 36, 803 58, 808 34, 808 35, 807 6, 807 38, 877 55, 87: 35, 8:4 9, 8:2 57, 8:0 56, 8:7 7, 894 58, 895 5, 890 38, 890 36, 897 5, 897 3, 897 7, 897 :, 897 55, 897 52, 897 50, 897 57, 897 59, 644 6

**ones**
844 9

**only**
595 56, 593 50, 340 36, 34: 38, 359 35, 337 33,

33: 59, 363 54, 368 34, 367 36, 325 33, 305 33, 378 50, 853 38, 865 58, 803 33, 873 35, 876 5:, 877 55, 893 3, 893 50, 644 :

**open**
302 0, 847 53, 847 56

**opportunity**
594 52

**oral**
326 54, 326 58

**order**
890 53

**original**
5:8 33, 642 59

**other**
5:3 6, 593 6, 598 59, 592 35, 347 6, 357 50, 357 5:, 38: 7, 38: 38, 367 55, 369 34, 324 0, 324 55, 324 34, 325 2, 325 9, 325 35, 320 8, 327 3, 327 53, 32: 36, 300 3, 30: 34, 374 7, 374 55, 374 34, 375 3, 375 6, 375 0, 375 58, 375 36, 373 8, 373 6, 373 :, 373 54, 373 58, 373 50, 378 3, 378 2, 378 56, 3:0 36, 3:7 5, 393 53, 393 56, 398 0, 39: 6, 39: 2, 844 59, 844 36, 845 52, 84: 6, 854 36, 855 3, 855 6, 855 55, 855 53,

853 :, 850 55, 85: 2, 834 0, 834 :, 835 2, 835 54, 838 :, 83: 6, 83: 38, 839 5, 839 7, 839 9, 883 56, 888 50, 888 57, 888 59, 880 6, 863 50, 868 53, 868 52, 806 34, 800 7, 875 58, 875 57, 873 :, 878 5:, 876 6, 877 36, 894 52, 890 36

**others**
333 33

**otherwise**
369 34, 39: 53, 39: 35, 870 :

**out**
354 8, 354 0, 354 9, 354 35, 355 9, 355 52, 355 5:, 332 38, 330 54, 339 2, 339 :, 389 54, 328 55, 328 35, 328 38, 326 6, 307 38, 30: 3, 30: 8, 30: 2, 30: 9, 370 56, 396 58, 399 36, 848 5, 848 :, 847 8, 85: 59, 85: 35, 859 35, 835 6, 837 35, 888 :, 886 33, 889 9, 889 53, 864 6, 864 54, 864 5:, 865 9, 863 54, 863 55, 863 5:, 863 33, 829 58, 829 50, 829 36, 890 :, 890 53, 890 35, 89: 55, 89: 50

**outside**
354 57, 387 58, 307 53, 307 56

**over**
344 :, 378 58, 84: 3, 858 33, 885 53, 865 36, 802 55, 800 38, 877 52

**overheard**
376 2

**owed**
375 52

**own**
358 57, 358 33, 35: 55, 359 38, 334 2, 826 0, 826 55

**owner**
334 3, 334 :

**oyo**
390 8, 390 2

---

**P**

---

**pachuca**
342 52, 33: 5:

**packet**
332 53

**pad**
832 36

**page**
5:6 8, 5:6 :, 5:2 6, 5:9 55, 5:9 53, 5:9 52, 594 3, 594 8, 594 6, 594 0, 594 58, 333 5:, 336 8, 336 58, 339 36, 808 5:, 808 34, 808 33, 807 6, 807 2, 80: 35, 874 0, 874 :, 8:5 58, 8:6 55, 8:2 :, 8:2 58, 8:2 35, 8:7 55, 8:9 9, 894 3, 894 54, 894 5:, 898 36,

CCSAO COI SUBPOENAS 000314

896 3, 890 8,
897 :, 89: 8,
89: 57, 648 7,
648 58, 648 59,
646 5, 646 7,
646 58

**pages**
5:2 0, 893 56,
898 7

**paid**
590 33, 386 3,
644 8

**pain**
598 5:, 598 33,
344 50, 344 57,
343 59, 343 35,
348 5, 348 36,
346 2, 34: 50,
34: 35, 349 5,
349 58, 855 38,
855 36, 853 5,
853 9, 850 :,
850 9, 850 55

**palapa**
384 :, 384 9,
384 52, 384 33

**palomares**
82: 5

**pandemic**
337 0

**panic**
598 53, 598 56,
598 52, 590 5,
590 3, 590 56,
590 5:, 597 8,
597 0, 597 53,
597 57, 597 35,
59: 54, 59: 58,
59: 52, 59: 5:,
59: 33, 599 3,
599 53, 599 56,
599 5:, 599 35

**paper**
34: 8, 356 52,
832 36, 899 55

**paragraph**
874 7

**paralegal**
330 :, 330 58

**pardon**
336 35, 3:: 7,
862 33

**parents**
320 53, 305 5:,
305 35, 824 52,
825 58, 825 57

**parked**
307 58, 307 56

**parking**
387 58, 38: :,
38: 38, 389 9,
363 5

**part**
355 2, 353 7,
330 2, 368 0,
823 2, 890 9

**participate**
327 52, 327 5:,
327 35, 303 5

**particular**
8:6 5, 8:6 2,
8:6 :, 8:2 52

**parties**
642 50

**passed**
373 3, 377 50,
855 5:

**passenger's**
307 :

**passions**
594 52, 594 50,
593 6

**past**
892 50

**pause**
355 36

**pay**
334 3, 334 9,
334 33, 334 38,
369 5, 325 36,
323 5, 323 0,
323 :, 327 7,
327 :, 327 56,
305 38, 30: 38,
30: 36, 899 2,
899 59

**payday**
890 50

**paying**
359 59, 359 36,
325 33

**pen**
8:0 57, 8:0 38,
8:7 5, 8:7 6,
8:7 7

**penalties**
5:7 52, 5:: 7

**penalty**
862 35, 860 5,
860 7, 860 55,
860 56, 860 36,
867 54, 86: 6,
643 2, 643 :

**people**
344 57, 349 5:,
354 6, 354 38,
355 56, 355 57,
358 0, 335 35,
337 57, 337 35,
339 34, 380 3,
38: 7, 38: 38,
364 6, 364 9,
364 54, 364 58,
364 50, 364 34,
365 6, 363 3,
3:2 6, 393 53,
834 0, 834 :,
835 0, 835 54,
883 56, 883 5:,
868 57, 868 5:,
868 34, 827 2,
899 55

**people's**
5:5 2

**percent**
390 36

**perhaps**
3:3 38

**period**
595 8, 595 57,
596 58, 356 6,
357 53, 386 2,
3:4 55, 886 35,
877 3, 8:8 50

**perjury**
5:7 52, 5:: 7,

643 2, 643 :

**person**
5:5 6, 5:5 56,
5:3 2, 592 9,
592 50, 387 38,
38: 8, 307 6,
378 50, 378 57,
376 :, 37: :,
3:0 3, 3:0 50,
882 53, 829 0,
80: 7, 8:5 50,
8:8 56, 8:9 36,
645 7

**persona**
353 38

**personal**
893 38, 898 53

**petition**
5:6 58, 806 38

**petitioner**
807 2, 807 55,
874 58

**petitions**
367 35

**phase**
867 54

**phone**
865 5, 865 2,
865 53

**phonetic**
592 0, 808 3

**photo**
8:2 9, 8:0 0,
8:0 59, 8:7 3,
8:: 54, 895 8,
893 8, 896 54

**photocopy**
8:2 35, 89: 59

**photograph**
5:6 37, 8:4 9,
8:5 38, 8:5 36,
8:3 9, 8:3 58,
8:3 57, 8:3 38,
8:3 36, 8:8 5,
8:8 59, 8:8 34,
8:6 3, 8:6 2,
8:6 :, 8:6 59,
8:6 33, 8:2 50,

CCSAO COI SUBPOENAS 000315

Transcript of Gabriel Solache, Volume 2
Conducted on December 8, 2021

84

8:2 34, 8:0 53,
8:7 7, 8:9 54,
8:9 55, 8:9 34,
8:9 33, 894 36,
896 8, 896 38,
892 5, 892 2
**photographed**
893 52
**photographs**
5:6 3:, 5:6 39,
5:6 84, 5:6 85,
5:2 2, 5:2 0,
5:2 9, 849 3,
849 0, 849 55,
854 3, 854 7,
854 55, 854 56,
879 38, 8:4 5,
8:4 58, 8:4 35,
8:5 53, 8:5 56,
8:6 53, 8:6 52,
8:6 57, 8:2 2,
8:2 34, 8:0 5,
8:0 6, 8:0 50,
8:7 58, 8:7 34,
8:7 38, 8:: 3,
8:: 2, 8:: 7,
8:9 6, 894 8,
894 6, 894 7,
894 55, 894 59,
894 34, 895 56,
895 57, 898 :
**photos**
8:2 6, 894 53
**phrase**
80: 55
**pick**
5:: 5:
**picture**
8:9 52
**pictures**
895 38
**pills**
346 35, 342 36,
34: 53
**place**
5:4 38, 5:0 52,
334 52, 382 54,
369 8, 307 2,

390 3, 397 53,
397 57, 399 34,
840 2, 877 5:,
897 35, 89: 58,
899 33, 644 53
**placed**
863 56, 642 :
**places**
358 9, 358 56,
334 34, 334 33
**placing**
863 50
**plaintiff**
5:4 0, 5:5 8,
5:6 57, 5:6 34,
5:0 59, 5:0 35,
5:7 34, 332 6,
332 34
**plaintiff's**
360 7
**plan**
595 5, 595 9,
595 54
**planet**
5:0 56
**planned**
593 53
**planner**
5:2 9
**plans**
352 5
**plastic**
3:7 34
**playing**
348 0, 330 3
**plaza**
824 59, 825 5
**please**
5:0 50, 5:0 57,
5:7 55, 352 50,
336 57, 385 58,
362 5, 300 33,
3:8 58, 3:8 5:,
3:7 5:, 848 5:,
800 55, 8:2 9
**pleasure**
896 55
**plus**
30: 33, 3:0 50

**point**
347 53, 349 38,
360 58, 30: :,
373 9, 373 59,
3:4 52, 3:3 33,
3:8 5:, 3:6 57,
3:9 8, 3:9 52,
394 :, 394 52,
394 59, 395 33,
393 9, 390 59,
397 57, 840 35,
840 36, 856 7,
852 58, 85: 36,
859 :, 859 53,
859 5:, 830 52,
830 34, 830 33,
88: 58, 863 57,
823 33, 807 5,
8:2 50
**points**
834 38
**pontiac**
343 5:, 346 5,
346 2, 347 55,
347 58, 347 57,
879 6
**pool**
829 35, 829 38,
804 5
**portion**
87: 50, 87: 57
**pose**
353 3
**possible**
5:: 9, 337 9,
383 0, 383 7,
3:0 38, 398 5:,
827 52, 827 57,
875 2, 875 7,
8:8 36
**possibly**
343 3, 848 58
**post-conviction**
5:6 56, 367 35
**potential**
827 55, 827 59,
82: 7, 82: 55,
82: 56, 829 3,

804 5:
**precise**
352 59
**prepare**
806 2
**prepared**
806 :, 802 58,
802 52
**prescribe**
342 50
**prescribed**
59: 35
**present**
5:8 50, 30: 58
**pressure**
347 36, 34: 5,
34: 2, 34: :,
34: 56
**pretty**
303 54
**prevented**
593 54
**previously**
892 3
**price**
359 6
**prior**
807 5, 8:2 50,
642 :
**prison**
593 50, 590 6,
590 0, 590 9,
590 57, 599 0,
345 54, 345 58,
343 59, 347 5:,
34: 50, 349 50,
349 34, 349 36,
354 8, 354 0,
354 7, 354 53,
354 58, 354 56,
354 52, 354 5:,
355 3, 355 9,
355 52, 355 5:,
358 6, 358 0,
302 50, 3:6 34
**prisoner**
397 5
**prisoners**
392 34, 390 53

CCSAO COI SUBPOENAS 000316

privacy
87: 57
privilege
353 53, 369 35,
324 :, 806 57,
870 2
pro-se
5:6 58, 806 38,
806 36
probably
804 52, 805 7,
809 :, 89: 52,
644 55
problem
327 9, 327 54,
32: 50, 305 36,
309 7, 3:6 7,
869 :, 822 53
problems
385 35, 385 33,
383 0, 882 33,
820 :, 820 50,
820 5:, 820 34,
877 35, 87: 3
proceeding
5:7 57, 88: 34
proceedings
822 7, 642 0,
642 7, 642 54
process
36: 55
profesional
353 36
program
355 56, 355 35,
358 6, 358 2,
358 0
programs
355 57, 353 59
prosecution
593 0, 593 9
prosecutor
394 9, 394 50,
394 35, 394 36,
834 55, 835 9,
836 58, 836 57,
836 34, 83: 52
protect
828 36

provide
350 55, 33: 50,
39: 6
provider
599 34, 344 9,
343 0, 343 9,
346 36, 340 55,
349 5, 349 55,
353 57, 357 7,
357 5:
providers
347 56
psychologist
590 54, 590 58
public
323 36
pull
330 6, 829 50,
829 36
pulling
330 6, 829 53
purpose
88: 34, 865 5
pursue
594 52
pursuing
593 53
pushed
888 53, 888 36,
886 8, 886 7
put
362 53, 369 53,
32: 2, 32: 7,
37: 33, 379 53,
379 50, 379 5:,
3:4 56, 3:7 52,
3:: 2, 3:: 9,
3:9 7, 3:9 54,
3:9 53, 3:9 59,
395 52, 395 36,
393 58, 845 56,
845 38, 848 34,
83: 57, 839 57,
839 34, 888 8,
888 9, 896 33

———— Q ————

que
80: 8, 80: 53

question
594 7, 593 9,
596 54, 59: 50,
344 5, 343 56,
347 :, 355 36,
353 3, 353 7,
353 33, 358 55,
358 53, 335 7,
336 7, 336 34,
330 35, 330 33,
337 6, 385 9,
385 58, 38: 5,
364 5:, 364 33,
365 5, 365 56,
363 36, 362 58,
362 5:, 362 59,
362 36, 360 5,
360 36, 303 7,
300 34, 309 2,
373 0, 3:8 53,
3:8 56, 3:8 59,
3:8 34, 3:7 7,
3:9 50, 394 58,
843 9, 843 54,
848 57, 842 6,
840 38, 853 34,
858 53, 858 50,
852 59, 859 3,
836 7, 839 8,
884 52, 865 59,
866 53, 862 54,
862 53, 869 7,
823 2, 802 55,
800 54, 800 34,
875 55, 878 6,
872 35, 870 0,
870 :, 870 9,
870 55, 895 59,
893 33, 898 54
questioned
377 56
questioning
898 55
questions
5:9 8, 594 5,
353 58, 333 56,
338 38, 336 0,
383 54, 395 58,

838 55, 838 56,
838 59, 838 34,
838 33, 836 5,
836 8, 836 7,
836 9, 836 55,
832 5:, 830 50,
830 5:, 830 35,
830 38, 837 3,
839 52, 839 50,
869 57, 869 59,
808 53, 8:4 5:,
8:2 8
quick
333 58, 832 0,
808 9
quickly
5:9 5, 887 :
quite
592 6, 337 34,
383 7
quote
352 59

———— R ————

raise
327 55, 327 53
raised
360 0
ramiro
825 3
ranch
595 38, 805 0,
805 53, 805 33
rd
304 54
reaction
3:5 0, 3:5 54
read
385 53, 385 56,
3:8 56, 3:8 34,
3:8 33, 392 56,
392 57, 392 59,
390 52, 390 35,
397 8, 862 54,
862 55, 800 3,
643 9, 643 54
reader-interpret-
er
645 5

PLANET DEPOS
888.433.3767 | WWW.PLANETDEPOS.COM

CCSAO COI SUBPOENAS 000317

| | | | |
|---|---|---|---|
| **reading** 390 33, 645 53, 645 57, 645 59, 642 57 **ready** 849 56, 892 5: **realize** 3:8 2, 3:8 38, 864 8, 864 9 **realized** 390 33, 864 57 **really** 359 55, 366 35, 303 53, 89: 56, 899 8 **reanswer** 362 59, 360 5 **reask** 362 5:, 362 36 **reason** 350 54, 337 52, 33: 59, 367 55, 392 35, 867 38, 800 7, 875 34, 875 38, 878 5:, 876 8, 876 6, 648 54, 648 50, 648 33, 646 6, 646 54, 646 50 **reasons** 875 0, 873 5: **recall** 347 5, 34: 6, 384 8, 383 58, 383 50, 383 36, 388 7, 388 55, 382 59, 380 6, 380 9, 380 53, 387 7, 368 53, 369 55, 323 57, 323 34, 328 2, 326 8, 32: 52, 32: 36, 37: 52, 393 33, 849 57, 854 7, 854 55, 854 56, 887 :, 863 0, 869 54, 826 35, 804 59, | 8:2 52, 896 53, 892 6 **recapped** 855 0 **receive** 860 54 **received** 332 56, 860 7, 800 53, 807 59 **recently** 865 7, 892 55, 892 58 **recess** 59: 2, 333 3, 362 2, 376 5:, 843 5:, 832 54, 862 2, 8:: 57 **recognize** 333 50, 364 50, 365 6, 808 50, 879 36, 8:4 3, 8:4 6, 8:4 54, 8:4 34, 8:5 36, 8:3 36, 8:9 55, 8:9 38, 894 8, 894 55, 894 52, 894 59, 894 33, 895 50, 893 3, 893 56, 893 5:, 898 7, 898 34, 890 0, 897 5: **recognized** 364 34, 365 3, 885 35 **recollection** 886 52 **record** 597 36, 59: 6, 59: 7, 333 5, 333 2, 385 56, 362 6, 362 :, 362 53, 376 57, 376 33, 3:8 52, 3:8 33, 843 57, 843 33, 846 36, 832 9, 832 53, 884 57, 884 33, 862 6, 862 :, | 862 55, 8:: 50, 8:: 34, 897 6, 644 59, 642 9 **recording** 362 33 **records** 5:6 55, 369 58 **recover** 828 53 **recovered** 828 34 **recreational** 87: 35, 87: 38 **reestablish** 593 52, 593 5:, 598 3 **refer** 300 :, 390 3, 837 56 **referenced** 5:6 :, 338 50 **referencing** 3:0 3, 892 5 **referral** 33: 56 **referred** 334 36 **referring** 354 57, 300 5, 37: 7, 3:2 55, 3:2 36, 83: 9, 87: 53 **reflect** 8:2 6 **regarding** 356 53, 383 55 **regardless** 595 55 **reguladisador** 335 53 **regulado** 335 7, 335 : **regularizado** 335 : **regularized** 334 50, 334 59, 335 5, 335 6, 335 : | **regularly** 380 59 **regulated** 335 0, 335 9, 335 53 **reiter** 5:3 5: **relate** 390 56 **related** 358 6, 384 36, 385 35, 383 6, 387 35, 378 5:, 838 6, 838 0, 838 9 **relationship** 593 5:, 593 59, 593 35, 350 9, 383 34, 828 55 **relationships** 593 52, 598 3, 598 2, 350 3, 350 58 **relative** 642 52 **released** 596 6, 596 56, 354 53 **relevance** 893 33 **relevancy** 898 54 **relief** 5:6 56 **remain** 377 : **remembering** 363 33, 368 53 **remembers** 828 36 **remind** 380 35 **remote** 642 54 **remotely** 5:5 37, 5:3 50, 5:3 3:, 5:8 2 **rent** 334 8, 386 3, |

CCSAO COI SUBPOENAS 000318

325 33, 325 36,
323 5, 323 0,
323 :, 327 :,
305 38
**repeat**
596 9, 385 9,
38: 5, 362 53,
360 36, 373 0,
3:8 57, 848 5:,
839 8, 865 59,
824 34, 823 6,
820 55
**repeated**
802 :
**repetition**
869 7, 802 59
**rephrase**
355 33, 352 57,
324 8, 3:9 50,
872 35
**reported**
5:4 32
**reporter**
5:4 30, 5:7 55,
5:7 58, 5:: 2,
385 53, 3:8 58,
842 5, 842 3,
862 9, 642 5,
642 6, 642 2
**represent**
5:0 57
**request**
338 3, 863 56,
863 50
**requested**
868 33, 645 52,
642 57
**required**
384 5:
**resident**
899 57, 644 3
**respect**
334 6, 877 34
**respectfully**
808 59
**respond**
3:2 0, 853 34
**responded**
836 8

**responding**
884 34
**response**
593 :, 339 33,
3:8 50
**responses**
336 7, 384 56
**restaurant**
382 6, 382 0
**restroom**
335 33
**result**
594 9, 355 5,
854 5:, 889 :,
873 58
**retain**
807 56
**return**
595 0, 595 54,
340 58, 340 56,
349 2
**returned**
35: 8, 845 2,
848 56, 855 50,
855 59
**returning**
357 5:
**revealing**
870 0, 870 53
**revenue**
359 2, 359 9
**review**
338 58, 802 36,
800 8, 800 33,
800 36, 80: 34
**reviewed**
5:9 59, 333 38,
800 52
**reyes**
5:3 37, 5:0 35,
5:7 34, 323 54,
323 58, 328 50,
328 57, 322 56,
322 50, 327 5:,
32: 52, 304 5,
304 6, 303 36,
308 7, 306 56,
300 52, 3:5 3,

3:9 55, 3:9 5:,
394 6, 394 38,
395 3, 395 2,
395 35, 393 56,
837 36, 839 34,
839 38, 884 6,
884 7, 885 6,
883 6, 883 52,
883 34, 883 36,
888 35, 880 5,
880 9, 880 56,
880 5:, 866 35,
862 56, 862 57,
862 34, 862 36,
860 54, 860 58,
807 59, 873 36,
878 9, 878 56,
878 59, 876 5,
876 7, 876 57,
876 33, 872 7,
870 8, 870 59,
8:5 6, 8:3 2,
8:3 53, 8:3 56,
8:6 53, 8:2 9,
894 38, 894 36,
895 0, 893 8,
893 2, 893 36,
898 53
**reynaldo**
5:5 30, 5:7 3,
5:7 6
**rfc-solache**
895 0
**ride**
383 33, 387 59,
38: 6, 389 3,
389 6, 389 55,
363 0, 363 9,
363 53, 328 8,
305 5
**rides**
803 0, 803 52
**right**
595 59, 596 52,
592 57, 592 36,
597 9, 348 3,
348 57, 348 34,
348 38, 346 3,

346 9, 347 52,
354 38, 355 3,
355 54, 358 33,
335 59, 336 3,
332 7, 332 36,
330 54, 339 53,
388 59, 386 38,
380 5:, 387 6,
387 :, 38: 56,
389 55, 368 53,
368 58, 366 34,
362 52, 360 50,
367 58, 324 :,
306 :, 307 5,
307 3, 307 38,
309 55, 3:2 50,
3:2 36, 3:9 5,
394 9, 393 54,
398 59, 390 53,
397 0, 399 :,
845 58, 845 57,
845 5:, 845 34,
848 50, 848 35,
848 36, 840 5,
847 6, 84: 34,
856 :, 859 59,
834 33, 835 3,
830 57, 830 34,
830 38, 887 0,
865 52, 868 7,
868 9, 860 56,
824 7, 823 58,
827 35, 803 38,
808 6, 808 33,
806 33, 8:5 6,
8:5 56, 8:3 36,
8:8 50, 8:8 57,
8:6 58, 8:2 33,
8:0 5, 8:0 36,
8:9 59, 895 2,
897 8, 897 55,
897 53, 899 7,
899 9, 899 56,
644 9, 644 56
**ring**
3:7 38, 3:7 36,
3:: 5, 3:: 8,
845 52, 845 5:,

CCSAO COI SUBPOENAS 000319

845 59, 843 2,
842 52, 84: 35
**rivera**
843 55
**rock**
5:5 50, 5:8 38
**romero**
824 59, 825 5,
825 3
**rosa**
826 56, 826 50,
826 59, 826 33
**rosauro**
323 :, 323 53,
328 55, 328 35,
326 6, 322 0,
322 9, 320 8,
320 0, 320 55,
327 8, 327 2,
327 55, 32: 53,
329 5, 329 0,
329 9, 329 50,
303 50, 308 57,
306 3, 306 55,
300 52, 300 59,
307 :, 30: :,
30: 58, 30: 5:,
309 58, 372 6,
372 55, 372 56,
37: 54, 37: 34,
3:4 2, 3:4 50,
3:4 34, 3:4 33,
3:5 8, 3:5 0,
3:5 36, 3:3 :,
3:3 34, 3:6 58,
3:6 59, 3:6 35,
3:6 38, 3:0 59,
3:7 3, 393 5,
873 3, 873 2,
8:4 38, 8:5 8,
8:3 8, 8:3 6,
8:3 52, 8:6 58
**rosauro's**
329 56, 307 53,
307 56, 3:2 0,
3:2 35, 873 5:
**rose**
869 8

**rouse**
367 52, 324 :,
324 9, 3:0 5:,
3:0 36, 887 0,
887 9, 887 58,
88: 54, 88: 56,
889 3, 868 35,
866 7, 866 9,
869 3, 869 6,
869 2, 809 5,
809 9, 809 5:
**rowley**
834 5:
**ruben**
5:4 32, 642 8,
642 32
**rubio**
827 36
**rules**
5:: 59
**running**
307 54, 307 55,
30: 5, 30: 6,
30: 0, 30: 54
**runs**
820 7, 820 52
**rutherford's**
5:6 33, 332 0,
332 33

---
**S**
---

**said**
598 6, 597 3,
59: 57, 345 6,
348 5:, 34: 8,
353 6, 356 56,
356 50, 35: 33,
335 7, 383 2,
388 9, 368 0,
360 53, 36: 52,
36: 35, 369 9,
369 38, 326 58,
320 6, 320 55,
320 53, 320 33,
300 36, 374 53,
374 58, 374 52,
375 7, 378 5,
378 59, 376 3,

3:4 34, 3:4 33,
3:5 8, 3:3 :,
3:3 54, 3:3 50,
3:3 38, 3:8 5:,
3:6 2, 3:6 35,
3:2 3, 3:2 33,
3:: 34, 397 53,
39: 55, 39: 53,
39: 56, 39: 34,
846 54, 846 34,
842 8, 842 6,
842 :, 858 3,
858 :, 856 38,
857 38, 832 5,
83: 53, 884 58,
886 55, 886 58,
886 50, 822 0,
802 0
**salary**
334 9
**salazar**
5:6 37, 896 6,
896 7, 896 55,
896 36
**salud**
353 36
**salvador**
827 36
**same**
5:: 59, 59: 50,
35: 57, 35: 5:,
35: 38, 33: 53,
385 35, 386 50,
364 54, 364 36,
307 6, 307 2,
3:6 6, 399 35,
845 7, 840 9,
84: 7, 84: :,
856 6, 859 33,
835 5, 837 2,
883 2, 883 52,
866 35, 862 58,
829 0, 803 :,
874 33, 873 7,
878 55, 878 35,
879 53, 8:4 36,
8:8 58, 8:8 56,
8:8 50, 8:6 50,

895 36, 899 33,
645 53, 643 54,
643 55
**samples**
878 36
**san**
5:4 38, 5:0 5
**satisfaction**
360 :
**saturday**
380 0, 380 7,
300 0, 3:6 2,
3:6 9
**save**
595 3, 595 0,
595 9
**saved**
595 53, 595 5:
**saw**
593 50, 342 :,
342 54, 340 0,
340 59, 340 36,
368 34, 3:3 53,
3:3 58, 3:3 56,
3:3 52, 3:9 36,
394 8, 395 8,
395 2, 393 9,
840 5:, 834 33,
837 36, 873 33,
898 2
**sayeth**
807 33, 80: 58
**saying**
596 53, 34: 3,
354 34, 383 50,
388 :, 388 57,
36: 38, 325 0,
320 2, 320 53,
32: 5, 32: 52,
305 :, 30: 57,
30: 33, 30: 38,
309 5, 373 7,
3:5 7, 840 :,
858 0, 85: 2,
85: 7, 859 9,
833 56, 833 34,
830 54, 884 57,
889 59, 827 34,

CCSAO COI SUBPOENAS 000320

80: 0, 80: :
**says**
594 6, 332 :,
384 54, 366 33,
824 3, 824 0,
822 5, 808 59,
806 38, 807 2,
807 9, 807 35,
874 :, 874 58,
896 8, 897 34,
897 35, 897 33,
89: 6, 899 50
**scene**
322 59, 878 58,
878 34, 878 36
**school**
356 38, 356 36,
352 3, 352 2,
844 9, 82: 34
**screen**
332 5:, 895 8
**sean**
5:3 83, 5:0 34
**seat**
372 9, 372 53,
372 52, 372 59
**second**
597 36, 355 33,
338 9, 336 58,
332 2, 332 9,
332 55, 330 55,
337 8, 372 5,
372 33, 370 5,
370 58, 370 35,
377 3, 377 9,
854 0, 825 56,
807 38, 874 0,
874 7, 8:0 56,
898 38, 896 3,
890 8
**security**
897 35, 89: 34,
89: 33, 899 :,
899 56, 644 5
**see**
5:9 50, 598 38,
596 57, 596 34,
590 54, 346 38,

342 8, 342 2,
340 33, 34: 0,
354 0, 353 5,
333 34, 332 58,
337 57, 337 38,
33: 5, 339 6,
384 8, 384 52,
385 8, 385 52,
38: 55, 389 57,
368 50, 368 36,
324 7, 325 3,
325 54, 328 56,
328 52, 328 50,
328 5:, 322 57,
322 5:, 320 57,
30: 7, 373 35,
373 36, 378 8,
378 55, 378 52,
376 54, 3:4 5,
3:0 53, 3:0 56,
3:: 53, 3:9 55,
3:9 5:, 3:9 33,
394 5, 394 38,
393 5, 393 8,
393 0, 393 53,
848 7, 830 3,
83: 5:, 839 34,
884 36, 885 6,
885 34, 880 5,
880 2, 880 :,
863 58, 863 56,
863 50, 824 54,
803 57, 808 52,
807 7, 874 :,
874 54, 874 53,
874 57, 870 38,
8:6 6, 8:6 33,
8:2 53, 8:2 34,
8:0 9, 8:7 53,
8:7 52, 8:: 5,
8:: 6, 8:: 0,
894 :, 893 2,
893 50, 897 33,
899 57
**seeing**
337 5, 337 2,
337 9, 337 54,
337 53, 337 56,

337 52, 33: :,
33: 34, 339 3,
384 33, 323 9,
373 59, 3:3 9,
854 7, 854 56,
8:2 52, 892 6
**seem**
59: 52
**seemed**
84: 58, 834 6
**seems**
849 36, 864 59,
867 2, 869 52,
8:7 6
**seen**
5:9 :, 597 34,
59: 35, 346 38,
340 54, 347 6,
34: 36, 349 54,
3:3 6, 3:3 57,
3:: 56, 847 5,
86: 35, 8:6 5,
894 0, 892 3
**sell**
386 35, 382 7
**send**
397 3
**sending**
367 38, 36: 8,
369 3, 369 6
**sense**
349 50
**sensitive**
366 59
**sent**
592 58, 36: 0,
369 0, 369 :,
390 3
**sentence**
86: 6, 807 59,
874 53
**separated**
825 34
**september**
826 56
**series**
879 33
**sessions**
384 55, 384 36

**set**
5:6 38, 592 57,
332 0, 332 56,
332 52, 332 33,
642 0
**several**
34: 53, 868 5:,
828 5
**severe**
343 6
**shake**
835 35
**share**
332 5:
**sheet**
643 58, 648 5
**shift**
380 5:, 380 59,
380 35
**shoes**
398 7, 398 9,
398 52, 398 57,
398 59, 398 35,
396 6, 847 3
**shorthand**
5:4 30, 642 5,
642 8, 642 53
**shortly**
395 52
**should**
355 36, 332 6,
32: 50, 3:4 35,
3:4 33, 3:5 8,
3:5 7, 846 50,
860 38
**show**
8:3 58, 8:3 34,
8:6 52, 8:9 52,
898 5, 896 8,
896 57
**showed**
854 50, 876 5
**shower**
599 9, 599 55,
599 57
**showers**
87: 53, 87: 52
**showing**
5:2 0, 893 33,

CCSAO COI SUBPOENAS 000321

Transcript of Gabriel Solache, Volume 2
Conducted on December 8, 2021

90

898 55
**shown**
854 3, 837 9
**si**
348 59, 333 35,
874 55
**siblings**
598 8, 598 0
**sick**
823 36, 828 3,
828 54
**side**
307 :, 847 55,
847 50, 847 36,
84: 2, 84: 53,
84: 57, 856 6,
856 2, 850 54,
850 53, 8:4 9,
8:7 58
**sight**
365 7
**sign**
800 6, 800 58,
8:7 35, 8:7 38,
8:: 3, 8:: 6,
8:: 0
**signature**
5:9 58, 5:9 52,
333 59, 336 6,
806 3, 80: 57,
8:7 53, 8:7 52,
8:: :, 890 5:,
890 59
**signature-llc0g**
642 38
**signature__date_-**
___
646 33
**signatures**
8:2 53, 8:2 57
**signed**
5:9 59, 333 36,
338 53, 800 5,
800 50, 800 57,
807 5
**signing**
80: :, 80: 33,
642 57

**similar**
859 34, 835 2,
8:4 33, 8:4 36,
8:5 3, 8:0 56
**simply**
300 36, 867 36,
828 54, 80: 7
**since**
597 57, 345 7,
340 58, 340 56,
347 2, 349 6,
357 5:, 35: 8,
337 54, 384 58,
365 59, 365 34,
805 3, 800 50,
800 5:, 807 5,
872 9
**single**
37: :
**sir**
330 50, 330 57
**sister**
827 53, 827 58
**sit**
59: 36, 379 3,
863 2, 825 35,
875 8, 896 53
**sitting**
372 :, 398 56,
398 57, 84: 57,
883 34
**six**
595 8, 595 55
**slap**
847 54, 847 53,
853 36, 858 59,
858 36, 856 7
**slapped**
853 58, 853 56,
853 33, 853 38,
858 8, 858 0,
858 54, 858 55,
858 58, 858 52,
856 8, 889 56
**slapping**
847 9, 889 :
**slaps**
854 59

**sleep**
350 5:, 350 38,
357 6
**sleeping**
350 50, 350 34,
382 36
**small**
324 57, 37: 36,
379 5, 399 36,
845 2, 845 7,
848 :, 848 52,
846 3, 842 53,
837 2, 837 9,
837 53, 837 52,
837 57
**social**
897 35, 89: 59,
89: 35, 899 :,
899 58, 644 5
**society**
354 :, 354 55,
354 52, 354 5:,
355 0, 355 9
**solache**
5:4 6, 5:4 57,
5:6 8, 5:6 32,
5:0 0, 5:0 7,
5:0 59, 5:7 5:,
5:: 2, 5:: 54,
5:: 50, 5:: 36,
5:9 :, 59: 9,
335 36, 333 6,
333 7, 333 53,
338 55, 336 50,
383 54, 366 33,
362 54, 362 5:,
360 53, 375 3,
376 50, 376 35,
376 36, 843 50,
843 35, 843 36,
862 8, 862 7,
86: 59, 824 52,
808 9, 808 58,
808 34, 807 0,
807 9, 879 35,
8:: 50, 8:: 59,
8:: 38, 893 35,
898 5, 898 55,

896 57, 896 33,
644 5:, 643 8,
643 36, 646 38
**solache's**
5:6 57, 5:6 34,
332 2, 332 35,
362 33, 820 7,
820 52
**solution**
385 38
**some**
594 5, 592 35,
344 36, 345 3,
345 6, 347 53,
34: 8, 34: 58,
356 3, 356 6,
357 55, 357 53,
333 56, 336 0,
385 33, 383 54,
382 6, 38: 38,
364 52, 364 38,
360 58, 306 38,
309 50, 373 9,
373 59, 3:4 55,
394 :, 394 52,
394 59, 396 35,
392 35, 397 0,
834 3, 830 52,
830 34, 830 33,
839 52, 883 9,
886 34, 88: 58,
863 57, 823 35,
827 2, 827 59,
800 7, 877 0,
8:4 58, 8:9 6,
89: 8
**somebody**
597 36, 384 7,
379 58, 393 59,
396 :, 840 9,
850 5, 88: :,
869 3, 829 5,
808 5
**somehow**
360 33, 378 5:,
879 :
**something**
592 2, 342 33,

CCSAO COI SUBPOENAS 000322

353 5, 334 0,
335 33, 388 9,
366 56, 36: 6,
323 8, 328 38,
328 36, 32: 6,
308 7, 3:5 52,
3:5 5:, 3:6 33,
858 :, 850 5,
85: 54, 837 5:,
884 35, 883 54,
886 55, 876 7,
8:7 5, 890 55

**sometimes**
598 57, 357 54,
382 53, 827 9

**son**
330 9

**soon**
388 57, 388 38

**sorry**
594 54, 592 3,
344 7, 343 52,
358 5, 338 6,
385 :, 388 6,
362 55, 360 38,
369 38, 374 5,
375 57, 394 53,
856 3, 832 8,
839 3, 86: 54,
869 0, 820 54,
802 6, 872 33,
8:7 54, 895 :

**sotos**
5:3 0

**sought**
339 38

**sound**
834 52

**source**
35: 35

**south**
5:3 34

**space**
302 0

**spanish**
363 36, 326 :,
320 34, 308 5:,
308 38, 306 3,

374 58, 374 57,
374 5:, 375 7,
375 :, 375 59,
378 36, 376 :,
3:8 9, 3:8 50,
3:: 35, 396 36,
390 8, 390 59,
39: 50, 846 58,
88: 6, 88: 0,
802 57, 802 34,
80: 5, 80: 56,
87: 58, 898 5:,
892 54

**spanish-speaking**
306 5:, 302 54,
300 53, 30: 53,
309 8, 309 56

**spanish:**
348 59, 333 35,
874 55

**speak**
389 59, 305 53,
305 52, 309 6,
374 :, 374 50,
374 5:, 372 56,
379 58, 3:4 57,
3:: 35, 395 3,
396 57, 392 0,
392 55, 390 5:,
833 50, 88: 2,
863 8, 8:2 2

**speaking**
30: 59, 376 :,
37: 52, 396 38,
845 6, 830 2,
830 7, 802 57,
802 34, 80: 3,
8:9 50

**speaks**
326 :, 320 34,
375 59, 378 36,
3:8 9, 39: 50,
846 58, 80: 56,
87: 58, 8:0 0,
8:0 59, 8:7 3,
8:: 54, 898 5:,
892 54, 645 7

**specific**
365 0, 3:2 34,

845 55, 836 54,
830 56, 837 58

**specifically**
838 2, 836 7

**spelled**
824 54

**spend**
363 5, 852 36

**spent**
822 50

**spoke**
308 5:, 308 33,
306 5, 374 58,
375 :, 379 50,
394 9, 394 50,
390 59, 804 33,
872 0

**spoken**
357 0, 840 8,
872 9

**springfield**
802 33

**st**
304 55

**stabbed**
856 57, 856 59

**staffing**
890 53, 890 52

**standing**
379 6, 395 7,
398 57, 398 59

**starr**
5:3 83, 5:0 34,
5:7 34, 32: 5:,
329 34, 308 3,
308 54, 884 54,
884 50, 884 36,
885 0, 883 7,
860 3, 860 57,
878 3, 878 55,
878 35, 876 56,
872 3, 895 3,
895 7, 895 5:,
895 36, 893 59,
898 9

**start**
590 3, 590 38,
344 6, 344 :,

345 36, 349 0,
383 52, 858 35,
838 5, 802 55,
800 38

**started**
590 2, 337 55,
387 5, 30: 2,
390 33, 842 57,
842 35, 847 7,
847 9, 850 6,
850 5:, 857 8,
833 55, 833 38,
833 36

**starting**
389 38

**starts**
590 38

**state**
5:0 57, 594 56,
599 36, 343 58,
347 7, 34: 52,
349 52, 354 3,
358 :, 358 58,
356 55, 352 :,
350 52, 339 35,
385 5, 385 6,
385 57, 643 35,
642 6

**statement**
88: 52, 80: 3

**states**
5:4 5, 5:0 :,
594 59, 594 38,
347 8, 334 35,
867 9, 867 58,
867 59, 828 56,
828 50, 828 59,
828 33, 826 6,
826 9, 826 58,
829 9, 804 50,
807 9

**stateville**
879 55

**stay**
595 56, 373 53,
3:4 6, 396 0,
390 :, 844 53,
854 35, 837 57,

CCSAO COI SUBPOENAS 000323

Transcript of Gabriel Solache, Volume 2
Conducted on December 8, 2021

92

**stayed**
885 38, 86: 0
396 2, 823 3,
823 9, 823 53,
823 50
**stephenson**
5:8 7, 5:7 2,
5:: 3
**still**
598 58, 590 8,
597 3, 346 56,
34: 35, 339 36,
388 5:, 370 56,
394 7, 889 52,
889 5:, 820 8,
805 0, 805 52,
643 56
**stipulate**
5:7 53
**stipulated**
5:7 59, 5:7 35,
5:7 38, 5:: 5,
5:: 8, 5:: 6
**stipulates**
5:7 34
**stomach**
346 5:, 3:3 56,
850 2, 850 5:,
850 33, 857 8,
857 0, 857 52,
857 57
**stop**
352 0, 337 56,
339 3, 363 2
**stopped**
346 55, 337 2,
337 9, 337 54,
337 52, 33: 34,
339 6, 373 59,
390 5, 845 8,
840 57, 85: 5,
85: 3, 830 50,
830 5:, 830 33,
837 3
**store**
35: 54, 35: 55,
35: 58, 35: 50,
359 3, 359 2,

359 9, 359 52,
359 38, 334 50,
386 58, 386 57,
386 35, 382 2
**strange**
3:5 55, 3:5 34,
3:5 35
**street**
5:5 59, 5:5 85,
5:3 86, 5:8 :,
307 50, 309 5:,
3:2 :, 3:2 50,
3:2 59, 3:2 38,
3:0 35, 3:7 6
**stress**
358 9, 358 56
**stressed**
339 7
**stresses**
339 2
**strike**
378 3, 377 0,
844 50, 847 52
**stumbling**
80: 9
**subject**
862 34, 862 36
**submitted**
808 59
**subscribed**
642 59
**subsequent**
383 6
**subway**
337 5:, 337 59,
337 38, 33: 2
**subways**
337 34
**suddenly**
322 5:
**suffer**
598 56, 598 52,
343 52, 346 56
**suffered**
346 3
**sugar**
340 6
**suite**
5:5 34, 5:5 83,

5:3 54, 5:3 35,
5:8 9
**suits**
309 59, 309 34
**summary**
873 57
**summer**
389 38
**supervisor**
82: 7
**supervisors**
807 50, 809 59
**supplemental**
5:6 35, 332 2,
332 :, 332 35,
337 8
**supplemented**
384 56
**supply**
382 2
**support**
807 57, 809 3,
809 54, 809 59
**supposedly**
3:8 6
**suppress**
88: 56
**sure**
592 6, 592 7,
358 53, 383 7,
38: 3, 362 56,
360 8, 320 54,
309 59, 309 38,
372 38, 3:0 :,
3:7 9, 845 53,
848 59, 855 0,
855 7, 834 2,
833 7, 832 7,
830 52, 839 2,
885 5, 864 59,
865 34, 862 5,
869 :, 824 33,
823 0, 820 53,
873 9, 870 58,
8:4 38, 8:: 58
**surprised**
368 50, 368 35,
3:6 56, 3:6 57,

885 6, 885 9
**susan**
869 5, 869 55
**suspected**
367 52
**suspicions**
360 59, 360 35,
367 0
**suspicious**
366 8, 366 0,
360 56, 369 57,
324 58, 3:5 38
**sustained**
594 :
**swaminathan**
5:3 85
**swearing**
5:7 53
**swelling**
84: 38
**swimming**
829 35, 829 38,
804 5
**symptom**
598 59
**symptoms**
343 50, 346 53

**T**

**take**
5:: 34, 5:: 38,
594 3, 595 3,
346 57, 342 33,
340 5, 359 57,
359 59, 334 55,
335 34, 335 35,
333 7, 333 53,
338 55, 33: 2,
387 53, 366 36,
32: 5, 303 :,
308 9, 373 7,
372 35, 399 59,
843 56, 832 3,
832 6, 832 0,
886 36, 866 36,
86: :, 86: 53,
86: 57, 869 34,
826 0, 826 55,

CCSAO COI SUBPOENAS 000324

Transcript of Gabriel Solache, Volume 2
Conducted on December 8, 2021                                                      93

808 6, 808 9,
879 50, 879 38,
8:4 53, 8:4 57,
8:5 55, 8:: 53,
8:: 36, 895 9,
893 :, 898 38,
892 35, 890 8
**taken**
5:0 56, 849 3,
849 0, 849 55,
854 3, 854 :,
854 55, 854 52,
837 35, 837 33,
837 38, 83: 3,
839 :, 839 53,
883 8, 883 6,
883 2, 883 53,
883 56, 883 50,
883 35, 883 36,
888 3, 888 :,
886 33, 886 38,
882 3, 882 0,
870 5:, 8:5 34,
8:8 34, 8:8 38,
8:6 34, 8:7 7,
643 9, 642 0
**takes**
325 8
**taking**
599 0, 599 9,
346 55, 33: 0,
323 56, 320 52,
327 8
**talk**
357 52, 330 0,
383 36, 388 8,
388 6, 388 7,
308 59, 308 38,
306 3, 306 2,
306 7, 30: 58,
309 9, 3:7 55,
39: 35, 83: 38,
839 7, 884 5,
884 6, 884 7,
803 56, 870 36
**talked**
399 :, 399 50,
848 52, 848 36,

842 34, 840 :,
83: 2, 83: 56,
839 5, 839 9,
804 58, 873 56
**talking**
597 :, 340 58,
349 6, 386 38,
380 57, 389 34,
389 38, 363 3,
369 34, 326 59,
322 3, 322 6,
320 0, 320 9,
37: 9, 37: 55,
3:9 56, 398 0,
84: 0, 835 5,
833 55, 83: 52,
839 8, 864 35,
806 5:, 895 6
**tape**
335 34
**tardy**
8:2 8
**taxes**
334 53
**tech**
336 33
**technical**
642 54
**technician**
336 35, 332 3,
332 :, 332 58,
332 5:, 332 34,
330 53, 330 50
**teenager**
339 53, 339 57
**teenagers**
804 2
**telephone**
5:2 7, 864 34,
863 9, 893 57
**tell**
594 50, 595 50,
598 53, 598 50,
599 6, 343 50,
34: 5:, 349 59,
354 6, 355 38,
358 54, 358 52,
356 58, 356 34,

352 38, 350 6,
350 56, 350 50,
338 53, 364 59,
366 9, 367 56,
378 6, 370 50,
379 58, 3:6 38,
3:6 36, 3:0 5:,
397 :, 397 54,
397 56, 397 59,
39: 53, 39: 34,
399 3, 846 2,
847 0, 839 58,
888 0, 88: 54,
889 3, 865 :,
863 :, 863 57,
863 35, 822 6,
875 0, 872 36,
87: 7, 8:0 54,
8:0 5:, 8:0 33,
897 56
**telling**
836 8, 866 50,
826 35
**temporary**
890 58, 89: 58
**ten**
590 0, 825 57,
825 38
**ten-hour**
380 5:
**tequila**
382 :
**term**
807 36
**terms**
374 33
**test**
340 8, 876 5
**testified**
849 33, 854 5,
854 0, 855 2,
855 53, 88: 5:,
88: 35, 868 0,
868 55, 868 58,
868 5:, 809 38,
874 58, 874 34,
875 3, 875 56,
875 5:, 873 :,

873 57
**testify**
848 55, 834 33,
866 5, 867 9,
867 58, 86: 8,
86: 0, 807 57,
809 59, 809 38,
874 34
**testifying**
369 50, 369 36,
88: 36, 642 :
**testimony**
5:7 56, 5:: 0,
33: 38, 385 7,
374 33
**th**
332 53, 386 9,
38: 34, 86: 34,
869 33, 826 56,
642 33
**thank**
5:: 55, 330 50,
330 57, 368 :,
366 33, 895 7
**thanks**
330 5:
**themselves**
5:0 57, 8:2 2
**therapist**
598 36, 596 57,
596 35, 592 8
**therapy**
820 3
**thereafter**
642 58
**thing**
386 57, 305 33,
307 3, 307 2,
85: 56, 893 3
**things**
838 6, 838 9,
830 58
**think**
5:7 54, 593 7,
592 6, 355 53,
338 2, 33: 6,
386 53, 386 50,
387 33, 363 59,

CCSAO COI SUBPOENAS 000325

Transcript of Gabriel Solache, Volume 2
Conducted on December 8, 2021

94

368 54, 362 34,
324 5:, 325 6,
325 54, 323 3,
323 38, 328 8,
304 54, 304 33,
375 53, 3:5 55,
3:5 58, 3:5 52,
3:5 57, 3:3 33,
39: 56, 846 50,
855 0, 855 :,
859 33, 834 3,
885 54, 885 55,
88: 2, 82: 33,
808 34, 874 6,
894 58, 895 8,
896 9, 890 9,
897 33

**thinking**
366 54

**thinks**
822 8

**third**
808 5:, 896 3

**thisday**
643 5:

**thomas**
5:5 39, 5:8 8

**thomas@ilesq**
5:5 82

**thought**
366 53, 325 34

**three**
384 54, 38: 58,
303 55, 377 36,
37: 33, 379 50,
3:4 53, 3:4 50,
835 55, 833 9,
803 34, 877 59,
894 53, 894 34

**through**
5:9 5, 385 34,
383 0, 827 0,
803 38, 8:9 7,
895 58

**throughout**
593 33, 360 6

**thumb**
5:9 5

**timeframe**
382 50, 854 52

**times**
596 34, 596 33,
596 38, 590 55,
597 50, 597 59,
847 52, 849 35,
849 36, 850 35,
850 36, 857 5,
865 56, 827 9,
82: 38

**tired**
644 52

**today**
5:0 58, 599 5,
34: 33, 365 50,
369 57, 324 5,
855 2, 839 54,
889 59, 863 2,
825 35, 807 5,
875 8, 875 56,
873 :, 873 52,
8:6 3, 8:2 50,
896 53

**today's**
5:0 55, 644 5:

**together**
300 50, 37: 34,
834 8

**toilet**
87: 5:

**told**
599 35, 344 54,
343 36, 347 56,
347 57, 34: 6,
34: 7, 364 38,
365 52, 363 59,
368 54, 369 57,
324 55, 374 6,
375 3, 375 8,
375 2, 373 8,
373 9, 373 58,
373 50, 3:3 6,
3:3 34, 3:6 2,
3:6 58, 3:6 59,
3:7 5, 3:7 54,
3:7 55, 3:7 53,
396 35, 397 2,

397 55, 397 5:,
39: :, 399 6,
844 33, 848 5,
848 :, 848 59,
846 7, 846 :,
846 5:, 842 5:,
840 3, 840 57,
847 8, 853 5:,
853 35, 858 5:,
856 54, 852 3,
836 36, 887 8,
889 8, 863 36,
86: 3, 822 2,
822 59, 803 34,
800 58

**tom**
5:7 8, 5:7 36

**tone**
326 33

**tongue**
645 58

**took**
323 58, 300 0,
3:3 8, 3:3 9,
398 7, 398 9,
398 58, 398 56,
398 57, 398 5:,
398 34, 396 8,
396 53, 397 53,
397 57, 399 36,
848 5, 848 :,
840 2, 847 3,
847 8, 852 55,
852 5:, 85: 59,
85: 35, 859 54,
859 56, 859 35,
835 6, 837 9,
837 50, 83: 35,
83: 36, 888 6,
82: 34, 873 33

**top**
824 55, 874 7,
8:5 50, 8:9 54,
894 58, 897 59

**topic**
388 53

**touch**
828 9

**town**
342 56, 827 34

**toyota**
356 :

**trade**
334 50, 334 5:

**traffic**
33: 8, 33: 54

**transcribed**
642 58

**transcript**
5:8 33, 5:7 50,
643 9, 642 53

**transferred**
392 36, 877 57

**translate**
353 8, 335 50,
368 0, 366 35,
390 6, 39: 5:,
645 54

**translated**
336 34, 846 57

**translates**
3:7 0, 3:7 7,
875 55

**translation**
353 35, 386 52,
363 36, 366 34,
362 34, 360 2,
375 5:, 390 2

**translations**
360 8

**translator**
884 59, 884 35

**transportation**
323 36

**transported**
883 9

**travel**
337 50

**treading**
806 53, 806 50

**treated**
87: 2

**treatment**
590 :, 343 0,
357 53, 357 50,
357 57, 336 :,

CCSAO COI SUBPOENAS 000326

Transcript of Gabriel Solache, Volume 2
Conducted on December 8, 2021

95

336 55, 330 38,
339 33, 384 5:,
384 33, 384 36
**trevino**
5:8 5:, 5:: 53,
333 54, 362 0,
846 33, 85: 53,
8:: 35
**trial**
369 53, 868 8,
868 6, 868 0,
868 53, 868 56,
866 34, 862 58,
896 9, 896 58,
896 52, 896 50
**tried**
3:8 57, 828 36
**trouble**
354 34, 383 3
**troubles**
385 2, 385 57
**truck**
883 53
**true**
5:7 56, 5:: 0,
852 8, 828 8,
643 55
**trust**
349 57, 354 8
**trusting**
354 38
**truth**
592 53, 30: 55,
39: 53, 39: 35,
86: 2
**truthfully**
838 38
**try**
5:: 5:, 385 54
**trying**
593 56, 598 3,
884 5:, 884 38,
822 54
**turn**
874 0, 89: 57
**turundeo**
824 7, 824 :,
827 34

**two**
594 57, 595 56,
35: 56, 33: 9,
372 7, 377 33,
379 36, 398 3,
398 36, 390 50,
397 57, 845 8,
847 5, 849 36,
884 5, 882 56,
887 3, 887 6,
88: 7, 866 38,
825 58, 82: 33,
8:2 34, 8:2 36,
8:0 8
**two-year**
595 57
**type**
593 5, 346 34,
342 59, 355 53,
356 7, 350 7,
33: 57, 383 34,
386 54, 382 6,
839 52, 869 5:,
89: 55
**typically**
380 7

---
**U**
---
**uh-huh**
35: 0, 82: 3,
8:9 2, 892 56
**ultrasound**
3:3 2, 3:3 9,
3:3 58, 3:3 52,
3:3 5:, 873 33,
873 38
**una**
353 38
**unable**
594 35
**uncle**
378 34, 376 8
**under**
5:7 56, 5:: 0,
643 2, 643 :,
643 52, 642 :,
642 58
**understand**
358 55, 3:7 9,

390 38, 848 57,
833 58, 833 59,
88: 38, 826 :,
80: 34
**understanding**
354 34, 325 56,
836 33, 880 36,
643 56
**understood**
332 34, 330 53,
390 38, 390 36,
645 5:
**undocumented**
899 7, 899 55,
899 34
**unfortunately**
330 :
**united**
5:4 5, 5:0 :,
594 59, 594 38,
347 3, 334 35,
867 9, 867 58,
867 59, 828 56,
828 50, 828 5:,
829 :, 804 50
**until**
387 2, 377 57,
37: 58, 37: 50,
3:7 0, 840 35,
840 36, 852 58,
852 5:, 859 5:,
823 50
**upstairs**
320 56
**use**
335 52, 335 33,
362 35, 844 9,
859 3, 87: 57
**using**
326 33, 864 34,
642 53

---
**V**
---
**valadez**
357 58, 357 57,
336 55, 337 5,
337 2, 337 56,
337 38, 33: 3,

33: 58, 33: 5:,
33: 34, 339 8
**valadez's**
33: 7
**valerie**
5:3 88
**van**
389 35, 364 6,
364 9, 364 56,
364 57, 364 35,
365 :, 365 33,
363 8, 883 54,
883 53, 808 5
**varga**
5:8 6, 5:7 0
**various**
834 38
**vehicle**
888 6, 888 :
**verbatim**
642 9
**verification**
5:6 5:, 5:9 53
**verified**
5:7 5:
**verifying**
3:4 9
**versus**
5:0 7
**via**
5:4 5:, 337 38
**video**
5:0 0, 5:0 53,
5:0 56, 362 35,
8:: 52
**videoconference**
5:4 5:, 642 2
**videographer**
5:8 57, 5:0 2,
5:0 58, 59: 8,
59: 0, 335 38,
333 8, 362 8,
362 7, 376 52,
376 34, 843 52,
843 34, 832 :,
832 55, 862 3,
862 0, 8:: 56,
8:: 5:, 644 57

CCSAO COI SUBPOENAS 000327

Transcript of Gabriel Solache, Volume 2
Conducted on December 8, 2021

videotaped
5:4 50
vigilance
349 57
vigilant
349 35
villita
89: 36
viola
367 56, 367 33,
324 :, 324 9,
324 53, 3:0 5:,
3:0 36, 887 0,
869 6, 806 34,
80: 36, 809 9,
809 5:
vision
820 :, 820 50,
820 5:, 820 34
visit
804 36
visited
827 5, 827 8,
827 2, 827 :
visits
592 57
voice
5:0 50, 326 38
voices
327 53
volume
5:4 52
vs
5:4 :

**W**

wacker
5:3 34
wait
385 54, 306 57,
3:7 2
waited
300 55
waiting
387 58, 387 33,
387 36, 38: 6,
389 2, 363 2,
363 9, 306 38,

302 54, 300 50
waived
324 7
wake
350 33, 357 5
walk
820 3
walked
843 55, 843 58,
846 7, 842 7,
842 54, 842 56,
840 33, 847 5,
858 2, 852 34,
833 0, 836 59
wall
3:7 35, 3:7 36,
3:: 5, 845 59,
843 2, 84: 35,
888 53, 888 36,
886 6, 886 7
wallet
893 5, 893 0
want
595 2, 353 0,
350 38, 322 7,
320 2, 32: 5,
300 35, 309 0,
3:7 2, 3:7 9,
392 35, 390 55,
867 5:, 867 34,
867 33, 867 36,
86: 2, 824 54,
825 2, 875 58,
893 59, 893 34,
897 2, 644 53
wanted
385 33, 322 0,
320 6, 374 55,
868 36, 826 52
wanting
322 9
watch
37: 3, 399 57
watches
325 8
watching
325 53, 325 52,
325 50, 325 59,

325 33
water
334 8, 334 38
wave
835 38
way
5:7 57, 358 35,
335 6, 337 33,
33: 55, 383 52,
365 5, 308 5,
3:3 3, 396 5,
84: 8, 833 8,
803 33, 80: 0,
875 3, 870 5,
87: 6, 8:5 59,
896 58
we'll
357 52
we're
5:: 5:, 597 38,
59: 5, 335 50,
332 59, 383 :,
383 9, 362 8,
360 5, 360 9,
842 2, 835 5,
806 53, 806 50,
870 6, 895 2
we've
360 6, 83: 6,
839 5, 839 9,
86: 5:, 879 35,
896 33
wearing
348 52, 309 5:,
309 59, 309 34,
8:8 53, 8:6 50
wednesday
5:4 35, 5:0 5
week
380 6, 368 36,
849 56, 892 52
weeks
36: 5:
wehrle
5:8 6, 5:7 7
went
594 59, 594 38,
598 38, 596 57,

596 38, 596 36,
590 54, 590 55,
343 38, 342 2,
34: 0, 384 54,
382 53, 326 57,
320 3, 329 5:,
306 33, 30: 9,
373 33, 378 56,
377 7, 3:8 8,
844 5, 849 7,
854 6, 854 9,
854 53, 880 35,
866 34, 862 53,
823 8, 823 54,
828 56, 803 59,
8:8 55
weren't
836 3, 82: 59
west
5:3 9
westin
5:0 52
whatever
346 5, 888 8
whereof
642 5:
whether
355 50, 353 5:,
380 9, 364 59,
369 53, 379 52,
3:6 0, 398 50,
860 38, 825 33,
828 59, 805 2,
8:4 38, 8:8 53,
8:2 6, 8:0 54,
8:0 58
white
848 3
whole
83: 50, 805 :,
80: 54
willing
375 38
wine
382 :
wishes
330 53
withdraw
394 58, 858 35

CCSAO COI SUBPOENAS 000328

**within**
597 56, 345 5,
892 52
**without**
350 9, 858 0,
806 5:, 870 0,
870 55
**witness**
5:6 8, 5:7 58,
5:7 57, 5:: :,
592 53, 599 9,
348 53, 340 50,
349 :, 358 8,
335 7, 336 34,
33: 36, 384 38,
385 59, 386 50,
368 0, 366 36,
326 :, 326 9,
326 56, 320 34,
32: 9, 374 6,
375 59, 375 34,
378 36, 376 5,
370 38, 3:8 :,
3:8 9, 3:6 6,
3:7 58, 3:7 36,
395 59, 39: 50,
39: 59, 399 52,
844 2, 846 58,
846 56, 84: 9,
856 8, 885 7,
864 7, 864 58,
868 50, 866 53,
866 57, 860 2,
82: 7, 82: 55,
82: 56, 829 3,
804 5:, 802 57,
802 34, 802 35,
800 59, 80: 56,
80: 52, 809 5,
809 54, 874 9,
878 58, 876 50,
87: 55, 87: 58,
87: 56, 8:6 9,
8:7 6, 8:: 53,
895 34, 893 5,
893 53, 898 2,
898 5:, 898 59,
892 54, 892 55,

89: 9, 644 58,
645 7, 645 58,
645 50, 645 5:,
642 7, 642 5:
**witnesses**
868 35, 827 55,
827 52, 827 59
**woken**
382 36
**woman**
320 59, 835 5,
822 6
**women**
352 54, 352 56,
352 35, 350 3,
350 54, 350 58
**word**
596 5, 353 35,
335 58, 335 57,
366 33, 309 55,
37: 2, 857 35,
859 3, 80: 9
**words**
352 5:, 392 53,
392 58, 855 3,
855 53, 80: 35
**work**
352 0, 386 7,
380 7, 387 8,
38: 36, 389 54,
389 36, 367 :,
367 35, 36: 5,
369 58, 324 7,
323 34, 323 35,
328 3, 328 0,
328 :, 328 57,
392 35, 390 53,
803 7, 803 55,
803 50, 803 38,
807 57, 809 59,
890 53, 890 58,
899 53, 899 56,
644 :
**worked**
386 6, 386 9,
386 55, 382 55,
382 52, 380 54,
380 58, 380 52,

380 34, 380 33,
387 :, 387 57,
364 54, 364 55,
365 6, 36: 52,
36: 5:, 36: 33,
369 5, 369 6,
323 50, 323 57,
39: 2, 869 3,
803 58, 644 2
**working**
352 0, 38: 0,
365 55, 365 58,
365 57, 36: 36,
390 5, 397 58,
397 5:, 397 34,
39: 9, 826 2,
826 54, 82: 59,
803 :
**works**
340 34
**worries**
388 2, 885 3
**worse**
33: 6, 879 8,
879 54
**wouldn't**
595 52
**write**
5:9 33, 844 :
**writing**
844 54, 834 6,
832 34, 832 35,
832 38, 830 5,
830 8, 890 38,
897 5, 897 8
**written**
338 0, 336 8,
869 35, 80: 35
**wrong**
375 5:

**Y**

**yeah**
598 58, 340 56,
354 2, 354 7,
358 59, 33: 53,
382 53, 387 2,
387 34, 389 34,

324 3, 323 33,
320 5, 320 3,
329 :, 307 53,
30: 8, 392 :,
856 3, 834 57,
832 2, 837 8,
888 56, 866 56,
869 5:, 82: 33,
804 5, 808 33,
808 38, 892 55,
890 56, 89: 3,
899 54, 644 50
**year**
599 2, 356 9
**yearly**
359 0, 359 54
**years**
594 57, 595 6,
595 55, 595 56,
593 57, 590 0,
35: 56, 365 34,
3:0 57, 825 57,
823 59, 823 38,
828 5, 876 7,
898 53
**yesterday**
35: 5:, 35: 38
**younger**
804 0, 804 9,
804 55, 804 53
**youngest**
825 58
**yourself**
334 9, 3:7 50,
3:: 0, 3:: 54,
393 5, 393 57,
888 57, 868 53,
826 54, 826 55,
806 0, 8:6 53

**Z**

**zehner**
5:5 5:
**zenaida**
827 38
**zone**
334 36
**zoom**
332 59, 822 55

CCSAO COI SUBPOENAS 000329

```
                  .          362 :,  882 0,      |  2  |          28
.0070                        882 :,  880 :,      2                843 33
5:5 9                        880 54,  869 58,    357 3,  843 33,  29
.0090                        825 9               807 58           5:6 54,  892 33,
5:3 38                       11305               20               892 36,  890 6
.1001                        642 32              342 2,  342 :,   |  3  |
5:5 33                       1180                340 0,  340 54,  3
.188                         5:5 7               34: 9,  876 7,   357 3,  832 9,
5:6 6                        12                  898 53,  645 54, 832 53,  862 6,
.3000                        387 2,  376 57,     642 33           807 52
5:8 55                       376 33,  823 5:,    200              30
.3300                        644 59,  644 34     305 38           387 5,  387 3,
5:3 53                       120                 2000             387 2,  390 54
.3705                        5:5 85              5:5 83,  5:6 30, 311
5:5 86                       1240                86: 34           5:3 34,  5:3 86
.5900                        5:3 54              2006             312.243
5:3 87                       141                 392 5:           5:3 87
   |  0  |                    5:3 9              2018             312.494
0/8/21                       15                  5:9 50,  5:9 34, 5:5 33
338 56                       832 53              336 53,  336 5:, 312.704
00                           151                 336 59,  330 36  5:8 55
357 3,  387 5,               5:8 :               2020             312.982
387 3,  387 2,               16                  332 54,  337 0,  5:3 38
363 57,  368 8,              376 57,  824 8      337 55,  384 6   321
368 0,  368 7                17                  2021             5:5 59
0040449                      5:6 30,  843 57,    5:4 35,  5:0 5,  33
897 9                        86: 34,  869 33,    5:0 55,  333 59, 59: 6
05                           869 36,  824 5,     333 36,  338 5:, 342
862 :                        826 56              643 5:,  642 33  897 33
07                           18                  21               3425
5:4 33                       5:4 :,  5:0 54,     642 33           897 38
08                           356 54,  362 6,     2200             348
5:0 53,  832 9               822 50              5:5 34           5:6 32
   |  1  |                    189                222               35
1                            5:6 57              5:6 34           372 36
5:4 :,  5:0 54,              1971                2312             36
843 57,  807 55              869 33,  824 5,     5:4 :,  5:0 54   333 2
10                           824 6               24               363
333 5,  333 2,               1995                333 5,  8:: 50   5:6 58
380 52                       826 56              25               379
100                          1997                372 36           5:6 3:
305 38                       343 5,  822 52,     2500             38
11                           820 33              5:8 9            59: 7
332 54,  332 53,             1998                26               380
380 52,  362 6,              594 33,  383 55,    5:9 50,  5:9 59  5:6 39
                             365 38,  3:0 9,     27               381
                             392 2,  392 54,     362 :,  376 33   5:6 84
                             392 52,  8:9 57
```

CCSAO COI SUBPOENAS 000330

**389**
5:6 85
**391**
5:2 2
**392**
5:2 0
**393**
5:2 9
**394**
5:6 37
**396**
5:6 54
**3rd**
5:3 82

---
**4**
---
**4**
387 5, 387 3,
363 57, 368 8,
368 0, 368 7,
862 :, 807 5:
**40**
3:0 50, 3:0 57,
8:: 34
**449**
897 57, 897 59
**45**
5:6 58, 808 2,
808 0
**450**
897 53, 89: 8
**47**
386 9, 38: 34
**48**
862 6

---
**5**
---
**5**
332 56, 8:: 50,
8:: 34
**5-8**
336 36
**5200**
5:3 35
**54**
5:6 57, 5:: 36,
5:9 2
**56**
5:6 34, 333 :,

330 52
**57**
332 53
**58**
333 7, 336 38,
332 3, 332 57

---
**6**
---
**6**
644 59, 644 34
**60**
390 36
**60602**
5:5 88
**60604**
5:3 55
**60606**
5:3 33, 5:8 54
**60607**
5:3 80
**60642**
5:5 :
**60654**
5:5 35
**63**
304 54
**630.735**
5:3 53
**65**
5:6 32, 86: 9,
86: 58, 86: 56,
86: 5:

---
**7**
---
**74**
897 38
**77**
5:6 37, 896 5:,
896 59, 896 38
**773.235**
5:5 9

---
**8**
---
**82**
895 0
**866.786**
5:5 86
**88**
5:6 3:, 879 57,

879 5:, 879 33
**89**
5:6 39, 8:4 58,
8:4 56

---
**9**
---
**9**
5:4 33, 5:0 53,
59: 6, 59: 7
**90**
5:6 84, 8:5 7,
8:5 :, 8:5 53
**91**
5:6 85, 8:: 36,
8:9 5
**92**
5:2 2, 895 9,
895 54
**93**
5:2 0, 893 9,
893 54
**94**
5:2 9, 898 3,
898 8

CCSAO COI SUBPOENAS 000331



# Transcript of Gabriel Solache, Volume 3

**Date:** December 9, 2021
**Case:** Solache -v- City of Chicago, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
www.planetdepos.com

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

CCSAO COI SUBPOENAS 000332

Transcript of Gabriel Solache, Volume 3
Conducted on December 9, 2021

1 (to4 )2 to58

---

**406**

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

GABRIEL SOLACHE,

              Plaintiff,

   vs.             No. 1:18 Civ. 2312

CITY OF CHICAGO, et al.,

        Defendants.    Volume III

Volume III

VIDEOTAPED DEPOSITION OF

GABRIEL SOLACHE

Via Videoconference

DATE:    December 9, 2021

TIME:    10:35 A.M.

PLACE:   Los Cabos San Lucas, Mexico

REPORTED BY:  Ruben Garcia
               Certified Shorthand Reporter

---

**407**

A P P E A R A N C E S

ON BEHAL  O  THE PLAINTI  :
   (In Person)

   PEOPLE S LAW O  ICE
   BY: JAN SUSLER, ESQ.
    80 North Milwaukee Avenue
   Chicago, Illinois 60642
   773.235.0070
   jsusler@peopleslawoffice.com

ON BEHAL  O  THE DE ENDANT CITY O  CHICAGO:
   (In Person)

   ROCK,  USCO & CONNELLY, LLC
   BY: EILEEN ROSEN, ESQ.
    JESSICA ZEHNER, ESQ.
   32  North Clark Street
   Suite 2200
   Chicago, Illinois 60654
   3 2.494. 00
   erosen@rfclaw.com

ON BEHAL  O  THE DE ENDANTS REYNALDO GUEVARA:
   (Remotely)

   LEINENWEBER, BARONI & DA ADA
   BY: THOMAS LEINENWEBER, ESQ.
    MEGAN McGRATH
   20 North LaSalle Street
   Suite 2000
   Chicago, Illinois 60602
   866.786.3705

---

**408**

APPEARANCES (Cont d)

ON BEHAL  O  INDIVIDUAL OTHER DE ENDANTS:
   (In person)

   THE SOTOS LAW  IRM
   BY: JOSH ENGQUIST, ESQ.
    CAROLINE GOLDEN, ESQ.
   4  West Jackson Boulevard
   Suite  240A
   Chicago Illinoios 60604
   630.735.3300

OR BEHAL  O  DE ENDANT DAVID NAVARRO:
   (Remotely)

   REITER BURNS, ESQ.
   BY: DANIEL BURNS, ESQ.
   3   South Wacker Drive
   Suite 5200
   Chicago, Illinois 60606
   3 2.982.0090

OR BEHAL  O  ARTURO REYES:
   (Remotely)

   LOEVY & LOEVY
   BY: ANAND SWAMINATHAN, ESQ.
    SEAN STARR, ESQ.
    VALERIE BARRAJAS
   3   North Aberdeen Street
   3rd  loor
   Chicago, Illinois 60607
   3 2.243.5900

---

**409**

APPEARANCES (Cont d:)

ON BEHAL  O  THOMAS O MALLEY, HEATHER BRUALDI, ANDREW VARGA, KARIN WEHRLE:
   (Remotely)

   HINSHAW & CULBERSON
   BY: MICHAEL STEPHENSON, ESQ.
   5  North  ranklin Street
   Suite 2500
   Chicago, Illinois 60606
   3 2.704.3000
   mstephenson@hinshawlaw.com

ALSO PRESENT:

   Itcoatl Carrillo, Videographer

   Jose  onseca and Adriana Trevino, Interpreters

NOTE:  The original deposition transcript will be

delivered to:  ROCK,  USCO & CONNELLY, LLC

---

CCSAO COI SUBPOENAS 000333

---

**410**

INDEX

WITNESS: Gabriel Solache                    PAGE

Examination by Ms. Rosen ..........    4 3
Examination by Mr. Enquist ....... 445, 472
Examination by Mr. Stephenson .....    457
Examination by Mr. Burns ..........    470
Examination By Ms. Susler ........    473

EXHIBITS RE ERENCED:                     PAGE

Exhibit    DESCRIPTION

7   Handwritten letter by Mr. Solache       4 9
    dated 5/ 2/ 8
8   Curriculum of Dr. Valadez              425
32   Affidavit of Gene Whitehorn           439
62   Statement of Gabriel Solache         475

---

**411**

LOS CABOS SAN LUCAS, MEXICO, THURSDAY, DECEMBER 9, 202

+ + + +

THE VIDEOGRAPHER: Here begins Media Number  in the video deposition of Gabriel Solache in the matter of Solache versus City of Chicago in the United States District Court for the Northern District of Illinois, Eastern Division, Case Number  : 8 Civ. 23 2.

Today s date is December 9, 202 . The time on the video monitor is  0:35 a.m. The videographer is Isco Carrillo on behalf of Planet depos. This deposition is being taken place at Westin Los Cabos.

Will counsel please voice identify themselves and state whom they represent please.

MS. SUSLER: Jan Susler on behalf of the plaintiff Gabriel Solache.

MR. SWAMINATHAN: Anand Swaminathan on behalf of plaintiff Arturo De Leon Reyes.

MS. ROSEN: Eileen Rosen on behalf of defendant City of Chicago.

MR. ENGQUIST: Josh Engquist on behalf of

---

**4 2**

all individual officer defendants with the exception of Reynaldo Guevara.

MR. LEINENWEBER: Tom Leinenweber and Megan McGrath on behalf of Reynaldo Guevara.

MR. STEPHENSON: Mike Stephenson on behalf of Defendants Brualdi, O'Malley, Wehrle and Varga.

MR. BURNS: Dan Burns on behalf of defendant David Navarro.

THE VIDEOGRAPHER: The court reporter is Ruben Garcia on behalf of Planet Depos. Will the reporter please swear in the interpreter and witness.

THE REPORTER: Will counsel stipulate that in lieu of formally swearing in the witness, the reporter will instead ask the witness to acknowledge their testimony will be true under the penalties of perjury, that counsel will not object to the admissibility of the transcript based on proceeding in this manner, and that the witness has verified that he is in fact Gabriel Solache.

MS. SUSLER: On behalf of plaintiff Solache, we stipulate.

MR. SWAMINATHAN: On behalf of plaintiff Reyes we so stipulate.

MS. ROSEN: On behalf of the City of

---

**4 3**

Chicago, we so stipulate.

MR. ENGQUIST: This Josh Engquist. On behalf of the individual defendant officers, except Reynaldo Guevara, we stipulate.

MR. LEINENWEBER: Tom Leinenweber on behalf of Mr. Guevara, we stipulate.

MR. STEPHENSON: Mike Stephenson on behalf of Brualdi, O'Malley, Varga and Wehrle stipulates.

MR. BURNS: Dan Burns on behalf of defendant David Navarro so stipulates.

ADRIANA TREVINO AND JOSE FONSECA, were sworn to translate from the English Language to the Spanish Language and from the Spanish Language to the English Language

(Interpretation by Jose Fonseca:)

EXAMINATION

BY MS. ROSEN:

Q   Good morning, Mr. Solache.

A   Good morning.

Q   I'm going to finish up my questioning hopefully before lunch, and then others are going to have some questions of you that will be much shorter

CCSAO COI SUBPOENAS 000334

than my questions -- they will be doing follow-up questions -- and then we are going to wrap up today.

THE REPORTER: Ms. Rosen, do you have your microphone on?

MS. ROSEN: I do.

THE REPORTER: You sound farther from the previous days.

(Microphones were adjusted)

BY MS. ROSEN:

Q Mr. Solache, I want to talk to you a little this morning about your treatment with Dr. Valadez.

Do you remember when you started going to see Dr. Valadez?

A The exact date I don't remember, but I was seeing Dr. Valadez.

Q Do you recall what year you started seeing Dr. Valadez?

A No, I don't remember.

Q Do you recall for how long you saw Dr. Valadez?

A No.

Q How often, while you were receiving -- well, why were you seeing Dr. Valadez?

A I was seeing him once a week, and I was seeing him to get guidance for him to help me.

Q What kind of help did you want to get from Dr. Valadez?

A Psychologically.

Q And why did you feel that you needed help psychologically?

A Because when I left jail, I felt bad, and I had to look for him for him to help me.

Q Can you describe for us in what ways you get bad?

A Desperate. Well, psychological problems.

Q Can you provide us any details about the psychological problems that you were having?

A To be integrated to society. I felt bad when I was with many people. That's what I remember now.

Q You say you felt bad when you were around a lot of people?

A Correct.

Q And was that something new for you, that you felt bad when you were around a lot of people?

MS. SUSLER: Objection. Form. You mean new since he came out of prison?

MS. ROSEN: Sure.

BY MS. ROSEN:

Q New since you came out of prison.

A Correct.

Q Did Dr. Valadez help you?

A Yes.

Q Now you said you saw him once a week; is that correct?

A Correct.

Q And how long did those sessions last?

A I don't remember. I didn't count them.

Q And just so that I'm clear, I mean, so each week how long were you there? Was it for an hour? Was it for two hours? That's what I mean.

A No, I don't remember whether or not it was an hour or more than an hour, but I was there once a week.

Q And what did you do while you were with Dr. Valadez?

A We would talk.

Q What types of things would you talk about?

A Well, about experiences I had in jail, about what I went through when I was in jail, about the way Detective Guevara hit me. Things like that.

MS. SUSLER: And just for the interpreter I think we had -- I don't know if a "disagreement," but when he uses the word "carcel," I think that can mean "prison," and you interpreted it as "jail." So I'm just putting that on the record.

MS. ROSEN: Okay.

MS. SUSLER: I don't know. Does the interpreter want to respond?

THE INTERPRETER: Yes, the exact translation, interpretation of "carcel" is "jail." The exact interpretation or translation of "prision" or "prison" is "prision," "prison."

BY MS. ROSEN:

Q Anything else that you recall talking to Dr. Valadez about, other than what you've just said?

A We, talked about more things, but that's what I remember now.

Q And then I think you told me yesterday, or maybe on Monday, that the reason you stopped going to see Dr. Valadez was because he was in Mexico City

CCSAO COI SUBPOENAS 000335

Transcript of Gabriel Solache, Volume 3
Conducted on December 9, 2021

t (t17 )2 t318

and that became too difficult and burdensome for you; is that right?

MS. SUSLER: Objection. Well, go ahead. Translate.

(Interpreter translates question)

MS. SUSLER: Objection. Asked and answered.

BY MS. ROSEN:

Q You can answer.

A That's correct.

Q Do you feel for the period of time that you went to Dr. Valadez, that -- strike that. Let me start over.

Do you feel that you could still benefit from treatment?

A Yes.

Q Do you have any plans to get further treatment?

THE INTERPRETER: Counsel, would you repeat the question?

MS. ROSEN: Sure.

BY MS. ROSEN:

Q Do you have any plans to start treatment again?

A Yes. But for now, I can't. That will be later.

Q Why can't you?

A I have work to do at the store.

Q Did you open the store -- strike that. Did you buy the store after you had finished going to see Dr. Valadez for treatment?

A Could you repeat the question, please?

Q Did you buy the store after you finished seeing Dr. Valadez for treatment?

A No.

Q Did you buy the store while you were seeing Dr. Valadez for treatment?

A Yes.

MS. ROSEN: Let's show what we've marked as Exhibit 7.

(Exhibit 7 was referenced for identification )

BY MS. ROSEN:

Q Mr. Solache, take a look at what we've marked as Exhibit Number 7, please.

A Yes.

Q I'm going to direct your attention to the first three pages of the exhibit. Is that something that you wrote?

A Yes.

Q Did Dr. Valadez ask you to write that?

A Yes.

Q Do you recall why he asked you to write that? Did he explain it to you?

MS. SUSLER: Objection. Foundation.

BY MS. ROSEN:

Q You can answer.

A He told me that it was a way to forget what had happened to me and that it was also a way to take out the frustration.

Q Did it help?

A Yes, a little.

Q If you can take a look at the next two pages. The handwriting that's on that form, that two-page form, is that your handwriting?

A No.

Q Is any of the handwriting on those two pages your handwriting?

A No.

Q There's a date at the top left-hand corner of the first page of those two documents. What date is that?

A It reads 6/2 of 2019.

Q Does that help refresh your recollection at all about the general time period of when you were seeing Dr. Valadez?

A Yes.

Q So sometime in 2019, for at least part of that year, you were seeing Dr. Valadez; is that correct?

A Correct.

Q And there's a reference in the document to Kankakee, Illinois. Do you see that?

A Yes.

Q And is the information on this document related to the time that you spent in the Kankakee Jail after you were released from the Illinois Department of Corrections?

MS. SUSLER: Objection. Foundation.

BY MS. ROSEN:

Q You can answer.

A Could you be more specific, please?

Q Sure. The two-page document contains references to Kankakee, Illinois, correct?

A Correct.

Q And then there's a couple drawings on the second page of the document. Do you see that

CCSAO COI SUBPOENAS 000336

Transcript of Gabriel Solache, Volume 3
Conducted on December 9, 2021

0 (t33 )2 t308

**422**

there?

A    Yes.

Q    Do you know what those drawings are trying to depict?

A    Yes.

Q    Can you explain that to us?

A    Of course.  The drawing is not very exact, but what I remember from that moment is that that's the design of the Kankakee Jail when I was inside at that moment.

Q    Do you recall talking to Dr. Valadez about your experiences in the Kankakee Jail?

A    Yes.

Q    And was that part of your treatment?

A    I believe so.

MS. SUSLER:  Tardy objection to foundation.

BY MS. ROSEN:

Q    Okay.  Let's go to the next two pages. Is any of the handwriting on the next two pages your handwriting?

A    No.

Q    And now let's go to the next two pages. Do you recognize those two pages?

A    Yes.

**423**

Q    Did you provide those two pages to Dr. Valadez?

A    Yes.

Q    And why did you provide those two pages to Dr. Valadez?

A    He told me he was going to present my case at a group, but I don't remember exactly the name of that group.

Q    When he told you he was going to present your case to a group, did he explain more about what he was going to present?

A    Yes, but I don't remember exactly what he said to me.

Q    Do you know if he ever did present your case to the group that he spoke to you about?

A    No, he didn't tell me.

Q    If we go to the next two pages, did you provide those to Dr. Valadez for the same reasons, because he was going to present your case to some group?

A    Correct.

Q    And the next two pages, again, did you provide those to Dr. Valadez so that he could present your case?

**424**

A    Yes.

Q    And the next two pages, did you provide those to Dr. Valadez so he could present your case to some group?

A    Yes.

Q    And is the same true for the next two pages?

A    Yes.

Q    And the next two pages, is it the same?

A    Yes.

Q    And the next two pages, did you provide those to Dr. Valadez so that he could present your case to some group?

A    Yes.

Q    And if you go through the next few pages until you get to the form that is at page -- one second because I can't read it -- page number 7526. So it's that one (indicating).

A    Yes.

Q    So all the pages before that that relate to your case you provided to Dr. Valadez so that he could present your case to some group, right?

A    Correct.

Q    And then these two pages that we're on

**425**

right now, is any of that handwriting yours?

A    No.

Q    And then if you just take a look at the last page, is any of the handwriting on that page yours?

A    No, that's not my handwriting.

MS. ROSEN:  Okay.  Great.  And now if you could provide Mr. Solache with Exhibit Number 8.

(Exhibit 8 was referenced for identification)

BY MS. ROSEN:

Q    You could take a few minutes to look through that exhibit and then I have a few questions for you.

All set?  The first five pages of the exhibit, have you ever seen that information, that document before?

A    No.

Q    How did you find Dr. Valadez as a doctor?

A    Through my attorney.

Q    Did you do any research about his credentials or anything like that?

THE INTERPRETER:  Interpreter is going to

CCSAO COI SUBPOENAS 000337

426

clarify "credentials."

(Interpreter speaking with witness in Spanish)

THE INTERPRETER: May I ask counselor to use another word for "credentials"?

MS. ROSEN: Sure.

BY MS. ROSEN:

Q Did you do any research on your own about Dr. Valadez and whether or not he was a good doctor?

A No.

Q And now if we go to the sixth page of document, is any of the handwriting on Page 6 yours?

A No.

Q And there's a date at the top of the document. Can you tell us what that date is?

MS. SUSLER: I object. There's no -- you haven't asked him if he's ever seen this before, if he even knows what it is, and you want him to testify about what it says?

MS. ROSEN: I asked him if he could read the date. Yes, I am asking him to read the date.

BY MS. ROSEN:

Q Can you read the date for us, please?

427

A November 4, 2018.

Q And does the information that appears on that page appear to relate to you?

MS. SUSLER: Same objection.

BY MS. ROSEN:

Q You can answer.

A Yes.

Q Does the November 2018 date at the top of this document help refresh your recollection at all about whether or not you were seeing Dr. Valadez at some point in time in the year 2018?

A Yes, the date is there. I believe that I was seeing him on that date.

Q And the information -- I can't read Spanish, but the information at the bottom of the page appears to be information related to you. Am I correct about that?

MS. SUSLER: Objection. Asked and answered.

THE WITNESS: Yes.

BY MS. ROSEN:

Q And it looks to me like it has information like your address and how old you are and other things like that. Am I right about that?

MS. SUSLER: Same objection.

428

THE WITNESS: Yes, that's my address.

BY MS. ROSEN:

Q Okay. Is the information that's written on that page accurate?

A Yes.

Q Do you recall Dr. Valadez asking you these questions when you met with him?

A I don't remember exactly the kind of questions that he asked me, but he asked me many questions.

Q And if you go now to the next page, it has some checks marks. Do you recall doing the -- go back one page one second, Mr. Solache. Go the other way.

There's some checks marks on that page. Do you see that there?

A Yes.

Q Do you recall filling out a form yourself and putting check marks there?

MS. SUSLER: Objection. Form, foundation, and I object to your asking him about a document that you haven't established that he's ever seen before or that he knows what it is.

429

BY MS. ROSEN:

Q You can answer.

A No.

Q Now can you go to the next page, please. Is any of the handwriting on that page your handwriting?

A No.

Q And if you go to the last page, is any of that handwriting yours?

MS. SUSLER: Can I just make sure I know what you mean by the "last page."

MS. ROSEN: The very last page of the exhibit which is Bates stamped 7492.

BY MS. ROSEN:

Q Is any of that handwriting yours on the very last page?

A No.

Q During the time that you saw Dr. Valadez, did he prescribe any medication for you?

A No.

Q Did he give you any kind of diagnosis or anything that might be wrong with you?

MS. SUSLER: Objection. Form. I'll just leave it at that, objection, form and foundation.

CCSAO COI SUBPOENAS 000338

Transcript of Gabriel Solache, Volume 3
Conducted on December 9, 2021

**430**

BY MS. ROSEN:

Q You can answer.

A I told him the problems I had. I believe that he must have written that here. But he didn't give me any treatment with pills or something like that.

Q I understand he didn't give you pills. My question is a little bit different. While you were seeing Dr. Valadez, did he tell you specifically what was wrong with you, if anything?

MS. SUSLER: Objection, form.

BY MS. ROSEN:

Q You can answer.

A Yes, I believe he said something, something like people who like myself have been abused and tortured and have been in jail for a long time presented the symptoms like the ones I had.

Q And when were you tortured? What are you referring to?

A The torture that I received from Detective Guevara, the 20 years that I was in prison that was unfair, and the attempted murder, and the death row, that I was going to go to the death row.

Q When you decided not to continue to see

**43**

Dr. Valadez, did you explain to him why you were not going to continue your treatment?

MS. SUSLER: Objection. Asked and answered.

BY MS. ROSEN:

Q You can answer.

A Yes, because when I was in Mexico City, the times when I was in Mexico City, I was altered by the fact that I was surrounded by so many people. I wasn't used to being around so many people, so I told him that I was going to stop with the therapy.

Q And did you explain to him that, the reason that you were going to stop your therapy?

MS. SUSLER: Objection. Asked and answered.

BY MS. ROSEN:

Q You can answer.

A Yes, that's what I answered.

Q And what did he say to you when you told him that the reason that you did not want to continue treatment was because of the crowds in Mexico City and that they bothered you?

A No, I don't remember what he said.

Q Am I correct that all of the treatment that you did with Dr. Valadez was you talking to him about the things that he asked you about and him

**432**

talking to you? Was that the extent of it, the two of you talking to one another?

A Correct.

Q Did you see any other doctors or counselors or anything else when you were seeing Dr. Valadez?

MS. SUSLER: Objection, form. Do you mean at the same time he was with the doctor physically or --

MS. ROSEN: Yeah, let me make it a little more clear.

BY MS. ROSEN:

Q At the facility that you were going to see Dr. Valadez.

A Yes.

Q Do you remember the names of any of those people?

A No, I only saw one doctor, but I don't remember his name.

Q How many times did you see that one doctor?

A One time.

Q Do you know what kind of doctor he was or she was?

**433**

A It was a female doctor, and it was just --

MS. SUSLER: No.

(Interpreter speaks with witness in Spanish)

THE WITNESS: It was a male doctor, just a health provider, like any doctor. He checked my blood pressure and then he had me to go carry out some tests.

BY MS. ROSEN:

Q So the doctor that you saw was a medical doctor, not a psychologist or a psych -- psychologist or psychiatrist?

MS. SUSLER: Objection. Foundation.

BY MS. ROSEN:

Q You can answer.

A Yes.

Can we take a break?

MS. ROSEN: Sure.

THE VIDEOGRAPHER: This marks the end of Media Number 1 in the deposition of Gabriel Solache. We are going off the record at 11:28 a.m.

(Recess)

(Adriana Trevino begins interpretation:)

THE VIDEOGRAPHER: Here begins Media

Transcript of Gabriel Solache, Volume 3
Conducted on December 9, 2021

7 (t9t )2 t968

Number 2. We are back on the record at 11:46.

MS. SUSLER: I just want to say Mr. Solache took a break because he's not feeling well. He's having a sore throat and he's congested, and we went over the break and got some flu symptom medication to try to manage the symptoms so that he can soldier on. But I just wanted to put that on the record. He's not feeling well.

MS. ROSEN: Okay.

BY MS. ROSEN:

Q   Mr. Solache, is there anything about the way you're currently feeling that will prevent you from testifying accurately and truthfully to the best of your ability?

A   I feel a little sick, like with a cold, but I don't think it's going to affect my testimony.

Q   If at any point in time you feel like you can't testify accurately or truthfully, you let us know, okay?

A   Of course.

Q   While you were in prison, did people send you money for your commissary account?

A   Yes.

Q   Did the Mexican Consulate send you money for your commissary account?

A   Yes.

Q   And do you know why the Mexican Consulate was sending you money?

A   Yes.

Q   Why?

A   Yes, because I'm a Mexican citizen, and they have the right to help nationals.

Q   Do you remember who else sent you money?

A   No.

Q   Do you know somebody by the name of Elaine Burrow, B-u-r-r-o-w?

A   Yes.

Q   And who is that?

A   It was a friend who lived in Lancaster, England.

Q   And how did you meet Ms. Burrow?

A   Well, I don't remember exactly. It was when I was on death row, and there was a program, I don't remember the name, and she was a member of it. It was an organization, and she started writing to me.

Q   Have you ever met her face-to-face?

A   No.

Q   And from your previous answer, my understanding is she initiated contact with you; is that right?

A   Yes.

Q   Who is Maria Solache?

A   She's my cousin.

Q   And did she send you money from time to time?

A   When I was in prison she never sent money to me.

Q   Are you close with that cousin?

A   Well, no. She saw me on the news and she thought we could be relative, related. And yes, we were, we are, and I met her and we talked.

Q   When did you meet her?

A   When I got out of prison.

Q   While you were still in the United States?

A   Yes.

Q   And how are you related?

A   Well, obviously we have the same last name and we come from the same town.

Q   Beyond knowing that you have the same last name and come from the same town, do you know how you're related?

A   Well, I mean, we're both "Solache." Everyone who's "Solache" came from that town. Plus, "Solache" is not a very common last name.

Q   But beyond that, you don't know how exactly you're related; is that right?

A   Well, no, I just know that we come from the same town and we are related.

Q   Do you know somebody by the name of Nancy Amabile, A-m-a-b-i-l-e?

A   No.

Q   Do you know somebody by the name of Ive Andujar? Ive, I-v-e, Andujar, A-n-d-u-j-a-r?

A   Yes.

Q   And who is that?

A   Well, she was a female friend. I mean, well, I never met her, but she would also send me money.

Q   Do you know why she was sending you money?

A   Well, I told her about my situation. I believe it was because of that.

Q   How did you first -- strike that. Did you ever meet Ms. Andujar?

CCSAO COI SUBPOENAS 000340

Transcript of Gabriel Solache, Volume 3
Conducted on December 9, 2021

5 (t97 )2 tt18

---

**438**

A   No.

Q   And how is it that you started commuting with Ms. Andujar?

A   Well, I think she's a member of an organization, and she started writing to me.

Q   So she initiated contact with you?

A   Yes.

Q   Do you know somebody by the name of Linda Tortolerro, T-o-r-t-o-l-e-r-r-o?

A   The name sounds familiar, but I don't remember meeting her in person. Maybe I did. She was a student at Northwestern.

Q   Do you recall that during the sentencing phase of your criminal case that there was a video that was created that had interviews with your family from Mexico?

A   Yes.

Q   And in that video, do you remember that your sister Lilia talked about your brother Mauricio going to the United States?

MS. SUSLER: Objection. Form. Do you have a transcript of the video you want to show him?

MS. ROSEN: I'm asking him if he remembers.

---

**439**

BY MS. ROSEN:

Q   Do you remember?

A   No.

Q   I think we talked about this on Monday, but did you go to the United States before any of your siblings -- any of your other siblings did?

A   Correct.

Q   After you suffered your head injury, did you apply for medical assistance from the Illinois Department of Human Services?

MS. SUSLER: Objection. Form. Are you talking about the 1997 brick?

MS. ROSEN: Yeah, the 199- -- I thought I said that. If I didn't ...

THE WITNESS: No, I don't remember.

MS. ROSEN: I'm going to ask that you show Mr. Solache Exhibit Number 32.

(Exhibit 32 was referenced for identification).

BY MS. ROSEN:

Q   Mr. Solache, have you had an opportunity to review Exhibit Number 32?

A   Yes.

Q   And do you see in the -- first of all,

---

**440**

have you ever seen that document before?

A   No, this is the first time.

Q   Okay. And do you see in the document where it says "Although Gabriel Solache applied for medical assistance from the Department, his application was denied on October 20th, 1997"?

A   Yes, I did see that my name is there, but I don't remember having applied for any help.

Q   Did you ever do any documentaries or -- yeah, did you ever do any documentaries about your case?

MS. SUSLER: Objection, form, to the term "do." Vague.

MS. ROSEN: Participate in any documentaries.

THE WITNESS: Yes.

BY MS. ROSEN:

Q   Can you remember how many documentaries you participated in?

A   That I remember, only one.

Q   Do you remember the name of the documentary?

A   Yes.

Q   What's the name of it?

---

**44**

THE INTERPRETER: "Dead Light."

MS. SUSLER: "Deadline."

MS. ROSEN: "Deadline."

THE INTERPRETER: Sorry. "Deadline."

BY MS. ROSEN:

Q   And did you get paid for your participation in the documentary?

A   No.

Q   Do you recall in 2014, while your post-conviction case was pending, being interviewed by some city lawyers from the law firm Sidley & Austin?

A   Yes.

Q   Do you recall telling the attorneys that interviewed that on the day Adriana brought the baby home from the hospital, after you had picked up your check, that you went out dancing with Carlos Martinez and Leobardo Mejia at Studio 51?

A   Can you specify? Like I went dancing with them like partners?

Q   I don't know. I don't think as partners. I think that -- I don't know.

A   Yes, we did go to that place.

Q   And did you go to that place on the day that Adriana brought the baby home from the hospital?

---

CCSAO COI SUBPOENAS 000341

Transcript of Gabriel Solache, Volume 3
Conducted on December 9, 2021

1o (tt3 )2 tt08

442

A    Yes, we would always go to that place because it was close to the house.

Q    I think that earlier in the deposition -- maybe Monday, maybe yesterday -- you told us that when you went out on the day that Adriana brought the baby home from the hospital, it was with a friend from the factory where you worked.

Do you recall telling us that?

MS. SUSLER: Objection.  Form.

BY MS. ROSEN:

Q    You can answer.

A    Yeah, I did go out with him, but it was not for a long time.  I mean, I don't remember for how long, but it was during the day or afternoon, but not for very long.

Q    And then did you go out with this other friend from the factory?

MS. SUSLER: Objection.  Form.  I think that's what he just told you.

BY MS. ROSEN:

Q    Did you go to Studio 51 in the afternoon?

A    No.

Q    Did you go out with the friend from the

443

factory in the afternoon?

A    Yes.

Q    Where did you go with the friend from the factory?

A    I don't remember exactly where we went, but we went out.

Q    And then you came home and then you went out with Carlos and Leobardo?

A    Yes, at night.

Q    Mr. Solache, do you have an Immigration lawyer currently?

A    I had one.  I haven't talked to her in a while.  I don't know if she's still working on my case.

Q    And what exactly did you believe that your lawyer was working on when you say "working" on your case?

A    Well, in reference to that, I'm not in Immigration, so I don't know exactly what she's working on.

MS. SUSLER:  I think he said "I'm not an immigration lawyer."

THE INTERPRETER:  Well, I said "immigration attorney."

444

MS. SUSLER:  Sorry.  I didn't hear that.  I apologize.

THE INTERPRETER:  No problem.

BY MS. ROSEN:

Q    What is your current immigration status with the United States?

A    Could you be more specific?

Q    Sure.  Are you permitted to return to the United States at this time?

A    No, I don't believe so.

(Attorney Sean Starr joins the virtual proceedings)

BY MS. ROSEN:

Q    Are you trying to do something so that you will be permitted to enter the United States?

MS. SUSLER:  I'm just going to insert an objection there.  May be approaching attorney/client communication.  If he can answer the question without violating attorney/client, then he can answer the question.

BY MS. ROSEN:

Q    You can answer.

A    Oh, no, I don't believe I'm going back to the United States because the United States showed

445

me the worst that they can show an immigrant, the worst they have for an immigrant.

Q    So you have no plans to ever return to the United States?

MS. SUSLER:  Same objection.

BY MS. ROSEN:

Q    You can answer.

A    No, I don't believe so.

MS. ROSEN:  I don't have any more questions at this time.  Thank you very much for your time, Mr. Solache.

MR. STEPHENSON:  I can go next if everybody's ready.

MR. ENGQUIST:  Is everybody ready to keep on going or not?

MR. STEPHENSON:  I couldn't hear you, Josh.

MR. ENGQUIST:  Sorry.  Let me get a mic.  Is everybody ready to keep on going or not?

MR. STEPHENSON:  I'm ready.

MR. ENGQUIST:  Okay.

(Jose Fonseca begins interpretation:)

EXAMINATION

BY MR. ENGQUIST:

Q    Hi, Mr. Solache.  I'm going to kind of

CCSAO COI SUBPOENAS 000342

jump around a little bit here. I don't want to replow the same stuff we already did.

A    Of course.

Q    Earlier -- I'm not sure if it was the first day or the second day -- you answered some questions having to do with your relationships with different members of Adriana's family.

Do you remember those questions?

A    Yes.

Q    While I understand that you've testified that you were not friends with Adriana, did you ever hang out with any kind of groups of people in which Adriana was part of back in Mexico as you were growing up?

A    Occasionally we would get together, but I never got to see Adriana in the group.

Q    So is it fair to say that your testimony is when you were growing up in Mexico, you never spent any time alone with Adriana at all?

A    Could you be more specific? With Adriana in what way?

Q    Just alone with her.

A    No.

Q    When you were growing up in Mexico, or when you were living in Mexico before you came to the United States, did you ever get in trouble with the law?

A    No.

Q    Now I know you've already testified that you've only went, I think, a few months past sixth grade. But the time you were in school, did you ever get in trouble in school?

A    No.

Q    Was there ever an occasion where you had to open the school by picking a lock?

A    Of course not.

Q    Are you right or left-handed?

A    I am right-handed.

Q    Earlier you did testify about the fact that you didn't contact the police after you said your car was stolen from the place where you worked, the parking lot, correct?

A    That's correct.

Q    Did you ever register that car?

A    Register under my name?

Q    Yes.

A    No.

Q    How long did you have the car before it was stolen?

A    I don't remember exactly how long, but it wasn't a long time.

Q    When you say "not a long time," was it less than a year?

A    I don't remember exactly how long, but it wasn't very long.

Q    Did you only have it a matter of days before it was stolen, the car?

A    I don't remember whether or not it was days, but it wasn't a long time.

Q    You said it wasn't registered under your name. Did you register that car under a different name but not yours?

A    No, I don't remember, but I didn't register it.

Q    And the reason you didn't register it was because you were an undocumented worker in this country?

A    I don't remember if it was because of that, but I didn't register the car.

Q    Is one of the reasons why you didn't go to the police after it was stolen because you were an unregistered worker in this country -- or in the United States?

A    Yes, that was one of the reasons I didn't file a report at the police station. The car was also old, and I didn't have a license. That was one of the reasons.

Q    Is it fair to say that you would go out of your way to avoid contact with the police during that time before your arrest because you were an undocumented worker?

MS. SUSLER: Objection. Form.

(Interpreter and witness speaking in Spanish)

MS. SUSLER: You need to repeat what he says. You don't answer him.

THE WITNESS: I didn't understand the question.

MS. SUSLER: I'm talking to you, Jose. He talked to you, and he said he needed the question repeated, and you're repeating the question. But your job is to say what he says, not to answer his questions.

THE WITNESS: I didn't understand the question.

MR. ENGQUIST: Could you have it read back, please, Mr. Court reporter.

CCSAO COI SUBPOENAS 000343

Transcript of Gabriel Solache, Volume 3
Conducted on December 9, 2021

13 (t0o )2 t098

---

(Record read as follows:
"Question: Is it fair to say that you would go out of your way to avoid contact with the police during that time before your arrest because you were an undocumented worker?")

THE WITNESS: Well, yes, it was an old car, and it was not important, and it was not necessary to report. It was an old car. And yes, I was undocumented.

BY MR. ENGQUIST:

Q When you say "it was an old car," how much did you pay for it?

A No, I don't remember how much I paid for it, but it wasn't a lot of money.

Q Did you have a lot of money at that time to spend on something and not keep, like a car?

A Can you repeat the question? I'm not listening.

MR. ENGQUIST: Could you read back the question, please.

(Record read as follows:
"Question: Did you have a lot of money at that time to spend on something and not keep, like a car?")

THE WITNESS: No, I didn't have money.

BY MR. ENGQUIST:

Q And that car was your only form of transportation, other than public transportation or asking for rides from other people, correct?

A Correct.

Q Did you have any documentation when you had that car, showing that you owned it?

A What kind of documentation?

Q Any.

A I believe that all the cars have a title, and I had the title of the car.

Q And did you have your name on the title of the car?

A No.

Q Whose name was on the title of the car?

A No, I don't remember.

Q I think you also said earlier -- and tell me if I'm wrong -- you didn't have a valid driver's license; is that correct?

A That's correct.

---

MR. ENGQUIST: Give me one second as I flip through my notes here.

BY MR. ENGQUIST:

Q The last factory you worked at, the Ready Metal Factory, what did you exactly do at that factory?

A I was the machines operator.

Q What machine?

A I don't know the name of the machines, but I operated several machines.

Q And what did the machines do?

A Worked.

Q Worked?

A I would operate it.

Q Did they bend metal? Did they shape metal? Did they cut metal? What did they do to the metal?

A All kinds of things. We would cut metal. We would bend metal. We would prepare the sheets to assemble them. Things like that.

Q The company you worked for, I think it was called Staffing Network, did you have another name for it?

A All the ones who worked for the company -- I just realized that the name was Staffing Network. They would call me from the office on Payday.

Q And Staffing Network or Payday, they were the ones who would send you out to the different factories or different places to work, correct?

A It wasn't different places. It was only two.

Q But they were the ones who told you where you had to work and when, correct?

A Correct.

Q And if you had a problem about work, those were the people that you would go to, correct?

MS. SUSLER: Objection, form.

THE WITNESS: Correct.

BY MR. ENGQUIST:

Q Did you have a specific contact there that you would deal with when you talked to anybody at Staffing Network?

A There were people there, but I don't remember their names.

Q And how would you talk to them? Would call them on the phone? Would you go in person? How would you do that?

Transcript of Gabriel Solache, Volume 3
Conducted on December 9, 2021

454

A   You had to go in person to the office.
Q   Did you ever contact Staffing Network by phone or did they ever contact you by phone?
A   Not that I remember.
Q   Did you ever reach out to anybody at Staffing Network after your arrest about contacting people at Ready Metal?
A   I only told my attorney where the office was, and as a matter of fact they owed me some days that I had worked, so they didn't pay me that. I didn't contact anybody.
Q   And why didn't you directly contact anybody there?
A   I didn't have their phone number.
Q   Did you ever ask for their phone number from anyone?
A   When I was outside or when I was in jail?
Q   In jail.
A   I don't believe that the officers would have that phone number, but no.
Q   Well, not just the officers at the jail, but did you ask anybody for the contact information for the Staffing Network while you were in

455

jail?
A   No.
Q   Why not?
A   It didn't occur to me. But who would I ask?
Q   You said you told your attorney about contacting Staffing Network; is that correct?
A   That's correct.
Q   Did you do this knowing that Staffing Network could help get information about all the different people that were working at Ready Metal?
A   I'm not listening to you.
MS. SUSLER: I think he said "I'm not hearing well."
THE WITNESS: I'm talking to you.
MS. SUSLER: But I think what he said was "I'm not hearing it well."
MR. ENGQUIST: Can you repeat the question, please, Mr. Court Reporter, and we'll have it retranslated.
(record read as follows:
"Question: Did you do this knowing that Staffing Network could help get information about

456

all the different people that were working at Ready Metal?")
THE WITNESS: No.
BY MR. ENGQUIST:
Q   You were saying your nickname was Grillo, g-r-i-l-l-o; is that correct? G-r-i-l-l-o.
A   That's what they used to call me when I was in the ranch.
Q   Is that for "cricket"?
A   That's what it means in English.
Q   Why? Why cricket?
MS. SUSLER: Objection. Foundation.
THE WITNESS: The truth, I don't know. They always called me that since I was a little. I don't know why they started calling me that.
MR. ENGQUIST: Actually, that's all I have right now. I don't know if we want to take a break before we go on with the County or not. I don't know if they're ready for that.
MR. STEPHENSON: I would like just a couple minutes, if that's okay, and then we can get rolling.
THE VIDEOGRAPHER: This marks the end of Number 2 in the deposition of Gabriel Solache. We are off the record at 12:32 p.m.

457

(Recess)
THE VIDEOGRAPHER: Here begins Media Number 3 in the deposition of Gabriel Solache. The time on the video monitor is 12:45 p.m.

(Interpretation by Jose Fonseca:)
EXAMINATION
BY MR. STEPHENSON:
Q   Good afternoon, Mr. Solache. My name is Mike Stephenson. I represent the Assistant State Attorneys Heather Brualdi, Karin Wehrle, Andrew Varga and Thomas O'Malley in this case.
A   Good afternoon.
Q   Mr. Solache, you did not sue any of those individuals in your case, correct?
A   In the case I have now or in which case?
Q   This civil case that you filed for which we're here today.
A   I have a lawsuit. I don't know whether or not you're part of that.
Q   So stated differently, you don't know whether you sued Heather Brualdi, Karin Wehrle, Andrew Varga or Thomas O'Malley?

CCSAO COI SUBPOENAS 000345

**458**

MS. SUSLER: Objection. Asked and answered.

THE WITNESS: I have a lawsuit. I don't know whether or not they're included in that lawsuit.

BY MR. STEPHENSON:

Q You're not alleging that they committed any wrongdoing in your lawsuit, correct?

A I don't know whether or not they committed any wrong in the lawsuit, but if there's a lawsuit against them, it's because they did something related to the lawsuit.

Q I want to focus on Ms. Brualdi. She was the Assistant State's Attorney that met with you at the police station at Grand and Central in April of 1998, right?

A That's correct.

Q Do you remember how many times you met with Ms. Brualdi at the police station?

A If I remember correctly, it was only one time.

Q Your meeting with Ms. Brualdi at the police station was the first time you ever met her, correct?

A That's correct.

Q It was prior to your meeting with

**459**

Ms. Brualdi that you claim Detective Guevara hit you, correct?

A I don't remember saying something about he hitting me at that moment.

Q No one, including Detective Guevara, physically abused you while in Ms. Brualdi's presence, correct?

A Yes, that's correct.

Q While you were in Ms. Brualdi presence at the police station, you kept your shirt or sweatshirt on the entire time, correct?

A That's correct.

Q You do not know when Ms. Brualdi arrived at the police station before she met with you, correct?

(Interpreter translates question to witness)

MS. SUSLER: Can you just repeat the question, please?

(Record read as follows:

"Question: You do not know when Ms. Brualdi arrived at the police station before she met with you, correct?")

THE WITNESS: No.

**460**

BY MR. STEPHENSON:

Q Aside from meeting with you, you do not know what Ms. Brualdi did or whom she spoke to at the police station regarding the Soto murders and abductions, correct?

A Could you repeat what you said? Before she walked into the room or when she was in the room?

Q So let's start with before. So before Ms. Brualdi met with you at the police station, you do not know what Ms. Brualdi did or whom she spoke to at the police station regarding the Soto murders and abductions?

A No, I didn't know that.

Q Similar question. After you met with Ms. Brualdi at the police station, you do not know what Ms. Brualdi did or whom she spoke to at the police station regarding the Soto murders and abductions, correct?

A I don't think it's a similar question. I think it's the same question, but I didn't know it.

Q You do not know what Ms. Brualdi was told about the investigation of the Soto murders and abductions before she met with you at the police station, correct?

**46**

A That's correct.

Q You do not know what Ms. Brualdi reviewed about the investigation of the Soto murders and abductions before she met with you at the police station, correct?

A That's correct.

Q You were not handcuffed during your meeting with Ms. Brualdi and Detective Guevara, correct?

A Correct.

Q When you met with Ms. Brualdi at the police station, you knew that the police were investigating you for the Soto murders and abductions, correct?

A No.

Q Prior to meeting with Ms. Brualdi, you told Detective Guevara that you participated in the Soto murders to get him to stop hitting, correct?

A That's correct.

Q Mr. Solache, you know that Mr. Reyes gave a statement to the police regarding the Soto murders and abductions, correct?

MR. STARR: Objection. Form, foundation. Mischaracterizes facts not in evidence.

CCSAO COI SUBPOENAS 000346

462

BY MR. STEPHENSON:

Q   Go ahead, Mr. Solache, if you could please answer.

A   No, at that moment I didn't know it.

Q   Did you later learn that he did?

MR. STARR:  Same objections.

THE WITNESS:  After some time, yes.

BY MR. STEPHENSON:

Q   You were not present when Arturo Reyes gave a written statement at the police station regarding the Soto murders and abductions, correct?

MS. SUSLER:  Objection, form.

MR. STARR:  Objection to form.  Join.

BY MR. STEPHENSON:

Q   Go ahead, Mr. Solache, please answer.

A   No, I didn't.

MS. SUSLER:  I think the question was "were you present" --

THE INTERPRETER:  "No, I wasn't."

MS. SUSLER:  -- and the answer was "No, I wasn't."

THE INTERPRETER:  "No, I wasn't."

BY MR. STEPHENSON:

Q   You did not see or hear Mr. Reyes being

463

interviewed by anyone at the police station, correct?

MR. STARR:  Objection, form.

THE WITNESS:  That's correct.

BY MR. STEPHENSON:

Q   Do you know who Thomas O'Malley is?

A   At that moment when I was at the police station I didn't know who he was, but now I know who he is.

Q   You never saw or heard Thomas O'Malley speak with anyone at the police station in April of 1998, correct?

A   Correct.

Q   You have never spoken directly with Mr. Thomas O'Malley at any point in time, correct?

A   That's correct.

Q   You did not see or hear Mr. Reyes being interviewed by an Assistant State's Attorney at the police station, correct?

A   Correct.

Q   You did not see or hear Mr. Reyes when he signed the written statement at the police station, correct?

MR. STARR:  Objection to form.

MR. STEPHENSON:  Did Mr. Solache get an

464

opportunity to answer the question?

THE WITNESS:  Yes, I said "correct."

MR. STEPHENSON:  Thank you.

BY MR. STEPHENSON:

Q   You did not see Thomas O'Malley at the police station in April of 1998, correct?

A   No, I didn't see him.

Q   You know that Guadalupe Mejia gave a written statement at the police station regarding the Soto murders and abductions, correct?

MS. SUSLER:  Objection, form.

MR. STEPHENSON:  Go ahead, Mr. Solache.

THE WITNESS:  No, I did not know that.  This is the first time I hear this.

(Interpretation by Adriana Trevino:)

BY MR. STEPHENSON:

Q   So as you sit here today, you never learned that Guadalupe Mejia gave a written statement to the police regarding the Soto murders and abductions?

MS. SUSLER:  Objection, form.

THE WITNESS:  No, I did not know.

BY MR. STEPHENSON:

Q   Do you know whether Guadalupe Mejia was

465

interviewed by anyone at the police station regarding the Soto murders and abductions?

A   No, I did not know.

Q   Do you know who Karin Wehrle is?

A   No.

Q   You never saw or heard Karin Wehrle speak with anyone at the police station in 1998 then, correct?

A   That is correct.

Q   And you've never spoken with Karin Wehrle at any point in time, correct?

A   No, I don't know her.  I don't know who she is.

Q   Did you learn that Rosauro Mejia gave a written statement at the police station regarding the Soto murders and abductions?

MS. SUSLER:  Objection, form.

BY MR. STEPHENSON:

Q   Go ahead, Mr. Solache.

A   No, I did not know.

Q   Did you know that Rosauro Mejia was interviewed by anyone at the police station -- let me withdraw that question and rephrase it.

Do you know whether Rosauro Mejia was

CCSAO COI SUBPOENAS 000347

**466**

interviewed by anyone at the police station regarding the Soto murders and abductions?

A   No.

MR. STARR:  Objection to form.

BY MR. STEPHENSON:

Q   Do you know who Andrew Varga is?

A   No.

Q   Then you never, to your knowledge, saw or heard Andrew Varga speak with anyone at the police station in April of 1998, correct?

MR. STARR:  Form.

BY MR. STEPHENSON:

Q   Go ahead, Mr. Solache.

A   No.

Q   You never have spoken with Andrew Varga at any point in time, correct?

A   No, I don't know him.

Q   You never spoke with Mr. Reyes about his allegations or claims against Ms. Brualdi, Andrew Varga, Thomas O'Malley or Karin Wehrle, correct?

MR. STARR:  Objection.  Form, foundation, asked and answered.

BY MR. STEPHENSON:

Q   Go ahead Mr. Solache?

**467**

A   Yes, it is correct.

Q   Aside from your lawyers, you have never spoken with anyone about the conduct of Ms. Brualdi, Andrew Varga, Thomas O'Malley or Karin Wehrle regarding the Soto murders and abductions, correct?

MS. SUSLER:  Objection.  Form, misstates the testimony and assumes facts not in evidence.

BY MR. STEPHENSON:

Q   Go ahead, Mr. Solache.

A   It is correct.  Can I take a break?

MR. STEPHENSON:  Absolutely.

THE VIDEOGRAPHER:  We're going off the record at 1:09 p.m.

(Recess)

THE VIDEOGRAPHER:  We are back on the record.  The time is 1:18 p.m.

MR. STEPHENSON:  Can we please hand Mr. Solache what's been marked as Exhibit 90.  It's a series of photographs.

MS. SUSLER:  It might take me a minute because those were used before and they're not organized.

MS. ROSEN:  I'll just give him mine.

MS. SUSLER:  Well, I need to know what they

**468**

are.

Okay.  Got it.

MR. STEPHENSON:  Thank you.

BY MR. STEPHENSON:

Q   Mr. Solache, if you could please go to Page 5 of Exhibit 90.  It's Bates stamped in the bottom right-hand corner "Reyes0023."  And please let me know when you have that in front of you.

A   This one?  2355?  The ending, the last two digits is "23"?

Q   Yes.

A   I have it.

Q   Did Detective Guevara take these two photographs of you?

A   I don't remember.

Q   Do you remember if Ms. Brualdi was present when these two photographs were taken of you?

A   No, I do not remember either.

MR. STEPHENSON:  Thank you.  We no longer need that exhibit up.

BY MR. STEPHENSON:

Q   Mr. Solache, you don't know if Ms. Brualdi committed any wrongdoing while at the police station in April of 1998, right?

**469**

MS. SUSLER:  Objection.  Calls for a legal conclusion.  Foundation.

MR. STARR:  Join in that.  And I would add, asked and answered.

BY MR. STEPHENSON:

Q   That's correct, right, Mr. Solache?

MR. STARR:  Same objections.

BY MR. STEPHENSON:

Q   Go ahead, Mr. Solache.

THE INTERPRETER:  The interpreter will ask him to repeat because the interpreter did not hear the answer.

THE WITNESS:  Well, I don't know because she didn't talk to me directly.  She talked to the detective.  So I don't know.

BY MR. STEPHENSON:

Q   And you don't know if Mr. Thomas O'Malley committed any wrongdoing at the police station in April of 1998, correct?

MS. SUSLER:  Objection.  Form, foundation, calls for a legal conclusion and asked and answered.

BY MR. STEPHENSON:

Q   Go ahead, Mr. Solache.

A   No, I don't know.

CCSAO COI SUBPOENAS 000348

470

MR. STEPHENSON: Thank you, Mr. Solache. That's all the questions I have for you.

THE WITNESS: Good afternoon.

MR. BURNS: I have a few questions.

EXAMINATION

BY MR. BURNS:

Q Good afternoon, Mr. Solache.

A Good afternoon.

Q My name is Dan Burns. I represent David Navarro. Mr. Solache, do you know who David Navarro is?

A No, I don't know him.

Q Have you ever met David Navarro?

A Not that I remember.

Q Did you ever speak with David Navarro at the Grand and Central police station in 1998?

A Well, I only talked to two people there who spoke Spanish. One of them was Guevara. I don't know if he was the other person who spoke Spanish.

MS. SUSLER: I just need to break for one second.

(Discussion off the record)

47

BY MR. BURNS:

Q Mr. Solache, who was the other person that you spoke to that spoke Spanish?

A I talked to Guevara and to another person whose name I do not know.

Q Was that person whose name you don't know, was that person a police officer?

A Yes.

MR. STARR: Objection. Foundation.

MS. SUSLER: I'll join.

BY MR. BURNS:

Q Mr. Solache, did you ever see David Navarro at the Grand and Central police station in 1998?

A No, I don't know who David Navarro is.

Q Do you know what, if anything, David Navarro was doing at the Grand and Central police station in 1998?

A No.

Q Do you know who David Navarro talked to at the Grand and Central police station in 1998?

A No, I don't know.

Q And you're not aware if David Navarro has ever mistreated you in any way, correct?

472

A That is correct.

MR. BURNS: I have no further questions.

MS. SUSLER: Is there any other defendant?

MR. ENGQUIST: Yes, give me one second.

EXAMINATION

BY MR. ENGQUIST:

Q I just want to make sure I'm correct, Mr. Solache. Your father's name is also Gabriel Solache, correct?

A Yes, it was. He already passed away, yes.

Q Do you remember what his date of birth was?

A No.

Q Was it March 23rd?

A I don't remember the date.

THE REPORTER: Is this Josh asking questions?

MR. ENGQUIST: Yes, this is me, yes.

BY MR. ENGQUIST:

Q Did your father ever move to the United States?

A No.

473

Q Do you know who Margarita Vega is?

A No.

MR. ENGQUIST: That's all I have.

MS. SUSLER: Defense is done?

MR. ENGQUIST: I think so.

MS. SUSLER: I think we're going to take a break, take a lunch break. I do have a few questions. I don't know if Reyes has questions, but we'll do 45 minutes -- shoot for 45 minutes. So that's fine.

THE VIDEOGRAPHER: This marks the end of Media number 3 in the deposition of Gabriel Solache. We are off the record at 12:30 p.m.

(Recess).

THE VIDEOGRAPHER: Here begins Media Number 4 in the deposition of Gabriel Solache. We are back on the record at 2:44 p.m.

(Interpretation by Jose Fonseca:)

EXAMINATION

BY MS. SUSLER:

Q Gabriel, I have some questions that I needed to ask you. Yesterday when Ms. Rosen asked you what happened when you were in the room with Detective Guevara and the woman prosecutor, Heather Brualdi, do

CCSAO COI SUBPOENAS 000349

**474**

you remember those questions?

A   Yes.

Q   And you told Ms. Rosen that Detective Guevara asked you a lot of questions related to the case, but that you didn't remember what he asked you about the case.

Do you remember being asked that?

MS. ROSEN: Objection. Asked and answered.

THE WITNESS: That's correct.

BY MS. SUSLER:

Q   You also told her that you didn't remember whether he asked you questions about things not related to the case. Do you remember that?

MS. ROSEN: Objection. Asked and answered.

THE WITNESS: Yes.

BY MS. SUSLER:

Q   And you told her that as Detective Guevara was talking to you, that Brualdi was writing. Do you recall that testimony?

MS. ROSEN: Objection. Asked and answered.

THE WITNESS: Yes.

BY MS. SUSLER:

Q   Would it help refresh your recollection about what Detective Guevara was saying to you if you

**475**

saw what Brualdi was writing?

MR. STEPHENSON: Objection, form.

THE WITNESS: Yes.

MS. SUSLER: All right. I'm going to show you what was produced to us by Ms. Rosen as Exhibit 62.

(Exhibit Number 62 was referenced for identification )

BY MS. SUSLER:

Q   Gabriel, do you recognize what I've handed you?

A   Yes.

Q   What do you recognize it to be?

A   This is the confession that I signed. This is what Mr. Guevara told me that I had to sign, and this is the testimony that Ms. Brualdi wrote.

Q   Let's look at the first page of Exhibit 62. Do you see about the fifth or the sixth line down where it says "Gabriel Solache states that he was born in Mexico and has lived in the United States for two years"?

A   This is the page that has as the last digit number ending in 306?

Q   No, I'm sorry. It's the first page.

**476**

And if you look at about five or six lines down, where it starts right about where I'm pointing.

A   Yes.

Q   Where it says "Gabriel Solache states that he was born in Mexico and has lived in the United States for two years," do you see that?

A   Yes.

Q   Is what's written, what we just read, is that information true?

A   Yes.

Q   And if you just see where it says in the next line, "Gabriel Solache states that he lives at 6234 South Mozart on the first floor."

THE WITNESS: No, that's not what he said.

MS. SUSLER: I think he's talking about your translation. You got the address wrong.

(Interpreter retranslates question)

THE WITNESS: Yes.

BY MS. SUSLER:

Q   And the information that we just read, was that true back in April of 1998?

A   Yes.

Q   And if you turn to the next page, if you look at the first line where it starts "Gabriel

**477**

states that Adriana and Carlos are from the same ranch as he, Gabriel, is from in Mexico."

A   Yes.

Q   And back in April of 1998, was that information true and accurate?

A   Yes.

Q   So some of the questions where you gave information, you gave Detective Guevara information about you and your background?

MS. ROSEN: Objection. Leading.

MR. STEPHENSON: Objection. Foundation, form.

THE WITNESS: Yes.

BY MS. SUSLER:

Q   And yesterday when you told Ms. Rosen that you answered Detective Guevara's questions truthfully, are those the questions that you were referring to?

MS. ROSEN: Objection. Form. Objection. Form and leading.

MR. STEPHENSON: Join.

THE WITNESS: Yes.

BY MS. SUSLER:

Q   Let's look further down into the

CCSAO COI SUBPOENAS 000350

478

exhibit. If you look at the very top of the third page, and there's a sentence that's about five lines down, and it says "Gabriel states he, Gabriel, drove to the hospital."

Did you see that sentence?

A    No -- yes, I already saw it.

Q    And you see the next line, it says "Gabriel states Arturo sat in the front passenger seat."

A    Yes.

Q    And do you see the next sentence that says "Gabriel states he drove to the front of the hospital and Adriana got in the back seat."

A    Yes.

Q    Did you give that information to Detective Guevara when you were in the room with him and Brualdi?

A    No.

Q    Do you know where that information came from?

MS. ROSEN: Objection. Foundation.

MR. STEPHENSON: Join.

THE WITNESS: That was said by Detective Guevara.

479

BY MS. SUSLER:

Q    When Detective Guevara gave that information, did you answer?

MS. ROSEN: Objection. Form, foundation.

MR. STEPHENSON: Join.

THE WITNESS: Yes. I answered "yes."

BY MS. SUSLER:

Q    When you said "Yes" to Detective Guevara, was that true?

A    No, it wasn't true, but I had to say what he asked me to do. He had already hit me, and I was scared at that moment, so I didn't want that to happen again, so I had to say yes to whatever he needed.

Q    And if you look at Page 5, at the top it says "Page 5 of Page 9," right about halfway down, sort of toward the right-hand side there's a sentence that starts "Gabriel states that he, Gabriel, grabbed a knife from the kitchen table."

MS. SUSLER: I don't see anything in there about his "right hand." I think you told him in Spanish something about the "right hand."

I'm going to ask the question again.

480

BY MS. SUSLER:

Q    Do you see where it says on Page 5 of 9, "Gabriel states that he Gabriel grabbed a knife from the kitchen table"?

It's right in the middle of Page 5.

A    I don't see anything like that.

Q    Can you see where I'm pointing? If you hand me the exhibit, I can show you where it is.

BY MS. SUSLER:

Q    I made a star for you in ink where the sentence starts. Do you see that?

Do you see where it says "Gabriel states that he Gabriel grabbed a knife from the kitchen table"?

A    Yes.

Q    And you see the next sentence that says "Gabriel states the knife, including the blade, was about 11 inches"?

A    Yes.

Q    And the next sentence states "Gabriel states he ran toward the back of the apartment and into the bedroom to see if anyone was back there."

A    Yes.

Q    And the next sentence says "Gabriel

48

states when he ran in the bedroom, there was a man laying face up in the bed."

A    Yes.

Q    And the next sentence states "Gabriel states the man was asleep and a little boy was laying next to him on the bed."

A    Yes.

Q    Now we're on Page 6, and we keep reading where we left off from. "Gabriel states that he started stabbing the man in the stomach."

Do you see that?

A    Yes.

Q    And it goes on to say "Gabriel states People's Exhibit D is a photo of the man he stabbed."

Do you see that?

A    Yes.

Q    And it goes on to say "Gabriel states the man screamed."

Do you see that?

A    Yes.

Q    And then it goes on to say "Gabriel states that then he, Gabriel, kept stabbing the man to finish what he started."

Do you see that?

CCSAO COI SUBPOENAS 000351

Transcript of Gabriel Solache, Volume 3
Conducted on December 9, 2021

3o (t73 )2 t708

482

A    Yes.

Q    Did you give any of that information to Detective Guevara?

A    No.

Q    Where did that information come from when you were in the room with Detective Guevara and the prosecutor Brualdi?

MS. ROSEN: Objection. Form, foundation.

MR. STEPHENSON: Join.

THE WITNESS: He made it up. He was giving me guidance to say "yes" to everything he was saying. I didn't say that. He made it up.

BY MS. SUSLER:

Q    Gabriel, did you ever go anywhere with Arturo and Adriana to go into a person's house and stab a man?

THE INTERPRETER: Can you please repeat it?

MS. SUSLER: Can the court reporter please repeat the question.

(Record read as follows:

"Question: Gabriel, did you ever go anywhere with Arturo and Adriana to go into a person's house and stab a man?")

483

THE WITNESS: No.

BY MS. SUSLER:

Q    So the information that's written here in Exhibit 62 that we just went over is not true?

A    That's a lie.

Q    And the rest of Exhibit 62, if you look -- if you read all the way through Page 7, up until right about the half, where it's the line that says -- up to where it says "Gabriel states he then went to sleep."

Do you see where we are on Page 7?

A    Yes.

Q    From where we left off on Page 6, all the way through to that point on Page 7, is that information that you gave Guevara?

A    No.

Q    Where did that information come from?

MS. ROSEN: Objection. Form, foundation.

THE WITNESS: He made it up.

BY MS. ROSEN:

Q    When he gave you that information, did you respond?

MS. ROSEN: Objection. Form, foundation.

THE WITNESS: Yes.

484

BY MS. SUSLER:

Q    How did you respond?

A    I said "yes."

Q    And the reason you said "yes" was the same reason you told us earlier?

MS. ROSEN: Objection. Leading.

THE WITNESS: Yes.

BY MS. ROSEN:

Q    How did you feel about Detective Guevara when you were sitting there in the room with him and Ms. Brualdi?

A    I felt limited --

MS. SUSLER: "I felt" what?

THE INTERPRETER: "Limited."

MS. SUSLER: He said "intimidated."

THE WITNESS: I felt intimidate because of the things he had said to me and because he was telling me to say "yes."

BY MS. SUSLER:

Q    If we look at Page 8 of 9, right about halfway through, there's a line that starts "Gabriel states he was treated good by the police and Assistant State's Attorney's Brualdi."

Do you see where that is?

485

A    Yes.

Q    Was that something that you told Guevara?

A    I didn't say anything to him. I believe that's what he said to Ms. Brualdi.

Q    Was it true that you were treated good by the police?

A    How could I say yes when Detective Guevara hit me? That's not having a good treatment.

Q    The statement says, just further down on Page 8, that "Gabriel states he has been able to use the bathroom when he wanted."

Do you see that? I'm pointing, showing where it says. Do you see where it says that?

A    Yes.

Q    Is that information that you gave to Guevara?

A    No.

Q    Was it true that you had been able to use the bathroom when you wanted during the many hours that you were held at Area 5?

A    No. They only allowed me to use it once, and I had to use a plastic bottle that was in the room.

CCSAO COI SUBPOENAS 000352

Transcript of Gabriel Solache, Volume 3
Conducted on December 9, 2021

31 (t74 )2 t758

486

Q   The next line says "Gabriel states he has had three sandwiches to eat and pop and water to drink and cigarettes to smoke."
Do you see that?
A   Yes.
Q   Is that information that you gave Guevara?
A   No.
Q   Was that true?
A   No.
Q   The next line says "Gabriel states that no promises have been made to him or threats and he is making this statement freely and voluntarily."
Do you see that?
A   Yes.
Q   Did you give that information to Guevara?
A   No.
Q   Was it true?
A   No.
Q   After Brualdi finished writing -- or at any time, did Detective Guevara read the entire statement to you aloud in Spanish and have you follow along?

487

A   No.
Q   Did Detective Guevara ever read to you in Spanish what's written here in Exhibit 62?
A   No.
Q   When you were in the room with Guevara and Brualdi, did you know what Brualdi was writing in English?
A   No.
Q   Did you understand anything that Ms. Brualdi said to Guevara while you were in the room with them?
A   No.
Q   Did you understand anything that Guevara said to Ms. Brualdi while you were in that room?
A   No.
Q   Could you read English on your own back on April 5th of 1998?
A   No.
Q   Gabriel, do you see your signature at the bottom of every page in Exhibit 62?
A   Yes.
Q   Why did you sign?
A   Detective Guevara asked me to put my

488

name there.
MS. SUSLER:  Can I just ask him to repeat the answer in Spanish because I don't think he said "asked me."
BY MS. SUSLER:
Q   Why did you sign where you signed Exhibit 62 on every page?
A   Detective Guevara told me to sign.
Q   When you placed your signature on each page, did you know what the document said?
A   No.
Q   Do you see your initials anywhere on -- like, let's look at Page 4.  Do you see about six or seven lines down, there's something crossed out?  Are you on Page 4?
A   Yes.
Q   Do you see where something is crossed out -- Gabriel, if you look this way, I'm showing you where it is.
A   Yes.
Q   Something is crossed out, and you see your initials?
A   Yes.
Q   You also see some other initials there?

489

A   Yes.
Q   And there are other places in the document where the same thing happened.  Why did you put your initials there and in the other places in the document where something is crossed out?
A   Detective Guevara told me to put them there.
Q   When you put your initials on the words that were crossed out, did you know what you were doing?
MS. ROSEN:  Object to form.
THE WITNESS:  No, but he told me to put my initials there.
MS. SUSLER:  Now I think we're done with that exhibit.  Let me show you what has already been shown as Exhibit 90.
(Adriana Trevino Begins Interpreting:)
BY MS. SUSLER:
Q   I'm going to ask you to look at the last page.  Those are the photos that Ms. Rosen and another lawyer asked you about yesterday and today, right?
A   Yes.
Q   If you look at the next page, the very

CCSAO COI SUBPOENAS 000353

490

last page of Exhibit 90, that shows the back side of those photographs. And you testified before that you see your signature on both of those photographs, right?

A    Yes.

Q    Why did you sign the photographs that you see here in Exhibit 90?

MS. ROSEN: Objection. Asked and answered.

THE WITNESS: Because Detective Guevara asked me to sign those pictures.

BY MS. SUSLER:

Q    And the other photos that you were shown by Detective Guevara or Ms. Brualdi when the three of you were in the room, did you do the same thing, sign them because Guevara told you to?

MS. ROSEN: Objection, leading.

THE WITNESS: Yes.

MS. SUSLER: I don't have any other questions.

MS. ROSEN: Sean?

MR. STARR: No questions from Plaintiff Reyes.

MS. ROSEN: We're going to take a short break.

492

MS. ROSEN: That's it.

THE VIDEOGRAPHER: This marks the end of today's deposition of the deposition of Gabriel Solache. We are going off the record at 3:34 p.m.

(Deposition concluded at 3:34 p.m.)

49

THE VIDEOGRAPHER: This marks the end of Media 4 in the deposition of Gabriel Solache. We are going off the record at 3:20 p.m.

(Recess)

THE VIDEOGRAPHER: Here begins Media Number 5 in the deposition of Gabriel Solache. We are back on the record at 3:32 p.m.

MS. ROSEN: And Sean, you said you didn't have any questions, right?

MR. STARR: I don't have any questions right now, no.

MS. ROSEN: I don't have any more questions.

MR. ENGQUIST: Nothing from me.

MR. BURNS: I have no questions.

MR. LEINENWEBER: I have no questions.

MS. ROSEN: Is that everybody?

THE REPORTER: This is the court reporter. Does anybody need a copy of the deposition?

MS. ROSEN: Yeah, I want a copy. This Eileen Rosen. The final -- you're not talking about a rough draft. Of the full transcript, right?

THE REPORTER: Correct. Anybody else?

MS. ROSEN: Are you reserving or waiving?

MS. SUSLER: We'll reserve.

493

CERTIFICATE OF READER INTERPRETER

I, _____,

whose address is_____

_____,

a person who speaks the language of the witness;

namely, Spanish, do hereby certify that on the

_____ day of _____, 20_____, I

did translate the foregoing deposition from the English language into the Spanish language, reading same to the witness in his native tongue, to the best of my ability; that all corrections and changes requested by the witness were made and initialed by the witness;

That upon completion of such reading, the witness did confirm to me that he had understood the reading

_____

Interpreter Reader

**494**

DEPOSITION SIGNATURE PAGE

Case Caption: Gabriel Solache v City of Chicago, et al

DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that I have read the entire transcript of my deposition taken in the above captioned matter or the same has been read to me, and the same is true and accurate, except for changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath

Executed on this_____ day of_____, 202_,

at_____,

_____

(city)          (country)

_____

GABRIEL SOLACHE

**496**

Page No _____ Line No _____ Change to:

_____

_____

Reason for change:

_____

_____

Page No _____ Line No _____ Change to:

_____

_____

Reason for change:

_____

_____

Page No _____ Line No _____ Change to:

_____

_____

Reason for change:

_____

_____

SIGNATURE_____ DATE_____

GABRIEL SOLACHE

**495**

DEPOSITION ERRATA SHEET

Page No _____ Line No _____ Change to:

_____

_____

Reason for change:

_____

_____

Page No _____ Line No _____ Change to:

_____

_____

Reason for change:

_____

_____

Page No _____ Line No _____ Change to:

_____

_____

Reason for change:

_____

_____

**497**

CERTIFIED SHORTHAND REPORTER

I, RUBEN GARCIA, a Certified Shorthand Reporter, do hereby certify:

That the foregoing reporter videoconference proceedings were taken before me at the time herein set forth; that any witness in the foregoing proceedings, prior to testifying, were placed under oath; that every attempt was made to ensure a verbatim record of the remote proceedings which inherently have technical interference and audio interruptions and issues. Such transcript was created by me using machine shorthand which was thereafter transcribed under my direction.

I further certify that I am neither financially interested in the action nor a relative or employee of any attorney nor of any of the parties.

Reading and signing was requested.

IN WITNESS WHEREOF, I have this date subscribed my name. My certificate to the original may be attached to certified copies electronically.

Dated this 24th day of December, 2021.

*Ruben Garcia*

RUBEN GARCIA, CSR NO. 11305

CCSAO COI SUBPOENAS 000355

Transcript of Gabriel Solache, Volume 3
Conducted on December 9, 2021

24

| A | | | |
|---|---|---|---|
| **a-m-a-b-i-l-e** | 826   5 | 886 649,88:  639 | 8:2 669,872 64 |
| 80:  65 | **above-captioned** | 887   09,848  39 | **also** |
| **a-n-d-u-j-a-r** | 828  65 | 835 689,83   :9 | 852 639,8  5  659 |
| 80:  60 | **absolutely** | 873   6 | 80:  6:9,882  89 |
| **abductions** | 83:  66 | **afternoon** | 846   69,8:   29 |
| 835  49,835  6  9 | **abused** | 88   689,88      9 | 8:8 669,877   8 |
| 835  679,835   09 | 805 649,842  3 | 880 69,84:  29 | **altered** |
| 836  89,836 609 | **account** | 84:  609,8:5 09 | 806  : |
| 836    9,83   669 | 808    9,804  6 | 8:5 79,8:5  2 | **although** |
| 838  659,838   59 | **accurate** | **again** | 885  8 |
| 834   9,834 639 | 8 7 89,8:: 49 | 867   09,8 0     9 | **always** |
| 833   9,83:  4 | 828  66 | 8:2 609,8:2   0 | 88   69,843  68 |
| **aberdeen** | **accurately** | **against** | **amabile** |
| 857 0 | 808 609,808  67 | 847 29,833  62 | 80:  65 |
| **ability** | **acknowledge** | **ahead** | **anand** |
| 808 689,820  68 | 86   68 | 867 09,83    9 | 857   29,866   5 |
| **able** | **action** | 83   649,838  6  9 | **andrew** |
| 874 669,874  62 | 82:  64 | 834  629,833 609 | 852 09,84:  669 |
| **about** | **actually** | 833   89,83:  29 | 84:   09,833  39 |
| 868 669,864  689 | 843  63 | 832 29,832   0 | 833 29,833  649 |
| 863   89,86:  69 | **add** | **al** | 833 629,83:  8 |
| 86:   9,86:  679 | 832  0 | 853 669,828  0 | **andujar** |
| 86:   59,8 6   9 | **address** | **all** | 80:  609,80:   89 |
| 8     6 9,8 0  669 | 8  :    9,8 7  69 | 86   69,8 6   9 | 807 0 |
| 8 0  649,8 4    9 | 8:3 639,820  3 | 8 8   59,8 4  649 | **another** |
| 8 3 29,8 3   59 | **adjusted** | 8  : 29,806    9 | 8  3 49,80    9 |
| 8  : 659,8  : 6:9 | 868  7 | 802   89,883 629 | 84     9,8:6 89 |
| 8  :   09,8 7   69 | **admissibility** | 846 689,84    679 | 872   6 |
| 806   89,808 669 | 86   6: | 84    89,844 659 | **answer** |
| 80:   69,807 629 | **adriana** | 843 69,843 639 | 867 79,8 5 79 |
| 802 89,802  6  9 | 852  679,860  6  9 | 8:5   9,8:0 09 | 8  6 679,8  :  39 |
| 885 659,88:  649 | 800   09,886  689 | 8:4 89,870  :9 | 8  2   9,805    9 |
| 840  6 9,848  39 | 886   89,88   49 | 870 609,820  68 | 805 609,806  49 |
| 844  39,844  659 | 883  669,883  609 | **allegations** | 806 649,800  649 |
| 844   89,842  09 | 883  639,883  629 | 833  62 | 803 69,88    669 |
| 835    9,836  09 | 883   69,838  649 | **alleging** | 888 679,888  629 |
| 833 679,83:  09 | 8::  69,8:7 609 | 847  4 | 888    9,884  :9 |
| 8:8 39,8:8  6  9 | 87    649,87    09 | **allowed** | 882 609,882  629 |
| 8:8   89,8:4  679 | 872  6: | 874 | 83   09,83   649 |
| 8:3 69,8:3   9 | **adriana's** | **alone** | 83    59,838  69 |
| 8:3 649,8::  29 | 883  : | 883 629,883 | 832  6 9,8:2 09 |
| 8:7    9,8:2 639 | **affect** | **along** | 877 0 |
| 8:2   69,8:2    9 | 808  63 | 873   8 | **answered** |
| 875 679,870  79 | **affidavit** | **aloud** | 867 39,8  :  679 |
| 878 29,878   59 | 865  63 | 873   0 | 806 09,806  609 |
| 877 609,872   69 | **after** | **already** | 806 639,883  49 |
| | 862  49,862  79 | 883   9,88:  49 | 847 69,833     9 |
| | 8  6 689,802  79 | 8:   669,8:7  39 | 832 89,832    69 |

CCSAO COI SUBPOENAS 000356

```
8:8 79,8:8 689
8:8  59,8:: 639
8:2 39,825 7
any
864 689,867 639
867  9,8 5 679
8  629,8 4 69
8 4 89,8 4  9
8 3 79,8 3 609
8 2 49,8 2 79
8 2 649,8 2 629
8 2  69,805 49
80  89,80  639
800 39,808 6:9
802 49,802 39
885 79,885 29
885 659,885 689
884 29,883 6 9
883 629,846 659
846 609,84: 689
847 39,847 79
830 689,834 669
833 639,837  09
832 679,8:6  89
8:  09,87  9
873  9,825 679
826 29,826 659
826 6 9,828 6 9
82: :9,82: 63
anybody
840 679,848 49
848 669,848 609
848  09,826 679
826
anyone
848 639,830 69
830 659,834 69
834 :9,834  9
833 69,833 29
83: 09,875
anything
86: 6:9,8 4  09
8 2  9,805 659
80  49,808 669
8:6 639,8:2  59
875 39,874 89
87: 29,87: 60
anywhere
87  689,87  9
```

```
877 6
apartment
875  6
apologize
888
appear
8 : 0
appearances
857 69,852 6
appears
8 :  9,8 : 63
application
885 3
applied
885 89,885 7
apply
802 2
approaching
888 6:
april
847 609,830 659
838 39,833 659
837  89,832 629
8:3  69,8:: 89
87: 67
area
874  6
around
864  59,864  09
806 29,883 6
arrest
882 79,845 39
848 3
arrived
842 689,842  6
arturo
857  49,866  69
83  29,8:7 79
87  649,87
aside
835  9,83:
asked
867 39,8 5 89
8 3 679,8 3  69
8 :  679,8 7 29
806 09,806 609
806  89,847 69
833  9,832 89
```

```
832  69,8:0  9
8:8 89,8:8 49
8:8 :9,8:8 79
8:8 6 9,8:8 689
8:8  59,8:2 669
87:  89,877 89
872  69,825 79
825 65
asking
8 3  9,8 7 39
8 7  69,807  09
846 79,8:  67
asleep
876 4
assemble
84  5
assistance
802 29,885 4
assistant
84: 659,847 6 9
830 6:9,878
assumes
83: :
at_
828 62
attached
82:  5
attempt
82: 2
attempted
805
attention
862
attorney
8 4  69,880  89
888 669,888 6:9
888 629,848 79
844 39,847 6 9
830 6:9,82: 63
attorney's
878  0
attorneys
886 609,84: 66
audio
82: 66
austin
886 66
avenue
85: 7
```

```
avoid
882 :9,845 8
aware
8:6  0
away
8:  66
```

**B**

```
b-u-r-r-o-w
804 60
baby
886 649,886  89
88  3
back
8 7 609,808 69
888  09,883 609
882  09,845  69
83: 649,8:0 649
8:3  69,8:: 89
8:7 609,875  69
875  9,87: 6:9
825 69,826 :
background
8:: 2
bad
864 79,864 669
864 6:9,864 629
864  0
baroni
85: 05
barrajas
857 06
based
86  6:
bates
8 2 609,837 3
bathroom
874 6 9,874  5
became
867 6
because
864 79,86:  89
8 0 629,8 8 6:9
806 39,806 629
808 09,804 :9
80:  9,88  9
888  89,887 679
887  59,887  09
```

CCSAO COI SUBPOENAS 000357

Transcript of Gabriel Solache, Volume 3
Conducted on December 9, 2021                                          26

```
882 79,845 39        830 639,8:8 :      brought              called
847 29,83:  69       believe            886 689,886  89      84     9,843 68
832 669,832 609      8    649,8 : 6 9   88  3               calling
878 639,878 6:9      805 89,805 689     brualdi              843 64
877 09,825 29        80:   9,880 649    852 09,86   39       calls
825 64               888 659,888  09    860 79,84: 669       832 69,832  6
bed                  884 79,846 689     84:  09,847 669      came
876  9,876 3         848  59,874 4      847 6:9,847  59      863  9,863 49
bedroom              bend               842 69,842 29        80: 09,880 :9
875  9,876 6         84  649,84  62     842 609,842  69      88: 69,8:7 62
been                 benefit            835 09,835 29        can't
805 649,805 639      867 68             835 659,835 649      867   89,862  9
83: 679,874 669      best               835 639,835  69      8 8 6:9,8 : 689
874 629,873 6 9      808 609,820 60     836  9,836 79        808 67
872 649,828 65       beyond             836 669,836 639      caption
before               803  09,80: 4      833 629,83: 09       828 0
860  09,8 8  59      birth              837 639,837  09      car
8 4 6:9,8 3 679      8:   60            8:0  89,8:8 679      88: 6:9,88:  59
8 7  9,802 49        bit                8:4 69,8:4 639       88:  89,887 29
885 69,88: 69        805 79,883 6       8:7 6:9,87  :9       887 609,887  69
88:  89,887 29       blade              878 669,878  09      882 09,845 79
882 79,845 49        875 6:             874 49,873  69       845 659,845 609
843 679,842 689      blood              87: 39,87: 659       845 679,846 09
842  9,835 39        800 3              87: 689,825 60       846 39,846 669
835 79,835  09       born               brualdi's            846 649,846 6:9
836 89,83:  69       8:4  59,8:3 4      842 3                846 62
825  9,82: 3         both               burdensome           carcel
begins               80:  9,825 0       867 6                86: 39,86: 60
866 49,800  09       bothered           burns                carlos
800  89,884  69      806  5             857 6:9,857 679      886 639,880 79
84:  9,8:0 689       bottle             865 :9,86  :9        8:: 6
872 6:9,826 4        874  0             860 29,8:5 89        caroline
behalf               bottom             8:5 :9,8:5 659       857 7
85: 89,85: 649       8 : 649,837 :9     8:6 69,8:6 669       carrillo
85:  :9,857 89       87:  6             8:   9,826 68        852 6:9,866 60
857 649,857  49      boulevard          burrow               carry
852 09,866 609       857 2              804 609,804 67       800 :
866 679,866  69      boy                buy                  cars
866  9,866  89       876 4              862 49,862 79        846 68
86  89,86  49        break              862 66               case
86  :9,86  659       800 6:9,808 09           C               866 29,8 0 :9
86   59,86   9       808 49,843 6:9     cabos                8 0 659,8 0 649
86   89,860 09       83: 659,8:5  69    853  49,866 69       8 0 629,8 0  89
860 49,860 :9        8:0 :9,825  8      866 64               8 8 09,8 8 609
860 2                brick              call                 8 8  69,8 8   9
being                802 6              840  9,840  09        807 689,885 669
866 689,806 29       brother            843 :                886 659,880 689
886 659,83   89      807 62                                  880 6:9,84: 6 9
```

CCSAO COI SUBPOENAS 000358

| | | | |
|---|---|---|---|
| 84: 649,84: 639 | civ | confession | 844 :9,844 79 |
| 84: 6:9,84: 679 | 853 29,866 65 | 8:4 68 | 843 39,84: 649 |
| 8:8 49,8:8 39 | civil | confirm | 847 39,847 649 |
| 8:8 609,828 0 | 84: 67 | 820 6: | 847 9,847 09 |
| central | claim | congested | 842 9,842 :9 |
| 847 609,8:5 6:9 | 842 6 | 808 8 | 842 79,842 669 |
| 8:6 609,8:6 6:9 | claims | connelly | 842 6 9,842 649 |
| 8:6 6 | 833 62 | 85: 6:9,852 0 | 842 09,835 49 |
| certificate | clarify | consulate | 835 679,835 89 |
| 820 9,82: 62 | 8 3 6 | 808 89,804 8 | 836 69,836 49 |
| certified | clark | cont'd | 836 39,836 29 |
| 853 059,82: 69 | 85: 5 | 857 6 | 836 659,836 689 |
| 82: 09,82: 5 | clear | cont'd: | 836 679,836 629 |
| certify | 863 689,80 66 | 852 6 | 836 9,83 669 |
| 820 29,82: 89 | client | contact | 830 69,830 09 |
| 82: 68 | 888 6:9,888 62 | 803 9,807 39 | 830 669,830 6 9 |
| change | close | 88: 639,882 :9 | 830 689,830 649 |
| 824 659,824 639 | 803 669,88 | 845 89,840 6:9 | 830 679,830 629 |
| 824 9,823 89 | cold | 848 9,848 09 | 830 9,838 9 |
| 823 659,823 63 | 808 64 | 848 669,848 6 9 | 838 39,838 659 |
| changes | com | 848 0 | 834 79,834 29 |
| 820 689,828 6 9 | 85: 669,85: 89 | contacting | 834 669,833 659 |
| 828 68 | 852 6 | 848 39,844 : | 833 639,833 59 |
| check | come | contains | 83: 69,83: 49 |
| 8 7 629,886 63 | 803 9,803 89 | 8 6 5 | 83: 659,832 39 |
| checked | 80: :9,87 49 | continue | 832 629,8:6 89 |
| 800 3 | 870 6: | 805 89,806 9 | 8: 69,8: 79 |
| checks | commissary | 806 62 | 8: 659,8:8 29 |
| 8 7 6 9,8 7 64 | 808 9,804 6 | copies | 826 |
| chicago | committed | 82: 5 | corrections |
| 853 669,85: 29 | 847 49,847 79 | copy | 8 6 649,820 689 |
| 85: 649,85: 9 | 837 09,832 67 | 826 679,826 62 | 828 6 |
| 85: 049,857 669 | common | corner | correctly |
| 857 69,857 089 | 80: 8 | 8 5 9,837 : | 847 67 |
| 852 659,866 :9 | communication | correct | could |
| 866 09,860 69 | 888 67 | 864 69,863 39 | 867 609,862 :9 |
| 828 0 | commuting | 863 659,863 669 | 8 6 629,8 0 09 |
| cigarettes | 807 0 | 867 29,8 6 :9 | 8 8 09,8 8 6 9 |
| 873 0 | company | 8 6 79,8 6 69 | 8 8 9,8 4 79 |
| citizen | 84 69,840 6 | 8 6 9,8 0 69 | 8 4 6 9,8 3 69 |
| 804 : | completion | 8 8 09,8 : 6:9 | 803 609,888 :9 |
| city | 820 63 | 806 9,80 09 | 883 59,882 09 |
| 853 669,85: 649 | concluded | 802 :9,88: 679 | 845 69,844 659 |
| 866 :9,866 09 | 82 4 | 88: 629,846 79 | 844 89,835 39 |
| 86 89,86: 89 | conclusion | 846 29,846 09 | 83 9,837 49 |
| 806 39,806 :9 | 832 9,832 6 | 846 89,840 39 | 874 79,87: 6: |
| 806 59,886 669 | conduct | 840 659,840 669 | couldn't |
| 828 09,828 6 | 83: 0 | 840 609,840 649 | 884 63 |

CCSAO COI SUBPOENAS 000359

Transcript of Gabriel Solache, Volume 3
Conducted on December 9, 2021

28

counsel
866 639,86 6 9
86 639,867 67
counselor
8 3 8
counselors
80 4
count
863 60
country
887 629,887 89
828 6
county
843 67
couple
8 6 09,843 5
course
8 :9,808 59
883 09,88: 6
court
853 69,866 79
86 29,882 89
844 629,87 679
826 6:
cousin
803 39,803 66
created
807 649,82: 6
credentials
8 4 09,8 3 69
8 3 4
cricket
843 29,843 66
criminal
807 68
crossed
877 689,877 6:9
877 69,872 49
872 2
crowds
806 62
csr
82: 4
culberson
852 3
current
888 4
currently
808 6 9,880 66

curriculum
865 64
cut
84 639,84 67

**D**

daffada
85: 05
dan
86 :9,860 29
8:5 65
dancing
886 639,886 67
daniel
857 67
date
853 09,866 669
868 649,8 5 69
8 5 09,8 3 649
8 3 639,8 3 9
8 3 89,8 : 79
8 : 6 9,8 : 609
8: 609,8: 6:9
82: 67
dated
865 689,82:
david
857 649,86 79
860 659,8:5 669
8:5 689,8:5 639
8:6 6 9,8:6 649
8:6 639,8:6 59
8:6 0
day
886 689,886 09
88 49,88 689
883 49,820 659
82:
days
868 :9,887 79
887 669,848 65
de
866 6
dead
886 6
deadline
886 9,886 09
886 8

deal
840 67
death
805 09,804 5
december
853 09,866 69
866 669,82:
decided
805 8
declaration
828 4
declare
828 7
defendant
85: 649,857 649
866 09,86 :9
860 09,860 29
8: 0
defendants
853 609,85: :9
857 89,86 69
86 3
defense
8:0 8
delivered
852 0
denied
885 3
department
8 6 649,802 659
885 4
depict
8 8
depos
866 689,86 65
deposition
853 679,852 9
866 39,866 689
800 59,88 89
843 09,84: 09
8:0 669,8:0 649
826 9,826 39
826 679,82 09
82 49,820 669
828 29,828 609
824 6
describe
864 65

description
865 6
design
8 2
desperate
864 6
details
864 68
detective
86: 09,805 69
842 69,842 49
836 79,836 6:9
837 609,832 649
8:0 09,8:8 09
8:8 6:9,8:8 89
8:: 79,8:: 639
8:7 639,8:7 09
8:2 9,8:2 79
87 09,87 39
878 29,874 79
873 9,87: 9
87: 89,877 79
872 39,825 29
825 60
diagnosis
8 2 6
different
805 79,883 :9
887 689,840 49
840 39,840 :9
844 669,843 6
differently
84:
difficult
867 6
digit
8:4 0
digits
837 65
direct
862
direction
82: 60
directly
848 6 9,830 609
832 68
disagreement
86: 4

CCSAO COI SUBPOENAS 000360

Transcript of Gabriel Solache, Volume 3
Conducted on December 9, 2021

29

| | | | |
|---|---|---|---|
| **discussion**<br>8:5 0<br>**district**<br>853 69,853 9<br>866 7<br>**division**<br>853 09,866 2<br>**doctor**<br>8 4 59,8 3 659<br>80 79,80 679<br>80 69,80 09<br>800 69,800 49<br>800 39,800 659<br>800 66<br>**doctors**<br>80 8<br>**document**<br>8 6 29,8 6 6 9<br>8 6 59,8 6 89<br>8 4 6:9,8 3 609<br>8 3 639,8 : 29<br>8 7 69,885 69<br>885 09,877 659<br>872 09,872 4<br>**documentaries**<br>885 29,885 659<br>885 649,885 67<br>**documentary**<br>885 9,886 :<br>**documentation**<br>846 659,846 6<br>**documents**<br>8 5<br>**doing**<br>868 69,8 7 6 9<br>8:6 6:9,872 65<br>**done**<br>8:0 89,872 68<br>**down**<br>8:4 629,8:3 69<br>8:: 89,8:7 09<br>8:2 639,874 659<br>877 68<br>**dr**<br>865 649,868 6 9<br>868 689,868 639<br>868 679,868 69<br>868 89,864 89 | 863 :9,863 69<br>86: 679,86: 89<br>867 669,862 39<br>862 29,862 6 9<br>8 5 9,8 6 09<br>8 6 39,8 669<br>8 0 9,8 0 49<br>8 0 679,8 0 09<br>8 8 09,8 8 6 9<br>8 8 69,8 4 629<br>8 3 29,8 : 659<br>8 7 39,8 2 629<br>805 29,806 69<br>806 09,80 39<br>80 68<br>**draft**<br>826 6<br>**drawing**<br>8 :<br>**drawings**<br>8 6 09,8 0<br>**drink**<br>873 0<br>**drive**<br>857 62<br>**driver's**<br>846 0<br>**drove**<br>8:7 09,8:7 6<br>**during**<br>8 2 679,807 609<br>88 689,882 :9<br>845 49,836 :9<br>874 5<br><hr>**E**<br>**each**<br>863 649,877 2<br>**earlier**<br>88 09,883 89<br>88: 649,846 69<br>878 4<br>**eastern**<br>853 09,866 2<br>**eat**<br>873<br>**eileen**<br>85: 679,866 9 | 826 5<br>**either**<br>837 67<br>**elaine**<br>804 60<br>**electronically**<br>82: 5<br>**else**<br>86: 6:9,80 49<br>804 29,826<br>**employee**<br>82: 63<br>**end**<br>800 629,843 9<br>8:0 659,826 69<br>82<br>**ending**<br>837 29,8:4 0<br>**england**<br>804 6:<br>**english**<br>860 609,860 649<br>843 659,87: :9<br>87: 6:9,820 66<br>**engquist**<br>857 :9,866 89<br>860 9,884 689<br>884 6:9,884 59<br>884 09,882 09<br>845 6 9,845 69<br>846 49,84 69<br>84 09,840 639<br>844 679,843 89<br>843 639,8: 89<br>8: :9,8: 59<br>8: 69,8:0 09<br>8:0 49,826 60<br>**enquist**<br>865 4<br>**ensure**<br>82: 2<br>**enter**<br>888 64<br>**entire**<br>842 669,873 9<br>828 2<br>**erosen@rfclaw**<br>85: 8 | **errata**<br>828 609,824 6<br>**esq**<br>85: :9,85: 679<br>85: 629,85: 069<br>857 :9,857 79<br>857 6:9,857 679<br>857 29,857 059<br>852 :<br>**established**<br>8 7<br>**et**<br>853 669,828 0<br>**even**<br>8 3 62<br>**ever**<br>8 0 689,8 4 639<br>8 3 679,8 7 9<br>804 09,80: 89<br>885 69,885 29<br>885 659,884 09<br>883 6 9,88: 9<br>88: 79,88: 659<br>88: 59,848 9<br>848 09,848 49<br>848 649,847 69<br>8:5 689,8:5 639<br>8:6 6 9,8:6 89<br>8: 9,87 689<br>87 9,87:<br>**every**<br>87: 69,877 :9<br>82: 7<br>**everybody**<br>884 689,884 679<br>826 63<br>**everybody's**<br>884 60<br>**everyone**<br>80: 0<br>**everything**<br>87 66<br>**evidence**<br>836 89,83: :<br>**exact**<br>868 649,86: 6 9<br>86: 689,8 7<br>**exactly**<br>8 0 :9,8 0 6 9 |

CCSAO COI SUBPOENAS 000361

Transcript of Gabriel Solache, Volume 3
Conducted on December 9, 2021

30

| | | | |
|---|---|---|---|
| 8 7 79,804 629 | face-to-face | file | fonseca |
| 80: 39,880 49 | 804  0 | 882 0 | 852 679,860 6 9 |
| 880 649,880 629 | facility | filed | 884  6 |
| 887  9,887 39 | 80  60 | 84: 67 | fonseca: |
| 84  4 | fact | filling | 860 6:9,84: 39 |
| examination | 86  629,806 79 | 8 7 67 | 8:0 6: |
| 865 89,865 49 | 88: 649,848 2 | final | foregoing |
| 865 39,865 :9 | factories | 826  5 | 820 669,82: 49 |
| 865 79,860 679 | 840 3 | financially | 82: : |
| 884  9,84: :9 | factory | 82: 64 | forget |
| 8:5 39,8:  39 | 88  :9,88  6:9 | find | 8 5 2 |
| 8:0 62 | 880 69,880 89 | 8 4 62 | form |
| except | 84  89,84  49 | fine | 863 69,8 5 649 |
| 860 09,828 66 | 84  3 | 8:0 2 | 8 5 639,8 8 639 |
| exception | facts | finish | 8 7 679,8 7  59 |
| 86  6 | 836  89,83: : | 860  9,876  0 | 8 2  09,8 2  89 |
| executed | fair | finished | 805 669,80  :9 |
| 828 67 | 883 6:9,882 39 | 862 49,862 29 | 807  69,802 669 |
| exhibit | 845 | 873  6 | 885 6 9,88  29 |
| 865 6 9,862 649 | familiar | firm | 88  679,882 659 |
| 862 639,862  59 | 807 65 | 857 39,886 66 | 846 39,840 689 |
| 862  09,8 4 79 | family | first | 836  09,83  6 9 |
| 8 4 29,8 4 609 | 807 639,883 : | 862  09,8 5  9 | 83  609,830  9 |
| 8 4 639,8 2 609 | farther | 8 4 649,80:  09 | 830  09,838 669 |
| 802 6:9,802 679 | 868 3 | 802  89,885  9 | 838  69,834 6:9 |
| 802  9,83: 679 | father | 883 49,847  69 | 833 89,833 669 |
| 837 39,837  59 | 8: | 838 689,8:4 6:9 | 833  69,83: 39 |
| 8:4 39,8:4 :9 | father's | 8:4  89,8:3 609 | 832  59,8:4  9 |
| 8:4 679,8:7 69 | 8:  2 | 8:3  8 | 8:: 6 9,8:: 629 |
| 875 79,876 689 | feel | five | 8::  59,8:2 89 |
| 870 89,870 39 | 864 39,867 659 | 8 4 649,8:3 69 | 87  79,870 679 |
| 87: 09,87:  69 | 867 609,808 649 | 8:7 | 870  09,872 66 |
| 877 :9,872 649 | 808 6:9,878 2 | flip | formally |
| 872 639,825 69 | feeling | 84  6 | 86  60 |
| 825 : | 808 09,808 79 | floor | forth |
| exhibits | 808 6 | 857 009,8:3 60 | 82: : |
| 865 66 | felt | flu | foundation |
| experiences | 864 79,864 639 | 808 4 | 8 5 39,8 6 639 |
| 86: 69,8  6 | 864 629,864  09 | focus | 8  639,8 7  59 |
| explain | 878 6 9,878 609 | 847 66 | 8 2  89,800 609 |
| 8 5 49,8  39 | 878 63 | follow | 843 6 9,836  09 |
| 8 0 659,806 69 | female | 873  0 | 833  69,832  9 |
| 806 66 | 800 69,80: 63 | follow-up | 832  59,8:6 29 |
| extent | few | 868 6 | 8:: 669,8:7  69 |
| 80  6 | 8 8 649,8 4 6 9 | follows | 8:2 89,87  79 |
| **F** | 8 4 609,88: 39 | 845 69,845  09 | 870 679,870  0 |
| face | 8:5 89,8:0 : | 844  69,842 629 | franklin |
| 876 | fifth | 87  5 | 852 7 |
| | 8:4 67 | | |

CCSAO COI SUBPOENAS 000362

Transcript of Gabriel Solache, Volume 3
Conducted on December 9, 2021

31

| | | | |
|---|---|---|---|
| **freely**<br>873 60<br>**friend**<br>804 639,80: 639<br>88 :9,88 6:9<br>88 89,880 0<br>**friends**<br>883 66<br>**front**<br>837 79,8:7 79<br>8:7 6<br>**frustration**<br>8 5 66<br>**full**<br>826 6<br>**further**<br>867 639,8: 9<br>8:: 89,874 659<br>82: 68<br>**fusco**<br>85: 6:9,852 0<br><br>**G**<br><br>**g-r-i-l-l-o**<br>843 3<br>**gabriel**<br>853 49,853 629<br>865 09,865 6:9<br>866 39,866 629<br>86 629,800 59<br>885 89,843 09<br>84: 09,8: 29<br>8:0 669,8:0 649<br>8:0 69,8:4 659<br>8:4 629,8:3 89<br>8:3 6 9,8:3 89<br>8:: 9,8:7 09<br>8:7 79,8:7 6 9<br>8:2 679,875 09<br>875 6 9,875 609<br>875 6:9,875 59<br>875 89,876 89<br>876 29,876 609<br>876 6:9,876 69<br>876 9,87 689<br>87 69,870 29<br>878 69,874 669<br>873 69,873 669 | 87: 59,877 679<br>826 9,826 39<br>82 09,828 09<br>828 89,823 0<br>**garcia**<br>853 29,86 659<br>82: 09,82: 4<br>**gave**<br>836 69,83 659<br>838 79,838 679<br>834 689,8:: :9<br>8:: 79,8:2 9<br>870 649,870 69<br>874 639,873 3<br>**gene**<br>865 63<br>**general**<br>8 6<br>**give**<br>8 2 69,805 49<br>805 :9,84 69<br>83: 09,8: 89<br>8:7 649,87 9<br>873 63<br>**giving**<br>87 65<br>**go**<br>867 09,8 679<br>8 9,8 0 6:9<br>8 8 649,8 3 6 9<br>8 7 669,8 7 6 9<br>8 7 609,8 2 89<br>8 2 79,805 09<br>800 :9,802 49<br>886 9,886 09<br>88 69,88 6 9<br>88 639,88 69<br>88 89,880 09<br>884 6 9,887 9<br>882 39,845 09<br>840 609,840 09<br>848 69,843 679<br>83 9,83 649<br>838 6 9,834 629<br>833 609,833 89<br>83: 29,837 49<br>832 29,832 09<br>87 689,87 649 | 87 9,87 0<br>**goes**<br>876 609,876 6:9<br>876 6<br>**going**<br>860 9,860 09<br>868 9,868 609<br>86: 09,862 49<br>862 9,8 0 39<br>8 0 29,8 0 669<br>8 0 629,8 4 89<br>805 09,806 9<br>806 659,806 6 9<br>80 609,800 69<br>808 639,807 59<br>802 639,888 639<br>888 09,884 649<br>884 679,884 89<br>83: 6 9,8:0 39<br>8:4 89,8:2 09<br>872 629,825 09<br>826 09,82 8<br>**golden**<br>857 7<br>**good**<br>860 59,860 69<br>8 3 29,84: 29<br>84: 609,8:5 09<br>8:5 79,8:5 29<br>878 9,874 39<br>874 2<br>**grabbed**<br>8:2 679,875 09<br>875 60<br>**grade**<br>88: :<br>**grand**<br>847 609,8:5 6:9<br>8:6 609,8:6 6:9<br>8:6 6<br>**great**<br>8 4 :<br>**grillo**<br>843 3<br>**group**<br>8 0 :9,8 0 79<br>8 0 659,8 0 649<br>8 0 59,8 8 89 | 8 8 609,8 8 9<br>883 63<br>**groups**<br>883 6<br>**growing**<br>883 689,883 679<br>883 8<br>**guadalupe**<br>838 79,838 679<br>838 8<br>**guevara**<br>85: :9,86 9<br>86 89,860 89<br>860 39,86: 09<br>805 69,842 69<br>842 49,836 79<br>836 6:9,837 609<br>8:5 629,8:6 89<br>8:0 89,8:8 89<br>8:8 679,8:8 89<br>8:4 649,8:: 79<br>8:7 639,8:7 89<br>8:2 9,8:2 29<br>87 09,87 39<br>870 649,878 659<br>874 09,874 29<br>874 6:9,873 :9<br>873 6:9,873 9<br>87: 9,87: 49<br>87: 659,87: 689<br>87: 89,877 79<br>872 39,825 29<br>825 609,825 64<br>**guevara's**<br>8:: 63<br>**guidance**<br>864 9,87 66<br><br>**H**<br><br>**half**<br>870 7<br>**halfway**<br>8:2 639,878 6<br>**hand**<br>83: 6:9,8:2 69<br>8:2 9,875 7<br>**handcuffed**<br>836 : |

CCSAO COI SUBPOENAS 000363

Transcript of Gabriel Solache, Volume 3
Conducted on December 9, 2021

32

| | | | |
|---|---|---|---|
| **handed** | 800 89,883 69 | **iii** | 870 6:9,870 69 |
| 8:4 66 | 84 9,84: 9 | 853 689,853 6: | 874 639,873 39 |
| **handwriting** | 84: 629,838 6:9 | **illinoios** | 873 63 |
| 8 5 649,8 5 639 | 8:0 689,870 09 | 857 66 | **inherently** |
| 8 5 679,8 5 629 | 87: 09,825 :9 | **illinois** | 82: 65 |
| 8 629,8 59 | 826 4 | 853 9,85: 29 | **initialed** |
| 8 4 69,8 4 89 | **hereby** | 85: 9,85: 049 | 820 64 |
| 8 4 39,8 3 609 | 820 29,82: 8 | 857 69,857 089 | **initials** |
| 8 2 49,8 2 39 | **herein** | 852 659,866 29 | 877 6 9,877 9 |
| 8 2 29,8 2 64 | 82: 3 | 8 6 659,8 6 689 | 877 89,872 89 |
| **handwritten** | **hereof** | 8 6 69,802 2 | 872 79,872 60 |
| 865 60 | 828 60 | **immigrant** | **initiated** |
| **hang** | **hi** | 884 69,884 | 803 9,807 3 |
| 883 6 | 884 8 | **immigration** | **injury** |
| **happen** | **hinshaw** | 880 659,880 629 | 802 7 |
| 8:2 60 | 852 3 | 880 9,880 09 | **ink** |
| **happened** | **hit** | 888 4 | 875 65 |
| 8 5 659,8:0 09 | 86: 09,842 69 | **important** | **insert** |
| 872 0 | 8:2 669,874 2 | 845 2 | 888 63 |
| **head** | **hitting** | **inches** | **inside** |
| 802 7 | 842 89,836 67 | 875 67 | 8 65 |
| **health** | **home** | **included** | **instead** |
| 800 3 | 886 649,886 89 | 847 0 | 86 68 |
| **hear** | 88 39,880 : | **including** | **integrated** |
| 888 69,884 639 | **hopefully** | 842 49,875 6: | 864 63 |
| 83 89,830 639 | 860 0 | **index** | **interested** |
| 830 59,838 689 | **hospital** | 865 6 | 82: 64 |
| 832 66 | 886 649,886 89 | **indicated** | **interference** |
| **heard** | 88 39,8:7 89 | 828 6 | 82: 66 |
| 830 29,834 39 | 8:7 60 | **indicating** | **interpretation** |
| 833 2 | **hour** | 8 8 67 | 860 6:9,86: 609 |
| **hearing** | 863 639,863 67 | **individual** | 86: 689,84: 39 |
| 844 689,844 6: | **hours** | 857 89,86 69 | 838 649,8:0 6: |
| **heather** | 863 639,874 5 | 860 0 | **interpretation:** |
| 852 09,84: 669 | **house** | **individuals** | 800 09,884 6 |
| 84: 09,8:0 8 | 88 9,87 649 | 84: 64 | **interpreted** |
| **held** | 87 8 | **information** | 86: : |
| 874 6 | **human** | 8 6 6 9,8 4 639 | **interpreter** |
| **help** | 802 65 | 8 : 9,8 : 689 | 86 669,86: 89 |
| 864 9,864 09 | | 8 : 649,8 : 639 | 86: 669,86: 6 9 |
| 864 :9,864 29 | **I** | 8 : 9,8 7 09 | 867 49,867 679 |
| 863 :9,8 5 6 9 | **i-v-e** | 848 89,844 659 | 8 4 89,8 3 9 |
| 8 6 69,8 : 29 | 80: 60 | 844 89,8:3 29 | 8 3 89,800 89 |
| 804 79,885 79 | **identification** | 8:3 59,8:: 49 | 886 69,886 89 |
| 844 659,844 89 | 862 6:9,8 4 659 | 8:: 79,8:7 649 | 880 09,888 09 |
| 8:8 0 | 802 629,8:4 7 | 8:7 629,8:2 09 | 882 669,842 639 |
| **here** | **identify** | 87 9,87 49 | 83 629,83 9 |
| 866 49,805 89 | 866 63 | 870 09,870 649 | 832 659,832 669 |

CCSAO COI SUBPOENAS 000364

| | | | |
|---|---|---|---|
| 8:3 6:9,87 6:9<br>878 68<br>**interpreter-read-**<br>**er**<br>820<br>**interpreters**<br>852 67<br>**interpreting:**<br>872 6:<br>**interruptions**<br>82: 66<br>**interviewed**<br>886 659,886 689<br>830 69,830 6:9<br>834 69,834 9<br>833 6<br>**interviews**<br>807 64<br>**intimidate**<br>878 63<br>**intimidated**<br>878 64<br>**investigating**<br>836 60<br>**investigation**<br>835 9,836 0<br>**is**<br>820 3<br>**isco**<br>866 60<br>**issues**<br>82: 66<br>**itcoatl**<br>852 6:<br>**ive**<br>80: 6 9,80: 60 | **jan**<br>85: :9,866 67<br>**jessica**<br>85: 62<br>**job**<br>882 62<br>**join**<br>83 609,832 09<br>8:6 659,8:: 69<br>8:7 9,8:2 49<br>87 2<br>**joins**<br>888 66<br>**jose**<br>852 679,860 6 9<br>860 6:9,884 69<br>882 639,84: 39<br>8:0 6:<br>**josh**<br>857 :9,866 89<br>860 9,884 639<br>8: 67<br>**jsusler@peoplesl-**<br>**awoffice**<br>85: 66<br>**jump**<br>883 6 | 846 6<br>**kinds**<br>84 67<br>**kitchen**<br>8:2 629,875 89<br>875 68<br>**knew**<br>836 6<br>**knife**<br>8:2 629,875 09<br>875 609,875 6:<br>**know**<br>86: 49,86: 659<br>8 09,8 0 689<br>8 2 659,80 09<br>808 629,804 09<br>804 6 9,803 89<br>80: 49,80: :9<br>80: 29,80: 6 9<br>80: 629,807 79<br>886 59,886 69<br>880 609,880 629<br>88: 49,84 29<br>843 609,843 649<br>843 6:9,843 679<br>84: 59,84: 9<br>847 09,847 :9<br>842 609,842 59<br>835 09,835 659<br>835 609,835 649<br>835 59,835 69<br>836 9,836 59<br>83 89,830 49<br>830 :9,838 79<br>838 609,838 9<br>838 89,834 09<br>834 89,834 6 9<br>834 59,834 69<br>834 89,833 39<br>833 6:9,83: 89<br>837 79,837 9<br>832 609,832 649<br>832 6:9,832 89<br>8:5 669,8:5 609<br>8:5 59,8:6 49<br>8:6 :9,8:6 649<br>8:6 639,8:6 59<br>8:6 9,8:0 69 | 8:0 79,8:7 629<br>87: 39,877 659<br>872 2<br>**knowing**<br>803 09,844 29<br>844 0<br>**knowledge**<br>833 7<br>**knows**<br>8 3 629,8 7 0<br>**L**<br>**lancaster**<br>804 63<br>**language**<br>860 609,860 689<br>860 649,820 79<br>820 6<br>**lasalle**<br>85: 00<br>**last**<br>863 6 9,8 4 89<br>8 2 79,8 2 669<br>8 2 6 9,8 2 639<br>803 69,803 89<br>80: 89,84 89<br>837 29,8:4 9<br>872 59,825 6<br>**later**<br>862 69,83 4<br>**law**<br>85: 39,857 39<br>886 669,88: 0<br>**lawsuit**<br>84: 59,847 9<br>847 09,847 39<br>847 79,847 29<br>847 65<br>**lawyer**<br>880 669,880 639<br>880 9,872 6<br>**lawyers**<br>886 669,83:<br>**laying**<br>876 9,876 4<br>**leading**<br>8:: 659,8:: 59<br>878 39,825 63 |
| **J** | **K** | | |
| **jackson**<br>857 2<br>**jail**<br>864 79,86: 69<br>86: 9,86: :9<br>86: 609,8 6 689<br>8 29,8 6 9<br>805 639,848 679<br>848 629,848 09<br>844 6 | **kankakee**<br>8 6 659,8 6 609<br>8 6 69,8 29<br>8 6<br>**karin**<br>852 89,84: 669<br>84: 09,834 89<br>834 39,834 659<br>833 59,83: 8<br>**keep**<br>884 689,884 679<br>845 679,846 9<br>876 7<br>**kept**<br>842 659,876<br>**kind**<br>864 09,8 7 79<br>8 2 69,80 09<br>884 89,883 6 9 | | |

CCSAO COI SUBPOENAS 000365

Transcript of Gabriel Solache, Volume 3
Conducted on December 9, 2021

34

| learn | line | looks | margarita |
|---|---|---|---|
| 83   49,834 68 | 8:4  629,8:3 6 9 | 8 :   6 | 8:0 6 |
| learned | 8:3   89,8:7 :9 | los | maria |
| 838 67 | 870 79,878   69 | 853   49,866 69 | 803 4 |
| least | 873 69,873 66 | 866 64 | marked |
| 8 6 4 | lines | lot | 862 689,862   59 |
| leave | 8:3 69,8:7  9 | 864   59,864   09 | 83: 67 |
| 8 2  8 | 877 68 | 88: 679,845 639 | marks |
| left | listening | 845 6:9,846 69 | 8 7 6 9,8 7 649 |
| 864 79,876 29 | 845   59,844 6 | 8:8 8 | 8 7 629,800 629 |
| 870 60 | little | lucas | 843    9,8:0 659 |
| left-hand | 868 669,8 5 609 | 853   49,866 6 | 826 69,82 |
| 8 5  6 | 805 79,80   659 | lunch | martinez |
| left-handed | 808 649,883 69 | 860   09,8:0 : | 886 6: |
| 88: 60 | 843 689,876 4 | | matter |
| legal | lived | **M** | 866 :9,887 79 |
| 832 69,832   6 | 804 639,8:4   59 | machine | 848 29,828 65 |
| leinenweber | 8:3 4 | 84   79,82: 6 | mauricio |
| 85: 059,85: 069 | lives | machines | 807 62 |
| 86   09,860 49 | 8:3 6 | 84   :9,84   29 | maybe |
| 826 64 | living | 84   659,84   66 | 86:   09,807 669 |
| leobardo | 88: 6 | made | 88  8 |
| 886 6:9,880 7 | llc | 875 659,87   659 | mcgrath |
| leon | 85: 6:9,852   0 | 87   6 9,870 629 | 85: 0 9,86   8 |
| 866  6 | lock | 873 6 9,820 649 | mean |
| less | 88: 66 | 82: 2 | 863 69,863 689 |
| 887 4 | loevy | make | 863 639,86: 39 |
| let's | 857   7 | 8 2 659,80   659 | 8 2 669,80   :9 |
| 862 689,8   679 | long | 8:   7 | 80:   9,80: 639 |
| 8     9,835 79 | 868   59,863 6 9 | making | 88   60 |
| 8:4 6:9,8:: 89 | 863 649,805 639 | 873 60 | means |
| 877 60 | 88   609,88   689 | male | 843 65 |
| letter | 88   649,88:   89 | 800 4 | media |
| 865 60 | 887   9,887 09 | man | 866 49,800   59 |
| license | 887 89,887 39 | 876 69,876 49 | 800   89,84:   9 |
| 882 89,846   0 | 887 :9,887 66 | 876 659,876 689 | 8:0 669,8:0 689 |
| lie | longer | 876 679,876   9 | 826   9,826 4 |
| 870 4 | 837 62 | 87   639,87   8 | medical |
| lieu | look | manage | 800 669,802 29 |
| 86   60 | 864 29,862 629 | 808 3 | 885 4 |
| light | 8 5 689,8 4 09 | manner | medication |
| 886 6 | 8 4 6 9,8:4 6:9 | 86   67 | 8 2 629,808 4 |
| lilia | 8:3 69,8:3   89 | many | meet |
| 807 62 | 8::   89,8:7 69 | 864 6:9,8 7 29 | 804 679,803 649 |
| limited | 8:2 649,870 :9 | 806 79,806 29 | 80:   8 |
| 878 6 9,878 68 | 878   59,877 609 | 80   59,885 679 | meeting |
| linda | 877 679,872 629 | 847 639,874   5 | 807 669,847   59 |
| 807 2 | 872  8 | march | 847   89,835   9 |
| | | 8:   63 | |

CCSAO COI SUBPOENAS 000366

Transcript of Gabriel Solache, Volume 3
Conducted on December 9, 2021

35

836 79,836 63
**megan**
85: 0 9,86 0
**mejia**
886 6:9,838 79
838 679,838 89
834 689,834 69
834 8
**member**
804 69,807 8
**members**
883 :
**met**
8 7 :9,804 09
803 689,80: 6:9
847 6 9,847 639
847 69,842 689
842 9,835 29
835 689,835 09
836 89,836 669
8:5 68
**metal**
84 49,84 649
84 639,84 6:9
84 629,848 :9
844 669,843
**mexican**
808 89,804 09
804 :
**mexico**
853 49,866 69
86: 89,806 39
806 :9,806 629
807 639,883 609
883 679,883 89
88: 69,8:4 59
8:3 49,8::
**mic**
884 6:
**michael**
852 :
**microphone**
868 8
**microphones**
868 7
**middle**
875 4
**might**
8 2 9,83: 5

**mike**
86 49,860 :9
84: 65
**milwaukee**
85: 7
**mine**
83: 0
**minute**
83: 5
**minutes**
8 4 6 9,843 69
8:0 2
**mischaracterizes**
836 8
**misstates**
83: 3
**mistreated**
8:6 8
**moment**
8 79,8 659
842 89,83 89
830 39,8:2 6
**monday**
86: 09,802 89
88 8
**money**
808 9,804 69
804 89,804 659
803 :9,803 659
80: 679,80: 59
845 639,845 6:9
846 69,846 8
**monitor**
866 6 9,84: 8
**months**
88: 3
**more**
863 679,86: 59
8 6 629,8 0 659
80 669,888 :9
884 29,883 59
826 6
**morning**
860 59,860 69
868 66
**move**
8:
**mozart**
8:3 60

**mstephenson@hins-**
**hawlaw**
852 6
**much**
860 89,884 659
845 689,845 64
**murder**
805
**murders**
835 89,835 669
835 6:9,835 9
836 09,836 609
836 679,836 9
83 669,838 659
838 629,834 9
834 639,833 9
83: 4
**must**
805 8
**myself**
805 64

_____ **N** _____

**name**
8 0 :9,80 629
804 6 9,804 69
803 9,803 89
80: 89,80: 29
80: 6 9,807 79
807 659,885 :9
885 69,885 89
88: 69,887 609
887 689,846 639
846 629,84 29
84 9,840 69
84: 29,8:5 659
8:6 49,8:6 39
8: 29,877 69
82: 62
**namely**
820 2
**names**
80 639,840 6
**nancy**
80: 65
**nationals**
804 7
**native**
820 60

**navarro**
857 649,86 79
860 659,8:5 669
8:5 6 9,8:5 689
8:5 639,8:6 609
8:6 649,8:6 6:9
8:6 59,8:6 0
**necessary**
845 2
**need**
882 6 9,83: 89
837 59,8:5 69
826 67
**needed**
864 39,882 6:9
8:0 9,8:2 68
**neither**
82: 68
**network**
84 9,840 9
840 89,840 629
848 9,848 39
848 89,844 :9
844 659,844 0
**never**
803 29,80: 6:9
883 639,883 629
830 29,830 609
838 6:9,834 39
834 659,833 79
833 649,833 679
83:
**new**
864 9,863 69
863 4
**news**
803 6
**next**
8 5 689,8 679
8 629,8 9
8 0 6:9,8 0 9
8 8 9,8 8 39
8 8 29,8 8 669
8 8 649,8 7 669
8 2 89,884 6 9
8:3 6 9,8:3 09
8:7 :9,8:7 669
875 639,875 59

CCSAO COI SUBPOENAS 000367

875 89,876 89
876 39,873 69
873 669,872 8
nickname
843 4
night
880 2
north
85: 79,85: 59
85: 009,857 0 9
852 7
northern
853 9,866 7
northwestern
807 6
note
852
notes
84
nothing
826 60
november
8 : 69,8 : 7
number
866 39,866 29
862 59,8 8 6:9
8 4 79,800 59
808 69,802 6:9
802 9,848 689
848 649,848 69
843 09,84: 09
8:0 669,8:0 689
8:4 :9,8:4 09
826 3

O

o'malley
852 09,86 39
860 79,84: 6 9
84: 89,830 49
830 29,830 689
838 49,833 59
83: 89,832 67
oath
828 649,82: 7
object
86 639,8 3 6:9
8 7 69,872 66

objection
863 69,867 09
867 39,8 5 39
8 6 639,8 639
8 : 89,8 : 679
8 : 89,8 7 59
8 2 09,8 2 89
805 669,806 09
806 609,80 :9
800 609,807 69
802 669,885 6 9
88 29,88 679
888 6:9,884 49
882 659,840 689
843 6 9,847 69
836 09,83 6 9
83 609,830 9
830 09,838 669
838 69,834 6:9
833 89,833 69
83: 39,832 69
832 59,8:6 29
8:8 79,8:8 689
8:8 59,8:4 9
8:: 659,8:: 669
8:: 629,8:7 69
8:2 89,87 79
870 679,870 09
878 39,825 79
825 63
objections
83 39,832 :
obviously
803 6
occasion
88: 65
occasionally
883 64
occur
844 8
october
885 3
of
828 67
offer
828 68
office
85: 39,840 9

848 69,848 2
officer
86 69,8:6 :
officers
860 09,848 59
848
often
868 0
oh
888 0
okay
86: 29,8 679
8 4 :9,8 7 09
808 29,808 629
885 09,884 59
843 69,837
old
8 : 9,882 89
845 79,845 659
845 60
once
864 69,863 29
863 679,874 0
one
8 8 639,8 8 679
8 7 609,80 9
80 679,80 59
80 9,885 59
880 6 9,887 9
882 9,882 49
84 69,847 629
842 49,837 29
8:5 629,8:5 69
8: 8
ones
805 6:9,84 89
840 49,840 2
only
80 679,885 59
88: 39,887 79
846 39,840 79
848 79,847 679
8:5 679,874
open
862 89,88: 66
operate
84 68
operated
84 65

operator
84 :
opportunity
802 9,838 6
organization
804 9,807 4
organized
83:
original
852 9,82: 62
other
857 89,86: 679
8 : 09,8 7 609
80 89,802 39
88 639,846 :9
846 79,8:5 59
8:6 9,8: 09
877 89,872 9
872 89,825 6 9
825 67
others
860 0
out
863 9,863 49
8 5 669,8 7 679
800 :9,803 639
886 639,88 49
88 6 9,88 639
88 89,880 39
880 79,883 6 9
882 39,845 09
840 49,848 49
877 689,877 679
877 69,872 49
872 2
outside
848 6:
over
867 6 9,808 49
870 8
owed
848 2
own
8 3 79,87: 6:
owned
846 66

P

page
865 09,865 669

CCSAO COI SUBPOENAS 000368

Transcript of Gabriel Solache, Volume 3
Conducted on December 9, 2021

37

8 5    9,8 6   89
8 8 639,8 8 6:9
8 4 89,8 3 6 9
8 3 609,8 : 09
8 : 649,8 7 89
8 7 669,8 7 609
8 7 649,8 2 89
8 2 49,8 2 79
8 2 669,8 2 6 9
8 2 639,837 39
8:4 6:9,8:4   9
8:4   89,8:3   09
8:7   9,8:2 649
8:2 639,875   9
875 49,876 79
870 :9,870 669
870 609,870 689
878   59,874 669
87:   69,877 :9
877 659,877 609
877 649,872   59
872   89,825 69
824 :9,824 609
824 629,823 69
823 :9,823 60

**pages**
862   09,8 5 649
8 5 629,8    679
8    629,8      9
8    09,8 0 69
8 0 89,8 0 6:9
8 0   9,8 8  9
8 8 :9,8 8 29
8 8 669,8 8 639
8 8   59,8 8   89
8 4 64

**paid**
886 39,845 64

**parking**
88: 67

**part**
8 6 49,8    689
883 609,84:   6

**participate**
885 68

**participated**
885 629,836 6:

**participation**
886 :

**parties**
82: 63

**partners**
886 629,886   6

**passed**
8:   66

**passenger**
8:7 7

**past**
88: 3

**pay**
845 689,848 65

**payday**
840 09,840 8

**penalties**
86   64

**penalty**
828 49,828 7

**pending**
886 65

**people**
864 6:9,864    59
864   89,805 649
806 79,806 29
80   6:9,808   69
883 6 9,846 79
840 609,840   59
848 :9,844 669
843 69,8:5 67

**people's**
85: 39,876 68

**period**
867 659,8 6

**perjury**
86   639,828 49
828 7

**permitted**
888 79,888 64

**person**
85: 49,85: 639
857 49,807 669
840   09,848 69
8:5   59,8:6   9
8:6 49,8:6 39
8:6 :9,820 7

**person's**
87   649,87    0

**phase**
807 68

**phone**
840   09,848 09
848 689,848 649
848   6

**photo**
876 68

**photographs**
83:   629,837 689
837 6:9,825   9
825 09,825 3

**photos**
872   59,825 6

**physically**
80   79,842 3

**picked**
886 64

**picking**
88:   66

**pictures**
825 65

**pills**
805 49,805 :

**place**
853   49,866 689
886   9,886   09
88   69,88: 6:

**placed**
877 29,82: 7

**places**
840 39,840 :9
872   9,872 8

**plaintiff**
853 :9,85: 89
866 629,866   69
86   59,86     9
825   6

**planet**
866 609,86   65

**plans**
867 639,867   9
884 0

**plastic**
874 0

**please**
866 639,866 6:9
86   669,862 :9
862   59,8 6 629
8 3   89,8 2 49

**phone**
882   89,845    9
844 629,842 679
83   09,83   649
83:   6:9,837 49
837 :9,87   6:9
87   67

**plus**
80: 0

**point**
8 : 669,808 6:9
830 689,834 669
833 639,870 68

**pointing**
8:3   9,875 :9
874 60

**police**
88: 639,887   09
882 09,882 :9
845 89,847 609
847 6:9,847   69
842 659,842 689
842   9,835 89
835 29,835 669
835 649,835 6:9
835   09,836 89
836 6 9,836   69
83   659,830 69
830 39,830 659
830 679,830   69
838 39,838 29
838 629,834 69
834 :9,834 649
834   9,833 69
833 29,837   89
832 679,8:5 6:9
8:6 :9,8:6 609
8:6 6:9,8:6   69
878   9,874 :

**pop**
873

**post-conviction**
886 65

**prepare**
84   62

**prescribe**
8 2 62

**presence**
842 39,842 2

CCSAO COI SUBPOENAS 000369

| | | | |
|---|---|---|---|
| **present** | 8 8 669,8 4 7 | 883 39,883 79 | **realized** |
| 852 639,8 0 39 | **provided** | 882   59,8:5   9 | 840 6 |
| 8 0 659,8 0 669 | 8 8   6 | 8:5 89,8:   9 | **reason** |
| 8 0 689,8 0 629 | **provider** | 8:   629,8:0 :9 | 86:   09,806 6 9 |
| 8 0   09,8 8 09 | 800 3 | 8:0 79,8:0   69 | 806 679,887 6:9 |
| 8 8 6 9,8 8   9 | **psych** | 8:8 69,8:8 89 | 878 89,878 49 |
| 83   29,83   679 | 800 66 | 8:8 6 9,8:: :9 | 824 659,824 639 |
| 837 6: | **psychiatrist** | 8:: 639,8:: 6:9 | 824   9,823 89 |
| **presented** | 800 6 | 825 629,825   69 | 823 659,823 63 |
| 805 6: | **psychological** | 826 29,826 659 | **reasons** |
| **pressure** | 864 6 9,864 64 | 826 6 9,826 689 | 8 0 679,887   9 |
| 800 : | **psychologically** | 826 64 | 882   9,882 4 |
| **prevent** | 864 49,864 : | **R** | **recall** |
| 808 6 | **psychologist** | | 868 6:9,868   59 |
| **previous** | 800 669,800 6 | **ran** | 86: 6:9,8 5 89 |
| 868 :9,803 6 | **public** | 875   69,876 6 | 8   669,8 7 39 |
| **prior** | 846 : | **ranch** | 8 7 6 9,8 7 679 |
| 847   89,836 639 | **put** | 843 79,8:: 6 | 807 609,886 29 |
| 82: 7 | 808 :9,87:   89 | **rd** | 886 609,88   79 |
| **prision** | 872 89,872 39 | 8:   63 | 8:8 62 |
| 86: 689,86: 64 | 872 79,872 6 | **reach** | **received** |
| **prison** | **putting** | 848 4 | 805   5 |
| 863   9,863 49 | 86: 79,8 7 62 | **read** | **receiving** |
| 86: :9,86: 649 | **Q** | 8 8 6:9,8 3   69 | 868   0 |
| 805   69,808   69 | **question** | 8 3   9,8 3   89 | **recess** |
| 803 29,803 63 | 867 49,867 629 | 8 : 689,882   09 | 800   9,84: 69 |
| **problem** | 862 :9,805 79 | 845 69,845   69 | 83: 689,8:0 609 |
| 888 09,840 6 | 888 679,888   59 | 845   09,844   69 | 826 8 |
| **problems** | 882 649,882 6:9 | 842 629,8:3 79 | **recognize** |
| 864 609,864 649 | 882 679,882   9 | 8:3   59,87   59 | 8   09,8:4 659 |
| 805 0 | 845   9,845 629 | 870 :9,873   9 | 8:4 60 |
| **proceeding** | 845   9,845   89 | 87:   9,87: 6:9 | **recollection** |
| 86   6: | 844 679,844   9 | 828 29,828 65 | 8 6   9,8 : 29 |
| **proceedings** | 842 639,842 679 | **reader-interpret-** | 8:8   0 |
| 888 6 9,82: 39 | 842   59,835 689 | **er** | **record** |
| 82: :9,82: 65 | 835 629,835   59 | 820 | 86: 79,800   69 |
| **produced** | 83 6:9,838 69 | **reading** | 808 69,808 :9 |
| 8:4 4 | 834   09,8:3 6:9 | 876 29,820 6 9 | 845 69,845   09 |
| **program** | 8:2   09,87   629 | 820 639,820 679 | 844   69,843   89 |
| 804   5 | 87   6 | 82: 6: | 842 629,83: 609 |
| **promises** | **questioning** | **reads** | 83: 639,8:5   09 |
| 873 6 | 860 | 8 5   8 | 8:0 6 9,8:0 639 |
| **prosecutor** | **questions** | **ready** | 87   59,826 09 |
| 8:0   89,87   : | 860   89,868 69 | 884 609,884 689 | 826 :9,82   89 |
| **provide** | 868   9,8 4 609 | 884 679,884 629 | 82: 2 |
| 864 689,8 0 69 | 8 7 :9,8 7 29 | 84   49,848 :9 | **reference** |
| 8 0 89,8 0 679 | 8 7 659,884 29 | 844 669,843   9 | 8 6 29,880 67 |
| 8 0   09,8 8   9 | | 843 62 | **referenced** |
| | | | 865 669,862 639 |

CCSAO COI SUBPOENAS 000370

Transcript of Gabriel Solache, Volume 3
Conducted on December 9, 2021

39

| | | | |
|---|---|---|---|
| 8 4 29,802 679 | 807 679,802 9 | 844 629,8: 679 | 837 89,832 39 |
| 8:4 7 | 802 649,885 79 | 87 679,826 6:9 | 8:4 89,8:3 9 |
| **references** | 885 679,885 59 | 826 9,82: 69 | 8:2 639,8:2 69 |
| 8 6 6 | 885 69,88 609 | 82: 89,82: 4 | 8:2 9,875 49 |
| **referring** | 880 49,883 79 | **represent** | 870 79,878 59 |
| 805 629,8:: 67 | 887 9,887 39 | 866 6:9,84: 659 | 872 9,825 89 |
| **refresh** | 887 659,887 649 | 8:5 65 | 826 29,826 659 |
| 8 6 69,8 : 29 | 887 59,845 649 | **requested** | 826 6 |
| 8:8 0 | 846 59,840 69 | 820 689,82: 6: | **right-hand** |
| **regarding** | 848 89,847 639 | **research** | 837 :9,8:2 6: |
| 835 89,835 669 | 847 679,842 09 | 8 4 9,8 3 7 | **right-handed** |
| 835 6:9,836 69 | 837 649,837 639 | **reserve** | 88: 68 |
| 83 669,838 29 | 837 679,8:5 649 | 826 8 | **rock** |
| 838 629,834 69 | 8: 609,8: 6:9 | **reserving** | 85: 6:9,852 0 |
| 834 649,833 69 | 8:8 69,8:8 49 | 826 0 | **rolling** |
| 83: 4 | 8:8 :9,8:8 6 9 | **respond** | 843 6 |
| **register** | 8:8 60 | 86: 669,870 9 | **room** |
| 88: 59,88: 69 | **remembers** | 878 | 835 :9,8:0 09 |
| 887 609,887 639 | 807 0 | **rest** | 8:7 639,87 39 |
| 887 6:9,887 6 | **remote** | 870 3 | 878 659,874 89 |
| **registered** | 82: 65 | **retranslated** | 87: 49,87: 659 |
| 887 6 | **remotely** | 844 5 | 87: 649,825 68 |
| **reiter** | 85: 79,857 639 | **retranslates** | **rosauro** |
| 857 6: | 857 39,852 4 | 8:3 6: | 834 689,834 69 |
| **relate** | **repeat** | **return** | 834 8 |
| 8 8 69,8 : 0 | 867 679,862 :9 | 888 79,884 0 | **rosen** |
| **related** | 882 6 9,845 629 | **review** | 85: 679,865 89 |
| 8 6 609,8 : 639 | 844 679,842 6:9 | 802 | 866 9,86 89 |
| 803 609,803 59 | 835 39,832 669 | **reviewed** | 860 629,868 09 |
| 80: 69,80: 39 | 87 6:9,87 629 | 836 0 | 868 49,868 29 |
| 80: 79,847 659 | 877 | **reyes** | 863 09,863 89 |
| 8:8 89,8:8 60 | **repeated** | 857 49,866 69 | 86: 29,86: 639 |
| **relationships** | 882 67 | 86 09,836 59 | 867 :9,867 59 |
| 883 3 | **repeating** | 83 29,83 89 | 867 69,862 689 |
| **relative** | 882 67 | 830 639,830 59 | 862 679,8 5 :9 |
| 803 609,82: 64 | **rephrase** | 833 679,837 :9 | 8 6 6:9,8 6:9 |
| **released** | 834 0 | 8:0 79,825 | 8 4 :9,8 4 669 |
| 8 6 68 | **replow** | **reynaldo** | 8 3 39,8 3 :9 |
| **remember** | 883 6 | 85: :9,86 9 | 8 3 69,8 3 09 |
| 868 609,868 649 | **report** | 86 89,860 8 | 8 : 49,8 : 59 |
| 868 629,864 679 | 882 09,845 65 | **rides** | 8 7 9,8 2 69 |
| 863 609,863 6:9 | **reported** | 846 7 | 8 2 6 9,8 2 689 |
| 86: 69,8 79 | 853 2 | **right** | 805 69,805 6 9 |
| 8 0 :9,8 0 6 9 | **reporter** | 867 9,8 8 9 | 806 89,806 689 |
| 8 7 79,806 69 | 853 059,86 29 | 8 4 69,8 : 09 | 80 659,80 6 9 |
| 80 639,80 629 | 86 669,86 6 9 | 804 79,803 09 | 800 29,800 689 |
| 804 29,804 629 | 86 689,868 09 | 80: 39,88: 609 | 800 679,808 29 |
| 804 69,807 669 | 868 39,882 89 | 843 6:9,847 689 | 808 659,807 09 |

CCSAO COI SUBPOENAS 000371

Transcript of Gabriel Solache, Volume 3
Conducted on December 9, 2021
40

```
802 69,802 609
802 639,802   59
885 689,885 6:9
886 09,886 49
88   659,88    59
888 89,888 609
888   69,884 39
884 29,83:   09
8:0   9,8:8 09
8:8 79,8:8 689
8:8   59,8:4 49
8:: 659,8:: 649
8:: 629,8:7  69
8:2 89,87  79
870 679,870  59
870   09,878 39
878 79,872 669
872   59,825 79
825 639,825   59
825   09,826 79
826 6 9,826 639
826 629,826   59
826   09,82  6
rough
826   6
row
805   09,804  5
ruben
853   29,86   659
82: 09,82:   4

          S

said
863 29,86: 629
8 0 609,805 689
806   69,802 689
880   69,880  09
88: 639,887 6 9
882 6:9,846   69
844 39,844 609
844 639,835 39
838   9,8:3 689
8:7   09,8:2 79
878 09,878 89
878 649,878 6:9
874 49,87: 659
87: 689,877 09
877 659,826 7
```

```
same
8 0 679,8 8 39
8 8 29,8 : 89
8 :   89,80   79
803   69,803    9
803   09,803   89
80: 79,884 49
883   9,835   59
83   39,832 :9
8:: 69,878 49
872 09,825 689
820 6 9,828 659
828 66
san
853   49,866 6
sandwiches
873
sat
8:7 7
saw
868   59,863 29
8 2 679,80   679
800 659,803 6 9
830 29,834 39
833 79,8:4 69
8:7 3
say
864 629,806 6:9
808   9,880 639
883 6:9,887 89
882 39,882 629
845   9,845 609
8:2 659,8:2 609
876 609,876 6:9
876   69,87   669
87   6 9,878 679
874 89,874 7
saying
843 49,842 09
8:8   89,87   66
says
8 3   59,885 89
882 609,882 629
8:4 629,8:3 89
8:3 669,8:7 09
8:7 :9,8:7 6 9
8:2 639,875   9
875 6 9,875 639
```

```
875   89,870 29
874 659,874 689
873 69,873 66
scared
8:2 6
school
88: :9,88: 79
88: 66
screamed
876 67
sean
857 059,888 669
825   59,826 7
seat
8:7 29,8:7 60
second
8 6   89,8 8 6:9
8 7 609,883 49
84   69,8:5   9
8:   8
see
868 689,86:   89
862 39,8 6 659
8 6   89,8 7 639
805   89,80   89
80   689,80   59
802   89,885 09
885 :9,883 639
83   89,830 639
830   59,838 49
838 :9,8:6 6 9
8:4 679,8:3 39
8:3 669,8:7 49
8:7 :9,8:7 669
8:2   59,875   9
875 39,875 :9
875 669,875 6 9
875 639,875   9
876 669,876 649
876 629,876   89
870 669,878   89
874 609,874 689
873 89,873 689
87:   59,877 6 9
877 609,877 6:9
877   69,877   89
825 09,825 :
seeing
868 639,868 679
```

```
868   89,864 69
864   9,862 29
862 6 9,8 6 09
8 6 39,8 : 659
8 : 609,805 29
80   4
seen
8 4 639,8 3 679
8 7   9,885 6
send
808   9,808   89
803 :9,80: 6:9
840 4
sending
804 89,80: 62
sent
804 29,803 2
sentence
8:7   9,8:7 49
8:7 669,8:2 6:9
875 669,875 639
875   59,875   89
876 8
sentencing
807 68
series
83: 62
services
802 65
sessions
863 6
set
8 4 649,82: 3
seven
877 68
several
84   65
shape
84   64
sheet
828 609,824 6
sheets
84    5
shirt
842 65
shoot
8:0 2
short
825   0
```

CCSAO COI SUBPOENAS 000372

Transcript of Gabriel Solache, Volume 3
Conducted on December 9, 2021

41

shorter
860   8
shorthand
853 059,82: 69
82: 09,82: 6
show
862 689,807    9
802 639,884 69
8:4 89,875 79
872 64
showed
888   8
showing
846 669,874 609
877 67
shown
872 639,825 60
shows
825 6
siblings
802 3
sick
808 64
side
8:2 6:9,825 6
sidley
886 66
sign
8:4 649,87:   09
877 39,877 79
825 39,825 659
825 64
signature
87:   59,877 29
825 0
signature-plkal
82:   0
signature__date_-
___
823
signed
830   69,8:4 689
877 3
signing
82: 6:
similar
835 689,835 62
since
863   9,863 49

843 68
sister
807 62
sit
838 6:
sitting
878 65
situation
80:   6
six
8:3 69,877 60
sixth
8 3 6 9,88: :9
8:4 67
sleep
870 65
smoke
873 0
society
864 63
solache
853 49,853 629
865 09,865 609
865 6:9,866 39
866 :9,866 629
86    629,86    59
860   59,868 659
862 629,8 4 79
8 7 609,800   59
808   9,808 669
803 49,80:   9
80: 09,80: 89
802 6:9,802   69
885 89,880 659
884 669,884   89
843   09,84: 09
84: 29,84: 689
836   59,83    9
83    649,830   89
838 6 9,834 629
833 609,833   89
83: 29,83: 679
837 49,837    9
832 39,832 29
832   09,8:5 69
8:5 79,8:5 669
8:6   9,8:6 6 9
8:   29,8:   659

8:0   669,8:0   649
8:4   629,8:3 89
8:3 6 9,826   9
826 39,82   89
828 09,828   89
823   0
soldier
808 3
some
860   89,8 0 629
8 8 89,8 8 609
8 8    9,8 : 669
8 7 6 9,8 7 649
800   :9,808 49
886 669,883 49
848 29,83   :9
8:0   69,8:: :9
877   8
somebody
804 6 9,80: 29
80: 6 9,807 7
something
864    9,862   89
805 49,805 689
805 649,888 689
845 679,846   9
847 29,842 09
8:2    9,874   9
877 689,877 6:9
877   69,872 4
sometime
8 6 4
sore
808 8
sorry
886 89,888 69
884 6:9,8:4   8
sort
8:2 6:
soto
835 89,835 669
835 6:9,835   9
836 09,836 609
836 679,836   69
83   669,838 659
838 629,834   9
834 639,833   9
83: 4

sotos
857 3
sound
868 3
sounds
807 65
south
857 629,8:3 60
spanish
860 689,8 3 09
8 : 649,800 89
882 669,8:5 629
8:5   59,8:6 09
8:2    9,873   09
87: 09,877 09
820 29,820 6
speak
830 659,834 :9
833 29,8:5 63
speaking
8 3   9,882 66
speaks
800 89,820 7
specific
8 6 629,888 :9
883   59,840 6:
specifically
805 2
specify
886 67
spend
845 679,846 6
spent
8 6 609,883 62
spoke
8 0 649,835 09
835 659,835 639
833 679,8:5 629
8:5   59,8:6 0
spoken
830 609,834 659
833 649,83: 0
stab
87   639,87    8
stabbed
876 68
stabbing
876 659,876

CCSAO COI SUBPOENAS 000373

| | | | |
|---|---|---|---|
| staffing | 888 29,888 649 | 838 09,838 89 | subscribed |
| 84 9,840 69 | 888 89,884 89 | 838 6 9,838 639 | 82: 62 |
| 840 89,840 629 | 88: 9,882 69 | 838 09,834 679 | sue |
| 848 9,848 39 | 8: 09,8:4 629 | 833 49,833 6 9 | 84: 68 |
| 848 89,844 :9 | 8:4 69,8:3 89 | 833 09,83: 79 | sued |
| 844 29,844 0 | 8:3 39,8:3 6 9 | 83: 669,83: 6:9 | 84: 0 |
| stamped | 8:: 69,8:7 09 | 837 09,837 89 | suffered |
| 8 2 609,837 3 | 8:7 79,8:7 6 9 | 837 629,837 69 | 802 7 |
| star | 8:2 679,875 09 | 832 49,832 79 | suite |
| 875 65 | 875 609,875 6:9 | 832 639,832 9 | 85: 69,85: 089 |
| starr | 875 59,875 69 | 8:5 69,8:4 9 | 857 659,857 59 |
| 857 059,888 669 | 876 69,876 89 | 8:: 669,8:: 69 | 852 2 |
| 836 09,83 39 | 876 49,876 29 | 8:7 9,8:2 49 | sure |
| 83 609,830 9 | 876 609,876 6:9 | 87 2 | 863 09,867 59 |
| 830 09,833 89 | 876 9,870 29 | still | 8 6 59,8 3 39 |
| 833 669,833 69 | 878 9,874 669 | 867 609,803 6:9 | 8 2 659,800 679 |
| 832 09,832 :9 | 873 69,873 66 | 880 609,828 68 | 888 79,883 89 |
| 8:6 29,825 69 | station | stipulate | 8: 7 |
| 826 65 | 882 09,847 609 | 86 6 9,86 69 | surrounded |
| start | 847 6:9,847 69 | 86 09,860 69 | 806 7 |
| 867 6 9,867 9 | 842 659,842 689 | 860 89,860 3 | susler |
| 835 7 | 842 9,835 89 | stipulates | 85: :9,865 79 |
| started | 835 29,835 669 | 860 79,860 65 | 866 679,86 59 |
| 868 609,868 6:9 | 835 649,835 6:9 | stolen | 863 69,86: 89 |
| 804 9,807 9 | 835 89,836 49 | 88: 6:9,887 69 | 86: 659,867 09 |
| 807 49,843 649 | 836 6 9,83 659 | 887 29,887 0 | 867 39,8 5 39 |
| 876 659,876 0 | 830 69,830 :9 | stomach | 8 6 639,8 639 |
| starts | 830 659,830 679 | 876 65 | 8 3 6:9,8 : 89 |
| 8:3 9,8:3 89 | 830 69,838 39 | stop | 8 : 679,8 : 89 |
| 8:2 679,875 669 | 838 29,834 69 | 806 659,806 6 9 | 8 7 59,8 2 659 |
| 878 6 | 834 :9,834 649 | 836 67 | 8 2 09,805 669 |
| state | 834 9,833 69 | stopped | 806 09,806 609 |
| 866 6:9,84: 65 | 833 659,837 89 | 86: 0 | 80 :9,800 09 |
| state's | 832 629,8:5 6:9 | store | 800 609,808 9 |
| 847 6 9,830 6:9 | 8:6 609,8:6 679 | 862 09,862 89 | 807 69,802 669 |
| 878 0 | 8:6 6 | 862 49,862 79 | 885 6 9,886 9 |
| stated | status | 862 66 | 88 29,88 679 |
| 84: | 888 4 | street | 880 69,888 69 |
| statement | stephenson | 85: 59,85: 009 | 888 639,884 49 |
| 865 6:9,836 69 | 852 :9,865 39 | 857 0 9,852 7 | 882 659,882 6 9 |
| 83 659,830 69 | 86 49,860 :9 | strike | 882 639,840 689 |
| 838 29,838 679 | 884 6 9,884 639 | 867 669,862 89 | 844 609,844 639 |
| 834 649,874 659 | 884 629,843 59 | 80: 0 | 843 6 9,847 69 |
| 873 609,873 0 | 84: 79,84: 659 | student | 842 6:9,83 6 9 |
| states | 847 89,835 69 | 807 6 | 83 6:9,83 59 |
| 853 69,866 79 | 83 69,83 79 | studio | 838 669,838 69 |
| 803 679,807 59 | 83 689,83 09 | 886 6:9,88 6 | 834 6:9,83: 39 |
| 802 49,888 39 | 830 89,830 89 | stuff | 83: 59,83: 89 |
| | | 883 | |

CCSAO COI SUBPOENAS 000374

Transcript of Gabriel Solache, Volume 3
Conducted on December 9, 2021

43

832 69,832 59
8:5 69,8:6 659
8: 09,8:0 89
8:0 39,8:0 59
8:8 659,8:8 639
8:8 9,8:4 89
8:4 29,8:3 649
8:3 629,8:: 689
8:: 09,8:2 69
8:2 :9,8:2 59
875 69,875 29
87 609,87 679
870 9,878 69
878 609,878 649
878 629,877 9
877 49,872 689
872 679,825 669
825 679,826 8

**swaminathan**
857 29,866 59
86

**swear**
86 66

**swearing**
86 60

**sweatshirt**
842 66

**sworn**
860 60

**symptom**
808 4

**symptoms**
805 6:9,808 3

**T**

t-o-r-t-o-l-e-r--
r-o
807 2

**table**
8:2 629,875 89
875 68

**take**
862 629,8 5 669
8 5 689,8 4 09
8 4 6 9,800 6:9
843 6:9,83: 659
83: 59,837 609
8:0 39,8:0 :9

825 0
**taken**
866 689,837 6:9
828 29,82: 3
**talk**
868 659,863 9
863 09,840 9
832 68
**talked**
86: 59,803 689
807 629,802 89
880 6 9,882 6:9
840 679,832 689
8:5 679,8:6 89
8:6 5
**talking**
86: 6:9,8 669
806 09,80 69
80 9,802 6 9
882 639,844 649
8:8 679,8:3 649
826 5
**tardy**
8 63
**technical**
82: 65
**tell**
8 0 639,8 3 639
805 29,846
**telling**
886 609,88 79
878 67
**term**
885 6
**testified**
883 669,88: 49
825
**testify**
8 3 629,808 679
88: 64
**testifying**
808 609,82: 7
**testimony**
86 649,808 639
883 679,83: :9
8:8 629,8:4 63
**tests**
800 7

**th**
885 39,82:
**thank**
884 659,838 09
837 09,837 629
8:5 6
**themselves**
866 6:
**therapy**
806 659,806 6
**thereafter**
82: 60
**thing**
872 09,825 64
**things**
863 09,86: 09
86: 59,8 : 09
806 89,84 679
84 59,8:8 6 9
878 6:
**think**
86: 49,86: 39
86: 9,808 639
807 89,802 89
886 59,886 69
88 09,88 679
880 69,88: 39
846 69,84 69
844 609,844 639
835 629,835 59
83 6:9,8:0 49
8:0 39,8:3 649
8:2 69,877 09
872 68
**third**
8:7 6
**thisday**
828 67
**thomas**
85: 069,852 09
84: 6 9,84: 89
830 49,830 29
830 689,838 49
833 59,83: 89
832 6:
**thought**
803 609,802 60
**threats**
873 6

**three**
862 09,873 9
825 68
**throat**
808 8
**through**
86: 9,8 8 649
8 4 609,8 4 69
84 9,870 :9
870 689,878 6
**thursday**
866 6
**time**
853 89,866 6 9
867 659,8 6 9
8 6 609,8 : 669
8 2 679,805 639
80 79,80 9
808 6:9,803 :9
803 79,885 9
88 609,888 29
884 659,883 629
88: :9,887 09
887 89,887 669
882 79,845 49
845 679,846 69
84: 89,847 629
847 69,842 669
83 :9,830 689
838 689,834 669
833 639,83: 639
873 9,82: 3
**times**
806 :9,80 59
847 63
**title**
846 649,846 639
846 62
**today**
868 9,84: 629
838 6:9,872 6
**today's**
866 669,82 0
**together**
883 64
**told**
86: 9,8 5 29
8 0 39,8 0 29

CCSAO COI SUBPOENAS 000375

805 09,806 29
806 679,80: 69
88 49,88 629
840 29,848 79
844 39,835 9
836 6:9,8:8 09
8:8 669,8:8 6:9
8:4 649,8:: 649
8:2 69,878 49
874 9,877 79
872 39,872 6 9
825 64

**tom**
86 09,860 4

**tongue**
820 60

**took**
808 0

**top**
8 5 69,8 3 649
8 : 79,8:7 69
8:2 64

**tortolerro**
807 2

**torture**
805 5

**tortured**
805 639,805 67

**toward**
8:2 6:9,875 6

**town**
803 9,803 89
80: 09,80: 7

**transcribed**
82: 60

**transcript**
852 9,86 6:9
807 9,826 69
828 29,82: 6

**translate**
860 609,867 89
820 66

**translates**
867 49,842 63

**translation**
86: 609,86: 689
8:3 63

**transportation**
846 :

**treated**
878 9,874 3

**treatment**
868 669,867 689
867 6:9,867 09
862 39,862 29
862 6 9,8 689
805 49,806 9
806 629,806 9
874 2

**trevino**
852 679,860 6 9
800 09,872 6:

**trevino:**
838 64

**trouble**
88: 9,88: 7

**true**
86 649,8 8 39
8:3 29,8:3 69
8:: 49,8:2 29
8:2 659,870 89
874 39,874 629
873 29,873 629
828 66

**truth**
843 60

**truthfully**
808 609,808 679
8:: 6:

**try**
808 3

**trying**
8 89,888 68

**turn**
8:3 0

**two**
863 639,8 5 689
8 5 679,8 5 9
8 679,8 629
8 9,8 09
8 0 69,8 0 89
8 0 6:9,8 0 9
8 8 9,8 8 39
8 8 29,8 8 669
8 8 89,80 69
840 79,837 659
837 609,837 6:9

8:5 679,8:4 69
8:3 3

**two-page**
8 5 639,8 6 5

**types**
863 0

---
**U**
---

**under**
86 649,88: 69
887 6 9,887 609
828 49,828 79
828 649,82: 79
82: 60

**understand**
805 :9,883 659
882 689,882 69
87: 29,87: 60

**understanding**
803 9,828 68

**understood**
820 6:

**undocumented**
887 679,882 29
845 :9,845 66

**unfair**
805

**united**
853 69,866 79
803 6:9,807 59
802 49,888 39
888 29,888 649
888 89,884 89
88: 9,882 69
8: 9,8:4 59
8:3 4

**unregistered**
887 8

**until**
8 8 639,870 7

**use**
8 3 89,874 6 9
874 59,874 9
874 0

**uses**
86: 3

**using**
82: 6

---
**V**
---

**vague**
885 60

**valadez**
865 649,868 6 9
868 689,868 639
868 679,868 69
868 89,864 89
863 :9,863 69
86: 679,86: 89
867 669,862 39
862 29,862 6 9
8 5 9,8 6 09
8 6 39,8 669
8 0 9,8 0 49
8 0 679,8 0 09
8 8 09,8 8 6 9
8 8 69,8 4 629
8 3 29,8 : 659
8 7 39,8 2 629
805 29,806 69
806 09,80 39
80 68

**valerie**
857 06

**valid**
846

**varga**
852 89,86 39
860 79,84: 669
84: 89,833 39
833 29,833 649
833 59,83: 8

**vega**
8:0 6

**verbatim**
82: 2

**verified**
86 67

**versus**
866 :

**via**
853 5

**video**
866 39,866 6 9
807 649,807 679
807 9,84: 8

CCSAO COI SUBPOENAS 000376

**videoconference**
853 59,82: 4
**videographer**
852 6:9,866 49
866 609,86 29
800 629,800 89
843 9,84: 9
83: 6 9,83: 649
8:0 659,8:0 689
826 69,826 49
82
**videotaped**
853 67
**violating**
888 62
**virtual**
888 6
**voice**
866 63
**volume**
853 689,853 6:
**voluntarily**
873 60
**vs**
853 2

---

**W**

**wacker**
857 62
**waiving**
826 0
**walked**
835 :
**want**
868 659,864 09
86: 669,8 3 629
806 679,808 9
807 9,883 69
843 6:9,847 669
8: 79,8:2 6 9
826 62
**wanted**
808 :9,874 6 9
874 5
**water**
873
**way**
86: 09,8 5 29

---

8 5 659,8 7 689
808 6 9,883 69
882 :9,845 09
8:6 89,870 :9
870 689,877 67
**ways**
864 65
**we'll**
844 629,8:0 79
826 8
**we're**
8 8 89,80: 9
84: 629,83: 6 9
8:0 39,876 79
872 689,825 0
**we've**
862 689,862 62
**week**
864 69,863 29
863 649,863 62
**wehrle**
852 89,86 39
860 79,84: 669
84: 09,834 89
834 39,834 669
833 59,83: 8
**went**
86: 9,867 669
808 89,886 639
886 679,88 49
880 49,880 39
880 79,88: 39
870 89,870 65
**west**
857 2
**westin**
866 68
**whatever**
8:2 60
**whereof**
82: 67
**whether**
863 6:9,8 3 29
8 : 659,887 659
84: 59,84: 09
847 09,847 :9
838 89,834 89
8:8 6

---

**whitehorn**
865 63
**withdraw**
834 0
**without**
888 67
**witness**
865 09,86 669
86 609,86 689
86 679,8 3 09
8 : 629,8 7 69
800 89,800 49
802 649,885 639
882 669,882 689
882 69,845 79
846 89,840 649
844 649,843 09
843 609,847 9
842 639,842 89
83 :9,830 09
838 9,838 609
838 9,832 609
8:5 09,8:8 29
8:8 649,8:8 69
8:4 09,8:3 689
8:3 679,8:: 609
8:: 9,8:7 09
8:2 39,87 659
870 69,870 629
870 89,878 :9
878 639,872 6 9
825 29,825 6:9
820 79,820 609
820 649,820 6:9
82: :9,82: 67
**woman**
8:0 8
**word**
86: 39,8 3 4
**words**
872 7
**work**
862 09,840 39
840 659,840 6
**worked**
88 :9,88: 6:9
84 89,84 6 9
84 609,84 69

---

84 89,848 65
**worker**
887 679,887 89
882 29,845 :
**working**
880 609,880 639
880 59,844 669
843
**worst**
884 69,884
**wrap**
868
**write**
8 5 9,8 5 8
**writing**
804 9,807 49
8:8 679,8:4 69
873 69,87: 3
**written**
8 7 89,805 89
83 659,830 69
838 29,838 679
834 649,8:3 79
870 09,87: 0
**wrong**
8 2 9,805 659
846 9,847 79
8:3 63
**wrongdoing**
847 39,837 09
832 67
**wrote**
862 89,8:4 63

---

**Y**

**yeah**
80 659,802 609
885 659,88 6 9
826 62
**year**
868 6:9,8 6 39
8 : 669,887 4
**years**
805 69,8:4 69
8:3 3
**yesterday**
86: 9,88 89
8:0 9,8:: 649

CCSAO COI SUBPOENAS 000377

| | | | |
|---|---|---|---|
| 872    6 | 1240 | 24 | 445 |
| **yourself** | 857 65 | 82: | 865 4 |
| 8  7  62 | **141** | **2500** | **45** |
| | 857  2 | 852  2 | 84:  89,8:0  79 |
| **Z** | **151** | **28** | 8:0  2 |
| **zehner** | 852  7 | 800    6 | **457** |
| 85:  62 | **18** | | 865 3 |
| | 853  29,865  689 | **3** | **46** |
| **.** | 866  29,83:  63 | **3** | 808  6 |
| **.0070** | **199** | 826  09,826  :9 | **470** |
| 85:  65 | 802  60 | 82    89,82    4 | 865  : |
| **.0090** | **1997** | **30** | **472** |
| 857 | 802  6  9,885  3 | 8:0  6 | 865  4 |
| **.1001** | **1998** | **306** | **473** |
| 85:   0 | 847  689,830  669 | 8:4   0 | 865  7 |
| **.3000** | 838  39,834  :9 | **311** | **475** |
| 852  66 | 833  659,837    89 | 857  629,857  0 | 865  6: |
| **.3300** | 832  629,8:5  6:9 | **312.243** | |
| 857  6 | 8:6  689,8:6  679 | 857  04 | **5** |
| **.3705** | 8:6    69,8:3    69 | **312.494** | **51** |
| 85:  03 | 8::  89,87:  67 | 85:   0 | 886  6:9,88      6 |
| **.5900** | | **312.704** | **5200** |
| 857  04 | **2** | 852  66 | 857   5 |
| | **2** | **312.982** | **5th** |
| **0** | 8:0  63 | 857 | 87:  67 |
| **0023** | **20** | **32** | **6** |
| 837  : | 805    69,885  39 | 865  639,802  6:9 | **60602** |
| **09** | 826  09,820  65 | 802  679,802      9 | 85:  04 |
| 83:  60 | **2000** | 843    89,826  : | **60604** |
| | 85:  08 | **321** | 857  66 |
| **1** | **2014** | 85:    5 | **60606** |
| **1** | **886  2** | **34** | 857    69,852  65 |
| 853  29,866  29 | **2018** | 82    89,82    4 | **60607** |
| 83:  609,83:  63 | 8  :  69,8  :  79 | **35** | 857  08 |
| **10** | 8  :  66 | 853    89,866  6 | **60642** |
| 853    89,866  6 | **2019** | **3rd** | 85:  2 |
| **11** | 8  5    89,8  6  4 | 857  00 | **60654** |
| 800    69,808  69 | **2021** | | 85: |
| 875  67 | 853    09,866  69 | **4** | **62** |
| **11305** | 866  669,828  679 | **413** | 865  6:9,8:4  39 |
| 82:    4 | 82: | 865  8 | 8:4  :9,8:4  679 |
| **1180** | **2200** | **419** | 870  89,870  39 |
| 85:  7 | 85:    6 | 865  60 | 87:  09,87:    69 |
| **12** | **23** | **425** | 877  : |
| 865  689,843    89 | 837  659,8:    63 | 865  64 | **6234** |
| 84:  89,8:0  6 | **2312** | **439** | 8:3  60 |
| **120** | 853  29,866  65 | 865  63 | **630.735** |
| 85:  00 | **2355** | **44** | 857  6 |
| | 837  2 | 8:0  63 | |

CCSAO COI SUBPOENAS 000378

7492
8 2 60
7526
8 8 6:
773.235
85: 65

866.786
85: 03

90
83: 679,837 39
872 639,825 69
825 :

CCSAO COI SUBPOENAS 000379

From: Rachel Brady
To: CHRISTA BOWDEN (States Attorney)
Cc: Anand Swaminathan; Valerie Barajas
Subject: Reyes: COI Additional Deposition
Date: Thursday, April 7, 2022 6:25:53 PM
Attachments: 020521 Adriana Mejia Vol. IV cond N ex.pdf

---

**External Message Disclaimer**

This message originated from an external source. Please use proper judgment and caution when opening attachments, clicking links, or responding to this email.

Christa,

I realized we inadvertently did not provide you with the transcript from the second half of Adriana Mejia's deposition in February 2021, which occurred on February 5, 2021. (The first half, which we attached to our opening brief as Exhibit 17, occurred on February 4, 2021.) I'm attaching it now, and also am attaching it to our reply. We have no objection if you want to address this transcript in a surreply.

Thanks,
Rachel

--
Rachel Brady
Loevy & Loevy
311 N. Aberdeen St., 3rd Floor
Chicago, IL 60607
312.243.5900
brady@loevy.com
she/her

CCSAO COI SUBPOENAS 000380

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION


ARTURO DELEON-REYES,                )
                                    )
               Plaintiff,           )
                                    )
vs.                                 ) Case No. 18-CV-01028
                                    )
REYNALDO GUEVARA, et al.,           )
                                    )
               Defendants.          )
_____)
GABRIEL SOLACHE,                    )
                                    )
               Plaintiff,           )
                                    )
vs.                                 ) Case No. 18-CV-02312
                                    )
REYNALDO GUEVARA, et al.,           )
                                    )
               Defendants.          )


        VOLUME IV OF THE VIDEOTAPED RECORD OF

PROCEEDINGS FOR THE DEPOSITION of ADRIANA MEJIA, a

witness, called by Defendant City of Chicago for

examination in the above-entitled cause, pursuant to

the Federal Rules of Civil Procedure, taken before me,

Brenda L. Zeitler, CSR, License No. 084-004062, by

Zoom Video Conference on the 5th day of February,

2021, commencing at 9:04 a.m.

ADRIANA MEJIA, 02/05/2021                                          Page 2..5

---

Page 2

APPEARANCES:

    LOEVY & LOEVY
    BY:  ANAND SWAMINATHAN, ESQ.
    and RACHEL BRADY, ESQ
    and SEAN STARR, ESQ
    311 North Aberdeen, 3rd Floor
    Chicago, Illinois  60607
    (312) 243-5900
    anand@loevy.com
    brady@loevy.com
    sean@loevy.com
         On Behalf of Plaintiff Arturo Reyes.
PEOPLE'S LAW OFFICE
    BY:  JAN SUSLER, ESQ.
    1180 North Milwaukee Avenue
    Chicago, Illinois  60642
    (773) 235-0070
    jsusler@gmail.com
         On Behalf of Plaintiff Gabriel Solache.
COOK COUNTY STATE'S ATTORNEY'S OFFICE
    BY:  EDWARD BRENER, ESQ.
    and DAVID ADELMAN, ESQ.
    50 West Washington Street, Room 500
    Chicago, Illinois  60602
    (312) 603-3369
    edward.brener@cookcountyil.gov
    david.adelman@cookcountyil.gov
         On Behalf of Cook County Defendants.
ROCK FUSCO & CONNELLY, LLC
    BY:  EILEEN E. ROSEN, ESQ.
    and THERES B. CARNEY, ESQ.
    312 North Clark, Suite 2200
    Chicago, Illinois  60654
    (312) 494-1000
    erosen@rfclaw.com
    tcarney@rfclaw.com
         On Behalf of Defendant City of Chicago.

---

Page 3

APPEARANCES (Continued):

    LEINENWEBER, BARONI & DAFFADA, LLC
    BY:  MEGAN McGRATH, ESQ.
    120 North LaSalle Street, Suite 2000
    Chicago, Illinois  60602
    (312) 663-3003
    mkm@ilesq.com
         On Behalf of Defendant Guevara.
REITER BURNS LLP
    BY:  DANIEL M. NOLAND, ESQ.
    311 South Wacker, Suite 5200
    Chicago, Illinois  60606
    (312) 982-0900
    dnoland@reiterburns.com
         On Behalf of Defendant Navarro.
THE SOTOS LAW FIRM, P.C.
    BY:  JOSH M. ENGQUIST, ESQ.
    and CAROLINE JAMIESON GOLDEN, ESQ.
    and SAMANTHA PALLINI, ESQ.
    141 West Jackson Boulevard, Suite 1240A
    Chicago, Illinois  60604
    (630) 735-3300
    jengquist@jsotoslaw.com
    cgolden@jsotoslaw.com
    spallini@jsotoslaw.com
         On Behalf of Individual Defendants.
BEDI & SINGER, LLP
    BY:  DENA M. SINGER, ESQ.
    53 West Jackson, Suite 1505
    Chicago, Illinois  60604
    (312) 525-2017
    dsinger@bedisinger.com
         On Behalf of the Deponent.
ALSO PRESENT:
    JOSEPH BONURA, Interpreter (9:00 to 1:00)
    ELSA MADRIGAL, Interpreter (1:00 to end of day)
    BRETT SCHATZLE, Videographer
    VALERIE BARAJAS, Paralegal for Loevy & Loevy

---

Page 4

                    I N D E X
WITNESS:
    ADRIANA MEJIA
         Exam by Mr. Swaminathan (Continued)   6
         Examination by Mr. Engquist ....... 214
         Further Examination by Ms. Rosen .. 227

EXHIBITS:

         PLAINTIFF'S EXHIBIT NO. 1 ................  68
         Area 5 Supplementary Report,
         Cleared Closed Report
         (RFC Solache Reyes 233-253
         PLAINTIFF'S EXHIBIT NO. 2 ............... 105
         Photographs of Car
         (RFC Solache Reyes 44)
         PLAINTIFF'S EXHIBIT NO. 3 ............... 113
         Google Map

         PLAINTIFF'S EXHIBIT NO. 4 ............... 119
         Prescriptions for Rosauro Mejia
         from Sinai Medical Group
         (Bluhm 25519 and 25520)
         PLAINTIFF'S EXHIBIT NO. 5................ 167
         "Notes," Two Sheets of Paper with
         Handwriting on Them
         (Reyes 264)

         PLAINTIFF'S EXHIBIT NO. 6 ............... 172
         04/15/98 Supplementary Report by
         McDonald and Collins
         (RC Solache Reyes 194 - 196)
         PLAINTIFF'S EXHIBIT NO. 7 ............... 174
         11/18/99 Area 5 Supplementary Report,
         Progress Investigation 3, Cleared
         Closed Report by Investigator Trevino
         (No Bates)
         PLAINTIFF'S EXHIBIT NO. 8 ............... 185
         Phone Log
         (RFD Solache Reyes 160 - 162)

---

Page 5

EXHIBITS (Continued):

         PLAINTIFF'S EXHIBIT NO. 9 ............... 202
         06/01/99 Letter from Adriana Mejia
         to Gabriel Solache
         (RFC Solache Reyes 4812 - 4816.)

         PLAINTIFF'S DEPOSITION EXHIBITS 10 ....... 204
         07/12/99 Letter from Adriana Mejia
         to Gabriel Solache
         (RFC Solache Reyes 4827 - 4836)
         DEFENDANT'S EXHIBIT NO. 5 ............... 198
         06/11/98 Letter to "Lupe"
         (RFC Solache Reyes 3949 - 3952)
         DEFENDANT'S EXHIBIT NO. 7 ...............  65
         Chicago Police Department CB Report
         (RFC Solache Reyes 207)
         DEFENDANT'S EXHIBIT NO. 9 ............... 189
         04/98 Cermak Health Record Form
         (HIPAA 4 and HIPAA 5)
         DEFENDANT'S EXHIBIT NO. 19 .............. 134
         Declaration of Jose Mejia
         (Reyes 8726 - 8729
         DEFENDANT'S EXHIBIT NO. 36 .............. 191
         Transcription of an Audio Recording
         of a Call that Took Place on October
         23, 2019

---

Page 6

THE VIDEOGRAPHER: This is the beginning of media unit 1, and we are now on the video record at 9:04 a.m. This is the continuing videotaped video conferenced deposition of Adriana Mejia taken on February 5, 2021. You may proceed.

MR. SWAMINATHAN: Good morning, Ms. Mejia.

THE WITNESS: Good morning.

MR. SWAMINATHAN: Did you get a chance to get some rest last night?

THE WITNESS: A little bit.

MR. SWAMINATHAN: You understand this is your continued deposition in this case, correct, a continuation from yesterday?

THE WITNESS: Si.

THE INTERPRETER: The translator wants to ask: Do I start interpreting now? Because I haven't been sworn in.

MR. SWAMINATHAN: Please. Let's start over. Can you please -- let's get the interpreter sworn in.

(Interpreter sworn.)

(Witness sworn.)

ADRIANA MEJIA, after having been first duly sworn to tell the truth, was examined and testified upon her oath through the

Page 7

interpreter as follows:

EXAMINATION (continued)

BY MR. SWAMINATHAN:

Q. Ms. Mejia, you understand this is a continuation of your deposition from yesterday, correct?

A. Yes.

Q. And just like yesterday, you remain under oath, correct?

A. Yes.

Q. Anything that would prevent you from being able to understand my questions and give truthful answers today?

A. No.

Q. You said yesterday that you were having headaches. Are you having headaches today?

A. Just a little bit. I took pills.

Q. So you feel like you're fine to be able to go forward with the questioning; is that right?

A. I'm going to try to answer everything truthfully and to be strong and do it well.

Q. Okay. If at any point you feel like your headaches or anything else is hurting your ability to understand my questions and answer them, please tell

Page 8

us, and we'll stop. Okay?

A. Okay.

Q. So as long as you continue to answer questions, we will assume you are feeling fine to be able to do so. Okay?

A. Okay.

Q. I'll indicate again to you this morning we can take a break any time you need to take a break, okay?

A. Very well.

Q. If at any point you are feeling tired or you need to get some food for your blood sugar, let us know and we'll take a break. Okay?

A. Very well. Thank you.

Q. I want to ask you about one thing you said yesterday. Yesterday, when you were describing what happened when you were first going into the Soto home, you said that Gabriel and then you went first and Arturo came later. That's the phrase you used. What did you mean by that?

A. When we got to the house first, Gabriel got out, and then I got out.

Q. Then did Arturo come later? Is that what you're saying?

Page 9

THE INTERPRETER: Translator wants to ask: Are you referring to did he arrive later?

MR. SWAMINATHAN: Let me reask it.

Q. When you and Gabriel first went to the house, Arturo came after that; is that right?

MS. ROSEN: Objection, form.

A. A few minutes afterwards. It didn't take long.

Q. Was he waiting in the car?

A. Yes. A few minutes, not a lot.

Q. Did anybody call him to come in, or did he come in on his own?

A. I no longer remember.

Q. When Arturo first came in, what had happened in the apartment at the point that he came in?

A. When he came in, I believe that Gabriel already had stabbed him. When he came in, he asked what were we doing, because he had come in a little bit later.

Q. So when he came in, Mr. Soto had already been stabbed; is that right?

A. Yes.

Q. Okay. I want to ask you about your background and go back to when you lived in Mexico. I

CCSAO COI SUBPOENAS 000383

Page 10

know you were asked a few questions about that. I want to ask you a couple of things.

A.   Very well.

Q.   What was the name of the town you grew up in?

THE INTERPRETER:  Translator is not able to make it out.  Turundeo.

MR. SWAMINATHAN:  Turundeo, yeah?

A.   Turundeo.

Q.   Did you grow up with both your parents?

A.   Yes.

Q.   Did they work?

A.   My dad is a -- works on the land, and my mother always worked at home.

Q.   Have your parents ever come to the United States to visit you?

A.   Yes.  They came when I did my time in 2000 and last year in December.

Q.   So they visited you, you said, in 2000?

A.   Yes, when I was sentenced.  I think it was around 2000.

Q.   Where would they see you when they came in 2000?

A.   The first time they saw me, they saw me in

Page 11

Cook County.

Q.   Where did they see you after that?

A.   They were there a couple months extra, and they came to see me in Dwight.

Q.   Anywhere else during the 2000 visit?

A.   Not until this year, this past year, in December.

Q.   How many times did they visit with you when they came in 2000, between Cook County Jail and Dwight Correctional Center?

A.   The truth is, I don't remember.

Q.   Did they stay with your brother Carlos?

A.   Yes.  Also for a time with my friend Lorena.

Q.   How did you know Lorena?

A.   Lorena is from Michoacan, but I know her because she is a friend of one of my aunts.

Q.   Do you stay in touch with her?

A.   Yes.

Q.   Do you still talk to her on the phone?

A.   No.  Unfortunately, I don't have a telephone number, just the address.

Q.   When was last time you were able to communicate with her on the phone?

A.   Since she went to Texas.

Page 12

Q.   And approximately when was that?

A.   The truth is I don't remember what year it was.

Q.   And then you said your parents came again in December of 2020.  Why did they come then?

A.   Because they came to see how I was.

Q.   Did they come to the US for any other reason in December of 2020?

A.   No.  They just came to see me and my brother.  That's it.

Q.   When did Carlos pass away?

A.   I'm not sure.  But when they had told me that he had passed away, it was around the 18th of May.  And when they told me he had already passed away, it had been already 23 days since he had passed away.

Q.   Were you able to go to his funeral?

A.   No.

Q.   I'm sorry to hear about that.

A.   (Nodding head up and down.)

Q.   That was May of 2020 when he passed away?

A.   Yes.

Q.   Do you have any other brothers who are in the US?

Page 13

A.   No.

Q.   When your parents came in December, I assume they came and visited you at the prison?

A.   Yes.

Q.   How many times did they visit you?

A.   They only had two weeks of permission.  It was a short time.  I think it was four or five times.

Q.   You said they only had two weeks for what?  For the mission?

A.   In other words, when they gave them their visa to come, their permission to come, they didn't get it for a long period.  It was for a short period of time to be here.

Q.   When they came in December of 2020, did you talk to them at all about this case?

A.   Very little.  People brought them, some friends.  Some friends had brought them.  No, very little.

Q.   The friends who brought them, were they people that you knew?

A.   Yes.  I know a girl or a young lady who came, and then the woman who visits me was from the church, and another friend with her brother-in-law.

Q.   So the people who came to visit with your

CCSAO COI SUBPOENAS 000384

ADRIANA MEJIA, 02/05/2021                                        Page 14..17

Page 14

parents, what were their names?

A.  Beatrice Lopez, Aurora Ortiz, Ramon Calvario, Yarina Sanchez, my brother Carlos.  Then some other people brought them, but they left my parents alone with me.

Q.  The person named -- is it Raido Sanchez?

A.  Ramon Calvario.

Q.  And then you said Raida Sanchez?  What was the next person's name?

A.  Yarina Sanchez.

Q.  Is that Y-a-d-i-r-a?

THE INTERPRETER:  Translator says spell that again, sir.  I'm sorry.

Translator says I got Y-a-r-i-d-a-n.  That's what I'm hearing.

A.  Yes, Yarina.

Q.  And you said Carlos brought your parents for some of those visits; is that right.

And would Carlos visit you regularly --

THE INTERPRETER:  Translator didn't get an answer.

MR. SWAMINATHAN:  Go ahead.  You can answer.

Let's start again because you said you didn't get an answer to the last question, right?

Page 15

THE INTERPRETER:  Translator repeated it again, and I still didn't get an answer.  I don't know why.

A.  When my brother came, he couldn't drive because he didn't have a license.  So when my brother came, he came with Beatrice Lopez, with her husband, but her husband could not come in to see me.

Q.  So Carlos came with your parents, right?

A.  Yes.

Q.  And would he also come regularly before he brought your parents?

A.  No.

Q.  When was the last time he visited you before he came with your parents?

A.  I don't remember if it was, like, nine or ten years.  I was not in communication with him.

Q.  Is there a reason why he wasn't visiting you or communicating with you?

MS. ROSEN:  Objection -- sorry.  Go ahead.

(Question translated.)

MS. ROSEN:  Objection:  Form, foundation.

A.  He had a personal problem among brothers.

THE INTERPRETER:  Translator is not sure if she said he did or I did.  That part didn't come out.

Page 16

I don't know if she said "tuve" or "tuvo" because I couldn't hear that.  I don't know if she said I had a problem or he had a problem with brothers.

MR. SWAMINATHAN:  Can you get clarification?

A.  My brother and I had had an argument.

Q.  What was the argument about?

A.  About some money.

Q.  Was it your money or his money that was the subject of the argument?

A.  Some family members had sent that to me, and he had never put it in.

Q.  And when did that fight happen?

A.  Like around 10 years or 11 years, something like that.  I'm not sure.  I don't remember exactly.

Q.  Did he tell you why he wasn't going to put the money in your account?

A.  No.  I was in communication with him.  He wasn't accepting my calls, and I was not calling him anymore.

Q.  Before that, had you and Carlos been close?

A.  Unfortunately, no.  My brother and I had always argued a lot from when we were kids.

Q.  And when you were in the US, you were living together at the Mozart house, correct?

Page 17

A.  Yes.

Q.  So were you close at that time?

A.  Very little, because he worked, and he would go with his friends to bars or dancing.

Q.  Would he drink?

A.  Yes.

Q.  Would he drink a lot?

A.  I think that's something that caused his death.  I'm not very sure.

Q.  Was he drinking a lot even back in 1998, when he was living with you?

A.  Yes.  He would drink with Gabriel Solache, with Leobardo, with my ex-husband, with my other brothers-in-law and a lot of friends.

Q.  Did you have any other family members living in the US with you other than Carlos?

A.  No.  I have family from my father's side, but I don't have communication with them.

Q.  Carlos, you said, would go to the bars and go out dancing.  Would he ever get in trouble with the police?

A.  The truth is, I don't know.

Q.  Do you know if he ever got arrested?

A.  The truth is, I don't remember if he told

CCSAO COI SUBPOENAS 000385

ADRIANA MEJIA, 02/05/2021

Page 18..21

Page 18

me.

Q. Do you know if he ever went to jail for any period of time?

A. As far as I know, no. I don't know.

Q. Did he use any drugs?

A. My brother?

Q. Yeah, Carlos.

A. The truth is, I don't know.

Q. Would he get in fights?

A. No.

Q. You said that Carlos was working a lot back then. Where did he work?

A. He worked in a type of a restaurant.

Q. Do you remember the name of it?

A. It was called Piadaria Jalisco. But after that, they closed it.

Q. When did they close it?

A. I don't remember what happened with the owner. Something my brother commented to me, I think he told me that the owner had gone to prison. I'm not sure though.

Q. But her brother told her that it was closed. Was that after she'd been arrested?

THE INTERPRETER: The translator asks you to

Page 19

repeat that, sir. It didn't come in clear.

Q. Yes. When her brother told her that the restaurant had been closed, was that sometime after she'd already been arrested?

MS. ROSEN: Objection, form. Her? She?

THE INTERPRETER: The translator asks that you ask the question directly to her. If I say, "When her brother," she's not going to know who I'm referring to. She's going to think I'm speaking about another woman. You have to speak to her. I am your voice.

MR. SWAMINATHAN: Okay. Sorry.

MS. ROSEN: Yeah. Objection, form.

MR. SWAMINATHAN: Yeah. Let me ask it again.

Q. When Carlos informed you that Jalisco had been closed, was that after you'd been arrested?

A. Yes. When he told me they had closed the bar, I was already in jail. I was already an inmate.

Q. What was Carlos's job at the Jalisco Piadaria?

A. I think he would make or prepare the tacos.

Q. So he was basically a cook?

A. Something similar to that. He would attend

Page 20

to the tables and to the clients, to the customers.

Q. So what was his usual shift? What hours did he work?

A. I don't think he had a shift. I think he went from the morning until very late, but I don't remember exactly the schedule.

Q. What time would he usually get home?

A. Different times.

Q. What were the earlier times he would usually get home?

A. Like 7:00 or 8:00 at night. I don't know.

Q. Then if he stayed out late, when would he come home?

MS. ROSEN: Objection, form,

MR. SWAMINATHAN: Go ahead.

A. Can you please repeat the question?

MR. SWAMINATHAN: Yeah. And Mr. Interpreter, yesterday you had not been interpreting the objections in the morning. Then we continued that practice in the afternoon with the other interpreter. It did reduce the confusion for the witness. I would suggest you continue that practice today. Then if there's a point we need to, we can do that.

Page 21

THE INTERPRETER: Just to make sure, the translator is asking: You don't want me to translate the objections, correct?

MR. SWAMINATHAN: That's right. That would be consistent with yesterday's practice.

THE INTERPRETER: Yes, sir, whatever makes it easier for you. Sorry about that.

MR. SWAMINATHAN: No problem. No problem.

BY MR. SWAMINATHAN:

Q. If he stayed up late, when would he usually come home?

MS. ROSEN: Objection: form, foundation.

A. I don't know. Sometimes I would be asleep. He'd get there different times.

Q. Was it your understanding that his work ended before midnight, but sometimes he would stay out after that?

A. Yes. Since he had a girlfriend, I would imagine he would go see his girlfriend. He had his friends.

Q. Would his shifts at work -- strike that. His work hours, did they end before midnight?

MS. ROSEN: Objection: form, foundation.

CCSAO COI SUBPOENAS 000386

ADRIANA MEJIA, 02/05/2021            Page 22..25

Page 22

A. Sometimes he would stay there if the boss would leave early. He would stay and close up. He would stay and clean up.

Q. If he stayed to close up, how late would he have to stay?

A. I don't know because I didn't pay too much attention to what time he would come.

Q. Was it a restaurant or bar?

A. It was a family restaurant.

Q. Would it close before midnight then?

A. Yeah. I think he closed, like, around 9:00. Depending if there was a lot of people or not a lot of people, they would close.

Q. Did Carlos have any other jobs other than the job at the Jalisco Piadaria?

A. Before, yes. I think he would mow the grass.

Q. In March and April of 1998, when you were arrested, was his only job the restaurant job?

THE INTERPRETER: Translator asks the job in the bar, correct?

MR. SWAMINATHAN: The restaurant job.

A. Yes.

Q. I wanted to go back to the money that you

Page 23

had an argument with Carlos over. How much money was sent for you?

A. They sent me -- I don't remember if it was 200 or $300.

Q. And who sent it?

A. My cousin who is in Washington, Elizabeth Torres.

Q. Why did she send it to you?

A. Well, she said she was going to help me so that I would have something, to help me in the prison.

Q. Was she someone you stayed in touch with, even after you were in prison?

A. Now? With her?

Q. Yeah. Do you stay in touch with her now?

A. No. Unfortunately, after all those years, after all that, once, she visited me in prison and then, after that, no.

Q. Do you have anyone who still visits you?

A. No, just the woman Aurora.

Q. Anyone else?

A. No. I don't have any visits.

Q. How do you know Aurora?

A. I know her, like, two or three years through a friend who is a woman from the church that they go

Page 24

visit people who are in jail, in prison.

Q. You said that you told your parents just a little bit about this case when they visited you.

MR. ENGQUIST: Objection to form.

Q. What little did you tell them?

A. Very little, because they came with people. I just told them to stay strong, to be strong. Very little.

Q. I know that was very little, but what was that little bit that you told them?

A. About my sentence. In Mexico, it's called perpetual -- the lowest chains a lot are different. I told them to continue having faith and continue praying a lot.

Q. Continue having faith that you would hopefully be released one day?

A. Yeah. I have faith that some day I'll be able to leave.

Q. Did you tell them that you were expecting that one day that would happen for you?

A. Why not? Why can't I have another opportunity?

Q. So that's, yes, you did tell them that you were expecting that, one day, that would happen to

Page 25

you?

A. Yes. I still feel that, and it could be soon, perhaps. You never know. No one knows.

Q. And did you tell them that, before that, you had to do these depositions in this case?

A. Now?

Q. When you visited with them, at that point, you knew that there were these depositions in this case, right?

MS. ROSEN: Objection, form, foundation.

MR. SWAMINATHAN: Go ahead.

A. No.

Q. You said that this visit was in December of 2020, right?

A. Yes.

Q. So you had already been deposed, right?

A. Yes.

Q. So did you tell them that you had to answer these -- you'd been answering these questions in this case?

MS. ROSEN: Objection: Form, foundation.

A. The truth is I don't remember.

Q. Have you ever told your parents before they visited you that you were hoping to be able to get

CCSAO COI SUBPOENAS 000387

Page 26

out?

A. I've always said that to them. I always have hope.

Q. Have you ever told them that you expected to be released soon?

A. I always thought that maybe I can get out soon. Why not?

Q. You've always said that you were going to get out soon?

A. I've always said that I have a lot of faith, a lot of hopes that --

MS. ROSEN: Is everything okay?

THE WITNESS: The guard is asking me if I'm okay.

MR. SWAMINATHAN: I think she was in the middle of her answer. Can you ask her the question again or read back my question?

THE WITNESS: Could you please repeat the question to me?

MR. SWAMINATHAN: Yeah, let's have the court reporter read it back.

(Requested record read.)

THE INTERPRETER: Translator wants to say that's all there was. I gave up until what I heard

Page 27

because she turned at that time to look at someone. And then someone asked her, "Is everything okay?" and she didn't give anymore.

MR. SWAMINATHAN: I'll just ask another question.

Q. Ms. Mejia, when your parents came to visit you in 2020, did you tell them that you expected that you would be released soon?

A. I always said it.

Q. You've always said that you expected to be released soon?

A. I still say it. There could be a miracle. You people have your laws, and I respect them.

Q. I just want to be clear. When you spoke to them in December when they visited you, you told them that you expected you would be released soon; is that right?

A. I hope to get out of here soon. I'm not going to stay here the rest of my life.

Q. That's what I want to -- did you tell them that you hoped to or that you expected to?

A. I hope. I hope.

Q. You didn't tell them that you expected that it was about to happen?

Page 28

A. Always like -- how can I say this -- I can't explain this question.

Q. You had mentioned yesterday that you had -- strike that.

Yesterday, you were asked if your parents had any interactions with Gabriel Solache. Do you remember that?

A. One time, I asked my mother -- I asked my mother if they have seen him. And she said they've only seen him once when he had recently went to Mexico and was in the town, but they didn't speak to him.

Q. So there was only one time that your mother saw Gabriel Solache, correct?

A. Yes.

Q. And he didn't say anything to her, right?

A. I don't think my family has -- are in communication with him.

Q. And your mom told you about this one time that she saw him in town, right?

A. Yes.

Q. Other than saying she saw him, did she say anything else about seeing him?

A. No. My mom is not going to say anything to me.

Page 29

Q. What do you mean she's not going to say anything to you?

A. My mom is, like -- my mother is not going to say absolutely anything about him.

Q. Your mother told you that she saw him?

A. Yes, just a little bit, just in passing.

Q. And she told you that they didn't have any kind of conversation, correct?

A. No.

Q. And that's it. That's all that happened?

MS. ROSEN: I have a belated form and foundation objection. Sorry.

A. That's all she told me, and she's not going to say any -- absolutely nothing to me about him.

Q. She did not tell you that he threatened her at all, right?

A. No.

Q. She not tell you that he scared her or anything like that, right?

A. The truth is I don't know.

Q. Well, she didn't tell you that she was in fear of him or that he said something to make her feel fearful, right?

A. No.

CCSAO COI SUBPOENAS 000388

ADRIANA MEJIA, 02/05/2021          Page 30..33

Page 30

Q. She just told you she saw him?

A. Yes.

Q. Are you still close with your parents?

A. Yes.

Q. How often do you talk to them on the phone?

A. Whenever I have minutes on my telephone, I call them.

Q. And how often is that?

A. I call them like four or three times per week.

Q. Do you talk to both your mom and dad?

A. Yes.

Q. Have you ever told them the truth about what happened?

A. No.

Q. Have you ever told them anything about it?

A. Very little.

Q. Have you told them a false story about what happened?

THE INTERPRETER: Translator says can you repeat that, please? You cut out.

Q. Have you told them a false story about what happened?

MS. ROSEN: Objection, form.

Page 31

A. I'm not going to answer that question.

Q. How old were you when you left Mexico?

A. I think 19.

Q. Had you been living at home until the time that you left?

Strike that. Let me ask a better question.

Were you living with your parents until the time that you left Mexico at 19?

A. No. When I got married, I went to my husband's town.

Q. And how old were you when you and Rosauro got married?

A. I was 16, and he was 18.

Q. When you went to live with him in his town, who lived with you in the house you lived in with Rosauro?

THE INTERPRETER: The translator couldn't make out what she said twice. It was echoing. Could I ask her to say it one more time slower?

A. When I went with him, I went to the house of one of his brothers. The house was loaned to us by his brother.

Q. So who lived at that house other than you and Rosauro?

Page 32

A. No one.

Q. And who is the brother who lent you all the house?

A. Encarnacion Mejia.

Q. Was that the only house you lived in while in Mexico with Rosauro before you came to the US?

A. Sometimes I would come to my mother-in-law's house, and I'd stay there with her.

Q. Who lived in that house?

A. My father-in-law, my sister-in-law Rosa, and two smaller brothers, younger brothers, of my husband, but they don't go to the Mexico capitol to work. They would only be there from time to time.

Q. What were their names?

A. Endovias Mejia, Leobardo Mejia.

Q. Any other Mejias who lived in the mother-in-law's house?

A. No.

Q. How did you meet Rosauro? How did you two end up getting married?

MS. ROSEN: Objection: form, compound.

A. It's a very long story. I'm not going to answer that.

Q. Did your families put you together, or did

Page 33

you guys meet and fall in love?

A. No. We met.

Q. And were you in love when you got married?

A. Yes.

Q. And when you were living in Mexico with Rosauro, were the two of you happy?

A. Yes.

Q. And then how was it decided that you would come to the United States?

A. When he came first.

Q. Why did he decide to come to the US?

MS. ROSEN: Objection: form, foundation.

A. Him?

Q. Yes?

A. Because, in Mexico, there's not a lot of opportunities for work.

Q. And so he -- go ahead.

A. He didn't have a stable job; so there was no way to get ahead.

Q. So did you both agree that you would move to the United States?

A. No. He wanted to come.

Q. So he made the decision on his own?

A. Yes.

Page 34

Q.  But did he tell you in advance, before he left?

A.  Yeah.  We would talk about it a lot.

Q.  And were you happy to go to the United States?

A.  Me?

Q.  Yes.

MS. SINGER:  Object to the form of the question.  She does have a Fifth Amendment right regarding this.

MR. SWAMINATHAN:  I'm sorry, Dena.  Do you want her to assert the Fifth on this?  Is that what you said?

MS. SINGER:  I do, yeah, on this line of questioning.

MR. SWAMINATHAN:  Do you want to talk to her, take a quick break and talk to her?

MS. SINGER:  I can talk to her and take a breakout room, or you guys can move on from this.

MR. SWAMINATHAN:  Why don't you go into a breakout room.  I'm not going to spend much more time on this, but I want to be able to assert what you need to assert.  So why don't you go quickly to a breakout room.

Page 35

MS. SINGER:  She's going to have to get a sheriff.

THE INTERPRETER:  The translator says you don't want to give the answer then, correct.

MS. SINGER:  I'm asking to hold off on the answer.  I'm asking to talk to her.

THE VIDEOGRAPHER:  All right.  Let's go off the record.  We're going off the video record at 10:09 at the end of media unit 1.

(Recess in proceedings from 10:09 to 10:14 a.m.)

THE VIDEOGRAPHER:  We are back on the video record at 10:14 at the beginning of media unit 2.

MR. SWAMINATHAN:  Madam court reporter, could you read back the last question, and then we'll have it interpreted to allow Ms. Mejia to answer?

(Pending question read.)

A.  I'm not going to answer.

Q.  Are you asserting your Fifth Amendment right?

A.  Yes.  In this question, yes.

Q.  When I asked you earlier today if you ever told your parents a false story about what happened to the Soto family, you said you were not going to answer

Page 36

that question, right?

A.  Yes.

Q.  Are you asserting your Fifth Amendment right for that question?

MS. ROSEN:  Objection: form, foundation.

A.  Yes.

Q.  Did you have concerns about coming to the United States?

MS. ROSEN:  Objection, form.

A.  I'm not going to answer.

Q.  Are you asserting your Fifth Amendment right?

A.  Yes.

Q.  Did you have concerns about staying in Mexico?

MS. ROSEN:  Objection, form.

A.  I'm not going to answer.

Q.  Are you asserting your Fifth Amendment right against self-incrimination?

THE INTERPRETER:  The translator is not sure if she answered.  Her volume is very low.  I think I heard "uh-huh," but I can't tell you for sure.

A.  Yes.

Q.  Did Rosauro have concerns about staying in

Page 37

Mexico?

MS. ROSEN:  Objection: form, foundation.

A.  I don't know.

Q.  Did Rosauro ever indicate to you that he had any concerns about staying in Mexico?

MS. ROSEN:  Objection, form.

A.  I don't know.

Q.  Did you or anyone in your family have any issues with the police in Mexico at the time that you were planning to leave?

MS. ROSEN:  Objection: form, foundation.

A.  Pardon me?  Could you please repeat the question?

Q.  Did anybody in your family have any issues with the police at the time that you were making a decision to leave?

MS. ROSEN:  Objection: form, foundation.

A.  No.

Q.  Did anyone in Rosauro's family have any problems with the police when you were making the decision to leave Mexico?

MS. ROSEN:  Objection: form, foundation.

A.  I don't know very much about my husband's family, if they had problems or not.

ADRIANA MEJIA, 02/05/2021          Page 38..41

**Page 38**

Q. When the decision was made to go to the United States, did anybody else go with Rosauro?

A. I don't remember. I don't know.

Q. When you went to the United States, did you go with anyone else?

A. Yes.

Q. Who else did you go with?

A. This is private. This is his family.

Q. Okay. These are important questions, and we need you to answer them.

Who else came with you to the United States?

MS. ROSEN: I'm going to object to form, foundation, and harassing and to your representations about what are and what are not important questions. From the Defendant's perspective, these are irrelevant questions.

MR. SWAMINATHAN: Go ahead.

A. I'm not going to give the names -- I'm not going to say the people who came with me.

Q. Were any of them members of Rosauro Mejia's family, the Mejia family?

MS. ROSEN: Objection: form, harassing.

A. I don't know. I'm not going to answer.

Q. Are you asserting your Fifth Amendment

**Page 39**

right?

A. Yes.

Q. Before you left to come to the United States, had you committed any crimes in Mexico?

A. Never.

Q. Before Rosauro came to the United States, did he commit any crimes in Mexico?

A. No.

Q. Before you came to the United States, did you know of any other members of his family committing any crimes in Mexico?

A. My family has never done anything bad, as far as I know.

Q. Before Carlos went to the United States, had he committed any crimes in Mexico?

A. No.

Q. When you went to the United States, had Carlos already gone to the United States?

A. No. He came when I came, afterwards.

Q. Did he come at the same time as you or after you?

A. No, after.

Q. When I asked you if you had concerns about coming to the US and you didn't answer my question,

**Page 40**

did you or your family have any issues with gangs in Mexico before you came to the United States?

A. In my town, there is no gangs. There was no islands. There were no criminal problems. No. No.

Q. What about in Rosauro's town? Were there any gang issues there?

A. That town is very small, but I don't know anything about that. So no. As far as I know, no.

Q. Did Rosauro or any of his family members have any problems with gang members in Mexico?

MR. ENGQUIST: Objection, foundation.

A. No.

Q. Are any members of your family in a gang?

A. As far as I know, no.

Q. Has Carlos ever been in a gang?

MR. ENGQUIST: Objection, asked and answered.

A. Never.

Q. If Rosauro said that Carlos was involved with gangs, is he lying?

MS. ROSEN: Objection: Form, foundation, misstates Rosauro's testimony.

A. I don't know.

Q. Is it possible that Carlos was involved with

**Page 41**

gangs in the United States?

MS. ROSEN: Objection: form, foundation.

A. I don't know.

Q. When you were coming to the United States, had Rosauro already settled in Chicago?

A. Would you repeat the question, please?

Q. When you were coming to the United States, Rosauro was already in the United States, right?

A. Could you please repeat the question again?

Q. When you came to the United States, Carlos was already in the US, right?

MS. ROSEN: Objection, form.

MR. SWAMINATHAN: Let me reask that. I asked the wrong name.

Q. When you came to the United States, Rosauro was already in the United States, right?

THE INTERPRETER: The translator is confused.

Q. I'll ask it again. When you came to the United States, Rosauro had already come, correct?

A. Yes.

Q. Where in the United States was he?

MS. ROSEN: Objection: form, foundation.

At what time?

CCSAO COI SUBPOENAS 000391

ADRIANA MEJIA, 02/05/2021                                      Page 42..45

Page 42

MR. SWAMINATHAN: When she's coming to the United States.

A. Confusing me a little bit. Can you please repeat the question?

Q. When you came to the United States, where was Rosauro?

A. I don't know.

Q. When you came to the United States, did you know you were going to be going to Chicago?

A. Yes.

Q. Did you or Rosauro have family in Chicago?

MS. ROSEN: Objection, form.

MR. SWAMINATHAN: Go ahead.

A. Why do you have to ask about my ex's family?

Q. Because many of those family members are in the US and are witnesses in this case, identified by both parties.

I'll ask my question again. Did you or Rosauro have any family members who were in Chicago?

A. Yes. He did. I did not.

Q. So when you came to the US, did you expect that you would be going to Chicago to join his family?

A. With my family or his family?

THE INTERPRETER: La familia de Rosauro.

Page 43

A. Yes.

Q. Which family members of his were already in the United States when you came?

MS. ROSEN: Objection, foundation.

A. Family, his brothers.

Q. Which ones were already here?

A. Adolpho Mejia, Horacio Mejia, Manuel Mejia, Clemente Mejia, with their children and families.

Q. Anyone else?

A. Leobardo Mejia and Clemente Mejia, I think, but he stayed a short time and then went back to Mexico.

Q. Anyone else?

A. Well, just them, that I recollect, as family.

Q. What did Adolpho Mejia do for work?

MS. ROSEN: Objection, foundation.

A. That's his life. I'm not going to explain it.

Q. Do you know what Adolpho did for work in the United States?

A. I never asked him. He was a man a lot older.

Q. Do you know what Horacio Mejia did for work

Page 44

in the US?

A. I don't remember what he did.

Q. Do you know what Manuel Mejia did for work?

MS. ROSEN: I'm going to object to relevance on what the Mejia family members' work was.

A. I don't remember the jobs. It's been years. I don't remember. It's their life.

Q. How long had Rosauro been in the US before you joined him?

THE INTERPRETER: Translator asks that you repeat that. You echoed.

Q. How long had Rosauro been in the US before you joined him?

A. I don't remember if it was months or a year. Something like that.

Q. When you came to the US, I think you said you first spent some time in Los Angeles, right?

A. Yes.

Q. Who did you live with when you were in Los Angeles?

A. With people from my town, acquaintances.

Q. Any members of the Mejia family?

A. No.

Q. And then was your next stop Chicago?

Page 45

A. Yes.

Q. And when you came to Chicago, Rosauro was not living at Mozart, right?

A. Yes.

Q. What address was he living at?

A. 51st and Western.

Q. Is that where you joined him and lived with him?

A. Yes.

Q. Was that an apartment that he rented?

A. Yes.

Q. And who lived with you and Rosauro at 51st and Western?

A. On the first floor, my brother-in-law Adolpho lived there. It was his. He rented us a small apartment with my brother-in law Encarnacion and, for a time, with the brother Clemente and two people from my husband's town. I don't remember their names.

Q. Then what was the next house you lived in after 51st and Western?

MR. ENGQUIST: I'm just going to object to asked and answered. We went through these addresses yesterday at length.

Page 46

MR. SWAMINATHAN: You're doing asked and answered based on your questioning of the witness?

MR. ENGQUIST: No. That was your questioning of the witness, Anand.

MR. SWAMINATHAN: No. Okay, go ahead, Adriana.

A. 62nd and Mozart, something like that.

Q. Okay. So you moved from 51st and Western to the Mozart house, right?

A. Yes.

Q. And you've already gone through everybody who lived at the Mozart house. Was there anybody who lived there a period of time and left before the time of your arrest?

THE INTERPRETER: Translator ask you to repeat that again, please.

MR. SWAMINATHAN: Yeah. Let me just ask a different question.

Q. Was there anybody who lived at the Mozart street address with you and then moved out?

A. Yes, a brother of my husband's.

Q. Who is that?

A. Encarnacion Mejia, his family.

Q. Anyone else who lived with you at that house

Page 47

and then moved out?

A. Two friends, a guy from my town and a guy from my husband's town, acquaintances.

Q. Where did Encarnacion go when he left the house?

A. He went to Texas.

Q. The Mozart house, was that an apartment you were renting?

A. Yes.

Q. Did you know who owned the house?

A. Yes.

Q. Who owned it?

A. Horacio Mejia.

Q. Did Horacio own other buildings as well?

MS. ROSEN: Objection, foundation.

A. I don't know about his life.

Q. Do you know if he owned other buildings?

A. That's his private life. I don't know if it was his house or if he was renting it.

Q. If you don't know the answer, then you can just tell me you don't know. If you do know, I need you tell me the answer or tell me you're refusing to answer. But --

A. I don't know about his life, whether it was

Page 48

his house or if he was renting it. How am I going to know about his life?

Q. If I ask you a question and the answer is you don't know, tell me you don't know. Okay?

MS. ROSEN: Objection: form, harassing. She just said she didn't know.

MR. SWAMINATHAN: She asked me why would she know. The answers are not supposed to be rhetorical questions. Let me ask the question one last time.

Q. Did Horacio own any other buildings that you know of?

A. I don't know.

Q. The family members of Rosauro who you lived with in Chicago, did you get to know them?

A. What's that?

Q. Did you get to know his family members?

MS. ROSEN: Objection, form.

A. I don't understand that question.

Q. Did you consider them to be part of your family?

A. Well, not that close, no.

Q. Were there any members of Rosauro's family who you became close with?

A. I always spoke a lot with his brother

Page 49

Edwiges, with Leobardo I spoke a lot with, his sister Rosa, his mother-in-law, but she already died, passed away. Well, I spoke with all of them, but a relationship --

Q. Okay. Were there any members of his family that you did not get along with?

A. No. I spoke with all of them.

Q. Among the people at the house at Mozart, who did you spend the most time with?

A. Guadalupe Mejia and Jorge Mejia and Edwiges Mejia and Jessica Mejia.

Q. Edwiges, was that Rosauro's brother?

A. Yes.

Q. And who was Jessica?

A. The wife of Edwiges.

Q. And where did they live?

A. They lived for a time with me, and then they went to where I lived before.

Q. Did you say you grew close with Guadalupe and Jorge Mejia?

A. Since we lived in the same apartment, I would watch their little girl sometimes.

Q. If you needed someone to talk to, who would you go to?

CCSAO COI SUBPOENAS 000393

Page 50

A. Sometimes on the weekend I would go with Estoria Mejia. I was also a little closer with her.

THE INTERPRETER: The translator could not hear what she said. It was going in and out. Can I ask her to repeat her last line?

MR. SWAMINATHAN: Yeah.

A. I spoke a lot with her, but she was already a woman much older than me.

Q. Who else other than her would you turn to?

A. Sometimes I would go with Carmen Mejia, with Rosalinda Mejia, and Marisa Mejia, but she was in Texas. I spoke very little with her.

Q. And was Guadalupe also someone you would also turn to for support?

THE INTERPRETER: Translator asks you to repeat that, sir. You came in garbled.

Q. Was Guadalupe Mejia someone you also turned to for support?

A. Yes. Almost every day, she spoke with me.

Q. Did she work, or was she at home?

A. She made bread to sell, and sometimes she took care of children.

Q. Did she do all of that from home?

A. Yes.

Page 51

Q. Would you see her every day?

A. The majority of the time, yes.

Q. What about Carlos? Would you ever turn to Carlos for support?

A. No.

Q. Jose Mejia, was he in the United States?

A. Yes.

Q. Who did he live with?

A. With his wife and his dad.

Q. Who was his dad?

THE INTERPRETER: The translator wants to say the way she said it, it could have been his dad or her dad.

MR. SWAMINATHAN: Can you clarify?

A. It was his dad.

Q. Who was his dad?

A. Adolpho Mejia.

Q. Did you -- were you friend with Jose Mejia?

A. Not very good friends. When I would go to the house, we would talk. I would watch the kids.

Q. How often would you see Jose Mejia?

A. Every time my husband would take me to his brother's house.

Q. How often was that?

Page 52

A. Sometimes every week. Sometimes every 15 days.

Q. And then, on the weekends, who would you spend time with on the weekends?

A. With my charity at the time, with my husband; but sometimes he would leave, and I would be by myself. I didn't have friends.

Q. Anyone else you spent time with on the weekend when Rosauro was not there?

A. Sometimes Lupe would invite us over to the house to eat. I would go down Lupe's apartment, and we would chat a little bit, or she would come up to my apartment.

Q. Anyone else you would spend time with on the weekends?

A. His brother-in-laws or when there were birthday parties or parties.

Q. One of the people living at the house we talked about yesterday was Martin Vaca, right?

A. Yes.

Q. Was he one of the people who you mentioned earlier who you knew from your town or Rosauro's town?

A. No. That man, he was from a town near my house, but he got married to a girl from my town.

Page 53

That's why I know him.

Q. What did Martin Vaca do for work?

A. I don't remember.

Q. And do you know a Ramiro Vaca?

A. I don't remember.

Q. Did Martin Vaca go by any other name?

A. The truth is I don't know.

Q. Did Rosauro have any nicknames?

A. What was that?

Q. Did Rosauro have any nicknames?

A. Yes.

Q. What was his nickname?

A. His brothers called him Chapa Pi (phonetic).

Q. What did you call him?

A. Chapa.

Q. Did he have any other nicknames?

A. The truth is I don't remember.

Q. Did you make any friends while you were living at Mozart Street, any friends from the United States?

A. No, I hardly had any friends. It was just with Miss Lorena who I speak with most.

Q. Lorena, was she your friend even when you were living at Mozart?

CCSAO COI SUBPOENAS 000394

Page 54

A. Yeah, because she lived three houses from where I lived.

Q. Did you know a person named Robert Kubon, K-u-b-o-n?

A. I don't remember.

Q. Does that name sound familiar to you at all?

A. At this moment, no, I don't know who it is.

Q. Do you know a person named Diana Gama?

A. Yes. I had spoke very little with her.

Q. Who was she?

A. It was woman who I met in a -- I think it was a -- I don't remember how I knew her, but I wasn't around her much.

Q. Was she someone -- so she was somebody that you know, or was she somebody that knew other people --

THE INTERPRETER: Translator asks: Can you repeat that, sir?

MR. SWAMINATHAN: Let me ask a better question. Sorry.

Q. Did other people at the house also know Diana Gama?

MS. ROSEN: Objection: form, foundation.

A. I don't think so.

Page 55

Q. So she was just somebody that you had gotten to know?

A. No. I hardly ever made friends here.

Q. And where did you meet her?

A. The truth is I don't remember. The truth is no.

Q. As far as you know, other than yourself, did anybody else in the house talk to Diana Gama or know Diana Gama?

MS. ROSEN: Objection: form, foundation.

A. No.

Q. What about Miguel Gama? Do you know -- is the name Miguel Gama familiar to you?

A. I don't remember exactly who they are.

Q. But Miguel Gama is also a name that's familiar to you?

A. At this moment, I'm remembering, but I'm not remembering well, totally.

Q. Was Miguel Gama always someone that you knew but not other people in the house knew. Strike that. Let me ask a better question.

Was Miguel Gama also someone that only you knew?

MS. ROSEN: Objection: form, foundation,

Page 56

mischaracterizes her testimony.

A. No. I don't remember who they are. I don't know.

Q. Are you familiar with the name Romualdo Moreno, R-o-m-u-a-l-d-o?

A. At this moment, I don't remember who they are.

Q. Is that name familiar to you?

A. The truth is I don't know what to tell you because I don't remember who they are.

Q. So let me ask a different question. Have you ever -- strike that.

Have you ever heard the name Romualdo Moreno?

MS. ROSEN: Objection: form, foundation.

A. The truth is, at the moment, I don't remember who it is.

Q. At some point, did you know a Romualdo Moreno, and you just can't remember who that is now?

MS. ROSEN: Objection: form, foundation.

A. I don't know. I don't remember if I know him or who it is. I don't know.

Q. Did you ever have any friends with the name Moreno?

Page 57

MS. ROSEN: Objection: form, foundation.

A. No. I don't remember who it is. It's the truth.

Q. Did you know anyone who has the nickname Moreno?

A. No, I don't remember.

Q. Did Rosauro or anybody else who lived at the house spend time with anybody with the first name or last name Moreno?

MS. ROSEN: Objection: form, foundation.

A. No. I don't know who they are.

Q. Back in March of 1998, a person named Romualdo Moreno had been calling the Mozart house. Would that be surprising to you?

MS. ROSEN: Objection: form, foundation.

A. No, I don't remember. I'm not going to answer because I don't remember.

Q. Yesterday we talked a little bit about the name Norma Salazar. Did you ever meet a woman named Norma Salazar?

A. No. I didn't know her, but someone had told me that her name was Norma Salazar.

Q. I'm just asking: Did you ever meet a person named Norma Salazar?

CCSAO COI SUBPOENAS 000395

ADRIANA MEJIA, 02/05/2021          Page 58..61

Page 58

A. No.

Q. Did you ever meet someone who you were told was Norma Salazar?

A. No.

Q. And you indicated yesterday that Gabriel had told you the name, Norma Salazar; is that right?

A. Yes.

MR. SWAMINATHAN: Did you get the answer?

THE INTERPRETER: The translator hasn't heard anything.

MR. SWAMINATHAN: She answered, but I think you missed it. Go ahead, Ms. Mejia.

THE REPORTER: The court reporter got a yes.

MR. SWAMINATHAN: The court reporter got a yes; so we can keep going.

Q. So have you ever told anyone else the name Norma Salazar?

MS. ROSEN: Objection, form.

A. Yeah. I think to my husband, I said that the little one that I was watching was Norma Salazar.

Q. Did you tell anybody else about Norma Salazar?

MS. ROSEN: Objection: form, foundation.

A. I don't remember.

Page 59

Q. Weren't you telling everybody at that time when you came home with the little boy that that was Norma Salazar's boy?

A. I don't remember that.

Q. When you were saying the name "Norma Salazar" to others, you knew that that was a lie, right?

A. Yes.

Q. Did you ever mention Norma Salazar to the police?

A. Yes.

Q. When you told police about -- you told the police that Normal Salazar -- strike that.

You told the police that the little boy belonged to Norma Salazar; is that right?

A. Yes.

Q. When you told them that, it was a lie, right?

A. Yes.

Q. At the police station, were you ever shown any photos of anybody the police believed to be Norma Salazar?

A. They showed me a lot of women in a line.

Q. This is women who were in person, live, when

Page 60

they showed you?

A. They were behind a glass. They were people arrested for things. I don't know.

Q. Before that, were you ever shown any photographs?

A. I think so.

Q. Were you asked, when you looked at photos, to pick out a person who was Norma Salazar?

MS. ROSEN: Objection, form.

A. The truth is I no longer remember.

Q. Tell us what you remember about being shown photos.

A. The truth is I no longer remember a lot.

Q. Did you look at any of the photos and select a photo of any one of the people?

A. I don't remember.

Q. After that at some point, did you see a lineup?

MR. ENGQUIST: Objection: form, mischaracterizes previous testimony.

MS. ROSEN: Foundation after that.

MR. SWAMINATHAN: Let me reask it.

Are you okay, Ms. Mejia?

THE WITNESS: I need to go to the lady's

Page 61

room. Can I?

MR. SWAMINATHAN: Let's take a break.

THE VIDEOGRAPHER: We are off the video record at 11:15 at the end of media unit 2.

(Recess in proceedings from 11:15 to 11:45 a.m.)

THE VIDEOGRAPHER: We are back on the video record at 11:45 at the beginning of media unit 3.

MR. SWAMINATHAN: Ms. Mejia, are you able to go forward right now?

THE WITNESS: Yes.

MR. SWAMINATHAN: You indicated earlier that you were feeling a little dizzy. Are you fine now?

THE WITNESS: Yes. I ate something sweet. I'm okay.

MR. SWAMINATHAN: If you need to stop once again, just tell us, and we can stop. Okay?

THE WITNESS: Very well. Yes.

BY MR. SWAMINATHAN:

Q. I asked you earlier about the name Moreno. There's one question I forgot to ask you.

A. The truth is I don't know who they are.

Q. Sitting here today, do you know anyone who goes by the name Moreno?

CCSAO COI SUBPOENAS 000396

ADRIANA MEJIA, 02/05/2021                                     Page 62..65

Page 62

A.  No.  I don't know.

Q.  Okay.  I was asking you about Norma Salazar. You described viewing a lineup at the police station, right?

A.  Yes.

Q.  How many people were in the lineup that you viewed?

A.  10 or 12.

Q.  Did you identify any of them?

A.  No.

Q.  Did any of them look familiar to you?

A.  No.

Q.  Where were you when you viewed the lineup?

A.  Detective Guevara took me to a small room. Yes, a small room, but I don't remember if it was the first floor or the basement.

Q.  And where were the people that you were viewing in the lineup?

A.  They were in a room that had a -- I could see them, but they could not see me.

Q.  And the person with you was Detective Guevara, did you say?

A.  Yes.

Q.  Were there any other police officers with

Page 63

you?

THE INTERPRETER:  Translator asks can you repeat that, sir?

Q.  Were there any other police officers with you?

A.  I don't know if it was a man or a woman that had --

THE INTERPRETER:  Translator couldn't make out what she said about the handcuffs.  Can I ask her?

MR. SWAMINATHAN:  Please.

A.  They had my hands handcuffed behind me, but I don't remember if it was a man or a woman that was taking me.

Q.  When you went in and actually viewed the 10 to 12 people in the lineup, was anybody there other than Detective Guevara?

MS. ROSEN:  Objection, form.

A.  At the entrance door, there was -- there was a guard at the door, and at the other exit, another guard and, at the door to get to the people on the lineup, another guard.

Q.  You viewed photos on that same day, right?

MR. ENGQUIST:  Asked and answered. Mischaracterizing her previous testimony.

Page 64

MR. SWAMINATHAN:  Go ahead.

A.  I think so.

Q.  How many photos were you shown?

A.  A lot of different people.

Q.  Can you describe what kind of photographs they were?

A.  They were like done in lapiz.  They were pencil.  It was as if someone had made a picture, but it was faces of people.

Q.  Are you describing a drawing?

A.  They were photos that they already had. They had a lot of them.

Q.  Were they Polaroids?

A.  Pardon me?

Q.  Do you know what Polaroid photos are?

THE INTERPRETER:  Translator would like to say:  Can I change the word "Polaroid" to something else to make her understand?

MR. SWAMINATHAN:  Yes.

A.  No.  It was like as if someone had done them.

Q.  Were you shown the photos before or after you saw the lineup?

A.  I don't remember.

Page 65

Q.  When you say you were shown a lot of photos, was it more or less than ten?

A.  There were a lot of them.  It was more like -- more than 20.

Q.  And where were you when you were shown those photos?

A.  With Detective Guevara in a room that had a --

THE INTERPRETER:  Translator wants to say she's coming in and out.  I see her mouth moving.  I don't hear anything.  Then I'll hear it way later. That's why I'm having trouble putting together her last two sentences.

MR. SWAMINATHAN:  Try again.  Can you ask her to answer it again and try to translate?

A.  Detective Guevara took me to a room where they had a lot of cabinets filled with papers.  There was a lot of other things I no longer remember.  But it was one of their offices.  It was an office of one of them.

Q.  Was there anybody there other than you and Detective Guevara?

A.  I think so, but they were doing other things.  The truth is I don't remember a lot, but I

Urlaub Bowen & Associates, Inc. 312-781-9586

CCSAO COI SUBPOENAS 000397

Page 66

believe so.

Q. I'm showing you a document that was marked as Exhibit 7 to your prior deposition. It's Bates stamped RFC Solache Reyes 207.

Ms. Mejia, is this person familiar to you?

MS. ROSEN: Object to the form.

A. I don't remember.

Q. Have you ever seen this picture before?

MS. ROSEN: Objection, form. She saw it at the last deposition.

A. I don't remember.

Q. Were you shown a photograph of this woman when you were at the police station in April of '98?

A. I don't remember. There were a lot of photographs. The truth is I don't remember.

Q. Were the photographs that you saw -- were they pages like this?

A. No. They were like when people do photos with a pencil, doing the face with a pencil.

Q. What do you mean it was like people doing it with a pencil? Does that mean it was a photo or a drawing?

A. Like when they do someone's -- like a face or a profile with a pencil.

Page 67

Q. Did it look like something taken with a camera?

A. No. They were photographs on a piece of white or blank paper --

THE INTERPRETER: Translator is not sure which because it means both.

A. -- but done with a pencil.

Q. So what you saw were pictures that looked like they were made with a pencil and not a camera; is that right?

A. It's different. I don't remember this photograph.

Q. I'm asking you a different question. What you were shown -- strike that.

If I understand you correctly, what you were shown were pictures created using a pencil and not a camera; is that right?

A. Yes, they were. They were from pencil.

Q. All right. When you were shown those pictures created by a pencil, did you pick any of them out?

A. I don't think so.

Q. Did any of them look familiar?

A. No.

Page 68

Q. Were you ever shown a single photograph taken by a camera of a woman?

A. I don't remember.

Q. When you were shown -- when Guevara showed you the pictures, what did he tell you he wanted you to do?

MS. ROSEN: Objection, form.

A. The truth is I don't remember.

Q. Did he tell you why he wanted you to do a lineup?

A. No, I don't remember why.

Q. When you were viewing the photos, was it your understanding that you were supposed to be identifying Norma Salazar?

MS. ROSEN: Objection, form.

A. It's been a lot of years, and I no longer remember.

Q. When you were shown a lineup, was it your understanding that you were to try to identify someone from the lineup who was Norma Salazar?

MS. ROSEN: Objection, form.

A. Yes, but I don't remember -- I don't remember a lot.

Q. I'm showing you a document that we'll mark

Page 69

as Plaintiff's Exhibit 1 to this deposition. This is RFC Solache Reyes 233 through 253. And it's Area 5 Supplementary Report, Cleared Closed Report.

The report states that a "Detective K. McDonald searched the ICAM database and located a woman named Norma Salazar." The report then states "A photo of this Norma Salazar was shown to Adriana Mejia, who identified her as being the woman who gave her the children."

Is that statement true or false?

MS. ROSEN: Objection: form, foundation.

A. False.

Q. What part of it is false?

MS. ROSEN: Objection, form.

A. I don't remember having said that.

Q. You don't remember having said what?

A. What you read to me at first.

Q. Which part did you not say?

MS. ROSEN: Objection, form.

Q. Let me try another way.

Ms. Mejia, where it says that you identified the photo of Norma Salazar as being the woman who gave you children, is that false?

MS. ROSEN: Objection, form.

CCSAO COI SUBPOENAS 000398

ADRIANA MEJIA, 02/05/2021 Page 70..73

Page 70

MR. SWAMINATHAN: Go ahead.

A. False. I didn't say that.

Q. Did you identify anyone from a photo as being the woman who gave you a child?

A. No.

Q. So is what is written here by the police a lie?

MS. ROSEN: Objection, form.

A. I didn't say that.

Q. So the police wrote something that you didn't say; is that right?

MS. ROSEN: Objection, form.

A. How am I going to answer that if I didn't say that?

Q. That's what I want to understand. The information written here, what you're saying is this did not happen. So what the police wrote is not true, right?

MS. ROSEN: Objection, form.

A. How was I going to know what they were putting down if I didn't know what they were speaking? I didn't speak English.

Q. Understood. All right. We talked yesterday about the phone calls. Strike that.

Page 71

We talked yesterday about the phone that was at the Mejia house, right?

THE INTERPRETER: The translator didn't hear anything.

A. Can you repeat the question, please?

Q. Yeah. Who would you call from the phone at the Mejia house? Who would you make calls to?

A. My parents in Mexico, Estoria Mejia, sometimes Marisa Mejia in Texas, Estoria Mejia. Mostly using it to speak -- to call my parents in Mexico.

Q. Who were the people who would regularly call you at the house?

A. The lady whose children I watched. Sometimes Jose Mejia would call me. Estoria Mejia. Javier Mejia to see if I would take care of the kids. Rosalinda Mejia sometimes. I don't remember who else called me.

Q. What was the name of the person whose kids you babysat?

A. Just Graviella Sanchez, Jose or his wife to watch his children, and Javier Mejia. I would watch his little boy.

Q. Was Rosauro close with Javier Mejia?

Page 72

A. No.

Q. Was Rosauro close with Jose Mejia?

A. No.

Q. Would Javier Mejia call the house to talk to Rosauro?

A. Almost never.

Q. Would Jose Mejia call the house to talk to Rosauro?

A. He does sometimes, when he has to fix his car.

Q. Fix whose car?

A. Either Jose's or my husband's. Sometimes to clean them or put in stereos.

Q. Jose would do that, and he would be calling Rosauro for help?

A. Sometimes, yes.

Q. Would Jose ever call to borrow Rosauro's car?

A. Jose?

Q. Yeah, Jose.

A. No. I don't think ever.

Q. What about Javier Mejia? Would he -- strike that?

Would Rosauro Mejia lend his car to other

Page 73

people?

A. Yes.

Q. Who would he lend his car to?

A. His brothers.

Q. Anyone else?

A. Sometimes. Or a lot of times, he would lend it to Gabriel Solache. I'm not sure, but to Martin Vaca also. I don't remember to who else.

Q. Okay. Was the first time you met Arturo Reyes when he moved into the Mozart house?

A. Yes.

Q. You never met him before he moved in, right?

A. Yes.

Q. He had his own room, right?

A. No.

Q. Did he share a room?

A. No. He shared the living room with my brother, with Gabriel. And he also shared it with a guy named Daniel, but he went to Los Angeles.

Q. Arturo had some family that lived nearby, right?

A. No. He just had his sister-in-law, Carmen.

Q. And he would spend time over at Carmen's house, right?

CCSAO COI SUBPOENAS 000399

ADRIANA MEJIA, 02/05/2021                                    Page 74..77

Page 74

THE INTERPRETER: Translator asks are you saying "he" or "she" would?

Q. Arturo would spend time at Carmen's house, right?

A. I wouldn't know what to tell you.

Q. Did Arturo work?

A. I think so.

Q. He worked a lot, right?

A. I think so. Although sometimes he didn't work because his job -- I think he was laid off. I don't remember.

Q. And when we wasn't at work, he would regularly spend time away from the house with others, right?

MS. ROSEN: Objection: form, foundation.

Q. He didn't spend much time at the house on Mozart, right?

MS. ROSEN: Objection, form.

A. I don't remember.

Q. Is it fair to say that you barely knew Arturo Reyes?

MS. ROSEN: Objection, form.

A. Very little. Very little. I lived with him very little or interacted with him very little.

Page 75

Q. And other than just saying hello to each other, did you ever have any other conversation?

A. Yes, when we would eat together.

Q. What would you talk about with him?

A. Food. And he would talk about his family in Mexico. But very little.

Q. Fair to say he was not someone that you would confide in?

A. Correct.

Q. He wasn't someone you looked to for support, right?

A. Correct.

Q. And he wasn't someone you would share your personal secrets with, right?

A. Yes.

Q. Who were the people you would share your personal secrets with? Who were you close enough to?

A. With no one. Until the present day, no.

Q. Did she say present day?

THE INTERPRETER: The interpreter understood "hasta la fecha" meaning until the present day. But then there was a word or two behind that. And another noise came in, and I couldn't actually make out if it was her or someone else.

Page 76

Q. Back in March of 1998, who would you share your personal secrets with?

A. With no one.

Q. After your arrest, did you ever talk to Arturo Reyes?

A. No. But I remember he sent me a letter. I think it was when I was still in Dwight, in prison.

Q. Let me come back to the letter. You and Arturo Reyes never spoke after you'd been at the police station and arrested, right?

MR. NOLAND: Object to form.

A. When we were arrested, when we were going to court together, yes, we would speak.

Q. What would Arturo say to you when you were going to court?

A. Very basic, like how I was.

Q. Anything else?

A. I remember, one time, I asked him about his family. Very basic.

Q. Other than when you saw him on the way to court, did you have any other conversations with Arturo Reyes?

A. No.

Q. And you said he sent you one letter?

Page 77

A. No. He sent me a letter.

Q. And what did he say in the letter?

A. It was written by a person, but I don't know who the person was. But yes, it said it was Arturo Reyes.

Q. So the letter was from him or someone else?

A. No. It was from him because it was from when I found out that he was in -- I don't remember the name of the place where he was incarcerated, but he told me where he was.

Q. What did the letter say?

A. He spoke about how he was. Through this, I don't remember much.

Q. Other than telling you how he was doing, did the letter say anything else?

A. Truth is I don't remember.

Q. Did you have any other communications with Arturo Reyes after you were charged with the crime other than the one letter he sent you and the communications on the way to court?

A. No.

Q. Arturo Reyes has never threatened you, correct?

A. No.

CCSAO COI SUBPOENAS 000400

ADRIANA MEJIA, 02/05/2021                                      Page 78..81

Page 78

Q.  Is that correct?

A.  Yes.

Q.  He's never promised you anything, correct?

A.  No.  But on an occasion when we were in jail, everything was going to be okay, that I should be strong.  What else did he tell me?  Trying to think.  He told me that I should pray a lot, that I should have a lot of faith, I think.  And I don't remember what else he told me.

Q.  Arturo Reyes was a religious person, right?

A.  Well, the truth is I don't know.

Q.  So he never promised you anything in any communications you had with him, right?

A.  I don't remember.

Q.  After you were arrested, did you have any communications with Gabriel Solache?

A.  Yes.

Q.  When did you have -- let me ask you any conversations you had.  Did you ever have conversations or speak to Gabriel Solache after you were charged with this crime?

A.  I don't remember.  I don't think so.

Q.  So the only communication you had with Gabriel since you were charged with this crime were

Page 79

letters; is that right?

A.  Except when we went to court.

Q.  Okay.  So the only communications that you had with Gabriel since this happened were letters and when you saw him before court, correct?

A.  Yes.

Q.  What did he tell you when you would talk to him before court?

A.  What didn't he tell me?

Q.  What did you tell him?

A.  For example, when we were close to the -- what are they called?

THE INTERPRETER:  Translator can't make out the word she's using.  I think she's saying something in English, but I can't make it out.

MR. SWAMINATHAN:  Bullpen.

THE INTERPRETER:  Oh, the bullpen?

A.  He would tell me to show him, like, my chest, that he was going to show me his intimate, his private parts.  He would tell me a lot of gross things.

Q.  Anything else that he would say to you or tell you when you were in the bullpen?

A.  That I was going to have everything on me

Page 80

and he was not going to keep taking the blame.

Q.  Did he tell you that he didn't want to take the blame for what happened?

A.  Yes, he said it.

Q.  And what would you say to him?  Did you ever -- strike that.

Did you ever tell him that you were sorry for what happened?

A.  I always said that everything we had done was -- it's difficult for me to say it.

Q.  Did you ever tell him that you were sorry for what had happened to him?

MR. NOLAND:  Objection, form.

A.  Yes.  One time, on one occasion, I told him I was sorry for everything that was happening when he lost his dad.

Q.  When was that?

A.  Because he was in jail and he couldn't be with his dad.

Q.  Other than that, was there any other time you told him you were sorry for what had happened to him?

A.  I always felt bad.  Yes, I think so.

Q.  Did you ever tell him it was your fault?

Page 81

A.  No.

Q.  Did you ever, in letters, write to him and tell him that it was your fault?

A.  I don't remember.

Q.  Well, is that something you would have ever written?

MS. ROSEN:  Objection:  form, foundation.

A.  The truth is I no longer remember.

Q.  So it is possible that you wrote to him and told him that it was your fault what had happened?

MS. ROSEN:  Objection, form.

A.  I don't remember if I wrote.  It's been a lot of years.  Truth is I don't remember.  He also wrote me telling me a lot of things; but unfortunately, when I came here, I lost those letters.

Q.  When you were -- strike that.

Anything else that you can remember Gabriel Solache saying to you or doing when you would see him going to court?

A.  When we were going to court, yes, he would say a lot of things to me.

Q.  But you told me some things that he told you.  You told me that there were things he would say that were of a sexual nature, right?

CCSAO COI SUBPOENAS 000401

Page 82

THE WITNESS: Give me a minute, please?

MS. SINGER: Are you okay?

THE WITNESS: He was asking me if I needed a break.

MR. SWAMINATHAN: You okay to go on?

THE WITNESS: Yes.

MR. SWAMINATHAN: We plan to stop in, like, 15 minutes, and maybe you can get some more food. Okay?

THE WITNESS: Okay. Thank you.

BY MR. SWAMINATHAN:

Q. You told us that in the bullpen, when you saw Gabriel, he said some things to you of a sexual nature, right?

A. Yes.

Q. And he told you some things about -- and he told you that you were the one who was going to be responsible, right?

A. Yes, he said that to me.

Q. Did he say anything else? Did he say anything else -- anything else you remember that he told you in the bullpen other than those two things?

A. Yes. He said to me -- I remember well the words that he said to me when he told me that, if I

Page 83

would have paid attention, if I would have preferred him as a boyfriend when I was a girlfriend of my husband, my husband's girlfriend -- he said it had been my fault, and he asked me why hadn't I chosen him as a boyfriend? All the things would have been different if I had.

But I didn't love him. And then he told me I had to pay for a lot of things. (Unintelligible.) He probably hadn't said all of that.

MR. SWAMINATHAN: I didn't understand the last part.

A. When my husband and him fought, it always ended up, like, a little bit -- he's always been a little bit gross, like a bully.

Q. Anything else? So he had some conversations with you about your past and about wanting to have a romantic relationship with you; is that right?

A. Yes.

Q. Anything else that you remember him talking to you about in the bullpens?

A. I don't remember a lot of things.

Q. Other than what -- so we've talked about some comments of a sexual nature, your past, and that you were the one to take the blame. Those are all the

Page 84

topics you can remember talking about in the bullpen, correct?

MS. ROSEN: Object to the form. Sorry, go ahead.

(Question was translated.)

MS. ROSEN: Object to the form.

A. Correct.

Q. Now, let me ask you about -- have you kept copies of any letters that Gabriel Solache sent you?

A. Unfortunately, no. When they moved me here, I lost a lot of things.

Q. And you sent letters to Gabriel Solache too, correct?

A. Yes.

Q. What would you tell Gabriel Solache in the letters you wrote him?

A. Truth is I no longer remember.

Q. Did you and Rosauro ever get divorced?

A. As far as I know. I didn't sign the papers. The person who signed the papers was my mom.

Q. So you are divorced from Rosauro?

A. I think so.

Q. When did that happen?

A. The truth is I don't know. I ended up

Page 85

finding out about things a lot later.

Q. Do you know if he has remarried?

A. Yes, he's married. He has children, but I don't know a lot.

Q. When did you last speak to him?

A. A week after I was imprisoned.

Q. Were you in Cook County Jail?

A. Yes.

Q. And he came to visit you?

A. No. He couldn't come in because he didn't have papers.

Q. So you didn't get a chance to speak to him then?

A. No.

Q. So has he ever come to visit you from the time that you were charged for this crime?

A. No.

Q. Do you still love Rosauro?

A. I don't think so.

Q. When you were living together in the United States, were you still in love with Rosauro?

A. Yes.

Q. Was there a point when -- strike that. At what point did you stop feeling in love with Rosauro?

CCSAO COI SUBPOENAS 000402

Page 86

A.  I don't know how to explain it.  The truth is I don't know.

Q.  What was your relationship like with Rosauro when you were living together in the United States?

A.  It was not a very -- not a lot of trust because he drank a lot.  He went out a lot because he would always listen to his brother, Horacio.  I think that -- I don't know.

Q.  What would Horacio want him to do that made you unhappy?

A.  It would bother me because he would take him on Friday until very late, and they would drink a lot.

Q.  What other things would Rosauro do with Horacio that bothered you?

A.  He would say to my husband that he was a wuss.  Why would he allow himself to be dominated by his wife?

Q.  What else?

A.  If they were going to go to any place, they would have to all go together.  Horacio would say, "I want to go to this place.  I want to go all together."  And they would all go together.

Q.  When you say "they," who would that be?  Horacio and Rosauro?

Page 87

A.  All of his brothers.

Q.  It sounds like he and his brothers would often go out drinking, right?

A.  Yes.

Q.  Where else would they go?

A.  I think to bars.

Q.  Anywhere else?

A.  The truth is I wouldn't know where else they would go.

Q.  Would Rosauro ever take you with him to the bars?

A.  No.  I never went to a bar.

Q.  Did you have any concerns that Rosauro was seeing other women?

MS. ROSEN:  Objection:  form, relevance.

A.  I don't know.

Q.  You said that you and Rosauro would argue; is that right?

A.  Yeah.  We argued a lot.

Q.  And one of the things you argued about was him listening to Horacio all the time, right?

A.  Yes.

Q.  What else would you argue about?

MS. ROSEN:  Objection.  I'm sorry.  I'm

Page 88

going to object to all of this detailed questioning about the relationship between Adriana and Rosauro as being not relevant, but I don't want to keep interrupting.

MR. SWAMINATHAN:  You can have a standing objection.

MS. ROSEN:  I have a standing objection.  Thank you.

MR. SWAMINATHAN:  Go ahead.

THE WITNESS:  I've forgotten the question.

Q.  Other than Horacio, what are the other things that you and Rosauro argued about?

A.  Because I didn't ask my brother to pay the rent or the food.  When I sent money to my parents.  When a lot was spent on the telephone.

Q.  Anything else?

A.  It bothered me because he insulted me a lot.

Q.  How did he insult you?

A.  Because he would make me feel ashamed when we would be walking in the stores.  He would call me a "bandeja."

THE INTERPRETER:  The translator wants to say that's an insult in Mexican.

Q.  What other insults would he use?

Page 89

A.  I no longer remember a lot.

Q.  Was he ever abusive toward you?

A.  Not as far as I can remember.  Just twice he hit me in the face.

Q.  This is while you were living in the Mozart?

A.  No.  Once in Mexico and once when we lived on 51st.

Q.  Did you call the police?

A.  No.

Q.  Had he been drinking when -- the first time he hit you, had he been drinking?

A.  No.

Q.  And had you had a fight that caused that?

A.  Yeah.  We argued about something, but I don't remember why.

Q.  The second time when he struck you, had he been drinking?

A.  I think so.

Q.  Do you know what -- what were you arguing about when he hit you?

A.  I believe it was because he was going to go with his brother Horacio.

Q.  And you didn't want him to go?

A.  Yes.

CCSAO COI SUBPOENAS 000403

ADRIANA MEJIA, 02/05/2021                    Page 90..93

Page 90

Q.  In March of 1998, you and Rosauro were still living together in the Mozart house, right?

A.  Yes.

Q.  And you shared a bedroom, right?

A.  Yes.

Q.  And he would sleep at that house, right?

THE INTERPRETER:  The translator asks can you repeat that?  He or she?

MR. SWAMINATHAN:  He.

Q.  Rosauro would sleep at that house at Mozart?

A.  Yes.

Q.  And would you sleep in the same bed?

A.  Yes.

Q.  I'm sorry to ask a very personal question, but were you guys still -- were you still sexually active?

A.  I don't have to answer.  I want to stay quiet.  That's private.

Q.  I fully appreciate why you don't want to answer it.  I know it's a very personal question, but it is very much relevant to this case.  We're allowed to ask you.  After I ask you this question, I won't spend time on it.

Were you and Rosauro Mejia still sexually

Page 91

active at that time?

A.  Yes.

Q.  And that was up to the time that you had been arrested?

A.  Yes.

Q.  Were you still trying to have children up to the time that you were arrested?

A.  Yes.

MS. ROSEN:  Objection, form.

MR. SWAMINATHAN:  Did you get the answer?

THE INTERPRETER:  Yes.

Q.  When you and Rosauro were sexually active in the months before your arrest, were you hoping to get pregnant?

A.  Yes.

Q.  Was he also hoping to get pregnant?

MS. ROSEN:  Objection:  form, foundation.  At what point in time?

MR. SWAMINATHAN:  Go ahead.

A.  He didn't pay a lot of attention to my things.

Q.  You wanted to have children, correct, at that time in 1998?

A.  Yes.

Page 92

Q.  Did he want to have kids?

A.  Yes.

Q.  How long had the two of you been trying to have kids?

A.  Me, always.  But that's why we had the arguments we had sometimes.

Q.  Some of the arguments were about trying to have kids?

A.  Yes.

Q.  What were you arguing about?

A.  (No response.)

Q.  I'm sorry, Ms. Mejia.

A.  I don't want to answer.

Q.  Let me just ask this.  You indicated that you had both wanted to have kids.  So what were you arguing about?

A.  It was because he blamed me and that I wasn't worth anything as a woman.

Q.  Because you weren't able to have a child?

A.  Yes.

Q.  And how long was it that you had been trying with Rosauro and had not been able to have a child?

A.  The truth is I don't remember, but for a long time.

Page 93

Q.  And you indicated that you were trying all the way until you were arrested, correct?

A.  Yes.

Q.  How many years before that had you been trying?

A.  The truth is I don't remember.

Q.  Was it multiple years?

A.  Like three, four years.

Q.  And for how long had you been getting testing to see if you had any medical issues that prevented you from having kids?

A.  Every month.

Q.  Starting when?

A.  The truth is I no longer remember that.

Q.  Was it for multiple years that you were getting testing?

A.  Yes.

Q.  Was Rosauro also going in for testing to see if he could have kids?

MS. ROSEN:  Objection, form.  Go ahead.

A.  Only on one occasion.

Q.  What did he do on that occasion?

A.  He went into a room with a nurse.  I think that the nurse gave him a small glass and then said

CCSAO COI SUBPOENAS 000404

ADRIANA MEJIA, 02/05/2021                                    Page 94..97

Page 94

that he had to put his sperm in there.

Q. So when was it that he went in and did this, gave sperm?

A. I no longer remember the dates or the years.

Q. How close in time was it to when you were arrested?

A. It would be like three years before.

Q. And then after that, you continued to get testing; is that right?

A. Yes.

Q. Was he cooperative in helping you try to get testing?

A. Yes. But he never went to the consults with me.

Q. I thought he -- didn't he sometimes drop you off and then come into the waiting area?

A. Yes. Sometimes he'll wait for me there, or sometimes he'll wait for me in his car.

Q. Was it ever requested that he do additional testing?

A. I don't remember.

MR. SWAMINATHAN: I said we would take a pause actually a little bit before this; so why don't we take a break now?

Page 95

THE INTERPRETER: Translator would like to say I was told that someone would be there by 1:00 to replace me.

MS. MADRIGAL: Yes. I logged on at 1:00.

THE VIDEOGRAPHER: We're off the video record at 1:05 at the end of media unit 3.

(Recess in proceedings
from 1:05 to 1:31 p.m.)

THE VIDEOGRAPHER: We're back on the video record at 1:31 at the beginning of media unit 4.

MR. SWAMINATHAN: Adriana, I want to move to other topics.

BY MR. SWAMINATHAN:

Q. In March of 1998, Rosauro was working, correct?

A. Yes.

MR. SWAMINATHAN: The interpreter is on mute.

MS. MADRIGAL: I am so sorry. Also, I do need to be sworn in.

(Interpreter sworn.)

A. Yes.

Q. Where was he working?

A. A cardboard factory near Franklin Park.

Page 96

Q. How much was he making per week or per month?

A. Honestly, I don't remember anymore.

Q. Were you working at that time?

A. No. I've never worked.

Q. How much were you paying in rent for the apartment?

A. Honestly, I don't recall because everybody paid the rent. So honestly, I don't recall how much we paid.

Q. Would Rosauro send money back to Mexico to his family?

A. No, because his mother lived here for some time.

Q. In the US in March of 1998?

A. For some time because she returned to Mexico in '98.

Q. Did she return to Mexico before or after you were arrested?

A. Before.

Q. Were you sending money back to your family in Mexico?

A. Sometimes.

Q. How often would you send money back?

Page 97

A. Not often.

Q. When you say "not often," do you mean once a month, once a year? Give us a sense.

A. I would send her for holidays, for mother's day, Christmas, because my ex-husband was putting money together for a house for us in Mexico.

Q. Were you and Rosauro hoping to move back to Mexico?

A. Yes.

Q. When you were sending money back to Mexico, how much would you send each time?

A. My ex-husband would send money to his brother Clemente because he was building the house. I believe it was $1,000 every two months, I believe.

Q. Were you and Rosauro -- other than the -- after the money that you were sending back regularly and the rent and everything else, were you and Rosauro able to save money while were living in the US?

MS. ROSEN: Objection, form.

MR. SWAMINATHAN: Go ahead.

A. Not really.

Q. Did you have a bank account?

A. No.

Q. Did you keep all of your money in cash?

CCSAO COI SUBPOENAS 000405

ADRIANA MEJIA, 02/05/2021          Page 98..101

Page 98

A. Yes.

Q. And how would you describe the overall financial situation for you and Rosauro in 1998?

A. Not very good.

Q. Would you say you did not have enough money at that time?

MS. ROSEN: Objection, form.

MR. SWAMINATHAN: Strike that. I'll withdraw it.

Q. Between you and Rosauro, was one of you in charge of the money?

MS. ROSEN: Objection, form.

MR. SWAMINATHAN: Go ahead.

A. For the most part, he kept the money.

Q. And if you needed money to buy things, how would you get the money?

A. I would have to ask him for it.

Q. So when you needed money to buy things, basically you would ask him for the money, and he would give it to you; is that right?

A. Yes.

Q. Would he ever give you extra money just to have around for yourself?

A. Sometimes when he had some left over.

Page 99

Q. How much would he give you when he was giving you extra money?

A. Maybe about 50 or $100.

Q. In March of 1998, did you have your own money that you were collecting outside, or were you depending on Rosauro?

A. By that time, I was babysitting for a boy.

Q. How much money were you making doing that?

A. I believe $30 or $50. I really don't recall.

Q. How often would you get that money?

A. Every week.

Q. And other than that, did you have any other money you were making separate from Rosauro?

A. When my brother Carlos would have me put money away that was his, I would save it for him.

Q. So Carlos was having you hold on to some of his money?

A. Yes, so that I could send money back to my mother from his money.

Q. So when you were making money from the babysitting, was that money that you would keep or that you would give to Rosauro for the two of you to use for the family?

Page 100

A. No. I would leave it for me.

Q. So would you use that money to buy things that you needed?

A. Sometimes I would buy things that I needed or things for the house.

Q. And when you said your overall financial situation was not good, does that mean you didn't have a lot of extra money lying around?

MS. ROSEN: Objection, form.

MR. SWAMINATHAN: Go ahead.

A. Perhaps you can say that I didn't have a lot of money, but maybe $10. I would save those.

Q. So you would sometimes have for yourself, you know, $10, $20, things like that; is that right?

A. For the most part, I almost always had a little bit of money.

Q. And then if you needed more than that, you would have to ask Rosauro; is that right?

A. Yes.

Q. And if you needed hundreds of dollars, you would have to ask Rosauro; is that right?

A. Yes.

Q. And if you took hundreds of dollars -- well, strike that.

Page 101

Did Rosauro have hundreds of dollars lying around the house?

A. No, because he had things with his sister-in-law Rosalinda that would put money away. They had like a little savings plan going.

Q. So you didn't have access to that?

A. Yes.

Q. How would you access that? You would have to ask him or Linda?

A. No. It's because it was like a savings with numbers that everybody would put in. When it was your number, then you would get the entire amount.

Q. How much would that be?

A. Sometimes it was 1,200, sometimes $1,000

THE INTERPRETER: Counsel, can we go off the record for a second?

MR. SWAMINATHAN: Yes.

THE VIDEOGRAPHER: Off the record at 1:44.

(Pause in proceedings.)

THE VIDEOGRAPHER: We're back on the video record at 1:46 p.m.

BY MR. SWAMINATHAN:

Q. Did you ever get the money from the tanda?

A. Yes. For the most part, I would receive it.

ADRIANA MEJIA, 02/05/2021          Page 102..105

Page 102

Q. When did you get the money from the tanda.

A. When it was his turn, it was his number, I would pick it up. I would take the money.

Q. When you say "his turn," do you mean Rosauro?

A. Yes.

Q. When was the last time that Rosauro had won the money in the tanda?

A. Sometime close to in March, around the time of my case.

Q. When you got that money from the tanda, did you and Rosauro use it for any family reasons or any family purpose?

A. No, because I picked up the money, and I kept the money that time.

Q. What did you do with that money?

A. I saved it for some time; and then he would ask me, and I would tell him that his money was there.

Q. So you never used that money. You gave it to Rosauro?

THE INTERPRETER: Sorry?

Q. So you said you were holding on to that money; is that right?

A. Yes, but I was also in a tanda. And from

Page 103

what little I was getting, I put my own money together.

Q. You were in a different tanda?

A. It was the same one; but he had a number, and I had a number.

Q. Okay. But the money that Rosauro got from the tanda, you kept that money for the family, right? You're not saying you spent it?

A. Yes.

Q. So that money from the tanda never got spent, right?

A. No.

Q. You didn't spend it on something for yourself, right?

A. Not that I recall.

Q. If you did, would Rosauro have noticed?

A. Yes.

Q. Would he have been upset?

A. Yes.

Q. If you had taken, you know, hundreds of dollars from that money that Rosauro and you had saved, would he have noticed?

A. Of course.

Q. If you took hundreds of dollars that Carlos

Page 104

had given you to send to Mexico, would he have noticed?

A. Yes.

Q. I'm going to ask you about cars. Back in 1998, did you drive?

A. No. Until present day, I don't know how to drive.

Q. And you said that Rosauro had a car, right?

A. Yes.

Q. Did he have more than one car?

A. He would buy and sell. So he had different cars.

Q. In March of 1998, near the time you got arrested, did he have more than one car?

A. Just one.

Q. And can you describe that car?

A. I don't know about cars.

Q. What color was it?

A. Honestly, I don't recall the color anymore.

MR. SWAMINATHAN: Let me show you a document. This is RFC Solache Reyes 44. And I apologize. I did not mark this as an exhibit. It didn't get included, but it's a document everyone is familiar with. My apologies.

Page 105

MS. ROSEN: You mean you haven't exchanged it as an exhibit?

MR. SWAMINATHAN: Yeah. We'll send a copy of this exhibit over to the court reporter and everybody so we have it. I'll identify it for the record.

MS. ROSEN: Can we mark it as whatever number? I think you started with your own numbering.

MR. SWAMINATHAN: Yeah. So this is Plaintiff's Exhibit 2. It is RFC Solache Reyes 44.

BY MR. SWAMINATHAN:

Q. Ms. Mejia, do you see that this is -- these are two pictures of a car?

A. Uh-huh.

Q. Was this Rosauro's car in March of 1998?

A. Honestly, I don't recall anymore.

Q. Was this the car that was used to go to the Soto home?

A. Honestly, I don't remember anymore.

Q. The car that you used to go to the Soto home, was it the same car that you got picked up in the next day by Rosauro and Guadalupe?

MS. ROSEN: Objection, form.

A. I'm not very sure. I think Gabriel Solache

Page 106

had a car, but I don't remember his car either.

Q.  Is it your testimony that you don't know what car you were in when you went to the Soto home?

MS. ROSEN:  Objection:  form, mischaracterizes her testimony.

A.  It's been so many years.  I don't recall.

Q.  When you went to the Soto home, were you in the car that's on Plaintiff's Exhibit 2?  Were you in a different car that Gabriel Solache owned, or were you in some other car?

MS. ROSEN:  Objection:  form, asked and answer.  She said she doesn't recall.

MR. SWAMINATHAN:  Go ahead.

A.  Honestly, I don't recall.

Q.  Does this car look familiar to you at all?

MS. ROSEN:  Objection, form.

A.  Perhaps, but I don't remember anymore.

Q.  Did Jose Mejia have his own car?

A.  Yes.

Q.  Did Horacio Mejia have his own car?

A.  Yes.  He had a van.

Q.  Did Adolpho Mejia have his own car?

A.  Yes.  He had a very old car, the big ones.

Q.  Did Jorge Mejia have his own car?

Page 107

A.  Yes.  They had a van.

Q.  Did Leobardo Mejia have his own car?

A.  I don't recall if he had a car or if he didn't have a car on those dates.

Q.  Did Carlos Martinez have his own car?

A.  When my brother was with me, he didn't know how to drive yet.

Q.  As of March of 1998, Carlos Martinez did not know how to drive; is that right?

A.  Yes, he didn't know how to drive.

Q.  All right.  We talked yesterday about the fact that, at some point, you pretended that you were pregnant, right?

A.  Yes.

Q.  Was there a point in time before that when you actually were pregnant?

A.  No.

Q.  Was there a point in time before that when you believed you were pregnant?

A.  Yes.

Q.  Why was it that you believed you were pregnant?

A.  Because I didn't have a period.

Q.  Did you tell people that you were pregnant?

Page 108

A.  Yes.

Q.  Did you take a pregnancy test?

A.  No.

Q.  Did you see a doctor?

A.  No.

Q.  How long was it that you believed you were pregnant?

A.  About two months.

Q.  And then, at some point, did you realize you were not pregnant?

A.  Yes.

Q.  How did you find out?

A.  Because I got my period.

Q.  And then did you tell anybody the fact that you were not pregnant?

A.  No.

Q.  And so did you then lie to your family about being pregnant?

A.  Yes.

Q.  Did you lie to your husband Rosauro Mejia about being pregnant?

A.  Yes.

Q.  Did you lie to everybody else in the house about being pregnant?

Page 109

A.  Yes.

Q.  Did you lie to Carlos Martinez?

A.  Yes.

Q.  Did you lie to your other family members?

A.  Yes.

Q.  Did you lie to your parents?

A.  Yes.

Q.  And did you lie to your friends?

A.  What friends?

Q.  What did you do to make it appear that you were pregnant?

A.  Well, no one would pay attention to me.

Q.  So you didn't do anything to make it appear that you were pregnant?

A.  Yes.  I would wear loose clothing, but no one would pay much attention to me.

Q.  Other than wearing loose clothing, would you do anything else to make it appear that you were pregnant?

A.  No.

Q.  Did you ever put anything under your shirt to make it appear that you had a belly?

A.  No.

Q.  Did you tell people when you were due?

ADRIANA MEJIA, 02/05/2021                                    Page 110..113

Page 110

A.  Yes.

Q.  Did you lie to them about when you were due?

A.  Yes.

Q.  Did you pretend to go to doctor's appointments for your pregnancy?

A.  Yes.

Q.  And would you actually go to a doctor's office, or would you just say that you had gone to a doctor's office?

A.  Sometimes I would say that I would go, and sometimes I would just go.

Q.  When you would just go, what would you do?

A.  I would go and wait in the waiting area at the hospital, or I would walk in the streets.

Q.  So sometimes you would go to the hospital and just walk around there?

A.  Yes.

Q.  And sometimes would you just go to clinics and walk around there?

A.  Yes.  Sometimes I would go on the streets that I was familiar walking around.

Q.  Okay.  So sometimes you would walk the streets.  Sometimes you would go to the hospital, and then you would go to the clinic.  Do I have that

Page 111

right?

A.  Yes.  I would go on the streets that I was familiar with.  I really didn't know how to get around Chicago; so for the most part, I would go around 26th Street.

Q.  When you would go to the hospital, which hospital would you go to?

A.  The one on 26th Street.  What is it called?

Q.  Mount Sinai?

A.  Yes.  Because I knew how to return to the University of Chicago.  I believe just there and then a small clinic that was there by the university.

Q.  When you would go to the hospital and to the clinic, would you just sit inside and sit in the waiting area?

A.  Sometimes I would go inside.  Sometimes I would go out to eat something.

Q.  Sometimes would Rosauro take you and drop you off at the hospital or the clinic?  I'm talking about when you were going to these pretend appointments.

A.  Yes.  Sometimes he would go in and wait in the waiting area, and I would go into the bathroom or wherever I could; or sometimes he would go outside and

Page 112

wait for me in the car.

Q.  Sometimes when he would come in with you, you would go into the bathroom to make it appear like you had actually seen a doctor; is that right?

A.  Yes.

Q.  In addition to these trips to the doctor's office where you weren't actually there for an appointment, you also had actual fertility appointments that you would go to as well, right?

A.  Yes.

Q.  And Rosauro would take you to those fertility appointments sometimes, right?

A.  Yes.

Q.  You said that one of the clinics -- do you remember where the clinic was that you were going to that was near the University of Illinois Chicago Hospital?

A.  No.  I don't remember the street anymore.

Q.  It was just near the hospital?  Is that as much as you can remember?

A.  Yes.  I don't recall.

Q.  Would you also go to that location for actual fertility appointments in addition to the pretend appointments?

Page 113

A.  Yes.

Q.  Would that be 20 South Wood Street?  Does that sound familiar?

A.  Honestly, I can't -- I don't remember the streets.

MR. SWAMINATHAN:  I'm going to show you a map.  This is just a Google map that identifies the University of Illinois Hospital at 820 South Wood Street.  We'll make this into an exhibit.  We'll mark it as Plaintiff's Exhibit 3.

MS. ROSEN:  So this is another exhibit that you haven't provided in advance that we need to give to the court reporter?  Is that what you're saying?

MR. SWAMINATHAN:  No.  I'll give this to the court reporter.  I just pulled this up on Google maps just a little bit ago.

BY MR. SWAMINATHAN:

Q.  So Ms. Mejia, this is -- in the lower right-hand area, it shows where the University of Illinois Hospital is.  Do you see that?  Are you able to see that, Ms. Mejia?  Go ahead.

A.  Yes.

Q.  And that's the hospital that you said that you were being picked up and dropped off from when you

Page 114

went to the Soto home, right?

A. It's very changed now. I really don't recall.

Q. Okay. When you went to the hospital -- strike that.

When you were referring to the University of Chicago Hospital during the course of your deposition, that's one of the hospitals that you would also go to for your pretend appointments, right?

A. Yes.

Q. And then up here in the center of this picture is 820 South Wood Street, which is one of the University of Illinois Chicago clinics. Does that look approximately like where you would go sometimes to the clinic?

MS. ROSEN: Objection: form, foundation.

A. Honestly, I no longer remember the address. I don't recall the numbers.

Q. The clinic that you would go to, you said that it was near the University of Illinois Chicago Hospital. Was it within one to two blocks, like this map shows?

A. Honestly, I don't remember.

Q. The clinic that you went to, was it on,

Page 115

like, a campus with other medical buildings?

MS. ROSEN: Objection: form, foundation.

A. There were a lot of buildings, and I really don't recall how the streets were.

Q. Let me ask you, when you were going for the pretend appointments to the clinic and to the hospital, would anybody drop you off or take you other than Rosauro?

A. Yes. My brother-in-law Edwiges and, on some occasions, Gabriel Solache.

Q. Anyone else?

A. No. I don't recall.

Q. Were you ever told why you were not able to get pregnant?

A. No.

Q. Did the doctors ever identify any problems that you had in your body that prevented you from being able to have kids?

A. I believe, when I was at Mount Sinai, the doctor said that I didn't ovulate too much.

Q. Did they give a particular reason why you weren't ovulating as much as you should?

A. No. I don't recall them saying anything.

Q. Did they ever tell you there were any

Page 116

problems in your reproductive organs?

A. I don't recall.

Q. Up to the point that you were arrested, had you ever had any serious medical issues during your life?

A. Yes. On two occasions in Mexico, I was sick with my kidneys. And once here in Chicago, I was also sick, and it was from my kidneys.

Q. Did this relate to your diabetes?

A. No. My diabetes was just about -- I'm sorry. My diabetes came about just about 15 years ago.

Q. So what were the issues you were having with your kidneys where you would go to the hospital?

A. Just, like, kidney stones.

Q. Okay. How long were you hospitalized?

A. In Mexico, my parents took me to regular doctors. Here, in Chicago, my husband didn't have money to take me to the doctor; so I had to take, like natural, like pills.

Q. When did that happen that you had this issue in the United States?

A. About three years after I had arrived from Mexico.

Page 117

Q. So what year would that have been?

A. Around '96.

Q. Have you ever been diagnosed with schizophrenia?

A. No.

Q. Have you ever been diagnosed with bipolarism?

A. No.

Q. Have you ever been diagnosed with a manic condition or manic episodes?

A. No.

Q. Have you ever been diagnosed with depression?

A. No.

Q. And you indicated yesterday that you've never tried to commit suicide, right?

A. Yes.

Q. Have you ever had hallucinations?

A. No.

Q. Have you ever had amnesia?

A. Can you explain to me what amnesia is?

Q. Have you ever had a condition where you just -- you lost memory of large periods of time?

A. Oh, no.

CCSAO COI SUBPOENAS 000410

ADRIANA MEJIA, 02/05/2021                                    Page 118..121

Page 118

Q. Or have you ever had a period where you lost memory of who you were?

A. No.

Q. Have you ever lost your consciousness, like been knocked out?

A. Yes, only when I lost my brother Carlos.

Q. What happened then?

A. When I got the news, I went to my room, and I felt my body was numb. And I just couldn't anymore.

Q. Did you lose consciousness?

A. It felt like my body wasn't responding, but my body was tired.

Q. Have you ever had a stroke?

A. No.

Q. Up until the point that you were arrested for the murders, had Rosauro had any serious medical issues?

A. No.

Q. Did he have any mental health issues, or was he taking any medications for any mental issues?

A. No.

Q. You said that he had had some testing to see -- for fertility. What were the results of that testing?

Page 119

MS. ROSEN: Objection to form. Go ahead.

A. Honestly, I don't remember anymore what they said.

Q. I am showing you a document that we'll mark as Plaintiff's Exhibit 4. It is Bluhm 25519 and 25520. This was previously marked as Deposition Exhibit 8 to Ms. Mejia's previous deposition.

This document indicates that -- this relates to an appointment at Mount Sinai. Is that a place where you were going to for facility appointments?

MS. ROSEN: Objection, form. Sorry. Go ahead and translate it.

(Question translated.)

MS. ROSEN: Objection: form, foundation.

MR. SWAMINATHAN: Go ahead. You can answer.

A. Yes.

Q. It indicates that Rosauro Mejia is supposed to go for a sperm analysis; is that right?

MS. ROSEN: Objection: form, foundation.

A. Yes.

Q. And the date of this is March 18, 1998, correct?

MS. ROSEN: Objection: form, foundation.

A. Yes.

Page 120

Q. And it indicates that he had an appointment on the eighth floor on March 20, 1998, correct?

MS. ROSEN: Objection: form, foundation.

A. Yes.

Q. So was it March 1998 when Rosauro went for his sperm test?

MS. ROSEN: Objection: form, foundation, mischaracterizes the record, misleading.

A. I honestly don't recall the year.

Q. So you're not sure?

MS. ROSEN: Objection: form, foundation.

Q. Is that right? You're not sure whether he had his sperm appointment in March of 1998?

MS. ROSEN: Objection: form, foundation, misleading.

A. No. I don't recall. I don't think it was in '98. It would have been '96 or around '97.

Q. So you think that he did not -- is it your statement that he did not go for a sperm analysis in March of 1998?

A. He did go one time, but I don't recall the date.

Q. Okay. I want to ask you about your plan for getting a baby, okay?

Page 121

When did you first speak with somebody about your plan to get a baby?

MR. ENGQUIST: Objection to the form.

MR. SWAMINATHAN: Go ahead.

A. When Gabriel found me crying, he's the first person I told.

Q. And when was that? What month?

A. Around -- I'm not sure if it was -- around January or February of '98.

Q. Okay. So it was more than a month before you actually went to the Soto home, correct?

A. Honestly, I don't remember anymore.

Q. Where in the house were you when he found you crying?

A. One time, he found me in the living room, and he asked me what was happening. And I didn't want to tell him. Then in the kitchen.

Q. Is that a different day?

A. Yes.

Q. And then when was it -- so is it a second time that you were crying and he asked you what was wrong?

A. No. I don't recall if it was two or three times. No, because when he would come home from work

Urlaub Bowen & Associates, Inc. 312-781-9586

ADRIANA MEJIA, 02/05/2021                           Page 122..125

Page 122

at night is when -- yes, I believe so.

Q. So how many times -- were there multiple times where Gabriel found you crying and he asked you what was wrong?

A. Yes, many times. Sometimes he would also see me sad during the day.

Q. And so a number of times when he saw you crying, you didn't tell him that you were faking a pregnancy, correct?

A. Yes.

Q. And then when was the first time that you actually told him?

A. When it was getting close to the time that I was supposedly going to have the baby, and I couldn't find a solution. And I had plans to go back to Mexico, but I couldn't.

Q. So at the time that you actually told him that you were faking, how close was that to when you went to the Soto home?

A. Honestly, I don't recall if it was a month or some weeks.

Q. Okay. And where were you in the house when you revealed to him that you were faking?

A. I really don't recall if it was in the

Page 123

kitchen or in the living room, but it was one of those two places.

Q. And what time of day was it?

A. It wasn't in the daytime. It was at night.

Q. Was anyone else home?

A. My brother was sleeping. My husband hadn't gotten home yet.

Q. And so you just revealed to him your secret; is that right?

A. Yes.

Q. Did he tell you something to get you to reveal your secret?

A. Well, he would always ask me, "Why is it that I'm always seeing you crying? Why is it I find you sad? Are you having problems? Are you having problems with your husband?"

And I would say, "No, everything is fine."

But he would say, "I would see you sad all the time." But one of those times, I didn't have any more, and I told him.

Q. Okay. And what did you say to him?

A. I told him the truth, that I wasn't pregnant, that I had faked a pregnancy, that I was having problems, that I was afraid about what my

Page 124

husband could tell me.

Q. And what was his response?

A. I don't remember the adequate words that he said to me, but he said that he would help me.

Q. Did he tell you that he would help you get a baby in that conversation?

A. I don't know if it was that day or the following day, the conversation where he told me that he knew a friend that didn't want her baby.

Q. So that day or the next day, he told you that he had a friend who didn't want their baby; is that right?

A. He told me he knew a lady that didn't want her baby.

Q. Did he tell you that person's name?

A. No. I think it was one of his friends or one of his girlfriends.

Q. And did he tell you how much it would cost?

A. Yes. He told me to put $600 together.

Q. And did he tell you why this person was getting rid of their child?

A. I don't really recall what he told me about that lady.

Q. Did he tell you if it was going to be a boy

Page 125

or girl?

A. No. I believe he said it was a girl.

Q. Did he tell you if the baby had been born yet?

A. I don't recall.

Q. Did he tell you when he was going to get the baby for you?

A. Yes. It was a little bit before I was about to have my child.

Q. You told him that you were faking a pregnancy, and that same day or the next day he told you all of this information about this person who actually had a baby for you, right?

A. Yes. But he didn't tell me everything the same day. He told me within days.

Q. That's what I'm asking you. There was an initial conversation where you told him that you were faking your pregnancy, right?

A. Yes, one conversation where he was asking what was happening. And he told me not to worry, that everything was going to be fine.

Q. And in that same conversation or a conversation on the next day, he told you he could get you a baby, right?

CCSAO COI SUBPOENAS 000412

ADRIANA MEJIA, 02/05/2021 — Page 126..129

Page 126

A. Yes.

Q. And in that conversation where he told you he could get you a baby, what else did he tell you?

A. That's when he told me not to worry, that he knew a lady that didn't want her baby.

Q. And did he tell you that it would cost $600?

A. Yes.

Q. And did he tell you that it was going to be a baby girl?

A. Yes. I believe he told me it was a girl.

Q. And in that conversation, did he tell you when he would have the baby available for you?

A. I don't really recall, but I believe he said in some days.

Q. So he indicated, when you had that conversation with him, that within a few days he'd be able to get you the baby; is that right?

A. Yes.

Q. And then how long did it take you to get $600?

A. Didn't I explain to you that it was in a tanda?

Q. Yeah. So you got the money from the tanda; is that right?

Page 127

A. Yes.

Q. So your testimony is the place where you got $600 was from a tanda with the Mejia family; is that right?

A. Yes.

Q. Did Rosauro ever find out about it?

A. That I had another number?

Q. Did Rosauro ever find out that you had received money from the tanda and that you had used it for some other purpose?

MS. ROSEN: Objection, foundation.

A. You confused me a little bit. Could you explain it to me a little slower?

Q. You're saying that you won money from the tanda separate from the money that Rosauro won; is that right?

A. Yes.

Q. From the same tanda?

A. You're not understanding me.

Q. Go ahead. Explain.

A. He had one number, and I had a separate number.

Q. But both were in the same tanda, right?

A. Yes.

Page 128

Q. And so you're saying that you got money from the tanda that he didn't know about. Is that what you're saying?

A. Yes. He didn't know I had the tanda until I got that money.

Q. And when you got that money, you're saying he had no idea that you got that money; is that right?

A. Yes. Because when my ex-sister-in-law Rosalinda Mejia gave me the money is when he found out I had that tanda.

Q. And when was that that he found out about that?

A. I believe around February.

Q. So in February, you got the money from the tanda, and he knew about that money, right?

A. Yes.

Q. What did he have you do with that money?

A. I had it saved for myself.

Q. Did he let you keep that money for yourself?

A. Yes, because he was putting together the other money from his tanda. He had me save both the money.

Q. So he was fine with you keeping the money from the other tanda?

Page 129

A. No. Because his plans were to send it to Mexico to finish building the house.

Q. And did he ever find out that you didn't send the money for the house?

A. Yes.

Q. And is it your testimony that you and him both got money from the tanda in February and March?

A. (Nodding head up and down.)

MR. SWAMINATHAN: Go ahead.

A. Yes.

Q. And how long after you had this conversation, this first conversation with Gabriel in which he said he could get you money, how long after that did you get money to give him?

THE INTERPRETER: I'm sorry, Counsel. Can you repeat that?

MR. SWAMINATHAN: Yeah. I'll ask a better question.

Q. How long was it from when you had this conversation with Gabriel about getting the baby that you came up with the $600?

A. It didn't take long because I had the money; so I gave it to him after.

Q. You had the money just -- you had the cash

CCSAO COI SUBPOENAS 000413

Page 130

in your house?

A. Yes.

Q. Where in the house were you keeping it?

A. I have a small jewelry box where you keep your -- what do you call it -- your jewelry.

Q. Did Rosauro know where you were saving that money?

A. Sometimes when he would search.

Q. And how much of the money was -- after you gave the money to Gabriel, how much money was left from the tanda?

A. $400.

Q. So you got $1,000 from the tanda in February?

A. Yes.

Q. When was the last time before that that you got money from the tanda?

A. I don't recall, but I think it was around -- I don't remember anymore.

Q. Was it in 1998? Was it in 1997?

A. 1998, but I don't --

UNIDENTIFIED SPEAKER: -- something, but I can't tell what.

MR. SWAMINATHAN: Somebody is not on mute?

Page 131

Sorry. Was she in the middle of the answer?

THE REPORTER: Yeah. Could you repeat the answer for me? This is the reporter.

A. 1998, but I don't recall the date.

Q. So you'd won the tanda before in 1998?

A. No, in '98.

Q. Yeah. So you got the money from the tanda in February of 1998; and before that, you had gotten money from the tanda also in 1998?

A. Yes. We would make a lot of tandas, and we would get a lot of numbers.

Q. So you were getting money from multiple tandas in 1998; is that right?

A. Yes. With my ex-husband's and mine and then -- I mean, a lot of his siblings would make tandas, and then I did too.

Q. And then you had to be lucky enough to have your number selected, right?

A. No. I could pick my number.

Q. Okay. You said you had the money lying around. So when Rosauro told you you would need to come up with $600, did you give him the money right then?

A. Rosauro?

Page 132

Q. Sorry if I said the wrong name. Let me ask it again.

When Gabriel said you would need to come up with $600, you already had the $600, right?

A. Yes.

Q. Did you give it to him at the same time?

A. Yes.

Q. And at that point, did he tell you the name of the person?

A. Honestly, I don't remember if it was that day or -- I really don't remember.

Q. When is the first time you learned the name of the person who was going to be giving you a baby?

A. I just recall that it was Norma Salazar, but I don't remember the date.

Q. Did he ever tell you that the person who was supposed to sell you a baby, that that had fallen through?

A. No.

Q. Your expectation was that you would have the baby in a few days, right?

A. Yes.

Q. And that didn't happen, right?

A. Yes.

Page 133

Q. So when that didn't happen after a few days, what did you do?

A. I was worried. I was frustrated. I was affected.

Q. Did you talk to Gabriel?

A. Yes. I believe about two days later.

Q. What did he say?

A. He told me not to worry, that he was going to keep helping me.

Q. What else did he tell you?

A. Not much, because we couldn't really talk much because there was a lot of people that lived with us. But he would just say not to worry, that he was going to help me, that he promised that he would help.

Q. And at least a few weeks went by, right?

A. I think so.

Q. At that point, were you past the due date that you'd been telling people in the family?

A. Yes.

Q. Were people asking you questions?

A. Yes. They would ask what was happening, if I had my calculations correct. Then I would tell them that everything was fine.

Q. Did anybody tell you that they didn't

CCSAO COI SUBPOENAS 000414

ADRIANA MEJIA, 02/05/2021          Page 134..137

Page 134

believe you that you were pregnant?

A.  No, because they would never pay attention to me.

Q.  Did they tell you that they were suspicious?

A.  No.

Q.  Did anyone act like they were suspicious?

A.  Not that I recall.

Q.  I'm going to show you a document, Defendant's Exhibit 19, since I cannot find our version.  This is Defendant's Exhibit 19, Reyes 8726 through 8729.  This is a declaration of Jose Mejia.  Ms. Mejia, have you ever seen this document before?

A.  No.

Q.  This document indicates that, back in 1998, his cell phone number was (773) 434-8643.  Do you remember what Jose Mejia's cell phone number was?

MS. ROSEN:  Objection, form.

A.  No.  Until now, I didn't remember.

Q.  His affidavit states -- strike that.  His declaration states, "Before her arrest, I had to become close with my aunt Adriana"; is that true?

MS. ROSEN:  Objection, form.

A.  Only on one occasion.  He went to pick me up when he asked if I could please watch his kids.

Page 135

Q.  Well, had you become close with Jose Mejia?

MS. ROSEN:  Objection:  form, asked and answered.

A.  I had gotten close to him, but not as far as trusting him.

Q.  He says:  "My aunt Adriana used to babysit my two children a few times a week.  She stopped babysitting shortly before her arrest."  Is that statement true?

MS. ROSEN:  Objection, form.  Oh, sorry.

(Question translated.)

MS. ROSEN:  Objection, form.

A.  Two times a week?  No, I just babysat on two occasions.

Q.  He write, "Adriana wanted to have children."  Is that true?

MS. ROSEN:  Objection, form.

A.  I don't know.

Q.  He says he knew that you were not actually -- strike that.

His declaration says, "I knew that she was not actually pregnant."  Did Jose Mejia ever say anything to you about knowing that you were not pregnant?

Page 136

MS. ROSEN:  Objection -- sorry.  Go ahead.

(Question translated.)

MS. ROSEN:  Objection, form.  This is improper what you're doing.  It is improper to put somebody else's declaration in front of a witness and ask -- and say, "This is what the witness said.  Is that true?  Is that not true?"

(Technical issues with connection.)

MR. SWAMINATHAN:  Defendants asked leading questions of a witness they can't lead through their entire portion.  So objection to form is noted for the same reason I made the same objection for trial exam purposes.

MS. ROSEN:  You did not object -- first of all, we didn't ask leading questions.  Second of all, you made no such objection.  Go ahead and hit yourself in the head.  It's okay.  I'm making an objection.  I'm giving you a warning.  Your use of this exhibit in this way is improper; and if this ends up being her trial testimony, we're moving to strike it.

I am giving you an opportunity -- stop trying to interrupt me.  I am giving you an opportunity to try and cure the defect.  If you don't want to take that opportunity, then you act at your

Page 137

own peril.

MR. SWAMINATHAN:  I'm going to note for the record that Defendants, through their exam, asked numerous, numerous leading questions of the witness to which I made objections to form without making a speaking objection.

Defendants, through the course of their exam, put documents and prior testimony and statements in front of Ms. Mejia and then asked her questions.  And I made objections to form, but I did not make speaking objections.

So I'm a little disappointed that Counsel is now suggesting to me that there's something improper about me asking these questions.

(Technical issues with connection.)

THE REPORTER:  Anand, I've lost you.  This is the court reporter.  I got ". . . Counsel is now suggesting to me that there's something improper about me asking these questions," but you've been freezing.

MR. SWAMINATHAN:  Well, we'll keep going.

BY MR. SWAMINATHAN:

Q.  In Jose Mejia's statement, his declaration:  "Once, I overheard my uncles, Jorge Mejia and Horacio Mejia, discussing Adriana's pregnancy with Rosauro."

ADRIANA MEJIA, 02/05/2021                                    Page 138..141

Page 138

Do you see that?

A. Uh-huh.

Q. "They were speaking in Spanish and assumed that I didn't understand them. But I did understand what they were saying. My uncles knew Adriana was not pregnant or were highly suspicious that she was not pregnant. I heard them telling Rosauro this."
Did any members of the Mejia family indicate to you that they were suspicious that you were not pregnant?

MS. ROSEN: Objection, form.

A. No.

Q. Did Rosauro ever say anything to you about being suspicious that you were not pregnant?

MS. ROSEN: Objection, form.

A. No.

Q. Were you concerned that Rosauro was going to figure out that you weren't pregnant?

A. Yes.

Q. What steps did you take to keep him from finding out that you were pregnant -- that you were not pregnant?

A. Towards the last months, I did -- we did have sexual relations, but I didn't let him see my

Page 139

body.

Q. Anything else you did?

A. No.

Q. Okay. Jose Mejia says: "I also saw Adriana changing in her bedroom in her apartment. She was pretending to be pregnant by placing a small pillow under her clothing and strapping it around her waist. I saw the pillow on the bed while she was changing."
Is that true?

A. That's a lie because he never came into the apartment that I lived in.

Q. So Jose Mejia, when he said that he saw you placing a pillow under your clothing, he's lying?

THE WITNESS: The officer is calling me for the count.

MR. SWAMINATHAN: Okay.

THE VIDEOGRAPHER: We're going off the video record at 2:59 at the end of media unit 4.

(Recess in proceedings from 2:59 to 3:08 p.m.)

THE VIDEOGRAPHER: We're back on the video record at 3:08 at the beginning of media unit 5.

MR. SWAMINATHAN: Can we have the last question read back? I don't believe we got an answer.

Page 140

A. He would never enter my home. He would stay from the door to the outside. And on the two occasions where he picked me up, he picked me up in front. And when he -- he also picked me up on Mozart, the street that runs -- where there's a lot of stores. But he never saw me. He's lying there because he never saw me.

Q. Is your testimony that, when Jose says he saw you with a pillow under your shirt, that he's lying?

A. Yes, he's lying, because he never saw me.

Q. I want to ask you about March 27, 1998, the day that you went to the hospital, okay?
What time that day did you go to the hospital?

A. In the morning.

Q. What time?

A. I don't recall if it was 8:00 or 9:00 in the morning.

Q. And Rosauro drove you, right?

A. Yes.

Q. How long did Rosauro stay with you at the hospital?

A. Not much -- very little time.

Page 141

Q. Where did you and Rosauro wait inside the hospital?

A. I believe in the waiting room.

Q. When you wait in the waiting room, where is that?

A. Where the people that are visiting the patients wait.

Q. Is that when you first enter, or do you have to go in further to the hospital?

A. It's when you enter. There's a waiting room there.

Q. Did you ever go into any other areas of the hospital that day?

A. I think so.

Q. Where else did you go in the hospital?

A. I believe I was walking around on different floors.

Q. Was that with Rosauro or after he'd left?

A. After he left.

Q. When Rosauro was there, you went into the waiting area. Then did you go check in at some counter?

A. I don't know how I told him to go back. I don't know if I registered or if I stayed inside.

CCSAO COI SUBPOENAS 000416

Page 142

Q.  Did you have any actual appointment that day for yourself, or were you pretending?

A.  I was just pretending.

Q.  And so you had to make it appear that you were actually checking in with someone, right?

A.  Yes.

Q.  Did you do that?

A.  I think so.  I talked to one of the nurses in the reception.

Q.  What did you say?

A.  I don't remember specifically what I asked, but I wanted my husband to see that I was there.

Q.  After he left, what are some things you did at the hospital while you were there?

A.  Once I was there, I called once to see if Gabriel would answer the call, if he was home.

Q.  Did he answer?

A.  No, because Guadalupe is the one that would answer.

Q.  What time of day was that that you made the call, hoping to get Gabriel?

A.  I don't recall.  It was about 12:00 or 1:00 p.m.

Q.  And did you have a conversation with

Page 143

Guadalupe at that time?

A.  I believe I hung up on her.

Q.  And that call was made from a pay phone at the hospital, right?

A.  I believe I took it on the phone that was on the street.

Q.  Where on the street?  Next to the hospital or in front of the hospital?

A.  I believe it was in front of the hospital.

Q.  And then we talked about some other phone calls that you made that evening, right?

A.  Yes.

Q.  And those were also made from pay phones in the hospital and just outside the hospital, right?

A.  Yes.

Q.  And we talked about a phone call that you made in the morning after you had the Soto children, right?

A.  Yes.

Q.  And that was also made from a pay phone at the hospital, right?

A.  Yes.

Q.  Other than those phone calls, what else did you do at the hospital that day after Rosauro left?

Page 144

A.  I stayed there in the waiting area for a long time, and then I was walking for a while.

Q.  Other than sitting there and walking around and making those phone calls, did you do anything else.

A.  I don't recall what else I did.

Q.  And then the next thing that happened was that Gabriel picked you up around 12:30 to 1:00 a.m., right?

A.  Yes.

Q.  And so you were basically at the hospital from around 9:00 a.m. that morning until 12:30 to 1:00 a.m., right?

A.  Yes.

Q.  And did you leave the hospital for any period of time?

A.  Yes.  I went out to walk through the streets that I was familiar with.

Q.  So you left the hospital for a little while?

A.  Yes.  Yes.

Q.  Did you go talk to anyone or see anyone that you knew?

A.  No, I didn't know anybody.  Everybody spoke English.

Page 145

Q.  All right.  And then finally around -- you get picked up by Gabriel -- strike that.

When you got picked up, where were you picked up from at the hospital?  Was it outside the entrance?

A.  Yes.  Not exactly in front, but almost in the front.

Q.  And had you been waiting outside?

A.  Yes, a little while.

Q.  Were picked up at the same place Rosauro dropped you off?

A.  Close.

Q.  And how did you know to come outside at that time?

A.  Because -- I don't recall if I saw Gabriel outside or he honked with the car he had.

Q.  So you were just sitting waiting, and eventually you just happened to see him parked outside or honking; is that right?

Strike that.  Strike that.

How did you know what time to be looking for Gabriel?

A.  Because he told me that, around the time he would get off work, he would pick me up around that

CCSAO COI SUBPOENAS 000417

ADRIANA MEJIA, 02/05/2021                                    Page 146..149

Page 146

time to go pick up the baby.

Q.  So you understood that he would be off work by -- in time to pick you up around 12:30; is that right?

A.  Yes.

Q.  When he picked you up, did you recognize the car that he was in?

A.  I don't really recall the color or the model of the cars.

Q.  And when he picked you up, your testimony is you didn't know who you were going to go see, right?

A.  Yes.

Q.  And your testimony is, when you got in the car, you thought you were just going to go buy the baby, right?

A.  Yes.

Q.  Your testimony is that, at that point, you had already given Gabriel the money weeks earlier, right?

MS. ROSEN:  Objection, asked and answered.

MR. SWAMINATHAN:  Go ahead.

A.  I think so.

Q.  So why were you there at all?

MS. ROSEN:  Objection, form.  Go ahead.

Page 147

A.  Because he told me he was going to give me the baby outside of the hospital.

Q.  So you thought that he already had the baby and was going to give it to you?

A.  Yes.  Because he said he was going to go pick it up with his friend.

Q.  So instead of him having the baby there for you, he told you to get in the car?

A.  Yes.  But when he told me to get into the car, Arturo Reyes was already in there as well.

Q.  And at that point, you thought that you were already supposed to have the baby?

A.  Yes.

Q.  So based on your version of events, you agree it doesn't make sense why you would need to go to the Soto home.  You had already handed over the money, right?

MS. ROSEN:  Objection to form.

MR. BRENER:  Objection to form. Argumentative.

MR. SWAMINATHAN:  Go ahead.

MR. ENGQUIST:  Vague.

A.  Yes.

Q.  Why did you go along?  At that point --

Page 148

strike that.

If you were just buying a baby and you had already given him the money, why did you go along with Gabriel at that point?

A.  I don't recall specifically what he told me, but he told me to get into the car.

Q.  What else did he tell you?

A.  I asked him where the baby was, and he said he would give it to me.

Q.  Anything else?

A.  No.

Q.  So you got in the car?

A.  Yes.

Q.  And then you drove off with them?

A.  Yes.

Q.  And then you got to the Soto home, right?

A.  Yes.

Q.  Did you know where you were?

A.  No.

Q.  It was the middle of the night, correct?

A.  Yes.

Q.  Did you park right in front of the house, or did you park a little bit away from the house?

A.  Honestly, I don't recall, but it wasn't very

Page 149

far.  I don't remember if it was in the front or a little bit to the side.

Q.  Other than Gabriel telling you to get in the car and that he was going to get you the baby, did you have any other conversation in that car on the way to the Soto home?

A.  Yes.  I asked him what was Arturo Reyes doing there.

Q.  What was his answer?

A.  He told me that he already knew because he had told him what was going on with me.

Q.  Did Arturo say anything in the car?

A.  Very little.

Q.  And then did the three of you discuss anything about what was going to happen when you went to the house?

A.  No.

Q.  Your testimony is that Gabriel went in, and you and Arturo waited in the car, right?

A.  Gabriel got out first, and then I got out after.

Q.  Did you go down to the house with him at the same time, or did he go down to the door to the house first?

CCSAO COI SUBPOENAS 000418

ADRIANA MEJIA, 02/05/2021                                    Page 150..153

Page 150

A. No. He was already opening the door with a hanger.

Q. When he went to the house, did he have anything with him?

A. Honestly, I don't know.

Q. Did you see anything in his hands when he got out of the car?

A. No, because he had a jacket on and a hat on his head, and he had gloves. So I didn't know if he had anything.

Q. And at the point that he goes down to the door, you're sitting in the car, right?

A. Not long because I got out behind him.

Q. That's what I'm trying to understand. He was picking the lock, right?

A. Yes. It was a normal door.

Q. What do you mean by that?

A. It just had a key.

Q. How many locks?

A. I think one.

Q. And you were there with him, standing next to him, when he was trying to open the lock, right?

A. Yes.

Q. And did you say anything to him while he was

Page 151

doing that?

A. Yes. I asked him what he was doing. He said not to worry, that everything was going to be fine.

Q. Did he say anything else?

A. No, not that I recall.

Q. And he was using a coat hanger to pick the lock; is that right?

A. Yes.

Q. How long did that take?

A. Not long.

Q. Give me an approximation. How many minutes?

MS. ROSEN: Objection, form.

A. Honestly, I wouldn't be able to say.

Q. Is it your testimony that there was only one lock that he had to open?

MS. ROSEN: Objection, form.

A. Yes. I think it was -- yes, I think it was only one lock.

Q. Did it take him more or less than ten minutes to pick the lock?

A. Honestly, I don't recall how long it took.

Q. So it could have been as much as ten minutes?

Page 152

MS. ROSEN: Objection, form.

A. Honestly, I wasn't counting the time.

Q. And while he was doing that, Arturo was in the car, correct?

A. Yes, for a little bit. Then he came in once we were inside.

Q. Had you ever seen Gabriel break through locks using a hanger before?

A. Not here, but in Mexico, I did.

Q. In Mexico, he used to break through locks with a hanger?

A. Yes.

Q. And when did you see him do that?

A. When we would go to school, then he would open the classroom doors.

Q. Any other times when you saw him breaking -- picking locks with a hanger?

A. No. I believe only once at school.

Q. And when he was finally able to open that door, what happened?

A. He made a little bit of noise, and that's when the man woke up.

Q. So he was able to pick the lock without causing anyone to wake up?

Page 153

A. I don't recall how the man woke up.

Q. The man woke up after you had already come into the house; is that right?

A. I think he heard the noises when the door was being opened.

Q. What did the man say?

A. I don't really recall the words, but I remember he said what were we doing there.

Q. What did you guys do in reaction?

A. I really don't recall much.

Q. What did Gabriel do when the man got up?

A. Why do I have to say it again?

Q. Well, I want to understand what happened inside that apartment, which we haven't talked about. I mean, we've talked about the fact that these people were stabbed, but I want to understand what happened in that house.

A. But I had already told you yesterday.

Q. Well, where was the man when he was stabbed?

MS. ROSEN: Objection, asked and answer.

Q. Where in the house?

A. I don't want to answer that anymore.

Q. Are you pleading the Fifth?

MS. ROSEN: Objection, asked and answered.

CCSAO COI SUBPOENAS 000419

Page 154

A. Yes. I already said it yesterday. I don't want to repeat that.

Q. Did Gabriel stab -- strike that.

When Mariano Soto was stabbed, was he stabbed in his front or his back?

A. Everywhere. First in front.

Q. And then in back?

A. I think so.

Q. And what was the knife that was used to do that?

MS. ROSEN: Objection, form. What was the knife?

Q. Yeah. Where was the knife from that was used to stab --

A. I don't know if he took it from somewhere close, from a little table where the lady had her knives, or where he took it from.

Q. I assume, at that point, Gabriel no longer had the coat hanger, right?

A. I don't think so.

Q. He dropped the coat hanger before he was dealing with Mariano, right?

MS. ROSEN: Objection: form, foundation.

A. I think he threw it to one side.

Page 155

Q. And then, when Mariano Soto was stabbed, that happened very quickly after you got into the house, right?

You can answer.

A. Yes.

Q. And then Jacinta Soto, did she wake up at that point?

MS. ROSEN: Objection, asked and answered.

MR. SWAMINATHAN: Go ahead.

A. Yes, because she heard the screams.

Q. So had Mariano been screaming when this happened?

A. Yes. He screamed some times.

Q. Tell me what you remember him screaming?

A. I recall him asking who we were or what we were doing there.

Q. Anything else you remember him saying?

A. No.

Q. And after Mariano had been stabbed and Jacinta was up, was Jacinta stabbed immediately after that?

MS. ROSEN: Objection, asked and answered.

A. Yes.

Q. Were both of them stabbed and killed very

Page 156

fast once you guys got into the house?

A. Yes.

Q. Were they both stabbed within less than a minute of being in the house?

A. I don't recall the time.

Q. Does that sound right? I mean, it happened very fast; so it would have been less than one minute for them to be both stabbed. Does that sound right?

MR. BRENER: Objection, form and foundation.

MR. ENQUIST: Sorry. He said form and foundation. I was going to say argumentative as well.

A. I don't recall the time. I don't know. I didn't count the time.

Q. Did Jacinta say anything?

A. Honestly, I don't remember.

Q. Did the kids say anything?

A. No. It was dark. They really didn't recognize us.

Q. And you grabbed the baby, right?

A. Yes.

Q. And who grabbed the boy?

A. Honestly, I don't recall if it was Gabriel or Arturo.

Q. Were both Mariano and Jacinta already killed

Page 157

by the time Arturo got into the apartment?

A. No. Just the gentleman was already stabbed, but not the lady.

Q. So you were able to see that Arturo -- your testimony is you could see that, after Mariano was killed, then Arturo came in before Jacinta was killed? Is that what you're saying?

MS. ROSEN: Objection: form, asked and answered.

A. I told you yesterday that by the time that the man was already stabbed, Arturo was already with us.

Q. Other than grabbing the two kids, did you guys grab anything else in the house?

MS. ROSEN: Objection, asked and answered.

A. I don't recall.

Q. Did you grab any clothes or anything else for the children?

A. No. Just a blanket.

Q. After both children had been killed, did you spend any time in the house, or did you just get out of there? Strike that.

After the parents had been killed and you grabbed the children, did you do anything else in the

CCSAO COI SUBPOENAS 000420

ADRIANA MEJIA, 02/05/2021                                    Page 158..161

Page 158

house?

A. No. We got out quickly.

Q. But you basically got in. They were both killed. You grabbed the kids, and you got out. Is that it?

MS. ROSEN: Objection, form.

MR. SWAMINATHAN: Go ahead.

A. Yes. From what I recall now, that was the quickest.

Q. Did you guys do anything to the bodies of Jacinta or Mariano?

MS. ROSEN: Objection, form.

A. I don't think so.

Q. Was there a lot of blood?

A. I don't recall.

Q. Did you have blood on you?

A. Perhaps.

Q. And you don't remember if your clothes had blood on them?

A. Perhaps my shoes and my pants.

Q. And what about Gabriel? Did he have a lot of blood on him?

A. Yes. He had a lot of blood on his gloves and his jacket.

Page 159

Q. And what about Arturo? Did he have lots of blood on him?

A. Perhaps just on his shoes.

Q. The overall apartment had a lot of blood in it, right?

A. I think so.

Q. The kids' blankets, did they also have a lot of blood on them?

MS. ROSEN: Objection, form.

A. Honestly, I don't recall.

Q. Did the children have blood on them, the children themselves?

A. I don't think so.

Q. So after you had the kids and you guys left, did you do anything else when you left the apartment?

A. Yes. We went to the car, and we were talking for a little bit. And then they took me to the hospital.

Q. And so when you left, you didn't have the keys to the apartment, did you?

A. No.

Q. You didn't lock the door?

A. Honestly, I'm not sure.

Q. Well, you couldn't lock the door, could you?

Page 160

A. I'm not sure.

Q. Well, did you have a key to the apartment?

A. I don't know. Perhaps, yes. I don't know.

Q. "Perhaps, yes," you did have a key to the apartment?

A. The persons, yes, not me.

Q. In fact, you did have a key to the apartment, didn't you, to the Soto home?

A. Of theirs? No, I didn't have a key of theirs.

Q. Were you aware that Jacinta Soto's family said that she had made a friend in the weeks before she was killed?

MS. ROSEN: Objection, form.

A. No.

Q. Are you aware that her family said that her key had been taken from her?

MS. ROSEN: Objection: form, foundation.

A. No.

Q. Didn't you take the key from Jacinta Soto?

A. How was I going to take her key if I didn't know her?

Q. Did you meet her? You met her at one of the clinics, right?

Page 161

A. No.

Q. When you got back in the car, where did each of you sit in the car?

A. Arturo and Gabriel sat in the front, and I sat in the back with the children.

Q. And they took you straight to the hospital and dropped you off, right?

A. Yes.

Q. And you went and -- strike that.

We discussed yesterday that you would have gotten back to hospital around 2:00 or 3:00 in the morning, right?

A. Yes.

Q. And what time did you get picked up the next morning?

A. Early in the morning.

Q. Around 8:00 or 9:00 in the morning?

A. Something like that.

Q. So you were at the hospital for four to six hours, right?

A. Yes.

Q. And where did you go in the hospital during that period?

A. I was waiting in the waiting area.

CCSAO COI SUBPOENAS 000421

ADRIANA MEJIA, 02/05/2021            Page 162..165

Page 162

Q. But you were sitting inside the hospital with the two children for hours?

A. Yes.

Q. And you had blood on your clothes?

A. Honestly, I didn't look, but perhaps.

Q. And you had blood on your shoes?

A. Perhaps.

Q. Did anyone come over to ask you any questions?

A. No.

Q. Did any security guard come and talk to you?

A. I don't recall.

Q. Were you just sitting in the waiting area the whole time, or did you walk around inside the hospital?

A. I don't know if I walked for a little bit.

Q. Your testimony is you spent hours in a hospital with blood on your shoes and on your clothes without anybody asking any questions?

MR. BRENER: Objection, misstates the witness's testimony.

MS. ROSEN: Form.

MR. SWAMINATHAN: Go ahead.

A. I don't recall.

Page 163

Q. You got picked up the next day by Rosauro and Guadalupe along with her kids, right?

THE INTERPRETER: I'm sorry?

Q. You got picked up the next day by Rosauro and Guadalupe, right?

MS. ROSEN: Objection, asked and answered.

A. Yes.

Q. Did they ask you any questions about -- strike that. They asked you some questions about the boy, right?

A. Yes.

Q. At that time, did you tell them the name Norma Salazar?

A. I believe I said it was a friend's.

Q. Did they ask you anything about -- did they indicate to you that they were surprised about how big the baby was?

A. Just Guadalupe said that she was very big.

Q. Did she say anything other than that?

A. I don't recall what else she said.

Q. Did Lupe make a comment to you that the baby couldn't possibly be yours because she was too beautiful?

A. No.

Page 164

Q. Did you say to Guadalupe in the car, "Don't you ever say that again because I will kill you"?

A. No.

Q. Is Lupe lying if she says you said that?

MS. ROSEN: Objection, form.

A. She didn't say that.

Q. When you were in the hospital with the kids, what were they doing?

A. The baby girl was asleep, and the little boy was asleep.

Q. Did you feed them at all?

A. No, not at that moment.

Q. When you got home, did anybody ask you any questions about how big the baby was?

A. No. I think just Guadalupe.

Q. Guadalupe was suspicious about the baby; is that right?

A. Perhaps.

Q. Anyone else?

A. No.

Q. Did anybody say anything to you about having blood on your clothes?

A. I don't recall.

Q. When you came home, what was the reaction

Page 165

from other family members?

A. Not much, because then they came to see me later.

Q. The boy, where did he stay at the house? Strike that.

Where did the boy sleep at your house?

A. In a little room.

Q. Whose room is that?

A. It was not a room. It was a little porch where there was a bed. I don't recall if that's where Gabriel would sleep.

Q. Did you keep the boy in a closet?

A. No.

Q. If Guadalupe says that you kept the boy in a closet, is she lying?

MS. ROSEN: Objection: form, misstates the testimony, foundation.

THE REPORTER: I lost the connection for about a minute, and then it came back up. The last question I had is: "If Guadalupe says you kept the boy in a closet, is she lying?" And then there was an objection from Ms. Rosen, and I did not get an answer. I apologize. The screen went blank.

MR. SWAMINATHAN: What was the question

Urlaub Bowen & Associates, Inc. 312-781-9586

CCSAO COI SUBPOENAS 000422

Page 166

right before that?

(Requested record discussed.)

MR. SWAMINATHAN: Okay, go ahead.

MR. INTERPRETER: I don't remember.

MR. SWAMINATHAN: Let's reask the question.

A. Yes. I never had him in a closet.

Q. After you came home with the baby and the boy, you had conversations with Arturo about the boy, right?

A. Yes.

Q. He was concerned about the boy, right?

A. Yes.

Q. And he took care of the boy, right?

A. Yes.

Q. And he would buy clothes for the boy and take care of him, right?

A. Yes. He would buy clothes for the baby. He would buy diapers, because the baby was still in diapers. He would buy him clothing.

Q. Did you have -- other than buying things for the baby, did you have any other conversations with Arturo after you came home from the hospital?

A. Honestly, I don't remember anymore.

Q. Did Arturo ever call you from anywhere else?

Page 167

While you were -- when you came back with the kids?

A. Can you repeat the word, the question?

Q. Yeah. Did Arturo ever make any calls to the house to talk to you?

A. Rarely, because Guadalupe would answer the phone.

Q. Arturo has never called the house to talk to you, has he?

A. No.

Q. Is that correct?

A. Yes.

Q. Showing you a document that was previously marked Plaintiff's Exhibit -- Adriana, it's a deposition exhibit from Adriana Mejia's previous deposition. We can mark it as Plaintiff's Exhibit 4 (sic) (Reporter's Note: This is Plaintiff's 5.) for this deposition, Reyes 264.

Ms. Mejia, do you recognize any of the handwriting on this note?

A. I think it's my writing.

Q. Where?

A. At the bottom.

Q. Where it says "Hospital"?

A. It seems like it.

Page 168

Q. You agree with me this is your handwriting?

A. I believe so.

Q. Is there any other handwriting on these notes that is yours?

A. I'm not too sure if the one on top.

Q. At some point, Arturo Reyes was asking for information about who the person was whose boy this was, right?

MS. ROSEN: Objection: form, foundation.

A. I don't recall, and I'm not going to answer.

Q. Are you asserting the Fifth?

A. Yes.

MS. ROSEN: Objection. She said, "I don't recall." Then you invite her to take the Fifth, and she's been ordered not to take the Fifth.

MR. SWAMINATHAN: I'm asking her -- she has now done this several times in the dep. I want to understand.

Q. Are you refusing to answer the question?

A. Yes.

Q. Arturo -- this note was found in Arturo Reyes's pocket. So you had written down the name Norma Salazar for him, correct?

MS. ROSEN: Objection, form.

Page 169

A. I'm not going to answer because I don't remember.

Q. Arturo Reyes -- strike that.

Arturo Reyes was asking you for information about whose boy it was, right?

MS. ROSEN: Objection: form, foundation.

A. I'm not going to answer. I don't remember.

Q. Do you not remember, or you're not going to answer the question? Which one is it?

MR. BRENAN: Objection, asked and answered, and now it's argumentative.

A. I'm not going to answer the answer.

Q. And so you're asserting your Fifth Amendment right?

MS. ROSEN: Objection to you -- go ahead. Translate it.

(Question translated.)

MS. ROSEN: I'm objecting to you inviting her to take the Fifth when she has said, "I don't recall." I'm objecting to you doing that. It's improper.

MR. SWAMINATHAN: Go ahead, Ms. Mejia.

A. I told you I'm not going to answer that answer.

CCSAO COI SUBPOENAS 000423

ADRIANA MEJIA, 02/05/2021                          Page 170..173

Page 170

Q. Okay. So I need to add to the process. Are you not answering because you're asserting your Fifth Amendment right?

A. Yes.

MR. SWAMINATHAN: And to be clear, I asked the witness if the reason she was not answering was because she couldn't remember or because she didn't want to answer. And she said -- she gave me the reason, which is why I asked about the question.

Ms. ROSEN: Well, but the original answers were: "I don't recall; so I'm not going to answer." And for you then to invite her to violate a court order -- because she's already been ordered. So now you are inviting her to violate a court order because I guess you prefer that. I don't know.

MS. SINGER: Hey, you guys, can I please have a moment with her?

MS. ROSEN: Yes.

MR. SWAMINATHAN: Sure.

MS. SINGER: Thanks.

THE VIDEOGRAPHER: We're off the record at 4:03.

(Recess in proceedings
from 4:03 to 4:21 p.m.)

Page 171

THE VIDEOGRAPHER: We are now back on the video record at 4:21 p.m.

BY MR. SWAMINATHAN:

Q. Looking again at this note, Ms. Mejia, you wrote this information down for Arturo because he was asking questions about where the boy's parents were, right?

A. I don't remember.

Q. All right. We talked yesterday about the night that the boy was taken to the police by Arturo and Gabriel and Rosauro, right?

A. Yes.

Q. You indicated that, at some point that night, Guadalupe saw the two children on the news, right?

A. Yes.

Q. And Guadalupe said something to you about seeing the two children on the news, right?

A. Yes.

Q. At that time, was Rosauro, Arturo, and Gabriel still at work, or were they home?

A. At work.

Q. You said, when you were taken to the police station, Guadalupe was also taken to the police

Page 172

station with you, right?

A. Yes.

Q. Were you both taken together in the same car?

A. Yes.

Q. And were you in the car with Detective Guevara?

A. Yes.

Q. What did he say to you in the car?

MS. ROSEN: Objection, asked and answered.

A. I don't recall.

Q. When you were at the police station, you talked about the fact that you were interviewed a number of times by Detective Guevara, right?

MS. ROSEN: Objection, asked and answered.

Q. Correct?

A. Yes.

Q. Showing you a document we'll mark as Plaintiff's Exhibit 6. It says, "RC Solache Reyes 194 through 196, and it's a supplementary report by McDonald and Collins dated April 15, 1998.

Ms. Mejia, this report indicates that Detective Guevara conducted an interview of you at the police station. Do you see that?

Page 173

MS. ROSEN: Objection: form, foundation.

Ms. Mejia, can you read English?

A. Very little but -- very little.

Q. Okay. So let me ask the question, and we'll have the translator translate it for you, okay?

A. That's fine.

MR. SWAMINATHAN: This is for the translator to just see where we're reading. Okay?

THE INTERPRETER: Okay.

Q. It states that "Mejia stated that she had been released from the hospital on 28 March '98. As she was waiting to leave the hospital, she was approached by a female Hispanic who identified herself as Norma Salazar and asked her if she would look after her little boy while she entered the hospital to have a baby. Mejia said that she agreed; and after they exchanged phone numbers, she took the child home with her."

What is described here, is that true or false?

A. False.

MS. ROSEN: Objection. Belated form objection.

Q. Did you tell Detective Guevara or other

CCSAO COI SUBPOENAS 000424

Page 174

police officers that that's what happened?

A. No. It's false.

Q. So what the police wrote is a lie; is that right?

MS. ROSEN: Objection, form.

Q. Is that right?

A. I am not going to answer.

Q. Ms. Mejia, are you asserting your Fifth Amendment right with regard to that question?

MS. SINGER: Can you reask the question? I'm sorry. I was having some internet issue, and I lost you.

Q. Is what the police wrote in that report a lie?

MS. ROSEN: Objection, form.

A. I don't recall.

Q. When you were at the police station, were you ever asked to act out how the crime occurred?

A. I told you yesterday that Detective Guevara wrote a lot of things that I hadn't said.

Q. Showing you a document marked Plaintiff's Exhibit 7. It is -- this copy does not have a Bates stamp on it. I'll identify it for the record. It is Area 5 Supplementary Report, Progress Investigation 3,

Page 175

Cleared Closed Report. And at the bottom, it's dated November 18, 1999, by Investigator Daniel Trevino.

Ms. Mejia, I'm going to read this again, and I'll ask the interpreter to read it for Ms. Mejia.

This police report states: "When asked to be specific, Ms. Mejia, by using a pen as a prop, acted out the scenario by showing the reporting investigator" -- that's Trevino -- "how she used the knife to stab the victim."

Did that happen, Ms. Mejia?

A. No.

Q. Did you use a pen and act out for the police how you stabbed the victim?

A. How was I going to use a pen if I was handcuffed?

Q. Is what the police wrote here a lie?

MS. ROSEN: Objection, form.

A. Yes.

Q. It says, "Mrs. Mejia also stated that, when the victim fell on the floor on all fours, she straddled her and began to stab her back."

Your testimony is that that did not happen; is that right?

A. I'm told today I didn't -- I'm finding out

Page 176

about this. I didn't know they had written this.

Q. And did you ever tell them?

A. No.

Q. So what the police wrote in this report is a lie, correct?

MS. ROSEN: Objection, form.

A. I'm not going to answer because I didn't say that.

Q. Okay. The next sentence says, "When asked to demonstrate, Mrs. Mejia got on all fours and started to act out as the victim while she was being stabbed."

Ms. Mejia, did that happen?

A. No. I already told you in that little while how things had happened.

Q. Did you ever demonstrate by getting on all fours and acting as a victim for the police?

A. No.

Q. What the police wrote here is a lie; is that right?

MS. ROSEN: Objection, form.

A. That's false, because I'm telling you how things were happening.

Q. During your interrogations -- at some point

Page 177

during the interrogations, were you taken to see Gabriel Solache?

A. I don't recall.

Q. Do you remember any point when you were at the police station that you saw Gabriel Solache?

A. I believe I did see him, but we couldn't have communication.

Q. When you saw Gabriel -- strike that.

Did you ever see Gabriel Solache get hit by Detective Guevara?

A. Yes. On one occasion when he passed in front of me, he was mistreating him.

Q. Who was mistreating Solache?

A. Detective Guevara.

Q. When you say he was mistreating him, what did he do?

A. He couldn't do much because he was handcuffed, from what I remember.

Q. Sorry. What did Detective Guevara do to Solache? Did he hit him?

A. I don't really recall if he hit him in his face or physically. I really don't recall anymore.

Q. Did Detective Guevara hit Gabriel Solache?

A. I think so. I believe so.

CCSAO COI SUBPOENAS 000425

Page 178

Q.  You previously testified that Guevara hit Gabriel Solache in front of you.  Is that testimony true or false?

MS. ROSEN:  Object to the form.

A.  I honestly don't remember.

Q.  Okay.  Did you testify at the trials of Arturo Reyes and Gabriel Solache?

MS. ROSEN:  Object to the form.  She didn't testify at the trials.

MR. SWAMINATHAN:  I said, "did you"?

THE INTERPRETER:  I'm sorry, Counsel?

MR. SWAMINATHAN:  She can go ahead and answer.

THE INTERPRETER:  I didn't hear the question Counsel.  I'm sorry.

Q.  Did you testify at the trials of Arturo Reyes and Gabriel Solache?

MS. ROSEN:  Object to the form, foundation.

A.  No.

Q.  Were you asked to testify at their trials?

A.  I don't recall.

Q.  Did any prosecutor talk to you before their trials?

MS. ROSEN:  You broke up for me.  Could I

Page 179

get the question back?

MR. SWAMINATHAN:  Can we have it read back?  Please?

(Requested record read.)

MS. ROSEN:  Before whose --

MR. SWAMINATHAN:  Reyes and Solache.

Go ahead.

A.  Honestly, I don't recall.  I don't think so.

Q.  Were you ever told that, if you testified against Reyes and Solache, you could get a lighter sentence?

A.  I don't recall.

MR. SWAMINATHAN:  Ms. Mejia, are you able to keep going now, or are you just really tired?

THE WITNESS:  Well, I'm a little tired, but I really want to finish this.

MR. SWAMINATHAN:  Okay.  Are you still able to answer the questions based on your memory, or are you too tired to be able to remember and answer questions?

THE WITNESS:  I'm not too tired.  It's just it's been many years, and I don't remember the investigations and the questions.  It's been many years.

Page 180

BY MR. SWAMINATHAN:

Q.  In recent years, have any lawyers for the police or prosecutors come to see you?

A.  Just two people when I was moved to this prison and then when they were released, but I don't remember the name of the people.

Q.  The two people who came, tell me what you remember about that.

A.  When they were released, they just came to tell me that they were free.

Q.  Were there individuals -- was there anyone from the prosecutor's office who came to talk to you about this case?

MS. ROSEN:  Objection, form.

A.  I'm not really good at remembering people. I just recall that it was a male and a female.

Q.  The male and female who came, did they come to the prison you're currently at?

A.  Yes.

Q.  Did they tell you who they represent?

A.  I don't recall anymore.

Q.  Did you say that they told you that Reyes and Solache had been released?

A.  Yes.

Page 181

Q.  And did they ask you some questions about this case?

A.  I don't remember much.

Q.  How long did they visit you?

A.  Very little time.

Q.  Did you walk through any of the facts of the case with them or the crime with them?

A.  I don't remember a lot of specific things.

Q.  Did they ask you to tell them what you remembered about what happened?

A.  At this moment, the only thing I recall is them asking how I was feeling, knowing that they were free and I was still in prison.  But that's what I remember at the moment.

Q.  And what was your response to that?

A.  I think I told them that I felt badly.

Q.  What was their response?

A.  Not much.  They just looked at each other.

Q.  Did they tell you that you were going to be deposed in this case?

MS. ROSEN:  Objection:  form, foundation.

A.  I don't recall.

Q.  Was there a time when you were taken to Chicago to the courthouse unexpectedly?

CCSAO COI SUBPOENAS 000426

ADRIANA MEJIA, 02/05/2021                                    Page 182..185

Page 182

MS. ROSEN: Objection, form.

A. I think so, on one occasion before they returned to court.

Q. You met with an attorney then, right?

A. They wanted to speak to me, but I told them I was not speaking to anyone because I didn't have an attorney to help me.

Q. How long did they meet with you?

A. Very little because they became upset.

Q. And did they try to ask you some more questions about what happened?

A. Yes. They told me that if I knew that my friends were going back to court on the case, and I said that I wasn't going to speak about anything because I didn't have an attorney to help me.

Q. They said that they were your friends?

MS. ROSEN: Objection, misstates her testimony. That's not what she just said.

MR. BRENER: Join.

MR. SWAMINATHAN: I thought she just said friends. Well, the record will say what it says. I'll ask a different question.

Q. So after you indicated that you didn't want to talk to them, they were upset?

Page 183

A. Yes. They told me that they took me because they wanted me to talk, but I didn't want to talk to them because I said I wouldn't say anything until I had someone representing me.

Q. And did they ask you some more questions anyway?

A. I don't really remember specifics because I wasn't there long. They returned me right away.

MR. SWAMINATHAN: Let's take a quick break for a few minutes. I'll try and get my last set of questions set up. I'll try to speed this up.

THE VIDEOGRAPHER: We're off the video record at 4:46 at the end of media unit 5.

(Recess in proceedings from 4:46 to 5:02 p.m.)

THE VIDEOGRAPHER: We are back on the video record at 5:02 at the beginning of media unit 6.

BY MR. SWAMINATHAN:

Q. Ms. Mejia, who is Ruben Artiaga?

A. I don't know any Ruben Artiaga. I know Ruben Luna.

Q. Who is Ruben Luna?

A. Someone I knew from my town.

Q. Is he somebody that you communicated with

Page 184

back in March of 1998?

A. I think just on two occasions.

Q. What did you communicate with Ruben Luna about?

A. Just very little. Just about how we were out here and how they were out there. Not much.

Q. Did Ruben Luna live in Chicago?

A. No.

Q. Did Ruben Luna live in Mexico?

A. Honestly, I wouldn't know what to say. It's been years.

Q. Who is Claudia Hernandez?

A. I don't know.

Q. Are you familiar with the name Claudia Hernandez?

MS. ROSEN: Objection, form.

A. No.

Q. Ms. Mejia, did you know anybody who had a cell phone back in 1997 and 1998?

A. Just Javier Mejia when he would leave it for me when I would watch his baby.

Q. Was that Javier Mejia or Jose Mejia?

A. Javier Mejia.

Q. You would watch Javier's kids, and you also

Page 185

watched Jose's kids?

A. For some time, I watched -- for about three months, I watched Javier's baby.

Q. All right, Ms. Mejia. I want to show you a document we'll mark as Plaintiff's Exhibit 7 (sic). (Reporter's Note: This is Plaintiff's 8.) This is RFD Solache Reyes 160 through 162. This is a log of phone calls that were obtained by the police related to calls to the Mejia home at Mozart, phone calls made to the 925-5124 number.

What I want to show you is calls made on March 27. This shows calls made on March 27, 1998, to the Mejia home. Do you see that?

MS. ROSEN: Objection: form, foundation.

Q. And it includes calls made on the morning of March 28, 1998.

MS. ROSEN: Objection: form, foundation.

Q. You previously stated that you called from the hospital to the home on the morning of March 28 after you had the Soto children, correct?

A. Yes.

Q. This log indicates that there were no calls made to the home between 12:30 a.m. and 10:50 a.m. Do you see that?

ADRIANA MEJIA, 02/05/2021            Page 186..189

Page 186

MS. ROSEN: Objection: form, foundation.

Q. Ms. Mejia, you didn't call the Mejia home on the morning of March 28, did you?

A. Yes, I did call. I don't know why they didn't come on there.

Q. You didn't make any calls from the hospital, did you?

A. Yes, I made many calls from the hospital.

Q. This phone number here, 434-8643, is the phone of Jose Mejia.

MS. ROSEN: Objection: form, foundation.

Q. Did you make the calls to the Mejia home from Jose Mejia's phone?

MS. ROSEN: Objection: form, foundation.

A. I don't recall.

Q. So you might have made the calls from Jose Mejia's phone but not from a pay phone; is that right?

MS. ROSEN: Objection: form, foundation.

A. I don't recall.

Q. So is it fair to say that the calls that you made to the house after you had the Soto children may not have actually been from a pay phone, but it might have actually been from a cell phone. Is that your testimony?

Page 187

MS. ROSEN: Objection: form, foundation, misstates her testimony.

A. I'm not going to answer.

Q. Are you not going to answer based on your Fifth Amendment rights?

A. Yes.

MS. ROSEN: Objection. Oh, my God.

MR. SWAMINATHAN: The witness is telling me she's not going to answer the question. What am I supposed to do?

MS. ROSEN: You're not supposed to invite her to violate a court order.

MR. SWAMINATHAN: Well, I've asked her to answer the question. Ms. Mejia, I'll ask it another time.

Q. Ms. Mejia, did you call home, not from a hospital, but from Jose Mejia's phone?

A. How am I going to use Jose Mejia's phone if I hadn't seen him in days?

Q. Do you have any explanation for why the only phone calls that were made to the Mejia home on the morning of March 28 were from Jose Mejia?

MS. ROSEN: Objection: form, foundation.

A. I don't recall.

Page 188

Q. Do you have any explanation for why this phone record does not indicate that there was any call made to the Mejia home on the morning of March 28, as you claim -- strike that.

You claim you made a call to the home from a pay phone at the hospital on the morning of March 28. Do you have any explanation for why that call is not included in this call log?

MS. ROSEN: Objection: form, foundation.

A. I'm not going to answer.

Q. Why not?

A. Because I'm not going to answer.

Q. Are you asserting your Fifth Amendment right?

MS. SINGER: Give me a second.

MR. SWAMINATHAN: Okay.

MS. SINGER: Can you take the exhibit down?

THE VIDEOGRAPHER: We're off the record at 5:13.

(Recess in proceedings from 5:13 to 5:19 p.m.)

THE VIDEOGRAPHER: We're back on the video record at 5:19.

MR. SWAMINATHAN: Counsel asked me to reask

Page 189

the question, which I'm happy to do.

Q. Ms. Mejia, you've testified in this deposition that you called the Mejia home from a pay phone at the hospital on the morning of March 28. Do you have any explanation for why there are no calls to the Mejia home on the phone log marked as Plaintiff's Exhibit 7 (sic) (Reporter's Note: Actually Plaintiff's Exhibit 8) on the morning of March 28?

MS. ROSEN: Objection: form, foundation.

A. I don't remember.

Q. Showing you a document that is marked as Defendant's Exhibit 9, Bates-stamped -- let's see if it's got a Bates stamp on it. Looks like HIPAA 4 and HIPAA 5.

Ms. Mejia, this is a Cermak health record form. This document is from April of 1998. That's the month that you were arrested and taken into custody, correct?

A. I don't recall.

Q. You were asked Question Number 6 on the Cermak. "Has detainee ever attempted suicide?"

Answer, "Yes."

"If yes, when?"

"February 23."

CCSAO COI SUBPOENAS 000428

ADRIANA MEJIA, 02/05/2021                                    Page 190..193

Page 190

Ms. Mejia, you testified at this deposition that you never attempted suicide, correct?

A. I've never tried to commit suicide.

Q. Is what is written here false?

A. I don't recall.

Q. It says here that you cut your wrist "because I couldn't have children."

Have you ever tried to cut your wrist?

A. No.

Q. Is what's written on this document false?

A. Yes. I've never tried to take my own life.

Q. Is your testimony that the person from Cermak who wrote this down wrote down a lie?

MR. BRENER: Objection to form and foundation.

A. I don't recall.

Q. Which is the truth, what is written here or what you're telling us today?

A. I'm telling you that I've never tried to take my own life.

Q. Do you know where the people from Cermak got that information?

A. I don't recall.

Q. Whatever it is, whatever they wrote down,

Page 191

according to you, is false, correct?

A. Yes.

Q. All right. I want to play an audio clip. I'd like you to listen to this audio clip. I'll share my screen.

Ms. Mejia, what I'm showing you is a document marked Defendant's Exhibit 36 produced to us by Defendants' counsel the day before this deposition. And it is a transcription of an audio recording dated October 23 -- a call that took place on October 23, 2019. Ms. Mejia, that's one day after you were previously deposed in this case.

Do you recall that?

UNIDENTIFIED SPEAKER: Ready for the clips?

Q. Ms. Mejia, you recall that, right? This is one day after you were previously deposed, right?

Go ahead, Ms. Mejia.

UNIDENTIFIED SPEAKER: I thought you were going to play an audio clip.

Q. I'm asking: Ms. Mejia, you understand this is -- October 23, 2019, is one day after your previous deposition. You agree, right?

THE INTERPRETER: I'm sorry, Counsel. One day previous?

Page 192

Q. One day after the prior deposition you gave in this case, right?

A. I don't recall that.

MR. SWAMINATHAN: Okay. Let's play the audio clip.

Shawn, it should be playing. Shawn, is it working?

SHAWN: I'm playing it. Hang on a second. Let me start it again. Maybe it will be better.

(Audio clip playing.)

MR. SWAMINATHAN: We can't hear it, Shawn.

We'll just use the transcript. I'll ask the interpreter to just read this for us -- read this for the witness.

THE INTERPRETER: Do you want me to interpret it as I'm reading, obviously?

MR. SWAMINATHAN: Yeah. Just interpret it for her, yeah.

(Interpreter reading the
document for Ms. Mejia in
Spanish.)

MR. SWAMINATHAN: Let me stop you there for one second.

BY MR. SWAMINATHAN:

Page 193

Q. Adriana, who is Maleno?

A. My brother.

Q. And where is Maleno?

A. Mexico.

MR. SWAMINATHAN: And then I want -- we can start here. Starting here.

THE INTERPRETER: Okay.

(Interpreter continuing to read
the document for Ms. Mejia in
Spanish.)

MR. SWAMINATHAN: Sorry. Let's pause there.

BY MR. SWAMINATHAN:

Q. Ms. Mejia, you're talking about the deposition that you had just given, right?

A. Yes.

MR. SWAMINATHAN: And then let's please read the next section. Can you read it? You need it a little bigger?

THE INTERPRETER: Yes. Starting where, Counsel? I'm sorry.

MR. SWAMINATHAN: Starting with "Adriana: But the attorney."

(Interpreter continuing to read
the document for Ms. Mejia in

CCSAO COI SUBPOENAS 000429

ADRIANA MEJIA, 02/05/2021                                    Page 194..197

Page 194

Spanish.)

MR. SWAMINATHAN: You can stop there.

BY MR. SWAMINATHAN:

Q.   Ms. Mejia, you were describing to your brother what happened at the deposition, correct?

A.   Yes.

Q.   What you told him is completely made up, right?

A.   Because I didn't want to worry them anymore because they're tired.  My parents have been tired for a long time.

Q.   What you told them didn't happen, right?

A.   Yes.

Q.   You said in here -- you told your brother that your attorney got up and she threw the papers at their face, right?

A.   Yes.

Q.   But that didn't happen, right?

A.   Yes.

Q.   You just made that up, right?

A.   Yes, because I don't want to worry them anymore.

Q.   You said -- you told your brother that you got a two-month -- in two months, you were going to be

Page 195

out, right?

A.   Because I'm going to get out of here.  Even if you don't believe it, I'm going to get out of here one day.

Q.   But what you told him was a lie.  You don't have any reason to believe you're going to be out in two months, do you?

A.   Perhaps.  Who are you to say that I'm not going to get out?

Q.   Has anybody suggested to you that you do have a chance of maybe getting out if you do the right thing?

MS. ROSEN:  Object to the form.

A.   I'm not going to answer.

Q.   You say -- in this call with your brother, you say, "The judge was going to give the sentence, the final one.  The opponents got up and, well, they gave me a continuance.  But it was fine."

That's made up, right?

THE INTERPRETER:  I'm sorry, Counsel.  Where are you?  Oh.

A.   I'm not going to answer.

Q.   That's not true, right?  That's made up, right?

Page 196

MS. ROSEN:  Object to the form, argumentative.

A.   I'm not going to answer.

Q.   Later in the same clip, you --

MR. SWAMINATHAN:  Let's read for Ms. Mejia what she said later in this clip.  Let me read it.  Then you can translate.

Later in this clip, you said, "Tell my mommy that everything is very good and explain to her . . . oh, my attorney says not to talk if there are people that communicate with you because they are against us.  And also, tell Carlos that my attorney said they are going to look for him to ask questions since he is here, that he is to say nothing, nothing, absolutely nothing.

A.   I'm not going to answer.

Q.   Ms. Mejia, you did not want your brother answering any questions about this case; is that right?

A.   I'm not going to answer.

Q.   And you told your brother Maleno to make sure that Carlos did not answer any questions about your case, right?

A.   Yes.

Page 197

Q.   And why was it so important to you to make sure that Carlos didn't talk about what happened?

A.   Because he didn't know anything, and they were always interrogating him.

Q.   Ms. Mejia, you wanted to -- it was important to you to make sure that Carlos didn't talk about this case, right?

MS. ROSEN:  Objection:  asked and answered, harassing.

A.   I'm not going to answer you.

Q.   Were you afraid of what he might say?

A.   No, because he didn't know anything.

Q.   So why couldn't he answer the questions and tell people he didn't know anything?

A.   Because they were always bothering him.

Q.   Who said they were bothering him?

A.   I don't know, but I think that a lot of people were bothering him.

Q.   If Carlos knew nothing, there would have been no problem for Carlos to answer questions and explain he knew nothing, correct?

A.   Objection:  form, argumentative.

MR. BRENER:  Join the objection.

Q.   What does Carlos know that you don't want

CCSAO COI SUBPOENAS 000430

Page 198

him to talk about?

A. He doesn't know anything.

Q. Ms. Mejia, you wrote letters from prison to Guadalupe Mejia, right?

A. I don't recall.

Q. But you testified about a letter you wrote to Guadalupe on October 22 at your prior deposition, right?

Strike that. At your October 22 deposition, you answered questions about a letter you wrote to Guadalupe on June 11, 1998. You remember that?

A. At this time, I don't recall.

Q. Ms. Mejia, I'm going to show you a letter. This is Exhibit 5 to your prior deposition, RFC Solache Reyes 3949 to 3952.

And I'll ask the court reporter to read the excerpt that starts at number 1. Here.

THE INTERPRETER: The court interpreter? You want me to read?

MR. SWAMINATHAN: Court interpreter, I'm sorry.

THE INTERPRETER: I'm trying to understand the handwriting, Counsel.

"I feel very badly' --

Page 199

MR. SWAMINATHAN: You can read it in Spanish.

MR. BRENER: We're going to need it in English for the record, too.

THE INTERPRETER: So you want me to read it to her in Spanish and then translate it?

MR. SWAMINATHAN: Yes.

THE INTERPRETER: Got you. I can't understand "perdi a Chapa."

MR. SWAMINATHAN: Let me let Ms. Mejia read it. And then we can have you interpret it in English.

THE INTERPRETER: Actually, there's just one word. I think Chapa is the name of someone?

MR. SWAMINATHAN: That's Rosauro's nickname.

THE INTERPRETER: Okay. Thank you.

"I feel badly because I know that I lost Chapa because of my fault, and that will be my punishment."

BY MR. SWAMINATHAN:

Q. In this letter to Lupe, you wrote about feeling sad about losing your husband, Chapa, right?

A. Yes.

Q. And you acknowledged that it was your fault, right?

Page 200

A. My fault in that -- how can I explain it?

Q. You didn't say it was anyone else's fault. You said it was your fault, right?

MS. ROSEN: You just interrupted her. She was not finished. She didn't finish her answer.

Q. Did you have more you wanted to say, Ms. Mejia?

A. I don't know how to explain it to you right now.

Q. You said it was your fault, not anybody else's fault, right?

MS. ROSEN: Objection, form.

A. And in order to better explain it and admit it was my fault and my personal -- with my husband, not other people.

Q. Take a look at the section here that we've highlighted on page 3 of this letter. You've had a chance to read that, Ms. Mejia?

Ms. Mejia, you told Guadalupe that you were planning to get out of jail in "no more than a few days," correct?

A. I don't recall.

Q. What made you think that you might be getting out of jail in just a few days after June 11

Page 201

of 1998?

A. I don't recall.

Q. Did you make that up, or did you believe that?

A. I still continue believing that I'm going to get out.

Q. Did you actually believe you were going to get out in a few days, or were you making that up?

MS. ROSEN: Objection, form.

A. I thought I was going to get out in three days.

Q. And you had a plan to get out, right?

A. No, not a plan.

Q. Let's look at this excerpt that we've marked as number 3. Go ahead and read that, Ms. Mejia?

A. You're going to read it. I'm not.

Q. You wrote to Lupe. "Soon I'm going to leave," right?

A. I don't recall.

Q. Let's take a look at the excerpt we've marked as number 4. You wrote to Lupe, "For now, I'll be here for a very short time. Then I'll follow my path together with my parents. They are waiting for me." You wrote that to Lupe, right?

CCSAO COI SUBPOENAS 000431

ADRIANA MEJIA, 02/05/2021                    Page 202..205

Page 202

A. I don't recall.

Q. Well, that's what you wrote to Lupe, right, in this letter?

A. I don't recall. It's many years.

Q. Well, do you dispute that what's written on -- that what I said, that's what you said in this letter? That's what I'm asking you.

A. I repeat that it's been many years. I don't remember.

Q. You didn't end up getting out a few days after you wrote that letter, did you?

A. I don't know.

Q. You said you didn't have a plan then. But in June of 1999, you came up with a plan, right?

A. I never made a plan.

Q. Take a look at the document marked Plaintiff's Exhibit 8 (sic) (Reporter's Note: This is Plaintiff's Exhibit 9). This is RFC Solache Reyes 4812 through 4816. This is a letter that you wrote on June 1, 1999, to Gabriel Solache. You were writing letters to Gabriel solache. We talked about that, right?

MS. ROSEN: Objection, form.

Q. You wrote him letters, right?

Page 203

A. Yes.

Q. And in those letters, you came up with a plan to get Gabriel to take responsibility for the crime so that you could go back to Mexico, right?

A. When he wrote, he had already decided, and he wrote a lot of things to me too. I've lost the letters, but otherwise I would prove that he had said a lot of things to me as well.

Q. You wrote to him and asked him to lie so that you could be released to go see your parents, right?

MS. ROSEN: Objection, form. Go ahead.

A. I don't recall.

Q. All right. Let's take a look. Looking at Plaintiff's Exhibit 8 (sic), if we look at the first excerpt, you wrote to Gabriel. Excerpt 1: "Write to me as soon as possible so that Montez (phonetic) can send you money and take you clothes."

You tried to get Gabriel Solache to do what you wanted by sending him money and clothes, right?

MS. ROSEN: Objection: form, argumentative.

A. I don't recall.

Q. Let's take a look at excerpt 3. "You said there is something about all of this, and I can't tell

Page 204

you." What did you mean by that?

A. That we couldn't speak by letter about the crime, about what had happened.

Q. You wrote to him telling him that there were things about this that you could not tell him. You were hiding something from him, right?

A. No.

Q. You were hiding from him what actually happened at the Soto residence, right?

A. I'm not going to answer. I don't remember.

Q. Let's take a look at another letter you wrote marked as Plaintiff's Exhibit 9 (sic) (Reporter's Note: This is Plaintiff's Exhibit 10). It's RFC Solache Reyes 4827 - 4836. This is a letter you wrote on July 12, 1999.

Looking at page 6 of this letter, you wrote, "You will soon be in Mexico, and I will have to come back to this place because this is what I deserve. Think about it and tell me if you'll help me for only about six months, just to make my mother happy."

You wrote that to Gabriel Solache in July of 1999, right?

A. I don't recall.

Q. You wanted to go back to Mexico to say

Page 205

goodbye to your parents, right?

A. I don't recall that.

Q. And you said you would take full responsibility for the crimes you committed, allowing Gabriel to be released, right?

MR. BRENER: Objection, argumentative.

MS. ROSEN: Objection: form, foundation.

MR. SWAMINATHAN: Go ahead.

A. I don't recall.

Q. Looking at excerpt number 2, you wrote, "All I ask are six months of happiness. After that, nothing will matter. I will make you a letter and sign it that you personally can submit. I know that they would go for it for me, but I would come back because then you could soon go free."

A. I don't recall.

Q. You were admitting there that Gabriel Solache should go free; but first, you wanted him to help you go home for a period to see your parents, right?

MS. ROSEN: Objection: form, foundation, mischaracterizes the letter.

A. I don't recall.

Q. You believe that Gabriel Solache did deserve

CCSAO COI SUBPOENAS 000432

ADRIANA MEJIA, 02/05/2021                               Page 206..209

Page 206

to be free, right?

A.  Why would he have to be freed if he was also an accomplice in the crime.

Q.  You wrote to him that, if he would just lie, you could go home for six months.  Then you would say whatever you needed for him to be able to go home, right?  That's what you wrote.

MS. ROSEN:  Objection:  form, foundation.  That's not what you read to her; and if it's somewhere in the letter, then you should let her read it.

MR. SWAMINATHAN:  Go ahead.

A.  I'm not going to answer.

Q.  All right.  Let's take a look at excerpt number 3.  You said, "I will help you and defend you of everything.  I want you to help at least a little.  I want to see my mother, ask her to forgive me, and then speak of everything.  I wanted to go see her and then say everything so that they can leave you in liberty."

THE INTERPRETER:  I'm trying to follow, Counsel, I'm sorry.

MR. SWAMINATHAN:  Sorry.  I can start over and go through it slower.

THE INTERPRETER:  Okay.

Page 207

Q.  "I will help you and defend you of everything.  I want you to help me at least a little.  I want to see my mother, ask her to forgive me, and then speak of everything.  I wanted to go see her and then say everything so that they can leave you in liberty."

You wrote, "I have to pay for what I did.  And I want my parents to hug me for the last time.  I ask this for my mother and for me.  I know I don't deserve anything from you.  But I know that you have a heart that's double or the same as God's."

You wrote that to Gabriel Solache, right?

MS. ROSEN:  Objection, form and foundation.  I don't know what you're reading from.  I don't know if that's an accurate translation.  So form, foundation.

MR. SWAMINATHAN:  Go ahead, Ms. Mejia?

A.  I don't recall.

Q.  You wrote in that letter that Gabriel deserved his liberty, right?

A.  Everybody deserves an opportunity.  Why just him?

Q.  Were you apologizing to him in this letter?

A.  I don't recall if I was apologizing to him

Page 208

or not.  I don't remember.

Q.  Let's take a look at one last section.  Take a look at excerpt number 5.  You wrote, "I hope some day you can forgive me all that you have suffered and that you have gone through because of my fault.  Forgive me.  It's easy to say.  And you must think, after all that's been done to me, you ask me for that."

You told him it was all your fault that he was in prison, right?

MS. ROSEN:  Object:  form, foundation.

MR. SWAMINATHAN:  Go ahead.

A.  I don't recall.

Q.  Ms. Mejia, do you dispute that you wrote that in the letter to him, that he should go free?

A.  I don't recall if I wrote that, no.

Q.  You agree this is your handwriting, right?

A.  (No response.)

Q.  Ms. Mejia, you previously testified about these letters.  Go ahead.

MS. ROSEN:  Objection, you're mischaracterizing what she testified to about this letter, this particular letter.

MR. SWAMINATHAN:  We have to take a break

Page 209

here.  She had to step away.  Oh, she's back.

Q.  Ms. Mejia, this is your handwriting.  This is a letter you wrote to Gabriel Solache, right?

A.  I don't recall.

Q.  You don't remember writing this letter?

A.  I don't recall.

Q.  And you agree that this is your handwriting, right, under oath?  It appears to be your handwriting?

A.  It looks like it, but --

Q.  But you don't remember saying this?

MS. ROSEN:  Objection:  form, foundation.  Mischaracterizes what she just said.

MR. SWAMINATHAN:  Go ahead, Ms. Mejia.

A.  I don't recall.

Q.  Ms. Mejia, you wrote to Gabriel Solache and told him multiple times that it was your fault, right?

A.  I felt guilty about the deaths, but not -- I don't know how to explain it.

Q.  You also told him in multiple letters that he deserved to be free, right?

A.  We all deserve to be free.  We have to pay for our mistakes, but --

Q.  All right.  Ms. Mejia, if the crime actually happened the way you've described here in your

CCSAO COI SUBPOENAS 000433

ADRIANA MEJIA, 02/05/2021          Page 210..213

Page 210

deposition yesterday and today, you never would have written to Gabriel Solache saying that he deserved to be free, would you?

MR. BRENER: Objection to form, argumentative.

A. I'm not going to answer.

Q. If -- strike that.

And you just mentioned feeling guilty. Do you feel guilty that your statements resulted in Gabriel Solache being locked up for many years?

MR. BRENER: Objection: form, foundation, mischaracterizes the record.

A. Can you repeat the question?

Q. Yeah. You said -- earlier, you used the word "guilty." You feel guilty about what happened to Gabriel Solache.

A. I feel guilty for -- I don't know how to explain it.

Q. Ms. Mejia, do you feel guilty to what happened to Arturo Reyes?

A. I'm not going to answer.

Q. Ms. Mejia, you realize that the story that you told us here today and yesterday, it's simply impossible, right?

Page 211

MS. ROSEN: Objection: form, argumentative.

MR. BRENER: Foundation.

MR. SWAMINATHAN: Go ahead.

A. I'm not going to answer.

Q. Based on the story you just told, your blood should not have been found anywhere in the Soto home, right?

MS. ROSEN: Objection: form, foundation.

MR. SWAMINATHAN: Go ahead.

A. I'm not going to answer.

Q. But it was. Your blood was found in the Soto home, right?

A. I'm not going to answer.

Q. And based on the story you just told, you had almost no role whatsoever, correct?

A. What do you mean, "role"?

Q. Based on the story you just told, you didn't really have any role in killing the Soto family, right? You didn't even know what was going to happen, right?

A. I'm not going to answer.

Q. And yet your blood was found on the knives in the house, right?

A. I don't know. I'm not going to answer.

Page 212

Q. The story you just told would require Gabriel to have skipped work that day, right?

MS. ROSEN: Objection: form, foundation.

A. I'm not going to answer.

Q. When you say the crime was happening, Gabriel Solache was at work, right?

MS. ROSEN: Objection: form, foundation.

A. I'm not going to answer.

Q. All right. The last few questions. Ms. Mejia, are you lying about what happened because you're angry at Gabriel Solache?

A. I'm not going to answer.

Q. Are you angry that he wouldn't help you go back to Mexico to see your parents?

A. I'm not going to answer anymore.

Q. Ms. Mejia, are you lying about what happened because you want to get released -- strike that.

Ms. Mejia, are you lying because you hope to one day get released from prison, and you're hoping your testimony will help you?

A. I can tell you that I respect your laws. I don't know. I know it's your job, but I can say that I believe in the law of God.

Q. Ms. Mejia, are you lying to protect others?

Page 213

A. No.

Q. Are you lying to protect whoever made the calls to the house on the night of March 27, the morning of March 28?

A. I'm not going to answer.

Q. Ms. Mejia, --

MS. ROSEN: You're out of time.

MR. SWAMINATHAN: I have two last questions.

Q. Ms. Mejia, you were previously asked questions about whether Arturo Reyes had anything to do with this crime. And in a previous deposition, you asserted your Fifth Amendment right against self-incrimination, correct?

A. I don't recall.

Q. Ms. Mejia, in a previous deposition, you were asked whether you lied when you implicated Gabriel Solache in this murder and kidnapping of the Sotos, and you asserted your Fifth Amendment right, correct?

A. Honestly, I don't remember anymore.

MR. SWAMINATHAN: I have no further questions.

MR. ENGQUIST: We have a few, or I have a few.

CCSAO COI SUBPOENAS 000434

ADRIANA MEJIA, 02/05/2021                                    Page 214..217

Page 214

MS. ROSEN: I assume Ms. Susler has no questions?

MS. SUSLER: That's correct.

MS. ROSEN: Thank you.

MR. ENGQUIST: Do you want me to go straight into it, or what?

MS. ROSEN: Ms. Mejia, would you like us to take a quick break before we ask some follow-up questions, or are you good to go?

THE WITNESS: How much longer is this going to take, a lot?

MR. ENGQUIST: Not too long for me. Not for me. But if you need to take a break to use the restroom before we start or something like that, just let me know.

THE WITNESS: Okay. If we could take a break in about 20 minutes.

MR. ENGQUIST: Okay. Sure.

EXAMINATION
BY MR. ENGQUIST:

Q. Ms. Mejia, I just want to -- I'm going to jump around a little bit, okay?

Earlier in your testimony -- I'm not sure if it was today or yesterday -- you talked about

Page 215

basically growing up with Mr. Solache; is that correct?

A. Yes.

Q. And I know, earlier today, you also talked about seeing him pick a lock at the school when you were in Mexico, correct?

A. Yes, because he was terrible.

Q. When you say "he was terrible," did you ever see him break any laws when he was in Mexico?

A. Not laws, but in Mexico, where we lived, there's no authority. I don't know if I can say it or if I have to reserve that to myself.

Q. Why would you have to reserve that to yourself about Mr. Solache's activities when he was growing up in Mexico?

A. Well, because when we were younger, when we were young, he was a little bit violent with his peers. He was kind of abusive.

Q. When you say "violent to his peers," can you describe what he would do to his peers that would be violent?

A. Violent in the fact that he would make fun. He would, like, make fun of people.

Q. Would he ever physically hurt anybody?

Page 216

A. I remember, when he used to hang out with my older brother, he was, like, very possessive, very abusive.

Q. When you say "abusive," was he physically abusive?

MS. ROSEN: Objection, been asked and answered.

MR. ENGQUIST: Go ahead.

A. Yes, very abusive because he would bully people from his generational line.

Q. I know you said you saw him use a hanger to get into the door the night of the murders, but you also saw him use it one time in Mexico. Do you ever see him any other time break in through a locked door other than those two times?

A. I remember, when we were in elementary school, there was a little room where they sold food. It was easy to take the windows off. He would go in with his little friends to get a lot of candy out. He had a lot of reports from his teachers.

Q. Other than reports from his teachers, did he ever get in trouble with the law, as far as you know, down in Mexico.

A. Yes. On one occasion, he tried to abuse a

Page 217

lady.

Q. And where was this?

A. In my town.

Q. Do you remember when this was, what year?

A. I don't recall the exact date, but that's why he fled my town.

Q. When you say "fled your town," was that before -- right before he went to the United States, or did he move somewhere else before coming to the United States?

A. I believe that happened -- when it happened, it was about April 25 when he tried to force her. And he left to the capitol with his mother.

Q. And do you know who that girl was or who that woman was?

A. Yes. Her name is Penelope. I don't recall her last name, but she's from my town.

Q. Do you know whatever happened with that -- or did anything ever happen with those allegations of abuse?

MR. SWAMINATHAN: Form. Go ahead.

A. All I know was that the lady's husband was looking for him.

Q. Do you know what the abuse was, what

Urlaub Bowen & Associates, Inc. 312-781-9586

CCSAO COI SUBPOENAS 000435

ADRIANA MEJIA, 02/05/2021                                    Page 218..221

Page 218

actually happened, allegedly happened?

A. No. Very little, no.

Q. Now, at some point while Mr. Solache was living in the United States, he received some type of head injury. Do you know anything about that?

A. Yes, for fighting.

Q. Who was he fighting with?

A. With Daniel.

Q. And do you remember when this fight took place?

A. No. I don't remember anymore.

Q. It was before the events which you were arrested for, correct?

A. Yes.

Q. Do you remember what his injury was?

A. Can you repeat the question?

Q. Sure. Do you remember what his injury was?

A. I think they put a brick in his head.

Q. Oh, he was struck on the head with a brick on the head? Is that correct?

A. I think Daniel stabbed him in the head with it.

Q. Do you know if Mr. Solache went to the hospital for that?

Page 219

A. I believe my brother-in-law Leobardo and my brother Carlos went to take him to Cook County.

Q. And was he hospitalized for a period of time with that.

A. Yes.

Q. Do you remember him having any kind of lasting injuries from that being struck in the head with a brick?

A. I don't know. But later, he would say that he couldn't see out of one eye. But I don't remember which eye.

Q. Did he ever complain to you about his hearing at that time?

A. At that time, I couldn't have a lot of communication with him. It was my brother Carlos and my brother-in-law Leobardo.

Q. Okay. I want to go back to the night of the crime and just do a couple of questions on that, if you don't mind.

You've already testified that Mr. Reyes came in after the husband was stabbed but before the wife was stabbed, correct?

A. Yes.

Q. Did Mr. Reyes tell Mr. Solache to stop when

Page 220

the wife was attacked?

A. I don't recall.

Q. Did he try to physically stop him at all?

A. I think so.

Q. You think so, okay. Do you know how he tried to physically stop him?

A. I think he wanted to grab him, but I'm not -- I think he did want to push him.

Q. Did he actually push him?

A. Yes, I think he did, a little bit.

Q. Is this when Mr. -- is this right before Mr. Solache was stabbing the woman in the back?

THE INTERPRETER: I'm so sorry, Counsel. What was that?

Q. Was this when you described Mr. Solache stabbing the woman in the back?

A. Yes.

Q. At this time, the woman was on the ground on all fours?

A. What do you mean "on all fours"?

Q. Down on her hands and knees.

A. Honestly, I don't recall.

Q. What else did Mr. Reyes do to try to stop Mr. Solache from stabbing the woman?

Page 221

A. I don't really remember a lot now.

Q. When the stabbing was going on, did either you or Mr. Reyes leave the apartment to try to get help?

A. No.

Q. You were testifying earlier how you thought that Mr. Solache would have had blood on his clothing. Remember that?

MR. SWAMINATHAN: Objection to form.

MS. ROSEN: Objection, mischaracterizes her testimony.

MR. ENQUIST: Go ahead.

A. Yes.

Q. Do you know what Mr. Solache did with that bloody clothing?

A. Yes.

Q. What?

A. He washed it in the bathroom and put it in a bag and went to throw it out.

Q. How do you know that?

A. Because I was watching him when he was washing them.

Q. Earlier, you testified that you did answer questions from police officers and also an Assistant

CCSAO COI SUBPOENAS 000436

ADRIANA MEJIA, 02/05/2021                 Page 222..225

Page 222

State's Attorney. Do you recall those questions?

A. Yes.

Q. When you answered the police officers and the State's Attorney, did you try to be truthful?

A. Yes.

Q. Did you ever change your story over time?

A. No.

Q. Did you tell the police or the state's attorney that you, Mr. Solache, Mr. Reyes were present when the Soto family were -- when Mr. and Mrs. Soto were killed?

A. Can you please repeat the question?

Q. Sure. I'll re-ask something.

Did you tell the police or the State's Attorney that you were present when Mr. and Mrs. Soto were killed?

A. I don't recall.

Q. Did you tell the police or the State's Attorney that Mr. Solache was present when the Sotos were killed?

A. I don't recall that

Q. Well, if you had told them that, that would have been true, correct?

A. I don't recall that question.

Page 223

Q. You talked earlier about talking directly to the State's Attorney, and he was asking you questions. Do you recall that?

A. Yes.

Q. And you tried to be honest with him?

A. Yes.

Q. If he would have asked you if Mr. Solache was involved in the murders, would you have told him yes?

MR. SWAMINATHAN: Objection to form.

MS. SUSLER: Join.

Q. Can I get the answer, please?

A. Yes.

Q. If he would have asked you if Mr. Reyes was present during the murders, would you have told him yes?

MR. SWAMINATHAN: Objection to form.

A. Yes.

Q. That's because it was true, correct?

MR. SWAMINATHAN: Objection to form.

A. Yes.

Q. And if you would have been asked who was involved in the kidnapping of the children, you would have told him that you, Mr. Reyes, and Mr. Solache

Page 224

were all involved; is that correct?

MR. SWAMINATHAN: Object to form.

MS. SUSLER: Join that.

A. Yes.

Q. That's because it's true, correct?

MR. SWAMINATHAN: Objection to form.

MS. SUSLER: Same.

A. Yes.

MR. ENGQUIST: I need about five minutes. I just want to look at something to make sure I'm going to be done. So if we could take a quick break for five minutes. This might be a good time to use the restroom, Ms. Mejia.

THE WITNESS: Okay.

THE VIDEOGRAPHER: We're off the record at 6:30 p.m.

(Recess in proceedings from 6:30 to 6:39 p.m.)

THE VIDEOGRAPHER: We're back on the video record at 6:39.

MR. ENQUIST: Before we get back on the record, I think you had one correction to make, Ms. Translator.

THE INTERPRETER: That is correct. When

Page 225

Ms. Mejia stated that he would bully people from his generation, I interpreted that literally. Because in Spanish, "generacion" actually means class, like if you're class of '99, class of 2000. That's the example. And I interpreted it as generation instead of saying from his class.

MR. ENGQUIST: I appreciate that. Thank you.

BY MR. ENGQUIST:

Q. Ms. Mejia, you were asked a lot of questions today about Jose Mejia.

Was Jose Mejia involved in the kidnapping of the Soto children?

A. No.

Q. Was Jose involved in the murders of Mr. and Mrs. Soto?

A. No.

Q. Did Jose Mejia know anything about the crime before it was committed?

A. No.

Q. You were also asked a lot of questions about your former husband, Rosauro?

A. Yes.

Q. Was Rosauro involved in the kidnapping of

CCSAO COI SUBPOENAS 000437

ADRIANA MEJIA, 02/05/2021          Page 226..229

Page 226

the Soto children?

A. No.

Q. Was Rosauro involved in the murders of Mr. and Mrs. Soto?

A. No.

Q. Was he aware of the crime before it was committed?

A. No.

Q. You were asked a lot of questions about your ex-husband's brothers. He had quite a few of them.

A. Yes.

Q. Were any of your former husband's brothers involved in the murders of Mr. and Mrs. Soto?

A. No.

Q. Were any of them involved in the kidnapping of the Soto children?

A. No.

Q. Did any of them know about the crime before it was committed?

A. No.

Q. You were also asked questions about your downstairs neighbors, including Guadalupe?

A. Yes.

Q. Was Guadalupe involved in the kidnapping of

Page 227

the Soto children?

A. No.

Q. Was Guadalupe involved in the murders of Mr. and Mrs. Soto?

A. No.

Q. Was she aware of the crimes before they were committed -- the plan for the crime before it was committed?

A. No.

MR. ENGQUIST: I don't think I have anything else.

Does anybody else on the defense counsel crew here have anything?

MS. ROSEN: I actually do have just a couple of questions.

FURTHER EXAMINATION

BY MS. ROSEN:

Q. Ms. Mejia, you were asked a lot of questions about your brother Carlos in the last two days, correct?

A. Yes.

Q. Was your brother Carlos involved in the murders of Mr. and Mrs. Soto?

A. No.

Page 228

Q. Was your brother involved in the kidnapping of the Soto children?

A. No.

Q. Did your brother Carlos know about the plan to kidnap the children and murder their parents before the crimes happened?

A. No.

MS. ROSEN: I don't have any more questions.

MR. NOLAND: I do not have any questions.

MR. BRENER: I also do not have any questions.

MR. SWAMINATHAN: Nothing else for us.

MR. ENGQUIST: The only other thing is whether or not you want to waive or reserve your signature. I do not know, Dena if you want to make a call on that or not. It's up to you.

MS. SINGER: No. It's fine. I don't have a position on it. I mean, I can reserve it. But I don't have a position on it.

MR. ENGQUIST: Okay. Do you want to ask her if she wants to waive or reserve or explain it to her? Do you want me to explain it to her?

MS. SINGER: Go ahead. You can do it. It's fine. It's easier if you can do it with the

Page 229

interpreter though so she understands.

MR. ENGQUIST: Ms. Mejia, the only issue left is whether or not you want to waive or reserve your signature. That means, when this deposition is typed up, you get to choose whether or not you have a chance to read it over for accuracy before it's finalized or whether or not you want to waive it and trust that the court reporter typed up everything accurately.

THE WITNESS: That's fine.

MR. ENGQUIST: Which one? Waive or reserve?

THE WITNESS: I don't know. Whatever my attorneys advises me.

MR. ENGQUIST: Back to you, Dena.

MS. SINGER: I would need a second to talk to her, guys. It's really her decision. So I've got to go into a breakout room real quick. I'm sorry.

MR. SWAMINATHAN: We can log off, right? You don't need any of us -- oh, no no. We need to get that, right.

MS. SINGER: You do, because you need to know the answer.

MR. SWAMINATHAN: Sorry. Go ahead.

MS. SINGER: Adriana, we're almost done.

Urlaub Bowen & Associates, Inc. 312-781-9586

CCSAO COI SUBPOENAS 000438

ADRIANA MEJIA, 02/05/2021          Page 230..233

Page 230

Can you grab the guard?

THE VIDEOGRAPHER: We're off the record at the 6:46.

(Recess in proceedings from 6:46 to 6:50 p.m.)

MR. ENGQUIST: Before it's asked, I will just say, yeah, I'll order. Etran.

MS. SINGER: She's on her way back in. She would like to read it, but the concern is that it's in English. So I don't know how to satisfy the issue of the whole transcript being in English.

MR. ENGQUIST: I don't either. Because I think it would be a tad overkill to have 2 days, 17 hours or whatever, worth of translations done.

MS. SINGER: Right.

MR. ENQUIST: I'm honestly not sure even how that works. Any thoughts from the peanut gallery here?

THE INTERPRETER: You can always hire me.

MR. STARR: Could we send her the video, and she could watch the video, and then send the transcript?

MS. SINGER: That's a good -- but will the

Page 231

facility have a way for her to do that?

MR. ENGQUIST: I honestly don't know. I'm going to order the video too, by the way.

MS. SCHATZLE: Just food for thought on the video side, I can send the video through email to whoever at the jail, and then they can pull it up on a computer and let her watch it. So it will be an electronic copy of the video.

MR. ENGQUIST: But I don't control what they're going to allow her access to or period of time or anything like that.

You know, we can work on getting her a copy, I guess, at some point. But I don't know what else to say about that. Eileen, do you have a thought on it?

MS. ROSEN? Me? Yes, me. What would it cost, Elsa to have you read it to her?

THE INTERPRETER: You would just contact the agency, and I'm sure they would work with you.

MS. ROSEN: I mean, if Plaintiffs are willing to split costs on something like that, I suppose it's something we can talk about.

THE INTERPRETER: I mean, I don't get involved with the pricing. But I work with them, and they would work with you.

Page 232

MR. SWAMINATHAN: My concern is it's going to be extremely time consuming and expensive. What I would propose we do is try get her the video and see if there's a way that she can get set up to be able to review that. If we need to be able to set up a notice for her to be able to get a room to be able to review the video, that's also fine, or whatever we can do to facilitate that.

MR. ENGQUIST: I have no problem trying to work out sharing with her the video. But if it's a reserving signature thing, then it's the reading of the transcript, not the video. Her watching a video doesn't alleviate that concern.

So if it's reserved, that's a different issue. And honestly, I don't know how to deal with that in this case. If it's going to be "waived, but I'd like to get a copy of it," then we can probably work that out.

MR. SWAMINATHAN: Maybe we need ask her that.

MS. SINGER: I'm sorry, what did you say?

MR. SWAMINATHAN: If we get her a copy of the video, is that what she would like? Or is she additionally indicating that she's not waiving, and

Page 233

she wants to be able to do a comparison to the actual transcript before she -- rather than waive signature?

In other words, if what she wants is --

MS. SINGER: No, I understand. I'm with you. It's 17 hours, but I got you. Is she there? Sorry. I can only see -- not everybody.

Elsa, I guess, can you ask her: Adriana, do you want to see the video, and is the video sufficient for to you determine if everything is accurate?

THE WITNESS: Because of the Corona virus, they're not going to let me see it. Everything is canceled right now.

MS. SINGER: Right. A lot of the facilities won't give them access to computers and stuff because of the virus.

Well, I think we should --

MR. SWAMINATHAN: If it's a matter of time, it could be that -- I don't know how long it usually takes to go back and forth; but if it's going to be 60, 90 days, we could be in a different place with regard to her ability to have access to a computer.

MS. SINGER: Well, then you guys are waiting 60 or 90 days until --

MR. SWAMINATHAN: I don't care about waiting

CCSAO COI SUBPOENAS 000439

ADRIANA MEJIA, 02/05/2021                                    Page 234..235

Page 234

60 to 90 days to have her sign off on the errata sheet, which is basically what we're talking about.

MR. ENGQUIST: The thing is, if it gets written, then you just have 30 days to determine.

MS. ROSEN: I know, you can extend that by agreement. we could agree to give her more time.

MS. SINGER: Adriana, are you comfortable waiving it? Are you comfortable saying that you think the transcript, as written, was taken accurately, or would you prefer to read it?

THE WITNESS: Whatever decision my attorney makes is fine.

MS. SINGER: All right. We can waive it.

THE VIDEOGRAPHER: Just to note, the video was not recording. Do you want that also on the video or just on the written transcript?

MR. ENGQUIST: The fact that it's waived?

THE VIDEOGRAPHER: Yeah.

MR. ENGQUIST: Just on the written transcript. That's fine.

THE VIDEOGRAPHER: I was just letting you guys know.

(Deposition concluded at 6:57 p.m.; by agreement, signature waived.)

Page 235

CERTIFICATE OF REPORTER

I, BRENDA L. ZEITLER, a Certified Shorthand Reporter within and for the State of Illinois, do hereby certify that the witness, ADRIANA MEJIA, whose testimony appears in the foregoing deposition was duly sworn by me through a Spanish interpreter; that the testimony of said witness was taken through Spanish interpreter on February 5, 2021, by me to the best of my ability and thereafter reduced to typewriting under my direction; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition was taken, and further that I am not a relative or employee of any attorney or counsel employed by the parties thereto, nor financially or otherwise interested in the outcome of the action.

_____

Brenda L. Zeitler, CSR

Illinois License No. 084-004062

CCSAO COI SUBPOENAS 000440

Index: $1,000-4

ADRIANA MEJIA, 02/05/2021

| Exhibits | 1 | 2 |
|---|---|---|
| **Plaintiff's Exhibit 1** 4:6 69:1 | **1** 6:2 35:9 69:1 198:17 202:20 203:16 | **2** 35:13 61:4 105:10 106:8 205:10 230:14 |
| **Plaintiff's Exhibit 2** 4:9 105:10 106:8 | **1,200** 101:14 | **20** 65:4 113:2 120:2 214:17 |
| **Plaintiff's Exhibit 3** 4:11 113:10 | **10** 16:13 62:8 63:14 204:13 | **200** 23:4 |
| **Plaintiff's Exhibit 4** 4:12 119:5 167:15 | **10:09** 35:8,11 | **2000** 10:17,19,21,23 11:5,9 225:4 |
| **Defendant's Exhibit 5** 4:15 5:7 198:14 | **10:14** 35:11,13 | **2019** 191:11,21 |
| **Plaintiff's Exhibit 5** 4:17 172:19 | **10:50** 185:23 | **2020** 12:5,8,21 13:14 25:14 27:7 |
| **Defendant's Exhibit 7** 4:20 5:9 66:3 174:22 185:5 189:7 | **11** 16:13 198:11 200:24 | **2021** 6:5 |
| **Plaintiff's Exhibit 6** 4:23 119:7 172:19 189:8 202:17 203:15 | **11:15** 61:4,6 | **207** 66:4 |
| **Defendant's Exhibit 9** 5:2,11 189:12 202:18 204:12 | **11:45** 61:6,8 | **22** 198:7,9 |
| **Plaintiff's Exhibit 7** 174:21,22 185:5 189:6,7 204:13 | **12** 62:8 63:15 204:15 | **23** 12:15 189:24 191:10,21 |
| **Plaintiff's Exhibit 8** 189:8 202:17 203:15 | **12:00** 142:22 | **233** 69:2 |
| **Plaintiff's Exhibit 9** 202:18 204:12 | **12:30** 144:8,12 146:3 185:23 | **25** 217:12 |
| **Plaintiff's Exhibit 10** 204:13 | **15** 52:1 82:8 116:11 172:21 | **253** 69:2 |
| **Defendant's Exhibit 19** 5:13 134:9,10 | **16** 31:13 | **25519** 119:5 |
| **Defendant's Exhibit 36** 5:15 191:7 | **160** 185:7 | **25520** 119:6 |
| | **162** 185:7 | **264** 167:17 |
| **$** | **17** 230:14 233:5 | **26th** 111:4,8 |
| | **18** 31:13 119:21 175:2 | **27** 140:12 185:12 213:3 |
| **$1,000** 97:14 101:14 130:13 | **18th** 12:13 | **28** 173:11 185:16,19 186:3 187:22 188:3,6 189:4,8 213:4 |
| **$10** 100:12,14 | **19** 31:3,8 134:9,10 | **2:00** 161:11 |
| **$100** 99:3 | **194** 172:19 | **2:59** 139:18,20 |
| **$20** 100:14 | **196** 172:20 | |
| **$30** 99:9 | **1997** 130:20 184:19 | **3** |
| **$300** 23:4 | **1998** 17:10 22:18 57:12 76:1 90:1 91:23 95:14 96:15 98:3 99:4 104:5, 13 105:15 107:8 119:21 120:2,5, 13,20 130:20,21 131:4,5,8,9,13 134:14 140:12 172:21 184:1,19 185:12,16 189:16 198:11 201:1 | **3** 61:8 95:6 113:10 174:24 200:17 201:15 203:23 206:14 |
| **$400** 130:12 | | **30** 234:4 |
| **$50** 99:9 | **1999** 175:2 202:14,20 204:15,22 | **36** 191:7 |
| **$600** 124:19 126:6,20 127:3 129:21 131:22 132:4 | **1:00** 95:2,4 142:22 144:8,13 | **3949** 198:15 |
| | **1:05** 95:6,8 | **3952** 198:15 |
| | **1:31** 95:8,10 | **3:00** 161:11 |
| | **1:44** 101:18 | **3:08** 139:20,22 |
| | **1:46** 101:21 | |
| | | **4** |
| | | **4** 95:10 119:5 139:18 167:15 189:13 201:21 |

CCSAO COI SUBPOENAS 000441

ADRIANA MEJIA, 02/05/2021

**434-8643** 186:9

**44** 104:21 105:10

**4812** 202:19

**4816** 202:19

**4827** 204:14

**4836** 204:14

**4:03** 170:22,24

**4:21** 170:24 171:2

**4:46** 183:13,15

**5**

**5** 6:5 69:2 139:22 167:16 174:24
183:13 189:14 198:14 208:3

**50** 99:3

**51st** 45:6,12,21 46:8 89:7

**5:02** 183:15,17

**5:13** 188:19,21

**5:19** 188:21,23

**6**

**6** 172:19 183:17 189:20 204:16

**60** 233:20,23 234:1

**62nd** 46:7

**6:30** 224:16,18

**6:39** 224:18,20

**6:46** 230:3,5

**6:50** 230:5

**6:57** 234:23

**7**

**7** 66:3 174:22 185:5 189:7

**773 434-8643** 134:15

**7:00** 20:11

**8**

**8** 119:7 185:6 189:8 202:17 203:15

**820** 113:8 114:12

**8726** 134:10

**8729** 134:11

**8:00** 20:11 140:18 161:17

**9**

**9** 189:12 202:18 204:12

**90** 233:20,23 234:1

**925-5124** 185:10

**96** 117:2 120:17

**97** 120:17

**98** 66:13 96:17 120:17 121:9 131:6
173:11

**99** 225:4

**9:00** 22:11 140:18 144:12 161:17

**9:04** 6:3

**A**

**a.m.** 6:3 35:11 61:6 144:8,12,13
185:23

**ability** 7:23 233:21

**absolutely** 29:4,14 196:14

**abuse** 216:24 217:20,24

**abusive** 89:2 215:18 216:3,4,5,9

**accepting** 16:18

**access** 101:6,8 231:10 233:14,21

**accomplice** 206:3

**account** 16:16 97:22

**accuracy** 229:6

**accurate** 207:15 233:9

**accurately** 229:9 234:9

**acknowledged** 199:23

**acquaintances** 44:21 47:3

**act** 134:6 136:24 174:18 175:12
176:11

**acted** 175:7

**acting** 176:17

**active** 90:16 91:1,12

**activities** 215:14

**actual** 112:8,23 142:1 233:1

**add** 170:1

**addition** 112:6,23

**additional** 94:19

**additionally** 232:24

**address** 11:21 45:5 46:20 114:17

**addresses** 45:23

**adequate** 124:3

**admit** 200:13

**admitting** 205:17

**Adolpho** 43:7,16,20 45:15 51:17
106:22

**Adriana** 6:4,22 46:6 69:7 88:2
95:11 134:21 135:6,15 138:5 139:4
167:13,14 193:1,21 229:24 233:7
234:7

**Adriana's** 137:24

**advance** 34:1 113:12

**advises** 229:13

**affected** 133:4

**affidavit** 134:19

**afraid** 123:24 197:11

**afternoon** 20:20

**agency** 231:18

**agree** 33:20 147:15 168:1 191:22
208:17 209:7 234:6

**agreed** 173:16

**agreement** 234:6,24

**ahead** 14:22 15:19 20:15 25:11
33:17,19 38:17 42:13 46:5 58:12
64:1 70:1 84:4 88:9 91:19 93:20
97:20 98:13 100:10 106:13 113:21
119:1,12,15 121:4 127:20 129:9
136:1,16 146:21,24 147:21 155:9
158:7 162:23 166:3 169:15,22
178:12 179:7 191:17 201:15
203:12 205:8 206:11 207:17
208:12,20 209:13 211:3,9 216:8
217:21 221:12 228:23 229:23

**allegations** 217:19

**allegedly** 218:1

**alleviate** 232:13

**allowed** 90:21

**allowing** 205:4

**Amendment** 34:9 35:19 36:3,11,
18 38:24 169:13 170:3 174:9 187:5

ADRIANA MEJIA, 02/05/2021

188:13 213:12,18

**amnesia** 117:20,21

**amount** 101:12

**analysis** 119:18 120:19

**Anand** 46:4 137:16

**Angeles** 44:17,20 73:19

**angry** 212:11,13

**answering** 25:19 170:2,6 196:18

**answers** 7:13 48:8 170:10

**anymore** 16:19 27:3 96:3 104:19 105:16,19 106:17 112:18 118:9 119:2 121:12 130:19 153:22 166:23 177:22 180:21 194:9,22 212:15 213:20 218:11

**apartment** 9:15 45:10,16 47:7 49:21 52:11,13 96:7 139:5,11 153:14 157:1 159:4,15,20 160:2,5, 8 221:3

**apologies** 104:24

**apologize** 104:22 165:23

**apologizing** 207:23,24

**appears** 209:8

**appointment** 112:8 119:9 120:1, 13 142:1

**appointments** 110:5 111:21 112:9,12,23,24 114:9 115:6 119:10

**approached** 173:13

**approximately** 12:1 114:14

**approximation** 151:12

**April** 22:18 66:13 172:21 189:16 217:12

**area** 69:2 94:16 110:13 111:15,23 113:19 141:21 144:1 161:24 162:13 174:24

**areas** 141:12

**argue** 87:17,23

**argued** 16:22 87:19,20 88:12 89:14

**arguing** 89:19 92:10,16

**argument** 16:5,6,9 23:1

**argumentative** 147:20 156:11 169:11 196:2 197:22 203:21 205:6 210:5 211:1

**arguments** 92:6,7

**arrest** 46:14 76:4 91:13 134:20 135:8

**arrested** 17:23 18:23 19:4,17 22:19 60:3 76:10,12 78:15 91:4,7 93:2 94:6 96:19 104:14 116:3 118:15 189:17 218:13

**arrive** 9:2

**arrived** 116:23

**Artiaga** 183:19,20

**Arturo** 8:19,23 9:5,14 73:9,20 74:3,6,21 76:5,9,14,22 77:4,18,22 78:10 147:10 149:7,12,19 152:3 156:23 157:1,4,6,11 159:1 161:4 166:8,22,24 167:3,7 168:6,21 169:3,4 171:5,10,20 178:7,16 210:20 213:10

**ashamed** 88:19

**asks** 18:24 19:6 22:20 44:10 50:15 54:17 63:2 74:1 90:7

**asleep** 21:13 164:9,10

**assert** 34:12,22,23

**asserted** 213:12,18

**asserting** 35:19 36:3,11,18 38:24 168:11 169:13 170:2 174:8 188:13

**Assistant** 221:24

**assume** 8:4 13:2 154:18 214:1

**assumed** 138:3

**ate** 61:14

**attacked** 220:1

**attempted** 189:21 190:2

**attend** 19:24

**attention** 22:7 83:1 91:20 109:12, 16 134:2

**attorney** 182:4,7,15 193:22 194:15 196:10,12 222:1,4,9,15,19 223:2 234:11

**attorneys** 229:13

**audio** 191:3,4,9,19 192:5,10

**aunt** 134:21 135:6

**aunts** 11:16

**Aurora** 14:2 23:19,22

**authority** 215:11

**aware** 160:11,16 226:6 227:6

---

**B**

---

**baby** 120:24 121:2 122:14 124:6,9, 11,14 125:3,7,13,24 126:3,5,9,12, 17 129:20 132:13,17,21 146:1,15 147:2,3,7,12 148:2,8 149:4 156:19 163:17,21 164:9,14,16 166:7,17, 18,21 173:16 184:21 185:3

**babysat** 71:20 135:13

**babysit** 135:6

**babysitting** 99:7,22 135:8

**back** 9:24 17:10 18:11 22:24 26:17,21 35:12,15 43:11 57:12 61:7 76:1,8 95:9 96:11,21,24 97:7, 10,16 99:19 101:20 104:4 122:15 134:14 139:21,24 141:23 154:5,7 161:2,5,11 165:19 167:1 171:1 175:21 179:1,2 182:13 183:16 184:1,19 188:22 203:4 204:18,24 205:14 209:1 212:14 219:17 220:12,16 224:19,21 229:14 230:9 233:19

**background** 9:24

**bad** 39:12 80:23

**badly** 181:16 199:16

**badly'** 198:24

**bag** 221:19

**bandeja** 88:21

**bank** 97:22

**bar** 19:19 22:8,21 87:12

**barely** 74:20

**bars** 17:4,19 87:6,11

**based** 46:2 147:14 179:18 187:4 211:5,14,17

**basement** 62:16

**basic** 76:16,19

**basically** 19:23 98:19 144:11 158:3 215:1 234:2

**Bates** 66:3 174:22 189:13

**Bates-stamped** 189:12

**bathroom** 111:23 112:3 221:18

**Beatrice** 14:2 15:6

**beautiful** 163:23

CCSAO COI SUBPOENAS 000443

ADRIANA MEJIA, 02/05/2021

**bed** 90:12 139:8 165:10

**bedroom** 90:4 139:5

**began** 175:21

**beginning** 6:1 35:13 61:8 95:10 139:22 183:17

**belated** 29:11 173:22

**believed** 59:21 107:19,21 108:6

**believing** 201:5

**belly** 109:22

**belonged** 59:15

**big** 106:23 163:16,18 164:14

**bigger** 193:18

**bipolarism** 117:7

**birthday** 52:17

**bit** 6:10 7:17 9:19 24:3,10 29:6 42:3 52:12 57:18 83:13,14 94:23 100:16 113:16 125:8 127:12 148:23 149:2 152:5,21 159:17 162:16 214:22 215:17 220:10

**blame** 80:1,3 83:24

**blamed** 92:17

**blank** 67:4 165:23

**blanket** 157:19

**blankets** 159:7

**blocks** 114:21

**blood** 8:12 158:14,16,19,22,23 159:2,4,8,11 162:4,6,18 164:22 211:5,11,22 221:7

**bloody** 221:15

**Bluhm** 119:5

**bodies** 158:10

**body** 115:17 118:9,11,12 139:1

**born** 125:3

**borrow** 72:17

**boss** 22:1

**bother** 86:11

**bothered** 86:14 88:17

**bothering** 197:15,16,18

**bottom** 167:22 175:1

**box** 130:4

**boy** 59:2,3,14 71:23 99:7 124:24 156:21 163:10 164:9 165:4,6,12, 14,21 166:8,11,13,15 168:7 169:5 171:10 173:15

**boy's** 171:6

**boyfriend** 83:2,5

**bread** 50:21

**break** 8:8,13 34:17 61:2 82:4 94:24 152:7,10 183:9 208:24 214:8,13,17 215:9 216:14 224:11

**breaking** 152:16

**breakout** 34:19,21,23 229:17

**BRENAN** 169:10

**BRENER** 147:19 156:9 162:20 182:19 190:14 197:23 199:3 205:6 210:4,11 211:2 228:10

**brick** 218:18,19 219:8

**broke** 178:24

**brother** 11:12 12:10 14:3 15:4,5 16:5,21 18:6,19,22 19:2,8 31:22 32:2 45:17 46:21 48:24 49:12 73:18 86:7 88:13 89:22 97:13 99:15 107:6 118:6 123:6 193:2 194:5,14,23 195:15 196:17,21 216:2 219:2,15 227:19,22 228:1,4

**brother's** 51:23

**brother-in** 45:16

**brother-in-law** 13:23 45:14 115:9 219:1,16

**brother-in-laws** 52:16

**brothers** 12:23 15:22 16:3 31:21 32:11 43:5 53:13 73:4 87:1,2 226:10,12

**brothers-in-law** 17:14

**brought** 13:16,17,19 14:4,17 15:11

**building** 97:13 129:2

**buildings** 47:14,17 48:10 115:1,3

**bullpen** 79:16,17,23 82:12,22 84:1

**bullpens** 83:20

**bully** 83:14 216:9 225:1

**buy** 98:15,18 100:2,4 104:11 146:14 166:15,17,18,19

**buying** 148:2 166:20

---

**C**

**cabinets** 65:17

**calculations** 133:22

**call** 9:11 30:7,9 53:14 71:6,10,12, 15 72:4,7,17 88:20 89:8 130:5 142:16,21 143:3,16 166:24 186:2,4 187:16 188:2,5,7,8 191:10 195:15 228:16

**called** 18:15 24:11 53:13 71:18 79:12 111:8 142:15 167:7 185:18 189:3

**calling** 16:18 57:13 72:14 139:14

**calls** 16:18 70:24 71:7 143:11,23 144:4 167:3 185:8,9,11,12,15,22 186:6,8,12,16,20 187:21 189:5 213:3

**Calvario** 14:3,7

**camera** 67:2,9,17 68:2

**campus** 115:1

**canceled** 233:12

**candy** 216:19

**capitol** 32:12 217:13

**car** 9:9 72:10,11,18,24 73:3 94:18 104:8,10,14,16 105:13,15,17,20,21 106:1,3,8,9,10,15,18,20,22,23,24 107:2,3,4,5 112:1 145:16 146:7,14 147:8,10 148:6,12 149:4,5,12,19 150:7,12 152:4 159:16 161:2,3 164:1 172:4,6,9

**cardboard** 95:24

**care** 50:22 71:16 166:13,16 233:24

**Carlos** 11:12 12:11 14:3,17,19 15:8 16:20 17:16,19 18:7,11 19:16 22:14 23:1 39:14,18 40:15,19,24 41:10 51:3,4 99:15,17 103:24 107:5,8 109:2 118:6 196:12,22 197:2,6,19,20,24 219:2,15 227:19, 22 228:4

**Carlos's** 19:20

**Carmen** 50:10 73:22

**Carmen's** 73:23 74:3

**cars** 104:4,12,17 146:9

**case** 6:12 13:15 24:3 25:5,9,20 42:16 90:21 102:10 180:13 181:2, 7,20 182:13 191:12 192:2 196:18,

CCSAO COI SUBPOENAS 000444

ADRIANA MEJIA, 02/05/2021

23 197:7 232:16

**cash** 97:24 129:24

**caused** 17:8 89:13

**causing** 152:24

**cell** 134:15,16 184:19 186:23

**center** 11:10 114:11

**Cermak** 189:15,21 190:13,21

**chains** 24:12

**chance** 6:8 85:12 195:11 200:18 229:6

**change** 64:17 222:6

**changed** 114:2

**changing** 139:5,8

**Chapa** 53:13,15 199:9,13,17,21

**charge** 98:11

**charged** 77:18 78:21,24 85:16

**charity** 52:5

**chat** 52:12

**check** 141:21

**checking** 142:5

**chest** 79:19

**Chicago** 41:5 42:9,11,19,22 44:24 45:2 48:14 111:4,11 112:16 114:7, 13,20 116:7,18 181:24 184:7

**child** 70:4 92:19,22 124:21 125:9 173:17

**children** 43:8 50:22 69:9,23 71:14, 22 85:3 91:6,22 135:7,15 143:17 157:18,20,24 159:11,12 161:5 162:2 171:14,18 185:20 186:21 190:7 223:23 225:13 226:1,16 227:1 228:2,5

**choose** 229:5

**chosen** 83:4

**Christmas** 97:5

**church** 13:23 23:24

**claim** 188:4,5

**clarification** 16:4

**clarify** 51:14

**class** 225:3,4,6

**classroom** 152:15

**Claudia** 184:12,14

**clean** 22:3 72:13

**clear** 19:1 27:14 170:5

**Cleared** 69:3 175:1

**Clemente** 43:8,10 45:17 97:13

**clients** 20:1

**clinic** 110:24 111:12,14,19 112:15 114:15,19,24 115:6

**clinics** 110:18 112:14 114:13 160:24

**clip** 191:3,4,19 192:5,10 196:4,6,8

**clips** 191:14

**close** 16:20 17:2 18:17 22:2,4,10, 13 30:3 48:21,23 49:19 71:24 72:2 75:17 79:11 94:5 102:9 122:13,18 134:21 135:1,4 145:12 154:16

**closed** 18:16,22 19:3,17,18 22:11 69:3 175:1

**closer** 50:2

**closet** 165:12,15,21 166:6

**clothes** 157:17 158:18 162:4,18 164:22 166:15,17 203:18,20

**clothing** 109:15,17 139:7,13 166:19 221:7,15

**coat** 151:7 154:19,21

**collecting** 99:5

**Collins** 172:21

**color** 104:18,19 146:8

**comfortable** 234:7,8

**comment** 163:21

**commented** 18:19

**comments** 83:23

**commit** 39:7 117:16 190:3

**committed** 39:4,15 205:4 225:19 226:7,19 227:7,8

**committing** 39:10

**communicate** 11:23 184:3 196:11

**communicated** 183:24

**communicating** 15:18

**communication** 15:16 16:17 17:18 28:17 78:23 177:7 219:15

**communications** 77:17,20 78:13, 16 79:3

**comparison** 233:1

**complain** 219:12

**completely** 194:7

**compound** 32:21

**computer** 231:7 233:21

**computers** 233:14

**concern** 230:10 232:1,13

**concerned** 138:17 166:11

**concerns** 36:7,14,24 37:5 39:23 87:13

**concluded** 234:23

**condition** 117:10,22

**conducted** 172:23

**conferenced** 6:4

**confide** 75:8

**confused** 41:18 127:12

**Confusing** 42:3

**confusion** 20:21

**connection** 136:8 137:15 165:18

**consciousness** 118:4,10

**consistent** 21:5

**consults** 94:13

**consuming** 232:2

**contact** 231:17

**continuance** 195:18

**continuation** 6:13 7:5

**continue** 8:3 20:22 24:13,15 201:5

**continued** 6:12 7:2 20:20 94:8

**continuing** 6:3 193:8,23

**control** 231:9

**conversation** 29:8 75:2 124:6,8 125:17,19,22,23 126:2,11,16 129:12,20 142:24 149:5

**conversations** 76:21 78:19,20 83:15 166:8,21

**cook** 11:1,9 19:23 85:7 219:2

**cooperative** 94:11

**copies** 84:9

CCSAO COI SUBPOENAS 000445

ADRIANA MEJIA, 02/05/2021

**copy** 105:3 174:22 231:8,12 232:17,22

**Corona** 233:10

**correct** 6:12 7:6,9 16:24 21:3 22:21 28:13 29:8 35:4 41:20 75:9, 12 77:23 78:1,3 79:5 84:2,7,13 91:22 93:2 95:15 119:22 120:2 121:11 122:9 133:22 148:20 152:4 167:10 168:23 172:16 176:5 185:20 189:18 190:2 191:1 194:5 197:21 200:21 211:15 213:13,19 214:3 215:2,6 218:13,20 219:22 222:23 223:19 224:1,5,24 227:20

**correction** 224:22

**Correctional** 11:10

**correctly** 67:15

**cost** 124:18 126:6 231:16

**costs** 231:20

**counsel** 101:15 129:15 137:12,17 178:11,15 188:24 191:8,23 193:20 195:20 198:23 206:21 220:13 227:12

**count** 139:15 156:13

**counter** 141:22

**counting** 152:2

**County** 11:1,9 85:7 219:2

**couple** 10:2 11:3 219:18 227:14

**court** 26:20 35:14 58:13,14 76:13, 15,21 77:20 79:2,5,8 81:19,20 105:4 113:13,15 137:17 170:12,14 182:3,13 187:12 198:16,18,20 229:8

**courthouse** 181:24

**cousin** 23:6

**created** 67:16,20

**crew** 227:13

**crime** 77:18 78:21,24 85:16 174:18 181:7 203:4 204:3 206:3 209:23 212:5 213:11 219:18 225:18 226:6, 18 227:7

**crimes** 39:4,7,11,15 205:4 227:6 228:6

**criminal** 40:4

**crying** 121:5,14,21 122:3,8 123:14

**cure** 136:23

**custody** 189:18

**customers** 20:1

**cut** 30:21 190:6,8

---

**D**

**dad** 10:13 30:11 51:9,10,12,13,15, 16 80:16,19

**dancing** 17:4,20

**Daniel** 73:19 175:2 218:8,21

**dark** 156:17

**database** 69:5

**date** 119:21 120:22 131:4 132:15 133:17 217:5

**dated** 172:21 175:1 191:9

**dates** 94:4 107:4

**day** 24:16,17,20,24 50:19 51:1 63:22 75:18,19,21 97:5 104:6 105:22 121:18 122:6 123:3 124:7, 8,10 125:11,15,23 132:11 140:13, 14 141:13 142:1,20 143:24 163:1,4 191:8,11,16,21,24 192:1 195:4 208:4 212:2,19

**days** 12:15 52:2 125:15 126:14,16 132:21 133:1,6 187:19 200:21,24 201:8,11 202:10 227:19 230:14 233:20,23 234:1,4

**daytime** 123:4

**de** 42:24

**deal** 232:15

**dealing** 154:22

**death** 17:9

**deaths** 209:17

**December** 10:18 11:7 12:5,8 13:2, 14 25:13 27:15

**decide** 33:11

**decided** 33:8 203:5

**decision** 33:23 37:16,21 38:1 229:16 234:11

**declaration** 134:11,20 135:21 136:5 137:22

**defect** 136:23

**defend** 206:14 207:1

**Defendant's** 38:15 134:9,10 189:12 191:7

**Defendants** 136:9 137:3,7

**Defendants'** 191:8

**defense** 227:12

**demonstrate** 176:10,16

**Dena** 34:11 228:15 229:14

**dep** 168:17

**depending** 22:12 99:6

**deposed** 25:16 181:20 191:12,16

**deposition** 6:4,12 7:5 66:3,10 69:1 114:7 119:6,7 167:14,15,17 189:3 190:1 191:8,22 192:1 193:14 194:5 198:7,9,14 210:1 213:11,15 229:4 234:23

**depositions** 25:5,8

**depression** 117:13

**describe** 64:5 98:2 104:16 215:20

**describing** 8:16 64:10 194:4

**deserve** 204:18 205:24 207:10 209:21

**deserved** 207:20 209:20 210:2

**deserves** 207:21

**detailed** 88:1

**detainee** 189:21

**Detective** 62:14,21 63:16 65:7,16, 22 69:4 172:6,14,23 173:24 174:19 177:10,14,19,23

**determine** 233:9 234:4

**diabetes** 116:9,10,11

**diagnosed** 117:3,6,9,12

**Diana** 54:8,22 55:8,9

**diapers** 166:18,19

**died** 49:2

**difficult** 80:10

**directly** 19:7 223:1

**disappointed** 137:12

**discuss** 149:14

**discussed** 161:10 166:2

**discussing** 137:24

**dispute** 202:5 208:14

CCSAO COI SUBPOENAS 000446

ADRIANA MEJIA, 02/05/2021

**divorced** 84:18,21

**dizzy** 61:13

**doctor** 108:4 112:4 115:20 116:19

**doctor's** 110:4,7,9 112:6

**doctors** 115:16 116:18

**document** 66:2 68:24 104:21,23 119:4,8 134:8,12,14 167:12 172:18 174:21 185:5 189:11,16 190:10 191:7 192:20 193:9,24 202:16

**documents** 137:8

**dollars** 100:20,23 101:1 103:21,24

**dominated** 86:16

**door** 63:18,19,20 140:2 149:23 150:1,12,16 152:20 153:4 159:22, 24 216:12,14

**doors** 152:15

**double** 207:11

**downstairs** 226:22

**drank** 86:6

**drawing** 64:10 66:22

**drink** 17:5,7,12 86:12

**drinking** 17:10 87:3 89:10,11,17

**drive** 15:4 104:5,7 107:7,9,10

**drop** 94:15 111:18 115:7

**dropped** 113:24 145:11 154:21 161:7

**drove** 140:20 148:14

**drugs** 18:5

**due** 109:24 110:2 133:17

**duly** 6:23

**Dwight** 11:4,9 76:7

**E**

**earlier** 20:9 35:22 52:22 61:12,20 146:18 210:14 214:23 215:4 221:6, 23 223:1

**early** 22:2 161:16

**easier** 21:7 228:24

**easy** 208:6 216:18

**eat** 52:11 75:3 111:17

**echoed** 44:11

**echoing** 31:18

**Edwiges** 49:1,10,12,15 115:9

**eighth** 120:2

**Eileen** 231:14

**electronic** 231:8

**elementary** 216:16

**Elizabeth** 23:6

**Elsa** 231:16 233:7

**else's** 136:5 200:2,11

**email** 231:5

**Encarnacion** 32:4 45:16 46:23 47:4

**end** 21:22 32:20 35:9 61:4 95:6 139:18 183:13 202:10

**ended** 21:16 83:13 84:24

**Endovias** 32:15

**ends** 136:19

**English** 70:22 79:15 144:24 173:2 199:4,11 230:11,12

**ENGQUIST** 24:4 40:11,16 45:22 46:3 60:19 63:23 121:3 147:22 213:23 214:5,12,18,20 216:8 224:9 225:7,9 227:10 228:13,20 229:2, 11,14 230:6,13 231:2,9 232:9 234:3,17,19

**ENQUIST** 156:10 221:12 224:21 230:17

**enter** 140:1 141:8,10

**entered** 173:15

**entire** 101:12 136:11

**entrance** 63:18 145:5

**episodes** 117:10

**errata** 234:1

**Estoria** 50:2 71:8,9,15

**Etran** 230:7

**evening** 143:11

**events** 147:14 218:12

**eventually** 145:18

**ex's** 42:14

**ex-husband** 17:13 97:5,12

**ex-husband's** 131:14 226:10

**ex-sister-in-law** 128:8

**exact** 217:5

**exam** 136:12 137:3,8

**EXAMINATION** 7:2 214:19 227:16

**examined** 6:24

**excerpt** 198:17 201:14,20 203:16, 23 205:10 206:13 208:3

**exchanged** 105:1 173:17

**exhibit** 66:3 69:1 104:22 105:2,4, 10 106:8 113:9,10,11 119:5,7 134:9,10 136:18 167:13,14,15 172:19 174:22 185:5 188:17 189:7, 8,12 191:7 198:14 202:17,18 203:15 204:12,13

**exit** 63:19

**expect** 42:21

**expectation** 132:20

**expected** 26:4 27:7,10,16,21,23

**expecting** 24:19,24

**expensive** 232:2

**explain** 28:2 43:18 86:1 117:21 126:21 127:13,20 196:9 197:21 200:1,8,13 209:18 210:18 228:21, 22

**explanation** 187:20 188:1,7 189:5

**extend** 234:5

**extra** 11:3 98:22 99:2 100:8

**extremely** 232:2

**eye** 219:10,11

**F**

**face** 66:19,23 89:4 177:22 194:16

**faces** 64:9

**facilitate** 232:8

**facilities** 233:13

**facility** 119:10 231:1

**fact** 107:12 108:14 153:15 160:7 172:13 215:22 234:17

**factory** 95:24

CCSAO COI SUBPOENAS 000447

ADRIANA MEJIA, 02/05/2021

**facts** 181:6

**fair** 74:20 75:7 186:20

**faith** 24:13,15,17 26:10 78:8

**faked** 123:23

**faking** 122:8,18,23 125:10,18

**fall** 33:1

**fallen** 132:17

**false** 30:18,22 35:23 69:10,12,13, 23 70:2 173:20,21 174:2 176:22 178:3 190:4,10 191:1

**familia** 42:24

**familiar** 54:6 55:13,16 56:4,8 62:11 66:5 67:23 104:24 106:15 110:21 111:3 113:3 144:18 184:14

**families** 32:24 43:8

**family** 16:10 17:15,17 22:9 28:16 35:24 37:8,14,19,24 38:8,21 39:10, 12 40:1,9,13 42:11,14,15,19,22,23 43:2,5,15 44:5,22 46:23 48:13,16, 20,22 49:5 73:20 75:5 76:19 96:12, 21 99:24 102:12,13 103:7 108:17 109:4 127:3 133:18 138:8 160:11, 16 165:1 211:18 222:10

**fast** 156:1,7

**father's** 17:17

**father-in-law** 32:10

**fault** 80:24 81:3,10 83:4 199:17,23 200:1,2,3,10,11,14 208:5,9 209:16

**fear** 29:22

**fearful** 29:23

**February** 6:5 121:9 128:13,14 129:7 130:14 131:8 189:24

**fecha** 75:21

**feed** 164:11

**feel** 7:18,22 25:2 29:22 88:19 198:24 199:16 210:9,15,17,19

**feeling** 8:4,11 61:13 85:24 181:12 199:21 210:8

**fell** 175:20

**felt** 80:23 118:9,11 181:16 209:17

**female** 173:13 180:16,17

**fertility** 112:8,12,23 118:23

**fight** 16:12 89:13 218:9

**fighting** 218:6,7

**fights** 18:9

**figure** 138:18

**filled** 65:17

**final** 195:17

**finalized** 229:7

**finally** 145:1 152:19

**financial** 98:3 100:6

**find** 108:12 122:15 123:14 127:6,8 129:3 134:9

**finding** 85:1 138:21 175:24

**fine** 7:18 8:4 61:13 123:17 125:21 128:23 133:23 151:4 173:6 195:18 228:17,24 229:10 232:7 234:12,20

**finish** 129:2 179:16 200:5

**finished** 200:5

**fix** 72:9,11

**fled** 217:6,7

**floor** 45:14 62:16 120:2 175:20

**floors** 141:17

**follow** 201:22 206:20

**follow-up** 214:8

**food** 8:12 75:5 82:8 88:14 216:17 231:4

**force** 217:12

**forgive** 206:16 207:3 208:4,6

**forgot** 61:21

**forgotten** 88:10

**form** 9:6 15:21 19:5,13 20:14 21:12,24 24:4 25:10,21 29:11 30:24 32:21 33:12 34:8 36:5,9,16 37:2,6,11,17,22 38:12,22 40:21 41:2,12,23 42:12 48:5,17 54:23 55:10,24 56:15,20 57:1,10,15 58:18,23 60:9,19 63:17 66:6,9 68:7,15,21 69:11,14,19,24 70:8,12, 19 74:15,18,22 76:11 80:13 81:7, 11 84:3,6 87:15 91:9,17 93:20 97:19 98:7,12 100:9 105:23 106:4, 11,16 114:16 115:2 119:1,11,14, 19,23 120:3,7,11,14 121:3 134:17, 22 135:2,10,12,17 136:3,11 137:5, 10 138:11,15 146:24 147:18,19 151:13,17 152:1 154:11,23 156:9, 10 157:8 158:6,12 159:9 160:14,18

162:22 164:5 165:16 168:9,24 169:6 173:1,22 174:5,15 175:17 176:6,21 178:4,8,18 180:14 181:21 182:1 184:16 185:14,17 186:1,11, 14,18 187:1,23 188:9 189:9,16 190:14 195:13 196:1 197:22 200:12 201:9 202:23 203:12,21 205:7,21 206:8 207:13,15 208:11 209:11 210:4,11 211:1,8 212:3,7 217:21 221:9 223:10,17,20 224:2,6

**forward** 7:19 61:10

**fought** 83:12

**found** 77:8 121:5,13,15 122:3 128:9,11 168:21 211:6,11,22

**foundation** 15:21 21:12,24 25:10, 21 29:12 33:12 36:5 37:2,11,17,22 38:13 40:11,21 41:2,23 43:4,17 47:15 54:23 55:10,24 56:15,20 57:1,10,15 58:23 60:21 69:11 74:15 81:7 91:17 114:16 115:2 119:14,19,23 120:3,7,11,14 127:11 154:23 156:9,11 160:18 165:17 168:9 169:6 173:1 178:18 181:21 185:14,17 186:1,11,14,18 187:1,23 188:9 189:9 190:15 205:7,21 206:8 207:13,16 208:11 209:11 210:11 211:2,8 212:3,7

**fours** 175:20 176:10,17 220:19,20

**Franklin** 95:24

**free** 180:10 181:13 205:15,18 206:1 208:15 209:20,21 210:3

**freed** 206:2

**freezing** 137:19

**Friday** 86:12

**friend** 11:13,16 13:23 23:24 51:18 53:23 124:9,11 147:6 160:12

**friend's** 163:14

**friends** 13:17,19 17:4,14 21:20 47:2 51:19 52:7 53:18,19,21 55:3 56:23 109:8,9 124:16 182:13,16,21 216:19

**front** 136:5 137:9 140:4 143:8,9 145:6,7 148:22 149:1 154:5,6 161:4 177:12 178:2

**frustrated** 133:3

**full** 205:3

**fully** 90:19

**fun** 215:22,23

ADRIANA MEJIA, 02/05/2021

**funeral** 12:17

---

**G**

---

**Gabriel** 8:18,21 9:4,16 17:12 28:6, 13 58:5 73:7,18 78:16,20,24 79:4 81:17 82:13 84:9,12,15 105:24 106:9 115:10 121:5 122:3 129:12, 20 130:10 132:3 133:5 142:16,21 144:8 145:2,15,22 146:18 148:4 149:3,18,20 152:7 153:11 154:3,18 156:22 158:21 161:4 165:11 171:11,21 177:2,5,8,9,23 178:2,7, 17 202:20,21 203:3,16,19 204:21 205:5,17,24 207:12,19 209:3,15 210:2,10,16 212:2,6,11 213:17

**gallery** 230:18

**Gama** 54:8,22 55:8,9,12,13,15,19, 22

**gang** 40:6,10,13,15

**gangs** 40:1,3,20 41:1

**garbled** 50:16

**gave** 13:10 26:24 69:8,22 70:4 93:24 94:3 102:19 128:9 129:23 130:10 170:8 192:1 195:18

**generacion** 225:3

**generation** 225:2,5

**generational** 216:10

**gentleman** 157:2

**get along** 49:6

**girl** 13:21 49:22 52:24 125:1,2 126:9,10 164:9 217:14

**girlfriend** 21:18,19 83:2,3

**girlfriends** 124:17

**give** 7:12 27:3 35:4 38:18 82:1 97:3 98:20,22 99:1,23 113:12,14 115:21 129:14 131:22 132:6 147:1, 4 148:9 151:12 188:15 195:16 233:14 234:6

**giving** 99:2 132:13 136:18,21,22

**glass** 60:2 93:24

**gloves** 150:9 158:23

**God** 187:7 212:23

**God's** 207:11

**good** 6:6,7 51:19 98:4 100:7 180:15 196:9 214:9 224:12 230:24

**goodbye** 205:1

**Google** 113:7,15

**grab** 157:14,17 220:7 230:1

**grabbed** 156:19,21 157:24 158:4

**grabbing** 157:13

**grass** 22:17

**Graviella** 71:21

**grew** 10:4 49:19

**gross** 79:20 83:14

**ground** 220:18

**grow** 10:10

**growing** 215:1,15

**Guadalupe** 49:10,19 50:13,17 105:22 142:18 143:1 163:2,5,18 164:1,15,16 165:14,20 167:5 171:14,17,24 198:4,7,11 200:19 226:22,24 227:3

**guard** 26:13 63:19,20,21 162:11 230:1

**guess** 170:15 231:13 233:7

**Guevara** 62:14,22 63:16 65:7,16, 22 68:4 172:7,14,23 173:24 174:19 177:10,14,19,23 178:1

**guilty** 209:17 210:8,9,15,17,19

**guy** 47:2 73:19

**guys** 33:1 34:19 90:15 153:9 156:1 157:14 158:10 159:14 170:16 229:16 233:22 234:22

---

**H**

---

**hallucinations** 117:18

**handcuffed** 63:11 175:15 177:18

**handcuffs** 63:9

**handed** 147:16

**hands** 63:11 150:6 220:21

**handwriting** 167:19 168:1,3 198:23 208:17 209:2,7,8

**hang** 192:8 216:1

**hanger** 150:2 151:7 152:8,11,17 154:19,21 216:11

**happen** 16:12 24:20,24 27:24 70:17 84:23 116:21 132:23 133:1

149:15 175:10,22 176:13 194:12, 18 211:19 217:19

**happened** 8:17 9:14 18:18 29:10 30:14,19,23 35:23 79:4 80:3,8,12, 21 81:10 118:7 144:7 145:18 152:20 153:13,16 155:2,12 156:6 174:1 176:15 181:10 182:11 194:5 197:2 204:3,9 209:24 210:15,20 212:10,16 217:11,18 218:1 228:6

**happening** 80:15 121:16 125:20 133:21 176:23 212:5

**happiness** 205:11

**happy** 33:6 34:4 189:1 204:20

**harassing** 38:13,22 48:5 197:9

**hasta** 75:21

**hat** 150:8

**he'll** 94:17,18

**head** 12:20 129:8 136:17 150:9 218:5,18,19,20,21 219:7

**headaches** 7:16,23

**health** 118:19 189:15

**hear** 12:19 16:2 50:4 65:11 71:3 178:14 192:11

**heard** 26:24 36:22 56:13 58:10 138:7 153:4 155:10

**hearing** 14:15 219:13

**heart** 207:11

**helping** 94:11 133:9

**Hernandez** 184:12,15

**Hey** 170:16

**hiding** 204:6,8

**highlighted** 200:17

**highly** 138:6

**HIPAA** 189:13,14

**hire** 230:20

**Hispanic** 173:13

**hit** 89:4,11,20 136:16 177:9,20,21, 23 178:1

**hold** 35:5 99:17

**holding** 102:22

**holidays** 97:4

**home** 8:17 10:14 20:7,10,13 21:11 31:4 50:20,23 59:2 105:18,21

ADRIANA MEJIA, 02/05/2021

106:3,7 114:1 121:11,24 122:19 123:5,7 140:1 142:16 147:16 148:16 149:6 160:8 164:13,24 166:7,22 171:21 173:17 185:9,13, 19,23 186:2,12 187:16,21 188:3,5 189:3,6 205:19 206:5,6 211:6,12

**honest** 223:5

**honestly** 96:3,8,9 104:19 105:16, 19 106:14 113:4 114:17,23 119:2 120:9 121:12 122:20 132:10 148:24 150:5 151:14,22 152:2 156:15,22 159:10,23 162:5 166:23 178:5 179:8 184:10 213:20 220:22 230:17 231:2 232:15

**honked** 145:16

**honking** 145:19

**hope** 26:3 27:18,22 208:3 212:18

**hoped** 27:21

**hopes** 26:11

**hoping** 25:24 91:13,16 97:7 142:21 212:19

**Horacio** 43:7,24 47:13,14 48:10 86:7,9,14,20,24 87:21 88:11 89:22 106:20 137:23

**hospital** 110:14,15,23 111:6,7,13, 19 112:17,19 113:8,20,23 114:4,7, 21 115:7 116:14 140:13,15,23 141:2,9,13,15 142:14 143:4,7,8,9, 14,21,24 144:11,15,19 145:4 147:2 159:18 161:6,11,19,22 162:1,15,18 164:7 166:22 167:23 173:11,12,15 185:19 186:6,8 187:17 188:6 189:4 218:24

**hospitalized** 116:16 219:3

**hospitals** 114:8

**hours** 20:2 21:22 161:20 162:2,17 230:15 233:5

**house** 8:21 9:5 16:24 31:15,20,21, 23 32:3,5,8,9,17 45:20 46:9,12,24 47:5,7,10,19 48:1 49:8 51:20,23 52:11,18,24 54:21 55:8,20 57:8,13 71:2,7,13 72:4,7 73:10,24 74:3,13, 16 90:2,6,10 97:6,13 100:5 101:2 108:23 121:13 122:22 129:2,4 130:1,3 148:22,23 149:16,22,23 150:3 153:3,17,21 155:3 156:1,4 157:14,21 158:1 165:4,6 167:4,7 186:21 211:23 213:3

**houses** 54:1

**hug** 207:8

**hundreds** 100:20,23 101:1 103:20,24

**hung** 143:2

**hurt** 215:24

**hurting** 7:23

**husband** 15:6,7 32:11 51:22 52:6 58:19 83:3,12 86:15 108:20 116:18 123:6,16 124:1 142:12 199:21 200:14 217:22 219:21 225:22

**husband's** 31:10 37:23 45:18 46:21 47:3 72:12 83:3 226:12

— I —

**ICAM** 69:5

**idea** 128:7

**identified** 42:16 69:8,21 173:13

**identifies** 113:7

**identify** 62:9 68:19 70:3 105:5 115:16 174:23

**identifying** 68:14

**Illinois** 112:16 113:8,20 114:13,20

**imagine** 21:19

**immediately** 155:20

**implicated** 213:16

**important** 38:9,14 197:1,5

**impossible** 210:24

**imprisoned** 85:6

**improper** 136:4,19 137:13,18 169:21

**incarcerated** 77:9

**included** 104:23 188:8

**includes** 185:15

**including** 226:22

**indicating** 232:24

**individuals** 180:11

**information** 70:16 125:12 168:7 169:4 171:5 190:22

**informed** 19:16

**initial** 125:17

**injuries** 219:7

**injury** 218:5,15,17

**inmate** 19:19

**inside** 111:14,16 141:1,24 152:6 153:14 162:1,14

**insult** 88:18,23

**insulted** 88:17

**insults** 88:24

**interacted** 74:24

**interactions** 28:6

**internet** 174:11

**interpret** 192:16,17 199:11

**interpreted** 35:16 225:2,5

**interpreter** 6:15,19,20 7:1 9:1 10:6 14:12,20 15:1,23 18:24 19:6 20:18,21 21:1,6 22:20 26:23 30:20 31:17 35:3 36:20 41:17 42:24 44:10 46:15 50:3,15 51:11 54:17 58:9 63:2,8 64:16 65:9 67:5 71:3 74:1 75:20 79:13,17 88:22 90:7 91:11 95:1,17,21 101:15 102:21 129:15 163:3 166:4 173:9 175:4 178:11,14 191:23 192:13,15,19 193:7,8,19,23 195:20 198:18,20,22 199:5,8,12,15 206:20,24 220:13 224:24 229:1 230:20 231:17,22

**interpreting** 6:16 20:19

**interrogating** 197:4

**interrogations** 176:24 177:1

**interrupt** 136:22

**interrupted** 200:4

**interrupting** 88:4

**interview** 172:23

**interviewed** 172:13

**intimate** 79:19

**Investigation** 174:24

**investigations** 179:23

**investigator** 175:2,8

**invite** 52:10 168:14 170:12 187:11

**inviting** 169:18 170:14

**involved** 40:19,24 223:8,23 224:1 225:12,15,24 226:3,13,15,24 227:3,22 228:1 231:23

ADRIANA MEJIA, 02/05/2021

**irrelevant** 38:15

**islands** 40:4

**issue** 116:21 174:11 229:2 230:11 232:15

**issues** 37:9,14 40:1,6 93:10 116:4, 13 118:17,19,20 136:8 137:15

---

### J

**Jacinta** 155:6,20 156:14,24 157:6 158:11 160:11,20

**jacket** 150:8 158:24

**jail** 11:9 18:2 19:19 24:1 78:5 80:18 85:7 200:20,24 231:6

**Jalisco** 18:15 19:16,20 22:15

**January** 121:9

**Javier** 71:16,22,24 72:4,22 184:20, 22,23

**Javier's** 184:24 185:3

**Jessica** 49:11,14

**jewelry** 130:4,5

**job** 19:20 22:15,19,20,22 33:18 74:10 212:22

**jobs** 22:14 44:6

**join** 42:22 182:19 197:23 223:11 224:3

**joined** 44:9,13 45:7

**Jorge** 49:10,20 106:24 137:23

**Jose** 51:6,18,21 71:15,21 72:2,7, 14,17,19,20 106:18 134:11,16 135:1,22 137:22 139:4,12 140:8 184:22 186:10,13,16 187:17,18,22 225:11,12,15,18

**Jose's** 72:12 185:1

**judge** 195:16

**July** 204:15,21

**jump** 214:22

**June** 198:11 200:24 202:14,20

---

### K

**K-U-B-O-N** 54:4

**keeping** 128:23 130:3

**key** 150:18 160:2,4,7,9,17,20,21

**keys** 159:20

**kidnap** 228:5

**kidnapping** 213:17 223:23 225:12,24 226:15,24 228:1

**kidney** 116:15

**kidneys** 116:7,8,14

**kids** 16:22 51:20 71:16,19 92:1,4, 8,15 93:11,19 115:18 134:24 156:16 157:13 158:4 159:14 163:2 164:7 167:1 184:24 185:1

**kids'** 159:7

**kill** 164:2

**killed** 155:24 156:24 157:6,20,23 158:4 160:13 222:11,16,20

**killing** 211:18

**kind** 29:8 64:5 215:18 219:6

**kitchen** 121:17 123:1

**knees** 220:21

**knew** 13:20 25:8 52:22 54:12,15 55:19,20,23 59:6 74:20 111:10 124:9,13 126:5 128:15 135:19,21 138:5 144:22 149:10 182:12 183:23 197:19,21

**knife** 154:9,12,13 175:9

**knives** 154:17 211:22

**knocked** 118:5

**knowing** 135:23 181:12

**Kubon** 54:3

---

### L

**la** 42:24 75:21

**lady** 13:21 71:14 124:13,23 126:5 154:16 157:3 217:1

**lady's** 60:24 217:22

**laid** 74:10

**land** 10:13

**lapiz** 64:7

**large** 117:23

**lasting** 219:7

**late** 20:5,12 21:10 22:4 86:12

**law** 45:16 212:23 216:22

**laws** 27:13 212:21 215:9,10

**lawyers** 180:2

**lead** 136:10

**leading** 136:9,15 137:4

**learned** 132:12

**leave** 22:2 24:18 37:10,16,21 52:6 100:1 144:15 173:12 184:20 201:18 206:18 207:5 221:3

**left** 14:4 31:2,5,8 34:2 39:3 46:13 47:4 98:24 130:10 141:18,19 142:13 143:24 144:19 159:14,15, 19 217:13 229:3

**lend** 72:24 73:3,6

**length** 45:24

**lent** 32:2

**Leobardo** 17:13 32:15 43:10 49:1 107:2 219:1,16

**letter** 76:6,8,24 77:1,2,6,11,15,19 198:6,10,13 199:20 200:17 202:3, 7,11,19 204:2,11,14,16 205:12,22 206:10 207:19,23 208:15,23 209:3, 5

**letters** 79:1,4 81:2,15 84:9,12,16 198:3 202:21,24 203:2,7 208:20 209:19

**letting** 234:21

**liberty** 206:19 207:6,20

**license** 15:5

**lie** 59:6,17 70:7 108:17,20,23 109:2,4,6,8 110:2 139:10 174:3,14 175:16 176:5,19 190:13 195:5 203:9 206:4

**lied** 213:16

**life** 27:19 43:18 44:7 47:16,18,24 48:2 116:5 190:11,20

**lighter** 179:10

**Linda** 101:9

**lineup** 60:18 62:3,6,13,18 63:15,21 64:23 68:10,18,20

**listen** 86:7 191:4

**listening** 87:21

**literally** 225:2

**live** 31:14 44:19 49:16 51:8 59:24

CCSAO COI SUBPOENAS 000451

ADRIANA MEJIA, 02/05/2021

184:7,9

**lived** 9:24 31:15,23 32:5,9,16 45:7, 12,15,20 46:12,13,19,24 48:13 49:17,18,21 54:1,2 57:7 73:20 74:23 89:6 96:13 133:12 139:11 215:10

**living** 16:23 17:11,15 31:4,7 33:5 45:3,5 52:18 53:19,24 73:17 85:20 86:4 89:5 90:2 97:18 121:15 123:1 218:4

**loaned** 31:21

**located** 69:5

**location** 112:22

**lock** 150:15,22 151:8,16,19,21 152:23 159:22,24 215:5

**locked** 210:10 216:14

**locks** 150:19 152:8,10,17

**log** 185:7,22 188:8 189:6 229:18

**logged** 95:4

**long** 8:3 9:8 13:12 32:22 44:8,12 92:3,21,24 93:9 108:6 116:16 126:19 129:11,13,19,22 140:22 144:2 150:13 151:10,11,22 181:4 182:8 183:8 194:11 214:12 233:18

**longer** 9:13 60:10,13 65:18 68:16 81:8 84:17 89:1 93:14 94:4 114:17 154:18 214:10

**looked** 60:7 67:8 75:10 181:18

**loose** 109:15,17

**Lopez** 14:2 15:6

**Lorena** 11:13,14,15 53:22,23

**Los** 44:17,19 73:19

**lose** 118:10

**losing** 199:21

**lost** 80:16 81:15 84:11 117:23 118:1,4,6 137:16 165:18 174:12 199:16 203:6

**lot** 9:10 16:22 17:7,10,14 18:11 22:12 24:12,14 26:10,11 33:15 34:3 43:22 48:24 49:1 50:7 59:23 60:13 64:4,12 65:1,3,17,18,24 66:14 68:16,23 73:6 74:8 78:7,8 79:20 81:13,14,21 83:8,21 84:11 85:1,4 86:5,6,12 87:19 88:15,17 89:1 91:20 100:8,11 115:3 131:10, 11,15 133:12 140:5 158:14,21,23 159:4,7 174:20 181:8 197:17

203:6,8 214:11 216:19,20 219:14 221:1 225:10,21 226:9 227:18 233:13

**lots** 159:1

**love** 33:1,3 83:7 85:18,21,24

**low** 36:21

**lower** 113:18

**lowest** 24:12

**lucky** 131:17

**Luna** 183:21,22 184:3,7,9

**Lupe** 52:10 163:21 164:4 199:20 201:17,21,24 202:2

**Lupe's** 52:11

**lying** 40:20 100:8 101:1 131:20 139:13 140:6,10,11 164:4 165:15, 21 212:10,16,18,24 213:2

---

**M**

**Madam** 35:14

**made** 33:23 38:1 50:21 55:3 64:8 67:9 86:9 136:12,16 137:5,10 142:20 143:3,11,13,17,20 152:21 160:12 185:9,11,12,15,23 186:8, 16,21 187:21 188:3,5 194:7,20 195:19,23 200:23 202:15 213:2

**MADRIGAL** 95:4,19

**majority** 51:2

**make** 10:7 19:22 21:1 29:22 31:18 53:18 63:8 64:18 71:7 75:23 79:13, 15 88:19 109:10,13,18,22 112:3 113:9 131:10,15 137:10 142:4 147:15 163:21 167:3 186:6,12 196:21 197:1,6 201:3 204:20 205:12 215:22,23 224:10,22 228:15

**makes** 21:6 234:12

**making** 37:15,20 96:1 99:8,14,21 136:17 137:5 144:4 201:8

**male** 180:16,17

**Maleno** 193:1,3 196:21

**man** 43:22 52:23 63:6,12 152:22 153:1,2,6,11,19 157:11

**manic** 117:9,10

**Manuel** 43:7 44:3

**map** 113:7 114:22

**maps** 113:15

**March** 22:18 57:12 76:1 90:1 95:14 96:15 99:4 102:9 104:13 105:15 107:8 119:21 120:2,5,13,20 129:7 140:12 173:11 184:1 185:12,16,19 186:3 187:22 188:3,6 189:4,8 213:3,4

**Mariano** 154:4,22 155:1,11,19 156:24 157:5 158:11

**Marisa** 50:11 71:9

**mark** 68:24 104:22 105:7 113:9 119:4 167:15 172:18 185:5

**marked** 66:2 119:6 167:13 174:21 189:6,11 191:7 201:14,21 202:16 204:12

**married** 31:9,12 32:20 33:3 52:24 85:3

**Martin** 52:19 53:2,6 73:7

**Martinez** 107:5,8 109:2

**matter** 205:12 233:17

**Mcdonald** 69:5 172:21

**meaning** 75:21

**means** 67:6 225:3 229:4

**media** 6:2 35:9,13 61:4,8 95:6,10 139:18,22 183:13,17

**medical** 93:10 115:1 116:4 118:16

**medications** 118:20

**meet** 32:19 33:1 55:4 57:19,23 58:2 160:23 182:8

**Mejia** 6:4,6,22 7:4 27:6 32:4,15 35:16 38:21 43:7,8,10,16,24 44:3, 5,22 46:23 47:13 49:10,11,20 50:2, 10,11,17 51:6,17,18,21 58:12 60:23 61:9 66:5 69:8,21 71:2,7,8,9, 15,16,17,22,24 72:2,4,7,22,24 90:24 92:12 105:12 106:18,20,22, 24 107:2 108:20 113:18,21 119:17 127:3 128:9 134:11,12 135:1,22 137:9,23,24 138:8 139:4,12 167:18 169:22 171:4 172:22 173:2,10,16 174:8 175:3,4,6,10,19 176:10,13 179:13 183:19 184:18,20,22,23 185:4,9,13 186:2,10,12 187:14,16, 21,22 188:3 189:2,3,6,15 190:1 191:6,11,15,17,20 192:20 193:9, 13,24 194:4 196:5,17 197:5 198:3, 4,13 199:10 200:7,18,19 201:15

ADRIANA MEJIA, 02/05/2021

207:17 208:14,19 209:2,13,15,23 210:19,22 212:10,16,18,24 213:6, 9,15 214:7,21 224:13 225:1,10,11, 12,18 227:18 229:2

**Mejia's** 38:20 119:7 134:16 137:22 167:14 186:13,17 187:17,18

**Mejias** 32:16

**members** 16:10 17:15 38:20 39:10 40:9,10,13 42:15,19 43:2 44:22 48:13,16,22 49:5 109:4 138:8 165:1

**members'** 44:5

**memory** 117:23 118:2 179:18

**mental** 118:19,20

**mention** 59:9

**mentioned** 28:3 52:21 210:8

**met** 33:2 54:11 73:9,12 160:23 182:4

**Mexican** 88:23

**Mexico** 9:24 24:11 28:10 31:2,8 32:6,12 33:5,15 36:15 37:1,5,9,21 39:4,7,11,15 40:2,10 43:12 71:8,11 75:6 89:6 96:11,16,18,22 97:6,8,10 104:1 116:6,17,24 122:16 129:2 152:9,10 184:9 193:4 203:4 204:17,24 212:14 215:6,9,10,15 216:13,23

**Michoacan** 11:15

**middle** 26:16 131:1 148:20

**midnight** 21:16,23 22:10

**Miguel** 55:12,13,15,19,22

**mind** 219:19

**mine** 131:14

**minute** 82:1 156:4,7 165:19

**minutes** 9:7,10 30:6 82:8 151:12, 21,24 183:10 214:17 224:9,12

**miracle** 27:12

**mischaracterizes** 56:1 60:20 106:5 120:8 205:22 209:12 210:12 221:10

**mischaracterizing** 63:24 208:22

**misleading** 120:8,15

**missed** 58:12

**mission** 13:9

**misstates** 40:22 162:20 165:16 182:17 187:2

**mistakes** 209:22

**mistreating** 177:12,13,15

**model** 146:8

**mom** 28:18,23 29:3 30:11 84:20

**moment** 54:7 55:17 56:6,16 164:12 170:17 181:11,14

**mommy** 196:8

**money** 16:7,8,16 22:24 23:1 88:14 96:11,21,24 97:6,10,12,16,18,24 98:5,11,14,15,16,18,19,22 99:2,5, 8,11,14,16,18,19,20,21,22 100:2,8, 12,16 101:4,23 102:1,3,8,11,14,15, 16,18,19,23 103:1,6,7,10,21 116:19 126:23 127:9,14,15 128:1, 5,6,7,9,14,15,17,19,21,22,23 129:4,7,13,14,22,24 130:7,9,10,17 131:7,9,12,20,22 146:18 147:17 148:3 203:18,20

**Montez** 203:17

**month** 93:12 96:2 97:3 121:7,10 122:20 189:17

**months** 11:3 44:14 91:13 97:14 108:8 138:23 185:3 194:24 195:7 204:20 205:11 206:5

**Moreno** 56:5,14,19,24 57:5,9,13 61:20,24

**morning** 6:6,7 8:7 20:5,19 140:16, 19 143:17 144:12 161:12,15,16,17 185:15,19 186:3 187:22 188:3,6 189:4,8 213:4

**mother** 10:14 28:8,9,12 29:3,5 96:13 99:20 204:20 206:16 207:3,9 217:13

**mother's** 97:4

**mother-in-law** 49:2

**mother-in-law's** 32:7,17

**Mount** 111:9 115:19 119:9

**mouth** 65:10

**move** 33:20 34:19 95:11 97:7 217:9

**moved** 46:8,20 47:1 73:10,12 84:10 180:4

**moving** 65:10 136:20

**mow** 22:16

**Mozart** 16:24 45:3 46:7,9,12,19 47:7 49:8 53:19,24 57:13 73:10 74:17 89:5 90:2,10 140:4 185:9

**multiple** 93:7,15 122:2 131:12 209:16,19

**murder** 213:17 228:5

**murders** 118:16 216:12 223:8,15 225:15 226:3,13 227:3,23

**mute** 95:18 130:24

---

**N**

**named** 14:6 54:3,8 57:12,19,24 69:6 73:19

**names** 14:1 32:14 38:18 45:19

**natural** 116:20

**nature** 81:24 82:14 83:23

**nearby** 73:20

**needed** 49:23 82:3 98:15,18 100:3,4,17,20 206:6

**neighbors** 226:22

**news** 118:8 171:14,18

**nickname** 53:12 57:4 199:14

**nicknames** 53:8,10,16

**night** 6:9 20:11 122:1 123:4 148:20 171:10,14 213:3 216:12 219:17

**nodding** 12:20 129:8

**noise** 75:23 152:21

**noises** 153:4

**NOLAND** 76:11 80:13 228:9

**Norma** 57:19,20,22,24 58:3,6,17, 20,21 59:3,5,9,15,21 60:8 62:2 68:14,20 69:6,7,22 132:14 163:13 168:23 173:14

**normal** 59:13 150:16

**note** 137:2 167:16,19 168:21 171:4 185:6 189:7 202:17 204:13 234:14

**noted** 136:11

**notes** 168:4

**notice** 232:5

**noticed** 103:16,22 104:2

**November** 175:2

ADRIANA MEJIA, 02/05/2021

**numb** 118:9

**number** 11:21 101:12 102:2 103:4, 5 105:8 122:7 127:7,21,22 131:18, 19 134:15,16 172:14 185:10 186:9 189:20 198:17 201:15,21 205:10 206:14 208:3

**numbering** 105:8

**numbers** 101:11 114:18 131:11 173:17

**numerous** 137:4

**nurse** 93:23,24

**nurses** 142:8

---

**O**

**oath** 6:24 7:9 209:8

**object** 34:8 38:12 44:4 45:22 66:6 76:11 84:3,6 88:1 136:14 178:4,8, 18 195:13 196:1 208:11 224:2

**objecting** 169:18,20

**objection** 9:6 15:19,21 19:5,13 20:14 21:12,24 24:4 25:10,21 29:12 30:24 32:21 33:12 36:5,9,16 37:2,6,11,17,22 38:22 40:11,16,21 41:2,12,23 42:12 43:4,17 47:15 48:5,17 54:23 55:10,24 56:15,20 57:1,10,15 58:18,23 60:9,19 63:17 66:9 68:7,15,21 69:11,14,19,24 70:8,12,19 74:15,18,22 80:13 81:7, 11 87:15,24 88:6,7 91:9,17 93:20 97:19 98:7,12 100:9 105:23 106:4, 11,16 114:16 115:2 119:1,11,14, 19,23 120:3,7,11,14 121:3 127:11 134:17,22 135:2,10,12,17 136:1,3, 11,12,16,17 137:6 138:11,15 146:20,24 147:18,19 151:13,17 152:1 153:20,24 154:11,23 155:8, 22 156:9 157:8,15 158:6,12 159:9 160:14,18 162:20 163:6 164:5 165:16,22 168:9,13,24 169:6,10,15 172:10,15 173:1,22,23 174:5,15 175:17 176:6,21 180:14 181:21 182:1,17 184:16 185:14,17 186:1, 11,14,18 187:1,7,23 188:9 189:9 190:14 197:8,22,23 200:12 201:9 202:23 203:12,21 205:6,7,21 206:8 207:13 208:21 209:11 210:4,11 211:1,8 212:3,7 216:6 221:9,10 223:10,17,20 224:6

**objections** 20:19 21:3 137:5,10, 11

**obtained** 185:8

**occasion** 78:4 80:14 93:21,22 134:23 177:11 182:2 216:24

**occasions** 115:10 116:6 135:14 140:3 184:2

**occurred** 174:18

**October** 191:10,21 198:7,9

**office** 65:19 110:8,9 112:7 180:12

**officer** 139:14

**officers** 62:24 63:4 174:1 221:24 222:3

**offices** 65:19

**older** 43:23 50:8 216:2

**open** 150:22 151:16 152:15,19

**opened** 153:5

**opening** 150:1

**opponents** 195:17

**opportunities** 33:16

**opportunity** 24:22 136:21,23,24 207:21

**order** 170:13,14 187:12 200:13 230:7 231:3

**ordered** 168:15 170:13

**organs** 116:1

**original** 170:10

**Ortiz** 14:2

**overheard** 137:23

**overkill** 230:14

**ovulate** 115:20

**ovulating** 115:22

**owned** 47:10,12,17 106:9

**owner** 18:19,20

---

**P**

**p.m.** 95:8 101:21 139:20 142:23 170:24 171:2 183:15 188:21 224:16,18 230:5 234:23

**pages** 66:17

**paid** 83:1 96:9,10

**pants** 158:20

**paper** 67:4

**papers** 65:17 84:19,20 85:11 194:15

**Pardon** 37:12 64:14

**parents** 10:10,15 12:4 13:2 14:1,5, 17 15:8,11,14 24:2 25:23 27:6 28:5 30:3 31:7 35:23 71:8,10 88:14 109:6 116:17 157:23 171:6 194:10 201:23 203:10 205:1,19 207:8 212:14 228:5

**park** 95:24 148:22,23

**parked** 145:18

**part** 15:24 48:19 69:13,18 83:11 98:14 100:15 101:24 111:4

**parties** 42:17 52:17

**parts** 79:20

**pass** 12:11

**passed** 12:13,14,15,21 49:2 177:11

**passing** 29:6

**past** 11:6 83:16,23 133:17

**path** 201:23

**patients** 141:7

**pause** 94:23 101:19 193:11

**pay** 22:6 83:8 88:13 91:20 109:12, 16 134:2 143:3,13,20 186:17,22 188:6 189:3 207:7 209:21

**paying** 96:6

**peanut** 230:18

**peers** 215:18,19,20

**pen** 175:6,12,14

**pencil** 64:8 66:19,21,24 67:7,9,16, 18,20

**pending** 35:17

**Penelope** 217:16

**people** 13:16,20,24 14:4 22:12,13 24:1,6 27:13 38:19 44:21 45:18 49:8 52:18,21 54:16,21 55:20 60:2, 15 62:6,17 63:15,20 64:4,9 66:18, 20 71:12 73:1 75:16 107:24 109:24 133:12,18,20 141:6 153:15 180:4, 6,7,15 190:21 196:10 197:14,18 200:15 215:23 216:10 225:1

**perdi** 199:9

ADRIANA MEJIA, 02/05/2021

**peril** 137:1

**period** 13:12 18:3 46:13 107:23 108:13 118:1 144:16 161:23 205:19 219:3 231:10

**periods** 117:23

**permission** 13:6,11

**perpetual** 24:12

**person** 14:6 54:3,8 57:12,23 59:24 60:8 62:21 66:5 71:19 77:3,4 78:10 84:20 121:6 124:20 125:12 132:9, 13,16 168:7 190:12

**person's** 14:9 124:15

**personal** 15:22 75:14,17 76:2 90:14,20 200:14

**personally** 205:13

**persons** 160:6

**perspective** 38:15

**phone** 11:19,23 30:5 70:24 71:1,6 134:15,16 143:3,5,10,16,20,23 144:4 167:6 173:17 184:19 185:7,9 186:9,10,13,17,22,23 187:17,18,21 188:2,6 189:4,6

**phones** 143:13

**phonetic** 53:13 203:17

**photo** 60:15 66:21 69:7,22 70:3

**photograph** 66:12 67:12 68:1

**photographs** 60:5 64:5 66:15,16 67:3

**photos** 59:21 60:7,12,14 63:22 64:3,11,15,22 65:1,6 66:18 68:12

**phrase** 8:19

**physically** 177:22 215:24 216:4 220:3,6

**Pi** 53:13

**Piadaria** 18:15 19:21 22:15

**pick** 60:8 67:20 102:3 131:19 134:23 145:24 146:1,3 147:6 151:7,21 152:23 215:5

**picked** 102:14 105:21 113:24 140:3,4 144:8 145:2,3,4,10 146:6, 10 161:14 163:1,4

**picking** 150:15 152:17

**picture** 64:8 66:8 114:12

**pictures** 67:8,16,20 68:5 105:13

**piece** 67:3

**pillow** 139:6,8,13 140:9

**pills** 7:17 116:20

**place** 77:9 86:19,21 119:9 127:2 145:10 191:10 204:18 218:10 233:20

**places** 123:2

**placing** 139:6,13

**Plaintiff's** 69:1 105:10 106:8 113:10 119:5 167:13,15,16 172:19 174:21 185:5,6 189:6,8 202:17,18 203:15 204:12,13

**Plaintiffs** 231:19

**plan** 82:7 101:5 120:23 121:2 201:12,13 202:13,14,15 203:3 227:7 228:4

**planning** 37:10 200:20

**plans** 122:15 129:1

**play** 191:3,19 192:4

**playing** 192:6,8,10

**pleading** 153:23

**pocket** 168:22

**point** 7:22 8:11 9:15 20:23 25:7 56:18 60:17 85:23,24 91:18 107:12,15,18 108:9 116:3 118:15 132:8 133:17 146:17 147:11,24 148:4 150:11 154:18 155:7 168:6 171:13 176:24 177:4 218:3 231:13

**Polaroid** 64:15,17

**Polaroids** 64:13

**police** 17:21 37:9,15,20 59:10,12, 13,14,20,21 62:3,24 63:4 66:13 70:6,10,17 76:10 89:8 171:10,23, 24 172:12,24 174:1,3,13,17 175:5, 12,16 176:4,17,19 177:5 180:3 185:8 221:24 222:3,8,14,18

**porch** 165:9

**portion** 136:11

**position** 228:18,19

**possessive** 216:2

**possibly** 163:22

**practice** 20:20,23 21:5

**pray** 78:7

**praying** 24:14

**prefer** 170:15 234:10

**preferred** 83:1

**pregnancy** 108:2 110:5 122:9 123:23 125:11,18 137:24

**pregnant** 91:14,16 107:13,16,19, 22,24 108:7,10,15,18,21,24 109:11,14,19 115:14 123:23 134:1 135:22,24 138:6,7,10,14,18,21,22 139:6

**prepare** 19:22

**present** 75:18,19,21 104:6 222:9, 15,19 223:15

**pretend** 110:4 111:20 112:24 114:9 115:6

**pretended** 107:12

**pretending** 139:6 142:2,3

**prevent** 7:11

**prevented** 93:11 115:17

**previous** 60:20 63:24 119:7 167:14 191:21,24 213:11,15

**previously** 119:6 167:12 178:1 185:18 191:12,16 208:19 213:9

**pricing** 231:23

**prior** 66:3 137:8 192:1 198:7,14

**prison** 13:3 18:20 23:10,12,16 24:1 76:7 180:5,18 181:13 198:3 208:10 212:19

**private** 38:8 47:18 79:20 90:18

**problem** 15:22 16:3 21:8 197:20 232:9

**problems** 37:20,24 40:4,10 115:16 116:1 123:15,16,24

**proceed** 6:5

**proceedings** 35:10 61:5 95:7 101:19 139:19 170:23 183:14 188:20 224:17 230:4

**process** 170:1

**produced** 191:7

**profile** 66:24

**Progress** 174:24

**promised** 78:3,12 133:14

**prop** 175:6

**propose** 232:3

ADRIANA MEJIA, 02/05/2021

**prosecutor** 178:22

**prosecutor's** 180:12

**prosecutors** 180:3

**protect** 212:24 213:2

**prove** 203:7

**provided** 113:12

**pull** 231:6

**pulled** 113:15

**punishment** 199:18

**purpose** 102:13 127:10

**purposes** 136:13

**push** 220:8,9

**put** 16:11,15 32:24 72:13 94:1 99:15 101:4,11 103:1 109:21 124:19 136:4 137:8 218:18 221:18

**putting** 65:12 70:21 97:5 128:20

---

**Q**

**question** 14:24 15:20 19:7 20:16 26:16,17,19 27:5 28:2 31:1,6 34:9 35:15,17,21 36:1,4 37:13 39:24 41:6,9 42:4,18 46:18 48:3,9,18 54:20 55:21 56:11 61:21 67:13 71:5 84:5 88:10 90:14,20,22 119:13 129:18 135:11 136:2 139:24 165:20,24 166:5 167:2 168:19 169:9,17 170:9 173:4 174:9,10 178:14 179:1 182:22 187:9,14 189:1,20 210:13 218:16 222:12,24

**questioning** 7:19 34:15 46:2,4 88:1

**questions** 7:12,24 8:4 10:1 25:19 38:9,14,16 48:9 133:20 136:10,15 137:4,9,14,19 162:9,19 163:8,9 164:14 171:6 179:18,20,23 181:1 182:11 183:5,11 196:13,18,22 197:13,20 198:10 212:9 213:8,10, 22 214:2,9 219:18 221:24 222:1 223:2 225:10,21 226:9,21 227:15, 18 228:8,9,11

**quick** 34:17 183:9 214:8 224:11 229:17

**quickest** 158:9

**quickly** 34:23 155:2 158:2

**quiet** 90:18

---

**R**

**R-O-M-U-A-L-D-O** 56:5

**Raida** 14:8

**Raido** 14:6

**Ramiro** 53:4

**Ramon** 14:2,7

**Rarely** 167:5

**RC** 172:19

**re-ask** 222:13

**reaction** 153:9 164:24

**read** 26:17,21,22 35:15,17 69:17 139:24 173:2 175:3,4 179:2,4 192:13 193:8,16,17,23 196:5,6 198:16,19 199:1,5,10 200:18 201:15,16 206:9,10 229:6 230:10 231:16 234:10

**reading** 173:8 192:16,19 207:14 232:11

**Ready** 191:14

**real** 229:17

**realize** 108:9 210:22

**reask** 9:3 41:13 60:22 166:5 174:10 188:24

**reason** 12:7 15:17 115:21 136:12 170:6,9 195:6

**reasons** 102:12

**recall** 96:8,9 99:10 103:15 104:19 105:16 106:6,12,14 107:3 112:21 114:3,18 115:4,12,23 116:2 120:9, 16,21 121:23 122:20,24 124:22 125:5 126:13 130:18 131:4 132:14 134:7 140:18 142:22 144:6 145:15 146:8 148:5,24 151:6,22 153:1,7, 10 155:15 156:5,12,22 157:16 158:8,15 159:10 162:12,24 163:20 164:23 165:10 168:10,14 169:20 170:11 172:11 174:16 177:3,21,22 178:21 179:8,12 180:16,21 181:11, 22 186:15,19 187:24 189:19 190:5, 16,23 191:13,15 192:3 198:5,12 200:22 201:2,19 202:1,4 203:13,22 204:23 205:2,9,16,23 207:18,24 208:13,16 209:4,6,14 213:14 217:5,16 220:2,22 222:1,17,21,24 223:3

**receive** 101:24

---

**received** 127:9 218:4

**recent** 180:2

**recently** 28:10

**reception** 142:9

**recess** 35:10 61:5 95:7 139:19 170:23 183:14 188:20 224:17 230:4

**recognize** 146:6 156:18 167:18

**recollect** 43:14

**record** 6:2 26:22 35:8,13 61:4,8 95:6,10 101:16,18,21 105:6 120:8 137:3 139:18,22 166:2 170:21 171:2 174:23 179:4 182:21 183:13, 17 188:2,18,23 189:15 199:4 210:12 224:15,20,22 230:2

**recording** 191:9 234:15

**reduce** 20:21

**referring** 9:2 19:9 114:6

**refusing** 47:22 168:19

**regard** 174:9 233:21

**registered** 141:24

**regular** 116:17

**regularly** 14:19 15:10 71:12 74:13 97:16

**relate** 116:9

**related** 185:8

**relates** 119:8

**relations** 138:24

**relationship** 49:4 83:17 86:3 88:2

**released** 24:16 26:5 27:8,11,16 173:11 180:5,9,23 203:10 205:5 212:17,19

**relevance** 44:4 87:15

**relevant** 88:3 90:21

**religious** 78:10

**remain** 7:8

**remarried** 85:2

**remember** 9:13 11:11 12:2 15:15 16:14 17:24 18:14,18 20:6 23:3 25:22 28:7 38:3 44:2,6,7,14 45:18 53:3,5,17 54:5,12 55:5,14 56:2,6, 10,17,19,21 57:2,6,16,17 58:24 59:4 60:10,11,13,16 62:15 63:12 64:24 65:18,24 66:7,11,14,15

CCSAO COI SUBPOENAS 000456

ADRIANA MEJIA, 02/05/2021

67:11 68:3,8,11,17,22,23 69:15,16 71:17 73:8 74:11,19 76:6,18 77:8, 13,16 78:9,14,22 81:4,8,12,13,17 82:21,23 83:19,21 84:1,17 89:1,3, 15 92:23 93:6,14 94:4,21 96:3 105:19 106:1,17 112:15,18,20 113:4 114:17,23 119:2 121:12 124:3 130:19 132:10,11,15 134:16, 18 142:11 149:1 153:8 155:14,17 156:15 158:18 166:4,23 169:2,7,8 170:7 171:8 177:4,18 178:5 179:19,22 180:6,8 181:3,8,14 183:7 189:10 198:11 202:9 204:10 208:1 209:5,10 213:20 216:1,16 217:4 218:9,11,15,17 219:6,10 221:1,8

**remembered** 181:10

**remembering** 55:17,18 180:15

**rent** 88:14 96:6,9 97:17

**rented** 45:10,15

**renting** 47:8,19 48:1

**repeat** 19:1 20:16 26:18 30:21 37:12 41:6,9 42:4 44:11 46:16 50:5,16 54:18 63:3 71:5 90:8 129:16 131:2 154:2 167:2 202:8 210:13 218:16 222:12

**repeated** 15:1

**replace** 95:3

**report** 69:3,4,6 172:20,22 174:13, 24 175:1,5 176:4

**reporter** 26:21 35:14 58:13,14 105:4 113:13,15 131:2,3 137:16,17 165:18 198:16 229:8

**reporter's** 167:16 185:6 189:7 202:17 204:13

**reporting** 175:7

**reports** 216:20,21

**represent** 180:20

**representations** 38:13

**representing** 183:4

**reproductive** 116:1

**requested** 26:22 94:19 166:2 179:4

**require** 212:1

**reserve** 215:12,13 228:14,18,21 229:3,11

**reserved** 232:14

**reserving** 232:11

**residence** 204:9

**respect** 27:13 212:21

**responding** 118:11

**response** 92:11 124:2 181:15,17 208:18

**responsibility** 203:3 205:4

**responsible** 82:18

**rest** 6:9 27:19

**restaurant** 18:13 19:3 22:8,9,19, 22

**restroom** 214:14 224:13

**resulted** 210:9

**results** 118:23

**return** 96:18 111:10

**returned** 96:16 182:3 183:8

**reveal** 123:12

**revealed** 122:23 123:8

**review** 232:5,6

**Reyes** 66:4 69:2 73:10 74:21 76:5, 9,22 77:5,18,22 78:10 104:21 105:10 134:10 147:10 149:7 167:17 168:6 169:3,4 172:19 178:7,17 179:6,10 180:22 185:7 198:15 202:18 204:14 210:20 213:10 219:20,24 220:23 221:3 222:9 223:14,24

**Reyes's** 168:22

**RFC** 66:4 69:2 104:21 105:10 198:14 202:18 204:14

**RFD** 185:6

**rhetorical** 48:8

**rid** 124:21

**right-hand** 113:19

**rights** 187:5

**Robert** 54:3

**role** 211:15,16,18

**romantic** 83:17

**Romualdo** 56:4,13,18 57:13

**room** 34:19,21,24 61:1 62:14,15, 19 65:7,16 73:14,16,17 93:23

118:8 121:15 123:1 141:3,4,10 165:7,8,9 216:17 229:17 232:6

**Rosa** 32:10 49:2

**Rosalinda** 50:11 71:17 101:4 128:9

**Rosauro** 31:11,16,24 32:6,19 33:6 36:24 37:4 38:2,20 39:6 40:9,19 41:5,8,15,20 42:6,11,19,24 44:8,12 45:2,12 48:13 52:9 53:8,10 57:7 71:24 72:2,5,8,15,24 84:18,21 85:18,21,24 86:3,13,24 87:10,13, 17 88:2,12 90:1,10,24 91:12 92:22 93:18 95:14 96:11 97:7,15,17 98:3, 10 99:6,14,23 100:18,21 101:1 102:5,7,12,20 103:6,16,21 104:8 105:22 108:20 111:18 112:11 115:8 118:16 119:17 120:5 127:6, 8,15 130:6 131:21,24 137:24 138:7,13,17 140:20,22 141:1,18,20 143:24 145:10 163:1,4 171:11,20 225:22,24 226:3

**Rosauro's** 37:19 40:5,22 48:22 49:12 52:22 72:17 105:15 199:14

**Rosen** 9:6 15:19,21 19:5,13 20:14 21:12,24 25:10,21 26:12 29:11 30:24 32:21 33:12 36:5,9,16 37:2, 6,11,17,22 38:12,22 40:21 41:2,12, 23 42:12 43:4,17 44:4 47:15 48:5, 17 54:23 55:10,24 56:15,20 57:1, 10,15 58:18,23 60:9,21 63:17 66:6, 9 68:7,15,21 69:11,14,19,24 70:8, 12,19 74:15,18,22 81:7,11 84:3,6 87:15,24 88:7 91:9,17 93:20 97:19 98:7,12 100:9 105:1,7,23 106:4,11, 16 113:11 114:16 115:2 119:1,11, 14,19,23 120:3,7,11,14 127:11 134:17,22 135:2,10,12,17 136:1,3, 14 138:11,15 146:20,24 147:18 151:13,17 152:1 153:20,24 154:11, 23 155:8,22 157:8,15 158:6,12 159:9 160:14,18 162:22 163:6 164:5 165:16,22 168:9,13,24 169:6,15,18 170:10,18 172:10,15 173:1,22 174:5,15 175:17 176:6,21 178:4,8,18,24 179:5 180:14 181:21 182:1,17 184:16 185:14,17 186:1, 11,14,18 187:1,7,11,23 188:9 189:9 195:13 196:1 197:8 200:4,12 201:9 202:23 203:12,21 205:7,21 206:8 207:13 208:11,21 209:11 211:1,8 212:3,7 213:7 214:1,4,7 216:6 221:10 227:14,17 228:8 231:15,19 234:5

**Ruben** 183:19,20,21,22 184:3,7,9

ADRIANA MEJIA, 02/05/2021

**runs** 140:5

---

**S**

**sad** 122:6 123:15,18 199:21

**Salazar** 57:19,20,22,24 58:3,6,17, 20,22 59:6,9,13,15,22 60:8 62:2 68:14,20 69:6,7,22 132:14 163:13 168:23 173:14

**Salazar's** 59:3

**Sanchez** 14:3,6,8,10 71:21

**sat** 161:4,5

**satisfy** 230:11

**save** 97:18 99:16 100:12 128:21

**saved** 102:17 103:22 128:18

**saving** 130:6

**savings** 101:5,10

**scared** 29:18

**scenario** 175:7

**SCHATZLE** 231:4

**schedule** 20:6

**schizophrenia** 117:4

**school** 152:14,18 215:5 216:17

**screamed** 155:13

**screaming** 155:11,14

**screams** 155:10

**screen** 165:23 191:5

**search** 130:8

**searched** 69:5

**secret** 123:8,12

**secrets** 75:14,17 76:2

**section** 193:17 200:16 208:2

**security** 162:11

**select** 60:14

**selected** 131:18

**self-incrimination** 36:19 213:13

**sell** 50:21 104:11 132:17

**send** 23:8 96:11,24 97:4,11,12 99:19 104:1 105:3 129:1,4 203:18 230:21,22 231:5

**sending** 96:21 97:10,16 203:20

**sense** 97:3 147:15

**sentence** 24:11 176:9 179:11 195:16

**sentenced** 10:20

**sentences** 65:13

**separate** 99:14 127:15,21

**set** 183:10,11 232:4,5

**settled** 41:5

**sexual** 81:24 82:13 83:23 138:24

**sexually** 90:15,24 91:12

**share** 73:16 75:13,16 76:1 191:4

**shared** 73:17,18 90:4

**sharing** 232:10

**Shawn** 192:6,8,11

**she'd** 18:23 19:4

**sheet** 234:2

**sheriff** 35:2

**shift** 20:2,4

**shifts** 21:21

**shirt** 109:21 140:9

**shoes** 158:20 159:3 162:6,18

**short** 13:7,12 43:11 201:22

**shortly** 135:8

**show** 79:18,19 104:20 113:6 134:8 185:4,11 198:13

**showed** 59:23 60:1 68:4

**showing** 66:2 68:24 119:4 167:12 172:18 174:21 175:7 189:11 191:6

**shown** 59:20 60:4,11 64:3,22 65:1, 5 66:12 67:14,16,19 68:1,4,18 69:7

**shows** 113:19 114:22 185:12

**Si** 6:14

**siblings** 131:15

**sic** 167:16 185:5 189:7 202:17 203:15 204:12

**sick** 116:6,8

**side** 17:17 149:2 154:24 231:5

**sign** 84:19 205:13 234:1

**signature** 228:15 229:4 232:11

233:2 234:24

**signed** 84:20

**similar** 19:24

**simply** 210:23

**Sinai** 111:9 115:19 119:9

**SINGER** 34:8,14,18 35:1,5 82:2 170:16,20 174:10 188:15,17 228:17,23 229:15,21,24 230:9,16, 24 232:21 233:4,13,22 234:7,13

**single** 68:1

**sir** 14:13 19:1 21:6 50:16 54:18 63:3

**sister** 49:1

**sister-in-law** 32:10 73:22 101:4

**sit** 111:14 161:3

**sitting** 61:23 144:3 145:17 150:12 162:1,13

**situation** 98:3 100:7

**skipped** 212:2

**sleep** 90:6,10,12 165:6,11

**sleeping** 123:6

**slower** 31:19 127:13 206:23

**small** 40:7 45:16 62:14,15 93:24 111:12 130:4 139:6

**smaller** 32:11

**solache** 17:12 28:6,13 66:4 69:2 73:7 78:16,20 81:18 84:9,12,15 104:21 105:10,24 106:9 115:10 172:19 177:2,5,9,13,20,23 178:2,7, 17 179:6,10 180:23 185:7 198:15 202:18,20,21 203:19 204:14,21 205:18,24 207:12 209:3,15 210:2, 10,16 212:6,11 213:17 215:1 218:3,23 219:24 220:12,15,24 221:7,14 222:9,19 223:7,24

**Solache's** 215:14

**sold** 216:17

**solution** 122:15

**someone's** 66:23

**Soto** 8:17 9:20 35:24 105:18,20 106:3,7 114:1 121:11 122:19 143:17 147:16 148:16 149:6 154:4 155:1,6 160:8,20 185:20 186:21 204:9 211:6,12,18 222:10,15 225:13,16 226:1,4,13,16 227:1,4,

ADRIANA MEJIA, 02/05/2021

23 228:2

**Soto's** 160:11

**Sotos** 213:18 222:19

**sound** 54:6 113:3 156:6,8

**sounds** 87:2

**South** 113:2,8 114:12

**Spanish** 138:3 192:21 193:10 194:1 199:2,6 225:3

**speak** 19:10 28:11 53:22 70:22 71:10 76:13 78:20 85:5,12 121:1 182:5,14 204:2 206:17 207:4

**SPEAKER** 130:22 191:14,18

**speaking** 19:9 70:21 137:6,11 138:3 182:6

**specific** 175:6 181:8

**specifically** 142:11 148:5

**specifics** 183:7

**speed** 183:11

**spell** 14:12

**spend** 34:21 49:9 52:4,14 57:8 73:23 74:3,13,16 90:23 103:13 157:21

**spent** 44:17 52:8 88:15 103:8,11 162:17

**sperm** 94:1,3 119:18 120:6,13,19

**split** 231:20

**spoke** 27:14 48:24 49:1,3,7 50:7, 12,19 54:9 76:9 77:12 144:23

**stab** 154:3,14 175:9,21

**stabbed** 9:17,21 153:16,19 154:4, 5 155:1,19,20,24 156:3,8 157:2,11 175:13 176:12 218:21 219:21,22

**stabbing** 220:12,16,24 221:2

**stable** 33:18

**stamp** 174:23 189:13

**stamped** 66:4

**standing** 88:5,7 150:21

**STARR** 230:21

**start** 6:16,18 14:23 192:9 193:6 206:22 214:14

**started** 105:8 176:11

**Starting** 93:13 193:6,19,21

**starts** 198:17

**state's** 222:1,4,8,14,18 223:2

**stated** 173:10 175:19 185:18 225:1

**statement** 69:10 120:19 135:9 137:22

**statements** 137:8 210:9

**states** 10:16 33:9,21 34:5 36:8 38:2,4,11 39:4,6,9,14,17,18 40:2 41:1,4,7,8,10,15,16,20,22 42:2,5,8 43:3,21 51:6 53:20 69:4,6 85:21 86:4 116:22 134:19,20 173:10 175:5 217:8,10 218:4

**station** 59:20 62:3 66:13 76:10 171:24 172:1,12,24 174:17 177:5

**stay** 11:12,17 21:16 22:1,2,3,5 23:14 24:7 27:19 32:8 90:17 140:1, 22 165:4

**stayed** 20:12 21:10 22:4 23:11 43:11 141:24 144:1

**staying** 36:14,24 37:5

**step** 209:1

**steps** 138:20

**stereos** 72:13

**stones** 116:15

**stop** 8:1 44:24 61:16,17 82:7 85:24 136:21 192:22 194:2 219:24 220:3, 6,23

**stopped** 135:7

**stores** 88:20 140:5

**story** 30:18,22 32:22 35:23 210:22 211:5,14,17 212:1 222:6

**straddled** 175:21

**straight** 161:6 214:5

**strapping** 139:7

**street** 46:20 53:19 111:5,8 112:18 113:2,9 114:12 140:5 143:6,7

**streets** 110:14,20,23 111:2 113:5 115:4 144:17

**strike** 21:21 28:4 31:6 55:20 56:12 59:13 67:14 70:24 72:22 80:6 81:16 85:23 98:8 100:24 114:5 134:19 135:20 136:20 145:2,20 148:1 154:3 157:22 161:9 163:9 165:5 169:3 177:8 188:4 198:9 210:7 212:17

**stroke** 118:13

**strong** 7:21 24:7 78:6

**struck** 89:16 218:19 219:7

**stuff** 233:14

**subject** 16:9

**submit** 205:13

**suffered** 208:4

**sufficient** 233:8

**sugar** 8:12

**suggest** 20:22

**suggested** 195:10

**suggesting** 137:13,18

**suicide** 117:16 189:21 190:2,3

**supplementary** 69:3 172:20 174:24

**support** 50:14,18 51:4 75:10

**suppose** 231:21

**supposed** 48:8 68:13 119:17 132:17 147:12 187:10,11

**supposedly** 122:14

**surprised** 163:16

**surprising** 57:14

**Susler** 214:1,3 223:11 224:3,7

**suspicious** 134:4,6 138:6,9,14 164:16

**SWAMINATHAN** 6:6,8,11,18 7:3 9:3 10:8 14:22 16:4 19:12,14 20:15,17 21:4,8,9 22:22 25:11 26:15,20 27:4 34:11,16,20 35:14 38:17 41:13 42:1,13 46:1,5,17 48:7 50:6 51:14 54:19 58:8,11,14 60:22 61:2,9,12,16,19 63:10 64:1,19 65:14 70:1 79:16 82:5,7,11 83:10 88:5,9 90:9 91:10,19 94:22 95:11, 13,17 97:20 98:8,13 100:10 101:17,22 104:20 105:3,9,11 106:13 113:6,14,17 119:15 121:4 129:9,17 130:24 136:9 137:2,20,21 139:16,23 146:21 147:21 155:9 158:7 162:23 165:24 166:3,5 168:16 169:22 170:5,19 171:3 173:7 178:10,12 179:2,6,13,17 180:1 182:20 183:9,18 187:8,13 188:16,24 192:4,11,17,22,24 193:5,11,12,16,21 194:2,3 196:5 198:20 199:1,7,10,14,19 205:8

CCSAO COI SUBPOENAS 000459

ADRIANA MEJIA, 02/05/2021

206:11,22 207:17 208:12,24 209:13 211:3,9 213:8,21 217:21 221:9 223:10,17,20 224:2,6 228:12 229:18,23 232:1,19,22 233:17,24

**sweet** 61:14

**sworn** 6:17,19,20,21,23 95:20,21

---

**T**

---

**table** 154:16

**tables** 20:1

**tacos** 19:22

**tad** 230:14

**takes** 233:19

**taking** 63:13 80:1 118:20

**talk** 11:19 13:15 30:5,11 34:3,16, 17,18 35:6 49:23 51:20 55:8 72:4,7 75:4,5 76:4 79:7 133:5,11 144:21 162:11 167:4,7 178:22 180:12 182:24 183:2 196:10 197:2,6 198:1 229:15 231:21

**talked** 52:19 57:18 70:23 71:1 83:22 107:11 142:8 143:10,16 153:14,15 171:9 172:13 202:21 214:24 215:4 223:1

**talking** 83:19 84:1 111:19 159:17 193:13 223:1 234:2

**tanda** 101:23 102:1,8,11,24 103:3, 7,10 126:22,23 127:3,9,15,18,23 128:2,4,10,15,21,24 129:7 130:11, 13,17 131:5,7,9

**tandas** 131:10,13,15

**teachers** 216:20,21

**technical** 136:8 137:15

**telephone** 11:20 30:6 88:15

**telling** 59:1 77:14 81:14 133:18 138:7 149:3 176:22 187:8 190:18, 19 204:4

**ten** 15:16 65:2 151:20,23

**terrible** 215:7,8

**test** 108:2 120:6

**testified** 6:24 178:1 179:9 189:2 190:1 198:6 208:19,22 219:20 221:23

**testify** 178:6,9,16,20

**testifying** 221:6

**testimony** 40:22 56:1 60:20 63:24 106:2,5 127:2 129:6 136:20 137:8 140:8 146:10,13,17 149:18 151:15 157:5 162:17,21 165:17 175:22 178:2 182:18 186:24 187:2 190:12 212:20 214:23 221:11

**testing** 93:10,16,18 94:9,12,20 118:22,24

**Texas** 11:24 47:6 50:12 71:9

**thing** 8:15 144:7 181:11 195:12 228:13 232:11 234:3

**things** 10:2 60:3 65:18,24 79:21 81:14,21,22,23 82:13,16,22 83:5,8, 21 84:11 85:1 86:13 87:20 88:12 91:21 98:15,18 100:2,4,5,14 101:3 142:13 166:20 174:20 176:15,23 181:8 203:6,8 204:5

**thought** 26:6 94:15 146:14 147:3, 11 182:20 191:18 201:10 221:6 231:4,14

**thoughts** 230:18

**threatened** 29:15 77:22

**threw** 154:24 194:15

**throw** 221:19

**time** 8:8 10:17,24 11:13,22 13:7,13 15:13 17:2 18:3 20:7 22:7 27:1 28:8,12,18 31:4,8,19 32:13 34:21 37:9,15 39:20 41:24 43:11 44:17 45:17 46:13 48:9 49:9,17 51:2,22 52:4,5,8,14 57:8 59:1 73:9,23 74:3, 13,16 76:18 80:14,20 85:16 87:21 89:10,16 90:23 91:1,3,7,18,23 92:24 94:5 96:4,14,16 97:11 98:6 99:7 102:7,9,15,17 104:13 107:15, 18 117:23 120:21 121:15,21 122:11,13,17 123:3,19 130:16 132:6,12 140:14,17,24 142:20 143:1 144:2,16 145:14,21,23 146:1,3 149:23 152:2 156:5,12,13 157:1,10,21 161:14 162:14 163:12 171:20 181:5,23 185:2 187:15 194:11 198:12 201:22 207:8 213:7 216:13,14 219:3,13,14 220:18 222:6 224:12 231:10 232:2 233:17 234:6

**times** 11:8 13:5,7 20:8,9 21:14 30:9 73:6 121:24 122:2,3,5,7 123:19 135:7,13 152:16 155:13 168:17 172:14 209:16 216:15

**tired** 8:11 118:12 179:14,15,19,21

194:10

**today** 7:13,16 20:23 35:22 61:23 175:24 190:18 210:1,23 214:24 215:4 225:11

**told** 12:12,14 17:24 18:20,22 19:2, 18 24:2,7,10,13 25:23 26:4 27:15 28:18 29:5,7,13 30:1,13,16,18,22 35:23 57:21 58:2,6,16 59:12,14,17 77:10 78:7,9 80:14,21 81:10,22,23 82:12,16,17,22,24 83:7 95:2 115:13 121:6 122:12,17 123:20,22 124:8,10,13,19,22 125:10,11,15, 17,20,23 126:2,4,10 131:21 133:8 141:23 145:23 147:1,8,9 148:5,6 149:10,11 153:18 157:10 169:23 174:19 175:24 176:14 179:9 180:22 181:16 182:5,12 183:1 194:7,12,14,23 195:5 196:21 200:19 208:9 209:16,19 210:23 211:5,14,17 212:1 222:22 223:8, 15,24

**top** 168:5

**topics** 84:1 95:12

**Torres** 23:7

**totally** 55:18

**touch** 11:17 23:11,14

**town** 10:4 28:11,19 31:10,14 40:3, 5,7 44:21 45:18 47:2,3 52:22,23,24 183:23 217:3,6,7,17

**transcript** 192:12 230:12,23 232:12 233:2 234:9,16,20

**transcription** 191:9

**translate** 21:2 65:15 119:12 169:16 173:5 196:7 199:6

**translated** 15:20 84:5 119:13 135:11 136:2 169:17

**translation** 207:15

**translations** 230:15

**translator** 6:15 9:1 10:6 14:12,14, 20 15:1,23 18:24 19:6 21:2 22:20 26:23 30:20 31:17 35:3 36:20 41:17 44:10 46:15 50:3,15 51:11 54:17 58:9 63:2,8 64:16 65:9 67:5 71:3 74:1 79:13 88:22 90:7 95:1 173:5,7 224:23

**Trevino** 175:2,8

**trial** 136:12,20

**trials** 178:6,9,16,20,23

ADRIANA MEJIA, 02/05/2021

**trips** 112:6

**trouble** 17:20 65:12 216:22

**true** 69:10 70:17 134:21 135:9,16 136:7 139:9 173:19 178:3 195:23 222:23 223:19 224:5

**trust** 86:5 229:8

**trusting** 135:5

**truth** 6:23 11:11 12:2 17:22,24 18:8 25:22 29:20 30:13 53:7,17 55:5 56:9,16 57:3 60:10,13 61:22 65:24 66:15 68:8 77:16 78:11 81:8, 13 84:17,24 86:1 87:8 92:23 93:6, 14 123:22 190:17

**truthful** 7:12 222:4

**truthfully** 7:21

**turn** 50:9,14 51:3 102:2,4

**turned** 27:1 50:17

**Turundeo** 10:7,8,9

**tuve** 16:1

**tuvo** 16:1

**two-month** 194:24

**type** 18:13 218:4

**typed** 229:5,8

**U**

**uh-huh** 36:22 105:14 138:2

**uncles** 137:23 138:5

**understand** 6:11 7:4,12,24 48:18 64:18 67:15 70:15 83:10 138:4 150:14 153:13,16 168:18 191:20 198:22 199:9 233:4

**understanding** 21:15 68:13,19 127:19

**understands** 229:1

**understood** 70:23 75:20 146:2

**unexpectedly** 181:24

**unhappy** 86:10

**UNIDENTIFIED** 130:22 191:14,18

**Unintelligible** 83:8

**unit** 6:2 35:9,13 61:4,8 95:6,10 139:18,22 183:13,17

**United** 10:15 33:9,21 34:4 36:8

38:2,4,11 39:3,6,9,14,17,18 40:2 41:1,4,7,8,10,15,16,20,22 42:2,5,8 43:3,21 51:6 53:19 85:20 86:4 116:22 217:8,10 218:4

**university** 111:11,12 112:16 113:8,19 114:6,13,20

**upset** 103:18 182:9,24

**usual** 20:2

**V**

**Vaca** 52:19 53:2,4,6 73:8

**Vague** 147:22

**van** 106:21 107:1

**version** 134:10 147:14

**victim** 175:9,13,20 176:11,17

**video** 6:2,3 35:8,12 61:3,7 95:5,9 101:20 139:17,21 171:2 183:12,16 188:22 224:19 230:21,22 231:3,5,8 232:3,7,10,12,23 233:8 234:14,15

**viewed** 62:7,13 63:14,22

**viewing** 62:3,18 68:12

**violate** 170:12,14 187:12

**violent** 215:17,19,21,22

**virus** 233:10,15

**visa** 13:11

**visit** 10:16 11:5,8 13:5,24 14:19 24:1 25:13 27:6 85:9,15 181:4

**visited** 10:19 13:3 15:13 23:16 24:3 25:7,24 27:15

**visiting** 15:17 141:6

**visits** 13:22 14:18 23:18,21

**voice** 19:11

**volume** 36:21

**W**

**waist** 139:7

**wait** 94:17,18 110:13 111:22 112:1 141:1,4,7

**waited** 149:19

**waiting** 9:9 94:16 110:13 111:15, 23 141:3,4,10,21 144:1 145:8,17 161:24 162:13 173:12 201:23

233:22,24

**waive** 228:14,21 229:3,7,11 233:2 234:13

**waived** 232:16 234:17,24

**waiving** 232:24 234:8

**wake** 152:24 155:6

**walk** 110:14,16,19,22 144:17 162:14 181:6

**walked** 162:16

**walking** 88:20 110:21 141:16 144:2,3

**wanted** 22:24 33:22 68:5,9 91:22 92:15 135:15 142:12 182:5 183:2 197:5 200:6 203:20 204:24 205:18 206:17 207:4 220:7

**wanting** 83:16

**warning** 136:18

**washed** 221:18

**washing** 221:22

**Washington** 23:6

**watch** 49:22 51:20 71:22 134:24 184:21,24 230:22 231:7

**watched** 71:14 185:1,2,3

**watching** 58:20 221:21 232:12

**wear** 109:15

**wearing** 109:17

**week** 30:10 52:1 85:6 96:1 99:12 135:7,13

**weekend** 50:1 52:9

**weekends** 52:3,4,15

**weeks** 13:6,8 122:21 133:15 146:18 160:12

**Western** 45:6,13,21 46:8

**whatsoever** 211:15

**white** 67:4

**wife** 49:15 51:9 71:21 86:17 219:21 220:1

**windows** 216:18

**withdraw** 98:9

**witness's** 162:21

**witnesses** 42:16

CCSAO COI SUBPOENAS 000461

ADRIANA MEJIA, 02/05/2021

**woke** 152:22 153:1,2

**woman** 13:22 19:10 23:19,24 50:8 54:11 57:19 63:6,12 66:12 68:2 69:6,8,22 70:4 92:18 217:15 220:12,16,18,24

**women** 59:23,24 87:14

**won** 102:7 127:14,15 131:5

**Wood** 113:2,8 114:12

**word** 64:17 75:22 79:14 167:2 199:13 210:15

**words** 13:10 82:24 124:3 153:7 233:3

**work** 10:12 18:12 20:3 21:15,21,22 32:12 33:16 43:16,20,24 44:3,5 50:20 53:2 74:6,10,12 121:24 145:24 146:2 171:21,22 212:2,6 231:12,18,23,24 232:10,18

**worked** 10:14 17:3 18:13 74:8 96:5

**working** 18:11 95:14,23 96:4 192:7

**works** 10:13 230:18

**worried** 133:3

**worry** 125:20 126:4 133:8,13 151:3 194:9,21

**worth** 92:18 230:15

**wrist** 190:6,8

**write** 81:2 135:15 203:16

**writing** 167:20 202:20 209:5

**written** 70:6,16 77:3 81:6 168:22 176:1 190:4,10,17 202:5 210:2 234:4,9,16,19

**wrong** 41:14 121:22 122:4 132:1

**wrote** 70:10,17 81:9,12,14 84:16 171:5 174:3,13,20 175:16 176:4,19 190:13,24 198:3,6,10 199:20 201:17,21,24 202:2,11,19,24 203:5,6,9,16 204:4,12,15,16,21 205:10 206:4,7 207:7,12,19 208:3, 14,16 209:3,15

**wuss** 86:16

---

**Y**

---

**Y-A-D-I-R-A** 14:11

**Y-A-R-I-D-A-N** 14:14

**Yarina** 14:3,10,16

**year** 10:18 11:6 12:2 44:14 97:3 117:1 120:9 217:4

**years** 15:16 16:13 23:15,23 44:6 68:16 81:13 93:4,7,8,15 94:4,7 106:6 116:11,23 179:22,24 180:2 184:11 202:4,8 210:10

**yesterday** 6:13 7:5,8,15 8:16 20:18 28:3,5 45:24 52:19 57:18 58:5 70:23 71:1 107:11 117:15 153:18 154:1 157:10 161:10 171:9 174:19 210:1,23 214:24

**yesterday's** 21:5

**young** 13:21 215:17

**younger** 32:11 215:16

| | |
|---|---|
| **From:** | Valerie Barajas |
| **To:** | CHRISTA BOWDEN (States Attorney); Rachel Brady; Sophia Atcherson (Judiciary); CrimDiv crt205 (Circuit Court) |
| **Subject:** | People v. Reyes, 98 CR 1244002-Petitioner"s Reply and Exhibits |
| **Date:** | Friday, April 8, 2022 9:31:53 AM |
| **Attachments:** | COI SJ Reply and Exhibits-FINAL-FILE STAMPED.pdf |

---

## External Message Disclaimer

This message originated from an external source. Please use proper judgment and caution when opening attachments, clicking links, or responding to this email.

Dear Judge Atcherson,

Attached, please find Petitioner's Reply in Support of Motion for Summary Judgment.

Sincerely,

--
**Valerie Barajas**
Paralegal
Loevy & Loevy
311 N. Aberdeen, 3rd Fl
Chicago, IL 60607
(312) 243-5900
valerie@loevy.com

CCSAO COI SUBPOENAS 000463

FILED
4/7/2022 9:01 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
98CR1244002
Martin, LeRoy K, Jr.
17418521

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, CRIMINAL DIVISION**

| | | |
|---|---|---|
| **ARTURO De LEON-REYES,** | ) | |
| | ) | |
| *Petitioner,* | ) | |
| v. | ) | **No. 98 CR 12440-02** |
| | ) | |
| **STATE OF ILLINOIS** | ) | |
| | ) | |
| *Respondent.* | ) | |

**PETITIONER'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT ON PETITION FOR CERTIFICATE OF INNOCENCE PURSUANT TO 735 ILCS 5/2-702**

Petitioner, Arturo De Leon-Reyes, through counsel, hereby replies in support of his Motion for Summary Judgment, as follows:

**INTRODUCTION**

In his opening brief, Mr. Reyes established that he is entitled to a certificate of innocence as a matter of law. Mr. Reyes presented ample evidence of innocence, including DNA showing he was not at the crime scene, his repeated and consistent testimony to his innocence, evidence that disgraced Detective Reynaldo Guevara coerced false inculpatory statements out of Mr. Reyes and his co-defendant, and a host of other testimony establishing innocence. The State's evidence in Response, on the other hand, even when construed in the State's favor, cannot overcome this evidence of innocence. In other words, there is no version of these facts in which Mr. Reyes does not meet his burden.

Keeping in mind the goal of the COI statute is to make it easier for petitioners to seek certificates of innocence and not impose additional burdens, and that this Court must interpret the statute in the petitioner's favor, 735 ILCS 5/2-701 *et seq.* & 735 ILCS 5/2-702 (including

1

CCSAO COI SUBPOENAS 000464

FILED DATE: 4/7/2022 9:01 PM   98CR1244002

COI statute in "Action For Declaratory Judgment"); *Illinois Gamefowl Breeders Ass'n v. Block*, 75 Ill. 2d 443, 452 (1979 ("The declaratory judgment remedy should be liberally applied and not restricted by unduly technical interpretations.")), this Court must grant Mr. Reyes a certificate of innocence ("COI").

### ARGUMENT

The State makes several critical concessions in its Response:

- Mr. Reyes has satisfied his burden under 735 ILCS 5/2-702(g)(1), (g)(2)(A), and (g)(4). The only element in dispute is whether Mr. Reyes has shown innocence by a preponderance of the evidence, as a matter of law. *Id.* at 5/2-702(g)(3).

- Mr. Reyes and Mr. Solache's statements, obtained based on physical and psychological abuse by Detective Guevara, are not admissible in these proceedings and cannot be considered.

- Ms. Mejia's original statement is also not admissible, for the same reasons.

- Detective Guevara has a pattern of engaging in gross misconduct during homicide investigations, including coercing false confessions from innocent people.

- Mr. Reyes's DNA was not found anywhere at the crime scene, but the crime scene contains DNA from Adriana Mejia and an unknown accomplice.

- Mr. Reyes has repeatedly and at every opportunity testified to his innocence.

- Mr. Reyes was not convicted as a principal.

- There is no evidence that Mr. Reyes committed murder or kidnapping as a principal.

The only remaining disputes are:

- Whether evidence that Guevara has a history of misconduct that includes coercing false confessions from innocent people is admissible;

- Whether inclusion of the word "they" in the indictment means Mr. Reyes was charged as an accomplice despite a lack of any statutory "accountability" language; and

- Whether the following evidence, when construed in the State's favor, could ever rebut the testimonial and DNA evidence showing Mr. Reyes's innocence, given that at most it establishes mere presence at the crime scene:

  o Mr. Reyes had a note in his pocket and a calendar entry listing the name of the woman whom Adriana Mejia told everyone she was babysitting for;

  o Adriana Mejia testified that she was told by Solache in Mr. Reyes's presence that Mr. Reyes was going to "help"; and that Mr. Reyes waited in the car while Mejia and Solache killed Mr. Soto, and then entered the home.

2

CCSAO COI SUBPOENAS 000465

FILED DATE: 4/7/2022 9:01 PM 98CR1244002

### I. MR. REYES WAS CHARGED AS A PRINCIPAL, AND THE STATE DOES NOT ARGUE THAT MR. REYES HAS NOT SHOWN INNOCENCE OF PRINCIPAL CRIMES.

*People v. Palmer* holds that a COI petitioner must prove innocence of the specific factual theory of the offense charged in the indictment. 2021 IL 125621, ¶72 ("we hold that subsection (g)(3) requires a petitioner to prove by a preponderance of the evidence his or her innocence of the offense *as it was charged in the indictment or information* that resulted in the wrongful criminal conviction") (emphasis added). *Palmer* also holds that if the State acknowledges there is no evidence that the petitioner is not innocent of those crimes, then the petitioner is entitled to a certificate of innocence as a matter of law. *Id.* ¶73 ("The State does not contest petitioner's substantive argument that the new forensic DNA evidence demonstrates that petitioner did not repeatedly strike the victim on the head, as petitioner was originally charged and convicted. Thus, the State implicitly concedes that…petitioner has satisfied" subsection (g)(3)).

The Court's holding in *Palmer* is binding on the facts here. The language in Mr. Reyes's indictment clearly charges him only with principal crimes. And critically, the State does *not* argue that Mr. Reyes has failed to show innocence of principal crimes of which he was charged and convicted. In other words, the State cites no evidence that Mr. Reyes murdered the Soto parents or kidnapped the children. Therefore, this Court must grant Mr. Reyes a certificate of innocence as a matter of law, based on *Palmer*.

The State's only argument is that Mr. Reyes was also charged under an accountability theory, and that he has not shown innocence of accountability. This argument is flawed for several reasons. First, the indictment does not include any language suggesting an accountability charge, and thus *Palmer* bars the State from challenging Mr. Reyes's certificate of innocence by arguing there is evidence to support an accountability theory. Second, even if the indictment did

CCSAO COI SUBPOENAS 000466

state an accountability theory—which it did not—the State has presented no evidence of Mr. Reyes's guilt under an accountability theory, and thus failed to create a material dispute of fact on that theory, as well. Accordingly, Mr. Reyes is still entitled to a COI as a matter of law.

### a. Mr. Reyes Was Charged as a Principal

Looking at the specific language in the indictment, as *Palmer* directs, 2021 IL 125621, ¶ 72, Mr. Reyes was charged only as a principal. For instance, to prove first-degree murder, the State must have shown that the defendant killed an individual without lawful justification, and "in performing the acts which cause the death":

(1) he either intends to kill or do great bodily harm to that individual or another, or knows that such acts will cause death to that individual or another; or

(2) he knows that such acts create a strong probability of death or great bodily harm to that individual or another; or

(3) he is attempting or committing a forcible felony other than second degree murder.

720 ILCS 5/9-1(a); *see* Ill. Pattern Jury Inst. 7.01.

To have proven home invasion in 1998, the State must have shown that the Defendant, as relevant here:

(1) A person who is not a peace officer acting in the line of duty commits home invasion when without authority he or she knowingly enters the dwelling place of another when he or she knows or has reason to know that one or more persons is present or he or she knowingly enters the dwelling place of another and remains in such dwelling place until he or she knows or has reason to know that one or more persons is present; and

(2) While armed with a dangerous weapon uses force or threatens the imminent use of force upon any person or persons within such dwelling place whether or not injury occurs….

720 ILCS 5/12-11(A)(1).

4

CCSAO COI SUBPOENAS 000467

To have proven kidnaping in 1998, the State must have shown, as relevant here, that the Defendant knowingly:

(1) and secretly confine[d] another against his or her will;

(2) by force or threat of imminent force carries another from one place to another with intent secretly to confine that other person against his or her will; or

(3) by deceit or enticement induces another to go from one place to another with intent secretly to confine that other person against his or her will; and

(4) takes as his or her victim a child under the age of 13 years, or a person with a severe or profound intellectual disability.

720 ILCS 5/10-1, 5/10-2(a)(2).

This is the exact language of principal liability that appears in each count of the indictment. Ex. 2 (Counts 1, 3, 17, 23, 25).[1]

An accountability indictment, on the other hand, would have required completely different language. At the time of Mr. Reyes's criminal trial, a person would be legally accountable for the conduct of another if:

(a) having a mental state described by the statute defining the offense, he causes another to perform the conduct, and the other person in fact or by reason of legal incapacity lacks such a mental state;

(b) the statute defining the offense makes him so accountable; or

(c) either before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid such other person in the planning or commission of the offense.

---

[1] Count 1: "intentionally or knowingly stabbed and killed Jacinta Soto with a knife"
Count 3: "intentionally or knowingly stabbed and killed Mariano Soto with a knife"
Count 17: "knowingly entered the dwelling place of Mariano Soto…while armed with a dangerous weapon, to wit: a knife, used force upon Mariano Soto"
Count 19: "knowingly entered the dwelling place of Jacinta Soto…and intentionally injured Jacinto Soto…to wit: stabbed Jacinto Soto with a knife"
Count 25: "knowingly and secretly confined Maria Soto…against her will"

5

CCSAO COI SUBPOENAS 000468

FILED DATE: 4/7/2022 9:01 PM   98CR1244002

720 ILCS 5/5-2 (1991); Ill. Pattern Jury Inst. 5.03; *People v. Ceasar*, 231 Ill. App. 3d 54, 56 (1992) (to prove guilt by accountability, prosecution must establish "that the defendant elicited, aided, abetted, agreed, or attempted to aid another person in planning or commission of offense").

The indictment does not so much as hint that Mr. Reyes caused someone else to commit the crime, or solicited, aided, or abetted a commission of the crime. The State argues, incorrectly, that Mr. Reyes was charged as an accomplice because he was charged in the same indictment with two co-defendants, and the indictment uses the word "they." Absent any language suggesting accountability, though, this does not mean he was charged with accountability; it means the three defendants were each charged as principals.

Indeed, the word "they" in the indictment does not provide Mr. Reyes with any notice that he needed to prepare a defense to an accountability charge. As the Illinois Supreme Court explained in *People v. Smith*, an indictment must include not only a statement of the offense and its elements, but also "allegations of the essential facts to enable the accused to prepare a defense which, if successful, would bar further prosecution for the same offense." 99 Ill.2d 467, 470-71 (1984); *see also People v. Lutz*, 73 Ill. 2d 204, 211-13 (1978) (charging instrument insufficient when it did not allege facts specifying any alternative methods of committing the offense); *People v. Trumbley*, 252 Ill. 29, 31 (1911) ("It is a fundamental rule of criminal pleading that an indictment must allege all of the facts necessary to constitute the crime with which the defendant is charged, and an indictment which does not set forth such facts with sufficient certainty will not support a conviction."); 725 ILCS 5/111-3 (requiring a charge to allege "the nature and elements of the offense as definitely as can be done").

6

CCSAO COI SUBPOENAS 000469

To the State's argument that the jury was instructed on accountability and the State's closing arguments referred to accountability: it does not matter. *Palmer* clearly instructs the Court to look at the specific language in the indictment, not the jury instructions or closing arguments. *Palmer*, 2021 IL 125621 at ¶72. And even if this Court were to consider the theories at trial, the State's closing argument supports Mr. Reyes's argument that he was charged and convicted as a principal.

To be clear, the State's theory at trial was that Mr. Reyes planned the killing with Mejia and Mr. Solache, entered the Soto home and immediately stabbed Mrs. Soto, entered the bedroom, and grabbed both of the children. And to put a finer point on it, the State's theory was specifically that:

- Mr. Reyes spoke to Adriana Mejia and agreed to help her steal a baby for $600.
- Mr. Reyes pre-planned the crime with Solache and Adriana Mejia.
- Mr. Reyes rushed into the Soto home, pulled a knife, and immediately stabbed Mrs. Soto.
- Mr. Reyes went into the bedroom and grabbed the baby and the boy and carried them out to their getaway car.

*E.g.,* State's Ex. 3, at 9611. In other words, the State unequivocally charged and convicted Mr. Reyes for acting as a principal in the murder and kidnapping.

What the State is doing now is attempting to infuse the indictment, and the trial, with an accountability theory that simply was not there. But comparing the theory in the indictment and the trial with the only theory available on the currently admissible evidence is revealing. Because the State concedes that the inculpatory statements of Mr. Reyes, Mr. Solache and Adriana Mejia are inadmissible—Judge Obbish granted a motion to suppress them given the evidence that Detective Guevara obtained them through the use of physical abuse—the only evidence available to it now is the current testimony of Adriana Mejia. That testimony does not support an accountability theory. Her testimony is as follows:

7

CCSAO COI SUBPOENAS 000470

- She and Mr. Reyes barely knew each other, and she'd had almost no interaction with him. Ex. 20 at 74-75.

- She had no conversations with Mr. Reyes about a murder or a kidnapping, at any point, ever. Ex. 17 (Mejia Feb. 4, 2021, Dep.) at 20, 96; Ex. 20 (Mejia Feb. 5, 2021 Dep.) at 148-49.

- She was surprised Mr. Reyes was even in the car when she was picked up by Solache to get the baby. Ex. 17 at 27.

- She and Mr. Solache went to the Soto home and entered, while Reyes came later, after Mr. Soto had been killed. Ex. 17 at 112; Ex. 20 at 8-9, 151-52, 156-57, 219.

- She took the baby girl from the apartment. Ex. 17 at 33, 99-100.

- She does not remember who took the boy from the apartment. Ex. 17 at 33.

- Mr. Reyes tried to stop Mr. Solache from stabbing Mrs. Soto. Ex. 20 at 219-20.

This is the only arguably admissible evidence to which the State cites.[2] To suggest that this evidence supports Mr. Reyes's guilt—as a principal or on an accountability theory—is fanciful. But more relevant to the issue at hand, it is a theory of guilt that constitutes a complete rewriting of the indictment (and the theory at trial). *Palmer* clearly prohibits such an approach.

### b. The State Acknowledges There is No Evidence that Mr. Reyes Committed any Crime as Principal

To its credit, the State does not argue that there is any admissible evidence that Mr. Reyes is guilty of committing any crime as a principal, nor could it for the reasons discussed above. Given that Mr. Reyes was charged only as a principal, *Palmer* establishes that Mr. Reyes is entitled to a certificate of innocence as a matter of law.

### II. MR. REYES PRESENTS AMPLE EVIDENCE OF INNOCENCE THAT IS UNREBUTTED AND THUS SUFFICIENT AS A MATTER OF LAW

Even if this Court concludes that Mr. Reyes was charged as an accomplice, Mr. Reyes has firmly established that he is innocent as a matter of law.

---

[2] The State's only other evidence is the note in Mr. Reyes's pocket referencing a Norma Salazar. As discussed below, that reference is not inculpatory in the slightest.

8

CCSAO COI SUBPOENAS 000471

FILED DATE: 4/7/2022 9:01 PM 98CR1244002

### a. Testimony Supporting Innocence

The State agrees that Mr. Reyes has testified at every available opportunity that he is innocent. He testified about his own innocence in his suppression hearing in March 2000, his criminal trial in June 2000, and his evidentiary hearing in 2013. Evidence that a defendant has maintained his innocence since his arrest, by itself, is sufficient to state a claim of actual innocence. *People v. Lofton*, 2011 IL App (1st) 100118, ¶¶ 36-37. These statements of innocence are corroborated by testimony from Mr. Reyes's co-worker, Salvador Olivares, establishing that it would have been almost impossible for Mr. Reyes to have committed these crimes. Ex. 14 (Trial Tr.) at 1903, 2033-34, 2121, 2125-26; 2419-25; *see also* Ex. 10 (Timesheets) (showing Mr. Reyes's long workdays the day of the crime and the day before, without any unusual behavior whatsoever). This Court must consider this evidence of innocence. *See People v. Caine*, Case No. 86 CR 6091 (Order, March 27, 2012); *see also People v. Fields*, 2011 IL App (1st) 100169, ¶ 19 (2011).

### b. DNA Shows Mr. Reyes Is Innocent and Corroborates His Testimony

The State acknowledges that Mr. Reyes has been excluded as a contributor to all DNA from the crime scene but argues that it does not support Mr. Reyes's claim of innocence. As an initial matter, of course the fact that Mr. Reyes's DNA was not found on any one of numerous items of evidence in a violent, DNA-rich crime scene is evidence of innocence. DNA evidence is the most powerful, objective evidence of innocence possible. *People v. Rozo*, 2012 IL App (2d) 100308, ¶ 19 (DNA evidence found under victim's fingers could "significantly advance defendant's claim of actual innocence"). The State argues the fact that Mr. Reyes's DNA was not at the crime scene is not definitive proof of his innocence. But that does not negate the fact that it is additional evidence of innocence worthy of some weight. All the more so, given that the State

9

admits that the DNA of Adriana Mejia was found at the crime scene, the one person who everyone agrees committed the crime. The State's argument does not rebut Mr. Reyes's evidence of innocence, nor does it constitute affirmative evidence of guilt that would warrant denying Petitioner's motion for summary judgment.

Next, among the items tested was a green towel containing blood stains found in the perpetrator's getaway car. That towel contained the DNA of Adriana Mejia, as well as an additional unknown person (excluding Reyes, Solache, and the victims). Ex. 21 (Reyes_Jenner 9572; Ex. 13 (Report of Dr. Reich) at 4. The State acknowledges such evidence, yet claims it is not evidence of innocence. That argument borders on frivolous. Evidence that a defendant's DNA was not found at a crime scene and/or evidence that someone else's DNA was found at a crime scene has been the basis of 246 murder exonerations nationwide since 1987, including 42 in Illinois alone. *See* National Registry of Exonerations, Browse by Cases, Sort by: State (Illinois)/Crime/DNA[3]. DNA evidence has also been the basis of dozens of certificates of innocence. *See* Petitioner's Motion, at 11-12. Evidence of an alternative perpetrator is also powerful evidence of innocence. *People v. Robinson*, 2020 IL 123849, ¶80 (evidence of another likely perpetrator "is of such a conclusive character as to probably change the outcome at a retrial.").

Put simply, the DNA evidence in this case is powerfully corroborative of Mr. Reyes's own testimony about his innocence.

---

[3] http://www.law.umich.edu/special/exoneration/Pages/detaillist.aspx (last accessed April 6, 2022).

10

CCSAO COI SUBPOENAS 000473

FILED DATE: 4/7/2022 9:01 PM   98CR1244002

### c. Guevara Coerces False Confessions from Multiple People

In addition, Mr. Reyes has presented evidence that the false confessions Guevara coerced in this case are consistent with his pattern of coercing false confessions from other innocent people in other cases. The State does not dispute this evidence, but asserts, without argument, that evidence is not admissible. This undeveloped argument is waived. *Sakellariadis v. Campbell*, 391 Ill. App. 3d 795, 804 (2009) ("failure to assert a well-reasoned argument supported by legal authority [in appellate brief] is a violation of Supreme Court Rule 341(h)(7)..., resulting in waiver.")

In any event, case law clearly establishes that this evidence is admissible. Courts routinely consider pattern and practice evidence in addressing claims of innocence. "Illinois courts have consistently held that a 'pervasive pattern of criminal conduct by police officers'" is not only relevant but "enough," on its own, to permit a court to reach a finding of actual innocence. *People v. Tyler,* 2015 IL App (1st) 123470, ¶189 (quoting *People v. Mitchell,* 2012 IL App (1st) 100907, ¶63, and citing *People v. Patterson,* 192 Ill.2d 93, 139-45 (2000); *People v. King,* 192 Ill.2d 189, 193-99 (2000); *People v. Cannon,* 293 Ill.App.3d 634, 640 (1997)). The First District Appellate Court held in *Tyler* that "evidence of systemic police misconduct is sufficient to support defendant's claim of actual innocence." *Id*. ¶200. Albeit in the context of a petition for post-conviction relief, based on allegations of police misconduct alone the *Tyler* court remanded for an evidentiary hearing on petitioner's actual innocence claim. *Tyler* at ¶¶200-02; *see also People v. Almodovar,* 2013 IL App (1st) 101476, ¶¶77-79 (concluding the court need not rule on the issue but stating that "a strong argument could be made" that evidence of Guevara's "history of improperly influencing witnesses" would satisfy the actual innocence standard in light of the questionable inculpatory evidence and the import of Guevara's

11

credibility). This holding is not surprising: Of course evidence of an officer's pattern of committing a particular kind of misconduct in a number of cases is relevant to whether he committed the same misconduct in the case at bar. Courts have repeatedly affirmed this axiomatic principle, including in cases involving Guevara specifically. *See People v. Montanez,* 2016 IL App (1st) 133726, ¶34 ("As we stated in another case concerning Guevara's misconduct, 'In our view, any allegation that Guevara coerced a person to provide evidence is relevant to whether defendants in the case at bar were similarly coerced.'" (quoting *People v. Reyes,* 369 Ill. App. 3d 1, 21 (2006)). In *Almodovar* at ¶68, the First Appellate District explained why that is so obviously the case:

> [I]n the instant case, we find that defendant's allegations that Detective Guevara influenced witnesses to provide identifications are relevant to whether witnesses in the case at bar were similarly influenced, since such allegations, if true, would damage Detective Guevara's credibility. As was the case in *Reyes,* the credibility of Detective Guevara is directly at issue with regard to the crucial question of how he procured the evidence that led to defendant's conviction. New evidence that attacks his credibility on that crucial question would be highly material.

The First Appellate District again affirmed the principle—in another Guevara case—that evidence of an officer's pattern of misconduct is relevant to whether that officer committed similar misconduct in the case at bar. *Martinez,* 2021 IL App (1st) 190490. The appellate court first had strong language about Guevara's pattern, noting that the State "does not dispute that Detective Guevara has a history of misconduct," that the First Appellate District "has recognized Guevara's well-documented history of influencing and manipulating witnesses," and calling Guevara "a malignant blight on the Chicago Police Department and the judicial system." *Martinez* at ¶64. The Court cataloged Guevara's common forms of misconduct and summarized the pattern evidence by saying Guevara's "toolbox of coercion was well-stocked with a wide variety of tools." *Id.* ¶80. The Court ultimately held that "evidence of Guevara's misdeeds in

12

CCSAO COI SUBPOENAS 000475

other cases would clearly be admissible in this case to show a pattern and practice of misconduct." *Id.* (emphasis added). Indeed, undersigned counsel has presented pattern evidence regarding Guevara's misconduct at multiple COI hearings in the last few months (*e.g.*, COI hearings of Mr. Thomas Sierra and Mr. Geraldo Iglesias, before Judge Reddick). And the only reason Mr. Reyes is in this situation to begin with is because Guevara fabricated his involvement out of whole cloth. Evidence that Mr. Reyes's conviction is based on evidence that was concocted through physical abuse, and thus inadmissible, is further evidence of Mr. Reyes's innocence.

To summarize, Mr. Reyes has presented ample evidence of innocence, including his own testimony, alibi evidence, and DNA, combined with a swath of evidence that it was Guevara's practice to coerce false confessions out of innocent people. This is more than sufficient. The COI statute cautions:

> It is the intent of the General Assembly that the court, in exercising its discretion as permitted by law regarding the weight and admissibility of evidence submitted pursuant to this Section, shall, in the interest of justice, give due consideration to difficulties of proof caused by the passage of time, the death or unavailability of witnesses, the destruction of evidence or other factors not caused by such persons or those acting on their behalf.

735 ILCS 5/2-702(a). Against this mandate, what other evidence could Mr. Reyes present 24 years after the fact to show innocence?

III.    **EVEN IF THE COURT READS ACCOUNTABILITY INTO THE INDICTMENT, THERE IS STILL NO EVIDENCE THAT MR. REYES IS NOT INNOCENT**

Even if this Court chooses to evaluate the evidence of accountability crimes, despite that accountability language does not appear in the indictment, the State has failed to point to any evidence to rebut the evidence of innocence. Mr. Reyes is still entitled to a certificate of innocence as a matter of law.

13

CCSAO COI SUBPOENAS 000476

### a. The State Must Present Evidence to Establish Its Defense

If this Court chooses to evaluate the evidence of innocence of an accountability charge versus the evidence of non-innocence, it must first consider whether Mr. Reyes, as the movant, has established a *prima facie* case of innocence. He has done that. Next, the Court must consider whether the State has presented evidence to establish a *prima facie* case of non-innocence. *People v. Williams*, 2017 IL App (1st) 152021, at ¶ 30 (citing *527 S. Clinton, LLC v. Westloop Equities, LLC*, 403 Ill. App. 3d 42, 52 (2010)[4]. Where the nonmovant presents no evidence on each essential element of its defense (non-innocence), the Court must find for the petitioner. *Stenger v. Swartwout*, 62 Ill. 257, 257 (1871) ("Where as to any essential element of a cause of action or defense there is no evidence at all…this court will interfere and set it aside.").

The State spends a portion of its brief explaining the difference between an affirmative showing of innocence and a lack of guilt. To be clear, Mr. Reyes does not argue that the State has the initial burden to show guilt. Mr. Reyes understands that his burden is to prove innocence by a preponderance of the evidence. The State fails to recognize, however, that once Mr. Reyes presents evidence of innocence—which he has—the burden then shifts to the state to disprove Mr. Reyes's evidence of innocence by 51%. There is a fine line between non-guilt and innocence.[5] And the defense to evidence of innocence is evidence of guilt. Therefore, in order to

---

[4] The State asserts that it does not need to present evidence of each element of the crimes it asserts Mr. Reyes is not innocent of, and attempts to distinguish *People v. Williams*, 2017 IL App (1st) 152020. The State says that *Williams* involves a motion for a directed finding rather than a motion for summary judgment, and that it involves a post-conviction matter. Though *Williams* involves a different procedural posture, at its core it discusses parties' burdens and a court's task of balancing evidence. Here it does not matter that there has not been a hearing, because at this stage, the Court must draw all reasonable inferences in the State's favor. *Beaman v. Freesmeyer*, 2021 IL 125617, ¶ 106, reh'g denied (Sept. 27, 2021). The principle remains: when a Court is balancing evidence, it first looks at whether the movant has provided evidence to establish a *prima facie* case. After so finding, it then looks to see whether the nonmovant has satisfied the elements of its defense. *Stenger v. Swartwout*, 62 Ill. 257, 257 (1871).

[5] In fact, it is up for debate whether the Constitution allows an innocence statute to require a petitioner to prove innocence in the first place. *See People v. Fields*, 2017 IL App (1st) 140988-U, ¶ 93

14

successfully rebut Mr. Reyes's evidence of innocence, the State must present at least some evidence that Mr. Reyes is guilty. As a matter of law, it has not, and cannot do that.

### b. The State's Evidence Cannot, as a Matter of Law, Satisfy the Elements of a Defense

Even construing all inferences in the State's favor, there is no version of events in which Mr. Reyes *does not* meet his burden of showing innocence. This is because the State has no evidence of its own. Indeed, even when construing the evidence in the State's favor, as the Court must at this stage, the State cannot meet its burden of presenting evidence on each essential element of its defense.

As a threshold matter, the State refers to 17 exhibits, most of which are duplicates of Mr. Reyes's exhibits, or hearsay. And of those 17 exhibits and the rest of the record, the state points to no actual evidence that undermines Mr. Reyes's claims of innocence. To the extent that the State expects this Court to wade through all those materials itself looking for evidence, "[j]udges are not like pigs, hunting for truffles buried in briefs." *United States v. Dunkel,* 927 F.2d 955, 956 (7th Cir.1991). The State has waived any argument about the substance of these materials beyond what it identifies in its brief. *Sakellariadis*, 391 Ill. App. 3d at 804.

As for the evidence the State has proffered, the relevant inquiry now is whether the evidence of non-innocence, even if taken in the State's favor, establishes non-innocence of *any crime at all*. As a matter of law, it does not. Out of the entire record in this case, the State identifies only four pieces of evidence that it says outweighs the powerful DNA and evidence of coerced confession: (1) Mr. Reyes's living arrangements; (2) a note in Mr. Reyes's pocket and a

---

(Pucinski, J., dissenting). The U.S. Supreme Court observed in *Nelson v. Colorado*, a state may not presume that a person who has been acquitted or exonerated is not entitled to statutory relief provided to innocent people by the state. 137 S. Ct. 1249, 1256 ("Colorado may not presume a person, adjudged guilty of no crime, nonetheless guilty *enough* for monetary exactions.").

15

name on a calendar; and Ms. Mejia's testimony that (3) she was told by Solache in Mr. Reyes's presence that Mr. Reyes was present to help get the baby, and (4) that Mr. Reyes waited in the car until getting the "signal" to enter the Soto home.

The State does not explain what it means by "living arrangements and relationships with his co-defendants" or "the sum of the testimony from the various witnesses at trial." To the extent it asserts that the fact that he rented a room from Mr. and Mrs. Mejia is evidence of guilt of murder and kidnapping on an accountability theory, that is preposterous. Indeed, if that is the case, then the 5-6 others who lived in that home who were Adriana's family members are equally guilty of accountability.

Likewise, the note in Mr. Reyes's pocket and a calendar entry listing Norma Salazar's name is not inculpatory in any way. According to the trial testimony of Adriana Mejia's husband, Rosauro Mejia, Adriana told him that she had given birth to the baby girl and was babysitting the older boy for a woman named Norma Salazar, who was in the hospital having another baby of her own. Ex. 14 (Trial Tr., Testimony of Rosauro Meija) at 1928. Mr. Reyes similarly testified that Adriana told him she was babysitting the boy for Norma Salazar and gave him Salazar's phone number when she asked him to look after the older boy for a time. Ex. 5 (Reyes Trial Testimony) at 2037-38, 2066. And, as it turns out, "Norma Salazar's" involvement is apparently made up; no Norma Salazar was ever charged or convicted. So, Adriana made up a lie and told it to both her husband Rosauro and Mr. Reyes. If it was inculpatory in any way, then Rosauro is implicated as well; but no one in this proceeding to date—certainly not the State—has asserted that he is not innocent. Moreover, the fact that a made-up person's name and phone number was in Mr. Reyes's possession—a name that no one says came from Mr. Reyes (and the State has not and cannot present any evidence to suggest otherwise)—is plainly exculpatory:

16

FILED DATE: 4/7/2022 9:01 PM 98CR1244002

why would Mr. Reyes write down the name and phone number of someone he knew did not exist or had nothing to do with the crime? Put simply, the State has simply stated a fact—Mr. Reyes had a note—without citation to any other evidence that would make it evidence of guilt. This evidence neither rebuts Mr. Reyes's evidence of innocence, nor provides any support for his guilt.

That leaves just two statements from Adriana Mejia on which the State relies: that Solache told her that Reyes was in the car to help get the baby, and that Reyes waited in the car until "getting the signal to enter the Soto home." For one, the State cites nothing to support its characterizations of Mejia's testimony, and instead sends this Court on a truffle hunt. More critically, however, the State does not accurately characterize Mejia's testimony. Mejia did not testify that Mr. Solache told her that Mr. Reyes was present to "help get the baby." Her testimony is much more nebulous. She testified that Mr. Solache told her that Reyes "wasn't going to say anything and that he was going to help us," Ex. 17 at 27, and that Solache told her that he had told Reyes "what was going on" with her and that Reyes "knew." Ex. 20 at 149. She also did not testify that Mr. Reyes waited in the car until "getting a signal." She testified that he waited in the car alone and did not enter the home until after Mr. Soto had been killed, and then tried to stop the killing of Mrs. Soto. Ex. 17 at 112; Ex. 20 at 8-9, 151-52, 156-57, 219-20. She never says anything about a "signal."

That evidence, even for the sake of argument accepting it as true and construing it in the light most favorable to the State is insufficient as a matter of law to support a finding of guilt on accountability murder or kidnapping. It is long established that mere presence at a crime scene and knowledge that a crime is being committed is insufficient to establish accountability. *People v. Ceasar*, 231 Ill.App.3d 54, 56 (1992) ("mere presence at scene of crime, even with knowledge

17

CCSAO COI SUBPOENAS 000480

that crime is being committed, is not enough to prove participation"); *see also People v. Reid*, 136 Ill.2d 27, 61 (1990) ("Mere presence of a defendant at the scene of the crime does not render him or her accountable for the offense."); *see also Brumley v. DeTella*, 83 F.3d 856, 863 (7th Cir. 1996) (In Illinois, "proof of accountability requires more than consent to the commission of a crime; more than knowledge of the commission of a crime; and more than presence at the scene of a crime, even when coupled with flight from the scene").

So, even accepting these two statements from Ms. Mejia, they do not as a matter of law rebut Mr. Reyes's evidence of innocence, nor do they constitute evidence of guilt of accountability even as a matter of law. Notably absent from the State's evidence, of course, is any assertion that Mr. Reyes participated in the planning or commission of the crime. That is because in the same deposition testimony the State relies on, Adriana Mejia stated that she had not had any planning conversations with Reyes, that she had no idea he would be there, that he did not enter the home with Adriana and Solache, that he did not kill Mr. or Mrs. Soto, that he did not grab the baby, and that she does not know who grabbed the boy. The only affirmative act she describes him committing is to try to stop Solache from stabbing Mrs. Soto upon arriving and seeing what was happening. Ex. 20 (Mejia Feb. 5, 2021 Dep.) at 219-220.[6] The State's only evidence, the testimony of Adriana, cannot possibly support guilt on an accountability theory, or any other. While the State attempts to dispute some of Mr. Reyes's facts, there is no dispute on a *material* issue, because all of the State's evidence combined cannot as a matter of law rebut Mr. Reyes's evidence of innocence.

___

[6] To be clear, Mr. Reyes disputes all of this vehemently; he has always maintained that he had absolutely no knowledge or involvement in the crime whatsoever. The factual presentation Petitioner presents is exclusively at summary judgment, construing the facts in the State's favor.

18

CCSAO COI SUBPOENAS 000481

Mr. Reyes understands that the State believes he is guilty of this crime, regardless of what decades of new evidence have revealed about the corruption of this police investigation (and so many other Guevara investigations). That is a pity. But the only legitimate thing that ever connected him to the crime was his and his co-defendants' coerced statements. Stripping those away, and *truly* removing them from consideration as this Court must do, there is no possible way that a note in his pocket and the fact that he lived with Ms. Mejia and several others, rebuts Mr. Reyes's evidence of innocence, or constitutes affirmative evidence of guilt. Indeed, that meager evidence is insufficient *as a matter of law* to support guilt of murder or kidnapping on an accountability theory.

Even assuming the State could change course now and pursue an accountability theory, contrary to Palmer, it has failed to present evidence to support such a theory. Mr. Reyes is entitled to a COI as a matter of law.

## IV. MR. REYES'S MOTION IS TIMELY

The State makes one additional argument, but it requires little attention at this point. The State asserts that this motion for summary judgment was not timely because the State did not have some depositions from Mr. Reyes's civil proceedings. The bulk of these depositions are neither relevant nor admissible (such as depositions of various prosecutors over the years, which contain multiple layers of hearsay). Indeed, the COI statute does not contemplate that the State can rely on any and all testimony ever generated in connection with a case. Subsection (c) says that the Court can consider materials attached to the petition, and subsection (f) makes clear that the State can rely on "prior sworn testimony or evidence admitted in the criminal proceedings related to the convictions." COI proceedings are not retrials and they are not evaluations of every shred of evidence under the sun. They are designed to be quick adjudications based on materials

19

FILED DATE: 4/7/2022 9:01 PM    98CR1244002

the *Petitioner* has presented. *See* 95th Ill. Gen. Assem., House Proceedings, May 18, 2007, at 5-6 (statements of Representative Flowers (explaining that the language in the statute allowing judicial notice of prior proceedings, 735 ILCS 5/2-702(f), was placed in the statute to address concerns "that the process of petitioning for a COI would force the court to try…the original case over again")). In any event, Mr. Reyes has now provided all outstanding depositions to the State, and so the State's argument is moot.[7]

## CONCLUSION

Mr. Reyes was charged with principal crimes, and the State agrees there is no evidence that he committed any crime as a principal. This entitles him to a certificate of innocence as a matter of law under the binding holding of *Palmer*. Even assuming *arguendo* that the State had charged Mr. Reyes under an accountability theory, the State cannot rebut Mr. Reyes's evidence of innocence or to present affirmative evidence sufficient to meet the elements of its defense. For these reasons, the other reasons discussed herein, and the reasons raised in Mr. Reyes's petition for a certificate of innocence and motion for summary judgment, Mr. Reyes respectfully requests that this Court grant his motion for summary judgment and issue a certificate of innocence.

---

[7] Petitioner inadvertently did not attach the transcript from the second half of Ms. Mejia's February 2021 deposition. He provided a copy to the State on April 7, 2022 and has no objection if the State wishes to file a sur-reply to address this testimony.

CCSAO COI SUBPOENAS 000483

FILED DATE: 4/7/2022 9:01 PM    98CR1244002

Respectfully Submitted,

/s/ Rachel Brady
Rachel Brady
Attorney for Arturo De Leon-Reyes

Jon Loevy
Anand Swaminathan
Steve Art
Rachel Brady
Sean Starr
Loevy & Loevy
311 N. Aberdeen St., 3rd floor
Chicago, IL 60607
(312) 243-5900
brady@loevy.com

Counsel for Petitioner Arturo De Leon-Reyes

21

CCSAO COI SUBPOENAS 000484

## CERTIFICATE OF SERVICE

I, Rachel Brady, an attorney, hereby certify that on this 7th day of April 2022, I caused a

copy of the foregoing to be served by electronic mail and USPS mail to:

Assistant State's Attorney
c/o Christa Bowden
Cook County State's Attorney's Office
2650 S. California Avenue
Chicago, IL 60608


Dated: April 7, 2022

Respectfully Submitted,


*/s/ Rachel Brady*
Rachel Brady
*Attorney for Arturo De Leon-Reyes*

Loevy & Loevy
311 N. Aberdeen St., 3rd floor
Chicago, IL 60607
(312) 243-5900
brady@loevy.com

22

CCSAO COI SUBPOENAS 000485

FILED DATE: 4/7/2022 9:01 PM   98CR1244002

# EXHIBIT 20

CCSAO COI SUBPOENAS 000486

# ILLINOIS STATE POLICE
### Division of Forensic Services
### Forensic Science Center at Chicago
1941 West Roosevelt
Chicago, Illinois 60608-1229
(312) 433-8000 (Voice) * 1-(800) 255-3323 (TDD)

George H. Ryan
*Governor*

December 16, 1999

Sam W. Nolen
*Director*

Detective Halvorsen
CHICAGO POLICE DEPARTMENT UNIT 650
DETECTIVE DIVISION, AREA 5
5555 WEST GRAND
CHICAGO, IL 60639

Laboratory Case #C98-015970
RD #C0198126

OFFENSE     Murder
SUSPECTS    Adriana Mejia/Gabriel Solache/Arturo DeLeon
VICTIMS     Jacinta Soto/Mariano Soto

The following evidence was received by the Forensic Science Center at Chicago on April 6, 1998:
**Inventory# 1972804**

| EXHIBIT | DESCRIPTION |
| --- | --- |
| 1A | Blood Standard:  Jacinta Soto |

The following evidence was received by the Forensic Science Center at Chicago on April 6, 1998:
**Inventory# 1972807**

| EXHIBIT | DESCRIPTION |
| --- | --- |
| 3A | Blood Standard:  Mariano Soto |

The following evidence was received by the Forensic Science Center at Chicago on April 7, 1998:
**Inventory# 1974077**

| EXHIBIT | DESCRIPTION |
| --- | --- |
| 18A | Blood stain from green towel found in 1984 Toyota Corolla |
| 18B | Blood stain from green towel found in 1984 Toyota Corolla |
| 18C | Blood stain from green towel found in 1984 Toyota Corolla |
| 18D | Blood stain from green towel found in 1984 Toyota Corolla |
| 18E | Blood stain from green towel found in 1984 Toyota Corolla |
| 18F | Blood stain from green towel found in 1984 Toyota Corolla |
| 18G | Blood stain from green towel found in 1984 Toyota Corolla |

Reyes_CCSAO 009572   COOK COI SUBPOENAS 000487

CHICAGO POLICE DEPARTMENT UNIT 650
Laboratory Case #C98-015970                    -2-                    December 16, 1999

The following evidence was received by the Forensic Science Center at Chicago on April 7, 1998:
**Inventory# 1982726**

| EXHIBIT | DESCRIPTION |
|---------|-------------|
| 19A | Blood stain from Adriana Mejia's shoes |
| 19B | Blood stain from Adriana Mejia's shoes |
| 19C | Blood stain from Adriana Mejia's shoes |
| 19D | Blood stain from Adriana Mejia's shoes |
| 19E | Blood stain from Adriana Mejia's shoes |
| 19F | Blood stain from Adriana Mejia's shoes |
| 19G | Blood stain from Adriana Mejia's shoes |

The following evidence was received by the Forensic Science Center at Chicago on April 9, 1998:
**Inventory# 1982723**

| EXHIBIT | DESCRIPTION |
|---------|-------------|
| 23B1 | Blood stain from towel |
| 23B2 | Blood stain from towel |

The following evidence was received by the Forensic Science Center at Chicago on April 9, 1998:
**Inventory# 1982731**

| EXHIBIT | DESCRIPTION |
|---------|-------------|
| 27A | Blood stain from Adriana Mejia's trousers |
| 27B | Blood stain from Adriana Mejia's trousers |
| 27C | Blood stain from Adriana Mejia's trousers |
| 27D | Blood stain from Adriana Mejia's trousers |

The following evidence was received by the Forensic Science Center at Chicago on September 2, 1999:
**Inventory# 2190428**

| EXHIBIT | DESCRIPTION |
|---------|-------------|
| 29A1 | Blood Standard:  Arturo DeLeon |
| 30A1 | Blood Standard:  Adriana Mejia |
| 31A1 | Blood Standard:  Gabriel Solache |

**RESULTS**

DNA from Exhibits 1A, 3A, 18A, 18B, 18F, 18G, 19B, 19C, 19D, 19E, 19G, 23B1, 23B2, 27A, 27B, 27C, 27D, 29A1, 30A1 and 31A1 was amplified using the Polymerase Chain Reaction (PCR) and profiled at the following loci: D3S1358, vWA, FGA, D8S1179, D21S11, D18S51, D5S818, D13S317, D7S820, D16S539, TH01, TPOX, CSF1PO and Amelogenin.

Due to an insufficient amount of human DNA for PCR analysis, Exhibit 19F was not profiled.

Reyes_Jemison 009573          COSAO COI SUBPOENAS 000488

CHICAGO POLICE DEPARTMENT UNIT 650
Laboratory Case #C98-015970                    -3-                    December 16, 1999

**RESULTS** (continued)
Exhibits 18C, 18D, 18E and 19A were not examined.

A DNA profile was identified in Exhibits 18A and 18G which matches the DNA profile of Adriana Mejia and does not match the DNA profile of Jacinto Soto, Mariano Soto, Gabriel Solache or Arturo DeLeon. This profile would be expected to occur in approximately 1 in 390 quadrillion Black, 1 in 2.1 quadrillion White or 1 in 1.7 quadrillion Hispanic unrelated individuals.

A mixture of DNA profiles was identified in Exhibit 18B. A DNA profile was identified in Exhibit 18B which matches the DNA profile of Adriana Mejia and does not match the DNA profile of Jacinto Soto, Mariano Soto, Gabriel Solache or Arturo DeLeon. This profile would be expected to occur in approximately 1 in 390 quadrillion Black, 1 in 2.1 quadrillion White or 1 in 1.7 quadrillion Hispanic unrelated individuals.

An additional DNA profile was identified in Exhibit 18B at the FGA, D8S1179, D21S11, D18S51, D5S818, TH01, TPOX, CSF1PO and Amelogenin loci which does not match the DNA profile of Jacinto Soto, Mariano Soto, Arturo DeLeon, Adriana Mejia or Gabriel Solache.

A mixture of DNA profiles was identified in Exhibit 18F. A DNA profile was identified in Exhibit 18F which matches the DNA profile of Adriana Mejia and does not match the DNA profile of Jacinto Soto, Mariano Soto, Gabriel Solache or Arturo DeLeon. This profile would be expected to occur in approximately 1 in 390 quadrillion Black, 1 in 2.1 quadrillion White or 1 in 1.7 quadrillion Hispanic unrelated individuals.

Low levels of an additional (male) DNA profile were detected in Exhibit 18F at the CSF1PO and Amelogenin loci that are not suitable for comparison to known standards.

A DNA profile was identified in Exhibits 19E, 19G, 23B1, 23B2, 27A, 27B, 27C and 27D which matches the DNA profile of Mariano Soto and does not match the DNA profile of Jacinto Soto, Adriana Mejia, Gabriel Solache or Arturo DeLeon. This profile would be expected to occur in approximately 1 in 170 quadrillion Black, 1 in 35 quadrillion White or 1 in 300 trillion Hispanic unrelated individuals.

A mixture of DNA profiles was identified in Exhibits 19B, 19C and 19D. A DNA profile was identified in Exhibits 19B, 19C and 19D which matches the DNA profile of Mariano Soto and does not match the DNA profile of Jacinto Soto, Adriana Mejia, Gabriel Solache or Arturo DeLeon. This profile would be expected to occur in approximately 1 in 170 quadrillion Black, 1 in 35 quadrillion White or 1 in 300 trillion Hispanic unrelated individuals.

Low levels of an additional DNA type were detected in Exhibits 19B, 19C and 19D at the D16S539 locus that are not suitable for comparison to known standards.

**CONCLUSIONS**
No comparisons were made from Exhibit 19F due to the insufficient amount of DNA obtained.

Reyes_Jorge 009574    COOK COUNTY SAO COI SUBPOENAS 000489

CHICAGO POLICE DEPARTMENT UNIT 650
Laboratory Case #C98-015970                    -4-                    December 16, 1999

**CONCLUSIONS** (continued)
The blood identified in Exhibits 18A, 18F and 18G is consistent with having originated from Adriana Mejia and could not have originated from Jacinto Soto, Mariano Soto, Gabriel Solache or Arturo DeLeon.

The mixture of DNA profiles identified in Exhibits 18B is consistent with having originated from Adriana Mejia and an unidentified individual.  Jacinto Soto, Marino Soto, Gabriel Solache or Arturo DeLeon could not have contributed to this mixture of DNA profiles.

The blood identified in Exhibits 19B, 19C, 19D, 19E, 19G, 23B1, 23B2, 27A, 27B, 27C and 27D is consistent with having originated from Mariano Soto and could not have originated from Jacinto Soto, Adriana Mejia, Gabriel Solache or Arturo DeLeon .

**REQUESTS**
Upon submission of additional standards, further analysis can be conducted to resolve the source of the open profile identified in Exhibit 18B.

No examination of Exhibits 18C, 18D, 18E and 19A was performed at this time.  If, at a later date, it is determined that the value of this evidence can significantly aid the case, please advise.

For results of previous biological examinations, please refer to my laboratory report and to the laboratory report by Forensic Scientist Elizabeth Boedeker from the Forensic Science Center at Chicago.

If you have any questions regarding this report, please feel free to contact me.

**EVIDENCE DISPOSITION**
DNA evidence will be maintained in the laboratory evidence vault until such time as the case has been adjudicated or the evidence is required by the agency.

Respectfully submitted,

Barbara J. Wilson
Forensic Scientist

cc:  Chief, Detective Division - Crime Analysis, Unit 601
     ASA Mercedes Luque-Rosales-Rm 11 B28-Cook County State's Attorney's Office, 2600 S. California

Reyes_JC 009575     CCSAO COI SUBPOENAS 000490

FILED DATE: 4/7/2022 9:01 PM   98CR1244002

# EXHIBIT 21

CCSAO COI SUBPOENAS 000491

FILED DATE: 4/7/2022 9:01 PM 98CR1244002

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ARTURO DELEON-REYES,                    )
                                        )
                Plaintiff,              )
                                        )
vs.                                     ) Case No. 18-CV-01028
                                        )
REYNALDO GUEVARA, et al.,               )
                                        )
                Defendants.             )
_____)
GABRIEL SOLACHE,                        )
                                        )
                Plaintiff,              )
                                        )
vs.                                     ) Case No. 18-CV-02312
                                        )
REYNALDO GUEVARA, et al.,               )
                                        )
                Defendants.             )

        VOLUME IV OF THE VIDEOTAPED RECORD OF

PROCEEDINGS FOR THE DEPOSITION of ADRIANA MEJIA, a

witness, called by Defendant City of Chicago for

examination in the above-entitled cause, pursuant to

the Federal Rules of Civil Procedure, taken before me,

Brenda L. Zeitler, CSR, License No. 084-004062, by

Zoom Video Conference on the 5th day of February,

2021, commencing at 9:04 a.m.

Page 2

APPEARANCES:

LOVEY & LOEVY
BY:  ANAND SWAMINATHAN, ESQ.
and RACHEL BRADY, ESQ
and SEAN STARR, ESQ
311 North Aberdeen, 3rd Floor
Chicago, Illinois  60607
(312) 243-5900
anand@loevy.com
brady@loevy.com
sean@loevy.com
        On Behalf of Plaintiff Arturo Reyes.
PEOPLE'S LAW OFFICE
BY:  JAN SUSLER, ESQ.
1180 North Milwaukee Avenue
Chicago, Illinois  60642
(773) 235-0070
jsusler@gmail.com
        On Behalf of Plaintiff Gabriel Solache.
COOK COUNTY STATE'S ATTORNEY'S OFFICE
BY:  EDWARD BRENER, ESQ.
and DAVID ADELMAN, ESQ.
50 West Washington Street, Room 500
Chicago, Illinois  60602
(312) 603-3369
edward.brener@cookcountyil.gov
david.adelman@cookcountyil.gov
        On Behalf of Cook County Defendants.
ROCK FUSCO & CONNELLY, LLC
BY:  EILEEN E. ROSEN, ESQ.
and THERES B. CARNEY, ESQ.
312 North Clark, Suite 2200
Chicago, Illinois  60654
(312) 494-1000
erosen@rfclaw.com
tcarney@rfclaw.com
        On Behalf of Defendant City of Chicago.

Page 3

APPEARANCES (Continued):

LEINENWEBER, BARONI & DAFFADA, LLC
BY:  MEGAN McGRATH, ESQ.
120 North LaSalle Street, Suite 2000
Chicago, Illinois  60602
(312) 663-3003
mkm@ilesq.com
        On Behalf of Defendant Guevara.
REITER BURNS LLP
BY:  DANIEL M. NOLAND, ESQ.
311 South Wacker, Suite 5200
Chicago, Illinois  60606
(312) 982-0900
dnoland@reiterburns.com
        On Behalf of Defendant Navarro.
THE SOTOS LAW FIRM, P.C.
BY:  JOSH M. ENGQUIST, ESQ.
and CAROLINE JAMIESON GOLDEN, ESQ.
and SAMANTHA PALLINI, ESQ.
141 West Jackson Boulevard, Suite 1240A
Chicago, Illinois  60604
(630) 735-3300
jengquist@jsotoslaw.com
cgolden@jsotoslaw.com
spallini@jsotoslaw.com
        On Behalf of Individual Defendants.
BEDI & SINGER, LLP
BY:  DENA M. SINGER, ESQ.
53 West Jackson, Suite 1505
Chicago, Illinois  60604
(312) 525-2017
dsinger@bedisinger.com
        On Behalf of the Deponent.
ALSO PRESENT:
    JOSEPH BONURA, Interpreter (9:00 to 1:00)
    ELSA MADRIGAL, Interpreter (1:00 to end of day)
    BRETT SCHATZLE, Videographer
    VALERIE BARAJAS, Paralegal for Loevy & Loevy

Page 4

I N D E X

WITNESS:
    ADRIANA MEJIA
            Exam by Mr. Swaminathan (Continued)   6
            Examination by Mr. Engquist ....... 214
            Further Examination by Ms. Rosen .. 227

EXHIBITS:

        PLAINTIFF'S EXHIBIT NO. 1 ................  68
            Area 5 Supplementary Report,
            Cleared Closed Report
            (RFC Solache Reyes 233-253
        PLAINTIFF'S EXHIBIT NO. 2 ............... 105
            Photographs of Car
            (RFC Solache Reyes 44)
        PLAINTIFF'S EXHIBIT NO. 3 ............... 113
            Google Map

        PLAINTIFF'S EXHIBIT NO. 4 ............... 119
            Prescriptions for Rosauro Mejia
            from Sinai Medical Group
            (Bluhm 25519 and 25520)
        PLAINTIFF'S EXHIBIT NO. 5................ 167
            "Notes," Two Sheets of Paper with
            Handwriting on Them
            (Reyes 264)

        PLAINTIFF'S EXHIBIT NO. 6 ............... 172
            04/15/98 Supplementary Report by
            McDonald and Collins
            (RC Solache Reyes 194 - 196)
        PLAINTIFF'S EXHIBIT NO. 7 ............... 174
            11/18/99 Area 5 Supplementary Report,
            Progress Investigation 3, Cleared
            Closed Report by Investigator Trevino
            (No Bates)
        PLAINTIFF'S EXHIBIT NO. 8 ............... 185
            Phone Log
            (RFD Solache Reyes 160 - 162)

Page 5

EXHIBITS (Continued):

        PLAINTIFF'S EXHIBIT NO. 9 ............... 202
            06/01/99 Letter from Adriana Mejia
            to Gabriel Solache
            (RFC Solache Reyes 4812 - 4816.)

        PLAINTIFF'S DEPOSITION EXHIBITS 10 ....... 204
            07/12/99 Letter from Adriana Mejia
            to Gabriel Solache
            (RFC Solache Reyes 4827 - 4836)
        DEFENDANT'S EXHIBIT NO. 5 ............... 198
            06/11/98 Letter to "Lupe"
            (RFC Solache Reyes 3949 - 3952)
        DEFENDANT'S EXHIBIT NO. 7 ...............  65
            Chicago Police Department CB Report
            (RFC Solache Reyes 207)
        DEFENDANT'S EXHIBIT NO. 9 ............... 189
            04/98 Cermak Health Record Form
            (HIPAA 4 and HIPAA 5)
        DEFENDANT'S EXHIBIT NO. 19 .............. 134
            Declaration of Jose Mejia
            (Reyes 8726 - 8729
        DEFENDANT'S EXHIBIT NO. 36 .............. 191
            Transcription of an Audio Recording
            of a Call that Took Place on October
            23, 2019

CCSAO COI SUBPOENAS 000493

FILED DATE: 4/7/2022 9:01 PM  98CR1244002

FILED DATE: 4/7/2022 9:01 PM   98CR1244002

Page 6

THE VIDEOGRAPHER: This is the beginning of media unit 1, and we are now on the video record at 9:04 a.m. This is the continuing videotaped video conferenced deposition of Adriana Mejia taken on February 5, 2021. You may proceed.

MR. SWAMINATHAN: Good morning, Ms. Mejia.

THE WITNESS: Good morning.

MR. SWAMINATHAN: Did you get a chance to get some rest last night?

THE WITNESS: A little bit.

MR. SWAMINATHAN: You understand this is your continued deposition in this case, correct, a continuation from yesterday?

THE WITNESS: Si.

THE INTERPRETER: The translator wants to ask: Do I start interpreting now? Because I haven't been sworn in.

MR. SWAMINATHAN: Please. Let's start over. Can you please -- let's get the interpreter sworn in.

(Interpreter sworn.)

(Witness sworn.)

ADRIANA MEJIA, after having been first duly sworn to tell the truth, was examined and testified upon her oath through the

Page 7

interpreter as follows:

EXAMINATION (continued)

BY MR. SWAMINATHAN:

Q. Ms. Mejia, you understand this is a continuation of your deposition from yesterday, correct?

A. Yes.

Q. And just like yesterday, you remain under oath, correct?

A. Yes.

Q. Anything that would prevent you from being able to understand my questions and give truthful answers today?

A. No.

Q. You said yesterday that you were having headaches. Are you having headaches today?

A. Just a little bit. I took pills.

Q. So you feel like you're fine to be able to go forward with the questioning; is that right?

A. I'm going to try to answer everything truthfully and to be strong and do it well.

Q. Okay. If at any point you feel like your headaches or anything else is hurting your ability to understand my questions and answer them, please tell

Page 8

us, and we'll stop. Okay?

A. Okay.

Q. So as long as you continue to answer questions, we will assume you are feeling fine to be able to do so. Okay?

A. Okay.

Q. I'll indicate again to you this morning we can take a break any time you need to take a break, okay?

A. Very well.

Q. If at any point you are feeling tired or you need to get some food for your blood sugar, let us know and we'll take a break. Okay?

A. Very well. Thank you.

Q. I want to ask you about one thing you said yesterday. Yesterday, when you were describing what happened when you were first going into the Soto home, you said that Gabriel and then you went first and Arturo came later. That's the phrase you used. What did you mean by that?

A. When we got to the house first, Gabriel got out, and then I got out.

Q. Then did Arturo come later? Is that what you're saying?

Page 9

THE INTERPRETER: Translator wants to ask: Are you referring to did he arrive later?

MR. SWAMINATHAN: Let me reask it.

Q. When you and Gabriel first went to the house, Arturo came after that; is that right?

MS. ROSEN: Objection, form.

A. A few minutes afterwards. It didn't take long.

Q. Was he waiting in the car?

A. Yes. A few minutes, not a lot.

Q. Did anybody call him to come in, or did he come in on his own?

A. I no longer remember.

Q. When Arturo first came in, what had happened in the apartment at the point that he came in?

A. When he came in, I believe that Gabriel already had stabbed him. When he came in, he asked what were we doing, because he had come in a little bit later.

Q. So when he came in, Mr. Soto had already been stabbed; is that right?

A. Yes.

Q. Okay. I want to ask you about your background and go back to when you lived in Mexico. I

CCSAO COI SUBPOENAS 000494

Page 10

know you were asked a few questions about that. I want to ask you a couple of things.

A. Very well.

Q. What was the name of the town you grew up in?

THE INTERPRETER: Translator is not able to make it out. Turundeo.

MR. SWAMINATHAN: Turundeo, yeah?

A. Turundeo.

Q. Did you grow up with both your parents?

A. Yes.

Q. Did they work?

A. My dad is a -- works on the land, and my mother always worked at home.

Q. Have your parents ever come to the United States to visit you?

A. Yes. They came when I did my time in 2000 and last year in December.

Q. So they visited you, you said, in 2000?

A. Yes, when I was sentenced. I think it was around 2000.

Q. Where would they see you when they came in 2000?

A. The first time they saw me, they saw me in

Page 11

Cook County.

Q. Where did they see you after that?

A. They were there a couple months extra, and they came to see me in Dwight.

Q. Anywhere else during the 2000 visit?

A. Not until this year, this past year, in December.

Q. How many times did they visit with you when they came in 2000, between Cook County Jail and Dwight Correctional Center?

A. The truth is, I don't remember.

Q. Did they stay with your brother Carlos?

A. Yes. Also for a time with my friend Lorena.

Q. How did you know Lorena?

A. Lorena is from Michoacan, but I know her because she is a friend of one of my aunts.

Q. Do you stay in touch with her?

A. Yes.

Q. Do you still talk to her on the phone?

A. No. Unfortunately, I don't have a telephone number, just the address.

Q. When was last time you were able to communicate with her on the phone?

A. Since she went to Texas.

Page 12

Q. And approximately when was that?

A. The truth is I don't remember what year it was.

Q. And then you said your parents came again in December of 2020. Why did they come then?

A. Because they came to see how I was.

Q. Did they come to the US for any other reason in December of 2020?

A. No. They just came to see me and my brother. That's it.

Q. When did Carlos pass away?

A. I'm not sure. But when they had told me that he had passed away, it was around the 18th of May. And when they told me he had already passed away, it had been already 23 days since he had passed away.

Q. Were you able to go to his funeral?

A. No.

Q. I'm sorry to hear about that.

A. (Nodding head up and down.)

Q. That was May of 2020 when he passed away?

A. Yes.

Q. Do you have any other brothers who are in the US?

Page 13

A. No.

Q. When your parents came in December, I assume they came and visited you at the prison?

A. Yes.

Q. How many times did they visit you?

A. They only had two weeks of permission. It was a short time. I think it was four or five times.

Q. You said they only had two weeks for what? For the mission?

A. In other words, when they gave them their visa to come, their permission to come, they didn't get it for a long period. It was for a short period of time to be here.

Q. When they came in December of 2020, did you talk to them at all about this case?

A. Very little. People brought them, some friends. Some friends had brought them. No, very little.

Q. The friends who brought them, were they people that you knew?

A. Yes. I know a girl or a young lady who came, and then the woman who visits me was from the church, and another friend with her brother-in-law.

Q. So the people who came to visit with your

CCSAO COI SUBPOENAS 000495

FILED DATE: 4/7/2022 9:01 PM 98CR1244002

Page 14

parents, what were their names?

A. Beatrice Lopez, Aurora Ortiz, Ramon Calvario, Yarina Sanchez, my brother Carlos. Then some other people brought them, but they left my parents alone with me.

Q. The person named -- is it Raido Sanchez?

A. Ramon Calvario.

Q. And then you said Raida Sanchez? What was the next person's name?

A. Yarina Sanchez.

Q. Is that Y-a-d-i-r-a?

THE INTERPRETER: Translator says spell that again, sir. I'm sorry.

Translator says I got Y-a-r-i-d-a-n. That's what I'm hearing.

A. Yes, Yarina.

Q. And you said Carlos brought your parents for some of those visits; is that right.

And would Carlos visit you regularly --

THE INTERPRETER: Translator didn't get an answer.

MR. SWAMINATHAN: Go ahead. You can answer. Let's start again because you said you didn't get an answer to the last question, right?

Page 15

THE INTERPRETER: Translator repeated it again, and I still didn't get an answer. I don't know why.

A. When my brother came, he couldn't drive because he didn't have a license. So when my brother came, he came with Beatrice Lopez, with her husband, but her husband could not come in to see me.

Q. So Carlos came with your parents, right?

A. Yes.

Q. And would he also come regularly before he brought your parents?

A. No.

Q. When was the last time he visited you before he came with your parents?

A. I don't remember if it was, like, nine or ten years. I was not in communication with him.

Q. Is there a reason why he wasn't visiting you or communicating with you?

MS. ROSEN: Objection -- sorry. Go ahead.

(Question translated.)

MS. ROSEN: Objection: Form, foundation.

A. He had a personal problem among brothers.

THE INTERPRETER: Translator is not sure if she said he did or I did. That part didn't come out.

Page 16

I don't know if she said "tuve" or "tuvo" because I couldn't hear that. I don't know if she said I had a problem or he had a problem with brothers.

MR. SWAMINATHAN: Can you get clarification?

A. My brother and I had had an argument.

Q. What was the argument about?

A. About some money.

Q. Was it your money or his money that was the subject of the argument?

A. Some family members had sent that to me, and he had never put it in.

Q. And when did that fight happen?

A. Like around 10 years or 11 years, something like that. I'm not sure. I don't remember exactly.

Q. Did he tell you why he wasn't going to put the money in your account?

A. No. I was in communication with him. He wasn't accepting my calls, and I was not calling him anymore.

Q. Before that, had you and Carlos been close?

A. Unfortunately, no. My brother and I had always argued a lot from when we were kids.

Q. And when you were in the US, you were living together at the Mozart house, correct?

Page 17

A. Yes.

Q. So were you close at that time?

A. Very little, because he worked, and he would go with his friends to bars or dancing.

Q. Would he drink?

A. Yes.

Q. Would he drink a lot?

A. I think that's something that caused his death. I'm not very sure.

Q. Was he drinking a lot even back in 1998, when he was living with you?

A. Yes. He would drink with Gabriel Solache, with Leobardo, with my ex-husband, with my other brothers-in-law and a lot of friends.

Q. Did you have any other family members living in the US with you other than Carlos?

A. No. I have family from my father's side, but I don't have communication with them.

Q. Carlos, you said, would go to the bars and go out dancing. Would he ever get in trouble with the police?

A. The truth is, I don't know.

Q. Do you know if he ever got arrested?

A. The truth is, I don't remember if he told

CCSAO COI SUBPOENAS 000496

Page 18

me.

Q.   Do you know if he ever went to jail for any period of time?

A.   As far as I know, no.  I don't know.

Q.   Did he use any drugs?

A.   My brother?

Q.   Yeah, Carlos.

A.   The truth is, I don't know.

Q.   Would he get in fights?

A.   No.

Q.   You said that Carlos was working a lot back then.  Where did he work?

A.   He worked in a type of a restaurant.

Q.   Do you remember the name of it?

A.   It was called Piadaria Jalisco.  But after that, they closed it.

Q.   When did they close it?

A.   I don't remember what happened with the owner.  Something my brother commented to me, I think he told me that the owner had gone to prison.  I'm not sure though.

Q.   But her brother told her that it was closed.  Was that after she'd been arrested?

THE INTERPRETER:  The translator asks you to

Page 19

repeat that, sir.  It didn't come in clear.

Q.   Yes.  When her brother told her that the restaurant had been closed, was that sometime after she'd already been arrested?

MS. ROSEN:  Objection, form.  Her?  She?

THE INTERPRETER:  The translator asks that you ask the question directly to her.  If I say, "When her brother," she's not going to know who I'm referring to.  She's going to think I'm speaking about another woman.  You have to speak to her.  I am your voice.

MR. SWAMINATHAN:  Okay.  Sorry.

MS. ROSEN:  Yeah.  Objection, form.

MR. SWAMINATHAN:  Yeah.  Let me ask it again.

Q.   When Carlos informed you that Jalisco had been closed, was that after you'd been arrested?

A.   Yes.  When he told me they had closed the bar, I was already in jail.  I was already an inmate.

Q.   What was Carlos's job at the Jalisco Piadaria?

A.   I think he would make or prepare the tacos.

Q.   So he was basically a cook?

A.   Something similar to that.  He would attend

Page 20

to the tables and to the clients, to the customers.

Q.   So what was his usual shift?  What hours did he work?

A.   I don't think he had a shift.  I think he went from the morning until very late, but I don't remember exactly the schedule.

Q.   What time would he usually get home?

A.   Different times.

Q.   What were the earlier times he would usually get home?

A.   Like 7:00 or 8:00 at night.  I don't know.

Q.   Then if he stayed out late, when would he come home?

MS. ROSEN:  Objection, form,

MR. SWAMINATHAN:  Go ahead.

A.   Can you please repeat the question?

MR. SWAMINATHAN:  Yeah.  And Mr. Interpreter, yesterday you had not been interpreting the objections in the morning.  Then we continued that practice in the afternoon with the other interpreter.  It did reduce the confusion for the witness.  I would suggest you continue that practice today.  Then if there's a point we need to, we can do that.

Page 21

THE INTERPRETER:  Just to make sure, the translator is asking:  You don't want me to translate the objections, correct?

MR. SWAMINATHAN:  That's right.  That would be consistent with yesterday's practice.

THE INTERPRETER:  Yes, sir, whatever makes it easier for you.  Sorry about that.

MR. SWAMINATHAN:  No problem.  No problem.

BY MR. SWAMINATHAN:

Q.   If he stayed up late, when would he usually come home?

MS. ROSEN:  Objection:  form, foundation.

A.   I don't know.  Sometimes I would be asleep.  He'd get there different times.

Q.   Was it your understanding that his work ended before midnight, but sometimes he would stay out after that?

A.   Yes.  Since he had a girlfriend, I would imagine he would go see his girlfriend.  He had his friends.

Q.   Would his shifts at work -- strike that.

His work hours, did they end before midnight?

MS. ROSEN:  Objection:  form, foundation.

CCSAO COI SUBPOENAS 000497

FILED DATE: 4/7/2022 9:01 PM   98CR1244002

Page 22

A. Sometimes he would stay there if the boss would leave early. He would stay and close up. He would stay and clean up.

Q. If he stayed to close up, how late would he have to stay?

A. I don't know because I didn't pay too much attention to what time he would come.

Q. Was it a restaurant or bar?

A. It was a family restaurant.

Q. Would it close before midnight then?

A. Yeah. I think he closed, like, around 9:00. Depending if there was a lot of people or not a lot of people, they would close.

Q. Did Carlos have any other jobs other than the job at the Jalisco Piadaria?

A. Before, yes. I think he would mow the grass.

Q. In March and April of 1998, when you were arrested, was his only job the restaurant job?

THE INTERPRETER: Translator asks the job in the bar, correct?

MR. SWAMINATHAN: The restaurant job.

A. Yes.

Q. I wanted to go back to the money that you

Page 23

had an argument with Carlos over. How much money was sent for you?

A. They sent me -- I don't remember if it was 200 or $300.

Q. And who sent it?

A. My cousin who is in Washington, Elizabeth Torres.

Q. Why did she send it to you?

A. Well, she said she was going to help me so that I would have something, to help me in the prison.

Q. Was she someone you stayed in touch with, even after you were in prison?

A. Now? With her?

Q. Yeah. Do you stay in touch with her now?

A. No. Unfortunately, after all those years, after all that, once, she visited me in prison and then, after that, no.

Q. Do you have anyone who still visits you?

A. No, just the woman Aurora.

Q. Anyone else?

A. No. I don't have any visits.

Q. How do you know Aurora?

A. I know her, like, two or three years through a friend who is a woman from the church that they go

Page 24

visit people who are in jail, in prison.

Q. You said that you told your parents just a little bit about this case when they visited you.

MR. ENGQUIST: Objection to form.

Q. What little did you tell them?

A. Very little, because they came with people. I just told them to stay strong, to be strong. Very little.

Q. I know that was very little, but what was that little bit that you told them?

A. About my sentence. In Mexico, it's called perpetual -- the lowest chains a lot are different. I told them to continue having faith and continue praying a lot.

Q. Continue having faith that you would hopefully be released one day?

A. Yeah. I have faith that some day I'll be able to leave.

Q. Did you tell them that you were expecting that one day that would happen for you?

A. Why not? Why can't I have another opportunity?

Q. So that's, yes, you did tell them that you were expecting that, one day, that would happen to

Page 25

you?

A. Yes. I still feel that, and it could be soon, perhaps. You never know. No one knows.

Q. And did you tell them that, before that, you had to do these depositions in this case?

A. Now?

Q. When you visited with them, at that point, you knew that there were these depositions in this case, right?

MS. ROSEN: Objection, form, foundation.

MR. SWAMINATHAN: Go ahead.

A. No.

Q. You said that this visit was in December of 2020, right?

A. Yes.

Q. So you had already been deposed, right?

A. Yes.

Q. So did you tell them that you had to answer these -- you'd been answering these questions in this case?

MS. ROSEN: Objection: Form, foundation.

A. The truth is I don't remember.

Q. Have you ever told your parents before they visited you that you were hoping to be able to get

CCSAO COI SUBPOENAS 000498

FILED DATE: 4/7/2022 9:01 PM  98CR1244002

Case: 1:18-cv-01028 Document #: 892-2 Filed: 04/04/26 Page 499 of 855 PageID #:121125

FILED DATE: 4/7/2022 9:01 PM   98CR1244002

Page 26

out?

A. I've always said that to them. I always have hope.

Q. Have you ever told them that you expected to be released soon?

A. I always thought that maybe I can get out soon. Why not?

Q. You've always said that you were going to get out soon?

A. I've always said that I have a lot of faith, a lot of hopes that --

MS. ROSEN: Is everything okay?

THE WITNESS: The guard is asking me if I'm okay.

MR. SWAMINATHAN: I think she was in the middle of her answer. Can you ask her the question again or read back my question?

THE WITNESS: Could you please repeat the question to me?

MR. SWAMINATHAN: Yeah, let's have the court reporter read it back.

(Requested record read.)

THE INTERPRETER: Translator wants to say that's all there was. I gave up until what I heard

Page 27

because she turned at that time to look at someone. And then someone asked her, "Is everything okay?" and she didn't give anymore.

MR. SWAMINATHAN: I'll just ask another question.

Q. Ms. Mejia, when your parents came to visit you in 2020, did you tell them that you expected that you would be released soon?

A. I always said it.

Q. You've always said that you expected to be released soon?

A. I still say it. There could be a miracle. You people have your laws, and I respect them.

Q. I just want to be clear. When you spoke to them in December when they visited you, you told them that you expected you would be released soon; is that right?

A. I hope to get out of here soon. I'm not going to stay here the rest of my life.

Q. That's what I want to -- did you tell them that you hoped to or that you expected to?

A. I hope. I hope.

Q. You didn't tell them that you expected that it was about to happen?

Page 28

A. Always like -- how can I say this -- I can't explain this question.

Q. You had mentioned yesterday that you had -- strike that.

Yesterday, you were asked if your parents had any interactions with Gabriel Solache. Do you remember that?

A. One time, I asked my mother -- I asked my mother if they have seen him. And she said they've only seen him once when he had recently went to Mexico and was in the town, but they didn't speak to him.

Q. So there was only one time that your mother saw Gabriel Solache, correct?

A. Yes.

Q. And he didn't say anything to her, right?

A. I don't think my family has -- are in communication with him.

Q. And your mom told you about this one time that she saw him in town, right?

A. Yes.

Q. Other than saying she saw him, did she say anything else about seeing him?

A. No. My mom is not going to say anything to me.

Page 29

Q. What do you mean she's not going to say anything to you?

A. My mom is, like -- my mother is not going to say absolutely anything about him.

Q. Your mother told you that she saw him?

A. Yes, just a little bit, just in passing.

Q. And she told you that they didn't have any kind of conversation, correct?

A. No.

Q. And that's it. That's all that happened?

MS. ROSEN: I have a belated form and foundation objection. Sorry.

A. That's all she told me, and she's not going to say any -- absolutely nothing to me about him.

Q. She did not tell you that he threatened her at all, right?

A. No.

Q. She not tell you that he scared her or anything like that, right?

A. The truth is I don't know.

Q. Well, she didn't tell you that she was in fear of him or that he said something to make her feel fearful, right?

A. No.

CCSAO COI SUBPOENAS 000499

ADRIANA MEJIA, 02/05/2021

Page 30

Q. She just told you she saw him?

A. Yes.

Q. Are you still close with your parents?

A. Yes.

Q. How often do you talk to them on the phone?

A. Whenever I have minutes on my telephone, I call them.

Q. And how often is that?

A. I call them like four or three times per week.

Q. Do you talk to both your mom and dad?

A. Yes.

Q. Have you ever told them the truth about what happened?

A. No.

Q. Have you ever told them anything about it?

A. Very little.

Q. Have you told them a false story about what happened?

THE INTERPRETER: Translator says can you repeat that, please? You cut out.

Q. Have you told them a false story about what happened?

MS. ROSEN: Objection, form.

Page 31

A. I'm not going to answer that question.

Q. How old were you when you left Mexico?

A. I think 19.

Q. Had you been living at home until the time that you left?

Strike that. Let me ask a better question.

Were you living with your parents until the time that you left Mexico at 19?

A. No. When I got married, I went to my husband's town.

Q. And how old were you when you and Rosauro got married?

A. I was 16, and he was 18.

Q. When you went to live with him in his town, who lived with you in the house you lived in with Rosauro?

THE INTERPRETER: The translator couldn't make out what she said twice. It was echoing. Could I ask her to say it one more time slower?

A. When I went with him, I went to the house of one of his brothers. The house was loaned to us by his brother.

Q. So who lived at that house other than you and Rosauro?

Page 32

A. No one.

Q. And who is the brother who lent you all the house?

A. Encarnacion Mejia.

Q. Was that the only house you lived in while in Mexico with Rosauro before you came to the US?

A. Sometimes I would come to my mother-in-law's house, and I'd stay there with her.

Q. Who lived in that house?

A. My father-in-law, my sister-in-law Rosa, and two smaller brothers, younger brothers, of my husband, but they don't go to the Mexico capitol to work. They would only be there from time to time.

Q. What were their names?

A. Endovias Mejia, Leobardo Mejia.

Q. Any other Mejias who lived in the mother-in-law's house?

A. No.

Q. How did you meet Rosauro? How did you two end up getting married?

MS. ROSEN: Objection: form, compound.

A. It's a very long story. I'm not going to answer that.

Q. Did your families put you together, or did

Page 33

you guys meet and fall in love?

A. No. We met.

Q. And were you in love when you got married?

A. Yes.

Q. And when you were living in Mexico with Rosauro, were the two of you happy?

A. Yes.

Q. And then how was it decided that you would come to the United States?

A. When he came first.

Q. Why did he decide to come to the US?

MS. ROSEN: Objection: form, foundation.

A. Him?

Q. Yes?

A. Because, in Mexico, there's not a lot of opportunities for work.

Q. And so he -- go ahead.

A. He didn't have a stable job; so there was no way to get ahead.

Q. So did you both agree that you would move to the United States?

A. No. He wanted to come.

Q. So he made the decision on his own?

A. Yes.

Urlaub Bowen & Associates, Inc. 312-781-9586

CCSAO COI SUBPOENAS 000500

FILED DATE: 4/7/2022 9:01 PM 98CR1244002

ADRIANA MEJIA, 02/05/2021 Page 34..37

FILED DATE: 4/7/2022 9:01 PM 98CR1244002

Page 34

Q. But did he tell you in advance, before he left?

A. Yeah. We would talk about it a lot.

Q. And were you happy to go to the United States?

A. Me?

Q. Yes.

MS. SINGER: Object to the form of the question. She does have a Fifth Amendment right regarding this.

MR. SWAMINATHAN: I'm sorry, Dena. Do you want her to assert the Fifth on this? Is that what you said?

MS. SINGER: I do, yeah, on this line of questioning.

MR. SWAMINATHAN: Do you want to talk to her, take a quick break and talk to her?

MS. SINGER: I can talk to her and take a breakout room, or you guys can move on from this.

MR. SWAMINATHAN: Why don't you go into a breakout room. I'm not going to spend much more time on this, but I want to be able to assert what you need to assert. So why don't you go quickly to a breakout room.

Page 35

MS. SINGER: She's going to have to get a sheriff.

THE INTERPRETER: The translator says you don't want to give the answer then, correct.

MS. SINGER: I'm asking to hold off on the answer. I'm asking to talk to her.

THE VIDEOGRAPHER: All right. Let's go off the record. We're going off the video record at 10:09 at the end of media unit 1.

(Recess in proceedings from 10:09 to 10:14 a.m.)

THE VIDEOGRAPHER: We are back on the video record at 10:14 at the beginning of media unit 2.

MR. SWAMINATHAN: Madam court reporter, could you read back the last question, and then we'll have it interpreted to allow Ms. Mejia to answer?

(Pending question read.)

A. I'm not going to answer.

Q. Are you asserting your Fifth Amendment right?

A. Yes. In this question, yes.

Q. When I asked you earlier today if you ever told your parents a false story about what happened to the Soto family, you said you were not going to answer

Page 36

that question, right?

A. Yes.

Q. Are you asserting your Fifth Amendment right for that question?

MS. ROSEN: Objection: form, foundation.

A. Yes.

Q. Did you have concerns about coming to the United States?

MS. ROSEN: Objection, form.

A. I'm not going to answer.

Q. Are you asserting your Fifth Amendment right?

A. Yes.

Q. Did you have concerns about staying in Mexico?

MS. ROSEN: Objection, form.

A. I'm not going to answer.

Q. Are you asserting your Fifth Amendment right against self-incrimination?

THE INTERPRETER: The translator is not sure if she answered. Her volume is very low. I think I heard "uh-huh," but I can't tell you for sure.

A. Yes.

Q. Did Rosauro have concerns about staying in

Page 37

Mexico?

MS. ROSEN: Objection: form, foundation.

A. I don't know.

Q. Did Rosauro ever indicate to you that he had any concerns about staying in Mexico?

MS. ROSEN: Objection, form.

A. I don't know.

Q. Did you or anyone in your family have any issues with the police in Mexico at the time that you were planning to leave?

MS. ROSEN: Objection: form, foundation.

A. Pardon me? Could you please repeat the question?

Q. Did anybody in your family have any issues with the police at the time that you were making a decision to leave?

MS. ROSEN: Objection: form, foundation.

A. No.

Q. Did anyone in Rosauro's family have any problems with the police when you were making the decision to leave Mexico?

MS. ROSEN: Objection: form, foundation.

A. I don't know very much about my husband's family, if they had problems or not.

CCSAO COI SUBPOENAS 000501

Page 38

Q. When the decision was made to go to the United States, did anybody else go with Rosauro?

A. I don't remember. I don't know.

Q. When you went to the United States, did you go with anyone else?

A. Yes.

Q. Who else did you go with?

A. This is private. This is his family.

Q. Okay. These are important questions, and we need you to answer them.

Who else came with you to the United States?

MS. ROSEN: I'm going to object to form, foundation, and harassing and to your representations about what are and what are not important questions. From the Defendant's perspective, these are irrelevant questions.

MR. SWAMINATHAN: Go ahead.

A. I'm not going to give the names -- I'm not going to say the people who came with me.

Q. Were any of them members of Rosauro Mejia's family, the Mejia family?

MS. ROSEN: Objection: form, harassing.

A. I don't know. I'm not going to answer.

Q. Are you asserting your Fifth Amendment

Page 39

right?

A. Yes.

Q. Before you left to come to the United States, had you committed any crimes in Mexico?

A. Never.

Q. Before Rosauro came to the United States, did he commit any crimes in Mexico?

A. No.

Q. Before you came to the United States, did you know of any other members of his family committing any crimes in Mexico?

A. My family has never done anything bad, as far as I know.

Q. Before Carlos went to the United States, had he committed any crimes in Mexico?

A. No.

Q. When you went to the United States, had Carlos already gone to the United States?

A. No. He came when I came, afterwards.

Q. Did he come at the same time as you or after you?

A. No, after.

Q. When I asked you if you had concerns about coming to the US and you didn't answer my question,

Page 40

did you or your family have any issues with gangs in Mexico before you came to the United States?

A. In my town, there is no gangs. There was no islands. There were no criminal problems. No. No.

Q. What about in Rosauro's town? Were there any gang issues there?

A. That town is very small, but I don't know anything about that. So no. As far as I know, no.

Q. Did Rosauro or any of his family members have any problems with gang members in Mexico?

MR. ENGQUIST: Objection, foundation.

A. No.

Q. Are any members of your family in a gang?

A. As far as I know, no.

Q. Has Carlos ever been in a gang?

MR. ENGQUIST: Objection, asked and answered.

A. Never.

Q. If Rosauro said that Carlos was involved with gangs, is he lying?

MS. ROSEN: Objection: Form, foundation, misstates Rosauro's testimony.

A. I don't know.

Q. Is it possible that Carlos was involved with

Page 41

gangs in the United States?

MS. ROSEN: Objection: form, foundation.

A. I don't know.

Q. When you were coming to the United States, had Rosauro already settled in Chicago?

A. Would you repeat the question, please?

Q. When you were coming to the United States, Rosauro was already in the United States, right?

A. Could you please repeat the question again?

Q. When you came to the United States, Carlos was already in the US, right?

MS. ROSEN: Objection, form.

MR. SWAMINATHAN: Let me reask that. I asked the wrong name.

Q. When you came to the United States, Rosauro was already in the United States, right?

THE INTERPRETER: The translator is confused.

Q. I'll ask it again. When you came to the United States, Rosauro had already come, correct?

A. Yes.

Q. Where in the United States was he?

MS. ROSEN: Objection: form, foundation. At what time?

CCSAO COI SUBPOENAS 000502

FILED DATE: 4/7/2022 9:01 PM   98CR1244002

Case: 1:18-cv-01028 Document #: 892-2 Filed: 04/04/26 Page 503 of 855 PageID #:121129

FILED DATE: 4/7/2022 9:01 PM  98CR1244002

Page 42

MR. SWAMINATHAN: When she's coming to the United States.

A. Confusing me a little bit. Can you please repeat the question?

Q. When you came to the United States, where was Rosauro?

A. I don't know.

Q. When you came to the United States, did you know you were going to be going to Chicago?

A. Yes.

Q. Did you or Rosauro have family in Chicago?

MS. ROSEN: Objection, form.

MR. SWAMINATHAN: Go ahead.

A. Why do you have to ask about my ex's family?

Q. Because many of those family members are in the US and are witnesses in this case, identified by both parties.

I'll ask my question again. Did you or Rosauro have any family members who were in Chicago?

A. Yes. He did. I did not.

Q. So when you came to the US, did you expect that you would be going to Chicago to join his family?

A. With my family or his family?

THE INTERPRETER: La familia de Rosauro.

Page 43

A. Yes.

Q. Which family members of his were already in the United States when you came?

MS. ROSEN: Objection, foundation.

A. Family, his brothers.

Q. Which ones were already here?

A. Adolpho Mejia, Horacio Mejia, Manuel Mejia, Clemente Mejia, with their children and families.

Q. Anyone else?

A. Leobardo Mejia and Clemente Mejia, I think, but he stayed a short time and then went back to Mexico.

Q. Anyone else?

A. Well, just them, that I recollect, as family.

Q. What did Adolpho Mejia do for work?

MS. ROSEN: Objection, foundation.

A. That's his life. I'm not going to explain it.

Q. Do you know what Adolpho did for work in the United States?

A. I never asked him. He was a man a lot older.

Q. Do you know what Horacio Mejia do for work

Page 44

in the US?

A. I don't remember what he did.

Q. Do you know what Manuel Mejia did for work?

MS. ROSEN: I'm going to object to relevance on what the Mejia family members' work was.

A. I don't remember the jobs. It's been years. I don't remember. It's their life.

Q. How long had Rosauro been in the US before you joined him?

THE INTERPRETER: Translator asks that you repeat that. You echoed.

Q. How long had Rosauro been in the US before you joined him?

A. I don't remember if it was months or a year. Something like that.

Q. When you came to the US, I think you said you first spent some time in Los Angeles, right?

A. Yes.

Q. Who did you live with when you were in Los Angeles?

A. With people from my town, acquaintances.

Q. Any members of the Mejia family?

A. No.

Q. And then was your next stop Chicago?

Page 45

A. Yes.

Q. And when you came to Chicago, Rosauro was not living at Mozart, right?

A. Yes.

Q. What address was he living at?

A. 51st and Western.

Q. Is that where you joined him and lived with him?

A. Yes.

Q. Was that an apartment that he rented?

A. Yes.

Q. And who lived with you and Rosauro at 51st and Western?

A. On the first floor, my brother-in-law Adolpho lived there. It was his. He rented us a small apartment with my brother-in law Encarnacion and, for a time, with the brother Clemente and two people from my husband's town. I don't remember their names.

Q. Then what was the next house you lived in after 51st and Western?

MR. ENGQUIST: I'm just going to object to asked and answered. We went through these addresses yesterday at length.

CCSAO COI SUBPOENAS 000503

FILED DATE: 4/7/2022 9:01 PM  98CR1244002

Page 46

MR. SWAMINATHAN: You're doing asked and answered based on your questioning of the witness?

MR. ENGQUIST: No. That was your questioning of the witness, Anand.

MR. SWAMINATHAN: No. Okay, go ahead, Adriana.

A. 62nd and Mozart, something like that.

Q. Okay. So you moved from 51st and Western to the Mozart house, right?

A. Yes.

Q. And you've already gone through everybody who lived at the Mozart house. Was there anybody who lived there a period of time and left before the time of your arrest?

THE INTERPRETER: Translator ask you to repeat that again, please.

MR. SWAMINATHAN: Yeah. Let me just ask a different question.

Q. Was there anybody who lived at the Mozart street address with you and then moved out?

A. Yes, a brother of my husband's.

Q. Who is that?

A. Encarnacion Mejia, his family.

Q. Anyone else who lived with you at that house

Page 47

and then moved out?

A. Two friends, a guy from my town and a guy from my husband's town, acquaintances.

Q. Where did Encarnacion go when he left the house?

A. He went to Texas.

Q. The Mozart house, was that an apartment you were renting?

A. Yes.

Q. Did you know who owned the house?

A. Yes.

Q. Who owned it?

A. Horacio Mejia.

Q. Did Horacio own other buildings as well?

MS. ROSEN: Objection, foundation.

A. I don't know about his life.

Q. Do you know if he owned other buildings?

A. That's his private life. I don't know if it was his house or if he was renting it.

Q. If you don't know the answer, then you can just tell me you don't know. If you do know, I need you tell me the answer or tell me you're refusing to answer. But --

A. I don't know about his life, whether it was

Page 48

his house or if he was renting it. How am I going to know about his life?

Q. If I ask you a question and the answer is you don't know, tell me you don't know. Okay?

MS. ROSEN: Objection: form, harassing. She just said she didn't know.

MR. SWAMINATHAN: She asked me why would she know. The answers are not supposed to be rhetorical questions. Let me ask the question one last time.

Q. Did Horacio own any other buildings that you know of?

A. I don't know.

Q. The family members of Rosauro who you lived with in Chicago, did you get to know them?

A. What's that?

Q. Did you get to know his family members?

MS. ROSEN: Objection, form.

A. I don't understand that question.

Q. Did you consider them to be part of your family?

A. Well, not that close, no.

Q. Were there any members of Rosauro's family who you became close with?

A. I always spoke a lot with his brother

Page 49

Edwiges, with Leobardo I spoke a lot with, his sister Rosa, his mother-in-law, but she already died, passed away. Well, I spoke with all of them, but a relationship --

Q. Okay. Were there any members of his family that you did not get along with?

A. No. I spoke with all of them.

Q. Among the people at the house at Mozart, who did you spend the most time with?

A. Guadalupe Mejia and Jorge Mejia and Edwiges Mejia and Jessica Mejia.

Q. Edwiges, was that Rosauro's brother?

A. Yes.

Q. And who was Jessica?

A. The wife of Edwiges.

Q. And where did they live?

A. They lived for a time with me, and then they went to where I lived before.

Q. Did you say you grew close with Guadalupe and Jorge Mejia?

A. Since we lived in the same apartment, I would watch their little girl sometimes.

Q. If you needed someone to talk to, who would you go to?

CCSAO COI SUBPOENAS 000504

FILED DATE: 4/7/2022 9:01 PM  98CR1244002

Page 50

A. Sometimes on the weekend I would go with Estoria Mejia. I was also a little closer with her.

THE INTERPRETER: The translator could not hear what she said. It was going in and out. Can I ask her to repeat her last line?

MR. SWAMINATHAN: Yeah.

A. I spoke a lot with her, but she was already a woman much older than me.

Q. Who else other than her would you turn to?

A. Sometimes I would go with Carmen Mejia, with Rosalinda Mejia, and Marisa Mejia, but she was in Texas. I spoke very little with her.

Q. And was Guadalupe also someone you would also turn to for support?

THE INTERPRETER: Translator asks you to repeat that, sir. You came in garbled.

Q. Was Guadalupe Mejia someone you also turned to for support?

A. Yes. Almost every day, she spoke with me.

Q. Did she work, or was she at home?

A. She made bread to sell, and sometimes she took care of children.

Q. Did she do all of that from home?

A. Yes.

Page 51

Q. Would you see her every day?

A. The majority of the time, yes.

Q. What about Carlos? Would you ever turn to Carlos for support?

A. No.

Q. Jose Mejia, was he in the United States?

A. Yes.

Q. Who did he live with?

A. With his wife and his dad.

Q. Who was his dad?

THE INTERPRETER: The translator wants to say the way she said it, it could have been his dad or her dad.

MR. SWAMINATHAN: Can you clarify?

A. It was his dad.

Q. Who was his dad?

A. Adolpho Mejia.

Q. Did you -- were you friend with Jose Mejia?

A. Not very good friends. When I would go to the house, we would talk. I would watch the kids.

Q. How often would you see Jose Mejia?

A. Every time my husband would take me to his brother's house.

Q. How often was that?

Page 52

A. Sometimes every week. Sometimes every 15 days.

Q. And then, on the weekends, who would you spend time with on the weekends?

A. With my charity at the time, with my husband; but sometimes he would leave, and I would be by myself. I didn't have friends.

Q. Anyone else you spent time with on the weekend when Rosauro was not there?

A. Sometimes Lupe would invite us over to the house to eat. I would go down Lupe's apartment, and we would chat a little bit, or she would come up to my apartment.

Q. Anyone else you would spend time with on the weekends?

A. His brother-in-laws or when there were birthday parties or parties.

Q. One of the people living at the house we talked about yesterday was Martin Vaca, right?

A. Yes.

Q. Was he one of the people who you mentioned earlier who you knew from your town or Rosauro's town?

A. No. That man, he was from a town near my house, but he got married to a girl from my town.

Page 53

That's why I know him.

Q. What did Martin Vaca do for work?

A. I don't remember.

Q. And do you know a Ramiro Vaca?

A. I don't remember.

Q. Did Martin Vaca go by any other name?

A. The truth is I don't know.

Q. Did Rosauro have any nicknames?

A. What was that?

Q. Did Rosauro have any nicknames?

A. Yes.

Q. What was his nickname?

A. His brothers called him Chapa Pi (phonetic).

Q. What did you call him?

A. Chapa.

Q. Did he have any other nicknames?

A. The truth is I don't remember.

Q. Did you make any friends while you were living at Mozart Street, any friends from the United States?

A. No, I hardly had any friends. It was just with Miss Lorena who I speak with most.

Q. Lorena, was she your friend even when you were living at Mozart?

CCSAO COI SUBPOENAS 000505

Page 54

A.  Yeah, because she lived three houses from where I lived.

Q.  Did you know a person named Robert Kubon, K-u-b-o-n?

A.  I don't remember.

Q.  Does that name sound familiar to you at all?

A.  At this moment, no, I don't know who it is.

Q.  Do you know a person named Diana Gama?

A.  Yes.  I had spoke very little with her.

Q.  Who was she?

A.  It was woman who I met in a -- I think it was a -- I don't remember how I knew her, but I wasn't around her much.

Q.  Was she someone -- so she was somebody that you know, or was she somebody that knew other people --

THE INTERPRETER:  Translator asks:  Can you repeat that, sir?

MR. SWAMINATHAN:  Let me ask a better question.  Sorry.

Q.  Did other people at the house also know Diana Gama?

MS. ROSEN:  Objection:  form, foundation.

A.  I don't think so.

Page 55

Q.  So she was just somebody that you had gotten to know?

A.  No.  I hardly ever made friends here.

Q.  And where did you meet her?

A.  The truth is I don't remember.  The truth is no.

Q.  As far as you know, other than yourself, did anybody else in the house talk to Diana Gama or know Diana Gama?

MS. ROSEN:  Objection:  form, foundation.

A.  No.

Q.  What about Miguel Gama?  Do you know -- is the name Miguel Gama familiar to you?

A.  I don't remember exactly who they are.

Q.  But Miguel Gama is also a name that's familiar to you?

A.  At this moment, I'm remembering, but I'm not remembering well, totally.

Q.  Was Miguel Gama always someone that you knew but not other people in the house knew.  Strike that.  Let me ask a better question.

Was Miguel Gama also someone that only you knew?

MS. ROSEN:  Objection:  form, foundation,

Page 56

mischaracterizes her testimony.

A.  No.  I don't remember who they are.  I don't know.

Q.  Are you familiar with the name Romualdo Moreno, R-o-m-u-a-l-d-o?

A.  At this moment, I don't remember who they are.

Q.  Is that name familiar to you?

A.  The truth is I don't know what to tell you because I don't remember who they are.

Q.  So let me ask a different question.  Have you ever -- strike that.

Have you ever heard the name Romualdo Moreno?

MS. ROSEN:  Objection:  form, foundation.

A.  The truth is, at the moment, I don't remember who it is.

Q.  At some point, did you know a Romualdo Moreno, and you just can't remember who that is now?

MS. ROSEN:  Objection:  form, foundation.

A.  I don't know.  I don't remember if I know him or who it is.  I don't know.

Q.  Did you ever have any friends with the name Moreno?

Page 57

MS. ROSEN:  Objection:  form, foundation.

A.  No.  I don't remember who it is.  It's the truth.

Q.  Did you know anyone who has the nickname Moreno?

A.  No, I don't remember.

Q.  Did Rosauro or anybody else who lived at the house spend time with anybody with the first name or last name Moreno?

MS. ROSEN:  Objection:  form, foundation.

A.  No.  I don't know who they are.

Q.  Back in March of 1998, a person named Romualdo Moreno had been calling the Mozart house.  Would that be surprising to you?

MS. ROSEN:  Objection:  form, foundation.

A.  No, I don't remember.  I'm not going to answer because I don't remember.

Q.  Yesterday we talked a little bit about the name Norma Salazar.  Did you ever meet a woman named Norma Salazar?

A.  No.  I didn't know her, but someone had told me that her name was Norma Salazar.

Q.  I'm just asking:  Did you ever meet a person named Norma Salazar?

CCSAO COI SUBPOENAS 000506

FILED DATE: 4/7/2022 9:01 PM  98CR1244002

Page 58

A. No.

Q. Did you ever meet someone who you were told was Norma Salazar?

A. No.

Q. And you indicated yesterday that Gabriel had told you the name, Norma Salazar; is that right?

A. Yes.

MR. SWAMINATHAN: Did you get the answer?

THE INTERPRETER: The translator hasn't heard anything.

MR. SWAMINATHAN: She answered, but I think you missed it. Go ahead, Ms. Mejia.

THE REPORTER: The court reporter got a yes.

MR. SWAMINATHAN: The court reporter got a yes; so we can keep going.

Q. So have you ever told anyone else the name Norma Salazar?

MS. ROSEN: Objection, form.

A. Yeah. I think to my husband, I said that the little one that I was watching was Norma Salazar.

Q. Did you tell anybody else about Norma Salazar?

MS. ROSEN: Objection: form, foundation.

A. I don't remember.

Page 59

Q. Weren't you telling everybody at that time when you came home with the little boy that that was Norma Salazar's boy?

A. I don't remember that.

Q. When you were saying the name "Norma Salazar" to others, you knew that that was a lie, right?

A. Yes.

Q. Did you ever mention Norma Salazar to the police?

A. Yes.

Q. When you told police about -- you told the police that Normal Salazar -- strike that.

You told the police that the little boy belonged to Norma Salazar; is that right?

A. Yes.

Q. When you told them that, it was a lie, right?

A. Yes.

Q. At the police station, were you ever shown any photos of anybody the police believed to be Norma Salazar?

A. They showed me a lot of women in a line.

Q. This is women who were in person, live, when

Page 60

they showed you?

A. They were behind a glass. They were people arrested for things. I don't know.

Q. Before that, were you ever shown any photographs?

A. I think so.

Q. Were you asked, when you looked at photos, to pick out a person who was Norma Salazar?

MS. ROSEN: Objection, form.

A. The truth is I no longer remember.

Q. Tell us what you remember about being shown photos.

A. The truth is I no longer remember a lot.

Q. Did you look at any of the photos and select a photo of any one of the people?

A. I don't remember.

Q. After that at some point, did you see a lineup?

MR. ENGQUIST: Objection: form, mischaracterizes previous testimony.

MS. ROSEN: Foundation after that.

MR. SWAMINATHAN: Let me reask it.

Are you okay, Ms. Mejia?

THE WITNESS: I need to go to the lady's

Page 61

room. Can I?

MR. SWAMINATHAN: Let's take a break.

THE VIDEOGRAPHER: We are off the video record at 11:15 at the end of media unit 2.

(Recess in proceedings from 11:15 to 11:45 a.m.)

THE VIDEOGRAPHER: We are back on the video record at 11:45 at the beginning of media unit 3.

MR. SWAMINATHAN: Ms. Mejia, are you able to go forward right now?

THE WITNESS: Yes.

MR. SWAMINATHAN: You indicated earlier that you were feeling a little dizzy. Are you fine now?

THE WITNESS: Yes. I ate something sweet. I'm okay.

MR. SWAMINATHAN: If you need to stop once again, just tell us, and we can stop. Okay?

THE WITNESS: Very well. Yes.

BY MR. SWAMINATHAN:

Q. I asked you earlier about the name Moreno. There's one question I forgot to ask you.

A. The truth is I don't know who they are.

Q. Sitting here today, do you know anyone who goes by the name Moreno?

CCSAO COI SUBPOENAS 000507

FILED DATE: 4/7/2022 9:01 PM   98CR1244002

Page 62

A. No. I don't know.

Q. Okay. I was asking you about Norma Salazar. You described viewing a lineup at the police station, right?

A. Yes.

Q. How many people were in the lineup that you viewed?

A. 10 or 12.

Q. Did you identify any of them?

A. No.

Q. Did any of them look familiar to you?

A. No.

Q. Where were you when you viewed the lineup?

A. Detective Guevara took me to a small room. Yes, a small room, but I don't remember if it was the first floor or the basement.

Q. And where were the people that you were viewing in the lineup?

A. They were in a room that had a -- I could see them, but they could not see me.

Q. And the person with you was Detective Guevara, did you say?

A. Yes.

Q. Were there any other police officers with

Page 63

you?

THE INTERPRETER: Translator asks can you repeat that, sir?

Q. Were there any other police officers with you?

A. I don't know if it was a man or a woman that had --

THE INTERPRETER: Translator couldn't make out what she said about the handcuffs. Can I ask her?

MR. SWAMINATHAN: Please.

A. They had my hands handcuffed behind me, but I don't remember if it was a man or a woman that was taking me.

Q. When you went in and actually viewed the 10 to 12 people in the lineup, was anybody there other than Detective Guevara?

MS. ROSEN: Objection, form.

A. At the entrance door, there was -- there was a guard at the door, and at the other exit, another guard and, at the door to get to the people on the lineup, another guard.

Q. You viewed photos on that same day, right?

MR. ENGQUIST: Asked and answered. Mischaracterizing her previous testimony.

Page 64

MR. SWAMINATHAN: Go ahead.

A. I think so.

Q. How many photos were you shown?

A. A lot of different people.

Q. Can you describe what kind of photographs they were?

A. They were like done in lapiz. They were pencil. It was as if someone had made a picture, but it was faces of people.

Q. Are you describing a drawing?

A. They were photos that they already had. They had a lot of them.

Q. Were they Polaroids?

A. Pardon me?

Q. Do you know what Polaroid photos are?

THE INTERPRETER: Translator would like to say: Can I change the word "Polaroid" to something else to make her understand?

MR. SWAMINATHAN: Yes.

A. No. It was like as if someone had done them.

Q. Were you shown the photos before or after you saw the lineup?

A. I don't remember.

Page 65

Q. When you say you were shown a lot of photos, was it more or less than ten?

A. There were a lot of them. It was more like -- more than 20.

Q. And where were you when you were shown those photos?

A. With Detective Guevara in a room that had a --

THE INTERPRETER: Translator wants to say she's coming in and out. I see her mouth moving. I don't hear anything. Then I'll hear it way later. That's why I'm having trouble putting together her last two sentences.

MR. SWAMINATHAN: Try again. Can you ask her to answer it again and try to translate?

A. Detective Guevara took me to a room where they had a lot of cabinets filled with papers. There was a lot of other things I no longer remember. But it was one of their offices. It was an office of one of them.

Q. Was there anybody there other than you and Detective Guevara?

A. I think so, but they were doing other things. The truth is I don't remember a lot, but I

CCSAO COI SUBPOENAS 000508

ADRIANA MEJIA, 02/05/2021                                    Page 66..69

Page 66

believe so.

Q. I'm showing you a document that was marked as Exhibit 7 to your prior deposition. It's Bates stamped RFC Solache Reyes 207.

Ms. Mejia, is this person familiar to you?

MS. ROSEN: Object to the form.

A. I don't remember.

Q. Have you ever seen this picture before?

MS. ROSEN: Objection, form. She saw it at the last deposition.

A. I don't remember.

Q. Were you shown a photograph of this woman when you were at the police station in April of '98?

A. I don't remember. There were a lot of photographs. The truth is I don't remember.

Q. Were the photographs that you saw -- were they pages like this?

A. No. They were like when people do photos with a pencil, doing the face with a pencil.

Q. What do you mean it was like people doing it with a pencil? Does that mean it was a photo or a drawing?

A. Like when they do someone's -- like a face or a profile with a pencil.

Page 67

Q. Did it look like something taken with a camera?

A. No. They were photographs on a piece of white or blank paper --

THE INTERPRETER: Translator is not sure which because it means both.

A. -- but done with a pencil.

Q. So what you saw were pictures that looked like they were made with a pencil and not a camera; is that right?

A. It's different. I don't remember this photograph.

Q. I'm asking you a different question. What you were shown -- strike that.

If I understand you correctly, what you were shown were pictures created using a pencil and not a camera; is that right?

A. Yes, they were. They were from pencil.

Q. All right. When you were shown those pictures created by a pencil, did you pick any of them out?

A. I don't think so.

Q. Did any of them look familiar?

A. No.

Page 68

Q. Were you ever shown a single photograph taken by a camera of a woman?

A. I don't remember.

Q. When you were shown -- when Guevara showed you the pictures, what did he tell you he wanted you to do?

MS. ROSEN: Objection, form.

A. The truth is I don't remember.

Q. Did he tell you why he wanted you to do a lineup?

A. No, I don't remember why.

Q. When you were viewing the photos, was it your understanding that you were supposed to be identifying Norma Salazar?

MS. ROSEN: Objection, form.

A. It's been a lot of years, and I no longer remember.

Q. When you were shown a lineup, was it your understanding that you were to try to identify someone from the lineup who was Norma Salazar?

MS. ROSEN: Objection, form.

A. Yes, but I don't remember -- I don't remember a lot.

Q. I'm showing you a document that we'll mark

Page 69

as Plaintiff's Exhibit 1 to this deposition. This is RFC Solache Reyes 233 through 253. And it's Area 5 Supplementary Report, Cleared Closed Report.

The report states that a "Detective K. McDonald searched the ICAM database and located a woman named Norma Salazar." The report then states "A photo of this Norma Salazar was shown to Adriana Mejia, who identified her as being the woman who gave her the children."

Is that statement true or false?

MS. ROSEN: Objection: form, foundation.

A. False.

Q. What part of it is false?

MS. ROSEN: Objection, form.

A. I don't remember having said that.

Q. You don't remember having said what?

A. What you read to me at first.

Q. Which part did you not say?

MS. ROSEN: Objection, form.

Q. Let me try another way.

Ms. Mejia, where it says that you identified the photo of Norma Salazar as being the woman who gave you children, is that false?

MS. ROSEN: Objection, form.

CCSAO COI SUBPOENAS 000509

FILED DATE: 4/7/2022 9:01 PM 98CR1244002

ADRIANA MEJIA, 02/05/2021

Page 70

MR. SWAMINATHAN: Go ahead.

A. False. I didn't say that.

Q. Did you identify anyone from a photo as being the woman who gave you a child?

A. No.

Q. So is what is written here by the police a lie?

MS. ROSEN: Objection, form.

A. I didn't say that.

Q. So the police wrote something that you didn't say; is that right?

MS. ROSEN: Objection, form.

A. How am I going to answer that if I didn't say that?

Q. That's what I want to understand. The information written here, what you're saying is this did not happen. So what the police wrote is not true, right?

MS. ROSEN: Objection, form.

A. How was I going to know what they were putting down if I didn't know what they were speaking? I didn't speak English.

Q. Understood. All right. We talked yesterday about the phone calls. Strike that.

Page 71

We talked yesterday about the phone that was at the Mejia house, right?

THE INTERPRETER: The translator didn't hear anything.

A. Can you repeat the question, please?

Q. Yeah. Who would you call from the phone at the Mejia house? Who would you make calls to?

A. My parents in Mexico, Estoria Mejia, sometimes Marisa Mejia in Texas, Estoria Mejia. Mostly using it to speak -- to call my parents in Mexico.

Q. Who were the people who would regularly call you at the house?

A. The lady whose children I watched. Sometimes Jose Mejia would call me. Estoria Mejia. Javier Mejia to see if I would take care of the kids. Rosalinda Mejia sometimes. I don't remember who else called me.

Q. What was the name of the person whose kids you babysat?

A. Just Graviella Sanchez, Jose or his wife to watch his children, and Javier Mejia. I would watch his little boy.

Q. Was Rosauro close with Javier Mejia?

Page 72

A. No.

Q. Was Rosauro close with Jose Mejia?

A. No.

Q. Would Javier Mejia call the house to talk to Rosauro?

A. Almost never.

Q. Would Jose Mejia call the house to talk to Rosauro?

A. He does sometimes, when he has to fix his car.

Q. Fix whose car?

A. Either Jose's or my husband's. Sometimes to clean them or put in stereos.

Q. Jose would do that, and he would be calling Rosauro for help?

A. Sometimes, yes.

Q. Would Jose ever call to borrow Rosauro's car?

A. Jose?

Q. Yeah, Jose.

A. No. I don't think ever.

Q. What about Javier Mejia? Would he -- strike that.

Would Rosauro Mejia lend his car to other

Page 73

people?

A. Yes.

Q. Who would he lend his car to?

A. His brothers.

Q. Anyone else?

A. Sometimes. Or a lot of times, he would lend it to Gabriel Solache. I'm not sure, but to Martin Vaca also. I don't remember to who else.

Q. Okay. Was the first time you met Arturo Reyes when he moved into the Mozart house?

A. Yes.

Q. You never met him before he moved in, right?

A. Yes.

Q. He had his own room, right?

A. No.

Q. Did he share a room?

A. No. He shared the living room with my brother, with Gabriel. And he also shared it with a guy named Daniel, but he went to Los Angeles.

Q. Arturo had some family that lived nearby, right?

A. No. He just had his sister-in-law, Carmen.

Q. And he would spend time over at Carmen's house, right?

CCSAO COI SUBPOENAS 000510

FILED DATE: 4/7/2022 9:01 PM 98CR1244002

ADRIANA MEJIA, 02/05/2021

Page 74

THE INTERPRETER: Translator asks are you saying "he" or "she" would?

Q. Arturo would spend time at Carmen's house, right?

A. I wouldn't know what to tell you.

Q. Did Arturo work?

A. I think so.

Q. He worked a lot, right?

A. I think so. Although sometimes he didn't work because his job -- I think he was laid off. I don't remember.

Q. And when we wasn't at work, he would regularly spend time away from the house with others, right?

MS. ROSEN: Objection: form, foundation.

Q. He didn't spend much time at the house on Mozart, right?

MS. ROSEN: Objection, form.

A. I don't remember.

Q. Is it fair to say that you barely knew Arturo Reyes?

MS. ROSEN: Objection, form.

A. Very little. Very little. I lived with him very little or interacted with him very little.

Page 75

Q. And other than just saying hello to each other, did you ever have any other conversation?

A. Yes, when we would eat together.

Q. What would you talk about with him?

A. Food. And he would talk about his family in Mexico. But very little.

Q. Fair to say he was not someone that you would confide in?

A. Correct.

Q. He wasn't someone you looked to for support, right?

A. Correct.

Q. And he wasn't someone you would share your personal secrets with, right?

A. Yes.

Q. Who were the people you would share your personal secrets with? Who were you close enough to?

A. With no one. Until the present day, no.

Q. Did she say present day?

THE INTERPRETER: The interpreter understood "hasta la fecha" meaning until the present day. But then there was a word or two behind that. And another noise came in, and I couldn't actually make out if it was her or someone else.

Page 76

Q. Back in March of 1998, who would you share your personal secrets with?

A. With no one.

Q. After your arrest, did you ever talk to Arturo Reyes?

A. No. But I remember he sent me a letter. I think it was when I was still in Dwight, in prison.

Q. Let me come back to the letter. You and Arturo Reyes never spoke after you'd been at the police station and arrested, right?

MR. NOLAND: Object to form.

A. When we were arrested, when we were going to court together, yes, we would speak.

Q. What would Arturo say to you when you were going to court?

A. Very basic, like how I was.

Q. Anything else?

A. I remember, one time, I asked him about his family. Very basic.

Q. Other than when you saw him on the way to court, did you have any other conversations with Arturo Reyes?

A. No.

Q. And you said he sent you one letter?

Page 77

A. No. He sent me a letter.

Q. And what did he say in the letter?

A. It was written by a person, but I don't know who the person was. But yes, it said it was Arturo Reyes.

Q. So the letter was from him or someone else?

A. No. It was from him because it was from when I found out that he was in -- I don't remember the name of the place where he was incarcerated, but he told me where he was.

Q. What did the letter say?

A. He spoke about how he was. Through this, I don't remember much.

Q. Other than telling you how he was doing, did the letter say anything else?

A. Truth is I don't remember.

Q. Did you have any other communications with Arturo Reyes after you were charged with the crime other than the one letter he sent you and the communications on the way to court?

A. No.

Q. Arturo Reyes has never threatened you, correct?

A. No.

FILED DATE: 4/7/2022 9:01 PM   98CR1244002

Page 78

Q. Is that correct?

A. Yes.

Q. He's never promised you anything, correct?

A. No. But on an occasion when we were in jail, everything was going to be okay, that I should be strong. What else did he tell me? Trying to think. He told me that I should pray a lot, that I should have a lot of faith, I think. And I don't remember what else he told me.

Q. Arturo Reyes was a religious person, right?

A. Well, the truth is I don't know.

Q. So he never promised you anything in any communications you had with him, right?

A. I don't remember.

Q. After you were arrested, did you have any communications with Gabriel Solache?

A. Yes.

Q. When did you have -- let me ask you any conversations you had. Did you ever have conversations or speak to Gabriel Solache after you were charged with this crime?

A. I don't remember. I don't think so.

Q. So the only communication you had with Gabriel since you were charged with this crime were

Page 79

letters; is that right?

A. Except when we went to court.

Q. Okay. So the only communications that you had with Gabriel since this happened were letters and when you saw him before court, correct?

A. Yes.

Q. What did he tell you when you would talk to him before court?

A. What didn't he tell me?

Q. What did you tell him?

A. For example, when we were close to the -- what are they called?

THE INTERPRETER: Translator can't make out the word she's using. I think she's saying something in English, but I can't make it out.

MR. SWAMINATHAN: Bullpen.

THE INTERPRETER: Oh, the bullpen?

A. He would tell me to show him, like, my chest, that he was going to show me his intimate, his private parts. He would tell me a lot of gross things.

Q. Anything else that he would say to you or tell you when you were in the bullpen?

A. That I was going to have everything on me

Page 80

and he was not going to keep taking the blame.

Q. Did he tell you that he didn't want to take the blame for what happened?

A. Yes, he said it.

Q. And what would you say to him? Did you ever -- strike that.

Did you ever tell him that you were sorry for what happened?

A. I always said that everything we had done was -- it's difficult for me to say it.

Q. Did you ever tell him that you were sorry for what had happened to him?

MR. NOLAND: Objection, form.

A. Yes. One time, on one occasion, I told him I was sorry for everything that was happening when he lost his dad.

Q. When was that?

A. Because he was in jail and he couldn't be with his dad.

Q. Other than that, was there any other time you told him you were sorry for what had happened to him?

A. I always felt bad. Yes, I think so.

Q. Did you ever tell him it was your fault?

Page 81

A. No.

Q. Did you ever, in letters, write to him and tell him that it was your fault?

A. I don't remember.

Q. Well, is that something you would have ever written?

MS. ROSEN: Objection: form, foundation.

A. The truth is I no longer remember.

Q. So it is possible that you wrote to him and told him that it was your fault what had happened?

MS. ROSEN: Objection, form.

A. I don't remember if I wrote. It's been a lot of years. Truth is I don't remember. He also wrote me telling me a lot of things; but unfortunately, when I came here, I lost those letters.

Q. When you were -- strike that.

Anything else that you can remember Gabriel Solache saying to you or doing when you would see him going to court?

A. When we were going to court, yes, he would say a lot of things to me.

Q. But you told me some things that he told you. You told me that there were things he would say that were of a sexual nature, right?

CCSAO COI SUBPOENAS 000512

FILED DATE: 4/7/2022 9:01 PM  98CR1244002

ADRIANA MEJIA, 02/05/2021                                          Page 82..85

FILED DATE: 4/7/2022 9:01 PM  98CR1244002

Page 82

THE WITNESS:  Give me a minute, please?

MS. SINGER:  Are you okay?

THE WITNESS:  He was asking me if I needed a break.

MR. SWAMINATHAN:  You okay to go on?

THE WITNESS:  Yes.

MR. SWAMINATHAN:  We plan to stop in, like, 15 minutes, and maybe you can get some more food.  Okay?

THE WITNESS:  Okay.  Thank you.

BY MR. SWAMINATHAN:

Q.  You told us that in the bullpen, when you saw Gabriel, he said some things to you of a sexual nature, right?

A.  Yes.

Q.  And he told you some things about -- and he told you that you were the one who was going to be responsible, right?

A.  Yes, he said that to me.

Q.  Did he say anything else?  Did he say anything else -- anything else you remember that he told you in the bullpen other than those two things?

A.  Yes.  He said to me -- I remember well the words that he said to me when he told me that, if I

Page 83

would have paid attention, if I would have preferred him as a boyfriend when I was a girlfriend of my husband, my husband's girlfriend -- he said it had been my fault, and he asked me why hadn't I chosen him as a boyfriend?  All the things would have been different if I had.

But I didn't love him.  And then he told me I had to pay for a lot of things.  (Unintelligible.)  He probably hadn't said all of that.

MR. SWAMINATHAN:  I didn't understand the last part.

A.  When my husband and him fought, it always ended up, like, a little bit -- he's always been a little bit gross, like a bully.

Q.  Anything else?  So he had some conversations with you about your past and about wanting to have a romantic relationship with you; is that right?

A.  Yes.

Q.  Anything else that you remember him talking to you about in the bullpens?

A.  I don't remember a lot of things.

Q.  Other than what -- so we've talked about some comments of a sexual nature, your past, and that you were the one to take the blame.  Those are all the

Page 84

topics you can remember talking about in the bullpen, correct?

MS. ROSEN:  Object to the form.  Sorry, go ahead.

(Question was translated.)

MS. ROSEN:  Object to the form.

A.  Correct.

Q.  Now, let me ask you about -- have you kept copies of any letters that Gabriel Solache sent you?

A.  Unfortunately, no.  When they moved me here, I lost a lot of things.

Q.  And you sent letters to Gabriel Solache too, correct?

A.  Yes.

Q.  What would you tell Gabriel Solache in the letters you wrote him?

A.  Truth is I no longer remember.

Q.  Did you and Rosauro ever get divorced?

A.  As far as I know.  I didn't sign the papers.  The person who signed the papers was my mom.

Q.  So you are divorced from Rosauro?

A.  I think so.

Q.  When did that happen?

A.  The truth is I don't know.  I ended up

Page 85

finding out about things a lot later.

Q.  Do you know if he has remarried?

A.  Yes, he's married.  He has children, but I don't know a lot.

Q.  When did you last speak to him?

A.  A week after I was imprisoned.

Q.  Were you in Cook County Jail?

A.  Yes.

Q.  And he came to visit you?

A.  No.  He couldn't come in because he didn't have papers.

Q.  So you didn't get a chance to speak to him then?

A.  No.

Q.  So has he ever come to visit you from the time that you were charged for this crime?

A.  No.

Q.  Do you still love Rosauro?

A.  I don't think so.

Q.  When you were living together in the United States, were you still in love with Rosauro?

A.  Yes.

Q.  Was there a point when -- strike that.  At what point did you stop feeling in love with Rosauro?

CCSAO COI SUBPOENAS 000513

ADRIANA MEJIA, 02/05/2021　　　　　　　　　　　　　Page 86..89

Page 86

A. I don't know how to explain it. The truth is I don't know.

Q. What was your relationship like with Rosauro when you were living together in the United States?

A. It was not a very -- not a lot of trust because he drank a lot. He went out a lot because he would always listen to his brother, Horacio. I think that -- I don't know.

Q. What would Horacio want him to do that made you unhappy?

A. It would bother me because he would take him on Friday until very late, and they would drink a lot.

Q. What other things would Rosauro do with Horacio that bothered you?

A. He would say to my husband that he was a wuss. Why would he allow himself to be dominated by his wife?

Q. What else?

A. If they were going to go to any place, they would have to all go together. Horacio would say, "I want to go to this place. I want to go all together." And they would all go together.

Q. When you say "they," who would that be? Horacio and Rosauro?

Page 87

A. All of his brothers.

Q. It sounds like he and his brothers would often go out drinking, right?

A. Yes.

Q. Where else would they go?

A. I think to bars.

Q. Anywhere else?

A. The truth is I wouldn't know where else they would go.

Q. Would Rosauro ever take you with him to the bars?

A. No. I never went to a bar.

Q. Did you have any concerns that Rosauro was seeing other women?

MS. ROSEN: Objection: form, relevance.

A. I don't know.

Q. You said that you and Rosauro would argue; is that right?

A. Yeah. We argued a lot.

Q. And one of the things you argued about was him listening to Horacio all the time, right?

A. Yes.

Q. What else would you argue about?

MS. ROSEN: Objection. I'm sorry. I'm

Page 88

going to object to all of this detailed questioning about the relationship between Adriana and Rosauro as being not relevant, but I don't want to keep interrupting.

MR. SWAMINATHAN: You can have a standing objection.

MS. ROSEN: I have a standing objection. Thank you.

MR. SWAMINATHAN: Go ahead.

THE WITNESS: I've forgotten the question.

Q. Other than Horacio, what are the other things that you and Rosauro argued about?

A. Because I didn't ask my brother to pay the rent or the food. When I sent money to my parents. When a lot was spent on the telephone.

Q. Anything else?

A. It bothered me because he insulted me a lot.

Q. How did he insult you?

A. Because he would make me feel ashamed when we would be walking in the stores. He would call me a "bandeja."

THE INTERPRETER: The translator wants to say that's an insult in Mexican.

Q. What other insults would he use?

Page 89

A. I no longer remember a lot.

Q. Was he ever abusive toward you?

A. Not as far as I can remember. Just twice he hit me in the face.

Q. This is while you were living in the Mozart?

A. No. Once in Mexico and once when we lived on 51st.

Q. Did you call the police?

A. No.

Q. Had he been drinking when -- the first time he hit you, had he been drinking?

A. No.

Q. And had you had a fight that caused that?

A. Yeah. We argued about something, but I don't remember why.

Q. The second time when he struck you, had he been drinking?

A. I think so.

Q. Do you know what -- what were you arguing about when he hit you?

A. I believe it was because he was going to go with his brother Horacio.

Q. And you didn't want him to go?

A. Yes.

Urlaub Bowen & Associates, Inc. 312-781-9586

CCSAO COI SUBPOENAS 000514

FILED DATE: 4/7/2022 9:01 PM 98CR1244002

Page 90

Q. In March of 1998, you and Rosauro were still living together in the Mozart house, right?

A. Yes.

Q. And you shared a bedroom, right?

A. Yes.

Q. And he would sleep at that house, right?

THE INTERPRETER: The translator asks can you repeat that? He or she?

MR. SWAMINATHAN: He.

Q. Rosauro would sleep at that house at Mozart?

A. Yes.

Q. And would you sleep in the same bed?

A. Yes.

Q. I'm sorry to ask a very personal question, but were you guys still -- were you still sexually active?

A. I don't have to answer. I want to stay quiet. That's private.

Q. I fully appreciate why you don't want to answer it. I know it's a very personal question, but it is very much relevant to this case. We're allowed to ask you. After I ask you this question, I won't spend time on it.

Were you and Rosauro Mejia still sexually

Page 91

active at that time?

A. Yes.

Q. And that was up to the time that you had been arrested?

A. Yes.

Q. Were you still trying to have children up to the time that you were arrested?

A. Yes.

MS. ROSEN: Objection, form.

MR. SWAMINATHAN: Did you get the answer?

THE INTERPRETER: Yes.

Q. When you and Rosauro were sexually active in the months before your arrest, were you hoping to get pregnant?

A. Yes.

Q. Was he also hoping to get pregnant?

MS. ROSEN: Objection: form, foundation. At what point in time?

MR. SWAMINATHAN: Go ahead.

A. He didn't pay a lot of attention to my things.

Q. You wanted to have children, correct, at that time in 1998?

A. Yes.

Page 92

Q. Did he want to have kids?

A. Yes.

Q. How long had the two of you been trying to have kids?

A. Me, always. But that's why we had the arguments we had sometimes.

Q. Some of the arguments were about trying to have kids?

A. Yes.

Q. What were you arguing about?

A. (No response.)

Q. I'm sorry, Ms. Mejia.

A. I don't want to answer.

Q. Let me just ask this. You indicated that you had both wanted to have kids. So what were you arguing about?

A. It was because he blamed me and that I wasn't worth anything as a woman.

Q. Because you weren't able to have a child?

A. Yes.

Q. And how long was it that you had been trying with Rosauro and had not been able to have a child?

A. The truth is I don't remember, but for a long time.

Page 93

Q. And you indicated that you were trying all the way until you were arrested, correct?

A. Yes.

Q. How many years before that had you been trying?

A. The truth is I don't remember.

Q. Was it multiple years?

A. Like three, four years.

Q. And for how long had you been getting testing to see if you had any medical issues that prevented you from having kids?

A. Every month.

Q. Starting when?

A. The truth is I no longer remember that.

Q. Was it for multiple years that you were getting testing?

A. Yes.

Q. Was Rosauro also going in for testing to see if he could have kids?

MS. ROSEN: Objection, form. Go ahead.

A. Only on one occasion.

Q. What did he do on that occasion?

A. He went into a room with a nurse. I think that the nurse gave him a small glass and then said

CCSAO COI SUBPOENAS 000515

FILED DATE: 4/7/2022 9:01 PM   98CR1244002

FILED DATE: 4/7/2022 9:01 PM 98CR1244002

Page 94

that he had to put his sperm in there.

Q. So when was it that he went in and did this, gave sperm?

A. I no longer remember the dates or the years.

Q. How close in time was it to when you were arrested?

A. It would be like three years before.

Q. And then after that, you continued to get testing; is that right?

A. Yes.

Q. Was he cooperative in helping you try to get testing?

A. Yes. But he never went to the consults with me.

Q. I thought he -- didn't he sometimes drop you off and then come into the waiting area?

A. Yes. Sometimes he'll wait for me there, or sometimes he'll wait for me in his car.

Q. Was it ever requested that he do additional testing?

A. I don't remember.

MR. SWAMINATHAN: I said we would take a pause actually a little bit before this; so why don't we take a break now?

Page 95

THE INTERPRETER: Translator would like to say I was told that someone would be there by 1:00 to replace me.

MS. MADRIGAL: Yes. I logged on at 1:00.

THE VIDEOGRAPHER: We're off the video record at 1:05 at the end of media unit 3.

(Recess in proceedings
from 1:05 to 1:31 p.m.)

THE VIDEOGRAPHER: We're back on the video record at 1:31 at the beginning of media unit 4.

MR. SWAMINATHAN: Adriana, I want to move to other topics.

BY MR. SWAMINATHAN:

Q. In March of 1998, Rosauro was working, correct?

A. Yes.

MR. SWAMINATHAN: The interpreter is on mute.

MS. MADRIGAL: I am so sorry. Also, I do need to be sworn in.

(Interpreter sworn.)

A. Yes.

Q. Where was he working?

A. A cardboard factory near Franklin Park.

Page 96

Q. How much was he making per week or per month?

A. Honestly, I don't remember anymore.

Q. Were you working at that time?

A. No. I've never worked.

Q. How much were you paying in rent for the apartment?

A. Honestly, I don't recall because everybody paid the rent. So honestly, I don't recall how much we paid.

Q. Would Rosauro send money back to Mexico to his family?

A. No, because his mother lived here for some time.

Q. In the US in March of 1998?

A. For some time because she returned to Mexico in '98.

Q. Did she return to Mexico before or after you were arrested?

A. Before.

Q. Were you sending money back to your family in Mexico?

A. Sometimes.

Q. How often would you send money back?

Page 97

A. Not often.

Q. When you say "not often," do you mean once a month, once a year? Give us a sense.

A. I would send her for holidays, for mother's day, Christmas, because my ex-husband was putting money together for a house for us in Mexico.

Q. Were you and Rosauro hoping to move back to Mexico?

A. Yes.

Q. When you were sending money back to Mexico, how much would you send each time?

A. My ex-husband would send money to his brother Clemente because he was building the house. I believe it was $1,000 every two months, I believe.

Q. Were you and Rosauro -- other than the -- after the money that you were sending back regularly and the rent and everything else, were you and Rosauro able to save money while were living in the US?

MS. ROSEN: Objection, form.

MR. SWAMINATHAN: Go ahead.

A. Not really.

Q. Did you have a bank account?

A. No.

Q. Did you keep all of your money in cash?

Page 98

A. Yes.

Q. And how would you describe the overall financial situation for you and Rosauro in 1998?

A. Not very good.

Q. Would you say you did not have enough money at that time?

MS. ROSEN: Objection, form.

MR. SWAMINATHAN: Strike that. I'll withdraw it.

Q. Between you and Rosauro, was one of you in charge of the money?

MS. ROSEN: Objection, form.

MR. SWAMINATHAN: Go ahead.

A. For the most part, he kept the money.

Q. And if you needed money to buy things, how would you get the money?

A. I would have to ask him for it.

Q. So when you needed money to buy things, basically you would ask him for the money, and he would give it to you; is that right?

A. Yes.

Q. Would he ever give you extra money just to have around for yourself?

A. Sometimes when he had some left over.

Page 99

Q. How much would he give you when he was giving you extra money?

A. Maybe about 50 or $100.

Q. In March of 1998, did you have your own money that you were collecting outside, or were you depending on Rosauro?

A. By that time, I was babysitting for a boy.

Q. How much money were you making doing that?

A. I believe $30 or $50. I really don't recall.

Q. How often would you get that money?

A. Every week.

Q. And other than that, did you have any other money you were making separate from Rosauro?

A. When my brother Carlos would have me put money away that was his, I would save it for him.

Q. So Carlos was having you hold on to some of his money?

A. Yes, so that I could send money back to my mother from his money.

Q. So when you were making money from the babysitting, was that money that you would keep or that you would give to Rosauro for the two of you to use for the family?

Page 100

A. No. I would leave it for me.

Q. So would you use that money to buy things that you needed?

A. Sometimes I would buy things that I needed or things for the house.

Q. And when you said your overall financial situation was not good, does that mean you didn't have a lot of extra money lying around?

MS. ROSEN: Objection, form.

MR. SWAMINATHAN: Go ahead.

A. Perhaps you can say that I didn't have a lot of money, but maybe $10. I would save those.

Q. So you would sometimes have for yourself, you know, $10, $20, things like that; is that right?

A. For the most part, I almost always had a little bit of money.

Q. And then if you needed more than that, you would have to ask Rosauro; is that right?

A. Yes.

Q. And if you needed hundreds of dollars, you would have to ask Rosauro; is that right?

A. Yes.

Q. And if you took hundreds of dollars -- well, strike that.

Page 101

Did Rosauro have hundreds of dollars lying around the house?

A. No, because he had things with his sister-in-law Rosalinda that would put money away. They had like a little savings plan going.

Q. So you didn't have access to that?

A. Yes.

Q. How would you access that? You would have to ask him or Linda?

A. No. It's because it was like a savings with numbers that everybody would put in. When it was your number, then you would get the entire amount.

Q. How much would that be?

A. Sometimes it was 1,200, sometimes $1,000

THE INTERPRETER: Counsel, can we go off the record for a second?

MR. SWAMINATHAN: Yes.

THE VIDEOGRAPHER: Off the record at 1:44.

(Pause in proceedings.)

THE VIDEOGRAPHER: We're back on the video record at 1:46 p.m.

BY MR. SWAMINATHAN:

Q. Did you ever get the money from the tanda?

A. Yes. For the most part, I would receive it.

CCSAO COI SUBPOENAS 000517

FILED DATE: 4/7/2022 9:01 PM   98CR1244002

FILED DATE: 4/7/2022 9:01 PM   98CR1244002

ADRIANA MEJIA, 02/05/2021                                     Page 102..105

Page 102

Q. When did you get the money from the tanda.

A. When it was his turn, it was his number, I would pick it up. I would take the money.

Q. When you say "his turn," do you mean Rosauro?

A. Yes.

Q. When was the last time that Rosauro had won the money in the tanda?

A. Sometime close to in March, around the time of my case.

Q. When you got that money from the tanda, did you and Rosauro use it for any family reasons or any family purpose?

A. No, because I picked up the money, and I kept the money that time.

Q. What did you do with that money?

A. I saved it for some time; and then he would ask me, and I would tell him that his money was there.

Q. So you never used that money. You gave it to Rosauro?

THE INTERPRETER: Sorry?

Q. So you said you were holding on to that money; is that right?

A. Yes, but I was also in a tanda. And from

Page 103

what little I was getting, I put my own money together.

Q. You were in a different tanda?

A. It was the same one; but he had a number, and I had a number.

Q. Okay. But the money that Rosauro got from the tanda, you kept that money for the family, right? You're not saying you spent it?

A. Yes.

Q. So that money from the tanda never got spent, right?

A. No.

Q. You didn't spend it on something for yourself, right?

A. Not that I recall.

Q. If you did, would Rosauro have noticed?

A. Yes.

Q. Would he have been upset?

A. Yes.

Q. If you had taken, you know, hundreds of dollars from that money that Rosauro and you had saved, would he have noticed?

A. Of course.

Q. If you took hundreds of dollars that Carlos

Page 104

had given you to send to Mexico, would he have noticed?

A. Yes.

Q. I'm going to ask you about cars. Back in 1998, did you drive?

A. No. Until present day, I don't know how to drive.

Q. And you said that Rosauro had a car, right?

A. Yes.

Q. Did he have more than one car?

A. He would buy and sell. So he had different cars.

Q. In March of 1998, near the time you got arrested, did he have more than one car?

A. Just one.

Q. And can you describe that car?

A. I don't know about cars.

Q. What color was it?

A. Honestly, I don't recall the color anymore.

MR. SWAMINATHAN: Let me show you a document. This is RFC Solache Reyes 44. And I apologize. I did not mark this as an exhibit. It didn't get included, but it's a document everyone is familiar with. My apologies.

Page 105

MS. ROSEN: You mean you haven't exchanged it as an exhibit?

MR. SWAMINATHAN: Yeah. We'll send a copy of this exhibit over to the court reporter and everybody so we have it. I'll identify it for the record.

MS. ROSEN: Can we mark it as whatever number? I think you started with your own numbering.

MR. SWAMINATHAN: Yeah. So this is Plaintiff's Exhibit 2. It is RFC Solache Reyes 44.

BY MR. SWAMINATHAN:

Q. Ms. Mejia, do you see that this is -- these are two pictures of a car?

A. Uh-huh.

Q. Was this Rosauro's car in March of 1998?

A. Honestly, I don't recall anymore.

Q. Was this the car that was used to go to the Soto home?

A. Honestly, I don't remember anymore.

Q. The car that you used to go to the Soto home, was it the same car that you got picked up in the next day by Rosauro and Guadalupe?

MS. ROSEN: Objection, form.

A. I'm not very sure. I think Gabriel Solache

ADRIANA MEJIA, 02/05/2021 Page 106..109

Page 106

had a car, but I don't remember his car either.

Q. Is it your testimony that you don't know what car you were in when you went to the Soto home?

MS. ROSEN: Objection: form, mischaracterizes her testimony.

A. It's been so many years. I don't recall.

Q. When you went to the Soto home, were you in the car that's on Plaintiff's Exhibit 2? Were you in a different car that Gabriel Solache owned, or were you in some other car?

MS. ROSEN: Objection: form, asked and answer. She said she doesn't recall.

MR. SWAMINATHAN: Go ahead.

A. Honestly, I don't recall.

Q. Does this car look familiar to you at all?

MS. ROSEN: Objection, form.

A. Perhaps, but I don't remember anymore.

Q. Did Jose Mejia have his own car?

A. Yes.

Q. Did Horacio Mejia have his own car?

A. Yes. He had a van.

Q. Did Adolpho Mejia have his own car?

A. Yes. He had a very old car, the big ones.

Q. Did Jorge Mejia have his own car?

Page 107

A. Yes. They had a van.

Q. Did Leobardo Mejia have his own car?

A. I don't recall if he had a car or if he didn't have a car on those dates.

Q. Did Carlos Martinez have his own car?

A. When my brother was with me, he didn't know how to drive yet.

Q. As of March of 1998, Carlos Martinez did not know how to drive; is that right?

A. Yes, he didn't know how to drive.

Q. All right. We talked yesterday about the fact that, at some point, you pretended that you were pregnant, right?

A. Yes.

Q. Was there a point in time before that when you actually were pregnant?

A. No.

Q. Was there a point in time before that when you believed you were pregnant?

A. Yes.

Q. Why was it that you believed you were pregnant?

A. Because I didn't have a period.

Q. Did you tell people that you were pregnant?

Page 108

A. Yes.

Q. Did you take a pregnancy test?

A. No.

Q. Did you see a doctor?

A. No.

Q. How long was it that you believed you were pregnant?

A. About two months.

Q. And then, at some point, did you realize you were not pregnant?

A. Yes.

Q. How did you find out?

A. Because I got my period.

Q. And then did you tell anybody the fact that you were not pregnant?

A. No.

Q. And so did you then lie to your family about being pregnant?

A. Yes.

Q. Did you lie to your husband Rosauro Mejia about being pregnant?

A. Yes.

Q. Did you lie to everybody else in the house about being pregnant?

Page 109

A. Yes.

Q. Did you lie to Carlos Martinez?

A. Yes.

Q. Did you lie to your other family members?

A. Yes.

Q. Did you lie to your parents?

A. Yes.

Q. And did you lie to your friends?

A. What friends?

Q. What did you do to make it appear that you were pregnant?

A. Well, no one would pay attention to me.

Q. So you didn't do anything to make it appear that you were pregnant?

A. Yes. I would wear loose clothing, but no one would pay much attention to me.

Q. Other than wearing loose clothing, would you do anything else to make it appear that you were pregnant?

A. No.

Q. Did you ever put anything under your shirt to make it appear that you had a belly?

A. No.

Q. Did you tell people when you were due?

FILED DATE: 4/7/2022 9:01 PM 98CR1244002

ADRIANA MEJIA, 02/05/2021                                    Page 110..113

Page 110

A. Yes.

Q. Did you lie to them about when you were due?

A. Yes.

Q. Did you pretend to go to doctor's appointments for your pregnancy?

A. Yes.

Q. And would you actually go to a doctor's office, or would you just say that you had gone to a doctor's office?

A. Sometimes I would say that I would go, and sometimes I would just go.

Q. When you would just go, what would you do?

A. I would go and wait in the waiting area at the hospital, or I would walk in the streets.

Q. So sometimes you would go to the hospital and just walk around there?

A. Yes.

Q. And sometimes would you just go to clinics and walk around there?

A. Yes. Sometimes I would go on the streets that I was familiar walking around.

Q. Okay. So sometimes you would walk the streets. Sometimes you would go to the hospital, and then you would go to the clinic. Do I have that

Page 111

right?

A. Yes. I would go on the streets that I was familiar with. I really didn't know how to get around Chicago; so for the most part, I would go around 26th Street.

Q. When you would go to the hospital, which hospital would you go to?

A. The one on 26th Street. What is it called?

Q. Mount Sinai?

A. Yes. Because I knew how to return to the University of Chicago. I believe just there and then a small clinic that was there by the university.

Q. When you would go to the hospital and to the clinic, would you just sit inside and sit in the waiting area?

A. Sometimes I would go inside. Sometimes I would go out to eat something.

Q. Sometimes would Rosauro take you and drop you off at the hospital or the clinic? I'm talking about when you were going to these pretend appointments.

A. Yes. Sometimes he would go in and wait in the waiting area, and I would go into the bathroom or wherever I could; or sometimes he would go outside and

Page 112

wait for me in the car.

Q. Sometimes when he would come in with you, you would go into the bathroom to make it appear like you had actually seen a doctor; is that right?

A. Yes.

Q. In addition to these trips to the doctor's office where you weren't actually there for an appointment, you also had actual fertility appointments that you would go to as well, right?

A. Yes.

Q. And Rosauro would take you to those fertility appointments sometimes, right?

A. Yes.

Q. You said that one of the clinics -- do you remember where the clinic was that you were going to that was near the University of Illinois Chicago Hospital?

A. No. I don't remember the street anymore.

Q. It was just near the hospital? Is that as much as you can remember?

A. Yes. I don't recall.

Q. Would you also go to that location for actual fertility appointments in addition to the pretend appointments?

Page 113

A. Yes.

Q. Would that be 20 South Wood Street? Does that sound familiar?

A. Honestly, I can't -- I don't remember the streets.

MR. SWAMINATHAN: I'm going to show you a map. This is just a Google map that identifies the University of Illinois Hospital at 820 South Wood Street. We'll make this into an exhibit. We'll mark it as Plaintiff's Exhibit 3.

MS. ROSEN: So this is another exhibit that you haven't provided in advance that we need to give to the court reporter? Is that what you're saying?

MR. SWAMINATHAN: No. I'll give this to the court reporter. I just pulled this up on Google maps just a little bit ago.

BY MR. SWAMINATHAN:

Q. So Ms. Mejia, this is -- in the lower right-hand area, it shows where the University of Illinois Hospital is. Do you see that? Are you able to see that, Ms. Mejia? Go ahead.

A. Yes.

Q. And that's the hospital that you said that you were being picked up and dropped off from when you

CCSAO COI SUBPOENAS 000520

FILED DATE: 4/7/2022 9:01 PM   98CR1244002

FILED DATE: 4/7/2022 9:01 PM   98CR1244002

Page 114

went to the Soto home, right?

A. It's very changed now. I really don't recall.

Q. Okay. When you went to the hospital -- strike that.

When you were referring to the University of Chicago Hospital during the course of your deposition, that's one of the hospitals that you would also go to for your pretend appointments, right?

A. Yes.

Q. And then up here in the center of this picture is 820 South Wood Street, which is one of the University of Illinois Chicago clinics. Does that look approximately like where you would go sometimes to the clinic?

MS. ROSEN: Objection: form, foundation.

A. Honestly, I no longer remember the address. I don't recall the numbers.

Q. The clinic that you would go to, you said that it was near the University of Illinois Chicago Hospital. Was it within one to two blocks, like this map shows?

A. Honestly, I don't remember.

Q. The clinic that you went to, was it on,

Page 115

like, a campus with other medical buildings?

MS. ROSEN: Objection: form, foundation.

A. There were a lot of buildings, and I really don't recall how the streets were.

Q. Let me ask you, when you were going for the pretend appointments to the clinic and to the hospital, would anybody drop you off or take you other than Rosauro?

A. Yes. My brother-in-law Edwiges and, on some occasions, Gabriel Solache.

Q. Anyone else?

A. No. I don't recall.

Q. Were you ever told why you were not able to get pregnant?

A. No.

Q. Did the doctors ever identify any problems that you had in your body that prevented you from being able to have kids?

A. I believe, when I was at Mount Sinai, the doctor said that I didn't ovulate too much.

Q. Did they give a particular reason why you weren't ovulating as much as you should?

A. No. I don't recall them saying anything.

Q. Did they ever tell you there were any

Page 116

problems in your reproductive organs?

A. I don't recall.

Q. Up to the point that you were arrested, had you ever had any serious medical issues during your life?

A. Yes. On two occasions in Mexico, I was sick with my kidneys. And once here in Chicago, I was also sick, and it was from my kidneys.

Q. Did this relate to your diabetes?

A. No. My diabetes was just about -- I'm sorry. My diabetes came about just about 15 years ago.

Q. So what were the issues you were having with your kidneys where you would go to the hospital?

A. Just, like, kidney stones.

Q. Okay. How long were you hospitalized?

A. In Mexico, my parents took me to regular doctors. Here, in Chicago, my husband didn't have money to take me to the doctor; so I had to take, like natural, like pills.

Q. When did that happen that you had this issue in the United States?

A. About three years after I had arrived from Mexico.

Page 117

Q. So what year would that have been?

A. Around '96.

Q. Have you ever been diagnosed with schizophrenia?

A. No.

Q. Have you ever been diagnosed with bipolarism?

A. No.

Q. Have you ever been diagnosed with a manic condition or manic episodes?

A. No.

Q. Have you ever been diagnosed with depression?

A. No.

Q. And you indicated yesterday that you've never tried to commit suicide, right?

A. Yes.

Q. Have you ever had hallucinations?

A. No.

Q. Have you ever had amnesia?

A. Can you explain to me what amnesia is?

Q. Have you ever had a condition where you just -- you lost memory of large periods of time?

A. Oh, no.

CCSAO COI SUBPOENAS 000521

ADRIANA MEJIA, 02/05/2021                          Page 118..121

Page 118

Q.  Or have you ever had a period where you lost memory of who you were?

A.  No.

Q.  Have you ever lost your consciousness, like been knocked out?

A.  Yes, only when I lost my brother Carlos.

Q.  What happened then?

A.  When I got the news, I went to my room, and I felt my body was numb.  And I just couldn't anymore.

Q.  Did you lose consciousness?

A.  It felt like my body wasn't responding, but my body was tired.

Q.  Have you ever had a stroke?

A.  No.

Q.  Up until the point that you were arrested for the murders, had Rosauro had any serious medical issues?

A.  No.

Q.  Did he have any mental health issues, or was he taking any medications for any mental issues?

A.  No.

Q.  You said that he had had some testing to see -- for fertility.  What were the results of that testing?

Page 119

MS. ROSEN: Objection to form.  Go ahead.

A.  Honestly, I don't remember anymore what they said.

Q.  I am showing you a document that we'll mark as Plaintiff's Exhibit 4.  It is Bluhm 25519 and 25520.  This was previously marked as Deposition Exhibit 8 to Ms. Mejia's previous deposition.

This document indicates that -- this relates to an appointment at Mount Sinai.  Is that a place where you were going to for facility appointments?

MS. ROSEN: Objection, form.  Sorry.  Go ahead and translate it.

(Question translated.)

MS. ROSEN: Objection:  form, foundation.

MR. SWAMINATHAN: Go ahead.  You can answer.

A.  Yes.

Q.  It indicates that Rosauro Mejia is supposed to go for a sperm analysis; is that right?

MS. ROSEN: Objection:  form, foundation.

A.  Yes.

Q.  And the date of this is March 18, 1998, correct?

MS. ROSEN: Objection:  form, foundation.

A.  Yes.

Page 120

Q.  And it indicates that he had an appointment on the eighth floor on March 20, 1998, correct?

MS. ROSEN: Objection: form, foundation.

A.  Yes.

Q.  So was it March 1998 when Rosauro went for his sperm test?

MS. ROSEN: Objection: form, foundation, mischaracterizes the record, misleading.

A.  I honestly don't recall the year.

Q.  So you're not sure?

MS. ROSEN: Objection:  form, foundation.

Q.  Is that right?  You're not sure whether he had his sperm appointment in March of 1998?

MS. ROSEN: Objection:  form, foundation, misleading.

A.  No.  I don't recall.  I don't think it was in '98.  It would have been '96 or around '97.

Q.  So you think that he did not -- is it your statement that he did not go for a sperm analysis in March of 1998?

A.  He did go one time, but I don't recall the date.

Q.  Okay.  I want to ask you about your plan for getting a baby, okay?

Page 121

When did you first speak with somebody about your plan to get a baby?

MR. ENGQUIST: Objection to the form.

MR. SWAMINATHAN: Go ahead.

A.  When Gabriel found me crying, he's the first person I told.

Q.  And when was that?  What month?

A.  Around -- I'm not sure if it was -- around January or February of '98.

Q.  Okay.  So it was more than a month before you actually went to the Soto home, correct?

A.  Honestly, I don't remember anymore.

Q.  Where in the house were you when he found you crying?

A.  One time, he found me in the living room, and he asked me what was happening.  And I didn't want to tell him.  Then in the kitchen.

Q.  Is that a different day?

A.  Yes.

Q.  And then when was it -- so is it a second time that you were crying and he asked you what was wrong?

A.  No.  I don't recall if it was two or three times.  No, because when he would come home from work

ADRIANA MEJIA, 02/05/2021             Page 122..125

FILED DATE: 4/7/2022 9:01 PM   98CR1244002

Page 122

at night is when -- yes, I believe so.

Q. So how many times -- were there multiple times where Gabriel found you crying and he asked you what was wrong?

A. Yes, many times. Sometimes he would also see me sad during the day.

Q. And so a number of times when he saw you crying, you didn't tell him that you were faking a pregnancy, correct?

A. Yes.

Q. And then when was the first time that you actually told him?

A. When it was getting close to the time that I was supposedly going to have the baby, and I couldn't find a solution. And I had plans to go back to Mexico, but I couldn't.

Q. So at the time that you actually told him that you were faking, how close was that to when you went to the Soto home?

A. Honestly, I don't recall if it was a month or some weeks.

Q. Okay. And where were you in the house when you revealed to him that you were faking?

A. I really don't recall if it was in the

Page 123

kitchen or in the living room, but it was one of those two places.

Q. And what time of day was it?

A. It wasn't in the daytime. It was at night.

Q. Was anyone else home?

A. My brother was sleeping. My husband hadn't gotten home yet.

Q. And so you just revealed to him your secret; is that right?

A. Yes.

Q. Did he tell you something to get you to reveal your secret?

A. Well, he would always ask me, "Why is it that I'm always seeing you crying? Why is it I find you sad? Are you having problems? Are you having problems with your husband?"

And I would say, "No, everything is fine."

But he would say, "I would see you sad all the time." But one of those times, I didn't have any more, and I told him.

Q. Okay. And what did you say to him?

A. I told him the truth, that I wasn't pregnant, that I had faked a pregnancy, that I was having problems, that I was afraid about what my

Page 124

husband could tell me.

Q. And what was his response?

A. I don't remember the adequate words that he said to me, but he said that he would help me.

Q. Did he tell you that he would help you get a baby in that conversation?

A. I don't know if it was that day or the following day, the conversation where he told me that he knew a friend that didn't want her baby.

Q. So that day or the next day, he told you that he had a friend who didn't want their baby; is that right?

A. He told me he knew a lady that didn't want her baby.

Q. Did he tell you that person's name?

A. No. I think it was one of his friends or one of his girlfriends.

Q. And did he tell you how much it would cost?

A. Yes. He told me to put $600 together.

Q. And did he tell you why this person was getting rid of their child?

A. I don't really recall what he told me about that lady.

Q. Did he tell you if it was going to be a boy

Page 125

or girl?

A. No. I believe he said it was a girl.

Q. Did he tell you if the baby had been born yet?

A. I don't recall.

Q. Did he tell you when he was going to get the baby for you?

A. Yes. It was a little bit before I was about to have my child.

Q. You told him that you were faking a pregnancy, and that same day or the next day he told you all of this information about this person who actually had a baby for you, right?

A. Yes. But he didn't tell me everything the same day. He told me within days.

Q. That's what I'm asking you. There was an initial conversation where you told him that you were faking your pregnancy, right?

A. Yes, one conversation where he was asking what was happening. And he told me not to worry, that everything was going to be fine.

Q. And in that same conversation or a conversation on the next day, he told you he could get you a baby, right?

CCSAO COI SUBPOENAS 000523

FILED DATE: 4/7/2022 9:01 PM 98CR1244002

Page 126

A. Yes.

Q. And in that conversation where he told you he could get you a baby, what else did he tell you?

A. That's when he told me not to worry, that he knew a lady that didn't want her baby.

Q. And did he tell you that it would cost $600?

A. Yes.

Q. And did he tell you that it was going to be a baby girl?

A. Yes. I believe he told me it was a girl.

Q. And in that conversation, did he tell you when he would have the baby available for you?

A. I don't really recall, but I believe he said in some days.

Q. So he indicated, when you had that conversation with him, that within a few days he'd be able to get you the baby; is that right?

A. Yes.

Q. And then how long did it take you to get $600?

A. Didn't I explain to you that it was in a tanda?

Q. Yeah. So you got the money from the tanda; is that right?

Page 127

A. Yes.

Q. So your testimony is the place where you got $600 was from a tanda with the Mejia family; is that right?

A. Yes.

Q. Did Rosauro ever find out about it?

A. That I had another number?

Q. Did Rosauro ever find out that you had received money from the tanda and that you had used it for some other purpose?

MS. ROSEN: Objection, foundation.

A. You confused me a little bit. Could you explain it to me a little slower?

Q. You're saying that you won money from the tanda separate from the money that Rosauro won; is that right?

A. Yes.

Q. From the same tanda?

A. You're not understanding me.

Q. Go ahead. Explain.

A. He had one number, and I had a separate number.

Q. But both were in the same tanda, right?

A. Yes.

Page 128

Q. And so you're saying that you got money from the tanda that he didn't know about. Is that what you're saying?

A. Yes. He didn't know I had the tanda until I got that money.

Q. And when you got that money, you're saying he had no idea that you got that money; is that right?

A. Yes. Because when my ex-sister-in-law Rosalinda Mejia gave me the money is when he found out I had that tanda.

Q. And when was that that he found out about that?

A. I believe around February.

Q. So in February, you got the money from the tanda, and he knew about that money, right?

A. Yes.

Q. What did he have you do with that money?

A. I had it saved for myself.

Q. Did he let you keep that money for yourself?

A. Yes, because he was putting together the other money from his tanda. He had me save both the money.

Q. So he was fine with you keeping the money from the other tanda?

Page 129

A. No. Because his plans were to send it to Mexico to finish building the house.

Q. And did he ever find out that you didn't send the money for the house?

A. Yes.

Q. And is it your testimony that you and him both got money from the tanda in February and March?

A. (Nodding head up and down.)

MR. SWAMINATHAN: Go ahead.

A. Yes.

Q. And how long after you had this conversation, this first conversation with Gabriel in which he said he could get you money, how long after that did you get money to give him?

THE INTERPRETER: I'm sorry, Counsel. Can you repeat that?

MR. SWAMINATHAN: Yeah. I'll ask a better question.

Q. How long was it from when you had this conversation with Gabriel about getting the baby that you came up with the $600?

A. It didn't take long because I had the money; so I gave it to him after.

Q. You had the money just -- you had the cash

CCSAO COI SUBPOENAS 000524

Page 130

in your house?

A. Yes.

Q. Where in the house were you keeping it?

A. I have a small jewelry box where you keep your -- what do you call it -- your jewelry.

Q. Did Rosauro know where you were saving that money?

A. Sometimes when he would search.

Q. And how much of the money was -- after you gave the money to Gabriel, how much money was left from the tanda?

A. $400.

Q. So you got $1,000 from the tanda in February?

A. Yes.

Q. When was the last time before that that you got money from the tanda?

A. I don't recall, but I think it was around -- I don't remember anymore.

Q. Was it in 1998? Was it in 1997?

A. 1998, but I don't --

UNIDENTIFIED SPEAKER: -- something, but I can't tell what.

MR. SWAMINATHAN: Somebody is not on mute?

Page 131

Sorry. Was she in the middle of the answer?

THE REPORTER: Yeah. Could you repeat the answer for me? This is the reporter.

A. 1998, but I don't recall the date.

Q. So you'd won the tanda before in 1998?

A. No, in '98.

Q. Yeah. So you got the money from the tanda in February of 1998; and before that, you had gotten money from the tanda also in 1998?

A. Yes. We would make a lot of tandas, and we would get a lot of numbers.

Q. So you were getting money from multiple tandas in 1998; is that right?

A. Yes. With my ex-husband's and mine and then -- I mean, a lot of his siblings would make tandas, and then I did too.

Q. And then you had to be lucky enough to have your number selected, right?

A. No. I could pick my number.

Q. Okay. You said you had the money lying around. So when Rosauro told you you would need to come up with $600, did you give him the money right then?

A. Rosauro?

Page 132

Q. Sorry if I said the wrong name. Let me ask it again.

When Gabriel said you would need to come up with $600, you already had the $600, right?

A. Yes.

Q. Did you give it to him at the same time?

A. Yes.

Q. And at that point, did he tell you the name of the person?

A. Honestly, I don't remember if it was that day or -- I really don't remember.

Q. When is the first time you learned the name of the person who was going to be giving you a baby?

A. I just recall that it was Norma Salazar, but I don't remember the date.

Q. Did he ever tell you that the person who was supposed to sell you a baby, that that had fallen through?

A. No.

Q. Your expectation was that you would have the baby in a few days, right?

A. Yes.

Q. And that didn't happen, right?

A. Yes.

Page 133

Q. So when that didn't happen after a few days, what did you do?

A. I was worried. I was frustrated. I was affected.

Q. Did you talk to Gabriel?

A. Yes. I believe about two days later.

Q. What did he say?

A. He told me not to worry, that he was going to keep helping me.

Q. What else did he tell you?

A. Not much, because we couldn't really talk much because there was a lot of people that lived with us. But he would just say not to worry, that he was going to help me, that he promised that he would help.

Q. And at least a few weeks went by, right?

A. I think so.

Q. At that point, were you past the due date that you'd been telling people in the family?

A. Yes.

Q. Were people asking you questions?

A. Yes. They would ask what was happening, if I had my calculations correct. Then I would tell them that everything was fine.

Q. Did anybody tell you that they didn't

CCSAO COI SUBPOENAS 000525

Page 134

believe you that you were pregnant?

A. No, because they would never pay attention to me.

Q. Did they tell you that they were suspicious?

A. No.

Q. Did anyone act like they were suspicious?

A. Not that I recall.

Q. I'm going to show you a document, Defendant's Exhibit 19, since I cannot find our version. This is Defendant's Exhibit 19, Reyes 8726 through 8729. This is a declaration of Jose Mejia. Ms. Mejia, have you ever seen this document before?

A. No.

Q. This document indicates that, back in 1998, his cell phone number was (773) 434-8643. Do you remember what Jose Mejia's cell phone number was?

MS. ROSEN: Objection, form.

A. No. Until now, I didn't remember.

Q. His affidavit states -- strike that. His declaration states, "Before her arrest, I had to become close with my aunt Adriana"; is that true?

MS. ROSEN: Objection, form.

A. Only on one occasion. He went to pick me up when he asked if I could please watch his kids.

Page 135

Q. Well, had you become close with Jose Mejia?

MS. ROSEN: Objection: form, asked and answered.

A. I had gotten close to him, but not as far as trusting him.

Q. He says: "My aunt Adriana used to babysit my two children a few times a week. She stopped babysitting shortly before her arrest." Is that statement true?

MS. ROSEN: Objection, form. Oh, sorry.

(Question translated.)

MS. ROSEN: Objection, form.

A. Two times a week? No, I just babysat on two occasions.

Q. He write, "Adriana wanted to have children." Is that true?

MS. ROSEN: Objection, form.

A. I don't know.

Q. He says he knew that you were not actually -- strike that.

His declaration says, "I knew that she was not actually pregnant." Did Jose Mejia ever say anything to you about knowing that you were not pregnant?

Page 136

MS. ROSEN: Objection -- sorry. Go ahead.

(Question translated.)

MS. ROSEN: Objection, form. This is improper what you're doing. It is improper to put somebody else's declaration in front of a witness and ask -- and say, "This is what the witness said. Is that true? Is that not true?"

(Technical issues with connection.)

MR. SWAMINATHAN: Defendants asked leading questions of a witness they can't lead through their entire portion. So objection to form is noted for the same reason I made the same objection for trial exam purposes.

MS. ROSEN: You did not object -- first of all, we didn't ask leading questions. Second of all, you made no such objection. Go ahead and hit yourself in the head. It's okay. I'm making an objection. I'm giving you a warning. Your use of this exhibit in this way is improper; and if this ends up being her trial testimony, we're moving to strike it.

I am giving you an opportunity -- stop trying to interrupt me. I am giving you an opportunity to try and cure the defect. If you don't want to take that opportunity, then you act at your

Page 137

own peril.

MR. SWAMINATHAN: I'm going to note for the record that Defendants, through their exam, asked numerous, numerous leading questions of the witness to which I made objections to form without making a speaking objection.

Defendants, through the course of their exam, put documents and prior testimony and statements in front of Ms. Mejia and then asked her questions. And I made objections to form, but I did not make speaking objections.

So I'm a little disappointed that Counsel is now suggesting to me that there's something improper about me asking these questions.

(Technical issues with connection.)

THE REPORTER: Anand, I've lost you. This is the court reporter. I got ". . . Counsel is now suggesting to me that there's something improper about me asking these questions," but you've been freezing.

MR. SWAMINATHAN: Well, we'll keep going.

BY MR. SWAMINATHAN:

Q. In Jose Mejia's statement, his declaration: "Once, I overheard my uncles, Jorge Mejia and Horacio Mejia, discussing Adriana's pregnancy with Rosauro."

CCSAO COI SUBPOENAS 000526

FILED DATE: 4/7/2022 9:01 PM 98CR1244002

ADRIANA MEJIA, 02/05/2021                        Page 138..141

Page 138

Do you see that?

A. Uh-huh.

Q. "They were speaking in Spanish and assumed that I didn't understand them. But I did understand what they were saying. My uncles knew Adriana was not pregnant or were highly suspicious that she was not pregnant. I heard them telling Rosauro this."

Did any members of the Mejia family indicate to you that they were suspicious that you were not pregnant?

MS. ROSEN: Objection, form.

A. No.

Q. Did Rosauro ever say anything to you about being suspicious that you were not pregnant?

MS. ROSEN: Objection, form.

A. No.

Q. Were you concerned that Rosauro was going to figure out that you weren't pregnant?

A. Yes.

Q. What steps did you take to keep him from finding out that you were pregnant -- that you were not pregnant?

A. Towards the last months, I did -- we did have sexual relations, but I didn't let him see my

Page 139

body.

Q. Anything else you did?

A. No.

Q. Okay. Jose Mejia says: "I also saw Adriana changing in her bedroom in her apartment. She was pretending to be pregnant by placing a small pillow under her clothing and strapping it around her waist. I saw the pillow on the bed while she was changing."

Is that true?

A. That's a lie because he never came into the apartment that I lived in.

Q. So Jose Mejia, when he said that he saw you placing a pillow under your clothing, he's lying?

THE WITNESS: The officer is calling me for the count.

MR. SWAMINATHAN: Okay.

THE VIDEOGRAPHER: We're going off the video record at 2:59 at the end of media unit 4.

(Recess in proceedings from 2:59 to 3:08 p.m.)

THE VIDEOGRAPHER: We're back on the video record at 3:08 at the beginning of media unit 5.

MR. SWAMINATHAN: Can we have the last question read back? I don't believe we got an answer.

Page 140

A. He would never enter my home. He would stay from the door to the outside. And on the two occasions where he picked me up, he picked me up in front. And when he -- he also picked me up on Mozart, the street that runs -- where there's a lot of stores. But he never saw me. He's lying there because he never saw me.

Q. Is your testimony that, when Jose says he saw you with a pillow under your shirt, that he's lying?

A. Yes, he's lying, because he never saw me.

Q. I want to ask you about March 27, 1998, the day that you went to the hospital, okay?

What time that day did you go to the hospital?

A. In the morning.

Q. What time?

A. I don't recall if it was 8:00 or 9:00 in the morning.

Q. And Rosauro drove you, right?

A. Yes.

Q. How long did Rosauro stay with you at the hospital?

A. Not much -- very little time.

Page 141

Q. Where did you and Rosauro wait inside the hospital?

A. I believe in the waiting room.

Q. When you wait in the waiting room, where is that?

A. Where the people that are visiting the patients wait.

Q. Is that when you first enter, or do you have to go in further to the hospital?

A. It's when you enter. There's a waiting room there.

Q. Did you ever go into any other areas of the hospital that day?

A. I think so.

Q. Where else did you go in the hospital?

A. I believe I was walking around on different floors.

Q. Was that with Rosauro or after he'd left?

A. After he left.

Q. When Rosauro was there, you went into the waiting area. Then did you go check in at some counter?

A. I don't know how I told him to go back. I don't know if I registered or if I stayed inside.

Urlaub Bowen & Associates, Inc. 312-781-9586

FILED DATE: 4/7/2022 9:01 PM  98CR1244002

ADRIANA MEJIA, 02/05/2021                                    Page 142..145

Page 142

Q. Did you have any actual appointment that day for yourself, or were you pretending?

A. I was just pretending.

Q. And so you had to make it appear that you were actually checking in with someone, right?

A. Yes.

Q. Did you do that?

A. I think so. I talked to one of the nurses in the reception.

Q. What did you say?

A. I don't remember specifically what I asked, but I wanted my husband to see that I was there.

Q. After he left, what are some things you did at the hospital while you were there?

A. Once I was there, I called once to see if Gabriel would answer the call, if he was home.

Q. Did he answer?

A. No, because Guadalupe is the one that would answer.

Q. What time of day was that that you made the call, hoping to get Gabriel?

A. I don't recall. It was about 12:00 or 1:00 p.m.

Q. And did you have a conversation with

Page 143

Guadalupe at that time?

A. I believe I hung up on her.

Q. And that call was made from a pay phone at the hospital, right?

A. I believe I took it on the phone that was on the street.

Q. Where on the street? Next to the hospital or in front of the hospital?

A. I believe it was in front of the hospital.

Q. And then we talked about some other phone calls that you made that evening, right?

A. Yes.

Q. And those were also made from pay phones in the hospital and just outside the hospital, right?

A. Yes.

Q. And we talked about a phone call that you made in the morning after you had the Soto children, right?

A. Yes.

Q. And that was also made from a pay phone at the hospital, right?

A. Yes.

Q. Other than those phone calls, what else did you do at the hospital that day after Rosauro left?

Page 144

A. I stayed there in the waiting area for a long time, and then I was walking for a while.

Q. Other than sitting there and walking around and making those phone calls, did you do anything else.

A. I don't recall what else I did.

Q. And then the next thing that happened was that Gabriel picked you up around 12:30 to 1:00 a.m., right?

A. Yes.

Q. And so you were basically at the hospital from around 9:00 a.m. that morning until 12:30 to 1:00 a.m., right?

A. Yes.

Q. And did you leave the hospital for any period of time?

A. Yes. I went out to walk through the streets that I was familiar with.

Q. So you left the hospital for a little while?

A. Yes. Yes.

Q. Did you go talk to anyone or see anyone that you knew?

A. No, I didn't know anybody. Everybody spoke English.

Page 145

Q. All right. And then finally around -- you get picked up by Gabriel -- strike that.

When you got picked up, where were you picked up from at the hospital? Was it outside the entrance?

A. Yes. Not exactly in front, but almost in the front.

Q. And had you been waiting outside?

A. Yes, a little while.

Q. Were picked up at the same place Rosauro dropped you off?

A. Close.

Q. And how did you know to come outside at that time?

A. Because -- I don't recall if I saw Gabriel outside or he honked with the car he had.

Q. So you were just sitting waiting, and eventually you just happened to see him parked outside or honking; is that right?

Strike that. Strike that.

How did you know what time to be looking for Gabriel?

A. Because he told me that, around the time he would get off work, he would pick me up around that

CCSAO CCI SUBPOENAS 000528

Page 146

time to go pick up the baby.

Q. So you understood that he would be off work by -- in time to pick you up around 12:30; is that right?

A. Yes.

Q. When he picked you up, did you recognize the car that he was in?

A. I don't really recall the color or the model of the cars.

Q. And when he picked you up, your testimony is you didn't know who you were going to go see, right?

A. Yes.

Q. And your testimony is, when you got in the car, you thought you were just going to go buy the baby, right?

A. Yes.

Q. Your testimony is that, at that point, you had already given Gabriel the money weeks earlier, right?

MS. ROSEN: Objection, asked and answered.

MR. SWAMINATHAN: Go ahead.

A. I think so.

Q. So why were you there at all?

MS. ROSEN: Objection, form. Go ahead.

Page 147

A. Because he told me he was going to give me the baby outside of the hospital.

Q. So you thought that he already had the baby and was going to give it to you?

A. Yes. Because he said he was going to go pick it up with his friend.

Q. So instead of him having the baby there for you, he told you to get in the car?

A. Yes. But when he told me to get into the car, Arturo Reyes was already in there as well.

Q. And at that point, you thought that you were already supposed to have the baby?

A. Yes.

Q. So based on your version of events, you agree it doesn't make sense why you would need to go to the Soto home. You had already handed over the money, right?

MS. ROSEN: Objection to form.

MR. BRENER: Objection to form. Argumentative.

MR. SWAMINATHAN: Go ahead.

MR. ENGQUIST: Vague.

A. Yes.

Q. Why did you go along? At that point --

Page 148

strike that.

If you were just buying a baby and you had already given him the money, why did you go along with Gabriel at that point?

A. I don't recall specifically what he told me, but he told me to get into the car.

Q. What else did he tell you?

A. I asked him where the baby was, and he said he would give it to me.

Q. Anything else?

A. No.

Q. So you got in the car?

A. Yes.

Q. And then you drove off with them?

A. Yes.

Q. And then you got to the Soto home, right?

A. Yes.

Q. Did you know where you were?

A. No.

Q. It was the middle of the night, correct?

A. Yes.

Q. Did you park right in front of the house, or did you park a little bit away from the house?

A. Honestly, I don't recall, but it wasn't very

Page 149

far. I don't remember if it was in the front or a little bit to the side.

Q. Other than Gabriel telling you to get in the car and that he was going to get you the baby, did you have any other conversation in that car on the way to the Soto home?

A. Yes. I asked him what was Arturo Reyes doing there.

Q. What was his answer?

A. He told me that he already knew because he had told him what was going on with me.

Q. Did Arturo say anything in the car?

A. Very little.

Q. And then did the three of you discuss anything about what was going to happen when you went to the house?

A. No.

Q. Your testimony is that Gabriel went in, and you and Arturo waited in the car, right?

A. Gabriel got out first, and then I got out after.

Q. Did you go down to the house with him at the same time, or did he go down to the door to the house first?

CCSAO COI SUBPOENAS 000529

FILED DATE: 4/7/2022 9:01 PM  98CR1244002

FILED DATE: 4/7/2022 9:01 PM 98CR1244002

ADRIANA MEJIA, 02/05/2021      Page 150..153

Page 150

A. No. He was already opening the door with a hanger.

Q. When he went to the house, did he have anything with him?

A. Honestly, I don't know.

Q. Did you see anything in his hands when he got out of the car?

A. No, because he had a jacket on and a hat on his head, and he had gloves. So I didn't know if he had anything.

Q. And at the point that he goes down to the door, you're sitting in the car, right?

A. Not long because I got out behind him.

Q. That's what I'm trying to understand. He was picking the lock, right?

A. Yes. It was a normal door.

Q. What do you mean by that?

A. It just had a key.

Q. How many locks?

A. I think one.

Q. And you were there with him, standing next to him, when he was trying to open the lock, right?

A. Yes.

Q. And did you say anything to him while he was

Page 151

doing that?

A. Yes. I asked him what he was doing. He said not to worry, that everything was going to be fine.

Q. Did he say anything else?

A. No, not that I recall.

Q. And he was using a coat hanger to pick the lock; is that right?

A. Yes.

Q. How long did that take?

A. Not long.

Q. Give me an approximation. How many minutes?

MS. ROSEN: Objection, form.

A. Honestly, I wouldn't be able to say.

Q. Is it your testimony that there was only one lock that he had to open?

MS. ROSEN: Objection, form.

A. Yes. I think it was -- yes, I think it was only one lock.

Q. Did it take him more or less than ten minutes to pick the lock?

A. Honestly, I don't recall how long it took.

Q. So it could have been as much as ten minutes?

Page 152

MS. ROSEN: Objection, form.

A. Honestly, I wasn't counting the time.

Q. And while he was doing that, Arturo was in the car, correct?

A. Yes, for a little bit. Then he came in once we were inside.

Q. Had you ever seen Gabriel break through locks using a hanger before?

A. Not here, but in Mexico, I did.

Q. In Mexico, he used to break through locks with a hanger?

A. Yes.

Q. And when did you see him do that?

A. When we would go to school, then he would open the classroom doors.

Q. Any other times when you saw him breaking -- picking locks with a hanger?

A. No. I believe only once at school.

Q. And when he was finally able to open that door, what happened?

A. He made a little bit of noise, and that's when the man woke up.

Q. So he was able to pick the lock without causing anyone to wake up?

Page 153

A. I don't recall how the man woke up.

Q. The man woke up after you had already come into the house; is that right?

A. I think he heard the noises when the door was being opened.

Q. What did the man say?

A. I don't really recall the words, but I remember he said what were we doing there.

Q. What did you guys do in reaction?

A. I really don't recall much.

Q. What did Gabriel do when the man got up?

A. Why do I have to say it again?

Q. Well, I want to understand what happened inside that apartment, which we haven't talked about. I mean, we've talked about the fact that these people were stabbed, but I want to understand what happened in that house.

A. But I had already told you yesterday.

Q. Well, where was the man when he was stabbed?

MS. ROSEN: Objection, asked and answer.

Q. Where in the house?

A. I don't want to answer that anymore.

Q. Are you pleading the Fifth?

MS. ROSEN: Objection, asked and answered.

FILED DATE: 4/7/2022 9:01 PM   98CR1244002

Page 154

A. Yes. I already said it yesterday. I don't want to repeat that.

Q. Did Gabriel stab -- strike that.

When Mariano Soto was stabbed, was he stabbed in his front or his back?

A. Everywhere. First in front.

Q. And then in back?

A. I think so.

Q. And what was the knife that was used to do that?

MS. ROSEN: Objection, form. What was the knife?

Q. Yeah. Where was the knife from that was used to stab --

A. I don't know if he took it from somewhere close, from a little table where the lady had her knives, or where he took it from.

Q. I assume, at that point, Gabriel no longer had the coat hanger, right?

A. I don't think so.

Q. He dropped the coat hanger before he was dealing with Mariano, right?

MS. ROSEN: Objection: form, foundation.

A. I think he threw it to one side.

Page 155

Q. And then, when Mariano Soto was stabbed, that happened very quickly after you got into the house, right?

You can answer.

A. Yes.

Q. And then Jacinta Soto, did she wake up at that point?

MS. ROSEN: Objection, asked and answered.

MR. SWAMINATHAN: Go ahead.

A. Yes, because she heard the screams.

Q. So had Mariano been screaming when this happened?

A. Yes. He screamed some times.

Q. Tell me what you remember him screaming?

A. I recall him asking who we were or what we were doing there.

Q. Anything else you remember him saying?

A. No.

Q. And after Mariano had been stabbed and Jacinta was up, was Jacinta stabbed immediately after that?

MS. ROSEN: Objection, asked and answered.

A. Yes.

Q. Were both of them stabbed and killed very

Page 156

fast once you guys got into the house?

A. Yes.

Q. Were they both stabbed within less than a minute of being in the house?

A. I don't recall the time.

Q. Does that sound right? I mean, it happened very fast; so it would have been less than one minute for them to be both stabbed. Does that sound right?

MR. BRENER: Objection, form and foundation.

MR. ENQUIST: Sorry. He said form and foundation. I was going to say argumentative as well.

A. I don't recall the time. I don't know. I didn't count the time.

Q. Did Jacinta say anything?

A. Honestly, I don't remember.

Q. Did the kids say anything?

A. No. It was dark. They really didn't recognize us.

Q. And you grabbed the baby, right?

A. Yes.

Q. And who grabbed the boy?

A. Honestly, I don't recall if it was Gabriel or Arturo.

Q. Were both Mariano and Jacinta already killed

Page 157

by the time Arturo got into the apartment?

A. No. Just the gentleman was already stabbed, but not the lady.

Q. So you were able to see that Arturo -- your testimony is you could see that, after Mariano was killed, then Arturo came in before Jacinta was killed? Is that what you're saying?

MS. ROSEN: Objection: form, asked and answered.

A. I told you yesterday that by the time that the man was already stabbed, Arturo was already with us.

Q. Other than grabbing the two kids, did you guys grab anything else in the house?

MS. ROSEN: Objection, asked and answered.

A. I don't recall.

Q. Did you grab any clothes or anything else for the children?

A. No. Just a blanket.

Q. After both children had been killed, did you spend any time in the house, or did you just get out of there? Strike that.

After the parents had been killed and you grabbed the children, did you do anything else in the

CCSAO COI SUBPOENAS 000531

Page 158

house?

A. No. We got out quickly.

Q. But you basically got in. They were both killed. You grabbed the kids, and you got out. Is that it?

MS. ROSEN: Objection, form.

MR. SWAMINATHAN: Go ahead.

A. Yes. From what I recall now, that was the quickest.

Q. Did you guys do anything to the bodies of Jacinta or Mariano?

MS. ROSEN: Objection, form.

A. I don't think so.

Q. Was there a lot of blood?

A. I don't recall.

Q. Did you have blood on you?

A. Perhaps.

Q. And you don't remember if your clothes had blood on them?

A. Perhaps my shoes and my pants.

Q. And what about Gabriel? Did he have a lot of blood on him?

A. Yes. He had a lot of blood on his gloves and his jacket.

Page 159

Q. And what about Arturo? Did he have lots of blood on him?

A. Perhaps just on his shoes.

Q. The overall apartment had a lot of blood in it, right?

A. I think so.

Q. The kids' blankets, did they also have a lot of blood on them?

MS. ROSEN: Objection, form.

A. Honestly, I don't recall.

Q. Did the children have blood on them, the children themselves?

A. I don't think so.

Q. So after you had the kids and you guys left, did you do anything else when you left the apartment?

A. Yes. We went to the car, and we were talking for a little bit. And then they took me to the hospital.

Q. And so when you left, you didn't have the keys to the apartment, did you?

A. No.

Q. You didn't lock the door?

A. Honestly, I'm not sure.

Q. Well, you couldn't lock the door, could you?

Page 160

A. I'm not sure.

Q. Well, did you have a key to the apartment?

A. I don't know. Perhaps, yes. I don't know.

Q. "Perhaps, yes," you did have a key to the apartment?

A. The persons, yes, not me.

Q. In fact, you did have a key to the apartment, didn't you, to the Soto home?

A. Of theirs? No, I didn't have a key of theirs.

Q. Were you aware that Jacinta Soto's family said that she had made a friend in the weeks before she was killed?

MS. ROSEN: Objection, form.

A. No.

Q. Are you aware that her family said that her key had been taken from her?

MS. ROSEN: Objection: form, foundation.

A. No.

Q. Didn't you take the key from Jacinta Soto?

A. How was I going to take her key if I didn't know her?

Q. Did you meet her? You met her at one of the clinics, right?

Page 161

A. No.

Q. When you got back in the car, where did each of you sit in the car?

A. Arturo and Gabriel sat in the front, and I sat in the back with the children.

Q. And they took you straight to the hospital and dropped you off, right?

A. Yes.

Q. And you went and -- strike that.

We discussed yesterday that you would have gotten back to hospital around 2:00 or 3:00 in the morning, right?

A. Yes.

Q. And what time did you get picked up the next morning?

A. Early in the morning.

Q. Around 8:00 or 9:00 in the morning?

A. Something like that.

Q. So you were at the hospital for four to six hours, right?

A. Yes.

Q. And where did you go in the hospital during that period?

A. I was waiting in the waiting area.

CCSAO COI SUBPOENAS 000532

FILED DATE: 4/7/2022 9:01 PM 98CR1244002

ADRIANA MEJIA, 02/05/2021                                    Page 162..165

Page 162

Q.  But you were sitting inside the hospital with the two children for hours?

A.  Yes.

Q.  And you had blood on your clothes?

A.  Honestly, I didn't look, but perhaps.

Q.  And you had blood on your shoes?

A.  Perhaps.

Q.  Did anyone come over to ask you any questions?

A.  No.

Q.  Did any security guard come and talk to you?

A.  I don't recall.

Q.  Were you just sitting in the waiting area the whole time, or did you walk around inside the hospital?

A.  I don't know if I walked for a little bit.

Q.  Your testimony is you spent hours in a hospital with blood on your shoes and on your clothes without anybody asking any questions?

MR. BRENER:  Objection, misstates the witness's testimony.

MS. ROSEN:  Form.

MR. SWAMINATHAN:  Go ahead.

A.  I don't recall.

Page 163

Q.  You got picked up the next day by Rosauro and Guadalupe along with her kids, right?

THE INTERPRETER:  I'm sorry?

Q.  You got picked up the next day by Rosauro and Guadalupe, right?

MS. ROSEN:  Objection, asked and answered.

A.  Yes.

Q.  Did they ask you any questions about -- strike that.  They asked you some questions about the boy, right?

A.  Yes.

Q.  At that time, did you tell them the name Norma Salazar?

A.  I believe I said it was a friend's.

Q.  Did they ask you anything about -- did they indicate to you that they were surprised about how big the baby was?

A.  Just Guadalupe said that she was very big.

Q.  Did she say anything other than that?

A.  I don't recall what else she said.

Q.  Did Lupe make a comment to you that the baby couldn't possibly be yours because she was too beautiful?

A.  No.

Page 164

Q.  Did you say to Guadalupe in the car, "Don't you ever say that again because I will kill you"?

A.  No.

Q.  Is Lupe lying if she says you said that?

MS. ROSEN:  Objection, form.

A.  She didn't say that.

Q.  When you were in the hospital with the kids, what were they doing?

A.  The baby girl was asleep, and the little boy was asleep.

Q.  Did you feed them at all?

A.  No, not at that moment.

Q.  When you got home, did anybody ask you any questions about how big the baby was?

A.  No.  I think just Guadalupe.

Q.  Guadalupe was suspicious about the baby; is that right?

A.  Perhaps.

Q.  Anyone else?

A.  No.

Q.  Did anybody say anything to you about having blood on your clothes?

A.  I don't recall.

Q.  When you came home, what was the reaction

Page 165

from other family members?

A.  Not much, because then they came to see me later.

Q.  The boy, where did he stay at the house?  Strike that.

Where did the boy sleep at your house?

A.  In a little room.

Q.  Whose room is that?

A.  It was not a room.  It was a little porch where there was a bed.  I don't recall if that's where Gabriel would sleep.

Q.  Did you keep the boy in a closet?

A.  No.

Q.  If Guadalupe says that you kept the boy in a closet, is she lying?

MS. ROSEN:  Objection:  form, misstates the testimony, foundation.

THE REPORTER:  I lost the connection for about a minute, and then it came back up.  The last question I had is:  "If Guadalupe says you kept the boy in a closet, is she lying?"  And then there was an objection from Ms. Rosen, and I did not get an answer.  I apologize.  The screen went blank.

MR. SWAMINATHAN:  What was the question

Urlaub Bowen & Associates, Inc. 312-781-9586

CCSAO COI SUBPOENAS 000533

FILED DATE: 4/7/2022 9:01 PM   98CR1244002

Page 166

right before that?

(Requested record discussed.)

MR. SWAMINATHAN: Okay, go ahead.

MR. INTERPRETER: I don't remember.

MR. SWAMINATHAN: Let's reask the question.

A. Yes. I never had him in a closet.

Q. After you came home with the baby and the boy, you had conversations with Arturo about the boy, right?

A. Yes.

Q. He was concerned about the boy, right?

A. Yes.

Q. And he took care of the boy, right?

A. Yes.

Q. And he would buy clothes for the boy and take care of him, right?

A. Yes. He would buy clothes for the baby. He would buy diapers, because the baby was still in diapers. He would buy him clothing.

Q. Did you have -- other than buying things for the baby, did you have any other conversations with Arturo after you came home from the hospital?

A. Honestly, I don't remember anymore.

Q. Did Arturo ever call you from anywhere else?

Page 167

While you were -- when you came back with the kids?

A. Can you repeat the word, the question?

Q. Yeah. Did Arturo ever make any calls to the house to talk to you?

A. Rarely, because Guadalupe would answer the phone.

Q. Arturo has never called the house to talk to you, has he?

A. No.

Q. Is that correct?

A. Yes.

Q. Showing you a document that was previously marked Plaintiff's Exhibit -- Adriana, it's a deposition exhibit from Adriana Mejia's previous deposition. We can mark it as Plaintiff's Exhibit 4 (sic) (Reporter's Note: This is Plaintiff's 5.) for this deposition, Reyes 264.

Ms. Mejia, do you recognize any of the handwriting on this note?

A. I think it's my writing.

Q. Where?

A. At the bottom.

Q. Where it says "Hospital"?

A. It seems like it.

Page 168

Q. You agree with me this is your handwriting?

A. I believe so.

Q. Is there any other handwriting on these notes that is yours?

A. I'm not too sure if the one on top.

Q. At some point, Arturo Reyes was asking for information about who the person was whose boy this was, right?

MS. ROSEN: Objection: form, foundation.

A. I don't recall, and I'm not going to answer.

Q. Are you asserting the Fifth?

A. Yes.

MS. ROSEN: Objection. She said, "I don't recall." Then you invite her to take the Fifth, and she's been ordered not to take the Fifth.

MR. SWAMINATHAN: I'm asking her -- she has now done this several times in the dep. I want to understand.

Q. Are you refusing to answer the question?

A. Yes.

Q. Arturo -- this note was found in Arturo Reyes's pocket. So you had written down the name Norma Salazar for him, correct?

MS. ROSEN: Objection, form.

Page 169

A. I'm not going to answer because I don't remember.

Q. Arturo Reyes -- strike that.

Arturo Reyes was asking you for information about whose boy it was, right?

MS. ROSEN: Objection: form, foundation.

A. I'm not going to answer. I don't remember.

Q. Do you not remember, or you're not going to answer the question? Which one is it?

MR. BRENAN: Objection, asked and answered, and now it's argumentative.

A. I'm not going to answer the answer.

Q. And so you're asserting your Fifth Amendment right?

MS. ROSEN: Objection to you -- go ahead. Translate it.

(Question translated.)

MS. ROSEN: I'm objecting to you inviting her to take the Fifth when she has said, "I don't recall." I'm objecting to you doing that. It's improper.

MR. SWAMINATHAN: Go ahead, Ms. Mejia.

A. I told you I'm not going to answer that answer.

CCSAO COI SUBPOENAS 000534

ADRIANA MEJIA, 02/05/2021       Page 170..173

FILED DATE: 4/7/2022 9:01 PM  98CR1244002

Page 170

Q. Okay. So I need to add to the process. Are you not answering because you're asserting your Fifth Amendment right?

A. Yes.

MR. SWAMINATHAN: And to be clear, I asked the witness if the reason she was not answering was because she couldn't remember or because she didn't want to answer. And she said -- she gave me the reason, which is why I asked about the question.

Ms. ROSEN: Well, but the original answers were: "I don't recall; so I'm not going to answer." And for you then to invite her to violate a court order -- because she's already been ordered. So now you are inviting her to violate a court order because I guess you prefer that. I don't know.

MS. SINGER: Hey, you guys, can I please have a moment with her?

MS. ROSEN: Yes.

MR. SWAMINATHAN: Sure.

MS. SINGER: Thanks.

THE VIDEOGRAPHER: We're off the record at 4:03.

(Recess in proceedings from 4:03 to 4:21 p.m.)

Page 171

THE VIDEOGRAPHER: We are now back on the video record at 4:21 p.m.

BY MR. SWAMINATHAN:

Q. Looking again at this note, Ms. Mejia, you wrote this information down for Arturo because he was asking questions about where the boy's parents were, right?

A. I don't remember.

Q. All right. We talked yesterday about the night that the boy was taken to the police by Arturo and Gabriel and Rosauro, right?

A. Yes.

Q. You indicated that, at some point that night, Guadalupe saw the two children on the news, right?

A. Yes.

Q. And Guadalupe said something to you about seeing the two children on the news, right?

A. Yes.

Q. At that time, was Rosauro, Arturo, and Gabriel still at work, or were they home?

A. At work.

Q. You said, when you were taken to the police station, Guadalupe was also taken to the police

Page 172

station with you, right?

A. Yes.

Q. Were you both taken together in the same car?

A. Yes.

Q. And were you in the car with Detective Guevara?

A. Yes.

Q. What did he say to you in the car?

MS. ROSEN: Objection, asked and answered.

A. I don't recall.

Q. When you were at the police station, you talked about the fact that you were interviewed a number of times by Detective Guevara, right?

MS. ROSEN: Objection, asked and answered.

Q. Correct?

A. Yes.

Q. Showing you a document we'll mark as Plaintiff's Exhibit 6. It says, "RC Solache Reyes 194 through 196, and it's a supplementary report by McDonald and Collins dated April 15, 1998.

Ms. Mejia, this report indicates that Detective Guevara conducted an interview of you at the police station. Do you see that?

Page 173

MS. ROSEN: Objection: form, foundation.

Ms. Mejia, can you read English?

A. Very little but -- very little.

Q. Okay. So let me ask the question, and we'll have the translator translate it for you, okay?

A. That's fine.

MR. SWAMINATHAN: This is for the translator to just see where we're reading. Okay?

THE INTERPRETER: Okay.

Q. It states that "Mejia stated that she had been released from the hospital on 28 March '98. As she was waiting to leave the hospital, she was approached by a female Hispanic who identified herself as Norma Salazar and asked her if she would look after her little boy while she entered the hospital to have a baby. Mejia said that she agreed; and after they exchanged phone numbers, she took the child home with her."

What is described here, is that true or false?

A. False.

MS. ROSEN: Objection. Belated form objection.

Q. Did you tell Detective Guevara or other

CCSAO COI SUBPOENAS 000535

ADRIANA MEJIA, 02/05/2021　　　　　　　　　　　　Page 174..177

Page 174

police officers that that's what happened?

A. No. It's false.

Q. So what the police wrote is a lie; is that right?

MS. ROSEN: Objection, form.

Q. Is that right?

A. I am not going to answer.

Q. Ms. Mejia, are you asserting your Fifth Amendment right with regard to that question?

MS. SINGER: Can you reask the question? I'm sorry. I was having some internet issue, and I lost you.

Q. Is what the police wrote in that report a lie?

MS. ROSEN: Objection, form.

A. I don't recall.

Q. When you were at the police station, were you ever asked to act out how the crime occurred?

A. I told you yesterday that Detective Guevara wrote a lot of things that I hadn't said.

Q. Showing you a document marked Plaintiff's Exhibit 7. It is -- this copy does not have a Bates stamp on it. I'll identify it for the record. It is Area 5 Supplementary Report, Progress Investigation 3,

Page 175

Cleared Closed Report. And at the bottom, it's dated November 18, 1999, by Investigator Daniel Trevino.

Ms. Mejia, I'm going to read this again, and I'll ask the interpreter to read it for Ms. Mejia.

This police report states: "When asked to be specific, Ms. Mejia, by using a pen as a prop, acted out the scenario by showing the reporting investigator" -- that's Trevino -- "how she used the knife to stab the victim."

Did that happen, Ms. Mejia?

A. No.

Q. Did you use a pen and act out for the police how you stabbed the victim?

A. How was I going to use a pen if I was handcuffed?

Q. Is what the police wrote here a lie?

MS. ROSEN: Objection, form.

A. Yes.

Q. It says, "Mrs. Mejia also stated that, when the victim fell on the floor on all fours, she straddled her and began to stab her back."

Your testimony is that that did not happen; is that right?

A. I'm told today I didn't -- I'm finding out

Page 176

about this. I didn't know they had written this.

Q. And did you ever tell them?

A. No.

Q. So what the police wrote in this report is a lie, correct?

MS. ROSEN: Objection, form.

A. I'm not going to answer because I didn't say that.

Q. Okay. The next sentence says, "When asked to demonstrate, Mrs. Mejia got on all fours and started to act out as the victim while she was being stabbed."

Ms. Mejia, did that happen?

A. No. I already told you in that little while how things had happened.

Q. Did you ever demonstrate by getting on all fours and acting as a victim for the police?

A. No.

Q. What the police wrote here is a lie; is that right?

MS. ROSEN: Objection, form.

A. That's false, because I'm telling you how things were happening.

Q. During your interrogations -- at some point

Page 177

during the interrogations, were you taken to see Gabriel Solache?

A. I don't recall.

Q. Do you remember any point when you were at the police station that you saw Gabriel Solache?

A. I believe I did see him, but we couldn't have communication.

Q. When you saw Gabriel -- strike that.

Did you ever see Gabriel Solache get hit by Detective Guevara?

A. Yes. On one occasion when he passed in front of me, he was mistreating him.

Q. Who was mistreating Solache?

A. Detective Guevara.

Q. When you say he was mistreating him, what did he do?

A. He couldn't do much because he was handcuffed, from what I remember.

Q. Sorry. What did Detective Guevara do to Solache? Did he hit him?

A. I don't really recall if he hit him in his face or physically. I really don't recall anymore.

Q. Did Detective Guevara hit Gabriel Solache?

A. I think so. I believe so.

CCSAO COI SUBPOENAS 000536

FILED DATE: 4/7/2022 9:01 PM  98CR1244002

ADRIANA MEJIA, 02/05/2021                    Page 178..181

Page 178

Q. You previously testified that Guevara hit Gabriel Solache in front of you. Is that testimony true or false?

MS. ROSEN: Object to the form.

A. I honestly don't remember.

Q. Okay. Did you testify at the trials of Arturo Reyes and Gabriel Solache?

MS. ROSEN: Object to the form. She didn't testify at the trials.

MR. SWAMINATHAN: I said, "did you"?

THE INTERPRETER: I'm sorry, Counsel?

MR. SWAMINATHAN: She can go ahead and answer.

THE INTERPRETER: I didn't hear the question Counsel. I'm sorry.

Q. Did you testify at the trials of Arturo Reyes and Gabriel Solache?

MS. ROSEN: Object to the form, foundation.

A. No.

Q. Were you asked to testify at their trials?

A. I don't recall.

Q. Did any prosecutor talk to you before their trials?

MS. ROSEN: You broke up for me. Could I

Page 179

get the question back?

MR. SWAMINATHAN: Can we have it read back? Please?

(Requested record read.)

MS. ROSEN: Before whose --

MR. SWAMINATHAN: Reyes and Solache. Go ahead.

A. Honestly, I don't recall. I don't think so.

Q. Were you ever told that, if you testified against Reyes and Solache, you could get a lighter sentence?

A. I don't recall.

MR. SWAMINATHAN: Ms. Mejia, are you able to keep going now, or are you just really tired?

THE WITNESS: Well, I'm a little tired, but I really want to finish this.

MR. SWAMINATHAN: Okay. Are you still able to answer the questions based on your memory, or are you too tired to be able to remember and answer questions?

THE WITNESS: I'm not too tired. It's just it's been many years, and I don't remember the investigations and the questions. It's been many years.

Page 180

BY MR. SWAMINATHAN:

Q. In recent years, have any lawyers for the police or prosecutors come to see you?

A. Just two people when I was moved to this prison and then when they were released, but I don't remember the name of the people.

Q. The two people who came, tell me what you remember about that.

A. When they were released, they just came to tell me that they were free.

Q. Were there individuals -- was there anyone from the prosecutor's office who came to talk to you about this case?

MS. ROSEN: Objection, form.

A. I'm not really good at remembering people. I just recall that it was a male and a female.

Q. The male and female who came, did they come to the prison you're currently at?

A. Yes.

Q. Did they tell you who they represent?

A. I don't recall anymore.

Q. Did you say that they told you that Reyes and Solache had been released?

A. Yes.

Page 181

Q. And did they ask you some questions about this case?

A. I don't remember much.

Q. How long did they visit you?

A. Very little time.

Q. Did you walk through any of the facts of the case with them or the crime with them?

A. I don't remember a lot of specific things.

Q. Did they ask you to tell them what you remembered about what happened?

A. At this moment, the only thing I recall is them asking how I was feeling, knowing that they were free and I was still in prison. But that's what I remember at the moment.

Q. And what was your response to that?

A. I think I told them that I felt badly.

Q. What was their response?

A. Not much. They just looked at each other.

Q. Did they tell you that you were going to be deposed in this case?

MS. ROSEN: Objection: form, foundation.

A. I don't recall.

Q. Was there a time when you were taken to Chicago to the courthouse unexpectedly?

Urlaub Bowen & Associates, Inc. 312-781-9586

CCSAO COI SUBPOENAS 000537

FILED DATE: 4/7/2022 9:01 PM  98CR1244002

ADRIANA MEJIA, 02/05/2021                                    Page 182..185

Page 182

MS. ROSEN: Objection, form.

A. I think so, on one occasion before they returned to court.

Q. You met with an attorney then, right?

A. They wanted to speak to me, but I told them I was not speaking to anyone because I didn't have an attorney to help me.

Q. How long did they meet with you?

A. Very little because they became upset.

Q. And did they try to ask you some more questions about what happened?

A. Yes. They told me that if I knew that my friends were going back to court on the case, and I said that I wasn't going to speak about anything because I didn't have an attorney to help me.

Q. They said that they were your friends?

MS. ROSEN: Objection, misstates her testimony. That's not what she just said.

MR. BRENER: Join.

MR. SWAMINATHAN: I thought she just said friends. Well, the record will say what it says. I'll ask a different question.

Q. So after you indicated that you didn't want to talk to them, they were upset?

Page 183

A. Yes. They told me that they took me because they wanted me to talk, but I didn't want to talk to them because I said I wouldn't say anything until I had someone representing me.

Q. And did they ask you some more questions anyway?

A. I don't really remember specifics because I wasn't there long. They returned me right away.

MR. SWAMINATHAN: Let's take a quick break for a few minutes. I'll try and get my last set of questions set up. I'll try to speed this up.

THE VIDEOGRAPHER: We're off the video record at 4:46 at the end of media unit 5.

(Recess in proceedings from 4:46 to 5:02 p.m.)

THE VIDEOGRAPHER: We are back on the video record at 5:02 at the beginning of media unit 6.

BY MR. SWAMINATHAN:

Q. Ms. Mejia, who is Ruben Artiaga?

A. I don't know any Ruben Artiaga. I know Ruben Luna.

Q. Who is Ruben Luna?

A. Someone I knew from my town.

Q. Is he somebody that you communicated with

Page 184

back in March of 1998?

A. I think just on two occasions.

Q. What did you communicate with Ruben Luna about?

A. Just very little. Just about how we were out here and how they were out there. Not much.

Q. Did Ruben Luna live in Chicago?

A. No.

Q. Did Ruben Luna live in Mexico?

A. Honestly, I wouldn't know what to say. It's been years.

Q. Who is Claudia Hernandez?

A. I don't know.

Q. Are you familiar with the name Claudia Hernandez?

MS. ROSEN: Objection, form.

A. No.

Q. Ms. Mejia, did you know anybody who had a cell phone back in 1997 and 1998?

A. Just Javier Mejia when he would leave it for me when I would watch his baby.

Q. Was that Javier Mejia or Jose Mejia?

A. Javier Mejia.

Q. You would watch Javier's kids, and you also

Page 185

watched Jose's kids?

A. For some time, I watched -- for about three months, I watched Javier's baby.

Q. All right, Ms. Mejia. I want to show you a document we'll mark as Plaintiff's Exhibit 7 (sic). (Reporter's Note: This is Plaintiff's 8.) This is RFD Solache Reyes 160 through 162. This is a log of phone calls that were obtained by the police related to calls to the Mejia home at Mozart, phone calls made to the 925-5124 number.

What I want to show you is calls made on March 27. This shows calls made on March 27, 1998, to the Mejia home. Do you see that?

MS. ROSEN: Objection: form, foundation.

Q. And it includes calls made on the morning of March 28, 1998.

MS. ROSEN: Objection: form, foundation.

Q. You previously stated that you called from the hospital to the home on the morning of March 28 after you had the Soto children, correct?

A. Yes.

Q. This log indicates that there were no calls made to the home between 12:30 a.m. and 10:50 a.m. Do you see that?

CCSAO COI SUBPOENAS 000538

ADRIANA MEJIA, 02/05/2021 Page 186..189

FILED DATE: 4/7/2022 9:01 PM 98CR1244002

**Page 186**

MS. ROSEN: Objection: form, foundation.

Q. Ms. Mejia, you didn't call the Mejia home on the morning of March 28, did you?

A. Yes, I did call. I don't know why they didn't come on there.

Q. You didn't make any calls from the hospital, did you?

A. Yes, I made many calls from the hospital.

Q. This phone number here, 434-8643, is the phone of Jose Mejia.

MS. ROSEN: Objection: form, foundation.

Q. Did you make the calls to the Mejia home from Jose Mejia's phone?

MS. ROSEN: Objection: form, foundation.

A. I don't recall.

Q. So you might have made the calls from Jose Mejia's phone but not from a pay phone; is that right?

MS. ROSEN: Objection: form, foundation.

A. I don't recall.

Q. So is it fair to say that the calls that you made to the house after you had the Soto children may not have actually been from a pay phone, but it might have actually been from a cell phone. Is that your testimony?

**Page 187**

MS. ROSEN: Objection: form, foundation, misstates her testimony.

A. I'm not going to answer.

Q. Are you not going to answer based on your Fifth Amendment rights?

A. Yes.

MS. ROSEN: Objection. Oh, my God.

MR. SWAMINATHAN: The witness is telling me she's not going to answer the question. What am I supposed to do?

MS. ROSEN: You're not supposed to invite her to violate a court order.

MR. SWAMINATHAN: Well, I've asked her to answer the question. Ms. Mejia, I'll ask it another time.

Q. Ms. Mejia, did you call home, not from a hospital, but from Jose Mejia's phone?

A. How am I going to use Jose Mejia's phone if I hadn't seen him in days?

Q. Do you have any explanation for why the only phone calls that were made to the Mejia home on the morning of March 28 were from Jose Mejia?

MS. ROSEN: Objection: form, foundation.

A. I don't recall.

**Page 188**

Q. Do you have any explanation for why this phone record does not indicate that there was any call made to the Mejia home on the morning of March 28, as you claim -- strike that.

You claim you made a call to the home from a pay phone at the hospital on the morning of March 28. Do you have any explanation for why that call is not included in this call log?

MS. ROSEN: Objection: form, foundation.

A. I'm not going to answer.

Q. Why not?

A. Because I'm not going to answer.

Q. Are you asserting your Fifth Amendment right?

MS. SINGER: Give me a second.

MR. SWAMINATHAN: Okay.

MS. SINGER: Can you take the exhibit down?

THE VIDEOGRAPHER: We're off the record at 5:13.

(Recess in proceedings from 5:13 to 5:19 p.m.)

THE VIDEOGRAPHER: We're back on the video record at 5:19.

MR. SWAMINATHAN: Counsel asked me to reask

**Page 189**

the question, which I'm happy to do.

Q. Ms. Mejia, you've testified in this deposition that you called the Mejia home from a pay phone at the hospital on the morning of March 28. Do you have any explanation for why there are no calls to the Mejia home on the phone log marked as Plaintiff's Exhibit 7 (sic) (Reporter's Note: Actually Plaintiff's Exhibit 8) on the morning of March 28?

MS. ROSEN: Objection: form, foundation.

A. I don't remember.

Q. Showing you a document that is marked as Defendant's Exhibit 9, Bates-stamped -- let's see if it's got a Bates stamp on it. Looks like HIPAA 4 and HIPAA 5.

Ms. Mejia, this is a Cermak health record form. This document is from April of 1998. That's the month that you were arrested and taken into custody, correct?

A. I don't recall.

Q. You were asked Question Number 6 on the Cermak. "Has detainee ever attempted suicide?"

Answer, "Yes."

"If yes, when?"

"February 23."

CCSAO COI SUBPOENAS 000539

FILED DATE: 4/7/2022 9:01 PM   98CR1244002

Page 190

Ms. Mejia, you testified at this deposition that you never attempted suicide, correct?

A. I've never tried to commit suicide.

Q. Is what is written here false?

A. I don't recall.

Q. It says here that you cut your wrist "because I couldn't have children."

Have you ever tried to cut your wrist?

A. No.

Q. Is what's written on this document false?

A. Yes. I've never tried to take my own life.

Q. Is your testimony that the person from Cermak who wrote this down wrote down a lie?

MR. BRENER: Objection to form and foundation.

A. I don't recall.

Q. Which is the truth, what is written here or what you're telling us today?

A. I'm telling you that I've never tried to take my own life.

Q. Do you know where the people from Cermak got that information?

A. I don't recall.

Q. Whatever it is, whatever they wrote down,

Page 191

according to you, is false, correct?

A. Yes.

Q. All right. I want to play an audio clip. I'd like you to listen to this audio clip. I'll share my screen.

Ms. Mejia, what I'm showing you is a document marked Defendant's Exhibit 36 produced to us by Defendants' counsel the day before this deposition. And it is a transcription of an audio recording dated October 23 -- a call that took place on October 23, 2019. Ms. Mejia, that's one day after you were previously deposed in this case.

Do you recall that?

UNIDENTIFIED SPEAKER: Ready for the clips?

Q. Ms. Mejia, you recall that, right? This is one day after you were previously deposed, right?

Go ahead, Ms. Mejia.

UNIDENTIFIED SPEAKER: I thought you were going to play an audio clip.

Q. I'm asking: Ms. Mejia, you understand this is -- October 23, 2019, is one day after your previous deposition. You agree, right?

THE INTERPRETER: I'm sorry, Counsel. One day previous?

Page 192

Q. One day after the prior deposition you gave in this case, right?

A. I don't recall that.

MR. SWAMINATHAN: Okay. Let's play the audio clip.

Shawn, it should be playing. Shawn, is it working?

SHAWN: I'm playing it. Hang on a second. Let me start it again. Maybe it will be better.

(Audio clip playing.)

MR. SWAMINATHAN: We can't hear it, Shawn.

We'll just use the transcript. I'll ask the interpreter to just read this for us -- read this for the witness.

THE INTERPRETER: Do you want me to interpret it as I'm reading, obviously?

MR. SWAMINATHAN: Yeah. Just interpret it for her, yeah.

(Interpreter reading the document for Ms. Mejia in Spanish.)

MR. SWAMINATHAN: Let me stop you there for one second.

BY MR. SWAMINATHAN:

Page 193

Q. Adriana, who is Maleno?

A. My brother.

Q. And where is Maleno?

A. Mexico.

MR. SWAMINATHAN: And then I want -- we can start here. Starting here.

THE INTERPRETER: Okay.

(Interpreter continuing to read the document for Ms. Mejia in Spanish.)

MR. SWAMINATHAN: Sorry. Let's pause there.

BY MR. SWAMINATHAN:

Q. Ms. Mejia, you're talking about the deposition that you had just given, right?

A. Yes.

MR. SWAMINATHAN: And then let's please read the next section. Can you read it? You need it a little bigger?

THE INTERPRETER: Yes. Starting where, Counsel? I'm sorry.

MR. SWAMINATHAN: Starting with "Adriana: But the attorney."

(Interpreter continuing to read the document for Ms. Mejia in

CCSAO COI SUBPOENAS 000540

FILED DATE: 4/7/2022 9:01 PM  98CR1244002

Page 194

Spanish.)

MR. SWAMINATHAN: You can stop there.

BY MR. SWAMINATHAN:

Q. Ms. Mejia, you were describing to your brother what happened at the deposition, correct?

A. Yes.

Q. What you told him is completely made up, right?

A. Because I didn't want to worry them anymore because they're tired. My parents have been tired for a long time.

Q. What you told them didn't happen, right?

A. Yes.

Q. You said in here -- you told your brother that your attorney got up and she threw the papers at their face, right?

A. Yes.

Q. But that didn't happen, right?

A. Yes.

Q. You just made that up, right?

A. Yes, because I don't want to worry them anymore.

Q. You said -- you told your brother that you got a two-month -- in two months, you were going to be

Page 195

out, right?

A. Because I'm going to get out of here. Even if you don't believe it, I'm going to get out of here one day.

Q. But what you told him was a lie. You don't have any reason to believe you're going to be out in two months, do you?

A. Perhaps. Who are you to say that I'm not going to get out?

Q. Has anybody suggested to you that you do have a chance of maybe getting out if you do the right thing?

MS. ROSEN: Object to the form.

A. I'm not going to answer.

Q. You say -- in this call with your brother, you say, "The judge was going to give the sentence, the final one. The opponents got up and, well, they gave me a continuance. But it was fine."

That's made up, right?

THE INTERPRETER: I'm sorry, Counsel. Where are you? Oh.

A. I'm not going to answer.

Q. That's not true, right? That's made up, right?

Page 196

MS. ROSEN: Object to the form, argumentative.

A. I'm not going to answer.

Q. Later in the same clip, you --

MR. SWAMINATHAN: Let's read for Ms. Mejia what she said later in this clip. Let me read it. Then you can translate.

Later in this clip, you said, "Tell my mommy that everything is very good and explain to her . . . oh, my attorney says not to talk if there are people that communicate with you because they are against us. And also, tell Carlos that my attorney said they are going to look for him to ask questions since he is here, that he is to say nothing, nothing, absolutely nothing.

A. I'm not going to answer.

Q. Ms. Mejia, you did not want your brother answering any questions about this case; is that right?

A. I'm not going to answer.

Q. And you told your brother Maleno to make sure that Carlos did not answer any questions about your case, right?

A. Yes.

Page 197

Q. And why was it so important to you to make sure that Carlos didn't talk about what happened?

A. Because he didn't know anything, and they were always interrogating him.

Q. Ms. Mejia, you wanted to -- it was important to you to make sure that Carlos didn't talk about this case, right?

MS. ROSEN: Objection: asked and answered, harassing.

A. I'm not going to answer you.

Q. Were you afraid of what he might say?

A. No, because he didn't know anything.

Q. So why couldn't he answer the questions and tell people he didn't know anything?

A. Because they were always bothering him.

Q. Who said they were bothering him?

A. I don't know, but I think that a lot of people were bothering him.

Q. If Carlos knew nothing, there would have been no problem for Carlos to answer questions and explain he knew nothing, correct?

A. Objection: form, argumentative.

MR. BRENER: Join the objection.

Q. What does Carlos know that you don't want

CCSAO COI SUBPOENAS 000541

Page 198

him to talk about?

A. He doesn't know anything.

Q. Ms. Mejia, you wrote letters from prison to Guadalupe Mejia, right?

A. I don't recall.

Q. But you testified about a letter you wrote to Guadalupe on October 22 at your prior deposition, right?

Strike that. At your October 22 deposition, you answered questions about a letter you wrote to Guadalupe on June 11, 1998. You remember that?

A. At this time, I don't recall.

Q. Ms. Mejia, I'm going to show you a letter. This is Exhibit 5 to your prior deposition, RFC Solache Reyes 3949 to 3952.

And I'll ask the court reporter to read the excerpt that starts at number 1. Here.

THE INTERPRETER: The court interpreter? You want me to read?

MR. SWAMINATHAN: Court interpreter, I'm sorry.

THE INTERPRETER: I'm trying to understand the handwriting, Counsel.

"I feel very badly' --

Page 199

MR. SWAMINATHAN: You can read it in Spanish.

MR. BRENER: We're going to need it in English for the record, too.

THE INTERPRETER: So you want me to read it to her in Spanish and then translate it?

MR. SWAMINATHAN: Yes.

THE INTERPRETER: Got you. I can't understand "perdi a Chapa."

MR. SWAMINATHAN: Let me let Ms. Mejia read it. And then we can have you interpret it in English.

THE INTERPRETER: Actually, there's just one word. I think Chapa is the name of someone?

MR. SWAMINATHAN: That's Rosauro's nickname.

THE INTERPRETER: Okay. Thank you.

"I feel badly because I know that I lost Chapa because of my fault, and that will be my punishment."

BY MR. SWAMINATHAN:

Q. In this letter to Lupe, you wrote about feeling sad about losing your husband, Chapa, right?

A. Yes.

Q. And you acknowledged that it was your fault, right?

Page 200

A. My fault in that -- how can I explain it?

Q. You didn't say it was anyone else's fault. You said it was your fault, right?

MS. ROSEN: You just interrupted her. She was not finished. She didn't finish her answer.

Q. Did you have more you wanted to say, Ms. Mejia?

A. I don't know how to explain it to you right now.

Q. You said it was your fault, not anybody else's fault, right?

MS. ROSEN: Objection, form.

A. And in order to better explain it and admit it was my fault and my personal -- with my husband, not other people.

Q. Take a look at the section here that we've highlighted on page 3 of this letter. You've had a chance to read that, Ms. Mejia?

Ms. Mejia, you told Guadalupe that you were planning to get out of jail in "no more than a few days," correct?

A. I don't recall.

Q. What made you think that you might be getting out of jail in just a few days after June 11

Page 201

of 1998?

A. I don't recall.

Q. Did you make that up, or did you believe that?

A. I still continue believing that I'm going to get out.

Q. Did you actually believe you were going to get out in a few days, or were you making that up?

MS. ROSEN: Objection, form.

A. I thought I was going to get out in three days.

Q. And you had a plan to get out, right?

A. No, not a plan.

Q. Let's look at this excerpt that we've marked as number 3. Go ahead and read that, Ms. Mejia?

A. You're going to read it. I'm not.

Q. You wrote to Lupe. "Soon I'm going to leave," right?

A. I don't recall.

Q. Let's take a look at the excerpt we've marked as number 4. You wrote to Lupe, "For now, I'll be here for a very short time. Then I'll follow my path together with my parents. They are waiting for me." You wrote that to Lupe, right?

CCSAO COI SUBPOENAS 000542

FILED DATE: 4/7/2022 9:01 PM    98CR1244002

Page 202

A. I don't recall.

Q. Well, that's what you wrote to Lupe, right, in this letter?

A. I don't recall. It's many years.

Q. Well, do you dispute that what's written on -- that what I said, that's what you said in this letter? That's what I'm asking you.

A. I repeat that it's been many years. I don't remember.

Q. You didn't end up getting out a few days after you wrote that letter, did you?

A. I don't know.

Q. You said you didn't have a plan then. But in June of 1999, you came up with a plan, right?

A. I never made a plan.

Q. Take a look at the document marked Plaintiff's Exhibit 8 (sic) (Reporter's Note: This is Plaintiff's Exhibit 9). This is RFC Solache Reyes 4812 through 4816. This is a letter that you wrote on June 1, 1999, to Gabriel Solache. You were writing letters to Gabriel solache. We talked about that, right?

MS. ROSEN: Objection, form.

Q. You wrote him letters, right?

Page 203

A. Yes.

Q. And in those letters, you came up with a plan to get Gabriel to take responsibility for the crime so that you could go back to Mexico, right?

A. When he wrote, he had already decided, and he wrote a lot of things to me too. I've lost the letters, but otherwise I would prove that he had said a lot of things to me as well.

Q. You wrote to him and asked him to lie so that you could be released to go see your parents, right?

MS. ROSEN: Objection, form. Go ahead.

A. I don't recall.

Q. All right. Let's take a look. Looking at Plaintiff's Exhibit 8 (sic), if we look at the first excerpt, you wrote to Gabriel. Excerpt 1: "Write to me as soon as possible so that Montez (phonetic) can send you money and take you clothes."

You tried to get Gabriel Solache to do what you wanted by sending him money and clothes, right?

MS. ROSEN: Objection: form, argumentative.

A. I don't recall.

Q. Let's take a look at excerpt 3. "You said there is something about all of this, and I can't tell

Page 204

you." What did you mean by that?

A. That we couldn't speak by letter about the crime, about what had happened.

Q. You wrote to him telling him that there were things about this that you could not tell him. You were hiding something from him, right?

A. No.

Q. You were hiding from him what actually happened at the Soto residence, right?

A. I'm not going to answer. I don't remember.

Q. Let's take a look at another letter you wrote marked as Plaintiff's Exhibit 9 (sic) (Reporter's Note: This is Plaintiff's Exhibit 10). It's RFC Solache Reyes 4827 - 4836. This is a letter you wrote on July 12, 1999.

Looking at page 6 of this letter, you wrote, "You will soon be in Mexico, and I will have to come back to this place because this is what I deserve. Think about it and tell me if you'll help me for only about six months, just to make my mother happy."

You wrote that to Gabriel Solache in July of 1999, right?

A. I don't recall.

Q. You wanted to go back to Mexico to say

Page 205

goodbye to your parents, right?

A. I don't recall that.

Q. And you said you would take full responsibility for the crimes you committed, allowing Gabriel to be released, right?

MR. BRENER: Objection, argumentative.

MS. ROSEN: Objection: form, foundation.

MR. SWAMINATHAN: Go ahead.

A. I don't recall.

Q. Looking at excerpt number 2, you wrote, "All I ask are six months of happiness. After that, nothing will matter. I will make you a letter and sign it that you personally can submit. I know that they would go for it for me, but I would come back because then you could soon go free."

A. I don't recall.

Q. You were admitting there that Gabriel Solache should go free; but first, you wanted him to help you go home for a period to see your parents, right?

MS. ROSEN: Objection: form, foundation, mischaracterizes the letter.

A. I don't recall.

Q. You believe that Gabriel Solache did deserve

CCSAO COI SUBPOENAS 000543

FILED DATE: 4/7/2022 9:01 PM 98CR1244002

Page 206

to be free, right?

A. Why would he have to be freed if he was also an accomplice in the crime.

Q. You wrote to him that, if he would just lie, you could go home for six months. Then you would say whatever you needed for him to be able to go home, right? That's what you wrote.

MS. ROSEN: Objection: form, foundation. That's not what you read to her; and if it's somewhere in the letter, then you should let her read it.

MR. SWAMINATHAN: Go ahead.

A. I'm not going to answer.

Q. All right. Let's take a look at excerpt number 3. You said, "I will help you and defend you of everything. I want you to help at least a little. I want to see my mother, ask her to forgive me, and then speak of everything. I wanted to go see her and then say everything so that they can leave you in liberty."

THE INTERPRETER: I'm trying to follow, Counsel, I'm sorry.

MR. SWAMINATHAN: Sorry. I can start over and go through it slower.

THE INTERPRETER: Okay.

Page 207

Q. "I will help you and defend you of everything. I want you to help me at least a little. I want to see my mother, ask her to forgive me, and then speak of everything. I wanted to go see her and then say everything so that they can leave you in liberty."

You wrote, "I have to pay for what I did. And I want my parents to hug me for the last time. I ask this for my mother and for me. I know I don't deserve anything from you. But I know that you have a heart that's double or the same as God's."

You wrote that to Gabriel Solache, right?

MS. ROSEN: Objection, form and foundation. I don't know what you're reading from. I don't know if that's an accurate translation. So form, foundation.

MR. SWAMINATHAN: Go ahead, Ms. Mejia?

A. I don't recall.

Q. You wrote in that letter that Gabriel deserved his liberty, right?

A. Everybody deserves an opportunity. Why just him?

Q. Were you apologizing to him in this letter?

A. I don't recall if I was apologizing to him

Page 208

or not. I don't remember.

Q. Let's take a look at one last section. Take a look at excerpt number 5. You wrote, "I hope some day you can forgive me all that you have suffered and that you have gone through because of my fault. Forgive me. It's easy to say. And you must think, after all that's been done to me, you ask me for that."

You told him it was all your fault that he was in prison, right?

MS. ROSEN: Object: form, foundation.

MR. SWAMINATHAN: Go ahead.

A. I don't recall.

Q. Ms. Mejia, do you dispute that you wrote that in the letter to him, that he should go free?

A. I don't recall if I wrote that, no.

Q. You agree this is your handwriting, right?

A. (No response.)

Q. Ms. Mejia, you previously testified about these letters. Go ahead.

MS. ROSEN: Objection, you're mischaracterizing what she testified to about this letter, this particular letter.

MR. SWAMINATHAN: We have to take a break

Page 209

here. She had to step away. Oh, she's back.

Q. Ms. Mejia, this is your handwriting. This is a letter you wrote to Gabriel Solache, right?

A. I don't recall.

Q. You don't remember writing this letter?

A. I don't recall.

Q. And you agree that this is your handwriting, right, under oath? It appears to be your handwriting?

A. It looks like it, but --

Q. But you don't remember saying this?

MS. ROSEN: Objection: form, foundation. Mischaracterizes what she just said.

MR. SWAMINATHAN: Go ahead, Ms. Mejia.

A. I don't recall.

Q. Ms. Mejia, you wrote to Gabriel Solache and told him multiple times that it was your fault, right?

A. I felt guilty about the deaths, but not -- I don't know how to explain it.

Q. You also told him in multiple letters that he deserved to be free, right?

A. We all deserve to be free. We have to pay for our mistakes, but --

Q. All right. Ms. Mejia, if the crime actually happened the way you've described here in your

CCSAO COI SUBPOENAS 000544

FILED DATE: 4/7/2022 9:01 PM   98CR1244002

FILED DATE: 4/7/2022 9:01 PM  98CR1244002

Page 210

deposition yesterday and today, you never would have written to Gabriel Solache saying that he deserved to be free, would you?

MR. BRENER:  Objection to form, argumentative.

A.  I'm not going to answer.

Q.  If -- strike that.

And you just mentioned feeling guilty.  Do you feel guilty that your statements resulted in Gabriel Solache being locked up for many years?

MR. BRENER:  Objection:  form, foundation, mischaracterizes the record.

A.  Can you repeat the question?

Q.  Yeah.  You said -- earlier, you used the word "guilty."  You feel guilty about what happened to Gabriel Solache.

A.  I feel guilty for -- I don't know how to explain it.

Q.  Ms. Mejia, do you feel guilty to what happened to Arturo Reyes?

A.  I'm not going to answer.

Q.  Ms. Mejia, you realize that the story that you told us here today and yesterday, it's simply impossible, right?

Page 211

MS. ROSEN:  Objection:  form, argumentative.

MR. BRENER:  Foundation.

MR. SWAMINATHAN:  Go ahead.

A.  I'm not going to answer.

Q.  Based on the story you just told, your blood should not have been found anywhere in the Soto home, right?

MS. ROSEN:  Objection:  form, foundation.

MR. SWAMINATHAN:  Go ahead.

A.  I'm not going to answer.

Q.  But it was.  Your blood was found in the Soto home, right?

A.  I'm not going to answer.

Q.  And based on the story you just told, you had almost no role whatsoever, correct?

A.  What do you mean, "role"?

Q.  Based on the story you just told, you didn't really have any role in killing the Soto family, right?  You didn't even know what was going to happen, right?

A.  I'm not going to answer.

Q.  And yet your blood was found on the knives in the house, right?

A.  I don't know.  I'm not going to answer.

Page 212

Q.  The story you just told would require Gabriel to have skipped work that day, right?

MS. ROSEN:  Objection:  form, foundation.

A.  I'm not going to answer.

Q.  When you say the crime was happening, Gabriel Solache was at work, right?

MS. ROSEN:  Objection:  form, foundation.

A.  I'm not going to answer.

Q.  All right.  The last few questions. Ms. Mejia, are you lying about what happened because you're angry at Gabriel Solache?

A.  I'm not going to answer.

Q.  Are you angry that he wouldn't help you go back to Mexico to see your parents?

A.  I'm not going to answer anymore.

Q.  Ms. Mejia, are you lying about what happened because you want to get released -- strike that.

Ms. Mejia, are you lying because you hope to one day get released from prison, and you're hoping your testimony will help you?

A.  I can tell you that I respect your laws.  I don't know.  I know it's your job, but I can say that I believe in the law of God.

Q.  Ms. Mejia, are you lying to protect others?

Page 213

A.  No.

Q.  Are you lying to protect whoever made the calls to the house on the night of March 27, the morning of March 28?

A.  I'm not going to answer.

Q.  Ms. Mejia, --

MS. ROSEN:  You're out of time.

MR. SWAMINATHAN:  I have two last questions.

Q.  Ms. Mejia, you were previously asked questions about whether Arturo Reyes had anything to do with this crime.  And in a previous deposition, you asserted your Fifth Amendment right against self-incrimination, correct?

A.  I don't recall.

Q.  Ms. Mejia, in a previous deposition, you were asked whether you lied when you implicated Gabriel Solache in this murder and kidnapping of the Sotos, and you asserted your Fifth Amendment right, correct?

A.  Honestly, I don't remember anymore.

MR. SWAMINATHAN:  I have no further questions.

MR. ENGQUIST:  We have a few, or I have a few.

CCSAO COI SUBPOENAS 000545

Page 214

MS. ROSEN: I assume Ms. Susler has no questions?

MS. SUSLER: That's correct.

MS. ROSEN: Thank you.

MR. ENGQUIST: Do you want me to go straight into it, or what?

MS. ROSEN: Ms. Mejia, would you like us to take a quick break before we ask some follow-up questions, or are you good to go?

THE WITNESS: How much longer is this going to take, a lot?

MR. ENGQUIST: Not too long for me. Not for me. But if you need to take a break to use the restroom before we start or something like that, just let me know.

THE WITNESS: Okay. If we could take a break in about 20 minutes.

MR. ENGQUIST: Okay. Sure.

EXAMINATION

BY MR. ENGQUIST:

Q. Ms. Mejia, I just want to -- I'm going to jump around a little bit, okay?

Earlier in your testimony -- I'm not sure if it was today or yesterday -- you talked about

Page 215

basically growing up with Mr. Solache; is that correct?

A. Yes.

Q. And I know, earlier today, you also talked about seeing him pick a lock at the school when you were in Mexico, correct?

A. Yes, because he was terrible.

Q. When you say "he was terrible," did you ever see him break any laws when he was in Mexico?

A. Not laws, but in Mexico, where we lived, there's no authority. I don't know if I can say it or if I have to reserve that to myself.

Q. Why would you have to reserve that to yourself about Mr. Solache's activities when he was growing up in Mexico?

A. Well, because when we were younger, when we were young, he was a little bit violent with his peers. He was kind of abusive.

Q. When you say "violent to his peers," can you describe what he would do to his peers that would be violent?

A. Violent in the fact that he would make fun. He would, like, make fun of people.

Q. Would he ever physically hurt anybody?

Page 216

A. I remember, when he used to hang out with my older brother, he was, like, very possessive, very abusive.

Q. When you say "abusive," was he physically abusive?

MS. ROSEN: Objection, been asked and answered.

MR. ENGQUIST: Go ahead.

A. Yes, very abusive because he would bully people from his generational line.

Q. I know you said you saw him use a hanger to get into the door the night of the murders, but you also saw him use it one time in Mexico. Do you ever see him any other time break in through a locked door other than those two times?

A. I remember, when we were in elementary school, there was a little room where they sold food. It was easy to take the windows off. He would go in with his little friends to get a lot of candy out. He had a lot of reports from his teachers.

Q. Other than reports from his teachers, did he ever get in trouble with the law, as far as you know, down in Mexico.

A. Yes. On one occasion, he tried to abuse a

Page 217

lady.

Q. And where was this?

A. In my town.

Q. Do you remember when this was, what year?

A. I don't recall the exact date, but that's why he fled my town.

Q. When you say "fled your town," was that before -- right before he went to the United States, or did he move somewhere else before coming to the United States?

A. I believe that happened -- when it happened, it was about April 25 when he tried to force her. And he left to the capitol with his mother.

Q. And do you know who that girl was or who that woman was?

A. Yes. Her name is Penelope. I don't recall her last name, but she's from my town.

Q. Do you know whatever happened with that -- or did anything ever happen with those allegations of abuse?

MR. SWAMINATHAN: Form. Go ahead.

A. All I know was that the lady's husband was looking for him.

Q. Do you know what the abuse was, what

FILED DATE: 4/7/2022 9:01 PM   98CR1244002

Page 218

actually happened, allegedly happened?

A. No. Very little, no.

Q. Now, at some point while Mr. Solache was living in the United States, he received some type of head injury. Do you know anything about that?

A. Yes, for fighting.

Q. Who was he fighting with?

A. With Daniel.

Q. And do you remember when this fight took place?

A. No. I don't remember anymore.

Q. It was before the events which you were arrested for, correct?

A. Yes.

Q. Do you remember what his injury was?

A. Can you repeat the question?

Q. Sure. Do you remember what his injury was?

A. I think they put a brick in his head.

Q. Oh, he was struck on the head with a brick on the head? Is that correct?

A. I think Daniel stabbed him in the head with it.

Q. Do you know if Mr. Solache went to the hospital for that?

Page 219

A. I believe my brother-in-law Leobardo and my brother Carlos went to take him to Cook County.

Q. And was he hospitalized for a period of time with that.

A. Yes.

Q. Do you remember him having any kind of lasting injuries from that being struck in the head with a brick?

A. I don't know. But later, he would say that he couldn't see out of one eye. But I don't remember which eye.

Q. Did he ever complain to you about his hearing at that time?

A. At that time, I couldn't have a lot of communication with him. It was my brother Carlos and my brother-in-law Leobardo.

Q. Okay. I want to go back to the night of the crime and just do a couple of questions on that, if you don't mind.

You've already testified that Mr. Reyes came in after the husband was stabbed but before the wife was stabbed, correct?

A. Yes.

Q. Did Mr. Reyes tell Mr. Solache to stop when

Page 220

the wife was attacked?

A. I don't recall.

Q. Did he try to physically stop him at all?

A. I think so.

Q. You think so, okay. Do you know how he tried to physically stop him?

A. I think he wanted to grab him, but I'm not -- I think he did want to push him.

Q. Did he actually push him?

A. Yes, I think he did, a little bit.

Q. Is this when Mr. -- is this right before Mr. Solache was stabbing the woman in the back?

THE INTERPRETER: I'm so sorry, Counsel. What was that?

Q. Was this when you described Mr. Solache stabbing the woman in the back?

A. Yes.

Q. At this time, the woman was on the ground on all fours?

A. What do you mean "on all fours"?

Q. Down on her hands and knees.

A. Honestly, I don't recall.

Q. What else did Mr. Reyes do to try to stop Mr. Solache from stabbing the woman?

Page 221

A. I don't really remember a lot now.

Q. When the stabbing was going on, did either you or Mr. Reyes leave the apartment to try to get help?

A. No.

Q. You were testifying earlier how you thought that Mr. Solache would have had blood on his clothing. Remember that?

MR. SWAMINATHAN: Objection to form.

MS. ROSEN: Objection, mischaracterizes her testimony.

MR. ENQUIST: Go ahead.

A. Yes.

Q. Do you know what Mr. Solache did with that bloody clothing?

A. Yes.

Q. What?

A. He washed it in the bathroom and put it in a bag and went to throw it out.

Q. How do you know that?

A. Because I was watching him when he was washing them.

Q. Earlier, you testified that you did answer questions from police officers and also an Assistant

CCSAO COI SUBPOENAS 000547

Page 222

Q. State's Attorney. Do you recall those questions?

A. Yes.

Q. When you answered the police officers and the State's Attorney, did you try to be truthful?

A. Yes.

Q. Did you ever change your story over time?

A. No.

Q. Did you tell the police or the state's attorney that you, Mr. Solache, Mr. Reyes were present when the Soto family were -- when Mr. and Mrs. Soto were killed?

A. Can you please repeat the question?

Q. Sure. I'll re-ask something.
Did you tell the police or the State's Attorney that you were present when Mr. and Mrs. Soto were killed?

A. I don't recall.

Q. Did you tell the police or the State's Attorney that Mr. Solache was present when the Sotos were killed?

A. I don't recall that

Q. Well, if you had told them that, that would have been true, correct?

A. I don't recall that question.

Page 223

Q. You talked earlier about talking directly to the State's Attorney, and he was asking you questions. Do you recall that?

A. Yes.

Q. And you tried to be honest with him?

A. Yes.

Q. If he would have asked you if Mr. Solache was involved in the murders, would you have told him yes?

MR. SWAMINATHAN: Objection to form.

MS. SUSLER: Join.

Q. Can I get the answer, please?

A. Yes.

Q. If he would have asked you if Mr. Reyes was present during the murders, would you have told him yes?

MR. SWAMINATHAN: Objection to form.

A. Yes.

Q. That's because it was true, correct?

MR. SWAMINATHAN: Objection to form.

A. Yes.

Q. And if you would have been asked who was involved in the kidnapping of the children, you would have told him that you, Mr. Reyes, and Mr. Solache

Page 224

were all involved; is that correct?

MR. SWAMINATHAN: Object to form.

MS. SUSLER: Join that.

A. Yes.

Q. That's because it's true, correct?

MR. SWAMINATHAN: Objection to form.

MS. SUSLER: Same.

A. Yes.

MR. ENGQUIST: I need about five minutes. I just want to look at something to make sure I'm going to be done. So if we could take a quick break for five minutes. This might be a good time to use the restroom, Ms. Mejia.

THE WITNESS: Okay.

THE VIDEOGRAPHER: We're off the record at 6:30 p.m.

(Recess in proceedings from 6:30 to 6:39 p.m.)

THE VIDEOGRAPHER: We're back on the video record at 6:39.

MR. ENQUIST: Before we get back on the record, I think you had one correction to make, Ms. Translator.

THE INTERPRETER: That is correct. When

Page 225

Ms. Mejia stated that he would bully people from his generation, I interpreted that literally. Because in Spanish, "generacion" actually means class, like if you're class of '99, class of 2000. That's the example. And I interpreted it as generation instead of saying from his class.

MR. ENGQUIST: I appreciate that. Thank you.

BY MR. ENGQUIST:

Q. Ms. Mejia, you were asked a lot of questions today about Jose Mejia.
Was Jose Mejia involved in the kidnapping of the Soto children?

A. No.

Q. Was Jose involved in the murders of Mr. and Mrs. Soto?

A. No.

Q. Did Jose Mejia know anything about the crime before it was committed?

A. No.

Q. You were also asked a lot of questions about your former husband, Rosauro?

A. Yes.

Q. Was Rosauro involved in the kidnapping of

FILED DATE: 4/7/2022 9:01 PM 98CR1244002

CCSAO COI SUBPOENAS 000548

ADRIANA MEJIA, 02/05/2021

Page 226..229

Page 226

the Soto children?

A. No.

Q. Was Rosauro involved in the murders of Mr. and Mrs. Soto?

A. No.

Q. Was he aware of the crime before it was committed?

A. No.

Q. You were asked a lot of questions about your ex-husband's brothers. He had quite a few of them.

A. Yes.

Q. Were any of your former husband's brothers involved in the murders of Mr. and Mrs. Soto?

A. No.

Q. Were any of them involved in the kidnapping of the Soto children?

A. No.

Q. Did any of them know about the crime before it was committed?

A. No.

Q. You were also asked questions about your downstairs neighbors, including Guadalupe?

A. Yes.

Q. Was Guadalupe involved in the kidnapping of

Page 227

the Soto children?

A. No.

Q. Was Guadalupe involved in the murders of Mr. and Mrs. Soto?

A. No.

Q. Was she aware of the crimes before they were committed -- the plan for the crime before it was committed?

A. No.

MR. ENGQUIST: I don't think I have anything else.

Does anybody else on the defense counsel crew here have anything?

MS. ROSEN: I actually do have just a couple of questions.

FURTHER EXAMINATION

BY MS. ROSEN:

Q. Ms. Mejia, you were asked a lot of questions about your brother Carlos in the last two days, correct?

A. Yes.

Q. Was your brother Carlos involved in the murders of Mr. and Mrs. Soto?

A. No.

Page 228

Q. Was your brother involved in the kidnapping of the Soto children?

A. No.

Q. Did your brother Carlos know about the plan to kidnap the children and murder their parents before the crimes happened?

A. No.

MS. ROSEN: I don't have any more questions.

MR. NOLAND: I do not have any questions.

MR. BRENER: I also do not have any questions.

MR. SWAMINATHAN: Nothing else for us.

MR. ENGQUIST: The only other thing is whether or not you want to waive or reserve your signature. I do not know, Dena if you want to make a call on that or not. It's up to you.

MS. SINGER: No. It's fine. I don't have a position on it. I mean, I can reserve it. But I don't have a position on it.

MR. ENGQUIST: Okay. Do you want to ask her if she wants to waive or reserve or explain it to her? Do you want me to explain it to her?

MS. SINGER: Go ahead. You can do it. It's fine. It's easier if you can do it with the

Page 229

interpreter though so she understands.

MR. ENGQUIST: Ms. Mejia, the only issue left is whether or not you want to waive or reserve your signature. That means, when this deposition is typed up, you get to choose whether or not you have a chance to read it over for accuracy before it's finalized or whether or not you want to waive it and trust that the court reporter typed up everything accurately.

THE WITNESS: That's fine.

MR. ENGQUIST: Which one? Waive or reserve?

THE WITNESS: I don't know. Whatever my attorneys advises me.

MR. ENGQUIST: Back to you, Dena.

MS. SINGER: I would need a second to talk to her, guys. It's really her decision. So I've got to go into a breakout room real quick. I'm sorry.

MR. SWAMINATHAN: We can log off, right? You don't need any of us -- oh, no no. We need to get that, right.

MS. SINGER: You do, because you need to know the answer.

MR. SWAMINATHAN: Sorry. Go ahead.

MS. SINGER: Adriana, we're almost done.

Urlaub Bowen & Associates, Inc. 312-781-9586

CCSAO COI SUBPOENAS 000549

FILED DATE: 4/7/2022 9:01 PM   98CR1244002

ADRIANA MEJIA, 02/05/2021      Page 230..233

Page 230

Can you grab the guard?

THE VIDEOGRAPHER: We're off the record at the 6:46.

(Recess in proceedings from 6:46 to 6:50 p.m.)

MR. ENGQUIST: Before it's asked, I will just say, yeah, I'll order. Etran.

MS. SINGER: She's on her way back in. She would like to read it, but the concern is that it's in English. So I don't know how to satisfy the issue of the whole transcript being in English.

MR. ENGQUIST: I don't either. Because I think it would be a tad overkill to have 2 days, 17 hours or whatever, worth of translations done.

MS. SINGER: Right.

MR. ENQUIST: I'm honestly not sure even how that works. Any thoughts from the peanut gallery here?

THE INTERPRETER: You can always hire me.

MR. STARR: Could we send her the video, and she could watch the video, and then send the transcript?

MS. SINGER: That's a good -- but will the

Page 231

facility have a way for her to do that?

MR. ENGQUIST: I honestly don't know. I'm going to order the video too, by the way.

MS. SCHATZLE: Just food for thought on the video side, I can send the video through email to whoever at the jail, and then they can pull it up on a computer and let her watch it. So it will be an electronic copy of the video.

MR. ENGQUIST: But I don't control what they're going to allow her access to or period of time or anything like that.

You know, we can work on getting her a copy, I guess, at some point. But I don't know what else to say about that. Eileen, do you have a thought on it?

MS. ROSEN? Me? Yes, me. What would it cost, Elsa to have you read it to her?

THE INTERPRETER: You would just contact the agency, and I'm sure they would work with you.

MS. ROSEN: I mean, if Plaintiffs are willing to split costs on something like that, I suppose it's something we can talk about.

THE INTERPRETER: I mean, I don't get involved with the pricing. But I work with them, and they would work with you.

Page 232

MR. SWAMINATHAN: My concern is it's going to be extremely time consuming and expensive. What I would propose we do is try get her the video and see if there's a way that she can get set up to be able to review that. If we need to be able to set up a notice for her to be able to get a room to be able to review the video, that's also fine, or whatever we can do to facilitate that.

MR. ENGQUIST: I have no problem trying to work out sharing with her the video. But if it's a reserving signature thing, then it's the reading of the transcript, not the video. Her watching a video doesn't alleviate that concern.

So if it's reserved, that's a different issue. And honestly, I don't know how to deal with that in this case. If it's going to be "waived, but I'd like to get a copy of it," then we can probably work that out.

MR. SWAMINATHAN: Maybe we need ask her that.

MS. SINGER: I'm sorry, what did you say?

MR. SWAMINATHAN: If we get her a copy of the video, is that what she would like? Or is she additionally indicating that she's not waiving, and

Page 233

she wants to be able to do a comparison to the actual transcript before she -- rather than waive signature?

In other words, if what she wants is --

MS. SINGER: No, I understand. I'm with you. It's 17 hours, but I got you. Is she there? Sorry. I can only see -- not everybody.

Elsa, I guess, can you ask her: Adriana, do you want to see the video, and is the video sufficient for to you determine if everything is accurate?

THE WITNESS: Because of the Corona virus, they're not going to let me see it. Everything is canceled right now.

MS. SINGER: Right. A lot of the facilities won't give them access to computers and stuff because of the virus.

Well, I think we should --

MR. SWAMINATHAN: If it's a matter of time, it could be that -- I don't know how long it usually takes to go back and forth; but if it's going to be 60, 90 days, we could be in a different place with regard to her ability to have access to a computer.

MS. SINGER: Well, then you guys are waiting 60 or 90 days until --

MR. SWAMINATHAN: I don't care about waiting

CCSAO COI SUBPOENAS 000550

FILED DATE: 4/7/2022 9:01 PM 98CR1244002

FILED DATE: 4/7/2022 9:01 PM   98CR1244002

ADRIANA MEJIA, 02/05/2021                                  Page 234..235

Page 234

60 to 90 days to have her sign off on the errata sheet, which is basically what we're talking about.

MR. ENGQUIST: The thing is, if it gets written, then you just have 30 days to determine.

MS. ROSEN: I know, you can extend that by agreement. we could agree to give her more time.

MS. SINGER: Adriana, are you comfortable waiving it? Are you comfortable saying that you think the transcript, as written, was taken accurately, or would you prefer to read it?

THE WITNESS: Whatever decision my attorney makes is fine.

MS. SINGER: All right. We can waive it.

THE VIDEOGRAPHER: Just to note, the video was not recording. Do you want that also on the video or just on the written transcript?

MR. ENGQUIST: The fact that it's waived?

THE VIDEOGRAPHER: Yeah.

MR. ENGQUIST: Just on the written transcript. That's fine.

THE VIDEOGRAPHER: I was just letting you guys know.

(Deposition concluded at 6:57 p.m.;
by agreement, signature waived.)

Page 235

CERTIFICATE OF REPORTER

I, BRENDA L. ZEITLER, a Certified Shorthand Reporter within and for the State of Illinois, do hereby certify that the witness, ADRIANA MEJIA, whose testimony appears in the foregoing deposition was duly sworn by me through a Spanish interpreter; that the testimony of said witness was taken through Spanish interpreter on February 5, 2021, by me to the best of my ability and thereafter reduced to typewriting under my direction; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition was taken, and further that I am not a relative or employee of any attorney or counsel employed by the parties thereto, nor financially or otherwise interested in the outcome of the action.

_____

Brenda L. Zeitler, CSR
Illinois License No. 084-004062

CCSAO COI SUBPOENAS 000551

| From: | Valerie Barajas |
|---|---|
| To: | CHRISTA BOWDEN (States Attorney); Rachel Brady; Sophia Atcherson (Judiciary); CrimDiv crt205 (Circuit Court) |
| Subject: | Re: People v. Reyes, 98 CR 1244002-Petitioner's Reply and Exhibits |
| Date: | Monday, April 11, 2022 8:50:20 AM |
| Attachments: | Reyes CORRECTED Reply and Exhibits-FS.pdf |

---

**External Message Disclaimer**

This message originated from an external source. Please use proper judgment and caution when opening attachments, clicking links, or responding to this email.

Dear Judge Atcherson,

Attached, please find Petitioner's CORRECTED Reply in Support of Motion for Summary Judgment.

Sincerely,

Valerie Barajas

On Fri, Apr 8, 2022 at 9:29 AM Valerie Barajas <valerie@loevy.com> wrote:
Dear Judge Atcherson,

Attached, please find Petitioner's Reply in Support of Motion for Summary Judgment.

Sincerely,

--
**Valerie Barajas**
Paralegal
Loevy & Loevy
311 N. Aberdeen, 3rd Fl
Chicago, IL 60607
(312) 243-5900
valerie@loevy.com

--
**Valerie Barajas**
Paralegal
Loevy & Loevy
311 N. Aberdeen, 3rd Fl
Chicago, IL 60607
(312) 243-5900
valerie@loevy.com

CCSAO COI SUBPOENAS 000552

FILED DATE: 4/8/2022 3:39 PM    98CR1244002

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CRIMINAL DIVISION**

FILED
4/8/2022 3:39 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
98CR1244002
Martin, LeRoy K, Jr.
17432512

|  |  |  |
|---|---|---|
| **ARTURO De LEON-REYES,** | ) | |
| | ) | |
| *Petitioner,* | ) | |
| v. | ) | **No. 98 CR 12440-02** |
| | ) | |
| **STATE OF ILLINOIS** | ) | |
| | ) | |
| *Respondent.* | ) | |

**PETITIONER'S CORRECTED REPLY IN SUPPORT OF MOTION FOR SUMMARY
JUDGMENT ON PETITION FOR CERTIFICATE OF INNOCENCE PURSUANT TO
735 ILCS 5/2-702**

Petitioner, Arturo De Leon-Reyes, through counsel, hereby replies in support of his Motion for Summary Judgment, as follows:

**INTRODUCTION**

In his opening brief, Mr. Reyes established that he is entitled to a certificate of innocence as a matter of law. Mr. Reyes presented ample evidence of innocence, including DNA showing he was not at the crime scene, his repeated and consistent testimony to his innocence, evidence that disgraced Detective Reynaldo Guevara coerced false inculpatory statements out of Mr. Reyes and his co-defendant, and a host of other testimony establishing innocence. The State's evidence in Response, on the other hand, even when construed in the State's favor, cannot overcome this evidence of innocence. In other words, there is no version of these facts in which Mr. Reyes does not meet his burden.

Keeping in mind the goal of the COI statute is to make it easier for petitioners to seek certificates of innocence and not impose additional burdens, and that this Court must interpret the statute in the petitioner's favor, 735 ILCS 5/2-701 *et seq.* & 735 ILCS 5/2-702 (including

1

CCSAO COI SUBPOENAS 000553

COI statute in "Action For Declaratory Judgment"); *Illinois Gamefowl Breeders Ass'n v. Block*, 75 Ill. 2d 443, 452 (1979 ("The declaratory judgment remedy should be liberally applied and not restricted by unduly technical interpretations.")), this Court must grant Mr. Reyes a certificate of innocence ("COI").

## ARGUMENT

The State makes several critical concessions in its Response:

- Mr. Reyes has satisfied his burden under 735 ILCS 5/2-702(g)(1), (g)(2)(A), and (g)(4). The only element in dispute is whether Mr. Reyes has shown innocence by a preponderance of the evidence, as a matter of law. *Id.* at 5/2-702(g)(3).

- Mr. Reyes and Mr. Solache's statements, obtained based on physical and psychological abuse by Detective Guevara, are not admissible in these proceedings and cannot be considered.

- Ms. Mejia's original statement is also not admissible, for the same reasons.

- Detective Guevara has a pattern of engaging in gross misconduct during homicide investigations, including coercing false confessions from innocent people.

- Mr. Reyes's DNA was not found anywhere at the crime scene or on evidence related to the crime. Evidence that was collected contained the DNA of Adriana Mejia and an unknown person (and likely accomplice).

- Mr. Reyes has repeatedly and at every opportunity testified to his innocence.

- There is no evidence that Mr. Reyes committed murder or kidnapping as a principal.

The only remaining disputes are:

- Whether evidence that Guevara has a history of misconduct that includes coercing false confessions from innocent people is admissible;

- Whether inclusion of the word "they" in the indictment means Mr. Reyes was charged as an accomplice despite a lack of any statutory "accountability" language; and

- Whether the following evidence, when construed in the State's favor, could ever rebut the testimonial and DNA evidence showing Mr. Reyes's innocence, given that at most it establishes mere presence at the crime scene:

  o Mr. Reyes had a note in his pocket and a calendar entry listing the name of the woman whom Adriana Mejia told everyone she was babysitting for;

  o Adriana Mejia testified that she was told by Solache in Mr. Reyes's presence that Mr. Reyes was going to "help"; and that Mr. Reyes waited in the car while Mejia and Solache killed Mr. Soto, and then entered the home.

CCSAO COI SUBPOENAS 000554

### I.  MR. REYES WAS CHARGED AS A PRINCIPAL, AND THE STATE DOES NOT ARGUE THAT MR. REYES HAS NOT SHOWN INNOCENCE OF PRINCIPAL CRIMES.

*People v. Palmer* holds that a COI petitioner must prove innocence of the specific factual theory of the offense charged in the indictment. 2021 IL 125621, ¶72 ("we hold that subsection (g)(3) requires a petitioner to prove by a preponderance of the evidence his or her innocence of the offense *as it was charged in the indictment or information* that resulted in the wrongful criminal conviction") (emphasis added). *Palmer* also holds that if the State acknowledges there is no evidence that the petitioner is not innocent of those crimes, then the petitioner is entitled to a certificate of innocence as a matter of law. *Id.* ¶73 ("The State does not contest petitioner's substantive argument that the new forensic DNA evidence demonstrates that petitioner did not repeatedly strike the victim on the head, as petitioner was originally charged and convicted. Thus, the State implicitly concedes that…petitioner has satisfied" subsection (g)(3)).

The Court's holding in *Palmer* is binding on the facts here. The language in Mr. Reyes's indictment clearly charges him only with principal crimes. And critically, the State does *not* argue that Mr. Reyes has failed to show innocence of principal crimes of which he was charged and convicted. In other words, the State cites no evidence that Mr. Reyes murdered the Soto parents or kidnapped the children. Therefore, this Court must grant Mr. Reyes a certificate of innocence as a matter of law, based on *Palmer*.

The State's only argument is that Mr. Reyes was also charged under an accountability theory, and that he has not shown innocence of accountability. This argument is flawed for several reasons. First, the indictment does not include any language suggesting an accountability charge, and thus *Palmer* bars the State from challenging Mr. Reyes's certificate of innocence by arguing there is evidence to support an accountability theory. Second, even if the indictment did

3

state an accountability theory—which it did not—the State has presented no evidence of Mr. Reyes's guilt under an accountability theory, and thus failed to create a material dispute of fact on that theory, as well. Accordingly, Mr. Reyes is still entitled to a COI as a matter of law.

### a. Mr. Reyes Was Charged as a Principal

Looking at the specific language in the indictment, as *Palmer* directs, 2021 IL 125621, ¶ 72, Mr. Reyes was charged only as a principal. For instance, to prove first-degree murder, the State must have shown that the defendant killed an individual without lawful justification, and "in performing the acts which cause the death":

(1) he either intends to kill or do great bodily harm to that individual or another, or knows that such acts will cause death to that individual or another; or

(2) he knows that such acts create a strong probability of death or great bodily harm to that individual or another; or

(3) he is attempting or committing a forcible felony other than second degree murder.

720 ILCS 5/9-1(a); *see* Ill. Pattern Jury Inst. 7.01.

To have proven home invasion in 1998, the State must have shown that the Defendant, as relevant here:

(1) A person who is not a peace officer acting in the line of duty commits home invasion when without authority he or she knowingly enters the dwelling place of another when he or she knows or has reason to know that one or more persons is present or he or she knowingly enters the dwelling place of another and remains in such dwelling place until he or she knows or has reason to know that one or more persons is present; and

(2) While armed with a dangerous weapon uses force or threatens the imminent use of force upon any person or persons within such dwelling place whether or not injury occurs….

720 ILCS 5/12-11(A)(1).

4

CCSAO COI SUBPOENAS 000556

To have proven kidnaping in 1998, the State must have shown, as relevant here, that the Defendant knowingly:

(1) and secretly confine[d] another against his or her will;

(2) by force or threat of imminent force carries another from one place to another with intent secretly to confine that other person against his or her will; or

(3) by deceit or enticement induces another to go from one place to another with intent secretly to confine that other person against his or her will; and

(4) takes as his or her victim a child under the age of 13 years, or a person with a severe or profound intellectual disability.

720 ILCS 5/10-1, 5/10-2(a)(2).

This is the exact language of principal liability that appears in each count of the indictment. Ex. 2 (Counts 1, 3, 17, 23, 25).[1]

An accountability indictment, on the other hand, would have required completely different language. At the time of Mr. Reyes's criminal trial, a person would be legally accountable for the conduct of another if:

(a) having a mental state described by the statute defining the offense, he causes another to perform the conduct, and the other person in fact or by reason of legal incapacity lacks such a mental state;

(b) the statute defining the offense makes him so accountable; or

(c) either before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid such other person in the planning or commission of the offense.

---

[1] Count 1: "intentionally or knowingly stabbed and killed Jacinta Soto with a knife"
Count 3: "intentionally or knowingly stabbed and killed Mariano Soto with a knife"
Count 17: "knowingly entered the dwelling place of Mariano Soto…while armed with a dangerous weapon, to wit: a knife, used force upon Mariano Soto"
Count 19: "knowingly entered the dwelling place of Jacinta Soto…and intentionally injured Jacinto Soto…to wit: stabbed Jacinto Soto with a knife"
Count 25: "knowingly and secretly confined Maria Soto…against her will"

5

CCSAO COI SUBPOENAS 000557

720 ILCS 5/5-2 (1991); Ill. Pattern Jury Inst. 5.03; *People v. Ceasar*, 231 Ill. App. 3d 54, 56 (1992) (to prove guilt by accountability, prosecution must establish "that the defendant elicited, aided, abetted, agreed, or attempted to aid another person in planning or commission of offense").

The indictment does not so much as hint that Mr. Reyes caused someone else to commit the crime, or solicited, aided, or abetted a commission of the crime. The State argues, incorrectly, that Mr. Reyes was charged as an accomplice because he was charged in the same indictment with two co-defendants, and the indictment uses the word "they." Absent any language suggesting accountability, though, this does not mean he was charged with accountability; it means the three defendants were each charged as principals.

Indeed, the word "they" in the indictment does not provide Mr. Reyes with any notice that he needed to prepare a defense to an accountability charge. As the Illinois Supreme Court explained in *People v. Smith*, an indictment must include not only a statement of the offense and its elements, but also "allegations of the essential facts to enable the accused to prepare a defense which, if successful, would bar further prosecution for the same offense." 99 Ill.2d 467, 470-71 (1984); *see also People v. Lutz*, 73 Ill. 2d 204, 211-13 (1978) (charging instrument insufficient when it did not allege facts specifying any alternative methods of committing the offense); *People v. Trumbley*, 252 Ill. 29, 31 (1911) ("It is a fundamental rule of criminal pleading that an indictment must allege all of the facts necessary to constitute the crime with which the defendant is charged, and an indictment which does not set forth such facts with sufficient certainty will not support a conviction."); 725 ILCS 5/111-3 (requiring a charge to allege "the nature and elements of the offense as definitely as can be done").

6

CCSAO COI SUBPOENAS 000558

To the State's argument that the jury was instructed on accountability and the State's closing arguments referred to accountability: it does not matter. *Palmer* clearly instructs the Court to look at the specific language in the indictment, not the jury instructions or closing arguments. *Palmer*, 2021 IL 125621 at ¶72. And even if this Court were to consider the theories at trial, the State's closing argument supports Mr. Reyes's argument that he was charged and convicted as a principal.

To be clear, the State's theory at trial was that Mr. Reyes planned the killing with Mejia and Mr. Solache, entered the Soto home and immediately stabbed Mrs. Soto, entered the bedroom, and grabbed both of the children. And to put a finer point on it, the State's theory was specifically that:

- Mr. Reyes spoke to Adriana Mejia and agreed to help her steal a baby for $600.
- Mr. Reyes pre-planned the crime with Solache and Adriana Mejia.
- Mr. Reyes rushed into the Soto home, pulled a knife, and immediately stabbed Mrs. Soto.
- Mr. Reyes went into the bedroom and grabbed the baby and the boy and carried them out to their getaway car.

*E.g.,* State's Ex. 3 (Closing Arguments) at 9605-07. In other words, the State unequivocally charged and convicted Mr. Reyes for acting as a principal in the murder and kidnapping.

What the State is doing now is attempting to infuse the indictment, and the trial, with an accountability theory that simply was not there. But comparing the theory in the indictment and the trial with the only theory available on the currently admissible evidence is revealing. Because the State concedes that the inculpatory statements of Mr. Reyes, Mr. Solache and Adriana Mejia are inadmissible—Judge Obbish granted a motion to suppress them given the evidence that Detective Guevara obtained them through the use of physical abuse—the only evidence available to it now is the current testimony of Adriana Mejia. That testimony does not support an accountability theory. Her testimony is as follows:

7

CCSAO COI SUBPOENAS 000559

- She and Mr. Reyes barely knew each other, and she'd had almost no interaction with him. Ex. 20 at 74-75.

- She had no conversations with Mr. Reyes about a murder or a kidnapping, at any point, ever. Ex. 17 (Mejia Feb. 4, 2021, Dep.) at 20, 96; Ex. 20 (Mejia Feb. 5, 2021 Dep.) at 148-49.

- She was surprised Mr. Reyes was even in the car when she was picked up by Solache to get the baby. Ex. 17 at 27.

- She and Mr. Solache went to the Soto home and entered, while Reyes came later, after Mr. Soto had been killed. Ex. 17 at 112; Ex. 20 at 8-9, 151-52, 156-57, 219.

- She took the baby girl from the apartment. Ex. 17 at 33, 99-100.

- She does not remember who took the boy from the apartment. Ex. 17 at 33.

- Mr. Reyes tried to stop Mr. Solache from stabbing Mrs. Soto. Ex. 20 at 219-20.

This is the only arguably admissible evidence to which the State cites.[2] To suggest that this evidence supports Mr. Reyes's guilt—as a principal or on an accountability theory—is fanciful. But more relevant to the issue at hand, it is a theory of guilt that constitutes a complete rewriting of the indictment (and the theory at trial). *Palmer* clearly prohibits such an approach.

### b. The State Acknowledges There is No Evidence that Mr. Reyes Committed any Crime as Principal

To its credit, the State does not argue that there is any admissible evidence that Mr. Reyes is guilty of committing any crime as a principal, nor could it for the reasons discussed above. Given that Mr. Reyes was charged only as a principal, *Palmer* establishes that Mr. Reyes is entitled to a certificate of innocence as a matter of law.

### II. MR. REYES PRESENTS AMPLE EVIDENCE OF INNOCENCE THAT IS UNREBUTTED AND THUS SUFFICIENT AS A MATTER OF LAW

Even if this Court concludes that Mr. Reyes was charged as an accomplice, Mr. Reyes has firmly established that he is innocent as a matter of law.

---

[2] The State's only other evidence is the note in Mr. Reyes's pocket referencing a Norma Salazar. As discussed below, that reference is not inculpatory in the slightest.

8

### a. Testimony Supporting Innocence

The State agrees that Mr. Reyes has testified at every available opportunity that he is innocent. He testified about his own innocence in his suppression hearing in March 2000, his criminal trial in June 2000, and his evidentiary hearing in 2013. Evidence that a defendant has maintained his innocence since his arrest, by itself, is sufficient to state a claim of actual innocence. *People v. Lofton*, 2011 IL App (1st) 100118, ¶¶ 36-37. These statements of innocence are corroborated by testimony from Mr. Reyes's co-worker, Salvador Olivares, establishing that it would have been almost impossible for Mr. Reyes to have committed these crimes. Ex. 14 (Trial Tr.) at 1903, 2033-34, 2121, 2125-26; 2419-25; *see also* Ex. 10 (Timesheets) (showing Mr. Reyes's long workdays the day of the crime and the day before, without any unusual behavior whatsoever). This Court must consider this evidence of innocence. *See People v. Caine*, Case No. 86 CR 6091 (Order, March 27, 2012); *see also People v. Fields*, 2011 IL App (1st) 100169, ¶ 19 (2011).

### b. DNA Shows Mr. Reyes Is Innocent and Corroborates His Testimony

The State acknowledges that Mr. Reyes has been excluded as a contributor to all DNA from the crime scene but argues that it does not support Mr. Reyes's claim of innocence. As an initial matter, of course the fact that Mr. Reyes's DNA was not found on any one of numerous items of evidence in a violent, DNA-rich crime scene is evidence of innocence. DNA evidence is the most powerful, objective evidence of innocence possible. *People v. Rozo*, 2012 IL App (2d) 100308, ¶ 19 (DNA evidence found under victim's fingers could "significantly advance defendant's claim of actual innocence"). The State argues the fact that Mr. Reyes's DNA was not at the crime scene is not definitive proof of his innocence. But that does not negate the fact that it is additional evidence of innocence worthy of some weight. All the more so, given that the State

9

FILED DATE: 4/8/2022 3:39 PM 98CR1244002

admits that the DNA of Adriana Mejia was found at the crime scene, the one person who everyone agrees committed the crime. The State's argument does not rebut Mr. Reyes's evidence of innocence, nor does it constitute affirmative evidence of guilt that would warrant denying Petitioner's motion for summary judgment.

Next, among the items tested was a green towel containing blood stains found in the perpetrator's getaway car. That towel contained the DNA of Adriana Mejia, as well as an additional unknown person (excluding Reyes, Solache, and the victims). Ex. 21 (Reyes_Jenner 9572; Ex. 13 (Report of Dr. Reich) at 4. The State acknowledges such evidence, yet claims it is not evidence of innocence. That argument borders on frivolous. Evidence that a defendant's DNA was not found at a crime scene and/or evidence that someone else's DNA was found at a crime scene has been the basis of 246 murder exonerations nationwide since 1987, including 42 in Illinois alone. *See* National Registry of Exonerations, Browse by Cases, Sort by: State (Illinois)/Crime/DNA[3]. DNA evidence has also been the basis of dozens of certificates of innocence. *See* Petitioner's Motion, at 11-12. Evidence of an alternative perpetrator is also powerful evidence of innocence. *People v. Robinson*, 2020 IL 123849, ¶80 (evidence of another likely perpetrator "is of such a conclusive character as to probably change the outcome at a retrial.").

Put simply, the DNA evidence in this case is powerfully corroborative of Mr. Reyes's own testimony about his innocence.

---

[3] http://www.law.umich.edu/special/exoneration/Pages/detaillist.aspx (last accessed April 6, 2022).

10

CCSAO COI SUBPOENAS 000562

FILED DATE: 4/8/2022 3:39 PM   98CR1244002

### c. Guevara Coerces False Confessions from Multiple People

In addition, Mr. Reyes has presented evidence that the false confessions Guevara coerced in this case are consistent with his pattern of coercing false confessions from other innocent people in other cases. The State does not dispute this evidence, but asserts, without argument, that evidence is not admissible. This undeveloped argument is waived. *Sakellariadis v. Campbell*, 391 Ill. App. 3d 795, 804 (2009) ("failure to assert a well-reasoned argument supported by legal authority [in appellate brief] is a violation of Supreme Court Rule 341(h)(7)..., resulting in waiver.")

In any event, case law clearly establishes that this evidence is admissible. Courts routinely consider pattern and practice evidence in addressing claims of innocence. "Illinois courts have consistently held that a 'pervasive pattern of criminal conduct by police officers'" is not only relevant but "enough," on its own, to permit a court to reach a finding of actual innocence. *People v. Tyler,* 2015 IL App (1st) 123470, ¶189 (quoting *People v. Mitchell,* 2012 IL App (1st) 100907, ¶63, and citing *People v. Patterson,* 192 Ill.2d 93, 139-45 (2000); *People v. King,* 192 Ill.2d 189, 193-99 (2000); *People v. Cannon,* 293 Ill.App.3d 634, 640 (1997)). The First District Appellate Court held in *Tyler* that "evidence of systemic police misconduct is sufficient to support defendant's claim of actual innocence." *Id*. ¶200. Albeit in the context of a petition for post-conviction relief, based on allegations of police misconduct alone the *Tyler* court remanded for an evidentiary hearing on petitioner's actual innocence claim. *Tyler* at ¶¶200-02; *see also People v. Almodovar,* 2013 IL App (1st) 101476, ¶¶77-79 (concluding the court need not rule on the issue but stating that "a strong argument could be made" that evidence of Guevara's "history of improperly influencing witnesses" would satisfy the actual innocence standard in light of the questionable inculpatory evidence and the import of Guevara's

11

CCSAO COI SUBPOENAS 000563

credibility). This holding is not surprising: Of course evidence of an officer's pattern of committing a particular kind of misconduct in a number of cases is relevant to whether he committed the same misconduct in the case at bar. Courts have repeatedly affirmed this axiomatic principle, including in cases involving Guevara specifically. *See People v. Montanez,* 2016 IL App (1st) 133726, ¶34 ("As we stated in another case concerning Guevara's misconduct, 'In our view, any allegation that Guevara coerced a person to provide evidence is relevant to whether defendants in the case at bar were similarly coerced.'" (quoting *People v. Reyes,* 369 Ill. App. 3d 1, 21 (2006)). In *Almodovar* at ¶68, the First Appellate District explained why that is so obviously the case:

> [I]n the instant case, we find that defendant's allegations that Detective Guevara influenced witnesses to provide identifications are relevant to whether witnesses in the case at bar were similarly influenced, since such allegations, if true, would damage Detective Guevara's credibility. As was the case in *Reyes,* the credibility of Detective Guevara is directly at issue with regard to the crucial question of how he procured the evidence that led to defendant's conviction. New evidence that attacks his credibility on that crucial question would be highly material.

The First Appellate District again affirmed the principle—in another Guevara case—that evidence of an officer's pattern of misconduct is relevant to whether that officer committed similar misconduct in the case at bar. *Martinez,* 2021 IL App (1st) 190490. The appellate court first had strong language about Guevara's pattern, noting that the State "does not dispute that Detective Guevara has a history of misconduct," that the First Appellate District "has recognized Guevara's well-documented history of influencing and manipulating witnesses," and calling Guevara "a malignant blight on the Chicago Police Department and the judicial system." *Martinez* at ¶64. The Court cataloged Guevara's common forms of misconduct and summarized the pattern evidence by saying Guevara's "toolbox of coercion was well-stocked with a wide variety of tools." *Id.* ¶80. The Court ultimately held that "evidence of Guevara's misdeeds in

12

other cases would clearly be admissible in this case to show a pattern and practice of misconduct." *Id.* (emphasis added). Indeed, undersigned counsel has presented pattern evidence regarding Guevara's misconduct at multiple COI hearings in the last few months (*e.g.*, COI hearings of Mr. Thomas Sierra and Mr. Geraldo Iglesias, before Judge Reddick). And the only reason Mr. Reyes is in this situation to begin with is because Guevara fabricated his involvement out of whole cloth. Evidence that Mr. Reyes's conviction is based on evidence that was concocted through physical abuse, and thus inadmissible, is further evidence of Mr. Reyes's innocence.

To summarize, Mr. Reyes has presented ample evidence of innocence, including his own testimony, alibi evidence, and DNA, combined with a swath of evidence that it was Guevara's practice to coerce false confessions out of innocent people. This is more than sufficient. The COI statute cautions:

> It is the intent of the General Assembly that the court, in exercising its discretion as permitted by law regarding the weight and admissibility of evidence submitted pursuant to this Section, shall, in the interest of justice, give due consideration to difficulties of proof caused by the passage of time, the death or unavailability of witnesses, the destruction of evidence or other factors not caused by such persons or those acting on their behalf.

735 ILCS 5/2-702(a). Against this mandate, what other evidence could Mr. Reyes present 24 years after the fact to show innocence?

### III. EVEN IF THE COURT READS ACCOUNTABILITY INTO THE INDICTMENT, THERE IS STILL NO EVIDENCE THAT MR. REYES IS NOT INNOCENT

Even if this Court chooses to evaluate the evidence of accountability crimes, despite that accountability language does not appear in the indictment, the State has failed to point to any evidence to rebut the evidence of innocence. Mr. Reyes is still entitled to a certificate of innocence as a matter of law.

13

CCSAO COI SUBPOENAS 000565

FILED DATE: 4/8/2022 3:39 PM 98CR1244002

### a. The State Must Present Evidence to Establish Its Defense

If this Court chooses to evaluate the evidence of innocence of an accountability charge versus the evidence of non-innocence, it must first consider whether Mr. Reyes, as the movant, has established a *prima facie* case of innocence. He has done that. Next, the Court must consider whether the State has presented evidence to establish a *prima facie* case of non-innocence. *People v. Williams*, 2017 IL App (1st) 152021, at ¶ 30 (citing *527 S. Clinton, LLC v. Westloop Equities, LLC*, 403 Ill. App. 3d 42, 52 (2010)[4]. Where the nonmovant presents no evidence on each essential element of its defense (non-innocence), the Court must find for the petitioner. *Stenger v. Swartwout*, 62 Ill. 257, 257 (1871) ("Where as to any essential element of a cause of action or defense there is no evidence at all…this court will interfere and set it aside.").

The State spends a portion of its brief explaining the difference between an affirmative showing of innocence and a lack of guilt. To be clear, Mr. Reyes does not argue that the State has the initial burden to show guilt. Mr. Reyes understands that his burden is to prove innocence by a preponderance of the evidence. The State fails to recognize, however, that once Mr. Reyes presents evidence of innocence—which he has—the burden then shifts to the state to disprove Mr. Reyes's evidence of innocence by 51%. There is a fine line between non-guilt and innocence.[5] And the defense to evidence of innocence is evidence of guilt. Therefore, in order to

---

[4] The State asserts that it does not need to present evidence of each element of the crimes it asserts Mr. Reyes is not innocent of, and attempts to distinguish *People v. Williams*, 2017 IL App (1st) 152020. The State says that *Williams* involves a motion for a directed finding rather than a motion for summary judgment, and that it involves a post-conviction matter. Though *Williams* involves a different procedural posture, at its core it discusses parties' burdens and a court's task of balancing evidence. Here it does not matter that there has not been a hearing, because at this stage, the Court must draw all reasonable inferences in the State's favor. *Beaman v. Freesmeyer*, 2021 IL 125617, ¶ 106, reh'g denied (Sept. 27, 2021). The principle remains: when a Court is balancing evidence, it first looks at whether the movant has provided evidence to establish a *prima facie* case. After so finding, it then looks to see whether the nonmovant has satisfied the elements of its defense. *Stenger v. Swartwout*, 62 Ill. 257, 257 (1871).

[5] In fact, it is up for debate whether the Constitution allows an innocence statute to require a petitioner to prove innocence in the first place. *See People v. Fields*, 2017 IL App (1st) 140988-U, ¶ 93

14

CCSAO COI SUBPOENAS 000566

FILED DATE: 4/8/2022 3:39 PM    98CR1244002

successfully rebut Mr. Reyes's evidence of innocence, the State must present at least some evidence that Mr. Reyes is guilty. As a matter of law, it has not, and cannot do that.

### b. The State's Evidence Cannot, as a Matter of Law, Satisfy the Elements of a Defense

Even construing all inferences in the State's favor, there is no version of events in which Mr. Reyes *does not* meet his burden of showing innocence. This is because the State has no evidence of its own. Indeed, even when construing the evidence in the State's favor, as the Court must at this stage, the State cannot meet its burden of presenting evidence on each essential element of its defense.

As a threshold matter, the State refers to 17 exhibits, most of which are duplicates of Mr. Reyes's exhibits, or hearsay. And of those 17 exhibits and the rest of the record, the state points to no actual evidence that undermines Mr. Reyes's claims of innocence. To the extent that the State expects this Court to wade through all those materials itself looking for evidence, "[j]udges are not like pigs, hunting for truffles buried in briefs." *United States v. Dunkel,* 927 F.2d 955, 956 (7th Cir.1991). The State has waived any argument about the substance of these materials beyond what it identifies in its brief. *Sakellariadis*, 391 Ill. App. 3d at 804.

As for the evidence the State has proffered, the relevant inquiry now is whether the evidence of non-innocence, even if taken in the State's favor, establishes non-innocence of *any crime at all*. As a matter of law, it does not. Out of the entire record in this case, the State identifies only four pieces of evidence that it says outweighs the powerful DNA and evidence of coerced confession: (1) Mr. Reyes's living arrangements; (2) a note in Mr. Reyes's pocket and a

---

(Pucinski, J., dissenting). The U.S. Supreme Court observed in *Nelson v. Colorado*, a state may not presume that a person who has been acquitted or exonerated is not entitled to statutory relief provided to innocent people by the state. 137 S. Ct. 1249, 1256 ("Colorado may not presume a person, adjudged guilty of no crime, nonetheless guilty *enough* for monetary exactions.").

15

CCSAO COI SUBPOENAS 000567

name on a calendar; and Ms. Mejia's testimony that (3) she was told by Solache in Mr. Reyes's presence that Mr. Reyes was present to help get the baby, and (4) that Mr. Reyes waited in the car until getting the "signal" to enter the Soto home.

The State does not explain what it means by "living arrangements and relationships with his co-defendants" or "the sum of the testimony from the various witnesses at trial." To the extent it asserts that the fact that he rented a room from Mr. and Mrs. Mejia is evidence of guilt of murder and kidnapping on an accountability theory, that is preposterous. Indeed, if that is the case, then the 5-6 others who lived in that home who were Adriana's family members are equally guilty of accountability.

Likewise, the note in Mr. Reyes's pocket and a calendar entry listing Norma Salazar's name is not inculpatory in any way. According to the trial testimony of Adriana Mejia's husband, Rosauro Mejia, Adriana told him that she had given birth to the baby girl and was babysitting the older boy for a woman named Norma Salazar, who was in the hospital having another baby of her own. Ex. 14 (Trial Tr., Testimony of Rosauro Meija) at 1928. Mr. Reyes similarly testified that Adriana told him she was babysitting the boy for Norma Salazar and gave him Salazar's phone number when she asked him to look after the older boy for a time. Ex. 5 (Reyes Trial Testimony) at 2037-38, 2066. And, as it turns out, "Norma Salazar's" involvement is apparently made up; no Norma Salazar was ever charged or convicted. So, Adriana made up a lie and told it to both her husband Rosauro and Mr. Reyes. If it was inculpatory in any way, then Rosauro is implicated as well; but no one in this proceeding to date—certainly not the State—has asserted that he is not innocent. Moreover, the fact that a made-up person's name and phone number was in Mr. Reyes's possession—a name that no one says came from Mr. Reyes (and the State has not and cannot present any evidence to suggest otherwise)—is plainly exculpatory:

16

CCSAO COI SUBPOENAS 000568

why would Mr. Reyes write down the name and phone number of someone he knew did not exist or had nothing to do with the crime? Put simply, the State has simply stated a fact—Mr. Reyes had a note—without citation to any other evidence that would make it evidence of guilt. This evidence neither rebuts Mr. Reyes's evidence of innocence, nor provides any support for his guilt.

That leaves just two statements from Adriana Mejia on which the State relies: that Solache told her that Reyes was in the car to help get the baby, and that Reyes waited in the car until "getting the signal to enter the Soto home." For one, the State cites nothing to support its characterizations of Mejia's testimony, and instead sends this Court on a truffle hunt. More critically, however, the State does not accurately characterize Mejia's testimony. Mejia did not testify that Mr. Solache told her that Mr. Reyes was present to "help get the baby." Her testimony is much more nebulous. She testified that Mr. Solache told her that Reyes "wasn't going to say anything and that he was going to help us," Ex. 17 at 27, and that Solache told her that he had told Reyes "what was going on" with her and that Reyes "knew." Ex. 20 at 149. She also did not testify that Mr. Reyes waited in the car until "getting a signal." She testified that he waited in the car alone and did not enter the home until after Mr. Soto had been killed, and then tried to stop the killing of Mrs. Soto. Ex. 17 at 112; Ex. 20 at 8-9, 151-52, 156-57, 219-20. She never says anything about a "signal."

That evidence, even for the sake of argument accepting it as true and construing it in the light most favorable to the State is insufficient as a matter of law to support a finding of guilt on accountability murder or kidnapping. It is long established that mere presence at a crime scene and knowledge that a crime is being committed is insufficient to establish accountability. *People v. Ceasar*, 231 Ill.App.3d 54, 56 (1992) ("mere presence at scene of crime, even with knowledge

17

FILED DATE: 4/8/2022 3:39 PM  98CR1244002

that crime is being committed, is not enough to prove participation"); *see also People v. Reid*, 136 Ill.2d 27, 61 (1990) ("Mere presence of a defendant at the scene of the crime does not render him or her accountable for the offense."); *see also Brumley v. DeTella*, 83 F.3d 856, 863 (7th Cir. 1996) (In Illinois, "proof of accountability requires more than consent to the commission of a crime; more than knowledge of the commission of a crime; and more than presence at the scene of a crime, even when coupled with flight from the scene").

So, even accepting these two statements from Ms. Mejia, they do not as a matter of law rebut Mr. Reyes's evidence of innocence, nor do they constitute evidence of guilt of accountability even as a matter of law. Notably absent from the State's evidence, of course, is any assertion that Mr. Reyes participated in the planning or commission of the crime. That is because in the same deposition testimony the State relies on, Adriana Mejia stated that she had not had any planning conversations with Reyes, that she had no idea he would be there, that he did not enter the home with Adriana and Solache, that he did not kill Mr. or Mrs. Soto, that he did not grab the baby, and that she does not know who grabbed the boy. The only affirmative act she describes him committing is to try to stop Solache from stabbing Mrs. Soto upon arriving and seeing what was happening. Ex. 20 (Mejia Feb. 5, 2021 Dep.) at 219-220.[6] The State's only evidence, the testimony of Adriana, cannot possibly support guilt on an accountability theory, or any other. While the State attempts to dispute some of Mr. Reyes's facts, there is no dispute on a *material* issue, because all of the State's evidence combined cannot as a matter of law rebut Mr. Reyes's evidence of innocence.

---

[6] To be clear, Mr. Reyes disputes all of this vehemently; he has always maintained that he had absolutely no knowledge or involvement in the crime whatsoever. The factual presentation Petitioner presents is exclusively at summary judgment, construing the facts in the State's favor.

18

Mr. Reyes understands that the State believes he is guilty of this crime, regardless of what decades of new evidence have revealed about the corruption of this police investigation (and so many other Guevara investigations). That is a pity. But the only legitimate thing that ever connected him to the crime was his and his co-defendants' coerced statements. Stripping those away, and *truly* removing them from consideration as this Court must do, there is no possible way that a note in his pocket and the fact that he lived with Ms. Mejia and several others, rebuts Mr. Reyes's evidence of innocence, or constitutes affirmative evidence of guilt. Indeed, that meager evidence is insufficient *as a matter of law* to support guilt of murder or kidnapping on an accountability theory.

Even assuming the State could change course now and pursue an accountability theory, contrary to Palmer, it has failed to present evidence to support such a theory. Mr. Reyes is entitled to a COI as a matter of law.

## IV. MR. REYES'S MOTION IS TIMELY

The State makes one additional argument, but it requires little attention at this point. The State asserts that this motion for summary judgment was not timely because the State did not have some depositions from Mr. Reyes's civil proceedings. The bulk of these depositions are neither relevant nor admissible (such as depositions of various prosecutors over the years, which contain multiple layers of hearsay). Indeed, the COI statute does not contemplate that the State can rely on any and all testimony ever generated in connection with a case. Subsection (c) says that the Court can consider materials attached to the petition, and subsection (f) makes clear that the State can rely on "prior sworn testimony or evidence admitted in the criminal proceedings related to the convictions." COI proceedings are not retrials and they are not evaluations of every shred of evidence under the sun. They are designed to be quick adjudications based on materials

CCSAO COI SUBPOENAS 000571

FILED DATE: 4/8/2022 3:39 PM   98CR1244002

the *Petitioner* has presented. *See* 95th Ill. Gen. Assem., House Proceedings, May 18, 2007, at 5-6 (statements of Representative Flowers (explaining that the language in the statute allowing judicial notice of prior proceedings, 735 ILCS 5/2-702(f), was placed in the statute to address concerns "that the process of petitioning for a COI would force the court to try…the original case over again")). In any event, Mr. Reyes has now provided all outstanding depositions to the State, and so the State's argument is moot.[7]

## CONCLUSION

Mr. Reyes was charged with principal crimes, and the State agrees there is no evidence that he committed any crime as a principal. This entitles him to a certificate of innocence as a matter of law under the binding holding of *Palmer*. Even assuming *arguendo* that the State had charged Mr. Reyes under an accountability theory, the State cannot rebut Mr. Reyes's evidence of innocence or to present affirmative evidence sufficient to meet the elements of its defense. For these reasons, the other reasons discussed herein, and the reasons raised in Mr. Reyes's petition for a certificate of innocence and motion for summary judgment, Mr. Reyes respectfully requests that this Court grant his motion for summary judgment and issue a certificate of innocence.

---

[7] Petitioner inadvertently did not attach the transcript from the second half of Ms. Mejia's February 2021 deposition. He provided a copy to the State on April 7, 2022 and has no objection if the State wishes to file a sur-reply to address this testimony.

20

CCSAO COI SUBPOENAS 000572

FILED DATE: 4/8/2022 3:39 PM   98CR1244002

Respectfully Submitted,

*/s/ Rachel Brady*
Rachel Brady
*Attorney for Arturo De Leon-Reyes*


Jon Loevy
Anand Swaminathan
Steve Art
Rachel Brady
Sean Starr
Loevy & Loevy
311 N. Aberdeen St., 3rd floor
Chicago, IL 60607
(312) 243-5900
brady@loevy.com

*Counsel for Petitioner Arturo De Leon-Reyes*

21

CCSAO COI SUBPOENAS 000573

## CERTIFICATE OF SERVICE

I, Rachel Brady, an attorney, hereby certify that on this 7th day of April 2022, I caused a

copy of the foregoing to be served by electronic mail and USPS mail to:

Assistant State's Attorney
c/o Christa Bowden
Cook County State's Attorney's Office
2650 S. California Avenue
Chicago, IL 60608

Dated: April 7, 2022

Respectfully Submitted,

/s/ Rachel Brady
Rachel Brady
*Attorney for Arturo De Leon-Reyes*

Loevy & Loevy
311 N. Aberdeen St., 3rd floor
Chicago, IL 60607
(312) 243-5900
brady@loevy.com

22

CCSAO COI SUBPOENAS 000574

FILED DATE: 4/8/2022 3:39 PM    98CR1244002

## CERTIFICATE OF SERVICE

I, Rachel Brady, an attorney, hereby certify that on this 8th day of April 2022, I caused a

copy of the foregoing to be served by electronic mail and USPS mail to:

Assistant State's Attorney
c/o Christa Bowden
Cook County State's Attorney's Office
2650 S. California Avenue
Chicago, IL 60608


Dated: April 8, 2022

Respectfully Submitted,


*/s/ Rachel Brady*
Rachel Brady
*Attorney for Arturo De Leon-Reyes*

Loevy & Loevy
311 N. Aberdeen St., 3rd floor
Chicago, IL 60607
(312) 243-5900
brady@loevy.com


CCSAO COI SUBPOENAS 000575

FILED DATE: 4/8/2022 3:39 PM   98CR1244002

# EXHIBIT 20

CCSAO COI SUBPOENAS 000576

# ILLINOIS STATE POLICE
Division of Forensic Services
Forensic Science Center at Chicago
1941 West Roosevelt
Chicago, Illinois 60608-1229
(312) 433-8000 (Voice) * 1-(800) 255-3323 (TDD)

George H. Ryan
*Governor*

December 16, 1999

**Sam W. Nolen**
*Director*

Detective Halvorsen
CHICAGO POLICE DEPARTMENT UNIT 650
DETECTIVE DIVISION, AREA 5
5555 WEST GRAND
CHICAGO, IL 60639

Laboratory Case #C98-015970
RD #C0198126

OFFENSE  Murder
SUSPECTS  Adriana Mejia/Gabriel Solache/Arturo DeLeon
VICTIMS  Jacinta Soto/Mariano Soto

The following evidence was received by the Forensic Science Center at Chicago on April 6, 1998:
**Inventory# 1972804**

| EXHIBIT | DESCRIPTION |
| --- | --- |
| 1A | Blood Standard:  Jacinta Soto |

The following evidence was received by the Forensic Science Center at Chicago on April 6, 1998:
**Inventory# 1972807**

| EXHIBIT | DESCRIPTION |
| --- | --- |
| 3A | Blood Standard:  Mariano Soto |

The following evidence was received by the Forensic Science Center at Chicago on April 7, 1998:
**Inventory# 1974077**

| EXHIBIT | DESCRIPTION |
| --- | --- |
| 18A | Blood stain from green towel found in 1984 Toyota Corolla |
| 18B | Blood stain from green towel found in 1984 Toyota Corolla |
| 18C | Blood stain from green towel found in 1984 Toyota Corolla |
| 18D | Blood stain from green towel found in 1984 Toyota Corolla |
| 18E | Blood stain from green towel found in 1984 Toyota Corolla |
| 18F | Blood stain from green towel found in 1984 Toyota Corolla |
| 18G | Blood stain from green towel found in 1984 Toyota Corolla |

Reyes_COSA 009572    COSA COI SUBPOENAS 000577

CHICAGO POLICE DEPARTMENT UNIT 650
Laboratory Case #C98-015970                -2-                December 16, 1999

The following evidence was received by the Forensic Science Center at Chicago on April 7, 1998:
**Inventory# 1982726**

| EXHIBIT | DESCRIPTION |
|---|---|
| 19A | Blood stain from Adriana Mejia's shoes |
| 19B | Blood stain from Adriana Mejia's shoes |
| 19C | Blood stain from Adriana Mejia's shoes |
| 19D | Blood stain from Adriana Mejia's shoes |
| 19E | Blood stain from Adriana Mejia's shoes |
| 19F | Blood stain from Adriana Mejia's shoes |
| 19G | Blood stain from Adriana Mejia's shoes |

The following evidence was received by the Forensic Science Center at Chicago on April 9, 1998:
**Inventory# 1982723**

| EXHIBIT | DESCRIPTION |
|---|---|
| 23B1 | Blood stain from towel |
| 23B2 | Blood stain from towel |

The following evidence was received by the Forensic Science Center at Chicago on April 9, 1998:
**Inventory# 1982731**

| EXHIBIT | DESCRIPTION |
|---|---|
| 27A | Blood stain from Adriana Mejia's trousers |
| 27B | Blood stain from Adriana Mejia's trousers |
| 27C | Blood stain from Adriana Mejia's trousers |
| 27D | Blood stain from Adriana Mejia's trousers |

The following evidence was received by the Forensic Science Center at Chicago on September 2, 1999:
**Inventory# 2190428**

| EXHIBIT | DESCRIPTION |
|---|---|
| 29A1 | Blood Standard:  Arturo DeLeon |
| 30A1 | Blood Standard:  Adriana Mejia |
| 31A1 | Blood Standard:  Gabriel Solache |

**RESULTS**
DNA from Exhibits 1A, 3A, 18A, 18B, 18F, 18G, 19B, 19C, 19D, 19E, 19G, 23B1, 23B2, 27A, 27B, 27C, 27D, 29A1, 30A1 and 31A1 was amplified using the Polymerase Chain Reaction (PCR) and profiled at the following loci: D3S1358, vWA, FGA, D8S1179, D21S11, D18S51, D5S818, D13S317, D7S820, D16S539, TH01, TPOX, CSF1PO and Amelogenin.

Due to an insufficient amount of human DNA for PCR analysis, Exhibit 19F was not profiled.

Reyes_Jermaine 009573     CCSAO COI SUBPOENAS 000578

CHICAGO POLICE DEPARTMENT UNIT 650
Laboratory Case #C98-015970                    -3-                    December 16, 1999

**RESULTS** (continued)
Exhibits 18C, 18D, 18E and 19A were not examined.

A DNA profile was identified in Exhibits 18A and 18G which matches the DNA profile of Adriana Mejia and does not match the DNA profile of Jacinto Soto, Mariano Soto, Gabriel Solache or Arturo DeLeon. This profile would be expected to occur in approximately 1 in 390 quadrillion Black, 1 in 2.1 quadrillion White or 1 in 1.7 quadrillion Hispanic unrelated individuals.

A mixture of DNA profiles was identified in Exhibit 18B. A DNA profile was identified in Exhibit 18B which matches the DNA profile of Adriana Mejia and does not match the DNA profile of Jacinto Soto, Mariano Soto, Gabriel Solache or Arturo DeLeon. This profile would be expected to occur in approximately 1 in 390 quadrillion Black, 1 in 2.1 quadrillion White or 1 in 1.7 quadrillion Hispanic unrelated individuals.

An additional DNA profile was identified in Exhibit 18B at the FGA, D8S1179, D21S11, D18S51, D5S818, TH01, TPOX, CSF1PO and Amelogenin loci which does not match the DNA profile of Jacinto Soto, Mariano Soto, Arturo DeLeon, Adriana Mejia or Gabriel Solache.

A mixture of DNA profiles was identified in Exhibit 18F. A DNA profile was identified in Exhibit 18F which matches the DNA profile of Adriana Mejia and does not match the DNA profile of Jacinto Soto, Mariano Soto, Gabriel Solache or Arturo DeLeon. This profile would be expected to occur in approximately 1 in 390 quadrillion Black, 1 in 2.1 quadrillion White or 1 in 1.7 quadrillion Hispanic unrelated individuals.

Low levels of an additional (male) DNA profile were detected in Exhibit 18F at the CSF1PO and Amelogenin loci that are not suitable for comparison to known standards.

A DNA profile was identified in Exhibits 19E, 19G, 23B1, 23B2, 27A, 27B, 27C and 27D which matches the DNA profile of Mariano Soto and does not match the DNA profile of Jacinto Soto, Adriana Mejia, Gabriel Solache or Arturo DeLeon. This profile would be expected to occur in approximately 1 in 170 quadrillion Black, 1 in 35 quadrillion White or 1 in 300 trillion Hispanic unrelated individuals.

A mixture of DNA profiles was identified in Exhibits 19B, 19C and 19D. A DNA profile was identified in Exhibits 19B, 19C and 19D which matches the DNA profile of Mariano Soto and does not match the DNA profile of Jacinto Soto, Adriana Mejia, Gabriel Solache or Arturo DeLeon. This profile would be expected to occur in approximately 1 in 170 quadrillion Black, 1 in 35 quadrillion White or 1 in 300 trillion Hispanic unrelated individuals.

Low levels of an additional DNA type were detected in Exhibits 19B, 19C and 19D at the D16S539 locus that are not suitable for comparison to known standards.

**CONCLUSIONS**
No comparisons were made from Exhibit 19F due to the insufficient amount of DNA obtained.

CHICAGO POLICE DEPARTMENT UNIT 650
Laboratory Case #C98-015970          -4-          December 16, 1999

**CONCLUSIONS** (continued)
The blood identified in Exhibits 18A, 18F and 18G is consistent with having originated from Adriana Mejia and could not have originated from Jacinto Soto, Mariano Soto, Gabriel Solache or Arturo DeLeon.

The mixture of DNA profiles identified in Exhibits 18B is consistent with having originated from Adriana Mejia and an unidentified individual. Jacinto Soto, Marino Soto, Gabriel Solache or Arturo DeLeon could not have contributed to this mixture of DNA profiles.

The blood identified in Exhibits 19B, 19C, 19D, 19E, 19G, 23B1, 23B2, 27A, 27B, 27C and 27D is consistent with having originated from Mariano Soto and could not have originated from Jacinto Soto, Adriana Mejia, Gabriel Solache or Arturo DeLeon .

**REQUESTS**
Upon submission of additional standards, further analysis can be conducted to resolve the source of the open profile identified in Exhibit 18B.

No examination of Exhibits 18C, 18D, 18E and 19A was performed at this time. If, at a later date, it is determined that the value of this evidence can significantly aid the case, please advise.

For results of previous biological examinations, please refer to my laboratory report and to the laboratory report by Forensic Scientist Elizabeth Boedeker from the Forensic Science Center at Chicago.

If you have any questions regarding this report, please feel free to contact me.

**EVIDENCE DISPOSITION**
DNA evidence will be maintained in the laboratory evidence vault until such time as the case has been adjudicated or the evidence is required by the agency.

Respectfully submitted,

Barbara J. Wilson
Forensic Scientist

cc: Chief, Detective Division - Crime Analysis, Unit 601
    ASA Mercedes Luque-Rosales-Rm 11 B28-Cook County State's Attorney's Office, 2600 S. California

Reyes_Jennings 009575     CCSAO COI SUBPOENAS 000580

FILED DATE: 4/8/2022 3:39 PM   98CR1244002

# EXHIBIT 21

CCSAO COI SUBPOENAS 000581

FILED DATE: 4/8/2022 3:39 PM   98CR1244002

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ARTURO DELEON-REYES,                 )
                                     )
              Plaintiff,             )
                                     )
vs.                                  ) Case No. 18-CV-01028
                                     )
REYNALDO GUEVARA, et al.,            )
                                     )
              Defendants.            )
_____)
GABRIEL SOLACHE,                     )
                                     )
              Plaintiff,             )
                                     )
vs.                                  ) Case No. 18-CV-02312
                                     )
REYNALDO GUEVARA, et al.,            )
                                     )
              Defendants.            )

        VOLUME IV OF THE VIDEOTAPED RECORD OF

PROCEEDINGS FOR THE DEPOSITION of ADRIANA MEJIA, a

witness, called by Defendant City of Chicago for

examination in the above-entitled cause, pursuant to

the Federal Rules of Civil Procedure, taken before me,

Brenda L. Zeitler, CSR, License No. 084-004062, by

Zoom Video Conference on the 5th day of February,

2021, commencing at 9:04 a.m.

FILED DATE: 4/8/2022 3:39 PM   98CR1244002

ADRIANA MEJIA, 02/05/2021                                    Page 2..5

### Page 2

APPEARANCES:

LOVEY & LOEVY
BY:  ANAND SWAMINATHAN, ESQ.
and RACHEL BRADY, ESQ
and SEAN STARR, ESQ
311 North Aberdeen, 3rd Floor
Chicago, Illinois  60607
(312) 243-5900
anand@loevy.com
brady@loevy.com
sean@loevy.com
        On Behalf of Plaintiff Arturo Reyes.

PEOPLE'S LAW OFFICE
BY:  JAN SUSLER, ESQ.
1180 North Milwaukee Avenue
Chicago, Illinois  60642
(773) 235-0070
jsusler@gmail.com
        On Behalf of Plaintiff Gabriel Solache.

COOK COUNTY STATE'S ATTORNEY'S OFFICE
BY:  EDWARD BRENER, ESQ.
and DAVID ADELMAN, ESQ.
50 West Washington Street, Room 500
Chicago, Illinois  60602
(312) 603-3369
edward.brener@cookcountyil.gov
david.adelman@cookcountyil.gov
        On Behalf of Cook County Defendants.

ROCK FUSCO & CONNELLY, LLC
BY:  EILEEN E. ROSEN, ESQ.
and THERES B. CARNEY, ESQ.
312 North Clark, Suite 2200
Chicago, Illinois  60654
(312) 494-1000
erosen@rfclaw.com
tcarney@rfclaw.com
        On Behalf of Defendant City of Chicago.

### Page 3

APPEARANCES (Continued):

LEINENWEBER, BARONI & DAFFADA, LLC
BY:  MEGAN McGRATH, ESQ.
120 North LaSalle Street, Suite 2000
Chicago, Illinois  60602
(312) 663-3003
mkm@ilesq.com
        On Behalf of Defendant Guevara.

REITER BURNS LLP
BY:  DANIEL M. NOLAND, ESQ.
311 South Wacker, Suite 5200
Chicago, Illinois  60606
(312) 982-0900
dnoland@reiterburns.com
        On Behalf of Defendant Navarro.

THE SOTOS LAW FIRM, P.C.
BY:  JOSH M. ENGQUIST, ESQ.
and CAROLINE JAMIESON GOLDEN, ESQ.
and SAMANTHA PALLINI, ESQ.
141 West Jackson Boulevard, Suite 1240A
Chicago, Illinois  60604
(630) 735-3300
jengquist@jsotoslaw.com
cgolden@jsotoslaw.com
spallini@jsotoslaw.com
        On Behalf of Individual Defendants.

BEDI & SINGER, LLP
BY:  DENA M. SINGER, ESQ.
53 West Jackson, Suite 1505
Chicago, Illinois  60604
(312) 525-2017
dsinger@bedisinger.com
        On Behalf of the Deponent.

ALSO PRESENT:
    JOSEPH BONURA, Interpreter (9:00 to 1:00)
    ELSA MADRIGAL, Interpreter (1:00 to end of day)
    BRETT SCHATZLE, Videographer
    VALERIE BARAJAS, Paralegal for Loevy & Loevy

### Page 4

I N D E X

WITNESS:
    ADRIANA MEJIA
            Exam by Mr. Swaminathan (Continued)   6
            Examination by Mr. Engquist .......  214
            Further Examination by Ms. Rosen ..  227

EXHIBITS:

        PLAINTIFF'S EXHIBIT NO. 1 ................  68
            Area 5 Supplementary Report,
            Cleared Closed Report
            (RFC Solache Reyes 233-253
        PLAINTIFF'S EXHIBIT NO. 2 ...............  105
            Photographs of Car
            (RFC Solache Reyes 44)
        PLAINTIFF'S EXHIBIT NO. 3 ...............  113
            Google Map

        PLAINTIFF'S EXHIBIT NO. 4 ...............  119
            Prescriptions for Rosauro Mejia
            from Sinai Medical Group
            (Bluhm 25519 and 25520)
        PLAINTIFF'S EXHIBIT NO. 5................  167
            "Notes," Two Sheets of Paper with
            Handwriting on Them
            (Reyes 264)

        PLAINTIFF'S EXHIBIT NO. 6 ...............  172
            04/15/98 Supplementary Report by
            McDonald and Collins
            (RC Solache Reyes 194 - 196)
        PLAINTIFF'S EXHIBIT NO. 7 ...............  174
            11/18/99 Area 5 Supplementary Report,
            Progress Investigation 3, Cleared
            Closed Report by Investigator Trevino
            (No Bates)
        PLAINTIFF'S EXHIBIT NO. 8 ...............  185
            Phone Log
            (RFD Solache Reyes 160 - 162)

### Page 5

EXHIBITS (Continued):

        PLAINTIFF'S EXHIBIT NO. 9 ...............  202
            06/01/99 Letter from Adriana Mejia
            to Gabriel Solache
            (RFC Solache Reyes 4812 - 4816.)

        PLAINTIFF'S DEPOSITION EXHIBITS 10 .......  204
            07/12/99 Letter from Adriana Mejia
            to Gabriel Solache
            (RFC Solache Reyes 4827 - 4836)
        DEFENDANT'S EXHIBIT NO. 5 ...............  198
            06/11/98 Letter to "Lupe"
            (RFC Solache Reyes 3949 - 3952)
        DEFENDANT'S EXHIBIT NO. 7 ...............  65
            Chicago Police Department CB Report
            (RFC Solache Reyes 207)
        DEFENDANT'S EXHIBIT NO. 9 ...............  189
            04/98 Cermak Health Record Form
            (HIPAA 4 and HIPAA 5)
        DEFENDANT'S EXHIBIT NO. 19 ..............  134
            Declaration of Jose Mejia
            (Reyes 8726 - 8729
        DEFENDANT'S EXHIBIT NO. 36 ..............  191
            Transcription of an Audio Recording
            of a Call that Took Place on October
            23, 2019

ADRIANA MEJIA, 02/05/2021     Page 6..9

FILED DATE: 4/8/2022 3:39 PM   98CR1244002

Page 6

THE VIDEOGRAPHER: This is the beginning of media unit 1, and we are now on the video record at 9:04 a.m. This is the continuing videotaped video conferenced deposition of Adriana Mejia taken on February 5, 2021. You may proceed.

MR. SWAMINATHAN: Good morning, Ms. Mejia.

THE WITNESS: Good morning.

MR. SWAMINATHAN: Did you get a chance to get some rest last night?

THE WITNESS: A little bit.

MR. SWAMINATHAN: You understand this is your continued deposition in this case, correct, a continuation from yesterday?

THE WITNESS: Si.

THE INTERPRETER: The translator wants to ask: Do I start interpreting now? Because I haven't been sworn in.

MR. SWAMINATHAN: Please. Let's start over. Can you please -- let's get the interpreter sworn in.

(Interpreter sworn.)

(Witness sworn.)

ADRIANA MEJIA, after having been first duly sworn to tell the truth, was examined and testified upon her oath through the

Page 7

interpreter as follows:

EXAMINATION (continued)

BY MR. SWAMINATHAN:

Q. Ms. Mejia, you understand this is a continuation of your deposition from yesterday, correct?

A. Yes.

Q. And just like yesterday, you remain under oath, correct?

A. Yes.

Q. Anything that would prevent you from being able to understand my questions and give truthful answers today?

A. No.

Q. You said yesterday that you were having headaches. Are you having headaches today?

A. Just a little bit. I took pills.

Q. So you feel like you're fine to be able to go forward with the questioning; is that right?

A. I'm going to try to answer everything truthfully and to be strong and do it well.

Q. Okay. If at any point you feel like your headaches or anything else is hurting your ability to understand my questions and answer them, please tell

Page 8

us, and we'll stop. Okay?

A. Okay.

Q. So as long as you continue to answer questions, we will assume you are feeling fine to be able to do so. Okay?

A. Okay.

Q. I'll indicate again to you this morning we can take a break any time you need to take a break, okay?

A. Very well.

Q. If at any point you are feeling tired or you need to get some food for your blood sugar, let us know and we'll take a break. Okay?

A. Very well. Thank you.

Q. I want to ask you about one thing you said yesterday. Yesterday, when you were describing what happened when you were first going into the Soto home, you said that Gabriel and then you went first and Arturo came later. That's the phrase you used. What did you mean by that?

A. When we got to the house first, Gabriel got out, and then I got out.

Q. Then did Arturo come later? Is that what you're saying?

Page 9

THE INTERPRETER: Translator wants to ask: Are you referring to did he arrive later?

MR. SWAMINATHAN: Let me reask it.

Q. When you and Gabriel first went to the house, Arturo came after that; is that right?

MS. ROSEN: Objection, form.

A. A few minutes afterwards. It didn't take long.

Q. Was he waiting in the car?

A. Yes. A few minutes, not a lot.

Q. Did anybody call him to come in, or did he come in on his own?

A. I no longer remember.

Q. When Arturo first came in, what had happened in the apartment at the point that he came in?

A. When he came in, I believe that Gabriel already had stabbed him. When he came in, he asked what were we doing, because he had come in a little bit later.

Q. So when he came in, Mr. Soto had already been stabbed; is that right?

A. Yes.

Q. Okay. I want to ask you about your background and go back to when you lived in Mexico. I

FILED DATE: 4/8/2022 3:39 PM   98CR1244002

**Page 10**

know you were asked a few questions about that. I want to ask you a couple of things.

A. Very well.

Q. What was the name of the town you grew up in?

THE INTERPRETER: Translator is not able to make it out. Turundeo.

MR. SWAMINATHAN: Turundeo, yeah?

A. Turundeo.

Q. Did you grow up with both your parents?

A. Yes.

Q. Did they work?

A. My dad is a -- works on the land, and my mother always worked at home.

Q. Have your parents ever come to the United States to visit you?

A. Yes. They came when I did my time in 2000 and last year in December.

Q. So they visited you, you said, in 2000?

A. Yes, when I was sentenced. I think it was around 2000.

Q. Where would they see you when they came in 2000?

A. The first time they saw me, they saw me in

**Page 11**

Cook County.

Q. Where did they see you after that?

A. They were there a couple months extra, and they came to see me in Dwight.

Q. Anywhere else during the 2000 visit?

A. Not until this year, this past year, in December.

Q. How many times did they visit with you when they came in 2000, between Cook County Jail and Dwight Correctional Center?

A. The truth is, I don't remember.

Q. Did they stay with your brother Carlos?

A. Yes. Also for a time with my friend Lorena.

Q. How did you know Lorena?

A. Lorena is from Michoacan, but I know her because she is a friend of one of my aunts.

Q. Do you stay in touch with her?

A. Yes.

Q. Do you still talk to her on the phone?

A. No. Unfortunately, I don't have a telephone number, just the address.

Q. When was last time you were able to communicate with her on the phone?

A. Since she went to Texas.

**Page 12**

Q. And approximately when was that?

A. The truth is I don't remember what year it was.

Q. And then you said your parents came again in December of 2020. Why did they come then?

A. Because they came to see how I was.

Q. Did they come to the US for any other reason in December of 2020?

A. No. They just came to see me and my brother. That's it.

Q. When did Carlos pass away?

A. I'm not sure. But when they had told me that he had passed away, it was around the 18th of May. And when they told me he had already passed away, it had been already 23 days since he had passed away.

Q. Were you able to go to his funeral?

A. No.

Q. I'm sorry to hear about that.

A. (Nodding head up and down.)

Q. That was May of 2020 when he passed away?

A. Yes.

Q. Do you have any other brothers who are in the US?

**Page 13**

A. No.

Q. When your parents came in December, I assume they came and visited you at the prison?

A. Yes.

Q. How many times did they visit you?

A. They only had two weeks of permission. It was a short time. I think it was four or five times.

Q. You said they only had two weeks for what? For the mission?

A. In other words, when they gave them their visa to come, their permission to come, they didn't get it for a long period. It was for a short period of time to be here.

Q. When they came in December of 2020, did you talk to them at all about this case?

A. Very little. People brought them, some friends. Some friends had brought them. No, very little.

Q. The friends who brought them, were they people that you knew?

A. Yes. I know a girl or a young lady who came, and then the woman who visits me was from the church, and another friend with her brother-in-law.

Q. So the people who came to visit with your

Page 14

parents, what were their names?

A. Beatrice Lopez, Aurora Ortiz, Ramon Calvario, Yarina Sanchez, my brother Carlos. Then some other people brought them, but they left my parents alone with me.

Q. The person named -- is it Raido Sanchez?

A. Ramon Calvario.

Q. And then you said Raida Sanchez? What was the next person's name?

A. Yarina Sanchez.

Q. Is that Y-a-d-i-r-a?

THE INTERPRETER: Translator says spell that again, sir. I'm sorry.

Translator says I got Y-a-r-i-d-a-n. That's what I'm hearing.

A. Yes, Yarina.

Q. And you said Carlos brought your parents for some of those visits; is that right.

And would Carlos visit you regularly --

THE INTERPRETER: Translator didn't get an answer.

MR. SWAMINATHAN: Go ahead. You can answer.

Let's start again because you said you didn't get an answer to the last question, right?

Page 15

THE INTERPRETER: Translator repeated it again, and I still didn't get an answer. I don't know why.

A. When my brother came, he couldn't drive because he didn't have a license. So when my brother came, he came with Beatrice Lopez, with her husband, but her husband could not come in to see me.

Q. So Carlos came with your parents, right?

A. Yes.

Q. And would he also come regularly before he brought your parents?

A. No.

Q. When was the last time he visited you before he came with your parents?

A. I don't remember if it was, like, nine or ten years. I was not in communication with him.

Q. Is there a reason why he wasn't visiting you or communicating with you?

MS. ROSEN: Objection -- sorry. Go ahead.

(Question translated.)

MS. ROSEN: Objection: Form, foundation.

A. He had a personal problem among brothers.

THE INTERPRETER: Translator is not sure if she said he did or I did. That part didn't come out.

Page 16

I don't know if she said "tuve" or "tuvo" because I couldn't hear that. I don't know if she said I had a problem or he had a problem with brothers.

MR. SWAMINATHAN: Can you get clarification?

A. My brother and I had had an argument.

Q. What was the argument about?

A. About some money.

Q. Was it your money or his money that was the subject of the argument?

A. Some family members had sent that to me, and he had never put it in.

Q. And when did that fight happen?

A. Like around 10 years or 11 years, something like that. I'm not sure. I don't remember exactly.

Q. Did he tell you why he wasn't going to put the money in your account?

A. No. I was in communication with him. He wasn't accepting my calls, and I was not calling him anymore.

Q. Before that, had you and Carlos been close?

A. Unfortunately, no. My brother and I had always argued a lot from when we were kids.

Q. And when you were in the US, you were living together at the Mozart house, correct?

Page 17

A. Yes.

Q. So were you close at that time?

A. Very little, because he worked, and he would go with his friends to bars or dancing.

Q. Would he drink?

A. Yes.

Q. Would he drink a lot?

A. I think that's something that caused his death. I'm not very sure.

Q. Was he drinking a lot even back in 1998, when he was living with you?

A. Yes. He would drink with Gabriel Solache, with Leobardo, with my ex-husband, with my other brothers-in-law and a lot of friends.

Q. Did you have any other family members living in the US with you other than Carlos?

A. No. I have family from my father's side, but I don't have communication with them.

Q. Carlos, you said, would go to the bars and go out dancing. Would he ever get in trouble with the police?

A. The truth is, I don't know.

Q. Do you know if he ever got arrested?

A. The truth is, I don't remember if he told

CCSAO COI SUBPOENAS 000586

FILED DATE: 4/8/2022 3:39 PM  98CR1244002

Case: 1:18-cv-01028 Document #: 892-2 Filed: 04/04/26 Page 587 of 855 PageID #:121213

Page 18

me.

Q.   Do you know if he ever went to jail for any period of time?

A.   As far as I know, no.  I don't know.

Q.   Did he use any drugs?

A.   My brother?

Q.   Yeah, Carlos.

A.   The truth is, I don't know.

Q.   Would he get in fights?

A.   No.

Q.   You said that Carlos was working a lot back then.  Where did he work?

A.   He worked in a type of a restaurant.

Q.   Do you remember the name of it?

A.   It was called Piadaria Jalisco.  But after that, they closed it.

Q.   When did they close it?

A.   I don't remember what happened with the owner.  Something my brother commented to me, I think he told me that the owner had gone to prison.  I'm not sure though.

Q.   But her brother told her that it was closed.  Was that after she'd been arrested?

THE INTERPRETER:  The translator asks you to

Page 19

repeat that, sir.  It didn't come in clear.

Q.   Yes.  When her brother told her that the restaurant had been closed, was that sometime after she'd already been arrested?

MS. ROSEN:  Objection, form.  Her?  She?

THE INTERPRETER:  The translator asks that you ask the question directly to her.  If I say, "When her brother," she's not going to know who I'm referring to.  She's going to think I'm speaking about another woman.  You have to speak to her.  I am your voice.

MR. SWAMINATHAN:  Okay.  Sorry.

MS. ROSEN:  Yeah.  Objection, form.

MR. SWAMINATHAN:  Yeah.  Let me ask it again.

Q.   When Carlos informed you that Jalisco had been closed, was that after you'd been arrested?

A.   Yes.  When he told me they had closed the bar, I was already in jail.  I was already an inmate.

Q.   What was Carlos's job at the Jalisco Piadaria?

A.   I think he would make or prepare the tacos.

Q.   So he was basically a cook?

A.   Something similar to that.  He would attend

Page 20

to the tables and to the clients, to the customers.

Q.   So what was his usual shift?  What hours did he work?

A.   I don't think he had a shift.  I think he went from the morning until very late, but I don't remember exactly the schedule.

Q.   What time would he usually get home?

A.   Different times.

Q.   What were the earlier times he would usually get home?

A.   Like 7:00 or 8:00 at night.  I don't know.

Q.   Then if he stayed out late, when would he come home?

MS. ROSEN:  Objection, form,

MR. SWAMINATHAN:  Go ahead.

A.   Can you please repeat the question?

MR. SWAMINATHAN:  Yeah.  And Mr. Interpreter, yesterday you had not been interpreting the objections in the morning.  Then we continued that practice in the afternoon with the other interpreter.  It did reduce the confusion for the witness.  I would suggest you continue that practice today.  Then if there's a point we need to, we can do that.

Page 21

THE INTERPRETER:  Just to make sure, the translator is asking:  You don't want me to translate the objections, correct?

MR. SWAMINATHAN:  That's right.  That would be consistent with yesterday's practice.

THE INTERPRETER:  Yes, sir, whatever makes it easier for you.  Sorry about that.

MR. SWAMINATHAN:  No problem.  No problem.

BY MR. SWAMINATHAN:

Q.   If he stayed up late, when would he usually come home?

MS. ROSEN:  Objection:  form, foundation.

A.   I don't know.  Sometimes I would be asleep.  He'd get there different times.

Q.   Was it your understanding that his work ended before midnight, but sometimes he would stay out after that?

A.   Yes.  Since he had a girlfriend, I would imagine he would go see his girlfriend.  He had his friends.

Q.   Would his shifts at work -- strike that.

His work hours, did they end before midnight?

MS. ROSEN:  Objection:  form, foundation.

CCSAO COI SUBPOENAS 000587

FILED DATE: 4/8/2022 3:39 PM  98CR1244002

FILED DATE: 4/8/2022 3:39 PM  98CR1244002

Page 22

A. Sometimes he would stay there if the boss would leave early. He would stay and close up. He would stay and clean up.

Q. If he stayed to close up, how late would he have to stay?

A. I don't know because I didn't pay too much attention to what time he would come.

Q. Was it a restaurant or bar?

A. It was a family restaurant.

Q. Would it close before midnight then?

A. Yeah. I think he closed, like, around 9:00. Depending if there was a lot of people or not a lot of people, they would close.

Q. Did Carlos have any other jobs other than the job at the Jalisco Piadaria?

A. Before, yes. I think he would mow the grass.

Q. In March and April of 1998, when you were arrested, was his only job the restaurant job?

THE INTERPRETER: Translator asks the job in the bar, correct?

MR. SWAMINATHAN: The restaurant job.

A. Yes.

Q. I wanted to go back to the money that you

Page 23

had an argument with Carlos over. How much money was sent for you?

A. They sent me -- I don't remember if it was 200 or $300.

Q. And who sent it?

A. My cousin who is in Washington, Elizabeth Torres.

Q. Why did she send it to you?

A. Well, she said she was going to help me so that I would have something, to help me in the prison.

Q. Was she someone you stayed in touch with, even after you were in prison?

A. Now? With her?

Q. Yeah. Do you stay in touch with her now?

A. No. Unfortunately, after all those years, after all that, once, she visited me in prison and then, after that, no.

Q. Do you have anyone who still visits you?

A. No, just the woman Aurora.

Q. Anyone else?

A. No. I don't have any visits.

Q. How do you know Aurora?

A. I know her, like, two or three years through a friend who is a woman from the church that they go

Page 24

visit people who are in jail, in prison.

Q. You said that you told your parents just a little bit about this case when they visited you.

MR. ENGQUIST: Objection to form.

Q. What little did you tell them?

A. Very little, because they came with people. I just told them to stay strong, to be strong. Very little.

Q. I know that was very little, but what was that little bit that you told them?

A. About my sentence. In Mexico, it's called perpetual -- the lowest chains a lot are different. I told them to continue having faith and continue praying a lot.

Q. Continue having faith that you would hopefully be released one day?

A. Yeah. I have faith that some day I'll be able to leave.

Q. Did you tell them that you were expecting that one day that would happen for you?

A. Why not? Why can't I have another opportunity?

Q. So that's, yes, you did tell them that you were expecting that, one day, that would happen to

Page 25

you?

A. Yes. I still feel that, and it could be soon, perhaps. You never know. No one knows.

Q. And did you tell them that, before that, you had to do these depositions in this case?

A. Now?

Q. When you visited with them, at that point, you knew that there were these depositions in this case, right?

MS. ROSEN: Objection, form, foundation.

MR. SWAMINATHAN: Go ahead.

A. No.

Q. You said that this visit was in December of 2020, right?

A. Yes.

Q. So you had already been deposed, right?

A. Yes.

Q. So did you tell them that you had to answer these -- you'd been answering these questions in this case?

MS. ROSEN: Objection: Form, foundation.

A. The truth is I don't remember.

Q. Have you ever told your parents before they visited you that you were hoping to be able to get

Case: 1:18-cv-01028 Document #: 892-2 Filed: 04/04/26 Page 589 of 855 PageID #:121215

FILED DATE: 4/8/2022 3:39 PM   98CR1244002

Page 26

out?

A. I've always said that to them. I always have hope.

Q. Have you ever told them that you expected to be released soon?

A. I always thought that maybe I can get out soon. Why not?

Q. You've always said that you were going to get out soon?

A. I've always said that I have a lot of faith, a lot of hopes that --

MS. ROSEN: Is everything okay?

THE WITNESS: The guard is asking me if I'm okay.

MR. SWAMINATHAN: I think she was in the middle of her answer. Can you ask her the question again or read back my question?

THE WITNESS: Could you please repeat the question to me?

MR. SWAMINATHAN: Yeah, let's have the court reporter read it back.

(Requested record read.)

THE INTERPRETER: Translator wants to say that's all there was. I gave up until what I heard

Page 27

because she turned at that time to look at someone. And then someone asked her, "Is everything okay?" and she didn't give anymore.

MR. SWAMINATHAN: I'll just ask another question.

Q. Ms. Mejia, when your parents came to visit you in 2020, did you tell them that you expected that you would be released soon?

A. I always said it.

Q. You've always said that you expected to be released soon?

A. I still say it. There could be a miracle. You people have your laws, and I respect them.

Q. I just want to be clear. When you spoke to them in December when they visited you, you told them that you expected you would be released soon; is that right?

A. I hope to get out of here soon. I'm not going to stay here the rest of my life.

Q. That's what I want to -- did you tell them that you hoped to or that you expected to?

A. I hope. I hope.

Q. You didn't tell them that you expected that it was about to happen?

Page 28

A. Always like -- how can I say this -- I can't explain this question.

Q. You had mentioned yesterday that you had -- strike that.

Yesterday, you were asked if your parents had any interactions with Gabriel Solache. Do you remember that?

A. One time, I asked my mother -- I asked my mother if they have seen him. And she said they've only seen him once when he had recently went to Mexico and was in the town, but they didn't speak to him.

Q. So there was only one time that your mother saw Gabriel Solache, correct?

A. Yes.

Q. And he didn't say anything to her, right?

A. I don't think my family has -- are in communication with him.

Q. And your mom told you about this one time that she saw him in town, right?

A. Yes.

Q. Other than saying she saw him, did she say anything else about seeing him?

A. No. My mom is not going to say anything to me.

Page 29

Q. What do you mean she's not going to say anything to you?

A. My mom is, like -- my mother is not going to say absolutely anything about him.

Q. Your mother told you that she saw him?

A. Yes, just a little bit, just in passing.

Q. And she told you that they didn't have any kind of conversation, correct?

A. No.

Q. And that's it. That's all that happened?

MS. ROSEN: I have a belated form and foundation objection. Sorry.

A. That's all she told me, and she's not going to say any -- absolutely nothing to me about him.

Q. She did not tell you that he threatened her at all, right?

A. No.

Q. She not tell you that he scared her or anything like that, right?

A. The truth is I don't know.

Q. Well, she didn't tell you that she was in fear of him or that he said something to make her feel fearful, right?

A. No.

CCSAO COI SUBPOENAS 000589

Page 30

Q. She just told you she saw him?

A. Yes.

Q. Are you still close with your parents?

A. Yes.

Q. How often do you talk to them on the phone?

A. Whenever I have minutes on my telephone, I call them.

Q. And how often is that?

A. I call them like four or three times per week.

Q. Do you talk to both your mom and dad?

A. Yes.

Q. Have you ever told them the truth about what happened?

A. No.

Q. Have you ever told them anything about it?

A. Very little.

Q. Have you told them a false story about what happened?

THE INTERPRETER: Translator says can you repeat that, please? You cut out.

Q. Have you told them a false story about what happened?

MS. ROSEN: Objection, form.

Page 31

A. I'm not going to answer that question.

Q. How old were you when you left Mexico?

A. I think 19.

Q. Had you been living at home until the time that you left?

Strike that. Let me ask a better question.

Were you living with your parents until the time that you left Mexico at 19?

A. No. When I got married, I went to my husband's town.

Q. And how old were you when you and Rosauro got married?

A. I was 16, and he was 18.

Q. When you went to live with him in his town, who lived with you in the house you lived in with Rosauro?

THE INTERPRETER: The translator couldn't make out what she said twice. It was echoing. Could I ask her to say it one more time slower?

A. When I went with him, I went to the house of one of his brothers. The house was loaned to us by his brother.

Q. So who lived at that house other than you and Rosauro?

Page 32

A. No one.

Q. And who is the brother who lent you all the house?

A. Encarnacion Mejia.

Q. Was that the only house you lived in while in Mexico with Rosauro before you came to the US?

A. Sometimes I would come to my mother-in-law's house, and I'd stay there with her.

Q. Who lived in that house?

A. My father-in-law, my sister-in-law Rosa, and two smaller brothers, younger brothers, of my husband, but they don't go to the Mexico capitol to work. They would only be there from time to time.

Q. What were their names?

A. Endovias Mejia, Leobardo Mejia.

Q. Any other Mejias who lived in the mother-in-law's house?

A. No.

Q. How did you meet Rosauro? How did you two end up getting married?

MS. ROSEN: Objection: form, compound.

A. It's a very long story. I'm not going to answer that.

Q. Did your families put you together, or did

Page 33

you guys meet and fall in love?

A. No. We met.

Q. And were you in love when you got married?

A. Yes.

Q. And when you were living in Mexico with Rosauro, were the two of you happy?

A. Yes.

Q. And then how was it decided that you would come to the United States?

A. When he came first.

Q. Why did he decide to come to the US?

MS. ROSEN: Objection: form, foundation.

A. Him?

Q. Yes?

A. Because, in Mexico, there's not a lot of opportunities for work.

Q. And so he -- go ahead.

A. He didn't have a stable job; so there was no way to get ahead.

Q. So did you both agree that you would move to the United States?

A. No. He wanted to come.

Q. So he made the decision on his own?

A. Yes.

CCSAO COI SUBPOENAS 000590

FILED DATE: 4/8/2022 3:39 PM   98CR1244002

FILED DATE: 4/8/2022 3:39 PM   98CR1244002

Page 34

Q. But did he tell you in advance, before he left?

A. Yeah. We would talk about it a lot.

Q. And were you happy to go to the United States?

A. Me?

Q. Yes.

MS. SINGER: Object to the form of the question. She does have a Fifth Amendment right regarding this.

MR. SWAMINATHAN: I'm sorry, Dena. Do you want her to assert the Fifth on this? Is that what you said?

MS. SINGER: I do, yeah, on this line of questioning.

MR. SWAMINATHAN: Do you want to talk to her, take a quick break and talk to her?

MS. SINGER: I can talk to her and take a breakout room, or you guys can move on from this.

MR. SWAMINATHAN: Why don't you go into a breakout room. I'm not going to spend much more time on this, but I want to be able to assert what you need to assert. So why don't you go quickly to a breakout room.

Page 35

MS. SINGER: She's going to have to get a sheriff.

THE INTERPRETER: The translator says you don't want to give the answer then, correct.

MS. SINGER: I'm asking to hold off on the answer. I'm asking to talk to her.

THE VIDEOGRAPHER: All right. Let's go off the record. We're going off the video record at 10:09 at the end of media unit 1.

(Recess in proceedings from 10:09 to 10:14 a.m.)

THE VIDEOGRAPHER: We are back on the video record at 10:14 at the beginning of media unit 2.

MR. SWAMINATHAN: Madam court reporter, could you read back the last question, and then we'll have it interpreted to allow Ms. Mejia to answer?

(Pending question read.)

A. I'm not going to answer.

Q. Are you asserting your Fifth Amendment right?

A. Yes. In this question, yes.

Q. When I asked you earlier today if you ever told your parents a false story about what happened to the Soto family, you said you were not going to answer

Page 36

that question, right?

A. Yes.

Q. Are you asserting your Fifth Amendment right for that question?

MS. ROSEN: Objection: form, foundation.

A. Yes.

Q. Did you have concerns about coming to the United States?

MS. ROSEN: Objection, form.

A. I'm not going to answer.

Q. Are you asserting your Fifth Amendment right?

A. Yes.

Q. Did you have concerns about staying in Mexico?

MS. ROSEN: Objection, form.

A. I'm not going to answer.

Q. Are you asserting your Fifth Amendment right against self-incrimination?

THE INTERPRETER: The translator is not sure if she answered. Her volume is very low. I think I heard "uh-huh," but I can't tell you for sure.

A. Yes.

Q. Did Rosauro have concerns about staying in

Page 37

Mexico?

MS. ROSEN: Objection: form, foundation.

A. I don't know.

Q. Did Rosauro ever indicate to you that he had any concerns about staying in Mexico?

MS. ROSEN: Objection, form.

A. I don't know.

Q. Did you or anyone in your family have any issues with the police in Mexico at the time that you were planning to leave?

MS. ROSEN: Objection: form, foundation.

A. Pardon me? Could you please repeat the question?

Q. Did anybody in your family have any issues with the police at the time that you were making a decision to leave?

MS. ROSEN: Objection: form, foundation.

A. No.

Q. Did anyone in Rosauro's family have any problems with the police when you were making the decision to leave Mexico?

MS. ROSEN: Objection: form, foundation.

A. I don't know very much about my husband's family, if they had problems or not.

CCSAO COI SUBPOENAS 000591

FILED DATE: 4/8/2022 3:39 PM   98CR1244002

Page 38

Q.  When the decision was made to go to the United States, did anybody else go with Rosauro?

A.  I don't remember.  I don't know.

Q.  When you went to the United States, did you go with anyone else?

A.  Yes.

Q.  Who else did you go with?

A.  This is private.  This is his family.

Q.  Okay.  These are important questions, and we need you to answer them.

Who else came with you to the United States?

MS. ROSEN:  I'm going to object to form, foundation, and harassing and to your representations about what are and what are not important questions. From the Defendant's perspective, these are irrelevant questions.

MR. SWAMINATHAN:  Go ahead.

A.  I'm not going to give the names -- I'm not going to say the people who came with me.

Q.  Were any of them members of Rosauro Mejia's family, the Mejia family?

MS. ROSEN:  Objection: form, harassing.

A.  I don't know.  I'm not going to answer.

Q.  Are you asserting your Fifth Amendment

Page 39

right?

A.  Yes.

Q.  Before you left to come to the United States, had you committed any crimes in Mexico?

A.  Never.

Q.  Before Rosauro came to the United States, did he commit any crimes in Mexico?

A.  No.

Q.  Before you came to the United States, did you know of any other members of his family committing any crimes in Mexico?

A.  My family has never done anything bad, as far as I know.

Q.  Before Carlos went to the United States, had he committed any crimes in Mexico?

A.  No.

Q.  When you went to the United States, had Carlos already gone to the United States?

A.  No.  He came when I came, afterwards.

Q.  Did he come at the same time as you or after you?

A.  No, after.

Q.  When I asked you if you had concerns about coming to the US and you didn't answer my question,

Page 40

did you or your family have any issues with gangs in Mexico before you came to the United States?

A.  In my town, there is no gangs.  There was no islands.  There were no criminal problems.  No.  No.

Q.  What about in Rosauro's town?  Were there any gang issues there?

A.  That town is very small, but I don't know anything about that.  So no.  As far as I know, no.

Q.  Did Rosauro or any of his family members have any problems with gang members in Mexico?

MR. ENGQUIST:  Objection, foundation.

A.  No.

Q.  Are any members of your family in a gang?

A.  As far as I know, no.

Q.  Has Carlos ever been in a gang?

MR. ENGQUIST:  Objection, asked and answered.

A.  Never.

Q.  If Rosauro said that Carlos was involved with gangs, is he lying?

MS. ROSEN:  Objection:  Form, foundation, misstates Rosauro's testimony.

A.  I don't know.

Q.  Is it possible that Carlos was involved with

Page 41

gangs in the United States?

MS. ROSEN:  Objection:  form, foundation.

A.  I don't know.

Q.  When you were coming to the United States, had Rosauro already settled in Chicago?

A.  Would you repeat the question, please?

Q.  When you were coming to the United States, Rosauro was already in the United States, right?

A.  Could you please repeat the question again?

Q.  When you came to the United States, Carlos was already in the US, right?

MS. ROSEN:  Objection, form.

MR. SWAMINATHAN:  Let me reask that. I asked the wrong name.

Q.  When you came to the United States, Rosauro was already in the United States, right?

THE INTERPRETER:  The translator is confused.

Q.  I'll ask it again.  When you came to the United States, Rosauro had already come, correct?

A.  Yes.

Q.  Where in the United States was he?

MS. ROSEN:  Objection:  form, foundation.

At what time?

CCSAO COI SUBPOENAS 000592

FILED DATE: 4/8/2022 3:39 PM 98CR1244002

ADRIANA MEJIA, 02/05/2021                          Page 42..45

Page 42

MR. SWAMINATHAN: When she's coming to the United States.

A. Confusing me a little bit. Can you please repeat the question?

Q. When you came to the United States, where was Rosauro?

A. I don't know.

Q. When you came to the United States, did you know you were going to be going to Chicago?

A. Yes.

Q. Did you or Rosauro have family in Chicago?

MS. ROSEN: Objection, form.

MR. SWAMINATHAN: Go ahead.

A. Why do you have to ask about my ex's family?

Q. Because many of those family members are in the US and are witnesses in this case, identified by both parties.

I'll ask my question again. Did you or Rosauro have any family members who were in Chicago?

A. Yes. He did. I did not.

Q. So when you came to the US, did you expect that you would be going to Chicago to join his family?

A. With my family or his family?

THE INTERPRETER: La familia de Rosauro.

Page 43

A. Yes.

Q. Which family members of his were already in the United States when you came?

MS. ROSEN: Objection, foundation.

A. Family, his brothers.

Q. Which ones were already here?

A. Adolpho Mejia, Horacio Mejia, Manuel Mejia, Clemente Mejia, with their children and families.

Q. Anyone else?

A. Leobardo Mejia and Clemente Mejia, I think, but he stayed a short time and then went back to Mexico.

Q. Anyone else?

A. Well, just them, that I recollect, as family.

Q. What did Adolpho Mejia do for work?

MS. ROSEN: Objection, foundation.

A. That's his life. I'm not going to explain it.

Q. Do you know what Adolpho did for work in the United States?

A. I never asked him. He was a man a lot older.

Q. Do you know what Horacio Mejia do for work

Page 44

in the US?

A. I don't remember what he did.

Q. Do you know what Manuel Mejia did for work?

MS. ROSEN: I'm going to object to relevance on what the Mejia family members' work was.

A. I don't remember the jobs. It's been years. I don't remember. It's their life.

Q. How long had Rosauro been in the US before you joined him?

THE INTERPRETER: Translator asks that you repeat that. You echoed.

Q. How long had Rosauro been in the US before you joined him?

A. I don't remember if it was months or a year. Something like that.

Q. When you came to the US, I think you said you first spent some time in Los Angeles, right?

A. Yes.

Q. Who did you live with when you were in Los Angeles?

A. With people from my town, acquaintances.

Q. Any members of the Mejia family?

A. No.

Q. And then was your next stop Chicago?

Page 45

A. Yes.

Q. And when you came to Chicago, Rosauro was not living at Mozart, right?

A. Yes.

Q. What address was he living at?

A. 51st and Western.

Q. Is that where you joined him and lived with him?

A. Yes.

Q. Was that an apartment that he rented?

A. Yes.

Q. And who lived with you and Rosauro at 51st and Western?

A. On the first floor, my brother-in-law Adolpho lived there. It was his. He rented us a small apartment with my brother-in law Encarnacion and, for a time, with the brother Clemente and two people from my husband's town. I don't remember their names.

Q. Then what was the next house you lived in after 51st and Western?

MR. ENGQUIST: I'm just going to object to asked and answered. We went through these addresses yesterday at length.

CCSAO COI SUBPOENAS 000593

FILED DATE: 4/8/2022 3:39 PM   98CR1244002

Page 46

MR. SWAMINATHAN: You're doing asked and answered based on your questioning of the witness?

MR. ENGQUIST: No. That was your questioning of the witness, Anand.

MR. SWAMINATHAN: No. Okay, go ahead, Adriana.

A. 62nd and Mozart, something like that.

Q. Okay. So you moved from 51st and Western to the Mozart house, right?

A. Yes.

Q. And you've already gone through everybody who lived at the Mozart house. Was there anybody who lived there a period of time and left before the time of your arrest?

THE INTERPRETER: Translator ask you to repeat that again, please.

MR. SWAMINATHAN: Yeah. Let me just ask a different question.

Q. Was there anybody who lived at the Mozart street address with you and then moved out?

A. Yes, a brother of my husband's.

Q. Who is that?

A. Encarnacion Mejia, his family.

Q. Anyone else who lived with you at that house

Page 47

and then moved out?

A. Two friends, a guy from my town and a guy from my husband's town, acquaintances.

Q. Where did Encarnacion go when he left the house?

A. He went to Texas.

Q. The Mozart house, was that an apartment you were renting?

A. Yes.

Q. Did you know who owned the house?

A. Yes.

Q. Who owned it?

A. Horacio Mejia.

Q. Did Horacio own other buildings as well?

MS. ROSEN: Objection, foundation.

A. I don't know about his life.

Q. Do you know if he owned other buildings?

A. That's his private life. I don't know if it was his house or if he was renting it.

Q. If you don't know the answer, then you can just tell me you don't know. If you do know, I need you tell me the answer or tell me you're refusing to answer. But --

A. I don't know about his life, whether it was

Page 48

his house or if he was renting it. How am I going to know about his life?

Q. If I ask you a question and the answer is you don't know, tell me you don't know. Okay?

MS. ROSEN: Objection: form, harassing. She just said she didn't know.

MR. SWAMINATHAN: She asked me why would she know. The answers are not supposed to be rhetorical questions. Let me ask the question one last time.

Q. Did Horacio own any other buildings that you know of?

A. I don't know.

Q. The family members of Rosauro who you lived with in Chicago, did you get to know them?

A. What's that?

Q. Did you get to know his family members?

MS. ROSEN: Objection, form.

A. I don't understand that question.

Q. Did you consider them to be part of your family?

A. Well, not that close, no.

Q. Were there any members of Rosauro's family who you became close with?

A. I always spoke a lot with his brother

Page 49

Edwiges, with Leobardo I spoke a lot with, his sister Rosa, his mother-in-law, but she already died, passed away. Well, I spoke with all of them, but a relationship --

Q. Okay. Were there any members of his family that you did not get along with?

A. No. I spoke with all of them.

Q. Among the people at the house at Mozart, who did you spend the most time with?

A. Guadalupe Mejia and Jorge Mejia and Edwiges Mejia and Jessica Mejia.

Q. Edwiges, was that Rosauro's brother?

A. Yes.

Q. And who was Jessica?

A. The wife of Edwiges.

Q. And where did they live?

A. They lived for a time with me, and then they went to where I lived before.

Q. Did you say you grew close with Guadalupe and Jorge Mejia?

A. Since we lived in the same apartment, I would watch their little girl sometimes.

Q. If you needed someone to talk to, who would you go to?

CCSAO COI SUBPOENAS 000594

Page 50

A. Sometimes on the weekend I would go with Estoria Mejia. I was also a little closer with her.

THE INTERPRETER: The translator could not hear what she said. It was going in and out. Can I ask her to repeat her last line?

MR. SWAMINATHAN: Yeah.

A. I spoke a lot with her, but she was already a woman much older than me.

Q. Who else other than her would you turn to?

A. Sometimes I would go with Carmen Mejia, with Rosalinda Mejia, and Marisa Mejia, but she was in Texas. I spoke very little with her.

Q. And was Guadalupe also someone you would also turn to for support?

THE INTERPRETER: Translator asks you to repeat that, sir. You came in garbled.

Q. Was Guadalupe Mejia someone you also turned to for support?

A. Yes. Almost every day, she spoke with me.

Q. Did she work, or was she at home?

A. She made bread to sell, and sometimes she took care of children.

Q. Did she do all of that from home?

A. Yes.

Page 51

Q. Would you see her every day?

A. The majority of the time, yes.

Q. What about Carlos? Would you ever turn to Carlos for support?

A. No.

Q. Jose Mejia, was he in the United States?

A. Yes.

Q. Who did he live with?

A. With his wife and his dad.

Q. Who was his dad?

THE INTERPRETER: The translator wants to say the way she said it, it could have been his dad or her dad.

MR. SWAMINATHAN: Can you clarify?

A. It was his dad.

Q. Who was his dad?

A. Adolpho Mejia.

Q. Did you -- were you friend with Jose Mejia?

A. Not very good friends. When I would go to the house, we would talk. I would watch the kids.

Q. How often would you see Jose Mejia?

A. Every time my husband would take me to his brother's house.

Q. How often was that?

Page 52

A. Sometimes every week. Sometimes every 15 days.

Q. And then, on the weekends, who would you spend time with on the weekends?

A. With my charity at the time, with my husband; but sometimes he would leave, and I would be by myself. I didn't have friends.

Q. Anyone else you spent time with on the weekend when Rosauro was not there?

A. Sometimes Lupe would invite us over to the house to eat. I would go down Lupe's apartment, and we would chat a little bit, or she would come up to my apartment.

Q. Anyone else you would spend time with on the weekends?

A. His brother-in-laws or when there were birthday parties or parties.

Q. One of the people living at the house we talked about yesterday was Martin Vaca, right?

A. Yes.

Q. Was he one of the people who you mentioned earlier who you knew from your town or Rosauro's town?

A. No. That man, he was from a town near my house, but he got married to a girl from my town.

Page 53

That's why I know him.

Q. What did Martin Vaca do for work?

A. I don't remember.

Q. And do you know a Ramiro Vaca?

A. I don't remember.

Q. Did Martin Vaca go by any other name?

A. The truth is I don't know.

Q. Did Rosauro have any nicknames?

A. What was that?

Q. Did Rosauro have any nicknames?

A. Yes.

Q. What was his nickname?

A. His brothers called him Chapa Pi (phonetic).

Q. What did you call him?

A. Chapa.

Q. Did he have any other nicknames?

A. The truth is I don't remember.

Q. Did you make any friends while you were living at Mozart Street, any friends from the United States?

A. No, I hardly had any friends. It was just with Miss Lorena who I speak with most.

Q. Lorena, was she your friend even when you were living at Mozart?

CCSAO COI SUBPOENAS 000595

FILED DATE: 4/8/2022 3:39 PM   98CR1244002

Page 54

A. Yeah, because she lived three houses from where I lived.

Q. Did you know a person named Robert Kubon, K-u-b-o-n?

A. I don't remember.

Q. Does that name sound familiar to you at all?

A. At this moment, no, I don't know who it is.

Q. Do you know a person named Diana Gama?

A. Yes. I had spoke very little with her.

Q. Who was she?

A. It was woman who I met in a -- I think it was a -- I don't remember how I knew her, but I wasn't around her much.

Q. Was she someone -- so she was somebody that you know, or was she somebody that knew other people --

THE INTERPRETER: Translator asks: Can you repeat that, sir?

MR. SWAMINATHAN: Let me ask a better question. Sorry.

Q. Did other people at the house also know Diana Gama?

MS. ROSEN: Objection: form, foundation.

A. I don't think so.

Page 55

Q. So she was just somebody that you had gotten to know?

A. No. I hardly ever made friends here.

Q. And where did you meet her?

A. The truth is I don't remember. The truth is no.

Q. As far as you know, other than yourself, did anybody else in the house talk to Diana Gama or know Diana Gama?

MS. ROSEN: Objection: form, foundation.

A. No.

Q. What about Miguel Gama? Do you know -- is the name Miguel Gama familiar to you?

A. I don't remember exactly who they are.

Q. But Miguel Gama is also a name that's familiar to you?

A. At this moment, I'm remembering, but I'm not remembering well, totally.

Q. Was Miguel Gama always someone that you knew but not other people in the house knew. Strike that. Let me ask a better question.

Was Miguel Gama also someone that only you knew?

MS. ROSEN: Objection: form, foundation,

Page 56

mischaracterizes her testimony.

A. No. I don't remember who they are. I don't know.

Q. Are you familiar with the name Romualdo Moreno, R-o-m-u-a-l-d-o?

A. At this moment, I don't remember who they are.

Q. Is that name familiar to you?

A. The truth is I don't know what to tell you because I don't remember who they are.

Q. So let me ask a different question. Have you ever -- strike that.

Have you ever heard the name Romualdo Moreno?

MS. ROSEN: Objection: form, foundation.

A. The truth is, at the moment, I don't remember who it is.

Q. At some point, did you know a Romualdo Moreno, and you just can't remember who that is now?

MS. ROSEN: Objection: form, foundation.

A. I don't know. I don't remember if I know him or who it is. I don't know.

Q. Did you ever have any friends with the name Moreno?

Page 57

MS. ROSEN: Objection: form, foundation.

A. No. I don't remember who it is. It's the truth.

Q. Did you know anyone who has the nickname Moreno?

A. No, I don't remember.

Q. Did Rosauro or anybody else who lived at the house spend time with anybody with the first name or last name Moreno?

MS. ROSEN: Objection: form, foundation.

A. No. I don't know who they are.

Q. Back in March of 1998, a person named Romualdo Moreno had been calling the Mozart house. Would that be surprising to you?

MS. ROSEN: Objection: form, foundation.

A. No, I don't remember. I'm not going to answer because I don't remember.

Q. Yesterday we talked a little bit about the name Norma Salazar. Did you ever meet a woman named Norma Salazar?

A. No. I didn't know her, but someone had told me that her name was Norma Salazar.

Q. I'm just asking: Did you ever meet a person named Norma Salazar?

CCSAO COI SUBPOENAS 000596

FILED DATE: 4/8/2022 3:39 PM   98CR1244002

FILED DATE: 4/8/2022 3:39 PM 98CR1244002

ADRIANA MEJIA, 02/05/2021                    Page 58..61

Page 58

A. No.

Q. Did you ever meet someone who you were told was Norma Salazar?

A. No.

Q. And you indicated yesterday that Gabriel had told you the name, Norma Salazar; is that right?

A. Yes.

MR. SWAMINATHAN: Did you get the answer?

THE INTERPRETER: The translator hasn't heard anything.

MR. SWAMINATHAN: She answered, but I think you missed it. Go ahead, Ms. Mejia.

THE REPORTER: The court reporter got a yes.

MR. SWAMINATHAN: The court reporter got a yes; so we can keep going.

Q. So have you ever told anyone else the name Norma Salazar?

MS. ROSEN: Objection, form.

A. Yeah. I think to my husband, I said that the little one that I was watching was Norma Salazar.

Q. Did you tell anybody else about Norma Salazar?

MS. ROSEN: Objection: form, foundation.

A. I don't remember.

Page 59

Q. Weren't you telling everybody at that time when you came home with the little boy that that was Norma Salazar's boy?

A. I don't remember that.

Q. When you were saying the name "Norma Salazar" to others, you knew that that was a lie, right?

A. Yes.

Q. Did you ever mention Norma Salazar to the police?

A. Yes.

Q. When you told police about -- you told the police that Normal Salazar -- strike that.

You told the police that the little boy belonged to Norma Salazar; is that right?

A. Yes.

Q. When you told them that, it was a lie, right?

A. Yes.

Q. At the police station, were you ever shown any photos of anybody the police believed to be Norma Salazar?

A. They showed me a lot of women in a line.

Q. This is women who were in person, live, when

Page 60

they showed you?

A. They were behind a glass. They were people arrested for things. I don't know.

Q. Before that, were you ever shown any photographs?

A. I think so.

Q. Were you asked, when you looked at photos, to pick out a person who was Norma Salazar?

MS. ROSEN: Objection, form.

A. The truth is I no longer remember.

Q. Tell us what you remember about being shown photos.

A. The truth is I no longer remember a lot.

Q. Did you look at any of the photos and select a photo of any one of the people?

A. I don't remember.

Q. After that at some point, did you see a lineup?

MR. ENGQUIST: Objection: form, mischaracterizes previous testimony.

MS. ROSEN: Foundation after that.

MR. SWAMINATHAN: Let me reask it.

Are you okay, Ms. Mejia?

THE WITNESS: I need to go to the lady's

Page 61

room. Can I?

MR. SWAMINATHAN: Let's take a break.

THE VIDEOGRAPHER: We are off the video record at 11:15 at the end of media unit 2.

(Recess in proceedings from 11:15 to 11:45 a.m.)

THE VIDEOGRAPHER: We are back on the video record at 11:45 at the beginning of media unit 3.

MR. SWAMINATHAN: Ms. Mejia, are you able to go forward right now?

THE WITNESS: Yes.

MR. SWAMINATHAN: You indicated earlier that you were feeling a little dizzy. Are you fine now?

THE WITNESS: Yes. I ate something sweet. I'm okay.

MR. SWAMINATHAN: If you need to stop once again, just tell us, and we can stop. Okay?

THE WITNESS: Very well. Yes.

BY MR. SWAMINATHAN:

Q. I asked you earlier about the name Moreno. There's one question I forgot to ask you.

A. The truth is I don't know who they are.

Q. Sitting here today, do you know anyone who goes by the name Moreno?

CCSAO COI SUBPOENAS 000597

FILED DATE: 4/8/2022 3:39 PM  98CR1244002

Page 62

A.  No. I don't know.

Q.  Okay. I was asking you about Norma Salazar. You described viewing a lineup at the police station, right?

A.  Yes.

Q.  How many people were in the lineup that you viewed?

A.  10 or 12.

Q.  Did you identify any of them?

A.  No.

Q.  Did any of them look familiar to you?

A.  No.

Q.  Where were you when you viewed the lineup?

A.  Detective Guevara took me to a small room. Yes, a small room, but I don't remember if it was the first floor or the basement.

Q.  And where were the people that you were viewing in the lineup?

A.  They were in a room that had a -- I could see them, but they could not see me.

Q.  And the person with you was Detective Guevara, did you say?

A.  Yes.

Q.  Were there any other police officers with

Page 63

you?

THE INTERPRETER:  Translator asks can you repeat that, sir?

Q.  Were there any other police officers with you?

A.  I don't know if it was a man or a woman that had --

THE INTERPRETER:  Translator couldn't make out what she said about the handcuffs. Can I ask her?

MR. SWAMINATHAN:  Please.

A.  They had my hands handcuffed behind me, but I don't remember if it was a man or a woman that was taking me.

Q.  When you went in and actually viewed the 10 to 12 people in the lineup, was anybody there other than Detective Guevara?

MS. ROSEN:  Objection, form.

A.  At the entrance door, there was -- there was a guard at the door, and at the other exit, another guard and, at the door to get to the people on the lineup, another guard.

Q.  You viewed photos on that same day, right?

MR. ENGQUIST:  Asked and answered. Mischaracterizing her previous testimony.

Page 64

MR. SWAMINATHAN:  Go ahead.

A.  I think so.

Q.  How many photos were you shown?

A.  A lot of different people.

Q.  Can you describe what kind of photographs they were?

A.  They were like done in lapiz. They were pencil. It was as if someone had made a picture, but it was faces of people.

Q.  Are you describing a drawing?

A.  They were photos that they already had. They had a lot of them.

Q.  Were they Polaroids?

A.  Pardon me?

Q.  Do you know what Polaroid photos are?

THE INTERPRETER:  Translator would like to say:  Can I change the word "Polaroid" to something else to make her understand?

MR. SWAMINATHAN:  Yes.

A.  No. It was like as if someone had done them.

Q.  Were you shown the photos before or after you saw the lineup?

A.  I don't remember.

Page 65

Q.  When you say you were shown a lot of photos, was it more or less than ten?

A.  There were a lot of them. It was more like -- more than 20.

Q.  And where were you when you were shown those photos?

A.  With Detective Guevara in a room that had a --

THE INTERPRETER:  Translator wants to say she's coming in and out. I see her mouth moving. I don't hear anything. Then I'll hear it way later. That's why I'm having trouble putting together her last two sentences.

MR. SWAMINATHAN:  Try again. Can you ask her to answer it again and try to translate?

A.  Detective Guevara took me to a room where they had a lot of cabinets filled with papers. There was a lot of other things I no longer remember. But it was one of their offices. It was an office of one of them.

Q.  Was there anybody there other than you and Detective Guevara?

A.  I think so, but they were doing other things. The truth is I don't remember a lot, but I

CCSAO COI SUBPOENAS 000598

Page 66

believe so.

Q. I'm showing you a document that was marked as Exhibit 7 to your prior deposition. It's Bates stamped RFC Solache Reyes 207.

Ms. Mejia, is this person familiar to you?

MS. ROSEN: Object to the form.

A. I don't remember.

Q. Have you ever seen this picture before?

MS. ROSEN: Objection, form. She saw it at the last deposition.

A. I don't remember.

Q. Were you shown a photograph of this woman when you were at the police station in April of '98?

A. I don't remember. There were a lot of photographs. The truth is I don't remember.

Q. Were the photographs that you saw -- were they pages like this?

A. No. They were like when people do photos with a pencil, doing the face with a pencil.

Q. What do you mean it was like people doing it with a pencil? Does that mean it was a photo or a drawing?

A. Like when they do someone's -- like a face or a profile with a pencil.

Page 67

Q. Did it look like something taken with a camera?

A. No. They were photographs on a piece of white or blank paper --

THE INTERPRETER: Translator is not sure which because it means both.

A. -- but done with a pencil.

Q. So what you saw were pictures that looked like they were made with a pencil and not a camera; is that right?

A. It's different. I don't remember this photograph.

Q. I'm asking you a different question. What you were shown -- strike that.

If I understand you correctly, what you were shown were pictures created using a pencil and not a camera; is that right?

A. Yes, they were. They were from pencil.

Q. All right. When you were shown those pictures created by a pencil, did you pick any of them out?

A. I don't think so.

Q. Did any of them look familiar?

A. No.

Page 68

Q. Were you ever shown a single photograph taken by a camera of a woman?

A. I don't remember.

Q. When you were shown -- when Guevara showed you the pictures, what did he tell you he wanted you to do?

MS. ROSEN: Objection, form.

A. The truth is I don't remember.

Q. Did he tell you why he wanted you to do a lineup?

A. No, I don't remember why.

Q. When you were viewing the photos, was it your understanding that you were supposed to be identifying Norma Salazar?

MS. ROSEN: Objection, form.

A. It's been a lot of years, and I no longer remember.

Q. When you were shown a lineup, was it your understanding that you were to try to identify someone from the lineup who was Norma Salazar?

MS. ROSEN: Objection, form.

A. Yes, but I don't remember -- I don't remember a lot.

Q. I'm showing you a document that we'll mark

Page 69

as Plaintiff's Exhibit 1 to this deposition. This is RFC Solache Reyes 233 through 253. And it's Area 5 Supplementary Report, Cleared Closed Report.

The report states that a "Detective K. McDonald searched the ICAM database and located a woman named Norma Salazar." The report then states "A photo of this Norma Salazar was shown to Adriana Mejia, who identified her as being the woman who gave her the children."

Is that statement true or false?

MS. ROSEN: Objection: form, foundation.

A. False.

Q. What part of it is false?

MS. ROSEN: Objection, form.

A. I don't remember having said that.

Q. You don't remember having said what?

A. What you read to me at first.

Q. Which part did you not say?

MS. ROSEN: Objection, form.

Q. Let me try another way.

Ms. Mejia, where it says that you identified the photo of Norma Salazar as being the woman who gave you children, is that false?

MS. ROSEN: Objection, form.

CCSAO COI SUBPOENAS 000599

FILED DATE: 4/8/2022 3:39 PM    98CR1244002

FILED DATE: 4/8/2022 3:39 PM   98CR1244002

Page 70

MR. SWAMINATHAN: Go ahead.

A. False. I didn't say that.

Q. Did you identify anyone from a photo as being the woman who gave you a child?

A. No.

Q. So is what is written here by the police a lie?

MS. ROSEN: Objection, form.

A. I didn't say that.

Q. So the police wrote something that you didn't say; is that right?

MS. ROSEN: Objection, form.

A. How am I going to answer that if I didn't say that?

Q. That's what I want to understand. The information written here, what you're saying is this did not happen. So what the police wrote is not true, right?

MS. ROSEN: Objection, form.

A. How was I going to know what they were putting down if I didn't know what they were speaking? I didn't speak English.

Q. Understood. All right. We talked yesterday about the phone calls. Strike that.

Page 71

We talked yesterday about the phone that was at the Mejia house, right?

THE INTERPRETER: The translator didn't hear anything.

A. Can you repeat the question, please?

Q. Yeah. Who would you call from the phone at the Mejia house? Who would you make calls to?

A. My parents in Mexico, Estoria Mejia, sometimes Marisa Mejia in Texas, Estoria Mejia. Mostly using it to speak -- to call my parents in Mexico.

Q. Who were the people who would regularly call you at the house?

A. The lady whose children I watched. Sometimes Jose Mejia would call me. Estoria Mejia. Javier Mejia to see if I would take care of the kids. Rosalinda Mejia sometimes. I don't remember who else called me.

Q. What was the name of the person whose kids you babysat?

A. Just Graviella Sanchez, Jose or his wife to watch his children, and Javier Mejia. I would watch his little boy.

Q. Was Rosauro close with Javier Mejia?

Page 72

A. No.

Q. Was Rosauro close with Jose Mejia?

A. No.

Q. Would Javier Mejia call the house to talk to Rosauro?

A. Almost never.

Q. Would Jose Mejia call the house to talk to Rosauro?

A. He does sometimes, when he has to fix his car.

Q. Fix whose car?

A. Either Jose's or my husband's. Sometimes to clean them or put in stereos.

Q. Jose would do that, and he would be calling Rosauro for help?

A. Sometimes, yes.

Q. Would Jose ever call to borrow Rosauro's car?

A. Jose?

Q. Yeah, Jose.

A. No. I don't think ever.

Q. What about Javier Mejia? Would he -- strike that.

Would Rosauro Mejia lend his car to other

Page 73

people?

A. Yes.

Q. Who would he lend his car to?

A. His brothers.

Q. Anyone else?

A. Sometimes. Or a lot of times, he would lend it to Gabriel Solache. I'm not sure, but to Martin Vaca also. I don't remember to who else.

Q. Okay. Was the first time you met Arturo Reyes when he moved into the Mozart house?

A. Yes.

Q. You never met him before he moved in, right?

A. Yes.

Q. He had his own room, right?

A. No.

Q. Did he share a room?

A. No. He shared the living room with my brother, with Gabriel. And he also shared it with a guy named Daniel, but he went to Los Angeles.

Q. Arturo had some family that lived nearby, right?

A. No. He just had his sister-in-law, Carmen.

Q. And he would spend time over at Carmen's house, right?

Page 74

THE INTERPRETER: Translator asks are you saying "he" or "she" would?

Q. Arturo would spend time at Carmen's house, right?

A. I wouldn't know what to tell you.

Q. Did Arturo work?

A. I think so.

Q. He worked a lot, right?

A. I think so. Although sometimes he didn't work because his job -- I think he was laid off. I don't remember.

Q. And when we wasn't at work, he would regularly spend time away from the house with others, right?

MS. ROSEN: Objection: form, foundation.

Q. He didn't spend much time at the house on Mozart, right?

MS. ROSEN: Objection, form.

A. I don't remember.

Q. Is it fair to say that you barely knew Arturo Reyes?

MS. ROSEN: Objection, form.

A. Very little. Very little. I lived with him very little or interacted with him very little.

Page 75

Q. And other than just saying hello to each other, did you ever have any other conversation?

A. Yes, when we would eat together.

Q. What would you talk about with him?

A. Food. And he would talk about his family in Mexico. But very little.

Q. Fair to say he was not someone that you would confide in?

A. Correct.

Q. He wasn't someone you looked to for support, right?

A. Correct.

Q. And he wasn't someone you would share your personal secrets with, right?

A. Yes.

Q. Who were the people you would share your personal secrets with? Who were you close enough to?

A. With no one. Until the present day, no.

Q. Did she say present day?

THE INTERPRETER: The interpreter understood "hasta la fecha" meaning until the present day. But then there was a word or two behind that. And another noise came in, and I couldn't actually make out if it was her or someone else.

Page 76

Q. Back in March of 1998, who would you share your personal secrets with?

A. With no one.

Q. After your arrest, did you ever talk to Arturo Reyes?

A. No. But I remember he sent me a letter. I think it was when I was still in Dwight, in prison.

Q. Let me come back to the letter. You and Arturo Reyes never spoke after you'd been at the police station and arrested, right?

MR. NOLAND: Object to form.

A. When we were arrested, when we were going to court together, yes, we would speak.

Q. What would Arturo say to you when you were going to court?

A. Very basic, like how I was.

Q. Anything else?

A. I remember, one time, I asked him about his family. Very basic.

Q. Other than when you saw him on the way to court, did you have any other conversations with Arturo Reyes?

A. No.

Q. And you said he sent you one letter?

Page 77

A. No. He sent me a letter.

Q. And what did he say in the letter?

A. It was written by a person, but I don't know who the person was. But yes, it said it was Arturo Reyes.

Q. So the letter was from him or someone else?

A. No. It was from him because it was from when I found out that he was in -- I don't remember the name of the place where he was incarcerated, but he told me where he was.

Q. What did the letter say?

A. He spoke about how he was. Through this, I don't remember much.

Q. Other than telling you how he was doing, did the letter say anything else?

A. Truth is I don't remember.

Q. Did you have any other communications with Arturo Reyes after you were charged with the crime other than the one letter he sent you and the communications on the way to court?

A. No.

Q. Arturo Reyes has never threatened you, correct?

A. No.

CCSAO COI SUBPOENAS 000601

FILED DATE: 4/8/2022 3:39 PM 98CR1244002

Page 78

Q. Is that correct?

A. Yes.

Q. He's never promised you anything, correct?

A. No. But on an occasion when we were in jail, everything was going to be okay, that I should be strong. What else did he tell me? Trying to think. He told me that I should pray a lot, that I should have a lot of faith, I think. And I don't remember what else he told me.

Q. Arturo Reyes was a religious person, right?

A. Well, the truth is I don't know.

Q. So he never promised you anything in any communications you had with him, right?

A. I don't remember.

Q. After you were arrested, did you have any communications with Gabriel Solache?

A. Yes.

Q. When did you have -- let me ask you any conversations you had. Did you ever have conversations or speak to Gabriel Solache after you were charged with this crime?

A. I don't remember. I don't think so.

Q. So the only communication you had with Gabriel since you were charged with this crime were

Page 79

letters; is that right?

A. Except when we went to court.

Q. Okay. So the only communications that you had with Gabriel since this happened were letters and when you saw him before court, correct?

A. Yes.

Q. What did he tell you when you would talk to him before court?

A. What didn't he tell me?

Q. What did you tell him?

A. For example, when we were close to the -- what are they called?

THE INTERPRETER: Translator can't make out the word she's using. I think she's saying something in English, but I can't make it out.

MR. SWAMINATHAN: Bullpen.

THE INTERPRETER: Oh, the bullpen?

A. He would tell me to show him, like, my chest, that he was going to show me his intimate, his private parts. He would tell me a lot of gross things.

Q. Anything else that he would say to you or tell you when you were in the bullpen?

A. That I was going to have everything on me

Page 80

and he was not going to keep taking the blame.

Q. Did he tell you that he didn't want to take the blame for what happened?

A. Yes, he said it.

Q. And what would you say to him? Did you ever -- strike that.

Did you ever tell him that you were sorry for what happened?

A. I always said that everything we had done was -- it's difficult for me to say it.

Q. Did you ever tell him that you were sorry for what had happened to him?

MR. NOLAND: Objection, form.

A. Yes. One time, on one occasion, I told him I was sorry for everything that was happening when he lost his dad.

Q. When was that?

A. Because he was in jail and he couldn't be with his dad.

Q. Other than that, was there any other time you told him you were sorry for what had happened to him?

A. I always felt bad. Yes, I think so.

Q. Did you ever tell him it was your fault?

Page 81

A. No.

Q. Did you ever, in letters, write to him and tell him that it was your fault?

A. I don't remember.

Q. Well, is that something you would have ever written?

MS. ROSEN: Objection: form, foundation.

A. The truth is I no longer remember.

Q. So it is possible that you wrote to him and told him that it was your fault what had happened?

MS. ROSEN: Objection, form.

A. I don't remember if I wrote. It's been a lot of years. Truth is I don't remember. He also wrote me telling me a lot of things; but unfortunately, when I came here, I lost those letters.

Q. When you were -- strike that.

Anything else that you can remember Gabriel Solache saying to you or doing when you would see him going to court?

A. When we were going to court, yes, he would say a lot of things to me.

Q. But you told me some things that he told you. You told me that there were things he would say that were of a sexual nature, right?

CCSAO COI SUBPOENAS 000602

FILED DATE: 4/8/2022 3:39 PM   98CR1244002

ADRIANA MEJIA, 02/05/2021

Page 82..85

Page 82

THE WITNESS: Give me a minute, please?

MS. SINGER: Are you okay?

THE WITNESS: He was asking me if I needed a break.

MR. SWAMINATHAN: You okay to go on?

THE WITNESS: Yes.

MR. SWAMINATHAN: We plan to stop in, like, 15 minutes, and maybe you can get some more food. Okay?

THE WITNESS: Okay. Thank you.

BY MR. SWAMINATHAN:

Q. You told us that in the bullpen, when you saw Gabriel, he said some things to you of a sexual nature, right?

A. Yes.

Q. And he told you some things about -- and he told you that you were the one who was going to be responsible, right?

A. Yes, he said that to me.

Q. Did he say anything else? Did he say anything else -- anything else you remember that he told you in the bullpen other than those two things?

A. Yes. He said to me -- I remember well the words that he said to me when he told me that, if I

Page 83

would have paid attention, if I would have preferred him as a boyfriend when I was a girlfriend of my husband, my husband's girlfriend -- he said it had been my fault, and he asked me why hadn't I chosen him as a boyfriend? All the things would have been different if I had.

But I didn't love him. And then he told me I had to pay for a lot of things. (Unintelligible.) He probably hadn't said all of that.

MR. SWAMINATHAN: I didn't understand the last part.

A. When my husband and him fought, it always ended up, like, a little bit -- he's always been a little bit gross, like a bully.

Q. Anything else? So he had some conversations with you about your past and about wanting to have a romantic relationship with you; is that right?

A. Yes.

Q. Anything else that you remember him talking to you about in the bullpens?

A. I don't remember a lot of things.

Q. Other than what -- so we've talked about some comments of a sexual nature, your past, and that you were the one to take the blame. Those are all the

Page 84

topics you can remember talking about in the bullpen, correct?

MS. ROSEN: Object to the form. Sorry, go ahead.

(Question was translated.)

MS. ROSEN: Object to the form.

A. Correct.

Q. Now, let me ask you about -- have you kept copies of any letters that Gabriel Solache sent you?

A. Unfortunately, no. When they moved me here, I lost a lot of things.

Q. And you sent letters to Gabriel Solache too, correct?

A. Yes.

Q. What would you tell Gabriel Solache in the letters you wrote him?

A. Truth is I no longer remember.

Q. Did you and Rosauro ever get divorced?

A. As far as I know. I didn't sign the papers. The person who signed the papers was my mom.

Q. So you are divorced from Rosauro?

A. I think so.

Q. When did that happen?

A. The truth is I don't know. I ended up

Page 85

finding out about things a lot later.

Q. Do you know if he has remarried?

A. Yes, he's married. He has children, but I don't know a lot.

Q. When did you last speak to him?

A. A week after I was imprisoned.

Q. Were you in Cook County Jail?

A. Yes.

Q. And he came to visit you?

A. No. He couldn't come in because he didn't have papers.

Q. So you didn't get a chance to speak to him then?

A. No.

Q. So has he ever come to visit you from the time that you were charged for this crime?

A. No.

Q. Do you still love Rosauro?

A. I don't think so.

Q. When you were living together in the United States, were you still in love with Rosauro?

A. Yes.

Q. Was there a point when -- strike that. At what point did you stop feeling in love with Rosauro?

Urlaub Bowen & Associates, Inc. 312-781-9586

CCSAO COI SUBPOENAS 000603

FILED DATE: 4/8/2022 3:39 PM 98CR1244002

Page 86

A. I don't know how to explain it. The truth is I don't know.

Q. What was your relationship like with Rosauro when you were living together in the United States?

A. It was not a very -- not a lot of trust because he drank a lot. He went out a lot because he would always listen to his brother, Horacio. I think that -- I don't know.

Q. What would Horacio want him to do that made you unhappy?

A. It would bother me because he would take him on Friday until very late, and they would drink a lot.

Q. What other things would Rosauro do with Horacio that bothered you?

A. He would say to my husband that he was a wuss. Why would he allow himself to be dominated by his wife?

Q. What else?

A. If they were going to go to any place, they would have to all go together. Horacio would say, "I want to go to this place. I want to go all together." And they would all go together.

Q. When you say "they," who would that be? Horacio and Rosauro?

Page 87

A. All of his brothers.

Q. It sounds like he and his brothers would often go out drinking, right?

A. Yes.

Q. Where else would they go?

A. I think to bars.

Q. Anywhere else?

A. The truth is I wouldn't know where else they would go.

Q. Would Rosauro ever take you with him to the bars?

A. No. I never went to a bar.

Q. Did you have any concerns that Rosauro was seeing other women?

MS. ROSEN: Objection: form, relevance.

A. I don't know.

Q. You said that you and Rosauro would argue; is that right?

A. Yeah. We argued a lot.

Q. And one of the things you argued about was him listening to Horacio all the time, right?

A. Yes.

Q. What else would you argue about?

MS. ROSEN: Objection. I'm sorry. I'm

Page 88

going to object to all of this detailed questioning about the relationship between Adriana and Rosauro as being not relevant, but I don't want to keep interrupting.

MR. SWAMINATHAN: You can have a standing objection.

MS. ROSEN: I have a standing objection. Thank you.

MR. SWAMINATHAN: Go ahead.

THE WITNESS: I've forgotten the question.

Q. Other than Horacio, what are the other things that you and Rosauro argued about?

A. Because I didn't ask my brother to pay the rent or the food. When I sent money to my parents. When a lot was spent on the telephone.

Q. Anything else?

A. It bothered me because he insulted me a lot.

Q. How did he insult you?

A. Because he would make me feel ashamed when we would be walking in the stores. He would call me a "bandeja."

THE INTERPRETER: The translator wants to say that's an insult in Mexican.

Q. What other insults would he use?

Page 89

A. I no longer remember a lot.

Q. Was he ever abusive toward you?

A. Not as far as I can remember. Just twice he hit me in the face.

Q. This is while you were living in the Mozart?

A. No. Once in Mexico and once when we lived on 51st.

Q. Did you call the police?

A. No.

Q. Had he been drinking when -- the first time he hit you, had he been drinking?

A. No.

Q. And had you had a fight that caused that?

A. Yeah. We argued about something, but I don't remember why.

Q. The second time when he struck you, had he been drinking?

A. I think so.

Q. Do you know what -- what were you arguing about when he hit you?

A. I believe it was because he was going to go with his brother Horacio.

Q. And you didn't want him to go?

A. Yes.

CCSAO COI SUBPOENAS 000604

FILED DATE: 4/8/2022 3:39 PM 98CR1244002

Page 90

Q.  In March of 1998, you and Rosauro were still living together in the Mozart house, right?

A.  Yes.

Q.  And you shared a bedroom, right?

A.  Yes.

Q.  And he would sleep at that house, right?

THE INTERPRETER:  The translator asks can you repeat that?  He or she?

MR. SWAMINATHAN:  He.

Q.  Rosauro would sleep at that house at Mozart?

A.  Yes.

Q.  And would you sleep in the same bed?

A.  Yes.

Q.  I'm sorry to ask a very personal question, but were you guys still -- were you still sexually active?

A.  I don't have to answer.  I want to stay quiet.  That's private.

Q.  I fully appreciate why you don't want to answer it.  I know it's a very personal question, but it is very much relevant to this case.  We're allowed to ask you.  After I ask you this question, I won't spend time on it.

Were you and Rosauro Mejia still sexually

Page 91

active at that time?

A.  Yes.

Q.  And that was up to the time that you had been arrested?

A.  Yes.

Q.  Were you still trying to have children up to the time that you were arrested?

A.  Yes.

MS. ROSEN:  Objection, form.

MR. SWAMINATHAN:  Did you get the answer?

THE INTERPRETER:  Yes.

Q.  When you and Rosauro were sexually active in the months before your arrest, were you hoping to get pregnant?

A.  Yes.

Q.  Was he also hoping to get pregnant?

MS. ROSEN:  Objection:  form, foundation.  At what point in time?

MR. SWAMINATHAN:  Go ahead.

A.  He didn't pay a lot of attention to my things.

Q.  You wanted to have children, correct, at that time in 1998?

A.  Yes.

Page 92

Q.  Did he want to have kids?

A.  Yes.

Q.  How long had the two of you been trying to have kids?

A.  Me, always.  But that's why we had the arguments we had sometimes.

Q.  Some of the arguments were about trying to have kids?

A.  Yes.

Q.  What were you arguing about?

A.  (No response.)

Q.  I'm sorry, Ms. Mejia.

A.  I don't want to answer.

Q.  Let me just ask this.  You indicated that you had both wanted to have kids.  So what were you arguing about?

A.  It was because he blamed me and that I wasn't worth anything as a woman.

Q.  Because you weren't able to have a child?

A.  Yes.

Q.  And how long was it that you had been trying with Rosauro and had not been able to have a child?

A.  The truth is I don't remember, but for a long time.

Page 93

Q.  And you indicated that you were trying all the way until you were arrested, correct?

A.  Yes.

Q.  How many years before that had you been trying?

A.  The truth is I don't remember.

Q.  Was it multiple years?

A.  Like three, four years.

Q.  And for how long had you been getting testing to see if you had any medical issues that prevented you from having kids?

A.  Every month.

Q.  Starting when?

A.  The truth is I no longer remember that.

Q.  Was it for multiple years that you were getting testing?

A.  Yes.

Q.  Was Rosauro also going in for testing to see if he could have kids?

MS. ROSEN:  Objection, form.  Go ahead.

A.  Only on one occasion.

Q.  What did he do on that occasion?

A.  He went into a room with a nurse.  I think that the nurse gave him a small glass and then said

CCSAO COI SUBPOENAS 000605

FILED DATE: 4/8/2022 3:39 PM  98CR1244002

ADRIANA MEJIA, 02/05/2021 Page 94..97

Page 94

that he had to put his sperm in there.

Q. So when was it that he went in and did this, gave sperm?

A. I no longer remember the dates or the years.

Q. How close in time was it to when you were arrested?

A. It would be like three years before.

Q. And then after that, you continued to get testing; is that right?

A. Yes.

Q. Was he cooperative in helping you try to get testing?

A. Yes. But he never went to the consults with me.

Q. I thought he -- didn't he sometimes drop you off and then come into the waiting area?

A. Yes. Sometimes he'll wait for me there, or sometimes he'll wait for me in his car.

Q. Was it ever requested that he do additional testing?

A. I don't remember.

MR. SWAMINATHAN: I said we would take a pause actually a little bit before this; so why don't we take a break now?

Page 95

THE INTERPRETER: Translator would like to say I was told that someone would be there by 1:00 to replace me.

MS. MADRIGAL: Yes. I logged on at 1:00.

THE VIDEOGRAPHER: We're off the video record at 1:05 at the end of media unit 3.

(Recess in proceedings from 1:05 to 1:31 p.m.)

THE VIDEOGRAPHER: We're back on the video record at 1:31 at the beginning of media unit 4.

MR. SWAMINATHAN: Adriana, I want to move to other topics.

BY MR. SWAMINATHAN:

Q. In March of 1998, Rosauro was working, correct?

A. Yes.

MR. SWAMINATHAN: The interpreter is on mute.

MS. MADRIGAL: I am so sorry. Also, I do need to be sworn in.

(Interpreter sworn.)

A. Yes.

Q. Where was he working?

A. A cardboard factory near Franklin Park.

Page 96

Q. How much was he making per week or per month?

A. Honestly, I don't remember anymore.

Q. Were you working at that time?

A. No. I've never worked.

Q. How much were you paying in rent for the apartment?

A. Honestly, I don't recall because everybody paid the rent. So honestly, I don't recall how much we paid.

Q. Would Rosauro send money back to Mexico to his family?

A. No, because his mother lived here for some time.

Q. In the US in March of 1998?

A. For some time because she returned to Mexico in '98.

Q. Did she return to Mexico before or after you were arrested?

A. Before.

Q. Were you sending money back to your family in Mexico?

A. Sometimes.

Q. How often would you send money back?

Page 97

A. Not often.

Q. When you say "not often," do you mean once a month, once a year? Give us a sense.

A. I would send her for holidays, for mother's day, Christmas, because my ex-husband was putting money together for a house for us in Mexico.

Q. Were you and Rosauro hoping to move back to Mexico?

A. Yes.

Q. When you were sending money back to Mexico, how much would you send each time?

A. My ex-husband would send money to his brother Clemente because he was building the house. I believe it was $1,000 every two months, I believe.

Q. Were you and Rosauro -- other than the -- after the money that you were sending back regularly and the rent and everything else, were you and Rosauro able to save money while were living in the US?

MS. ROSEN: Objection, form.

MR. SWAMINATHAN: Go ahead.

A. Not really.

Q. Did you have a bank account?

A. No.

Q. Did you keep all of your money in cash?

Urlaub Bowen & Associates, Inc. 312-781-9586

CCSAO COI SUBPOENAS 000606

FILED DATE: 4/8/2022 3:39 PM 98CR1244002

ADRIANA MEJIA, 02/05/2021                                    Page 98..101

Page 98

A. Yes.

Q. And how would you describe the overall financial situation for you and Rosauro in 1998?

A. Not very good.

Q. Would you say you did not have enough money at that time?

MS. ROSEN: Objection, form.

MR. SWAMINATHAN: Strike that. I'll withdraw it.

Q. Between you and Rosauro, was one of you in charge of the money?

MS. ROSEN: Objection, form.

MR. SWAMINATHAN: Go ahead.

A. For the most part, he kept the money.

Q. And if you needed money to buy things, how would you get the money?

A. I would have to ask him for it.

Q. So when you needed money to buy things, basically you would ask him for the money, and he would give it to you; is that right?

A. Yes.

Q. Would he ever give you extra money just to have around for yourself?

A. Sometimes when he had some left over.

Page 99

Q. How much would he give you when he was giving you extra money?

A. Maybe about 50 or $100.

Q. In March of 1998, did you have your own money that you were collecting outside, or were you depending on Rosauro?

A. By that time, I was babysitting for a boy.

Q. How much money were you making doing that?

A. I believe $30 or $50. I really don't recall.

Q. How often would you get that money?

A. Every week.

Q. And other than that, did you have any other money you were making separate from Rosauro?

A. When my brother Carlos would have me put money away that was his, I would save it for him.

Q. So Carlos was having you hold on to some of his money?

A. Yes, so that I could send money back to my mother from his money.

Q. So when you were making money from the babysitting, was that money that you would keep or that you would give to Rosauro for the two of you to use for the family?

Page 100

A. No. I would leave it for me.

Q. So would you use that money to buy things that you needed?

A. Sometimes I would buy things that I needed or things for the house.

Q. And when you said your overall financial situation was not good, does that mean you didn't have a lot of extra money lying around?

MS. ROSEN: Objection, form.

MR. SWAMINATHAN: Go ahead.

A. Perhaps you can say that I didn't have a lot of money, but maybe $10. I would save those.

Q. So you would sometimes have for yourself, you know, $10, $20, things like that; is that right?

A. For the most part, I almost always had a little bit of money.

Q. And then if you needed more than that, you would have to ask Rosauro; is that right?

A. Yes.

Q. And if you needed hundreds of dollars, you would have to ask Rosauro; is that right?

A. Yes.

Q. And if you took hundreds of dollars -- well, strike that.

Page 101

Did Rosauro have hundreds of dollars lying around the house?

A. No, because he had things with his sister-in-law Rosalinda that would put money away. They had like a little savings plan going.

Q. So you didn't have access to that?

A. Yes.

Q. How would you access that? You would have to ask him or Linda?

A. No. It's because it was like a savings with numbers that everybody would put in. When it was your number, then you would get the entire amount.

Q. How much would that be?

A. Sometimes it was 1,200, sometimes $1,000

THE INTERPRETER: Counsel, can we go off the record for a second?

MR. SWAMINATHAN: Yes.

THE VIDEOGRAPHER: Off the record at 1:44.

(Pause in proceedings.)

THE VIDEOGRAPHER: We're back on the video record at 1:46 p.m.

BY MR. SWAMINATHAN:

Q. Did you ever get the money from the tanda?

A. Yes. For the most part, I would receive it.

CCSAO COI SUBPOENAS 000607

FILED DATE: 4/8/2022 3:39 PM   98CR1244002

ADRIANA MEJIA, 02/05/2021                                    Page 102..105

Page 102

Q. When did you get the money from the tanda.

A. When it was his turn, it was his number, I would pick it up. I would take the money.

Q. When you say "his turn," do you mean Rosauro?

A. Yes.

Q. When was the last time that Rosauro had won the money in the tanda?

A. Sometime close to in March, around the time of my case.

Q. When you got that money from the tanda, did you and Rosauro use it for any family reasons or any family purpose?

A. No, because I picked up the money, and I kept the money that time.

Q. What did you do with that money?

A. I saved it for some time; and then he would ask me, and I would tell him that his money was there.

Q. So you never used that money. You gave it to Rosauro?

THE INTERPRETER: Sorry?

Q. So you said you were holding on to that money; is that right?

A. Yes, but I was also in a tanda. And from

Page 103

what little I was getting, I put my own money together.

Q. You were in a different tanda?

A. It was the same one; but he had a number, and I had a number.

Q. Okay. But the money that Rosauro got from the tanda, you kept that money for the family, right? You're not saying you spent it?

A. Yes.

Q. So that money from the tanda never got spent, right?

A. No.

Q. You didn't spend it on something for yourself, right?

A. Not that I recall.

Q. If you did, would Rosauro have noticed?

A. Yes.

Q. Would he have been upset?

A. Yes.

Q. If you had taken, you know, hundreds of dollars from that money that Rosauro and you had saved, would he have noticed?

A. Of course.

Q. If you took hundreds of dollars that Carlos

Page 104

had given you to send to Mexico, would he have noticed?

A. Yes.

Q. I'm going to ask you about cars. Back in 1998, did you drive?

A. No. Until present day, I don't know how to drive.

Q. And you said that Rosauro had a car, right?

A. Yes.

Q. Did he have more than one car?

A. He would buy and sell. So he had different cars.

Q. In March of 1998, near the time you got arrested, did he have more than one car?

A. Just one.

Q. And can you describe that car?

A. I don't know about cars.

Q. What color was it?

A. Honestly, I don't recall the color anymore.

MR. SWAMINATHAN: Let me show you a document. This is RFC Solache Reyes 44. And I apologize. I did not mark this as an exhibit. It didn't get included, but it's a document everyone is familiar with. My apologies.

Page 105

MS. ROSEN: You mean you haven't exchanged it as an exhibit?

MR. SWAMINATHAN: Yeah. We'll send a copy of this exhibit over to the court reporter and everybody so we have it. I'll identify it for the record.

MS. ROSEN: Can we mark it as whatever number? I think you started with your own numbering.

MR. SWAMINATHAN: Yeah. So this is Plaintiff's Exhibit 2. It is RFC Solache Reyes 44.

BY MR. SWAMINATHAN:

Q. Ms. Mejia, do you see that this is -- these are two pictures of a car?

A. Uh-huh.

Q. Was this Rosauro's car in March of 1998?

A. Honestly, I don't recall anymore.

Q. Was this the car that was used to go to the Soto home?

A. Honestly, I don't remember anymore.

Q. The car that you used to go to the Soto home, was it the same car that you got picked up in the next day by Rosauro and Guadalupe?

MS. ROSEN: Objection, form.

A. I'm not very sure. I think Gabriel Solache

CCSAO COI SUBPOENAS 000608

FILED DATE: 4/8/2022 3:39 PM   98CR1244002

ADRIANA MEJIA, 02/05/2021                                    Page 106..109

Page 106

had a car, but I don't remember his car either.

Q. Is it your testimony that you don't know what car you were in when you went to the Soto home?

MS. ROSEN: Objection: form, mischaracterizes her testimony.

A. It's been so many years. I don't recall.

Q. When you went to the Soto home, were you in the car that's on Plaintiff's Exhibit 2? Were you in a different car that Gabriel Solache owned, or were you in some other car?

MS. ROSEN: Objection: form, asked and answer. She said she doesn't recall.

MR. SWAMINATHAN: Go ahead.

A. Honestly, I don't recall.

Q. Does this car look familiar to you at all?

MS. ROSEN: Objection, form.

A. Perhaps, but I don't remember anymore.

Q. Did Jose Mejia have his own car?

A. Yes.

Q. Did Horacio Mejia have his own car?

A. Yes. He had a van.

Q. Did Adolpho Mejia have his own car?

A. Yes. He had a very old car, the big ones.

Q. Did Jorge Mejia have his own car?

Page 107

A. Yes. They had a van.

Q. Did Leobardo Mejia have his own car?

A. I don't recall if he had a car or if he didn't have a car on those dates.

Q. Did Carlos Martinez have his own car?

A. When my brother was with me, he didn't know how to drive yet.

Q. As of March of 1998, Carlos Martinez did not know how to drive; is that right?

A. Yes, he didn't know how to drive.

Q. All right. We talked yesterday about the fact that, at some point, you pretended that you were pregnant, right?

A. Yes.

Q. Was there a point in time before that when you actually were pregnant?

A. No.

Q. Was there a point in time before that when you believed you were pregnant?

A. Yes.

Q. Why was it that you believed you were pregnant?

A. Because I didn't have a period.

Q. Did you tell people that you were pregnant?

Page 108

A. Yes.

Q. Did you take a pregnancy test?

A. No.

Q. Did you see a doctor?

A. No.

Q. How long was it that you believed you were pregnant?

A. About two months.

Q. And then, at some point, did you realize you were not pregnant?

A. Yes.

Q. How did you find out?

A. Because I got my period.

Q. And then did you tell anybody the fact that you were not pregnant?

A. No.

Q. And so did you then lie to your family about being pregnant?

A. Yes.

Q. Did you lie to your husband Rosauro Mejia about being pregnant?

A. Yes.

Q. Did you lie to everybody else in the house about being pregnant?

Page 109

A. Yes.

Q. Did you lie to Carlos Martinez?

A. Yes.

Q. Did you lie to your other family members?

A. Yes.

Q. Did you lie to your parents?

A. Yes.

Q. And did you lie to your friends?

A. What friends?

Q. What did you do to make it appear that you were pregnant?

A. Well, no one would pay attention to me.

Q. So you didn't do anything to make it appear that you were pregnant?

A. Yes. I would wear loose clothing, but no one would pay much attention to me.

Q. Other than wearing loose clothing, would you do anything else to make it appear that you were pregnant?

A. No.

Q. Did you ever put anything under your shirt to make it appear that you had a belly?

A. No.

Q. Did you tell people when you were due?

CCSAO COI SUBPOENAS 000609

FILED DATE: 4/8/2022 3:39 PM  98CR1244002

ADRIANA MEJIA, 02/05/2021                                    Page 110..113

Page 110

A. Yes.

Q. Did you lie to them about when you were due?

A. Yes.

Q. Did you pretend to go to doctor's appointments for your pregnancy?

A. Yes.

Q. And would you actually go to a doctor's office, or would you just say that you had gone to a doctor's office?

A. Sometimes I would say that I would go, and sometimes I would just go.

Q. When you would just go, what would you do?

A. I would go and wait in the waiting area at the hospital, or I would walk in the streets.

Q. So sometimes you would go to the hospital and just walk around there?

A. Yes.

Q. And sometimes would you just go to clinics and walk around there?

A. Yes. Sometimes I would go on the streets that I was familiar walking around.

Q. Okay. So sometimes you would walk the streets. Sometimes you would go to the hospital, and then you would go to the clinic. Do I have that

Page 111

right?

A. Yes. I would go on the streets that I was familiar with. I really didn't know how to get around Chicago; so for the most part, I would go around 26th Street.

Q. When you would go to the hospital, which hospital would you go to?

A. The one on 26th Street. What is it called?

Q. Mount Sinai?

A. Yes. Because I knew how to return to the University of Chicago. I believe just there and then a small clinic that was there by the university.

Q. When you would go to the hospital and to the clinic, would you just sit inside and sit in the waiting area?

A. Sometimes I would go inside. Sometimes I would go out to eat something.

Q. Sometimes would Rosauro take you and drop you off at the hospital or the clinic? I'm talking about when you were going to these pretend appointments.

A. Yes. Sometimes he would go in and wait in the waiting area, and I would go into the bathroom or wherever I could; or sometimes he would go outside and

Page 112

wait for me in the car.

Q. Sometimes when he would come in with you, you would go into the bathroom to make it appear like you had actually seen a doctor; is that right?

A. Yes.

Q. In addition to these trips to the doctor's office where you weren't actually there for an appointment, you also had actual fertility appointments that you would go to as well, right?

A. Yes.

Q. And Rosauro would take you to those fertility appointments sometimes, right?

A. Yes.

Q. You said that one of the clinics -- do you remember where the clinic was that you were going to that was near the University of Illinois Chicago Hospital?

A. No. I don't remember the street anymore.

Q. It was just near the hospital? Is that as much as you can remember?

A. Yes. I don't recall.

Q. Would you also go to that location for actual fertility appointments in addition to the pretend appointments?

Page 113

A. Yes.

Q. Would that be 20 South Wood Street? Does that sound familiar?

A. Honestly, I can't -- I don't remember the streets.

MR. SWAMINATHAN: I'm going to show you a map. This is just a Google map that identifies the University of Illinois Hospital at 820 South Wood Street. We'll make this into an exhibit. We'll mark it as Plaintiff's Exhibit 3.

MS. ROSEN: So this is another exhibit that you haven't provided in advance that we need to give to the court reporter? Is that what you're saying?

MR. SWAMINATHAN: No. I'll give this to the court reporter. I just pulled this up on Google maps just a little bit ago.

BY MR. SWAMINATHAN:

Q. So Ms. Mejia, this is -- in the lower right-hand area, it shows where the University of Illinois Hospital is. Do you see that? Are you able to see that, Ms. Mejia? Go ahead.

A. Yes.

Q. And that's the hospital that you said that you were being picked up and dropped off from when you

CCSAO COI SUBPOENAS 000610
FILED DATE: 4/8/2022 3:39 PM   98CR1244002

Page 114

went to the Soto home, right?

A. It's very changed now. I really don't recall.

Q. Okay. When you went to the hospital -- strike that.

When you were referring to the University of Chicago Hospital during the course of your deposition, that's one of the hospitals that you would also go to for your pretend appointments, right?

A. Yes.

Q. And then up here in the center of this picture is 820 South Wood Street, which is one of the University of Illinois Chicago clinics. Does that look approximately like where you would go sometimes to the clinic?

MS. ROSEN: Objection: form, foundation.

A. Honestly, I no longer remember the address. I don't recall the numbers.

Q. The clinic that you would go to, you said that it was near the University of Illinois Chicago Hospital. Was it within one to two blocks, like this map shows?

A. Honestly, I don't remember.

Q. The clinic that you went to, was it on,

Page 115

like, a campus with other medical buildings?

MS. ROSEN: Objection: form, foundation.

A. There were a lot of buildings, and I really don't recall how the streets were.

Q. Let me ask you, when you were going for the pretend appointments to the clinic and to the hospital, would anybody drop you off or take you other than Rosauro?

A. Yes. My brother-in-law Edwiges and, on some occasions, Gabriel Solache.

Q. Anyone else?

A. No. I don't recall.

Q. Were you ever told why you were not able to get pregnant?

A. No.

Q. Did the doctors ever identify any problems that you had in your body that prevented you from being able to have kids?

A. I believe, when I was at Mount Sinai, the doctor said that I didn't ovulate too much.

Q. Did they give a particular reason why you weren't ovulating as much as you should?

A. No. I don't recall them saying anything.

Q. Did they ever tell you there were any

Page 116

problems in your reproductive organs?

A. I don't recall.

Q. Up to the point that you were arrested, had you ever had any serious medical issues during your life?

A. Yes. On two occasions in Mexico, I was sick with my kidneys. And once here in Chicago, I was also sick, and it was from my kidneys.

Q. Did this relate to your diabetes?

A. No. My diabetes was just about -- I'm sorry. My diabetes came about just about 15 years ago.

Q. So what were the issues you were having with your kidneys where you would go to the hospital?

A. Just, like, kidney stones.

Q. Okay. How long were you hospitalized?

A. In Mexico, my parents took me to regular doctors. Here, in Chicago, my husband didn't have money to take me to the doctor; so I had to take, like natural, like pills.

Q. When did that happen that you had this issue in the United States?

A. About three years after I had arrived from Mexico.

Page 117

Q. So what year would that have been?

A. Around '96.

Q. Have you ever been diagnosed with schizophrenia?

A. No.

Q. Have you ever been diagnosed with bipolarism?

A. No.

Q. Have you ever been diagnosed with a manic condition or manic episodes?

A. No.

Q. Have you ever been diagnosed with depression?

A. No.

Q. And you indicated yesterday that you've never tried to commit suicide, right?

A. Yes.

Q. Have you ever had hallucinations?

A. No.

Q. Have you ever had amnesia?

A. Can you explain to me what amnesia is?

Q. Have you ever had a condition where you just -- you lost memory of large periods of time?

A. Oh, no.

CCSAO COI SUBPOENAS 000611

FILED DATE: 4/8/2022 3:39 PM   98CR1244002

Page 118

Q.  Or have you ever had a period where you lost memory of who you were?

A.  No.

Q.  Have you ever lost your consciousness, like been knocked out?

A.  Yes, only when I lost my brother Carlos.

Q.  What happened then?

A.  When I got the news, I went to my room, and I felt my body was numb.  And I just couldn't anymore.

Q.  Did you lose consciousness?

A.  It felt like my body wasn't responding, but my body was tired.

Q.  Have you ever had a stroke?

A.  No.

Q.  Up until the point that you were arrested for the murders, had Rosauro had any serious medical issues?

A.  No.

Q.  Did he have any mental health issues, or was he taking any medications for any mental issues?

A.  No.

Q.  You said that he had had some testing to see -- for fertility.  What were the results of that testing?

Page 119

MS. ROSEN:  Objection to form.  Go ahead.

A.  Honestly, I don't remember anymore what they said.

Q.  I am showing you a document that we'll mark as Plaintiff's Exhibit 4.  It is Bluhm 25519 and 25520.  This was previously marked as Deposition Exhibit 8 to Ms. Mejia's previous deposition.

This document indicates that -- this relates to an appointment at Mount Sinai.  Is that a place where you were going to for facility appointments?

MS. ROSEN:  Objection, form.  Sorry.  Go ahead and translate it.

(Question translated.)

MS. ROSEN:  Objection:  form, foundation.

MR. SWAMINATHAN:  Go ahead.  You can answer.

A.  Yes.

Q.  It indicates that Rosauro Mejia is supposed to go for a sperm analysis; is that right?

MS. ROSEN:  Objection:  form, foundation.

A.  Yes.

Q.  And the date of this is March 18, 1998, correct?

MS. ROSEN:  Objection:  form, foundation.

A.  Yes.

Page 120

Q.  And it indicates that he had an appointment on the eighth floor on March 20, 1998, correct?

MS. ROSEN:  Objection: form, foundation.

A.  Yes.

Q.  So was it March 1998 when Rosauro went for his sperm test?

MS. ROSEN:  Objection:  form, foundation, mischaracterizes the record, misleading.

A.  I honestly don't recall the year.

Q.  So you're not sure?

MS. ROSEN:  Objection:  form, foundation.

Q.  Is that right?  You're not sure whether he had his sperm appointment in March of 1998?

MS. ROSEN:  Objection:  form, foundation, misleading.

A.  No.  I don't recall.  I don't think it was in '98.  It would have been '96 or around '97.

Q.  So you think that he did not -- is it your statement that he did not go for a sperm analysis in March of 1998?

A.  He did go one time, but I don't recall the date.

Q.  Okay.  I want to ask you about your plan for getting a baby, okay?

Page 121

When did you first speak with somebody about your plan to get a baby?

MR. ENGQUIST:  Objection to the form.

MR. SWAMINATHAN:  Go ahead.

A.  When Gabriel found me crying, he's the first person I told.

Q.  And when was that?  What month?

A.  Around -- I'm not sure if it was -- around January or February of '98.

Q.  Okay.  So it was more than a month before you actually went to the Soto home, correct?

A.  Honestly, I don't remember anymore.

Q.  Where in the house were you when he found you crying?

A.  One time, he found me in the living room, and he asked me what was happening.  And I didn't want to tell him.  Then in the kitchen.

Q.  Is that a different day?

A.  Yes.

Q.  And then when was it -- so is it a second time that you were crying and he asked you what was wrong?

A.  No.  I don't recall if it was two or three times.  No, because when he would come home from work

CCSAO COI SUBPOENAS 000612

FILED DATE: 4/8/2022 3:39 PM  98CR1244002

ADRIANA MEJIA, 02/05/2021

Page 122..125

Page 122

at night is when -- yes, I believe so.

Q. So how many times -- were there multiple times where Gabriel found you crying and he asked you what was wrong?

A. Yes, many times. Sometimes he would also see me sad during the day.

Q. And so a number of times when he saw you crying, you didn't tell him that you were faking a pregnancy, correct?

A. Yes.

Q. And then when was the first time that you actually told him?

A. When it was getting close to the time that I was supposedly going to have the baby, and I couldn't find a solution. And I had plans to go back to Mexico, but I couldn't.

Q. So at the time that you actually told him that you were faking, how close was that to when you went to the Soto home?

A. Honestly, I don't recall if it was a month or some weeks.

Q. Okay. And where were you in the house when you revealed to him that you were faking?

A. I really don't recall if it was in the

Page 123

kitchen or in the living room, but it was one of those two places.

Q. And what time of day was it?

A. It wasn't in the daytime. It was at night.

Q. Was anyone else home?

A. My brother was sleeping. My husband hadn't gotten home yet.

Q. And so you just revealed to him your secret; is that right?

A. Yes.

Q. Did he tell you something to get you to reveal your secret?

A. Well, he would always ask me, "Why is it that I'm always seeing you crying? Why is it I find you sad? Are you having problems? Are you having problems with your husband?"

And I would say, "No, everything is fine."

But he would say, "I would see you sad all the time." But one of those times, I didn't have any more, and I told him.

Q. Okay. And what did you say to him?

A. I told him the truth, that I wasn't pregnant, that I had faked a pregnancy, that I was having problems, that I was afraid about what my

Page 124

husband could tell me.

Q. And what was his response?

A. I don't remember the adequate words that he said to me, but he said that he would help me.

Q. Did he tell you that he would help you get a baby in that conversation?

A. I don't know if it was that day or the following day, the conversation where he told me that he knew a friend that didn't want her baby.

Q. So that day or the next day, he told you that he had a friend who didn't want their baby; is that right?

A. He told me he knew a lady that didn't want her baby.

Q. Did he tell you that person's name?

A. No. I think it was one of his friends or one of his girlfriends.

Q. And did he tell you how much it would cost?

A. Yes. He told me to put $600 together.

Q. And did he tell you why this person was getting rid of their child?

A. I don't really recall what he told me about that lady.

Q. Did he tell you if it was going to be a boy

Page 125

or girl?

A. No. I believe he said it was a girl.

Q. Did he tell you if the baby had been born yet?

A. I don't recall.

Q. Did he tell you when he was going to get the baby for you?

A. Yes. It was a little bit before I was about to have my child.

Q. You told him that you were faking a pregnancy, and that same day or the next day he told you all of this information about this person who actually had a baby for you, right?

A. Yes. But he didn't tell me everything the same day. He told me within days.

Q. That's what I'm asking you. There was an initial conversation where you told him that you were faking your pregnancy, right?

A. Yes, one conversation where he was asking what was happening. And he told me not to worry, that everything was going to be fine.

Q. And in that same conversation or a conversation on the next day, he told you he could get you a baby, right?

Urlaub Bowen & Associates, Inc. 312-781-9586

CCSAO COI SUBPOENAS 000613

ADRIANA MEJIA, 02/05/2021            Page 126..129

FILED DATE: 4/8/2022 3:39 PM  98CR1244002

Page 126

A. Yes.

Q. And in that conversation where he told you he could get you a baby, what else did he tell you?

A. That's when he told me not to worry, that he knew a lady that didn't want her baby.

Q. And did he tell you that it would cost $600?

A. Yes.

Q. And did he tell you that it was going to be a baby girl?

A. Yes. I believe he told me it was a girl.

Q. And in that conversation, did he tell you when he would have the baby available for you?

A. I don't really recall, but I believe he said in some days.

Q. So he indicated, when you had that conversation with him, that within a few days he'd be able to get you the baby; is that right?

A. Yes.

Q. And then how long did it take you to get $600?

A. Didn't I explain to you that it was in a tanda?

Q. Yeah. So you got the money from the tanda; is that right?

Page 127

A. Yes.

Q. So your testimony is the place where you got $600 was from a tanda with the Mejia family; is that right?

A. Yes.

Q. Did Rosauro ever find out about it?

A. That I had another number?

Q. Did Rosauro ever find out that you had received money from the tanda and that you had used it for some other purpose?

MS. ROSEN: Objection, foundation.

A. You confused me a little bit. Could you explain it to me a little slower?

Q. You're saying that you won money from the tanda separate from the money that Rosauro won; is that right?

A. Yes.

Q. From the same tanda?

A. You're not understanding me.

Q. Go ahead. Explain.

A. He had one number, and I had a separate number.

Q. But both were in the same tanda, right?

A. Yes.

Page 128

Q. And so you're saying that you got money from the tanda that he didn't know about. Is that what you're saying?

A. Yes. He didn't know I had the tanda until I got that money.

Q. And when you got that money, you're saying he had no idea that you got that money; is that right?

A. Yes. Because when my ex-sister-in-law Rosalinda Mejia gave me the money is when he found out I had that tanda.

Q. And when was that that he found out about that?

A. I believe around February.

Q. So in February, you got the money from the tanda, and he knew about that money, right?

A. Yes.

Q. What did he have you do with that money?

A. I had it saved for myself.

Q. Did he let you keep that money for yourself?

A. Yes, because he was putting together the other money from his tanda. He had me save both the money.

Q. So he was fine with you keeping the money from the other tanda?

Page 129

A. No. Because his plans were to send it to Mexico to finish building the house.

Q. And did he ever find out that you didn't send the money for the house?

A. Yes.

Q. And is it your testimony that you and him both got money from the tanda in February and March?

A. (Nodding head up and down.)

MR. SWAMINATHAN: Go ahead.

A. Yes.

Q. And how long after you had this conversation, this first conversation with Gabriel in which he said he could get you money, how long after that did you get money to give him?

THE INTERPRETER: I'm sorry, Counsel. Can you repeat that?

MR. SWAMINATHAN: Yeah. I'll ask a better question.

Q. How long was it from when you had this conversation with Gabriel about getting the baby that you came up with the $600?

A. It didn't take long because I had the money; so I gave it to him after.

Q. You had the money just -- you had the cash

CCSAO COI SUBPOENAS 000614

ADRIANA MEJIA, 02/05/2021          Page 130..133

Page 130

in your house?

A. Yes.

Q. Where in the house were you keeping it?

A. I have a small jewelry box where you keep your -- what do you call it -- your jewelry.

Q. Did Rosauro know where you were saving that money?

A. Sometimes when he would search.

Q. And how much of the money was -- after you gave the money to Gabriel, how much money was left from the tanda?

A. $400.

Q. So you got $1,000 from the tanda in February?

A. Yes.

Q. When was the last time before that that you got money from the tanda?

A. I don't recall, but I think it was around -- I don't remember anymore.

Q. Was it in 1998? Was it in 1997?

A. 1998, but I don't --

UNIDENTIFIED SPEAKER: -- something, but I can't tell what.

MR. SWAMINATHAN: Somebody is not on mute?

Page 131

Sorry. Was she in the middle of the answer?

THE REPORTER: Yeah. Could you repeat the answer for me? This is the reporter.

A. 1998, but I don't recall the date.

Q. So you'd won the tanda before in 1998?

A. No, in '98.

Q. Yeah. So you got the money from the tanda in February of 1998; and before that, you had gotten money from the tanda also in 1998?

A. Yes. We would make a lot of tandas, and we would get a lot of numbers.

Q. So you were getting money from multiple tandas in 1998; is that right?

A. Yes. With my ex-husband's and mine and then -- I mean, a lot of his siblings would make tandas, and then I did too.

Q. And then you had to be lucky enough to have your number selected, right?

A. No. I could pick my number.

Q. Okay. You said you had the money lying around. So when Rosauro told you you would need to come up with $600, did you give him the money right then?

A. Rosauro?

Page 132

Q. Sorry if I said the wrong name. Let me ask it again.

When Gabriel said you would need to come up with $600, you already had the $600, right?

A. Yes.

Q. Did you give it to him at the same time?

A. Yes.

Q. And at that point, did he tell you the name of the person?

A. Honestly, I don't remember if it was that day or -- I really don't remember.

Q. When is the first time you learned the name of the person who was going to be giving you a baby?

A. I just recall that it was Norma Salazar, but I don't remember the date.

Q. Did he ever tell you that the person who was supposed to sell you a baby, that that had fallen through?

A. No.

Q. Your expectation was that you would have the baby in a few days, right?

A. Yes.

Q. And that didn't happen, right?

A. Yes.

Page 133

Q. So when that didn't happen after a few days, what did you do?

A. I was worried. I was frustrated. I was affected.

Q. Did you talk to Gabriel?

A. Yes. I believe about two days later.

Q. What did he say?

A. He told me not to worry, that he was going to keep helping me.

Q. What else did he tell you?

A. Not much, because we couldn't really talk much because there was a lot of people that lived with us. But he would just say not to worry, that he was going to help me, that he promised that he would help.

Q. And at least a few weeks went by, right?

A. I think so.

Q. At that point, were you past the due date that you'd been telling people in the family?

A. Yes.

Q. Were people asking you questions?

A. Yes. They would ask what was happening, if I had my calculations correct. Then I would tell them that everything was fine.

Q. Did anybody tell you that they didn't

CCSAO COI SUBPOENAS 000615

FILED DATE: 4/8/2022 3:39 PM   98CR1244002

ADRIANA MEJIA, 02/05/2021                                    Page 134..137

Page 134

believe you that you were pregnant?

A.  No, because they would never pay attention to me.

Q.  Did they tell you that they were suspicious?

A.  No.

Q.  Did anyone act like they were suspicious?

A.  Not that I recall.

Q.  I'm going to show you a document, Defendant's Exhibit 19, since I cannot find our version.  This is Defendant's Exhibit 19, Reyes 8726 through 8729.  This is a declaration of Jose Mejia.  Ms. Mejia, have you ever seen this document before?

A.  No.

Q.  This document indicates that, back in 1998, his cell phone number was (773) 434-8643.  Do you remember what Jose Mejia's cell phone number was?

MS. ROSEN:  Objection, form.

A.  No.  Until now, I didn't remember.

Q.  His affidavit states -- strike that.  His declaration states, "Before her arrest, I had to become close with my aunt Adriana"; is that true?

MS. ROSEN:  Objection, form.

A.  Only on one occasion.  He went to pick me up when he asked if I could please watch his kids.

Page 135

Q.  Well, had you become close with Jose Mejia?

MS. ROSEN:  Objection:  form, asked and answered.

A.  I had gotten close to him, but not as far as trusting him.

Q.  He says:  "My aunt Adriana used to babysit my two children a few times a week.  She stopped babysitting shortly before her arrest."  Is that statement true?

MS. ROSEN:  Objection, form.  Oh, sorry.

(Question translated.)

MS. ROSEN:  Objection, form.

A.  Two times a week?  No, I just babysat on two occasions.

Q.  He write, "Adriana wanted to have children."  Is that true?

MS. ROSEN:  Objection, form.

A.  I don't know.

Q.  He says he knew that you were not actually -- strike that.

His declaration says, "I knew that she was not actually pregnant."  Did Jose Mejia ever say anything to you about knowing that you were not pregnant?

Page 136

MS. ROSEN:  Objection -- sorry.  Go ahead.

(Question translated.)

MS. ROSEN:  Objection, form.  This is improper what you're doing.  It is improper to put somebody else's declaration in front of a witness and ask -- and say, "This is what the witness said.  Is that true?  Is that not true?"

(Technical issues with connection.)

MR. SWAMINATHAN:  Defendants asked leading questions of a witness they can't lead through their entire portion.  So objection to form is noted for the same reason I made the same objection for trial exam purposes.

MS. ROSEN:  You did not object -- first of all, we didn't ask leading questions.  Second of all, you made no such objection.  Go ahead and hit yourself in the head.  It's okay.  I'm making an objection.  I'm giving you a warning.  Your use of this exhibit in this way is improper; and if this ends up being her trial testimony, we're moving to strike it.

I am giving you an opportunity -- stop trying to interrupt me.  I am giving you an opportunity to try and cure the defect.  If you don't want to take that opportunity, then you act at your

Page 137

own peril.

MR. SWAMINATHAN:  I'm going to note for the record that Defendants, through their exam, asked numerous, numerous leading questions of the witness to which I made objections to form without making a speaking objection.

Defendants, through the course of their exam, put documents and prior testimony and statements in front of Ms. Mejia and then asked her questions.  And I made objections to form, but I did not make speaking objections.

So I'm a little disappointed that Counsel is now suggesting to me that there's something improper about me asking these questions.

(Technical issues with connection.)

THE REPORTER:  Anand, I've lost you.  This is the court reporter.  I got ". . . Counsel is now suggesting to me that there's something improper about me asking these questions," but you've been freezing.

MR. SWAMINATHAN:  Well, we'll keep going.

BY MR. SWAMINATHAN:

Q.  In Jose Mejia's statement, his declaration:  "Once, I overheard my uncles, Jorge Mejia and Horacio Mejia, discussing Adriana's pregnancy with Rosauro."

CCSAO COI SUBPOENAS 000616

FILED DATE: 4/8/2022 3:39 PM  98CR1244002

ADRIANA MEJIA, 02/05/2021                    Page 138..141

Page 138

Do you see that?

A. Uh-huh.

Q. "They were speaking in Spanish and assumed that I didn't understand them. But I did understand what they were saying. My uncles knew Adriana was not pregnant or were highly suspicious that she was not pregnant. I heard them telling Rosauro this."
Did any members of the Mejia family indicate to you that they were suspicious that you were not pregnant?

MS. ROSEN: Objection, form.

A. No.

Q. Did Rosauro ever say anything to you about being suspicious that you were not pregnant?

MS. ROSEN: Objection, form.

A. No.

Q. Were you concerned that Rosauro was going to figure out that you weren't pregnant?

A. Yes.

Q. What steps did you take to keep him from finding out that you were pregnant -- that you were not pregnant?

A. Towards the last months, I did -- we did have sexual relations, but I didn't let him see my

Page 139

body.

Q. Anything else you did?

A. No.

Q. Okay. Jose Mejia says: "I also saw Adriana changing in her bedroom in her apartment. She was pretending to be pregnant by placing a small pillow under her clothing and strapping it around her waist. I saw the pillow on the bed while she was changing."
Is that true?

A. That's a lie because he never came into the apartment that I lived in.

Q. So Jose Mejia, when he said that he saw you placing a pillow under your clothing, he's lying?

THE WITNESS: The officer is calling me for the count.

MR. SWAMINATHAN: Okay.

THE VIDEOGRAPHER: We're going off the video record at 2:59 at the end of media unit 4.

(Recess in proceedings from 2:59 to 3:08 p.m.)

THE VIDEOGRAPHER: We're back on the video record at 3:08 at the beginning of media unit 5.

MR. SWAMINATHAN: Can we have the last question read back? I don't believe we got an answer.

Page 140

A. He would never enter my home. He would stay from the door to the outside. And on the two occasions where he picked me up, he picked me up in front. And when he -- he also picked me up on Mozart, the street that runs -- where there's a lot of stores. But he never saw me. He's lying there because he never saw me.

Q. Is your testimony that, when Jose says he saw you with a pillow under your shirt, that he's lying?

A. Yes, he's lying, because he never saw me.

Q. I want to ask you about March 27, 1998, the day that you went to the hospital, okay?
What time that day did you go to the hospital?

A. In the morning.

Q. What time?

A. I don't recall if it was 8:00 or 9:00 in the morning.

Q. And Rosauro drove you, right?

A. Yes.

Q. How long did Rosauro stay with you at the hospital?

A. Not much -- very little time.

Page 141

Q. Where did you and Rosauro wait inside the hospital?

A. I believe in the waiting room.

Q. When you wait in the waiting room, where is that?

A. Where the people that are visiting the patients wait.

Q. Is that when you first enter, or do you have to go in further to the hospital?

A. It's when you enter. There's a waiting room there.

Q. Did you ever go into any other areas of the hospital that day?

A. I think so.

Q. Where else did you go in the hospital?

A. I believe I was walking around on different floors.

Q. Was that with Rosauro or after he'd left?

A. After he left.

Q. When Rosauro was there, you went into the waiting area. Then did you go check in at some counter?

A. I don't know how I told him to go back. I don't know if I registered or if I stayed inside.

CCSAO COI SUBPOENAS 000617

FILED DATE: 4/8/2022 3:39 PM    98CR1244002

Page 142

Q. Did you have any actual appointment that day for yourself, or were you pretending?

A. I was just pretending.

Q. And so you had to make it appear that you were actually checking in with someone, right?

A. Yes.

Q. Did you do that?

A. I think so. I talked to one of the nurses in the reception.

Q. What did you say?

A. I don't remember specifically what I asked, but I wanted my husband to see that I was there.

Q. After he left, what are some things you did at the hospital while you were there?

A. Once I was there, I called once to see if Gabriel would answer the call, if he was home.

Q. Did he answer?

A. No, because Guadalupe is the one that would answer.

Q. What time of day was that that you made the call, hoping to get Gabriel?

A. I don't recall. It was about 12:00 or 1:00 p.m.

Q. And did you have a conversation with

Page 143

Guadalupe at that time?

A. I believe I hung up on her.

Q. And that call was made from a pay phone at the hospital, right?

A. I believe I took it on the phone that was on the street.

Q. Where on the street? Next to the hospital or in front of the hospital?

A. I believe it was in front of the hospital.

Q. And then we talked about some other phone calls that you made that evening, right?

A. Yes.

Q. And those were also made from pay phones in the hospital and just outside the hospital, right?

A. Yes.

Q. And we talked about a phone call that you made in the morning after you had the Soto children, right?

A. Yes.

Q. And that was also made from a pay phone at the hospital, right?

A. Yes.

Q. Other than those phone calls, what else did you do at the hospital that day after Rosauro left?

Page 144

A. I stayed there in the waiting area for a long time, and then I was walking for a while.

Q. Other than sitting there and walking around and making those phone calls, did you do anything else.

A. I don't recall what else I did.

Q. And then the next thing that happened was that Gabriel picked you up around 12:30 to 1:00 a.m., right?

A. Yes.

Q. And so you were basically at the hospital from around 9:00 a.m. that morning until 12:30 to 1:00 a.m., right?

A. Yes.

Q. And did you leave the hospital for any period of time?

A. Yes. I went out to walk through the streets that I was familiar with.

Q. So you left the hospital for a little while?

A. Yes. Yes.

Q. Did you go talk to anyone or see anyone that you knew?

A. No, I didn't know anybody. Everybody spoke English.

Page 145

Q. All right. And then finally around -- you get picked up by Gabriel -- strike that.

When you got picked up, where were you picked up from at the hospital? Was it outside the entrance?

A. Yes. Not exactly in front, but almost in the front.

Q. And had you been waiting outside?

A. Yes, a little while.

Q. Were picked up at the same place Rosauro dropped you off?

A. Close.

Q. And how did you know to come outside at that time?

A. Because -- I don't recall if I saw Gabriel outside or he honked with the car he had.

Q. So you were just sitting waiting, and eventually you just happened to see him parked outside or honking; is that right?

Strike that. Strike that.

How did you know what time to be looking for Gabriel?

A. Because he told me that, around the time he would get off work, he would pick me up around that

CCSAO COI SUBPOENAS 000618

FILED DATE: 4/8/2022 3:39 PM 98CR1244002

Page 146

time to go pick up the baby.

Q. So you understood that he would be off work by -- in time to pick you up around 12:30; is that right?

A. Yes.

Q. When he picked you up, did you recognize the car that he was in?

A. I don't really recall the color or the model of the cars.

Q. And when he picked you up, your testimony is you didn't know who you were going to go see, right?

A. Yes.

Q. And your testimony is, when you got in the car, you thought you were just going to go buy the baby, right?

A. Yes.

Q. Your testimony is that, at that point, you had already given Gabriel the money weeks earlier, right?

MS. ROSEN: Objection, asked and answered.

MR. SWAMINATHAN: Go ahead.

A. I think so.

Q. So why were you there at all?

MS. ROSEN: Objection, form. Go ahead.

Page 147

A. Because he told me he was going to give me the baby outside of the hospital.

Q. So you thought that he already had the baby and was going to give it to you?

A. Yes. Because he said he was going to go pick it up with his friend.

Q. So instead of him having the baby there for you, he told you to get in the car?

A. Yes. But when he told me to get into the car, Arturo Reyes was already in there as well.

Q. And at that point, you thought that you were already supposed to have the baby?

A. Yes.

Q. So based on your version of events, you agree it doesn't make sense why you would need to go to the Soto home. You had already handed over the money, right?

MS. ROSEN: Objection to form.

MR. BRENER: Objection to form. Argumentative.

MR. SWAMINATHAN: Go ahead.

MR. ENGQUIST: Vague.

A. Yes.

Q. Why did you go along? At that point --

Page 148

strike that.

If you were just buying a baby and you had already given him the money, why did you go along with Gabriel at that point?

A. I don't recall specifically what he told me, but he told me to get into the car.

Q. What else did he tell you?

A. I asked him where the baby was, and he said he would give it to me.

Q. Anything else?

A. No.

Q. So you got in the car?

A. Yes.

Q. And then you drove off with them?

A. Yes.

Q. And then you got to the Soto home, right?

A. Yes.

Q. Did you know where you were?

A. No.

Q. It was the middle of the night, correct?

A. Yes.

Q. Did you park right in front of the house, or did you park a little bit away from the house?

A. Honestly, I don't recall, but it wasn't very

Page 149

far. I don't remember if it was in the front or a little bit to the side.

Q. Other than Gabriel telling you to get in the car and that he was going to get you the baby, did you have any other conversation in that car on the way to the Soto home?

A. Yes. I asked him what was Arturo Reyes doing there.

Q. What was his answer?

A. He told me that he already knew because he had told him what was going on with me.

Q. Did Arturo say anything in the car?

A. Very little.

Q. And then did the three of you discuss anything about what was going to happen when you went to the house?

A. No.

Q. Your testimony is that Gabriel went in, and you and Arturo waited in the car, right?

A. Gabriel got out first, and then I got out after.

Q. Did you go down to the house with him at the same time, or did he go down to the door to the house first?

CCSAO COI SUBPOENAS 000619

FILED DATE: 4/8/2022 3:39 PM   98CR1244002

Page 150

A.  No. He was already opening the door with a hanger.

Q.  When he went to the house, did he have anything with him?

A.  Honestly, I don't know.

Q.  Did you see anything in his hands when he got out of the car?

A.  No, because he had a jacket on and a hat on his head, and he had gloves. So I didn't know if he had anything.

Q.  And at the point that he goes down to the door, you're sitting in the car, right?

A.  Not long because I got out behind him.

Q.  That's what I'm trying to understand. He was picking the lock, right?

A.  Yes. It was a normal door.

Q.  What do you mean by that?

A.  It just had a key.

Q.  How many locks?

A.  I think one.

Q.  And you were there with him, standing next to him, when he was trying to open the lock, right?

A.  Yes.

Q.  And did you say anything to him while he was

Page 151

doing that?

A.  Yes. I asked him what he was doing. He said not to worry, that everything was going to be fine.

Q.  Did he say anything else?

A.  No, not that I recall.

Q.  And he was using a coat hanger to pick the lock; is that right?

A.  Yes.

Q.  How long did that take?

A.  Not long.

Q.  Give me an approximation. How many minutes?

MS. ROSEN:  Objection, form.

A.  Honestly, I wouldn't be able to say.

Q.  Is it your testimony that there was only one lock that he had to open?

MS. ROSEN:  Objection, form.

A.  Yes. I think it was -- yes, I think it was only one lock.

Q.  Did it take him more or less than ten minutes to pick the lock?

A.  Honestly, I don't recall how long it took.

Q.  So it could have been as much as ten minutes?

Page 152

MS. ROSEN:  Objection, form.

A.  Honestly, I wasn't counting the time.

Q.  And while he was doing that, Arturo was in the car, correct?

A.  Yes, for a little bit. Then he came in once we were inside.

Q.  Had you ever seen Gabriel break through locks using a hanger before?

A.  Not here, but in Mexico, I did.

Q.  In Mexico, he used to break through locks with a hanger?

A.  Yes.

Q.  And when did you see him do that?

A.  When we would go to school, then he would open the classroom doors.

Q.  Any other times when you saw him breaking -- picking locks with a hanger?

A.  No. I believe only once at school.

Q.  And when he was finally able to open that door, what happened?

A.  He made a little bit of noise, and that's when the man woke up.

Q.  So he was able to pick the lock without causing anyone to wake up?

Page 153

A.  I don't recall how the man woke up.

Q.  The man woke up after you had already come into the house; is that right?

A.  I think he heard the noises when the door was being opened.

Q.  What did the man say?

A.  I don't really recall the words, but I remember he said what were we doing there.

Q.  What did you guys do in reaction?

A.  I really don't recall much.

Q.  What did Gabriel do when the man got up?

A.  Why do I have to say it again?

Q.  Well, I want to understand what happened inside that apartment, which we haven't talked about. I mean, we've talked about the fact that these people were stabbed, but I want to understand what happened in that house.

A.  But I had already told you yesterday.

Q.  Well, where was the man when he was stabbed?

MS. ROSEN:  Objection, asked and answer.

Q.  Where in the house?

A.  I don't want to answer that anymore.

Q.  Are you pleading the Fifth?

MS. ROSEN:  Objection, asked and answered.

CCSAO COI SUBPOENAS 000620

FILED DATE: 4/8/2022 3:39 PM  98CR1244002

ADRIANA MEJIA, 02/05/2021                                    Page 154..157

Page 154

A. Yes. I already said it yesterday. I don't want to repeat that.

Q. Did Gabriel stab -- strike that.

When Mariano Soto was stabbed, was he stabbed in his front or his back?

A. Everywhere. First in front.

Q. And then in back?

A. I think so.

Q. And what was the knife that was used to do that?

MS. ROSEN: Objection, form. What was the knife?

Q. Yeah. Where was the knife from that was used to stab --

A. I don't know if he took it from somewhere close, from a little table where the lady had her knives, or where he took it from.

Q. I assume, at that point, Gabriel no longer had the coat hanger, right?

A. I don't think so.

Q. He dropped the coat hanger before he was dealing with Mariano, right?

MS. ROSEN: Objection: form, foundation.

A. I think he threw it to one side.

Page 155

Q. And then, when Mariano Soto was stabbed, that happened very quickly after you got into the house, right?

You can answer.

A. Yes.

Q. And then Jacinta Soto, did she wake up at that point?

MS. ROSEN: Objection, asked and answered.

MR. SWAMINATHAN: Go ahead.

A. Yes, because she heard the screams.

Q. So had Mariano been screaming when this happened?

A. Yes. He screamed some times.

Q. Tell me what you remember him screaming?

A. I recall him asking who we were or what we were doing there.

Q. Anything else you remember him saying?

A. No.

Q. And after Mariano had been stabbed and Jacinta was up, was Jacinta stabbed immediately after that?

MS. ROSEN: Objection, asked and answered.

A. Yes.

Q. Were both of them stabbed and killed very

Page 156

fast once you guys got into the house?

A. Yes.

Q. Were they both stabbed within less than a minute of being in the house?

A. I don't recall the time.

Q. Does that sound right? I mean, it happened very fast; so it would have been less than one minute for them to be both stabbed. Does that sound right?

MR. BRENER: Objection, form and foundation.

MR. ENQUIST: Sorry. He said form and foundation. I was going to say argumentative as well.

A. I don't recall the time. I don't know. I didn't count the time.

Q. Did Jacinta say anything?

A. Honestly, I don't remember.

Q. Did the kids say anything?

A. No. It was dark. They really didn't recognize us.

Q. And you grabbed the baby, right?

A. Yes.

Q. And who grabbed the boy?

A. Honestly, I don't recall if it was Gabriel or Arturo.

Q. Were both Mariano and Jacinta already killed

Page 157

by the time Arturo got into the apartment?

A. No. Just the gentleman was already stabbed, but not the lady.

Q. So you were able to see that Arturo -- your testimony is you could see that, after Mariano was killed, then Arturo came in before Jacinta was killed? Is that what you're saying?

MS. ROSEN: Objection: form, asked and answered.

A. I told you yesterday that by the time that the man was already stabbed, Arturo was already with us.

Q. Other than grabbing the two kids, did you guys grab anything else in the house?

MS. ROSEN: Objection, asked and answered.

A. I don't recall.

Q. Did you grab any clothes or anything else for the children?

A. No. Just a blanket.

Q. After both children had been killed, did you spend any time in the house, or did you just get out of there? Strike that.

After the parents had been killed and you grabbed the children, did you do anything else in the

CCSAO COI SUBPOENAS 000621

FILED DATE: 4/8/2022 3:39 PM 98CR1244002

FILED DATE: 4/8/2022 3:39 PM  98CR1244002

Page 158

house?

A. No. We got out quickly.

Q. But you basically got in. They were both killed. You grabbed the kids, and you got out. Is that it?

MS. ROSEN: Objection, form.

MR. SWAMINATHAN: Go ahead.

A. Yes. From what I recall now, that was the quickest.

Q. Did you guys do anything to the bodies of Jacinta or Mariano?

MS. ROSEN: Objection, form.

A. I don't think so.

Q. Was there a lot of blood?

A. I don't recall.

Q. Did you have blood on you?

A. Perhaps.

Q. And you don't remember if your clothes had blood on them?

A. Perhaps my shoes and my pants.

Q. And what about Gabriel? Did he have a lot of blood on him?

A. Yes. He had a lot of blood on his gloves and his jacket.

Page 159

Q. And what about Arturo? Did he have lots of blood on him?

A. Perhaps just on his shoes.

Q. The overall apartment had a lot of blood in it, right?

A. I think so.

Q. The kids' blankets, did they also have a lot of blood on them?

MS. ROSEN: Objection, form.

A. Honestly, I don't recall.

Q. Did the children have blood on them, the children themselves?

A. I don't think so.

Q. So after you had the kids and you guys left, did you do anything else when you left the apartment?

A. Yes. We went to the car, and we were talking for a little bit. And then they took me to the hospital.

Q. And so when you left, you didn't have the keys to the apartment, did you?

A. No.

Q. You didn't lock the door?

A. Honestly, I'm not sure.

Q. Well, you couldn't lock the door, could you?

Page 160

A. I'm not sure.

Q. Well, did you have a key to the apartment?

A. I don't know. Perhaps, yes. I don't know.

Q. "Perhaps, yes," you did have a key to the apartment?

A. The persons, yes, not me.

Q. In fact, you did have a key to the apartment, didn't you, to the Soto home?

A. Of theirs? No, I didn't have a key of theirs.

Q. Were you aware that Jacinta Soto's family said that she had made a friend in the weeks before she was killed?

MS. ROSEN: Objection, form.

A. No.

Q. Are you aware that her family said that her key had been taken from her?

MS. ROSEN: Objection: form, foundation.

A. No.

Q. Didn't you take the key from Jacinta Soto?

A. How was I going to take her key if I didn't know her?

Q. Did you meet her? You met her at one of the clinics, right?

Page 161

A. No.

Q. When you got back in the car, where did each of you sit in the car?

A. Arturo and Gabriel sat in the front, and I sat in the back with the children.

Q. And they took you straight to the hospital and dropped you off, right?

A. Yes.

Q. And you went and -- strike that.

We discussed yesterday that you would have gotten back to hospital around 2:00 or 3:00 in the morning, right?

A. Yes.

Q. And what time did you get picked up the next morning?

A. Early in the morning.

Q. Around 8:00 or 9:00 in the morning?

A. Something like that.

Q. So you were at the hospital for four to six hours, right?

A. Yes.

Q. And where did you go in the hospital during that period?

A. I was waiting in the waiting area.

CCSAO COI SUBPOENAS 000622

ADRIANA MEJIA, 02/05/2021                    Page 162..165

Page 162

Q. But you were sitting inside the hospital with the two children for hours?

A. Yes.

Q. And you had blood on your clothes?

A. Honestly, I didn't look, but perhaps.

Q. And you had blood on your shoes?

A. Perhaps.

Q. Did anyone come over to ask you any questions?

A. No.

Q. Did any security guard come and talk to you?

A. I don't recall.

Q. Were you just sitting in the waiting area the whole time, or did you walk around inside the hospital?

A. I don't know if I walked for a little bit.

Q. Your testimony is you spent hours in a hospital with blood on your shoes and on your clothes without anybody asking any questions?

MR. BRENER: Objection, misstates the witness's testimony.

MS. ROSEN: Form.

MR. SWAMINATHAN: Go ahead.

A. I don't recall.

Page 163

Q. You got picked up the next day by Rosauro and Guadalupe along with her kids, right?

THE INTERPRETER: I'm sorry?

Q. You got picked up the next day by Rosauro and Guadalupe, right?

MS. ROSEN: Objection, asked and answered.

A. Yes.

Q. Did they ask you any questions about -- strike that. They asked you some questions about the boy, right?

A. Yes.

Q. At that time, did you tell them the name Norma Salazar?

A. I believe I said it was a friend's.

Q. Did they ask you anything about -- did they indicate to you that they were surprised about how big the baby was?

A. Just Guadalupe said that she was very big.

Q. Did she say anything other than that?

A. I don't recall what else she said.

Q. Did Lupe make a comment to you that the baby couldn't possibly be yours because she was too beautiful?

A. No.

Page 164

Q. Did you say to Guadalupe in the car, "Don't you ever say that again because I will kill you"?

A. No.

Q. Is Lupe lying if she says you said that?

MS. ROSEN: Objection, form.

A. She didn't say that.

Q. When you were in the hospital with the kids, what were they doing?

A. The baby girl was asleep, and the little boy was asleep.

Q. Did you feed them at all?

A. No, not at that moment.

Q. When you got home, did anybody ask you any questions about how big the baby was?

A. No. I think just Guadalupe.

Q. Guadalupe was suspicious about the baby; is that right?

A. Perhaps.

Q. Anyone else?

A. No.

Q. Did anybody say anything to you about having blood on your clothes?

A. I don't recall.

Q. When you came home, what was the reaction

Page 165

from other family members?

A. Not much, because then they came to see me later.

Q. The boy, where did he stay at the house? Strike that.

Where did the boy sleep at your house?

A. In a little room.

Q. Whose room is that?

A. It was not a room. It was a little porch where there was a bed. I don't recall if that's where Gabriel would sleep.

Q. Did you keep the boy in a closet?

A. No.

Q. If Guadalupe says that you kept the boy in a closet, is she lying?

MS. ROSEN: Objection: form, misstates the testimony, foundation.

THE REPORTER: I lost the connection for about a minute, and then it came back up. The last question I had is: "If Guadalupe says you kept the boy in a closet, is she lying?" And then there was an objection from Ms. Rosen, and I did not get an answer. I apologize. The screen went blank.

MR. SWAMINATHAN: What was the question

Urlaub Bowen & Associates, Inc. 312-781-9586

CCSAO COI SUBPOENAS 000623

FILED DATE: 4/8/2022 3:39 PM  98CR1244002

Page 166

right before that?

(Requested record discussed.)

MR. SWAMINATHAN: Okay, go ahead.

MR. INTERPRETER: I don't remember.

MR. SWAMINATHAN: Let's reask the question.

A. Yes. I never had him in a closet.

Q. After you came home with the baby and the boy, you had conversations with Arturo about the boy, right?

A. Yes.

Q. He was concerned about the boy, right?

A. Yes.

Q. And he took care of the boy, right?

A. Yes.

Q. And he would buy clothes for the boy and take care of him, right?

A. Yes. He would buy clothes for the baby. He would buy diapers, because the baby was still in diapers. He would buy him clothing.

Q. Did you have -- other than buying things for the baby, did you have any other conversations with Arturo after you came home from the hospital?

A. Honestly, I don't remember anymore.

Q. Did Arturo ever call you from anywhere else?

Page 167

While you were -- when you came back with the kids?

A. Can you repeat the word, the question?

Q. Yeah. Did Arturo ever make any calls to the house to talk to you?

A. Rarely, because Guadalupe would answer the phone.

Q. Arturo has never called the house to talk to you, has he?

A. No.

Q. Is that correct?

A. Yes.

Q. Showing you a document that was previously marked Plaintiff's Exhibit -- Adriana, it's a deposition exhibit from Adriana Mejia's previous deposition. We can mark it as Plaintiff's Exhibit 4 (sic) (Reporter's Note: This is Plaintiff's 5.) for this deposition, Reyes 264.

Ms. Mejia, do you recognize any of the handwriting on this note?

A. I think it's my writing.

Q. Where?

A. At the bottom.

Q. Where it says "Hospital"?

A. It seems like it.

Page 168

Q. You agree with me this is your handwriting?

A. I believe so.

Q. Is there any other handwriting on these notes that is yours?

A. I'm not too sure if the one on top.

Q. At some point, Arturo Reyes was asking for information about who the person was whose boy this was, right?

MS. ROSEN: Objection: form, foundation.

A. I don't recall, and I'm not going to answer.

Q. Are you asserting the Fifth?

A. Yes.

MS. ROSEN: Objection. She said, "I don't recall." Then you invite her to take the Fifth, and she's been ordered not to take the Fifth.

MR. SWAMINATHAN: I'm asking her -- she has now done this several times in the dep. I want to understand.

Q. Are you refusing to answer the question?

A. Yes.

Q. Arturo -- this note was found in Arturo Reyes's pocket. So you had written down the name Norma Salazar for him, correct?

MS. ROSEN: Objection, form.

Page 169

A. I'm not going to answer because I don't remember.

Q. Arturo Reyes -- strike that.

Arturo Reyes was asking you for information about whose boy it was, right?

MS. ROSEN: Objection: form, foundation.

A. I'm not going to answer. I don't remember.

Q. Do you not remember, or you're not going to answer the question? Which one is it?

MR. BRENAN: Objection, asked and answered, and now it's argumentative.

A. I'm not going to answer the answer.

Q. And so you're asserting your Fifth Amendment right?

MS. ROSEN: Objection to you -- go ahead. Translate it.

(Question translated.)

MS. ROSEN: I'm objecting to you inviting her to take the Fifth when she has said, "I don't recall." I'm objecting to you doing that. It's improper.

MR. SWAMINATHAN: Go ahead, Ms. Mejia.

A. I told you I'm not going to answer that answer.

CCSAO COI SUBPOENAS 000624

FILED DATE: 4/8/2022 3:39 PM   98CR1244002

Page 170

Q. Okay. So I need to add to the process. Are you not answering because you're asserting your Fifth Amendment right?

A. Yes.

MR. SWAMINATHAN: And to be clear, I asked the witness if the reason she was not answering was because she couldn't remember or because she didn't want to answer. And she said -- she gave me the reason, which is why I asked about the question.

Ms. ROSEN: Well, but the original answers were: "I don't recall; so I'm not going to answer." And for you then to invite her to violate a court order -- because she's already been ordered. So now you are inviting her to violate a court order because I guess you prefer that. I don't know.

MS. SINGER: Hey, you guys, can I please have a moment with her?

MS. ROSEN: Yes.

MR. SWAMINATHAN: Sure.

MS. SINGER: Thanks.

THE VIDEOGRAPHER: We're off the record at 4:03.

(Recess in proceedings from 4:03 to 4:21 p.m.)

Page 171

THE VIDEOGRAPHER: We are now back on the video record at 4:21 p.m.

BY MR. SWAMINATHAN:

Q. Looking again at this note, Ms. Mejia, you wrote this information down for Arturo because he was asking questions about where the boy's parents were, right?

A. I don't remember.

Q. All right. We talked yesterday about the night that the boy was taken to the police by Arturo and Gabriel and Rosauro, right?

A. Yes.

Q. You indicated that, at some point that night, Guadalupe saw the two children on the news, right?

A. Yes.

Q. And Guadalupe said something to you about seeing the two children on the news, right?

A. Yes.

Q. At that time, was Rosauro, Arturo, and Gabriel still at work, or were they home?

A. At work.

Q. You said, when you were taken to the police station, Guadalupe was also taken to the police

Page 172

station with you, right?

A. Yes.

Q. Were you both taken together in the same car?

A. Yes.

Q. And were you in the car with Detective Guevara?

A. Yes.

Q. What did he say to you in the car?

MS. ROSEN: Objection, asked and answered.

A. I don't recall.

Q. When you were at the police station, you talked about the fact that you were interviewed a number of times by Detective Guevara, right?

MS. ROSEN: Objection, asked and answered.

Q. Correct?

A. Yes.

Q. Showing you a document we'll mark as Plaintiff's Exhibit 6. It says, "RC Solache Reyes 194 through 196, and it's a supplementary report by McDonald and Collins dated April 15, 1998.

Ms. Mejia, this report indicates that Detective Guevara conducted an interview of you at the police station. Do you see that?

Page 173

MS. ROSEN: Objection: form, foundation.

Ms. Mejia, can you read English?

A. Very little but -- very little.

Q. Okay. So let me ask the question, and we'll have the translator translate it for you, okay?

A. That's fine.

MR. SWAMINATHAN: This is for the translator to just see where we're reading. Okay?

THE INTERPRETER: Okay.

Q. It states that "Mejia stated that she had been released from the hospital on 28 March '98. As she was waiting to leave the hospital, she was approached by a female Hispanic who identified herself as Norma Salazar and asked her if she would look after her little boy while she entered the hospital to have a baby. Mejia said that she agreed; and after they exchanged phone numbers, she took the child home with her."

What is described here, is that true or false?

A. False.

MS. ROSEN: Objection. Belated form objection.

Q. Did you tell Detective Guevara or other

CCSAO COI SUBPOENAS 000625

Case: 1:18-cv-01028 Document #: 892-2 Filed: 04/04/26 Page 626 of 855 PageID #:121252

FILED DATE: 4/8/2022 3:39 PM   98CR1244002

Page 174

police officers that that's what happened?

A. No. It's false.

Q. So what the police wrote is a lie; is that right?

MS. ROSEN: Objection, form.

Q. Is that right?

A. I am not going to answer.

Q. Ms. Mejia, are you asserting your Fifth Amendment right with regard to that question?

MS. SINGER: Can you reask the question? I'm sorry. I was having some internet issue, and I lost you.

Q. Is what the police wrote in that report a lie?

MS. ROSEN: Objection, form.

A. I don't recall.

Q. When you were at the police station, were you ever asked to act out how the crime occurred?

A. I told you yesterday that Detective Guevara wrote a lot of things that I hadn't said.

Q. Showing you a document marked Plaintiff's Exhibit 7. It is -- this copy does not have a Bates stamp on it. I'll identify it for the record. It is Area 5 Supplementary Report, Progress Investigation 3,

Page 175

Cleared Closed Report. And at the bottom, it's dated November 18, 1999, by Investigator Daniel Trevino.

Ms. Mejia, I'm going to read this again, and I'll ask the interpreter to read it for Ms. Mejia.

This police report states: "When asked to be specific, Ms. Mejia, by using a pen as a prop, acted out the scenario by showing the reporting investigator" -- that's Trevino -- "how she used the knife to stab the victim."

Did that happen, Ms. Mejia?

A. No.

Q. Did you use a pen and act out for the police how you stabbed the victim?

A. How was I going to use a pen if I was handcuffed?

Q. Is what the police wrote here a lie?

MS. ROSEN: Objection, form.

A. Yes.

Q. It says, "Mrs. Mejia also stated that, when the victim fell on the floor on all fours, she straddled her and began to stab her back."

Your testimony is that that did not happen; is that right?

A. I'm told today I didn't -- I'm finding out

Page 176

about this. I didn't know they had written this.

Q. And did you ever tell them?

A. No.

Q. So what the police wrote in this report is a lie, correct?

MS. ROSEN: Objection, form.

A. I'm not going to answer because I didn't say that.

Q. Okay. The next sentence says, "When asked to demonstrate, Mrs. Mejia got on all fours and started to act out as the victim while she was being stabbed."

Ms. Mejia, did that happen?

A. No. I already told you in that little while how things had happened.

Q. Did you ever demonstrate by getting on all fours and acting as a victim for the police?

A. No.

Q. What the police wrote here is a lie; is that right?

MS. ROSEN: Objection, form.

A. That's false, because I'm telling you how things were happening.

Q. During your interrogations -- at some point

Page 177

during the interrogations, were you taken to see Gabriel Solache?

A. I don't recall.

Q. Do you remember any point when you were at the police station that you saw Gabriel Solache?

A. I believe I did see him, but we couldn't have communication.

Q. When you saw Gabriel -- strike that.

Did you ever see Gabriel Solache get hit by Detective Guevara?

A. Yes. On one occasion when he passed in front of me, he was mistreating him.

Q. Who was mistreating Solache?

A. Detective Guevara.

Q. When you say he was mistreating him, what did he do?

A. He couldn't do much because he was handcuffed, from what I remember.

Q. Sorry. What did Detective Guevara do to Solache? Did he hit him?

A. I don't really recall if he hit him in his face or physically. I really don't recall anymore.

Q. Did Detective Guevara hit Gabriel Solache?

A. I think so. I believe so.

CCSAO COI SUBPOENAS 000626

ADRIANA MEJIA, 02/05/2021                    Page 178..181

FILED DATE: 4/8/2022 3:39 PM   98CR1244002

Page 178

Q.   You previously testified that Guevara hit Gabriel Solache in front of you.  Is that testimony true or false?

MS. ROSEN:  Object to the form.

A.   I honestly don't remember.

Q.   Okay.  Did you testify at the trials of Arturo Reyes and Gabriel Solache?

MS. ROSEN:  Object to the form.  She didn't testify at the trials.

MR. SWAMINATHAN:  I said, "did you"?

THE INTERPRETER:  I'm sorry, Counsel?

MR. SWAMINATHAN:  She can go ahead and answer.

THE INTERPRETER:  I didn't hear the question Counsel.  I'm sorry.

Q.   Did you testify at the trials of Arturo Reyes and Gabriel Solache?

MS. ROSEN:  Object to the form, foundation.

A.   No.

Q.   Were you asked to testify at their trials?

A.   I don't recall.

Q.   Did any prosecutor talk to you before their trials?

MS. ROSEN:  You broke up for me.  Could I

Page 179

get the question back?

MR. SWAMINATHAN:  Can we have it read back? Please?

(Requested record read.)

MS. ROSEN:  Before whose --

MR. SWAMINATHAN:  Reyes and Solache. Go ahead.

A.   Honestly, I don't recall.  I don't think so.

Q.   Were you ever told that, if you testified against Reyes and Solache, you could get a lighter sentence?

A.   I don't recall.

MR. SWAMINATHAN:  Ms. Mejia, are you able to keep going now, or are you just really tired?

THE WITNESS:  Well, I'm a little tired, but I really want to finish this.

MR. SWAMINATHAN:  Okay.  Are you still able to answer the questions based on your memory, or are you too tired to be able to remember and answer questions?

THE WITNESS:  I'm not too tired.  It's just it's been many years, and I don't remember the investigations and the questions.  It's been many years.

Page 180

BY MR. SWAMINATHAN:

Q.   In recent years, have any lawyers for the police or prosecutors come to see you?

A.   Just two people when I was moved to this prison and then when they were released, but I don't remember the name of the people.

Q.   The two people who came, tell me what you remember about that.

A.   When they were released, they just came to tell me that they were free.

Q.   Were there individuals -- was there anyone from the prosecutor's office who came to talk to you about this case?

MS. ROSEN:  Objection, form.

A.   I'm not really good at remembering people. I just recall that it was a male and a female.

Q.   The male and female who came, did they come to the prison you're currently at?

A.   Yes.

Q.   Did they tell you who they represent?

A.   I don't recall anymore.

Q.   Did you say that they told you that Reyes and Solache had been released?

A.   Yes.

Page 181

Q.   And did they ask you some questions about this case?

A.   I don't remember much.

Q.   How long did they visit you?

A.   Very little time.

Q.   Did you walk through any of the facts of the case with them or the crime with them?

A.   I don't remember a lot of specific things.

Q.   Did they ask you to tell them what you remembered about what happened?

A.   At this moment, the only thing I recall is them asking how I was feeling, knowing that they were free and I was still in prison.  But that's what I remember at the moment.

Q.   And what was your response to that?

A.   I think I told them that I felt badly.

Q.   What was their response?

A.   Not much.  They just looked at each other.

Q.   Did they tell you that you were going to be deposed in this case?

MS. ROSEN:  Objection:  form, foundation.

A.   I don't recall.

Q.   Was there a time when you were taken to Chicago to the courthouse unexpectedly?

Urlaub Bowen & Associates, Inc. 312-781-9586

CCSAO COI SUBPOENAS 000627

FILED DATE: 4/8/2022 3:39 PM   98CR1244002

ADRIANA MEJIA, 02/05/2021                                        Page 182..185

Page 182

MS. ROSEN: Objection, form.

A. I think so, on one occasion before they returned to court.

Q. You met with an attorney then, right?

A. They wanted to speak to me, but I told them I was not speaking to anyone because I didn't have an attorney to help me.

Q. How long did they meet with you?

A. Very little because they became upset.

Q. And did they try to ask you some more questions about what happened?

A. Yes. They told me that if I knew that my friends were going back to court on the case, and I said that I wasn't going to speak about anything because I didn't have an attorney to help me.

Q. They said that they were your friends?

MS. ROSEN: Objection, misstates her testimony. That's not what she just said.

MR. BRENER: Join.

MR. SWAMINATHAN: I thought she just said friends. Well, the record will say what it says. I'll ask a different question.

Q. So after you indicated that you didn't want to talk to them, they were upset?

Page 183

A. Yes. They told me that they took me because they wanted me to talk, but I didn't want to talk to them because I said I wouldn't say anything until I had someone representing me.

Q. And did they ask you some more questions anyway?

A. I don't really remember specifics because I wasn't there long. They returned me right away.

MR. SWAMINATHAN: Let's take a quick break for a few minutes. I'll try and get my last set of questions set up. I'll try to speed this up.

THE VIDEOGRAPHER: We're off the video record at 4:46 at the end of media unit 5.

(Recess in proceedings from 4:46 to 5:02 p.m.)

THE VIDEOGRAPHER: We are back on the video record at 5:02 at the beginning of media unit 6.

BY MR. SWAMINATHAN:

Q. Ms. Mejia, who is Ruben Artiaga?

A. I don't know any Ruben Artiaga. I know Ruben Luna.

Q. Who is Ruben Luna?

A. Someone I knew from my town.

Q. Is he somebody that you communicated with

Page 184

back in March of 1998?

A. I think just on two occasions.

Q. What did you communicate with Ruben Luna about?

A. Just very little. Just about how we were out here and how they were out there. Not much.

Q. Did Ruben Luna live in Chicago?

A. No.

Q. Did Ruben Luna live in Mexico?

A. Honestly, I wouldn't know what to say. It's been years.

Q. Who is Claudia Hernandez?

A. I don't know.

Q. Are you familiar with the name Claudia Hernandez?

MS. ROSEN: Objection, form.

A. No.

Q. Ms. Mejia, did you know anybody who had a cell phone back in 1997 and 1998?

A. Just Javier Mejia when he would leave it for me when I would watch his baby.

Q. Was that Javier Mejia or Jose Mejia?

A. Javier Mejia.

Q. You would watch Javier's kids, and you also

Page 185

watched Jose's kids?

A. For some time, I watched -- for about three months, I watched Javier's baby.

Q. All right, Ms. Mejia. I want to show you a document we'll mark as Plaintiff's Exhibit 7 (sic). (Reporter's Note: This is Plaintiff's 8.) This is RFD Solache Reyes 160 through 162. This is a log of phone calls that were obtained by the police related to calls to the Mejia home at Mozart, phone calls made to the 925-5124 number.

What I want to show you is calls made on March 27. This shows calls made on March 27, 1998, to the Mejia home. Do you see that?

MS. ROSEN: Objection: form, foundation.

Q. And it includes calls made on the morning of March 28, 1998.

MS. ROSEN: Objection: form, foundation.

Q. You previously stated that you called from the hospital to the home on the morning of March 28 after you had the Soto children, correct?

A. Yes.

Q. This log indicates that there were no calls made to the home between 12:30 a.m. and 10:50 a.m. Do you see that?

CCSAO COI SUBPOENAS 000628

ADRIANA MEJIA, 02/05/2021                          Page 186..189

FILED DATE: 4/8/2022 3:39 PM   98CR1244002

Page 186

MS. ROSEN: Objection: form, foundation.

Q. Ms. Mejia, you didn't call the Mejia home on the morning of March 28, did you?

A. Yes, I did call. I don't know why they didn't come on there.

Q. You didn't make any calls from the hospital, did you?

A. Yes, I made many calls from the hospital.

Q. This phone number here, 434-8643, is the phone of Jose Mejia.

MS. ROSEN: Objection: form, foundation.

Q. Did you make the calls to the Mejia home from Jose Mejia's phone?

MS. ROSEN: Objection: form, foundation.

A. I don't recall.

Q. So you might have made the calls from Jose Mejia's phone but not from a pay phone; is that right?

MS. ROSEN: Objection: form, foundation.

A. I don't recall.

Q. So is it fair to say that the calls that you made to the house after you had the Soto children may not have actually been from a pay phone, but it might have actually been from a cell phone. Is that your testimony?

Page 187

MS. ROSEN: Objection: form, foundation, misstates her testimony.

A. I'm not going to answer.

Q. Are you not going to answer based on your Fifth Amendment rights?

A. Yes.

MS. ROSEN: Objection. Oh, my God.

MR. SWAMINATHAN: The witness is telling me she's not going to answer the question. What am I supposed to do?

MS. ROSEN: You're not supposed to invite her to violate a court order.

MR. SWAMINATHAN: Well, I've asked her to answer the question. Ms. Mejia, I'll ask it another time.

Q. Ms. Mejia, did you call home, not from a hospital, but from Jose Mejia's phone?

A. How am I going to use Jose Mejia's phone if I hadn't seen him in days?

Q. Do you have any explanation for why the only phone calls that were made to the Mejia home on the morning of March 28 were from Jose Mejia?

MS. ROSEN: Objection: form, foundation.

A. I don't recall.

Page 188

Q. Do you have any explanation for why this phone record does not indicate that there was any call made to the Mejia home on the morning of March 28, as you claim -- strike that.

You claim you made a call to the home from a pay phone at the hospital on the morning of March 28. Do you have any explanation for why that call is not included in this call log?

MS. ROSEN: Objection: form, foundation.

A. I'm not going to answer.

Q. Why not?

A. Because I'm not going to answer.

Q. Are you asserting your Fifth Amendment right?

MS. SINGER: Give me a second.

MR. SWAMINATHAN: Okay.

MS. SINGER: Can you take the exhibit down?

THE VIDEOGRAPHER: We're off the record at 5:13.

(Recess in proceedings from 5:13 to 5:19 p.m.)

THE VIDEOGRAPHER: We're back on the video record at 5:19.

MR. SWAMINATHAN: Counsel asked me to reask

Page 189

the question, which I'm happy to do.

Q. Ms. Mejia, you've testified in this deposition that you called the Mejia home from a pay phone at the hospital on the morning of March 28. Do you have any explanation for why there are no calls to the Mejia home on the phone log marked as Plaintiff's Exhibit 7 (sic) (Reporter's Note: Actually Plaintiff's Exhibit 8) on the morning of March 28?

MS. ROSEN: Objection: form, foundation.

A. I don't remember.

Q. Showing you a document that is marked as Defendant's Exhibit 9, Bates-stamped -- let's see if it's got a Bates stamp on it. Looks like HIPAA 4 and HIPAA 5.

Ms. Mejia, this is a Cermak health record form. This document is from April of 1998. That's the month that you were arrested and taken into custody, correct?

A. I don't recall.

Q. You were asked Question Number 6 on the Cermak. "Has detainee ever attempted suicide?"

Answer, "Yes."

"If yes, when?"

"February 23."

CCSAO COI SUBPOENAS 000629

ADRIANA MEJIA, 02/05/2021 — Page 190..193

FILED DATE: 4/8/2022 3:39 PM 98CR1244002

Page 190

Ms. Mejia, you testified at this deposition that you never attempted suicide, correct?

A. I've never tried to commit suicide.

Q. Is what is written here false?

A. I don't recall.

Q. It says here that you cut your wrist "because I couldn't have children."

Have you ever tried to cut your wrist?

A. No.

Q. Is what's written on this document false?

A. Yes. I've never tried to take my own life.

Q. Is your testimony that the person from Cermak who wrote this down wrote down a lie?

MR. BRENER: Objection to form and foundation.

A. I don't recall.

Q. Which is the truth, what is written here or what you're telling us today?

A. I'm telling you that I've never tried to take my own life.

Q. Do you know where the people from Cermak got that information?

A. I don't recall.

Q. Whatever it is, whatever they wrote down,

Page 191

according to you, is false, correct?

A. Yes.

Q. All right. I want to play an audio clip. I'd like you to listen to this audio clip. I'll share my screen.

Ms. Mejia, what I'm showing you is a document marked Defendant's Exhibit 36 produced to us by Defendants' counsel the day before this deposition. And it is a transcription of an audio recording dated October 23 -- a call that took place on October 23, 2019. Ms. Mejia, that's one day after you were previously deposed in this case.

Do you recall that?

UNIDENTIFIED SPEAKER: Ready for the clips?

Q. Ms. Mejia, you recall that, right? This is one day after you were previously deposed, right?

Go ahead, Ms. Mejia.

UNIDENTIFIED SPEAKER: I thought you were going to play an audio clip.

Q. I'm asking: Ms. Mejia, you understand this is -- October 23, 2019, is one day after your previous deposition. You agree, right?

THE INTERPRETER: I'm sorry, Counsel. One day previous?

Page 192

Q. One day after the prior deposition you gave in this case, right?

A. I don't recall that.

MR. SWAMINATHAN: Okay. Let's play the audio clip.

Shawn, it should be playing. Shawn, is it working?

SHAWN: I'm playing it. Hang on a second. Let me start it again. Maybe it will be better.

(Audio clip playing.)

MR. SWAMINATHAN: We can't hear it, Shawn. We'll just use the transcript. I'll ask the interpreter to just read this for us -- read this for the witness.

THE INTERPRETER: Do you want me to interpret it as I'm reading, obviously?

MR. SWAMINATHAN: Yeah. Just interpret it for her, yeah.

(Interpreter reading the document for Ms. Mejia in Spanish.)

MR. SWAMINATHAN: Let me stop you there for one second.

BY MR. SWAMINATHAN:

Page 193

Q. Adriana, who is Maleno?

A. My brother.

Q. And where is Maleno?

A. Mexico.

MR. SWAMINATHAN: And then I want -- we can start here. Starting here.

THE INTERPRETER: Okay.

(Interpreter continuing to read the document for Ms. Mejia in Spanish.)

MR. SWAMINATHAN: Sorry. Let's pause there.

BY MR. SWAMINATHAN:

Q. Ms. Mejia, you're talking about the deposition that you had just given, right?

A. Yes.

MR. SWAMINATHAN: And then let's please read the next section. Can you read it? You need it a little bigger?

THE INTERPRETER: Yes. Starting where, Counsel? I'm sorry.

MR. SWAMINATHAN: Starting with "Adriana: But the attorney."

(Interpreter continuing to read the document for Ms. Mejia in

CCSAO COI SUBPOENAS 000630

FILED DATE: 4/8/2022 3:39 PM 98CR1244002

Page 194

Spanish.)

MR. SWAMINATHAN: You can stop there.

BY MR. SWAMINATHAN:

Q. Ms. Mejia, you were describing to your brother what happened at the deposition, correct?

A. Yes.

Q. What you told him is completely made up, right?

A. Because I didn't want to worry them anymore because they're tired. My parents have been tired for a long time.

Q. What you told them didn't happen, right?

A. Yes.

Q. You said in here -- you told your brother that your attorney got up and she threw the papers at their face, right?

A. Yes.

Q. But that didn't happen, right?

A. Yes.

Q. You just made that up, right?

A. Yes, because I don't want to worry them anymore.

Q. You said -- you told your brother that you got a two-month -- in two months, you were going to be

Page 195

out, right?

A. Because I'm going to get out of here. Even if you don't believe it, I'm going to get out of here one day.

Q. But what you told him was a lie. You don't have any reason to believe you're going to be out in two months, do you?

A. Perhaps. Who are you to say that I'm not going to get out?

Q. Has anybody suggested to you that you do have a chance of maybe getting out if you do the right thing?

MS. ROSEN: Object to the form.

A. I'm not going to answer.

Q. You say -- in this call with your brother, you say, "The judge was going to give the sentence, the final one. The opponents got up and, well, they gave me a continuance. But it was fine."

That's made up, right?

THE INTERPRETER: I'm sorry, Counsel. Where are you? Oh.

A. I'm not going to answer.

Q. That's not true, right? That's made up, right?

Page 196

MS. ROSEN: Object to the form, argumentative.

A. I'm not going to answer.

Q. Later in the same clip, you --

MR. SWAMINATHAN: Let's read for Ms. Mejia what she said later in this clip. Let me read it. Then you can translate.

Later in this clip, you said, "Tell my mommy that everything is very good and explain to her . . . oh, my attorney says not to talk if there are people that communicate with you because they are against us. And also, tell Carlos that my attorney said they are going to look for him to ask questions since he is here, that he is to say nothing, nothing, absolutely nothing.

A. I'm not going to answer.

Q. Ms. Mejia, you did not want your brother answering any questions about this case; is that right?

A. I'm not going to answer.

Q. And you told your brother Maleno to make sure that Carlos did not answer any questions about your case, right?

A. Yes.

Page 197

Q. And why was it so important to you to make sure that Carlos didn't talk about what happened?

A. Because he didn't know anything, and they were always interrogating him.

Q. Ms. Mejia, you wanted to -- it was important to you to make sure that Carlos didn't talk about this case, right?

MS. ROSEN: Objection: asked and answered, harassing.

A. I'm not going to answer you.

Q. Were you afraid of what he might say?

A. No, because he didn't know anything.

Q. So why couldn't he answer the questions and tell people he didn't know anything?

A. Because they were always bothering him.

Q. Who said they were bothering him?

A. I don't know, but I think that a lot of people were bothering him.

Q. If Carlos knew nothing, there would have been no problem for Carlos to answer questions and explain he knew nothing, correct?

A. Objection: form, argumentative.

MR. BRENER: Join the objection.

Q. What does Carlos know that you don't want

Page 198

him to talk about?

A. He doesn't know anything.

Q. Ms. Mejia, you wrote letters from prison to Guadalupe Mejia, right?

A. I don't recall.

Q. But you testified about a letter you wrote to Guadalupe on October 22 at your prior deposition, right?

Strike that. At your October 22 deposition, you answered questions about a letter you wrote to Guadalupe on June 11, 1998. You remember that?

A. At this time, I don't recall.

Q. Ms. Mejia, I'm going to show you a letter. This is Exhibit 5 to your prior deposition, RFC Solache Reyes 3949 to 3952.

And I'll ask the court reporter to read the excerpt that starts at number 1. Here.

THE INTERPRETER: The court interpreter? You want me to read?

MR. SWAMINATHAN: Court interpreter, I'm sorry.

THE INTERPRETER: I'm trying to understand the handwriting, Counsel.

"I feel very badly' --

Page 199

MR. SWAMINATHAN: You can read it in Spanish.

MR. BRENER: We're going to need it in English for the record, too.

THE INTERPRETER: So you want me to read it to her in Spanish and then translate it?

MR. SWAMINATHAN: Yes.

THE INTERPRETER: Got you. I can't understand "perdi a Chapa."

MR. SWAMINATHAN: Let me let Ms. Mejia read it. And then we can have you interpret it in English.

THE INTERPRETER: Actually, there's just one word. I think Chapa is the name of someone?

MR. SWAMINATHAN: That's Rosauro's nickname.

THE INTERPRETER: Okay. Thank you.

"I feel badly because I know that I lost Chapa because of my fault, and that will be my punishment."

BY MR. SWAMINATHAN:

Q. In this letter to Lupe, you wrote about feeling sad about losing your husband, Chapa, right?

A. Yes.

Q. And you acknowledged that it was your fault, right?

Page 200

A. My fault in that -- how can I explain it?

Q. You didn't say it was anyone else's fault. You said it was your fault, right?

MS. ROSEN: You just interrupted her. She was not finished. She didn't finish her answer.

Q. Did you have more you wanted to say, Ms. Mejia?

A. I don't know how to explain it to you right now.

Q. You said it was your fault, not anybody else's fault, right?

MS. ROSEN: Objection, form.

A. And in order to better explain it and admit it was my fault and my personal -- with my husband, not other people.

Q. Take a look at the section here that we've highlighted on page 3 of this letter. You've had a chance to read that, Ms. Mejia?

Ms. Mejia, you told Guadalupe that you were planning to get out of jail in "no more than a few days," correct?

A. I don't recall.

Q. What made you think that you might be getting out of jail in just a few days after June 11

Page 201

of 1998?

A. I don't recall.

Q. Did you make that up, or did you believe that?

A. I still continue believing that I'm going to get out.

Q. Did you actually believe you were going to get out in a few days, or were you making that up?

MS. ROSEN: Objection, form.

A. I thought I was going to get out in three days.

Q. And you had a plan to get out, right?

A. No, not a plan.

Q. Let's look at this excerpt that we've marked as number 3. Go ahead and read that, Ms. Mejia?

A. You're going to read it. I'm not.

Q. You wrote to Lupe. "Soon I'm going to leave," right?

A. I don't recall.

Q. Let's take a look at the excerpt we've marked as number 4. You wrote to Lupe, "For now, I'll be here for a very short time. Then I'll follow my path together with my parents. They are waiting for me." You wrote that to Lupe, right?

CCSAO COI SUBPOENAS 000632

FILED DATE: 4/8/2022 3:39 PM  98CR1244002

Page 202

A. I don't recall.

Q. Well, that's what you wrote to Lupe, right, in this letter?

A. I don't recall. It's many years.

Q. Well, do you dispute that what's written on -- that what I said, that's what you said in this letter? That's what I'm asking you.

A. I repeat that it's been many years. I don't remember.

Q. You didn't end up getting out a few days after you wrote that letter, did you?

A. I don't know.

Q. You said you didn't have a plan then. But in June of 1999, you came up with a plan, right?

A. I never made a plan.

Q. Take a look at the document marked Plaintiff's Exhibit 8 (sic) (Reporter's Note: This is Plaintiff's Exhibit 9). This is RFC Solache Reyes 4812 through 4816. This is a letter that you wrote on June 1, 1999, to Gabriel Solache. You were writing letters to Gabriel solache. We talked about that, right?

MS. ROSEN: Objection, form.

Q. You wrote him letters, right?

Page 203

A. Yes.

Q. And in those letters, you came up with a plan to get Gabriel to take responsibility for the crime so that you could go back to Mexico, right?

A. When he wrote, he had already decided, and he wrote a lot of things to me too. I've lost the letters, but otherwise I would prove that he had said a lot of things to me as well.

Q. You wrote to him and asked him to lie so that you could be released to go see your parents, right?

MS. ROSEN: Objection, form. Go ahead.

A. I don't recall.

Q. All right. Let's take a look. Looking at Plaintiff's Exhibit 8 (sic), if we look at the first excerpt, you wrote to Gabriel. Excerpt 1: "Write to me as soon as possible so that Montez (phonetic) can send you money and take you clothes."

You tried to get Gabriel Solache to do what you wanted by sending him money and clothes, right?

MS. ROSEN: Objection: form, argumentative.

A. I don't recall.

Q. Let's take a look at excerpt 3. "You said there is something about all of this, and I can't tell

Page 204

you." What did you mean by that?

A. That we couldn't speak by letter about the crime, about what had happened.

Q. You wrote to him telling him that there were things about this that you could not tell him. You were hiding something from him, right?

A. No.

Q. You were hiding from him what actually happened at the Soto residence, right?

A. I'm not going to answer. I don't remember.

Q. Let's take a look at another letter you wrote marked as Plaintiff's Exhibit 9 (sic) (Reporter's Note: This is Plaintiff's Exhibit 10). It's RFC Solache Reyes 4827 - 4836. This is a letter you wrote on July 12, 1999.

Looking at page 6 of this letter, you wrote, "You will soon be in Mexico, and I will have to come back to this place because this is what I deserve. Think about it and tell me if you'll help me for only about six months, just to make my mother happy."

You wrote that to Gabriel Solache in July of 1999, right?

A. I don't recall.

Q. You wanted to go back to Mexico to say

Page 205

goodbye to your parents, right?

A. I don't recall that.

Q. And you said you would take full responsibility for the crimes you committed, allowing Gabriel to be released, right?

MR. BRENER: Objection, argumentative.

MS. ROSEN: Objection: form, foundation.

MR. SWAMINATHAN: Go ahead.

A. I don't recall.

Q. Looking at excerpt number 2, you wrote, "All I ask are six months of happiness. After that, nothing will matter. I will make you a letter and sign it that you personally can submit. I know that they would go for it for me, but I would come back because then you could soon go free."

A. I don't recall.

Q. You were admitting there that Gabriel Solache should go free; but first, you wanted him to help you go home for a period to see your parents, right?

MS. ROSEN: Objection: form, foundation, mischaracterizes the letter.

A. I don't recall.

Q. You believe that Gabriel Solache did deserve

CCSAO COI SUBPOENAS 000633

FILED DATE: 4/8/2022 3:39 PM   98CR1244002

FILED DATE: 4/8/2022 3:39 PM   98CR1244002

Page 206

to be free, right?

A. Why would he have to be freed if he was also an accomplice in the crime.

Q. You wrote to him that, if he would just lie, you could go home for six months. Then you would say whatever you needed for him to be able to go home, right? That's what you wrote.

MS. ROSEN: Objection: form, foundation. That's not what you read to her; and if it's somewhere in the letter, then you should let her read it.

MR. SWAMINATHAN: Go ahead.

A. I'm not going to answer.

Q. All right. Let's take a look at excerpt number 3. You said, "I will help you and defend you of everything. I want you to help at least a little. I want to see my mother, ask her to forgive me, and then speak of everything. I wanted to go see her and then say everything so that they can leave you in liberty."

THE INTERPRETER: I'm trying to follow, Counsel, I'm sorry.

MR. SWAMINATHAN: Sorry. I can start over and go through it slower.

THE INTERPRETER: Okay.

Page 207

Q. "I will help you and defend you of everything. I want you to help me at least a little. I want to see my mother, ask her to forgive me, and then speak of everything. I wanted to go see her and then say everything so that they can leave you in liberty."

You wrote, "I have to pay for what I did. And I want my parents to hug me for the last time. I ask this for my mother and for me. I know I don't deserve anything from you. But I know that you have a heart that's double or the same as God's."

You wrote that to Gabriel Solache, right?

MS. ROSEN: Objection, form and foundation. I don't know what you're reading from. I don't know if that's an accurate translation. So form, foundation.

MR. SWAMINATHAN: Go ahead, Ms. Mejia?

A. I don't recall.

Q. You wrote in that letter that Gabriel deserved his liberty, right?

A. Everybody deserves an opportunity. Why just him?

Q. Were you apologizing to him in this letter?

A. I don't recall if I was apologizing to him

Page 208

or not. I don't remember.

Q. Let's take a look at one last section. Take a look at excerpt number 5. You wrote, "I hope some day you can forgive me all that you have suffered and that you have gone through because of my fault. Forgive me. It's easy to say. And you must think, after all that's been done to me, you ask me for that."

You told him it was all your fault that he was in prison, right?

MS. ROSEN: Object: form, foundation.

MR. SWAMINATHAN: Go ahead.

A. I don't recall.

Q. Ms. Mejia, do you dispute that you wrote that in the letter to him, that he should go free?

A. I don't recall if I wrote that, no.

Q. You agree this is your handwriting, right?

A. (No response.)

Q. Ms. Mejia, you previously testified about these letters. Go ahead.

MS. ROSEN: Objection, you're mischaracterizing what she testified to about this letter, this particular letter.

MR. SWAMINATHAN: We have to take a break

Page 209

here. She had to step away. Oh, she's back.

Q. Ms. Mejia, this is your handwriting. This is a letter you wrote to Gabriel Solache, right?

A. I don't recall.

Q. You don't remember writing this letter?

A. I don't recall.

Q. And you agree that this is your handwriting, right, under oath? It appears to be your handwriting?

A. It looks like it, but --

Q. But you don't remember saying this?

MS. ROSEN: Objection: form, foundation. Mischaracterizes what she just said.

MR. SWAMINATHAN: Go ahead, Ms. Mejia.

A. I don't recall.

Q. Ms. Mejia, you wrote to Gabriel Solache and told him multiple times that it was your fault, right?

A. I felt guilty about the deaths, but not -- I don't know how to explain it.

Q. You also told him in multiple letters that he deserved to be free, right?

A. We all deserve to be free. We have to pay for our mistakes, but --

Q. All right. Ms. Mejia, if the crime actually happened the way you've described here in your

CCSAO COI SUBPOENAS 000634

ADRIANA MEJIA, 02/05/2021                                    Page 210..213

Page 210

deposition yesterday and today, you never would have written to Gabriel Solache saying that he deserved to be free, would you?

MR. BRENER: Objection to form, argumentative.

A. I'm not going to answer.

Q. If -- strike that.

And you just mentioned feeling guilty. Do you feel guilty that your statements resulted in Gabriel Solache being locked up for many years?

MR. BRENER: Objection: form, foundation, mischaracterizes the record.

A. Can you repeat the question?

Q. Yeah. You said -- earlier, you used the word "guilty." You feel guilty about what happened to Gabriel Solache.

A. I feel guilty for -- I don't know how to explain it.

Q. Ms. Mejia, do you feel guilty to what happened to Arturo Reyes?

A. I'm not going to answer.

Q. Ms. Mejia, you realize that the story that you told us here today and yesterday, it's simply impossible, right?

Page 211

MS. ROSEN: Objection: form, argumentative.

MR. BRENER: Foundation.

MR. SWAMINATHAN: Go ahead.

A. I'm not going to answer.

Q. Based on the story you just told, your blood should not have been found anywhere in the Soto home, right?

MS. ROSEN: Objection: form, foundation.

MR. SWAMINATHAN: Go ahead.

A. I'm not going to answer.

Q. But it was. Your blood was found in the Soto home, right?

A. I'm not going to answer.

Q. And based on the story you just told, you had almost no role whatsoever, correct?

A. What do you mean, "role"?

Q. Based on the story you just told, you didn't really have any role in killing the Soto family, right? You didn't even know what was going to happen, right?

A. I'm not going to answer.

Q. And yet your blood was found on the knives in the house, right?

A. I don't know. I'm not going to answer.

Page 212

Q. The story you just told would require Gabriel to have skipped work that day, right?

MS. ROSEN: Objection: form, foundation.

A. I'm not going to answer.

Q. When you say the crime was happening, Gabriel Solache was at work, right?

MS. ROSEN: Objection: form, foundation.

A. I'm not going to answer.

Q. All right. The last few questions. Ms. Mejia, are you lying about what happened because you're angry at Gabriel Solache?

A. I'm not going to answer.

Q. Are you angry that he wouldn't help you go back to Mexico to see your parents?

A. I'm not going to answer anymore.

Q. Ms. Mejia, are you lying about what happened because you want to get released -- strike that.

Ms. Mejia, are you lying because you hope to one day get released from prison, and you're hoping your testimony will help you?

A. I can tell you that I respect your laws. I don't know. I know it's your job, but I can say that I believe in the law of God.

Q. Ms. Mejia, are you lying to protect others?

Page 213

A. No.

Q. Are you lying to protect whoever made the calls to the house on the night of March 27, the morning of March 28?

A. I'm not going to answer.

Q. Ms. Mejia, --

MS. ROSEN: You're out of time.

MR. SWAMINATHAN: I have two last questions.

Q. Ms. Mejia, you were previously asked questions about whether Arturo Reyes had anything to do with this crime. And in a previous deposition, you asserted your Fifth Amendment right against self-incrimination, correct?

A. I don't recall.

Q. Ms. Mejia, in a previous deposition, you were asked whether you lied when you implicated Gabriel Solache in this murder and kidnapping of the Sotos, and you asserted your Fifth Amendment right, correct?

A. Honestly, I don't remember anymore.

MR. SWAMINATHAN: I have no further questions.

MR. ENGQUIST: We have a few, or I have a few.

CCSAO COI SUBPOENAS 000635

FILED DATE: 4/8/2022 3:39 PM  98CR1244002

Page 214

MS. ROSEN: I assume Ms. Susler has no questions?

MS. SUSLER: That's correct.

MS. ROSEN: Thank you.

MR. ENGQUIST: Do you want me to go straight into it, or what?

MS. ROSEN: Ms. Mejia, would you like us to take a quick break before we ask some follow-up questions, or are you good to go?

THE WITNESS: How much longer is this going to take, a lot?

MR. ENGQUIST: Not too long for me. Not for me. But if you need to take a break to use the restroom before we start or something like that, just let me know.

THE WITNESS: Okay. If we could take a break in about 20 minutes.

MR. ENGQUIST: Okay. Sure.

EXAMINATION

BY MR. ENGQUIST:

Q. Ms. Mejia, I just want to -- I'm going to jump around a little bit, okay?

Earlier in your testimony -- I'm not sure if it was today or yesterday -- you talked about

Page 215

basically growing up with Mr. Solache; is that correct?

A. Yes.

Q. And I know, earlier today, you also talked about seeing him pick a lock at the school when you were in Mexico, correct?

A. Yes, because he was terrible.

Q. When you say "he was terrible," did you ever see him break any laws when he was in Mexico?

A. Not laws, but in Mexico, where we lived, there's no authority. I don't know if I can say it or if I have to reserve that to myself.

Q. Why would you have to reserve that to yourself about Mr. Solache's activities when he was growing up in Mexico?

A. Well, because when we were younger, when we were young, he was a little bit violent with his peers. He was kind of abusive.

Q. When you say "violent to his peers," can you describe what he would do to his peers that would be violent?

A. Violent in the fact that he would make fun. He would, like, make fun of people.

Q. Would he ever physically hurt anybody?

Page 216

A. I remember, when he used to hang out with my older brother, he was, like, very possessive, very abusive.

Q. When you say "abusive," was he physically abusive?

MS. ROSEN: Objection, been asked and answered.

MR. ENGQUIST: Go ahead.

A. Yes, very abusive because he would bully people from his generational line.

Q. I know you said you saw him use a hanger to get into the door the night of the murders, but you also saw him use it one time in Mexico. Do you ever see him any other time break in through a locked door other than those two times?

A. I remember, when we were in elementary school, there was a little room where they sold food. It was easy to take the windows off. He would go in with his little friends to get a lot of candy out. He had a lot of reports from his teachers.

Q. Other than reports from his teachers, did he ever get in trouble with the law, as far as you know, down in Mexico.

A. Yes. On one occasion, he tried to abuse a

Page 217

lady.

Q. And where was this?

A. In my town.

Q. Do you remember when this was, what year?

A. I don't recall the exact date, but that's why he fled my town.

Q. When you say "fled your town," was that before -- right before he went to the United States, or did he move somewhere else before coming to the United States?

A. I believe that happened -- when it happened, it was about April 25 when he tried to force her. And he left to the capitol with his mother.

Q. And do you know who that girl was or who that woman was?

A. Yes. Her name is Penelope. I don't recall her last name, but she's from my town.

Q. Do you know whatever happened with that -- or did anything ever happen with those allegations of abuse?

MR. SWAMINATHAN: Form. Go ahead.

A. All I know was that the lady's husband was looking for him.

Q. Do you know what the abuse was, what

Urlaub Bowen & Associates, Inc. 312-781-9586

CCSAO COI SUBPOENAS 000636

FILED DATE: 4/8/2022 3:39 PM   98CR1244002

FILED DATE: 4/8/2022 3:39 PM  98CR1244002

ADRIANA MEJIA, 02/05/2021                                    Page 218..221

Page 218

actually happened, allegedly happened?

A. No. Very little, no.

Q. Now, at some point while Mr. Solache was living in the United States, he received some type of head injury. Do you know anything about that?

A. Yes, for fighting.

Q. Who was he fighting with?

A. With Daniel.

Q. And do you remember when this fight took place?

A. No. I don't remember anymore.

Q. It was before the events which you were arrested for, correct?

A. Yes.

Q. Do you remember what his injury was?

A. Can you repeat the question?

Q. Sure. Do you remember what his injury was?

A. I think they put a brick in his head.

Q. Oh, he was struck on the head with a brick on the head? Is that correct?

A. I think Daniel stabbed him in the head with it.

Q. Do you know if Mr. Solache went to the hospital for that?

Page 219

A. I believe my brother-in-law Leobardo and my brother Carlos went to take him to Cook County.

Q. And was he hospitalized for a period of time with that.

A. Yes.

Q. Do you remember him having any kind of lasting injuries from that being struck in the head with a brick?

A. I don't know. But later, he would say that he couldn't see out of one eye. But I don't remember which eye.

Q. Did he ever complain to you about his hearing at that time?

A. At that time, I couldn't have a lot of communication with him. It was my brother Carlos and my brother-in-law Leobardo.

Q. Okay. I want to go back to the night of the crime and just do a couple of questions on that, if you don't mind.

You've already testified that Mr. Reyes came in after the husband was stabbed but before the wife was stabbed, correct?

A. Yes.

Q. Did Mr. Reyes tell Mr. Solache to stop when

Page 220

the wife was attacked?

A. I don't recall.

Q. Did he try to physically stop him at all?

A. I think so.

Q. You think so, okay. Do you know how he tried to physically stop him?

A. I think he wanted to grab him, but I'm not -- I think he did want to push him.

Q. Did he actually push him?

A. Yes, I think he did, a little bit.

Q. Is this when Mr. -- is this right before Mr. Solache was stabbing the woman in the back?

THE INTERPRETER: I'm so sorry, Counsel. What was that?

Q. Was this when you described Mr. Solache stabbing the woman in the back?

A. Yes.

Q. At this time, the woman was on the ground on all fours?

A. What do you mean "on all fours"?

Q. Down on her hands and knees.

A. Honestly, I don't recall.

Q. What else did Mr. Reyes do to try to stop Mr. Solache from stabbing the woman?

Page 221

A. I don't really remember a lot now.

Q. When the stabbing was going on, did either you or Mr. Reyes leave the apartment to try to get help?

A. No.

Q. You were testifying earlier how you thought that Mr. Solache would have had blood on his clothing. Remember that?

MR. SWAMINATHAN: Objection to form.

MS. ROSEN: Objection, mischaracterizes her testimony.

MR. ENQUIST: Go ahead.

A. Yes.

Q. Do you know what Mr. Solache did with that bloody clothing?

A. Yes.

Q. What?

A. He washed it in the bathroom and put it in a bag and went to throw it out.

Q. How do you know that?

A. Because I was watching him when he was washing them.

Q. Earlier, you testified that you did answer questions from police officers and also an Assistant

Case: 1:18-cv-01028 Document #: 892-2 Filed: 04/04/26 Page 638 of 855 PageID #:121264

FILED DATE: 4/8/2022 3:39 PM   98CR1244002

Page 222

State's Attorney. Do you recall those questions?

A. Yes.

Q. When you answered the police officers and the State's Attorney, did you try to be truthful?

A. Yes.

Q. Did you ever change your story over time?

A. No.

Q. Did you tell the police or the state's attorney that you, Mr. Solache, Mr. Reyes were present when the Soto family were -- when Mr. and Mrs. Soto were killed?

A. Can you please repeat the question?

Q. Sure. I'll re-ask something.

Did you tell the police or the State's Attorney that you were present when Mr. and Mrs. Soto were killed?

A. I don't recall.

Q. Did you tell the police or the State's Attorney that Mr. Solache was present when the Sotos were killed?

A. I don't recall that

Q. Well, if you had told them that, that would have been true, correct?

A. I don't recall that question.

Page 223

Q. You talked earlier about talking directly to the State's Attorney, and he was asking you questions. Do you recall that?

A. Yes.

Q. And you tried to be honest with him?

A. Yes.

Q. If he would have asked you if Mr. Solache was involved in the murders, would you have told him yes?

MR. SWAMINATHAN: Objection to form.

MS. SUSLER: Join.

Q. Can I get the answer, please?

A. Yes.

Q. If he would have asked you if Mr. Reyes was present during the murders, would you have told him yes?

MR. SWAMINATHAN: Objection to form.

A. Yes.

Q. That's because it was true, correct?

MR. SWAMINATHAN: Objection to form.

A. Yes.

Q. And if you would have been asked who was involved in the kidnapping of the children, you would have told him that you, Mr. Reyes, and Mr. Solache

Page 224

were all involved; is that correct?

MR. SWAMINATHAN: Object to form.

MS. SUSLER: Join that.

A. Yes.

Q. That's because it's true, correct?

MR. SWAMINATHAN: Objection to form.

MS. SUSLER: Same.

A. Yes.

MR. ENGQUIST: I need about five minutes. I just want to look at something to make sure I'm going to be done. So if we could take a quick break for five minutes. This might be a good time to use the restroom, Ms. Mejia.

THE WITNESS: Okay.

THE VIDEOGRAPHER: We're off the record at 6:30 p.m.

(Recess in proceedings from 6:30 to 6:39 p.m.)

THE VIDEOGRAPHER: We're back on the video record at 6:39.

MR. ENQUIST: Before we get back on the record, I think you had one correction to make, Ms. Translator.

THE INTERPRETER: That is correct. When

Page 225

Ms. Mejia stated that he would bully people from his generation, I interpreted that literally. Because in Spanish, "generacion" actually means class, like if you're class of '99, class of 2000. That's the example. And I interpreted it as generation instead of saying from his class.

MR. ENGQUIST: I appreciate that. Thank you.

BY MR. ENGQUIST:

Q. Ms. Mejia, you were asked a lot of questions today about Jose Mejia.

Was Jose Mejia involved in the kidnapping of the Soto children?

A. No.

Q. Was Jose involved in the murders of Mr. and Mrs. Soto?

A. No.

Q. Did Jose Mejia know anything about the crime before it was committed?

A. No.

Q. You were also asked a lot of questions about your former husband, Rosauro?

A. Yes.

Q. Was Rosauro involved in the kidnapping of

CCSAO COI SUBPOENAS 000638

Page 226

the Soto children?

A. No.

Q. Was Rosauro involved in the murders of Mr. and Mrs. Soto?

A. No.

Q. Was he aware of the crime before it was committed?

A. No.

Q. You were asked a lot of questions about your ex-husband's brothers. He had quite a few of them.

A. Yes.

Q. Were any of your former husband's brothers involved in the murders of Mr. and Mrs. Soto?

A. No.

Q. Were any of them involved in the kidnapping of the Soto children?

A. No.

Q. Did any of them know about the crime before it was committed?

A. No.

Q. You were also asked questions about your downstairs neighbors, including Guadalupe?

A. Yes.

Q. Was Guadalupe involved in the kidnapping of

Page 227

the Soto children?

A. No.

Q. Was Guadalupe involved in the murders of Mr. and Mrs. Soto?

A. No.

Q. Was she aware of the crimes before they were committed -- the plan for the crime before it was committed?

A. No.

MR. ENGQUIST: I don't think I have anything else.

Does anybody else on the defense counsel crew here have anything?

MS. ROSEN: I actually do have just a couple of questions.

FURTHER EXAMINATION

BY MS. ROSEN:

Q. Ms. Mejia, you were asked a lot of questions about your brother Carlos in the last two days, correct?

A. Yes.

Q. Was your brother Carlos involved in the murders of Mr. and Mrs. Soto?

A. No.

Page 228

Q. Was your brother involved in the kidnapping of the Soto children?

A. No.

Q. Did your brother Carlos know about the plan to kidnap the children and murder their parents before the crimes happened?

A. No.

MS. ROSEN: I don't have any more questions.

MR. NOLAND: I do not have any questions.

MR. BRENER: I also do not have any questions.

MR. SWAMINATHAN: Nothing else for us.

MR. ENGQUIST: The only other thing is whether or not you want to waive or reserve your signature. I do not know, Dena if you want to make a call on that or not. It's up to you.

MS. SINGER: No. It's fine. I don't have a position on it. I mean, I can reserve it. But I don't have a position on it.

MR. ENGQUIST: Okay. Do you want to ask her if she wants to waive or reserve or explain it to her? Do you want me to explain it to her?

MS. SINGER: Go ahead. You can do it. It's fine. It's easier if you can do it with the

Page 229

interpreter though so she understands.

MR. ENGQUIST: Ms. Mejia, the only issue left is whether or not you want to waive or reserve your signature. That means, when this deposition is typed up, you get to choose whether or not you have a chance to read it over for accuracy before it's finalized or whether or not you want to waive it and trust that the court reporter typed up everything accurately.

THE WITNESS: That's fine.

MR. ENGQUIST: Which one? Waive or reserve?

THE WITNESS: I don't know. Whatever my attorneys advises me.

MR. ENGQUIST: Back to you, Dena.

MS. SINGER: I would need a second to talk to her, guys. It's really her decision. So I've got to go into a breakout room real quick. I'm sorry.

MR. SWAMINATHAN: We can log off, right? You don't need any of us -- oh, no no. We need to get that, right.

MS. SINGER: You do, because you need to know the answer.

MR. SWAMINATHAN: Sorry. Go ahead.

MS. SINGER: Adriana, we're almost done.

CCSAO COI SUBPOENAS 000639

FILED DATE: 4/8/2022 3:39 PM  98CR1244002

**Page 230**

Can you grab the guard?

THE VIDEOGRAPHER: We're off the record at the 6:46.

(Recess in proceedings from 6:46 to 6:50 p.m.)

MR. ENGQUIST: Before it's asked, I will just say, yeah, I'll order. Etran.

MS. SINGER: She's on her way back in. She would like to read it, but the concern is that it's in English. So I don't know how to satisfy the issue of the whole transcript being in English.

MR. ENGQUIST: I don't either. Because I think it would be a tad overkill to have 2 days, 17 hours or whatever, worth of translations done.

MS. SINGER: Right.

MR. ENQUIST: I'm honestly not sure even how that works. Any thoughts from the peanut gallery here?

THE INTERPRETER: You can always hire me.

MR. STARR: Could we send her the video, and she could watch the video, and then send the transcript?

MS. SINGER: That's a good -- but will the

**Page 231**

facility have a way for her to do that?

MR. ENGQUIST: I honestly don't know. I'm going to order the video too, by the way.

MS. SCHATZLE: Just food for thought on the video side, I can send the video through email to whoever at the jail, and then they can pull it up on a computer and let her watch it. So it will be an electronic copy of the video.

MR. ENGQUIST: But I don't control what they're going to allow her access to or period of time or anything like that.

You know, we can work on getting her a copy, I guess, at some point. But I don't know what else to say about that. Eileen, do you have a thought on it?

MS. ROSEN? Me? Yes, me. What would it cost, Elsa to have you read it to her?

THE INTERPRETER: You would just contact the agency, and I'm sure they would work with you.

MS. ROSEN: I mean, if Plaintiffs are willing to split costs on something like that, I suppose it's something we can talk about.

THE INTERPRETER: I mean, I don't get involved with the pricing. But I work with them, and they would work with you.

**Page 232**

MR. SWAMINATHAN: My concern is it's going to be extremely time consuming and expensive. What I would propose we do is try get her the video and see if there's a way that she can get set up to be able to review that. If we need to be able to set up a notice for her to be able to get a room to be able to review the video, that's also fine, or whatever we can do to facilitate that.

MR. ENGQUIST: I have no problem trying to work out sharing with her the video. But if it's a reserving signature thing, then it's the reading of the transcript, not the video. Her watching a video doesn't alleviate that concern.

So if it's reserved, that's a different issue. And honestly, I don't know how to deal with that in this case. If it's going to be "waived, but I'd like to get a copy of it," then we can probably work that out.

MR. SWAMINATHAN: Maybe we need ask her that.

MS. SINGER: I'm sorry, what did you say?

MR. SWAMINATHAN: If we get her a copy of the video, is that what she would like? Or is she additionally indicating that she's not waiving, and

**Page 233**

she wants to be able to do a comparison to the actual transcript before she -- rather than waive signature?

In other words, if what she wants is --

MS. SINGER: No, I understand. I'm with you. It's 17 hours, but I got you. Is she there? Sorry. I can only see -- not everybody.

Elsa, I guess, can you ask her: Adriana, do you want to see the video, and is the video sufficient for to you determine if everything is accurate?

THE WITNESS: Because of the Corona virus, they're not going to let me see it. Everything is canceled right now.

MS. SINGER: Right. A lot of the facilities won't give them access to computers and stuff because of the virus.

Well, I think we should --

MR. SWAMINATHAN: If it's a matter of time, it could be that -- I don't know how long it usually takes to go back and forth; but if it's going to be 60, 90 days, we could be in a different place with regard to her ability to have access to a computer.

MS. SINGER: Well, then you guys are waiting 60 or 90 days until --

MR. SWAMINATHAN: I don't care about waiting

CCSAO COI SUBPOENAS 000640

ADRIANA MEJIA, 02/05/2021                              Page 234..235

Page 234

60 to 90 days to have her sign off on the errata sheet, which is basically what we're talking about.

MR. ENGQUIST: The thing is, if it gets written, then you just have 30 days to determine.

MS. ROSEN: I know, you can extend that by agreement. we could agree to give her more time.

MS. SINGER: Adriana, are you comfortable waiving it? Are you comfortable saying that you think the transcript, as written, was taken accurately, or would you prefer to read it?

THE WITNESS: Whatever decision my attorney makes is fine.

MS. SINGER: All right. We can waive it.

THE VIDEOGRAPHER: Just to note, the video was not recording. Do you want that also on the video or just on the written transcript?

MR. ENGQUIST: The fact that it's waived?

THE VIDEOGRAPHER: Yeah.

MR. ENGQUIST: Just on the written transcript. That's fine.

THE VIDEOGRAPHER: I was just letting you guys know.

(Deposition concluded at 6:57 p.m.; by agreement, signature waived.)

Page 235

CERTIFICATE OF REPORTER

I, BRENDA L. ZEITLER, a Certified Shorthand Reporter within and for the State of Illinois, do hereby certify that the witness, ADRIANA MEJIA, whose testimony appears in the foregoing deposition was duly sworn by me through a Spanish interpreter; that the testimony of said witness was taken through Spanish interpreter on February 5, 2021, by me to the best of my ability and thereafter reduced to typewriting under my direction; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition was taken, and further that I am not a relative or employee of any attorney or counsel employed by the parties thereto, nor financially or otherwise interested in the outcome of the action.

_____

Brenda L. Zeitler, CSR

Illinois License No. 084-004062

FILED DATE: 4/8/2022 3:39 PM   98CR1244002

CCSAO COI SUBPOENAS 000641

**From:** CHRISTA BOWDEN (States Attorney)
**To:** Anand Swaminathan
**Subject:** Re: Reyes COI - SJ argument
**Date:** Tuesday, April 12, 2022 3:12:46 PM

Ok! Thanks for letting me know. I appreciate it.

Christa Bowden

On Apr 12, 2022, at 3:11 PM, Anand Swaminathan <anand@loevy.com> wrote:

**External Message Disclaimer**

This message originated from an external source. Please use proper judgment and caution when opening attachments, clicking links, or responding to this email.

Christa, just wanted to give you heads up that I was in front of Judge Atcherson on another matter today and she indicated that she does not yet know if she will be keeping the Reyes COI, and that in any event she will not be ready to hear argument on the motion on Thursday. So, I wouldn't spend too much time getting ready - it's either going to move to a new date or a new judge!

Thanks,
Anand

--
Anand Swaminathan
Loevy & Loevy
311 N. Aberdeen Street, 3rd Floor
Chicago, Illinois 60607
(312) 243-5900
anand@loevy.com

CCSAO COI SUBPOENAS 000642

| From: | Anand Swaminathan |
|---|---|
| To: | Sophia Atcherson (Judiciary) |
| Cc: | CHRISTA BOWDEN (States Attorney); Rachel Brady; Jan Susler |
| Subject: | Reyes COI, 98 CR 12440-02 - copy of pleadings and exhibits |
| Date: | Friday, April 15, 2022 11:53:21 AM |

**External Message Disclaimer**

This message originated from an external source. Please use proper judgment and caution when opening attachments, clicking links, or responding to this email.

Judge, per our discussion yesterday in court, below is a link that contains Petitioner Reyes' COI Petition (and exhibits), Notice of Supplemental Authority, and Summary Judgment motion and reply (and exhibits).

https://drive.google.com/drive/folders/10XJ6ms8WH1WR9zhkBQRD1EKoRou87z7n?usp=sharing

You should be able to view and/or download the documents from the link. If not, please let us know and we can messenger a flash drive containing the material to you.

Thanks,
Anand

--
Anand Swaminathan
Loevy & Loevy
311 N. Aberdeen Street, 3rd Floor
Chicago, Illinois 60607
(312) 243-5900
anand@loevy.com

CCSAO COI SUBPOENAS 000643

| From: | Jan Susler |
|---|---|
| To: | Sophia Atcherson (Judiciary) |
| Cc: | CHRISTA BOWDEN (States Attorney); Anand Swaminathan; Rachel Brady |
| Subject: | Gabriel Solache COI, 98 CR 12440-03 |
| Date: | Friday, April 15, 2022 3:34:30 PM |
| Attachments: | 4.27.2018 Solache COI petition and exhibits FINAL.pdf |

## External Message Disclaimer

This message originated from an external source. Please use proper judgment and caution when opening attachments, clicking links, or responding to this email.

Dear Judge Atcherson, pursuant to your request in court yesterday, we are attaching Mr. Solache's Petition for a Certificate of Innocence, with exhibits.
Should you have any trouble opening the attachment, please let us know.
Respectfully, Jan Susler

--

Jan Susler
People's Law Office
1180 N. Milwaukee, 3rd floor
Chicago, IL 60642
773.235.0070
c. 773.252.4049
jsusler@peopleslawoffice.com

CCSAO COI SUBPOENAS 000644

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, CRIMINAL DIVISION**

| | |
|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, ) | |
| ) | |
| *Respondent*, ) | |
| ) | |
| -vs- ) | No. 98 CR 12440-03 |
| ) | |
| GABRIEL SOLACHE, ) | |
| ) | |
| *Petitioner*. ) | |

**PETITION FOR A CERTIFICATE OF INNOCENCE PURSUANT TO 735 ILCS 5/2-702**

Petitioner GABRIEL SOLACHE, through his attorneys KAREN L. DANIEL of the CENTER ON WRONGFUL CONVICTIONS at the BLUHM LEGAL CLINIC at NORTHWESTERN PRITZKER SCHOOL OF LAW, and JAN SUSLER, JOHN L. STAINTHORP, and BEN H. ELSON of the PEOPLE'S LAW OFFICE, respectfully petitions this Court to enter an order granting him a certificate of innocence pursuant to 735 ILCS 5/2-702. In support of this request, Mr. Solache states as follows:

**I. JURISDICTION**

1.      This proceeding is brought under 735 ILCS 5/2-702.

2.      The certificate of innocence statute permits a person whose convictions have been set aside to apply for judicial certification of innocence of the underlying crimes. *Id.*

3.      The statute was passed due to the Legislature's recognition "that innocent persons who have been wrongly convicted of crimes in Illinois and subsequently imprisoned have been frustrated in seeking legal redress due to a variety of substantive and technical obstacles in the

1

law and that such persons should have an available avenue to obtain a finding of innocence so that they may obtain relief through a petition in the Court of Claims." 735 ILCS 5/2-702(a).

## II. PROCEDURAL HISTORY

4. Mr. Solache was arrested in this matter on April 3, 1998. The indictment against him was filed on May 8, 1998.

5. On June 20, 2000, a Cook County jury found Mr. Solache guilty of two counts of first degree murder, two counts of aggravated kidnapping, and home invasion. Judge Stanley J. Sacks sentenced Mr. Solache to death for the murders and to concurrent prison terms of 30 years for each count of aggravated kidnapping and for home invasion. A copy of the corrected mittimus, filed on January 17, 2001, is attached as Exhibit A.

6. On January 10, 2003, then-Governor George Ryan commuted Mr. Solache's death sentence to one of natural life imprisonment.

7. The Appellate Court affirmed the convictions on direct appeal. *People v. Solache*, No. 1-03-1149 (1st Dist. Aug. 19, 2003). Leave to appeal was denied on October 4, 2004. *People Solache*, 211 Ill. 2d 608 (2004).

8. On December 18, 2003, Mr. Solache filed a petition for post-conviction relief. Judge Sacks summarily dismissed the petition on March 12, 2004. On December 11, 2006, the Appellate Court reversed the summary dismissal and remanded for further post-conviction proceedings before a different judge. The Appellate Court ordered the same relief for Mr. Solache's codefendant Arturo Reyes. *People v. Reyes & Solache*, 369 Ill. App. 3d 1 (1st Dist. 2006). Leave to appeal was denied on March 28, 2007. *People v. Reyes*, 223 Ill. 2d 669 (2007).

9. On June 20, 2008, Mr. Solache filed an amended petition for post-conviction relief. On June 29, 2016, following a lengthy evidentiary hearing at which Mr. Solache testified

CCSAO COI SUBPOENAS 000646

that he was innocent, Judge James M. Obbish granted Mr. Solache's post-conviction petition in part by ordering a new hearing on Mr. Solache's motion to suppress his confession as involuntary. Mr. Reyes received the same relief. A copy of Judge Obbish's order granting post-conviction relief is attached as Exhibit B. The State filed a notice of appeal, but the appeal was dismissed on the State's motion on January 3, 2017.

10. On December 13, 2017, following an evidentiary hearing, Judge Obbish granted Mr. Solache's motion to suppress his confession, finding that Guevara was an utterly incredible witness and could not be believed in any proceeding. Judge Obbish ordered the same relief for Mr. Reyes. On December 21, 2017, Mr. Solache's judgment of conviction was vacated, the State dismissed all charges, and Mr. Solache was released from prison. A copy of the accompanying order is attached as Exhibit C.

### III. STATUTE OF LIMITATIONS

11. Mr. Solache is within the limitation period for filing a petition for a certificate of innocence, as charges were dismissed against him on December 21, 2017, and this petition is filed within two years of that date. *See* 735 ILCS 5/2-702(i).

### IV. FACTUAL BACKGROUND

**A. Circumstances of the offense and Gabriel Solache's conviction**

12. The underlying crime is summarized in the Circuit Court's order granting post-conviction relief on June 29, 2016:

> Petitioners' convictions arose from the fatal stabbings of Mariano and Jacinta Soto and the abduction of their infant, Maria, and toddler, Santiago. During March of 1998, petitioners' co-defendant Adriana Mejia (Mejia) was picked up from the hospital by her husband Rosauro Mejia (Rosauro) under the pretense of having given birth to the infant who accompanied her. Mejia also brought along a toddler boy who she explained as having been left in her care by another hospital patient by the name of Norma Salazar.

(Exh. B, p. 1).

<div align="center">3</div>

13.     On the afternoon of Friday, March 27, 1998, Mr. Solache left the Chicago residence he shared with at least eleven people, including Adriana and Rosauro Mejia, and went to his full-time factory job as a machine operator. He returned home in the early morning on March 28, 1998, talked briefly with a housemate, and went to bed. When he awoke later that Saturday morning, he was informed that Adriana had gone to the hospital the night before and had returned home with a newborn baby girl and a little boy, who Adriana claimed was the son of a woman she had met at the hospital. Mr. Solache had no personal knowledge of Adriana's activities that night and did not accompany her anywhere.

14.     On April 2, 1998, another house resident saw a television news report about the murders of Mariano and Jacinta Soto, which included photos of their two missing children. The photo of the missing boy matched the boy Adriana had brought home from the hospital. Over Adriana's objections, her husband Rosauro decided to take the boy to the police, and Mr. Solache and another housemate, Arturo Reyes, agreed to accompany him. They arrived at a local police station at about 2:00 a.m. on April 3, 1998.

15.     After the boy was positively identified as Santiago Soto, the three men were transported to Area 5 headquarters, separated, and interrogated. Adriana Mejia was arrested at her home, brought to Area 5, and also interrogated. All three men later maintained that Detective Reynaldo Guevara beat them during their interrogations. Adriana similarly claimed that Guevara physically abused her. By April 5, 1998, Mr. Solache, Mr. Reyes, and Adriana Mejia had signed English-language confessions to the murders and kidnappings, although none of them spoke English at that time.

16.     Mr. Solache did not participate in the crime and maintained his innocence throughout his trial and post-conviction proceedings. He has always asserted that he falsely

4

confessed and signed a statement he could not read only because Guevara beat him, and that Guevara provided the facts about the crime that were included in the confession. That coerced and false confession was the evidentiary basis for Mr. Solache's wrongful convictions.

**B. Forensic evidence**

17. Substantial physical evidence linked Adriana Mejia to the crime. Her DNA was found on the knife recovered from behind the couch in the Soto apartment and on the green towel that was recovered from the car and which the prosecution believed was used in the crime. Further, Mariano Soto's blood was found on Adriana Mejia's shoes and pants.

18. In contrast, no DNA or other physical evidence linked Mr. Solache or Mr. Reyes to the crime. Their DNA was not present on any of the items tested, and their fingerprints were not found at the scene. Mr. Solache's shoes were confiscated during his interrogation, but no blood was found on them.

19. Law enforcement officials did not collect blood standards from any of the other adults in the Mejia household, including Rosauro Mejia.

20. During post-conviction proceedings, new DNA testing revealed that DNA from an unknown person was recovered from the knife found under Mariano Soto. Mr. Solache, Mr. Reyes, Adriana Mejia and both victims were excluded as the source of this partial DNA profile.

<div align="center">

**V. BASIS FOR CERTIFICATE OF INNOCENCE**

</div>

21. To obtain a certificate of innocence under the statute, Mr. Solache must prove by a preponderance of the evidence that:

    a. He was convicted of one or more felonies, was sentenced to a term of imprisonment, and has served all or any part of the sentence;

<div align="center">5</div>

CCSAO COI SUBPOENAS 000649

b. The judgment of conviction was reversed or vacated and the charges were subsequently dismissed;

c. He is innocent of the charged offenses; and

d. He did not by his own conduct voluntarily cause or bring about his conviction.

735 ILCS 5/2-702(g).

22. Mr. Solache meets all of the requirements for relief under the statute.

23. Mr. Solache was convicted of two counts of first degree murder and spent nearly twenty years behind bars, counting pretrial and post-trial incarceration. (*See* Exhs. A, B).

24. The judgment of conviction has been vacated and the charges dismissed. (*See* Exh. C).

25. As stated above and as testified to by Mr. Solache at trial and during post-conviction proceedings, he was not present at the crime, he had no involvement in the crime, and he is innocent of the crime.

26. Mr. Solache was convicted based on an involuntary, coerced, and fabricated confession. He pleaded not guilty, he moved to suppress his statement, and he was convicted after a contested trial. Accordingly, he did not voluntarily bring about his own conviction.

WHEREFORE, for the reasons stated above, Mr. Solache requests that the Court grant him a certificate of innocence and enter an order of expungement pursuant to 735 ILCS 2/702(h), and that this Court order the Clerk of the Court to send the certificate to the Court of Claims in accordance with the statute.

6

Respectfully submitted,

_____

Karen L. Daniel
Center on Wrongful Convictions
Bluhm Legal Clinic
Northwestern University Pritzker School of Law
375 E. Chicago Ave.
Chicago, IL 60611
(312) 503-3027
Attorney No. 60832

PEOPLE'S LAW OFFICE
Jan Susler, John L. Stainthorp, Ben H. Elson
People's Law Office
1180 N. Milwaukee Ave.
Chicago, IL 60642
(773) 235-0070

*Counsel for Gabriel Solache*

7

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, CRIMINAL DIVISION**

| | |
|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) |
| | ) |
| *Respondent*, | ) |
| | ) |
| -vs- | ) No. 98 CR 12440-03 |
| | ) |
| GABRIEL SOLACHE, | ) |
| | ) |
| *Petitioner*. | ) |
| | ) |

NOTICE OF FILING AND CERTIFICATE OF SERVICE

To:   Cook County State's Attorney's Office
      Attn: Assistant State's Attorney Jim Papa
      2650 S. California Ave., 12th Floor, Chicago, IL 60608

      Illinois Attorney General Lisa Madigan
      100 W. Randolph St., 12th Floor, Chicago, IL 60601

Please take notice that on April 27, 2018, I filed in the above Court the attached Petition for a Certificate of Innocence Pursuant to 735 ILCS 5/2-702, a copy of which is attached hereto and served on you. This matter will be heard before Judge LeRoy K. Martin Jr., or any judge sitting in his stead, in Courtroom 101 at 9:00 a.m. on May 9, 2018.

_____
Karen L. Daniel
Attorney for Petitioner

On April 27, 2018, I caused to be served a copy of the attached Petition on all parties listed above by personal service.

_____
Karen L. Daniel

Karen L. Daniel
Center on Wrongful Convictions
Bluhm Legal Clinic
Northwestern University School of Law
375 East Chicago Avenue
Chicago, IL 60611
(312) 503-3027

CCSAO COI SUBPOENAS 000652

IN THE CIRCUIT COURT OF COOK COUNTY

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS )<br>V. )<br>GABRIEL SOLACHE )<br>Defendant | CASE NUMBER 98CR1244003<br>DATE OF BIRTH 04/16/74<br>DATE OF ARREST 04/03/98<br>IR NUMBER 1232213 SID NUMBER _____ | |

*Corrected Mittimus*

ORDER OF COMMITMENT AND SENTENCE TO
ILLINOIS DEPARTMENT OF CORRECTIONS
=================================

The above named defendant having been adjudged guilty of the offense(s) enumerated below
i hereby sentenced to the Illinois Department of Corrections as follows:

| Count | Offense | Statutory Citation | Sentence | Class |
|---|---|---|---|---|
| | First Degree Murder | 720 5 9-1(A)(1) | YRS. Death | M |
| | *and said sentence shall run (concurrent with) (consecutive to) the sentence imposed on:* | | | |
| | First Degree Murder | 720 5 9-1(A)(1) | YRS. Death | M |
| | *and said sentence shall run (concurrent with) (consecutive to) the sentence imposed on:* | | | |
| In | Home Invasion | 720 5 12-11(A)(1) | YRS. 30 MOS. ___ | X |
| | *and said sentence shall run (concurrent with) (consecutive to) the sentence imposed on:* | | | |
| 23 | Agg. Kidnapping | 720 5 10-2(A)(2) | YRS. 30 MOS. ___ | X |
| | *and said sentence shall run (concurrent with) (consecutive to) the sentence imposed on:* | | | |
| 25 | Agg. Kidnapping | 720-5 10-2(A)(2) | YRS. 30 MOS. ___ | X |

On Count ____ defendant having been convicted of a class ____ offense is sentenced as
a class x offender pursuant TO 730 ILCS 5/5-5-3(C)(8).

On Count ____ defendant is sentenced to AN EXTENDED TERM PURSUANT TO 730 ILCS 5/5-8-2.

The Court finds that the defendant is entitled to receive credit for time actually served
i custody for a total credit of 990 days as of the date of this order

IT IS FURTHER ORDERED that the above sentence(s) be (concurrent with)(consecutive to)
the sentence imposed in case number(s) _____
A D: (concurrent with)(consecutive to) the sentence imposed under case number(s) _____

IT IS FURTHER ORDERED that *credit time served as of 12/18/2000*
*(Mitt. to issue)*

IT IS FURTHER ORDERED that the Clerk provide the Sheriff of Cook County with a copy of this Order and that the Sheriff
take the defendant into custody and deliver him/her to the Illinois Department of Corrections and that the Department take
him/her into custody and confine him/her in a manner provided by law until the above sentence is fulfilled.

**ENTERED**

DATED ___ JANUARY 17, 2001   HARRIET CONDELEE ER: 01/17/01

JAN 17 2001

CERTIFIED BY ( (L)CONDELEE   CLERK OF CIRCUIT COURT   JUDGE: SACKS, STANLEY   1531
DEPUTY CLERK                 CRIMINAL DIVISION

JUDGE _____

GCPH 01/17/01 11:15:37

CCSAO COI SUBPOENAS 000653

C 347

**EXHIBIT B**



**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CRIMINAL DIVISION**

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| Plaintiff-Respondent, | ) | |
| | ) | Post-conviction Petition |
| v. | ) | 98 CR 1244002 |
| | ) | 98 CR 1244003 |
| ARTURO REYES, | ) | |
| GABRIEL SOLACHE | ) | Hon. James M. Obbish, |
| | ) | Judge Presiding. |
| Defendants-Petitioners. | ) | |

## ORDER

Petitioners, Arturo Reyes (Reyes) and Gabriel Solache (Solache), seek post-conviction relief from the judgments of conviction entered against them on December 18, 2000 in simultaneous trials before separate juries. Following their jury trials, petitioners were found guilty of home invasion, 720 ILCS 5/12-11(A)(1); two counts of first degree murder, 720 ILCS 5/9-1(A)(1); and two counts of aggravated kidnapping 720 ILCS 5/10-2(A)(2). Both petitioners were sentenced to concurrent terms of 30 years of imprisonment in the Illinois Department of Corrections (IDOC) for each count of home invasion and aggravated kidnapping. On the two first degree murder counts, Reyes was sentenced to a term of natural life imprisonment without parole and Solache was sentenced to death. Solache's death sentence was later commuted to a term of natural life imprisonment without parole.

## BACKGROUND

Petitioners' convictions arose from the fatal stabbings of Mariano and Jacinta Soto and the abduction of their infant, Maria, and toddler, Santiago. During March of 1998, petitioners' co-defendant Adriana Mejia (Mejia) was picked up from the hospital by her husband Rosauro Mejia (Rosauro) under the pretense of having given birth to the infant who accompanied her. Mejia also brought along a toddler boy who she explained as having been left in her care by another hospital patient by the name of Norma Salazar.

CCSAO COI SUBPOENAS 000654

At that time, petitioners were living in an apartment with Mejia and her husband. On April 2, 1998, Mejia's sister-in-law, Guadalupe, recognized the three-year-old boy that Mejia had brought home from the hospital a few days earlier in a picture shown in a television news report about the recent murders of the Sotos and the abduction of their children. Subsequent to Rosauro's sister recognizing the toddler, petitioners accompanied Rosauro to the police station to turn the child over to law enforcement. Upon verification that the three-year-old was Santiago Soto, Officers took Rosauro, Solache and Reyes to the Area 5 police station for further questioning. After contacting the hospital and learning that neither Norma Salazar nor Mejia had ever been a patient there, detectives went to Mejia's apartment, identified the infant that she had brought home from the hospital as Maria Soto, and arrested Mejia. Rosauro, Solache and Reyes were then also arrested. Rosauro was held at Area 5 for over two days and then released without being charged.

Mejia, Reyes and Solache were interrogated separately by Chicago Police Department (CPD) Detective Reynaldo Guevara (Det. Guevara) who was fluent in Spanish, the language spoken by Mejia, Reyes, and Solache. During initial questioning Mejia, Reyes and Solache denied any involvement in the murders. However, upon being confronted with items which had blood on them, Mejia confessed to the crimes and stated that it was Reyes who had actually conducted the murders and kidnappings. It was not until the early morning hours of April 5, 1998 that all three of them signed written inculpatory statements before three separate Assistant State's Attorneys (ASAs). Mejia's statement was given to ASA David Navarro, who spoke Spanish fluently; Reyes' statement was given to ASA Thomas O'Malley, with Officer Daniel Trevino interpreting; and Solache's statement was taken by ASA Heather Brualdi, with Det. Guevara interpreting.

Prior to trial, petitioners Solache and Reyes moved to suppress their statements, in part, on the grounds that the statements had been coerced. During the hearings, there was testimony from Reyes, Solache, Mejia, Det. Guevara, and a woman named Maria Rivera (Rivera). Reyes and Solache testified to the same details of their abuse and confessions that they have testified to in the instant proceedings. Mejia testified that Det. Guevara told her he was tired of her lies, pulled her hair three times and hit her "very hard" on her back. She also testified, as had Solache, that Det. Guevara took her to the room where Solache was being held and slapped Solache in her presence. Rivera, who was called to testify in support of petitioners' claim that they were

CCSAO COI SUBPOENAS 000655

coerced, testified that she had encountered Det. Guevara in 1996 in relation to two fatal shootings that occurred near her home. Although she had not seen the shooters, she later made a false identification of a person in a line-up as the shooter at the behest of Det. Guevara. Det. Guevara testified that the defendants were held for approximately two days before making inculpatory statements and those statements were made after Mejia implicated Reyes, Reyes implicated Solache and they were all confronted with these statements against one another.

During their trial testimony, Reyes and Solache denied any involvement in the murders. Reyes and Solache also repeated their allegations that they had been abused by Det. Guevara during interrogation. During Det. Guevara's trial testimony, he denied striking or slapping Reyes and Solache and stated that he did not see any facial injuries on them or receive any complaints that either had been struck by a police officer. Rosauro testified, in support of Reyes and Solache's claims, that Det. Guevara physically abused him. Rosauro stated that Det. Guevara asked him how much he had paid for the little girl and, when he answered that he did not pay anything for a girl, Det. Guevara hit him repeatedly. Testimony from a forensics expert established that the DNA analysis performed on bloodstained items connected only Mejia to the murders. The DNA tests did not reveal DNA matching the profile of either Reyes or Solache.

Both, Reyes and Solache, filed post-trial motions requesting a new trial alleging, *inter alia*, that the court had erred by denying their motions to suppress their inculpatory statements. The trial court denied petitioners' motions for a new trial. In relevant part, the court concluded that "[t]here was no credible evidence whatever that Solach[e] and Reyes were injured in police custody at all." and went further to explain that the motion to suppress hearing and trial testimony regarding alleged abuse was not believed and that Solache and Reyes made inculpatory statements only after they were confronted with statements which implicated them in the kidnappings and double murder.

Further details regarding the home invasion, murders, and kidnappings as established at trial are recounted in an Appellate Court opinion and need not be recapitulated here. *People v. Reyes*, 369 Ill. App. 3d 1 (1st Dist. 2006).

CCSAO COI SUBPOENAS 000656

## PROCEDURAL HISTORY

### I. Direct Appeal

Petitioners' filed separate appeals, asserting almost identical claims.

#### A. Gabriel Solache

On direct appeal, petitioner Solache asserted that the trial court erred in denying his motion to suppress his confession because his confession: (1) was obtained after the State failed to comply with the Vienna Convention on Consular Relations; (2) was not attenuated from his illegal arrest; and (3) was obtained through the use of physical abuse and coercion by Chicago Det. Guevara.

On August 19, 2003, the Appellate Court affirmed Solache's conviction. *People v. Solache*, 341 Ill. App. 3d 1112 (1st Dist. 2003) (unpublished opinion pursuant to Supreme Court Rule 23). The Court found that suppression of his confession was not a proper remedy for a failure to comply with notice requirements under the Convention; Reyes and Mejia's statements were lawful and admissible, providing police with probable cause to arrest him; and there were intervening circumstances between his illegal arrest and confession in that he confessed due to the legally obtained evidence he was confronted with and not because he was illegally arrested. With regard to petitioner's assertion that his confession should have been suppressed because his confession was obtained through the use of physical abuse and coercion, the Court deferred to the trial court's credibility determination and held that the trial court properly found his confession to be voluntary. Specifically, the Court noted that it was not for the Court to second guess the trial court's decision finding petitioner's claim non-credible since the trial court's determination was specifically made based upon demeanor and the trial court was not required to give more credence to petitioner's claim than Det. Guevara's testimony denying abuse and coercion. Petitioner sought further review by the Illinois Supreme Court; however, on October 6, 2004, the Court denied his petition for leave to appeal. *People v. Solache*, 211 Ill. 2d 608 (2004).

#### B. Arturo Reyes

On direct appeal, petitioner Reyes asserted that his motion to suppress his confession should have been granted because his confession: (1) was obtained after failure to comply with the Vienna Convention; (2) was involuntary given his age, background, education, mental state, vulnerability, and the abuse he suffered; and (3) was not attenuated to his illegal arrest because:

CCSAO COI SUBPOENAS 000657

a) he only confessed after Det. Guevara illegally seized papers from his pocket, and b) the length of his detention weighed against attenuation given his age, background, physical condition and abuse he suffered.

On September 30, 2003, the Appellate Court affirmed Reyes' conviction. *People v. Reyes*, 343 Ill. App. 3d 1292 (1st Dist. 2003) (unpublished opinion pursuant to Supreme Court Rule 23), Docket No. 1-01-2875. The Court held that the trial court properly found sufficient attenuation and admitted his statement at trial, citing *Brown v. Illinois*, 422 U.S. 590 (1975) (as quoted by the Illinois Supreme Court in *People v. Foskey*, 136 Ill. 2d 66, 87 (1990)) which set forth four factors to be considered in determining whether a confession was the product of an illegal arrest. Specifically, the Court explained that: because he was twice confronted with the statements implicating him, petitioner Reyes had time to reflect; Mejia's first statement implicating petitioner was legally obtained; and, although petitioner was initially illegally arrested, Mejia's statement provided police with intervening probable cause to question and detain petitioner and therefore the pieces of paper were legally seized from petitioner and his statement was sufficiently attenuated from the taint of his arrest and not obtained as a result of illegally seized evidence. Regarding the voluntariness of Reyes' confessional statement, the Court deferred to the trial court's credibility determinations that testimony by Rivera in support of petitioner's motion was not relevant and that ASA Tom O'Malley, Officer Daniel Trevino and jail intake paramedic Johnny Musa provided credible testimony that no injuries were observed and petitioner made no complaints of injuries. Petitioner sought leave to appeal to the Illinois Supreme Court; however, on October 6, 2004, the Court denied his petition. *People v. Reyes*, 211 Ill. 2d 605, 823 N.E.2d 975 (2004).

## II. Post-conviction

### A. First Stage Proceedings

Petitioners filed separate initial post-conviction petitions, alleging substantially similar claims regarding their inculpatory statements and errors made by the State and their trial and appellate counsels. On December 17, 2003, petitioner Reyes filed an initial post-conviction petition, asserting that his counsel rendered ineffective assistance by failing to investigate the abuse and coercion he experienced by Det. Guevara. On December 18, 2003, petitioner Solache filed an initial post-conviction petition asserting that his trial counsel and appellate counsel rendered ineffective assistance; the State withheld exculpatory evidence in violation of the rule

articulated in *Brady v. Maryland*, 373 U.S. 83 (1963); and there was newly discovered evidence in support of his claim of abuse and coercion which demonstrated that Det. Guevara engaged in a pattern of abuse and coercion. On March 2, 2004, the court summarily dismissed petitioner Reyes' petition and on March 12, 2004, the court summarily dismissed petitioner Solache's petition and denied his motion for leave to file one of his post-conviction petition claims under seal. Reyes and Solache appealed the summary dismissal of their petitions and their appeals were consolidated. (Reyes, No. 1-04-1047, and Solache, No. 1-04-1150). In Reyes' appeal, he additionally argued that newly discovered evidence established that Det. Guevara engaged in a pattern of abuse and coercion, referencing the newly discovered evidence included in Solache's petition.

On December 11, 2006, the Appellate Court reversed and remanded the matter to the trial court for second stage proceedings to be conducted before a different trial judge. *People v. Reyes*, 369 Ill. App. 3d 1 (1st Dist. 2006). Specifically, the Court held that the petitioners' new allegations and new evidence were sufficiently material, conclusive and newly discovered to meet the test set forth in *People v. Patterson*, 192 Ill. 2d 93 (2000) as applied to a first-stage proceeding. The Court further held that, as set forth in *Patterson*, the doctrine of *res judicata* may be relaxed with regard to defendants' claims of abuse by Det. Guevara in the interest of fundamental fairness.

### B. Second Stage Proceedings

On remand, on June 13, 2008, petitioners filed amended petitions for post-conviction relief, asserting identical claims with varying issues. Petitioner Solache asserted that: (1) newly discovered evidence of repeated physical and mental coercion of suspects and witnesses by Det. Guevara and numerous incidents of other violent, illegal and unethical conduct requires a new trial where his conviction rests solely on Det. Guevara's testimony and where his defense was that Det. Guevara beat him into making a false confession; (2) he was denied his right to a fair trial where the State failed to disclose material evidence that was favorable to the defense regarding past misconduct by Det. Guevara that both impeached Det. Guevara and corroborated his testimony that he only confessed after being beaten by Det. Guevara; and (3) his trial and appellate counsels rendered ineffective assistance. Petitioner Reyes asserted that: (1) newly discovered evidence showed that his statements were involuntary and the product of physical coercion by Det. Guevara; (2) he was denied a fair trial because the State failed to disclose

CCSAO COI SUBPOENAS 000659

complaints of brutality and unconstitutional coercion in violation of his right to due process as interpreted in *Brady v. Maryland*, 373 U.S. 83 (1963); and (3) his trial and appellate counsels rendered ineffective assistance. On June 17, 2009, the State moved to dismiss petitioners' claims.

Upon reviewing petitioners' claims, as well as the State's motion to dismiss, and hearing arguments from all parties; this court determined that the sole claim warranting a third stage evidentiary hearing, based on petitioners' substantial showing of a constitutional violation, was the claim that there is newly discovered evidence that Det. Guevara engaged in abuse and coercion in other instances and that such instances demonstrate that their confessional statements were involuntary and the result of abuse and coercion.

### C. Third Stage Proceedings

On February 13, 2013, third stage evidentiary proceedings commenced with witness testimony; and, after hearing closing arguments from each party, this court took the matter under advisement. As stated above, the sole claim before the court is petitioners' claim that there is newly discovered evidence that Det. Guevara engaged in abuse and coercion in other instances and that such instances demonstrate that their confessional statements which were admitted at trial and ultimately led to their convictions were the result of abuse and coercion and, therefore, involuntary. Petitioners' request that this court suppress their involuntary confessions and vacate their judgments of conviction or, alternatively, that this court grant them a new motion to suppress hearing.

### ANALYSIS

The Post-Conviction Hearing Act (the "Act") (725 ILCS 5/122-1 *et seq.* (LEXIS 2003)) provides a remedy to criminal defendants who claim that a substantial violation of their federal or state constitutional rights occurred at the proceedings which resulted in their convictions, when such a claim has not been, and could not have been, adjudicated previously." *People v. Johnson*, 191 Ill. 2d 257, 268 (2000), citing *People v. Griffin*, 178 Ill. 2d 65, 72-73 (1997) and *People v. Brisbon*, 164 Ill. 2d 236, 242 (1995). The Act sets forth a three-stage process for adjudicating post-conviction petitions. 725 ILCS 5/122-1 *et seq.* (West 2014). At the third stage, which occurs after the petitioner makes a "substantial showing of a constitutional deprivation" entitling him to a hearing, the petitioner may present testimony and evidence in support of his

CCSAO COI SUBPOENAS 000660

claims for relief. *People v. Pendleton*, 223 Ill. 2d 458, 473 (2006). Whereas the court must accept as true all well pleaded facts not rebutted by the record during the first and second stages, it is during the third stage evidentiary proceedings that the court engages in fact-finding and credibility determinations to reach a disposition. *People v. Coleman*, 183 Ill. 2d 366, 385 (1998). At the evidentiary hearing, the trial court, "serves as the fact finder, and, therefore, it is the [trial] court's function to determine witness credibility, decide the weight to be given testimony and evidence, and resolve any evidentiary conflicts." *People v. Domagala*, 2013 IL 113688, ¶ 34. In order to obtain relief, "the burden of proof is upon the petitioner to show [the] denial of [a] constitutional right by a preponderance of the evidence." *People v. Coleman*, 2013 IL 113307, ¶ 92.

Criminal defendants have a right to protection against self-incrimination under the 5th amendment of the United States Constitution. U.S. Const., amend. V. The protection against self-incrimination brought about by state actors is provided for by the due process clause of the 14th amendment which states that no State shall, "deprive any person of life, liberty, or property, without due process of law.", XIV §1. *Malloy v. Hogan*, 378 U.S. 1, 6 (1964). "It is 'axiomatic' that a conviction based 'in whole or in part, on an involuntary confession, regardless of its truth or falsity' violates a defendant's constitutional rights." *Peoples v. Hughes*, 2015 IL 117242, ¶31; citing *Miranda v. Arizona*, 384 U.S. 436 (1966). In order to be properly admitted into evidence during trial, confessional statements must have been made freely, voluntarily and without inducement of any sort. *People v. Richardson*, 234 Ill. 2d 233, 252 (2009). "When police conduct results in a violation of constitutional rights, evidence obtained as a result of that violation...is to be suppressed." *People v. McCauley*, 163 Ill. 2d 414, 448 (1994), citing *New York v. Harris*, 495 U.S. 14 (1990).

As a preliminary matter, this court notes that throughout the proceedings there was evidence introduced concerning matters that are not relevant to the issue of abuse, coercion and other tactics allegedly employed by Det. Guevara. For instance, the brutal nature of the crimes and the vast details describing the events leading up to petitioners' arrests must not divert attention from the primary purpose of the proceedings; as the instant matter is a collateral proceeding on the issue of deprivation of constitutional rights during interrogation and not a redetermination of guilt or innocence. See *People v. Evans*, 186 Ill. 2d 83, 89 (1999). More significantly, the issuance and acknowledgment of Miranda rights, as discussed in each incident,

CCSAO COI SUBPOENAS 000661

does not vitiate the claims of abuse put forth by petitioners or those persons subject of the incidents petitioners submitted in support of their claims. In the instant proceeding, the basis for petitioners claims is not that their confessional statements were involuntary and therefore inadmissible during trial by virtue of not being given their Miranda rights as set forth in *Miranda v. Arizona*, 384 U.S. 436, 475-77(1966). Rather, their contention is solely that their statements were involuntary by virtue of the abuse and coercion that they suffered. Accordingly, since the issuance of Miranda rights is neither the basis for petitioners' claim for relief nor conclusive in the determination of whether abuse and coercion occurred, the reading and acknowledgement of Miranda rights in each incident is not a focus of this court's analysis.

The lack of visible injuries, as observed in a photograph or otherwise, is relevant in that the lack of injuries could undermine testimony; however, it is not conclusive as to whether abuse is likely to have occurred. Although the visibility of injuries is a strong indication of physical abuse; it does not follow that the nonappearance of bruising, bleeding or swelling affirmatively proves that no abuse occurred. For instance, marks can fade or injuries can possibly be hidden underneath clothing. Slaps in the face and punches in the stomach, which are claimed to have been suffered by petitioners (and the witnesses they presented), are the types of abuse that are likely to have not left visible or lasting indications of physical abuse. Conversely, repeated punches to the face constitutes a striking that is more likely to leave visible marks and, therefore, is the type of abuse that would require corroborating physical injury evidence to substantiate a claim of abuse. See *People v. Hobley*, 159 Ill. 2d 272, 312(1994); *People v. Hobley*, (*Hobley II*) 182 Ill. 2d 404, 448 (1998). Indeed, it is where the extent of the alleged abuse is not consistent with the reasonably expected corresponding visible injuries that the evidence corroborating a petitioner's claim of abuse, or the lack thereof, weighs most heavily. Thus, "[t]he fact that the defendant has suffered a physical injury is only one of many factors to consider when determining whether evidence of prior allegations of police brutality is admissible. The question of relevancy is a determination to be made by the trial court after a consideration of, *inter alia*, the defendant's allegations of torture and their similarity to the prior allegations." *People v. Patterson*, 192 Ill. 2d 93, 144-146 (2000).

Additionally, the non-reporting of abuse in the various incidents, including those of petitioners, is similarly not conclusive as to whether the abuse is more or less likely to have occurred. Where abuse is not revealed through report by the victim, such failure to report can

CCSAO COI SUBPOENAS 000662

reasonably be attributed to the victim being at risk for further abuse by virtue of being held in custody. This court takes notice of the instances where Det. Guevara's alleged abuse was not reported and, although the failure to report is not determinative on the issue of whether abuse is likely to have occurred, the lack of reporting in various instances is a factor in the consideration of the evidence presented.

## I. Petitioners Reyes and Solache

### A. Testimony

In the instant proceedings, petitioners testified to their claims of abuse and coercion and called Det. Guevara to testify with regard to same. In turn, the State presented evidence including testimony from the Assistant State's Attorneys who took the confessional statements made by petitioners and their co-defendant Mejia.[1]

#### i. Petitioner Reyes

Reyes testified that, during questioning, he was placed in an interview room at Area 5 and, when Det. Guevara entered the room to question him, Det. Guevara immediately slapped him in the face, handcuffed him and asked him why he committed the murders, home invasion, and kidnappings. Reyes stated that Det. Guevara continued to ask him questions over a long period of time and Det. Guevara had slapped him in multiple instances where he would answer "no". Reyes also testified that the contents of his pants were removed and Det. Guevara brought Mejia to the interrogation room at which time Mejia stated that Reyes had done everything. Reyes testified that he signed the confessional statement and identified photos of the Sotos, Mejia, and Solache, as he was told to by Youth Officer Daniel Trevino (Ofc. Trevino), because Det. Guevara had slapped him earlier and he believed Ofc. Trevino when Ofc. Trevino told him he would help him.

Reyes testified that being slapped by Det. Guevara coerced him to confess, yet he maintained that Det. Guevara did not tell him to sign the document and was not present when he signed the confessional statement. According to Reyes, the written and oral confessional

---

[1] Former ASA David Navarro, who interviewed and took the written confessional statement of Mejia, testified that he had created the pre-printed Miranda rights section in Spanish, as shown on Mejia's confessional statement and that he believes that the same form was copied and provided to Solache and Reyes as well. He also testified that his interaction with Mejia was conducted in Spanish since Spanish was her first language and he is fluent in Spanish in addition to English. Navarro was not asked about and did not testify regarding any abuse or coercion on the part of Det. Guevara. ASA Navarro's testimony contributed nothing in refutation of Reyes', or Solache's, allegations because he had no interaction whatsoever with petitioners and was not present during their interrogation or confessional statements.

CCSAO COI SUBPOENAS 000663

statements that he made concerning the events surrounding the murders, kidnappings and home invasion were false statements which Ofc. Trevino told him to make and Ofc. Trevino tricked him into signing the written confession. Reyes further testified that long periods of time had passed between the times when Det. Guevara slapped him and when he signed to statement and when Ofc. Trevino told him that he would help him and the time that he signed the statement. Reyes admitted to initialing and signing each page of the confessional statement; however, he claims that he did not read the contents of the confessional statement because Ofc. Trevino rushed him to sign, he was not given an opportunity to review the document, and he could not read English.

On cross-examination, the State inquired into Reyes capability to understand English at the time of his filing of his post-conviction petition in December of 2003. Reyes testified that he had written his petition in Spanish and other IDOC inmates translated the petition into English. He maintained that he more or less knew what was contained in the petition and that he was aware that the notarization of his signature on the affidavit constituted a swearing to the truth of the statements contained in his petition. The State additionally introduced transcripts of testimony from CPD and correctional facility personnel, Officer Basurto and Johnny Musa, who encountered Reyes after the alleged abuse. Both Basurto and Musa testified that Reyes did not report abuse or appear to have been abused.

Although Det. Guevara was called to testify in these proceedings he neither admitted nor denied the allegations to which Reyes testified; rather, he asserted his 5th amendment constitutional right to not answer the questions posed. Det. Guevara declined to answer questions regarding whether he: interrogated Reyes in connection with murders of the Sotos; threatened, struck and coerced a confessional statement from Reyes; was lying when he said other people were blaming Reyes for the murder; found any evidence connecting Reyes to the murder during his investigation; or knew that Reyes did not actually have the information to put in his confessional statement or that the statement Reyes made would be used against him in court.

Former ASA Tom O'Malley (ASA O'Malley), who took Reyes' confessional statement through the Spanish-English translation by Ofc. Trevino, testified regarding the abuse which Reyes claims to have suffered. ASA O'Malley testified that no one yelled at, threatened or struck Reyes in his presence. ASA O'Malley also testified that, in observing Reyes' demeanor and appearance during his interview and the memorialization of Reyes' confessional statement,

CCSAO COI SUBPOENAS 000664

Reyes did not seem upset, nervous or afraid of him or Ofc. Trevino and there were no signs of a recent beating such as bruises, red marks or bleeding. ASA O'Malley further testified that he has no first-hand knowledge with regard to what happened when Det. Guevara and Reyes were in the same room because he was never in the room with Reyes and Det. Guevara at the same time. During his testimony, ASA O'Malley referenced Reyes' interview statement that he had been treated very well by police. ASA O'Malley testified that, the interview and preparation of the confessional statement as well as the issuance of Reyes' Miranda rights were facilitated through the use of Ofc. Trevino as the Spanish interpreter because he was not fluent in Spanish and Spanish was Reyes' primary language. Reyes said the word "si" in response, and initialed "si" on the statement near the pre-printed Spanish translation of the Miranda rights located within the statement.

There was no eyewitness testimony presented that directly contradicted petitioner's allegation of abuse and coercion. Det. Guevara asserted his 5th amendment right to not answer the questions posed by petitioner's counsel regarding his interaction with Reyes and Reyes' allegations of abuse and, accordingly, neither admitted nor denied any of Reyes' accusations. Ofc. Trevino did not testify in these proceedings and, therefore, this court was not presented with an affirmation or denial of Reyes' version of events by the only person who could communicate with Reyes as a fluent Spanish speaker. The only testimony presented in an effort to rebut petitioner's claim of abuse and coercion was ASA O'Malley, who was neither present during interrogation nor capable of understanding the translation between Reyes and Ofc. Trevino.

ASA O'Malley, the only witness called by the State in response to Reyes' allegations of abuse, had no firsthand knowledge regarding the interaction that took place between Reyes and Det. Guevara. Although O'Malley testified as to his perception of Reyes' demeanor and appearance and referenced Reyes' confessional statement assurance that he was treated well by police officers, O'Malley was never in the same room with Det. Guevara and Reyes and, therefore, could not attest to whether or not Reyes was actually abused by Det. Guevara. While O'Malley testified that Ofc. Trevino provided the English version of what Reyes stated, O'Malley did not and could not provide reliable testimony as to what Reyes may or may not have said because O'Malley was not fluent in Spanish. The exact exchange between Reyes and Ofc. Trevino could not be refuted by ASA O'Malley because O'Malley understood nothing aside from the familiar Spanish word "si" which mean "yes" in English.

CCSAO COI SUBPOENAS 000665

Reyes provided reliable testimony regarding the abuse and coercion he claims to have suffered. Petitioner's testimony concerning the filing of his post-conviction petition, written in English (a language he could not speak or write), did not diminish his credibility because it is not unbelievable that he indeed entrusted another inmate with the translation of his petition into English and accordingly believed that his words were being accurately translated. Unless the facts section of his petition, as pointed out by the State, differed from his testimony regarding the facts in the instant proceeding; whether or not he had his petition translated to a language he could not read, however swore was truthful, is irrelevant. The unrebutted testimony regarding the abuse Reyes claims to have suffered at the hands of Det. Guevara is sufficiently reliable to render his confessional statement involuntary.

### ii. Petitioner Solache

Petitioner Solache testified that during interrogation he denied any involvement in the home invasion, murders and kidnappings and after he was handcuffed to a wall Det. Guevara entered the room, hit him in the face, asked him why he had "done it", told him that he did not want any more lies and threatened that something bad was going to happen to him. He states that, in spite of telling Det. Guevara that he had already spoken to the other detective and told him his whereabouts at the time of the crimes, Det. Guevara did not believe him and proceeded to slap him. Solache also testified, as he had during his pre-trial motion to suppress hearing, that Det. Guevara then brought Mejia into the room, asked him if he was going to keep denying the crime in front of the lady, slapped him, and after escorting Mejia out of the room repeatedly punched him in his stomach until he confessed to committing the crimes. Solache states that he told Det. Guevara that he had committed the crimes because Det. Guevara was hitting him and he could not take it, however, Solache maintains that he did not provide any details of the crime.

Solache testified that the written and oral confessional statements that he made concerning the events surrounding the murder, kidnapping and home invasion were untrue. He stated that, subsequent to his encounter with Det. Guevara, Det. Guevara placed him in another room with an ASA where Det. Guevara remained present and acted as a translator between him and the ASA. During Det. Guevara's questioning him in Spanish, and the ASA's drafting of the statement, Solache never spoke to the ASA directly. When the ASA finished writing she gave the statement to Det. Guevara and Det. Guevara gave it to him and told him to put his name on the pages. Solache testified that Det. Guevara did not read the statement back to him and he did

not read the statement on his own; rather, he states that he simply signed the statement because Det. Guevara told him to do so and he had to do whatever Det. Guevara said because Det. Guevara had already struck him. Solache states that he could not understand verbal or written English and, therefore, he did not know what Det. Guevara told the ASA or what information was included in the statement.

The State's cross-examination of Solache consisted of questions regarding the issuance of his Miranda rights; whether he attempted to report the abuse he suffered to others; whether he had any visible injuries or indications that he was struck; and the origin of the scar on his head. While Solache testified that no one told him that he had a right to an attorney, he acknowledged that he signed and placed his initials at the bottom of the pre-printed recitation of Miranda rights contained in the written statement. Solache testified that he did not immediately report any abuse to law enforcement of correctional facility personnel, that he only later reported the abuse to his public defender. Solache acknowledged that he had no bleeding as a result of being struck and there were no visible injuries indicated in the photo taken of him. He admitted that during his testimony in his motion to suppress hearing he falsely testified that the scar on his head originated from a car accident rather than being struck by his cousin in 1997.

Det. Guevara and the ASA who took Solache's statement, ASA Heather Brualdi, were called to testify regarding Solache's allegations of abuse and coercion. Det. Guevara asserted his 5th amendment right to not answer any questions relating to Solache's interrogation. Specifically, Det. Guevara asserted his 5th amendment right in response to all questions such as: whether he was aware of any evidence connecting Solache to the murders; whether he threatened, struck, physically coerced, verbally coerced Solache; whether he served as a translator during the ASA's interview and drafting of Solache's written confessional statement or told Solache what to say in the statement; whether he brought Ms. Mejia into the room.

Corroborating Solache's testimony, ASA Brualdi testified that Det. Guevara served as a translator between her and Solache because she did not speak Spanish. She stated that Det. Guevara was present the entire time she spoke with Solache and that during the two interviews she conducted with Solache she did not observe any injuries or bruising to his face and he did not make any gestures to her indicating that he had been physically abused or appear disheveled or to have been in any pain. ASA Brualdi admitted that the only person in the room she could understand was Det. Guevara and that, for the most part, she could not understand what was

CCSAO COI SUBPOENAS 000667

being said because Solache only spoke Spanish. ASA Brualdi further testified that she, Det. Guevara, and Solache signed each page of the confessional statement, which she drafted in English, and initialed the corrections made upon review of the statement.

There was no testimony presented rebutting Solache's claims of abuse and coercion, as Det. Guevara answered no questions regarding Solache and ASA Brualdi was not present during Solache's interrogation. While both Solache and ASA Brualdi provided credible testimony, ASA Brualdi's testimony did not rebut Solache's claims of abuse and coercion. ASA Brualdi's testimony established that she was in an interview room with Solache and Det. Guevara during the taking of Solache's written confessional statement; however, her testimony did not establish that she had personally observed Det. Guevara during the interrogation where he is alleged to have threatened and physically abused Solache. Further, during her interview of Solache, she could not have known what was being said by Solache and Det. Guevara because she was not fluent in Spanish. Given that ASA Brualdi did not understand the Spanish exchange between Solache and Det. Guevara, she could not have been able to discern whether there was a word-for-word translation and whether Solache provided his own statements or was being misquoted by Det. Guevara. Because the only witnesses called to testify regarding petitioner's claim of abuse, Det. Guevara and ASA Brualdi, provided no testimony regarding the interrogation where the abuse allegedly occurred or the content of Solache's confession, Solache's testimony regarding abuse and coercion stands unrebutted.

Solache has consistently maintained that he was threatened and physically abused in the manner in which he testified during the instant proceedings. The origin of the scar on his head and his previous false testimony regarding such is not dispositive on the issue of whether he was struck by Det. Guevara and coerced into confessing. The court observes the inconsistency in his testimony regarding the scar, however, notes that such discrepancy without more is insufficient to render the remainder of his testimony unreliable. For instance, the additional presence of multiple inconsistencies, inconsistencies related to the issue of abuse and coercion, or testimonial evidence rebutting his claims of abuse would be factors that would work together to discredit Solache's testimony overall. However, such is not the case here. As such, this court finds that Solache's testimony regarding the abuse and coercion is sufficiently credible insofar as his testimony establishing his claim must be adequate enough for the determination of whether he has presented new evidence to support his claim.

CCSAO COI SUBPOENAS 000668

## II.  NEWLY DISCOVERED EVIDENCE:
## PATTERN AND PRACTICE OF ABUSE AND COERCION

In support of their claims that Det. Guevara physically abused them and coerced their confessional statements in violation of their right to due process, petitioners presented evidence and testimony regarding unrelated incidents where Det. Guevara allegedly engaged in abusive, coercive, and otherwise questionable conduct during suspect interrogations and witness statements and identifications of suspects. These unrelated incidents vary in type and year of occurrence. Det. Guevara was also questioned regarding each of these incidents. In opposition of petitioners' evidence, the State presented evidence including testimony from the assistant state's attorneys, detectives and other individuals who were involved in these unrelated incidents.

For new evidence to be sufficient to warrant a new trial, it must be newly discovered; material and not merely cumulative; and of such conclusive character that it will probably change the result upon retrial. *Patterson*, 192 Ill. 2d 93 (2000); citing *People v. Molstad*, 101 Ill. 2d 128, 134 (1984) (quoting *People v. Baker*, 16 Ill. 2d 364, 374 (1959)); *Hobley*, 182 Ill. 2d at 449. Evidence is considered "newly discovered" if: (a) it has been discovered since the trial; and, (b) the defendant could not have discovered it sooner through due diligence. *Id.* at 334. Evidence is material if it is relevant and probative of petitioner's innocence. *People v. Coleman*, 2013 IL 113307, ¶ 96. Evidence is considered cumulative when it adds nothing to what was already before the jury. *Id.*; *People v. Molstad*, 101 Ill. 2d 128, 135 (1984). In addition to serving as a basis for a new trial, sufficient "new evidence that would have been pertinent to the trial court's rulings and 'special circumstances'" may warrant relitigation of a motion to suppress. *People v. Cannon*, 293 Ill. App. 3d 634, 640 (1st Dist. 1997), citing *People v. Enis*, 163 Ill. 2d 367, 387 (1994); *People v. Holland*, 56 Ill. 2d 318, 321-22, (1974).

As noted earlier, on appeal of the denial of their first stage post-conviction claims, the Appellate Court found that petitioners had stated the gist of a constitutional claim that there was new evidence supporting their claims of abuse and coercion. Contrary to petitioners' assertion, the *Patterson* inquiry did not end there; as the Court merely held that their claims survived summary dismissal under *Patterson* and not that they had made a substantial showing of a violation of their constitutional rights under *Patterson*. During the instant proceedings, this court determined that the evidence submitted in relation to the nine incidents/witnesses discussed below is indeed both new evidence and material evidence. Accordingly, the remaining issue for

CCSAO COI SUBPOENAS 000669

this court's consideration is whether petitioners have made a sufficient showing that the evidence submitted is of such conclusive character that it would probably change the result of earlier proceedings. See *People v. Coleman*, 2013 IL 113307, ¶113; *People v. Whirl*, 2015 IL App (1st) 111483, ¶¶108-110. In doing so, the court has made the following fact-finding and credibility determinations.

## A. INTERROGATED SUSPECTS

Petitioners presented evidence, including live testimony, of four individuals who were interrogated by Det. Guevara and claim to have been abused and coerced into providing confessional statement leading to their murder convictions. The four individuals, Adrian Duta, Adolfo Frias, LeShurn Hunt, and Daniel Pena had encounters with Det. Guevara in 1994, 1993, 1986 and 1983, respectively.

### i. Adrian Duta

Adrian Duta (Duta) testified that, on March 23, 1994, Det. Guevara questioned him, struck him in his head with a folder and punched him in his stomach prior to his signing of a confessional statement admitting to the murder of Paul Sukipson (Sukipson) which had occurred two months prior. Duta testified that Det. Guevara became angry when he denied any knowledge of the murder in question and that, although he continued to deny any knowledge of the murder after Det. Guevara punched him, he eventually signed a confessional statement because Det. Guevara physically abused him and told him he could go home if he signed the statement. He stated that the first time Det. Guevara told him that he could go home if he signed the statement he agreed to do so because he was tired and ready to go home. Duta testified that during the interrogation Det. Guevara conducted, ASA Karen Iwasaki (ASA Iwasaki) was present and ASA Iwasaki said nothing when Det. Guevara punched him and told him that he could go home if he signed the written confessional statement. Duta confirmed that it was his signature and initials next to changes made within his statement.

During his testimony, Det. Guevara asserted his 5th amendment right to decline to answer questions regarding Duta's interrogation and confessional statement. Specifically, Det. Guevara asserted the 5th amendment when he was asked whether he interrogated and physically abused Duta; whether Duta initially denied involvement in the crime and only agreed to sign the statement after such abuse; and whether he testified and gave truthful testimony at Duta's suppression hearing on May 10, 1995.

ASA Iwasaki testified that she did not witness any abuse of Duta by Det. Guevara and Duta did not report to her, on his own or when he was asked, that he had been struck. She further testified that, although she stepped outside the interview room at various intervals, she remained in close proximity to Duta and could see him and that no one could have entered the interview room for any length of time without her being aware of their entry. She further stated that Det. Guevara was out of the police station for a lengthy amount of time, doing the legwork necessary to bring witnesses to the station and collect all available evidence on the murder, while she was outside the interview room. ASA Iwasaki also testified that Duta had initially been brought in for an aggravated battery, however, suddenly began to provide her with details of Sukipson's murder.

Duta's testimony contained a number of inconsistencies. Duta initially denied knowing who gave Det. Guevara the details provided in the statement, however, later contradicted himself when he testified that he had provided the information to Det. Guevara and the statement was prepared for him to sign based on that information. Additionally, Duta acknowledged that his testimony in the instant proceedings did not reflect the assertion he made in his affidavit that Det. Guevara had punched him in the arm and slapped him in the face with an open palm. Further, Duta initially testified that Det. Guevara questioned him about some murder he knew nothing about; however, upon cross-examination he admitted that he in fact committed the murder. Duta also admitted that he told law students working for counsel for Solache that he had made up a confession, Det. Guevara then changed the confession to match the facts that had been given to him by a witness to the crime, and there was a public defender present during the interrogation; all assertions which differ from his testimony in the instant proceeding.

Aside from his allegation of abuse, Duta's testimony was substantially similar to ASA Iwasaki's testimony in most other respects. Notably, Duta never claimed to have been abused while ASA Iwasaki was out of the interview room. ASA Iwasaki testified credibly and there is no reason for the court to believe that her testimony was inaccurate or unreliable. Because Duta's testimony was unreliable, as shown by the multiple inconsistencies, his testimony that he experienced abuse and was coerced into confessing is not credible.

CCSAO COI SUBPOENAS 000671

### ii. Adolfo Frias

Adolfo Frias (Frias), who underwent interrogation by Det. Guevara on July 29, 1993, testified that Det. Guevara insisted he was guilty of murder and threatened him prior to his making of a confessional statement admitting to murdering his neighbor Dora Alva. Frias testified that during questioning his right hand was handcuffed to a wall, Det. Guevara hit him in his face multiple times, another detective placed his foot on his private parts, and yet another detective hit him in his stomach. Frias testified that the beating did not last long and that he agreed to say that he was guilty after his nephew was brought by the interrogation room looking as if he had been beaten and Det. Guevara told him that that was what would happen to his wife and that he and his wife were going to prison.

Frias testified that, after he told Det. Guevara that he would take the blame if they let his family go, Det. Guevara told him to tell him how it happened and when he told Det. Guevara he was not at the murder scene Det. Guevara told him the narrative he must recite in order to be believed by the Judge. Frias testified that he had only spoken with the ASA for a minute or two, everything he said was translated through Det. Guevara, and he did not attempt to tell the ASA he was beaten. He acknowledged his signing and initialing in various places of the confessional statement and that there was a section written in Spanish which provided the Miranda rights, yet he claims that he never read anything contained in the document. Frias stated that he did not know what the document contained because he could not read English and that Det. Guevara had simply told him that the document contained what they had already agreed upon. Det. Guevara was questioned during the instant proceedings regarding his encounter with Frias and he asserted his 5th amendment right, declining to answer questions such as whether he interrogated, threatened or hit Frias; whether he witnessed other officers beat Frias and failed to intervene in the beating; and whether he testified and provided truthful testimony at Frias' suppression hearing.

Former ASA Martin Fogerty, who interviewed Frias and drafted his confessional statement, testified that Frias did not seem frightened of Det. Guevara and he did not see any bruises or red marks on Frias or anything indicating aggression or hostility by Det. Guevara during his initial meeting with Det. Guevara and Frias. Fogerty stated that during the two times that he met with Frias Det. Guevara was present, however, Det. Guevara did not serve as an interpreter for him. Fogerty did not recall whether Det. Guevara went back into the interrogation

CCSAO COI SUBPOENAS 000672

room with Frias when he left the room to write the statement, however, he was aware that Frias had been interviewed at an earlier time by Det. Guevara and another detective. Fogerty stated that at no time, during his two interviews of Frias or when he returned to the room alone, did Frias ever tell him that anyone had threatened him or his wife, threatened to take away his children, or that anyone promised him anything, coerced or forced him to make the confession. Fogerty admitted that he had no firsthand knowledge of how Frias was treated by the detectives prior to his arrival, which was inconsistent with his previous testimony during Frias' trial proceedings on August 31, 1995.

Frias' testimony differs from that of ASA Fogerty's on a number of points. While Frias states that he only spoke with the ASA for a minute or two prior to signing a statement that was prepared out of his presence, ASA Fogerty testified that his first interview of Frias lasted for approximately 1 hour and the second lasted at least 20 minutes. Frias testified that Det. Guevara acted as a translator between himself while Fogerty testified that he spoke to Frias in English and Det. Guevara did not serve as a translator aside from assisting with Frias' expression of a few English words. Frias testified he did not receive Miranda warnings from officers, the ASA or by virtue of reading the Spanish section of his statement which recited his rights and he did not remember giving away those rights. Fogerty testified that Frias was made aware of his Miranda rights by his recitation of those rights to him and Det. Guevara's reading of the rights to him in Spanish and Frias reading of the pre-printed Spanish Miranda rights on the form which he acknowledged by signing underneath the section.

Although Frias' testimony conflicted with Fogerty's in the above outlined manner, there was no testimony provided by either Fogerty or Det. Guevara which stood in direct contradiction to Frias' assertions of abuse and coercion. Moreover, it is apparent that Frias did not readily confess to the murder, rather his confession came about a day later. Fogerty did not take Frias' confessional statement on Frias' first day in custody and Fogerty does not recall the detectives who gave him an overview of the murder telling him on the first day that Frias had confessed. In the day preceding Frias' interview with Fogerty, Fogerty had interviewed five witnesses, including Frias' wife. That Frias did not readily confess supports Frias' assertion that he was not initially willing to confess. The lack of testimony contradicting Frias' claim that he was abused and coerced to confess, combined with the lengthy passage of time before he ultimately made a

CCSAO COI SUBPOENAS 000673

confessional statement, makes Frias' claim that he unwillingly confessed due to abuse sufficiently credible.

### iii.    LeShurn Hunt

LeShurn Hunt (Hunt), who was interrogated on February 15, 1983 by Det. Guevara, testified that Det. Guevara slapped him and told him the factual details to include in his confessional statement wherein he admitted to committing armed robbery and murder. Hunt testified that, during questioning, Det. Guevara became angry and slapped him when he told Det. Guevara that he had told his brother not to talk to interviewing detectives because his lawyer would be arriving later. Hunt stated that Det. Guevara tried to convince him to go along with certain information and that he ultimately gave a court reported confessional statement in the presence of Det. Alan Jaglowski (Det. Jaglowski ) and ASA Alfred Petrocelli due to the physical abuse he had suffered at the hands of Det. Guevara and other detectives. Hunt maintained that, when he told the ASA that he was being physically abused, ASA Petrocelli stated that he was there solely to take his statement and then told Det. Jaglowski what Hunt had told him. Hunt states that, after Jaglowski subsequently aggressively confronted him about wishing to change his statement, he complied and no longer resisted giving the statement containing information given to him by Det. Guevara and other detectives.

During the instant proceedings, Det. Guevara asserted his 5th amendment right in response to questions such as whether he assisted in the interrogation of Hunt and slapped Hunt in the face prior to his confession; whether Hunt denied involvement in the crime being investigated; and whether he testified truthfully at Hunt's suppression hearing. The State did not present any witnesses to refute Hunt's testimony. There were no other witnesses called to testify regarding Hunt's encounter with Det. Guevara.

The State introduced an affidavit from former ASA Petrocelli, wherein he stated that he took Hunt's court reported confessional statement and did not observe any physical or verbal abuse by Det. Guevara or any other detective or officer. Other documentary evidence submitted includes an affidavit from Hunt, Hunt's letter to the Office of Professional Standards, Hunt's confession, the decision rendered in Hunt's direct appeal, *People v. Hunt*, 247 Ill. App. 3d 1102 (1st Dist. 1993), and the decision rendered in the appeal of his federal civil rights case, *Hunt v. Jaglowski*, 926 F.2d 689 (7th Cir. 1991).

CCSAO COI SUBPOENAS 000674

Hunt's testimony was not consistent or reliable. Throughout his testimony, he provided various answers to questions posed. For instance, Hunt initially testified that Det. Guevara was not in the room when he confessed to the murder; however, he soon after contradicted himself stating that Guevara was indeed present during his statement for a period of time. Additionally, Hunt stated that he only testified in his criminal trial and that he did not testify in the federal civil trial; however, when the court questioned him seeking clarification on his inconsistent narrative, he then stated that he testified in the federal case that Det. Guevara had provided him with information that he included in his confession. It is also worthy of note that, subsequent to serving his sentence for the murder which he claims to have been abused and coerced into confessing to, he was convicted of an armed robbery and is currently serving a 29 year term of imprisonment, after which he will be transferred to Wisconsin to serve a term of imprisonment on another armed robbery. Overall, Hunt's reactions to questions posed demonstrated a disposition indicating untruthfulness. Moreover, his credibility was impeached to such an extent that his account concerning Det. Guevara is equivocal and sketchy at best. As such, Hunt's testimony does not serve as adequate support for petitioners' claim.

### iv. Daniel Pena

Petitioners assert that Daniel Pena's (Pena) encounter with Det. Guevara involved abuse and coercion to provide a confessional statement and, in support thereof, petitioners presented documentary evidence. During a proceeding in his case, Pena testified, that during interrogation on January 22, 1986, Det. Guevara hit him multiple times in different areas of his body with a flashlight after he denied knowledge of the murder while being questioned at Area 5. He also claimed that Officer Patrick McCarthy (Ofc. McCarthy) hit him and pressured him into cooperating, along with Det. Guevara. Pena maintained that he was tired of getting beaten, so he complied with their demands and made a statement. At some point prior to giving his statement, during the day or so he had been in custody, Pena was taken to a lock-up where he saw two friends whom he told about the beating. Pena stated that he was later taken to the State's Attorney's office, showing visible bruises, and requested a doctor. One of the friends Pena saw in the holding cell testified, corroborating his testimony that he was beaten and bruised. Pena's brother-in-law testified that he saw Pena in the police station and Pena appeared beaten up.

During his court reported confessional statement, Pena stated that one or two officers "smacked" him a few times when he was arrested and since he had been at the police station one

CCSAO COI SUBPOENAS 000675

officer mistreated him. Pena further stated that he was not giving the confessional statement because he was mistreated and that he was giving the statement of his own free will and wanted to give the statement because it was the truth.

During Pena's motion to suppress hearing, Ofc. McCarthy, the undercover narcotics officer whose efforts let to Pena's arrest on the drug charge for which he was originally brought to the station, testified that after the vehicle they occupied was curbed by other officers he and Pena were "dragged out of the car, thrown on the trunk of the car, and handcuffed". Ofc. McCarthy stated that he did not hit Pena and he did not see any other officers hit Pena. The next time he saw Pena was at the station was when he poked his head into the interview room briefly to show Pena he was an officer and he did not see any bruises on Pena. Det. Guevara testified denying that he or the other detective present during interrogation abused, coerced, or threatened Pena. Also, during the motion to suppress hearing, the parties stipulated that Cermak Health Services treated Pena in response to his complaining of pain in his leg and the treating physician found an abrasion and bruising on his nose and leg. On appeal of his conviction, the Appellate Court held that Pena's statement was made voluntarily. *People v. Pena, 174 Ill. App. 3d 281* (1st Dist. 1988). The Court reasoned that although Pena's confessional statement corroborated evidence that he was injured during his arrest, Pena's description of the abuse was inconsistent as he initially stated that he was beaten over a period of five hours and later stated the duration was two hours and he stated that he was repeatedly beaten in the head, ribs, and legs while the extent of that description was not corroborated by medical evidence.

In the instant proceedings, Det. Guevara asserted the 5th amendment in response to questions such as whether: he arrested Pena on a drug warrant, questioned Pena about a murder, struck Pena during questioning when he told him he did not know anything, denied Pena a lawyer when Pena asked for a lawyer during interrogation, denied Pena's request to make a phone call; told Pena what to say in his confession; testified truthfully in Pena's trial; and whether it was only after he had treated Pena in such manner that Pena confessed. The other testifying witness who was present at the station, former ASA William Connelly (ASA Connelly), testified that Det. Guevara was present during the taking of Pena's statement and that no one threatened or mistreated Pena in his presence. ASA Connelly maintained that Pena did not make any off the record complaints to him, and Pena did not seem afraid, apprehensive or nervous around the detectives, specifically Det. Guevara. ASA Connelly testified that he did not

CCSAO COI SUBPOENAS 000676

follow-up by asking any more details about Pena's statement that he had been mistreated by police because he assumed that the mistreatment was part of the arrest.

ASA Connelly was not present during interrogation was only able to attest to what he perceived subsequent to the interrogation. Oddly, although Connelly maintained that Pena did not appear nervous, afraid or beaten, Pena did in fact state to him, in the presence of Guevara, that he was mistreated during arrest and at the station. Pena's explicit assertion raised the issue of mistreatment, whether or not Connelly perceived him as not being nervous, afraid or beaten. It is questionable why, even after Pena reported being mistreated, ASA Connelly did not follow-up with a single question seeking to clarify when and how such alleged mistreatment had occurred. Similarly unexplained, ASA Connelly claimed to have not seen any bruising on Pena; however, a doctor from the jail recorded an abrasion and bruising on Pena's nose, consistent with Pena's claim of being hit.

Aside from Pena's testimony, none of the other testimony provided addressed Pena's interrogation. Ofc. McCarthy stated that he saw Pena at the police station only very briefly when he poked his head into the interview room and Det. Guevara asserted his 5th amendment right to not answer any questions regarding his encounter with Pena. Unlike Ofc. McCarthy, there was no affirmation from Det. Guevara that his testimony during Pena's motion to suppress hearing was truthful. Ofc. McCarthy's testimony that he was not present during the interrogation; the lack of confirmation or denial from Det. Guevara about what exactly occurred during interrogation; and ASA Connelly's interaction with Pena, occurring after the interrogation, which ignored Pena's report of mistreatment and the bruising supporting it, all constitute evidence which fails to rebut Pena's claim that he was abused and coerced by Det. Guevara.

### B. WITNESSES

Petitioners presented evidence, including live testimony, of five individuals who encountered Det. Guevara where he was involved in witness questioning and or suspect identification and is said to have engaged in threats, abuse, coercion and suggestive identification procedures. Petitioners presented documentary evidence concerning Wilfredo Rosario, Jose Melendez and Robert Ruiz; and live testimony from David Velasquez, Retired CPD Detective Dorsch. These five individuals had encounters with Det. Guevara in 1991, 1997, 1995 and 1991, and approximately 1998, respectively.

i.    **David Velasquez**

David Velasquez (Velasquez) testified that, on May 10, 1991, Det. Guevara abused him and coerced him to make a witness statement regarding a murder committed by his fellow members of the street gang Spanish Cobras. Velazquez testified that he was approached by Det. Guevara and his partner Det. Halverson regarding a murder that his cousin, Jason Rivera, had told police that they witnessed and when he told Det. Guevara and his partner that he did not know anything about the murder they took him to rival gang territory, told rival gang members that he had murdered their member and knew the other Spanish Cobra involved. Velasquez testified that the rival gang members became enraged, calling him names and threatening to beat and kill him, and he begged the detectives to let him back in the car, telling them he would do anything they wanted him to do. Velasquez further testified that, when he was subsequently taken to the police station, Det. Guevara slapped, choked, and poured water on him and told him how to recite his witness statement to the ASA and to just sign whatever she brings in front of him. Velasquez testified that he answered a female ASA's questions by giving her false information and that, during his testimony in the subsequent murder trial of one of the offenders he stated that he had been forced to give the statement and that he had given the statement because he thought Det. Guevara would pin a murder on him.

In the instant proceedings, Det. Guevara asserted the 5th amendment in response to questions concerning whether he interviewed Velasquez in 1991; whether Velazquez initially told him knew nothing about the murder; whether he took him to rival gang territory and accused him of murder in front of the other gang members to scare him or threaten his life; and whether he then took Velasquez to the police station, questioned him, and struck him to coerce a statement from him.

Jason Rivera (Rivera), Velasquez' cousin, testified that he was not threatened, abused or coerced to provide his written witness statement by Det. Guevara or any other police officers. Rivera further testified that he and Velasquez both experienced revenge from the Spanish Cobras as a result of their cooperation with the police. Rivera testified that he witnessed Spanish Cobras beating Velasquez with wooden two-by-fours, knocking Velasquez' teeth out, and that he (Rivera) had to relocate twice because the Spanish Cobras burned his house down and one of the defendants threatened him and his family and forced him to speak with his defense attorney.

Former ASA Patrick Walsh (ASA Walsh), testified that Det. Guevara was not present during the taking of Velasquez' statement and he never saw Det. Guevara in the same room as Velasquez. ASA Walsh acknowledged that he knew Det. Guevara was involved with the investigation, as he had seen Det. Guevara the previous night when he had taken Rivera's statement, and believed that Det. Guevara was likely at the station on the second night when he interviewed Velasquez. Walsh stated that during his interview of Velasquez, only Det. Halvorsen was present and there was no female ASA present during his questioning. ASA Walsh later came into contact with Velasquez again in August of 1992, during his narcotics courtroom assignment, when a gang crimes ASA notified him that Velasquez was in custody and in the building. At that time, Velasquez told ASA Walsh that he could not stand by the statement that he had provided to Walsh because he was afraid for his life because after giving the statement he had been shot, beaten, and harassed by his gang and the rival gang. ASA Walsh testified that he never investigated the claims Velasquez made about being under threat by multiple gangs.

Overall, the testimony provided regarding Velasquez' encounter with Det. Guevara does not negate Velasquez' account of abuse and coercion. Neither Rivera nor ASA Walsh claims to have been present during Velasquez' encounter with Det. Guevara. Therefore, neither had personal knowledge regarding any abuse or coercion Velasquez' claims to have experienced. Additionally, there was no testimony provided from Det. Halvorsen the only other individual who is said to have been present during both the initial threat that Velasquez would be left in the hostile presence of the rival gang as well as the questioning that subsequently took place at the police station. While ASA Walsh provided credible testimony and was at the station as early as the day prior to his taking of Velasquez' statement, Walsh has no direct knowledge about what actually occurred during Velasquez' encounter with Det. Guevara in or outside the police station.

Overall, Velasquez provided credible testimony regarding the threats and abuse he allegedly suffered at the hands of Det. Guevara. His testimony only lacked credibility on facts such as the gender of the ASA who took his statement and the length of his interaction with the ASA, which are both minor and unrelated to the matter at hand. There was consistent testimony provided among Velasquez, Rivera and ASA Walsh regarding the retribution Velasquez suffered from his gang and the rival gang which establishes that Velasquez' indeed refused to stand by his witness statement because he was afraid for his life. The showing that Velasquez was intimidated from testifying does not negate his claims of abuse and coercion, especially the instance where

detectives are said to have dangled him like bait in rival gang territory. Because Velasquez' account, detailing abuse and coercion, is sufficiently credible and was not contradicted by any individual who was present and capable of refuting those occurrences; Velasquez' encounter with Det. Guevara is an incident which adequately supports petitioners' claims.

ii.    **Wilfredo Rosario**

During his testimony in a murder trial, Wilfredo Rosario (Rosario) claimed that in January of 1991, when he was questioned about witnessing events surrounding a fatal shooting in July of 1988, Det. Guevara told him to state that he heard more shots than he actually heard and threatened him that if he did not cooperate police would charge him with gun possession, lock him up and let the Latin King street gang deal with him. Rosario testified that, upon being arrested for gun possession, Det. Guevara and his partner asked him whether he knew anything about various murder cases. He claimed that the only information that he knew about those cases was what he had heard around town. Rosario stated that he had fabricated details he provided to the detectives because, at the time, he had already received death threats from the Latin Kings for previously providing information and being scheduled to testify in another murder case and he was afraid for his life. In addition to being threatened with gun charges, Rosario claimed that Det. Guevara had threatened to charge him with the murder or conspiracy.

Rosario testified that the same course events had occurred on the earlier occasion where he had cooperated in the investigation of another murder case; that Det. Guevara held him in jail for several hours and told him that if he did not cooperate he would be charged with the murder. Prior to trial, during the grand jury hearing, Rosario stated that he was not promised anything, threatened to provide the statement or mistreated by the police or ASA. An officer who had questioned Rosario testified that Rosario had told him that he was in the witness protection program and since he was no longer in fear for his safety he knew that it was his civic duty to come forward and tell what he had seen over 2 years earlier.

In the instant proceedings, former ASA Eileen Rubin (ASA Rubin) testified that Rosario appeared unharmed and, over the course of several hours she spent interviewing Rosario, she did not see any detective or officer mistreat Rosario. ASA Rubin stated that there was no detective named Reynaldo Guevara present and that she does not know Det. Guevara. Upon arriving at the station, ASA Rubin met with Detectives Jim Capesius and John McKenna, however, she did not know who questioned Rosario prior to her arrival. In Rosario's written witness statement, he

stated that during his attendance at a house party he witnessed fellow Latin King gang members remove a man from their vehicle and shoot him 7 times in "Snake Alley". Rosario also stated that he was treated well by the police and had not been threatened or promised anything in exchange for his statement. ASA Rubin provided no testimony stating that she had any firsthand knowledge regarding Rosario's treatment prior to her arrival. During the instant proceedings, Det. Guevara asserted the 5th amendment in relation to all questions asked regarding Rosario.

Rosario's testimony does not carry much weight because it was not credible. For instance, Rosario claimed to have been pressured to give a witnesses statement under the threat of being charged with gun possession; however, he was facing criminal charges whether or not he provided a witness statement. Indeed, even after giving the statement he was ultimately charged with the unlawful use of a weapon and sent to jail. Additionally, Rosario had an incentive to provide the information which he claimed to have been fabricated to the police. Rosario had previously provided information on a murder committed by the Latin Kings and in order to avoid being charged with gun possession and being placed in jail it is quite possible that he self-servingly told detectives what he thought they wanted to hear in this case as well. Since, according to Rosario's testimony, there was already the view that certain people were responsible and he did not want to go to jail and be deprived of drugs, it is likely that Rosario identified the individuals for personal gain rather than due to force. As such, evidence concerning Rosario's account of threats and misconduct on the part of Det. Guevara is not a reliable account in support of petitioners' claim.

### iii. Robert Ruiz

Robert Ruiz (Ruiz) identified shooters who fired fatal gunshots at his friend, however, during his testimony at the murder trial of the accused, "Santiago Brothers", he denied that he had seen the defendants murder his friend and claimed that the statements he made to police, the ASA and the grand jury were all false and came about as a result of pressure from Det. Guevara. Ruiz testified that he identified the Santiago Brothers because Det. Guevara told him to do so during questioning in early July of 1997. Specifically, he stated, Det. Guevara showed him a photo array, told him that his friend had picked out the defendant in the photo, and told him how to state what had happened. Although Ruiz stated that he was not abused or threatened by Det. Guevara, he claims to have been locked in a room. Ruiz admitted that when he made his witness statement to the ASA and was asked how he was treated he answered that he was treated well

CCSAO COI SUBPOENAS 000681

and that he never told the ASA that he had been hit, yelled at or instructed to identify anyone. While the State questioned Ruiz during the Santiago Brothers' murder trial, ASA Thomas Darman notified the lead prosecutor that a man sitting in the front row was making motions across his neck with his hand and the prosecutor, accordingly, notified the court.

Jose Reyes (Reyes), who was with Ruiz at the time of the shooting, testified during a deposition conducted in a civil case against Det. Guevara that neither he nor Ruiz were one-hundred percent sure that the Santiagos were the shooters. Reyes maintained that he did not have a good view of the shooters and that he had concluded that the Santiagos were the shooters and identified them because other people in the neighborhood were saying that it was them. In spite of being unsure, Reyes told Ruiz that he was one-hundred percent sure that the Santiagos were the shooters.

Ruiz' sudden allegation that he had been directed to identify the defendants is not reliable It appears more likely that he made an identification that may or may not have been based on neighborhood buzz and then became unwilling to proceed with the identification only after trial had begun. The incident at trial could be reasonably interpreted as intimidation and that intimidation could have influenced Ruiz to recant his grand jury testimony and attribute his identification of the defendants to inappropriate persuasion by the questioning detective who happened to be Det. Guevara. There has been no explanation provided as to why Ruiz would suddenly change course and admit to being persuaded by Det. Guevara to identify the Santiago Brothers. Ruiz' hollow allegation of a suggestive photo array does not carry much weight as evidence supporting petitioners' claim that Det. Guevara engaged in a pattern and practice of abuse.

### iv.    Jose Melendez

Jose Melendez (Melendez) testified during the murder trial of Thomas Sierra (Sierra) that, while he was being shown a photo array by Det. Guevara, Det. Guevara told him who to point out by holding one picture in his hand, while the other photos were placed on the table, and telling Melendez that he had reason to believe that the guy in the picture he held was the shooter. Melendez testified that he was driving in a car along with two passengers when occupants of another vehicle fired shots at them, fatally striking one of his passengers. As he drove away from the scene he was stopped by police and gave a description of the car from which the shots came. Approximately one week later he was picked up by Det. Guevara and shown a photo array.

When Det. Guevara asked him if he recognized anyone, he stated that he had not. Melendez stated that Det. Guevara's indication was the reason why he then identified the defendant, Sierra.

Former detective Lt. John McMurray (Lt. McMurray) testified in these proceedings that, on May 23, 1995 when he responded to the shooting and spoke with Melendez near the scene and at the station, Melendez was upset yet coherent and cooperative, and provided details regarding the shooting, the shooter and the shooter's vehicle. Based on the descriptions given, Lt. McMurray spoke with Melendez again two days later, when suspect Sierra had been picked up and Melendez and Rodriguez came to the station to view the line-up, and Melendez identified the vehicle Sierra had driven at time of the shooting that was recovered and put in the station parking lot. Lt. McMurray stated that he did not observe Det. Guevara at the crime scene and that Det. Guevara was not present when Melendez identified the shooter's vehicle. Lt. McMurray was not present when Det. Guevara conducted the photo array. Melendez did not complain about mistreatment or Det. Guevara in any way to Lt. McMurray, rather Melendez was very cooperative. In the instant proceedings, Det. Guevara asserted the 5th amendment in response to all questions asked concerning Melendez.

Alberto Rodriguez (Rodriguez), who provided testimony through a deposition conducted by the State, testified that he did not know whether Melendez saw the shooter and that even he himself was unable to provide a detailed description of the shooter (such as facial hair) because the windows were tinted. Rodriguez stated that at the time of the shooting he could only ascertain that the shooter was Hispanic and that he did not recall giving a description immediately after the incident or identifying anyone from the hundreds of photos he was shown by officers during his initial visit to the police station. Rodriguez later identified an individual as the shooter and stated that he was no coerced, forced, or influenced to identify the individual.

Melendez' testimony during Sierra's trial is reliable evidence constituting a credible account of misconduct engaged in by Det. Guevara. Lt. McMurray's testimony only referenced that Melendez described the shooter and did not provide any details concerning that description which would establish that his claim that Melendez had seen the shooter's face was more or less truthful. As such, Lt. McMurray's testimony that Melendez had seen and described the shooter, when compared against Melendez' testimony that he had done neither, has little weight. Furthermore, during Melendez' testimony as a witness for the State in Sierra's trial, Melendez did not waver from his assertion that he had not seen or actually believed that Sierra was the

shooter. While Melendez clearly stated in his written witness statement that he saw and identified the shooter; the statement, a memorialization consistent with his false identification during the photo array, does not prove that his claim of a suggestive photo array is fictitious.

Additionally, Rodriguez' testimony did not serve to diminish Melendez' assertion that he had not seen the shooter. Rodriguez' ability to ultimately identify the shooter does not indicate that Melendez had likewise been able to identify the shooter. This is so in spite of Melendez being the driver and, therefore, closer to the shooter who sat in the passenger seat of the vehicle situated to the left of Melendez' vehicle. As the driver, Melendez may not have had the opportunity to get a sufficient look at any of the occupants of the vehicle the shooter occupied; as is more likely than not given that Melendez alerted Rodriguez to keep an eye on the vehicle occupants. The Appellate Court's affirmation of Sierra's conviction and sentence, stating that there was sufficient evidence to support the jury's finding that Melendez' identification of the Sierra was more credible than his repudiation, *People v. Sierra*, 297 Ill. App. 3d 1123 (1998), similarly does not invalidate Melendez' claim that he did not view the shooter and had only identified Sierra due to Det. Guevara's suggestion.

Significantly, there was no evidence presented contradicting Melendez' assertion that Det. Guevara conducted a suggestive photo array. Neither Rodriguez nor Lt. McMurray were present during Det. Guevara's interaction with Melendez and, therefore, whether Det. Guevara suggested Melendez to identify the defendant in the photo array is not within Rodriguez' and Lt. McCarthy's knowledge. Lt. McCarthy was only able to provide his observation that Melendez did not complain of mistreatment and that he was very cooperative at the time that he had spoken with Melendez at the scene and at the station during his identification of the vehicle the shooter occupied. Moreover, the only person who could have refuted Melendez' account, Det. Guevara, did not provide testimony regarding the encounter. Because Melendez' account is reliable and stands unrebutted, his account adequately supports petitioners' claim that Det. Guevara engaged in various forms of misconduct while conducting investigations.

v.    **Retired Detective William Dorsch**

William Dorsch (Det. Dorsch), a retired CPD Detective, testified that he worked with Det. Guevara on an investigation where Det. Guevara demonstrated questionable conduct during a witness' viewing of a photo array. Det. Dorsch testified that, when he was assigned to Area 5 homicide, Det. Guevara brought in two teen boys for the purpose of identifying a suspect in a

murder investigation. The witnesses provided the license plate number of a vehicle from which they claim the driver fatally shot the driver of another vehicle. Once officers identified the owner of the vehicle and acquired a photo of him, a photo array was conducted. Det. Dorsch testified that, when the first witness viewing the photos had not identified anyone after a considerable period of time, Det. Guevara "reached out and put his finger right on the photo and said, 'that's him', and the kid said, 'Yeah that's him, I was just about to say it was him. He looks a little different'". The second witness was unable to identify anyone from the photo array. The suspect, a local university student who worked at Walgreens, was located and brought into the station for a physical line-up. During the separate physical line-ups conducted for each witness, where Det. Guevara was not present, the first witness again identified the individual he pointed out in the photo array and the second witness again identified no one. Dorsch testified that, in spite of his discomfort with the interference with the identification by Det. Guevara, he contacted felony review for the initiation of charges against the suspect. Det. Dorsch stated that when he contacted felony review he expressed his discomfort.

Det. Dorsch stated that he told his supervisor that he was uncomfortable with the identification and, the next morning, he went out and spoke with the witnesses about his discomfort with the photo array identification and asked them whether they were comfortable with putting an innocent person in jail. Both of the teens then admitted to Det. Dorsch that they had been paid to identify the individual by "Spanky"[2], the man who had accompanied them to the police station during their first and second visits, and that the individual they identified had been dating Spanky's ex-girlfriend. Det. Dorsch took the two witnesses to Branch 66, where they told the State's attorney that they had been paid money to identify the suspect, the suspect was not the offender, the suspect had been dating the ex-girlfriend of the man who paid them. Det. Dorsch then asked the ASA that the student who had been charged be released and the charges against the student were subsequently dismissed.

Det. Dorsch testified that he did not report Det. Guevara's conduct during the photo array in a written report, or to a supervisor, or to the ASA that came out after the photo array. He

---

[2] The individual nicknamed "Spanky" was identified by the identifying teen (Ferdinand Vargas), in a photograph shown to him during these proceedings, as Sam Perez-Melendez, an individual who had earlier testified in the instant proceedings that he had prior dealings with Det. Guevara wherein Det. Guevara picked him up and suggested to him that a certain four gang members should be identified as committing a murder and that he, accordingly, identified the individuals because he believed that Det. Guevara would pin a murder on him if he did not. Sam Perez-Melendez' testimony was excluded prior to Vargas' identification of him as "Spanky".

CCSAO COI SUBPOENAS 000685

stated that he did not immediately report the incident because the task at hand was getting a proper identification and if the second witness had identified the same individual on the second day then perhaps he could have written off Det. Guevara's pointing as an error or mistake. When asked whether he reported the incident to anyone in his chain of command, Det. Dorsch responded that many people knew of it and an official report had never been made by anyone. In these proceedings, Det. Guevara asserted the 5th amendment in response to all questions asked regarding the witness identification in this case.

Ferdinand Vargas, the teen who made the identification during the photo array and physical line-up, testified that he identified the person whom he was directed to identify by Spanky and that no police officer directed him to select anyone in the photo array, threatened him or promised him anything. Vargas testified that Spanky, whom he did not know very well, told him and his friend Jonathan Nelson that he knew who committed a murder that occurred and that he would pay him and Nelson money and a car radio to point the person out at the police station, as if they themselves had witnessed the murder. After Vargas and Nelson agreed, Spanky showed them a photo of a man, provided them with a license plate number and pointed out a Chrysler LeBaron and told them to provide that information to police. Vargas states that he studied the photo and practiced remembering the license plate number on the way to the station and when he arrived at the station he pointed out the individual in the photo array and identified the make and model of his car in the station parking lot.

Det. Dorsch's account was credible, as it contained no inconsistencies concerning the issue at hand and stands unrefuted. As noted, Det. Guevara did not answer questions regarding the incident. The only witness providing testimony in refutation of the evidence presented by petitioners, lacked credibility. Vargas' testimony was not credible on the issue of whether Det. Guevara directed him to identify a certain individual. Notably, Vargas was willing to lie to send an innocent person to prison for a murder he did not commit and equally as troubling is that he simply agreed to do so at the behest of a person he barely knew for little to nothing. Overall, Vargas' demeanor and testimony indicated that he was an unreliable witness. Because Vargas was not a reliable witness, this court does not believe that his testimony, that Det. Guevara did not suggest to him which individual should be selected from the photo array, is credible. Furthermore, since Det. Dorsch's account was credible and was not refuted, his testimony is unrebutted and constitutes evidence which sufficiently support petitioners' claim.

CCSAO COI SUBPOENAS 000686

## CONCLUSION

At issue in the instant post-conviction proceedings, is whether or not petitioners have made a sufficient showing that the new evidence they have submitted is of such conclusive character that it would probably change the result of earlier proceedings. In this matter, where petitioner's allege their right to due process was violated by a detective's procuring of involuntary confessional statements through abuse and coercion and the admission of those statements into evidence during their respective trials, the court's analysis requires a determination on whether the outcome of the motion to suppress hearing could have been different if the court had before it the new evidence which was obtained after trial. As stated earlier, petitioners have indeed requested a new motion to suppress hearing.

In addition to testifying on their own behalf and calling Det. Guevara to testify, petitioners provided evidence of various accounts alleging a variety of misconduct on the part of Det. Guevara, ranging from suggestive identifications to abuse and coercion. As discussed, these witness accounts had varying credibility and weight. The accounts of the unrelated incidents provided by petitioner are sufficiently similar to the accounts testified to by petitioners in that they all include threats, abuse and coercion to secure statements and occurred within a range of time so as to constitute a pattern and practice. Altogether, these incidents include details implying that Det. Guevara would employ methods to secure a confessional or witness statement by whatever means that he could.

None of the testimony or evidence, provided in an effort to discredit the accounts detailed in petitioners' new evidence, originated from any individual with personal knowledge of the specific occurrences concerning Det. Guevara. While the testimony introduced in opposition of petitioners' new evidence was generally credible, the fact remains that such testimony is unrelated to the specific issue at hand: the tactics carried out by Det. Guevara. Similarly, any inconsistencies indicating diminished credibility on the part of the petitioners' witnesses were only determinative insofar as such inconsistencies related to the specific issue at hand rather than ancillary details which have no bearing on the abuse, coercion, and other misconduct which is alleged to have occurred. Because there was no evidence presented in direct refutation of claims of abuse, coercion and other misconduct, petitioners newly discovered evidence is unrebutted.

Significantly, all accounts, including and especially those put forth by petitioners, stood unrefuted by Det. Guevara. As noted, Det. Guevara asserted his 5th amendment right to decline to

CCSAO COI SUBPOENAS 000687

answer questions regarding the any of the interrogations and witness questioning conducted in the incidents testified to in these proceedings. In instances where a witness believes he might subject himself to prosecution if he answers questions during a court proceeding, the United States Constitution's 5th amendment privilege against self-incrimination gives him the right to refuse to provide incriminating testimony against himself. *People v. Redd*, 135 Ill. 2d 252, 304 (1990). Where a witness asserts the 5th amendment in post-conviction proceedings, the court is not only permitted to draw a negative inference from the refusal to testify, but should do so in circumstances where the petitioner's evidence goes unrebutted by the State. *Whirl*, 2015 IL App (1st) 111483. Because petitioners' evidence was unrebutted by the State and there was no testimony from Det. Guevara regarding the conduct he is alleged to have engaged in, this court draws the negative inference that he refused to answer so as to avoid admitting wrongdoing while under oath. The inference that Det. Guevara possibly engaged in wrongdoing overwhelmingly supports petitioners' claim that he engaged in abuse and coercion in the incidents submitted as new evidence as well as their own interrogations.

While petitioners have maintained that they were abused and coerced into providing confessional statements as early as their pre-trial motions to suppress, they did not then have the additional multiple unrelated incidents which they have submitted here to support their assertions. As the Appellate Court expressed in petitioners' post-conviction appeal, "If even a fraction of the allegations included in this evidence had been presented prior to trial, it appears likely that Guevara's credibility would have been damaged and defendants' confessions would have been suppressed. Without these confessions, the State's case against defendants would have been severely weakened." *Reyes*, 369 Ill. App. 3d 1, 19 (1st. Dist. 2006). Further, this court agrees with Appellate Court's view that the various incidents put forth as evidence of "allegations of Guevara's improperly influencing witnesses' identifications of suspects" is evidence that is " relevant to whether defendants in the case at bar were similarly coerced". *Id.* at 21.

After reviewing the evidence in third stage evidentiary proceedings, it is abundantly clear that, the uncontradicted accounts of these specific interactions entailing abuse, coercion and improper influence in addition to the negative inference drawn from Det. Guevara's assertion of his 5th amendment privilege against self-incrimination lend credence to petitioners' allegations of abuse and coercion. A majority of the new evidence presented by petitioners is credible and,

given that those accounts are unrebutted, the new evidence is conclusive enough to establish that the outcome of petitioners' previous motion to suppress would likely have been different. Had petitioners been armed with these multiple credible and unrebutted accounts of the incidents introduced in these proceedings at the time of their motion to suppress, the court would have likely rendered a different decision and excluded their statements from introduction during trial in protection of their right to due process. In order to determine whether petitioners' new evidence in support of their claim of abuse and coercion would render their confessional statements involuntary and, therefore, inadmissible at trial, a new motion to suppress hearing should be held.

Accordingly, this court finds that petitioners have made a substantial showing that they were denied their constitutional right to due process, by a preponderance of the evidence, and are therefore entitled to new motion to suppress hearings. Consistent with the relief requested by petitioners during arguments, a new motion to suppress hearing is hereby GRANTED. At this time, petitioners' requests that this court vacate their convictions are DENIED.

ENTERED:

Hon. James M. Obbish
Circuit Court of Cook County
Criminal Division

DATED: 6-29-16

ENTERED
JUDGE JAMES M. OBBISH-1752

JUN 29 2016

DOROTHY BROWN
CLERK OF THE CIRCUIT COURT
OF COOK COUNTY, IL
DEPUTY CLERK

CCSAO COI SUBPOENAS 000689

EXHIBIT C

**ENTERED**

DEC 2 1 2017

JUDGE JAMES M. OBBISI
CIRCUIT COURT - 1752

**IN THE CIRCUIT COURT OF COOK COUNTY**
**COUNTY DEPARTMENT-CRIMINAL DIVISION**

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| | ) | |
| Respondent, | ) | |
| | ) | |
| | ) | |
| vs. | ) | No. 98cr-12440 |
| | ) | Honorable Judge Presiding |
| GABRIEL SOLACHE | ) | |
| Petitioner. | ) | |
| | ) | |
| | ) | |

**ORDER**

It is Hereby Ordered that pursuant to the State's motion, the conviction and sentence in the above-captioned matter are vacated and it is further ordered that Gabriel Solache, Inmate number R01940, be released immediately from the Illinois Department of Corrections.

Entered: _____
Judge James Obbish

Date:_____

CCSAO COI SUBPOENAS 000690

**From:** Anand Swaminathan
**To:** CHRISTA BOWDEN (States Attorney)
**Subject:** Re: Reyes COI - sending pleadings
**Date:** Friday, April 15, 2022 11:54:59 AM

---

**External Message Disclaimer**

This message originated from an external source. Please use proper judgment and caution when opening attachments, clicking links, or responding to this email.

figured it out - thanks.

On Fri, Apr 15, 2022 at 11:32 AM CHRISTA BOWDEN (States Attorney)
<christa.bowden@cookcountyil.gov> wrote:

I think there is a 1 or 2 after her last name. I am out of the office today and don't have access to it right now. Sorry.
Cb

Christa Bowden

> On Apr 15, 2022, at 10:53 AM, Anand Swaminathan <anand@loevy.com> wrote:

**External Message Disclaimer**

This message originated from an external source. Please use proper judgment and caution when opening attachments, clicking links, or responding to this email.

Is Judge Atcherson's email sophia.atcherson@cookcountyil.gov? Just want to make sure - I'm going to send her the pleadings/exhibits (and cc you).

Thanks.

CCSAO COI SUBPOENAS 000691

**From:** Anand Swaminathan (via Google Drive)
**To:** CHRISTA BOWDEN (States Attorney)
**Subject:** Folder shared with you: "De Leon-Reyes COI "
**Date:** Friday, April 15, 2022 11:53:43 AM

---

## External Message Disclaimer

This message originated from an external source. Please use proper judgment and caution when opening attachments, clicking links, or responding to this email.



# Anand Swaminathan shared a folder

Anand Swaminathan (anand@loevy.com) added you as an editor. Verify your email to securely start contributing to this folder. You will need to verify your email every 7 days. Learn more.

De Leon-Reyes COI

Open

Use is subject to the Google Privacy Policy

Google LLC, 1600 Amphitheatre Parkway, Mountain View, CA 94043, USA
You have received this email because anand@loevy.com shared a file or folder located in Google Drive with you.
Delete visitor session

CCSAO COI SUBPOENAS 000692

| | |
|---|---|
| From: | Rachel Brady |
| To: | CHRISTA BOWDEN (States Attorney) |
| Cc: | Valerie Barajas; Anand Swaminathan |
| Subject: | Re: Reyes COI: No. 98CR1244002 |
| Date: | Wednesday, March 30, 2022 12:38:06 PM |

---

**External Message Disclaimer**

This message originated from an external source. Please use proper judgment and caution when opening attachments, clicking links, or responding to this email.

Thanks. Appreciate it.

Rachel

On Wed, Mar 30, 2022 at 12:31 PM CHRISTA BOWDEN (States Attorney) <christa.bowden@cookcountyil.gov> wrote:

> I am Ok, as long as I get the response by 4/7.
>
> Christa Bowden
> Assistant State's Attorney
> 2650 South California Avenue
> Special Litigation, 12C42
> Chicago, Illinois 60608
> (773)674-7537
> christa.bowden@cookcountyil.gov
>
> The information contained in this electronic message may be confidential and may be subject to the attorney-client privilege and/or the attorney work product doctrine. It is intended only for the use of the individual or entity to whom it is addressed. If you are not the intended recipient, you are hereby notified that any use, dissemination or copying of this communication is strictly prohibited. If you have received this electronic message in error, please delete the original message from your e-mail system. Thank you.
>
> **From:** Rachel Brady <brady@loevy.com>
> **Sent:** Wednesday, March 30, 2022 12:28 PM
> **To:** CHRISTA BOWDEN (States Attorney) <christa.bowden@cookcountyil.gov>
> **Cc:** Valerie Barajas <valerie@loevy.com>; Anand Swaminathan <anand@loevy.com>
> **Subject:** Re: Reyes COI: No. 98CR1244002

---

**External Message Disclaimer**

This message originated from an external source. Please use proper judgment and caution when opening attachments, clicking links, or responding to this email.

Dear Christa,

Here are the transcripts you requested: https://spaces.hightail.com/receive/xFntNEQKkA
We dispute that most of these transcripts are relevant or admissible in these proceedings (particularly those of the prosecutors), but in the interest of moving this case along, we are

CCSAO COI SUBPOENAS 000693

providing them. We do not have a transcript of Mr. Sussman's deposition, and cannot see how it is relevant to these COI proceedings. He has no personal knowledge of the underlying crime, investigation, or prosecutions, and his testimony is at least one and possibly two layers of hearsay.

Separately, I realize that when you got the extension to file your response brief, we didn't ask the Court for a commensurate extension of our deadline to reply. Do you have any objection to us filing our reply by Friday?

Thanks,
Rachel

On Wed, Mar 30, 2022 at 11:52 AM CHRISTA BOWDEN (States Attorney) <christa.bowden@cookcountyil.gov> wrote:

Thank you for the list. I would copies of Alfredo, Jose, and Rosa Aranda, Art Hill, Jorge, Jose and Rosauro Mejia, Salvador Olivares, Kevin Sheehan, Daniel Trevino and Karen Wherle. I did not see Eric Sussman on your list, but I am aware he was deposed late last year. I would like his deposition as well.

Best regards,

Christa Bowden
Assistant State's Attorney
2650 South California Avenue
Special Litigation, 12C42
Chicago, Illinois 60608
(773)674-7537
christa.bowden@cookcountyil.gov

The information contained in this electronic message may be confidential and may be subject to the attorney-client privilege and/or the attorney work product doctrine. It is intended only for the use of the individual or entity to whom it is addressed. If you are not the intended recipient, you are hereby notified that any use, dissemination or copying of this communication is strictly prohibited. If you have received this electronic message in error, please delete the original message from your e-mail system. Thank you.

**From:** Rachel Brady <brady@loevy.com>
**Sent:** Thursday, March 24, 2022 5:51 PM
**To:** CHRISTA BOWDEN (States Attorney) <christa.bowden@cookcountyil.gov>
**Cc:** Anand Swaminathan <anand@loevy.com>; Valerie Barajas <valerie@loevy.com>
**Subject:** Re: Reyes COI: No. 98CR1244002

**External Message Disclaimer**

This message originated from an external source. Please use proper judgment and caution when opening attachments, clicking links, or responding to this email.

Christa,

There are a lot of depositions in the Solache/Reyes civil cases, almost none of which have

any bearing on these COI proceedings. For that reason, we did not understand the Court in these proceedings to be ordering parallel discovery with the civil case. Nevertheless, so we can put this issue aside and proceed with summary judgment, here are the remaining transcripts we have, excluding Reyes and Adriana Mejia (which you already have), and those witnesses who relate to our policy and practice claims:

- Aranda, Alfredo (Soto neighbor)
- Aranda, Jose (Jacinta Soto's nephew-in-law, Interrogated by Guevara)
- Aranda, Rosa (Jacinta Soto's niece, interrogated by Guevara)
- Bank, Naomi (Solache trial PD)
- Brualdi, Heather (prosecutor)
- Cerda, Jose (CPD officer)
- Dickinson, Edwin (CPD officer)
- Dorsch, William (former CPD officer who witnessed Guevara committing misconduct in other cases/pattern and practice witness)
- Guevara, Reynaldo (takes the Fifth on all questions)
- Harvey, Mark (evidence technician)
- Hill, Art (prosecutor)
- Mejia, Guadalupe (Adriana Mejia's sister in law)
- Mejia, Jorge (Rosauro Mejia's brother)
- Mejia, Jose (Rosauro Mejia's cousin)
- Mejia, Rosauro (Adriana Mejia's husband)
- Olivares, Salvador (Arturo Reyes's coworker)
- O'Malley, Tom (prosecutor)
- Rouse, Viola (Solache PD)
- Rutherford, Robert (CPD)
- Sheehan, Kevin (prosecutor)
- Soto, Jorge (Mariano Soto's brother, ID's the body)
- Trevino, Daniel (CPD youth officer, translated Reyes's statement)
- Valentin, David (CPD, called to crime scene)
- Varga, Andrew (CPD)
- Velazquez, David (pattern and practice witness)
- Verdun, Tom (prior Reyes attorney)
- Wehrle, Karen (prosecutor)

I'm attaching Navarro and Solache. Please let us know which depositions you want and we will send them right away.

Thanks,
Rachel

On Thu, Mar 24, 2022 at 9:29 AM CHRISTA BOWDEN (States Attorney) <christa.bowden@cookcountyil.gov> wrote:

> Mr. Swaminathan was present on the zoom on 12/3. A discussion was had about the depositions that were ocurring around that time (Solache, Eric Sussman, Judge Navarro(?)), I indicated that I did not have the deps from the civil case. Mr. Swaminathan assured the court that I would receive everything as it became available. The problem is that I do not know what depositions have been taken. If you would provide a list of depositions taken in the combined civil case of both Solache and Reyes,

I can then make a determination as to what I do not have.

Best regards,

Christa Bowden
Assistant State's Attorney
2650 South California Avenue
Special Litigation, 12C42
Chicago, Illinois 60608
(773)674-7537
christa.bowden@cookcountyil.gov

The information contained in this electronic message may be confidential and may be subject to the attorney-client privilege and/or the attorney work product doctrine. It is intended only for the use of the individual or entity to whom it is addressed. If you are not the intended recipient, you are hereby notified that any use, dissemination or copying of this communication is strictly prohibited. If you have received this electronic message in error, please delete the original message from your e-mail system. Thank you.

**From:** Rachel Brady <brady@loevy.com>
**Sent:** Thursday, March 24, 2022 8:00 AM
**To:** CHRISTA BOWDEN (States Attorney) <christa.bowden@cookcountyil.gov>
**Cc:** Anand Swaminathan <anand@loevy.com>; Valerie Barajas <valerie@loevy.com>
**Subject:** Reyes COI: No. 98CR1244002

---

### External Message Disclaimer

This message originated from an external source. Please use proper judgment and caution when opening attachments, clicking links, or responding to this email.

---

Christa,

The State's response to Mr. Reyes's summary judgment motion in the COI case says that the Court ordered us on December 3, 2021 to provide deposition transcripts as they become available. There have been only two depositions taken in the Reyes civil case since December 3, 2021. Both of those were depositions of corporate designees for the City of Chicago relating to Chicago Police Department policies and practices. They are not substantively related to the Reyes case, and do not bear on Mr. Reyes's petition for a certificate of innocence.

If there are any depositions you believe are outstanding, please let me know and we will provide them immediately. Otherwise, we will represent to the Court in our reply that this issue has been resolved.

Thanks,
Rachel

--

Rachel Brady
Loevy & Loevy
311 N. Aberdeen St., 3rd Floor

CCSAO COI SUBPOENAS 000696

Chicago, IL 60607
312.243.5900
brady@loevy.com
she/her

--
Rachel Brady
Loevy & Loevy
311 N. Aberdeen St., 3rd Floor
Chicago, IL 60607
312.243.5900
brady@loevy.com
she/her

--
Rachel Brady
Loevy & Loevy
311 N. Aberdeen St., 3rd Floor
Chicago, IL 60607
312.243.5900
brady@loevy.com
she/her

--
Rachel Brady
Loevy & Loevy
311 N. Aberdeen St., 3rd Floor
Chicago, IL 60607
312.243.5900
brady@loevy.com
she/her

CCSAO COI SUBPOENAS 000697



**From:** Joshua Tepfer <josh@exonerationproject.org>
**Sent:** Tuesday, June 14, 2022 12:52:51 PM
**To:** JANEA BENNETT (States Attorney) <JANEA.BENNETT@cookcountyil.gov>
**Cc:** Anand Swaminathan <anand@loevy.com>; Steve Art <steve@loevy.com>
**Subject:** Re: Meeting with State's Attorney Foxx

<div style="border: 1px dashed black; background-color: #FFFF00; padding: 10px;">

**External Message Disclaimer**

This message originated from an external source. Please use proper judgment and caution when opening attachments, clicking links, or responding to this email.

</div>

Hi Janea,

Sorry for the last minute but in case Ms. Foxx and Ms. Lanier would like to have it, here is a copy of the slides we will be using during our presentation. I don't know if you wanted to send it to them or if they are in the office to print it out for them.

Thank you again,
Josh

On Mon, Jun 13, 2022 at 1:40 PM JANEA BENNETT (States Attorney) <JANEA.BENNETT@cookcountyil.gov> wrote:

> Perfect. Thank you so much!

CCSAO COI SUBPOENAS 000698



**Janea Bennett**
*Executive Assistant to*
*Cook County State's Attorney, Kimberly M. Foxx*

Cook County State's Attorney's Office
69 W. Washington, Suite 3200
Chicago, IL 60602
Email: janea.bennett@cookcountyil.gov

Get Outlook for iOS

**From:** Joshua Tepfer <josh@exonerationproject.org>
**Sent:** Monday, June 13, 2022 1:36:28 PM
**To:** JANEA BENNETT (States Attorney) <JANEA.BENNETT@cookcountyil.gov>
**Cc:** Anand Swaminathan <anand@loevy.com>; Steve Art <steve@loevy.com>
**Subject:** Re: Meeting with State's Attorney Foxx

---

**External Message Disclaimer**

This message originated from an external source. Please use proper judgment and caution when opening attachments, clicking links, or responding to this email.

---

Wonderful, Janea, thank you.

Here is a link to the Zoom meeting if that works. It might say a name other than mine when the participants log in but this should work.

Join Zoom Meeting https://us02web.zoom.us/j/85239897369?pwd=L2w2UEFjY0hOWG5wMjBYWW1VeTEyQT09 Meeting ID: 852 3989 7369 Passcode: 083234

Thank you again,
Josh

On Mon, Jun 13, 2022 at 1:24 PM JANEA BENNETT (States Attorney) <JANEA.BENNETT@cookcountyil.gov> wrote:

> Good Afternoon Josh,
>
> Thank you so much for following up. Yes, we are still confirmed for the meeting

CCSAO COI SUBPOENAS 000699

tomorrow. The attendees from our office will be SA Foxx and her First assistant, Risa Lanier. We typically use Teams for our meetings but I believe you were gracious enough to send a zoom link last time. Do you mind doing that again?

Thank you,

Janea

---

**From:** Joshua Tepfer <josh@exonerationproject.org>
**Sent:** Monday, June 13, 2022 8:45 AM
**To:** JANEA BENNETT (States Attorney) <JANEA.BENNETT@cookcountyil.gov>
**Subject:** Re: Meeting with State's Attorney Foxx

**External Message Disclaimer**

This message originated from an external source. Please use proper judgment and caution when opening attachments, clicking links, or responding to this email.

Hi Janea,

I just wanted to confirm that we are still going forward via zoom tomorrow at 1 pm for this meeting with Ms. Foxx. And if so, if you could please confirm who will be attending the meeting from your Office.

From our end, it will be my colleagues Steve Art and Anand Swaminathan joining me.

Thank you again and hope you are enjoying the beginning of summer.

Josh

CCSAO COI SUBPOENAS 000700

On Mon, May 16, 2022 at 11:46 AM JANEA BENNETT (States Attorney) <JANEA.BENNETT@cookcountyil.gov> wrote:

Hi Josh,

I hope you had a great weekend! I'd like to confirm 6/14 at 1:00. As of now let's plan for it to be a virtual meeting. I will send a link as we get a little closer to the day.

Thank you,

Janea

**Janea Bennett**
*Executive Assistant to*
*Cook County State's Attorney, Kimberly M. Foxx*

Cook County State's Attorney's Office
69 W. Washington, Suite 3200
Chicago, IL 60602
Email: janea.bennett@cookcountyil.gov

Get Outlook for iOS

**From:** Joshua Tepfer <josh@exonerationproject.org>
**Sent:** Tuesday, May 10, 2022 8:31:18 AM
**To:** JANEA BENNETT (States Attorney) <JANEA.BENNETT@cookcountyil.gov>
**Subject:** Re: Meeting with State's Attorney Foxx

**External Message Disclaimer**

This message originated from an external source. Please use proper judgment and caution when opening attachments, clicking links, or responding to this

CCSAO COI SUBPOENAS 000701

email.

Hi Janea,

Thank you so much for reaching out. Sorry for the delay. I just wanted to touch base with Anand Swaminathan and Steve Art, who are my partners on most things Guevara and would like to have join the meeting. We really look forward to it.

The dates and times on either 6/14 and 6/21 would be best for us.

Thank you,

Josh

On Mon, May 9, 2022 at 7:40 AM JANEA BENNETT (States Attorney) <JANEA.BENNETT@cookcountyil.gov> wrote:

Good morning,

I hope you had a great weekend. State's Attorney Foxx would like to get a meeting on the calendar for next month to discuss the Guevara cases. I have added some dates below to get started but please let me know what works best for you.

6/14- 1 or 2

6/15- 11 or 1

6/16- 2 or 3

6/21- 1 or 2

Thanks,

CCSAO COI SUBPOENAS 000702

Janea

**Janea Bennett**
*Executive Assistant to*
*Cook County State's Attorney, Kimberly M. Foxx*

Cook County State's Attorney's Office
69 W. Washington, Suite 3200
Chicago, IL 60602
Email: janea.bennett@cookcountyil.gov

Get Outlook for iOS

--

Joshua Tepfer

Exoneration Project

311 N. Aberdeen Street, 3rd floor

Chicago, IL 60607

(312) 789-4955

--

Joshua Tepfer

Exoneration Project

311 N. Aberdeen Street, 3rd floor

Chicago, IL 60607

(312) 789-4955

--

CCSAO COI SUBPOENAS 000703

Joshua Tepfer
Exoneration Project
311 N. Aberdeen Street, 3rd floor
Chicago, IL 60607
(312) 789-4955


--
Joshua Tepfer
Exoneration Project
311 N. Aberdeen Street, 3rd floor
Chicago, IL 60607
(312) 789-4955

CCSAO COI SUBPOENAS 000704

CONVICTIONS OBTAINED
BY REYNALDO GUEVARA
JUNE 14, 2022

CCSAO COI SUBPOENAS 000705

CCSAO COI SUBPOENAS 000706

## INTRODUCTION

*Convictions based on evidence fabricated by Detective Reynaldo Guevara violate due process and cannot stand.*

CCSAO COI SUBPOENAS 000707

## GUEVARA'S VICTIMS

*22 people convicted of murder as the result of investigations by Detective Guevara have had their convictions thrown out.*

## GUEVARA'S VICTIMS

The 22 are: David Gecht, Daniel Rodriguez, Demetrius Johnson, Jacques Rivera, Juan Johnson, Jose Montanez, Armando Serrano, Jorge Pacheco, Roberto Almodovar, William Negron, Jose Maysonet, Angel Rodriguez, Santos Flores, Henry Johnson, Arturo DeLeon Reyes, Gabriel Solache, Ariel Gomez, Xavier Arcos, Ricardo Rodriguez, Robert Bouto, Thomas Sierra, and Geraldo Iglesias.

CCSAO COI SUBPOENAS 000708

CCSAO COI SUBPOENAS 000709

## GUEVARA'S VICTIMS

The 22 are: *David Gecht, Daniel Rodriguez, Demetrius Johnson, Jacques Rivera, Juan Johnson, Jose Montanez, Armando Serrano, Jorge Pacheco, Roberto Almodovar, William Negron, Jose Maysonet, Angel Rodriguez, Santos Flores, Henry Johnson, Arturo DeLeon Reyes, Gabriel Solache, Ariel Gomez, Xavier Arcos, Ricardo Rodriguez, Robert Bouto, Thomas Sierra, and Geraldo Iglesias.*

*These men spent nearly half a millennium in prison for no reason.*

*A number of them spent many years engaged in protracted post-conviction litigation.*

CCSAO COI SUBPOENAS 000710

## GUEVARA'S VICTIMS

*The 22 are: David Gecht, Daniel Rodriguez, Demetrius Johnson, Jacques Rivera, Juan Johnson, Jose Montanez, Armando Serrano, Jorge Pacheco, Roberto Almodovar, William Negron, Jose Maysonet, Angel Rodriguez, Santos Flores, Henry Johnson, Arturo DeLeon Reyes, Gabriel Solache, Ariel Gomez, Xavier Arcos, Ricardo Rodriguez, Robert Bouto, Thomas Sierra, and Geraldo Iglesias.*

*These men spent nearly half a millennium in prison for no reason.*

**FOCUS FOR TODAY**

CCSAO COI SUBPOENAS 000711

Case: 1:18-cv-01028 Document #: 892-2 Filed: 04/04/26 Page 712 of 855 PageID #:121338

CCSAO COI SUBPOENAS 000712

**FOCUS FOR TODAY**

**1. ACKNOWLEDGEMENT OF GUEVARA MISCONDUCT**

## FOCUS FOR TODAY

### 1. ACKNOWLEDGEMENT OF GUEVARA MISCONDUCT

### 2. ILLUSTRATIONS OF GUEVARA MISCONDUCT

CCSAO COI SUBPOENAS 000713

## FOCUS FOR TODAY

## 1. ACKNOWLEDGEMENT OF GUEVARA MISCONDUCT

## 2. ILLUSTRATIONS OF GUEVARA MISCONDUCT

## 3. CURRENT CASES INVOLVING GUEVARA

CCSAO COI SUBPOENAS 000714

CCSAO COI SUBPOENAS 000715

*1.*
ACKNOWLEDGEMENT OF
GUEVARA MISCONDUCT

**ACKNOWLEDGMENT OF MISCONDUCT**

**By the Illinois Appellate Court**

The Illinois Appellate Court has called Guevara "a malignant blight on the Chicago Police Department and the judicial system"

*People v. Martinez*, 2021 IL App (1st) 190490, ¶ 64.

- The Appellate Court has recognized in at least 8 published decisions that Detective Guevara has a well-documented history of coercing and manipulating witnesses and suspects has tainted criminal convictions.

CCSAO COI SUBPOENAS 000716

Case: 1:18-cv-01028 Document #: 892-2 Filed: 04/04/26 Page 717 of 855 PageID #:121343

## ACKNOWLEDGMENT OF MISCONDUCT

The Illinois Appellate Court has called Guevara "a malignant blight on the Chicago Police Department and the judicial system"

*People v. Martinez*, 2021 IL App (1st) 190490, ¶ 64.

## By the Illinois Appellate Court

- The Appellate Court has recognized in at least 8 published decisions that Detective Guevara has a well-documented history of coercing and manipulating witnesses and suspects has tainted criminal convictions.

- *People v. Martinez*: "The State does not dispute that Detective Guevara has a history of misconduct. Nor could it. This Court has recognized Detective Guevara's well-documented history of influencing and manipulating witnesses. The allegations against him span decades and share common threads." 2021 IL App (1st) 190490: ¶ 64

CCSAO COI SUBPOENAS 000717

CCSAO COI SUBPOENAS 000718

## ACKNOWLEDGMENT OF MISCONDUCT

The Illinois Appellate Court has called Guevara "a malignant blight on the Chicago Police Department and the judicial system"

*People v. Martinez*, 2021 IL App (1st) 190490, ¶ 64.

## By the Illinois Appellate Court

- The Appellate Court has recognized in at least 8 published decisions that Detective Guevara has a well-documented history of coercing and manipulating witnesses and suspects has tainted criminal convictions.

- *People v. Martinez*: "The State does not dispute that Detective Guevara has a history of misconduct. Nor could it. This Court has recognized Detective Guevara's well-documented history . . . ."

- *People v. Robinson*: "At the outset, we note the State does not dispute that Detective Guevara has an extensive history of misconduct, including influencing witnesses to obtain false identifications, nor could it." 2022 IL App (1st) 200483-U, ¶ 26.

Case: 1:18-cv-01028 Document #: 892-2 Filed: 04/04/26 Page 719 of 855 PageID #:121345

## ACKNOWLEDGMENT OF MISCONDUCT

The Illinois Appellate Court has called Guevara "a malignant blight on the Chicago Police Department and the judicial system"

*People v. Martinez*, 2021 IL App (1st) 190490, ¶ 64.

## By the Illinois Appellate Court

- The Appellate Court has recognized in at least 8 published decisions that Detective Guevara has a well-documented history of coercing and manipulating witnesses and suspects has tainted criminal convictions.

- *People v. Martinez*: "The State does not dispute that Detective Guevara has a history of misconduct. Nor could it. This Court has recognized Detective Guevara's well-documented history . . . ."

- *People v. Robinson*: "At the outset, we note the State does not dispute that Detective Guevara has an extensive history of misconduct . . . ."

- *People v. Gomez*: "This court has recognized that Guevara has a history of influencing witnesses." 2021 IL App (1st) 192020, ¶ 58.

CCSAO COI SUBPOENAS 000719

CCSAO COI SUBPOENAS 000720

## ACKNOWLEDGMENT OF MISCONDUCT

## The Illinois Appellate Court has called Guevara "a malignant blight on the Chicago Police Department and the judicial system"

*People v. Martinez*, 2021 IL App (1st) 190490, ¶ 64.

## By the Illinois Appellate Court

- The Appellate Court has recognized in at least 8 published decisions that Detective Guevara has a well-documented history of coercing and manipulating witnesses and suspects has tainted criminal convictions.

- *People v. Martinez*: "The State does not dispute that Detective Guevara has a history of misconduct. Nor could it. This Court has recognized Detective Guevara's well-documented history . . . ."

- *People v. Robinson*: "At the outset, we note the State does not dispute that Detective Guevara has an extensive history of misconduct . . . ."

- *People v. Gomez*: "This court has recognized that Guevara has a history of influencing witnesses."

- *People v. Gonzalez*: "[T]here is little doubt that Guevara was engaged in a pattern of improperly influencing witness identifications." 2016 IL App (1st) 141660, ¶ 57.

Case: 1:18-cv-01028 Document #: 892-2 Filed: 04/04/26 Page 721 of 855 PageID #:121347

## ACKNOWLEDGMENT OF MISCONDUCT

### By the Illinois Appellate Court

The Illinois Appellate Court has called Guevara "a malignant blight on the Chicago Police Department and the judicial system"

*People v. Martinez*, 2021 IL App (1st) 190490, ¶ 64.

- The Appellate Court has recognized in at least 8 published decisions that Detective Guevara has a well-documented history of coercing and manipulating witnesses and suspects has tainted criminal convictions.

- *People v. Martinez*: "The State does not dispute that Detective Guevara has a history of misconduct. Nor could it. This Court has recognized Detective Guevara's well-documented history . . . ."

- *People v. Robinson*: "At the outset, we note the State does not dispute that Detective Guevara has an extensive history of misconduct . . . ."

- *People v. Gomez*: "This court has recognized that Guevara has a history of influencing witnesses."

- *People v. Gonzalez*: "[T]here is little doubt that Guevara was engaged in a pattern of improperly influencing witness identifications."

- Also: *Serrano*, 2016 IL App (1st) 133493; *Montanez*, 2016 IL App (1st) 133726; *Almodovar*, 2013 IL App (1st) 101476; *Reyes & Solache*, 369 Ill. App. 3d 1, 21 (2006).

CCSAO COI SUBPOENAS 000721

Case: 1:18-cv-01028 Document #: 892-2 Filed: 04/04/26 Page 722 of 855 PageID #:121348

CCSAO COI SUBPOENAS 000722

## ACKNOWLEDGMENT OF MISCONDUCT

Judge Obbish granted a new trial in *Reyes* and *Solache* finding that Detective Guevara had told **"bald-face lies" during court testimony and had "eliminated any possibility of [] being considered a credible witness in any proceeding"**

*People v. Solache & Reyes*, 98 CR 12440-03.

## By Cook County Judges

- Cook County Judges have repeatedly found that Detective Guevara corrupted criminal convictions by committing investigative misconduct.

Case: 1:18-cv-01028 Document #: 892-2 Filed: 04/04/26 Page 723 of 855 PageID #:121349

## ACKNOWLEDGMENT OF MISCONDUCT

### By Cook County Judges

Judge Obbish granted a new trial in *Reyes* and *Solache* finding that Detective Guevara had told **"bald-face lies"** during court testimony and had **"eliminated any possibility of [] being considered a credible witness in any proceeding"**

*People v. Solache & Reyes*, 98 CR 12440-03.

- Cook County Judges have repeatedly found that Detective Guevara corrupted criminal convictions by committing investigative misconduct.

- Judge Reddick granted Geraldo Iglesias a certificate of innocence, finding that "there is significant evidence of Detective Guevara's wrongdoing repeatedly case after case in many of these murder matters." *People v. Iglesias*, No. 93 CR 15199.

CCSAO COI SUBPOENAS 000723

Case: 1:18-cv-01028 Document #: 892-2 Filed: 04/04/26 Page 724 of 855 PageID #:121350

CCSAO COI SUBPOENAS 000724

## ACKNOWLEDGMENT OF MISCONDUCT

Judge Obbish granted a new trial in *Reyes* and *Solache* finding that Detective Guevara had told **"bald-face lies" during court testimony and had "eliminated any possibility of [] being considered a credible witness in any proceeding"**

*People v. Solache & Reyes*, 98 CR 12440-03.

## By Cook County Judges

- Cook County Judges have repeatedly found that Detective Guevara corrupted criminal convictions by committing investigative misconduct.

- Judge Reddick granted Geraldo Iglesias a certificate of innocence, finding that "there is significant evidence of Detective Guevara's wrongdoing repeatedly case after case in many of these murder matters."

- Judge Kenworthy granted a new trial to David Gecht saying, "This Court finds that Detective Guevara engaged in a pattern and practice of misconduct in police investigations through intimidating, threatening, and influencing witnesses to give false testimony and identifications and through physical abuse that led to false confessions." *People v. Gecht*, 99 C 7227 (May 25, 2022).

CCSAO COI SUBPOENAS 000725

## ACKNOWLEDGMENT OF MISCONDUCT

## By Cook County Judges

Judge Obbish granted a new trial in *Reyes* and *Solache* finding that Detective Guevara had told **"bald-face lies" during court testimony and had "eliminated any possibility of [] being considered a credible witness in any proceeding"**

*People v. Solache & Reyes*, 98 CR 12440-03.

- Cook County Judges have repeatedly found that Detective Guevara corrupted criminal convictions by committing investigative misconduct.

- Judge Reddick granted Geraldo Iglesias a certificate of innocence, finding that "there is significant evidence of Detective Guevara's wrongdoing repeatedly case after case in many of these murder matters."

- Judge Kenworthy granted a new trial to David Getch saying, "This Court finds that Detective Guevara engaged in a pattern and practice of misconduct in police investigations through intimidating, threatening, and influencing witnesses to give false testimony and identifications and through physical abuse that led to false confessions."

- Judge Atcherson granted a new trial to Daniel Rodriguez finding a "pattern and practice of police misconduct in investigating cases with respect to suspects, witnesses, intimidation, force, and abuse carried on by Detective Guevara and Detective Halverson." *People v. Rodriguez*, 91 CR 13938.

Case: 1:18-cv-01028 Document #: 892-2 Filed: 04/04/26 Page 726 of 855 PageID #:121352

## ACKNOWLEDGMENT OF MISCONDUCT

### By the Cook County State's Attorney

"We're not here to determine whether or not former Detective Guevara betrayed the public trust. There was quite a bit of evidence that that in fact happened on many occasions."

State in *People v. Sierra*, 95 CR 18602.

- This Office also has acknowledged that Detective Guevara corrupted criminal investigations.

CCSAO COI SUBPOENAS 000726

CCSAO COI SUBPOENAS 000727

## ACKNOWLEDGMENT OF MISCONDUCT

## By the Cook County State's Attorney

"The fact that Reynaldo Guevara takes Five to every question he's ever asked is beyond disappointing to many people in the building . . . . Let the record by very clear about what our position is. That's shameful. It's beyond shameful."

State in *People v. Johnson*, 91 CR 19833.

- This Office also has acknowledged that Detective Guevara corrupted criminal investigations.

Case: 1:18-cv-01028 Document #: 892-2 Filed: 04/04/26 Page 728 of 855 PageID #:121354

## ACKNOWLEDGMENT OF MISCONDUCT    By the City of Chicago and Its Officers

- City of Chicago's commissioned report on Guevara's misconduct by Sidley and Scott Lassar found that Guevara had engaged in misconduct in multiple homicide cases, causing wrongful murder convictions.

- Chicago Police Detective Dorsch blew the whistle, testifying, "suddenly Detective Guevara just reached out and put his finger right on the photo and said 'That's him,' and the kid said, 'Yeah, that's him.' . . . I've never seen that before in my career."

- Chicago Police Officer Malcyk talking to the media about Guevara's work said, "Did they once-upon-a-time me?" — Did they make it up? "It wouldn't be the first time."

CCSAO COI SUBPOENAS 000728

Case: 1:18-cv-01028 Document #: 892-2 Filed: 04/04/26 Page 729 of 855 PageID #:121355

CCSAO COI SUBPOENAS 000729

## GUEVARA WILL NOT DEFEND HIS WORK

*Answering hours of questioning about dozens of his homicide investigations, he asserts his Fifth Amendment right not to incriminate himself in response to all substantive questions.*

CCSAO COI SUBPOENAS 000730

## GUEVARA WILL NOT DEFEND HIS WORK

*Answering hours of questioning about dozens of his homicide investigations, he asserts his Fifth Amendment right not to incriminate himself in response to all substantive questions.*

*Assertions of the Fifth Amendment are relevant and admissible in post-conviction proceedings.*
*People v. Whirl, 2015 IL App (1st) 111483 ¶ 106.*

## GUEVARA WILL NOT DEFEND HIS WORK

*Answering hours of questioning about dozens of his homicide investigations, he asserts his Fifth Amendment right not to incriminate himself in response to all substantive questions.*

*Assertions of the Fifth Amendment are relevant and admissible in post-conviction proceedings. People v. Whirl, 2015 IL App (1st) 111483 ¶ 106.*

*An adverse inference must be drawn against Guevara in all of his cases (because there is no credible reason not to draw that inference). People v. Gibson, 2018 IL App (1st) 162177.*

CCSAO COI SUBPOENAS 000731

CCSAO COI SUBPOENAS 000732

# 2.
# ILLUSTRATIONS OF
# GUEVARA MISCONDUCT

## IMPOSSIBLE IDENTIFICATIONS

### Rivera – Victim ID

- September 10, 1988
- Victim Felix Valentin
- Identifies Jacques Rivera

CCSAO COI SUBPOENAS 000733

Rivera – Victim ID

IMPOSSIBLE IDENTIFICATIONS



CCSAO COI SUBPOENAS 000734



- Unresponsive to pain stimuli
- No spontaneous breathing
- Paralyzed for treatment
- Pupils unresponsive to light
- Could not communicate
- Could not make an identification
- Died a few days later

CCSAO COI SUBPOENAS 000735

Case: 1:18-cv-01028 Document #: 892-2 Filed: 04/04/26 Page 735 of 855 PageID #:121361

CCSAO COI SUBPOENAS 000736

## IMPOSSIBLE IDENTIFICATIONS

RODRIGUEZ, Hugo. M/WH/16.
5916 N. PAULINA 2ND          27 APR 77
3WN HS, 2ND YEAR.      NO. CARR,
- UNEMPLOYED -

FATHER - 3113 W. AINSLE 2ND.
RODRIGUEZ FORTUNATO.   NO. PH.
mother in MEXICO.

- middle REAR Seat.
- AFTER SHooting SAW off in
- ALL BLK -
    - Run into Alley -
- HEARD 5 SHots.

## Iglesias – Hugo Rodriguez ID

- Circumstances:
    o In the middle rear seat of car between two others
    o Vehicle moving when shooting begins → he ducks down

- Only description he could give initially was that the shooter was wearing all black

- Stranger ID, two weeks later

- Only one who makes an ID

- By trial, he ducked down, then popped head up, observed shooter as car driving away from shooter, through rear window

IMPOSSIBLE IDENTIFICATIONS    Iglesias – Hugo Rodriguez ID



CCSAO COI SUBPOENAS 000737

IMPOSSIBLE IDENTIFICATIONS

Iglesias – Hugo Rodriguez ID



Blinds obstructing view through rear window

CCSAO COI SUBPOENAS 000738

## IMPOSSIBLE IDENTIFICATIONS

### Sierra – Melendez & Rodriguez IDs



- Shooting between two cars
- Tinted windows
- Rolled up the whole time
- Everyone ducks
- No time to see the shooter

CCSAO COI SUBPOENAS 000739

## IMPOSSIBLE IDENTIFICATIONS

### Sierra – Melendez & Rodriguez IDs



- Description at scene
- Identifies race
- No further descriptive details

CCSAO COI SUBPOENAS 000740

Case: 1:18-cv-01028 Document #: 892-2 Filed: 04/04/26 Page 741 of 855 PageID #:121367

CCSAO COI SUBPOENAS 000741

## IMPOSSIBLE IDENTIFICATIONS

### Sierra – Melendez & Rodriguez IDs

#### Melendez 2019



you were next to this car, did you see the shooter's face?

A. Nah. I wasn't trying to -- i ain't trying to look at no one. I'm trying to get away, man.

Q. Did you ever get a look at that shooter that would have let you make an identification of him later?

A. No.

#### Rodriguez 2009

Q. How many people did you see in the other car?

A. I would say three people.

Q. Okay. I'm going to ask you to describe each one for me. Let's start with the passenger. Can you give me a description of the passenger?

A. Not too good of a description because of the tinted window. I couldn't tell if he had a mustache or not. Umm. I know they were Hispanic.

Q. How about the driver?

A. I would say he was Hispanic as well.

- Both have testified they did not see the shooter
- Guevara claimed to get IDs from both
- Melendez testified truthfully at trial

## RIGGED PHOTO ARRAYS & LINEUPS

Improper Identification Procedures



- Lying about witness identifications

CCSAO COI SUBPOENAS 000742

Case: 1:18-cv-01028 Document #: 892-2 Filed: 04/04/26 Page 743 of 855 PageID #:121369

## RIGGED PHOTO ARRAYS & LINEUPS

### Improper Identification Procedures



Q. Do you remember how many photos he laid out on the table?

A. I don't know. There was like -- it could have been anywhere from five or six. I'm not sure, you know, I wasn't counting.

Q. Right. How many photographs was he holding in his hand?

A. One.

Q. Did he tell you anything about that photograph that he held in his hand?

A. I mean, he told me that -- that he was the shooter, you know, he like "this guy shot your friend."

- Lying about witness identifications
- Telling witnesses who to pick

CCSAO COI SUBPOENAS 000743

Case: 1:18-cv-01028 Document #: 892-2 Filed: 04/04/26 Page 744 of 855 PageID #:121370

CCSAO COI SUBPOENAS 000744

## RIGGED PHOTO ARRAYS & LINEUPS

### Improper Identification Procedures



Lopez told Guevara that Rivera **"was the wrong guy,"** but Guevara told him to make a selection

- Lying about witness identifications
- Telling witnesses who to pick
- Obviously improper identification procedures

Rivera – Suspect Before ID

- Rivera IDed on Aug 29, 1988
- During civil case, suppressed police reports disclosed

PICKING SUSPECTS FIRST

CCSAO COI SUBPOENAS 000745

Rivera – Suspect Before ID

PICKING SUSPECTS FIRST

CCSAO COI SUBPOENAS 000746

# PICKING SUSPECTS FIRST

# Montanez & Serrano – Suspect Before ID

CCSAO COI SUBPOENAS 000747

**SUPPRESSED POLICE REPORTS** Johnson – Lineup Reports

Secret lineup report revealed decades later

Official lineup report disclosed to prosecution and defense



CCSAO COI SUBPOENAS 000748

CCSAO COI SUBPOENAS 000749

## SUPPRESSED POLICE REPORTS

Official lineup report disclosed to prosecution and defense

PERSON PARTICIPATING IN LINE-UP

#1)PATTERSON,Dewan M/B 18yrs. 5'8 140lbs

#2) McFADGEN, Carlos M/B 18yrs 5'6 130

#3) DAVID Dwayne M/B 16yrs 5'8 140lbs

#4) JOHNS, BRAYN M/B 15yrs 5'6 130lbs

#5) ROBINSON,Michael M/B 17yrs 5'8 135lbs

PERSONS IDENTIFIED IN LINE-UP:          NEGATIVE LINE-UP

HISTORY & INVESTIGATION:          On 12 Jun 91 at 2300hrs. The R/Dets. conducted a line-up at area five, relative to a suspect in the FRED,Edwin Homicide. After four witnesses viewing this line-up the results of it was negative. Because the results of the line-up was negative the subject JOHNS,Bryan was released with out charging.

## Johnson — Lineup Reports

Secret lineup report revealed decades later

PERSONS PARTICIPATING IN LINE UP:
#1  Jozell HOBBS     CB# 8853-977
#2  Bryan JOHNS      volunteer
#3  Terrell AGEE     volunteer
#4  James BROWN      CB# 8854-359
#5  Fabian WELLS     CB# 8854-072

PERSON IDENTIFIED IN LINE UP:     #2 Bryan JOHNS  (see narrative)

HISTORY & INVESTIGATION:
     The above line up was viewed by 6 witnesses at seperate times.  Forrest GARNETT viewed the line up first.  He viewed the participants as they were sitting side by side in chairs.  The participants were not required to repeat any phrases.  After viewing this line-up he was unable to make any identification.
     Rosa BERGOS viewed the line up next.  The participants were first viewed as they were sitting side by side in chairs.  The participants were then requested to stand and step forward to the center.  They each took turns standing and stepping forward and then facing to the right and then the left.  They were not required to repeat any phrases.  After viewing this line up, Rosa BERGOS was unable to make any identification.
     Aby GONZALEZ then viewed the line up.  He viewed the line up as the participants were sitting side by side in chairs.  The participants were not required to make any movements or repeat any phrases.  After viewing this line up, he identified the #2 participant, Bryan JOHNS, as the offender in said homicide.

CCSAO COI SUBPOENAS 000750

## SUPPRESSED POLICE REPORTS

**Prosecutor questioning Guevara at trial:**

Prosecutor: Counsel initially asked you about a number of people that you interviewed in connection with this case, among those were a Fina Montanez, a Forest Garnett, an[] **Abbey Gonzalez**, and a Rosa Burgos. You interviewed those people?

Guevara: I interviewed some of them, yes.

Prosecutor: As a matter of fact those people stood and viewed that negative first lineup, did they not?

Guevara: **Yes they did.**

Prosecutor: That's the one with Brian Johns, aka Little D was in?

Guevara: That's correct.

(R. B73-74).

**Prosecutor (later Judge) Kevin Sheehan closing argument:**

Now much ado has been made in this case about this Brian Johns, this other Maniac Latin Disciple who was known as Little D. . . . Miss Gubin (Defense Attorney) asked Detective Guevara [about his interviews of multiple eyewitnesses]. Yes, Forest Garnett. Yes, <u>Abbey Gonzalez</u>. **Did they look at the first lineup? Did they pick out Brian Johns? No. It was a negative lineup. People on the scene, it isn't Brian Johns, he did not do it.**

(R. B104-05).

## Johnson – Lineup Reports

## The Erickson lineup report positively identifying Johns was clearly suppressed

- Judge Sheehan would have never elicited the testimony he did

- Judge Sheehan would have never made the closing argument he did

- And at a recent deposition, Judge Sheehan testified "It's not the argument that gives me confidence [that I was never provided a copy of the Erickson lineup report]. **What gives me confidence is the truth, I never got it.**" *Johnson v. Guevara* Deposition.

- Criminal defense attorney for Johnson (now a sitting federal Magistrate Judge) testified in her deposition that she also never received the Erickson report.

## Sierra – Melendez & Rodriguez Car IDs

DETECTIVE DIVISION
AREA FIVE DETECTIVES

30 MAY 1995

HOMICIDE/FIRST DEGREE MURDER
VICTIM: AMOUAR, Noel

On 30 May 95 at 1945 hrs. the first interview was conducted with Thomas SIERRA at Area Five Detectives. Present for this interview were Det. R. GUEVARA and A.S.A. W. FARRELL. Thomas SIERRA acknowledged understanding each of his Miranda Rights as they were given to him by A.S.A. W. FARRELL. He agree to waive his rights and answer questions.

SIERRA, Thomas

In summary stated the following. He denied being involved in the shooting of Noel AMOUAR. He requested that the R/Dets. contact his girlfriend Lucy MONTALVO who would provide an alibi for him.

GCSP J. RODRIGUEZ and E. WIOGA observed the Black Buick Park Ave. of Hector MONTANEZ driving down the street. They stopped this car and determined that the driver was a Jose MELENDEZ. This is a different Jose MELENDEZ, not the eye-witness in this case. Jose MELENDEZ stated that he had just traded cars with Hector MONTANEZ that day, it was explained to Jose MELENDEZ that this car may be involved in a murder investigation. Jose MELENDEZ agreed to drive this car to Area Five. Jose MELENDEZ parked his car among a number of other cars in the front parking lot at Area Five. The R/Dets. asked eye-witness Jose MELENDEZ and Alberto RODRIGUEZ to walk through this parking lot and see if the car involved in the shooting of Noel AMOUAR was present. They both identified the Black Buick Park Ave. VIN# 1G4vxdsgaG0404421, as the car from which Thomas SIERRA fired his gun. Photos of this car were taken by an Evidence Technician.

**PERMANENT RETENTION FILE** — FARRELL next conducted interviews with Alberto RODRIGUEZ and Jose MELENDEZ. On 30 May 95, at 2035 hrs. A.S.A. W. FARRELL took a handwritten witnesses statement from Alberto RODRIGUEZ. On 30 May 95, at 2040 hrs. A.S.A. W. FARRELL took a handwritten witness statement from Jose MELENDEZ.

Thomas SIERRA provided Det. R. GUEVARA with the telephone number of Lucy MONTALVO. She was contacted by Det. R. GUEVARA and driven into Area Five by GCSP J. RODRIGUEZ. The first interview with Lucy MONTALVO was conducted on 30 May 95, 2215 hrs. in an interview room at Area Five Detectives. Present for that interview were Det. R. GUEVARA and A.S.A. W. FARRELL.

## FABRICATED EVIDENCE



CCSAO COI SUBPOENAS 000751

Sierra – Melendez & Rodriguez Car IDs

FABRICATED EVIDENCE

Q. Sir, do you recognize this to be the car that Guevara showed you in the parking lot at Area 5?

A. That is the car. No tints. No rims.

Q. All right. Is this car in Exhibit 5 the car that shot at you and that killed your friend?

A. Nah, it don't got no rims and no tints.

Q. Okay. Did you tell Detective Guevara that was not the car used in the shooting?

A. Yeah. I told him "this ain't the car."

CCSAO COI SUBPOENAS 000752

## FABRICATED WITNESS TESTIMONY

### Francisco Vicente – Three Cases

## Vicente Statements

- Robert Bouto ▶ COI
  - May 28, 1993

- Montanez/Serrano/Pacheco ▶ COI
  - June 2, 1993

- Geraldo Iglesias: ▶ COI
  - June 25, 1993

Same Testimony: Jailhouse Snitch

## Halvorsen

According to Lassar report, when told there was a third purported confession to Vicente in Iglesias case, Halvorsen "expressed surprise, stating: 'He's got another one? In the Cook County jail?' Det. Halvorsen then stated of Vicente, 'This guy's a roving confession elicitor.'"

CCSAO COI SUBPOENAS 000753

CCSAO COI SUBPOENAS 000754

## FABRICATED WITNESS TESTIMONY

Francisco Vicente – Three Cases

### Vicente Nov. 19, 2018 deposition testimony in Serrano/Montanez:

"Everything that's written in it other than my signatures was coerced to me by Guevara and Ernie Halvorsen at the Grand and Central station. None of it was true. It was all coerced on all three cases."

"The whole story and every story that I have signed on the statement has been told by Guevara and Halvorsen. They falsified this whole story from the beginning."

Case: 1:18-cv-01028 Document #: 892-2 Filed: 04/04/26 Page 755 of 855 PageID #:121381

CCSAO COI SUBPOENAS 000755

## COERCED CONFESSIONS & ABUSE

### GECHT'S TESTIMONY

**March 2, 1999**

"Guevara was always there by himself" L-180

"Q. Where did he hit you? A. My face." L-198

"Q. Closed fist or open fist? A. Open fist." L.198

"He punched me in the stomach" L-200

### PATTERN TESTIMONY

- Gabriel Solache – **March 1998** "started slapping me," "on the left-hand side of my face," "open hand"(307)
  - "Guevara came back and he started beating me on the stomach" (316)
- Rosauro Mejia – **March 1998** "most of them were on my stomach (50)
  - "on my stomach and on my face" (105)
- Arturo Reyes – **March 1998**
  - "slapped me on the face" (309)
  - "it was not with a fist . . . it was with an open hand" (309)

→All found credible by J. Obbish, City

Exs. 29, 49

## COERCED CONFESSIONS & ABUSE

CCSAO COI SUBPOENAS 000756

### GECHT'S TESTIMONY

**March 2, 1999**

"Guevara was always there by himself" L-180

"Q. Where did he hit you? A. My face." L-198

"Q. Closed fist or open fist? A. Open fist." L.198

"He punched me in the stomach" L-200

### PATTERN TESTIMONY

- Adolfo Frias -- 1993
  - Q: Can you say specifically what Detective Guevara did to you?
  - A: He was hitting me with his hand, and he was yelling
  - Q: Where was he hitting you?
  - A: In my face.
- David Velasquez -- 1991
  - Guevara and Halvorsen "slapped me around, choked me"
- Jose E. Melendez -- 1991
  - Spanish, glasses officer – only remember him because he's the one that hit me.
- Daniel Pena – 1986
  - Guevara "smacked me in my face, hit me on the side of my ribs."

→ All found credibe by Judge Obbish

## COERCED CONFESSIONS & ABUSE

### GECHT'S TESTIMONY

**March 2, 1999**

"Guevara was always there by himself" L-180

"Q. Where did he hit you? A. My face." L-198

"Q. Closed fist or open fist? A. Open fist." L.198

"He punched me in the stomach" L-200

### PATTERN TESTIMONY

- Daniel Vicente – 1993
  - Guevara started beating me, grabbing me around the neck.
  - Continual beatings

- Armando Serrano – 1993
  - "Guevara repeatedly slapped me across the face. He would also hit me in the body."
  - "Guevara slapped me with his open hand."
    → COI granted

- Jose Maysonet – 1990
  - Guevara started physically slapping me, hitting me in the head.
    → COI granted

CCSAO COI SUBPOENAS 000757

CCSAO COI SUBPOENAS 000758

## COERCED CONFESSIONS & THREATS TO FAMILY

<u>COLEEN MILLER'S TESTIMONY:</u>

She falsely testified because Guevara threatened to take her unborn child away from her.

<u>PATTERN TESTIMONY</u>

- Evelyn Diaz – 1995
    - "He told me that if I didn't go, they were going to take my kids away from me. That he was going to DCFS to take my son away from me." (47, 52)
    - "He pointed at the picture." (68)
- Bordoy – 1995
    - "He tried to say that I was there, that I know, that I'm a liar, he called me the B word, that my kids are going with the DCFS" (67, 69, 73)
    - "I'll never forget, he had an Indian ring," "Latino" (61-62) → like Jose E Melendez
- Rosa Bello – 1990
    - "Basically, I was a single mom and they can take my kids from me." (69)
    - "Q. So at some point it was mentioned that they had the power to take your kids from you? A. Yes." (69)
    - "There is no reason for you to threaten to take my children." (70)

Case: 1:18-cv-01028 Document #: 892-2 Filed: 04/04/26 Page 759 of 855 PageID #:121385

## THE MIEDZIANOWSKI CONNECTION

Hernandez Hearing: **There was a specific plan between Miedzianowski and Guevara to frame Juan Hernandez**

- Testified to by Fred Rock – US Atty star witness
- Corroborated by Jondalyn Fields
- Corroborated by the police records

CCSAO COI SUBPOENAS 000759

## THE MIEDZIANOWSKI CONNECTION

### AFFIDAVIT

Fredrick Rock, being duly sworn to, under penalty of perjury, states that the following is true and correct.

---

4. I first met Joe Miedzianowski in 1990, and I signed a paper with Joe Miedzianowski and the ATF stating that I would work as an informant – but things did not work out that way because Joe, who acted as my CPD handler, was secretly in the cocaine business himself and I ended-up working for him. I assisted Joe in arranging deals where the real purpose was not to make a purchase or arrest, but instead to set-up a meeting so that Joe could rob the dealer before or afterwards. Joe called these rip-offs *toombas* or *geezos*. I would then resell the drugs, splitting with Joe in whatever dollar amount he told me. I also bought and sold drugs on my own.

### Joe Miedzianowski's threats to Juan Hernandez, including in the presence of Detective Reynaldo Guevara

13. Joe had a thing against Poochie, and several times in the months before Poochie was locked up he stated that he was going to frame him.

Fred Rock is US Government's Star Witness in Prosecution of Miedzianowski, who is serving life in prison.

CCSAO COI SUBPOENAS 000760

CCSAO COI SUBPOENAS 000761

## THE MIEDZIANOWSKI CONNECTION

### AFFIDAVIT

Fredrick Rock, being duly sworn to, under penalty of perjury, states that the following is true and correct.

16. From time to time I would shoot the breeze with Joe at his Maxwell Street and Grand and Central offices. And, it was at Joe's Grand and Central office that I first met Detective Reynaldo Guevara. I remember from the first meeting his dark skin and perfect hair. Joe said that Detective Guevara was a "very close friend" of his and in charge of homicides at Grand and Central. Joe said in front of me and Guevara me words to the effect "we are going to get Poochie," and I took that to mean that Joe wanted Guevara to help arrest Poochie.

17. I recall having two other conversations with Joe and Detective Guevara about Poochie, at the Grand and Central and Maxwell St. gang crimes police offices. Present were Joe, Detective Guevara, and me. I remember Joe saying at one of those meetings that he was going to "frame" Poochie. I also remember Joe saying words to the effect "I have to get this guy" referring to Poochie in front of me and Guevara.

Rock testified to all of this at Hernandez hearing last week.

And it was all corroborated by a woman named Jondalyn Fields.

Case: 1:18-cv-01028 Document #: 892-2 Filed: 04/04/26 Page 762 of 855 PageID #:121388

## THE MIEDZIANOWSKI CONNECTION

Other evidence of Guevara-Miedzianowski connection

- Jose Maysonet – framed
- Sam Perez – assisted in framing someone
- Jorge Laureano – tried to get him to frame someone
- Bill Dorsch – whistleblowing officer

CCSAO COI SUBPOENAS 000762

JORGE LAUREANO,

Q    So, when you got to Area 5, did you speak with Guevara, Joseph Miedzianowski, and Ernie Halvorsen?

A    Yes, I did.

Q    And what did you say to them, and what did they say to you?

A    They said, "Bro, we need a favor.  We don't like this asshole, and we just need you to say it was him.  He is a jag off, we don't like him, and we want to put this case on him."

Q    They were talking about this guy, Chino, that they said they didn't like?

A    That's right.

CCSAO COI SUBPOENAS 000763

## 3. PENDING CASES

CCSAO COI SUBPOENAS 000764

## PENDING CASES

- Pending post-conviction litigation

- Certificate of innocence litigation

- Conviction Integrity Unit

- Cases under Exoneration Project review

CCSAO COI SUBPOENAS 000765

Case: 1:18-cv-01028 Document #: 892-2 Filed: 04/04/26 Page 766 of 855 PageID #:121392

CCSAO COI SUBPOENAS 000766

## THE LEGAL STANDARD IS MET

The Post-Conviction Hearing Act, 725 ILCS 5/122-1, requires a conviction to be set aside when a petitioner makes a substantial showing of a constitutional violation by a preponderance of the evidence.

Convictions based on evidence fabricated by Detective Guevara all meet this standard.

CCSAO COI SUBPOENAS 000767

## THE LEGAL STANDARD IS MET

*Judge Kenworthy in Gecht found that the evidence of Guevara pattern established "a substantial violation of due process." People v. Gecht, 99 C 7227 (May 25, 2022).*

**CONCLUSION**

CCSAO COI SUBPOENAS 000768

CCSAO COI SUBPOENAS 000769

# CONVICTIONS OBTAINED
# BY REYNALDO GUEVARA
## JUNE 14, 2022

| | |
|---|---|
| **From:** | Joshua Tepfer |
| **To:** | RISA LANIER (States Attorney) |
| **Subject:** | Re: Guevara Follow Up |
| **Date:** | Monday, July 25, 2022 3:56:40 PM |
| **Attachments:** | image001.png |
| | Guevara Presentation 6-14-2022 FINAL.pdf |

---

### External Message Disclaimer

This message originated from an external source. Please use proper judgment and caution when opening attachments, clicking links, or responding to this email.

No problem. Here it is.

On Mon, Jul 25, 2022 at 3:03 PM RISA LANIER (States Attorney) <risa.lanier@cookcountyil.gov> wrote:

> One final request Josh. I cannot find the presentation that you sent to the S.A. and I regarding the Guevara cases. Would you mind having that resent to me?
>
>
> Thank you,
>
>
> Risa



CCSAO COI SUBPOENAS 000770



CCSAO COI SUBPOENAS 000772





CCSAO COI SUBPOENAS 000775







# CONVICTIONS OBTAINED BY REYNALDO GUEVARA
## JUNE 14, 2022

CCSAO COI SUBPOENAS 000779

CCSAO COI SUBPOENAS 000780

## INTRODUCTION

*Convictions based on evidence fabricated by Detective Reynaldo Guevara violate due process and cannot stand.*

Case: 1:18-cv-01028 Document #: 892-2 Filed: 04/04/26 Page 781 of 855 PageID #:121407

CCSAO COI SUBPOENAS 000781

## GUEVARA'S VICTIMS

*22 people convicted of murder as the result of investigations by Detective Guevara have had their convictions thrown out.*

CCSAO COI SUBPOENAS 000782

## GUEVARA'S VICTIMS

*The 22 are: David Gecht, Daniel Rodriguez, Demetrius Johnson, Jacques Rivera, Juan Johnson, Jose Montanez, Armando Serrano, Jorge Pacheco, Roberto Almodovar, William Negron, Jose Maysonet, Angel Rodriguez, Santos Flores, Henry Johnson, Arturo DeLeon Reyes, Gabriel Solache, Ariel Gomez, Xavier Arcos, Ricardo Rodriguez, Robert Bouto, Thomas Sierra, and Geraldo Iglesias.*

Case: 1:18-cv-01028 Document #: 892-2 Filed: 04/04/26 Page 783 of 855 PageID #:121409

CCSAO COI SUBPOENAS 000783

## GUEVARA'S VICTIMS

The 22 are: David Gecht, Daniel Rodriguez, Demetrius Johnson, Jacques Rivera, Juan Johnson, Jose Montanez, Armando Serrano, Jorge Pacheco, Roberto Almodovar, William Negron, Jose Maysonet, Angel Rodriguez, Santos Flores, Henry Johnson, Arturo DeLeon Reyes, Gabriel Solache, Ariel Gomez, Xavier Arcos, Ricardo Rodriguez, Robert Bouto, Thomas Sierra, and Geraldo Iglesias.

These men spent nearly half a millennium in prison for no reason.

A number of them spent many years engaged in protracted post-conviction litigation.

CCSAO COI SUBPOENAS 000784

## GUEVARA'S VICTIMS

*The 22 are: David Gecht, Daniel Rodriguez, Demetrius Johnson, Jacques Rivera, Juan Johnson, Jose Montanez, Armando Serrano, Jorge Pacheco, Roberto Almodovar, William Negron, Jose Maysonet, Angel Rodriguez, Santos Flores, Henry Johnson, Arturo DeLeon Reyes, Gabriel Solache, Ariel Gomez, Xavier Arcos, Ricardo Rodriguez, Robert Bouto, Thomas Sierra, and Geraldo Iglesias.*

*These men spent nearly half a millennium in prison for no reason.*

FOCUS FOR TODAY

CCSAO COI SUBPOENAS 000785

## FOCUS FOR TODAY

## 1. ACKNOWLEDGEMENT OF GUEVARA MISCONDUCT

CCSAO COI SUBPOENAS 000786

CCSAO COI SUBPOENAS 000787

**FOCUS FOR TODAY**

**1. ACKNOWLEDGEMENT OF GUEVARA MISCONDUCT**

**2. ILLUSTRATIONS OF GUEVARA MISCONDUCT**

CCSAO COI SUBPOENAS 000788

**FOCUS FOR TODAY**

**1. ACKNOWLEDGEMENT OF GUEVARA MISCONDUCT**

**2. ILLUSTRATIONS OF GUEVARA MISCONDUCT**

**3. CURRENT CASES INVOLVING GUEVARA**

**1.**
**ACKNOWLEDGEMENT OF**
**GUEVARA MISCONDUCT**

CCSAO COI SUBPOENAS 000789

CCSAO COI SUBPOENAS 000790

## ACKNOWLEDGMENT OF MISCONDUCT

The Illinois Appellate Court has called Guevara "a malignant blight on the Chicago Police Department and the judicial system"

*People v. Martinez*, 2021 IL App (1st) 190490, ¶ 64.

## By the Illinois Appellate Court

- The Appellate Court has recognized in at least 8 published decisions that Detective Guevara has a well-documented history of coercing and manipulating witnesses and suspects has tainted criminal convictions.

Case: 1:18-cv-01028 Document #: 892-2 Filed: 04/04/26 Page 791 of 855 PageID #:12147

CCSAO COI SUBPOENAS 000791

## ACKNOWLEDGMENT OF MISCONDUCT

The Illinois Appellate Court has called Guevara "a malignant blight on the Chicago Police Department and the judicial system"

*People v. Martinez*, 2021 IL App (1st) 190490, ¶ 64.

## By the Illinois Appellate Court

- The Appellate Court has recognized in at least 8 published decisions that Detective Guevara has a well-documented history of coercing and manipulating witnesses and suspects has tainted criminal convictions.

- *People v. Martinez*: "The State does not dispute that Detective Guevara has a history of misconduct. Nor could it. This Court has recognized Detective Guevara's well-documented history of influencing and manipulating witnesses. The allegations against him span decades and share common threads." 2021 IL App (1st) 190490: ¶ 64

CCSAO COI SUBPOENAS 000792

## ACKNOWLEDGMENT OF MISCONDUCT

### By the Illinois Appellate Court

The Illinois Appellate Court has called Guevara "a malignant blight on the Chicago Police Department and the judicial system"

*People v. Martinez*, 2021 IL App (1st) 190490, ¶ 64.

- The Appellate Court has recognized in at least 8 published decisions that Detective Guevara has a well-documented history of coercing and manipulating witnesses and suspects has tainted criminal convictions.

- *People v. Martinez*: "The State does not dispute that Detective Guevara has a history of misconduct. Nor could it. This Court has recognized Detective Guevara's well-documented history . . . ."

- *People v. Robinson*: "At the outset, we note the State does not dispute that Detective Guevara has an extensive history of misconduct, including influencing witnesses to obtain false identifications, nor could it." 2022 IL App (1st) 200483-U, ¶ 26.

CCSAO COI SUBPOENAS 000793

## ACKNOWLEDGMENT OF MISCONDUCT

### The Illinois Appellate Court has called Guevara "a malignant blight on the Chicago Police Department and the judicial system"

*People v. Martinez*, 2021 IL App (1st) 190490, ¶ 64.

## By the Illinois Appellate Court

- The Appellate Court has recognized in at least 8 published decisions that Detective Guevara has a well-documented history of coercing and manipulating witnesses and suspects has tainted criminal convictions.

- *People v. Martinez*: "The State does not dispute that Detective Guevara has a history of misconduct. Nor could it. This Court has recognized Detective Guevara's well-documented history . . . ."

- *People v. Robinson*: "At the outset, we note the State does not dispute that Detective Guevara has an extensive history of misconduct . . . ."

- *People v. Gomez*: "This court has recognized that Guevara has a history of influencing witnesses." 2021 IL App (1st) 192020, ¶ 58.

## ACKNOWLEDGMENT OF MISCONDUCT

### By the Illinois Appellate Court

The Illinois Appellate Court has called Guevara **"a malignant blight on the Chicago Police Department and the judicial system"**

*People v. Martinez*, 2021 IL App (1st) 190490, ¶ 64.

- The Appellate Court has recognized in at least 8 published decisions that Detective Guevara has a well-documented history of coercing and manipulating witnesses and suspects has tainted criminal convictions.

- *People v. Martinez*: "The State does not dispute that Detective Guevara has a history of misconduct. Nor could it. This Court has recognized Detective Guevara's well-documented history . . . ."

- *People v. Robinson*: "At the outset, we note the State does not dispute that Detective Guevara has an extensive history of misconduct . . . ."

- *People v. Gomez*: "This court has recognized that Guevara has a history of influencing witnesses."

- *People v. Gonzalez*: "[T]here is little doubt that Guevara was engaged in a pattern of improperly influencing witness identifications." 2016 IL App (1st) 141660, ¶ 57.

CCSAO COI SUBPOENAS 000794

CCSAO COI SUBPOENAS 000795

## ACKNOWLEDGMENT OF MISCONDUCT

## By the Illinois Appellate Court

The Illinois Appellate Court has called Guevara "a malignant blight on the Chicago Police Department and the judicial system"

*People v. Martinez*, 2021 IL App (1st) 190490, ¶ 64.

- The Appellate Court has recognized in at least 8 published decisions that Detective Guevara has a well-documented history of coercing and manipulating witnesses and suspects has tainted criminal convictions.

- *People v. Martinez*: "The State does not dispute that Detective Guevara has a history of misconduct. Nor could it. This Court has recognized Detective Guevara's well-documented history . . . ."

- *People v. Robinson*: "At the outset, we note the State does not dispute that Detective Guevara has an extensive history of misconduct . . . ."

- *People v. Gomez*: "This court has recognized that Guevara has a history of influencing witnesses."

- *People v. Gonzalez*: "[T]here is little doubt that Guevara was engaged in a pattern of improperly influencing witness identifications."

- Also: *Serrano*, 2016 IL App (1st) 133493; *Montanez*, 2016 IL App (1st) 133726; *Almodovar*, 2013 IL App (1st) 101476; *Reyes & Solache*, 369 Ill. App. 3d 1, 21 (2006).

Case: 1:18-cv-01028 Document #: 892-2 Filed: 04/04/26 Page 796 of 855 PageID #:121422

CCSAO COI SUBPOENAS 000796

## ACKNOWLEDGMENT OF MISCONDUCT

## By Cook County Judges

Judge Obbish granted a new trial in *Reyes* and *Solache* finding that Detective Guevara had told **"bald-face lies" during court testimony and had "eliminated any possibility of [] being considered a credible witness in any proceeding"**

*People v. Solache & Reyes*, 98 CR 12440-03.

- Cook County Judges have repeatedly found that Detective Guevara corrupted criminal convictions by committing investigative misconduct.

CCSAO COI SUBPOENAS 000797

## ACKNOWLEDGMENT OF MISCONDUCT

Judge Obbish granted a new trial in *Reyes* and *Solache* finding that Detective Guevara had told **"bald-face lies"** during court testimony and had **"eliminated any possibility of [] being considered a credible witness in any proceeding"**

*People v. Solache & Reyes*, 98 CR 12440-03.

## By Cook County Judges

- Cook County Judges have repeatedly found that Detective Guevara corrupted criminal convictions by committing investigative misconduct.

- Judge Reddick granted Geraldo Iglesias a certificate of innocence, finding that "there is significant evidence of Detective Guevara's wrongdoing repeatedly case after case in many of these murder matters." *People v. Iglesias*, No. 93 CR 15199.

CCSAO COI SUBPOENAS 000798

## ACKNOWLEDGMENT OF MISCONDUCT

Judge Obbish granted a new trial in *Reyes* and *Solache* finding that Detective Guevara had told **"bald-face lies" during court testimony and had "eliminated any possibility of [] being considered a credible witness in any proceeding"**

*People v. Solache & Reyes*, 98 CR 12440-03.

## By Cook County Judges

- Cook County Judges have repeatedly found that Detective Guevara corrupted criminal convictions by committing investigative misconduct.

- Judge Reddick granted Geraldo Iglesias a certificate of innocence, finding that "there is significant evidence of Detective Guevara's wrongdoing repeatedly case after case in many of these murder matters."

- Judge Kenworthy granted a new trial to David Gecht saying, "This Court finds that Detective Guevara engaged in a pattern and practice of misconduct in police investigations through intimidating, threatening, and influencing witnesses to give false testimony and identifications and through physical abuse that led to false confessions." *People v. Gecht*, 99 C 7227 (May 25, 2022).

## ACKNOWLEDGMENT OF MISCONDUCT

Judge Obbish granted a new trial in *Reyes* and *Solache* finding that Detective Guevara had told **"bald-face lies" during court testimony and had "eliminated any possibility of [] being considered a credible witness in any proceeding"**

*People v. Solache & Reyes*, 98 CR 12440-03.

## By Cook County Judges

- Cook County Judges have repeatedly found that Detective Guevara corrupted criminal convictions by committing investigative misconduct.

- Judge Reddick granted Geraldo Iglesias a certificate of innocence, finding that "there is significant evidence of Detective Guevara's wrongdoing repeatedly case after case in many of these murder matters."

- Judge Kenworthy granted a new trial to David Getch saying, "This Court finds that Detective Guevara engaged in a pattern and practice of misconduct in police investigations through intimidating, threatening, and influencing witnesses to give false testimony and identifications and through physical abuse that led to false confessions."

- Judge Atcherson granted a new trial to Daniel Rodriguez finding a "pattern and practice of police misconduct in investigating cases with respect to suspects, witnesses, intimidation, force, and abuse carried on by Detective Guevara and Detective Halverson." *People v. Rodriguez*, 91 CR 13938.

CCSAO COI SUBPOENAS 000799

CCSAO COI SUBPOENAS 000800

## ACKNOWLEDGMENT OF MISCONDUCT

### By the Cook County State's Attorney

"We're not here to determine whether or not former Detective Guevara betrayed the public trust. There was quite a bit of evidence that that in fact happened on many occasions."

State in *People v. Sierra*, 95 CR 18602.

- This Office also has acknowledged that Detective Guevara corrupted criminal investigations.

CCSAO COI SUBPOENAS 000801

## ACKNOWLEDGMENT OF MISCONDUCT

**"The fact that Reynaldo Guevara takes Five to every question he's ever asked is beyond disappointing to many people in the building . . . . Let the record by very clear about what our position is. That's shameful. It's beyond shameful."**

State in *People v. Johnson*, 91 CR 19833.

## By the Cook County State's Attorney

- This Office also has acknowledged that Detective Guevara corrupted criminal investigations.

CCSAO COI SUBPOENAS 000802

## ACKNOWLEDGMENT OF MISCONDUCT — By the City of Chicago and Its Officers

- City of Chicago's commissioned report on Guevara's misconduct by Sidley and Scott Lassar found that Guevara had engaged in misconduct in multiple homicide cases, causing wrongful murder convictions.

- Chicago Police Detective Dorsch blew the whistle, testifying, "suddenly Detective Guevara just reached out and put his finger right on the photo and said 'That's him,' and the kid said, 'Yeah, that's him.' . . . I've never seen that before in my career."

- Chicago Police Officer Malcyk talking to the media about Guevara's work said, "Did they once-upon-a-time me?" — Did they make it up? "It wouldn't be the first time."

Case: 1:18-cv-01028 Document #: 892-2 Filed: 04/04/26 Page 803 of 855 PageID #:121429

## GUEVARA WILL NOT DEFEND HIS WORK

*Answering hours of questioning about dozens of his homicide investigations, he asserts his Fifth Amendment right not to incriminate himself in response to all substantive questions.*

CCSAO COI SUBPOENAS 000803

Case: 1:18-cv-01028 Document #: 892-2 Filed: 04/04/26 Page 804 of 855 PageID #:121430

## GUEVARA WILL NOT DEFEND HIS WORK

*Answering hours of questioning about dozens of his homicide investigations, he asserts his Fifth Amendment right not to incriminate himself in response to all substantive questions.*

*Assertions of the Fifth Amendment are relevant and admissible in post-conviction proceedings. People v. Whirl, 2015 IL App (1st) 111483 ¶ 106.*

CCSAO COI SUBPOENAS 000804

CCSAO COI SUBPOENAS 000805

## GUEVARA WILL NOT DEFEND HIS WORK

*Answering hours of questioning about dozens of his homicide investigations, he asserts his Fifth Amendment right not to incriminate himself in response to all substantive questions.*

*Assertions of the Fifth Amendment are relevant and admissible in post-conviction proceedings. People v. Whirl, 2015 IL App (1st) 111483 ¶ 106.*

*An adverse inference must be drawn against Guevara in all of his cases (because there is no credible reason not to draw that inference). People v. Gibson, 2018 IL App (1st) 162177.*

CCSAO COI SUBPOENAS 000806

**2.**
**ILLUSTRATIONS OF**
**GUEVARA MISCONDUCT**

CCSAO COI SUBPOENAS 000807

## IMPOSSIBLE IDENTIFICATIONS

### Rivera – Victim ID

- September 10, 1988
- Victim Felix Valentin
- Identifies Jacques Rivera

IMPOSSIBLE IDENTIFICATIONS

Rivera – Victim ID





CCSAO COI SUBPOENAS 000808

## IMPOSSIBLE IDENTIFICATIONS

### Rivera – Victim ID



- Unresponsive to pain stimuli
- No spontaneous breathing
- Paralyzed for treatment
- Pupils unresponsive to light
- Could not communicate
- Could not make an identification
- Died a few days later

CCSAO COI SUBPOENAS 000809

Case: 1:18-cv-01028 Document #: 892-2 Filed: 04/04/26 Page 809 of 855 PageID #:121435

CCSAO COI SUBPOENAS 000810

## IMPOSSIBLE IDENTIFICATIONS

RODRIGUEZ, Hugo. M/WH/16.
5916 N. PAULINA 2ND      27APR77
3RN HS, 2ND YEAR.      No. ORANA,
- UNEMPLOYED -

FATHER - 3113 W. AINSLIE 2ND.
RODRIGUEZ FORTUNATO. No. PH.
mother in MEXICO.

- middle REAR Seat.
- AFTER SHooting SAW off in
- ALL BLK -
      - Run into Alley -
- HEARD 5 SHots.

## Iglesias – Hugo Rodriguez ID

- Circumstances:
  o In the middle rear seat of car between two others
  o Vehicle moving when shooting begins → he ducks down

- Only description he could give initially was that the shooter was wearing all black

- Stranger ID, two weeks later

- Only one who makes an ID

- By trial, he ducked down, then popped head up, observed shooter as car driving away from shooter, through rear window

IMPOSSIBLE IDENTIFICATIONS

Iglesias – Hugo Rodriguez ID



CCSAO COI SUBPOENAS 000811



Blinds obstructing view through rear window

CCSAO COI SUBPOENAS 000812

Case: 1:18-cv-01028 Document #: 892-2 Filed: 04/04/26 Page 813 of 855 PageID #:121439

## IMPOSSIBLE IDENTIFICATIONS

### Sierra – Melendez & Rodriguez IDs



- Shooting between two cars
- Tinted windows
- Rolled up the whole time
- Everyone ducks
- No time to see the shooter

CCSAO COI SUBPOENAS 000813

# IMPOSSIBLE IDENTIFICATIONS

## Sierra – Melendez & Rodriguez IDs



- Description at scene
- Identifies race
- No further descriptive details

CCSAO COI SUBPOENAS 000814

Case: 1:18-cv-01028 Document #: 892-2 Filed: 04/04/26 Page 815 of 855 PageID #:121441

CCSAO COI SUBPOENAS 000815

## IMPOSSIBLE IDENTIFICATIONS

### Sierra – Melendez & Rodriguez IDs

**Melendez 2019**



you were next to this car, did you see the shooter's face?

A. Nah. I wasn't trying to -- I ain't trying to look at no one. I'm trying to get away, man.

Q. Did you ever get a look at that shooter that would have let you make an identification of him later?

A. No.

**Rodriguez 2009**

Q. How many people did you see in the other car?

A. I would say three people.

Q. Okay. I'm going to ask you to describe each one for me. Let's start with the passenger. Can you give me a description of the passenger?

A. Not too good of a description because of the tinted window. I couldn't tell if he had a mustache or not. Umm. I know they were Hispanic.

Q. How about the driver?

A. I would say he was Hispanic as well.

- Both have testified they did not see the shooter
- Guevara claimed to get IDs from both
- Melendez testified truthfully at trial

## RIGGED PHOTO ARRAYS & LINEUPS

### Improper Identification Procedures



- Lying about witness identifications

CCSAO COI SUBPOENAS 000816

## RIGGED PHOTO ARRAYS & LINEUPS

### Improper Identification Procedures



Q. Do you remember how many photos he laid out on the table?

A. I don't know. There was like -- it could have been anywhere from five or six. I'm not sure, you know, I wasn't counting.

Q. Right. How many photographs was he holding in his hand?

A. One.

Q. Did he tell you anything about that photograph that he held in his hand?

A. I mean, he told me that -- that he was the shooter, you know, he like "this guy shot your friend."

- Lying about witness identifications
- Telling witnesses who to pick

CCSAO COI SUBPOENAS 000817

## RIGGED PHOTO ARRAYS & LINEUPS

### Improper Identification Procedures



Lopez told Guevara that Rivera **"was the wrong guy,"** but Guevara told him to make a selection

- Lying about witness identifications
- Telling witnesses who to pick
- Obviously improper identification procedures

CCSAO COI SUBPOENAS 000818

## PICKING SUSPECTS FIRST

## Rivera – Suspect Before ID

- Rivera IDed on Aug 29, 1988
- During civil case, suppressed police reports disclosed

CCSAO COI SUBPOENAS 000819

**Rivera – Suspect Before ID**

**PICKING SUSPECTS FIRST**



CCSAO COI SUBPOENAS 000820

CCSAO COI SUBPOENAS 000821

## PICKING SUSPECTS FIRST

DETECTIVE DIVISION    2        2 JUNE 1993
AREA FIVE VIOLENT CRIMES        RD# X-094183

HOMICIDE/FIRST DEGREE MURDER
VICTIM: VARGAS, Rodrigo

WANTED FOR QUESTIONING: MONTANEZ, Jose R/WM/Age 25, DOB ▆▆▆ 67, 1913 N. Kildare, 6-03, 240 lbs. Hair black, Eyes brown, Known member of the Imperial Gangsters Street Gang, IR# 736499

On 2 June 93, the R/Dets. had a meeting with a circumstantial witness who for his own safety must remain anonymous at this time. This witness provided the following information.

He is a member of the Imperial Gangsters Street Gang. On Friday 5 Feb. 93, he was hanging out by a dope spot at Hamlin and Aitgeld. Between 0830-0900 hrs. a car arrived at this location. He recognized the driver of the car as being "PISTOL PETE". Also in the car were "JORDAN", and "MONDO". He recognized all three of these guys as they were also members of the Imperial Gangsters. They were riding in a Tan colored Buick Regal, that he recognized as being "PISTOL PETE'S" car. "JORDAN" and "MONDO", got out of the car. "PISTOL PETE", sat in the car playing around with a bag of dope. The three of them were talking about a robbery they had just done, that had gone bad. "PISTOL PETE" stated, "MONDO fucked up, he went at that guy wrong, we would never did what we did if MONDO never fucked up". "JORDAN" stood around laughing as "PISTOL PETE" yelled at "MONDO". The witness asked "PISTOL PETE" what he was talking about. "PISTOL PETE" stated, "We shot a stud, we hurt that stud bad". "PISTOL PETE" told "MONDO", "Man you better think about it, if we had got caught up". "PISTOL PETE" told the witness that the day before the three of them had spotted a victim with lots of money. "PISTOL PETE" was getting change for a dollar when the victim walked in and showed a lot of money. "PISTOL PETE" and the other two guys decided to rob this victim and followed him home. At the last minute they held off sticking this guy up because he was with his lady and some kids. They knew this guy would be a sweet victim so they laid out for him. The witness saw "PISTOL PETE" take a large frame, 9mm semi-automatic pistol from under the dashboard of the car and put the gun in one of the heating ducts in the dashboard. "PISTOL PETE" stated that they did not get money from the victim they popped, and needed to get some money to buy dope, (Heroin). "PISTOL PETE" stated that they robbed some kid on the street with his school bags. "MONDO" stated that he took the school ring off the victims finger. "PISTOL PETE" stated he took this victims three neck chains, and his bracelet. The witness, got into "PISTOL PETE'S" car, along with "JORDAN" and "MONDO". They all drove to a place called, "Gold Busters", located at Diversey and Harding. They went there to sell the jewelry to get money to buy heroin. They got to "Gold Busters" around 0930 hrs. and found the store not yet open. They drove back to Hamlin and Aitgeld.

## Montanez & Serrano — Suspect Before ID

## Johnson – Lineup Reports

Secret lineup report revealed decades later

## SUPPRESSED POLICE REPORTS

Official lineup report disclosed to prosecution and defense

CCSAO COI SUBPOENAS 000822

Case: 1:18-cv-01028 Document #: 892-2 Filed: 04/04/26 Page 823 of 855 PageID #:121449

CCSAO COI SUBPOENAS 000823

## SUPPRESSED POLICE REPORTS

Official lineup report disclosed to prosecution and defense

| PERSON PARTICIPATING IN LINE-UP | |
|---|---|
| | #1)PATTERSON,Dewan M/B 18yrs. 5'8 140lbs |
| | #2) McFADGEN, Carlos M/B 18yrs 5'6 130 |
| | #3) DAVID Dwayne M/B 16yrs 5'8 140lbs |
| | #4) JOHNS, BRAYN M/B 15yrs 5'6 130lbs |
| | #5) ROBINSON,Michael M/B 17yrs 5'8 135lbs |
| PERSONS IDENTIFIED IN LINE-UP: | NEGATIVE LINE-UP |

HISTORY & INVESTIGATION:    On 12 Jun 91 at 2300hrs. The R/Dets. conducted a line-up at area five, relative to a suspect in the FRED,Edwin Homicide. After four witnesses viewing this line-up the results of it was negative. Because the results of the line-up was negative the subject JOHNS,Bryan was released with out charging.

## Johnson — Lineup Reports

Secret lineup report revealed decades later

| PERSONS PARTICIPATING IN LINE UP: | |
|---|---|
| #1 | Jozell HOBBS    CB# 8853-977 |
| #2 | Bryan JOHNS    volunteer |
| #3 | Terrell AGEE    volunteer |
| #4 | James BROWN    CB# 8854-359 |
| #5 | Fabian WELLS    CB# 8854-072 |
| PERSON IDENTIFIED IN LINE UP: | #2 Bryan JOHNS  (see narrative) |

HISTORY & INVESTIGATION:
        The above line up was viewed by 6 witnesses at seperate times.  Forrest GARNETT viewed the line up first.  He viewed the participants as they were sitting side by side in chairs.  The participants were not required to repeat any phrases.  After viewing this line-up he was unable to make any identification.
        Rosa BERGOS viewed the line up next.  The participants were first viewed as they were sitting side by side in chairs.  The participants were then requested to stand and step forward to the center.  They each took turns standing and stepping forward and then facing to the right and then the left.  They were not required to repeat any phrases.  After viewing this line up, Rosa BERGOS was unable to make any identification.
        Aby GONZALEZ then viewed the line up.  He viewed the line up as the participants were sitting side by side in chairs.  The participants were not required to make any movements or repeat any phrases.  After viewing this line up, he identified the #2 participant, Bryan JOHNS, as the offender in said homicide.

Case: 1:18-cv-01028 Document #: 892-2 Filed: 04/04/26 Page 824 of 855 PageID #:121450

CCSAO COI SUBPOENAS 000824

## SUPPRESSED POLICE REPORTS

### Prosecutor questioning Guevara at trial:

Prosecutor: Counsel initially asked you about a number of people that you interviewed in connection with this case, among those were a Fina Montanez, a Forest Garnett, an[] **Abbey Gonzalez**, and a Rosa Burgos. You interviewed those people?
Guevara: I interviewed some of them, yes.
Prosecutor: As a matter of fact those people stood and viewed that negative first lineup, did they not?
Guevara: **Yes they did.**
Prosecutor: That's the one with Brian Johns, aka Little D was in?
Guevara: That's correct.
(R. B73-74).

### Prosecutor (later Judge) Kevin Sheehan closing argument:

Now much ado has been made in this case about this Brian Johns, this other Maniac Latin Disciple who was known as Little D. . . . Miss Gubin (Defense Attorney) asked Detective Guevara [about his interviews of multiple eyewitnesses]. Yes, Forest Garnett. Yes, <u>Abbey Gonzalez</u>. **Did they look at the first lineup? Did they pick out Brian Johns? No. It was a negative lineup. People on the scene, it isn't Brian Johns, he did not do it.**
(R. B104-05).

## Johnson – Lineup Reports

### The Erickson lineup report positively identifying Johns was clearly suppressed

- Judge Sheehan would have never elicited the testimony he did

- Judge Sheehan would have never made the closing argument he did

- And at a recent deposition, Judge Sheehan testified "It's not the argument that gives me confidence [that I was never provided a copy of the Erickson lineup report]. **What gives me confidence is the truth, I never got it.**" *Johnson v. Guevara* Deposition.

- Criminal defense attorney for Johnson (now a sitting federal Magistrate Judge) testified in her deposition that she also never received the Erickson report.

## Sierra – Melendez & Rodriguez Car IDs



## FABRICATED EVIDENCE



CCSAO COI SUBPOENAS 000825

## FABRICATED EVIDENCE

## Sierra – Melendez & Rodriguez Car IDs

CCSAO COI SUBPOENAS 000826

Q. Sir, do you recognize this to be the car that Guevara showed you in the parking lot at Area 57

A. That is the car. No tints. No rims.

Q. All right. Is this car in Exhibit 5 the car that shot at you and that killed your friend?

A. Nah, it don't got no rims and no tints.

Q. Okay. Did you tell Detective Guevara that was not the car used in the shooting?

A. Yeah. I told him "this ain't the car."

Case: 1:18-cv-01028 Document #: 892-2 Filed: 04/04/26 Page 827 of 855 PageID #:121453

CCSAO COI SUBPOENAS 000827

## FABRICATED WITNESS TESTIMONY

### Vicente Statements

- Robert Bouto  COI
  - May 28, 1993

- Montanez/Serrano/Pacheco   COI
  - June 2, 1993

- Geraldo Iglesias: COI
  - June 25, 1993

Same Testimony: Jailhouse Snitch

## Francisco Vicente – Three Cases

### Halvorsen

According to Lassar report, when told there was a third purported confession to Vicente in Iglesias case, Halvorsen "expressed surprise, stating: 'He's got another one? In the Cook County jail?' Det. Halvorsen then stated of Vicente, 'This guy's a roving confession elicitor.'"

CCSAO COI SUBPOENAS 000828

**FABRICATED WITNESS TESTIMONY**        Francisco Vicente – Three Cases

## Vicente Nov. 19, 2018 deposition testimony in Serrano/Montanez:

"Everything that's written in it other than my signatures was coerced to me by Guevara and Ernie Halvorsen at the Grand and Central station. None of it was true. It was all coerced on all three cases."

"The whole story and every story that I have signed on the statement has been told by Guevara and Halvorsen. They falsified this whole story from the beginning."

Case: 1:18-cv-01028 Document #: 892-2 Filed: 04/04/26 Page 829 of 855 PageID #:121455

## COERCED CONFESSIONS & ABUSE

### GECHT'S TESTIMONY

**March 2, 1999**

"Guevara was always there by himself" L-180

"Q. Where did he hit you? A. My face." L-198

"Q. Closed fist or open fist? A. Open fist." L.198

"He punched me in the stomach" L-200

### PATTERN TESTIMONY

- Gabriel Solache – **March 1998** "started slapping me," "on the left-hand side of my face," "open hand"(307)
  - "Guevara came back and he started beating me on the stomach" (316)
- Rosauro Mejia – **March 1998** "most of them were on my stomach (50)
  - "on my stomach and on my face" (105)
- Arturo Reyes – **March 1998**
  - "slapped me on the face" (309)
  - "it was not with a fist . . . it was with an open hand" (309)

→All found credible by J. Obbish, City

Exs. 29, 49

CCSAO COI SUBPOENAS 000829

## COERCED CONFESSIONS & ABUSE

CCSAO COI SUBPOENAS 000830

### GECHT'S TESTIMONY

**March 2, 1999**

"Guevara was always there by himself" L-180

"Q. Where did he hit you? A. My face." L-198

"Q. Closed fist or open fist? A. Open fist." L.198

"He punched me in the stomach" L-200

### PATTERN TESTIMONY

- Adolfo Frias -- 1993
  - Q: Can you say specifically what Detective Guevara did to you?
  - A: He was hitting me with his hand, and he was yelling
  - Q: Where was he hitting you?
  - A: In my face.
- David Velasquez -- 1991
  - Guevara and Halvorsen "slapped me around, choked me"
- Jose E. Melendez -- 1991
  - Spanish, glasses officer – only remember him because he's the one that hit me.
- Daniel Pena – 1986
  - Guevara "smacked me in my face, hit me on the side of my ribs."

→ All found credibe by Judge Obbish

Case: 1:18-cv-01028 Document #: 892-2 Filed: 04/04/26 Page 831 of 855 PageID #:121457

CCSAO COI SUBPOENAS 000831

## COERCED CONFESSIONS & ABUSE

### GECHT'S TESTIMONY

**March 2, 1999**

"Guevara was always there by himself" L-180

"Q. Where did he hit you? A. My face." L-198

"Q. Closed fist or open fist? A. Open fist." L.198

"He punched me in the stomach" L-200

### PATTERN TESTIMONY

- Daniel Vicente – 1993
  - Guevara started beating me, grabbing me around the neck.
  - Continual beatings

- Armando Serrano – 1993
  - "Guevara repeatedly slapped me across the face. He would also hit me in the body."
  - "Guevara slapped me with his open hand."
    - → COI granted

- Jose Maysonet – 1990
  - Guevara started physically slapping me, hitting me in the head.
    - → COI granted

CCSAO COI SUBPOENAS 000832

## COERCED CONFESSIONS & THREATS TO FAMILY

| COLEEN MILLER'S TESTIMONY: | PATTERN TESTIMONY |
|---|---|
| She falsely testified because Guevara threatened to take her unborn child away from her. | • **Evelyn Diaz – 1995**<br>  • "He told me that if I didn't go, they were going to take my kids away from me. That he was going to DCFS to take my son away from me." (47, 52)<br>  • "He pointed at the picture." (68)<br><br>• **Bordoy – 1995**<br>  • "He tried to say that I was there, that I know, that I'm a liar, he called me the B word, that my kids are going with the DCFS" (67, 69, 73)<br>  • "I'll never forget, he had an Indian ring," "Latino" (61-62) → like Jose E Melendez<br><br>• **Rosa Bello – 1990**<br>  • "Basically, I was a single mom and they can take my kids from me." (69)<br>  • "Q.· So at some point it was mentioned that they had the power to take your kids from you? A. Yes." (69)<br>  • "There is no reason for you to threaten to take my children." (70) |

## THE MIEDZIANOWSKI CONNECTION

Hernandez Hearing: **There was a specific plan between Miedzianowski and Guevara to frame Juan Hernandez**

- Testified to by Fred Rock – US Atty star witness
- Corroborated by Jondalyn Fields
- Corroborated by the police records

CCSAO COI SUBPOENAS 000833

CCSAO COI SUBPOENAS 000834

## THE MIEDZIANOWSKI CONNECTION

### AFFIDAVIT

Fredrick Rock, being duly sworn to, under penalty of perjury, states that the following is true and correct.

_____

4. I first met Joe Miedzianowski in 1990, and I signed a paper with Joe Miedzianowski and the ATF stating that I would work as an informant – but things did not work out that way because Joe, who acted as my CPD handler, was secretly in the cocaine business himself and I ended-up working for him. I assisted Joe in arranging deals where the real purpose was not to make a purchase or arrest, but instead to set-up a meeting so that Joe could rob the dealer before or afterwards. Joe called these rip-offs *toombas* or *geezos*. I would then resell the drugs, splitting with Joe in whatever dollar amount he told me. I also bought and sold drugs on my own.

### Joe Miedzianowski's threats to Juan Hernandez, including in the presence of Detective Reynaldo Guevara

13. Joe had a thing against Poochie, and several times in the months before Poochie was locked up he stated that he was going to frame him.

Fred Rock is US Government's Star Witness in Prosecution of Miedzianowski, who is serving life in prison.

Case: 1:18-cv-01028 Document #: 892-2 Filed: 04/04/26 Page 835 of 855 PageID #:121461

CCSAO COI SUBPOENAS 000835

## THE MIEDZIANOWSKI CONNECTION

### AFFIDAVIT

Fredrick Rock, being duly sworn to, under penalty of perjury, states that the following is true and correct.

16. From time to time I would shoot the breeze with Joe at his Maxwell Street and Grand and Central offices. And, it was at Joe's Grand and Central office that I first met Detective Reynaldo Guevara. I remember from the first meeting his dark skin and perfect hair. Joe said that Detective Guevara was a "very close friend" of his and in charge of homicides at Grand and Central. Joe said in front of me and Guevara me words to the effect "we are going to get Poochie," and I took that to mean that Joe wanted Guevara to help arrest Poochie.

17. I recall having two other conversations with Joe and Detective Guevara about Poochie, at the Grand and Central and Maxwell St. gang crimes police offices. Present were Joe, Detective Guevara, and me. I remember Joe saying at one of those meetings that he was going to "frame" Poochie. I also remember Joe saying words to the effect "I have to get this guy" referring to Poochie in front of me and Guevara.

Rock testified to all of this at Hernandez hearing last week.

And it was all corroborated by a woman named Jondalyn Fields.

CCSAO COI SUBPOENAS 000836

## THE MIEDZIANOWSKI CONNECTION

Other evidence of Guevara-Miedzianowski connection

- Jose Maysonet – framed
- Sam Perez – assisted in framing someone
- Jorge Laureano – tried to get him to frame someone
- Bill Dorsch – whistleblowing officer

JORGE LAUREANO,

Q    So, when you got to Area 5, did you speak with Guevara, Joseph Miedzianowski, and Ernie Halvorsen?

A    Yes, I did.

Q    And what did you say to them, and what did they say to you?

A    They said, "Bro, we need a favor. We don't like this asshole, and we just need you to say it was him. He is a jag off, we don't like him, and we want to put this case on him."

Q    They were talking about this guy, Chino, that they said they didn't like?

A    That's right.

CCSAO COI SUBPOENAS 000837

Case: 1:18-cv-01028 Document #: 892-2 Filed: 04/04/26 Page 837 of 855 PageID #:121463

## 3. PENDING CASES

CCSAO COI SUBPOENAS 000838

## PENDING CASES

- Pending post-conviction litigation

- Certificate of innocence litigation

- Conviction Integrity Unit

- Cases under Exoneration Project review

CCSAO COI SUBPOENAS 000839

Case: 1:18-cv-01028 Document #: 892-2 Filed: 04/04/26 Page 840 of 855 PageID #:121466

CCSAO COI SUBPOENAS 000840

## THE LEGAL STANDARD IS MET

The Post-Conviction Hearing Act, 725 ILCS 5/122-1, requires a conviction to be set aside when a petitioner makes a substantial showing of a constitutional violation by a preponderance of the evidence.

Convictions based on evidence fabricated by Detective Guevara all meet this standard.

CCSAO COI SUBPOENAS 000841

## THE LEGAL STANDARD IS MET

*Judge Kenworthy in Gecht found that the evidence of Guevara pattern established "a substantial violation of due process." People v. Gecht, 99 C 7227 (May 25, 2022).*

# CONCLUSION

CCSAO COI SUBPOENAS 000842

# CONVICTIONS OBTAINED BY REYNALDO GUEVARA
## JUNE 14, 2022

CCSAO COI SUBPOENAS 000843

From: Anand Swaminathan
To: CHRISTA BOWDEN (States Attorney)
Cc: Jan Susler; Rachel Brady
Subject: Re: Solache/ Reyes
Date: Monday, September 26, 2022 11:39:39 AM

<div style="border:1px solid black; background-color:yellow; text-align:center;">

**External Message Disclaimer**

This message originated from an external source. Please use proper judgment and caution when opening attachments, clicking links, or responding to this email.

</div>

In other words, you will ask her to move it.
Delay = State wins. You got me.

We'll be on zoom on Wednesday. With that, we expect that this argument will go forward on Wednesday as planned.

Thanks,
Anand

On Mon, Sep 26, 2022 at 11:33 AM CHRISTA BOWDEN (States Attorney)
<christa.bowden@cookcountyil.gov> wrote:

> Ok. I will be on zoom on Wednesday and the judge will do whatever the judge decides we should do.
>
> Christa Bowden
>
>> On Sep 26, 2022, at 11:31 AM, Anand Swaminathan <anand@loevy.com> wrote:
>>
>> <div style="border:1px solid black; background-color:yellow; text-align:center;">
>>
>> **External Message Disclaimer**
>>
>> This message originated from an external source. Please use proper judgment and caution when opening attachments, clicking links, or responding to this email.
>>
>> </div>
>>
>> I did not mean to indicate that we have it for zoom. We have it for that date/time. I have no notation or indication that it is for zoom.
>> Are you sure we agreed to argue it by zoom? I will order the transcript - if we agreed to do it by zoom, then we'll do that. If not, we plan to be there in person for argument.
>>
>> Thanks,
>> Anand

CCSAO COI SUBPOENAS 000844

On Mon, Sep 26, 2022 at 11:17 AM CHRISTA BOWDEN (States Attorney)
<christa.bowden@cookcountyil.gov> wrote:

The judge set it for zoom, you have it set for zoom- so you said in previous
email. At he time the judge asked if that was OK and everyone said yes...

Christa Bowden
Assistant State's Attorney
2650 South California Avenue
Special Litigation, 12C42
Chicago, Illinois 60608
(773)674-7537
christa.bowden@cookcountyil.gov

The information contained in this electronic message may be confidential and may be subject to the
attorney-client privilege and/or the attorney work product doctrine. It is intended only for the use of
the individual or entity to whom it is addressed. If you are not the intended recipient, you are hereby
notified that any use, dissemination or copying of this communication is strictly prohibited. If you have
received this electronic message in error, please delete the original message from your e-mail
system. Thank you.

From: Anand Swaminathan <anand@loevy.com>
Sent: Monday, September 26, 2022 11:14 AM
To: CHRISTA BOWDEN (States Attorney) <christa.bowden@cookcountyil.gov>
Subject: Re: Solache/ Reyes

**External Message Disclaimer**

This message originated from an external source. Please use proper
judgment and caution when opening attachments, clicking links, or
responding to this email.

i don't recall agreeing to do it on zoom. if i did, then of course i'll honor that,
but i don't see anything in my email about agreeing to do zoom.

thanks.

On Mon, Sep 26, 2022 at 11:13 AM CHRISTA BOWDEN (States Attorney)
<christa.bowden@cookcountyil.gov> wrote:

I really don't have a strong objection but I feel at a disadvantage when we
agreed to do it on zoom and you are now appearing in person.

Christa Bowden

On Sep 26, 2022, at 11:11 AM, Anand Swaminathan
<anand@loevy.com> wrote:

**External Message Disclaimer**

CCSAO COI SUBPOENAS 000845

This message originated from an external source. Please use proper judgment and caution when opening attachments, clicking links, or responding to this email.

Christa, we do not believe there is any basis to continue the argument if you are able to appear on Zoom. I have argued many times with Carol or others in person and me on zoom, and vice versa. This was fully briefed as of April, so we would like to go forward on Wednesday.

Thanks,
Anand

On Mon, Sep 26, 2022 at 10:47 AM CHRISTA BOWDEN (States Attorney) <christa.bowden@cookcountyil.gov> wrote:

I cannot be there in person as I am sick. I may ask to continue the arguments if you are going to argue in person.

Christa Bowden
Assistant State's Attorney
2650 South California Avenue
Special Litigation, 12C42
Chicago, Illinois 60608
(773)674-7537
christa.bowden@cookcountyil.gov

The information contained in this electronic message may be confidential and may be subject to the attorney-client privilege and/or the attorney work product doctrine. It is intended only for the use of the individual or entity to whom it is addressed. If you are not the intended recipient, you are hereby notified that any use, dissemination or copying of this communication is strictly prohibited. If you have received this electronic message in error, please delete the original message from your e-mail system. Thank you.

From: Anand Swaminathan <anand@loevy.com>
Sent: Monday, September 26, 2022 10:44 AM
To: CHRISTA BOWDEN (States Attorney) <christa.bowden@cookcountyil.gov>
Cc: Jan Susler <jsusler@peopleslawoffice.com>; Rachel Brady <brady@loevy.com>
Subject: Re: Solache/ Reyes

**External Message Disclaimer**

This message originated from an external source. Please use proper judgment and caution when opening attachments, clicking links, or responding to this email.

That's what I have as well. However, we were planning to be there in person for the argument.

CCSAO COI SUBPOENAS 000846

Thanks,
Anand

On Mon, Sep 26, 2022 at 10:36 AM CHRISTA BOWDEN (States Attorney) <christa.bowden@cookcountyil.gov> wrote:

Good morning, I have this set to argue the motion for summary judgement on Reyes at 11 on zoom on Wednesday. I am just checking in to verify we all have the same info.

cb

Christa Bowden
Assistant State's Attorney
2650 South California Avenue
Special Litigation, 12C42
Chicago, Illinois 60608
(773)674-7537
christa.bowden@cookcountyil.gov

The information contained in this electronic message may be confidential and may be subject to the attorney-client privilege and/or the attorney work product doctrine. It is intended only for the use of the individual or entity to whom it is addressed. If you are not the intended recipient, you are hereby notified that any use, dissemination or copying of this communication is strictly prohibited. If you have received this electronic message in error, please delete the original message from your e-mail system. Thank you.

| | |
|---|---|
| **From:** | CHRISTA BOWDEN (States Attorney) |
| **To:** | Anand Swaminathan |
| **Cc:** | Sophia Atcherson (Judiciary); brady@loevy.com; Jan Susler; Josh Tepfer; Sean Starr |
| **Subject:** | Re: Court still reviewing exhibits in Reyes and Solache |
| **Date:** | Monday, September 26, 2022 5:36:56 PM |

Thank you, November 14, works for the State as well.

Christa Bowden

On Sep 26, 2022, at 5:32 PM, Anand Swaminathan <anand@loevy.com> wrote:

**External Message Disclaimer**

This message originated from an external source. Please use proper judgment and caution when opening attachments, clicking links, or responding to this email.

Judge, thank you for letting us know. Yes, for Petitioner Reyes, we are fine with doing the SJ argument on the 14th if that timing works for the Court, and re-scheduling the hearing to a date that works for everyone.

Thanks,
Anand

On Mon, Sep 26, 2022 at 5:23 PM Sophia Atcherson (Judiciary) <Sophia.Atcherson2@cookcountyil.gov> wrote:
Good afternoon,

I wanted to reach out to all of you to let you know that I am not ready to hear arguments on Reyes's motion for summary judgment set for 9/28/22. I have included counsel for Mr. Solache as I am still reviewing exhibits for both cases and a continuance of the arguments on the motion for summary judgment is likely to effect the date for the hearing on the COI petitions which is set for 11/14/22 .

I believe the November 14th date is a more realistic date for argument on the motion for summary judgment, but I am open to other suggestions.

If I have missed any counsels associated with the cases, please forward this message to them.

Thank you.

*Judge Sophia Atcherson*
Circuit Court of Cook County

CCSAO COI SUBPOENAS 000848

Criminal Division
(773) 674-3160
(773) 674-7419 (Courtroom)

CCSAO COI SUBPOENAS 000849

| From: | Anand Swaminathan |
|---|---|
| To: | Jan Susler |
| Cc: | Sophia Atcherson (Judiciary); CHRISTA BOWDEN (States Attorney); brady@loevy.com; Josh Tepfer; Sean Starr |
| Subject: | Re: Court still reviewing exhibits in Reyes and Solache |
| Date: | Friday, September 30, 2022 1:07:06 PM |

---

**External Message Disclaimer**

This message originated from an external source. Please use proper judgment and caution when opening attachments, clicking links, or responding to this email.

---

Judge Atcherson, the parties have conferred and are available Feb 22, 23 and or 24 for the COI hearing. Please let us know if two of those dates work for Your Honor (I believe we were previously scheduled for two days). If not, we'll go back to the drawing board and propose new dates.

Thanks,
Anand

On Mon, Sep 26, 2022 at 5:41 PM Jan Susler <jsusler@peopleslawoffice.com> wrote:
Judge Atcherson, we really appreciate your letting us know in advance.
We will make November 14 work.
Respectfully, Jan Susler, attorney for Gabriel Solache

On Mon, Sep 26, 2022 at 5:23 PM Sophia Atcherson (Judiciary) <Sophia.Atcherson2@cookcountyil.gov> wrote:
Good afternoon,

I wanted to reach out to all of you to let you know that I am not ready to hear arguments on Reyes's motion for summary judgment set for 9/28/22. I have included counsel for Mr. Solache as I am still reviewing exhibits for both cases and a continuance of the arguments on the motion for summary judgment is likely to effect the date for the hearing on the COI petitions which is set for 11/14/22 .

I believe the November 14th date is a more realistic date for argument on the motion for summary judgment, but I am open to other suggestions.

If I have missed any counsels associated with the cases, please forward this message to them.

Thank you.

*Judge Sophia Atcherson*
Circuit Court of Cook County
Criminal Division
(773) 674-3160
(773) 674-7419 (Courtroom)

CCSAO COI SUBPOENAS 000850

--
Jan Susler
People's Law Office
1180 N. Milwaukee, 3rd floor
Chicago, IL 60642
773.235.0070
jsusler@peopleslawoffice.com

CCSAO COI SUBPOENAS 000851

**From:** Anand Swaminathan
**To:** CHRISTA BOWDEN (States Attorney)
**Subject:** Re: Reyes COI hearing
**Date:** Friday, September 30, 2022 1:03:50 PM

---

<div style="background-color:yellow">

**External Message Disclaimer**

This message originated from an external source. Please use proper judgment and caution when opening attachments, clicking links, or responding to this email.

</div>

Sounds good.

On Fri, Sep 30, 2022 at 1:00 PM CHRISTA BOWDEN (States Attorney)
<christa.bowden@cookcountyil.gov> wrote:

> Sure, I believe she said that would be ok. Why don't you send an email to her, and CC all of us saying we had a discussion.
>
> cb
>
> Christa Bowden
> Assistant State's Attorney
> 2650 South California Avenue
> Special Litigation, 12C42
> Chicago, Illinois 60608
> (773)674-7537
> christa.bowden@cookcountyil.gov
>
> The information contained in this electronic message may be confidential and may be subject to the attorney-client privilege and/or the attorney work product doctrine. It is intended only for the use of the individual or entity to whom it is addressed. If you are not the intended recipient, you are hereby notified that any use, dissemination or copying of this communication is strictly prohibited. If you have received this electronic message in error, please delete the original message from your e-mail system. Thank you.
>
> ---
>
> **From:** Anand Swaminathan <anand@loevy.com>
> **Sent:** Friday, September 30, 2022 12:57 PM
> **To:** CHRISTA BOWDEN (States Attorney) <christa.bowden@cookcountyil.gov>
> **Subject:** Re: Reyes COI hearing

<div style="background-color:yellow">

**External Message Disclaimer**

This message originated from an external source. Please use proper judgment and caution when opening attachments, clicking links, or responding to this email.

</div>

Yup - those dates work.

How shall we inform court? Can we email her?

On Thu, Sep 29, 2022 at 10:31 AM CHRISTA BOWDEN (States Attorney)
<christa.bowden@cookcountyil.gov> wrote:

CCSAO COI SUBPOENAS 000852

how about Feb 22, 23 and or 24? I hope to be traveling the week of 2/14 due to the court holidays 2/13 and 20.

Christa Bowden
Assistant State's Attorney
2650 South California Avenue
Special Litigation, 12C42
Chicago, Illinois 60608
(773)674-7537
christa.bowden@cookcountyil.gov

The information contained in this electronic message may be confidential and may be subject to the attorney-client privilege and/or the attorney work product doctrine. It is intended only for the use of the individual or entity to whom it is addressed. If you are not the intended recipient, you are hereby notified that any use, dissemination or copying of this communication is strictly prohibited. If you have received this electronic message in error, please delete the original message from your e-mail system. Thank you.

**From:** Anand Swaminathan <anand@loevy.com>
**Sent:** Thursday, September 29, 2022 10:22 AM
**To:** CHRISTA BOWDEN (States Attorney) <christa.bowden@cookcountyil.gov>
**Cc:** Jan Susler <jsusler@gmail.com>; Rachel Brady <brady@loevy.com>
**Subject:** Reyes COI hearing

### External Message Disclaimer

This message originated from an external source. Please use proper judgment and caution when opening attachments, clicking links, or responding to this email.

Christa, to follow up on yesterday's status, how do days among Feb 14-17 look for you for the hearing?

Thanks for agreeing to in-person for the SJ argument.

Anand

Anand Swaminathan
Loevy & Loevy
311 N. Aberdeen Street, 3rd Floor
Chicago, Illinois 60607
(312) 243-5900
anand@loevy.com

CCSAO COI SUBPOENAS 000853

| From: | Jan Susler |
|---|---|
| To: | Anand Swaminathan |
| Cc: | Sophia Atcherson (Judiciary); CHRISTA BOWDEN (States Attorney) |
| Subject: | Re: Solache/Reyes |
| Date: | Friday, November 11, 2022 3:03:37 PM |

---

**External Message Disclaimer**

This message originated from an external source. Please use proper judgment and caution when opening attachments, clicking links, or responding to this email.

Adding our thanks as well.
Hoping all enjoy the long weekend.
See you on Monday. Jan

On Fri, Nov 11, 2022 at 2:39 PM Anand Swaminathan <anand@loevy.com> wrote:
> Christa, thank you so much for letting us know - everyone gets a little more time with family this weekend!

Happy Veterans Day, and see you all Monday.

Thanks,
Anand

On Fri, Nov 11, 2022 at 8:33 AM Sophia Atcherson (Judiciary) <Sophia.Atcherson2@cookcountyil.gov> wrote:
> Good morning and happy Veterans Day. Thank you for this update.

Sent from my iPad

> On Nov 11, 2022, at 8:02 AM, CHRISTA BOWDEN (States Attorney) <christa.bowden@cookcountyil.gov> wrote:
>
> Good morning Judge Atcherson, I am currently out of town but was just informed that I will be requesting that the State be granted leave to withdraw as intervenors in these matters on Monday. I wanted to let all parties know to avoid any unnecessary preparation for the arguments set for that day.
>
> Best regards,
> ASA Christa Bowden

--
Jan Susler
People's Law Office
1180 N. Milwaukee, 3rd floor
Chicago, IL 60642
773.235.0070
jsusler@peopleslawoffice.com

CCSAO COI SUBPOENAS 000854

www.peopleslawoffice.com
she/her/ella

CCSAO COI SUBPOENAS 000855