IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ARTURO DELEON-REYES,                    )
                                        )
                Plaintiff,              )
                                        )
vs.                                     ) Case No. 18-CV-01028
                                        )
REYNALDO GUEVARA, et al.,               )
                                        )
                Defendants.             )
_____)
GABRIEL SOLACHE,                        )
                                        )
                Plaintiff,              )
                                        )
vs.                                     ) Case No. 18-CV-02312
                                        )
REYNALDO GUEVARA, et al.,               )
                                        )
                Defendants.             )

THE VIDEOTAPED RECORD OF PROCEEDINGS FOR THE DEPOSITION

of ADRIANA MEJIA, Volume III, a witness, called by

Defendant City of Chicago for examination in the

above-entitled cause, pursuant to the Federal Rules of

Civil Procedure, taken before me, Brenda L. Zeitler,

CSR, License No. 084-004062, by Zoom Video Conference

on the 4th day of February, 2021, commencing at

9:31 a.m.

REYES 012040

ADRIANA MEJIA, 02/04/2021          Page 2..5

Page 2

APPEARANCES:

LOVEY & LOEVY
BY: ANAND SWAMINATHAN, ESQ.
and RACHEL BRADY, ESQ
and SEAN STARR, ESQ
311 North Aberdeen, 3rd Floor
Chicago, Illinois 60607
(312) 243-5900
anand@loevy.com
brady@loevy.com
sean@loevy.com
     On Behalf of Plaintiff Arturo Reyes.

PEOPLE'S LAW OFFICE
BY: JAN SUSLER, ESQ.
1180 North Milwaukee Avenue
Chicago, Illinois 60642
(773) 235-0070
jsusler@gmail.com
     On Behalf of Plaintiff Gabriel Solache.

COOK COUNTY STATE'S ATTORNEY'S OFFICE
BY: EDWARD BRENER, ESQ.
and DAVID ADELMAN, ESQ.
50 West Washington Street, Room 500
Chicago, Illinois 60602
(312) 603-3369
edward.brener@cookcountyil.gov
david.adelman@cookcountyil.gov
     On Behalf of Cook County Defendants.

ROCK FUSCO & CONNELLY, LLC
BY: EILEEN E. ROSEN, ESQ.
and THERESA B. CARNEY, ESQ.
312 North Clark, Suite 2200
Chicago, Illinois 60654
(312) 494-1000
erosen@rfclaw.com
tcarney@rfclaw.com
     On Behalf of Defendant City of Chicago.

Page 3

APPEARANCES (Continued):

LEINENWEBER, BARONI & DAFFADA, LLC
BY: MEGAN McGRATH, ESQ.
120 North LaSalle Street, Suite 2000
Chicago, Illinois 60602
(312) 663-3003
mkm@ilesq.com
     On Behalf of Defendant Guevara.

REITER BURNS LLP
BY: DANIEL M. NOLAND, ESQ.
311 South Wacker, Suite 5200
Chicago, Illinois 60606
(312) 982-0900
dnoland@reiterburns.com
     On Behalf of Defendant Navarro.

THE SOTOS LAW FIRM, P.C.
BY: JOSH M. ENGQUIST, ESQ.
and CAROLINE JAMIESON GOLDEN, ESQ.
and SAMANTHA PALLINI, ESQ.
141 West Jackson Boulevard, Suite 1240A
Chicago, Illinois 60604
(630) 735-3300
jengquist@jsotoslaw.com
cgolden@jsotoslaw.com
spallini@jsotoslaw.com
     On Behalf of Individual Defendants.

BEDI & SINGER, LLP
BY: DENA M. SINGER, ESQ.
53 West Jackson, Suite 1505
Chicago, Illinois 60604
(312) 525-2017
dsinger@bedisinger.com
     On Behalf of the Deponent.

ALSO PRESENT:
JOSEPH BONURA, Interpreter (9:30 to 1:00)
ELSA MADRIGAL, Interpreter (1:00 to end of day)
BRETT SCHATZLE, Videographer
VALERIE BARAJAS, Paralegal for Loevy & Loevy

Page 4

I N D E X

WITNESS:

ADRIANA MEJIA

Examination by Ms. Rosen .......... 8
Examination by Mr. Noland ......... 79
Examination by Mr. Swaminathan .... 92

EXHIBITS:

DEPOSITION EXHIBIT NO. 45 ................ 61
08/02/15 Letter from Ms. Mejia on
Behalf of Marilyn Mulero

DEPOSITION EXHIBIT NO. 46 ................ 80
Solache 5602 - Transcript of Court
Testimony (Motion to Suppress)

Page 5

THE VIDEOGRAPHER: This is the beginning of medial unit 1. We are now on the video record at 9:31 a.m. This is the videotaped video conference deposition of Adriana Mejia being taken on February 4, 2021. This deposition is being taken on behalf of the Defendant in the matter of Arturo Deleon-Reyes, et al. versus Reynaldo Guevara, et al. The Case Number is 18 CV 01028 consolidated with 18 CV 02312 filed in the United States District Court, Northern District of Illinois, Eastern Division.

My name is Brett Schatzle, Legal Videographer, representing Urlaub Bowen & Associates with offices at 20 North Clark Street, Suite 600, Chicago, Illinois. The court reporter today is Brenda Zeitler, also of Urlaub Bowen & Associates.

Counsel, please identify yourselves for the video record and the parties which you represent.

MS. ROSEN: Eileen Rosen on behalf of Defendant City of Chicago.

MS. CARNEY: Theresa Carney also on behalf of Defendant City of Chicago.

MS. SINGER: Dena Singer on behalf of Ms. Mejia.

MR. NOLAND: Daniel Noland on behalf of

Urlaub Bowen & Associates, Inc. 312-781-9586

ADRIANA MEJIA, 02/04/2021                                        Page 6..9

Page 6

David Navarro.

MR. BRENER: Edward Brenner on behalf of Tom O'Malley, Heather Brualdi, Andrew Varga, Karin Wehrle, and Cook County.

MR. ADELMAN: David Adelman also on behalf of Cook County, Andrew Varga, Heather Brualdi, Karin Wehrle, and Tom O'Malley.

MR. ENQUIST: Josh Enquist on behalf of Defendants Dickinson, Halvorsen, Rutherford, Stankus, Naujokas, Karalow, Harvey, Trevino, Mingey, Biebel, and Cappitelli.

MS. McGRATH: Megan McGrath on behalf of Defendant Guevara.

MS. GOLDEN: Caroline Golden also for the individual officer defendants.

MS. PALLINI: Samantha Pallini also on behalf of the individual officer defendants.

MR. SWAMINATHAN: Good morning, Ms. Mejia. Anand Swaminathan on behalf of Plaintiffs Arturo Deleon-Reyes along with my colleagues Sean Starr, Rachel Brady, and Valerie Barajas.

MS. SUSLER: Jan Susler on behalf of Plaintiff Gabriel Solache.

And I just want to be sure the record

Page 7

reflects that this deposition is also in Mr. Solache's case.

THE VIDEOGRAPHER: Will the court reporter please swear in the witness.

(Interpreter sworn.)

(Witness sworn.)

MS. SUSLER: I just need to ask, Mr. Interpret, Mr. Bonura, if you wouldn't mind allowing the question to be asked and then do the interpretation. Then let her answer completely and then do the interpretation. I would be very grateful.

THE INTERPRETER: That's normally how I do it here. No problem. You have my word. I'll try my best.

MR. SUSLER: Thank you so much.

MS. ROSEN: Everybody ready? Ms. Mejia, are you ready?

THE WITNESS: Yes.

MS. ROSEN: Ms. Mejia, we're here again for your deposition. As you recall, we were at Logan a little over a year ago, where we took your deposition.

THE INTERPRETER: The translator wants to say before we get started, if we're going to do it that way -- we're not going to be doing it

Page 8

simultaneously. I understand that fully -- you're going to have to give me a couple of sentences, stop for a breath, and I'll shoot it out. Otherwise, I have to memorize, and it's impossible.

MS. ROSEN: Let me start over.

THE INTERPRETER: Also, I haven't been here; so all the names, like Logan, I have to get familiar with.

MS. ROSEN: I understand. We'll try and do our best here to get this done in an efficient manner.

ADRIANA MEJIA, after having been first duly sworn to tell the truth, was examined and testified upon her oath through the interpreter as follows:

EXAMINATION

BY MS. ROSEN:

Q. Ms. Mejia, you recall that we were at Logan about a year ago, correct?

A. Yes.

Q. And you're aware, are you not, that the Court has ordered us -- has ordered you to now answer questions. Are you aware of that?

MR. SWAMINATHAN: Objection to form. Go ahead.

Page 9

A. Yes.

Q. Ms. Mejia, why are you at Logan?

THE INTERPRETER: The translator asks -- I can barely hear her. It's very low. All I heard was "muertes" and "sequestro." I heard death and kidnapping. That's all I heard.

MS. ROSEN: Ms. Mejia, can you keep your voice up?

THE WITNESS: Yes.

Q. Can you tell us again why you're at Logan?

A. I'm accused of two deaths and a kidnapping.

Q. And did you participate in the two deaths?

A. No.

Q. Did you participate in the kidnappings?

A. Yes.

Q. You know that the names of the people that were killed were named Soto, correct?

A. Yes.

Q. Did you kidnap the children from the Soto home?

A. Yes.

Q. Were you in the Soto home when Mr. and Mrs. Soto were killed?

A. Yes.

Urlaub Bowen & Associates, Inc.   312-781-9586

REYES 012042

ADRIANA MEJIA, 02/04/2021           Page 10..13

Page 10

Q. Did you see who killed Mr. Soto?

A. Yes.

Q. Who killed Mr. Soto?

A. Gabriel Solache.

Q. Did you see who killed Mrs. Soto?

A. Yes.

Q. Who killed Mrs. Soto?

A. Gabriel Solache.

Q. Do you know who Arturo Deleon-Reyes is?

A. Yes.

Q. Was Mr. Reyes at the Soto home when the Sotos were killed?

MR. SWAMINATHAN: Objection to form. Go ahead.

Q. I didn't hear your answer.

THE INTERPRETER: The translator wants to say she didn't give an answer yet.

A. Yes.

Q. So Mr. Reyes was in the home when the Sotos were killed?

MR. SWAMINATHAN: Objection to foundation. sorry. Go ahead, and then I'll make my objection after you translate.

(Question is translated.)

Page 11

MR. SWAMINATHAN: Object to the foundation and form. Go ahead.

A. Yes, he was inside.

Q. Did you see him in the house?

A. Yes.

Q. Did he participate in the murder of Mr. Soto?

A. No.

Q. Did he participate in the murder of Mrs. Soto?

A. No. He was just present.

Q. Did he help kidnap the children?

A. Yes.

Q. Why did you kidnap the children?

A. Because Gabriel Solache said that those were the children that they was going to give me -- well, the little girl.

Q. Why was Gabriel Solache going to give you the little girl?

A. Because he had promised her to me.

MS. SUSLER: Tardy objection to that question. Foundation and form.

Q. When did Gabriel Solache promise to give you the baby girl?

Page 12

A. He told he was going to help me with the problem that I had. I answered him, and he knew everything about my, my problem.

Q. And when you say "your problem," what do you mean?

A. When he saw me, that I was sad in the house, he said he was going to help me and not to worry about anything.

Q. When did he see that you were sad in the house?

A. He only saw me sad. He only saw me worried.

Q. And what were you sad and worried about?

A. Because I wasn't explaining to anyone what was happening, what was going on with me. One day he got there, and I explained it to him.

Q. My understanding from reading the paperwork from your criminal case is that you told your husband that you were pregnant; is that correct?

MR. SWAMINATHAN: Objection to form.

MS. ROSEN: You can answer.

MS. SUSLER: Same objection.

A. Yes.

Q. When did you tell your husband that you were pregnant?

Page 13

A. In June.

Q. In June of 1997.

A. Yes.

Q. Why did you tell your husband that you were pregnant?

A. Because we were having a lot of problems.

Q. You and your husband were having problems?

A. Yes.

Q. Had you been trying to get pregnant?

A. Yes.

Q. Your husband's name is Rosauro, right?

A. Yes.

Q. When did you and Rosauro get married?

A. In 1993.

Q. And where did you and Rosauro get married?

A. In Mexico.

Q. Did you know Gabriel Solache when you lived in Mexico?

A. Yes, I've known him my whole life.

Q. Did you live in the same town?

A. Yes.

Q. Did you live close to one another?

A. He lived behind my parents' house.

Q. Were you friends growing up?

REYES 012043

ADRIANA MEJIA, 02/04/2021      Page 14..17

Page 14

A. Yes.

Q. Were you and Gabriel Solache ever romantically involved?

MR. SWAMINATHAN: Objection, form.

MS. SUSLER: Objection form.

MS. ROSEN: You can answer.

A. No.

Q. How often would you see Gabriel Solache when you were growing up in Mexico?

A. Almost every day. He practically lived in my house. He ate there.

THE INTERPRETER: Translator wants to say the last part I'm not sure if she said that he helped her or she helped him. It came in garbled.

MS. ROSEN: You thought she said what?

THE INTERPRETER: At the very end, I wasn't sure if she had said I would help him or he would help me. The last couple of words, I can't guess. I just have to let you know I'm not 100 percent sure.

Q. Ms. Mejia, the last couple words that you said, can you repeat them?

MR. SWAMINATHAN: Objection to form.

A. He helped a lot with my brothers.

Q. He was friends with your brothers?

Page 15

A. Yes, my two brothers, the older ones.

Q. What are the names of your two brothers, the older ones?

A. Jose Louis Martinez and Carlos Martinez, but he already passed away.

Q. Carlos passed away recently, right?

A. Yes.

MS. ROSEN: I'm sorry for your loss.

THE WITNESS: Thank you.

Q. But Carlos lived with you and Rosauro for some period of time back in 1997, 1998, right?

A. Yes.

Q. Did you tell Carlos that you were pregnant?

A. Yes.

Q. Did you ever tell Carlos that you were lying about being pregnant?

A. No.

Q. Was Carlos with you when you kidnapped the children?

A. No.

Q. Did you ever tell your husband, Rosauro, that you were lying about being pregnant before you kidnapped the children?

A. No.

Page 16

Q. Was Rosauro with you in the house when you kidnapped the children?

A. No.

Q. Other than you and Gabriel Solache and Arturo Reyes, was there anybody else in the Soto house when the Sotos were murdered?

A. No.

Q. Okay. When did you first meet your then husband Rosauro Mejia?

A. When I was like 13, 14 years old.

Q. Did he also live in the same town with you and Mr. Solache?

A. No. He lived in another pueblo, another town.

THE INTERPRETER: Translator can't be sure, but I think she said Jazmin.

Q. Is that the name of the town, Ms. Mejia?

A. Yes.

Q. Did you know Rosauro's brothers?

A. Yeah, the whole family.

Q. Who is Guadalupe Mejia?

A. One of Rosauro's sister-in-laws.

Q. How long have you known Guadalupe Mejia?

A. A long time, a lot of years. She lived in

Page 17

my town.

Q. So she lived in the same town as you and Gabriel Solache?

THE INTERPRETER: Translator wants to say did you say lived or lives?

MS. ROSEN: Lived.

A. Yes.

Q. Can you remind me when you first came to the United States?

A. Would you repeat the words to me?

Q. Yes. Can you remind me when it was that you first came to the United States to live?

A. I'm not sure, but I think it was like around '95 or '96.

Q. And when you first came to the United States, you were in Los Angeles, and then you shortly thereafter came to Chicago, right?

A. Yes.

Q. When you first came to Chicago, where did you live?

A. On 51st and Western.

Q. Who did you live with at 51st and Western?

A. My husband and his brother, Adolpho Mejia, we rented an apartment and Encarnacion Mejia. I don't

REYES 012044

ADRIANA MEJIA, 02/04/2021                                    Page 18..21

Page 18

remember the other names, but we lived with two of his brothers and two friends from their town.

Q. Do you know who Jose Mejia is?

A. Yes.

Q. Who is Jose Mejia?

A. A cousin -- a nephew of my husband.

Q. Who is Jose Mejia's father? Do you know?

A. Yes. Adolpho Mejia.

Q. Did he live at the house or apartment at 51st and Western when you lived there?

A. Yes.

Q. Is he older than you, younger than you, the same age?

A. No. He's older than me.

Q. Jose is older than you?

A. Yes.

Q. How long did you live at the house or apartment at 51st and Western before you moved to the house on Mozart?

A. I don't remember, but I think it was like a year.

Q. Did you ever babysit for any of Jose Mejia's children?

A. Yes.

Page 19

Q. How many children did he have?

A. Two.

Q. Were you babysitting for those children during the time period that you had told your family that you were pregnant?

A. I don't remember.

MR. SWAMINATHAN: Sorry. Madam court reporter, can you read back the question? It cut out for me.

(Requested record read.)

A. I don't remember.

MS. ROSEN: Let me start that all over.

Q. Do you recall whether or not you babysat Jose Mejia's children during the time period that you were claiming you were pregnant?

A. I watched those children, and also I watched --

THE INTERPRETER: Translator wants to say she faded out. And then I heard, "and then children from another brother." Her sentence didn't come through. It came through garbled.

MS. ROSEN: Let's see if we can clarify that.

Q. So you babysat for Jose's children, but you

Page 20

also babysat for another brother's children; is that right?

A. Yes.

Q. When you were telling your family members that you were pregnant, did you ever put a pillow under your clothes to make it look like you were pregnant?

A. No.

Q. Did you ever tell Jose Mejia that you were not pregnant, that you were lying?

A. No.

Q. Did you tell Gabriel Solache that you were lying to your family members and that you really weren't pregnant?

A. Yes.

Q. When did you tell Gabriel Solache that you were lying and you really weren't pregnant?

A. I don't remember the exact dates; but I remember one day that I was in the living room, and he found me crying. That's when he said to me "What's wrong?" And I didn't want to tell him. But he was telling me that if I had a problem, that he could help me.

Q. So did you tell him?

Page 21

A. Yes.

Q. What exactly did you tell him?

A. While I was crying, I didn't want to tell him. But after -- and then he convinced me. He said, "Don't worry." Whatever it was, he was going to help me.

Q. So did you tell him that you were lying when you were telling everybody that you were pregnant?

A. Yes.

Q. And did Gabriel say he would help you?

A. Yes.

Q. Did he explain how he would help you?

A. He said that he knew a woman who didn't want her baby, and he was going to help me get to her.

Q. Did he explain how he was going to help you get the babies?

A. No. He was only going to give me a baby, not babies.

Q. I see. Because you were pregnant; so you need to have had a baby, right?

A. Yes.

Q. Did he explain to you how he was going to help you get the baby from the family that he thought didn't want it?

Urlaub Bowen & Associates, Inc.   312-781-9586

REYES 012045

ADRIANA MEJIA, 02/04/2021          Page 22..25

Page 22

MS. SUSLER: Objection, asked and answered.

A. No. Only that he knew a woman who did not want her baby.

Q. And this conversation that you had with Gabriel, was that shortly before the Soto family was murdered and the children were kidnapped?

MS. SUSLER: Objection, form.

MR. SWAMINATHAN: Same objection. Go ahead.

A. Yes.

Q. And the Soto family was murdered, and the children were kidnapped at the end of March, 1998. Do I have that right?

MR. SWAMINATHAN: Objection to form.

MS. ROSEN: You can answer.

A. Yes.

MS. SUSLER: I'll join in that objection.

Q. Did you also tell Arturo Reyes that you were lying about being pregnant?

A. No. I never spoke with Arturo Reyes.

Q. Did you know Mr. Reyes from when you lived in Mexico?

A. No. He's from a different state in Mexico.

Q. When did you first meet Mr. Reyes?

A. He came with a brother-in-law of mine whose

Page 23

name is Manolo Mejia.

