IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MADELINE MENDOZA,            )
        Plaintiff,           )
    vs.                      ) No. 23 CV 2441
REYNALDO GUEVARA, et         )
al.,                         )
        Defendants.          )
-----------------------      )
MARILYN MULERO, et al.,      )
        Plaintiff,           )
    vs.                      ) No. 23 CV 4795
REYNALDO GUEVARA, et         )
al,                          )
        Defendants.          )

The deposition of KIMBERLY FOXX called for examination pursuant to Notice and the Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before Marlo Rodriguez, a notary public within and for the County of Cook and State of Illinois, at 20 South Clark Street, Suite 1700, Chicago, Illinois, on April 16, 2026, at the hour of 10:00 a.m.

APPEARANCES:

    KENNETH FLAXMAN, P.C., by
    MR. JOEL FLAXMAN
    MS. INAARA TAJUDDIN (via Zoom)
    200 South Michigan Avenue, Suite 201
    Chicago, Illinois  60604
    (312) 427-3200
    jaf@kenlaw.com
        Representing Madeline Mendoza;


    HART, McLAUGHLIN & ELDRIDGE, by
    MR. BRIAN ELDRIDGE
    MR. CARTER GRANT
    One South Dearborn, Suite 1400
    Chicago, Illinois  60603
    (312) 955-0545
    beldridge@hmelegal.com
    cgrant@hmelegal.com
        Representing Marilyn Mulero;


    BORKAN & SCAHILL, LTD., by
    MR. TIMOTHY P. SCAHILL
    MS. ANDREA CHECKAI (via Zoom)
    20 South Clark Street, Suite 1700
    Chicago, Illinois  60603
    (312) 580-1030
    tscahill@borkanscahill.com
    acheckai@borkanscahill.com
        Representing Reynaldo Guevara;


    COOK COUNTY STATE'S ATTORNEY'S OFFICE, by
    MS. JENNIFER BAGBY
    MS. CRISTIN DUFFY
    69 West Washington Street, Suite 3200
    Chicago, Illinois  60602
    (312) 603-2352
    jennifer.bagby@cookcountysao.org
    cristin.duffy@cookcountysao.org
        Representing Carol Rogala and
        CCSAO;

APPEARANCES (CONT.):

    ROCK, FUSCO & CONNELLY, LLC, by
    MS. EILEEN ROSEN
    333 West Wacker Drive, Suite 1900
    Chicago, Illinois  60606
    (312) 494-1000
    erosen@rfclaw.com
        Representing the City of Chicago;


    THE SOTOS LAW FIRM, P.C., by
    MR. JOHN TIMBO (via Zoom)
    141 West Jackson Boulevard, Suite 1240A
    Chicago, Illinois  60604
    (630) 735-3300
        Representing Defendant Officers;


    ROMANUCCI & BLANDEN, LLC, by
    MR. PATRICK DRISCOLL (via Zoom)
    321 North Clark Street, Suite 900
    Chicago, Illinois  60654
    (312) 458-1000
    pdriscoll@rblaw.net
        Representing Marilyn Mulero;


    AKERMAN, LLP, by
    MR. GREGORY A. KUBLY
    MS. AMANDA J. HAMILTON
    71 South Wacker Drive, Suite 4700
    Chicago, Illinois  60606
    (312) 634-5736
    amanda.hamilton@akerman.com
    gregory.kubly@akerman.com
        Representing Kimberly Foxx.


ALSO PRESENT:  Clare Brunn (Zoom)

Peter Van Winkle, videographer.

THE VIDEOGRAPHER: We are now on the video record on April 16th, 2026 for the videotaped deposition of Kim Foxx. We are located at Borkan & Scahill, Chicago, Illinois, in the action entitled Madeline Mendoza versus Reynaldo Guevara, et al., Case No. 23 CV 2441 and Marilyn Mulero, et al., versus Reynaldo Guevara, et al., Case No. 23 CV 475 -- 95, excuse me.

My name is Peter Winkle. I'm from Fortz Legal Support, LLC.

Would the court reporter please swear in the witness and the attorneys briefly identify themselves for the record and state whom they represent.

(Witness sworn.)

MR. SCAHILL: Timothy Scahill on behalf of Reynaldo Guevara.

MS. ROSEN: Eileen Rosen on behalf of City of Chicago.

MR. GRANT: Carter Grant for Marilyn Mulero.

MR. ELDRIDGE: Brian Eldridge behalf of Marilyn Mulero.

MR. FLAXMAN: Joel Flaxman for Madeline Mendoza.

MS. DUFFY: Cristin Duffy, Cook County State's Attorney's Office.

MS. BAGBY: Jennifer Bagby, Cook County State's Attorney's Office.

MS. HAMILTON: Amanda Hamilton for the deponent.

MR. KUBLY: Greg Kubly on behalf of the deponent.

MR. TIMBO: John Timbo on Zoom on behalf of defendants estate of Halvorsen, Steven Gards, Robert Bibo and Anthony Riccio. Good morning.

MS. CHECKAI: Good morning. Andrea Checkai on behalf of defendant Reynaldo Guevara.

MS. TAJUDDIN: Good morning. Inaara Tajuddin on behalf of Madeline Mendoza.

MR. SCAHILL: All right. Let's try this again.

THE WITNESS: Yes.

MR. SCAHILL: Ms. Foxx, can you please state your name and spell it for the record.

THE WITNESS: Yes. Kimberly Foxx, K-i-m-b-e-r-l-y, F-o-x-x.

MR. SCAHILL: Ms. Foxx, I understand you have given a deposition before, yes?

THE WITNESS:  Yes.

MR. SCAHILL:  And I understand that because of your legal training, you understand the rules, but we are going to put them on the record in the beginning any way.  Okay?

THE WITNESS:  Thank you.

MR. SCAHILL:  First of all, even though this is on video, make sure that you are verbalizing all of your answers instead of shaking or nodding your head for the purposes of the court reporter. Could you agree to do that?

THE WITNESS:  Yes, I can.

MR. SCAHILL:  Thank you.

Please wait until I'm done or any of the other attorneys are done when they're asking you questions before you start to answer just so we have a clean record.  Okay?

THE WITNESS:  Got it.

MR. SCAHILL:  All right.  If at any time you need to take a break, that's fine.  The only thing we ask is that you answer the question pending before -- excuse me, before you take the break unless of course there's an issue with privilege or something like that for which you

can consult with your attorneys.  Can you agree to do that, please?

THE WITNESS:  Yes.

MR. SCAHILL:  Okay.  And again if you don't understand a question that I have asked or anyone else has asked, please ask us to rephrase. That's bound to happen from time to time.  If you don't ask us to rephrase, we are going to assume you understood it.  Okay?

THE WITNESS:  Understood.

MR. SCAHILL:  All right.  Fair enough.

KIMBERLY FOXX,

called as a witness herein, having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. SCAHILL:

Q.   You were the duly elected State's Attorney for Cook County from December 1st, 2016 to December 1st, 2024; is that correct?

A.   November 30th, 2024, so December 1st, 2016 until 11:59 November 30th.

Q.   Got it.  Thank you for that correction. So that was two 4-year terms that you served,

correct?

A.    Correct.

Q.    Then you elected not to run for a third term and a new State's Attorney took over on December 1st, 2024, correct?

A.    That is correct.

Q.    Are you currently employed?

A.    I'm on a sabbatical.  I take projects as they come.

Q.    Okay.  Great.  Are you currently practicing law?

A.    No.

Q.    Those are private sector projects that you take on?

A.    Yes.

Q.    Okay.  You are not -- you have not worked in any governmental capacity since you left office as State's Attorney?

A.    I have not.

Q.    You are represented here by two sets of counsel, private counsel, and also by the State's Attorney's Office counsel; is that fair?

A.    I think that's fair.  I'm representing my personal capacity by private counsel and the

State's Attorney's Office is here as it related to my work as a State's Attorney.

Q. Understood.

You understand that the case that you are being asked to testify about today is the Marilyn Mulero and Madeline Mendoza cases that are pending in the United States District Court?

A. I'm aware.

Q. What did you do to prepare for your deposition here today?

A. I met with my attorneys about two weeks ago.

Q. When you say your attorneys, are you referring to the personal attorneys or the attorneys for the State's Attorney's Office?

A. Personal attorneys.

Q. That was about two weeks ago, you said?

A. I believe so.

Q. All right. Did you meet with the State's Attorney's attorneys in preparation for your deposition here today?

A. We didn't meet in preparation for today. I believe there was a conversation we had some time in the fall alerting me that there were

motions and things pending as it related to this, but not preparing me for today's -- for the deposition.

Q. So the preparation for today's deposition was done with your personal attorneys and about two weeks ago?

A. Yes.

Q. Okay. Again I don't want to know anything you talked to your attorneys about, but while you were meeting with them, were you shown any documents?

A. Yes.

Q. What were you shown?

A. I was shown an e-mail, a press release, maybe two e-mails. As far as I can remember, I believe two e-mails and press release.

Q. Were you shown any videos?

A. No.

Q. Were you shown any police reports?

A. No.

Q. Were you shown any documents that related specifically to the Mulero or Mendoza cases? And when I say the Mendoza or Mulero cases, I mean anything relating to the criminal

cases postconviction or the civil litigation?

A. No.

Q. Okay. So I take it from your answers you didn't review any court transcripts either?

A. No.

Q. And you didn't review any petitions for postconviction relief or petitions for certificates of innocence or anything of that ilk?

A. No.

Q. The e-mails that you reviewed, we may get into them later, but what's your recollection of what those e-mails were?

A. I believe there's an e-mail -- there was an e-mail exchange, I don't recall to or from myself and Josh from the Innocence Project.

Q. You are referring to Josh Tepfer?

A. Yes.

Q. Okay. And was that from the summer of 2022?

A. To the best of my recollection, yes.

Q. Okay. Did you review any internal State's Attorney policies in preparation for your deposition?

A. Yes. Actually I did see the Guevara protocol.

Q. We may talk about that later. But when you are talking about the Guevara protocol, you are referring to the Guevara case review protocol that was implemented in late 2020?

A. I believe that's correct.

Q. All right. Did you review any other policies of the State's Attorney's Office?

A. No.

Q. Okay. You didn't review any written standards with respect to the operation of the postconviction unit?

A. No.

Q. All right. How long did you meet with your counsel for in preparation for the deposition?

A. Maybe two hours.

Q. Okay. In preparation for your deposition, did you speak to any other either former or current State's Attorney employees?

A. No.

Q. Did you do any of your own research into the matters that you thought may be at issue in

12

the deposition here today?

A.   Not at all.

Q.   Okay.  Fair enough.

Prior to meeting with your counsel and preparing for this deposition, did you have any recollection of the Mulero or Mendoza cases which would include their postconviction or certificate of innocence proceedings?

A.   When you say recollection, can you tell me what you mean?

Q.   Just any recollection whatsoever about just anything generally relating to those cases before you prepared for your deposition here?

A.   Since I left office, no.

Q.   Okay.  Do you have any sort of general recollection of those cases as you sit here today?

A.   I have seen Marilyn Mulero I believe at some point while I was still in office, but the specifics of her case or the Mendoza case, no.

Q.   When you say you saw Ms. Mulero, are you referring to when she was at the City Club during the speech that you gave in April of 2023?

A.   At least at the City Club.

13

Q.   Okay.  Were there other interactions that you had with Ms. Mulero one on one or in the group either before or after April of 2023?

A.   I think she may have come to -- we had a wrongful conviction event.  I forget which year it was.  It was on October 1st.  I believe she was there.

Q.   This was while you were still in office?

A.   Correct.

Q.   Was that before or after your speech to the City Club in April of 2023?

A.   I don't recall.

Q.   All right.  Have you ever met Ms. Mendoza before?

A.   As I sit here today, I don't recall meeting Ms. Mendoza.

Q.   Okay.  We may get into your communications with Ms. Mulero later, but let me just ask you generally, when you were present at those events, either the City Club event or the wrongful conviction event that you referred to, did you have communications with Ms. Mulero?

A.   Yes.

Q.   Okay.  And this was verbal

14

communications?

A. Yes.

Q. Face to face?

A. Yes.

Q. Other than verbal face-to-face communications with Ms. Mulero, have you ever had any other communications with her meaning e-mails, text messages, anything of that sort?

A. Not that I recall, no.

Q. All right. Fair enough.

You are aware as you sit here today that Ms. Mulero's conviction was vacated in August of 2022?

A. I'm aware.

Q. And you are also aware as you sit here today that Ms. Mendoza's conviction was vacated in January of 2023?

A. I don't recall the date, no.

Q. Do you recall that her conviction was vacated while you were still the State's Attorney, correct?

A. Correct.

Q. All right. And when those convictions were vacated -- well, you were the State's

Attorney during the time period when both of those convictions were vacated, right?

A.   Correct.

Q.   And when you were State's Attorney, you understood that you were the final decisionmaker as to whether the State's Attorney's Office would agree to postconviction relief being sought by persons petitioning the courts for such relief, correct?

MR. GRANT:  Object to the form.

THE WITNESS:  That our office would make a recommendation.  Ultimately a judge would make the determination as to whether or not relief would be given.

BY MR. SCAHILL:

Q.   Right.  And so what I was asking is, and I think we are talking about the same thing, you were the final decisionmaker as to the position that the State's Attorney's Office would take with respect to whether postconviction relief would be granted or not?

MR. GRANT:  Object to form.

THE WITNESS:  So members of the office did a review of the cases and said these are the cases

16

that they made recommendations to move on, and I concurred with that opinion.

MR. SCAHILL: Got it.

THE WITNESS: Those opinions.

BY MR. SCAHILL:

Q. But the final decision was yours to make?

A. I concurred with the review that was done. Yes.

Q. Okay. But at the end of the day, whether -- the other members of your office can only make recommendations, you were the person and solely the person that can make a decision as to what the State's Attorney's position is going to be with respect to a request for postconviction relief?

A. Again, there was a team of attorneys who looked at the cases, reviewed the evidence and the law and made recommendations. And based on their recommendations, I concurred.

Q. Okay. With respect to certificate of innocence proceedings, were you the final decisionmaker as to whether the State's Attorney's Office would intervene and oppose or

elect to not intervene a certificate of innocence proceedings?

A.   I'm sorry, can you repeat the question?

Q.   Sure.  During your time as a State's Attorney, was it your understanding that you were the final decisionmaker for the State's Attorney's Office as to whether the State's Attorney's Office would intervene in the certificate of innocence proceeding and oppose it or not oppose it?

A.   There was never -- folks didn't come and get sign off from me whether or not we were intervening or not.  If there was a recommendation to intervene, it might be brought to me.

If there was not going to be a recommendation to intervene, it might not have been brought to me.  So there's not a blanket answer.  It depended on the case.

Q.   Okay.  But if it was brought to you with some recommendation, you would have to make a judgment call on behalf of the State's Attorney's Office as to what the ultimate position was going to be?

A.   If it was brought to me, yes.

Q.   Okay.  And when you say if it was brought to you, if -- obviously there were many petitions for certificates of innocence that, you know, occurred during your tenure, right?

A.   Correct.

Q.   Okay.  And we are not going to go into the specifics of any of those, but just generally, those -- those petitions and recommendations would regularly be brought to you, right?

A.   Again, I don't know the number of petitions that we would receive.  And so when you say regularly, I don't know what that cadence would be.

On occasion, there would be some that would be brought to me.  But in the grand scheme of how many petitions, I don't know what that number would be.

Q.   So if a specific recommendation was not brought to you from your office on a petition for certificate of innocence seeking specifically your input, would the office have no position or would other persons in your office make the

19

decision on that position?

A.   Can you repeat that again?

Q.   Sure.  You have referenced a couple of times that you would take recommendations if they were brought to you and then make a call on those, right?

A.   Correct.

Q.   Okay.  And so I'm just trying to understand, when petitions for certificate of innocence were pending in Cook County during your tenure, are you saying that the State's Attorney's Office would formulate a position on those without your input?

A.   What I'm saying is there would be occasion where they would say we would like to intervene on a certificate of innocence and bring that information to me.

On cases where they were not seeking to intervene, they were not coming to me and saying we are not seeking to intervene.

Q.   Okay.  And under the latter set of circumstances, who would be the individual or individuals who would make that decision?

A.   The people who were reviewing the cases,

and I don't know if that would be postconviction or CIU or civil.

Q. So when you were the State's Attorneys who -- what was -- who was the unit or what was the unit that was responsible for investigating and determining whether to make a recommendation to you on a certificate of innocence proceeding?

A. It was not just one unit. We would involve civil, the civil bureau. We would also have input from whether it was postconviction or CIU.

Q. Okay. And would all of those units be involved in the decisionmaking or you are saying that different units were involved in the decisionmaking at different times?

A. I'm saying different units at different times.

Q. Got it. Okay.

When you were State's Attorney, one of the other matters that was in the purview of your duties was electing to weigh in on requests for clemency to the governor if the conviction happened in your jurisdiction?

A. Yes.

Q. Okay. And the position that the State's Attorney's Office takes on those clemency petitions are things that you were the final decisionmaker on ultimately, correct?

MR. GRANT: Object to form.

THE WITNESS: Again it depends. There were numerous clemency petitions that were often filed and asked for our input on, not all of those made it to my attention. So it would depend on if the case came to me, but I did not see every clemency petition that came in. I did not vet every clemency petition.

BY MR. SCAHILL:

Q. Which unit or units were responsible for looking into whether the State's Attorney's Office would take a position on a clemency petition, and if so, what it would be?

A. As I sit here, I don't recall because we had a point person who was doing clemency at some point. I don't recall.

Q. Can you give us any units that may have been involved in that decisionmaking process during your tenure?

A. As I sit here, I don't recall. I know

22

that we had at one point someone on the team -- I don't recall. I don't want to say anything that's inaccurate, but I believe perhaps postconviction, but I don't recall.

Q. When you say postconviction, you mean the postconviction unit in the State's Attorney's Office?

A. Yes. But with someone liaisoning with them and reporting to me, not me talking directly to someone from postconviction.

Q. When you say someone liaisoning with you, what do you mean by that?

A. We had an employee at one point who would compile a list of clemency recommendations, do the vetting and say these are cases that you should be involved with, but that was not someone I don't believe who worked directly in postconviction, but they worked with people from postconviction in making the recommendations to me.

Q. Do you know who that person was in 2019?

A. Oh, as I sit here today, I do not recall.

Q. Okay. Did you delegate to subordinates

the ability to formulate the final position on what the State's Attorney's Office would take on clemency petitions when you were State's Attorney?

A.    I delegated quite a bit to the employees that we had.  When we -- when I came into office, there had been a protocol that existed before I gotten there.  And we -- when I came into office, I believe we -- there's an existing protocol when we gotten there.  At some point as I said, we had someone who was liaisoning on some of these cases.

Q.    And you don't remember who that person was in 2019?

A.    I do not.

Q.    Do you remember who that person was at any point during your tenure as State's Attorney?

A.    It's been a minute since I have been there.  I know there was a woman who was there. I don't remember when she was there.  It might have been -- I don't want to speculate.  I know at least one person.  I cannot recall her name as I sit here today.

Q.    The name of any person during the eight

24

years you were in office that had that position, you don't remember who that may have been?

A. No.

Q. Okay. Was your understanding of your role, and when I say your role, I suppose in this context, I mean the State's Attorney's office role in a clemency petition is that you could, but were not required to take a position on whether someone should be granted clemency by the governor or not?

A. Yes.

Q. And so I assume it was often the case that your office during your tenure didn't take positions at all by filing objections or what have you; is that fair?

