**CIRCUIT COURT OF COOK COUNTY ILLINOIS
CRIMINAL DIVISION**

People of the State of Illinois,       )
                                        )       Case No. 91 CR 22401-02
          Respondent,                   )
                                        )       Chief Judge LeRoy K. Martin,
     v.                                 )       Judge Presiding
                                        )
Arturo De Leon Reyes,                   )
                                        )
          Petitioner.                   )

## NOTICE OF MOTION

TO:   Hon. Kim Foxx                             State of Illinois
      Carol Rogala                              Office of the Attorney General
      Office of the Cook County State's Attorney 100 West Randolph Street
      2650 S. California Avenue                  Chicago, IL 60601
      Chicago, IL 60608

Please take notice that on May 9, 2018, at 9:00 a.m., I will appear in Courtroom 101 in the Circuit Court of Cook County, 2650 S. California Avenue, Chicago, IL 60608, and then and there present Petitioner's Petition for a Certificate of Innocence Pursuant to 735 ILCS 5/2-702, a copy of which is hereby served on you.

Dated: April 30, 2018

                                        Respectfully submitted,

                                        By:

                                        _____
                                        One of His Attorneys

Anand Swaminathan
THE EXONERATION PROJECT
The University of Chicago Law School
6020 S. University Ave.
Chicago, IL 60637
Telephone:   (312) 789-4955
Facsimile:   (312) 588-7276

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, CRIMINAL DIVISION

| | |
|---|---|
| **ARTURO DeLEON REYES,** ) | |
| ) | |
| *Petitioner,* ) | |
| ) | **No. 98 CR 12440-02** |
| v. ) | |
| ) | |
| **STATE OF ILLINOIS** ) | |
| ) | |
| *Respondent.* ) | |

## PETITION FOR CERTIFICATE OF INNOCENCE PURSUANT TO 735 ILCS 5/2-702

# TABLE OF CONTENTS

INTRODUCTION...................................................................................................................1

JURISDICTION ..................................................................................................................3

PROCEDURAL HISTORY ...................................................................................................3

FACTUAL OVERVIEW........................................................................................................5

    A.  The Crime and Initial Investigation...................................................................5

    B.  Adriana Mejia ....................................................................................................6

    C.  Arturo DeLeon Reyes .........................................................................................6

    D.  Mr. Reyes and Mr. Solache Do the Right Thing................................................7

    E.  Defendants Interrogate Mr. Reyes and Fabricate a False Confession........................ 8

    F.  Evidence of Mr. Reyes' Innocence ...................................................................11

    G.  Ample Evidence of Guevara's Similar Misconduct .........................................12

    ARGUMENT.......................................................................................................................24

        A.  Legal Standard.................................................................................................24

        B.  Mr. Reyes Meets the Procedural Requirements of Section 2-702 ...................24

        C.  Mr. Reyes Has Established Innocence by a Preponderance of the Evidence 25

    CONCLUSION ...................................................................................................................27

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, CRIMINAL DIVISION**

| | | |
|---|---|---|
| ARTURO DeLEON REYES, | ) | |
| | ) | |
| *Petitioner,* | ) | |
| v. | ) | No. 98 CR 12440-02 |
| | ) | |
| STATE OF ILLINOIS | ) | |
| | ) | |
| *Respondent.* | ) | |

**PETITION FOR CERTIFICATE OF INNOCENCE PURSUANT TO 735 ILCS 5/2-702**

Petitioner, ARTURO DeLEON REYES, by his attorneys LOEVY & LOEVY,

respectfully petitions this Court to enter an order granting him a certificate of innocence pursuant

to 735 ILCS 5/2-702. In support of this request, Petitioner states as follows:

**INTRODUCTION**

1.      On December 21, 2017, after 19 years in prison for a crime he did not commit, the

conviction of Petitioner Arturo DeLeon Reyes for murder, aggravated kidnapping and home

invasion was thrown out. Following post-conviction hearings, the Cook County State's Attorney

moved to dismiss all charges against Reyes, and Judge James Obbish of the Cook County Circuit

Court ordered him released from prison.

2.      Mr. Reyes had nothing to do with the murders or abductions. Indeed, despite a

crime scene full of blood and other physical evidence, not one piece of that evidence has ever

connected Mr. Reyes to the crime. None of the forensic testing of DNA and other physical

evidence recovered from the crime scene has ever suggested that Mr. Reyes was a perpetrator.

3.      In fact, after Mr. Reyes's conviction DNA testing was performed on the physical

evidence recovered from the crime scene; the testing excluded Mr. Reyes and instead revealed

1

the presence of the DNA profile of an unidentified person.

4.      Reyes' conviction for a crime he did not commit was only possible because of the blatant misconduct of now-disgraced Chicago police detective Reynaldo Guevara.

5.      During Reyes' post-conviction hearing, Detective Guevara invoked his Fifth Amendment right not to incriminate himself in response to questions about whether he physically abused Mr. Reyes during his interrogation. Evaluating that testimony, Cook County Judge James Obbish said that Guevara had told "bald face lies" and further stated that Guevara had "eliminated any possibility of [] being considered a credible witness in any proceeding."

6.      In total, sixteen convictions investigated by Detective Guevara have been vacated, including many that were set aside based on allegations similar to this case—that Detective Guevara coerced suspects and witnesses in order to frame an innocent person for a crime.

7.      Petitioner had come to the United States approximately three months before his ordeal began. Like so many other immigrants of all races and nationalities throughout American history, Mr. Reyes had come to work and to make a better future for his family. Mr. Reyes immediately found a job in Chicago, earning what he could and sending money back to Mexico to provide for his pregnant wife, young daughter, and nine siblings. He had no run-ins with police at all in his time in the United States. What little time he had after working long hours he spent with his wife's family in Chicago. But Mr. Reyes's pursuit of the American dream ended with his wrongful conviction at the hands of Detective Guevara.

8.      Because Arturo DeLeon Reyes is innocent—and he satisfies all other aspects of the statute—Petitioner respectfully requests that this Court enter an order granting him a certificate of innocence.

2

## JURISDICTION

9. This petition for a certificate of innocence is brought pursuant to 735 ILCS 5/2-702.

10. The Illinois legislature enacted Public Act 95-70 in 2008 to permit a person whose conviction has been set aside to apply for certification from the judiciary that he is actually innocent of the underlying crime. This provision allows an individual who has been wrongfully imprisoned to seek assistance and redress from the State, including financial compensation through the Court of Claims and access to the Department of Employment Security's job placement services. *See* 735 ILCS 5/2-702.