THE INTERPRETER: Translator wants to correct that. I apologize. It was Manuel Mejia, not Manolo Mejia.

MS. ROSEN: Thank you.

Q. So you first met Mr. Reyes when he came to the United States?

A. Yes. I met him, yes.

Q. Do you know somebody named Norma Salazar?

A. No. But it was the woman who Gabriel told me about that didn't want the baby.

Q. So Gabriel Solache told you that the woman who didn't want her baby was named Norma Salazar?

MS. SUSLER: Objection: form, foundation.

MR. SWAMINATHAN: Same objection.

MS. ROSEN: You can answer.

A. Yes.

Q. When did Mr. Solache first tell you that the woman who didn't want her baby was named Norma Salazar?

A. He said that she was his friend or his girlfriend and that she did not want her baby.

Q. Did he tell you about Norma Salazar that first time that you told him that you were lying about

Page 24

being pregnant?

MS. SUSLER: Objection, form. You can answer.

THE INTERPRETER: The translator couldn't make out what she just said. It was like in the distance.

MS. ROSEN: Repeat your answer, please. We didn't hear you.

A. I don't remember.

THE INTERPRETER: The translator wants to say there's no sound coming out. I just heard "no me recuerdo," which is I don't remember, and then the sound stopped coming from her.

MS. ROSEN: Ms. Mejia did you say anything other than, "I don't remember"?

A. No.

Q. Did you offer to pay Gabriel Solache $600 for the baby?

MS. SUSLER: Objection, form.

MS. ROSEN: You can answer.

A. He told me that he needed $600 if I could get that for him.

Q. And did you give him $600?

A. Yes.

Page 25

Q. And this was so that he would help you find the baby, right?

MS. SUSLER: Objection, form.

MR. SWAMINATHAN: Same objection.

MR. ROSEN: You can answer.

A. Yes.

Q. Can you tell me how you ended up at the Soto house when they were killed?

MS. SUSLER: Objection, form.

MS. ROSEN: You can answer.

A. Gabriel Solache picked me up at the hospital, and he took me to the Reyes home, to the Reyes house.

Q. The Soto house, you mean? Or the Reyes house?

MR. SWAMINATHAN: Objection to form and foundation.

A. The Sotos house, the house of the people who died.

Q. So Gabriel Solache picked you up at the hospital?

A. Yes.

Q. Why were you at the hospital?

A. Because Gabriel Solache said that that was

Urlaub Bowen & Associates, Inc.    312-781-9586

REYES 012046

ADRIANA MEJIA, 02/04/2021           Page 26..29

Page 26

where they were going to give me the baby, the little girl.

Q. How did you get to the hospital?

A. My ex-husband took me.

Q. Did you tell your ex-husband to take you to the hospital because you were going to be induced to have the baby?

A. Yes.

Q. And had you arranged before going to the hospital that Gabriel Solache would pick you up?

A. Yes.

Q. When Gabriel Solache picked you up, was Mr. Reyes with him?

A. Yes, in the car.

Q. Whose car were they driving?

A. Gabriel's.

Q. What kind of car was it? Do you remember?

A. I don't know a lot about cars, but I remember it was like a greenish-type car. But I don't know as far as the make.

Q. But it was Gabriel's car?

A. Yes.

Q. Did Gabriel later say that that car got stolen?

Page 27

MS. SUSLER: Objection, form.

MR. SWAMINATHAN: Same objection.

MS. ROSEN: You can answer.

A. No. It was his because my ex-husband had sold it to him.

Q. Rosauro?

A. Yes.

Q. Did you know that Mr. Reyes was going to be in the car?

A. No.

Q. When you saw him in the car, did you ask why he was there?

A. Yes. I asked Gabriel.

Q. And what did Gabriel tell you?

A. For me not to worry, that he wasn't going to say anything and that he was going to help us.

Q. When you got in the car with Gabriel, where did you think you were going?

A. To go get the baby.

Q. Did you think you were going to get the baby from Norma Salazar?

A. Yes.

Q. Then tell me how you ended up at the Soto home?

Page 28

A. Gabriel Solace said for me to wait there a few minutes. Then he got out of the car. And then I believe they lived in the basement. He went to open the door. He opened it with, like --

THE INTERPRETER: Translator wants to say she's using a word like "goncho," which is a hook. but it could also mean something to pry something open. I'm not sure what she's referring to there.

MS. SUSLER: Correction. I think it also means hanger.

THE INTERPRETER: Goncho? Possibly, not usually, but it could possibly --

MS. SUSLER: I stand corrected.

THE INTERPRETER: No. No, ma'am, The translator wants to say you might be correct. If you'd like, with your permission, I can ask her.

MS. ROSEN: I'll follow up.

Q. Ms. Mejia, Gabriel pried the door open with something, right?

A. Yes.

Q. The word that you are using, we're not sure what it means. A hanger is something that you hang clothes on. Is that what he was using?

A. Yes.

Page 29

Q. And you were in the car while this was happening?

A. Yes.

Q. Was it daytime or night time?

A. Night time.

Q. But you could see what Gabriel was doing?

A. First he went in. Then he said for me to follow. That's when the three of us went in.

Q. So were you standing there when he used the hanger to open the door?

MS. SUSLER: Objection, form.

MR. SWAMINATHAN: Objection, asked and answered. Go ahead.

MR. ROSEN: You can answer.

THE INTERPRETER: The translator asked her to repeat it. It came out garbled, and I then see her mouth moving, and no sounds coming out again.

Q. Can you repeat your answer, Ms. Mejia?

A. When he got to door, right after he opened it, he went in. That's when we went in.

Q. Tell me what happened when you went into the house.

A. This is the most difficult for me, but okay.

Q. I'm sorry that's it's difficult for you, but

Urlaub Bowen & Associates, Inc. 312-781-9586

REYES 012047

ADRIANA MEJIA, 02/04/2021 — Page 30..33

Page 30

we have to know what happened. Just take your time.

A. When we went in, Gabriel went straight to the kitchen and got a knife.

Q. And then what happened?

A. The man got up from his bed because they were asleep. The man heard noises. That's when Gabriel started to attack. That's when he gave him a lot of stabs.

Q. And then what happened?

A. Then I remember the gentleman, the man, fell to the floor.

Q. What were you doing?

A. There standing, seeing, observing.

Q. And then what happened?

A. Then a woman got up from her bed.

Q. And then what happened?

A. Also, I remember that he stabbed her in her body. And the woman fell in her bedroom near her bed, I think.

Q. Where is the little boy?

A. The boy or the girl?

Q. The boy.

A. The boy was in a --

THE INTERPRETER: The translator is looking

Page 31

for the right word. I'm stumped on a word for one second.

MS. SUSLER: It's crib.

THE INTERPRETER: Thank you very much. Crib.

Q. The boy was in a crib?

A. Yes.

Q. Where was the little girl?

A. In bed with her mom.

Q. You told the police that Mr. Reyes also stabbed Mr. Soto and Mrs. Soto. Do you remember telling the police that?

MR. SWAMINATHAN: Objection to form.

MS. ROSEN: You can answer.

A. The truth is I don't remember.

Q. Do you remember talking the night that you were -- days after you were arrested, do you remember talking to an Assistant State's Attorney?

A. I remember I spoke with a lot of them, but I don't remember.

THE INTERPRETER: The translator wants to say the last two words didn't come out. I think it was "mucho," but the last two words didn't come out.

Q. Can you repeat the last two words, please?

Page 32

A. I spoke with a lot of them; but the truth is, I don't remember.

Q. Do you remember telling people that you spoke with that Mr. Reyes also participated in the murders?

THE INTERPRETER: Can you repeat that?

MS. ROSEN: Sure.

Q. Do you remember telling the people that you spoke to in the days after you were arrested that Mr. Reyes also participated in the murders?

MR. SWAMINATHAN: Objection to form.

MS. ROSEN: You can answer.

A. No, I don't remember.

Q. Did Mr. Reyes participate in the murders?

MR. SWAMINATHAN: Objection to form and asked and answered.

MS. SUSLER: Same.

MS. ROSEN: You can answer.

A. Yes.

Q. What did you see Mr. Reyes do?

A. I just remember, Arturo, he helped move the man.

Q. Do you remember seeing him stab anybody?

A. No, I don't remember. I don't think so. I

Page 33

think it was just Solache.

Q. And what happened after Mr. and Mrs. Soto were both stabbed?

A. Gabriel said to me to watch the little girl, and I should wrap her in a covering. Then Arturo Reyes -- I don't remember if Gabriel wrapped the other baby, because there were two babies.

Q. There was a little boy who was, like, 2 or 3 years old, right?

MR. SWAMINATHAN: Objection to form and foundation.

MS. ROSEN: You can answer.

A. Yes.

Q. And then there was a little baby girl who was the little girl that you were going to say you gave birth to, right?

A. Yes.

Q. So did you wrap the little baby girl as Gabriel asked you to?

A. Yes.

Q. Then what happened with the little boy?

A. We took him in the car.

Q. And where did you go after you got in the car?

Urlaub Bowen & Associates, Inc. 312-781-9586

REYES 012048

Page 34

A. To the hospital.

Q. The same hospital where your husband had dropped you off earlier?

A. Yes.

Q. Did you have the baby and the little boy with you when you got dropped off at the hospital?

A. Yes.

Q. And then did Gabriel and Arturo leave?

A. Yes, they left.

Q. And then what did you do once you were back at the hospital with the baby and the little boy?

A. I was there for a good bit of time.

Q. And then what?

A. Then I called my husband to come pick me up, that I had given birth.

(External voices.)

MS. ROSEN: Hold on one second.

MR. SWAMINATHAN: Sorry.

MS. ROSEN: Are we good?

MR. SWAMINATHAN: Yeah, I'm sorry.

MS. ROSEN: That's all right.

Q. So then you called your husband; is that what you said?

A. Yes.

Page 35

Q. And what were you planning to tell your husband about the little boy?

A. That a woman had left him to me to watch him.

Q. And were you planning to tell your husband that the woman that gave you the little boy was named Norma Salazar?

A. I think so.

Q. Was that your idea or Gabriel Solache's idea?

MS. SUSLER: Objection, form.

MS. ROSEN: You can answer.

A. Gabriel Solache's.

Q. Did your husband come to pick you up at the hospital?

A. Yes.

Q. Was he alone, or did he have other people with him?

A. No. Guadalupe Mejia was with him, and I believe her daughters.

Q. When your husband and Guadalupe came to the hospital to pick you up, what did you say to them about the little boy?

A. That a woman had left him with me for me to

Page 36

watch him.

Q. What was your plan with regards to the little boy? What were you going to do with him?

A. I wasn't going to do anything. The person that was going to take care of the little boy was Gabriel, not me.

Q. Did Gabriel tell you what he was going to do with the little boy?

A. No. I don't remember. I think he told me he was going to give him to someone for that person to watch him.

Q. When you left the Soto home with the baby and the little boy, did you take a knife with you too?

A. I don't remember.

Q. When your husband picked you up at the hospital, where did you go?

A. To the house where I was living.

Q. Were you happy that you had the little baby girl?

A. No.

Q. Did you say no?

THE INTERPRETER: Translator didn't hear anything.

A. No, I was never happy.

Page 37

Q. Why weren't you happy?

A. Because of what happened with her parents.

Q. Did you know that Gabriel had planned to kill these people?

MS. SUSLER: Objection, form and foundation.

MR. SWAMINATHAN: Same objection. Go ahead.

MS. ROSEN: You can answer.

A. No.

Q. Did you try and stop it when you were in the house?

A. A couple of times I said for him to leave them, but he didn't do it.

Q. Now, you pled guilty to participating in the murders, right?

A. I feel guilty. How am I not going to feel guilty? Two people died.

Q. Okay. How many days were you back at your home after coming from the hospital with the baby and the little boy before the police came?

A. From like Saturday through Friday night, I believe.

Q. When you were in the Soto house, did Mr. Reyes try to stop Mr. Solache from stabbing Mr. and Mrs. Soto?

ADRIANA MEJIA, 02/04/2021                              Page 38..41

Page 38

A. I don't remember. It's been a long time. I no longer remember everything.

Q. The little boy was taken to the police station. You know that, right?

A. Yes.

Q. Do you know who took him to the police station?

A. Because Arturo Reyes had the baby, yes.

Q. Did Arturo Reyes take him to the police station?

A. No. I think where they were taking care of him, the gentleman -- I think it was a policeman who was a friend of Arturo Reyes. I think that he recognized him.

Q. Recognized the little boy?

A. Yes, something like that.

Q. Do you remember Guadalupe Mejia seeing a picture of the little boy on TV and telling you that the little boy needed to be taken to the police because his parents had been killed?

MR. SWAMINATHAN: Objection to form.

MS. ROSEN: You can answer.

A. Yes.

Q. And do you remember then Guadalupe -- let me

Page 39

strike that.

When Guadalupe told you that she saw a picture of the little boy on TV and said you should take the boy to the police station, what did you say to her?

A. No, I don't think I said very much. I didn't speak with her much. I didn't tell her too much at all what was happening.

Q. Do you remember Guadalupe telling your ex-husband, Rosauro, that she had seen a picture of the little boy on the TV and Rosauro saying we have to take the boy to the police?

MR. SWAMINATHAN: Objection to form.

MS. ROSEN: You can answer.

A. I no longer remember that.

Q. Do you remember Rosauro being at the police station when you were at the police station?

A. Yes.

Q. Do you know why he was there?

A. Because they were investigating him.

THE INTERPRETER: The translator wants to say it could be investigating him or investigating it. There's no way for me to know which one.

Q. Did you ever talk to Rosauro while you were

Page 40

at the police station?

A. No, not much. Less than a minute, just as I was going by him. They didn't let me speak with him.

MR. SWAMINATHAN: Eileen, when you get to a good stopping point, whatever that is, let's take a break, please.

MS. ROSEN: We can do it now. This is good.

MR. SWAMINATHAN: Whatever is best for you.

MS. ROSEN: This is fine. Let's take a break. How much time do you want?

MR. SWAMINATHAN: Just have to go to the bathroom. A few minutes.

MS. ROSEN: Ms. Singer, you need to break at 11:30; is that right?

MS. SINGER: I do.

MS. ROSEN: Okay. So let's take a short break now, and then we'll take a little longer break at 11:30.

THE INTERPRETER: Ms. Susler, thank you very, very much for helping me before. I had it on the tip of my tongue, but I couldn't get that word out. Thank you.

MS. SUSLER: Thank you for accepting my input.

Page 41

THE INTERPRETER: No, I appreciate it. Sometimes --

THE VIDEOGRAPHER: One second, please. I have to go off.

We've off the video record at 10:50 a.m.

(Recess in proceedings from 10:50 to 10:58 a.m.)

THE VIDEOGRAPHER: We are back on the video record at 10:58 a.m.

MS. ROSEN: Ms. Mejia are you ready?

THE WITNESS: Yes.

MS. ROSEN: If at any point in time you need to take a break, just let us know, okay?

THE WITNESS: Because I am diabetic and my sugar was going off a little.

MS. ROSEN: So do you need to eat?

THE WITNESS: I'm eating a piece of candy. I'm okay.

MS. ROSEN: We're going to take a break at 11:30 that will be a longer break; so if you want to eat something at 11:30, then maybe that's a good time to do it, okay?

THE WITNESS: Yes.

BY MS. ROSEN:

Urlaub Bowen & Associates, Inc.   312-781-9586

REYES 012050

ADRIANA MEJIA, 02/04/2021                                        Page 42..45

Page 42

Q. Have you had any conversations with Gabriel Solache since you were arrested? Have you ever spoken with him?

A. When we were in Cook County, we wrote to each other.

Q. And what did you write about?

A. We couldn't speak about the case. We'd just speak a little bit about what had happened. And he told me that everything was going to be okay.

Q. You know now that Gabriel is out of prison, right?

A. Yes.

Q. And you know that he's back in Mexico, right?

A. Yes.

Q. Do you know where in Mexico he is?

A. The truth is, no.

Q. Do you still have family in Mexico?

A. Yes, my parents and two brothers.

Q. And do you speak to your parents and your two brothers?

A. Yes.

Q. Have either of your parents mentioned to you when you have spoken with them that they have seen

Page 43

Gabriel Solache?

MS. SUSLER: Objection.

MS. ROSEN: You can answer.

A. Once, I asked my mother if she had seen Gabriel, and she had said that she had only seen him once.

Q. Did she talk to him that time she saw him; do you know?

MS. SUSLER: Excuse me. I think that was mistranslated. Would you mind asking the question again about whether either of her parents had mentioned that they saw Gabriel? Thank you.

Q. Sure. Have either of your parents mentioned that they saw Mr. Solache since he's returned to Mexico?

A. No. I have asked my mom just that she had seen him when he had recently returned to Mexico.

Q. And had she seen him?

A. Yes. She just saw him for a short time.

Q. Did she speak with him that time that she saw him?

MS. SUSLER: Objection, form.

Q. And she only saw him that one time, is what she told you, right?

Page 44

THE INTERPRETER: The translator didn't get an answer for the last one.

MS. ROSEN: Sorry.

Q. Did she speak with him?

A. No.

Q. And she only saw him the one time, right?

A. Yes.

Q. And how about your brothers? Have your brothers mentioned seeing Gabriel Solache at all since he's been returned to Mexico?

A. No. I don't ask them, and they're not going to tell me anything.

Q. Are you aware that Mr. Reyes is also out of prison?

A. Yes.

Q. And do you know where he is currently?

A. No.

Q. How does it make you feel that Mr. Solache is out of prison?

A. Bad. I feel very bad.

Q. Why do you feel bad?

A. Because then they listen not to me since I didn't have defense.

Q. What do you mean you didn't have defense?

Page 45

A. Because I don't have a lawyer, an attorney that helps me, that defends my case.

Q. You had a lawyer 20 years ago, right, when your case was -- when the criminal case was pending? You had a lawyer, right?

A. But never even gotten a paper or document with what my -- saying what my charges are or nothing.

Q. You mean, when your criminal case was pending, you never saw papers?

A. Nothing until the present day. I don't know anything about my case.

Q. Do you remember that you testified during the course of the criminal case?

A. I think so.

Q. Do you remember the name of the attorney that you had when you were going to court for your criminal case?

A. I think her name was or her name is, I think, Mary. I don't remember her last name.

Q. Is it Mary Danahy?

A. I think so.

Q. And she was representing you for the whole time that your criminal case was going on, right?

A. Yes.

Urlaub Bowen & Associates, Inc.  312-781-9586

REYES 012051

ADRIANA MEJIA, 02/04/2021                                Page 46..49

Page 46

Q. And she was representing you when you made the decision to plead guilty to the murders and the kidnappings, correct?

A. Well, she told me that it was better for me to plead guilty. It was the 8th of February. Because if I went to trial, they would give me the death penalty.

Q. And you agreed to plead guilty?

A. Yes.

Q. And do you remember the judge talking to you at the time that you pled guilty saying that the decision was your decision to make?

A. Yes.

Q. Do you believe that you deserve to get out of prison too?

A. I know that what I committed and being here my whole life is not going to bring back the people that I killed. If I could give my life to get those people back, I would do it. But it's too late. It can't be done now. I'm sorry for the children, for my error, my mistake, that they took their parents away. All my life, knowing that those children are left without parents, that bothers me.

Q. And I just want to be clear. Other than

Page 47

Mr. Solache and Mr. Reyes and yourself, did anybody else help you to kidnap those children?

MR. SWAMINATHAN: Objection to form, asked and answered.

MS. ROSEN: You can answer.

MS. SUSLER: Same objection.

A. No.

Q. Do you remember somebody that lived in the house on Mozart by the name of Martin Vaca?

A. Yes.

Q. And do you know who he was? Was he somebody's relative? A friend?

THE INTERPRETER: The translator asks if you can you repeat that, ma'am? You went out.

Q. Sure. Do you know who Mr. Vaca was? Was he somebody's relative or a friend?

MR. SWAMINATHAN: Objection to form.