A. That would be fair.

Q. Okay. And so but your office did select some to object to during that period, right?

A. Yes.

Q. Okay. In preparation for your deposition, did you review any documents relating to your office's position on clemency petitions with respect to Ms. Mulero?

A. No.

Q. Okay.

(Whereupon, Deposition Exhibit

No. 1 was marked for

identification.)

BY MR. SCAHILL:

Q. I have handed you what's been marked as Defendant's Exhibit 1. If you can take a moment to look at that, and when you are ready for some questions, look up and I will ask you some.

First of all, I think you told me that you did not review this document before today in preparation for your deposition, right?

A. Correct.

Q. Do you recognize this to be a clemency objection that was submitted under the letterhead of the State's Attorney's Office in September of 2019 relating to Ms. Mulero?

A. That's what it appears to show.

Q. Okay. And do you see in the first sentence after dear members that this suggests that it's brought on your behalf as the State's Attorney of Cook County?

A. Yes.

Q. Okay. And do you see that this

specifies that these -- this is in opposition to clemency for Ms. Mulero?

A. Yes.

Q. Okay. And if you could flip to the final page for me. Do you see under the very truly yours line that it lists three individuals as the signatories for this?

A. Yes.

Q. And the first one is yourself?

A. I see that.

Q. And the second one is Risa Lanier?

A. I see that.

Q. Risa Lanier at this time in September 2019 was chief of Criminal Prosecutions Bureau?

A. I believe that's correct.

Q. She later became your first assistant?

A. Yes.

Q. When was that?

A. It was during the pandemic. My first assistant at the time before Risa was Joe Magats who I believe left in late 2020 if I can recall.

Q. And then the third person is Sara Whitecotton. Do you see that?

27

A.    I do.

Q.    Do you know who Sara Whitecotton is?

A.    I do not.  I'm assuming she was an Assistant State's Attorney at the time.

Q.    Okay.  Do you recognize this to be the official position that the State's Attorney's Office took on Ms. Mulero's clemency petition in September of 2019?

A.    I recognize that this is a document with our letterhead and will assume as much, but I don't recall seeing this prior to today.

Q.    Got it.  Do you have any reason to doubt that -- and this was produced to us by the State's Attorney's office.  Do you have any reason to doubt this is the official position that your office took on Ms. Mulero's clemency petition in September of 2019?

A.    I do not, but this is the first time I'm seeing it.

Q.    Okay.  So are you saying that you don't remember seeing this or are you saying for sure that you did not see this?

A.    I don't recall seeing this.

Q.    So it's -- I know a lot was coming

28

across your desk back in those days for sure?

A.    Quite a bit.  Yes.

Q.    But you can't say one way or another whether you reviewed this or not?

A.    As I sit here today, I do not recall seeing this.

Q.    Got it.  Okay.

Is this document similar to the objections that your office would provide in circumstances when you were objecting to clemency petitions?

A.    It would appear so.

Q.    Okay.  And that would include a summary of the factual background of the case, correct?

A.    Generally speaking, yes.

Q.    All right.  And where generally would that information come from?

A.    So I -- there's a team that looked at these, apparently Sara on this particular case, would go and look at the file and pull together the information.

Q.    And was that -- and then would make a summary of that for the State's Attorney's position on the facts of the case?

A.   Correct.

Q.   Okay.  And was that -- was that a duty that you delegated to your subordinates to do on your behalf?

A.   Absolutely.

Q.   Fair.  You can't -- you don't have enough time in the day to do this yourself on each and every one of them, I assume?

A.   This is a reminder of the second largest prosecutor's office in the country, which at that time about 1200 employees across a number of bureaus.  So no, I was not getting into the weeds of clemency petitions.

Q.   Fair enough.

Then if you look at Page 6, you will see basis for objection?

A.   Yes.

Q.   Okay.  And what was your understanding of what the purpose of that part of this document was?

A.   To write what the basis for the objection to clemency would be.

Q.   So you have the facts and then you are sort of tying it together with your analysis to

30

explain why you don't think this particular person is entitled to clemency?

A. And when you say you, the person that drafted this document, yes.

Q. But on behalf of the office?

A. Yes.

Q. Got it.

And so I just want to make sure because we are talking about delegation here, are you disputing that this is the official position of the State's Attorney's Office on clemency?

A. On clemency in this particular case?

Q. Yes.

A. I'm not disputing that. What I'm saying is I don't recall seeing this. I don't recall engaging with this, but I'm not disputing that this document is -- got the State's Attorney's letterhead and is an objection to clemency.

Q. Got it. I just want to make sure as far as what this means that we are clear though.

You delegated to other people the duty that you had to decide to object or not to clemency to make those decisions and to take an official position on behalf of the office?

A.   I delegated to my staff to review these types of documents and take positions on behalf of the office.  Yes.

Q.   Okay.  And so assuming that this is what it purports to be, this is the official position that the office had on Ms. Mulero's clemency petition as of September of 2019?

A.   Assuming that this is what it purports to be and was tendered, yes.

Q.   Got it.  Fair enough.

I know you have not -- I know you didn't read this line by line because you just kind of briefly looked at it.  I'm not necessarily asking you to do that now, but if you could briefly just read through the basis for objection for me and then I'm going to ask you a couple questions on that.

MR. KUBLY:  The entirety of it?

MR. SCAHILL:  Just the basis for it.  I mean, you can read the entirety of it if you would like.  I'm not going to ask you about the factual record in the case right now, but it's up to you whether or not you would like to do that or not.

MR. KUBLY:  I was just trying to clarify the

entirety of the section under basis of objection.

MR. SCAHILL: That's what I was referring to.

MR. KUBLY: Okay.

THE WITNESS: Okay.

BY MR. SCAHILL:

Q. You are done?

A. Yes.

Q. Thank you.

Okay. The first sentence appears to summarize in general terms what your position is and also what Ms. Mulero generally is asking for, which is that you are opposing clemency and that she's requesting that because, one, she is innocent, and two, that she has a stellar institutional record, which would suggest that she should be given clemency on an alternative ground. Is that the way you read that?

A. That's what it says, yes.

Q. On behalf of the office, whoever took this position on behalf of the office disagreed with those arguments that she was making as not meriting what you believe to be clemency?

A. Based on this document, yes.

Q. Okay. Before we get into some of the

33

other things in here, were there a set of standards in your office when you were the State's Attorney for how the office was supposed to investigate claims for clemency?

A.   I believe there were, yes.

Q.   Okay.  And were those written standards or were they just sort of unwritten standards through training or otherwise?

A.   I don't recall.

Q.   Do you recall what those standards were?

A.   I don't recall.  I do not get into the weeds of the standards for the clemency petitions.

Q.   Do you recall whether there were any written standards with respect to how the persons who were looking into determining the office's position on clemency, how they were going to go about making those decisions?

A.   As I sit here today, I don't know. Again, the office was rather large.  So we delegated the responsibility to look at these petitions to people who worked on those.  What those standards are, I do not recall or know.

Q.   I'm sorry?

A.   Or know -- knew at the time.

Q.   Okay.  Do you believe you did know at the time when you were in office what those standards were and you just -- you just don't remember because time has passed or do you believe that you were not privy to what those standards were when you were in office?

A.   I'm saying that we delegated the responsibility to look at clemency petitions to folks within our office.

I believe there were protocols that they adhered to.  But as I said, as the State's Attorney, was I in the weeds of what those protocols were, I was not.

Q.   Okay.  Do you know who we could talk to who would be able to tell us what those standards were as you sit here today?

A.   I would assume people who worked on clemency petitions on behalf of the office during that time period.

Q.   Okay.  But you don't know what unit of the State's Attorney's Office those persons would have been in during your time in office?

A.   As I sit here today, I don't recall.

Not as I sit here today.  I don't recall.

Q.  So you can't tell us either the unit that would have been doing that or the individual persons within the unit who would have been doing that?

A.  Again, there was someone who liaisoned with us who would go back and look at some of these petitions.  I know at one point Michelle Mbekeani looked at some of these.  I don't remember when Michelle was working on these cases.

And it's really -- there was another woman whose name I just cannot call up who was working on these cases and I believe left during the pandemic, who may have been here during this time.

But again, that 2019 was 7 years ago right before the pandemic, and I have been out of office for the last 16 months.  So I cannot recall with any specificity.

Q.  That first name you gave us Mbekeani?

A.  Mbekeani.

Q.  I'm sorry?

A.  Mbekeani.

36

Q.   Oh, Mbekeani, okay.  I see.  That's a single last name?

A.   Yes.

Q.   And the first name is?

A.   Michelle.

Q.   Michelle, okay.

And when did she become employed by the State's Attorney's Office?

A.   I don't recall.  Yeah.  I don't recall.

Q.   Was it before or after 2019?

A.   Honestly I don't recall.

Q.   Okay.  Fair enough.

With respect to the -- and again I'm not going to ask you about all of these facts and the factual background, but was it your understanding when you were State's Attorney that the -- whoever was charged with that was supposed to be doing an investigation into what the factual background was to formulate what the State's Attorney's position on, you know, the facts of the case would be?

A.   My expectation would be that they would be looking into the background.  Yes.

Q.   Okay.  Not just parroting what's in, you

know, pleadings and the like, but actually sort of investigating the evidence and putting what the State's Attorney's position was on those facts?

A.   That was the expectation.

Q.   I mean, clemency petitions obviously are a very serious and important procedural vehicle in the state of Illinois, right?

A.   Sure.

Q.   That was one that you took very seriously, I would imagine, during your time in office?

A.   Yes.

Q.   Okay.  And did you during your time in office even though you were not in the weeds on it impart to your subordinates that it was important to take care and make sure that you came to the right result on the ultimate position that the office was taking on these things?

A.   Yes.

Q.   Okay.  And did you have any reason to believe during your time in office that your subordinates were not doing that?

A.   I'm trying to find the way to answer.

When I first got into office, there had been concerns raised that there was copying and pasting of documents to object to whether it was clemency or parole or things before the Prisoner Review Board. And so there was a conversation that was had about the necessity to make sure that we were not in the position of copying and pasting and doing our due diligence. That was early in my term.

Q. Got it.

A. In my first term.

Q. Got it. So this would have been shortly after you came into office in 2016?

A. It was after 2016. I don't know about shortly, but yes, it was after December of 2016.

Q. But when you became aware of that practice, you imparted to your subordinates that that's not an acceptable practice, we need to be taking, you know, care to make sure that we are getting it right as opposed to relying on what someone else did; is that what you are getting at?

A. Yes.

Q. If you had seen a clemency objection

39

that appeared to be sort of falling under the guise of what you consider to be poor work product, the cutting and pasting, would you have done something about that during your term to make sure that that was corrected?

A. I mean, I would assume so, but you are asking me to speculate about things that did not happen.

Q. Got it. You don't recall that ever happening after you said, hey, we need to be taking more care on these things?

A. As I sit here right now, I don't recall that.

Q. Fair enough.

But getting back to the basis of objection portion here, in reading through that, does this strike you as you read this as something that neglected to take the appropriate amount of care that you expected your subordinates to do in one of these clemency objections?

A. I don't know that I'm in a position to say they did or did not having just had a first glance at this. I don't know.

Q.   What else would you need to know to make that determination?

A.   We need to have a conversation as to why they came to that opinion.  I don't know.

Q.   Okay.  So but as you sit here today, do you have any -- after reading this, do you -- does this strike you as something that would be inconsistent with the standards that you imparted the office to take with respect to objections to clemency petitions?

A.   When you say a departure from standards, what do you mean?

Q.   You testified a few moments ago about concerns that you had when you came into office about the care that was taken on some of these documents and articulating that they needed to do better.  And so I'm asking you to apply those set of standards to this particular document?

A.   I mean, I can't answer that question in the way that you are presenting because I have nothing to compare it to.

What I'm reading is a document that was prepared.  As to what standards were applied to get to this document without any additional

41

information, I cannot make an assumption one way or the other.

Q. Got it. We are going to talk a lot about this later, but ultimately, there was a decision made by your office to not oppose postconviction relief that was requested by Ms. Mulero, right?

A. Yes.

Q. Okay. In making that decision, did you take into account your office's prior position on the clemency in 2019?

A. The people who were reviewing the cases for the postconviction relief that was granted did their work and made recommendations to me. Whether they considered this or not, I do not know.

Q. When you say the persons from postconviction who made recommendations to you, who are you referring to?

A. I don't recall who they were specifically in the unit at the time who were making those recommendations, but they were part of the group that was looking at these cases. And I don't know that they looked at this or not.

42

Q. When you say the group, are you referring to the postconviction unit or are you referring to a different unit of the State's Attorney's Office?

A. The postconviction unit. I know at a minimum, Carol Rogala was working on these cases, but there were other people within the unit with her who I don't recall.

Q. Got it.

And so other than the postconviction unit, who else was working on reviewing Ms. Mulero's case with respect to making recommendations to you about what should be done?

A. As I sit here today, I do not recall.

Q. Got it.

Flipping to the -- let's see, seventh page, this is the third full paragraph beginning with additionally, you obviously read that a few moments ago, correct?

A. Yes.

Q. This purports to analyze some of the facts that had been previously stated and come to the conclusion on behalf of the office that Ms. Mulero's statements about her lack of

involvement in the crime are completely unbelievable; do you see that?

A. Yes.

Q. And that you have no reason to dispute that that was the position that was taken by your office in September of 2019 with respect to Ms. Mulero's case?

A. What I know is that that's what's on this document that was submitted. That's what I know.

Q. Okay. You don't have any reason as you sit here today to dispute that that was in fact the position that was taken by the office at that time?

A. As I sit here today, I'm telling you having read this, at this moment that that's what it says as of that time.

Q. But I just want to know whether you have any reason to dispute that that is -- I'm not asking you to say that was put in there. I'm just asking whether you have any reason to doubt that's the position that your office took?

A. No.

Q. Were you aware that notwithstanding the

44

objection of your office that Ms. Mulero was in fact granted clemency in 2020?

A.   No.

Q.   You didn't become aware of that at any point before her -- you had agreed to not oppose her postconviction?

A.   Not that I recall.  No.

Q.   Okay.  When a -- when the governor grants clemency, that is not the same as pardoning somebody, correct?

A.   Correct.

Q.   Clemency just means that essentially it's time served, but the conviction is intact?

A.   Correct.

Q.   Were you aware that after Ms. Mulero was granted executive clemency, she was then put on mandatory supervisory release?

A.   I was not aware of what was happening with Marilyn Mulero at the time.

Q.   Okay.  Fair enough.

So let's fast forward to the following year in 2020.  In March of 2020, did you become aware that some of your subordinates were having meetings with members of the Exoneration Project

45

relating to Guevara cases?

A.   March of 2020?

Q.   Yes.

A.   As I sit here right now, I don't recall.

Q.   So in March of 2020, did you initiate any -- strike that.

In March of 2020, did you direct any of your subordinates to initiate contact with members of the Exoneration Project with respect to the Guevara cases that were pending with your office?

A.   As I sit here today, I do not recall that of March of 2020.

Q.   Okay.  You mentioned having reviewed the Guevara Protocol that was implemented in December of 2020?

A.   Yes.

Q.   When is the first time you saw any version of that document?

A.   I don't recall.  As I sit here today, I do not recall.

Q.   So we -- I'm not sure if you are aware of this, but we took the deposition of one of your former subordinates, Adam Weber, a number of

months ago.

First question, did you review Mr. Weber's deposition at any point?

A.   No.

Q.   Okay.  Mr. Weber was one of your subordinates in March of 2020, correct?

A.   I believe so.

Q.   You know Mr. Weber, right?

A.   I recall Mr. Weber, yes.  March of 2020 was the pandemic, and so you will have to forgive me.  You can ask me a million different things about March of 2020.  I just recall an election and the pandemic.

So the specifics of anything beyond the election and the pandemic, I don't recall.  You say Adam Weber worked there in March of 2020, that could be, but I don't recall.

Q.   So let me just ask more generally because that's a fair point that you are making with respect to the specific dates.

Did you become aware at some point before the Guevara case review protocol was implemented that your subordinates had been meeting with members of the Exoneration Project

with respect to cases involving Mr. Guevara?

A.    Specifically Mr. Guevara or meeting with members of the Exoneration Project, if you can clarify?

Q.    Yeah.  Specifically with respect to Mr. Guevara.  So let me just sort of characterize for you what Mr. Weber told us and then you can maybe sort of weigh in on what your recollection of this general period was.

A.    Thank you.

Q.    Mr. Weber testified that in March of 2020, he was called into a meeting with Joe Magats, who was your first assistant and Jennifer Coleman, who I believe was chief deputy at the time to meet with three members of the Exoneration Project regarding your office's approach to cases involving Mr. Guevara generally.

He advised us that after that meeting, he was directed by Mr. Magats to formulate a policy based on the discussions that were had with the Exoneration Project.  So that's a 10,000 foot of what his testimony was.

So my question to you is, were you aware

48

that that went on?

A.   As I sit here today, I don't recall that.

Q.   At some point in 2020, were you given a draft version of what became the Guevara case review protocol?

A.   As I sit here today, I don't recall getting the draft.  I saw the draft in prep for this, but I don't recall when I got that draft.

Q.   Okay.  You did get the draft at some point before it was implemented by your office?

A.   I don't recall when I got the draft.

Q.   Are you suggesting that you may not have gotten the draft before it was ultimately implemented by your office?

A.   What I'm saying is I don't recall when I got the draft.  I don't remember.

Q.   When you reviewed the draft in preparation for your deposition here today, you saw that there was an effective date in the -- I believe it was December 7th of 2020.  Do you remember seeing that on there?

A.   I remember seeing December of 2020.

Q.   Okay.  And so can you say that you at

49

some point before it was implemented reviewed that document?

A.   I honestly don't recall.  Even when I saw the draft in preparation for today, I don't recall.

Q.   Before the Guevara case review protocol was implemented, had you during the year of 2020 had any communications with members of the Exoneration Project relating to generally how your office should be approaching cases involving former Detective Guevara?

A.   As I sit here today, I do not recall.

Q.   In 2020, you knew who Josh Tepfer was?

A.   Yes, I did.

Q.   And did you know who Steve Art was at that time?

A.   I don't recall.

Q.   Did you know who Anand Swaminathan was?

A.   In 2020?

Q.   Yes.

A.   I may have.  I know I have met him.  I don't remember when I met him.

Q.   Do you know who Sean Starr was in 2020?

A.   I think I have heard of Sean Starr's

name, but I don't remember when I met him if it was 2020 or some other time.

Q. Okay. Josh Tepfer is somebody who worked on a lot of postconviction cases with your office over the years?

A. Sure.

Q. Yeah. And you understood that in 2020 he represented a number of people that were making claims of misconduct against Mr. Guevara?

A. In 2020?

Q. Yeah.

A. I'm assuming.

Q. Okay. So I understand that you may have had conversations with attorneys over the years about specific cases, and I'm not asking you to get into all of that right now.

My question to you with respect to 2020 is did you have any communications with Mr. Tepfer with respect to generally how your office should formulate its policy with respect to cases involving Mr. Guevara, not tethered to a specific case, but generally what your office's policy would be?

A. As I sit here today, I do not recall

51

those conversations, no, in 2020.

Q. In 2020, did you authorize your subordinates to have communications with members of the Exoneration Project with respect to what your office's policy should be with respect to cases involving Mr. Guevara generally?