11. This legislation was enacted in an effort to provide some measure of recompense for the relationships, opportunities, and happiness lost during wrongful incarceration. It is a remedy that a factually innocent person who has served time is entitled to, as a matter of law, after his or her conviction is set aside.

## PROCEDURAL HISTORY

12. Mr. Reyes was arrested in this matter on April 3, 1998. The indictment against him was filed on May 8, 1998.

13. On June 20, 2000, a Cook County jury found Mr. Reyes guilty of two counts of first degree murder, two counts of aggravated kidnapping, and home invasion. On December 18, 2000, Judge Stanley J. Sacks sentenced him to life without the possibility of parole for the murders, and to concurrent prison terms of 30 years for each count of aggravated kidnapping and home invasion. A copy of the mittimus is attached as Exhibit 1.

14. The Appellate Court affirmed Reyes' conviction on direct appeal. *People v. Reyes*, 343 Ill. App. 3d 1292 (1st Dist. Sept. 30, 2003). Leave to appeal was denied on October 6,

3

2004. *People v. Reyes*, 211 Ill. 2d 605 (2004).

15. On December 17, 2003, Mr. Reyes filed a petition for post-conviction relief. Judge Sacks summarily dismissed the petition on March 2, 2004. On December 11, 2006, the Appellate Court reversed the summary dismissal and remanded for further post-conviction proceedings before a different judge. The Appellate Court ordered the same relief for Mr. Reyes' codefendant Gabriel Solache. *People v. Reyes & Mr. Solache*, 369 Ill. App. 3d 1 (1st Dist. 2006). Leave to appeal was denied on March 28, 2007. *People v. Reyes*, 223 Ill. 2d 669 (2007).

16. On June 13, 2008, Mr. Reyes filed an amended petition for post-conviction relief, as did Mr. Solache. The court determined that a third stage evidentiary hearing was warranted on Mr. Reyes and Mr. Solache's claims that newly discovered evidence indicated that Detective Guevara engaged in abuse and coercion in other instances, indicating that the confessions of Mr. Reyes and Mr. Solache were involuntary and procured through abuse and coercion. A copy of the court's ruling is attached as Exhibit 2.

17. On June 29, 2016, following a lengthy evidentiary hearing at which Mr. Reyes testified that he was innocent, Judge James M. Obbish granted Mr. Reyes' post-conviction petition in part by ordering a new hearing on Mr. Reyes' motion to suppress his confession as involuntary. Mr. Solache received the same relief. A copy of Judge Obbish's order granting post-conviction relief is attached as Exhibit 3. The State filed a notice of appeal, but the appeal was dismissed on the State's motion on January 3, 2017.

18. In the ensuing evidentiary hearing, in response to questions about whether he physically abused Mr. Reyes during his interrogation, Detective Reynaldo Guevara invoked his Fifth Amendment right not to incriminate himself. A transcript of the relevant suppression hearing testimony is attached as Exhibit 4, and referred to herein as "S. Hearing." (*See* S.

4

Hearing Combined 227-228.) Evaluating that testimony, Cook County Judge James Obbish said that Guevara had told "bald face lies" and further stated that Guevara had "eliminated any possibility of [] being considered a credible witness in any proceeding." (S. Hearing Combined 266, 300-301.)

19. On December 13, 2017, Judge Obbish granted Mr. Reyes' motion to suppress his confession. (S. Hearing Combined 302.) On December 21, 2017, Mr. Reyes' judgment of conviction was vacated, the State dismissed all charges, and Mr. Reyes was released from prison. Judge Obbish ordered the same relief for Mr. Solache. A copy of the accompanying order is attached as Exhibit 5.

20. Mr. Reyes is within the limitation period for filing a petition for a certificate of innocence, as charges were dismissed against him on December 21, 2017, and this petition is filed within two years of that date. *See* 735 ILCS 5/2-702(i).

## FACTUAL OVERVIEW

### A. The Crime and Initial Investigation

21. In March of 1998, Mariano and Jacinta Soto lived in a basement apartment in Chicago, along with their three-year old son Santiago and infant daughter Maria. (R. 268-69.)

22. On the morning of April 1, 1998, police officers conducting a well-being check at their apartment found the bodies of Mariano and Jacinta. Jacinta was found lying face down in the bedroom; Mariano was found lying face up in the kitchen, with a number of defensive wounds on the back of both hands. The children were nowhere to be found. Police suspected that the crime had occurred on or around March 28, 1998. (R. 1354-56[1]; Ex. 6, General Offense Report dated 4/1/98.)

---

[1] The complete trial record is provided on a disc submitted with this petition, and referred to herein as "R."

5

23. The Police Officer Defendants investigated the crime scene. Along with other Chicago police officers, they secured the house and began to gather the physical evidence left at the scene. Among other things, the Police Officer Defendants found two bloody knives and a butcher block at the scene, as well as blood-stained clothing and bed coverings, fingerprints throughout the house, broken glass, shoeprints in dried blood on the kitchen floor, and blood spatter on the bedroom wall. A police photographer took photographs of the scene. All of the evidence was collected and inventoried. None of the physical evidence discovered at the scene connected Mr. Reyes to the crime. (Ex. 7, Supp. Report dated 4/1/98.)

**B.      Adriana Mejia**

24. On March 28, 1998, around the time the crime occurred, a woman named Adriana Mejia was picked up from the University of Illinois Hospital by her husband and sister-in-law, Rosauro and Guadalupe Mejia. The day before, on March 27, Adriana had been dropped off there supposedly to deliver a baby. She had been pretending for nine months that she was pregnant, lying to her family members. But when her family picked her up on March 28, she was holding a baby that she claimed was hers, and she was with a three-year-old boy who she claimed she was watching temporarily for another woman who had gone into labor at the hospital. In reality, these children were Santiago and Maria Soto, who had been abducted from the crime scene after their parents were murdered. (R. 1441, 1909-10, 1928.)

25. Adriana Mejia's DNA was found all over the crime scene. (R. 1544-49, 1564-65.) After admitting that she had committed the murder and abduction, Adriana pleaded guilty. She is serving life in prison for the crimes to this day. (Ex. 8 Mejia Mittimus).