MS. ROSEN: You can answer.

A. He must have been a friend from another town there because he was renting.

Q. Do you recall having a phone conversation with him the night that you called the house to tell Rosauro that you had had the baby and that he should come pick you up the next day?

Page 48

A. Yes. I remember that he answered the phone when I called the house.

Q. There was just one phone, one phone number, in that house that everybody used, right?

A. Yes.

Q. My understanding is that Guadalupe lived in the basement apartment with her husband and her two children; is that correct?

MR. SWAMINATHAN: Objection to form.

MS. ROSEN: You can answer.

A. Yes.

Q. Did anybody else live with Guadalupe and her family in the basement?

A. Yes, Leobardo Mejia.

THE INTERPRETER: The translator is not hearing it closely.

Q. You said Leobardo, right?

A. Mejia, yes.

Q. And then on the first floor of the house, where you lived, who else lived with you and Rosauro?

A. My brother Carlos, Gabriel Solache, Arturo Reyes, and Martin Vaca.

Q. And did anybody live on the third floor while you were living there?

Page 49

A. Yes, people we didn't know, unknown people.

Q. Who was Lorena Saucedo? Saucedo maybe?

A. She's a friend from Mexico. Well, she's not my friend. She's a friend of my aunt.

Q. Is she somebody you stay in contact with since you've been in prison?

A. Yes.

Q. Does she sometimes send you money and put it in your commissary account?

A. Yes.

Q. Who is Marvin Hill?

A. Who is quien?

Q. The name is Marvin, M-a-r-v-i-n, Hill, H-i-l-l.

A. Can you write it?

Q. M-a-r-v-i-n Hill, H-i-l-l.

A. No, they don't put money in to buy, no.

MS. SUSLER: Mr. Interpreter, I think there might be a mistranslation.

THE INTERPRETER: Translator wants to say you might be right because she's got a bad echo every now and then. I did the best I could. That's what I thought I heard. But you're right.

MS. SUSLER: Of course. I understood her to

Urlaub Bowen & Associates, Inc.  312-781-9586

REYES 012052

ADRIANA MEJIA, 02/04/2021                                    Page 50..53

Page 50

say, "No, they just put money in my account."

THE INTERPRETER: The translator would like to ask: You want me to ask her again?

MS. ROSEN: Yeah, please.

(Question repeated.)

A. Yes. They only put money in for me to buy things. I don't know them.

Q. So you don't know Mr. Hill. You just know he puts money in your account?

A. Yes.

Q. Do you know why he puts money in your account?

A. Yes.

Q. Why?

A. Because unfortunately I don't have anyone to send me a lot of money, and I buy minutes to be able to call my parents.

Q. So why would this person that you don't know give you money?

A. Because I buy things for other people in jail that he asks me to buy.

Q. He asks you to buy things for other people in the jail?

A. No. How can I explain it? The girl whose

Page 51

name was Loriel (phonetic) asked her family to put money in my account, and they put money in my account.

Q. So one of your cell mates knows Mr. Hill?

MS. SUSLER: Objection, form and foundation.

MR. SWAMINATHAN: Same objection.

MS. ROSEN: You can answer.

A. Yes, they put money, and I buy through my account what she needs.

MS. SUSLER: Interpreter, I think she is speaking in the plural. "I buy what they need."

THE INTERPRETER: I didn't hear that, but you might be right. I'm not going to argue with you, but I didn't hear that.

MS. SUSLER: Let's ask it again.

(Question repeated.)

A. I buy from the store for this girl, "esta muchacha," this young girl or girl.

Q. Who is the girl?

A. She's an African American, a young African American.

Q. Is she another prisoner?

A. Yes.

Q. And is she there with you at Logan?

A. Yes.

Page 52

Q. Why doesn't Marvin put the money in her account?

MS. SUSLER: Objection, form and foundation.

MR. SWAMINATHAN: Same objection.

MS. ROSEN: You can answer.

A. Since we can only buy $100 of food. Because during the COVID virus, the food that they have given us is not very appetizing.

Q. So this way, she can have extra food?

A. Yes.

Q. Do you know somebody named Marcos Alvarez?

A. Yes. He's one of my friend Maria's sons.

Q. And he sends you money every once in a while too, right?

A. Yes.

Q. And do you know somebody named Ludwika Solis?

THE INTERPRETER: The translator didn't hear anything yet.

A. No, I don't remember her. Perhaps she puts money in for me also.

Q. But the person -- that name is not familiar to you?

A. No.

Page 53

THE INTERPRETER: The translator couldn't make out the whole. She said something more. I think she said I don't know who it is.

Q. Do you know somebody named Joyce Kammeyer?

A. No.

Q. How about somebody by the name of Aurora Ortiz?

A. Yes, she's my friend.

Q. And she sends you money every once in a while too, right?

A. Yes.

Q. How about Miranda Marcellino?

A. Miranda Marcellino.

Q. Doesn't sound familiar?

A. No.

Q. How about somebody named Suhad Jacob?

A. Oh yes. Yes.

Q. Who is that?

A. Someone I know.

Q. How do you know Mr. Jacob or Ms. Jacob?

A. Through the person that I said to you.

Q. The person that you're buying things for in the prison?

A. Yes.

Urlaub Bowen & Associates, Inc.   312-781-9586

REYES 012053

ADRIANA MEJIA, 02/04/2021                                        Page 54..57

Page 54

MS. ROSEN: Okay. It's just about 11:30; so Ms. Singer needs to take a break.

MS. SINGER: Thanks.

THE VIDEOGRAPHER: We are going off the video record at 11:29 at the end of media unit 1.

(Recess in proceedings from 11:29 to 11:56.)

THE VIDEOGRAPHER: We're back on the video record at 11:56 at the beginning of media unit 2.

MS. ROSEN: Thank you. Everybody ready?

(No response.)

MS. ROSEN: Ms. Mejia, are you ready?

THE WITNESS: Yes.

Q. I'm going to pick up where we left off at the break and ask you a couple more questions about names.

A. Yes.

Q. Do you know somebody by the name of Roshaundra Roper?

A. No.

Q. How about Damian Rey Velesquez?

A. Perhaps I know him. Maybe I don't know him, but he just sends me money. The truth is I don't know him.

Page 55

Q. Okay. And then somebody named Mayan Castro, M-a-y-a-n?

A. No.

Q. How about somebody named Tanya White?

A. She's the mother of a prisoner here who also sends me money.

Q. So that you can buy things for her daughter?

A. No. The truth is she gifted me $100. She gave me $100.

Q. For you?

A. For me.

THE INTERPRETER: The translator wants to say there's still a couple of her words are not coming through. I'll see her mouth move, and there will be no sound. But what I'm giving you is what I'm hearing.

MS. ROSEN: Okay. Thank you.

Q. How about somebody named Larry Burns?

A. He buys for his daughter also.

Q. So he gives money to you so that you can buy for his daughter?

A. Yes.

Q. All right. Now I want to ask you a couple more questions about Mr. Reyes's participation in the

Page 56

murder and the kidnapping. You told us --

MR. SWAMINATHAN: Objection to form.

Q. You told us earlier that he helped move Mr. Soto's body; is that right?

A. Yes.

Q. Do you remember him doing anything else while he was in the Soto house?

A. I don't remember.

Q. When you and Gabriel and Mr. Reyes went into the Soto house, do you remember who went in first?

A. Yes, Gabriel Solache.

Q. Then who went in next?

A. I think it was me. And after me, I think it was Arturo.

Q. Do you recall ever seeing Arturo with a knife in his hand?

A. No.

Q. Do you remember telling anybody while you were at the police station that Arturo had a knife in his hand?

A. No, because when they took my declaration, I didn't know what they were writing.

Q. "When they took your declaration," you mean your statement at the police station?

Page 57

THE INTERPRETER: Translator wants to say yes. That's the interpretation for -- the better interpretation for declaration.

Q. What statement are you talking about, Ms. Mejia?

A. The first statement that Detective Guevara took.

Q. Are you talking about the statement that you signed?

A. Well, I signed, but I signed blank pages that I didn't know what it was that I was signing.

Q. You signed blank pages. There was no writing on the pages? Is that what you're saying on the pages that you signed?

A. Yes.

Q. Who was present when you signed that statement with the blank pages?

A. Detective Guevara was there and more police.

Q. Was the State's Attorney there?

A. No. He arrived later.

Q. Do you remember doing a statement with the State's Attorney where he read the statement to you?

A. Well, he didn't read a lot of things to me, but I do remember he was asking me questions.

Urlaub Bowen & Associates, Inc.   312-781-9586

REYES 012054

ADRIANA MEJIA, 02/04/2021 — Page 58..61

Page 58

Q. And do you remember that he was writing things down when he talked to you?

MR. SWAMINATHAN: Sorry. Can you finish the question? Sorry.

THE INTERPRETER: Translator finished the question.

MR. SWAMINATHAN: Objection to form. Go ahead.

MS. ROSEN: You can answer.

A. Yes. He wrote a lot of things.

Q. And then after he wrote it, he read what he wrote to you and had you sign it, right?

MR. SWAMINATHAN: Objection to form and foundation.

MS. ROSEN: You can answer.

A. Well, since they were -- he was speaking in English, I didn't know what they were saying. I didn't know what they were saying. I still didn't speak a lot of English; so I didn't know.

Q. But the State's Attorney was speaking to you in Spanish, remember?

MR. SWAMINATHAN: Objection to form and foundation. Go ahead.

A. Yes, at times. But when he communicated

Page 59

with the detectives, they would speak in English, and I didn't understand.

Q. When he was communicating with you, he was speaking with you in Spanish, right?

A. Well, his language was Puerto Rican, and mine is Mexican. There's a lot of difference.

Q. The State's Attorney was Puerto Rican?

A. I think so.

Q. How do you know that?

A. Detective Guevara said he was going to get me an attorney; but when he spoke to me, his language was a lot different than mine.

Q. Whose language? Detective Guevara?

A. Yes.

Q. Okay. I'm not talking about Detective Guevara. I'm talking about the State's Attorney.

MR. SWAMINATHAN: Objection, form.

Q. Okay? Do you understand? I'm talking to you right now about the State's Attorney. So my questions are about the State's Attorney, okay?

MR. SWAMINATHAN: Objection to form and foundation.

MS. ROSEN: You can answer.

A. Yes.

Page 60

Q. So when the State's Attorney was speaking with you, he was speaking with you in Spanish, right?

A. Yes.

Q. And when he was speaking with you, he asked you what happened in the Soto house, right?

A. Yes.

Q. And you told him what happened in the Soto house, right?

MR. SWAMINATHAN: Objection to form.

MS. ROSEN: You can answer.

A. Yes.

Q. All right. And then after he finished talking to you, he had prepared a statement, right?

MR. SWAMINATHAN: Objection to form.

MS. ROSEN: You can answer.

A. Yes.

Q. And in fact, you later testified about that statement in court, right?

MR. SWAMINATHAN: Objection to form.

MS. ROSEN: You can answer.

Can you repeat your answer?

THE INTERPRETER: Translator wants to say I didn't hear any answer.

MS. ROSEN: One more time, Ms. Mejia.

Page 61

A. Yes.

Q. Thank you. Okay. I want to switch gears for a second and ask you about somebody named Marilyn Mulero. Do you know Marilyn Mulero?

A. She got out free.

Q. When did she get out?

A. Last year.

Q. Did you write a letter for her to help her to get out?

A. No.

Q. I'm going to ask that we screen share Exhibit No. 45, please. Ms. Mejia, we're going to put a document up on the screen, and I'm going to ask you to take a look at it.

EXHIBITS TECHNICIAN: Just a moment.

Q. Ms. Mejia, do you see this letter that we have up on the screen?

A. Yes.

Q. Do you recognize the handwriting?

A. Yes.

Q. And can you tell us what the date of the letter is?

A. August 2 of '15.

Q. Okay. Do you recall writing this letter?

Urlaub Bowen & Associates, Inc. 312-781-9586

REYES 012055

ADRIANA MEJIA, 02/04/2021                                    Page 62..65

Page 62

A. Yes. It's been years. I didn't remember.

Q. This is a letter that you wrote for Marilyn, right? To help her get out?

A. I think so. The truth is I don't remember.

Q. In the letter, you say -- if you look three lines down, it says, "Gran amiga." You see that there?

A. Uh-huh.

Q. You have to say yes or no.

A. Yes.

Q. And what does that mean? Does that mean a very good friend or a great friend?

A. Yes. She was my friend. She was the first Hispanic that I knew when I went into jail.

Q. And did you meet her in 1998, when you first went into prison?

A. Yes.

Q. Did you meet her at Cook County Jail?

A. Yes.

Q. And do you know what she was in Cook County for when you first met her?

A. No. I just knew that she was fighting her case.

Q. And she also eventually was convicted,

Page 63

right?

A. Yes.

Q. And when was the next time you saw Marilyn after you both left Cook County Jail?

A. When they sent me to --

THE INTERPRETER: Translator couldn't make out the last word.

MS. ROSEN: Dwight, she said.

THE INTERPRETER: Dwight, okay.

Q. So you and Marilyn were at Dwight together; is that correct?

A. Yes.

Q. And you knew that she was in prison for murder, right?

A. Yes.

Q. And you also knew that one of the detectives that worked on her case was Detective Guevara, right?

A. Yes.

Q. When did you first learn that Detective Guevara also investigated the case involving Marilyn?

A. The truth is I don't know, but it came up on one occasion in a chat.

Q. What did she have to say about Detective Guevara?

Page 64

A. That we both had the same detective, the detective who arrested her and also arrested me.

Q. Did she say anything about how Detective Guevara treated her?

A. I think so, but I don't remember the details well.

Q. Do you know how it is that Marilyn got out of prison last year?

A. Very little since we both live in different -- we don't speak much. The only thing I know is she won the clemency.

Q. Do you know who her lawyers are that got her her clemency?

A. No.

Q. Are you also hoping to get some kind of clemency?

A. I'm working on it; but with the corona virus, everything is stopped. I can't go to the library.

Q. Do you have any lawyers working on your case to help you get out?

A. No. At this point in time, no. No, I just requested from the Mexican Consulate that they could send me a clemency form.

Page 65

Q. Other than Ms. Singer, who represents you in connection with the depositions that you've been giving in this case, have you had any other lawyers working for you in the last five years?

MS. SUSLER: Objection, form.

A. No.

Q. Before we came and took your deposition in 2019, did any lawyers representing Mr. Solache come to visit you?

A. A lot of people have come, but I don't remember what positions they have. When I first got into Logan, two people come, but I don't know who they are -- who they were.

Q. When did you first come to Logan?

A. I don't remember the date.

Q. And the two people that came, were they males or females?

A. A man and a woman.

Q. Since you've been at Logan, did any of Mr. Reyes' lawyers come to visit you?

A. Yes.

Q. When did lawyers that represent Mr. Reyes come to visit you?

A. Before the first meeting that we had, like

Urlaub Bowen & Associates, Inc.  312-781-9586

REYES 012056

ADRIANA MEJIA, 02/04/2021                                            Page 66..69

Page 66

six or five months before we had spoken.

Q. When you say "before we had spoken," you mean the last time we did the deposition?

A. Yes.

Q. And do you remember the name of the attorney that represents Mr. Reyes that came to visit you?

A. I don't remember, but it was two women.

Q. Did you see one of those women at the deposition the last time we were there?

A. Yeah. The first time the two of them came together when I refused to speak.

Q. You didn't talk to them when they came to visit you?

A. They just said hello to me.

Q. How long were they there?

A. A short time because I told them I wasn't going to speak if I didn't have an attorney to defend me.

Q. And this conversation that you had with them, that was before we all came down with the court reporter and everything, right?

A. Yes.

Q. And what did they say to you when they came to speak with you?

Page 67

A. The two female attorneys?

Q. Yes.

A. One was representing Arturo Reyes, and the other was representing Gabriel Solache.

Q. Did they tell you what they wanted to talk to you about?

A. Yes.

Q. What did they say?

A. They said they were defending them to be able to clean their name -- to clear their name.

Q. And were they trying to get you to help them clear their name?

MR. SWAMINATHAN: Objection, form.

MS. SUSLER: Objection, form?

A. Yes.

Q. Did they tell you how you could help them clear their name?

MS. SUSLER: Objection, form

MR. SWAMINATHAN: Same objection.

MS. ROSEN: You can answer.

A. That I should tell them everything that had happened. I told them everything that had happened, the truth.

THE INTERPRETER: The translator didn't get

Page 68

the last part.

MS. ROSEN: Can you repeat your answer, Ms. Mejia?

A. They came to ask me if, please, I could help them to clear the record.

Q. And what did you say to them?

A. And I told them the truth. As I was guilty, they also were guilty.

Q. And what did they say to you when you told them that?

A. That they were sure that their clients were innocent.

Q. And what did you say to them when they said that?

A. I said to them: So if they're innocent, then I'm the one who is going to take everything, be blamed for everything?

Q. And what did they say to that?

A. They said that they were sure that their clients were innocent.

Q. Did they explain to you why they were so sure their clients were innocent?

A. I don't remember, but they said that they had gotten out free.

Page 69

THE INTERPRETER: Translator didn't hear the last part.

MS. ROSEN: Ms. Mejia, could you repeat your answer?

A. Because they said, since they were already out free, they wanted to clean -- clear their record.

MS. ROSEN: Okay. Can we take Exhibit No. 45 down, please?

Jan, can you turn your camera on just so I can ask her if she recognizes you as one of the attorneys that came down?

Q. Ms. Mejia, do you see the attorney that just turned her camera on? She's wearing the brown glasses.

A. Yes, I recognize her. She was one of them that visited me.

MS. ROSEN: And Rachel Brady, can you turn your camera on, please?

Q. Do you see the other female attorney with the white sweater? Do you recognize her?

A. I think so. Does she speak Spanish?

MS. ROSEN: Okay. So can we have Valerie turn her camera on, please?

(No response.)

Urlaub Bowen & Associates, Inc.   312-781-9586

REYES 012057

ADRIANA MEJIA, 02/04/2021        Page 70..73

Page 70

MS. ROSEN: Is Valerie there to turn on her camera?

MR. SWAMINATHAN: Might not be. She must not be there.

MS. ROSEN: Okay. Well, at some point, we're going to ask Valerie to turn on her camera. So if somebody could let her know --

MR. SWAMINATHAN: She can't turn on her camera. She's trying. Yeah, she says it's not working.

MS. ROSEN: Her camera is not working?

MR. SWAMINATHAN: Yeah.

MS. ROSEN: Okay.

BY MS. ROSEN:

Q. Did the lawyers explain to you how you could help their clients clear their name?

A. Yes, that I should tell the truth and confess the truth.

Q. Did they explain to you what they believed the truth was?

MS. SUSLER: Objection, form.

A. Yes. They had been already free, and they wanted to clear their record.

Q. But did they explain to you what you could

Page 71

do?

MS. SUSLER: Objection, asked and answered.

MR. SWAMINATHAN: Objection.

MS. ROSEN: You can answer.

A. I don't remember exactly what they said, but what I do know is that I wasn't going to take all of the blame for this case. I'm guilty, but they also are.

MS. ROSEN: Okay. Why don't we take a short break here. Give us just ten minutes.

THE WITNESS: Can I ask a question, please?

MS. ROSEN: Sure.

THE VIDEOGRAPHER: Are we still on the record?

MS. ROSEN: Stay on the record.

THE INTERPRETER: The translator wants to say the client is asking a question, not me.

MS. ROSEN: I understand.

THE WITNESS: Why does the policeman have to be here with me?

MS. ROSEN: Is there a policeman in the room with you?

THE WITNESS: She comes in and out. Why does she have to be here if this is private?

Page 72

MS. ROSEN: I don't know the answer to that. I think it just must be the prison rules. Does she stay in there or no?