A. I don't recall.

Q. Okay. When you first got the Guevara Protocol, did you review it?

A. I don't recall reviewing or getting the protocol. I know a protocol exists. I don't remember getting a protocol.

Q. You did get it at some point though, yes?

A. I don't recall getting a protocol.

Q. So you don't recall ever getting the protocol?

A. I'm not saying I don't recall ever getting a protocol, counsel. 2020 was 6 years ago in the middle of a pandemic, and there was a lot going on.

I saw that there was a protocol that existed during that time. I do not recall the specifics of the protocol coming across my desk,

52

my e-mail.  I don't know if we were in the office at that point in December of 2020.

Q.  I understand you may not remember the specifics of the protocol?

A.  Or getting the protocol.  I know there was a protocol.  I do not recall as I sit here today when/how that protocol got to me or when I saw it or what was said about it.

Q.  Did you at some point authorize the Guevara case review protocol to be a policy of the Cook County State's Attorney's office?

A.  I don't know that I personally authorized it or my first assistant at the time, Joe Magats, did.  I don't recall.

Q.  But do you dispute as you sit here today that the Guevara case review protocol was a valid -- validly implemented policy at the State's Attorney's Office subsequent to December of 2020?

A.  I don't dispute that, no.

Q.  Okay.  Are you disputing that you authorized either directly or through a subordinate that the Guevara case review protocol was a policy to be implemented by the Cook County State's Attorney's Office subsequent to December

of 2020?

A.   Can you ask that one more time?

Q.   Sure.  I'm just -- you are saying you don't remember this --

A.   Yeah.

Q.   -- and so I'm just trying to make sure that I understand what you are saying.

A.   Yeah.

Q.   Did you -- are you disputing that the Guevara case review protocol was a valid policy authorized by the State's Attorney's Office after its implementation date in December of 2020?

A.   I'm not disputing that, no.

Q.   Okay.  And so when you reviewed it in preparation for your deposition, did you recognize this to be a policy that you understood was a policy of your office during the time you were in office?

A.   When I reviewed it, I looked at the date and said I don't remember what was happening then, but I don't dispute that that document is what that document purports to be.

Q.   Okay.  And just circling back to these communications with the Exoneration Project, you

do not recall having any communications with your subordinates, which would include Mr. Magats, which would include Ms. Coleman about what had occurred during communications they had with the Exoneration Project about Guevara policy generally?

A.   In 2020?

Q.   Correct.

A.   I don't recall.

Q.   All right.  You referenced that you had reviewed some e-mails from 2022 with the Exoneration Project, right?

A.   I believe that was 2022.

Q.   And we will talk about those in a little bit, but between when your subordinates have said that there was communications with the Exoneration Project up until 2022 when you see that there's e-mails reflecting that additional communications, do you recall any communications that you were privy to with the Exoneration Project relating to Guevara policy between those two time periods?

A.   Policy or cases?

Q.   Well, so that's a fair question.  Let me

attempt to clarify here.

A. Thank you.

Q. Your office had numerous cases while you were in office where there were claims being made against Mr. Guevara of misconduct, correct?

A. Correct.

Q. All right. And for a significant period of time when you were in office, those were handled essentially by whatever unit was handling the postconviction or the CIU depending on procedurally how those claims came in, right?

A. Correct.

Q. All right. And at some point there was a discussion with the Exoneration Project about generally how to look at these cases as sort of a grouping as opposed to individually, right?

A. I believe so. Yes.

Q. All right. And so what I'm trying to figure out here time wise is if you say you don't remember the part in March of 2020 of your subordinates having these communications, when is the first period of time that you do remember those communications with the Exoneration Project commencing?

A.    I see.  I don't recall the time period. And again, counsel, 2020 was a pretty remarkable year for the office, and so I hear you when you are saying it.  I don't recall.  But at some point there were conversations about them as a grouping.

Q.    So in 2020, you had not directed any of your subordinates to try to formulate general policy with respect to how to approach Guevara cases?

A.    I'm not saying I did not.  I'm saying I don't recall if that was in 2020.

Q.    Okay.  Do you recall that occurring?

A.    Or directing, I don't recall that.

Q.    Do you recall -- well, let's use directing or authorizing your office to look into a general policy with respect to how you would approach cases involving former Detective Guevara.  When is the first time that -- did that happen first of all?

A.    There was a conversation at some point around looking at these cases as a collective.  I don't recall when that was.

Q.    Do you recall what year it was?

57

A.   I don't.

Q.   Do you understand after reading the Guevara case review protocol that that protocol specified a number of investigatory standards and recommendations to you for relief that were contemplated by that protocol?

A.   Yes.

Q.   All right.  Other than the Guevara case review protocol format, was there another either parallel or separate set of standards that your office was applying with respect to cases involving Mr. Guevara prior to you agreeing to vacate Ms. Mulero's conviction in August of 2022?

A.   Can you repeat that?  I don't understand your question.

Q.   Sure.  You understand the Guevara case review protocol sets forth people can make claims, they're to be investigated in a certain fashion and that the CIU when they're -- after they do their review would make recommendations to you for relief and that there were different types of relief that would be recommended by them, that's generally what the format was of it, right?

A.    Based on what I recently saw, yes.

Q.    Okay.  And so you understood that that was going on with your office prior to August of 2022, meaning that the CIU was implementing this policy?

A.    Yes.

Q.    Okay.  So and that that policy was for lack of a better term Guevara specific, it only involved cases of misconduct alleged against former Detective Guevara?

A.    Yes.

Q.    All right.  So my second question with respect to that is, was there any other policy or program or investigation of that sort specifically directed to general claims about Mr. Guevara that were going on other than what was going on with the Guevara case review protocol during that same time period?

A.    I'm sorry, I'm still missing your question.  You mean outside of the protocol, were there other individual cases regarding Guevara?

Q.    No.  No.

So you understand that the Guevara case review protocol had a set of standards that were

59

put in place --

A.    Yes.

Q.    -- for -- hang on one second.

For investigating claims specific to Mr. Guevara only, full stop, right?

A.    Yes.

Q.    All right.  And part of that was just sort of looking generally at the universe of those cases involving Mr. Guevara and how to handle those from the State's Attorney's perspective?

A.    Correct.

Q.    All right.  And so Mr. Weber talked about what went on there.  I'm not going to necessarily ask you too much about that, but what I'm interested in from you is was there anything similar to that that was being done by another unit of the State's Attorney's Office, in other words, that you were looking generally at, how do we approach -- we have all of these separate cases about Mr. Guevara, let's generally look at how we approach these and investigate these, and what are we going to do about it?  Did anything like that exist?

A.   I don't recall anything separate existing.

Q.   Okay.  All right.  Fair enough.

One of the portions of the Guevara case review protocol had that you were to be updated periodically about how this program was being implemented and the things that they were doing. Do you recall ever being updated on that as that progressed?

A.   I don't recall, no.

Q.   At any point?

A.   I don't recall, and I don't know if that -- I don't recall.  My pause is it may be from Joe, but not the unit, but I don't recall if I'm speaking to Mr. Weber directly.

Q.   Or Ms. Adduci who was the director at the time?

A.   I don't recall speaking -- I spoke to Nancy about cases from the CIU.  I don't recall a specific conversation with the Guevara Protocol.

Q.   Got it.  So just to sort of put a bow on this, I understand that your office was handling numerous individual cases involving claims against Mr. Guevara.

And so I just want to make sure that I understand what you are saying, the only sort of generalized investigation of misconduct with Mr. Guevara that you were aware of going on in your office prior to August of 2022 was the one that was contemplated by the Guevara case review protocol?

A. Yes. When you are saying generalized versus specific cases that might have been winding their way through, I'm saying to you that those cases might have been investigated separate and apart, but a generalized protocol, that's the only one I recall.

Q. Okay. And so when we are talking about the individual cases, those cases other than what was being done by the CIU for the Guevara case review protocol, those were winding their way through your office in the units that would normally be investigating those cases, specifically the postconviction unit or perhaps the CIU if there was a claim of actual innocence?

A. Yes.

Q. All right. No other units that you are aware of other than those being involved in

62

reviewing Guevara cases?

A. Not that I recall. No.

Q. All right.

A. Do you mind if I -- we take a break?

Q. Oh, absolutely. Take a break any time you want.

A. No. No. It's cool. As you can tell, my throat is getting a little --

Q. Yeah. Do you need tea or anything?

A. Ooh, you have tea?

Q. Sure.

THE VIDEOGRAPHER: Let me take us off the record.

MR. SCAHILL: We don't need drink orders on here.

THE WITNESS: I am so sorry.

THE VIDEOGRAPHER: Off the record at 11:14 a.m.

(A short break was taken.)

THE VIDEOGRAPHER: We are back on the record at -- excuse me, one second.

We are back on the record at 11:26 a.m.

(Whereupon, Deposition Exhibit No. 2 was marked for

identification.)

BY MR. SCAHILL:

Q.   During the break, we marked what is Defendant's Exhibit 2, which purports to be the Guevara case review protocol.  Have you had the opportunity to glance at that?

A.   I have.  Thank you.

Q.   This is the document that you reviewed in preparation for your deposition here today?

A.   Correct.

Q.   We are not going to go through all of the details of this, I promise you.

A.   Thank you.

Q.   But I do want to have you flip real quick to Page 9.

A.   Yes, sir.

Q.   So Page 9 through I guess it's just 9 to 10 discusses recommendations and final determinations to be made under the Guevara case review protocol; do you see that?

A.   Yes.

Q.   Okay.  And did you understand when you reviewed this that there were four separate recommendations that could be made by the CIU

64

under the Guevara case preview protocol in specific cases?

A.   I recall reading what is on the page, yes.

Q.   And those are -- there could be a recommendation that a person was innocent?

A.   Uh-huh.

Q.   Right?

A.   Yes.

Q.   Okay.  Another one would be that there would be a recommendation to vacate a case in the interest of justice?

A.   Yes.

Q.   The third one was a recommendation for a new trial?

A.   Yes.

Q.   And the final one was a recommendation of no action, right?

A.   That's what it says.  Yes.

Q.   Got it.  Okay.

Now, before we get into Ms. Mulero's case, these cases were to be investigated and reviewed as contemplated here by the Conviction Integrity Unit, right?

A.   As contemplated by this document, yes.

Q.   Yeah.  And normally the Conviction Integrity Unit's role in looking at postconviction cases were limited to cases alleging actual innocence, right?

A.   That was the normal protocol.  Yes.

Q.   Right.  This protocol specific to former Detective Guevara had innocence as one of the recommendations, but it also had several others short of actual innocence for which relief could be granted by your office, right?

A.   That is correct.

Q.   All right.  Are you aware that Ms. Mulero in fact filed a -- filed a request that her case be reviewed under the Guevara case review protocol?

A.   No.

Q.   All right.  Did you ever become aware of that?

A.   No.

Q.   All right.  At any point prior to your office making the determination that it would not be opposing Ms. Mulero's request for postconviction relief, had the CIU under the

66

Guevara case review protocol made any recommendations to you for determination on Ms. Mulero's case?

A. I don't recall that.

Q. Okay. And if Mr. Weber testified that no such recommendations were ever made to you under the protocol, would you have any reason to disagree with what he said?

A. Because I don't recall, no.

Q. Okay. Fair enough.

Do you know whether Ms. Mulero's case was ever substantively investigated under the Guevara case review protocol by the Conviction Integrity Unit?

A. Can you ask it again?

Q. Yeah.

Are you aware of whether Ms. Mulero's case was ever substantively -- the merits of it were substantively investigated by the Conviction Integrity Unit under the Guevara case review protocol?

A. I don't know if it was under the Conviction Integrity Unit or some other unit. There was a recommendation to vacate the

conviction. My assumption is that the assistants who were delegated to it did the review. I don't know where they would have sat.

Q. Okay. So you don't have any recollection here today of either Ms. Adduci or Mr. Weber or anyone else from the Conviction Integrity Unit specifically making a recommendation to you to vacate Ms. Mulero's conviction based on an investigation that they did?

A. To me directly, no.

Q. What about indirectly?

A. There were recommendations that were being made to my first assistant or the chief deputy that might have been communicated to me, but I don't recall speaking directly to Nancy Adduci or Adam Weber about these cases in particular.

Q. So just coordinating this to the CIU investigation, whether this came directly to you or -- whether it was communicated directly to you or indirectly to you, were you informed that the Conviction Integrity Unit was recommending postconviction relief for Ms. Mulero?

68

A. In 2022?

Q. Correct.

A. I believe Ms. Mulero's case was a part of the cases that were vacated in 2022.

Q. I'm asking something a little bit different. Perhaps this is bad phrasing by me, so let me give it another shot.

A. It's okay.

Q. You mentioned recommendations that were given to you on cases in 2022 to, you know, not oppose postconviction, right?

A. Yes.

Q. One of those was Ms. Mulero's case?

A. I believe that's right.

Q. Okay. So let's stick to Ms. Mulero's case for this next question.

Either directly or indirectly, were you given a recommendation by the CIU under the Guevara case review protocol recommending that postconviction relief for Ms. Mulero be agreed to?

A. I don't recall it coming directly from CIU in 2022, no. I don't recall.

Q. Got it. Okay.

69

So and I'm not referring necessarily to someone from CIU specifically talking to you, Ms. Foxx, saying we recommend this, but perhaps another subordinate, your first assistant or someone of -- a bureau chief or someone else saying the CIU is recommending that we not oppose postconviction relief for Ms. Mulero. So with that as the context of the question, did that occur?

A. I can't say that it was CIU. I recall speaking to members of the executive team, the first assistant and the chief deputy at the time about cases that were going to be vacated and the recommendations, but I don't recall them saying based on this being CIU or the postconviction unit or somewhere else. I don't know that that conversation happened. I only know what my executive team said to me in terms of their recommendation.

Q. Okay. Did you become aware that Ms. Mulero filed a motion for postconviction relief under the Postconviction Act in March of 2022?

A. No.

Q.   Okay.  Are you aware of that as you sit here today, in other words, that Ms. Mulero had both a request that her case be reviewed under the Guevara case review protocol and additionally that she had filed a petition for postconviction relief in the courts?

A.   I was not aware of that.  But again, because of the convictions that were vacated in 2022, I know some of those came from postconviction.  So I was not aware of where she sat, but I know postconviction was a part of it.

Q.   Okay.  Before the decision was made to vacate -- agree to vacate Ms. Mulero's conviction, are you aware of any investigation that was done by the CIU on Ms. Mulero's case specifically?

A.   I don't know whether it was CIU or postconviction.  I was not personally aware.

Q.   Okay.  And so same question for postconviction, are you aware of any investigation that was done by the postconviction unit with respect to the merits of Ms. Mulero's request for postconviction relief prior to you -- to your office agreeing to vacate Ms. Mulero's

conviction?

A. What I know is that there was a -- that there were reviews of certain Guevara cases from that year, I believe it was 2022, and the work was delegated between CIU and postconviction to review the merits of those cases to make a recommendation for vacating.

I do not recall the specifics of which unit investigated which person. Again I delegated to my first assistant and chief deputy to work with those units who were looking at these cases in making those recommendations, but the specifics as to which unit, I cannot tell you.

Q. Okay. But as I think you have testified earlier, the only two units who would have been doing those investigations would have been CIU under the Guevara case review protocol or the postconviction unit that was headed by Ms. Rogala at the time?

A. Correct.

Q. No other units that you are aware of doing any investigation into these cases?

A. Again I'm not that I'm aware of unless

72

there were individual cases that they were looking at individually, but that doesn't ring a bell to me.

Q. Okay. Fair enough.

In approximately March of 2022, did you -- let me ask you this question first, in March of 2022, was your executive assistant the woman by the name of Janea Bennett?

A. Janea Bennett.

Q. Oh, Janea Bennett, I'm sorry, thank you for the correction.

A. Yes.

Q. Was it Janea Bennett?

A. Yes.

Q. Okay. In approximately March of 2022, did you instruct Ms. Bennett to reach out to Mr. Tepfer to discuss the Guevara cases?

A. I don't recall specifically, but it's possible.

Q. Okay. When you say it's possible, you don't have any recollection of that occurring?

A. I don't.

Q. Do you have a recollection of sometime in the spring of 2022 deciding that your office

73

should start seeking input on how the Guevara cases generally should be addressed?

A. No.

Q. You are aware that Ms. Bennett did in fact reach out to the Exoneration Project to schedule a meeting with you to discuss Guevara cases?

A. I don't recall specifically. I'm sure I had a meeting with Josh at some point, but I don't know if it was because I asked or Janea set it up. I have no idea.

Q. How did that come about that the Exoneration Project was going to be discussing with you Guevara cases generally?

A. I don't -- I just want to make sure I'm answering your question correctly. I recall meeting with Josh. I don't recall that I said call him to talk about Guevara cases and that's what it was. I know I talked to him. I don't recall how the meeting transpired.

Q. So when you say you talked to him, are you referring to the meeting in June where there was a PowerPoint presentation given?

A. I'm sorry, I thought you were

referencing something in March of 2022?

Q. Yes. And you said that eventually you had communication with Josh about the Guevara cases, right?

A. I'm sorry, you're -- I'm --

Q. Let me try to clarify.

A. Thank you.

Q. So at some point there was a discussion that you had with Mr. Tepfer from the Exoneration Project relating to Guevara cases generally and your office's policy towards them, right?

A. No. I know at some point that I recall that Mr. Tepfer came with someone, I believe it was Anand, you mentioned his name earlier, to do a pitch on certain cases regarding Guevara. And those were cases, not a protocol.

So I just want to make sure I'm understanding your question correctly. I don't recall when that was, but I do believe it was in 2022.

Q. Got it. Okay.

And so we will get into the substance of that meeting in a moment here, but your understanding with respect to what was to be

75

discussed with Mr. Tepfer was specific cases pending with your office as opposed to generally how your office should approach cases involving former Detective Guevara?

A. As far as I can recall, yes.

Q. All right. And you don't remember whether you initiated that discussion about those cases or whether someone else did?

A. I don't know if Janea was responding to a call from Mr. Tepfer and saying I would meet with him. I don't recall saying, hey, set this meeting up. I don't know.

That was -- as I sit here, that would have been four years ago and a phone call when we spoke to attorneys quite a bit on specific cases. So I don't recall that.

Q. So at this point in time, March of 2022, your office did in fact have a protocol in place for generally sort of grouping the Guevara cases together and how they would go about investigating them?

A. Per this document, which is the protocol that says effective December 2020, I would assume that that was still in place in 2022, so yes.

76

Q.   Okay.  And that was the only one that was in place that you were aware of at that point in time?

A.   A written protocol related to those cases, yes.

Q.   Got it.  Okay.

Was there an unwritten protocol that you are aware of?

A.   No.  I'm just going back to individual cases that might have been reviewed separate and apart from what's written on here.

Q.   Got it.  Okay.  And so in March of 2022 or thereabout, leading into the summer, was -- were you pursuing a different way in which to look at Guevara cases generally?

A.   I don't recall that.

Q.   So you're -- I just want to be clear, you are saying that when you met with Mr. Tepfer and a couple other members of the Exoneration Project in the summer of 2022, this was not to discuss sort of a generalized policy with respect to how your office would approach cases involving Mr. Guevara was limited to a specific grouping of cases?

77

A. As far as I can recall, yes.

Q. All right. Fair enough.

At some point, you did in fact have that meeting with Mr. Tepfer and those other members of the Exoneration Project?

A. I know there was at least one other person. I don't know about other members. There was at least one other, but I don't recall if there were more.