**C.      Arturo DeLeon Reyes**

26. When Mr. Reyes came to the United States from Mexico three months before the

6

Soto murders to work, he left behind his pregnant wife, young daughter, and nine siblings. He was raised in Santa Ana Tepetitlan, Mexico, where he lived until he was 25 years old. He attended school through 9th grade and thereafter worked as a construction worker. While he was living in Mexico, Mr. Reyes was never arrested. (R. 637-38, 2060.)

27. His wife's aunt lived in Chicago, and so Mr. Reyes came to live first with her and her family. Mr. Reyes quickly found work, and he worked long hours six or seven days a week. He used some of the money that he had saved to rent a single room in a nearby apartment. (R. 2117-2121, 2031.)

28. The apartment in which he happened to rent a room belonged to Adriana and Rosauro Mejia. Mr. Reyes did not know the Mejias. Outside of his long work days, Mr. Reyes spent all of his free time with his wife's family. He had very little contact with the Mejias other than seeing them in passing on his way to or from work. (R. 2118-21, 2030-31.)

29. Another Mexican immigrant named Gabriel Solache also had rented a room in the Mejias' apartment. Mr. Reyes had no prior relationship with Mr. Solache either. R. 2031.)

### D. Mr. Reyes and Mr. Solache Do the Right Thing

30. In the early morning hours of April 3, 1998, Mr. Reyes woke up and overheard Rosauro and Adriana Mejia arguing in another room. Mr. Reyes could hear that the argument was about the three-year old boy that Mejia had said she was watching. Mr. Reyes told the Mejias that if there was a problem with the boy, they should take the boy to the police station. Mr. Reyes offered to go with them. (R. 1911-12, 2039-40.)

31. Mr. Solache had also come out of his room and agreed to accompany the boy to the police station. (R. 2039-40; Ex. 9, S. Hearing Combined 18-19, 51-52, 133-134).

32. Mr. Reyes and Mr. Solache escorted Rosauro Mejia and the boy to the 8th District

7

Chicago police station, over the objection of Adriana Mejia. It would be the last time Mr. Reyes or Mr. Solache set foot outside as free men for nearly 20 years. (R. 1389-90, 1404, 1411, 1913, 2040.)

**E.      Defendants Interrogate Mr. Reyes and Fabricate a False Confession**

33.     Although Mr. Reyes and Mr. Solache had ensured that a missing boy was safely returned to the police, after the boy was positively identified as Santiago Soto the three men were transported to Area 5 headquarters, separated, and interrogated. Adriana Mejia was arrested at her home, brought to Area 5, and also interrogated. By April 5, 1998, Mr. Solache, Mr. Reyes, and Adriana Mejia had signed English-language confessions to the murders and kidnappings. Mr. Reyes, for one, did not speak English. (R. 1389-90, 1404, 1411, 2043, 2060.)

34.     All three of the men who brought the boy to the station on April 3—Mr. Reyes, Mr. Solache, and Mr. Rosauro Mejia—maintain that Detective Reynaldo Guevara beat them during their interrogations. (*See, e.g.*, R. 1917, 2044, 2051-52, 2066, 2084.) Adriana similarly claimed that Guevara physically abused her. (R. 958.)

35.     Mr. Reyes' interrogation began in the morning hours of April 3, 1998 and continued over the next 40 hours. There is no dispute that for many hours Reyes was interrogated and maintained his innocence. (R. 579, 2050-2053.)

36.     Indeed, Mr. Reyes did not participate in the crime, and maintained his innocence throughout his trial and post-conviction proceedings.

37.     Mr. Reyes has maintained that the following physically and psychologically abusive tactics were used to secure his false confession:

38.     After remaining in an interrogation room with no windows for an unknown amount of time, Petitioner's interrogation began when Detective Guevara came into the room,

8

immediately slapped Mr. Reyes across the face, and yelled at him about why he "did it." Mr. Reyes had no idea what was going on. He knew that the three-year old had been reported missing, but he knew nothing else about the boy, he did not know the boy had been abducted, he did not know that an infant had also been abducted, and he knew nothing of the Soto murders. Guevara handcuffed Mr. Reyes to the wall before leaving the room. (R. 1586-87, 2044-45; Exhibit 9, S. Hearing Combined 15, 20-21, 23, 26, 52.)

39.     At one point, Guevara told Mr. Reyes that if he did not start talking about his role in the crimes he would get the electric chair and would be put to death. (R. 2051; Ex. 9 S. Hearing Combined 21.)

40.     Later, Guevara entered the interrogation room again and continued to interrogate Mr. Reyes about the crimes. Every time that Mr. Reyes denied involvement or responded that he did not know anything, Guevara slapped him across the face, each time harder than the last. This continued for an extended period. Mr. Reyes remained handcuffed throughout this beating. (R. 2055.)

41.     Plaintiff was also in an extreme state of sleep deprivation throughout the interrogation. Mr. Reyes went to the police station around 4 a.m. on April 3, after a long day of work and less than a couple of hours of sleep. Mr. Reyes had initially arrived at the police station in the middle of the night, and was kept awake and handcuffed to the wall in a windowless interview room during his days-long interrogation. By the time Mr. Reyes's interrogation came to an end on April 5, Mr. Reyes had not slept more than a few hours since waking up on the morning of April 2.

42.     Mr. Reyes was not given Miranda warnings. At no point did Mr. Reyes knowingly or voluntarily waive his right to remain silent or his right to have counsel present at

9

the interrogation. (R. 2045, 2064.)

43. Despite all of this, Mr. Reyes steadfastly maintained his innocence. Mr. Reyes told Detective Guevara and others over and over that he did not know anything about the crime and that he was not involved in any way in the Soto murder and abduction. (R. 579, 2050-2053.)

44. At one point the police came in and insisted that Mr. Reyes sign a form consenting to a search of his room in the apartment. Mr. Reyes signed the form, and the Defendants then searched his room and found nothing that implicated or connected Mr. Reyes to the crime in any way. (Ex. 10, Consent to Search dated 4/4/98; R. 2048-49.)

45. In the middle of the night of April 5, 1998, after 40 hours of abusive interrogation involving all of the events described above and more, Mr. Reyes's will was finally broken and he signed a statement implicating himself and Mr. Solache in the Soto murders and abductions. The statement was in English, which Mr. Reyes could not read. It also contained claims that could not be squared with the evidence at the crime scene. (R. 2060-2063; Ex. 11, Statement of Arturo DeLeon Reyes dated 4/5/98.)