THE WITNESS: She's listening.

MS. ROSEN: It must just be the prison rules. I don't know because we're not there.

THE WITNESS: This is confidential. This is personal regarding my life. To be listening --

MR. SWAMINATHAN: Ms. Mejia, is it making you uncomfortable that that police officer is in the room?

THE WITNESS: Yeah, a little bit.

MR. SWAMINATHAN: Is it affecting your ability to listen to the questions and answer them?

THE WITNESS: I think this is private. This is my life.

MR. ENGQUIST: Let me clarify whether we're talking about a police officer or a prison guard.

THE WITNESS: It's a policeman from here, Logan.

MS. ROSEN: One of the guards at Logan?

THE WITNESS: Yes.

MR. SWAMINATHAN: Are there other questions other folks want to ask?

Page 73

MS. ROSEN: Ms. Mejia, is the fact that the guard is there preventing you from providing truthful testimony?

THE WITNESS: Yes. It's that I feel a little bit nervous that she's here with me.

MR. SWAMINATHAN: All right. Our position on the record is this is problematic. The witness has told us that she's uncomfortable and she's reluctant to answer questions. She has specifically been asked by me if it is impacting her ability to understand and answer questions, and she said yes. And she's been asked by Eileen if it is affecting her ability to answer questions, and she said yes and provided some qualifications around that.

I'm extremely uncomfortable with the implications of that. I think we need to find out if that court reporter -- if that correctional officer or guard can be kept out of the room. Or if that person needs to come, we need to take a pause each time that person comes in. We didn't have this issue when we were there in person; so it doesn't seem to me there's policy that this person needs to be coming in.

MS. ROSEN: I don't know what the prison policies are or what they aren't.

Urlaub Bowen & Associates, Inc. 312-781-9586

REYES 012058

ADRIANA MEJIA, 02/04/2021                                      Page 74..77

Page 74

We've been at this since 9:00 this morning, and this is the first time she's raised it. We can ask the prison if the person needs to be in the room with her.

She had an opportunity to discuss -- her lawyer is here. If she had this issue, she could have raised it. I don't have a problem with raising it with the prison. But, you know, we're almost four hours into this, and this is the first time we're even aware of the fact that there's a guard in the room.

MR. SWAMINATHAN: I'm not blaming anybody. I'm just saying we got to resolve the issue because obviously I'm not comfortable going forward when this witness has raised this concern about her ability to understand and answer questions now in response to two questions.

So let's start there. The easy solution is if we can get the guard out of the room.

MS. ROSEN: We were going to take a break anyway. We'll find out what's going on.

THE WITNESS: Can I speak with my attorney?

MS. ROSEN: Sure. We can go into a breakout room.

MR. SWAMINATHAN: Before we go off, what is

Page 75

your plan for lunch or a break for lunch and for the witness? I know she's mentioned that she's diabetic. What do we need to do on those fronts? Does she need a lunch break? What do we want to do?

MS. ROSEN: Ms. Mejia, did you eat when we broke for 20 minutes before, or do you need to break for lunch?

THE WITNESS: I need some cookies. Thanks.

MS. ROSEN: Do you want to break for a lunch?

THE WITNESS: They didn't really give me my lunch break, but one doesn't feel like eating the lunch that they gave. It's not edible.

MS. ROSEN: So how about if Ms. Mejia speaks with her attorney, and we'll take a break, let's say, until 1:00. And we'll communicate with the prison about the guard situation.

MS. ROSEN: Okay?

THE WITNESS: Okay.

THE VIDEOGRAPHER: We're off the video record at 12:43.

(Recess in proceedings
From 12:43 to 1:02 p.m.)

THE VIDEOGRAPHER: We're back on the video

Page 76

record at 1:02.

MS. ROSEN: Thanks. Ms. Mejia, you were there. We talked to the guard, and they're not going to come into the room anymore. They're just going to check on you through the window. Okay?

THE WITNESS: Thank you.

MS. ROSEN: If they happen to come into the room again, let us know. Okay?

THE WITNESS: Thank you.

MR. SWAMINATHAN: Eileen, I just missed the beginning of that. So they're not -- they said they're not going to come into the room?

MS. ROSEN: Correct. Right at the break, we needed to get her help with the breakout room to talk to Ms. Singer; so we had her knock on the door and ask the guard to come in. And so then we spoke with him. And he is going to instruct whoever happens to be standing outside the door that they are to simply monitor her through the window or whatever.

And now I've told her, if they happen to come into the room, to let us know so that we know and we can deal with it. Okay?

Ms. Mejia, the fact that the guard was coming in and out of the room this morning, did that

Page 77

impact any of the answers that you gave to my questions, meaning, would they have been different?

MR. SWAMINATHAN: Objection to form. Go ahead.

MS. SUSLER: Same objection.

THE WITNESS: No. It was the person coming in and coming out and seeing me.

MS. ROSEN: Okay. But your answers are what your answers are, and you are comfortable with all the answers that you gave us as being the truth, right?

MS. SUSLER: Objection, form.

MR. SWAMINATHAN: Same objection.

MS. ROSEN: You can answer.

THE WITNESS: Yes.

MS. ROSEN: Can I just ask. Somebody new is on the screen, and it's a name I don't recognize. I don't mean to be calling you out, but somebody named Elsa?

THE INTERPRETER: Translator wants to say I was just told that they are going to be switching me off. I didn't think I really need it, but just to make sure, because they suggested it, so that everybody would be happy. My mother-is-law is dying right now, and things just got a little -- that's

Urlaub Bowen & Associates, Inc.  312-781-9586

REYES 012059

ADRIANA MEJIA, 02/04/2021          Page 78..81

Page 78

probably what it is. I just got a message myself.

MS. ROSEN: Perfect. So I think we have a new translator, is what I'm seeing.

THE ATTORNEYS: Our condolences.

MS. ROSEN: Very sorry for your loss.

THE INTERPRETER: Thank you. Should I disconnect right now?

MS. ROSEN: Are you ready?

MS. MADRIGAL: I'm ready.

MS. ROSEN: Okay. Thank you so much.

MR. BONURA: It was a pleasure. Let me just get out of here. There we go.

MS. ROSEN: So now we have a new translator, Ms. Mejia, who is going to be translating for the rest of the afternoon, I believe. Okay?

THE WITNESS: (Nodding head up and down.)

MS. ROSEN: With that, I have concluded asking questions at this time. To the extent that there is remaining time for the Defendants of the seven hours allotted, I reserve that time after Plaintiffs have gone forward. But I think that Mr. Noland has some questions.

We'll get the time once all the Defendants have concluded so that we're sure how much time

Page 79

Defendants have eaten up. Okay?

MR. NOLAND: Before we proceed, can the new translator be sworn in?

(Interpreter sworn.)

MR. NOLAND: Ms. Mejia, my name is Daniel Noland, and I represent former Assistant State's Attorney David Navarro, okay?

THE WITNESS: Okay.

MR. NOLAND: I have a new follow-up questions for you.

THE WITNESS: (Nodding head up and down.)

EXAMINATION
BY MR. NOLAND:

Q. Do you recall that Mr. Navarro was the Assistant State's Attorney that you spoke with and gave the statement to at the police station, right?

A. Yes.

Q. You told Ms. Rosen earlier that you remember testifying in your court case?

A. Yes.

Q. And I think you also said that you told the truth to the best of your ability when you testified at your court proceeding?

A. Yes.

Page 80

Q. So Ms. Mejia, I'm just going to read for you -- I'm going to put it up on your screen -- your testimony. And I'm going to confirm that a few of the excerpts that you testified to were the truth. Okay?

A. Yes.

MR. NOLAND: Can we bring up Exhibit 46, please?

THE EXHIBITS TECHNICIAN: Yes.

MR. NOLAND: And if you could scroll down to the Bates stamp -- there's three Bates stamps, but the one on the far right, Solache 5602.

THE WITNESS: Yes.

MR. NOLAND: I'd like to show on the screen lines 11 through 24.

I think we're there. Thank you very much.

BY MR. NOLAND:

Q. Ms. Mejia, do you remember that one of the prosecutors who was asking you questions during your criminal case was a woman by the name of Mercedes Lugue-Rosales?

A. I honestly don't remember.

Q. I'm going to now read lines 11 through 24 of this page, which is your testimony, talking about the handwritten statement that you provided to

Page 81

Mr. Navarro. Okay?

A. Yes.

Q. At line 11, "Question: He wrote out this document. For the record, this will be March 31st H. He wrote out this document in front of you?

"Answer: Yes.

"Question: And when he was writing out this statement in front of you, you were in that big office, again with the desks?

"Answer: Yes.

"Question: And Detective Halvorsen, the American detective, was in there with him?

"Answer: Yes.

"Question: You saw him write out all of the pages of this statement?

"Answer: Yes, he wrote them."

All right. Ms. Mejia, was that truthful testimony that you gave?

A. I don't recall that, but I don't think so.

Q. Okay. Were you asked those questions, and did you give those answers at your Motion to Suppress hearing?

A. I don't recall if they were -- if I said it because I don't recall what it is that they were

Urlaub Bowen & Associates, Inc. 312-781-9586

REYES 012060

ADRIANA MEJIA, 02/04/2021        Page 82..85

Page 82

asking of me. I don't know.

Q. Let's go to the next page. I'm going to read lines 1 through 21, okay? This is on page Solache 5603.

"Question: After he wrote it out, you signed parts of the statement?

"Answer: Yes.

"Question: And I'm going to show you each of the pages. Look at the bottom of each of the pages and tell us whose signature that is.

"Answer: Mine.

"Question: Is that your signature on all of the pages?

"Answer: Yes.

"Question: Let the record reflect she's going page-by-page on the document.

"THE COURT: Very well.

"Answer: Yes.

"Question: In fact, on the first page, in the middle portion is also your signature, correct?

"Answer: Yes.

"Question: And that's right after a Spanish portion; is that correct?

"Answer: Yes."

Page 83

Ms. Mejia, were you asked those questions, and did you give those answers at your -- when you testified?

THE INTERPRETER: Does it go on past 24?

MR. NOLAND: No. I had just read to line 21.

THE INTERPRETER: Oh, I'm sorry. Okay.

Q. So Ms. Mejia, were you asked those questions and gave those answers at your testimony?

A. No. I signed a lot of blank papers. I don't recall seeing that.

Q. Earlier in the deposition today, you talked about signing blank papers with Detective Guevara, right?

A. Yes.

Q. I'm not asking you about that. Okay?

A. (Nodding head up and down.)

Q. I'm asking you about when you were with Assistant State's Attorney Navarro. Okay?

MR. SWAMINATHAN: Objection to form and foundation.

Q. And this testimony is about when you were with Assistant State's Attorney Navarro, okay?

MR. SWAMINATHAN: Objection to form and

Page 84

foundation. I'm going to make a standing objection. This is the second time she's been asked about Navarro as opposed to Guevara, and it's yet to be established that she knows who is who and what is what. So that's a standing objection I'll have for all questions about the State's attorney or Navarro because no foundation has been laid that she understands who that person is.

MS. SUSLER: I will join in those objections and the standing objection.

Q. And Ms. Mejia, do you understand that I'm asking you about your interaction with Assistant State's Attorney Navarro? Okay?

A. Yes.

Q. And that was a different interaction than your interaction with Guevara, correct?

A. Yes.

Q. When you testified at your criminal case, you told the truth, right?

A. Well, he said a lot of things that he wrote. How was I supposed to know? I did not know what he was writing.

Q. There was -- when you testified before Judge -- do you remember the Judge was Judge Stanley Sacks that you testified before?

Page 85

A. Well at the time, I didn't know what was going on. I didn't know anything about laws. How do you want me to answer if I didn't know anything about that? I didn't know about how to answer with education.

Q. Ms. Mejia, I'm not asking you about that. I'm just asking you whether or not you recall that the name of the judge that you testified before was Judge Sacks?

A. Yes. I recall the name of the judge now that it came to mind, but --

Q. When you were testifying, there was an interpreter for you?

A. Yes.

Q. And you were doing your best to answer the questions that were asked to you to the best of your ability, right?

A. Yes.

Q. And when you talked to David Navarro after he wrote out the statement, you signed each page of that statement, right?

A. Yes. Yes, I did sign. I signed many papers. You don't think I signed a lot of blank papers? I did. I didn't know what I was signing.

REYES 012061

ADRIANA MEJIA, 02/04/2021          Page 86..89

Page 86

How am I going to defend myself? There were a lot of police around.

Q. Ms. Mejia, you also signed the statement that Mr. Navarro hand-wrote out in front of you with the words on it, correct?

MR. SWAMINATHAN: Objection to form.

A. Yes. Because when Detective Guevara was asking me: "Ms. Mejia, sign here so that you can get a phone call. Sign here so that you can get a sandwich." And it was all lies. He was writing whatever he wanted to write.

Q. Ms. Mejia, I'm not asking you anything about Detective Guevara, okay?

A. Okay. That's fine.

Q. You do recall Mr. Navarro, correct?

A. Yes, I think so.

Q. He was the Assistant State's Attorney, and he explained to you that he was a prosecutor and not your lawyer, correct?

MR. SWAMINATHAN: Objection, form and foundation. Go ahead.

A. I don't recall that.

Q. Okay. I think you've already testified today that your interaction with Mr. Navarro was after

Page 87

your interaction with Guevara, right?

MR. SWAMINATHAN: Objection to form and foundation.

A. I don't recall.

Q. Can you go to page 5606? And I'm going to read lines 6 through 14.

"Question: Now, after this statement was written out, he then read it to you in Spanish?

"Answer: Yes.

"Question: And you went through the whole statement with him page by page?

"Answer: Yes.

"Question: And you understood his Spanish when he's going over the statement with you?

"Answer: Yes.

Ms. Mejia, those questions were asked, and those were the answers that you gave at your testimony, right?

A. I don't recall.

Q. And Ms. Mejia, do you recall that Mr. Navarro, after he wrote the statement, that he read the statement to you in Spanish?

A. I don't recall.

Q. So when you say you don't recall, you don't

Page 88

recall one way or the other?

A. Honestly, it's been so many years. I don't recall.

Q. But when you testified before the judge, things were more fresh in your mind, right?

A. I believe so, yes.

Q. And you were doing your best to tell the judge the truth, right?

A. Yes. But sometimes the interpreter spoke very fast, and I couldn't understand it. And my English isn't very good; so how do you want me to understand?

Q. While you were testifying, you didn't tell the judge that you were having any problem with the interpreter, did you?

A. No, because it was hard being before a judge. My nerves -- I was very nervous, and it was very embarrassing because of what had happened.

Q. And you were doing the best you could?

A. No. My mind was confused. And when the judge was talking and explaining, I think it was just my mind that was confused. I was confused.

Q. Do you recall anything specific that you were confused about when you were testifying before

Page 89

the judge?

A. No. Because my attorney would try to explain to me, and sometimes I couldn't even understand through the interpreter. And I didn't know about laws or anything.

Q. So Ms. Mejia, is it your testimony today that you do not recall your interactions with Mr. Navarro at the police station back in 1998?

A. Can you repeat that question?

Q. Are you saying today that you don't remember your interaction with Mr. Navarro in 1998?

A. I don't recall many things. It's been many years, and honestly, no.

Q. Do you remember, Ms. Mejia, having any other interactions at the police station with any other Assistant State's Attorneys?

A. Well, a lot of people were entering, and it was hard for me to remember the names of who was asking me questions. And everything that was happening was very confusing to me.

Q. Do you have a memory today though of any interaction with any other specific Assistant State's Attorneys other than Mr. Navarro?

A. Yes. I spoke to another detective, but I

Urlaub Bowen & Associates, Inc.    312-781-9586

REYES 012062

ADRIANA MEJIA, 02/04/2021                                    Page 90..93

Page 90

don't recall his name.

Q.  And I'm not asking you about detectives. Okay?

A.  Okay.

Q.  I'm asking if you have any memory of talking to any other Assistant State's Attorneys other than Mr. Navarro.

A.  Perhaps, but I don't -- there were so many people that would come in and talk to me.  It's been so many years.  I honestly don't remember.

MR. NOLAND:  Okay.  I have nothing further at this time.  Just to the extent there's time left for the Defendants, I would reserve any additional time.

MS. ROSEN:  Could we get a precise time?

THE VIDEOGRAPHER:  On the record, we've been recording for about 3 hours and 12 minutes.

MS. ROSEN:  Great.  Thank you.

MR. SWAMINATHAN:  Are all Defendants done with their questioning?

MS. ROSEN:  Yeah.  We're going to reserve the remaining time.

MR. SWAMINATHAN:  Okay.  Let's take a quick break, and then we'll start our questioning.

Page 91

MS. ROSEN:  How much time?

MR. SWAMINATHAN:  Five or ten minutes.

THE VIDEOGRAPHER:  We're off the video record at 1:37 at the end of media unit 2.

(Recess in proceedings from 1:37 to 2:07 p.m.)

THE VIDEOGRAPHER:  We're back on the video record at 2:07 at the beginning of media unit 3.

MR. SWAMINATHAN:  All right.  Good afternoon, Ms. Mejia.  As I said at the beginning, I am Anand Swaminathan.  I'm the attorney for -- one of the attorneys for Arturo Deleon-Reyes.  We met at your previous deposition.  Do you remember that?

A.  (No response.)

MR. SWAMINATHAN:  Did you get an answer?

THE INTERPRETER:  No.

THE WITNESS:  Yes.

MR. SWAMINATHAN:  Ms. Mejia, if you need to take a break at any point, please let me know, and we will take a break.  You indicated that you have diabetes.  So if there's any point when you're feeling like you need to take a break to get a bite of something, will you let us know?

THE WITNESS:  Yes.  That's fine.

Page 92

MR. SWAMINATHAN:  And as long as we're going forward and you haven't requested a break, I'm going to assume you're comfortable and you're okay with going forward.  Is that fair?

THE WITNESS:  Yes.

MR. SWAMINATHAN:  If I ask you a question and you don't understand my question, please tell me and I will rephrase it, okay?

THE WITNESS:  That's fine.

MR. SWAMINATHAN:  If you answer my question, I'm going to assume you understood my question; is that also fair?

THE WITNESS:  Yes.

EXAMINATION

BY MR. SWAMINATHAN:

Q.  Are you taking any medications currently?

A.  No, just Tylenol.

Q.  Are you taking Tylenol for pain?

A.  For headaches.

Q.  Do you have a headache today?

A.  No.

Q.  You mentioned that you have diabetes; is that right?

A.  Yes.  My diabetes is a little normal.  I try

Page 93

to control it.  I exercise so I don't take medication for it.

Q.  Do you have any other medical conditions?

A.  Yes.  I have a condition.  I don't know what it's called.  I was born with a big kidney and a smaller kidney.  I don't know what you call it.

Q.  And you don't take any medication for that?

A.  No, not anymore.

Q.  Do you have any other medical conditions?

A.  No.

Q.  Do you take any medications for any mental health issues like depression?

A.  No.  I've never taken any medication for -- what do you call it -- for depression or to control any of that.

Q.  Have you ever been depressed?

A.  Yes.  When I lost my brother Carlos, I was very depressed.

Q.  I'm sorry to hear about your loss.

A.  Thank you.

Q.  Other than when Carlos -- that was relatively recently that he died; is that right?

A.  Yes.

Q.  Before that, was there any period of your

Urlaub Bowen & Associates, Inc.   312-781-9586

REYES 012063

ADRIANA MEJIA, 02/04/2021                                    Page 94..97

Page 94

life in which you suffered from depression?