Q. Okay. Who was -- was that in person or was that remote via Zoom?

A. I believe that was in person.

Q. Okay. Tell us what you recall about that meeting.

A. I was there, my first assistant, Risa Lanier was there. I believe Chief Deputy Thor Martin was there. Oh, maybe Thor was not there. I'm sorry, I know at least myself and Risa Lanier were there. Josh and Anand, I don't recall his last name, had a slide presentation regarding some cases that they had concerns about.

Q. Okay. And so they gave essentially a PowerPoint slide presentation to you and at least Ms. Lanier?

78

A. Correct. And I believe Allison Miller, my chief of staff.

Q. Got it.

Other than sort of putting on a presentation, what else occurred during this meeting?

A. We talked about their presentation.

Q. Okay. Do you remember what was said?

A. No.

Q. Okay. Do you recall which cases were discussed?

A. There was a list, a matrix. I don't remember the cases specifically other than Jose Cruz. And that's because I got deposed on Jose Cruz's case.

Q. Was Ms. Mulero's case one of the cases?

A. I don't recall specifically. No.

Q. Do you understand as you sit here today that at the time that Ms. Mulero's conviction was vacated that she was in fact represented by Mr. Tepfer in the Exoneration Project?

A. I was not aware of that.

Q. You don't -- but with respect to the meeting with the Exoneration Project, you do not

recall if Ms. Mulero's case in particular was discussed during that meeting?

A. I don't recall. Like I said, there were a number of cases that they were -- that they had on their slide deck. I don't recall the specifics.

We were not talking the specifics about each individual case. And the cases were going to be reviewed by people on the team, but I don't recall Ms. Mulero specifically.

Q. Got it.

So when you say we were not talking about individual cases, what do you mean by that?

A. I'm saying they were doing a pitch about concerns regarding the cases, and given the number of cases that they were discussing, I did not have the time or bandwidth to sit and have individual pitches on the number of cases.

There were at least seven or eight cases, at least, but probably more than that. And so they were talking about concerns that they were having regarding the review of those cases.

Q. Were the members of the Exoneration

80

Project suggesting that your office should have a different way of approaching these cases involving former Detective Guevara that was different than how your office had currently been investigating and making determinations on?

A. What I can recall is that they had concerns that their cases were not being investigated.

Q. And how do they articulate that?

A. We have these cases that we feel need further investigation.

Q. So your recollection of it is that they were saying more needs to be done in actually investigating the cases that were pending or that they were saying the manner in which your --

A. Yeah.

Q. Hang on one second. The manner in which your office is handling cases with respect to Mr. Guevara should be handled differently than other cases with your office?

A. No. What I'm saying is if they had a list of cases that they wanted to make sure were brought to the attention of the office to be reviewed, and apparently those cases have been

pending for some time, but there was no proposal of like what we should be doing. No.

Q. So they were not suggesting to you something along the lines of, you know, there's just too many allegations of Mr. Guevara to merit your office fighting them on individual bases, you should just sort of look at these generally and say, you know, this is sort of a lot of bad acts being alleged, we should have a different approach to these than what your office is looking at now which is looking at them individually?

A. That's not what they said to me. No.

Q. Their gripe to you, for lack of a better term, was you need to be -- we think that these specific cases are not being investigated as comprehensively as we would like?

A. I don't know that it was not as comprehensively as we like, that they had concerns about those particular cases that they wanted to highlight for our office.

Q. Got it.

Fair enough. How long did this meeting last?

82

A.   I don't recall, but I don't imagine it was more than an hour.

Q.   Got it.

Other than this meeting prior to the first week of August of 2022, did you have any communications with Mr. Tepfer or anyone else from the Exoneration Project relating to your office's approach to Guevara cases generally and how you should be going about approaching them?

A.   I'm sorry, you said prior to the meeting in August?

Q.   No.

A.   If you can rephrase your question.

Q.   Happy to do it.

A.   Thank you.

Q.   So one of the dates here that we are sort of focused on is August of 2022, which is when Ms. Mulero's postconviction petition was granted and your office had withdrawn your objection to it, right?  You understand that's the date that that happened?

A.   Yes.

Q.   Okay.  So we now talked about a PowerPoint presentation you were present with

83

with the Exoneration Project at some point in the summer?

A. Yes.

Q. And so I'm talking about between those two time periods, did you have additional communications with anyone from the Exoneration Project about your office's general policy with regard to cases involving former Detective Guevara and how you should approach them?

A. Not about the general policy, no.

Q. Okay. Was it you had other communications, but they were about specific cases?

A. I had a conversation with Mr. Tepfer after the pitch meeting that he had done, yes.

Q. And how -- approximately how long after the pitch meeting was that?

A. It wasn't very long.

Q. And do you recall what occurred during that conversation?

A. The conversation was in essence we needed to get a universe. There were too many cases that he was asking for people to look at all at once. Our staff was not a large staff to

84

be able to review the cases with however many there were, that there should be an assessment based on certain -- like narrow his scope. You can't come with 15-20 cases and expect people to understand what's happening. We needed to narrow the scope of the cases.

Q. That's him saying you needed to narrow the scope of the cases or you saying that to him?

A. What I said to him was I understood his frustration because it was frustration about the individual cases, but that our office had to -- there were not just Guevara cases that we were looking at, there were other cases that we were looking at, the Conviction Integrity Unit, the postconviction unit were overwhelmed with many cases.

And so him coming in and just saying we have a bunch of cases was not helpful. If he wanted us to be thorough and thoughtful about these cases, he should narrow the scope of the cases that were being brought to us.

Q. Okay. When you said that to him, what did you mean by narrowing the scope of cases that he brought to you?

85

A.   It was what are the cases?  Every case isn't a case.  Narrow the scope.  What are the cases that you believe are priority cases for us to be able to evaluate.

Q.   Okay.  Did Mr. Tepfer -- let me strike that.

Was this a phone conversation or an in-person conversation?

A.   Phone conversation.

Q.   Okay.  During this phone conversation, did Mr. Tepfer suggest to you that your office should be applying a different standard to cases involving Mr. Guevara and the investigation of those cases that was different than your office was applying to other postconviction cases not involving Mr. Guevara?

A.   No.  Mr. Tepfer, I'm trying to be polite, is excitable.

Q.   You don't have to be.  I know Mr. Tepfer.  I know Mr. Tepfer very well.  He's a friend of mine.  Go ahead.

A.   He can be excitable.  He's a lovely gentleman, but he could be excitable.  And I think he was frustrated that there were, you

86

know, these cases in which he believed he and others were making compelling cases for. And I was trying to explain to him, I understood his excitement and his zealous advocacy for his clients, but we had a lot of cases and perhaps the wise thing to do was prioritize the cases in which he was seeking those reviews.

Q. Okay. So with respect to prioritizing the cases, what did you contemplate him doing? Is just giving you a list of cases that he really wanted you guys to sort of dig your teeth into or was it something else that you had contemplated with that?

A. I don't know that I was contemplating anything other than, Josh, you can't have 30 cases that you are expecting 4 people to review. Figure out a way to talk about what cases are cases that we can look at.

Q. Okay. After that -- was that the extent of the conversation or is there more?

A. As far as I can recall. Yes.

Q. Okay. But during that conversation, Josh didn't say to you we think that your office should just look at the cases and recognize that

these are allegations against an officer who has a ton of allegations of misconduct against him and just agree to postconviction relief because of the weight of the allegations against this guy and not do investigations into them?

A. No.

Q. Okay. And you certainly didn't agree to that?

A. I would never agree to that, no.

Q. Like you wouldn't agree if -- you would not agree to a proposal from the Exoneration Project or another set of defense attorneys to just not investigate a case because of the weight of the allegations against a particular officer?

A. Absolutely not.

Q. Okay. And you didn't do so in this particular instance?

A. Absolutely not.

Q. Okay. Other than that conversation with Mr. Tepfer, did you have any other conversations with Mr. Tepfer about, you know, Guevara cases generally before the first week of August 2022?

A. I think we had an e-mail exchange.

Q. Okay. Is that the e-mail that you

88

reviewed for your deposition?

A.   Yes, sir.

Q.   Was that from July of 2022?

A.   I would have to look at it, but I believe so.

Q.   I will show it to you in a minute.

A.   Thank you.

Q.   Actually you know what, let's just do it now.  Why waste time.

MR. SCAHILL:  This is going to be Defendant's Exhibit 3.

(Whereupon, Deposition Exhibit No. 3 was marked for identification.)

MR. SCAHILL:  Ms. Duffy?

MS. DUFFY:  I'm good.

MR. SCAHILL:  I have one for you.

MS. DUFFY:  But thank you.

BY MR. SCAHILL:

Q.   Ms. Foxx, you have been handed what's been marked as Defendant's Exhibit 3.  Just take a moment and peruse that and then I will ask you some questions about it.

A.   Yes, sir.

89

Q.   Ready?

A.   Yes, sir.

Q.   Okay.  First question, is this the e-mail string that you reviewed in preparation for your deposition or something similar to it?

A.   Yes.

Q.   Okay.  So I guess we have to kind of start from the back here because it looks like you are responding on a string that Mr. Tepfer had started on July 13th of 2022.

So Mr. Tepfer appears to have sent an e-mail, which included you on July 13th of 2022 at 9:38 a.m.  Do you see that at the bottom of the first page?

A.   Yes.

Q.   Okay.  Did you in fact receive that e-mail from Mr. Tepfer?

A.   I'm assuming so.  I don't recall.

Q.   So Mr. Tepfer -- the first sentence in his e-mail references that he was following up on a discussion that you and he had had late Monday afternoon relating to Guevara matters; do you see that?

A.   I do.

Q.   Is that the discussion that you were referring to a moment ago or is there a different discussion?

A.   Yes?  I believe so.

Q.   That was one you were talking about before?

A.   I believe so.  Yes.

Q.   Okay.  So Mr. Tepfer is referring to late Monday afternoon, which by my reference to the calendar looks like it would have been the -- July 13th was a Wednesday and it would have been that Monday on July 11th.  Do you have any reason to dispute that?  I know you don't remember it specifically?

A.   I don't.  And I don't have a calendar, but I will take your word for it.

Q.   All right.  Fair enough.

So the first sentence Mr. Tepfer says to you is I want to again thank you for your proactive positions on these issues.  Needless to say, the substantive discussion with Ms. Foxx and the decision to no longer contest postconviction matters where Guevara is at the heart of them is very satisfying to me personally and will

91

meaningfully impact people's lives.  Do you see that?

A.    I do.

Q.    Did you tell Mr. Tepfer that your office had made the decision to no longer contest postconviction matters where Guevara is at the heart of them?

A.    No.

Q.    Okay.  You do respond to this couple of hours later.  Do you see that?

A.    I do.

Q.    All right.  It doesn't look like you corrected what he said on there, right?

A.    I don't know that I didn't correct it. What I said was there would be on ongoing process requiring additional vetting of cases.

So again we were talking about universe of cases, prioritizing case in which Detective Guevara was at the heart of the cases, but we would have to do vetting of those cases.

Q.    Got it.

So just so we are clear never told Josh Tepfer during that call or any other time that your office had made some across-the-board

92

decision to no longer contest postconviction matters where Guevara is at the heart of it?

A. Correct.

Q. Okay. And at this point in time, July 13th of 2022, the State's Attorney's Office had not made that decision in fact, had they?

A. Correct.

Q. All right. At some point after this exchange, did your office change the policy with respect to how you were approaching cases involving former Detective Guevara?

A. Change the policy meaning?

Q. Meaning change it from we are investigating these through the CIU and the Guevara case review protocol and the PC unit, the way that it was normally done to something else?

A. Yes.

Q. You did, okay. When did that happen?

A. Some point after that meeting, I assigned, I believe, it was Risa, I don't know who Risa was working with, to work with them to get the universe of cases to prioritization of the cases involving Detective Guevara to evaluate the role that Detective Guevara had in those

individual cases.

Q. Got it.

Okay. So going back to this e-mail, the cases that Mr. Tepfer highlighted for you includes Ms. Mulero's case, correct?

A. It's number 12, yes.

Q. Okay. So that is one of the cases he was asking your office to sort of pay particular attention to?

A. Yes.

Q. Mr. Tepfer includes a wealth of other information in this e-mail about this being, you know, essentially a mass exoneration and sort of implying that that's what your office had agreed to. That's what he seems to be implying here, right?

A. Those are his words, correct.

Q. Right. But you are saying that you had at no point told or suggested to Mr. Tepfer we are no longer standing by cases where Mr. Guevara is at the heart of them and that -- that did not occur?

A. What I'm saying is I told Mr. Tepfer to give us the priority list of cases involving

94

Detective Guevara where he was at the heart of them and that our team would evaluate those cases. In those cases in which we believe we would not be able to be successful, we would move to vacate.

Q. Okay.

A. Or no longer -- not vacate. No longer object to postconviction.

Q. I say that all the time. I understand.

A. I got to get it right.

Q. Nuts and bolts, you have a position, but ultimately the Court makes the decision?

A. Correct. But that it would -- yes. That's correct.

Q. Got it.

So but you are saying at some point after that, you made a decision to modify the general policy that your office had previously been taking with respect to cases involving former Detective Guevara?

A. What I'm saying is at some point after that, I asked Mr. Tepfer to work with my then first assistant Risa Lanier regarding the universe of cases and then Risa would direct the

95

members of our team to review those cases for the validity of the claims.

Q. Okay. And so you directed Risa to look at the cases that he highlighted and to look at them to see whether those were ones that merited your recommendations of relief?

A. What I directed was that she would be the point person on those cases, and that she would work with members of CIU and the postconviction unit to prioritize looking at those cases.

Q. And one of those was Ms. Mulero's case?

A. According to this, yes.

Q. So when you -- do you have a -- is there a distinction in the policy and standards that your office was applying in reviewing these cases at this point that was different from the policy and standards that you had been applying before under the Guevara case review protocol in the PC unit standards?

A. I can't answer that because I don't recall reviewing the protocol before that conversation.

Q. So when you gave your directive to

Ms. Lanier, did you articulate to her we should be looking at whether we are going to oppose or not oppose these under a different set of investigatory standards than we previously applied under either the Guevara case review protocol or the PC unit's ordinary standards?

A.   I did not give that level of specificity.  What I said was I wanted her to look -- or have the team take these specific cases and look where Mr. Guevara's role played in them that those cases for the review for postconviction relief.

Q.   Was that the extent of the directives that you gave as to how they were to go about looking at those cases?

A.   Yes.  I trusted the team on the ground to be able to do the work that they were assigned to do and again laid out a broader policy and that was the extent of it.

Q.   And what was the broader policy?

A.   Again to look at the prioritization of cases that were sent to us, the role that Detective Guevara played in those cases and vet those cases for the validity of granting

97

postconviction relief.

Q.   So when you were giving that sort of general overview of what the policy would be, were you contemplating that your subordinates would stop doing any investigation at all into the underlying cases and just agree to relief regardless of what the status of the investigation was?

A.   Absolutely not.  And I want to be clear, I was not saying it was a policy.  I was asking for a review.  And so the review of those cases didn't mean that there was a policy that was being established.

It was here are the list of cases, determine if Detective Guevara was at the heart of them, vet those cases for the validity of whether or not we should continue to object to postconviction relief.

Q.   So what you contemplated when you were giving that directive, I know you are not comfortable with the term policy, but when you were --

A.   Because there was not a policy.

Q.   Understood.  When you were giving that

98

directive to your subordinates about what you expected them to do, what you expected them to do is to continue to investigate the actual cases and the merits of them and to determine what role Mr. Guevara had in those cases?

A. Correct.

Q. And to look at the evidence that supported their cases and perhaps, you know, militated against them and to sort of weigh that in the normal way that your office went about evaluating postconviction cases?

A. Correct.

Q. Which would mean doing a meticulous, thorough investigation into the allegations and making decisions on postconviction based on that review of the evidence?

A. Correct.

Q. Okay. And that's what you expected your subordinates to do with your directive?

A. Correct.

Q. All right. You gave that directive to Ms. Lanier?

A. I said to Ms. Lanier, yes, to talk -- to work with Josh and team to get the universe of

99

cases.  Once getting the universe of case work with the team, to do the review of those cases and make recommendations based on that review.

Q.  Okay.  So this is subsequent to July 13th of 2022, right?

A.  Based on the e-mails, yes.  I would assume so.

Q.  Okay.  And at some point after that, did your team come to you with recommendations?

A.  Yes.

Q.  All right.  When did that occur?

A.  I don't recall.  Some time after that and before August apparently.

Q.  So the case of Ms. Mulero and several other ones were -- came up for your position and then ultimately were vacated on I believe August 9th of 2022?

A.  I don't recall the date specifically.

Q.  But this set of determinations that you are saying were articulated to you by your team would have taken place between July 13th of 2022 and August 9th of 2022?

A.  I'm assuming so.  Yes.

Q.  That couple week period.  Okay.  Got it.

You do not recall specifically what date that was?

A. I do not.

Q. Okay. Do you recall whether it was within a couple days of July 13th or was it, you know, closer to a week or two?

A. I don't recall.

Q. Do you have a recollection of that -- those recommendations being made to you as you sit here today?

A. As I sit here today, I know they -- there were conversations about it. I don't remember when or the specifics therein, but I know we had conversations about it.

Q. Okay. And when you say we had conversations about it, who are you referring to?

A. I believe at a minimum, Risa Lanier and myself.

Q. So at some point Risa Lanier and yourself have a conversation about recommendations for relief in pending postconviction cases?

A. Yes.

Q. Okay. And was Ms. Mulero's case one of

those?

A.   I believe so.  Because she got the relief in August.

Q.   Okay.  So do you recall Ms. Lanier making a recommendation to you for not opposing Ms. Mulero's request for postconviction relief?

A.   I recall the conversations.  I don't recall Ms. Mulero's case specifically.  I recall the conversation about the universe of cases where she believed these were cases we should no longer oppose postconviction relief.  I don't recall the specifics about Ms. Mulero's case.

Q.   So tell me what you recall just generally about that discussion then with Ms. Lanier?

A.   That based on the review from the respective teams, these were the recommendations for the cases in which we should no longer oppose relief.

Q.   Did Ms. Lanier give you any reasoning or rationale for her recommendation?

A.   What I can recall is based on a review from the teams of the cases, that was the recommendation.

Q. Okay. And this involved quite a number of cases?

A. Yes.

Q. Okay. And as best you can recall it, Ms. Lanier was not, in other words, saying okay, Ms. Mulero's case, it involves this set of facts, here is the interviews we did, here are the problems, you know, this is the evidence of this, this is the evidence of that, this is how we sort of analyzed this and for those reasons, we are recommending it? It was not that sort of substantive discussion, is that what you are saying?

A. I don't recall Ms. Mulero's case in particular. I recall having a conversation with Ms. Lanier about some of the facts of the cases, and they would bleed together. But I don't recall Ms. Mulero in particular, but I do recall there being some explanation as to why some cases merited relief and others did not, but I don't recall Ms. Mulero in particular.

Q. Okay. So you do not recall as you sit here today any substantive explanation from Ms. Lanier about why there was a recommendation

on Ms. Mulero's case in particular?

A.   I don't recall the conversation -- the substantive nature.  There was a conversation that said this is why we believe these cases are warranted.  I don't recall the particulars of the substance of Ms. Mulero's case.

Q.   Okay.  Do you recall having any questions during that communication with Ms. Lanier about these cases, about -- and the merits of any of the cases?