46. Mr. Reyes has maintained throughout his trial and post-conviction proceedings, and maintains today, that he did not participate in the crime, and that he falsely confessed and signed a statement he could not read only because Guevara beat him; and further, that he did not provide the facts about the crime that were included in the confession. (R. 643, 655-656, 660, 746-48, 2044, 2051, 2055; Ex. 9, S. Hearing Combined 20-21, 23, 25-26.)

47. That coerced and false confession was the evidentiary basis for Mr. Reyes's wrongful convictions. (*See, e.g.,* R. 2212.)

48. Mr. Solache was in a separate interrogation room and subject to similar treatment. Like Reyes, after a days-long interrogation in which he repeatedly denied any involvement in the

crime, his will was finally overcome and he too signed an English language statement implicating himself and Reyes in the crime. Mr. Solache, like Mr. Reyes, has consistently maintained that that he falsely confessed and signed a statement he could not read only because Guevara beat him; and further, that he did not provide the facts about the crime that were included in the confession. A copy of the relevant excerpts from Mr. Solache's trial are attached as Exhibit 12. (Ex. 12, Solache R. 716, 722-23, 746, 852, 909, 2051-52, 2055, 2066; Ex. 9, S. Hearing Combined 46-52, 54.)

### F.    Evidence of Mr. Reyes' Innocence

49.    Substantial physical evidence linked Adriana Mejia to the crime. Among other things, her DNA was found on the knife recovered from behind the couch in the Soto apartment and on the green towel that was recovered from the car that the prosecution believed was used in the crime. Further, Mariano Soto's blood was found on Adriana Mejia's shoes and pants. (R. 1544-49, 1564-65.)

50.    In contrast, no DNA or other physical evidence linked Mr. Reyes or Mr. Solache to the crime. Their DNA was not present on any of the items tested, and their fingerprints were not found at the scene. Mr. Reyes's shoes were confiscated during his interrogation, but no blood was found on them. (R. 1377-83, 1553-64, 1570, 2054.)

51.    Law enforcement officials did not collect blood standards from any of the other adults in the Mejia household, including Rosauro Mejia. (R. 1564-65.)

52.    During post-conviction proceedings, new DNA testing revealed that DNA from an unknown person was recovered from the knife found under Mariano Soto. Mr. Reyes and Mr. Solache were excluded as the source of this partial DNA profile. So too were Adriana Mejia and both victims, indicating it came from a yet-to-be-identified perpetrator. (Ex. 13, Lab Report

11

dated 1/15/17.)

53.     In addition, employee timesheets showing Mr. Reyes's long workdays the day of the crime and the day before made it almost impossible for him to have committed a violent double murder and double child abduction. (R. 1903, 2033-34, 2121; Ex. 14, DeLeon Reyes Timesheets.)

54.     Mr. Reyes also voluntarily came to the police station to report the missing three-year old boy. *See supra.*

### G.     Ample Evidence of Guevara's Similar Misconduct

55.     Since the trial of Mr. Reyes, a remarkable amount of evidence has been developed regarding Guevara's rampant misconduct, including in ways very similar to the allegations here. This evidence has been credited by Illinois appellate courts in this case and others. *See People v. Reyes and Mr. Solache*, 369 Ill.App.3d 1860 (1st Dist. 2006); *see also People v. Montanez*, 2016 IL App (1st) 133726; *People v. Serrano*, 2016 IL App (1st) 133493; *People v. Almodovar*, 2013 IL App (1st) 101476. Mr. Reyes attached to his post-conviction petition affidavits, testimony or proofs from dozens of Guevara victims in support of his contention that Guevara routinely committed egregious misconduct, including through the use of physical force and threats to obtain confessions, as occurred in this case.

56.     In *Montanez*, the Appellate Court found those proofs to be "evidence of Guevara's misconduct and witness coercion from more than 20 people, all from within a 10-year period." *Montanez*, 2016 IL App (1st) 133726, ¶ 34. Indeed, the opinions in *Montanez* and *Serrano* review multiple allegations of misconduct levied against Guevara which constitute "profoundly alarming acts of misconduct" that "warrant closer scrutiny by appropriate authorities." *Montanez* at ¶ 1; *Serrano* at ¶ 1. Following remand, on July 20, 2016, Chief Judge LeRoy K. Martin

12

entered an order vacating the convictions of Montanez and Serrano upon agreement of the State. On November 2, 2016, Montanez and Serrano were certified innocent. Exhibit 15.

57.    On April 14, 2017, the State dropped all charges against Roberto Almodovar and William Negron. Referring to the evidence of the pattern and practice of Guevara's misconduct, the State's Attorney stated:

After a thorough and deliberate review of the evidence and arguments presented to the circuit court, the State's Attorney's Office has concluded that the evidence presented could change the result of this case on retrial.

In light of this decision, we have determined that proceeding with this case is no longer in the best interests of justice and we are withdrawing our opposition to petitioners' request for a new trial. Based on the totality of the evidence currently available, the office has concluded that it is insufficient to support a retrial of this case.

58.    *Foxx Drops Case Against Pair in Alleged Frame-Up By CPD's Guevara*, CBS, April 13, 2017, available at http://chicago.cbslocal.com/2017/04/13/charges-dropped-william-negron-roberto-almodovar-kimberly-foxx-reynaldo-guevara-chicago-police-detective/

59.    In addition, the City of Chicago commissioned an investigation into Guevara and hired former United States Attorney Scott Lassar, now of the law firm of Sidley Austin LLP, to conduct the investigation. Reports in the investigation were completed in 2015 and concluded that four different men that alleged misconduct by Guevara are "most likely innocent." *See* Ex. 16 (Lassar Report). These men include Almodovar, Serrano, Montanez, and Robert Buoto.