A. No. I was just getting depressed at the beginning when my case was starting.

Q. What do you mean by when your case was starting?

A. When I couldn't solve the problem of when I was lying.

Q. When were you lying?

A. When I was saying that I was pregnant but I knew that I wasn't pregnant.

Q. So you were depressed during that period?

A. Yes, very depressed, very sad.

Q. Was this before your arrest or after your arrest?

A. Before.

Q. That period in which you were feeling depressed, did you take any medications?

A. No.

Q. Did you tell anyone about your feelings of depression?

A. No.

Q. Did you ever try to hurt yourself or commit suicide?

A. No.

Page 95

Q. All right. Let me ask you some questions about -- well, let me start with this. Strike that.

Ms. Mejia, you were asked some questions by Ms. Rosen, and I want to follow up on some of those issues. Okay?

A. Yes.

Q. And I want to make sure I understand clearly. Your testimony today is that Arturo Reyes did not kill the Sotos, correct?

A. He didn't kill anyone, but he was present.

Q. Okay. So to be clear, he did not kill Mariano and Hacinta Soto, correct?

A. No, but he was there.

Q. Did he have a knife?

MR. ENQUIST: Objection, asked and answered.

A. Honestly, I don't recall. It was dark.

Q. He did not stab anyone, correct?

MR. ENQUIST: Objection, asked and answered.

A. I don't recall.

Q. He did not participate in any plan to murder the Sotos, correct?

MS. ROSEN: Objection, foundation.

MR. ENQUIST: Join.

A. I didn't understand. What did you say?

Page 96

Q. He didn't participate in any planning to go murder the Sotos, correct?

MR. ENQUIST: Objection, foundation.

A. No. He didn't know until afterward.

Q. And you indicated -- strike that.

And you don't have any memory of Arturo Reyes ever stabbing anyone, correct?

A. I don't recall -- no, I don't think so.

Q. In terms of murdering the Sotos, you agree that Arturo Reyes is innocent of that?

MS. ROSEN: Objection, form, foundation

MR. ENGQUIST: Join.

MR. SWAMINATHAN: Go ahead.

A. Can you repeat the question?

Q. When it comes to the killing of the Sotos, Arturo Reyes is innocent of that, correct?

MS. ROSEN: Objection, form, foundation.

MR. ENGQUIST: Join

MS. McGRATH: Join.

MS. ROSEN: Go ahead.

A. I'm not going to answer.

Q. Why not?

A. Because you're confusing me.

Q. What is confusing about my question?

Page 97

A. When you ask me something and then the other attorneys say something, I don't understand what they're saying.

Q. They're making their objections for the record. It's just like before, when they were asking you questions and I was making objections. You just answer after -- you answer my question after they've had a chance to make objections.

A. Oh, okay.

Q. Before, when I was making objections, that's between the lawyers. Do you understand that?

A. Yes.

MS. McGRATH: Maybe to avoid any further confusion with this, I'll just join -- consider that any objection from Ms. Rosen I join, unless I say differently.

THE WITNESS: Can I have a minute for COVID test? Can you give me a couple of minutes?

THE CORRECTIONAL OFFICER: We're going to jump her up to the front of it. If you don't mind, I can get her right back in to you.

MS. ROSEN: That's fine. Thanks.

THE VIDEOGRAPHER: We're off the record at 2:19.

REYES 012064

ADRIANA MEJIA, 02/04/2021                Page 98..101

Page 98

(Recess in proceedings from 2:19 to 2:23 p.m.)

THE VIDEOGRAPHER: We're back on the video record at 2:23.

MR. SWAMINATHAN: Are you ready, Ms. Mejia?

THE WITNESS: Yes.

BY MR. SWAMINATHAN:

Q. Let me ask my question again. Focus on my question, okay? Thank you.

In your testimony today, when it comes to the killing of the Sotos, Mr. Reyes is innocent of that, correct?

MS. ROSEN: Objection: form, foundation.

MR. SWAMINATHAN: You can go ahead.

A. Yes. He's innocent of the deaths, but he was present.

Q. So he is innocent of the murders, correct?

MS. ROSEN: Objection: asked and answered, form.

A. That's correct.

MR. NOLAND: Just for the record, on behalf of -- my client is going to join in the other objections so I don't have to add objections. Thank you.

Page 99

Q. The testimony that you've given today -- strike that.

Your story today is you're also innocent of killing the Sotos, correct?

MS. ROSEN: Objection: form, foundation.

MR. SWAMINATHAN: Go ahead.

A. Yes. Of the deaths, yes. And like I said, I don't feel I'm not responsible, but I do feel uncomfortable. I do regret. I feel bad for the people that died. I have regrets. But what can I do? I can't return them to life.

Q. And if I understand correctly, what you're saying today is you did not stab either of the Sotos, right?

A. Yes.

Q. And what you're saying today is you did not hurt Mr. or Mrs. Soto, correct?

A. No.

Q. Is that correct, or that's not correct?

A. Correct.

Q. And based on your testimony today, you were there, and you observed what happened, right?

A. Yes.

Q. I think you said you wrapped up the baby and

Page 100

took the baby, right?

A. Yes.

Q. And that's all you did, correct?

A. Yes. To enter in the home and see what happened, oh -- it hurts.

MR. SWAMINATHAN: You need a minute, Ms. Mejia? Let's go off the record until she's ready.

THE VIDEOGRAPHER: We're off the record at 2:28.

(Pause in proceedings from 2:28 to 2:30 p.m.)

THE VIDEOGRAPHER: We're back on the video record at 2:30.

MR. SWAMINATHAN: Eileen, are you there? You ready?

MS. ROSEN: I am.

BY MR. SWAMINATHAN:

Q. Ms. Mejia, your testimony today is that you did not do anything else other than take the baby. Do I have that right?

A. Yes.

Q. You did not grab anything else from the home, correct?

A. No.

Page 101

Q. No, it's not correct, or yes, it is correct?

A. It's not correct. No, it is correct. I didn't take anything.

Q. Let me ask it again so it's clear. You did not take anything from the home; is that correct?

MS. ROSEN: Other than the baby.

A. No, just the baby.

Q. And you did not grab anything or touch anything else in the home other than the baby, correct?

A. I did touch the chairs and where the bed was. I believe some other things, but I don't know what they were. It was dark.

Q. Did you ever grab any knives?

A. Not that I recall.

Q. You didn't have any knife with you?

A. No.

Q. When you say you touched some chairs in the bedroom, was that when you were going to get the baby?

A. Yes.

Q. Is that the only other thing you touched other than the baby?

A. I don't recall. But the door? Honestly, no, I don't recall.

Urlaub Bowen & Associates, Inc.    312-781-9586

REYES 012065

ADRIANA MEJIA, 02/04/2021                                      Page 102..105

Page 102

Q. You don't recall touching anything other than the door and a chair when you were getting the baby, correct?

A. Yes. Honestly, I don't recall right now. It's been so many years. I don't remember a lot of things.

Q. So do I have that correct? You don't remember touching anything else other than the door and the chair when you were getting the baby?

A. Yes.

Q. And your testimony today is that you did not know that the Sotos were going to be killed that day, correct?

A. Yes.

Q. All right. Ms. Mejia, you had previously said that you were hoping to file something in court so you can be released from prison, right?

A. How?

Q. Well, you've indicated in the deposition today that you're hoping to get released, right?

A. Yes. I would like the opportunity the way they got it. I think I would have a right to defend myself.

Q. And you indicated that you were working on

Page 103

it, right? That you were working on trying to file something to help yourself get released, right?

A. Yes. I got a form from the Mexican Consulate for a pardon; but with COVID, everything is canceled. I haven't been able to do much.

Q. So you're hoping to eventually get released, right?

A. Yes. But I would like the opportunity to defend myself. I mean, I'm guilty of what happened, but I think I can also get an opportunity. If Arturo and Gabriel had one, why can't I?

Q. You indicated you are aware that Arturo Reyes and Gabriel Solache have had their conviction thrown out and have been released, right?

A. I just know that they were released, but I don't know anything else.

Q. And your testimony is that, if they have been released, you also deserve to be released, right?

A. I've said it. I'm guilty, but I'm not going to be guilty of the killings.

Q. Is it your understanding that, by giving this testimony today, that you can help yourself try to get released?

A. No. But I think, to help, that's on them.

Page 104

I really don't understand much.

Q. You understand that what you say at this deposition today is going to matter in terms of whether you get released or not, right?

MS. ROSEN: Objection, foundation.

MR. ENGQUIST: Join.

MR. SWAMINATHAN: Go ahead.

A. Perhaps it might help me in the future.

Q. And are you hoping that, in the future, by giving this testimony today, you might be able to have your sentence reduced?

A. It can be a possibility. Perhaps in the future, it could.

Q. And is it your hope that, by giving this testimony today, they might let you go earlier?

A. No. Perhaps it might take some time. Laws change.

Q. Is it your understanding that what you say in this deposition might make a difference in whether or not you're ultimately going to get released?

MS. ROSEN: Objection, foundation.

A. Perhaps. I don't know.

Q. That's something you've thought about, right? You've thought about trying to get released,

Page 105

right?

A. I haven't thought about being released, but I thought about having an opportunity.

Q. Do you understand that -- strike that.

You understand that, the more you say that you were involved in the killings, the harder it's going to be for you to get released; you understand that, right?

MS. ROSEN: Objection, form.

MR. ENGQUIST: And foundation.

A. Well for him, yes. But I respect laws, and I respect the work that they're doing. But I have a lot of faith in God. And why am I not going to get another opportunity?

Q. Do you consider this deposition one important step in trying to get another opportunity?

MS. ROSEN: Objection, form.

A. I'm not going to answer.

Q. You understand that if you -- the smaller your role was in the crime, the better chance you have to get released?

MS. ROSEN: Objection, form.

A. No.

Q. Do you understand that, the more you were

Urlaub Bowen & Associates, Inc.   312-781-9586

REYES 012066

ADRIANA MEJIA, 02/04/2021                                    Page 106..109

Page 106

involved in the crime, the harder it's going to be to get released?

MS. ROSEN: Objection, form.

A. Perhaps for the attorney, but perhaps other attorneys can help me.

Q. And if you had a smaller role, you agree you would have a better chance of getting an attorney to help you?

MS. ROSEN: Objection, form.

A. I'm not going to answer.

Q. Do you understand that, if you participated in a kidnapping but not a killing, that would give you a better chance of getting an attorney?

MS. ROSEN: Objection: Form and foundation.

A. Perhaps.

Q. You understand that, now that Mr. Reyes and Mr. Solache have been released, they cannot be convicted again for this crime? You understand that, right?

MS. ROSEN: Objection: form, foundation.

A. Yes, I do understand that, but you pay everything you do in this life.

Q. And do you understand that, if you blame others for participating in the crime, those

Page 107

individuals could be arrested and convicted?

A. Can you repeat that question?

Q. You understand that, if you blame somebody else for this crime other than Arturo Reyes and Gabriel Solache now, those individuals could be arrested and convicted of this crime?

A. Yes. But there weren't any other people involved in this crime. It's just Arturo Deleon-Reyes and Gabriel Solache and myself.

Q. You understand that, if you blamed anybody else for the crime now, that it's unlikely they would believe you?

MR. ENGQUIST: Objection to form and foundation as to who "they" are.

A. That they'd believe me?

Q. Well, you understand that, if you want to get released, you're going to have to get a judge and prosecutors to agree to release you, right?

MR. BRENER: Objection to foundation.

A. I understand.

Q. And you understand that, if you told a judge and prosecutor now that it was somebody other than Reyes and Solache, they would be unlikely to believe you, right?

Page 108

MS. ROSEN: Objection: form, foundation, calls for speculation as to what unnamed judges and prosecutors would think.

MR. SWAMINATHAN: Go ahead.

A. I don't know.

Q. And it would be harder to get released, right?

MS. ROSEN: Objection: form, foundation, calls for speculation.

A. Maybe that's what you think, but I don't know. I can't answer.

Q. Well, what do you think? Do you think it would help you if you blamed anybody else?

MS. ROSEN: Objection, form.

MR. SWAMINATHAN: Go ahead.

A. Why am I going to blame anyone else if the people already there -- if it's Arturo Reyes and Gabriel Solache, why am I going to involve someone else?

Q. You've given testimony in the past about what happened, right? You talked to police officers and others about what happened, right?

MS. ROSEN: Objection -- sorry, go ahead.

(Question translated.)

Page 109

MS. ROSEN: Objection, form.

A. Yes, but I'm not going to answer.

Q. Why are you not going to answer?

A. Because if I fight my case, I don't want to be more affected than I already am.

Q. What do you mean by that?

A. I'm going to reserve a lot of words so that when I have the opportunity to defend myself.

Q. So there's things you're not going to tell us in this deposition today. Do I have that right?

MS. ROSEN: Objection, form.

A. Yes. I'm telling the truth. I want my truth to come to light. Why am I going to hide it? But you're representing Arturo Solache -- or was it Arturo Reyes. Why can't I have the opportunity as well to give my side with your client?

Q. So am I understanding you correctly? You are going to reserve some information that you're not going to answer here because you want to defend your ability to fight for yourself; is that right?

MS. ROSEN: Objection: form, foundation, harassing, and that's not what she said.

A. Can I answer?

Q. Yes.

Urlaub Bowen & Associates, Inc.   312-781-9586

REYES 012067

ADRIANA MEJIA, 02/04/2021                                          Page 110..113

Page 110

A.  I'm under oath.  Why would I be lying?  I've spent more than half my life here in prison.  Why would I be lying?

Q.  I'm just asking you:  You've previously told different versions of the story when you were asked by police, correct?

A.  I don't recall.  It's been so many years.

Q.  When I asked you that question, you indicated that you're not going to answer that question, right?

A.  Yes.  But you're attacking me.  I understand that you have to defend your client, but why are you -- I mean, I tell you that he was also participating.  He was also in the house.

Q.  Ms. Mejia, I'm not trying to attack you.  I'm just trying to ask you questions to understand what you know and what you don't know.  Okay?

And you used the phrase that you were going to "reserve your words."  I just want to understand what that means.  Okay?

A.  Because you are saying that I am fighting the fact that there's other people involved, and I've already said no.  Why are you asking me that?

Q.  No.  I'm not saying that other people were

Page 111

involved, and I'm not putting words in your mouth.  I'm asking you questions.  And you simply answer my questions to the best of your ability.  Okay?

MS. ROSEN:  Object to the form.  Object to the harassing.

A.  That's fine.

Q.  Let me ask you the question that I started with again.  Have you told -- strike that.

In terms of what happened at the Soto house, have you told anything that's different than what you've told us here today about what happened?

A.  Like I said before, it's been many years.  It's not fresh in my head.  I'm not going to remember a lot of details.

Q.  I'm not asking you about remembering details.  I'm just asking you if you've told the same story you've told us here today in the past.

MS. ROSEN:  Objection, form.

A.  Honestly, I think so.

Q.  Have you ever lied in the past about what happened?

A.  Why am I going to lie if I'm already in jail?  What else could I lose?

Q.  So you've indicated -- strike that.

Page 112

So let me make sure I understand.  Are you indicating that, in the past, you've never lied about what happened?

MR. BRENER:  Objection, misstates -- I'm sorry.  Go ahead.

(Question translated.)

MR. BRENER:  Objection, misstates prior testimony.

A.  I'm telling you the truth.  Why don't you believe me?

Q.  And have you always told the truth about what happened?

A.  I've already told you.  Gabriel Solache helped me.  Arturo arrived later.  Why don't you believe me?  I understand you're defending your client.

Q.  I'm just asking:  Have you ever told it different than what you've just described?

MS. ROSEN:  Objection, form.

A.  To their attorneys.  But I don't recall.  I said the truth.

Q.  You said the truth -- well, strike that.

When you spoke with the police at the police station, did you tell them the same version of events

Page 113

as you told us here today?

MS. ROSEN:  Objection:  form, foundation.

A.  I'm going to tell you again.  I'm going to repeat it like I said the first time.  I didn't understand any English.  I didn't understand what they were writing on those papers.

Q.  I'm not asking you what they wrote on the papers.  Okay?  What they wrote on the papers, that's a different subject.  I'm going to ask -- I have a lot of questions for them about what they wrote on the papers.  Okay?

A.  That's fine.

MS. ROSEN:  Objection, form.

Q.  And I have a lot of concerns about what the police wrote on the papers.  Okay?

MS. ROSEN:  Objection, form.  Objection to the --

MR. ENGQUIST:  I'm objecting to the narrative.

Q.  And that's why I'm asking you not what they wrote down, but what you told them.  Because that's what I want to understand, right?  That's the only part you can talk about.  Is that fair?

MS. ROSEN:  Objection:  form, harassing.

Urlaub Bowen & Associates, Inc.  312-781-9586

REYES 012068

ADRIANA MEJIA, 02/04/2021                                    Page 114..117

Page 114

Q. All right. So putting aside what they wrote down, just focusing on what you told them, that's the part I'm asking you. Okay?

A. (Nodding head up and down.)

Q. Did you describe what happened to the police officers the same way you've described today?

MS. ROSEN: Objection: form, foundation.

A. Yes. I explained to Detective Guevara what happened, how things happened.

Q. And did you explain it the same as you explained it today?

MS. ROSEN: Objection: form, foundation. You haven't established that she remembers what she said to the police.

MR. SWAMINATHAN: Did you get the answer?

A. Yes.

Q. All right. Let me ask you about Detective Guevara because you just mentioned him.

When you went to the police station, you were questioned there. Do you remember that?

A. Yes.

Q. Did any police officers physically abuse you?

A. Yes, when they beat me.

Page 115

Q. Who beat you?

A. Detective Guevara.

Q. Did anyone else beat you?

A. Not physically. But I was telling them that I need to make a phone call, that I was hungry, that I had to use the restroom; but they denied me.

Q. In terms of Detective Guevara beating you, can you describe how he beat you?

A. Yes. He slapped my back, and then he hit my face and even made my face bleed.

Q. How many times did he hit you?

A. Yes, he hit me in the face once, but he kept slapping my back. And he was calling me curse words that I didn't understand back then, but I understand now.

Q. Now that you understand them, what were they?

A. Well, they were very offensive words for someone like me who is Mexican. Why was he offending me?

Q. So was he insulting you?

A. Yes.

Q. What insults did he use?

A. He would say, "Fucking Mexican, you are

Page 116

going to help."

Q. What other insult did he say to you?

A. He told me I was a "wetback," and what was I doing in this country?

Q. What else?

A. That did I know what a problem I'd gotten myself into, if I knew what problem I had gotten myself into, and that I was going to rot in jail for the rest of my life.

Q. And what else?

A. He called me a "whore" in English.

Q. What else?

A. He would just insult me every -- often and just his same language with me.

Q. I want to go back to the physical abuse. In addition to hitting you, did he do anything else?

A. Well, whenever I'm escorted to the restroom, he said, "Bitch, use the restroom there." And I said, "I'm not an animal."

Q. So he denied you access to the bathroom?

A. Yes.

Q. Did you -- over the time that you were in the interrogation -- strike that.

Over the time that you were at the police

Page 117

station, were you ever allowed to use the bathroom?

A. Yes, about twice, but I had to hold it. I almost had to beg them to let me use the restroom.

Q. How long was it before they first let you first use the bathroom?

A. For many hours. Because I even had a stomachache, and I was asking for water. They wouldn't give me water. They wouldn't let me go to the restroom. I believe, the whole time I was there, they gave me a sandwich, and that was it.

Q. Did he ever pull your hair?

A. Yes.

Q. How many times did he do that?

A. When I wouldn't sign the papers, he would insult me. My hair was short; and yes, he did pull it.

Q. At some point, he got you to sign some papers, right?

A. Yes, when he would come in alone.

Q. And the papers he got you to sign, are those the blank papers you referenced earlier?

A. Yes.

Q. Did he ever have you sign any papers that were not blank?

Urlaub Bowen & Associates, Inc.   312-781-9586

REYES 012069

ADRIANA MEJIA, 02/04/2021          Page 118..121

Page 118

MR. NOLAND: Objection, foundation.

A. He had me sign many papers. There were many sheets. And he would say, "This one's to make a phone call. This one's for a sandwich. This one's to go to the bathroom." I didn't even know why I was signing so many papers, but I signed a lot of papers.