A.   I'm pretty sure I had questions at the time.

Q.   Do you remember having any questions about Ms. Mulero's case?

A.   I don't recall Ms. Mulero in particular, no.

Q.   Okay.  And again I asked this in some other way, but you don't remember what the bases were for Ms. Lanier articulating to you, if she did at all, why there had been a decision to not oppose Ms. Mulero's request for postconviction?

A.   Again I don't recall.  I know we had a conversation.  I don't specifically remember Ms. Mulero's case.

Q.    Okay.   In July of 2022, did you have any communications with Ms. Rogala about Ms. Mulero's case?

A.    Not that I recall.

Q.    So Ms. Rogala, we took her deposition in this case, she indicated that she was on a Zoom call with you in July of 2022 relating to the Mulero case and the disposition of it.  Do you dispute that that occurred?

A.    I don't recall it.

Q.    Okay.   So this is what I will tell you, what Ms. Rogala testified in this case was that she had been handling the Mulero postconviction matter in the postconviction unit, and they had not really done any investigation at all and that she was on a Zoom call with you and that you just told her to cease her investigation and to agree to postconviction relief for Ms. Mulero.

Is that an accurate description of what happened prior to Ms. Mulero's case being -- you agreeing to postconviction relief for Ms. Mulero?

A.    I don't recall that at all.

Q.    Are you disputing that that's what occurred?

105

A.    It would be counter to what we were doing in terms of vetting the cases for the relief.  So I don't recall the conversation, but it's counter to the directive that we were given.

Q.    Your directive was fully, completely, meticulously and thoroughly investigate the cases and come to the right decision on whether postconviction relief was warranted based on the facts and the evidence?

A.    I don't know if I used that many adjectives, but yes, a thorough investigation of the cases to determine whether or not we would continue to object.

Q.    But maybe I'm putting too much of a luster on it, but you wanted a full investigation of this stuff because that's the right thing to do?

A.    Yes.  And to be clear, these were cases in which there were allegations of homicide as opposed to some of the other cases where we had done mass relief regarding cases of guns or drugs.  These people had victims.  There would be families that would be impacted, so no, I would not have flippantly said don't do investigation

on these cases.  Absolutely not.

Q.    Or to stop an investigation?

A.    Absolutely --

Q.    Hang on.

A.    Absolutely not.

Q.    I understand, and I agree with the position you are taking.  Let me get the question out.

You neither stated nor implied to any of your subordinates that they should stop investigating postconviction cases in which there had been virtually no investigation done into the merits of it and just agree to postconviction relief?

A.    I don't recall that at all.  No.

Q.    That would be completely contrary to what you were contemplating that your subordinates were going to be doing?

A.    We had a conversation about how to go about looking at these particular cases.  That is contrary to what we had discussed.

Q.    Got it.  Okay.

So if -- as you sit here today, do you know what investigation, if any, was done by the

107

Cook County State's Attorney's Office into the merits of Ms. Mulero's postconviction claims prior to you agreeing to not oppose her postconviction?

A.   Again that was delegated to the teams that were working on them that included Ms. Rogala, excuse me.  And Risa Lanier was the point person on those.  As to the specifics of the investigation, I again delegated that to the attorneys on the case.

Q.   So when they were making the recommendations, you were assuming that there had been a full and complete investigation into the merits of the claims that were made under ordinary standards, and that they were not just agreeing to it because there's, you know, a number of allegations against the officer that was involved in their investigation?

A.   Yes.  I was assuming that the Assistant State's Attorneys who took an oath were adhering to the oath that they had taken to review these cases in making those recommendations.

Q.   Okay.  So if Ms. Rogala says that she was just specifically directed by you personally,

stop the investigation that you are doing, agree to this postconviction relief on this case, you would dispute that that's what happened, right?

MR. FLAXMAN: Objection. Form. Misstates facts.

THE WITNESS: I will say that while I don't remember a lot from a long time ago, I know that I would not ask Ms. Rogala to violate the oath that she took, which is as a prosecutor to make sure that she was upholding the Constitution and following her ethical obligations as a prosecutor. I would not ask her to do that. No.

BY MR. SCAHILL:

Q. And in your opinion, would that be a violation of that oath if an individual in the postconviction unit just stopped doing an investigation of the merits and agreed to --

A. Yeah, I think -- not the oath, but our standards, our ethical standards as prosecutors, I would not ask her to deviate from our health ethical standards. And to suggest to just do something because I said it, that was contrary to what the evidence would suggest is not something that I would have asked any of my assistants to

do.

Q.    Okay.  On Ms. Mulero's case or any other case?

A.    Correct.  Again I don't remember Ms. Mulero's case specifically at all.

Q.    And that was the case whether that was a case involving Mr. Guevara or anybody else?

A.    Correct.

Q.    Same standards apply?

A.    Your prosecutorial ethical standards, yes.

Q.    I mean, look, we all are -- you know, not to beat around the bush, we all know that there are a number of allegations against Mr. Guevara and your office handled them, and you know, that came up frequently, right?

A.    Yes.

Q.    Okay.  I just want to be clear what you are saying is that despite the fact that there was a weight of these allegations that you were aware of, you were still treating the cases against where Mr. Guevara was accused of misconduct the same way that you were treating the cases of misconduct by any other police

110

officer?

A.    Absolutely.  In fact, we offered Detective Guevara immunity on a case, on a postconviction case, in which there was -- we believed that the evidence suggested that -- or that the defendants had committed a heinous act of murder.

I, I personally, authorized the granting of immunity to Mr. Guevara to come into court and testify despite of history of allegations that existed for Mr. Guevara.  Mr. Guevara then came into court and was subsequently found by that judge because he refused to testify, his memory was fuzzy, and that judge said that he would no longer be credible in any court in Cook County.

I knowing Mr. Guevara's history, but also knowing that I believed that the people who were charged in that case committed that crime was willing to do that for Mr. Guevara.

So yes, absolutely, absolutely.  If I did not believe that the evidence was suggestive of our ability to use it, I would not have said just disregard it.  My history, particularly with Mr. Guevara, says otherwise.

Q.   So you are referring to the selection in the Reyes case?

A.   Yes.

Q.   So just, and I appreciate all of that --

A.   Just context for your question.

Q.   And I appreciate all of that, and that's appropriate.

So even up until August of 2022 when your office made these decisions to not oppose the postconviction, despite that, there was a weight of allegations against Mr. Guevara, you were still -- your approach to what you were directing your subordinates to do was you still have to investigate all of these cases fully and completely and determine whether postconviction is the correct thing to do regardless of these other allegations against Mr. Guevara?

A.   Correct.  My position was that just because Mr. Guevara was involved in cases did not automatically mean that the defendants were actually innocent until we had to do our due diligence in looking at those cases as evidenced by the history we had with Mr. -- or Detective Guevara.

Q. So are you aware as you sit here today that your postconviction unit did not do any substantive investigation into Ms. Mulero's claims at all?

A. I'm not aware of that.

Q. You are aware that they interviewed no witnesses whatsoever?

A. I'm not aware of the substance of their investigation. I'm aware that they were delegated the tasks to look at these cases and came back with recommendations that were made to me.

Q. Was -- so the time period between when you asked for this -- these cases to be looked at specifically and when you agreed to not oppose the relief for postconviction, this is a pretty tight period of time, it's a couple weeks, right?

A. Well, also -- that is correct. Yes.

Q. Was it surprising to you that your subordinates came to you with recommendations on a number of cases that were ongoing that came up with some substantive recommendation in that real small period of time?

A. I know that Mr. -- or Detective Guevara

113

had had his cases reviewed or being reviewed over a number of years, so that time period, yes. But we had already come into the office in 2016 with the Lazar report, and I believe some of these cases there was overlap with that, and any additional cases that had come up.

And so yes, while the period of time you are talking about was a matter of weeks, regarding Detective Guevara in some of these cases, they had been ongoing for some time.

Q. But Ms. --

A. I don't recall Ms. Mulero's case.

Q. Ms. Mulero's case was not part of the Lazar investigation that you are aware of?

A. I don't recall.

Q. Okay. And if I represent to you that Ms. Mulero filed her postconviction petition in March of 2022, would you have any reason to disagree with me?

A. I don't recall, but I don't know.

Q. So were you also aware that Mr. Weber testified that in their investigation of Ms. Mulero's claims under her request under Guevara case review protocol, that they had done

114

essentially no investigation whatsoever into their claims?

MR. GRANT: Object to form.

THE WITNESS: I'm confused as to when Mr. Weber would have said that investigation would have happened.

BY MR. SCAHILL:

Q. Well, Mr. -- Ms. Mulero filed the request, I think we talked about this earlier, for her case to be reviewed under the Guevara case review protocol in December of 2020?

A. Under CIU?

Q. Correct.

A. Okay.

Q. And by the time the summer of 2022 rolled around, Mr. Weber testified in this case that the CIU had essentially done no substantive investigation into Ms. Mulero's claims at all. Does that surprise you to learn that?

MR. CARTER: Object to the form.

THE WITNESS: It would, because I relied upon the team to make the recommendations in terms of postconviction after having done a thorough investigation of the cases.

115

BY MR. SCAHILL:

Q. So would it surprise you to learn that neither CIU nor the postconviction unit interviewed a single witness during their investigation into Ms. Mulero's claims?

MR. CARTER: Object to form.

THE WITNESS: I think again the team was delegated to do a review of the cases, however they did those reviews to make sure that information supported a recommendation for postconviction relief.

MR. KUBLY: Tim, when you get to your next logical break, can we take a break?

MR. SCAHILL: We can do it now if you want, that's fine.

MR. KUBLY: I don't want to interrupt your flow.

MR. SCAHILL: No. That's fine. Go ahead.

THE WITNESS: Can I get more tea?

MR. SCAHILL: You absolutely can. Same order?

THE VIDEOGRAPHER: Off the record at 12:22 p.m.

(A short break was taken.)

THE VIDEOGRAPHER: We are back on the record at 12:34 p.m.

BY MR. SCAHILL:

Q. Okay. So we were talking just generally about sort of the directions that you gave to your subordinates about what to do with this grouping of cases when you are talking to Mr. Tepfer.

So I know you don't have specific recollection of the specific cases, you know, and the recommendations and how that was articulated to you in July, fair?

A. That's fair.

Q. Including you don't remember anything whatsoever about the recommendation and the reason, therefore, given to you in Ms. Mulero's case during those conversations?

A. I do not recall.

Q. Okay. Or if there were specifics given to you by your subordinates about why they felt it was appropriate to no longer contest Ms. Mulero's postconviction proceeding?

A. I do not recall that. No.

Q. Okay. If -- well, let me ask -- I may

117

have asked this before, but was it Ms. Lanier who was giving these recommendations or was it Ms. Lanier and others as well? I mean, can you kind of narrow that down a little bit for us?

A. Ms. Lanier was the point person to liaise with the folks, whether it was CIU or postconviction. As my first assistant, she would report back to me. So it is -- that's generally who I spoke with about these cases.

It would be rare for me to be speaking with the people conducting the investigation. I would delegate that to Ms. Lanier.

Q. Got it.

So is it your recollection that when they're -- when you accepted the recommendation of your subordinates that you directed them to inform the individuals who were in the PC unit and the CIU about what the decision was that had been made?

A. I'm sorry, can you repeat that?

Q. Yeah. So when the decision was made -- at some point, there was a decision made, you accepted the recommendations of your subordinates on Ms. Mulero's case and others that this is what

the position of the office is going to be, and then after that, did you rely upon those subordinates to articulate that position to, for example, the PC unit or to CIU?

A. I don't know that I get the recommendation. Again it's delegated through my first assistant and whomever we are working on this to talk about what was going to happen next.

Q. Got it. Okay.

You mentioned before that you certainly believe that there were times during this grouping of cases that you, you know, may have had questions about specifics of cases and there being kind of a substantive back and forth, even though you don't remember the specifics now?

A. Sure.

Q. That's a fair characterization of what you said?

A. That is fair.

Q. Okay. If during the -- that discussion, it had been disclosed to you by your subordinates that there had been, in fact, been no substantive investigation done on the underlying allegations underlying the PC, would you have directed your

subordinates to go back and do that investigation?

MR. GRANT: Objection. Form. Speculation.

MR. FLAXMAN: Objection.

THE WITNESS: Yeah. I'm not quite sure how to answer that. I don't -- the assumption was that the staff was doing what they had been asked, which was to vet the cases, to look at the substances of the cases.

BY MR. SCAHILL:

Q. So let me give you a hypothetical. You are in the meeting about postconviction, and you are having a back and forthwith your subordinates, and they say to you, we recommend, you know, that we no longer standby this case, no longer object to postconviction, and you said, well, you know, why do you think that, and they say, well, we didn't really do an investigation into it, we didn't interview anyone, you know, we just -- that's just what our recommendation is, what would you have done under those circumstances?

MR. GRANT: Same objections. Incomplete hypothetical.

120

THE WITNESS: I mean, I would assume I would interrogate that recommendation of what they just said.

BY MR. SCAHILL:

Q. But that -- but if that were in fact true that there had in fact been no substantive investigation by the units charged with that, and that had been told to you, you would not shave agreed to not oppose the PC at that point in time, would you?

MR. GRANT: Same objections.

THE WITNESS: Again their job was to vet the cases to take the office so the office could take a position of whether or not to object to postconviction relief.

So the assumption that I was making was that these prosecutors, career prosecutors, were doing that. So it's hard for me to speculate of what I would say. If they say we had not done that, because based on the talent in the office, I wouldn't expect that they would not have done that.

BY MR. SCAHILL:

Q. And if that is in fact what occurred

121

that they had not in fact done those investigations, that would be inconsistent with the standards and expectations that you had laid down in the office for how you were to -- subordinates were to go about investigating postconviction cases, wouldn't it?

MR. GRANT: Same objections. It misstates testimony.

THE WITNESS: And I'm certainly not saying how they should have conducted their investigations. What they were charged with was vetting those cases for purposes of making a recommendation. And what the nature of that vetting looked like, I would leave for them to decide.

BY MR. SCAHILL:

Q. But the vetting at minimum, at least in the standards that you expected of your subordinates, would be to actually sort of dig into the facts of the case and to see whether the allegations that were being made in the postconviction proceedings were meritorious or not?

A. Correct. But I also want to be clear,

it was not that it was a -- or a determination of actual innocence. It was whether to determine whether or not we would not stand in objection of postconviction relief.

Q. Understood. Understood.

Some of these petitions do make actual innocence allegations and some of them make constitutional claims and some of them have both, right?

A. Correct.

Q. Okay. So if a -- but if a petition is alleging an actual innocence prong and a constitutional violation prong, you would expect your subordinates to do an investigation into both of those issues prior to making a recommendation to you about what the suggestive relief should be?

A. I don't know that I would need them to do both. The question would be whether or not there was sufficiency for us to say that we no longer objected.

Would we be able to -- if this case proceeded to the next stage in a hearing, would we be able to prevail in that case, which if

there's a pending actual innocence claim, it wouldn't matter if we are talking about the postconviction piece. And so I don't know if there would be an expectation that they would have to rundown both, but vet the cases. The charge was to do a review and a vetting of the cases. That was the charge.

Q. Vetting the cases under the guise of what the claims were that were being made by the individual?

A. Correct.

Q. Got it. And that varied in cases, but under your normal protocols, it would be to actually look into what those bases are and to make a recommendation based on one or both of them?

A. Correct.

Q. Got it. Okay.

You do not -- so when you were presented with the recommendation of Ms. Mulero's case, do you remember whether that was presented to you individually or it was presented to you amongst a group of other cases?

A. Ms. Mulero's case was presented as part

124

of a collective of cases.

Q. In the same meeting?

A. I believe so.

Q. Okay. Do you remember which other cases her case was presented with?

A. I don't.

Q. Okay. You mentioned the José Cruz case before. Was it with the José Cruz case?

A. I mentioned José Cruz because I got deposed on that case.

Q. Okay.

A. Which is why I remember that case.

Q. More of the tip of the brain thing?

A. It was my first deposition. Yes.

Q. Got it.

A. But I don't remember specifically.

Q. All right. So -- and Ms. Mulero's case ended up being vacated with your office removing their objection in early August of 2022, right?

A. Correct.

MR. GRANT: Object to form.

BY MR. SCAHILL:

Q. And on the same day that you did that, your office released a press release about it?

A.   I believe so.  Yes.

Q.   Okay.  I think you did not mention having reviewed that in preparation for the deposition; is that --

A.   I should have.  Yes, I did see that.

Q.   I'm going to show it to you now, so you will have an opportunity to do that.

MR. GRANT:  She did mention it.

MR. SCAHILL:  I don't think she did.

MR. GRANT:  She did.

MR. SCAHILL:  Did she mention the press release?  Oh, let's do it again.

THE WITNESS:  Thank you.  I knew I was --

MR. SCAHILL:  I stand corrected.  Well, you are going to have another chance right now because I'm about to give it to you.

THE WITNESS:  Thank you.

                (Whereupon, Deposition Exhibit

                No. 4 was marked for

                identification.)

MR. SCAHILL:  Take it and pass it around.

BY MR. SCAHILL:

Q.   I handed you what's been marked as Exhibit No. 3 -- 4, sorry, take a look at that.

126

And when you are ready for some questions, look up.  Are you ready?

A.   Yes, sir.

Q.   Okay.  Do you recognize this to be a press release that your office issued on August 9th of 2022 relating to among other cases Ms. Mulero's postconviction case?

A.   I do.

Q.   Okay.  I take it you did not draft this; is that correct?

A.   That would be accurate.

Q.   Okay.  You have a press office that does such things?

A.   I do or did, sorry, yes.

Q.   Did you review this press release before it went out?

A.   I don't recall.

MR. SCAHILL:  Bless you.

BY MR. SCAHILL:

Q.   There appear to be quotations attributed to you in there; do you see that?

A.   I do.

Q.   Okay.  Those are in fact statements that you made, right?

127

A.    Not necessarily, no.

Q.    Why do you say not necessarily?

A.    A press release oftentimes, what would happen is someone from the press shop would draft this and write a quote that's attributed to me. It's not a sit with a mic and I'm dictating to them what to say.

So oftentimes a press release would go out that I had never seen. It would contain a quote from me. So I don't recall making this statement, but it went out attributed to me.

Q.    Got it. Do you know who from your press office drafted this?

A.    I do not.

Q.    All right. So the second paragraph, let's -- I'm going to ask you about the quote here?

A.    Sure.

Q.    What it says is today the Cook County State's Attorney's Office acted on our obligation as seekers of justice and took measured and necessary steps to write the wrongs of the past said Cook County State's Attorney's Kim Foxx, a comprehensive case-by-case review of these cases

revealed of police misconduct by Guevara that called the validity of these questions into question and we concluded that the totality of the evidence currently available is insufficient to support a retrial of these cases.

Did I read that correctly?

A. That is what it says.

Q. Okay. The reference to a comprehensive case-by-case review of these cases, what does that refer to?

A. I didn't write this, so I can't tell you what they were referencing.

Q. Do you know as you sit here today what that is referencing?

A. I don't -- I didn't write this.

Q. Okay. Were you aware in August of 2022 of a comprehensive case-by-case review of these cases other than what was being done on the individual cases by your PC unit or by the CIU under the Guevara case review protocol?

A. I was aware that they had been given a universe of cases to look at vet and the validity of those cases for purposes of reviewing postconviction. That's what I was aware of.

Q.   I'm sorry, who?

A.   Risa Lanier with the help of the postconviction unit and the CIU unit.

Q.   Got it.

So I know you didn't write this, but there is no other comprehensive case-by-case review of the cases that were subject to this, the ones that are listed in this press release other than the ones that were being conducted by the PC unit or the CIU under the Guevara case review protocol that you are aware of?