60.    As of the filing of this complaint, fifteen men have had their convictions thrown out as a result of Detective Guevara's misconduct. Those men served hundreds of years in prison for crimes they did not commit. In addition to Mr. Reyes, the other fourteen men are Jacques Rivera, Juan Johnson, Jose Montanez, Armando Serrano, Jorge Pacheco, Roberto Almodovar, William Negron, Jose Maysonet, Angel Rodriguez, Santos Flores, Henry Johnson, Gabriel Solache, Thomas Sierra, and Ariel Gomez

13

61. There is ample additional evidence of Guevara's *modus operandi*, which supports Mr. Reyes' claim that he is innocent, and that he confessed only as a result of Guevara's physically and psychologically abusive interrogation. The evidence includes the following:

a. Bill Dorsch is a former Chicago police detective. While serving with the Chicago police department, Dorsch was assigned to investigate a murder. Several months after the murder occurred, Defendant Guevara brought two juveniles to the police station that purported to have witnessed a shooting and recorded the license place of the shooter. Based on the information provided, Detective Dorsch created a photo array for the juveniles to attempt to identify the shooter. While the first juvenile was viewing the photo array, and before he identified any of the photographs, Defendant Guevara pointed to the suspect's photo and told the juvenile "that's him." The juvenile then agreed with Guevara, saying that was the person who committed the shooting. Dorsch then directed Defendant Guevara to leave the room and had the other juvenile view the same photo array, and he was unable to make any identification. Based on the first juvenile's identification, the suspect was charged with murder. Subsequently, Dorsch spoke to the two juveniles without Defendant Guevara being present. The juveniles admitted that they had been paid to falsely claim that the suspect was the person responsible for the shooting. After prosecutors spoke to the two juveniles, the suspect was released. (Ex. 17, Testimony of Bill Dorsch.)

b. Defendant Guevara's activities have drawn the interest of federal law enforcement officers. In 2001, the FBI authored a special report detailing the criminal activity of Chicago Police Officer Joseph Miedzianowski and his associates, including Defendant Guevara. The report details that Defendant Guevara, while acting in his capacity as a police officer, would apprehend drug and gun dealers and then allow them to "buy their way of trouble." According to

14

the report, Guevara also took bribes to alter both positive and negative lineups of murder suspects. Finally, the report states that Guevara, using an attorney as a conduit, would receive cash in exchange for the ultimate dismissal of murder cases he investigated. (Ex. 18, FBI Report.)

     c.     In 1989, Defendant Guevara coerced Samuel Perez into falsely identifying Juan Johnson as the person who killed Ricardo Fernandez. Defendant Guevara put Perez inside his car, showed Perez a photo of Juan Johnson, and told Perez that he wanted Juan Johnson to take the blame for the murder. Unsurprisingly, Perez subsequently falsely identified Johnson as a murderer. (Ex. 19, Testimony of Samuel Perez.)

     d.     In 1989, Defendant Guevara also coerced Salvador Ortiz into making a false identification of Juan Johnson, which he later recanted. (Ex. 20, Declaration of Salvador Ortiz.)

     e.     Juan Johnson was later exonerated and brought suit against Defendant Guevara. A federal jury found that Guevara framed Johnson for murder and awarded Johnson $21 million in damages.

     f.     In 1989, Defendant Guevara coerced Virgilio Muniz into making a false identification by repeatedly threatening Muniz that if he did not identify Manuel Rivera as the murderer, Muniz would "go down for the murder."

     g.     In 1989, Defendant Guevara coerced Virgilio Calderon Muniz (unrelated to Virgilio Muniz, described in the above paragraph) into making a false identification by telling him who to identify and making a veiled threat as to what would happen if he did not. (Ex. 21, Testimony and Affidavit of Virgilio Calderon Muniz.)

     h.     In 1991, Defendant Guevara coerced Wilfredo Rosario into making a false

identification and giving false testimony before the Grand Jury by threatening Rosario that if he did not identify Xavier Arcos as the murderer, Rosario would be "pinned" for the murder. Guevara fed Rosario details of the crime, such as the number of shots fired, the type of vehicle used in the crime, and the participants in the crime. Rosario recanted his identification of Arcos at trial. Though Arcos was still found guilty of murder by a jury, the appellate court overturned the conviction based on the lack of sufficient evidence. (Ex. 22, Testimony of Wilfredo Rosario.)

i.        In 1991, Defendant Guevara physically coerced sixteen year-old David Velazquez into making a false identification and giving false testimony by taking him to a rival gang's territory, beating him while chained to a wall at Area 5, and threatening to "get you for anything I can" if he did not talk. All of the false details of Velazquez's statement were provided by Guevara. (Ex. 23, Testimony of David Velazquez.)

j.        In 1993, Defendant Guevara coerced an identification from Carl Richmond by threatening Richmond that he could make his life very uncomfortable if Richmond did not identify Robert Bouto as the murderer of one of Richmond's friends. Richmond, who was familiar with Guevara's tactics, believed that Guevara would honor this threat. (Ex. 24, Affidavit of Carl Richmond.)

k.        In 1995, Defendant Guevara arrested Edwin Davila and, in an attempt to coerce a confession, chained him to the wall of an interrogation room and told him that he was going to frame him for murder. After Davila told Guevara that he did not do it, Guevara forced Davila to participate in a lineup in which two witnesses identified Davila as the perpetrator, despite the fact that each of those witnesses had previously told the police that they had not been able to see the shooter. (Ex. 25, Testimony of Edwin Avila.)

l.        In 1991, Defendant Guevara told Efrain and Julio Sanchez to pick David

16

Colon out of a lineup. As a result, these men falsely claimed that Colon had committed murder, but later came forward to bring Defendant Guevara's misconduct to light. (Ex. 26, Affidavits of Efrain and Julio Sanchez.)

m. In 1995, Defendant Guevara coerced Evelyn Diaz into making a false identification and providing false testimony to the Grand Jury by threatening Diaz that if she did not identify Luis Serrano as the shooter, her children would be taken away by the Department of Children and Family Services.

n. In 1995, Defendant Guevara told Luis Figueroa to falsely identify Angel Diaz as the perpetrator even though Figueroa did not see anything. Figueroa identified Diaz but recanted his identification at trial. (Ex. 27, Testimony of Luis Figueroa.)

o. In 1995, Defendant Guevara coerced Gloria Ortiz Bordoy into making a false statement and testifying falsely against Santos Flores at trial. During Ortiz Bordoy's six-to-eight hour interrogation, Guevara yelled in her face, threatened that her children would be taken by the Department of Children and Family Services, called her "the B word," and "raised his hand" saying that he "felt like smacking" her. Finally, without reading its contents, Ortiz Bordoy signed a statement that the detectives wrote out for her because she just wanted to "get out of there." (Ex. 28, Deposition of Gloria Ortiz Bordoy.)