Q. When you say Guevara hit you and pulled your hair, did he do that before you signed the papers?

A. No. He was forcing me to sign the papers. Yes, when I would remain quiet, wouldn't pay attention, he'd say, "Okay, bitch. Sign here. Sign here for a sandwich. Sign here to go to the restroom." And "fucking Mexican wetback." Like he would just -- how was I not going to be frightened. I didn't know what he was telling me.

Q. You said something about being silent. Are you indicating that he was -- well, strike that.

Was he hitting you when you were being silent? Is that what you're saying?

A. Yes. He didn't really speak to me much. When he would come into the room where I was handcuffed -- he would come in, and that's when he would insult me. He would come in quite often.

Q. Was he the first person to come into the

Page 119

room?

A. Yes.

Q. And was he the person who came in most often?

A. Yes, him and a white man, but I don't recall his name.

Q. And when he hit you, was he alone, or was he also with someone else?

A. No. He was always by himself.

Q. And when he was insulting you, would he do that when he was alone too?

A. Yes.

Q. And when he was doing those things, what was he trying to get you to do?

A. He would say, "If you sign this, then you're going to be released" or "If you sign this, they're going to give you an attorney" or "Look, sign this, and you'll get a phone call." How was I not going to get confused?

Q. Was he trying to get you to talk and tell a story about what happened?

MS. ROSEN: Objection, form.

MR. ENGQUIST: Foundation.

A. When I wasn't saying anything, he said,

Page 120

"Okay, we're going to go outside with that" -- what do you call it? -- to see if you're lying with a little machine.

Q. The lie detector?

A. Yes, I believe so, because he took me to some other place. I don't recall which place.

Q. And when he took you, did he take you by himself?

A. Yes.

Q. Had he hit you and insulted you before he took you to the lie detector test?

A. Yes. Because when we went, he said that I had to be quiet because there was another police officer waiting for us.

Q. In other words, he told you -- strike that.

Did he tell you that you better not say anything about him hitting you when you went to see the other police?

A. Yes. He said that they were going to put, like, a little machine here and then, like, a little bit of things connected here and that I had to say nothing but the truth.

Q. And did he tell you that you better not say anything about him having hit you?

Page 121

A. Yes. He said that, if I spoke against him, that that was going to cause a lot of problems for me.

Q. What else did he say about that?

A. No. When we were at the station, he took me; and all I do remember is that he was driving very fast and I was a little bit frightened. And I was handcuffed.

Q. When you came back from the lie detector test, did he also hit you and insult you after that?

A. Yes. The whole time, since we got into the car, he was saying a lot of bad things to me.

Q. Did he threaten you?

A. Yes.

Q. What kind of threats did he make?

A. Yes. He said that he was a very powerful detective and that I was an undocumented Mexican and that I shouldn't even be in this country. Who was going to defend me?

Q. What other threats did he make?

A. He said that if I knew what had happened to my parents or to my brother Carlos or -- I can't remember with whom in my family that he threatened me.

Q. So he threatened you that something bad could happen to your family if you didn't cooperate?

Urlaub Bowen & Associates, Inc.   312-781-9586

REYES 012070

ADRIANA MEJIA, 02/04/2021                                  Page 122..125

Page 122

A. With my parents or with my brother who lived here.

Q. So if I understand correctly, he made threats about your family members, but you don't remember which ones; is that right?

A. I don't recall if it was with my -- against my parents or with my brother, the one that lived here that passed away. But yes, he did.

Q. Did he threaten that, if you didn't do what he wanted, something bad could happen to your parents or your brother?

THE INTERPRETER: I'm sorry, Counsel. Can you repeat that?

Q. Did he threaten that, if you didn't do what he wanted, something bad could happen to your brother or to your parents, one of the two?

A. Yes.

Q. What other threats did he make?

A. He just said that if I didn't know what problem I got myself into, that I would never see light of day, and that I was going to rot in jail for being a bitch.

Q. Did he also threaten you with the death penalty? Strike that.

Page 123

Did he also threaten you that, if you did not do what he wanted, you could get the death penalty?

A. No. He told me I was already dead, that I already had a death sentence on me.

Q. Did he promise you help if you did what he wanted?

A. Yes. He told me that he would help me because he was very powerful at the station, that he had a lot of power, if I cooperated.

Q. Did he promise -- if you did what he wanted, what did he promise to do for you?

A. That I could be free, that he would help me, that he knew a lot of people, that he was very powerful, that he was a powerful detective and had a lot of contacts in Illinois. He did put the fear in me.

Q. Did he tell you what he wanted you to say in order for him to help you?

MR. ENGQUIST: Objection, foundation.

MR. SWAMINATHAN: Go ahead.

A. Yes. He always told me to say what he would tell me to say and that, if they would ask me if what was written on the papers was the truth, that I would

Page 124

say yes.

Q. So did he tell you things that he wanted you to say?

A. No, but he said that when other people would ask if what he'd written down was the truth and nothing but the truth.

Q. So did he write down things that he wanted you to say?

A. Yes.

Q. And did he write down things that he wanted you to say about how the crime had occurred?

A. Well, he wasn't telling me a lot of things, but I remember that he was writing down a lot of things.

Q. Was he telling you that the things he was writing down were things he wanted you to say?

A. Yes. But he would say, "Tell them, when they ask you this, that yes, you were involved of the deaths." But I didn't understand. I was very ignorant at the time. I didn't know anything about laws.

Q. And the things that he was writing down, did he give you the paper that he wrote that on to try to memorize what he had written down?

Page 125

A. Yes. He would tell me -- he would say some of the things, but he said, "If people ask you if I treated you well, say yes. If you were involved in the crime, say yes. If I was good to you, tell them, yes, that I let you have contact with your family."

Q. And the things that he wrote down on the paper that he wanted you to say, did he leave that paper with you sometimes in the room?

A. No. He would never leave anything.

Q. Were some of the things that he wrote down on the paper that he wanted you to say false?

MR. ENGQUIST: Objection, foundation.

MR. SWAMINATHAN: Go ahead.

A. Yes. There was a lot of things that he lied with his threats. I was very afraid of him.

Q. And the things that he was -- so was he also lying about the things that he wanted you to say?

MS. ROSEN: Objection: foundation, form.

MR. SWAMINATHAN: Go ahead.

A. Yes. How am I not going to be afraid? Even up until now, today, I've never really seen my file about my case, about -- what do you call it -- my first statement. So how am I not going to be fearful?

Q. Understood. I want to go back to -- we're

Urlaub Bowen & Associates, Inc.   312-781-9586

REYES 012071

Page 126

going to come to the statement later that the other lawyers were asking you about. I'm talking about just in the period that you think Guevara was coming into the room and talking to you, okay?

A. Okay.

Q. In that period, he was writing down things that he wanted you to say, right?

A. Yes.

Q. And some of the things he was writing down that he wanted you to say were false, right?

MS. ROSEN: Objection: form, foundation.

A. Yes.

Q. And he was using threats and abuse to get you to say those false things; is that right?

A. Yes.

Q. And he was using his abuse and his threats to get you to lie, right?

A. Yes.

Q. Would you say that he was asking you what happened or that he was telling you what he wanted you to say happened?

MS. ROSEN: Objection: form, foundation.

A. I'm sorry, can you repeat that question?

Q. Would you say that he was telling you what

Page 127

he wanted you to say happened?

MS. ROSEN: Objection: form, foundation.

A. Yes. Many of the things he had written down were things that he wanted me to tell others, and he had already told me about them, that I was supposed to say that I was guilty.

Q. Would you say that, when he came to talk to you, he had already decided what the story was?

MS. ROSEN: Objection: form, foundation.

A. From the time he got to the house where he arrested me, where I lived, he was already very upset. He was insulting me.

Yes. When he got there, he was telling me that I had to tell him the truth, and he was already, like, intimidating. He was putting fear in me. Of course I was going to be afraid because he was a big detective.

Q. Based on the things you've told us, would you say that he was asking you what happened or that he was telling you what happened?

MS. ROSEN: Objection: form, foundation.

A. When we got to the station, he said, "Mexican, if you tell the truth, you're going to be fine; but if you lie, you're going to go to hell."

Page 128

And with his words, with his curse words, he frightened me.

Q. Then when he wrote things down that he wanted you to repeat, were those things truths, or were those things lies?

MS. ROSEN: Objection: form, foundation.

MR. BRENER: Join.

A. There were a lot of things he wrote down to his convenience. There were things he didn't ask me about.

Q. Did he tell you that other people had implicated you in the crime?

A. No.

Q. You said you went to do a polygraph exam. What did he tell you about the polygraph exam after it was over?

A. No.

Q. How long total do you think you were at the police station being questioned in those rooms?

A. About three and half days.

Q. Were you able to sleep at all during that period?

A. No.

Q. Were you handcuffed during that period?

Page 129

A. Yes.

Q. I think I asked a poor question. Were you handcuffed that whole time?

A. The whole time.

Q. Was there a bed in Interrogation where you could sleep?

A. It was like there were chairs -- no, it wasn't chairs. It was like a cement bench.

Q. Were you handcuffed to the wall?

A. Yes.

Q. Was it -- strike that. The bench that you -- strike that. Were you able to sleep given those conditions of the handcuffs and the bench?

A. No. How was I going to sleep? I was cold. The air conditioner was on.

Q. Over that whole period, did they bring food into the room for you?

A. No. They gave me a sandwich when they were going to transfer me to Cook County.

Q. So that was after the interrogation was over; is that right?

A. At the very end.

Q. At the end of all the questioning from

REYES 012072

ADRIANA MEJIA, 02/04/2021          Page 130..133

Page 130

Detective Guevara, you were told to sign a confession, correct?

MS. ROSEN: Objection: form, foundation.

A. Yes.

Q. You were told to sign a statement confessing to the crime, correct?

MS. ROSEN: Objection: form, foundation.

MR. SWAMINATHAN: Go ahead.

A. Yes. That was when they -- I don't recall.

Q. Do you recall that, at the end of the process, they made you sit down and sign some papers confessing to the crime?

MS. ROSEN: Objection: form, foundation.

MR. BRENER: Join.

A. I honestly don't recall how it happened.

Q. Do you recall them ever -- did they ever take you to another room near the end of the questioning to meet with other people?

MS. ROSEN: Objection: form, foundation.

A. I believe I went to another small room where there were a lot of police officers.

Q. What happened in that room?

A. I believe there were about -- I remember there being about two or three other people.

Page 131

Q. And what happened in that room?

A. They were speaking English. I don't recall much.

Q. Was anybody asking you questions in that room?

A. I believe that Detective Guevara was the only one that spoke Spanish. The other ones didn't speak Spanish.

Q. Were the other ones white?

A. Yes. I really don't recall anymore. I believe they were white.

Q. Were they detectives?

A. Yes, I think so.

Q. Were you asked about what happened to the Sotos when you were in that room with those two white people and Guevara?

A. Very little. Detective Guevara is the one that spoke the most, and he was the one that was explaining to them.

Q. So when you were in that room with some other police officers -- strike that.

When you were in another room with some white detectives, it was mostly just Guevara talking to those detectives; is that right?

Page 132

A. Yes. What I do recall right now is, most of the time, Detective Guevara was, like, interpreting but saying: "Yes, tell them that you were there. Tell them that you did do that."

Q. Were you doing much talking, or was it mostly Guevara?

A. No. Detective Guevara is the one that spoke the most.

Q. Was he telling you what he wanted you to say?

A. Yes. He had already told me that I had to say what I had to say.

Q. So before you went to talk to those other detectives, when you were alone with Guevara, did he tell you -- he had already told you what you had to say when you met those other detectives; is that right?

A. Yes. He had already threatened me. He said, "You have to say yes to everything."

Q. And at the end of the process, you were given a handwritten statement from a prosecutor that you signed, right?

MR. NOLAND: Objection: form and foundation.

Page 133

A. Yes.

Q. Before you went to go sign that handwritten statement, did Detective Guevara tell you exactly what you had to say when you went in to sign that statement?

MR. NOLAND: Objection: form, foundation, asked and answered.

MR. SWAMINATHAN: Go ahead.

A. Yes. He told me, "You have to plead guilty." And what I recall is that word "rapis" (phonetic). Now I understand that it means that they were my accomplices. And he says, "Yes, you can't stay quiet so that you can be liberated."

Q. When you were going to go to that other room to sign the handwritten statement, did he tell you that you needed to repeat the things that he had written down for you?

MS. ROSEN: Objection: form, foundation.

MR. SWAMINATHAN: Go ahead.

A. He told me that, from what they'd written, that I had to say yes to everything.

Q. Before you went in at the end to sign that handwritten statement, did he also warn you that you better not say anything about the abuse that he used

Urlaub Bowen & Associates, Inc. 312-781-9586

REYES 012073

ADRIANA MEJIA, 02/04/2021        Page 134..137

Page 134

against you?

A. Yes. He'd already threatened me that, if I said anything, that he would take care of me, that he would do more damage.

Q. So when you went in -- strike that.

The statement that they had you sign, that statement was in English, correct?

MS. ROSEN: Objection: form, foundation.

A. Yes.

Q. And you did not understand English at that time, correct?

A. Yes, nothing.

Q. Did you sign the statement in English because Detective Guevara told you to?

MS. ROSEN: Objection: form, foundation.

A. Yes.

Q. And Ms. Mejia, you've had a chance to see that statement recently, right?

A. I believe so.

Q. And when you reviewed that statement, would you agree that it contains a lot of false information?

MS. ROSEN: Objection: form, foundation.

A. Yes.

Q. And why did you end up signing a statement

Page 135

that contained false information in it?

A. Because I didn't know what was going to happen with my life, and I was just -- I didn't know anything.

Q. Did you sign it even though it had false information because of the threats and abuse from Detective Guevara?

MR. ENGQUIST: Objection, leading.

A. Yes. I signed a lot of things because I didn't know what to do. I didn't know who to turn to. I didn't know who could help me. I did, I signed a lot of things that I didn't know what they said until just recently that I'm finding out.

Q. When you signed it, were you exhausted?

A. Yes. I was exhausted because I landed there at dawn on a Friday. I had been through a lot of threats and interrogations. I was tired.

Q. And were you in pain from Guevara hitting you and the abuse?

A. Yes. Because when he hit me, he hit me in my back; and he did bruise me, like around my shoulder. And, yes, I was tired. I had cried a lot, and I was tired and frustrated.

Q. When you signed it, were you afraid of what

Page 136

Guevara might do to you if you did not sign it? Let me ask it better.

Were you afraid of what Guevara might do to you if you did not sign it?

A. Yes.

Q. Were you afraid that, if you did not sign it, he might hurt your family?

A. Yes.

Q. Did you feel hopeless at that point?

A. Yes. I fell terrorized. I felt a lot of fear. I felt that, if something happened to my family, I would never forgive myself. Yes, I felt badly.

Q. At that point, did you feel like you had no choice but to sign it?

(Someone entering room with the witness.)

MR. SWAMINATHAN: Ms. Mejia, do you want to take a break to eat something?

THE WITNESS: Yes.

THE VIDEOGRAPHER: We're going off the video record at 3:45 at the end of media unit 3.

(Recess in proceedings from 3:45 to 4:06 p.m.)

Page 137

THE VIDEOGRAPHER: We're back on the video record at 4:06 at the beginning of media unit 4.

BY MR. SWAMINATHAN:

Q. Ms. Mejia, when I had just been questioning before, you indicated that Detective Guevara had made some threats against your family, correct?

A. Yes. That's correct.

Q. Did he threaten that, if you didn't do what he wanted, that he might lock them up on this case too?

MS. ROSEN: Objection: form, foundation. Did you say "on this case"?

MR. SWAMINATHAN: On this case too, yes.

A. No, not on this case, but threatened to, like, do something to them.

Q. Did he ever threaten -- strike that.

Did he threaten that, if you didn't do what he wanted, that he could -- that he might arrest them?

A. No, not arrest them, but perhaps to have something done to them in Mexico and to my brother here.

Q. Did he indicate to you that, if you didn't do what he wanted, that he might do something to Rosauro?

Urlaub Bowen & Associates, Inc.    312-781-9586

REYES 012074

ADRIANA MEJIA, 02/04/2021          Page 138..141

Page 138

A. Yes.

Q. And what threats did he make about Rosauro?

A. Perhaps about harming him because he had already met him at the police department.

Q. So Rosauro was somebody who Guevara specifically mentioned to you?

A. Como?

Q. I'll ask it again.

When Guevara was making threats, one of the people he specifically mentioned was Rosauro; is that right?

A. Mostly specifically to my parents, to my brother Carlos, and to the one who was my husband, yes.

Q. And anyone else?

A. No.

Q. With regard to Rosauro, did Guevara threaten that he could get convicted for this crime if you didn't cooperate with him?

A. Yes.

Q. Is the same also true for Carlos?

MR. NOLAND: Objection, asked and answered.

MR. SWAMINATHAN: Did you get the answer?

A. Yes.

Page 139

MR. SWAMINATHAN: I'm want to go back to where I had left off with my questions before. Sorry, go ahead. Is there something going on there?

THE WITNESS: No. They were asking me where I lived. Everything is fine.

Q. Going back to where I left off, you had indicated that, based on Guevara's interrogations of you, that you were feeling exhausted and in pain and that you were scared, right?

A. Yes.

Q. And you were feeling hopeless, right?

A. Yes.

Q. And did you feel like you had no choice but to sign the confessions containing false information?

MS. ROSEN: Objection: form, foundation.

A. I didn't feel like I had hope to do anything else.

Q. So at that point, did you -- strike that.

Did you feel like you had no choice?

MS. ROSEN: Objection: form, foundation.

A. No, I didn't. I felt finished.

Q. Did you feel like you had no choice but to point a finger at whoever Guevara told you to point a finger at?

Page 140

MS. ROSEN: Objection: form, foundation.

MR. NOLAND: Mischaracterizes prior testimony. Go ahead.

A. Yes.

Q. At that point, would you have repeated anything he wanted you to say or pointed a finger at whoever he wanted for it to be over, for the abuse to be over?

MS. ROSEN: Objection: form, foundation

MR. ENGQUIST: And also speculation.

A. Well, yes. That he would harm my parents, my brother, and the person who was my husband. I had already done enough damage to them for them to be hurt again.

MS. SUSLER: Excuse me, Ms. Interpreter. I think she also said and he'd already hurt me in her answer.

THE INTERPRETER: No. I'd already hurt them.

Q. At that point, would you have pointed a finger at anyone if it would be over?

THE INTERPRETER: I'm sorry. I couldn't hear you, Counsel.

Q. At that point, were you willing to point the

Page 141

finger at anyone so that this would be over?

MS. ROSEN: Objection: form, foundation, calls for speculation.

A. No.

Q. No, you wouldn't have pointed a finger at anyone or, yes, you would have?

MS. ROSEN: Objection: asked and answered. She clearly said no.

A. No.

Q. Who would you not have pointed a finger? Strike that.

Who would you not have pointed a finger at no matter how much abuse?

MS. ROSEN: Objection.

MR. ENGQUIST: Objection, form.

A. I wouldn't have blamed someone who hadn't done anything.

Q. No matter how much abuse, would you have ever pointed a finger at any of your family members?

MR. ENGQUIST: Objection: argumentative, form, asked and answered.

MR. BRENER: I'll add objection to speculation.

MR. SWAMINATHAN: Go ahead.

Urlaub Bowen & Associates, Inc. 312-781-9586

REYES 012075

ADRIANA MEJIA, 02/04/2021                                    Page 142..145

Page 142

A. No.

Q. At your last deposition in this case, you said that you blamed Guevara for being locked up currently. Is that still true, that you blame Guevara?

A. Yes.

Q. Why do you blame Guevara?

A. He didn't warn me about the laws. He didn't give me the opportunity to look for help. He didn't give me the opportunity to speak to anyone who would advise me.