MR. GRANT:  Object to form.

THE WITNESS:  And I just want to be clear, when I say the Guevara case protocol, are you talking about from 2021 or the cases that they were reviewing in July of 2022?  Yeah.  I'm confused when you say the protocol.  What protocol are you referring to?

BY MR. SCAHILL:

Q.   Well, now I'm confused, so let's try to --

A.   All right.  I apologize.

Q.   -- figure each other out.  That is fine.

There's a quote here attributed to you

that references a comprehensive case-by-case review of these cases?

A.   Yes.

Q.   Okay.  And obviously we have the PC unit that's doing investigation on cases involving Guevara, some of them, right?

A.   Yes.

Q.   There's also the Guevara case review protocol that we talked about that was implemented in late 2020 --

A.   Yes.

Q.   -- by CIU.  That's another review that was going on, right?

A.   Yes.

Q.   And so I'm just trying to figure out whether with this quote attributed to you whether this is a reference to those two things going on or whether there's something else that constitute -- constitutes this comprehensive case-by-case review?

MR. CARTER:  Object to form and foundation.

THE WITNESS:  Sorry.  I can't answer that because I didn't write the quote.

BY MR. SCAHILL:

131

Q. Okay. And as you sit here today, do you know what that refers to?

A. I didn't write the quote, so I can't speculate as to what it refers to.

Q. I know you didn't write it, but you don't know as you sit here today, meaning you don't have personal knowledge what that refers to, if it's not the PC unit and the case review protocol?

A. Yeah. I don't have --

MR. CARTER: Object to form.

THE WITNESS: I'm sorry. I don't have knowledge as to why those particular words were chosen in this press release.

BY MR. SCAHILL:

Q. Okay. And do you have personal knowledge of a comprehensive case-by-case review of these cases, meaning the ones that are referred to in this press release other than the PC unit's investigation or the more general investigation being done by the CIU under the Guevara case review protocol?

MR. CARTER: Object to form.

THE WITNESS: I'm sorry, any additional

looking at these cases that were being vetted since July of 2022.

BY MR. SCAHILL:

Q. So is that -- did you understand that to be an additional case review of those cases, which was going to have an additional investigation other than what was being done by the PC unit or the CIU?

MR. CARTER: Object to form.

THE WITNESS: There were a lot of additionals in there, so I'm confused by the question.

BY MR. SCAHILL:

Q. Okay. Let me try to clarify.

I know you are delegating to Ms. Lanier what you expected to happen in July of 2022?

A. Yes.

Q. With the case universe that Mr. Tepfer had referenced?

A. Yes.

Q. Are you aware as you sit here today of there actually being a comprehensive case-by-case review being conducted involving Ms. Lanier or anyone else other than the investigations that were being done by the PC unit or by the CIU

133

under the Guevara case review protocol?

MR. CARTER:  Object to form.

THE WITNESS:  What I want to be clear is Ms. Lanier was not doing the review.  Ms. Lanier was the point person who was interfacing with the folks who were looking at those cases from the universe of cases that were listed.  That is what I'm referring to.

Those cases were being evaluated for making a recommendation as to whether or not we were going to object to postconviction relief. That's what I'm -- I'm talking about.

However, I did not draft this quote, and so I cannot speculate if they're talking about that review or the reviews that you are discussing from prior to that with CIU or the Guevara protocol.

BY MR. SCAHILL:

Q.   So if it's something other than what occurred with the CIU or the postconviction, you do not have any knowledge about that investigation taking place?

MR. CARTER:  Object to form.

THE WITNESS:  In reference to the quote?

134

MR. SCAHILL: Yes. In reference to this comprehensive case-by-case review that's referenced in the quote that's attributed to you.

THE WITNESS: Again, I did not draft the quote. So the basis of the -- what they're pulling the quote from, whether it's the most recent review of those cases or long-term reviews of the cases, I can't speak to that because I did not draft it.

BY MR. SCAHILL:

Q. Okay. And you don't -- so you don't know what that is referring to specifically then?

A. Not specifically, no.

Q. Okay. It also says that this case-by-case review revealed police misconduct by Guevara that called the validity of these convictions into question; do you see that?

A. I do see that.

Q. With respect to Ms. Mulero, do you know specifically what that's in reference to?

A. I don't recall Ms. Mulero's case.

Q. Okay. So you don't recall what, if any, police misconduct by Guevara called the validity of Ms. Mulero's conviction into question?

A.   I don't recall Ms. Mulero's case.

Q.   Okay.  And the final part of that sentence says we concluded that the totality of the evidence currently available is insufficient to support a retrial of these cases; do you see that?

A.   I do see that.

Q.   Okay.  Are you aware of what the totality of evidence was in Ms. Mulero's case that made it insufficient to support a retrial of her?

A.   I don't recall Ms. Mulero's case.

Q.   Okay.  Going to the last paragraph on that page, the last paragraph that starts on that page?

A.   Yes, sir.

Q.   It reads when it became clear that the allegations of misconduct against Guevara had significant merit, we could no longer stand behind these convictions where individuals spent decades incarcerated devastating families and communities in Chicago; do you see that?

A.   I do.

Q.   With respect to Ms. Mulero's case, do

136

you know what was the basis for saying that the allegations of misconduct against Guevara had significant merit was based on?

A.    Again I didn't draft this quote.  I don't recall -- or I can't speak to why they wrote that, and I don't recall Ms. Mulero's case specifically.

Q.    Okay.  This is in quotations though and attributed to you, right?

A.    It is.

Q.    Okay.  And you are saying that -- are you saying that that's a quote that you did not in fact make personally and was just -- this was attributed to you?

A.    I'm saying as part of what happens with press releases, they're released from the office. Quotes are attributed to the principal and put in so.  So, yes, it's attributed to me, but that's not a direct quote from the Cook County State's Attorney.

Q.    Okay.  And then flipping to the last page, the last sentence reads, the office's long-term investigation was initiated in 2019 and several additional cases involving Guevara's

137

alleged police misconduct are expected to be resolved with similar court action in the upcoming weeks; do you see that?

A. I do see that.

Q. Do you know what's being referred to as the office's long-term investigation being initial -- that was initiated in 2019?

A. I don't.

Q. Okay. And once again, you are not aware specifically of any investigation into Ms. Mulero's case or Mr. Guevara's cases other than what the PC unit was doing and the CIU was doing?

MR. CARTER: Object to form.

THE WITNESS: Can you repeat the question, I'm sorry?

BY MR. SCAHILL:

Q. Yeah. We have asked this a number of times, but I'm going to ask it again in the context --

A. I want to make sure I understand it.

Q. Yeah. You are not aware of any long-term investigation into either Ms. Mulero's case or generally involving allegations of

misconduct for Mr. Guevara other than the individual investigations that were going on with the PC unit and what the CIU was doing under the Guevara case review protocol?

MR. CARTER: Object to form.

THE WITNESS: Again I don't recall Ms. Mulero's case specifically at all. I know these cases were being investigated. I don't recall the specifics of her case.

BY MR. SCAHILL:

Q. But as far as the long-term investigation, the only thing that could be characterized as a long-term investigation that would encompass Ms. Mulero's case would be either what the PC unit was doing with her case or what the CIU was doing under the Guevara case review protocol?

A. I don't recall Ms. Mulero's case, but those were the units that were investigating Detective Guevara cases.

Q. Got it. And no others that you are aware of?

MR. CARTER: Object to form.

THE WITNESS: Unless it was on individual

cases involving Detective Guevara.

BY MR. SCAHILL:

Q. Right. But the individual cases are the ones that are in the PC unit or CIU and being individually investigated?

A. Generally, yes.

Q. Got it. Fair enough.

Okay. You can put that to the side.

On this same day, you gave a press conference? Do you remember?

A. If you say so.

Q. Okay. I do say so. And I swear, I'm telling the truth because I'm about to play parts of it for you.

A. Okay.

Q. So we are going to turn this into an audio/visual presentation in a minute here. So this is going to be -- let's see what's my Bates number on this? This is BS485, and this is a recording of a press conference that you gave on August the 9th of 2022.

(Whereupon, Deposition Exhibit No. 5 was marked for identification.)

140

(Whereupon, there was a video played that was not herein taken down by the court reporter.)

BY MR. SCAHILL:

Q.   Before I play part of this, you see on the screen in front of you that is you standing if front of the American flag, the microphones?

A.   Yes.

Q.   That's in fact you?

A.   That is me with my summer braids, yes.

Q.   All right.  And so does this now refresh your recollection that you in fact gave a press conference around August of 2022?

A.   That is me, yes.

Q.   So we are not going to play the whole thing, I promise.  There are just a couple things I wanted to play for you and then ask you a couple questions about, okay?

A.   Yes.

Q.   So this is going to start at 56 seconds. This is going to go to 1:15.

(Whereupon, there was a video that was herein played that was

not taken down by the court reporter.)

BY MR. SCAHILL:

Q.   All right.  Those are statements that you made?

A.   I said that.  Yes.

Q.   Okay.  I just want to make sure I'm understanding what you meant by that.

Were you saying there that consistent with what you testified in this deposition that even though there was sort of this legacy of allegations against Mr. Guevara that your office still wanted to make sure that you were, you know, fully investigating the cases notwithstanding the claims of allegations to make sure that you did the right thing with the merits of the investigations or am I misinterpreting that?

A.   That was a lot of words.  I'm sorry, I got lost.

Q.   Why don't you -- let's do it an easier way.

A.   Yeah.

Q.   I heard the words that you said, but can

142

you explain for us kind of what you meant by that?

A. Yeah. What I meant just because Detective -- I knew coming into the office that Detective Guevara had a history based on the Lazar report, but just because Detective Guevara was on a case did not mean that the people who were charged in certain offenses did not actually do the crime for which they were accused.

And so understanding that, yes, we had this legacy and this history regarding the detective, it did not mean that we dismissed the possibility that folks had actually done the things that they were accused of. So we wanted to maintain convictions even with Detective Guevara on them where we could and that was important to me.

Q. Okay. That's what I thought you meant. Thank you for that clarification.

A. You are welcome.

Q. So let's go to 3:02 and play a snippet for you and ask you a couple more questions.

A. Yes, sir.

(Whereupon, a video was herein played that was not herein taken down by the court reporter.)

BY MR. SCAHILL:

Q. Okay. Those are statements that you made at the press conference?

A. Yes.

Q. And that was about not just Ms. Mulero's case, but a number of cases that had been vacated that day?

A. Yes.

Q. Okay. When you are referring to that justice requires that you are as meticulous and thorough as can be, what were you referring to? What did you mean by that?

A. Again, I came into office with the Lazar report. There were people from day one who were suggesting that we just get rid of any case involving Detective Guevara.

And people who were frustrated with me personally because of the decision that we had made regarding Solache and Reyes and offering Detective Guevara immunity. And I wanted to

144

address that I understood and heard that if this is 2022, there had been noise about Detective Guevara ruminating since 2015. So we had to do -- we were not in a position to just say anything that Guevara touched goes away.

So it was addressing the concerns that people had and some of the families who were frustrated with me and had meetings with me in the past and were left angry that we did not throw out cases because he was involved in them. It was addressing that.

Q. So that's what I thought. And so along those lines, is this just sort of another way that you are articulating that, look, even though there's sort of this history of allegations against Mr. Guevara, what our office did was looked at the merits of all of these cases, the underlying cases to make sure that we came to the right outcome on the merits because that was important because these were murders and there's victims involved that we needed to do it that way?

A. We needed to do it thoroughly. Again, the concern was people saw what happened with the

145

Watts cases and said, and by people, I mean across the ward, why don't you do that, and we could not do that. These were murders. These were murders.

Q. So the distinction you are drawing here obviously, you know, I think we all sort of are familiar with the sort of Watts and what happened there, but you were looking at these cases differently because it was not, for lack of a better term, a victimless crime involving drugs, there's an actual victim because someone has lost their life. So that's important to look not just at the allegations of misconduct, but what actually happened in the underlying case?

A. And listen, I also want to be clear, we do thorough investigation of Watts and I was very proud of the protocols that were put in place for that. But yes, the victims of these homicides deserved to even if the outcome would be disappointing to them ultimately to know that an investigation was done before we made the ultimate decisions.

Q. So am I reading your statements correctly that you were saying this under the

assumption that your subordinates who you had delegated the investigatory responsibilities for the underlying cases had done as meticulous and as thorough as a job as they were supposed to do given the oaths that they took as prosecutors?

A.    Yes.  And not just over the course of several weeks, but over the course of years with these cases, years.

Q.    And you were -- before making this statement, you were -- you had been led to believe that that actually had been done by your subordinates, that they had done a meticulous and thorough job looking into the underlying allegations of all of the cases that were subject to the action that your office took in -- on August 9, 2022?

A.    I entrusted career prosecutors who had a reputation for doing good work to do this work. I had no reason to disbelief that they had deviated from that.

So yes, I was commending them on the work that they had done, again not just in the upcoming or the weeks that led up to this, but over the course of our time in office.

Q. So when you are referring at the end of this clip that I played to thanking the dedicated prosecutors, investigators and staff of the Cook County State's Attorney's Office for their intensive labor on the review of these cases, the bases for you saying that was what had been communicated to you by your subordinates where they had insured they had in fact done this intensive labor and review of the cases?

A. And again not just the cases that were being dismissed that day, but overall. There were a number of cases. And I think it merits saying where we were continuing to fight for the convictions to stand, where we had said no, we don't believe that they're actually innocent and we want to continue to go forth on those cases, so those investigations.

It was not just in the convictions that we were no longer opposing. It was also in the convictions that we were fighting to maintain.

So again I think you are trying to make a distinction between July and August, and I'm making a distinction between December 1st and August of 2022 -- December 1st, 2016 and August

of 2022.

Q. Got it. And thank you for that.

With respect to the cases that were the subject of that press conference, meaning the seven that your office had took action on, when you made these statements about justice requiring that the review was meticulous and thorough as can be, you were very much under the impression that the review into those specific seven cases had in fact been meticulous and thorough?

A. I was under the impression that the dedicated prosecutors who had been working on these cases did what they had been instructed to do and have done over the course of their careers when making the recommendation to me that we no longer object to these cases.

Q. When you were thanking those people for having done that, that was under the assumption that they actually had done those things, meaning done a meticulous and thorough review of the cases?

A. I was thanking them, yes, for allowing us to be in the position we were in to vacate those cases, yes.

149

Q. By doing a meticulous and thorough review as they were required to do and as you had indicated as they should be doing?

A. Correct.

Q. Okay. Let's go to 4:34. This is going to start, I'm sure your favorite part of the press conference --

A. The questions?

Q. -- where you are asked questions, yes.

A. Almost as fun as this.

Q. Let's go to 4:54. Oh, I'm sorry, I mean, 4:34. Okay. So let's just play a snippet and then I will ask you some questions. I'm going to pause that.

MR. SCAHILL: This question is coming from the front. Can you jack up the volume more on that? I just want to make sure we --

THE VIDEOGRAPHER: Is it coming from my speaker?

MR. SCAHILL: It is, but it's not very loud because it's coming from a reporter that's not directly in front of a mic. Can we like jack up the volume for just a few seconds so we can hear the question that Ms. Foxx was asked because even

on the original, it's -- and then we are going to have to turn it down or else we are all going to need earmuffs for it.

THE VIDEOGRAPHER:  It's maxxed out.

BY MR. SCAHILL:

Q.  You ready?

A.  Oh, okay.  Sure.

Q.  I want you to focus in.  You are going to be asked a question and I want you to --

A.  Focus on the question?

Q.  -- focus on the question, and then we will pause before you give your answer because it's going to be really loud, okay?

A.  Okay.  Thank you.

(Whereupon, a video was herein played that was not herein taken down by the court reporter.)

MR. SCAHILL:  Pause that for one second.

BY MR. SCAHILL:

Q.  Could you make out that question?

A.  I heard actually innocent in there, but I didn't hear anything else.

Q.  Yeah.  So what it sounds like I heard

was it's a two-part question, which was was this the first time in which your office has agreed to oppose a murder case involving Mr. Guevara, and the second part was about whether your office had -- whether it was the position of your office that they were innocent or whether you just couldn't meet the burden?

A.   Got it.

Q.   Okay.  So I'm going to play your answer and then you can tell me whether you think I misconstrued that -- I think that's what the question was, but then let's play this and then I will ask you a couple questions about that.  Okay?

A.   Okay.

(Whereupon, there was a video played that was not herein taken down by the court reporter.)

BY MR. SCAHILL:

Q.   All right.  That's the answer that you gave to the question.  So does that refresh your recollection that you were being asked whether the basis for your action in vacating the

152

convictions on that day were on the basis of innocence or on the basis of not being able to meet your burden?

A.   That sounds correct.

Q.   Okay.  And that was in fact the position that your office was taking on these particular seven cases, that it was not based on innocence?

A.   Correct.

Q.   Okay.  And that included Ms. Mulero's case?

A.   Correct.

Q.   Okay.  Your office as of August 9, 2022 had not made any specific finding that Ms. Mulero was innocent of the offenses for which she was convicted; is that true?

A.   That's correct.

Q.   Okay.  We covered that.

Do you recall during this -- well, let me just play this for you and then I will ask you questions about it.  Let's go to 14:40.  Close enough, 14:38.

(Whereupon, a video was herein played that was not taken down by the court reporter.)

153

BY MR. SCAHILL:

Q. Let me pause that for one second. Did you hear the question?

A. No.

Q. Let's try to see if we can suss it out again. It sounded like it was a question relating to whether your office was considering criminal charges against Officer Guevara, but let's play it again. I don't want to put words in anyone's mouth.

(Whereupon, a video was herein played that was not taken down by the court reporter.)

BY MR. SCAHILL:

Q. Did you hear that, is your office looking at charges against Detective Guevara?

A. I didn't hear it, but I trust you.

Q. All right. Well, let's just hear your answer and maybe that will clarify it. This is go until 16:07.

(Whereupon, a video was herein played that was not taken down by the court reporter.)

BY MR. SCAHILL:

154

Q. Okay. Does that now clarify that those series of questions are about whether your office would consider pursuing charges against former Detective Guevara?

A. Yes.

Q. And fair to say that you -- your office had not ruled that out as of August of 2022?

MR. FLAXMAN: I'm going to object to this. This is outside of the scope of this deposition. It's not proper for you to ask her these questions.

THE WITNESS: I think it was certainly something we were continuing to look at.

BY MR. SCAHILL:

Q. Okay. And that's a statement you made publically?

A. Yes.

Q. Okay. Subsequent to August of 2022, your -- are you aware that your office similarly had agreed to postconviction relief on a postconviction -- actually it was a 1401 petition brought by Madeline Mendoza Mulero?

A. I don't recall Madeline Mendoza.

Q. Okay. Let me try this. We are done

with this for now.

MR. SCAHILL:  This is 5, and then this would be 6 because the video would be?

THE COURT REPORTER:  Sure.

MR. SCAHILL:  Okay.  So this is going to be 6.

(Whereupon, Deposition Exhibit No. 6 was marked for identification.)

BY MR. SCAHILL:

Q.   I have handed you what's been marked as Defendant's Exhibit 6.  You can look at those really quick.  I will tell you that you are -- you are not on these strings, but I still do want to ask you some questions about the context.  If you can go through it, that would be great.