p. In 1995, Defendant Guevara coerced Rodolfo Zaragoza, who was a victim and an eyewitness to a crime, into making a false identification and providing false testimony. Zaragosa was intimidated by Guevara and identified Ricardo Rodriguez as the offender because Guevara told him that Rodriguez was the shooter. (Ex. 29, Affidavit of Rodolfo Zaragoza.)

q. In 1996, Defendant Guevara coerced Maria Rivera into making a false identification of a man in a lineup by unzipping his pants and propositioning her. Rivera later

17

told the prosecutor that she had falsely identified an individual in a lineup at Guevara's direction. The prosecution later abandoned murder charges against the individual whom Rivera falsely identified in the lineup. (Ex. 30, Testimony of Maria Rivera.)

r.     In 1997, Defendant Guevara coerced Robert Ruiz into making a false identification. Guevara detained Ruiz repeatedly over the course of a ten-day period, locking him in an interrogation room without food, water, or a bathroom. Though Ruiz kept telling Guevara that he had not seen the shooter or the driver involved in the crime, Guevara told Ruiz whom to identify and what to say in his statement. Ruiz finally implicated Freddy and Concepcion Santiago in the murder because Ruiz believed that Guevara would continue to harass him until he changed his story. Ruiz recanted his identification at trial, and the judge found Freddy and Concepcion Santiago not guilty. The trial judge found it disturbing that Guevara was the lead detective in the case because the victim was Guevara's nephew. (Ex. 31, Testimony of Robert Ruiz.)

s.     In 1997, Defendant Guevara withheld physical evidence and failed to disclose the exculpatory statements of witness Ruth Antonetty to Ariel Gomez. Gomez was accused of firing multiple shots from a car into a crowd. Ruth Antonetty told Guevara that she heard multiple shots coming from within the crowd, not from Gomez's vehicle. Guevara continued to pressure her to change her account, and when she would not, he told her he "had other witnesses" and "didn't need her." As a result, Ariel Gomez did not have access to key Brady material at his trial. (Ex. 32 Affidavit of Ruth Antonnetty).

t.     In 1988, Defendant Guevara used suggestive tactics to force twelve-year-old Orlando Lopez to falsely identify Jacques Rivera as the person who shot Felix Valentin. As a result, Rivera was convicted of murder. In 2011, Lopez testified at an evidentiary hearing that he

18

had never been able to identify Rivera as the murderer. As a result, Rivera received a new trial. Ultimately, the State's Attorney dropped all charges against Rivera, who was granted a certificate of innocence.

u.      Also during the Felix Valentin shooting investigation, Defendant Guevara falsely claimed that the victim of that shooting identified Jacques Rivera as his shooter before he died. Defendant Guevara claimed that the identification was made at a time that the victim was in a medically-induced coma, unresponsive to any stimuli, and laying in a bed that was in constant motion to prevent his lungs from filling with fluid and killing him.

v.      In November 2001, Defendant Guevara's girlfriend, Judith Martinez, attended a trial in which Guevara was testifying and observed the testimony of trial witnesses. She then conferred with Guevara, even though the Court had ordered all witnesses excluded from the courtroom to prevent collusion among the witnesses.

w.      In 2011, the first district granted Tony Gonzalez a post-conviction hearing on the basis that Defendant Guevara conducted an unduly suggestive lineup wherein he concocted an array in which Gonzalez's photo was the only one that stood out from the rest in a photo array.

x.      In 1982, Defendant Guevara and another officer arrested and physically assaulted Annie Turner for smoking on a bus. Guevara called her a "bitch" and pushed her out the back door of the bus. He twisted her arm, threatened to "snap" it, and handcuffed her so tightly that her skin broke. He also hit her across the face with a metal bracelet he was wearing and called her a "nigger bitch." Turner sought medical treatment and filed a complaint with the Office of Professional Standards. (Ex. 33, Annie Turner Complaint.)

y.      In 1982, Defendant Guevara and three other officers broke through

19

Almarie Lloyd's locked front door and conducted a warrantless search of her home. When Lloyd asked who they were, she was told to shut up. The officers terrified Lloyd, her brother, and two children, and left the home in shambles. Lloyd filed a complaint with the Office of Professional Standards the next day. (Ex. 34, Almarie Lloyd Complaint.)

z.      In 1983, Defendant Guevara and other officers forcibly removed Leshurn Hunt from his home and handcuffed him to a ring in the wall at the police station where he was beaten about the head, face, and body until he confessed to murder and robbery charges. Hunt was detained for approximately 23 hours and deprived of food, water, and sleep until after he confessed. Hunt sought medical treatment for his injuries and filed a complaint with the Office of Professional Standards. Witnesses who saw Hunt while in custody corroborated his claim of a beating by the police. The criminal court judge suppressed Hunt's confession, and a jury returned a favorable verdict in a related civil rights action on Hunt's claim of excessive detention against the City of Chicago. (Ex. 35, Testimony and Affidavit of Leshurn Hunt.)

aa.      In 1984, Defendant Guevara and other officers physically assaulted Graciela Flores and her 13-year old sister Anna during a search of their home, during which the officers did not identify themselves as police. Guevara repeatedly slapped Graciela, called her a "bitch" and pulled her hair. As a result of this incident, Graciela's arm was put in a sling and she spent one week in the hospital. (Ex. 36, Testimony of Ana & Graciela Flores.)

bb.      In 1985, Defendant Guevara attempted to coerce a false statement from Reynaldo Munoz. Guevara handcuffed Munoz and put him in the back of a squad car. When Munoz denied knowing the people Guevara was asking about, Guevara repeatedly hit him in the mouth with his fist. Guevara then took Munoz to rival gang territory where he allowed rival gang members to spit on Munoz and beat Munoz about the head. (Ex. 37, Affidavit of Reynaldo

20

Munoz.)

cc.     In 1986, Defendant Guevara threw Rafael Garcia against a car, struck him in the face several times, kicked him and hit him in the head. Garcia filed a complaint with the Chicago Police Department's Office of Professional Standards (OPS). Although Guevara denied the charges, Garcia's complaints were corroborated by physical evidence, as he was treated at the hospital for lacerations to the head. After an investigation into the incident, OPS found that Guevara had lied about the incident and recommended that Guevara be suspended for two days.