Q. Do you blame Guevara because it was his abuse that caused you to sign a confession containing false information?

MS. ROSEN: Objection: form, foundation.

MR. SWAMINATHAN: Go ahead.

A. Yes.

Q. If Guevara had not abused you, would you have signed that statement containing false information?

MS. ROSEN: Objection: form, foundation, calls for speculation.

A. No, because I'm telling the truth. Before, I didn't know what Detective Guevara had put, but now

Page 143

I'm telling the truth.

Q. I'm just asking about the statement back in 1998, okay?

A. Yes. I understood you.

Q. If Guevara had not abused you, you would not have signed a confession containing false information; is that right?

MS. ROSEN: Objection: form, foundation.

MR. SWAMINATHAN: Go ahead.

A. Yes.

Q. If Guevara had not abused you, you would not have signed a statement implicating yourself in the crime; is that correct?

MS. ROSEN: Objection: form, foundation.

MR. SWAMINATHAN: Go ahead.

A. Yes.

Q. And so it was Guevara's abuse that caused you to sign a false confession implicating yourself; is that correct?

MS. ROSEN: Objection: form, foundation.

A. No.

Q. Why do you say no?

A. Because -- how do I say it? Because I was going to say things that weren't correct.

Page 144

Q. You were going to say things that were not correct because of Guevara's abuse, correct?

THE INTERPRETER: I'm sorry, Counsel. I couldn't hear you.

Q. You were going to say things that were not correct because of Guevara's abuse, correct?

MS. ROSEN: Objection: form, foundation.

MR. SWAMINATHAN: Go ahead.

A. Yes.

Q. So it was Guevara's abuse that caused you to sign a confession containing false information implicating yourself; is that correct?

MS. ROSEN: Objection: form, foundation.

MR. NOLAND: I'll join. Asked and answered and, also, I think at this point it's harassing. I move to strike the entire testimony because I think it's attempting to get a false record.

MR. SWAMINATHAN: Go ahead.

A. I'm not going to answer.

Q. Why not?

A. You're confusing me a lot.

Q. Did you not understand my question? Because if you don't understand my question, just tell me, and I'll ask it differently.

Page 145

A. Okay. Yes.

Q. You want me to rephrase the question?

A. Yes, please.

Q. The confession that you signed that implicated yourself in the crime, you signed that because of Guevara's abuse; is that right?

MS. ROSEN: Objection: form, foundation.

A. Perhaps, yes.

Q. And that same confession that you signed also blamed Arturo Reyes, correct?

MS. ROSEN: Objection, form.

MR. SWAMINATHAN: Go ahead.

A. I can't answer.

Q. That same confession that you signed containing false information also blamed Gabriel Solache, correct?

MS. ROSEN: Objection: form, foundation.

A. I'm not going to answer.

Q. Sorry. One second.

Okay. Earlier, I was asking you about your interaction with Detective Guevara, and I think you mentioned that he came to your house; is that right?

A. Yes.

Q. So at some point, Detective Guevara came to

REYES 012076

ADRIANA MEJIA, 02/04/2021

Page 146..149

Page 146

the house on Mozart Street when you were there?

A. Yes.

Q. The first time police came to the house on Mozart, was Detective Guevara with them?

A. Yes.

Q. That first time that police came to the house, what time of day was that approximately?

A. I don't recall if it was in the day or at night.

Q. Who else came with Detective Guevara?

A. A lot of police officers.

Q. Were they also detectives or others?

A. I believe it was detectives and more police officers.

Q. When you say police officers, are you referring to the ones wearing uniforms?

A. Yes.

Q. So if I understand correctly, when the police first came to the house, there were some who were detectives and some who were in uniforms; is that right?

A. Yes.

Q. What's the first thing that happened when they came to the house?

Page 147

A. When they came to the house, I believe the one who opened the door was my brother Carlos.

Q. And then what happened?

A. They came inside without saying anything.

Q. And then what happened?

A. They came to where I was, but I believe I was in the living room.

Q. And had they asked for consent to come in, or did they just come in on their own?

A. They came in as if nothing. They didn't have any papers or anything.

Q. Had Carlos agreed to let them in, or had you agreed to let them in?

A. No. Because my brother got a little frightened.

Q. And once they came in, were they looking for you?

A. Yes. They were looking for -- yes.

Q. And do you know why they were there? Strike that.

Did you know why they were there?

A. Well, yes, because Arturo and Gabriel and the one who was my husband were already at the police.

Q. Had you made any calls to the police

Page 148

station?

A. No.

Q. Had anyone else in the house made any calls to the police station?

MS. ROSEN: Objection, foundation.

A. Not that I recall.

Q. When the police came, who is the first person they spoke to? Was it you?

MS. ROSEN: Objection, foundation.

A. I don't recall if it was me.

Q. What did the police do at the house when they came in?

A. They went everywhere.

Q. Were they searching the whole house?

A. Yes.

Q. Did they go in all the rooms?

A. Yes.

Q. Did they take anything?

A. I later found out that Detective Guevara took a photo album. I believe he took my clothes. Honestly, I don't recall if he took more things.

Q. Where was the album of photos that he took?

A. The room that was mine.

Q. Did they find the baby when they were there?

Page 149

A. Yes.

Q. Where was the baby when they found the baby?

A. Honestly, I don't recall if in the bed or in the crib.

Q. Other than searching the house and finding those things, what else did they do?

A. They were asking for me, and then a lady came. I think a police officer. She's the one that took the little girl.

Q. What else happened?

A. Detective Guevara in the living room, he asked me to sit down. He was asking me questions. Did I know what had happened?

Q. What was your answer?

A. I didn't really answer much because I was a little afraid.

Q. Did you tell him anything about the baby?

A. He asked if the baby was mine. I said yes.

Q. What else did he ask you?

A. He told me I had to go with him to the police station.

Q. What else?

A. I remember that Guadalupe Mejia went with me.

Urlaub Bowen & Associates, Inc.  312-781-9586

REYES 012077

ADRIANA MEJIA, 02/04/2021                Page 150..153

Page 150

Q. Did anybody else go with you?

A. No. I don't think so.

Q. What about Jorge Mejia? Did he go?

A. No. He stayed with his girls.

Q. Other than asking you if the baby was yours or asking you whose baby it was -- strike that. Other than asking you whose baby it was, did Guevara do any other questioning with you?

A. I honestly don't recall.

Q. Did the police ask any questions to Guadalupe Mejia at the house?

A. I think so.

Q. Were you there when they were asking her questions?

A. I honesty don't recall.

Q. Do you know what questions were asked to Guadalupe Mejia?

A. No.

Q. Was Guevara the one asking her questions or someone else?

MS. ROSEN: Objection, foundation.

A. I honestly don't recall if it was Detective Guevara or a different police officer. I don't remember.

Page 151

Q. Did the police question Carlos Martinez?

THE INTERPRETER: I'm sorry.

Q. I'll ask it again. Sorry. Did the police question Carlos Martinez in the house?

MS. ROSEN: Objection, foundation.

A. I think so.

Q. Were you there when they were questioning him?

A. No.

Q. How do you know that they questioned him?

A. Because he called them into another small room.

Q. Who was in the other room with him when he was questioned?

MS. ROSEN: Objection, foundation.

A. I don't recall who questioned him. They did take him into another little room, but I don't remember the people.

Q. Was he questioned by Detective Guevara while he was at the house?

MS. ROSEN: Objection, foundation.

A. I don't recall anymore.

Q. Did anybody speak Spanish among the police officers other than Detective Guevara?

Page 152

A. Yes, the police lady that went for the little girl.

Q. Anyone else?

A. No. I don't think so.

Q. Was anybody else at the house questioned by the police?

MS. ROSEN: Objection, foundation.

A. I honestly don't recall.

Q. When Guevara told you you had to go to the police station, did you agree to go?

A. No. He told me I had to go, that it was obligatory that I go. He said, "No, you have to go."

Q. Did he handcuff you?

A. I don't think so.

Q. When is the first time you were handcuffed by the police?

A. I recall when they put me in the little room.

Q. Had Rosauro or Arturo or Gabriel called the house at all after they had left with the boy?

MS. ROSEN: Objection, foundation.

A. I think my husband.

Q. What do you remember about that?

A. That they had picked up the little boy where

Page 153

he was and that someone had gone with them to the police station or something like that.

Q. When Rosauro and Arturo and Gabriel left with the boy, did you know where they were going?

A. I don't think I knew it at the time, but I believe I knew it later.

Q. So when they left, you did not know where they were going with the boy?

MR. ENGQUIST: Objection, asked and answered.

MR. SWAMINATHAN: Go ahead.

A. No. Because when they left, they went to where Arturo had him watched.

Q. And what was your understanding of what that place was?

A. A friend that Arturo had met. I think he was a police officer or something like that.

Q. So had Arturo been taking care of the boy at his police officer friend's house?

A. No. He took him so that the wife could babysit him.

Q. The wife of the police officer?

A. I don't know her. I don't know who that was. I don't know.

Urlaub Bowen & Associates, Inc. 312-781-9586

REYES 012078

Page 154

Q. The place that he was -- if I understand correctly -- let me ask you -- strike that.

The place where Arturo had been taking the boy was for the boy to be babysat; is that right?

A. Yes.

Q. And Arturo's friend lived there, right?

A. Yes.

Q. And that friend was a police officer?

A. I think he was a police officer.

Q. And when Arturo and Rosauro and Gabriel left with the boy, your understanding is that they were going to that police officer friend's house; is that right?

A. I think so, yes.

Q. Whose idea was it to go to that police officer's house?

A. I believe Arturo because I think Arturo said he was going to go pick him up.

Q. So was there -- before Arturo, Gabriel, and Rosauro left the house, was the boy with you all at the house, or was the boy at this police officer's house?

A. At the friend's house.

Q. So they were going to pick up the boy?

Page 155

A. I believe so.

Q. And had they already decided that they were going to be taking the boy to the police station?

A. On the way, they probably all agreed. I really don't know much about that.

Q. When the three of them left the house, had it been decided that they were going to go to the police station?

A. I think so.

Q. How had that been decided?

A. Because they were talking.

Q. So the three of them decided to pick up the boy and take him to the police station?

A. I don't recall, but I think the man at the house where they took care of him said that they had to take him to the police department.

Q. And what's your reason for believing that? You didn't go with them to that person's house, right?

A. Well, when they were talking, Gabriel would get very nervous, and they would look at each other, the two of them. So I think.

Q. You think what?

A. I think they were agreeing to take him to the police department, that nothing was going to

Page 156

happen to us, that they weren't going to discover us.

Q. When Arturo, Gabriel, and Rosauro left the house to get the boy, had it already been decided that the boy would go to the police station?

A. Perhaps. I don't recall much.

Q. Did you agree with the decision to take the boy to the police station?

A. I don't think so. I didn't know.

Q. So the decision to take the boy to the police station had been made by Rosauro, Gabriel, and Arturo, right?

MR. ENGQUIST: Objection, foundation.

A. It was mostly the gentleman where he was being watched.

Q. Had Arturo called that person to talk to him about what happened?

MS. ROSEN: Objection, foundation.

A. No. I don't think he called him. I think they went out, and they left.

Q. So was the decision to take the boy to the police station made once they went to pick up the boy and talked to the policeman?

MS. ROSEN: Objection, foundation.

A. I think so. I really don't recall now how

Page 157

it happened.

Q. When is the first time you learned that they went to the police station?

A. I think my husband called me or -- I don't know. I think my husband or maybe Guadalupe. I don't know.

Q. One of them told you that?

A. I believe I recall that Guadalupe went up and asked me if I was watching the news, that the children on there were the ones they were looking for.

Q. When the news showed that the children -- strike that.

When the children were on the news, had Rosauro, Arturo, and Gabriel already left with the boy?

A. No. They didn't know because they were working.

Q. So when Guadalupe saw the news with the boy, they had not yet left; is that right?

A. No. She came to tell me.

Q. And then after she told you -- when Rosauro, Arturo, and Gabriel left, did they leave before this conversation with Guadalupe or after?

A. Oh, no, that was a lot later, like overnight

REYES 012079

ADRIANA MEJIA, 02/04/2021                                        Page 158..161

Page 158

when they returned from work.

Q. Okay. And when they returned from work, that's when they decided to go get the boy; is that right?

MR. ENGQUIST: Objection to the form and foundation.

MR. SWAMINATHAN: Go ahead.

A. I believe so.

Q. And so when they came home from work, at that time the boy was at the friend's house being babysat?

A. Yes.

Q. And so then after that -- at what point after that did you learn that they had gone to the police station?

A. I believe my husband called me and told me he was at the police station.

Q. What else did he tell you other than that he was at the police station?

A. I honestly don't recall. He just told me he had gone with Arturo, Gabriel, and the other gentleman, but I really don't recall the words that he told me.

Q. Did he ask you anything when he called you?

Page 159

A. No, I don't think so.

Q. When he called you, did he call you on the home phone number?

A. Yes.

Q. Was that the 51 -- strike that.

Was the home phone number 773-925-5124?

A. I honestly don't recall anymore.

Q. How many phone lines were there at the house?

A. One.

Q. It was a land line?

A. Yes.

Q. And was that for both your apartment and Guadalupe's apartment?

A. No. Only Guadalupe had a phone. We didn't have one.

Q. So if Rosauro was calling you, would he call you on Guadalupe's phone?

A. Yes.

Q. And if someone wanted -- if anyone wanted to call the house to speak to somebody who lived on the first floor, you or Rosauro or Carlos or anyone else, would they call Guadalupe's phone?

A. Yes.

Page 160

Q. You testified earlier that, after the children had been kidnapped, you had gone back to the hospital, right?

A. Yes.

Q. And then you said you made a call -- after you were back at the hospital with the kids, you made a call home, correct?

A. Yes.

Q. So when you called home, you called Guadalupe's number, right?

A. Yes.

Q. Did you call from the hospital?

A. Yes.

Q. Around what time was that?

A. I honestly don't recall the time. In the morning?

Q. When you called home at that time, what did you say?

A. I asked to be picked up.

Q. Did you say anything else?

A. That I had the baby.

Q. Anything else?

A. That I was ready.

Q. Anything else?

Page 161

A. Honestly, I don't recall anymore.

Q. Who did you speak to when you called the house that morning?

A. I think it was Guadalupe. I think Guadalupe gave my husband the phone.

Q. So Guadalupe answered. Then she gave it to Rosauro?

A. I believe so or someone else. I don't recall. But somebody, yes.

Q. If somebody called to Guadalupe's apartment but they wanted to speak to somebody on the first floor, was there a portable phone? How did that work?

A. She had the phone that could be moved everywhere.

Q. It had no wire?

A. Yes.

Q. Was there any phones that were plugged in on the first floor?

A. Yes. But I didn't have a phone. I didn't have a line.

Q. Was it the case that anytime someone called the house, it was always answered by somebody in the basement?

A. Yes.

Urlaub Bowen & Associates, Inc.   312-781-9586

REYES 012080

ADRIANA MEJIA, 02/04/2021                                Page 162..165

Page 162

Q. And how many phones did they have in the basement apartment?

A. I believe two. I think one in Guadalupe's room and one in Leobardo's room.

Q. Other than the call that you made from the hospital to home in the morning after you had the children, did you make any other calls from the hospital to the house?

A. I don't recall.

Q. Was there a point in time when you were at the hospital before you went to get the kids?

A. Como?

Q. Let me ask it again.

A. Can you repeat the question?

Q. Yeah. Before you went to the Soto home, had you been at the hospital?

A. Before?

Q. Yes.

A. Yes.

Q. And did you make calls from the hospital to home during that period, before you went to the Soto home?

THE INTERPRETER: I'm sorry, Counsel. Can you repeat that?

Page 163

Q. Yes. Did you call from the hospital to home before you went to the Soto home?

A. Yes.

Q. How many calls did you make from the hospital to home before you went to the Soto house?

A. I honestly don't recall.

Q. It was more than one?

A. Probably.

MS. ROSEN: Could we hang on for one second? I just got a text from Eddie saying he lost his connection. But now I see him on the screen.

MR. BRENER: I'm back.

MS. ROSEN: Okay. Thanks. Sorry.

MR. SWAMINATHAN: No problem.

Q. Those were calls that you made back to the house from the hospital; is that right?

A. Yes.

Q. Did you use the pay phone in the hospital?

A. Yes.

Q. Where in the hospital did you use pay phones to call home before you had gone to the Soto house?

A. The ones in waiting area.

Q. Did you use those phones for all of the calls that you made before going to the Soto house?

Page 164

A. I think one on the outside.

Q. Did you use pay phones that were both inside and outside the hospital?

A. I think yes, one on the outside.

Q. Did you also -- strike that.

When you made the phone call in the morning after you had been at the Soto house, did you use the inside pay phone or outside pay phone?

A. I don't recall which one I used.

Q. When you called -- strike that.

Before you went to the Soto home, when you used the pay phones at the hospital to call the house, who did you speak to?

A. I think with my husband or with Martin Vaca. I don't really recall.

Q. Why did you call home before you had gone to the Soto home?

A. Just to be informing them.

Q. What did you inform them of?

A. That I was fine, that they shouldn't worry.

Q. Did you tell them that you had a baby?

A. I think so.

Q. Did you have a conversation with -- strike that.

Page 165

Did you have a conversation with Rosauro before you went to the Soto home telling him that you had a baby?

A. Honestly, I don't remember anymore if it was before or after. I don't recall.

Q. Did you have any conversation with Guadalupe Mejia from the -- strike that.

Did you call the house from the hospital and talk to Guadalupe Mejia to tell her that you had the baby?

A. I think so.

Q. Around what time was that that you called and spoke to Guadalupe Mejia about having had the baby?

A. I believe in the evening. I don't really recall. Yes, it was late.

Q. And what did you tell Guadalupe Mejia?

A. That I had a baby.

Q. Anything else?

A. No. I really don't recall. It's been many years.

Q. Did you tell her that the baby was a boy or girl?

A. Honestly, I don't recall. I really don't

Urlaub Bowen & Associates, Inc.   312-781-9586

REYES 012081

ADRIANA MEJIA, 02/04/2021                                    Page 166..169

Page 166

recall well, but I think I told her it was a girl.

Q. And were you by yourself when you made that call to Guadalupe Mejia?

A. Yes.

Q. And did you call and speak to Martin Vaca from the hospital before you went to the Soto home?

A. No. I was dialing him to see if my husband was there so that he could connect me with him.

Q. Did Martin Vaca have a different phone number?

A. No. It was the same phone.

Q. And so when you called the house to speak to Rosauro, was it Martin Vaca who answered the phone?

A. Gabriel answered. He's the one that took the call.

Q. Okay. And did you call Martin Vaca that you had had a baby?

A. Honestly, I don't recall if I spoke a lot or a little bit to him.

Q. When you spoke to -- when you called the house and told them that you had had a baby, did they come to pick you up?

A. They went to pick me up the following day.

Q. Why didn't they come that same day?

Page 167

A. Because I told them not to go.

Q. Why did you tell them not to come?

A. Because I told them that everything was fine.

Q. You were fine; but if you'd had the baby, didn't Rosauro want to come and see the baby right away?

A. No, he didn't go.

Q. Were you worried that you told him that you'd had the baby, that he was going to want to come right away?

A. Yes, but he didn't go.

Q. Did you tell him anything to get him to not come right away to see the baby?

A. I think so. I told him not to go, that everything was fine.

Q. Anything else you told him?

A. I honestly don't remember anymore.

Q. The call that you made to the house, you said -- strike that.

The call to Guadalupe, you said, was in the evening, right?

A. I called, I believe, in the morning and the evening. I called often, but it wasn't to talk to

Page 168

anyone. It was to talk to my husband.

Q. You said you called often. Strike that.

What were the times that you were calling the house in the evening before you went to the Soto home?