A.   Okay.

Q.   Just whenever you are ready, just look up and I will ask you a couple questions.

A.   Okay.

Q.   First question, have you seen these e-mails before?

A.   No.

Q.   Okay.  These e-mails purport to be a

series of e-mails between my friend Mr. Flaxman over there and various personnel from your office including Carol Rogala and Risa Lanier regarding a 1401 petition brought by Mr. Flaxman's client, Madeline Mendoza, do you see that that's what this series of e-mails reflects?

A. Again having just seen them, I can't refute what your assessment is, but I don't know.

Q. Okay. According to the last page of this, Mr. Flaxman indicates to both Ms. Rogala and Risa Lanier that his office just filed a 1401 petition on behalf of Madeline Mendoza and he referenced that she was a co-defendant of Ms. Mulero; do you see that?

A. I'm reading that, yes.

Q. Okay. At any point did you review Ms. Mendoza's 1401 petition?

A. I don't know. I don't recall.

Q. I'm sorry, were you finished?

A. Yeah. I'm confounded, but yes, no, I don't recall reviewing any petitions related to Ms. Mendoza.

Q. I'm going to go try to unconfound you.

A. Thank you.

Q.   I might not be successful.

We all know what this is, but just for the record, a 1401 petition is another vehicle for a convicted person to attack their criminal conviction by seeking relief, except the person cannot unlike in a postconviction act claim be in custody so they have to file it under 2-1401 under the Code of Civil Procedure?

MR. FLAXMAN:  Objection.  Form.  Misstates the law.

MR. SCAHILL:  Does it?

MR. FLAXMAN:  Yes.  Look up Kevin Jackson's case.

MR. SCAHILL:  Are you saying -- well, we can talk about it later.

THE WITNESS:  Kevin Jackson too, Jesus.

MR. FLAXMAN:  We are not going talk about it.

THE WITNESS:  Thank you.

MR. SCAHILL:  We will talk about it in Kevin Jackson's case.

MR. FLAXMAN:  I hope.

BY MR. SCAHILL:

Q.   Anyway, you understood a 1401 petition is another vehicle by which a convicted person

can attack their criminal conviction?

A.   Seek relief from the criminal conviction, yes.

Q.   Yeah.  And the standards that your office was to apply in investigating those petitions would be similar or the same as they were supposed to apply in investigating the petitions brought under the postconviction act, meaning the investigatory standards?

MR. FLAXMAN:  Objection.  Form.

THE WITNESS:  I don't understand your question.  In general --

MR. SCAHILL:  Yes, in general.

THE WITNESS:  -- are you asking me how our office looked at 1401 petitions?

BY MR. SCAHILL:

Q.   Yeah.  The investigatory standards on those was the same or similar to how your office was supposed to be investigating a petition brought under the Postconviction Hearing Act?

A.   Yeah.  I can't speak -- you are asking me a broad question.  Our office takes these petitions and looks at them on the individual merits based on the facts, the evidence and the

law.

So what standards you are talking about, I'm not sure. But yes, they look at them on an individual basis.

Q. Got it. Okay.

At this point in time, September 29 of 2022, had the State's Attorney's Office modified the standards by which they were supposed to be reviewing postconviction claims including 1401 petitions in cases involving Mr. Guevara?

A. I don't understand your question.

Q. Okay. So I think what you told me as of August of 2022 when these seven cases were vacated, you were essentially operating under the same standards that had previously been applied, which is that we investigate all of these cases on an individual basis regardless of the allegations against Mr. Guevara and make your -- you accept the recommendations and chose whether to follow those or not to your subordinates and make decisions based on that, that's how it existed in August, I think that's what you said? Was that --

A. Yeah. What I said was we had a universe

160

of cases. They were vetting the cases for the appropriateness of whether we would object to or agree to postconviction relief.

Q. Okay. So my question with respect to September 29, 2022, was that still the approach that you had directed your subordinates to follow?

A. In general or related to cases regarding Detective Guevara? I'm confused by your question.

Q. In cases involving Detective Guevara.

A. We had a universe of cases that were being reviewed. I don't know where Ms. Mendoza's case was as part of that review. But her case I would assume would be evaluated on its individual merits.

Q. Okay. And that was your directive to your subordinates that that's how they were to continue going about investigating and reviewing cases involving Mr. Guevara?

A. Your term my directive to my subordinates I think misstates things. I didn't have a directive. If there were ongoing cases that were happening, the unit should review those

161

cases if they would review cases.

There was not a directive from me here now and hence forever forward, this is what you should do. That did not exist.

Q. Yeah. Maybe that was not the right word. Were the -- did the approach that your office -- strike that.

Was the approach that your office was supposed to be taking with respect to evaluation of postconviction claims including 1401 petitions involving former Detective Guevara the same in September of 2022 as it was in August of 2022?

A. What I'm saying to you is that there were specific cases that were -- a universe of cases that were being vetted for August.

Anything that was not in that universe that came in looking for relief, the units should look at those individual cases and make a determination based on the facts and the evidence and the law pertinent to that case.

Q. So you had not advised your subordinates to apply some lesser standard in how they were to go about reviewing postconviction cases involving Detective Guevara in September of 2022?

162

A.   Can you define what lesser standards are?

Q.   A standard that would be applicable to allegations against police officers other than Mr. Guevara?

A.   There was not a lesser standard that was applied to anybody in these cases.

Q.   Fair enough.

And do you see -- so we see that Mr. Flaxman purports to have sent this motion to vacate on behalf of his client, Ms. Mendoza, on September 29th of 2022?

A.   That's the date on the e-mail I'm looking at.

Q.   Okay.  And if you go to the first page, this takes place over a series of about three months, so we get into late December.  And this indicates -- you know, we don't have to go through all of the e-mails, but essentially this indicates from Ms. Rogala to Mr. Flaxman that final approval has been given referencing not opposing Ms. Mendoza's postconviction petition as well; do you see that?

A.   I see it says, yes, final approval has

been given.

Q. Okay. Did you give final approval to your subordinates to not oppose postconviction relief on behalf of Ms. Mendoza?

A. I don't recall Ms. Mendoza's case.

Q. Do you have any reason to dispute that final approval was given by you to officially not oppose Ms. Mendoza's postconviction petition?

A. You are assuming that final approval was sought by me personally, and I cannot speak to that because I don't recall Ms. Mendoza's case at all.

Q. Okay. Are you aware of any investigation that was done by the Cook County State's Attorney's Office into the specific merits of the allegations made by Ms. Mendoza in her 1401 petition?

A. I do not recall Ms. Mendoza's case at all, so I cannot speak to any investigation related to Ms. Mendoza.

Q. And it was your expectation during this time period all the way through December of 2022 that the subordinates in your office who were responsible for investigating these cases would

164

have done it in the way that you had advised them to do, which was to investigate the underlying merits of the cases, right?

A.   That they would --

MR. FLAXMAN:  Objection to form.

THE WITNESS:  They would be advised to look at these cases under their obligations as prosecutors based on the facts, the evidence and the law.

BY MR. SCAHILL:

Q.   Okay.  Are you aware as you sit here today that there was also no substantive investigation into the claims or allegations made by Ms. Mendoza in her postconviction petition by your office?

MR. FLAXMAN:  Objection.  Form.  Misstates the evidence.

THE WITNESS:  I can't speak to anything related to Ms. Mendoza's case because I don't recall Ms. Mendoza's case.

BY MR. SCAHILL:

Q.   At this period of time, 1401 petitions were handled by the PC unit?

A.   I believe so.

Q.   Okay.  Ms. Rogala testified in this case that when they received this petition, that their -- that the PC unit did not do any investigation whatsoever into Ms. Mendoza's allegations.  Is that consistent with the manner in which you expected your PC unit personnel to investigate those cases?

MR. FLAXMAN:  Objection.  Form.  Misstates testimony.

THE WITNESS:  Again having not heard Ms. Rogala say that, that would be a surprise given how thorough she was as a prosecutor.  So I don't recall this case.

BY MR. SCAHILL:

Q.   And so -- but making a recommendation for not opposing postconviction without doing any investigation at all would be contrary to the standards that you expected your personnel to apply in postconviction matters?

MR. FLAXMAN:  Objection.  Form.  Misstates evidence.

THE WITNESS:  Again, I don't recall Ms. Mendoza's case.  I had no reason to doubt that the dedicated prosecutors of the State's

Attorney's Office were not doing their ethical obligations in reviewing the facts, the evidence and the law before making a recommendation.

BY MR. SCAHILL:

Q. And so if Ms. Rogala indicated that in response to Ms. Mendoza's petition that they didn't interview any witnesses, didn't compile any documents, and didn't do any other substantive investigation, would that be consistent with the standards that you expected them to comply with while they were working as your subordinates?

MR. FLAXMAN: Objection. Form. Misstates the evidence.

THE WITNESS: I can't speak to if in fact Ms. Rogala said that. What I do know is that Ms. Rogala was a well-regarded attorney within the office and had a career in the office that would be contrary to what you just stated.

BY MR. SCAHILL:

Q. Okay. So you did not -- and during this time period, talking about September 29 to December 21st of 2022, advise or dictate to your subordinates that they should just not oppose a

claim for postconviction just because it involved Mr. Guevara and do no substantive investigation on it other than the fact that Mr. Guevara was involved in the case?

A.     There was no such directive that came from me regarding that.  In fact, the history had demonstrated and that as the press conference indicated, that I did not believe that every indication -- or every allegation against Mr. Guevara meant that someone was actually innocent.  We had to do our due diligence in these cases before making recommendations.

Q.    Okay.  And when recommendation were made to you about postconviction dispositions, it was your expectation that that's what your subordinates had in fact done?

MR. FLAXMAN:  Objection.  Form.

THE WITNESS:  My expectation is that when making recommendations, that the facts, the evidence and the law were reviewed.

BY MR. SCAHILL:

Q.    Got it.

So in -- we are now in December of 2022. Between September of -- I'm sorry, between

December of 2022 and April of 2023 -- well, strike that. That's not the best way to phrase this.

Sometimes before April 25th of 2023, you decided not to run for another term, correct?

A. That is correct.

Q. Okay. And your decision to not run for another term, that was something that you presented publically at the City Club on April the 25th of 2023?

A. That is correct.

Q. All right. Before that -- before that speech that you gave, had you had communications with Ms. Mulero?

A. No. Oh, I seen her that day.

Q. Okay. Ms. Mulero was in attendance at the speech that you gave at the City Club?

A. She was, yes.

Q. Okay. Do you know how it came about that she was there?

A. I don't. I was surprised to see her.

Q. Had you ever met her before?

A. I don't recall that I met her before that day.

Q.   Okay.  And she was not there at your request?

A.   Absolutely not.

Q.   Did you -- were you introduced to her before the speech?

A.   Yes.

Q.   Okay.  By whom?

A.   I believe she came up to me on her own. I don't know that she was introduced to me.  I think she sought me out.

Q.   Okay. And do you recall -- did you have any conversation with her?

A.   A brief one.

Q.   Tell me what you remember about it.

A.   I remember she came and introduced herself as Marilyn Mulero.  She had tears in her eyes.  And I was like Mulero, that sounds vaguely familiar.  And she reminded me that her case had been one of the cases that had been vacated.

Q.   Did she tell you any specifics about the case?

A.   She didn't discuss the specifics of the case, no.

Q.   Okay.  Up to that point, were you privy

170

to the specifics of Ms. Mulero's case?

A. I don't recall the specifics. I don't -- again, I don't recall what the specifics were. I'm not saying I wasn't, but I don't recall.

Q. Okay. And as far as what you may have been privy to, would that just have been what your subordinates had advised to you about the recommendations for vacating her conviction or some other source?

A. Again, I don't recall her case specifically. And as we were looking at these cases, there was a lot of information that was given about the cases overall. I don't remember her case specifically.

Q. So between when your recommendation was made to you to not oppose the postconviction on Ms. Mulero's case and this press -- not press conference, speech, I guess that you gave at the City Club in April of 2023, were you aware of any other investigation that was continuing on with respect to Ms. Mulero's case?

A. I don't recall that. No.

Q. So you don't recall before April 25th of

171

2023 becoming privy to, you know, other pieces of evidence or, you know, other --

A. I don't recall.

Q. -- matters relating to Ms. Mulero's case?

A. No.

Q. We are getting late in the day. Let's not talk over each other.

A. I apologize. No.

Q. No need to apologize. Everyone does it.

A. No.

Q. Okay. Thank you.

All right. When you gave that speech, you had some prepared remarks?

A. Correct.

Q. Okay. And I believe from having listened to it, is that you decided to not give the prepared remarks that you gave; is that a fair characterization?

A. That's fair. To the frustration of my team, yes.

Q. Understandable.

Was Ms. Mulero's case referenced in your prepared remarks?

172

A. She was, yes.

Q. Okay. Do you -- so the prepared remarks that you have, did you actually prepare those or did you have someone that was working on your speeches with you, some combination of the two?

A. I think it was a combination of the two.

Q. Who was working on -- working with you on the prepared speech?

A. I think my communications director at the time, Eugena, I can't remember Eugena's last name.

Q. Was it your choice to include Ms. Mulero's case in your prepared remarks?

A. She was not in my prepared remarks.

Q. Oh, I'm sorry, I thought you said she was? I misheard you then.

A. Then I would have misspoke. I thought you were asking were there prepared remarks. Then I disregarded. I disregarded my prepared remarks when I got up to the podium and included comments about Ms. Mulero that were off the cuff.

Q. Okay. So Ms. --

A. Yeah. That was not a part of -- let me be abundantly clear, those were not part of the

remarks because I didn't even know she was coming. And I had no intention of discussing her because why would I.

Q. Okay. All right. Thank you.

A. Thank you.

Q. At some point you did make reference to Ms. Mulero during your actual remarks that you gave?

A. I did.

Q. And that was in the context of that your office is handling all reverse conviction cases generally?

A. Yes.

Q. Okay. And you referenced a number of other people too other than Ms. Mulero including Jose Cruz, right?

A. Yes. He also was there that day.

Q. Right. Was he in the prepared remarks?

A. None of them were in the prepared remarks.

Q. Okay. And that would include Clarissa Glenn, and I don't remember the other ones?

A. No. Clarissa Glenn was also there that day.

Q.   Got it.   But you had not made arrangements for any of those people to be there?

A.   Absolutely not.

Q.   And did not -- were not aware that they were going to be there until they were there?

A.   Correct.

Q.   Got it.   Okay.

So I am going to play, this is maybe about a seven-minute snippet here?

A.   Oh, gosh.

Q.   It's a little bit longer one.

A.   I just hate looking at myself this way. Sorry to all of you, but go on.

Q.   Absolutely not.   You look great.

MR. SCAHILL:   So this is going to be Defendant's Exhibit 7.

(Whereupon, Deposition Exhibit No. 7 was marked for identification.)

THE WITNESS:   Actually can I use the bathroom --

MR. SCAHILL:   Absolutely.   I'm going to go get my AV set up.   Why don't we take a couple minute break.

THE WITNESS:  All of your tea cups have finally --

MR. SCAHILL:  Do you want some more?

THE WITNESS:  No.  We are good.  We are at the end, but I should probably -- especially if it's seven minutes.

MR. SCAHILL:  Yeah.

THE VIDEOGRAPHER:  Off the record at 1:37 p.m.

(A short break was taken.)

THE VIDEOGRAPHER:  We are back on the record at 1:50 p.m.

BY MR. SCAHILL:

Q.  Okay.  Welcome back, Ms. Foxx.  So I have up on the screen what has been marked a Defendant's Exhibit 6 --

A.  7.

Q.  7.  I always get that wrong.  This is BS486 with Bates number.

Before we play it, do you recognize that is -- you are looking down here, but that that's you at a press conference that was -- I'm sorry, a speech that was given in April of 2023?

A.  That's correct.

176

Q. Okay. And we are going to pick up at 26:58, and I'm going to -- like I said, it's going to be a couple minutes, so just watch it and then I'm going to ask you some questions about it. Okay?

A. Yes, sir.

(Whereupon, a video was herein played that was not taken down by the court reporter.)

MR. SCAHILL: Let's pause there at 34:39.

BY MR. SCAHILL:

Q. First of all, those were statements that you made at the City Club in April of 2023?

A. Correct.

Q. Okay. Was the entire portion that we just listened to sort of off-the-cuff statements that you were making?

A. The entire speech was off-the-cuff.

Q. Got it. Okay.

So I don't want to put words in your mouth, but it seemed to me that the theme of this portion of your speech was you sort of lamenting that people were not focusing on some of the good things that you had done when you were in office

177

and instead were focusing on this whole Jussie Smollett thing, is that a fair characterization of generally the theme of this portion?

A. No.

Q. Tell me --

A. This portion was, and I apologize, I get emotional looking at it. I apologize.

I think I had been -- I have been one of the most scrutinized State's Attorneys in the history of the Cook County State's Attorney's Office. And my credibility as a State's Attorney, I think was attempted to be undermined because of how I talked about and addressed a lot of the issues that we didn't talk about or address.

And one of the ways that they tried to undermine that was an overemphasis on Jussie. And so what you are seeing and what I'm feeling, the PTSD that is coming up, is the reminder of the things that I had to endure being said about me, about my office, my office, and the dedicated men and women who worked there when we spent so much time talking about Jussie and not just the good works that we did.

I honestly wish that I did not have that many stories to tell, that we did not have -- I didn't come into a system where there was so much work to be done on those issues, but I felt that we needed to give more attention to that than Mr. Smollett.

Q. Okay.

A. So it was not just about the good works that my office had done because we would have then talked about the people who prosecuted murders and rapists and who insured the victims of violent crime had their say.

Q. Thank you. Thank you for that. And you put it far more eloquently than I ever could.

So with respect to Ms. Mulero, what you told us a little bit ago, that was your office's decision to not oppose postconviction relief for Ms. Mulero was not based on the finding of innocence, correct?

A. That is correct.

Q. Okay. And that's true?

A. That's correct.

Q. And you do make statements here though that say that Ms. Mulero went to prison for a

crime, which she did not commit. Did you hear that?

A. I did hear that.

Q. Had there been some finding from the State's Attorney's Office between when you vacated the conviction on April 2023 and which this had been some finding of the office she was innocent?

A. Not that I'm aware.

Q. Okay. So I guess in your own words, what was the basis for saying that -- for you saying that Ms. Mulero went to prison for a crime she didn't commit?

A. I certainly regret making an off-the-cuff statement about Ms. Mulero's case. I talked to her as I said immediately upon arriving, she approached me. I had not seen her, and she had told me her story. I was recounting what she was telling me because I had never seen her before.

And the emotions of it all is what that statement was generated by, not based on any information that had come subsequent to the investigation that happened.

180

Q. Okay. And I appreciate that. And we could all tell during this and while you were watching this that you were -- had some true emotions about this. So I just want to be very clear on this, that you were not saying those words about Ms. Mulero having been convicted of a crime she didn't commit based on any finding that the State's Attorney's Office had made about her innocence?

A. Correct.

Q. And you were not making those statements based on any personal knowledge that you had about her innocence?

A. Correct.

Q. And you were not making those statements as an explanation for why the State's Attorney's Office took any of the actions that it did with respect to Ms. Mulero's criminal case?

A. With respect to actual innocence or with respect to the fact that the conviction could no longer stand because of Detective Guevara's involvement?

Q. Actual innocence.

A. Actual innocence, correct.

Q. Okay. Were you -- so were you just sort of -- she had sort of stated her innocence to you and you just sort of in the heat of the moment just sort of put that out during your off-the-cuff speech?

A. That's a fair statement. Yes.

Q. Okay. Are you aware that Ms. Mulero has cited these comments both in her lawsuit in this case and she cited them in her petition for certificate of innocence sort of implying that you had made some finding that she was innocent? Were you aware of that?