dd.     In 1986, Defendant Guevara and two other officers coerced a confession from Daniel Pena by beating him about the face and ribs with their hands and about the groin and thighs with flashlights during an interrogation. Pena was taken to see a doctor where he complained about being beaten by the police. The doctor found bruising to Pena's legs and abrasions and lacerations to Pena's nose. Family members corroborated Pena's claim that he had been beaten while in police custody. (Ex. 38, Testimony of Daniel Pena.)

ee.     In 1986, Defendant Guevara pulled over Melvin Warren because Warren cut him off while driving westbound on Augusta Boulevard. Guevara called Warren a "nigger dog" and "threatened to tear [Warren's] head off." Guevara hit Warren in the face with a closed fist and then forced him down into the front seat of his car and began to choke him. Two eyewitnesses confirmed that Guevara initiated the beating. In response to this incident, Warren sought medical treatment and filed a complaint with the Office of Professional Standards (OPS). OPS sustained Warren's allegations that Guevara had physically and verbally assaulted him and recommended that Guevara be reprimanded. (Ex. 39, Testimony of Melvin Warren.)

ff.     In 1989, Defendant Guevara coerced a false confession from Victor Vera by transporting him to rival gang territory and threatening to release him unless he confessed to

21

the murder of Edwin Castaneda. Fearing for his life, Vera agreed to falsely confess to a crime he knew nothing about. (Ex. 40, Affidavit of Victor Vera.)

gg.    In 1991, Defendant Guevara coerced David Rivera into signing a confession for murder by intimidation, threats, and inducements. Guevara told Rivera that if he confessed he would serve seven years in prison whereas if he did not confess, he would be sent away for fifty years. Guevara then promised Rivera that if he signed a statement, he could go home. (Ex. 41, Affidavit of David Rivera.)

hh.    In 1991, Defendant Guevara coerced a false confession from Daniel Rodriguez through the use of threats and intimidation. While en route to the police station, Guevara threatened to harm Rodriguez's family if he did not cooperate. Once at Area 5, Rodriguez was chained to a wall, denied food, water, and use of a restroom, and beaten by Guevara's partner, Defendant Halvorsen in the chest and torso. Guevara provided details of the crime to Rodriguez to include in Rodriguez's false confession. (Ex. 42, Testimony and Affidavit of Daniel Rodriguez.)

ii.    In 1992, Defendant Guevara engaged in misconduct when he interrogated Jacqueline Montanez (no relation to Plaintiff) without a youth officer present. The appellate court reversed and remanded Ms. Montanez's conviction for murder, noting that "not only was defendant interrogated before having an opportunity to confer with a concerned adult, but, worse, any opportunity to do so was effectively frustrated by police."

jj.    In 1993, Defendant Guevara arrested fifteen year old Elizar Cruzado and threatened him with life imprisonment if he did not make a statement implicating himself in a murder. Guevara also told Cruzado that he could go home and see his family again, but only if he agreed to make a statement. At the time, Cruzado had a limited ability to read and write. (Ex. 43,

22

Testimony of Elizer Cruzado.)

kk.     In 1993, Defendant Guevara used physical force and threats to coerce a false confession from Adolfo Frias-Munoz. Over the course of a two-day interrogation, Frias-Munoz was handcuffed to a ring on the wall of the interrogation room, hit in the face with an open hand by Defendant Guevara, and beaten by two other officers. Though isolated in a locked interrogation room, Frias-Munoz could hear his wife screaming and his son crying in another room. Guevara threatened Frias-Munoz that if he did not confess, his wife would go to prison and his children would be taken away. Frias-Munoz, who did not speak English, agreed to give a statement to an assistant state's attorney. Frias-Munoz spoke in Spanish and Guevara translated the statement so that the prosecutor could write the statement in English. Frias-Munoz then signed a statement he could not read. (Ex. 44, Testimony and Affidavit of Adolfo Frias-Munoz.)

ll.     In 1994, Defendant Guevara, after 14 hours of interrogation, coerced a confession from Adrian Duta by hitting him in the face with an open palm, punching him in the stomach, and telling him he could go home if he signed a statement. When Duta's father came to see Duta at the station house, Duta was exhausted and crying and repeatedly said that he did not know what he had signed and had only signed the document so he could go home. Duta complained to his father of being struck in the head and stomach by Guevara. (Ex. 45, Affidavit of Adrian Duta.)

mm.     In 1995, Defendants Guevara and Halvorsen coerced a confession from 17-year-old Santos Flores after handcuffing him to the wall of a locked interview room and refusing his requests for an attorney. During the course of the 11-hour interrogation, Guevara yelled at him, slapped him numerous times on the side of his head, and told him that if he did not confess he would never see the light of day. Flores eventually gave a statement to the police

23

indicating his involvement in the crime. Flores's statement was ruled inadmissible on appeal on the grounds that it was elicited in violation of Miranda.

nn.    In 1997, Defendant Guevara coerced a false confession from Voytek Dembski by beating him while chained to a wall in a locked interrogation room. Dembski, a Polish National who did not speak English, was interrogated by Guevara without Miranda warnings, without notification to the Polish consulate, and without a Polish language interpreter. Dembski could not read the statement he eventually signed as it was written in English.

## ARGUMENT

**Arturo DeLeon Reyes should be certified innocent because he satisfies all procedural requirements of the statute, has demonstrated his innocence by a preponderance of the evidence, and did not voluntarily bring about his own conviction.**

### A.    Legal Standard

62.    To obtain a certificate of innocence under Section 2-702(g) , Mr. Reyes must prove by a preponderance of the evidence that:

a.    He was convicted of one or more felonies, was sentenced to a term of imprisonment, and has served all or any part of the sentence;

b.    The judgment of conviction was reversed or vacated and the charges were subsequently dismissed;

c.    He is innocent of the charged offenses; and

d.    He did not by his own conduct voluntarily cause or bring about his conviction.

63.    In consideration of whether a petitioner meets this standard, a court is required to consider the materials attached to the petition, including sworn prior statements, testimony, and other evidence in the record. *People v. Fields*, 2011 IL App (1st) 100169, ¶ 19.

### B.    Mr. Reyes Meets the Procedural Requirements of Section 2-702

64.    Mr. Reyes meets all of the requirements for relief under the statute.

24

65. As set forth above, Mr. Reyes was convicted of two counts of first degree murder and spent nearly twenty years behind bars, counting pretrial and post-trial incarceration. (See also Exhibits. A, B).