A. I don't recall exactly the time, but I do remember it was late.

Q. Was it late meaning, like, what time of night?

MR. NOLAND: Objection, foundation.

A. I honestly don't recall the time. I didn't have a watch.

Q. Was it closer to midnight, or was it closer to 5:00 or 6:00 p.m.?

MR. NOLAND: Objection, form and foundation.

A. It was a little late, but I don't recall the time.

Q. You indicated that you made a number of -- do I understand correctly that you called home several times, and you got no answer?

A. I don't recall.

Q. If I understand your testimony from a few minutes ago correctly, you indicated that you tried several times that night, correct?

Page 169

A. Yes. But I don't recall if they answered or they weren't answering. Honestly, I really don't recall much.

Q. Did you make any calls from the hospital to anywhere other than the Guadalupe land line at the house?

A. Honestly, at this moment, I don't recall if I called any other of his siblings. I don't remember.

Q. If you were going to call to let somebody know that you'd had the baby, other than Rosauro and Guadalupe, who else would you call to share the news?

MS. ROSEN: Objection: foundation, calls for speculation, form.

A. I honestly don't recall.

Q. Why did you call home to tell them that you had already had a baby if you didn't have the baby yet?

THE INTERPRETER: I'm sorry, Counsel. What was that?

Q. Why did you call home to tell them that you had had the baby if you did not have the baby yet?

A. Because Gabriel had already told me that that was the day he was going to give me the baby.

Q. And why were you so certain that you would

Urlaub Bowen & Associates, Inc.  312-781-9586

REYES 012082

ADRIANA MEJIA, 02/04/2021                                Page 170..173

Page 170

be able to get the baby? Strike that.

Is it fair to say that you were certain that you were going to be able to get the baby?

A. Because Gabriel had already promised me that that day he was going to give me the baby.

Q. And so you were confident that you were going to be able to get the baby that night?

A. Yes.

Q. You knew you would be able to get into the Soto home?

A. No. I didn't know I was going to go there.

Q. Did you know who the Sotos were?

A. No.

Q. Had you ever been to that house?

A. No.

Q. Do you know how Gabriel found the Soto -- strike that.

Who identified the Sotos?

A. Gabriel.

Q. How did he find them?

A. Honestly, I don't know if he followed the lady or how he found her. I don't know.

Q. When did he find her?

A. I just knew that same day when we went to

Page 171

her house.

Q. When did you know that Gabriel had identified the Soto family?

A. I just knew he was going to pick up the girl, but I didn't know he had identified the lady.

Q. And when had he told you that he had promised that he was going to have a child for you that night?

A. The day before that, we had spoken, when he had asked me for the money.

Q. How much earlier was that?

A. Before he left for work.

Q. The same day?

A. Honestly, I don't recall if it was the same day before he left or a day before.

Q. Now, the day that you went to the Soto home, was it that same day that Gabriel told you that he had identified somebody who was going to give you the baby?

A. Yes.

Q. And that day when he told you that, did he tell you that -- he told you that after you had already gone to the hospital, correct?

A. Yes.

Page 172

Q. Did he tell you that at the hospital?

A. No. When we were at the hospital, he told me we were going to go pick up the baby.

Q. What time of day was it when he told you that?

A. I believe about 2:30. I really don't recall, but a few hours before.

Q. A few hours before you went to go get the baby is when he told you that you guys were going to be going that night?

A. Yes, because I told him it was about time that I had the baby. I asked what was happening. He said not to worry, that everything was going to be fine.

Q. What time was it when you left to go to the Soto home?

A. Overnight.

Q. You said it was still night time when it happened, right?

A. Yes. It was pretty late.

Q. And who came to pick you up?

A. Gabriel.

Q. What time was it when Gabriel picked you up from the hospital? What that at night?

Page 173

A. It was at night. It was about 1:00 or 12:30 or 1:00, something like that.

Q. So it was a little after midnight when Gabriel came to get you; is that right?

A. Yes, something like that or in the evening, but I really don't recall. It was late.

Q. When you say "late," it was late at night, not early the next morning, correct?

A. Yes. It was already late.

Q. When you were picked up to go to the Soto home, how long before -- strike that.

So if it was around -- is it fair to say it was around 12:30 to 1:00 a.m. that Gabriel came to get you?

MS. ROSEN: Objection, foundation.

A. I think so.

Q. How long before that did he tell you that he had identified the baby that you were going to get?

A. I honestly don't recall if it was in the car or -- I don't remember, but he told me that he already had the baby.

Q. When you were going to the Soto home, what was your understanding of what the plan was?

A. Well, my plan was that we were going to pick

Urlaub Bowen & Associates, Inc. 312-781-9586

REYES 012083

ADRIANA MEJIA, 02/04/2021                                    Page 174..177

Page 174

up a baby, not that we were going to do what happened.

Q. When you say "pick up a baby," do you mean to pay for the baby?

A. Yes. Not do what we did.

Q. Was it your understanding that you were going to be stealing the baby?

A. At the time, I didn't know we were going to steal it. I knew that we were going to go buy it.

Q. How much did you pay to buy the baby?

A. $600.

Q. Whose money was that?

A. Well, I had gotten it together because I was doing a savings, and I had some money.

Q. Did Gabriel have the money -- strike that. Who had the money with them that night? Anybody?

A. No. I gave it to him. I don't recall if it was the day before or a day after.

Q. That night when you went to the Soto home, did you have money with you?

A. Yes, very little.

Q. You didn't have money to pay for the baby that night; is that right?

A. No.

Page 175

Q. Do you know if Gabriel had money with him that night?

A. How was I going to know?

Q. If you were going to buy a baby, was it your understanding that the people who were giving you the baby were willing to sell it to you?

A. Yes. But Gabriel told me he had already gotten the person; so what was I to know?

Q. If you were going to just buy the baby, why were you going in the middle of the night?

A. Because he told me that's the time they were going to hand him over to him.

MR. SWAMINATHAN: One second. Let's take a quick break.

THE VIDEOGRAPHER: We're off the video record at 5:19 at the end of media unit 4.

(Recess in proceedings from 5:19 to 5:31 p.m.)

THE VIDEOGRAPHER: We're back on the video record at 5:31 at the beginning of media unit 5.

BY MR. SWAMINATHAN:

Q. When you were questioned earlier today by Ms. Rosen, you were asked whether it was still night time or whether it was morning when you went to the

Page 176

Soto home. Do you remember that?

A. Did I say that I thought it was in the evening?

Q. Let me just ask you. When you -- strike that.

When you went to the Soto home, it was still night time, correct?

A. Yes.

Q. And when you say it was night time, you mean it was still dark out?

A. Yes. For me, it was in the evening. It's already -- it's dark, yes.

Q. And when you were dropped back off at the hospital, it was still dark out, right?

A. Yes.

Q. And when you were picked up at the hospital, did you go straight to the Soto home?

A. Yes. When Gabriel went to pick me up at the hospital, that's the first time I saw Arturo.

Q. Then did you go straight to the Soto home, or did you stop anywhere?

A. I think we did go to the Sotos house.

Q. So you went straight from the hospital to the Soto house; is that right?

Page 177

A. Yes.

Q. And if -- strike that.

You were picked up sometime around 12:30 or 1:00 in the morning by Gabriel. Around what time was it when you arrived at the Soto home?

MR. ENGQUIST: Objection.

A. I really don't recall, but I believe it was a little after 1:00 a.m.

Q. Then how long were you in the Soto home?

A. Not long.

Q. Was it two minutes? Was it ten minutes? Was it 30 minutes? What's a good approximation?

A. I think more than 30 minutes.

Q. Was it close to an hour?

A. Honestly, I didn't look at the time, but we were there for quite a while.

Q. What were you doing there for so long?

A. It wasn't a lot of time, just again --

MR. SWAMINATHAN: I missed the answer. Could the court reporter read it back? Sorry.

A. Again, to remember the same thing, I don't want to.

Q. I understand, Ms. Mejia. I don't think it's fun for anybody, but we have to go through it. Okay?

Urlaub Bowen & Associates, Inc.   312-781-9586

REYES 012084

ADRIANA MEJIA, 02/04/2021                                         Page 178..181

Page 178

(Requested record read.)

Q. After you left the Soto home, did you go straight to the hospital, or did you stop anywhere?

A. No. We went straight to the hospital.

Q. You were dropped off at the hospital?

A. Yes.

Q. Did you stay in the car for any period of time before going into the hospital?

A. No. About five or six minutes at the most.

Q. Did you have any conversations in the car before they dropped you off?

A. Yes. We were talking that we didn't have to tell anyone.

Q. Anything else that was talked about in the car on the way back to the hospital from the Soto home?

A. Yes. I recall that Gabriel informed me that I didn't have to tell anybody anything, that I had to remain quiet, because now the three of us had already gotten involved in the deaths.

Q. Other than a conversation about not saying anything to anybody about it, was there anything else that was said in the car on the way back to the hospital from the Soto home?

Page 179

A. Honestly, I was confused, and I was nervous. And my head was terrorized from what had happened. And I don't recall a lot.

Q. Do you remember anything else that was said in that car?

A. Just Arturo told me that I had to say that I had a baby, that the baby was born, and that the little boy was left to me by a lady for me to watch him.

Q. Anything else?

A. No, I don't recall.

Q. You testified -- strike that.

You testified at your last deposition in this case that you had not heard the name Norma Salazar; is that right?

MS. ROSEN: Objection, form.

A. I'd always said that the person that Gabriel had mentioned was Norma Salazar.

Q. Did Gabriel Solache tell you the name Norma Salazar that night on the way from the Soto home back to the hospital?

MS. ROSEN: Objection, form.

A. No. I just know he had a friend, but I didn't know her name until afterwards. He told me the

Page 180

name.

Q. The first time you heard the name Norma Salazar was after you'd gone back to the Mozart home with the baby?

MS. ROSEN: Objection: form, foundation, misstates her prior testimony.

A. Right now, I don't recall.

Q. I think you just indicated that, when you were going back to the hospital, you had not heard the name Norma Salazar yet, right?

MS. ROSEN: Objection: form, foundation, misstates her testimony.

A. I don't recall.

Q. And in any event, in that car ride, he didn't mention the name Norma Salazar, correct?

A. I don't think so.

Q. What hospital did you get dropped off at?

A. At the University of Chicago.

Q. Can you tell us where that is?

A. I don't remember the streets.

Q. And when you were dropped off by Rosauro the day before, what hospital were you dropped off at?

A. At the University of Chicago.

Q. Same hospital?

Page 181

A. Yes.

Q. Had you ever been to that hospital before?

A. Yes.

Q. When had you been at that hospital before that?

A. I've gone many times.

Q. Why had you gone to that hospital many times?

MR. SWAMINATHAN: I think she cut off. Ms. Mejia, I think it cut out. Can you start over?

A. I would go to the hospital there by myself many times.

Q. For what reason?

A. Because I went to say that I was going to go get a check-up.

Q. Did you actually ever go there for checkups?

A. I think so.

Q. Did you go to the hospital, or did you go to a different clinic when you were going in for checkups?

A. When I was there, they would send me from the hospital to a smaller clinic where they would draw blood.

Q. When you would go to the hospital for

Urlaub Bowen & Associates, Inc.  312-781-9586

REYES 012085

ADRIANA MEJIA, 02/04/2021                                    Page 182..185

Page 182

checkups, how would you get there?

A. Well, I remember they would put me on a bus on 63rd and Mozart, but I don't remember the name of the streets now. It's been many years. I don't recall.

Q. Would Rosauro ever drive you to the hospital?

A. Sometimes.

Q. Who else would drive you?

A. On one occasion, Gabriel took me.

Q. Anyone else?

A. I don't recall if my brother-in-law Leobardo or my brother-in-law Eduwiges.

Q. Other than the University of Chicago Hospital, were there other hospitals that you would go to?

A. I think I would go to Mount -- it's on California. I don't recall what it's called.

Q. Mount Sinai?

A. I think so.

Q. What would you go to Mount Sinai for?

A. I would go there to get examined to find out why I couldn't have children.

Q. Did you go to any appointments at the

Page 183

University of Chicago Hospital related to finding out why you couldn't have children?

A. I think so.

Q. Did you go to both places?

A. No. At first, I went to Mount Sinai, but I believe, from Mount Sinai, they sent me to the University of Chicago.

Q. You were at the University of Chicago Hospital on March 27. That's the day that you -- that night is when you went to the Soto home, right?

A. Yes.

Q. When is the last time you'd been at the University of Chicago Hospital before that?

A. Honestly, I'm not good with remembering. I don't recall.

Q. Had you gone to any hospitals or doctor's offices the day before?

A. Yes, to a clinic close to the University of Illinois.

Q. Why did you go there?

A. Why did I go there? I think they sent me to get some tests done.

Q. For what?

A. To see what my -- what do you call it -- my

Page 184

ovulation problem.

Q. Was it a clinic that was specializing in fertility issues?

A. Not specifically, but I think there was a specialist there that was going to help me -- well, that was going to see me.

Q. Did you go to any other hospitals that day, on March 26? Hospitals or clinics.

A. Honestly, I don't think I remember.

Q. Who took you that day on March 26 for the fertility issue?

A. My husband.

Q. Did he go inside with you?

A. No. He would always stay in the waiting area.

Q. So he came inside the building, but he just hung out in the waiting area; is that right?

A. Yes. He would always stay outside. He would never go in.

Q. I want to make sure I understand correctly. He wouldn't go into the room with the doctor, but he would sit in the waiting area of the clinic or hospital; is that right?

A. Yes.

Page 185

Q. And so that day, on March 26, was he there with you at that -- strike that.

That day, on March 26, did he wait with you at the clinic and then drive you home?

A. No. He left me there. And then I told him to come home, and he came.

Q. He came back and picked you up?

A. The next day.

Q. Wait. So on March 26, did you also spend the whole night away from home?

A. No. The 26th, we just went for a little. I believe he went to work, and I returned by myself.

Q. So on the 26th, he took you to the fertility clinic, sat in the waiting area for a while, and then went to work; is that right?

MS. ROSEN: Objection, form.

A. I think he came back, or he went to his job; and I returned home alone.

Q. Okay. And then the next day, on March 27, he took you to the hospital, the University of Chicago Hospital, correct?

A. Yes.

Q. What time of day did he take you to the hospital?

Urlaub Bowen & Associates, Inc.   312-781-9586

REYES 012086

ADRIANA MEJIA, 02/04/2021                              Page 186..189

Page 186

A. In the morning.

Q. Around what time?

A. About 8:00 in the morning or 9:00 in the morning.

Q. Why did you go so early?

A. Because I talked to Gabriel, and he told me to go at whatever time I wanted, and I decided to go early.

Q. Did Rosauro come inside the hospital that day, on the 27th?

A. I think he just left me at the door.

Q. So Rosauro didn't come inside and sit with you?

A. I don't know if he was with me for a little while and then I told him to come back home.

Q. The day before, on the 26th, when you went to the clinic, where was that clinic that Rosauro took you to?

THE INTERPRETER: I'm sorry, Counsel. Can you repeat that?

Q. The 26th, when you went to the clinic and Rosauro took you there, where was that clinic?

A. It was close to the university, I believe, but I don't recall the streets.

Page 187

Q. What was the name of the clinic?

A. I don't recall.

Q. What was the name of the doctor you were seeing?

A. I don't recall that.

Q. How long were you at the clinic that day?

A. A good while.

Q. One hour? Four hours? Give me an approximation.

MS. ROSEN: Objection: form, foundation.

A. I don't recall the time, but it was a long while.

Q. Other than Rosauro, did you see anybody else at the clinic on the 26th?

A. No.

Q. Then after you were at the clinic, did you go home by bus?

A. Yes.

Q. Did Rosauro know why you were at the clinic, why he brought you to the clinic?

MS. ROSEN: Objection: form, foundation.

Q. Strike that. I'll ask a better question. Sorry.

Did Rosauro know why you were at the clinic

Page 188

on the 26th?

MS. ROSEN: Objection: form, foundation.

A. I think I told him I was going to have a baby or something like that, but I really don't recall.

Q. Okay. And then when Rosauro took you to the clinic on the 26th, had you told him that you were going to be having the baby at that clinic?

A. No. I wouldn't have told him I was going to have a baby there because it was a small clinic. I told him I was going to see what was going on.

Q. What do you mean by that, "see what was going on"?

A. Because I had to speak to Arturo -- I'm sorry, no, to Gabriel because there was always someone at home, and we couldn't talk, or he was at work. So I was starting to get worried.

Q. When you went to the clinic that day on the 26th, did you have an appointment, or were you just there as an excuse to be able to talk to somebody else?

A. No, I had an appointment.

Q. And did you actually go in for your appointment?

Page 189

A. I don't recall.

Q. On the 27th, when Rosauro took you to the hospital, what did you tell him about why you were going to the hospital that day?

A. Because I told him I didn't feel well, that I already had labor pains.

Q. And did he stay with you at the hospital? Did Rosauro think that you were going to be having the baby that day?

MS. ROSEN: Objection: form, foundation.

A. Yes.

Q. Did you tell him you were going to be having the baby that day?

A. Yes.

Q. Did he come into the hospital with you to be there when you would have the baby?

THE INTERPRETER: I'm sorry, Counsel. What?

Q. Did he come into the hospital to be with you to have the baby?

A. No.

Q. Why not?

A. Because I told him to leave, to go back.

Q. Was he working that day?

A. I don't think so.

Urlaub Bowen & Associates, Inc.   312-781-9586

REYES 012087

ADRIANA MEJIA, 02/04/2021                          Page 190..192

Page 190

Q. Where in the University of Illinois Chicago Hospital did Rosauro leave you?

A. I don't recall if -- I honestly don't remember.

Q. I think we have to stop here. It's 6:00. Let me ask you one last question.

The phone that you had at the Mozart home in Guadalupe's basement apartment, do you remember what I'm talking about?

A. Yes.

Q. Would that phone tell you where the call was coming in from?

A. Honestly, I don't know.

Q. Was it like a digital phone where it would show you some information digitally?

MS. ROSEN: Objection: form, foundation.

MR. ENGQUIST: Asked and answered.

A. I honestly don't recall.

Q. When you used to live in that home and get phone calls, would you know who was calling before you answered the phone? Strike that. I'll ask a better question.

When you were living at the Mozart house, would you sometimes know who was calling before you

Page 191

picked up the phone?

MS. ROSEN: Objection: form, foundation.

MR. ENGQUIST: And asked and answered.

A. I don't recall because she had a wireless phone that I could use from the outside. And I don't know if, on the inside, you had one that you could hear calls in.

Q. Last question. Have you heard of caller ID?

A. Yes.

Q. Did the phone have caller ID?

MR. ENGQUIST: Objection, asked and answered.

MS. ROSEN: Objection: Form, foundation.

A. Honestly, I don't recall.

MR. SWAMINATHAN: I've gone over my few minutes, and I apologize for that.

MS. ROSEN: We can go off the record, but I want to know how much time the Plaintiffs have been on the record.

THE VIDEOGRAPHER: We are off the record at 6:03 at the end of media unit 5.

(Deposition adjourned at 6:03 p.m.)

Page 192

CERTIFICATE OF REPORTER

I, BRENDA L. ZEITLER, a Certified Shorthand Reporter and Registered Professional Reporter within and for the State of Illinois, do hereby certify that the witness, ADRIANA MEJIA, whose testimony appears in the foregoing deposition was duly sworn by me; that the testimony of said witness was taken on February 4, 2021, by me to the best of my ability and thereafter reduced to typewriting under my direction; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition was taken, and further that I am not a relative or employee of any attorney or counsel employed by the parties thereto, nor financially or otherwise interested in the outcome of the action.

_____

Brenda L. Zeitler, CSR-RPR

Illinois License No. 084-004062

Urlaub Bowen & Associates, Inc.   312-781-9586

REYES 012088