MR. CARTER: Object to form and outside the scope of the deposition.

THE WITNESS: I was not aware of that.

BY MR. SCAHILL:

Q. Okay. To the extent that your statements are being used in any forum to suggest that you or your office made any sort of findings on her actual innocence of involvement in the crimes that she was convicted for, you would dispute that characterization entirely, correct?

MR. CARTER: Object to form and outside the scope of the deposition. It's not a proper

question.

THE WITNESS: There was not a finding of actual innocence of Marilyn Mulero.

BY MR. SCAHILL:

Q. Okay. And so you did not have any actual factual basis for making the statement in April of 2025 that she went to prison for a crime she did not commit; is that fair?

A. 2023.

Q. 2023, sorry.

A. I had Ms. Mulero's statement that she went to prison for a crime that she did not commit. I did not have a legal finding that she was actually innocent.

Q. Other than her statement that she was innocent, was that based on any other evidence whatsoever?

A. Ms. Mulero --

MR. CARTER: Object to form.

THE WITNESS: Ms. Mulero shared her experience and said that she was innocent. There was not an actual finding by the Cook County State's Attorney's Office of actual innocence.

BY MR. SCAHILL:

Q. And the factual basis for your having made that statement was just based on what Ms. Mulero had said to you that day?

A. And my emotions at the time, yes. Correct. But it was not a legal finding by the Cook County State's Attorney's Office.

Q. Okay. Thank you. And when you referenced that she was convicted based on the testimony of a corrupt detective, what was the basis for you saying that?

A. I knew Detective Guevara. Again I didn't know the specifics of Ms. Mulero's case before I saw her that day. Again I believe that was the first time I had met her. But I had enough experience with other cases with Detective Guevara including the Solache and Reyes case and our attempts to offer him immunity and the finding by a Court that he could not be found credible in any court of law based on his testimony in that case. But I had concluded that Detective Guevara by my assertion was corrupt.

Q. But so your quote was that she was wrongfully convicted based upon the evidence and the testimony of a corrupt police officer.

184

So what was the factual basis for saying that Ms. Mulero was wrongfully convicted based upon the evidence and testimony?

A. Ms. Mulero -- I apologize.

Q. Go ahead.

A. Ms. Mulero's statements, not an actual finding by the Cook County State's Attorney that Detective Guevara had provided testimony that was used against Ms. Mulero.

Q. Or that -- right, or that it was false?

A. Correct.

MR. CARTER: Object to form.

BY MR. SCAHILL:

Q. Are you aware as you sit here today that Mr. Guevara didn't testify in any proceeding against Ms. Mulero ever?

MR. CARTER: Hold on. Object to the form and misstates the record.

THE WITNESS: I'm not aware of the particulars of the testimony in Ms. Mulero's underlying case.

BY MR. SCAHILL:

Q. Okay. And you were not aware of that at the time you made these statements?

185

A.    Correct.

Q.    When -- so when Ms. -- strike that.

Ms. Mulero at some point while you were still in office filed a petition for a certificate of innocence; are you aware of that?

A.    I'm not aware.

Q.    Okay.  Were you the decisionmaker on whether your office would oppose or not oppose that?

A.    Our office had previously developed a protocol of when we were intervened in cases regarding certificates of innocence.

From a bandwidth and capacity standpoint, we could not object to every petition.  And so in instances where the office believed that we should intervene, those cases would be brought to my attention.  I do not recall Ms. Mulero's case coming to my attention for intervention.

Q.    Was -- your office did decide not to intervene in that petition; are you aware of that?

A.    I'm not aware of that.

Q.    Okay.  Was the decision of your office

not to intervene in Ms. Mulero's petition for certificate of innocence based on any finding that she was innocent of the charges for of what she was convicted?

MR. CARTER: Object to form and foundation.

THE WITNESS: Because it was never presented to me, I don't know the rationale for why it was not presented to me to not intervene.

BY MR. SCAHILL:

Q. So are you saying it was never presented to you at all?

A. For intervention?

Q. Yes.

A. No. I don't recall it being presented to me.

Q. Okay.

A. I shouldn't say no. I don't recall it being presented to me.

Q. Are you aware of your office making any determination that it would not oppose Ms. Mulero's petition for certificate of innocence based on a finding or a belief that Ms. Mulero was in fact of innocent of the crimes for which she had been convicted?

187

A. Again, I don't recall anyone coming and saying, which was typically how it was done, we would like to intervene in this case. I don't recall that conversation happening with regards to Ms. Mulero's case.

Q. You referenced some issues with respect to bandwidth and workload and your office at the time on certificates of --

A. Yes.

Q. -- innocence. There were a lot of these going on in your term of office, right, a lot of these petitions that were filed?

A. That's correct.

Q. And I think what you said is that your office would often make the determinations not to oppose and had nothing to do with whether you believe that person was innocent or not; is that true?

A. No. That's not what I'm saying. What I'm saying is as a matter of -- the office historically objected to anything and everything related to these petitions.

The position had been we fight it out for conviction -- if a conviction was procured,

the history of the office had been to secure the petition -- or the conviction.

As I alluded to earlier, you know, some of the things that we were seeing coming back from Prison Review Board and other places was that we were rubber stamping decisions that were made without a thorough investigation into the individual facts and evidence of those cases.

Having a policy that simply said that we were agreeing to oppose something without going into the record to see if in fact we should was something that I thought was counter to prosecutorial discretion.

So what we said was that we would intervene in those cases, not just the bandwidth issue, but we would not just rubber stamp decisions without doing an investigation of the cases.

And so we came up with working with our civil bureau and looking at how we would intervene or when we would intervene in certain cases. That's how the decision was made. It was not simply a bandwidth, but it was also exercising prosecutorial discretion and not

simply rubber stamping cases because a conviction had been secured, particularly after what we saw in the Watts cases, where many of those cases should have been thoroughly vetted from the beginning.

Q. So with respect to that process as it existed in 2022, 2023, 2024, what were the standards that you expected of your subordinates in investigating whether you would or would not oppose a certificate of innocence?

A. I mean, look, the minimum standards were if we believed that this was a conviction in which we believed was properly secured and a certificate of innocence ran counter to that, then we would file to intervene in that case to block the granting of that certificate.

Q. Did you have a set of investigatory standards that your subordinates were supposed to follow in making that determination by looking at the underlying evidence and allegations that are made in the certificate of innocence?

A. Excuse me, generally yes, the first assistant, the chief deputy, the attorneys reviewing the cases would confer, particularly

the attorneys who were handling the cases directly would say this is a case that we ought to intervene in. They would communicate with members of the executive team. And historically the executive team would come to me and say this is a certificate that we should intervene in.

Q. In the cases where it was a nonintervention, would that occur as well or no?

A. I'm not saying that there was not a case or two that someone would come and say, hey, this might have been on your radar, but we don't believe we should intervene here, I think that's happened on a couple of occasions.

But generally when it got to my radar, it was not handled by the executive -- the first assistant of the chief deputy. It was generally when we were going to ask to intervene.

Q. So just on the noninterventions, was it your expectation that your subordinates in making the decision not to intervene in a COI proceeding, that they would actually do an underlying investigation into the merits of the claims that were being made in the petition?

A. The expectation of that is on that in

191

reviewing the certificate of innocence, that they would look at the facts and the evidence and determine whether or not we should in fact intervene or not.

So yes, there was an expectation that that would be done in each case. There was not an everyone gets a certificate just because. Their attorneys were supposed to review those cases to determine whether or not we should intervene or not.

Q. And if the attorneys did not do any actual substantive investigation into the allegations made, would that be inconsistent with the standards that you expected of your subordinates?

A. The obligation of the prosecutors within that office was to look at the facts, the evidence, and the law to make a determination at every level of the case including certificates of innocence.

Q. Do you know what, if any, investigation was done to investigate the petition for certificate of innocence that was filed by Ms. Mulero?

192

A.   I do not know what happened with Ms. Mulero's case.  I do not recall Ms. Mulero case coming to me.

Q.   But just so we are clear about the meaning of all of this, just because your office has decided not to intervene in a proceeding does not mean that your office believes the person who filed the petition to be innocent?

A.   Yes.  To be clear, just because we were not intervening, sometimes it was what is our -- how are we going to meet our burden.  How are we going to be able to prove this.  Are we going to be able to rebut any presumptions that are a part of that.

So sometimes it is not about actual -- it's like can we make our case.  If we can't make our case, it doesn't mean that we are saying this person isn't actually innocent.  You are weighing a number of factors.  So a nonintervention does not mean that we are saying that someone is actually innocent.

Q.   Got it.  And --

A.   Our silence does not mean actual innocence.

Q. Thank you for that. Thank you for that clarification.

I think I know your answer to this, but Ms. Mendoza also filed a petition for certificate of innocence. Have you ever seen that before?

A. I have not.

Q. Okay. Your office elected not to intervene in that petition as well? Were you aware of that?

A. I was not aware of that.

Q. Okay. Are you aware of any investigation that was done by your office into the allegations made by Ms. Mendoza and her petition for a certificate of innocence?

A. I'm sorry, I don't recall Ms. Mendoza's case at all, so I have no idea.

Q. Okay. And the mere fact that your office did not oppose Ms. Mendoza's petition for certificate of innocence is not a finding by your office that it believed that Ms. Mendoza was innocent of involvement in the crimes for which she was convicted; is that true?

A. Our silence of certificates of innocence is not an indication of actual innocence.

Q.   Okay.  Thank you.

And same question with respect to Ms. Mendoza as I asked with Ms. Mulero, which is was it your expectation that your subordinates after getting a petition for certificate of innocence brought on behalf of Ms. Mendoza would have done an actual investigation into the merits of the allegations she was making?

A.   Yes.

MR. SCAHILL:  All right.  I think that's all that I have.

THE WITNESS:  Should I not look so excited, I'm sorry?

MR. SCAHILL:  There's going to be other questions I assume, but nearly as longwinded as me, but thank you so much for your time, Ms. Foxx.  I really appreciate it.

MS. ROSEN:  Hi, Ms. Foxx, I just have a couple questions.

THE WITNESS:  Of course.

CROSS-EXAMINATION

BY MS. ROSEN:

Q.   On the issue of the press release and the quotations and how some of the language is in

quotation and some of the language is not in quotation, who decides what to put in quotation marks?

A.   The person who drafted the statement, generally what happens is they will make a draft. They will go to whatever department or bureau that was involved in the case.  So if it was CIU or postconviction, hey, does this look right? This is what we are going to say.  This is what we are attributing to the State's Attorney.  They draft it and make a determination as to what the background is versus what the quotations are.

Q.   And do you know what the basis of their decision is regarding what to put in quotes and what not to put in quotes?

A.   I do not.

Q.   And you were aware while you were the State's Attorney that press releases were going out with statements attributed to you via the mechanism of quotation marks without you actually reviewing them?

A.   Yes.

MR. KUBLY:  Object to form.

THE WITNESS:  I'm sorry.  Yes.  We literally

would sent out a hundred of press releases on a myriad of things that had quotes from me on them.

BY MS. ROSEN:

Q.   Why include quotes at all if the statements are not directly coming from you?

A.   Again, I'm not a communication specialist, but it is a practice that's done, whether in government or in the private sector. That's something that my communications director would have to answer.

MS. ROSEN:  Okay.  I don't have anymore questions.

MR. CARTER:  Do you want to talk first?

MR. FLAXMAN:  I have a couple.  Do you want me to take a microphone?

Ms. Foxx, thanks for your time today.

THE WITNESS:  Thank you.

CROSS-EXAMINATION

BY MR. FLAXMAN:

Q.   One thing Mr. Scahill asked you about was your office's review of the case before taking a position on a postconviction petition. Do you recall that?

A.   He asked me a lot.  Yes.  I believe.

Yes.

Q. Okay. And am I right that your office would undertake a review of the case before they would go into court and take a position on a postconviction petition?

A. That is correct.

Q. One time you said your office would review the facts, the evidence and the law; is that right?

A. That's the expectation, yes.

Q. Was there a universal rule for what that review would entail in every single case?

A. I don't think I understand your question.

Q. Am I right that different cases have different facts and the appropriate review in one case is going to be different than the appropriate review in another case?

A. Correct. I mean, part of what I was trying to get to about prosecutorial discretion, no two cases are the same. Even if you have similar charges, you look at the individual case, the individual facts, the individual evidence, and you make an evaluation based on the

individuality of that case.

One of the things that we were trying to get away from was kind of blanket approaches. It was giving prosecutors, again these are the guardrails, look at the facts, evidence of your particular case and make a determination based on that.

Q. And that review is something you relied on the prosecutors in your office to undertake, correct?

A. That -- the role of the State's Attorney means that you have hundreds of assistants who are imparted with the ability to exercise the same level of discretion that you have and look at those cases because while my name is on the door, it is impossible for me to look at tens of thousands of cases that come through our office. So that review is imparted upon them and their judgment to exercise. Yes.

MR. FLAXMAN: Thank you for your time. I don't have anything else.

THE WITNESS: Thank you.

MR. TIMBO: Does anybody else in the room have questions? I have a couple.

Ms. Foxx, I just have a couple questions. Thank you for your time today.

THE WITNESS: Thank you.

CROSS-EXAMINATION

BY MR. TIMBO:

Q. Am I correct then that you have no specific recollection with respect to your communication with your assistant, Ms. Lanier, regarding the specifics of any investigations your office did with respect to Ms. Mulero's petition?

A. I heard specific a couple times. Could you repeat your question?

Q. Sure. I'm sorry if it cut out there.

I believe you testified earlier that you are not able to give any testimony with respect to any specifics that Ms. Lanier may have talked to you about when she came and gave you that list of recommendations, correct?

A. That's correct. I do not recall. I'm not saying she didn't. I just don't recall what the facts were.

Q. And so you have no testimony to give whether any of the individuals that I'm

representing, Mr. Halvorsen's estate prior -- previously Detective Gards, Bibo or Riccio, if any alleged misconduct against them was part of that decision?

A.   Yeah.  I have no recollection of that.

Q.   And then the same question with respect to Ms. Mendoza's 1401 petition, do you have any testimony to give that any of those four gentlemen that I just identified or any alleged misconduct that anybody has alleged against them was part of that decision?

A.   I have no recollection of that.

Q.   At the beginning of your deposition, you said that you are currently on a sabbatical, correct?

A.   That's correct.

Q.   But that you also are taking on projects?

A.   That is correct.

Q.   What type of projects?  Can I ask what are you working on now?

A.   So I do a lot of teaching.  I just -- part of the reason I don't have a voice, I just taught at the University of California-Berkeley

on Friday.  I have a fellowship with them.  I have a fellowship with the University of Pennsylvania School of Law where I would go and teach one semester in the fall and one semester in the spring and work with their Quattrone Center.

I also work with John Jay College in the Institute for Innovation and Prosecution doing webinars for them and looking at -- and I teach a couple of things with them as well.  It's a lot of teaching and consulting around that work.

Q.   Do you currently have any projects with any members of the Exoneration Project?

A.   No.

MR. TIMBO:  Thank you.  I have no further questions.

THE WITNESS:  I should be clear I have no projects with folks in the Chicagoland area at all.

MR. TIMBO:  Thank you.

MR. CARTER:  Off the record for one minute.

THE VIDEOGRAPHER:  Off the record at 2:25 p.m.

(A short break was taken.)

THE VIDEOGRAPHER:  Back on the record at 2:28 p.m.

MR. CARTER:  Just for the record, counsel for Ms. Mulero does not have any questions.

MR. SCAHILL:  Anyone else?  All right. Ms. Foxx, you are officially done.  The only last piece of business here is you can either waive signature or you can reserve signature.

Reserve just means that you get the opportunity to look at the transcript, make changes as you desire.  Totally up to you.  None of us have a position on it at all.  So just let the court reporter know what you want to do so we can put it on the record and that will be that.

MR. KUBLY:  We are going to reserve.

MR. SCAHILL:  Fair enough.

THE VIDEOGRAPHER:  And before we go off the record, if I could please get any orders at this time; transcript or video.

MR. SCAHILL:  We will take the transcript.

MS. BAGBY:  We will take the transcript.

MR. CARTER:  Yes, please.

MR. FLAXMAN:  No.

THE VIDEOGRAPHER:  All right.  That concludes

the deposition.  Off the record time is 2:29 p.m.

(The deposition concluded at 2:29 p.m.)

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION


MADELINE MENDOZA, et       )

al,                        )

          Plaintiffs,      ) No. 23 CV 2441

     vs.                   )

REYNALDO GUEVARA, et       )

al.,                       )

          Defendants.      )

     This is to certify that I have read the transcript of my deposition taken in the above-entitled cause by Marlo Rodriguez, Certified Shorthand Reporter, on April 16, 2026, and that the foregoing transcript accurately states the questions asked and the answers given by me as they now appear.

                    _____

                         KIMBERLY FOXX

SUBSCRIBED AND SWORN TO

before me this _____day

of _____2026.

_____

     Notary Public

205

STATE OF ILLINOIS )

                    )   SS:

COUNTY OF C O O K )

I, Marlo Rodriguez, a notary public within and for the County of Cook County and State of Illinois, do hereby certify that heretofore, to-wit, on April 16, 2026, personally appeared before me, at 20 South Clark Street, Suite 1700, Chicago, Illinois, KIMBERLY FOXX, in a cause now pending and undetermined in the United States District Court, Northern District of Illinois, Eastern Division, wherein MADELINE MENDOZA are the Plaintiffs, and REYNALDO GUEVARA, et al., are the Defendants.

I further certify that the said witness was first duly sworn to testify the truth, the whole truth and nothing but the truth in the cause aforesaid; that the testimony then given by said witness was reported stenographically by me in the presence of the said witness, and afterwards reduced to typewriting by Computer-Aided Transcription, and the foregoing is a true and correct transcript of the testimony so given by said witness as aforesaid.

I further certify that the signature to the foregoing deposition was reserved by counsel for the respective parties.

I further certify that the taking of this deposition was pursuant to Notice, and that there were present at the deposition the attorneys hereinbefore mentioned.

I further certify that I am not counsel for nor in any way related to the parties to this suit, nor am I in any way interested in the outcome thereof.

IN TESTIMONY WHEREOF:  I have hereunto set my hand and affixed my notarial seal this _____day of _____, 2026.

_____
NOTARY PUBLIC, COOK COUNTY, ILLINOIS

WITNESS ERRATA SHEET


    I wish to make the following changes for the following reasons:


Page  Line

              Change: _____
____  ____  Reason: _____

              Change: _____
____  ____  Reason: _____

              Change: _____
____  ____  Reason: _____

              Change: _____
____  ____  Reason: _____

              Change: _____
____  ____  Reason: _____

              Change: _____
____  ____  Reason: _____

              Change: _____
____  ____  Reason: _____

              Change: _____
____  ____  Reason: _____

              Change: _____
____  ____  Reason: _____


(Signed) _____

208

I N D E X

WITNESS                                    EXAMINATION

KIMBERLY FOXX

   Direct Examination By Mr. Scahill     7

   Cross-Examination By Ms. Rosen        195

   Cross-Examination By Mr. Flaxman      197

   Cross-Examination By Mr. Timbo        200


E X H I B I T S

NUMBER                              MARKED FOR ID

Defendant's Deposition Exhibit

       No. 1                              26

       No. 2                              63

       No. 3                              89

       No. 4                              126

       No. 5                              140

       No. 6                              156

       No. 7                              175