66. The judgment of conviction has been vacated and the charges dismissed. (See Ex. B)

67. As stated above and as testified to by Mr. Reyes at trial and during post-conviction proceedings, he was not present at the crime, he had no involvement in the crime, and he is innocent of the crime.

68. Mr. Reyes was convicted based on an involuntary, coerced and fabricated confession. He has vigorously maintained his innocence, pled not guilty, was convicted after a contested trial, and pursued other forms of relief in the years since being convicted. *See* 735 ILCS 5/2-702(g)(4). Accordingly, he did not voluntarily bring about his own conviction.

**C.      Mr. Reyes Has Established Innocence by a Preponderance of the Evidence**

69. Stating further with regard to the innocence element, Section 2-702 provides that a certificate of innocence shall issue when the petitioner can establish innocence by a preponderance of the evidence. Petitioner must present evidence that "permit[s] the court to find that petitioner is likely to succeed at trial in proving that the petitioner is innocent of the offenses charged." 735 ILCS 5/702(b), (d), (g)(3); *People v. Simon*, 2017 IL App (1st) 152173, ¶ 19, 21 (noting that sufficient detail in the pleading and supporting documentation satisfies this requirement when no parties intervene or object); *Fields*, 2011 IL App (1st) 100169, ¶ 19 (instructing lower courts to rely on attached documentation in considering whether a petitioner satisfied his burden under the statute); *Caine v. State*, 86 CR 6091(02), Order, March 27, 2012, attached as Ex. 46 (citing, amongst other cases, *Bucktown Partners v. Johnson*, 119 Ill. App. 3d

25

346 (1st Dist. 1983) (noting that where the evidence presented by an innocence petitioner is unrebutted, uncontradicted, and not inherently improbable, a court must take it as established).

70.    Mr. Reyes hereby incorporates all of the evidence identified above in support of his claim of innocence, as well as all evidence attached to his previous post-conviction pleadings, raised at his criminal trial, and otherwise incorporated in the appellate court record. Mr. Reyes further cites the additional evidence attached to this petition and obtained during the evidentiary hearing and renewed suppression hearing that culminated in Judge Obbish vacating his conviction and the State moving to dismiss all charges against Mr. Reyes.

71.    As Judge Obbish noted in in his June 29, 2016 decision granting a new motion to suppress hearing, based on the evidence presented at an extensive third stage evidentiary hearing, "it is abundantly clear that, the uncontradicted accounts of these specific interactions entailing abuse, coercion and improper influence in addition to the negative inference drawn from Det. Guevara's assertions of his 5th Amendment privilege against self-incrimination lend credence to [Mr. Reyes's and Mr. Solache's] allegations of abuse and coercion." *See also* National Registry of Exonerations, Browse by Cases, Sort by State (Illinois)[2] (listing 197 Illinois exonerations, including 71 where the wrongfully convicted individual falsely confessed).

72.    Then, at the end of a new suppression hearing in 2017, Cook County Judge James Obbish concluded that Detective Guevara's testimony consisted of "bald face lies," and Judge Obbish further stated that Guevara had "eliminated any possibility of [] being considered a credible witness in any proceeding." Detective Guevara was primarily responsible for the interrogations of Mr. Reyes and Mr. Solache, and he is the one Mr. Reyes and Mr. Solache have long accused of physical abuse and of coercing them into signing written statements implicating

---

[2] http://www.law.umich.edu/special/exoneration/Pages/detaillist.aspx?SortField=FC&View={faf6eddb-5a68-4f8f-8a52-2c61f5bf9ea7}&FilterField1=ST&FilterValue1=IL&SortDir=Desc (last accessed October 29, 2017).

themselves and each other. With Detective Guevara deemed untrustworthy, and in any event unwilling to testify about his conduct during the interrogations, the testimony of Mr. Reyes and Mr. Solache is unrebutted that their confessions were the product of physical and psychological abuse that overcame their will and caused them to confess to a crime they did not commit.

73.     The most compelling remaining evidence in the case, the forensic evidence, strongly supports Mr. Reyes's innocence. As discussed above, not one piece of the ample physical evidence at the scene linked Mr. Reyes (or Mr. Solache) to the crime. Instead, the forensic evidence points convincingly to Ms. Adriana Mejia, along with a second perpetrator whose DNA was recovered from the knife found under Mariano Soto. But testing excludes Mr. Reyes (and Mr. Solache) as the source of the DNA recovered from the knife found under Mariano Soto.

74.     Finally, as set forth in paragraphs 61 a-nn above, numerous criminal defendants and witnesses have come forward to expose Guevara's egregious misconduct. This includes numerous witnesses who all claim, like Mr. Reyes, that Detective Guevara beat them or otherwise physically or psychologically coerced them during investigations or interrogations. This includes Graciela Flores, Melvin Warren, Rafael Garcia, Daniel Pena, Armando Serrano, Adolfo Friar, Voytek Dembski, Leshurn Hunt, Elizer Cruzado, Santos Flores, Gloria Ortiz, Daniel Rodriguez, Timothy Rankins, and Maria Rivera.

## CONCLUSION

For the foregoing reasons, Arturo DeLeon Reyes respectfully requests that the Court grant him a certificate of innocence and that this Court order the Clerk to send the certificate to the Court of Claims in accordance with the 735 ILCS 5/2-702(h). If there are any factual disputes, Mr. Reyes respectfully requests that the Court order an evidentiary hearing.

27

Respectfully Submitted,

_____
Attorney for Arturo DeLeon Reyes

JON LOEVY
ANAND SWAMINATHAN
STEVEN ART
Loevy & Loevy
311 N. Aberdeen St., 3rd floor
Chicago, IL 60607
(312) 243-5900
anand@leovy.com

*Counsel for Petitioner Arturo DeLeon Reyes*

28

## CERTIFICATE OF SERVICE

I, Anand Swaminathan an attorney, hereby certify that on this 30th day of

April 2018, I caused a copy of the foregoing PETITION OF ARTURO DE LEON

REYES FOR A CERTIFICATE OF INNOCENCE to be served via hand-delivery

to:    Attorney General
State of Illinois
100 West Randolph Street
Chicago, IL 60601

Assistant State's Attorney
Cook County State's Attorneys' Office
2650 S. California Avenue
Chicago, IL 60608


DATED: April 30, 2018



Loevy & Loevy
311 N. Aberdeen, 3rd Floor
Chicago, IL 60607
312-243-5900


*Attorney for Petitioner Arturo De Leon Reyes*